UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Master File No. 1:11-md-02262-NRB |

**RESPONSE OF PLAINTIFF MAYOR AND CITY COUNCIL OF BALTIMORE
TO MOTION TO APPOINT GRANT & EISENHOFER, KIRBY MCINERNY, ROBBINS
GELLER RUDMAN & DOWD, STEWART HALEBIAN JACOBSON AS INTERIM
CLASS COUNSEL**

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................... 2

ARGUMENT ........................................................................................................................ 5

    I.    The Leadership Structure Proposed by the Grant & Eisenhofer Group Fails to Adequately Address the Different Interests of the Various Categories of Claimants. ................................... 5

    II.    The Leadership Structure Proposed by the Grant & Eisenhofer Group is Likely to Lead to Case Management Difficulties and Inefficiencies. ................................................................. 8

1693427v1/012751

# TABLE OF AUTHORITIES

**Cases**

*303030 Trading, LLC v. Bank of America Corporation et al.*
  No. 11 Civ. 4047 (N.D. Ill.) .................................................................................................. 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) .............................................................................................................. 7

*Carpenters Pension Fund of West Virginia v. Bank of America Corporation et al*,
  11 Civ. 2283 (S.D.N.Y.)........................................................................................................ 3

*Chill v. Green Tree Fin. Corp.*,
  181 F.R.D. 398 (D. Minn. 1998)........................................................................................... 8

*City of Dania Beach Police & Firefighters' Retirement System v. Bank of America Corporation et al*, 11 Civ. 3128 (S.D.N.Y.) ............................................................................. 3

*de Atucha v. Commodity Exchange Inc.*,
  608 F. Supp. 510 (S.D.N.Y. 1985)........................................................................................ 7

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .............................................................................................................. 7

*In re Air Cargo Shipping Services Antitrust Litig.*,
  240 F.R.D. 56 (E.D.N.Y. 2006) ............................................................................................ 8

*In re Literary Works In Electronic Databases Copyright Litig.*,
  05-5943-CV (L) (2d Cir. Aug. 17, 2011) ......................................................................... 6, 7

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004) ........................................................................................... 9

*In re Wachovia Corp. Erisa Litig.*,
  No. 08 Civ. 5320 (NRB), 2008 WL 5459852 (S.D.N.Y. Dec. 24, 2008) ............................ 8, 9

*Municipal Derivatives Antitrust Litigation*,
  MDL No. 1950 (S.D.N.Y.) ................................................................................................... 9

*Ocean View Capital, Inc. v. Sumitomo Corp. of America*,
  No. 98 Civ. 4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15 1999) .......................................... 7

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980) ............................................................................................. 7

*Three Crown Ltd. P'ship v. Caxton Corp.*,
  817 F. Supp. 1033 (S.D.N.Y. 1993) ............................................................................. 10

*Vincelli v. Nat'l Home Health Care Corp.*,
  112 F. Supp. 2d 1309 (M.D. Fla. 2000) ......................................................................... 8

**Other Authorities**

Manual of Complex Litigation (Fourth) § 10.221 ............................................................. 8

Manual of Complex Litigation (Fourth) § 10.2224 ........................................................... 8

Manual of Complex Litigation (Fourth) § 21.11 ............................................................... 8

Plaintiff Mayor and City Council of Baltimore ("Baltimore") and its counsel, Hausfeld LLP and Susman Godfrey L.L.P. ("Proposed Lead Counsel"), respectfully submit this response in opposition to the motion filed by the law firms Grant & Eisenhofer LLP, Kirby McInerny LLP, Robbins Geller Rudman & Dowd LLP, and Lovell Stewart Halebian Jacobson LLP (collectively, the "Grant & Eisenhofer Group"), for appointment as interim class counsel.

The leadership organizational structure proposed by the Grant & Eisenhofer Group would have four law firms serve jointly as lead counsel over litigation brought by a variety of disparate claimants, including plaintiffs with direct purchaser claims under the federal antitrust laws, indirect purchasers with claims under the Commodities Exchange Act ("CEA"), and others. However, the need for separate counsel to represent the interests of plaintiffs with materially different interests and claims is without question. Even the Grant & Eisenhofer Group acknowledges the need to appoint **_other firms_** to be "fiduciaries" for different categories of claimants. Grant & Eisenhofer Group App. at 20-21. However, Interim Class Counsel are required to be fiduciaries for the entire class they seek to represent. Because of this glaring inconsistency in its position, the Grant & Eisenhofer Group should not be appointed as Interim Class Counsel to supervise the direct purchaser cases.

Proposed Lead Counsel, on the other hand, filed a complaint specifically asserting *only* federal antitrust claims on behalf of direct, "over-the-counter" purchasers of derivative instruments from the defendants, and to make the point perfectly clear, that is the class we seek to represent.[1] For this reason, and those stated in our opening memorandum of law, Proposed Lead Counsel respectfully request that the Court appoint them as interim lead counsel

---

[1] Proposed Lead Counsel did not address the "direct" versus "indirect" purchaser issue in their opening memorandum because the class identified in Baltimore's complaint was limited to direct purchasers.

1

representing a class of over-the-counter purchasers of derivative instruments from the defendants asserting claims for violation of the Sherman Act.

## BACKGROUND

This litigation has been transferred to this Court as *In re Libor-Based Financial Instruments Antitrust Litigation*. 18 class cases have currently been filed. The plaintiffs in these cases seek to represent purchasers of LIBOR-based derivatives and have been variously brought on behalf of purchasers of over-the-counter derivatives and purchasers of exchange-traded financial instruments. For instance, while Baltimore engaged in direct "over-the-counter" transactions with UBS, the plaintiff in *Independence Trading Inc. v. Bank of America Corp.*, 11 Civ. 4736, represented by Grant & Eisenhofer, transacted in LIBOR-based financial instruments on a commodities exchange.

The market for LIBOR-based derivatives, however, is dominated by over-the-counter financial derivatives, primarily interest rate swaps such as those transacted by Baltimore. The November 1999 Report of the President's Working Group on Financial Markets notes that at year-end 1998, "the total estimated notional amount of outstanding [U.S.] OTC derivative contracts was $80 trillion," whereas "exchange-traded futures and options contracts amounted to just $13.5 trillion," or 14% of the total market.[2] The Bank for International Settlements indicates that as of June 30, 2008, the total worldwide value of interest rate swaps was $357 trillion,

---

[2] Report of the President's Working Group on Financial Markets, Over-the-Counter Derivatives Markets and the Commodity Exchange Act (November 1999) at 4, available at http://www.treasury.gov/resource-center/fin-mkts/Documents/otcact.pdf

2

whereas the total value of all exchange-traded interest rate contracts was just $74 trillion, or 17% of the total market.[3]

In stark contrast to the market characteristics, the majority of cases filed to date have been brought by individual traders who purchased or sold exchange-traded contracts. While many of the complaints are vague as to the specific financial product purchased by the plaintiff, the Grant & Eisenhofer Group asserts that it is possible to identify the types of interest underlying a plaintiff's claim by looking at the causes of action alleged. "Specifically, those Plaintiffs who traded on an exchange will allege both Sherman Act antitrust and CEA claims. Those who transacted over-the-counter will likely assert primarily Sherman Act antitrust claims." Grant & Eisenhofer Group App. at 20. Of the eighteen class cases filed, **_fifteen_** allege both antitrust and CEA claims, indicating that the plaintiffs in each of those actions purchased instruments on the commodity exchanges.

Only three plaintiffs appear to represent over-the-counter purchasers: Baltimore, and two pension funds represented by Robbins Geller Rudman & Dowd LLP.[4] Baltimore purchased over one hundred million dollars of over-the-counter interest rate swaps linked to its municipal debt, the majority directly from Defendants. *See* Baltimore Memo of Law at 2. The precise products that the two pension funds purchased and the extent of those purchases are unclear. However, it is doubtful that their purchases (and subsequent damages) are as large as those of Baltimore. Moreover, as these are not debt-issuing entities, it is likely that these plaintiffs entered into

---

[3] Bank of International Settlements, OTC derivatives market activity in the first half of 2008 (November 2008) at 6 available at http://www.bis.org/publ/otc_hy0811.pdf.

[4] *Mayor and City Council of Baltimore v. Bank of America Corporation, et al.*, No. 11 Civ. 5450 (S.D.N.Y.); *Carpenters Pension Fund of West Virginia v. Bank of America Corporation et al*, 11 Civ. 2283 (S.D.N.Y.); *City of Dania Beach Police & Firefighters' Retirement System v. Bank of America Corporation et al*, 11 Civ. 3128 (S.D.N.Y.)

3

derivative contracts purely for investment purposes and that they thus represent only a small subset of the market for over-the-counter interest rate derivatives. *See id.* at 3 & n.5.

The Grant & Eisenhofer Group has proposed a seven-firm leadership structure consisting of four co-lead counsel – Grant & Eisenhofer LLP, Kirby McInerny LLP, Robbins Geller Rudman & Dowd LLP, and Lovell Stewart Halebian Jacobson LLP; two additional firms, who are not being proposed as Interim Class Counsel, "to oversee and act as fiduciaries for Plaintiffs who transacted in exchange-traded financial instruments tied to Libor" – Cohen Milstein Sellers & Toll PLLC and Lowey Dannenberg Cohen & Hart P.C.; and one firm – Berger & Montague, P.C. – "to oversee and act as fiduciary for Plaintiffs who transacted in over-the-counter financial instruments tied to Libor." Grant & Eisenhofer Group Application at 1, 20. Of the firms within the Grant & Eisenhofer group, including the supporting firms, **_only_** Robbins Geller Rudman & Dowd LLP represents a plaintiff who appears to be a direct, over-the-counter purchaser. Every other firm, including the designated "fiduciary" firms for the over-the-counter plaintiffs, represents plaintiffs who purchased exchange-traded derivatives.

Further, it is entirely unclear from the Grant & Eisenhofer motion what role the "fiduciaries" would play. Would they have veto power over case strategy and settlement matters as to their "beneficiaries," or would they be mere advisors? If they have veto power, then their appointment as part of the Interim Class Counsel group would seem to be an improper delegation of their duties as the Court-appointed fiduciaries for the class. Would the "fiduciaries" appointed by Interim Class Counsel serve at the pleasure of Interim Class Counsel? If so, their independence could obviously be called into question.

The Grant & Eisenhofer Group's structure is further complicated by the fact that Shapiro Haber & Urmy LLP and Shepherd, Finkelman, Miller & Shah LLP ("Proposed Indirect Class

4

Counsel") have moved separately for the appointment of interim class counsel to represent an "indirect purchaser class" consisting of those who purchased and sold "exchange-traded LIBOR-based derivative[s]," precisely the same products that plaintiffs in 14 of the 16 cases in the Grant & Eisenhofer Group purchased. *See* Memorandum of Law in Support of Motion to Appoint Counsel for Indirect Purchaser Plaintiffs, Exhibit A at ¶ 8, Doc. 5-1. In other words, the classes these two groups of lawyers seek to represent appear to overlap.

While there is uncertainty about the scope and parameters of the representation planned by the Grant & Eisenhofer group, Proposed Lead Counsel, on behalf of Baltimore, filed a complaint specifically asserting *only* federal antitrust claims on behalf of direct, over the counter purchasers of derivative instruments from the defendants. This is the class we seek to represent.[5]

## ARGUMENT

### I. The Leadership Structure Proposed by the Grant & Eisenhofer Group Fails to Adequately Address the Different Interests of the Various Categories of Claimants

The Grant & Eisenhofer group styles itself as the "Majority Plaintiffs" group because they have support from 16 of the 18 cases filed to date. But the plaintiffs in the Grant & Eisenhofer Group represent only the **_minority_** of purchasers of LIBOR-based financial derivatives. The Group is dominated by purchasers of exchange-traded derivates, 17% of the overall market. The two over-the-counter purchasers in the group are not debt-issuing entities, and thus represent only a small subset of the entities active in the dominant over-the-counter market. Moreover, Baltimore's investment in over-the-counter interest rate swaps is high

---

[5] Separate representation of an indirect purchaser class, or a Steering Committee approved by the Court (an approach suggested in our opening memorandum, *see* Baltimore Memo of Law at 22-23), is advisable for reasons that are acknowledged even by the Grant & Eisenhofer Group.

enough that it is doubtful that the combined interest of all of these plaintiffs rises to the level of being the majority financial interest in just the ***presently filed cases***.

As a result of this imbalance, the Grant & Eisenhofer Group has proposed a leadership structure placing the oversight of this litigation entirely in the hands of the minority interest. In particular, while exchange purchases constitute just 17% of the overall market for interest rate derivatives, six out of the seven firms (or 86%) in the proposed leadership structure represent exchange purchasers.[6] In short, the Grant & Eisenhofer Group, by seeking to represent all claimants, except indirect purchasers solely in their capacity as state law antitrust claims, have proposed a leadership structure fraught with potential conflicts and difficulties which they acknowledge in their own proposal. This is precisely the representational overbreadth and imbalance that the Second Circuit has held impermissible. *See In re Literary Works In Electronic Databases Copyright Litig.*, 05-5943-CV (L) (2d Cir. Aug. 17, 2011) (plaintiffs holding 99% of the claims not adequately represented by a plaintiffs group dominated by those with an interest in the remaining, more valuable, claims).

This is particularly concerning here given the potential conflicts between over-the-counter and exchange purchasers. The Grant & Eisenhofer Group appear to contend that antitrust claims can be sustained on behalf of purchasers on commodity exchanges, even though individual purchases cannot be directly traced to a particular defendant. *See* Grant & Eisenhofer Group App. at 21. However, such cases have failed for lack of antitrust standing where, for

---

[6] The exchange purchaser focus of the Grant & Eisenhofer Group is exemplified by the proposed "fiduciaries." The Grant & Eisenhofer Group, if appointed, will designate two firms to act on behalf of exchange purchasers and only one firm to act on behalf of the over-the-counter purchasers. It should be noted that the "fiduciary" for the over-the-counter plaintiffs, Berger & Montague, represents an exchange purchaser. *See 303030 Trading, LLC v. Bank of America Corporation et al.* No. 11 Civ. 4047 (N.D. Ill.).

6

example, there is a more direct (*i.e.*, less remote) purchaser who has brought a claim. *See, e.g., de Atucha v. Commodity Exchange Inc.*, 608 F. Supp. 510, 518 (S.D.N.Y. 1985) (commodity exchange plaintiff had no standing where more direct purchasers had brought a claim); *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980) (scrap copper purchaser did not have standing where the manipulation was targeted at refined copper); *Ocean View Capital, Inc. v. Sumitomo Corp. of America*, No. 98 Civ. 4067, 1999 WL 1201701, at *5 (S.D.N.Y. Dec. 15 1999) (presence of more direct victims meant plaintiff in copper cash market had no standing); *see generally Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983).

In *Literary Works*, the Second Circuit was faced with a situation very similar to the one presented by the Grant & Eisenhofer Group's proposal: a class dominated by minority interest. In *Literary Works* there was no adequate representation because, *inter alia*, "the selling out of one category of claim for another is not improbable." *Literary Works* at 20. The very same infirmity exists under the Grant & Eisenhofer Group's proposal. Because of the antitrust injury and standing proof requirements annunciated by the Supreme Court in *Illinois Brick* and *Associated General Contractors*, the exchange plaintiffs may gain significantly from a weakening or dismissal of the over-the-counter plaintiffs' position. Moreover, as in *Literary Works,* the exchange plaintiffs may be incentivized to enter into settlements which favor the minority of claims over a more equitable distribution based on the size of the relevant markets.[7]

---

[7] Similar concerns do not exist concerning the over-the-counter plaintiffs whose claims are not weakened by the presence of the exchange plaintiffs in this case. Thus, appointment of minority plaintiffs' counsel to a Steering Committee would ensure that views of minority plaintiffs are adequately represented.

7

1693427v1/012751

## II. The Leadership Structure Proposed by the Grant & Eisenhofer Group is Likely to Lead to Case Management Difficulties and Inefficiencies

The seven firm leadership structure proposed by the Grant & Eisenhofer Group also fails to provide a sensible structure for the prosecution of this litigation. Interim Class Counsel appointments are designed to ensure the efficient prosecution of a complex litigation. *See generally Manual of Complex Litigation (Fourth)* § 21.11. Overly complicated organizational structures that can "lead to substantially increased costs" and to "unnecessary duplication of efforts" among counsel should be avoided. *Id.* § 10.221.[8]

Grant & Eisenhofer Group correctly distinguishes this proceeding from the circumstances of *In re Wachovia Corp. Erisa Litig.*, No. 08 Civ. 5320 (NRB), 2008 WL 5459852, at * 1 (S.D.N.Y. Dec. 24, 2008), but that ultimately gets them nowhere. While it is true that unlike the ERISA claims at issue in that case, the present litigation is sufficiently large and complex to justify more than one lead counsel to coordinate these proceedings. However, these circumstances do not justify the Grant & Eisenhofer Group's large and complex structure of four co-leads, three plaintiff "fiduciaries" for just two types of plaintiffs, and an unknown number of other work allocation agreements.[9] As in the *Wachovia Corp. Erisa Litigation,* such a structure

---

[8] See *also Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 413 (D. Minn. 1998) ("The functions of lead counsel may be divided among several attorneys, but the number should not be so large as to defeat the purpose of making such appointments."); *Vincelli v. Nat'l Home Health Care Corp.*, 112 F. Supp. 2d 1309, 1318 (M.D. Fla. 2000) ("Having five firms making decisions for or with the plaintiffs could increase the difficulty of arriving at decisions and monitoring the case."); *In re Air Cargo Shipping Services Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006) (proposed leadership structure was "too large and therefore r[an] the risk of both inefficiency and unnecessary expense").

[9] The Grant & Eisenhofer Group has not disclosed whether it has other agreements with co-counsel as to allocation of work in the case. *See Manual for Complex Litig. (Fourth)* § 10.2224 (counseling courts to assess, inter alia, "whether there has been full disclosure of all agreements and understandings among counsel."). Proposed Lead Counsel believe it is possible that there may be additional agreements as to the allocation of work yet to be disclosed to the Court. *See also* Memorandum of Law in Support of Motion to Appoint Counsel for Indirect Purchaser

is "unduly complex and susceptible to duplicative billing," *id*., as exemplified by the "scores of telephone conferences with other counsel . . . multiple in-person meetings . . . [and] subcommittees" that the Grant & Eisenhofer Group admit were needed just to reach consensus on their proposed group's structure and to engage in the post-filing investigation of facts and legal theories. *See* Grant & Eisenhofer Group App. at 9. The structure before the Court may have been designed to incorporate the interests of as large a number of plaintiffs firms as possible, but it is not designed to efficiently prosecute this action for the benefit of all claimants.

Further, Proper Lead Counsel have special expertise in prosecuting antitrust litigation.[10] This is not to say that the co-lead counsel proposed by the Grant & Eisenhofer Group are not excellent lawyers and firms with antitrust experience; they are. It is merely to state – as this Court recognized in the *Wachovia Corp. Erisa Litigation* – that specialized counsel is particularly important to ensure the effective and efficient prosecution of an action such as this. *See Wachovia Corp. Erisa Litigation*, 2008 WL 5459852, at * 1 (favoring an ERISA-specialized firm for lead where alternate proposed counsel had experience with ERISA litigation but, as here, were specialized in other areas of law); *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) (finding proposed co-lead counsel's "experience in, and knowledge of [antitrust law]" to be the most persuasive factor in deciding the appointment of lead counsel).

---

Plaintiffs, Doc. 5, at 3, fn 2 (naming additional counsel with whom the indirect plaintiffs' counsel would need to coordinate).

[10] Proposed Lead Counsel are widely recognized for their prowess in antitrust law, and they have valuable experience gained in the related *Municipal Derivatives Antitrust Litigation*, MDL No. 1950 (S.D.N.Y.) (VM), a case involving an alleged conspiracy among major banks, to fix, maintain and stabilize the price of derivatives, such as interest rate swaps, and to rig bids and allocate customers and markets for derivatives, which were sold to municipalities and other entities. Moreover, Proposed Lead Counsel have worked successfully with most, if not all, plaintiffs' attorneys in this action and can easily do so again here.

The Grant & Eisenhofer Group's investigation of claims in this action does not alter this analysis. Nothing in the Grant & Eisenhofer Group's application indicates that counsel in the group did anything other than perform an investigation of facts and claims necessary to state and develop causes of action after learning about the enforcement activities of the various regulatory authorities around the world. Proposed Lead Counsel conducted a similar investigation prior to filing Baltimore's complaint. In contrast with the *Vitamins Antitrust Litigation*, the Grant & Eisenhofer Group do not claim to have developed the case on their own.[11] In addition, the existence of CEA claims does not counsel for the inclusion of a specialized commodities law firm as co-lead counsel.[12] To the extent that specialized commodity experience – or other support – is needed, this can best be provided through separate interim class counsel to represent these claimants, or through a Steering Committee appointed with the Court's approval, which is precisely the approach suggested by Proposed Lead Counsel in their opening papers.

Accordingly, we respectfully submit that proposed interim class counsel selected by Baltimore, the plaintiff with the largest stake in the litigation, be appointed to serve as Interim Class Counsel for a class of direct purchasers pursuing claims for damages under the Sherman Act.

---

[11] *See, e.g.,* Prof. John M. Connor, *The Great Global Vitamins Conspiracy: 1989-1999*, at 83 available at http://www.agecon.purdue.edu/staff/connor/papers/The%20Great%20Global%20Vitamins%20Conspiracy.pdf .

[12] Proposed Lead Counsel believe that there are a number of unique hurdles that the CEA claimants must navigate in this action, which set these claimants apart from direct purchasers asserting claims under the Sherman Act. *See, e.g., Three Crown Ltd. P'ship v. Caxton Corp.,* 817 F. Supp. 1033, 1043 (S.D.N.Y. 1993) (noting that commodity manipulation claims require intent to manipulate the underlying commodity and dismissing manipulation of Eurodollar futures in a conspiracy related to Treasury notes where Defendants had argued that "eurodollars are the commodity underlying eurodollar futures.").

1693427v1/012751

Dated: September 8, 2011

By: /s/ Arun Subramanian

William Christopher Carmody
Arun Subramanian
SUSMAN GODFREY L.L.P.
560 Lexington Ave, 15th Floor
New York, NY 10022

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, CA 90067-6029

Michael D. Hausfeld
William P. Butterfield
Ralph J. Bunche
HAUSFELD LLP
1700 K St NW, Suite 650
Washington, DC 20006

*Attorneys for Plaintiff Mayor and City Council of Baltimore*

11

1693427v1/012751