UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Metzler Investment GmbH, on behalf of itself and all others similarly situated, | Docket No. 11-MD-2262 |
| Plaintiffs, | |
| - against - | **AMENDED CLASS ACTION COMPLAINT** |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA CORPORATION, BANK OF AMERICA SECURITIES LLC, J.P. MORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN FUTURES, INC.,  HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., LLOYDS BANKING GROUP PLC, WESTLB AG, UBS AG, UBS SECURITIES, LLC, ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., THE NORINCHUKIN BANK, CITIBANK NA and CITIGROUP GLOBAL MARKETS INC. | **JURY TRIAL DEMANDED** |
| Defendants. |  |

Plaintiff Metzler Investment GmbH ("Plaintiff"), by its undersigned attorneys, brings this

action against Defendants pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1,

*et seq.* (the "CEA"), Sherman Act, 15 U.S.C. § 1, and New York law, on behalf of itself and all

others who transacted Libor-based contracts on the Chicago Mercantile Exchange ("CME") or

other exchanges between January 2007 and January 2010 (the "Class Period").

Plaintiff's allegations as to itself and its own actions are based upon personal knowledge

and as to all other allegations upon information obtained during the course of its attorneys'

investigation, including, but not limited to, the analysis and review of (a) public news reports

concerning pending investigations by the Securities and Exchange Commission, Department of

Justice, British regulatory authorities and the Japanese Financial Supervisory Agency of

manipulation in the London Interbank Offered Rate ("Libor"); (b) market data, price, open

interest and volume information for Libor-based derivative contracts; (c) CME Eurodollar futures

and options settlement practices; (d) fixed income market commentary; and (e) other public

reports of the information alleged herein, and upon belief, as follows:

## SUMMARY OF ALLEGATIONS

1.     Libor is the interest rate used as the basis for the pricing of fixed income futures,

options, swaps and other derivative products traded on the CME and the Chicago Board of Trade

("CBOT"). This action arises from the Defendants' unlawful and intentional misreporting and

manipulation of – as well as their combination, agreement and conspiracy to fix – Libor prices

and to restrain trade in the market for Libor-based derivatives during the Class Period in violation

of Sections 2(a)(1)(B), 4s(h), 9(a)(2) and 22(a) of the CEA, the Sherman Act, 15 U.S.C. § 1, and

New York law.

2.     Further, CME Eurodollar futures contracts were subject to, and contractually

required to be performed in accordance with, the CME rules, including CME Rule 432 and

similar CBOT rules prohibiting price manipulation. And the Clearing Defendants' (*see* ¶ 32

*infra*) conduct and relations with their customers were all subject to the CME Rules which

prohibit manipulation. By manipulating LIBOR, the Manipulator Defendants (*see* ¶ 31 *infra*)

knowingly and intentionally caused the Clearing Defendants and CME Clearing to settle

Eurodollar futures contracts at manipulated, artificially high prices in violation of CME Rule 432

and Chapter 452 of the CME Rulebook and similar CBOT rules.

3.     The Clearing Defendants, who are subsidiaries or affiliates of the Manipulator

2

Defendants and were members of CME Clearing during the Class Period, knowingly aided and abetted the manipulation. Also, they otherwise breached their duties, including their duties to Class members who purchased Eurodollar or other futures contracts directly from the Clearing Defendants, by their conduct alleged herein.

4.    Also Class members, including Class members who purchased their CME Eurodollar futures contracts directly from or through the Clearing Defendants, have additional claims for breach of duty against the Clearing Defendants.

## JURISDICTION AND VENUE

5.    This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and New York law, respectively.

6.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceed $5,000,000 and there are members of the Class who are citizens of a different state than the Defendants.

7.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d). Each of the Defendants transacted business in the Southern District of New York and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the prices of Libor-based derivative products traded in

this District.

## PARTIES

8.    Plaintiff Metzler Investment GmbH ("Metzler") is a fund company that launches and manages investment funds under German law. The range of funds includes various types of securities, money market, and derivative funds, as well as general and specialized investment funds. Metzler manages assets totaling approximately €47 billion and is based in Frankfurt, Germany. Its funds traded on-exchange based products tied to Libor and were harmed as a consequence of Defendants' actions.

9.    Defendant Credit Suisse Group AG ("Credit Suisse") is a Switzerland company headquartered in offices in Zurich, Switzerland. At all relevant times, Credit Suisse was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

10.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") was, during all or part of the Class Period, a subsidiary or affiliate or Credit Suisse and was engaged in clearing CME futures contracts.

11.    Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. At all relevant times, Bank of America was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

12.    Defendant Bank of America Securities LLC ("Bank of America Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Bank of America and was engaged in clearing CME futures contracts.

13.    Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a Delaware financial holding company headquartered in New York, New York. At all relevant times, J.P. Morgan was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

4

14.     Defendant J.P. Morgan Clearing Corp. ("J.P. Morgan Clearing") was, during all or part of the Class Period, a subsidiary or affiliate of J.P. Morgan and was engaged in clearing CME futures contracts.

15.     Defendant J.P. Morgan Futures, Inc. ("J.P. Morgan Futures") was, during all or part of the Class Period, a subsidiary or affiliate or J.P. Morgan and was engaged in clearing CME futures contracts.

16.     Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England. At all relevant times, HSBC was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

17.     Defendant HSBC Securities (USA) ("HSBC Securities") was, during all or part of the Class Period, a subsidiary or affiliate of HSBC and was engaged in clearing CME futures contracts.

18.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. At all relevant times, Barclays was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

19.     Defendant Barclays Capital Inc. ("Barclays Capital") was, during all or part of the Class Period, a subsidiary or affiliate of Barclays and was engaged in clearing CMS futures contracts.

20.     Defendant The Norinchukin Bank ("Norinchukin") is a Japan cooperative bank headquartered in Tokyo, Japan. At all relevant times, Norinchukin was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

21.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the

acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB"). At all relevant

times, both HBOS and Lloyds TSB were contributing members of the British Bankers'

Association's U.S. dollar Libor panel.

22.     Defendant WestLB AG ("WestLB") is a Germany joint stock company

headquartered in Dusseldorf, Germany. At all relevant times, WestLB was a contributing

member of the British Bankers' Association's U.S. dollar Libor panel.

23.     Defendant UBS AG ("UBS") is a Switzerland company based in Basel and

Zurich, Switzerland. At all relevant times, UBS was a contributing member of the British

Bankers' Association's U.S. dollar Libor panel.

24.     Defendant UBS Securities LLC ("UBS Securities") was, during all or part of the

Class Period, a subsidiary or affiliate of UBS and was engaged in clearing CME futures

contracts.

25.     Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a

United Kingdom public limited company headquartered in Edinburgh, Scotland. At all relevant

times, Royal Bank of Scotland was a contributing member of the British Bankers' Association's

U.S. dollar Libor panel.

26.     Defendant RBS Securities Inc. ("RBS Securities") was, during all or part of the

Class Period, a subsidiary or affiliate of Royal Bank of Scotland and was engaged in clearing

CME futures contracts.

27.     Defendant Deutsche Bank AG ("Deutsche Bank") is a Germany financial services

company headquartered in Frankfurt, Germany. At all relevant times, Deutsche Bank was a

contributing member of the British Bankers' Association's U.S. dollar Libor panel.

28.     Defendant Deutsche Bank Securities ("Deutsche Bank Securities") was, during all

or part of the Class Period, a subsidiary or affiliate or Deutsche Bank and was engaged in clearing CME futures contracts.

29.    Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York. At all relevant times, Citibank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

30.    Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") was, during all or part of the Class Period, a subsidiary or affiliate or Citibank NA and/or Citigroup, Inc. and was engaged in clearing CME futures contracts.

31.    As used herein, Defendants Bank of America, Barclays, Citibank, Credit Suisse, Deutsche Bank, Royal Bank of Scotland, HSBC, J.P. Morgan, Lloyds, Norinchukin, UBS and WestLB are referred to collectively as the "Manipulator Defendants."

32.    As used herein, Defendants Bank of America Securities, Barclays Capital, Citigroup Global Markets, Credit Suisse Securities, Deutsche Bank Securities, RBS Securities, HSBC Securities, J.P. Morgan Clearing, J.P. Morgan Futures and UBS Securities are referred to collectively as the "Clearing Defendants."

33.    Plaintiff alleges on information and belief that at all relevant times, Defendants John Does Nos. 1-10, inclusive, who performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of Libor-based futures, options, swaps and other derivative products. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does Nos. 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John

Does Nos. 1-10, inclusive.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   Overview of Libor

34.     The London Interbank Offered Rate ("Libor") is a daily reference rate based on the interest rates at which banks borrow unsecured funds from other banks in the London wholesale money market (or interbank lending market.)  Alternatively, Libor can be seen from the point of view of the banks making the offer, as the interest rate the banks will lend to each other – that is, offer money in the form of a loan for various time periods (maturities) and in different currencies.  In this Complaint, reference to Libor specifically means Libor as a rate of reference for the US dollar.

35.     Libor is calculated and published by Thomson Reuters on behalf of the British Bankers' Association ("BBA") after 11:00 am (and generally around 11:45 am) each day (London time).  It is a trimmed average of interbank deposit rates offered by designated contributor banks, for maturities ranging from overnight to one year.  Libor is calculated for 10 currencies.  For the US dollar-denominated Libor, there are sixteen contributor banks (most of which are Defendants in this action) on the Libor panel, and the reported interest rate is the mean of the middle values (the interquartile mean).  The rates are a benchmark rather than a tradable rate.  The actual rate at which banks will lend to one another continues to vary throughout the day.

36.     By market convention, all Libor rates are quoted as an annualized interest rate. So, for example, if an overnight rate from a contributor bank is given as 2.00%, that means that

the bank would expect to pay 2.00% divided by 365.

37.     The BBA defines Libor as: "The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting interbank offers in reasonable market size, just prior to 11:00 London time." This definition is amplified as follows:

    a.  The rate at which each bank submits must be formed from that bank's perception of its cost of funds in the interbank market.

    b.  Contributions must represent rates formed in the London Money Market and not elsewhere.

    c.  Contributions must be for the currency concerned, not the cost of producing one currency by borrowing in another currency and accessing the required currency via the foreign exchange markets.

    d.  The rates must be submitted by members of staff at a bank with primary responsibility for management of a bank's case, rather than a bank's derivative book.

    e.  The definition of "funds" is unsecured interbank case or cash raised through primary issuance of interbank Certificates of Deposit.

38.     Libor therefore depends on the integrity of the contributor banks on the Libor Panel for its reporting accuracy.

**B.    Libor-Based Futures, Options, Swaps and other Derivative Products**

39.     Libor is the primary benchmark for short-term interest rates globally.

40.     According to the BBA, "the objectivity and accuracy of the [Libor] rates allowed derivatives to be created based on the data as a reference, and this has flourished to become an enormously successful cornerstone of business transacted in London and worldwide."

9

41.     The integrity of Libor allows many derivative products to price based on Libor. To the extent that Libor is mispriced, these derivatives are also mispriced.

42.     Many Libor-based futures, options, swaps and other derivative products trade on the CME. These contracts are traded in an open outcry form in Chicago and also electronically on the CME's GLOBEX platform.

43.     The CME's Eurodollar contracts are based on three-month US dollar Libor rates. They are the world's most heavily traded short-term interest rate futures contracts and extend up to ten years. The most actively traded futures months for Eurodollars are March, June, September and December.

44.     The ticker symbols for Eurodollars traded on the CME are: ED and GE depending on whether the contract is traded by open outcry or on the CME GLOBEX electronic platform. By convention, the months March, June, September and December are represented by the letters H, M, U and Z respectively. Thus, most Eurodollar futures contracts will have the following prefixes EDH or GEH, EDM or GEM, EDU or GEU, or EDZ or GEZ followed by the last two digits representing the year of expiration.

45.     Thus, some typical ticker symbol for Eurodollar futures contracts are, for example: EDH08 (eurodollar futures for March 2008); EDM08 (eurodollar futures for June 2008); EDU08 (eurodollar futures for September 2008); EDZ08 (eurodollar futures for December 2008).

46.     Each Eurodollar futures contract is for a Eurodollar Interbank Time Deposit and has a principal value of $1,000,000 with a three-month term to maturity. Eurodollar futures terminate trading at 11:00 a.m. London Time on the second London bank business day immediately preceding the third Wednesday of the contract's named month of delivery (*e.g.,*

10

March, June, September or December).

47.     The final settlement price of an expiring Eurodollar contract is 100 minus the

three-month Eurodollar interbank time deposit rate determined at the BBA Libor fixing on the

second London bank business day immediately preceding the third Wednesday of the contract's

named month of delivery.

48.     When Eurodollar traders hold open positions in a futures contract at the time of

termination of trading in that contract, they must make payment to (if short the contract) or

receive payment from (if long the contract) the CME's clearing house  based on a settlement

price equal to the final settlement price of Libor as discussed above.

49.     Eurodollars thus are priced specifically on three-month Libor as reported by

Manipulator Defendants to the BBA.  If the rates that Manipulator Defendants reported for Libor

were artificially low, then at the time of expiration, the settlement price for Eurodollar futures

would be artificially high.  This is because the underlying value of the Eurodollar contract is

inversely related to the interest rate.  That is, the settlement price is 100 minus the three-month

Eurodollar interbank time deposit rate.  The lower the rate, the higher the settlement price.

Manipulator Defendants' artificial suppression of Libor would have caused higher Eurodollar

futures contract settlement prices than would have otherwise occurred.

50.     Only a small percentage of all futures contracts traded each year on CME and

other exchanges results in actual delivery of the underlying commodities.  Instead, traders

generally offset their futures positions before their contracts mature.  For example, a purchaser of

a Eurodollar futures contract can cancel or offset his future obligation to the contract

market/exchange clearing house by selling an offsetting futures contract.  The difference between

the initial purchase or sale price and the price of the offsetting transaction represents the realized

profit or loss.

51.     Traders who exit their positions before settlement are still affected by Libor mispricing because the Eurodollar futures contracts trade based on what Libor is expected to be in the future. To the extent that Libor is mispriced in the present, expectations of what Libor will be in the future will also be skewed.

52.     In addition to Eurodollar contracts, the CME has other contracts that are based, at least in part, on Libor. Options on Eurodollar futures settle according to Eurodollar futures prices and therefore are derivatively based on Libor prices. There are two types of options, calls and puts. A call gives the holder of the Eurodollar option the right, but not the obligation, to buy the underlying Eurodollar futures contract at a certain price – the strike price. Conversely, the put gives the holder the right, but not the obligation, to sell the underlying Eurodollar futures contract at the strike price. Puts are usually bought when the expectation is for neutral or falling prices; a call is usually purchased when the expectation is for rising prices. The price at which an option is bought or sold is the premium. The premium is affected by the underlying price of the Eurodollar futures contract, which, in turn, is directly affected by the reported Libor.

53.     Interest rate swaps traded on the Chicago Mercantile for (5-, 7-, 10- and 30-year tenors) and options on interest rate swaps are also based on Libor. CME interest rate swaps are based on OTC plain vanilla swaps. In a plain vanilla interest rate swap, Company A and Company B choose a time frame, a principal amount, a single currency, a fixed interest rate, a floating interest rate and payment dates. On the specified payment dates for the duration of the time frame, Company A pays Company B a fixed rate of interest on the principal amount, and Company B pays Company A a floating interest rate on the principal amount. All payments are made in the same currency and only the net sum of each payment exchanges hands. The purpose

of such an exchange might be to reduce interest rate risk.

54.     For interest rate swaps traded on the CME, the settlement price is based on certain formulas. The final settlement value, measured in price basis points, will be determined as:

5-Year: $100 * [\,4/r5 + (1 - 4/r5)*(1 + r5/200)-10\,]$

7-Year: $100 * [\,4/r7 + (1 - 4/r7)*(1 + r7/200)-14\,]$

10-Year: $100 * [\,4/r10 + (1 - 4/r10)*(1 + r10/200)-20\,]$

30-Year: $100 * [\,4/r30 + (1 - 4/r30)*(1 + r30/200)-60\,]$

where r5, r7, r10, and r30 represent, respectively, ISDA Benchmark Rates for 5-Year, 7-Year, 10-Year and 30-Year U.S. dollar. (For example, if the ISDA Benchmark Rate is five and one quarter percent, then r is equal to 5.25.) ISDA Benchmark Rates derive, at least in part, from Libor.

55.     Interest rate swap traders would be harmed if Libor was artificially lowered, because they would have to pay back the Libor-based leg of the contract at artificially elevated prices. The interest rate swaps will be mispriced to the extent that Libor has been misrepresented.

56.     Ticker symbols for CME interest rate swaps are: (1) for five year tenor, NGH or SAH, NGM or SAM, NGU or SAU, NGZ or SAZ; for seven-year tenor, 7IH, 7IM, 7IU, 7IZ; for 10-year tenor, NIH or SRH, NIM or SRM, NIU or SRU, NIZ or SRZ; and for 30-year tenor, NZH or I3H, NZM or I3M, NZU or I3U, NZZ or I3Z, followed by the last two digits representing a year.

II.     **Manipulator Defendants Did Suppress and/or Maintain at Artificial, Manipulated**
        **Levels their Reported Libor During the Class Period**

    A.     **Manipulator Defendants Suppressed Libor**

    57.     Beginning as early as 2006 and extending into 2009, a portion of the contributing banks to the Libor panel, Manipulator Defendants herein, individually artificially suppressed, and collectively agreed to artificially suppress, the Libor rate. In the early months of 2008, during the most significant financial crisis since the great depression, US dollar Libor rates submitted by contributor banks did not vary markedly, nor did they increase or decrease sharply. This fact did not correspond to traditional market behavior because in times of severe uncertainty, banks would normally be reluctant to lend to one another on an unsecured basis without receiving a higher risk premium. In a market not artificially suppressed, Libor rates should have increased significantly during this period. In addition, because different banks were experiencing different levels of severe stress, the banks should have been receiving markedly different borrowing rates. None of this was reflected in the Libor rates reported by Manipulator Defendants.

    58.     When compared with other reliable measures of bank risk, such as federal funds trades (which require collateral) and the credit default market, the reported Libor rates of the contributing banks all were underpriced. For example, in 2008, the Federal Reserve auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82% – 0.1% percentage point higher than the comparable Libor rate. However, because banks put up securities as collateral for the Federal Reserve loans, they should have received them for a lower rate than Libor, which is unsecured. Despite clear reasons why Libor should have been higher, the reported Libor did not reflect this market reality.

    59.     A 2008 Wall Street Journal examination of the borrowing costs submitted by the

banks during the first four months of 2008 showed that banks reported remarkably similar costs despite the fact that the banks were facing different financial stresses. For the first four months of 2008, for example, the three-month borrowing rates reported by Manipulator Defendant remained, on average, within a range of only 0.06 of a percentage point.

60.     According to Stanford University Professor Darrell Duffie, these reported rates "[were] far too similar to be believed."

61.     Economists from the Bank of International Settlements raised concerns that banks might report incorrect rate information. In a report, these economists said that banks might have an incentive to provide false rates to profit from derivative transactions. The report said that despite some protections, Libor rates can still "be manipulated if contributor banks collude or if a sufficient number change their behavior."

62.     Manipulator Defendants had the opportunity to collude. When posting rates to the BBA, the 16 contributor banks' traders were able to phone brokers at firms such as Tullett Prebon PLC, ICAP PLC and Compagnie Financiere Tradition to get estimates of where the brokers perceived the loan market to be. It is through such communications, among others, that banks are able to communicate their intent to report a given Libor rate.

63.     In addition to finding reported Libor rates were uncannily similar, the study by The Wall Street Journal of the 16 contributor banks to the Libor Panel found that the Manipulator Defendants' reported Libor rates did not correspond to the banks' perceived health as that health is measured in the credit default market.

64.     On the afternoon of March 10, 2008, for instance, investors in the credit default market were estimating that Defendant WestLB, which was hit hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse Group, a Swiss bank that was

perceived to be in better shape. Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse.

65. Defendant Citibank's reported rates differed the most from what the credit default market suggested. On average, the rates at which Citibank said that it could borrow dollars for three months (i.e., its Libor rates) were about 0.87 percentage points lower than the rate calculated using default-insurance data. The difference was 0.7 percentage points for WestLB, 0.57 for HBOS, 0.43 for J.P. Morgan, and 0.42 for UBS. Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and Royal Bank of Scotland also differed from their expected credit default market rates by about 0.3 percentage points.

66. The money market committee of The Bank of England raised questions in November 2007, and again in April 2008, about the integrity of Libor. In November 2007, minutes of the meeting stated that, "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress." On April 3, 2008, minutes of the committee's discussions say that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates." Although BBA and at least some Defendant banks were members of this committee, BBA later announced that Libor continued to be reliable even in times of financial crisis. BBA's conduct served to aid Defendants in fraudulently concealing their conduct.

67. In April 2008, Citibank interest-rate strategist Scott Peng raised questions about the integrity of Libor, writing that "Libor at times no longer represents the level at which banks extend loans to others." Following Peng's report, the BBA began an inquiry into rate reporting by the U.S. Libor panel, telling The Wall Street Journal that if its investigation found reason, it would "take action to preserve the reputation and standing in the market of our rates."

16

68.     The move by the BBA came in response to the concerns among bankers and the financial media that the panel members were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash.

69.     On April 17, 2008, the day after The Wall Street Journal reported the suspicions of Peng and other financial analysts, there was a sudden jump in dollar-denominated Libor. The benchmark dollar Libor rate for three-month borrowing shot up from 2.73375% on April 16 to 2.90750% on April 18, an immense two-day increase that amounted to an extremely rare 5.53 standard deviation event. The Manipulator Defendants' unlawful conduct caused and forced CME Clearing to settle CME Eurodollar and many other standardized futures contracts at the manipulated LIBOR prices caused by the Manipulator Defendants.

70.     Although prior to the BBA investigation, reported Libor rates had remained clustered and low, on April 17, 2008, the dynamic changed. The highest quote of the morning was submitted by U.K. lender HBOS (acquired in 2009 by Defendant Lloyds), which submitted a 2.86% rate for a three-month loan. That was up 0.10 percentage point from Wednesday. HSBC Holdings PLC posted a rate of 2.85%, up 0.12 percentage point from Wednesday. Bank of America Corp. submitted the lowest rate of 2.77%, up from 2.75% on Wednesday.

71.     Suspiciously, other lending rates for other currencies fell or remained relatively flat at the time Libor surged, a sign that the dollar Libor rate was susceptible to manipulation.

72.     In a note to clients the day after Libor jumped, UBS strategist William O'Donnell suggested that banks were responding to heightened scrutiny of their reporting practices. He said that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market."

73.     At that same time, William Porter, credit strategist at Credit Suisse, said he

17

believed the three-month dollar rate was 0.4 percentage points below where it should be. Porter's

analysis echoed that of Peng, who said that Libor understated banks' true borrowing costs by as

much as 0.3 percentage points.

74.     On May 29, 2008, Bloomberg reported an overt admission by Barclays Capital

strategist Tim Bond that banks "routinely" misstated interest rates to the BBA:

> Banks routinely misstated borrowing costs to the British Bankers' Association to
> avoid the perception that they faced difficulty raising funds as credit markets seized
> up, said Tim Bond, a strategist at Barclays Capital.
>
> "The rates the banks were posting to BBA became a little bit divorced from reality,"
> Bond, head of asset-allocation research in London, said in a Bloomberg Television
> interview. "We had one week in September where our treasurer, who takes his
> responsibilities pretty seriously, said: 'right, I've had enough of this, I'm going to
> quote the right rates.' All we got for our pains was a series of media articles saying
> that we were having difficulty financing."

75.     The Bloomberg article specifically singled out Defendant UBS as a Libor-setting

bank whose rate submissions painted a far rosier picture of its stability than suggest its many dire

financial disclosures in that time period indicated:

> As well as varying from member to member, rates show little correlation to banks'
> costs of insuring debt from default. UBS AG, whose default-insurance costs rose 919
> percent between July 2 and April 15 as it racked up $38 billion of writedowns and
> losses, quoted dollar-borrowing costs that were lower than its rivals on 85 percent of
> the days during that period, Bloomberg data shows.

76.     In early 2008, The Wall Street Journal conducted its own analysis of Libor that

identified several banks that had been reporting much lower borrowing costs than default-

insurance market data suggested they should have been. In comparing the costs of insuring

against banks defaulting on debt with the borrowing costs that the same banks submitted to

Libor, The Wall Street Journal found that those costs have historically shifted together. But

starting in January 2008, those metrics diverged. Amid growing anxiety over the banks'

solvency, the cost of purchasing default insurance on the banks rose while the banks' reported borrowing costs showed no such reaction.

77.    In particular, The Wall Street Journal's report identified Citibank, WestLB, HBOS, UBS and J.P. Morgan as the banks with the widest divergence between their reported Libor rates and their more likely costs as calculated with default insurance data. The report stated that Defendant Citibank's rate submissions were about 0.87 percentage point too low, while Defendant WestLB's submissions were 0.7 percentage point too low, and the submissions of Defendants HBOS, UBS and J.P. Morgan between 0.42 and 0.57 percentage point too low.

78.    Months after the Libor surge in April, strong reservations about the accuracy of rate reporting persisted. On June 2, 2008, The Financial Times reported that "the rate of borrowing in Libor has lagged behind other market-based measures of unsecured funding used by the vast majority of financial institutions. This has aroused suspicions that the small group of banks which supply the BBA with Libor quotes have understated true borrowing costs so as not to fan fears they have funding problems."

### B.    Academic Studies Bolster Evidence of Libor Manipulation

79.    Defendants had several reasons to suppress Libor. The first was to assuage the market's doubts about their financial stability. During the height of the credit crisis during 2007-2008, Manipulator Defendants were loath to disclose the risk premium that the market was attaching to them. To have disclosed that the market was charging any individual bank a much higher interest rate than the others would have demonstrated that the bank was at greater risk of default than the others. Manipulator Defendant banks had a collective desire to dissuade the market from perceiving members of their panel as risky.

80.    A 2010 study from the university ESCP Europe said that a likely indication that a

19

bank was manipulating its Libor quotes in order to save face was if it submitted rates lower than the Libor while its CDS rose more rapidly than the rest of the panel on average. According to the study, that trend precisely characterized the reporting of Defendants Bank of America, Royal Bank of Scotland, HBOS, Citibank and UBS during the first months of 2008.

81.     Another study released by economists Connan Snider and Thomas Youle also found striking disparities in the movement of Defendant Citibank's Libor submissions and CDS, which they believe indicate that Citibank likely under-reported its rate submissions to appear more creditworthy than its CDS indicated it was. The study illustrated that claim through a comparison between Defendant Citibank and a panel member that did not exhibit signs of manipulation:

> The first puzzling fact is that while Citigroup has a substantially higher CDS spread than [Bank of Tokyo-Mitsubishi UFJ], it submits a slightly lower Libor quote. The CDS spreads suggest that the market perceives Citigroup as riskier than Mitsubishi, as it is more expensive to insure against the event of Citigroup's default. The Libor quotes, however, tell the opposite story. If Citigroup and Mitsubishi were truthfully reporting their costs, then the quotes suggest that market participants view lending to Citigroup as slightly safer than Mitsubishi.

82.     Clearing Defendants were also motivated to misprice Libor in order to take advantage of trading opportunities provided by their inside information in the Libor-based derivative market.  Regulators are currently investigating Defendant Barclays, as well as other Defendants, for piercing the wall between derivative trading and treasury functions (through which Libor would normally be reported).  To pierce this wall would be in violation to the dictates of the BBA which require that banks separate their Libor reporting functions from derivative trading.  The reason for doing it would be to take advantage of reported Libor rates in Libor-based derivatives trading.

83.     In their April 2010 study, Snider and Youle asserted that Defendants' exposure to

Libor-related trading provided their chief incentive to manipulate the rate in a way that would most benefit their portfolios. "Given the large notional values," the study said, "a small unhedged exposure to the Libor can generate large incentives to alter the overall Libor." The authors supported their theory with an analysis of the clustering trends of rate submissions from two Manipulator Defendants with high Libor exposure. "Here we see that Citigroup and Bank of America tend to submit quotes that are identical to the fourth lowest quote of the fifteen other banks.... This is consistent with Bank of America and Citigroup having incentives, potentially stemming from their possession of Libor-indexed contracts, to lower the overall Libor rate...."

84.     In addition to profiting through Libor-related trading, Manipulator Defendants had motivation as borrowers to keep Libor low. The ESCP Europe study emphasized that cash-strapped banks would have a high incentive to encourage lending in an edgy, hesitant environment. "The principal reason for [Libor manipulation by banks] is to borrow at a better rate than they were ready to lend," the study said.

85.     Further, Manipulator Defendants' exclusive influence over Libor combined with their illogically similar rate submissions provides evidence that they colluded to coordinate their manipulation of Libor during the class period. As the ESCP Europe study explained, misreporting by less than five banks could not significantly suppress Libor as the lowest four submissions are cut from the calculation. Before scrutinizing the five Defendants listed above, the ESCP Europe authors astutely observed that "if a manipulation took place during the three first months of 2008, it is due to a cartel of institutions that we shall identify and not to a collective and general manipulation."

86.     Clearing Defendants are registered swap dealers or major swap participants (as those terms are used in the CEA). Clearing Defendants had the motive and ability to use the

information that they had about their reported Libor rates to trade advantageously in the Libor-based derivative markets, including the CME.

## C.    **Governmental Investigations**

87.    The artificial pricing of Libor during the Class Period has spurred investigations by several government regulatory agencies into the reporting practices of the banks on the BBA's U.S. dollar panel for the period between 2006 and 2009.

88.    The fact of the investigations came to light on March 15, 2011 when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission, the Commodity Futures Trading Commission and the Department of Justice, as well as an information request from the Japanese Financial Supervisory Agency, relating to its interest rate submissions to the BBA. UBS's disclosure states that the focus of the investigations is "whether there were improper attempts by UBS (among others), either acting on [its] own or together with others, to manipulate LIBOR at certain times."

89.    A Financial Times article published the same day as UBS's disclosure reported that the three U.S. agencies, the Japanese agency and the United Kingdom's Financial Services Authority had also requested information, and had begun interviewing witnesses, connected to the Defendants for several months.

90.    On March 28, 2011, Bloomberg further reported that people close to the inquiries by U.S. and U.K. regulatory agencies said that at least Defendant Barclays is being investigated for allegedly breaking information-sharing regulations through Libor-related communications between its treasury and traders.

91.    To date, Defendants UBS, Bank of America, Citibank and Barclays have received official subpoenas, but based on sources familiar with the investigations, the Financial Times

reported that "[a]ll the panel members are believed to have received at least an informal request

for information — an earlier stage in an investigation process before a subpoena."

92.     On Sept. 7, 2011, the Financial Times further reported that U.S. investigators may

charge bank executives with criminal violations of the Commodity Exchange Act that could

result in prison sentences of up to 14 years. Along with criminal violations of transmitting false

reports that affect the price of a commodity, U.S. investigators are also examining possible

collusion between the banks' traders and treasury departments in 2007 and 2008.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure ("FRCP") on his own behalf and as representative of a class ("Class")

defined as all persons, corporations and other legal entities (other than Defendants, their

employees, affiliates, parents, subsidiaries, and co-conspirators) that transacted in Libor-based

products on-exchange such as the CME during the Class Period and were harmed thereby.

94.     The Class is so numerous that the individual joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time,

Plaintiff is informed and believes that at least thousands of geographically dispersed Class

members traded on-exchange Libor-based derivative contracts during the Class Period.

95.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions that affect only individual members of the Class.  These

common questions of law and fact include, without limitation:

      a.  Whether Defendants' manipulation acts constituted a manipulative or unlawful

         act;

      b.  Whether Defendants injected into on-exchange Libor-based derivatives

illegitimate forces of supply and demand;

   c.  Whether Defendants manipulated on-exchange Libor-based derivatives in violation of the CEA;

   d.  Whether Defendants conspired to manipulate on-exchange Libor-based derivatives in violation of the CEA;

   e.  Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize on-exchange Libor-based derivatives in violation of the antitrust laws;

   f.  The character, extent, and duration of Defendants' manipulation of on-exchange Libor-based derivatives;

   g.  Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

   h.  Whether Defendants' aiding and abetting violates the CEA;

   i.  Whether Defendants' conduct was in violation of state law;

   j.  The fact and degree of impact on on-exchange Libor-based derivatives prices from Defendants' course of unlawful conduct; and

   k.  The appropriate measure of relief.

96.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

97.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse

to the interests of absent Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and class action litigation.

98.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

99.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

100.     By its very nature, the unlawful activity, as alleged herein, that the Manipulator Defendants engaged in was self-concealing. The Manipulator Defendants, *inter alia*, falsely reported interest rate information to the BBA and Reuters in order to depress United States Dollar LIBOR to artificially low levels and thereby manipulate the price for Eurodollar futures and other exchange-based contracts.

101.     Analysts offered various reasons in 2008 to explain the divergence of reported LIBOR rates and other market indices such as default insurance rates. In light of the freezing up

of the credit markets during the financial crisis, the dearth of lending by banks, even to each other, could have affected the accuracy of the borrowing rates they provided. Others noted that some U.S. banks, such as Citibank and JP Morgan, had access to large customer deposits and borrowing from the Federal Reserve, such that they might not need more expensive loans from other banks.

102.   At the time of the financial crisis in 2008, representatives of the Manipulator Defendants said they provided accurate rates, and industry groups with connections to the Manipulator Defendants similarly attempted to refute assertions that the panel was falsely reporting interest rate information to depress United States Dollar LIBOR.

103.   During 2008, for example, the BBA stated that LIBOR was reliable, and that the financial crisis had caused many indicators to act in unusual ways. A spokesman for the BBA stated that there was "no indication" that the default insurance market provided a picture of banks' borrowing costs more accurate than that provided by LIBOR.

104.   Everything changed on March 15, 2011, when UBS released its annual report stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA. UBS described the focus of the investigation as "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."

105.   The *Financial Times* reported on March 15, 2011 that the three United States agencies, the Japanese agency and the United Kingdom's Financial Services Authority had also requested information and had been interviewing witnesses connected to the Manipulator Defendants.

26

106.   In addition to UBS, Bank of America, Citibank and Barclays have received subpoenas. The *Financial Times* has reported that "[a]ll the panel members are believed to have received at least an informal request for information—an earlier stage in an investigation process before a subpoena."

107.   In contrast to their earlier denials of misreporting, representatives of Deutsche Bank, Bank of America, Citigroup, JP Morgan, Barclays and Lloyds have specifically declined to comment since the March 15, 2011 disclosure of the government investigations as to whether the Manipulator Defendants colluded to artificially reduce LIBOR.

108.   In further contrast to its earlier statements that LIBOR was reliable, in February 2011 the BBA expanded the Panel of banks that contribute to U.S. dollar LIBOR from sixteen to twenty members.

109.   Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on March 15, 2011.

110.   Because the Manipulator Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on March 15, 2011.

111.   Due to the Manipulator Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

112.   In addition, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled by the filing of other cases against the

Manipulator Defendants.

113.   The manipulator Defendants are equitably estopped to assert that any otherwise applicable period of limitations has run.

114.   The Manipulator Defendants' conduct as alleged herein constitutes a continuing violation of law.  Plaintiff and members of the Class bring this action within two years of the end of such continuing violation.

### AS AND FOR A FIRST CLAIM AGAINST THE MANIPULATOR DEFENDANTS FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

115.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

116.   The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in various on-exchange Libor-based futures, options, swaps and other derivative products.  CME is an organized, centralized market that provides a forum for trading on-exchange Libor-based futures, options, swaps and other derivative products.

117.   As to the CME Libor-based derivatives, by their intentional misconduct, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of on-exchange Libor-based derivative contracts to be artificial, including artificially inflated and/or maintained, during the Class Period.

118.   Defendants' activities alleged herein constitute market power manipulation of the prices of CME Libor-based derivatives in violation of Sections 4s(h), 9(a) and 22(a) of the CEA,

7 U.S.C. §§ 6s(h), 13(a) and 25(a).

119.   Defendants' extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

120.   Plaintiff and others who transacted in on-exchange Libor-based derivative contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

121.   Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM AGAINST THE MANIPULATOR DEFENDANTS FOR VICARIOUS LIABILITY FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT (7 U.S.C. § 2)

122.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

123.   Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## AS AND FOR A THIRD CLAIM AGAINST ALL DEFENDANTS FOR AIDING AND ABETTING IN VIOLATION OF THE COMMODITY EXCHANGE ACT (7 U.S.C. § 25)

124.   Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

125.   Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of other Defendants'

manipulations of Eurodollar futures contracts prices, including by false reporting of interest rate information, and willfully intended to assist these manipulations to cause the price of CME Eurodollar futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

126.    Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

127.    As a further direct and proximate result of the acts of Defendants, Plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

### AS AND FOR A FOURTH CLAIM
### AGAINST THE MANIPULATOR DEFENDANTS
### FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT
### (15 U.S.C. § 1)

128.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

129.    The Manipulator Defendants combined, conspired and agreed to fix, maintain and inflate the prices of CME Eurodollar futures contracts, and other standardized contracts priced on the basis of Dollar LIBOR, by intentionally reporting false interest rate information to the BBA and Reuters for the fixing of LIBOR. This is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

130.    Because of the Manipulator Defendants' combination, conspiracy or agreement, Plaintiff and the members of the Class have paid supra-competitive prices for Eurodollar futures contracts during the Class period and have been damaged in their property thereby. Unless enjoined, the Manipulator Defendants' contract, combination and conspiracy will continue.

30

## AS AND FOR A FIFTH CLAIM
## AGAINST THE MANIPULATOR DEFENDANTS FOR VIOLATION OF THE DONNELLY ACT, GEN. BUS. LAW §§ 340 *et seq.*

131.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

132.    Defendants' combinations or conspiracies had the following effects: (1) the prices in the market for Libor-based products on exchange were restrained, suppressed, and eliminated; (2) prices for on-exchange Libor-based derivative contracts were raised, fixed, maintained and stabilized at artificially high levels; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for Libor-based derivative contracts when it purchased the products than would have been absent the conspirators illegal acts, or was unable to purchase products that it would have otherwise have purchased absent the illegal conduct.

133.    During the Class Period, Defendants' illegal conduct substantially affected commerce, including New York.

134.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury.

135.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340 *et seq.*  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiff seeks all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

31

## AS AND FOR A SIXTH CLAIM
## AGAINST THE CLEARING DEFENDANTS
## FOR BREACH OF CONTRACT

136.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

137.    The CME Rules, including without limitation Rule 432, to which every futures contract traded on the CME is subject and which provide standards of performance of such contracts, prohibit price manipulation.

138.    One of the terms of all CME Eurodollar futures contracts provides that such contracts financially settle to LIBOR.

139.    By intentionally misstating their LIBOR rates, the Manipulator Defendants caused the prices of such Eurodollar futures contracts to be manipulated and not to be the product of legitimate market forces of supply and demand.

140.    The conspiracy and other unlawful conduct of the Manipulator Defendants caused the Clearing Defendants, which were each subsidiaries or affiliates of the Manipulator Defendants and were counterparties to such futures contracts, to breach the CME Eurodollar futures contracts by imposing manipulated prices as settlement prices of those contracts in violation of CME rules, including without limitation CME Rulebook Chapter 452, and the Clearing Defendants' duties to Plaintiff and members of the Class, including duties of good faith and fair dealing.

141.    Such multiple breaches of the CME Eurodollar futures contracts by causing artificial settlement prices further manipulated the benchmark prices for such contracts to which the market trades.

142.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Clearing Defendants therefore.

### AS AND FOR A SEVENTH CLAIM
### AGAINST THE MANIPULATOR DEFENDANTS FOR
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATION

143.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

144.    By intentionally misstating their LIBOR rates and by causing the prices of CME Eurodollar futures contracts to be manipulated and not the product of legitimate market forces of supply and demand, the Manipulator Defendants induced the breach of such Eurodollar futures contracts by preventing Plaintiff and members of the Class from obtaining performance of such contracts at non-manipulated prices.

145.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from Defendants therefore.

### AS AND FOR AN EIGHTH CLAIM AGAINST
### THE MANIPULATOR DEFENDANTS FOR TORTIOUS INTERFERENCE
### WITH BUSINESS OR ECONOMIC ADVANTAGE

146.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

147.    Plaintiffs and members of the Class had a reasonable expectation that the financial instruments they entered into whose prices were based upon LIBOR were priced upon free and open competition, and thereforee that in entering into these transactions they were entering into valid business relationships.

148.    The Manipulator Defendants, who took pains to conceal their conduct in underreporting LIBOR, knew of the foregoing expectation of Plaintiff and members of the Class.

33

149.    The Manipulator Defendants' purposeful interference prevented the legitimate expectancy of Plaintiff and members of the Class from ripening into a valid business relationship at prices which were free of manipulation.

150.    As a direct result of the Manipulator Defendants' interference, Plaintiff and members of the Class have been damaged.

151.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Manipulator Defendants therefore.

## AS AND FOR A NINTH CLAIM
## AGAINST THE MANIPULATOR DEFENDANTS FOR
## RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT

152.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

153.    It would be inequitable for the Manipulator Defendants to be allowed to retain the benefits which the Manipulator Defendants obtained from their illegal agreement and manipulative acts and other unlawful conduct described herein, at the expense of Plaintiff and members of the Class.

154.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed upon the benefits to the Manipulator Defendants from their unjust enrichment and inequitable conduct.

155.    Alternatively or additionally, each Manipulator Defendant should pay restitution of its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)   For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and Plaintiff's counsel as Class counsel;

(B)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(D)   For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(E)   For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(F)   For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)   For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated:  December 23, 2011
New York, NY

KIRBY McINERNEY LLP

By: _____

Roger Kirby, Esq.
David Kovel, Esq.
Daniel Hume, Esq.
825 Third Avenue
New York, New York 10022
Telephone: (212) 317-2300
Facsimile: (212) 751-2540

**MOTLEY RICE LLC**
Joseph F. Rice
William H. Narwold
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**STURMAN LLC**
Deborah Sturman
275 Seventh Avenue, 2nd Floor
New York, NY 10001
Telephone: (212) 367-7017
Facsimile: (917) 546-2544

*Attorneys for Plaintiff and the Proposed
Class*