# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | ECF Case |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

1.    Plaintiffs Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, and Nathanial Haynes ("Plaintiffs"), by their undersigned attorneys, bring this action against defendants identified below (collectively, "Defendants") pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. § 1, and common law on behalf of itself and all others who transacted in Eurodollar futures contracts and options on futures contracts on the Chicago Mercantile Exchange ("CME") between August 2007 and May 2010 (the "Class Period").[1]

## SUMMARY OF ALLEGATIONS

2.    LIBOR is a reference interest rate used as the basis for the pricing of fixed income futures, options, swaps and other derivative products traded on the CME and the Chicago Board of Trade ("CBOT"). This action arises from Defendants' unlawful and intentional misreporting and manipulation of – as well as their combination, agreement and conspiracy to fix – LIBOR rates and to restrain trade in the market for LIBOR-based derivatives during the respective Class

---

[1] Plaintiffs have delineated the Class Period based on currently available information, including the independent analysis performed by consulting experts Plaintiffs have retained, as well as analyses undertaken by experts retained by other plaintiffs in these coordinated proceedings. As detailed later in the Complaint, those analyses indicate Defendants manipulated LIBOR as of at least August 8, 2007 and continued their manipulation through at least May 17, 2010.

Period in violation of Sections 2(a)(1)(B), 4s(h), 9(a)(2) and 22(a) of the CEA, the Sherman Act, 15 U.S.C. § 1, and common law.

3.      Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and LIBOR, which Plaintiffs (through their counsel) obtained from, among other sources:  (i) analyses by consulting experts engaged by Plaintiffs and other plaintiffs in these coordinated proceedings; (ii) publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (iii) filings Defendants made to the United States Securities and Exchange Commission ("SEC"); (iv) court documents submitted in LIBOR-related proceedings in Canada, Singapore, and Japan; and (v) scholarly literature concerning the potential manipulation of LIBOR during the Class Period.  These sources collectively support Plaintiffs' allegations that Defendants collusively and systematically manipulated LIBOR rates and restrained trade in the market for LIBOR-based derivatives during the Class Period.

4.      Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' improper activities.  Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct.  Moreover, numerous pending government investigations—both domestically and abroad, including by the DOJ, the Commodity Futures Trading Commission ("CFTC"), and the SEC—concerning potential LIBOR manipulation could yield information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . . because of the difficulty in proving that banks reported borrowing costs for LIBOR

at one rate and obtained funding at another."[2]  Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

5.      This case arises from the manipulation of LIBOR for the U.S. dollar ("USD-LIBOR" or simply "LIBOR")[3]- the reference point for determining interest rates for trillions of dollars in financial instruments - by a cadre of prominent financial institutions.  Defendants perpetrated a scheme to depress LIBOR for two primary reasons.  First, well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with the bank, Defendants understated their borrowing costs to the British Bankers' Association ("BBA") (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were—of particular importance given investors' trepidation in light of the widespread market turmoil of the past few years.  Indeed, in an April 10, 2008 report, analysts at Defendant Citigroup Global Markets Inc. posited the "liquidity crisis" had "created a situation where LIBOR at times no longer represents the level at which banks extend loans to others"; specifically, the analysts concluded LIBOR "may understate actual interbank lending costs by 20-30bp [basis points]."[4]  Second, artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, and otherwise affect the price for LIBOR-based derivatives like Eurodollar futures.

6.      Each business day, Thomson Reuters calculates LIBOR—a set of reference or benchmark interest rates priced to different ranges of maturity, from overnight to one year—on

---

[2] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, March 17, 2011.

[3] While the term "LIBOR" generally encompasses rates with respect to numerous currencies (which are separately referred to as, for example, USD-LIBOR or Yen-LIBOR), for convenience Plaintiffs use the term "LIBOR" to reference USD-LIBOR.

[4] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?", April 10, 2008 (published by Citigroup Global Markets Inc.)

behalf of the BBA, which first began setting LIBOR on January 1, 1986. During most of the Class Period, the BBA established LIBOR based on the rates that 16 major banks, including Defendants, would have to pay for an unsecured loan for each designated maturity period.[5] Every day, the banks responded to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" On its website, the BBA explains "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active." The banks informed the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months). The BBA discarded the upper four and lower four quotes and set LIBOR by calculating the mean value of the remaining middle eight quotes, known as an "inter-quartile" methodology. Thomson Reuters then published LIBOR, also reporting the quotes on which the BBA based its LIBOR calculation.

      7.    The composition of the LIBOR panel is intended to reflect the constituency of the London interbank money market for U.S. Dollars. The LIBOR definition is amplified as follows:

- The rate at which each bank submits must be formed from that bank's perception of its cost of unsecured funds in the London interbank market. This will be based on the cost of funds not covered by any governmental guarantee scheme.

- Contributions must represent rates at which a bank would be offered funds in the London interbank market.

- Contributions must be for the specific currency concerned and not the cost of producing the currency by borrowing in a different currency and obtaining the required

---

[5] On February 9, 2009, Société Générale replaced Defendant HBOS on the BBA's USD-LIBOR panel. In February 2011, in response to concerns about possible LIBOR manipulation, the BBA added four more banks to the panel. On August 1, 2011, Defendant WestLB, at its request, was removed from the panel. As of December 2011, the USD-LIBOR panel consisted of 18 banks.

currency via the foreign exchange markets.

- The rates must be submitted by members of staff at a bank with primary responsibility for management of a bank's cash, rather than a bank's derivative book.

- The definition of "funds" is: unsecured interbank cash or cash raised through primary issuance of interbank Certificates of Deposit.

8.      The BBA describes itself on its website as "the leading trade association for the UK banking and financial services sector", claiming that it "speak[s] for over 200 member banks from 60 countries on the full range of UK and international banking issues."[6] The Defendants are among the member banks of the BBA.  As the BBA itself concedes, it is not a regulatory body and has no regulatory function.[7]  Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[8]

9.      No regulatory agency oversees the setting of LIBOR rates by the BBA and its members. The resultant rates are not filed with, or subject to the approval of, any regulatory agency. As the BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[9]

10.     LIBOR is set by the BBA and its member banks. Each of the ten currencies (namely U.S. Dollars, Japanese Yen, pound sterling, the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc and the Swedish krone) is overseen by a separate LIBOR panel created by the BBA.  During the Class Period, designated

---

[6] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[7] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012

[8] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[9] *See* http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[10]  Similarly, thirteen banks participated on both the dollar and yen LIBOR panels[11] and eleven banks participated on both the U.S. dollar and Swiss franc LIBOR panels.[12]  It is a requirement of membership of a LIBOR contributor panel that the bank is regulated and authorized to trade on the London money market.  As the BBA recently told Bloomberg: "As all contributor banks are regulated, they are responsible to their regulators, rather than us."[13]

  11. As "the primary benchmark for short term interest rates globally,"[14] LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets.  For example, market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (*e.g.*, "LIBOR + [X] bps")[15] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR).  Additionally, the pricing and settlement of Eurodollar futures and options—the most actively traded interest-rate futures contracts on the Chicago Mercantile Exchange—are based on the three-month LIBOR.  LIBOR thus affects the pricing of trillions of dollars' worth of financial

---

[10]  Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS

[11] Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB.

[12] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS.

[13] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.

[14] *See* http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[15] The term "bps" stands for basis points.  100 basis points equal 1%.

transactions, rendering it, in the BBA's own words, "the world's most important number."[16]

12.    Accordingly, it is well-established among market participants that, as *The Wall Street Journal* has observed, confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[17]  Moreover, given the vast universe of financial instruments LIBOR impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[18]

13.    Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by underreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – *i.e.*, their true costs of borrowing – on a daily basis.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set artificially low.

14.    Defendants' manipulation of LIBOR allowed them to pay unduly low interest rates to investors, on LIBOR-based financial instruments offered during the Class Period. Investors—who until recently had no reason to suspect Defendants' knowing suppression of LIBOR—justifiably believed the financial instruments they were purchasing derived from a rate that was based on USD-LIBOR panel members' honest and reasonable assessments of their borrowing costs.  To the contrary, Defendants—in the debt-instrument context, the borrowers— surreptitiously bilked investors—the lenders—of their rightful rates of return on their

---

[16] BBA press release, "BBA LIBOR: the world's most important number now tweets daily," May 21, 2009, available at http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily, last accessed on April 28, 2012.

[17] Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

[18] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, March 2012.

investments, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.  They also affected the LIBOR-based derivative market – in products like Eurodollar futures.  Defendants' affiliates actively traded in these markets, including and especially in the Eurodollar futures market on the CME.  Moreover, by understating their true borrowing costs, Defendants provided a false or misleading impression of their financial strength to investors and the rest of the market.

15.     Defendants' manipulation depressed returns on various types of financial instruments, including notes Defendants issued to raise capital during the Class Period.  In addition to floating-rate notes, whose interest rates are specifically set as a variable amount over LIBOR, market participants use LIBOR as the starting point for negotiating rates of return on short-term fixed-rate instruments, such as fixed-rate notes maturing in one year or less.  Thus, by suppressing LIBOR, Defendants ensured that artificially low interest rates would attach to fixed-rate and variable notes.

16.     Plaintiffs now seek relief for the damages they have suffered as a result of Defendants' violations of federal and state law.

## JURISDICTION AND VENUE

17.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and common law, respectively.

18.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceed $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

19.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c)

and (d).  Each of the Defendants transacted business in the Southern District of New York and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

<div align="center">**THE PARTIES**</div>

**Plaintiffs**

20.    Plaintiff Metzler Investment GmbH ("Metzler") is a fund company that launches and manages investment funds under German law. The range of funds includes various types of securities, money market, and derivative funds, as well as general and specialized investment funds.  Metzler manages assets totaling approximately €47 billion and is based in Frankfurt, Germany.  Its funds traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

21.    Plaintiff FTC Futures Fund SICAV ("FTC SICAV"), a fund based in Luxembourg, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

22.    Plaintiff FTC Futures Fund PCC Ltd. ("FTC PCC"), a fund of FTC Capital based in Gibraltar, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

23.    Plaintiff Atlantic Trading USA, LLC ("Atlantic") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Atlantic Trading USA, LLC traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

24.    Plaintiff 303030 Trading LLC ("303030") is an Illinois limited liability corporation with its principal place of business in Lake County, Illinois. 303030 traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

25.    Plaintiff Gary Francis ("Francis") is a resident of Chicago, Illinois.  Plaintiff Francis traded on-exchange based products tied to LIBOR such as Eurodollar futures and was

harmed as a consequence of Defendants' unlawful conduct.

26.     Plaintiff Nathanial Haynes ("Haynes") is a resident of Chicago, Illinois. Plaintiff Haynes traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

**Defendants**

27.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a federally chartered national banking association headquartered in Charlotte, North Carolina and an indirect, wholly owned subsidiary of Defendant Bank of America Corporation.  Defendant Bank of America Corporation and Bank of America, N.A. are hereinafter referred to collectively as "BAC")

28.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

29.     Defendant Citibank, N.A. ("Citibank") is federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant Citigroup, Inc. ("Citigroup").  Defendant Citigroup is a Delaware corporation headquartered in New York, New York.

30.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

31.     Defendant J.P. Morgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York.  Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant JPMorgan Chase.

32.     Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London, England.  Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and a wholly owned subsidiary of

Defendant HSBC.

33.     Defendant Lloyds Banking Group plc ("Lloyds") is a British public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Lloyds TSB Bank plc.

34.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Westdeutsche ImmobilienBank AG is a German company headquartered in Mainz and wholly owned subsidiary of Defendant WestLB.

35.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

36.     Defendant Royal Bank of Scotland Group plc ("RBS") is a British public limited company headquartered in Edinburgh, Scotland.

37.     Defendant Deutsche Bank, AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

38.     Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

39.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Toyko" or "BTMU") is a Japan company headquartered in Tokyo, Japan.

40.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands.

41.     Defendant The Norinchukin Bank ("Norinchukin" or "Norin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

42.     During the Class Period, Defendants BAC, Credit Suisse, JPMorgan Chase, HSBC, Barclays, Lloyds, HBOS, WestLB, RBS, UBS, Deutsche Bank, Citibank, Royal Bank of Canada, Rabobank, BTMU and Norinchukin were members of the BBA's USD-LIBOR panel. Additionally, Citigroup, which controlled Citibank and reaped significant financial benefit from the suppression of LIBOR, actively participated in the conspiracy.

## AGENTS AND UNNAMED CO-CONSPIRATORS

43.     During the Class Period, the following subsidiaries or other affiliates of Defendants joined and furthered the conspiracy by trading LIBOR-based financial instruments such as Eurodollar futures contracts at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of Defendants: (i) Credit Suisse Securities (USA) LLC; (ii) Bank of America Securities LLC; (iii) J.P. Morgan Clearing Corp.; (iv) J.P. Morgan Futures, Inc.; (v) HSBC Securities (USA); (vi) Barclays Capital Inc.; (vii) UBS Securities LLC; (viii) RBS Securities Inc.; (ix) Deutsche Bank Securities; and (x) Citigroup Global Markets Inc.

44.     In addition to the above entities' participation in selling LIBOR-based financial instruments to Plaintiffs during the Class Period, investigations regarding Defendants' manipulation of Yen-LIBOR (detailed below) have revealed that securities-dealer subsidiaries of Yen-LIBOR panel members, including Defendant UBS, participated in manipulating Yen-LIBOR during the Class Period.  In light of those facts, Plaintiffs have reason to believe the dealer entities identified above materially aided or contributed to the manipulation of USD-LIBOR.

## DEFENDANTS SUPPRESSED LIBOR DURING THE CLASS PERIOD

45.     Throughout the Class Period, Defendants conspired to suppress LIBOR below the levels it would have been set had Defendants accurately reported their borrowing costs to the BBA.  Plaintiffs' allegations that Defendants suppressed LIBOR are supported by (i) Defendants' powerful incentives to mask their true borrowing costs and to reap unjustified revenues by setting artificially low interest rates on LIBOR-based financial instruments that investors purchased; (ii) an independent analysis by other plaintiffs' consulting experts, comparing LIBOR panel banks' daily individual quotes with the banks' probability of default, as measured by Kamakura Risk Information Services, as well as by Plaintiffs' consulting experts conducting analyses of the spread between LIBOR as reported and the Federal Reserve Eurodollar Deposit Rate; (iii) publicly available economic analyses, by prominent academics and other commentators, of LIBOR's behavior during the Class Period compared with other well-

accepted measures of Defendants' borrowing costs, as well as the notable tendency of Defendants' daily submitted LIBOR quotes to "bunch" near the bottom quartile of the collection of reported rates used to determine LIBOR; and (iv) revelations in connection with the numerous domestic and foreign governmental investigations into potential manipulation of USD-LIBOR and LIBOR for other currencies, most prominently Yen-LIBOR and Euroyen TIBOR.

### A.    Defendants Possessed Strong Motives To Suppress LIBOR

46.    Defendants each had substantial financial incentives to suppress LIBOR.  First, Defendants were motivated, particularly given investors' serious concerns over the stability of the market in the wake of the financial crisis that emerged in 2007, to understate their borrowing costs—and thus the level of risk associated with the banks.  Moreover, because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant shared a powerful incentive to collude with its co-Defendants to ensure it was not the "odd man out."  Indeed, analysts at Citigroup Global Markets—a subsidiary of Defendant Citigroup—acknowledged in an April 10, 2008 report:

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment.  If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one higher than its competitors.  Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences.[19]

Strategists at entities affiliated with other Defendants likewise confirmed that banks suppressed LIBOR.  Echoing the sentiment of the above analysts, William Porter, credit strategist at Defendant Credit Suisse, said in April 2008 that he believed the three-month USD-LIBOR was

---

[19] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?," April 10, 2008.

0.4 percentage points – or 40 basis points – below where it should be.[20]  And the next month, Tim Bond, head of asset-allocation research of Barclays Capital—a subsidiary of Defendant Barclays—observed that banks routinely misstated borrowing costs to the BBA to avoid the perception that they faced difficulty raising funds as credit markets seized up.[21]

47.    Second, by artificially suppressing LIBOR, Defendants paid lower interest rates on LIBOR-based financial instruments they sold to investors during the Class Period. Illustrating Defendants' motive to artificially depress LIBOR, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously.  JPMorgan Chase likewise reported significant exposure to interest rates in 2009.  The bank stated that if interest rates increased by 1%, it would lose over $500 million.  HSBC and Lloyds also estimated they would earn hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates and would lose comparable amounts in response to higher rates.  These banks collectively earned billions in net interest revenues during the Class Period.

48.    Defendants thus possessed reputational and financial incentives to manipulate LIBOR—which, as detailed below, they did

**B.    Independent Analyses By Consulting Experts Engaged by Plaintiffs and Other Plaintiffs In These Proceedings Strongly Indicate Defendants Artificially Suppressed LIBOR During the Class Period**

49.    Plaintiffs' consulting experts, as well as consulting experts engaged by other plaintiffs in these coordinated proceedings, have measured LIBOR against other recognized benchmarks for determining banks' borrowing costs.  Employing well-reasoned methodologies, these experts have demonstrated Defendants artificially suppressed LIBOR during the Class Period.  The experts' common conclusion is clear: during the Class Period, LIBOR did not

---

[20] Carrick Mollenkamp, "Libor Surges After Scrutiny Does, Too," *The Wall Street Journal*, April 18, 2008.

[21] Gavin Finch and Elliott Gotkine, "Libor Banks Misstated Rates, Bond at Barclays Says," *Bloomberg*, May 29, 2008.

appropriately correspond with other measures of Defendants' borrowing costs, as indicated by:
(i) the spread between LIBOR and Eurodollar Deposit rates, and (ii) the difference between
Defendants' respective LIBOR quotes and their probabilities of default.

50.    Additional independent expert analysis performed in connection with these
proceedings indicates Libor suppression.  At one date during the Class Period, when the BBA
announced it would investigate the reporting of LIBOR, members of the LIBOR panel increased
their rates in unison despite the lack of any market reason.  The most plausible explanation for
this movement is Defendants' collective fear of detection of their LIBOR suppression.
Bolstering this point is that since October 2011, when the European Commission raided most or
all of Defendants in connection with the LIBOR probe, reported LIBOR has returned to its
historic norm compared with the overall Eurodollar deposit market.

       1.    **The Discrepancy Between LIBOR and the Federal Reserve
Eurodollar Deposit Rate During the Class Period Suggests Defendants
Collusively Suppressed LIBOR**

51.    As demonstrated by the work of independent consulting experts retained by
counsel in these actions, analysis of the Eurodollar market strongly supports that Defendants
suppressed their LIBOR quotes and colluded to suppress reported LIBOR rates.  Moreover, this
analysis further supports that Defendants colluded to control the amount of suppression over the
Class Period.

52.    The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for
banks (the "Federal Reserve Eurodollar Deposit Rate").  These Eurodollar deposit rates are
analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar
money market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at
which panel banks in the London interbank market lend U.S. dollars to one another. The Federal
Reserve obtains its data from Bloomberg and the ICAP brokerage company.[22]  Bloomberg
Eurodollar deposit rate is similar to BBA's LIBOR except that the sampling is not limited to the

---

[22] *See* http://federalreserve.gov/releases/h15/data.htm, footnote 8.  Last visited on April 23, 2012.

16 banks chosen by BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.[23]
ICAP surveys its client banks and updates its Eurodollar deposit rates about 9:30 AM each
morning.

53.    While Defendants could  have access to the ICAP Eurodollar deposit rates prior to
submitting their individual LIBOR quotes at 11:00 each day, they would not — absent collusion
— have access to other bank LIBOR quotes, which are confidential until submitted.  Thus, even
within the context of a suppressed LIBOR, absent collusion, individual panel banks would not
know what quote other panel banks intended to submit relative to the Federal Reserve Eurodollar
Deposit Rate.

54.    The consulting experts determined that because of the nature of the relationship
between the Federal Reserve Eurodollar Deposit Rate and LIBOR (detailed below), it would be
unusual even for one bank to submit a LIBOR bid below the Federal Reserve's Eurodollar
Deposit Rate.  For all Defendants to submit bids below the Federal Reserve Eurodollar Deposit
Rate would be extremely unusual, and strongly supports evidence of collusion among the banks.

55.    Economic and statistical analysis strongly supports the use of the Federal Reserve
Eurodollar Deposit Rate as a benchmark for measuring the validity of LIBOR as reported by the
panel banks.  To measure how well the Federal Reserve Eurodollar Deposit Rate and LIBOR
move together, for the purposes of this analysis, the difference between the two rates, the
"Spread," is calculated as follows:  Spread = BBA LIBOR – Federal Reserve Eurodollar Deposit
Rate.

56.    Since both LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the

---

[23] "ICAP is the world's premier voice and electronic interdealer broker and the source of global market information and commentary for professionals in the international financial markets. The Group is active in the wholesale markets in interest rates, credit, energy, foreign exchange and equity derivatives. ICAP has an average daily transaction volume in excess of $1.5 trillion, more than 60% of which is electronic. ICAP plc was added to the FTSE 100 Index on 30 June 2006. For more information go to www.icap.com."  *See* http://www.icapenergy.com/company/ (last accessed on April 30, 2012).

lending cost to banks of Eurodollar deposits, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the Spread. The BBA's LIBOR panel is intended to reflect the Eurodollar deposit market in London. By focusing on the Spread, the model therefore should be able to factor out normal and expected co-movements in banks' LIBOR quotes that arise from changes in Market Fundamentals.

57. To analyze how well the Federal Reserve Eurodollar Deposit Rate captures changes in Market Fundamentals and absorbs variations in LIBOR that are driven by such fundamentals, consulting experts used regression analysis to measure the day-to-day changes in the Spread against changes in the T-Bill rate and the commercial paper rate. The evidence from these regressions strongly supports that day-to-day changes in the Federal Reserve Eurodollar Deposit Rate effectively capture day-to-day movements in LIBOR caused by Market Fundamentals. Thus, once the Federal Reserve Eurodollar Deposit Rate is subtracted to arrive at the Spread, remaining movements in LIBOR reflected in the Spread would be unrelated to movements in Market Fundamentals.

58. Because Market Fundamentals are fully captured by the Spread, absent manipulation, the Spread should always be zero or close to zero. Thus, as more fully discussed below, negative Spreads provide a strong basis to conclude that Defendants suppressed and colluded to artificially suppress LIBOR.[24]

59. Figures 1 and 2 show the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid 2012. As can be seen, between January 5, 2000 and around August 7, 2007, Federal Reserve's Eurodollar Deposit

_____

[24] It is important to note that to the extent panel banks submitting LIBOR quotes submit suppressed rates to the BBA, and these suppressed rates are also considered by Bloomberg or ICAP, then the resultant Federal Reserve Eurodollar Deposit rate would also be understated by the same suppression. Consequently, the Spread computed above could even understate the true magnitude of the suppression.

Rate tracked LIBOR very closely and the Spread remained positive and very close to zero.  This finding indicates that the Spread effectively captures shared risks of the banks sampled by BBA and by Bloomberg and ICAP.  The validity of this finding is bolstered by the fact that the Spread remained very close to zero in the face of multiple major financial dislocations, including the bursting of the dot-com bubble in 2000, the terrorist attacks of September 2001, and the 2001 U.S. economic recession.  Likewise, the unusual downward movements in the Spread starting in August 2007 strongly evidences that LIBOR was being manipulated and suppressed during this period.[25]

---

[25] The Spread only became consistently positive around the end of October 2011, just after the European Commission raided banks in connection with LIBOR.



Figure 1: LIBOR and Federal Reserve Eurodollar Deposit Rate
LIBOR
Federal Reserve Eurodollar Deposit Rate
0
1
2
3
4
5
6
7
20000105
20000317
20000601
20000811
20001025
20010109
20010322
20010606
20010816
20011105
20020122
20020405
20020620
20020903
20021114
20030130
20030411
20030626
20030909
20031120
20040205
20040420
20040702
20040915
20041129
20050211
20050427
20050711
20050921
20051205
20060221
20060505
20060718
20060928
20061211
20070226
20070510
20070723
20071003
20071217
20080304
20080516
20080729
20081009
20081223
20090310
20090522
20090804
20091016
20091231
20100316
20100528
20100810
20101025
20110106
20110317
20110602
20110811
20111021
20120104
20120314



## Figure 2: LIBOR and Federal Reserve Eurodollar Deposit Rate

60.     Figure 3 shows the Spread between 3-month maturity BBA LIBOR and the Federal Reserve Eurodollar Deposit rate (3-month maturity BBA LIBOR – Federal Reserve Eurodollar Deposit rate), from January 2006 through early April 2012.



61.     The shorter period between January 3, 2006 and August 7, 2007 demonstrated above contains 393 trading days.  In this sub-period, there were only 3 days when the Spread was negative.  Furthermore, the magnitude of these negative Spreads were also very small, equaling -0.9 basis point on June 14, 2006, -0.5 basis point on July 27, 2006 and -0.2 basis point on November 2, 2006.[26]  This finding again strongly supports that the Federal Reserve Eurodollar Deposit Rate serves as a good benchmark to control for Market Fundamentals that determine LIBOR.  The average magnitude of the Spread during this period equaled less than one basis point.   This finding also strongly supports that the risks of the banks sampled by BBA and Bloomberg and ICAP were similar.

62.     By August 2007, however, the Spread began to move into negative territory. During the early part of August 2007, the Federal Reserve Eurodollar Deposit Rate stayed around 5.36%.  On August 8, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis points to 5.41%, while BBA LIBOR did not keep pace.  The Spread turned negative 3 basis points on August 8, 2007.  The Spread remained mostly negative after August 7 so that by August 15, 2007, the trailing 10-day moving-average of the Spread also turned negative.  By August 31, 2007, the Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while LIBOR was lagging.  The negative Spread on August 31 grew to -16 basis points.

63.     The Spread remained negative over the next year.  Between August 31, 2007 and September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days. The magnitude of the negative Spread averaged about -12 basis points.  During this approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

64.     A big shock to LIBOR (and the Spread) came just after Lehman Brothers filed for bankruptcy on September 15, 2008, leading to significantly increased concerns about the health of all banks.  The increased concerns about the health of the banks were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate.  On September 15, 2008, the Federal

---

[26]  One basis point is one-hundredth of a percentage point.

Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on September 16, 17 and 18, respectively. By September 30, the Federal Reserve Eurodollar Deposit Rate doubled to 6%.

65.    In spite of increased risks and worries about the banks after the Lehman bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread to become more negative. On September 16, 2008, the negative Spread nearly doubled to -32 basis points. The next day, on September 17, the negative Spread doubled again reaching -69 basis points. On September 18, the negative Spread more than doubled once again reaching -180 basis points. Finally, on September 30, 2008, the negative Spread reached -195 basis points.

66.    Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the banks, while LIBOR increased by less than one-half, or by 123 basis points during the same period. This diversion in the behavior of the two rates strongly supports the finding that Defendants intensified their collusive suppression of the LIBOR, and did so to understate their borrowing costs in the face of increasing concerns about the health of the banks.

67.    The Spread remained negative for more than one and a half years following the Lehman filing, until May 17, 2010. As concerns about banks' financial health eased, so did the magnitude of the suppression of LIBOR. As stated earlier, Federal Reserve's Eurodollar Deposit Rate reached 6% on September 30, 2008. With the easing of the financial crisis, Federal Reserve's Eurodollar Deposit Rate fell to 0.45% on May 17, 2010. The average suppression of the LIBOR rate between October 1, 2008 and May 17, 2010 equaled negative 38 basis points. The Spread finally turned positive for the first time during the post-Lehman period on May 17, 2010. Following this date, the Spread again became negative, with the magnitude of the Spread averaging around -10 basis points. The dramatic period of negative Spread during the Class Period, following years of uniform behavior between each individual Defendant Bank's LIBOR quote and the Federal Reserve Eurodollar Deposit Rate, is also graphically demonstrated by

24

Figures 4 to 19 below on a bank-by-bank basis.  Every Spread during the period August 8, 2007 to May 17, 2010 is statistically significant at the extremely high 99% confidence level.













Figure 9: WestLB LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



















Figure 18: Norin LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



68.    As the following chart demonstrates, the average Spread for each of the individual Defendants was uniformly negative throughout the entire Class Period, strongly supporting that each of these banks was suppressing its LIBOR quotes, and colluding to suppress reported LIBOR rates.

| **BANK NAME** | **Average Spread between August 8, 2007 through May 17, 2010** |
|---|---|
| 1. Bank of Tokyo-Mitsubishi | -25 basis points |
| 2. Bank of America | -30 basis points |
| 3. Barclays | -25 basis points |
| 4. Citi | -32 basis points |
| 5. CSFB | -27 basis points |
| 6. Deutsche Bank | -31 basis points |
| 7. HBOS | -29 basis points |
| 8. HSBC | -32 basis points |
| 9. JP Morgan Chase | -35 basis points |
| 10. Lloyds | -30 basis points |
| 11. Norin Bank | -25 basis points |
| 12. Rabo Bank | -32 basis points |
| 13. Royal Bank of Canada | -28 basis points |
| 14. Royal Bank of Scotland | -26 basis points |
| 15. UBS | -29 basis points |
| 16. West | -35 basis points |

69.    Moreover, as set forth in the following chart, during the critical two week period following the bankruptcy of Lehman Brothers, each of Defendants dramatically increased its collusive suppression of LIBOR.

| **BANK NAME** | **Average Spread between September 16, 2008 and September 30, 2008** |
|---|---|
| 1. Bank of Tokyo-Mitsubishi | -120 basis points |
| 2. Bank of America | -144 basis points |
| 3. Barclays | -87 basis points |
| 4. Citi | -142 basis points |
| 5. CS | -122 basis points |

42

| 6. Deutsche Bank | -129 basis points |
| 7. HBOS | -110 basis points |
| 8. HSBC | -141 basis points |
| 9. JP Morgan Chase | -153 basis points |
| 10. Lloyds | -146 basis points |
| 11. Norin Bank | -126 basis points |
| 12. Rabo Bank | -143 basis points |
| 13. Royal Bank of Canada | -140 basis points |
| 14. Royal Bank of Scotland | -140 basis points |
| 15. UBS | -141 basis points |
| 16. West | -138 basis points |

70.     Every Spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the extremely high 99% confidence level.

71.     Plaintiffs' consulting experts find the results reflected in these two tables to be powerful and statistically significant evidence of Defendants' collusive suppression of LIBOR during the Class Period.

72.     As detailed above, analysis based on well accepted statistical methodologies strongly supports that suppression of LIBOR occurred during the Class Period, accomplished through the collusive conduct of Defendants.  The sustained period during which the Federal Reserve Eurodollar Deposit – LIBOR Spread fell and remained starkly negative, as seen in Figure 2 above, accounting as it does for Market Fundamentals, is not plausibly achievable absent collusion among Defendants.  The intensified suppression from September 16, 2008 to September 30, 2008 (following the Lehman bankruptcy), in defiance of economic expectations, provides further powerful support for the suppression of LIBOR achieved through collusion by Defendants.  Because no Defendant Bank – absent collusive conduct – could know what LIBOR quote another panel bank actually intended to submit prior to those numbers being made public after 11:00 in the morning, the fact that all Defendants submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate over the Class Period further strongly supports the participation of each Defendant Bank in the suppressive and collusive scheme.

2.    **An Independent Analysis By Consulting Experts – Showing The Discrepancy Between Defendants' LIBOR Quotes And Their Respective Probabilities of Default – Provides Strong Evidence of LIBOR Suppression During the Class Period**

73.    Assessing the likelihood that LIBOR was suppressed during the Class Period, Plaintiffs' expert consultants compared USD-LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks—as determined, and updated daily for each maturity (term), by Kamakura Risk Information Services ("KRIS").[27] The study focused on identifying any periods of severe discrepancy between each bank's probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA.

74.    The KRIS reduced-form model estimates each bank's default risk on a daily basis by analyzing each bank's equity and bond prices, accounting information, and general economic conditions, such as the level of interest rates, unemployment rates, inflation rates, etc. On its website, KRIS states it "provides a full term structure of default for both corporate and sovereign credit names based upon a multiple models approach" and its default probabilities "are updated daily and cover more than 29,000 companies in 36 countries."[28]

75.    PD provides a measure of a bank's credit (default) risk exposure, essentially the likelihood that the bank will default within a specified time period. PD can be estimated using statistical models, whereas LIBOR is a rate of return required by investors lending short-term funds to the bank. A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given bank over a given term period violates the fundamental relationship between risk and return that is the cornerstone of finance. That is, investors require a higher required rate of return as a premium for taking on additional risk exposure. This results in a positive relationship (correlation) between risk and return. An increase in the bank's PD indicates that the risk of default has increased, thereby causing investors to require a higher rate

---

[27] KRIS did not have PDs for Defendants WestLB, Rabobank, or Norinchukin, because those companies were not publicly traded. This PD analysis therefore does not include those banks.

[28] *See* http://www.kris-online.com/, last accessed on April 23, 2012.

of return for loans to the bank—which should correspond with a higher LIBOR quote.

76.    Accordingly, a finding of a statistically significant negative coefficient (of any size) between a bank's daily LIBOR quotes and its PDs shows that increases in PDs correspond with decreases in LIBOR quotes—which violates fundamental finance theory.  This would indicate that banks are suppressing their LIBOR quotes to avoid revealing the higher rates that reflect their true (higher) probabilities of default.  In other words, any finding of negative, statistically significant correlation coefficients between a bank's PDs and its LIBOR quotes suggests LIBOR suppression by the bank over the analysis period.

77.    The magnitude of the correlation coefficient is impacted by the volatility of both PD and LIBOR for each bank during the time period.  Thus, for example, if a bank has high volatility in its PDs, the absolute value of the correlation coefficient will tend to be lower (*i.e.*, less negative) as compared to an identical bank with low PD volatility.  However, both may be equally engaged in LIBOR suppression if their correlation coefficients are statistically significant and negative.

78.    Plaintiffs' consulting experts used the KRIS database to test whether, for the period under study, each bank's daily sealed LIBOR quote correlates with the bank's estimated PD that day for the same maturity term (provided by KRIS).  For example, the consultants examined the correlation between Bank of America's sealed quote for three-month LIBOR on each date with the three-month PD for Bank of America, as provided by the KRIS database on that same day.  As explained above, standard finance theory implies that a positive correlation between a bank's PD and its LIBOR quote should exist—*i.e.*, as the bank's default risk (PD) increases, its borrowing rate (LIBOR quote) should increase, and *vice versa*.  That is, using the above example, standard finance theory predicts a positive correlation between Bank of America's three-month PD and its three-month LIBOR quote.  A finding of either a zero or negative correlation between a bank's PD and its LIBOR quote indicates the latter does not reflect the bank's default-risk probability, which evidences LIBOR suppression.  A negative correlation means the two values have an inverse relationship; as one goes up, the other tends to

go down. A statistically significant negative correlation between a bank's LIBOR quote and its PD is consistent with the bank's reducing its LIBOR quote in order to mask its higher risk exposure during a period of financial crisis, such as during the 2007-2008 period. By submitting an artificially low LIBOR quote, the bank sends a false signal that it is less risky than it truly is.

79.    Plaintiffs' consulting experts found suppression over the 2007-2008 period for one-month, three-month, six-month, and 12-month LIBOR.

80.    The LIBOR quotes for all the reporting banks (except HSBC) during 2007 were *negatively correlated* with their daily updated PDs (for the same maturity term) to a statistically significant degree. For example, the correlation between Bank of America's daily LIBOR quotes and its daily PDs, for example, was negative and statistically significant at a very high level for the one-month, three-month, six-month and 12-month terms, *i.e.*, between -0.5857 and -0.6093.[29] In other words, the data indicate that, contrary to fundamental finance theory, the higher a panel bank's PD was, the *lower* its LIBOR quote was.

81.    Performing the same analysis with respect to the LIBOR panel banks' daily LIBOR quotes and PDs during 2008, the expert consultants found that for all of the banks, the submitted LIBOR quotes were negatively correlated with their PDs at the one-month and three-month maturities. Indeed, all of the banks were submitting unduly low LIBOR quotes at all maturities during the time period from August 9, 2007 until September 12, 2008, and, with only one exception, from September 15 through December 31, 2008, the period following the Lehman bankruptcy.

82.    The following graphs illustrate the findings of this expert analysis—which demonstrates a striking negative correlation between USD-LIBOR panel banks' LIBOR quotes and PDs during 2007 and 2008, indicating they severely depressed LIBOR during that time.

---

[29] Correlation coefficients range from a value of -1 to 1. A correlation coefficient of -0.50, for example, would imply that a 1% increase in PD would result in a 50-basis point decline in the bank's LIBOR quote.

**Graph 1**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**One-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph2**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Three-Month Term**



(Note: PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 3**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Six-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 4**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Twelve-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)