**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 Master File No. 1:11-md-2262-NRB ECF Case |
| THIS DOCUMENT RELATES TO:  EXCHANGE-BASED PLAINTIFF ACTION | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE EXCHANGE-BASED PLAINTIFFS' CLAIMS**

**Table of Contents**

**Page**

Preliminary Statement..................................................................................................1

Factual Background .....................................................................................................3

    A.       Defendants And The LIBOR Process ...................................................3

    B.       Plaintiffs And The Eurodollar Futures Contracts They Traded.............4

    C.       The CEA Allegations In The Amended Complaint ...............................5

ARGUMENT ...............................................................................................................6

I.       PLAINTIFFS' CEA CLAIMS ARE TIME-BARRED...........................................6

    A.       Plaintiffs Were On Inquiry Notice Before April 15, 2009....................6

    B.       Plaintiffs Fail To Plead Fraudulent Concealment ...............................10

II.     PLAINTIFFS' CEA CLAIMS MUST BE DISMISSED AS IMPERMISSIBLY EXTRATERRITORIAL .........................................................13

    A.       The CEA Has No Extraterritorial Application......................................13

    B.       The Relevant CEA Provisions Focus On Domestic Manipulation Of Commodities. .................................................................14

    C.       The Manipulation Of Commodity Prices Alleged By Plaintiffs Is Entirely Foreign, And Therefore Is Not Actionable Under The CEA ................................15

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR MANIPULATION UNDER THE CEA .......................................................................17

    A.       Plaintiffs Fail To Plead A Manipulation Claim ...................................17

          1.      Plaintiffs' Allegations Fail To Satisfy The Heightened Pleading Standard Under Rule 9(b)........................................18

          2.      The Amended Complaint Fails To Allege Manipulative Conduct...........19

               a.      The Amended Complaint Fails To Specify What Manipulative Acts Were Performed..............................19

               b.      The Amended Complaint Fails To Specify Which Defendants Performed The Unidentified Manipulative Acts.............................20

               c.      The Amended Complaint Fails to Specify When The Manipulative Acts Were Performed .............................21

          3.      The Amended Complaint Fails To Allege A Loss Caused By Defendants' Alleged Manipulation...........................22

          4.      The Amended Complaint Fails To Allege That Defendants Specifically Intended To Manipulate USD LIBOR..................24

    B.       Plaintiffs Fail to State A Claim For Aiding And Abetting Under The CEA .........28

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT .................29

Conclusion ............................................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................29, 30

*Bamberg v. SG Cowen,*
    236 F. Supp. 2d 79 (D. Mass 2002) ..............................................................8

*Benak v. Alliance Capital Mgmt. L.P.,*
    435 F.3d 396 (3d Cir. 2006)...........................................................................8

*Bingham v. Zolt,*
    683 F. Supp. 965 (S.D.N.Y. 1988) ..............................................................11

*Campo v. Sears Holding Co.,*
    371 F. App'x 213 (2d Cir. 2010) .................................................................26

*Camreta v. Greene,*
    131 S. Ct. 2020 (2011).................................................................................24

*CFTC v. Garofalo,*
    No. 10 C 2417, slip op. (N.D. Ill. filed Dec. 21, 2010) ..............................15

*Compagnia Importazioni Esportazioni Rapresentanze v. L-3 Commc'ns Corp.,*
    No. 06 Civ. 3157(NRB), 2007 WL 2244062 (S.D.N.Y. July 31, 2007)................................16

*Concorde Funds, Inc. v. Value Line, Inc.,*
    No. 04-9932, 2006 WL 522466 (S.D.N.Y. Mar. 2, 2006).....................................22

*Corsello v. Verizon New York, Inc.,*
    18 N.Y.3d 777 (2012) ..................................................................................31

*DeBenedictis v. Merrill Lynch & Co., Inc.,*
    492 F.3d 209 (3d Cir. 2007)...........................................................................8

*DiPlacido v. CFTC,*
    364 F. App'x 657 (2d Cir. 2009) .............................................................17, 24

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005).................................................................................23, 24

*Eaves v. Designs for Fin., Inc.,*
    785 F. Supp. 2d 229 (S.D.N.Y. 2011)..........................................................22

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009)...................................................................8

*Georgia Malone & Co. v. Rieder*,
   No. 132, 2012 WL 2428246 (N.Y. June 28, 2012)..............................................30

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
   580 F. Supp. 2d 321 (S.D.N.Y. 2008)...................................................................7

*Hershey v. Energy Transfer Partners L.P.*,
   610 F.3d 239 (5th Cir. 2010) ...............................................................................27

*Hershey v. PIMCO LLC*,
   697 F. Supp. 2d 945 (N.D. Ill. 2010) ...................................................................23

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ....................................................................23, 24

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008)........................................................... passim

*In re Anthony J. DiPlacido*,
   No. 01-23, 2008 WL 4831204 (C.F.T.C. 2008) ...................................................28

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)................... passim

*In re Energy Transfer Partners Litig.*,
   No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009).............23, 24, 25

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
   No. CIVA503MD1530TJW, MDL-1530, 2004 WL 5278716 (E.D. Tex. June 16,
   2004)......................................................................................................................8

*In re Indiana Farm Bureau Coop. Ass'n*,
   No. 75-14, 1982 WL 30249 (C.F.T.C. 1982) ......................................................25

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998).................................................................................12

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004).................................................................6

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005).....................................................18, 19, 29

*In re Platinum & Palladium Commodities Litig.*,
   No. 10-3617, 2011 WL 4048780 (S.D.N.Y. Sept. 13, 2011) ...............17, 23, 27, 28

*In re UBS Sec. Litig.*,
 No. 07 Civ. 11225 (RJS), 2011 WL 4059356 (S.D.N.Y. Sept. 13, 2011).............................17

*In re Ultrafem Inc. Sec. Litig.*,
 91 F. Supp. 2d 678 (S.D.N.Y. 2000)........................................................................................8

*Koch v. Christie's Int'l PLC*,
 785 F. Supp. 2d 105 (S.D.N.Y. 2011)..........................................................................6, 11, 12

*Kolbeck v. LIT Am., Inc.*,
 923 F. Supp. 557 (S.D.N.Y. 1996) ................................................................................ *passim*

*Lane v. Page*,
 649 F. Supp. 2d 1256 (D.N.M. 2009) .....................................................................................8

*Leist v. Simplot*,
 638 F.2d 283 (2d Cir. 1980).....................................................................................................4

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)...............................................................................................................24

*Mandarin Trading Ltd. v. Wildenstein*,
 16 N.Y.3d 173, 944 N.E.2d 1104 (2011)...............................................................................30

*Mills v. Polar Molecular Corp.*,
 12 F.3d 1170 (2d Cir. 1993)...................................................................................................21

*Moll v. U.S. Life Title Ins. Co. of New York*,
 700 F. Supp. 1284 (S.D.N.Y. 1988).......................................................................................11

*Morrison v. National Australia Bank Ltd.*,
 130 S. Ct. 2869 (2010)................................................................................................13, 14, 15

*New York v. Hendrickson Bros., Inc.*,
 840 F.2d 1065 (2d Cir. 1988).................................................................................................11

*O'Brien v. Nat'l Prop. Analysts Partners*,
 719 F. Supp. 222 (S.D.N.Y. 1989) .........................................................................................11

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
 648 F.3d 533 (7th Cir. 2011) ....................................................................................7, 9, 10, 11

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
 No. 10 Civ. 2737 (LAK), 2011 U.S. Dist. LEXIS 66419 (S.D.N.Y. June 22, 2011).............28

*Reading Int'l v. Oaktree Cap. Mgmt.*,
 317 F. Supp. 2d 301 (S.D.N.Y. 2003).....................................................................................30

*Redtail Leasing, Inc. v. Bellezza*,
    No. 95 Civ. 5191 (JFK), 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)......................30

*S & A Farms, Inc. v. Farms.com, Inc.*,
    678 F. 3d 949, 2012 WL 1935086 (8th Cir. May 30, 2012)................................23

*S.E.C. v. Jones*,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007)..................................................11

*S.E.C. v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)..................................................28

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006).............................................................8

*Statistical Phone Philly v. NYNEX Corp.*,
    116 F. Supp. 2d 468 (S.D.N.Y. 2000)..................................................11

*Tab P'ship v. Grantland Fin. Corp.*,
    866 F. Supp. 807 (S.D.N.Y. 1994) ....................................................7

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ...........................................................28

*Three Crown Ltd. P'ship v. Caxton Corp.*,
    817 F. Supp. 1033 (S.D.N.Y. 1993).....................................................21

*Tomlinson v. Goldman, Sachs & Co.*,
    682 F. Supp. 2d 845 (N.D. Ill. 2009) .........................................6, 10, 11

**STATUTES**

15 U.S.C. § 1 ..............................................................................1

7 U.S.C. § 1a(30)(A), (B) ...............................................................14

7 U.S.C. § 2.............................................................................2, 14

7 U.S.C. § 6c(a), and (b) ...............................................................15

7 U.S.C. § 13(a)(2)..............................................................1, 2, 14, 15

7 U.S.C. § 25 ...........................................................................6, 15

15 U.S.C. § 78c(a)(17).....................................................................14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .................................................................. passim

http://bbalibor.com/technical-aspects/fixing-value-and-maturity .................................................16

http://www.bbalibor.com/bbalibor-explained/the-basics ..........................................................3, 20

http://www.bbalibor.com/governance .........................................................................................16

http://www.bbalibor.com/technical-aspects/setting-bbalibor .....................................................16

http://www.cmegroup.com/trading/interest-
    rates/files/IR148_Eurodollar_Futures_final.pdf ...................................................................4

JPMorgan Annual Report at 116 (2008), *available at*
    http://investor.shareholder.com/jpmorganchase/annual.cfm. ..................................................27

JPMorgan Annual Report at 131 (2009), *available at*
    http://investor.shareholder.com/jpmorganchase/annual.cfm. ..................................................26

Defendants[1] submit this memorandum of law in support of their motion to dismiss the claims brought by the Plaintiffs in the Amended Consolidated Class Action Complaint (the "Amended Complaint" or "Am. Compl.") filed in the "Exchange-Based Plaintiff Action."[2]

### Preliminary Statement

Plaintiffs' principal claims are asserted under the Commodity Exchange Act (the "CEA"). Plaintiffs' theory is that Defendants made certain submissions to the British Bankers' Association ("BBA")—a U.K.-based trade organization that calculates a reference interest rate known as the U.S. Dollar London Interbank Offered Rate ("USD LIBOR")—that were intentionally too low, which caused USD LIBOR to be artificially "depressed." Am. Compl. ¶ 5. Plaintiffs allege that at unspecified times during the Class Period, various Defendants "underreported" their answers to the BBA "LIBOR question": "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am [London time]?" *Id.* ¶¶ 6, 13. This, Plaintiffs aver, caused USD LIBOR "to be set artificially low." Plaintiffs claim that Defendants therefore "manipulated" the price of a "commodity in interstate commerce, or for future delivery, or on or subject to the rules of any" futures exchange in violation of Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2) ("Section 9(a)(2)") (First Claim for Relief), and are also liable "for the manipulative acts of

---

[1] This memorandum is submitted on behalf of Bank of America Corporation, Bank of America, N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., Citibank, N.A., Citigroup, Inc., Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, The Norinchukin Bank, Royal Bank of Canada, The Royal Bank of Scotland Group plc, and WestLB AG.

[2] The "Exchange-Based Plaintiffs" ("Plaintiffs") are Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, Gary Francis and Nathanial Haynes. This memorandum addresses all of the claims in the Amended Complaint in the Exchange-Based Plaintiff Action other than the Fourth Claim for Relief, which is a claim for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. That claim is addressed in the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims (the "Antitrust Memorandum"), submitted concurrently with this memorandum. To the extent the Antitrust Memorandum addresses the factual background common to the antitrust and CEA claims, Defendants incorporate by reference the discussion in the Antitrust Memorandum rather than repeat what is stated there.

[unnamed] agents, representatives and/or other persons acting for them" under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1) (Second Claim for Relief), and for aiding and abetting violations of Section 9(a)(2) by other (unidentified) Defendants (Third Claim for Relief). *See* Am. Compl. ¶¶ 228-44. Plaintiffs further claim that Defendants were unjustly enriched by the alleged manipulation. (Fifth Claim for Relief). *Id.* ¶¶ 250-53. According to Plaintiffs, this LIBOR manipulation had the effect of increasing the cost to Plaintiffs of purchasing Eurodollar futures contracts (which are priced inversely to 3-month USD LIBOR).

These claims should be dismissed for the following four reasons.

*First*, the CEA claims are time-barred. The CEA has a two-year limitations period for claims by private parties, and claims "arise" when a party is placed on inquiry notice of the violation. Plaintiffs' own Amended Complaint sets forth *Wall Street Journal* articles and other publicly available sources that put them on inquiry notice well over two years before they filed the first of their complaints.

*Second*, Plaintiffs' CEA claims are impermissibly extraterritorial. Their claims are all based on alleged manipulation in London of a London-based "commodity," but the CEA has no extraterritorial scope; claims that allege foreign manipulation of a foreign "commodity" may not be maintained under the statute.

*Third*, Plaintiffs have failed to state a claim under the CEA upon which relief can be granted. Plaintiffs have not pleaded at all, and certainly not with the particularity demanded by Rule 9(b) of the Federal Rules of Civil Procedure, the elements of a manipulation claim. The Amended Complaint is devoid of particularized allegations of, for example, what acts of manipulation were performed by which Defendant and when they were performed. The Class Period (August 2007 – May 2010) covers approximately 700 dates on which each of the 16

members of the USD LIBOR panel submitted rates for 15 different maturities, but Plaintiffs fail to identify any particular submission by any Defendant that was allegedly manipulative. Plaintiffs have not pointed to a single instance in which any Defendant committed a manipulative act, but instead improperly lump all Defendants and all submissions together and state generally that they were "manipulative."  Nor have Plaintiffs alleged that their damages were a result of any Defendant's alleged manipulation, or that any Defendant had the requisite specific intent to manipulate the price of any commodity.  In addition, Plaintiffs' conclusory pleading fails to state a claim for aiding and abetting.

*Fourth*, Plaintiffs have failed to state a claim for unjust enrichment.  Plaintiffs have alleged no direct relationship with Defendants, as required to establish such a quasi-contractual claim, and moreover, their vague allegations of inequity fail to satisfy federal pleading standards.

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice in its entirety.

## Factual Background

### A.    Defendants And The LIBOR Process

Defendants are sixteen banks that were designated by the BBA to contribute to the determination of USD LIBOR during the Class Period.  Their contributions were made in London between 11:00 and 11:10 a.m. London time on any weekday that is not a bank holiday in the United Kingdom.  *See* http://www.bbalibor.com/bbalibor-explained/the-basics (last visited June 28, 2012).

An overview of the process by which LIBOR in various currencies is determined, together with a description of certain uses of LIBOR as a benchmark rate, is set forth in the Antitrust Memorandum at 7-8.

### B.     Plaintiffs And The Eurodollar Futures Contracts They Traded

Plaintiffs are four companies and two individuals who allegedly "traded," on unspecified dates, "on-exchange based products tied to [USD] LIBOR such as Eurodollar futures [contracts]."[3] Am. Compl. ¶¶ 20-26.  For example, the first-named plaintiff, Metzler Investment GmbH, is a German fund company that manages assets totaling approximately € 47 billion (equivalent to approximately $59 billion).  *Id.* ¶ 20.  Without furnishing any further information—such as when they purchased such contracts, at what prices, whether they sold them, and if so, at what prices—Plaintiffs allege that they "purchased standardized [Chicago Mercantile Exchange ("CME")] Eurodollar futures contracts."  *Id.* ¶ 214.

According to the CME's website,  the instrument underlying a Eurodollar futures contract is a "Eurodollar Time Deposit having a principal value of USD $1,000,000 with a three-month maturity, and the final settlement of the contract is "[c]ash settlement to 100 minus the British Bankers' Association survey of 3-month [USD] LIBOR." http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_final.pdf (last visited June 28, 2012); *see also* Am. Compl. ¶ 203.  The CME defines Eurodollars as "U.S. dollars deposited in commercial banks outside the United States," *id.*, and Plaintiffs have embraced this definition.  *See* Am. Compl. ¶ 200 & n.85.  As the CME states, and Plaintiffs confirm, "Eurodollar futures [contracts] terminate trading at 11:00 A.M. London Time on the second London bank business day immediately preceding the third Wednesday of the contract's named month of delivery . . . ."  *Id.* ¶ 203.

---

[3] A commodity futures contract is "a bilateral executory agreement for the purchase and sale of a particular commodity."  *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980).  The seller (the "short") agrees to deliver the commodity at a fixed date in the future, and the buyer (the "long") commits to accept delivery and pay the agreed price.  *Id.*  Typically, the short and long liquidate their positions before delivery takes place by forming an opposite contract for the same quantity, so that the obligations will offset each other.  *Id.*

### C.      The CEA Allegations In The Amended Complaint

Plaintiffs allege in conclusory terms that "[t]hroughout the Class Period, Defendants . . . conspired to, and did, manipulate [USD] LIBOR by underreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market—*i.e.*, their true costs of borrowing—on a daily basis." *Id.* ¶ 13.  Plaintiffs allege that Defendants had two motivations to manipulate USD LIBOR downward: (1) "to portray themselves as economically healthier than they actually were"; and (2) "to pay lower interest rates on [USD] LIBOR-based financial instruments that Defendants sold to investors, and otherwise affect the price for LIBOR-based derivatives like Eurodollar futures." *Id.* ¶ 5.  Further detail about Plaintiffs' "motive" allegations is contained in the Antitrust Memorandum at 8-9.

To support their assertion that USD LIBOR was lower than it should have been throughout the Class Period, Plaintiffs rely heavily on various statistical analyses discussed in the Antitrust Memorandum at 9-10.  Moreover, Plaintiffs seek to bolster their allegations with references to ongoing investigations and proceedings involving certain U.S. and foreign governmental authorities, which are discussed in the Antitrust Memorandum at 10-11.

Plaintiffs contend that USD LIBOR is a "commodity" within the meaning of the CEA and that Defendants, by making unduly low submissions to the BBA around 11:00 am London time, intentionally "manipulated" the price of that "commodity."  Am. Compl. ¶ 207.  Plaintiffs do not, however, state the date(s) on which USD LIBOR was allegedly manipulated, which Defendants were responsible for each such act of manipulation, or how (or even whether) such manipulation caused them to suffer an actual trading loss.

<u>**ARGUMENT**</u>

**I.**    **PLAINTIFFS' CEA CLAIMS ARE TIME-BARRED**

Plaintiffs' claim for alleged manipulation under the CEA must "be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c) (2011). A cause of action "arises" under the CEA when a party is placed on inquiry notice of the violation. *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004) ("*In re Natural Gas I*"). Here, the Amended Complaint establishes that Plaintiffs were on inquiry notice more than two years before they first filed an action asserting CEA claims, and thus that those claims are time-barred.[4]

**A.**    **Plaintiffs Were On Inquiry Notice Before April 15, 2009**

In calculating the CEA's two-year statute of limitations, inquiry notice arises "when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded." *Id.* (quoting *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 564 (S.D.N.Y. 1996)). The test for inquiry notice "'is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings.'" *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011) (quoting *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996)). "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Tomlinson v. Goldman, Sachs & Co.*, 682 F.

---

[4] The first LIBOR-related complaint asserting CEA claims was filed on April 15, 2011. *See FTC Capital GmbH et al. v. Credit Suisse Group AG et al.*, No. 11-CV-2613 (NRB). Therefore, the CEA claims are time-barred if Plaintiffs were on inquiry notice of their claims before April 15, 2009.

Supp. 2d 845, 847 (N.D. Ill. 2009), *aff'd*, *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011).[5]

Here, to the extent Plaintiffs otherwise could have stated any claim under the CEA, it is clear from the Amended Complaint that Plaintiffs were on inquiry notice well before April 15, 2009.[6]  For example, Plaintiffs cite the following publicly available sources:

- An April 16, 2008 *Wall Street Journal* article noting that LIBOR diverged from its "historical relationship" with the Federal Reserve rate.  Am. Compl. ¶ 108.

- An April 17, 2008 *Wall Street Journal* article titled "British Bankers Group Steps Up Review of Widely Used Libor," which highlighted the BBA's review of LIBOR submissions and noted "questions about whether banks are submitting rates that accurately reflect actual borrowing costs." *Id.* ¶ 115.

- An April 18, 2008 *Wall Street Journal* article titled "Libor Surges After Scrutiny Does, Too," which cited a credit strategist's belief that "three-month USD-LIBOR was .4 percentage points – or 40 basis points – below where it should be." *Id.* ¶ 46.  The article observed that USD LIBOR "took its largest jump since the advent of the credit crisis in a sign that banks could be responding to increasing concerns that the rate doesn't reflect their actual borrowing costs."

- An April 2008 report by Citigroup stating that LIBOR "no longer represents the level at which banks extend loans to others" and "may understate actual interbank lending costs by 20-30 bps." *Id.* ¶¶ 5, 46 n.19.

- A May 29, 2008 *Wall Street Journal* article titled "Study Casts Doubt on Key Rate – WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," which raised concerns about underreporting of USD LIBOR.  The article revealed that five panel banks "have been reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggests they should be." *Id.* ¶¶ 12 n.17, 84, 87.  A Stanford professor was quoted as saying

---

[5] Courts may consider "the sophistication of a plaintiff investor in evaluating issues of inquiry notice . . . because an investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced that investor to inquire into the likelihood of fraud involving his or her investment."  *Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 811 n.3 (S.D.N.Y. 1994); *see also GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 328 (S.D.N.Y. 2008).  Here, Plaintiffs are sophisticated institutional investors.  *See, e.g.*, Am. Compl. ¶ 20 (plaintiff Metzler Investment GmbH is a "fund company that launches and manages investment funds," including "derivative funds" and "general and specialized investment funds").

[6] As discussed in Section III, *infra*, Plaintiffs fail to state a claim under the CEA with the particularity demanded by Fed. R. Civ. P. 9(b).  However, even if Plaintiffs' allegations were legally sufficient, the facts they rely upon were available to them more than two years before they brought suit.

that "banks LIBOR quotes [were] 'far too similar to be believed'" and estimated that "underreporting of LIBOR had a $45 billion effect." *Id.* ¶¶ 12, 87-94.

- A May 29, 2008 *Bloomberg* article, which reported "that banks routinely misstated borrowing costs to the BBA to avoid the perception that they faced difficulty raising funds as credit markets seized up." *Id.* ¶ 46.

- A September 24, 2008 *Wall Street Journal* article titled "Libor's Accuracy Becomes Issue Again," which "raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction." *Id.* ¶ 109.

- A February 2009 article from the North Carolina Banking Institute discussing "irregularities" in USD LIBOR and exploring whether banks were misrepresenting borrowing costs. *Id.* ¶ 86.

Every one of the *Wall Street Journal* articles cited above is exactly the type of widely read press article that has been held to start the statute of limitations period running.[7]

Despite their heavy reliance on these articles, Plaintiffs attempt to downplay them as a "smattering of statements in late 2007-early 2008 questioning LIBOR's viability." *Id.* ¶ 197. But Plaintiffs offer no explanation why these articles did not put them on inquiry notice. Even leaving the news articles aside, the Amended Complaint relies extensively upon other public data from 2007-08 in an effort to support the claims alleged. For example, Plaintiffs rely on the following analyses:

- An analysis comparing "USD-LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks—as determined, and updated daily for each maturity (term) by Kamakura Risk Information Services ('KRIS')." *Id.* ¶ 73. Analyzing only some of the panel

---

[7] *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692-93 (S.D.N.Y. 2000) (one article led to inquiry notice where it discussed the same issues that formed the basis for some of plaintiffs' claims); *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 217-18 (3d Cir. 2007) (*Wall Street Journal* article and other publications placed plaintiff on inquiry notice); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 403 (3d Cir. 2006) (same); *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) ("Information contained in articles in the financial press may trigger the duty to investigate"); *Lane v. Page*, 649 F. Supp. 2d 1256, 1302-03 (D.N.M. 2009) (*Wall Street Journal* article triggered inquiry notice); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1280-81 (M.D. Fla. 2009) (same); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 85 (D. Mass 2002) (securities claims dismissed as time-barred based in part on a series of *Wall Street Journal* articles); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, MDL-1530, 2004 WL 5278716, at *47 (E.D. Tex. June 16, 2004) (inquiry notice began at the latest by the date of a *Wall Street Journal* article discussing the alleged conduct).

banks, Plaintiffs' "consulting experts" supposedly "found [LIBOR] suppression over the 2007-2008" period.  *Id.* ¶¶ 73-82.

- A purported analysis showing that some Defendants increased their USD LIBOR submissions on April 17, 2008.  *Id.* ¶¶ 115-21.

- An analysis of the "spread" between USD LIBOR and the Federal Reserve Eurodollar Deposit Rate, which according to Plaintiffs, "provide[s] a strong basis" to conclude that Defendants colluded to artificially suppress LIBOR.  *Id.* ¶¶ 55, 58.  The data purports to show "unusual downward movements" in the spread between these two rates "starting in August 2007," which became most severe between August 2008 and about February of 2009.  *Id.* ¶¶ 59, 60.

Plaintiffs could have performed these analyses in 2008—the data underlying them was *updated and published on a daily basis*.  Indeed, several of Plaintiffs' data comparisons duplicate comparisons the popular press conducted and reported on in 2008.[8]

Plaintiffs provide no valid excuse for their bringing suit beyond the statute of limitations.  Nor do they allege any significant event or disclosure that occurred between the time the *Wall Street Journal* articles ran in 2008 and the time they finally filed their first complaint in April 2011.

Aware of their statute of limitations problem, Plaintiffs seek to circumvent the time bar by asserting that they could not have had notice of their claims until March 15, 2011, when one Defendant disclosed in a footnote in its Form 20-F that it had "received subpoenas" from regulatory agencies.  *Id.* ¶¶ 137, 182, 197.  This disclosure, however, did not reveal any new information to the public, and Plaintiffs' argument is not plausible as a matter of law.  *See Premium Plus*, 648 F.3d at 537 (inquiry notice arose well before the filing of an SEC complaint

---

[8] For example, the May 29, 2008 *Wall Street Journal* article discussed *supra* raised concerns that some banks were "reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggests"—a principal theory of the Amended Complaint.  Am. Compl. ¶¶ 87−94.  The article also reported on a study that showed a variance between Defendants' LIBOR quotes and their CDS costs, the same study that appears in the Amended Complaint.  *Id.* ¶¶ 84, 87.

revealing no new facts to the public; inquiry notice does not focus on "what a federal agency such as the SEC believes").

According to Plaintiffs, the disclosure of subpoenas was the first purported revelation that Defendants "*knowingly*" colluded to suppress LIBOR.  Am. Compl. ¶ 197.  But the receipt of a regulatory subpoena is not evidence of Defendants' scienter, and even if it was, evidence of scienter is not necessary to trigger inquiry notice.  "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."  *Tomlinson*, 682 F. Supp. 2d at 847 (internal quotation and citation omitted); *see also Premium Plus*, 648 F.3d at 536-37.  Here, the harm alleged by Plaintiffs is depressed investment returns because USD LIBOR was suppressed.  Am. Compl. ¶¶ 15, 236-37.  On that issue, there were numerous articles that revealed the very harm about which Plaintiffs now complain.  *Id.* ¶ 93 (article disclosing that an "underreporting of LIBOR had a $45 billion effect on the market"); *id.* ¶ 12 (article noting that "even a small manipulation" of LIBOR "could potentially distort capital allocations all over the world"); *id.* ¶ 109 (article "raised further concerns" about LIBOR being too low).  These articles put Plaintiffs on inquiry notice of the harm they allege.

### B.    Plaintiffs Fail To Plead Fraudulent Concealment

Recognizing that their CEA claims are time-barred, Plaintiffs allege fraudulent concealment to try to toll the limitations period.  *Id*. ¶¶ 182-99.  However, Plaintiffs' allegations of fraudulent concealment fall well short of what is required by law.

To establish fraudulent concealment, a plaintiff must allege that "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period

plaintiff seeks to have tolled." *Koch*, 785 F. Supp. 2d at 116. These elements must be pleaded with particularity. *Id.*; *see also Kolbeck*, 923 F. Supp. at 565.

Here, Plaintiffs do not come close to satisfying this pleading standard. On the first element, Plaintiffs must show "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Plaintiffs are unable to plead this element because they rely only on Defendants' statements denying wrongdoing. *See* Am. Compl. ¶¶ 188-96. "Taking plaintiffs' theory to its logical extreme, so long as a defendant denies wrongdoing or characterizes the available evidence in its favor, the statute of limitations cannot begin to run. This argument is plainly without merit." *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 483 (S.D.N.Y. 2000); *see also Tomlinson*, 682 F. Supp. 2d at 848; *Premium Plus*, 648 F.3d at 536-37.[9] Plaintiffs also allege that Defendants failed to publicly disclose expected borrowing costs and internal communications (Am. Compl. ¶ 186), but allegations of concealment by mere silence are insufficient as a matter of law. *S.E.C. v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007); *Moll v. U.S. Life Title Ins. Co. of New York*, 700 F. Supp. 1284, 1290-91 (S.D.N.Y. 1988).

Moreover, any claim that the conduct was self-concealing (Am. Compl. ¶ 185) is contradicted by the Amended Complaint. As noted above, Plaintiffs rely heavily on allegations that the accuracy of USD LIBOR was questioned by many market participants and journalists in 2008. In fact, Plaintiffs seek to support their legal theories almost exclusively with information that was *publicly available prior to April 2009*. These allegations distinguish the alleged

---

[9] Even if these allegations were sufficient, the limitation period is only tolled "as to those defendants who committed the concealment," *Bingham v. Zolt*, 683 F. Supp. 965, 975, (S.D.N.Y. 1988), and Plaintiffs have not alleged concealment by each named defendant nor could they. *See O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989).

conduct from traditional price fixing or other conspiracies that have been held to be self-concealing.  In addition, Plaintiffs cannot claim to have been unaware of Defendants' USD LIBOR submissions, which were published daily and served as the basis for the public reports that Plaintiffs now seek to rely on.  *Id.* ¶ 6 ("Thomson Reuters then published [USD] LIBOR, also reporting the quotes on which the BBA based its [USD] LIBOR calculation.").

Plaintiffs also fail to satisfy the second element of fraudulent concealment—*i.e.*, that they remained unaware of the violation during the limitations period.  *Kolbeck*, 923 F. Supp. at 565.  Even if some information was concealed, Plaintiffs have not alleged why the information that was available did not place them on inquiry notice.  *See Koch*, 785 F. Supp. 2d at 117 (fraudulent concealment must actually succeed in depriving plaintiffs of notice).  Plaintiffs cannot reasonably claim to have been unaware of the pre-April 2009 public reports on which they now rely.

On the final prong of the fraudulent concealment defense, Plaintiffs fail to allege facts sufficient to demonstrate diligence in pursuing discovery of their claims.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (plaintiffs bear the burden to allege what they did to investigate the possibility of fraud).  For example, Plaintiffs do not allege what steps, if any, they took in response to public reports "in late 2007-early 2008 questioning LIBOR's viability."  Am. Compl. ¶ 197.  There are no allegations concerning what inquiries Plaintiffs made, "when such inquiries were made, to whom, regarding what, and with what response."  *In re Merrill Lynch*, 154 F.3d at 60.  To the contrary, Plaintiffs rely almost entirely on articles and data publicly available before April 2009.

In sum, Plaintiffs' CEA claims were first filed more than two years after they arose, and Plaintiffs fail to plead a legal basis to toll the limitations period.  Accordingly, the CEA claims should be dismissed as time-barred.

## II.  PLAINTIFFS' CEA CLAIMS MUST BE DISMISSED AS IMPERMISSIBLY EXTRATERRITORIAL

In *Morrison v. National Australia Bank Ltd*., the Supreme Court made clear that American laws, such as the CEA, do not apply outside the territorial jurisdiction of the United States unless Congress has clearly manifested extraterritorial intent.  130 S. Ct. 2869, 2878 (2010).  Because the CEA explicitly extends only to domestic manipulation of commodities, and both USD LIBOR and the alleged manipulation thereof are foreign, the Plaintiffs cannot state a claim under the CEA.

### A.    The CEA Has No Extraterritorial Application

In *Morrison*, the Supreme Court reaffirmed the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  130 S. Ct. at 2877 (quotations omitted).  The Supreme Court unequivocally held that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Id.* at 2878-79.  In *Morrison*, because there was no such "affirmative indication" in Section 10(b) of the Exchange Act, the statute had only domestic application.  *Id*. at 2883.  The *Morrison* Court thus abrogated the "conduct" and "effects" test by which lower federal courts had justified extraterritorial application of certain U.S. statutes, explaining that it was "judicial-speculation-made-law" that was "complex in formulation and unpredictable in application."  *Id.* at 2878-81.

The Supreme Court's holding in *Morrison* applies with equal force to the CEA claims asserted by Plaintiffs.  The provisions of the CEA at issue here lack any affirmative indication

that they should be applied extraterritorially.  To the contrary, Section 9(a)(2)—the prohibition on manipulation that is the central basis for liability asserted by Plaintiffs—is expressly limited to attempted or actual manipulation of "the price of any commodity *in interstate commerce*, or for future delivery on or subject to the rules of any registered entity, or of any swap."  7 U.S.C. § 13(a)(2) (emphasis added).[10]  Congress could not have been more clear.  Far from containing an "affirmative indication" of extraterritorial reach, Congress explicitly limited the reach of the CEA manipulation provisions to domestic commodities.  Plaintiffs also rely on the CEA provisions for vicarious liability and aiding and abetting, 7 U.S.C. §§ 2, 25.  But like Section 10(b) and the Exchange Act construed in *Morrison,* those provisions lack any mention of foreign commerce or international application.  None of the CEA provisions on which this action is based has extraterritorial reach.[11]

### B.     The Relevant CEA Provisions Focus On Domestic Manipulation Of Commodities.

As the *Morrison* Court noted, it is the "rare case" that has no contact with the United States.  130 S. Ct. at 2884.  To give the prohibition against extraterritorial application teeth, and to confirm the rejection of the "conduct" and "effects" tests, the Court explained that neither some alleged conduct within the United States, nor some effects in this country, would prevent dismissal due to a statute's territorial limitation.  *Id.* at 2884-85.  Rather, to determine whether an

---

[10] Congress drafted the CEA to be even more clearly domestic than the Exchange Act.  The CEA defines "interstate commerce" as commerce "between any State, territory, or possession, or the District of Columbia, and any place outside thereof" or "between points within the same State, territory, or possession, or the District of Columbia, but through any place outside thereof, or within any territory or possession, or the District of Columbia."  7 U.S.C. § 1a(30)(A), (B).  In contrast, the Exchange Act at issue in *Morrison* contains an express reference to "foreign" commerce.  *See* 15 U.S.C. § 78c(a)(17) ("The term 'interstate commerce' means trade, commerce, transportation, or communication among the several States, *or between any foreign country and any State*, or between any State and any place or ship outside thereof.") (emphasis added).  In *Morrison*, the Exchange Act's "general reference to foreign commerce" did not "defeat the presumption against extraterritoriality."  130 S. Ct. at 2882.  The CEA provisions at issue here, which do not even contain such a general reference, cannot overcome that presumption.

[11] The geographic scope of a statute does not limit the courts subject matter jurisdiction and is properly considered on a 12(b)(6) motion.

- 14 -

alleged statutory violation is beyond the territorial reach of a statute the Court must look to the "'focus' of congressional concern" in enacting the statutory provisions. *Id.* at 2884.

Although no court since *Morrison* has addressed the "focus" of the provisions of the CEA at issue here,[12] a review of the CEA's text makes that focus clear.  The CEA anti-manipulation provisions preclude intentional manipulation of the prices of (1) futures contracts traded on *domestic* exchanges or (2) the underlying *domestic* commodities.  *See* Section 9(a)(2), 7 U.S.C. § 13(a)(2); Section 22(a)(1), 7 U.S.C. § 25(a)(1).  Plaintiffs attempt to assert a manipulation claim by alleging that Defendants distorted USD LIBOR.  Plaintiffs claim that USD LIBOR is a "commodity," and "is the reference price for the futures contract just as the physical prices of soybean or silver are the reference price for their respective futures contracts traded on exchanges."  Am. Compl. ¶ 207.  Thus, the sole "focus" of the CEA that is relevant to this case is alleged manipulation of the cash commodity—in this case LIBOR—which the language of the CEA makes clear must be domestic.

**C.    The Manipulation Of Commodity Prices Alleged By Plaintiffs Is Entirely Foreign, And Therefore Is Not Actionable Under The CEA**

Plaintiffs' CEA claims concern only the foreign manipulation of USD LIBOR, a foreign commodity.  Plaintiffs' own allegations establish that LIBOR is a London-based and London-created reference rate based on the London interbank market.  The Eurodollar futures traded by Plaintiffs are based on "U.S. dollars deposited in commercial banks *outside the United States.*"  *Id.* ¶ 200 (emphasis added).  The LIBOR process is managed by BBA LIBOR Ltd., an entity that

---

[12] There are no published decisions post-*Morrison* on the extraterritorial reach of *any* provision of the CEA or on that statute's "focus."  However, a Magistrate Judge in the Northern District of Illinois considered the extraterritorial application of CEA Section 4c(a) and (b), 7 U.S.C. § 6c(a), and (b) (relating to "wash sales" and noncompetitive and deceptive commodities options trades), in an unreported Report and Recommendation, which concluded that the CEA did not apply extraterritorially.  *See CFTC v. Garofalo*, No. 10 C 2417, slip op. at 10-13 (N.D. Ill. filed Dec. 21, 2010).  A copy of the unreported *Garofalo* Report & Recommendation is attached as Exhibit 1.

is registered in England and Wales and headquartered in London. *See* http://www.bbalibor.com/governance (last visited June 28, 2012).[13]  The BBA selects banks for LIBOR panels "on the basis of activity in the *London* market." *See* http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited June 28, 2012) (emphasis added).  And it instructs those banks to contribute "[r]ates…for deposits: [1] made in the *London* interbank market in reasonable market size; [2] that are simple and unsecured; [3] governed by the laws of *England and Wales*; [and 4] where the parties are subject to the jurisdiction of the courts of *England and Wales*." *Id.* (emphasis added).  Banks make their contributions "between 1100 hrs and 1110 hrs, *London* time." *Id.* (emphasis added); *see also* Am. Compl. ¶ 7.[14]  LIBOR is then "constructed in *London*." *See* http://bbalibor.com/technical-aspects/fixing-value-and-maturity (last visited June 28, 2012) (emphasis added).  Plaintiffs themselves allege that Defendants perpetrated the manipulation by underreporting such rates to the BBA *in London*.  Am. Compl. ¶¶ 6, 13 (emphasis added).

Moreover, Plaintiffs make no plausible claim (*see* Section III.4 *infra*) that Defendants engaged in their alleged conduct with the intent to manipulate contracts on U.S. futures exchanges.  Rather, their central theory is that Defendants intended to manipulate USD LIBOR "to portray themselves as economically healthier than they actually were." Am. Compl. ¶ 5.  The sole U.S. connection pleaded by Plaintiffs is that the *effects* of this alleged foreign manipulation

---

[13]  Where, as here, plaintiffs rely on articles and other secondary sources in their pleadings, defendants may rely upon them in moving to dismiss, whether or not they are attached to the Amended Complaints. *See Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Commc'ns Corp.*, No. 06 Civ. 3157(NRB), 2007 WL 2244062, at *4 (S.D.N.Y. July 31, 2007) (Buchwald, J.) ("For purposes of dismissal, the complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

[14]  To the extent plaintiffs are attempting to allege a manipulation of Eurodollars, as opposed to USD LIBOR, their claim is still based on alleged manipulation of a foreign commodity.  The Eurodollar is a commodity that by its very definition ("U.S. dollars deposited in commercial banks outside the United States") (Am. Compl. ¶ 200) does not exist in the United States.

were felt on a domestic futures exchange, because Eurodollar futures contracts settle based on USD LIBOR.  *See id.* at 94 ("Defendants' suppression of LIBOR broadly impacted Eurodollar futures and options on futures" (capitalization altered)).  But after *Morrison,* such reliance on domestic effects is unavailing.  *See In re UBS Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2011 WL 4059356, at *8 (S.D.N.Y. Sept. 13, 2011) (explaining that the plaintiff's "re-articulation of the 'effects' test . . . was squarely rejected by the *Morrison* Court").  Plaintiffs' effort to plead violations of the CEA's manipulation provisions fails as a matter of law, because Plaintiffs have alleged merely the foreign manipulation of a foreign commodity, and the relevant statute has no extraterritorial scope.[15]  Accordingly, Plaintiffs' CEA claims must be dismissed.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR MANIPULATION UNDER THE CEA

Plaintiffs' CEA manipulation claims should also be dismissed for failure to state a claim. Plaintiffs have failed to plead the elements of a market manipulation claim at all, much less with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.  In addition, Plaintiffs have failed to state a claim for aiding and abetting.

### A.    Plaintiffs Fail To Plead A Manipulation Claim

The elements of a market manipulation claim under the CEA are: (i) that the defendant possessed an ability to influence market prices; (ii) that the defendant specifically intended to do so; (iii) that an artificial price existed; and (iv) that the defendant caused the artificial price. *DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009); *In re Platinum & Palladium Commodities Litig.*, No. 10-3617, 2011 WL 4048780, at *7 (S.D.N.Y. Sept. 13, 2011); *see also*

---

[15] Barclays' recent settlement with U.S. and foreign regulators does not alter this conclusion:  nothing in the settlement agreements refers to any Defendant or plausibly suggests that any Defendant was a party to any manipulative conduct, either within or outside the United States, that was alleged and/or admitted by Barclays.

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y.
June 28, 2007) (Buchwald, J.).

The Amended Complaint is replete with innuendo, ambiguity, and general allegations,
but short on particularized facts necessary to allege a CEA violation.[16]  The Amended Complaint
therefore fails to satisfy the heightened pleading requirements under Rule 9(b).

### 1.    Plaintiffs' Allegations Fail To Satisfy The Heightened Pleading Standard Under Rule 9(b)

A CEA manipulation claim that sounds in fraud must comply with the heightened
pleading requirements of Rule 9(b).  *See Crude Oil*, 2007 WL 1946553, at *5 (applying
Rule 9(b) where Defendants allegedly created a "false impression" regarding the supply of oil
that drove up prices for crude oil futures contracts); *In re Natural Gas Commodity Litig.*, 358 F.
Supp. 2d 336, 343 (S.D.N.Y. 2005) (applying Rule 9(b) where plaintiffs alleged a scheme to
manipulate the price of the natural gas futures market by falsely reporting physical market
transaction information to published indices) ("*In re Natural Gas II*"); *see also In re Amaranth
Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) ("[A] complaint that
alleges manipulation of commodities prices must satisfy Rule 9(b).").  Here, Plaintiffs'
manipulation claim sounds in fraud and is therefore subject to Rule 9(b).

The entire Amended Complaint is premised on the theory that Defendants made false
statements to the BBA in order to mislead the market.  *See* Am. Compl. ¶ 5.  Plaintiffs repeatedly
allege that Defendants "underreported," "masked," and "misrepresented," their "true" borrowing
costs to the BBA, *see id.* ¶¶ 13, 45, 184, and that this was done to provide "a false or misleading
impression of their financial strength."  *Id.* ¶ 14.  Just as in *In re Natural Gas II*, these allegations

---

[16] Even the purported scholarly studies on which Plaintiffs attempt to rely do not purport to implicate all of the panel banks and in some instances provide support for their dismissal.  *See* Antitrust Memorandum at Section I.C.

- 18 -

purport to describe "a scheme that is 'classically associated with fraud': the dissemination of '*inaccurate*, *misleading*, and *false trading information*.'" 358 F. Supp. 2d at 343 (emphasis in original); *see also Crude Oil*, 2007 WL 1946553, at *5 (applying Rule 9(b) where "the crux of plaintiffs' allegations is that defendants misled the market . . . resulting in artificial prices."). Thus, Plaintiffs' market manipulation claims are subject to Rule 9(b).

### 2.   The Amended Complaint Fails To Allege Manipulative Conduct

To state a claim for commodity market manipulation under Rule 9(b), a complaint must specify "what manipulative acts were performed, which Defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market." *Amaranth*, 587 F. Supp. 2d at 535; *see also In re Natural Gas II*, 358 F. Supp. 2d at 343-45.  The Amended Complaint provides no such information.  Instead, it broadly suggests a vast conspiracy—16 banks colluding to manipulate USD LIBOR for almost a three-year period—without specifying what manipulative acts were performed, by which Defendant, or when they were performed. Where, as here, the alleged manipulative scheme is described "in a wholly speculative and conclusory manner," the claim fails to satisfy Rule 9(b) and should be dismissed.[17]  *Id.*

### a.   The Amended Complaint Fails To Specify What Manipulative Acts Were Performed

None of the 250-plus paragraphs in the Amended Complaint states what specific acts Defendants performed to manipulate USD LIBOR.  Plaintiffs' "description" of the alleged manipulation amounts to nothing more than an overview of how BBA LIBOR is calculated and

---

[17] Plaintiffs make clear that their allegations are pled almost entirely upon information and belief.  *See* Am. Compl. ¶ 3.  But pleading based on "information and belief" is not a "'free license to base claims of fraud on speculation and conclusory allegations'; rather, the complaint must 'adduce specific facts supporting a strong inference of fraud.'" *Crude Oil*, 2007 WL 1946553, at *7 (citation omitted).  Implicitly acknowledging the deficiencies of their Amended Complaint, Plaintiffs state their belief that "evidentiary support for their allegations will come to light after a reasonable opportunity for discovery."  Am. Compl. ¶ 4.  However, as this Court has noted, "[i]t's black letter law that lawsuits are not to be filed in search of lawsuits."  Conf. Tr. at 4 (Mar. 1, 2012).  That is exactly what Plaintiffs are trying to do here.

the conclusion that Defendants conspired to manipulate USD LIBOR.  *See* Am. Compl. ¶¶ 5-13. The closest the Amended Complaint comes to alleging manipulative conduct is the generic and conclusory statement that Defendants depressed USD LIBOR by "underreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds." *Id.* ¶ 13.  But the vague assertion that Defendants "understat[ed] their borrowing costs," *id.* ¶ 46, provides no indication of what rate was underreported, by which Defendant, and when this alleged underreporting took place.

Plaintiffs' failure to identify what rate was "underreported" is emblematic of this deficiency.  As the Amended Complaint explains, USD LIBOR is "based on the rates that 16 major banks . . . would have to pay for an unsecured loan *for each designated maturity period*." *Id.* ¶ 6 (emphasis added).  In fact, USD LIBOR is published for 15 different maturities, resulting in 15 unique USD rates every day.  *See* http://www.bbalibor.com/bbalibor-explained/the-basics (last visited June 28, 2012).  Was every bank's USD LIBOR submission for every maturity understated on every day during the Class Period?  The Amended Complaint leaves Defendants guessing as to what has allegedly been manipulated, by whom and when the manipulation occurred.  Plaintiffs' conclusory assertions about Defendants' USD LIBOR reporting do not satisfy Rule 9(b).  *See Crude Oil*, 2007 WL 1946553, at *6 (dismissing CEA manipulation claim where plaintiffs could not "point to one specific instance" where defendants engaged in the allegedly manipulative conduct).

b.    **The Amended Complaint Fails To Specify Which Defendants Performed The Unidentified Manipulative Acts**

Likewise, the Amended Complaint fails to identify *which* Defendants performed the (unidentified) manipulative acts.  Under Rule 9(b), "in situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by

each defendant." *Id.*; *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *Kolbeck*, 923 F. Supp. at 569 ("In a case involving multiple defendants, Rule 9(b) mandates that the complaint inform *each* defendant of his alleged role in the deception.") (emphasis added).

Here, the generalized allegations in the Amended Complaint do not inform each Defendant of its role in the alleged scheme.  Other than being identified as panel bank members, several Defendants are barely mentioned in the Amended Complaint by name.  Instead, the Amended Complaint repeatedly refers to "Defendants" in the collective and lumps Defendants together in vague and conclusory allegations.  *See, e.g.*, Am. Compl. ¶¶ 2, 5, 13-15, 43, 45-48. "Such wide-scale clumping is unacceptable" and fails to satisfy Rule 9(b)'s particularity requirement.  *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993); *see also Crude Oil*, 2007 WL 1946553, at *6.  At best, the Amended Complaint impermissibly seeks to establish guilt by association, but this too is insufficient.  *Kolbeck,* 923 F. Supp. at 569 ("Broad allegations . . . that some defendants are guilty because of their association with others[] do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b).").

### c.   The Amended Complaint Fails to Specify When The Manipulative Acts Were Performed

Plaintiffs' allegations about when the manipulative acts supposedly occurred are also lacking.  The Amended Complaint is rife with vague references to nonspecific acts having occurred "during the Class Period"—which spans nearly three years and includes approximately 700 days on which USD LIBOR submissions were made.  *See, e.g.*, Am. Compl. ¶ 42 ("*During the Class Period*, Defendants . . . actively participated in the conspiracy.") (emphasis added). "Courts have consistently held that such a lengthy time-frame fails to satisfy the particularity

requirement of Rule 9(b)." *Crude Oil*, 2007 WL 1946553, at *6 (finding a four-year class period insufficient to satisfy Rule 9(b)); *cf. Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 248-49 (S.D.N.Y. 2011) (allegations insufficient under Rule 9(b) where plaintiffs alleged a one-year period within which six representations were allegedly made); *Concorde Funds, Inc. v. Value Line, Inc.*, No. 04-9932, 2006 WL 522466, at *5 (S.D.N.Y. Mar. 2, 2006) (Buchwald, J.) (finding a two-year time frame too lengthy to satisfy Rule 9(b)).  Thus, Plaintiffs' vague allegations as to "when" the manipulative acts took place do not meet Rule 9(b)'s heightened pleading standard.

*      *      *

As explained above, the Amended Complaint lacks any explanation of what manipulative acts occurred, which Defendant performed them, and when the manipulation occurred.  The Amended Complaint therefore fails to give Defendants fair notice of Plaintiffs' manipulation claims and should be dismissed.  *See Kolbeck*, 923 F. Supp. at 568 (dismissing CEA fraud claim under Rule 9(b) where plaintiffs' "foggy allegations . . . fail[ed] to notify defendants of . . . their own alleged wrongdoing and ma[de] it close to impossible to prepare a defense").

### 3.   The Amended Complaint Fails To Allege A Loss Caused By Defendants' Alleged Manipulation

Plaintiffs fail to allege that they suffered any loss, let alone a loss that was the result of Defendants' alleged manipulation.  This too requires dismissal of their claims.  *In re Energy Transfer Partners Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *10 (S.D. Tex. Aug. 26, 2009); *see Hershey v. PIMCO LLC*, 697 F. Supp. 2d 945, 954 (N.D. Ill. 2010) (loss causation is an element of private manipulation claim under CEA); *S & A Farms, Inc. v. Farms.com, Inc.*, 678 F. 3d 949, 2012 WL 1935086, at *3 (8th Cir. May 30, 2012) ("[P]laintiff is only authorized

to bring suit, and can only recover, for those [CEA] violations that caused the plaintiff to suffer 'actual damages.'").

In the case of a manipulation caused by false information, like the manipulation alleged here, plaintiffs must plead that they established a market position while prices were artificially inflated and exited the position at a loss after the artificiality subsided. *Energy Transfer*, 2009 WL 2633781, at *11; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005). In *Dura*, the Supreme Court explained that merely alleging an inflated purchase price is insufficient to establish loss causation. 544 U.S. at 342. If a plaintiff buys a security whose price is artificially inflated but sells before the artificiality changes, the plaintiff has not suffered a loss as a result of the artificial price. *Id.*[18] Here, Plaintiffs have alleged only that they purchased Eurodollar futures contracts at inflated prices and stated in conclusory terms that they were "harmed" by the alleged conduct. Am. Compl. ¶¶ 20-26. To adequately plead loss causation, they must allege that they sold those contracts at a loss and did so during a time when the price of Eurodollars had dropped because Defendants' manipulation was revealed or had ceased. *See Dura*, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."); *Energy Transfer*, 2009 WL 2633781, at *11 (rejecting conclusory allegation that plaintiffs purchased futures contracts at artificial prices and were "damaged as a direct result of

---

[18] Some courts have rejected the *Dura* analysis and allowed plaintiffs to rely on a presumption of causation where the alleged manipulation is the result of artificial trading that is designed to give the appearance of legitimate market activity. *See, e.g.*, *Platinum & Palladium*, 2011 WL 4048780, at *10; *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010). The Court should decline to apply that presumption here. Courts allowing the presumption have done so because the trading-based manipulations are "discrete events" that do not change the information available to the market. Once the illegal trading ceases, "the information available to the market is the same as before, and the stock [or commodity] price gradually returns to its true value." *Platinum & Palladium*, 2011 WL 4048780, at *10 (*citing In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 673-74 (S.D.N.Y. 2003)). This logic does not apply to an artificial price caused by false information, which will continue until the market receives new or different information. *See, e.g.*, *Dura*, 544 U.S. at 344-45.

Defendants' manipulation").  Plaintiffs have not done so, and their manipulation claims must be dismissed.[19]

### 4.   The Amended Complaint Fails To Allege That Defendants Specifically Intended To Manipulate USD LIBOR

Plaintiffs' manipulation claim also fails because the Amended Complaint does not adequately allege specific intent.  To establish a claim for manipulation under the CEA, Plaintiffs must allege that Defendants had the ability to influence market prices and that each Defendant *specifically intended* to do so.  *See DiPlacido*, 364 F. App'x at 661; *see also Crude Oil*, 2007 WL 1946553, at *3.  Further, under Rule 9(b)'s heightened pleading standard, Plaintiffs must plead facts that establish a "strong inference of fraud" either "(a) by alleging facts to show that defendants had both the motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Crude Oil*, 2007 WL 1946553, at *8 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 290-91 (2d Cir. 2006)); *Amaranth*, 587 F. Supp. 2d at 535-36 ("Under Rule 9(b), the factual allegations in the complaint [alleging violations of the CEA] must give rise to a 'strong inference' of scienter.").  The Amended Complaint falls well short.

The Amended Complaint contains only conclusory statements regarding Defendants' intent that have no factual support.  *See* Am. Compl. ¶¶ 219-20, 230.  In lieu of factual allegations, Plaintiffs offer two specious motives for the alleged manipulation, neither of which establishes a strong inference that Defendants specifically intended to manipulate USD LIBOR, let alone the CME Eurodollar futures and options markets.

---

[19] Because Plaintiffs fail to allege any trading losses at all, they also lack Article III and statutory standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article II standing requires "injury in fact" caused by the defendant's conduct); *Camreta v. Greene*, 131 S. Ct. 2020, 2028 (2011); *Amaranth*, 269 F.R.D. at 378 ("To have standing under the CEA, a private plaintiff must have purchased or sold a futures contract and suffered 'actual damages resulting from' the alleged manipulation. . . .").

*First*, Plaintiffs allege a reputation-based motive, suggesting that Defendants did not act with specific intent to manipulate, but instead submitted lower rates in order "to portray themselves as economically healthier than they actually were." *Id.* ¶ 5. That is, according to the Amended Complaint, Defendants were not seeking to manipulate the "price" of USD LIBOR, but were trying to avoid exposing their level of credit risk. Under this theory, any impact on USD LIBOR was incidental to the alleged conduct and Defendants lacked the requisite "specific intent" to manipulate required by the CEA. *See In re Indiana Farm Bureau Coop. Ass'n*, No. 75-14, 1982 WL 30249, at *7 (C.F.T.C. 1982) (specific intent requires proof "that the accused acted . . . with the *purpose* or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand") (emphasis added); *see also Energy Transfer*, 2009 WL 2633781, at *7 (noting that, even if Plaintiffs alleged a causal relationship between defendants' actions and the effect on exchange traded futures and options, "they do not allege facts that allow the reasonable inference that Defendants intended to affect the prices on the exchanges").

In any event, this alleged motive is not a plausible reason to conspire with other banks. The risk of a panel bank being exposed as uncreditworthy comes from the public scrutinizing *each bank's individual USD LIBOR quote*, not the overall BBA USD LIBOR composite.[20] Consequently, if anything, for Defendants to appear "healthier than they actually were," each individual bank would need to intend to manipulate *its own* individual USD LIBOR submission.[21] Thus, Plaintiffs' first proffered motive fails to support a strong inference that

---

[20] As the Amended Complaint notes, Thomson Reuters publishes daily not only composite BBA USD LIBOR, but also each individual bank's USD LIBOR submission on which the BBA bases its USD LIBOR calculation. *See* Am. Compl. ¶ 6.

[21] For the same reason, Plaintiffs' suggestion that Defendants specifically intended to manipulate Eurodollar futures as part of their plan to suppress USD LIBOR and "avoid[] any 'run' on their banks" is not plausible. Am. Compl.

Defendants intended to manipulate USD LIBOR.  *See Campo v. Sears Holding Co.*, 371 F.

App'x 213, 216 (2d Cir. 2010) ("Sufficient motive allegations entail concrete benefits that could

be realized by one or more of the false statements and wrongful nondisclosures alleged."

(quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001))).

　　*Second*, Plaintiffs suggest a financial motive that is baseless.  Plaintiffs speculate that

Defendants depressed USD LIBOR in order "to pay lower interest rates on LIBOR-based

financial instruments that Defendants sold to investors."  Am. Compl. ¶ 47; *see also id.* ¶¶ 5, 14,

15, 47.  As support for this proposition, Plaintiffs refer to vague and unidentified "reports" made

by four Defendants stating that they were sensitive to interest rate changes.  From this, Plaintiffs

conclude that all 16 Defendants "possessed . . . financial incentives to manipulate LIBOR."  *Id.*

¶¶ 47-48.  This is nonsensical.  First, Plaintiffs have conjured a motive for a conspiracy involving

16 banks based on a handful of general comments from only a few.[22]  Second, for Plaintiffs'

theory to make sense, all 16 Defendants must have been *net* short USD LIBOR-linked

derivatives on an entity-wide basis (*i.e.*, positioned to benefit, in the aggregate, from lower

USD LIBOR throughout bank operations overall, not just on those USD LIBOR-based financial

instruments on which they pay interest)—a fact that has not been pled.[23]  Finally, Plaintiffs'

---

¶ 230.  The risk of a "run on the bank" comes from a panel bank's individual USD LIBOR submission standing out as too high, not from public scrutiny of the level of Eurodollar futures trading.

[22] Tellingly, Plaintiffs' allegations in paragraph 47 are not supported by citation to the public disclosures on which the Amended Complaint relies.  For example, the risk management section of JPMorgan's 2009 Annual Report, which appears to be a source of Plaintiffs' allegations, discusses unanticipated "immediate change[s] in rates" (and not gradual or sustained rate changes) and thus by its own terms "present[s] a limited view of risk."  *See* JPMorgan Annual Report at 131 (2009), *available at* http://investor.shareholder.com/jpmorganchase/annual.cfm.  Indeed, the same section of JPMorgan's 2008 Annual Report reflected that a 100bp increase in interest rates would result in a *gain* of $672 million.  JPMorgan Annual Report at 116 (2008), *available at* http://investor.shareholder.com/jpmorganchase/annual.cfm.  In short, Plaintiffs' allegations as to Defendants' alleged economic motivation for lower interest rates are conclusory and insufficient.

[23] USD LIBOR is, at most, one of many factors that could impact a bank's interest costs in only a subset of its transactions, and Plaintiffs have failed to link movement in USD LIBOR to Defendants' overall exposure to general interest rate changes.

allegations regarding financial incentives at most suggest a generalized profit motive, one that "could be imputed to any corporation with a large market presence in any commodity market" and is therefore "insufficient to show intent." *Crude Oil*, 2007 WL 1946553, at *8. Thus, Plaintiffs' second proffered motive does not support a strong inference that Defendants intended to manipulate USD LIBOR.[24]

In sum, Plaintiffs "present[] no indication of motive and intent supportive of [their] position." *Hershey v. Energy Transfer Partners L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) (quoting *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1058-59 (N.D. Ill. 1995)). Plaintiffs have failed to allege any facts suggesting that Defendants acted "with the purpose . . . of causing . . . a price or price trend" in the Eurodollar futures market "that did not reflect the legitimate forces of supply and demand." *See Platinum & Palladium*, 2011 WL 4048780, at *8 (quoting *Indiana Farm Bureau Coop.*, 1982 WL 30249, at *7).[25] Thus, Plaintiffs have failed to plead specific intent.[26]

---

[24] Further, Plaintiffs' allegations that largely relate to Yen LIBOR and Euroyen TIBOR, *see* Am. Compl. ¶¶ 133-81, do not establish facts supporting a strong inference of manipulative intent or conduct by all 16 Defendants in the CME Eurodollar futures and options markets. *See Crude Oil,* 2007 WL 1946553, at *8 (allegations of unrelated government investigations "cannot be seen as sufficient facts upon which one could strongly infer manipulative intent or conduct").

[25] In addition, Plaintiffs fail to satisfy the artificial price prong of their market manipulation claim because they fail to plausibly allege that the price of the Eurodollar futures contracts they purchased did not reflect market forces of supply and demand. In *In re Anthony J. DiPlacido*, the CFTC found that a broker had created artificial settlement prices by entering into trades that "violated" bids and offers, holding that "the placement of uneconomic bids or offers results in artificial prices because those prices are not determined by the free forces of supply and demand on the exchange." No. 01-23, 2008 WL 4831204, at *32 (C.F.T.C. 2008). This allegation—that Plaintiffs paid more, or received less, than prevailing market prices for Eurodollar futures or options—is notably missing here. Instead, Plaintiffs argue that USD LIBOR did not reflect market forces of supply and demand. USD LIBOR, however, is a hypothetical rate produced by an informal survey of 16 banks quoting the rate at which they believe they could borrow dollars in the London market. Unlike commodities like copper or gas, USD LIBOR is neither bought nor sold (*see* Antitrust Memorandum at 21-25), so its level is unaffected by supply and demand in the way prices for commodities are. Because USD LIBOR is not the product of marketplace activity and does not reflect "the free forces of supply and demand," any manipulation of USD LIBOR would not, as *DiPlacido* requires, have replaced market prices shaped by supply and demand with "artificial" prices. Plaintiffs therefore have not and cannot claim that the settlement prices they paid were "artificial."

[26] Plaintiffs' manipulation claim also fails because Plaintiffs have not pled scienter as to each Defendant. "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter . . . *for each*

**B.      Plaintiffs Fail to State A Claim For Aiding And Abetting Under The CEA**

Plaintiffs' claim for aiding and abetting (the Third Claim for Relief) fails for two reasons.

*First*, the aiding and abetting claim is foreclosed by Plaintiffs' failure to plead a primary violation for manipulation.  "In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the [CEA], a plaintiff must first prove that a primary party committed a commodities violation." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996); *see also Platinum and Palladium*, 2011 WL 4048780, at *8 (dismissing aiding and abetting claim as a matter of law where primary manipulation claim failed).  As explained above, because Plaintiffs fail to state a primary claim for manipulation, their aiding and abetting claim also fails.

*Second*, Plaintiffs' aiding and abetting claim has not been adequately pled.  To establish aiding and abetting liability under the CEA, Plaintiffs must prove that "the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *Amaranth*, 587 F. Supp. 2d at 531.  Further, Plaintiffs must plead aiding and abetting in accordance with Rule 9(b)'s heightened pleading requirements.  *See In re Natural Gas II*, 358 F. Supp. 2d at 345.

Here, Plaintiffs have failed to plead any particularized facts that support the aiding and abetting claim.  The Amended Complaint contains one conclusory paragraph as to aiding and abetting, which states "Defendants knowingly aided, abetted, counseled, induced, and/or

---

defendant; guilt by association is impermissible." *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 321 (S.D.N.Y. 2010) (emphasis added).  Further, under Rule 9(b), "'[w]hen the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, No. 10 Civ. 2737 (LAK), 2011 U.S. Dist. LEXIS 66419, at *67 (S.D.N.Y. June 22, 2011) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F. 3d 190, 195 (2d Cir. 2008)).  Here, Plaintiffs make no particularized allegations as to scienter for any one corporate Defendant, nor do they allege facts suggesting that any individual acted with the requisite intent to manipulate USD LIBOR.  Thus, Plaintiffs fail to satisfy Rule 9(b).

procured the violations of the CEA" and did so "knowing of other Defendants' manipulations of Eurodollar futures contracts prices, including by false reporting of interest rate information, and willfully intended to assist these manipulations to cause the price of CME Eurodollar futures contracts to reach artificial levels during the Class Period." Am. Compl. ¶ 242. This conclusory allegation does not satisfy Rule 9(b). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Amended Complaint does not allege that any particular Defendant had knowledge of another's intent to manipulate USD LIBOR (let alone CME Eurodollar futures contracts prices) or that any particular Defendant intended to further such a manipulation, or that any specific acts were performed in furtherance thereof, as is required by Rule 9(b). *See Amaranth*, 587 F. Supp. 2d at 531 (dismissing aiding and abetting claim where defendants were lumped together in generalized allegations). Accordingly, Plaintiffs' aiding and abetting claim should be dismissed.[27]

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

The Court should also dismiss Plaintiffs' unjust enrichment claim.[28] First, an unjust enrichment claim "requires some type of direct dealing or actual, substantive relationship with a defendant." *Reading Int'l v. Oaktree Cap. Mgmt.*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104 (2011); *see also*

---

[27] Similarly, Plaintiffs have failed to adequately allege a claim for vicarious liability under the CEA. "[T]o state a claim for vicarious liability [under the CEA], plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal 'maintain[ed] control over key aspects of the undertaking.'" *Amaranth*, 587 F. Supp. 2d at 546. Here, Plaintiffs have clearly failed to adequately allege a claim for vicarious liability under the CEA because Plaintiffs have merely recited the elements of such a claim rather than alleging particular and specific facts giving rise to a reasonable inference that Plaintiffs are entitled to relief on this claim. *See Iqbal*, 556 U.S. at 678. For instance, Plaintiffs have neither alleged any facts regarding any agent of any of the Defendants nor identified any conduct allegedly taken by such agents within the scope of this principal-agent relationship to further the alleged violations of the CEA. *Id.* at 547 (holding that plaintiffs' "general, vague, and conclusory" allegations were insufficient to state a claim for vicarious liability under CEA).

[28] For the reasons stated herein, the Court should also dismiss the unjust enrichment claims in the OTC Complaint.

*Georgia Malone & Co. v. Rieder*, No. 132, 2012 WL 2428246, slip op. at 9-11 (N.Y. June 28, 2012) (affirming dismissal of unjust enrichment claim where plaintiff did not allege any direct contact with defendant) ("the relationship between [plaintiff] and [defendant] is too attenuated because they simply had no dealings with each other").

        Allegations that a plaintiff traded in a market that was allegedly manipulated by a defendant do not establish the type of relationship necessary to support an unjust enrichment claim. *Amaranth*, 587 F. Supp. 2d at 532; *Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191 (JFK), 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997) ("contemporaneous trading relationship" insufficient).

        In *Amaranth*, this Court dismissed an unjust enrichment claim predicated on the alleged manipulation of natural gas contracts traded on the NYMEX because the plaintiffs had failed to allege "any direct relationship, trading or otherwise, between themselves and any [defendants]." 587 F. Supp. 2d at 547.  This Court should do the same here.[29]

        Second, where a plaintiff attempts to plead an unjust enrichment claim that merely duplicates recognized torts, the unjust enrichment claim should be dismissed. *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012) (unjust enrichment "is not a catchall cause of action to be used when others fail") (citations omitted).  Plaintiffs explicitly base their unjust enrichment claim on their CEA and Sherman Act claims. *See* Am. Compl. ¶ 251.  If Plaintiffs' statutory claims "succeed, the unjust enrichment claim is duplicative; if [P]laintiffs' other claims

---

[29] The alleged connection between Plaintiffs and Defendants is even more attenuated than the link in *Amaranth*, where the plaintiffs alleged that an investment fund used its substantial market power to artificially move the price of natural gas futures. *Id.* at 523-24.  Here, Plaintiffs do not allege any manipulative trading in Eurodollar futures, instead claiming that Defendants reported artificial LIBOR rates across the ocean in London.

are defective, an unjust enrichment claim cannot remedy the defects." *Corsello*, 18 N.Y.3d at

791.  Accordingly, the Court should dismiss Plaintiffs' claim for unjust enrichment.[30]

### Conclusion

For the foregoing reasons, Defendants respectfully request that this Court dismiss the

claims in the Exchange-Based Plaintiff Action as to Defendants.

Dated:   New York, New York                         Respectfully Submitted,
         June 29, 2012


/s/ Robert F. Wise, Jr.                             /s/ Daryl A. Libow
Robert F. Wise, Jr.                                 Daryl A. Libow
Arthur J. Burke                                     Christopher M. Viapiano
Paul S. Mishkin                                     SULLIVAN & CROMWELL LLP
DAVIS POLK & WARDWELL LLP                           1701 Pennsylvania Avenue, N.W.
450 Lexington Avenue                                Washington, D.C. 20006
New York, NY 10017                                  libowd@sullcrom.com
robert.wise@davispolk.com                           viapianoc@sullcrom.com
arthur.burke@davispolk.com                          Telephone: (202) 956-7500
paul.mishkin@davispolk.com                          Fax: (202) 956-7056
Telephone: (212) 450-4000
Fax: (212) 450-4800                                 *Attorneys for Defendant The Bank of Tokyo-*
                                                    *Mitsubishi UFJ, Ltd.*
*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

---

[30] In addition to the flaws noted above, Plaintiffs' unjust enrichment claim is based exclusively on conclusory allegations.  *See* Am. Compl. ¶¶ 250-53 (alleging that "[i]t would be inequitable for Defendants to be allowed to retain the benefits which Defendants obtained from their illegal agreement and manipulative acts and other unlawful conduct described herein.")  As explained in Section III, *supra*, these types of broad and ambiguous allegations fail to meet the applicable pleading requirements.

/s/ Andrew A. Ruffino

Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com
Tel: 212.841.1000

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
awiseman@cov.com
tisaacson@cov.com
Tel: 202.662.6000

Michael R. Lazerwitz
Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
mlazerwitz@cgsh.com
jkim@cgsh.com
Tel: 212.225.2000

*Attorneys for Defendants Citibank, N.A. and
Citigroup, Inc.*

/s/ David R. Gelfand

David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY
LLP
One Chase Manhattan Plaza
New York, New York 10005
dgelfand@milbank.com
smurphy@milbank.com
Telephone: (212) 530-5000

*Attorneys for Defendant Coöperatieve
Centrale Raiffeisen-Boerenleenbank B.A.*

/s/ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
richard.schwed@shearman.com

*Attorneys for Defendant Credit Suisse Group AG*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
msilverman@paulweiss.com
afinch@paulweiss.com
Telephone: (212) 373-3355

*Attorneys for Defendant Deutsche Bank AG*

/s/ Ed DeYoung
Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendant HSBC Holdings plc
and HSBC Bank plc*

/s/ Thomas C. Rice
Thomas C. Rice
Juan A. Arteaga
Joan E. Flaherty
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
jflaherty@stblaw.com

*Attorneys for Defendants JPMorgan Chase &
Co. and JPMorgan Chase Bank, N.A.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant Lloyds Banking Group
plc*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant HBOS plc*

/s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant The Norinchukin Bank*

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
Telephone: (312) 902-5200

*Attorneys for Defendant Royal Bank of Canada*

/s/ Robert G. Houck
Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd St.
New York, NY 10019
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com
Telephone: 212-878-8000

*Attorneys for Defendant The Royal Bank of
Scotland Group plc*

/s/ Ethan E. Litwin
Ethan E. Litwin
Morgan J. Stecher
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
litwin@hugheshubbard.com
stecher@hugheshubbard.com
Telephone: (212) 837-6000

*Attorneys for Defendant WestLB AG*