**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 Master File No. 1:11-md-2262-NRB ECF Case |
| THIS DOCUMENT RELATES TO: | |
| CHARLES SCHWAB BANK, N.A., ET AL., Plaintiffs, v. BANK OF AMERICA CORPORATION, ET AL. Defendants. | |
| SCHWAB MONEY MARKET FUND, ET AL., Plaintiffs, v. BANK OF AMERICA CORPORATION, ET AL., Defendants. | |
| SCHWAB SHORT-TERM BOND MARKET FUND, ET AL., Plaintiffs, v. BANK OF AMERICA CORPORATION, ET AL., Defendants. | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SCHWAB PLAINTIFFS' AMENDED COMPLAINTS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT FACTUAL BACKGROUND ............................................................ 3

    A.    The Schwab Plaintiffs File Lawsuits Against LIBOR Panel Banks ....................... 3

    B.    The Schwab Plaintiffs Allege LIBOR Manipulation Based on Paid "Expert Opinions," Press Commentary, and Unsupported Inferences from Ongoing Government Investigations ........................................................................ 4

    C.    The Schwab Plaintiffs Append Boilerplate Allegations of Mail, Wire, and Bank Fraud to Their Complaints ................................................................. 4

ARGUMENT .................................................................................................... 5

I.    THE RICO CLAIMS SHOULD BE DISMISSED ............................................ 5

    A.    The Private Securities Litigation Reform Act Bars the RICO Claims ................. 5

    B.    The RICO Claims Seek an Impermissible Extraterritorial Application of U.S. Law .................................................................................................... 10

    C.    The Schwab Plaintiffs Lack Standing to Assert RICO Claims ........................... 13

    D.    The Schwab Plaintiffs Fail to Plead Predicate Acts of Racketeering ................. 14

        1.    The Amended Complaints Impermissibly Lump All Defendants Together ................................................................................................ 14

        2.    The Allegations of Mail Fraud and Wire Fraud Are Insufficient ............ 15

        3.    The Allegations of Bank Fraud Are Insufficient .................................... 17

    E.    The Schwab Plaintiffs Fail to Plead a "Pattern" of Racketeering Activity ........... 18

    F.    The RICO Conspiracy Claims Also Should Be Dismissed ................................ 19

        1.    The Amended Complaints Fail to Allege an Agreement Among Defendants with Sufficient Particularity ................................................ 19

        2.    The Amended Complaints' Allegations of Purported Parallel Conduct Are Insufficient to State a RICO Conspiracy Claim ................................ 21

        3.    Defendants' Membership on the USD LIBOR Panel Does Not Give Rise to a Plausible RICO Conspiracy ..................................................... 23

4.     A RICO Conspiracy Cannot Plausibly Be Inferred from the Existence of Ongoing Government Investigations ................................................... 23

II.    THE CALIFORNIA STATE LAW CLAIMS SHOULD BE DISMISSED .................... 24

A.    The Cartwright Act Claims Fail for the Same Reasons as the Sherman Act Claims ............................................................................................................... 24

B.    The Claims for Interference with Economic Advantage Should Be Dismissed ... 25

C.    The Claims for Breach of an Implied Covenant of Good Faith and Fair Dealing Should Be Dismissed .............................................................................. 28

D.    The Unjust Enrichment Claim Should Be Dismissed ........................................... 30

CONCLUSION ....................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648
(N.D. Cal. Nov. 6, 2009)...............................................................................30

*In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005) ...................................8

*Aluminum Bahrain B.S.C. v. Alcoa Inc.*, No. 08-299, 2012 WL 2093997
(W.D. Pa. June 11, 2012)...............................................................................11

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) ....................22, 23

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ............................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................20

*Associated General Contractors of California, Inc. v. California State Council of
Carpenters*, 459 U.S. 519 (1983)...................................................................13

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321 (3d Cir. 1999) .......8, 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................*passim*

*BioResource, Inc. v. U.S. PharmaCo Distribution, Ltd.*, 2010 WL 3853025
(N.D. Cal. Sept. 29, 2010) .............................................................................26

*Bittel Tech., Inc. v. Bittel USA, Inc.*, No. C 10-00719, 2010 WL 3221864
(N.D. Cal. Aug. 13, 2010)..............................................................................30

*Burrows v. BAC Home Loans Servicing, LP*, No. 09-01813, 2010 WL 308720
(E.D. Cal. Jan. 12, 2010)...........................................................................28, 29

*Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673 (E.D. Pa. 2001) .........................8

*Cedeño v. Intech Group, Inc.,* 733 F. Supp. 2d 471 (S.D.N.Y. 2010), *aff'd sub nom.,
Cedeño v. Castillo*, No. 10-3861, 2012 WL 205960 (2d Cir. Jan. 25, 2012*)* ...................11

*CRV Imperial-Worthington, LP v. Gemini Ins. Co.*, 770 F. Supp. 2d 1074
(S.D. Cal. 2010) ......................................................................................30, 31

*Chanayil v. Gulati*, 169 F.3d 168 (2d Cir. 1999) .....................................................15

*Cheske v. Waring*, No. 10-06363, 2010 WL 4916611 (C.D. Cal. Nov. 24, 2010) ...............26

*Chevron Corp. v. Donziger*, No. 11-0691, 2012 WL 1711521 (S.D.N.Y. May 14, 2012)............11

*Cohain v. Klimley*, No. 08-cv-5047, 2010 WL 3701362 (S.D.N.Y. Sept. 20, 2010) ....................9

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553
    (S.D.N.Y. June 28, 2007)...........................................................................15

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987)...........................14

*Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677 (9th Cir. 2009).......................................................31

*Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057 (C.D. Cal. 2010) ........................................................31

*Dollar Tree Stores Inc. v. Toyama Partners, LLC*, No. 10-00325, 2010 WL 1688583
    (N.D. Cal. Apr. 26, 2010) ........................................................................27

*In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072
    (N.D. Cal. 2007).......................................................................................25

*In re Elevator Antittrust Litig.*, 502 F.3d 47 (2d Cir. 2007) ........................................................24

*Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297 (S.D.N.Y. 2010) ....................19, 20, 21, 23

*European Cmty. v. RJR Nabisco, Inc.*, No. 02-5771, 2011 WL 843957 (E.D.N.Y.
    Mar. 8, 2011), *app. pending*, No. 11-2475 (2d Cir. filed June 10, 2011) .........................11

*F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333 (Cal. Ct. App. 2008)..................................................30

*FD Prop. Holding, Inc. v. US Traffic Corp.*, 206 F. Supp. 2d 362 (E.D.N.Y. 2002)...................20

*F.M. Tarbell Co. v. A&L Partners, Inc.*, No. 10-1589, 2011 WL 1153539
    (C.D. Cal. Mar. 23, 2011) ........................................................................29

*First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) .........................19

*First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480 (S.D.N.Y. 1997)..........................15

*In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) ..............24

*Gollust v. Mendell*, 501 U.S. 115 (1991) .......................................................................................7

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011
    (N.D. Cal. 2007)....................................................................................23, 25

*Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269 (S.D.N.Y. 2011) ........................................17

*Griner v. Mercurio,* No. CV 05-6583 DSF, 2005 WL 6133906 (C.D. Cal. Dec. 6, 2005) ..........27

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .......................................20

*Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983 (2010) .......................................................13

*Hill v. City of El Segundo*, 33 F. App'x 254, 257 (9th Cir. 2002)................................................26

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)....................................................................18

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)...........................................................13

*Inter-Mark USA, Inc. v. Intuit, Inc.*, No. 07-04178, 2008 WL 552482
    (N.D. Cal. Feb. 27, 2008)..................................................................................................28, 29

*Jerome M. Sobel & Co. v. Fleck*, No. 03-1041, 2003 WL 22839799
    (S.D.N.Y. Dec. 1, 2003).....................................................................................................15, 16

*Jordan (Bermuda) Inv. Co. v. Hunter Green Invs., Ltd.*, 205 F. Supp. 2d 243
    (S.D.N.Y. 2002) ......................................................................................................................8

*Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-588, 2012 WL 1638326
    (S.D.N.Y. May 8, 2012).........................................................................................................17

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Sup. Ct. Cal. 2003) ........................26

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007).........................26

*In re Le-Nature's, Inc.*, No. 9-1445, 2011 WL 2112533 (W.D. Pa. May 26, 2011).....................11

*Lent v. JP Morgan Chase Bank*, No. 11-345, 2011 WL 5971190
    (C.D. Cal. Nov. 29, 2011).....................................................................................................29

*In re Managed Care Litig.*, No. 00-1334-MD, 2009 WL 812257
    (S.D. Fla. Mar. 26, 2009)......................................................................................................22

*Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310 (2d Cir. 1995) ......................................................23

*Marin Cnty Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833 (Cal. 1976).......................................25

*Mazur v. eBay Inc.*, No. C 07-03967 MHP, 2008 WL 2951351
    (N.D. Cal. July 25, 2008).......................................................................................................23

*McClain v. Octagon Plaza, LLC*, 71 Cal. Rptr. 3d 885, 897 (Cal. Ct. App. 2008) ......................29

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992).................................................................14

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233
   (S.D.N.Y. 2006) ...............................................................................................8, 9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-2923, 1994 WL 88129
   (S.D.N.Y. Mar. 15, 1994) .......................................................................................15

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ...............................................15, 16

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, No. 11-2861, 2012 WL 1657108
   (N.D. Cal. May 10, 2012) .........................................................................................11

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268 (2d Cir. 2011)..........................5, 6, 9

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)..............................2, 10, 12, 13

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514
   (S.D.N.Y. 2001) .....................................................................................................21

*Nat'l Group for Commc'ns. & Computers Ltd. v. Lucent Techs., Inc.*, 420 F. Supp. 2d 253
   (S.D.N.Y. 2006) ................................................................................................19, 20

*Neiman Marcus Group, Inc. v. Dispatch Transp. Corp.*, No. 09-6861, 2011 WL 1142922
   (S.D.N.Y. Mar. 17, 2011) .......................................................................................19

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010) .................................10

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282
   (S.D.N.Y. 2000) .....................................................................................................17

*Openwave Sys. Inc. v. Fuld*, 2009 WL 1622164 (N.D. Cal. June 6, 2009) ................................27

*In re Optical Disk Drive Antirust Litig.*, No. 10-2143, 2011 WL 3894376
   (N.D. Cal. Aug. 3, 2011)...........................................................................................24

*Pac. States Enters., Inc. v. City of Coachella*, 17 Cal. Rptr. 2d 68 (Cal. Ct. App. 1993)..............28

*Purchase Real Estate Group Inc. v. Jones*, No. 05-10859, 2010 WL 3377504
   (S.D.N.Y. Aug. 24, 2010) .....................................................................................17, 18

*Salinas v. United States*, 522 U.S. 52 (1997)...............................................................................19

*Sorota v. Sosa*, No. 11-80897, 2012 WL 313530 (S.D. Fla. Jan. 31, 2012)..................................11

*Swartz v. KPMG LLP*, 476 F. 3d 756 (9th Cir. 2007) ................................................................28

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
　612 F. Supp. 2d 267 (S.D.N.Y. 2009) ................................................................9

*Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993) .........14

*Town of W. Hartford v. Operation Rescue*, 915 F.2d 92 (2d Cir. 1990) .....................14

*In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) ..............................11

*United States v. Barrett*, 178 F.3d 643 (2d Cir. 1999) ...............................................17

*United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23 (D.D.C. 2011) ............11

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ..............................................19

*Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337 (Ct. App. 1995) ..............................26

*Weaver v. James*, 10-6609, 2011 WL 4472062 (S.D.N.Y. Sept. 27, 2011) ................15

## STATUTES

15 U.S.C. § 1 ...............................................................................................................4

15 U.S.C. § 77B(1) .....................................................................................................7

18 U.S.C. § 1961 .........................................................................................................4

18 U.S.C. § 1961(1) ...................................................................................................14

18 U.S.C. § 1964(c) .............................................................................................2, 3, 13

Cal. Civ. Proc. Code § 339 .......................................................................................26

Cal. Bus. & Prof. Code § 16720, *et seq.* .................................................................25

Fed. R. Civ. P. 9(b) ....................................................................................................2

Defendants[1] submit this memorandum of law in support of their motion to dismiss the amended complaints[2] (collectively, the "Amended Complaints") filed by various entities and funds related to Charles Schwab & Co., Inc. (collectively, the "Schwab Plaintiffs").

## PRELIMINARY STATEMENT

This memorandum addresses the three non-class action complaints in this multi-district litigation.  In most respects, the allegations in the Amended Complaints are identical to those in the class action lawsuits.  The Schwab Plaintiffs make the same conclusory allegations of misconduct (collusion to artificially lower U.S. Dollar LIBOR ("USD LIBOR")) based on the same flawed sources of information (opinions of paid litigation "experts," "commentary" in press reports, and unsupported inferences drawn from ongoing government investigations).  The principal distinguishing characteristic of the Amended Complaints is that, in addition to Sherman Act claims, the Schwab Plaintiffs also assert causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and California state law.  But these claims, too, are flawed and should be dismissed as a matter of law.

The RICO claims are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") because the alleged conduct that forms the basis for the RICO claims would have been actionable as securities fraud – *i.e.*, fraud in the purchase and sale of securities that reference USD LIBOR.  In fact, in their original complaints, the Schwab Plaintiffs asserted

---

[1] This memorandum is submitted on behalf of Bank of America Corporation, Bank of America, N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., Citigroup, Inc., Citibank, N.A., Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HSBC Bank plc, HSBC Holdings plc, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, HBOS plc, The Norinchukin Bank, Royal Bank of Canada, The Royal Bank of Scotland Group plc, and WestLB AG.

[2] There are three Amended Complaints: (1) the Schwab Short-Term Bond Market Amended Complaint (the "Bond Compl."); (2) the Schwab Bank, N.A. Amended Complaint (the "Bank Compl."); and (3) the Schwab Money Market Fund Amended Complaint (the "Money Compl.").  Because the allegations in the Amended Complaints are nearly identical, citations herein will be to the Bond Complaint except where separate citations are necessary to distinguish among the Amended Complaints.

federal securities fraud claims based on the very same alleged conduct.  Apparently recognizing the legal problem created by their securities fraud claims, the Schwab Plaintiffs stripped the Amended Complaints of references to securities laws and added a self-serving disclaimer that they are not relying on conduct actionable as securities fraud.  Courts, however, have properly rejected such efforts to circumvent the PSLRA.  The same result should apply here.

The RICO claims are also barred by the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), because the claims would result in an inappropriate extraterritorial application of U.S. law.  Indeed, as the Amended Complaints illustrate, the members of the alleged RICO enterprise are global and international banks – most headquartered outside of the United States – who are accused of manipulating a benchmark interest rate that is set in London under the auspices of the British Bankers' Association ("BBA").  The RICO statute does not reach such alleged foreign enterprises.

The Schwab Plaintiffs also lack standing to assert the RICO claims under 18 U.S.C. § 1964(c) because there is no direct relationship between the injuries alleged in the Amended Complaints and the alleged RICO violations.

The RICO claims are in any event inadequately pled under Fed. R. Civ. P. 9(b).  The Amended Complaints merely tack on boilerplate assertions of mail, wire, and bank fraud following the allegations of USD LIBOR manipulation.  The Amended Complaints do not identify a single predicate act committed by any Defendant.  Instead, the Schwab Plaintiffs lump together all sixteen Defendants in a blunderbuss pleading that alleges only that "Defendants" sent a generic list of unidentified communications.  Such allegations do not satisfy Rule 9(b)'s requirement that predicate acts of mail, wire, and bank fraud be pled with particularity.

The Schwab Plaintiffs' allegations of a RICO conspiracy fare no better.  The Amended Complaints are devoid of any factual allegations that Defendants entered into an agreement to manipulate USD LIBOR.  At best, the Schwab Plaintiffs have alleged that Defendants engaged in parallel conduct.  Such allegations of parallelism, however, are legally insufficient to establish an unlawful conspiracy under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 555 (2007).

The Schwab Plaintiffs' claims under California state law also must be dismissed.  The claims under the California antitrust statute, the Cartwright Act, must be dismissed because, as with their Sherman Act claims, the Schwab Plaintiffs have failed to adequately plead concerted action, antitrust standing, and an antitrust injury.  The Schwab Plaintiffs' intentional interference claims fail because the Amended Complaints do not identify any specific economic relationship that has been disrupted or allege facts showing that Defendants had the requisite intent to disrupt those unidentified relationships.  The claims for breach of the implied covenant of good faith fail because the Schwab Plaintiffs have not identified any valid contract between the parties or alleged any facts showing that Defendants violated any obligation under the unidentified contracts.  Finally, the claims for unjust enrichment fail because the Amended Complaints do not allege any facts showing that Defendants were enriched at the expense of the Schwab Plaintiffs.

## RELEVANT FACTUAL BACKGROUND

### A.    The Schwab Plaintiffs File Lawsuits Against LIBOR Panel Banks

In August 2011, the Schwab Plaintiffs filed three complaints that largely parroted the allegations in previously-filed complaints.  The Schwab Plaintiffs asserted claims under the Sherman Act, RICO, the federal securities laws, and California state law.  All of the Schwab Plaintiffs' claims, including the claims for securities fraud, were based on Defendants' alleged manipulation of USD LIBOR.

On April 30, 2012, the Schwab Plaintiffs filed three Amended Complaints.  The

underlying allegations in each of the Amended Complaints are identical and assert that

Defendants colluded to artificially lower USD LIBOR between August 2007 and May 2010.

The Amended Complaints assert claims under Section 1 of the Sherman Act (15 U.S.C. § 1),

RICO (18 U.S.C. §§ 1961 *et seq.*), and California law.  The Amended Complaints omit the prior

claims for alleged violations of the federal securities laws.

### B.    The Schwab Plaintiffs Allege LIBOR Manipulation Based on Paid "Expert Opinions," Press Commentary, and Unsupported Inferences from Ongoing Government Investigations

Like the other LIBOR-related lawsuits before the Court, the Schwab Plaintiffs allege a

conspiracy to lower USD LIBOR based on three principal sources: (1) opinions from

unidentified consulting "experts" hired by plaintiffs' attorneys; (2) "commentary" found in the

press; and (3) reports concerning ongoing government investigations.  (*See* Bond Compl. ¶ 36.)

Large portions of the Amended Complaints are not even directed toward USD LIBOR, but to

investigations into Japanese Yen LIBOR, including by the Canadian authorities, even though the

Schwab Plaintiffs make no claims relating to Yen LIBOR.

Beyond the paid "expert" opinions, press commentary, and unsupported inferences based

on reports of ongoing government investigations, the Amended Complaints do not allege a single

communication between any Defendants nor any *facts* showing that Defendants agreed to

manipulate USD LIBOR or individually submitted inaccurate estimates of their borrowing costs

to the BBA.

### C.    The Schwab Plaintiffs Append Boilerplate Allegations of Mail, Wire, and Bank Fraud to Their Complaints

Near the end of the Amended Complaints, the Schwab Plaintiffs add allegations of mail,

wire, and bank fraud that bear little relationship to the preceding allegations of LIBOR

manipulation.  The mail, wire, and bank fraud allegations are also cursory.  For example, the

Schwab Plaintiffs' allegations of mail fraud are limited to a single conclusory paragraph:

> Defendants have . . . placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from those entities such documents or packages, including: (i) documents offering for sale LIBOR-based financial instruments and (ii) correspondence regarding offerings of LIBOR-based financial instruments (the conduct described in this paragraph is referred to as the "Mail Fraud").

(Bond Compl. ¶ 224.)  Tellingly, the Amended Complaints fail to identify a single mailing sent

by any Defendant or to explain how any such unidentified mailings furthered a fraudulent

scheme.  The Schwab Plaintiffs' allegations of wire fraud are similarly limited to one sparse

paragraph.  (*See id.* ¶ 226.)  Again, the Schwab Plaintiffs do not identify a single wire that was

actually sent by any Defendant.  Although the Schwab Plaintiffs also allege bank fraud, the

Amended Complaints do not contain any allegations in support of that assertion other than

quotations from the statute.  (*See id.* ¶ 217.)

## ARGUMENT

## I.    THE RICO CLAIMS SHOULD BE DISMISSED

### A.    The Private Securities Litigation Reform Act Bars the RICO Claims

Section 107 of the PSLRA – which is often referred to as the "RICO Amendment" –

provides that "no person may rely upon any conduct that would have been actionable as fraud in

the purchase or sale of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c).

Prior to the RICO Amendment, "'fraud in the sale of securities'" was listed as a predicate

offense that could trigger a RICO claim.  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d

268, 274 (2d Cir. 2011).  Plaintiffs thus "'regularly elevated fraud to RICO violations because

RICO offered the potential bonanza of recovering treble damages.'"  *Id.* (citation omitted).  The

RICO Amendment was enacted "'to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages.'" *Id.*

As the Second Circuit has held, the RICO Amendment is a far-reaching bar on "civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant." *Id.* at 277. The RICO Amendment also prohibits artful pleading of "'other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'" *Id.* at 279 (quoting H.R. Rep. 104-369, at 47 (1995)).

Here, the Amended Complaints make clear that the alleged conduct underlying the RICO claims would have been actionable as a claim for fraud in the purchase and sale of securities.[3] For example, the Schwab Plaintiffs allege that:

- They "*acquired billions of dollars' worth of LIBOR-based financial instruments from Defendants and other issuers*" (Bond Compl. ¶ 12 (emphasis added));

- Defendants committed mail fraud by mailing "(i) documents *offering for sale LIBOR-based financial instruments* and (ii) correspondence regarding *offerings of LIBOR-based financial instruments*" (*id.* ¶ 224 (emphasis added));

- Defendants committed wire fraud by "transmitting documents *offering LIBOR-based financial instruments for sale*" (*id.* ¶ 226 (emphasis added));

- Defendants "knew the scheme would defraud *purchasers and holders of LIBOR-based financial instruments* of millions of dollars of interest" (*id.* ¶ 234 (emphasis added));

- The Schwab Plaintiffs were injured because they "*unknowingly paid money to Defendants for LIBOR-based financial instruments that paid interest at a manipulated rate*" (*id.* ¶ 235 (emphasis added)).

---

[3] Defendants do not concede that the Schwab Plaintiffs could have maintained their claims for securities fraud against Defendants had those claims not been removed from the Amended Complaints. As the Second Circuit has noted, "section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant." *MLSMK Inv. Co.*, 651 F.3d at 277.

The Amended Complaints thus make clear that the RICO claims arise out of alleged fraud in the purchase and sale of "LIBOR-based financial instruments," which the Schwab Plaintiffs define as fixed and floating rate notes.  (*id.* ¶ 3; *see also, e.g.,* Bank Compl. ¶ 191 (concerning the Schwab Plaintiffs' purchase of floating-rate notes); *id.* at ¶ 193 (concerning the Schwab Plaintiffs' purchase of fixed-rate instruments).)  Such instruments fall squarely within the definition of a "security" under Section 2(a)(1) of the 1933 Act, which includes, among other things, any "note . . . bond, debenture, evidence of indebtedness, . . . [or] certificate of deposit." 15 U.S.C. § 77B(1); *see also Gollust v. Mendell*, 501 U.S. 115, 123 (1991) (Securities Exchange Act of 1934's definition of "securities" is "broad enough to include stock, notes, warrants, bonds, debentures, puts, calls, and a variety of other financial instruments").

Tellingly, the *Schwab Plaintiffs themselves* previously asserted that Defendants' alleged conduct was actionable as securities fraud.  For example, in their original complaints, the Schwab Plaintiffs asserted that Defendants' alleged manipulation of USD LIBOR violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  (*See, e.g.*, Charles Schwab Bank, N.A. First Compl. ¶¶ 113-24; 125-33; 134-37; 138-47; 148-50.)  The Schwab Plaintiffs alleged that:

> Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of [] their securities in an effort to cause LIBOR to be set at an artificially low rate, which in turn allowed Defendants to pay lower interest rates on the notes and other securities Plaintiffs acquired from Defendants and other issuers, *in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder*.

(Charles Schwab Bank, N.A. First Compl. ¶ 140 (emphasis added).)  This securities fraud allegation was based on *exactly the same alleged conduct* that the Schwab Plaintiffs now seek to shoehorn into RICO claims.  (*See, e.g.*, Bond Compl. ¶¶ 220, 221.)

Apparently recognizing that their securities fraud claims were inconsistent with a claim for treble damages under the RICO statute, the Schwab Plaintiffs now have attempted to plead around the problem. The Amended Complaints thus remove express references to the securities laws and instead perfunctorily state that the Schwab Plaintiffs "do not base their RICO claims on any conduct that would have been actionable as fraud in the purchase or sale of securities." (*id.* ¶ 228.) Such artful pleading, however, cannot circumvent the PSLRA. A "[p]laintiff cannot magically revive his [RICO] claim by picking out discreet details of his allegations and then claiming that they are not actionable as securities fraud." *Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001). Moreover, the fact that a plaintiff "has not attempted to plead a federal securities claim in connection with its losses . . . does not mean that it can instead assert a RICO claim." *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs., Ltd.*, 205 F. Supp. 2d 243, 248 (S.D.N.Y. 2002). Nor can a plaintiff evade the PSLRA's RICO Amendment merely by packaging his allegations of racketeering as mail or wire fraud, rather than securities fraud: "Congress was clear in stating that the PSLRA 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.'" *Id.; accord Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud. . . . Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment."). Finally, the inclusion of a self-serving disclaimer cannot trump the true nature of the Schwab Plaintiffs' allegations. *Cf. In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 239 (S.D.N.Y. 2006) (ignoring disclaimer and focusing on the substance of the allegations to determine whether the complaint sounded in fraud); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 530 (S.D.N.Y. 2005) (same).

To hold otherwise would elevate form over substance and undermine the express purpose of the RICO Amendment.

The Schwab Plaintiffs have attempted to accomplish precisely what the RICO Amendment prevents.  They take allegations concerning an alleged fraud on investors in LIBOR-related financial instruments and assert a RICO claim by adding an allegation that Defendants sent unspecified mails and wires in connection with the alleged scheme.  The Second Circuit has repeatedly rejected exactly this type of pleading under the RICO Amendment.  For example, in *MLSMK* the Second Circuit held that the RICO claims asserted by an investor in Bernard Madoff's now-infamous Ponzi scheme were properly dismissed under the RICO Amendment.  *See* 651 F.3d at 277.  As with the Schwab Plaintiffs, MLSMK alleged that it had suffered injury as a result of its investment in securities.  *See id.* at 270-72.  Also like the Schwab Plaintiffs, MLSMK attempted to cast its allegations as a RICO claim by adding allegations that the defendant had furthered Madoff's fraudulent scheme by sending "numerous interstate wire communications."  *Id.* at 273.  The Second Circuit affirmed the dismissal of MLSMK's claims under the RICO Amendment, noting that the PSLRA bars all claims that arise from conduct that would have been actionable as securities fraud, regardless of how a plaintiff frames his particular claims.  *Id.* at 277-78.  Numerous other courts have reached similar results.  *See, e.g.*, *Bald Eagle*, 189 F.3d at 328 (rejecting attempt to plead RICO violations for alleged scheme to defraud investors); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 282 (S.D.N.Y. 2009) (rejecting attempt to plead RICO claims arising out of alleged misrepresentations related to LBO transaction); *Cohain v. Klimley*, No. 08-cv-5047, 2010 WL 3701362, at *10 (S.D.N.Y. Sept. 20, 2010) (rejecting RICO claims arising from allegations

concerning fraud in the issuance of debt instruments).  The Schwab Plaintiffs' RICO claims similarly should be dismissed.

### B.   The RICO Claims Seek an Impermissible Extraterritorial Application of U.S. Law

The RICO claims should also be dismissed because they require an impermissible extraterritorial application of the statute.  The alleged RICO enterprise and the alleged predicate acts of racketeering are focused abroad.  The only link Plaintiffs make to this country is that "Defendants' Suppression of LIBOR Broadly *Impacted* LIBOR-Based Financial Instruments." (Bond Compl. at 84 (emphasis added).)  But predicating the application of a statute on domestic *effects* has been emphatically rejected by the Supreme Court.

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court reaffirmed the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  130 S. Ct. at 2877 (quotations omitted).  The Supreme Court rejected as "judicial-speculation-made-law" the "conduct" and "effects" tests by which lower federal courts previously had justified the extraterritorial application of federal statutes, including RICO.  *Id.* at 2878-81.  Instead, the Supreme Court adopted a bright-line rule for determining whether Congress intended a statute to apply extraterritorially: "When a statute gives no clear indication of an extraterritorial application, it has none."  *Id.* at 2878-79.  Following *Morrison*, the Second Circuit has held that because "RICO is silent as to any extraterritorial application," it does not have any "extraterritorial reach."  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010).

Courts have taken two principal approaches to determining whether an alleged RICO violation is domestic or foreign.  The majority of the courts to address the issue look at the

location of the alleged RICO enterprise itself, as opposed to the location of the predicate acts of racketeering.  Judge Rakoff explained the rationale for this approach in *Cedeño v. Intech Group, Inc.*: "RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts.  Rather, it prohibits the use of such a pattern to impact an enterprise . . . . Thus, the focus of RICO is on the enterprise as the recipient of, or cover for, a pattern of criminal activity."  733 F. Supp. 2d 471, 473-74 (S.D.N.Y. 2010), *aff'd sub nom., Cedeño v. Castillo*, No. 10-3861, 2012 WL 205960 (2d Cir. Jan. 25, 2012).[4]

Courts that have looked at the location of the alleged RICO enterprise have generally applied a "nerve center" test.  Under this test, an alleged RICO violation is deemed to occur at "the place where overall corporate policy originates or the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objectives."  *European Cmty.*, 2011 WL 843957, at *6 (citation omitted).  "An analysis of the territoriality of an enterprise in a RICO complaint, therefore, should focus on the decisions effectuating the relationships and common interest of its members, and how those decisions are made."  *Id.*

A minority of the courts that have analyzed the application of *Morrison* to RICO have looked at the locale of the predicate acts of racketeering in addition to the location of the alleged RICO enterprise.  *See, e.g.*, *Chevron Corp. v. Donziger*, No. 11-0691, 2012 WL 1711521, at *6 n.50, *7 (S.D.N.Y. May 14, 2012) (holding that while the location of the RICO enterprise may

---

[4] *Accord European Cmty. v. RJR Nabisco, Inc.*, No. 02-5771, 2011 WL 843957, at *4-6 (E.D.N.Y. Mar. 8, 2011), *app. pending*, No. 11-2475 (2d Cir. filed June 10, 2011); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, No. 11-2861, 2012 WL 1657108, at *4 n.7 (N.D. Cal. May 10, 2012); *Sorota v. Sosa*, No. 11-80897, 2012 WL 313530, at *4 (S.D. Fla. Jan. 31, 2012); *In re Le-Nature's, Inc.*, No. 9-1445, 2011 WL 2112533, at *2-3 (W.D. Pa. May 26, 2011); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 28-29 (D.D.C. 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 914 (C.D. Cal. 2011); *Aluminum Bahrain B.S.C. v. Alcoa Inc.*, No. 08-299, 2012 WL 2093997, at *2-4 (W.D. Pa. June 11, 2012).

be relevant, a court should also look at where the pattern of racketeering is alleged to have occurred).

The RICO claims are subject to dismissal under either of these tests.  The Amended Complaints contain *no* allegations that would locate the RICO enterprise in the United States. Wherever the Amended Complaints contain allegations relevant to the location of the alleged RICO violations, those allegations all point to London.  For example, the Schwab Plaintiffs allege that:

- The relevant "enterprise" is Defendants' membership on the *British* Bankers' Association's USD LIBOR Panel (Bond Compl. ¶ 220);

- According to the website cited in the Amended Complaints, the BBA is "the leading *UK* trade association for the *UK* banking and financial services sector," with its headquarters in *London*.  (*id.* ¶¶ 6, 7 n.5 (emphases added));

- According to the May 23, 2011 *Telegraph* article cited in the Amended Complaints, "[t]he *British* Banking Association is responsible for setting LIBOR" (*id.* ¶ 130 (emphasis added));

- According to the April 16, 2008 *Wall Street Journal* article quoted in the Amended Complaints, LIBOR is "[c]alculated every morning in *London*," and the LIBOR Panel member banks submit their LIBOR data "to Reuters Group PLC, a *London*-based business-data and news company" (*id.* ¶ 98 (emphases added)); and

- Defendants perpetrated a scheme to depress the *London* InterBank Offered Rate (*id.* ¶ 1).

The only connections the Schwab Plaintiffs allege between the purported RICO violations and the United States are that six of the sixteen Defendants allegedly are headquartered in the United States, and that the effects of the "enterprise" allegedly were felt by some plaintiffs in the United States.  (*See, e.g.*, *id.* ¶ 84.)  Even as to those six Defendants, however, the Schwab Plaintiffs do not allege that they sent their LIBOR submissions from the United States, rather than from London.  Moreover, to find a domestic application of RICO

12

based on these allegations would effectively resurrect the "conduct" and "effects" tests that were expressly rejected in *Morrison*.

Under these circumstances – where the Schwab Plaintiffs have alleged a RICO violation based on alleged collusion between global and international banks to suppress a benchmark interest rate that is set in London and owned by a British organization – *Morrison* bars application of the RICO statute.

### C.   The Schwab Plaintiffs Lack Standing to Assert RICO Claims

A person has standing to assert a private cause of action under RICO only if that person was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Section 1964(c) thus requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). The Supreme Court has "repeatedly observed that Congress modeled § 1964(c) on the civil action provision of the federal antitrust laws." *Id.* at 267. As a result, courts apply the analysis set forth in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), to determine whether a plaintiff has standing under § 1964(c). *Holmes*, 503 U.S. at 268. In particular, courts analyze the "directness" of the injury, whether the injury "could have resulted from factors other than petitioners' alleged acts," the "risk of duplicative recoveries," the "speculative nature" of the damages claim, and whether there are more "immediate victims." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006); *see also Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 991 (2010) ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").

The Schwab Plaintiffs lack standing under § 1964(c) for the same reasons that they lack standing to assert their antitrust claims. (*See* Mem. of Law in Support of Defs.' Mot. to Dismiss

Plaintiffs' Antitrust Claims (the "Antitrust Memorandum") at Part III.)  As set forth in the

Antitrust Memorandum, the Schwab Plaintiffs' allegations of injury are too indirect and

speculative to sustain a claim of standing.  (*Id.*)

### D.      The Schwab Plaintiffs Fail to Plead Predicate Acts of Racketeering

The Schwab Plaintiffs' RICO claims also fail because they have not met the requirement

of § 1962(c) that the plaintiff allege facts showing that the defendant committed at least two of

the enumerated acts of "racketeering" listed in 18 U.S.C. § 1961(1).  *See, e.g.*, *Town of W.*

*Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).  If the plaintiff alleges predicate

acts of racketeering that sound in fraud – such as mail fraud, wire fraud, or bank fraud – the

plaintiff must plead those acts with particularity under Rule 9(b).  *E.g.*, *DiVittorio v. Equidyne*

*Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *McLaughlin v. Anderson*, 962 F.2d

187, 191 (2d Cir. 1992).  Moreover, where, as here, there are multiple defendants, the plaintiff is

required to "inform each defendant of the nature of his alleged participation in the fraud."

*DiVittorio*, 822 F.2d at 1247.  Sweeping references to the collective fraudulent actions of

multiple defendants do not satisfy the particularity requirements of Rule 9(b).  *Three Crown Ltd.*

*P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1041 (S.D.N.Y. 1993).

The Schwab Plaintiffs have alleged that Defendants committed three types of

"racketeering" listed in § 1961(1):  mail fraud, wire fraud, and bank fraud.  (Bond Compl. ¶ 212.)

None of these is pled with the particularity required by Rule 9(b).

### 1.      The Amended Complaints Impermissibly Lump All Defendants Together

As an initial matter, the Schwab Plaintiffs have impermissibly lumped all sixteen

Defendants together and alleged only that "Defendants" sent a list of generic mails and wires.

(*id*. ¶¶ 224-26.)  Courts have repeatedly held that such "sweeping allegation[s] that [a group of

14

defendants] caused the listed communications to be made impermissibly collectivizes the defendants, failing to inform each of these defendants of the specific communications it is alleged to have made or caused to be made in furtherance of the fraudulent scheme." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-2923, 1994 WL 88129, at *11 (S.D.N.Y. Mar. 15, 1994). Such blanket allegations are insufficient under Rule 9(b). *See, e.g.*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) (Buchwald, J.) (same); *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 485 (S.D.N.Y. 1997) (same). The Schwab Plaintiffs' RICO claims should be dismissed on this basis alone.

### 2. The Allegations of Mail Fraud and Wire Fraud Are Insufficient

To state a claim for mail or wire fraud, a plaintiff must allege facts showing "(1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of wire, mail, or television communications in interstate commerce in furtherance of the scheme." *Chanayil v. Gulati*, 169 F.3d 168, 170-71 (2d Cir. 1999). Where a plaintiff claims that mails or wires were themselves fraudulent, Rule 9(b) requires allegations showing "the contents of the communications, who was involved, where and when they took place, and explain[ing] why they were fraudulent." *Mills*, 12 F.3d at 1176; *accord Weaver v. James*, 10-6609 (NRB), 2011 WL 4472062, at *4 (S.D.N.Y. Sept. 27, 2011) (Buchwald, J.). Where a plaintiff alleges that the mails or wires were not themselves fraudulent, but rather were used in furtherance of an underlying scheme to defraud, "*a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications*" is required. *Jerome M.*

*Sobel & Co. v. Fleck*, No. 03-1041, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003)
(emphasis in orginal).

The Schwab Plaintiffs offer only generalized and opaque allegations of mail and wire
fraud.  In their mail fraud allegation, the Schwab Plaintiffs state only that "Defendants" mailed
unidentified "documents" and "correspondence" relating to the sale of LIBOR-based financial
instruments.  (Bond Compl. ¶ 224.)  Similarly, in their wire fraud allegation, the Schwab
Plaintiffs vaguely assert that "Defendants" transmitted "phony" information via the wires,
including in (i) unidentified "documents" related to the sale of financial instruments, (ii)
unidentified "statements" about borrowing costs, and (iii) unidentified "email communications"
about such statements.  (*id.* ¶ 226.)

These cursory allegations do not satisfy Rule 9(b).  As an initial matter, the Schwab
Plaintiffs appear to claim that the mails and wires contained fraudulent (*i.e.*, "phony")
representations.  The Amended Complaints, however, do not identify the specific alleged
"contents of the communications, who was involved, where and when they took place, and
explain why they were fraudulent" as is required under Rule 9(b).  *Mills*, 12 F.3d at 1176.
Indeed, it is impossible to divine from the Amended Complaints whether the Schwab Plaintiffs
are alleging that the LIBOR submissions themselves constituted mail or wire fraud or whether
transactional documents in the marketplace were fraudulent or some other theory.

To the extent that the Schwab Plaintiffs intended to claim that the unidentified mails and
wires were not themselves fraudulent, but instead sent to further a fraudulent scheme, the
Amended Complaints still fail because the Schwab Plaintiffs do not offer "a detailed description"
of the connection between the alleged scheme and the mail and wire communications.  *Jerome
M. Sobel*, 2003 WL 22839799, at *5.  Indeed, the Amended Complaints amount to nothing more

than a series of allegations that Defendants engaged in a fraudulent scheme to manipulate LIBOR followed by the boilerplate allegation that they sent various generic kinds of mails and wires.  As this Court has noted, however, mail fraud allegations are insufficient where "there are no facts in the body of the complaint that refer to use of the mail or telephone in connection with the fraudulent scheme."  *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 301 (S.D.N.Y. 2000) (Buchwald, J.) (dismissing RICO claims based on mail fraud where "the Amended Complaint does not allege even a single specific use of the mails by [defendant]"); *accord Kilkenny v. Law Office of Cushner & Garvey*, LLP, No. 08-588, 2012 WL 1638326, at *8 (S.D.N.Y. May 8, 2012) (holding "vague references to 'fraudulent schemes orchestrated by' Defendants, 'racketeering activities,' 'mail fraud,' and 'wire fraud,'" are insufficient to state a RICO claim under Rule 9(b)."); *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 301 (S.D.N.Y. 2011) (same).

### 3. The Allegations of Bank Fraud Are Insufficient

The Schwab Plaintiffs' allegations of bank fraud are just as deficient.  "The well established elements of the crime of bank fraud are that the defendant (1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss."  *United States v. Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999).

Here, the Schwab Plaintiffs do not make *a single factual allegation* in support of their assertion of bank fraud.  (*See* Bond Compl. ¶ 223.)  They do not identify (i) the "federally chartered or insured" bank or banks that were the target of the alleged fraud; (ii) which Defendants are alleged to have made misrepresentations to the unspecified target; (iii) the time or place of the alleged misrepresentations; or (iv) the content of the misrepresentations.  Such allegations of bank fraud fall far short of the requirements of Rule 9(b).  *See Purchase Real*

*Estate Group Inc. v. Jones*, No. 05-10859, 2010 WL 3377504, at *10 (S.D.N.Y. Aug. 24, 2010) (dismissing RICO claim where plaintiffs had "offer[ed] little information about the substance of the mail and wire fraud acts and absolutely no information, beyond their own conclusory assertions, about the bank fraud and identity fraud acts").

E.   **The Schwab Plaintiffs Fail to Plead a "Pattern" of Racketeering Activity**

In order to sustain a RICO claim, the Schwab Plaintiffs also must adequately allege that the predicate acts of racketeering formed a "pattern" of racketeering activity.  The Supreme Court has held that the term "pattern" requires that the predicate acts be "related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

As noted above, the Schwab Plaintiffs have failed to identify even a single predicate act of racketeering, much less pled that there was a pattern of such activity.  Moreover, the generic, boilerplate allegations of the Amended Complaints themselves provide an inconsistent and contradictory explanation of the theory that the Schwab Plaintiffs are pursuing with respect to the pattern element.  The Schwab Plaintiffs assert that the "Relevant Period" was from August 2007 until May 2010.  (Bond Compl. ¶ 1.)  In making their specific RICO allegations, however, the Schwab Plaintiffs inexplicably allege that the unidentified acts of racketeering occurred over "at least the past four years."  (*id*. ¶¶ 233, 235.)  The Schwab Plaintiffs then add further confusion by asserting that the pattern of racketeering "is continuous, ongoing, and will continue unless Defendants are enjoined." (*id*. ¶ 236.)  Under these circumstances – where the Schwab Plaintiffs have not identified a single specific act of racketeering and have offered contradictory boilerplate allegations as to when the alleged racketeering occurred – the Amended Complaints fail to allege a "pattern."

### F.        The RICO Conspiracy Claims Also Should Be Dismissed

Because the Amended Complaints fail adequately to allege a substantive RICO violation,

the Schwab Plaintiffs' RICO conspiracy claims should be dismissed for want of a primary

violation.  *See, e.g.*, *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir.

2004) ("[B]ecause Plaintiffs did not adequately allege a substantive violation of RICO[,] . . . the

District Court properly dismissed . . . [the Plaintiffs'] RICO conspiracy [claim]."); *Neiman*

*Marcus Group, Inc. v. Dispatch Transp. Corp.*, No. 09-6861, 2011 WL 1142922, at *9

(S.D.N.Y. Mar. 17, 2011) (Buchwald, J.) (same).

The RICO conspiracy claims should also be dismissed for the independent reason that the

Amended Complaints fail to provide any factual content whatsoever to show that Defendants

"kn[e]w of, and agree[d] to, the general criminal objective of a jointly undertaken scheme."

*United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) (citing *Salinas v. United States*, 522

U.S. 52, 63 (1997)).  "The core of a RICO conspiracy is an agreement to commit predicate acts,"

so a complaint "must contain allegations of 'some factual basis for a finding of a conscious

agreement among the defendants.'"  *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313

(S.D.N.Y. 2010).  As this Court has held, "'[c]onclusory allegations . . . are insufficient' to plead

[a RICO conspiracy] claim."  *Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs.,*

*Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) (citation omitted).

### 1.        The Amended Complaints Fail to Allege an Agreement Among Defendants with Sufficient Particularity

The Amended Complaints allege that Defendants "organized and implemented" a scheme

to manipulate USD LIBOR even though Defendants "knew the scheme would defraud

purchasers and holders of LIBOR-based financial instruments."  (Bond Compl. ¶¶ 233-34.)  The

Amended Complaints, however, do not "set forth specific facts tending to show that each of the

19

defendants entered into an agreement" to manipulate USD LIBOR and that Defendants committed at least two predicate RICO violations "in furtherance of [this agreement]."  *Elsevier*, 692 F. Supp. 2d at 313.  For instance, the Amended Complaints fail to allege any facts showing "how each of the defendants, through words or actions, reached an agreement" to manipulate USD LIBOR for a three-year period.  *Lucent Techs.*, 420 F. Supp. 2d at 272.  Moreover, the Amended Complaints do not "state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it."  *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002). Instead, the Amended Complaints merely assert that Defendants "conspired" and "colluded" to manipulate USD LIBOR and simply recite the elements of a RICO conspiracy claim.  (Bond Compl. ¶¶ 3, 9, 36-37, 211, 231-34.)  Such conclusory allegations are inadequate to "plead a RICO conspiracy [claim] with sufficient particularity" because they do not set forth "some factual basis for a finding of a conscious agreement among the defendants" to manipulate USD LIBOR.  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 & n.4 (2d Cir. 1990); *see also Twombly*, 550 U.S. at 555-56 ("labels and conclusions" are insufficient); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements . . . do not suffice").

In *National Group for Communications & Computers Ltd. v. Lucent Technologies Inc.*, this Court dismissed a RICO conspiracy claim where, as here, the plaintiff "repeatedly state[d] that defendants 'conspired' or 'agreed' with one another" without "set[ting] forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement."  420 F. Supp. 2d at 272; *see also Elsevier*, 692 F. Supp. 2d at 313 (dismissing RICO conspiracy claim because the complaint "contains nothing more than a conclusory allegation of an agreement among defendants and a further allegation that each of the individual defendants committed

certain discrete acts of fraud"); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F.

Supp. 2d 514, 541 (S.D.N.Y. 2001) (same).  The same result should apply here.

### 2.    The Amended Complaints' Allegations of Purported Parallel Conduct Are Insufficient to State a RICO Conspiracy Claim

The allegations that Defendants submitted similar USD LIBOR rates to the BBA do not

provide a factual basis to infer a RICO conspiracy because "an allegation of parallel conduct and

a bare assertion of conspiracy will not suffice" to state a claim.  *Twombly*, 550 U.S. at 556; *see*

*also Elsevier*, 692 F. Supp. 2d at 313 ("parallel conduct by different defendants affords an

insufficient basis for inferring that an agreement was reached").  The Schwab Plaintiffs'

allegations of parallel conduct must be "placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that could just as well be independent action."

*Twombly*, 550 U.S. at 557.  Moreover, the Schwab Plaintiffs' allegations regarding Defendants'

motivation to manipulate USD LIBOR are consistent with "a wide swath of rational and

competitive business strategy unilaterally prompted by common perceptions of the market."  *Id.*

at 554.

The Schwab Plaintiffs allege that Defendants conspired to submit false and suppressed

USD LIBOR to the BBA because Defendants did not want the market to view them as

financially weaker and presenting a higher credit risk than other financial institutions.  (Bond

Compl. ¶¶ 5, 37.)  This allegation fails to plausibly suggest that Defendants conspired to

manipulate USD LIBOR because – even accepting the Schwab Plaintiffs' theory – each

individual Defendant would have had a unilateral interest in signaling the market, through its

LIBOR submission, that it was in sound financial condition and could borrow at low rates.  No

cooperation from other banks would have been required.  If anything, the signal to the market

that a bank was creditworthy would be stronger if other banks did not follow suit.  The Schwab

Plaintiffs make no allegations regarding why a bank would have needed cooperation from other banks in order to signal the market that it was creditworthy. *See, e.g.*, *Twombly*, 550 U.S. at 554; *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (holding that parallel conduct allegations were insufficient to state a RICO conspiracy claim because the "complaint does not plausibly suggest that . . . Defendants have acted in any way inconsistent with the independent pursuit of their own economic self-interest").[5]

The Schwab Plaintiffs also allege that Defendants conspired to submit false and suppressed USD LIBOR to the BBA because suppressed rates would have allowed Defendants to earn "millions, if not billions, of dollars" in profits by paying lower interest rates on LIBOR-based financial instruments that Defendants sold to investors. (Bond Compl. ¶¶ 5, 10, 38.) This allegation similarly fails to plausibly suggest that Defendants conspired to manipulate USD LIBOR because each Defendant did not need to cooperate to serve its individual interest in increasing its profits. *See, e.g.*, *Twombly*, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *Am. Dental Ass'n*, 605 F.3d at 1295-96 (affirming dismissal of RICO conspiracy claim because unlawful agreement could not be plausibly inferred from allegations of parallel conduct); *In re Managed Care Litig.*, No. 00-1334-

---

[5] For the same reasons, the Schwab Plaintiffs' allegations about the results of the supposed "studies" conducted by their paid consultants fail to plausibly suggest that Defendants' conspired to manipulate USD LIBOR. For example, the Schwab Plaintiffs allege that the analysis showing the purported discrepancy between Defendants' LIBOR quotes and their respective probabilities of default suggests that Defendants suppressed USD LIBOR "to avoid revealing the higher rates that reflect[ed] their true (higher) probabilities of default." (Bond Compl. ¶ 44.) In addition, the Schwab Plaintiffs allege that the analysis showing the supposed discrepancy between USD LIBOR and the Federal Reserve Eurodollar Deposit Rate during the class period suggest that Defendants manipulated USD LIBOR to "understate their borrowing costs in the face of increasing concerns about the health of the banks." (*Id.* ¶ 66.) Even assuming the validity of these studies, these allegations are insufficient to plausibly show that Defendants conspired to manipulate USD LIBOR because each Defendant's purported desire to project itself as financially stable during the financial crisis is consistent with "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.

MD, 2009 WL 812257, at *6 (S.D. Fla. Mar. 26, 2009) (same); *Mazur v. eBay Inc.*, No. C 07-03967 MHP, 2008 WL 2951351, at *6 (N.D. Cal. July 25, 2008) (same).

### 3.    Defendants' Membership on the USD LIBOR Panel Does Not Give Rise to a Plausible RICO Conspiracy

The allegation that Defendants' membership on the BBA's USD LIBOR panel permitted them to form and perpetrate a conspiracy to manipulate USD LIBOR (Bond Compl. ¶¶ 220-23) is also insufficient to establish a conspiracy because courts have repeatedly held that the "'mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.'" *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir. 1995) (citation omitted); *see also Am. Dental Ass'n*, 605 F.3d at 1295 ("it was well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy").  Defendants' mere participation on the USD LIBOR panel thus does not provide a "'factual basis for a finding of a conscious agreement" to manipulate USD LIBOR.  *Elsevier Inc.*, 692 F. Supp. 2d at 313.

### 4.    A RICO Conspiracy Cannot Plausibly Be Inferred from the Existence of Ongoing Government Investigations

The Schwab Plaintiffs' allegation that "several Defendants have admitted that government entities . . . have targeted them in seeking information about potential misconduct [regarding LIBOR]" (Bond Compl. ¶ 118) is also insufficient to state a plausible RICO conspiracy claim because courts have held that the existence of an ongoing government investigation "carries no weight in pleading an [unlawful] conspiracy claim" given that "[i]t is unknown whether the investigation will result in indictments or nothing at all." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  Moreover, any inferences drawn from ongoing confidential government investigations would amount to "pure speculation" because these investigations "may be broader or narrower than the allegations at issue." *Id.* (holding that allegations that the Department of Justice "served defendants with

subpoenas and [was] conducting a grand jury investigation" were insufficient to state antitrust

conspiracy claim); *see also In re Optical Disk Drive Antitrust Litig.*, No. 10-2143, 2011 WL

3894376, at *9 (N.D. Cal. Aug. 3, 2011) (same); *In re Fla. Cement & Concrete Antitrust Litig.*,

746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010) (same).

The Schwab Plaintiffs' allegations concerning ongoing government investigations are

also insufficient because the Amended Complaints show that many of the investigations are not

even directed toward USD LIBOR.  (*See, e.g.*, Bond Compl. ¶¶ 116-63.)  As the Second Circuit

has made clear, allegations about foreign investigations and proceedings without any linkage to

the wrongdoing at issue in the United States are insufficient to adequately plead an unlawful

conspiracy because such allegations amount to "merely [ ] suggest[ing] . . . that 'if it happened

there, it could have happened here.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir.

2007); *see also In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1315-16

(holding that allegations about "foreign government and international investigations, and

antitrust fines" were insufficient to allege conspiracy claim).[6]

## II.     THE CALIFORNIA STATE LAW CLAIMS SHOULD BE DISMISSED

### A.     The Cartwright Act Claims Fail for the Same Reasons as the Sherman Act Claims

The Schwab Plaintiffs' claims under California's state antitrust statute, the Cartwright

Act (Cal. Bus. & Prof. Code § 16720, *et seq.*), are entirely derivative of their federal antitrust

claims and should be dismissed for the reasons set forth in Defendants' Antitrust Memorandum,

---

[6] For the same reasons, the Schwab Plaintiffs' allegations that UBS has been "'granted conditional leniency or conditional immunity from authorities in certain jurisdictions . . . in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR'" are inadequate to state a RICO conspiracy claim arising out of the supposed manipulation of USD LIBOR.  (Bond Compl. ¶ 131.)  Similarly, Barclays' recent settlement with U.S. and foreign regulators does not provide the factual basis necessary to support the Schwab Plaintiffs' claims because nothing in the Barclays settlement agreements refers to any Defendant or plausibly suggests that there was a conspiracy among the Defendants.

which are incorporated herein by reference.[7]  Other than the *Illinois Brick* indirect purchaser doctrine, which is inapplicable under the Cartwright Act,[8] all of the federal requirements for asserting a Sherman Act section 1 violation apply to the Schwab Plaintiffs' claim under the Cartwright Act.  Thus, the Schwab Plaintiffs' failure to adequately plead concerted action, antitrust standing, and injury in fact each independently mandates dismissal not only of their Sherman Act claims, but of their Cartwright Act claims as well.  *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1025 ("Federal pleading standards govern in federal court, even as to state claims . . . .  Since plaintiffs' federal and state-law antitrust claims are predicated on the same allegations of conspiracy, they likewise are insufficient to state a claim for conspiracy."); *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) (same); *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338-39 (Ct. App. 1995) (same); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) (applying *Twombly* and dismissing Cartwright Act claim).

The Schwab Plaintiffs do not attempt to allege otherwise.  The brief, boilerplate sections of the Amended Complaints devoted to the Cartwright Act simply rehash their Sherman Act section 1 theory and expressly cite an alleged "*per se* violation of the federal antitrust laws" as a basis for their Cartwright Act claims.  (Bond Compl. ¶¶ 239-45.)

## B.   The Claims for Interference with Economic Advantage Should Be Dismissed

To state a claim for intentional interference with prospective economic advantage under California law, a plaintiff must allege facts showing "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;

---

[7] For the reasons set forth in Defendants' Antitrust Memorandum, the Schwab Plaintiffs' Sherman Act claims (First Claim for Relief) should also be dismissed.

[8] *See In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1087 (N.D. Cal. 2007).

(2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the

defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5)

economic harm to the plaintiff proximately caused by the acts of the defendant.'" *Korea Supply*

*Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Sup. Ct. Cal. 2003).  Where, as here, the

plaintiff alleges that fraudulent conduct disrupted an economic relationship, Rule 9(b) applies.

*See, e.g.*, *BioResource, Inc. v. U.S. PharmaCo Distrib., Ltd.*, No. 10-1053, 2010 WL 3853025, at

*3 (N.D. Cal. Sept. 29, 2010).

As a threshold matter, the Schwab Plaintiffs' claims for intentional interference with

prospective economic advantage should be dismissed as time barred.  Under California law,

claims for intentional interference with prospective economic advantage must be brought within

two years.  Cal. Civ. Proc. Code  § 339; *Cheske v. Waring*, No. 10-06363, 2010 WL 4916611, at

*2 (C.D. Cal. Nov. 24, 2010).  For the reasons articulated in Part I.A of the Memorandum of

Law in Support of Defendants' Motion to Dismiss the Exchange-Based Plaintiffs' Claims (the

"Exchange-Based Memorandum"), which are incorporated herein by reference, the Schwab

Plaintiffs were on inquiry notice of their potential claims more than two years before the first

Schwab complaint was filed on August 23, 2011.  As a result, those claims are time-barred.

The Schwab Plaintiffs also have not adequately pled their claims for intentional

interference with prospective economic advantage because they fail to identify the economic

relationships that allegedly have been disrupted.  Rather, they generically assert only that they

had relationships with unidentified "issuers or sellers of LIBOR-based financial instruments."

(Bond Compl. ¶ 248.)  Under such circumstances the claims for intentional interference must be

dismissed.  *See Hill v. City of El Segundo*, 33 F. App'x 254, 257 (9th Cir. 2002) (affirming

dismissal where complaint "does not identify an economically gainful relationship between the [plaintiff] and a third party").

The Schwab Plaintiffs also do not allege any facts showing that Defendants were aware of the economic relationships between the Schwab Plaintiffs and the unnamed third parties or that Defendants intentionally interfered with those unidentified economic relationships.  Instead, the Schwab Plaintiffs merely parrot the legal elements of the claim, asserting that "Defendants acted with the knowledge that interference or disruption of the [plaintiffs'] relationships with issuers or sellers of LIBOR-based financial instruments were certain or substantially certain to result from Defendants' unlawful manipulation of LIBOR."  (Bond Compl. ¶ 250.)  Such boilerplate allegations of intent are facially deficient.  *See, e.g.*, *Dollar Tree Stores Inc. v. Toyama Partners, LLC*, No. 10-00325, 2010 WL 1688583, at *4 (N.D. Cal. Apr. 26, 2010) (granting motion to dismiss where complaint contained no clear statement of facts showing that defendant had knowledge that interference was certain or substantially certain to occur); *Griner v. Mercurio*, No. CV 05-6583 DSF, 2005 WL 6133906, at *12 (C.D. Cal. Dec. 6, 2005) (same).

Finally, the Schwab Plaintiffs fail to identify the role each Defendant is alleged to have played in disrupting the unidentified economic relationships.  Instead, they generically assert that "Defendants" collectively "interfered with and disrupted" the unidentified relationships.  (Bond Compl. ¶ 249.)  Such omnibus pleading is impermissible.  As California courts have recognized, "[i]n a case with multiple defendants, 'a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme.'"  *Openwave Sys. Inc. v. Fuld*, No. 08-5683, 2009 WL 1622164, at *5 (N.D. Cal. June 6, 2009) (quoting *Swartz v. KPMG LLP*, 476 F. 3d 756, 765 (9th Cir. 2007)).

### C.     The Claims for Breach of an Implied Covenant of Good Faith and Fair Dealing Should Be Dismissed

The Schwab Plaintiffs' claims that Defendants breached the implied covenant of good faith and fair dealing should be dismissed because the Amended Complaints do not adequately allege the existence of a valid contract between the parties, much less identify any specific contractual obligation that Defendants allegedly failed to carry out in good faith.

"[A] cause of action for a breach of the implied contractual covenant of good faith and fair dealing cannot be stated in the absence of a valid contract to which the covenant appertains." *Pac. States Enters., Inc. v. City of Coachella*, 13 Cal. Rptr. 2d 68, 74 (Cal. Ct. App. 1993); *accord Burrows v. BAC Home Loans Servicing, LP*, No. 09-01813, 2010 WL 308720, at *3 (E.D. Cal. Jan. 12, 2010) ("[A] claim for 'breach of the implied covenant of good faith and fair dealing . . . depends on the existence of an enforceable contract.'") (citation omitted).  Moreover, even where a valid contract between the parties is properly pled, a claim for breach of the implied covenant of good faith and fair dealing nonetheless must be dismissed unless "the specific contractual obligation from which the implied covenant of good faith and fair dealing arose" is sufficiently alleged.  *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. 07-04178, 2008 WL 552482, at *6 (N.D. Cal. Feb. 27, 2008).

The bare-boned allegations in the Amended Complaints fail to satisfy these pleading requirements.  The Schwab Plaintiffs allege only in conclusory terms that they "contracted to purchase LIBOR-based financial instruments from Defendants or dealer entities that were subsidiaries or other affiliates of Defendants."  (Bond Compl. ¶ 252.)  They fail to specify which of the Schwab Plaintiffs allegedly entered into a contract with which Defendant, when the contracts were allegedly entered into, or what any of the terms of the alleged contracts were.  In the absence of any such factual allegations, this Court cannot reasonably infer the existence of an

enforceable contract between the parties.  *See Lent v. JP Morgan Chase Bank*, No. 11-345, 2011 WL 5971190, at *2-3 (C.D. Cal. Nov. 29, 2011) (in order to adequately plead existence of a contract, plaintiff must plead the "contract either 'by its terms, set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference, or by its legal effect'") (citation omitted).  And if no contract existed between the parties, there can be no claim for breach of the implied covenant of good faith and fair dealing.  *See Pac. States Enters., Inc.*, 17 Cal. Rptr. 2d at 74; *Burrows*, 2010 WL 308720, at *3.

Moreover, the Schwab Plaintiffs fail to identify any express terms of the unidentified contracts that Defendants supposedly failed to discharge in good faith.  The Schwab Plaintiffs claim that Defendants acted "unfairly . . . by secretly manipulating LIBOR to be lower than it otherwise would have been."  (Bond Compl. ¶ 255.)  But the Court cannot sustain a breach of the implied covenant claim based on this kind of freestanding allegation of bad faith, unconnected in any way to an express contractual obligation that Defendants owed to the Schwab Plaintiffs.  *See Inter-Mark*, 2008 WL 552482, at *7 ("The implied covenant of good faith and fair dealing is intended to 'protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.'") (citation omitted); *F.M. Tarbell Co. v. A&L Partners, Inc.*, No. 10-1589, 2011 WL 1153539, at *3 (C.D. Cal. Mar. 23, 2011) (same).[9]

---

[9] The Schwab Plaintiffs that purchased fixed-rate instruments allege that they "relied on the accuracy of LIBOR in undertaking these transactions."  (Bond Compl. ¶¶ 191, 193; Market Compl. ¶¶ 195, 197; Bank Compl. ¶¶ 191, 193.)  To the extent that these plaintiffs are claiming that Defendants engaged in some sort of bad faith *prior to* entering into any contract, those allegations cannot support a cause of action for breach of the implied duty of good faith and fair dealing.  *See McClain v. Octagon Plaza, LLC*, 71 Cal. Rptr. 3d 885, 897 (Cal. Ct. App. 2008) (implied covenant of good faith and fair dealing "does not require parties to negotiate in good faith prior to any agreement").

### D.       The Unjust Enrichment Claim Should Be Dismissed

As a threshold matter, the Schwab Plaintiffs' unjust enrichment claims are untimely because they were filed more than three years after the Schwab Plaintiffs were on inquiry notice of their potential claims. *See F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 346-48 (Cal. Ct. App. 2008) (applying three-year statute of limitations to unjust enrichment claim). Specifically, as is noted in Defendants' Exchange-Based Memorandum (*see* Part I.A), the Schwab Plaintiffs had notice of their potential claims at least several months before August 23, 2008.

The unjust enrichment claims are also inadequately pled. To the extent that those claims are based on alleged fraudulent conduct by Defendants, Rule 9(b) requires the claims to be pled with particularity. *See Bittel Tech., Inc. v. Bittel USA, Inc.*, No. C 10-00719, 2010 WL 3221864, at *5 (N.D. Cal. Aug. 13, 2010); *In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009), *aff'd*, 2011 WL 6887072 (9th Cir. Dec. 30, 2011). The Schwab Plaintiffs, however, fail to allege the substance of any purported misrepresentations or when or by which Defendant those supposed misrepresentations were made.[10]

The Amended Complaints also do not give rise to a plausible inference that Defendants were unjustly enriched at the Schwab Plaintiffs' expense. *See CRV Imperial-Worthington*, 770 F. Supp. 2d at 1078 (claim for unjust enrichment requires pleading the "receipt of a benefit and the unjust retention of the benefit at the expense of another"). Although the Schwab Plaintiffs allege in a conclusorily manner that "Defendants knowingly received and retained wrongful benefits and funds from" the Schwab Plaintiffs, (Bond Compl. ¶ 259), they never explain what "benefits" Defendants allegedly received at the Schwab Plaintiffs' expense. To the extent that

---

[10] A claim for unjust enrichment is a quasi-contractual claim that "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *CRV Imperial-Worthington, LP v. Gemini Ins. Co.*, 770 F. Supp. 2d 1074, 1078 (S.D. Cal. 2010). Thus, to the extent that the Court finds that the Schwab Plaintiffs have sufficiently pled the existence of a valid contract with Defendants, their unjust enrichment claims must be dismissed.

the Schwab Plaintiffs claim that Defendants benefitted by being able "to pay unduly low interest rates to investors" (Bond Compl. ¶ 10), that allegation fails to support an unjust enrichment claim at least with respect to those Schwab Plaintiffs that purchased financial instruments that were not issued by Defendants.  Those Schwab Plaintiffs could not have received interest payments from, and are not alleged to have had any relationship whatsoever with, Defendants. In the absence of any such relationship, the Schwab Plaintiffs' unjust enrichment claims must be dismissed.  *See Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009) (finding that connection between plaintiffs and defendant was "too attenuated" to support unjust enrichment claim where defendant allegedly profited from contracts entered into with suppliers that employed plaintiffs and subjected them to substandard working conditions); *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1122 (C.D. Cal. 2010) (dismissing unjust enrichment claim where plaintiffs failed to identify any relationship between defendants and the plaintiff laborers who worked on farms from which defendants purchased cocoa).

## CONCLUSION

For the foregoing reasons, the Schwab Plaintiffs' Amended Complaints should be dismissed in their entirety.

31

Dated:  June 29, 2012

/s/ Robert F. Wise, Jr.
Robert F. Wise, Jr.
Arthur J. Burke
Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
robert.wise@davispolk.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
Telephone: (212) 450-4000
Fax: (212) 450-4800

*Attorneys for Defendants Bank of America
Corporation and Bank of America, N.A.*

Respectfully Submitted By:

/s/ Daryl A. Libow
Daryl A. Libow
Christopher M. Viapiano
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
libowd@sullcrom.com
viapianoc@sullcrom.com
Telephone: (202) 956-7500
Fax: (202) 956-7056

*Attorneys for Defendant The Bank of Tokyo-
Mitsubishi UFJ, Ltd.*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com
Tel: 212.841.1000

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
awiseman@cov.com
tisaacson@cov.com
Tel: 202.662.6000

Michael R. Lazerwitz
Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
mlazerwitz@cgsh.com
jkim@cgsh.com
Tel: 212.225.2000

*Attorneys for Defendants Citibank, N.A. and Citigroup, Inc.*

/s/ David R. Gelfand
David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
dgelfand@milbank.com
smurphy@milbank.com
Telephone: (212) 530-5000

*Attorneys for Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*

/s/ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com


Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
richard.schwed@shearman.com

*Attorneys for Defendant Credit Suisse Group AG*


/s/ Ed DeYoung
Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendant HSBC Holdings plc and HSBC Bank plc*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
msilverman@paulweiss.com
afinch@paulweiss.com
Telephone: (212) 373-3355

*Attorneys for Defendant Deutsche Bank AG*


/s/ Thomas C. Rice
Thomas C. Rice
Juan A. Arteaga
Joan E. Flaherty
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
jflaherty@stblaw.com

*Attorneys for Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.*

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant Lloyds Banking Group plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant HBOS plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant The Norinchukin Bank*

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
Telephone: (312) 902-5200

*Attorneys for Defendant Royal Bank of Canada*

/s/ Robert G. Houck
Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd St.
New York, NY 10019
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com
Telephone: 212-878-8000

*Attorneys for Defendant The Royal Bank of Scotland Group plc*

/s/ Ethan E. Litwin
Ethan E. Litwin
Morgan J. Stecher
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
litwin@hugheshubbard.com
stecher@hugheshubbard.com
Telephone: (212) 837-6000

*Attorneys for Defendant WestLB AG*