# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | **ORAL ARGUMENT REQUESTED** |

**THE EXCHANGE-BASED PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE
EXCHANGE-BASED AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

LOVELL STEWART HALEBIAN
JACOBSON LLP
Christopher Lovell
Gary Jacobson
Ian Stoll
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
clovell@lshllp.com
gsjacobson@lshllp.com
istoll@lshllp.com

KIRBY McINERNEY LLP
David Kovel
Daniel Hume
Andrew McNeela
Roger Kirby (*of counsel*)
825 Third Avenue, 16th floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
dkovel@kmllp.com
dhume@kmllp.com
amcneela@kmllp.com
roger.w.kirby@gmail.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................…......1

ARGUMENT ..........................................................................……………1

I.    PLAINTIFFS ADEQUATELY ALLEGE A CLAIM FOR MANIPULATION UNDER THE CEA .......................................................……………1

    A.    Far More Than In *In re Natural Gas*, The Exchange Complaint Alleges Plausible Claims For Manipulation In Violation Of The CEA......................……1

    B.    The Link Between LIBOR and Eurodollar Futures is Undeniable ........................4

    C.    Recently Available Information Plausibly Shows That Defendants Knowingly, Intentionally And Systematically Manipulated LIBOR And Eurodollar Futures Contract Prices ........................................................................5

    D.    Defendants Propose Overly Stringent Pleading Requirements That Are Contrary To The CEA's Remedial Purpose ..........................................................8

        1.    LIBOR Is A Commodity Under The CEA, And Its Given Level Constitutes The "Price" Of LIBOR ..........................................................10

        2.    Section 22(a) Is "Critical" To Preventing Manipulation, And LIBOR Is The Commodity Underlying Eurodollar Futures Contracts.................11

        3.    Rule 9(b) Specifically Provides That "Intent" May Be Alleged Generally, And Manipulation Is In The Nature Of An Illegal Restraint Of Trade ..........................................................12

    E.    Plaintiffs' Allegations Are Far More Detailed And Plausible Than Those Upheld In Prior Cases ..........................................................13

        1.    Barclays And Other Traders Requested Changes In LIBOR To Benefit Their Eurodollar Futures Contract Positions.................................17

        2.    Defendants' *Dura*-Related Arguments Are Misplaced............................18

        3.    Defendants' Ability To Influence Prices, As Well As Causation, Are Plausibly Alleged In Detail..........................................................20

    F.    Plaintiffs Plausibly Pled Manipulative Intent ........................................21

    G.    Plaintiffs Adequately Pled a Claim for Aiding and Abetting ...............................22

    H.    Plaintiffs Adequately Pled a Claim for Vicarious Liability...................................23

i

II.     PLAINTIFFS' CEA CLAIM IS TIMELY ........................................................................24

        A.      Plaintiffs Were Not On Inquiry Notice Before March 2011.................................24

        B.      Plaintiffs Adequately Pled Fraudulent Concealment.............................................30

III.    THE CEA IS NOT BEING APPLIED EXTRATERRITORIALLY..................................32

        A.      Plaintiffs Satisfy the Standard Traditionally Applied in this Circuit....................32

        B.      Plaintiffs' Claims Comport with Morrison Because the Challenged
                Transactions Occurred on a Domestic Exchange ..................................................32

        C.      The Contention that the CEA Is Being Applied Extraterritorially Is Meritless.....33

IV.     PLAINTIFFS ADEQUATELY ALLEGE A CLAIM FOR UNJUST ENRICHMENT ....36

CONCLUSION.................................................................................................................................37

# TABLE OF AUTHORITIES

*766347 Ontario Ltd. v. Zurich Capital Markets, Inc.*,
   274 F. Supp. 2d 926 (N.D. Ill. 2003);.........................................................23

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)........................................................................34

*In re Air Cargo Shipping Services Antitrust Litig.*,
   MDL No. 1775 (E.D.N.Y. Aug. 21, 2009) ...................................................5

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ...............................................................19

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) ............................................... *passim*

*In re Amaranth Natural Gas Commodities Litig.*,
   612 F. Supp. 2d 376 (S.D.N.Y. 2009) ........................................................22

*In re Amaranth Natural Gas Commodities Litig.*,
   711 F. Supp. 2d 301 (S.D.N.Y. 2010) ........................................................23

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)........................................................27

*Amerigas Propane, L.P. v. BP Am., Inc.*,
   691 F. Supp. 2d 844 (N.D. Ill. 2010) ........................................................26

*Anderson v. Dairy Farmers of Am., Inc.*,
   No. 08 Civ. 4726, 2010 WL 1286181 (D. Minn. March 29, 2010)............29

*In re Ann Taylor Stores Sec. Litig.*,
   807 F. Supp. 990 (S.D.N.Y. 1992)............................................................13

*In the Matter of: Anthony J. DiPlacido*,
   CFTC No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008) .....................10, 16, 17

*In re Blech Sec. Litig.*,
   928 F. Supp. 1279 (S.D.N.Y. 1996)..........................................................12

*Blount v. Rizzi*,
   400 U.S. 410 (1971)..................................................................................34

iii

*Blue Cross of Cent. N.Y. v. Wheeler,*
    93 A.D. 2d 995, 461 N.Y.S. 2d 624 (4th Dept. 1983) .................................................36

*Cange v. Stotler & Co.,*
    826 F. 2d 581 (7th Cir. 1987) ............................................................................11, 18

*Cargill, Inc. v. Hardin,*
    452 F. 2d 1154 (8th Cir. 1971) ...............................................................................10

*CFTC v. Garofalo,*
    No. 10 C 2417, Rec. Doc. 83 (N.D. Ill. Dec. 21, 2010).........................................32, 33

*CFTC v. Parnon Energy Inc.,*
    No. 11 Civ. 3543, 2012 WL 1450443 (S.D.N.Y. Apr. 26, 2012).....................3, 15, 20

*Chevron Corp. v. Donziger,*
    No. 11 Civ. 0691, 2012 WL 1711521 (S.D.N.Y. May 14, 2012)..............................35

*City of Pontiac Gen. Employees Ret. Sys. v. MBIA, Inc.,*
    637 F.3d 169 (2d Cir. 2011)..............................................................................25, 26

*Cox v. Microsoft Corp.,*
    8 A.D. 3d 39 (N.Y. App. Div. 2004) ...................................................................35, 36

*In re Crude Oil Commodity Litig.,*
    No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y June 28, 2007)...............................14

*De David v. Alaron Trading Corp.,*
    814 F. Supp. 2d 822 (N.D. Ill 2011) ......................................................................37

*Denney v. Deutsche Bank A.G.,*
    443 F.3d 253, 264-65 (2d Cir. 2006) .....................................................................19

*DGM Investments, Inc. v. New York Futures Exchange, Inc.,*
    265 F. Supp. 2d 254 (S.D.N.Y. 2003).....................................................................13

*DiPlacido v. CFTC,*
    364 F. App'x 657 (2d Cir. 2009) ...........................................................................11

*Dodona I, LLC v. Goldman, Sachs & Co.,*
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)................................................................35, 36

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)...........................................................................................18, 19

*Eaves v. Designs for Fin., Inc.,*
    785 F. Supp. 2d 229 (S.D.N.Y. 2011).........................................................................13

*In the Matter of Edward A. Cox, Jr. and George F. Frey, Jr.,*
    CFTC No. 75-16, 1987 WL 106879 (CFTC July 15, 1987)........................................15

*In re Elec. Books Antitrust Litig.,*
    No. 11 MD 2293 (DLC), 2012 WL 1946759 (S.D.N.Y. May 15, 2012) ...................37

*Ello v. Singh,*
    531 F. Supp. 2d 552 (S.D.N.Y. 2007).........................................................................24

*In re Energy Transfer Partners Natural Gas Litig.,*
    No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) .......................19, 21

*Frulla v. CRA Holdings, Inc.,*
    596 F. Supp. 2d 275 (D. Conn. 2009).........................................................................31

*In the Matter of Global Minerals & Metals Corp.,*
    CFTC No. 99-11, 1999 WL 1023586 (CFTC Nov. 12, 1999) ....................................12

*Global Servs. v. IKON Office Solutions,*
    No. C 10-05974-JSW, 2011 WL 6182425 (N.D. Cal. Dec. 13, 2011) .......................27

*In re Griffin Trading Co.,*
    683 F.3d 819 (7th Cir. 2012) .....................................................................................32

*Gunderson v. ADM Investor Servs., Inc.,*
    No. C96-3148-MWB, C96-3151-MWB, 2001 WL 624834 (N.D. Iowa Feb. 13, 2001)..26

*Guttman v. CFTC,*
    197 F.3d 33 (2d Cir. 1999).........................................................................................23

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,*
    580 F. Supp. 2d 321 (S.D.N.Y. 2008).........................................................................25

*Hershey v. Pacific Inv. Mgmt. Co. LLC,*
    697 F. Supp. 2d 945 (N.D. Ill. 2010) .........................................................................19

*In re Indiana Farm Bureau Coop. Assoc., Inc.,*
    CFTC No. 75-14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982) ....................................16

*In re Initial Public Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)...................................................................12, 18

*Kohen v. Pacific Inv. Mgmt. Co. LLC,*
   244 F.R.D. 469 (N.D. Ill. 2007)..................................................................19

*Leist v. Simplot,*
   638 F.2d 283 (2d Cir. 1980)......................................................................9

*Log On Am. v. Promethean Asset Mgmt. L.L.C.,*
   223 F.Supp.2d 435 (S.D.N.Y. 2001)........................................................12

*Merck & Co., Inc. v. Reynolds,*
   130 S. Ct. 1784 (2010)............................................................................25

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,*
   543 F.3d 150 (3d Cir. 2008)....................................................................29

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,*
   500 F.3d 171 (2d Cir. 2007).....................................................................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
   456 U.S. 353 (1982) (S. Ct. 1982) ............................................................9

*Minpeco, S.A., v. Nelson Bunker Hunt, et al.,*
   81 Civ. 7619 (MEL) (S.D.N.Y. 1989) .....................................................20

*Morrison v. Nat'l Australia Bank Ltd.,*
   130 S. Ct. 2869 (2010)..............................................................32, 33, 35

*In re Natural Gas Commodity Litig,*
   337 F. Supp. 2d 498 (S.D.N.Y. 2004)................................................ *passim*

*In re Natural Gas Commodity Litig.,*
   358 F. Supp. 2d 336 (S.D.N.Y. 2005) .....................................................23

*Newby v. Enron Corp.(In re Enron Corp. Secs., Derivative & MDL-1446 "ERISA" Litig.),*
   MDL-1446, 2005 2005 WL 1637912 (S.D. Tex. June 14, 2005)..............................27

*N.Y. v. Hendrickson Bros., Inc.,*
   840 F.2d 1065 (2d Cir. 1988)...................................................................30

*Park v. Thomson Corp.,*
   No. 05 Civ. 2931, 2007 WL 119461 (S.D.N.Y. Jan. 11, 2007)..................................37

*In re Platinum & Palladium Commodities Litig.,*
   828 F. Supp. 2d 588 (S.D.N.Y 2011).............................................18, 19, 23

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.,*
   No. 08 Civ. 42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)......................................31

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.,*
   648 F.3d 533 (7th Cir. 2011) .............................................................................25, 31

*Psimenos v. E.F. Hutton & Co., Inc.,*
   722 F.2d 1041 (2d Cir. 1983)..................................................................................32

*R&W Technical Servs. Ltd. v. CFTC,*
   205 F.3d 165 (5th Cir. 2000) ..................................................................................34

*Redtail Leasing, Inc. v. Bellezza,*
   95 Civ. 5191 (JFK), 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) ..........................36

*In re Rough Rice Commodity Litig.,*
   No. 11 Civ. 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012)....................................21

*S&A Farms, Inc. v. Farms.com, Inc.,*
   678 F.3d 949 (8th Cir. 2012) ..................................................................................19

*Samuels v. Schultz,*
   No. 11 Civ. 6255, 2012 WL 1114095 (W.D.N.Y. Mar. 30, 2012)...........................24

*S.E.C. v. Cavanagh,*
   445 F.3d 105 (2d Cir. 2006)....................................................................................37

*Starr v. Sony BMG Music Entertainment,*
   592 F.3d 314, 323–25 (2d Cir. 2010)......................................................................13

*Statistical Phone Philly v. NYNEX Corp.,*
   116 F. Supp. 2d 468 (S.D.N.Y. 2000).....................................................................31

*Strobl v. N.Y. Mercantile Exch.,*
   768 F.2d 22 (2d Cir. 1985).......................................................................................9

*In re Sumitomo Copper Litig.,*
   182 F.R.D. 85 (S.D.N.Y. 1998) ...............................................................10, 16, 20, 32

*In re Sumitomo Copper Litig.,*
   104 F. Supp. 2d 314 (S.D.N.Y. 2000)......................................................................27

*In re Sys. Software Assocs., Inc. Sec. Litig.,*
   No. 97 Civ. 177, 2000 WL 283099 (N.D. Ill. Mar. 8, 2000)...................................28

*Tab P'Ship v. Grantland Fin. Corp.*,
   866 F. Supp. 807 (S.D.N.Y. 1994).............................................................25

*Tamari v. Bache & Co. S.A.L.*,
   730 F.2d 1103 (7th Cir. 1984) ................................................................33

*Tomlinson  v. Goldman Sachs & Co.*,
   682 F. Supp. 2d 845 (N.D. Ill. 2009) ........................................................25

*U.S. Educ. Loan Trust III, LLC v. RBC Capital Mkts. Corp.*,
   No. 11 Civ. 860, 2011 WL 6778480 (S.D.N.Y. Dec. 21, 2011)................................24

*U.S. v. Reliant Energy Servs., Inc.*,
   420 F. Supp. 2d 1043 (N.D. Cal. 2006) ....................................................15, 16, 17, 22

*U.S. v. Sumeru*,
   449 F. App'x 617 (9th Cir. 2011) ...............................................................32

*Waldman v. New Chapter, Inc.*,
   714 F. Supp. 2d 398 (E.D.N.Y. 2010) ........................................................36

*Wexner v. First Manhattan Co.*,
   902 F.2d 169 (2d Cir. 1990)......................................................................13

*Whelan v. Andy Warhol Found. for the Visual Arts, Inc*,
   No. 07 Civ. 6423 (LTS) (S.D.N.Y. May 26, 2009) ........................................37

**Statutes**

Commodities and Exchange Act, 7 U.S.C §1, *et seq.*................................................ *passim*

Federal Rules of Civil Procedure 9(b) ..................................................... 12

15 U.S.C. 78 u-4(b)(4) ...................................................................18

## INTRODUCTION

Defendants' somewhat conflicting motions[1] fail to carry their burden of showing that the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"), and unjust enrichment claims should be dismissed.

## ARGUMENT

### I.   PLAINTIFFS ADEQUATELY ALLEGE A CLAIM FOR MANIPULATION UNDER THE CEA

#### A.   Far More Than In *In re Natural Gas*, The Exchange Complaint Alleges Plausible Claims For Manipulation In Violation Of The CEA

Regardless of whether the antitrust conspiracy allegations rise to the level of showing an agreement among Defendants to fix and suppress LIBOR[2] (or merely show conscious parallelism),[3] collusion is not an element of a CEA claim.  Compared to the allegations that were deemed sufficient to state a claim in *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ("*Natural Gas*"), the Exchange Complaint makes far more detailed and

---

[1] *See* Memorandum of Law in Support of Defendants' Motions to Dismiss the Exchange-Based Plaintiffs' Claims [Dkt. 168] ("Def. Br."), and certain supplemental memoranda of other Defendants as they are defined in the accompanying Declaration of David E. Kovel: [Dkt. 179] ("UBS Br."); [Dkt. 177] ("Barclays Br."); [Dkt. 171] (Norinchukin Br."); [Dkt. 173] ( "BTMU Br."); and [Dkt. 175] ("Credit Suisse Br.").   Plaintiffs' have also filed a separate joint opposition memorandum relating to their antitrust claims concurrently with this brief (the "Antitrust Opp. Mem.").   To the extent that the antitrust brief provides factual background or legal argument related to the CEA claims, Plaintiffs incorporate that memorandum by reference here.   Barlays has entered into a settlement relating to the alleged manipulation of LIBOR and has not joined certain portions of the Def. Br.   As discussed in the Antitrust Opp. Mem., Defendants have agreed that the Court may consider the settlement documents as incorporated into all plaintiffs' complaints.   The relevant documents include the "DOJ SOF," the "CFTC Order," and the "FSA Final Notice," as defined in the Antitrust Opp. Mem., as well as certain other documents, which are Exhibits 3-5 to the Declaration of David E. Kovel filed herewith. It is also well-established that these documents are subject to judicial notice. *See In re Natural Gas Commodity Litig.* ("*Natural Gas*"), 337 F. Supp. 2d 498, 510 (S.D.N.Y. 2004).

[2] LIBOR is a leading short-term interest rate benchmark intended to reflect a certain bank's costs of borrowing unsecured funds in certain interbank markets.   Amended Consolidated Class Action Complaint in the Exchange-Based Plaintiff Action, [Dkt. 134 in MDL 2262] ("Exch. Compl.") ¶¶11, 15, 75.  Reference to LIBOR is to US Dollar LIBOR unless otherwise stated.

[3]   *See* UBS Br. at 7 ("Even accepting the undisclosed consultant's conclusions at face value, this is at most evidence that Defendants acted in parallel to suppress their USD LIBOR submissions.").

plausible allegations of: (i) false reporting for each Defendant (Exch. Compl. Fig. 1-19); (ii) a causal connection between the price being misreported and the futures price (*id.* ¶¶200-20); and (iii) traders profiting from the misreports as further evidenced by several government investigations (*id.* ¶ 181-82).  And *Natural Gas* is, by far, the most comparable prior CEA manipulation case to this one.  Specifically, between August 2007 and May 2010 ("Class Period"), Plaintiffs plausibly allege that:

- Each Defendant systematically made false reports of its own borrowing rate, a discretionary number that only the Defendant itself could know.  As a result of the false reports, the LIBOR quote of each Defendant was distorted and suppressed as compared to numerous specifically identified benchmarks. *Compare* ¶¶49-82 *with Natural Gas passim*.

- Unlike in *Natural Gas*, Plaintiffs here presented data driven measurements of daily suppression in graphic form *for each Defendant* in Figures 1-19 of the Exchange Complaint.

- Each Defendant knew about the other Defendants' false reports because, unlike in *Natural Gas*, each Defendant's reports were made public each morning by the British Bankers Association ("BBA").  *Compare* ¶¶ 6-13, 72 *with Natural Gas passim*. Absent collusion, however, it was not plausible that all Defendants would submit LIBOR bids below the Federal Reserve Eurodollar Deposit rate.  ¶¶ 53-54.

- Each Defendant failed to publicly disclose anything about the falsity of its and the other Defendants' borrowing rates submissions.  ¶¶ 184-87, 197.  On the contrary, certain Defendants individually, and all Defendants through the BBA, publicly stated that the reports were accurate.  ¶¶ 188-96.[4]

---

[4]  On August 5, 2008, the BBA published a "Feedback Statement" on LIBOR which concluded that "contributing banks that responded to the BBA's request for consultation were confident that their submitted rates were 'truly reflective of their perceived borrowing costs,'" DOJ SOF ¶ 44 and further that "*all contributing banks are confident that their submissions reflect their perception of their true costs of borrowing, at the time at which they submitted their rates.*" FSA Final Notice ¶ 138 (emphasis added).  The senior executives of at least seven of the Defendants (or their affiliates) are members of the governing board of the BBA, which oversees the setting of LIBOR.  Exch. Compl. ¶ 8.

- Because LIBOR is the underlying commodity for Eurodollar futures, the relationship between LIBOR and the Eurodollar futures contract price is far more direct than the relationship in *Natural Gas* between the various natural gas indices and the natural gas futures contract prices.  ¶¶ 200-20; *see* Section I.B. and I.D.1. *infra*.

- Each Defendant was not a neophyte in the Eurodollar futures market but well knew, and necessarily intended, that the manipulation of LIBOR would cause artificial prices of Eurodollar futures contracts.  ¶¶ 43, 215-20.  Indeed, Defendants' employees and affiliates traded Eurodollar futures contracts and profited from the false LIBOR reports.

- Each Defendant had an additional, interrelated motive to falsely report and manipulate LIBOR: improving its apparent financial health during the financial crisis by making its borrowing costs seem lower than they actually were.  ¶¶ 43, 46-48.

- Each Defendant's actions materially contributed to and were therefore a cause of what Plaintiffs allege in great detail to have been the artificially suppressed LIBOR and artificially increased Eurodollar futures contract prices during the Class Period. ¶ 215.

- Plaintiffs paid the artificial prices to transact in Eurodollar futures contracts.  ¶¶ 21-26, 214, 236-37.

By virtue of the foregoing allegations, the Exchange Complaint far more plausibly states the four elements[5] of CEA manipulation as to each Defendant's individual conduct than did the sustained complaint in *Natural Gas*.  Specifically, each Defendant had the ***ability to influence LIBOR*** and Eurodollar futures contract prices by virtue of each Defendant's submission of its own false reports, its omissions to disclose anything about its false reports or the false reports of others banks, and certain Defendants' false public statements on their own or through the BBA. In this manner, each individual Defendant intentionally caused (*i.e.,* materially contributed to) artificial prices of LIBOR and Eurodollar futures contracts during the Class Period.

---

[5] The four elements are: "(1) the defendant possessed the ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant intended to do so."  *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.,* 11 CIV. 3543 (WHP), 2012 WL 1450443, at *8 (S.D.N.Y. Apr. 26, 2012).

**B.     The Link Between LIBOR And Eurodollar Futures Is Undeniable**

Despite Defendants' attempts to decouple LIBOR and Eurodollar futures, the two are inextricably linked such that a manipulation of the former is a manipulation of the latter.  The Eurodollar futures contracts at issue did not provide for delivery of Eurodollar or other deposits or instruments in satisfaction of the contract. Exch. Compl. ¶ 214.  Nor did Eurodollar futures "cash settle" to actual Eurodollar deposits or prices.  Instead, the Eurodollar futures contracts were valued and "cash settled" **to and only to** the applicable LIBOR formula.   ¶ 204.  Specifically, the cash settlement price for Eurodollar futures contracts is calculated as one hundred (100) minus the three-month LIBOR.[6]  DOJ SOF ¶ 9.  Thus, LIBOR is the ***only*** variable component and the sole determinant of the settlement price of the (misnamed) Eurodollar futures contracts; in actuality, such futures contracts are reflections of the market's estimates of LIBOR subtracted from 100 and, at contract settlement, are precisely this amount.  Exch. Compl. ¶ 204.  "[T]he terms 'LIBOR futures' and 'Eurodollar futures' are often used interchangeably."  *Id.*

Furthermore, the Chicago Mercantile Exchange ("CME") has a licensing agreement with the BBA that "permits the [CME] to use BBA LIBOR as the basis for settling Three-Month Eurodollar futures contracts and to refer to BBA LIBOR in connection with creating, marketing, trading, clearing, settling and promoting Three-Month Eurodollar futures contracts." CME Rulebook, Chapter 452, Three-Month Eurodollar Futures.  The CME also has the same licensing agreement to use BBA LIBOR as the basis for settling CME one-month Eurodollar contracts.  CFTC Order at 6, n.3.  Accordingly, in this context, LIBOR ***is*** the commodity underlying and, indeed, the determining value of the so-called Eurodollar futures contract.  Exch. Compl. ¶¶ 206-

---

[6]  This is because Eurodollar futures are settled at the fixing on the second London bank business day immediately preceding the third Wednesday (*i.e.*, usually a Monday) of March, June, September and December.  DOJ SOF ¶ 9.

07.  For this reason, the Commodity Futures Trade Commission ("CFTC") has determined that LIBOR is a commodity in interstate commerce.  CFTC Order at 4, 11, 25-27.[7]

### C.   Recently Available Information Plausibly Shows That Defendants Knowingly, Intentionally And Systematically Manipulated LIBOR And Eurodollar Futures Contract Prices

In addition to the Exchange Complaint's  detailed and plausible allegations of manipulation, the Court should consider recent events that occurred subsequent to the filing of that pleading, in construing the allegations in the light most favorable to Plaintiffs.[8]

Here, various subsequent government orders and newly-released documents from the Barclays settlement show that Barclays, and several other banks, knowingly, intentionally and systematically manipulated dollar LIBOR and Eurodollar futures contracts for pecuniary gain and reputational advantage between 2005 and 2009.  These recent developments fully dovetail with and buttress the allegations of manipulation in the Exchange Complaint, as more fully discussed below.

The Barclays settlement makes clear that Defendants' manipulation stemmed from two interrelated motives: (1) protecting the panel banks from appearing weak during the recent financial crisis, **_starting in August 2007_**, _see_ DOJ SOF ¶¶ 39-40; and (2) for Barclays and other banks, profiting from their financial derivatives positions in Eurodollar futures contracts on the

---

[7]  The CEA defines "Commodity" as, _inter alia_, an interest in which contracts for future delivery are presently or in the future dealt in.  7 U.S.C. § 1a (9).  The CFTC, which is to be accorded substantial deference on the point, has explicitly found LIBOR to be a commodity traded in interstate commerce.  _See_ CFTC Order at 4, 11, 25-27 (_e.g._, "Here, as evidenced by the extensive communications among traders and submitters, Barc1ays' traders and submitters each specifically intended to affect the price at which the daily BBA LIBOR for U.S. Dollar, Sterling, and Yen … all commodities in interstate commerce, would be fixed.").  Further, Defendants concede that LIBOR is a commodity.  _See_ Def. Br. at 15 (Plaintiffs' CEA claims concern "manipulation of USD LIBOR, a foreign commodity.").

[8]  _See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig._, MDL No. 1775, 2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009) ("_In re Air Cargo_") (reversing Magistrate Judge's finding of lack of plausibility by reading the complaint in the light of government charges and admissions by certain defendants that all occurred after the filing of the complaint).

CME. *See* DOJ SOF ¶¶ 11-16, 22, 24, 26-27; FSA Final Notice ¶¶ 59, 191 ("Where Barclays acted in concert with other banks, the method of calculation of . . . LIBOR meant that the risk of manipulation increased materially.").  Plaintiffs have alleged both such motives.  Exch. Compl. ¶¶ 43, 47.  But the Barclays settlement shows that Defendants' manipulation to profit from their trading positions began in 2005, much earlier than the August 2007 date alleged in the Exchange Complaint.  *Id.* ¶¶ 1, 47.

Specifically, the Barclays settlement documents show that: Barclays employed derivatives traders in New York, New York and in London, England (1) who traded financial instruments tied to LIBOR, including Eurodollar futures contracts, and were involved in the LIBOR manipulation by submitting and causing the submission of materially false and misleading LIBOR contributions; and (2) who, after initiating and continuing their effort to manipulate LIBOR contributions, negotiated and entered into derivative transactions, ***including Eurodollar futures transactions***, with counterparties that did not know that Barclays employees were attempting to manipulate the relevant rate.  DOJ SOF ¶¶ 10, 22, 33.  These false submissions affected LIBOR at least "on some occasions," (*id.* ¶ 30) and "***[m]oreover, those false and misleading Dollar LIBOR contributions affected or tended to affect the price of commodities, including Eurodollar futures contracts.***"  *Id.* ¶ 33 (emphasis added); FSA Final Notice ¶ 45.

The Barclays settlements further demonstrate that:

- Barclays, and likely other banks, participated in an illegal scheme specifically designed to manipulate the price of Eurodollar futures contracts, especially at settlement.  *See* DOJ SOF ¶¶ 13, 22; FSA Final Notice ¶¶ 59, 75-78; CFTC Order

at 2.[9]  Settlement prices could be manipulated because 100 minus the applicable LIBOR equals the Eurodollar futures settlement price. And Barclays traders repeatedly requested that LIBOR submissions be manipulated on the day of Eurodollar futures settlements for trading profit. *See* Exch. Compl. ¶ 204.

- Barclays was able to manipulate LIBOR (and thus Eurodollar futures) on its own by deliberately getting "knocked out" from the interquartile composite LIBOR range.  CFTC Order at 9; *see also* FSA Final Notice ¶ 58.

- Barclays and other banks specifically manipulated LIBOR to move and manipulate the prices of Eurodollar futures contracts on the CME in their favor. DOJ SOF ¶¶ 9, 11-16, 22, 24, 26-27; FSA Final Notice ¶¶ 59, 191.

- Between January 2005 and May 2009, at least 173 trader requests for LIBOR submissions were made to Barclays' LIBOR submitters (including 11 requests based on communication from traders at other banks).  FSA Final Notice ¶ 56(i).

- From August 2005 through at least May 2008, "[c]ertain Barclays swaps traders made requests of traders at other Contributor Panel banks for favorable LIBOR or EURIBOR submissions from those banks.  In addition, certain Barclays swaps traders received requests from traders at other banks for favorable LIBOR or EURIBOR submissions from Barclays rate submitters."  DOJ SOF ¶¶ 24.[10]

- Barclays employed derivatives traders in ***New York*** and in London, who traded financial instruments tied to LIBOR, including Eurodollar futures contracts, and

_____

[9] For example, on Friday, March 10, 2006, a Barclays dollar swaps trader located in London ("Trader-1") sent an email to a Barclays  LIBOR submitter ("Submitter-1") stating: "Hi mate[.] ***We have an unbelievably large set on Monday (the IMM)***.  We need a really low 3m [3-month] fix, it could potentially cost a fortune.  Would really appreciate any help, I'm being told by my NYK [counterparts in New York] that it's extremely important.  Thanks." On Monday, March 13, 2006 (***the last trading day for the March Eurodollar futures contract***), Trader-1 wrote to Submitter-1 stating: "The big day has[] arrived…My NYK were screaming at me about an unchanged 3m libor.  As always, any help wd be greatly appreciated.  What do you think you'll go for 3m?  Submitter-1 responded, "I am going 90 altho 91 is what I should be posting."  DOJ SOF ¶ 13; FSA Notice at ¶ 59 (emphasis added).

[10]  For example, on October 26, 2006, a trader at another bank, referred to as Trader-1, at approximately 7:12 a.m. communicated by electronic message with a Barclays trader, stating: "where do you think 3m libor will be today? When the Barclays trader replied that Barclays' submitter "thinks 38," Trader 1 responded: "wow, unchanged?!…If it come in unchanged I'm a dead man ha ha."  The Barclays trader replied that he would "have a chat" and later that day, when Barclays' 3-month LIBOR submission was lower, Trader 1 wrote: "Dude I owe you big time! Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor."  DOJ SOF ¶ 26.

were involved in the LIBOR manipulation by causing the submission of false LIBOR quotes.  DOJ SOF ¶¶ 10, 16, 33.

- Barclays' manipulations of the submissions, at traders' requests, affected the ***fixed rates*** on some occasions, and false and misleading LIBOR contributions "affected or tended to affect the price of commodities, including Eurodollar futures contracts."  DOJ SOF ¶¶ 30, 33.

- Barclays' false and misleading LIBOR contributions affected or tended to affect the price of commodities, including Eurodollar futures contracts, and "[w]here Barclays acted in concert with other banks, the method of calculation of . . . LIBOR meant that the risk of manipulation increased materially."  FSA Final Notice ¶ 191.

- Barclays employed derivatives traders who negotiated and entered into derivative transactions, including Eurodollar futures transactions, with counterparties that did not know that Barclays' employees were attempting to manipulate the relevant rate.  DOJ SOF ¶¶ 10, 33.

- On the majority of occasions where Barclays traders contacted Barclays' submitters with requests, as evidenced in "a large amount of e-mail and instant messages," Barclays' LIBOR submissions were consistent with the traders' requests. The submitters knew accommodating traders' requests was improper. FSA Final Notice ¶¶ 55, 71(i); CFTC Order at 9-11.

## D.   Defendants Propose Overly Stringent Pleading Requirements That Are Contrary To The CEA's Remedial Purpose

In their motions to dismiss, several of the Defendants argue that LIBOR is unlike other commodities subject to the CEA, or propose pleading requirements far more onerous than those required by that statute or the Federal Rules.  But these arguments, in addition to being incorrect on the law, *see* Sections D.1-3, E-F, *infra*, are counter to the CEA's broad remedial goals.

Defendants first argue that LIBOR is a "hypothetical" and "informal" number, subject to the reporting banks' discretion and beyond the CEA's ambit.  *See* Def. Br. at 27 & n.25.

8

Notably, however, no Defendant argues that its LIBOR submissions reflected its honestly held belief as to its true borrowing costs.  Nor do Defendants dispute that they could not borrow and did not borrow at the rate stated in their respective reports to the BBA.  Tellingly, Defendants UBS and Barclays have expressly distanced themselves from this argument.  *See* UBS Br. at 14 n.11 (carving out argument from those incorporated by reference).

Concurrently, Defendants manufacture a virtually insurmountable pleading standard that demands particularized details of each step taken by each Defendant.  The exception, of course, is Barclays, which does not join in the other Defendants' manipulation arguments because it admitted facts speaking to the very allegations of manipulation the other Defendants protest as being implausible. *See* Barclays Br. at 1 & n.5.  It almost goes without saying that Barclays' admission of facts establishing Plaintiffs' allegations makes them not just plausible, but certain.

In any event, all Defendants construct aggressive standing, loss causation, and other arguments that would, notwithstanding the pleading of the falsity of each Defendant's reports, further raise the bar far above what may practically be known and alleged at the pleading stage.

However, the CEA was originally enacted and has since consistently been expanded and strengthened for the overarching purpose of preventing price manipulation.  *Leist v. Simplot*, 638 F.2d 283, 315 (2d Cir. 1980) ("*Leist*"), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).  The primary benefit of the futures markets is price discovery and, unlike the federal securities laws, the CEA prohibits **all** price manipulation. *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985) ("a little price manipulation" is permitted under the federal securities laws but any and all price manipulation is prohibited under the CEA).  Because the "means of manipulation are limited only by the ingenuity of man" and woman, Congress and the Courts have purposely refrained from creating immunities or safe

harbors from the definition of manipulation lest crafty traders evade the CEA's blanket prohibition of all price manipulation. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) *cert. denied,* 406 U.S. 932 (1972); *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 89-90 (S.D.N.Y. 1998) (same).

As such, the CEA is unqualifiedly remedial legislation which must be construed and applied consistent with its overarching purpose to **deter, prevent and redress** manipulation. *Parnon Energy*, 2012 WL 1450443, at *8.

## 1.   LIBOR Is A Commodity Under The CEA, And Its Given Level Constitutes The "Price" Of LIBOR

The Exchange Complaint plainly alleges that each Defendant violated Section 13(a) of the CEA by (i) manipulating "the price of **any** commodity in interstate commerce…**or** for future delivery …" and (ii) by delivering "false **or** misleading **or** knowingly inaccurate reports concerning … market information **or** conditions that affect **or** tend to affect the price of **any** commodity in interstate commerce" by falsely reporting borrowing costs to the BBA.  7 U.S.C. §§ 9, 13(a)(2) (emphasis added).

Contrary to Defendants' argument that "LIBOR is a hypothetical rate," *e.g.*, Def. Br. at n. 25, the CFTC and DOJ have recognized that LIBOR is a "commodity"[11] and the **level** of LIBOR is a "price" within the meaning of the CEA.  *See* CFTC Order at 27 (finding that Barclays' traders and submitters each specifically intended to affect the ***price*** at which the daily BBA LIBOR . . . would be fixed" (emphasis added)); *see also In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *31 (CFTC Nov. 5, 2008) ("*DiPlacido*") (finding that an artificial price includes

---

[11]  *See supra,* n.7.

the calculation of an average of prices over a given time period), *DiPlacido v. CFTC*, 364 Fed.

Appx. 657 (2d Cir. 2009), *cert. denied* ---U.S.--- , 130 S. Ct. 1883 (2010).

> ## 2.  Section 22(a) Is "Critical" To Preventing Manipulation, And LIBOR Is The Commodity Underlying Eurodollar Futures Contracts

In 1982, the CEA was amended to include an express right of action for civil plaintiffs

under Section 22(a). *See* 7 U.S.C. § 25(a).  "Congress viewed private lawsuits as critical to

protecting the public and fundamental to maintaining the credibility of the futures market."

*Cange v. Stotler & Co.,* 826 F.2d 581, 594-95 (7th Cir. 1987).

Section 22(a)(1)(D) of the CEA permits a private action if the violation constitutes a

manipulation of the price of "any contract of sale of any commodity for future delivery" (or

option on such contract or commodity) or "the price of the commodity underlying such

contract."  7 U.S.C. §§ 25(a)(1)(D).  Here, Defendants intended to, and did, manipulate the

prices of both Eurodollar futures contracts and LIBOR, which is the "commodity underlying"

and determining the value of the Eurodollar futures contract.  *See* pp. 2-6 and Sections I.B. and

I.D.1 *supra*.  Again, there is no delivery of Eurodollars on the Eurodollar futures contract and the

*only* variable component for the cash settlement of the Eurodollar futures contract is LIBOR.

Exch. Compl.  ¶¶ 204, 206; *see* Section I.B. and I.D.1. *supra*.

Thus, LIBOR directly and precisely determined Eurodollar futures contract value at

settlement.  The precise amount of artificiality in LIBOR determined the precise amount of

artificiality in the Eurodollar futures contract settlement.  Exch. Compl. ¶ 204, 206.  Moreover,

the CME's licensing agreement with the BBA to use BBA LIBOR as the basis for settling

Eurodollar futures contracts further demonstrates this essential connection.

### 3.   Rule 9(b) Specifically Provides That "Intent" May Be Alleged Generally, And Manipulation Is In The Nature Of An Illegal Restraint Of Trade

The CFTC has pronounced that manipulation is "an example of an illegal restraint of trade."  *In the Matter of Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999 WL 1023586, *n.51 (CFTC Nov. 12, 1999).  Rule 9(b) makes clear that the "intent" element of a restraint or other claim may be alleged generally under Rule 8(a).  Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Therefore, Rule 8(a) should govern Plaintiffs' intent allegations.

To the extent Rule 9(b) applies, Defendants are not arguing or implying that their reputations have been impugned.  The cases are clear that Rule 9(b)'s requirements must be "practical," and that the "nature, purposes, and effects" standard for Rule 9(b) is appropriate even in **securities** law manipulation cases.   *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 386 at n.163 (S.D.N.Y. 2003) ("*IPO*") ("no support for" requiring Plaintiffs to plead particular manipulative trades); *Log On America v. Promethean Asset Mgmt. LLC*, 223 F. Supp. 2d 435, 445 (SDNY 2001) (same); *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1291 (S.D.N.Y. 1996) (Rule 9(b) satisfied by alleging "the nature of the market manipulation scheme … despite the absence of specific dates, times, places, prices, and other details outside the purview of the Plaintiffs.").

Depending on what is "practical" in a given case, a plaintiff need not allege even one specific trade or false report.  *See Natural Gas*, 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004). Here, under any assessment of what is "practical," the Exchange Complaint adequately specifies which Defendants underreported LIBOR, and indicates each Defendant's degree of underreporting. *See* Section I.F. *infra.*

### E.    Plaintiffs' Allegations Are Far More Detailed And Plausible Than Those Upheld In Prior Cases

Plaintiffs allege that government investigations, including the admission by UBS that it had obtained leniency from the Department of Justice[12] for LIBOR related misconduct, show the plausibility of the manipulation.  Exch. Compl. ¶ 148, 182; *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323–25 (2d Cir. 2010) (relying in part in a motion to dismiss on the fact that "defendants' price-fixing is the subject of a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice").

In addition, Defendants largely ignore (Def. Br. at 25-28, n.25) that Plaintiffs' allegations include an empirical analysis and an explanation of numerous facts showing that each Defendant underreported its borrowing costs.  *See* Exch. Compl. ¶¶ 48-196.  For example, Plaintiffs identify the anomalous LIBOR-Federal Reserve Eurodollar Deposit Rate spread for sixteen banks.  *See, e.g., id.* ¶ 68.  Each Defendant's LIBOR report, as well as the composite LIBOR, is alleged to have been critically depressed as demonstrated graphically in Figures 1-19 of the Exchange Complaint.[13]  These spreads are uniformly negative from August 8, 2007 through May 17, 2010.

---

[12] The Antitrust Division may grant leniency to corporations reporting "illegal antitrust activity" if they meet certain conditions. *See* Antitrust Div., U.S. Dep't of Justice, Corporate Leniency Policy (1993), *available at* http://www.justice.gov/atr/public/guidelines/0091.pdf, attached as Exhibit 6 to the Kovel Decl.

[13] Defendants assert that Plaintiffs "provide[] no indication of what rate was underreported, by which defendant, and when this alleged underreporting took place."  Def. Br. at 20.  As set forth in the text, each Defendant was a member of the LIBOR reporting panel, each committed the same set of underlying acts – misreporting their borrowing costs to the BBA, publicly stating the costs were accurate, and consistently omitting to disclose the falsity of one another's reports – and estimates of the underreporting of each are alleged in the Exch. Compl. Figures 1-19.  This information is sufficient to provide each Defendant with notice of its false reports and the degree of the alleged falsity.  *Id.* ¶¶ 5, 81.

Moreover, as this Court held in *Eaves v. Designs for Finance, Inc.*, generalities such as allegations against Defendants in the aggregate "may be excused where, for instance, the facts upon which a plaintiff bases its fraud claim are peculiarly within a defendant's knowledge." 785 F. Supp. 2d 229, 249 (S.D.N.Y. 2011) (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)); *see also In re Ann Taylor Stores Sec. Litig.*, 807 F. Supp. 990, 1005 (S.D.N.Y. 1992) (observing that courts have relaxed the Rule 9(b) pleading standard when Plaintiffs are unaware of each defendants' precise role in a conspiracy).  Plaintiffs are simply not required to provide the level of specificity Defendants seek.  *See DGM Invs., Inc. v. New York Futures Exchange, Inc.*, 265 F. Supp. 2d 254, 264

*Id.* ¶¶ 54, 68-69.  Following the bankruptcy of Lehman Brothers, the spread of each defendant uniformly became increasingly negative.  *Id.* In fact, they do not become positive again until October 2011, after the European Commission raided some of the Defendant banks in connection with its LIBOR investigation.  *Id.* ¶ 59, n.25.

Plaintiffs further support their allegation as to each Defendant that its BBA reports were unduly low by pointing to the "severe discrepancy" and "statistically significant negative correlation[s]" between Defendants' LIBOR quotes and their probability of each Defendant's default.  *Id.* ¶¶ 73-82.  Plaintiffs provide yet further detail as to each Defendant by alleging specific LIBOR submissions that amounted to "bunching" around the fourth lowest quote submitted to the BBA, providing additional support for the assertion that each Defendants was intentionally reducing its LIBOR report.  *Id.* ¶ 99.[14]

Moreover, it is a mathematical certainty that, if a reporting bank adjusts its position in, joins, or removes itself from, the interquartile range used in the LIBOR composite through misreporting its individual LIBOR quote, it will affect the composite of LIBOR.  These allegations are wholly consonant with the recent regulatory findings that Barclays traders serially attempted to manipulate composite LIBOR including by having their bank's quotes removed from the interquartile range to influence composite LIBOR and to profit Barclays' trading.  *See, e.g.,* FSA Final Notice ¶ 58; CFTC Order at 9-10.

---

(S.D.N.Y. 2003) (scienter alleged when "[d]efendants had a financial interest in covering up the manipulation, and although they had knowledge of the manipulation, they failed to enforce [rules] and take affirmative steps to cure the problem").  For this reason, the various arguments that no particularized evidence of misreporting has been alleged are misplaced.

[14]  The cases Defendants cite are inapposite.  For example, the problem in *In re Crude Oil Commodity Litig.*, was that Plaintiffs had failed to allege with specificity any of the manipulative acts.  No. 06 Civ. 6677, 2007 WL 1946553, at *6 (S.D.N.Y June 28, 2007).

The plausibility of Plaintiffs' allegations that Defendants caused artificially low LIBOR is further buttressed by the significant government evidence that ***all*** the reporting banks were suppressing their LIBOR quotes starting in August 2007 and until at least mid-2009.[15]  These same government reports further note that when there was coordination among Defendants, it caused an even larger misreporting of LIBOR.  FSA Final Notice ¶ 191; DOJ SOF ¶ 24 ("The likelihood that the LIBOR . . . fix would be affected increased when other Contributor Panel banks also manipulated their submissions as part of a coordinated effort.").

Furthermore, each Defendant also publicly made, itself or through the BBA, false statements to the effect that LIBOR was correct and the individual quotes were correct.  Exch. Compl. ¶¶ 189-96; *see also* n. 4 *supra*.  The timing, maker and substance of these false public statements are alleged as to each Defendant.  *Id.*

With respect to suppression, each Defendant's false reports, and false statements are illegitimate factors that "contributed"[16] to or played a "substantial part"[17] in bringing about artificial LIBOR and, therefore, artificial Eurodollar futures contract prices. "Fundamentally, markets are information processing systems," and a "market price is only as 'real' as the data

---

[15] *See*, *e.g.*, DOJ SOF at ¶ 36 (during the period August 2007 through at least January 2009, Barclays often submitted "inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been"), ¶ 42 ("all of the Contributor Panel banks, including Barclays, were contributing rates that were too low"), ¶ 44 ("The BBA noted suggestions [from Barclays] that contributor banks may be exhibiting 'herd' behavior."); CFTC Order at 22 (in December 2007, a senior Barclays LIBOR submitter emailed his supervisor stating: "My worry is that *we (both Barclays and the contributor bank panel)* are being seen to be contributing *patently false rates*. We are therefore being *dishonest by definition* and are at risk of damaging our reputation in the market and with the regulator") (emphasis added).

[16] *CFTC v. Parnon Energy*, 2012 WL 1450443, at *13 (S.D.N.Y. Apr. 26, 2012) (quoting *In re Kosuga*, 19 Agric. Dec. 603, 624 (USDA 1960)) ("It is enough, for purposes of a finding of manipulation in violation of sections 6(b) and 9[(a)(2)] of the [CEA] that respondents' actions **contributed** to the price [movement].")  (emphasis added).

[17] *In re Cox*, CFTC No. 75-16, 1987 WL 106879, at *12 n.8 (CFTC July 15, 1987) (recognizing there can be multiple causes of an artificial price and holding that a charge of manipulation can be sustained where respondents' acts are a proximate cause of the artificial price *i.e.*, "the act or omission played a substantial part in bringing about or actually causing the artificial price; and that the artificial price was either a direct result or a reasonably probable consequence of the act or omission.").

that inform the process of price discovery." *U.S. v. Reliant Energy*, 420 F. Supp. 2d 1043, 1058

(N.D. Cal. 2006).[18]  Far more than in *Natural Gas*, 337 F. Supp. 2d at 508-09, the Exchange

Complaint plausibly alleges that each Defendant caused LIBOR suppression *i.e.*, caused an

artificial LIBOR or artificial LIBOR price.

The Exchange Complaint also adequately alleges the causal connection between artificial

LIBOR prices and artificial prices of Eurodollar futures.  *See*, *e.g.*, Exch. Compl. ¶¶ 207, 211-12,

Figure 20.  Plaintiffs allege that prices of Eurodollar futures have a precise price relationship

with the value of LIBOR.  *Id.* ¶¶ 5, 215 (artificially suppressing LIBOR inflated "the price for

LIBOR-based derivatives like Eurodollar futures").  Indeed, as both the commodity underlying

the Eurodollar futures contract and the benchmark to which that contract mathematically settles,

LIBOR *ipso facto* dictates the price of Eurodollar futures contracts (which are sometimes called

LIBOR futures).  *Id.* ¶¶ 200-20, 236.  To the same extent that LIBOR is artificial, the settlement

price of Eurodollar futures contract will also be artificial, *albeit* in the opposite direction because

of the mathematical formula determining Eurodollar futures contract value.  *See DiPlacido*, 2008

WL 4831204, at *31.  The Barclays settlement documents confirm that the manipulation of

LIBOR affected or tended to affect the price of Eurodollar futures.  DOJ SOF ¶ 33.

Nor in the anticipatory futures market was this direct relation somehow magically limited

to the Eurodollar futures contract's cash settlement day.  Rather, as the name "futures contract"

implies, class members "who exit their [Eurodollar futures contract] positions before settlement

are still affected by LIBOR mispricing because . . . to the extent that LIBOR is mispriced in the

present, expectations of what LIBOR will be in the future will also be skewed."  Exch. Compl. ¶

---

[18] It is well established that "when a price is affected by a factor which is not legitimate, the resulting price is
necessarily artificial."  *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 91 (quoting *In re Indiana Farm Bureau*,
CFTC No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982)); *see also Reliant Energy*, 420 F. Supp. 2d at 1058 (same).

209.  Separately, the "current and prospective higher settlement prices of CME Eurodollar futures created higher reference points for the expectations of all market participants." *Id.* ¶ 218.

Plaintiffs also graphically allege the relationship between Eurodollar futures and LIBOR in April 2008.  *Id.* ¶¶ 211-12, Figure 20.  Given these detailed facts, Plaintiffs have plausibly alleged the artificiality in the prices for Eurodollar futures.  *Id.* ¶¶ 206, 215 ("By suppressing and manipulating LIBOR to artificially low levels, the defendants necessarily manipulated and directly inflated CME Eurodollar futures contract prices to artificially high levels.").  Plainly the "supra-competitive prices for CME Eurodollar futures contracts" and other LIBOR-based futures were "artificial" within the meaning of the CEA.  *Id.* ¶¶ 210, 217.  *See Reliant Energy*, 420 F. Supp. 2d at 1058 ("Fraud and deceit are not legitimate market forces."); *see also DiPlacido*, 2008 WL 4831204, at *29-31.

### 1. Barclays And Other Traders Requested Changes In LIBOR To Benefit Their Eurodollar Futures Contract Positions

Again, Barclays misreported LIBOR at times directly to impact the price of Eurodollar futures contracts.  *See* DOJ SOF ¶¶ 13, 22; FSA Final Notice ¶¶ 59, 75-78.  Carefully echoing the statutory language of Section 13 of the CEA, the DOJ stated that such manipulation "affected or tended to affect the price of commodities, including Eurodollar futures contracts."  DOJ SOF ¶ 33.

Complementing Plaintiffs' extensive allegations of each Defendants substantial underreporting, the regulators have found that Barclays traders, primarily from New York and London, kept requesting that Barclays submit false LIBOR quotes.  *See* pp. 6-8 *supra* (recounting the government's findings in these respects).  Because Barclays' traders made the requests in order to impact their positions in the Eurodollar futures contracts, causation as it relates to Plaintiffs' artificial price allegations are essentially admitted.

17

### 2.  Defendants' *Dura* Related Arguments Are Misplaced

Unlike the federal securities laws, the CEA does not statutorily create a requirement to plead or prove loss causation.  *Compare* CEA *passim with* 15 U.S.C. §78u-4(b)(4) *and Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-6 (2005) (the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(b)(4), "expressly imposes" on plaintiffs "the burden of proving" loss causation).  In seeking to apply this statutory requirement and the intent of Congress in the securities fraud context, the U.S. Supreme Court in *Dura* was guided by the purpose of the Private Securities Litigation Reform Act ("PSLRA").[19]

Applying this securities law requirement in *Dura*, the Supreme Court relied on the "pure logic" that the violation there, a single misstatement, had a static effect on the market until correction of the misstatement.  544 U.S. at 342-3.  Therefore, a person who bought at the inflated price would logically also sell at the inflated price unless an intervening event occurred to at least somewhat partially reveal the truth and diminish the inflation.  *Id.* at 342.  In stark contrast to the static inflation of *Dura*, the charts of each Defendant's false reporting tend to indicate daily and varying amounts of falsity and impact over time (however, this is all subject to discovery).  Exch. Compl. ¶¶ 51-72 and Figures 1-19.

And courts confronted with allegations of manipulation (rather than with misrepresentation) have repeatedly held that the manipulation dissipates on its own after the occurrence of conduct.  *Compare IPO I*, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003) *with In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-01 (S.D.N.Y 2011)

---

[19]  The PSLRA had found that there were significant class action abuses under the federal securities laws including the filing of too many cases with too little basis, which caused businesses too much in costs to defend.  In stark contrast to the hundreds of filings of securities law class actions in some years, class actions for CEA manipulation have been extremely rare, averaging less than one per year for the last two decades prior to 2011.  Also unlike the federal securities laws, under the CEA, the private right of action is "critical."  *Cange*, 826 F.2d at 594-95.

(holding that "*Dura*'s loss causation principles" do not apply manipulative conduct alleged under the CEA; loss causation is ***not*** an element of a CEA claim); *see also Kohen v. Pacific Inv. Mgmt. Co.*, 244 F.R.D. 469,475 (N.D. Ill. 2007), *aff'd* 571 F.3d 672, 679 (7th Cir. 2009) (Posner, J.) (rejecting invitation to extend *Dura* to the CEA context because "the elements of proof are different");[20] *see also Merrill Lynch & Co.*, 500 F.3d at 183 (refusing to extend *Dura* to common-law fraud claims); Exch. Compl. ¶ 6.[21]

Finally, at this stage, Plaintiffs are not required to plead precise trading ***losses*** to support standing or causation.  Injury, for both Article III and statutory standing purposes, exists simply by virtue of the fact that Plaintiffs allege they "paid a higher price than would otherwise be the case absent the alleged manipulation."  *Kohen*, 244 F.R.D. at 475; *Denney v. Deutsche Bank A.G.*, 443 F.3d 253, 264-65 (2d Cir. 2006) (offsets which eliminate damages do not impair "injury-in-fact" standing). [22]

---

[20]  Defendants' citation to cases outside this District in no way detracts from the solid reasoning of cases such as *Platinum & Palladium* and *Kohen*.  First, *S&A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949 (8th Cir. 2012), was not a manipulation case, was decided at the summary judgment stage, and expressly recognized that "the causation requirement of [the CEA] may be met more easily than defendants imagine."  Second, *Hershey v. Pacific Inv. Mgmt. Co.*, 697 F. Supp. 2d 945, 954-55 (N.D. Ill. 2010), was a magistrate judge's decision disregarding "that the district court [had already drawn] a distinction between class certification in cases brought pursuant to the [CEA] and those brought pursuant to the Security Exchange Act of 1934" when ruling on an evidentiary motion.  Such a clear violation of the law-of-the-case doctrine cannot be considered persuasive authority. Ultimately, Defendants' sole support for importing *Dura* to a CEA claim is a single unpublished decision, which did not decide whether "to import" *Dura* into the CEA context.  *See In re Energy Transfer Partners Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *11-12 (S.D. Tex. Aug. 26, 2009) (unreported).  To the extent this Court disagrees and imports a PSLRA loss causation standard to CEA claims, Plaintiffs respectively request leave to re-plead.

[21]  While Defendants claim that Plaintiffs do not properly allege standing, Def. Br. at 24 n.19, the very case they rely on to support that point notes that when "plaintiffs transacted at artificial prices, injury may be presumed."  *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 380 (S.D.N.Y. 2010).  Plaintiffs allege such trading, *see, e.g.*, Exch. Compl. ¶¶ 231, 234, 236-37, and their statutory standing is accordingly presumed.  *Id.; see also Kohen*, 244 F.R.D. at 474, *aff'd*, 571 F.3d 672 (7th Cir. 2009) (standing proper when plaintiff "alleged that he suffered actual damages from purchasing the. . . [c]ontract at a manipulated price").

[22] Defendants are wrong that Plaintiffs have not alleged that they paid more, or received less, than prevailing market prices for Eurodollar futures or options, and suffered a loss.  Def. Br. at 22, 27 n.25.  Plaintiffs allege that during the Class Period, they and other class members traded on exchange-based products tied to LIBOR such as Eurodollar

### 3.   Defendants' Ability To Influence Prices, As Well As Causation, Are Plausibly Alleged In Detail

The allegations and argument supporting Defendants' causation of artificial prices also supports the element of Defendants' ability to influence LIBOR and Eurodollar futures prices. *Compare* pp. 2-8 *supra* and 27-31 *infra* relating to the combination of commissions whereby each Defendant caused artificial prices *with Parnon Energy*, 2012 WL 1450443, at *13 (holding that the elements of a manipulation claim are overlapping and interdependent).  Indeed, courts have refused to recognize the "ability to influence prices" as an element that is separate from the elements of the causation of artificial prices.  *Compare In re Sumitomo,* 182 F.R.D. at 89-90 (Pollack, J.) *with Minpeco, S.A., v. Nelson Bunker Hunt, et al.*, 81 Civ. 7619, Corrected Transcript dated August 15, 1988 at p. 16716 (Lasker, J.) (attached as Exhibit 10 to the Kovel Decl.).

Further, Plaintiffs' allegations that Defendants had the ability to influence the price of Eurodollar futures contracts is also plausibly supported by the detailed causation allegations described *supra*.  Exch. Compl. ¶ 233 ("Because Eurodollar futures contract prices settle to, and solely to, LIBOR, persons manipulating LIBOR have the ability to influence and, indeed, manipulate the price of Eurodollar futures contracts.").  Again, plausibility is enhanced by reading this "ability to influence" allegation in the light of the fact that Barclays misreported LIBOR at times directly to impact the price of Eurodollar futures contracts.  *See* DOJ SOF ¶¶ 13, 22; FSA Final Notice ¶¶ 59, 75-78.  Barclays traders would not have continued to do this unless the conduct "affected or tended to affect the price of commodities, including Eurodollar futures contracts."  DOJ SOF ¶ 33.

---

futures and options; transacted at artificial and unlawful prices; paid artificially-high prices; and were harmed as a consequence of defendants' unlawful conduct.  *See* Exch. Compl. ¶¶ 20-26, 236-37.

### F.   Plaintiffs Plausibly Pled Manipulative Intent

Here, Plaintiffs can establish manipulative intent by sufficiently alleging intent to manipulate either Eurodollar futures **or** the commodity underlying Eurodollar futures, *i.e.,* LIBOR.  *See Natural Gas,* 337 F. Supp. 2d at 522 (citing Section 22(a)(1)(D)).[23]  Because they are so intertwined, intentional manipulation of either would suffice to state a claim, and here Plaintiffs have plausibly alleged intentional manipulation of both.  *See* Exch. Compl. ¶¶ 43, 215-20, Figs. 1-19.  Plaintiffs support this by alleging strong facts from which Defendants' intent can reasonably be inferred: (a) Government investigations of Defendants including of wrong-doing by Defendants' traders (Exch. Compl. ¶¶ 180-82, 133-81 generally); (b) interrelated motives of trading profit and masking deteriorating financial health (*id.* ¶¶ 43, 46-48); (c) the precise mathematical correlation between LIBOR and Eurodollar futures settlement prices (which was much different than *Natural Gas* where most of the cash markets at issue were not the underlying commodity for natural gas futures) (*id.* ¶¶ 200-20); (d) that at least seven of the Defendants' executives were on the twelve-member BBA board, which licensed the CME to use LIBOR as the settlement factor (*i.e.*, underlying commodity) for Eurodollar futures (*id.* ¶¶ 8, 201, 204, 206-07); and (e) that Defendants otherwise well knew what the consequence of LIBOR price artificiality would be for Eurodollar futures contract settlement and trading price because Defendants dealt in Eurodollar futures, which were the largest commodity futures contract by

---

[23] Defendants' comparisons to *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) and *In re Energy Transfer Partners Natural Gas Litig.*, 2009 WL 2633781, at *7 (UBS Br. at 17) are inapposite.  *Energy Transfer*, is at odds with precedent in this District (*see Natural Gas*, 337 F. Supp. 2d at 508) and, unlike here, rejected a CEA claim based on allegations of manipulation of a commodity that did not underlie the natural gas futures contract.  *Rough Rice* involved the question of whether violating position limit rules, without more, gave rise to a manipulation claim for the futures contracts at issue.

trading volume.  *Id.* ¶¶ 8, 43, 200-20.[24]

Reading these allegations in the light of the subsequent Barclays settlement greatly enhances the plausibility of the manipulative intent allegations.  Barclays, acting with other banks, specifically intended to ***manipulate Eurodollar futures contracts*** and LIBOR through false reports of LIBOR from 2005 forward.  *See* DOJ SOF ¶¶ 13, 22; FSA Final Notice ¶¶ 59, 75-78.[25]  Critically, the Barclays settlement shows that the trading profit motive manipulation came first in 2005.  This suggests that Defendants' later "financial health" motives were only part of Defendants' on-going manipulation for trading profit motives.  *See Reliant Energy*, 420 F. Supp. 2d at 1059 ("[I]f one intends to deceive the market into setting a price different from the price that would otherwise prevail, one intends to create an artificial price.").

### G.    Plaintiffs Adequately Pled a Claim for Aiding and Abetting

Plaintiffs have adequately alleged aiding and abetting,[26] first, by alleging primary violations of the CEA based upon a showing of coordinated behavior among Defendants.  Exch. Compl. ¶¶ 43, 54, 72, 162, 181, 218-20; *see also* Antitrust Opp. Mem. at pp. 6-28.  Drawing as well from the coordinated behavior described in the Barclays settlements, the allegations relating to UBS, and the ongoing global government regulatory and criminal investigations, *id.* ¶¶ 131-

---

[24] At a minimum, Defendants' manipulation of LIBOR was reckless as to the intent to manipulate Eurodollar futures. *In re Amaranth Nat'l Gas Commodities Litig., III,* 612 F. Supp. 2d 376, 384 n.21 (S.D.N.Y. 2009).

[25] *See* DOJ SOF ¶¶ 11-16, 22, 25-27, 39-40; *see also* FSA Final Notice ¶ 188 (the Derivatives Traders requested LIBOR submissions that "were motivated by profit and sought to benefit Barclays' trading positions."); Exch. Compl. ¶¶ 148, 157, 167-76.  The CFTC found that Barclays' LIBOR submitters understood the traders' motives and "acted with manipulative intent by submitting false, misleading or knowingly inaccurate market information," which reflected the "profit motive" of Barclays' and other banks' swaps traders.  CFTC Order at 27.  The CFTC found that such profit motive may evidence intent, although profit motive is not a necessary elements.  *Id.*

[26] Pleading aiding and abetting under Section 22(a)(1), 7 U.S.C. § 25(a)(1), requires that the defendant: "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *Natural Gas*, 337 F. Supp. 2d at 511; *see also Amaranth II*, 587 F. Supp. 2d at 542 (aiding and abetting sufficiently pled where it was "reasonable to infer" knowledge).

53; DOJ SOF ¶¶ 11, 23, 36, 50, it is reasonable to infer at this stage that Defendants knew of and aided each others' wrongdoing.[27]

### H.      Plaintiffs Adequately Pled a Claim for Vicarious Liability

Contrary to Defendants' contention, *see* Def. Br. at 29, n.27, Plaintiffs have stated a claim for vicarious liability under Section 2(a)(1) of the CEA because they allege that Defendants' agents were "acting for" Defendants. *See In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp. 2d 301, 311 (S.D.N.Y. 2010) ("*Amaranth IV*") (citing *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999)).[28]  Specifically, the Exchange Complaint adequately alleges that several of Defendants' subsidiaries or affiliates furthered the manipulation, and identifies several of their former employees who are implicated in the global investigation into LIBOR.  *See* Exch. Compl. ¶¶ 43-44, 181.[29]  Undoubtedly, the submitters for Barclays and other BBA panel banks were "acting for" Defendants within the meaning of the CEA.  The specific identities of the agents who undertook the manipulation, including Barclays' agents, need not be alleged at this time and can be identified through discovery.

---

[27]  *See Natural Gas,* 337 F. Supp. 2d at 500-03, 509-12 (denying motion to dismiss CEA aiding and abetting claims based on similar collusive manipulative activity); *Amaranth II,* 587 F. Supp. 2d at 542 (allegations creating inference that floor broker "proceeded [to execute orders] despite the knowledge that he was aiding Amaranth's market manipulation" sufficient); *766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.,* 274 F. Supp. 2d 926, 935 (N.D. Ill. 2003) (allegations that defendants "took some affirmative acts in furtherance of the commodities fraud and that these acts were designed to aid in the success of the venture" were sufficient); *see also In re Natural Gas Commodity Litig.,* 358 F. Supp. 2d 336, 345 (S.D.N.Y. 2005) ("*Natural Gas II*") (Rule 9(b) satisfied even if conduct did not directly cause the manipulation of the natural gas futures market but aided and abetted others).

[28]  *See also In re Platinum & Palladium Commodities Litig.,* 828 F. Supp. 2d at 599 ("[A] principal 'need not actually have participated in [the agent's] wrongful conduct or have controlled [the agent's] behavior.'") (quoting *Guttman,* 197 F.3d at 39).

[29]  Moreover, Barclays has expressly acknowledged that the "wrongful acts taken by its participating employees" in furtherance of its manipulation of its LIBOR submissions "were within the scope of their employment at Barclays" and were "intended, at least in part, to benefit Barclays." DOJ SOF at ¶ 50; *see also* FSA Final Notice ¶ 188 ("The Derivative Traders were motivated by profit and sought to benefit Barclays' trading positions."). As with Barclays, all Defendants needed agents to act.

## II.      PLAINTIFFS' CEA CLAIM IS TIMELY

### A.      Plaintiffs Were Not On Inquiry Notice Before March 2011

As an initial matter, because each discrete act of manipulation gives rise to an actionable

claim under the CEA, any claims that are based on misconduct occurring within two years of the

date of the initial complaint in this matter are timely, without the need for tolling.  Thus, it is

undisputed that Plaintiffs have pled timely claims for the period covering April 2009 (two years

prior to the filing of the complaint) at least through May 2010 (the end of the class period).  In

any event, all of Plaintiffs' claims are timely because the earliest they could have pleaded their

CEA claims was March 2011, when UBS disclosed that it was being investigated in connection

with its LIBOR submissions.

Defendants' assertion that Plaintiffs' pre-April 2009 claims are time-barred is based on

two contradictory arguments: (i) that there was sufficient public information before April 15,

2009 to put Plaintiffs on inquiry notice that they had an actionable CEA claim, *see* Def. Br. at 6-

10; and (ii) that Plaintiffs nonetheless have not pled sufficient facts for a CEA manipulation

claim, *see id.* at 2-3, 17-28.  *See U.S. Educ. Loan Trust III, LLC v. RBC Capital Mkts. Corp*., No.

11 Civ. 860 (NRB), 2011 WL 6778480, at *7 (S.D.N.Y. Dec. 21, 2011) (characterizing

defendant's challenges to both the merits and timeliness of the claim as "a logical puzzle").

Their arguments, in addition to being unfair and illogical, are contrary to the law and the facts.[30]

According to Defendants, a plaintiff need not be aware of facts sufficient to plead the

elements of a CEA claim, such as scienter, in order for the statute of limitations to run.  *See* Def.

---

[30]   "Dismissal for failure to state a claim based on a statute of limitations is appropriate only if a complaint shows ***clearly*** that a claim is not timely." *Ello v. Singh*, 531 F. Supp. 2d 552, 568 (S.D.N.Y 2007) (citations and internal quotation marks omitted) (emphasis added);  *see also Samuels v. Schultz*, No. 11-cv-6255, 2012 WL 1114095, at *2 (W.D.N.Y. Mar. 30, 2012) (same).  Defendants have not met that standard here.

Br. at 10 ("[T]he focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim.") (internal marks omitted).  The Second Circuit, however, rejected this very argument in *City of Pontiac Gen. Employees Ret. Sys. v. MBIA, Inc*., 637 F.3d 169 (2d Cir. 2011), stating:

> [A] statute of limitations is intended to prevent plaintiffs from unfairly surprising defendants by resurrecting stale claims. . . [and because of this] it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim: ***A claim that has not yet accrued could never be considered stale***. . . . Only after a plaintiff can ***adequately plead his claim can that claim be said to have accrued***, and only after a claim has accrued can the statute of limitations on that claim begin to run.

*Id*. at 175 (emphasis added). [31]  Accordingly, "a fact is not deemed 'discovered' [for purposes of triggering a statute of limitation] until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id*. [32]

Therefore, in accordance with *Pontiac*, the earliest the statute of limitations could have started running in this case is the point in time when a reasonably diligent plaintiff of "ordinary intelligence"[33] would have had sufficient information to "adequately plead" the CEA claims at

---

[31]  While *Pontiac* involved claims brought under the Securities Exchange Act of 1934 ("Exchange Act") and its holding was based, in part, on *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010), the relevant portions of that decision discussed herein relate to statutes of limitations generally, and those principles apply with equal force to the CEA's statute of limitations.  *See Pontiac*, 637 F.3d at 175 ("Further guidance on this question can be inferred from the basic purpose of a statute of limitations.").

[32]  Defendants' reliance on *Tomlinson v. Goldman Sachs & Co.*, 682 F.Supp. 2d 845, 847 (N.D. Ill. 2009)  is misplaced because that decision pre-dates and is inconsistent with the Supreme Court's decision in *Merck*, and the Second Circuit's decision in *Pontiac*.   Similarly, *Premium Plus Partners, L.P. v. Goldman, Sachs & Co*., 648 F.3d 533, 536 (7th Cir. 2011), which Defendants cite as "affirming" *Tomlinson*, does not aid their argument.  In *Premium Plus*, the Seventh Circuit, assuming *arguendo* that *Merck* applied to the CEA, affirmed the judgment in *Tomlinson* because in that case "***all*** of the facts needed to make out a claim [including *scienter*]" were in the public domain.  *Id*. at 537 (emphasis added).  In light of the Second Circuit's broad and definite ruling in *Pontiac*, there is no need to look to the Seventh Circuit for guidance on that issue.

[33]  Defendants' reliance on *Tab P'Ship v. Grantland Fin. Corp*., 866 F. Supp. 807 (S.D.N.Y. 1994) and *GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,* 580 F. Supp. 2d 321 (S.D.N.Y. 2008) to argue that a plaintiff's sophistication can lower the standard for notice is misplaced.   First, under the CEA, the statute of

issue in a complaint.  *Pontiac*, 637 F.3d at 175.  None of Defendants' arguments come close to establishing that Plaintiffs possessed such information prior to March 2011.[34]

Defendants argue that Plaintiffs were on notice of their claims in 2008, based on a smattering of articles that discussed the possibility that certain LIBOR submissions were inaccurate.  *See* Def. Br. at 7.   But Defendants simply ignore that the articles did nothing more than speculate about possible LIBOR discrepancies, did not even suggest that such discrepancies resulted from Defendants' intentional manipulation of their LIBOR submissions, and were accompanied by denials from the BBA that the panel banks submissions represented anything other than their true borrowing costs.

For example, Defendants first rely on a series of three *Wall Street Journal* ("*WSJ*") articles published in April 2008, *see* Def. Br. at 7.  But none of these articles permitted Plaintiffs to plead a CEA claim "with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss," *Pontiac*, 637 F.3d at 175, because they merely: 1) noted that LIBOR had diverged from its "historical relationship" with the Federal Reserve rate (Def. Br. 7-8) raised "***questions*** about whether banks are submitting rates that accurately reflect actual borrowing costs;" (*id.*) and 3) speculated that "banks ***could be*** responding to increasing concerns" that LIBOR did not reflect actual borrowing costs (*id.*).

Similarly, Defendants' reliance on an April 2008 Citigroup analyst report is misplaced

---

limitation is tied to notice by "a person of ordinary intelligence."  *See Natural Gas*, 337 F. Supp. 2d at 512. Second, Plaintiffs represent a class which certainly includes numerous unsophisticated investors, and neither of Defendants' cited authorities are class cases.

[34]  Courts within this Circuit and beyond agree that whether a plaintiff was placed on inquiry notice raises a fact issue that is generally inappropriate on a pre-discovery motion to dismiss.  *See, e.g., Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 859 (N.D. Ill. 2010); *Natural Gas*, 337 F. Supp. 2d at 514; *Gunderson v. ADM Investor Servs., Inc.*, No. C96-3148-MWB, C96-3151-MWB, 2001 WL 624834, at *9, 22 (N.D. Iowa Feb. 13, 2001).

because it did nothing more than suggest that LIBOR *may* understate actual lending costs by 20-30 basis points without implicating any wrongdoing by the panel banks.  *Id.*  Relatedly, although two articles published in May 2008 in the *WSJ* and *Bloomberg* casted doubt on certain LIBOR data, *see id.*, individual Defendants and the BBA continued to maintain that the LIBOR setting process had integrity, including through media campaigns.  Exch. Compl. ¶¶ 188-96.  Finally, Defendants cite two additional articles published in September 2008 and February 2009 by the *WSJ* and the North Carolina Banking Institute, respectively, that, again, simply raised "concerns" about LIBOR's  accuracy, without assigning Defendants' misconduct as the root cause.  *Id.* ¶¶ 86,87.

More critically, at the same time this handful of articles raised mere "questions" and "concerns" about what "may" be happening to LIBOR, Defendants affirmatively and repeatedly denied any wrongdoing, *see* Exch. Compl. ¶¶ 192, 196, and the BBA publicly reported that LIBOR had not been manipulated, *see id.* at ¶ 191.  For example, on August 5, 2008, the BBA reported that "contributing banks that responded to the BBA's request for consultation were confident that their submitted rates were 'truly reflective of their perceived borrowing costs.'" DOJ SOF ¶ 44; *see also* FSA Final Notice ¶ 138 ("*[A]ll contributing banks are confident that their submissions reflect their perception of their true costs of borrowing at the time at which they submitted their rates*.")  (emphasis added).  Such affirmative, public denials of wrongdoing wholly undermine Defendants' inquiry notice analysis.  *See In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 276-77 (S.D.N.Y. 2010) (defendants' denials regarding conduct underlying action "expose[] defendants' inquiry notice argument as trivial at best").[35]

---

[35]  *See also In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 323-24 (S.D.N.Y. 2000) (public denial of belief that "any undue influence" could have been exercised in the market could constitute fraudulent concealment); *Global*

Lastly, despite the various media accounts described above, the Government regulators' apparent inaction in 2008 and 2009 is perhaps the most convincing proof that an average investor lacked sufficient information to plead adequately a CEA claim.  Indeed, as of April 2009, not a single government regulator in the United Kingdom or the United States – despite their unparalleled access to the Panel banks – gave any public indication that they believed that Defendants had manipulated LIBOR.[36]

Defendants' second argument that the data underlying Plaintiffs' analyses was available in April of 2009 also fails.  The analyses Plaintiffs submitted were created by world-class financial and statistical experts who spent hundreds of hours on sophisticated regression analyses and comparisons of different complex financial benchmarks over long periods of time, ***including the period after the alleged suppression***.  Exch. Compl. ¶¶ 49-82, n.25, 115-21.  A statute of limitations is triggered by what a person of "ordinary intelligence" can ascertain, not what a team of financial experts working in concert can discover after expending hundreds of hours.  *See, e.g., Natural Gas*, 337 F. Supp. 2d at 512 (must suggest to a person of "ordinary intelligence" the probability that he has a claim).

---

*Servs. v. IKON Office Solutions*, No. C 10-05974-JSW, 2011 WL 6182425, at *3 (N.D. Cal. Dec. 13, 2011) ("The affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances made the plaintiff's reliance upon the denial reasonable.") (internal citations omitted); *Newby v. Enron Corp.*, MDL No. 1446, 2005 WL 1637912, at *2 (S.D. Tex. June 14, 2005) (persistent public denials of counterclaims "minimized any purported effect other disclosures may have had in causing investors of ordinary intelligence to realize JPMorgan had defrauded them") (internal citation omitted); *In re Sys. Software Assocs., Inc. Sec. Litig.*, No. 97 C 177, 2000 WL 283099, at *11 (N.D. Ill. Mar. 8, 2000) (newspaper articles did not provide constructive notice to securities plaintiff in circumstance where "[d]efendants failed to acknowledge . . . their own emphatic denials of any improprieties published in these very same articles").

[36] As the heads of the Bank of England and the FSA recently testified, "the first I knew of any alleged wrongdoing [regarding LIBOR] was when the reports ***came out two weeks ago***."  Kovel Decl. Exs. 8-9 (emphasis added); *see also id.*, July 16, 2012 Transcript at 39 (the FSA Chairman testified: "I do not think that I had ever thought about manipulation of LIBOR until I was informed of the developing possibility of a case that, as best we can work out from our record, was some time in mid-November 2009"); *id.* at 36 (the FSA's Director of Enforcement and Financial Crimes Division testified: "Towards the end of 2009, it became clear that what that was revealing was some serious concerns" and "we started our own formal investigation in May 2010").

Moreover, knowledge of LIBOR pricing is meaningless without information reasonably revealing the motivation behind the LIBOR pricing patterns. *See Anderson v. Dairy Farmers of Am., Inc.*, No. 08 Civ. 4726, 2010 WL 1286181, at *6 (D. Minn. Mar. 29, 2010) (unless "plaintiffs knew or should have known of DFA's alleged intent to cause artificial . . . prices," the statute of limitations cannot commence based solely on knowledge that DFA purchased the commodity during the relevant time); *Amaranth II,* 587 F. Supp. 2d at 534 ("If a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA because it does not send a false signal. There must be 'something more,' some additional factor that causes the dissemination of false or misleading information.").

It was not until UBS' public revelation in March 2011 that the government was investigating possible LIBOR manipulation that an investor of ordinary intelligence would think that, contrary to the BBA's and the LIBOR banks' frequent denials, the strange movements in LIBOR were due to the Panel bank's scheme to manipulate LIBOR by submitting false data.[37]

Finally, the statute of limitations cannot bar CEA claims based on the conduct relating to the trading scheme described in Barclays settlements made public on June 27, 2012, and not alleged in the Exchange Complaint. *See, e.g.,* DOJ SOF ¶¶ 11-16, 23, 25-27; FSA Final Notice at ¶¶ 53-56(i), 57-60, 63-65, 67, 73-78, 82-83, 91. This is because, prior to June 27, 2012, there was not a single public article or news report even hinting at this day-to-day opportunistic manipulation of LIBOR to benefit Barclays' and other banks' traders, *or that this misconduct began as early as 2005.* The statute of limitations cannot have run as to this conduct, and

---

[37] Plaintiffs properly timed the filing of their complaints by waiting until some evidence of misconduct was available. To punish them for having waited would only serve to encourage the filing of premature claims. *See, e.g.*, *In re Merck & Co. Sec. Derivative & ERISA Litig.*, 543 F.3d 150, 162 & 164-65 (3d Cir. 2008) (explaining that courts must "remain mindful of the dangers in adopting too broad an interpretation of inquiry notice," which could "open the floodgate" to a rush of premature litigation).

Plaintiffs should be permitted to amend the complaint to include these allegations.

**B.      Plaintiffs Adequately Pled Fraudulent Concealment**

Even if the statute of limitations were somehow triggered, which it was not, it was tolled

under the fraudulent concealment doctrine.  *See Natural Gas*, 337 F. Supp. 2d at 512 ("The

statute of limitations for a violation of the CEA may be tolled if a plaintiff can show fraudulent

concealment of the violation by a defendant.").  "A plaintiff asserting fraudulent concealment . . .

must show: (1) that the defendant concealed the existence of the CEA violation; (2) that the

plaintiff remained unaware of the violation during the limitations period; and (3) that the

plaintiff's continuing ignorance as to the claim was not a result of a lack of due diligence."  *Id*. at

513.  All three requirements are satisfied here.

The first factor, concealment, can be established "by showing either that the defendant

took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong

itself was of such a nature as to be self-concealing."  *Id*. (citations and internal punctuation

omitted).  Here, Defendants' conduct was by its nature self-concealing.  *See* Exch. Compl. ¶¶

184-87.  Defendants' submissions to the LIBOR panel were supposed to, but did not, reflect their

own borrowing costs: information which, by definition, is known only to each Defendant.  The

reporting of false data is a quintessential example of inherently self-concealing misconduct.[38]

Defendants argue, without any citation to case law, that their activity was not self-

concealing because LIBOR submissions were published daily and because of the LIBOR articles

cited above.  Def. Br. at 7-9.  Both arguments are specious.  First, the gravamen of the Exchange

---

[38]  *See Natural Gas*, 337 F. Supp. 2d at 513 ("Among the principal allegations against Defendants are assertions that they reported false trade data to entities that collect  information for public dissemination . . . Such activities are inherently self-concealing."); *New York v. Hendrickson Bros., Inc*., 840 F.2d 1065, 1083-84 (2d Cir. 1988) (bid rigging is inherently self-concealing).

Complaint is that Defendants' public LIBOR submissions were false and did not, in fact, accurately reflect their true borrowing costs.  *See Frulla v. CRA Holdings, Inc.*, 596 F. Supp. 2d 275, 288 (D. Conn. 2009) (public disclosure does not vitiate claim of concealment because disclosure of transactions does not necessarily inform plaintiff of claim).  Second, because Defendants' true borrowing costs were only known to them, the articles discussed above at most raised questions about the accuracy of Defendants' submissions, since there was no direct way of knowing that they were the product of manipulation.

Defendants also took multiple affirmative steps to prevent discovery of their misconduct, *see* Exch. Compl. ¶¶ 192-96, which included using the BBA to conduct an investigation concluding that no LIBOR manipulation had taken place.  *Id.* ¶¶ 188-91; *see also* n. 4, *supra*. Defendants reinforced this message through an affirmative media campaign to combat speculation of possible LIBOR manipulation.  *Id.* ¶¶ 192-96.  These affirmative steps are more than sufficient to adequately plead fraudulent concealment.[39]

Similarly, the second and third prongs of fraudulent concealment are readily met.  As discussed above in detail, Plaintiffs remained unaware of the violations during the limitations period and this was not a result of a lack of due diligence.[40]  *See* Exch. Compl. ¶¶ 182-99.  The real borrowing rates that the Defendants should have been reporting were only available to them. Even Defendants' regulators, with full subpoena power, were unable to ferret out Defendants'

---

[39]  Defendants' supporting citations are wholly inapposite.  *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 483 (S.D.N.Y. 2000) held that defendant's assertion in a legal proceeding that "the evidence does not prove that [it] acted in a grossly negligent manner" cannot toll the statute of limitations.  This modest assertion in court is completely different from the Defendants' affirmative out-of-court media campaign here.  Similarly, neither *Tomlinson* nor *Premium Plus* involved a situation where all Defendants publicly denied all wrongdoing.

[40]  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42, 2011 WL 7053807, at *54 (E.D.N.Y. Jan. 4, 2011) ("[W]here the plaintiffs have adequately pleaded a self-concealing conspiracy, the question of diligence for purposes of fraudulent concealment is better left for the summary judgment stage or the finder of fact at trial.").

schemes until after April 2009.  Due to the self-concealing nature of Defendants' scheme, "no

person of ordinary intelligence would have discovered, or with reasonable diligence could have

discovered before March 15, 2011, facts indicating Defendants were unlawfully suppressing

LIBOR during the Class Period."  Exch. Compl. ¶ 187.

## III.    THE CEA IS NOT BEING APPLIED EXTRATERRITORIALLY

### A.    Plaintiffs Satisfy the Standard Traditionally Applied in this Circuit

Courts in this Circuit have applied the "conduct and effects test" to assess the CEA's

reach in cases involving a quantum of foreign conduct.[41]  Defendants do not dispute that the the

test is satisfied here.  *See* Def. Br. at 16 (plaintiffs plead the "effects of this alleged foreign

manipulation were felt on a domestic futures exchange").  Instead, Defendants argue that that

traditional test is no longer the law in light of *Morrison v. National Australia Bank Ltd.*, 130 S.

Ct. 2869 (2010), which did not address the CEA.  No case in this Circuit has held that *Morrison*

has displaced the application of *Psimenos* to the CEA.[42]  In any event, under *Morrison*, Plaintiffs'

claims do not call for an impermissible extraterritorial application of the CEA.

### B.    Plaintiffs' Claims Comport with *Morrison* Because the Challenged Transactions Occurred on a Domestic Exchange

In *Morrison*, the Supreme Court adopted a transactional approach in assessing the

territorial reach of the Securities Exchange Act:  if "the purchase or sale [of a security] is made

---

[41]  *See Psimenos v. E.F. Hutton & Co., Inc.*, 722 F.2d 1041, 1044-47 (2d Cir. 1983); *see generally In re Sumitomo Copper Litig.*, 182 F.R.D. at 87, 97 (certifying class in case asserting, *inter alia*, CEA claims based on foreign defendants' actions taken outside the United States, including London, that impacted the price of copper futures on a domestic exchange).

[42]  Defendants cite a single, unpublished district court decision from the Northern District of Illinois in support of their position *See* Def. Br. at 15 n.12 (citing *CFTC v. Garofalo*, No. 10 C 2417, Rec. Doc. 83 at 12 (N.D. Ill. Dec. 21, 2010)); *but see In re Griffin Trading Co.*, 683 F.3d 819, 825 (7th Cir. 2012) (finding foreign futures commission merchant registered with the CFTC subject to the CFTC's domestic and extraterritorial regulations) (citing *Morrison*, 130 S. Ct. at 2882-32); *U.S. v. Sumeru*, 449 Fed. Appx. 617, 621 (9th Cir. 2011) (rejecting application of *Morrison* to "*offer* or sale" of certificates of deposit in violation of the Securities Act of 1933 and noting its "textual differences" from the Exchange Act).

in the United States, **or** involves a security listed on a domestic exchange" then application of U.S. securities laws to that transaction is *not* extraterritorial.  *Morrison*, 130 S. Ct. at 2886. *Morrison* explained that "[t]he focus of the Exchange Act is **not upon the place where the deception originated, but upon purchases and sales of securities in the United States**." 130 S. Ct. at 2884 (emphasis added).  It was "the foreign location of the **transaction**" that ran afoul of the presumption against extraterritoriality in *Morrison*.  *Id.* at 2884-85 (emphasis added).

Applying *Morrison* to Plaintiffs' CEA claims, the relevant inquiry is "where the underlying options [or futures] contracts were actually traded."  *Garofalo*, No. 10 C 2417, Rec. Doc. 83 at 12 (N.D. Ill. 2010).[43]  Here, the challenged transactions occurred in **Chicago, Illinois on the CME**,[44] and Defendants' extraterritoriality argument fails here just as it did in *Garofalo*. *Id.* at 13 (CEA applied if trading was executed in Chicago or the relevant contracts were on the CME).

### C.      The Contention that the CEA Is Being Applied Extraterritorially Is Meritless

While suggesting that the Court apply *Morrison*, Defendants ask the Court to do precisely the opposite of what *Morrison* commanded – namely, treat the location of the transactions at issue as irrelevant and the location of Defendants' conduct as dispositive.  *See* Def. Br. at 15-17; UBS Br. at 16.  Defendants' primary tactic is to label LIBOR a "foreign" or "international" commodity because the CEA purportedly reaches only "*domestic* commodities."  Def. Br. at 15 (emphasis added) (citing 7 U.S.C. §§ 13(a)(2), 25(a)(1)); UBS Br. at 18.  But Defendants'

---

[43]  The CEA aims to protect domestic exchanges and markets, *see Tamari v. Bache & Co. S.A.L.,* 730 F.2d 1103, 1106 (7th Cir. 1984) ("[T]he Act creates a comprehensive regulatory scheme premised on control over domestic futures exchanges and the trading of futures contracts on those exchanges."), and prohibits manipulation resulting from *both interstate and international transactions*, *see* 7 U.S.C. § 5(a) ("The transactions subject to this chapter are entered into regularly in interstate and international commerce . . . .").

[44]  *See* Exch. Compl.  ¶ 1 ("[O]n behalf of itself and all others who transacted in Eurodollar futures contracts and options on futures contracts on the Chicago Mercantile Exchange ("CME") . . . .").

33

newly-minted nomenclature ignores that there is no such thing as a "domestic commodity" or an "international commodity" under the CEA.  *See* 7 U.S.C. § 1a.  In fact, the CEA's definition of "commodity" lacks any territorial constraints, *see* 7 U.S.C. § 1a(9), and the Court should decline Defendants' invitation to re-write the statute here.  *See Blount v. Rizzi*, 400 U.S. 410, 419 (1971).

Further undercutting Defendants' argument, the CTFC, the agency charged with administering the CEA, recently determined that LIBOR is a commodity "in interstate commerce."  CFTC Order at 4, 11, 26.  The CFTC's reasonable interpretation of the CEA is owed considerable deference.  *See, e.g.*, *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 171 (5th Cir. 2000).  Defendants' related argument that the allegations merely consist of the domestic "effects" of foreign manipulation of a foreign commodity, *see*, *e.g.*, UBS Br. at 18, ignores that: (i) Eurodollar futures settle based on LIBOR, which Defendants concede is a commodity; (ii) the CEA expressly proscribes the manipulation of a ***commodity that underlies a futures contract*** traded on a domestic exchange, *see* 7 U.S.C. §§ 13(a)(2), 25(a)(1)(D)(ii); (iii) Eurodollar futures are traded domestically on the CME; and (iv) Barclays admitted that its misconduct emanated from and benefitted its New York traders' positions, including Eurodollar futures positions, and that such manipulation impacted the price of those futures contracts.[45]

By its express statutory terms, the CEA is not being applied in an impermissible extraterritorial manner – regardless of Defendants' erroneous contention that their misconduct was limited to London – because the Defendants manipulated a commodity underlying futures contracts traded on a domestic exchange.  *See* 7 U.S.C. § 25(a)(1)(D); Exch. Compl. ¶¶ 14-15,

---

[45]  Such conduct is directly proscribed by Section 9 of the CEA, which makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of ***any commodity in interstate commerce, or for future delivery***. . . ." 7 U.S.C. § 13(a)(2) (emphasis added), and Section 22 permits a private party to sue for manipulation in connection with a futures contract "***or the price of the commodity underlying such contract***."  7 U.S.C. § 25(a)(1)(D)(ii) (emphasis added); *see also Amaranth II*, 587 F. Supp. at  513.

34

207-10; *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir.

2012) ("[T]he transactional test announced in *Morrison* does not require that each defendant

alleged to be involved in a fraudulent scheme engage in conduct in the United States.").

Finally, Defendants mischaracterize not only LIBOR, but also their own conduct.[46]  They

claim that any manipulation occurred in, and was limited to, London, England.  Both the

Exchange Complaint and the Barclays settlement documents tell a different story.  Only two of

the Defendant banks are located or incorporated in England.  Exch. Compl. ¶¶ 27-41 (three

Defendants located in the U.S.).  The false information the three United States Defendants

submitted to the BBA each day necessarily originated domestically.  Moreover, all Defendants

actively traded in the U.S. market, including the Eurodollar futures market.  *Id.* ¶¶ 14-15, 43,

207-10.  Defendant Barclays, in particular, manipulated LIBOR *from New York* in part "to

benefit Barclays' derivatives trading positions," "includ[ing] swaps and futures trading

positions."  CFTC Order at 2.  Because the conduct occurred in part in the U.S. and necessarily

impacted transactions on a domestic exchange, the CEA is not being applied extraterritorially.[47]

## IV.   PLAINTIFFS ADEQUATELY PLEAD A CLAIM FOR UNJUST ENRICHMENT

Privity is unnecessary for an unjust enrichment claim.[48]  *See Cox v. Microsoft Corp.*, 8

---

[46] Defendants' argument that "Plaintiffs make *no plausible claim* . . . that Defendants engaged in the alleged conduct . . . to manipulate contracts on U.S. futures exchanges," Def. Br. at 16 (emphasis added), rings hollow in light of Barclays' admissions that it manipulated LIBOR for the very purpose of benefitting its NY traders' positions, which "affected or tended to affect the price of commodities, including Eurodollar futures contracts." *See* DOJ SOF ¶¶ 12-16; CFTC Order at 2-3, 8-10, 33.  Defendants' affiliates also were registered with the CFTC.  *See, e.g.*, CFTC Order at 5 (Barclays Capital Inc., a wholly-owned subsidiary of Barclays was registered with the CFTC as a Futures Commission Merchant and maintains a business address and an active trading office in New York).

[47]   *Cf. Chevron Corp. v. Donzinger*, No. 11 Civ. 0691, 2012 WL 1711521, at *4-9 (S.D.N.Y. May 14, 2012) (finding application of federal statute proper where the matter involved a multinational scheme through acts that occurred both in the United States and abroad).

[48]   To show unjust enrichment, Plaintiffs must only plead that: 1) Defendants were enriched; 2) the enrichment was at plaintiffs' expense; and 3) the circumstances were such that equity and good conscience require defendants to make restitution.  *See Dodona I*, 847 F. Supp. 2d at 640 (citation omitted).

A.D. 3d 39, 40 (N.Y. App. Div. 2004); *Dodona I*, 847 F. Supp. 2d 624, 640.[49] "A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit" such as "where he is saved expense or loss."  *Blue Cross of Cent. N.Y. v. Wheeler*, 93 A.D.2d 995, 996; 461 N.Y.S.2d 624 (4th Dept. 1983) (citations omitted).

Plaintiffs have sufficiently alleged facts (which are supported by the settlements with Barclays) to infer that Defendants' influenced LIBOR and Eurodollar futures for their own profit or to avoid loss, *see* Exch. Compl. ¶¶ 43, 215-19; *see also* DOJ SOF ¶¶ 11-16, 22, 26-27; FSA Final Notice ¶¶ 53, 59, 75-78; CFTC Order at 10,[50] and Plaintiffs were harmed by this conduct. *See* Exch. Compl. ¶¶ 20-26.

Defendants' own analogous authority establishes that Plaintiffs' allegations state a sufficient relationship to plead an unjust enrichment claim. *See Amaranth II*, 587 F. Supp. 2d at 547 (allegations of a relationship between members of a class and defendant's "entity or trader" arising from NYMEX trades may establish the requisite relationship).  Here, then, Plaintiffs are not too attenuated to support an unjust enrichment claim because Defendants' false LIBOR reports caused them to pay artificial prices for Eurodollar futures.

Furthermore, while CEA and antitrust claims seek redress for plaintiffs' injuries and damages, unjust enrichment claims seek disgorgement of Defendants' ill-gotten gains.  Thus, Plaintiffs' unjust enrichment claim is not duplicative.  To the contrary, courts regularly permit plaintiffs to pursue simultaneously CEA, antitrust, and unjust enrichment claims, and an unjust

---

[49] Defendants' reliance upon *Redtail Leasing, Inc. v. Bellezza*, 95 Civ. 5191, 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997) is misplaced.  In *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (S.D.N.Y. 2010), the district court rejected *Redtail* as "not the law today, as promulgated by New York's own courts . . . ." *Waldman*, 714 F. Supp. 2d at 403 (citing cases, including *Cox v. Microsoft Corp.*, 8 A.D. 3d 39, 40 (N.Y. App. Div. 2004)).

[50] *See, e.g.*, DOJ SOF ¶¶ 13, 22, 26; FSA Final Notice ¶¶ 58-59, 75-78.

enrichment claim may proceed even when its success hinges on the success of other claims.[51]  If Plaintiffs' CEA and antitrust claims succeed, the resulting damages will help compensate class members for their losses, while the unjust enrichment claims would serve the separate, but equally salutary goal, of punishing Defendants and discouraging future manipulative conduct.[52] Justice dictates that Defendants should not unjustly profit from their manipulative practices.

## CONCLUSION

For the foregoing reasons and those set forth in the Antitrust Opposition Memorandum, Plaintiffs respectfully request that the Court deny Defendants' Motions in their entirety, or in the alternative grant Plaintiffs leave to amend their complaint.

Dated:  August 28, 2012

By:   _/s/ Christopher Lovell___         By:   ___/s/ David E. Kovel____

LOVELL STEWART HALEBIAN              KIRBY McINERNEY LLP
JACOBSON LLP                         David Kovel
Christopher Lovell                   Daniel Hume
Gary Jacobson                        Andrew McNeela
Ian Stoll                            Roger Kirby (*of counsel*)
61 Broadway, Suite 501               825 Third Avenue, 16th floor
New York, New York 10006             New York, New York 10022
Telephone: (212) 608-1900            Telephone: (212) 371-6600
clovell@lshllp.com                   dkovel@kmllp.com
gsjacobson@lshllp.com                dhume@kmllp.com
istoll@lshllp.com                    amcneela@kmllp.com
                                     roger.w.kirby@gmail.com

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

---

[51]  *See, e.g.*, *De David v. Alaron Trading Corp.*, 814 F. Supp. 2d 822, 826, 830 (N.D. Ill 2011); *Whelan v. Andy Warhol Found. for the Visual Arts, Inc*, No. 07 Civ. 6423 (LTS) 2009 WL 1457177, at *1, 10 (S.D.N.Y. May 26, 2009); *Park v. Thomson Corp.*, No. 05 Civ. 2931, 2007 WL 119461, at *10 (S.D.N.Y. Jan. 11, 2007); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2012 WL 1946759, at *9, 22 (S.D.N.Y. May 15, 2012).

[52]  *See, e.g.*, *SEC v. Cavanagh*, 445 F.3d 105, 119 (2d Cir. 2006) (the equitable purpose of disgorgement is not to compensate (like damages), but rather "to force a defendant to give up the amount by which he was unjustly enriched").

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2012, I caused the foregoing Exchange-Based Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Exchange-Based Amended Consolidated Class Action Complaint to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Southern District of New York, on all parties registered for CM/ECF in the above captioned matters.


Dated: August 28, 2012

                                        s/ DAVID KOVEL
                                        DAVID KOVEL
                                        KIRBY McINERNEY LLP
                                        825 Third Avenue, 16th Floor
                                        New York, NY 10022
                                        Tel: 212-317-2300
                                        Fax: 212-699-1194
                                        E-mail:dkovel@kmllp.com