**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION

MDL No. 2262

THIS DOCUMENT RELATES TO:

Master File No. 1:11-md-2262-NRB

ECF Case

SCHWAB MONEY MARKET FUND, *et al.*,

Plaintiffs,

v.

BANK OF AMERICA CORPORATION, *et al.*,

Defendants.

No. 11-cv-6412-NRB

**ORAL ARGUMENT REQUESTED**

CHARLES SCHWAB BANK, N.A., *et al.*,

Plaintiffs,

v.

BANK OF AMERICA CORPORATION, *et al.*,

Defendants.

No. 11-cv-6411-NRB

SCHWAB SHORT-TERM BOND MARKET FUND, *et al.*,

Plaintiffs,

v.

BANK OF AMERICA CORPORATION, *et al.*,

Defendants.

No. 11-cv-6409-NRB

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SCHWAB PLAINTIFFS' AMENDED COMPLAINTS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. Plaintiffs Sufficiently State RICO Claims Against Defendants. ........ 4

A. The RICO Amendment Does Not Bar Plaintiffs' Claims. ........ 4

1. Certain LIBOR-based financial instruments on which Plaintiffs suffered damages are not securities. ........ 5

2. Defendants have not shown that securities-fraud claims could lie even with respect to LIBOR-based financial instruments that are securities. ........ 7

3. Plaintiffs' inclusion of securities claims in their original complaints is irrelevant. ........ 10

B. Plaintiffs' Claims Do Not Entail Extraterritorial Application of RICO. ........ 11

1. Plaintiffs allege a widespread scheme—which included several of the most prominent U.S. banks—to suppress *U.S.-Dollar* LIBOR. ........ 11

2. The Court can conclude at this stage that the enterprise bore a sufficient connection to the U.S. ........ 13

3. The alleged racketeering activity was sufficiently tied to the U.S. ........ 15

C. Plaintiffs Possess Standing to Assert RICO Claims. ........ 16

D. Plaintiffs Sufficiently Allege Predicate Acts of Racketeering by Defendants. ........ 17

1. Plaintiffs have pled a scheme by which Defendants intended to defraud investors in LIBOR-based financial instruments. ........ 17

2. Plaintiffs allege with sufficient particularity that Defendants used the mails and wires "in furtherance of" their scheme to defraud. ........ 19

E. Plaintiffs Plead A "Pattern" of Racketeering Activity. ........ 21

F. Plaintiffs State RICO Conspiracy Claims. ........ 22

II. Plaintiffs State Claims Under California Law. ........ 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

A. The Amended Complaints Do Not "Clearly Show" that Plaintiffs' Claims Are Untimely. ..... 23

B. Plaintiffs State Claims under the Cartwright Act. ..... 29

C. Plaintiffs State Claims for Intentional Interference with Prospective Economic Advantage. ..... 29

D. Plaintiffs State Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing ..... 32

E. Plaintiffs State Claims for Unjust Enrichment ..... 33

CONCLUSION ..... 34

## TABLE OF AUTHORITIES

Page

### CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ........................................................................................ 22

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................ 2

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................... 2

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)................................................................................................... 9, 17

*Calabrese v. CSC Holdings, Inc.*,
283 F. Supp. 2d 797 (E.D.N.Y. 2003) .......................................................................... 21

*Cedeño v. Castillo*,
457 F. App'x 35 (2d Cir. Jan. 25, 2012)........................................................................ 11

*Cedeño v. Intech Group, Inc.*,
733 F. Supp. 2d 471 (S.D.N.Y. 2010) ...................................................................... 14, 15

*CGC Holding Co. v. Hutchens*,
824 F. Supp. 2d 1193 (D. Colo. 2011)................................................................ 13, 15, 16

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK), 2012 U.S. Dist. LEXIS 67207 (S.D.N.Y. May 14, 2012)4, 17, 18, 19

*Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63 (2d Cir. 1998)....................................... 10

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase & Co.*,
553 F.3d 187 (2d Cir. 2009) .......................................................................................... 8

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*,
No. 04cv2562 JM (LSP), 2005 U.S. Dist. LEXIS 45237 (S.D. Cal. Aug. 9, 2005)................. 31

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) .......................................................................................... 6

*European Community v. RJR Nabisco, Inc.*,
No. 02-CV-5771 (NGG) (VVP), 2011 U.S. Dist. LEXIS 23538 (E.D.N.Y. Mar. 7, 2011)..... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Fox v. Ethicon Endo-Surgery, Inc.*,
110 P.3d 914 (Cal. 2005) ........ 24

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*,
282 F. App'x 94 (2d Cir. 2008) ........ 22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985) ........ 6, 7

*Gulf Coast Dev. Grp., LLC v. Lebror*,
No. 02 Civ. 6949 (NRB), 2003 U.S. Dist. LEXIS 21740 (S.D.N.Y. Dec. 3, 2003)..... 14, 22, 23

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)........ 21

*Hemi Grp., LLC v. City of N.Y.*,
130 S. Ct. 983 (2010)........ 16

*Ideal Steel Supply Corp. v. Anza*,
652 F.3d 310 (2d Cir. 2011) ........ 2

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ........ 28

*In re Ambac Financial Group, Inc., Securities Litigation*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........ 28, 29

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001) ........ 28

*In re Enron Corp. Sec., Derivative & MDL-1446 "ERISA" Litig.*,
No. H-01-3624, 2005 U.S. Dist. LEXIS 34059 (S.D. Tex. June 14, 2005)........ 26

*International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund v. Bank of New York Mellon Corp.*,
No. C 11-03620 WHA, 2012 U.S. Dist. LEXIS 18281 (N.D. Cal. Feb. 14, 2012)...... 25, 32, 33

*Jerome M. Sobel & Co. v. Fleck*,
No. 03 Civ. 1041 (RMB) (GWG), 2003 U.S. Dist. LEXIS 21362 (S.D.N.Y. Dec. 1, 2003).. 18, 20

*Jones v. E. Brooklyn Sec. Servs. Corp.*,
No. 11-CV-1021 (JG) (SMG), 2012 U.S. Dist. LEXIS 110713 (E.D.N.Y. Aug. 7, 2012) ...... 33

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Kelter v. Apex Equity Options Fund, LP*,
No. 08 Civ 2911 (NRB), 2009 U.S. Dist. LEXIS 74970 (S.D.N.Y. Aug. 21, 2009) ............... 10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........................................................................................ 29

*Korea Supply Co. v. Lockheed Martin Corp.*,
63 P.3d 937 (Cal. 2003) ........................................................................................ 30, 31

*Lee Myles Assocs. Corp. v. Paul Rubke Enters., Inc.*,
557 F. Supp. 2d 1134 (S.D. Cal. 2008) ........................................................................ 30, 32

*Malfatti v. Mortg. Elec. Registrations Sys., Inc.*,
No. C 11-03142 WHA, 2011 U.S. Dist. LEXIS 136784 (N.D. Cal. Nov. 29, 2011) ............... 34

*Marine Bank v. Weaver*,
455 U.S. 551 (1982) ........................................................................................ 6, 7

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011) ........................................................................ 7

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
No. 11-2861 SC, 2012 U.S. Dist. LEXIS 65826 (N.D. Cal. May 10, 2012) ........................... 14

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
651 F.3d 268 (2d Cir. 2011) ........................................................................................ 5, 10

*Neder v. United States*,
527 U.S. 1 (1999) ........................................................................................ 9

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) ........................................................................................ 11, 15

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
85 F. Supp. 2d 282 (S.D.N.Y. 2000) ........................................................................ 2, 20

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990) ........................................................................................ 19

*Powers v. British Vita, P.L.C.*,
57 F.3d 176 (2d Cir. 1995) ........................................................................................ 17, 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*SEC v. Gabelli*,
653 F.3d 49 (2d Cir. 2011) ........................................................................................ 23

*United States v. Graham*,
No. 10-4119-cr (L), 2012 U.S. App. LEXIS 8789 (2d Cir. May 1, 2012) ................................ 9

*United States v. Maze*,
414 U.S. 395 (1974)..................................................................................................... 19

*Zeller v. Bogue Elec. Mfg. Corp.*,
476 F.2d 795 (2d Cir. 1973) ........................................................................................ 6

**STATUTES**

15 U.S.C. § 77B(1) ........................................................................................................ 5

15 U.S.C. § 78c(a)(10)................................................................................................... 5, 6

18 U.S.C. § 1962(c) ....................................................................................................... 4

18 U.S.C. § 1962(d) ....................................................................................................... 4

18 U.S.C. § 1964(c) ....................................................................................................... 4

California Business & Professions Code
§ 16720 *et seq.* .............................................................................................................. 23

California Business & Professions Code
§ 16750(a) ..................................................................................................................... 29

**OTHER AUTHORITIES**

SEC Release 4412 (Sept. 20, 1961) ................................................................................ 6

## PRELIMINARY STATEMENT

The Schwab Plaintiffs—consisting of The Charles Schwab Corporation, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., and 11 affiliated Schwab funds—seek relief for the damages they suffered due to Defendants' scheme to artificially suppress the London InterBank Offered Rate for U.S. dollars ("U.S.-Dollar LIBOR" or "LIBOR") from August 2007 to May 2010 (the "Relevant Period").[1] Defendants deprived the Schwab Plaintiffs of millions, if not billions, of dollars in interest on LIBOR-based financial instruments—including floating-rate and fixed-rate notes, commercial paper, and certificates of deposit—that they would have received had Defendants not manipulated LIBOR for their own benefit.

In addition to their claims under the Sherman Act—which are addressed, together with those of other plaintiffs in these proceedings, in Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims ("Antitrust Brief")—the Schwab Plaintiffs assert claims under California's antitrust law (the Cartwright Act) and under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as common-law claims for intentional interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. This brief, which incorporates by reference the Statement of Facts contained in the Antitrust Brief ("Statement of Facts"), details Plaintiffs' legal arguments establishing that they have stated those claims.

---

[1] The Schwab Plaintiffs initially filed three separate, non-class actions in the Northern District of California—each consisting of several Schwab Plaintiffs—which were then transferred to this Court for inclusion in these multidistrict proceedings. While each of the three Schwab Plaintiff groups filed an amended complaint in its specific case, the complaints are substantively identical. For convenience, Plaintiffs refer to the three complaints—the "Charles Schwab Bank Complaint," the "Bond Market Fund Complaint," and the "Money Market Fund Complaint"—collectively as the "Amended Complaints" and cite only to the Charles Schwab Bank Complaint. Unless otherwise indicated, all citations to "¶ __" are to paragraphs of the Charles Schwab Bank Complaint, and all citations to "Defs.' Br." are to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Schwab Plaintiffs' Amended Complaints (Dkt. No. 169). The Schwab Plaintiffs' arguments apply equally to Defendants' joint brief and the individual briefs certain Defendants filed in support of dismissal (Dkt. Nos. 171, 173, 175, 177, 179).

## ARGUMENT

The pleading standards governing the Schwab Plaintiffs' Sherman Act claims—discussed in the Antitrust Brief, which Plaintiffs incorporate by reference—apply equally to Plaintiffs' other claims. *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323 (2d Cir. 2011) (applying plausibility standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in reversing dismissal of RICO claims). Additionally, while certain of Plaintiffs' allegations concerning RICO "predicate acts" must meet Rule 9(b)'s particularity threshold, because the facts relating to Defendants' perpetration of the alleged LIBOR suppression lie almost exclusively within their knowledge, the particularity requirements are relaxed. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (where fraud-based claim could "involve facts solely within the defendant's knowledge," plaintiff did not need to plead the claim with the typical "degree of specificity" Rule 9(b) demands). Indeed, this Court has noted "a RICO complaint need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pled so as to give notice to each of the defendants where," as here, "the sufficiency challenge precedes discovery." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 302 (S.D.N.Y. 2000) (Buchwald, J.).

Contrary to Defendants' arguments—including their improper suggestion that the Court should deem their purported version of the facts *more plausible* than the Schwab Plaintiffs' well-pled theory of liability—Plaintiffs allege:

i. analyses by economists with whom the Schwab Plaintiffs and other plaintiffs have consulted, showing that—contrary to principles of economics and finance—during much of the Relevant Period LIBOR bore a negative correlation with Defendants' probabilities of default, and that, for the entire Relevant Period, a marked disparity existed between LIBOR and the Federal Reserve Eurodollar Deposit Rate (¶¶ 40-72);

ii. analyses by other academics and commentators further illustrating LIBOR's anomalous behavior during the Relevant Period (¶¶ 73-104);

     iii.    a comparison of the LIBOR submissions of certain major banks and indicia of their respective financial conditions during 2008 and 2009, showing that those banks' LIBOR quotes did not reflect their financial performance, as they should have (¶¶ 105-15);

     iv.    facts and findings arising from worldwide government investigations into Defendants' unlawful conduct (¶¶ 116-63); and

     v.    a detailed explanation of the timing and circumstances of the Schwab Plaintiffs' discovery of facts relating to Defendants' misconduct (¶¶ 164-84), as well as the connection between the misconduct and Plaintiffs' damages (¶¶ 190-200).

Additionally, since the Schwab Plaintiffs filed their Amended Complaints, facts have emerged from LIBOR investigations by government entities—including through internal e-mails and other documents disclosed by Defendant Barclays—that corroborate and enhance Plaintiffs' allegations.  As described fully in the Antitrust Brief, Barclays recently settled civil cases with the Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and the British Financial Services Authority ("FSA"), which entailed findings by those agencies—including Barclays' admissions to the DOJ—of illegal conduct related to U.S.-Dollar LIBOR.[2]  As explained in the Antitrust Brief, investigations by these and other regulatory bodies are ongoing as to other Defendants, and Plaintiffs expect facts concerning Defendants' wrongful conduct will continue to emerge.

Taken as true and considered collectively—and buttressed by continually emerging facts—Plaintiffs' allegations far exceed the applicable pleading threshold.  Moreover, none of the legal roadblocks Defendants attempt to throw in front of Plaintiffs' claims are availing.  The Court therefore should deny Defendants' motions to dismiss.

---

[2] The statements of findings by the DOJ, the CFTC, and the FSA issued in connection with the Barclays settlements—referenced by plaintiffs in these proceedings as the "DOJ Statement of Facts," the "CFTC Order," and the "FSA Final Notice," respectively—are detailed in the Statement of Facts and are included as exhibits to the Declaration of Hilary K. Scherrer that accompanies the Antitrust Brief ("Scherrer Declaration").

## I. Plaintiffs Sufficiently State RICO Claims Against Defendants.

The Schwab Plaintiffs sufficiently allege that each Defendant violated RICO, which affords a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To plead a Section 1962(c) violation, the plaintiff must allege "(1) an enterprise, (2) the conduct of the affairs of the enterprise through (3) a pattern of racketeering activity, and (4) injury to [plaintiff's] business or property . . . caused by the violation of Section 1962." *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2012 U.S. Dist. LEXIS 67207, at *11 (S.D.N.Y. May 14, 2012) (ellipsis in original) (citation and internal quotation marks omitted). Section 1962(d) provides for a separate claim against any person who "conspire[s] to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The Schwab Plaintiffs sufficiently plead claims under Section 1962(c) and (d). ¶¶ 1-163, 209-38. The Court should reject Defendants' arguments for dismissal of those claims.

### A. The RICO Amendment Does Not Bar Plaintiffs' Claims.

Defendants first assert that the Private Securities Litigation Reform Act's "RICO Amendment"—prohibiting any person from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" (18 U.S.C. § 1964(c))—precludes Plaintiffs' claims. The question the Court must answer is whether Defendants have established that Plaintiffs or anyone else could assert actionable securities-fraud claims under the Securities Exchange Act of 1934 ("Exchange Act") arising from the alleged "predicate acts" Defendants committed to further their scheme to suppress

LIBOR. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 270, 273-80 (2d Cir. 2011). As explained below, they have not.

**1. Certain LIBOR-based financial instruments on which Plaintiffs suffered damages are not securities.**

Defendants' entire RICO Amendment argument revolves around their manifestly incorrect assertion that the "LIBOR-based financial instruments" from which the Schwab Plaintiffs' claims arise all constitute "securities" that can support a claim under the antifraud provisions of the securities laws. Specifically, Defendants inaccurately (and misleadingly) state—without quoting the relevant portions of the Amended Complaints—that Plaintiffs' claims arise only from "fixed and floating rate notes" and that "'[s]uch instruments fall squarely within the definition of a 'security' under Section 2(a)(1) of the 1933 [Securities] Act, which includes, among other things, any "note . . . bond, debenture, evidence of indebtedness, . . . [or] certificate of deposit.'" Defs.' Br. 7 (ellipsis and third alteration in original) (quoting 15 U.S.C. § 77B(1)). In fact, however, Plaintiffs identify (i) "commercial paper," constituting "an unsecured promissory obligation with a fixed maturity typically of up to nine months" that is "issued and sold by large corporations and banks in order to raise short-term funds," as well as (ii) "certificates of deposit," constituting "time deposits with a financial institution such as a credit union or bank," as principal examples of the LIBOR-based financial instruments Plaintiffs purchased during the Relevant Period. ¶¶ 190-94.

These particulars matter, because the Exchange Act expressly excludes from its definition of "security," for example, "any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10). That exception, the Second Circuit has observed, includes "short-term commercial paper." *Enron*

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 n.4 (2d Cir. 2011); *see also Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 799-800 (2d Cir. 1973) (Friendly, C.J.) (stating Rule 10b-5 does not encompass notes that "fit[] the general notion of 'commercial paper'" defined by the Securities and Exchange Commission ("SEC") as "prime quality negotiable commercial paper . . . used to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks") (quoting SEC Release 4412 (Sept. 20, 1961)).  The RICO Amendment cannot, as a matter of law, apply to Plaintiffs' claims for losses on investments in short-term commercial paper, as alleged in the Amended Complaints.

The same holds true with respect to certificates of deposit ("CDs") Plaintiffs purchased. The Supreme Court has declared that, notwithstanding the Exchange Act's inclusion of "certificate[s] of deposit" in its definition of "security" (15 U.S.C. § 78c(a)(10)), CDs "purchased from a federally regulated bank" generally do not fall within "the antifraud provisions of the federal securities laws."  *See Marine Bank v. Weaver*, 455 U.S. 551, 558-59 (1982) ("The definition of 'security' in the [Exchange] Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires.  It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws.").

The Second Circuit, in *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985), determined *Marine Bank*'s holding did not apply to CDs sold through a "CD Program" operated by investment bank Merrill Lynch.  *Id.* at 240-42. In connection with that program, however:  (i) Merrill "investigat[ed] issuers, market[ed] the

CDs, and creat[ed] a secondary market"; (ii) investors "expect[ed] profits derived solely from the efforts of Merrill Lynch and the banks"; and (iii) plaintiff's investment in the CD Program "was motivated by the expectation of a return of cash investment, the potential for price appreciation due to interest rate fluctuations, and the liquidity of these highly negotiable instruments." *Id*. Nothing in the Amended Complaints or in Defendants' arguments indicates the CDs the Schwab Plaintiffs purchased are akin to those at issue in *Gary Plastic*. The RICO Amendment therefore cannot, at least at the pleading stage, bar RICO claims based on damages Plaintiffs suffered on CDs. *See Marini v. Adamo*, 812 F. Supp. 2d 243, 261 n.15 (E.D.N.Y. 2011) (declining to apply RICO Amendment at *summary-judgment stage* where it was "not clear based on the . . . record" whether the subject transactions "involved 'securities,'" thus it was "unclear whether defendants' alleged conduct [was] 'actionable' under the securities laws").

Because a significant portion of the billions of dollars in LIBOR-based financial instruments the Schwab Plaintiffs purchased, and which give rise to their RICO claims, do not constitute "securities," those instruments *cannot possibly* be the basis for *securities-fraud* claims. The RICO Amendment therefore does not bar RICO claims based on those instruments.

**2. Defendants have not shown that securities-fraud claims could lie even with respect to LIBOR-based financial instruments that are securities.**

The Court should also deny Defendants' motion with respect to any RICO claims arising from LIBOR-based financial instruments that do constitute securities, because the alleged fraudulent scheme—consisting of Defendants' submissions of false LIBOR quotes to the BBA, on which the BBA relied to establish LIBOR, resulting in LIBOR being set too low—cannot support claims for *securities fraud*, which require the satisfaction of specific elements not present here. *See Marine Bank*, 455 U.S. at 556 ("[W]e are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."). Contrary to

Defendants' attempt to suggest—by isolating certain allegations out of context and relying on now-inoperative pleadings—the existence of some faintly imagined, but never defined, securities-fraud claim, the actual theory of liability on which Plaintiffs premise their claims does not turn on "conduct that would have been actionable as fraud in the purchase or sale of securities." In other words, on these facts, no one could successfully plead that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase & Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation and internal quotation marks omitted).

To be clear, Plaintiffs do allege that Defendants made misrepresentations. *See, e.g.*, ¶¶ 5, 6, 9, 166, 220. Plaintiffs also allege that, among the fraudulent acts Defendants committed to further their scheme to suppress LIBOR, they mailed or otherwise transmitted offering materials for LIBOR-based financial instruments (including some securities). ¶¶ 223, 225. But, critically, neither Plaintiffs nor others allege, or could allege, (i) that the misrepresentations Defendants made—consisting entirely of the false, sealed LIBOR quotes Defendants submitted *to the BBA*—were made *to Plaintiffs or other investors* "in connection with" the purchase or sale of specific securities; or (ii) that Plaintiffs or other investors relied on Defendants' false LIBOR quotes, as opposed to merely LIBOR itself (¶¶ 191, 193)—which the BBA, not Defendants, set and Thomson Reuters (again, not Defendants) published. Accordingly, securities-fraud claims, as opposed to claims based on RICO predicate acts of mail, wire, and bank fraud—none of which require that Plaintiffs plead those elements—do not lie.

The acts of mail and wire fraud Plaintiffs cite as RICO predicates do not transmute this case into a securities suit—particularly because Plaintiffs' RICO claims do not, as securities

claims would, turn on either the existence of any false statements in the offering materials or Plaintiffs' reliance on any specific misrepresentation, neither of which Plaintiffs allege. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) ("a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations"); *Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the [mail, wire, or bank fraud] statutes."). Rather, "[t]he gravamen of the [mail- or wire-fraud] offense," as the Supreme Court and the Second Circuit have explained, "is the scheme to defraud," and "any mailing [or wire transmission] that is *incident to* an essential part of the scheme satisfies the mailing element." *Bridge*, 553 U.S. at 647 (emphasis added) (citation and internal quotation marks omitted); *see also United States v. Graham*, No. 10-4119-cr (L), 2012 U.S. App. LEXIS 8789, at *12-13 (2d Cir. May 1, 2012) (observing that the mail fraud and wire fraud statutes "criminalize the scheme to defraud, rather than the completed fraud") (citation and internal quotation marks omitted). Here, Defendants' misrepresentations were directed not at buyers of specific securities, but at the BBA. *See, e.g.*, ¶¶ 5, 6, 9, 166, 220. And Plaintiffs do not allege that they relied on those misrepresentations—but rather that *the BBA* did. *See, e.g.*, ¶ 9 ("The BBA . . . relied on the false information Defendants provided to set LIBOR."). Moreover, the mailings and wire transmissions that actually were directed to Plaintiffs are not alleged to have been false or misleading—or, indeed, to contain any actionable misrepresentation about LIBOR—but rather were "incident to" Defendants' fraudulent LIBOR-suppression scheme. ¶¶ 223, 225.

If Plaintiffs, or anyone else, cannot allege (i) a false statement made in connection with the purchase or sale of a security and (ii) reliance on the false statement, then they cannot allege an actionable 10b-5 claim against anyone. *See Kelter v. Apex Equity Options Fund, LP*, No. 08

Civ 2911 (NRB), 2009 U.S. Dist. LEXIS 74970, at *28 (S.D.N.Y. Aug. 21, 2009) (Buchwald, J.) (dismissing securities-fraud claim where, *inter alia*, "[t]here [was] no allegation . . . that plaintiff relied on any specific statement of the Apex defendants"). Notably, the Schwab Plaintiffs' inability to state such a claim does not arise from a technical defect rendering them the "wrong plaintiffs" or the LIBOR Panel Banks the "wrong defendants." *Cf. MLSMK*, 651 F.3d at 274 (holding that lack of aider-and-abettor liability under securities laws did not preclude application of RICO Amendment). Rather, the inapplicability of the RICO Amendment results from the nature of Defendants' scheme: making false statements to the BBA to manipulate LIBOR, rather than making false statements to investors to inflate the value of specific securities. The RICO Amendment therefore does not bar Plaintiffs' claims.

**3. Plaintiffs' inclusion of securities claims in their original complaints is irrelevant.**

Unable to demonstrate that the facts alleged in the Amended Complaints give rise to a securities-fraud claim (by Plaintiffs or anyone else), Defendants rely on Plaintiffs' inclusion of securities claims in their original complaints. As a legal matter, Plaintiffs' assertion of securities claims in now-inoperative pleadings has no bearing on whether the RICO Amendment applies. The Second Circuit has observed that "it is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir. 1998) (citation and internal quotation marks omitted). It is therefore inappropriate to evaluate Plaintiffs' RICO claims by referencing claims Plaintiffs included in their initial pleadings.

As a practical matter, the Schwab Plaintiffs did exactly what litigants are expected to do in amending their pleadings: narrow and limit their claims to those justified by the facts. Based on their further factual and legal analysis, including further evaluation of the LIBOR-based

financial instruments they purchased, Plaintiffs determined (contrary to their earlier belief) they did not have a viable securities claim. In any event, Defendants have not met their burden to establish that such a claim exists.

### B. Plaintiffs' Claims Do Not Entail Extraterritorial Application of RICO.

Defendants next contend that Plaintiffs' RICO claims involve an impermissibly "extraterritorial" application of RICO, which the Second Circuit has forbidden but not defined. *See Cedeño v. Castillo*, 457 F. App'x 35, 37 (2d Cir. Jan. 25, 2012) (deeming it unnecessary in the case before the Court to decide "whether RICO . . . focus[es] on domestic enterprises, as the district court held, or on patterns of racketeering, as [plaintiff] contends it should be"). Based on their tautological observations that the BBA is a "British" entity and LIBOR is the "London" InterBank Offered Rate, calculated there, Defendants ask the Court to conclude that neither (i) the alleged RICO enterprise nor (ii) the alleged predicate acts of racketeering—the two tests courts have devised to answer the extraterritoriality question with respect to RICO claims—bear a sufficient connection to the United States to invoke RICO. To the contrary, the Schwab Plaintiffs' claims satisfy either test, as they evince far more than the "slim contacts with the United States" that the Second Circuit has deemed insufficient. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010).

#### 1. Plaintiffs allege a widespread scheme—which included several of the most prominent U.S. banks—to suppress *U.S.-Dollar* LIBOR.

Defendants' alleged misconduct (which Barclays has admitted) involved financial institutions that are either based in the United States—Bank of America Corporation; Bank of America, N.A.; Citigroup, Inc.; Citibank, N.A.; JP Morgan Chase & Co.; and JPMorgan Chase Bank, N.A.—or conduct substantial business here. ¶¶ 15-16, 20-35. Those banks allegedly submitted false quotes with respect to the rates at which they could borrow funds from each other

and from their fellow banks, thereby artificially suppressing *U.S.-Dollar* LIBOR. Defendants' misconduct affected billions, if not trillions, of dollars' worth of LIBOR-based financial instruments that investors, including the Schwab Plaintiffs, purchased in the U.S. ¶¶ 10, 12.

Additionally, the findings with respect to London-based Defendant Barclays arising in part from the same misconduct Plaintiffs allege against Barclays and the other Defendants confirm that Defendants' LIBOR manipulation, while global in scope, involved significant activities in this country. *See, e.g.*, Scherrer Decl. Ex. 4 (CFTC Order), at 2 (finding that "commencing in at least 2005," Barclays Bank and other Barclays entities, "by and through their agents, officers and employees located in at least *New York*, London and Tokyo," repeatedly "attempted to manipulate and made false, misleading or knowingly inaccurate submissions" concerning U.S.-Dollar LIBOR and other benchmark interest rates") (emphasis added); *see also* Statement of Facts. Indeed, that the CFTC and the DOJ, both U.S. governmental agencies, took action against Barclays—based in part on Barclays' unlawful collaboration with other members of the U.S.-Dollar LIBOR Panel (nearly all of whom are Defendants here)—and that Barclays has agreed to pay $200 million and $160 million to the CFTC and the DOJ, respectively, demonstrate that the misconduct had a significant U.S. connection. Moreover, numerous Defendants have disclosed that U.S. government agencies have targeted them in connection with LIBOR-related investigations. ¶¶ 120-48.

Indeed, Plaintiffs' theory of liability rests on Defendants' alleged suppression of *U.S.-Dollar* LIBOR, which affected billions or trillions of dollars' worth of *U.S.-Dollar*-based financial instruments. Surely Congress did not intend to withhold from RICO's grasp alleged misconduct that (i) U.S. financial giants played a large role in perpetrating; (ii) has impacted nearly every corner of the U.S. financial markets; (iii) has incited investigations by U.S.

agencies, including the DOJ, the CFTC, and the SEC; and (iv) caused significant damages to U.S. entities like the Schwab Plaintiffs, as a result of engaging in U.S. transactions. By any relevant measure, Plaintiffs' claims reside well within RICO's jurisdictional ambit.

### 2. The Court can conclude at this stage that the enterprise bore a sufficient connection to the U.S.

Because the alleged enterprise—which included major U.S. financial institutions Citigroup, Bank of America, and JPMorgan—did not exist as a physical entity residing in one place, but rather consisted of a collection of entities that shared the common purpose of submitting false U.S.-Dollar LIBOR quotes to suppress U.S.-Dollar LIBOR, it did not embody a single "nerve center" (as some courts have conceptualized the enterprise test). Instead, the enterprise's decisions and operations emanated from the central locations of each of its constituent members, where the fruits of the enterprise's illegal conduct—the billions of dollars Defendants bilked from investors by artificially suppressing U.S.-Dollar LIBOR—also presumably were located. Additionally, that "some of the participants in the enterprise reside outside the United States" does not render RICO inapplicable. *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1209 (D. Colo. 2011).

Moreover, because, as Thomson Reuters (which publishes U.S.-Dollar LIBOR) has observed, members of the U.S.-Dollar LIBOR Panel submit their LIBOR quotes "electronically" each day,[3] the fact that LIBOR is calculated in London actually says nothing about where the enterprise resided. Given the decentralized nature of the enterprise, its location is more appropriately determined by looking to where the banks' LIBOR submissions were determined. To that end, the Court reasonably can infer at the pleading stage that the U.S.-Dollar LIBOR

---

[3] *See* http://thomsonreuters.com/content/news_ideas/articles/financial/our-role-in-the-calculation-and-distribution-of-bba-libor. The Court can take judicial notice of this and other "matters of public record." *See Gulf Coast Dev. Grp., LLC v. Lebror*, No. 02 Civ. 6949 (NRB), 2003 U.S. Dist. LEXIS 21740, at *8 (S.D.N.Y. Dec. 3, 2003) (Buchwald, J.).

submissions of the major U.S. banks that participated on the U.S.-Dollar LIBOR Panel were determined by, and flowed from, their U.S. headquarters or personnel. *See Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, No. 11-2861 SC, 2012 U.S. Dist. LEXIS 65826, at *24 (N.D. Cal. May 10, 2012) (determining, with respect to defendant U.S. corporations, that "[t]heir domestic status tends to show . . . that the decision making necessary to effectuate the alleged association-in-fact enterprise's common purpose occurred substantially within the territory of the United States").

In light of the allegations, findings, admissions, and inferences present here, Defendants' reliance on *Cedeño v. Intech Group, Inc.*[4]—in which Judge Rakoff observed that "RICO does not apply where," as there, "the alleged enterprise and the impact of the predicate activity upon it are *entirely foreign*"[5]—is unavailing. *Cedeño* involved claims against "a collection of persons and entities—many of them associated with the government of Venezuela"—who allegedly arranged to have one of the plaintiffs, a Venezuelan citizen, "unjustifiably imprisoned for almost three years in Venezuela" and allegedly damaged his business (the co-plaintiff), "a company incorporated in the British Virgin Islands." *Id.* at 472. Plaintiffs alleged that the defendants conducted their unlawful scheme "through an 'association-in-fact' RICO enterprise comprised of '[t]he foreign exchange regime of the government of Venezuela, including CADIVI, the central bank of Venezuela, and the Venezuelan government agency that prosecutes alleged violations of Venezuela's laws.'" *Id.* The court observed that "[t]he scheme's contacts with the United States . . . were limited to the movement of funds into and out of U.S.-based bank accounts." *Id.* Accordingly, the court determined that the alleged enterprise and predicate activity lacked

---

[4] 733 F. Supp. 2d 471 (S.D.N.Y. 2010), *aff'd sub nom.*, *Cedeño v. Castillo*, *supra*.

[5] *Id.* at 474 (emphasis added).

sufficient contacts with the U.S. to allow for RICO claims. The facts in *Cedeño* are far removed from those in this case.[6]

**3. The alleged racketeering activity was sufficiently tied to the U.S.**

Plaintiffs' allegations, the facts that have emerged regarding Barclays and its fellow LIBOR Panel Banks, and the reasonable inferences those allegations and facts afford Plaintiffs, sufficiently establish for pleading purposes that the fraudulent acts constituting Defendants' alleged racketeering activity took place in material part in the U.S. Those predicate acts include the multitudinous instances of wire fraud Defendants—including prominent U.S.-based banks—allegedly committed by submitting false LIBOR quotes electronically to the BBA throughout the Relevant Period. ¶ 225. Those significant ties to the U.S. go well beyond the "slim contacts" the Second Circuit has deemed "insufficient to support extraterritorial application of the RICO statute." *Norex*, 631 F.3d at 31, 33.

The facts in this case more closely resemble those in *CGC Holding Co. v. Hutchens*, which involved an alleged "loan fraud scheme designed to extract monies from victims in the United States." 824 F. Supp. 2d at 1209. Rejecting defendants' argument that plaintiff's RICO claims were impermissibly extraterritorial, the court observed that while "most of the participants in the activities that are the subject of the RICO claim . . . reside in Canada," the alleged racketeering activity "was directed at and largely occurred within the United States." *Id.* Plaintiffs alleged that "[t]he goal of the enterprise" was "to extract money" from plaintiffs "through a phony loan scheme" and that defendants "used telephone, mail, and email communications directed to potential borrowers in the United States." *Id.* at 1209-10. Several

[6] *European Community v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG) (VVP), 2011 U.S. Dist. LEXIS 23538 (E.D.N.Y. Mar. 7, 2011), which Defendants also highlight, likewise is inapposite, as "[n]othing" in the complaint in that case "even remotely suggest[ed] that Defendants had any hand in the planning, decisions, or 'overall corporate policy'" of the drug smuggling, currency swap, or currency purchase steps comprising the operation of the enterprise. *Id.* at *21-22.

participants in the alleged scheme engaged in conduct within the United States that helped procure the loans. *Id.* at 1210.

The court deemed those facts "a far cry from those of *Norex* and *Cedeño*, where the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental." *Id.* To the contrary, the court observed, in the case before it "the conduct of the enterprise within the United States was a key to its success." *Id.* The same is true here.

**C. Plaintiffs Possess Standing to Assert RICO Claims.**

Defendants next argue that Plaintiffs lack standing to assert RICO claims. To state a RICO claim, the Schwab Plaintiffs must sufficiently allege "that a RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of N.Y.*, 130 S. Ct. 983, 989 (2010) (citation and internal quotation marks omitted). The Supreme Court has instructed that "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations"—thus it must entail "*some* direct relation between the injury asserted and the injurious conduct alleged." *Id.* (emphasis added). Plaintiffs sufficiently plead both "but for" and proximate causation.

Plaintiffs allege that they suffered direct, tangible harm in their "property" (i.e., economic injury) due to Defendants' suppression of LIBOR, which Defendants effectuated partly through fraudulent wire transmissions and mailings on which Plaintiffs' mail-fraud and wire-fraud allegations are based. ¶¶ 10-12, 234-37. Those fraudulent acts primarily consisted of Defendants' transmission of false LIBOR quotes to the BBA, which were aimed to, and did, cause LIBOR to be set at a lower level than it should have been. ¶¶ 190-200, 220-27. The predicate acts thus served as critical components of the alleged scheme; without them, Plaintiffs would not have suffered harm. ¶¶ 223-27. It is difficult to conceive how such a palpable connection between Defendants' alleged misconduct and Plaintiffs' damages could be "too

indirect and speculative" (Defs.' Br. 14). Moreover, as noted in Section I.A.2. above, "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Bridge*, 553 U.S. at 649. For those reasons, and as set forth in the Antitrust Brief (pp. 41-44, addressing Plaintiffs' Sherman Act standing), Defendants' argument that Plaintiffs lack RICO standing is meritless.

### D. Plaintiffs Sufficiently Allege Predicate Acts of Racketeering by Defendants.

Contrary to Defendants' assertions, Plaintiffs allege, with sufficient particularity under Rule 9(b), that Defendants "used the mails or wire transmissions in furtherance of a scheme to defraud." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995). Facts alleged in the Amended Complaints satisfy all the elements of mail and wire fraud: "(1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire communications in furtherance of the scheme." *Chevron*, 2012 U.S. Dist. LEXIS 67207, at *43-44; *see also* ¶¶ 5, 9-12, 36-163, 190-200, 208-37.[7] And though "it is not necessary to prove that anyone was actually defrauded," Plaintiffs sufficiently allege Defendants' "intent to defraud." *Powers*, 57 F.3d at 184; *see also* ¶¶ 5, 9-12, 36-163, 219-37.

#### 1. Plaintiffs have pled a scheme by which Defendants intended to defraud investors in LIBOR-based financial instruments.

The "scheme to defraud" prong of mail and wire fraud "has been construed liberally to include any plan consummated by the use of the mails [or wires], in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his

---

[7] Plaintiffs have also sufficiently alleged that Defendants committed bank fraud by manipulating LIBOR, at least with respect to Plaintiff The Charles Schwab Bank, N.A., a federally-insured "national banking association." *See* ¶¶ 18, 216, 222; http://www.schwabbank.com/, last visited on August 25, 2012.

property." *Chevron*, 2012 U.S. Dist. LEXIS 67207, at *44 (citation and internal quotation marks omitted). As Judge Kaplan recently explained:

> The scheme need not have succeeded to complete the offense. It need not otherwise be prohibited by state or federal law, nor need it fit traditional common law concepts of fraud. There is no requirement that the defendant him- or herself use the mails [or wires]. It suffices if the defendant caused them to be used by an agent, or set in motion events which foreseeably would involve their use. *Id.*

Plaintiffs allege that Defendants knowingly made false statements to the BBA for the purpose of manipulating LIBOR to make themselves appear healthier than they actually were and to pay less interest on LIBOR-based financial instruments than they should have paid. ¶¶ 5, 9-12, 36-163, 208-37. In light of the allegations and facts (including Barclays' admissions) recounted in this brief and detailed comprehensively in the Statement of Facts, Plaintiffs well exceed their burden to "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Powers*, 57 F.3d at 184 (citation and internal quotation marks omitted). Specifically, the Court can infer that Defendants possessed "a motive for committing fraud and a clear opportunity for doing so" or that circumstances existed "indicating conscious behavior" by Defendants. *Id.* (citation omitted); *see also Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041 (RMB) (GWG), 2003 U.S. Dist. LEXIS 21362, at *22-23 (S.D.N.Y. Dec. 1, 2003) ("*Sobel*") (plaintiffs sufficiently pled "conscious behavior" by alleging that defendant "made false and misleading statements to Plaintiffs . . . each year, deposited the checks received [as a result of the alleged misconduct] into several of his personal accounts, directed or influenced the unlawful activities of the alleged enterprise, and utilized the employees, property, resources, and services of the Partnership . . . without the knowledge or consent of [plaintiffs]") (second ellipsis in original) (citations and internal quotation marks omitted). Indeed, where, as here, "the allegations lie peculiarly within the opposing parties'

knowledge and are accompanied by information that raises a strong inference of fraud," dismissal is unwarranted. *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990).

**2. Plaintiffs allege with sufficient particularity that Defendants used the mails and wires "in furtherance of" their scheme to defraud.**

To sufficiently plead that the prohibited use of the mails or wires occurred "in furtherance of" the scheme to defraud, Plaintiffs need allege only that the use of mails or wires "be 'for the purpose of executing' the scheme." *Chevron*, 2012 U.S. Dist. LEXIS 67207, at *44 & 46 n.98 (quoting *United States v. Maze*, 414 U.S. 395, 400 (1974)). It is not necessary to allege "that fraudulent representations be transmitted by mail [or wire]," nor need the mails or wires "be essential to the conduct of the scheme." *Id.* at *44. Additionally, "[e]ach prohibited use of the mails [or wires] . . . is a separate indictable offense even if all are made pursuant to a single corrupt scheme." *Id.*

Plaintiffs allege, among the predicate acts forming the basis for their RICO claims, that Defendants committed wire fraud primarily by submitting false LIBOR quotes to the BBA and transmitting e-mail communications about determining, making, or transmitting those false LIBOR quotes. ¶ 225. To plead those wire-fraud acts, which Plaintiffs allege were false or misleading, Plaintiffs satisfy, as they must, Rule 9(b)'s requirement that they "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Sobel*, 2003 U.S. Dist. LEXIS 21362, at *13 (citation and internal quotation marks omitted). To that end, the Amended Complaints detail:

- the "contents" of the wire communications and "who was involved"—by describing the process by which Defendants made their LIBOR submissions to the BBA on a daily basis throughout the Relevant Period (¶ 6) and by providing a probability-of-default study that involved an examination of the Kamakura Risk Information Services (KRIS) database (which recounts each LIBOR Panel Bank's submission for each day) (¶¶ 41-50), as well as a study of the Eurodollar-LIBOR "spread" during the Relevant Period (¶¶ 51-72);

- "where and when" the wire communications "took place"—by alleging that each bank submitted its quotes before 11 a.m. London every morning (¶ 6); and
- "why [the LIBOR submissions] were fraudulent"—by detailing the long-running, pervasive scheme through which Defendants artificially suppressed LIBOR by submitting false quotes to the BBA (¶¶ 36-163).

Additionally, the findings in connection with Barclays' government settlements identify specific e-mail correspondence, telephone conversations, and instant-message "chats" either (i) among individuals at Barclays, (ii) between Barclays personnel and representatives of government regulatory bodies, or (iii) between Barclays personnel and individuals at other LIBOR Panel Banks (almost all of whom are Defendants here) that furthered the manipulation of LIBOR by Barclays and other banks. *See* Statement of Facts. At the very least, Plaintiffs have sufficiently pled "the nature of the RICO scheme" (¶¶ 36-163, 208-37)—all that is required where, as here, "the sufficiency challenge precedes discovery." *Odyssey Re*, 85 F. Supp. 2d at 302.

Moreover, "Rule 9(b)'s particularity requirements do not apply" with respect to the rest of the alleged wire communications and mailings on which Plaintiffs' RICO claims rely, as Plaintiffs do not allege that those communications themselves were false or misleading. *Sobel*, 2003 U.S. Dist. LEXIS 21362, at *15. Rather, Plaintiffs need only provide "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications." *Id.* at *16 (citation and emphasis omitted). As illustrated above and more extensively in the Statement of Facts, Plaintiffs meet that standard. *See Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 808 (E.D.N.Y. 2003) (complaint "satisfied the pleading standard under Rule 9(b) relating to allegations of an ongoing scheme to defraud" where plaintiffs' allegations as to the subject agreement between defendants "were made with adequate particularity" and there was "no question that Defendants used the mail and wires in furtherance

of this alleged scheme," as defendants were "alleged to have made telephone calls and sent letters in furtherance of the scheme").

**E. Plaintiffs Plead A "Pattern" of Racketeering Activity.**

Plaintiffs also plead a "pattern" of racketeering activity. A RICO plaintiff must allege that "the racketeering activities are related" and "they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Relatedness" exists where the alleged predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (citation and internal quotation marks omitted). A RICO pattern need not, however, consist of "multiple schemes." *Id.* at 240-41. Additionally, a plaintiff may plead "continuity" by alleging "a series of related predicates extending over a substantial period of time." *Id.* at 242.

As described above, Plaintiffs allege that Defendants committed numerous acts of mail and wire fraud—including transmitting false LIBOR quotes to the BBA—continually over a nearly three-year period as part of their scheme to suppress LIBOR. Plaintiffs have amply alleged a sufficient relationship between these predicate acts.

With respect to continuity, the "length of time over which the alleged predicate acts took place," the "number and variety of acts," the "number of participants," and the "number of victims"—several non-dispositive factors courts consider in determining whether "closed-ended continuity" exists—all weigh in Plaintiffs' favor. *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (citation and internal quotation marks omitted). Moreover, as the Second Circuit explained in *Fresh Meadow*, "[w]here the racketeering acts span nearly three and one-half years"—only slightly longer than the alleged scheme in this case—"the presence or absence of the other factors is less critical." *Id.* Whether this Court

looks primarily to the duration of the alleged scheme or considers other factors as well, Plaintiffs have pled continuity.

### F. **<u>Plaintiffs State RICO Conspiracy Claims.</u>**

In addition to pleading substantive RICO claims, Plaintiffs sufficiently allege that Defendants conspired to violate RICO. As an initial matter, this Court has observed that "the pleading requirements with respect to a RICO conspiracy . . . are governed by FRCP 8(a), not Rule 9(b)." *Gulf Coast Dev. Grp.*, 2003 U.S. Dist. LEXIS 21740, at *14. Moreover, the plaintiff "need only allege that a conspirator intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at *15 (citation and internal quotation marks omitted). Nor must a complaint "allege that each defendant manifested an agreement to commit two or more predicate acts in furtherance of the common purpose of the RICO enterprise." *Id.* at *16. Finally, "the agreement to commit a RICO violation may be inferred from circumstantial evidence of [the alleged conspirator's] status in the enterprise or knowledge of the wrongdoing." *Id.* at *16-17 (citation and internal quotation marks omitted). Indeed, as the Second Circuit recently observed, "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (citation and internal quotation marks omitted).

Plaintiffs' allegations—corroborated by facts that have emerged in connection with, and in the wake of, the Barclays settlements—allow the Court to "infer[] that [D]efendants consciously agreed to engage in a RICO conspiracy." *Gulf Coast Dev. Grp.*, 2003 U.S. Dist. LEXIS 21740, at *16. *See also* Antitrust Br. 14-28 (responding to Defendants' arguments concerning antitrust conspiracy).

## II. Plaintiffs State Claims Under California Law.

Defendants' alleged misconduct involving LIBOR gives rise to claims under California's antitrust law, the Cartwright Act (Cal. Bus. Prof. Code § 16720 *et seq.*), as well as common-law claims for intentional interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Defendants contend that Plaintiffs' intentional-inference and unjust-enrichment claims are barred by their respective two- and three-year statutes of limitations and that Plaintiffs fail to sufficiently plead any of their state-law claims. Once again, Defendants are mistaken.

### A. The Amended Complaints Do Not "Clearly Show" that Plaintiffs' Claims Are Untimely.

The Second Circuit has explained "[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove," and dismissing claims on statute-of-limitations grounds "is appropriate only if a complaint *clearly shows* the claim is out of time." *SEC v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011) (emphasis added) (citations and internal quotation marks omitted). Defendants do not, and cannot, satisfy that standard here.

While a plaintiff ordinarily must bring a claim under California law "within the limitations period after accrual of the cause of action"—the date of accrual being "when the cause of action is complete with all of its elements"—California recognizes the "discovery rule" as "[a]n important exception" to that principle. *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 919 (Cal. 2005) (citations and internal quotation marks omitted). The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action," i.e., "when he or she has reason at least to suspect a *factual basis* for its elements." *Id.* at 919 (emphasis added) (citation and internal quotation marks omitted). Specifically, "suspicion of one or more of the elements" of the claim, "coupled with *knowledge* of any remaining

elements," will "generally trigger the statute of limitations period." *Id.* (emphasis added). The plaintiff is "charged with knowledge of the information that would have been revealed" by a reasonable investigation conducted "after becoming aware of an injury." *Id.* at 921. Moreover, the California Supreme Court has explained "the term 'injury,' as used in determining the date of accrual of a cause of action," means both the injury itself (the damages) "*and* its [tortious] cause." *Id.* (emphasis in original) (citation and internal quotation marks omitted).

Given the discovery rule's emphasis on *facts*, rather than rumor or speculation, that would allow an injured party to discover a link between his or her injury and its cause, Plaintiffs could not have been on constructive, or inquiry, notice—before March 2011, at the earliest—of their claims for intentional interference with prospective economic advantage or unjust enrichment. ¶¶ 164-189. Defendants' contention that investors in LIBOR-based financial instruments were on inquiry notice as of April or May 2008 is erroneous, for three critical reasons:

First, Defendants' misconduct was inherently self-concealing. The LIBOR-setting process itself, by which Defendants submitted sealed quotes of their purported costs of borrowing, was secretive. Moreover, the nature of the alleged wrongdoing—a collaborative, sophisticated scheme that primarily involved communications within and among the banks to further their objective—prevented a reasonable investor from discovering it. ¶¶ 101-104.

The facts here thus resemble those in *International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund v. Bank of New York Mellon Corp.*, No. C 11-03620 WHA, 2012 U.S. Dist. LEXIS 18281 (N.D. Cal. Feb. 14, 2012) ("*BoNY Mellon*"), where the court rejected defendants' argument that plaintiff's claims under California and New York law were time-barred. *Id.* at *20-22. Plaintiff in *BoNY Mellon* alleged that defendants "engaged

in a scheme through a series of deceptive acts" by which, in performing foreign-currency

exchange ("FX") transactions for the plaintiffs and then charging fees to plaintiffs for those

transactions, defendants would misrepresent the rate at which they "actually traded" in the

subject currency so that they could "keep the difference between the true cost of the trade and the

fictitious FX rate defendants claimed to have paid and charged plaintiff, creating a windfall in

profits." *Id.* at *6-7.  Addressing plaintiff's argument "that it was unaware of defendants'

'deceptive practices' until the recent unsealing of several whistleblower complaints filed by

defendants' employees," the court determined plaintiff pled sufficient facts to invoke the

discovery rule. *Id.* at *21.  The court explained "[n]othing in the FX rates reported to plaintiff

indicated that the rates were false and included hidden and unauthorized markups or

markdowns," thus plaintiff "would have had little reason to believe, prior to the unsealing of the

whistleblower complaints in 2011, that it had been deceptively charged fictitious FX rates." *Id.*

Like the plaintiff in *BoNY Mellon*, the Schwab Plaintiffs "sufficiently demonstrate[] that

to the extent their claims are foreclosed by the statutes of limitation, they did not know of the

facts constituting the claims within the claims periods, could not have discovered them through

reasonable diligence due to the sophistication of [D]efendants' alleged scheme, and only recently

discovered the facts constituting their claims." *Id.* at *21-22.  The Court therefore should not

dismiss Plaintiffs' claims as untimely.

Second, none of the speculation that some commentators and market participants

expressed in 2008 concerning LIBOR's "veracity" developed past the level of rumor and

hypothesis—until last year, when details of government investigations into possible LIBOR

manipulation began to surface.  Indeed, a recently released internal report prepared by the New

York Fed in May 2008—i.e., when, Defendants assert, Plaintiffs had sufficient facts to assert

their claims—observed: "*Beyond the anecdotal evidence and LIBOR re-sets, it is difficult to find convincing evidence of actual misreporting*. Few public sources of data on actual Eurodollar transaction rates exist, and again, the extent of credit tiering makes it difficult to extrapolate from what data there is . . . ." *See* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_May202008.pdf (emphasis added).

Moreover, that Plaintiffs have now, with the assistance of professional economists, been able to plead claims based in part on data that existed during the Relevant Period has no bearing as to what facts Plaintiffs and other investors reasonably could have been expected to discover *at that time*. *See In re Enron Corp. Sec., Derivative & MDL-1446 "ERISA" Litig.*, No. H-01-3624, 2005 U.S. Dist. LEXIS 34059, at *9-10 (S.D. Tex. June 14, 2005) (agreeing with plaintiff "that JPMorgan Chase's effort in hindsight to establish sufficient facts, . . . based on a few articles and a case arising out of JPMorgan's dispute with its insurers over risk insurance . . ., is insufficient to constitute inquiry notice").

<u>Third</u>, and perhaps most significantly, in the wake of the speculation that began to percolate in 2008, several Defendants, as well as the BBA, reassured investors of the integrity of the banks' LIBOR submissions and of LIBOR itself, thereby counteracting whatever "storm warnings" arguably had arisen in the market. ¶¶ 175-81. Among Defendants' representations:

- On April 21, 2008, Dominic Konstam of Defendant Credit Suisse stated low LIBOR rates were attributable to "[b]anks . . . hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply." ¶ 177.

- In an April 28, 2008 *Financial Times* interview, Konstam stated, "The main problem with Libor is the capital strains facing banks . . . . Initially there was some confusion that Libor itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing. ¶ 178.

- On May 16, 2008, Defendant JPMorgan stated "[t]he Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch." ¶ 179.

- That same day, Colin Withers of Defendant Citigroup assured the public of LIBOR's reliability, emphasizing "the measures we are using are historic—up to 30 or 40 years old." ¶ 180.

- In response to *The Wall Street Journal*'s request in May 2008 to numerous Defendants that they comment on the media speculation concerning aberrations in LIBOR, those Defendants made affirmative representations designed to further conceal their wrongdoing. ¶ 181. On May 29, 2008, for instance, Defendant Citibank affirmatively claimed innocence and stated it "continued to submit [its] Libor rates at levels that accurately reflect [its] perception of the market." *Id.* Defendant HBOS similarly asserted that its LIBOR quotes constituted a "genuine and realistic" indication of the bank's borrowing costs. *Id.*

Additionally, on April 17, 2008—the day after the *Journal* initially reported on LIBOR's anomalous behavior and the BBA stated it would conduct an inquiry—a sudden rate-jump occurred. ¶ 182. Specifically, the three-month U.S.-Dollar LIBOR rate hit 2.8175%, about eight basis points higher than the previous day's rate of 2.735%, while LIBOR rates for other currencies fell or remained relatively flat. ¶¶ 182-83. That unexpected spike in LIBOR further indicates Defendants were attempting to dispel any concern within the market about possible LIBOR manipulation. *See, e.g.*, ¶¶ 184-188 (describing results of expert regression analysis of the change in LIBOR on April 17, 2008, which suggest Defendants were suppressing LIBOR).

As this Court has observed, "[c]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 337 (S.D.N.Y. 2001) (Buchwald, J.) (citation and internal quotation marks omitted). Moreover, the Court has explained, the stringent standards for interpreting what constitutes a "storm warning" sufficient to place an investor on inquiry notice serve to ensure "that potentially frivolous litigation is not commenced

precipitously and without sufficient factual basis out of an abundance of caution that the statute of limitations does not run." *Id.*

This Court's reasoning in *In re Ambac Financial Group, Inc., Securities Litigation*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (Buchwald, J.), is particularly apposite. In *Ambac*, the Court rejected defendants' argument that various "storm warnings" put investors on notice of Ambac's allegedly lowered underwriting standards and its underperforming portfolio of collateralized debt obligations. Defendants cited:

> (1) questions from Ambac's investors expressing concern about the company's mortgage-related exposures at conferences held in March and June 2007, (2) a May 2007 MarketWatch article citing a report by well-known short-seller Bill Ackman, who publicly said that Ambac was overpriced, and (3) losses in the mortgage portfolio at Countrywide (once the largest mortgage originator in the United States) that were disclosed on July 23, 2007.

*Id.* at 276 (footnotes omitted).

The Court noted, however, plaintiffs alleged "numerous statements of 'comfort' by Ambac officers who sought to alleviate investor concerns about these supposed storm warnings." *Id.* (quoting *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 527 (S.D.N.Y. 2005)). Among those reassuring statements, Ambac's Executive Vice President responsible for U.S. Structured Finance and Emerging Markets said during investor conferences that Ambac had "'maintained the same conservative standards over the years'" and "'a little turmoil in the market, to be honest, that's actually a good thing for financial guarantors.'" *Id.* (quoting complaint).

A reasonable investor, the Court determined, "could have relied on such statements to allay their concerns about Ambac's underwriting and portfolio performance." *Id.* Indeed, it was "partially these words of reassurance by Ambac management that form the basis for plaintiffs' lawsuit alleging fraud under the Exchange Act." *Id.* Moreover, defendants' assertion that plaintiffs were on inquiry notice more than two years before they filed suit "implie[d] that

Ambac's investors should have been aware of the company's financial troubles at a time when Ambac's own officers deny knowing that anything was wrong." *Id.* The Court concluded, "While we acknowledge the permissibility of arguing in the alternative under the Federal Rules, this glaring contradiction exposes defendants' inquiry notice argument as trivial at best." *Id.* at 276-77. The same "glaring contradiction" illuminates the flaws in Defendants' statute-of-limitations arguments here.[8]

**B. <u>Plaintiffs State Claims under the Cartwright Act.</u>**

California's Cartwright Act, like the Sherman Act, condemns horizontal agreements to fix prices; it also does not "limit[] the ability of indirect purchasers to recover damages." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000); Cal. Bus. & Prof Code § 16750(a); *see also* Defs.' Br. 25. The Cartwright Act expressly provides that a claim "may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant*." Cal. Bus. & Prof. Code § 16750(a) (emphasis added). In other words, there is no "*Illinois Brick*" defense to Cartwright Act claims. Accordingly, for the same reasons detailed in the Antitrust Brief, the Court should reject Defendants' arguments for dismissal of Plaintiffs' Cartwright Act claims.

**C. <u>Plaintiffs State Claims for Intentional Interference with Prospective Economic Advantage.</u>**

The Schwab Plaintiffs have sufficiently pled claims for intentional interference with prospective economic advantage. ¶¶ 246-50. To state these claims, Plaintiffs must allege:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the

[8] Additionally, for the reasons detailed in the Exchange-Based Plaintiffs' brief in opposition to Defendants' motions to dismiss, which the Schwab Plaintiffs incorporate by reference, Plaintiffs sufficiently plead fraudulent concealment. *See also* ¶¶ 164-89.

> plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Lee Myles Assocs. Corp. v. Paul Rubke Enters., Inc.*, 557 F. Supp. 2d 1134, 1140 (S.D. Cal. 2008) (citation omitted).  Regarding the third element, Plaintiffs must plead "that the defendant[s] engaged in an independently wrongful act" and "that the defendant[s] acted either with the desire to interfere or the knowledge that interference was certain or substantially certain to occur as a result of its action."  *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 957-58 (Cal. 2003).  But Defendants' wrongful actions need not "be directed towards the plaintiff[s] seeking to recover for this tort."  *Id.* at 956.

Defendants assert that Plaintiffs (i) fail to identify the economic relationships Defendants allegedly disrupted, (ii) do not allege "any facts" showing that Defendants knew of those economic relationships or intentionally interfered with them, and (iii) fail to identify the role each Defendant allegedly played in disrupting those relationships.  Defs.' Br. 27.  None of those purported deficiencies actually exist.

Regarding the nature of the economic relationships with third parties, Plaintiffs allege that they were deprived of competitive returns on LIBOR-based financial instruments issued or sold by non-Defendants, as well as by subsidiaries or other affiliates of Defendants.  ¶¶ 190-200, 247.  Plaintiffs in the Charles Schwab Bank action, for example, specify they "purchased billions of dollars in LIBOR-based financial instruments impacted by Defendants' misconduct, including instruments issued or sold by . . . dealer entities that were subsidiaries of, or otherwise affiliated with, Defendants." ¶ 195 (identifying specific dealer entities); *see also* Bond Market Fund Compl. ¶¶ 190-201; Money Market Fund Compl. ¶¶ 194-213.  The Schwab Plaintiffs thus have

pled the economic relationships on which their intentional-interference claims are premised, at least with respect to the identified third parties.

Additionally, the Court reasonably can infer at the pleading stage—particularly with respect to third parties that are Defendants' subsidiaries or other affiliates—that Defendants knew of those relationships. *See Eldorado Stone, LLC v. Renaissance Stone, Inc.*, No. 04cv2562 JM (LSP), 2005 U.S. Dist. LEXIS 45237, at *14 (S.D. Cal. Aug. 9, 2005) (plaintiffs' allegations "gave rise to an inference" that defendant knew of the relationships at issue). Moreover, through their detailed allegations regarding the nature and scope of Defendants' scheme to suppress LIBOR—by, among other things, committing acts of mail and wire fraud—Plaintiffs have sufficiently pled that Defendants engaged in "independently wrongful" acts. Relatedly, in light of Plaintiffs' well-pled allegations as to Defendants' motives for suppressing LIBOR, their far-reaching acts to further that scheme, and the manifestly foreseeable results of Defendants' actions (lower rates of return on LIBOR-based financial instruments), the Court reasonably can infer that Defendants—the most sophisticated multinational banks in the world—"acted either with the desire to interfere or the knowledge that interference was certain or substantially certain to occur as a result of [their] action." *Korea Supply Co.*, 63 P.3d at 957-58.

Finally, contrary to Defendants' suggestion, Plaintiffs need not plead with particularity each Defendant's specific role in disrupting Plaintiffs' economic relationships with third-party issuers or sellers of LIBOR-based financial instruments. *See Lee Myles Assocs.*, 557 F. Supp. 2d at 1140-41 (upholding intentional-interference claim where plaintiff alleged that "Defendants . . . intentionally interfered with Plaintiff's prospective economic relationships by making false, defamato[ry] representations to Plaintiff's existing and potential ADRs [Area Development Representatives] and franchisees" and that those representations "were designed to interfere with

and disrupt the economic relationship between Plaintiff and its existing and potential ADRs and franchisees"). Defendants' argument "run[s] afoul of the liberal pleading requirements of Rule 8," which apply to these claims. *Id.*

### D. **Plaintiffs State Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Claims for breach of the implied covenant of good faith and fair dealing arise from the "duty" every contract "imposes upon each party" to observe "good faith and fair dealing" in the performance and enforcement of the contract. *BoNY Mellon*, 2012 U.S. Dist. LEXIS 18281, at *17 (citation and internal quotation marks omitted). The covenant "is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Id.* (citation and internal quotation marks omitted). Defendants assert that Plaintiffs do not (i) adequately allege the existence of a valid contract between Defendants and them, and (ii) identify "any specific contractual obligation" Defendants allegedly failed to fulfill in good faith. Defs.' Br. 28. As they do with respect to other claims, Defendants narrowly—and improperly—focus on isolated allegations from the Amended Complaints' "Claims for Relief" section, to the exclusion of the 250 paragraphs that preceded them.

Plaintiffs expressly allege that during the Relevant Period, they purchased LIBOR-based financial instruments that were "issued or sold to [Plaintiffs] by Defendants" (¶¶ 190-94)[9] and identify specific Defendants from whom they purchased particular types of financial instruments. ¶¶ 196-200; *see also* Bond Market Fund Compl. ¶¶ 196-201; Money Market Fund Compl. ¶¶ 200-213. Those allegations, considered together with Plaintiffs' allegation that they "contracted

[9] *See also* Bond Market Fund Compl. ¶¶ 190-94; Money Market Fund Compl. ¶¶ 194-98.

to purchase LIBOR-based financial instruments from Defendants" (and others) (¶ 251),[10] suffice "to notify the defendants of the nature of [Plaintiffs'] claim." *Jones v. E. Brooklyn Sec. Servs. Corp.*, No. 11-CV-1021 (JG) (SMG), 2012 U.S. Dist. LEXIS 110713, at *21, *22 (E.D.N.Y. Aug. 7, 2012) (upholding breach-of-contract claim despite defendants' assertion that plaintiff "fail[ed] to allege even one . . . contract or any facts particular to any particular . . . contract") (citation and internal quotation marks omitted).

Additionally, the Amended Complaints make clear the nature of Defendants' failure to act in "good faith" with respect to performing their obligations under their contracts to sell LIBOR-based financial instruments to Plaintiffs. Inherent in those agreements—which either explicitly (with respect to floating-rate notes) or implicitly (with respect to fixed-rate notes) based the rates of return on LIBOR—was Defendants' obligation not to surreptitiously, and unlawfully, manipulate LIBOR to their benefit and to Plaintiffs' detriment. Through their detailed allegations of Defendants' improper scheme to suppress LIBOR, Plaintiffs have plausibly alleged that Defendants failed to deal with them fairly and in good faith. *See BoNY Mellon*, 2012 U.S. Dist. LEXIS 18281, at *17-18 (observing that "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another" and holding that defendants "were required to exercise this discretionary power in a fair and good faith manner, and plaintiff sufficiently alleges that defendants did not").

**E. <u>Plaintiffs State Claims for Unjust Enrichment.</u>**

Finally, the Schwab Plaintiffs plausibly allege claims for unjust enrichment, which entail "the receipt of a benefit and unjust retention of the benefit at the expense of another." *Malfatti v. Mortg. Elec. Registrations Sys., Inc.*, No. C 11-03142 WHA, 2011 U.S. Dist. LEXIS 136784, at

[10] *See also* Bond Market Fund Compl. ¶ 252; Money Market Fund Compl. ¶ 264.

*7 (N.D. Cal. Nov. 29, 2011) (citation and internal quotation marks omitted). The gravamen of Plaintiffs' case is that Defendants deprived Plaintiffs of their rightful rates of return on LIBOR-based financial instruments and unjustly kept those ill-gotten gains—i.e., received a benefit and unjustly retained it, at Plaintiffs' expense. ¶¶ 257-263.

Contrary to Defendants' assertion, Plaintiffs need not base these claims on "misrepresentations" (Defs.' Br. 30). But Plaintiffs' claims satisfy even the heightened standard Defendants imagine, as they allege that Defendants submitted false LIBOR quotes to the BBA, causing LIBOR to be set artificially low, which allowed them to reap the alleged "benefits." ¶¶ 1-200, 256-63.

Defendants also profess, incredibly, a lack of awareness as to what constitutes those "benefits." As Defendants ultimately acknowledge, the alleged "benefit" is, indeed, Defendants' ability—as a result of their suppression of LIBOR—"'to pay unduly low interest rates to investors.'" Defs.' Br. 31 (quoting Bond Market Fund Compl. ¶ 10). Moreover, Defendants apparently do not contest that Plaintiffs can state unjust-enrichment claims based on financial instruments issued by Defendants. *See id.* As with their other claims, Plaintiffs have satisfied the pleading requirements with respect to unjust enrichment.[11]

## CONCLUSION

The Court should deny Defendants' motions to dismiss in their entirety. Alternatively, if the Court concludes Plaintiffs have failed to sufficiently plead one or more of their claims, it should allow Plaintiffs leave to replead.

[11] The Over-the-Counter Plaintiffs join the Schwab Plaintiffs' arguments with respect to unjust enrichment, which likewise support denial of Defendants' motion to dismiss the Over-the-Counter Plaintiffs' unjust-enrichment claims.

Dated: August 28, 2012

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**

By: *___/s/ Steven E. Fineman___*
Steven E. Fineman (SF8481)
Michael J. Miarmi (MM1193)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin (BG7314)
Joseph Forderer
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Lowell Haky
Vice President and Associate General Counsel
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, CA 94105
Telephone: (415) 667-0622
Facsimile: (415) 667-1638

*Attorneys for the Schwab Plaintiffs*