# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB) (THK) |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | ECF Case |
| | **ORAL ARGUMENT REQUESTED** |
| MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*, <br> Plaintiffs, <br> v. <br> CREDIT SUISSE GROUP AG, *et al.*, <br> Defendants. | No. 11-cv-5450 |
| EXCHANGE-BASED PLAINTIFF ACTION | No. 11-cv-2613 |
| GELBOIM, *et al.*, <br> Plaintiffs, <br> v. <br> CREDIT SUISSE GROUP AG, *et al.*, <br> Defendants. | No. 12-cv-1026 |
| SCHWAB MONEY MARKET FUND, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORPORATION, *et al.*, <br> Defendants. | No. 11-cv-6412 |
| CHARLES SCHWAB BANK, N.A., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORPORATION, *et al.*, <br> Defendants. | No. 11-cv-6411 |
| SCHWAB SHORT-TERM BOND MARKET FUND, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORPORATION, *et al.*, <br> Defendants. | No. 11-cv-6409 |

## PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' ANTITRUST CLAIMS

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 4

   A. LIBOR .................................................................................................................. 4

   B. Admitted Agreement to Manipulate LIBOR to Benefit Trading Positions. ....... 5

   C. Evidence of Agreement to Suppress LIBOR. ..................................................... 6

       1.   Economic Analysis by Plaintiffs' Experts Demonstrates
           LIBOR Suppression. ................................................................................ 6

       2.   Economic Analysis by the *Wall Street Journal* and
           Economists Not Involved in this Litigation Demonstrates
           LIBOR Suppression. ................................................................................ 8

       3.   Evidence from the Barclays Settlements of Conspiracy to
           Suppress LIBOR. ..................................................................................... 9

   D. Continuing Government Investigations. ........................................................... 12

   E. Injury to Plaintiffs. ........................................................................................... 13

ARGUMENT .................................................................................................................. 14

I. MOTION TO DISMISS STANDARD ..................................................................... 14

II. PLAINTIFFS HAVE ADEQUATELY ALLEGED
   A CONTRACT, COMBINATION, OR CONSPIRACY ..................................... 14

      A. Legal Standards. ................................................................................................ 15

         1.   The *Twombly* Complaint Rested On Routine, Parallel
            Business Behavior Very Different from the Unusual
            LIBOR Suppression Alleged Here. ....................................................... 16

         2.   *Twombly* Requires a Complaint to Proceed if A Conspiracy
            Is One Plausible Inference from the Facts Alleged. ............................. 17

      B. Plaintiffs' Allegations and the Barclays Settlements Make It
        Plausible that Discovery Will Reveal Additional Evidence
        of Agreement. .................................................................................................... 18

         1.   The Structure of the LIBOR-Setting Process
            Facilitates Collusion. ............................................................................. 18

2.  Defendants Barclays and UBS Have Admitted
    Collusion in the LIBOR-Setting Process. ................................. 19

3.  Complex and Historically Unprecedented Pricing
    Changes Make Plausible An Agreement to
    Suppress LIBOR. ...................................................................... 21

4.  Similar LIBOR Submissions Despite Varying
    Creditworthiness Make Plausible An Agreement
    to Suppress LIBOR. .................................................................. 23

5.  The Barclays Settlements Make Plausible An
    Agreement to Suppress LIBOR. ................................................ 24

C.  Government Investigations Into Defendants' Antitrust
    Violations Are Continuing Worldwide. ............................................. 26

D.  Plaintiffs' Allegations and the Barclays Settlements Make
    Plausible A Conspiracy to Suppress LIBOR. .................................... 27

III. PLAINTIFFS HAVE ADEQUATELY ALLEGED
     A RESTRAINT OF TRADE ................................................................... 29

IV. PLAINTIFFS HAVE ANTITRUST STANDING ..................................... 35

A.  Plaintiffs Have Suffered Antitrust Injury ......................................... 36

B.  Defendants' Other Standing Arguments Are Without Merit. .............. 38

    1.  OTC Plaintiffs and Schwab Direct Transactions. ......................... 38

    2.  Bondholder Plaintiffs, Exchange Plaintiffs, and
        Remaining Schwab Transactions. .............................................. 41

        a.  These Plaintiffs Have *AGC* Standing Because
            Their Injuries are Directly the Result of Defendants'
            Violations and Not Speculative. ...................................... 41

            i.   These Plaintiffs' Injuries are Direct. ...................... 41

            ii.  The Injury To These Plaintiffs Falls Within
                 the Legal Definition of a Direct Injury. .................. 42

            iii. Well-Established Case Law Holds That Traders
                 of Futures Contracts Like the Exchange-Based
                 Plaintiffs Have Standing to Assert Antitrust Claims
                 Against Defendants. ............................................... 44

       iv. Defendants' Additional Attacks on the Exchange Based
          Plaintiffs' Standing are Meritless .................................................. 45

       v. The Exchange-Based and Boldholder Plaintiffs' Claims
          are as Direct as Others'. ............................................................... 45

       vi. These Plaintiffs' Injuries are Straightforward
          and Determinable, Not Speculative. ............................................. 46

    b. *Illinois Brick* Has No Bearing On Plaintiffs' Standing. ...................... 48

V. DEFENDANTS' ARGUMENTS IN THEIR INDIVIDUAL
   MEMORANDA OF LAW ARE WITHOUT MERIT ........................................ 49

VI. THE COURT SHOULD GRANT LEAVE TO AMEND IF IT
   GRANTS DEFENDANTS' MOTION ................................................................ 52

CONCLUSION ...................................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Tube & Conduit Corp. v. Indian Head,*
486 U.S. 492 (1988)................................................................................................33, 34, 37

*Amarel v. Connell,*
102 F.3d 1494 (9th Cir. 1996) ........................................................................................46

*American Tobacco Co. v. United States,*
328 U.S. 781 (1946)........................................................................................................28

*Anderson News, L.L.C. v. American Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)............................................................................15, 18, 19, 22

*Aquatherm Industries, Inc. v. Florida Power & Light Co.,*
145 F.3d 1258 (11th Cir. 1998) ......................................................................................35

*Arizona v. Maricopa Cnty. Med. Soc'y,*
457 U.S. 332 (1982)........................................................................................................29

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...................................................................................................14, 15

*Associated General Contractors of California v. California State Council of Carpenters,*
459 U.S. 519 (1983)................................................................................................. passim

*Balaklaw v. Lovell,*
14 F.3d 793 (2d Cir. 1994)..............................................................................................38

*Bd. of Trade of City of Chicago v. United States,*
246 U.S. 231 (1918).........................................................................................................33

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................. passim

*Bigelow v. RKO Radio Pictures,*
327 U.S. 251 (1946).........................................................................................................39

*Blanchard & Co. v. Barrick Gold Corp.,*
C.A. No. 02-3721 Sec. "C" (3), 2003 U.S. Eost. LEXIS 15519 (E.D.La. Sept. 3,
2003). .................................................................................................................................47

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982).........................................................................................................48

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)................................................................................................3, 36, 38

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989)................................................................................48

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980)..........................................................................29, 31

*Chattanooga Foundry & Pipe Works v. City of Atlanta*,
203 U.S. 390 (1906)......................................................................4, 39, 40

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................................18

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)......................................................................52

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................................51

*de Atucha v. Commodity Exchange, Inc.*,
608 F. Supp. 510 (S.D.N.Y. 1985) .........................................................42

*DLJ Mortgage Capital, Inc. v. Kontogiannis*,
726 F. Supp. 2d 225 (E.D.N.Y. 2010) ....................................................51

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992)................................................................................34

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)................................................................................33

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ..................................................................52

*Grosser v. Commodity Exch., Inc.*,
639 F. Supp. 1293 (S.D.N.Y. 1986).......................................................47

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968)................................................................................40

*Hinds County, Miss. v. Wachovia Bank N.A.*,
790 F. Supp. 2d 106 (S.D.N.Y. 2011).....................................................27

*Hinds County. v. Wachovia Bank N.A.*,
708 F. Supp. 2d 348 (S.D.N.Y. 2010).....................................................51

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003).............................................31, 33, 37, 43

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)......................................................................... passim

*In the Matter of Diplacido*,
 CFTC No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008)...........................................42, 45

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 No. 06-MD-1775, 2009 U.S. Dist. LEXIS 97365 (E.D.N.Y. Aug. 21, 2009).........................26

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 No. 06-MDL-1775 (JG) (VVP) ECF No. 1270 (E.D.N.Y. Sept. 22, 2010) ...............15, 40, 50

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
 08 CIV. 8093 LTS KNF, 2012 WL 1076216 (S.D.N.Y. Mar. 30, 2012) ...............................26

*In re Blood Reagents Antitrust Litig.*,
 756 F. Supp. 2d 623 (E.D. Pa. 2010) ....................................................................................27

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
 906 F.2d 432 (9th Cir. 1990) .................................................................................................25

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
 MDL 2031, 2011 WL 589625 (N.D. Ill. Feb. 4, 2011) ........................................25, 32, 44, 50

*In re Digital Music Antitrust Litig.*,
 812 F. Supp. 2d 390 (S.D.N.Y. 2011).....................................................................................42

*In re Flash Memory Antitrust Litig.*,
 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................................15, 16, 20, 50

*In re Flat Glass Antitrust Litig.*,
 385 F.3d 350 (3rd Cir. 2004) ............................................................................................31, 49

*In re Graphics Processing Units Antitrust Litig.*,
 540 F. Supp. 2d 1085 (N.D. Cal. 2007) .................................................................................15

*In re High Fructose Corn Syrup Antitrust Litig.*,
 295 F.3d 651 (7th Cir. 2002) (Posner, J.) ..............................................................................31

*In re High-Tech Employee Antitrust Litig.*,
 No. 11-CV-02509-LHK, 2012 WL 1353057 (N.D. Cal. Apr. 18, 2012) .........................30, 37

*In re Industrial Diamonds Antitrust Litig.*,
 167 F.R.D. 374 (S.D.N.Y. 1996) ...........................................................................................31

*In re Processed Egg Prods. Antitrust Litig.*,
 No. 08-md-02002, 2001 WL 4465355 (E.D. Pa. Sept. 26 2011) ...........................................19

*In re Publication Paper Antitrust Litig.*,
 No. 11-101-CV, 2012 WL 3156156 (2d Cir. Aug. 6, 2012)...................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 587 F. Supp. 2d 27 (D.D.C. 2008) ...................................................................18, 21, 31, 33

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d .................................................................................20

*In re Text Messaging Antitrust Litig*,
  630 F.3d 622 (7th Cir. 2010) ........................................................ 15, 19, 21, 28

*In re Yarn Processing Patent Validity Litig.*,
  541 F.2d 1127 (5th Cir. 1976) ..............................................................31

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
  864 F.2d 1409 (7th Cir. 1989) ..............................................................35

*J.Truett Payne Co. v. Chrysler Motor Corp.*,
  451 U.S. 557 (1981)............................................................................39

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ......................................................... passim

*LaFlamme v. Societe Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................27

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ........................................................ passim

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ..............................................................40

*Louisiana Wholesale Drug Co. v. Sanofi-Aventis U.S., LLC*,
  07 Civ. 7343 (HB), 2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) .........................46

*Matsushita Elec. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................16, 17

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
  676 F. Supp. 486 (S.D.N.Y. 1987) ........................................................40

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984).....................................................................15, 16, 17

*Nat'l Macaroni Mfrs. Ass'n v. FTC*,
  345 F.2d 421 (7th Cir. 1965) ..............................................................31

*Nat'l Soc'y of Prof'l Engineers v. United States*,
  435 U.S. 679 (1978)......................................................................33, 38

*New York v. Hendrickson Bros.*,
  840 F.2d 1065 (2d Cir. 1988)..............................................................40

*New York v. St. Francis Hosp.*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000)......................................................32

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
    665 F. Supp. 869 (E.D. Cal. 1986) ..................................................................... 31

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
    279 F.2d 128 (9th Cir. 1960) ......................................................................... 31

*Pollock v. Citrus Assocs.*,
    512 F. Supp. 711 (S.D.N.Y. 1981) ............................................................ 47, 48

*Reading Industries, Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980) ............................................................................ 42

*Sanderson v. Culligan International Co.*,
    415 F.3d 620 (7th Cir. 2005) ......................................................................... 35

*Sanner v. Board of Trade of the City of Chicago*,
    62 F.3d 918 (7th Cir. 1995) .................................................................. passim

*Schachar v. American Academy Of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ................................................................... 34, 35

*Standard Iron Works v. Arcelormittal*,
    No. 08 C 5315, 2009 WL 1657449 (N.D. Ill. June 12, 2009) ................................. 18

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010) ............................................................ 15, 26, 27, 50

*Stephens v. CMG Health*,
    No. 96 Civ. 7798, 1997 U.S. Dist. LEXIS 23797 (S.D.N.Y. July 27, 1997) ............ 20, 32

*Strax v. Commodity Exch., Inc.*,
    524 F. Supp. 936 (S.D.N.Y. 1981) ................................................................. 47

*Sunshine Cellular v. Vanguard Cellular Sys., Inc.*,
    810 F. Supp. 486 (S.D.N.Y. 1992) ................................................................. 47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 4, 18

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,
    No. 92 Civ. 3142 (RPP), 1995 U.S. Dist. LEXIS 9961 (S.D.N.Y. July 13, 1995) ........... 47, 48

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................ 32

*Twombly v. Bell Atl. Corp.*,
    425 F.3d 99 (2d Cir. 2005) .......................................................................... 27

*Union Carbide Corp. v. Superior Court*,
    36 Cal. 3d 15 (1984) ................................................................................. 48

*United States v. American Society of Anesthesiologists,*
473 F. Supp. 147 (S.D.N.Y. 1979) ("*ASA*") ........................................35

*United States v. Andreas,*
216 F.3d 645 (7th Cir. 2000) ........................................20

*United States v. Container Corp. of Am.,*
393 U.S. 333 (1969)........................................17, 25, 28, 32

*United States v. Gen. Motors Corp.,*
384 U.S. 127 (1966)........................................31

*United States v. Snow,*
462 F.3d 55 (2d Cir. 2006)........................................15

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940)........................................ passim

*United States v. Wilkinson,*
754 F.2d 1427 (2d Cir. 1985)........................................49

*White v. R.M. Packer Co.,*
635 F.3d 571 (1st Cir. 2011)........................................28

*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
438 F.2d 1286 (5th Cir. 1971)........................................33

## STATUTES

15 U.S.C. § 1 ........................................ passim

15 U.S.C. § 15(a) ........................................30

Cal. Bus. & Prof. Code § 16750(a)........................................48

## OTHER AUTHORITIES

ABA Sections of ANTITRUST LAW , *Proving Antitrust Damages: Legal and Economic Issues* 199 (2d ed. 2010) ........................................4

Fed. R. Civ. P. 8(a)(2)........................................14

OXFORD ENGLISH DICTIONARY 1099 (2d ed. 1989)........................................29

PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (3rd ed. 2010) ........................................ passim

PHILIP E. AREEDA & HERBERT HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW (3rd ed. 2007) ........................................39

# INTRODUCTION

There is now no question that the London Interbank Offered Rate ("LIBOR") has been manipulated and suppressed over a multiyear period. Revelations of LIBOR manipulation have shaken confidence in global financial markets and led to recommendations to eliminate LIBOR, and government authorities worldwide continue to investigate wrongful conduct. Defendants— members of the U.S. Dollar ("USD") LIBOR panel, the focus of most of the LIBOR suppression investigations—have nonetheless moved to dismiss the Complaints'[1] antitrust claims because they contend Plaintiffs have not alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). *See* Mem. of Law in Supp. of Defs. Mot. to Dismiss Antitrust Claims, ECF No. 166, at 11–22 ("Defs. Mem."). Defendants make this assertion even though:

- Defendant Barclays has admitted illegal conduct related to USD LIBOR;[2]

- Defendant UBS has entered the DOJ Antitrust Division's conditional leniency

---

[1] The amended consolidated class action complaints are as follows: Consol. Am. Compl., *Mayor and City Council of Baltimore v. Credit Suisse Grp. AG*, Apr. 30, 2012 ("OTC Compl."); Am. Consol. Class Action Compl., *Exchange-Based Plaintiff Action*, Apr. 30, 2012 ("Exch. Compl."); First Am. Class Action Compl., *Gelboim v. Credit Suisse Grp. AG*, Apr. 30, 2012 ("Bondholders Compl."). The Schwab Complaints are: Am. Compl., *Charles Schwab Bank, N.A. v. Bank of Am. Corp.*, Apr. 30, 2012 ("Charles Schwab Compl."); Am. Compl., *Schwab Money Market Fund v. Bank of Am. Corp.*, Apr. 30, 2012 ("Schwab Money Market Compl."); Am. Compl., *Schwab Short-Term Bond Market Fund v. Bank of Am. Corp.*, Apr. 30, 2012 ("Schwab Short-Term Bond Compl."). Plaintiffs will follow the convention in Defendants' memoranda and cite to the OTC Complaint, with particular allegations in other complaints noted where appropriate. *See* Defs. Mem. at 1 n.4. Unless otherwise noted, all other Complaints have functionally identical allegations.

[2] Barclays recently settled civil cases with the Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and the British Financial Services Authority ("FSA") (collectively, the "Barclays Settlements"), Defendants have agreed the Court may consider the Barclays Settlements incorporated into the Complaints for purposes of deciding the Motions to Dismiss. *See* Aug. 7, 2012 Wise Ltr. (Declaration of Hilary K. Scherrer ("Scherrer Decl.") Ex. 1); Aug. 8, 2012 Tr. of Hrg. (Scherrer Decl. Ex. 2) at 6 (Court's statement that "[D]efendants' concession that plaintiffs can reference the Barclays' settlement has in effect permitted plaintiffs to amend their complaint, at least to some degree."). The Barclays Settlements are Exhibits 3-5 to the Scherrer Declaration. Barclays agreed it would not contest the accuracy of the DOJ Statement of Facts ("DOJ SOF"). DOJ Non-Prosecution Agreement (Scherrer Decl. Ex. 2) at 1 ("It is understood that Barclays, admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A."). The statements in the DOJ SOF are not allegations; Barclays has admitted their truth.

program, which is reserved for parties who admit Sherman Act violations;[3]

- During the Class Period,[4] LIBOR diverged from at least five different predictive metrics (the Federal Reserve Eurodollar Deposit rate ("Eurodollar rate"), probabilities of default, CDS prices, Federal Reserve auction rates, and commercial-paper rates). For example, in August 2007 all Defendants suddenly started and continued to submit LIBOR rates below the Eurodollar rate, a historically unprecedented development that only stopped in October 2011, after the European Commission ("EC") raided banks in connection with its LIBOR probe;

- Defendants' LIBOR quotes during the Class Period clustered together far more closely than their varying creditworthiness would predict; and

- Although individual LIBOR submissions were supposed to be secret until published, Defendants exchanged proposed LIBOR submissions before submitting them to the British Bankers Association ("BBA"), and the Barclays Settlements show Barclays used this pre-publication information to ensure it stayed "within the pack" of other Defendants' LIBOR rates.[5]

Plaintiffs will outline below additional factual allegations further supporting an inference of agreement to suppress LIBOR. The Court need not fear that permitting the actions to proceed will subject Defendants to the "potentially enormous expense of discovery" (*Twombly*, 550 U.S. at 559) on the basis of nothing more than speculative allegations of wrongdoing based on ordinary, garden-variety competitive conduct. Rather, Defendants have engaged in highly anomalous and (for Defendants Barclays and UBS) admittedly illegal, collusive conduct. Plaintiffs' inference of collusion is thus highly plausible; Defendants' version of events—that they each suddenly, independently, and simultaneously decided to risk regulatory and criminal sanctions by reporting falsely low LIBOR rates that clustered far closer together than Defendants' varying creditworthiness would predict—is implausible.

---

[3] OTC Compl. ¶ 153. The Antitrust Division may grant leniency to corporations reporting "illegal antitrust activity" if they meet certain conditions. *See* ANTITRUST DIV., U.S. DEP'T OF JUSTICE, CORPORATE LENIENCY POLICY (1993), *available at* http://www.justice.gov/atr/public/guidelines/0091.pdf, attached as Exhibit 6 to the Scherrer Decl.

[4] The Complaints define the Class Period as August 2007 to May 2010, which is the "Relevant Period" in the Schwab Complaints. *See* OTC Compl. ¶ 34; Charles Schwab Compl. ¶ 1.

[5] The phrase "within the pack" comes from Barclays' management instructions to its LIBOR submitters. DOJ SOF ¶ 37.

Defendants also argue that even if they collusively fixed LIBOR, they cannot be liable because their collusion was not in "restraint of trade." Defs. Mem. at 22–25. But Defendants concede that they are competitors with respect to the sale of financial instruments based on LIBOR[6] and that LIBOR is an element of the total economics of Plaintiffs' transactions.[7] Plaintiffs allege Defendants agreed with direct competitors to fix the returns Plaintiffs received on financial instruments based on LIBOR, a market index the BBA calls the "world's most important number" (OTC Compl. ¶ 45), which directly determined the returns on Plaintiffs' financial instruments. OTC Compl. ¶ 44. This is *per se* illegal price-fixing under the Sherman Act.

Finally, Defendants argue Plaintiffs lack standing on a variety of grounds, including that Plaintiffs have not suffered an antitrust injury and that some Plaintiffs lack standing as indirect purchasers. Defs. Mem. at 25–34. Defendants cite no case holding that a party lacks an antitrust injury when it pays more, receives less, or both, because of a price-fixing conspiracy. Plaintiffs' injuries are "injur[ies] of the type the antitrust laws were intended to prevent and that flow from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Nor are there concerns about remote injuries or speculative damages: Defendants' conduct has injured all Plaintiffs, and damages can be measured using the overcharge method the Supreme Court has recognized in price-fixing cases for over a century, calculating damages using the difference between the actual price and the price that would have

---

[6] Defs. Mem. at 3 ("Defendants do compete for the provision of loans and other financial products, some of which are indexed to USD LIBOR . . . ."); *id.* at 22 ("Banks are expected to compete in the marketplace of making loans, etc. . . .").

[7] Defs. Mem. at 31 ("Here, the economics of Plaintiffs' transactions are divided into two parts: the price of the instrument and its rate of interest."). In the case of the Bondholder Plaintiffs, where no purchase or sale is involved, there is only one part: the rate of interest received.

prevailed absent the collusive conduct.[8] Defendants' motion should be denied.

## STATEMENT OF FACTS

The Complaints' allegations, which are taken as true for purposes of a motion to dismiss, and the facts revealed in the Barclays Settlements are as follows:

### A.    LIBOR.

LIBOR is the world's primary benchmark for short-term interest rates, affecting the pricing of trillions of dollars of financial transactions. OTC Compl. ¶ 44–45. The BBA, which describes itself on its website as "the leading trade association for the U.K. banking and financial services sector" calls LIBOR "the world's most important number" and "the primary benchmark for short-term interest rates globally," an index the BBA reports "for the good of the market." *Id*. ¶¶ 42, 44–45, 49.

The BBA is not a governmental or regulatory body; it is a trade association that has been described as an insiders' club, self-governed by a board of 12 members (five of which are Defendants) which meet four times each year. *Id*. ¶ 42. No regulatory authority oversees the BBA or the LIBOR-setting process. *Id*. ¶¶ 42, 49.

LIBOR is reported for ten different currencies[9] and fifteen different maturities ranging from overnight to one year. *Id*. ¶¶ 43–44. The BBA has established LIBOR panels for each of the ten LIBOR currencies. There was considerable overlap among the panel memberships for the various currencies during the Class Period: for example, thirteen banks[10] participated in both the

---

[8] *See, e.g.*, *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (affirming overcharge damage methodology); *see* ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 199 (2d ed. 2010).

[9] The ten currencies are U.S. dollars, Japanese Yen, pounds sterling, Australian dollars, Canadian dollars, New Zealand dollars, Danish kroner, Euros, Swiss francs, and Swedish kroner. *Id*. ¶¶ 42-43.

[10] The banks that are members of both the U.S. Dollar and Yen LIBOR panels are Defendants Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB. *Id*. ¶ 46 n.12.

USD and Yen LIBOR panels. *Id*. ¶ 46. Defendants were members of the USD LIBOR panel during the Class Period. *Id*. ¶ 29.

Each day, LIBOR panel banks answer the question "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" *Id*. ¶ 48. Banks submit LIBOR rates to the BBA for each LIBOR currency and maturity: individual banks' LIBOR submissions are supposed to be kept confidential until they are published, and the BBA requires each bank to submit rates without reference to other banks' submissions.[11] The BBA then calculates LIBOR as the average of the middle eight (of sixteen) reported rates. OTC Compl. ¶ 48. Thomson Reuters publishes LIBOR along with all rates submitted by panel banks. *Id*.

## B.    Admitted Agreement to Manipulate LIBOR to Benefit Trading Positions.

In theory, then, LIBOR is what it purports to be—the market rates for borrowing various currencies for various maturities, as reported by the world's largest banks. *Id*. ¶¶ 44–45. However, Defendant Barclays has now admitted that, even before the start of the Class Period, it conspired with other financial institutions to manipulate USD LIBOR to benefit trading positions.[12] Barclays accepted requests from other financial institutions to submit particular USD LIBOR rates. For example, on October 26, 2006, a trader at another bank requested a low LIBOR setting from Barclays; when Barclays agreed, the trader responded: "Dude I owe you big time! Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor."

---

[11] OTC Compl. ¶¶ 44, 48, 69, 88; DOJ SOF ¶ 6; *see* Defs. Mem. at 7 ("The banks' daily USD LIBOR submissions are non-public before their communication to the administrator, but become public thereafter.").

[12] *See* DOJ SOF ¶ 23 ("From at least approximately August 2005 through at least approximately May 2008, certain Barclays swaps traders communicated with swaps traders at other Contributor Panel banks and other financial institutions about requesting LIBOR and EURIBOR contributions that would be favorable to the trading positions of the Barclays swaps traders and/or their counterparts at other financial institutions."). The Barclays Settlements do not identify the other banks who participated in the agreement, but at least some were members of the USD LIBOR panel. *See id.* ¶¶ 23–24; FSA Final Notice ¶ 82; CFTC Order at 28.

DOJ SOF ¶ 26.[13] Communications in furtherance of the conspiracy also went in the other direction, with Barclays traders requesting particular USD LIBOR quotes from other panel banks.[14] Barclays and its co-conspirators thus colluded to affect the final LIBOR.[15]

Defendant UBS has essentially admitted a similar conspiracy in Yen LIBOR. UBS disclosed in an SEC filing that it had been granted conditional leniency or immunity from (among other authorities) the DOJ's Antitrust Division "in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo Interbank Offered Rate)." OTC Compl. ¶ 153. Counsel for a bank that the press identified as UBS, (*id*. ¶ 173), volunteered to Canada's Competition Bureau that UBS and Defendants HSBC, RBS, Deutsche Bank, JP Morgan, and Citigroup (or their affiliates) "*entered into agreements* to submit artificially high or artificially low [LIBOR] submissions in order to impact the Yen LIBOR interest rates" and that these banks "submitted rates *consistent with the agreements and were able to move Yen LIBOR rates to the overall net benefit* of the [participating banks]." *Id*. ¶ 174 (emphasis added).[16]

## C. Evidence of Agreement to Suppress LIBOR.

The Barclays and UBS admissions do not stand alone. The Complaints and the Barclays Settlements contain additional allegations and facts showing collusion to suppress LIBOR.

### 1. Economic Analysis by Plaintiffs' Experts Demonstrates LIBOR Suppression.

---

[13] Similarly, another trader from an unidentified financial institution requested that Barclays set its LIBOR quote low: "I know I'm asking for much, but ONLY if u guys care, a low 3m libor would be great…anywhere below 5.35…thanks dude." *Id*. ¶ 27.

[14] *See, e.g.*, FSA Final Notice ¶ 91 (Barclays trader to external trader: "duuuuude…whats up with ur guys 34.5 3m fix…tell him to get it up!"; trader responds "I'll talk to him right away."). Barclays has also admitted that traders within Barclays influenced Barclays' own LIBOR quotes. *See, e.g.*, DOJ SOF ¶¶ 11–22.

[15] *See* DOJ SOF ¶ 24 ("The likelihood that the LIBOR or EURIBOR fix would be affected increased when other Contributor Panel banks also manipulated their submissions as part of a coordinated effort.").

[16] The supporting factual detail is reprinted in OTC Compl. ¶¶ 175–79.

During the Class Period, USD LIBOR (both in the aggregate and Defendants' individual LIBOR submissions) behaved anomalously with respect to several metrics. Plaintiffs' experts compared Defendants' USD LIBOR submissions to the Eurodollar rate (the rate at which banks in the London Eurodollar market lend U.S. dollars to one another). *Id*. ¶ 67-68. For years, the Eurodollar rate was a valid benchmark for USD LIBOR, as the two rates are reported each day, measure borrowing costs for the same currency for large multinational banks, and therefore should reflect the same underlying market fundamentals. *Id*. ¶¶ 72-74. Statistical evidence of the spread between the two rates demonstrates that (until August 2007) the spread was almost perfectly correlated, at or near zero. *Id*. ¶ 75; Figs. 1 & 2.[17] It would therefore be very unusual for even *one* bank to submit a LIBOR quote below the reported Eurodollar rate. *Id*. ¶¶ 70. But suddenly, in August 2007, *all* Defendants began and continued to submit USD LIBOR rates below the Eurodollar rate. *Id*. ¶¶ 67–88. Over the course of the Class Period, USD LIBOR submissions—both by individual panel banks and in the aggregate—continued to show the same pattern of sharply negative spreads. *Id*. ¶¶ 78–83; Figs. 4–19. The consistent pattern of submitting USD LIBOR rates below Eurodollar rates intensified just after Lehman Brothers filed for bankruptcy (*id*. ¶¶ 80–88) and only stopped in October 2011, after the EC raided banks in connection with its LIBOR probe. *Id*. ¶ 75 n.30.

Plaintiffs' experts also compared Defendants' USD LIBOR rates with Defendants' respective probabilities of default ("PD") as calculated by Kamakura Risk Information Services ("KRIS"). *Id*. ¶¶ 57–66. The KRIS PD attempts to measure the probability that a bank will default in a specified time period. *Id*. ¶ 59. Logically, then, the PD for a particular bank and that bank's LIBOR submissions should be positively related; a bank with a relatively high PD (risk of

---

[17] The relationship between USD LIBOR and Eurodollar rates remained stable across multiple financial dislocations—the bursting of the dot-com bubble in 2000, the 9/11 attacks, and the recession starting in late 2001. OTC Compl. ¶ 75.

default) should report relatively high LIBOR as the market demands a greater return for lending to a riskier bank (and vice versa). *Id.* However, Plaintiffs' experts found a *negative* relationship between USD LIBOR quotes and PD during the Class Period—a finding that turns the risk-return relationship underpinning modern finance on its head. *Id.* ¶¶ 60, 64; graphs 1–6.

Finally, Plaintiffs' experts looked at LIBOR rates after the *Wall Street Journal* (the "*Journal*") reported on LIBOR's anomalous behavior, and the BBA announced it would conduct an inquiry. *Id.* ¶¶ 121–27. On April 17, 2008, when the *Journal* and the BBA announced investigations, USD LIBOR increased suddenly by eight basis points—at a time when LIBOR for other currencies fell or remained relatively flat. *Id.* ¶¶ 121–22. Market developments that day cannot explain this sudden jump; the Eurodollar rate did not increase in the same way. *Id.* ¶¶ 124–26; tables 1-2.

### 2. Economic Analysis by the *Wall Street Journal* and Economists Not Involved in this Litigation Demonstrates LIBOR Suppression.

In 2008, the *Journal* commissioned a study comparing USD LIBOR with the cost of purchasing credit default swaps ("CDS"), a product that insures against an entity's default. *Id.* ¶¶ 90–100. Generally speaking, the two should be positively correlated; more expensive CDS indicates the market believes a bank to be a relatively poorer credit risk, which should be reflected in a relatively higher LIBOR submission as the market demands greater returns to compensate for perceived greater risk. *Id.* ¶¶ 91–92. However, the *Journal* reported that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs," a divergence that was particularly stark with respect to Defendants Citibank, WestLB, HBOS, JPMorgan Chase, and UBS. *Id.* ¶ 93–94.[18]

---

[18] Two other economists not involved with this litigation (Connan Snider and Thomas Youle, of the economics departments at UCLA and the University of Minnesota, respectively) conducted a similar analysis and corroborated the *Journal*'s findings: banks' USD LIBOR rates during the Class Period deviated from the banks' CDS prices. *Id.* ¶¶ 101–03.

LIBOR also behaved anomalously with respect to Federal Reserve auction rates. *Id.* ¶ 114. Federal Reserve loans to banks—unlike the loans banks make to one another—are secured by collateral, which means Federal Reserve loan rates should be below LIBOR. *Id.* ¶ 115. And yet, in April 2008, the Federal Reserve auctioned off $50 billion in one-month loans to banks for 2.82%—10 basis points higher than the corresponding LIBOR rate. *Id.* ¶ 114. Similarly, the rate for a 28-day Federal Reserve loan in September 2008 was 3.75%, much higher than the reported one-month LIBOR of 3.18%. *Id.* ¶ 115.

There were also discrepancies between the banks' LIBOR quotes and their actual costs of borrowing in the commercial-paper market. For example, Defendant UBS paid 2.85% to borrow money for three months in mid-April 2008, a rate twelve basis points above its mid-April LIBOR submission. *Id.* ¶ 96.

Finally, Defendants' LIBOR submissions often clustered together far more than objective measures of their creditworthiness, such as the price of CDS insurance, would predict. For example, on the afternoon of March 10, 2008, CDS market investors were betting Defendant WestLB was nearly twice as likely to renege on its debts as Defendant Credit Suisse, yet the next morning the two banks submitted identical LIBOR quotes. OTC Compl. ¶ 95. This clustering behavior was not unique to WestLB and Credit Suisse: Defendants' three-month LIBOR submissions in the period the *Journal* analyzed remained within only .06 of a percentage point, even though their CDS insurance costs varied far more widely. *Id.* ¶ 97. Stanford University finance professor Darrell Duffie, who the *Journal* asked to review its findings, called the banks' LIBOR quotes "far too similar to be believed" in light of their varying creditworthiness. *Id.*

### 3. Evidence from the Barclays Settlements of Conspiracy to Suppress LIBOR.

Defendant Barclays has admitted that starting in August 2007 (the beginning of the Class Period), it submitted USD LIBOR quotes that were "improperly low" and "inaccurate"—that is,

that did not reflect its actual anticipated borrowing costs. *See* DOJ SOF ¶¶ 36, 39.[19] Barclays informed regulators that other Defendants engaged in the same practice: Barclays employees "advised that *all of the Contributor Panel banks, including Barclays*, were contributing rates that were too low." DOJ SOF ¶ 42 (emphasis added).[20] Barclays admitted the active suppression of USD LIBOR continued for several years.[21]

As Defendants recognize,[22] LIBOR quotes are supposed to be confidential to each bank until they are published (OTC Compl. ¶¶ 44, 48, 69, 88); the BBA expressly requires banks to submit rates without reference to the rates contributed by other panel banks. DOJ SOF ¶ 6. Yet the Barclays Settlements make clear that Barclays had advance knowledge of other banks' supposedly secret LIBOR quotes, either directly, through communication with brokers, or both.[23] Barclays actively coordinated its LIBOR submissions with those of other banks: at times, Barclays managers instructed LIBOR submitters to stay within a certain range—ten basis points—of the other Defendants' submissions;[24] at other times, the submitters were to stay

---

[19] The Barclays Settlements focus largely on USD LIBOR rather than other LIBOR currencies. *See, e.g.*, DOJ SOF ¶¶ 36–37; CFTC Order at 3, 7 n.6; FSA Final Notice ¶ 114.

[20] Analysts at affiliates of Defendants Citigroup, Credit Suisse, and Barclays raised concerns in the spring of 2008 that LIBOR appeared to be lower than it should be. OTC Compl. ¶ 52.

[21] The Barclays Settlements identify the relevant time period as overlapping with the Class Period: beginning August 2007 and continuing for several years. *See, e.g.*, DOJ SOF ¶ 36 (August 2007 through January 2009); CFTC Order at 3 (late August 2007 through early 2009); FSA Final Notice ¶ 114 (September 2007 forward).

[22] Defs. Mem. at 7 ("The banks' daily USD LIBOR submissions are non-public before their communication to the administrator, but become public thereafter.").

[23] *See, e.g.*, FSA Final Notice ¶ 117 ("[B]rokers tell me that [another panel bank] is going to set at 5.15 for both (up 8.5 and 10 from yesterday)" (quoting Barclays email)); CFTC Order at 21 (Barclays supervisor rejecting a particular planned LIBOR submission because it would be twenty basis points above "the pack" and "it's going to cause a shit storm;" instead setting at the same level as another bank's planned LIBOR submission); Transcript of Telephone Conference between Barclays and Federal Reserve Bank of New York, Oct. 24, 2008 ("[T]hree-month libor is going to come in at 3.53. . . . it's a touch lower than yesterday's but please don't believe it. It's absolute rubbish."). The transcript, which became available in connection with the Barclays Settlements, is attached as Exhibit 7 to the Scherrer Decl.

[24] CFTC Order at 20 ("Senior Barclays Treasury managers provided the [LIBOR] submitters with the general guidance that Barclays's submitted rates should be within ten basis points of the submissions by the other U.S. Dollar panel banks . . . .").

"exactly where the market is setting them." FSA Final Notice ¶ 120. Barclays USD LIBOR submitters had to comply with these directives on a "day-to-day basis." CFTC Order at 21. Barclays employees referred to this coordination as staying "within the pack," being "in line," or not being an "outlier"—or, most colorfully, not "sticking its head above the parapet." DOJ SOF ¶ 37; CFTC Order at 20. As one Barclays submitter put it, "just set it where everyone else sets it, we do not want to be standing out." FSA Final Notice ¶ 123. Or, as Barclays candidly admitted to the FSA: "So, to the extent that, um, the LIBORs have been understated, *are we guilty of being part of the pack? You could say we are.*" (statements from Barclays manager in call with FSA, Apr. 17, 2008, quoted in FSA Final Notice ¶ 131) (emphasis added).

There was danger in submitting artificially low LIBOR quotes for any bank that attempted to do so independently. Unrealistically low LIBOR quotes in comparison to those of other panel banks on any given day exposed banks to the risk of unwanted attention from the BBA or (more seriously) from financial regulators and the press.[25] Barclays' internal emails show its employees were concerned about the possible consequences if they were caught submitting artificially low rates.[26] But there were dangers in the other direction as well. If a

---

[25] For at least part of the Class Period, the BBA and FSA were inquiring about LIBOR. *See* CFTC Order at 23; DOJ SOF ¶¶ 44–45; FSA Final Notice ¶ 135. "Barclays received communications from the BBA on several occasions during the financial crisis, including in the period following publication of the *Wall Street Journal* article, on 17 April 2008 and 2 May 2008. These communications referred to concerns that had been raised with the BBA about the accuracy of LIBOR submissions, and in particular that some banks' US dollar LIBOR submissions were being made at levels that did not reflect the LIBOR definition because of concerns about attracting negative media attention. 'The BBA communications made clear that if true, this was unacceptable.'" FSA Final Notice ¶ 135.

[26] In December 2007, the senior Barclays USD LIBOR submitter emailed his supervisor about submitting a one-month LIBOR lower than he would prefer if he were "given a free hand," and explicitly stated: "My worry is that *we (both Barclays and the contributor bank panel) are being seen to be contributing patently false rates.* We are therefore being *dishonest by definition* and are at risk of damaging our reputation in the market and with the regulators." CFTC Order at 22 (emphasis added). In another email, the senior Barclays USD LIBOR submitter wrote: "I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore *will not be posting honest prices.*" *Id.* at 24 (emphasis added). In May 2008, Barclays did not want to disclose to the FSA that its reported LIBOR rates understated its true borrowing costs for fear that reporting the "honest truth" would be a "can of worms." DOJ SOF ¶ 46. As Barclays sheepishly and belatedly informed the BBA: "we're clean, but *we're dirty-clean, rather than clean-clean.*" The BBA representative responded: "No one's clean-clean." CFTC Order at 23 (emphasis added).

Defendant submitted LIBOR quotes significantly higher than other Defendants, it ran the risk of questions about its financial health relative to other banks.[27]

## D.   Continuing Government Investigations.

Government entities in the United States and worldwide, including DOJ, the Securities Exchange Commission ("SEC"), the CFTC, the Canadian Competition Bureau, the FSA, antitrust authorities in the European Union, the Monetary Authority of Singapore, the Swiss Competition Commission, the Japanese Securities and Exchange Surveillance Commission ("SESC") and Financial Services Agency ("JFSA"), are investigating Defendants' improper conduct related to LIBOR. OTC Compl. ¶¶ 142, 149, 157, 159–63, 165–69, 171–180.[28] These government investigations target exactly the type of wrongdoing the Complaints allege. UBS summarized the investigations in an SEC filing as "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." *Id*. ¶ 142. The press or government agencies have identified—by name—18 people employed by Defendants (or their affiliates) as targets even at this early stage: UBS (2 people), RBS (8), Citigroup (3), JP Morgan Chase (2), Deutsche Bank (1), and HSBC (1). OTC Compl. ¶ 186. *Bloomberg* has reported that Defendants Citigroup, Deutsche Bank, and RBS have dismissed or put on leave employees in connection with the investigations. *Id*. ¶ 167.

---

[27] DOJ SOF ¶ 40 (Barclays managers "sought to avoid inaccurate, negative attention about Barclays's financial health as a result of its high LIBOR submissions *relative to other banks*. . . . Barclays managers sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape *when compared to its peers*.") (emphasis added). In September 2007, for example, Barclays received negative press coverage, in part because of its relatively high LIBOR submissions. Barclays managers instructed LIBOR submitters to keep the bank's "head below the parapet" so it did not get "shot" off. *Id*. ¶¶ 39–40.

[28] Defendants UBS, Barclays, RBS, Lloyds, and HSBC have disclosed in public regulatory filings that they have received requests for information or subpoenas from government bodies investigating LIBOR. OTC Compl. ¶¶ 142, 149–50, 153–55. The financial media has also reported that investigators are targeting defendants BAC, Citigroup, WestLB, JP Morgan Chase, Deutsche Bank, and Credit Suisse. *Id*. ¶¶ 143, 145–46, 165. Thus, as of the filing of the amended complaint on April 30, 2012, fully eleven of the sixteen defendant entities are (either by their own admission or according to press reports) specifically identified by name as targets of ongoing governmental investigations, and the *Financial Times* has reported that all sixteen panel banks for USD-LIBOR from 2006–08 had received informal requests for information. *Id*. ¶ 143.

E.     **Injury to Plaintiffs.**

Defendants' LIBOR manipulation caused Plaintiffs to pay more, receive less, or both on LIBOR-based financial instruments than they would have in the absence of Defendants' collusion. For example, some Defendants sold the Mayor and City Council of Baltimore ("Baltimore") hundreds of millions of dollars of interest rate swaps where Baltimore paid Defendants a fixed interest rate and Defendants paid Baltimore a rate tied to LIBOR.  *Id.* ¶¶ 8, 12, 32(f), 219, 222. Defendants' LIBOR manipulation thus enabled them to pay less to Baltimore than they would have but-for their collusive manipulation. *Id.* The other Plaintiffs similarly allege they have suffered loss because Defendants' LIBOR manipulation artificially adjusted the price and/or interest on their LIBOR-based financial instruments.[29] Each Plaintiff alleges how it was injured by Defendants' conduct. For example, various Plaintiffs held floating-rate instruments indexed to LIBOR. Charles Schwab Compl. ¶ 191; Bondholder Compl. ¶ 11, 15-16. These instruments paid a rate of return based on LIBOR. By suppressing LIBOR, Defendants were able to reduce the overall interest rate paid on these instruments. Charles Schwab Compl. ¶ 191; Bondholder Compl. ¶¶ 11, 173. Similarly, Defendants' artificial suppression of LIBOR caused the settlement prices of Eurodollar futures to be higher than they would be otherwise because the price of these futures contracts is, by definition, directly tied to LIBOR. Exch. Compl. ¶ 206. Defendants' conduct even artificially adjusted the price and value of fixed-rate financial instruments because market participants commonly consider the spread between fixed-rate instruments' offered rates and LIBOR to determine how attractive the offered rates are. Charles Schwab Compl. ¶ 193. Because this spread is what matters to investors (and thus banks), a suppression of LIBOR will tend to suppress the offered rate by making lower offered rates relatively more attractive. *Id.*

---

[29] *See, e.g.*, Charles Schwab Compl. ¶¶ 10, 11, 190–200, 203; Bondholder Compl. ¶¶ 11, 207; Exch. Compl. ¶¶ 14, 246, 248.

## ARGUMENT

## I.  MOTION TO DISMISS STANDARD

A complaint is entitled to proceed past a motion to dismiss if it states a "plausible" claim to relief. *See generally Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A claim to relief is "plausible" when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. It merely requires allegations that "nudge [the] claims across the line from conceivable to plausible" (*id.* at 570) or that cross the line "between the factually neutral and the factually suggestive" (*id.* at 557 n.5)—that raise a right to relief "above the speculative level." *Id.* at 555. *Twombly* and *Iqbal* did not overrule Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.[30] A court evaluating a complaint on a motion to dismiss takes its allegations as true, without assessing the likelihood the plaintiff will be able to prove the case at trial. *See Twombly*, 550 U.S. at 555.

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CONTRACT, COMBINATION, OR CONSPIRACY

Defendants' first argument is that Plaintiffs have not alleged sufficient facts to make it plausible that discovery will reveal evidence of any agreement to fix prices. Defs. Mem. at 11–22. However, government investigations already *have* revealed evidence of such agreement through the Barclays Settlements and UBS's entry into the Antitrust Division's leniency program. The findings in the Barclays Settlements and the facts alleged in the Complaints,

---

[30] *See Iqbal*, 556 U.S. at 678 (Rule 8 does not "require detailed factual allegations," but requires more than "an unadorned, the defendant-unlawfully-harmed me accusation.") (internal quotation marks omitted).

including Plaintiffs' independent economic analyses, make it more than plausible that discovery will reveal additional evidence of an illegal agreement to suppress LIBOR.

### A.  Legal Standards.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" in restraint of trade. 15 U.S.C. § 1. A Section 1 violation requires "an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). The crucial question in a Section 1 case is therefore whether the challenged conduct "stem[s] from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks and citation omitted).

*Twombly* does not require that Plaintiffs allege detailed facts specific to the conduct of each Defendant.[31] Nor must Plaintiffs plead direct evidence of a conspiracy (although such evidence exists here). Even after *Twombly* and *Iqbal*, a conspiracy can properly be pled based on allegations of circumstantial evidence.[32] As the Second Circuit has observed, "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News*, 680 F.3d at 183 (internal quotation marks and citation omitted).[33]

---

[31] *See, e.g., Starr*, 592 F.3d at 325 (rejecting defendants' argument that *Twombly* requires that plaintiff identify the specific time, place, or person related to each conspiracy allegation); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 (JG) (VVP), ECF No. 1270, pp. 16-17 (E.D.N.Y. Sept. 22, 2010); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145-48 (N.D. Cal. 2009).

[32] *See, e.g., Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (upholding complaint alleging circumstantial evidence of conspiracy); *In re Text Messaging Antitrust Litig*, 630 F.3d 622, 629 (7th Cir. 2010) (same); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007) ("[D]irect allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary").

[33] *See also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (holding that agreement may be proven by "direct or circumstantial evidence that reasonably tends to prove that [the allegedly conspiring parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective"); *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) ("[C]onspiracy by its very nature is a secretive operation, and it is a rare case

15

1.     The *Twombly* Complaint Rested On Routine, Parallel Business Behavior Very Different from the Unusual LIBOR Suppression Alleged Here.

Although Defendants' brief discusses *Twombly* at length, they overlook the facts that distinguish *Twombly* from the Complaints' allegations. The parallel conduct in *Twombly*—firms' decisions not to enter one another's geographic markets[34]—was behavior that happens in a normally functioning market every day and is perfectly consistent with independent decision-making. *See Twombly*, 550 U.S. at 569 ("[F]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.") (internal quotation marks omitted). Garden-variety business conduct is not suspicious and does not plausibly suggest conspiracy. Hence *Twombly*—building on prior Supreme Court decisions cautioning against inferring conspiracies merely from parallel conduct[35]—was concerned about "false positives" (*Twombly*, 550 U.S. at 554) and (at the pleading stage) subjecting defendants to the "potentially enormous expense of discovery" (*id.* at 559) when there is "nothing beyond parallel conduct" (*id.* at 554) (citing *Theatre Enterprises*), a lack of "evidence tending to exclude the possibility of independent action" (*id.*) (citing *Monsanto*), and a lack of evidence (at the summary judgment stage) that "tend[s] to rule out the possibility that the defendants were acting independently" (*id.*) (citing *Matsushita*).

This case is completely different. Even Defendants do not assert that LIBOR suppression was routine, everyday market behavior. Defendants' conduct is not normal business conduct such as deciding not to enter every possible market or parallel pricing naturally produced through

---

where all aspects of a conspiracy can be laid bare"); *Flash Memory,* 643 F. Supp. 2d at 1147 ("'[C]ircumstantial evidence is the lifeblood of antitrust law'") (quoting *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973)).

[34] Contrary to Defendants' assertion, the *Twombly* plaintiffs did not try to "sustain a price-fixing conspiracy charge." Defs. Mem. at 11. Rather, the claim was based on companies' decisions not to enter certain geographic markets.

[35] *See, e.g., Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Monsanto*, 465 U.S. 752.

competition, as when gas stations raise prices in response to a gasoline price spike. The "false positive" concerns that animated *Twombly* and prior Supreme Court cases concerned with chilling routine business behavior are not present here.[36] The Complaints' allegations of LIBOR suppression—taken as true, and supported by independent confirmations from the Barclays Settlements—demonstrate anomalous, misleading, and almost surely illegal behavior that is contrary to the normal functioning of the LIBOR-setting process.[37]

### 2. *Twombly* Requires a Complaint to Proceed if A Conspiracy Is One Plausible Inference from the Facts Alleged.

*Twombly* does not require a plaintiff to demonstrate that conspiracy is the *only* plausible explanation for the allegations. Rather, as the Second Circuit recently explained, the complaint must proceed if agreement is *one* plausible interpretation of the facts alleged:

> The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. . . . A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible. . . .
>
> The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible. . . . [T]he plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct

---

[36] *See, e.g.*, *Matsushita*, 475 U.S. at 593 ("In *Monsanto*, we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct."); *id.* at 594 ("[C]utting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. . . . We must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition.") (internal quotation marks and citations omitted). The Supreme Court in *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969), distinguished exchanges of price information among competitors—unusual, extra-market behavior—as "obviously quite different from the parallel business behavior" condoned in previous cases. *Id.* at 335.

[37] The Second Circuit recently held that, at summary judgment, anomalous behavior such as LIBOR suppression permits a stronger inference of collusion than ordinary business conduct. *See In re Publication Paper Antitrust Litig.*, No. 11-101-CV, 2012 WL 3156156, at *8 (2d Cir. Aug. 6, 2012) ("[B]roader inferences are permitted, and the [*Matsushita*] tends to exclude standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive.") (internal quotation marks and citations omitted).

> may be plausible, that does not mean that the plaintiff's allegation that conduct
> was culpable is not also plausible.

*Anderson News*, 680 F.3d at 185, 189–90. A case should not be dismissed merely because

Defendants offer a plausible innocuous interpretation of their conduct (such as Defendants' claim

that they were, at most, independently trying hide their true financial conditions, *see* Defs. Mem.

at 14–16); rather, the case proceeds to discovery so long as Plaintiffs' interpretation is also

plausible. *See Anderson News*, 680 F.3d at 192 (rejecting argument that the presence of a

"common economic stimulus" made it impossible for plaintiffs to plead a Sherman Act claim).

This legal principle alone disposes of most of Defendants' *Twombly* argument.

### B. Plaintiffs' Allegations and the Barclays Settlements Make It Plausible that Discovery Will Reveal Additional Evidence of Agreement.

The Complaints and the Barclays Settlements have sufficient allegations and facts from

which the Court may plausibly infer an agreement. In arguing to the contrary, Defendants

impermissibly resort to dismembering the Complaints, focusing on individual allegations that

they argue do not give rise to an inference of a conspiracy. However, on a motion to dismiss, a

court must consider the allegations as a whole and not in isolation and out of context.[38] As set

forth in more detail below, when all the allegations are viewed together, Plaintiffs have clearly

and plausibly pled a conspiracy.

### 1. The Structure of the LIBOR-Setting Process Facilitates Collusion.

---

[38] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts must avoid "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Post-*Twombly* antitrust decisions have routinely rejected attempts to compartmentalize factual allegations and consider them independently of each other. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 n.4 (D.D.C. 2008) ("*Twombly* did not change this principle: [T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.") (internal quotation marks and citation omitted); *Standard Iron Works v. Arcelormittal*, 639 F.Supp.2d 877, 902 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition that [t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.") (internal quotation marks and citation omitted).

As described more fully in Section A of the Statement of Facts ("SOF"), the LIBOR-setting process has the hallmarks of a structure ripe for collusion: a self-governed trade association controlled by a small number of banks, overlapping panel membership among the LIBOR currencies, the same banks setting LIBOR and (supposedly) policing the process, all without regulatory oversight. *See* SOF A. This is an industry structure conducive to collusion, which makes an inference of collusion plausible. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion.") ("*Text Messaging*").[39]

### 2. Defendants Barclays and UBS Have Admitted Collusion in the LIBOR-Setting Process.

Defendants Barclays and UBS have admitted collusion in the LIBOR-setting process.[40] *See* SOF B. This case is thus unlike *Twombly*, where the complaint rested exclusively on allegations of everyday parallel conduct, without any factual allegation that suggested agreement.[41] Defendants cannot seriously contend it is implausible that discovery will "reveal evidence of illegal agreement" (*Twombly*, 550 U.S. at 556) when several Defendants have already admitted illegal agreement. Defendants' motion should be denied on the basis of the Barclays and UBS admissions alone; not only do they demonstrate actual collusion, but they show the structure of the LIBOR-setting process lends itself to collusion.

Defendants have suggested the Court should ignore these admissions as they involved

---

[39] *See also In re Processed Egg Prods. Antitrust Litig.,* No. 08-md-02002, 2001 WL 4465355, n.8 (E.D. Pa. Sept. 26 2011) ("[T]he Court certainly considers the alleged market conditions and their 'ripeness' for collusion to be a notable factor in considering the totality of the allegations against each defendant").

[40] Defendants predictably try to minimize the collusive aspects of the course of conduct Barclays admitted: their one footnote acknowledging the Barclays Settlements makes no mention of any interbank, collusive communications at all. Defs. Mem. at 10 n.11

[41] *See Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 186 (2d Cir. 2012) (noting the *Twombly* complaint did not "plausibly allege an agreement" but rather the "'plaintiffs...proceed[ed] *exclusively* via allegations of parallel conduct'") (quoting *Twombly*, 550 U.S. at 565 n.11).

attempts to move LIBOR up *and* down, rather than just down.[42] However, this Court has itself acknowledged the importance of a "defendant's record of past collusion-related antitrust violations" in determining whether allegedly anticompetitive actions were pursuant to an agreement. *Stephens v. CMG Health*, No. 96 Civ. 7798, 1997 U.S. Dist. LEXIS 23797, at *18 n.13 (S.D.N.Y. July 27, 1997) (report and recommendation of Buchwald, J.).[43] This agreement was not in the "past"; rather, it overlapped with the Class Period[44] and involved the collusive manipulation of LIBOR.[45] Defendants cite no authority for the proposition that a court may dismiss a Sherman Act claim when there is direct evidence of a price-fixing agreement merely because the alleged facts can also be interpreted to support what Defendants characterize as two different types of conspiracies during the Class Period.[46]

---

[42] *See* Scherrer Decl. Ex. 1, ("Moreover, the [Barclays] Settlement Agreement is largely inconsistent with Plaintiffs' allegations and theory of the case. Although Plaintiffs claim that Defendants artificially *suppressed* LIBOR throughout the relevant period, the Settlement Agreement describes traders allegedly seeking both higher and lower LIBORs depending on individual traders' positions that day."); Memorandum of Law In Support of UBS AG's Motion to Dismiss (ECF No. 170) ("UBS Mem.") at 3, 13–14 ("Alleged conduct by individual traders collusively to attempt to adjust LIBOR up *or* down on a given day to benefit a specific trading position is simply inconsistent with Plaintiffs' theory that Defendants conspired to keep USD LIBOR artificially low over a period of years.").

[43] *See also United States v. Andreas*, 216 F.3d 645, 664–66 (7th Cir. 2000) (recognizing that evidence concerning a prior conspiracy may be relevant and admissible to show the background and development of a current conspiracy); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148–49 (N.D. Cal. 2009) (finding that a conspiracy to fix prices in a separate product market was relevant and properly pleaded to establish plausibility for a similar conspiracy in the present case); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d at 903 ("Although the allegations regarding the DRAM guilty pleas are not sufficient to support Plaintiffs' claims standing on their own, they do support an inference of a conspiracy in the SRAM industry."). 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)

[44] *See* DOJ SOF ¶ 23 (Barclays interbank trader conspiracy "[f]rom at least approximately August 2005 through at least approximately May 2008"); OTC Compl. ¶ 172 (Canada's Competition Bureau investigation into Yen LIBOR from 2007 to 2010).

[45] *See, e.g.*, DOJ SOF ¶ 26 (recounting Barclays' submission of lower-than-previous LIBOR on October 26, 2006, at request by trader at unnamed financial institution who thanked Barclays trader with "Dude I owe you big time! Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor."); DOJ SOF ¶ 27 (trader at unnamed financial institution to Barclays trader: "I know I'm asking for much, but ONLY if u guys care, a low 3m libor would be great…anywhere below 5.35…thanks dude."); OTC Compl. ¶ 175 ("[T]raders at the Participant Banks communicated with each other their desire to see a higher *or lower* Yen LIBOR to aid their trading position(s).") (emphasis added).

[46] To the extent Defendants wish to argue that agreement to move LIBOR up and down to benefit trading positions is inconsistent with agreement to suppress LIBOR, discovery will show they are wrong; Barclays did both at the same time. *Compare* FSA Final Notice ¶ 67 (August 2007 request from Barclays trader to Barclays LIBOR

### 3. Complex and Historically Unprecedented Pricing Changes Make Plausible An Agreement to Suppress LIBOR.

LIBOR's divergence during the Class Period from five different predictive metrics (the Eurodollar rate, probabilities of default, CDS prices, Federal Reserve auction rates, and commercial-paper rates) (*see* SOF C.1 & C.2) is an example of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4; *see also Text Messaging*, 630 F.3d at 627 ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing").[47]

Take the Eurodollar rate as an example. In what Defendants dismiss as a "one-sentence, passing reference," (Defs. Mem. at 19) when it is actually an extensive discussion (OTC Compl. ¶¶ 69–88), Plaintiffs' experts made a highly anomalous finding: suddenly, in August 2007, *all* Defendants started and continued to submit USD LIBOR rates below Eurodollar rates. This was unprecedented: before August 2007 the two rates had moved in tandem, even during major financial crises such as the dot-com bust and 9/11. *Id.* This sudden divergence from historical behavior strongly suggests collusion. USD LIBOR submissions are sealed; how else but through collusion could Defendants have known what each one intended to submit relative to the Eurodollar rate so they could start and continue submitting LIBOR rates below the Eurodollar rate? OTC Compl. ¶¶ 69–70, 88. Similarly, during the Class Period, LIBOR did not bear any

---

submitter to set LIBOR high) *with* DOJ SOF ¶¶ 34–49 (Barclays and other banks' submission of lower-than-accurate LIBOR rates from August 2007 through at least January 2009). Prices need not be "uniform" to be illegally fixed but can be within an agreed range. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940). It would still be price-fixing if Defendants agreed generally to suppress LIBOR but made particular adjustments—up or down—on particular days to benefit trading positions within a generally suppressed range. But these are all merits arguments; at this stage, the existence of the admitted agreement is enough to justify discovery.

[47] *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34–35 (D.D.C. 2008) (removal of fuel from surcharge index and use of new indices as part of alleged price-fixing conspiracy is an example of "complex and historically unprecedented changes in pricing structure" making conspiracy allegations plausible).

economically sensible relationship to several other predictive metrics: probabilities of default, CDS insurance prices, Federal Reserve auction rates, and banks' commercial paper rates. *See* SOF C.1 & C.2. The LIBOR spikes during the Class Period are no less noteworthy: for example, on April 17, 2008, when the *Journal* and BBA announced investigations, USD-LIBOR jumped significantly while LIBOR for other currencies fell or remained stable. OTC Compl. ¶¶ 121–27 & tables 1 & 2. No market developments that day would explain the sudden jump, leaving temporarily relaxed suppression in the face of sudden scrutiny as the most likely explanation. *Id.*

Defendants respond to the studies comparing LIBOR to various predictive metrics by arguing that they "do not even purport to address the question of potential coordination" and that LIBOR's unexpected divergence from these metrics during the Class Period "simply underscore[s] the unprecedented impact of the recent crisis on banks." Defs. Mem. at 18 & n.18. Defendants contend they were, at most, responding independently to the economic crisis by quoting low LIBOR to hide their true financial conditions. Defs. Mem. *passim*. But Defendants improperly ask the Court to resolve facts in their favor on a motion to dismiss.[48] Nor are Defendants correct. Plaintiffs' experts' Eurodollar analysis controls for the effects of market events and the financial crisis; the LIBOR-Eurodollar relationship remained stable across multiple financial dislocations. OTC Compl. ¶ 75 & figs. 1 & 2. Plaintiffs assert collusion is the most likely explanation for the sudden, unprecedented change in LIBOR's behavior with respect to Eurodollar rates, while Defendants assert there might be some non-collusive explanation. Even at summary judgment this would be a question for the fact-finder; it is clearly inappropriate to decide this fact-based argument on a motion to dismiss.

---

[48] "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012).

Defendants argue that an academic study by Rosa Abrantes-Metz and Albert Metz (the "Metz Study") analyzing LIBOR submissions from August 2006 to August 2007 (cited in OTC Compl. ¶¶ 117–18) "directly undermines Plaintiffs' theory" (Defs. Mem. at 19) because the authors opined that the similarity of Defendants' LIBOR submissions before August 2007 showed evidence of collusion. The Metz Study includes a graph that shows LIBOR quotes diverging from one another after August 2007—from which Defendants wish the Court to draw the inference that any collusion stopped after August 2007. *See* Wise Decl. Ex. C at 4. Not only is this argument inappropriate on a motion to dismiss, where all inferences are drawn in Plaintiffs' favor, the study itself does not support Defendants' suggested inference: The authors do not draw any conclusions about collusion after August 2007. *See* Wise Decl. Ex. C.[49] This is another fact-based argument not properly resolved on a motion to dismiss.

### 4. Similar LIBOR Submissions Despite Varying Creditworthiness Make Plausible An Agreement to Suppress LIBOR.

A conspiracy is also plausible because Defendants' individual LIBOR quotes clustered together far more closely than other measures of banks' creditworthiness, such as the price of CDS insurance, would predict—a convergence that a professor consulted by the *Journal* called "far too similar to be believed." *See* SOF C.2. *See, e.g.*, OTC Compl. ¶¶ 95, 97. This is "incredible simultaneous parallelism" that gives rise to a plausible inference of conspiracy. *See generally* 6 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1425c (3d ed. 2010). Professors Areeda and Hovenkamp give the example of two firms making identical secret bids on some non-standardized product; without coordination, such a coincidence would seem incredible. But that is exactly what happened here where (for example) Defendants WestLB and

---

[49] Importantly, Plaintiffs cite this study solely for the proposition that there is publicly available information suggesting that collusion may extend back to 2006, not to support the inference of collusion during the Class Period. OTC Compl. ¶ 117.

Credit Suisse submitted identical LIBOR quotes on a day where their risk profiles—as measured by CDS insurance prices—were wildly different. OTC Compl. ¶ 95. Defendants' argument that not all banks were facing financial risk[50] supports Plaintiffs' theory: if the financial health of the panel banks varied, the panel banks' LIBOR submissions and movements in their LIBOR submissions should have varied far more widely than they actually did.

### 5. The Barclays Settlements Make Plausible An Agreement to Suppress LIBOR.

The Barclays Settlements set forth the following additional facts that make plausible an inference of conspiracy to suppress LIBOR:

1. Defendant Barclays had advance knowledge of the supposedly secret pre-publication USD LIBOR quotes to be submitted by other Defendants (*see* SOF C.3);

2. Defendant Barclays submitted LIBOR rates at levels where it would be "part of the pack" of other Defendants (*see id.*); and

3. Defendants faced dangers of independent action in submitting LIBOR rates either too low or too high relative to one another (too low, and they could face regulatory or media scrutiny for possible LIBOR manipulation; too high, and they could face unwanted attention for possible financial weakness) and thus had to coordinate their actions so they could stay "within the pack." *See id.*

Facts #1 and #2, considered together, give rise to a plausible inference of conspiracy. If Barclays and the other banks were to stay "part of the pack," they needed to know where the "pack" was going to report each day—particularly when Barclays management set very specific rules for its LIBOR submitters, which they were to follow on a "day-to-day basis," such as staying within ten basis points of other Defendants' submissions. *See* SOF C.3. Barclays had advance knowledge of supposedly secret LIBOR quotes because of illicit exchanges of supposedly confidential information: Defendants told each other (either directly or through the

---

[50] "[Plaintiffs] do not—and cannot—allege that all Defendants were having financial problems. Some Defendants, for example, had a AAA credit rating during the relevant time period." Defs. Mem. at 16 n.15.

intermediary of cash brokers, *see id.*)[51] what LIBOR quotes they were going to post before they became public. This enabled Defendants to coordinate their LIBOR submissions so they would stay "part of the pack." In *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969), the Supreme Court held that such behavior, standing alone, was sufficient to establish an agreement to exchange price information, which itself meets the Sherman Act's agreement requirement[52]—and here there is evidence from the Barclays Settlement that Defendants used the information exchange to coordinate their LIBOR quotes.

Fact #3 is an example of what one treatise calls among the most important indications of an agreement:[53] facts that tend to show "the conduct would be in the parties' self-interests if they all agreed to act in the same way, but would be contrary to their self-interests if they acted alone." 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 12 (7th ed. 2012). A Defendant that individually decided to start submitting lower-than-accurate LIBOR would stick out like a sore thumb: it would immediately put itself at risk of regulatory action. (Given the BBA methodology, it would also be much less likely to have any effect on the final reported LIBOR.) But all Defendants could take such action together, betting they would be safe from

---

[51] Defendants' conduct does not become any less collusive if it was through brokers rather than directly. *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("[T]he *form* of an exchange . . . should not be determinative of its legality.") (quoting RICHARD POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 146 (1976)); 6 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1404 (3d ed. 2010) ("The statements that would form an agreement when uttered face to face have no less effect when communicated through an intermediary.").

[52] *Container*, 393 U.S. at 335 ("Here all that was present was a request by each defendant of its competitor for information as to the most recent price charged or quoted, whenever it needed such information and whenever it was not available from another source. Each defendant on receiving that request usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it. That concerted action is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act."); 6 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1406 (3d ed. 2010) (a "simple[] justification for finding an agreement" in *Container* is that the inter-competitor phone calls to verify price quotes were "extra-market behavior involving consensual and collaborative activity" and stating that "[n]othing more is needed": "The respondent forms an agreement to give information to its interrogator when it answers the question").

[53] In a true conscious parallelism case involving normal business conduct consistent with independent decision-making, without communications among the defendants, courts often require the presence of certain "plus factors" to make a conspiracy inference plausible. *See generally* 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 11 (7th ed. 2012).

unwanted attention so long as they were "part of the pack." Similarly, in the other direction, a Defendant that submitted too high might be sticking its "head above the parapet" and get it "shot" off by the financial press or other actors in the market. *See* SOF C.3. Hence the importance of staying "within the pack": too low, and a bank attracts regulatory scrutiny for cheating; too high, and a bank attracts market scrutiny for perceived weakness.

But "the pack" was not static; it was a moving target. A new LIBOR was reported each day. Defendants thus had to coordinate their submissions to ensure they would be safely "within the pack" on any one day. That is not independent behavior; rather, it is coordinated, collusive behavior. Even at summary judgment, this would be evidence "tending to exclude the possibility of independent action" and that "tend[s] to rule out the possibility that the defendants were acting independently" (*Twombly*, 550 U.S. at 554 (citing summary judgment standard)); at the pleading stage, it is more than sufficient to permit discovery.

### C. Government Investigations Into Defendants' Antitrust Violations Are Continuing Worldwide.

The Court may consider the Barclays Settlements and UBS's wrongful conduct: the Barclays Settlements by Defendants' agreement, and the UBS conduct because a defendant's admission of a violation of antitrust law to the Antitrust Division tends to make plausible an inference of such a violation.[54] As for the ongoing investigations, the Second Circuit has made clear that it is proper for a complaint to use government investigations to provide part of the "factual context" (*Twombly*, 550 U.S. at 549) that make allegations of conspiracy plausible.[55]

---

[54] *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2009 U.S. Dist. LEXIS 97365, at *63 (E.D.N.Y. Aug. 21, 2009) (upholding sufficiency of allegations under *Twombly* in part because "three [Defendants] have entered the Department of Justice's leniency program (and thus have no doubt admitted their involvement in price-fixing)").

[55] *See, e.g.*, *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 323–25 (2d Cir. 2010) (relying in part on the fact that "defendants' price-fixing is the subject of a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice" as one of the allegations which, taken together, place parallel conduct in a context suggesting agreement); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 08 CIV. 8093 LTS KNF, 2012 WL 1076216, at *16 n.24 (S.D.N.Y. Mar. 30, 2012) (rejecting "absolute rule" that any

*See* SOF D. Even Defendants' authorities recognize the distinction between investigations into conduct dissimilar from a complaint's allegations and investigations directed (as here) at the very misconduct alleged, (*see* SOF D); the latter may support an inference of conspiracy.[56]

### D. Plaintiffs' Allegations and the Barclays Settlements Make Plausible A Conspiracy to Suppress LIBOR.

Plaintiffs' allegations and the Barclays Settlements evidence: (i) an industry susceptible to collusion; (ii) admitted collusion to manipulate USD and Yen LIBOR extending into the Class Period; (iii) industry-wide suppression; (iv) simultaneous LIBOR divergence from predictive metrics; (v) LIBOR quotes clustering far more closely than other measures of creditworthiness would predict; (vi) advance exchanges of supposedly secret price information followed by LIBOR quotes submitted in a "pack"; (vii) the need to coordinate LIBOR submissions to quote neither too high nor too low; and (viii) investigations by regulators around the world regarding LIBOR manipulation. When these allegations are taken together, they raise more than a sheer possibility that Defendants have acted unlawfully—they raise a reasonable expectation that discovery will reveal additional evidence of agreement.

---

portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f) because "[n]ot all complaints are created equal—while some barely satisfy the pleading requirement, others are replete with detailed factual information of obvious relevance to the case at hand") (citations omitted); *Hinds County, Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) ("Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims."); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) (relying in part on the "existence of a parallel criminal investigation—an allegation demonstrating that the government believes a crime may have occurred" as making conspiracy allegations plausible under *Twombly*).

 The cases cited by Defendants for the contrary position are of questionable authority as none of them cite, let alone provide any reason for departing from, the Second Circuit's precedent in *Starr*. Indeed, Defendants' authorities acknowledge the distinction between a complaint that relies only on governmental investigations and a complaint that (as here) references investigations in conjunction with other evidence to "bolster the plausibility" of its claims. See *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) *rev'd*, 550 U.S. 544 (2007) ("An allegation that someone has made a similar allegation does not, *without more*, add anything to the complaint's allegations of fact." (emphasis added)); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) (stating that an "investigation *alone* 'carries no weight in pleading an antitrust conspiracy claim'" (emphasis added)) (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D.Cal. 2007)).

[56] *LaFlamme*, 702 F. Supp. 2d at 153 (Defs. Mem. at 20) (distinguishing irrelevant government investigations from those the Second Circuit properly considered in *Starr*, where the defendants were "simultaneously subject to multiple investigations for the very conduct at issue in the complaint").

The Seventh Circuit's recent ruling in *Text Messaging* is instructive. The plaintiffs alleged a mixture of parallel behavior, industry structure, and industry practices that facilitate collusive behavior. 630 F.3d at 627. Specifically, the complaint alleged defendants increased their prices in the face of falling costs and simultaneously changed their pricing structures. *Id.* at 628. The complaint alleged such changes could not have been accomplished without agreement. *Id.* Finally, the complaint alleged that the four defendants belonged to a trade association and exchanged pricing information at association meetings. *Id.* The court found such allegations were sufficient to plead a plausible conspiracy, explaining,

> We need not decide whether the circumstantial evidence that we have summarized is sufficient to *compel* an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's "plausibility." . . . The plaintiffs have conducted no discovery. Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability. All that we conclude at this early stage in the litigation is that the district judge was right to rule that the second amended complaint provides a sufficiently plausible case of price fixing to warrant allowing the plaintiffs to proceed to discovery.

*Id.* at 629.

Plaintiffs' allegations go far beyond those in *Text Messaging*. In addition to alleging an industry structure that facilitates collusive behavior and advance exchanges of supposedly secret price information, Plaintiffs also allege unprecedented anomalous LIBOR suppression and direct collusion in the LIBOR-setting process. Accordingly, Plaintiffs have alleged sufficient facts from which a plausible conspiracy may be inferred.[57]

---

[57] At the very least, the Complaints and the Barclays Settlements support an inference of a tacit agreement. A tacit agreement is formed by the conspirators' actions and not any express communications. *White v. R.M. Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011); *see also American Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy … The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchanges of words."). A tacit agreement is distinguishable from conscious parallelism by "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *White*, 635 F.3d at 576 (internal quotation marks and citations omitted). *See, e.g.*, *Container*, 393 U.S. at 335 (1969) (agreement to exchange price information).

## III. PLAINTIFFS HAVE ADEQUATELY ALLEGED A RESTRAINT OF TRADE

Defendants also contend Plaintiffs do not allege a restraint of trade. Defs Mem. at 22–25. Defendants largely ignore Plaintiffs' allegations of injury and the relevant law,[58] and thus a brief factual and legal overview is appropriate.

Plaintiffs have alleged a price-fixing conspiracy, which is a *per se* violation of the Sherman Act. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 347 (1982) ("We have not wavered in our enforcement of the *per se* rule against price fixing.").[59] Although Defendants try to cast LIBOR as merely a market index and not a "price," they concede both that they are competitors with respect to the sale of financial instruments based on LIBOR[60] and that LIBOR is part of the economics of Plaintiffs' transactions.[61] The rate of interest on a debt is the price the borrower pays for using the lender's money.[62] These rates—which were supposed to be set based on Defendants' accurate reports of anticipated borrowing costs—were instead intentionally distorted by Defendants' collusive conduct. Defendants' wordplay that LIBOR is "not a 'price'

---

[58] Defendants' arguments in this section and the related section on antitrust injury are so contrary to law that Defendant UBS, who has to "exercise care in connection with the positions it takes," (UBS Mem. at 1) because of its entry into the Antitrust Division's leniency program, can only join in a few pages. *See* UBS Mem. at 2 n.3 ("UBS joins and incorporates by reference only Section I and pages 22–23 of Section II of the Co-Defendants' Antitrust Memo.").

[59] *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("It has long been settled that an agreement to fix prices is unlawful *per se*. It is no excuse that the prices fixed are themselves reasonable."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) ("[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.").

[60] *See, e.g.*, Defs. Mem. at 3 ("Defendants do compete for the provision of loans and other financial products, some of which are indexed to USD LIBOR . . . ."); *id.* at 22 ("Banks are expected to compete in the marketplace of making loans, etc. . . .").

[61] "Here, the economics of Plaintiffs' transactions are divided into two parts: the price of the instrument and its rate of interest." Defs. Mem. at 31. Of course, to the extent this statement refers to price of the instrument, the statement is obviously false as to the Bondholder Plaintiffs' claims and certain Schwab Plaintiffs' claims, which do not arise from a purchase or sale, but from the diminished interest paid on the bonds.

[62] *See* 7 THE OXFORD ENGLISH DICTIONARY 1099 (2d ed. 1989) (defining "interest" as money paid for the use of money lent).

of anything" but rather a mere "index, a composite" (Defs. Mem. at 3) is demonstrably false:[63] Plaintiffs allege they and other market participants were injured because Defendants' LIBOR suppression caused them to pay more, receive less, or both on LIBOR-based financial instruments than they would have absent collusion. *See* SOF E.

This is a classic case of *per se* illegal price-fixing. The Clayton Act grants a cause of action to "any person . . . injured in his business or property" (15 U.S.C. § 15(a)) by reason of anything the Sherman Act forbids; it does not differentiate between persons who paid more or received less because of price-fixing as both have suffered injury to their "business or property."[64] Price-fixing is *per se* illegal because of the unique role prices play in a market economy. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *Socony-Vacuum*, 310 U.S. at 224 n.59. Manipulating the pricing mechanism in any form is anticompetitive: "[a]ny combination which tampers with price structures is engaged in an unlawful activity." *Id.* at 221. In *Socony-Vacuum*, for instance, the Supreme Court held it was not relevant that the conspirators "were in no position to control the market" because "to the extent that [defendants] raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." *Id.* at 221.

"[T]he machinery employed by a combination for price-fixing is immaterial. Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is

---

[63] *See* OTC Compl. ¶ 44 (the BBA describing LIBOR as "the primary benchmark for short-term interest rates globally").

[64] *See, e.g.*, *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2012 WL 1353057, at *16–17 (N.D. Cal. Apr. 18, 2012) (employees who alleged they received less in wages because of defendants' price-fixing stated claim under Clayton Act).

illegal *per se*." *Id.* at 223. This is true where, for instance, the challenged conduct affects only a reference point or starting point for prices,[65] changes only one component of a total price,[66] or affects prices only indirectly[67]—by manipulating an index that in turn serves as a reference point or benchmark for prices[68] or otherwise acting indirectly on the price mechanism.[69] "To constitute

---

[65] *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (Posner, J.) ("An agreement to fix list prices is . . . a *per se* violation of the Sherman Act even if most or for that matter all transactions occur at lower prices."); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362–63 (3rd Cir. 2004) (horizontal agreement to fix list prices illegal even if actual transaction prices declined); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (trade association's circulation of list prices for automobiles *per se* illegal even when dealers used list prices "only as a starting point"). Courts in this district have recognized fixing list prices states an antitrust claim. *See In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996).

[66] *See, e.g.*, *Catalano*, 446 U.S. at 648 (elimination of credit for retailers' beer purchases *per se* illegal because credit terms are an "inseparable part of the price"); *In re Yarn Processing Patent Validity Litig.*, 541 F.2d 1127, 1136–37 (5th Cir. 1976) (price-fixing conspiracy *per se* illegal even if it affected only one element of total price of yarn processing machines); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986) (finding that fixing a cooling and palletizing charge illegal even though that charge composed only one element of the total price of cantaloupes, court notes that "[d]efendants' argument that they may fix a component charge with impunity is unsupported by price-fixing case law, and is contrary to the decisions in numerous price-fixing cases . . . .") (collecting cases).

[67] *United States v. Gen. Motors Corp.*, 384 U.S. 127 (1966) ("[T]he *per se* rule applies even when the effect upon prices is indirect.").

[68] *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) (conspiracy to manipulate the National Cheese Exchange (NCE) bulk cheese price (which in turn affected the state agency formula for setting minimum milk prices), even though milk producers were free to sell above the minimum formula price); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003) (conspiracy to inflate the Chicago Mercantile Exchange (CME) butter price, which is an element in the federally regulated milk price formula which in turn affected prices of milk, cheese, and butter); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 488 (7th Cir. 2002) (collusively manipulated copper futures contract price served as the benchmark for transactions in physical copper); *Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918, 927–29 (7th Cir. 1995) (collusively imposed soybean futures trading rule suppressed the futures contract price on the exchange, which was the benchmark price for physical soybean sales in the cash market).

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008), held allegations that major railroads' removal of fuel from an industry price-escalation index followed by their imposition of fuel surcharges based on other indices adequately stated a Section 1 claim. Defendants argue *Rail Freight Fuel Surcharge* is inapposite because the railroads allegedly created the index "as part of an allegedly broader scheme to restrict actual marketplace competition." Defs. Mem. at 25 n.19. But Defendants do not identify this "allegedly broader scheme," rather, the scheme was very simple: remove fuel from the previously used index, start using new indices, and thus extract more money from freight consumers. Defendants here manipulated an already-existing index in a way that enabled them to pay less money to Plaintiffs. Defendants do not explain why agreements to change an existing index and create a new index to charge higher prices should be actionable where an agreement to manipulate an existing index is not.

[69] *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940) (joint program among gasoline companies to purchase surplus gasoline on the spot market *per se* illegal as it would "curtail[]" competition by "reduc[ing] the play of the forces of supply and demand"); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421 (7th

horizontal price fixing, the agreement among competitors need not directly concern the final or total prices charged to consumers." 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 87 (7th ed. 2012). *See generally* 7 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2022a (3d ed. 2010) ("The *per se* rule generally governs not only explicit price fixing but also agreements to fix a 'price element'. . . ."); *New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000) ("The Supreme Court has ruled repeatedly that price fixing does not have to be direct in order to be actionable."). Indeed, the Supreme Court has recognized that an unlawful price-fixing conspiracy can accomplish its goals without agreeing on price levels by simply exchanging information about current and future prices that allows the conspirators to coordinate their activity.[70]

These well-established legal principles dispose of Defendants' arguments. Defendants argue, for instance, that Plaintiffs do not allege "defendants *restrained competition* in the marketplace." Defs. Mem. at 22. But nearly a century of caselaw makes clear that manipulation of the pricing mechanism is the classic restraint of trade: price is the "central nervous system of the economy" (*Socony-Vacuum*, 310 U.S. at 224 n.59), critical to the market's functioning.[71] Defendants' actions were also anticompetitive because they affected the flow of information that set the market. Absent collusion, Defendants would have independently quoted their borrowing rates. Instead, Defendants jointly submitted agreed-upon, artificially suppressed rates so that composite LIBOR did not reflect the conditions prevailing in the market but rather an artificial

---

Cir. 1965) (macaroni trade association resolution stating macaroni producers should use a 50/50 durum wheat blend in their macaroni rather than 100% durum *per se* illegal as it would tend to depress durum wheat prices).

[70] *Container*, 393 U.S. at 336–37 (agreement to provide price information may, under appropriate market conditions, constitute circumstantial evidence of an agreement to stabilize prices); *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) (exchanges of "current price information" have "the greatest potential for generating anti-competitive effects" and "exchanges of future price information are considered especially anticompetitive.").

[71] *See, e.g., Stephens*, 1997 U.S. Dist. LEXIS 23797, at *37-38 ("A horizontal agreement to fix prices is automatically considered an unreasonable restraint of trade under the per se rule.") (Buchwald, J.)

rate collusively set by Defendants. Accurate market information—particularly about price—is at the very core of the competitive process. Multiple Supreme Court cases have found Sherman Act violations (even apart from the price-fixing context) where defendants conspired to impede the flow of accurate information.[72] Entire subfields of established antitrust law would cease to exist under Defendants' position that the Sherman Act has no concern for "false reports . . . to a trade association" or "false information" (Defs. Mem. at 1, 24), much less collusively manipulated false price information. The Supreme Court's decision for the plaintiffs in *Allied Tube*, involving the manipulation of product standards,[73] and the line of cases permitting Sherman Act liability for persons who report false information (particularly price information) to governmental authorities would have to vanish if Defendants' view were law.[74]

Defendants' restraint of trade argument is largely a series of *non sequiturs*. Defendants assert they cannot be liable for price-fixing because they do not "compete" with respect to the setting of LIBOR (Defs. Mem. at 23)—but Defendants have already conceded they compete with respect to the sale of LIBOR-based financial instruments (Defs. Mem. at 3, 22); the Sherman Act does not impose the additional requirement that parties to a price-fixing conspiracy compete with respect to the specific mechanism used to carry out the conspiracy.[75] Defendants claim they

---

[72] *See, e.g.*, *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) (dental association's policy of refusing to provide X-rays to insurers); *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679 (1978) (engineering association's policy of refusing to discuss price before a client engages an engineer). *See Cf. Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 240 (1918) (holding Chicago Board of Trade rule requiring members who purchased after close of market to purchase at the day's closing price upheld under the rule of reason as procompetitive because, *inter alia*, prior to rule's adoption market participants "had to buy and sell without adequate knowledge of actual market conditions.").

[73] *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492 (1988) (steel pipe manufacturer's manipulation of industry standard to exclude PVC pipes).

[74] *See, e.g.*, *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1292–98 (5th Cir. 1971) (defendants' filing false forecasts of well production with state agency, which led to agency setting production allowances for plaintiffs' wells at lower levels). *See generally* 1 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶¶ 203f (3rd ed. 2010).

[75] The defendants in *Knevelbaard Dairies* and *Ice Cream Liquidation* did not compete with respect to the government minimum milk price formulae that caused their conspiracy to affect the plaintiffs; the defendants in *Rail*

cannot be liable because LIBOR is not itself a "product" or a "transaction," something that "involves buying, selling, or any competition" (Defs Mem. at 22, 23)—but not only did Defendants themselves sell trillions of dollars of financial products with LIBOR as part of the price; the Sherman Act does not impose the requirement that antitrust conspiracies involve "products" or items that are "sold." Defendants say they cannot be liable for price-fixing because Plaintiffs had "already" decided to use LIBOR in their transactions (Defs. Mem. at 25)—but Defendants cite no authority absolving a price-fixing conspiracy just because the conspiracy's mechanism was already incorporated into the plaintiffs' transactions;[76] if anything, Plaintiffs who "already" owned instruments tied to LIBOR were more vulnerable, as they had lesser or no freedom to change the terms of their transactions.[77]

Defendants' authorities are inapposite. *Schachar v. American Academy Of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989) (Defs. Mem. at 23–25) is not a price-fixing case; it holds that a doctors' association opinion that a certain procedure was "experimental" was not actionable under the antitrust laws. *Schachar*, 870 F.2d at 398 ("*All* the Academy did is state its position that radial keratotomy was 'experimental' and issue a press release with a call for

---

*Freight Fuel Surcharge* did not compete with respect to the fuel indices through which their conspiracy was implemented. Even outside of the uniquely toxic context of price-fixing, there is no Sherman Act requirement that parties to a restraint compete with respect to the specific mechanism used to carry out the restraint—the defendants and co-conspirators in *Allied Tube* did not compete with respect to the private industry standard-setting organization through which they carried out the conspiracy.

[76] In *Knevelbaard Dairies* and *Ice Cream Liquidators*, the mechanism linking the price of certain commodities to certain formulae was "already" in place when the conspirators manipulated commodity prices; in *Sanner* and *Loeb*, the injured plaintiffs purchased or sold a physical commodity whose price was tied, by market forces or by contract, to the manipulated futures contract exchange prices.

[77] The Supreme Court has recognized parties who are locked in to a transaction may be especially vulnerable to the impacts of anticompetitive behavior as they have no opportunity (or only a costly opportunity) to change the transaction's terms. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 477 (1992) (discussing anticompetitive harms to consumers who are "locked in" to Kodak equipment and forced to purchase Kodak service at allegedly supracompetitive prices).

research."). The allegations were akin to trade libel.[78] Similarly, *Sanderson v. Culligan International Co.*, 415 F.3d 620 (7th Cir. 2005) and *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998) (Defs. Mem. at 24) are cases where competitors alleged business rivals either slandered their rivals' products or puffed up their own products: they involved no allegations of price-fixing nor of collusively circulating false price information. They were not even conspiracy cases; they alleged only unilateral action, so Section 1 was not implicated[79]—after all, much of what Section 1 condemns for a group of firms acting together is entirely legal for a firm acting on its own. Finally, *United States v. American Society of Anesthesiologists*, 473 F. Supp. 147 (S.D.N.Y. 1979) ("*ASA*") (Defs. Mem. at 23, 24), a case involving promulgation of anesthesiology relative value guides ("RVGs"),[80] is inapposite as there was no allegation of a conspiracy to manipulate the guide values similar to the allegations here.[81]

## IV. PLAINTIFFS HAVE ANTITRUST STANDING

Defendants' final argument is that even if they colluded to manipulate LIBOR,

---

[78] "Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law." *Schachar*, 870 F.2d at 399.

[79] *Sanderson*, 415 F.3d at 622 ("Sanderson's antitrust claim rests on § 1 of the Sherman Act . . . and fails at the threshold because Sanderson does not contend (in the complaint or anywhere else) that Culligan has conspired with other producers to set price or output, or that it possesses the sort of market power that would lead to condemnation under the Rule of Reason."); *Aquatherm*, 145 F.3d at 1263 ("[Plaintiff's] only claim is [defendant] acted unfairly by disseminating false information, and this unfair competition in turn harmed [plaintiff's] business.").

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989), which Defendants cite with no explanation (Defs. Mem. at 24), does not appear remotely relevant; the page Defendants cite addresses a Section 2 attempted monopolization claim and notes the boilerplate that the Sherman Act "does not reach conduct that is only unfair, impolite, or unethical." *Id.* at 1413.

[80] RVGs are guides that identify relative values of certain procedures considered in relation to one another—for example, the guide in *ASA* reported that anesthesia for an excision and graft of the thoracic aorta was worth five times anesthesia for an appendectomy. *ASA*, 473 F. Supp. at 153.

[81] For example, there was no allegation in *ASA* that the anesthesiologists collaborated with one another to report artificial relative values of procedures, and that those artificially reported values led an insurer to pay more for certain procedures than they otherwise would have.

Plaintiffs—even those who purchased LIBOR-based instruments directly from Defendants—somehow lack antitrust standing because (1) Plaintiffs have not suffered antitrust injury (Defs. Mem. at 26–27); (2) Plaintiffs' injuries are too indirect and speculative (*Id.* at 27–33); and (3) certain Plaintiffs lack standing because they are indirect purchasers (*Id.* at 33–34). The antitrust injury argument is common to all Plaintiffs; Plaintiffs will address the remaining arguments in subsections joined only by Plaintiffs with similar issues.

### A.      Plaintiffs Have Suffered Antitrust Injury.

An antitrust plaintiff must show antitrust injury: "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.* 429 U.S. at 489. Plaintiffs have alleged a classic antitrust injury: Defendants collusively manipulated the index or benchmark that determined the returns Plaintiffs received on financial instruments—instruments that (for the OTC Plaintiffs and many of the Schwab transactions) Defendants sold directly to Plaintiffs.[82] The collusion distorted the transactions so Plaintiffs paid more or received less than they would have in a market free from Defendants' collusion. This is equally true for instruments sold to Plaintiffs by third parties or Defendants' affiliates or subsidiaries: the prices and rates of return were affected by Defendants' unlawful behavior. Plaintiffs are the parties directly harmed by Defendants' price-fixing; they are the ones who received less on their financial instruments because of Defendants' collusion. Plaintiffs' injury was thus "of the type the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful." *Id.*

The injury here is similar to the one pled in *Knevelbaard Dairies*, where milk producers suffered antitrust injury when the defendant cheese makers conspired to manipulate an input to a

---

[82] OTC Compl. ¶¶ 12–13, 34; Charles Schwab Compl. ¶¶ 192, 194, 195, 197–98, 200; Schwab Money Market Compl. ¶ 196, 198, 199, 200–213; Schwab Short-Term Bond Compl. ¶ 192, 194, 195, 196–201. Schwab and OTC Plaintiffs' direct purchases included purchases from both Defendants and their affiliated broker-dealers.

state agency formula for setting minimum milk prices. *Knevelbaard Dairies*, 232 F.3d at 987–

89.[83] The Ninth Circuit explained:

> [S]ince the plaintiffs allegedly were subjected to artificially depressed milk prices, the injury flows 'from that which makes the conduct unlawful,' i.e., from the collusive price manipulation itself . . . . When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs.

*Id.* at 987-88 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).[84]

If anything, Plaintiffs' injuries are more directly tied to the purposes of the Sherman Act than

injuries that have given rise to valid antitrust claims. In *Allied Tube*, for instance, the Supreme

Court held that plaintiffs who lost business due to defendants' manipulation of a standard-setting

process with persuasive influence on marketplace transactions were entitled to Sherman Act

relief. *Allied Tube*, 486 U.S. at 510 (referring to "antitrust liability flowing from the effect the

standard has of its own force in the marketplace"). Here, Plaintiffs claim injury not just from the

collusive manipulation of a standard with persuasive force but a standard explicitly incorporated

into their financial instruments.

Plaintiffs' antitrust injury is also evident from the mechanism Defendants used to

implement the price-fixing conspiracy: agreeing to submit inaccurate information affecting the

market, which pushed down the reported LIBOR. As the cases cited in the previous section

demonstrate, price information is at the heart of the competitive process. An unmanipulated

LIBOR is the result of the free flow of information; collusive manipulation of LIBOR altered the

---

[83] *Knevelbaard Dairies* involved claims under California's Cartwright Act, where California "affords standing more liberally than does federal law," *Knevelbaard Dairies*, 232 F.3d at 987, but the Ninth Circuit's discussion of antitrust injury relied exclusively on federal law. *Id.*, at 987–88.

[84] *See Sanner*, 62 F.3d at 927 (where defendants collusively adopted a commodities exchange rule that caused soybean futures contract price to drop, "farmers who sold soybeans at depressed prices [in the cash crop market] have alleged an antitrust injury"); *High-Tech Employee*, 2012 WL 1353057 at *16–17 (plaintiffs alleged antitrust injury by receiving less than they bargained for due to defendants' price-fixing); *Ice Cream Liquidation*, 253 F. Supp. 2d at 272–73 (antitrust injury for ice cream manufacturer who allegedly paid more than it otherwise would have because defendants conspired to manipulate milk prices by inflating Chicago Mercantile Exchange (CME) butter price, an input into federally regulated formula for minimum milk prices).

signals the market received, disrupting what the BBA itself describes as "the primary benchmark for short-term interest rates globally." OTC Compl. ¶ 44.

This situation is very different from the cases Defendants cite. Both the Supreme Court and lower courts have held that a party—typically a competitor, rather than a consumer—injured by too much competition has no antitrust injury. *See, e.g.*, *Brunswick Corp.*, 429 U.S. at 488 (holding no antitrust injury from claim that defendant "preserved competition" by acquiring struggling bowling centers and enabling them to survive, thereby reducing competing plaintiff bowling center's profits) (Defs. Mem. at 26); *Balaklaw v. Lovell*, 14 F.3d 793, 798 (2d Cir. 1994) (holding no antitrust injury from claim that doctor "los[t] out in the competition" for an exclusive contract") (Defs. Mem. at 26). Not surprisingly, Defendants cite no case holding that a party who pays more, receives less, or both because of collusive price-fixing has not suffered an antitrust injury; such a holding would be (to borrow the Supreme Court's words from another context) "nothing less than a frontal assault on the basic policy of the Sherman Act." *Engineers*, 435 U.S. at 695.

### B. Defendants' Other Standing Arguments Are Without Merit.

#### 1. OTC Plaintiffs and Schwab Direct Transactions.

The only additional standing argument that even arguably applies to the OTC Plaintiffs and the Schwab transactions directly with Defendants and their affiliated broker-dealers is that the injuries are speculative (Defs. Mem. at 27–29)—by which Defendants mean damages calculations will be complex.[85] The fact that there will be some element of estimation involved

---

[85] Defendants concede their indirect purchaser argument does not apply to the OTC Plaintiffs, Defs. Mem. at 34, and their argument that certain injuries are indirect and attenuated has no conceivable application to the OTC Plaintiffs: Defendants argue certain Plaintiffs' injuries are indirect because the values of LIBOR-based financial instruments are "substantially determined by other factors that are set through competitive processes and are affected by other market forces and independent decisionmakers" (*id.* at 28), but this is clearly not the case for the OTC Plaintiffs, who purchased instruments directly from Defendants whose returns (LIBOR) Defendants controlled (rather than some other "market force[]" or "independent decisionmaker[]"). Defendants' collusive suppression of LIBOR directly changed the returns the OTC and Schwab Plaintiffs received on their LIBOR-based financial instruments

in antitrust damages calculations does not bar recovery. "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J.Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 566 (1981). Therefore, damages may be calculated according to a "just and reasonable estimate . . . based on relevant data," including both "probable and inferential, as well as . . . direct and positive proof." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (internal quotation marks and citations omitted).

The basic measure of damages in price-fixing cases is well-established: "After an illegal price-fixing conspiracy, one would compare the agreed price, or the actual price resulting from an agreed formula or other misbehavior, with the price that would have prevailed in the absence of the illegal conduct." 2A PHILIP E. AREEDA & HERBERT HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW ¶ 340b1 (3rd ed. 2007). Defendants assert this exercise is impossible because "there is no objectively verifiable 'correct' USD LIBOR" (Defs. Mem. at 4), but this is equally true (and equally irrelevant) in every price-fixing case: the "but-for" price (the price that would have prevailed absent collusion) is not the "correct" price in some ontological sense; rather, it is an estimate of the price that would have existed but-for the price-fixing. *See, e.g.*, *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390 (1906).

Contrary to Defendants' assertions (Defs. Mem. at 29–33), implementing this measure does not present such complexities as to make it inherently speculative. For financial instruments Baltimore purchased before the Class Period, where Baltimore paid a certain fixed interest rate and received a rate tied to LIBOR, the damages calculation is very simple: Estimate a "but-for"

---

purchased directly from Defendants. It is difficult to imagine a more directly injured party than Baltimore, for example, which entered into swaps with Defendants where Baltimore paid a fixed rate of interest to Defendants and Defendants paid Baltimore a floating rate tied to LIBOR—but Defendants collusively suppressed this floating rate so Baltimore received less than it otherwise would have. OTC Compl. ¶¶ 8, 12, 32(f), 219, 222.

LIBOR using (for example) one of the historically predictive LIBOR metrics such as the Eurodollar rate, and then calculate the difference between what Baltimore actually received and the but-for LIBOR level. The same calculation would determine damages for Bondholder Plaintiffs whose interest payments were expressly tied to LIBOR. This has been the standard price-fixing damages methodology for over a century. *See generally Chattanooga Foundry*, 203 U.S. 390.[86]

Defendants also assert there would be difficulties in determining whether Plaintiffs had suffered a "net injury," that is, an injury from price-fixing offset against any gains from price-fixing. Defs. Mem. at 32. But—setting aside whether Defendants' view of the law is correct, which Plaintiffs contest[87]—the Court need not consider the question of netting at the pleading stage. The computation of an offset would be relevant, if at all, to the amount of Plaintiffs'

---

[86] The basic overcharge methodology—damages measured by the difference between the actual price and the but-for price—will remain the same for any financial instrument.

[87] Defendants' netting argument is a variation on the long-rejected argument that a plaintiff must demonstrate it suffered a net injury and it did not, for instance, pass on the overcharge to its customers. The Supreme Court has expressly rejected that argument. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977). The Second Circuit has held that "antitrust treble-damage actions should not be complicated by a need to trace the effects of the overcharge with respect to such matters as prices, costs, and the potentially different behavior of all the pertinent variables in the absence of the overcharges." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1079 (2d Cir. 1988). The multi-variate "tracing" analysis that the Supreme Court and Second Circuit have both flatly rejected is precisely what Defendants seek to re-introduce. *See* Def. Mem. at 32 ("That analysis would involve re-pricing nearly all transactions in what Plaintiffs allege is a more than $300 trillion market.").

Defendants point to *Minpeco, S.A. v. Conticommodity Services, Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987), but *Minpeco* was a commodities manipulation case, not an antitrust case, and did not implicate the issue of antitrust standing. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) ("*NFL*"), was not an antitrust standing case, but rather a case about the ultimate computation of damages. The most that *NFL* held was that in calculating damages, the harm caused by an antitrust violation should take into account amounts saved *as to that violation or transaction*. For instance, the *NFL* pointed to *Hanover Shoe*, a case involving the refusal to sell, as opposed to rent, shoe machinery. *Hanover Shoe* permitted the deduction of interest from the plaintiff's lost profits award because the plaintiff would have had to pay interest to borrow the purchase sum if the defendant had allowed the purchase of shoe machinery. At the same time, however, the court categorically disclaimed the "netting" of various different transactions and subsequent market exchanges in determining damages. The issue in *NFL* was even more straightforward. There, the court simply found that the plaintiff's damages award had to be reduced because the plaintiff had improperly received the benefit of an injunction during a period where there was no antitrust violation. That is worlds apart from this case, where Defendants are trying to "net" hundreds of thousands of transactions together, including those in which they were not involved, in an attempt to avoid accountability for their actions. Defendants cite no authority supporting their proposed methodology.

damages; it has no relevance to the threshold question of whether these elements have been pled. Indeed, none of the offset cases Defendants cite has anything to do with the *pleading* of antitrust injury.

### 2. Bondholder Plaintiffs, Exchange Plaintiffs, and Remaining Schwab Transactions.[88]

Defendants assert the Bondholder and Exchange Plaintiffs and Schwab transactions other than those directly with Defendants lack standing, relying on *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 535-36 (1983) ("*AGC*") and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Defendants' arguments are meritless.

### a. These Plaintiffs Have *AGC* Standing Because Their Injuries are Directly the Result of Defendants' Violations and Not Speculative.

### i. These Plaintiffs' Injuries are Direct.

Defendants claim there is an attenuated chain of causation between their benchmark manipulation and these Plaintiffs' injury, since "the values of the USD LIBOR-based financial instruments that Plaintiffs purchased, held, or traded are substantially determined by other factors that are set through competitive processes and are affected by other market forces and independent decision-makers." Defs. Mem. at 28. This contention is factually wrong and irrelevant as the Complaints' allegations show Plaintiffs' injuries are direct and substantial.

The Bondholder Plaintiffs allege they lost interest income directly due to, and in proportion to, the suppression of LIBOR, since their variable rate bonds paid interest at a rate expressed as LIBOR plus a fixed premium or minus a fixed discount.[89] *See* Bondholder Compl. ¶ 1 (the bonds pay interest "at a rate expressly linked to the U.S. Dollar Libor rate");*see also id*.

---

[88] The OTC Plaintiffs do not join this Section.

[89] As the Bondholder Plaintiffs' claim is for interest they never received, Defendants' contention about the factors affecting the value of the Bondholder Plaintiffs' bonds is irrelevant.

¶¶ 8, 11, 208. The Schwab Plaintiffs likewise allege they received suppressed rates of return on floating-rate and fixed-rate instruments as a direct result of Defendants' unlawful conduct. *See* SOF at E. The Exchange Plaintiffs have alleged direct causation between their injury and Defendants' benchmark manipulation, specifically alleging both conduct directed at the Eurodollar market and a direct link between LIBOR and Eurodollar futures contracts that settle to LIBOR. *See* Mem. of Law in Opp'n to the Mot. to Dismiss the Exchange-Based Pls.' Claims; FSA Final Notice ¶ 45; Exch. Compl., ¶¶ 204, 206, 207, 210, 212, 215, 217, 219, 232-33; *In the Matter of Diplacido*, CFTC No. 01-23, 2008 WL 4831204, *31 (CFTC Nov. 5, 2008) (holding artificially obtained price included in calculation of settlement price "causes the settlement price to be subject to artificial influence as well").

Focusing on the directness of the alleged injury, as *AGC* requires, the Barclays Settlement shows Barclays intended the manipulated LIBOR benchmark to directly impact the Eurodollar futures price. *See* DOJ SOF ¶ 13, 22 (internal email showing Barclays' specific intent to manipulate Eurodollar futures contracts settling on December 2006); FSA Final Notice, ¶¶ 59, 75-78 (same).[90]

> **ii.  The Injury To These Plaintiffs Falls Within the Legal Definition of a Direct Injury.**

Under *AGC*, it is the directness of the link from the violation to the injury that counts, *not*

---

[90] These Plaintiffs' position is supported by the rule laid out in a case Defendants rely upon. *Digital Music Antitrust Litigation* held that "[a]bsent allegations of some conduct directed at the CD market or a direct linkage between the [CD and Internet Music] markets, an allegation of wrongdoing in the Internet Music market bears little connection to the CD market." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403 (S.D.N.Y. 2011). Here, Plaintiffs allege conduct directed at the Eurodollar futures contract market and a direct link between LIBOR and the Eurodollar contract market. The other cases Defendants cite do not support a finding of indirect injuries in this case. *de Atucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985) involved an Argentine plaintiff alleging that the defendants manipulated the U.S. silver market which caused the London silver market in which he invested to collapse. In *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980) the plaintiff alleged a convoluted and attenuated theory of causation whereby a conspiracy to drive down prices in the refined copper market drove prices up in the separate copper scrap market, but there was no evidence that the refined copper price had a direct effect on scrap copper prices. "The court found the injury indirect because it depended upon a complicated series of market interactions, including the actions and pricing decisions of refiners, fabricators, dealers, speculators, and consumers of copper." *Loeb*, 306 F.3d at 488 (quotation marks and citations omitted).

whether Plaintiffs dealt with the Defendants. *See AGC*, 459 U.S. at 540 (stating that directness concerns "the chain of causation between the Union's injury and the alleged restraint"); *Loeb* 306 F.3d at 487 ("[D]irectness relates to the question whether there exists a chain of causation between a defendant's action and a plaintiff's injury.").

*Sanner* conducted this analysis with respect to an analogous situation where soybeans were priced with reference to the benchmark soybean futures price. *See Sanner*, 62 F.3d at 927–30 (holding farmers who sold soybeans in the cash market had antitrust standing to seek damages caused by implementation of a trading rule for soybean futures contracts on a commodity exchange even though the farmers had not dealt with the commodity exchange or its members). Similarly, in *Loeb*, the court held that plaintiffs (Viacom) who purchased physical copper cathode at prices expressly indexed to the benchmark copper cathode futures market price manipulated by defendants had standing even though the plaintiffs purchased no copper from the defendants and traders of copper cathode futures contracts had also sued the defendants. *See Loeb*, 306 F.3d at 484-85. Likewise, in *Ice Cream Liquidation,* the court denied a motion to dismiss on *AGC* standing grounds where the plaintiff alleged the defendants had manipulated the benchmark butter futures contract price in order to increase above competitive levels the wholesale prices of milk, cream, and butter. *See Ice Cream Liquidation,* 253 F. Supp. 2d 262, 273-74 (D. Conn. 2003).

The circumstances of these cases parallel the facts here, where the futures contracts prices and the interest paid on the bonds moved in direct response to LIBOR. This is unlike *AGC*, where the plaintiff suffered injuries "only [as] an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors." *AGC*, 459 U.S. at 541. Highlighting this distinction, Defendants here have not identified another party which, like the contractors and subcontractors in *AGC*, purportedly suffered harm that in turn caused these

Plaintiffs' injuries.

Nor have Defendants identified the supposed "competitive processes," "market forces," or "independent decision-makers" that allegedly came between Defendants' benchmark manipulation and Plaintiffs' injuries. There are no intervening, independent market forces. Defendants concede (as they must) that there is no issue of such indirectness with regard to the claims of the OTC Plaintiffs. *See* Defs. Mem. at 29. Yet, just as the OTC Plaintiffs' interest rate swaps are directly linked to Defendants benchmark manipulation through the principal variable of LIBOR (OTC Compl. ¶¶ 12, 13, 32(f), 34), the directness is identical for the other Plaintiffs' injuries as well. Regardless, *AGC* standing has been found where the defendants' conduct, as here, causes damage in two separate but related markets. *See Loeb*, 306 F.3d at 481-85. These Plaintiffs have alleged a comparable direct causal link between their injuries and Defendants' wrongdoing.

### iii. Well-Established Case Law Holds That Traders of Futures Contracts Like the Exchange-Based Plaintiffs Have Standing to Assert Antitrust Claims Against Defendants.

It is well established that traders of futures contracts, such as the Exchange-Based Plaintiffs, have standing to assert antitrust claims. Defendants have cited no decisions, nor are there any extant, which have held that traders of futures contracts do not have antitrust standing. On the contrary, it is taken for granted by courts and Defendants that traders of futures contracts have *AGC* standing. *See id.* at 484 (recognizing that Comex futures traders had "more direct injuries at the hands of the defendants" than certain other types of plaintiffs, there purchasers of scrap copper); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL 2031, 2011 WL 589625, at *2 (N.D. Ill. Feb. 4, 2011) (noting that defendants conceded that purchasers of milk futures had standing to assert claims based on monopolization of the futures market).

### iv. Defendants' Additional Attacks on the Exchange-Based Plaintiffs' Standing are Meritless.

Ignoring the Exchange-Based Plaintiffs' well pled allegations of directness, Defendants attempt to rely upon two references in the Exchange-Based Complaint which Defendants take entirely out of context. *See* Defs. Mem. at 28 n.20. Unfortunately for Defendants, these two references are to securities *that are not part of the class* — making their argument irrelevant. The language upon which Defendants rely states that certain floating rate notes use LIBOR as a benchmark reference for determination of their interest rate — these notes are not within the Exchange-Based Plaintiffs' proposed class definition. *See id.* ¶ 11, 15.[91] Beyond that, Defendants contend, without more, that "the terms of the transaction [presumably for Eurodollar futures and options] likely would have been different" if they had not suppressed LIBOR in violation of the Sherman Act. This is inappropriate factual speculation contradicted by the well-pleaded allegations and case law. *See Diplacido*, 2008 WL 4831204 at *31; FSA Final Notice ¶ 45. In addition, the underlying premise of the argument misses the mark entirely. *AGC*, as Defendants acknowledge, is concerned with the directness of the alleged injury — not the extent or measure of the injury.[92]

### v. The Exchange-Based and Bondholder Plaintiffs' Claims are as Direct as Others.

Defendants acknowledge that the *AGC* factors address whether Plaintiffs will be "efficient enforcers of the antitrust laws." Def. Mem. at 26. These Plaintiffs suffered injury as the

---

[91] The discussion in ¶ 15 of the Exchange-Based Complaint relates entirely to certain notes which are in no way the options or futures encompassed in the proposed class definition. *Compare* Exch. Compl. ¶ 15 *with* ¶ 221.

[92] Significantly, the directness that is the focus of *AGC* is *not* the directness of *Illinois Brick*. For *Illinois Brick*, as discussed below, the issue is whether price inflation has been passed on down a chain of distribution of the goods sold. In *AGC*, by contrast, the issue is whether there has been any intervening actor or cause between defendants' conduct and the injury these plaintiffs have suffered. While *AGC* focuses on the cause of the injury, *Illinois Brick* focuses on apportionment among potential victims of the injury. For *AGC* standing purposes, contrary to Defendants' argument, these Plaintiffs are not indirect at all.

direct result of Defendants' LIBOR manipulation, and no one else can bring a claim for their damages. Thus, these Plaintiffs have a "self-interest in pursuing the claim along with" the OTC Plaintiffs sufficient to meet the efficient enforcer requirements. *Louisiana Wholesale Drug Co. v. Sanofi-Aventis U.S., LLC*, 07 Civ. 7343 (HB), 2008 WL 169362, at *6 (S.D.N.Y. Jan. 18, 2008).

Defendants attempt to differentiate the OTC Plaintiffs' claims from the Exchange-Based and Bondholder Plaintiffs' claims, asserting that the former are "more direct" than the latter "because the other classes' purchases of USD LIBOR-based financial instruments cannot be directly traced to any individual Defendant." Defs. Mem. at 29.[93] However, all Plaintiffs' injuries—including those of the OTC Plaintiffs—result directly from the manipulated benchmark rates published by the BBA. The Exchange-Based and Bondholder Plaintiffs' claims are as direct as those of the OTC Plaintiffs whose directness Defendants do not challenge. In sum, the LIBOR-based derivatives at issue in the OTC Plaintiffs' case and the LIBOR-based futures contracts, options, and bonds at issue in the other class cases "are so closely related that a [manipulation aimed] toward one promised to invariably impact the other." *Sanner*, 62 F.3d at 930; *see Amarel v. Connell*, 102 F.3d 1494, 1512 (9th Cir. 1996) ("Given the close ties between the paddy rice market and the milled rice market, and given that plaintiffs' profits were, in part, a function of profits in the milled rice market, defendants' alleged predatory pricing in the market for milled rice 'predictably would have impacted' the price of paddy rice.") (internal quotations omitted). All Plaintiffs are therefore equally well positioned to assert their respective antitrust claims, and none is "closer" or more direct in the causative sense contemplated in *AGC*.

### vi. These Plaintiffs' Injuries are Straightforward and Determinable, Not Speculative.

Defendants argue that antitrust standing is lacking because these Plaintiffs' injuries are "highly speculative." Defs. Mem. at 29. *See also id.* at 30. On the contrary, as discussed above,

---

[93] Defendants do not separately address the Schwab Plaintiffs in this argument.

the linkage of Plaintiffs' injuries to Defendants' benchmark manipulation, and the calculation in dollars of lost value or interest may be "ascertained to the penny" without any speculation. *AGC*, 459 U.S. at 543 n.49 (internal quotation marks omitted).

Without any meaningful citation to the allegations of the Complaints or authority supporting their approach, Defendants concoct a four-step process which they claim is required to determine these Plaintiffs' damages and assert this so-called analysis "would involve re-pricing nearly all transactions in what Plaintiffs allege is a more than $300 trillion market." Defs. Mem. at 32. This baseless argument is wrong, premature and fails to give these Plaintiffs the benefit of every reasonable inference in support of their claims.[94]

Determination of damages for the Exchange, Bondholder and Schwab transactions is not as complex as Defendants assert. In *Loeb*, the Seventh Circuit rejected just the kind of argument Defendants make here, holding that the determination of damages in a large commoditized market "is not speculative or complex, only time-consuming." 306 F.3d at 493 and that it can be done, like in every price-fixing case, via discovery and expert testimony. *Id.*[95] As discussed previously, the calculation of damages for the Bondholder Plaintiffs involves the simple process of comparing the interest they should have received with what they actually were paid due to the

---

[94] Tellingly, Defendants' themselves recognize the limitations of their argument – making no attempt whatsoever to apply their "test" to the Exchange, Bondholder, or Schwab Plaintiffs and, unconvincingly, attempt to apply only one element of their four part "test" to the OTC Plaintiffs.

[95] "The mere fact that each individual transaction relevant to an antitrust scheme must be examined on a case-by-case basis to assess damages does not thereby render those damages speculative." *Id.* (citing *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1059 (9th Cir. 1999)). Indeed, trading in a commodities market manipulated by an anticompetitive scheme inherently inflicts antitrust injury. *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1319 (S.D.N.Y. 1986). These Plaintiffs' claims are not speculative because they suffered substantial damages as a direct result of Defendants' conduct. *See Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 492 (S.D.N.Y. 1992). Moreover, even in cases where there were "'extraneous factors' apart from the alleged conspiracies which affect[ed] price movements" of commodities, that did *not* preclude standing. *Grosser*, 639 F. Supp. at 1319 (quoting *AGC*, 459 U.S. at 543). *See also Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, No. 92 Civ. 3142 (RPP), 1995 U.S. Dist. LEXIS 9961 (S.D.N.Y. July 13, 1995); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936 (S.D.N.Y. 1981) *Pollock v. Citrus Assocs.*, 512 F. Supp. 711 (S.D.N.Y. 1981); *Blanchard & Co. v. Barrick Gold Corp.*, C.A. No. 02-3721 Sec. "C"(3), 2003 U.S. Dist. LEXIS 15519, at *19 (E.D. La. Sept. 3, 2003) ("At this point, the Court is unprepared to dismiss this action altogether, simply because calculating and apportioning damages may be difficult.").

suppressed LIBOR.

        **b.**    ***Illinois Brick* Has No Bearing On Plaintiffs' Standing.**

Defendants also assert that "to the extent plaintiffs bought or sold USD LIBOR financial instruments in transactions with non-Defendants, and to the extent the alleged overcharge or underpayment was already built into those instruments, the claims of such Plaintiffs are barred by the direct purchaser rule of *Illinois Brick*." Defs. Mem. at 33. *See Illinois Brick*, 431 U.S. at 720.[96] Contrary to Defendants' position, "*Illinois Brick* does not stand for the proposition . . . that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)." *Loeb*, 306 F.3d at 481. Instead, *Illinois Brick* "focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474-75 (1982). The instant cases implicate no concern of duplicative recovery; they involve no chain of distribution. Thus, *Illinois Brick* has no bearing on these Plaintiffs' standing.

Defendants cite no cases that support their position. Courts in this Circuit, however, have long held that *Illinois Brick* does not bar a plaintiff's antitrust claims when the plaintiff traded in a futures market affected by the defendants' conduct. *See, e.g., Three Crown Ltd. P'ship*, No 92 Civ. 3142 (RPP), 1995 U.S. Dist. LEXIS 9961, at *16-17 (S.D.N.Y. July 13, 1995) (holding that since there was no pass on down a distribution chain, there was no *Illinois Brick* bar to antitrust claim by short sellers of government two-year notes against defendants who manipulated that market although plaintiffs never dealt directly with defendants); *Pollock*, 512 F. Supp. at 712, 719 (holding sellers of orange juice futures contracts were not barred by *Illinois Brick* from suing

---

[96] Defendants explicitly admit that the indirect purchaser rule does not apply to the Schwab Direct Transactions. Defs' Mem. at 34. Additionally, *Illinois Brick* as a matter of law does not apply to the Schwab Plaintiffs' state antitrust claims under the Cartwright Act. *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989); Cal. Bus. & Prof. Code § 16750(a); *Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 19-20 (1984).

manipulators of the market although they never sold contracts to them, because "unlike *Illinois Brick*, in which there were other plaintiffs who could, at least theoretically, pursue claims against the defendants, the plaintiffs herein are the parties closest to and most directly affected by the alleged antitrust violations").

## V. DEFENDANTS' ARGUMENTS IN THEIR INDIVIDUAL MEMORANDA OF LAW ARE WITHOUT MERIT

Defendants Barclays, UBS, Norinchukin, and Bank of Tokyo-Mitsubishi UFJ submitted supplemental memoranda in support of the motions to dismiss. Many of their arguments are also in Defendants' consolidated brief, and Plaintiffs will respond only to unique arguments here.

Several Defendants submit memoranda arguing there is no evidence tying them to any alleged LIBOR suppression conspiracy.[97] Two well-known legal principles should be kept in mind when considering these Defendants' assertions. First, even in a criminal case requiring proof beyond a reasonable doubt, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985). Second, actions as well as words can show entry into a conspiracy, as (for example) acting in parallel with other known conspirators. As the Third Circuit has explained:

> If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also a party to the agreement. That is especially so if the sister firm's behavior mirrored that of the five conceded coconspirators.

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 363 (3rd Cir. 2004).

While they need not do so, the Complaints allege facts specific to *each* Defendant—including Defendants BTMU, Credit Suisse, and Norinchukin, which filed the individual

---

[97] *See* Defendant The Norinchukin Bank's Supplemental Mem. of Law in Supp. of Mots. to Dismiss, ECF No. 171 ("Norinchukin Suppl. Mem."); Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd.'s Supplemental Mem. of Law In Supp. of Its Mot. to Dismiss, ECF No. 173 ("BTMU Suppl. Mem."); Defendant Credit Suisse Group AG's Supplemental Mem. of Law in Supp. of Its Mot. to Dismiss, ECF No. 175 ("CS Suppl. Mem.").

memoranda—that demonstrate improperly low LIBOR submissions for all members of the USD LIBOR panel.[98] These allegations are summarized in the statement of facts; the Defendants that submitted individual memoranda, like the other Defendants, submitted LIBOR rates that diverged from Eurodollar rates[99] and probabilities of default[100] and participated in the sudden jumps in LIBOR on April 17, 2008, when the *Journal* and BBA announced inquiries into LIBOR.[101]

Credit Suisse, BTMU, and Norinchukin further argue they did not have motives alleged in the Complaint—they claim they were not in financial distress, for example.[102] However, as outlined above, Plaintiffs have alleged Credit Suisse, BTMU, and Norinchukin did in fact suppress their LIBOR quotes; whether they did so for the motives pled in the Complaint or some other motive is irrelevant.[103]

BTMU relies on the fact that *one* of the studies cited in the Complaint—a 2010 study by Connan Snider and Thomas Youle—did not find that BTMU suppressed LIBOR according to their study's methodology. BTMU Suppl. Mem. at 3–5. But BTMU simply ignores the other allegations, summarized above, that BTMU did in fact participate in LIBOR suppression; the

---

[98] As noted above, *Twombly* does not require that Plaintiffs allege detailed facts specific to the conduct of each Defendant. *See, e.g., Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir. 2010); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 (JG) (VVP), ECF No. 1270, pp. 16-17 (E.D.N.Y. Sept. 22, 2010); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145-48 (N.D. Cal. 2009).

[99] OTC Compl. ¶ 83, Figs. 14 (Credit Suisse), 18 (Norinchukin), ¶ 84 (BTMU, Credit Suisse, and Norinchukin negative spreads), 85 (BTMU, Credit Suisse, and Norinchukin spreads after Lehman bankruptcy).

[100] *See* OTC Compl. ¶ 66, Graphs 1–6 (reporting results for every Defendant other than Norinchukin, WestLB, and Rabobank, who do not have probabilities of default).

[101] *See* OTC Compl. ¶¶ 121–27, Tables 1 & 2 (including specific findings for BTMU, Credit Suisse, and Norinchukin).

[102] *See* CS Suppl. Mem. at 1–3; BTMU Suppl. Mem. at 4–5; Norinchukin Suppl. Mem. at 1–2.

[103] *See* 1 ABA Section of Antitrust Law, Antitrust Law Developments 4 (7th ed. 2012) ("That the parties to an agreement did not have identical motives, or that one party to the agreement was coerced to participate, does not negate the finding of an agreement for purposes of Section 1, so long as the parties share a commitment to a common scheme.").

extent of its participation will be a subject of discovery.

Defendant Credit Suisse's arguments that no evidence links it to the conspiracy are particularly inapposite. The Complaints identify Credit Suisse by name as a participant in behavior that is evidence of collusion rather than independent action; Credit Suisse is one of two Defendants (the other is WestLB) which reported identical LIBOR quotes on the same day, a finding anomalous given the two banks' very different credit profiles. OTC Compl. ¶ 95. In addition, the Complaint notes that the Swiss Competition Commission is investigating Credit Suisse and other financial institutions with respect to collusive agreements to manipulate LIBOR. *Id.* ¶ 165.

Finally, Defendant UBS argues that expert economic analysis is inappropriate in a complaint, in part because such expert analysis has not been tested under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (UBS Mem. at 4). Putting aside for a moment the obvious irrelevance of *Daubert* (a case concerned with a court's gatekeeper role in keeping junk expert testimony from a *jury*) at the pleading stage, UBS's authorities do not support the proposition that a complaint may not use expert economic analysis of factual material. UBS appears to confuse statistical analyses conducted by experts with opinions rendered by experts. UBS Mem. at 4. The statistical analyses in the Complaints are factual allegations—that LIBOR deviated from its historical relationship to a number of metrics—from which a conspiracy can be inferred. Statistical evidence is routinely included in complaints and the court may properly consider it on a motion to dismiss.[104] Even to the extent the Court considers the statistical analyses to be expert opinions, there is "no inflexible rule" against including such opinions in pleadings. *See DLJ Mortgage Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 234 (E.D.N.Y.

---

[104] *See, e.g., Hinds County. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 360 (S.D.N.Y. 2010) (relying on statistical analysis of bidding patterns to determine whether plaintiffs raised plausible inference of conspiracy by bank defendants, including UBS).

2010). Courts frequently permit the inclusion of allegations derived from expert work in a complaint;[105] even one of UBS's authorities permitted the inclusion of the non-conclusory factual portions of an expert affidavit in a complaint. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285 (5th Cir. 2006) (UBS Mem. at 4). UBS makes no argument as to why expert economic analysis of the correlation between LIBOR quotes and various predictive metrics—which even UBS does not argue is improper if the *Journal* or independent economists perform it—suddenly becomes improper if an expert retained by Plaintiffs performs it. *Twombly* does not require expert statistical analysis, but its use is certainly consistent with the Supreme Court's concern that complaints should contain more than raw conclusory assertions.

## VI. THE COURT SHOULD GRANT LEAVE TO AMEND IF IT GRANTS DEFENDANTS' MOTION

Plaintiffs respectfully request leave to amend if the Court grants Defendants' motion in whole or part.[106] The media has recently reported that internal investigations at several Defendants have uncovered wrongdoing and that certain Defendants are conceding the likelihood of large fines or further admissions of wrongdoing.[107] Recent media reports and government investigations also outline additional features of the LIBOR-setting process that

---

[105] *See, e.g., Mannkind Sec. Actions*, 835 F. Supp.2d 797, 820–21 (C.D. Cal. 2011).

[106] "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[107] For example, it has been reported that Royal Bank of Scotland's involvement in the Libor rigging scandal could be worse than Barclays' and may force the state-owned bank to pay a bigger fine. Julia Kollewe, *RBS may be Bigger Libor Culprit than Barclays, MP Says*, The Guardian, Aug. 23, 2012, available at http://www.guardian.co.uk/business/2012/aug/23/rbs-libor-barclays-mp. Deutsche Bank has admitted involvement in the LIBOR rate-rigging scandal. Jill Treanor, *Deutsche Bank Admits Libor Involvement*, The Guardian, Jul. 31, 2012, available at http://www.guardian.co.uk/business/2012/jul/31/deutsche-bank-libor. It has also been reported that internal investigations at Credit Suisse, JP Morgan, Citibank, and Bank of America found wrong-doing with respect to LIBOR. BTMU has become the latest bank to face questioning about its role in the LIBOR scandal. Michiyo Nakamoto, *Japan Lender Caught up in Libor Probe*, The Financial Times, Aug. 9, 2012, available at http://www.ft.com/intl/cms/s/0/93e5a1b0-e200-11e1-b3ff-00144feab49a.html#axzz24rF4bDiJ. BTMU's involvement is particularly curious: one analyst explained that it was difficult to imagine a BTMU trader deciding to manipulate the rate, but that BTMU traders could have been approached by staff at other banks seeking co-operation. *Id.*

make it ripe for collusion.[108] This is the type of material Plaintiffs would incorporate into any proposed amended Complaints. Plaintiffs requested in their August 1, 2012, letter to the Court that they be permitted to amend not just to bolster the existing claims but to add additional claims warranted by the Barclays Settlements and other currently developing evidence.[109] Plaintiffs respectfully reassert that request here if the Court dismisses the antitrust claims, and will seek leave of the Court to present additional detail as to their planned allegations and claims—whether by letter to the Court, following the Court's individual procedures, or some other procedure—should that become necessary.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion in its entirety or grant Plaintiffs' leave to amend their Complaints.

Dated: August 28, 2012

*/s/ William Christopher Carmody*　　　　　　　*/s/ Michael D. Hausfeld*　　　　　　

William Christopher Carmody　　　　　　　　Michael D. Hausfeld
Arun Subramanian　　　　　　　　　　　　　William P. Butterfield
SUSMAN GODFREY L.L.P.　　　　　　　　　Hilary K. Scherrer
560 Lexington Avenue, 15th Floor　　　　　　HAUSFELD LLP
New York, New York 10022　　　　　　　　　1700 K Street, N.W., Suite 650
　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006

---

[108] The Wheatley Review, commissioned by the U.K.'s Chancellor of the Exchequer in the wake of the Barclays Settlements, criticized LIBOR's governance structure, under the oversight of the LIBOR Foreign Exchange and Money Market ("FX&MM") committee, for "potentially significant limitations," including "insufficient independence," "lack of transparency," and failure to "provide the necessary degree of accountability." THE WHEATLEY REVIEW OF LIBOR: INITIAL DISCUSSION PAPER (Crown Aug. 2012), ¶¶ 2.28, 2.30, available at http://hm-treasury.gov.uk/d/condoc_wheatley_review.pdf. The Wheatley Review noted that "the membership of FX&MM and its subcommittees is not publicly known" and that information regarding its oversight and enforcement activities "is not published." *Id.* ¶ 2.30. As *Bloomberg* recently reported, the FX&MM meets every two months "at an undisclosed location," "no minutes are published." and the BBA "won't identify any members [of the FX&MM], saying it wants to protect them from being lobbied, and declined to make the chairman available for interview." Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg, Aug. 21, 2012, http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[109] *See* Letter from Michael Hausfeld to Judge Buchwald, Aug. 1, 2012.

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, California 90067-6029

Drew D. Hansen (*pro hac vice* pending)
SUSMAN GODFREY L.L.P.
1201 Third Avenue Suite 3800
Seattle, WA 98101

*Interim Co-Lead Counsel for Over-the-Counter Plaintiffs and the Class*


/s/ Steven E. Fineman
Steven E. Fineman (SF8481)
Michael J. Miarmi (MM1193)
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Richard M. Heimann
Eric B. Fastiff
Brendan Glackin (BG7314)
Joseph P. Forderer
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Lowell Haky
Vice President and Associate General Counsel
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, California 94105
Telephone: (415) 667-0622
Facsimile: (415) 667-1638

*Counsel for the Charles Schwab Plaintiffs*


/s/ David Kovel
David Kovel, Esq.
Daniel Hume, Esq.
Roger Kirby, Esq.
KIRBY McINERNEY LLP
825 Third Avenue, 16th floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

/s/ Christopher Lovell
Christopher Lovell
Gary Jacobson
Ian T. Stoll
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

/s/ Karen L. Morris
Karen L. Morris
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
 COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Tele: (302) 426-0400
Fax: (302) 426-0406

/s/ David H. Weinstein
David H. Weinstein
Robert S. Kitchenoff
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tele: (215) 545-7200
Fax: (215) 545-6535

*Interim Co-Lead Counsel for Bondholder Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Hilary K. Scherrer, hereby certify that on August 28, 2012, I caused the following documents to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Southern District of New York, on all parties registered for CM/ECF in the above-captioned matters:  Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims; and Declaration of Hilary K. Scherrer with attached exhibits.

Dated: August 28, 2012

*/s/ Hilary K. Scherrer*
Hilary K. Scherrer