**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 Master File No. 1:11-md-2262-NRB ECF Case |
| THIS DOCUMENT RELATES TO:  EXCHANGE-BASED PLAINTIFF ACTION | **ORAL ARGUMENT REQUESTED** |

<u>**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION TO DISMISS THE EXCHANGE-BASED PLAINTIFFS' CLAIMS**</u>

## TABLE OF CONTENTS

Page

I.     PLAINTIFFS' CLAIMS ARE TIME-BARRED.................................................................1

       A.    Plaintiffs Were On Inquiry Notice Before April 15, 2009.....................................1
       B.    Plaintiffs Fail To Plead Fraudulent Concealment...................................................3
       C.    Plaintiffs' Post-April 15, 2009 Claims Should Also Be Dismissed ......................4

II.    PLAINTIFFS' CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL ...................4

       A.    *Morrison* Applies To The Relevant Provisions Of The CEA...............................5
       B.    Plaintiffs Allege Foreign Manipulation Of A Foreign "Commodity" ...................6

III.   PLAINTIFFS FAIL TO STATE A MANIPULATION CLAIM .......................................9

       A.    Plaintiffs Fail To Plead Manipulation In Compliance With Rule 9(b)..................9
       B.    Plaintiffs Fail To Allege Loss Causation .............................................................11
       C.    Plaintiffs Fail To Plead Specific Intent................................................................14
       D.    Plaintiffs Fail To State An Aiding And Abetting Claim ......................................15

IV.    PLAINTIFFS FAIL TO PLEAD UNJUST ENRICHMENT ...........................................15

Conclusion ......................................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Absolute Activist Value Master Fund v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ........................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................9

*Benz v. Compania Naviera Hidalgo, S.A.*,
    353 U.S. 138 (1957) ................................................................................5

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) .................................................................7

*City of Pontiac Gen. Employees Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ....................................................................1

*DeBenedictis v. Merrill Lynch & Co.*,
    492 F.3d 209 (3d Cir. 2007) ....................................................................2

*Dodds v. Cigna Sec. Inc.*,
    12 F.3d 346 (2d Cir. 1993) ......................................................................2

*Double Alpha, Inc. v. Mako Partners, L.P.*,
    No. 99 Civ. 11541, 2000 WL 1036034 (S.D.N.Y. July 27, 2000) .........11

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..........................................................................12, 13

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ................................................................................5

*Ello v. Singh*,
    531 F. Supp. 2d 552 (S.D.N.Y. 2007) .....................................................1

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ................................................................................5

*Fin. Acquisition Partners LP v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006) .................................................................10

*Foley v. Filardo*,
    336 U.S. 281 (1949) ................................................................................5

*Georgia Malone & Co. v. Rieder*,
    19 N.Y.3d 511 (2012) ............................................................................15

*Hudson v. Wilhelm*,
   651 F. Supp. 1062 (D. Colo. 1987)............................................................................12

*In Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 416 (S.D.N.Y. 2003)........................................................................3

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) .............................................................................13

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................................9, 15

*In re Blech Securities Litig.*,
   928 F. Supp. 1279 (S.D.N.Y. 1996).....................................................................10, 14

*In re Crude Oil Commodity Litig.*,
   No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)........................9, 10

*In re Energy Transfer Partners Natural Gas Litig.*,
   No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) .........................13

*In re Initial Public Offering Sec. Litig.*,
   297 F. Supp. 2d 668 (S.D.N.Y. 2003).......................................................................12

*In re Initial Public Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) .................................................................10, 14

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998)..........................................................................................4

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004)..........................................................2, 9, 10, 11

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005)........................................................................9

*In re Parmalat Sec. Litig.*,
   479 F. Supp. 2d 332 (S.D.N.Y. 2007).......................................................................11

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011)..........................................................11, 12, 13

*Koch v. Christie's Int'l PLC*,
   785 F. Supp. 2d 105 (S.D.N.Y. 2011)........................................................................3

*Kohen v. PIMCO*,
   244 F.R.D. 469 (N.D. Ill. 2007)................................................................................13

*Kolbeck v. LIT Am., Inc.*,
   923 F. Supp. 557 (S.D.N.Y. 1996) ................................................................2

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)..........................................................................8

*Merck & Co. v. Reynolds*,
   130 S. Ct. 1784 (2010) .............................................................................1, 2

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)......................................................................................5

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ........................................................................ passim

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010)............................................................................5

*Ping He (Hai Nam) Co. v. NonFerrous Metals (USA) Inc.*,
   22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated in part on other grounds*, 187
   F.R.D. 121 (S.D.N.Y. 1999) .......................................................................12

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-CV-42 (JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .................4

*Premium Plus Partners, L.P. v. Goldman Sachs & Co.*,
   648 F.3d 533 (7th Cir. 2011) ...................................................................2, 3

*R&W Technical Servs. Ltd. v. CFTC*,
   205 F.3d 165 (5th Cir. 2000) ........................................................................8

*Rich v. Maidstone Fin., Inc.*,
   98 Civ. 2569 (DAB), 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) .......................11

*S & A Farms, Inc. v. Farms.com, Inc.*,
   678 F.3d 949 (8th Cir. 2012) ......................................................................12

*Tomlinson v. Goldman, Sachs & Co.*,
   682 F. Supp. 2d 845 (N.D. Ill. 2009) .............................................................3

*United States v. McKeon*,
   738 F.2d 26 (2d Cir. 1984)..........................................................................11

*United States v. Weingarten*,
   632 F.3d 60 (2d Cir. 2011)............................................................................5

## STATUTES

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b)............................................1, 5, 6, 8

7 U.S.C. § 1a(30) ............................................................................................7

7 U.S.C. § 13(a)(2)........................................................................................6, 7

7 U.S.C. § 25(a) ...........................................................................................6, 12

7 U.S.C. § 25(c) ...............................................................................................2

28 U.S.C. § 1658(b) ......................................................................................1, 2

**RULES**

Fed. R. Civ. P. 8 ..............................................................................................9

Fed. R. Civ. P. 9(b) ....................................................................................3, 9, 10

**OTHER AUTHORITIES**

http://www.bbalibor.com/technical-aspects/setting-bbalibor ...................................8

http://www.hm-treasury.gov.uk/wheatley_review.htm ..........................................6

http://www.hm-treasury.gov.uk/queensspeech_2012.htm......................................6

http://www.parliament.uk/business/committees/committees-a-z/commons-select/treasury-committee/inquiries1/parliament-2010/libor/ .......................................................5

http://www.parliament.uk/business/committees/committees-a-z/joint-select/professional-standards-in-the-banking-industry/news/call-for-evidence/ .....................................5

Defendants[1] submit this reply memorandum of law in further support of their motion to dismiss the Exchange-Based Plaintiffs' Amended Complaint with prejudice.

## I.   PLAINTIFFS' CLAIMS ARE TIME-BARRED

### A.   Plaintiffs Were On Inquiry Notice Before April 15, 2009

Because several *Wall Street Journal* articles undeniably placed them on inquiry notice more than two years before the first complaint was filed, Plaintiffs argue for a different standard.[2]  Citing *City of Pontiac Gen. Employees Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), Plaintiffs contend that the limitations period begins to run only when public sources reveal particularized facts establishing scienter.  *See* CEA Opp. at 24-26.  *Pontiac*, however, relied upon *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), which does not govern CEA claims.

*Merck* involved fraud claims brought under the Securities Exchange Act of 1934 (the "Exchange Act").  The Supreme Court "reject[ed] 'inquiry notice'" in that context because it could not be reconciled with the language of the statute at issue.  *Merck*, 130 S. Ct. at 1798. Relying on what it called "critical language" in 28 U.S.C. § 1658(b)(1) (which supplies the limitations period for securities fraud claims under the Exchange Act), the Supreme Court emphasized that the limitations period in such a case does not begin to run until "discovery of the *facts constituting the violation*."  *Id.* at 1796 (emphasis in original).  Based on this "critical" statutory language, the Supreme Court held that "[s]cienter is assuredly a 'fact'" which constitutes an element of a violation of Exchange Act § 10(b), 15 U.S.C. § 78j(b).  *Id.*

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in Defendants' opening memorandum of law in support of their motion to dismiss the Exchange-Based Plaintiffs' claims ("CEA Mem.").

[2] Citing *Ello v. Singh*, 531 F. Supp. 2d 552, 568 (S.D.N.Y. 2007), Plaintiffs argue that a limitations defense must be clear on the face of the complaint.  CEA Opp. at 24 n.30.  In *Ello*, the court refused to consider a factual affidavit submitted by defendants to establish when the cause of action accrued.  531 F. Supp. 2d at 568.  Here, in contrast, Defendants rely *only* upon materials cited in the Amended Complaint itself.

The "critical language" on which *Merck* turned simply does not exist in the CEA context. In the only case to consider this issue, Judge Easterbrook explained that "[t]he reason *Merck* asked when the 'facts constituting the violation' had been discovered is that 28 U.S.C. § 1658(b) adopts this rule for securities-fraud suits." *Premium Plus Partners, L.P. v. Goldman Sachs & Co.*, 648 F.3d 533, 536 (7th Cir. 2011). But the relevant CEA provision, "says that suit must be filed within two years of 'the date the cause of action arises,'" which is "the date on which the investor discovers that he has been injured." *Id.* That is consistent with this Court's decisions construing "the date the cause of action arises" in 7 U.S.C. § 25(c) to mean inquiry notice. *See In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004) ("*Natural Gas I*"); *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 564 (S.D.N.Y. 1996).

Because *Merck* is inapplicable, the dispositive question here is whether Plaintiffs were on inquiry notice. They cannot plausibly dispute that they were. Indeed, Plaintiffs acknowledge that the numerous press articles and published reports (*see* CEA Mem. 7-9) raised "concerns" and "questions" about USD LIBOR, CEA Opp. at 27—precisely the type of storm warnings that trigger inquiry notice. *See, e.g.*, *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216-18 (3d Cir. 2007); *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 352 (2d Cir. 1993); CEA Mem. 8 n.7. Plaintiffs argue that several banks' supposed denials of wrongdoing "wholly undermine Defendants' inquiry notice analysis." CEA Opp. at 27. However, denials of wrongdoing are relevant, if at all, to fraudulent concealment—not whether inquiry notice was triggered.[3]

But even if *Merck* did apply to CEA claims, dismissal is still required. Any factual allegations in the Amended Complaint even remotely addressing scienter were publicly available

---

[3] The "denial of wrongdoing" cases cited by Plaintiffs, CEA Opp. at 27 n.35, relate to fraudulent concealment, not whether inquiry notice existed. The inadequacy of Plaintiffs' fraudulent concealment arguments based on "denial of wrongdoing" is discussed at page 3, *infra*.

more than two years before the first complaint was filed.  Unable to point to any facts not available years earlier,[4] Plaintiffs cite regulators' "apparent inaction" until after 2009 as supposed proof that they could not have brought a CEA claim any earlier.[5]  CEA Opp. at 28. This argument was rejected in *Premium Plus*.  648 F.3d at 537 ("It would be silly to conclude that, because the SEC did not file its complaint until September 2003, no reasonably diligent person could have inferred scienter earlier.").  Plaintiffs offer no contrary authority.

### B.     Plaintiffs Fail To Plead Fraudulent Concealment

Plaintiffs fall well short of alleging each of the three elements required to establish fraudulent concealment.  On the first element (wrongful concealment of material facts), Plaintiffs merely point to certain Defendants' purported denials of liability.  CEA Opp. at 30-31.  This is inadequate as a matter of law.  *See, e.g.*, *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 848 (N.D. Ill. 2009) ("statements [that] are mere denials of liability [] do not support tolling of the limitations period"); *In Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 (S.D.N.Y. 2003) ("a plaintiff's duty to inquire is not dissipated merely because of a defendant's later refusal to acknowledge or own up to the alleged fraud").

As to the second element, Plaintiffs merely state in conclusory fashion that they could not have discovered the conduct earlier.  CEA Opp. at 31.  But Plaintiffs bear the burden of pleading fraudulent concealment, and must do so with specificity.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 116 (S.D.N.Y. 2011) (applying Rule 9(b)).  The Amended Complaint relies on numerous sources that Plaintiffs concede raised "questions" and "concerns" about USD

---

[4] Plaintiffs claim without explanation that the first evidence of scienter was one bank's March 15, 2011 disclosure of regulatory subpoenas.  CEA Opp. at 29, 32.  But this information is not evidence of scienter at all, and added no new facts to the many previously published articles questioning USD LIBOR's accuracy (articles which Plaintiffs repeatedly cite in the Amended Complaint to try to support their claims).  *See* CEA Mem. 9-10.

[5] The Barclays settlements confirm that inquiry notice arose in 2008.  *See* FSA Final Notice ¶ 129 (noting a "general perception" by April 2008 that "contributing banks' LIBOR submissions were not reflecting adequately conditions in the London interbank market," based on articles in the *Wall Street Journal* and other publications).

LIBOR and led to "speculation of possible LIBOR manipulation."  CEA Opp. at 27, 31.  Yet Plaintiffs offer no credible explanation as to why they remained completely in the dark for years after many such articles were published in major newspapers.  And on the third element (due diligence), the Amended Complaint lacks any indication of Plaintiffs' diligence, much less "when such inquiries were made, to whom, regarding what, and with what response."  *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).[6]

> ### C.      Plaintiffs' Post-April 15, 2009 Claims Should Also Be Dismissed

Plaintiffs suggest that even if most of their CEA claims are time-barred, they nonetheless can assert claims for the period April 15, 2009 to May 2010 (*i.e.*, the part of the class period falling within two years before the first complaint was filed).  *See* CEA Opp. at 24.  However, both the allegations of the Amended Complaint and the Barclays settlements on which Plaintiffs rely relate to conduct occurring almost exclusively before April 15, 2009.  *See, e.g.*, Am. Compl. ¶¶ 51-121, 188-96; DOJ SOF ¶ 12 (conduct took place "frequent[ly]" from June 2005 through September 2007 and "occasionally" from September 2007 to May 2009); FSA Final Notice ¶¶ 8, 12 (conduct took place between 2005 and May 2009).  In addition, Plaintiffs do not allege that they made any purchases between April 15, 2009 and May 2010, and therefore do not even assert claims arising in that period.

## II.      PLAINTIFFS' CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL

Plaintiffs contend that: (a) the presumption against extraterritorial application of U.S. legislation, reaffirmed in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), does

---

[6] No court has ever excused a plaintiff's burden of pleading diligence, yet Plaintiffs make *no* allegations regarding this necessary element of fraudulent concealment.  Plaintiffs' reliance on *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG)(VVP), 2011 WL 7053807, at *54 (E.D.N.Y. Jan. 4, 2011), is misplaced because in that case, unlike here, the inquiry into the sufficiency of the diligence allegations was "fact-intensive."  Moreover, as the court recognized in *Precision*, a plaintiff's diligence is properly addressed at the pleading stage where, as here, defendants "point to specific public disclosures or information that should have alerted plaintiffs to possible misconduct."  *Id.* at *53.

not apply to the CEA, so that the "conduct and effects" test discredited by *Morrison* remains valid; and (b) their claims are not extraterritorial because "challenged transactions" occurred on a U.S. futures exchange.  CEA Opp. at 32-35.  Both contentions are wrong.

### A.   *Morrison* Applies To The Relevant Provisions Of The CEA

Plaintiffs argue that because *Morrison* "did not address the CEA," this Court should ignore the Supreme Court's decision.  CEA Opp. at 32.  But *Morrison* held that the presumption against extraterritoriality applies "in all cases"—*i.e.*, to all U.S. statutes, 130 S. Ct. at 2881—and its rejection of the "conduct and effects test" as "judicial-speculation-made-law" was by no means limited to Exchange Act § 10(b), *id.* at 2878-81.[7]  The Second Circuit has indeed applied *Morrison* to other statutes.  *See, e.g.*, *United States v. Weingarten*, 632 F.3d 60, 65 (2d Cir. 2011) (statute barring transportation of minors for purposes of prostitution); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 35 (2d Cir. 2010) (RICO).

Plaintiffs overlook not only *Morrison*'s broad application, but also the reason for the presumption against extraterritoriality—*i.e.*, applying U.S. law on foreign territory "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs."  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004). It is therefore for Congress "alone" to make the "important policy decision" about a statute's extraterritorial reach.  *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957).[8]  The

---

[7] For decades before *Morrison*, the Supreme Court applied the presumption against extraterritoriality to a broad range of statutes.  *See, e.g.*, *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007) (Patent Act); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (Title VII of the Civil Rights Act of 1964); *Foley v. Filardo*, 336 U.S. 281, 285 (1949) (the Eight Hour Law).

[8] The United Kingdom has a preeminent interest in regulating the *London* Interbank Offered Rate (LIBOR)–a creation of the *British* Bankers Association that is set and managed in *London* and intended to reflect the cost of funds in *London*.  *See* CEA Mem. at 15-16.  That strong interest is manifested in, among other things, the activities of: the UK Treasury Select Committee, appointed by the House of Commons (*see* http://www.parliament.uk /business/committees/committees-a-z/commons-select/treasury-committee/inquiries1/parliament-2010/libor/ (last visited Sept. 26, 2012)); the Parliamentary Commission on Banking Standards (*see* http://www.parliament.uk /business/committees/committees-a-z/joint-select/professional-standards-in-the-banking-industry/news/call-for-

provisions of the CEA at issue here "give[] no clear indication of an extraterritorial application," *Morrison*, 130 S. Ct. at 2879, and Plaintiffs do not suggest otherwise.

**B.     Plaintiffs Allege Foreign Manipulation Of A Foreign "Commodity"**

In the alternative, Plaintiffs deny that they seek to apply the CEA extraterritorially.  They direct the Court's attention to unspecified transactions in Eurodollar futures contracts on the CME, supposedly affected by Defendants' alleged manipulation of USD LIBOR, and away from the alleged manipulation itself.  *See* CEA Opp. at 32-35.  Plaintiffs misread *Morrison* and confuse the underlying "commodity" with the derivative futures contract.

Plaintiffs argue that *Morrison* adopted "a transactional approach" in which the location of on-exchange transactions determines whether a statute is being applied extraterritorially.  CEA Opp. at 32-33.  But the Supreme Court did not hold that a "transactional" test should be applied to every statute.  Instead, *Morrison* instructed courts to look to the "'focus' of congressional concern" in enacting a particular statute to determine whether the alleged violation is beyond the legislation's territorial limit.  130 S. Ct. at 2884.  In enacting Exchange Act § 10(b), Congress's focus was purchases and sales of securities in the U.S.; that statute therefore applied only to transactions in securities listed on domestic exchanges and domestic transactions in other securities.  *Id.* at 2888.  The anti-manipulation provisions of the CEA were motivated by different concerns, but their focuses are similarly domestic; they prohibit manipulation of the price of *either* (1) futures contracts traded on a domestic exchange *or* (2) the underlying domestic commodities.  *See* CEA Sections 9(a)(2), 22(a)(1), 7 U.S.C. §§ 13(a)(2), 25(a)(1).

---

evidence/ (last visited Sept. 26, 2012)); a review, commissioned by the Chancellor of the Exchequer and being undertaken by the managing director of the UK Financial Services Authority, of the structure and governance of LIBOR (*see* http://www.hm-treasury.gov.uk/wheatley_review.htm (last visited Sept. 26, 2012)); and Parliament's consideration of a Financial Services Bill and Banking Reform Bill (*see* http://www.hm-treasury.gov.uk/queensspeech_2012.htm (last visited Sept. 26, 2012)).

Neither focus is implicated here.  Plaintiffs allege no facts supporting the conclusion that Defendants intentionally manipulated the price of any *futures contract traded on a domestic exchange.  Cf. Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1162, 1164-72 (8th Cir. 1971) (describing "squeeze" to manipulate futures prices).  Instead, Plaintiffs allege only that Defendants manipulated the price of USD LIBOR, as *the "commodity" underlying the Eurodollar futures contracts*, by making inaccurate submissions to the BBA in London.[9]  But USD LIBOR is not a domestic "commodity."  Any change to domestic futures contracts prices resulting from its alleged manipulation would have been at most an "effect" of Defendants' foreign USD LIBOR submissions.  Where those futures contracts were traded is immaterial.  Under *Morrison*, what matters is that USD LIBOR, the underlying "commodity" whose price Plaintiffs alleged was manipulated, was foreign, and its alleged manipulation occurred abroad.

Plaintiffs' contention that the CEA's "definition of 'commodity' lacks any territorial constraints," CEA Opp. at 34, is wrong because the anti-manipulation provisions of the CEA explicitly apply only to commodities "in *interstate commerce*," 7 U.S.C. § 13(a)(2) (emphasis added).  As defined in 7 U.S.C. § 1a(30), this phrase does *not* include foreign commerce but is limited to commerce within the U.S.  *See* CEA Mem. at 14 n.10.  It is Plaintiffs' burden to plead facts showing that their claims are domestic.  *See Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 69-70 (2d Cir. 2012).  They have failed to do so, because if USD LIBOR is a "commodity," it is based in London—and if it was manipulated, it was manipulated there.

---

[9] *See*, *e.g.*, Am. Compl. ¶ 5 ("This case arises from *the manipulation of LIBOR for the U.S. dollar . . .* by a cadre of prominent financial institutions.  Defendants perpetrated *a scheme to depress LIBOR* for two primary reasons."), *id.* ¶ 13 (Defendants "conspired to, and did, *manipulate LIBOR by underreporting to the BBA* the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market–*i.e.*, their true costs of borrowing–on a daily basis. . . . *Defendants caused LIBOR to be set artificially low.*"), *id.* ¶ 14 ("Defendants' *manipulation of LIBOR* allowed them to pay unduly low interest rates to investors . . . ."), *id.* ¶ 99 (certain "Defendants collectively *depressed LIBOR by reporting the lowest possible rates* that would not be excluded from the calculation of LIBOR on a given day") (emphasis added).

This conclusion is not altered by the statements in Barclays' settlements that certain of its traders in New York attempted to influence some submissions made by its London-based LIBOR submitters to the BBA.  As an initial matter, that conduct is irrelevant to Plaintiffs' CEA claim as pleaded—*i.e.*, that defendants conspired to *suppress* USD LIBOR.  *See* Am. Compl. ¶ 13.  In any event, such conduct by Barclays' traders gives rise to no inference of wrongdoing in the U.S. by *other* defendants.  Equally unavailing to Plaintiffs is their hypothesis that because three of the 16 USD LIBOR panel banks were based in the U.S., their USD LIBOR submissions "necessarily originated domestically."  CEA Opp. at 35.  Plaintiffs do not allege that any Defendant made its USD LIBOR submission from the U.S., rather than London.[10]  In any event, *some* U.S. conduct would not be enough.  In *Morrison*, it was immaterial that part of the deceptive conduct allegedly took place in Florida, because "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Id.* at 2884 (emphasis in original).[11]

---

[10] Any such allegation would be implausible, as it would ignore the facts that the BBA selects banks for inclusion on LIBOR panels "on the basis of [their] activity in the London market," that the U.S.-based panel members have London offices and that LIBOR submissions are made at 11:00 a.m. London time (6:00 a.m. in New York).  *See* http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Sept. 26, 2012).  Nor does the circumstance that three of the 16 BBA USD LIBOR panel banks were U.S. banks affect the location of either the "commodity" at issue or the alleged manipulation.  *Morrison*, too, involved "American defendants," 130 S. Ct. at 2875, but the Supreme Court nevertheless held that the plaintiffs had invoked Section 10(b) in an improperly extraterritorial way.

[11] Plaintiffs assert that in the Barclays settlements, the CFTC "determined that LIBOR is a commodity 'in interstate commerce'" and that "[t]he CFTC's reasonable interpretation of the CEA is owed considerable deference."  CEA Opp. at 34.  That is wrong.  Unlike positions reached by the CFTC following formal rulemakings or adjudications, "interpretations advanced by the Commission *during* [a] litigation may be construed as offered for the purpose of 'provid[ing] a convenient litigation position,'" and "would *not* be entitled to deference."  *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 171 n.21 (5th Cir. 2000) (emphasis added) (cited at CEA Opp. at 34).  Moreover, "a consent judgment between a federal agency and a private corporation is not the result of an actual adjudication of any of the issues."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976).  The CFTC has issued no interpretation entitled to deference here.

### III.   PLAINTIFFS FAIL TO STATE A MANIPULATION CLAIM

#### A.      Plaintiffs Fail To Plead Manipulation In Compliance With Rule 9(b)

As three cases discussed in Defendants' opening memorandum (*see* CEA Mem. at 18-

19)—*In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y.

2008); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June

28, 2007); and *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)

("*Natural Gas II*")—make clear, CEA manipulation claims based on fraud are subject to Rule

9(b)'s heightened pleading requirement.  In response, Plaintiffs repeatedly emphasize the

purported "plausibility" of their claim and analogize this case to *Natural Gas I*, which applied a

Rule 8 standard.  CEA Opp. at 1-3, 12, 13, 15, 16.  But *Natural Gas I* is irrelevant for two

reasons.  *First*, the decision relied on the "no possible set of facts" standard subsequently

overruled in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See Natural Gas I*, 337 F. Supp. 2d at 510.

*Second*, defendants in *Natural Gas I* did not even argue that Rule 9(b) governed CEA § 9(a)

manipulation claims.  *Id*. at 509.  However, another defendant in the same action later made that

argument, and the court held that the heightened pleading standard *does* apply to such claims

where—as in this case—they sound in fraud.  *Natural Gas II*, 358 F. Supp. 2d at 343.[12]

Defendants have spelled out how the Amended Complaint fails to satisfy Rule 9(b)'s

requirement that a complaint specify "what manipulative acts were performed, which defendants

performed them, when the manipulative acts were performed, and what effect the scheme had on

---

[12] Plaintiffs' opposition and the Barclays settlements only reinforce the fact that Plaintiffs' manipulation claims sound in fraud.  Plaintiffs assert that Barclays made "false and misleading LIBOR contributions," CEA Opp. at 6; that Barclays derivatives traders manipulated USD LIBOR "by submitting and causing the submissions of materially false and misleading LIBOR contributions," CEA Opp. at 6; and that each Defendant "publicly made, itself or through the BBA, false statements to the effect that LIBOR was accurate and the individual quotes were correct," CEA Opp. at 15.  These allegations seek to describe a manipulative scheme based on misstatements, which is subject to Rule 9(b).  *See* CEA Mem. at 18-19; *Crude Oil*, 2007 WL 1946553, at *5.

the market."  *Crude Oil*, 2007 WL 1946553, at *6; *see also* CEA Mem. at 19-22.[13]  Plaintiffs

respond that their allegations are "far more detailed and plausible than those upheld in prior

cases," CEA Opp. at 13, but cite no cases that support this proposition.[14]  Plaintiffs also point to:

(1) nondescript references to government investigations, CEA Opp. at 13; (2) flawed and

unspecific statistical analyses by supposed experts,[15] CEA Opp. at 13-14; and (3) the conclusory

assertion that a BBA-published "Feedback Statement" contained statements that were false as to

every Defendant, CEA Opp. at 15.  But Plaintiffs fail to identify any particular manipulative acts,

which Defendant performed them, or when they occurred, as required under Rule 9(b).  *See* CEA

Mem. at 19-22.

Plaintiffs attempt to stave off dismissal by repeatedly referring to the settlements that one

defendant—Barclays—entered into with certain regulators.  However, the Barclays settlements

say nothing whatsoever about any other defendant.  Nothing in the settlement documents

supports an inference that any other defendant did anything improper.  And they do not specify a

single manipulative act allegedly performed by any other defendant.[16]  Just as lumping all

---

[13] Plaintiffs' suggested invention of a new "practical" pleading standard, purportedly borrowed from securities law, *see* CEA Opp. at 12, in no way detracts from Defendants' CEA cases applying Rule 9(b) to *commodity* manipulation cases.  *See* CEA Mem. at 18-19.  In any event, *In re Blech Securities Litig.,* 928 F. Supp. 1279, 1291 (S.D.N.Y. 1996), confirms that even a *securities* market manipulation claim must meet the "who, what, when" standard.  Both *Blech* and *In re Initial Public Offering Securities Litig.* ("*IPO I*") are distinguishable because unlike Plaintiffs here, plaintiffs in those cases pled "at least some aspects of the time, place, and other details of a defendant's activity." *Blech*, 328 F. Supp. at 1291; *see also IPO I*, 241 F. Supp. 2d 281, 309-310, 386 n.163 (S.D.N.Y. 2003).

[14] *Natural Gas I* involved detailed allegations from multiple CFTC settlements with multiple defendants that *described the same conduct* alleged in the complaints.  337 F. Supp. 2d at 509 ("[M]any of the . . . Defendants have already paid multimillion dollar fines to the CFTC to settle investigations *into the very same misbehavior underlying Plaintiffs' suit*.") (emphasis added).  As explained at page 11, *infra*, the only "misbehavior" identified by the Barclays settlements is that of Barclays, and it is at odds with what Plaintiffs plead in the Amended Complaint.

[15] *See* Antitrust Mem. at 18-20.  Further, it is improper to rely upon expert opinions in pleadings.  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (expert opinions require a court to "confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage") (quotation omitted).

[16] Plaintiffs' sweeping assertion that there is "significant government evidence that *all* banks were suppressing their LIBOR quotes," CEA Opp. at 15, should be disregarded.  Plaintiffs refer merely to portions of the Barclays settlements that recount the opinions of a handful of Barclays employees or unidentified BBA commentators; they

defendants together collectively in vague and conclusory terms is insufficient,[17] so too is suggesting that the Barclays settlements implicate the other defendants or indeed support Plaintiffs' claims against any of the defendants.

Moreover, the Barclays settlements undermine Plaintiffs' pleaded theory:  the fact that Barclays traders requested *either higher or lower* USD LIBOR submissions on certain dates, to suit their own trading positions, is inconsistent with the Amended Complaint's assertion of a concerted, years-long scheme by all Defendants to underreport their cost of funds to the BBA in order to suppress USD LIBOR.  *See, e.g.*, DOJ SOF ¶¶ 11-22 (describing "Swaps Trader's Requests *Within* Barclays") (emphasis added); *id.* ¶¶ 34-41 (describing *internal* instructions from Barclays management); *id.* ¶ 16 (quoting a Barclays trader as requesting a setting "as high as possible").  The Barclays settlements not only fail to "describe[] the same conduct alleged in the [Amended] Complaint," *Natural Gas I*, 337 F. Supp. 2d at 510, but are actually at odds with such alleged conduct.  *Cf. United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("A party . . . cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version.").

### B.    Plaintiffs Fail To Allege Loss Causation

Plaintiffs do not deny their failure to allege that they sustained trading losses caused by Defendants' alleged conduct.  They instead argue only that the CEA does not require proof of loss causation.  *See* CEA Opp. at 18-19.  Plaintiffs are wrong.  The CEA creates a private right of

---

are not factual findings about other banks' USD LIBOR submissions.  *See* DOJ SOF ¶¶ 36, 42, 44; CFTC Order at 22.  In any event, citing to such settlements in order to establish underlying facts of liability is impermissible.  *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-594 (S.D.N.Y. 2011).

[17] *See In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 340 (S.D.N.Y. 2007) ("Where, as here, multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); *Rich v. Maidstone Fin., Inc.*, 98 Civ. 2569 (DAB), 2001 WL 286757, at *6 (S.D.N.Y. Mar. 23, 2001) ("[W]hen fraud is alleged against multiple defendants, a plaintiff must ... set[ ] forth separately the acts complained of by each defendant."); *Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) (same).

action only in favor of those market participants who suffer "actual damages resulting from" a defendant's violation of the CEA.  7 U.S.C. § 25(a).  Every court examining this provision has held that it creates a private right of action only where a plaintiff suffers an actual loss proximately caused by a particular defendant's violation.  *See, e.g.*, *S & A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 953-54 (8th Cir. 2012); *Ping He (Hai Nam) Co. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated in part on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999); *Hudson v. Wilhelm*, 651 F. Supp. 1062, 1067 (D. Colo. 1987).  Plaintiffs therefore must allege facts establishing that they entered a Eurodollar futures position at a price that was artificial and exited the position when that effect was no longer present.  As in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), Plaintiffs allege no loss resulting from trades they made during the period of alleged artificiality.

Rather than allege that they exited from their futures trades after the alleged influence of manipulation on prices had ended, Plaintiffs rely on a purported exception that is irrelevant here.  Several courts have distinguished cases of isolated manipulative trading, in which the effect of prices begins to dissipate as soon as the manipulative trade is over, from cases of persistent misinformation.  *See*, *e.g.*, *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600 (S.D.N.Y. 2011); *In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 673-74 (S.D.N.Y. 2003) ("*IPO II*").  Those decisions make clear that dissipation cannot be presumed where the alleged misinformation persisted in the marketplace, as is alleged here.

In *IPO II*, which pre-dates *Dura*, the court held that "allegations of artificial inflation are sufficient to plead loss causation" in cases involving isolated manipulative trading because "it is fair to infer that the inflationary effect must inevitably diminish over time."  297 F. Supp. 2d at 671.  *Platinum & Palladium* found this reasoning persuasive in a case that involved "banging the

close," a "discrete act" that began and ended "in the final seconds of the close" of trading in certain illiquid futures markets. 828 F. Supp. 2d at 600-01. *Platinum & Palladium* did not, as Plaintiffs state, hold that "loss causation is *not* an element of a CEA claim," CEA Opp. at 19—it simply found that the plaintiffs in that case should not be required to make factual allegations regarding their exit from the position to establish loss causation in light of "the type of manipulative conduct alleged" in that case. 828 F. Supp. 2d at 594, 601. Indeed, the court held that the analysis in *Dura* was "persuasive in the context of information hidden from the market." *Id.* at 600; *see also In re Energy Transfer Partners Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *10 (S.D. Tex. Aug. 26, 2009) (applying *Dura*'s reasoning to a CEA manipulation claim and requiring plaintiffs to allege facts establishing an actual loss).

Here, Plaintiffs plead themselves out of the exception they invoke. They repeatedly allege the persistence and duration of the alleged manipulation. Thus, Plaintiffs allege that Defendants "systemically manipulated LIBOR rates . . . during the Class Period" (Am. Compl. ¶ 3), and that the alleged manipulation took place "throughout" the 34-month Class Period (*id.* ¶¶ 13, 45). Because such allegations are of persistent misinformation, rather than isolated trading, Plaintiffs must allege both entering their positions at a time when prices were artificial and exiting these positions when the prices were no longer artificial.[18] They have not done so.

---

[18] The other cases Plaintiffs cite provide no greater support for their claims. *Kohen v. PIMCO*, 244 F.R.D. 469 (N.D. Ill. 2007), merely held that at the class certification stage, lead plaintiffs were not required to prove that each class member suffered a loss. *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010), also a ruling on a class certification motion, in fact found that the named representatives had standing only because they each provided affidavits that showed they "suffered a net loss during the class period," something the Plaintiffs in this case have not even alleged.

### C.     Plaintiffs Fail To Plead Specific Intent

Defendants have shown that the Amended Complaint does not allege a motive that establishes a strong inference of fraud.[19]  CEA Mem. at 24-27.  In response, Plaintiffs point to supposed "strong facts," CEA Opp. at 21, that, even when taken together, are in fact weak.

*First*, Plaintiffs attempt to defend their allegation of a reputation-based motive, but it is undermined by the Barclays settlements.  Those settlements reveal that, to avoid what it considered inaccurate media speculation, Barclays' management acted only "to influence *Barclays' benchmark interest rate submissions, not the resulting fixes*."  DOJ SOF ¶ 41 (emphasis added).  In other words, Barclays underreported its cost of borrowing for its own sake and without regard to the effect of such underreporting on the eventual LIBOR fixing, much less Eurodollar futures contracts.  This is insufficient to allege a specific intent to manipulate LIBOR or Eurodollar futures under the CEA.  *See* CEA Mem. at 25.   And contrary to Plaintiffs' suggestion that Defendants engaged in an interbank scheme to shield each other from "appearing weak" in the market, CEA Opp. at 5, the Barclays settlements confirm what logic would suggest: that when Barclays underreported USD LIBOR, it did so unilaterally.  *See* DOJ SOF ¶¶ 39-49. The reputation-based motive provides no plausible reason for any bank to conspire with others or to manipulate USD LIBOR.  *See* CEA Mem. at 25-26.

*Second*, Plaintiffs suggest a financial motive—that traders were seeking to benefit trading positions—which is inconsistent with both Plaintiffs' reputation-based motive and their allegations that USD LIBOR was depressed throughout the entire Class Period.  *See* Am. Compl. ¶¶ 5, 13-15, 45-132.  In fact, Barclays' derivatives traders requested lower *or higher* USD

---

[19] Plaintiffs' own cases show that conclusory allegations of scienter must be "supported by facts giving rise to a 'strong inference' of fraudulent intent."  *Blech*, 928 F. Supp. at 1291 (quotation omitted); *see also IPO I*, 241 F. Supp. 2d at 384-85.

LIBOR submissions on particular dates, which conflicts with the conspiracy to consistently depress USD LIBOR that the Amended Complaint alleges.[20] *See*, *e.g.*, DOJ SOF ¶ 16.

### D. Plaintiffs Fail To State An Aiding And Abetting Claim

Plaintiffs have failed to plead aiding and abetting with specificity. *See* CEA Mem. at 28. The Barclays settlements do not add any specific facts concerning any other specific defendant. And contrary to Plaintiffs' speculation that defendants knew of and aided each other's alleged wrongdoing, CEA Opp. at 22-23, the settlements show that Barclays acted unilaterally.

## IV. PLAINTIFFS FAIL TO PLEAD UNJUST ENRICHMENT

The New York Court of Appeals recently confirmed that an unjust enrichment claim does not lie where the parties "had no dealings with each other." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-18 (2012). Here, Plaintiffs allege no relationship with any Defendant. Every court addressing similar facts has found that such a complete absence of any relationship precludes an unjust enrichment claim. *Amaranth*, cited by Plaintiffs, in fact directly refutes their claim. 587 F. Supp. 2d at 547 (trading in a market allegedly manipulated by defendants was not a sufficient connection to support unjust enrichment claim).

## <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss the claims in the Exchange-Based Plaintiff Action, with prejudice, as against them.

---

[20] Plaintiffs have seemingly abandoned their theory that Defendants had a motive to suppress USD LIBOR based upon a bank's overall interest rate risk. This theory, too, is undermined by the Barclays settlements, which confirm that traders may have had their own interest in moving USD LIBOR down *or up* irrespective of their institution's overall interest rate risk. *See also* CEA Mem. at 26-27.

Dated: New York, New York
      September 27, 2012

                                         Respectfully submitted,

/s/ Robert F. Wise, Jr.                           /s/ Daryl A. Libow
Robert F. Wise, Jr.                               Daryl A. Libow
Arthur J. Burke                                Christopher M. Viapiano
Paul S. Mishkin                              SULLIVAN & CROMWELL LLP
DAVIS POLK & WARDWELL LLP       1701 Pennsylvania Avenue, N.W.
450 Lexington Avenue                     Washington, D.C. 20006
New York, NY 10017                    libowd@sullcrom.com
robert.wise@davispolk.com          viapianoc@sullcrom.com
arthur.burke@davispolk.com         Telephone: (202) 956-7500
paul.mishkin@davispolk.com        Fax: (202) 956-7056
Telephone: (212) 450-4000
Fax: (212) 450-4800

*Attorneys for Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

*Attorneys for Defendants Bank of America Corporation and Bank of America, N.A.*

/s/ Andrew A. Ruffino

Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com
Tel: 212.841.1000

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
awiseman@cov.com
tisaacson@cov.com
Tel: 202.662.6000

Michael R. Lazerwitz
Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
mlazerwitz@cgsh.com
jkim@cgsh.com
Tel: 212.225.2000

*Attorneys for Defendants Citibank, N.A. and Citigroup, Inc.*

/s/ David R. Gelfand

David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
dgelfand@milbank.com
smurphy@milbank.com
Telephone: (212) 530-5000

*Attorneys for Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*

- 17 -

/s/ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
richard.schwed@shearman.com
*Attorneys for Defendant Credit Suisse Group AG*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
msilverman@paulweiss.com
afinch@paulweiss.com
Telephone: (212) 373-3355

*Attorneys for Defendant Deutsche Bank AG*

/s/ Ed DeYoung
Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendant HSBC Holdings plc and HSBC Bank plc*

/s/ Thomas C. Rice
Thomas C. Rice
Juan A. Arteaga
Joan E. Flaherty
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
jflaherty@stblaw.com

*Attorneys for Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant Lloyds Banking Group plc*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant HBOS plc*

/s/ Andrew W. Stern

Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant The Norinchukin Bank*

/s/ Arthur W. Hahn

Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
Telephone: (312) 902-5200

*Attorneys for Defendant Royal Bank of Canada*

/s/ Robert G. Houck

Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd St.
New York, NY 10019
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com
Telephone: 212-878-8000

*Attorneys for Defendant The Royal Bank of Scotland Group plc*

/s/ Ethan E. Litwin

Ethan E. Litwin
Morgan J. Feder
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
litwin@hugheshubbard.com
feder@hugheshubbard.com
Telephone: (212) 837-6000

*Attorneys for Defendant Portigon AG (formerly known as WestLB AG)*

- 20 -