# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | ECF Case |
| | **ORAL ARGUMENT REQUESTED** |
| MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL., <br>      Plaintiffs, <br>   v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>      Defendants. | No. 11-cv-5450 |
| EXCHANGE-BASED PLAINTIFF ACTION | No. 11-cv-2613 |
| GELBOIM, ET AL., <br>      Plaintiffs, <br>   v. <br> CREDIT SUISSE GROUP AG, ET AL., <br>      Defendants. | No. 12-cv-1025 |
| CHARLES SCHWAB BANK, N.A., ET AL., <br>      Plaintiffs, <br>   v. <br> BANK OF AMERICA CORPORATION, ET AL. <br>      Defendants. | No. 11-cv-6411 |
| SCHWAB MONEY MARKET FUND, ET AL., <br>      Plaintiffs, <br>   v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>      Defendants. | No. 11-cv-6412 |
| SCHWAB SHORT-TERM BOND MARKET FUND, ET AL., <br>      Plaintiffs, <br>   v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>      Defendants. | No. 11-cv-6409 |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' ANTITRUST CLAIMS

## TABLE OF CONTENTS

P<small>AGE</small>

ARGUMENT ................................................................................................................... 1

I.    PLAINTIFFS FAIL TO PLEAD A CONTRACT, COMBINATION OR CONSPIRACY 1

    A.    The Barclays Settlements Do Not Support an Inference of Conspiracy ................. 2

        1.    Allegations of Discrete Attempts by Barclays and UBS to Impact Benchmark Indices Do Not Support Plaintiffs' Antitrust Conspiracy Claims ...................................................................................................... 3

        2.    The Structure of the LIBOR-Setting Process Undermines Plaintiffs' Allegations of Collusion ...................................................................... 4

    B.    The "Studies" Cited by Plaintiffs Suggest At Most Parallel Conduct ................... 6

    C.    Ongoing Government Investigations Do Not Help Plaintiffs Satisfy Their Pleading Requirements ......................................................................................... 7

II.   PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE ..................................... 8

III.  PLAINTIFFS LACK ANTITRUST STANDING ........................................................... 10

    A.    Plaintiffs Fail to Allege Antitrust Injury ............................................................ 10

    B.    Plaintiffs' Injuries Are Too Indirect and Speculative to Support Standing .......... 10

        1.    Indirect Plaintiffs Lack Standing .................................................... 11

        2.    OTC Plaintiffs Lack Standing .......................................................... 15

CONCLUSION ............................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant:small-caps">Cases</span>

<span style="font-variant:small-caps">Page</span>

*Allied Tube & Conduit Corp. v. Indian Head*,
    486 U.S. 492 (1988)............................................................................................. 9

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)................................................................................ 1

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................. 1

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)........................................................................................... 11

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)........................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................ 1, 7

*Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*,
    996 F.2d 537 (2d Cir. 1993)................................................................................ 4

*Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*,
    686 F.3d 741 (9th Cir. 2012) ............................................................................ 14

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)............................................................... 13

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).................................................................................. 1

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)............................................................................................. 9

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y. 1997)..................................................................... 13

*Ice Cream Liquidation, Inc. v. Land-O-Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003)............................................................ 9, 14

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)........................................................................................... 14

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939)................................................................................ 7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ............................................................. 9, 14

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ............................................................. 9, 14

*Nat'l Macaroni Mfrs. Ass'n v. FTC*,
    345 F.2d 421 (7th Cir. 1965) ................................................................. 9

*Nat'l Soc'y of Prof'l Engineers v. United States*,
    435 U.S. 679 (1978)................................................................................ 9

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
    No. 98 CIV. 4067 (LAP), 1999 U.S. Dist. LEXIS 19194 (S.D.N.Y. Dec. 15, 1999) ...... 12, 13

*In re Optical Disk Drive Antitrust Litigation*,
    No. 3:10-md-2143 RS, 2011 U.S. Dist. LEXIS 101763 (N.D. Cal. Aug. 3, 2011)................. 4

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    587 F. Supp. 2d 27 (D.D.C. 2008) ......................................................... 9

*Reading Indus. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980)............................................................... 11, 12

*Sanner v. Bd. of Trade of City of Chicago*,
    62 F.3d 918 (7th Cir. 1995) ............................................................. 9, 14

*Seaboard Supply Co. v. Congoleum Corp.*,
    770 F.2d 367 (3d Cir. 1985)................................................................. 1

*Simon v. Keyspan Corp.*,
    __ F.3d __, 2012 U.S. App. LEXIS 19815 (2d Cir. Sept. 20, 2012) ..................... 14

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010)................................................................. 7

*Stephens v. CMG Health*,
    No. 96 Civ. 7798 (KMW), 1997 U.S. Dist. LEXIS 23797 (S.D.N.Y. July 21, 1997)............. 7

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .............................................................. 5

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975)........................................................................ 5, 6

*United States v. Container Corp. of America*,
  393 U.S. 333 (1969)..................................................................................... 5

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)..................................................................................... 9

*W. Va. ex rel. McGraw v. Bank of Am., N.A. (In re Mun. Derivatives Antitrust Litig.)*,
  790 F. Supp. 2d 106 (S.D.N.Y. 2011)....................................................... 4, 7

*Woods Exploration & Producing Co. v. Aluminum Co. of America*,
  438 F.2d 1286 (5th Cir. 1971) ................................................................... 9

## OTHER AUTHORITIES

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 335 (3d ed. 2010)................11, 12

Defendants[1] submit this Reply Memorandum in support of their motion to dismiss the antitrust claims in the three amended consolidated class action complaints and the amended complaints in the three individual *Schwab* actions (collectively, the "Amended Complaints").

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLEAD A CONTRACT, COMBINATION OR CONSPIRACY

In order to state a claim under section 1 of the Sherman Act, Plaintiffs may not rely on allegations of "merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  It is not enough to make allegations of an antitrust conspiracy that are merely "consistent with an unlawful agreement," but also consistent with unilateral conduct. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).[2]  Instead, Plaintiffs must plead facts "rais[ing] a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557,[3] and must do so with respect to each and every Defendant because group pleading is insufficient to allege an unlawful conspiracy.  *See In re Elevator*, 502 F.3d at 50-51.  Plaintiffs rely on three allegations to satisfy *Twombly*:  (1) the Barclays settlements; (2) purported studies

---

[1] This reply is submitted on behalf of the same defendants identified in n.1 of the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims ("Antitrust Mem.").  Defendants UBS AG and Barclays Bank plc are filing separately, but joining in certain of the arguments herein.

[2] Plaintiffs cannot escape this pleading requirement by asserting that Defendants' behavior was "almost surely illegal," and that Plaintiffs' allegations therefore avoid the "false positive" concerns underlying *Twombly*.  Antitrust Opp. at 17.  Plaintiffs' conclusory assertion that Defendants' conduct was "illegal" is insufficient to allege an antitrust conspiracy.  *See, e.g., Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir. 1985).  Indeed, *Twombly* itself involved allegations that the defendants engaged in illegal conduct, which were found insufficient because, as here, plaintiffs failed to sufficiently allege concerted action in restraint of trade.  *See Twombly*, 550 U.S. at 550, 566 (alleging various violations of the 1996 Telecommunications Act).

[3] Plaintiffs' reliance on *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185, 189-90 (2d Cir. 2012), is misplaced.  *Anderson News* involved significant evidence of "actual agreement" to engage in the conspiracy alleged, *see* Antitrust Mem. at 14 n.12, and merely stated that the court need not make a "choice between two plausible inferences" in denying a motion to dismiss.  *Anderson News*, 680 F.3d at 185.  It did not purport to (nor could it) alter *Twombly*'s and *Iqbal*'s holding that allegations that are "'merely consistent with'" conspiracy fail to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

of LIBOR data; and (3) ongoing government investigations, including the UBS leniency

application.  None has merit.

### A.      The Barclays Settlements Do Not Support an Inference of Conspiracy

Plaintiffs rely heavily on the Barclays settlements, but the settlement documents provide

no evidence of conspiracy among panel banks to suppress USD LIBOR.  Despite extensive

government investigations by multiple agencies in different jurisdictions, the settlement

documents do not allege any such conspiracy or identify any inter-bank communications

regarding suppression of USD LIBOR.  To the contrary, they:

- describe episodic efforts by lower level traders at Barclays to adjust upward or downward EURIBOR submissions and, to a much lesser extent, USD LIBOR submissions to benefit particular trading positions (*see, e.g.*, FSA Final Notice ¶¶ 8, 88).  Such conduct provides no support for (and is actually inconsistent with) Plaintiffs' allegation of a high level industry-wide conspiracy to suppress USD LIBOR;

- indicate that Barclays submitted low USD LIBOR quotes to avoid "standing out," but provide *no indication* of coordination or conspiracy with respect to such low submissions (*compare* FSA Final Notice ¶¶ 8-11, *with id.* ¶¶ 12-14).  According to these documents, it was Barclays' desire "to avoid inaccurate, negative attention about [its] financial health" that drove it to submit low USD LIBOR quotes, not an industry conspiracy (DOJ SOF ¶ 40; *see also, e.g.*, CFTC Order at 4);

- cite evidence that Barclays did not know why other USD LIBOR panel banks were submitting the quotes that they did beyond its own speculation that other banks did not want to stand out (*see, e.g.*, DOJ SOF ¶¶ 42-43) – evidence that is also inconsistent with conspiracy;

- point out that references in Barclays' email to the "pack" or staying "within the pack" related not to any agreement, express or tacit, among the USD LIBOR panel banks, but to Barclays' use of public information to estimate the range of quotes to be submitted the next day (*see, e.g.*, CFTC Order at 7);

- state that Barclays repeatedly communicated with U.S. and U.K. regulatory bodies regarding USD LIBOR throughout the relevant time period (*see, e.g.*, DOJ SOF ¶ 42), behavior again inconsistent with conspiracy.

After extensive investigations resulting in more than a hundred pages of findings, the Barclays settlements were concluded with the U.K. Financial Services Authority, the U.S. CFTC, and the U.S. DOJ Criminal Fraud Section.  Insofar as Plaintiffs assert that the Barclays settlements support an inference of antitrust conspiracy, it is telling that no antitrust violations were even hinted at, much less claimed, against Barclays with respect to USD LIBOR.

1. **Allegations of Discrete Attempts by Barclays and UBS to Impact Benchmark Indices Do Not Support Plaintiffs' Antitrust Conspiracy Claims**

Plaintiffs repeatedly point to Barclays' admission that certain of its traders engaged in episodic efforts with other former Barclays traders to adjust USD LIBOR submissions, as well as similar allegations regarding traders at UBS involving JPY LIBOR and Euroyen TIBOR (entirely different indices), to infer a much broader conspiracy among all USD LIBOR panel banks to suppress USD LIBOR.  *See* Antitrust Opp. at 19-20.  Not only is such conduct different from the conspiracy Plaintiffs seek to allege, but allegations that a few traders at Barclays sought to *increase* or decrease certain USD LIBOR submissions run counter to Plaintiffs' theory of a broad agreement among the sixteen panel banks to *suppress* USD LIBOR throughout a three-year period.[4]  Indeed, the settlement documents explicitly distinguish discrete efforts to affect USD LIBOR by traders from Barclays' own efforts to submit low USD LIBOR quotes for the purpose of avoiding unwanted media attention.[5]  Courts have consistently rejected attempts by

---

[4] Moreover, the requests to influence USD LIBOR submissions came from traders at non-panel banks (*i.e.*, non-Defendants).  *See* FSA Final Notice ¶ 82.

[5] *Compare* FSA Final Notice ¶¶ 8-11 (describing attempts to influence LIBOR submissions by certain Barclays traders from January 2005 to July 2008, including "on behalf of derivatives traders at other banks"), *with* ¶¶ 12-14 (describing Barclays' LIBOR submissions from September 2007 to May 2009 that "took into account concerns over the negative media perception" with no findings of coordination among any panel bank).

plaintiffs to convert discrete instances of misconduct by one party into evidence of a broad antitrust conspiracy, let alone evidence of conspiracy by others.[6]

### 2.    The Structure of the LIBOR-Setting Process Undermines Plaintiffs' Allegations of Collusion

Plaintiffs argue that the LIBOR-setting process was "ripe for collusion," Antitrust Opp. at 19, but the "mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 545 (2d Cir. 2003). Moreover, even assuming that one or more USD LIBOR panel banks adjusted their submissions to stay in line with those of other panel banks, the LIBOR submission process allowed for such conduct to occur without any collusion. As Plaintiffs acknowledge, the banks' submissions were published daily. *See* Antitrust Opp. at 5. Thus, under Plaintiffs' theory that each Defendant wanted to avoid appearing as an outlier, the LIBOR publication process, which Plaintiffs do not challenge, allowed each bank to adjust its submissions if it wanted to and thereby stay in line independently, rather than collusively.

This is borne out in the Barclays settlements. The "pack" did not refer to a conspiracy; instead, it referred to where Barclays submitters *expected* the range of submissions to be the next day.[7] Remaining "within the pack" reflected Barclays' unilateral desire to stay close to other banks' submissions to avoid standing out. *See, e.g.*, DOJ SOF ¶ 43. None of this required or even suggests collusion, and the settlement documents do not identify any communications

---

[6] *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2011 U.S. Dist. LEXIS 101763, at *38-39 (N.D. Cal. Aug. 3, 2011) (discrete instances of misconduct were "far cry" from establishing broad-based price fixing conspiracy); *W. Va. ex rel. McGraw v. Bank of Am., N.A. (In re Mun. Derivatives Antitrust Litig.)*, 790 F. Supp. 2d 106, 116 (S.D.N.Y. 2011) (rejecting theory grounded in "guilt based on association").

[7] *See* DOJ SOF ¶ 36 ("Barclays Dollar LIBOR submitters . . . submitted rates that they *believed would be consistent* with" USD LIBOR panel bank submissions, "or at least, that would not be too far above the *expected* rates of other members of the Contributor Panel.") (emphasis added); CFTC Order at 7 (Barclays' USD LIBOR submitters considered "prior LIBOR submissions by Barclays and other panel banks" to determine daily submissions).

among any panel banks to that end.[8]

Plaintiffs point to the additional "fact" that Barclays had "advance knowledge" of pre-published USD LIBOR quotes to be submitted by certain other (unidentified) Defendants. Antitrust Opp. 10-11 & n.23.  As discussed above, panel banks could estimate where other banks' submissions would fall given the prior day's submissions and other public information. At most, Plaintiffs point to discrete instances in which Barclays obtained information from third parties concerning USD LIBOR submissions to be made by certain other banks and independently used that information so that it would not fall outside what it gauged would be the potential range of submissions.[9]  Barclays' reported conduct did not involve a conspiracy with any Defendant, nor do the settlement documents suggest otherwise.[10]  The settlement documents show that Barclays did not understand other USD panel banks' submissions, beyond speculating that those banks also wanted to avoid standing out.[11]  If Barclays were conspiring with other banks, it would not need to speculate about other banks' conduct and motives.[12]

---

[8] For these reasons, Plaintiffs' reliance on *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010), is misplaced.  There, plaintiffs alleged specific meetings at which collusion was discussed, and the change in the industry pricing structure "could not have been accomplished without agreement."  *Id.* at 628.  This stands in sharp contrast to the allegations here of changes in USD LIBOR submissions based on data made publicly available daily.

[9] *See* FSA Final Notice ¶ 117; CFTC Order at 21; Exhibit 7 to the Scherrer Decl. ("Scherrer Ex. 7").  In one of the communications Plaintiffs cite as evidence of advance knowledge, the Barclays submitter made clear that he was "[n]ot really sure why contributors are keeping [USD LIBOR submissions] so low," *see* FSA Final Notice ¶ 117, a remark plainly at odds with an alleged conspiracy.  Further, the telephone call Plaintiffs cite, *see* Scherrer Ex. 7, shows that *even regulators* expected panel banks to be able to predict where USD LIBOR would set each day.

[10] *See* DOJ SOF ¶ 40; *see also* CFTC Order at 4.

[11] *See, e.g.*, FSA Final Notice ¶ 109 ("Draw your own conclusions about why people are going for unrealistically low libors."); Scherrer Ex. 7 (Q: "If this is what you're seeing then why are these being set? . . . I mean I've seen Barclays is on the panel."  A: Yeah, I'd love to know.  I really would love to know."); DOJ SOF ¶ 43.

[12] Plaintiffs cite *Container Corp.*, but that case involved an *express agreement* among defendants to exchange "information as to the most recent price charged or quoted, whenever [any defendant] needed such information and whenever it was not available from another source."  393 U.S. 333, 335 (1969).  Here, there are no factual allegations of such an express agreement.  Moreover, after *Container Corp.*, the Supreme Court clarified that "the dissemination of price information is not itself a per se violation of the Sherman Act."  *United States v. Citizens & S.*

Finally, Barclays' repeated contact with regulators in connection with USD LIBOR makes no sense if Barclays and other panel banks were involved in a conspiracy to suppress USD LIBOR.  *See, e.g.*, DOJ SOF ¶ 42.  In fact, in some communications with regulators, Barclays representatives "attempted to find a solution that would allow Barclays" to make submissions that would not stand out from submissions by other panel banks.  *Id.*

**B.      The "Studies" Cited by Plaintiffs Suggest At Most Parallel Conduct**

Plaintiffs rely on "studies" of LIBOR submission data to argue that the movements in USD LIBOR submissions during the alleged Class Period are an example of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  Antitrust Opp. at 21.  But Plaintiffs acknowledge that the alleged reduction in USD LIBOR occurred during one of the greatest dislocations in the financial markets – and the interbank lending market in particular – in history, and they allege that "the most obvious explanation" for the alleged reduction was a desire by banks to not appear less healthy than their peers during a time of crisis.  *See* OTC Compl. ¶¶ 52, 62.[13]  Thus, Plaintiffs themselves allege a "discernible," unilateral reason for parallel conduct, based on a common reaction to external events.[14]  The Barclays settlement documents bear this

---

*Nat'l Bank*, 422 U.S. 86, 113 (1975).  Plaintiffs do not purport to be alleging an antitrust violation based on the rule of reason.

[13] Moreover, the divergence between USD LIBOR and the Eurodollar Deposit Rate that Plaintiffs find anomalous and suggestive of conspiracy coincided with the market disturbances that allegedly created the purported motive to reduce LIBOR submissions.  *See* OTC Compl. ¶¶ 80-83.

[14] Similarly, the parallel "jump[]" in panel banks' USD LIBOR submissions that allegedly occurred on April 17, 2008, does not support an inference of an unlawful conspiracy because such conduct would be consistent with independent reactions to the common external stimulus of a *Wall Street Journal* article alleging that LIBOR rates were too low and that the BBA would investigate.  *See* Antitrust Opp. at 22.  Here too, Plaintiffs have supplied the non-collusive "discernible reason" for alleged parallel conduct.

6

out.  They show that Barclays unilaterally adjusted its USD LIBOR submissions to avoid standing out from at least some other banks.  *See, e.g.*, FSA Final Notice ¶ 115; DOJ SOF ¶ 43.[15]

### C.      Ongoing Government Investigations Do Not Help Plaintiffs Satisfy Their Pleading Requirements

Finally, Plaintiffs assert that the existence of ongoing investigations supports an inference of conspiracy, citing *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010).  *See* Antitrust Opp. at 26-27.  But the mere existence of investigations cannot satisfy the *Twombly* pleading standard.  In *Starr*, government investigations were mentioned merely in passing as an additional factor to buttress the extensive evidence of conspiracy in that case.  Here, unlike in *Starr*, the investigations focus on a different set of allegations than those alleged in the complaint.  Moreover, the results of such investigations, as reflected in the settlement documents, *contradict* Plaintiffs' allegations of a conspiracy since the Barclays settlements contained no support for the contention that Barclays agreed with any other Defendant to suppress USD LIBOR systematically during the financial crisis.[16]  Plaintiffs also refer to the fact that UBS has entered the DOJ Antitrust leniency program with respect to an investigation into JPY LIBOR and Euroyen TIBOR, but do not explain what this has to do with an alleged conspiracy to suppress USD LIBOR, the only index at issue in this litigation.

---

[15] Plaintiffs also argue that their allegations "support an inference of a tacit agreement."  Antitrust Opp. 28 n.57.  But Plaintiffs have at most pleaded only parallel conduct that could just as well be independent action, and as this Court has previously noted, it is not unlawful for "rivals in an industry [to] coordinate their conduct simply by observing and reacting to the moves of their competitors."  *Stephens v. CMG Health*, No. 96 Civ. 7798 (KMW), 1997 U.S. Dist. LEXIS 23797, at *18 n.12 (S.D.N.Y. July 22, 1997) (recommendation of Buchwald, J.).  This stands in sharp contrast to the archetypal tacit agreement in *Interstate Circuit*, where, among other things, each defendant knew that "others were asked to participate . . . [and] that cooperation was essential to successful operation of the plan."  306 U.S. 208, 226 (1939).

[16] *See In re Mun. Derivatives Antitrust Litig.*, 790 F. Supp. 2d at 116 ("[H]ad the Antitrust Division possessed evidence sufficient to connect its charged defendants and named co-conspirators to transactions and misdeeds other than those identified . . . [in criminal charges] it presumably would have done so.").

II.     **PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE**

It is axiomatic that to be a "restraint of trade or commerce" prohibited by section 1, competition in some market must be restrained.  Here, Plaintiffs claim horizontal price fixing, but in what market?  There is no "market" for reporting USD LIBOR; in submitting their rate reports, Defendants are not buying or selling anything to anyone.  Indeed, by definition, the reports are not of rates set by the panel banks for products or services they sell, but of rates they believe other banks in the London market would charge them if they chose to borrow.  None of the Plaintiff classes includes such lender banks in the London market, and Plaintiffs in their opposition do not claim that interest rates for actual transactions in that market were fixed.

Plaintiffs allege that various financial instruments reference USD LIBOR, but Plaintiffs do not allege any agreement to restrict competition in the markets for those instruments.  The competition in such markets relates to the spread to LIBOR, not LIBOR itself, which is the same regardless of the issuer.  Even under Plaintiffs' allegations, each Defendant remained free to buy or sell USD LIBOR-based instruments at whatever spread to LIBOR they could obtain.  This is not a situation where the Defendants allegedly sought to restrain competition in the marketplace and used an index to help achieve that goal.  Rather, the allegation is that the agreement extended no further than the USD LIBOR submissions themselves, with no allegedly coordinated effort by Defendants to restrain competition for any actual product sold by Defendants.

These facts distinguish every case Plaintiffs cite, all of which involve allegations of an agreement not to compete *with respect to a product in a marketplace*.  Plaintiffs' slew of citations merely shows that price-fixing in restraint of trade can occur in a variety of contexts, not that it exists where the agreement does not concern a competitively traded product.  Plaintiffs focus in particular on agreements regarding list prices or components of a product's price.  *See* Antitrust Opp. at 31 nn.65-66.  But to the extent such agreements are found to be in restraint of

trade, that is because they allegedly reduce marketplace competition for a product or service, not something like USD LIBOR, which is neither.

Plaintiffs argue that "manipulating an index which, in turn, serves as a reference point or benchmark for prices" is price-fixing, but every case they cite involved an agreement on a product as to which the defendants competed, and not a mere agreement on an index. *Id*. at 31 n.68. Defendants do not "compete" in the setting of USD LIBOR. For example, in *Knevelbaard Dairies v. Kraft Foods, Inc*., the defendants "rigged the price of bulk cheese" which affected the price of milk. 232 F.3d 979, 982 (9th Cir. 2000). But unlike USD LIBOR submissions, which are not subject to competition between Defendants, the defendants in *Knevelbaard* should have competed on the price of bulk cheese. The secondary effect on the price of milk stemmed from an actual restraint on trade in bulk cheese. Plaintiffs' other cases are similarly distinguishable.[17]

Plaintiffs claim that *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 587 F. Supp. 2d 27 (D.D.C. 2008), upheld a complaint that only alleged a conspiratorial change in the "AIILF" index, and not a "broader scheme" to use fuel surcharges in the marketplace. Antitrust Opp. at 31 n.68. To the contrary, the *Rail* complaint alleged that the railroads "conspired to *impose* Rail Fuel Surcharges that far exceeded any increase in Defendants' fuel costs."[18]

---

[17] *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (manipulation of an industry standard to exclude PVC pipes blocked competition with steel manufacturers); *Woods Exploration & Producing Co., Inc. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1292 (5th Cir. 1971) (agreement to submit low forecasts as part of an agreement to limit oil production and raise prices); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 452 (1986) (agreement to withhold x-rays reduced competition); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (agreement not to engage in competitive bidding suppressed competition); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940) (agreement on spot market purchases of surplus gasoline restrained trade); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477 (7th Cir. 2001) (defendants hoarded physical copper and entered sham contracts to raise prices); *Sanner v. Bd. of Trade*, 62 F.3d 918, 921 (7th Cir. 2005) (conspiracy to depress soybean cash crop prices); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 423 (7th Cir. 1965) (conspiracy to limit pasta content to depress the price of durum wheat); *Ice Cream Liquidation, Inc. v. Land-O-Lakes, Inc.*, 253 F. Supp. 2d 262, 269 (D. Conn. 2003) (conspiracy to inflate CME butter price to inflate price of other dairy products).

[18] Exhibit A to Declaration of Robert F. Wise, Jr. dated September 27, 2012 ("Wise Decl.") at ¶ 2 (emphasis added).

Counsel to the *Rail* plaintiffs – also co-lead counsel here[19] – represented in that case that their complaint "alleges that **the conspiracy was not limited** to the publication of the AIILF, but extended to agreement by the Defendants **to act in concert in imposing** stand-alone rail fuel surcharges on their customers by *using* the AIILF."  Ex. B to Wise Decl. at 34 (bold added, italics in original).  Plaintiffs here seek to rely upon a characterization of the *Rail* complaint at odds with how the *Rail* plaintiffs characterized it.

Because the alleged conspiracy here, unlike in every case cited by Plaintiffs, is limited to the publication of USD LIBOR, and not the use of that index to suppress customers' or counterparties' prices, Plaintiffs have failed to allege a conspiracy *in restraint of trade*.

## III.    PLAINTIFFS LACK ANTITRUST STANDING

### A.    Plaintiffs Fail to Allege Antitrust Injury

Even if Plaintiffs could allege a restraint of trade (which they cannot), Plaintiffs still lack antitrust standing because they have failed to allege injury "stem[ming] from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).  Plaintiffs do not allege that the market forces of supply and demand were restrained in any market in which Plaintiffs traded.  Plaintiffs' alleged injuries, therefore, do not stem from a reduction in competition and are not cognizable *antitrust* injuries.

### B.    Plaintiffs' Injuries Are Too Indirect and Speculative to Support Standing

Even if Plaintiffs had otherwise satisfied the pleading requirements for a section 1 claim, Plaintiffs' injuries are too remote from the alleged conspiracy and too speculative to support

---

[19] Hausfeld LLP, co-lead counsel for the OTC Plaintiffs, is also co-lead counsel in *Rail*.

antitrust standing under the requirements of *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  *See* Antitrust Mem. at 25-34.

### 1.    Indirect Plaintiffs Lack Standing

Plaintiffs who claim injuries based on transactions not involving the Defendants (*i.e.*, indirect Plaintiffs) plainly lack antitrust standing to sue for alleged suppression of USD LIBOR.  Such Plaintiffs cover an extremely broad range of transactions, involving a wide array of USD LIBOR-related instruments and an indeterminate number of counter-parties.[20]  Beyond the indirect Plaintiffs subject to the current motion, there have already emerged numerous other indirect Plaintiffs in this case (whose complaints are currently stayed), claiming losses from yet additional transaction types.[21]  If – as Plaintiffs appear to contend – merely having economic exposure to USD LIBOR is enough to confer standing, there is no limit to potential plaintiffs, because *anyone*, with respect to *any* transaction, might choose to reference USD LIBOR.

Under such a broad interpretation of standing, Defendants would have essentially limitless liability to entities with which they had no dealings and from which they made no profit.  This result flies in the face of basic antitrust standing doctrine, which is designed precisely to avoid such limitless antitrust liability.  *See, e.g., Reading Indus. v. Kennecott Copper Corp.*, 631 F.2d 10, 12 (2d Cir. 1980) (antitrust defendants are not liable "to every person who can persuade a jury that he suffered a loss in some manner 'that might conceivably be traced' to the conduct of the defendants") (quotation omitted); 2A Phillip E. Areeda & Herbert

---

[20] Indirect Plaintiffs consist of:  the Exchange-Based Plaintiffs, who allegedly traded Eurodollar futures and options on public exchanges (Exch. Compl. ¶ 221); the Gelboim Bondholder Plaintiffs, who allegedly held debt securities that paid interest tied to USD LIBOR during the Class Period (Gelboim Compl. ¶ 1); and at least certain of the Schwab Plaintiffs, some of whose antitrust claims are based on purchases from unidentified "third parties" of fixed and floating rate notes (*e.g.*, Charles Schwab Compl. ¶¶ 12, 192, 194-200).

[21] *See, e.g.*, Class Action Compl., *Berkshire Bank v. Bank of Am. Corp.*, No. 12 Civ. 5723 (S.D.N.Y. July 25, 2012) ¶ 76 (alleging losses by financial institutions that lent money to non-Defendants at rates tied to USD LIBOR).

Hovenkamp, *Antitrust Law*, ¶ 335g (3d ed. 2010) ("[W]ithout some limitations on standing, the courts and the defendants would be subject to endlessly proliferating suits.  The resulting liability could far exceed what was contemplated in a statute that awards . . . treble damages.").

Contrary to Plaintiffs' claim, indirect purchasers are not afforded standing merely because there is some alleged causal relationship between purportedly reduced USD LIBOR and the terms of their transactions.  *See, e.g.*, Antitrust Opp. at 41-42.  Apart from the fact that such causal relationship is highly complex and speculative, *see* Antitrust Mem. at 27-33, its existence alone is insufficient to confer standing.  Defendants' and Plaintiffs' cases show that standing requires – at a minimum – some market-based connection between the plaintiff and defendant, typically through participation by the plaintiff as a competitor, customer, or other commercial counter-party of the defendant within the same market that the defendant has attempted to restrain for its own advantage.

In *Reading*, for example, the Second Circuit held that Reading, a purchaser of scrap copper, lacked standing to sue for alleged price-fixing in the market for refined copper, even though pricing of the latter impacted the former.  In denying standing, the Second Circuit explained that plaintiffs with standing to sue for price manipulation are normally buyers or sellers within the same market that defendants intended to restrain, whereas Reading was neither.  *See* 631 F.2d at 14; *see also Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, 98 Civ. 4067 (LAP), 1999 U.S. Dist. LEXIS 19194, at *17-18 (S.D.N.Y. Dec. 15, 1999) (holding that courts in the Second Circuit – specifically those addressing commodities exchange markets – consistently limit standing to "only those [plaintiffs] who actually participate in the same market as the defendant").[22]  Indeed, even where the defendant and plaintiff do participate in the same market,

---

[22] Plaintiffs attempt to distinguish *Reading* on the basis of complex market factors impacting the relationship between scrap copper and refined copper prices.  *See* Antitrust Opp. at 42 n.90.  In addition to ignoring the massive

the plaintiff will typically lack standing absent a direct transactional relationship with the defendant.  *See Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 2d 242, 246 (S.D.N.Y. 1997) (plaintiffs who purchased shoes from non-conspiring dealers denied standing despite allegation that conspiracy inflated prices market-wide).  This Court's standing inquiry also includes – among other considerations – whether the alleged conduct was "directed at" the plaintiff in question, *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 400-03 (S.D.N.Y. 2011), and whether the defendants intended to cause the particular harm alleged, *see Ocean View*, 1999 U.S. Dist. LEXIS 19194, at *15-16.

While no single factor is dispositive, all relevant considerations weigh decidedly against a finding of standing for indirect Plaintiffs here.  The extent of any alleged causal relationship between allegedly suppressed USD LIBOR and indirect Plaintiffs' injuries is speculative at best.  *See* Antitrust Mem. at 27-33.  Moreover, by definition, indirect Plaintiffs here are not competitors, customers, or any other type of commercial counter-parties of Defendants within any market that Plaintiffs have sought to define.  Indirect Plaintiffs allege no transactions with Defendants, nor any nexus between their claimed losses and the economic advantage that Defendants purportedly sought to obtain – *i.e.*, financial gains on their *own* transactions.  Nor do indirect Plaintiffs allege any intent or plausible motivation of Defendants to injure them, or any aspect of the alleged conspiracy specifically directed at them.[23]  Taken together, these circumstances preclude a finding of standing.

---

complexities in assessing injury in this case, as detailed in Defendants' opening brief (*see* Antitrust Mem. at 27-34), Plaintiffs do not address *Reading*'s focus on the required market connection between plaintiff and defendant, or the fact that no such connection exists here between indirect Plaintiffs and Defendants.

[23] Exchange-Based Plaintiffs make the conclusory allegation that Defendants' conduct was "directed at" the "Eurodollar futures contract market," Antitrust Opp. at 42 n.90, but do not support that conclusion based on the allegations made, let alone seek to explain how the alleged conduct was specifically directed at Exchange-Based Plaintiffs with whom Defendants never dealt.

Plaintiffs cite a handful of cases, mostly from outside this Circuit, that purportedly support standing for indirect Plaintiffs here.  All these cases are distinguishable based on one or more of the factors discussed above.  In *Sanner*, for example, the anticompetitive conduct at issue was specifically intended to impact both parts of the soybean market (the soybean future and cash markets), with the harm alleged by plaintiffs in the cash market of the precise type that defendants were alleged to have intended through more direct targeting of the futures market. *See* 62 F.3d at 929-30.  Similarly, in *Knevelbaard* (which, in any event, was decided under the broader standing principles of California antitrust law, not the Sherman Act[24]), the relevant anticompetitive conduct in one market (cheese) was specifically intended to impact another market (milk) in which the defendants also participated and within which the defendants stood to benefit from the alleged restraint.  232 F.3d at 984-85, 987.  In these and Plaintiffs' other cases, broad findings of standing – to the extent correct and consistent with Second Circuit case law – were supported by a broad anticompetitive purpose to restrain trade and reap a corresponding benefit across multiple markets and/or at the expense of multiple categories of plaintiffs participating in the same market alongside defendants.[25]  By contrast, indirect Plaintiffs here do not and cannot allege that the purported conduct was aimed at them in any way.[26]

---

[24] *See Crayton v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 754 (9th Cir. 2012) (holding fixing prices in one market did not confer standing on customers in a related market and distinguishing *Knevelbaard* as applying state law).

[25] Plaintiffs' other cases are similarly distinguishable.  *See, e.g., Loeb*, 306 F.3d at 482 (finding that the alleged conspiracy "sought directly to manipulate the price of copper the plaintiffs were buying"); *Ice Cream Liquidation*, 253 F. Supp. 2d at 272 (finding that the "purpose of the price-fixing was to artificially inflate prices in the milk, cream, and butter markets in which both plaintiff and defendants were participants").

[26] This result is not only mandated by the *AGC* analysis discussed above, but indeed, any other result would also be highly anomalous under *Illinois Brick*.  Application of *Illinois Brick*'s indirect purchaser doctrine requires denial of standing even to parties that *did* suffer a loss specifically intended by defendants (*i.e.*, an overcharge resulting from an inflated price), and at whose expense defendants *did* profit, for reasons of efficiency and manageability of antitrust enforcement.  *See* 431 U.S. at 728-29; *see also Simon v. Keyspan Corp.*, __ F.3d __, 2012 U.S. App. LEXIS 19815, at *12-13 (2d Cir. Sept. 20, 2012).  If the downstream purchaser lacks antitrust standing, it would be highly inconsistent to confer standing upon someone whose purported losses were purely incidental to the alleged

### 2.      OTC Plaintiffs Lack Standing

OTC Plaintiffs also lack antitrust standing because of the inherent speculativeness and indirectness of the injuries they allege with respect to interest rate swaps and other USD LIBOR-based instruments they allegedly purchased.  One of the sources of this speculativeness is that interest rate swaps are commonly used to hedge against movements in floating rates – *i.e.*, to ensure that a party remains floating rate neutral and would therefore *not* suffer material injury in the event that floating rates moved up or down.  *See* Antitrust Mem. at 32-33.  OTC Plaintiffs do not deny that this was the exact strategy employed by the City of Baltimore, one of the lead OTC Plaintiffs, as indicated by its public disclosures.

Moreover, determining the existence and extent of alleged injuries is not – as OTC Plaintiffs claim – a simple exercise of recalculating a "but-for" USD LIBOR figure.  For instance, interest rate swaps, such as those the OTC Plaintiffs allege, consist of two legs, a LIBOR floating rate to be paid by the bank to the swap purchaser and a fixed rate to be paid by the purchaser to the bank.  It is the latter that is the cost to the purchaser for the swap. Determining whether there was any injury from alleged suppression of LIBOR at the time the purchaser entered into the swap would require determination of not only a speculative "but for" LIBOR, but also whether the difference had any effect and, if so, beneficial or detrimental to the purchaser, on the fixed rate charged by the bank, which adds yet another layer of speculation and uncertainty.  Contrary to OTC Plaintiffs' claim, these complexities are not minor details to be worked out as part of a damages calculation, but are rather fundamental issues undermining standing under *AGC.  See id.* at 29-30.

---

conspiracy, were not alleged to have been intended by Defendants, and are unrelated to any alleged improper profits flowing to Defendants.

## **CONCLUSION**

For the foregoing reasons and those set forth in Defendants' opening submission, all antitrust claims asserted by all Plaintiffs should be dismissed with prejudice.

Dated:   New York, New York
         September 27, 2012

Respectfully Submitted,

/s/ Robert F. Wise, Jr.

Robert F. Wise, Jr.
Arthur J. Burke
Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
robert.wise@davispolk.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
Telephone: (212) 450-4000
Fax: (212) 450-4800

*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

/s/ Daryl A. Libow

Daryl A. Libow
Christopher M. Viapiano
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
libowd@sullcrom.com
viapianoc@sullcrom.com
Telephone: (202) 956-7500
Fax: (202) 956-7056

*Attorneys for Defendant The Bank of Tokyo-*
*Mitsubishi UFJ, Ltd.*

16

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com
Tel: 212.841.1000

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
awiseman@cov.com
tisaacson@cov.com
Tel: 202.662.6000

Michael R. Lazerwitz
Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
mlazerwitz@cgsh.com
jkim@cgsh.com
Tel: 212.225.2000

*Attorneys for Defendants Citibank, N.A. and
Citigroup, Inc.*

/s/ David R. Gelfand
David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY
LLP
One Chase Manhattan Plaza
New York, New York 10005
dgelfand@milbank.com
smurphy@milbank.com
Telephone: (212) 530-5000

*Attorneys for Defendant Coöperatieve
Centrale Raiffeisen-Boerenleenbank B.A.*

17

/s/ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
richard.schwed@shearman.com

*Attorneys for Defendant Credit Suisse Group AG*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
msilverman@paulweiss.com
afinch@paulweiss.com
Telephone: (212) 373-3355

*Attorneys for Defendant Deutsche Bank AG*

/s/ Ed DeYoung
Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendant HSBC Holdings plc
and HSBC Bank plc*

/s/ Thomas C. Rice
Thomas C. Rice
Juan A. Arteaga
Joan E. Flaherty
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
jflaherty@stblaw.com

*Attorneys for Defendants JPMorgan Chase &
Co. and JPMorgan Chase Bank, N.A.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant Lloyds Banking Group
plc other than in 11-cv-6409, 11-cv-6411, and
11-cv-6412*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant HBOS plc other than
in 11-cv-6409, 11-cv-6411, and 11-cv-6412*

19

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant Lloyds Banking Group plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant The Norinchukin Bank*

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant HBOS plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
Telephone: (312) 902-5200

*Attorneys for Defendant Royal Bank of Canada*

20

/s/ Robert G. Houck
Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd St.
New York, NY 10019
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com
Telephone: 212-878-8000

*Attorneys for Defendant The Royal Bank of Scotland Group plc*

/s/ Ethan E. Litwin
Ethan E. Litwin
Morgan J. Feder
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
litwin@hugheshubbard.com
stecher@hugheshubbard.com
Telephone: (212) 837-6000

*Attorneys for Defendant Portigon AG (formerly known as WestLB AG)*