## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE LIBOR-BASED FINANCIAL
INSTRUMENTS ANTITRUST LITIGATION

)
)
)
)

MDL No. 2262

)

Master File No. 1:11-md-2262-NRB

THIS DOCUMENT RELATES TO:

)
)
)

THE BERKSHIRE BANK and GOVERNMENT
DEVELOPMENT BANK FOR PUERTO RICO,
Individually and On Behalf of All Others
Similarly Situated,

)
)
)
)
)

ECF Case

                              Plaintiffs,

)
)
)

Civil Action No. 12-CV-5723-NRB

            v.

)
)
)

BANK OF AMERICA CORPORATION; BANK
OF AMERICA, N.A.; BANK OF TOKYO
MITSUBISHI UFJ LTD.; BARCLAYS BANK
PLC; CITIGROUP, INC.; CITIBANK, N.A.;
COÖPERATIEVE CENTRALE
RAIFFEISENBOERENLEENBANK
B.A.; CREDIT SUISSE GROUP AG; DEUTSCHE
BANK AG; HSBC HOLDINGS PLC; HSBC
BANK PLC; JPMORGAN CHASE & CO.;
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION; LLOYDS BANKING GROUP
PLC; HBOS PLC; ROYAL BANK OF CANADA;
THE NORINCHUKIN BANK; THE ROYAL
BANK OF SCOTLAND GROUP PLC; UBS AG;
WESTLB AG; and WESTDEUTSCHE
IMMOBILIENBANK AG,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**JURY TRIAL DEMANDED**

                              Defendants.

)
)

RECEIVED NOV 21 2012 S.D.N.Y.

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs The Berkshire Bank ("Berkshire"), a New York banking corporation, and

Government Development Bank for Puerto Rico ("GDB"), a statutory banking entity in the

Commonwealth of Puerto Rico, a United States territory (collectively, "Plaintiffs"), individually

and on behalf of all others similarly situated, by their undersigned attorneys, for its Amended

Class Action Complaint against defendants, alleges upon personal knowledge as to themselves

and their own acts, and upon information and belief as to all other matters, based on, *inter alia*,

the investigation conducted by and through their attorneys, which included, among other things:

a review of the defendants' public documents; review of regulatory materials; review of

scholarly research and other expert analysis; review of wire and press releases; and other

obtainable information:

## NATURE OF THE ACTION

1.      This is an action brought asserting claims of common law fraud on behalf of all

lending institutions headquartered in the states and territories of the United States that

originated, purchased outright, or purchased a participation interest in, loans paying interest at

rates tied to the U.S. Dollar London Interbank Offered Rate ("USD LIBOR"),[1] the interest rate

of which adjusted at any time between August 1, 2007 and May 31, 2010, inclusive (the "Class

Period"). Plaintiffs and the Class suffered damages as a result of Defendants' fraudulent

conduct in artificially decreasing the USD LIBOR rate during the Class Period, causing them to

receive lower interest than they would have been entitled but for Defendants' fraud.

2.      The British Bankers' Association ("BBA") describes LIBOR as "the primary

benchmark for short term interest rates globally." Consistent with the BBA's description, USD

LIBOR is the "primary benchmark" for short-term interest rates in the United States (including

---

[1] Although USD LIBOR is by far the most important currency denomination in which LIBOR is
reported, the BBA also calculates and reports LIBOR rates for borrowing costs in non-dollar
currencies, such as the Pound, Euro, and Yen. This action only addresses USD LIBOR, which
was the focus of Defendants' fraud.

its territories), and in particular in the State of New York, its banking capital.  As an analyst for

a division of Defendant Citigroup explained:

> LIBOR is by far the most popular floating-rate index in the world. Its importance
> has evolved far beyond its humble roots as an interbank lending rate. LIBOR
> touches everyone from the largest international conglomerate to the smallest
> borrower in Peoria: It takes center stage in every interest rate swap (whether it is
> explicitly part of the cash flow or not) and the great majority of floating-rate
> securities and loans. As such, the functionality and relevance of LIBOR is of
> primary importance to the global financial system.

*See* S. Peng, C. Gandhi, A. Tyo, "Special Topic: Is LIBOR Broken?," April 10, 2008 (Citigroup

Capital Markets).

3.     Hundreds of billions of dollars of floating-rate loans are originated or sold within

the United States (including its territories) each year with rates tied to USD LIBOR.  Typically,

a floating-rate loan (whether residential or commercial), will be issued at a base rate and will

reset periodically to a rate set by adding a premium to the current rate of USD LIBOR (e.g.,

USD LIBOR + 3%).  As a result, a misrepresentation in the referenced USD LIBOR rate on the

date on which a loan resets will generally reduce the amount of interest that a lender receives by

an equivalent amount.

4.     USD LIBOR is calculated mechanically each business day and published under

the auspices of the BBA.  The BBA defines USD LIBOR as:

> The rate at which an individual Contributor Panel bank could borrow funds, were
> it to do so by asking for and then accepting inter-bank offers in reasonable market
> size, just prior to 11:00 [a.m.] London time.

> This definition has been in place since approximately 1998.

5.     Defendants, who were each Contributor Panel banks (or the holding companies

for Contributor Panel banks) for the USD LIBOR panel, knew and understood that it was

common practice during the Class Period for banks throughout the United States to issue

3

floating-rate loans tied to USD LIBOR rates.  Indeed, Defendants themselves transacted in loans tied to USD LIBOR rates, and referenced USD LIBOR rates in their own analyses of the U.S. financial services sector.  Accordingly, it was not only foreseeable but obvious that by manipulating the rate of USD LIBOR, Defendants would impair the interest income received by Plaintiffs and other lenders providing USD LIBOR-tied loans.

6.      Despite knowing that manipulating USD LIBOR could profoundly impact vast quantities of financial transactions, Defendants repeatedly made intentionally false representations about their borrowing costs to the BBA, resulting in the artificial suppression of USD LIBOR rates during the Class Period, and causing significant damages to Plaintiffs and the Class.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under the common law of the State of New York, and/or the common law of the other states and territories in the United States of America.

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because it is brought as a putative class action, because there is diversity of citizenship between one or more Plaintiff and one or more defendants, and because it involves amounts in controversy exceeding $5,000,000.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged occurred in substantial part in this District.

10.      This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this jurisdiction.

## PARTIES

11.     Plaintiff The Berkshire Bank is a banking corporation chartered by the State of New York that, as part of its normal business activities, originated and purchased, either outright or as a participation interest, loans tied to USD LIBOR.  During the Class Period, The Berkshire Bank owned or held interests in loans tied to USD LIBOR that were issued to borrowers located or domiciled within the states of New York, New Jersey and Georgia.

12.     Plaintiff GDB is a bank chartered in the Commonwealth of Puerto Rico by legislation known as Act 17 of September 23, 1948.  In addition to serving as the fiscal agent and financial advisor for the Puerto Rican Government, GDB is a substantial lender and provides financing to private enterprises (as well as public entities) in order to boost the island's economic development.  During the Class Period, GDB owned or held interests in loans tied to USD LIBOR which were issued to individuals and entities located or domiciled in the Commonwealth of Puerto Rico.

13.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina. Defendant Bank of America, N.A.—a federally chartered national banking association headquartered in Charlotte, North Carolina—is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation. Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "Bank of America."

14.     Defendant Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese financial services company headquartered in Tokyo, Japan.

15.     Defendant Barclays Bank plc ("Barclays") is a British financial services business organized as a public limited company and headquartered in London, England.

16.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York. Defendant Citibank, N.A.—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

17.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

18.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

19.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

20.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank plc—a United Kingdom public limited company headquartered in London, England—is a wholly-owned subsidiary of Defendant HSBC Holdings plc. Defendants HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as "HSBC."

21.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York. Defendant JPMorgan Chase Bank, N.A.—a federally chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referenced collectively in this Complaint as "JPMorgan Chase."

22.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Defendant Lloyds was formed in 2009

through the acquisition of Defendant HBOS plc ("HBOS")—a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland—by Lloyds TSB Bank plc.

23.     Defendant Royal Bank of Canada ("RBC") is a Canadian corporation headquartered in Toronto, Canada.

24.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

25.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

26.     Defendant UBS AG ("UBS") is a Swiss corporation based in Basel and Zurich, Switzerland.

27.     Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany. Defendant Westdeutsche ImmobilienBank AG—a German company headquartered in Mainz, Germany—is a wholly-owned subsidiary of WestLB AG. Defendants WestLB AG and Westdeutsche ImmobilienBank AG are referenced collectively in this Complaint as "WestLB."

28.     Defendants Bank of America, BTMU, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, RBC, Norinchukin, RBS, UBS, and WestLB (collectively, "Defendants") were members of the BBA's USD LIBOR Contributing Panel during the Class Period.

## SUBSTANTIVE ALLEGATIONS

29.     USD LIBOR is the most important benchmark that lending institutions throughout the country, including Plaintiffs and the Class, use to set interest rates for floating rate loans. During the Class Period, Defendants were on the panel from which USD LIBOR rates were set,

and provided false information on their own borrowing costs which was incorporated into USD LIBOR rates, having the effect of artificially lowering such rates.

30.    The USD LIBOR is the result of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA.  During most of the Class Period, the Contributor Panel for USD LIBOR consisted of 16 banks, including Defendants.[2]

31.    No regulatory agency oversees the setting of LIBOR by the BBA and its members. The resultant rates are not reviewed by or subject to the approval of any regulatory agency, and therefore the integrity of LIBOR relies entirely upon the honesty of the Contributing Panel. The BBA has been quoted as saying it "calculates and produces BBA Libor at the request of [its] members for the good of the market."[3]

32.    Each member of the Contributor Panel indicates its borrowing costs for fifteen different maturities, or durations, ranging from one day to one year, and submits that information every London business day through electronic means to Thomson Reuters, the calculating agent for the BBA, by 11:10 a.m. London Time.  Once each Contributor Panel bank has submitted its rates, the submitted rates are ranked.  The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (i.e., 50% of the submissions) are averaged to formulate the resulting USD LIBOR "fix" or "setting."

---

[2] On February 9, 2009, Société Générale replaced Defendant HBOS on the BBA's USD-LIBOR panel. In February 2011, in response to concerns about possible LIBOR manipulation, the BBA added four more banks to the panel. On August 1, 2011, Defendant WestLB, at its request, was removed from the panel. As of December 2011, the USD-LIBOR panel consisted of 18 banks.

[3] *See* http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backsia way-from-tarnished-rate.

33.     The USD LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the USD LIBOR fix is rounded, if necessary, to five decimal places.  USD LIBOR rates and spreads are sometimes referenced in terms of "basis points," which mean one-hundredths of one percent.  Thus, a +22 basis point spread between USD LIBOR and, for example, U.S. Treasuries, would mean that the USD LIBOR rate was 0.22% higher than the corresponding U.S. Treasury yield at the time of measurement.

34.     Thomson Reuters calculates the data submitted by the Contributing Panel on behalf of the BBA, and publishes the resulting USD LIBOR rates each business day by approximately 11:30 a.m. London Time.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources, including *The Wall St. Journal*.  In addition to the USD LIBOR fix resulting from the calculation, Thomson Reuters publishes the individual rate quotes submitted by each Contributor Panel bank.

35.     According to the BBA, at all times relevant hereto, Contributor Panel banks were supposed to submit their own rates without reference to rates contributed by other Contributor Panel banks.  The basis for a Contributor Panel bank's submission, according to the BBA, must be the rate at which members of the bank's staff primarily responsible for management of a bank's cash consider that the bank can borrow unsecured funds in the interbank market.  As BBA Contributing Panel banks, Defendants had actual knowledge of these submission standards.

**Pre-Class Period Manipulation**

36.     Prior to the Class Period, there is anecdotal evidence that Contributing Panel banks submitted false reports to BBA in order to benefit the derivatives traders at their

respective banks.  For example, Barclays has admitted that from June 2005 through September 2007, and periodically thereafter, its New York and London-based derivatives traders made requests for favorable USD LIBOR contributions to the Barclays' USD LIBOR submitters on the bank's London money markets desk, and that on numerous occasions, Barclays submitted USD LIBOR quotes to the BBA that reflected its traders' requests rather than Barclays' interbank borrowing rates.

37.    Unlike during the Class Period, the pre-Class Period manipulation was aimed at maximizing the traders' positions at specific points in time.  For instance, on February 22, 2006, at approximately 9:42 a.m., a Barclays' derivatives trader sent an e-mail to a Barclays USD LIBOR submitter on its money market desk stating, "Hi (again) We're getting killed on our 3m resets, we need them to be up this week before we roll out of our positions.  Consensus for 3m today is 4.78 - 4.7825, it would be amazing if we could go for 4.79...Really appreciate ur help mate."  (ellipses in original).  The Barclays' submitter responded, "Happy to help."  Barclays's 3-month USD LIBOR submission on February 22, 2006 was 4.79%.

38.    About a month later, on Friday, March 10, 2006, the same Barclays trader sent an e-mail to another Barclays USD LIBOR submitter stating: "Hi mate[.] We have an unbelievably large set on Monday (the IMM).  We need a really low 3m [3-month USD LIBOR] fix, it could potentially cost a fortune.  Would really appreciate any help, I'm being told by my NYK [counterparts in New York] that it's extremely important.  Thanks."  The following Monday morning, March 13, 2006, the trader wrote again: "The big day has[] arrived...My NYK were screaming at me about an unchanged 3m libor.  As always, any help wd [would] be greatly appreciated.  What do you think you'll go for 3m?"  The Barclays' USD LIBOR submitter responded by email, "I am going 90 altho[ugh] 91 is what I should be posting."  The trader

replied: "[W]hen I retire and write a book about this business your name will be in golden letters," to which the Barclays' USD LIBOR submitter responded, "I would prefer this not be in any books!" As the trader requested, Barclays's 3-month USD LIBOR submission on March 13, 2006 was 4.90%.

39.    On information and belief, similar misconduct occurred at other banks prior to the Class Period. The pre-Class Period misconduct exposed the willingness of Defendants to lie on USD LIBOR submissions, and their success and profits from these deceptive practices emboldened them to make the far more significant misrepresentations during the Class Period that injured Plaintiffs and the Class.

**Defendants' Manipulation of USD LIBOR during the Class Period**

40.    Throughout the Class Period, Defendants caused the USD LIBOR to be manipulated by knowingly and intentionally submitting false data to BBA, which did not honestly reflect the submitting banks' actual borrowing costs on the interbank market. Defendants had two reasons to falsify their submissions. First, the Contributing Panel banks did not want to signal their own distress by admitting publicly that their peers were reluctant to lend to them except at elevated rates. Second, due to their own net interest rate exposure, at least some of the Contributing Panel banks stood to reap large financial benefits from even a modest decrease in USD LIBOR.

41.    By August 2007, the global credit crisis was just beginning to unfold. Two Bear Stearns hedge funds had blown up, Germany had to bail out IKB Deutsche Industriebank, and the European Central Bank had to inject 95 billion Euros into the European banking system. Globally, banking was becoming increasingly risky, and no bank wanted to appear to be the next to face difficulty. For the USD LIBOR Contributing Panel banks, this was a problem. The

BBA published the rates reported by each member of the Contributing Panel. If a Contributing Panel bank admitted that its peers were charging it heightened rates for interbank loans, this would signal to the market that the financial institution was perceived to be risky. In the worst case, fears could snowball and create a run on the bank. Therefore, Defendants had a motive to, and did in fact, falsify the rates that they submitted to give the appearance that their funding costs were lower than they actually were, and to give the appearance that Defendants remained strong despite the deteriorating economic environment.

42.    The business press also focused on high USD LIBOR submissions as a sign of distress at submitting banks. For example, in early September 2007, Barclays reported higher USD LIBOR rates than their peers, a Bloomberg article entitled "Barclays Takes a Money-Market Beating" questioned "So what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest in the money market?" Other newspapers, including the U.K. Financial Times and The Standard ran similar articles.

43.    Citibank analysts also acknowledged that the Contributing Panel had a motive to misrepresent USD LIBOR quotes.

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment. If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one higher than its competitors. Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding. With markets in such a fragile state, this kind of perception could have dangerous consequences.[4]

44.    Additionally, at least some Defendants had a substantial economic incentive to try to push the aggregate reported USD LIBOR rate lower. For example, in the Form 10-K Annual

---

[4] Peng, et al., "Is LIBOR Broken?," *supra.*

Report for the Year ending December 31, 2007 that Defendant Citibank filed with the Securities and Exchange Commission ("SEC") in early 2008, Citibank calculated that it would profit between $540 and $837 million from a 100 basis point (i.e., 1%) decrease in interest rates. Similarly, in its 2007 10-K, Defendant Bank of America estimated that a 100 basis point drop would yield a profit on its net interest rate exposure of more than $800 million. A recent paper by UCLA economics professor Connan Snider and University of Minnesota economics professor Thomas Youle also concludes that bank portfolio exposure to LIBOR – the most popular measure of interest rates in swaps and other derivatives – is a "source of misreporting incentive."[5] Defendants therefore had both reputational and financial motive to manipulate USD LIBOR.

45. Numerous sources of corroborating evidence confirm that Defendants did in fact manipulate USD LIBOR rates during the Class Period:

- An analysis by the Federal Reserve Bank of New York ("New York Fed") between reported USD LIBOR rates and actual rates paid for funding under the Federal Reserve's Term Auction Facility suggested that USD LIBOR rates were being underreported;

- Contacts at the Defendant Banks admitted to the New York Fed that USD LIBOR rates were being underreported;

- A New York Fed analysis of USD LIBOR spikes during periods of media scrutiny found that the spikes likely were reversions to actual borrowing rates, demonstrating that the surrounding rates were artificially depressed and did not reflect actual borrowing rates;

- Certain Defendants, or their employees, have admitted that rates were being manipulated;

---

[5] *See* C. Snider and T. Youle, *Does the LIBOR reflect banks' borrowing costs?,* April 2, 2010, available at www.ssrn.com.

- Deviations between rates reported by the Defendant banks and rates charged in the marketplace for credit default swaps on Defendant banks confirm that rates were being underreported;

- Intraday analysis of submissions suggests that USD LIBOR rates were being manipulated by underreporting; and

- Deviations between USD LIBOR rates and other rates with which they typically correlated, such as Federal Reserve Eurodollar Deposit Rates and Overnight Index Swaps further demonstrate that USD LIBOR rates were being manipulated.

New York Federal Reserve Analysis

46.     On April 12, 2008, the New York Fed Federal Reserve Bank of New York noted in an internal report that the USD LIBOR, a rate reflecting the representations of the Contributing Panel banks rather than actual transacted rates, was significantly lower than the rate that banks had bid to access USD funds in the Federal Reserve's Term Auction Facility ("TAF"), a true auction for actual funding.   According to the New York Fed, this raised "questions over the accuracy of the BBAs [USD] LIBOR fixing rate."[6]

47.     The divergence between the actual transactions banks were willing to pay to access TAF funds and the reported USD LIBOR rates reached as much as 30 basis points by April 2008, "similar to that observed during prior periods of heightened market stress, most notably in August and early December 2007."   The New York Fed acknowledged that sources within the Defendant banks had admitted to the New York Fed that the divergence was caused by false reporting to BBA:

---

[6] Federal Reserve Bank of New York, *MarketSOURCE: Weekly Market Review*, April 11, 2008, available at: http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_ Internal_FRBNY_Weekly_Market_Review.pdf.   This report, circulated   to Federal Reserve officials – on information and belief including New York Fed Director Jamie Dimon, also Chief Executive Officer of Defendant JPMorgan Chase – was made public as part of a recent inquiry by the United States House of Representatives.

Our contacts at LIBOR contributing banks have indicated a tendency to under-report actual borrowing costs when reporting to the BBA in order to limit the potential for speculation about the institutions' liquidity problems.[7]

48.     In a May 6, 2008 presentation that the New York Fed made to officials at the United States Department Treasury, the New York Fed again acknowledged that there were suggestions that the Contributing Panel banks were "actually misquoting LIBOR" and that the misquoting may have been spurred by the Contributing Panel banks' economic "incentive to avoid signaling funding changes."[8]

49.     In another internal report dated May 20, 2008, the New York Fed stated that the unmonitored quoting mechanism employed in calculating USD LIBOR "may lead to some deliberate misreporting designed to avoid the stigma of revealing high funding costs" by Contributing Panel banks.[9]   The report noted as evidence of manipulation that there were momentary lapses in the depression of USD LIBOR rates that occurred when LIBOR credibility questions surfaced in the business press:

> Additionally, around days on which the BBA's efforts to address LIBOR have received media attention, there have been fairly dramatic increases in the LIBOR fixings. For example, in the two days surrounding the WSJ's April 16 article, 3-month LIBOR increased 17 bps, which was the largest two-day increase in the rate since August.  Earlier this week, as the integrity of LIBOR again received attention, 1-year LIBOR increased 21 bps, and OIS and fed funds-LIBOR basis

---

[7] *Id.*

[8] Presentation slides available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/May_6_2008_Slide_Deck_of_Presentation_to_Treasury.pdf.

[9] "MarketSOURCE In-Depth Report: Recent Concerns about LIBOR Credibility," May 20, 2008, now available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_May20 2008.pdf.

swaps suggest that a large portion of this rise was not due to a re-pricing of policy expectations.[10]

Thus, Defendants' USD LIBOR reporting was more honest in those brief periods when they knew that dishonesty was likely to be exposed by harsh media scrutiny.

50.    In a confidential presentation that the New York Fed made to the United States Inter-Agency Financial Markets Working Group, the New York Fed cited additional evidence of malfeasance: reports from brokers that Contributing Panel banks were bidding in the swap market above USD LIBOR quotes.[11]    In other words, those banks were seeking interbank funding at rates *higher* than their purported interbank funding costs that they reported to the BBA.

Admissions By Defendants And Their Employees

51.    Barclays has admitted that, at least between September 2007 and April 2008, it consistently submitted false LIBOR reports to the BBA.  Specifically, as Barclays recently admitted, Barclays "managers gave instructions to Barclays [USD LIBOR] submitters to lower their LIBOR submissions….[T]he intent was to protect Barclays from the unfounded negative perceptions by bringing Barclays LIBORs closer to the pack."   Barclays also stated its belief that "other banks were making LIBOR submissions that were too low and did not reflect market conditions," as evidenced by "Barclays observations that other banks were making submissions which were lower than levels at which they appeared to be undertaking transactions" in actual interbank funding markets.[12]

---

[10] *Id.*

[11] Slide presentation available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/June_5_2008_presentation_to_IFMGM.pdf.

[12] *See* "Supplementary information regarding Barclays settlement with the Authorities in respect

52.    Barclays further admitted artificially reducing its USD LIBOR submissions in the Fall of 2008 based upon communications with the Bank of England.  While Barclays' CEO did not believe that the communications were intended to pressure Barclays to misrepresent its funding rates to the BBA, another senior Barclays executive erroneously believed that was the message that the Bank of England was conveying, and accordingly manipulated Barclays' LIBOR quotes to be substantially lower than its actual funding cost.[13]

53.    Similarly, a report that Citibank distributed to some of its brokerage clients conceded that "LIBOR may understate actual interbank lending costs by 20-30bp….The current liquidity crisis has created a situation where LIBOR at times no longer represents the level at which banks extend loans to each other."  As a result, the report concluded that "[s]omething is rotten in the state of [LIBOR]" (brackets in original) and cited as evidence the following factors: (1) Federal Reserve TAF auction rates were higher than USD LIBOR; (2) deviations between USD LIBOR and Fed Eurodollar rates; (3) anecdotal reports that interbank loans were occurring at "significant yield premium" to reported USD LIBOR; and (4) deviations in cross-currency basis swap levels.

54.    Peter Hahn, a finance professor at London's Cass Business School and a former managing director at Citigroup, admitted that "Libor has always been a lie, because it represents what banks would pay for funds rather than what they are actually paying....People who have an

---

of their investigations into the submission of various interbank offered rates," available in the Barclays News section at http://group.barclays.com.

[13] *Id.*

incentive to make money from mispriced markets are able to misprice those markets, and that is a serious control problem."[14]

Credit Default Swaps

55.    The significant variance between Defendants' USD LIBOR quotes and the actual cost at the time of credit default swaps ("CDS") on Defendants' debt demonstrates that Defendants' quotes underreported their cost of borrowing during the Class Period.  A CDS is a common form of credit derivatives that operates like insurance.  It is an agreement by which one party, the protection buyer, seeks financial protection in the event of a default on an underlying credit instrument such as a bond or note, in exchange for a series of payments to the protection seller, called CDS "fees" or "spreads," that operate similarly to premiums on insurance policies.  In exchange for these payments, the CDS protection seller is required to make payment if the underlying credit instrument experiences an adverse credit event.

56.    The CDS spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the underlying loan—the greater the risk of default the underlying bond or loan bears, the greater the CDS spread.  Historically, "[t]he cost of bank default insurance has generally been positively correlated with LIBOR. That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[15]

---

[14] *See* http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html.

[15] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform," 13 *North Carolina Banking Institute* 365, 371 (2009) (footnotes omitted).

57.    However, as reported in a *Wall St. Journal* article, during the Class Period, the cost of Defendants' CDS rose substantially more than their USD LIBOR quotes would imply, even though the two series were historically correlated:



Source: C. Mollenkamp and M. Whitehouse, "Study Casts Doubt on Key Rates—WSJ Analysis Suggests Banks May Have Reported Flawed Interest Rate Data For Libor," *Wall St. Journal*, May 29, 2008.

58.    The *Wall St. Journal* article reported the conclusion of a study it had commissioned and had reviewed by noted economists.  The study indicated that numerous banks caused USD LIBOR, "which is supposed to reflect the average rate at which banks lend

to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial crisis." The *Wall St. Journal* study found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs." The study posited that that a possible explanation for the wide deviations from historical correlations was "that banks understated their borrowing rates."

59.    According to the May 29, 2008 article, three independent academics reviewed the *Wall St. Journal*-commissioned study: Stanford University finance professor Darrell Duffie, London Business School finance professor Mikhail Chernov, and Columbia University statistics professor David Juran. All three found the study's approach and methodology to be sound.

60.    The study also found suspicious the fact that certain of the more distressed banks that were considered to be dangerous default risks as measured by CDS spreads reported the same USD LIBOR quotes as less distressed banks. For example, on the afternoon of March 10, 2008, CDS rates for Defendant WestLB implied a likelihood of default *twice* that of Credit Suisse, yet the next morning the two banks submitted identical USD LIBOR quotes.

61.    Additionally, after comparing the banks' USD LIBOR quotes to their actual costs of borrowing in the commercial-paper market, the *Wall St. Journal* reported serious discrepancies indicating that the banks' actual costs of borrowing was higher than they were telling BBA, further evidencing fraud. For example, in mid-April 2008, UBS paid 2.85% to borrow dollars for three months, but on April 16, 2008, the bank quoted a borrowing cost of 2.73% to the BBA.

62.    The subsequent study by Snider and Youle cited in Paragraph 43 above confirms the findings of the *Wall St. Journal*, concluding that discrepancies between CDS rates and USD LIBOR rates suggest that USD LIBOR rates had been tampered. For example, Snider and

Youle note that Citigroup's quote was often "significantly below its CDS spread," implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them a guaranteed 5 percent loss." That implication would contravene basic rules of economics and finance; the only rational explanation was that Citibank underreported its borrowing costs to the BBA.

Intraday bunching of USD LIBOR quotes

63.    During the Class Period, the rates reported by certain Defendants—in particular, Citibank, Bank of America, and JPMorgan Chase—also demonstrated suspicious "bunching" around the fourth lowest quote submitted by the 16 banks to the BBA. Indeed, Citibank's and Bank of America's quotes often tended to be identical to the fourth-lowest quote for the day.

64.    Because the USD LIBOR calculation involved excluding the lowest (and highest) four reported rates every day, bunching around the fourth-lowest rate suggests Defendants collectively depressed USD LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of USD LIBOR on a given day.

65.    The following charts, generated by Snider and Youle, show the frequency with which the USD LIBOR quotes submitted by Defendants Citigroup, Bank of America, and JPMorgan Chase fell within a given percentage rate from the fourth-lowest quote. A negative difference means the reporting bank was below the fourth-lowest quote, and therefore its rate was not included in the daily USD LIBOR calculation, while zero difference means that the bank reported the fourth-lowest quote on a given day (either by itself or tied with other reporting banks, in which case one of the tied quotes was selected at random to be included, and the other excluded):



66.    According to Snider and Youle, the fact that observed bunching occurred around the pivotal fourth-lowest reported rate reflects the reporting banks' intention to ensure that the lowest possible borrowing rates were included in the calculation of USD LIBOR (which includes only the fifth lowest through the twelfth-lowest quotes).

67.    In other words, banks that bunched their quotes around the fourth-lowest submission helped ensure the maximum downward manipulation of the resulting rate. Further demonstrating the aberrant nature of the observed bunching around the fourth-lowest quote, Snider and Youle noted "the intraday distribution of other measures of bank borrowing costs do not exhibit this bunching pattern."

68.    For example, Snider and Youle found that the "bunching" phenomenon was not apparent in CDS spreads for the same banks.  They concluded, "If banks were truthfully quoting their costs . . . we would expect these distributions to be similar."



Suspicious deviations between LIBOR and other historically-correlated spreads

69.    Defendants' manipulation of USD LIBOR rates during the Class Period is also evident from the sudden and significant Class Period deviations between USB LIBOR quotes and other credit market rates with which they were strongly correlated prior to the manipulation.

70.    For example, prior to the Class Period, both Defendants' individual USD LIBOR quotes and the USD LIBOR fix strongly correlated with the Federal Reserve Eurodollar Deposit Rate.  This makes sense.  The Federal Reserve Eurodollar Deposit Rate, like LIBOR, is

supposed to measure the rates at which big banks lend U.S. dollars to one another. The Federal Reserve obtains its data from Bloomberg and ICAP, a large Eurodollar broker-dealer in London, that surveys its client banks each morning.

71.     Since both USD LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the interbank lending cost of large banks, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally should be reflected similarly on both variables, and therefore should not affect the Spread.

72.     Between January 3, 2006 and August 7, 2007, the USD LIBOR/Federal Reserve Eurodollar Deposit Rate Spread (the "Spread") was generally flat or slightly positive. There were only 3 days in this period when the Spread was negative, and the magnitude of these negative observances were very small.

73.     However, beginning around August 7, 2007, the Spread turned meaningfully negative, and remained so for most of the following year. Between August 31, 2007 and September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days. The magnitude of the negative Spread averaged about -12 basis points. During this approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

74.     A big shock came just after Lehman Brothers filed for bankruptcy on September 15, 2008, leading to significantly increased concerns about the health of all global banks. These increased concerns were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate. On September 15, 2008, the Federal Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on September 16, 17 and 18, respectively. By September 30, 2008, the Federal Reserve Eurodollar Deposit Rate doubled to 6%.

75.     Absent manipulation, an equivalent rise would be expected in USD LIBOR rates. However, while USD LIBOR rates did increase, they did so at a significantly more muted pace, causing the negative Spread to double, then more than double again, over the next three days to -180 basis points.  The Spread reached its widest point on September 30, 2008, but remained negative until May 2010.

76.     Another suspicious indication that USD LIBOR was have been fixed during the Class Period is its observed deviation from the overnight-index swap ("OIS") rate. In his academic article analyzing USD LIBOR data for the period of the second half of 2007 and 2008, Justin Wong observed that between 2001 and July 2007, when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points." By July 2008, on the other hand, that gap approached 100 basis points, a figure significantly higher than the spread from a year prior, and by October 2008, "it peaked at 366 basis points." While the spread "receded somewhat in November 2008 to 209 basis points," that was still "far above the pre-crisis level."[16]   The wide discrepancy between OIS and USD LIBOR provides further support that Defendants suppressed USD LIBOR by falsely underreporting their borrowing costs.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all banks, savings & loan institutions, and credit unions headquartered in the United States, including its fifty (50) states and United States territories, that originated loans, purchased whole loans, or purchased interests in loans with

---

[16] Wong, "*LIBOR Left in Limbo; A Call for More Reform,*" *supra.*

interest rates tied to USD LIBOR, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were more than ten thousand (10,000) banks, savings & loan institutions and credit unions headquartered in the United States. Plaintiffs are informed and believe, consistent with standard banking practices, that most banks, savings & loan institutions and credit unions located within the United States offered or purchased loans with interest rates tied to USD LIBOR, and were therefore injured by Defendants' unlawful suppression of USD LIBOR rates. Potential class members can be readily ascertained from regulatory records, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

79.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct complained of herein.

80.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class litigation and knowledgeable about the financial services industry. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether each Defendant submitted false USD LIBOR quotes during the Class Period;

- whether Defendants intended to induce reliance upon any misrepresented quotes;

- whether it was foreseeable that misrepresentation of USD LIBOR quotes would reduce interest income, and therefore cause injury to, lenders that originated or purchased loans adjusted in reference to USD LIBOR rates; and

- the amount by which misrepresented USD LIBOR quotes artificially depressed the USD LIBOR fix during the Class Period.

82.    The common law of the State of New York can be applied to the claims of all Class members because there is no actual conflict between the common law tort of fraud under the law of the State of New York and the laws of other states and territories. Alternatively, the common law of the State of New York can be applied to the claims of all Class members because no state or territory has a greater interest in regulating the conduct alleged in this Complaint. Specifically, the State of New York has a greater aggregation of the defendant banks, both in terms of presence and headquarters, than any other state or territory, and the fraudulent LIBOR quotes that form the basis of this action are believed to have emanated for at least two of the Defendants, JPMorgan Chase and Citibank, within the State of New York.

83.    In the event that there is an actual conflict between the laws of the State of New York and other states or territories, and the laws of other states or territories are deemed to apply to the claims of certain Class members, such claims can be asserted by the following subclasses:

a)  "Alabama State Subclass":

All lending institutions either headquartered in Alabama, that originated loans, purchased whole purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Alabama, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

b)  "Alaska State Subclass":

All lending institutions either headquartered in Alaska that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Alaska, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

c)   "American Samoa Subclass":

All lending institutions either headquartered in American Samoa that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in American Samoa, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

d)   "Arizona State Subclass":

All lending institution either headquartered in Arizona that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Arizona, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

e) "Arkansas State Subclass":

All lending institutions either headquartered in Arkansas that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Arkansas, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

f) "California State Subclass":

All lending institutions headquartered in California that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in California, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

g)  "Colorado State Subclass":

All lending institutions either headquartered in Colorado that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Colorado, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

h)  "Connecticut State Subclass":

All lending institutions either headquartered in Connecticut that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Connecticut, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

i)    "Delaware State Subclass":

All lending institutions either headquartered in Delaware that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Delaware, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

j)    "District of Colombia Subclass":

All lending institutions either headquartered in the District of Columbia that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in the District of Columbia, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

k) "Florida State Subclass":

All lending institutions either headquartered in Florida that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Arizona, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

l) "Georgia State Subclass":

All lending institutions either headquartered in Georgia that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Georgia, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

m) "Guam Subclass":

All lending institutions either headquartered in Guam that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Guam, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

n) "Hawaii State Subclass":

All lending institutions either headquartered in Hawaii that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Hawaii, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

o)  "Idaho State Subclass":

All lending institutions either headquartered in Idaho that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Idaho, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

p)  "Illinois State Subclass":

All lending institutions either headquartered in Illinois that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Illinois, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

q)  "Indiana State Subclass":

All lending institutions either headquartered in Indiana that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Indiana, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

r)  "Iowa State Subclass":

All lending institutions either headquartered in Iowa that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Iowa, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

s) "Kansas State Subclass":

All lending institutions either headquartered in Kansas that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Kansas, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

t) "Kentucky State Subclass":

All lending institutions either headquartered in Kentucky that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Kentucky, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

u)  "Louisiana State Subclass":

All lending institutions either headquartered in Louisiana that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Louisiana, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

v)  "Maine State Subclass":

All lending institutions either headquartered in Maine that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Maine, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

w) "Maryland State Subclass":

All lending institutions either headquartered in Maryland that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Maryland, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

x) "Massachusetts State Subclass":

All lending institutions either headquartered in Massachusetts that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Massachusetts, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

y) "Michigan State Subclass":

All lending institutions either headquartered in Michigan that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Michigan, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

z) "Minnesota State Subclass":

All lending institutions either headquartered in Minnesota that originated loans, purchased whole loans, that purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Minnesota, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

aa) "Mississippi State Subclass":

All lending institutions either headquartered in Mississippi that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Mississippi, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

bb) "Missouri State Subclass":

All lending institutions either headquartered in Missouri that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Missouri, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

cc) "Montana State Subclass":

All lending institutions either headquartered in Montana that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Montana, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

dd) "Nebraska State Subclass":

All lending institutions either headquartered in Nebraska that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Nebraska, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ee) "Nevada State Subclass":

All lending institutions either headquartered in Nevada that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Nevada, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ff) "New Hampshire State Subclass"

All lending institutions either headquartered in New Hampshire that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in New Hampshire, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

43

gg) "New Jersey State Subclass":

All lending institutions either headquartered in New Jersey that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in New Jersey, rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

hh) "New Mexico State Subclass":

All lending institutions either headquartered in New Mexico that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in New Mexico, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ii) "New York State Subclass":

All lending institutions either headquartered in New York that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in New York, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

jj) "North Carolina State Subclass":

All lending institutions either headquartered in North Carolina that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in North Carolina, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

kk) "North Dakota State Subclass":

> All lending institutions either headquartered in North Dakota that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in North Dakota, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ll) "Northern Marianas Islands Subclass":

> All lending institutions either headquartered in the Northern Marianas Islands that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in the Northern Marianas Islands, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

mm) "Ohio State Subclass":

All lending institutions either headquartered in Ohio that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Ohio, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

nn) "Oklahoma State Subclass":

All lending institutions either headquartered in Oklahoma that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Oklahoma, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

oo) "Oregon State Subclass":

All lending institutions either headquartered in Oregon that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Oregon, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

pp) "Pennsylvania State Subclass":

All lending institutions either headquartered in Pennsylvania that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Pennsylvania, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

qq) "Puerto Rico Subclass":

All lending institutions either headquartered in Puerto Rico that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Puerto Rico, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

rr) "Rhode Island State Subclass":

All lending institutions either headquartered in Rhode Island that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Rhode Island, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ss) "South Carolina State Subclass"

All lending institutions either headquartered in South Carolina that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in South Carolina, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

tt) "South Dakota State Subclass":

All lending institutions either headquartered in South Dakota that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in South Dakota, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

uu) "Tennessee State Subclass":

All lending institutions either headquartered in Tennessee that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Tennessee, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

vv) "Texas State Subclass:

All lending institutions either headquartered in Texas that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Texas, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ww) "Utah State Subclass":

All lending institutions either headquartered in Utah that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Utah, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

xx) "Vermont State Subclass":

All lending institutions either headquartered in Vermont that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Vermont, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

yy) "Virginia State Subclass":

All lending institutions either headquartered in Virginia that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Virginia, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

zz) "Virgin Islands Subclass":

All lending institutions either headquartered in the U.S. Virgin Islands that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled the U.S. Virgin Islands, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

aaa) "Washington State Subclass":

>All lending institutions either headquartered in Washington that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled Washington, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

bbb) "West Virginia State Subclass":

>All lending institutions either headquartered in West Virginia that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in West Virginia, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive.  Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ccc) "Wisconsin State Subclass":

All lending institutions either headquartered in Wisconsin that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Wisconsin, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

ddd) "Wyoming State Subclass":

All lending institutions either headquartered in Wyoming that originated loans, purchased whole loans, or purchased interests in loans with interest rates tied to USD LIBOR, or headquartered in any other state or territory within the United States that owned or held interests in such loans issued to individuals or entities located and/or domiciled in Wyoming, which rates adjusted at any time between August 1, 2007 and May 31, 2010, both dates inclusive. Excluded from the Class are Defendants herein, and any businesses controlled or majority-owned by any Defendant or the officers and directors of any Defendant, the members of their immediate families and their legal representatives, heirs, successors or assigns.

84.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action, and any individual issues related to the nature of each Class member's loans can be ascertained in the normal course of a claims process.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

85.    Before UBS's March 15, 2011 announcement that it had been subpoenaed in connection with the U.S. government's investigation into possible USD LIBOR manipulation, Plaintiffs had not discovered, and could not with reasonable diligence have discovered, that Defendants were engaging in fraudulent misconduct that caused USD LIBOR to be artificially depressed during the Class Period.

86.    Moreover, though some market participants voiced concerns in early 2008 that USD LIBOR did not reflect banks' true borrowing costs, Defendants and the BBA downplayed those concerns through a campaign of media propaganda.

### A.  Defendants' Unlawful Activities Were Inherently Self-Concealing.

87.    Defendants' misconduct was, by its very nature, self-concealing. Defendants could not expect to suppress USD LIBOR or hide their own fragility if the general public knew that they were reporting artificially depressed USD LIBOR quotes.    Defendants' misrepresentations could only succeed by preventing the public from knowing what they were doing.

88.    In addition, the facts surrounding Defendants' operations were internal to them. Their actual borrowing costs were not publicly disclosed, rendering it impossible to discern without internal documents and sophisticated expert analysis the full extent of their fraud.

89.    Additionally, communications among employees of Defendants admitting fraudulent misrepresentation of USD LIBOR rates are only now starting to become available as the result of investigations by the United Kingdom's Financial Services Authority, the United States Department of Justice and Commodity Futures Trading Commission, the Canadian Competition Bureau, and corresponding regulatory bodies in Japan and Singapore.

90.    As a result, no person of ordinary intelligence would have discovered, or with reasonable diligence could have discovered before March 15, 2011, facts substantiating an actionable claim against Defendants.

**B.    The BBA and Defendants Effectively Negated Early 2008 Reports About LIBOR Inaccuracy.**

91.    In late 2007 and early 2008, sporadic concerns arose that the members of the LIBOR panel might be understating their true costs of borrowing, thus causing LIBOR to be set artificially low.

92.    In response to those concerns, the BBA conducted an inquiry regarding LIBOR.

93.    Notably, shortly after the BBA announced its investigation in April 2008, the LIBOR panel banks raised their reported rates, causing LIBOR to log its biggest increase since August 2007.  Defendants thus falsely and misleadingly signaled that any improper reporting of false rates that may have previously occurred had ended.

94.    Subsequently, the BBA falsely stated that LIBOR had not been manipulated, providing false assurance to Plaintiffs and the Class that the concerns expressed by some market participants were unfounded.

95.    Moreover, Defendants engaged in a media strategy that diffused the speculation that had arisen concerning LIBOR and further concealed their unlawful conduct. On April 21, 2008, for instance, Dominic Konstam of Credit Suisse affirmatively stated the low LIBOR rates were attributable to the fact that U.S. banks, such as Citibank and JPMorgan, did not need interbank loans. In an April 28, 2008 interview with the Financial Times, Konstam continued to defend LIBOR's reliability, dismissing concerns as "confusion."

96.    On May 16, 2008, in response to a media inquiry, JPMorgan misrepresented, "[t]he Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch." The same article quotes Colin Withers of Defendant Citibank assuring the public that LIBOR remained reliable and emphasizing "the measures we are using are historic -- up to 30 to 40 years old."[17]

97.    Even in the main journalistic investigation into LIBOR manipulation, the May 2008 *Wall St. Journal* article, Defendants made affirmative representations designed to further conceal their wrongdoing. For instance, Citibank affirmatively claimed innocence and stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the

---

[17] K. Donovan, J. McGeever, et al., "*European, U.S. bankers work on Libor problems,*" reuters.com, available at http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110 020080516.

market." HBOS similarly misrepresented that its LIBOR quotes constituted a "genuine and realistic" indication of borrowing costs.[18]

## CLAIM FOR RELIEF

## COUNT I: FRAUD

### (Against All Defendants)

98.     Plaintiffs re-allege each and every allegation contained above as if fully set forth herein.

99.     This Count is asserted against all Defendants under the common law tort of fraud. During the Class Period, Defendants each submitted materially false USD LIBOR quotes to the BBA, with the intent and understanding that those bids would become part of the USD LIBOR fix calculated by the BBA and widely disseminated to the financial services industry. Defendants' false USD LIBOR submissions succeeded in artificially depressing the reported USD LIBOR fix throughout the Class Period.

100.     Defendants each had actual knowledge of the falsity of their USD LIBOR quotes during the Class Period, because each knew that their USD LIBOR quotes were less than the actual rates at which they could borrow funds of a reasonable size in the interbank market, and were less than the rates at which Defendants actually borrowed funds in the interbank market. In the alternative, Defendants recklessly disregarded the falsity of their USD LIBOR quotes during the Class Period.

101.     Defendants intended to induce reliance upon their misrepresentations.  Indeed, the *only* reason that Defendants submitted USD LIBOR quotes to the BBA was for the inclusion of those quotes in the calculation of the BBA's daily USD LIBOR fix and dissemination of their

---

[18] C. Mollenkamp & M. Whitehouse, "*Study Casts Doubt on Key Rate,*" *supra.*

individual quotes and the aggregated fix to financial markets. As participants in the financial services industry, Defendants each had actual knowledge of the commonly-known uses of USD LIBOR, including its use to set interest rates in residential in commercial mortgages. Indeed most transacted regularly in loans tied to USD LIBOR.

102. Plaintiffs and the Class did in fact detrimentally rely upon Defendants' misrepresentations, by calculating interest due from borrowers based upon the fraudulently suppressed USD LIBOR rates and therefore collecting less interest than they would have received had Defendants submitted honest USD LIBOR quotes, and not caused USD LIBOR to be artificially suppressed. The reliance of Plaintiffs and the Class upon the integrity of Defendants' USD LIBOR quotes was both justifiable and reasonable, in that it was consistent with the norms of the financial services industry throughout the Class Period and encouraged by Defendants and the BBA.

103. Plaintiffs and the Class were injured as a result of Defendants' scheme because they were unable to collect the full measure of interest income to which they were entitled, and would have received but for Defendants' fraud.

104. The injuries sustained by Plaintiffs and the Class were proximately caused by Defendants' misconduct. They were the foreseeable and direct result of Defendants' submissions of false USD LIBOR quotes to the BBA. Because of the mechanical nature of the BBA's calculation, Defendants' false submissions necessarily had an impact on USD LIBOR fixes during the Class Period, and had to affect loans tied to USD LIBOR rates. Defendants had actual knowledge of this connection, due to their own transactions in USD LIBOR-tied loans and their analyses of credit markets and financial services firms, and would certainly have

understood that falsifying USD LIBOR quotes would impact adjustable rate loans issued by other lenders.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Class described herein;

B.    Certifying Plaintiffs as the Class representatives and certifying Plaintiffs' Counsel, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, as Class Counsel;

C.    Awarding compensatory damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiffs and the other members of the Class punitive damages of sufficient magnitude to discourage Defendant banks from future misconduct;

E.    Awarding prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs; and

F.    Awarding such other equitable, injunctive or other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated:  November 21, 2012

Respectfully Submitted,

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**

Marc I. Gross
Michael M. Buchman
Jeremy A. Lieberman
600 Third Avenue
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665
mgross@pomlaw.com
mbuchman@pomlaw.com
jalieberman@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS**

Patrick V. Dahlstrom
Joshua B. Silverman
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
lcludwig@pomlaw.com

***Counsel for Plaintiffs and the Class***

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2012, I electronically transmitted the attached document to the Clerk's Office via electronic mail (caseopenings@nysd.uscourts.gov) for filing and transmittal of a Notice of Electronic Filing to all counsel of record registered with the CM/ECF system.

Jeremy A. Lieberman