## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE LIBOR-BASED FINANCIAL ) | MDL No. 2262 |
| INSTRUMENTS ANTITRUST LITIGATION ) | Master Case 11-md-2262 (NRB) |
| ) | ECF Case |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| Case No. 12 CV 1025 (NRB) ) | |
| ) | |
| ) | |
| GELBOIM, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **ORAL ARGUMENT** |
| v. ) | **REQUESTED** |
| ) | |
| CREDIT SUISSE GROUP AG, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## BONDHOLDER PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND

Karen L. Morris (Bar No. 1939701)
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
    COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Tel: (302) 426-0400
Fax: (302) 426-0406

David H. Weinstein
Steven A. Asher
Robert S. Kitchenoff
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER
    LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 545-7200
Fax: (215) 545-6535

*Interim Co-Lead Counsel for Bondholder
Plaintiffs and the Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A. The Bondholder Plaintiffs ...................................................................................... 2

    B. The Defendants ........................................................................................................ 3

    C. LIBOR ..................................................................................................................... 3

        1. The Competitive Libor Setting Process ........................................................... 4

        2. Defendants' Agreement to Suppress LIBOR ................................................... 5

        3. Harm from Defendants' Agreement to Suppress LIBOR ................................. 7

            a. Injury to Plaintiffs and the Bondholder Class ........................................... 7

            b. Harm to Competition ................................................................................ 8

ARGUMENT ..................................................................................................................... 8

    A. The Motion for Leave to Amend Should Be Granted under the
        Applicable Standards ........................................................................................... 8

    B. The Proposed Amended Complaint Adequately Alleges Antitrust Injury ......... 10

        1. Defendants' Collusive Suppression of LIBOR Was Anticompetitive ........... 11

            a. Defendants' Collusive Suppression of LIBOR Harmed Competition by
               Fixing Prices Plaintiffs and the Bondholder Class Received ................ 11

            b. Why Defendants' Collusive Buyer Price Suppression Is
               Anticompetitive and Illegal ................................................................... 14

            c. Defendants Subverted the BBA Trade Association LIBOR Setting Process to
               Achieve an Anticompetitive Effect ....................................................... 15

            d. Defendants' Collusion Undermined the Competitive
               LIBOR Setting Process .......................................................................... 17

2.   Plaintiffs' Harm Flows from the Anticompetitive Nature of Defendants' Conduct ........ 19

a.   Sellers Who Receive Less Due to Collusion Buyer-Side Price Suppression
Suffer Antitrust Injury..............................................................................................19

b.   Misrepresentation Does Not Negate Antitrust Injury ...........................................20

c.   The PSAC Satisfies *Brunswick* ...........................................................................22

C.   Granting Leave to Amend Will Not Prejudice Defendants ...............................................23

CONCLUSION.............................................................................................................................25

## TABLE OF AUTHORITIES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .........................15, 16, 17

*Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921) ...............................................16

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ...................................15

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ........................... *passim*

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) ....................................................11

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)........................................17, 23

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007),
    *aff'g In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005)............9

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ..........................17, 19, 22, 23

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)............................................................11

*City of Long Beach v. Standard Oil*, 872 F.2d 1401 (9th Cir.1989)..............................................21

*Doe v. Ariz. Hosp. & Healthcare Ass'n*, 2009 WL 1423378 (D. Ariz., March 19, 2009).............20

*Foman v. Davis*, 371 U.S. 178 (1962) ...............................................................................8, 9, 24

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68 (2d Cir. 2013) .............10, 11

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) ..................................................................17

*In re Adelphia Communications Corp.*, 452 B.R. 484, 491 (Bankr. S.D.N.Y., 2011) .................24

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) ...............................................23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp.2d 27(D.D.C. 2008) .................12

*In re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 730 (E.D. Tenn. 2011) ...............19

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938 (2d Cir. 1987),
    *aff'd, Allied Tube,* 486 U.S. 492 (1988).........................................................................15, 16

*Int'l Outsourcing Services, LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860
    (N.D. Ill. 2006)...........................................................................................................20

*Kamakahi v. Am. Soc. for Repro. Med.*, No. C 11–01781 SBA, 2013 U.S. Dist. Lexis
    61250 (N.D. Cal., March 29, 2013) ....................................................................................19

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ............................ *passim*

*Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) ............................14, 19

*Nat'l Soc. of Prof'l Eng'rs v. U. S.*, 435 U.S. 679 (1978)15..........................................................15

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*,
    709 F.3d 109 (2d Cir. 2013).............................................................................................10

*Oliver Schools, Inc. v. Foley*, 930 F.2d 248 (2d Cir. 1991)............................................................9

*Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031 (N.D. Ill. 2007)....................20

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) ...................13

*Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 72 F.R.D. 556
    (S.D.N.Y. 1976).................................................................................................................24

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)...........................................24

*Telecor Communications, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124
    (10th Cir. 2002)...........................................................................................................14, 15

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).......................................11, 13, 20

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010)..........................14, 19

*Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011).....................................................9, 10, 24

*Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286
    (5th Cir. 1971)............................................................................................................17, 21, 22

## **TREATISES**

7 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2022a (3d ed. 2010).......................12

Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application (2nd and 3rd Ed., CCH Incorporated 1998-2010)
    Vol. 2A ¶ 391b2........................................................................................................14, 19

**INTRODUCTION**

The March 29, 2013 Memorandum and Order (MDL Doc. 286) ("March 29 Decision") stated:  "Although there might have been antitrust injury if defendants had restrained competition in the market for LIBOR-based financial instruments . . .  plaintiffs have not alleged that defendants' alleged fixing of LIBOR[1] caused any harm to competition between sellers of those instruments or between buyers of those instruments." *Id.* at 31-32.  But in the Bondholder case, the parties are not properly viewed as "sellers" and "buyers" of LIBOR-based financial instruments.  Instead, Plaintiffs are holders of floating rate LIBOR-Based Debt Securities ("bonds") who were harmed by receiving suppressed prices (interest) for the use of their funds. In their proposed Second Amended Complaint (the "PSAC"),[2] Plaintiffs add allegations showing that Defendants' collusive suppression of LIBOR harmed competition by replacing prices (interest) paid to bondholders that were set by the forces of competition with prices primarily set by Defendants' agreement to suppress LIBOR:

- Defendants were horizontal competitors in numerous markets, including as issuers of, and borrowers under, LIBOR-Based Debt Securities.

- Defendants, as the members of the BBA's LIBOR panel, had and exercised the power to control LIBOR by acting collusively.

- For LIBOR-Based Debt Securities, LIBOR was the primary determinant of prices (interest) issuers paid to holders for the use of their funds over the term of the bond.

- Daily LIBOR, which the BBA described as "a unique snapshot of competitive funding costs," was determined, and moved from day to day based upon, the forces of

---

[1] As in the PSAC, Plaintiffs use the term "Libor" to refer generally to Libor set for any currency, and the term "LIBOR" to denote U.S. Dollar LIBOR.

[2] Attached hereto as Exhibit A (clean) and Exhibit B (as a redline to the Gelboim First Amended Complaint).

1

competition in the London interbank loan market, even if one assumes that the LIBOR setting process itself was not a competitive process.

- In colluding to suppress LIBOR, Defendants harmed competition by causing prices paid to bondholders, which were formerly determined by the forces of competition, to be replaced by suppressed prices primarily determined by Defendants' collusion.

At this procedural stage, these allegations must be accepted as true.  As demonstrated below, these allegations satisfy the antitrust injury requirement *even if* a finder of fact were to conclude—as the March 29 Decision did—that the LIBOR setting process was not competitive.

But the PSAC also adds allegations explaining how, prior to Defendants' collusion, the LIBOR setting process *was in fact a competitive process,* and that  Defendants harmed competition by agreeing not to compete in that process.  These allegations, too, must be accepted as true, and further support the PSAC's pleading of antitrust injury.

Thus, filing the PSAC would not be futile.  Because Defendants would not suffer prejudice at this early stage before issue has been joined or discovery commenced, because Plaintiffs have not acted in bad faith and acted promptly following dismissal to initiate their motion for leave to amend, and consistent with Supreme Court and Second Circuit authority favoring at least one post-dismissal opportunity to cure pleading defects so that disputes may be resolved on their merits, Plaintiffs respectfully submit that leave to amend should be granted.

## STATEMENT OF FACTS

### A.     The Bondholder Plaintiffs

Plaintiffs (and the members of the Class) are holders of LIBOR-Based Debt Securities, which pay interest at a floating rate, reset at defined intervals (*e.g.,* quarterly) over the term of the bond, based on LIBOR for a defined tenor (*e.g.,* 1-month LIBOR, 3-month  LIBOR).  The

floating rate is defined as a spread above or below LIBOR (*e.g.,* in Plaintiff Gelboim's bond, 3-month LIBOR plus 0.10%). The spread remains fixed, while the LIBOR component changes over time. The LIBOR component (1) is typically a substantial portion of the interest rate at any time,[3] and, (2) accounts for all of the variation of the interest rate over the life of the bond.[4] LIBOR-Based Debt Securities are credit instruments under which the holder is a lender and the issuer is a borrower. The borrower pays a price—interest—for the use of the holder's funds. Because the interest rate changes based on changes in LIBOR, the total price paid by the issuer to the holder is known only after the final rate adjustment date. PSAC, ¶¶ 1, 183, 185-90.

## B.  The Defendants

Defendants were the members of the British Bankers Association ("BBA") LIBOR panel during the Class Period, and, as such, had the power to control LIBOR. They competed with each other, and other similar entities, across multiple markets, including competing as buyers of debt funding, *i.e.*, borrowers. As such, Defendants competed with each other (and other entities) with respect to, *inter alia*, interbank loans and LIBOR-Based Debt Security funding. During the Class Period, Defendants collectively were issuer/borrowers with respect to hundreds of billions of dollars of LIBOR-Based Debt Securities.[5] PSAC, ¶¶ 9-23, 30-32, 184, 192, 232.

## C.  LIBOR

The BBA published Libor daily for ten currencies and described it as "the world's most

---

[3] For example, with respect to Plaintiff Gelboim's bond, at issuance (October 19, 2005), 3-month LIBOR was 4.18063%, at the January 17, 2008 adjustment date 3-month LIBOR was 3.92625%, and at January 21, 2010, 3-month LIBOR was 0.2488%, so at these times, the LIBOR component accounted for 98%, 97.516%, and 71.3%, respectively, of the total interest rate on the bond. PSAC, ¶ 187.

[4] In the Bondholder case, the "price" that was suppressed and is at issue is not the price for which the LIBOR-Based Debt Security is bought or sold, but rather the price the issuer pays to the holder for the use of the borrowed funds over the life of the bond.

[5] During the Class Period, at least 11 of the 16 Defendants, including Bank of America, Citibank and JPMorgan (directly and through subsidiaries) were issuers/obligors, *i.e.*, buyers of funding, with respect to LIBOR-Based Debt Securities, with an aggregate individual maximum face amount of over one-quarter of a trillion dollars. PSAC, ¶ 32 n.5.

important number."  As the BBA put it, Libor was important because, *inter alia*, it "represent[ed] a unique snapshot of competitive funding costs."  Through operation of the BBA Libor panel rules, as discussed below, the Libor rates were set each day by a competitive process reflecting conditions in the London interbank loan market, including supply, demand, and the relative creditworthiness of the panel banks. The Libor indices were used in countless financial instruments, including LIBOR-Based Debt Securities.  PSAC, ¶¶ 33, 37, 40, 46.

The utility and acceptance of the Libor indices depended upon their ability to accurately capture and reflect competitive funding costs.   Only a Libor rate determined pursuant to a competitive process would provide an effective price discovery mechanism leading to efficient allocation of capital and risk. The use of an index reflecting competitively determined interest rates facilitated, among other things, the use of longer term floating rate debt contracts.  In the absence of such an index, floating rate debt contracts would require periodic competitive renegotiation of the interest rate.  Use of a standardized interest rate reset mechanism, based on a competitively determined index, enabled more efficient transaction structures, and thus a more efficient market for floating rate funding.  This market convention did not remove competition from the determination of prices (amounts of interest) paid to investors, but instead became the means by which such prices were determined by competitive forces.  PSAC, ¶¶ 39, 40.

### 1.    The Competitive Libor Setting Process

Three BBA Libor panel rules ensured that the Libor setting process was competitive and produced, as described by the BBA, "a unique snapshot of competitive funding costs."  The first key Libor panel rule defined the daily submissions, requiring the panel banks to answer the question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" Under this rule, each

panel bank was required to exercise its good faith judgment each day about the interest rate that it would be required to pay, based on its own expert knowledge of market conditions, including supply, demand, and its own competitive posture as a borrower. PSAC, ¶¶ 37, 41-42, 46-47.

The second Libor panel rule mandated that each panel bank's submission remain confidential until the BBA's publication of the daily LIBOR.  This rule ensured that each bank's submission would be independent of the others. PSAC, ¶ 43.

The third Libor panel rule mandated that upon the publication of each day's Libor, the individual rates submitted that day by each panel bank would be simultaneously published.  This third rule made the process transparent on an *ex post* basis, to the markets and the panel banks themselves.  Moreover, this third rule provided the incentive that, operating in conjunction with the first two rules, ensured that the Libor setting process was in fact a competitive process.  The daily disclosure of the panel bank submissions signaled each panel bank's relative creditworthiness and financial strength to the financial markets.  Lower funding costs signaled greater creditworthiness and financial strength.  The third rule created an incentive for each panel bank to submit the lowest funding cost estimate possible, consistent with market conditions, as required by the first Libor panel rule.  This goal for submissions mirrored the goal in actually entering into interbank borrowing—obtaining the lowest funding cost possible.  PSAC, ¶¶ 44-47.

### 2.    Defendants' Agreement to Suppress LIBOR

Extensive statistical evidence, [6] as well as documentary evidence revealed through

---

[6] In the PSAC, Plaintiffs offer detailed data analyses by the consulting expert, including a comparison of LIBOR and U.S. Federal Reserve Eurodollar Deposit rates prior to and during the Class Period (*see* PSAC, ¶¶ 51-73), and analyses of  the behavior of the Panel Banks during two suspect periods: (i) immediately following *The Wall Street Journal's* April 16, 2008 article questioning whether LIBOR rates were artificially suppressed (*id.* ¶¶ 82-88); and (ii) during the period of extreme market volatility following the Lehman Brothers' bankruptcy on September 16, 2008 (*id.* ¶¶ 69-73). These analyses strongly supported the conclusions that not only was LIBOR suppressed during this period, but also that the timing and pattern of suppression among all Panel Banks was highly consistent, even in the face of extreme market volatility (*id.* ¶¶ 67-73, figs. 4-19) and that the Panel Banks could only have maintained the degree and duration of suppression demonstrated through collusion (*id.* ¶¶ 73, 184).  In addition, based on

government investigations and other public sources,[7] show that during the Class Period, Defendants colluded to systematically suppress LIBOR.  To do so, Defendants collusively subverted the LIBOR setting process by submitting daily borrowing rate estimates lower than rates at which they honestly believed they could borrow, in violation of the first Libor panel rule described above.  PSAC, ¶ 154.

Each Defendant was aware that each other Defendant was breaking this Libor panel rule. But no Defendant, armed with this knowledge, insisted (1) to the BBA or regulatory authorities that the Libor panel rules be enforced or (2) that the other Defendants' unreasonably low submissions be the subject of regulatory action.  The failure to do so was not rational competitive behavior, because any Defendant that believed it was harmed by the others' unreasonably low submissions would have sought enforcement of the rule to protect its reputation for comparative creditworthiness.  PSAC, ¶¶ 155-56, 158.

Instead, each Defendant agreed to continue to participate in the agreed LIBOR setting process, albeit to do so with the agreement among them that the first Libor panel rule described

---

materials made public in connection with the regulatory settlements, Plaintiffs' expert performed probability analysis demonstrating a less than 1% probability chance that UBS would have been able to successfully comply with its management's directive to ensure UBS submissions were "in the middle of the pack" as successfully as they did over the ten month period of mid-June 2008 through mid-April 2009 absent collusion (*id.* ¶¶ 74-81).

[7] The PSAC details internal communications from Panel Banks that have been the subject to date of governmental regulatory settlements – Barclays, UBS and RBS, as well as documents from the Federal Reserve Bank of New York and the Bank of England, made public in connection with those settlements.  These internal documents and communications demonstrate, *inter alia*: (i) the long history of derivatives traders and LIBOR submitters working together, both within and among Panel Banks, to submit false LIBOR rates that were favorable to proprietary trading positions on any given day (*see* PSAC, ¶¶ 141-46); (ii) that Panel Banks actively exchanged information regarding LIBOR rates they intended to submit, and knew in advance what rates other Panel Banks intended to submit on a given day (*id.* ¶¶ 134-39); (iii) that Panel Banks changed or adjusted their own rates to be submitted in response to this information (*id.* ¶¶ 137-40); (iv) that Panel Banks knew in advance of the publication of LIBOR where LIBOR rates would set be on a given day (*id.* ¶ 136); (v) that the decision to submit suppressed LIBOR rates came from senior management at Panel Banks (*id.* ¶ 74); (vi) that it was widely recognized and understood among the Panel Banks – and even by the NY Fed and Bank of England – that the LIBOR rates being submitted by Panel Banks during the Class Period were false and suppressed (*id.* ¶¶ 129-33); and (vii) the role cash brokers played in relaying information about purportedly confidential LIBOR submissions among Panel Banks (*id.* ¶¶ 140-41, 146-49).  These allegations regarding these documents and communications, and the reasonable inferences Plaintiffs draw from them, further support that the Panel Banks colluded to suppress LIBOR rates during the Class Period.

above had been discarded or suspended in order to permit suppressed submissions. By doing so, Defendants agreed not to compete in the signaling of their relative creditworthiness and financial strength through the LIBOR setting process.  This agreement was in the collective interest of the Defendants because (1) suppression of LIBOR would benefit them as banks by reducing their costs of funding, and (2) by colluding to coordinate suppressed submissions, each Defendant could reduce the reputational costs of suppressed submissions by the others, by maintaining the suppression at a stable level.  PSAC, ¶¶ 157, 159-62.

Defendants, acting individually, could not have sustained suppressed submissions for the duration and to the extent pleaded by Plaintiffs.  First, the statistical evidence shows that Defendants could not have sustained the duration and extent of the suppression absent collusion. Second, absent agreement, the rational individual competitive self-interests of the Defendants would have caused one or more to blow the whistle and effectively shut down any sustained pattern of individually suppressed submissions.  Third, individual suppression would have been unsustainable because the reputational self-interests of individual Defendants would have caused an unstable race to the bottom, hurting all Defendants by undermining the credibility of the LIBOR setting process.  PSAC, ¶¶ 72, 158, 161-62.

3.     **Harm from Defendants' Agreement to Suppress LIBOR**

a.     **Injury to Plaintiffs and the Bondholder Class**

Plaintiffs and the Bondholder Class were injured as the result of Defendants' collusive suppression of LIBOR because they received a suppressed price for the use of their funds over the term of their LIBOR-Based Debt Securities.  This injury flowed directly from the harms to competition described immediately below.  PSAC, ¶¶ 182, 191, 193.

### b.    Harm to Competition

Defendants' collusive suppression of LIBOR harmed competition by (a) causing prices issuers paid to holders for the use of their funds during the term of the LIBOR-Based Debt Securities, which were formerly determined by the forces of competition (and primarily by the forces of competition as reflected in LIBOR), to be replaced by  prices primarily determined by Defendants' agreement to suppress LIBOR, and (b) subverting the competitive LIBOR setting process by agreeing not to compete therein.  PSAC, ¶¶ 157, 193.

Collusive buyer-side suppression of prices paid to suppliers, including suppliers of credit funding, is anticompetitive and therefore illegal under the antitrust laws because it creates an economic deadweight loss, inducing reduced supplier output in the form of savings and investment.  As a group, savers and investors respond to prices suppressed below competitive levels by decreasing the level of savings and investment, and individual savers and investors may select inefficient alternative investments or elect not to save or invest.  Reductions and inefficiencies in investment and savings will deprive enterprises of the competitively priced capital needed to produce the goods and services they sell to ultimate consumers, resulting in relative scarcity, higher prices and reduced product quality.  PSAC ¶¶ 194-96.

## ARGUMENT

### A.    The Motion for Leave to Amend Should Be Granted under the Applicable Standards.

The instant motion is the *first* request by Bondholder Plaintiffs for leave to amend *following* the Court's dismissal of their claims for failure to state a claim.  Both the Supreme Court and the Second Circuit favor leave to amend in circumstances like these.  In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Court held that denial of such leave was an abuse of discretion, listing (by contrast) "*repeated* failure to cure deficiencies *by amendments previously*

8

*allowed*" as possible grounds for denial of leave.  *Id.* (emphasis added)  "Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course."  *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir. 1991).  In *Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011), the Second Circuit held that "in denying [plaintiff's] postjudgment motion [to replead, the district court] applied a standard that overemphasized considerations of finality at the expense of the liberal amendment policy" of the Rules of Civil Procedure.  *Id.* at 210.  Relying on *Foman*, the court explained:

> The district court apparently believed that a motion for leave to replead is not timely unless made "in the first instance."  The court did not explain precisely what it meant by "in the first instance."  In the circumstances of this case, however, it can only have meant one of two things: that the plaintiff was under obligation to seek leave to replead either immediately upon answering the motion to dismiss the complaint (without yet knowing whether the court will grant the motion, or, if so, on what ground), or immediately upon receipt of the court's ruling granting the motion and prior to the entry of judgment thereupon. Regardless which of the two the court had in mind, *Foman* makes unmistakably clear there is no such rule.

*Id.* at 214.

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007), *aff'g In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005) does not support denying leave to amend here.  There the plaintiff had sought leave to file a *third* amended complaint after it had the benefit of a special, pre-amendment procedure under which (a) the defendants submitted letters outlining alleged defects in the consolidated complaint, (b) the plaintiff then filed a second amended complaint, and finally, (c) the parties litigated the motion to dismiss.  *See Eaton Vance,* 403 F. Supp. 2d at 318.  Moreover, "especially" important to the Second Circuit's affirming opinion, the proposed third amended complaint merely rehashed dismissed claims in a manner that was futile.  *See Bellikoff,* 481 F.3d at 118 (citing *Hayden v. County of Nassau*, 180 F.3d 42,

53-54 (2d Cir. 1999) for its futility holding).  Unlike in *Bellikoff*, here there was no special

process.  More significantly, Plaintiffs have had *no* opportunity to cure after notice of defects.

Plaintiffs have amended only once, shortly after the case commenced and well before Defendants

moved to dismiss for failure to state a claim.  After the motions to dismiss were filed, Plaintiffs

sought through the Court's pre-motion letter and conference practice to initiate a Rule 15 motion,

but the Court denied them the opportunity to file the motion.[8]  Moreover, here, as demonstrated

below, the proposed amendment is not futile.

A proposed amended complaint is judged by "the same standards as those governing the

adequacy of a filed pleading."  *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 185 (2d

Cir. 2012).  The Court must not act as a factfinder, deciding which of competing plausible

interpretations of events is the most plausible, *see id.* at 190, or based on its view that "that actual

proof of [the alleged] facts is improbable, and that recovery is very remote and unlikely."  *New

Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 125 (2d

Cir. 2013).  Instead, the Court must "accept as true the factual allegations of the complaint, and

construe all reasonable inferences that can be drawn from the complaint in the light most

favorable to the plaintiff."  *Anderson News,* 680 F.3d at 185.

## B.   The Proposed Amended Complaint Adequately Alleges Antitrust Injury.

A "three-step process" is employed to determine whether a plaintiff has sufficiently

alleged antitrust injury.  *Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76

---

[8] Although the addition of facts revealed by the Barclays settlement was the main focus of Plaintiffs' August 1, 2012 pre-motion letter, Plaintiffs respectfully submit that permitting reference to these facts in their opposition to the motion to dismiss was not an adequate substitute for a Rule 15(a) motion.  Even a Rule 15(a) motion at the time could not have addressed the concerns identified in the Court's ruling that plaintiffs harmed by receiving suppressed prices as the result of a horizontal price fixing conspiracy did not, by pleading those facts, adequately plead antitrust injury.  As Plaintiffs stated in their August 1, 2012 letter, "Plaintiffs cannot, of course, predict how the Court will rule on Defendants' motions seeking dismissal of the existing complaints in their entirety."  *See Williams*, 659 F.3d at 214 (suggesting that it may not always be appropriate to assume that plaintiffs can adequately address a district court's views concerning pleading deficiencies "without yet knowing whether the court will grant the motion [to dismiss], or, if so, on what ground").

(2d Cir. 2013).  First, plaintiff must identify "the practice complained of and the reasons such a practice is or might be anticompetitive."  *Id*.  Next, the Court identifies the "actual injury the plaintiff alleges."  *Id*.  Finally, the Court "compar[es] the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.'"  *Id*. (citations omitted).  Application of this analysis shows that Plaintiffs have adequately alleged antitrust injury, which is injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful."  *Id.*

> ### 1.     Defendants' Collusive Suppression of LIBOR Was Anticompetitive.

Plaintiffs allege horizontal price-fixing, which is a per se violation of the Sherman Act. *See Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 347 (1982); *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 218 (1940).  Moreover, the PSAC alleges that Defendants' collusion to suppress LIBOR actually harmed competition.

> ### a.     Defendants' Collusive Suppression of LIBOR Harmed
> ###        Competition by Fixing Prices Plaintiffs and the Bondholder
> ###        Class Received.

The PSAC alleges that Defendants were competitors with respect to borrowing under LIBOR-Based Debt Securities, and explains how LIBOR is the primary determinant of the prices issuers paid to holders of such securities. PSAC, ¶¶ 185-90.  It further alleges that Defendants had the power to act collusively to control LIBOR, and that they did so.  PSAC, ¶¶ 31, 184, 192. By colluding to suppress LIBOR, Defendants caused the prices received by holders of LIBOR-Based Debt Securities, which were formerly determined by competitive forces (and primarily by the forces of competition reflected in LIBOR), to be replaced by prices primarily determined by Defendants' collusion. PSAC, ¶¶ 193, 197.  These factual allegations are clearly plausible and must therefore be accepted as true at this stage.  *See Anderson News,* 680 F.3d at 185.

An agreement among horizontal competitors that has the effect of fixing a component of

price constitutes illegal price fixing under Section 1, regardless of the mechanism that produces this effect. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980); *Socony*, 310 U.S. at 223 ("the machinery employed . . . is immaterial").[9]  Case law supports the instant application of that legal tenet.  For example, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008), involved the manipulation of a cost index used as a component of rail freight prices.  The defendants replaced an indexed fuel cost price component that captured competitive fuel costs, *see id.,* at 30, with a collusively adopted, inflated uniform percentage surcharge that did not.  *See id.* at 36.[10]  Here, Defendants replaced the LIBOR component of prices issuers paid to bondholders ("a unique snapshot of competitive funding costs," PSAC, ¶¶ 37, 46) with a LIBOR component that was suppressed by Defendants' agreement and was therefore no longer reflective of competition.  Defendants thereby suppressed the prices Plaintiffs received for the use of their funds.  These facts are the same as those in *Rail Freight* in all legally material respects.[11]

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) held that the plaintiffs stated a claim for price fixing where they alleged that milk buyers collusively suppressed milk prices by rigging the key input, NCE bulk cheese prices, for the California

---

[9] *See generally* 7 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2022a (3d ed. 2010) ("The per se rule generally governs not only explicit price fixing but also agreements to fix a 'price element'. . . ."). This is precisely the basis of the United States' criminal price fixing charges against former employees at UBS and referred to in the deferred prosecution agreement with RBS.  To the extent that the March 29 Decision's antitrust injury ruling was dependent on the determination that the LIBOR setting process is not competitive and therefore not legally susceptible of harm to competition, that reasoning would necessarily conflict with the government's charges and defeat the prosecutions.

[10] The district court also held that rail freight service purchasers who paid supra-competitive prices as the result of the defendants' conspiracy had adequately alleged "precisely the sort of injury that the antitrust laws are intended to protect against."  *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 593 F.Supp.2d 29, 42 (D.D.C. 2008).

[11] *Rail Freight* is not distinguishable.  By alleging that, prior to Defendants' collusion, the LIBOR setting process was competitive and yielded "a unique snapshot of competitive funding costs" (PSAC ¶¶ 37, 46), the PSAC alleges that Defendants fixed "an otherwise competitively determined price."  *See* March 29 Decision at 47.

minimum milk price formula. *Id.* at 984-87. The court explained, in holding that plaintiffs had pleaded antitrust injury, that such collusive suppression of milk prices was anticompetitive:

> When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured in fact. The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels-namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices.

*Id.* at 988 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 375b at 297 (rev. ed.1995)). Here, Plaintiffs allege that Defendants suppressed prices issuers paid to bond holders by collusively rigging LIBOR, the primary determinant of those prices. In terms of harm to competition, Plaintiffs' claims are the same as those upheld in *Knevelbaard.*[12]

    *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) also supports the PSAC's allegations of an anticompetitive restraint of trade. The court held that the setting of list prices by horizontal competitors (auto dealers) constituted illegal price fixing, explaining that the "fixed uniform list price . . . agreed upon between competitors . . . had to do with, and had its effect upon, price" and the "fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant." *Id.* at 132; *see also Socony*, 310 U.S. at 220 (fact that illegally stabilized prices "were still governed by some competition is of no consequence"). The PSAC alleges that LIBOR acts as a benchmark and starting point for determination of the interest rate on LIBOR-Based Debt Securities, and that the suppression of this benchmark had its effect on the bonds' interest rate. PSAC, ¶¶ 190, 193, 197. This effect harms competition; the continuation of some competition

---

[12] The March 29 Decision distinguished *Knevelbaard* on the grounds that the cheese auction manipulated by defendants was a competitive process in which they "failed to compete." March 29 Decision at p. 47. Even assuming Plaintiffs are wrong in their respectful disagreement with the Court's interpretation of *Knevelbaard*, *see infra*, for purposes of evaluating the PSAC, the distinction is not apt because the PSAC alleges that the LIBOR setting process was competitive, and Defendants' collusive suppression of LIBOR involved an agreement not to compete in that process. PSAC, ¶¶ 41-47, 153-62.

"is of no consequence." *Socony*, 310 U.S. at 220; *Plymouth Dealers*, 279 F.2d at 132.

The Bondholder Plaintiffs' claims are stronger than those in *Plymouth Dealers*. Here, LIBOR was far more than a mere starting point in pricing. The March 29 Decision appears to assume that prices in the Bondholder case are set at the time the bond is issued, just as the sale price of an automobile or of a "LIBOR-based financial instrument," is set at the time of sale. That is not so. The PSAC alleges that the price issuers paid to bondholders for the use of their money is the interest paid over the term of the bond. Because the interest rate floats, that price is not known until the last rate adjustment. PSAC, ¶ 186. Over the life of the bond, the forces of competition play out, and are the primary determinant of the price for the use of the bond principal. Defendants' collusion eliminated that competition and suppressed to below competitive levels the prices Plaintiffs and the Class received.

### b.   Why Defendants' Collusive Buyer Price Suppression Is Anticompetitive and Illegal.

Horizontal price suppression schemes have long been condemned as Section 1 violations. *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948). The "anticompetitive consequence of [collusive price suppression] is the reduction of price below the competitive level, which creates a deadweight welfare loss that mirrors the welfare loss from a sellers' cartel." Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (2nd and 3rd Ed., CCH Inc. 1998-2010) Vol. 2A ¶ 391b2 (hereinafter, "Areeda & Hovenkamp, Antitrust Law").

> [T]here is a dead-weight loss associated with imposition of monopsony pricing restraints. Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products. … So, even proceeding from the premise that antitrust laws aim only at protecting consumers, monopsonies fall under antitrust purview because monopsonistic practices will eventually adversely affect

consumers.

*Telecor Communications, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1136 (10th Cir. 2002) (citations omitted); *see also Knevelbaard,* 232 F.3d at 988; *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104-105 (3d Cir. 2010) (same).

The economic effects of buyer price suppression in the market for funding are the same. The producers/sellers in this market are investors or savers, who sell the use of their funds for a price, which is the interest they receive; "output" is the flow of funds from investors/savers into the financial market for funding.  The Bondholder Plaintiffs and the Class are thus investors or savers who received a price for the use of their funds that was primarily determined by the competition reflected in movement of the LIBOR index over their bonds' term.  Because this price is suppressed below a competitive level by Defendants' collusion, some investors/savers will invest/save less, choose inefficient substitute investments, or even choose not to invest/save at all (PSAC, ¶¶ 194-96), just as "[s]ome producers will either produce less or cease production altogether," *Telecor Communications,* 305 F.3d at 1136.  It is easy to visualize the eventual harm threatened to consumers.  Reductions or inefficiencies in investment and savings deprive enterprises of competitively priced capital, resulting in relative scarcity, higher prices and reduced product quality.  *See id.*

   c.  **Defendants Subverted the BBA Trade Association**
       **LIBOR Setting Process to Achieve an Anticompetitive Effect.**

Like *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), this case involves the setting of a standard by a trade association. Here the "standard setting" is of a special kind—the setting of an index controlling price, which is the "central nervous system of the economy."  *Nat'l Soc. of Prof'l Eng'rs v. U. S.*, 435 U.S. 679, 692 (1978).  Courts have long recognized that standard setting by private trade associations "can be rife with opportunities for

anti-competitive activity." *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571

(1982); *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 943 (2d Cir. 1987),

*aff'd*, *Allied Tube,* 486 U.S. 492 (1988).  As the Supreme Court stated:

> [P]rivate standard-setting by associations comprising firms with horizontal and
> vertical business relations is permitted at all under the antitrust laws only on the
> understanding that it will be conducted in a nonpartisan manner offering
> procompetitive benefits. . . . [T]he hope of procompetitive benefits depends upon
> the existence of safeguards sufficient to prevent the standard-setting process from
> being biased by members with economic interests in restraining competition.

*Allied Tube,* 486 U.S. at 506-09.

 As alleged in the PSAC, three key BBA Libor panel rules provided safeguards that

ensured that Libor provided "a unique snapshot of competitive funding costs," PSAC, ¶¶ 37, 41-

47, and thereby offered benefits in terms of efficiencies in the financial markets. PSAC, ¶¶ 38-

40.  When the Defendants agreed to continue setting LIBOR while abandoning compliance with

these safeguards, whatever pro-competitive benefits the establishment and maintenance of

LIBOR might arguably have had were lost.  The Second Circuit's decision in *Indian Head*

establishes that the collusive subversion of trade association standard setting processes to achieve

an anticompetitive effect constitutes a restraint of trade.  *See Indian Head,* 817 F.2d at 946-47.[13]

The March 29 Decision states that *Allied Tube* is distinguishable, because "here plaintiffs

have not alleged that defendants' suppression of LIBOR gave them an advantage over their

competitors."  March 29 Decision at 44.  This is a false distinction.  *Allied Tube* was brought by

a competitor, so harm to that competitor was necessary to its recovery.  *Allied Tube* does not

hold that such harm is necessary in a case brought by a buyer or seller alleging horizontal price

---

[13] Because the trade association standard setting process in *Indian Head* was a non-competitive, collaborative
process, it would support liability to Plaintiffs here even if, contrary to the allegations of the PSAC, *see* discussion
*infra*, the finder of fact were to determine that the LIBOR setting process was not competitive, but instead was a
collaborative trade association standard setting process that produced, in the absence of Defendants' collusive
suppression, LIBOR rates reflective of competition in the interbank loan funding market.

fixing.  Trade association activity effectively fixing prices may violate Section 1 even when the only advantage gained by Defendants is the reduction of competition amongst themselves.  *See Am. Column & Lumber Co. v. U. S.*, 257 U.S. 377, 410 (1921) (restraint inherent in cooperation among association members, who were otherwise "natural competitors"); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 782 (1975) (consumer action challenging bar association minimum fee schedule).  A requirement of harm *to competitors* does not square with the Supreme Court's oft-repeated admonition that the antitrust laws were enacted for "the protection of competition, *not competitors*." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis added); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990).[14]

### d.  Defendants' Collusion Undermined the Competitive LIBOR Setting Process.

The arguments presented above demonstrate that the PSAC pleads harm to competition even if one were to assume that the LIBOR setting process was not a competitive process.  But that assumption would be inappropriate under the standards applicable to the present motion, because the PSAC alleges how, prior to Defendants' collusion, three key BBA Libor panel rules made the daily LIBOR setting process a competitive process.  PSAC, ¶¶ 41-47.  The PSAC further alleges that Defendants agreed not to compete in the daily LIBOR setting process.  PSAC, ¶¶ 157-62.  Defendants' conduct thus harmed competition by eliminating or reducing competition in the LIBOR setting process.  These factual allegations satisfy the standard of plausibility and must be accepted as true.  *See Anderson News,* 680 F.3d at 185.

---

[14] At page 45 of the March 29 Decision, the Court states that *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286 (5th Cir. 1971) is distinguishable because it "involved a harm to competition beyond what is present here," namely, that collusive misrepresentation to suppress a state determined gas field output restriction disproportionately harmed the competitor-plaintiff.  Plaintiffs respectfully submit that this distinction is misconceived for the same reasons as the March 29 Decision's treatment of *Allied Tube.  See* discussion *infra* of *Woods Exploration.*

The March 29 Decision bases much of its reasoning on the factual finding that "the process of setting LIBOR was never intended to be competitive." *Id.* at 31. The Decision stated further that "plaintiffs rightly acknowledged [this] at oral argument," citing Tr. 12 and 18. Plaintiffs respectfully submit that no plaintiff acknowledged that the LIBOR setting process "was never intended to be competitive." The closest statement to such an assertion appears at Tr. 12, but that was a factual argument made by Mr. Wise on behalf of Defendants, understandably characterizing the facts in the light most favorable to them, contrary to the standards applicable to a Rule 12(b)(6) motion. *See Anderson News*, 680 F.3d at 185. At Tr. 18, the Court elicited from Mr. Carmody agreement with the Court's statement that Defendants are "not competitors" "when they're submitting the bids or the prices," but Mr. Carmody immediately amended his agreement by stating that "[t]hey were competing at the time they submitted the pricing information . . . in the sense that they're always competing in the financial products market." Tr. 19. *See also* Tr. 29 (same).

At Tr. 118, Mr. Carmody modified and elaborated on his previous comments by stating "if you take a look at the definition of LIBOR, what that's geared to do is elicit submissions from each and every defendant based upon their own creditworthiness." This statement is key, and is consistent with the PSAC's allegations that the BBA Libor panel rules ensured that the panel banks would act independently and competitively in making their daily LIBOR submissions because of the motivation of each of them to signal the best possible relative creditworthiness. PSAC, ¶¶ 43-46. The financial markets' perception of the relative creditworthiness of each individual bank was of tremendous importance to its competitive standing among all banks. PSAC, ¶¶ 45-46, 158.[15] Nothing in the previous complaints, and nothing said at oral argument,

---

[15] Given Mr. Carmody's last clarification, his earlier statement, read in the light most favorable to Plaintiffs, *see Anderson News*, 680 F.3d at 185, should be taken to mean only that the LIBOR setting process is cooperative in the

can fairly be taken to foreclose the PSAC's allegations regarding the LIBOR setting process and the rules governing it. Those allegations are consistent with Messrs. Carmody's and Lovell's statements taken as a whole.

### 2. Plaintiffs' Harm Flows from the Anticompetitive Nature of Defendants' Conduct.

Plaintiffs' antitrust injury (a) flows directly from the anticompetitive nature of Defendants' conduct, (b) is not negated by the Defendants' method—collusive misrepresentation—of achieving the suppression, and (c) is not negated by the counterfactual hypothetical assumption that Plaintiffs could have suffered the same type of injury even if Defendants had not colluded.

### a. Sellers Who Receive Less Due to Collusive Buyer-Side Price Suppression Suffer Antitrust Injury.

"When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs." *Knevelbaard*, 232 F.3d at 988. Leading commentators recognize horizontal price fixing claims by injured buyers or sellers as the clearest case of antitrust injury. *See* Areeda & Hovenkamp, Antitrust Law ¶ 391b ("There are instances in which identifying the anticompetitive aspect of a business practice and the corresponding injuries is easy. A prime example is a horizontal price-fixing agreement."). Courts have long recognized that sellers injured by horizontal buyer-side price suppression have a claim for treble damages, *see Mandeville Island Farms*, 334 U.S. at 235-36, and price suppression cases decided after *Brunswick* hold that injured

---

sense that the standard setting process of a trade association is an agreed process directed to the standard setting task. Moreover, at Tr. 24, Mr. Lovell stated that "there's supposed to be a competitive process by which each defendant's borrowing rates are determined on supply and demand. *That competitive process* is a proxy for the exchange plaintiffs and I believe for the other plaintiffs as well. . . ." (emphasis added); see also Tr. 25 (Mr. Lovell refers to "the competitive process in LIBOR"). Mr. Lovell's statement indicates that Plaintiffs made no concession that the LIBOR setting process was not intended to be competitive.

sellers such as Plaintiffs satisfy the antitrust injury requirement.  *See e.g.*, *Knevelbaard*, 232 F.3d at 988; *W. Penn Allegheny Health Sys.*, 627 F.3d at 105; *Kamakahi v. Am. Soc. for Repro. Med.*, No. C 11–01781 SBA, 2013 U.S. Dist. Lexis 61250 at * 19 n.3 (N.D. Cal., March 29, 2013); *In re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 730-31 (E.D. Tenn. 2011); *Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, 2009 WL 1423378 at *3-4 (D. Ariz., March 19, 2009); *Int'l Outsourcing Services, LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 864-65 (N.D. Ill. 2006).

### b.    Misrepresentation Does Not Negate Antitrust Injury.

The March 29 Decision concluded that *even if* the Plaintiffs *were harmed as a result of price fixing*, that harm cannot be antitrust injury because it flowed from misrepresentations made by Defendants.  *See* March 29 Decision at 31.[16]  This conclusion was not based on any precedent, and overlooked precedent to the contrary.  As the Supreme Court has stated, "the machinery employed by a combination for price-fixing is immaterial."  *Socony*, 310 U.S. at 223.

*Knevelbaard* considered the issue and concluded that antitrust injury would be found in a case of price fixing by collusive misrepresentation.  The Ninth Circuit found antitrust injury to plaintiff milk sellers where milk buyers collusively suppressed milk prices by rigging the key input, NCE bulk cheese prices, for the California minimum milk price formula.  The defendant buyers allegedly did so through rigged bidding to suppress prices in the NCE cheese auction.  But their method for introducing a false, suppressed component into the milk pricing formula did not matter: "The result for purposes of antitrust injury analysis *should be no different than if the cheese makers had conspired to report a fictitious NCE price* in order to depress the milk price,

---

[16] To the extent this conclusion was based on the Court's finding that "the process of setting LIBOR was never intended to be competitive," it would not apply to the claims set forth in the PSAC, which alleges that the LIBOR setting process was a competitive process that produced a benchmark that was "a unique snapshot of competitive funding costs."  PSAC, ¶¶ 37, 46.

which clearly would cause direct injury to the milk producers." *Knevelbaard,* 232 F.3d at 990 (emphasis added).[17]

In support of this conclusion, the Ninth Circuit cited, *City of Long Beach v. Standard Oil,* 872 F.2d 1401, 1408 (9th Cir.1989) and *Woods Exploration,* 438 F.2d at 1296.  In *City of Long Beach*, the plaintiff had entered into a long term contract for sale of oil to defendant oil refiners, under which the price was "based substantially upon the arithmetical average of prices 'posted' during the month by major purchasers."  872 F.2d at 1403.  The plaintiff alleged that the refiners conspired to maintain noncompetitive prices for oil produced from plaintiff's field by submitting postings below competitive prices, while (through another avenue) trading oil at market prices. *See id.* at 1405.  The district court had granted summary judgment to the refiners, holding, in part, that the plaintiff had failed to offer adequate evidence of conspiracy, but the Ninth Circuit reversed.  *Knevelbaard* read *City of Long Beach* as a case in which allegations of price suppression through collusive misrepresentation (posted prices not truly reflective of market prices at which each posting defendant was willing to buy) by horizontal competitors presented a viable case of antitrust injury to the seller plaintiff.  *Knevelbaard,* 232 F.3d at 990.[18]

In *Woods Exploration,* the Texas Railroad Commission regulated natural gas field output by setting monthly production allowances for producers, relying on producer sales forecasts to set the overall field production level.  The plaintiffs charged that the defendants filed false sales forecasts in order to reduce the gas field production allowances for the plaintiffs.  *See* 438 F.2d at 1292.  The district court granted partial summary judgment to the defendants, but the Fifth

---

[17] Plaintiffs respectfully submit that the March 29 Decision overlooked this passage when it distinguished *Knevelbaard* on grounds that the defendants had failed to compete in the cheese market.  March 29 Decision at 47. Because the Ninth Circuit found that collusive misrepresentation to report a fictitious cheese price would support antitrust injury, the defendants' failure to compete in the cheese market was not important to the court's analysis.

[18] The parallels between *City of Long Beach* and the Bondholder case are striking, because here, too, Defendants colluded to suppress individual hypothetical price submissions to manipulate an index-based pricing formula, while continuing to trade at competitive prices outside the index setting process.

Circuit reversed, stating that, because the commission's actions were based on the defendants' collusive submission of false information, liability existed.  *Id.* at 1295-98.  The court noted that "[w]hile state remedies may exist to correct this conduct, such activities also may state a cause of action under the federal antitrust laws."  *Id.* at 1296.

Thus, irrespective of the means Defendants employed—here, misrepresentation—their price-fixing conduct is actionable, and Plaintiffs have suffered antitrust injury.

### c.   The PSAC Satisfies *Brunswick*.

The March 29 Decision, citing *Brunswick*, reasoned that because Plaintiffs would have received suppressed prices even if Defendants' misrepresentations had been individual instead of collusive, Plaintiffs' injuries cannot be antitrust injuries.  *See* March 29 Decision at 34-38.  This reasoning is inapplicable here because it is dependent on the factual assumptions that "the LIBOR submission process is not competitive," March 29 Decision at 37, and "it would have been sustainable for each defendant individually to submit an artificial LIBOR quote."  *Id.*

The PSAC directly contradicts these assumptions.  It alleges that:

- The LIBOR submission process was competitive because three key BBA Libor panel rules ensured that LIBOR submissions were made independently and competitively. PSAC, ¶¶ 41-47.

- It would not have been sustainable for each defendant individually to submit an artificial LIBOR quote for the duration and to the degree that they all did; only through agreement and coordination could such duration and degree of suppression have been achieved. PSAC, ¶ 73.

- It would not have been sustainable, absent agreement by Defendants, for each of them individually to submit artificial LIBOR quotes, because the economic self-interests of panel banks would have motivated them to insist on compliance with the panel rules, through persistent and effective complaints to the BBA or regulatory authorities, to maintain their relative competitive advantage in signaling creditworthiness through the LIBOR submission process.  For example, a panel bank with relatively high creditworthiness would have been strongly motivated to blow the whistle and shut down the suppression.  None ever did.  PSAC, ¶¶ 155-58.

- The Defendants were motivated to agree to continue the LIBOR setting process with the rules suspended in order to permit suppressed submissions because of (a) their collective interest in reducing their funding costs by suppressing LIBOR, and (b) their interest in reducing the reputational costs of individual suppression by establishing and maintaining a stable, credible level of panel-wide suppressed submissions, which could not be achieved absent agreement and coordination.  PSAC, ¶¶ 160-62.

These factual allegations satisfy the standard of plausibility and must be accepted as true.  *See*

*Anderson News,* 680 F.3d at 185.

Additionally, Plaintiffs respectfully submit that the March 29 Decision misapplied

*Brunswick*.  The Supreme Court's observation that the competitor plaintiff would have suffered

the same harm if its competitor had been saved by refinancing was an illustration, not a test for

antitrust injury.  *See Brunswick*, 429 U.S. at 487.   The logic of such a test breaks down in cases

where buyers or sellers allege harm from horizontal price fixing.  The Sixth Circuit so held in *In

re Cardizem CD Antitrust Litig*., 332 F.3d 896 (6th Cir. 2003), observing:

> [T]he defendants' position, if adopted, risks undermining a basic premise of antitrust law that, as the district court observed, in many instances, an otherwise legal action—e.g., setting a price—becomes illegal if it is pursuant to an agreement with a competitor.  Under the defendants' view, such an action would never cause antitrust injury because a defendant could have unilaterally and legally set the same price.

*Id*. at 915 n.19.  The core holding of *Brunswick* is that a private antitrust plaintiff cannot obtain

redress for injury arising from a competition-preserving effect of an antitrust violation.  *See

Brunswick*, 429 U.S. at 488; *Atlantic Richfield*, 495 U.S. at 343-44.[19]  This holding does not

apply to the PSAC, which alleges injury arising from harm to competition.

## C.    Granting Leave to Amend Will Not Prejudice Defendants.

Even if Plaintiffs could be accused of delay—which Plaintiffs respectfully submit they

---

[19] Contrary to the March 29 Decision's suggestion, the *Atlantic Richfield* Court did not apply the hypothetical test—it merely observed that non-predatory price reduction does not harm a competitor plaintiff because it is the "essence of competition."  *Atlantic Richfield,* 495 U.S. at 338
.

cannot[20]—"mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).  Here, Plaintiffs have promptly sought a single post-dismissal opportunity to replead, and the litigation is at an early stage, with no answer filed and discovery not even commenced.  The only disadvantage to Defendants threatened here is that pleading deficiencies found in the March 29 Decision would be cured, and the litigation would continue. That type of harm does not constitute prejudice under rule 15(a).  *See Williams*, 659 F.3d at 210, 214; *see also Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 72 F.R.D. 556, 561 (S.D.N.Y. 1976) ("A party may hardly resist an amendment curing a defectively stated claim on the ground that it will expose him to a possible liability"); *In re Adelphia Communications Corp.*, 452 B.R. 484, 491 (Bankr. S.D.N.Y., 2011).

Given the absence of prejudice, bad faith, or undue delay, the scope of the alleged wrongdoing, the importance of the LIBOR cases, and the potential importance of the March 29 Decision's ruling that sellers who were harmed by receiving suppressed prices as the result of a horizontal price fixing conspiracy nevertheless have no claim because they cannot establish antitrust injury, this case should not be terminated with no opportunity to replead.  *See Foman*, 371 U.S. at 181-82 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits"); *Williams*, 659 F.3d at 212-13 (citing strong preference for resolving disputes on their merits).

---

[20] As noted above, prior to submission of their opposition to Defendants' motion to dismiss, Plaintiffs attempted to initiate a Rule 15 motion for leave to amend, but were denied the opportunity to file the motion at that time. Plaintiffs acted promptly to seek leave to replead in response to the March 29 Decision, initiating the Court's pre-motion letter and conference practice within the time contemplated by the Local Rules for a motion for reconsideration, and before entry of judgment under Rule 58.

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully submit that the Court should grant the Bondholder Plaintiffs' motion for leave to amend.

Dated: May 17, 2013

/s/ David H. Weinstein
Karen L. Morris (Bar No. 1939701)
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
   COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE  19807
Tele: (302) 426-0400
Fax:  (302) 426-0406


David H. Weinstein
Steven A. Asher
Robert S. Kitchenoff
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Tele: (215) 545-7200
Fax:  (215) 545-6535

*Interim Co-Lead Counsel for Bondholder
Plaintiffs and the Class*