**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFFS' ACTION | ECF Case |
| | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**THE EXCHANGE-BASED PLAINTIFFS' MOTION FOR LEAVE**
**TO AMEND AS TO COMMODITY EXCHANGE ACT CLAIMS AND**
**FILE THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

      1.    The Barclays Settlements ............................................................................ 4

      2.    The UBS Settlements .................................................................................. 6

      3.    The RBS Settlements ................................................................................. 6

LEGAL STANDARD ................................................................................................................ 7

ARGUMENT ............................................................................................................................. 8

I.     PLAINTIFFS' CEA CLAIMS ARISING FROM EURODOLLAR
     CONTRACTS PURCHASED BEFORE APRIL 15, 2009 ARE TIME-BARRED ............ 8

     A.    Claims Involving Eurodollar Contracts Purchased Between
           August 1, 2007 and May 29, 2008 Are Time-Barred ........................................... 10

     B.    Claims Involving Eurodollar Contracts Purchased Between
           May 30, 2008 and April 14, 2009 Are Time-Barred .............................................. 12

          1.    Purchasers of Eurodollar Contracts During Period 2 Were
              on Inquiry Notice at the Time of Purchase ................................................. 13

          2.    Plaintiffs Were Not Relieved of Their Duty of Inquiry
              After May 29, 2008 ...................................................................................... 16

     C.    Plaintiffs' Claims Involving Eurodollar Contracts Purchased
           Between January 1, 2005 and July 31, 2007 Are Time-Barred ............................. 18

     D.    Plaintiffs Fail to Adequately Allege Fraudulent Concealment ............................. 19

II.    PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINT FAILS
     TO STATE A CLAIM BASED ON THE ALLEGED TRADER CONDUCT .................. 20

     A.    Plaintiffs Fail to Plead That Each Defendant Engaged in Trader Conduct ......... 20

     B.    Plaintiffs Fail to Plausibly Allege Specific Intent ................................................ 22

     C.    Plaintiffs Fail to Plead Loss Causation ................................................................ 24

CONCLUSION ........................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................................7-8

*Benfield v. Mocatta Metals Corp.,*
    26 F.3d 19 (2d Cir. 1994) ............................................................................................8

*Bingham v. Zolt,*
    683 F. Supp. 965 (S.D.N.Y. 1988)..............................................................................19

*Burch v. Pioneer Credit Recovery, Inc.,*
    551 F.3d 122 (2d Cir. 2009).........................................................................................7

*Butala v. Agashiwala,*
    916 F. Supp. 314 (S.D.N.Y. 1996).........................................................................19-20

*Coal. for a Level Playing Field, L.L.C. v. Autozone, Inc.,*
    813 F. Supp. 2d 557 (S.D.N.Y. 2011).........................................................................7

*DiPlacido v. CFTC,*
    364 F. App'x 657 (2d Cir. 2009) .................................................................................8

*Domenikos v. Roth,*
    288 Fed. App'x 718 (2d Cir. 2008)............................................................................19

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)....................................................................................................25

*GEM Global Yield Fund Ltd. v. Surgilight, Inc.,*
    No. 04-4451, 2006 WL 2389345 (S.D.N.Y. Aug. 17, 2006)....................................15

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,*
    580 F. Supp. 2d 321 (S.D.N.Y. 2008)......................................................................12

*Hall Special Situations Inv. Fund v. Basix Corp.,*
    No. 91-1202, 1994 WL 132235 (S.D.N.Y. Apr. 14, 1994) ......................................13

*Hershey v. Energy Transfer Partners L.P.,*
    610 F.3d 239 (5th Cir. 2010) ....................................................................................22

*Hopkinson v. Estate of Siegal,*
    No. 10-1743, 2011 WL 1458633 (S.D.N.Y. Apr. 11, 2011) ....................................17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)................................................................20

*In re Commodity Exchange, Inc. Silver Futures & Options Trading Litig.*,
    No. 11-02213, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013)................................22

*In re Crude Oil Comm. Litig.*,
    No. 06-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ................................20

*In re Energy Transfer Partners Natural Gas Litig.*,
    No. 07-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) .........................24, 25

*In re Global Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)................................................................11

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    815 F. Supp. 620 (S.D.N.Y. 1993)....................................................................12

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    850 F. Supp. 1105 (S.D.N.Y. 1993)..................................................................19

*In re LIBOR-Based Fin. Instruments Litig.*,
    No. 11-2262, 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013)......................... passim

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)................................................................13

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ...............................................................12

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998)................................................................................20

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)............................................................8, 22

*In re Rough Rice Commodity Litig.*,
    No. 11-618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ......................................22

*Kolbeck v. LIT Am., Inc.*,
    923 F. Supp. 557 (S.D.N.Y. 1996)....................................................................21

*LC Capital Partners v. Frontier Ins. Grp. Inc.*,
    318 F.3d 148 (2d Cir. 2003)..................................................................12, 16, 17

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)..................................................................8

*Loginovskaya v. Batratchenko*,
  No. 12-336, 2013 WL 1285421 (S.D.N.Y. Mar. 29, 2013)...................23

*Lucente v. IBM Corp.*,
  310 F.3d 243 (2d Cir. 2002)..................................................................7

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010)........................................................................23

*O'Brien v. Nat'l Prop. Analysts Partners*,
  719 F. Supp. 222 (S.D.N.Y. 1989)......................................................19

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
  648 F.3d 533 (7th Cir. 2011) ..............................................................18

*Schuler v. NIVS Intellimedia Tech. Grp., Inc.*,
  No. 11-2484, 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013)..................24

*Sheppard v. Manhattan Club Timeshare Assoc.*,
  No. 11-4362, 2012 WL 1890388, (S.D.N.Y. May 23, 2012) ...............23

*Starshinova v. Batratchenko*,
  No. 11-9498, 2013 WL 1104288 (S.D.N.Y. Mar. 15, 2013)................23

*Statistical Phone Philly v. NYNEX Corp.*,
  116 F. Supp. 2d 468 (S.D.N.Y. 2000)..................................................11

*Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*,
  821 F. Supp. 212 (S.D.N.Y. 1993)......................................................12

*Yeadon v. New York City Transit Authority*,
  719 F. Supp. 204 (S.D.N.Y. 1989)......................................................11

**STATUTE & RULES**

7 U.S.C. § 25(c) ..........................................................................................8

Fed. R. Civ. P. 9(b) .............................................................................. passim

Fed. R. Civ. P. 12(b)(6).................................................................................7

Fed. R. Civ. P. 15(a) .....................................................................................7

iv

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**OTHER AUTHORITY**

7 Thomas L. Hazen Treatise on the Law of Securities Regulation, § 22.7
   (6th ed. 2009 & Supp. 2013)................................................................................................12

The undersigned Defendants respectfully submit this memorandum of law in opposition to the Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint [Dkt. No. 341].

## PRELIMINARY STATEMENT

The Court's March 29, 2013 decision (the "Decision") dismissing most of Plaintiffs' First Amended Complaint ("FAC") permits Plaintiffs to move for leave to amend their Commodity Exchange Act ("CEA") claims to address one narrowly defined set of claims—allegations of "day-to-day, trading motivated manipulation" ("Trader Conduct"). *In re LIBOR-Based Fin. Instruments Litig.* ("*In re LIBOR*"), No. 11-2262, 2013 WL 1285338, at *32 (S.D.N.Y. Mar. 29, 2013). The Court's expressed skepticism about whether such claims would be timely and whether Plaintiffs could adequately plead loss causation was well founded. Plaintiffs' Proposed Second Amended Complaint ("PSAC") is deficient with respect to the issues highlighted by the Court and does not meet Plaintiffs' Rule 9(b) pleading burden.

*First*, Plaintiffs' Trader Conduct claims arising from contracts purchased before April 15, 2009 are time-barred. Plaintiffs rely on widely available public media reports and data that put them on inquiry notice of their claims more than two years before they filed suit. As this Court suggested, such information is sufficient to have "placed plaintiffs on inquiry notice of their injury based on *any* sort of LIBOR manipulation." *In re LIBOR*, at *33.

*Second*, the vague, conclusory, and contradictory allegations in the PSAC fail entirely to state a plausible claim for manipulation and do not satisfy the heightened pleading standard of Rule 9(b). Indeed, the PSAC fails to allege any actionable conduct whatsoever as to the non-settling Defendants.

*Third*, the PSAC fails to adequately allege that Defendants had the specific intent to manipulate *Eurodollar futures or options contracts* ("Eurodollar Contracts") traded on domestic

exchanges.  The PSAC alleges only (and insufficiently) that Defendants intended to manipulate Eurodollar Contracts generally.  It does not contain any supporting allegations that the purported manipulative conduct was specifically intended to affect the prices of domestically traded Eurodollar Contracts.  The settlements of Barclays, UBS, and RBS do not include admissions of conduct specifically intended to affect the prices of such contracts.  The absence of such allegations in the PSAC is fatal to Plaintiffs' motion.  Further, those settlements fail to provide any factual basis for scienter against the non-settling defendants.

*Fourth*, Plaintiffs fail to plead that the Trader Conduct proximately caused their purported losses on Eurodollar Contracts.  These deficiencies render the PSAC incapable of surviving a motion to dismiss and illustrate that amendment would be futile here.

## BACKGROUND

The PSAC asserts claims for price manipulation under Section 9(a)(2) of the CEA on behalf of all persons or entities that traded Eurodollar Contracts "on exchanges such as the CME between January 1, 2005 and May 2010 (the 'Class Period')."  PSAC ¶ 502.

### Dismissal of Plaintiffs' First Amended Complaint

Plaintiffs filed the FAC on behalf of the same purported class for a shorter class period: August 2007 to May 2010.  *In re LIBOR*, at *4.  The FAC alleged that Defendants violated the CEA by, among other things, underreporting their LIBOR submissions to create the impression that the banks were financially healthier than they actually were.  *Id.*  On June 29, 2012, Defendants moved to dismiss the FAC, and the Court issued its Decision on March 29, 2013.

The Court's Decision significantly narrowed Plaintiffs' CEA claims.  The Court held that (i) Rule 9(b) applied to the claims, as they sounded in fraud, *id.* at *36; (ii) the CEA required a showing that Defendants specifically intended to manipulate the prices of Eurodollar

Contracts—not LIBOR itself, *id.* at *43-44; and (iii) certain of the CEA claims were time-barred due to Plaintiffs' failure to investigate or file a claim within two years of May 2008, when Plaintiffs were clearly on inquiry notice of their CEA claims, *id.* at *36, 62.

The Court divided Plaintiffs' CEA claims into three time periods for the purpose of conducting its inquiry notice analysis. *First*, the Court dismissed CEA claims based on transactions from August 2007 to May 29, 2008 ("Period 1") as time-barred because news articles and LIBOR's alleged divergence from relevant benchmarks put Plaintiffs on notice of probable injuries related to their transactions by May 29, 2008. *Id.* at *28, 35. *Second*, the Court suggested that claims based on contracts executed *after* the relevant news articles were published, between May 30, 2008 and April 14, 2009 ("Period 2"), might also be barred depending on whether other publicly available information would have put Plaintiffs on notice, but withheld judgment on the issue. *Id.* at *35. *Third*, the Court held that claims based on contracts between April 15, 2009 and May 2010 ("Period 3") were timely. *Id.*

The Court gave Plaintiffs permission to file a motion for leave to amend to add allegations regarding "potential claims based on day-to-day, trading motivated manipulation . . . based on information derived from the Barclays settlements." *Id.* at *32. But the Court stated it was "skeptical" of the timeliness of potential Period 1 claims because the injury at issue would be the same as the losses claimed in the FAC. *Id.* at *33. The Court also suggested that claims based on transactions pre-dating August 2007, if not time-barred, "will face even greater challenges with regard to loss causation than plaintiffs' other claims face." *Id.* at *32.

### Plaintiffs' Reliance on the Barclays, UBS, and RBS Settlements

Plaintiffs rely on the settlement agreements of Barclays, UBS, and RBS with the U.S. Department of Justice ("DOJ"), U.S. Commodity Futures Trading Commission ("CFTC"), and

U.K. Financial Services Authority ("FSA")[1] as the sole purported basis for their allegations of Trader Conduct in support of their motion to amend.  As explained below, however, Plaintiffs mischaracterize those settlements.

Although Barclays, UBS and RBS admitted to certain facts in their respective settlements with the DOJ, the facts recited in their settlements with the CFTC were admitted only to the extent they were admitted in their settlements with the DOJ.  B-CFTCS at 1; U-CFTCS at 1; R-CFTCS at 1.  Barclays, RBS, and UBS did not admit any facts included in their respective settlements with the FSA.  As detailed further below, none of the facts admitted in the various settlements supports the new CEA claims that Plaintiffs now wish to assert.  And in any event, the allegations regarding the settlements are irrelevant to the remaining Defendants.

### 1.     *The Barclays Settlements*

On June 27, 2012, Barclays announced settlements with the DOJ, CFTC, and FSA resolving investigations concerning Barclays' submissions to the bodies that set various interbank offered rates.  Barclays did not concede any liability or admit any violations of law in these settlements.

The PSAC asserts that "Barclays intended to manipulate (and did manipulate) Eurodollar futures contracts through manipulation of USD-LIBOR."  PSAC ¶¶ 183-90.  But the Barclays Settlements summarize Barclays' Trader Conduct as follows:  "From approximately 2005 through 2007, and occasionally thereafter through approximately 2009, certain Barclays swaps traders requested that certain Barclays LIBOR and EURIBOR submitters submit LIBOR and

---

[1] The Barclays Settlements are attached as Exhibits A-C to the declaration of Matthew J. Porpora ("Porpora Decl."). (All exhibits referenced herein are exhibits to the Porpora Decl. and are hereinafter cited as "Ex. [ ].")  The UBS Settlements are attached as Exs. D-F.  The RBS Settlements are attached as Exs. G-I.  In this Memorandum of Law, "CFTS" refers to the CFTC settlements, "DOJS" refers to the DOJ Non-Prosecution Agreements or Deferred Prosecution Agreements, and "FSAS" refers to the FSA Final Notices for each of the three settling banks.  The terms are further modified to note the bank to which they pertain:  "B" for Barclays; "U" for UBS; and "R" for RBS.

EURIBOR contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR and EURIBOR." B-DOJS ¶ 11.

The Barclays Settlements describe a few communications concerning requests for favorable USD LIBOR submissions between certain Barclays swaps traders and two of their former colleagues who had moved to other financial institutions. *See* B-DOJS ¶¶ 25-27; B-CFTCS at 9; B-FSAS ¶¶ 82-83, 88-89, 91. The DOJ settlement makes clear that one of these former Barclays traders worked at a financial institution that "was not a member of the Dollar LIBOR Contributor Panel" and therefore is not a defendant in this action. B-DOJS ¶ 25. The communications involving the other former Barclays trader occurred on a handful of occasions from "approximately March 2006 through approximately February 2007." B-DOJS ¶ 25. These limited instances of interbank conduct provide no indication of the kind of global conspiracy to manipulate USD LIBOR that Plaintiffs have alleged.

Nor do the Barclays Settlements support Plaintiffs' claims that they were harmed by the Trader Conduct. The Barclays Settlements mention Eurodollar Contracts to note that Barclays participated in the market for such contracts, *see* B-DOJS ¶ 9; B-CFTCS ¶ 8, and that "Dollar LIBOR contributions affected or tended to affect the price of commodities, including Eurodollar futures contracts." B-DOJS ¶ 33. Although the Barclays Settlements state that requests by Barclays' swaps traders, when accommodated, "affected the fixed rates on some occasions," B-DOJS ¶ 30, they do not identify those occasions or specify how USD LIBOR was affected or in what tenors. Notably, the PSAC does not fill these gaps, and almost all requests from Barclays swaps traders cited in the PSAC have no apparent—or alleged—connection with Eurodollar Contracts. *See* PSAC ¶¶ 191-217.

5

### 2.    *The UBS Settlements*

In December 2012, UBS AG entered into settlements with the DOJ, CFTC, and FSA that resolved various governmental investigations of UBS and its subsidiary, UBS Securities Japan Co., Ltd. ("UBS Securities-Japan") (collectively, "UBS").  UBS Securities-Japan also agreed to plead guilty to one count of wire fraud relating to Yen LIBOR submissions.

The PSAC alleges that UBS traders made false USD LIBOR submissions to profit on trading positions in USD LIBOR-linked derivative instruments.  The UBS Settlements do not support this allegation.  The U-DOJS identifies just two occasions on which UBS traders asked UBS's USD LIBOR submitters for favorable submissions, and it is explicit that *in neither case* did UBS's submitters accommodate the trader's request.  *See* U-DOJS ¶¶ 88-90.  Indeed, despite in-depth, multi-year investigations of UBS, *none* of the UBS Settlements identifies *any instance* in which UBS made false USD LIBOR submissions to benefit derivative positions.

Implicitly recognizing the absence of support in the UBS Settlements for their claims, Plaintiffs cite just a single communication—described in a portion of the CFTC settlement that UBS did not admit—in which a UBS USD LIBOR submitter *offered* to adjust the submission "'*if*'" a trader "'let [him] know'" an adjustment was wanted.  PSAC ¶ 218 (quoting U-CFTCS at 45 n.27) (emphasis added).  Of course, none of the UBS Settlements indicates that the submitter's offer was ever taken up or acted upon.  Yet Plaintiffs misrepresent this communication to argue that the regulators found "UBS submitted false USD LIBOR to [ ] benefit its trading positions."  *Id.*  Nothing in the UBS Settlements supports that contention.

### 3.    *The RBS Settlements*

In February 2013, RBS announced settlements with the DOJ, CFTC, and FSA to resolve investigations into RBS's submissions to the bodies that set various interbank offered rates.

PSAC ¶ 179.  An RBS subsidiary in Japan also agreed to plead guilty to one count of wire fraud in connection with Yen LIBOR.  *Id.*

Plaintiffs' efforts to extract allegations relevant to Eurodollar futures trading from the RBS Settlements come up short.  In its DOJ settlement, RBS admitted to a limited set of facts—none of which relates to the alleged manipulation of USD LIBOR, let alone Eurodollar Contracts.  PSAC ¶ 221.  Like the DOJ settlement, RBS's CFTC settlement contains no admissions or substantive findings concerning USD LIBOR or Eurodollar Contracts.[2]  Similarly, RBS's FSA settlement does not contain admissions or even "factual content" (as Plaintiffs incorrectly allege).  *Id.* ¶ 222.  It only contains unadjudicated allegations that Plaintiffs do not connect to Eurodollar futures trading.  *Id.* ¶ 220.

## LEGAL STANDARD

This Court has discretion to deny leave to amend under Fed. R. Civ. P. 15(a) for good reason, including futility, bad faith, undue delay, or undue prejudice.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2009).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  Indeed, as is the case here, a plaintiff should not be permitted to amend when, being "'on the plainest notice of what was required,' he fails to correct the deficiencies in a prior pleading."  *Coal. for a Level Playing Field, L.L.C. v. Autozone, Inc.*, 813 F. Supp. 2d 557, 565 (S.D.N.Y. 2011).

In determining whether a complaint has alleged facts sufficient "to state a claim for relief that is plausible on its face," a court should not accept as true any legal conclusion couched as a

---

[2] Plaintiffs do not allege otherwise, except to mischaracterize a single line from a communication cited in RBS's CFTC settlement in connection with Yen LIBOR as somehow suggesting misconduct in USD LIBOR.  PSAC ¶ 222. Nothing in the CFTC settlement supports this allegation.

factual allegation.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although Plaintiffs have filled

the PSAC with conclusions purportedly drawn from the regulatory settlements of certain

Defendants, the Court should consider only the factual allegations drawn from settlements or

parts of settlements containing factual admissions when assessing the adequacy of the PSAC.[3]

Furthermore, because Plaintiffs' CEA claims sound in fraud, the PSAC must satisfy the

heightened pleading requirements of Rule 9(b).  *In re LIBOR*, at *36.  Thus, Plaintiffs must plead

particularized facts to show that (i) Defendants possessed an ability to influence prices of

Eurodollar Contracts; (ii) Defendants specifically intended to manipulate the prices of such

instruments; (iii) an artificial price existed for such instruments; and (iv) Defendants caused the

artificial price.  *See DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009) (summary order).

## ARGUMENT

**I.    PLAINTIFFS' CEA CLAIMS ARISING FROM EURODOLLAR
CONTRACTS PURCHASED BEFORE APRIL 15, 2009 ARE TIME-BARRED.**

"A claim pursuant to the CEA must be brought 'not later than two years after the date the

cause of action arises.'"  *In re LIBOR*, at *21 (quoting 7 U.S.C. § 25(c)).  Because the CEA "'is

silent on the issue' of when a cause of action accrues, . . . courts apply a 'discovery accrual rule'

wherein 'discovery of the injury, not discovery of the other elements of a claim is what starts the

clock.'"  *Id*.  Plaintiffs' proposal to assert Trader Conduct claims under the CEA would be futile

because those claims are time-barred.[4]

Plaintiffs' proposed Trader Conduct claims rest upon alleged injuries that are, for

purposes of inquiry notice, identical to those underlying their original CEA claims, many of

---

[3] *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976)*; In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011).

[4] Plaintiffs' claims for vicarious liability, PSAC ¶¶ 531-33, and aiding and abetting, PSAC ¶¶ 534-37, are similarly time-barred.  *See Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994).

which this Court dismissed as time-barred in its Decision.  *See In re LIBOR,* at *33.  Reports that were publicly available both prior to May 29, 2008, *see id.* at *35, and throughout the remainder of 2008 would have suggested to a person of ordinary intelligence a probability that she had been injured by the alleged LIBOR manipulation, regardless of whether that purported manipulation was motivated by reputational concerns or derivatives trading positions.  Because Plaintiffs failed to make any inquiry once these public reports triggered notice, their manipulation claims are time-barred.

Any claims based on Eurodollar Contracts purchased between August 1, 2007 and May 29, 2008 (Period 1) are time-barred because reports published before May 29, 2008 were sufficient to "place[ ] [P]laintiffs on inquiry notice of their injury based on *any* sort of LIBOR manipulation" during Period 1.  *In re LIBOR*, at *33.  Plaintiffs' claims based on contracts entered between May 30, 2008 and April 14, 2009 (Period 2) are also time-barred because concerns regarding LIBOR manipulation continued to be widely reported during this period, and the facts alleged in the PSAC show that LIBOR's continued deviation from its alleged relationships with purported benchmarks placed Plaintiffs on notice of a probability that the alleged LIBOR manipulation reported during Period 1 had continued unabated throughout Period 2.  Finally, claims based on contracts entered prior to August 1, 2007 (the "Initial Period") are time-barred because subsequent reports of supposed fundamental problems with LIBOR's accuracy and integrity would have, by May 29, 2008 (or, at the very latest, April 14, 2009), prompted a person of ordinary intelligence to investigate whether earlier investments had been similarly impacted by LIBOR manipulation.

9

A.    **Claims Involving Eurodollar Contracts Purchased Between August 1, 2007 and May 29, 2008 Are Time-Barred.**

Plaintiffs' proposed new claims arising during Period 1 are time-barred for substantially the same reasons set forth in the Court's Decision.  Plaintiffs argue that "[t]here were no public reports of misreporting used for trading gain that was the hallmark of" the "episodic manipulation that occurred for trading gain starting in 2005."  Pls. Br. at 7.  Even if that assertion were true (and it is not), it is legally irrelevant.  During Period 1, Plaintiffs were "on inquiry notice of their injury based on *any* sort of LIBOR manipulation," *In re LIBOR*, at *28, 33, because they were on notice of reports that reflected a probability that LIBOR had been set at artificially low levels that they allege would have caused them to suffer losses.  PSAC ¶ 513 (alleging Defendants caused injury "[b]y causing LIBOR to be artificially low").  Furthermore, it was widely reported that Defendants' sizable derivatives trading positions could have motivated Defendants to manipulate LIBOR during Period 1.  *See infra* n.5.

Plaintiffs' claims regarding alleged LIBOR suppression during Period 1 were dismissed as time-barred because, by May 29, 2008, Plaintiffs were on notice of reports that reflected "the probability that the LIBOR fixes which affected the prices of plaintiffs' Eurodollar contracts had been manipulated."  *In re LIBOR*, at *23, 28.  Multiple, well-publicized reports put Plaintiffs on notice of information suggesting "that LIBOR was probably being set at artificial levels."  *Id.* at *28.  Though "none of the articles" published during Period 1 "definitively established that LIBOR was being manipulated, they did not need to do so" because the articles "suggest[ed] to a person of ordinary intelligence the probability that LIBOR had been manipulated."  *Id.*

Similarly, it is legally irrelevant that none of the reports directly discussed "episodic manipulation . . . for trading gain."  Pls. Br. at 7.  Plaintiffs' claims regarding Period 1 are based on their allegation that Defendants caused injuries "by causing LIBOR to be artificially low."

PSAC ¶ 513.  Plaintiffs were, therefore, aware of the probability of their alleged injury, which was sufficient to put them on inquiry notice.  *See In re LIBOR*, at *33 (noting that injury from Trader Conduct and alleged LIBOR suppression "would be the same").  Statutes of limitations are "not tolled for a plaintiff's 'leisurely discovery of the full details of the alleged scheme.'"  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 201 (S.D.N.Y. 2003).  "'Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice.'"  *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 481 (S.D.N.Y. 2000).  Thus, Plaintiffs did not need to be aware of the exact means and motives of Defendants' alleged LIBOR manipulation to be on inquiry notice of all claims that might arise from it.  *See In re LIBOR*, at *28.

Regardless, the PSAC alleges that Defendants suppressed LIBOR while holding trillions of dollars in publicly disclosed interest rate derivatives positions.  PSAC ¶¶ 454-88.  News articles published during Period 1 suggested Defendants had an incentive to manipulate LIBOR to benefit those trading positions.[5]  Indeed, Plaintiffs now assert that the "trader manipulation described in the settlement documents is consistent with Plaintiffs' prior allegations of suppression" because "[t]raders could take advantage of LIBOR misreports to make a gain on trading positions."  Pls. Br. at 10 n.6.  This underscores how the same information that provided notice of the alleged suppression also provided notice of the alleged Trader Conduct.[6]

---

[5] *See* Ex. J (Duncan Wood, *Libor's True Colours*, Risk Magazine, Jan. 1, 2008) (quoting European bank treasury head as stating, "because swaps are fixed from Libor, if it suits your book to have the Libor fix as low as possible, maybe you'd submit an unrealistic bid to push the fix lower"); Ex. K (Carrick Mollenkamp, *Libor Fog: Bankers Cast Doubt on Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008) (citing study that raised concerns "that banks might have an incentive to provide false rates to profit from derivatives transactions").

[6] Plaintiffs' reliance on *Yeadon v. New York City Transit Authority*, 719 F. Supp. 204 (S.D.N.Y. 1989) is entirely misplaced.  Pls. Br. at 9.  Unlike the plaintiffs in *Yeadon, id.* at 209-10, Plaintiffs had all of the information necessary to discover all of the claims they are currently asserting.  *See In re LIBOR*, at *31 ("our case is distinguishable from those in which the information necessary to place plaintiffs on inquiry notice is solely in the control of the defendants").

**B.      Claims Involving Eurodollar Contracts Purchased Between
            May 30, 2008 and April 14, 2009 Are Time-Barred.**

In its Decision, the Court withheld judgment on claims arising during Period 2 but

suggested that such claims could be time-barred because "other articles may have been published

during Period 2 that would have put plaintiffs on notice." *In re LIBOR*, at \*35.  The Court cited

one such article and noted that "there may be more." *Id.*  As demonstrated below, the articles

that questioned the accuracy and integrity of LIBOR during Period 1 led to an ongoing debate

that continued as the financial crisis deepened in 2008.  "[A] plaintiff is charged with knowledge

of publicly available news articles and analysts' reports,"[7] including information that was

publicly available before Plaintiffs made their purchases.[8]  Thus, even if some Plaintiffs

transacted solely after May 29, 2008, they "were placed on inquiry notice at the time they

purchased" their Eurodollar Contracts or shortly thereafter, *In re Integrated Res. Real Estate Ltd.

P'ships Sec. Litig.*, 815 F. Supp. 620, 652 (S.D.N.Y. 1993), and the Court should now dismiss all

CEA claims asserted in the PSAC that arose in Period 2.

In any event, the PSAC does not allege that *any* of the named Plaintiffs—the focus of this

motion as no class has been certified—made no purchases within Period 1.  PSAC ¶ 27.  Rather,

the named Plaintiffs allegedly traded throughout the Class Period.  *Id.*  Because the named

---

[7] *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212, 222 (S.D.N.Y. 1993).  This is especially true for sophisticated investors like Plaintiffs.  *See GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 328 (S.D.N.Y. 2008).  Indeed, "commodities futures are [considered] suitable only for sophisticated investors who are able to bear the loss of their entire investment."  7 Thomas L. Hazen Treatise on the Law of Securities Regulation, § 22.7[1] (6th ed. 2009 & Supp. 2013).

[8] Courts regularly dismiss claims on statute of limitations grounds regardless of whether class members' purchases were made before, after, or contemporaneously with the event triggering inquiry notice.  For example, in *LC Capital Partners v. Frontier Ins. Grp. Inc.*, the Second Circuit held that "publicly available documents gave rise to a duty of inquiry no later than December 1998" for all plaintiffs, whether they purchased before or after that date, and affirmed dismissal in full, even as to class members who purchased after December 1998.  318 F.3d 148, 151, 155 (2d Cir. 2003); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 423 (S.D.N.Y. 2003) ("for inquiry notice purposes[,] it is irrelevant when the class period ends" and "[s]imilarly irrelevant is the fact that some class members may have purchased stock as late as the end of the class period").

Plaintiffs were on inquiry notice before and during Period 2, amendment would be futile

regardless of whether "there may be some class members whose claims are not time barred."

*Hall Special Situations Inv. Fund v. Basix Corp.*, No. 91-1202, 1994 WL 132235, at *2

(S.D.N.Y. Apr. 14, 1994).[9]

Moreover, the PSAC alleges that LIBOR was manipulated because it diverged from

purported benchmarks with which it supposedly should have been correlated throughout Period 1

and Period 2.  PSAC ¶¶ 72-182.  Because these allegations are based on data and modes of

analysis that were well-publicized throughout Period 1 and Period 2, Plaintiffs' own allegations

show that their Period 2 claims are time-barred.  *See In re LIBOR*, at *31, 35.

### 1.   Purchasers of Eurodollar Contracts During Period 2 Were on Inquiry Notice at the Time of Purchase.

Throughout Period 2, reports continued to question LIBOR's accuracy and integrity.

Articles published by the *Wall Street Journal*, Reuters, Bloomberg, Dow Jones, the *Financial*

*Times* and the *Daily Telegraph* between May 30, 2008 and January 2009 raised serious questions

about the accuracy of LIBOR submissions, often referencing the earlier reports of purported

LIBOR manipulation.[10]  Plaintiffs' allegation that, "[b]etween May 29, 2008 and April 15, 2009,

potential LIBOR suppression received virtually no media coverage" is false.  PSAC ¶ 347.

---

[9] "It is axiomatic that a putative class representative must be able to individually state a claim against defendants." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).

[10] *See, e.g.*, Ex. L (Gavin Finch & Ben Livesey, *BBA Avoids Changes to Libor, Seeks to Bolster Review*, Bloomberg, May 30, 2008 ("The BBA . . . has been under pressure to overhaul" Libor "after the Bank for International Settlements said in a March report some members understated their rates to avoid being perceived as having difficulty raising financing.")); Ex. M (Michael Mackenzie & Gillian Tett, *Libor Remarks Fail to Put Unease to Rest*, Financial Times, June 2, 2008) ("Libor quotes have understated true borrowing rates so as not to fan fears they have funding problems.")); Ex. N (Gavin Finch & Ben Livesey, *Libor Overhaul May Fail to Restore Confidence in Rate*, Bloomberg, June 11, 2008) ("Banks routinely misstated borrowing costs to the BBA to avoid the perception they faced difficulty raising funds as credit markets seized up, turning Libor into 'a lie,' according to Tim Bond, head of asset allocation at Barclays Capital, a unit of Barclays Plc.")); Ex. O (Laurence Norman, *Changes to Libor Rejected*, Wall St. J., Aug. 6, 2008) ("Bankers and analysts have also expressed concern that panel banks might be understating their true borrowing costs to avoid looking desperate for cash.")); Ex. P (Alistair Osborne, *Former*

The concerns that surrounded LIBOR did not evaporate on May 30, 2008.  On June 19, 2008, a widely reported survey stated that 82% of market participants agreed or strongly agreed with "the view that Libor rates don't reflect true money market rates."  Ex. T (Adam Bradbery, *Market Participants Doubt Libor Rates Reflect Market Rates—Survey*, Dow Jones Capital Markets Report, June 19, 2008).  This survey reportedly came "amid concern that some banks may have been contributing deliberately low rates to the BBA's dollar-Libor fixing . . . ."  *Id.* Despite such reports, Plaintiffs allege that they could not have been on inquiry notice during Period 2 because academics did not *unanimously* conclude that LIBOR was being manipulated. PSAC ¶¶ 325-31.[11]  But the mere existence of a robust public debate over whether LIBOR was being intentionally manipulated was enough to suggest to a person of ordinary intelligence that she had probably been injured by the alleged LIBOR manipulation.  *See In re LIBOR*, at *28.

The PSAC's reliance on LIBOR's apparent divergence from several alleged benchmarks fully supports this conclusion.  PSAC ¶¶ 72-161.  Replicating a form of analysis that had been widely publicized prior to Period 2,[12] the PSAC alleges that the spread between the Federal

---

*MPC Man Calls for Libor To Be Replaced*, The Telegraph, Sept. 11, 2008) ("Amid the credit crisis, serious questions have been raised over the suitability of Libor.  In March, the Bank for International Settlements said some lenders may have understated borrowing costs to hide the true extent of their funding difficulties.")); Ex. Q (Jamie McGeever, *Money Market Crisis Deepens; Dollar Spreads Hits Record*, Reuters, Sept. 25, 2008) ("Some analysts say banks are deliberately overstating London interbank offered rates (Libor) so as not to lend, and some suggest others may be understating Libor rates to help reduce exposure on Libor-related liabilities such as swaps contracts.")); Ex. R (Adam Bradbery, *BBA Mulls Impact of UK Government Bank Aid Plan on Libor*, Dow Jones Newswires, Oct. 15, 2008 ("[The BBA] faced criticism earlier this year that its dollar Libor rate didn't reflect the real costs of borrowing because banks were contributing artificially low quotes to hide their true funding pressures.")); Ex. S (Adam Bradbery, *BBA Takes Steps to Restore Trust in Libor Fixing*, Wall St. J. Europe, Dec. 18, 2008) ("Some bankers and analysts have expressed concerns that panel banks might be understating their actual borrowing costs to avoid appearing as though they are experiencing funding difficulties. . . .  The association also laid out some changes to how it sets and polices Libor in June, reversing its earlier position that there were no problems with the rate.")).

[11] Further, the study issued by defendant JP Morgan (PSAC ¶¶ 329-31) constitutes an alleged denial of wrongdoing that is insufficient to negate inquiry notice for the reasons set forth *infra* at Section I.B.2.

[12] Mollenkamp, *supra* n.5 (noting that Scott Peng of Citigroup believed that the Eurodollar Deposit Rate showed that LIBOR was understated by 20 to 30 basis points).

14

Reserve Eurodollar Deposit Rate and LIBOR ("Eurodollar Spread") "strongly supports that Defendants suppressed their LIBOR quotes and colluded to suppress reported LIBOR rates."  *Id.* ¶ 81.  Based on the Eurodollar Spread, the PSAC alleges that LIBOR was suppressed by an average of approximately 12 basis points between August 31, 2007 and September 15, 2008, *id.* ¶ 93, and approximately 38 basis points between October 1, 2008 and May 17, 2010, *id.* ¶ 97. Indeed, the PSAC alleges that LIBOR suppression *peaked* during Period 2.  *Id.* ¶ 95.

The PSAC makes similar allegations using other forms of analysis that were well publicized during Period 2.  Based on an analysis from a September 24, 2008 *Wall Street Journal* article, the PSAC alleges that the spread between LIBOR and the Federal Reserve auction rate "further suggests Defendants artificially suppressed LIBOR during the Class Period."  *Id.* ¶ 147. Using an academic study published on February 22, 2009, the PSAC alleges that the spread between LIBOR and overnight index swaps "provides further support for Plaintiffs' allegations that Defendants suppressed LIBOR."  *Id.* ¶ 149.

Nevertheless, Plaintiffs litter the PSAC with unconvincing arguments that all of this allegedly strong evidence of LIBOR suppression was actually too weak and too equivocal to put a person of ordinary intelligence on inquiry notice.  *See id.* ¶¶ 280-425.  Plaintiffs go so far as to argue that the May 29, 2008 *Wall Street Journal* article "exonerated" some Defendants, and that Plaintiffs were therefore relieved of their duty to inquire.  *Id.* ¶ 286(g).  But Plaintiffs also allege that publicly available data showed that each Defendant understated LIBOR by an average of 25 to 35 basis points between August 8, 2007 and May 17, 2010.  *Id.* ¶ 98.  The contrast between such allegations could not be more stark.  Such "inconsistent" pleading cannot save Plaintiffs' claims from being time-barred.  *GEM Global Yield Fund Ltd. v. Surgilight, Inc.*, No. 04-4451, 2006 WL 2389345, at *14 (S.D.N.Y. Aug. 17, 2006).

###### 2.    Plaintiffs Were Not Relieved of Their Duty of Inquiry After May 29, 2008.

Plaintiffs argue that, despite the continuous reporting of possible LIBOR manipulation, they were not on inquiry notice after May 2008 because of a number of "contraindicating factors," including:  (i) a variety of public denials by Defendants and the BBA; (ii) the alleged failure of regulators to uncover LIBOR manipulation; and (iii) the lack of a decline in stock price after the reports were published.  PSAC ¶ 286.  These arguments fail.

Plaintiffs' FAC included conclusory assertions that Defendants and the BBA "deflected concerns" about LIBOR.  FAC ¶¶ 188-96.  The PSAC contains a few new allegations echoing this assertion, but they do nothing to undermine this Court's holding that Plaintiffs "could not have reasonably relied on the reassurances of defendants and the BBA" to excuse their duty to inquire.  *In re LIBOR*, at *29.  When determining whether "apparent storm warnings have dissipated" because of reassuring statements, courts consider how (i) "significant the . . . disclosed problems are," (ii) "likely they are of a recurring nature," and (iii) "substantial are the 'reassuring' steps announced to avoid their recurrence."  *LC Capital Partners*, 318 F.3d at 155.  These factors show that reliance upon the alleged denials would have been unreasonable.

Before May 30, 2008 (the first day of Period 2), public reports broadcasted that banks supposedly had strong incentives to manipulate LIBOR to avoid appearing "desperate for cash" and "to profit from derivatives transactions."  *In re LIBOR*, at *25.  As long as these supposed incentives remained and LIBOR was reportedly inaccurate, a person of ordinary intelligence would have understood that a probability of injury through LIBOR manipulation remained.

The actions allegedly taken by the BBA did nothing to remove reported incentives to manipulate LIBOR or to quell concerns regarding LIBOR.  Plaintiffs allege the BBA announced an investigation of potential LIBOR manipulation in June 2008 and its results in August 2008,

PSAC ¶¶ 299-302, but the BBA's investigation merely "reported that the panel banks had vouched for the legitimacy of LIBOR."  Pls. Br. at 14; PSAC ¶ 301.  No person of ordinary intelligence would have been reassured by this "investigation" because "the BBA had a strong incentive to maintain market confidence in LIBOR's integrity."  *In re LIBOR*, at *29.

Moreover, the BBA's response to reports of possible LIBOR manipulation was "devoid of any specific steps taken to avoid" problems in the future.  *LC Capital Partners*, 318 F.3d at 156.  The BBA did not change the LIBOR submission process to remove any supposed incentives to misreport LIBOR, nor did it implement any new safeguards to avoid abuses.[13]  Instead, the BBA solely threatened to remove the very banks it had just exonerated from the LIBOR panel if they misreported LIBOR in the future.  Pls. Br. at 13; PSAC ¶ 302.  Reports show that steps taken by the BBA failed to quell concerns about LIBOR in the market,[14] and that the BBA undertook further reforms in December 2008.  Bradbery, *BBA Takes Steps to Restore Trust in LIBOR Fixing*, supra, n.10.

Plaintiffs also argue that they were not on inquiry notice during Period 2 because Defendants deflected concerns about LIBOR.  Pls. Br. 14-15.  It is, however, well established that a "mere denial of wrongdoing will not dispel a plaintiff's duty to inquire."  *Hopkinson v. Estate of Siegal*, No. 10-1743, 2011 WL 1458633, at *7 (S.D.N.Y. Apr. 11, 2011).  Indeed, "[a] person of ordinary intelligence would have understood that [D]efendants each had a strong incentive to portray [their LIBOR submissions] as truthful."  *In re LIBOR*, at *29.

---

[13] *See, e.g.*, Ex. U (Laurence Norman & Deborah Lynn Blumberg, *BBA Rejects Key Proposals for Libor Process Change*, Dow Jones Int'l News, Aug. 5, 2008) (reporting that the BBA "decided against making bank quotes anonymous or delaying the publication of the rates they quote" to remove the "incentive to understate rates").

[14] *See, e.g.*, Finch & Livesey, *supra* n.10; Ex. V (Carrick Mollenkamp, *U.K. Bankers to Alter Libor to Address Rate Doubts*, Wall St. J., June 11, 2008); Norman, *supra* n.10; Bradbery, *supra*, at 14; Osborne, *supra* n.10; Ex. W (Carrick Mollenkamp, *Libor's Accuracy Becomes Issue Again*, Wall St. J., Sept. 24, 2008).

Plaintiffs contend that they were absolved of their duty to inquire because (i) governmental bodies continued to rely upon LIBOR during the Class Period, and (ii) the FSA allegedly failed to uncover LIBOR manipulation sooner.  PSAC ¶¶ 351-411.  These arguments fail because inquiry notice does not depend upon what regulators believe.  *See Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 537 (7th Cir. 2011).  Moreover, Plaintiffs' first argument ignores the public record:  "market actors had begun to shift away from LIBOR-based instruments . . . because of their distrust of recent LIBOR fixes," *In re LIBOR*, at *28, and continued reliance on LIBOR was reportedly due to a lack of viable alternatives, not trust in LIBOR's integrity.[15]  Further, Plaintiffs' reliance on the FSA Audit Report is misplaced because the report itself acknowledges that "the CFTC contacted the FSA in June 2008 regarding media coverage" about potential LIBOR manipulation, and that these discussions "ultimately led to further investigations and the financial penalties imposed on firms."  FSA, Internal Audit Report 69 (2013), www.fsa.gov.uk/static/pubs/other/ia-libor.pdf.  In other words, media reports caused the CFTC and FSA to do what Plaintiffs failed to do: investigate.[16]

### C.    Plaintiffs' Claims Involving Eurodollar Contracts Purchased Between January 1, 2005 and July 31, 2007 Are Time-Barred.

Plaintiffs' claims based on contracts purchased during the Initial Period—*i.e.*, between January 2005 and July 31, 2007—are also time-barred.  This Court has already held that, from at least August 1, 2007 to May 29, 2008, "a person of ordinary intelligence would clearly have

---

[15] *See, e.g.*, Ex. X (Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate,* Wall St. J., May 29, 2008) ("[P]lugging a new benchmark into trillions of dollars of securities and loans would require a big restructuring of the financial system—something unlikely to occur in the near term.")).

[16] Lastly, Plaintiffs cite no law to support their argument that inquiry notice cannot arise absent a drop in the Defendants' share price.  Pls. Br. 17-18.  It is hardly surprising that the market did not react strongly to the publication of any one article in spring of 2008 because the market had been steadily receiving information about possible LIBOR manipulation since late 2007.  *See* PSAC ¶¶ 295-96.  Furthermore, Plaintiffs identify no significant pattern of stock price declines on March 15, 2011, the date they claim they were put on inquiry notice.  *Id.* ¶ 280.

been on notice that LIBOR was probably being set at artificial levels." *In re LIBOR*, at *28, 35. The articles published during Periods 1 and 2 questioning the accuracy and integrity of LIBOR did not "pertain[] explicitly" to the Initial Period, but they discussed purportedly fundamental flaws in LIBOR that "would have alerted an investor of ordinary intelligence" that LIBOR submissions "issued earlier . . . may have suffered from the same infirmities." *Domenikos v. Roth*, 288 F. App'x 718, 720 (2d Cir. 2008) (summary order). Given the allegedly direct link between LIBOR and the price of Eurodollar Contracts, PSAC ¶¶ 433, 440, it would have been unreasonable for any investor who had traded in LIBOR-linked derivatives (such as the Plaintiffs here), once on notice of reports reflecting a probability that LIBOR was being manipulated over a significant period, to fail to investigate the cause of any earlier losses.[17]

### D.    Plaintiffs Fail to Adequately Allege Fraudulent Concealment.

To the extent Plaintiffs argue that the statute of limitations should be tolled due to fraudulent concealment, their amendments to the PSAC are futile and are insufficient to cause this Court to revisit its rejection of Plaintiffs' fraudulent concealment arguments. *See In re LIBOR*, at *34. The conduct at issue was not inherently self-concealing because "a person of ordinary intelligence could have reviewed the submitted quotes along with numerous articles analyzing these quotes and explaining why they were likely artificial." *Id.* *34.[18] More fundamentally, "the doctrine of fraudulent concealment . . . does not toll the statute unless the plaintiff demonstrates both fraudulent concealment and due diligence." *Butala v. Agashiwala*,

---

[17] Indeed, in their FAC, Plaintiffs cited studies that found that one-month LIBOR was "virtually constant" from August 2006 to August 2007, and concluded that "explicit collusion" was the "most likely explanation" for this anomaly.  FAC ¶¶ 111-14.  These allegations were deleted from the PSAC, but "Plaintiffs may not, by amending their Complaint, undo the inquiry notice and resulting obligations conceded by their first complaint." *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1132 n.47 (S.D.N.Y. 1993).

[18] Plaintiffs' conclusory allegations about Defendants' "affirmative steps" to conceal their supposed misconduct, Pls. Br. at 14, are not pled with the requisite particularity or pled as to each Defendant. *Bingham v. Zolt*, 683 F. Supp. 965, 973-74 (S.D.N.Y. 1988); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989).

916 F. Supp. 314, 319 (S.D.N.Y. 1996).  Plaintiffs fail to do so, as the PSAC "make[s] no allegation of any specific inquiries" and does not "detail when such inquiries were made, to whom, regarding what, and with what response." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).

## II.   PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM BASED ON THE ALLEGED TRADER CONDUCT.

Plaintiffs' proposed CEA claims concerning Trader Conduct are also futile because the proposed allegations fail to state a claim for three reasons.  *First*, Plaintiffs fail to specifically allege that each Defendant engaged in the Trader Conduct at issue.  *Second*, Plaintiffs fail to plead specific intent as to any Defendant in connection with the alleged Trader Conduct.  *Third*, Plaintiffs have not adequately pled that the Trader Conduct caused their alleged losses.

### A.   Plaintiffs Fail to Plead That Each Defendant Engaged in Trader Conduct.

The PSAC fails to specifically allege that each Defendant engaged in the Trader Conduct at issue.[19]  Rule 9(b) requires that Plaintiffs specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market."  *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).  When multiple defendants are named, "the complaint must specifically allege the fraud perpetrated by each defendant."  *In re Crude Oil Commodity Litig.*, No. 06-6677, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007).

As a threshold matter, this Court's ruling that the suppression-related CEA claims in the FAC were adequately pled does not apply to the Trader Conduct allegations in the PSAC.  In its Decision, the Court held that Plaintiffs had adequately pled a suppression-based claim based in

---

[19] In the PSAC, Plaintiffs plead absolutely *no* facts in support of their theory that Defendants manipulated LIBOR in order to pay lower returns on unspecified LIBOR-linked instruments.  *See* PSAC ¶ 77.

part on graphs showing that, from August 2007 to May 2010, each Defendant's USD LIBOR submissions diverged from other benchmarks that they allegedly should have tracked.  *In re LIBOR*, at \*40.  By contrast, Plaintiffs' new claims are neither supported by data nor premised on any theory that might plausibly implicate every Defendant.  Rather, the new claims are based on the very different hypothesis that each Defendant was *individually* motivated to manipulate USD LIBOR to benefit its own positions in the derivatives markets.  *See* PSAC ¶ 522.

Nevertheless, Plaintiffs fail to plead facts to show that each Defendant engaged in Trader Conduct.  Plaintiffs' new allegations are premised almost entirely on the Barclays Settlements, and those allegations are irrelevant to the other Defendants.[20]  *See* Pls. Br. at 6; PSAC ¶¶ 183-217.  Indeed, the vast majority of these allegations relate to internal requests from one bank's derivatives traders to *its own* USD LIBOR submitters.  PSAC ¶¶ 191-217.  The *only* trader-related allegations that even arguably relate to other USD LIBOR panel banks are contained in paragraphs 238 and 240 of the PSAC.[21]  These allegations, however, are insufficient to tie any particular Defendant to any instance of alleged Trader Conduct because they do not identify which particular Defendants supposedly received or made such requests, suggest that any Defendant altered its USD LIBOR submission in response, or evidence intent to manipulate Eurodollar futures or options prices.  Plaintiffs cannot establish that all Defendants engaged in Trader Conduct by pointing to conduct in one bank's settlements.  Rule 9(b) requires that "the complaint inform *each* defendant" of his role in the alleged fraud.  *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996) (emphasis added).  Plaintiffs have failed to do so here.

---

[20] While Plaintiffs rely on these settlements to allege that Barclays engaged in Trader Conduct, those allegations are insufficient to state a CEA claim against Barclays for the reasons set forth above and *infra* Sections II.B. and II.C.

[21] Paragraph 238 asserts only that "swaps traders" at one panel bank made requests to traders at other panel banks for favorable "LIBOR and EURIBOR submissions" and received similar requests.  The allegation in paragraph 240 is similarly unspecific.  And Paragraphs 239 and 241 specifically refer to communications with a trader at a financial institution that was not on the USD LIBOR panel and is *not* one of the Defendants.

**B.      Plaintiffs Fail to Plausibly Allege Specific Intent.**

A plaintiff suing for price manipulation under the CEA must show that a defendant

"acted 'with the purpose . . . of causing . . . a price or price trend in the [particular] market that

did not reflect the legitimate forces of supply and demand.'"  *In re Platinum & Palladium*, 828 F.

Supp. 2d at 598.  Rule 9(b) requires that the plaintiff allege facts that "give rise to a strong

inference of scienter."  *In re LIBOR*, at *37.  Nothing in the PSAC enables Plaintiffs to meet this

specific intent threshold.  *See In re Commodity Exchange, Inc. Silver Futures & Options Trading

Litig.*, No. 11-02213, 2013 WL 1100770, at *2-3 (S.D.N.Y. Mar. 18, 2013).

To state a claim, Plaintiffs must plausibly allege that each Defendant specifically

intended to cause artificial prices of Eurodollar Contracts traded on domestic exchanges.  *See In

re LIBOR*, at *21, *43 n.18.  It is not enough to allege that Defendants intended to manipulate

USD LIBOR submissions to appear financially healthy, *cf., e.g.*, PSAC ¶¶ 5, 74-76, even if

Defendants allegedly knew their conduct would impact CME Eurodollar Contracts.[22]  *See, e.g.*,

*In re Commodity Exchange*, 2013 WL 1100770, at *2-3; *see also Hershey v. Energy Transfer

Partners L.P.*, 610 F.3d 239, 248 (5th Cir. 2010) ("intentionality and inevitability are not legally

equivalent"); *In re Rough Rice Commodity Litig.*, No. 11-618, 2012 WL 473091, at *7 (N.D. Ill.

Feb. 9, 2012).

Nor is it enough for Plaintiffs to allege that Defendants *generally intended* to manipulate

USD LIBOR-linked derivatives or Eurodollar futures or options traded anywhere in the world or

*specifically intended* to manipulate Eurodollar futures or options traded on markets located

*outside* the United States.  *Cf., e.g.*, PSAC ¶¶ 72-74, 77, 511.  USD LIBOR derivatives and

---

[22] Although both Barclays and UBS admitted to instructing that LIBOR submissions be made consistent with an appearance of financial health, the admitted facts are explicit that those "directions were issued with the intent to influence [the banks'] LIBOR submissions, rather than with the intent to affect the published LIBOR fix"—let alone the prices of Eurodollar futures traded on domestic exchanges.  U-DOJS ¶ 100 n.13; *see* B-DOJS ¶ 41.

Eurodollar futures and options are traded in a number of different locations around the world—including, for example, on the Singapore Exchange[23] and the London International Financial Futures and Options Exchange.[24]  To the extent Plaintiffs mean to plead specific intent based on a supposed purpose to affect Eurodollar futures or other derivatives traded on *foreign* exchanges, their pleading is barred by *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), and cases applying it to the CEA.  *See In re LIBOR*, at *20 ("Because . . . the CEA 'gives no clear indication of an extraterritorial application, it has none.'").[25]  Plaintiffs cannot plead specific intent based on allegations related to derivatives that are beyond the reach of the CEA.

As to the Defendants that have not settled with regulators, it is particularly clear that the allegations in the PSAC are simply too vague and general on the issue of specific intent to satisfy Plaintiffs' burden.  The PSAC impermissibly lumps all non-settling Defendants together with the settling banks, *see, e.g.*, PSAC ¶¶ 13, 511, without "'providing a factual basis for scienter for each defendant.'"  *Sheppard v. Manhattan Club Timeshare Assoc.*, No. 11-4362, 2012 WL 1890388, at *3, 5 (S.D.N.Y. May 23, 2012).  And most of the intent allegations relevant to the non-settling Defendants do not even mention the CME, instead alleging intent to affect "Eurodollar futures contracts" or "LIBOR-based derivative products" *generally*.  PSAC ¶¶ 72-74, 511, 522.[26]

---

[23] http://www.sgx.com/wps/portal/sgxweb/home/products/derivatives/interest_rates/eurodollar (last visited June 30, 2013) (listing specifications for SGX Eurodollar futures).

[24] http://www.thefreelibrary.com/LIFFE+to+List+Global+Eurodollar+Contract+from+18+March.-a0112535247 (Jan. 26, 2004) (reporting launch of LIFFE Eurodollar futures).

[25] *See also Loginovskaya v. Batratchenko*, No. 12-336, 2013 WL 1285421, at *13 (S.D.N.Y. Mar. 29, 2013); *Starshinova v. Batratchenko*, No. 11-9498, 2013 WL 1104288, at *7-8 (S.D.N.Y. Mar. 15, 2013).

[26] Indeed, Plaintiffs studiously avoid identifying which derivatives underlie their claims, referring sometimes to "Eurodollar futures and options . . . on the Chicago Mercantile Exchange," PSAC ¶ 11, while other times opting instead for "Eurodollar futures and options . . . on exchanges such as the CME," *id.* ¶ 502, or even the generalized "on-exchange based products tied to LIBOR such as Eurodollar futures," *id.* ¶ 27.  These vague, general, and conclusory allegations are insufficient to state a claim under Rule 9(b).

As to those Defendants that *have* settled with regulators, the PSAC includes no new facts that would meet the specific intent threshold.  As explained previously, nothing in the settlements suggests that any of the Defendants acted with the intent to manipulate Eurodollar futures traded on domestic exchanges.[27]  Plaintiffs plead no other facts evincing such an intent.

### C.      Plaintiffs Fail to Plead Loss Causation.

Amendment would also be futile because Plaintiffs fail to allege that they suffered any actual losses as a result of the newly alleged Trader Conduct.[28]  Unlike the FAC, the PSAC alleges that Plaintiffs suffered damages as a result of attempts to alternately suppress *or inflate* USD LIBOR.  *See, e.g.*, PSAC ¶¶ 186, 188.  But the PSAC contains no specific allegations as to how the named Plaintiffs suffered an actual loss when LIBOR was allegedly artificially inflated.  Indeed, by their allegations in the FAC, the named Plaintiffs have made a judicial admission that they allegedly suffered losses when LIBOR was artificially suppressed.  They cannot now claim, without any explanation whatsoever, that artificially inflated LIBOR rates also caused them to suffer losses.  Moreover, the named Plaintiffs fail to allege that they transacted in Eurodollar Contracts on the dates that the Trader Conduct allegedly took place.

Notwithstanding the new allegations of downward *or upward* manipulation in the PSAC, Plaintiffs' theory that Defendants' conduct caused them actual damages has not changed: Plaintiffs allege that they purchased Eurodollar Contracts during the Class Period at artificial

---

[27] Plaintiffs cannot use the Barclays Settlements to state a claim by citing one request for a higher three-month LIBOR submission referencing unidentified "futures contracts," PSAC ¶ 186, and certain other requests that allegedly coincided with International Money Market dates, *id.* ¶¶ 187-90.  None of these communications expressly references domestically traded Eurodollar Contracts, and the Barclays Settlements contain no admission that any of these requests actually affected a published LIBOR fixing.  As discussed *infra* Section II.C, Plaintiffs—who have consistently alleged that they were harmed by LIBOR *suppression*—allege no facts to show how they were harmed by an *upward* request or that they had trading positions that were harmed as a result of *any* of these alleged requests.

[28] *See In re Energy Transfer Partners Natural Gas Litig.*, No. 07-3349, 2009 WL 2633781, at *11 (S.D. Tex. Aug. 26, 2009); *see also Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11-2484, 2013 WL 944777, at *11 (S.D.N.Y. Mar. 12, 2013) (dismissing 10b-5 class action claims where allegations failed to tie named plaintiff's losses to the alleged corrective disclosure).

prices as a result of Defendants' alleged manipulation of USD LIBOR.  While this Court found such allegations sufficient where Plaintiffs alleged that Defendants suppressed LIBOR, which in turn caused Eurodollar futures contracts to be artificially high, *In re LIBOR*, at *42, a different conclusion is warranted here, where Defendants allegedly manipulated USD LIBOR both downward and upward.  Plaintiffs' allegations that Defendants inflated USD LIBOR—which would, by their own theory, cause Eurodollar futures prices to be artificially low—is inconsistent with their generalized allegation that they suffered damages by purchasing Eurodollar Contracts at artificially high prices.  The named Plaintiffs offer no explanation of how they or others in the proposed class suffered damages from purchasing such contracts at artificially low prices.

Further, the named Plaintiffs do not allege that they transacted in Eurodollar Contracts on the dates when the Trader Conduct allegedly took place.  The named Plaintiffs' proposed reliance on specific instances of allegedly episodic Trader Conduct requires them to plead specific facts showing that they established market positions while prices were artificial and exited positions at a loss after the artificiality subsided.  *See Energy Transfer Partners*, 2009 WL 2633781, at *11; *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  Unlike Plaintiffs' previous claims premised on the uniform manipulation of LIBOR for an extended period, the Trader Conduct claims are based on allegations that USD LIBOR was manipulated on discrete occasions and in different directions.  Thus, the timing of the named Plaintiffs' Eurodollar futures transactions and the nature of those transactions are essential elements of their proposed Trader Conduct claims.  These elements are entirely missing from the PSAC.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

25

Dated: New York, New York
       July 1, 2013

/s/ Robert F. Wise, Jr.                     /s/ Daryl A. Libow
Robert F. Wise, Jr.                         Daryl A. Libow
Arthur J. Burke                             Christopher M. Viapiano
Paul S. Mishkin                             SULLIVAN & CROMWELL LLP
DAVIS POLK & WARDWELL LLP                   1701 Pennsylvania Avenue, N.W.
450 Lexington Avenue                        Washington, D.C.  20006
New York, New York  10017                   Telephone: (202) 956-7500
Telephone: (212) 450-4000                   Fax: (202) 956-6973
Fax: (212) 450-4800                         libowd@sullcrom.com
robert.wise@davispolk.com                   viapianoc@sullcrom.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com                  *Attorneys for Defendant The Bank of Tokyo-*
                                            *Mitsubishi UFJ, Ltd.*

*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A. Tokyo*

26

/s/ Jeffrey T. Scott
David H. Braff
Yvonne S. Quinn
Jeffrey T. Scott
Matthew S. Fitzwater
Matthew J. Porpora
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
braffd@sullcrom.com
scottj@sullcrom.com
fitzwaterm@sullcrom.com
porporam@sullcrom.com


/s/ Jonathan D. Schiller
Jonathan D. Schiller
Leigh M. Nathanson
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
lnathanson@bsfllp.com

Michael Brille
5301 Wisconsin Avenue NW
Washington, D.C.  20015
Telephone: (202) 237-2727
mbrille@bsfllp.com

*Attorneys for Defendant Barclays PLC*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Jonathan Gimblett
1201 Pennsylvania Avenue N.W.
Washington, D.C.  20004
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
jgimblett@cov.com


/s/ Michael R. Lazerwitz
Michael R. Lazerwitz
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
mlazerwitz@cgsh.com

*Attorneys for Defendants Citibank, N.A. and Citigroup Inc.*

/s/ David R. Gelfand

David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & MCCLOY LLP
One Chase Manhattan Plaza
New York, New York  10005
Telephone: (212) 530-5000
dgelfand@milbank.com
smurphy@milbank.com

*Attorneys for Defendant Coöperatieve*
*Centrale Raiffeisen-Boerenleenbank B.A.*

/s/ Herbert S. Washer

Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

*Attorneys for Defendant Credit Suisse Group AG*

/s/ Ed DeYoung

Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
3 World Financial Center
New York, New York  10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendants HSBC Holdings plc and*
*HSBC Bank plc*

/s/ Thomas C. Rice

Thomas C. Rice
Juan A. Arteaga
Omari L. Mason
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
omason@stblaw.com

*Attorneys for Defendants JPMorgan Chase & Co.*
*and JPMorgan Chase Bank, N.A.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Lisa J. Fried
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York  10022
Telephone: (212) 918-3000
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com

*Attorneys for Defendants Lloyds Banking Group
plc and HBOS plc*

/s/ Andrew W. Stern
Alan M. Unger
Andrew W. Stern
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
Telephone: (212) 839-5300
Fax: (212) 839-5599
aunger@sidley.com
astern@sidley.com
ncrowell@sidley.com

*Attorneys for Defendant The Norinchukin Bank*

/s/ Ethan E. Litwin
Ethan E. Litwin
Christopher M. Paparella
Marc A. Weinstein
Morgan J. Feder
HUGES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York  10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
litwin@hugheshubbard.com
paparella@hugheshubbard.com
feder@hugheshubbard.com

*Attorneys for Defendant Portigon AG (f/k/a
WestLB AG)*

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois  60661
Telephone: (312) 902-5200
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com

*Attorneys for Defendant Royal Bank of Canada*

*/s/* Fraser L. Hunter, Jr.
Fraser L. Hunter, Jr.
David S. Lesser
Alan E. Schoenfeld
WILMER CUTLER PICKERING
    HALE AND DORR LLP
250 Greenwich Street,
New York, New York  10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York  10019
Telephone: (212) 878-8000
Fax: (212) 878-8375
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com

*Attorneys for Defendant The Royal Bank of
Scotland Group plc*

*/s/* Peter Sullivan
Peter Sullivan
Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
lzweifach@gibsondunn.com

Thomas G. Hungar (*of counsel*)
D. Jarrett Arp (*admitted pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
jarp@gibsondunn.com
thungar@gibsondunn.com

*Attorneys for Defendant UBS AG*