**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | ECF Case |
| | **ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**EXCHANGE-BASED PLAINTIFFS' MOTION FOR LEAVE TO**
**AMEND AS TO COMMODITY EXCHANGE ACT CLAIMS AND FILE**
**THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**LOVELL STEWART**
**HALEBIAN JACOBSON LLP**
Christopher Lovell
Jody R. Krisiloff
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Email: clovell@lshllp.com
jkrisiloff@lshllp.com
amiller@lshllp.com

**KIRBY McINERNEY LLP**
David Kovel
Daniel Hume
Lauren Wagner Pederson, Of Counsel
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 371-6600
Email: dkovel@kmllp.com
dhume@kmllp.com
lpederson @kmllp.com

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT .......................................................................................... 2

I.   TRADER-BASED MANIPULATION CLAIMS AND ALL CLAIMS AFTER
     MAY 29, 2008 ARE TIMELY AND AMENDMENT IS THEREFORE NOT FUTILE ...... 2

     A.   The Pre-August 2007 Trader-Based Manipulation Claims Are Timely ............... 2

     B.   The Period 1 Trader-Based Manipulation Claims Are Timely ........................... 4

     C.   Any Inquiry Notice Dissipated After May 2008 ................................................ 6

     D.   Plaintiffs' Amended Allegations Demonstrate Fraudulent Concealment .......... 12

II.  THE PSAC PLAUSIBLY PLEADS TRADER-BASED MANIPULATION
     CLAIMS UNDER THE CEA ........................................................................ 14

     A.   The PSAC Plausibly Alleges That Each Defendant Engaged In
          Trading-Motivated Manipulation To Benefit Its Derivatives Positions.............. 14

     B.   The PSAC Plausibly Pleads Manipulative Intent ................................................ 15

     C.   The PSAC Plausibly Pleads Trader Manipulation Caused Artificial Prices ....... 16

CONCLUSION....................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*In re Amaranth Natural Gas Commodities Litigation*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................................................... 16

*Anderson News, LLC v. American Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)........................................................................................ 12

*In re Anthony J. DiPlacido*,
   CFTC No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008) .................................... 17

*In re Apple Computer Securities Litigation*,
   886 F.2d 1109 (9th Cir.1989) ....................................................................................... 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................. 7, 14

*Baskin v. Hawley*,
   807 F.2d 1120 (2d Cir. 1986)...................................................................................... 13

*Butala v. Agashiwala*,
   916 F. Supp. 314 (S.D.N.Y. 1996).............................................................................. 13

*CFTC v. Parnon Energy*
   875 F. Supp. 2d 233 (S.D.N.Y. 2012).......................................................................... 15

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013)................................................................................*passim*

*In re Copper Antitrust Litigation*,
   No. 99–C–621, 2000 WL 34230131 (W.D. Wis. 2000)............................................... 8

*In re DaimlerChrysler AG Securities Litigation*,
   269 F. Supp. 2d 508 (D. Del. 2003).............................................................................. 9

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010).......................................................................................... 9

*DiPlacido v. CFTC*
   364 F. App'x 657 (2d Cir. 2009) ................................................................................ 15

*Dodona I, LLC v. Goldman Sachs & Co.*.
   847 F. Supp. 2d 624 (S.D.N.Y. 2012)......................................................................... 16

*Domenikos v. Roth,*
 288 F. App'x 718 (2d Cir. 2008) ............................................................ 4

*Dura Pharmaceuticals, Inc. v. Broudo,*
 544 U.S. 336 (2005)....................................................................... 2, 17

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC,*
 376 F. Supp. 2d 385 (S.D.N.Y. 2005).................................................. 16

*Koch v. Christie's International PLC,*
 699 F.3d 141 (2d Cir. 2012)............................................................ 1, 10

*In re Global Crossing, Ltd. Securities Litigation,*
 313 F. Supp.2d 189 (S.D.N.Y. 2003)..................................................... 5

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation,*
 No. 00 Civ. 7804, 2004 WL 487222 (S.D.N.Y. March 12, 2004).......................... 13

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.,*
 318 F.3d 148 (2d Cir.2003)............................................................ 7, 8

*Leist v. Simplot,*
 638 F.2d 283 (2d Cir. 1980)............................................................ 16

*Lentell v. Merrill Lynch & Co.,*
 396 F.3d 161 (2d Cir. 2005)............................................................. 8

*In re LIBOR-Based Financial Instruments Litigation,*
 No. 11-2262, 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013)........................... *passim*

*In re Merrill Lynch Ltd. Partnerships Litigation,*
 154 F.3d 56 (2d Cir. 1998)............................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith v. Curran,*
 456 U.S. 353 (1982).................................................................... 16

*In re Natural Gas Commodity Litigation,*
 337 F. Supp. 2d 498 (S.D.N.Y. 2004)................................................... 13

*In re Natural Gas Commodity Litigation,*
 358 F. Supp. 2d 336 (S.D.N.Y. 2005)................................................... 15

*Newman v. Warnaco Group, Inc.,*
 335 F.3d 187 (2d Cir. 2003)......................................................... 9, 13

*In re Nine West Shoes Antitrust Litigation*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000)......................................................... 13

*O'Brien v. National Property Analysts Partners*,
   719 F. Supp. 222 (S.D.N.Y. 1989)........................................................... 13

*In re Platinum and Palladium Commodities Litigation*,
   828 F. Supp.2d 588 (S.D.N.Y. 2011)....................................................... 17

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
   648 F.3d 533 (7th Cir. 2011) ................................................................... 11

*Rotella v. Wood*,
   528 U.S. 549 (2000)................................................................................... 6

*Shah v. Meeker*,
   435 F.3d 244 (2d Cir. 2006)..................................................................... 10

*Staehr v. Hartford Financial Services Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)........................................................... 10, 12, 13

*State of New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988)................................................................... 13

*Statistical Phone Philly v. Nynex Corp.*,
   116 F. Supp. 2d 468 (S.D.N.Y. 2000)........................................................ 5

*In re Sumitomo Copper Litigation*,
   104 F. Supp. 2d 314 (S.D.N.Y. 2000)....................................................... 16

*Yeadon v. New York City Transit Authority*,
   719 F. Supp. 204 (S.D.N.Y. 1989).......................................................... 5, 6

## Statutes

Federal Rule of Civil Procedure 9(b)........................................................... 2, 15

## Other Authorities

Black's Law Dictionary 1201 (6th ed. 1990)..................................................... 1

## PRELIMINARY STATEMENT

In opposing Plaintiffs' motion to amend, Defendants are reduced to:  (i) rehashing arguments this Court already rejected; (ii) eliding the difference between LIBOR suppression and episodic trader-based manipulation, despite previously admitting that these distinct scenarios involve "two different types of allegations," March 5, 2013 Tr. at 47:17-48:9; and (iii) erecting new CEA pleading standards.  Defendants' arguments are meritless and should be rejected.

**Statute of Limitations:**  Defendants do not meet their heavy burden of demonstrating that Plaintiffs had inquiry notice[1] of Defendants' trader-based manipulation for any time period. First, as this Court previously observed, because the purported motivation for Defendants' LIBOR suppression was the financial crisis, there was no basis for a person of ordinary intelligence to suspect probable pre-financial crisis LIBOR manipulation.  Second, because systemic LIBOR suppression and episodic trader-based LIBOR manipulation involved distinct misconduct and at times fundamentally different injuries (depending on downward versus upward manipulation of LIBOR), inquiry notice of the former is not inquiry notice of the latter. Indeed, the Second Circuit recently clarified this principal in *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013).  Third, any inquiry notice that arose between August 2007 to May 2008 dissipated during the height of the financial crisis in light of Defendants' and the BBA's repeated denials of continued wrongdoing, and several respected publications positing benign explanations for LIBOR's movement and rejecting the *Wall Street Journal* ("*WSJ*") analysis. The Second Circuit's decision in *Koch*, 699 F.3d 141, is particularly instructive, and establishes

---

[1] At the pleading stage, to satisfy their heavy burden Defendants must show that "a person of ordinary intelligence would consider it 'probable' that fraud had occurred." *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 151 n.3 (2d Cir. 2012).  "Probability" is defined in Black's Law Dictionary as "[a] condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it," (Black's Law Dictionary 1201 (6th ed. 1990)) and "[t]he likelihood of a proposition or hypothesis being true, from its conformity to reason or experience, or from superior evidence or arguments adduced in its favor."  *Id.* at 1201.

that, owing to the numerous contra-indicators present during this period, a person of ordinary intelligence would not have suspected probable LIBOR suppression or trader-based manipulation.  *See also Cohen*, 711 F.3d at 363 (discussing hindsight bias).

**CEA Pleading Requirements:**  First, Defendants confuse the manipulative conduct at issue when they argue that Plaintiffs were required, but failed, to identify each futures contract underlying Defendants' trader-based manipulation.  Rather, as the Court already held, the manipulative conduct was Defendants' artificial LIBOR submissions, which the Court also determined Plaintiffs had sufficiently pled.  In any event, even if Plaintiffs were generally under an obligation to plead such information, Rule 9(b) is relaxed, where, as here, the specific information regarding Defendants' manipulation is known only to Defendants.  Second, the Court has already held that Plaintiffs sufficiently alleged Defendants' manipulative intent based on their undisclosed self-dealing in connection with their LIBOR suppression.  That ruling applies with even more force to Plaintiffs' allegations that Defendants' surreptitiously fixed LIBOR to benefit their proprietary trading positions.  Third, Defendants forget that Plaintiffs are only required to allege loss causation, not prove it, at the pleading stage.  Moreover, this Court has already rejected Defendants' bid to shoehorn the *Dura* analysis into the CEA context.

Accordingly, because Defendants have failed to establish that any of Plaintiffs' proposed amendments would be futile, the Court should grant Plaintiffs' motion to amend in its entirety.

## ARGUMENT

## I.   TRADER-BASED MANIPULATION CLAIMS AND ALL CLAIMS AFTER MAY 29, 2008 ARE TIMELY AND AMENDMENT IS THEREFORE NOT FUTILE

### A.   The Pre-August 2007 Trader-Based Manipulation Claims Are Timely

In its March 29, 2013 decision, the Court noted that claims based on pre-August 2007 trader-based LIBOR manipulation were likely timely because the articles cited by the parties

"did not suggest artificiality in LIBOR levels prior to" August 2007.  *In re LIBOR-Based Fin. Instruments Litig.* ("*LIBOR*"), No. 11-md-2262, 2013 WL 1285338, at *32 (S.D.N.Y. Mar. 29, 2013).  This was especially so, "given that August 2007 is commonly recognized as the start of the financial crisis, and that banks' incentive to manipulate LIBOR, as reported in the articles, was related to the crisis."  *Id.*  For this reason, "a person of ordinary intelligence could [not] reasonably have thought that LIBOR manipulation started" earlier than August 2007.  *Id.*

In arguing that such claims are nonetheless untimely, Defendants are unable to identify *any* information (that was not already in the record as of the March 29, 2013 decision), which purportedly demonstrates that "a person of ordinary intelligence" would have known that injury prior to August 2007 was "probable".  *See* Opp. at 18-19.[2]  Rather, Defendants merely conclude that even though the "articles published during Periods 1 and 2" did not pertain "to the Initial Period," an ordinary person should have been alerted to the supposed (but nonexistent) probability that they had been injured during the earlier periods.  *Id.* at 19.

Defendants' argument is flawed for multiple reasons.  First, Defendants ignore that the articles were temporally limited to Period 1, because Defendants' LIBOR suppression was, at most, suspected to be in response to the financial crisis.  *LIBOR*, 2013 WL 1285338, at *32.  As such, there was no basis to believe that Defendants' LIBOR suppression also preceded the

---

[2] "Opp" refers to Defendants opposition to Plaintiff' motion for leave to amend [Dkt. No. 362].  Defendants' observation that the proposed Second Amended Consolidated Class Action Complaint ("PSAC") omits two studies referenced in the First Amended Complaint ("FAC") and that purportedly concern LIBOR manipulation prior to August 2007, is factually inaccurate and legally irrelevant.  *See* Opp. at 19 n.17.  Factually, the primary study at issue is referenced *in both versions* of the complaint.  *Compare* ¶ 12 n.12, *with* FAC ¶ 111 n.39.  In any event, the Court already deemed all the information relevant to Defendants' SOL arguments -- including the studies referenced in ¶¶ 111-14 of the FAC -- insufficient to place Plaintiffs who purchased Eurodollar futures contracts between January 1, 2005 and July 31, 2007 on notice of probable manipulation.  *See LIBOR*, 2013 WL 1285338, at *32.  And for good reason, the studies at issue were published in July 2010 and March 2012 -- *within two years* of the filing of this action.  References herein to "¶ __" are to the PSAC.

financial crisis.[3]  Second, Defendants' contention that the articles discussed broad "fundamental flaws in LIBOR," Opp. at 19, is akin to saying that the articles had nothing to do with trader-based manipulation, and would not put an ordinary person on notice of such conduct prior to August 2007.  Rather the articles, if anything, referred to the possibility that Defendants might be suppressing LIBOR for reputational reasons during the financial crisis.  *See Cohen*, 711 F.3d at 363-64 (holding general awareness of hiding income in a divorce proceeding is not inquiry notice of hiding a settlement for a property investment in the same proceeding, even if the latter was suspected and could have been known).  Because, as Defendants admit, suppression and trader-based manipulation involve "two different types of allegations," Mar. 5, 2013 Tr. at 47:17-48:9, there was no probability (nor even a reason to suspect) any LIBOR manipulation prior to August 2007.  Third, Defendants' argument is wholly unbounded: if LIBOR suppression in response to the financial crisis somehow provided notice of pre-financial crisis LIBOR manipulation, then there would be no limit on how far back an "ordinary person" would have had to inquire.

Accordingly, Defendants have failed to carry their heavy burden of establishing that there was a reported probability of pre-August 2007 manipulation and therefore Plaintiffs' proposed amendment regarding claims based on Defendants' pre-August 2007 conduct is not futile.

### B.      The Period 1 Trader-Based Manipulation Claims Are Timely

Defendants are similarly incorrect that public reports show a probability of trader-based manipulation and that Plaintiffs were on inquiry notice of claims arising from such manipulation between August 1, 2007 and May 29, 2008.

---

[3] For this reason, the Second Circuit's summary order in *Domenikos v. Roth*, 288 F. App'x 718, 720 (2d Cir. 2008) is misplaced since, among other things, the accounting fraud in question was not temporally limited.

Despite this Court's finding that LIBOR suppression and episodic trader-based manipulation "differ in how plaintiffs' injury would be caused" *LIBOR*, 2013 WL 1285338, at *33, and the FSA Audit Report's conclusion that there was *no indication* of manipulation to benefit derivatives traders between January 1, 2007 and May 31, 2009, ¶¶ 365-411, Defendants nonetheless argue that inquiry notice of suppression also yields inquiry notice of manipulation. This is supposedly because the injury from both scenarios ostensibly is the same.  It is not. Suppression harms by increasing Eurodollar futures prices, while trader-based manipulation can injure by lowering Eurodollar futures prices.  In contrast to long-term suppression, trader-based manipulation could cause volatile price movements, resulting in different types and instances of injuries than suppression.  Accordingly, despite Defendants' assertion that suppression and trader-based manipulation necessarily result in the same injury, Plaintiffs' well-pleaded allegations to the contrary must be accepted as fact at this stage.

Defendants' argument is also contrary to the Second Circuit's decision in *Cohen*, 711 F.3d at 362-63.  Following *Cohen*, even assuming *arguendo* that Plaintiffs had inquiry notice during Period 1 of Defendants' systemic suppression of LIBOR, there is no authority supporting the argument that an ordinary person should have found it probable that she had been injured due to episodic trader-based LIBOR manipulation.  *Cf.  Yeadon v. New York City Trans. Auth.*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989).[4]

Equally fatal, Defendants also utterly fail to explain how a plaintiff *generally suspicious* of Defendants' LIBOR submissions during Period 1, could possibly have discovered which

---

[4] Defendants' reliance on *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) and *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468 (S.D.N.Y. 2000) is misplaced.  In *Global Crossing*, the district court denied defendants' motion to dismiss on statute of limitations grounds despite the existence of certain "storm warnings." 313 F. Supp. 2d at 200-03. Meanwhile, *Statistical Phone Philly* was a summary judgment case, where the court's determination was based on a developed record.  *See* 116 F. Supp. 2d at 472.

Defendants engaged in episodic trader-based manipulation.  *Rotella v. Wood*, 528 U.S. 549, 556 (2000); *see also Yeadon*, 719 F. Supp. at 210 (claim not untimely where "plaintiffs knew of their injury, but lacked critical facts about who had inflicted them and for what reason").  This failure is especially telling in light of the FSA Audit Report's conclusion that there was *no indication* of manipulation to benefit derivatives traders between January 1, 2007 and May 31, 2009.  ¶¶ 365-411.[5]  Accordingly, Defendants have failed to carry their burden to show that claims for trader-based LIBOR manipulation for Eurodollar contracts purchased during Period 1 are untimely, or that Plaintiffs' proposed amendment is futile.

### C.    Any Inquiry Notice Dissipated After May 2008

Defendants offer so-called new evidence purportedly demonstrating that Plaintiffs were on inquiry notice for all claims after May 29, 2008.  Opp. at 13-18.  However, as the PSAC demonstrates, the vast bulk of information after May 2008 contraindicated and dissipated whatever storm warnings may have existed earlier, such that after May 29, 2008 a person of ordinary intelligence would not have been alerted to the probability that she had been injured from LIBOR suppression or trader-based conduct.

For example, Plaintiffs have alleged that the BBA – the self-regulatory organization overseeing LIBOR – publicly announced and undertook an examination of LIBOR and declared that it would punish any bank found to be misstating its rates.  ¶ 302.  The announcement of the investigation in April 2008 seemingly put an end to whatever misreporting was occurring (¶¶ 158-60), and when the BBA gave LIBOR a clean bill of health and did not sanction any

---

[5] Nor do the two articles that Defendants identify from the tail-end of Period 1 yield inquiry notice.  *See* Opp. at 11 n.5.  For example, the January 1, 2008 article appearing on the Risk Magazine website noted that "market participants hazard a number of explanations" for LIBOR's movement,  and that one "can only surmise" that LIBOR was manipulated to benefit specific trades:  a theory that "might not be totally far-fetched."  *See* July 1, 2013 Declaration of Matthew J. Porpora ("Porpora Decl.") at Ex. J [Dkt. No. 363].  Similarly, the April 16, 2008 *WSJ* article remarked, in passing, on a report noting that banks "*might* have an incentive to provide false rates to profit from derivatives transactions."  Porpora Decl., at Ex. K.

submitter in 2008, it appeared to do so with the tacit approval of the Federal Reserve and the Bank of England ("BOE").  ¶¶ 301-03; Kovel Decl. Ex.[6] G (June 10, 2008 Dow Jones article saying these regulators were very interested in the review process).  Under the circumstances, a person of ordinary intelligence would have plausibly concluded that there had been no illicit misreporting of LIBOR and certainly no continuing misconduct.  This is because the BBA "had a strong incentive to maintain market confidence in LIBOR's integrity." *LIBOR*, 2013 WL 1285338, at *29; *see also Cohen*, 711 F.3d at 360 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).[7]

In addition, Defendants took steps to conceal their communications about misreporting after April 2008.  ¶¶ 297-98, 424-25.  Certain defendants also gave detailed explanations for why the benchmark was being reported correctly, even if it appeared out of kilter with other market indicators such as the Eurodollar deposit rate, or the OIS or CDS markets.  ¶¶ 304-08, 310, 330. Additionally, JP Morgan produced an unequivocal and persuasive research report rebutting the Peng Report, *see LIBOR*, 2013 WL 1285338, at *29, and exonerating all the banks and the LIBOR mechanism itself.  (Kovel Decl. Ex. C at 1, 3-5)  The research report, which was relied on by the FSA (¶ 403), presented a detailed explanation as to why LIBOR could be accurate and yet diverge strongly from other benchmarks.[8]

---

[6] "Kovel Decl. Ex. __" refers to the exhibits cited in the Declaration of David Kovel submitted herewith.  *See also* Kovel Decl. Ex. O, chart listing BBA's significant involvement in oversight of LIBOR investigation.

[7] The contention that a person of ordinary intelligence would have been "cautious" about the BBA's statements (*LIBOR*, 2013 WL 1285338, at *29) is, respectfully, unsupported by the PSAC, which does not include any facts suggesting that  the BBA was not going to investigate, that it was corrupt, or that it was complicit in Defendants' misconduct.  The BBA's promise to remove any bad acting bank could logically be taken on its face and is nothing like the more anodyne "mere expressions of hope" exhibited in *LC Capital Partners, LP, v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003).

[8] *E.g.*, "after trimming out the higher and lower quartiles, the BBA averages the remaining rates.  In contrast, the Fed data is untrimmed and is likely to contain more outlying observations," thus tending to "pull" the Federal Reserve's daily published rate "above the BBA Libor level".  Kovel Decl. Ex. C at 3.

Taken in chorus, Defendants' active and specific denials (individually and through the BBA), their other acts of concealment (*see* ¶¶ 297-98, 304-10, 424-25), and the apparent approval of the two regulators with inside knowledge, all of which occurred in the highly uncertain backdrop of the post-May 29, 2008 financial crisis, dissipated any prior probability of manipulation.  Such dissipation occurred because: (1) the Defendants disclosed problems with respect to LIBOR that were not significant and readily identifiable relative to other dislocations occurring during the financial crisis; (2) the conditions for reoccurrence of the conduct were not likely given the BBA investigation and heightened scrutiny of LIBOR submissions;[9] and (3) the alleged reassuring steps taken to avoid the reoccurrence of misreporting were substantial.  *See LC Capital Partners,* 318 F.3d at 155.[10]

At the end of May 2008, information in the market included, *inter alia*:

- The JP Morgan report.[11]

- An August 2008 working paper by four academics (finally published in 2009, ¶ 328) which appeared to undermine the validity of the *WSJ* article's analysis and found that the very evidence the *WSJ* used "is inconsistent with an effective manipulation of the level" of LIBOR (Kovel Decl. Ex. K at 10, 14).

- The BBA's initiation of investigation, consistent declarations of oversight of LIBOR, and exoneration in August. ¶¶ 295-303.

---

[9] Defendants point out that they had the same incentives to manipulate in Period 2 as in Period 1.  Opp. at 16. However, "conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud—let alone furnish a basis sufficiently particular to support a fraud complaint."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005).

[10] Even as those investors who traded Eurodollar futures contracts both prior to and after May 29, 2008 the mix of information available would have caused a person of ordinary intelligence to believe that whatever injury occurred in the earlier period was no longer ongoing.  Each "overt act" of trader manipulation that injured Plaintiffs starts the statutory period running again, "regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  *In re Copper Antitrust Litig.*, No. 99–C–621, 2000 WL 34230131, at *21 -22 (W.D. Wis. July 12, 2000) (finding that a RICO cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff).

[11] Concluding that "other explanations can account for [ ] discrepancy [between LIBOR and other benchmarks]" and, "data from the Eurodollar deposit market also tends to contradict the notion that BBA Libor is out of line with actual bank borrowing levels." Kovel Decl. Ex. C at 3-4.

- The FSA Banking Sector, which carried out an analysis and found the *WSJ* study "contained inaccuracies." ¶ 403.

- An International Money Fund report concluding LIBOR was accurate. ¶ 408.

In the foregoing context, an ordinary person could plausibly believe that LIBOR had diverged from other money market indicators because of the frozen interbank lending market and interquartile averaging of LIBOR. ¶¶ 304, 307; Kovel Decl. Ex. C at 3. Knowledge that LIBOR failed to reflect true money market rates during the financial crisis is entirely different from knowledge that each Defendant's estimate of **its** subjective and opaque borrowing rate was intentionally and falsely understated.[12]

Although Defendants cite to non-authoritative sources which report, generally, on the divergence between LIBOR and other benchmarks,[13] Opp. at 13-14, media sources contain innocent structural explanations for such divergence. *See, e.g.*, Kovel Decl. Ex. J (July 29, 2008 *Financial Times* article stating, *inter alia*, that "[t]he main problem with Libor is the capital strains facing banks."). Moreover articles available after May 29, 2008 did not mention banks by name or do more than report previous rumors that LIBOR *might have been* intentionally misreported and manipulated by the banks.[14] Conversely, the BBA, the Defendants' studies and denials, and the apparent interest of the Federal Reserve and BOE in the investigation all addressed this precise issue in an authoritative manner. *See Cohen*, 711 F.3d at 363 ("inquiry

---

[12] *See Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194 (2d Cir. 2003); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 515-16 (D. Del. 2003) ("When evaluating the mix of information available to them, Plaintiffs ha[ve] a right to believe in and trust the position of management who knew the terms of the arrangement intimately, as opposed to the speculation of media analysts and commentators who analyzed it from afar.") (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989) (recognizing that "[t]he investing public justifiably places heavy reliance on the statements and opinions of corporate insiders")).

[13] Defendants' additional articles cannot be relied on for any purpose other than their existence. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,111,113 (2d Cir.2010) (citation omitted). To the extent the Court deems it proper to even consider these articles, Plaintiffs have provided certain additional documents to show the countervailing information in the market.

[14] For example, the survey Defendants cite, Opp. at 14 (citing to Porpora Decl. Ex. T), simply asked unnamed respondents whether LIBOR reflected true money market rates, not whether LIBOR was suppressed and by whom.

notice is triggered by awareness of *facts* which a reasonable person would investigate; it is not triggered by unfounded suspicions") (emphasis in original).

Plaintiffs thus plausibly allege that there was uncertainty as to why a divergence between LIBOR and money market benchmarks was occurring sufficient to refute Defendants' claims of notice.[15]  *See* Plaintiffs' opening brief at 2-3, 10-21.  Indeed, market regulators "recognised that LIBOR dislocation was caused by structural issues in the LIBOR fixing process interacting with the deteriorating market conditions" (¶¶ 391, 408, 410 (internal quotation marks omitted)), and lack of interbank lending (¶¶ 379-82), instead of ascribing the divergence to manipulative suppression.  That LIBOR was increasing dramatically at this time such that market participants thought it was *too high* also served to diminish concern about suppression.  ¶ 408.  As described contemporaneously by a member of the FSA's Markets Division, when considering intentional suppression, "Its [*sic*] very difficult to tell if this is a real issue. . . ."  ¶ 402.  If it was "very difficult" for an insider expert with special information, it was impossible for an outsider of ordinary intelligence.

This general fact pattern of whether a mix of contra-indicators and indicators permit a finding of "probability" that the plaintiff had been injured was presented in *Koch*, 699 F.3d at 151 n.3.  There, a sophisticated investor in counterfeit wine was **not** put on inquiry notice even when articles, experts and litigation all suggested or alleged that the wine's provenance was not as represented.  *Id.*; *accord Cohen*, 711 F.3d at 362-63.  No such litigation existed here.  Here, the denials were made by the only persons with personal knowledge, and the BBA which

---

[15] For this reason, Plaintiffs' supposedly "inconsistent" pleadings (Opp. at 15) about what banks were implicated by the *WSJ* article are a reflection of the uncertain and contradictory information available to the person of ordinary intelligence in 2008.  In this context, it is understandable that the *WSJ* study could not have put a person of ordinary intelligence on notice that all reporting banks were suppressing LIBOR.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 431 (2d Cir. 2008) (article not directly implicating particular defendant could not put plaintiffs on inquiry notice as to that defendant); *Shah v. Meeker*, 435 F.3d 244, 250-51 (2d Cir. 2006) (exact defendant and conduct identified).

investigated the matter.  Considering that the reasons alleged for LIBOR's divergence conflicted, a person of ordinary intelligence would not see probability of manipulation here.

Contrary to Defendants' assertion, Opp. at 18, the fact that the CFTC began scrutinizing LIBOR during Period 1, if true, does not establish inquiry notice and certainly not for Period 2. The CFTC operates under merely a "deems appropriate" standard to issue a private order of investigation, which is a substantially lower threshold than a probability standard.  In any event, Plaintiffs also plausibly allege that many other governmental bodies did not believe that LIBOR had been manipulated because they continued to rely on the benchmark after May 2008.  ¶¶ 351-64.  Plaintiffs plausibly allege that highly sophisticated market participants (*i.e.*, central banks) based unprecedented stimulus packages on LIBOR.  ¶¶ 352-61. In doing this, government market participants demonstrated a firm belief in LIBOR's reliability, which they conveyed to the public.  *Id.*  As the BOE representative testified:  "We would not have dreamt of using LIBOR as part of the pricing structure for Bank of England operations had we doubts about what is now referred to as low-balling or high-balling, or anything else. … [W]e did not have suspicions of dishonesty and we thought … the pattern of LIBOR movements made sense." Kovel Decl. Ex. N at 13.  The BOE did not have suspicions of dishonesty in the Spring of 2008, and arguably the most sophisticated market participant in the world (the United States Department of Treasury) was increasing its reliance on LIBOR – shifting from prime to LIBOR – in late 2008.[16]  This is evidence that any suspicions of LIBOR manipulation had dissipated.

---

[16]  Defendants' reliance on *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 537 (7th Cir. 2011) involves a very different scenario. Opp. at 18.  There the trading occurred on October 31, 2001, and full details as to why it were improper were known publicly shortly thereafter, even though regulatory enforcement did not begin until several years later.  In contrast here, there was no certainty in the first place that LIBOR was improperly reported.

Defendants also fail to adequately address the study alleged in the PSAC which shows the behavior of stock prices of reporting banks indicates that the market did not believe that banks would be exposed to regulatory fines due to LIBOR manipulation until 2011 or 2012. ¶¶ 335-43. This study focused on specific days in April and May of 2008 when articles reported divergences of LIBOR from other rates and presented conflicting explanations for such divergence. *Id.* This same study also shows a significant decline in Defendants' stock prices during March 2011 and, especially, June 2012, when the Barclays settlement occurred. *Id.* Thus, Plaintiffs plausibly allege that the collective wisdom of the market did not consider that manipulation was probable during 2008, but did during 2011 or 2012. Defendants' alternative and unsubstantiated assertion that the market was incorporating these liabilities into bank prices over time in 2008 is both premature and rank speculation when compared with Plaintiffs' statistically grounded allegations. *Compare Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) *with Cohen*, 711 F.3d at 360. Defendants' attempts to have the Court make contrary factual inferences at this point in the litigation should be rejected.[17]

### D.   Plaintiffs' Amended Allegations Demonstrate Fraudulent Concealment

Defendants' trader-based episodic LIBOR manipulation is a prototypical example of self-concealing conduct sufficient to establish fraudulent concealment. ¶¶ 287-94, 413 ("this strategy sometimes involved smaller misreports by the banks and was therefore virtually undetectable

---

[17] Defendants inappropriately argue that certain articles *factually demonstrate* that market participants shifted away from LIBOR-based investments during 2008 because of perceived problems with the LIBOR process. Opp. at 18. The May 29, 2008 *Bloomberg* article relied on for this proposition, *LIBOR*, 2013 WL 1285338, at *28, at most only weakly and without basis connects lower Eurodollar futures volume with lower confidence in LIBOR, *see* Porpora Decl., Ex. X at 4, and is contradicted by other articles that give more plausible reasons for futures volume decreases, *see, e.g.*, Kovel Decl., Ex. M (December 8, 2008 Barron's article attributing reduction in futures volume to significantly less hedging by banks no longer in the swaps market). Thus, the *Bloomberg* article certainly cannot be accepted as to the truth of its assertions. *See Staehr*, 547 F.3d at 425. It is insufficient to give notice of anything more than decreasing Eurodollar futures volume at the CME. **In fact**, futures volume and open interest did not decrease in a statistically significant way on any purported relevant inquiry notice days in April or May 2008.

without insider knowledge of the activities").[18]   Plaintiffs could not have ascertained which particular Defendant on any given day submitted an artificial LIBOR quote for trading advantage without access to Defendants' internal files.   ¶ 419.  *See Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986) (it would not be reasonable to require a plaintiff to establish diligence in attempting to obtain concealed files).

Defendants' reliance on *Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996) is misplaced because there the court found there were "conspicuous warnings" of defendants' misrepresentations.  *Id.* at 319.  In contrast, prior to the Barclays' settlements, Plaintiffs had no facts suggesting that LIBOR and Eurodollar futures contracts were being manipulated for trading gain, as opposed to suppression. ¶¶ 415-23.[19]  Plaintiffs' amended allegations of fraudulent concealment also demonstrates both that Defendants took affirmative steps to prevent Plaintiffs' discovery of their manipulation claim, and that the trader-based manipulation was self-concealing in nature.  ¶¶ 295-310, 329-30, 346.[20]  Accordingly, it is not necessary to examine whether Plaintiffs exercised due diligence because they could not have been "alerted as to the probability of fraud." *Butala*, 916 F. Supp. at 319 (citation omitted).

---

[18] *See State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (collusive bid rigging is of such a nature as to be self-concealing); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2004); *In re Issuer Plaintiff Initial Public Offering Antitrust Litig.*, No. 00 Civ. 7804, 2004 WL 487222, at *4 (S.D.N.Y. March 12, 2004) (price fixing is inherently self-concealing); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (same).

[19] *See Staehr*, 547 F.3d at 426–27 (to constitute a "storm warning," the "triggering information must relate [ ] directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants") (citations omitted); *see also Newman*, 335 F.3d at 193 (same).

[20] *O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989), and *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir. 1998), cited by Defendants, do not involve self-concealing conduct.

## II.   THE PSAC PLAUSIBLY PLEADS TRADER-BASED MANIPULATION CLAIMS UNDER THE CEA

### A.   The PSAC Plausibly Alleges That Each Defendant Engaged In Trading-Motivated Manipulation To Benefit Its Derivatives Positions

Conceding as law of the case that Plaintiffs adequately pleaded their suppression-based CEA claims, Opp. at 3, 20, Defendants wrongly argue that Plaintiffs are required to identify each trade transacted by each Defendant in order to adequately plead trader-motivated LIBOR manipulation.  Although Defendants attempt to elide the issue, the "manipulative act" here is Defendants' artificial LIBOR submissions.  This Court has already held that Plaintiffs sufficiently alleged that "each defendant" performed manipulative acts by making artificial LIBOR submissions "on all or a substantial of the business days" during August 2007 to May 2010.  *LIBOR*, 2013 WL 1285338, at *39.[21]

Moreover, Defendants wholly ignore that "courts generally relax Rule 9(b)'s requirements in the context of manipulation claims, as such claims often involve facts solely within the defendants' knowledge." *Id.* at *37 (internal marks omitted).  This is precisely the scenario here:  it would be manifestly unreasonable to require Plaintiffs to identify the specific trades that motivated Defendants' false LIBOR submissions, as such specifics are essentially unknowable absent discovery.  In contrast, where Plaintiffs could glean such information from certain of the Defendants' regulatory settlements, that information was pled in detail.

Plaintiffs are only required to provide each Defendant with notice of its trader-based conduct in accordance with Rule 8(a)'s "plausibility" standard, a low burden which Plaintiffs have easily met.  *Iqbal*, 556 U.S. at 668 ("The plausibility standard is not akin to a 'probability

---

[21] Based on the new information from regulatory settlements, the PSAC now alleges, *inter alia*, that Defendants were heavily involved in trading financial instruments tied to LIBOR, including Eurodollar futures contracts, and that their trading was benefitted by the LIBOR manipulation.  ¶¶ 183-217.

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citation omitted). The PSAC alleges that each Defendant engaged in trader-based LIBOR manipulation during the Class Period; alleges the same motive and opportunity for such conduct by each Defendant, *i.e.*, the ability to profit through undisclosed self-dealing; provides specific examples of such conduct by certain of the Defendants;[22] and recounts that the various settlements implicate the other Defendants in the same misconduct.[23] *See, e.g.*, ¶ 420 (Barclays ex-CEO calls manipulation an "industry wide problem"). The PSAC plausibly alleges each Defendant's involvement in this "industry-wide problem."[24]

### B.     The PSAC Plausibly Pleads Manipulative Intent

Defendants continue to erroneously argue that the "strong inference of scienter" standard – which is applied to securities fraud claims and based on the Private Securities Litigation Reform Act – is the appropriate intent standard under the CEA. Opp. at 22-24. Neither the Second Circuit, the CFTC, nor Rule 9(b) of the Federal Rules of Civil Procedure have imported the "strong inference of scienter" requirement from the securities context to the CEA.[25] In any event, it is the law of the case that Plaintiffs sufficiently pleaded facts giving rise to a "strong

---

[22] The PSAC provides several examples where Barclays sought to benefit its position on Eurodollar futures contracts by manipulating LIBOR at settlement. *See* ¶¶ 183-90.

[23] Indeed, this Court has already held that documents produced in the Barclays settlements "suggest that Barclays cooperated with other banks, including banks of the USD LIBOR panel, in ways that were not necessarily in the mutual interest of all parties involved," including by communicating with traders at other panel banks to request LIBOR submissions that would be favorable to the trading positions of Barclays traders and/or their counterparts at other banks. *LIBOR*, 2013 WL 1285338, at *46; *see also* ¶¶ 195-96, 218, 220-22, 235-36, 250, 275.

[24] Defendants' argument that the regulatory settlements purported to create an exhaustive catalog of the violations found by the regulators is false. Rather, the settlements merely provided "examples" of Defendants' "routine" conduct. *Compare* ¶¶ 186, 188, 193, 197 *with* B-DOJS ¶¶ 12, 13-16, 26-27; ¶ 218 *with* U-SFAS at 2 ¶ 7; *and* ¶¶ 221-22 *with* R-SFAS at 1-2. Where, as here, the regulatory orders and filings "merely attempt[] to summarize evidence of [defendants'] CEA violations," and the specific facts are exclusively within the knowledge of Defendants, the complaint need not allege the specifics of the misconduct and name each person involved. *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 345 n.7 (S.D.N.Y. 2005).

[25] *See DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009); *CFTC v. Parnon Energy*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) ("Because proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused.") (citation omitted).

inference of scienter" as to each Defendant by alleging that Defendants stood to gain concrete benefits from manipulating Eurodollar futures contracts, and "undeniably had the opportunity to manipulate Eurodollar contract prices by submitting artificial LIBOR quotes." *LIBOR*, 2013 WL 1285338, at *38. Such motive and opportunity stand in even greater relief with respect to the allegations of trading-motivated LIBOR misreporting.[26]

Because all Defendants are alleged to have been motivated to submit artificial LIBOR submissions in order to benefit their proprietary trading positions on Eurodollar futures contracts, Plaintiffs have plausibly pleaded manipulative intent with respect to each Defendant.

## C.     The PSAC Plausibly Pleads Trader Manipulation Caused Artificial Prices

Defendants echo their motion for reconsideration in arguing that Plaintiffs did not allege that their positions were long or short, and thus not only failed to plead "loss causation" but also made a "judicial admission" that they were not injured by a trading-motivated upward manipulation of LIBOR.[27] But Defendants do not suggest how a trader's injuries from upward manipulation at certain times would be inconsistent with injuries with a downward manipulation at other times. The inquiry on a CEA manipulation claim must be on the existence of artificial prices, not whether prices were artificially high or artificially low. *LIBOR*, 2013 WL 1285338, at *39.[28] Plaintiffs cannot be expected to state "precisely how" each Defendant's LIBOR quote on each day of the Class Period was artificial or inaccurate. *LIBOR*, 2013 WL 1285338, at *39.

---

[26] *See Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012) (ability to profit from undisclosed self-dealing sufficient to establish motive and opportunity) (citation omitted); *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 540 (S.D.N.Y. 2008) (actions to manipulate closing price "strongly suggest an improper motive"); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (same).

[27] *Compare* Defendants' Mem. of Law in Support of Their Motion for Reconsideration or Reargument dated April 12, 2013 [Dkt. No. 297] at 3 *with* Opp. at 24.

[28] *See also Leist v. Simplot*, 638 F.2d 283, 290-91 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353 (1982); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91 (S.D.N.Y. 1998).

Finally, Defendants are incorrect that Plaintiffs must "plead specific facts showing that they established market positions while prices were artificial and exited positions at a loss after the artificiality subsided." Opp. at 25.  First, as Defendants recognize, *id.* at 8, "loss causation" is not an element of a CEA manipulation claim. *LIBOR*, 2013 WL 1285338, at *23.  Second, the argument again improperly attempts to re-litigate an argument previously decided against Defendants.  *Id.* at *42 ("Although this information might be in the possession of defendants, it could not be known by plaintiffs").  Third, the securities fraud model of loss causation explained in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), is not suited to episodic CEA manipulation claims, and Defendants' reliance thereon is misplaced.  *LIBOR*, 2013 WL 1285338, at *40 (citation omitted); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d at 600-01 (collecting cases); *see also* ¶ 412.

Under the CEA, Plaintiffs instead must plead "that defendants' conduct caused Eurodollar futures contracts to trade and settle at artificial prices," a requirement Plaintiffs have already satisfied.  *LIBOR*, 2013 WL 1285338, at *39.  The PSAC plausibly pleads that Defendants caused artificial prices in Eurodollar futures contracts.[29]

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant them leave to file their Second Amended Complaint.

---

[29] The PSAC alleges that Barclays' misreporting of LIBOR was often timed to coincide with the last trading day of a particular Eurodollar futures contract.  ¶¶ 187-90.  In addition to being a badge of manipulative intent, trading abuses at futures contract expiration is a well-recognized cause of price artificiality.  *E.g.*, *In the Matter of Anthony J. DiPlacido*, CFTC No. 01-23, 2008 WL 4831204 at *30-31 (CFTC Nov. 5, 2008), *aff'd,* 364 Fed. App'x 657, 2009 WL 3326624 (2d Cir. Oct. 16, 2009).

Dated:  July 22, 2013
New York, New York

**KIRBY McINERNEY LLP**


By: _____*/s/ David Kovel*_____
David Kovel
Daniel Hume
Lauren Wagner Pederson, Of Counsel
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 371-6600
Email: dkovel@kmllp.com
       dhume@kmllp.com
       lpederson @kmllp.com

**LOVELL STEWART**
**HALEBIAN JACOBSON LLP**


By: _____*/s/ Christopher Lovell*_____
Christopher Lovell
Jody R. Krisiloff
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Email: clovell@lshllp.com
       jkrisiloff@lshllp.com
       amiller@lshllp.com


*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*