UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments       **MEMORANDUM AND ORDER**
Antitrust Litigation.
                                          11 MD 2262 (NRB)

THIS DOCUMENT RELATES TO: All Cases

----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### I. Introduction

On March 29, 2013, we issued a Memorandum and Order granting in part and denying in part defendants' motions to dismiss plaintiffs' complaints (the "March 29 Order"). In re LIBOR-Based Fin. Instruments Antitrust Litig. (Mar. 29 Order), No. 11 MD 2262 (NRB), 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013). Specifically, we dismissed plaintiffs' antitrust and RICO claims in full; we dismissed plaintiffs' commodities manipulation claims to the extent they were based on contracts entered into between August 2007 and May 29, 2008; and, we allowed plaintiffs' commodities manipulation claims to the extent they were based on contracts entered into between May 30, 2008, and May 2010.[1]   Finally, we dismissed with prejudice the exchange-

---

[1] In ruling on plaintiffs' commodities manipulation claims, we trifurcated the Class Period (as defined in the plaintiffs' complaints then before us) into three periods: August 2007 through May 29, 2008 ("Period 1"), May 30, 2008, through April 14, 2009 ("Period 2"), and April 15, 2009, through May 2010

based plaintiffs' state-law claim for unjust enrichment and declined to exercise supplemental jurisdiction over the remaining state-law claims.

Since the issuance of the March 29 Order, the parties have filed a number of motions.  First, the exchange-based plaintiffs have moved for certification of the March 29 Order for interlocutory appeal on the question of whether LIBOR is the commodity underlying Eurodollar futures contracts ("plaintiffs' motion for interlocutory appeal").   Second, three defendants, Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BT-MU"), Credit Suisse Group AG ("Credit Suisse"), and Norinchukin Bank ("Norinchukin") have moved for reconsideration of that portion of our Memorandum and Order denying their motion to dismiss the exchange-based plaintiff's commodity manipulation claims ("defendants' motion for reconsideration").   Third, the over-the-counter ("OTC"), bondholder, and exchange-based plaintiffs have each moved for leave to file a second amended complaint to add allegations in response to our ruling that plaintiffs had not plausibly alleged antitrust injury ("plaintiffs' motion to amend their antitrust

---

("Period 3").  Mar. 29 Order, 2013 WL 1285338, at *34-*36.  We found that the Commodity Exchange Act ("CEA")'s statute of limitations barred plaintiffs' claims to the extent they were based on contracts entered into during Period 1, but did not bar plaintiffs' claims based on contracts entered into during Period 3.  Id.  With regard to claims based on contracts purchased during Period 2, we declined to dismiss plaintiffs' claims because we "[were] not in a position to address" the issues bearing on whether those claims were timely.  Id. at *35.

claims").[2]  Finally, the exchange-based plaintiffs have moved for leave to file a second amended complaint to add allegations relating to their commodity manipulation claims ("plaintiffs' motion to amend their commodities manipulation claims").

For the reasons stated below, the exchange-based plaintiffs' motion for interlocutory appeal is denied; the OTC, bondholder, and exchange-based plaintiffs' motions to add allegations with respect to antitrust are denied; the exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation is denied; BT-MU, Credit Suisse, and Norinchukin's motion for reconsideration is denied without prejudice to a similar motion being filed by defendants that addresses the issues raised herein; and, the OTC plaintiffs' motion for leave to reassert their unjust enrichment claim and to add a claim for breach of the implied covenant of good faith and fair dealing is granted.

Because the background of this case has been thoroughly set out in the March 29 Order, we will proceed directly to our consideration of the pending motions.

## II. Discussion

---

[2] The motion to amend filed by the OTC plaintiffs also seeks leave (1) to add an allegation that we have jurisdiction under the Class Action Fairness Act ("CAFA") over the OTC plaintiffs' state-law claims, (2) to reassert the previously pleaded claim for unjust enrichment, which we dismissed without prejudice due to lack of subject matter jurisdiction, and (3) to advance a new claim for breach of contract.

### A. Plaintiffs' Motion for Interlocutory Appeal

Plaintiffs have moved for certification of the March 29 Order for interlocutory appeal on the following question: "Whether LIBOR is the 'commodity underlying' the Eurodollar futures contract within the meaning of Section 22(a)(1)(D) of the Commodity Exchange Act ('CEA')." Letter from Christopher Lovell and David E. Kovel to the Court (Apr. 22, 2013) [hereinafter Pls.' Letter Mot. for Interlocutory Appeal].[3] Under 28 U.S.C. § 1292:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order[.]

---

[3] In a Memorandum filed on May 3, 2013, we noted that we had received a letter from the exchange-based plaintiffs seeking leave to move for certification of our Memorandum and Order of March 29 for interlocutory appeal, as well as a letter from defendants in opposition. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2013 WL 1947367, at *2 (S.D.N.Y. May 3, 2013). We further observed that, "[b]ased on the submissions to date, this Court could not enter such a certification." Id. Nonetheless, "to give exchange-based plaintiffs a full opportunity to support their position," we permitted plaintiffs to submit a reply submission within two weeks, noting that we would treat plaintiffs' original letter as a letter motion. Plaintiffs submitted their reply on May 20.

28 U.S.C. § 1292(b).[4]  As the Second Circuit has held: "It is a basic tenet of federal law to delay appellate review until a final judgment has been entered.  Section 1292(b)'s legislative history reveals that . . . [this law] is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996) (citation omitted).  Indeed, "only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment," Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 426 F. Supp. 2d 125, 127 (S.D.N.Y. 2005) (alteration in original) (quoting Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990)) (internal quotation marks omitted), and district courts must "exercise great care in making a § 1292(b) certification," id. (quoting Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp., 964 F.2d 85, 89 (2d Cir. 1992)).

Here, interlocutory appeal is not warranted because there is not "substantial ground for difference of opinion" regarding whether LIBOR is the commodity underlying Eurodollar futures contracts.  As we explained in the March 29 Order, a Eurodollar futures contract is a futures contract whose "underlying instrument" is a "Eurodollar Time Deposit having a principal

---

[4] Although section 1292 also authorizes appeals of interlocutory orders in several other situations, none of those situations is present here.

value of USD $1,000,000 with a three-month maturity." CME Group, _Eurodollar Futures: Contract Specifications_, http://www.cmegroup.com/trading/interest-rates/stir/eurodollar_ contract_specifications.html (last visited August 23, 2013). "Eurodollars are U.S. dollars deposited in commercial banks outside the United States." CME Group, _Eurodollar Futures_, http://www.cmegroup.com/trading/interest-rates/files/IR148_ Eurodollar_Futures_Fact_Card.pdf. At settlement, the price of a Eurodollar futures contract "is equal to 100 minus the three-month Eurodollar interbank time deposit rate," which rate is defined as the LIBOR fix on the contract's last trading day. CME Group, _Eurodollar Futures Final Settlement Procedure_, http://www.cmegroup.com/trading/interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf. Prior to settlement, "the price of a 3-month Eurodollar futures contract is an indication of the market's prediction of the 3-month Dollar LIBOR on [that] date." Settlement Agreement Between Dep't of Justice, Criminal Div., and Barclays (June 26, 2012), Appendix A, ¶ 9, Ex. B, Porpora Decl.

Plaintiffs argue that LIBOR is the commodity underlying Eurodollar futures contracts for purposes of the CEA. But this position is simply implausible. For one, LIBOR is a price index; it is not a "commodity," which the CEA defines to include "all services, rights, and interests . . . in which contracts

for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).   Moreover, to call LIBOR a commodity, one would need to be able to articulate a price of LIBOR independent from LIBOR itself.   Plaintiffs have not plausibly done so, and we cannot imagine how they could.

As we reasoned in the March 29 Order, "[t]he only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price of the contract is settled or traded at a value based on LIBOR."[5]   Mar. 29 Order, 2013 WL 1285338, at *43.   Just as the prices of futures contracts based, for example, on gold or copper track the prices of their respective underlying commodities, see Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 488 (7th Cir. 2002); Sanner v. Bd. of Trade of City of Chicago, 62 F.3d 918, 929 (7th Cir. 1995), so the prices of Eurodollar futures contracts track (generally) the prices of three-month U.S. dollar time deposits in foreign banks.   In the case of futures based on physical commodities, the correlation of futures contract price with underlying commodity price occurs

---

[5] Given that the commodity underlying Eurodollar futures contracts is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, the price of that commodity would be the interest rate charged for the use of such a time deposit.   LIBOR, of course, does not correspond to any actual interest rate charged for the use of U.S. dollars, but rather is an index based on the LIBOR panel banks' estimates of the rate at which they would be able to borrow funds.

by virtue of the natural operation of the market.  In the case of Eurodollar futures, the correlation occurs because the futures price directly incorporates LIBOR, which is an index intended to represent the average price paid by banks for three-month U.S. dollar time deposits.  If, as plaintiffs allege, defendants submitted false LIBOR quotes to the BBA, it would be inaccurate to say that they manipulated the commodity underlying Eurodollar futures contracts or the price of that commodity, thereby affecting Eurodollar futures prices indirectly.  Rather, the best characterization of what defendants allegedly did would be that they affected Eurodollar futures prices directly by manipulating the index that was directly incorporated into the formula for those prices.

Contrary to plaintiffs' argument, <u>see</u> Pls.' Letter Mot. for Interlocutory Appeal 2, the fact that defendants have described Eurodollar futures contracts as "bets on LIBOR" does not suggest that LIBOR is the commodity underlying those contracts.  Every futures contract is a bet.  Strictly speaking, however, a futures contract is not a bet on the underlying commodity itself (whatever that might mean).  Rather, a futures contract is a bet on which direction the average price for the underlying commodity will move.  So also with Eurodollar futures, which are bets on which direction the average interest rate for three-month U.S. dollar time deposits in foreign banks, represented by

LIBOR, will move.  In short, although it is undoubtedly correct to say that Eurodollar futures contracts are bets on LIBOR, to say this is not to embrace plaintiffs' assertion that LIBOR is a commodity, but rather to acknowledge the obvious fact that LIBOR is a price index.

Plaintiffs also argue that, because Eurodollar futures contracts trade and settle based on LIBOR and do not involve any actual delivery of three-month U.S. dollar time deposits, those contracts can be manipulated only by manipulating LIBOR, not by manipulating the time deposit market.  See Id. at 2-3. According to plaintiffs, "[t]he amounts of phantom dollar deposits that are never delivered have no significance whatsoever for purposes of manipulation of Eurodollar futures prices (except as to supply a multiplication unit by which to measure the degree of loss from such manipulation of LIBOR)." Pls.' Reply Mem. of Law in Supp. of Mot. to Certify the Mar. 29, 2013 Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), at 8 [hereinafter Pls.' Interlocutory Appeal Reply]. In light of this, plaintiffs contend that the CEA's purposes of deterring and remedying manipulation of the commodities futures markets[6] support a finding that LIBOR is the commodity underlying Eurodollar futures contracts.  Id.

_____

[6] Further, plaintiffs argue that Congress's specific purpose in adding a cause of action based on manipulation of the price of the commodity underlying futures contracts was to "expand[] the prevention of manipulation and the

Although we appreciate the important functions served by the CEA, we do not agree with plaintiffs that the only way to manipulate Eurodollar futures is to manipulate LIBOR directly. When properly calculated, LIBOR reflects the average interest rate for three-month U.S. dollar loans in the London interbank lending market. By manipulating this market, which is a subset of the broader market for three-month U.S. dollar time deposits in foreign banks, an entity would cause LIBOR, and thereby Eurodollar futures prices, to be artificial. Thus, one could plausibly manipulate the price of Eurodollar futures contracts by manipulating the price of foreign three-month U.S. dollar time deposits; one need not manipulate LIBOR directly.

Finally, not only is plaintiffs' position implausible, but there is no split of authority on this issue which would counsel in favor of certifying our decision for interlocutory appeal. See Consub Del. LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007) ("The requirement that such a substantial ground [for a difference of opinion] exist may be met when '(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." (quoting In re Lloyd's Am. Trust Funds Litig., No. 96 Civ. 1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug.

---

protection of the integrity of futures contract prices." Pls.' Interlocutory Appeal Reply 8.

12, 1997)).  The only authority that even arguably supports plaintiffs' claim that LIBOR is the commodity underlying Eurodollar futures contracts consists of a few stray clauses in the Barclays CFTC settlement order stating that LIBOR is "a commodity in interstate commerce" for purposes of sections 9(a)(2) and 6(c) of the CEA.  See CFTC Barclays Settlement Order (June 27, 2012), at 4, 25-26, Ex. A, Porpora Decl.; see also Pls.' Interlocutory Appeal Reply 5-6.  However, these stray references do not convince us that there is a substantial ground for difference of opinion.

First, even assuming that LIBOR is "a commodity in interstate commerce" for purposes of sections 9(a)(2) and 6(c) of the CEA, it does not necessarily follow that LIBOR is the commodity underlying Eurodollar futures contracts for purposes of section 22(a).  Indeed, section 22(a), the provision of the CEA which establishes a private right of action for any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap," 7 U.S.C. § 25(a)(1)(D), is not even referenced in the CFTC settlement order at issue.

Moreover, to whatever extent the CFTC's "commodity in interstate commerce" language is in tension with our finding that LIBOR is not the commodity underlying Eurodollar futures

contracts, such tension is not substantial enough to warrant interlocutory appeal. Although courts generally "defer to an agency's reasonable interpretation of a statute it is charged with administering," Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 525 (2009), such deference is not appropriate when the court is "not reviewing an agency rulemaking or adjudication, but only a settlement agreement," Se. Fed. Power Customers, Inc. v. Geren, 514 F.3d 1316, 1327 (D.C. Cir. 2008) (Silberman, J., concurring). This is especially so when "the agency itself [was] an interested party to the agreement." Id. (alteration in original) (quoting Nat'l Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1571 (D.C. Cir. 1987)). Here, although we would normally afford deference to the CFTC's interpretation of the CEA, see Damato v. Hermanson, 153 F.3d 464, 472 (7th Cir. 1998), we need not defer to statements made in the Barclays settlement order. See Sec. Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 336 (Bkrtcy. S.D.N.Y. 1999) ("The Second Circuit has clearly held that consent judgments . . . are not the result of actual adjudications on the merits . . . ."); cf. In re Platinum and Palladium Commodities Litig., 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (prohibiting plaintiffs from relying on a CFTC order to plead the "underlying facts of liability" because, "[a]lthough the CFTC Order included certain factual findings, it nevertheless was the product of a settlement

between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding"). Therefore, we cannot conclude, based on the references to LIBOR as "a commodity in interstate commerce" in the CFTC's Barclays settlement order, that a substantial ground for difference of opinion exists that would justify interlocutory appeal.

For the foregoing reasons, plaintiffs have not even approached satisfying the requirements of 28 U.S.C. § 1292(b), and their motion for certification of the March 29 Order for interlocutory appeal is denied.

## B. Defendants' Motion for Reconsideration

### 1. Background

Defendants BT-MU, Credit Suisse, and Norinchukin (collectively, the "moving defendants") have moved for reconsideration of that portion of our Memorandum and Order denying their motion to dismiss the exchange-based plaintiff's commodity manipulation claims, on the ground that we improperly found that plaintiffs had adequately pleaded scienter. In the March 29 Order, we held that, although the scienter element of a commodities manipulation claim "may be alleged generally," Mar. 29 Order, 2013 WL 1285338, at *37 (quoting Fed. R. Civ. P. 9(b)) (internal quotation marks omitted), plaintiffs must still allege facts that "give rise to a strong inference of scienter," id. (alteration in original) (quoting In re Amaranth Natural Gas

<u>Commodities Litig.</u>, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009)) (internal quotation marks omitted).  Plaintiffs may demonstrate scienter by, <u>inter alia</u>, "alleging facts to show that defendants had both motive and opportunity to commit fraud."[7]  <u>Id.</u> (quoting <u>In re Crude Oil Commodity Litig.</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007)). "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  <u>Id.</u> (quoting <u>In re Amaranth Natural Gas Commodities Litig.</u>, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009)) (internal quotation marks omitted).  In the case at bar, we found that plaintiffs' allegations of defendants' motive and opportunity were sufficient to demonstrate scienter.  <u>Id.</u> at *38.

Our conclusion that plaintiffs had adequately pleaded that "defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts," <u>id.</u>, was based on plaintiffs' allegation that "[d]efendants, through their broker-dealer affiliates actively traded Eurodollar futures and options on those futures during the Class Period."  Exchange-Based Pls.'

---

[7] Scienter can also be pleaded "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  <u>In re Crude Oil Commodity Litig.</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (quoting <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290-91 (2d Cir. 2006)) (internal quotation mark omitted).  However, plaintiffs cannot satisfy this standard.  The only alleged action of defendants that might qualify as "conscious misbehavior or recklessness" is their alleged submission of artificial LIBOR quotes to the BBA.  However, as discussed below, merely submitting artificial LIBOR quotes does not by itself indicate an intent to manipulate Eurodollar futures contract prices.

Am. Consol. Class Action Compl. ¶ 218. Plaintiffs' first amended complaint proceeded to list broker-dealer affiliates of certain of the defendants, including Credit Suisse, but not of others, such as BT-MU or Norinchukin. Id. Nonetheless, we understood plaintiffs to be alleging that each defendant, through its broker-dealer affiliate, "actively traded Eurodollar futures and options on those futures during the Class Period." Id. Whether or not we were correct in our interpretation of the exchange-based plaintiffs' first amended complaint, the exchange-based plaintiffs have since moved for leave to file a second amended complaint that would add, inter alia, explicit allegations that Credit Suisse, BT-MU, and Norinchukin, or their respective affiliates, each held or traded Eurodollar futures contracts during the Class Period. See Exchange-Based Pls.' Second Am. Consol. Class Action Compl. ¶¶ 459, 467, 479, Ex. A, Revised Kovel Decl. [hereinafter Exchange-Based Pls.' PSAC]. As discussed below, although we will not permit the exchange-based plaintiffs to add all of their proposed new allegations, we do not object to the paragraphs immediately at issue here. Therefore, in addressing the present motion, we understand plaintiffs to have explicitly alleged that each of the moving defendants held or traded Eurodollar futures contracts during the Class Period.

Defendants maintain that such allegations are insufficient to plead scienter.  According to defendants, "plaintiffs do not allege any facts to suggest that each (or any) Movant 'took specific actions which exhibited an actual intent' to manipulate the price of Eurodollar futures contracts or made 'specific communications . . . about any specific plan to cause artificial prices' in that market."  Defs.' Mem. of Law in Supp. of Mot. for Reconsideration or Reargument 3 (alteration in original) (quoting In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig., No. 11 Md. 2213 (RPP), 2012 WL 6700236, at *10-*11 (S.D.N.Y. Dec. 21, 2012)).  Further, defendants argue, "plaintiffs do not allege whether each Movant was long or short -- a fact that is essential to showing that each Movant would have gained 'concrete benefits' from the alleged manipulation of the price of those contracts."  Id.  Finally, although plaintiffs have alleged that defendants held or traded Eurodollar contracts, defendants contend that "[t]he desire to profit from trading such contracts is precisely the kind of general motive possessed by most corporate defendants that is insufficient to adequately allege scienter."  Id. at 4.

Although we have considered defendants' motion carefully, we are not at present prepared to resolve it because several important issues have not been sufficiently briefed.  Thus, we deny defendants' motion for reconsideration without prejudice to

a similar motion being filed, by September 20, 2013, which addresses the following concerns.

## 2. Relevant Authority

In general, courts have held that, to plead scienter, it is insufficient to allege merely "a generalized motive" that could be "imputed to any publicly-owned, for-profit endeavor." Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996). For instance, "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not 'entail concrete benefits.'" Id. Also insufficient are a corporation's "desire[ for] its stock to be priced highly by the market," id. at 268 n.5, or its "desire to maintain the company's credit rating," id. at 268 (citing San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc. 75 F.3d 801, 813-14 (2d Cir. 1996)). Further, allegations that individual defendants "were motivated by a desire to maintain or increase executive compensation" or to "achieve the most lucrative acquisition proposal [for their company]" are inadequate to plead motive. Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001).

With regard to plaintiffs' allegations that defendants were motivated to manipulate Eurodollar futures contract prices because they held positions in that market, the authority cited

by defendants raises a serious question regarding whether plaintiffs' allegations are sufficient.[8]  Specifically, in <u>In re Crude Oil Commodity Litigation</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007), we held that plaintiffs had failed to plead motive to manipulate crude oil prices where they had alleged that "defendants had a large presence in the crude oil market [and] the NYMEX crude oil futures and options market, and also engaged in the purchase and sale of OTC contracts in crude oil."  <u>Id.</u> at *8.  Similarly, in <u>In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.</u>, No. 11 Md. 2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012), the Court found that plaintiffs had failed to plead defendant's motive to manipulate silver futures contract prices by alleging that

---

[8] In their opposition, plaintiffs argue that "[the Court] could have found and held that the allegations of hundreds of manipulative acts by each Movant, accompanied by competent allegations of that Movant's knowledge of thousands of manipulative acts by other Defendants and the circumstance that Eurodollar futures prices were the inverse of LIBOR, sufficed to give rise to a reasonable inference of manipulative intent."  Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Reconsideration or Reargument 6 (citations omitted).  We neither so found nor so held.  We have never, and do not, accept the notion that intentionally submitting false LIBOR quotes is tantamount to intending to manipulate Eurodollar futures contracts.  Indeed, plaintiffs themselves have alleged that one of the primary goals of each defendant in submitting false LIBOR quotes was to protect the market's perception of that defendant's financial health.  Plaintiffs have also alleged that a separate goal was to profit on LIBOR-based trading, which may or may not involve Eurodollar futures contracts.  In short, even accepting plaintiffs' allegations that each defendant submitted false LIBOR quotes over a long period of time and was aware that the other defendants were doing the same, those allegations by themselves do not make plausible that defendants intended to manipulate Eurodollar futures contracts.  Of course, although defendants were likely aware that submitting artificial LIBOR quotes would affect the Eurodollar market, "[m]ere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA."  <u>In re Rough Rice Commodity Litig.</u>, No. 11 C 618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) (citing <u>Hershey v. Energy Transfer Partners, L.P.</u>, 610 F.3d 239, 249 (5th Cir. 2010)).

defendant was "a large holder of COMEX silver futures contracts, short puts, and options," had engaged in allegedly suspicious trading activity, and made allegedly "'unusual' deliveries of silver between March 2008 and October 2010." Id. at *10-*12.[9] To the extent that these cases are analogous to the facts here, they give rise to serious questions regarding whether plaintiffs have adequately pleaded motive.

### 3. What Plaintiffs Have, and Could Have, Alleged

Complicating the analysis is the fact that, as we were led to understand at oral argument,[10] plaintiffs are operating with significantly limited information. As plaintiffs' counsel informed us, the details of particular trades in Eurodollar futures contracts, including the identity of the transacting parties, are not publicly available. Tr. 20-23.[11] Specifically, according to plaintiffs' counsel, brokers have a fiduciary duty not to disclose the details of their clients' trades, and,

---

[9] The Court in Silver Futures did not specify whether it was applying the "motive and opportunity" standard for scienter or the "strong circumstantial evidence of conscious misbehavior or recklessness" standard. Crude Oil, 2007 WL 1946519, at *8; see also Silver Futures, 2012 WL 6700236, at *10-*12.

[10] Significantly, it was not until oral argument that the issues addressed in this section, involving what information plaintiffs could reasonably be expected to know about defendants' Eurodollar futures contract positions, received any meaningful discussion. Given that we anticipate that this issue will inform whether plaintiffs have adequately pleaded scienter, the minimal and belated attention devoted to the issue contributes to our disinclination to rule on whether reconsideration is warranted until we have received further briefing.

[11] Citations to "Tr." refer to the transcript of the oral argument held on August 8, 2013.

although the CFTC publishes aggregated trading data, it is prohibited from publicly identifying the parties to trades.  Id. Thus, it appears that we cannot reasonably expect plaintiffs, prior to discovery, to have identified the particular contracts and transactions on which the moving defendants allegedly sought to profit.  Of course, it is well established that pleading requirements are relaxed where proof of a claim "involve[s] facts solely within the defendant's knowledge." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007); see also DGM Investments, Inc. v. N.Y. Futures Exchange, Inc., 265 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) ("Dismissal on the ground that facts within Defendants' knowledge have not yet been proven in the pleading stage is 'particularly inappropriate.'" (quoting Sam Wong & Son, Inc. v. New York Mercantile Exchange, 735 F.2d 653, 678 (2d Cir. 1984)).

Indeed, there is yet another layer of uncertainty impeding plaintiffs' ability to plead with specificity.  One way of proving motive is to show that a defendant executed a transaction that yielded a concrete benefit to it as the result of the defendant's manipulative conduct.  Here, plaintiffs might have shown that a given defendant exited a position in a Eurodollar futures contract such that the defendant profited as a result of the defendant's manipulation.  However, pleading with such specificity appears to be impossible at this stage.

For one, as discussed above, plaintiffs do not know which positions defendants held or when they exited those positions. Further, plaintiffs are not in a position to demonstrate that the degree of LIBOR artificiality changed over the time that defendants held their positions in such a way that defendants profited by exiting when they did.

To elaborate on the latter point: In their Proposed Second Amended Complaint ("PSAC"), plaintiffs allege that LIBOR was artificial to some degree for all or most of the period from August 2007 through May 2010.[12] Therefore, the mere fact that a defendant exited a position at a time when LIBOR was artificial does not establish that the defendant benefited from manipulation. Rather, the defendant would profit only if LIBOR's degree of artificiality changed over the time that the defendant held its position in a manner that benefited the defendant. Regardless of whether plaintiffs will ever be able to show this, we cannot discern how they could allege it with specificity now. As we reasoned in the March 29 Order, because "[t]he benchmarks referenced by plaintiffs, though generally probative of when LIBOR was at an artificial level, do not

---

[12] Because alleged trader-based manipulation is the basis for plaintiffs' new allegation that the Class Period begins in January 2005 rather than August 2007, and because, for the reasons stated below, we deny the exchange-based plaintiffs leave to add allegations based on such manipulation, we will assume for purposes of the present discussion that the Class Period begins in August 2007.

indicate precisely at which level LIBOR should have been fixed on any given day," plaintiffs "cannot reasonably be expected to know the spread between LIBOR's 'true' value and its actual level on any given day, let alone how this spread changed over time." Mar. 29 Order, 2013 WL 1285338, at *42.   Therefore, although it is possible that, after discovery, plaintiffs will be able to point to particular trades by defendants to show that the defendants stood to reap a concrete benefit from their alleged manipulative conduct, we question whether we can reasonably expect plaintiffs to have alleged that at this stage.

### 4. Important Issues that Have Not Been Adequately Briefed

In light of the above discussion, there are three issues that concern us.   First, putting aside considerations of what information can be reasonably attributed to plaintiffs, have plaintiffs adequately alleged scienter?[13]   Second, if the first question is answered in the negative, do plaintiffs'

---

[13] As we see it, this question involves at least two subparts.  First, as discussed above, there is an issue regarding whether plaintiffs' allegations that defendants held positions in the Eurodollar futures market is sufficient to plead scienter.  Second, in light of the fact that the various groups of plaintiffs have alleged several motives of defendants to manipulate LIBOR other than profiting from Eurodollar futures contracts, namely portraying themselves as economically healthier than they actually were and profiting on particular LIBOR-based financial instruments other than Eurodollar futures, what burden do plaintiffs bear in pleading that defendants' actions were actually motivated, at least in part, by their desire to profit on Eurodollar futures?  In other words, assuming we find at least one of the non-Eurodollar-based motives to manipulate LIBOR plausible, what showing must plaintiffs make to demonstrate that defendants' LIBOR submissions were, in fact, made with the specific intent to manipulate the price of Eurodollar futures?

informational handicaps change the result?  And, third, if both of the previous questions are answered in the negative, can the analysis reasonably be confined to the moving defendants, or is it equally applicable to all defendants?[14]  Because these issues have not been adequately briefed, we think it would be imprudent, especially in a case of this magnitude, to resolve the present motion without further briefing.

Accordingly, defendants' motion for reconsideration is denied without prejudice to defendants' filing, by September 20, 2013, of a similar motion that addresses the concerns raised herein.

### C. Exchange-Based Plaintiffs' Motion to Amend Their Commodities Manipulation Claims

#### 1. Background

In the March 29 Order, we granted the exchange-based plaintiffs leave to move to file a second amended complaint to include allegations based on the day-to-day, trading-based manipulation at issue in the Barclays settlement, that is, manipulation wherein defendants allegedly submitted specific LIBOR quotes in order to benefit particular positions that they

---

[14] At oral argument, defense counsel sought to distinguish the moving defendants from the non-moving defendants by arguing that plaintiffs' allegations of artificial LIBOR submissions are especially weak with respect to the movants and, indeed, that the data cited by plaintiffs actually exculpate them.  See Tr. 10-15.  However, although these arguments might be relevant to whether artificial Eurodollar futures contract prices existed and whether the moving defendants caused those artificial prices, it is unclear how the arguments are relevant to scienter.

held in the Eurodollar futures market.[15]   Mar. 29 Order, 2013 WL
1285338, at *36.   On May 23, plaintiffs filed such a motion, as
well as a proposed second amended complaint.   Defendants have
opposed plaintiffs' motion on the grounds that the proposed
amendments are futile, as they are time-barred and fail to state
a claim under the CEA.   Defs.' Mem. of Law in Opp'n to Exchange-
Based Pls.' Mot. for Leave to Amend as to CEA Claims and File
the Second Am. Consol. Class Action Compl. [hereinafter Defs.'
Opp'n to Mot. to Amend CEA Claims.].   Among defendants'
arguments is that plaintiffs have failed to plead that they
suffered actual damages.   Id. at 24-25.   We agree that
plaintiffs have not adequately alleged that they suffered an
injury as a result of defendants' alleged trader-based conduct,
and thus plaintiffs lack standing under the CEA to pursue such
claims.[16]   This ground being sufficient to deny plaintiffs'
motion to amend, we do not reach defendants' other arguments.

### 2. Legal Standard

Under Rule 15(a) of the Federal Rules of Civil Procedure, a
second amended complaint may be filed "only with the opposing
party's written consent or the court's leave."   Fed. R. Civ. P.

---

[15] We required that "any such motion address[] the concerns raised [in the
March 29 Order] and [be] accompanied by a proposed second amended complaint."
Mar. 29 Order, 2013 WL 1285338, at *36.

[16] As discussed below, although loss causation is not an element of a
commodities manipulation claim, private plaintiffs must still plead actual
damages in order to have standing to bring suit under the CEA.

15(a)(2).   Although "[t]he court should freely give leave when justice so requires," id., we "ha[ve] discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).   "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." Lucente v. Int'l Business Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).   Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.  In applying this standard, a court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the plaintiff. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).   The Court may also "properly consider

'matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.'" Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

### 3. Analysis

As discussed in the March 29 Order, to avoid dismissal, plaintiffs not only must allege the elements of a commodities manipulation claim, but also must show that they have standing to sue. See Mar. 29 Order, 2013 WL 1285338, at *37. Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered "actual damages" as a result of defendant's manipulation. 7 U.S.C. § 25(a)(1). "The term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation." Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc., 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), vacated on other grounds, 187 F.R.D. 121 (S.D.N.Y. 1999) (ruling that, "[e]ven if [defendant] violated every provision of the CEA or the CFTC rules, under the express language of § 22, [plaintiff] is only authorized to bring suit, and can only recover, for those violations that caused [plaintiff] to suffer 'actual damages'" (quoting 7 U.S.C. § 25(a))).

Here, the exchange-based plaintiffs have not adequately pleaded that they suffered actual damages as a result of the newly alleged trader-based conduct.[17]  In contrast to the alleged persistent suppression of LIBOR that was the sole basis for plaintiffs' Amended Consolidated Class Action complaint, the day-to-day, trader-based LIBOR manipulation that is the basis for plaintiffs' new allegations was episodic and varying in direction.  That is, it consists of a number of discrete instances of allegedly false LIBOR submissions, and those submissions were, at times, artificially high and, at other times, artificially low.  See, e.g. Exchange-Based Pls.' PSAC ¶¶ 183-217.  To plead actual damages based on such manipulation, plaintiffs would need to allege that the resulting artificiality in LIBOR caused them injury, in light of their trading of Eurodollar futures contracts.

Plaintiffs have failed to meet this burden.  In the PSAC, plaintiffs do not include any allegations that make plausible (1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, or (2) that their

---

[17] We would note from the outset that plaintiffs' allegations of trader-based manipulation of three-month USD LIBOR do not implicate every defendant, but rather are essentially confined to Barclays.

positions were such that they were injured.[18]   Cf. In re Energy Transfer Partners Natural Gas Litig., No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) (requiring plaintiffs, in order to allege actual damages under the CEA, to show an overlap between the time period during which the manipulation occurred and the period during which plaintiffs traded their contracts). Indeed, despite the fact that plaintiffs indisputably have access to their own Eurodollar futures contract trading records, the PSAC is devoid of any references to particular Eurodollar contracts.[19]   See Tr. 38-41, 45.   Rather than plead with such specificity, plaintiffs have simply alleged that each of the named plaintiffs "traded on-exchange based products tied to

---

[18] Although plaintiffs' argument that "[t]he inquiry on a CEA manipulation claim must be on the existence of artificial prices, not whether prices were artificially high or artificially low," Pls.' Reply Mem. of Law in Supp. of Exchange-Based Pls.' Mot. for Leave to Amend as to CEA Claims and File the Second Am. Consol Class Action Compl. 16, is correct with regard to pleading the elements of a commodities manipulation claim, it is not correct with regard to pleading CEA standing, for which actual damages are required. Whereas a CEA claim brought by the CFTC is focused wholly on defendants' conduct, such that the injury suffered by individual traders is irrelevant, a CEA claim brought by private plaintiffs pursuant to section 22 is focused both on defendants' conduct and on whether that conduct caused plaintiffs' injury. As seems almost tautological, moreover, the issue of whether plaintiffs were harmed by defendants' alleged manipulative conduct, which caused the price of Eurodollar futures contracts to be either artificially high or artificially low, must turn, at least in part, on whether plaintiffs' positions were such that plaintiffs were benefited by the manipulation or harmed by it.

[19] At oral argument, plaintiffs' counsel stated that, while plaintiffs could have alleged the particular Eurodollar contracts they traded, they did not do so because they did not think it necessary. Tr. 50. We are skeptical that plaintiffs' motivation for failing to identify their particular Eurodollar futures contracts was in fact so innocent. At any rate, for the reasons set forth herein, which we note cannot come as any great surprise to plaintiffs' counsel, we reject the notion that it is unnecessary here to plead the particular contracts on which plaintiffs were allegedly harmed.

LIBOR such as Eurodollar futures" during the Class Period,
Exchange-Based Pls.' PSAC ¶¶ 20-27, and that the members of the
proposed class "transacted in Eurodollar futures and options on
Eurodollar futures on exchanges such as the CME [during the
Class Period] and were harmed by Defendants' manipulation of
LIBOR," id. ¶ 502.  However, because the alleged trader-based
manipulation did not occur on every day of the Class Period, but
rather on only a subset of those days -- a subset that
plaintiffs can, at least in part, identify -- and because the
alleged manipulation on any given day went in a particular
direction -- a direction which, again, plaintiffs can, at least
in part, identify[20] -- and thus would have harmed only those
entities with certain positions, the broad allegations
plaintiffs have offered are insufficient to allege actual
damages.

To elucidate this point, we can contrast plaintiffs'
persistent suppression theory, where we found plaintiffs'
pleading sufficient, with their trader-based manipulation
theory, where we do not.  In evaluating the persistent
suppression allegations in plaintiffs' first amended complaint,

---

[20] Although "plaintiffs could not have known the 'true' level of any LIBOR
quote[ and thus] could not have pleaded, consistent with Rule 11, precisely
which quotes were inaccurate and by how much," Mar. 29 Order, 2013 WL
1285338, at *39, the Barclays settlements reveal, for at least some of the
days on which Barclays' alleged trader-based manipulation occurred, in which
direction LIBOR was manipulated (and thus which positions would have been
harmed).

we did not require plaintiffs to allege the specific days on which they traded because LIBOR, and consequently Eurodollar futures prices, was allegedly artificial throughout the Class Period. Here, by contrast, the proposed trader-based claims, even if accepted, would entail only that LIBOR was artificial for certain discrete days during the Class Period, and thus the allegation that plaintiffs traded during the Class Period is insufficient to show that plaintiffs suffered actual damages. With regard to alleging plaintiffs' positions, we relaxed the requirement in the persistent suppression context because plaintiffs could not be expected to know how LIBOR compared to "true LIBOR" on any given day (as opposed to whether LIBOR was artificial on average over a period of time). In the trader-based manipulation context, however, the Barclays allegations suggest, for at least some of the days on which manipulation occurred, in which direction LIBOR deviated from "true LIBOR." Thus, whereas we could not expect plaintiffs to allege how their specific positions were negatively affected by persistent suppression of LIBOR, we can expect plaintiffs to allege how their positions were negatively affected by trader-based manipulation.

Contrary to plaintiffs' assertion, see Pls.' CEA Reply 17, this analysis does not involve an application of the loss causation principles established in Dura Pharmaceuticals, Inc.

v. Broudo, 544 U.S. 336 (2005).  As we explained in the March 29 Order, Dura established that "where plaintiffs' injury results from defendants' dissemination of false information, 'an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.'"  Mar. 29 Order, 2013 WL 1285338, at *40 (quoting Dura, 544 U.S. at 342).  Interpreting the cases decided in the wake of Dura, we concluded:

> [I]f the manipulation alleged here is analogous to isolated artificial stock purchases, we can presume that plaintiffs suffered damages based on an inflated purchase price [because we can presume that the artificiality dissipated soon after plaintiffs' purchase].  If, however, the manipulation is more akin to disseminating inaccurate information, plaintiffs need to show that they sold or settled their Eurodollar contracts at a loss [because we cannot presume that artificiality resulting from inaccurate information will dissipate on its own].

Id.  We found that persistent suppression "is less like isolated manipulative activity and more like disseminating false information."  Id. at *41.  To the extent that they assert claims based on persistent LIBOR suppression, therefore, plaintiffs will be required to show that they sold their Eurodollar contracts at a loss; at the pleading stage, we found their allegations sufficient in light of their limited access to information.  See id. at 41-42.

By contrast, the trader-based conduct described in the Barclays settlement documents falls squarely in the category of

isolated (though repeated) manipulative activity.  As such, we can presume that the effect of the manipulation dissipated, see id. at *40, and plaintiffs need only allege that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct, and that the artificiality was adverse to their position.  As discussed above, however, plaintiffs have not even alleged this.

Finally, although plaintiffs asserted at oral argument that the trader-based manipulation was sufficiently frequent to render the Eurodollar futures market artificial for the duration of the Class Period, Tr. 27-28, 46-52, this claim is not supported by the facts.  As alleged in the PSAC: "[b]etween January 2005 and May 2009, at least 173 requests for USD-LIBOR submissions were made to Barclays' Submitters."  Exchange-Based Pls.' PSAC ¶ 195.  Of these 173 requests, 111 were made between January 3, 2006, and August 6, 2007.  Id.  The United Kingdom Financial Services Authority ("FSA") found that, of these 111 requests, "on around 70% of those occasions, the submissions were consistent with the traders' request."  Id. ¶ 196. Although plaintiffs have not alleged how frequently the remaining 62 requests affected LIBOR submissions, we can assume the 70% rate here, as well.  Thus, plaintiffs' allegations indicate the following: between January 2005 and May 2009, 121 LIBOR submissions were artificial as a result of trader-based

manipulation; between January 3, 2006, and August 6, 2007, 78 were; and, between August 7, 2007, and May 2009, at most 43 were.

Assuming that there are roughly 250 trading days per year,[21] we can calculate the approximate frequency of trader-based manipulation during the Class Period.  Between January 2005 and May 2009, LIBOR submissions were artificial roughly 11% of the time; in the narrower period between January 3, 2006, and August 6, 2007, submissions were artificial roughly 20% of the time; and, between August 7, 2007, and May 2009, LIBOR was artificial, at most, roughly 10% of the time.  Taking these numbers at face value, we cannot say that the alleged trader-based manipulation was so constant that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period. Moreover, there is no indication that the alleged manipulation was evenly spaced throughout the relevant time periods; given the possibility that the manipulation was concentrated in certain weeks or months, it is even less likely that plaintiffs' generalized allegations demonstrate actual damages.

---

[21] In 2013, the CME Group recognized 11 holidays.  CME Group, CME Group Holiday Calendar, http://www.cmegroup.com/tools-information/holiday-calendar/ (last visited Aug. 23, 2013).  Assuming roughly 104 weekend days per year, there are 250 days on which Eurodollars futures contracts could be traded on the CME.  (We recognize that "[o]n CME Group recognized holidays, open outcry trading and CME Globex trading observe different opening and closing times, depending on markets traded," id., and that our calculation of 250 trading days is a simplification.  Nonetheless, it will do for present purposes.)

To whatever extent the foregoing analysis has failed to discredit plaintiffs' pleading of actual damages, a footnote in the FSA's report delivers the coup de grâce. Explaining its methodology for calculating 173 requests between January 2005 and May 2009, the FSA stated:

> If more than one request was contained in the same communication, these have been counted separately. For example, a request for a "high 3 month and low 6 month" would be counted as two requests. A request for a "high 3 month for the next two days" would also be counted as two requests. A request for "high" or "low" submissions which did not specify a particular maturity would be counted as three requests (for one month, three month and six month submissions) unless the context of the communication indicates otherwise.

FSA Barclays Final Notice (June 27, 2012), ¶ 56(i) n.15, Ex. C, Porpora Decl. In other words, although Eurodollar futures contract prices are based solely on 3-month U.S. dollar LIBOR, the FSA included in its analysis requests relating to one-month and six-month LIBOR.[22] Not only does this methodology suggest that the frequencies calculated above might significantly overstate how often three-month LIBOR was artificial, but it also introduces an indefiniteness into plaintiffs' pleading that precludes their argument that Eurodollar futures prices were artificial for essentially all of the Class Period. Deprived of this argument, plaintiffs cannot justify their failure to show

---

[22] With regard to the 111 requests between January 3, 2006, and August 6, 2007, the FSA similarly failed to distinguish among different tenors, referring instead simply to "requests . . . relating to US dollar LIBOR submissions." FSA Final Notice (June 27, 2012), ¶ 71(i).

that their trading in Eurodollar futures was such that they suffered actual damages from defendants' alleged misconduct.[23]

### 4. Conclusion

The exchange-based plaintiffs have not adequately pleaded that they suffered actual damages from defendants' alleged trader-based manipulation of Eurodollar futures contract prices. Therefore, plaintiffs are denied leave to amend their complaint to add allegations of such manipulation. Separately, it appears that the exchange-based plaintiffs are seeking to amend their complaint in other ways relevant to their CEA claims. Among these proposed amendments is their naming of Societe Generale as a defendant, as well as their new allegations stating more explicitly that (almost) every defendant, or its affiliate, traded in Eurodollar futures contracts. These proposed amendments do not appear to be opposed. Accordingly, the exchange-based plaintiffs shall submit, by September 10, 2013, a version of the PSAC that contains only those allegations consistent with the holdings herein.

Finally, we would note that defendants advanced arguments in opposing plaintiffs' motion to amend that appear to be aimed

---

[23] Obviously, we could not expect plaintiffs to connect their trading to instances of manipulative conduct that occurred on dates that are still not publicly available. However, the Barclays settlement documents do identify the dates and circumstances of a number of instances of alleged manipulative conduct. To plead actual damages, plaintiffs would have needed to show that, at least for some of these instances, their Eurodollar futures trading was such that they suffered damages from defendants' conduct.

at seeking reconsideration of our March 29 Order.  Specifically, whereas we had dismissed only those "persistent suppression" claims based on contracts entered into during "Period 1," from August 2007 through May 29, 2008, defendants seem to be arguing now that we should also dismiss "persistent suppression" claims based on contracts entered into at other times.  Whether or not this was defendants' intention, we are not prepared to dismiss claims we previously declined to dismiss based on arguments contained in an opposition to a motion to amend.  If defendants intend to seek reconsideration of our March 29 Order on statute of limitations grounds, or intend to submit a renewed motion to dismiss regarding "Period 2" claims, they may move for leave to file such a motion by September 20, 2013.

### D. Plaintiffs' Motion to Amend Their Antitrust Claims

In the March 29 Order, we dismissed plaintiffs' antitrust claims because plaintiffs failed to plead antitrust injury and thus lacked standing to bring claims pursuant to the Clayton Act.  See Mar. 29 Order, 2013 WL 1285338, at *10-*19.  In response, the OTC, exchange-based, and bondholder plaintiffs have moved to amend their respective complaints, principally to add allegations addressed to antitrust injury.

As discussed above, although "[t]he court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P.

15(a)(2), we "ha[ve] discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." Lucente v. Int'l Business Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)).

For the two independent reasons discussed below, plaintiffs' motion for leave to amend is denied.

## 1. Given the Circumstances of this Case, Amendment Would Not Be Proper

In light of the history and circumstances of this case, justice does not require us to afford plaintiffs yet another opportunity to amend. Each of plaintiffs' first amended complaints[24] asserted a cause of action for violation of section 1 of the Sherman Act. These amended complaints, which ranged in length from 211 to 253 paragraphs, resulted from the consolidation of twenty original complaints, and were filed following a fierce competition for appointment as class counsel. Indeed, our decision appointing class counsel reflected that we

---

[24] For purposes of the present analysis, we do not address the complaints filed by the Schwab plaintiffs, who have not sought leave to replead.

had then been persuaded that all of the firms competing to be class counsel "have extensive experience in complex litigation," "have adequate knowledge of the applicable law," "would each devote significant resources to prosecuting plaintiffs' claims," and, finally, "have demonstrated that they have thoroughly investigated the relevant claims." In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2011 WL 5980198, at *3 (S.D.N.Y. Nov. 29, 2011). We appointed Hausfeld and Susman Godfrey as interim class counsel for the OTC plaintiffs and Kirby McInerney and Lovell Stewart as interim class counsel for the exchange-based plaintiffs, id. at *4; the bondholder plaintiffs, who filed later, are represented by Weinstein Kitchenoff & Asher and Morris & Morris. In short, the allegations in the first amended complaints not only drew on the work of twenty sets of plaintiffs and plaintiffs' counsel, but also presumably represented the best efforts of six highly experienced firms to state a viable claim.

At the time that the first amended complaints were filed, it was widely projected that damages in this case might reach billions of dollars. See Mark Gongloff, Libor Scandal May Cost Banks $35 Billion: Study, Huffington Post (July 17, 2012), http://www.huffingtonpost.com/2012/07/17/libor-scandal-cost-banks_n_1680764.html; Halah Touryalai, Libor Lawsuits Are Piling Up and Could Cost Billions, Banks Brace for Another Big Legal

Battle, Forbes (July 12, 2012), http://www.forbes.com/sites/halahtouryalai/2012/07/12/libor-lawsuits-are-piling-up-and-could-cost-billions-banks-brace-for-another-big-legal-battle/; Alistair Osborne, Banks Face Crippling Libor Litigation Costs: Britain's Banks Face Costs Running into Tens of Billions of Pounds from the Libor Scandal if US Litigants Prove They Were the Victims of Four Years of Mispricing, City Experts Have Warned, Telegraph (June 28, 2012), http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9363260/Banks-face-crippling-Libor-litigation-costs.html; see also OTC Pls.' Consol. Am. Compl. ¶ 6 ("By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be calculated or suppressed artificially low, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.").

In sum, given the competition to become interim lead counsel, which revealed the experience of the competitors; the number of original complaints that had been filed; and, the obvious motivation to craft sustainable first amended complaints containing all factual and legal allegations that supported plaintiffs' claims, the Court was entitled to rely on these pleadings to contain the strongest possible statement of plaintiffs' case based on the collective skills of plaintiffs' counsel.

The subject of plaintiffs' motions to amend, namely antitrust injury, figured prominently in the case after the filing of the first amended complaints, being presented clearly and repeatedly as a flaw in the pleading of plaintiffs' complaints.   In their motion papers filed on June 29, 2012, defendants argued that plaintiffs' amended complaints should be dismissed because, inter alia, they failed to allege antitrust injury.   See Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Antitrust Claims 26-27.   Although plaintiffs thereafter submitted a letter to the Court on August 1, 2012, seeking leave to amend, primarily on the basis of information contained in the Barclays settlements, there was no indication in plaintiffs' letter that the proposed amendments would bolster plaintiffs' allegations of antitrust injury.   When plaintiffs perfunctorily reiterated their request for leave to amend in their opposition to defendants' motion to dismiss the antitrust claims, they again did not indicate that new allegations would remedy any previous defects regarding antitrust injury.   See Pls.' Joint Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Antitrust Claims 36-38, 52-53.   Finally, the issue of antitrust injury featured prominently in the oral argument held on March 5, 2013, and a concession by plaintiffs' counsel that the LIBOR-setting process is not competitive was the topic of significant discussion.   Yet, despite being squarely on notice that the

Court considered antitrust injury a serious and, indeed, threshold issue, plaintiffs did not seek to amend their complaint to strengthen their pleading of antitrust injury until after we issued the 161-page March 29 Order.[25]

Whatever might be the appropriate result in other cases, here, justice does not require us to permit plaintiffs to file a second amended complaint. Indeed, just the opposite. This is surely a case in which "the defendants and the Court were entitled to the plaintiffs' best effort at presenting their claims in response to the objections raised by the defendants." In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005). Further, it would be unacceptable to allow plaintiffs, after failing to seek to amend their complaints with regard to antitrust injury in response to defendants' motion and after tremendous effort was expended by defendants and the Court in considering and ruling on the motions to dismiss, to seek to plug the holes in their complaints identified by the March 29 Order. Plaintiffs "[are] not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." Id. (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 699 (6th Cir. 2004) (internal quotation marks omitted). Indeed, to

---

[25] That decision followed briefing that exceeded 330 pages (exclusive, of course, of complaints and declarations).

permit amendment here might have the perverse effect of turning
defense counsel and the Court into plaintiffs' counsel's co-
counsel, with plaintiffs waiting to see what objections
defendants raise and how the Court rules on those objections and
then amending their complaint as necessary based on what they
learned in the process.  Especially in a case of this magnitude,
with so much at stake and with enormous expenditure of resources
by defendants and the Court, that is an unacceptable way to
operate a system of justice.  Nor is this a situation, as with
pro se parties, where either plaintiffs or their counsel (who
will, if they prevail, seek to have their fees paid by
defendants) are deserving of any special solicitude.

Finally, it must emphasized that essentially none of the
allegations plaintiffs put forward with regard to antitrust
injury rest on new facts that plaintiffs could not have pleaded
before.  Indeed, after receiving plaintiffs' letter of August 1,
2012, we permitted plaintiffs to rely on the Barclays settlement
documents in opposing defendants' motions to dismiss, and,
although settlements involving UBS and RBS have since come to
light, these settlements do not advance plaintiffs' antitrust
injury argument in any way that the Barclays settlement did not.
Plaintiffs' new antitrust injury allegations mostly involve
reframing previously known facts in an attempt to remedy the

defects we identified on the fundamental issue of antitrust standing.

### 2. Plaintiffs' Proposed Amendments Would Be Futile

Even if we did not find plaintiffs' effort to amend their complaints for a second time with regard to antitrust standing to be wholly unwarranted in these circumstances, we would deny them leave to amend because the proposed amendment would be futile. Specifically, even taking into account plaintiffs' proposed allegations, plaintiffs do not adequately plead antitrust injury.

The issue of antitrust injury was thoroughly examined in the March 29 Order, and we stand by our reasoning in that opinion. As we stated there, antitrust injury is an injury "attributable to an anticompetitive aspect of the practice under scrutiny." Mar. 29 Order, 2013 WL 1285338, at *11 (quoting Atl. Richfield Co. v. USA Petroleum Co. ("ARCO"), 495 U.S. 328, 334 (1990)) (internal quotation marks omitted). The injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)), and it must involve "loss [that] stems from a competition-reducing aspect or effect of the defendant's behavior," id. (quoting ARCO, 495 U.S. at 344).

Here, after careful review of the allegations in plaintiffs' proposed second amended complaints, we conclude that none of plaintiffs' new allegations change the outcome reached in the March 29 Order. Plaintiffs' allegations include new ways of packaging previously known facts, such as arguing that the LIBOR-setting rules themselves give rise to competition, and new theories for how defendants compete, such as that they compete over their creditworthiness, that they compete to offer customers the best interest rate benchmark on financial instruments, or that they compete by "keeping other banks honest" and reporting any improper conduct by them. However, regardless of the creativity they display, none of plaintiffs' allegations make plausible that there was an arena in which competition occurred, that defendants' conduct harmed such competition, and that plaintiffs suffered injury as a result. Even where plaintiffs have identified a market in which defendants are, in fact, competitors, they have not plausibly alleged that each defendant failed to act in its independent individual self-interest. In other words, even if we grant that plaintiffs have alleged a vertical effect -- that they suffered harm as a result of defendants' conduct -- they have not plausibly alleged a horizontal effect -- that the process of competition was harmed because defendants failed to compete with

each other or otherwise interacted in a manner outside the bounds of legitimate competition.

Therefore, both because amendment would not be proper in the circumstances of this case and because plaintiffs' new allegations would be futile, plaintiffs are denied leave to amend their antitrust claims.

### E. State Law Claims

In their first amended complaint, the OTC plaintiffs asserted a single state-law claim for unjust enrichment and restitution. OTC Pls.' Consol. Am. Compl. ¶¶ 227-30. Because we dismissed the OTC plaintiffs' antitrust claim -- their only other asserted claim for relief -- we declined to exercise supplemental jurisdiction over their state-law claim.[26] Mar. 29 Order, 2013 WL 1285338, at *58-*59.

Since the March 29 Order was issued, plaintiffs have taken the position, despite the fact that they had not previously relied on diversity jurisdiction at all, that subject matter jurisdiction based on the Class Action Fairness Act of 2005 ("CAFA"), in fact, exists. Pls.' Mem. of Law in Supp. of Their Mot. for Leave to File Proposed Consol. Second Am. Compl. 14-15.

---

[26] We also noted that, "[a]lthough it [was] conceivable that we could retain jurisdiction over [plaintiffs' state-law] claim by virtue of diversity of citizenship," we did not need to consider this ground for jurisdiction because "plaintiffs ha[d] not pleaded that this Court has diversity jurisdiction over their state law claim, nor ha[d] they alleged facts that would support our exercise of diversity jurisdiction." Mar. 29 Order, 2013 WL 1285338, at *58 n.23.

Defendants agree.  See Defs.' Mem. of Law in Opp'n to OTC Pls.'
Request for Leave to Amend State Law Claims 1 [hereinafter
Defs.' State Law Opp'n].  As do we: this is a case in which at
least one member of the putative class is diverse from at least
one defendant, 28 U.S.C. § 1332(d)(2) (2006); the matter in
controversy plausibly exceeds the sum of $5,000,000, id.; and,
the number of members of the proposed plaintiff class exceeds
100, id. § § 1332(d)(5)(B).  Further, the exceptions to CAFA
jurisdiction do not seem to apply.  Therefore, we may assert
jurisdiction over the OTC plaintiffs' proposed state-law causes
of action.

     As discussed above, Rule 15(a) provides that a second
amended complaint may be filed "only with the opposing party's
written consent or the court's leave," though "[t]he court
should freely give leave when justice so requires."  Fed. R.
Civ. P. 15(a)(2).  We "ha[ve] discretion to deny leave for good
reason, including futility, bad faith, undue delay, or undue
prejudice to the opposing party."  Holmes v. Grubman, 568 F.3d
329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet
Corp., 482 F.3d 184, 200 (2d Cir. 2007)).

     Here, plaintiffs seek to reassert their unjust enrichment
claim, Pls.' Second Consol. Am. Compl. ¶¶ 389-92, Ex. A, Pls.'
Mem. of Law in Supp. of Their Mot. for Leave to File Proposed
Consol. Second Am. Compl. [hereinafter OTC Pls.' PSAC], and to

plead a new claim for breach of contract, based primarily on defendants' alleged breach of the implied duty of good faith and fair dealing, id. ¶¶ 375-88. Defendants argue that we should deny plaintiffs leave to make these amendments because the amendments are futile and because plaintiffs' delay in seeking to amend is inexcusable.

Unlike in the antitrust context, we do not believe that considerations of bad faith, undue delay, or undue prejudice to defendants require us to deny plaintiffs leave to amend regarding their state-law claims.[27]   For the reasons stated below, moreover, we also do not believe that futility mandates that we deny plaintiffs leave to amend, though our decision is without prejudice to a motion by defendants to dismiss any second amended complaint.

Although we grant plaintiffs' motion, we are concerned that plaintiffs failed to include contract claims in their first amended complaint.  Our concern was not alleviated during oral argument, as, despite questioning, no adequate explanation was proffered by plaintiffs' counsel.  We note further that this failure has the consequence of further delaying the

---

[27] We would note that, in their letter to the Court of August 1, 2012, submitted after defendants filed their motions to dismiss but before plaintiffs filed their opposition papers, plaintiffs requested leave to amend to add, inter alia, new causes of action.  In this respect, plaintiffs' present request to amend is differently situated from their request to add allegations to cure their amended complaint's defects relating to antitrust injury, which plaintiffs did not seek to do, despite being on notice of the issue since at least June 2012, until after we issued the March 29 Order.

determination of the contours of the complaint -- a delay that obviously is not to plaintiffs' advantage.

### 1. Unjust Enrichment

Plaintiffs reassert their claim for unjust enrichment, over which we previously declined to exercise jurisdiction.  In the March 29 Order, we considered the elements of an unjust enrichment claim in the context of addressing the exchange-based plaintiffs state-law claim.  As we stated there: "Under New York law, '[t]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"  Mar. 29 Order, 2013 WL 1285338, at *60 (quoting Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012)).  To state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Id. (quoting Georgia Malone, 19 N.Y.3d at 516) (internal quotation mark omitted).

Based on the present record, we cannot conclude that plaintiffs' unjust enrichment claim would be futile.  Plaintiffs have alleged that they purchased financial instruments from defendants wherein they paid defendants fixed sums and received in return a floating amount tied to LIBOR.  OTC Pls.' PSAC

¶¶ 12-13, 35.   Additionally, plaintiffs have alleged that defendants "knowingly understate[d] their true borrowing costs" during the Class Period and thereby "caused LIBOR to be calculated or suppressed artificially low."  <u>Id.</u> ¶ 5.   This conduct allegedly "allowed [defendants] to pay unduly low interest rates to investors, including Baltimore Plaintiffs, on LIBOR-based financial instruments during the Class Period."  <u>Id.</u> ¶ 8.   In short, plaintiffs have alleged that defendants were enriched at their expense by receiving from plaintiffs fixed sums set based on an "accurate" LIBOR, <u>see</u> <u>id.</u> ¶ 336, and paying plaintiffs floating amounts that were artificially low due to defendants' alleged manipulation of LIBOR.   Further, plaintiffs plausibly allege that it would be inequitable to permit defendants to retain the rewards they reaped at plaintiffs' expense.   Although plaintiffs had entered into their swap agreements with the "expectation that the floating payments [they] would receive over the life of the contract would be calculated based on LIBOR submissions that conformed to the LIBOR definition, an accurate measure of interbank borrowing costs," <u>id.</u>, defendants allegedly manipulated LIBOR such that it was fixed at a lower level than it would have been at normally, and thereby paid plaintiffs less than they were entitled to receive.   On face, these allegations appear to state a claim for unjust enrichment.

Nonetheless, defendants argue that plaintiffs' claims are barred because their relationships with defendants were governed by contract.  Under New York law, the cause of action of unjust enrichment does not lie "where the parties have entered into a contract that governs the subject matter" at issue.  Pappas v. Tzolis, 20 N.Y.3d 228, 234 (2012) (quoting Cox v NAP Constr. Co., 10 N.Y.3d 592, 607 (2008)) (internal quotation mark omitted).  Here, defendants contend that the contracts between plaintiffs and defendants "govern the consideration for the financial instruments [plaintiffs] purchased, and thus their claim for unjust enrichment fails as a matter of law."  Defs.' Mem. of Law in Opp'n to OTC Pls.' Request for Leave to Amend State Law Claims 4 [hereinafter Defs.' State Law Opp'n].

We are not convinced.  "[T]he predicate for dismissing quasi-contract claims is that the contract at issue 'clearly covers the dispute between the parties.'"  Union Bank, N.A. v. CBS Corp., No. 08 Civ. 8362 (PGG), 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987)); see also id. at *8 (declining to dismiss unjust enrichment claim where there was a chance that "resolution of th[e] dispute [would] require[] going outside the four corners of the parties' agreements").

Here, although the swap contracts clearly required defendants to pay plaintiffs the prescribed floating rate of

return using the LIBOR reported by the BBA, the contracts did not "clearly cover[]" the subject matter now at issue,[28] namely whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs.[29]  As such, the existence of plaintiffs' swap agreements with defendants does not bar plaintiffs' unjust enrichment claim.

Defendants also argue that plaintiffs' pleading of unjust enrichment is insufficient because plaintiffs' allegations do not show that defendants reaped a "net gain" at the expense of plaintiffs' "net loss."  See Defs.' State Law Opp'n 5-6.  In support of this argument, defendants cite Maryland Casualty Co. v. W.R. Grace and Co., 218 F.3d 204 (2d Cir. 2000), which involved a dispute among insurers of a manufacturer of asbestos-containing products, in which insurers who had settled with the

---

[28] Defendants surely overreach when they argue that plaintiffs' unjust enrichment claim is barred because the swap contracts govern the subject matter of "the consideration for the financial instruments [plaintiffs] purchased." Defs.' State Law Opp'n 4.  If a plaintiff could not assert a claim for unjust enrichment based on any conduct by the defendant that affected the "consideration" the plaintiff received under a contract with the defendant, unjust enrichment claims would effectively be barred whenever a contract between the plaintiff and the defendant existed.  Such a result, though possibly to defendants' liking, is not countenanced by New York law.

[29] Importantly, the question we face here is distinct from that we face in deciding whether plaintiffs may add a new claim for breach of the implied duty of good faith and fair dealing.  In evaluating whether plaintiffs may add their contract claim, we ask whether plaintiffs have plausibly alleged that a duty not to manipulate LIBOR was implicit in the swaps contracts.  By contrast, in evaluating whether plaintiffs may reassert their unjust enrichment claim, we ask whether the swaps contracts clearly govern whether defendants are permitted to submit artificial LIBOR quotes to the BBA.  Apart from how we answer the former question, we answer the latter question in the negative.

manufacturer early on sought reimbursement of covered litigation defense costs from insurers who settled subsequently. Id. The earlier-settling insurers had argued that the later-settling insurers had been unjustly enriched because they "simply sat back and waited until the early settling insurers paid amounts that settled [the manufacturer]'s claim for defense costs accruing prior to the [early] settlements." Id. at 212.

The Second Circuit rejected this argument. Although the early settlements entered into by plaintiffs forced them to cover the insured's then-incurred defense costs, they also absolved plaintiffs of responsibility for later defense costs, which were far greater, and allowed plaintiffs to pay out their indemnity limits before defense costs sharply escalated. Id. at 213. Therefore, "it [could not] be determined whether (overall) [plaintiffs] paid more in combined indemnity and defense payments as a result of the non-contribution of [defendants], or whether (overall) [plaintiffs] paid less." Id. Combined with the fact that the decision of when to settle was inherently risky and involved some amount of benefit and some amount of harm, the Circuit concluded that defendants had not been unjustly enriched. Id.

Maryland Casualty is plainly distinguishable. In that case, the issue was not whether defendants had been unjustly enriched through transactions directly with plaintiffs, but

rather whether defendants had paid less than their fair share to the insured manufacturer and therefore should be compelled to reimburse plaintiffs.  In light of this, the relevant comparison was necessarily between the overall amount plaintiffs paid the insured, in fact, and the overall amount plaintiffs would have paid had defendants settled earlier.  Here, by contrast, plaintiffs entered into swap contracts directly with defendants, and the allegation is that defendants benefited at plaintiffs' expense by paying plaintiffs less on those contracts.  <u>Maryland Casualty</u> is inapposite to these facts.[30]

For the foregoing reasons, we are not convinced that the OTC plaintiffs' requested amendment would be futile.  Thus, although we do not preclude defendants from moving to dismiss any unjust enrichment claim asserted in a second amended complaint, we will permit plaintiffs to make such an amendment.

---

[30] Defendants also argue that plaintiffs have failed to satisfy Rule 9(b)'s requirements of pleading fraud with particularity.  We disagree, for substantially the reasons given in the March 29 Order for why the exchange-based plaintiffs had satisfied Rule 9(b).  <u>See Mar. 29 Order</u>, 2013 WL 1285338, at *39-*40.  With regard to the one requirement of Rule 9(b) that is different between the OTC and the exchange-based claims, alleging the effect that defendants' scheme had on the market at issue, here the OTC plaintiffs have alleged, as discussed above, that the contracts they entered into with defendants paid a floating rate of return based on LIBOR, such that manipulation of LIBOR directly affected defendants' payments on those contracts.

## 2. Breach of the Implied Duty of Good Faith and Fair Dealing

The OTC plaintiffs seek to add a new claim for breach of the implied covenant of good faith and fair dealing.[31]  Under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts."  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co., 30 N.Y.2d 34, 45 (1972)).  The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract.  Id. (quoting Rowe v Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69 (1978)) (internal quotation marks omitted).  Specifically, implied in every contract is a promise

---

[31] Plaintiffs style this claim: "Breach of Contract and Implied Covenant of Good Faith and Fair Dealing."  OTC Pls.' PSAC, at 157.  Although plaintiffs focus this claim on breach of the implied duty, they also allege that "Defendants' collusion to manipulate the LIBOR rate also breached the contractual term that provided that Plaintiffs would receive payments that were based on the LIBOR definition."  Id. ¶ 387.  However, plaintiffs have not alleged an explicit term in their swap contracts that required the benchmark used to calculate the floating amount to be based on the LIBOR definition.  See Tr. 65, 69-71.  The contracts' provision that the floating rate would be based on "USD-LIBOR-BBA," OTC Pls.' PSAC ¶¶ 377, 379, though it may give rise to an implied duty, is not such an explicit term.  Moreover, given that LIBOR is, by definition, an average of eight banks' submissions to the BBA, no one bank could possibly guarantee that a particular LIBOR fix was determined in a manner that wholly complied with the BBA's rules.  Therefore, plaintiffs cannot state a claim for breach of an explicit contractual provision, and our analysis here will focus instead on whether they can state a claim for breach of the implied covenant of good faith and fair dealing.

that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (quoting Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 87 (1933)) (internal quotation marks omitted); see also LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc., Nos. 11-5425-cv, 12-1382-cv, 2013 WL 3927615, at *9 (2d Cir. July 31, 2013) ("The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" (quoting Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991))).  That said, the implied covenant arises "only in connection with the rights or obligations set forth in the terms of the contract," Paul v. Bank of Am. Corp., No. 09-CV-1932 (ENV) (JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011); see also Corazzini v. Litton Loan Servicing LLP, No. 1:09-CV-0199 (LEK/RFT), 2010 WL 1132683, at *7 (N.D.N.Y. Mar. 23, 2010) ("[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304 (1983))), and "cannot create duties that negate explicit rights under a contract," LJL 33rd St. Assocs., 2013 WL 3927615, at *9.

Here, plaintiffs have plausibly alleged that defendants breached the implied covenant good faith and fair dealing.  As

discussed above, plaintiffs allege that they entered into swap contracts with defendants wherein they paid defendants a fixed rate and received in return a floating rate tied to LIBOR.  In entering into these contracts, plaintiffs allege, they expected LIBOR to be set according to its definition, such that it reflected the average interest rate being charged in the London interbank lending market.  Such an expectation would have been integral to the "bet" that is one purpose of entering into a swap: each plaintiff, as the party paying a fixed rate and receiving a floating rate, bet that interest rates would rise over the life of the contract, and each defendant, as the party paying a floating rate and receiving a fixed rate, bet that interest rates would fall.[32]  By allegedly manipulating LIBOR

---

[32] Defendants argue that, for at least some of the plaintiffs, such as the City of Baltimore, the purpose of entering into swap contracts was not to bet on the direction of prevailing interest rates, but rather to hedge against exposure to interest rate fluctuation resulting from other instruments plaintiffs had entered into, with the effect of making plaintiffs floating rate neutral.  Tr. 62-63;  Defs.' State Law Opp'n 6 n.7; Defs.' Mem. of Law in Supp. of Mot. to Dismiss Pls.' Antitrust Claims 32-33.  However, even if this was one of plaintiffs' purposes in entering into the swap contracts, there is no indication that this was any plaintiff's sole purpose; that is, it is not clear that any plaintiff purchased swaps so as to make itself actually floating rate neutral.  There is also no indication that this hedging purpose was held by every plaintiff.  Moreover, even if hedging was any plaintiff's sole purpose in entering into a swap, that does not indicate that the plaintiff sought to be <u>LIBOR</u>-neutral, as opposed to <u>interest-rate</u>-neutral, generally; in other words, the plaintiff's purpose might have been to receive payments tied to prevailing interest rates, as reflected through LIBOR, in order to hedge exposure to both LIBOR and non-LIBOR rates it was paying on other instruments.  Although defendants might be able to establish through discovery that plaintiffs' sole purpose in entering into the swaps was to hedge their exposure to LIBOR, we are not in a position to decide that now.  For present purposes, plaintiffs have sufficiently alleged that one of their purposes in entering into the swaps was to profit from receiving a rate that reflected prevailing interest rates.  <u>See, e.g.</u>, OTC Pls.' PSAC ¶ 336 (alleging that the City of Baltimore entered into the swaps with the

downward, such that it was lower than it would have been if set according to its definition, defendants depressed the consideration plaintiffs received pursuant to their contracts and undermined the contractual bargain whereby plaintiffs agreed to pay a certain fixed rate in exchange for receiving a rate that reflected prevailing interest rates.   In other words, plaintiffs have alleged that defendants "injur[ed their right] to receive the fruits of the contract," Dalton, 87 N.Y.2d at 389 (quoting Kirke La Shelle, 263 N.Y. at 87) (internal quotation mark omitted), "so directly . . . impair[ing] the value of the contract for [plaintiffs] that it may be assumed that [defendants' alleged actions] are inconsistent with the intent of the parties." LJL 33rd St. Assocs., 2013 WL 3927615, at *9 (quoting Bank of China, 937 F.2d at 789) (internal quotation marks omitted).   Further, an implied duty not to manipulate LIBOR is "in connection with" plaintiffs' explicit contractual right to receive a LIBOR-based rate, and defendants' obligation to pay such a rate, because manipulation of LIBOR would cause the contractual exchange to depart from what the parties

---

"expectation that the floating payments it would receive over the life of the contract would be calculated based on LIBOR submissions that conformed to the LIBOR definition, an accurate measure of interbank borrowing costs"); id. ¶ 386 (stating that "the purpose of the contracts" was "to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition").

intended.[33]   Thus, plaintiffs plausibly allege that the duty of good faith and fair dealing implicit in their contracts with defendants included a promise by defendants not to manipulate LIBOR to their benefit and plaintiffs' detriment.

The allegations here are analogous to those in City of New York v. Coastal Oil New York, Inc., No. 96 Civ. 8667 (RPP), 1999 WL 493355 (S.D.N.Y. July 12, 1999).  In Coastal Oil, the City of New York had a contract with a fuel oil vendor whereby the City purchased fuel oil at variable prices adjusted weekly based on wholesale prices reported in an industry publication.  Id.  The defendant vendor was one of six companies that submitted prices to the publication, id. at *3, and, during the life of its contract with the City, submitted artificially high prices to the publication which caused the price paid by the City under the contract to be artificially high.  Id. at *3-*4.  Although the City's contract with the vendor contained "no explicit agreement . . . regarding the prices that [the vendor] could submit to [the industry publication],"[34] id. at *3, the City brought suit on the theory that the vendor's submission of false

---

[33] Additionally, of course, an implied duty not to manipulate LIBOR does not "negate explicit rights under [the parties'] contract[s]."  LJL 33rd St. Assocs., 2013 WL 3927615, at *9.

[34] There also was no "written or oral agreement between [the publication] and [the vendor] defining the prices [the vendor] could submit to [the publication]," though the submitted prices were understood to "represent advertised wholesale asking prices for the date listed in [the publication] as the effective date."  Coastal Oil, 1999 WL 493355, at *3 & n.4.

wholesale prices constituted a breach of the implied duty of good faith and fair dealing.

The Court held that plaintiffs had raised a genuine issue of material fact precluding summary judgment.  Finding that "[t]he purpose of the price adjustment clause . . . [was] to produce a delivered price 'which shall vary with the market . . . according to the method of adjustment," and reasoning that "[t]he delivered price could not vary with market conditions if it was not based on bona fide [published] quotes," the Court concluded that "[t]he artificial manipulation of the [wholesale] price average in [the publication] would prevent the price adjustment clause from accomplishing this essential purpose."  Id. at *7.  By manipulating the wholesale price it reported to the publication, therefore, the vendor breached its implied duty of good faith and fair dealing.

At oral argument, defendants sought to distinguish Coastal Oil by arguing that, whereas the purpose of the contract there was clearly frustrated by defendant's conduct, here, the purpose of the swap contracts was merely to pay the LIBOR reported by the BBA, which defendants undeniably did.  Tr. 61-67.  This distinction, however, is not convincing.  Although plaintiffs surely expected to be paid at a rate incorporating reported LIBOR, there is no indication that they wanted this merely for its own sake.  Rather, as plaintiffs have plausibly alleged,

they expected to be paid at a rate that reflected prevailing interest rates, which LIBOR, as defined, did.   Indeed, as discussed above, one of the purposes of entering into a swap is to bet on the direction prevailing interest rates will move,[35] and this purpose is undermined if the interest rate index incorporated into the contractual payment formula is decoupled from the market through the manipulative conduct of defendants. Thus, contrary to defendants' arguments, <u>Coastal Oil</u> counsels in favor of granting plaintiffs' motion for leave to amend.

Defendants' additional arguments also fail to convince us that plaintiffs should be denied leave to amend.   Although defendants reprise their contention that plaintiffs have not shown a net loss based on LIBOR suppression in light of their overall exposure to LIBOR, <u>see</u> Defs.' State Law Opp'n 10, this argument is even weaker than it was in the unjust enrichment context, given that, here, our focus is squarely on the individual contracts on which plaintiffs received a floating rate tied to LIBOR and therefore were allegedly harmed when LIBOR was artificially reduced.   Further, even if "the implied covenant of good faith will not be breached without some showing of intent to harm the other contracting party or a reckless

---

[35] For the reasons discussed above, although defendants argue that plaintiffs entered into the swap contracts not to bet on the direction interest rates would move, but rather to hedge their exposure to LIBOR fluctuation, we cannot conclude, on the present record, that this was any plaintiff's sole purpose in entering into the swaps.

disregard of it," <u>Paul v. Bank of Am. Corp.</u>, No. 09-CV-1932 (ENV) (JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011), plaintiffs here have plausibly alleged that defendants' alleged manipulation of LIBOR was at least in reckless disregard of the detriment to plaintiffs, with whom defendants were in direct contractual privity.  Finally, despite defendants' argument that plaintiffs' contract claim is unsuited to class treatment and that "the implausibility of certification weighs heavily against permitting the belated addition of a breach of contract claim," Defs.' State Law Opp'n 11 (failing to cite any authority for this proposition), we do not think that class certification concerns require us to deny the present motion.  Regardless of whether plaintiffs will ultimately be able to prevail on a class certification motion, the propriety of class treatment does not bear on our decision whether to permit plaintiffs to add their contract claim.

Defendants have not demonstrated that plaintiffs' proposed contract claim would be futile.  As with plaintiffs' unjust enrichment claim, therefore, although we do not preclude defendants from moving to dismiss any contract claim asserted in a second amended complaint, we grant plaintiffs leave to add such a claim.

## F. Stay of Actions Not Subject to the Prior
## Motions to Dismiss

On August 14, 2012, we issued a Memorandum and Order imposing a stay on all complaints not then subject to defendants' motions to dismiss. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2012 WL 3578149 (S.D.N.Y. Aug. 14, 2012). On May 3 of this year, we issued a Memorandum in which we stated: "The stay shall remain in place for now with respect to cases that raise issues addressed in our Memorandum and Order [of March 29, 2013]. If there are any complaints that do not raise any such issue, please advise." In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2013 WL 1947367, at *2 (S.D.N.Y. May 3, 2013). In response to that invitation, we have received a number of letters from plaintiffs seeking to lift the stay on their cases. Having reviewed those letters, and in light of the conclusions in the present Memorandum and Order and the fact that the legal landscape of this case, though substantially clarified, is still in somewhat of a state of flux, we think the most prudent course of action is to maintain the stay on all actions previously subject to it. Further, given the magnitude of this multi-district litigation and the fact that the universe of actions encompassed by it continues to expand, we are wary of addressing the individual cases piecemeal rather than

comprehensively.     Therefore,   all    actions   not   subject   to
defendants' previously filed motions to dismiss shall continue
to be stayed, pending further order of the Court.[36]

---

[36] The stay does not apply to the motion to remand in <u>Salix Capital US Inc. v.
Banc of America Securities LLC</u>, No. 13 Civ. 4018 (NRB).

## III. Conclusion

For the reasons stated above, the exchange-based plaintiffs' motion for interlocutory appeal is denied; the OTC, bondholder, and exchange-based plaintiffs' motions to add allegations with respect to antitrust are denied; the exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation is denied; BT-MU, Credit Suisse, and Norinchukin's motion for reconsideration is denied without prejudice to a similar motion being filed by defendants that addresses the issues raised herein; and, the OTC plaintiffs' motion for leave to reassert their unjust enrichment claim and to add a claim for breach of the implied covenant of good faith and fair dealing is granted.

By September 10, 2013, the OTC plaintiffs and the exchange-based plaintiffs shall each file a second amended complaint that conforms with the rulings herein. If defendants believe that the new complaints are inconsistent with our rulings, they shall inform us by September 20, 2013. Further, if defendants wish to file a motion for reconsideration on grounds similar to those asserted in BT-MU's, Credit Suisse's, and Norinchukin's motion and which addresses the issues we have raised, they must file such a motion by September 20, 2013. Finally, if defendants intend to move for reconsideration of the March 29 Order on statute of limitations grounds or to make a renewed motion to

dismiss with regard to "Period 2" claims, they must seek leave to file such a motion by September 20, 2013.

This Memorandum and Order resolves docket entry nos. 296, 316, 327, 330, 333, and 341.

**SO ORDERED.**

Dated:   New York, New York
         August 23, 2013

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE