IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANICAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 No. 1:11-MD-02262-NRB |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | ECF CASE |

**EXCHANGE-BASED PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION
OF THE COURT'S AUGUST 23, 2013 MEMORANDUM AND ORDER**

**LOVELL STEWART
HALEBIAN JACOBSON LLP**
Christopher Lovell
Jody R. Krisiloff
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
Email: clovell@lshllp.com
jkrisiloff@lshllp.com
amiller@lshllp.com

**KIRBY McINERNEY LLP**
David Kovel, Esq.
Daniel Hume, Esq.
Roger Kirby, Of Counsel
Lauren Wagner Pederson, Of Counsel
825 Third Avenue, 16th floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: dkovel@kmllp.com
dhume@kmllp.com
roger.w.kirby@gmail.com
lpederson@kmllp.com

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

## <u>TABLE OF CONTENTS</u>

Preliminary Statement..................................................................................................1

Standard Governing Motions For Reconsideration .....................................................2

Argument ......................................................................................................................2

A.   Amendment Was Not Futile ...............................................................................2

B.   This Court Overlooked Important Parts Of The March 29 Order And Authority Cited Therein ...............................................................................................................7

     1.   The Importance Of Plaintiffs' Inability To Plead The "True" Level Of A Given LIBOR Report And Whether The Degree Of Artificiality Increased Or Decreased .........................................................................7

          a.   Plaintiffs Propose To Comply With The Reasoning In The August 23 Order...............................................................................10

          b.   *Crude Oil* Reached The Same Result As The March 29 Order................10

     2.   The August 23 Order Overlooked The Qualitative Distinction Between Trade Manipulation And False Reports, Other Findings Made In The March 29 Order, And Related Law..................................................................11

Conclusion ..................................................................................................................14

# Table of Authorities

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60 (2d Cir. 2012) ........................ 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 4

*Cange v. Stotler and Co., Inc.,* 826 F.2d 581 (7th 1987) ............................................................. 9

*Daewoo Int'l. (Am.) Corp. Creditor Trust v. SSTS Am. Corp*., No. 02 Civ. 9629

  U.S. Dist. LEXIS 12298 (S.D.N.Y. July 1, 2004) .................................................. 2

*Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005)............................................................ *passim*

*In re Amaranth Natural Gas Commodities Litig*., 269 F.R.D. 366 (S.D.N.Y. 2010) .................. 11

*In re Crude Oil Commodity Futures Litig*., 913 F.Supp.2d 41 (S.D.N.Y. 2012) ........................ 10

*In re Indiana Farm Credit Bureau*, CFTC No. 75-14, 1982 WL 30249

  (CFTC Dec. 17, 1982) ........................................................................................ 8

*In re Initial Public Offering Sec. Litig.*, 297 F.Supp.2d 668 (S.D.N.Y. 2003) ..................... *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-2262, 2013 WL 1285338

  (S.D.N.Y. Mar. 29, 2013) ............................................................................... *passim*

*In re LIBOR-Based Fin. Instruments Litig.*, No. 11-2262, 2013 WL 4504769

  (S.D.N.Y. Aug. 23, 2013) ................................................................................. 2, 13

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) ................................................ 8, 9

*Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229 (2d Cir. 2007) ....................................... 3, 4

*Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) ............... 11

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) *aff'd sub nom. Merrill Lynch, Pierce, Fenner &*

  *Smith v. Curran*, 456 U.S. 353 (1982). .............................................................. 8

*Lucente v. IBM*, 210 F.3d 243 (2d Cir. 2002) ............................................................................. 2

ii

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).............................. 9

*Panther Partners Inc. v. Ikanos Communs., Inc.*, 347 Fed. Appx. 617 (2d Cir. 2009) ......... 1, 3, 4

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ............................................................ 2

*Small v. Nobel Biocare USA, LLC*, No. 05 Civ.3225 WL 952396

 (S.D.N.Y. Mar. 21, 2012) ........................................................................................................ 2

*Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 11 Civ. 1209 WL 424535

 (D. Conn. 2013) ....................................................................................................................... 4

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992)........................... 2

**Rules**

Fed. R. Civ. 15(a)(2) ................................................................................................................... 1

Pursuant to Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and Rule 15(a)(2) of the Federal Rules of Civil Procedure, the Exchange-Based Plaintiffs ("Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Reconsideration of that portion of the Court's August 23, 2013 Memorandum and Order denying Plaintiffs motion to amend their allegations to include trader-based manipulation during the period January 1, 2005 through the beginning of August 2007.

## PRELIMINARY STATEMENT

Reconsideration is warranted for two primary reasons.  First, the Court did not apply the appropriate standard in determining that the proposed amendment to include trader-based manipulation clams for the period January 1, 2005 through early August 2007 was futile because Plaintiffs did not provide their individual trade data to show actual damages.  Putting aside whether such data is required at the pleading stage, or whether such a requirement could have been anticipated based on the Court's March 29, 2013 decision, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-2262, 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013) ("March 29 Order"), the Court erred because an amendment is not futile if the plaintiff is capable of curing any purported deficiencies.  *See Panther Partners Inc. v. Ikanos Communs., Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009).  Plaintiffs can provide such data – as Plaintiffs, in fact, represented to the Court during the hearing on their motion to amend – and the data shows damages to Plaintiffs at certain times when LIBOR was reportedly manipulated during the pre-August 2007 period.  Therefore proposed amendment is not futile.

Second, the Court overlooked important parts of its March 29 Order and related law in holding that Plaintiffs had failed adequately to allege injury and standing.  *See* Argument "B" *infra*.

1

**STANDARD GOVERNING MOTIONS FOR RECONSIDERATION**

A motion for reconsideration is appropriate when a party "can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *accord Small v. Nobel Biocare USA, LLC*, No. 05 Civ.3225, 2012 WL 952396, at *1 (S.D.N.Y. Mar. 21, 2012). Simply put, "[t]he purpose of a motion for reconsideration . . . is to draw a court's attention to its prior missteps, whatever they may have been." *Small*, 2012 WL 952396, at *2 n.5 (granting in part motion for reconsideration based on "all relevant precedent"). "Additionally, a motion for reconsideration may be granted to correct a clear error, or prevent 'manifest injustice.'" *Daewoo Int'l. (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629, 2004 U.S. Dist. LEXIS 12298, *4 (S.D.N.Y. July 1, 2004) (J. Buchwald) (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

**ARGUMENT**

**A.      Amendment Was Not Futile**

The Court denied Plaintiffs' motion to file pre-August 2007 claims in the Proposed Second Amended Consolidated Class Action Complaint ("PSAC") on the grounds that Plaintiffs had not adequately pleaded injury and that amendment was futile insofar as "the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *In re LIBOR-Based Fin. Instruments Litig.*, No. 11-2262, 2013 WL 4504769, at ** 9, 13 (S.D.N.Y. Aug. 23, 2013) ("August 23 Order") (*quoting Lucente v. IBM*, 210 F.3d 243, 258 (2d Cir. 2002)).

However, the Second Circuit has ruled that when a court determines that the proposed amendment cannot withstand a motion to dismiss, the amendment is still not futile if plaintiffs

2

can "address the deficiencies identified by the court and allege facts sufficient to support the claim." *Panther Partners*, 347 Fed. Appx. at 622.  "[C]ourts need not determine futility based only on an assessment of the proposed amendments--that is, the complaint presented to the court for its consideration." *Id*; c*f. Kassner v. 2nd Ave. Delicatessen, Inc*., 496 F.3d 229, 245 (2d Cir. 2007) (the district court may consider "whether the proposed amendment or *different amendments* to the complaint should be allowed") (emphasis added).

The Court's finding of futility was based upon a finding that the PSAC's failed to allege that Plaintiffs were injured by the trader-based manipulation, specifically because Plaintiffs did not allege "(1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, or (2) that their positions were such that they were injured." Aug. 23 2013 Order at *11.  During Oral Argument on August 8, 2013, Plaintiffs' counsel stated that "we could list each plaintiff's trades and say all of these trades happened in an artificial market, artificial prices trends…"  Aug. 8, 2013 Tr. 50:20-22.  *See also id.* at 51:10-41 ("if we put in the trades . . .for a few days where we have a few quotes . . . we could make inferences and guesses" to "infer[] which way [Defendants] were lying on this or that day".).

The Court, however, did not consider whether the addition of allegations that specified Plaintiffs' Eurodollar futures transactions trades on certain days that the Barclays settlement documents describe LIBOR manipulation, could render the PSAC sufficient to survive a motion to dismiss.  Because Plaintiffs can provide the information necessary to "address the deficiencies identified by the court and allege facts sufficient to support the claim," the amendment is not futile, and the Court should reconsider that portion of its August 23 Order denying Plaintiffs' leave to include trader-based manipulation claims for the period January 1, 2005 through the

3

beginning of August 2007.   *See Panther Partners*, 347 Fed. Appx. at 622.   *See also Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 71 (2d Cir. 2012) (directing "the district court to grant the plaintiffs leave to amend their complaint in order to plead additional factual allegations to support their claim" because "we cannot conclude that amendment would be futile given the Funds' representations made both in their briefs and at oral argument that additional facts could be alleged to show that the transactions were domestic" and "that the underlying transactional documents, which are not currently part of the record in this case, demonstrate that the transactions occurred in the United States.").

The Court's reasoning that Plaintiffs are not entitled to wait to see how the Court rules on defendants' objections and "then amend[] their complaint as necessary based on what they learned in the process" (August 23 Order, at *16) inaccurately describes Plaintiffs' intentions which were geared to the March 29 Order.   *See* "B" *infra*.   Also, such reasoning is contrary to Second Circuit authority in *Panther Partners* allowing leave to amend to "address deficiencies identified by the court." 347 Fed. Appx. at 622; *see also Kassner,* 496 F.3d at 245.

The examples provided below establish Plaintiffs' ability to allege their Eurodollar trades with particularity is not speculative.[1]   This is because Plaintiffs may, under the reasoning of the August 23 Order, identify specific Eurodollar futures trades on days which were disadvantaged by the false reports revealed by the Barclays orders.

For example, Plaintiffs can allege that on at least three days in 2006, Plaintiff 303030 Trading LLC ("303030 Trading") was damaged through its Eurodollar futures trades.   *See* Declaration of David E. Kovel in Support of the Exchange-Based Plaintiffs' Motion for

---

[1] *See Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 11 Civ. 1209, 2013 WL 424535, *4 (D. Conn. 2013) (noting that the Second Circuit applies the *Ashcroft v. Iqbal*, 556 U.S. 662(2009) "yardstick for futility of amendment under Rule 15(a)(2).").

Reconsideration of the Court's August 23, 2013 Memorandum and Order ("Kovel Decl.") at ¶ 3 and Exhibit A thereto.  Barclays manipulation of its LIBOR reports affected composite LIBOR in many instances and also had a concomitant (but inverse) effect on Eurodollar futures. Consistent with this Court's reasoning in the August 23 Order (*see* "B.1.a." below), LIBOR was inflated by Barclays misreports on March 20, 2006.  *See* Kovel Decl. ¶ 9 and Exhibit B thereto. 303030 Trading was therefore damaged by the reported Barclays LIBOR manipulation on this day by net selling Eurodollar futures into a deflated Eurodollar futures market.  Similarly, on December 20, 2006, Barclays suppressed composite LIBOR.  *See* PSAC ¶ 205; Kovel Decl. ¶ 10 and Exhibit C thereto.  303030 Trading was injured on this day because it bought spot and nearby month futures contracts against deferred contracts in an inflated Eurodollar futures market.  As a final example, on December 27, 2006 Barclays also successfully suppressed composite LIBOR.  *See* PSAC ¶ 205; Kovel Decl. ¶ 10 and Exhibit C thereto.  303030 Trading was damaged on this day because it bought spot and nearby month futures contract against deferred contracts in an inflated Eurodollar futures market.[2]

Overall, Plaintiff 303030 Trading traded on all but two trading days in February 2006, and on every trading day in March 2006, when as the PSAC shows, Barclays' U.S. dollar Derivatives Traders made requests to Barclays' LIBOR submitters on 16 out of the 20 days on which Barclays made LIBOR submissions in February 2006 and on 14 out of the 23 days on which it made LIBOR submissions in March 2006.  *See* PSAC ¶ 193 (citing Barclays FSA Final Notice ¶ 55).  Similarly, Plaintiff Atlantic Trading USA, LLC ("Atlantic Trading") traded large positions throughout the pre-August 2007 period including during specific incidents of trader-based manipulation cited in the Barclays settlements.  *See* Kovel Decl. ¶ 8.  *Cf* PSAC ¶¶ 206-09

---

[2]  Plaintiffs will plausibly allege that nearby calendar futures contracts are impacted more by changes in LIBOR than deferred calendar months and therefore artificiality from LIBOR manipulation will be more pronounced in spot and nearby futures contracts.

(citing FSA Final Notice ¶¶ 57(ii), 67, 91).  Other Plaintiffs also traded significantly during this period in which trader-based manipulation occurred.  *See* Kovel Decl. ¶¶ 4-7.  Therefore, Plaintiffs will be able to demonstrate that certain named Plaintiffs transacted within days, if not on the same day, of an artificial report revealed by the Barclays settlements.

The specific facts described above support, and were reasonably inferable from the PSAC's more general allegations and Plaintiffs' statements at oral argument.  The PSAC alleged that Plaintiffs traded Eurodollar futures during the relevant time periods at issue, "and were harmed as a consequence of Defendants' unlawful conduct." PSAC   ¶ 27.[3]  Moreover, the PSAC alleged in its Second Claim for Relief[4] that "Plaintiffs and Class Members paid artificial prices for their Eurodollar futures contracts, were deprived of a lawfully operating market free from manipulation, and are entitled to recover their actual damages resulting therefrom." PSAC ¶ 529.

At oral argument on the motion to amend, Plaintiffs' counsel apprised the Court that pleading these trades was possible, but that due to the Court's previous holding that such specificity was unnecessary with respect to the suppression-based claims, counsel considered it unnecessary to include them with respect to the trader-based allegations.  *See* Aug. 23 2013 Order at *11 n.19.  The Court has expressed "skepticism" that the PSAC's omission of specific trades "was in fact so innocent."  *Id*.   The Court was required to "draw all reasonable inferences in favor of the plaintiff[s]."  August 23 Order, at *10.  But the Court drew inferences against Plaintiffs' foregoing allegations including that a lack of specific alleged trades indicated that

---

[3] "Plaintiffs traded on-exchange based products tied to LIBOR such as Eurodollar futures in various periods during the Class Period, including during January 1, 2005 through the beginning of August 2007 . . . and were harmed as a consequence of Defendants' unlawful conduct." *Id*.
[4] The Second Claim, as specified in its subtitle, is pled "[a]gainst All Panel Bank Defendants for Price Manipulation from January 2005 through the beginning of August 2007".

6

there were no trades which could have resulted in actual damages. *Id* at \*11. Again, Plaintiffs did not include the trade data for the precise reasons stated. *See* "B" below. The proposed amendment was not futile given Plaintiffs' ability to include highly specific trade data satisfying the Court's requirements for pleading actual damages. *See* Kovel Decl. ¶¶ 3-8.

Accordingly, the Court should grant Plaintiffs' motion to reconsider its August 23 Order to correct errors and prevent manifest injustice to Plaintiffs.

**B.   This Court Overlooked Important Parts Of The March 29 Order And Authority Cited Therein**

**1.   The Importance Of Plaintiffs' Inability To Plead The "True" Level Of A Given LIBOR Report And Whether The Degree Of Artificiality Increased Or Decreased**

This Court found that Plaintiffs could have alleged whether false reports in the Barclays orders harmed any specific trades by Plaintiffs. August 23 Order, at \*12-13. However, in their Reply on the motion for leave to amend, Plaintiffs argued that "'loss causation' is not an element of a CEA manipulation claim," and that Plaintiffs need only allege injury and standing, not actual damages, in order to plead a manipulation claim under Section 22(a) of the CEA. Dkt. No. 366, at pp. 16-17. Plaintiffs contended that, in alleging injury and standing in a price manipulation claim under the CEA, "the pleading inquiry is…on the existence of artificial prices" when Plaintiffs transact, "not whether prices were artificially high or low". *Id.* at p.16.[5] Plaintiffs argued that they had adequately alleged that "defendants' conduct caused Eurodollar

---

[5] In their reply, Plaintiffs cited to portions of cases that stand for propositions that support the arguments recited in the text above. Dkt. No. 366 at 16, fn. 28 citing to *Leist v. Simplot*, 638 F.2d 283, 290-91 (2d Cir. 1980) (at summary judgment, simultaneous upward and downward manipulation made the market artificial without specifying that prices were artificially high or low), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353 (1982). Plaintiffs also cited, Dkt. No. 366 at 16, fn. 28, to *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91 (S.D.N.Y. 1998) ("*Sumitomo*") (focus of pleading (and proving) artificial prices is on the factors causing the price not the ultimate direction of the price). *Sumitomo* in turn cited to *In re Indiana Farm Credit Bureau*, CFTC No. 75-14, 1982 WL 30249, at \*10 (CFTC Dec. 17, 1982)).

futures contracts to trade and settle at artificial prices" during January 2005-August 2007.  *Id.* at 17.

To further support their argument, Plaintiffs asserted that they cannot be expected to allege by how much each Defendant's LIBOR quote was artificial.   Dkt. No. 366, at p. 16, citing the March 29 Order, at *39.  Therefore, as in the March 29 Order, Plaintiffs could not plead (a) the **degree** of artificiality for any false report, (b) the cumulative degree of overall artificiality on any day, nor (c) whether the degree of falsity in a given false report on a given day either added to the pre-existing, cumulative degree of artificiality or subtracted from such pre-existing degree of artificiality.

Specifically, in the March 29 Order, the core reason that the Court excused Plaintiffs from pleading the specifics of their own transactions, was that Plaintiffs "cannot reasonably be expected to know the spread between LIBOR's 'true' value and its actual level on any given day let alone how this spread changed over time."  March 29 Order, at *42; *see also* *39 ("Although Plaintiffs have not identified precisely how each LIBOR quote from each defendant on each day during the class period was or was not artificial, they could not reasonably be expected to do so at this stage of the litigation.  It is not a matter of public knowledge what interest rate each bank subjectively expected to pay to borrow US dollars in the London Interbank Market…").

The same core reason applies to the pre-August 2007 manipulation: Plaintiffs could not reasonably be expected to know the true rate at which any Defendant could borrow nor whether a given false report added to or subtracted from the cumulative artificiality.  Here, there are the false reports by Barclays alone revealed by the Barclays orders, the false reports by Barclays alone that are not revealed by the Barclays orders, and the false reports by other Defendants, including those Defendants working with Barclays.  *See* March 29 Order, at *46.  They make

Plaintiffs' inability to plead the true rate of any false report, and whether that false report added to or diminished the existing cumulative degree of artificiality, even more, not less, pronounced than in the facts presented in the March 29 Order.  Thus, Plaintiffs did not believe it was practicable to commit to a directional change in artificiality caused by any given report, and respectfully submit that it was premature and unavailing for Plaintiffs to plead and try to infuse significance into their specific transactions.[6]

However, in the August 23 Order, this Court apparently reasoned or found that the degree of artificial impact on prices of each of the known false reports revealed by the Barclay's orders, was greater than and moved the pre-existing degree of artificiality before such false report in the direction (up or down) of the false report.  *Id.* at pp. 32-35.

> a.    **Plaintiffs Now Propose To Comply With The Reasoning In The August 23 Order**

Plaintiffs now follow the reasoning of the August 23 Order in arguing that they would comply with its pleading requirements by amending the complaint allege that their specific trades at the times of the false reports revealed by the Barclays orders were injured by such revealed false reports.  But trades by Plaintiffs that are not obviously affected (under the foregoing reasoning, or finding) by the false reports revealed by the Barclays orders, should not

---

[6] In the "esoteric" commodity futures markets, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355-6 (1982), and given the notoriously "complex" nature of CEA manipulation, *In re Sumitomo*, 74 Supp.2d at 395, it is important that practical limitations be recognized in pleading standards.  Otherwise, the "critical" role, *Cange v. Stotler and Co., Inc.*, 826 F.2d 581, 584 (7th 1987), of the Section 22(a) private right of action to the integrity of the futures markets will be diminished.

In this regard, wholly unlike with the securities markets, there are very few CEA manipulation class actions.  A WESTLAW search for commodity manipulation class actions yielded only 46 entries, going back to 1974.  (The search of the ALLFEDS database specified the following terms: "class /3 action /p commodit! /s manip!".)  When duplicate entries and non-commodity cases were culled from the list, only 20 cases remained, averaging fewer than one commodity manipulation class action filed every 2 years.

be dismissed.  Under the important parts of the March 29 Order, Plaintiffs have adequately

alleged injury as to these trades as well; also, after discovery, these trades may be shown to have

been artificially affected and injured by Defendants' false reports.

       **b.**       ***Crude Oil* Reached The Same Result As The March 29 Order**

*In re Crude Oil Commodity Futures Litig.*, 913 F.Supp.2d 41 (S.D.N.Y. 2012) ("*Crude*

*Oil*"), reached the same result as this Court did in the March 29 Order.  *Crude Oil* was a class

action alleging "[two] upward and [two] downward manipulations" of West Texas Intermediate

("WTI") grade crude oil futures contracts by trades over a five month period.  *Crude Oil*, 913

F.Supp.2d at 61.  The Court rejected defendants' argument "that Plaintiffs must allege the date

and price of the specific WTI derivatives they bought and sold, and specific losses from those

transactions."  *Id*. at 60.  The Court held that plaintiffs had adequately pleaded their standing to

assert Section 22 claims by alleging that they were "injured as a result of Defendants'

manipulation of the prices of NYMEX WTI crude oil futures contracts."  *Id*. at 61.[7]

> in the context of a CEA manipulation claim, there is no similar bright line
> indicating when losses begin or cease to accrue.  And the period during which the
> manipulative activity occurs is not necessarily a proxy for the period when losses
> attributable to artificial prices occur.  The issue of 'actual damages' thus becomes
> a complex factual inquiry.

913 F.Supp.2d at 60-61.  Unlike here, *Crude Oil* involved four specifically alleged trade

manipulations which, under this Court's case law principles, would have less persistent artificial

impact than false reports.  *See* "2" *infra*.  But the rate of dissipation of artificiality and the issue

---

[7] Indeed, the court found no case requiring a CEA plaintiff to plead loss causation, while noting,
on the other hand, that courts have observed that "loss causation is not a statutory element of
proof under the CEA."  *Id*. at 60, citing *In re Amaranth Natural Gas Commodities Litig.*, 269
F.R.D. 366, 379-80 (S.D.N.Y. 2010) (in context of CEA class certification, "case law suggests
that because plaintiffs transacted at artificial prices, injury may be presumed"), and *Kohen v.
Pacific Investment Management Co. LLC*, 244 F.R.D. 469, 475 (N.D. Ill. 2007) (*Dura* was not
controlling in analyzing "actual injury" requirement for class certification under the CEA
because it was "not a securities fraud case and, thus, the elements of proof [were] different").

of actual damages presented a "fact intensive inquiry for another day." *Id.* at 61.  Thus, *Crude Oil* rejected defendants' argument that plaintiffs lacked standing under Section 22 of the CEA because they failed to allege actual damages. *Id.* at 60-62.[8]

> **2.      The August 23 Order Overlooked The Qualitative Distinction Between Trade Manipulation And False Reports, Other Findings Made In The March 29 Order, And Related Law**

This Court found in the August 23 Order that Plaintiffs did not plausibly allege price artificiality throughout the pre-August 2007 period.  August 23 Order, at *12.  However, in the March 29 Order, this Court distinguished the dissemination of false information in the securities market, which **would be** expected to have a static and persistent amount of artificial impact, from manipulative trades made after an initial public offering in the securities market, which **would not be** expected to result in a static amount of inflation.  March 29 Order, at *40.  The focus of the Court's distinction was correctly on the **quality** of the manipulative act: the manipulative trade compared to the dissemination of false information.

---

[8] "Actual damages" in Section 22 of the CEA is a **qualitative** limitation on **recovery** not a quantitative pleading requirement.  That is, actual damages must occur in the commodity futures markets. *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 736 F.Supp. 511, 523 and n.15 (S.D.N.Y. 1990) ("[t]he 1982 amendments to the CEA, which authorized private causes of action, limit a plaintiff's recovery to 'actual damages'"; it was "clear from this [House of Representatives] report that the 'actual damages' provision was added to limit a plaintiff's recovery to damages to assets which are traded on a commodities prices," quoting H.R.Rep. No. 565, 97th Cong., 2d Sess. at 57 ("Report"), 1982 U.S.C.C.A.N. at 3906; the "actual damages" limitation of Section 22 was intended to "authorize private rights of action by market participants but not by members of the public who did not participate in the market and claimed to be injured in their commercial transactions by declines in commodities prices," quoting Report at 145; the legislative history of the 1982 amendments dealing with "actual damages" demonstrated "that Congress added that language to prevent the CEA from being used to recover damages not suffered directly on the commodities market.  This Court finds that the CEA limits a plaintiff's recovery to damages to assets that are part of a futures market.").

*See McBlaine v. Jack Carl Associates, Inc.*, 705 F.Supp. 1340, 1344 (N.D. Ill. 1989) (actual damages available even where there was a net gain; the specifics about a plaintiff's transactions are for discovery, not an amended complaint).

Specifically, this Court, in the March 29 Order, relied on *In re Initial Public Offering Sec. Litig.*, 297 F.Supp.2d 668, 674–75 (S.D.N.Y. 2003) ("*IPO*") to find that, where injury resulted from "artificial stock purchases in the immediate aftermath of an initial public offering in order to drive up price, 'allegations of artificial inflation are sufficient to plead loss causation because it is fair to infer that the inflationary effect must inevitably diminish over time.'"  March 29 Order, at *40 *quoting IPO*, 297 F.Supp.2d at 674-75.[9]

In contrast, relying on *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342 (2005) ("*Dura*"), this Court found that "where plaintiffs' injury results from defendants' dissemination of false information… [artificial impact]…. continues to affect the stock price until contradictory information becomes available.  March 29 Order, at *40.  Relying primarily on the foregoing qualitative distinction (*i.e.*, manipulative trades versus false reports), the Court concluded that the manipulation alleged here is more like the false report situation.  March 29 Order, at *41.

But this Court also noted the quantity distinction, referring to the "isolated" acts (apparently in *IPO*).  *Id.* at 40-41.  Again, in *IPO,* the manipulative trades happened **only** in the first few days of the public offering and were not later repeated during the multi-year Class Period.  *IPO*, 297 F.Supp.2d at 674-75.  In stark contrast, here the known false reports revealed by the Barclays order are distributed between September 2005 and August 2007 including false reports in September and November 2005; February, March, April, May, September, October, December 2006; February, March, May, July, August 2007 (and continued on and off until

---

[9] *IPO* "infer[red]" that there was a dissipation of the specific trade based manipulation at issue there based on the specific fact record before it, *i.e.*, that the alleged manipulative "laddering" trades were made only at or near the time of the initial offering such and did not thereafter continue.  *IPO*, 297 F.Supp.2d at 669, 674-675.

Moreover, *IPO* reasoned that where the precise cause of the loss may be unclear, it should be sufficient to allege artificial inflation even if the plaintiff is not precisely sure how the manipulate conduct caused the loss such that the "particulars may be obtained in discovery."  *IPO*, 297 F.Supp.2d 674-675, n. 31.

2009).  *See* Barclays DOJ SOF ¶¶ 13-16, 22, 26-27, CFTC Order at 9-11, FSA Final Notice ¶¶ 55, 57-59, 65, 67, 71, 73-76, 91, 164-65, 168.

Moreover, there is a much greater amount of **un**known false reports than known false reports by Barclays.  *See* Barclays CFTC Order at 9, 14; FSA Final Notice ¶ 56.  Thus, it is reasonable to infer that just the Barclays false reports occurred in many more (or all) months than those listed above.  Third, it is further reasonable to infer that the false reports by other Defendants including Defendants working with Barclays (March 29 Order, at *46), may further add to the months in which false reports occurred.

Accordingly, the facts here extend far, far beyond and are wholly unlike the "isolated" false reports on the first few days of the multi-year class periods in *IPO*.

In the March 29 Order, this Court also recognized distinctions between the specific fact pattern here and those in other cases.[10]  The Court only relieved Plaintiffs from a presumption of static artificiality by noting (a) that, after the first false report, others were made: "This is not to deny that, as plaintiffs allege, the degree of artificiality, or how many basis points LIBOR was 'off' by, likely varied," *id.* at *41, and (b) finding that Plaintiffs could not be expected to allege the "true" borrowing cost for any Defendant let alone the cumulative non-manipulated LIBOR for all Defendants.  *Id.*, at *39, *42-43; *see* "B.1." *supra*.

---

[10] The Court recognized that
> the manipulation alleged here is not perfectly analogous to disseminating false information, given that LIBOR was fixed anew every day and that the degree of artificiality likely varied, the two types of manipulation are similar in the important respect that the price remained at artificial levels, such that it is not clear that a contract purchased at artificial prices would have been sold at a loss.

*Id.* at *41.

In the Court's August 23 Order, the Court overlooked its qualitative distinction made in the March 29 Order, focused on the frequency of the false reports, and overlooked that the false reports here are the opposite of the few "isolated" false reports at the start of the Class Period. August 23 Order, at *12.  Under the March 29 Order, (a) the principle of *Dura* indicated persistent artificiality from false reports, absent other changes in the market, and did not require frequent false reports for persistent impact; BUT (b) the premise in *Dura* concerning the static amount of artificiality did not apply where, as here, there were repeated false reports with changing amounts of falsity and Plaintiffs could not be expected to allege the exact amounts of falsity/artificiality.

The foregoing core reasoning of the March 29 Order applies fully and with greater force to the facts of pre-August 2007 manipulation.  This includes the changes in the sign (*i.e.*, plus or minus) of the false reports.  Taking reasonable inferences in Plaintiffs' favor, the "episodic" repeating false reports occurring throughout the pre-August 2007 period, reasonably indicate a persistent but not static artificial impact on prices.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court reconsider its August 23 Order insofar as it denied Plaintiffs leave to amend the PSAC to include allegations for the period January 1, 2005 through early August 2007.

Respectfully submitted,

Dated: September 6, 2013
New York, New York

**LOVELL STEWART HALEBIAN JACOBSON LLP**

14

By:     /s/ *Christopher Lovell*
Christopher Lovell
Jody R. Krisiloff
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Email: clovell@lshllp.com
     jkrisiloff@lshllp.com
     amiller@lshllp.com

**KIRBY McINERNEY LLP**

By:     /s/ *David Kovel*
David Kovel, Esq.
Daniel Hume, Esq.
Roger Kirby, Of Counsel
Lauren Wagner Pederson, Of Counsel
825 Third Avenue, 16th floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: dkovel@kmllp.com
     dhume@kmllp.com
     roger.w.kirby@gmail.com
     lpederson@kmllp.com

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

15