# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | |
| METZLER INVESTMENT GmbH, FTC FUTURES FUND SICAV, and FTC FUTURES FUND PCC LTD., ATLANTIC TRADING USA, LLC, 303030 TRADING LLC, GARY FRANCIS AND NATHANIAL HAYNES, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>CREDIT SUISSE GROUP AG, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, N.A., HSBC HOLDINGS PLC, HSBC BANK PLC, HBOS PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, LLOYDS TSB BANK PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, THE NORINCHUKIN BANK, ROYAL BANK OF CANADA, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., COOPERATIVE CENTRAL RAIFFEISEN-BOERENLEENBANK B.A., SOCIÉTÉ GÉNÉRALE S.A., CITIGROUP, INC., CITIBANK NA,, and JOHN DOES 1-5,<br><br>Defendants. | ECF Case<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      SUMMARY OF ALLEGATIONS ..................................................................... 1

II.     NATURE OF THE ACTION ........................................................................... 2

III.    JURISDICTION AND VENUE ...................................................................... 7

IV.     THE PARTIES ................................................................................................. 7

    A.   Plaintiffs ............................................................................................... 7

    B.   Defendants ............................................................................................ 8

    C.   Agents And Unnamed Co-Conspirators .............................................. 11

    D.   Interdealer Brokers .............................................................................. 11

V.      FACTUAL ALLEGATIONS ......................................................................... 12

    A.   The BBA LIBOR ................................................................................. 12

        1.   The BBA Was A Trade Association Of Horizontal Competitors............12

        2.   The BBA Created LIBOR Panels And Reported Daily LIBOR Rates......13

        3.   The Various Forms Of LIBOR .................................................15

        4.   The BBA LIBOR Panel Rules ..................................................17

    B.   Defendants Misreported LIBOR During The Class Period ................. 20

        1.   Defendants Possessed Strong Motives To Suppress LIBOR...................20

        2.   Independent Analyses By Consulting Experts Engaged By Plaintiffs And Other Plaintiffs In These Proceedings Strongly Indicate Defendants Colluded To Suppress LIBOR During The Class Period .........................21

    C.   Empirical Analyses By Academics And Other Commentators Further Indicate LIBOR Suppression Occurred ............................................................... 64

        1.   The Discrepancy Between Defendants' Reported LIBOR Quotes And Their CDS Spreads Indicates The Banks Misrepresented Their Borrowing Costs To The BBA..................................................................64

        2.   Cross-Currency Discrepancies In Defendants' LIBOR Quotes Indicate They Suppressed USD-LIBOR ...................................................68

        3.   The Frequency With Which At Least Certain Defendants' LIBOR Quotes "Bunched" Around The Fourth-Lowest Quote Of The Day Suggests Manipulation .......................................................................70

        4.   That LIBOR Diverged From Its Historical Relationship With The Federal Reserve Auction Rate Indicates Suppression Occurred............................74

        5.   LIBOR's Divergence From Its Historical Correlation To Overnight Index Swaps Also Suggests It Was Artificially Suppressed During The Class Period .................................................................................75

6.    Expert Analysis Performed In Connection With These Proceedings Indicates LIBOR's Increase Following Expressions Of Concern Over LIBOR's Viability Resulted From Defendants' Reaction To Events Unrelated To Market Factors ................................................. 75

D.    That At Least Some Defendants Faced Dire Financial Circumstances During The Class Period Further Renders Their Unduly-Low LIBOR Quotes Striking .. 79

1.    Citigroup ......................................................................... 80

2.    RBS, Lloyds, And HBOS ................................................ 80

3.    WestLB ........................................................................... 82

E.    Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide ...................................... 83

F.    Barclays Intended To Manipulate (And Did Manipulate) Eurodollar Futures Contracts Through Manipulation of USD-LIBOR ............................................... 85

1.    Barclays' Derivatives Traders' Internal Requests for Favorable USD LIBOR Submissions to Benefit Their Trading Positions ......................... 88

2.    Additional Traders' Requests Concerning USD-Dollar LIBOR Submissions ...................................................................... 94

G.    Findings From UBS Settlement Involving USD-LIBOR .................................... 95

H.    Findings From RBS Settlement Involving USD LIBOR..................................... 97

I.    The Regulatory Settlements and Disclosures Support Collusion during the Class Period. .......................................................................................................... 100

1.    The Panel Banks Submitted Suppressed LIBOR Beginning in August 2007.................................................................................. 100

2.    The Panel Banks Actively Communicated Regarding Their LIBOR Submissions As A Primary Means To Implement The Collusion Scheme 104

3.    The DOJ Found Defendants' Manipulation Of LIBOR To Constitute A Violation Of The Sherman Act ........................................... 111

4.    Defendants' Failure To Report BBA Rule Violations And Manipulation Further Supports Collusion .................................................. 112

5.    Defendants' Improper Activities Have Caused Numerous Governmental Investigations, Legal Proceedings And Disciplinary Actions Worldwide 115

VI.    INQUIRY NOTICE, EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT.................................................................................. 118

A.    Defendants' Unlawful Activities Were Inherently Self-Concealing. ................. 120

B.    The BBA And Defendants Deflected Concerns Raised By Some Market Observers And Participants In Late 2007 And Early 2008 About LIBOR's Accuracy ................................................................................ 122

C.      The May 2008 Wall Street Journal Article Exonerated Certain Defendants, Did Not Mention Other Defendants, And Transactions In Eurodollar Futures Occurring After Such Article Were Not Subject To Any Notice Of Such Defendants' Manipulation ................................................................................. 126

D.      Contemporaneous Studies Of The early 2008 Period Contradicted The May 2008 *Wall Street Journal* Study And Added Uncertainty To A Person Of Ordinary Intelligence As To Whether They Had Been Harmed ........................................ 129

E.      Plaintiffs Certainly Could Not Have Known Or Reasonably Discovered—Until At Least March 2011—Facts Suggesting Defendants *Knowingly Colluded* To Suppress LIBOR ................................................................................................... 132

F.      The Absence of Any Statistically Significant Negative Stock Price Reactions for any of the Defendant Banks Based on the Various 2008 Articles That Speculate that LIBOR was Manipulated Demonstrates That Plaintiffs Did Not Have Inquiry Notice of their Injuries ....................................................................................... 133

G.      To the Extent Investors Had Notice of Their Injuries or Possible Wrongdoing in April or May 2008, It Applied Only to Injuries and Conduct Occurring Between August 2007 and April 2008 .................................................................................. 145

H.      Governmental Authorities Continued to Use LIBOR Evidencing That They Lacked Notice That The Benchmark Was Suppressed Or Otherwise Manipulated ......................................................................................................................... 148

I.      Recently Published Audit Reports From The United Kingdom Financial Services Authority Indicated That It Was Not Aware Of Intentional Suppression Of LIBOR In 2008 And 2009 .................................................................................... 151

        1.      The Period From January 1, 2007 To December 31, 2007 .................... 153

        2.      The Period From January 1, 2008 To March 31, 2008 .......................... 156

        3.      The Period From April 1, 2008 To June 25, 2008 ................................. 158

        4.      The Period From June 26, 2008 To May 31, 2009 ................................ 162

        5.      The United Kingdom's Financial Services Authority Conclusion For The Period From January 1, 2007 To May 31, 2009 ..................................... 164

J.      The Manipulation Described In The Barclays, UBS and RBS Settlement Documents Were Not Publicly Available ............................................................ 165

K.      The Evidence Produced In The Barclays And UBS Settlements Confirm That After The Wall Street Journal Published Its Article, Defendants Took Affirmative Steps To Conceal Their Manipulation Of LIBOR For Trading Purposes .......... 168

VII.    EURODOLLAR FUTURES AND OPTIONS ON FUTURES ..................................... 169

A.      Defendants' Manipulation Of LIBOR Broadly Impacted Eurodollar Futures And Options On Eurodollar Futures ........................................................................... 169

B.      Defendants' Participation in the Eurodollar Futures Market and the Connection Between Defendants' Conduct and Plaintiffs' Injury ........................................ 178

iii

1.     Defendants' Collusive Conduct Suppressed The Price Received And/Or Inflated The Price Paid By Plaintiffs And Members Of The Class For The Use Of Their Money ........................................................................178

2.     Defendants Had And Exercised Control Over LIBOR. ..........................179

3.     Defendants Compete in the Market for Eurodollar Futures Contracts ....179

4.     The Collusive Manipulation Of LIBOR Harmed Competition and Plaintiffs ..............................................................................................188

C.     Plaintiffs' Injury Flowed Directly From Defendants' Anticompetitive Conduct 189

VIII.     EFFECT ON INTERSTATE COMMERCE ....................................................... 190

IX.     CLASS ACTION ALLEGATIONS .................................................................... 191

X.     CLAIMS FOR RELIEF ...................................................................................... 193

FIRST CLAIM FOR RELIEF ........................................................................ 193

SECOND CLAIM FOR RELIEF .................................................................... 195

THIRD CLAIM FOR RELIEF ........................................................................ 197

FOURTH CLAIM FOR RELIEF .................................................................... 198

FIFTH CLAIM FOR RELIEF ......................................................................... 198

SIXTH CLAIM FOR RELIEF ......................................................................... 199

PRAYER FOR RELIEF ............................................................................................... 200

JURY DEMAND ......................................................................................................... 200

1.      Plaintiffs Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, and  Nathanial Haynes ("Plaintiffs"), by their undersigned attorneys, bring this action against defendants identified below (collectively, "Defendants") pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1, *et seq.* (the "CEA"),  the Sherman Act, 15 U.S.C. § 1, and common law on behalf of itself and all others who transacted in Eurodollar futures contracts and options on futures contracts on the Chicago Mercantile Exchange ("CME") between August 2007 and May 2010 (the "Class Period").

## I.      SUMMARY OF ALLEGATIONS

2.      LIBOR is a reference interest rate used as the basis for the pricing of fixed income futures, options, swaps and other derivative products traded on the CME and the Chicago Board of Trade ("CBOT").  This action arises from Defendants' unlawful and intentional misreporting and manipulation of – as well as their combination, agreement and conspiracy to fix – LIBOR rates and to restrain trade in the market for Eurodollar futures and other LIBOR-based derivatives during the respective Class Period in violation of Sections 2(a)(1)(B), 4s(h), 9(a)(2) and 22(a) of the CEA, the Sherman Act, 15 U.S.C. § 1, and common law.

3.      Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and LIBOR, which Plaintiffs (through their counsel) obtained from, among other sources:  (i) analyses by consulting experts engaged by Plaintiffs and other plaintiffs in these coordinated proceedings; (ii) publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (iii) filings Defendants made to the United States Securities and Exchange Commission ("SEC"); (iv) settlement documents between governmental authorities on the one hand and certain defendant banks on the other; and (v)

scholarly literature concerning the potential manipulation of LIBOR during the Class Period. These sources collectively support Plaintiffs' allegations that Defendants collusively and systematically manipulated LIBOR and restrained trade in the exchange-based market for LIBOR-based derivatives during the Class Period.

4.    Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' improper activities.  Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct.  Moreover, numerous pending government investigations—both domestically and abroad, including by the United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), the SEC and state governments—concerning potential LIBOR manipulation could yield additional information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . . because of the difficulty in proving that banks reported borrowing costs for LIBOR at one rate and obtained funding at another."[1]  Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## II.    NATURE OF THE ACTION

5.    This case arises from the manipulation of LIBOR for the U.S. dollar ("USD-LIBOR" or simply "LIBOR")[2]- the reference point for determining interest rates for trillions of dollars in financial instruments - by a cadre of prominent financial institutions.  Defendants perpetrated a scheme to depress LIBOR for two primary reasons.  First, well aware that the

---

[1] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, March 17, 2011.

[2] While the term "LIBOR" generally encompasses rates with respect to numerous currencies (which are separately referred to as, for example, USD-LIBOR or Yen-LIBOR), for convenience Plaintiffs use the term "LIBOR" to reference USD-LIBOR in most contexts.

interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with the bank, Defendants understated their borrowing costs to the British Bankers' Association ("BBA") (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were—of particular importance given investors' trepidation in light of the widespread market turmoil during the financial crisis. Second, artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, and otherwise affect, and profit from changes in, the price for LIBOR-based derivatives like Eurodollar futures.

6.    Each business day, Thomson Reuters calculates LIBOR—a set of reference or benchmark interest rates priced to different ranges of maturity, from overnight to one year—on behalf of the BBA, which first began setting LIBOR on January 1, 1986. During most of the Class Period, the BBA established LIBOR based on the rates that 16 major banks, including Defendants, would have to pay for an unsecured loan for each designated maturity period. Every day, the banks responded to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a m?" On its website, the BBA explains "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active." The banks informed the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months). The BBA discarded the upper four and lower four quotes and set LIBOR by calculating the mean value of the remaining middle eight quotes, known as an "inter-quartile" methodology. Thomson Reuters then published LIBOR, also reporting the quotes on which the BBA based its LIBOR calculation.

7.    The composition of the LIBOR panel is intended to reflect the constituency of the London interbank money market for U.S. Dollars.

8.    The BBA describes itself on its website as "the leading trade association for the

UK banking and financial services sector", claiming that it "speak[s] for over 200 member banks from 60 countries on the full range of UK and international banking issues."[3] The Defendants are among the member banks of the BBA. As the BBA itself concedes, it is not a regulatory body and has no regulatory function.[4] Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[5]

9.     No regulatory agency oversaw the setting of LIBOR during the Class Period by the BBA and its members. The resultant rates were not filed with, or subject to the approval of, any regulatory agency. As the BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[6]

10.     LIBOR is set by the BBA and its member banks. Each of the ten currencies (namely U.S. dollars, Japanese Yen, pound sterling, the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc and the Swedish krona) is overseen by a separate LIBOR panel created by the BBA. During the Class Period, designated contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. It is a requirement of membership of a LIBOR contributor panel that the bank is regulated and authorized to trade on the London money market. As the BBA recently told Bloomberg: "As all

---

[3] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[4] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012

[5] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[6] *See* http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

contributor banks are regulated, they are responsible to their regulators, rather than us."[7]

11.    As "the primary benchmark for short term interest rates globally,"[8] LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets. For example, market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (*e.g.*, "LIBOR + [X] bps")[9] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR). Additionally, the pricing and settlement of Eurodollar futures and options—the most actively traded interest-rate futures contracts on the Chicago Mercantile Exchange—are priced entirely on three-month LIBOR. LIBOR thus affects the pricing of trillions of dollars' worth of financial transactions, rendering it, in the BBA's own words, "the world's most important number."[10]

12.    Accordingly, it is well-established among market participants that, as *The Wall Street Journal* has observed, confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[11]    Moreover, given the vast universe of financial instruments LIBOR impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[12]

13.    Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by misreporting

---

[7] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.

[8] *See* http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[9] The term "bps" stands for basis points. 100 basis points equal 1%.

[10] BBA press release, "BBA LIBOR: the world's most important number now tweets daily," May 21, 2009, available at http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily, last accessed on April 28, 2012.

[11] Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

[12] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion? New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, March 2012.

to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – *i.e.*, their true costs of borrowing – on a daily basis. The BBA then relied on the false information Defendants provided to set LIBOR. By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set at artificial levels.

14.    Defendants' manipulation of LIBOR allowed them to manipulate the price of Eurodollar futures contracts, which move in lockstep with LIBOR, and make trading profits by trading against unsuspecting investors. Defendants' manipulation of LIBOR also allowed them to pay unduly low interest rates to investors, on LIBOR-based financial instruments offered during the Class Period. Investors—who until recently had no reason to suspect Defendants' knowing suppression of LIBOR—justifiably believed the financial instruments they were purchasing derived from a rate that was based on USD-LIBOR panel members' honest and reasonable assessments of their borrowing costs. To the contrary, Defendants—in the debt-instrument context, the borrowers—surreptitiously bilked investors—the lenders—of their rightful rates of return on their investments, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains. They also affected the LIBOR-based derivative market – in products like Eurodollar futures. Defendants' affiliates actively traded in these markets, including and especially in the Eurodollar futures market on the CME. Moreover, by understating their true borrowing costs, Defendants provided a false or misleading impression of their financial strength to investors and the rest of the market.

15.    Defendants' manipulation depressed returns on various types of financial instruments, including notes Defendants issued to raise capital during the Class Period. In addition to floating-rate notes, whose interest rates are specifically set as a variable amount over LIBOR, market participants use LIBOR as the starting point for negotiating rates of return on short-term fixed-rate instruments, such as fixed-rate notes maturing in one year or less. Thus, by suppressing LIBOR, Defendants ensured that artificially low interest rates would attach to fixed-rate and variable notes.

16.     Plaintiffs now seek relief for the damages they have suffered as a result of Defendants' violations of federal and state law.

### III.    JURISDICTION AND VENUE

17.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and common law, respectively.

18.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceed $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

19.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d).  Each of the Defendants transacted business in the Southern District of New York and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

### IV.    THE PARTIES

#### A.    Plaintiffs

20.     Plaintiff Metzler Investment GmbH ("Metzler") is a fund company that launches and manages investment funds under German law.  The range of funds includes various types of securities, money market, and derivative funds, as well as general and specialized investment funds.  Metzler manages assets totaling approximately €47 billion and is based in Frankfurt, Germany.   Its funds traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

21.     Plaintiff FTC Futures Fund SICAV ("FTC SICAV"), a fund based in

Luxembourg, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

22.    Plaintiff FTC Futures Fund PCC Ltd. ("FTC PCC"), a fund of FTC Capital based in Gibraltar, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

23.    Plaintiff Atlantic Trading USA, LLC ("Atlantic") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Atlantic Trading USA, LLC traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

24.    Plaintiff 303030 T rading LLC ("303030") is an Illinois limited liability corporation with its principal place of business in Lake County, Illinois. 303030 traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

25.    Plaintiff Gary Francis ("Francis") is a resident of Chicago, Illinois.  P laintiff Francis traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

26.    Plaintiff Nathanial Haynes ("Haynes") is a resident of Chicago, Illinois.  Plaintiff Haynes traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

27.    Plaintiffs traded on-exchange based products tied to LIBOR such as Eurodollar futures in various periods prior to and during the Class Period, including during January 1, 2005 through the beginning of August 2007, a nd during August 2007 t hrough May 29, 2008, a nd during May 30, 2008 t hrough May 2010 a nd were harmed as a consequence of Defendants' unlawful conduct.

**B.    <u>Defendants</u>**

28.    Defendant Bank of America Corporation is a Delaware corporation headquartered

in Charlotte, North Carolina. Defendant Bank of America, N.A. is a federally chartered national banking association headquartered in Charlotte, North Carolina and an indirect, wholly owned subsidiary of Defendant Bank of America Corporation. Defendant Bank of America Corporation and Bank of America, N.A. are hereinafter referred to collectively as "BAC")

29.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

30.     Defendant Citibank, N.A. ("Citibank") is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant Citigroup, Inc. ("Citigroup"). Defendant Citigroup is a Delaware corporation headquartered in New York, New York.

31.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

32.     Defendant J.P. Morgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York. Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant JPMorgan Chase.

33.     Defendant HBOS plc ("HBOS") was a British public limited company with divisional offices throughout the United Kingdom. Prior to its merger in January 2009 with Defendant Lloyds TSB Bank plc, HBOS was a member of the USD LIBOR panel. HBOS currently is a direct subsidiary of Lloyds TSB Bank plc and a wholly-owned indirect subsidiary of Defendant Lloyds Banking Group plc.

34.     Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London, England. Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and a wholly owned subsidiary of Defendant HSBC.

35.     Defendant Lloyds Banking Group plc and its wholly-owned indirect subsidiary Defendant Lloyds TSB Bank plc (together, "Lloyds") is a British public limited company

9

headquartered in London, England. Lloyds was formed in 2009 t hrough the acquisition of Defendant HBOS by Lloyds TSB Bank plc.

36.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany. Defendant Westdeutsche ImmobilienBank AG is a German company headquartered in Mainz and wholly owned subsidiary of Defendant WestLB.

37.     Defendant UBS AG ("UBS") is a S wiss company based in Basel and Zurich, Switzerland.

38.     Defendant Royal Bank of Scotland Group plc ("RBS") is a British public limited company headquartered in Edinburgh, Scotland.

39.     Defendant Deutsche Bank, AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

40.     Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

41.     Defendant Société Générale S.A. ("SocGen") is a f inancial services company headquartered in Paris, France and is the parent company of Société Générale. S ocGen offers commercial, retail, private banking services and investment banking services, including financial and commodities futures brokerage services.

42.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Toyko" or "BTMU") is a Japan company headquartered in Tokyo, Japan.

43.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands.

44.     Defendant The Norinchukin Bank ("Norinchukin" or "Norin") is a J apanese cooperative bank headquartered in Tokyo, Japan.

45.     During the Class Period, Defendants BAC, Credit Suisse, JPMorgan Chase, HSBC, Barclays, Lloyds, HBOS, WestLB, RBS, UBS, Deutsche Bank, Citibank, Royal Bank of Canada, Rabobank, Société Générale, BTMU and Norinchukin were members of the BBA's USD-LIBOR panel and are sometimes collectively referred to herein as the "Panel Bank

Defendants.".    Additionally, Citigroup, which controlled Citibank and reaped significant financial benefit from the suppression of LIBOR, actively participated in the conspiracy.

### C.    Agents And Unnamed Co-Conspirators

46.    During the Class Period, the following subsidiaries or other affiliates of Defendants joined and furthered the conspiracy by trading LIBOR-based financial instruments such as Eurodollar futures contracts at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of all Defendants: (i) Bank of America Securities LLC; (ii) Barclays Capital Inc.; (iii) Citigroup Global Markets Inc.; (iv) Credit Suisse Securities (USA) LLC; (v) Deutsche Bank Securities Inc.; (vi) HSBC Securities (USA) Inc.; (vii) J.P. Morgan Clearing Corp.; (viii) J.P. Morgan Futures, Inc.; (ix) J.P. Morgan Securities LLC; (x) Merrill Lynch, Pierce, Fenner & Smith Incorporated; (xi) Mitsubishi UFJ Securities (USA), Inc.; (xii) Mizuho Securities USA Inc.; (xiii) Rabo Securities USA, Inc.; (xiv) RBC Capital Markets Corporation; (xv) RBS Greenwich Capital Inc; (xvi) RBS Securities Inc.; (xvii) SG Americas Securities, LLC; (xiii) UBS Securities LLC; (xix) UBS Financial Services; (xx) WestLB Securities, Inc.

47.    In addition to the above entities' participation in selling LIBOR-based financial instruments to Plaintiffs during the Class Period, investigations regarding Defendants' manipulation of Yen-LIBOR (detailed below) have revealed that securities-dealer subsidiaries of Yen-LIBOR panel members, including Defendant UBS, participated in manipulating Yen-LIBOR during the Class Period.  In light of those facts, Plaintiffs have reason to believe the dealer entities identified above materially aided or contributed to the manipulation of USD-LIBOR.

### D.    Interdealer Brokers

48.    Defendants John Doe 1-5 are persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR.  During the Class Period, interdealer brokers provided

voice and electronic brokering services to the Panel Bank Defendants, including sharing information between and among banks regarding pre- and post-trading information regarding interest rates and derivative transactions, including where the Panel Bank Defendants wanted to set LIBOR on certain days during the Class Period.  In certain instances these interdealer brokers received bribes from Defendants in the form of wash trades.  The interdealer brokers are currently under investigation by the FSA and other government and regulatory agencies for various LIBOR currencies, including possibly USD LIBOR.

## V.    FACTUAL ALLEGATIONS

### A.    The BBA LIBOR

#### 1.    The BBA Was A Trade Association Of Horizontal Competitors

49.    During the Class Period, the BBA was a trade association composed of horizontal competitor banks. The BBA was not a regulatory body and had no regulatory function; its activities were not overseen by any U.K. or foreign regulatory agency.  Rather, as the BBA has acknowledged, it was the leading trade association for the United Kingdom banking and financial services sector.  The BBA advocated on behalf of its more than 200 member banks from 60 countries on a full range of U.K. and international banking issues.

50.    During the Class Period, this banking trade association was described as an insider's club, self-governed by a board of member banks that met four times each year.  The board at relevant times was composed of senior executives from twelve banks, including defendants (or their affiliates) Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, and RBS.

51.    The BBA member banks were competitors among themselves and with other firms (including non-banks) in seeking to borrow funds, attract deposits and/or provide a broad range of other financial services customarily associated with banking.  As a BBA member bank, each Defendant carried out that competition, among other ways, by reflecting its respective costs

of borrowing in its individual LIBOR submissions, which was publicized. Another part of the Defendants' horizontal competition with one another and many other firms and persons, is Defendants' competition in the exchange-based markets for LIBOR-based derivatives. Each Defendant competed to trade Eurodollar futures contracts and sought to attract customers for Eurodollar futures contracts and/or other LIBOR based derivatives products. In taking their own investing positions and risks in these products each Defendant competed with each other and other similar market participants.

52.    Defendants thus were horizontal competitors across a broad spectrum of banking, trading and brokerage services. Defendants were the banks serving as members of the BBA U.S. dollar panel (described below) that together controlled the setting of LIBOR during the Class Period (the "Panel Banks"[13]). As is alleged in detail hereafter, by colluding on their dollar LIBOR submissions, Defendants harmed their foregoing and other forms of competition with one another.

53.    As is alleged in detail hereafter, by colluding on t he LIBOR submissions, Defendants harmed their foregoing and other forms of competition with one another.

### 2.    The BBA Created LIBOR Panels And Reported Daily LIBOR Rates

54.    One of the principal functions of the BBA during the Class Period was to publish LIBOR rates for ten different currencies, which included the U.S. dollar, Australian dollar, New Zealand dollar, Japanese yen, European Union euro, British pound s terling, Swedish krona and Danish krone. To set LIBOR for each currency, the BBA established and maintained panels for each currency, consisting of BBA member banks who agreed to serve as panel members.

55.    The composition of the LIBOR panel was intended to reflect the constituency of the London interbank money market for U.S. dollars. D uring most of the Class Period, the LIBOR panel consisted of sixteen banks.[14]  The BBA has maintained that panel member banks,

---

[13]  While the capitalized term "Panel Banks" refers to the USD-LIBOR Panel Banks, "panel banks" refers to all banks, collectively, that served on any of the ten currency panels.

[14]  On February 9, 2009, Société Générale replaced defendant HBOS on the BBA's LIBOR panel,

*Footnote continued on next page*

generally, were chosen based on their scale of market activity, credit rating and perceived expertise in the currency concerned.

56.    There was substantial overlap in membership among panel banks for different currencies.  For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar panel also served on the Japanese yen, Swiss franc and EU euro panels.[15]  Similarly, thirteen banks participated on both the U.S. dollar and Japanese yen panels[16], and eleven banks participated on both the U.S. dollar and Swiss franc panels.[17]

57.    SocGen replaced Defendants HBOS as a member of the BBA's LIBOR panel beginning on 2009.  On September 5, 2012, the CEO of Société Générale, Frederic Oudea, stated the bank was cooperating with U.S. authorities in connection with their LIBOR investigation, while the bank continued its own internal probe.  On February 12, 2013, Mr. Oudea said SocGen was "carrying on with cooperating with the regulators" in the LIBOR investigation and that SocGen's general provision of $404 million for litigation issues in the fourth quarter of 2012 may also cover risks for possible LIBOR fines.[18]

58.    The panel banks followed an agreed daily process to determine LIBOR.  Under

---

*Footnote continued from previous page*
and subsequently Société Générale participated in the LIBOR Panel Banks' collusive suppression of LIBOR.  In February 2011, the BBA added four more banks to the panel.  On August 1, 2011, Defendant WestLB, at its request, was removed from the panel.  As of December 2011, the LIBOR panel consisted of 18 banks.  The U.K. government also has stripped the BBA from its LIBOR rate-setting role and will establish a new administrator and institutions for LIBOR.

[15]  Those banks were Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, Rabobank, RBS, and UBS.

[16] Those banks were Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and WestLB.

[17] Those banks were Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank. HSBC, JPMorgan Chase, Lloyds, Rabobank, RBS, and UBS.

[18] *See* Fabio Benedetti-Valentini & Caroline Connan, SocGen Cooperating With Authorites on Libor, Chief Says, Bloomberg (Feb. 13, 2013), http://www.bloomberg.com/news/2013-02-13/socgen-still-cooperating-with-authorities-on-libor-chief-says.html.

this daily process, governed by the BBA LIBOR panel rules, each panel bank submitted its individual borrowing rates, for a range of maturities (called tenors) extending from overnight to one year, to Thomson Reuters, which acted as the agent of the BBA in the LIBOR setting process. Following the panel bank submissions, daily LIBORs were calculated pursuant to an "interquartile methodology." Under this methodology, the highest one-quarter and lowest one-quarter of rates submitted for each currency and tenor were disregarded. The LIBOR was then calculated as the mean value of the remaining middle two-quarters of submitted rates. The inter-quartile methodology thus excluded outliers – both high and low – from the final calculation of the published LIBOR. Acting on behalf of the BBA, pursuant to this methodology, at around 11:30 a.m. London time each business day during the Class Period, Thomson Reuters published LIBOR for each currency and tenor.

### 3.    The Various Forms Of LIBOR

59.    LIBORs were broadly recognized and served as benchmarks for interest rates because they were established by competition in the London interbank market. As the BBA put it, LIBOR was important because, *inter alia*, it "represent[ed] a unique snapshot of competitive funding costs." Through operation of the BBA LIBOR setting process in accordance with the BBA LIBOR panel rules, as discussed below, LIBORs were set, and moved from day to day based upon, competitive conditions in the London interbank loan market, including the demand for and supply of unsecured interbank loans of cash, and the relative creditworthiness of the banks making up the LIBOR panels. Because it reflected a competitively determined rate set on a daily basis, each Panel Bank's published submission represented part of their competition with one another, and the LIBOR indices derived from the composite of their submissions became accepted and were used as competitively-determined rates in numerous types of financial instruments, including Eurodollar futures contracts.

60.    The valuable information about each Panel Bank's individual competitively determined costs of borrowing was an important part of Defendants' competition with one

another and with non-Defendants to attract deposits, borrow funds, trade Eurodollar futures contracts, and otherwise. In submitting its own published competitively determined borrowing rates each Defendant was competing with the other Defendants in all of these areas.

61.     In addition, the benefits of using such a benchmark to market participants, like Plaintiffs and the Class, included, *inter alia*, reducing the risks and costs of gathering and interpreting information. These costs and risks to suppliers of credit would include, for example, requiring individuals to each separately gather information regarding debt funding costs from individual or multiple sources by calling numerous different lenders and/or borrowers to obtain information about competitive market rates. Use of a benchmark that accurately reflected competitively determined interest rates paid by major banks would enhance market efficiency and reduce credit supplier risk. This increased efficiency and reduced risk would, in turn, lead to increased availability of funding from credit suppliers at prices (amounts of interest) reflective of the reduced informational risks.

62.     Accurate individual submissions further the competition among Defendants and others for funds, deposits, in trading Eurodollar futures contracts, and otherwise. Also, only a competitively determined LIBOR would discover the fair interest rate that reflects the risk of the borrowing banks in the current market conditions. Because LIBOR was determined, when set in accordance with the BBA LIBOR panel rules, by the competitive forces of supply and demand and the competitive credit risk posture of the panel banks, it would represent an effective price discovery mechanism leading to efficient allocation of capital and risk. Indeed, the utility of the LIBOR indices to, and acceptance by, the financial markets depended upon t heir ability to accurately capture and reflect competitively determined funding costs.

63.     Additionally, the use of an index reflecting competitively determined interest rates would facilitate the use of longer term floating rate debt contracts by obviating the need for and cost of periodic renegotiation of the interest rate payable under such contracts. In the absence of such an index, floating rate debt contracts would require periodic competitive renegotiation of the interest rate payable at each reset date. By interposing a s tandardized

interest rate reset mechanism based on a competitively determined index in the place of periodic renegotiation, more efficient transaction structures, and thus a more efficient market for floating rate funding, would be enabled.  This market convention did not remove competition from the determination of prices (amounts of interest) paid in this market, but instead became the means by which such prices (amounts of interest) were determined by competitive forces.

4.    **The BBA LIBOR Panel Rules**

64.    As noted above, the agreed daily process for setting LIBOR was designed to proceed in accordance with the BBA LIBOR panel rules.  Three key BBA LIBOR panel rules described below operated to make the LIBOR setting process a competitive process that produced competitively determined daily LIBOR rates and established a daily contest between the panel banks to signal their relative ranking in terms of credit risk, access to funding, and liquidity profile.

65.    The first key BBA LIBOR panel rule defined the daily submissions to be made by the panel banks (with respect to LIBOR, the Defendants).  This rule required the panel banks for each currency to answer the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[19]  Thus, under this rule, each panel bank was required to independently exercise its

---

[19]  The LIBOR definition is amplified as follows:

a.    The rate each bank submits must be formed from that bank's perception of its cost of unsecured funds in the London interbank market. This will be based on the cost of funds not covered by any governmental guarantee scheme.

b.    Submissions must represent rates at which the bank would be offered funds in the London interbank market.

c.    Submissions must be for the specific currency concerned and not the cost of producing the currency by borrowing in a different currency and obtaining the required currency via the foreign exchange markets.

d.    The rates must be submitted by bank personnel with primary responsibility for management of the bank's cash, rather than the bank's derivative book.

e.    The subject funds are unsecured interbank cash or cash raised through primary issuance of interbank certificates of deposit.

good faith judgment each day about the interest rate that it would be required to pay, based upon its own expert knowledge of market conditions, including supply and demand conditions and the panel bank's own competitive posture as a borrower within the market for interbank loan funds. Through the mechanism of individual submissions reflecting each submitting bank's honest competitive posture as a borrower each day, the composite LIBOR reflected, and moved from day to day based upon, actual competitive conditions in the London interbank loan market.

66.    The second key BBA LIBOR panel rule mandated that each panel bank's daily submissions would remain confidential until after the calculation and publication of the daily LIBOR rates. Adherence to this rule would prevent collusion and ensure that each panel bank's submission would be independent of the others, and therefore reflect only that panel bank's independent expert judgment concerning its own competitive posture as a borrower within the market.

67.    The third key LIBOR panel rule mandated that upon the publication of each day's LIBOR, the BBA, through Thomson Reuters, simultaneously published the individual rates submitted in the LIBOR setting process for each panel bank, currency and tenor for that day. This third rule made the process and the individual panel bank submissions transparent on an *ex post* basis, to the capital markets and the panel banks themselves.

68.    Moreover, this third rule provided the incentive to the panel banks that, operating in conjunction with the first two rules, ensured that the LIBOR-setting process was in fact a competitive process. Because the capital markets view the funding costs of the panel banks as reflective of their relative creditworthiness and financial strength, the daily disclosure of the panel bank submissions signaled each panel bank's relative creditworthiness and financial strength to the market. Lower funding costs reflected greater creditworthiness and financial strength, and vice versa.

69.    The third rule thus created an incentive for each panel bank to submit the lowest honest funding cost estimate possible, consistent with market conditions as required by the first BBA LIBOR panel rule. This goal for submissions mirrors precisely the goal that would be

pursued in actually entering into interbank borrowing transactions—obtaining the lowest funding cost obtainable in the market.  By creating this incentive to signal the lowest honest funding cost, this third BBA LIBOR panel rule ensured that the LIBOR-setting process was in fact competitive, and produced, as the BBA termed it, "a unique snapshot of competitive funding costs."

70.    These three BBA LIBOR panel rules were the safeguards ensuring, if faithfully adhered to, that Libor would reflect, and change from day to day based on, t he forces of competition in the London interbank loan market.  C orrespondingly, these rules prevented collusion among the panel banks to set, peg, stabilize, or otherwise manipulate LIBOR at mutually desired levels.    LIBOR could not reflect and move day to day based upon a ctual competitive conditions if it were not based upon i ndependent, good faith submissions of the individual panel banks.  C ollusion to submit artificial and/or coordinated rates would, by definition, remove LIBOR's linkage to day-to-day competitive forces.

71.    In addition to these three key BBA LIBOR panel rules, several other aspects of the BBA LIBOR setting process emphasized and enhanced the fact that the LIBOR rates reflected competitive funding costs.  First, the use of the Thomson Reuters agency to collect submissions, calculate, and publish the daily LIBOR rates signaled their independence from the collective self-interests of the BBA and the panel members.  Second, the interquartile averaging method used for calculating daily LIBOR, which excluded the highest and lowest quartile of daily panel submissions, meant that no individual panel bank could easily affect the daily LIBOR through an independent falsely high or low submission.  Third, the fact any bank that traded in the London market could apply to be on any currency panel added to the robustness of the competitive LIBOR setting process through the ability to add additional competitors.[20]

---

[20]  For example, on December 8, 2010, the BBA announced that beginning February 1, 2011, the LIBOR panel would be expanded from 16 to 20 members.

**B.**    **Defendants Misreported LIBOR During The Class Period**

72.    Throughout the Class Period, Defendants conspired to suppress LIBOR below the levels it would have been set had Defendants accurately reported their borrowing costs to the BBA or otherwise manipulated LIBOR for trading gain.  Plaintiffs' allegations that Defendants suppressed LIBOR are supported by (i) Defendants' powerful incentives to mask their true borrowing costs and to reap unjustified revenues by setting artificially low interest rates on LIBOR-based financial instruments that investors purchased; (ii) an independent analysis by other plaintiffs' consulting experts, comparing LIBOR panel banks' daily individual quotes with the banks' probability of default, as measured by Kamakura Risk Information Services, as well as by Plaintiffs' consulting experts conducting analyses of the spread between LIBOR as reported and the Federal Reserve Eurodollar Deposit Rate; (iii) publicly available economic analyses, by prominent academics and other commentators, of LIBOR's behavior during the Class Period compared with other well-accepted measures of Defendants' borrowing costs, as well as the notable tendency of Defendants' daily submitted LIBOR quotes to "bunch" near the bottom quartile of the collection of reported rates used to determine LIBOR; and (iv) revelations in connection with the numerous domestic and foreign governmental investigations into potential manipulation of USD-LIBOR and LIBOR for other currencies.

**1.**    **Defendants Possessed Strong Motives To Suppress LIBOR**

73.    Defendants each had substantial financial incentives to suppress LIBOR.  <u>First</u>, each of the Defendants actively traded Eurodollar futures and other Libor-based derivative products on a large scale.  Manipulating LIBOR gave Defendants an unfair trading edge which allowed them to make sizable profits in trading Eurodollar futures and other Libor-based derivative products at the expense of unsuspecting investors.

74.    <u>Second</u>, Defendants were motivated, particularly given investors' serious concerns over the stability of the market in the wake of the financial crisis that emerged in 2007, to understate their borrowing costs—and thus the level of risk associated with the banks.

75.    A bank that submits high LIBORs runs the risk of being perceived as a weak institution, which can lead to negative consequences for the bank.  As the DOJ explained, and UBS admitted:

> Because a bank's LIBOR contributions, even if they are not based entirely on actual money market transactions, should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market, a bank's LIBOR contributions may be viewed as an indicator of a bank's creditworthiness. If a bank's LIBOR contributions are relatively high, those submissions could suggest that the bank is paying more than others to borrow funds. Thus, a bank could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank.

76.    Moreover, because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant shared a powerful incentive to collude with its co-Defendants to ensure it was not the "odd man out."

77.    Third, by artificially suppressing LIBOR, Defendants paid lower interest rates on LIBOR-based financial instruments they sold to investors during the Class Period.

78.    Defendants thus possessed reputational and financial incentives to manipulate LIBOR—which, as detailed below, they did.

### 2.    Independent Analyses By Consulting Experts Engaged By Plaintiffs And Other Plaintiffs In These Proceedings Strongly Indicate Defendants Colluded To Suppress LIBOR During The Class Period

79.    Plaintiffs' consulting experts, as well as consulting experts engaged by other plaintiffs in these coordinated proceedings, have measured LIBOR against other recognized benchmarks for determining banks' borrowing costs.  Employing well-reasoned methodologies, these experts have demonstrated Defendants artificially suppressed LIBOR during the Class Period.  The experts' common conclusion is clear: during at least part of the Class Period, LIBOR did not appropriately correspond with other measures of Defendants' borrowing costs, as indicated by:  (i) the spread between LIBOR and Eurodollar Deposit rates, and (ii) the difference between Defendants' respective LIBOR quotes and their probabilities of default.

80.    Additional independent expert analysis performed in connection with these proceedings indicates Libor suppression.  At one date during the Class Period, when the BBA announced it would investigate the reporting of LIBOR, members of the LIBOR panel increased their rates in unison despite the lack of any market reason.  The most plausible explanation for this movement is Defendants' collective fear of detection of their LIBOR suppression. Bolstering this point is that since October 2011, when the European Commission raided most or all of Defendants in connection with the LIBOR probe, reported LIBOR has returned to its historic norm compared with the overall Eurodollar deposit market.

a.    **The Discrepancy Between LIBOR And The Federal Reserve Eurodollar Deposit Rate During The Class Period Suggests Defendants Collusively Suppressed LIBOR**

81.    As demonstrated by the work of independent consulting experts retained by counsel in these actions, analysis of the Eurodollar market strongly supports that Defendants suppressed their LIBOR quotes and colluded to suppress reported LIBOR rates.  Moreover, this analysis further supports that Defendants colluded to control the amount of suppression over the Class Period.

82.    The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for banks (the "Federal Reserve Eurodollar Deposit Rate").  These Eurodollar deposit rates are analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at which panel banks in the London interbank market lend U.S. dollars to one another. The Federal Reserve obtains its data from Bloomberg and the ICAP brokerage company.[21]    Bloomberg Eurodollar deposit rate is similar to BBA's LIBOR except that the sampling is not limited to the 16 banks chosen by BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.[22]

---

[21] *See* http://federalreserve.gov/releases/h15/data.htm, footnote 8.  Last visited on April 23, 2012.

[22] "ICAP is the world's premier voice and electronic interdealer broker and the source of global market information and commentary for professionals in the international financial markets. The

*Footnote continued on next page*

ICAP surveys its client banks and updates its Eurodollar deposit rates about 9:30 AM each morning.

83.     While Defendants could have access to the ICAP Eurodollar deposit rates prior to submitting their individual LIBOR quotes at 11:00 each day, they would not — absent collusion — have access to other bank LIBOR quotes, which are confidential until submitted.  Thus, even within the context of a suppressed LIBOR, absent collusion, individual panel banks would not know what quote other panel banks intended to submit relative to the Federal Reserve Eurodollar Deposit Rate.

84.     The consulting experts determined that because of the nature of the relationship between the Federal Reserve Eurodollar Deposit Rate and LIBOR (detailed below), it would be unusual even for one bank to submit a LIBOR bid below the Federal Reserve's Eurodollar Deposit Rate.  For all Defendants to submit bids below the Federal Reserve Eurodollar Deposit Rate would be extremely unusual, and strongly supports evidence of collusion among the banks.

85.     Economic and statistical analysis strongly supports the use of the Federal Reserve Eurodollar Deposit Rate as a benchmark for measuring the validity of LIBOR as reported by the panel banks.  To measure how well the Federal Reserve Eurodollar Deposit Rate and LIBOR move together, for the purposes of this analysis, the difference between the two rates, the "Spread," is calculated as follows:  Spread = BBA LIBOR – Federal Reserve Eurodollar Deposit Rate.

86.     Since both LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the lending cost to banks of Eurodollar deposits, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors

---

*Footnote continued from previous page*

Group is active in the wholesale markets in interest rates, credit, energy, foreign exchange and equity derivatives. ICAP has an average daily transaction volume in excess of $1.5 trillion, more than 60% of which is electronic.  ICAP plc was added to the FTSE 100 Index on 30 June 2006. For more information go to www.icap.com."  See http://www.icapenergy.com/company/ (last accessed on April 30, 2012).

facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the Spread. The BBA's LIBOR panel is intended to reflect the Eurodollar deposit market in London. By focusing on the Spread, the model therefore should be able to factor out normal and expected co-movements in banks' LIBOR quotes that arise from changes in Market Fundamentals.

87.    To analyze how well the Federal Reserve Eurodollar Deposit Rate captures changes in Market Fundamentals and absorbs variations in LIBOR that are driven by such fundamentals, consulting experts used regression analysis to measure the day-to-day changes in the Spread against changes in the T-Bill rate and the commercial paper rate. The evidence from these regressions strongly supports that day-to-day changes in the Federal Reserve Eurodollar Deposit Rate effectively capture day-to-day movements in LIBOR caused by Market Fundamentals. Thus, once the Federal Reserve Eurodollar Deposit Rate is subtracted to arrive at the Spread, remaining movements in LIBOR reflected in the Spread would be unrelated to movements in Market Fundamentals.

88.    Because Market Fundamentals are fully captured by the Spread, absent manipulation, the Spread should always be zero or close to zero. Thus, as more fully discussed below, negative Spreads provide a strong basis to conclude that Defendants suppressed and colluded to artificially suppress LIBOR.[23]

89.    Figures 1 and 2 show the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid-2012. As can be seen, between January 5, 2000 and around August 7, 2007, Federal Reserve's Eurodollar Deposit Rate tracked LIBOR very closely and the Spread remained positive and very close to zero. This finding indicates that the Spread effectively captures shared risks of the banks sampled by BBA

---

[23] It is important to note that to the extent panel banks submitting LIBOR quotes submit suppressed rates to the BBA, and these suppressed rates are also considered by Bloomberg or ICAP, then the resultant FRED Rate would also be understated by the same suppression. Consequently, the Spread computed above could even understate the true magnitude of the suppression.

and by Bloomberg and ICAP. The validity of this finding is bolstered by the fact that the Spread remained very close to zero in the face of multiple major financial dislocations, including the bursting of the dot-com bubble in 2000, the terrorist attacks of September 2001, and the 2001 U.S. economic recession. Likewise, the unusual downward movements in the Spread starting in August 2007 strongly evidences that LIBOR was being manipulated and suppressed during this period.[24]

---

[24] The Spread only became consistently positive around the end of October 2011, just after the European Commission raided banks in connection with LIBOR.



Figure 1: LIBOR and Federal Reserve Eurodollar Deposit Rate



## Figure 2: LIBOR and Federal Reserve Eurodollar Deposit Rate

90.    Figure 3 shows the Spread between 3-month maturity BBA LIBOR and the Federal Reserve Eurodollar Deposit rate (3-month maturity BBA LIBOR – Federal Reserve Eurodollar Deposit rate), from January 2006 through early April 2012.



91.    The shorter period between January 3, 2006 and August 7, 2007 demonstrated above contains 393 trading days.  In this sub-period, there were only 3 days when the Spread was negative.  Furthermore, the magnitude of these negative Spreads were also very small, equaling -0.9 basis point on June 14, 2006,  -0.5 basis point on July 27, 2006 a nd -0.2 basis point on November 2, 2006.[25]  This finding again strongly supports that the Federal Reserve Eurodollar Deposit Rate serves as a good benchmark to control for Market Fundamentals that determine LIBOR.  The average magnitude of the Spread during this period equaled less than one basis point.   T his finding also strongly supports that the risks of the banks sampled by BBA and Bloomberg and ICAP were similar.

92.    By August 2007, how ever, the Spread began to move into negative territory.  During the early part of August 2007, t he Federal Reserve Eurodollar Deposit Rate stayed around 5.36%.  On August 8, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis points to 5.41%, while BBA LIBOR did not keep pace.  T he Spread turned negative 3 ba sis points on A ugust 8, 20 07.  T he Spread remained mostly negative after August 7 s o that by August 15, 2007, t he trailing 10-day moving-average of the Spread also turned negative.  B y August 31, 2007, t he Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while LIBOR was lagging.  The negative Spread on August 31 grew to -16 basis points.

93.    The Spread remained negative over the next year.  Between August 31, 2007 and September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days.  The magnitude of the negative Spread averaged about -12 basis points.  D uring this approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

94.    A big shock to LIBOR (and the Spread) came just after Lehman Brothers filed for bankruptcy on S eptember 15, 2008, l eading to significantly increased concerns about the health of all banks.  The increased concerns about the health of the banks were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate.  On September 15, 2008, t he Federal

---

[25]  One basis point is one-hundredth of a percentage point.

Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on September 16, 17 and 18, respectively.   By September 30, the Federal Reserve Eurodollar Deposit Rate doubled to 6%.

95.    In spite of increased risks and worries about the banks after the Lehman bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread to become more negative.  On September 16, 2008, the negative Spread nearly doubled to -32 basis points.  The next day, on September 17, the negative Spread doubled again reaching -69 basis points.  On September 18, the negative Spread more than doubled once again reaching -180 basis points.  Finally, on September 30, 2008, the negative Spread reached -195 basis points.

96.    Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the banks, while LIBOR increased by less than one-half, or by 123 basis points during the same period.  This diversion in the behavior of the two rates strongly supports the finding that Defendants intensified their collusive suppression of the LIBOR, and did so to understate their borrowing costs in the face of increasing concerns about the health of the banks.

97.    The Spread remained negative for more than one and a half years following the Lehman filing, until May 17, 2010.  As concerns about banks' financial health eased, so did the magnitude of the suppression of LIBOR.  As stated earlier, Federal Reserve's Eurodollar Deposit Rate reached 6% on September 30, 2008.  With the easing of the financial crisis, Federal Reserve's Eurodollar Deposit Rate fell to 0.45% on May 17, 2010.  The average suppression of the LIBOR rate between October 1, 2008 and May 17, 2010 equaled negative 38 basis points.  The Spread finally turned positive for the first time during the post-Lehman period on May 17, 2010.  Following this date, the Spread again became negative, with the magnitude of the Spread averaging around -10 basis points.  The dramatic period of negative Spread during the Class Period, following years of uniform behavior between each individual Defendant Bank's LIBOR quote and the Federal Reserve Eurodollar Deposit Rate, is also graphically demonstrated by

31

Figures 4 to 20 below on a bank-by-bank basis.  Every Spread during the period August 8, 2007 to May 17, 2010 is statistically significant at the extremely high 99% confidence level.



















**Figure 12: Bank of Tokyo LIBOR - Federal Reserve Eurodollar Spread in Percentage Points**







**Figure 15: BoA LIBOR - Federal Reserve Eurodollar Spread in Percentage Points**









**Figure 20**



98.     As the following chart demonstrates, the average Spread for each of the individual Defendants was uniformly negative throughout all relevant times during the Class Period, strongly supporting that each of these banks was suppressing its LIBOR quotes, and colluding to suppress reported LIBOR.[26]

| **BANK NAME** | **Average Spread between August 8, 2007 through May 17, 2010** |
| --- | --- |
| 1. Bank of Tokyo-Mitsubishi | -25 basis points |
| 2. Bank of America | -30 basis points |
| 3. Barclays | -25 basis points |
| 4. Citi | -32 basis points |
| 5. CSFB | -27 basis points |
| 6. Deutsche Bank | -31 basis points |
| 7. HBOS | -29 basis points |
| 8. HSBC | -32 basis points |
| 9. JP Morgan Chase | -35 basis points |
| 10. Lloyds | -30 basis points |
| 11. Norin Bank | -25 basis points |
| 12. Rabo Bank | -32 basis points |
| 13. Royal Bank of Canada | -28 basis points |
| 14. Royal Bank of Scotland | -26 basis points |
| 15. UBS | -29 basis points |
| 16. WestLB | -35 basis points |

99.     Moreover, as set forth in the following chart, during the critical two week period following the bankruptcy of Lehman Brothers, each of Defendants dramatically increased its collusive suppression of LIBOR.

---

[26]  For Société Générale, the average spread between February 9, 2009 and May 17, 2010 was 27.1 basis points.

| BANK NAME | Average Spread between September 16, 2008 and September 30, 2008 |
|---|---|
| 1. Bank of Tokyo-Mitsubishi | -120 basis points |
| 2. Bank of America | -144 basis points |
| 3. Barclays | -87 basis points |
| 4. Citi | -142 basis points |
| 5. CS | -122 basis points |
| 6. Deutsche Bank | -129 basis points |
| 7. HBOS | -110 basis points |
| 8. HSBC | -141 basis points |
| 9. JP Morgan Chase | -153 basis points |
| 10. Lloyds | -146 basis points |
| 11. Norin Bank | -126 basis points |
| 12. Rabo Bank | -143 basis points |
| 13. Royal Bank of Canada | -140 basis points |
| 14. Royal Bank of Scotland | -140 basis points |
| 15. UBS | -141 basis points |
| 16. WestLB | -138 basis points |

100.    Every Spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the extremely high 99% confidence level.

101.    Plaintiffs' consulting experts find the results reflected in these two tables to be powerful and statistically significant evidence of Defendants' collusive suppression of LIBOR during the Class Period.

102.    The results show that each Defendant bank misreported its LIBOR submissions literally hundreds of times during the Class Period, and that collectively the misreporting by all banks numbered in the thousands.

103.    As detailed above, analysis based on well accepted statistical methodologies strongly supports that suppression of LIBOR occurred during parts of the Class Period, accomplished through the collusive conduct of Defendants.  The sustained period during which the Federal Reserve Eurodollar Deposit – LIBOR Spread fell and remained starkly negative, as seen in Figure 2 above, accounting as it does for Market Fundamentals, is not plausibly

achievable absent collusion among Defendants.  The intensified suppression from September 16, 2008 to September 30, 2008 ( following the Lehman bankruptcy), in defiance of economic expectations, provides further powerful support for the suppression of LIBOR achieved through collusion by Defendants.  Because no Defendant Bank – absent collusive conduct – could know what LIBOR quote another panel bank actually intended to submit prior to those numbers being made public after 11:00 in the morning, the fact that all Defendants submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate over the Class Period further strongly supports the participation of each Defendant Bank in the suppressive and collusive scheme.

        **b.**      **<u>Consulting Expert's Analysis Of Management Directives Supports Collusion</u>**

104.   The regulatory settlements with Barclays and UBS revealed that these banks actively suppressed their LIBOR submissions at the direction of management.   These management directives included, for example, at Barclays, staying within a certain range—ten basis points—of the other Panel Bank submissions, and, at other times, submitting rates that fell where other Panel Banks were setting them that day.  The latter directive was described by Barclays employees as "staying within the pack," being "in line," not being an "outlier," or, most colorfully, not "sticking ones head above the parapet."   Likewise at UBS, management's directives included being "on the low side," and being "in the middle of the pack" of Panel Bank rates for a given day.   Through the advance knowledge of other Panel Banks' daily rate submissions, Barclays and UBS LIBOR submitters were able to comply with their management's directives over the Class Period.

105.   Moreover, the active exchange of advance information regarding proposed submissions provided the mechanism through which individual Panel Banks, such as Barclays and UBS, could guarantee their submissions avoided potential adverse press and market reaction by ensuring they were consistent with those of the other Panel Banks on a given day.

106.   Based on the specific information provided by regulators in the UBS settlements regarding the nature and timing of management's directives, the consulting expert was able to

test the likelihood that UBS submitters could have complied with management directives absent collusion with the other Defendants.

107.    The consulting expert looked specifically at the period beginning on or about June 18, 2008 and continuing until mid-April 2009, during which time UBS LIBOR submitters were directed to be in the middle of the pack.  The consulting expert first looked at how often UBS's daily 3-month LIBOR submissions were "in the middle of the pack" during this six month period.

108.    The expert then undertook probability analysis to determine how likely it was the UBS LIBOR submitters could have been able to successfully target their submissions "in the middle of the pack" as often as they did absent collusion.  To do this, the expert looked at relevant public information available to the LIBOR submitters at the time they made their submissions at around 11:00 a.m. London time.  The consulting expert determined the relevant public information reasonably available to UBS LIBOR submitters to be: (i) prior day 3-month LIBOR submissions from the Panel Banks; and (ii) changes in the Federal Reserve Eurodollar Deposit ("FRED") Rate, which would have reflected changes in relevant Market Fundamental from the prior day; and iii) changes in the opening and closing prices of Eurodollar futures prices from one day prior and from two days prior.

109.    The expert determined that during the period of June 18, 2008 through April 14, 2009, UBS's LIBOR submitters were highly successful in meeting management's directive. Specifically, over this ten month period, UBS's 3-month LIBOR submissions were at or within the interquartile range (the two middle fourths of Panel Bank submissions that were averaged to calculate each day's LIBOR rates) 99.0% of the time, and were within the interquartile range (*i.e.*, not tied with the 4th lowest or 13th highest submission) 86.7% of the time.  Further demonstrating UBS submitters' stunning ability to consistently target the actual published LIBOR rates despite a volatile market, the DOJ found that from June 18, 2008, and continuing for approximately the same 10 month period, UBS's 3-month LIBOR submissions were identical to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other

tenors.

110.    Using probability analysis, the consulting expert then calculated the likelihood to be *less than 1%* that UBS could have achieved this remarkable consistency based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions.  The expert further determined that there was also a *less than 1%* likelihood that UBS could have achieved its consistent record during this period based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions and changes in the FRED Rate.  The expert also determined that there was also a less than 1% likelihood that UBS could have achieved its consistent record during this period based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions and changes in the Eurodollar opening or closing prices from either one day prior or from two days prior.

111.    As with the expert's conclusions in connection with the Eurodollar analysis above, the duration of, and the degree of successful compliance with management's specific LIBOR quote submission directives relative to where other Panel Banks' suppressed submissions fell on a  daily basis further strongly support that the LIBOR suppression was accomplished through the collusive cooperation and agreement among the Panel Banks.

          c.    **An Independent Analysis By Other Consulting Experts – Showing The Discrepancy Between Defendants' LIBOR Quotes And Their Respective Probabilities Of Default – Provides Strong Evidence Of LIBOR Suppression During The Class Period**

112.    Assessing the likelihood that LIBOR was suppressed during the Class Period, Plaintiffs' expert consultants compared USD-LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks—as determined, and updated daily for each maturity (term), by Kamakura Risk Information Services ("KRIS").[27] The study focused on identifying any periods of severe discrepancy between each bank's

---

[27] KRIS did not have PDs for Defendants WestLB, Rabobank, or Norinchukin, because those companies were not publicly traded.  This PD analysis therefore does not include those banks.

probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA.

113.    The KRIS reduced-form model estimates each bank's default risk on a daily basis by analyzing each bank's equity and bond prices, accounting information, and general economic conditions, such as the level of interest rates, unemployment rates, inflation rates, etc. On its website, KRIS states it "provides a full term structure of default for both corporate and sovereign credit names based upon a multiple models approach" and its default probabilities "are updated daily and cover more than 29,000 companies in 36 countries."[28]

114.    PD provides a measure of a bank's credit (default) risk exposure, essentially the likelihood that the bank will default within a specified time period. PD can be estimated using statistical models, whereas LIBOR is a rate of return required by investors lending short-term funds to the bank. A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given bank over a given term period violates the fundamental relationship between risk and return that is the cornerstone of finance. That is, investors require a higher required rate of return as a premium for taking on additional risk exposure. This results in a positive relationship (correlation) between risk and return. An increase in the bank's PD indicates that the risk of default has increased, thereby causing investors to require a higher rate of return for loans to the bank—which should correspond with a higher LIBOR quote.

115.    Accordingly, a finding of a statistically significant negative coefficient (of any size) between a bank's daily LIBOR quotes and its PDs shows that increases in PDs correspond with decreases in LIBOR quotes—which violates fundamental finance theory. This would indicate that banks are suppressing their LIBOR quotes to avoid revealing the higher rates that reflect their true (higher) probabilities of default. In other words, any finding of negative, statistically significant correlation coefficients between a bank's PDs and its LIBOR quotes suggests LIBOR suppression by the bank over the analysis period.

116.    The magnitude of the correlation coefficient is impacted by the volatility of both

---

[28] *See* http://www.kris-online.com/, last accessed on April 23, 2012.

PD and LIBOR for each bank during the time period. Thus, for example, if a bank has high volatility in its PDs, the absolute value of the correlation coefficient will tend to be lower (*i.e.*, less negative) as compared to an identical bank with low PD volatility. However, both may be equally engaged in LIBOR suppression if their correlation coefficients are statistically significant and negative.

117.    Plaintiffs' consulting experts used the KRIS database to test whether, for the period under study, each bank's daily sealed LIBOR quote correlates with the bank's estimated PD that day for the same maturity term (provided by KRIS). For example, the consultants examined the correlation between Bank of America's sealed quote for three-month LIBOR on each date with the three-month PD for Bank of America, as provided by the KRIS database on that same day. As explained above, standard finance theory implies that a positive correlation between a bank's PD and its LIBOR quote should exist—*i.e.*, as the bank's default risk (PD) increases, its borrowing rate (LIBOR quote) should increase, and *vice versa*. That is, using the above example, standard finance theory predicts a positive correlation between Bank of America's three-month PD and its three-month LIBOR quote. A finding of either a zero or negative correlation between a bank's PD and its LIBOR quote indicates the latter does not reflect the bank's default-risk probability, which evidences LIBOR suppression. A negative correlation means the two values have an inverse relationship; as one goes up, the other tends to go down. A statistically significant negative correlation between a bank's LIBOR quote and its PD is consistent with the bank's reducing its LIBOR quote in order to mask its higher risk exposure during a period of financial crisis, such as during the 2007-2008 period. By submitting an artificially low LIBOR quote, the bank sends a false signal that it is less risky than it truly is.

118.    Plaintiffs' consulting experts found suppression over the 2007-2008 period for one-month, three-month, six-month, and 12-month LIBOR.

119.    The LIBOR quotes for all the reporting banks (except HSBC) during 2007 were *negatively correlated* with their daily updated PDs (for the same maturity term) to a statistically significant degree. For example, the correlation between Bank of America's daily LIBOR

quotes and its daily PDs, for example, was negative and statistically significant at a very high level for the one-month, three-month, six-month and 12-month terms, *i.e.*, between -0.5857 and -0.6093.[29]    In other words, the data indicate that, contrary to fundamental finance theory, the higher a panel bank's PD was, the *lower* its LIBOR quote was.

120.    Performing the same analysis with respect to the LIBOR panel banks' daily LIBOR quotes and PDs during 2008, the expert consultants found that for all of the banks, the submitted LIBOR quotes were negatively correlated with their PDs at the one-month and three-month maturities.    Indeed, all of the banks were submitting unduly low LIBOR quotes at all maturities during the time period from August 9, 2007 until September 12, 2008, and, with only one exception, from September 15 through December 31, 2008, the period following the Lehman bankruptcy.

121.    The following graphs illustrate the findings of this expert analysis—which demonstrates a striking negative correlation between USD-LIBOR panel banks' LIBOR quotes and PDs during 2007 and 2008, indicating they severely depressed LIBOR during that time.

---

[29] Correlation coefficients range from a value of -1 to 1.  A correlation coefficient of -0.50, for example, would imply that a 1% increase in PD would result in a 50-basis point decline in the bank's LIBOR quote.

**Graph 1**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**One-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 2**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Three-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 3**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Six-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 4**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Twelve-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

61

**Graph 5**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**9 August 2007 – 12 September 2008 Period**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 6**
**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**15 September 2008 – 31 December 2008 Period**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

63

**C.    Empirical Analyses By Academics And Other Commentators Further Indicate LIBOR Suppression Occurred**

122.    In addition to the independent expert work detailed above, publicly available analyses by academics and other commentators likewise support Plaintiffs' allegations.  While those studies used various comparative benchmarks and did not employ uniform methodologies, they collectively indicate LIBOR was artificially suppressed during the Class Period.

**1.    The Discrepancy Between Defendants' Reported LIBOR Quotes And Their CDS Spreads Indicates The Banks Misrepresented Their Borrowing Costs To The BBA**

123.    One economic indicator that Defendants suppressed USD-LIBOR during the Class Period is the variance between their LIBOR quotes and their contemporaneous cost of buying default insurance—*i.e.*, a credit-default swap ("CDS")—on debt they issued during that period.  A CDS—"the most common form of credit derivative, *i.e.*, [a] contract which transfers credit risk from a protection buyer to a credit protection seller"[30]—constitutes an agreement by which one party, the protection buyer, seeks financial protection in the event of a default on an underlying credit instrument (typically a bond or loan).  Typically, a CDS buyer makes a series of payments (often referred to as the CDS "fee" or "spread") to the CDS seller in exchange for a payment if the underlying credit instrument experiences an adverse credit event.

124.    The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan—the greater the risk of default the underlying bond or loan bears, the greater the CDS spread.  In the case of a CDS for which the underlying instrument consists of an interbank loan where a USD-LIBOR panel bank is the borrower, the greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against the increased risk of a default on the underlying loan.

125.    As one commentator has observed, "The cost of bank default insurance has

---

[30] *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 171-72 (2d Cir. 2004) (alteration in original) (citation and internal quotation marks omitted).

generally been positively correlated with LIBOR. That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[31]    During the Class Period, however, those historically-correlated indicia of banks' borrowing costs diverged significantly.

126.    That discrepancy was detailed in a May 29, 2008 *Wall Street Journal* article reporting the results of a study it had commissioned. The *Journal*'s analysis indicated numerous banks caused LIBOR, "which is supposed to reflect the average rate at which banks lend to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial crisis."[32]    The *Journal* found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."

127.    The *Journal* observed that the widest gaps existed with respect to the LIBOR quotes of Defendants Citibank, WestLB, HBOS, JPMorgan Chase, and UBS. According to the *Journal*'s analysis, Citibank's LIBOR rates differed the most from what the CDS market suggested the bank's borrowing cost was. On average, the rates at which Citibank reported it could borrow dollars for three months (*i.e.*, its three-month LIBOR rates) were about 87 basis points *lower* than the rates calculated using CDS data. WestLB, HBOS, JPMorgan Chase, and UBS likewise exhibited significant LIBOR-CDS discrepancies—of 70, 57, 43, and 42 basis points, respectively—while Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and RBS each exhibited discrepancies of about 30 basis points. The study's authors concluded "one possible explanation for this gap is that banks understated their borrowing rates."

128.    Citing another example of suspicious conduct, the *Journal* observed that on the afternoon of March 10, 2008, investors in the CDS market were betting that WestLB—hit especially hard by the credit crisis—was nearly twice as likely to renege on its debts as Credit

---

[31] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform," 13 *North Carolina Banking Institute* 365, 371 (2009) (footnotes omitted).

[32] *See* Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor."

Suisse, which was perceived to be in better shape, yet the next morning the two banks submitted identical LIBOR quotes.

129.    Additionally, having compared the banks' LIBOR quotes to their actual costs of borrowing in the commercial-paper market, the *Journal* reported, for example, that in mid-April 2008, UBS paid 2.85% to borrow dollars for three months, but on April 16, 2008, the bank quoted a borrowing cost of 2.73% to the BBA.

130.    The *Journal* further noted an uncanny equivalence between the LIBOR panel banks' quotes: the three-month borrowing rates the banks reported remained within a range of only 0.06 of a percentage point, even though at the time their CDS insurance costs (premiums) varied far more widely, reflecting the market's differing views as to the banks' creditworthiness. According to Stanford University professor Darrell Duffie, with whom the authors of the *Journal* article consulted, the unity of the banks' LIBOR quotes was "far too similar to be believed."

131.    David Juran, a statistics professor at Columbia University who reviewed the *Journal*'s methodology, similarly concluded that the *Journal's* calculations demonstrate "very convincingly" that reported LIBOR rates are lower, to a statistically significant degree, than what the market thinks they should be.

132.    Calculating an alternate borrowing rate incorporating CDS spreads, the *Journal* estimated that underreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (the banks) did not pay to lenders (investors in debt instruments issued by the banks) that they would otherwise have had to pay.

133.    According to the *Journal*, three independent academics, including Professor Duffie, reviewed its methodology and findings, at the paper's request. All three deemed the *Journal*'s approach "reasonable."

134.    Further economic analysis supports the correlation seen in the *Journal*'s report. A study by Connan Snider and Thomas Youle—of the economics departments at UCLA and the University of Minnesota, respectively—released in April 2010 concluded LIBOR did not

accurately reflect average bank borrowing costs, its "ostensible target."[33]   Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if LIBOR quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance."  According to Snider and Youle's analysis, however, quotes provided by USD-LIBOR panel banks in fact deviated from their costs of borrowing as reflected in CDS spreads.

135.    Comparing, for example, the 12-month USD-LIBOR quotes from Citigroup and Bank of Tokyo together with each banks' corresponding one-year senior CDS spreads, Snider and Youle observed (as illustrated in the graph below) "that while Citigroup has a substantially higher CDS spread than [Bank of Tokyo], it submits a slightly lower Libor quote."  Accordingly, the authors explain, while the CDS spreads "suggest that the market perceives Citigroup as riskier than [Bank of Tokyo], as it is more expensive to insure against the event of Citigroup's default," the banks' LIBOR quotes "tell the opposite story."

---

[33] Connan Snider and Thomas Youle, "Does the LIBOR reflect banks' borrowing costs?", April 2, 2010.



136.    Snider and Youle further noted the level of Citigroup's CDS spreads relative to its LIBOR quotes was "puzzling."  The authors explained, "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread."  But the authors observed that Citigroup's quote was often "significantly below its CDS spread," implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them *a guaranteed 5 percent loss*."  (Emphasis added).  That discrepancy contravenes basic rules of economics and finance, thus indicating Citibank underreported its borrowing costs to the BBA.

### 2.    Cross-Currency Discrepancies In Defendants' LIBOR Quotes Indicate They Suppressed USD-LIBOR

137.    Defendants' LIBOR quotes also displayed inexplicable "cross-currency rank reversals."  That is, as detailed in Snider and Youle's paper referenced above, at least some Defendants reported lower rates on USD-LIBOR than did other panel members but, for other

currencies, provided higher rates than did those same fellow banks.  Both BAC and BTMU, for instance, quoted rates for USD-LIBOR and Yen-LIBOR during the period under study, yet BAC quoted a lower rate than BTMU for USD-LIBOR and a *higher* rate than BTMU for Yen-LIBOR. Other Defendants included in Snider and Youle's analysis—Barclays, Citigroup, and JPMorgan Chase—displayed similar anomalies across currencies, as the graphs below illustrate.  Citigroup, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the USD-LIBOR scale.  Because, Snider and Youle explain, "the same bank is participating in each currency," the credit risk "is the same for loans in either currency"; thus these "rank reversals" demonstrate that differences in the banks' LIBOR quotes "are not primarily due to differences in credit risk, something we would expect of their true borrowing costs."



### 3. The Frequency With Which At Least Certain Defendants' LIBOR Quotes "Bunched" Around The Fourth-Lowest Quote Of The Day Suggests Manipulation

138.    During the Class Period, the rates reported by certain Defendants—in particular, Citibank, BAC, and JPMorgan Chase—also demonstrated suspicious "bunching" around the fourth lowest quote submitted by the 16 ba nks to the BBA.   Indeed, Citibank's and BAC's quotes often tended to be identical to the fourth-lowest quote for the day.  Because the LIBOR calculation involved excluding the lowest (and highest) four reported rates every day, bunching around the fourth-lowest rate suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.

139.    Bunching among Defendants' respective LIBOR quotes indicates the banks intended to report the same or similar rates, notwithstanding the banks' differing financial conditions, which, as detailed above, reasonably should have resulted in differing LIBOR quotes. Those discrepancies suggest Defendants colluded to suppress LIBOR.

140.    The following charts show the frequency with which the USD-LIBOR quotes submitted by Defendants Citigroup, BAC, and JPMorgan Chase fell within a given percentage rate from the fourth-lowest quote.  A negative difference means the reporting bank was below the fourth-lowest quote, and therefore its rate was not included in the daily LIBOR calculation, while zero difference means that the bank reported the fourth-lowest quote on a given day (either by itself or tied with other reporting banks).[34]

---

[34] In the event of a tie between two or more banks, one of the banks' quotes, selected at random, was discarded.







141.    According to Snider and Youle, the fact that observed bunching occurred around the pivotal fourth-lowest reported rate reflected the reporting banks' intention to ensure the lowest borrowing rates were included in the calculation of USD-LIBOR (which includes only the fifth-lowest through the twelfth-lowest quotes).

142.    In other words, banks that bunched their quotes around the fourth-lowest submission helped ensure the maximum downward manipulation of the resulting rate. Furthermore, that a panel bank reported one of the four lowest quotes (*i.e.*, quotes excluded from the ultimate LIBOR calculation) does not mean the bank did not also participate in the collusion.

143.    Further demonstrating the aberrant nature of the observed bunching around the fourth-lowest quote, Snider and Youle noted "the intraday distribution of *other* measures of bank borrowing costs do not exhibit this bunching pattern."  (Emphasis added).

144.    Additionally, Snider and Youle detailed a discrepancy between USD-LIBOR panel banks' LIBOR quotes and their CDS spreads.  The authors found that "with the intra-day variation of both Libor quotes and CDS spreads increasing from their historical levels," the CDS

spreads' intra-day variation "grew considerably larger than that of Libor quotes."[35]

145.    Snider and Youle further observed that—as the graphs below, embodying a composite of all the banks, illustrate—during the Class Period Defendants' quotes tended to "bunch" around the fourth-lowest quote much more commonly than those banks' CDS spreads "bunched" around the fourth-lowest spread.  The authors concluded, "If banks were truthfully quoting their costs, . . . we would expect these distributions to be similar."



146.    Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that strong concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

---

[35] Snider and Youle, "Does the LIBOR reflect banks' borrowing costs?"

### 4.     That LIBOR Diverged From Its Historical Relationship With The Federal Reserve Auction Rate Indicates Suppression Occurred

147.    A comparison between LIBOR and the Federal Reserve auction rate further suggests Defendants artificially suppressed LIBOR during the Class Period.  An April 16, 2008 *Wall Street Journal* article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82%—10 basis points higher than the comparable USD-LIBOR rate.   That differential would make no economic sense if the reported LIBOR rate was accurate, the *Journal* observed:  "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

148.    A subsequent *Journal* article raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.[36]  According to the *Journal*, because the Federal Reserve requires collateral:

> banks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [*e.g.*, as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral. In other words, the rate for the Fed auction should be lower than Libor.

To the contrary, though, two days before the *Journal* article (September 22, 2008), the rate for the 28-day Fed facility was 3.75%—much higher than one-month USD-LIBOR, which was 3.18% that day[37] and 3.21% the next day.

---

[36] Carrick Mollenkamp, "Libor's Accuracy Becomes Issue Again," *The Wall Street Journal*, September 24, 2008.

[37] The *Journal* initially reported the one-month USD-LIBOR rate for that day as 3.19% but later noted the correct figure.

### 5.    LIBOR's Divergence From Its Historical Correlation To Overnight Index Swaps Also Suggests It Was Artificially Suppressed During The Class Period

149.    Yet another measure of LIBOR's aberrant behavior with respect to other measures of banks' borrowing costs during the Class Period is its observed deviation from the overnight-index swap ("OIS") rate.  In his academic article analyzing LIBOR data for the period of the second half of 2007 and 2008, Justin Wong observed that between 2001 and July 2007, when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points."[38]  By July 2008, on the other hand, that gap approached 100 basis points, a figure significantly higher than the spread from a year prior, and by October 2008, "it peaked at 366 basis points."  While the spread "receded somewhat in November 2008 to 209 basis points," that was still "far above the pre-crisis level."  Wong's analysis provides further support for Plaintiffs' allegations that Defendants suppressed LIBOR.

### 6.    Expert Analysis Performed In Connection With These Proceedings Indicates LIBOR's Increase Following Expressions Of Concern Over LIBOR's Viability Resulted From Defendants' Reaction To Events Unrelated To Market Factors

150.    On April 17, 2008, the day after *The Wall Street Journal* initially reported on LIBOR's anomalous behavior and the BBA stated it would conduct an inquiry concerning LIBOR, there was a sudden jump in USD-LIBOR—the three-month borrowing rate hit 2.8175% that day, about eight basis points more than the previous day's rate of 2.735%.

151.    Suspiciously, reported LIBOR rates for other currencies fell or remained relatively flat at the time USD-LIBOR rose, a sign that the latter was susceptible to manipulation.

152.    Consulting experts engaged by Plaintiffs in these coordinated proceedings have conducted an analysis of the change in LIBOR on the single date of April 17, 2008.  The analysis tested the hypothesis that if banks did not manipulate LIBOR, there would be no systematic

---

[38] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform."