**DICKSTEIN**SHAPIRO LLP

1825 Eye Street NW | Washington, DC 20006-5403
TEL (202) 420-2200 | FAX (202) 420-2201 | dicksteinshapiro.com

August 20, 2014

Via Hand Delivery and ECF

The Honorable Naomi Reice Buchwald
United States District Court Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *In re LIBOR-Based Financial Instruments Antitrust Litigation*,
      Master File No. 1:11-md-02262-NRB – Antitrust Issues

Dear Judge Buchwald:

Dickstein Shapiro LLP represents plaintiffs the Federal Deposit Insurance Corporation as Receiver for 38 closed banks (collectively, the "FDIC-R") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). This letter responds to Defendants' pre-motion letter asserting that antitrust claims in all stayed actions should be summarily dismissed based on the Court's prior rulings in other cases (MDL Doc. 594).

This Court should decline Defendants' request for summary dismissal. Defendants wrongly assert that the Complaints rest solely on the same "core theory" previously argued in *LIBOR I* and *LIBOR II*[1]—that Defendants restrained competition by conspiring to make false LIBOR submissions to the British Bankers Association ("BBA"). Defendants' assertion is not correct. Freddie Mac's amended complaint, filed after the *LIBOR I* decision, alleges agreements, relevant markets, and harms to competition that materially differ from those addressed in *LIBOR I* or in *LIBOR II*. The FDIC-R's complaint, filed after *LIBOR I* and *LIBOR II*, alleges generally similar facts and antitrust theories (together, the "Complaints").

These additional allegations support a different result than *LIBOR I* or *LIBOR II*, and include: broader sets of conspirators and agreements;[2] additional anticompetitive effects in other defined

---

[1] *See generally In re LIBOR-Based Financial Instruments Antitrust Litig.*, No.1:11-md-02262-NRB, 935 F.Supp.2d 666, MDL Doc. 286 (S.D.N.Y. 2013) ("*LIBOR I*"); *In re LIBOR-Based Financial Instruments Antitrust Litig.*, No.1:11-md-02262-NRB, 962 F.Supp.2d 606, MDL Doc. 389 (S.D.N.Y. 2013) ("*LIBOR II*").

[2] The Complaints allege that the Panel Banks agreed among themselves *and with the BBA* (a Defendant) to publish artificially low LIBORs *and* to misrepresent LIBOR as a reliable benchmark for short-term interest rates. *Fed. Home Loan Mortg. Corp. v. Bank of Am. Corp.*, No. 1:13-cv-03952-NRB, Am. Compl. ¶¶ 114-118 (S.D.N.Y. July 22, 2013) (Doc. 25) ("Freddie Mac Compl."); *FDIC v. Bank of Am. Corp.*, No. 1:14-cv-01757-NRB, Compl. ¶¶ 320-328 (S.D.N.Y. Mar. 14, 2014) (Doc. 2) ("FDIC-R Compl.").

**DICKSTEIN**SHAPIRO LLP

The Honorable Naomi Reice Buchwald
August 20, 2014

markets; facts showing that the agreements constituted an unreasonable restraint of trade under a rule-of-reason analysis, and not merely *per se* violations;[3] and that the alleged injuries arose, not only from the fraudulent statements, but from adverse effects on the competitive process.

For example, the Complaints allege that the agreements discouraged innovation and effectively excluded competitors from the market for short-term interest rate benchmarks. Freddie Mac Compl. ¶¶ 4-5, 8, 114, 123; FDIC-R Compl. ¶¶ 320-321, 323, 327, 333. Absent collusion, Defendants would have had to compete on the merits to maintain LIBOR's position as the dominant benchmark.[4] *Id.* Indeed, after the agreements were discovered in 2012, competition led to significant reforms to LIBOR. Freddie Mac Compl. ¶ 123; FDIC-R Compl. ¶ 333. These anticompetitive effects injured market participants like Freddie Mac and the FDIC-R by depriving them of a reliable benchmark. Freddie Mac Compl. ¶¶ 5, 96, 123, 126; FDIC-R Compl. ¶¶ 323, 333, 336.

In addition, the Complaints allege that the Panel Banks competed for cash, not only in the London interbank loan submarket, but also against Panel and non-Panel Banks in various other submarkets (e.g., commercial paper, repos, sale of asset-backed securities). Freddie Mac Compl. ¶¶ 2-8, 38-39, 89, 124, 139-140; FDIC-R Compl. ¶¶ 321-322, 324. The Complaints allege that the collusive agreements harmed competition in markets for cash by distorting the perceived supply/demand balance of money, reducing transparency, and increasing transaction costs. Freddie Mac Compl. ¶¶ 4, 88-89; FDIC-R Compl. ¶¶ 329-332, 334. Economic theory recognizes that disclosure of accurate information enhances efficiency and promotes competition, especially in financial markets. Freddie Mac Compl. ¶¶ 3-4, 120; FDIC-R Compl. ¶ 332.[5] Absent collusion, the Panel Banks would have to have competed for cash on the merits by providing better products and prices. Freddie Mac Compl. ¶¶ 3, 89, 120, 122; FDIC-R Compl. ¶¶ 76, 321, 330, 332. These harms to the competitive process injured market participants like Freddie Mac and the FDIC-R by depriving them of accurate information regarding the prices of securities and the underlying demand and supply factors, and injecting false information into negotiations for

---

[3] Restraints that do not fit within the *per se* rule are analyzed under the rule of reason, in which the essential inquiry is whether or not the challenged agreement enhances competition in a particular market. *NCAA v. Bd. of Regents of Okla.*, 468 U.S. 85, 104 (1984). Even if an agreement was made as part of a cooperative process, the trier-of-fact must still determine the agreement's effect on price, quality, service, and/or innovation. *Id.* at 104-05 & n.28. The over-the-counter class proposed to include five rule-of-reason allegations in an amended complaint, but those limited allegations were materially different than the allegations in the Complaints and not addressed in *LIBOR II*.

[4] Agreements that tend to exclude potential competitors are often deemed antitrust violations. *See, e.g. Associated Press v. United States,* 326 U.S. 1, 13-14 (1945) ("Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect."); *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.,* No. 04 Civ. 8024 (LBS) 2007 WL 2254721, at *9 (S.D.N.Y. Aug. 6, 2007).

[5] *See also In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 568-70 (N.D. Cal. 2013) (agreements that impair price-discovery process can harm competition and cause antitrust injury).

**DICKSTEIN**SHAPIRO LLP

The Honorable Naomi Reice Buchwald
August 20, 2014

the products they purchased and sold. Freddie Mac Compl. ¶¶ 90, 96, 120, 126; FDIC-R Compl. ¶¶ 330, 336.

Likewise, the Complaints allege that the agreements impaired the ability of non-Panel Banks to compete against the Panel Banks in the markets for LIBOR-based products because non-Panel Banks priced LIBOR-based products on the expectation that competitive market forces, not collusion, would determine short-term interest rates. Freddie Mac Compl. ¶¶ 4, 52, 55-59, 121; FDIC-R Compl. ¶¶ 322, 330-331, 333-334. The Complaints allege that the agreements were expressly forward-looking and therefore interfered with the competitive process by which counterparties negotiated prices for swap contracts and LIBOR-based derivatives. Freddie Mac Compl. ¶¶ 4, 90, 121; FDIC-R Compl. ¶¶ 75-77, 322, 330-331.[6] At a minimum, these additional allegations justify a different result than in *LIBOR I* and *LIBOR II*.

Defendants acknowledge that the Complaints allege facts that were not set forth in the complaints at issue in *LIBOR I* and *LIBOR II*. Moreover, several recent developments, not all of which can be listed here, support the Complaints' allegations. The European Commission ("EC"), for example, found that agreements among Panel Banks harmed competition in other LIBOR-based markets. EC Vice President Joaquin Almunia called "the *collusion* between banks who are supposed to be *competing* with each other" "shocking," adding that "[h]ealthy *competition* and transparency are crucial for financial markets to work properly."[7] In addition, Lloyds recently admitted that it systematically suppressed its LIBOR submissions to obtain short-term funding at artificially low rates—in the London interbank loan market and all other cash markets. *See, e.g., In re Lloyds Banking Grp. plc*, No. 14-18, 2014 WL 3783951, at *3 (C.F.T.C. July 28, 2014) (LIBOR is used as "a gauge of the market's expectation of future central bank interest rates"); *id.* at *11 (accurate submissions "could potentially create an issue with buyers of our paper"); *id.* at *12 (company directive not to "make bids for cash in the market above the rate of the daily LIBOR fixing"); *id.* (LIBOR suppression preserved Lloyds' ability to raise funds from other market participants at suppressed prices).[8]

In addition to the Complaints' articulation of claims and theories not present in *LIBOR I* or *LIBOR II*, dismissal of the Complaints would deprive Freddie Mac and the FDIC-R of their rights to preserve their claims against the risk of waiver. While MDL proceedings facilitate coordination of cases for pretrial purposes, each plaintiff continues to litigate its own claims.[9]

---

[6] *See, e.g., Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 692-94 (1978) (conduct that interfered with setting of prices by free market forces harmed competition).

[7] *Antitrust: Commission fines banks €1.71 billion for participating in cartels in the interest rate derivatives industry*, European Commission (Dec. 4, 2013), http://europa.eu/rapid/press-release_IP-13-1208_en.htm (emphasis added).

[8] In the event that this Court authorizes amendments to complaints, Freddie Mac and the FDIC-R would amend their complaints to include these recent developments in the context of *per se* and rule-of-reason allegations.

[9] *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, 115 F.3d 456, 457 (7th Cir. 1997) (opt-outs could not appeal summary judgment against class because opt-outs were not parties and therefore not bound by judgment).

**DICKSTEIN**SHAPIRO**LLP**

The Honorable Naomi Reice Buchwald
August 20, 2014

Consequently, MDL litigants must press any "meaningfully different" arguments or those arguments may be waived. *See Sompo Japan Ins. Co. of Ame. v. Norfolk S. Ry Co.*, -- F.3d --, 2014 WL 3844155, at *19 (2d Cir. Aug. 6, 2014). For example, some courts have held that an antitrust plaintiff waived rule-of-reason arguments by pressing only *per se* theories. *See Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1090-91 (9th Cir. 2000).

Accordingly, Freddie Mac and the FDIC-R respectfully request the opportunity to brief and orally argue these additional allegations and theories either in opposition to motions to dismiss or, if the Court would prefer, in response to an Order to Show Cause.

Respectfully submitted,

Richard J. Leveridge
James R. Martin
Jennifer D. Hackett
DICKSTEIN SHAPIRO LLP
(202) 420-4778 direct dial
(202) 379-9325 direct fax

cc:     All Counsel of Record (via ECF)