**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | ECF Case |
| MAYOR AND CITY COUNCIL OF BALTIMORE and CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, YALE UNIVERSITY, JENNIE STUART MEDICAL CENTER, INC., VARIETY CHILDREN'S HOSPITAL, D/B/A MIAMI CHILDREN'S HOSPITAL, HIGHLANDER REALTY LLC, AND SEIU PENSION PLANS MASTER TRUST, on behalf of themselves and all others similarly situated | |
| Plaintiffs, | **[PROPOSED] THIRD CONSOLIDATED AMENDED COMPLAINT** |
| v. | |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE (USA), INC., BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, HSBC HOLDINGS PLC, HSBC BANK PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, CITIZENS BANK OF MASSACHUSETTS, A/K/A RBS CITIZENS BANK, N.A., DEUTSCHE BANK AG, CITIBANK NA, CITIGROUP INC., COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A., THE NORINCHUKIN BANK, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., HBOS PLC, SOCIÉTÉ GÉNÉRALE S.A., and ROYAL BANK OF CANADA, | **JURY TRIAL DEMANDED** |

1

Defendants.

1.      Plaintiffs Mayor and City Council of Baltimore, ~~and~~ City of New Britain Firefighters' and Police Benefit Fund, ~~and~~ Texas Competitive Electric Holdings Company LLC, Yale University, Jennie Stuart Medical Center, Inc., Variety Children's Hospital, d/b/a Miami Children's Hospital, Highlander Realty LLC, and SEIU Pension Plans Master Trust (collectively, the "OTC Plaintiffs"), on behalf of themselves and all others similarly situated, by their counsel, assert claims for ~~violations of federal antitrust law,~~ breach of contract, and unjust enrichment against the Defendants identified below (collectively, "Defendants") arising from the~~ir~~ collusion among Defendants and the other members of the LIBOR panel (collectively, "panel banks") to manipulate the London InterBank Offered Rate ("LIBOR") from on or before August 2007 through at least May 2010 (the "Class Period").[1]

2.      Several defendants have reached settlements with government authorities relating to the LIBOR conspiracy alleged in this complaint. These settlements contain admissions and reveal documentary evidence that confirms a global conspiracy to manipulate LIBOR during the Class Period, including:

- In August 2007, a senior RBS trader of Yen LIBOR told one of his colleagues that LIBOR is a "cartel now in London."[2] This price-fixing cartel existed from August 2007 through May 2010.

- On November 29, 2007, Barclays learned the confidential USD LIBOR submissions of *every* defendant before they were made public and adjusted its LIBOR submission

---

[1] The Court dismissed ~~the~~ OTC Plaintiffs' antitrust claim, brought on behalf of themselves and all others similarly situated, by Order dated March 29, 2013, and denied leave to amend this claim by Order dated August 23, 2013. Plaintiffs ~~include~~remove thi~~s~~e antitrust claim ~~and the related amended pleadings in~~ from this amended complaint ~~to~~but preserve the claim against all panel banks and the issues for appeal.

[2] *In the Matter of The Royal Bank of Scotland plc and RBS Securities Japan Limited,* CFTC Docket No. 13-14, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (Feb. 6, 2013) ("RBS CFTC") at 14.

downward by 20 basis points in order to stay within the pack of other banks' low LIBOR submissions.[3] Barclays managers issued standing instructions to stay within specific ranges of other panel banks USD submissions, indicating that Barclays believed that it would have continued access to every other panel bank's confidential LIBOR submissions before they were published. According to the CFTC's review of the evidence it collected, "Senior Barclays Treasury managers provided the [LIBOR] submitters with the ***general guidance*** that Barclays's submitted rates should be ***within ten basis points*** of the submissions by the other U.S. Dollar panel banks . . . ."[4]

- That same day, on November 29, 2007, a Barclays manager explained that "other banks 'are reluctant to post higher and because no one will get out of the pack, ***the pack sort of stays low***.'"[5] Barclays and UBS admitted that they issued and obeyed instructions to stay within the pack of other banks' low LIBOR submissions during large portions of the Class period.

- In communications between November 2007 and October 2008, Barclays' employees revealed that "all of the Contributor Panel banks, including Barclays, were contributing rates that were too low."[6]

- On April 27, 2008, a Barclays manager conceded, "to the extent that, um, the LIBORs have been understated, ***are we guilty of being part of the pack? You could say we are***."[7] As one Barclays submitter put it, "just set it where everyone else set it, we do not want to be standing out."[8]

- In April 2008, the BBA acknowledged that no panel banks were "clean-clean" and that it understood what would happen to any bank that "moved against the trend of lower submissions."

- On May 21, 2008, when a Wall Street Journal reporter asked UBS by email why UBS had been "paying 12 basis points for [commercial paper] more than it was posting as a Libor quote," a senior manager at UBS told another senior UBS manager that "the answer would be 'because the whole street was doing the same and because we did not want to be an outlier in the libor fixings, just like everybody else.'"[9]

---

[3] Financial Services Authority, Final Notice to Barclays Bank Plc (June 27, 2012) ("Barclays FSA") ¶ 118.

[4] *In the Matter of Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc.,* CFTC Docket No. 12-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (June 27, 2012) ("Barclays CFTC") at 20 (emphasis added).

[5] Letter from Denis J. McInerney, Chief, Criminal Division, Fraud Section, United States Department of Justice, Appendix A (June 26, 2012) ("Barclays SOF") ¶ 43 (emphasis added).

[6] Barclays SOF ¶ 42.

[7] Barclays FSA ¶ 131 (emphasis added).

[8] Barclays FSA ¶ 123.

[9] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice (Dec. 18,2012) ("UBS SOF") ¶ 117.

- On June 18, 2008, two UBS employees explained why it was important for banks to collusively suppress as part of an anticompetitive pack: "*...[Senior Manager B] want[s] us to get in line with the competition by Friday ... if you are too low you get written about for being too low ... if you are too high you get written about for being too high.*"[10]

- Between June 2008 and April 2009, "UBS's 3-month U.S. Dollar LIBOR submissions were *identical* to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors."[11]  This was the case even though "[d]uring this 10-month period, there were significant disruptions in the financial markets, affecting individual financial institutions in different ways."[12]

- The empirical evidence shows that ~~Defendants~~the panel banks conspired to suppress USD LIBORs in a pack: they submitted LIBOR rates at similarly suppressed levels, which they could not have done without colluding because their submissions diverged dramatically and in unpredictable ways from benchmark rates that tracked market fundamentals.

- On February 11, 2013, during testimony before the Parliamentary Commission on Banking Standards, Johnny Cameron, the former Chairman of Global Banking and Markets at RBS Group, characterized the LIBOR manipulation efforts as "*a cartel of people across a number of banks who felt they could fix it.*"[13]

- On April 12, 2013, the DOJ charged RBS with one count of *"price-fixing" in violation of Section 1 of the Sherman Act*.  RBS admitted that it was responsible for the acts of its employees charged in the Information, which alleged that, from at least as early as 2007 through at least 2010, RBS employees "engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce . . . the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key price component of the price thereof, on certain occasions."  Documents show that RBS colluded with other defendants in this price-fixing conspiracy.

3.      Except as alleged in this Complaint, neither the OTC Plaintiffs nor other members of the public have access to the underlying facts relating to ~~Defendants~~the panel banks' improper activities.  Rather, that information lies exclusively within the possession and control of ~~Defendants~~the panel banks and other insiders, which prevents the OTC Plaintiffs from further

---

[10] Financial Services Authority, Final Notice to UBS AG ¶ 124 (Dec. 19, 2012) ("UBS FSA") (emphasis added).

[11] UBS SOF ¶ 122 (emphasis added).

[12] UBS SOF ¶ 123.

[13] Parliamentary Commission on Banking Standards, Feb. 11, 2013; Testimony of Johnny Cameron.

detailing ~~Defendants~~the panel banks' misconduct.  Moreover, numerous pending government investigations—both domestically and abroad, including by the United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), the SEC, the British Financial Services Agency ("FSA") and the European Commission—concerning potential LIBOR manipulation and collusion could yield information from ~~Defendants~~the panel banks' internal records or personnel that bears significantly on the OTC Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . . because of the difficulty in proving that banks reported borrowing costs for LIBOR at one rate and obtained funding at another."[14]  The OTC Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

4.     This case arises from a global conspiracy to manipulate LIBOR—the reference point for determining interest rates for trillions of dollars in financial instruments worldwide—by a cadre of prominent financial institutions.

5.     Throughout the Class Period, ~~Defendants~~the panel banks conspired to, and did, manipulate LIBOR by misreporting the actual interest rates at which they expected they could borrow funds—*i.e.,* their true costs of borrowing—on a daily basis. By acting together and in concert to knowingly understate their true borrowing costs, ~~Defendants~~the panel banks caused LIBOR to be calculated or suppressed artificially low, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.

6.     Investigations regarding LIBOR are ongoing in the United States, Switzerland,

---

[14] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, March 17, 2011.

Japan, United Kingdom, Canada, the European Union, and Singapore by ten different governmental agencies, including the DOJ, the SEC, the FSA, and the CFTC. Additionally, numerous employees, including supervisors, traders, and brokers, from various financial institutions have been accused of improper conduct related to LIBOR.

      7.     Several ~~Defendants~~ panel banks have reached settlements relating to their manipulation of LIBOR and other interest rate indices that have resulted in fees, admissions, and regulatory findings.

      a.     On June 27, 2012, Barclays agreed to pay a total of $453.6 million:

      i.     $200 million in connection with the investigation by Commodity Futures Trading Commission ("CFTC");[15]

      ii.     $160 million in connection with the investigation by Department of Justice ("DOJ");[16]

      iii.     $93.6 million in connection with the investigation by United Kingdom Financial Services Authority ("FSA").[17]

      b.     On December 19, 2012, UBS agreed to pay a total of $1.52 billion:

      i.     $700 million in connection with the investigation by CFTC;[18]

      ii.     $500 million in connection with the investigation by DOJ;[19]

      iii.     $259 million in connection with the investigation by FSA;[20] and

      iv.     $64 million in connection with the investigation by Swiss Financial Market Supervisory Authority ("FINMA").[21]

---

[15] Barclays CFTC.

[16] Barclays SOF.

[17] Barclays FSA.

[18] *In the Matter of UBS AG and UBS Securities Japan Co., Ltd.,* CFTC Docket No. 13-09, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (Dec. 19, 2012) ("UBS CFTC").

[19] UBS SOF.

[20] UBS FSA.

[21] *FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG,* at 2 (Dec. 19, 2012).

      c.      On February 6, 2013, RBS agreed to pay a total of $612 million:

           i.      $325 million in connection with the investigation by CFTC;[22]

           ii.      $150 million in connection with the investigation by DOJ;[23] and

           iii.      $137 million in connection with the investigation by FSA.[24]

8.     ~~Defendants~~the panel banks' manipulation of LIBOR allowed them to pay unduly low interest rates to investors, including OTC Plaintiffs, on LIBOR-based financial instruments during the Class Period. Accordingly, the OTC Plaintiffs seek relief for the damages they have suffered as a result of ~~Defendants~~the panel banks' violations of federal and state law and for injunctive relief. OTC Plaintiffs assert claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Act, 15 U.S.C. § 12 *et seq*, and state law.

## JURISDICTION AND VENUE

9.     This action arises under Section 1 of the Sherman Act, 15 U.S.C., § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and state law.

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Court also has original jurisdiction over the state law claims under 28 U.S.C. § 1332(d)(2), 5(b), 6, because the action involves 100 or more class members; at least one member of the proposed class is a citizen of a State different from the State of citizenship of at least one defendant; at least one defendant is a citizen or subject of a foreign state; and the matter in controversy exceeds $5 million in sum or value.

11.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). One or more of the

---

[22] RBS CTFC.

[23] *United States* v. *Royal Bank of Scotland plc*, Deferred Prosecution Agreement, Attachment A (Feb. 5, 2013) ("RBS SOF").

[24] Financial Services Authority, Final Notice to the Royal Bank of Scotland (Feb. 6, 2013) ("RBS FSA").

~~Defendants~~ panel banks resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiffs' claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### Plaintiffs

12.     Plaintiff Mayor and City Council of Baltimore ("Baltimore") is an independent city in the State of Maryland. During the Class Period, Baltimore owned and purchased hundreds of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

13.     Plaintiff City of New Britain Firefighters' and Police Benefit Fund ("New Britain") is a pension fund located in Connecticut with the mission of providing retirement benefits to the city's employees and their spouses. During the Class Period, New Britain owned and purchased tens of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

14.     Plaintiff Texas Competitive Electric Holdings Company LLC ("TCEH") is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas and headquartered in Dallas, Texas.   During the Class Period, TCEH owned and purchased hundreds of millions of dollars in interest rate swaps directly from at least one of the Defendants in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

15.     Plaintiff Yale University ("Yale") is located in New Haven, Connecticut. During

the Class Period, Yale owned and purchased hundreds of millions of dollars in interest rate swaps directly from several of the Defendants in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

16.    Plaintiff Jennie Stuart Medical Center, Inc. ("Jennie Stuart") is a non-stock, non profit corporation organized and existing under the laws of the Commonwealth of Kentucky, with its principal place of business in Kentucky. During the Class Period, Jennie Stuart owned and purchased an interest rate swap directly from at least one of the Defendants in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

17.    Plaintiff Variety Children's Hospital, d/b/a Miami Children's Hospital ("Miami Children's Hospital"), is a hospital based in Miami, Florida.  During the Class Period, Miami Children's Hospital owned and purchased an interest rate swap directly from at least one of the Defendants in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

18.    Plaintiff Highlander Realty, LLC ("Highlander") is a Rhode Island domestic limited liability company with offices at 1632 Kingstown Road located in the Peace Dale Section of Wakefield, Rhode Island.  During the Class Period, Highlander owned and purchased an interest rate swap directly from at least one of the Defendants in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

19.    Plaintiff SEIU Master Trust ("SEIU") is a consortium of funds with total assets of over $1.3 billion.  The funds are multi-employer Taft-Hartley pension funds headquartered in Washington, D.C.  SEIU purchased LIBOR-linked bonds in the listed quantities from the specified Defendants or their directly controlled subsidiaries, which it held during the Class Period, as follows:

9

- 500,000 units of CUSIP 225434DS5, issued by Credit Suisse (USA), Inc., from Credit Suisse Securities (USA) LLC on November 15, 2006;

- 200,000 units of CUSIP 78008EWA1, issued by RBC, from RBC Dain Rauscher Inc. on June 4, 2009

> Formatted: Bulleted + Level: 1 + Aligned at: 0.25" + Indent at:  0.5"

**Defendants**

16.20.  Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A.—a federally-chartered national banking association headquartered in Charlotte, North Carolina—is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation.  Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "Bank of America."

17.21.  Co-Conspirator Defendant Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.

18.22.  Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

19.23.  Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.  Defendant Citibank, N.A.—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

20.24.  Co-Conspirator Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

25.    Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.  Defendant Credit Suisse International is a bank domiciled in the United Kingdom and an indirect wholly owned subsidiary of Credit Suisse Group AG. Defendant Credit Suisse (USA), Inc. is an indirect wholly owned subsidiary of Credit Suisse Group AG and is domiciled in Wilmington, Delaware.  Credit Suisse (USA), Inc. is part of the "integrated global bank" Credit Suisse Group AG, is controlled by the Group, and its debt securities are guaranteed by the Group.  Collectively, these entities are referred to as "Credit Suisse."

26.    Credit Suisse International and its subsidiaries are "controlled" by their ultimate parent, Credit Suisse Group AG, as Credit Suisse International's own financial reports state.  These entities operate under a unified brand and logo, and Credit Suisse presents itself as an "integrated global bank."  Credit Suisse takes a unified approach to risk management that requires certain Credit Suisse International personnel ultimately to report to Credit Suisse Group AG personnel.  Credit Suisse International is managed as part of the Investment Banking Division of Credit Suisse Group AG, and Credit Suisse International has revenue sharing agreements with its parent.  Credit Suisse Group AG ensures that its subsidiary is able to meet its debt obligations, and makes loans worth billions of dollars to that end.

21.27.    Credit Suisse also has overarching organizational and employment policies.  Credit Suisse International and Credit Suisse Group AG have overlapping Boards of Directors, and Credit Suisse Group AG approves all Board appointments for its subsidiary Credit Suisse International.  The Credit Suisse Group AG Remuneration Committee recommends employee compensation amounts for Credit Suisse International.  Credit Suisse International also adheres to employment policies put out by its parent, Credit Suisse Group AG

22.    Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company

~~headquartered in Zurich, Switzerland.~~

~~23.~~28.  Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

~~24.~~29.  Co-Conspirator ~~Defendant~~ HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  Co-Conspirator ~~Defendant~~ HSBC Bank plc—a United Kingdom public limited company headquartered in London, England—is a wholly-owned subsidiary of Co-Conspirator ~~Defendant~~ HSBC Holdings plc.  Co-Conspirators ~~Defendants~~ HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as "HSBC."

~~25.~~30.  Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National Association—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, National Association are referenced together in this Complaint as "JPMorgan" or "JPMorgan Chase."

~~26.~~31.  Co-Conspirator ~~Defendant~~ Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Co-Conspirator ~~Defendant~~ Lloyds was formed in 2009 through the acquisition of Co-Conspirator ~~Defendant~~ HBOS plc ("HBOS")—a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland—by Lloyds TSB Bank plc.

~~27.~~32.  Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

~~28.~~33.  Co-Conspirator ~~Defendant~~ Société Générale S.A. ("SocGen") is a financial

12

services company headquartered in Paris, France and is the parent company of Societe Generale Group. SocGen offers commercial, retail, private banking services and investment banking services, including financial and commodities futures brokerage services.

29.34. Co-Conspirator Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

35. Defendant The Royal Bank of Scotland Group plc ("RBS Group") is a United Kingdom public limited company headquartered in Edinburgh, Scotland. Defendant Citizens Bank of Massachusetts, a/k/a RBS Citizens Bank, N.A. ("Citizens Bank"), is a wholly owned subsidiary of RBS Group. Collectively, these entities are referred to as "RBS."

36. RBS Group, at all times material hereto, set the policies, controlled and directed Citizens Bank as to its commercial lending and swaps businesses.

37. RBS Group used Citizens Bank as its arm to conduct banking activities in the United States, and oversaw Citizens Bank through its central banking committees. For instance, the Chief Executive of Citizens Financial Group (now RBS Citizens Financial Group), Citizens Bank's parent, had a permanent seat on RBS's Executive Committee, whose goals include complete oversight of the group's activities, including determining and delivering group strategy.

38. RBS Group and Citizens Bank operate under shared logos, RBS Group receives the revenues from Citizens Bank's operations, and RBS Group provides financing and financial support to Citizens Bank in order for the bank to conduct its activities.

30.39. Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

31.40. Co-Conspirator Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany. Co-Conspirator Defendant Westdeutsche

Formatted: Indent: Left: 0", First line: 0.5", Tab stops: 1", List tab + Not at 0.25"

ImmobilienBank AG—a German company headquartered in Mainz, Germany—is a wholly-owned subsidiary of WestLB AG.  Defendants WestLB AG and Westdeutsche ImmobilienBank AG are referenced together in this Complaint as "WestLB."

32.41.  Defendants and Co-Conspirators Bank of America, BTMU, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, RBC, Norinchukin, RBS, SocGen, UBS, and WestLB (collectively, "Defendantspanel banks") were members of the BBA's USD-LIBOR panel during the Class Period.[25]

## UNNAMED CO-CONSPIRATORS

33.42.  Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## DEFINITIONS

34.43.  LIBOR-Based Instruments are Derivative Instruments and Non-Derivative Instruments that are indexed to one or more LIBOR currencies (e.g., USD-LIBOR, Yen-LIBOR, and Euro-LIBOR).  Only LIBOR-Based Instruments that were sold in over-the-counter transactions are at issue in the OTC Plaintiffs' Complaint.

35.44.  Derivative Instruments include but are not limited to asset swaps, collateralized debt obligations, credit default swaps, forward rate agreements, inflation swaps, interest rate swaps, total return swaps, and options.

---

[25] SocGen replaced HBOS on the USD LIBOR panel on February 9, 2009.

a.      Asset Swaps are a type of over-the-counter derivative in which one investor exchanges the cash flows of an asset or pool of assets for a different cash flow. This is done without affecting the underlying investment position. For instance, if a Defendant wanted to own a particular Euro-denominated fixed rate issue, but preferred to receive a floating rate US dollar cash flow, the Defendant could purchase the Euro-denominated bond and then enter into an asset swap with another bank or investor to receive US Dollar LIBOR payments (+/- spread) in return for paying a fixed rate coupon in Euros to the bank or investor. Asset Swaps can be indexed to LIBOR.

b.      Collateralized Debt Obligations ("CDOs") are a type of structured asset backed security ("ABS"). ABSs are derivatives and are sold in over-the-counter transactions. CDOs have multiple tranches, or levels of risk, and are issued by "special purpose entities." They are collateralized by debt obligations including bonds and loans. Each tranche offers a varying degree of risk and return so as to meet investor demand. Interest and principal payments are made in order of seniority, so that junior tranches offer higher coupon payments (and interest rates) or lower prices to compensate for additional default risk; in general, "senior" tranches are considered the safest securities. In some cases, investors utilize leverage and hope to profit from the excess of the spread offered by the senior tranche and their cost of borrowing. This is because senior tranches pay a spread above LIBOR despite their AAA-ratings. CDOs can be indexed to LIBOR.

15

c.      Credit Default Swaps ("CDSs") are a type of over-the-counter, credit-based derivative whereby the seller of the CDSs compensates the buyer of the CDS only if the underlying loan goes into default or has another "credit event." The buyer of the CDS makes a series of payments (the CDS "fee" or "spread") to the seller and, in exchange, receives a payoff if the loan defaults. In the event of default, the buyer of the CDS receives compensation (usually the face value of the loan), and the seller of the CDS takes possession of the defaulted loan. However, anyone can purchase a CDS, even buyers who do not hold the loan instrument and who have no direct insurable interest in the loan (these are called "naked" CDSs).

d.      Forward Rate Agreements ("FRAs") are a type of over-the-counter derivative based on a "forward contract." The contract sets the rate of interest or the currency exchange rate to paid or received on an obligation beginning at a future start date. The contract will determine the rates to be used along with the termination date and notional value. On this type of agreement, it is only the differential that is paid on the notional amount of the contract. It is paid on the effective date. The reference rate is fixed one or two days before the effective date, dependent on the market convention for the particular currency. An FRA differs from a swap in that a payment is only made once at maturity. FRAs can be indexed to LIBOR.

e.      Inflation Swaps are a type of over-the-counter derivative used to transfer inflation risk from one party to another through an exchange of cash flows. In an inflation swap, one party pays a fixed rate on a notional principal amount, while the other party pays a floating rate linked to an inflation index. The party paying the floating rate pays the inflation adjusted rate multiplied by the notional principal amount. Inflation Swaps can be indexed to LIBOR.

16

f.      Interest Rate Swaps are a type of over-the-counter derivative in which two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another. These are highly liquid financial derivatives. Interest rate swaps are commonly used for both hedging and speculating. In an interest rate swap, each party agrees to pay either a fixed or floating rate denominated in a particular currency to the other party. The fixed or floating rate is multiplied by a notional principal amount. This notional amount is typically not exchanged between counterparties, but is used only for calculating the size of cash flows to be exchanged. Interest Rate Swaps can be indexed to LIBOR.

g.      Total Return Swaps are a type of over-the-counter derivative based on financial contracts that transfer both the credit and market risk of an underlying asset. These derivatives allow one contracting party to derive the economic benefit of owning an asset without putting that asset on its balance sheet; the other contracting party, which retains the underlying asset on its balance sheet, is, in effect, buying protection against loss on that asset's value. Total Return Swaps can be indexed to LIBOR.

h.      Options are a type of over-the-counter derivative based on a contract between two parties for a future transaction on an asset. The other Derivative Instruments, defined above, can serve as the asset for an Option; an Option on a swap is commonly referred to as a "swaption". The buyer of an option gains the right, but not the obligation, to engage in that future transaction (buy or sell) while the seller of the option is obligated to fulfill the future transaction.  In general, the option's price is the difference between the asset's reference price and the value of the underlying asset (*i.e.*, a stock, bond, currency contract, or futures contract)

plus a spread. Thus, where the underlying asset is indexed to LIBOR, the Option's price is impacted by LIBOR.

36.45.  Non-derivative instruments include but are not limited to floating rate notes. Floating rate notes evidence an amount of money owed to the buyer from the seller. The interest rate on floating rate notes is adjusted at contractually-set intervals and is based on a variable rate index, such as LIBOR. Thus, floating rate notes can be indexed to LIBOR.

<u>**CLASS ACTION ALLEGATIONS**</u>

37.46.  The OTC Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class" is defined as:

> All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in the United States, directly from a Defendant (or a Defendant's subsidiaries or affiliates), a financial instrument that paid interest indexed to LIBOR ("LIBOR-Based Instrument") and that owned the LIBOR-Based Instrument any time during the period August 2007 through May 2010 (the "Class Period").

38.47.  The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time, the OTC Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members purchased LIBOR-Based Derivatives directly from Defendantspanel banks during the Class Period.

39.48.  The OTC Plaintiffs' claims are typical of the claims of the other members of the Class. The OTC Plaintiffs and the members of the Class sustained damages arising out of Defendantsthe panel banks' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendantsthe panel banks' wrongful conduct in violation of the antitrust laws as alleged herein.

40.49.  The OTC Plaintiffs will fairly and adequately protect the interests of the members

18

of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

41.50. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendantsthe panel banks conspired with others to artificially suppress LIBOR in violation of the Sherman Act;

b. Whether Defendantsthe panel banks' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

c. Whether Defendantsthe panel banks' conduct negatively affected the rates of return of LIBOR-Based Instruments purchased directly from the Defendants during the Class Period; and

d. The appropriate measure of damages for the injury sustained by the OTC Plaintiffs and other members of the Class as a result of Defendants' unlawful activities.

42.51. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

43.52. The interest of members of the Class in individually controlling the prosecution of

separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. The OTC Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

44.53.  As discussed in more detail below, the British Bankers' Association ("BBA") rate-setting cartel provides the means through which ~~Defendants~~the panel banks could manipulate LIBOR; banks were motivated to manipulate LIBOR, among other reasons, to hide their precarious financial conditions and to financially benefit from a manipulated LIBOR; there is economic evidence that LIBOR was manipulated and could not have been so manipulated in the absence of a conspiracy; there are governmental investigations worldwide regarding LIBOR manipulation, many of which have already resulted in reports, admissions, and orders that reveal details about ~~Defendants~~the panel banks' conspiracy to manipulate LIBOR; there are news reports that LIBOR was manipulated; and there are admissions of collusive manipulation with respect to Yen LIBOR and other LIBOR currencies.  The foregoing factors evidence a worldwide conspiracy regarding LIBOR manipulation. While ~~Defendants~~the panel banks have at times used different means to bring out their ends, their goal throughout has been to collude to set the rates of LIBOR in a fashion that benefits ~~Defendants~~the panel banks' own interests, in contravention of the LIBOR definition.

**A.**    **LIBOR Is Administered By The BBA Rate-Setting Cartel**

45.54.  In August 2007, a senior RBS trader of Yen LIBOR told one of his colleagues that LIBOR is a "cartel now in London." RBS CFTC Order at 14.  This price-fixing cartel existed from at least August 2007 through May 2010.

20

46.55.  The BBA's activities in setting LIBOR for various currencies reflect a global rate-setting cartel. As one commentator has noted, "LIBOR is not a real market rate of interest and is instead set by a cartel of mostly foreign banks operating in London with little or no oversight and no transparency. . . . The Wall Street Journal reported that the BBA is hesitant to change how LIBOR is calculated because it is worried about legal liability which is not a surprise. If the BBA admits that LIBOR isn't a market rate but a cartel rate that was established through price fixing, it will be subject to global lawsuits resulting from fraudulent behavior and misrepresentations. The likelihood of the BBA reforming itself, providing transparency and giving up its cartel monopoly is very low given the astronomical liability that will result."[26] Indeed, the BBA directly profits from the usage of LIBOR. Since 2009, it has operated BBA LIBOR, Ltd., which earns revenue from licensing the rate.

47.56.  The BBA describes itself on its website as "the leading trade association for the U.K. banking and financial services sector. We speak for over 200 member banks from 60 countries on the full range of U.K. and international banking issues."[27] The Defendants panel banks are among the member banks of the BBA.  As the BBA itself concedes, it is not a regulatory body and has no regulatory function.[28]  Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Defendants the panel banks Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[29] "This is a quaint, insider

---

[26] http://www.thesunshinereport.net/marksunshine/?p=36, last accessed April 30, 2012.
[27] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.
[28] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012
[29] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

club which is clearly not fit for the 21st century," said Richard Werner, a finance professor at the University of Southampton, England.[30]

48.57.  Commencing in January of 1986, the BBA began disseminating LIBOR, initially in three currencies: U.S. dollars, Japanese Yen, and pound sterling; LIBOR is now disseminated for ten currencies: the foregoing three, the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc, and the Swedish krone.

49.58.  LIBOR is a daily benchmark interest rate at which designated contributor panel banks predict they can borrow unsecured funds from other banks in the London wholesale money market for fifteen different maturities ranging from overnight to one year.  As "the primary benchmark for short term interest rates globally,"[31] LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets.  For example, LIBOR is commonly used as the floating rate on interest rate swaps; market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (*e.g.*, "LIBOR + [X] bps")[32] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR).

50.59.  LIBOR affects the pricing of trillions of dollars' worth of financial transactions. In a May 21, 2009 press release, the BBA called LIBOR "the world's most important number."[33] Accordingly, it is well-established among market participants that confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[34]

---

[30]    http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html, last accessed on April 30, 2012.

[31] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[32] The term "bps" stands for basis points.  100 basis points equal 1%.

[33]    http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily.

[34] Carrik Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29,
*Footnote continued on next page*

54.60.  As the CFTC's Order related to UBS stated:

> LIBOR is the most widely used benchmark interest rate throughout the world. LIBOR is intended to be a barometer to measure strain in money markets and is often a gauge of the market's expectation of future central bank interest rates. Approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR. LIBOR also is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges, including the one-month and three-month Eurodollar futures contracts on the Chicago Mercantile Exchange ("CME"). Moreover, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers.

UBS CFTC at 6.

52.61.  The review of LIBOR conducted by Marvin Wheatley, the managing director of the FSA, at the request of the British Government, assumed that LIBOR was the benchmark for 50% of certain financial instruments:  floating rate notes, interest rate swaps, and forward rate agreements.[35]

53.62.  LIBOR is set by the BBA and its member banks. Each of the ten aforementioned currencies is overseen by a separate LIBOR panel created by the BBA.  During the Class Period, designated contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar panel also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[36]  Similarly, thirteen banks participated on both the dollar and yen LIBOR panels[37] and eleven banks

---

*Footnote continued from previous page*
2008.
[35]  The Wheatley Review of LIBOR: Final Report (Sept. 2012), *available at* http://www.hm-treasury.gov.uk/wheatley_review.htm (last visited April 16, 2013).
[36]  Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS
[37]  Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP
*Footnote continued on next page*

participated on both the U.S. dollar and Swiss franc LIBOR panels.[38]   It is a requirement of membership of a LIBOR contributor panel that the bank is regulated and authorized to trade on the London money market.  As the BBA recently told Bloomberg: "As all contributor banks are regulated, they are responsible to their regulators, rather than us."[39]

54.63.  According to the BBA's "LIBOR Governance and Scrutiny" report issued in 2008,[40] "Thomson Reuters...act[s] as the 'designated distributor' of BBA LIBOR rates.  All contributions to the LIBOR rate-setting process are collected by Thomson Reuters, who currently perform[s] checking procedures, supervised by the LIBOR manager, on all the submissions before running the calculation and distributing the fixes."

55.64.  During the Class Period, the BBA purported to establish LIBOR based on the rates that designated banks for each currency would have to pay for an unsecured loan for each designated maturity period.[41]  Every day, the banks responded to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  On its website, the BBA explains "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  The banks informed the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months).  Contributed rates are ranked in descending order and the arithmetic mean of only the middle two quartiles is used to formulate

---

*Footnote continued from previous page*
Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB.
[38] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS.
[39] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.
[40] http://www.bbalibor.com/news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures, last accessed on April 30, 2012.
[41] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 30, 2012.

24

the resulting BBA LIBOR calculation for that particular currency and maturity.[42]

56.65. Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London Time.  Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months. The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources. In addition to the LIBOR fix resulting from the calculation, Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks.

57.66. No regulatory agency oversees the setting of LIBOR by the BBA and its members. The resultant rates are not filed with, or subject to the approval of, any regulatory agency. The BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[43]

58.67. The LIBOR-setting process was designed to proceed in accordance with the BBA LIBOR panel rules. Three key panel rules described below operated to make the LIBOR-setting process a competitive process that produced competitively determined daily LIBOR rates and established a daily contest between the panel banks to signal their relative ranking in terms of credit risk, access to funding, and liquidity profile.

59.68. The first key panel rule required each of the panel banks to independently exercise its good faith judgment each day about the interest rate that it would be required to pay, based upon its own expert knowledge of market conditions, including supply and demand conditions and the panel bank's own competitive posture as a borrower within the market for

---

[42] http://www.bbalibor.com/technical-aspects/setting-bbalibor, last accessed March 30, 2012.
[43]   http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

interbank loan funds.     Through the mechanism of individual submissions reflecting each submitting bank's honest competitive posture as a borrower each day, the composite LIBOR reflected, and moved from day to day based upon, actual competitive conditions in the London interbank loan market.

60.69.  This panel rule meant that each bank's LIBOR submissions should accurately reflect the estimated costs of the bank's borrowing costs in the interbank lending market—rather than represent an artificial number generated to benefit the bank's trading positions, enhance the bank's reputation as creditworthy, or something else.  As ~~defendants~~ Barclays, UBS, and RBS admitted:

> The basis for a Contributor Panel bank's submission, according to the BBA, must be the rate at which members of the bank's staff primarily responsible for management of a bank's cash, rather than a bank's derivative trading book, consider that the bank can borrow unsecured interbank funds in the London money market.  Further, according to the BBA, a Contributor Panel bank may not contribute a rate based on the pricing of any derivative instrument.  In other words, a Contributor Panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivative transactions tied to LIBOR.

Barclays DOJ ¶ 6.  *See* UBS DOJ ¶ 7; RBS DOJ ¶ 7.

61.70.  The second key panel rule mandated that each panel bank's daily submissions would remain confidential until after the calculation and publication of the daily LIBOR rates. Adherence to this rule would prevent collusion and ensure that each panel bank's submission would be independent of the others, and therefore reflect only that panel bank's independent expert judgment concerning its own competitive posture as a borrower within the market. As defendants Barclays, UBS, and RBS have admitted: "According to the BBA, from at least 2005 to the present, each Contributor Panel bank must submit its rate without reference to rates

26

contributed by other Contributor Panel banks." Barclays DOJ ¶ 6, *see* UBS DOJ ¶ 7, RBS DOJ ¶ 7.

62.71.  The third key panel rule mandated that upon the publication of each day's LIBOR, the BBA, through Thomson Reuters, simultaneously published the individual rates submitted in the LIBOR-setting process for each panel bank, currency and tenor for that day. This third rule made the process and the individual panel bank submissions transparent on an *ex post* basis, to the capital markets and the panel banks themselves.

63.72.  Moreover, this third rule, operating in conjunction with the first two rules, reflected that the LIBOR-setting process was a competitive process.  Because the capital markets view the funding costs of the panel banks as reflective of their relative creditworthiness and financial strength, the daily disclosure of the panel bank LIBOR submissions signaled each panel bank's creditworthiness and financial strength to the market.   Lower funding costs reflected greater creditworthiness and financial strength, and vice versa.

64.73.  Each panel bank was in competition with the others to submit the lowest honest funding cost estimate possible.  By creating this incentive to signal the lowest honest funding cost, this third rule was designed to ensure that the LIBOR setting process produce, as the BBA termed it, "a unique snapshot of competitive funding costs."

65.74.  These three rules were the safeguards ensuring that LIBOR would reflect the forces of competition in the London interbank loan market.  Collusion to submit artificial and coordinated rates not only violated the three rules but removed LIBOR's linkage to competition.

B.    ~~Defendants'~~ **The Panel Banks' Incentives To Collude To Suppress USD LIBOR**

66.75.  ~~Defendants~~ The panel banks each had substantial incentives to collude to suppress USD LIBOR between August 2007 and May 2010.

67.76.  First, every panel bank ~~Defendant~~ was motivated to understate its borrowing costs

during this time, particularly given investors' serious concerns over the stability of the market in the wake of the financial crisis that emerged in 2007—and over the level of risk associated with the banks. The banks could not do this effectively without colluding to suppress as a group.

68.77.  A bank that submits high LIBORs runs the risk of being perceived as a weak institution, which can lead to negative consequences for the bank.  As the DOJ explained, and UBS admitted:

> Because a bank's LIBOR contributions, even if they are not based entirely on actual money market transactions, should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market, *a bank's LIBOR contributions may be viewed as an indicator of a bank's creditworthiness. If a bank's LIBOR contributions are relatively high, those submissions could suggest that the bank is paying more than others to borrow funds. Thus, a bank could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank.*

> UBS DOJ ¶98-99 (emphasis added).

69.78.  The instructions at UBS to suppress USD LIBOR to stay within the pack and err on the low side "were issued, at least in significant part, because of concerns that if UBS submitted higher LIBOR rates relative to other banks, UBS could attract negative attention in the media."[44] In so acting, UBS "sought to avoid negative media attention and, relatedly, sought to avoid creating an impression that it was having difficulty obtaining funds."[45] To the extent those directions from UBS management "were motivated by reputational concerns," they "were inconsistent with the definition of LIBOR."[46]

70.79.  In September 22, 2008, a UBS employee wrote in an electronic chat that "the real cash market isn't trading anywhere near LIBOR," and he suspected the reason was that Banks'

---

[44] UBS DOJ SOF ¶ 100.
[45] *Id.*
[46] *Id.*

"undervalue [LIBOR] in times like this . . . so as to not show where they really pay in case it creates headlines about that bank being desperate for cash."  UBS DOJ ¶ 101.

71.80. Similarly, the CFTC found that Barclays' misconduct in knowingly submitting false LIBOR quotes stemmed from its desire "to protect [its] reputation against what it believed were negative and unfair media and market perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions."[47]

a.     The DOJ observed that Barclays' improper submissions "began in approximately late August 2007," shortly after Barclays "twice drew on the Bank of England's emergency liquidity facility (known as the 'window'), borrowing approximately £1.6 billion the second time."[48] The DOJ further explained:

> News articles about the withdrawals in late August 2007 noted a decline in Barclays's share price and questioned Barclays's liquidity position, while Barclays explained publicly that the visits to the window were due to technical glitches.  Meanwhile, because of the onset of the financial crisis, there was diminished liquidity in funding markets, and Barclays set certain of its LIBOR submissions relatively high compared to other Contributor Panel banks.  In early September 2007, Barclays received negative press coverage concerning Barclays's high LIBOR submissions in Sterling, Euro, and Dollar.  A news article questioned Barclays's liquidity position, in light of Barclays's high LIBOR submissions and its visits to the Bank of England's window, and noted that Barclays's share price had fallen.[49]

b.     Senior managers at Barclays "expressed concern about the negative publicity."[50] Managers on Barclays' money-markets desk and in its Treasury department "who gave the instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions," aimed "to avoid inaccurate, negative attention about Barclays's financial health as

---

[47] Barclays CFTC at 19.
[48] Barclays DOJ SOF ¶39.
[49] Id.
[50] Id. ¶40.

a result of its high LIBOR submissions relative to other banks."[51] They "wanted to prevent any adverse conclusions about Barclays's borrowing costs, and more generally, its financial condition, because they believed that those conclusions would be mistaken and that other Contributor Panel banks were submitting unrealistically low Dollar LIBORs."[52]

      c.    Because those managers "sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape when compared to its peers," Barclays "engaged in this misconduct in order to reduce the reputational risk associated with proper, higher LIBOR submissions."[53]  In other words, the DOJ explained—borrowing from Barclays employees' comments in internal communications—"***the purpose of the strategy of under-reporting Dollar LIBORs was to keep Barclays's 'head below the parapet' so that it did not get 'shot' off***."[54]

    ~~72.~~81.  Analysts at Citigroup Global Markets—a subsidiary of Defendant Citigroup—similarly acknowledged in an April 10, 2008 report:

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment.  If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one higher than its competitors.  Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences.[55]

    ~~73.~~82.  Strategists at entities affiliated with other ~~Defendants~~ panel banks likewise confirmed these incentives.  Echoing Peng's sentiment, William Porter, credit strategist at Credit

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* (emphasis added).
[55] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?," April 10, 2008.

Suisse, said in April 2008 that he believed the three-month USD-LIBOR was 40 basis points below where it should be.[56] And the next month, Tim Bond, head of asset-allocation research of Barclays Capital—a subsidiary of Defendant Barclays—observed that banks routinely misstated borrowing costs to the BBA to avoid the perception that they faced difficulty raising funds as credit markets seized up.[57]

74.83. The only way for every Defendant to appear financially strong through low LIBOR submissions without drawing unwanted media and regulatory attention was for all Defendants the panel banks to collude to suppress as a pack. That is because, on the one hand, a bank that submits LIBORs that are above the pack signals its relative weakness and illiquidity to the media and market. As Barclays acknowledged, a bank submitting too high risked sticking its "head above the parapet," which could get it "shot" off by the financial press. Barclays SOF ¶ 43.[58] On the other hand, a bank that submits LIBORs that are lower than the pack risks drawing unwanted media and regulatory attention.

75.84. An employee of Defendant UBS told UBS's Thomas Hayes, who the DOJ charged with criminal price-fixing, that he would "not set[] libor 7bp away from the truth" because "*i'll get ubs banned if I do that, no interest in that*."[59] Also, a Defendant bank who acted alone to submit lower-than-accurate LIBOR would risk being reported by other Defendant banks who were (or should have been) competing to appear more creditworthy to the market by submitting truthfully low LIBORs. However, if all Defendants the panel banks were colluding to suppress LIBOR, there was less risk that any Defendant would report another Defendant for

---

[56] Carrick Mollenkamp, "Libor Surges After Scrutiny Does, Too," *The Wall Street Journal*, April 18, 2008.
[57] Gavin Finch and Elliott Gotkine, "Libor Banks Misstated Rates, Bond at Barclays Says," *Bloomberg*, May 29, 2008.
[58] Barclays agreed that it would not contest the accuracy of the DOJ Statement of Facts ("Barclays DOJ SOF"). DOJ Non-Prosecution Agreement at 1.
[59] Complaint, *U.S. v. Hayes & Darin*, No. 12 Mag 3229 (Dec. 12, 2012), Exhibit 2 (emphasis added).

submitting lower-than-accurate LIBOR.

76.85. In a June 18, 2008 chat, UBS employees discussed why it was important for LIBOR submissions to neither be too high nor low, but in the middle of the pack:

| Trader D: | *"...[Senior Manager B] want us to get in line with the competition by Friday ..."* |
| Trader Submitter E: | *"... if you are too low you get written about for being too low...if you are too high you get written about for being too high ... "* |
| Trader D: | *"middle of the pack there is no issue..."* |

UBS FSA ¶ 124.

77.86. Because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks, or as having submitted an artificially low LIBOR, each ~~Defendant~~ panel bank shared a powerful incentive to collude with other panel banks ~~its co-Defendants~~ to ensure it was not the "odd man out." Because all banks wanted to appear financially healthy during the financial crisis, they had a powerful incentive to collude to suppress their LIBOR submissions as a group.

78.87. Second, by artificially suppressing LIBOR, ~~Defendants~~the panel banks paid lower interest rates on LIBOR-based financial instruments they sold to investors, including the OTC Plaintiffs, during the Class Period. Illustrating ~~Defendants~~the panel banks' motive to artificially suppress LIBOR, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously. JPMorgan Chase likewise reported significant exposure to interest rates in 2009: The bank stated that if interest rates increased by 1%, it would lose over $500 million. HSBC and Lloyds also estimated they would earn hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates and would lose comparable amounts in response to

32

higher rates.  And Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to LIBOR because LIBOR was low.[60]  These banks collectively earned billions in net revenues between August 2007 and May 2010 from suppressed USD LIBOR.

79.88.  ~~Defendants~~ The panel banks thus possessed reputational and financial incentives to manipulate LIBOR—which, as detailed below, they did.

**C.**     ~~Defendants~~ **The Panel Banks Colluded To Suppress USD LIBOR**

80.89.  The most plausible inference from the empirical evidence, discussed in detail below, is that ~~Defendants~~ the panel banks conspired to suppress LIBOR between August 2007 and May 2010.   For example, the empirical evidence from the Eurodollar Study shows anomalous divergences during this period between the Eurodollar benchmark and LIBOR submissions.   Those divergences are unprecedented before and after this period and not explainable by market fundamentals.  Before and after this period, LIBOR and the Eurodollar benchmark were very closely correlated.  During this period, however, Defendants' LIBOR submissions were, on average, approximately 29.4 basis points lower than the Eurodollar benchmark ("Eurodollar spread").  In addition, Defendants' patterns of divergence from the Eurodollar benchmark were very similar to each other during this period, as every Defendant had an average Eurodollar spread within 6 basis points of each other.  As many market participants observed, ~~Defendants~~ the panel banks suppressed as a pack during this period.  This empirical evidence gives rise to a plausible inference of collusion because all ~~Defendants~~ the panel banks were artificially suppressing LIBOR in common but unpredictable ways that did not correspond to the LIBOR definition, or track market fundamentals, even though their submissions were supposed to be confidential.

---

[60] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor,* Wall St. J., Jan. 10, 2013, http://online. wsj .com/article/SB10001424127887324442304578231721272636626.html.

81.90.  In addition to the empirical evidence showing that ~~Defendants~~the panel banks colluded, there is also ample direct and inferential evidence that ~~Defendants~~the panel banks colluded to suppress LIBOR.

82.91.  During the Class Period, ~~Defendants~~the panel banks subverted the USD LIBOR setting process by submitting daily USD borrowing rate estimates at rates lower than those at which they believed they could borrow.  These submissions were in violation of the first BBA LIBOR panel rule described above.

83.92.  During the Class Period, the ~~Defendants~~ panel banks also violated the second panel rule described above by routinely sharing amongst themselves, directly and through cash brokers, their planned daily borrowing cost submissions for the purpose of coordinating their submissions to suppress USD LIBOR.

84.93.  Defendants' collusive suppression of USD LIBOR removed the effects of competition from the primary determinant of price for LIBOR-based instruments, and replaced it with a primary determinant of price that was manipulated by Defendants' collusion.

**D.    All ~~Defendants the~~ Panel Banks Knew That Every ~~Defendant~~Panel Bank Suppressed USD LIBOR**

85.94.  Barclays admitted that between August 2007 and January 2009, it often reported suppressed USD LIBOR rates at the direction of its managers.  These rates were false because they were lower than what Barclays would have submitted had it honored the definition of LIBOR.

> From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been. Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the

34

proper, higher LIBORs. Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel. Consequently, on some occasions, Barclays submitted rates that were *false* because they were lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR.

Barclays DOJ SOF ¶ 36 (emphasis added).

86.95.  Barclays also admitted that its submitters understood that Barclays was submitting falsely suppressed USD-LIBOR rates during this period because "Barclays was submitting its LIBOR contributions lower than the rate at which Barclays was borrowing or could have borrowed funds, and lower than the rate at which Barclays should have been submitting its LIBOR contributions." Barclays DOJ SOF ¶ 37.

a.  In December 2007, a senior Barclays USD LIBOR submitter emailed his supervisor about submitting a one-month LIBOR lower than he would prefer if he were "given a free hand," and explicitly stated: "My worry is that *we* (both Barclays and the contributor bank panel*)* are being seen to be contributing patently false rates. We are therefore being **dishonest by definition** and are at risk of damaging our reputation in the market and with the regulators." CFTC Order at 22 (emphasis added). In another email, the senior Barclays USD LIBOR submitter wrote: "I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore **will not be posting honest prices**." *Id.* at 24 (emphasis added). In May 2008, Barclays did not want to disclose to the FSA that its reported LIBOR rates understated its true borrowing costs for fear that reporting the "honest truth" would be a "can of worms." DOJ SOF ¶ 46 .

b.  As the CFTC found, "Barclays knew that accounting for its reputational risk in its determination of LIBOR submissions was not permissible under BBA's definition and

35

criteria."[61]  Barclays' LIBOR submitters and their supervisor nonetheless "understood that they were to follow this directive regardless of market conditions or whether their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be otherwise."[62]  In other words, "Barclays' U.S. Dollar LIBOR submitters knew that, by acting upon senior management's instruction . . . , they were making improper U.S. Dollar LIBOR submissions that were management's rates and not the rates that the submitters had determined were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing unsecured funds in the London interbank money market."[63]  The CFTC further found that the senior Barclays Treasury managers "frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive."[64]  The CFTC observed that those discussions "were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period."[65]

87.96.  Barclays also knew that the other panel banks, acting as a "pack," were submitting USD LIBOR rates that were too low.  Barclays' employees revealed that "***all of the Contributor Panel banks***, including Barclays, were contributing rates that were too low."  DOJ SOF ¶ 42 (emphasis added).

88.97.  The FSA similarly concluded that "Barclays believed that the submissions of other contributing banks were inappropriate during the financial crisis."  FSA ¶ 117.

    a.    A Barclays senior compliance officer stated in an internal e-mail to several levels of Barclays' senior management that he had informed the FSA "that Barclays believed that

---

[61] Barclays CFTC Order at 20.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*

LIBOR submissions by the panel banks were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go higher given the negative media reporting about Barclays; that Barclays had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were 'problematic actions' by some banks."[66] That senior compliance officer did not, however, inform the FSA "that Barclays was making its LIBOR submissions based on considerations of negative market or press perceptions of Barclays or that its LIBOR submitters' assessments of the appropriate rates for submission were being altered to adhere to the directive to be below 'the parapet.'"[67]

      b.    On another occasion, following an April 16, 2008 Wall Street Journal article speculating "that panel member banks were making LIBOR submissions lower than what they were actually paying for funds to prevent the market from concluding that the banks were desperate for cash," a senior Barclays Treasury manager informed the BBA "that [Barclays] had not been reporting accurately," although he further noted "Barclays was not the worst offender of the panel bank members."[68]

      89.98.  The DOJ also concluded that "During approximately November 2007 through approximately October 2008, certain employees at Barclays sometimes raised concerns with individuals at the BBA, the [FSA], the Bank of England, and the Federal Reserve Bank of New York concerning the diminished liquidity available in the market and their views that the Dollar LIBOR fixes were too low and did not accurately reflect the market."[69]  Those employees, the DOJ found, "attempted to find a solution that would allow Barclays to submit honest rates without standing out from other members of the Contributor Panel, and they expressed the view

---

[66] Barclays CFTC Order at 22.
[67] *Id.*
[68] *Id.* at 23.
[69] Barclays DOJ SOF ¶42.

that Barclays could achieve that goal if other banks submitted honest rates."[70] The DOJ noted, however, Barclays' communications to regulators "were not intended and were not understood as disclosures through which Barclays self-reported misconduct to authorities."[71]  Indeed, following those communications, "Barclays continued improperly to take concerns about negative publicity into account when making its submissions."[72]   Moreover, the DOJ emphasized, "on other occasions, those employees did not provide full and accurate information during their conversations with these external parties."[73]

90.99.  The CFTC similarly found that UBS's submissions were false:

> A bank's concerns about its reputation, negative market or press reports, or its trading positions and related profits are not legitimate or permissible factors upon which a bank may base its daily benchmark interest rate submissions. Benchmark interest rate submissions convey market information about the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets and a bank's, such as UBS's ability to borrow funds in the particular markets. By basing its submissions, in whole or in part, on UBS's trading positions and at times its reputational concerns, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR, Euribor, and Euroyen TIBOR were based on and solely reflected the costs of borrowing unsecured funds in the relevant interbank markets and were truthful and reliable.

UBS CFTC 52.

91.100.UBS also knew that all banks were artificially suppressing USD LIBOR as a "pack."  As UBS admitted and acknowledged corporate responsibility for, "[a]t least some at UBS recognized that during this period, the 'pack' of Contributor Panel banks was not a reliable reference point for the bank's LIBOR submissions."   DOJ UBS ¶ 101. As is reflected in a

---

[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*

September 22, 2008 electronic chat between an ALM employee[74] and another UBS employee:

| UBS Employee: | why is the [Investment Bank] cash curve for USD so much higher than Libor? offered 35bps above libor currently |
|---|---|
| ALM employee: | because the real cash market isn't trading anywhere near Libor . . . Libors currently are even more ficticious than usual |
| UBS Employee: | isn't libor meant to represent the rate at which banks lend to each other? |
| ALM employee: | that's the theory . . . in practise, it's a made up number . . . hence all the critisism it was getting a few months ago[[14]] |
| UBS Employee: | why do banks undervalue it in times like this? |
| ALM employee: | so as to not show where they really pay in case it creates headlines about that bank being desparate for cash . . . I suspect |

UBS DOJ ¶101(DOJ citations omitted).

92.101.On May 21, 2008, a Wall Street Journal reporter asked UBS, by email, why, back in mid-April UBS, UBS had been "paying 12 basis points for [commercial paper] more than it was posting as a Libor quote?" The senior manager heading ALM forwarded a proposed answer to the question to the Group Treasury senior manager in Stamford, stating: "the answer would be 'because *__the whole street was doing the same and because we did not want to be an outlier in the libor fixings, just like everybody else__*.'" DOJ ¶ 117 (emphasis added)

93.102.UBS and Barclays were correct: all other ~~Defendants~~ panel banks were submitting USD LIBORs that were too low. And every Defendant knew this, just as UBS and Barclays did.[75]

## E.    ~~Defendants~~ The Panel Banks Suppressed "Within The Pack"

---

[74] ALM refers to the Asset and Liability Management group at UBS. According to the DOJ agreement, ALM "is the part of the Investment Bank Division which managed the bank's liquidity buffer and issuance of new commercial paper and certificates of deposit. Group Treasury provided guidance to ALM on funding issues. The head of ALM worked for the Investment Bank Division." DOJ UBS ¶ 17.

[75] While the DOJ's agreement with RBS does not discuss USD suppression, RBS's agreement with DOJ "encompasses RBS's submissions for the additional benchmark rates listed in Attachment C," which is held in confidence. RBS DOJ NPA ¶2. In addition, "In April 2010, RBS began an investigation into potential USD LIBOR-related misconduct in the form of potential USD suppression." The results of that investigation have not been published.

94.103. The empirical evidence shows that ~~Defendants~~the panel banks suppressed in a pack: they submitted LIBOR rates at similarly suppressed levels and yet diverged dramatically and in unpredictable ways from benchmark rates that tracked market fundamentals.

95.104. The Barclays and UBS investigations confirm that ~~Defendants~~the panel banks attempted to, and did, stay "within the pack" of LIBOR submissions – a pack that "stayed low." As Barclays admitted,

> Manager-1 explained that Contributor Panel banks are submitting rates that are too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at." Manager-1 explained his/her view that Barclays was posting higher LIBORs than any other bank, and that other banks "are reluctant to post higher and because no one will get out of the pack, **the pack sort of stays low**."

Barclays DOJ ¶ 43 (November 29, 2007) (emphasis added).[76]

96.105. UBS issued standing instructions during various times during the Class Period to stay within the middle of the pack of USD LIBOR submissions. For example, "[o]n April 17, 2008, Submitter Advisor-2 – who was tasked with advising the U.S. Dollar submitter each day – sent an email to the U.S. Dollar LIBOR submitter informing him/her that 'the guidance I got from my management with regards to libors is that we should aim to be in the **_middle of the pack_**.'" UBS DOJ ¶ 115 (emphasis added). "Immediately after this direction was issued on or about April 17, 2008, UBS's LIBOR submissions were in the middle of the submissions of the Contributor Panel banks for the next several days." *Id.* ¶ __.

97.106. Later communications within UBS discussing the reasons behind the "middle of the pack" directive revealed that all panel banks were following similar instructions to stay

---

[76] In another discussion, the DOJ notes that Manager-1 "did not disclose Barclays's management directive to submit lower LIBORs in order to avoid negative media attention, which directive had resulted in improperly low LIBOR submissions." Barclays DOJ ¶ 44.

within the middle of the pack.  As a UBS employee explained, "***the whole street was doing the***

***same*** and we did not want to be an outlier in the libor fixings, just like everybody else." UBS

DOJ ¶ 117 (emphasis added).

98.107. While UBS may have briefly attempted on June 2, 2008 to move its submissions

"closer" to where it was actually obtaining cash in response to media pressure, UBS quickly

reversed course and, during the week of June 16, 2008, "a Zurich-based UBS senior manager

directed U.S. Dollar LIBOR submitters to lower their submissions over the next three days 'to

***get in line with the competition***' because, by contributing LIBOR submissions closer to CD and

CP issuance levels, UBS was becoming an outlier relative to other Contributor Panel banks."

UBS DOJ ¶120.  Following this instruction, "on June 18, 2008, UBS's 3-month U.S. Dollar

LIBOR submissions immediately dropped 5 basis points, to the 'middle of the pack' of the

Contributor Panel banks." *Id.* ¶ 121.

99.108. As UBS admitted, "[f]rom that time, and for approximately the next 10 months,

UBS's 3-month U.S. Dollar LIBOR submissions were ***identical*** to the published LIBOR fix, and

largely consistent with the published LIBOR fix in the other tenors."  UBS DOJ SOF ¶122

(emphasis added).  This was the case even though "[d]uring this 10-month period, there were

significant disruptions in the financial markets, affecting individual financial institutions in

different ways." UBS DOJ SOF ¶ 123.

100.109. ____ "Communications reflecting this 'middle of the pack' approach [at UBS]

to formulating LIBOR submissions continued in late 2008 and early 2009."  UBS DOJ SOF

¶124.

101.110. ____ Barclays also admitted that, during this period, it followed instructions

from its managers to stay "within the pack" of submissions from other panel banks:

According to internal Barclays communications, for certain time periods, Barclays management instructed the Barclays Dollar LIBOR submitters not to be an "outlier" compared to other Contributor Panel banks, even if Barclays contributed the highest rate; Barclays could be "at the top of the pack" but not too far above the next highest contributor. In adopting that approach, certain managers believed that Barclays's submitted rates typically would be in the upper quartile of rates submitted by the Contributor Panel banks and thus excluded from the rates used in the calculation of the LIBOR fix. For certain other periods, however, management did not want Barclays to submit a rate higher than other Contributor Panel banks, and instructed the Dollar LIBOR submitters to stay "within the pack" of other members of the Dollar LIBOR Contributor Panel, and to submit rates "in line" with the other contributors. To the extent that those managers had any concerns about Barclays's submissions being used in the calculation of the LIBOR fix, those concerns apparently were outweighed by their priority for Barclays's submissions to be "***within the pack***."

Barclays DOJ SOF ¶37 (emphasis added).

~~102.~~111.    On April 27, 2008, a Barclays manager conceded, "***to the extent that, um, the LIBORs have been understated, are we guilty of being part of the pack? You could say we are***." FSA ¶ 131. As one Barclays submitter put it, "just set it where everyone else sets it, we do not want to be standing out." Barclays FSA Final Notice ¶ 123.

~~103.~~112.    In late October 2008, for example, "a member of senior management conveyed an instruction to the LIBOR submitters, through their supervisor, that Barclays' U.S. Dollar and Sterling LIBOR submissions needed to be lowered to be within the pack." Barclays CFTC 24. "In emails and other communications, Barclays' submitters continued to indicate into at least mid-2009 that they were still basing their submissions at levels to minimize market or press speculation about Barclays." Barclays CFTC 25.

~~104.~~113.    On November 27, 2007, a Barclays manager expressed the view, just as UBS had, that other banks also wanted to stay within the pack: "other banks 'are reluctant to post higher and because no one will get out of the pack, the pack sort of stays low.'" Barclays DOJ ¶ 43.

105.114.     Barclays instructed its employees to follow the directive to stay within the pack on a day-to-day basis. On November 30, 2007, for example, a "senior Barclays Treasury manager" spoke with Barclays' "senior U.S. Dollar LIBOR submitter," who was "seeking guidance on his submissions."[79] During that conversation, the senior Treasury manager "related his understanding that senior management had discussed the issue and directed them to continue to 'stick within the bounds[,] so no head above [the] parapet.'"[80] The Treasury manager also told the LIBOR submitter "that they would have to deal with the settings, meaning how to make LIBOR submissions per this directive, on 'a day-to-day-basis.'"

106.115.     Even the BBA acknowledged in April 2008 that no panel banks were "clean-clean" and that it understood what would happen to any bank that "moved against the trend of lower submissions."

> At this time, a senior Barclays Treasury manager informed BBA in a telephone call that it had not been reporting accurately, although he noted that Barclays was not the worst offender of the panel bank members. "We're clean, but we're dirty-clean, rather than clean-clean." ***The BBA representative responded, "no one is clean-clean."*** The senior Barclays Treasury manager replied "no, because of the very fact of what happened to us… We were clean .. the market … reacted accordingly. And that's why we stepped away again." The senior Barclays Treasury manager was referencing the market speculation about Barclays' high LIBOR submission in early fall 2007. ***The BBA representative indicated that he understood what happened to any bank that moved against the trend of lower submissions….***

> Barclays did not explain in these calls that it was making its LIBOR submissions pursuant to a management directive and not in accordance with BBA's definition and criteria or consistent with the costs of obtaining unsecured funds in the London interbank money market.

Barclays CFTC p. 23.

**F.     ~~Defendants~~ The Panel Banks Conspired To Suppress As a Pack By Sharing Confidential LIBORs**

107.116.     Direct evidence shows that ~~Defendants~~ the panel banks' conspiracy to

suppress LIBOR as a pack was facilitated by sharing LIBOR bids with each other ***before they were submitted***, in contravention of the LIBOR rules that required the submissions to remain confidential.

~~108.~~117.      For example, a November 29, 2007 email shows that Barclays knew, in advance of the submission deadline, the proposed confidential submissions of ***every USD LIBOR panel bank***.

> On 29 November 2007, all the contributing banks' submissions for one month US dollar LIBOR increased by a range of 35 to 48 basis points. Barclays' submission increased from 4.86 on 28 November to 5.3 on 29 November (an increase of 44 basis points). The offer that Barclays saw in the market was 30 basis points higher, at 5.60. Barclays' Submitter had intended to submit a rate of 5.50 on that day. However he was overruled on a conference call during which the submissions were discussed, as a rate of 5.50 was expected to draw negative media attention (***as this would have been 20 basis points above the next highest submission***). Manager E said on the call that ***"it's going to cause a shit storm"***. Barclays therefore submitted a rate of 5.30, which was in line with another contributing bank's submission that day.

> Barclays FSA ¶118 (emphasis added).

~~109.~~118.      Barclays could not have known in advance that its proposed submission would be "20 basis points above the ***next highest submission***" unless it knew the proposed submissions of ***every other panel bank before those rates were published***.   A review of the publicly available 1M LIBOR submissions confirms what is implied by FSA ¶ 118:  Barclays had advance knowledge that the "next highest submission" of the other 15 panel banks was going to be 5.30, which is exactly 20 basis points below the 5.50 that Barclays had ***intended to submit that day***.

**1 Month USD LIBOR Submissions**

| Date | BTMU | Barc | BAC | Citi | CS | DBK | HBOS | HSBA | JPM | LlOY | Norin | Rabo | RBC | RBS | UBS | WestLB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/28/2007 | 4.82 | 4.86 | 4.9 | 4.83 | 4.9 | 4.78 | 4.82 | 4.8 | 4.82 | 4.82 | 4.85 | 4.81 | 4.815 | 4.83 | 4.8 | 4.82 |
| 11/29/2007 | 5.25 | 5.3 | 5.25 | 5.18 | 5.25 | 5.18 | 5.3 | 5.2 | 5.25 | 5.25 | 5.23 | 5.2 | 5.2 | 5.18 | 5.16 | 5.22 |

Barclays used its advance knowledge of every bank's confidential submissions to alter its submission to further suppress LIBOR to stay within the pack.

~~110.~~119.    The high volatility in LIBOR submissions between November 28 and November 29, 2007 also shows why it would have been impossible for Barclays – or any other panel bank – to stay within the pack without colluding to share confidential LIBOR submissions. The banks could not have predicted the submissions of other panel banks on November 29, 2007 based solely on the previous day's public submissions because submissions moved on average approximately 40 basis points from the previous day. Nor could they have predicted the submissions of other panel banks on November 29, 2007 based on publicly available information about market fundamentals. The Eurodollar benchmark, which captured changes in market fundamentals, moved much more dramatically between November 28th and November 29th than LIBOR did: the Eurodollar benchmark moved 70 basis points that day (from 4.9 to 5.6), whereas LIBOR only moved 40 basis points (from 4.82 to 5.22). Rather than basing their November 29, 2007 submissions on the LIBOR definition, or on predictions of what other banks would do, a plausible inference is that every panel bank colluded to share pricing information in order to stay low as a pack.

~~111.~~120.    Nor was this an isolated event: Barclays' managers issued standing instructions for certain periods not to be too far above the "next highest contributor" (Barclays DOJ SOF ¶ 37) – something that could not be achieved unless Barclays expected that it would continue to have access to the advance, confidential submissions of every other panel bank on an ongoing basis. And the instructions were very precise. According to the CFTC's review of the evidence it collected, "Senior Barclays Treasury managers provided the [LIBOR] submitters with the general guidance that Barclays's submitted rates should be ***within ten basis points*** of the

submissions by the other U.S. Dollar panel banks . . . ." Barclays CFTC 20 (emphasis added). Similarly, on April 26, 2008, a senior Barclays treasury manager asked USD submitters to "not sort of be *__ten basis points above the next__*" highest submitter.   Barclays CFTC p. 23.[77] Submitters could not be expected to stay within 10 basis points of the next highest submitter unless the senior treasury manager expected that Barclays would continue to have access to every Defendant's confidential LIBOR submissions in advance.   The Barclays Settlements indicate other instances when Barclays had advance knowledge of other banks' supposedly secret LIBOR quotes, either directly, through communication with brokers, or both. *E.g.*, FSA Final Notice ¶ 117 ("[B]rokers tell me that [another panel bank] is going to set at 5.15 for both (up 8.5 and 10 from yesterday)" (quoting Barclays email)); Transcript of Telephone Conference between Barclays and Federal Reserve Bank of New York, Oct. 24, 2008 ("[T]hree-month libor is going to come in at 3.53. . . . it's a touch lower than yesterday's but please don't believe it. It's absolute rubbish.").

112.121.   A plausible inference is that ~~Defendants~~the panel banks shared confidential LIBOR submissions in advance in order to enable them to collude to suppress LIBOR. That is what Barclays' did with the information on November 29, 2007.  Plaintiffs anticipate that discovery will reveal substantial additional evidence of the advance sharing of LIBOR submissions in service of the conspiracy.

113.122.   Based on the specific information provided by regulators in the UBS settlements regarding the nature and timing of management's directives, a consulting expert was able to test the likelihood that UBS submitters could have complied with management directives to stay within the pack absent collusion with the other ~~Defendants~~panel banks.

---

[77] Upon hearing this, the submitter told his supervisor that "he thought there was a compliance issue, [but] no internal action was taken to address his concerns." Barclays CFTC p. 23.

114.123.      The consulting expert looked specifically at the period beginning on or about June 18, 2008 and continuing until mid-April 2009. The consulting expert first looked at how often UBS's daily 3-month LIBOR submissions were "in the middle of the pack" during this six month period.

115.124.      The expert then undertook probability analysis to determine how likely it was the UBS LIBOR submitters could have been able to successfully target their submissions "in the middle of the pack" as often as they did absent collusion. To do this, the expert looked at relevant public information available to the LIBOR submitters at the time they made their submissions at around 11:00 a.m. London time. The consulting expert determined the relevant public information reasonably available to UBS LIBOR submitters to be: (i) prior day 3-month LIBOR submissions from the Panel Banks; and (ii) changes in the Federal Reserve Eurodollar Deposit (FRED) Rate, which would have reflected changes in relevant Market Fundamental from the prior day, and (iii) changes in the opening and closing prices of Eurodollar futures prices from one day prior and from two days prior. *See, e.g.*, ¶¶ 176–177.

116.125.      The expert determined that during the period of June 18, 2008 through April 14, 2009, UBS's LIBOR submitters were highly successful in meeting management's directive. Specifically, over this ten month period, UBS's 3-month LIBOR submissions were at or within the interquartile range (the two middle fourths of Panel Bank submissions that were averaged to calculate each day's LIBOR rates) 99.0% of the time, and were within the interquartile range (*i.e.*, not tied with the 4th lowest or 13th highest submission) 86.7% of the time. Further demonstrating UBS submitters' stunning ability to consistently target the actual published LIBOR rates despite a volatile market, the DOJ found that from June 18, 2008, and continuing for approximately the same 10 month period, UBS's 3-month LIBOR submissions

were identical to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors.

117.126.    Using probability analysis, the consulting expert then calculated the likelihood to be ***less than 1%*** that UBS could have achieved this remarkable consistency based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions.  The expert further determined that there was also **a *less than 1%*** likelihood that UBS could have achieved its consistent record during this period based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions and changes in the FRED Rate.  The expert also determined that there was also ***a less than 1%*** likelihood that UBS could have achieved its consistent record during this period based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions and changes in the Eurodollar opening or closing prices from either one day prior or from two days prior.

118.127.    As with the expert's conclusions in connection with the Eurodollar analysis above, the duration of, and the degree of successful compliance with management's specific LIBOR quote submission directives relative to where other Panel Banks' suppressed submissions fell on a daily basis further strongly support that the LIBOR suppression was accomplished through the collusive cooperation and agreement among the Panel Banks.

**G.    Defendants'  The Panel Banks' Collusion to Manipulate LIBOR To Benefit Individual Trading Positions**

119.128.    As noted above, at least some Defendants panel banks were motivated to participate in the conspiracy to suppress USD LIBOR partly in order to benefit their net trading positions.  In addition, Defendants the panel banks conspired to manipulate LIBOR currencies between at least January 2007 and June 2010 to benefit their daily trading positions, including by colluding to manipulate USD and Yen LIBOR.

48

120.129.    Even small shifts in LIBOR settings can have a huge impact on the profitability of Defendantsthe panel banks' LIBOR-Based Instruments.   For example, in October 2008, a UBS manager advised that "UBS had trading positions that would cause losses of ***USD 4m per basis point*** if 'libors move higher.'" UBS FSA ¶ 103.   Similarly, RBS admitted that "Because of the high value of the notional amounts underlying derivatives transactions tied to Yen and Swiss Franc LIBOR, even very small movements in those rates could have a significant positive impact on the profitability of traders' trading portfolios, and a correspondingly negative impact on their counterparties' trading positions." RBS DOJ SOF ¶78.

121.130.    Collusion to suppress LIBOR and collusion to manipulate LIBOR to benefit individual trading positions were motivated by precisely the same improper purpose: illegitimately protecting the banks' profitability using the banks' control of LIBOR.

1.    **RBS**

122.131.    In a deferred prosecution filed on February 6, 2013, RBS acknowledged and agreed that the DOJ will file a two-count criminal Information in the United States, alleging "one count of ***price-fixing***, in violation of the Sherman Act, Title 15, United States Code, Section 1." DOJ DPA (emphasis added).   As part of that agreement, RBS "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts." DOJ DPA ¶2.

123.132.    RBS agreed that by colluding to manipulate Yen LIBOR, RBS colluded to fix the price of LIBOR-based instruments because Yen LIBOR is a component of price of LIBOR-based instruments:

> Traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen LIBOR submissions, causing the manipulation of the

49

LIBOR reference rate on certain occasions. Because Yen LIBOR was a pricing component of derivatives contracts held by the financial institutions, the traders benefited from this agreement by affecting the profitability of the contracts on particular settlement dates.

RBS DOJ ¶ 82.

~~124.~~133.    On April 12, 2013, the DOJ charged RBS with one count of "price-fixing" in violation of Section 1 of the Sherman Act.  RBS admitted that it was responsible for the following acts, as charged in the Information

> From at least as early as 2007 through at least 2010, Defendant THE ROYAL BANK OF SCOTLAND PLC, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce.  The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendant and its co-conspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key price component of the price thereof, on certain occasions.

> In violation of Title 15, United States Code, Section 1.

~~125.~~134.    RBS also agreed that its Yen LIBOR price-fixing conspiracy lasted from at least as early as February 2007 through 2010:

> From at least as early as February 2007 through 2010, RBS regularly colluded with UBS to request that their respective Yen LIBOR submitters contribute Yen LIBOR submissions to benefit their trading positions. ¶ 43-65.

> RBS DOJ SOF ¶43.

Similarly, the FSA found that:

> Between February 2007 and June 2010, RBS, through two of its Derivatives traders, colluded with Panel Banks and Broker Firms in relation to JPY and CHF LIBOR submissions.

> RBS FSA ¶ 9.

~~126.~~135.    Documents published in the RBS orders and reports issued by various agencies confirm that RBS colluded, or expected that it would be able to collude, with every Yen

panel bank:

a.     Emails show that RBS colluded with at least 5 different Yen Panel Banks in fixing Yen LIBOR. RBS FSA ¶¶ 59-60, 65-67. For example, on June 6, 2009, a RBS trader (identified as Derivatives Trader B) enlisted a Broker to collude with at least 4 different panel banks to lower LIBORs in several tenors:

> Broker A:            *Alright okay, alright, no we've okay just confirming it.*
> *We've, so far we've spoke to [Panel Bank 3]. We've spoke to*
> *a couple of people so we'll see where they come in alright.*
> *We've spoke, basically... basically we spoke to [Panel Bank*
> *3], [Panel Bank 4], [Panel Bank 5], who else did I speak to?*
> *[Panel Bank 6]. There's a couple of other people that the boys*
> *have a spoke to but as a team we've basically said we want a*
> *bit lower so we'll see where they come in alright?*
>
> Derivatives Trader B:   *Cheers.*

(b)     As the FSA concluded, RBS engaged in "at least 30 wash trades in order to facilitate corrupt brokerage payments to Broker Firms," in many instances in exchange "for efforts to influence Panel Banks' JPY LIBOR submissions." FSA ¶¶ 63, 65.

(c)     RBS  also colluded with a sixth bank -- a Swiss Panel Bank - to fix CHF (Swiss Franc) LIBOR.

~~127.~~136.     Documents also confirm that, according to RBS, price-fixing of LIBORs was the norm, not the exception, during the financial crisis.  For instance, a RBS Submitter "observed to a Broker during the financial crisis that, in the absence of liquidity, 'people are just setting LIBORs to suit their books' and 'it's just where you've got your fixings really….'" RBS FSA ¶71.

~~128.~~137.     RBS manipulated USD LIBOR and other LIBOR currencies for profit, at least internally. For example, the FSA found, after reviewing the documents, that RBS "Primary Submitters took into account the impact of LIBOR or RBS's LIBOR submissions on the profitability of transactions in their money market trading books as a factor when making (or

51

directing others to make) RBS's JPY, CHF and USD LIBOR submissions." FSA ¶ 105.

~~129.~~138.    "In total, the misconduct involved at least 21 individuals at RBS, at least one of whom was a Manager." FSA ¶ 109.

### 2.    **UBS and Thomas Hayes**

~~130.~~139.    RBS admitted to the Antitrust Division of the Department of Justice that it colluded regularly with UBS to manipulate Yen LIBOR from at least as early as February 2007 through 2010.

~~131.~~140.    Thomas Hayes, who worked at UBS from the spring of 2006 through December 2009, was criminally charged with violating the Sherman Act by conspiring to fix Yen LIBOR, which is a component of price of LIBOR-based instruments:

> In or about May 2009, in the Southern District of New York and elsewhere, TOM ALEXANDER WILLIAM HAYES, the defendant, and his co-conspirators, including an employee at a major financial institution, and others known and unknown, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act. The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among HAYES and his co-conspirators, the substantial terms of which were to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.

~~132.~~141.    Documents show that, while Mr. Hayes was at UBS, UBS colluded with other Yen panel banks to manipulate Yen LIBOR with great frequency and for enormous profit from at least as early as January 2007 through at least September 2009.  According to CFTC's review of the documents:

> The [UBS] Senior Yen Trader conducted his extensive, systematic course of unlawful conduct to manipulate Yen LIBOR and periodically, Euroyen TIBOR, from shortly after he joined UBS in early July 2006 until his departure in the fall of 2009, following a dispute with UBS over his compensation.
>
> CFTC 11.

52

As with his internal requests, the Senior Yen Trader began coordinating regularly with derivatives traders at other panel banks by January 2007. The Senior Yen Trader coordinated with traders primarily at four panel banks whom he knew or had worked with previously.

CFTC 17

~~133.~~142.    The CFTC gave the following summary of a small sampling of the numerous communications between Mr. Hayes and other Yen Panel banks.

As with his internal requests, the Senior Yen Trader began coordinating regularly with derivatives traders at other panel banks by January 2007. The Senior Yen Trader coordinated with traders primarily at four panel banks whom he knew or had worked with previously. The Senior Yen Trader, or others acting on his behalf, made about 100 requests of traders at the other panel banks.

The Senior Yen Trader generally made requests of the other banks' traders, who regularly agreed to pass his requests to their Yen LIBOR or, on occasion, Euroyen TIBOR submitters. The Senior Yen Trader also made requests directly of the submitter of at least one bank. The other traders often conveyed success with comments such as, "done" and "we normally do well for u!!!"

For their own manipulative purposes of benefiting their derivatives trading positions, certain of the derivatives traders at the other banks sought reciprocating assistance from the Senior Yen Trader to make requests on their behalf to UBS's submitters. The Senior Yen Trader readily agreed to help the other traders. In fact, he often encouraged them to ask for help as a way to curry favor and ensure his requests were accommodated.

The following small sampling of the numerous communications between the Senior Yen Trader and derivatives traders at the other panel banks reveal:

- descriptions of the Senior Yen trader's strategy and his success in keeping rates "artificially high;

- how, as with the internal requests, the Senior Yen Trader pressed traders at the other banks for assistance particularly on key fixing dates around the IMM dates or the turn of the calendar year;

- how routine the requests were and how the traders believed that LIBOR was vulnerable to manipulation at their whim and for their benefit;

53

- that the requests covered a number of days of LIBOR submissions at times, such that one request could result in multiple days of false LIBOR submissions potentially affecting the fixing for the same period;

- the pressure the Senior Yen Trader felt to keep making money for UBS; and

- that the traders believed that they succeeded at times.

CFTC 17-18

134.143.     Within the collection of documents reviewed by the FSA, Mr. Hayes was involved in a high number of written requests evidencing collusion with other panel banks:

> The Senior Yen Trader and others at UBS made approximately 2,000 written requests of UBS's Trader-Submitters, traders at other panel banks and interdealer brokers to try to achieve their manipulative goals. The written requests of the Senior Yen Trader and others occurred on approximately 570 trading/reporting days, mostly between late 2006 and late 2009, which is approximately 75% of the time.

135.144.     UBS, through Mr. Hayes, colluded with other Yen LIBOR panel banks to suppress Yen LIBOR to benefit Mr. Hayes's trading positions.  Mr. Hayes colluded either directly with other Yen LIBOR panel banks or through intermediaries such as interdealer brokers.  For example:

a.     On Feb. 25, 2009, Mr. Hayes asked an employee at an interdealer broker, "Broker B"[78] for "low 1m and 3m," saying "we must keep 3m down" and "try for low on all of em." The broker responded: "ok ill do my best for those tday."[79]

b.     On Mar. 6, 2007, an employee at a bank identified in the Hayes-Darin Complaint as "a global financial services company headquartered in Edinburgh. Scotland"

---

[78] The Hayes-Darin Complaint identifies "Broker B" as "a broker employed at Brokerage Firm B, "a London-based, inter-dealer broker that, in exchange for commissions or other fees, matched buyers and sellers in various financial products, enabling them to engage in transactions."  Hayes-Darin Cmplt. at 5.
[79] Hayes-Darin Cmplt., Exh. 9.

("Trader C") requested that Mr. Hayes take steps to ensure low UBS Yen LIBOR submissions for all maturities: "can u go fr low everything plse?" Mr. Hayes responded that he would make the request but he personally needed a high 3-month Yen LIBOR fixing. Mr. Hayes then made a request to a UBS LIBOR submitter for low 1-month and 6-month Yen LIBOR submissions "hi pls don't forget low 1m and 6m!" The Hayes-Darin complaint notes that "[t]hat day, compared to the previous day, UBS's 1-month and 6-month Yen LIBOR submissions dropped by 2.0 and 2.5 basis points, respectively, consistent with Trader C's request to Hayes." Hayes-Darin Cmplt. at 22.

        c.      Between about Apr. 19 and Apr. 24, 2007, Mr. Hayes requested low Yen LIBOR submissions from Trader C.

                i.      On Apr. 19, 2007, Mr. Hayes asked Trader C "can you do me a favour and ask your cash guys for a low 3m" because Mr. Hayes had "some huge huge fixes." Trader C responded "will do my best I am pretty flat at the moment" "so don't really care."[80] The Hayes-Darin Complaint notes: "That same day, Bank C's 3-month Yen LIBOR submission was 0.65 percent, down from 0.67 percent the previous day." Hayes-Darin Cmplt at 22–23.

                ii.     The next day, Mr. Hayes thanked Trader C: "hi mate thanks for keeping 3m low y/day wd really appreciate it if u cld try for the same over the next few days . . . ."[81] Later that day, Mr. Hayes asked Trader C again: "i know i only talk to you when I need something but if you could ask your guys to keep 3m low wd be

---

[80] Hayes-Darin Cmplt., Exh. 15.
[81] Hayes-Darin Cmplt., Exh.15.

massive help as long as it doesn't interfere with your stuff."[82]   Mr.

Hayes followed up later, asking Trader C "mate did you manage to

spk to your cash boys?"   Trader C responded "yes u owe me they

are going 68 and 71"  Mr. Hayes responded "thx mate yes i do . . .

in fact i owe you big time."  Then later, after learning that Bank C

had made a 3-month Yen LIBOR submission of 0.64 percent that

day. Mr. Hayes exclaimed: "mater they set 64! . . . that's beyond

the call of duty!"[83]

    iii.    On Apr. 24, 2007, Mr. Hayes wrote "Trader C": "hello mate

thanks for the help on libors, if you cld ask for a low 3m for one

last day wd be big help"[84]

    iv.    The Hayes-Darin Complaint notes: "After three consecutive

trading days at 0.64 percent, Bank C's 3-month Yen LIBOR

submission increased to 0.65 percent the following day, on or

about Wednesday, Apr. 25, 2007." Hayes-Darin Cmplt. at 23.

~~136.~~145.    Further, after Mr. Hayes left UBS and started working with "Bank D,"

which the Hayes-Darin Complaint identifies as "a global financial services company

headquartered in New York, New York" (Hayes-Darin Cmplt. at 5)[85], Mr. Hayes continued to

collude to manipulate Yen LIBOR to benefit his trading positions, for example:

---

[82] Hayes-Darin Cmplt., Exh. 15
[83] Hayes-Darin Cmplt., Exh. 15.
[84] Hayes-Darin Cmplt, Exh. 15.
[85] The Hayes-Darin Complaint notes that "From in or about December 2009 through in or about September 2010, after leaving UBS, HAYES was employed as a senior Yen swaps trader at Bank D in Tokyo." Hayes-Darin Cmplt. at 6. The *Wall Street Journal* identified Defendant Citigroup as Mr. Hayes' employer immediately after Defendant UBS. David Enrich, "Rate-Rig Spotlight Falls on 'Rain Man'," *Wall Street Journal*, Feb. 8, 2013.

     a.     On May 12, 2010, Mr. Hayes told a rate submitter at UBS: "libors are going down tonight" "because i am going to put some pressure on people."[86]

     b.     Between Mar. 3 and 4, 2010, Mr. Hayes attempted to influence Bank C's Yen LIBOR submissions.

     i.     Mr. Hayes told a broker on Mar. 3, 2010, "i really need a low 3m jpy libor into the imm [the International Monetary Market date, which occurs quarterly on the third Wednesday of March, June, September, and December]," and "any favours you can get with the due at [Bank C] would be much appreciated" "even if he on;ly move 3m down 1bp." The broker said "i'll give him a nudge later, see what he can do" and then asked the Bank C submitter: "u see 3m jpy libor going anywhere btween now and imm?" noting "we have a mutual friend who'd love to see it go down, no chance at all?" The Bank C submitter said "haha TH by chance," and the broker responded "shhh."[87]

     ii.     The Hayes-Darin Complaint notes that, the next day, Bank C's 3-month Yen LIBOR submission decreased by one basis point compared to the previous day. Hayes-Darin Cmplt. at 26. After the LIBOR submissions were posted, the Bank C LIBOR submitter reported back to the broker: "Libor lower ;)," and the broker responded "good work!!!!"[88]

---

[86] Hayes-Darin Cmplt. Exh. 17.
[87] Hayes-Darin Cmplt., Exh. 18.
[88] Hayes-Darin Cmplt., Exh. 18.