# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In RE: | MDL No. 2262 |
| LIBOR-Based Financial Instrument Antitrust Litigation | Master File No. 1:11-md-2262-NRB |
| *This Application Applies to the Payne Case* | |

| | |
|---|---|
| CARL A. PAYNE, et al. | Civil Action No.: 1:13-cv-00598-NRB |
|        Plaintiffs, | |
|    vs. | |
| BANK OF AMERICA, et al., | |
|        Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS CARL A. PAYNE AND KENNETH W. COKER'S MOTION FOR CREATION OF A NEW HOMEOWNER CLASS GROUP AND FOR APPOINTMENT OF BARON & BUDD, P.C. AS INTERIM LEAD COUNSEL

In accordance with this Court's September 5, 2014 Order (MDL Dkt. 638), Plaintiffs Carl A. Payne and Kenneth Coker (collectively the "Homeowner Plaintiffs") submit this memorandum of law in support of their motion for the creation of a new putative class called the "Homeowner LIBOR Suppression Class," which consists of homeowners injured by Defendants' artificial suppression of the LIBOR rate.  For the reasons discussed below, the Homeowner Plaintiffs also move for the appointment of Baron & Budd, P.C. as interim lead counsel for the Homeowner LIBOR Suppression Class.

## PRELIMINARY STATEMENT

On December 31, 2012, Plaintiffs Carl A. Payne and Kenneth Coker filed a putative class action in the United States District Court for the Northern District of California, originally styled as *Carl A. Payne, et al. v. Bank of America Corp., et al.,* Case No. 4:12-cv-06571-DMR (N.D. Cal.) (now, Case No. 1:13-cv-00598-NRB (S.D.N.Y.)).  On January 25, 2013, the case was transferred from the Northern District of California and consolidated for pretrial purposes with this multi-district litigation proceeding, *In Re: Libor-Based Financial Instruments Antitrust Litigation,* Case No. 1:11-md-02262-NRB (S.D.N.Y.) (the "MDL").  *See* Payne Dkt. 9.

The Homeowner Plaintiffs' action is brought on behalf of homeowners who obtained LIBOR-based adjustable rate mortgage home loans ("ARM" loans) during the period from March 2007 to March 2011 (the "Homeowner LIBOR Suppression Class").  The Homeowner Plaintiffs allege that Defendants' suppression of the U.S. Dollar LIBOR rate (the three-month, six-month and one-year U.S. Dollar LIBOR rate) caused the members of the putative Homeowner LIBOR Suppression Class to incur artificially higher "margin" rates on their ARM loans which, in turn, caused such class members to pay more interest on their ARM loans.

Specifically, as discussed in detail below, the Homeowner Plaintiffs allege that, as a result of Defendants' suppression of the LIBOR rate, ARM loans originated during the period from March 2007 to March 2011 had artificially higher "margins" or "spreads" applied to them. In an ARM loan, the margin or spread is a fixed percentage that is added to an index rate (*i.e.*, the three-month, six-month or one-year U.S. Dollar LIBOR rate).  When an ARM loan is

originated, the margin is adjusted so that when it is added to the index rate, a "fully-indexed" market rate is achieved. Here, however, because the U.S. Dollar LIBOR index rate was suppressed, the added margin was necessarily increased to achieve a "fully-indexed" market rate. And, although Defendants arguably stopped suppressing the LIBOR rate sometime after the regulatory investigations in 2011, because the margin is set for the life of the ARM loan, members of the Homeowner LIBOR Suppression Class are nevertheless now stuck with an inflated margin for the life of their ARM loans. As a result, members of the Homeowner LIBOR Suppression Class are paying a higher interest rate than they would be paying had the Defendants not suppressed the U.S. Dollar LIBOR rate.

On September 5, 2014, this Court issued an Order, which, among other things, granted the parties leave "to file motions to serve as interim lead counsel for the proposed classes of lenders, homeowners, and students." *See* MDL Dkt. 638. Accordingly, the Homeowner Plaintiffs, by and through their undersigned counsel, on behalf of themselves and the proposed Homeowner LIBOR Suppression Class, hereby respectfully apply for the creation of a new putative class group known as the "Homeowner LIBOR Suppression Class" in this MDL, and to appoint them as interim Lead Plaintiffs and their counsel, Baron & Budd, P.C., as interim Lead Counsel for the putative class.

<u>**ARGUMENT**</u>

**I.     THE INTERESTS OF THE PUTATIVE HOMEOWNER LIBOR SUPPRESSION CLASS ARE NOT CURRENTLY REPRESENTED BY ANY EXISTING PUTATIVE CLASS GROUP**

As discussed above, the Homeowner Plaintiffs bring their action on behalf of themselves and all other U.S. residents who obtained LIBOR-based ARM loans during the period from March 2007 to March 2011, and who were damaged as a result of the artificial suppression of the U.S. Dollar LIBOR Rate (the "LIBOR rate"). None of the existing three putative class groups established in this MDL protects or represents the interests of the Homeowner LIBOR

Suppression Class.  Indeed, of the existing putative class groups established by the Court, none concerns claims by homeowners who obtained a U.S. Dollar LIBOR-based ARM loans.

The proposed putative Homeowner LIBOR Suppression Class consists of millions of borrowers who obtained LIBOR-based ARM loans during the period March 2007 and March 2011, and involves claims and legal theories distinct from the existing putative class groups in this MDL.  Almost half of ARM loans in the United States are tied to the LIBOR rate (typically the 6-month and 1-year LIBOR rate), with the remaining ARM loans tied to other indices such as the U.S. Treasury rate, the Prime Rate, etc.  When news of the Defendants' alleged artificial suppression of the LIBOR rate first surfaced, commentators suggested that consumers with LIBOR-based ARM loans may have actually benefitted from the suppression of the LIBOR rate because the interest rate on their ARM loans was artificially *lowered*.  That simplistic argument applies, if at all, to LIBOR-based ARM loans that originated *before* the Defendants' suppression of the LIBOR rate in early 2007, however, consumers who *originated* a LIBOR-based ARM loan *during* the period that the Defendants artificially suppressed the LIBOR rate (*i.e.* during the period 2007 to 2011), were indisputably harmed.  To appreciate how such borrowers were harmed requires an understanding of the mechanics of an ARM loan.

The interest rate on an ARM loan is determined by two variables: one is the "index" rate and one is the added "spread" or "margin" rate.  The two components make up the "fully-indexed" ARM loan rate which a borrower pays.

The index rate is simply a floating interest rate which is used as a benchmark to "adjust" the interest rate on the ARM loan at various points in time over its term.  Historically, the most popular index rate for an ARM loan has been the six-month and one-year LIBOR rate, followed by U.S. Treasury rates.  As the index rate fluctuates it causes the interest rate on the ARM loan to also fluctuate.

By contrast, the "margin" rate that is added to the index rate remains fixed over the entire term of the ARM loan.  The margin is set at the origination of the ARM loan, it is expressed in percentage points and it gets added to the index rate to calculate the ARM loan's fully-indexed

interest rate.  For example, a one-year LIBOR-based ARM Loan that originated in 2007 may have had a fully-indexed interest rate of 6.12%, which was achieved by using the published one-year LIBOR rate of 5.12% as its "index" rate and adding a "margin" rate of 1%.

The Homeowner Plaintiffs' Complaint alleges that the Defendants' artificial suppression of the LIBOR rate caused members of the Homeowner LIBOR Suppression Class to incur artificially higher interest rates on all LIBOR-based ARM loans originated during the period from March 2007 to March 2011 (the "Manipulation Period").  Specifically, the Homeowner Plaintiffs allege that, as a result of Defendants' suppression of the LIBOR rate, the LIBOR-based ARM loans that originated during the Manipulation Period had artificially higher *margin* rates applied to them.  Taking the above example, if the published one-year LIBOR index rate used to calculate a 6.12% LIBOR-based ARM loan in 2007 was artificially suppressed by 20 basis points (*i.e.* the LIBOR rate was suppressed to 5.12% instead of 5.32%), then the margin that was added to such ARM loan to achieve the fully-indexed rate of 6.12% was necessarily inflated by 20 basis points (*i.e.* the margin rate was 1% instead of .8%), and that inflated margin rate remained fixed for the *entire* term of the ARM loan.  Thus, when the Defendants arguably stopped suppressing the LIBOR rate after the regulatory investigations in 2011, and the LIBOR rate "corrected" up 20 basis points, borrowers were nevertheless stuck with an *inflated* margin rate for the entire ARM loan term.  As a result, all borrowers who obtained a LIBOR-based ARM loan *originated during* the Manipulation Period were thereafter required to pay a higher interest rate than they would have paid had the Defendants not artificially suppressed the LIBOR rate.

Based on the foregoing, the Homeowner Plaintiffs filed a Complaint which asserts claims under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), claims for common law fraud and, at the moment, claims under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").  However, in their presently contemplated First Amended Complaint ("FAC"), the Homeowner Plaintiffs intend to voluntarily dismiss their RICO claim (in light of this Court's prior rulings), and to add claims for

breach of their mortgage contracts (which expressly required lenders to utilize the actual "interbank offered rates for [three month, six month and one-year] U.S. dollar-denominated deposits in the London market…" in setting ARM loan rates) and breach of the attendant covenant of good faith and fair dealing, against only those defendants with whom the Homeowner Plaintiffs entered into LIBOR-based ARM loan agreements (*i.e.,* Defendants JPMorgan Chase, Citibank and Bank of America).  The Homeowners Plaintiffs' First Amended Complaint will also add three additional plaintiffs.

> A.    **The Current Class Structure in the MDL Does Not Include Claims on Behalf of Homeowners Who Obtained LIBOR-Based ARM Loans.**

To date, the Court has established the following putative class groups in this MDL:  (i) the "Over-the-Counter Class"; (ii) the "Exchange-Based Class"; and (iii) the "Bondholder Class."

The Over-the-Counter Class, the Exchange-Based Class and the Bondholder Class all concern plaintiffs who engaged in various financial transactions with the Defendants, directly or indirectly, including (1) plaintiffs who purchased from the Defendants a financial instrument that paid interest indexed to LIBOR (the "Over-the-Counter-Class"), (2) plaintiffs who transacted in Eurodollar futures and options on exchanges such as the Chicago Mercantile Exchange (the "Exchange-Based Class") and (3) plaintiffs who invested in bonds or other debt security instruments whose interest was payable at a rate linked to the LIBOR rate (the "Bondholder Class").  None of these classes represents, or purports to represent, homeowners who obtained LIBOR-based ARM loans.

It is indisputable that the nature and composition of the putative Homeowner LIBOR Suppression Class is distinct from the existing class groups in this MDL.  Quite simply, there is no overlap between any of the three existing class groups and the Homeowner LIBOR Suppression Class.

**B.** **The Homeowner LIBOR Suppression Class Is Distinct from the Putative Classes Alleged in the *Adams* and *Earle* Complaints.**

To the Homeowners Plaintiffs' knowledge, there are only two other pending cases in this MDL that purport to represent the interests of homeowners – *Adams v. Bank of America Corp., et al.*, Case No. 1:12-cv-07461-NRB (S.D.N.Y.) (*See* MDL Dkt. 574 and Item No. 9 on the spreadsheet provided by Liaison Counsel), and *Earle v. Bank of America Corp., et al.*, Case No. 1:13 cv-00407 NRB (S.D.N.Y.) (*See* Dkt. 574 and Item No. 12 on the spreadsheet provided by Liaison Counsel).

Counsel for the *Adams* plaintiffs intends to voluntarily dismiss his case.  And, the *Earle* case is predicated on a completely different set of facts, and asserts different legal theories. Indeed, unlike the Complaint filed by the Homeowner Plaintiffs, which addresses Defendants' *suppression* of the LIBOR rate[1], the charging allegations in the later-filed *Earle* case are based

---

[1] Like virtually all of the other complaints in this MDL, the Homeowners Plaintiffs in this *Payne* case allege that the Defendants artificially *suppressed* the U.S. Dollar LIBOR Rate, regardless of whether that rate was the three-month, six-month or one-year U.S. Dollar rate.  Indeed, the Statement of Facts between the United States Department of Justice and Barclays Bank confirms that"[f]rom approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that *under-reported* its perception of its borrowing costs and its assessment of where its Dollar LIBOR submissions should have been. … Consequently, on some occasions, Barclays submitted rates that were false because they were *lower* than Barclays otherwise would have submitted and contrary to the definition of LIBOR." SOF ¶ 36 (emphasis added).   Additionally, Barclays admitted that "[o]n several occasions, e-mail messages and phone conversations involving a Barclays Dollar LIBOR submitter reflected the LIBOR submitter's belief that, due to the pressure from Barclay's management, Barclays was submitting its LIBOR contributions *lower* than the rate at which Barclays was borrowing or could have borrowed funds, and *lower* than the rate at which Barclays should have been submitting its LIBOR contributions, and thus that submitter believed s/he was contributing a false rate."  *Id.* at ¶ 39.  "Those managers wanted to prevent any adverse conclusions about Barclay's borrowing costs, and more generally, its financial condition, because they believed that those conclusions would be mistaken and that *other Contributor Panel banks were submitting unrealistically low Dollar LIBORs*."  *Id.* at ¶ 40 (emphasis added).  In fact, the Department of Justice noted the existence of an email exchange between a Barclay's manager and LIBOR submitter that reflected an *underreporting* of its *one-year* U.S. Dollar LIBOR rate.  *See Id.* ¶ 46. Similarly, the Statement of Facts between the Department of Justice and UBS confirms UBS directed U.S. Dollar LIBOR submitters to "err on the *low* side" in order to protect the bank's reputation.  SOF ¶ 103, 106-107 (emphasis added).  Indeed, emails from UBS U.S. Dollar

on the theory that the six-month and one-year LIBOR rates were *inflated* on certain dates that ARM loans "re-set," which caused certain homeowners to pay higher interest rates. Although the named plaintiffs in the original *Earle* complaint all appear to have originated LIBOR-based ARM loans *prior* to the Manipulation Period (as opposed to the Homeowner Plaintiffs who originated their ARM loans *during* the Manipulation Period), the *Earle* class of plaintiffs, their legal theories and their alleged injury are distinct from those alleged by the Homeowner Plaintiffs, such that different counsel for each class group is necessary.

By Order dated October 18, 2011, this Court concluded that separate putative classes should be maintained for the Over-the-Counter Class and the Exchange-Based Class because two distinct classes "may be differently positioned at various stages of litigation, creating a potential conflict in their joint representation." *See* MDL Dkt. 32. The Court also stated that "separate representation is advisable because the two categories of plaintiffs may require different treatment in the event of settlement." *Id*. Similar distinctions are also present here. Although the Homeowner Plaintiffs and the *Earle* plaintiffs represent homeowners harmed by Defendants' manipulation of the LIBOR rate, they assert distinctly different and potentially conflicting legal theories and, thus, they cannot be represented by the same counsel. *See De Figueiredo v. Trans World Airlines, Inc.*, 55 F.R.D. 44, 47 (S.D.N.Y. 1971) ("In th[e] case, [*Dupont v. Southern Pacific Company*, 366 F.2d 193, 196 (5th Cir. 1966)], the Fifth Circuit held that it was an abuse of discretion for the trial court to order consolidation where two sets of plaintiffs with opposing interests were represented by the same lead counsel. In the instant case no such danger exists because the plaintiff in the *De Figueiredo* case and the plaintiffs in the *Maguire* case are represented by different counsel."); *see also Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093, 1100 (5th Cir. 1973) (consolidation of cases is inappropriate where consolidation would result in confusion and create a conflict of interest for the lead counsel).

---

submitter confirm that "we are fixing on the <u>low side</u> of all other banks in the libor panel in <u>4-12 mo period</u> by several bps . . ." *Id.* at 107 (emphasis added).

Therefore, good cause exists to create two putative classes of homeowners -- the Homeowner LIBOR *Suppression* Class and Homeowner LIBOR *Inflation* Class -- to account for the differences in the legal theories, rights and remedies.

II.   **THE COURT SHOULD APPOINT PLAINTIFFS PAYNE AND COKER AS INTERIM LEAD PLAINTIFFS AND THEIR COUNSEL BARON & BUDD, P.C. AS INTERIM LEAD COUNSEL FOR THE PUTATIVE HOMEOWNER LIBOR SUPPRESSION CLASS**

   A.   **Plaintiffs Payne and Coker Will Fairly and Adequately Protect the Interests of the Homeowner LIBOR Suppression Class.**

Plaintiffs Payne and Coker are ideal representatives to serve as Lead Plaintiffs for the Homeowner LIBOR Suppression Class. Both are individuals who obtained LIBOR-based ARM loans during the Manipulation Period and who were damaged as a result of the suppression of the LIBOR rate. When they obtained their LIBOR-based ARM loans, they entered into standard ARM loan agreements which provided that the LIBOR rate would be used as the "index" rate and a fixed "margin" rate would be added to their LIBOR rates to achieve the "fully indexed rate" charged on their ARM loans. Their standard loan agreements also provided that fixed margin rate would be applied for the entire term of the ARM loan. When the Defendants' suppressed the LIBOR rate, they caused the margin rate on such ARM loans to increase. Stated differently, had the Defendants not suppressed the LIBOR rate, Plaintiffs Payne and Coker's margin rates would have been lower. And, because the inflated margin rates are applied for the life of their ARM loans, Plaintiffs Payne and Coker, and all members of the Homeowner LIBOR Suppression Class, have been forced to pay an artificially inflated interest rate on their ARM loans.

Plaintiffs and Coker's claims are typical of class members and they are ideally suited to serve as interim Lead Plaintiffs on behalf of the Homeowner LIBOR Suppression Class.

8

**B.      Baron & Budd, P.C. Should Be Appointed as Lead Interim Counsel for the Homeowner LIBOR Suppression Class Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.**

Rule 23(g)(3) of the Federal Rules of Civil Procedure authorizes this Court to "designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006) ("…where multiple overlapping and duplicative class actions have been transferred to a single district for the coordination of pretrial proceedings, designation of interim counsel is encouraged, and indeed is probably essential for efficient case management."). In determining the sufficiency of interim class counsel, a court may consider the factors enumerated in Rule 23(g)(1). *See, e.g., Parkinson v. Hyundai Motor America*, 2006 U.S. Dist. LEXIS 59055, at *6 (C.D. Cal. Aug 7, 2006); *In re Air Cargo Shipping Services Antitrust Litigation*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006).   And courts have held that the same standards apply as when selecting class counsel at the class certification stage.   *See, e.g., Michelle v. Arctic Zero, Inc.*, No. 12-cv-2063-GPC (NLS), 2013 U.S. Dist. LEXIS 30229, at *6-7 (S.D. Cal. Mar. 1, 2013) ("While Rule 23(g)(1) applies to class counsel and does not address interim class counsel, courts look to Rule 23(g)(1) factors to appoint interim class counsel."); *Hill v. Tribune Co*., No. 05 C 2606, 2005 U.S. Dist. LEXIS 23931, at *3 (N.D. Ill. Oct. 13, 2005) ("*Rule 23(g)* provides criteria to consider when appointing class counsel.   No distinction is made regarding appointing interim counsel.").

The Court should, therefore, consider the following factors in appointing interim class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

*Michelle*, 2013 U.S. Dist. LEXIS 30229, at *7-8 (citing Fed. R. Civ. P. 23(g)(1)(A)).   The "Court 'may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.'"   *Id* at *8 (citing Fed. R. Civ. P. 23(g)(1)(B)).

These factors strongly support appointing Baron & Budd, P.C. ("Baron & Budd") as interim Class Counsel for the Homeowner LIBOR Suppression Class.

> **1.**     **Baron & Budd Has Performed Substantial Work on Behalf of the Homeowner LIBOR Suppression Class.**

Baron & Budd has done substantial work to identify and investigate the claims of the proposed Homeowner LIBOR Suppression Class and to initiate this litigation, including interviewing class members, analyzing the evidence, retaining ARM loan experts, economists, accountants and mathematicians.  After significant investigation and analysis of the facts and the law, Baron & Budd prepared the first case filed on behalf of homeowners harmed by Defendants' suppression of the LIBOR rate.  Since the filing of that case, Baron & Budd has interviewed dozens of additional class members and has been retained by three additional plaintiffs.  And, since the filing of the original action, Baron & Budd attorneys attended this Court's hearing on Defendants' motions to dismiss, and subsequent hearings, first advocated for the creation of a new homeowner class, and worked collaboratively with liaison counsel to provide the Court with requested information.

> **2.**     **Baron & Budd Has Significant Experience in Successfully Litigating Financial and Complex Class Actions and Knowledge of the Applicable Law.**

Baron & Budd has extensive experience and a has taken a leadership role in numerous multi-state, complex class action cases like this, involving federal claims, common law claims and the laws of many different states.  A representative sample of such cases includes:

- Served on the Plaintiffs' Steering Committee in a multi-state class action concerning the manipulation of bank overdraft fees which resulted in a $410 million settlement with Bank of America and a $110 million settlement with JPMorgan Chase.

- Lead counsel in *Bias v. Wells Fargo*, a nationwide putative class action involving a fraudulent scheme to charge and conceal inflated loan servicing fees.

- Lead counsel in *Ellis v. J.P. Morgan Chase & Co.*, a nationwide putative class action involving a fraudulent scheme to charge and conceal unlawful loan servicing fees.

- Lead counsel in *Stitt v. Citibank, N.A.*, a nationwide putative class action involving a fraudulent scheme to charge and conceal unlawful loan servicing fees.

- Lead counsel in *Cirino v. Bank of America, N.A.*, a nationwide putative class action involving a fraudulent scheme to charge and conceal unlawful loan servicing fees.

- Lead counsel in *Vega v. Ocwen Financial Corporation*, a nationwide putative class action involving a fraudulent scheme to charge and conceal unlawful loan servicing fees.

- Lead counsel in *Waldrup v. Countrywide Financial Corporation*, a nationwide putative class action involving fraudulent scheme to charge and conceal fees for manipulated and inflated real property appraisals.

- One of only four firms chosen to serve on both the Plaintiffs' Executive Committee and Steering Committee of the Gulf Oil Spill MDL case.

- One of a handful of firms who achieved a landmark nationwide settlement involving the manufacture and sale of defective Chinese drywall, valued at between $800 million and $1 billion.

- Represented the states of Mississippi, Maryland, Kentucky, West Virginia, South Carolina, Utah and New Mexico in lawsuits against GlaxoSmithKline arising out of the fraudulent marketing of the drug Avandia that resulted in a $177 million settlement.

- Represented over 200 water providers from 17 states in lawsuits to recover the costs of removing a gasoline additive which contaminated their water supplies.  The Firm recovered approximately $800 million.

### 3.    Baron & Budd Has, and Will Commit, Substantial Resources to Represent The Homeowner LIBOR Suppression Class.

Finally, Baron & Budd is one of the oldest and most successful plaintiff's firms in the country.  Our practice is dedicated to cases like this.  We have 36 lawyers and 126 support staff, including paralegals and technical support personnel, in offices in Dallas, Austin, Baton Rouge and Los Angeles.  We have the talent, personnel and capital necessary to represent the Homeowner LIBOR Suppression Class, and have already demonstrated a willingness to expend these resources to properly and efficiently prosecute these actions.  The attorneys representing the Homeowner LIBOR Suppression Class have a history of vigorously representing Plaintiffs in cases throughout the United States.  The qualifications, specialized training and relevant work

11

history of Baron & Budd's key personnel, and of the Firm as a whole, are set forth in the attached Firm Brochure.

Baron & Budd will commit the time, energy, and financial resources to this case, making it a matter of our highest priority.

Since the firm's founding almost 40 years ago, Baron & Budd has garnered national acclaim for its complex litigation work on behalf of plaintiffs in cases like this.  A representative sample of the firm's noteworthy accolades include the following:

- Named by the *National Law Journal* as one of America's Elite Trial Lawyers in 2014;

- Repeatedly named to the *National Law Journal's* "Plaintiffs' Hot List" of exemplary plaintiffs' firms in the United States;

- Winner of the *Public Justice Foundation's* Trial Lawyer of the Year Award for its representation of Arizona residents impacted by groundwater contamination;

- Finalist for *Public Justice Foundation's* Trial Lawyer of the Year Award for the recovery of more than $400 million in product liability case filed on behalf of 150 municipalities from 17 states and for its bank overdraft fee class action litigation;

- Selected by *American Lawyer* as one of the sixteen most successful plaintiffs' firms in the country; and

- Repeatedly selected by *The Legal 500* as one of the country's premier law firms in class action litigation.

///

///

///

## CONCLUSION

For all of the foregoing reasons, the Homeowners Plaintiffs and their counsel respectfully request that the Court establish a new putative Homeowner LIBOR Suppression Class, and appoint Plaintiffs Carl A. Payne and Kenneth Coker as interim Lead Plaintiffs and their counsel, Baron & Budd, P.C., as interim Lead Counsel for such class.  No other class group presently established by the Court in this MDL represents this class group, and no other class group adequately protects the unique interests of the Homeowner LIBOR Suppression Class.

Dated:  September 15, 2014                               BARON & BUDD, P.C.

                                                                   /s Daniel Alberstone

                                                  By:   Daniel Alberstone

                                                         Daniel Alberstone
                                                         dalberstone@baronbudd.com
                                                         Roland Tellis
                                                         rtellis@baronbudd.com
                                                         Mark Pifko
                                                         mpifko@baronbudd.com
                                                         Michael Isaac Miller
                                                         imiller@baronbudd.com
                                                         David Fernandes
                                                         dfernandes@baronbudd.com
                                                         BARON & BUDD, P.C.
                                                         15910 Ventura Boulevard, Suite 1600
                                                         Encino, California 91436
                                                         Telephone:     (818) 839-2333
                                                         Facsimile:      (818) 986-9698