September 23, 2014

**By ECF and Hand Delivery**

Honorable Naomi Reice Buchwald
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, MDL No. 2262,
11 Civ. 2613, Master File No. 1:11-md-2262-NRB

Dear Judge Buchwald:

We write on behalf of Defendants Coöperatieve Centrale Raiffeisen-Boerenleenbank
B.A. ("Rabobank"), and Lloyds Banking Group plc, Lloyds Bank plc (formerly known as Lloyds
TSB Bank plc) and HBOS plc (collectively, "Lloyds") in response to Plaintiffs' reply letter of
September 15, 2014 (the "September 15 Letter") (Dkt. No. 648).  In that letter, Plaintiffs assert
for the first time that the Court erred in indicating this past June (consistent with its ruling in
March 2013) that CEA manipulation claims premised on trader conduct are time-barred to the
same extent as CEA manipulation claims premised on persistent suppression.  Plaintiffs identify
no basis for the Court to reconsider its previous rulings.  They should not be permitted to assert
the contemplated trader conduct claims against Rabobank and Lloyds.

*LIBOR III* limited Plaintiffs' proposed trader conduct claims against Barclays and
Rabobank to the pre-August 2007 period.  *See In re LIBOR-Based Fin. Instruments Antitrust
Litig.*, 2014 WL 2815645, at *8 (S.D.N.Y. June 23, 2014) ("*LIBOR III*").  In so ruling, the Court
noted both "statute of limitations bars" and the limited scope of the then-pending motion for
leave to amend.[1]  *Id.*  The application of time bars to these proposed claims was consistent with
this Court's earlier statements and rulings.[2]

---

[1]     Rabobank's letter of August 20, 2014 already addressed why the Court need not reconsider its ruling
barring Plaintiffs from asserting post-August 2007 trader conduct claims against Rabobank for the additional reason
that such claims were outside the scope of Plaintiffs' motions (Dkt. No. 609).  Because the September 15 Letter
raises no new grounds for the Court to reconsider that ruling, this letter focuses only on new arguments Plaintiffs
advance in their September 15 Letter.

[2]     In *LIBOR I*, this Court held after reviewing the numerous articles which "suggested that LIBOR had been
at artificial levels since August 2007," that "a person of ordinary intelligence would clearly have been on notice [by
May 29, 2008] that LIBOR was probably being set at artificial levels and, consequently, that Eurodollar futures

Hon. Naomi Reice Buchwald
September 23, 2014
Page 2

Plaintiffs, however, now contend that "any inquiry notice of the probability that 'LIBOR was fixed at artificial levels beginning in August 2007' from constant suppression of LIBOR, is insufficient to trigger inquiry notice of the probability that Plaintiffs' Eurodollar futures transactions were injured by episodic trader-based manipulation" after August 2007 because "[b]efore the Lloyds and Rabobank government settlements disclosed specific examples of when these Defendants manipulated LIBOR to benefit their own trading positions, Plaintiffs could neither discover nor plausibly plead the particular contracts on which Plaintiffs were harmed." September 15 Letter at 1-2.  This argument fails for several reasons.

First, Plaintiffs' premise – that inquiry notice cannot be triggered unless Plaintiff is aware of sufficient facts to plead a commodities manipulation claim – is one that Plaintiffs have previously asserted and this Court has previously rejected.  In unsuccessfully opposing statute of limitations dismissal of their CEA claims, Plaintiffs argued that "the statute of limitations did not begin to run until they could have adequately pleaded a claim for commodities manipulation." *LIBOR I*, 935 F. Supp. 2d at 699 (reciting Plaintiffs' position that "[o]nly after a plaintiff can adequately plead his claim can that claim be said to have accrued").  The Court rejected that argument, holding (consistent with a long line of precedent) that the statute of limitations begins to run when "circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded."  *Id.* at 698, 699 (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 151 (2d Cir. 2012)).  Tolling the statute of limitations until discovery of the elements of a claim would be "at odds with the basic policies of all limitations provisions" – "repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities" – and would "dilute the incentive of private attorneys general diligently to investigate, prosecute, and bring unlawful activity to light."  *Koch*, 699 F.3d at 150.  None of the cases Plaintiffs recycle in their September 15 Letter undermines this conclusion.[3]

_____

contract prices had also been artificial" beginning in August 2007.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 700, 705 (S.D.N.Y. 2013) ("*LIBOR I*").  Thus, claims based on Eurodollar futures contracts purchased between August 1, 2007 and May 29, 2008 are time-barred, *id.* at 711, a ruling this Court extended in *LIBOR III* to purchases between May 29, 2008 and April 14, 2009.  *LIBOR III*, 2014 WL 2815645, at *15, 18-19 (noting that "publicly available information during Period 2 reinforced the notion that LIBOR was subject to manipulation").  In *LIBOR I*, the Court stated that it was inclined to conclude that articles suggesting that LIBOR had been artificial beginning in August 2007 "placed plaintiffs on inquiry notice of their injury based on *any* sort of LIBOR manipulation, including both the persistent suppression alleged in plaintiffs' amended complaint and the day-to-day manipulation for trading advantage."  935 F. Supp. 2d at 709 (emphasis in original).

[3]      For example, Plaintiffs cite cases in which inquiry notice was not even being discussed.  *See* September 15 Letter at 2, 3 (citing *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 345-46 (S.D.N.Y. 2000); *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 185-86 (2d Cir. 2013)).  In addition, Plaintiffs cite *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013), a divorce case which this Court has already advised Plaintiffs' counsel is irrelevant here.  *See* Aug. 8, 2013 Oral Arg. Tr. [Dkt. No. 463] at 103:9-10 ("It's just different. It's just another situation. And [the *Cohen* plaintiff] is not a private Attorney General.").  Plaintiffs also cite *Rotella v. Wood*, 528 U.S. 549, 556 (2000) and *Yeadon v. New York City Transit Authority*, 719 F. Supp. 204, 210 (S.D.N.Y. 1989), to assert that they could not have been on inquiry notice unless storm warnings indicated to them "who had inflicted" their injuries and "for what reason."  September 15 Letter at 2.  But this Court already rejected that argument, holding that "plaintiffs need not have been aware that the artificiality in LIBOR fixes 'resulted from Defendants' intentional manipulation of [LIBOR],'" that "[t]he specificity required to trigger inquiry notice is not necessarily specificity with regard to defendant, but rather specificity that notifies a plaintiff that he has been injured," and that regardless, "[i]t was a matter of public knowledge which banks were on the USD LIBOR panel, what rate those

Hon. Naomi Reice Buchwald
September 23, 2014
Page 3

Second, Plaintiffs identify no reason why the press articles suggesting persistent manipulation of LIBOR beginning in August 2007 would be insufficient also to trigger inquiry notice of isolated, sporadic instances of LIBOR manipulation after August 2007 for trader profit. Courts have consistently held that inquiry notice can be triggered even where there has not been disclosure of every detail of the alleged fraud or permutation of the alleged injury.[4]  In any event, media reports discussing LIBOR manipulation prior to May 29, 2008 explicitly mentioned the possibility that traders may be manipulating LIBOR for their own profit.[5]

Third, this Court has already rejected Plaintiffs' argument that they could not have been on inquiry notice of injury from isolated, sporadic instances of LIBOR manipulation after August 2007 even if they were – as they now concede – on inquiry notice of injury from persistent LIBOR manipulation beginning in August 2007.  In *LIBOR I*, the Court held that for purposes of the inquiry notice analysis, Plaintiffs' injury would be the same under either theory of manipulation.[6]  Plaintiffs' own complaint makes clear that Plaintiffs' CEA claims – regardless of the theory of manipulation – are premised on the same injury (*i.e.*, injury resulting from "artificial" or "manipulated" LIBOR).[7]  And it is the law of the case that, based on "numerous articles which suggested that LIBOR had been set at artificial levels since the start of the Class Period," Plaintiffs "were on inquiry notice" of that injury "no later than May 29, 2008."[8]

---

banks submitted to the BBA each day, and how the final LIBOR fix was determined."  *LIBOR I*, 935 F. Supp. 2d at 705-07.

[4]     *See, e.g.*, *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427, 434 (2d Cir. 2008) ("'Storm warnings' need not detail every aspect of the alleged fraudulent scheme . . . If a complaint alleges various frauds, an investor need not know the details of each fraud in order to be placed on inquiry notice."); *Marshall v. Milberg LLP*, No. 07 Civ. 6950 (LAP), 2009 U.S. Dist. LEXIS 121208, at *10 (S.D.N.Y. Dec. 23, 2009) ("A plaintiff need not have notice of all of the relevant details or know about the entire fraud being perpetrated to be on inquiry notice, but instead merely must be aware of the general fraudulent scheme.") (internal citations and quotations omitted); *Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 48 (S.D.N.Y. 2001) ("it is not necessary for a plaintiff to understand every permutation of his or her injury, rather the plaintiff simply needs to have a 'hint' or 'suspicion' of the injury and its cause to be put on inquiry notice").

[5]     *See, e.g.*, Duncan Wood, *Libor's True Colours*, Risk Magazine (Jan. 1, 2008) (quoting European bank head as stating, "because swaps are fixed from Libor, if it suits your book to have the Libor fix as low as possible, maybe you'd submit an unrealistic bid to push the fix lower") [Dkt. No. 363 at Ex. J]; Carrick Mollenkamp, *Libor Fog: Bankers Cast Doubt on Key Rate Amid Crisis*, Wall St. J. (Apr. 16, 2008) (citing study that raised concerns "that banks might have an incentive to provide false rates to profit from derivatives transactions") [*Id.* at Ex. K].

[6]     *LIBOR I*, 935 F. Supp. 2d at 710 ("Critically, although these two scenarios [*i.e.*, persistent suppression vs. trader conduct] differ in how plaintiffs' injury would be caused, the injury would be the same. . . . Therefore, notice that the prices of plaintiffs' Eurodollar contracts likely decreased due to defendants' alleged manipulation of LIBOR would have been sufficient for inquiry notice [for trader conduct claims]").

[7]     *Compare* Corrected Second Amended Consolidated Class Action Complaint [Dkt. No. 438] ¶ 521 (suppression claims: "Plaintiffs [] paid artificial prices for their Eurodollar futures contracts, were deprived of a lawfully operating market free from manipulation, and are entitled to recover their actual damages resulting therefrom."), *with* ¶ 532 (trader conduct claims: "Plaintiffs [] paid artificial prices for their Eurodollar futures contracts, were deprived of a lawfully operating market free from manipulation, and are entitled to recover their actual damages resulting therefrom."); *see also id.* ¶¶ 446, 439, 447, 448.

[8]     *LIBOR III*, 2014 WL 2815645, at *14.

Hon. Naomi Reice Buchwald
September 23, 2014
Page 4

        In addition, Plaintiffs are incorrect in now asserting that the DOJ Statement of Facts
("SOF") in Lloyds' case "raised a fact-intensive inquiry into whether there was any compliance
with a requested manipulation on May 11, 2009."  September 15 Letter at 5.  The relevant
paragraph of the SOF raises no such issue.  Rather, it quotes the requester as withdrawing the
request as "just joking," and fails to raise an inference that the submitter's assistant (to whom the
request was communicated) even passed the withdrawn request on to Lloyds' Dollar LIBOR
submitter, much less that the submitter complied with it or that any manipulation took place on
that day.[9]

        For all these reasons and those previously stated by Rabobank and Lloyds, this Court
should deny Plaintiffs' request to assert certain trader conduct claims against them.

Respectfully submitted,                         Respectfully submitted,

By: */s/* Marc J. Gottridge                     By: */s/* David R. Gelfand
    Marc J. Gottridge                               David R. Gelfand
    Hogan Lovells US LLP                            Milbank, Tweed, Hadley & McCloy LLP
    875 Third Avenue                                1 Chase Manhattan Plaza
    New York, New York  10022                       New York, New York  10005
    Tel:    (212) 918-3000                          Tel:    (212) 530-5000
    E-mail:  marc.gottridge@hoganlovells.com        E-mail:  dgelfand@milbank.com

    *Attorney for Defendants Lloyds Banking*        *Attorney for Defendant Coöperatieve*
    *Group plc, Lloyds Bank plc (formerly*          *Centrale Raiffeisen-Boerenleenbank B.A.*
    *known as Lloyds TSB Bank plc) and HBOS*
    *plc*

cc:  All counsel (via ECF)

---

[9]      Lloyds DOJ SOF (Ex. A to Plaintiffs' August 13, 2014 Letter [Dkt. No. 592]) ¶ 19.  *See also* Lloyds'
August 20, 2014 Letter [Dkt. No. 611] at 2 & n.8.