**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Case No. 1:11-md-2262-NRB |
| | **AMENDED COMPLAINT** |
| THIS DOCUMENT RELATES TO: | **JURY TRIAL DEMANDED** |
| 1:14-CV-04189-NRB | |

---

PRUDENTIAL INVESTMENT
PORTFOLIOS 2, f/k/a DRYDEN CORE
INVESTMENT FUND, o/b/o PRUDENTIAL
CORE SHORT-TERM BOND FUND and
PRUDENTIAL CORE TAXABLE MONEY
MARKET FUND,

                    Plaintiff,

          v.

BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., BARCLAYS
BANK PLC, BARCLAYS CAPITAL INC.,
BARCLAYS PLC, CITIBANK, N.A.,
CITIGROUP FUNDING INC., CITIGROUP
GLOBAL MARKETS INC., CITIGROUP
INC., CREDIT SUISSE AG, CREDIT
SUISSE GROUP AG, CREDIT SUISSE
SECURITIES (USA) LLC, CREDIT SUISSE
(USA) INC., DEUTSCHE BANK AG, HSBC
BANK PLC, HSBC FINANCE CORP., HSBC
HOLDINGS PLC, HSBC SECURITIES
(USA) INC., HSBC USA INC., JPMORGAN
CHASE & CO., JPMORGAN CHASE
BANK, N.A., J.P. MORGAN SECURITIES
LLC, f/k/a J.P. MORGAN SECURITIES
INC., MERRILL LYNCH, PIERCE,
FENNER & SMITH INC., f/k/a BANC OF
AMERICA SECURITIES LLC, ROYAL
BANK OF CANADA, RBC CAPITAL
MARKETS, LLC, THE ROYAL BANK OF
SCOTLAND PLC, RBS SECURITIES INC.,
f/k/a GREENWICH CAPITAL MARKETS,
INC., UBS AG, and UBS SECURITIES LLC,

Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ...................................................................................................1

PARTIES AND RELEVANT NON-PARTIES ......................................................................4

JURISDICTION AND VENUE .............................................................................................11

BACKGROUND .....................................................................................................................12

    A.    The Process of Setting Libor.............................................................................13

    B.    The BBA .............................................................................................................16

    C.    Libor's Role in the Financial Marketplace ......................................................19

    D.    Worldwide Investigations into Libor Manipulation .......................................20

ALLEGATIONS REGARDING DEFENDANTS' MISCONDUCT ...................................26

I.    DEFENDANTS MANIPULATED USD LIBOR ...................................................26

    A.    Facts Made Public by Barclays' Settlements..................................................26

    B.    Facts Made Public by UBS's Settlements .......................................................34

    C.    Facts Made Public by RBS's Settlements .......................................................42

    D.    Facts Made Public by Rabobank's Settlements...............................................48

    E.    Facts Made Public By the European Commission Settlements...........................51

    F.    Defendants' Motives to Manipulate Libor.......................................................53

    G.    Statistical Evidence of Consistent and Uniform Suppression...............................57

        1.    Evidence of the commencement of the manipulation...............................58

        2.    Evidence from comparing Libor's movements to those in the similar Fed Eurodollar Rate ...............................................................59

        3.    Evidence from comparing the banks' USD Libor submissions to those in other currencies ...............................................................67

        4.    Evidence from comparing the bank's submissions to movements in the credit default swap market ...............................................................68

5.      Additional expert analysis performed in connection with the class action proceedings shows a sudden increase in Libor after expressions about its integrity................................................................73

6.      Evidence from comparing USD Libor's movements to those in other measurements of the banks' likelihood of default...........................75

7.      Evidence from comparing USD Libor's movements to those in the Federal Reserve's Term Auction Facility....................................................80

8.      Evidence from the stability and bunching of the Libor submissions........81

H.    Additional Evidence of Defendants' Wrongdoing ...............................................86

II.    DEFENDANTS ACTED WITH SCIENTER ....................................................................93

III.   DEFENDANTS' MISCONDUCT HARMED PLAINTIFF ...........................................95

A.    Defendants' Misconduct Breached Many of the Terms of their Swap Contracts ................................................................................................................97

B.    Defendants' Collusion Harmed Competition and Caused Antitrust Injury to Plaintiff ..............................................................................................................100

IV.    PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................107

A.    No Limitations Period Could Begin Until Defendants' Last Bad Act................107

B.    No Limitations Period Could Begin Until the Termination of the Transactions ...........................................................................................................107

C.    Inquiry Notice, Equitable Tolling, and Fraudulent Concealment.......................108

1.      Defendants' wrongful conduct was self-concealing................................108

2.      Defendants actively concealed their misconduct and deflected any and all concerns that were sporadically raised..........................................109

3.      As a result of Defendants' conduct, no reasonable counterparty would have known of the probability that it had been injured by Defendants' joint suppression of Libor until June 2012..........................122

4.      A study examining Defendants' stock prices in relation to questions regarding the accuracy of Libor in April or May 2008 confirms that no reasonable investor was on inquiry notice until much later..............................................................................................125

5.    That the U.S. and U.K. governments continued to rely on Libor in 2008 and beyond further confirms that the 2008 articles did not place reasonable investors on inquiry notice ...........................................128

D.    The *American Pipe* Doctrine Applies to Plaintiff's Claims................................130

E.    Tolling Under the Clayton Act ........................................................................132

FIRST CAUSE OF ACTION ........................................................................................133

SECOND CAUSE OF ACTION ...................................................................................137

THIRD CAUSE OF ACTION .......................................................................................139

FOURTH CAUSE OF ACTION ....................................................................................141

FIFTH CAUSE OF ACTION .........................................................................................143

SIXTH CAUSE OF ACTION ........................................................................................144

SEVENTH CAUSE OF ACTION ..................................................................................145

EIGHTH CAUSE OF ACTION ......................................................................................146

NINTH CAUSE OF ACTION ........................................................................................147

TENTH CAUSE OF ACTION ........................................................................................150

ELEVENTH CAUSE OF ACTION .................................................................................161

TWELFTH CAUSE OF ACTION....................................................................................162

THIRTEENTH CAUSE OF ACTION .............................................................................164

PRAYER FOR RELIEF ..................................................................................................165

Plaintiff Prudential Investment Portfolios 2, formerly known as Dryden Core Investment Fund ("PIP2" or "Plaintiff"), on behalf of the Prudential Core Short-Term Bond Fund ("Core STB") and the Prudential Core Taxable Money Market Fund ("Core MM") (collectively, the "Funds"), by and through its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, brings this action and alleges as follows:

## NATURE OF THE ACTION

1.      Defendants' systematic and collusive manipulation of the London Interbank Offered Rate ("Libor") over a period of years has touched every corner of the global economy. Libor provides the interest-rate benchmark for hundreds of trillions of dollars in financial investments. Participants in the financial markets worldwide tie their obligations to Libor because it is purportedly "a reliable indicator of the state of the money markets,"[1] and thus should ensure that payments made over time will bear a reasonable relationship with current market interest rates. The economic interests at stake in Libor's reliability are enormous: a bias of just one basis point (0.01%) distorts payments on Libor-linked financial products by tens of billions of dollars per year.

2.      Defendants were members of a panel of banks (the "panel banks") established by the British Bankers' Association ("BBA") to determine Libor, or their affiliates. The BBA determines Libor each day based on the representations of the individual panel banks as to the rates at which they could each borrow in various currencies on the London interbank lending market. These representations were supposed to be made independently and accurately. Each Defendant was a member of the panel for U.S. Dollar Libor ("USD Libor"), or its affiliate.

3.      It is now clear, however, that Defendants abused their role in the Libor-setting

---

[1] British Bankers' Association, *Annual Report* (2010).

process in order to reap massive profits at the expense of investors such as Plaintiff and the Funds.  From at least August 2007 through at least the end of 2010 (the "Relevant Period"), the panel banks, working in a secretly concerted fashion, made artificially low Libor submissions to the BBA in a successful effort to suppress Libor for their financial gain.  Defendants' scheme allowed them to reap windfall profits, while harming Plaintiff and other investors in financial investments tied to Libor.  As part of this scheme, Defendants each agreed that, rather than exercising their independent business judgment, they would submit artificially low Libor rates and keep secret the fact that they, and their direct competitors, were doing this in a coordinated fashion.

4.     For years, the panel banks deceived the public and government regulators about their efforts to manipulate Libor.  Defendants held themselves out as competitors and represented that they were making their individual submissions consistent with their role as competitors in the marketplace.  As a result, even extremely sophisticated market participants were unaware of this misconduct at the time it was occurring.  Former Chairman of the Federal Reserve, Alan Greenspan, for example, has acknowledged that "what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor-bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[2]

5.     The panel banks secretly worked together and with the BBA to hide their conduct and to engage in a campaign of misinformation to mask the widespread systematic suppression that was occurring.  The success of Defendants' efforts to shield their misconduct was aided by

---

[2] Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), available at http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

the onset of a global financial crisis of historic proportions, which made it impossible for investors to know contemporaneously that Libor rates were being manipulated. Defendants' effort to hide their conduct from the public was successful until governmental bodies, armed with subpoena powers, disclosed the results of their investigations.

6.    Defendants' artificial suppression of Libor during the Relevant Period caused Plaintiff substantial losses and damages on the Funds' numerous transactions involving Libor-linked securities and other investments, as described in Exhibits A and B (the "Transactions").[3] Plaintiff incurred substantial losses relating to the purchase, sale, or holding of the investments involved in the Transactions, and received substantially less interest on those Transactions than if Libor had not been manipulated. Plaintiff also incurred losses because it received Libor-linked floating-rate payments on swaps entered into with certain Defendants, also listed in Exhibits A and B.

7.    Plaintiff relied on the integrity of the process for setting Libor, the truthfulness of Defendants' representations about that process, and the truthfulness of Defendants' representations concerning the interest rates to be paid on the Transactions entered into directly with Defendants. And Plaintiff entered into the Transactions to, among other reasons, receive payments based on a Libor rate set according to the terms of the Libor definition, as opposed to the artificially suppressed Libor actually paid. Those responsible for calculating the interest payments to be made on Libor-linked securities and investments likewise relied on the integrity of Libor in calculating payments due to Plaintiff. By covertly suppressing Libor, however, Defendants artificially lowered the amounts Plaintiff would and should receive for holding the securities and other investments purchased in the Transactions. Had Plaintiff known Defendants

---

[3] The Exhibits are incorporated into this Complaint as if fully set forth herein.

were artificially and wrongfully suppressing Libor—even by a few basis points—it would not have purchased, or held, the securities or other investments, nor otherwise entered into the Transactions.

8.    Defendants in bad faith exploited their control over Libor for their own benefit, at the expense of Plaintiff and other investors worldwide.  Plaintiff suffered significant harm as a result of the systematic and collusive suppression of Libor.  Accordingly, Plaintiff seeks to recover the damages sustained as a result of Defendants' unlawful conduct.  Plaintiff asserts claims for:  (i) common-law fraud; (ii) aiding and abetting fraud; (iii) intentional interference with contract; (iv) intentional interference with prospective economic relations; (v) breach of the swap agreements; (vi) breach of the covenant of good faith and fair dealing contained in the swap agreements; (vii) breach of contract where Defendants is the underlying obligor for a security; (viii) breach of the covenant of good faith and fair dealing where a Defendant is the underlying obligor for a security; (xi) unjust enrichment; (x) violations of New Jersey's RICO statutes; (xi) violations of the Sherman Act; (xii) negligent misrepresentation; and (xiii) civil conspiracy.

## PARTIES AND RELEVANT NON-PARTIES

9.    ***Plaintiff***.  Plaintiff PIP2, formerly known as Dryden Core Investment Fund, is an unincorporated business trust organized under the laws of Delaware, with its principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102.  It is an open-end management investment company registered with the SEC and is comprised of six separate series, including the Funds.

10.    Core STB is an investment fund that seeks income with relative stability of principal by investing primarily in money market obligations, bonds, and other fixed income debt obligations such as U.S. government securities, mortgage-backed securities, asset-backed

securities, foreign securities, and other short-term debt obligations.

11.     Core MM is an investment fund that seeks current income consistent with the preservation of capital and the maintenance of liquidity by investing in a diversified portfolio of short-term debt obligations issued by the U.S. government, its agencies and instrumentalities, as well as commercial paper, asset-backed securities, funding agreements, variable rate demand notes, bills, notes and other obligations issued by banks, corporations and other companies, obligations issued by foreign banks, companies or foreign governments, and municipal bonds and notes.

12.     ***Relevant Prudential Non-Parties***: Prudential Investments LLC ("PI"), headquartered at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102, manages the operations and business affairs of the Core STB and Core MM Funds under a management agreement with PIP2.  PI is a wholly owned subsidiary of Prudential Financial, Inc.

13.     Prudential Investment Management, Inc. ("PIM") is an investment manager located at Gateway Center Two, 100 Mulberry Street, Newark, New Jersey 07102.  PIM is PIP2's investment subadviser, and a wholly owned subsidiary of Prudential Financial, Inc.

14.     PIP2 is an investment advisory client of PIM, pursuant to investment management agreements in which PIP2 has delegated investment discretion to PIM, subject to certain written mandates and restrictions.  In its role as an investment advisor to Plaintiff, PIM effectuates transactions on behalf of Plaintiff PIP2 and the Funds using monies provided by Plaintiff. Although PIM brokers transactions for its clients pursuant to investment discretion, it still must act according to the investment client's mandates and restrictions.  At all times, PIM acted as an agent for Plaintiff and the Funds in executing the Transactions at issue in this lawsuit.

15.     Plaintiff holds (or held) title to the securities and other investments at issue in this

Complaint, and bears (or bore) the risk of loss on them.  PIM does not, and never did, have legal

title to the securities and other instruments, nor does it have a proprietary interest in the claims

asserted by Plaintiff.  PIM entered into the Transactions for the benefit of and in the name of (or

the name of the nominee of) Plaintiff and the Funds.

16.    Plaintiff's decisions to purchase the securities and other Libor-linked instruments

(including the swaps) that comprise the Transactions all took place in New Jersey.  Virtually all,

if not all, of Plaintiff's purchases took place in New Jersey.  Plaintiff's reliance on the

representations of Libor, as well as the receipt and review of offering or descriptive materials

concerning the securities and other Libor-linked investments—which included representations of

the Libor-linked interest rate to be paid—likewise took place in New Jersey.  And Plaintiff and

PIM at all times communicated with Defendants from New Jersey, and received the daily Libor

postings and offering materials for the Libor-linked securities in New Jersey.

17.    ***Defendants***.  Defendants were USD Libor panel banks during the Relevant

Period, or affiliates of USD Libor panel banks.  Additionally, and as also set forth in the exhibits,

at the very least:

- Defendants Bank of America Corp., Bank of America, N.A., Barclays Bank plc, Barclays

  plc, Citibank, N.A., Citigroup Inc., Credit Suisse AG, Credit Suisse Group AG, Deutsche

  Bank AG, HSBC Bank plc, JPMorgan Chase Bank, N.A., Royal Bank of Canada, The

  Royal Bank of Scotland plc, and UBS AG, were USD Libor panel banks during the

  Relevant Period ("Panel Bank Defendants"), and in cooperation with their affiliates,

  including trading desks and senior managers at separate but affiliated entities (as

  described below), made daily submissions to the BBA for the purpose of setting USD

  Libor;

- Defendants Bank of America Corp., Barclays Bank plc, Barclays Capital Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank AG, HSBC Holdings plc, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., RBC Capital Markets, LLC, The Royal Bank of Scotland plc, RBS Securities Inc., UBS AG, and UBS Securities LLC, were direct transactional counterparties with Plaintiff or Plaintiff's agents in the Transactions; and

- Defendants Bank of America Corp., Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Citigroup Funding Inc., Citigroup Inc., Credit Suisse (USA) Inc., Deutsche Bank AG, HSBC Bank plc, HSBC Finance Corp., HSBC USA Inc., JPMorgan Chase & Co., Royal Bank of Canada, The Royal Bank of Scotland plc, UBS AG, and other affiliates of certain Defendants, were obligors on the securities, swaps, or other Libor-linked investments purchased by Plaintiff or Plaintiff's agents in the Transactions.

18.     ***Bank of America***.  Defendant **Bank of America Corporation ("BAC")** is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant **Merrill Lynch, Pierce, Fenner & Smith Inc. ("ML")**, the successor (by merger) to Banc of America Securities LLC, is a registered broker-dealer organized under the laws of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of BAC.  Defendant **Bank of America, N.A. ("BANA")** is a federally chartered national banking association headquartered in Charlotte, North Carolina.  Defendants BAC, ML, and BANA are collectively referred to herein as "Bank of America."  BANA and/or BAC was a member of the USD Libor panel during the Relevant Period, and in cooperation with BAC, ML, and other Bank of America affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

19.     ***Barclays***.  Defendant **Barclays Bank plc ("Barclays Bank")** is a British public

limited company headquartered in London, England.  Defendant **Barclays Capital Inc. ("Barclays Capital")** is a registered broker-dealer incorporated under the laws of Connecticut with its principal place of business in New York, New York.  Defendants Barclays Bank and Barclays Capital are wholly owned subsidiaries of Defendant **Barclays PLC**, a British public limited company incorporated and domiciled in England and Wales.  Defendants Barclays Bank, Barclays Capital, and Barclays PLC are collectively referred to herein as "Barclays."  Barclays PLC and/or Barclays Bank was a member of the USD Libor panel during the Relevant Period and, in cooperation with the other Barclays Defendants and other Barclays affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

20.     *Citi*.  Defendant **Citigroup Inc. ("Citigroup")** is a Delaware corporation headquartered in New York, New York.  Defendant **Citibank, N.A. ("Citibank")** is a federally chartered national banking association headquartered in New York, New York, and is a wholly owned subsidiary of Citigroup.  Defendant **Citigroup Global Markets Inc. ("CGMI")**, a New York corporation with its principal place of business in New York, New York, is an indirect wholly owned subsidiary of Citigroup.  Defendant **Citigroup Funding Inc. ("Citi Funding")**, a Delaware corporation with its principal place of business in New York, New York, is an indirect wholly owned subsidiary of Citigroup.  Defendants Citigroup, Citibank, Citi Funding, and CGMI are collectively referred to herein as "Citi."  Citigroup and/or Citibank was a member of the USD Libor panel during the Relevant Period and, in cooperation with CGMI and other Citi affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

21.     *Credit Suisse*.  Defendant **Credit Suisse Group AG ("Credit Suisse Group")** is a Swiss company headquartered in Zurich, Switzerland.  Defendant **Credit Suisse AG** is a Swiss bank headquartered in Zurich, Switzerland and is a wholly owned subsidiary of Credit Suisse

Group.  Defendant **Credit Suisse Securities (USA) LLC ("Credit Suisse Securities")** is a Delaware limited liability company and a registered broker-dealer with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Credit Suisse Group.  Defendant **Credit Suisse (USA) Inc. ("Credit Suisse USA")** is a Delaware corporation with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Credit Suisse Group AG.  Credit Suisse Group, Credit Suisse AG, Credit Suisse Securities, and Credit Suisse USA are collectively referred to herein as "Credit Suisse."  Credit Suisse Group and/or Credit Suisse AG was a member of the USD Libor panel during the Relevant Period and, in cooperation with the other Credit Suisse Defendants and other Credit Suisse affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

22.     *Deutsche Bank.*  Defendant **Deutsche Bank AG ("Deutsche Bank")** is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank was a member of the USD Libor panel during the Relevant Period and, in cooperation with certain Deutsche Bank affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

23.     *HSBC*.  Defendant **HSBC Holdings plc ("HSBC Holdings")** is a United Kingdom public limited company headquartered in London, England.  Defendant **HSBC Bank plc ("HSBC Bank")** is a United Kingdom public limited company headquartered in London, England.  HSBC Bank is a wholly owned direct subsidiary of HSBC.  Defendant **HSBC Finance Corp. ("HSBC Finance")** is a Delaware corporation headquartered in Mettawa, Illinois, and is an indirect wholly owned subsidiary of HSBC Holdings.  Defendant **HSBC Securities (USA) Inc. ("HSBC Securities")** is a registered broker-dealer organized under the laws of Delaware with its principal place of business in New York, and is an indirect wholly owned subsidiary of

HSBC Holdings.  Defendant **HSBC USA Inc. ("HSBC USA")** is a Delaware corporation headquartered in New York, New York, and is an indirect wholly owned subsidiary of HSBC Holdings.  HSBC Holdings, HSBC Bank, HSBC Finance, HSBC Securities, and HSBC USA are collectively referred to herein as "HSBC."  HSBC Bank was a member of the USD Libor panel during the Relevant Period and, in cooperation with the other HSBC Defendants and other HSBC affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

24. *JPMorgan*.  Defendant **JPMorgan Chase & Co. ("JPMorgan Chase")** is a Delaware corporation headquartered in New York, New York.  Defendant **JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank")** is a federally chartered national banking association headquartered in New York, New York, and is a wholly owned subsidiary of JPMorgan Chase.  Defendant **J.P. Morgan Securities LLC ("JPMorgan Securities")** is a Delaware limited liability company and registered broker-dealer with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of JPMorgan Chase.  Defendants JPMorgan Chase, JPMorgan Chase Bank, and JPMorgan Securities are collectively referred to herein as "JPMorgan."  JPMorgan Chase and/or JPMorgan Chase Bank was a member of the USD Libor panel during the Relevant Period and, in cooperation with the other JPMorgan Defendants and other JPMorgan affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

25. *RBC*.  **Royal Bank of Canada** is a Canadian chartered bank with executive officers in Toronto and Montreal, Canada.  **RBC Capital Markets, LLC ("RBC Capital Markets")** is a Delaware limited liability company and registered broker-dealer located in Minneapolis, Minnesota and is an indirect wholly owned subsidiary of Royal Bank of Canada.  Defendants Royal Bank of Canada and RBC Capital Markets are collectively referred to herein

as "RBC."  Royal Bank of Canada was a member of the USD Libor panel during the Relevant

Period and, in cooperation with RBC Capital Markets and other RBC affiliates, made daily

submissions to the BBA for the purpose of setting USD Libor.

26.    *RBS*.  Defendant **The Royal Bank of Scotland plc ("Royal Bank of Scotland")**

is a United Kingdom public limited company headquartered in Edinburgh, Scotland and a wholly

owned subsidiary of non-party Royal Bank of Scotland Group plc.  Defendant **RBS Securities**

**Inc. ("RBS Securities")** is a Delaware corporation and registered broker-dealer headquartered in

Stamford, Connecticut.  RBS Securities is an indirect wholly owned subsidiary of non-party

Royal Bank of Scotland Group plc.  Defendants Royal Bank of Scotland and RBS Securities are

collectively referred to herein as "RBS."  Royal Bank of Scotland was a member of the USD

Libor panel during the Relevant Period and, in cooperation with RBS Securities and other RBS

affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

27.    *UBS*.  Defendant **UBS AG** is a Swiss corporation headquartered in Switzerland,

and was a member of the USD Libor panel during the Relevant Period and, in cooperation with

certain UBS affiliates, made daily submissions to the BBA for the purpose of setting USD Libor.

Defendant **UBS Securities LLC ("UBS Securities")** is a limited liability company organized

under the laws of Delaware with its principal place of business in Stamford, Connecticut.  UBS

Securities is a registered broker-dealer and was a wholly owned subsidiary of UBS AG during

the Relevant Period.  UBS AG and UBS Securities are collectively referred to herein as "UBS."

28.    ***Other Relevant Non-Parties***.  In addition to Defendants, various other entities

and individuals participated in, conspired with Defendants in furtherance of, and performed acts

and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

30.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Relevant Period, all the Defendants resided, transacted business, were found, or had agents in the District of New Jersey; a substantial part of the events or omissions giving rise to these claims occurred in the District of New Jersey; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in the District of New Jersey.  Venue is proper in this District pursuant to the transfer of this action to the MDL.

31.     The District of New Jersey has personal jurisdiction over each Defendant, because each Defendant:  transacted business throughout the United States, including in the District of New Jersey; had substantial contacts with the United States, including in the District of New Jersey; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.  In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in the District of New Jersey.

32.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## **BACKGROUND**

33.     As discussed in more detail below, Defendants actively, secretly, and collusively manipulated Libor in order to advantage themselves and to disadvantage Plaintiff.  This section provides background about how Libor is calculated and how it works.

A.    **The Process of Setting Libor**

34.    Libor is supposed to be the average interest rate at which lending banks in London could borrow from other banks in a reasonable amount in the Interbank Market.  It is based on a survey of a panel of banks asking the question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?"

35.    Each panel bank submits its rates every London business day electronically to Thomson Reuters, the agent of the BBA.  Once each bank has submitted its rate, the submitted rates are ranked.  During the Relevant Period, for USD Libor, the highest and lowest four were excluded (to lessen the impact of outliers), with the rest being averaged to calculate the official rate that would be published.  This is referred to as an interquartile method of averaging.

36.    Thomson Reuters then electronically communicates the official rates—called the Libor "fixings"—to the BBA's licensees, including companies located in the United States such as the *Wall Street Journal* and *Bloomberg News*, who then further publish the rate.  Defendants' submissions are also transmitted through the BBA's licensed data vendors.  Libor and Defendants' submissions were published on a daily basis.

37.    The BBA publishes rules governing the way that the panel banks determine their submissions.  These rules were supposed to ensure that submissions were based on an individual bank's truthful answer to the aforementioned question and that they would not be the product of collusion among the panel banks.  One panel rule required each of the panel banks independently to exercise its good faith judgment each day about the interest rate that it would be required to pay, based upon its own knowledge of competitive conditions in the market, including supply and demand conditions and the panel bank's own competitive posture as a borrower within the market for interbank loan funds.  Through this mechanism, Libor was supposed to reflect, and

move from day to day based upon, actual competitive conditions in the London interbank

lending market.

38.    As Barclays, UBS, RBS, and non-party Coöperatieve Centrale Raiffeisen-

Boerenleenbank B.A. ("Rabobank") admitted:

> The basis for a Contributor Panel bank's submission, according to the BBA, must be the rate at which members of the bank's staff primarily responsible for management of a bank's cash, rather than a bank's derivative trading book, consider that the bank can borrow unsecured interbank funds in the London money market.  Further, according to the BBA, a Contributor Panel bank may not contribute a rate based on the pricing of any derivative instrument.  In other words, a Contributor Panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivative transactions tied to LIBOR.[4]

39.    Another panel rule mandated that each panel bank's daily submission would

remain confidential until after the calculation and publication of the daily Libor submissions.

This rule was meant to prevent collusion and ensure that each panel bank's submission would

reflect only that panel bank's independent expert judgment concerning its own competitive

posture as a borrower within the market.  As Barclays, UBS, RBS and Rabobank have admitted:

"According to the BBA, from at least 2005 to the present, each Contributor Panel bank must

submit its rate without reference to rates contributed by other Contributor Panel banks."

Barclays SOF ¶ 6; UBS SOF ¶ 7; RBS SOF ¶ 7; Rabobank SOF ¶ 7.

40.    Another panel rule mandated that upon publication of each day's Libor, the BBA,

through Thomson Reuters, simultaneously published the individual rates submitted in the Libor-

---

[4] Re: Barclays Bank plc, Statement of Facts ¶ 6 (June 26, 2012) ("Barclays SOF"), available at http://www.justice.gov/iso/opa/resources/931201271017342665941.pdf; Re: UBS AG, Statement of Facts (Dec. 18, 2012) ¶ 7 ("UBS SOF"), available at http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf; Statement of Facts ¶ 7, United States v. RBS Securities Japan Ltd. (D. Conn. Feb. 5, 2013) ("RBS SOF"), available at http://www.justice.gov/iso/opa/resources/21720132613354074939.pdf; Statement of Facts ¶ 7, United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (D. Conn. Oct. 29, 2013) ("Rabobank SOF"), available at http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf.

setting process for each panel bank, currency, and tenor for that day.  This third rule made the process and the individual panel bank submissions transparent on an *ex post* basis, to the capital markets and the panel banks themselves.  The use of Thomson Reuters, an agency separate and independent from the BBA, to collect submissions, and calculate, and publish the daily Libor rates, signaled the purported independence of those rates from the collective self-interests of the BBA and the panel members.

41.     Because the capital markets view the funding costs of the panel banks as reflective of their relative creditworthiness and financial strength, the daily disclosure of Libor submissions signaled each panel bank's creditworthiness and financial strength to the market.  Thus, as the BBA has stated, the Libor-setting process was supposed to reflect "a unique snapshot of competitive funding costs."

42.     On its website, the BBA explains that "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  Defendants publicly claimed they abided by the BBA's rules and based their individual submissions on their cost of funds in the London Interbank Market without reference to rates submitted by other panel banks or the pricing of any derivative financial investment.[5]

43.     Libor is calculated for different borrowing periods and currencies, each of which had its own panel of banks.  Defendants were all members of the USD Libor panel during the Relevant Period, or affiliates of the panel banks.  There is substantial overlap in membership

---

[5] *See* Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice, Appendix A (Dec. 18, 2012) ¶ 7; BBA, *Welcome to bbalibor, the Basics*, http://www.bbalibor.com/bbalibor-explained/the-basics; BBA, *Welcome to bbalibor, Setting bbalibor*, http://www.bbalibor.com/technical-aspects/setting-bbalibor; BBA, *Welcome to bbalibor*, *Definitions*, http://www.bbalibor.com/bbalibor-explained/definitions.

among the panels.  For example, during the Relevant Period, nine of the sixteen banks that served on the USD Libor panel also served on the Japanese yen ("JPY"), Swiss franc ("CHF"), and Euribor panels.[6]  Similarly, fourteen banks participated on both the USD and JPY panels,[7] and twelve banks participated on both the USD and CHF panels.[8]

**B.    The BBA**

44.     Throughout the Relevant Period, the BBA was the leading trade association for the U.K. banking and financial services sector.  Defendants were horizontal competitors and member banks of the BBA.  Defendants competed among themselves and with other firms (including non-banks) in seeking to borrow funds, attract deposits, and provide a broad range of financial services.  As part of their competitive efforts, Defendants used their status as panel banks to market themselves to investors, and Defendants also sought to market themselves based on their integrity.  As a BBA member bank, each Defendant carried out that competition by, among other things, reporting its purported borrowing costs in its Libor submissions.

45.     Defendants were members of the BBA panel, or affiliates of the panel banks.  The BBA is not a regulatory body and has no regulatory function.  Its activities are not overseen by any U.K. or foreign regulatory agency.  Instead, it is governed by a board of member banks that meets four times each year.  The board is composed of senior executives from twelve banks, including Defendants Barclays, Citi, Deutsche Bank, HSBC, JPMorgan, RBC, Royal Bank of

---

[6] Those banks are Bank of Tokyo, Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, Lloyds, RBS, and UBS.

[7] Those banks are Bank of America, Bank of Tokyo, Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, Lloyds, Norinchukin, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and WestLB.

[8] Those banks are Bank of Tokyo, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, Lloyds, RBS, Société Générale (beginning in 2009), UBS, and WestLB.

Scotland, and UBS.[9]  As described by Richard Werner, a finance professor at the University of

Southampton, "This is a quaint, insider club which is clearly not fit for the 21st Century."[10]

46.    The panel banks were supposed to make their Libor submissions as independent

actors.  Instead, the Panel Banks ignored the Libor panel rules and took advantage of the BBA's

self-governing structure, making the BBA a de facto cartel.  This cartel provided the means

through which Defendants could suppress Libor, across all tenors, and profit from their

wrongdoing through the activities of the Panel Bank Defendants and their affiliates.  As an RBS

trader stated to a colleague in a recently-released instant message, "[i]t's just amazing how Libor

fixing can make you that much money . . . ***It's a cartel now in London***."[11]  Others have observed

in connection with the misconduct that has come to light that the BBA's administration of Libor

during the Relevant Period was a case of the proverbial fox guarding the henhouse.

47.    Through 2010, the Foreign Exchange and Money Markets Committee of the BBA

had responsibility for Libor.  Thirteen "active market participants" comprised this committee.

Although the BBA does not disclose who is on this committee, UBS and RBS have admitted that

they were represented.[12]  Other Defendants also served on the committee.  The chair and two

deputy chairs were representatives from the panel banks.

48.    The BBA presented itself as having a robust structure in place to oversee Libor

and to ensure its integrity.  It turns out, however, that this was a sham.  As recently reported by

---

[9] British Bankers' Association, *BBA Board*, available at: https://www.bba.org.uk/about-us/bba-board/.

[10] Lindsay Fortado, Liam Vaughan & Joshua Gallu, *UBS Turning Whistleblower in Libor Probe Pressures Rivals*, Bloomberg (Feb. 21, 2012).

[11] RBS CFTC Order at 14-15.

[12] UBS SOF ¶ 85; Financial Services Authority, Final Notice to UBS AG, FSA 186958, ¶ 122 (Dec. 19, 2012) ("UBS FSA Final Notice"); Financial Services Authority, Final Notice to the Royal Bank of Scotland, FSA 121882, ¶ 89 (Feb. 6, 2013) ("RBS FSA Final Notice").

Martin Wheatley, chief executive of the Financial Conduct Authority (though at the time managing director of the Financial Services Authority ("FSA")) who was asked by the U.K. government to examine Libor's future after it was found to have been manipulated on multiple instances:  "Oversight of Libor is the responsibility of a committee set up by the BBA with two subcommittees looking at unresolved problems and disciplinary procedures respectively.  *The only problem is that these committees hardly ever met*."  Mr. Wheatley concluded that "essentially, people had an overt level of trust in a system that did not have the right level of checks and balances in place."

49.     In January 2010, potentially in an effort to limit its liability, the BBA created a new entity, BBA LIBOR Ltd., to assume responsibility for the day-to-day running of the benchmark.[13]

50.     In July 2012, the BBC reported that a "former member of the Libor compilation team at Thomson Reuters says it regularly warned senior BBA staff" about problems with Libor. "'At the end of the week,'" the compiler explained, "'we would send details of these oddities in a report to the BBA,'" and that approximately every two months "a bigger report would be sent to the BBA saying 'there is something wrong with some of these banks.'"  John Ewan, head of BBA Libor at the time, "told the Libor team he would look into the repeated evidence of unusual Libor submissions, which were coming increasingly frequently from several banks."  The compiler explained "'I wouldn't say he took no action . . . .  He took note of them.  Action was taken.  But the BBA was not very effectual at the time.'"[14]

_____

[13] *See* David Enrich & Max Colchester, *Before Scandal Clash over Control of Libor*, Wall St. J. (Sept. 11, 2012), available at http://online.wsj.com/article/SB10000872396390443847 404577631404235329424.html.

[14] Ian Pollock, "Libor: BBA 'warned weekly' says former rate-compiler," BBC News (July 25, 2012), available at http://www.bbc.com/news/business-18930191.

51.    In September 2012, an independent panel recommended that the BBA be stripped of its role in Libor rate setting.  Mr. Wheatley noted at the time, "the BBA acts as the lobby organization for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."  In February 2013, the BBA agreed to cede control of Libor to a new operator.

### C.    Libor's Role in the Financial Marketplace

52.    As seen above, Libor was held out as a representation of the true borrowing costs of the panel banks in a given day's economic environment, and it was understood by investors to be just that.  The BBA has acknowledged that Libor "has always been relied on by the market as a reliable benchmark."[15]

53.    The BBA has correctly observed that Libor is "the primary benchmark for short term interest rates globally."[16]  Libor was used as a benchmark for many types of transactions to calculate floating interest rates that reset at regular intervals to reflect changing market and credit conditions.  A variety of financial investments—from home mortgages to interest rate swaps— have terms expressing interest rates as Libor plus $x$ basis points ("bps").  Swaps, forwards, futures, options, and other derivatives traded in over-the-counter markets and on exchanges worldwide are priced and settled based on Libor.

54.    Accurate and untainted Benchmark interest rates, such as Libor, provide substantial benefits to the marketplace.  For instance, lenders and issuers need not conduct their own, potentially unreliable market research into the price of debt, but instead can (or should be

---

[15] BBA, *Libor Gets Enhanced Governance and Scrutiny Procedures*, http://www.bbalibor.com/news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures.

[16] BBA, *Welcome to bbalibor, the Basics*, http://www.bbalibor.com/bbalibor-explained/the-basics.

able to) look to Libor as a reliable indicator of prevailing interest rates established in a competitive market by an array of global financial institutions.  Similarly, investors seeking floating-rate investments also can (or should be able to) rely upon their Libor-linked instruments to pay prevailing interest rates.  Benchmarks such as Libor also allow counterparties to execute long-term floating rate debt contracts, such as swaps, without having periodically to renegotiate the interest rate by tying (or purporting to tie) such instruments directly to a reliable indicator of market interest rates.  Accordingly, at any given time, investors seeking reliability hold *trillions* of dollars in Libor-linked instruments.

55.    As the Department of Justice ("DOJ") explained in its December 19, 2012 Statement of Facts regarding Libor-related misconduct at UBS ("UBS SOF"):  "Because of the widespread use of LIBOR and other benchmark interest rates in financial markets, these rates play a fundamentally important role in financial systems around the world."  Defendants knew that, given the vast universe of financial investments Libor impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[17]

D.    **Worldwide Investigations into Libor Manipulation**

56.    The first public revelation regarding the existence and focus of government investigations into Libor manipulation occurred on March 15, 2011, when UBS disclosed that the bank had "received subpoenas . . . in connection with investigations regarding submissions to the [BBA]."  UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times."  UBS further disclosed that it had "received an order to provide

---

[17] Rosa M. Abrantes-Metz & Albert D. Metz, *How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting*, CPI Antitrust Chronicle (Mar. 2012).

information to the Japan Financial Supervisory Agency concerning similar matters." UBS stated it was "conducting an internal review" and was "cooperating with the investigations."

57.    Shortly thereafter, various news agencies reported that UBS, Bank of America, Citigroup, and Barclays had also received subpoenas from United States regulators regarding the potential manipulation of USD Libor. *The Financial Times* and others would soon report that investigators had demanded information from "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08." Follow-up reports by *Bloomberg* and others confirmed that banks such as Citi, Deutsche Bank, Bank of America, and JPMorgan had been asked to make employees available for testimony.

58.    In May 2011, the *Daily Telegraph* reported that the Federal Bureau of Investigation was working closely with U.S. and foreign regulatory authorities in connection to the Libor investigation. The U.K. Serious Fraud Office, which handles criminal investigations into financial matters, revealed it was also taking an active interest in the Libor probe. In the months that followed, many of the Defendants and other panel banks confirmed that they were "cooperating" with investigations into their Libor submissions.

59.    In July 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations."

60.    In an Interim Report dated August 2011, HSBC Holdings disclosed that it was included in the ongoing worldwide Libor investigations: "[v]arious regulators and enforcement authorities around the world including in the UK, the US and the EU, are conducting investigations related to certain past submissions made by panel banks to the BBA in connection with the setting of [Libor]. As HSBC Bank is a panel bank, HSBC and/or its subsidiaries have

received requests from these various regulators for information and are cooperating with their enquiries."[18]

61.    In September 2011, the *Financial Times* reported that, as part of its Libor investigations, the DOJ and the Commodity Futures Trading Commission ("CFTC") were assessing whether certain Defendants violated the Commodity Exchange Act, by examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."

62.    In October 2011, the *Financial News* observed that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citi, and Bank of America, had been quoting deliberately low rates."

63.    On December 9, 2011, Law360 reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") had alleged that employees of Citigroup Global Markets Japan Inc. ("CGMJ") and UBS Securities Japan Ltd. ("USJ") attempted to influence the Tokyo Interbank Offered Rate, or Tibor.[19]  On December 16, 2011, Japan's Financial Services Agency ("JFSA") reported administrative action against CGMJ, for, among other things, "[i]nappropriate actions related to TIBOR."[20]  The *Wall Street Journal*'s headline read "Japan's

---

[18] HSBC Holdings plc, Press Release, *2011 Interim Results* (Aug. 1, 2011), at 45, available at http://www.hsbc.co.jp/1/PA_ES_Content_Mgmt/content/TKY2/website/en/about_us/news_awards/pdf/2011/interim_result2011_en.pdf.

[19] Juan Carlos Rodriguez, *Japan Accuses Citi, UBS of Market Trickery*, Law360 (Dec. 9, 2011), available at http://www.law360.com/articles/292117/japan-accuses-citi-ubs-of-market-trickery.

[20] Japan Financial Services Agency, *Administrative Action on Citigroup Global Markets Japan Inc.* (Dec. 16, 2011), available at http://www.fsa.go.jp/en/news/2011/20111216-2.html.

Financial Regulators Sanction Citi Japan for 3rd Time in Seven Years."[21]  On the same day, the

JFSA announced administrative actions against USJ and the branches of UBS AG located in

Japan for inappropriate actions relating to Euroyen TIBOR and JPY LIBOR.[22]

64.    Throughout the end of 2011 and the beginning of 2012, there were numerous

articles relating to government investigations and probes relating to illegal collusion and

manipulation of various Libor rates, including USD Libor.  For instance, according to

*Bloomberg*, the FSA had "received email evidence of potential collusion" and was "probing

whether banks' proprietary-trading desks exploited information they had about the direction of

Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."

Reports indicate that RBS and Deutsche Bank had fired employees connected with the Libor

wrongdoing.

65.    It was also reported in 2012 that European Commission antitrust regulators were

investigating whether Defendants had formed a global cartel and colluded to understate their

borrowing costs in response to the economic crisis that began in 2007.  The European

Commission's settlement with several Defendants is described below.

66.    In July 2012, the DOJ confirmed it was conducting an unprecedented joint

investigation by both the antitrust and criminal divisions into manipulation of Libor rates for

various currencies.  The investigation reportedly focuses on "whether banks whose funding costs

were rising as the financial crisis intensified tried to mask that trend by submitting artificially

---

[21] Atsuko Fukase, *UPDATE: Japan's Financial Regulators Sanction Citi Japan for 3rd Time in Seven Years*, Wall Street Journal (Dec. 16, 2011), available at http://online.wsj.com/article/BT-CO-20111216-704569.html.

[22] Japan Financial Services Agency, *Administrative Actions against UBS Securities Japan Ltd. and UBS AG, Japan Branches* (Dec. 16, 2011), available at http://www.fsa.go.jp/en/news/2011/20111216-3.html.

low readings of their daily borrowing costs."[23]  These banks include Bank of America and Citi, among others.

67.    On July 24, 2012, the *Wall Street Journal* reported that "[s]everal groups of traders are under investigation by regulators around the world for allegedly banding together to rig interest rates," and that the facts point to "a widespread conspiracy that continued for several years and cascaded around the world."[24]  The *Journal* further reported that the scandal had "ensnared at least 16 financial institutions" between 2005 and 2011, when traders allegedly "profited by manipulating Libor and other key interest rates."[25]

68.    In June 2013, it was announced that the Monetary Authority of Singapore sanctioned twenty banks—including UBS, Deutsche Bank, JPMorgan, Barclays, and RBS— after finding that 133 traders attempted to manipulate benchmark interest rates.  All of the banks sanctioned were found to have "deficiencies in the governance, risk management, internal controls and surveillance systems" for their involvement in setting the benchmarks.[26]

69.    The full scale of Defendants' scheme continues to expand.  On October 21, 2013, the U.K. Serious Fraud Office identified twenty-two individuals as alleged co-conspirators of Thomas Hayes, a former trader at UBS and Citi, whom British prosecutors have charged with eight criminal counts of conspiracy to defraud for his role in manipulating benchmark interest

---

[23] John Detrixhe, *Libor Reported as Rigged in '08 Proving 2012's Revelation*, Bloomberg (July 19, 2012), available at http://www.bloomberg.com/news/2012-07-18/libor-reported-as-rigged-in-08-crisis-proving-revelation-in-12.html.

[24] Jean Eaglesham & David Enrich, *Libor Probe Expands to Bank Traders*, Wall Street Journal (July 24, 2012), available at http://online.wsj.com/news/articles/SB10000872396390443295404577545350903902004.

[25] *Id.*

[26] Brooke Masters, *Singapore Punishes 20 Banks in Rate Probe*, Financial Times (June 14, 2013), available at http://www.ft.com/intl/cms/s/0/fed38a0a-d4d5-11e2-b4d7-00144feab7de.html#axzz2Ws56Tq4c.

rates. Those twenty-two individuals include former employees of UBS, Deutsche Bank, and RBS.[27]

70.    On October 24, 2013, the CFTC announced it had secured an unprecedented $1.7 billion in sanctions during fiscal year 2013—"with most of the fines stemming from an investigation into alleged [Libor] manipulation by large financial firms."[28]  Approximately $1.1 billion of that total came from fines against Defendants UBS and RBS, and nonparty ICAP Europe Ltd.[29]

71.    On January 22, 2014, another probe of the European Commission was announced, this time into the manipulation of interest rates tied to the Swiss Franc, including Libor, by UBS, RBS, JPMorgan Chase, and Credit Suisse.[30]

72.    On February 3, 2014, the U.K. Financial Conduct Authority ("FCA") "released warning notices to two bankers who could face penalties for their alleged involvement in the manipulation of the London Interbank Offered Rate and other benchmark interest rates, marking the first civil cases against individuals in the global probe."[31]  And on February 18, 2014, the U.K.'s Serious Fraud Office began criminal proceedings against three former Barclays

---

[27] Caroline Binham, *SFO Narrows Libor Charges*, Financial Times (Oct. 21, 2013), available at http://www.ft.com/intl/cms/s/0/b5ae82ae-3a73-11e3-b234-00144feab7de.html#axzz2jyUgSI4q.

[28] Max Stendahl, *Libor Probe Was CFTC's Cash Cow in 2013*, Law360 (Oct. 24, 2013), available at http://www.law360.com/articles/483089/libor-probe-was-cftc-s-cash-cow-in-2013.

[29] *Id.*

[30] Dan Prochilo, *EU Targets UBS, RBS in Swiss Franc Rate-Rigging Probe*, Law360 (Jan. 22, 2014), available at http://www.law360.com/articles/503105/eu-targets-ubs-rbs-in-swiss-franc-rate-rigging-probe.

[31] Kira Lerner, *2 Bankers Face 1st Civil Penalties in UK Libor Probe*, Law360 (Feb. 3, 2014), available at http://www.law360.com/articles/506272/2-bankers-face-1st-civil-penalties-in-uk-libor-probe.

employees for conspiring to manipulate Libor.[32]

73.    As demonstrated above, the actions of the Defendants and others in manipulating multiple Libor indices, including USD Libor, had nothing short of a global impact upon investors and trillions of dollars in investments.

## ALLEGATIONS REGARDING DEFENDANTS' MISCONDUCT

**I.    DEFENDANTS MANIPULATED USD LIBOR**

74.    During the Relevant Period, Defendants and their employees, agents, and affiliates knowingly conspired to suppress USD Libor by submitting false reports to the BBA. Evidence of Defendants' scheme, which continues to mount as new facts are brought to light, include:  (i) facts admitted to by the growing number of Panel Bank Defendants and their agents and affiliates in connection with regulatory and criminal investigations into Libor-setting misconduct; (ii) Defendants' powerful motives and opportunity to suppress USD Libor in order to conceal their financial difficulties and manipulate the value of Libor-linked transactions; and (iii) statistical analyses of the behavior of USD Libor relative to reliable benchmarks, and of the Panel Banks' individual submissions to the BBA during the Relevant Period.

### A.    Facts Made Public by Barclays' Settlements

75.    Barclays avoided prosecution in the United Kingdom and the United States by entering into settlements with the FSA, CFTC, and the DOJ's Fraud Section.  In the United Kingdom, as part of its settlement with the FSA, Barclays agreed to pay $92.8 million in fines. The CFTC issued an Order Instituting Proceedings ("Barclays CFTC Order") finding that Barclays violated the Commodity Exchange Act, and ordered Barclays to pay $200 million—the

---

[32] Benjamin Horney, *3 Ex-Barclays Employees Charged Over Libor Conspiracy*, Law360 (Feb. 18, 2014), available at http://www.law360.com/articles/510508/3-ex-barclays-employees-charged-over-libor-conspiracy.

largest civil penalty the CFTC had ever imposed. And Barclays' settlement with the DOJ required it to pay another $160 million. Together its fines totaled approximately $453 million.

76.    Barclays admitted to a detailed Statement of Facts, which cited scores of internal emails, as well as communications with other panel banks, in furtherance of their scheme to manipulate and suppress the published Libor rates. Marcus Agius, then-Chairman of Barclays, said in a press release at the time: "The Board takes the issues underlying today's announcement extremely seriously and views them with the utmost regret."

77.    Barclays admitted that, starting at least by August 2007, it intentionally submitted "improperly low" USD Libor quotes that did not reflect Barclays' actual borrowing costs. Barclays confirmed that "all of the Contributor Panel banks, including Barclays, were contributing rates that were too low" during this same period. Following the settlements, Agius and Barclays' CEO Bob Diamond resigned—just before Barclays' Chief Operating Officer, Jerry del Missier, testified that Diamond had instructed him to lower the bank's Libor submissions—or that Barclays should "'get our Libor rates down—we shouldn't be outliers.'"[33] Del Missier also testified that he was aware that Barclay's compliance department was informed of his instruction, but "'[c]ompliance never followed up,'"[34] though in any event Del Missier thought the instruction "'seemed appropriate' given the chaos in financial markets at the time," and that he was not doing anything illegal.[35] On July 4, 2012, the day after Bob Diamond stepped down, he told the British Parliament: "There is an industry-wide problem coming out now."

78.    The disclosures in July 2012 resulting from these governmental investigations

---

[33] Sharlene Goff, *Del Missier Spells out Differences on Libor*, Financial Times (July 16, 2012), available at http://www.ft.com/intl/cms/s/0/0094e92e-cf64-11e1-a1d2-00144feabdc0.html#axzz 303AXi8sw.

[34] *Id.*

[35] *Id.*

into Barclays revealed, for the first time, the type of collective manipulation of Libor by Defendants that had occurred, as summarized in the following paragraphs.

79.    In early September 2007, after Barclays reported higher USD Libor rates than its peers, a *Bloomberg* article entitled "Barclays Takes a Money-Market Beating" questioned "So what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest in the money market?"  Other newspapers, including the *Financial Times* and *The Standard*, ran similar articles.

80.    Thereafter, on November 29, 2007, the supervisor of the USD Libor submitters at Barclays convened a meeting with senior Barclays Treasury managers and the USD Libor submitters in which he noted that if the submitters made accurate quotes, they would be 20 basis points above "the pack."

81.    Barclays could not have known where its submission would stand relative to other banks without knowing those banks' submissions prior to publication, in violation of the Libor panel rules.  The supervisor elevated the issue to more senior levels of Barclays' management, after which the group decided to adjust Barclays' Libor submission downward by 20 basis points in order to stay within the range of other banks' low Libor submissions.  Barclays managers issued standing instructions to stay within specific ranges of other panel banks' USD Libor submissions, indicating that Barclays believed it would have continued access to the confidential Libor submissions of other banks before they were published.  According to the CFTC's review of the evidence it collected, "Senior Barclays Treasury managers provided the [Libor] submitters with the **general guidance** that Barclays's submitted rates should be **within ten basis points** of the submissions by the other U.S. Dollar panel banks . . . ."  Barclays CFTC Order at 20 (emphasis added).

82.     In addition, a Barclays manager contacted a representative of the BBA to advise that "[USD] LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the panel banks.  The Barclays manager stated that Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."  According to the Barclays manager, "other banks 'are reluctant to post higher and because no one will get out of the pack, *the pack sort of stays low*.'"  Barclays SOF ¶ 43 (emphasis added).

83.     On November 30, 2007, a private discussion occurred between a representative of Barclays and the FSA.  An internal Barclays memorandum reveals that Barclays "didn't say anything along the lines of, you know, we're not posting where we think we should."  On December 4, 2007, however, a senior Barclays USD Libor submitter emailed his supervisor about submitting a 1-month Libor lower than he would prefer if he were "given a free hand," and explicitly stated:  "My worry is that we (both Barclays and the contributor bank panel) are being seen to be contributing *patently false rates*.  We are therefore being *dishonest by definition* and are at risk of damaging our reputation in the market and with the regulators."  Barclays CFTC Order at 22 (emphasis added).  In another email, the senior Barclays USD Libor submitter wrote:  "I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore *will not be posting honest prices*."  *Id.* at 24 (emphasis added).

84.     Barclays' managers specifically instructed Barclays USD Libor submitters to make artificially low Libor submissions and to do so in coordination with the submissions of other Defendants—that is, to stay "within the pack."  Barclays SOF ¶ 37.  Barclays' submitters were told "they would have to deal with the settings, meaning how to make LIBOR submissions

per this directive, on a 'day-to-day-basis.'"  The CFTC found that Barclays' managers "frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive."  The CFTC observed that those discussions "were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period."

85.    Internal communications at Barclays made public in connection with the investigation further reveal that the other panel banks were doing the same.  Similarly, on October 3, 2007, a Barclays employee noted internally that an unidentified panel bank submitted a Libor rate that was lower than the rate it actually paid.[36]  On April 27, 2008, a Barclays manager conceded in a recently-disclosed liquidity call to the FSA "***to the extent that, um, the LIBORs have been understated, are we guilty of being part of the pack?  You could say we are.***"  In communications between November 2007 and October 2008, Barclays' employees revealed that "all of the Contributor Panel banks, including Barclays, were contributing rates that were too low."  Barclays SOF ¶ 42.

86.    According to documents found by the government investigations, on numerous occasions between January 2005 and June 2009, Barclays' derivatives traders requested that submitters make false submissions that favored their trading positions.  Specifically, the CFTC found that "Barclays based its LIBOR submissions for U.S. Dollar . . . on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions."  Barclays CFTC Order at 2.

87.    The majority of these requests came from traders on Barclays' New York

---

[36] E-mail to Jason Miu (dated October 3, 2007), BARC-MAY6000086-87.

Interest Rate Swaps Desk and involved USD Libor, and included requests made on behalf of

other banks.  The requests were made openly, sometimes shouted across the office to confirm

that no conflicting requests for manipulation were made.  The traders' conduct was common and

pervasive, and known by other traders and trading desk managers located near the New York

Swaps Desk.  Some traders made entries in their electronic calendars to remind themselves what

requests to make of Barclays' Libor submitters the next day.

      88.     The following provide just a sample of the numerous requests made by Barclays'

traders, as revealed in documents quoted in Barclays' settlement papers:

- "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!!  We need a 4.17 fix in 1m (low fix)."

- "You need to take a close look at the reset ladder.  We need 3M to stay low for the next 3 sets . . . ."

- "This is the [book's] risk.  We need low 1M and 3M libor.  Pls ask [submitter] to get 1M set to 82.  That would help a lot."

- "Hi Guys, We got a big position in 3m libor for the next 3 days.  Can we please keep the lib or fixing at 5.39 for the next few days.  It would really help.  We do not want it to fix any higher than that.  Tks a lot."

- "Hi mate[.]  We have an unbelievably large set on Monday (the IMM).  We need a really low 3m fix, it could potentially cost a fortune.  Would really appreciate any help, I'm being told by my NYK [counterparts in New York] that it's extremely important.  Thanks."

- "I really need a very very low 3m fixing on Monday—preferably we get kicked out.  We have about 80 yards [billion] fixing for the desk and each 0.1 [one basis point] lower in the fix is a huge help for us.  So 4.90 or lower would be fantastic."

      89.     The documents revealed by the investigation also confirm that the Libor

submitters regularly altered Barclays' USD Libor reports based on the traders' requests.  For

example, on December 19, 2006, a Barclays trader sent an email to a Barclays submitter with the

subject line, "3m Libor," asking, "Can you pls [please] continue to go in for 3m Libor at 5.365 or

lower, we are all very long cash here in ny."  The submitter asked "How long . . . ?"  The trader

replied "Until the effective date goes over year end (i.e. turn drops out) if possible."  The

submitter replied "Will do my best sir."  On December 19, 20, and 21, 2006, Barclays' 3-month

USD Libor submissions were 5.37%, 5.37%, and 5.375%, respectively.

90.    On December 21, 2006, the submitter created an electronic calendar entry stating,

"SET 3 MONTH US$ LIBOR LOW!!!!!!" that was scheduled to begin on December 22, 2006,

at 9:00 a.m. and continue until January 1, 2007, at 9:30 a.m.  On December 22, 2006, and the

subsequent trading days through the end of the year, Barclays' 3-month USD Libor submissions

were 5.36%, 5.365%, 5.35%, and 5.36%, respectively.

91.    By way of further examples where the submitters directly agreed to make false

submissions:

- "For you . . . anything.  I am going to go . . . 92.5.  It is difficult to go lower than that in threes.  looking at where cash is trading.  In fact, if you did not want a low one I would have gone 93 at least."

- "Always happy to help, leave it with me, Sir."

- Trader C:  "The big day [has] arrived . . . .  My NYK are screaming at me about an unchanged 3m libor.  As always, any help wd be greatly appreciated.  What do you think you'll go for 3m?"  Submitter:  "I am going 90 altho[ugh] 91 is what I should be posting."  Trader C:  "[W]hen I retire and write a book about this business your name will be written in golden letters."  Submitter:  "I would prefer this [to] not be in any book!"

- Submitter:  "Hi All, Just as an FYI, I will be in noon'ish on Monday . . . ."  Trader B:  "Noonish?  Whos going to put my low fixings in?  hehehe."  Submitter:  "[X or Y] will be here if you have any requests for the fixings."  Confirming the requests did not go unheeded, Barclays' 3-month USD Libor submission on March 13, 2006, was 4.90%, which was tied for the lowest rate submitted.

- Trader C:  "If it's not too late low 1m and 3m would be nice, but please feel free to say 'no' . . . Coffees will be coming your way either way, just to say thank you for your help in the past few weeks."  Submitter: "Done . . . for you big boy."

- On February 5, 2008, Manager B instructed Trader B to:  "just tell him to keep it, to put it low."  Trader B said that he had "begged" the submitter to put in a low Libor submission and the submitter had said he would "see what I can do."

92.     The FSA made similar findings in a Final Notice ("Barclays FSA Final Notice"). Based on the evidence it uncovered, the FSA determined Barclays was engaged in widespread and pervasive misconduct with respect to its Libor submissions.  The FSA found that between January 2005 and May 2009, derivatives traders made at least 173 requests for USD Libor submissions to Barclays' submitters.

93.     These manipulations were also carried out with the help of, and at the request of, other panel banks.  For instance, after a trader at another bank requested a low Libor setting from Barclays and, when the Barclays trader agreed, the trader responded:  "Dude, I owe you big time!  Come over one day after work and I'm opening up a bottle of Bollinger!  Thanks for the Libor."  Similarly, a trader from an unidentified bank requested that Barclays set its Libor quote low:  "I know I'm asking for much, but ONLY if u guys care, a low 3m libor would be great . . . anywhere below 5.35 . . . thanks dude."  The FSA found that between February 2006 and October 2007, derivatives traders made at least 63 requests to external traders with the aim that those traders would pass on the requests for USD Libor submissions to their bank's submitters.

94.     According to the FSA's findings, at least 14 derivatives traders at Barclays were involved in this manipulation, including senior derivative traders and trading desk managers. Further demonstrating the complete lack of controls, willingness to conspire, and general corruption in the system, the FSA and other investigations found this problem to extend beyond USD Libor.  For instance, the FSA found that between September 2005 and May 2009, derivatives traders made at least 58 requests for Euribor submissions to Barclays' submitters (including 20 requests based on communications from derivative traders at other banks) and between August 2006 and June 2009, at least 26 requests for JPY Libor submissions were made to Barclays' submitters.

95.     An independent review conducted by Anthony Salz, the former senior partner of Freshfields Bruckhaus Deringer LLP, found that Barclays developed a win-at-all-costs culture that laid the foundation for Barclays' misconduct in the Libor scandal.  The Salz Review quoted Alistair Darling, the former Chancellor of the Exchequer:  "Quite clearly, there was a culture here that tolerated—if it didn't encourage—this sort of behaviour."[37]  And Benjamin Heineman, General Electric's former general counsel and senior fellow at Harvard Law School, noted that this was a case in which the authorities "'squeezed Barclays and Barclays yelped, which will be important for the making of cases against the other Libor banks.  There was obviously collusion with other banks.'"[38]

### B.     Facts Made Public by UBS's Settlements

96.     On December 19, 2012, UBS announced a settlement with numerous regulators under which it would pay over $1.5 billion in fines (including $400 million to the DOJ) and have its Japanese subsidiary plead guilty to felony wire fraud and pay a $100 million fine.  The investigations concluded that UBS's managers were well aware of and "actively involved in UBS's attempts to manipulate LIBOR and EURIBOR submissions."  The FSA found a "total disregard for proper standards by these Traders and Brokers," which was "clear from the documented communications in which particular individuals referred to each other in congratulatory and exhortatory terms such as 'the three muscateers [sic],' 'superman,' 'be a hero today,' and 'captain caos [sic].'"

97.     In its own corporate statement commenting on the settlements with U.S. and U.K.

---

[37] Anthony Salz, *An Independent Review of Barclays' Business Practice*s, ¶ 3.20 (Apr. 2013).

[38] James B. Stewart, *Calculated Deal in a Rate-Rigging Inquiry*, New York Times (July 13, 2012), available at http://www.nytimes.com/2012/07/14/business/in-barclays-inquiry-the-calculation-in-making-a-deal-common-sense.html?pagewanted=all&amp;gwt=regi&amp;_r=0.

regulators, UBS conceded that "employees at the bank colluded with employees at other banks and cash brokers to influence certain benchmark rates . . ." and that UBS personnel gave "inappropriate directions to UBS submitters" that were designed to misrepresent the bank's financial condition.[39]

98.    Under the non-prosecution agreement, UBS agreed to admit to a Statement of Facts detailing its manipulation of Libor and other benchmark interest rates.  The statement revealed that UBS had *no* systems, controls, policies, or procedures governing its Libor submissions.  *No* formal training was even given to those responsible for making the submissions.  It was not until August 2008 that UBS tried to enact such procedures—but even then they did not address the inherent conflicts of interest in mixing trading and submission resources.

99.    On December 11, 2012, the U.K. Serious Fraud Office arrested three individuals: Thomas Hayes, who had worked as a trader for Defendant UBS, among others, and Terry Farr and Jim Gilmour, both employees of brokerage firm RP Martin Holdings Ltd.  It was reported that UBS fired 24 employees in connection with the investigation of its Libor manipulation.

100.    The same day UBS announced its settlement with regulators, the DOJ's criminal complaint against former senior UBS traders Hayes and Roger Darin was unsealed (the "Hayes-Darin Complaint").  According to the Hayes-Darin Complaint, Hayes attempted to pressure colleagues and employees at other banks into manipulating Tibor.  For example:

- On March 3, 2010, Hayes told a broker "i really need a low 3m jpy libor into the imm [the International Monetary Market date, which occurs quarterly on the third Wednesday of March, June, September, and December]," and "any favours you can get with the due at [Bank C] would be much appreciated" "even if he only move 3m down 1bp."  The broker said "i'll give him a nudge later, see what he can do" and

---

[39] UBS, Press Release, *UBS Board of Directors authorizes settlements of LIBOR-related claims with US and UK authorities; Swiss regulator to issue order* (Dec. 19, 2012).

then asked the Bank C submitter: "u see 3m jpy libor going anywhere btween now and imm?" noting "we have a mutual friend who'd love to see it go down, no chance at all?" The Bank C submitter said "haha TH by chance," and the broker responded "shhh."

- The Hayes-Darin Complaint notes that, the next day, Bank C's 3-month JPY Libor submission decreased by one basis point compared to the previous day. After the Libor submissions were posted, the Bank C submitter reported back to the broker: "Libor lower," and the broker responded "good work!!!!"

- On May 12, 2010, Hayes told a UBS submitter: "libors are going down tonight" "because i am going to put some pressure on people."

101.    Hayes and Darin were charged with conspiracy to commit wire fraud. Hayes was also charged with price fixing in violation of the Sherman Act:

> In or about May 2009, in the Southern District of New York and elsewhere, TOM ALEXANDER WILLIAM HAYES, the defendant, and his co-conspirators, including an employee at a major financial institution, and others known and unknown, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act. The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among HAYES and his co-conspirators, the substantial terms of which were to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.

Hayes-Darin Complaint at 3.

102.    As with Barclays, the investigative materials confirm that the panel banks were manipulating their Libor submissions in a coordinated way to line their own pockets and to make themselves appear healthier than they really were. The FSA's Final Notice states "UBS sought to manipulate Libor and Euribor in order to improve the profitability of trading positions."[40] The CFTC reached the same conclusion, and also found that UBS worked with at least four other panel banks to make false submissions, and induced at least five interdealer brokers to

---

[40] *See* UBS FSA Final Notice ¶ 15b.

disseminate false information or otherwise influence other panel banks' submissions."[41]

103.    The FSA concluded that UBS "acted improperly" in making false Libor submissions.  As summarized by the FSA:

> In reaction to increased media scrutiny of the financial standing of and banks' LIBOR submissions during the financial crisis, UBS directives to its LIBOR submitters intended to:  'protect our franchise in these sensitive markets' . . . . These directives changed over time, but for a significant part of the period from at least 17 June 2008 to at least December 2008, ***their purpose was to influence UBS's LIBOR submissions to ensure that they did not attract negative media comment about UBS's creditworthiness***.

104.    Similarly, the CFTC concluded that, from August 2007 through mid-2009, UBS managers directed that the bank's USD Libor submissions be artificially suppressed so as to "***place UBS in 'the middle of the pack' of panel bank submissions*** . . . . [T]hese directions, at times, caused UBS's U.S. Dollar LIBOR and other benchmark submissions to be knowingly false."

105.    The decision to lower submissions was memorialized in an August 9, 2007 email from the Head of Asset and Liability Management to the Manager of the Derivatives Trading Desk that submitted the majority of UBS's Libor contributions, and others:  ***"[I]t is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.***  Fixing risk and [profit and loss] thereof is secondary priority for now."  The next day, UBS dropped its overnight submission 50 basis points.

106.    Consistent with this new practice, a UBS derivatives trader advised a USD Libor submitter that, as to UBS's Libor contribution that day, the "aim should really be to be on the lower side of range."  When the submitter described his intended submission, the derivatives

---

[41] *See* CFTC, Press Release: PR6472-12, U.S. Commodity Futures Trading Commission, *CFTC Orders UBS to Pay $700 Million Penalty to Settle Charges of Manipulation, Attempted Manipulation and False Reporting of LIBOR and Other Benchmark Interest Rates* ("CFTC Press Release") (Dec. 19, 2012).

trader responded, "this seems probably a tad low right now, but recon [sic] that's what we should try to be," and added, "we just don't want to give the market a wrong impression . . . . so therefore don't want to be on the highs of libors."  Later that day, before leaving for vacation, the submitter reminded his replacement to "[p]lease remember to err on the low side."  A month later, on September 5, 2007, the USD Libor submitter informed a senior manager in the Investment Bank:  "we are fixing on the low side of all other banks in the libor panel in the 4-12 mo period by several bps . . . . [As a] bank we are erring on the low side."

107.    Traders understood that this direction came from UBS's senior management.  In a September 5, 2007 electronic chat, for instance, a trader complained about UBS's low Libor submissions, stating that "***all senior management . . . want to show the world we are the strongest bank with loads of liquidity.***  We'd lend at 0 US!"

108.    In June 2008, a UBS Senior Manager instructed USD Libor submitters to lower their submissions over the next three days "to get in line with the competition."  UBS's 3-month USD Libor submissions immediately dropped 5 basis points to the "middle of the pack."

109.    Internally, some employees questioned the directive to report false Libor submissions.  In one 2008 internal exchange via electronic chat, a UBS employee noted that "Libors are currently even more fictitious than usual."  The first UBS employee asks, "isn't Libor meant to represent the rates at which banks lend to each other?"  The response:  "***it's a made up number***" that the panel banks were underreporting at the time "to not show where they really pay in case it creates headlines about . . . being desperate for cash."  Or as one UBS senior manager explained the reason for UBS's "middle of the pack" directive:  "***the answer would be 'because the whole street was doing the same and because [UBS] did not want to be an outlier in the Libor fixings, just like everybody else.'***"

110.    As with Barclays, recently released materials show that the bank was also manipulating its submissions to directly line its own pockets.  For instance, in reference to USD Libor, a UBS trader in Connecticut emailed that the submitting office had "only one mission . . . We need 3mo Libor set low."

111.    The corrupt nature of the rate-submission process is also seen in how rates other than USD Libor were manipulated.  Recently revealed emails show traders asking for JPY submitters:  "Can we pls go for lower Libors tonight, across all tenors," and "hi . . . can we go low 1m and 3m again pls."  Like Barclays, the evidence shows the submitters responded favorably writing "will do" and "we can try."  The FSA found that UBS traders "routinely" made requests of UBS's Libor submitters to adjust submissions to benefit UBS trading positions, including "more than 800 documented Internal Requests" to manipulate JPY Libor and "more than 115 Internal Requests" to manipulate other currency-denominated Libor, including USD Libor.  The FSA also found that UBS "colluded with interdealer brokers to attempt to influence the JPY Libor submissions of other banks" and were in "regular contact" with at least four other banks.

112.    According to the Japanese FSA, while employed by UBS, Thomas Hayes "attempted to pressure colleagues and employees at other banks involved in the rate-setting process for the Tokyo Interbank Offered Rate, or Tibor."  For example, UBS admitted that on March 31, 2009, Trader-1 (identified in the press as Hayes)[42] "**asked Broker C to help influence 9 of the 16 banks** by convincing them to lower their LIBOR submissions from the previous day, thus lowering the resulting 1-month and 3-month Yen LIBOR fix."  The CFTC found similarly

---

[42] A press report identifies the Senior Yen Trader as Hayes.  *See* David Enrich, *Rate-Rig Spotlight Falls on 'Rain Man'*, Wall Street Journal, (Feb. 8, 2013), available at http://online.wsj.com/article/SB10001424127887324445904578285810706107442.html

that Hayes communicated with other Yen Libor panel banks in an effort to manipulate that

benchmark:

> As with his internal requests, the Senior Yen Trader began coordinating
> regularly with derivatives traders at other panel banks by January 2007.
> The Senior Yen Trader coordinated with traders primarily at four panel
> banks whom he knew or had worked with previously.  The Senior Yen
> Trader, or others acting on his behalf, made about 100 requests of traders at
> the other panel banks.
>
> The Senior Yen Trader generally made requests of the other banks' traders, who
> regularly agreed to pass his requests to their Yen LIBOR or, on occasion, Euroyen
> TIBOR submitters.  The Senior Yen Trader also made requests directly of the
> submitter of at least one bank.   The other traders often conveyed success with
> comments such as, "done" and "we  normally do well for u!!!"[43]

113.    On May 15, 2014, the CFTC announced related penalties concerning UBS's Yen

Libor manipulation against RP Martin Holdings Limited, as well as a subsidiary.  Specifically,

the CFTC settled charges that RP Martin brokers working on its Yen desk "at times knowingly

disseminated false and misleading information concerning Yen borrowing rates to market

participants in attempts to manipulate, at times successfully, the official fixing of the daily Yen

Libor," and engaged in this conduct "primarily to aid and abet a senior Yen derivatives trader . . .

employed at [UBS] and later at another bank."[44]  The CFTC Order also indicates, among other

things, that RP Martin "contacted certain Yen LIBOR submitters and asked them directly to

move their Yen LIBOR submissions in a manner that would benefit the Senior Yen Trader."[45]

114.    In December 2012, UBS Securities Japan Co., Ltd. , the entity where Hayes

worked, agreed to plead guilty to one count of wire fraud, 18 U.S.C. § 1343, for secretly

manipulating JPY Libor and Tibor.  UBS Securities Japan admitted in its plea that false and

---

[43] CFTC Order at 17.

[44] CFTC Release dated May 15, 2014, at 1.

[45] *Id.*

misleading Libor submissions were "material" from the perspective of counterparties to financial transactions.

115.    On June 18, 2013, the U.K. Serious Fraud Office charged Hayes with eight counts of conspiracy to defraud.  According to a June 21, 2013 *Wall Street Journal* article, each of the eight charges accuse Hayes of "dishonestly seeking to manipulate [Libor] . . . with the intention that the economic interests of others *would be prejudiced* and/or to make personal gain for themselves or another."  In addition, the charges allege that Hayes conspired with employees at eight banks and interdealer brokerage firms, as well as with colleagues at UBS and Citi.  The banks include JPMorgan, Deutsche Bank, and RBS.  In January 2013, Hayes sent a text message to the *Wall Street Journal* stating "this goes much higher than me."

116.    UBS has suspended employees for their involvement in manipulating Libor, including Yvan Ducrot, who was the co-head *of UBS's rates bus*iness.  Holger Seger, the global head of short-term interest rates trading at UBS, was likewise suspended by UBS in connection with international probes and ultimately left his position in April 2012.

117.    Also similar to Barclays, the UBS evidence shows that this corruption spread across banks, as UBS traders are seen corresponding with traders at other banks (identified only as "Bank B" and the like in the released materials) along the lines of "if you could ask your guys to keep 3m low wd be massive help," "real big favour to ask, could you try for low 6m fix today pls wld be most appreciated," and "I need you to keep it as low as possible."  As with the internal corruption, the responses at the other (unidentified) banks would be favorable:  "will try my best . . . hows u ? ? ?" and "ill try and push a few fictitious offers and this mg see if that helps."

118.    UBS's employees were richly rewarded for their rate-rigging efforts.  For example, two traders whose positions depended on Libor rates engaged in wash trades (*i.e.*, risk-

free trades that cancelled each other out and which had no legitimate commercial rationale) to gin up "corrupt brokerage payments . . . as reward for their efforts" to manipulate the submissions.  In a 2008 phone conversation recently detailed by the FSA, a UBS trader promised the UBS broker to do "one humongous deal with you" if the JPY Libor rate was kept "as low as possible."  The trader went on:  "I'll pay you, you know, 50,000 dollars, 100,000 dollars . . . whatever you want . . . I'm a man of my word."  UBS made "corrupt payments of £15,000 per quarter to Brokers to reward them for their assistance" in rigging Libor.

### C.    Facts Made Public by RBS's Settlements

119.    RBS also has admitted to wide-ranging rate-setting misconduct as part of settlements with multiple government authorities.  RBS's CEO stated in advance of the settlement that the bank's Libor-related misconduct "is a deeply regrettable thing . . . . the sort of thing the industry has to put behind it."  Similarly, Johnny Cameron, RBS's former Chairman of Global Banking and Markets, stated before British Parliament that Libor manipulation involved *"a cartel of people across a number of banks who felt they could fix it."*  RBS's primary regulator, the FSA, found that RBS's Libor submissions process suffered from pervasive conflicts of interest that undermined the integrity of its submissions.

120.    RBS's USD Libor submissions were in the bottom half of the panel banks more than two-thirds of the time.  That RBS was reporting below-median borrowing costs throughout the Relevant Period is remarkable given the depth of RBS's financial problems at the time. Despite mounting concern about RBS's stability in September 2008, the bank's Libor submissions only briefly exceeded their 2007 peak.

121.    RBS delegated responsibility for its daily Libor submissions to fixed-income traders whose "bonuses were linked in part to the profit and loss ('P&L') of their money market trading books."  This gave RBS's traders significant incentives to falsify their Libor submissions

to influence profits on the bank's own positions.  The FSA concluded that the risk traders would alter their Libor submissions to suit their trading strategies "crystallized with respect to RBS's JPY, CHF, and USD LIBOR submissions."

122.    Emails, instant messages, and telephone transcripts recently made public confirm that RBS's employees knew that ***"people are just setting Libors to suit their books"*** and ***"it's just where you've got your fixing really."***  RBS FSA Final Notice ¶ 71 (emphasis in original).  That is, the submissions were set only in relation to what would make RBS the most money.  One submitter acknowledged that ***"I set a rate to benefit my interest as a Money Market trader."***  *Id.* (emphasis in original).  According to telephone transcripts obtained by *Bloomberg*, Paul Walker, who headed RBS's money-markets trading and was responsible for its USD Libor submissions, summed up his views in call with another trader:  "Libor is what you say it is."[46]  *Bloomberg* reported that these same phone transcripts showed "[s]enior managers at RBS, Britain's largest publicly owned lender, knew banks were systematically rigging Libor as early as August 2007."[47]  Walker was fired in the months before RBS's settlement with regulators.[48]

123.    One RBS trader gloated, "[i]t's just amazing how Libor fixing can make you that much money . . . ***It's a cartel now in London***."[49]  As for outside investors such as Plaintiff, another RBS trader responded, "Must be damn difficult to trade, man . . . . Especially [if] you [are] not in the loop."[50]

---

[46] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg, Dec. 13, 2012.

[47] *Id.*

[48] Lindsay Fortado, *RBS Traders Helped UBS's Hayes with Libor Bribes, Regulators Say*, Bloomberg (Feb. 6, 2013).

[49] Andrea Tan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012) (emphasis added).

[50] *Id.*

124.    The FSA's Final Notice described specific instances where traders at RBS made fraudulent USD Libor submissions to inflate trading profits.  For example, in 2007 one trader told an RBS colleague "I've got massive fixing in ones, so I said to [the trader] I just want the really, really low ones."  The reference to "massive fixing" was to a $4 billion borrowing facility RBS had that was set to fix at the time the requests were made.  RBS's submissions for 1-month USD Libor dropped, just in time for RBS's "massive fixing."  The trader was unsatisfied, complaining that "we need usd libor to drop faster," and sought confirmation that "on monday, usd libor will drop 5bps."

125.    A similar example took place between March 9 and March 18, 2010, when another trader explained to the submitter how he "wanted to keep [USD Libor] down because of some fixes."  The submitter confirmed his understanding that "we do have some big fixes in London so suits for low libors."  RBS's USD Libor submissions stayed low while five large, dollar-denominated, floating-rate transactions fixed.

126.    These episodes typify how, according to the RBS FSA Final Notice, RBS's Libor submitters "inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make)" Libor submissions, including USD Libor.

127.    As with the other settling banks, the corrupt nature of the process is further confirmed by the fact that RBS's manipulation extended beyond USD Libor.  For example, on August 17, 2007, two RBS traders discussed their planned manipulation of both USD Libor and JPY Libor: "so on Monday, usd libor will drop 5bps, but jpy [Libor] will only follow suit a few days later."  As this exchange demonstrates, the same individuals were often involved in manipulating Libor across different currencies.

128.    *Bloomberg's* December 13, 2012, article entitled "Libor Transcripts Expose Rate-Rigging With Police Nearby" recites transcripts of instant messages and telephone conversations among RBS's traders agreeing to rig Libor.  For example, *Bloomberg* reviewed a transcript of an instant message discussion held on December 3, 2007, wherein Jezri Mohideen, then RBS's head of JPY products in Tokyo, instructed colleagues in the United Kingdom to lower the bank's six-month Libor submission that day, ordering "We want lower Libors . . . . Let the money market guys know."  Will Hall, a trader in London, confirmed, "Sure, I'm setting."  Mohideen replied, "Great, set it nice and low."

129.    Hall was also named in an affidavit filed by a Canadian Competition Law Officer in Libor-related proceedings in Canada.  The affidavit sought orders requiring RBS and other banks[51] to produce documents in connection with an inquiry concerning whether the banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from 2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."

130.    According to the affidavit, Hall colluded with other traders to manipulate JPY Libor.  Other traders at RBS have been implicated in the Libor scandal, including Brent Davies, another trader in London who, like Hall, was named in the Canadian Competition Law Officer's affidavit for manipulation of JPY Libor.

131.    Further details on the rigging of JPY Libor have been revealed in a Singapore wrongful termination lawsuit.  In that case, Tan Chi Min, former head of delta trading for RBS's

---

[51] Those banks include Deutsche Bank and JPMorgan.

global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), was terminated over accusations that "he tried to improperly influence the bank's rate setters from 2007 to 2011 to persuade them to offer Libor submissions that would benefit his trading positions." According to Tan, however, it was acceptable at RBS for traders to attempt to influence Libor submissions. Tan further alleges that his manager, Todd Morakis, confirmed to him around October 2011 that "the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry."

132. RBS was charged with violating the Sherman Act due to its manipulation of JPY Libor. In a deferred prosecution agreement filed on February 6, 2013, RBS acknowledged and agreed that the DOJ will file a two-count criminal information in the United States alleging one count of price-fixing, in violation of the Sherman Act, Title 15, United States Code, Section 1. RBS Deferred Prosecution Agreement ("DPA"). As part of that agreement, RBS "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts." RBS DPA ¶ 2.

133. RBS agreed that by colluding to manipulate JPY Libor, RBS colluded to fix the price of Libor-based instruments because JPY Libor is a component of price of Libor-based instruments:

> Traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen LIBOR submissions, causing the manipulation of the LIBOR reference rate on certain occasions. Because Yen LIBOR was a pricing component of derivatives contracts held by the financial institutions, the traders benefited from this agreement by affecting the profitability of the contracts on particular settlement dates.

RBS SOF ¶ 82.

134. On April 12, 2013, the DOJ charged RBS with one count of "price-fixing" in

violation of Section 1 of the Sherman Act.  RBS admitted that it was responsible for the

following acts, as charged in the information:

> ROYAL BANK OF SCOTLAND PLC, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce.  The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendant and its co-conspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key price component of the price thereof, on certain occasions.

135.    In its settlements, RBS agreed that its JPY Libor price-fixing conspiracy lasted

from at least as early as February 2007 through 2010.  *See* RBS SOF ¶ 43; *see also* RBS FSA

Final Notice ¶ 9 ("Between February 2007 and June 2010, RBS, through two of its Derivatives

traders, colluded with Panel Banks and Broker Firms in relation to JPY and CHF LIBOR

submissions.").

136.    RBS's settlement with the CFTC also revealed coordination among the panel

banks in setting JPY Libor rates.  The CFTC reports that an RBS Yen trader "on at least one

occasion" asked an interdealer broker "to try to influence other panel banks' Yen LIBOR

submissions to benefit the trading positions of" the trader.  RBS CFTC Order at 23.[52]  Later the

same day, the interdealer broker informed the RBS Yen trader that the broker had spoken with

certain panel banks:  "We've, so far we've spoke to [Bank F].  We've spoke to a couple of

people so we'll see where they come in alright.  We've spoke, basically one second, basically we

spoke to [Bank F], [Bank G], [Bank H], who else did I speak to? [Bank I].  There's a couple of

other people that the boys have spoke to but as a team we've basically said we want a bit lower

so we'll see where they come in alright?"[53]  This evidence shows collusion in making JPY Libor

---

[52] *In re The Royal Bank of Scotland plc and RBS Securities Japan Limited*, CFTC Docket No. 13-14 (Feb. 6, 2013) ("RBS CFTC Order").

[53] *Id.* at 24.

submissions, and, along with the other evidence presented, strongly suggests such collusion in other currencies, including USD Libor, as well.

137.    RBS employees have been disciplined or dismissed for their involvement in rigging Libor.  For example, Andrew Hamilton, a former investment advisor at RBS in London, was dismissed by RBS on October 21, 2011.  "In total, the misconduct involved at least 21 individuals at RBS, at least one of whom was a Manager."   RBS FSA Final Notice ¶ 109.

### D.    **Facts Made Public by Rabobank's Settlements**

138.    On October 29, 2013, non-party Rabobank agreed to pay approximately $1 billion in fines to settle allegations that it manipulated Libor and other benchmark interest rates.  This included $325 million to the DOJ and $475 million to the CFTC.  In connection with these settlements, the CFTC determined that:

> From at least mid-2005 through early 2011, Rabobank traders engaged in hundreds of manipulative acts undermining the integrity of U.S. Dollar and Yen LIBOR, Euribor and, to a lesser extent, Sterling LIBOR.  These violations took various forms [including that] Rabobank traders, some of whom doubled as LIBOR and Euribor submitters, regularly made and accommodated their fellow traders' requests to make favorable rate submissions to benefit their trading positions through attempts to manipulate U.S. Dollar Libor and Yen LIBOR and Euribor.[54]

The DOJ made a similar finding, adding that "[n]ot only was [Rabobank's] conduct fraudulent, it compromised the integrity of globally-used interest rate benchmarks—undermining financial markets worldwide."[55]

139.    Under a deferred prosecution agreement, Rabobank admitted to a Statement of Facts revealing that like the other panel banks to have reached settlements, it too made Libor

---

[54] CFTC, Press Release, *Rabobank to Pay $475 Million Penalty to Settle Manipulation and False Reporting Charges Related to LIBOR and Euribor* (Oct. 29, 2013), available at http://www.cftc.gov/PressRoom/PressReleases/pr6752-13.

[55] DOJ Office of Public Affairs, Press Release, *Rabobank Admits Wrongdoing in Libor Investigation, Agrees to Pay $325 Million Criminal Penalty* (Oct. 29, 2013), available at http://www.justice.gov/opa/pr/2013/October/13-crm-1147.html.

submissions to benefit its trading positions and failed to report accurately its borrowing costs. As an example, on October 17, 2007, a Rabobank swaps trader emailed a USD Libor submitter requesting "[a] nice low 1 month for the rest of the week please matey.  Cheers."  That day, Rabobank's 1-month USD Libor submission dropped four basis points, and remained low for the rest of the week.  According to the Statement of Facts, complying with requests such as this was a regular part of Rabobank's rate-setting process.

140.    Rabobank's manipulation was not limited to USD Libor, but included other rates, including JPY Libor, Euribor, and Sterling Pound Libor.  For instance, on August 24, 2007, a trader emailed a JPY Libor submitter stating "I would like today's 6m libor lower today mate."  The submitter responded:  "Ok mate what level do you want mate."  The trader instructed the trader to enter submissions of "1m 0.78," "3m 0.99," and "6m 1.00."  After the JPY submissions and fixing had been published, the trader emailed the submitter: "Ops... sorry that I meant 6m is 1.10…. Not 1.00%.  Just bit surprised when I saw our 6m libor price."  That day, Rabobank's JPY Libor submissions were just as the trader instructed, including a 6-month submission of 1.00% per the trader's mistaken request—a 15 basis point decrease from the previous day.

141.    Notwithstanding the erroneous submission, the same trader continued to make these types of requests.  On October 17, 2008, for example, he asked a submitter "If possible, could you keep setting 6m libor at 0.80% for a while please?"  The submitter's response confirms that Rabobank's manipulation was both systemic and substantial: "Hi mate – oh yes – *we are now setting all libor significantly under the market levels.*"

142.    Submitters were fully aware that the goal of manipulating Rabobank's Libor submissions was to influence the final Libor fixing.  For instance, on January 29, 2009, a submitter noted that he "saw the 6m vs 3m basis collapsing last night," prompting a trader to

gloat "because we lowered 6m libor !"  Another trader at Rabobank similarly told a third party at another financial institution that "Sometimes if you want the LIBOR to be set, if you want today's LIBOR at a certain price, your desired number [would be achieved]."  The trader further explained:  "Well, we are the ones who set [LIBOR].  The recent 97 had been set at 97 due to my wishes.  That is obviously . . . that's a little bad . . . Well, anyway, the person with the strongest wishes gets to decide it.  Well, this is the way it is."

143.    Rabobank created an environment ripe for this type of corruption by assigning traders with Libor-based positions to also serve *as Libor submitters*.  As an example, on September 19, 2007, one submitter told another that "today i have fixing so am low on the 3mth."  That day, Rabobank's 3-month USD Libor submission dropped *39 basis points*. Following its review of internal correspondence such as this, the CFTC concluded:  "Submitters were improperly left to choose between their responsibility to make an honest assessment of borrowing costs and their desire to maximize the profitability of their trading positions.  Here, Rabobank's submitters often resolved the conflict in favor of profit."

144.    Also facilitating rate manipulation was the fact that Rabobank employed submitters with limited knowledge of the rate-setting process and *no* training.  This enabled traders to exert even more control over Libor submissions.  In fact, Rabobank submitters often actively sought trader input in the setting process.  For example, on January 30, 2009, a submitter asked a trader "any preferences in fixings today?"  The trader replied, "6m 0.82% pls," to which the submitter responded, "will do."  That day, Rabobank's 6-month JPY Libor submission was 0.82, a decrease of 3 basis points from the previous day.  Submitters also on occasion allowed traders to make Rabobank's submissions directly.

145.    Supervisors at Rabobank were aware of this misconduct, and were even active

participants in it.  On November 4, 2008, for instance, a trader wrote to three submitters, including Rabobank's Global Head of Liquidity and Finance and the head of Rabobank's money markets desk in London:  "Could you set 6m libor at 0.98% today if possible please?"  One of the submitters responded:  "SURE."  That day, Rabobank's 6-month JPY Libor submission was set at 0.98%, a decrease of 5 basis points.

146.    Rabobank's settlement papers also illustrate the collusion that occurred among panel banks.  Until at least October 2008, a Rabobank JPY Libor submitter regularly communicated with a submitter at another panel bank about the rates that each would submit for JPY Libor.  On July 19, 2007, for instance, the outside submitter wrote:  "mrng beautiful. . . . if u can would love a low fixing in 3s libor today. . . .[0].77 if poss but just no higher than yest!!"  The Rabobank submitter replied:  "no prob."  On September 25, 2008, the outside trader wrote: "where r u pitching 6 s libor . . . got a fixing."  The Rabobank submitter responded: "where would you like me to set it mate?"  The outside trader responded:  "i need a low one . . . anything and 1 pc would be ok."

147.    The same Rabobank submitter similarly colluded with an outside derivatives broker, rigging submissions to benefit the derivatives broker's clients, including UBS.  With respect to one fix, the Rabobank submitter commented:  "You know, scratch my back, yeah, and all," to which the derivatives broker replied:  "Yeah oh definitely, yeah, play the rules."  As the Rabobank submitter now admits, there was "deffinite [sic] manipulation . . . i always used to ask if anyone needed a favour and vice versa . . . a little unethical but always helps to have friends in mrkt."

### E.    Facts Made Public By the European Commission Settlements

148.    On December 4, 2013, in a press release titled "Antitrust: Commission fines

banks € 1.71 billion for participating in cartels in the interest rate derivatives industry,"[56] the European Commission described its settlements with several Defendants relating to their participation in cartels relating to interest-rate derivatives denominated in Euros and Yen.

149.    The press release explained that the cartel relating to Euro-denominated interest rate derivatives "aimed at distorting the normal course of pricing components for these derivatives," and that "[t]raders of different banks discussed their bank's submissions for the calculation of EURIBOR as well as their trading and pricing strategies."[57]

150.    In published press conference materials from the same day, Joaquín Almunia, the European Commission Vice President responsible for Competition Policy, explained that "we found that the participating banks coordinated with each other to influence the EURIBOR benchmark," which included discussions of "confidential and commercially sensitive information that they are not allowed to share with other market players" and that they "exchanged on their pricing and trading strategies and trading positions."[58]  The Defendants in this matter who were involved in this cartel and settled with the European Commission were Barclays, Deutsche Bank, and RBS.

151.    The press release also explained that the cartel relating to Yen-denominated interest-rate derivatives "included discussions between traders of the participating banks on certain JPY LIBOR submissions."  The traders involved, the release continued, "also exchanged, on occasions, commercially sensitive information relating either to trading positions or to future

---

[56] European Commission, Press Release (Dec. 4, 2013), available at http://europa.eu/rapid/press-release_IP-13-1208_en.htm.

[57] *Id.* at 2.

[58] Joaquín Almunia, *Introductory Remarks on Cartels in the Financial Sector*, (Dec. 4, 2013), at 2, available at http://europa.eu/rapid/press-release_SPEECH-13-1020_en.htm.

JPY LIBOR submissions."[59]  Mr. Almunia elaborated that this cartel included "discussions between the banks' traders about the upcoming submissions to the panels for the relevant benchmarks . . . . The aim of these talks between traders was to increase their banks' profits and in turn their own bonuses.  They also shared commercially sensitive information of the type that competitors normally keep secret."[60]  The Defendants in this matter who were involved in this cartel and settled with the European Commission were UBS, RBS, Deutsche Bank, Citi, and JPMorgan.

152.    Mr. Almunia noted:

What is shocking about the LIBOR and EURIBOR scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other.  Today's decision sends a clear message that the Commission is determined to fight and sanction these cartels in the financial sector.  Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few.[61]

F.    **Defendants' Motives to Manipulate Libor**

153.    The evidence described above confirms that Defendants had powerful motives to suppress USD Libor.

154.    First, Defendants were motivated by the direct desire to line their own pockets by way of their own exposure to interest-rate risk.  An academic study by UCLA economics professor Connan Snider and University of Minnesota economics professor Thomas Youle, discussed further below, concludes that bank portfolio exposure to Libor is a "source of misreporting incentive."  That is, by manipulating Libor, Defendants were able to control how much they were paying out to their own counterparties and affect the value of other instruments

---

[59] European Commission, Press Release (Dec. 4, 2013), at 2.

[60] Almunia at 3.

[61] *Id.* at 4.

that could be traded.

155.    One direct impact of suppressing Libor for a panel bank would be that it would have to pay less interest on its own portfolio.  Defendants had "unbalanced" portfolios, meaning they often stood to pay more on floating-rate instruments than they stood to receive on floating-rate instruments.  Suppression of Libor, then, would save the panel banks billions.  For example, according to Snider and Youle, JPMorgan reported significant exposure to rising interest rates in 2009, stating that if interest rates increased by 1%, it would lose over $500 million in revenue.

156.    As of September 30, 2008, Deutsche Bank calculated it could gain or lose €68 million ($91.6 million) for every basis point of change in the spread between Libor and Euribor, and had similar exposure to changes in the Libor "yield curve" (the relationship between short- and long-term rates).[62]  Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to Libor because Libor was low.

157.    Citigroup's 2007 Annual Report calculated that the bank would profit between $540 and $837 million from a 1% decrease in interest rates.  In 2009, Citigroup reported it would make $936 million in net interest revenue if rates would fall by 25 basis points per quarter over the next year and $1.935 billion if rates fell 1%.

158.    BAC's 2007 Annual Report estimated that a 1% drop in USD interest rates would yield a profit of more than $800 million.  JPMorgan Chase reported in 2009 that an increase in interest rates of 1% would cost it more than $500 million.  HSBC Holdings estimated it stood to earn hundreds of millions more in 2008 and 2009 from low interest rates—or would lose similar amounts from high interest rates.  And Deutsche Bank is reported to have earned more than $650

---

[62] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall Street Journal (Jan. 9, 2013).

million in trading during 2008 on account of low Libor rates.[63]

159. Second, Defendants were also motivated to understate their borrowing costs to avoid negative publicity, particularly as the financial crisis that began to unfold in 2007 brought the banks under increasing scrutiny about their liquidity and creditworthiness. The BBA published the rates reported by every panel bank. If a panel bank's published rate revealed that its peers were charging it higher rates than were being charged to the other banks, this would signal that that bank was thought to be less creditworthy and riskier. Therefore, Defendants had a motive to falsify the rates that they submitted to give the appearance that their funding costs were lower than they actually were, as to portray to the market a (false) appearance of financial health despite the deteriorating condition of themselves and the marketplace.

160. The business press focused on high USD Libor submissions as a sign of distress. Such publicity increased Defendants' motivation to coordinate and lower their submissions. As noted above, this happened to Barclays in September 2007. As another example, an April 23, 2008 Société Générale report questioned the strength of RBS, and noted that RBS had left itself "no capital headroom," and recommended shareholders not invest further. Later reports noted the "loss of confidence in the bank's ability to continue to operate as a private sector player . . . In this instance, the shares could have very limited value, if at all." And UBS admitted the same motive, as described by the DOJ:

> Because a bank's LIBOR contributions, even if they are not based entirely on actual money market transactions, should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market, a bank's LIBOR contributions may be viewed as an indicator of a bank's creditworthiness. If a bank's LIBOR contributions are relatively high, those submissions could suggest that the bank is paying more than others to borrow funds. Thus, a bank could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank.

---

[63] *Id.*

161.    The CFTC found expressly that UBS acted to further this motive: "from approximately August 2007 to mid-2009, UBS, at times, used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself against media speculation concerning its financial stability during the financial crisis." CFTC UBS Order at 2.[64]

162.    These motives were not just reason to submit misleadingly low reports, but to do so through collusion. A single bank's "low" submission may not move the published rate far enough for the banks to make their ill-gotten gains—and may have been excluded from the calculation as an "outlier." And the only way for every Defendant to appear financially strong through low Libor submissions without drawing unwanted media and regulatory attention was for all Defendants to collude to suppress as a pack. That is because, on the one hand, a bank that submits Libor rates that are above the pack signals its relative weakness and illiquidity to the media and market. As Barclays acknowledged, a bank submitting too high risked sticking its "head above the parapet," which could get it "shot" off by the financial press. Barclays SOF ¶ 43. At the same time, a bank that artificially submitted rates that were noticeably lower than the other panel banks would also risk attention from the media or government regulators that could lead to exposure of its illicit submissions.

163.    Absent collusion it would have been in the unilateral self-interest of an individual bank to report that the other banks were artificially suppressing their Libor submissions, once the bank learned that was occurring. Such a report would have increased the perceived integrity of the reporting bank, while bringing into serious question the integrity and the financial strength of

---

[64] *In re UBS AG and UBS Secs. Japan Co., Ltd.*, CFTC Docket No. 13-09, Dec. 19, 2012, at 2. *See also id.* at 4 ("During the financial crisis, certain UBS managers issued directions for making UBS benchmark interest rate submissions in order to protect against what UBS perceived as unfair and inaccurate negative public and media perceptions about UBS.").

the banks that were providing false submissions—in other words, such a report would have conferred a significant competitive advantage upon the reporting bank. Because of their collusion, however, no bank reported on any other, meaning that investors like Plaintiff were harmed by this failure to seek an individual competitive advantage.

### G.    Statistical Evidence of Consistent and Uniform Suppression

164.    With the clarity the above evidence has brought, numerous statistical analyses of Libor can be and have been conducted. No matter how the data is sliced, the conclusion is the same: During the Relevant Period, there is a consistent gap between the actual behavior of USD Libor at the time, and what one would expect when comparing Libor to the behavior of other benchmark measurements both before and after the Relevant Period. Because of the turbulence created by the financial crisis, it was not clear at the time that this gap was the result of intentional fraudulent conduct by Defendants and the other panel banks, and certainly was not clear it was the result of collusive conduct. At the same time, the panel banks were falsely assuring the public of the integrity of the Libor rate-setting process. But with the now-public revelations discussed above, these statistical anomalies confirm that USD Libor was being continually, intentionally, and artificially suppressed.

165.    The statistical evidence also demonstrates that Defendants and the other panel banks conspired to suppress Libor throughout the Relevant Period. For example, the Eurodollar study, performed by consulting experts retained by plaintiffs in the class actions and discussed below, shows anomalous divergences during this period between the Eurodollar deposit rate benchmark, published by the Federal Reserve Bank of New York ("Fed Eurodollar Rate") and Libor submissions. Those divergences are unprecedented before and after this period and not explainable by market fundamentals. Before and after this period, Libor and the Fed Eurodollar Rate were very closely correlated. During this period, however, Defendants' and the other panel

banks' Libor submissions were, on average, approximately 26 basis points lower than the Fed Eurodollar Rate ("Eurodollar spread").

166.    In addition, Defendants' and the other panel banks' patterns of divergence from the Fed Eurodollar Rate were very similar to each other during this period, as every panel bank had an average Eurodollar Spread within 9 basis points of each other.  The panel banks suppressed as a pack during this period.  This statistical evidence shows collusion because all the panel banks, including Defendants, were artificially suppressing Libor in common but unpredictable ways that did not correspond to the Libor definition, or track market fundamentals, even though their submissions were supposed to be confidential.

### 1.    Evidence of the commencement of the manipulation

167.    On August 9, 2007, various panel banks made Libor submissions that were substantially greater than the prior day, evoking media suspicion that panel banks were concerned about lending funds to one another.

168.    By August 16, 2007, however, the panel banks were making substantially lower Libor submissions to the BBA.  Figure A below shows that Libor submissions between August 7 and August 28, 2007 begin dispersed, but then conform to one another by month's end.  The pattern is consistent with other allegations that the collusion to suppress Libor began in August 2007.[65]

---

[65] The information in this section 1, including Figure A, are attributed to the Complaint filed in *FDIC as Receiver for Amcore Bank, N.A. et al. v. Bank of America Corporation, et al.*, 14-cv-1757 (S.D.N.Y. Mar. 14, 2014).

*Figure A: Libor Submissions Between August 7 and August 28, 2007*



### 2. Evidence from comparing Libor's movements to those in the similar Fed Eurodollar Rate

169.    Like Libor, Eurodollar deposit rates published by the Federal Reserve Bank of New York (as defined above, the "Fed Eurodollar Rate") reflect the cost at which Defendants and other banks lend dollars to one another in the London Interbank Market. The Federal Reserve's data are less susceptible to manipulation because they are based on anonymous polls of a larger sample of banks, and because unlike USD Libor, Fed Eurodollar Rate is not commonly used as a benchmark in financial transactions. Thus, the institutions surveyed for the purpose of determining Fed Eurodollar Rates have fewer financial or reputational incentives to falsify their reports, and a more limited ability to carry out and enforce a collusive scheme to manipulate Fed Eurodollar Rates. Comparing USD Libor to Fed Eurodollar Rates in the same tenor thus provides striking evidence confirming that the panel banks collusively suppressed

USD Libor during the Relevant Period.

170.    In particular, both Libor and the Fed Eurodollar Rate reflect the cost to banks of borrowing Eurodollar deposits.  It would therefore be unusual for a bank to submit a USD Libor quote to the BBA that was substantially lower than its Fed Eurodollar Rate quote for the same day, since the two rates should reflect identical underlying factors that influence borrowing costs. For multiple panel banks, including Defendants, to do so numerous times is so unusual as to strongly suggest manipulation and collusion among USD Libor panel banks.  In other words, the spread between the two should be at or close to zero, and therefore a "negative spread"—*i.e.* where Libor is lower than the Fed Eurodollar Rate—strongly suggests manipulation and collusion.

171.    As demonstrated in Figure B below, USD Libor and the Fed Eurodollar Rate moved nearly in lockstep until the beginning of the 2007 financial crisis, and where they diverged, USD Libor typically exceeded the Fed Eurodollar Rate.  Between August 2007 and the beginning of 2011, however, the Fed Eurodollar Rate consistently exceeded the USD Libor rate.[66]

---

[66] The divergence of USD Libor from Eurodollar deposit rates cannot be explained by financial distress, as the two rates remained closely aligned during previous periods of financial dislocation, such as those following the terrorist attacks of September 11, 2001.

*Figure B:  Movement of the 3-Month Fed Eurodollar Rate & 3-Month USD Libor
Between 2000 and 2012*



172.    Similarly, Figure C shows the dramatic increase in the negative spread between

the two rates beginning in August 2007:

*Figure C:  Spread Between the 3-Month Fed Eurodollar Rate & 3-Month USD Libor Between 2000 and 2012*



173.    Figure D shows in closer detail the substantial spread between the Fed Eurodollar Rate and USD Libor between 2006 and 2009, including by an average margin exceeding 100 bps beginning on September 15, 2008, the day Lehman Brothers filed for bankruptcy, through the remainder of 2008.

*Figure D:  Spread (bps) Between 3-Month Fed Eurodollar Rate & 3-Month USD Libor*



174.    The divergence between three-month USD Libor and the comparable Fed Eurodollar Rate is also observable based on the submissions of each panel bank, as shown (for example) for Barclays in Figure E below.

*Figure E:  Spread (percentage points), 3-Month USD Libor Submissions of Barclays vs. 3-Month Fed Eurodollar Rate, January 3, 2006 through February 5, 2009*



For additional charts depicting the spreads between the 3-Month Fed Eurodollar Rate & 3-month USD Libor submissions for the individual Defendants, see Appendix A, incorporated here by reference.

175.    Figure F sets out this same data in number of basis points by panel bank, showing that the average spread for each Defendant was uniformly negative throughout the Relevant Period.  Figure G demonstrates the dramatic increase in the spread during the two-week period following Lehman Brothers' collapse.

*Figure F:  Spread, 3-Month USD Libor Submissions vs. 3-Month Fed Eurodollar Rate*
*August 8, 2007 through December 31, 2010*

| Panel Bank | Average Spread Between August 8, 2007 and December 31, 2010[67] |
|---|---|
| Bank of America | -27 basis points |
| Bank of Tokyo | -22 basis points |
| Barclays | -23 basis points |
| Citi | -28 basis points |
| Credit Suisse | -24 basis points |
| Deutsche Bank | -27 basis points |
| HSBC | -29 basis points |
| JPMorgan | -31 basis points |
| Lloyds | -27 basis points |
| Norinchukin | -21 basis points |
| Rabobank | -29 basis points |
| RBC | -25 basis points |
| RBS | -23 basis points |
| UBS | -26 basis points |

*Figure G:  Spread, 3-Month USD Libor Submissions vs. 3-Month Fed Eurodollar Rate*
*September 16, 2008 through September 30, 2008*

| Panel Bank | Average Spread Between September 16, 2008 and September 30, 2008 |
|---|---|
| Bank of America | -144 basis points |
| Bank of Tokyo | -120 basis points |
| Barclays | -87 basis points |
| Citi | -142 basis points |
| Credit Suisse | -122 basis points |
| Deutsche Bank | -129 basis points |
| HBOS | -110 basis points |
| HSBC | -141 basis points |

---

[67] As the Exchange-Based Plaintiffs calculated, the average spread for the period from August 8, 2007 through May 17, 2010 was -30 basis points for Bank of America, -25 basis points for Bank of Tokyo, -25 basis points for Barclays, -32 basis points for Citi, -27 basis points for Credit Suisse, -31 basis points for Deutsche Bank, -29 basis points for HBOS, -32 basis points for HSBC, -35 basis points for JPMorgan, -30 basis points for Lloyds, -25 basis points for Norinchukin, -32 basis points for Rabobank, -28 basis points for RBC, -26 basis points for RBS, -29 basis points for UBS, and -35 basis points for WestLB.  Plaintiffs reported further that each calculated spread between August 8, 2007 and May 17, 2010 is "statistically significant at the extremely high 99% confidence level."  [Corrected] Second Amended Consolidated Class Action Complaint at 50, *Metzler Investment GmbH v. Credit Suisse Grp. AG*, No. 11-cv-2613 (S.D.N.Y. filed Sept. 30, 2013).

| JPMorgan | -153 basis points |
| Lloyds | -146 basis points |
| Norinchukin | - 127 basis points |
| Rabobank | -143 basis points |
| RBC | -140 basis points |
| RBS | -140 basis points |
| UBS | -141 basis points |
| WestLB | -138 basis points |

176.    Between January 3, 2006 and August 7, 2007, the spread between USD Libor and the Fed Eurodollar Rate was negative on just three trading days, and each time by a fraction of a basis point.  By contrast, beginning in August 2007, Libor began to lag, resulting in a 16-basis-point spread by August 31.  Between that date and September 15, 2008, the spread averaged 12 basis points, and was greater than 25 basis points on at least 18 trading days.  Between September 15, 2008—when Lehman Brothers filed for bankruptcy—and September 30, 2008, the Fed Eurodollar Rate doubled from 3% to 6%, while USD Libor again lagged:  by 32 basis points on September 16, 69 basis points on September 17, 180 basis points on September 18, and as much as 195 basis points on September 30, 2008.  This evidence strongly suggests that the panel banks colluded to suppress Libor, and particularly during a time when they sought to appear financially healthy.

177.    Every spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the 99% confidence level.  To put the magnitude of the suppression in perspective, the average 3-month Fed Eurodollar Rate between September 16 and September 30, 2008 was 4.81% (481 bps).  Suppression by 139 bps (the average spread over this period) would thus represent a ***nearly 28.8% decrease*** in the rate itself.

178.    The figures in these charts provide statistically significant evidence that the panel banks, including Defendants, suppressed Libor throughout the Relevant Period.  The figures show that the Defendants and other panel banks falsified its Libor submissions consistently

during the Relevant Period, and together underreported thousands of Libor submissions.

179.    While the degree of Libor suppression is shocking, the uniformity of the spreads between Libor and the Fed Eurodollar Rate—during turbulent and unpredictable times in the markets—also demonstrate that the suppression of Libor was due to collusion and coordination among Defendants and the other panel banks.

### 3.    Evidence from comparing the banks' USD Libor submissions to those in other currencies

180.    The USD Libor panel banks also made submissions as members of Libor panels in many other currencies.  Borrowing rates will vary across these currencies to reflect the risk of fluctuations in foreign-exchange rates and other costs specific to a given currency.  A bank with comparatively low borrowing costs in one currency should not, however, experience comparatively high borrowing costs in another currency.  That is, a bank with a given default risk should stand in a similar position relative to its peers no matter which currency is analyzed.  Accordingly, the consistent submission of relatively low USD rates alongside a relatively high submission in other currencies is evidence that the bank was strategically underreporting USD Libor.

181.    Defendants' and the other panel banks' Libor submissions displayed suspicious "cross-currency risk reversals."  For example, a study by Connan Snider and Thomas Youle found that Defendant JPMorgan submitted relatively high British Pound Libor reports during the Relevant Period even as it submitted relatively low USD Libor reports.[68]  Defendants Deutsche Bank and Barclays exhibited similar cross-currency discrepancies.  The authors found the results highly anomalous because "most of the variables that [economists] would expect to be important

---

[68] Connan Snider & Thomas Youle, *Does Libor Reflect Banks' Borrowing Costs?* Figure 2 (Working Paper, Apr. 2, 2010).  The study reported similar anomalies for Barclays, Citigroup, and JP Morgan in comparisons between various currencies' Libor.

for pricing debt either do not vary across banks or do not vary across currencies."

### 4. Evidence from comparing the bank's submissions to movements in the credit default swap market

182. A credit default swap ("CDS") is an agreement whereby one party accepts periodic payments in exchange for a commitment to make a payment if a "credit event" occurs (such as a bankruptcy filing) in relation to the issuer of a particular debt security.

183. The price of this "insurance" (typically expressed in bps as "spreads") fluctuates with the perceived chances the credit event will occur.  Similarly, in a competitive interbank lending market, the banks' borrowing costs should be related to their perceived credit risk.  As one commentator observed, "The cost of bank default insurance has generally been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[69]  Thus, one would not expect to see banks with materially different "costs" of default insurance to report the same cost of borrowing.

184. During the Relevant Period, CDS spreads should have been an accurate predictor of Libor submissions.  Because Libor is supposed to represent the interest rate at which panel banks can borrow in the Interbank Market, it (when accurately reported) contains both a risk-free rate component and a credit spread component that reflects the banks' creditworthiness.  CDS, on the other hand, do not contain a risk-free component.  As noted above, they are contracts that pay when a credit event occurs, and thus provide a direct market rate for the credit risk of the reference entity.  Because the risk-free rate was extremely (and consistently) low during the Relevant Period, Libor should have almost exclusively reflected the panel banks' credit risk.

---

[69] Justin Wong, *LIBOR Left in Limbo: A Call for More Reform*, 13 North Carolina Banking Institute 365, 371 (2009).

The CDS spread and Libor submission of a panel bank, then, should have closely tracked one another.

185.    Yet during the Relevant Period, Defendants' and the other panel banks' Libor submissions were unnaturally clustered together despite wide variation in their CDS spreads. The discrepancy between the panel banks' Libor submissions and CDS spreads was described in a May 29, 2008 article in the *Wall Street Journal*.  According to the *Wall Street Journal*'s analysis, numerous panel banks caused Libor, "which is supposed to reflect the average rate at which banks lend to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial crisis."[70]  The article further found that "reported LIBOR rates fail[ed] to reflect rising default-insurance costs."  Because CDS spreads were set by the market, thus providing an accurate measure of the panel banks' credit risk, discrepancies between CDS spreads and Libor submissions provide evidence of Libor suppression.

186.    The *Wall Street Journal* observed that the widest gaps existed with respect to the Libor submissions of a group of panel banks that included Defendants Citi, JPMorgan, and UBS. On average, Citi submitted 3-month Libor quotes that were 87 basis points below their borrowing rates as calculated using CDS data.  For JPMorgan the gap was 43 basis points, and for UBS 42.[71]  Defendants Credit Suisse, Deutsche Bank, Barclays, and RBS each exhibited discrepancies of about 30 basis points.  Notably, the *Journal* also reported that, in mid-April 2008, UBS was offering to pay 2.85% to borrow US dollars for three months, but on April 16, 2008 reported it could borrow at 2.73%—which was similar to reports from the other panel

---

[70] *See* Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall Street Journal (May 29, 2008).

[71] *Id.*

banks.[72]

187.    Also anomalous is that during the Relevant Period, CDS data frequently indicated that a given panel bank was riskier than its peers, while the bank's Libor submissions suggested the opposite.  For example, there were many instances in which a bank's CDS spread was higher than the median of its peers, while its 3-month Libor quote was lower.  This was true for about 30% of UBS's submissions, just under 30% of JPMorgan and RBS's submissions, and 20% of Deutsche Bank and Barclays' submissions.

188.    The *Wall Street Journal* further noted the uncanny equivalence between the panel banks' Libor submissions:  their 3-month Libor quotes fell within a range of only 6 bps, even though at the time their CDS spreads varied far more widely, reflecting the market's differing views as to the banks' creditworthiness.  David Juran, a statistics professor at Columbia University who reviewed the *Wall Street Journal*'s methodology, concluded its calculations demonstrate "very convincingly" that reported Libor is lower, to a statistically significant degree, than what the market thinks it should be.

189.    Calculating an alternate borrowing rate incorporating CDS spreads, the *Wall Street Journal* estimated that misreporting of Libor had a $45 billion effect on the market over just a four-month period, these losses falling on investors receiving Libor-based payments under derivatives, such as Plaintiff.

190.    Further academic studies support the *Wall Street Journal*'s analysis.  The Snider and Youle study, cited above, concluded Libor did not accurately reflect average bank borrowing costs, its "ostensible target."  Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle

---

[72] *Id.*

posited that if Libor quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance." According to Snider and Youle, however, quotes provided by panel banks in fact deviated from their costs of borrowing as reflected in CDS spreads.

191.    For example, Snider and Youle observed that Citi exhibited substantially higher CDS spreads than Bank of Tokyo during the crisis, suggesting that the market perceived Citi as much riskier.  Yet its USD Libor submissions tell the opposite story, as they were slightly lower than Bank of Tokyo's submissions.  This is shown in the graph below:

*Figure H: Citigroup and Bank of Tokyo's One-Year Libor Quotes and CDS Spreads*



192.    Evidence from the CDS market also reveals a second anomaly.  As Snider and Youle explained:  "Given that purchasing credit protection for a loan makes the loan risk free,

one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate. This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread." For example, if a bank were to make a loan at an interest rate of 5% and then spend 3% on credit protection, the net rate of return on the loan becomes 2%. With the credit protection, that 2% difference is risk free, and should approximate the risk free rate of return prevailing in the market.

193.    As the authors observed, however, Citi's Libor submissions were often "significantly below its CDS spread." This implied that "there were interbank lenders willing to lend to Citi at rates which, after purchasing credit protection, would earn them *a guaranteed 5 percent loss*." (Emphasis added). In other words, the credit *premium*, which of course should only constitute a portion of the loan's interest rate, was *5% larger* than the purported interest rate itself—*i.e.*, Citi's Libor quote. This discrepancy contravenes basic rules of economics, indicating that Citi was underreporting its borrowing costs to the BBA.

194.    A 2012 analysis published in the *Journal of Banking & Finance* similarly found that the Libor submissions of Bank of America, Citigroup, Rabobank, JPMorgan, Deutsche Bank, and UBS consistently reported below-median borrowing costs in April-May 2008 despite exhibiting relatively high CDS spreads..[73] The *Wall Street Journal* concluded in 2012 that "banks' submissions used to calculate the London interbank offered rate . . . sometimes fail to track the market's view of the credit risk posed by each firm."[74]

---

[73] Rosa M. Abrantes-Metz et al., *Libor Manipulation?*, 36 J. Banking & Fin. 136, 148 tbl.7 (2012).

[74] Jean Eaglesham, Rob Barry & Tom McGinty, *Libor Furor: Key Rate Gets New Scrutiny*, Wall Street Journal (Sept. 12, 2012); *see also* Jennie Bai & Pierre Collin-Dufresne, *The CDS-Bond Basis During the Financial Crisis of 2007-2009* (Working Paper Apr. 30, 2012); Alessandro Fontana, *The Persistent Negative CDS-Bond Basis During the 2007/08 Financial Crisis* (Working Paper 2009).

   5. **Additional expert analysis performed in connection with the class action proceedings shows a sudden increase in Libor after expressions about its integrity**

  195. A consulting expert engaged by class-action plaintiffs analyzed the change in Libor on April 17, 2008—the day after a *Wall Street Journal* article reported on certain unexpected aspects of Libor's behavior, and the BBA announced an inquiry into Libor.  The expert's hypothesis was that, if the panel banks were not manipulating Libor, any change to the benchmark on April 17, 2008 should be similar to typical changes seen between January 5, 2000 and May 13, 2011.  But, if the banks were manipulating Libor, and responded to the *Journal* article, they would be likely to substantially reduce their manipulation immediately thereafter to avoid further reporting and convince the market that Libor was reliable.  That reduction in manipulation would lead to a corresponding increase in the panel banks' Libor submissions.

  196. The expert's analysis concluded that Libor increased in a statistically significant way on April 17, 2008, and that increases in 11 of the 16 panel banks' submissions were likewise statistically significant.  The table below illustrates these changes:

|  | Dependent variable | Average change during non-suppression days | Change in the dependent variable on April 17, 2008 relative to non-suppression days' average | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| 1 | BBA LIBOR | -0.000371 | 0.0909* | 5% |
| 2 | HSBC LIBOR | 0.000154 | 0.1273** | 1% |
| 3 | JPMC LIBOR | -0.000333 | 0.0872* | 5% |
| 4 | BARCLAYS LIBOR | -0.000333 | 0.1072* | 5% |
| 5 | WEST LB LIBOR | -0.000314 | 0.0971* | 5% |
| 6 | RBS LIBOR | -0.000352 | 0.0921* | 5% |
| 7 | RABOBANK LIBOR | -0.000364 | 0.0872* | 5% |
| 8 | CITI LIBOR | -0.000344 | 0.1022* | 5% |
| 9 | RBC LIBOR | 0.002067 | 0.1021* | 5% |
| 10 | UBS LIBOR | -0.000777 | 0.1021* | 5% |
| 11 | NORIN LIBOR | -0.00038 | 0.0971* | 5% |
| 12 | HBOS LIBOR | 0.002467 | 0.1111* | 5% |
| Statistical significance is assessed using a AR(3) model for the residuals | | | | |
| * While not shown here, an additional dummy variable is used to control for changes during the Relevant Period of August 8, 2007 to May 17, 2010. | | | | |

197.    The expert also tested the hypothesis that other market events could have caused the increase in Libor, but that such events should have moved the Fed Eurodollar Rate, and therefore the spread between the two benchmarks should remain the same.  If the increase were a reaction solely to the *Wall Street Journal* report and BBA announcement, however, only Libor should be affected.

198.    Once again, the expert's analysis found that the spread between Libor and the Fed Eurodollar Rate increased for 11 out of 16 panel banks, and also in the overall Libor rate at statistically significant levels.  The table below illustrates these changes:

| | Changes in Spread (BBA LIBOR – Federal Reserve's Eurodollar Deposit Rate) on April 17, 2008 in Percentage Points* | | | |
|---|---|---|---|---|
| | Dependent variable | Average change in Spread during non-suppression days | Change in the dependent variable on April 17, 2008 relative to non-suppression days' average | Statistical Significance at the 1-5% level of the April 17, 2008 move |
| 1 | BBA LIBOR Spread | -0.000078 | 0.0838 | 5% |
| 2 | HSBC LIBOR Spread | 0.000508 | 0.1205 | 1% |
| 3 | JPMC LIBOR Spread | -0.000103 | 0.0803* | 5% |
| 4 | BARCLAYS LIBOR Spread | -0.000067 | 0.1002** | 1% |
| 5 | RBS LIBOR Spread | -0.0001 | 0.0851* | 5% |
| 6 | TOKYO LIBOR Spread | -0.000092 | 0.0797* | 5% |
| 7 | CITI LIBOR Spread | -0.00012 | 0.0953* | 5% |
| 8 | CS LIBOR Spread | -0.000224 | 0.07* | 5% |
| 9 | RBC LIBOR Spread | -0.000135 | 0.0951* | 5% |
| 10 | UBS LIBOR Spread | -0.000172 | 0.095* | 5% |
| 11 | NORIN LIBOR Spread | -0.000179 | 0.0903** | 1% |
| 12 | HBOS LIBOR Spread | 0 | 0.1007* | 5% |
| | | | | |
| | Statistical significance is assessed using a AR(3) model for the residuals | | | |
| | * While not shown here, an additional dummy variable is used to control for changes during the Relevant Period of August 8, 2007 to May 17, 2010. | | | |

### 6. Evidence from comparing USD Libor's movements to those in other measurements of the banks' likelihood of default

199.    The consulting experts for other plaintiffs in the multidistrict Libor litigation using a proprietary database provided by Kamakura Risk Information Services ("KRIS") conducted another study concluding that the USD Libor submissions were being moved by factors other than the panel banks' borrowing costs.

200.    The KRIS data estimates each panel bank's default risk on a daily basis by applying multiple models to each bank's equity and bond prices, accounting information, the level of interest rates and other objective and observable indicators. The KRIS data measures the probability of default of a borrower.

201.    It is a fundamental tenet of finance theory that a bank's borrowing costs should correlate positively with its perceived probability of default.  That bank's objectively measured riskiness, and its Libor submissions, should have increased in parallel during 2008, reflecting its expectation that, as a riskier institution, it would have to pay more to borrow funds in the London Interbank Market.  But the KRIS analysis found a negative correlation—that is, as the perceived risk increased, the purported borrowing cost, meaning Libor, actually declined.  Such a statistically significant negative correlation between a bank's Libor submission and its probability of default is consistent with, and strongly suggests, that the bank is manipulating its Libor submission to paint an unwarranted picture of financial health.  Figures I and J show the almost universally negative correlation coefficient for one-month Libor and one-month default probabilities, and three-month Libor and three-month default probabilities, respectively, across various Defendants for both 2007 and 2008; and figures I and J show again that, almost without exception, there were negative correlation coefficients across all tenors of Libor for the indicated time periods.

*Figure I:  Correlation Coefficient Between 1-Month USD Libor Submissions and 1-Month Probability of Default*



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

*Figure J:  Correlation Coefficient Between 3-Month USD Libor Submissions and 3-Month Probability of Default*



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

*Figure K:  Correlation Coefficient Across All Tenors*
*Between August 9, 2007 and September 12, 2008*



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

*Figure L:  Correlation Coefficient Across All Tenors*
*Between September 15, 2008 and December 31, 2008*



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

### 7.    Evidence from comparing USD Libor's movements to those in the Federal Reserve's Term Auction Facility

202.    Libor suppression is also apparent in the discrepancy between Defendants' Libor submissions and the rates at which banks were borrowing from the Federal Reserve's Term Auction Facility.

203.    From late 2007 to mid 2010, the Federal Reserve conducted periodic auctions in which it made secured loans.  The facility extended only loans secured by acceptable collateral, which carried lower risk than the unsecured interbank borrowings measured by Libor.  Thus, the banks should not have been willing to put in a bid (which required the posting of collateral) at a lower rate than its purported unsecured interbank lending rate.

204.    In fact, Defendants were submitting auction bids substantially above their

purported Libor borrowing rates.[75]  For example, two days before publication of the *Journal*

article, the 28-day rate for the Fed facility was 3.75%—well above Libor's 3.18% for that day,

and its 3.21% rate the following day.[76]

### 8.    Evidence from the stability and bunching of the Libor submissions

205.    As discussed above, the panel banks were not supposed to know each other's

daily submissions.  Thus, consistent clustering would support a conclusion of manipulation and

conspiratorial behavior.

206.    A group of banks seeking to manipulate Libor would want to submit the lowest

bids possible, without drawing attention to themselves by being outliers.  By making low

submissions that were among the lowest but not so low as to be excluded as being in the lowest

quartile, the banks could place maximum downward pressure on Libor while at the same time

deflecting potential suspicion from being too low.  As a Rabobank trader explained:  "Rabo JPY

LIBOR numbers are already one of the lowest four banks among 16 panel banks so even if we

put them lower further, it wouldn't change on yen Libors . . . and i think just keep libors one of

the lowest four banks is the good idea because it isnt so obvious that ppl wouldnt notice.  if it is

too obvious, ppl could start looking at us manipulating libors."  Consistent with this explanation,

any clustering of submissions around the fourth-lowest bid would indicate that banks were acting

together to drive the Libor rate downward.

207.    In fact, during the Relevant Period rate submissions by a group of panel banks

that included Defendant JPMorgan exhibited suspicious "bunching" patterns around the bottom

of the second quartile.

---

[75] Carrick Mollenkamp, *Libor's Accuracy Becomes Issue Again*, Wall Street Journal
(Sept. 24, 2008).

[76] *Id.*

*Figure M*



208.    Citi and Bank of America also bunched their submissions in this manner, frequently submitting USD Libor quotes that were ***identical*** to the fourth-lowest submission.

*Figure N*



*Figure O*



209.    Studies have found that other measures of bank creditworthiness—such as the spreads on CDS referencing each of these three banks—did not exhibit this bunching behavior during the Relevant Period.  Figure P below illustrates this discrepancy with information comparing spreads on CDS referencing the panel banks with a term of one year with quotes submitted by the panel banks for one-year USD Libor.

*Figure P*



210.    As Snider and Youle explain, the graphs in Figure P are "normalized by subtracting the value of the day's fourth highest quote for each bank quote," and the same is done for CDS spreads.  As the Figure shows, Libor quotes cluster around the day's fourth lowest quote, while CDS are more evenly distributed.  "If banks were truthfully quoting their costs," the study notes, "we would expect these distributions to be similar."[77]

211.    Similarly, a 2012 analysis found statistically significant evidence of non-random "joint participation" in the deciding group for USD Libor during the summer of 2008.[78]  This means certain groups of banks tended to enter the deciding group on the same day at a suspiciously high frequency, providing further evidence of collusion.

212.    The banks could not bunch or follow directions to "err on the low side" merely by guesswork.  It required coordination.  Based on the specific information provided by regulators

---

[77] Snider & Youle at 6.

[78] Abrantes-Metz, *Libor Manipulation?*, 36 J. Banking & Fin. at 144-47.

in the UBS settlements regarding the nature and timing of management's directives to "err on the low side" or to be "in the middle of the pack," a consulting expert in the Libor MDL examined the likelihood that UBS submitters could have complied with these directives absent collusion with the other Defendants.  Specifically, the expert examined the period between June 18, 2008 and mid-April 2009.

213.    First, the expert determined the frequency with which UBS's daily 3-month Libor submissions were "in the middle of the pack" during this time.

214.    The expert then analyzed the likelihood that the UBS Libor submitters could have targeted "the middle of the pack" so often without colluding with the other panel banks.  Specifically, the expert examined relevant public information available to those Libor submitters around 11:00 a.m. London time, which included:  (i) prior day 3-month Libor submissions from the panel banks; (ii) changes in the Fed Eurodollar Rate, which would reflect changes in relevant market fundamentals from the prior day; and (iii) changes in the opening and closing prices of Eurodollar futures prices from one day and two days prior.

215.    The expert found that between June 18, 2008 and April 14, 2009, UBS's Libor submitters very often fulfilled management's directive:  UBS's 3-month Libor submissions were at or within the interquartile range[79] 99.0% of the time, and within the interquartile range 86.7% of the time.  Additionally, DOJ found that, during the same time period, UBS's 3-month Libor submissions were identical to the published Libor, and often consistent with published Libor in the other tenors.  The expert then determined, using probability analysis, that the likelihood of achieving this consistency based solely upon combined knowledge of points (i) and (ii), or points (i) and (iii), was less than 1%.  The accuracy of UBS' submissions, and the duration over which

---

[79]  This term refers to the two middle quartiles of panel bank submissions.

it sustained such accuracy, strongly support that UBS had additional information, obtained

through collusion, that allowed it to target its submissions.

### H.    Additional Evidence of Defendants' Wrongdoing

216.    *As to Barclays, UBS, and RBS,* as well as non-defendant *Rabobank*, these banks'

wrongdoings were detailed at length in their respective regulatory settlements discussed above.

217.    *As to Deutsche Bank*, Guillaume Adolph was a derivatives trader at Deutsche

Bank named in the Canadian Competition Law Officer's affidavit as a trader involved in the

manipulation of JPY Libor.  According to the affidavit, Trader A communicated to Adolph his

trading positions, his desire for a certain movement in JPY Libor and instructions to get

Deutsche Bank to make JPY Libor submissions consistent with his wishes, and Adolph agreed to

do so.  Deutsche Bank's manipulation of JPY Libor was part of a broader scheme to benefit its

trading positions, including through suppression of USD Libor, and enabled it to make

substantial ill-gotten gains.

218.    Deutsche Bank was also implicated in the wrongful termination lawsuit filed by

Tan Chi Min, the former head of delta trading for RBS's global banking and markets division in

Singapore.  Those proceedings revealed an August 19, 2007 message from Tan to a trader at

Deutsche Bank stating "[i]t's just amazing how Libor-fixing can make you that much money or

lose it if opposite."  "It is a cartel now in London," Tan added.

219.    On July 31, 2012, Deutsche Bank confirmed that certain of its employees

improperly manipulated Libor.  For example, Deutsche Bank discovered that Christian Bittar, the

head of its money markets derivatives group, colluded with a trader at Barclays to rig Libor.  As

a proprietary trader, Bittar bet on Libor with the bank's own money, and was paid a percentage

of his trading profits.  The profits Deutsche Bank earned from these bets were substantial.

According to the *Wall Street Journal*, Deutsche Bank made $654 million by betting on small

changes in Libor during 2008.  Bittar was suspended and eventually fired for his misconduct.

Bittar was reportedly forced to give up €40 million (over $53.9 million) in deferred pay due to

his involvement in the Libor scandal.  Deutsche Bank has dismissed or suspended a total of

seven employees due to their roles in rigging Libor.

220.    As reported by *Bloomberg* on January 22, 2013, Deutsche Bank's co-CEO Anshu

Jain told clients and investors during a panel discussion that "[t]he Libor sickens us all. . .

It sickens me the most of all scandals."[80]  According to Jain, multiple banks were engaged in

wrongdoing related to Libor.

221.    BaFin, the German financial regulator, has launched an investigation into Libor

manipulation by Deutsche Bank, as have regulators in the United States, Japan, and Singapore.

BaFin President Elke König urged banks involved in the scandal to make "provisions for

anticipated losses," and said the magnitude of the manipulations has rendered her speechless.

On March 21, 2013, it was reported that BaFin's investigation had exposed "organisational

flaws" at Deutsche Bank.  BaFin's report is expected to feed into Libor-related settlement talks

between Deutsche Bank and regulators in the United States and United Kingdom.

222.    On September 11, 2013, Deutsche Bank lost a lawsuit filed by four traders whom

the bank had dismissed for allegedly violating company policy by manipulating benchmark

interest rates.  In a recent judgment, the Frankfurt Labor Court chastised the bank for creating an

environment that fostered the very misconduct for which it terminated these employees:  "It

[Deutsche Bank] accuses [traders] of communicating with [other] traders, but has encouraged a

close integration of its traders and the people who submit the rates.  It criticises a behaviour that

it made possible in the first place."  The judgment also revealed that Deutsche Bank's traders

---

[80] Nicholas Comfort, *Deutsche Bank's Jain Sickened by Libor Manipulation Scandal*,
Bloomberg (Jan. 22, 2013).

were *directly* engaged in the submission process.  As the court observed:  "These functions are incompatible.  Traders responsible for taking risks can hardly completely ignore the positions of the bank.  They are in a constant conflict of interest, brought about by the bank."

223.    Deutsche Bank manipulated Libor not only through its own corrupt submission process, but also by colluding with traders at other banks.  The U.K. Serious Fraud Office recently identified employees of Deutsche Bank as having conspired with Tom Hayes to manipulate rates.  Among the names released was Guillaume Adolph, the Deutsche Bank trader also named in the Canadian Competition Law Officer's affidavit for his involvement in manipulating JPY Libor.

224.    Deutsche Bank remains under investigation by regulators around the globe for its role in the Libor scandal.  The bank recently set aside an additional €1.2 billion ($1.6 billion) to cover potential litigation costs, almost wiping out its third quarter profit for 2013.

225.    ***As to JPMorgan***, as discussed above, the bank had a very unbalanced exposure to USD Libor that benefitted greatly from suppressed USD Libor—and thus it is not surprising that the bank was another whose submissions were suspiciously bunched among the lowest ones.

226.    Paul Glands and Stewart Wiley were derivatives traders with JPMorgan, who were named in the Canadian Competition Law Officer's affidavit as involved in the manipulation of JPY Libor.  According to the affidavit, Trader A communicated to the traders his trading positions, his desire for a certain movement in JPY Libor and instructions for the traders to get JPMorgan to make JPY Libor submissions consistent with his wishes, and the traders agreed to do so.  JPMorgan's manipulation of JPY Libor was part of a broader scheme to benefit its trading positions, including through manipulation of USD Libor.  JPMorgan was also among the banks recently sanctioned by the Monetary Authority of Singapore for manipulating

benchmark interest rates.  Finally, JPMorgan was named in criminal charges recently filed by the

U.K. Serious Fraud Office as one of the banks with which Tom Hayes conspired to manipulate

Libor.

227.    ***As to Bank of America***, Bank of America had a very unbalanced USD Libor

portfolio, providing it with a powerful incentive to have Libor set low.  Unsurprisingly, then, as

also discussed above, the bank was among those that "bunched" among the lowest submitters,

and has been a repeated target of the many ongoing Libor probes.

228.    On March 17, 2011, *Bloomberg* reported that Bank of America had received

subpoenas from the SEC and DOJ regarding its Libor setting.  Several days later, *Bloomberg*

revealed that Bank of America and several other banks had been asked by regulators "to make

employees available to testify as witnesses" in connection with an investigation into Libor

manipulation.

229.    In June 2013, it was reported that Bank of America was required by the Monetary

Authority of Singapore to increase its reserves by S$ 700-800 million ($549-627 million) as a

sanction for artificially manipulating benchmark interest rates.  This development, in addition to

Bank of America's bunching and other statistical evidence discussed above, demonstrate that it

suppressed its Libor submissions during the Relevant Period.

230.    ***As to Citi***, the bunching behavior described above is particularly suspect given its

serious financial problems during the Relevant Period.  On November 21, 2008, for instance, the

*Wall Street Journal* reported that Citi executives "began weighing the possibility of auctioning

off pieces of the financial giant or even selling the company outright" after the company faced a

plunging stock price.  The article noted Citi executives and directors "rushing to bolster the

confidence of investors, clients and employees" in response to uncertainty about Citi's exposure

to risk concerning mortgage-related holdings.  On November 24, 2008, *CNNMoney* wrote:

> If you combine opaque structured-finance products with current fair-value accounting rules, almost none of the big banks are solvent because that system equates solvency with asset liquidity.  So at this moment Citi isn't solvent.  Some argue that liquidity, not solvency, is the problem.  But in the end it doesn't matter.  Fear will drive illiquidity to such a point that Citi could be rendered insolvent under the current fair-value accounting system.

231.    On January 20, 2009, *Bloomberg* reported that Citigroup "posted an $8.29 billion fourth-quarter loss," completing its worst year, and planned to split in two under CEO Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis.  The article further stated, "[t]he problems of Citi, Bank of America and others suggest the system is bankrupt."

232.    Despite Citi's financial woes, which necessarily raised its actual borrowing costs, the bank's Libor submissions did not appreciably increase.  Instead, Citi made low submissions bunched around those of other panel banks.

233.    A July 2012 *CNNMoney* article posited "Barclays the biggest Libor liar? No, that may have been Citi."[81]  The article observed that Pandit recently had "told analysts not to use Barclays' $450 million Libor settlement as a guidepost for what his firm might have to pay."  Citing a study showing that "on average Citi understated its borrow[ing] costs by an average of 0.12 percentage points from August 2007 to August 2008," which was "50% more than the 0.08 percentage points that Barclays under report[ed] its own borrowing costs"—the article suggested Citigroup "might end up paying much more" than Barclays did.

234.    Like other panel banks, there is evidence that Citi manipulated not just USD Libor, but Libor denominated in other currencies.  As described above, on December 9, 2011, it was reported that Japan's SESC alleged that CGMJ "employed staffers who attempted to

---

[81]    Stephen Gandel, *Barclays the biggest Libor liar? No, that may have been Citi*, CNNMoney (July 20, 2012).

influence" Tibor "to gain advantage on derivative trades," and recommended that the Japanese prime minister and the head of the Japanese FSA take action against Citi. The SESC specified that Citi's head of G-10 rates and a Citi trader were involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem."

235.    Citi did not deny the SESC's findings. A Citi spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation. The company has started working diligently to address the issues raised."

236.    Citigroup later disclosed that on December 16, 2011, the Japanese FSA took administrative action against CGMJ for, among other things, certain communications made by two CGMJ traders about Tibor. The Japanese FSA issued a business improvement order and suspended CGMJ's trading in derivatives related to JPY Libor, as well as Euroyen and Yen-Tibor from January 10 to January 23, 2012. On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the communications made by the CGMJ traders to employees of Citibank Japan about Euroyen Tibor had not been properly reported to Citibank Japan's management team.

237.    As discussed above, Thomas Hayes was lured from UBS to Citi with a $5 million job offer. According to the Japanese FSA, Hayes proceeded to attempt to pressure colleagues and employees at other banks into manipulating Tibor. For example:

- On March 3, 2010, Hayes told a broker "i really need a low 3m jpy libor into the imm [the International Monetary Market date, which occurs quarterly on the third Wednesday of March, June, September, and December]," and "any favours you can get with the due at [Bank C] would be much appreciated" "even if he only move 3m down 1bp." The broker said "i'll give him a nudge later, see what he can do" and then asked the Bank C submitter: "u see 3m jpy libor going anywhere btween now and imm?" noting "we have a mutual friend who'd love to see it go down, no chance at all?" The Bank C submitter said "haha TH by chance," and the broker responded "shhh."

- The Hayes-Darin Complaint notes that, the next day, Bank C's 3-month JPY Libor submission decreased by one basis point compared to the previous day. After the Libor submissions were posted, the Bank C submitter reported back to the broker: "Libor lower ;)," and the broker responded "good work!!!!"

- On May 12, 2010, Hayes told a UBS submitter: "libors are going down tonight" "because i am going to put some pressure on people."

238.    Christopher Cecere was the head of G10 trading and sales for Asia at Citibank. The Japanese FSA found that Cecere "and another Citi trader engaged in 'seriously unjust and malicious' conduct by asking bankers to alter data they submitted while setting a benchmark Japanese lending rate."

239.    Brian McAppin was Citi's brokerage head in Japan. According to an article in the *Wall Street Journal*, the Japanese investigation found that he "overlooked" alleged attempts by traders to influence interest rates despite "recognizing these actions."

240.    As reported by *Bloomberg*, Citi has "dismissed, put on leave or suspended traders as part of the investigations" into Libor manipulation.

241.    Citi's manipulation of Libor in other currencies was part of a broad scheme to benefit its trading positions and protect its reputation, which, as shown by the facts above, included suppression of its USD Libor submissions.

242.    *As to Credit Suisse,* in February 2012, the bank disclosed that the Swiss Competition Commission had commenced an investigation involving the bank concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the

Libor and Tibor reference rates fixed with respect to certain currencies, and collusive agreements

to influence these rates.  In October 2012, it was reported that New York Attorney General Eric

Schneiderman had issued subpoenas to nine banks, including Credit Suisse, as part of an

investigation into Libor manipulation.  In June 2013, it was reported that Credit Suisse was

sanctioned by the Monetary Authority of Singapore for manipulating benchmark interest rates.

This development and the statistical evidence discussed above—including discrepancies between

Credit Suisse's Libor submissions on the one hand, and other measures of its borrowing costs,

such as its probability of default and CDS spreads on the other—demonstrate that Credit Suisse

suppressed its Libor quotes during the Relevant Period.

## II.    <u>DEFENDANTS ACTED WITH SCIENTER</u>

243.    The facts pleaded in Section I are powerful evidence that Defendants consciously,

or at the very least recklessly, misbehaved by making false and fraudulent USD Libor (and other

currencies) submissions to the BBA.  The facts indicate that, absent collusive falsification of

those submissions, Libor should not have deviated markedly from, among other indicators, the

Fed Eurodollar Rate, the Defendants' probabilities of default, and other market indicators.

244.    Since it was Defendants' own data—the rates at which they purportedly believed

they could borrow funds in the London Interbank Market—that were misrepresented, Defendants

necessarily had direct knowledge that their submissions were false.  In fact, *only* Defendants

have knowledge of their own expectation of the proper borrowing rate,  There is no plausible

explanation, apart from intentional and collusive suppression, as to how Defendants could

innocently have made Libor submission to the BBA that were uniquely low relative to other

benchmarks that Libor had always tracked.  The statistical evidence described above—including

Libor's deviation from the Fed Eurodollar Rate beginning in 2007, its sharper deviation after the

collapse of Lehman Brothers, and the ability for UBS, among other Defendants, to submit bids in

the "middle of the pack" over a 10-month study period—shows that Defendants knowingly and intentionally made Libor submissions that understated their true borrowing costs.  And since Defendants actively borrowed funds in the London Interbank Market, they must have been aware that their reported borrowing costs differed from their actual borrowing costs, even though they were required to make accurate reports to the BBA.

245.    Facts revealed in the settlements discussed above confirm Defendants' intent.  By way of examples, Barclays admitted to regulators it submitted "[i]mproperly low" USD Libor quotes, that it instructed submitters to be within ten basis points of the other panel banks' submissions (something it could accomplish only with improper prior knowledge of the other panel banks' planned submissions), and that its traders made numerous requests, honored by the Libor submitters, that submissions be kept low.  UBS similarly directed that its submissions be kept "in the middle of the pack" and to "err on the low side," and its regulatory settlements show that UBS colluded with other banks to suppress JPY Libor as well.  As demonstrated above in Section I, RBS and Rabobank admitted similar misconduct to regulators, and other Defendants— whose Libor submissions also comprise the statistical evidence discussed above—remain under investigation for their collusive roles in suppressing Libor.

246.    Furthermore, Defendants understood the impact of their wrongdoing on the value of Libor-linked transactions, including those to which Plaintiff was party.  Defendants, as some of the largest, most sophisticated financial institutions in the world, and as panel banks, were intimately familiar with Libor and the Libor-linked financial investments held by millions of investors around the world, including Plaintiff, and knew that the value of these instruments was tied to USD Libor.  That Defendants' falsely low Libor submissions would depress the interests rates paid on billions or trillions of dollars of Libor-linked securities, and would lower the rates

paid by holders of the floating-rate leg of an interest rate swap, was either known to these institutions or so obvious they could not help but be aware of it. Accordingly, the panel banks actually knew, or at the very least were reckless in not knowing, the impact of their misconduct on Libor-linked transactions.

247.    The alleged collusive manipulation has no legitimate purpose. Rather, Defendants knowingly and intentionally engaged in such manipulation solely for illegitimate purposes. The facts pleaded above also demonstrate powerful illegitimate motives for Defendants to manipulate Libor. One such motive was the *admitted* need to mislead the marketplace into believing Defendants were financially healthy. As discussed in Section I.G,, evidence from the Barclays and UBS settlements demonstrate the banks' strong interest in keeping rates low to maintain a veneer of financial health. And Section I.H.2, concerning Libor's deviation from the Fed Eurodollar Rate, shows the marked decline in all Defendants' submissions to the BBA right after Lehman's collapse cast doubt on the viability of virtually every banking institution.

248.    The other driving motivation was the windfall of illegitimate revenues Defendants received by depressing interest rates paid on Libor-linked instruments and to swap counterparties. As described above, Defendants stood to gain hundreds of millions in revenues from low interest rates, and conversely to lose hundreds of millions from higher interest rates, in either case at the expense of Plaintiff and similarly situated customers.

249.    And, of course, as panel banks (or their affiliates), Defendants had not only the opportunity, but the *exclusive* opportunity to manipulate Libor by making false submissions to the BBA.

## III.    DEFENDANTS' MISCONDUCT HARMED PLAINTIFF

250.    As detailed in the Exhibits, Plaintiff purchased, held, and sold billions of dollars

in Libor-linked securities and other investments. Plaintiff purchased a substantial number of these instruments from or through Defendants themselves. Consequently, Plaintiff contracted to receive millions of dollars in Libor-linked interest payments, as well as the Libor-keyed floating rate payments on interest-rate swaps for which certain Defendants were counterparties.

251.    Plaintiff entered into all of these Transactions relying on the integrity of Libor as a benchmark interest rate, and with the understanding and expectation that it would receive interest rate payments based on USD Libor that reflected an accurate measure of interbank borrowing costs, and therefore conformed to the definition of USD Libor. Instead of receiving what was represented to them, and what they had bargained for, however, Plaintiff received something worth far less. Libor could *not* accurately reflect interbank borrowing costs nor conform to the definition of Libor because Defendants artificially suppressed it.

252.    Plaintiff should have benefited from the declining credit quality of USD Libor panel banks during the Relevant Period. Had Libor reflected the existing bank credit risk, Libor would have been significantly higher. During the periods of highest stress in late 2008 and early 2009, true bank borrowing costs (as demonstrated by, for instance, CDS spreads) were several hundred basis points higher than where Libor was being fixed. But for Defendants' fraudulent suppression of Libor, Plaintiff would have received much greater interest payments on the Transactions, since the interest rate paid on these largely fixed-income securities and other instruments would have been substantially higher, and/or would not have entered into the transactions had Plaintiff known that Defendants were suppressing Libor and therefore diminishing the value of Plaintiff's investments, and/or would have sold its investments sooner and reinvested the funds in instruments that paid true prevailing interest rates. The individuals or entities that calculated the payments to which Plaintiff, as holder of Libor-linked securities and

other investments, was entitled, necessarily relied on the published Libor rates.

253.    While the amount each panel bank subjectively expected to pay to borrow U.S. dollars in the London Interbank Market on a given day, and what rate each bank did, in fact, pay, are facts uniquely in Defendants' possession, the overall, consistent suppression of Libor by each panel bank, Libor's material divergence from other benchmarks that it should have tracked, and Defendants' own statements all demonstrate their intentional manipulation.

254.    Libor suppression, as described above, was very lucrative for Defendants, who also earned commissions on the Transactions with Plaintiff, or profited by paying a suppressed interest rate on the swaps.

## A.    **Defendants' Misconduct Breached Many of the Terms of their Swap Contracts**

255.    The exact terms of Plaintiff's contracts with each Defendant are set forth in Exhibits E-G and are also summarized in the Counts below.  The contractual relationships between Plaintiff and each Defendant followed the same pattern.  The swaps in particular were documented under ISDA Master Agreements.

256.    ISDA Master Agreements are market-standard agreements that provide a common set of terms to be used in a series of swaps between two parties.[82]  The parties may customize the ISDA Master Agreement through use of a Schedule, which contains elections, additions, and amendments.  ISDA Master Agreements are also typically supplemented by a Credit Support Annex ("CSA"), which governs the amount of collateral to be delivered on the demand of a party.  While the ISDA Master Agreement and the Credit Support Annex set the general terms of

---

[82] As documented in Exhibits E-G, the Schedules to each ISDA Master Agreement specified that New York law would govern.

a relationship, a Confirmation is used to document a particular transaction. The Confirmation supplements and forms part of the ISDA Master Agreement between the two parties.

257. Confirmations for the interest rate swaps involved here provided that the banks were to pay the "Floating Amount," calculated by a "Calculation Agent" with reference to USD Libor. Either the Confirmations or the Schedules to the ISDA Master Agreements involved here specified that each Defendant would act as "Calculation Agent" for its interest rate swaps with Plaintiff. As that term was defined, the Calculation Agent was to calculate its floating-rate payments "in good faith and in a commercially reasonable manner." Defendants breached such terms, and others, in each of their respective agreements when floating payments were calculated not based on Libor as properly calculated, but based on knowingly manipulated and suppressed Libor rates.

258. The ISDA Master Agreements also have a term requiring that each party "comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." Defendants breached such terms, and others, in each of their respective agreements when they violated numerous laws by manipulating, and colluding to manipulate, Libor. For example, on June 27, 2012, the DOJ stated that "[f]or years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered. For this illegal conduct, Barclays is paying a steep price."

259. UBS entered into a non-prosecution agreement with the DOJ while its subsidiary, UBS Securities Japan Co. Ltd., pleaded guilty to felony wire fraud for manipulating JPY Libor and Tibor. In addition, two senior UBS traders—Tom Hayes and Roger Darin—were charged in

a criminal complaint alleging conspiracy and antitrust violations based on the same misconduct. According to Assistant Attorney General Lanny A. Breuer, "[t]he scheme alleged is epic in scale."  Breuer added that the "agreement by UBS Japan to plead guilty, the charges against individual alleged perpetrators of these crimes, and our agreement recognizing the steps being taken by UBS AG to right itself demonstrate the Justice Department's determination to hold accountable those in the financial marketplace who break the law."

260.    Similarly, RBS Securities Japan Limited, pleaded guilty to felony wire fraud based on its manipulation of JPY Libor.  As part of a deferred prosecution agreement, the DOJ also filed a criminal information charging RBS with wire fraud and antitrust violations for its role in manipulating JPY and Swiss Franc Libor.  As discussed above, UBS and RBS engaged in the same misconduct with respect to USD Libor, and thus clearly broke numerous laws due to their manipulation of USD Libor as well.

261.    As noted above, a CSA governs the amount of collateral to be delivered on the demand of a party.  Under the terms of a CSA, this amount is calculated based on the mark-to-market value of the transactions governed by the related ISDA Master Agreement.  The CSAs here had an express term requiring the calculations of collateral demands to be made "in good faith and in a commercially reasonable manner."  Defendants breached such terms, and others, in each of their respective agreements when Defendants instead calculated their collateral demands based on Libor figures they knew were being manipulated and suppressed.[83]

---

[83] Because Funds were obligated under the swaps to pay a fixed amount and receive a Libor-based amount in return, legitimately "low" Libor would expose Plaintiff to collateral calls to account for the growing gap between what it "owed" and what it would be "paid" under the swaps.  Thus, Libor suppression caused the collateral calls to be much, much higher than they would have been absent Defendants' wrongful conduct.

262.    Each Defendant's conduct also breached its implied duty of good faith and fair dealing created by its contractual relationships with Plaintiff.  The Libor suppression allowed each Defendant to reap windfall profits, first calculating and then paying artificially low floating rates substantially below the fixed rates owed by the Funds.  Defendants further breached their duties of good faith and fair dealing by making collateral calls without disclosing that those demands were being calculated based on a manipulated Libor figure.  Finally, each Defendant committed fraud-by-omission, by entering into swaps in which it would make payments based on USD Libor and then making lower payments and higher collateral demands than it should have, without disclosing that USD Libor was being and would continue to be manipulated and suppressed.

B.    **Defendants' Collusion Harmed Competition and Caused Antitrust Injury to Plaintiff**

263.    Plaintiff suffered antitrust injury as a result of the anticompetitive aspects of Defendants' conduct.

264.    Defendants are direct competitors and separate, profit maximizing entities, that are expected to act unilaterally in the marketplace as independent centers of decision making—all for the benefit of consumers.  Defendants are expected to compete in the market, including by competing to offer more attractive terms to investors.

265.    Pursuant to their agreement, however, Defendants restrained themselves from acting independently in favor of concerted action intended to maximize their financial interests in a way they could not have achieved unilaterally.  Defendants' agreement jointly to restrain their conduct was intended to, and had the effect of, tampering with price structures in the market, including by directly affecting the payments due, and net payments due, under the Transactions at issue in this matter.  Defendants knew that their conduct would have the

immediate effect of inflating the payments they would receive from investors on existing financial instruments while decreasing the payments their counterparties would receive. Rather than competing, Defendants chose to work together—and to jointly keep their scheme secret—to inflate prices and reap profits they could not otherwise have achieved.

266. Absent collusion it would have been in the unilateral self-interest of an individual bank to report that the other banks were artificially suppressing their Libor submissions, once the bank learned what was occurring, and not to engage in that behavior itself. As a result of Defendants' conspiracy, however, this did not occur, and Plaintiff and other investors suffered significant financial losses as a result.

267. Defendants are direct, horizontal competitors with respect to the sale of Libor-based instruments, and Libor is a central component of the price of such instruments. Thus, Defendants' anticompetitive conduct had severe adverse consequences on competition in that the Plaintiff's payments under the transactions were directly affected by Defendants' horizontal price-fixing and their failure to compete. As a result, Plaintiff was injured in its business and property in the form of significant financial losses.

268. As the DOJ charged RBS on April 12, 2013, and RBS admitted, by colluding to fix Libor, Defendants conspired to fix the price of Libor-based instruments, which was a conspiracy "in unreasonable restraint of interstate and foreign commerce":

> From at least as early as 2007 through at least 2010, ***Defendant THE ROYAL BANK OF SCOTLAND PLC, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce***. The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendant and its coconspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key component of the price thereof, on certain occasions.

> In violation of Title 15, United States Code, Section 1.

RBS Information (Apr. 12, 2013) (emphasis added).

269.    The DOJ also charged a former UBS employee, Thomas Hayes, with violating the Sherman Act by conspiring to fix JPY Libor as a component of price of Libor-based instruments. *See* Hayes-Darin Complaint at 3 ("The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among HAYES and his co-conspirators, the substantial terms of which were to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.").

270.    Defendants used Libor as the floating component of price on trillions of dollars of financial instruments.  Defendants' collusive manipulation of Libor therefore directly affected a component of the price of these instruments.  Thus, after entering into the Libor-based instruments at issue with Defendants, Plaintiff performed under instruments whose value was reduced by Defendants' collusive suppression of a component of their price.

271.    As noted above, the DOJ charged RBS with price-fixing in violation of the Sherman Act and RBS admitted to the underlying facts.  By letter dated March 22, 2013, the Department of Justice notified entities that entered into transactions with RBS that they may be victims of and may have been harmed by an antitrust violation by RBS, explaining:

> RBS and RBSSJ [RBS Securities Japan Limited] admit that certain RBS and RBSSJ traders attempted to manipulate and manipulated certain Yen and Swiss Franc LIBOR fixings on certain dates from 2006 through 2010 to benefit their trading positions in derivatives contracts to the detriment of counterparties to those contracts. ***RBS also admitted that certain traders conspired to fix prices*** in connection with Yen LIBOR from 2007 through 2010.  To the extent RBS or RBSSJ traders were successful in manipulating Yen and/or Swiss Franc LIBOR, ***other parties to derivatives contracts, mortgages, loans, and/or credit cards that were tied to manipulated LIBOR rates also may have been harmed***.

The DOJ's actions reflect the fact that Defendants' misconduct was the type of which the antitrust laws were designed to prohibit and may have harmed those persons who entered transactions at the fixed price.

272.    Thus, Plaintiff paid more, received less, or both, on financial instruments tied to Libor than they would have absent a conspiracy among horizontal competitors to fix prices.  This harm is the result of a naked restraint of trade that lies at the most fundamental concerns of the antitrust laws.

273.    Defendants' collusion also restrained competition as to the benchmark in floating-rate financial products.  In a free and competitive market, Defendants would have competed vigorously as to the benchmark used to calculate the floating component of price on various financial products to provide the best and most competitive products to their customers.

274.    As noted by the court in the Libor MDL, "LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, 2013 WL 1285338, at *16 (S.D.N.Y. Mar. 29, 2013).  But because of Defendants' collusion, Libor no longer accurately reflected the competitively determined outcomes of the interbank lending market during the Relevant Period.  Knowing that their collusion meant that Libor no longer served the function it was supposed to serve, Defendants in a competitive market would have competed to use alternative benchmarks that more accurately and reliably reflected actual competitive forces in the market.

275.    Defendants, however, did not do this because they wanted to preserve the centrality of Libor rather than some other benchmark precisely because Defendants controlled

Libor and could collude to manipulate it for their own ends.  According to a press report, in November 2008, in response to complaints about Libor manipulation, the BBA "drew up plans to license Libor to an independent third party that would pay a fee to administer the rate instead of the BBA."[84]

276.     This proposal was rejected by Defendants because "when BBA staffers pitched the idea to industry executives, they got the impression that the big banks—which paid most of the BBA's bills through their membership fees—wanted Libor kept in-house so that they could continue to influence it, according to people familiar with the talks."[85]  By restraining competition as to the benchmark used to calculate the floating component of price, Defendants were able to maintain the dominance of Libor—a benchmark that they controlled and could collusively manipulate for their own ends, whether to generate profits for their trading books, to bolster their reputations in times of financial stress, or some other end.

277.     Competitive market forces should have eliminated the use of Libor financial instruments.  But that did not happen.  Instead, Libor remained the dominant benchmark for financial instruments sold by Defendants during the Relevant Period, including the interest rate swaps at issue, due to their collusion.

278.     Defendants' conduct also restrained competition as to creditworthiness given that Libor submissions reflect perceived creditworthiness.  As the DOJ explained, and UBS admitted:

> Because a bank's LIBOR contributions, even if they are not based entirely on actual money market transactions, should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market, a bank's LIBOR contributions may be viewed as an indicator of a bank's creditworthiness.  If a bank's LIBOR contributions are relatively high, those submissions could suggest that the bank is paying more than

---

[84]   David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 12, 2012.

[85]   *Id.*

others to borrow funds.  Thus, a bank could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank.

UBS SOF ¶ 99.

279.    Libor reflected the creditworthiness of all large banks by acting as a measure of the stress faced by the financial system as a whole.  As the BBA stated: "BBA LIBOR rates are calculated daily from the rates at which banks will agree to lend each other money, so it is accepted as an accurate barometer of how global markets are reacting to prevailing market conditions."[86]

280.    In a competitive market, Defendants would compete with their peers, including other panel banks and all market participants, as to their perceived creditworthiness.  Greater perceived creditworthiness benefits a bank in many ways, including in the market for Libor-based instruments.  Similarly, weak perceived creditworthiness can lead to lower ratings, collateral calls, and other negative actions.

281.    Defendants who could truthfully post lower Libor submissions would have had a competitive advantage over Defendants who could not truthfully post lower Libor submissions because of Libor's importance as an indicator of a bank's creditworthiness.  In a free and competitive market, then, each Defendant would have competed to appear more creditworthy than other panel banks through the posting of lower truthful Libor submissions, and the stronger banks would not have tolerated artificially low Libor submissions from the weaker banks.

282.    During the Relevant Period, however, Defendants restrained competition among the banks for the best market perception of their creditworthiness.  Instead of competing with each other to post the lowest but accurate Libor submissions, they conspired to post artificially

---

[86]    BBA, *Understanding BBA Libor—a briefing by the British Bankers' Association*, http://www.bbalibor.com/download/1191.

low Libor submissions as a "pack," which reduced the differences between their relative creditworthiness.

283.    The more creditworthy banks did not force the less creditworthy banks to post accurate Libor submissions so that the less creditworthy banks could be revealed as weaker, permitting the stronger banks to take their business.  Instead, the stronger banks acceded to the weaker banks' making of falsely low Libor submissions and lowered their own Libor submissions as well.  The stronger banks did so because the artificially low Libor enabled them to reap huge trading profits.  By lowering their own Libor submissions, the stronger banks reduced the reputational costs caused by other banks suppressing Libor quotes.

284.    The restraint of competition as to creditworthiness harmed Plaintiff by enabling the collusive suppression that occurred.  Had Defendants competed vigorously over their creditworthiness by striving to make the lowest but accurate Libor submissions relative to the competition, the suppression conspiracy could never have happened in the first place.

285.    In addition to being a naked and *per se* unlawful restraint of trade, Defendants' conspiracy was also anticompetitive under the rule of reason.

286.    During the Relevant Period, there were markets for the sale of Libor-based instruments, including for the securities and interest rate swaps at issue.  Defendants have market power in the market for interest rate swaps.  As panel banks for USD Libor, Defendants had the ability to control and exercised control over USD Libor.

287.    Defendants' control over Libor meant that they were able to suppress Libor and to cause the injuries and anticompetitive effects identified above.  Defendants' ability to cause supracompetitive payments in the swaps and securities markets demonstrates their market power.  In addition, Defendants' agreement to exchange confidential, pre-publication Libor quotes also

caused supracompetitive payments in the swaps and securities markets, and the other injuries and anticompetitive effects identified above.

## IV.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.    No Limitations Period Could Begin Until Defendants' Last Bad Act

288.    Defendants' misconduct occurred and continued on a daily basis with each false submission to the BBA.  Each false submission artificially lowered Libor, reducing the Libor-based payments to which Plaintiff was entitled under the securities, swaps, and other Libor-linked investments described on the Exhibits.  Plaintiff would not have been harmed to the extent it was had Defendants' wrongs been only a few isolated acts.  Rather, it was the sustained suppression of Libor over a multi-year period that inflicted heavy losses on Plaintiff.

289.    The acts of manipulation described herein were not carried out by individuals, but through a conspiracy between and amongst, among others, the panel banks.  Such collusion was necessary because of the way Libor is calculated and has been confirmed by government investigations, as discussed above.  Collusion was also necessary in that it kept the panel banks from engaging in a race to the bottom, and instead allowed them to agree upon a level of suppression that would maintain a façade of reliability for Libor as a benchmark.  Defendants committed numerous overt acts in furtherance of their conspiracy, including making false submissions to the BBA and actively concealing their misconduct by, among other things, making false or misleading public statements concerning Libor.

290.    These facts require the tolling of any otherwise-applicable statute of limitations until, at the very earliest, the occurrence of Defendants' last bad act.

### B.    No Limitations Period Could Begin Until the Termination of the Transactions

291.    Each of the Transactions involved a continuing contract under which Plaintiff and

the applicable counterparty would make payments to and/or from each other, based on calculations referencing Libor. Thus Defendants' continuous suppression of Libor over a period of years generated a continuing and accumulating shortfall between the amount of Libor-linked payments owed to, and actually paid to, Plaintiff.

292.    These facts require the tolling of any otherwise-applicable statute of limitations until, at the very earliest, the termination of the underlying contracts.

### C.    Inquiry Notice, Equitable Tolling, and Fraudulent Concealment

293.    In actuality, however, the statutes of limitations applicable to Plaintiff's claims did not begin to run until much later. This is because during the Relevant Period, Defendants effectively, affirmatively, and fraudulently concealed their wrongful acts from Plaintiff and the public. Plaintiff did not know, nor could it reasonably have known, facts indicating that Defendants were engaging in intentional misconduct that caused Libor to be artificially depressed until, at the earliest June 2012, when the settlements with Barclays were made public.

### 1.    Defendants' wrongful conduct was self-concealing

294.    Defendants' conspiracy to share information about, and to coordinate, their individual Libor submissions and to misrepresent their borrowing costs to the BBA was, by its very nature, self-concealing, and Defendants made every effort to ensure it remained concealed. Defendants' efforts to suppress Libor only worked as long as they did because they were and remained hidden.

295.    Regulators have emphasized the secretive nature of Defendants' conspiracy. In its findings against UBS, for example, the FSA stated that: "[t]he misconduct was extensive and widespread" and included "an unquantifiable number of oral requests, which by their nature

would not be documented."[87]  In fact, traders were strongly encouraged to make their requests verbally, as at UBS, where a submitter who received an internal transmission of a written request complained to the trader's manager that such requests should not be made in writing.  UBS SOF ¶ 38.  For this same reason, Rabobank grouped submitters on the same desks as traders—so that oral requests to manipulate Libor could be made more easily.  Rabobank CFTC Order at 2-3.

296.    In addition, Defendants' Libor submissions were not made based on objective metrics observable to market participants.  This fact, combined with the general opacity of the interbank loan market *and* with the highly confusing and unreliable condition of the market during the height of the financial crisis during 2008, made the self-concealing nature of Defendants' scheme all the more pronounced.  As a result of these factors, no reasonable investor would have had any reason to conclude that any discrepancies between Libor and other measures of Defendants' borrowing costs were due to Defendants' intentional efforts, rather than market disruption or other factors.

### 2.    Defendants actively concealed their misconduct and deflected any and all concerns that were sporadically raised

297.    Defendants also engaged in affirmative acts to conceal their misconduct.  As a result, even extremely sophisticated market participants were unaware that this misconduct was occurring.  As noted at the outset of this Complaint, the former Chairman of the United States Federal Reserve, Alan Greenspan, has commented:  "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor-bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."

---

[87] Financial Services Authority, FSA/PN/116/2012, *UBS Fined £160 million for Significant Failings in Relation to LIBOR and EURIBOR* (Dec. 19, 2012), available at http://www.fsa.gov.uk/library/communication/pr/2012/116.shtml.

298.    Defendants, in conjunction with the BBA, actively denied the existence of a conspiracy and engaged in a campaign of misinformation to mask the widespread, systematic suppression that was occurring.  On August 10, 2007, for instance, the BBA issued a press release explaining that "[c]entral banks (such as the Bank of England, the US Federal Reserve and the European Central Bank) may fix official base rates monthly, but BBA LIBOR reflects the actual rate at which banks borrow money from each other."[88]

299.    On November 29, 2007, a Barclays manager contacted a representative of the BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of Defendants.  The Barclays manager stated that Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did.  You get shot at."  The Barclays manager identified certain other Defendants that were submitting Libor rates lower than where those banks could actually borrow funds.  In order to protect its members, however, the BBA kept this information from the public.  It was only released much later, in connection with Barclays' settlement agreements.

300.    The BBA's Foreign Exchange and Money Markets Committee—which was responsible for the functioning and development of Libor and counted certain of Defendants among its members—likewise covered up Defendants' fraudulent and collusive scheme.  UBS's representative on the Foreign Exchange and Money Markets Committee in 2009, for instance, knew that Libor was being rigged but directed employees to "be careful" not to expose Defendants' wrongdoing.  On May 19, 2008, the Committee held a meeting, although it

---

[88] BBA, *Key Facts About BBA LIBOR* (Aug. 10, 2007).

officially refused to confirm that fact.[89]  According to Bank of England Deputy Governor Paul

Tucker, who spoke to Angela Knight of the BBA, the meeting was intended as a "working level

pre meeting," but nonetheless the BBA was inclined to conclude that "no change [was] needed

substantively, although some recognition of perceptions problem."[90]

301.    Indeed, on June 6, 2008, the *New York Times* reported that the BBA determined at

its May 30, 2008 meeting that "there would be no immediate change to the process used to

determine [Libor]," but instead "all the trade body would commit to was strengthening its

oversight of Libor—saying it would give more details in due course."[91]  On May 31, 2008,

Angela Knight confirmed the results of the meeting for Paul Tucker, explaining that "we merely

confirmed existing panels and then said we would be giving details of strengthened governance

in due course."[92]  The same day, Bank of England Governor Mervyn King informed Tucker and

Michael Cross, another Bank of England official, that he believed BBA's general intent to

"strengthen[] the oversight of BBA Libor" was a "wholly inadequate" response.[93]

302.    On June 5, 2008, Cross sent an e-mail noting that he "sent comments to the BBA

. . . (1) urging them to consult on governance and policing and (2) asking them to remove direct

and indirect references to the Bank of England from" a forthcoming consultation document.[94]

On June 26, 2008, King told Tucker he should "'impress' on the BBA the 'need for greater

---

[89] E-mail from Angela Knight to Paul Tucker (dated May 21, 2008).

[90] E-mail from Paul Tucker to Michael Cross et al. (dated May 28, 2008).

[91] New York Times, *INTERNATIONAL: Libor Process* (June 6, 2008), available at http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html.

[92] E-mail from Angela Knight to Paul Tucker (dated May 31, 2008).

[93] E-mail to "Governors - GPS" with handwritten notes (dated May 31, 2008).  *See also* Jesse Westbook and Gavin Finch, *BOE Wanted Its Name Off Libor Review Over Governance Issues*, Bloomberg (July 20, 2012), available at http://www.bloomberg.com/news/2012-07-20/boe-didn-t-want-its-name-on-libor-review-over-governance-issues.html ("King had said in a note dated May 31 that the BBA's initial proposals seemed 'wholly inadequate.'").

[94] E-mail from Michael Cross to Bill Dudley et al. (dated June 5, 2008).

energy' on the Libor review."[95]

303.    Because UBS and other Defendants made a concerted effort to hide their misconduct from regulators and the public, the FSA concluded that the "routine and widespread manipulation of the submissions was not detected by Compliance or by Group Internal Audit," despite five audits of the relevant business area during the Relevant Period.

304.    Defendants also concealed their misconduct from regulators through outright falsehoods.  For example, on March 5, 2008, the FSA asked Barclays what it was paying for funding in certain tenors and currencies.  A Barclays manager stated internally that he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to Libor.  A Barclays submitter agreed that if he responded with "the honest truth" it might open a "can of worms."  Barclays responded to the FSA that it was paying for twelve-month USD at Libor "flat," which was false.

305.    Even when regulators began to uncover evidence that Defendants were falsifying their Libor submissions, they did not immediately reveal that information to the public.  On April 11, 2008, for instance, a Barclays employee told an employee of the New York Federal Reserve that he was aware Defendants were making Libor submissions lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[96]  The Barclays employee said that Barclays could not borrow money at the rates submitted by other Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really . . . I mean we, you-you know we speak to everyone that everyone else does so . . . [u]m, yeah it's,

---

[95] Westbrook and Finch, *BOE Wanted Its Name Off Libor Review Over Governance Issues*.

[96] New York Federal Reserve Bank, Unofficial Transcript, ID09274211, at 7 (Apr. 11, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_transcript.pdf.

it's quite, quite an uncomfortable feeling, and . . . I don't know if at some stage LIBORs will correct themselves." This information was not publicly disclosed until July 2012.[97]

306.    Similarly, on October 10, 2008, a Barclays employee privately reported to the New York Federal Reserve that its USD Libor submissions were "unrealistic."[98] And on October 24, 2008, another Barclays employee privately reported to the New York Federal Reserve that USD Libor rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being artificially low.[99] The employee stated he was aware of banks that were making Libor submissions that were below what they actually paid to borrow funds. Again, none of this was revealed to the public until recently.

307.    In a pair of internal audit reports released in March 2013, the FSA confirmed that it actively monitored Libor and regularly communicated with the panel banks about their Libor submissions throughout the 2007 to 2009 period.[100] During that time, the FSA amassed tens of thousands of emails and other documents relating to the Libor submission process. While the vast majority of those documents were not publically available at the time, the FSA kept itself

---

[97] In its recent decision in *Carpenters Pension Trust Fund of St. Louis v. Barclays plc et al.*, 13-2678 (2d Cir. Apr. 25, 2014), the Second Circuit noted Barclays' concession at oral argument that Barclays' June 27, 2012 public disclosure of its settlements with regulators "was the (first) occasion that Barclays disclosed its false 2007-2009 submission rates." *Id.* at 13-14.

[98] New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-000091-97, at 95 (Oct. 10, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_10_2008_transcript.pdf.

[99] New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-00098-100, at 000098, 000100 (Oct. 24, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_24_2008_transcript.pdf.

[100] Internal Audit Report, A review of the extent of awareness within the FSA of inappropriate LIBOR submissions (March 2013) ("FSA Internal Audit Report"), available at http://www.fsa.gov.uk/static/pubs/other/ia-libor.pdf; FSA Internal Audit report, A review of the extent of awareness within the FSA of inappropriate LIBOR submissions, Management Response (March 2013) ("FSA Management Response"), available at http://www.fca.org.uk/static/documents/fsa-ia-libor-management-response.pdf.

apprised of the *Wall Street Journal* and *Bloomberg* articles from April and May 2008, as well other public documents.[101]

308.    Despite this abundance of contemporaneous information, the FSA took no action regarding Libor until years later.  The FSA did not even announce a formal investigation into the rate-fixing process until May of 2010.[102]  And the results of the investigation, and the subsequent enforcement actions by the FSA and other regulators, were not known to the public until 2012, when the Barclays, UBS, and other settlements were finally revealed.

309.    That the FSA and other regulators did not become fully aware of the Defendants' intentional misconduct until many years after the fact further confirms that investors like Plaintiff—who did not have access to the FSA's volumes of non-public information—stood no chance of gaining such knowledge.

310.    Not only did Defendants and the BBA hide the fact that Libor was being artificially manipulated, but they also actively misled investors and the public by making false representations about the integrity of the Libor fixing process.  In 2008, the BBA's "LIBOR Governance and Scrutiny" report stated that "[t]he BBA employs a full time manager to supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the marketplace.  The LIBOR manager works with a team of professionals both in-house and externally to ensure all processes operate to the highest standards."[103]  The report further explained that "Thomson Reuters . . . act[s] as the 'designated distributor' of BBA LIBOR rates. All contributions to the LIBOR rate-setting process are collected by Thomson Reuters, who

---

[101]    *See* FSA Internal Audit Report at 45-46, 50, 53-54, 56-61, 63, and 72.

[102]    *See* Transcript, House of Commons, Oral Evidence Taken Before the Treasury Committee, July 16, 2012 at Q1085 (MDL No. 2262 Dkt. No. 209-8).

[103]    BBA, *LIBOR Governance and Scrutiny* (Dec. 18, 2008), available at http://www.bbalibor.com/download/4025.

currently perform[s] checking procedures, supervised by the LIBOR manager, on all the submissions before running the calculation and distributing the fixes."  Investors like Plaintiff had no reason to disbelieve assurances by the BBA that Libor was not being manipulated.

311.    Defendants also engaged in a media campaign, characterized by the BBA as an "offensive," that was designed to avoid public scrutiny of their Libor submissions, particularly after a report was published in the *Wall Street Journal* in April 2008 questioning the accuracy of Libor at that time.

312.    On April 18, 2008, for instance, BBA director John Ewan denied that the rise in Libor after publication of the *Wall Street Journal* article was in any way related to increased scrutiny.  Instead, Ewan stated that he was "pretty confident" the jump in Libor rates "has been an effect of the market moving. . . . It's another stage in the evolution of this extremely strained market that we've been seeing since August last year."[104]

313.    On April 21, 2008, Dominic Konstam of Credit Suisse affirmatively stated that low Libor rates were attributable to the fact that U.S. banks, such as Citi and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks:  "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply."  Similarly, Jeffrey Rosenberg, head of credit strategy at Banc of America Securities, stated that variations in Libor were the result of the way Libor is calculated by the BBA.  Specifically, he said that the BBA approach "works when both overall bank risk is low and the dispersion of risks across banks is small . . . [which] is clearly not the case currently."  Through statements such as this, Defendants provided then-credible

---

[104] Alistair Barr, *Libor Rate Jumps Again as Banking Group Accelerates Reviews*, MarketWatch (Apr. 18, 2008).

alternative explanations for low Libor rates (such as cash hoarding) that were plausible to investors.

314.    In an April 28, 2008 interview with the *Financial Times*, Konstam continued to defend Libor's reliability:  "Libor has been a barometer of the need for banks to raise capital. The main problem with Libor is the capital strains facing banks. . . . Initially there was some confusion that Libor itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing."  As a result of these statements, Credit Suisse misled investors to believe that low Libor rates were a function of readily available alternative sources of cash, which lessened the need for interbank borrowing, rather than any collusive effort to suppress Libor.

315.    In a May 16, 2008, Reuters report, JPMorgan made the assertion—which was plausible at the time—that the volatility in Libor rates was a reflection of the unfolding financial crisis:

> The Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch.

> *    *    *

> Everyone is funding at a similar level, but when credit conditions worsen and we have periods like this of unprecedented turmoil, the reality is there is not a single borrowing rate.

316.    JPMorgan further asserted that differences between Libor and other indices at that time could "largely be explained" by limitations that had existed since the inception of the Libor in 1984, and stated that the "main limitations of Libor are due more to lack of liquidity in the market rather than any bias in the fixing process."  JPMorgan further reported that the composition and "constituents" of the BBA Libor Panel consisted of "some of the best known and best capitalized banks in the world."  And therefore, "[i]n a market where significant credit

tiering is evident, it seems plausible the BBA panel banks could enjoy an advantage in credit

costs." The research report further explained the reasons that the "Fed data" differed from Libor

was owing to the fact that the BBA trims the highest and lowest quartile and averages the

remaining rates, whereas the "Fed data is untrimmed and is likely to contain more outlying

observations," thus tending to "pull" the Federal Reserve's daily published rate "above the BBA

Libor level." In that same report, Colin Withers of Citi claimed Libor was reliable because its

methods were time-tested: "the measures we are using are historic—up to 30 to 40 years old."

317.    Other Defendants similarly attributed low Libor rates to market forces. An April

2008 UBS report, for example, noted that "we don't even know if contributing banks are mis-

pricing Libor in the first place. Libor could be simply responding to the rise in other market

rates." A May 2008 Deutsche Bank report suggested that "Libor has developed different

sensitivity to fundamental market risks (liquidity and credit) together with [a] separate

idiosyncratic component which has not been as strong in the past."

318.    Adding to the confusion was a *Wall Street Journal* article published on May 2,

2008 suggesting that Libor was actually too *high*. According to the article, Libor "remain[ed]

unusually high compared with expected Federal Reserve interest rates, an indication that banks

continue to hoard dollars." The *Wall Street Journal* explained that "Fed officials attribute the

recent Libor rise to European banks' needing to borrow in dollars, because the pressure tends to

slacken around midday in the U.S. when the European day ends" and described steps that the Fed

was taking to "reduc[e] tensions in the Libor market."[105]

319.    Defendants quickly endorsed the theory that Libor was higher than it should be.

For example, Terry Belton of JPMorgan posited that uncertainty surrounding the panel banks'

---

[105] Joellen Perry, Greg Ip & Carrick Mollenkamp, *Central Banks Ponder Dollar-Debt Rate*, Wall Street Journal, May 2, 2008.

credit losses, "along with balance sheet constraints, [wa]s weighing on Libor, leaving many banks anxious about potential future losses" and driving Libor up.

320.    Defendants continued to make assurances that the panel banks were making accurate submissions.  Belton posited that "the Libor fixing process is not broken; BBA Libor broadly reflects the borrowing costs of top tier large banks. . . . The main limitations of Libor are due more to lack of liquidity rather than any bias in the fixing process."  Mustafa Chowdhury of Deutsche Bank similarly asserted:  "there is little evidence that rate manipulation, if it exists, has been appreciably affecting the LIBOR fixing . . . Collaboration among a large number of the survey banks to submit non-market-based quotes is also highly unlikely."

321.    On May 29, 2008, the *Wall Street Journal* published an article again raising questions about accuracy of Libor based on data over a short period in early 2008.  That article suggested that one "possibility" might be that some banks had understated their borrowing costs but stopped far short of demonstrating that this was a probability.  Rather, as the article acknowledges, "[t]he Journal's analysis doesn't prove that banks are lying or manipulating Libor," and even if the Libor data that the banks were submitting in the Libor process were in "doubt" or "flawed," various other explanations for the observed data, which did not involve wrongdoing, were accepted at the time to be *at least* just as plausible.

322.    One explanation that the *Wall Street Journal* article itself offered for the observed data, which did not involve wrongdoing and which is consistent with explanations expressed by both the U.K.'s FSA and the BBA, is that "since the financial crisis began, banks have all but stopped lending to each other for periods of three months or more, so their estimates of how much it would cost to borrow involve a lot of guesswork."

323.    This explanation, considered plausible at the time, considered the "gap" observed

in the *Wall Street Journal* article to be a byproduct of "structural issues in the Libor fixing process interacting with the deteriorating market conditions," rather than being the result of any wrongdoing.[106]  At the time, even the U.K.'s financial regulator held the view (even after the May 29, 2008 publication and consideration of the *Wall Street Journal's* analysis and other analyses during the April and May 2008 time period), that "[t]he combination of deteriorating market conditions and structural issues in the LIBOR fixing process . . . caused dislocation completely independent of any [wrongdoing]."[107]

324.    As an additional explanation as to why this analysis did not lead one to conclude that "banks [were] lying or manipulating Libor," the *Wall Street Journal* explained that certain banks "have ample deposits and access to loans from the Federal Reserve, meaning they might not need to borrow at higher rates from other banks."[108]

325.    The BBA and the panel banks continued their offensive to mislead investors after May 29, 2008.  That same day, a BBA spokesman stated:  "We have every confidence in the integrity of the BBA Libor-setting process and the accuracy of the figures it produces[.]"[109]  As for the panel banks, J.P. Morgan's head of global fixed-income strategy wrote that the *Wall Street Journal's* "[m]ethodology is based on too high a risk-free rate which produces a large

---

[106] *See, e.g.*, FSA, *Internal Audit Report:  A Review of the Extent of Awareness within the FSA of Inappropriate LIBOR Submissions* ¶ 28 (2013), available at http://www.fca.org.uk/static/pubs/other/ia-libor.pdf.

[107] *Id.* ¶ 26.

[108] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall Street Journal (May 29, 2008).

[109] Gavin Finch & Elliott Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008).

upward bias in the Journal's measure of bank borrowing costs."[110]  Citi falsely stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market."[111]  All of these representations were false, and were designed to prevent investors like Plaintiff from discovering that Libor was being rigged.

326.    On June 10, 2008, the BBA published a release titled "Understanding the construction and operation of BBA LIBOR—strengthening for the future," which sought to assure the public of Libor's integrity, and to dispel the notion that Libor rates were subject to manipulation.  The BBA claimed that this paper "represent[ed] the views of the Foreign Exchange and Money Markets Committee, many other members of the BBA and incorporates the overwhelming number of informed comments that the BBA has received."  Excerpts of the paper provided:

- "Since its inception in 1985, BBA LIBOR has enjoyed a reputation for accuracy. However, just as the credit crunch has led to stress in the markets, and the breakdown of longstanding correlations in the pricing of assets, as a barometer of these markets, it has also been stressed.  This has led to discussion of some of the BBA LIBOR currency fixes—particularly the Dollar fix—within the financial community.  This proper discussion *has overflowed into commentary in the media, and the BBA believes that it needs to correct a number of misunderstandings and misperceptions*." (emphasis added)

- "The dispersion of [Libor] rates input by each bank is reflective of the credit conditions facing each bank on a daily basis.  For several years therefore the spread between the highest and lowest has been tight as the credit environment was benign. *An increase in dispersion rates has occurred since August 2007 as a consequence both of the greater credit costs in the bank market since the start of the credit crunch and the lack of liquidity*." (emphasis added)

- "Credit crunch effects have ebbed and flowed on several occasions during the past months which in turn impact the LIBOR fix as it does other

---

[110] *Banks May Be Understating Key Lending rate: Report*, Reuters (May 29, 2008), available at http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[111] *Id.*

indicators. . . . ***These issues relating directly to the current environment will inevitably result in a volatility*** that is today more than that experienced in benign conditions." (emphasis added)

- "***The argument is sometimes made that the U.S. Dollar fixing MUST be too low, otherwise there is apparent arbitrage.  This is in fact not correct***.  It is simply that the market is no longer offering a cost free arbitrage between the FX swap and cash transactions." (emphasis added)

- "Differences between the London Euro Dollar rate and the domestic U.S. Dollar rates are **a reflection of existing market conditions, not necessarily a distortion in benchmarks**." (emphasis in original)

The BBA also stated that there would be tighter scrutiny of the rates submitted by panel banks, and that any discrepancies in rates would have to be justified.[112]

327.    After conducting an investigation, the BBA declared that Libor had not been manipulated.  On August 5, 2008, the BBA published a "Feedback Statement" on Libor, reasserting that "***BBA LIBOR has been the subject of inaccurate and misconceived commentary in some areas of the media and that this needs to be addressed***."[113]  The paper concluded that "contributing banks . . . were confident that their submitted rates were 'truly reflective of their perceived borrowing costs,'" and further that "***all contributing banks are confident that their submissions reflect their perception of their true costs of borrowing, at the time at which they submitted their rates***."[114]

328.    The BBA also publicly announced on April 17, 2008 it would expel any panel bank that deliberately submitted inaccurate Libor quotes.  But it never did so, leading the

---

[112] BBA, *Understanding the Construction and Operation of BBA LIBOR—Strengthening for the Future: A Consultative Paper from the BBA* §§ 2.3, 2.4, 5.1, 6.8, 6.9, 7.3, 7.4, 8.7 (June 10, 2008), available at http://www.bba.org.uk/media/article/bba-announces-steps-to-strengthen-libor.

[113] BBA, *Libor Consultation Feedback Statement* § 2.4 (Aug. 5, 2008), available at http://www.bba.org.uk/media/article/bba-libor-review-consultation-feedback-statement/latest-news (emphasis added).

[114] *Id.* § 3.19 (emphasis in original).

ordinary person to understand that, during the BBA's review, no bank was found to have been reporting inaccurate Libor rates. The same day, the *Wall Street Journal* reported the BBA's announcement that it would conduct an "intensive review" of relevant data, but "the BBA doesn't believe banks have submitted false quotes."[115] Thereafter, in nearly every article during 2008 in which the integrity of Libor was questioned, a BBA spokesperson was quoted stating the benchmark was valid and reliable.

> **3.    As a result of Defendants' conduct, no reasonable counterparty would have known of the probability that it had been injured by Defendants' joint suppression of Libor until June 2012**

329.    Libor's brief rise in September 2008 and the subsequent creation and expansion of liquidity and bailout facilities in the United States and globally made it difficult or impossible to discern signs of manipulation contemporaneously. Consequently, Libor's movements from September 2008 to at least December 2009 were widely accepted as valid and incorporated into government, investor, and academic analyses in reliance on their integrity. For example, through at least December 2009 it was widely accepted that the spread between Libor and the OIS during the Relevant Period was an appropriate index of interbank liquidity risk.

330.    A search of the academic literature on Libor after September 2008 overwhelmingly returns analyses accepting the integrity of Libor during this period. Almost no one suspected that Libor had been suppressed after September 2008, let alone by the magnitude now apparent, and certainly not that it was attributable to the type of collusion that has since come to light.

331.    Similarly, beginning in October 2008, financial reporting focused extensively on

---

[115] Carrick Mollenkamp and Laurence Norman, *British Bankers Group Steps Up Review of Widely Used Libor*, Wall Street Journal (Apr. 17, 2008), available at http://online.wsj.com/news/articles/SB120838284713820833.

the fact that Libor was at historic highs.  In light of the fact that Libor was at or near record

highs, a reasonable investor would not have suspected that banks were actively suppressing

Libor.

332.    Even before that period, an academic study in the respected *BIS Quarterly Review*

and published in March 2008 found no evidence of collusion or even manipulation in setting

Libor using data up to January 2008.  A study by Gyntelberg and Wooldridge states:

> If a majority of banks engaged in strategic behaviour, then trimming alone would not
> have mitigated the impact on the fixing.  That said, there is little evidence that this
> was the case.  In the US dollar market, the widening of Sibor and H.15 spreads over
> Libor is consistent with signalling [sic] by Libor contributor banks.  However, many
> of the banks on the US dollar Libor panel are also on the euro Libor panel, and there
> are no signs that signalling [sic] distorted the latter fixing.  Likewise, ***available data
> do not support the hypothesis that contributor banks manipulated their quotes to
> profit from positions based on fixings***.

333.    Instead the academics conclude:  "A deterioration in market liquidity, an increase

in interest rate volatility and differences in the composition of the contributor panels were the

main causes of the divergence."  These academics thus attributed the dislocation in Libor to

market factors peculiar to the financial crisis and idiosyncratic to the particular reporting banks.

334.    In 2009, another academic study published in the *BIS Quarterly Review* also

found no evidence of manipulation as late as May 2008.  Notably, this study attempted to

"extend" the *Wall Street Journal* study to ascertain whether Libor manipulation was occurring.

Abrantes-Metz *et al.* state:

> On May 29, 2008, the Wall Street Journal (the Journal) printed an article that alleged
> that several global banks were reporting unjustifiably low borrowing costs for the
> calculation of the daily Libor benchmark.  Specifically, the writers alleged that the
> banks were reporting costs that were significantly lower than the rates that were
> justified by bank-specific cost trend movements in the default insurance market. . . .
>
> In this paper, we extend the Journal's study and perform the following analyses:
> (a) a comparison of Libor with other rates of short-term borrowing costs, (b) an
> evaluation of the individual bank quotes that were submitted to the British Banker's

Association (BBA), and (c) a comparison of these individual quotes to individual CDS spreads and market cap data. We do so during the following three periods: 1/1/07 through 8/8/07 (Period 1), 8/9/07 through 4/16/08 (Period 2), and 4/17/08 through 5/30/08 (Period 3). Furthermore, on April 17, 2008, the Wall Street Journal first published the news that the BBA intended to investigate the composition of these rates.

Individual Libor quotes are analyzed from January 2007 through May 2008, while the level of the Libor itself is studied from 1990 using Bloomberg data sources. After verifying that the patterns are essentially the same for the one month and three month Libor rates, we generally restrict our attention to the one month Libor. We also study data on other market indicators, both at aggregate levels and for the individual Libor banks. A few missing days are filled by linear interpolation. Our primary findings are that, while there are some apparent anomalies within the individual quotes, ***the evidence found is inconsistent with an effective manipulation of the level of the Libor*** [emphasis added].

335.    The upheaval in the markets, the lack of available data on interbank lending, and in particular the bailout facilities made available to the panel banks were widely understood to be the factors causing interest rates to behave anomalously during the Relevant Period, as almost every other economic indicator—from the price of crude oil, to the rate of inflation, to the interest rates on short-term deposits—did during the Relevant Period. Thus, Libor was understood to be sending meaningful economic signals about the crisis rather than exhibiting signs of tampering.

336.    Because Defendants took affirmative steps to conceal their misconduct, no reasonable counterparty could have discovered facts indicating that Defendants were unlawfully manipulating Libor until, at the earliest, June 2012, when the Barclays settlement was announced. It was not until the recent revelations from this settlement and others, as well as the news of arrests and indictments, that Defendants' misconduct began to come to light. These revelations surfaced after a year-and-a-half intensive global probe that involved investigators and regulatory authorities from around the world, something that counterparties like Plaintiff could not have done on its own. Even today, the full scope of the conspiracy continues to evolve as

investigations uncover additional evidence.

337.    For years after Defendants' and the BBA's denials were issued, there were virtually no indications that Libor manipulation had persisted beyond May 2008.  For example, even when government investigations into rate-setting misconduct first came to light, it was universally reported that the inquiry was focused on this early period.[116]

338.    In October 2008, the International Monetary Fund published a Global Financial Stability Report in which it noted that "[a]lthough the integrity of the U.S. dollar LIBOR fixing process has been questioned by some market participants and the financial press, it appears that U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding."[117]

339.    Yet between December 2009 and March 2011 no news reports indicated even a suspicion that Libor had experienced continued manipulation.  If counterparties should have recognized signs that Libor was manipulated in late 2008 and 2009, one would expect there to be at least some discussion in the public record.  Instead, virtually no suspicions were aired.

340.    Counterparties could not have detected Defendants' Libor manipulation because the integrity of Defendants' submissions was within their exclusive knowledge:  only Defendants could know whether they were accurately reporting the rates at which they could borrow.

**4.    A study examining Defendants' stock prices in relation to questions regarding the accuracy of Libor in April or May 2008 confirms that no reasonable investor was on inquiry notice until much later**

341.    As further proof of the fact that no reasonable investor had reason to be on notice

---

[116] Brooke Masters et al. *Big Banks Investigated Over Libor*, Financial Times (Mar. 15, 2011), available at http://www.ft.com/intl/cms/s/0/ab563882-4f08-11e0-9c25-00144feab49a.html.

[117] International Monetary Fund, *Global Financial Stability Report* (Oct. 2008), available at http://www.imf.org/external/pubs/ft/gfsr/2008/02/pdf/chap2.pdf.

that Defendants were actively suppressing Libor in 2008 or 2009, a study was recently conducted by a consulting expert engaged by class-action plaintiffs to determine whether Libor panel bank members suffered any significant stock losses in response to articles raising questions about Libor's accuracy in April or May 2008.  That study, conducted in 2013, demonstrates that the articles did not affect stock prices, confirming that these articles were not in any way sufficient to convey to investors that there was any basis upon which to conclude that panel banks were intentionally suppressing Libor, much less in a collusive manner.

342.    More specifically, the analysis tested the hypothesis that these articles implied to a person of ordinary intelligence, with at least 50% probability, that Libor was being manipulated.  The results of the analysis, as described more fully below, are that despite the possible negative financial consequences to the health of the banks, the markets did not react to the 2008 articles and only reacted slightly at most to the March 15, 2011 disclosure by UBS that it had received subpoenas in connection with a Libor manipulation by punishing Defendants' stock prices.  To the contrary, the only time that the stock prices of the Defendants decreased in a statistically significant way against a baseline index was in June 2012, when Barclays announced its settlement with governmental authorities.  The conclusion to draw from this is that the market, composed of highly sophisticated investors, did not seriously contemplate that the Defendants would have any exposure for Libor manipulation until June 2012 and consequently were not on inquiry notice of such a probability until that time.

343.    The analysis also inquired as to the kind of price reactions that would have occurred if typical market participants thought that Libor was manipulated with 50% or higher likelihood.  In other words, if the average investor were to expect that a bank had committed a fraud with a 50% or higher likelihood, the average investor would also expect this to impose

significant costs on the offending banks such that the stock price of those banks would decline substantially to reflect the 50% or higher likelihood of paying significant damages.  Here, the recent settlements of Barclays, UBS, RBS, and Rabobank with regulatory authorities resulted in these Defendants collectively paying almost $4 billion for Libor manipulation to government regulators alone.

344.    The *Financial Times* recently estimated that the currently-held Libor linked financial products have about $350 trillion in notional value in 2013.  Given these enormous dollar volumes of Libor-linked financial products, potential exposure to private claimholders could be many multiples greater than the government settlements.  Consequently, if the 2008 articles created an expectation, with at least a 50% likelihood, that banks had engaged in an illegal manipulation scheme with a possible cost of tens of billions of dollars each, the expectation is that each of the banks would suffer substantial stock losses when those articles were published.

345.    The analysis conducted a regression of the stock returns for each of the panel banks on the value-weighted stock market index and indicator variables on the dates of each of the 2008 articles as well as on the announcement of the UBS subpoenas in March 2011 and the Barclays settlement in June 2012.

346.    If the 2008 articles created an expectation of possible manipulation by Defendants for the average investor, the analysis is expected to show substantial stock price declines for each bank on at least some of the dates after controlling for the overall stock market index.  These stock price declines should result in statistically significant negative parameter coefficients for the indicator variables.

347.    The results, which have been publicly reported in detail, demonstrate that none of

the 2008 articles are associated with any statistically significant negative stock price reactions for any of the defendant banks for which stock prices are available.  The only exception to this finding is HSBC and Bank of Tokyo on March 16, 2011, when their stock prices declined abnormally at 3% and 4.5% respectively.  However, these are the only banks that declined statistically significantly on this date, which is approximately when UBS announced that it was being investigated for Libor irregularities.

348.    Further, the largest stock price reaction for the panel banks occurred on June 28, 2012, just after the $453 million Barclays settlement was publicly announced.  In reaction to this announcement, Barclays' stock price suffered a decline of almost 12%, resulting in a market cap decline of about $4.5 billion in a single day.  This stock price drop exceeded the settlement fine by about ten-fold, indicating likely additional future costs for Barclays such as settlements with private claimholders.  RBS also declined by a statistically significant 9.4% on June 28, 2012. The other panel banks collectively suffered a statistically significant 2.97% abnormal stock price decline on this day, thus recognizing some of the implications of the Barclays settlement for the other panel members at this time.

349.    Overall, the evidence that has been objectively reported supports Plaintiff's assertion that they were not on inquiry notice of their injuries until June 2012 because none of the 2008 articles changed the expectations of the ordinary investor.  Based on this objective statistical evidence, the 2008 articles do not serve as inquiry notice.

> **5.    That the U.S. and U.K. governments continued to rely on Libor in 2008 and beyond further confirms that the 2008 articles did not place reasonable investors on inquiry notice**

350.    As further confirmation that the 2008 articles did not place reasonable investors on inquiry notice, both the U.S. and U.K. governments continued to rely on Libor in 2008 and throughout the Relevant Period.

351.    As an example, in July 2008, the U.K. Treasury utilized Libor in connection with its Special Liquidity Program despite evidence that 3-month Libor was declining.  That it continued to do so after articles suggesting suppression indicates that the Treasury had faith in Libor despite sporadic speculation concerning its accuracy.

352.    In late 2008, the U.S. Treasury caused the terms of Treasury-supported Small Business Administration loans to change from "Prime, a domestic interest rate, to LIBOR."  The U.S. Treasury also extended billions of dollars of loans on which it received Libor-based interest payments:

- On December 31, 2008, the U.S. Treasury agreed to lend General Motors Corporation $13.4 billion based on "LIBOR +3%."

- On January 2, 2009, the U.S. Treasury agreed to lend Chrysler Holding LLC $4 billion based on "3% or 8% (if the company is in default of its terms under the agreement) plus the greater of a) three-month LIBOR or b) LIBOR floor (2.00%)."

- On January 16, 2009, the U.S. Treasury agreed to lend General Motors $884 million based on "LIBOR +3%."

- On January 16, 2009, the U.S. Treasury agreed to lend Chrysler Financial $1.5 billion based on "LIBOR + 1% for first year[,] LIBOR + 1.5% for remaining" term.

353.    Beginning in the second quarter of 2009, the FDIC, Federal Reserve and Treasury agreed to extend Libor-based loans to financial institutions through TARP's Public-Private Investment Program for Legacy Assets ("PPIP").

354.    During the period 2009-10, the U.K. Treasury issued Libor-based loans to the Financial Services Compensation Scheme, which was established to repay the depositors of failed banks.

355.    In her July 2010 Quarterly Report to Congress, the TARP Inspector General explained that most TALF loans were tied to Libor, "a generally accepted short-term interest rate standard."

356.

357.    The above examples demonstrate that, given the continuing reliance on Libor by the U.S. and U.K. governments, a reasonable investor would not have concluded that Libor was being actively suppressed.

358.    Throughout the Relevant Period, Plaintiff diligently sought to protect its investment interests, including by analyzing securities and other investments in question and their performance.  Despite the exercise of active and reasonable diligence, however, Plaintiff could not and did not uncover Defendants' misconduct due to the self-concealing nature of their scheme and their active efforts to hide it from the public.  For these reasons, any statute of limitations affecting or limiting the rights of action by Plaintiff was equitably tolled.

### D.    The *American Pipe* Doctrine Applies to Plaintiff's Claims

359.    Numerous class actions have been filed on behalf of those who purchased financial products tied to Libor, including but not limited to:

- *FTC Capital GmbH v. Credit Suisse AG*, No. 11-cv-2613 (S.D.N.Y. filed April 15, 2011);

- *Carpenters Pension Fund of West Virginia v. Bank of America Corp.*, No. 11-cv-02883 (S.D.N.Y. filed April 27, 2011);

- *City of Dania Beach Police & Firefighters' Retirement System v. Bank of America Corp.*, No. 11-cv-3128 (S.D.N.Y. filed May 9, 2011);

- *Ravan Investments, LLC v. Bank of America Corp.*, No. 11-cv-3249 (S.D.N.Y. filed May 13, 2011);

- *Insulators & Asbestos Workers Local #14 v. Bank of America Corp.*, No. 11-cv-3781 (S.D.N.Y. filed June 3, 2011);

- *Mayor and City Council of Baltimore v. Bank of America Corp.*, No. 11-cv-5450 (S.D.N.Y. filed Aug. 5, 2011);

- *Gelboim v. Credit Suisse Group AG*, No. 12-cv-1025 (S.D.N.Y. filed Feb. 9, 2012);

- *33-35 Green Pond Road Associates, LLC v. Bank of America Corp.*, No. 12-cv-5822

(S.D.N.Y. filed July 30, 2012); and

- *Lieberman v. Credit Suisse Group AG*, No. 12-cv-6056 (S.D.N.Y. filed Aug. 8, 2012).

360.    Many of these complaints, including the *Baltimore* complaint, alleged causes of action for:  (a) violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act; and (b) unjust enrichment and restitution.  Plaintiff here likewise brings claims for violations of the Sherman Act, unjust enrichment, and restitution.  In addition, proof of Plaintiff's other claims will require evidence of the same or similar wrongful acts as would proof of the claims asserted in *Baltimore* and other Libor class actions in the MDL proceeding.

361.    Defendants Bank of America Corp., Bank of America, N.A., Barclays Bank plc, Citibank N.A., Citigroup Inc., Credit Suisse Group AG, Deutsche Bank AG, HSBC Bank plc, HSBC Holdings plc, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Royal Bank of Canada, and UBS AG are also defendants in:  the Second Consolidated Amended Complaint filed in the *Baltimore* class action, No. 11-md-2262-NRB (S.D.N.Y. filed Sept. 10, 2013); the First Amended Class Action Complaint filed in the *Gelboim* class action, No. 11-md-2262-NRB (S.D.N.Y. filed April 30, 2012); and the (Corrected) Second Amended Consolidated Class Action Complaint filed in the *FTC Capital* class action, sub nom. *Metzler Investment GmbH v. Credit Suisse Group AG*, No. 11-md-2262-NRB (S.D.N.Y. filed Sept. 30, 2013).

362.    Plaintiff was originally included in the defined class in the class actions in the Libor MDL.

363.    Plaintiff reasonably and justifiably relied on the named plaintiffs in the class actions in the Libor MDL proceeding to protect its rights, and it reasonably and justifiably relied on the class-action doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir.

2007), and other similarly applicable doctrines, to satisfy the statutes of limitations and repose on its claims.

364.    Under *American Pipe*, all proposed class members are treated as if they filed their own individual actions, until they either opt out or a certification decision excludes them. *American Pipe*, 414 U.S. at 255.

365.    Accordingly, the claims here are deemed to have been brought as of the date they or similar claims were brought in the related class actions, and therefore the *Baltimore* action and other Libor class actions tolled Plaintiff's claims.

### E.    Tolling Under the Clayton Act

366.    In addition, the Clayton Act contains a tolling provision triggered whenever the United States institutes civil or criminal proceedings to prevent, restrain, or punish violations of the antitrust laws.  15 U.S.C. § 16(i).

367.    As noted above, on December 12, 2012, the DOJ filed a complaint charging Tom Hayes, a former trader for Defendants UBS and Citi, with a criminal violation of Section 1 of the Sherman Act.  Mr. Hayes' Yen Libor manipulation and Defendants' USD Libor manipulation were part of the same overarching conspiracy, which involved the same panel banks, the same means of submitting false rates, and the same objectives of boosting perceived financial health and profiting from derivative trading.  Because Plaintiff's claims are "based in whole or in part on any matter complained of" in the December 12, 2012 complaint against Mr. Hayes, the Clayton Act tolls Plaintiff's claims against Defendants beginning on December 12, 2012 and continuing to present.

368.    Additionally, on February 5, 2013, the DOJ entered a deferred-prosecution agreement with RBS, in connection with which the DOJ filed a criminal information charging RBS with one count of wire fraud and one count of price-fixing in violation of Section 1 of the

Sherman Act. Because Plaintiff's claims are "based in whole or in part on any matter complained of" in the criminal information, the Clayton Act tolls Plaintiff's claims against Defendants beginning on February 5, 2013 and continuing to the present.

## FIRST CAUSE OF ACTION
### (Common-Law Fraud as Against All Defendants)

369.    Plaintiff realleges each allegation above as if fully set forth herein.

370.    This count is against all Defendants for joint and several liability for all losses associated with the Transactions identified in the Exhibits. Defendants participated in the fraudulent conduct alleged herein both directly and through their subsidiaries and affiliates.

371.    Defendants were USD Libor panel banks throughout the Relevant Period and submitted false Libor submissions to the BBA on a daily basis. The panel banks participated in the fraudulent conduct alleged herein both directly and through their subsidiaries and affiliates.

372.    Defendants made, authorized, or caused the following material misrepresentations and omissions:

        a.    Each Defendant made, authorized, and caused false statements or omissions to be made to Plaintiff to induce it to enter into the Transactions where they served as either a counterparty or obligor. Examples of these representations are set forth in Exhibits A-D.[118]

        b.    Each Defendant also made, authorized, or caused false submissions to be made to the BBA for the purposes of determining Libor.

---

[118] As noted in Exhibits A and B, all the transactions listed in Exhibit A and B involved terms and representations that payments made to Plaintiff would be based on Libor. In all instances, Plaintiff reasonably understood that such terms and representations meant that payments to Plaintiff would be calculated according to the definition of Libor set forth in the governing contracts and the BBA, rather than by an artificially suppressed figure calculated based on falsified submissions.

    c.  By their false submissions, each Defendant caused Libor to misrepresent actual panel bank borrowing rates.

    d.  Each Defendant had a duty to disclose the manipulation of Libor to its counterparties and the public, including Plaintiff, but omitted to do so.

    e.  By their omissions and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation of Libor from Plaintiff and the public.

    f.  Each Defendant misrepresented the basis of payments Plaintiff would receive and/or pay under the Transactions, and omitted to disclose that the cash flows would be calculated by reference to manipulated Libor.

373.    Defendants made these misrepresentations and omissions knowing that they were false or misleading, or with reckless disregard for their truth, in part to avoid detection and to perpetuate the fraudulent and collusive conduct described in this Complaint.

374.    Each Defendant also knowingly and intentionally, or with reckless disregard for the truth, made, authorized, and caused the false statements to be made on a daily basis to the BBA concerning their borrowing costs and the proper level of Libor, knowing that investors worldwide, including Plaintiff and its agents, would rely upon those false submissions and the false level of Libor in purchasing, selling, or holding Libor-linked securities and other investments, as described in the Exhibits.

375.    Each Defendant had a duty to disclose the manipulation of Libor to its counterparties and the public, including Plaintiff, but omitted to do so.  These duties were triggered not only by direct transactions between the parties, but also by Defendants' exclusive knowledge about the true, manipulated nature of Libor, and Defendants' participation in

submitting Libor bids to the BBA without disclosing the manipulation and suppression, and by falsely denying manipulation had taken place.

376.    By their omissions and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation of Libor from Plaintiff and the public.

377.    Defendants had reason to expect that Plaintiff was among the class of persons who would receive and rely on their misrepresentations and omissions, including the statements and omissions passed through the BBA to the investing public, and intended Plaintiff to so rely. Indeed, Defendants were aware that reliance upon their Libor submissions was inevitable for any party holding, or considering the purchase of, Libor-linked securities, and Defendants intended the public and Plaintiff to so rely.

378.    Defendants also were aware, or should have been aware, that those individuals and/or entities that executed the instructions contained in the Libor-linked securities or other investments involved in the Transactions ("Libor Third Parties")—such as those calculating, and making, the required interest payments to holders of Libor-linked bonds—would likewise rely upon the published Libor rates, and intended the Libor Third Parties to so rely.

379.    At the time these misrepresentations were made and the material facts not disclosed, Plaintiff was ignorant of the facts about Libor's suppression.  If Plaintiff had known the truth, it would not have entered into the Transactions, accepted or made payments calculated based on artificially low Libor, and would have sold certain securities or investments acquired in the Transactions that they instead held in reliance upon Libor.

380.    Plaintiff and the Libor Third Parties reasonably and justifiably relied on Defendants' false representations and misleading omissions, including the false submissions to

the BBA that each Panel Bank Defendant made on a daily basis, which were necessary inputs for calculating Libor. Accordingly, Plaintiff and the Libor Third Parties relied on *each* Panel Bank Defendant's false submission with respect to *each* Transaction listed in the Exhibits.

381.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff entered into the Transactions at issue and held or traded in financial investments linked to Libor in reliance on Libor's integrity, and/or accepted or made payments linked to Libor based upon and resulting from Defendants' fraud, to Plaintiff's detriment.

382.    As a result of the foregoing, Plaintiff has suffered damages to be proven at trial. Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

383.    Defendants acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period. Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator, in the committing of fraud against Plaintiff.

384.    Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct by intentionally making false and misleading statements to the public, and/or directly to Plaintiff, about Libor's integrity, or by intentionally failing to disclose the material information that Defendants were suppressing Libor. Defendants acted with malice, and intended to injure investors and Plaintiff through the actions described herein.

385.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Panel Bank Defendant's submission was a necessary input for calculating Libor, *each* Panel Bank Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud as Against All Defendants)

386.    Plaintiff realleges each allegation above as if fully set forth herein.

387.    This count is against all Defendants for joint and several liability for all losses associated with all of the Transactions identified in the Exhibits.

388.    Defendants aided and abetted the fraud of the other USD Libor panel banks.

389.    By falsifying its own Libor submissions, and by omitting to inform the investing public and Plaintiff that Libor was systematically suppressed, each Defendant gave substantial assistance to the other panel banks in their conspiratorial efforts to suppress Libor.

390.    Each of the Defendants knew of the fraud perpetrated by the other panel banks, including other Defendants.  Each knew of the representations and omissions made by the others.  Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.  The statistical evidence of suppression described above, including Libor's consistent failure to track the Fed Eurodollar Rate benchmark, analysis of Defendants' implementation of management directives to stay "in the middle of the pack" of Libor submissions, and Libor's sudden and sharp decline after the collapse of Lehman Brothers, strongly indicates collusion among the panel banks in making their Libor-determining submissions.  Furthermore, since Defendants lend to one another in the London Interbank Market, they should have been aware that each panel bank's Libor submissions did not reflect the rates at which each panel bank could actually borrow U.S. dollars

in that market.

391.     Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other panel banks in their fraud by colluding to artificially suppress USD Libor. Each Panel Bank Defendant's submission was a necessary input for calculation of the published Libor.

392.     Plaintiff reasonably and justifiably relied on Defendants' false representations and misleading omissions in purchasing, selling, or holding Libor-linked securities and other investments, as described on the Exhibits.

393.     As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff entered into the Transactions at issue and held or traded in financial investments linked to Libor in reliance on Libor's integrity.  Because each Panel Bank Defendant's submission was a necessary input for calculating Libor, *each* Panel Bank Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits.

394.     As a result of the foregoing, Plaintiff has suffered damages to be proven at trial. Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

395.     Defendants' acts constituted a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.  Accordingly, each Defendant is being sued both individually as a primary violator of the law and as a co-conspirator.

396.     Defendants each committed numerous overt acts in furtherance of that conspiracy

and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct by intentionally making false and misleading statements to the public, and/or directly to Plaintiff, about Libor's integrity, or by intentionally failing to disclose the material information that Defendants were suppressing Libor. Defendants acted with malice, and intended to injure investors and Plaintiff through the actions described herein.

397.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Contract as Against All Defendants)**

398.    Plaintiff realleges each allegation above as if fully set forth herein.

399.    This claim is for intentional interference with contract alleged against all Defendants.

400.    Plaintiff had valid, enforceable contracts with certain Defendants and with other unnamed third parties, including the securities and other Libor-linked investments described in Exhibits A-B, during the Relevant Period.

401.    Each Defendant's fraudulent and unlawful conduct described above, including each Defendant's false Libor submissions, constituted intentional interference with Plaintiff's contracts with other Defendants and non-parties. The Defendants' misconduct interfered with and disrupted Plaintiff's contracts by causing the securities and other investments Plaintiff held to yield lower interest and other payments than Plaintiff had bargained for. The Defendants' manipulation of Libor therefore interfered with Plaintiff's rights to receive interest and other payments in accordance with their contracts, causing Plaintiff injury and damage.

402.    Through their knowledge of the ubiquitous use of Libor to determine interest rates

on trillions of dollars of securities and other investments and through their direct dealings with

Plaintiff, or others who dealt with Plaintiff, the Defendants knew or should have known that

Plaintiff had entered into Transactions whose interest rate and other payments were keyed to

Libor.  The Defendants acted intentionally or with knowledge that their misconduct and

wrongful acts would interfere with Plaintiff's contracts.

403.    The Defendants acted solely out of malice and acted solely by dishonest, and

unfair and improper means including fraud, misrepresentation, and material omissions.

404.    As a direct and proximate result of the Defendants' misconduct, Plaintiff has

suffered damages.  In addition, because the Defendants' actions were willful and wanton, and

because, by their acts, the Defendants knowingly affected the general public, including but not

limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

405.    The Defendants also acted in concert and entered into a civil conspiracy and

corrupt agreement to manipulate and suppress their Libor submissions during the Relevant

Period.  Accordingly, each Defendant is being sued both individually as a primary violator of the

law, as stated in this Complaint, and as a co-conspirator, in the intentional interference with

Plaintiff's contracts.

406.    The Defendants each committed numerous overt acts in furtherance of that

conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA

on a daily basis, actively concealing their misconduct by intentionally making false and

misleading statements to the public, and/or directly to Plaintiff, about Libor's integrity, or by

intentionally failing to disclose the material information that the Defendants were suppressing

Libor.  The Defendants acted with malice, and intended to injure investors and Plaintiff through

the actions described herein.

407.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits.

## FOURTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Relations as Against All Defendants)

408.    Plaintiff realleges each allegation above as if fully set forth herein.

409.    This is a claim for intentional interference with prospective economic relations alleged against all Defendants.

410.    Plaintiff had valid, enforceable contracts with certain Defendants and with other unnamed third parties, including the securities and other Libor-linked investments described in Exhibits A-B during the Relevant Period.  Plaintiff also had a reasonable expectation of future economic relations with Defendants on Libor-linked securities and other investments.

411.    Each Defendant's fraudulent and unlawful conduct described above, including each Defendant's false Libor submissions, was an intentional interference with Plaintiff's contracts with other Defendants and non-parties, and with Plaintiff's prospective economic relations with Defendants and third parties.  The Defendants' misconduct interfered with and disrupted Plaintiff's prospective economic relations by causing the securities and other investments Plaintiff held to yield lower interest and other payments than Plaintiff had bargained for.  The Defendants' manipulation of Libor therefore interfered with Plaintiff's prospective economic relations and rights to receive interest payments, causing Plaintiff injury and damage.

412.    Through their knowledge of the ubiquitous use of Libor to determine interest rates on trillions of dollars of securities and other investments and through their direct dealings with Plaintiff, or others who dealt with Plaintiff, the Defendants knew or should have known that

Plaintiff had entered into Transactions whose interest rate and other payments were keyed to Libor or had prospective economic relations with Defendants or third parties with which their actions would interfere. The Defendants acted intentionally or with knowledge that their misconduct and wrongful acts would interfere with Plaintiff's prospective economic relations.

413.    The Defendants acted solely out of malice and acted solely by dishonest, and unfair and improper means including fraud, misrepresentation, and material omissions.

414.    As a direct and proximate result of the Defendants' misconduct, Plaintiff has suffered damages. In addition, because the Defendants' actions were willful and wanton, and because, by their acts, the Defendants knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

415.    The Defendants also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period. Accordingly, each Defendant is being sued both individually as a primary violator and as a co-conspirator, in the intentional interference with Plaintiff's prospective economic relations.

416.    The Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct, by intentionally making false and misleading statements to the public, and/or directly to Plaintiff, about Libor's integrity, or by intentionally failing to disclose the material information that the Defendants were suppressing Libor. The Defendants acted with malice, and intended to injure investors and Plaintiff through the actions described herein.

417.    Each Defendant was at all relevant times fully aware of the conspiracy and

substantially furthered it as set forth above.  Because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits as well as to any prospective economic relations.

## FIFTH CAUSE OF ACTION
### (Breach of Contract as Against the Swap Defendants)

418.    Plaintiff realleges each allegation above as if fully set forth herein.

419.    This is a claim for breach of contract asserted against Barclays, Deutsche Bank, and RBS ("Swap Defendants").

420.    As set forth in Exhibits E-G to this Complaint, Plaintiff or its agents (or both) entered into ISDA Master Agreements with the Swap Defendants.  Each ISDA Master Agreement was accompanied by a corresponding Schedule, Credit Support Annex, and Swap Confirmations.  Plaintiff entered into the transactions at issue, among other reasons, to receive payments based on a Libor rate set according to the terms of the Libor definition, as opposed to the artificially suppressed Libor actually paid.

421.    These agreements (the "Swap Agreements") required the Swap Defendants to: (a) calculate and pay to Plaintiff a floating amount determined in good faith and in a commercially reasonable manner based on a Libor untainted by manipulation; and (b) calculate and demand from Plaintiff collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.  Instead, the Swap Defendants knowingly paid, and Plaintiff unknowingly received, a floating amount that was artificially suppressed, based on an artificially suppressed Libor that reflected neither the true costs of borrowing in the London Interbank Market nor the definition of Libor.  The expectation that Plaintiff would receive an untainted floating amount was integral to Plaintiff's decision to

enter into the Swap Agreements in the first place.

422.    Swap Defendants knowingly breached and defaulted on the Swap Agreements through their fraudulent conduct, their failure to disclose their fraudulent conduct and improper collusion with other Defendants, their intentional misrepresentation and manipulation of Libor as panel banks, and their artificially suppressed Libor-linked payments to Plaintiff.

423.    As a result of the Swap Defendants' breaches of the Swap Agreements, Plaintiff has suffered an economic loss and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the Swap Agreements had been fully performed.  Plaintiff seeks all losses caused by Libor suppression, including loss of Libor-linked payments, lost profits, and all losses on the Swap Agreements.  Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.  Plaintiff also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Plaintiff's rights under the Swap Agreements.

424.    Plaintiff performed its obligations under the Swap Agreements.

### SIXTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing
as Against the Swap Defendants)**

425.    Plaintiff realleges each allegation above as if fully set forth herein.

426.    This is a claim for breach of the implied covenant of good faith and fair dealing asserted against the Swap Defendants.

427.    Implied in the Swap Agreements are covenants that the parties would deal with each other in good faith and would not engage in any conduct to destroy or injure the right of the other party to receive the benefits or fruits of the Transactions.  Also implied was a promise by the Swap Defendants that Libor would not be manipulated to the Swap Defendants' benefit and to Plaintiff's detriment.

428.    The Swap Defendants failed to perform their obligations in good faith under the Swap Agreements by knowingly, intentionally, and secretly suppressing Libor to reduce their payments under the swaps to their advantage, and at the expense and to the detriment of Plaintiff. The Swap Defendants were aware that Plaintiff was willing to enter into the Swap Agreements only in reliance on the integrity of Libor.  At the very least, the Swap Defendants acted with reckless disregard for the interests of Plaintiff.

429.    As the Swap Defendants knew, however, their and the other Defendants' manipulation of Libor deprived Plaintiff of the benefit of the bargain by causing payments to Plaintiff under the swaps that were much lower than they should have been.  As a direct and proximate result of the Swap Defendants' knowing, intentional and bad faith violation of the Swap Agreements' implied covenants of good faith and fair dealing, Plaintiff has suffered damages in an amount to be determined at trial.  Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.  Plaintiff seeks all losses caused by Libor suppression, including loss of Libor-linked payments, lost profits, and all losses on the Swap Agreements.  Plaintiff also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Plaintiff's rights under the Swap Agreements.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract as Against the Obligor Defendants)

430.    Plaintiff realleges each allegation above as if fully set forth herein.

431.    This is a claim for breach of contract against Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBC, RBS, and UBS (the "Obligor Defendants").

432.    Plaintiff or its agents (or both) purchased, held, or sold Libor-linked securities or other investments for which the Obligor Defendants were the obligors on the securities.  The

Transactions under which Defendants were themselves obligors are the "Obligor Transactions." As the obligors on the Obligor Transactions, the Obligor Defendants were required to make to Plaintiff Libor-linked interest and other payments. The Obligor Transactions constituted contracts between Plaintiff and the Obligor Defendants.

433. The Obligor Defendants knowingly breached and defaulted on the Obligor Transactions through their fraudulent conduct, their failure to disclose their fraudulent conduct and improper collusion with other Defendants, their intentional misrepresentation and manipulation of Libor, and their artificially suppressed interest payments.

434. As a result of the Obligor Defendants' breaches of the Obligor Transactions, Plaintiff has suffered an economic loss and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the Obligor Transactions had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of Libor-linked payments, lost profits, and all losses on the Obligor Transactions. Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions. Plaintiff also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Plaintiff's rights under the Obligor Transactions.

435. Plaintiff performed its obligations under the Obligor Transactions.

## EIGHTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing as Against the Obligor Defendants)

436. Plaintiff realleges each allegation above as if fully set forth herein.

437. This is a claim for breach of the implied covenant of good faith and fair dealing asserted against the Obligor Defendants, as defined above.

438. Implied in the Obligor Transactions are covenants that the parties would deal with each other in good faith and would not engage in any conduct to destroy or injure the right of the

other party to receive the benefits or fruits of the Obligor Transactions.  Also implied was a promise by the Obligor Defendants that Libor would not be manipulated to the Obligor Defendants' benefit and to Plaintiff's detriment.

439.    The Obligor Defendants failed to perform their obligations in good faith under the Obligor Transactions by knowingly, intentionally, and secretly suppressing Libor to reduce their payments under the Obligor Transactions to their advantage, and at the expense and to the detriment of Plaintiff.  The Obligor Defendants were aware that Plaintiff was willing to enter into the Obligor Transactions only in reliance on the integrity of Libor.  At the very least, the Obligor Defendants acted with reckless disregard for the interests of Plaintiff.

440.    As the Obligor Defendants knew, however, their and the other Defendants' manipulation of Libor deprived Plaintiff of the benefit of the bargain by causing payments to Plaintiff under the Obligor Transactions that were much lower than they should have been.  As a direct and proximate result of the Obligor Defendants' knowing, intentional and bad faith violation of the Obligor Transactions' implied covenants of good faith and fair dealing, Plaintiff has suffered damages in an amount to be determined at trial.  Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.  Plaintiff seeks all losses caused by Libor suppression, including loss of Libor-linked payments, lost profits, and all losses on the Obligor Transactions.  Plaintiff also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Plaintiff's rights under the Swap Agreements.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment/Restitution as Against All Defendants)

441.    Plaintiff realleges each allegation above as if fully set forth herein.

442.    This is a claim for unjust enrichment/restitution asserted against all Defendants.

It is against each set of affiliated Defendants for only those Transactions where an affiliate played a role, as set forth in the Exhibits.

443.    Plaintiff engaged directly in Transactions with the Defendants, which Transactions included the purchase of securities or other Libor-linked investments, interest-rate swaps, and the Obligor Transactions.

444.    Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff through these direct Transactions.  As described above, Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiff by suppressing Libor, in conscious and/or reckless disregard for Plaintiff's rights.

445.    Defendants were unjustly enriched at Plaintiff's expense through the sale of instruments that purportedly paid interest rates linked to Libor, but in fact paid to Plaintiff rates of interest lower than those reflecting true, untainted Libor.  Defendants therefore received from Plaintiff the purchase price for a Libor-linked security, but sold to Plaintiff a security far less valuable.

446.    Defendants were unjustly enriched at Plaintiff's expense by receiving from Plaintiff the fixed interest leg of the interest-rate swaps while paying to Plaintiff floating amounts that were artificially suppressed due to Defendants' manipulation of Libor.  Defendants therefore received more than they were entitled to, and paid  to Plaintiff less than Plaintiff was entitled to receive.

447.    Defendants were also unjustly enriched at Plaintiff's expense by issuing to the public, including Plaintiff, instruments on which Defendants were purportedly required to pay interest rates based on Libor, but in fact paid artificially suppressed interest rates.  Defendants therefore paid to Plaintiff less than Plaintiff was entitled to receive, and received more than

Defendants were entitled to receive.

448.    Defendants therefore knowingly received and retained wrongful financial and other benefits at Plaintiff's expense, and have therefore been unjustly enriched.

449.    Defendants' retention of funds under these circumstances would be unjust and against equity and good conscience, since Defendants have no right to the benefits that were obtained through their unlawful conduct, and because, had the true facts been known to the Plaintiff, it would have expected Defendants to remunerate them when the unjust benefit was conferred upon them.

450.    Plaintiff has no adequate remedy at law for Defendants' misappropriated gains. The Court should issue a constructive trust compelling Defendants to disgorge to Plaintiff all unlawful or inequitable proceeds Defendants received, and all funds Defendants unjustly retained that should have been paid to Plaintiff.  Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.

451.    Defendants also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period. Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator, in obtaining the unjust enrichment alleged herein.

452.    Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct, by intentionally making false and misleading statements to the public, and/or directly to Plaintiff, about Libor's integrity, or by intentionally failing to disclose the material information that Defendants were suppressing Libor.  Defendants

acted with malice, and intended to injure investors and Plaintiff through the actions described herein.

453.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits.

## TENTH CAUSE OF ACTION
### (New Jersey Civil RICO as Against All Defendants)

454.    Plaintiff realleges each allegation above as if fully set forth herein.

455.    This is a claim for violation of New Jersey Civil RICO asserted against all Defendants.

456.    The racketeering activities committed by Defendants had a substantial impact on New Jersey commerce.  Specifically, Plaintiff, and parties related to Plaintiff as described above, are headquartered in New Jersey.  Consequently, all of the Transactions described on the Exhibits were executed by Plaintiff in New Jersey, and Plaintiff's acts of reliance upon Defendants' representations concerning Libor took place in New Jersey.  Plaintiff suffered economic harm in New Jersey.

457.    Defendants' unlawful conduct also affected every investor in New Jersey who purchased, held, or sold Libor-linked securities, and every borrower or lender in New Jersey whose transactions included interest rates keyed to Libor.  Defendants also transmitted to New Jersey materials offering, describing, or soliciting for sale Libor-linked investments, otherwise actively solicited residents of New Jersey to purchase Libor-linked investments or enter into Libor-referencing transactions, and did enter into numerous Libor-referencing transactions with New Jersey residents.  Numerous New Jersey residents therefore incurred losses and other

damages from the purchase, sale, or holding of Libor-linked securities and other investments, and/or from collecting less interest on their Libor-linked securities and other investments than they would have had Libor not been artificially suppressed.

458.    For the purposes of this Cause of Action, Plaintiff alleges that Defendants acted with the knowledge and intent required to violate the statutes identified as racketeering activity below or were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to Plaintiff.

459.    Defendants violated the New Jersey Civil RICO statute by committing or conspiring amongst themselves and others to commit a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and 2C:41-2(d).

### *The Enterprise*

460.    Defendants' collective association, including as members of the BBA's USD Libor panel, constitutes the racketeering enterprise in this case.  Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA or by using the false quotes to increase their profits to effectuate the common purpose of the enterprise: making artificially low interest and other payments to investors such as Plaintiff.

461.    Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in an association-in-fact enterprise.  The enterprise (the "Libor Enterprise") consists of the persons and entities that suppressed Libor, including the Defendants and all other entities that were USD Libor panel banks during the Relevant Period, so that Defendants could enter into transactions with investors such as Plaintiff on the basis of false and fraudulent representations concerning the interest to be paid on the investments purchased and sold in the transactions.

462.    The Defendants, as well as their agents, affiliates, subsidiaries, and unnamed additional parties, played discrete and well-defined roles in a carefully planned, highly organized scheme:  each USD Libor panel bank, including the Panel Bank Defendants, made a submission, on a daily basis to the BBA concerning its borrowing costs.  Each Defendant was a USD Libor panel bank or an affiliate thereof; each Panel Bank Defendant's daily submission was necessary for the Libor-setting process to function; and the activities of all of the Defendants, including Defendants affiliated with the Panel Bank Defendants, furthered the common purpose of the enterprise.

463.    The members of the Libor Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with suppressing Libor and in transacting with such investors as Plaintiff.

464.    At all relevant times, the Libor Enterprise was and remains engaged in trade or commerce, or in activities affecting trade or commerce, in connection with the sale and purchase of securities in the State of New Jersey.  The Libor Enterprise's manipulations affected trillions of dollars in securities daily.

465.    Upon information and belief, certain Defendants made their daily Libor submissions from their offices within the United States.  Nineteen of the thirty-one defendants are U.S. banks or other financial companies located in the United States.

466.    The Libor Enterprise is an enterprise within the meaning of N.J.S.A. 2C:41-1(c).

### *The Pattern of Racketeering Activity*

467.    From at least 2007 to 2010 and beyond, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating Libor to be lower than it otherwise would have been.  Defendants did so for the purpose and with the effect of

decreasing their net payments to investors such as Plaintiff and increasing their profits. Defendants reaped hundreds of millions, if not billions, of dollars in wrongful profits as a result, which they shared with the employees who perpetrated the scheme. The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

468.    In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate Libor and to profit from the manipulation of Libor. Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform, nearly identical system of procedures used in virtually an identical way every day.

469.    Defendants, along with the other members of the Libor Enterprise, engaged in a pattern of racketeering activity consisting of two or more separate and distinct acts of racketeering activity. Defendants committed this pattern of racketeering activity during at least 2007 to 2010 and beyond, and in connection with but not limited to the Transactions on the Exhibits. The acts of racketeering include, but are not limited to, those set forth below:

a.    **Violations of the New Jersey Uniform Securities Act (N.J.S.A. 49:3-47, *et seq.*)**

470.    Under N.J.S.A. 49:3-52(b), it is "unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

471.    Similarly, under N.J.S.A. 49:3-52(a) and -52(c), it is unlawful for any person to offer, sell or purchase a security by employing "any device, scheme, or artifice to defraud" or by engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

472.    Defendants are "persons" within the meaning of N.J.S.A. 49:3-49(i).

473.    Most if not all of the investments purchased by Plaintiff, as set forth on the Exhibits, are "securities" within the meaning of N.J.S.A. 49:3-49(m).

474.    Defendants and unnamed affiliates, subsidiaries, and third parties qualify as offerors or sellers of the securities on the Exhibits because they issued, marketed, or sold the securities to Plaintiff and other members of the public for their own financial benefit within the meaning of N.J.S.A. 49:3-49(j)(1)-(2).

475.    Defendants and unnamed affiliates, subsidiaries, and third parties offered and sold the securities listed on the Exhibits to Plaintiff in the State of New Jersey within the meaning of N.J.S.A. 2C:1-3.

476.    As identified above, on two or more occasions, in violation of N.J.S.A. 49:52(a), (b), and (c), the Panel Bank Defendants made material misstatements to the BBA concerning the proper level of Libor.  Defendants also made misstatements and/or omissions in connection with the sale of the securities on the Exhibits to Plaintiff, including but not limited to misrepresentations of the Libor-linked interest rate specified in offering materials presented to Plaintiff, as well as in any verbal descriptions of the securities or other Libor-linked investments listed on the Exhibits.

477.    As alleged in detail above, the Defendants made numerous materially false and misleading representations concerning the securities, including the applicable interest rate, by misrepresenting that Libor was valid.

478.    Defendants knew that their representations concerning the interest rate paid on the securities contained material misrepresentations of fact and misleading omissions concerning the true nature of Libor, and therefore the true interest rate paid on the securities.

479.     In the alternative, Defendants recklessly and consciously disregarded a substantial and unjustifiable risk that the representations concerning the interest rate to be paid on the securities included untrue statements of material fact and misleading omissions.  Given the nature of this risk, the Defendants' knowledge of Libor suppression, and the disregard by these Defendants of the risk that their statements concerning the interest rate paid on the securities and their statements concerning Libor were materially misleading or fraudulent, Defendants' conduct constituted a gross deviation from the standard of conduct that a reasonable person would observe in the same situation.

480.     Defendants made these misrepresentations and omissions with the purpose and intent of benefiting themselves and of convincing Plaintiff to enter into the Transactions on the Exhibits.

481.     Plaintiff did not know, and in the exercise of due diligence could not have known, of the misrepresentations and omissions.

482.     Defendants are not only liable as primary violators, they are also jointly and severally liable because they controlled one or more of the primary violators, including with respect to the Transactions listed on the Exhibits.

483.     Defendants' violations of N.J.S.A. 49:3-52(a), -(b), and -(c), as well as 49:3-70(a) and -(b), constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(p).

**b.     Deceptive Business Practices (N.J.S.A. 2C:21-7(i))**

484.     On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in intentional acts involving deceptive business practices.

485.     As alleged in detail above, Defendants in the course of their business made false

or misleading statements concerning Libor, including in connection with the Transactions listed on the Exhibits, or omitted material information required by law to be disclosed therein. Defendants' misstatements and omissions were contained in, among other things, offering or other descriptive materials presented to Plaintiff concerning the securities and other Libor-linked investments described on the Exhibits, as well as in any verbal descriptions.

486.    Defendants knew that their representations included those untrue statements of fact or material omissions.

487.    The Transactions listed on the Exhibits, including those with Defendants, which were entered into by Plaintiff on the basis of Defendants' false and misleading statements concerning Libor and the interest rates paid, which statements the Libor Third Parties likewise relied upon to calculate and make Libor-linked interest payments specified in the Transactions, are "securities" within the meaning of N.J.S.A. 2C:21-7(i).

488.    Defendants made these misrepresentations and omissions for the purpose of promoting the sale of securities to Plaintiff and other investors for their own pecuniary gain.

489.    Defendants' violations of N.J.S.A. 2C:21-7(i) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(o).

          c.    **Theft by Deception (N.J.S.A. 2C:20-4)**

490.    On two or more occasions, Defendants purposefully committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving theft by deception by obtaining the property of another by deceitful means and artful practices with the intention of depriving Plaintiff and other investors of their property.

491.    As alleged in detail, the Panel Bank Defendants repeatedly made false and misleading submissions to the BBA, and made representations to Plaintiff concerning the nature

of and interest rate paid on the Transactions listed on the Exhibits, including misrepresentations of the Libor-linked interest rate specified in offering materials presented to Plaintiff.

492.    By this conduct, Defendants created or reinforced Plaintiff's false impression of existing facts, including facts relating and directly relevant to the value of those Transactions, which Defendants knew or believed to be false, in violation of N.J.S.A. 2C:20-4(a).  Similarly, Defendants created or reinforced the Libor Third Parties' false impression of existing facts, including facts relating and directly relevant to the value of the Transactions and the proper interest rate to be paid to holders of Libor-linked bonds, in violation of N.J.S.A. 2C:20-4(a).

493.    Defendants also prevented Plaintiff from acquiring information pertinent to the disposition of its funds, including information that would have contradicted the false representations of fact concerning Defendants' Libor submissions and the true rate of interest Plaintiff should have earned on the Transactions listed on the Exhibits, in violation of N.J.S.A. 2C:20-4(b).  Defendants likewise prevented Libor Third Parties' from acquiring information that would have contradicted the false representations of fact concerning the Panel Bank Defendants' Libor submissions and the true rate of interest the Libor Third Parties should have calculated and paid on the Transactions listed on the Exhibits, in violation of N.J.S.A. 2C:20-4(a).

494.    By failing to amend the materially false and misleading submissions to the BBA, and/or by failing to notify Plaintiff of those false submissions, Libor suppression, the misrepresentations of the interest rate specified in the offering materials sent to Plaintiff, and the true rate of interest or other payments that should have been paid on the Transactions on the Exhibits, Defendants were able to hide their enterprise from discovery by Plaintiff, other investors, and the Libor Third Parties.  Defendants' failure to correct the false impression they created or reinforced by their misstatements or misleading omissions was in violation of N.J.S.A.

2C:20-4(c).

495.    Defendants' repeated and related violations of N.J.S.A. 2C:20-4(a), -4(b), and -4(c) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(1)(n).

### d.    Falsifying Records (N.J.S.A. 2C:21-4(a))

496.    On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving falsifying or tampering with records with the intention of deceiving or injuring the public, Plaintiff, and other investors.

497.    As alleged in detail above, Defendants repeatedly used false and misleading Libor submissions and statements concerning the rate of interest to be paid on the Transactions listed on the Exhibits to knowingly falsify, remove, or conceal material facts relevant to the Transactions, including facts related to the true Libor rate.

498.    The Libor submissions, as well as the materials that described the Transactions into which Plaintiff entered, including offering materials sent directly to Plaintiff, created and/or utilized by Defendants, constitute a "writing or record" within the meaning of N.J.S.A. 2C:21-4(a).

499.    Defendants' violations of N.J.S.A. 2C:21-4(a) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(1)(o).

### e.    Relatedness of the Acts of Racketeering Activity

500.    The incidents of racketeering activity committed by the Defendants and other members of the Libor Enterprise had, among other things, the same or similar intents, results, victims, and methods of commission.

501.    The acts of racketeering activity committed by Defendants relating to the Transactions listed on the Exhibits involve transactions or purported transactions with or

affecting Plaintiff.

502.    The acts of racketeering activity committed by Defendants relating to the Transactions listed on the Exhibits have the same or similar intents in that they sought to obtain property, including but not limited to Plaintiff's money, through illegal means.

503.    The acts of racketeering activity committed by Defendants relating to the Transactions listed on the Exhibits have the same or similar results, in that Defendants actually obtained personal property, including but not limited to Plaintiff's money, through illegal means.

504.    The acts of racketeering activity committed by Defendants relating to the Transactions listed on the Exhibits have the same or similar victims:  investors (including Plaintiff) in Libor-linked securities and investments.

505.    The methods by which Defendants committed the incidents of racketeering activity relating to the Transactions listed on the Exhibits were the same or similar, including by way of example and not limitation, inducing Plaintiff to pay Defendants to enter into the Transactions listed on the Exhibits on the basis of materially false and misleading statements concerning Libor and the interest rate to be paid on the securities, including statements made in offering materials concerning the Transactions transmitted to Plaintiff.

506.    In the Libor Enterprise, the acts of racketeering committed by the Defendants serving as members thereto are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar types of misrepresentations or omissions, the same or similar benefits to Defendants, the same or similar injuries to Plaintiff, and the same or similar efforts by Defendants' to conceal their misconduct.

***Defendants' Violations of the New Jersey RICO Statute***

507.    Defendants violated N.J.S.A. 2C:41-2(c) by associating with an enterprise and conducting or participating, directly or indirectly, in that enterprise through a pattern of racketeering activity.

508.    Defendants also violated N.J.S.A. 2C:41-2(d) by conspiring with others, including but not limited to the other members of the Libor Enterprise, to violate N.J.S.A. 2C:41-2(c).  In furtherance of that conspiracy, Defendants committed overt acts that include but are not limited to the racketeering activity alleged above.

### *Proximate Cause of Injury to Plaintiff by Defendants' New Jersey RICO Violations*

509.    Defendants' behavior directly targeted Plaintiff, which entered into numerous Transactions listed on the Exhibits based on the false and fraudulent representations concerning Libor and the interest rate to be paid on the Transactions.  Defendants also targeted all investors, including those in New Jersey, who purchased, held, or sold Libor-linked securities and other investments.  As a result, Plaintiff purchased securities at falsely inflated values, and has been paid lower interest rates and smaller interest or other payments than if Libor had not been suppressed.  Similarly, as a result, the Libor Third Parties calculated lower interest rates, and made smaller interest or other payments, than if Libor had not been suppressed.  Defendants' misrepresentations and omissions have adversely affected both the value of the securities purchased by Plaintiff and by investors generally, and the income flow therefrom.  As a result, Plaintiff's injuries flow directly from acts of racketeering activity committed by Defendants that constitute part of the pattern of racketeering activity.

510.    Plaintiff has been injured by reason of these violations of N.J.S.A. 2C:41-2 and is entitled to recover three times the actual damages it has sustained pursuant to N.J.S.A. 2C:41-4(c).

511.    Pursuant to N.J.S.A. 2C:41-4(c), Plaintiff is also entitled to recover its attorneys' fees in the trial and appellate courts, and its costs of investigation and litigation reasonably incurred.

512.    Pursuant to N.J.S.A. 2C:41-4(a), Plaintiff is also entitled to such other and further relief that this Court may deem just and proper, including but not limited to the dissolution or reorganization of Defendants' RICO enterprise; the denial, suspension, or revocation of Defendants' licenses to do business in the State of New Jersey; and any and all appropriate cease and desist orders necessary to discontinue Defendants' acts or conduct.

## ELEVENTH CAUSE OF ACTION
**(Violation of 15 U.S.C. § 1 Agreement Restraining Trade as Against all Defendants)**

513.    Plaintiff realleges each allegation above as if fully set forth herein.

514.    This count is against all Defendants.  As set forth above, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to submit false USD Libor rates that were inconsistent with the definition of Libor, below their actual borrowing costs, and to do so in a coordinated fashion.  Defendants' unlawful agreement to suppress Libor from at least August 2007 through the end of 2010, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

515.    During the Relevant Period, Defendants entered into a series of agreements to reduce competition amongst themselves by artificially suppressing Libor and, as a result, the interest or other payments paid to Plaintiff for the Transactions set forth on the Exhibits.

516.    This conspiracy to suppress Libor caused injury to Plaintiff by depriving them of the benefit of accurate Libor submissions and of millions of dollars in interest payments.

517.    The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the markets for

asset-backed and other securities and investments purchased by Plaintiff.  There is no legitimate business justification for, or pro-competitive benefits from, the Panel Bank Defendants' conduct.

518.    As a direct and proximate result of the Panel Bank Defendants' violation of Section 1 of the Sherman Act, Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for Libor-referencing financial investments.

519.    As a direct and proximate result of the Panel Bank Defendants' violation of Section 1 of the Sherman Act, Plaintiff suffered injury to their business and property throughout the Relevant Period.

520.    As a proximate result of Defendants' unlawful conduct, Plaintiff suffered antitrust injury in that Plaintiff has made supracompetitive net payments (where it was called to make payments), and/or received supracompetitively low net payments (where it received payments), under the Libor-referencing financial instruments.

521.    Defendants' conspiracy, and resulting impact on the market for swaps and other Libor-based instruments, occurred in or affected interstate and foreign commerce.

522.    Plaintiff is entitled to treble damages for the violations of the Sherman Act alleged herein.  Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.

## TWELFTH CAUSE OF ACTION
### (Negligent Misrepresentation as Against All Defendants)

523.    Plaintiff realleges each allegation above as if fully set forth herein.

524.    This count is against all Defendants.  It is against each set of affiliated Defendants for only those Transactions where an affiliate played a role, as set forth in the Exhibits.

525.    Each Defendant negligently made, authorized, or caused to be made false statements or omissions to Plaintiff concerning the rate of interest paid on the Transactions listed

on the Exhibits, including within offering materials concerning the Transactions transmitted directly to Plaintiff.  Each Defendant also negligently made, authorized, or caused to be made false submissions to the BBA for the purposes of determining Libor.

526.    Defendants had reason to expect that Plaintiff was among the class of persons who would receive and rely on their statements, since Plaintiff purchased many investments listed on the Exhibits directly from Defendants.  Defendants likewise had reason to expect that the Libor Third Parties would receive and rely on their statements, since they calculated and made the required interest payments to holders of Libor-linked bonds, and intended Plaintiff and the Libor Third Parties to so rely.

527.    Plaintiff, and the Libor Third Parties, reasonably and justifiably relied on Defendants' negligently false representations, including the false submissions that each Defendant made on a daily basis, which were necessary inputs for calculating Libor, and the negligent misrepresentations Defendants made to Plaintiff when Plaintiff purchased Libor-linked investments directly from Defendants, including negligent misrepresentations made in offering materials concerning the Transactions transmitted directly to Plaintiff.  Accordingly, Plaintiff relied on *each* Defendant's false submission with respect to *each* Transaction listed in the Exhibits.

528.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff entered into the Transactions at issue and held or traded in financial investments linked to Libor in reliance on Libor's integrity.  Again, because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiff with respect to *each* Transaction listed in the Exhibits.

529.    As a result of the foregoing, Plaintiff has suffered damages to be proven at trial.

Plaintiff is also entitled to rescission of the Transactions or rescissory damages with respect to the Transactions.

### THIRTEENTH CAUSE OF ACTION
**(Civil Conspiracy Against All Defendants)**

530.     Plaintiff realleges each allegation above as if fully set forth herein.

531.     This count is for civil conspiracy to commit a fraud on Plaintiff and to tortiously interfere with Plaintiff's contracts and business relations, brought against all Defendants for joint and several liability for all losses associated with all of the transactions identified in Exhibits A and B.  Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator.

532.     Defendants entered into a corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.

533.     Defendants each committed numerous overt acts in furtherance of that agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis and actively concealing their misconduct, including by making false or misleading public statements about Libor's integrity.

534.     Defendants intentionally took these and other overt acts described above to further the corrupt agreement between Defendants and to carry out a common plan to execute a fraud on Plaintiff, to tortiously interfere with Plaintiff's contracts and business relations, and to benefit Defendants.

535.     Defendants acted with malice, and intended to injure Plaintiff by, among other things, lowering the payments Plaintiff was entitled to receive under the interest rate swaps and interfering with Plaintiff's contracts and business relations.

536.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

537.    As a direct and proximate result of Defendants' conspiracy, Plaintiff entered into the swaps; traded in financial investments linked to Libor and other investments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity.

538.    As a result of Defendants' unlawful conspiracy, Plaintiff has the right to rescissory damages; in the alternative to rescissory damages, Plaintiff has suffered damages according to proof.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

An award in favor of Plaintiff against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.    That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

b.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

c.    Damages as provided under federal antitrust laws, and that a joint and several

judgment in favor of the Plaintiff be entered against Defendants in an amount to be trebled in accordance with such laws;

      d.     The monetary losses suffered by Plaintiff, including from reduced interest payments on the Transactions, in an amount to be determined at trial but not less than $100 million;

      e.     Consequential damages;

      f.     Punitive damages;

      g.     Attorneys' fees and costs;

      h.     Prejudgment interest at the maximum legal rate;

      i.     Rescission;

      j.     Indemnification; and

      k.     Such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:   New York, New York
         October 6, 2014

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

By: _____

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100
jeremyandersen@quinnemanuel.com

*Attorneys for Plaintiff Prudential Investment
Portfolios 2 on behalf of Prudential Core Short-
Term Bond Fund and Prudential Core Taxable
Money Market Fund*