# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re: LIBOR-based Financial Instruments Antitrust Litigation** | Civil Action No. 11 MDL 2262 (NRB) |
| | ECF CASE |
| This document applies to: | |
| *The Regents of the Univ. of California v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05186; | **DIRECT ACTION PLAINTIFFS' CONSOLIDATED FIRST AMENDED COMPLAINT** |
| *East Bay Municipal Utility District v. Bank of America Corporation, et al.* S.D.N.Y. Case No. 1:13-cv-00626; | JURY TRIAL DEMANDED |
| *San Diego Assoc. of Governments v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05221; | |
| *City of Richmond, et al. v. Bank of America Corporation, et al.* S.D.N.Y. Case No. 1:13-cv-00627; | |
| *City of Riverside, et al. v. Bank of America Corporation, et al.* S.D.N.Y. Case No. 1:13-cv-00597; | |
| *County of Mendocino v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-08644; | |
| *County of Sacramento v. Bank of America, et al.* S.D.N.Y. Case No. 1:13-cv-05569; | |
| *County of San Diego v. Bank of America Corporation, et al.* S.D.N.Y. Case No. 1:13-cv-00667; | |
| *County of San Mateo, et al. v. Bank of America Corporation, et al.* S.D.N.Y. Case No. 1:13-cv-00625; | |
| *County of Sonoma, et al. v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05187. | |

## TABLE OF CONTENTS

Page

I.  **INTRODUCTION**........................................................................................................ 2

II.  **JURISDICTION AND VENUE**................................................................................. 13

III.  **PARTIES**................................................................................................................... 15

    A.  Plaintiffs .......................................................................................................... 15

    B.  Defendants ....................................................................................................... 23

    C.  Unnamed Co-Conspirators ............................................................................. 28

    D.  Agents and Co-Conspirators........................................................................... 28

IV.  **FACTUAL ALLEGATIONS**................................................................................... 29

    A.  The London Interbank Offered Rate Defined.................................................. 29

    B.  Defendants' Global Conspiracy And Fraudulent Scheme To Manipulate
        LIBOR Is Supported By Substantial Evidence ................................................ 38

    C.  Defendants Had Financial Incentives To Conspire To
        Manipulate LIBOR........................................................................................... 39

    D.  Defendants' LIBOR Manipulation Harmed Numerous Types Of Financial
        Instruments And Investments With Interest Rates Set To LIBOR ............... 45

    E.  Defendants Colluded Among Themselves And Others
        To Manipulate LIBOR ..................................................................................... 50

        1.  Each Defendant Knew Other LIBOR Banks Were Manipulating
            LIBOR................................................................................................... 55

        2.  Defendants Colluded to Manipulate LIBOR as a "Pack".................... 60

        3.  Defendants' Collusion to Manipulate LIBOR Had A
            Global Impact....................................................................................... 65

    F.  Defendants Conspired To Manipulate U.S. Dollar And
        Other LIBOR Rates To Benefit Their Profits, Credit-Worthiness
        And Trading Positions...................................................................................... 68

1.       **Barclays' Role in LIBOR Manipulation** ................................................ **71**

2.       **UBS's Role in LIBOR Manipulation** ...................................................... **77**

3.       **RBS' Role in LIBOR Manipulation** ....................................................... **88**

4.       **Lloyds' and HBOS' Role in LIBOR Manipulation** ............................ **92**

5.       **Rabobank's Role in LIBOR Manipulation** ............................................ **93**

G.    **Government Investigations Reveal That The LIBOR Manipulation Conspiracy By Defendants And Unnamed Co-Conspirators Was Global** .... **99**

       1.       **European Commission Antitrust Regulators Fine Citigroup, JP Morgan, Deutsche Bank, UBS, RBS and Others For LIBOR Manipulation** ........................................................................................... **99**

       2.       **Government Investigations into Defendants' Conspiracy to Manipulate LIBOR Became Public in March 2011** ......................... **103**

       3.       **Barclays Settles Criminal and Civil Claims with Prosecutors and Regulators in the United Kingdom and United States** ...................... **112**

       4.       **UBS Settles Criminal and Civil Claims with Prosecutors and Regulators in the United States, United Kingdom and Switzerland** ...................................................................................... **124**

       5.       **The First Individuals Face Criminal Charges and Arrests** ............. **126**

       6.       **The Royal Bank of Scotland Settles Criminal and Civil Claims with Prosecutors and Regulators in the United States and United Kingdom** .................................................................................. **127**

       7.       **Rabobank Settles with Prosecutors and Regulators in the United States, United Kingdom, and the Netherlands** ................................... **130**

       8.       **Lloyds and HBOS Settles with Prosecutors and Regulators in the United States and the United Kingdom** ............................... **131**

       9.       **ICAP Fined by Regulators as Employees Face Criminal Charges** .. **134**

       10.     **RP Martin Settles in Exchange for Cooperating with the CFTC** ..... **135**

       11.     **Evidence Disclosed to Date in Canada and Singapore Confirms that Certain Defendants Conspired to Manipulate Yen-LIBOR** ............. **135**

a.      Canadian Investigation...............................................................136

b.      Singaporean Legal Action ......................................................140

H.     Comparison Of Adjusted LIBOR With The Federal Reserve Eurodollar Deposit Rate Indicates LIBOR Was Artificially Suppressed ......................141

I.      Empirical Analyses Indicates Artificial Suppression Of LIBOR .................159

1.      The Discrepancy Between Defendants' LIBOR Submissions and Their Credit Default Swap Spreads Indicates They Misreported LIBOR  159

2.      Cross-Currency Discrepancies in Defendants' LIBOR Submissions Indicates Suppression of U.S. Dollar LIBOR.....................................164

3.      The "Bunching" of Certain Defendants' LIBOR Submissions Around the Fourth-Lowest Quote of the Day Indicates LIBOR Manipulation ...........................................................165

4.      LIBOR's Divergence from its Historical Relationship with the Federal Reserve Auction Rate Indicates LIBOR Was Suppressed................166

5.      LIBOR's Divergence from its Historical Correlation to Overnight Index Swaps Also Suggests LIBOR Was Artificially Suppressed....167

6.      LIBOR May Have Been Manipulated as Early as 2005....................168

J.      Defendants' Difficult Financial Situations Caused Them To Suppress Their LIBOR Submissions To Falsely Enhance Their Credit Worthiness............169

1.      Defendant Citigroup .............................................................170

2.      Defendant RBS ...................................................................171

3.      Defendant HBOS/Lloyds .......................................................172

4.      Defendant WestLB...............................................................173

5.      Defendant Barclays..............................................................174

K.     Defendants Materially Misrepresented and Concealed Information For Which They Had a Duty to Disclose to Plaintiffs...........................................176

**V.** **PLAINTIFFS DIRECTLY ENTERED INTO TRANSACTIONS WITH DEFENDANT LIBOR BANKS, WHO BREACHED THEIR CONTRACTUAL OBLIGATIONS TO PLAINTIFFS AND FRAUDULENTLY DECEIVED PLAINTIFFS ABOUT THEIR MANIPULATION OF LIBOR** ............................. 179

    **A.** **The Regents** ...................................................................................... 179

        1.    Defendant Bank of America .................................................. 179

        2.    Defendant Barclays ................................................................ 180

        3.    Defendant JPMorgan .............................................................. 180

        4.    Defendant Citigroup .............................................................. 181

        5.    Defendant Deutsche Bank ..................................................... 181

        6.    Defendant HSBC .................................................................... 182

        7.    Defendant Rabobank .............................................................. 182

        8.    Defendant Royal Bank of Canada ........................................ 182

        9.    Defendant Royal Bank of Scotland ...................................... 183

        10.    Defendant UBS ....................................................................... 183

        11.    Transactions with Third Parties ........................................... 183

    **B.** **Plaintiff EBMUD** .............................................................................. 184

        1.    Defendant Citigroup .............................................................. 184

        2.    Defendant JPMorgan .............................................................. 185

        3.    Defendant Bank of America .................................................. 186

        4.    Transactions with Third Parties ........................................... 187

    **C.** **Plaintiff SANDAG** ........................................................................... 188

        1.    Defendant Bank of America .................................................. 189

        2.    Transactions with Third Parties ........................................... 190

    **D.** **Plaintiff Richmond** ........................................................................... 191

|   |   |   |   |
|---|---|---|---|
| | 1. | Defendant JPMorgan ...................................................................... | 191 |
| | 2. | Defendant Royal Bank of Canada .................................................. | 191 |
| E. | Plaintiff Riverside ............................................................................ | | 193 |
| | 1. | Defendant Bank of America ............................................................ | 193 |
| | 2. | Defendant JPMorgan ...................................................................... | 194 |
| F. | Plaintiff Mendocino ......................................................................... | | 195 |
| | 1. | Defendant Barclays ......................................................................... | 195 |
| | 2. | Defendant Deutsche Bank ............................................................... | 196 |
| | 3. | Defendant Credit Suisse ................................................................. | 196 |
| | 4. | Defendant JPMorgan ...................................................................... | 196 |
| | 5. | Defendant HSBC .............................................................................. | 196 |
| | 6. | Defendant Bank of America ............................................................ | 197 |
| | 7. | Transactions with Third Parties .................................................... | 197 |
| G. | Plaintiff Sacramento ....................................................................... | | 198 |
| | 1. | Defendant Bank of America ............................................................ | 198 |
| | 2. | Defendant Deutsche Bank ............................................................... | 198 |
| | 3. | Transactions with Third Parties .................................................... | 199 |
| H. | Plaintiff San Diego ........................................................................... | | 200 |
| | 1. | Transactions with Third Parties .................................................... | 200 |
| I. | Plaintiff San Mateo ......................................................................... | | 201 |
| | 1. | Defendant Citigroup ....................................................................... | 201 |
| | 2. | Defendant Credit Suisse ................................................................. | 202 |
| | 3. | Defendant Bank of America ............................................................ | 202 |

4.     Defendant Deutsche Bank ....................................................... 202

5.     Defendant UBS ...................................................................... 202

6.     Defendant JPMorgan .............................................................. 203

7.     Defendant Royal Bank of Canada ........................................... 203

8.     Transactions with Third Parties ............................................. 203

J.     Plaintiff Sonoma .......................................................................... 204

1.     Defendant Citigroup .............................................................. 205

2.     Defendant JPMorgan .............................................................. 205

3.     Defendant Bank of America .................................................... 205

4.     Transactions with Third Parties ............................................. 205

VI.     **PLAINTIFFS DID NOT KNOW, NOR COULD THEY REASONABLY HAVE KNOWN, ABOUT DEFENDANTS' MISCONDUCT CONCERNING LIBOR UNTIL AT LEAST MARCH 2011** ............................................ 206

A.     **Defendants' Unlawful Activities Were Inherently Self-Concealing** ............. 207

B.     **Defendants and The British Bankers' Association Deflected Concerns Raised by Market Observers and Participants about LIBOR's Accuracy** ............. 208

C.     **Plaintiffs Could Not Have Known or Reasonably Discovered Until at Least March 2011 Facts Suggesting Defendants Knowingly Colluded to Suppress LIBOR** ............................................................................... 211

D.     **The Statute of Limitations is Tolled by the *American Pipe* Doctrine** ........... 212

VII.     **PLAINTIFFS HAVE SUFFERED SIGNIFICANT INJURY AS A RESULT OF DEFENDANTS' LIBOR MANIPULATION CONSPIRACY** ........... 212

A.     **Defendants' Manipulation of LIBOR Broadly Impacted LIBOR-Based Financial Instruments and Investments** ........................................... 212

B.     **Plaintiffs Transacted LIBOR-Based Financial Instruments That Paid Artificially Low Interest Rates or Charged Artificially High Interest Rates** ................................................................................... 214

C.     **Plaintiffs Suffered Antitrust Injury** ................................................ 217

**VIII.   CLAIMS FOR RELIEF** ............................................................................ **225**

    **FIRST CAUSE OF ACTION**
    **FRAUD AND DECEIT (AFFIRMATIVE AND CONCEALMENT)**...................... **225**

    **SECOND CAUSE OF ACTION**
    **AIDING AND ABETTING FRAUD**........................................................... **228**

    **THIRD CAUSE OF ACTION**
    **NEGLIGENT MISREPRESENTATION**................................................... **230**

    **FOURTH CAUSE OF ACTION**
    **BREACH OF CONTRACT** ...................................................................... **232**

    **FIFTH CAUSE OF ACTION**
    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**........................... **235**

    **SIXTH CAUSE OF ACTION**
    **INTERFERENCE WITH ECONOMIC ADVANTAGE**............................... **237**

    **SEVENTH CAUSE OF ACTION**
    **UNJUST ENRICHMENT** ........................................................................ **239**

    **EIGHTH CAUSE OF ACTION**
    **VIOLATIONS OF CALIFORNIA CARTWRIGHT ANTITRUST ACT** .............. **240**

    **NINTH CAUSE OF ACTION**
    **VIOLATIONS OF SHERMAN ANTITRUST ACT (15 U.S.C. §§ 1, ET SEQ.)** ... **242**

**IX.   PRAYER FOR RELIEF**............................................................................ **245**

**X.   JURY TRIAL DEMAND** ............................................................................ **247**

Direct Action Plaintiffs The Regents of the University of California; East Bay Municipal Utility District; San Diego Association of Governments; City of Richmond; Richmond Joint Powers Financing Authority; Successor Agency to the Richmond Community Redevelopment Agency; City of Riverside; Riverside Public Financing Authority; County of Mendocino; County of Sacramento; County of San Diego; County of San Mateo; San Mateo County Joint Powers Financing Authority; County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma (collectively "Plaintiffs" or "Direct Action Plaintiffs"), hereby bring this action for damages and relief against Defendants Bank of America Corporation, Bank of America, N.A. ("BofA"), Bank of Tokyo-Mitsubishi UJF Ltd. ("Tokyo-Mitsubishi"), Barclays Bank, PLC ("Barclays"), Citigroup, Inc., Citibank, N.A. ("Citigroup"), Coöperatieve Central Raiffseisen-Boerenleenbank, B.A. ("Rabobank"), Credit Suisse Group AG ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), HSBC Holdings PLC, HSBC Bank PLC ( "HSBC"), JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. ( "JPMorgan"), Lloyds Banking Group PLC ("Lloyds"), HBOS PLC, ("HBOS"), Royal Bank of Canada ("RBC"), The Norinchukin Bank ("Norinchukin"), Société Générale, S.A. ("SocGen") The Royal Bank of Scotland Group PLC ("RBS"), UBS AG ("UBS"), Portigon AG, and WestDeutsche ImmobilienBank AG ( "WestLB"), for violations of California state common law and for violations of federal antitrust laws (the "Sherman Act" and the "Clayton Act") and California antitrust laws ("Cartwright Act") (Cal. Bus. & Prof. Code §§ 16720, *et. seq.*).  Direct Action Plaintiffs' consolidated amended complaint is jointly filed for purposes of efficiency, and each Plaintiff individually complains and alleges upon information and belief except as to those paragraphs that are based on personal knowledge, as follows:

## I.      INTRODUCTION

1.      This case is about the fraud and deception of banks around the world and their global conspiracy to manipulate the London Interbank Offered Rate ("LIBOR"), the benchmark interest rate that was once viewed as one of the most trustworthy foundations of the global financial system.  It was because of that trust that LIBOR became one of the central benchmark interest rates used to set the rates for a vast array of financial instruments worth trillions of dollars.  Financial instruments including interest rate swaps, options, futures, forward rate agreements, and other interest rate derivative financial instruments traded in the over-the-counter market and on exchanges worldwide have interest rates set to LIBOR.  In addition, mortgages, credit cards, student loans, and other consumer lending products have interest rates set to LIBOR.

2.      Simply stated, LIBOR is intended to represent the interest rate that a LIBOR member bank could borrow from other LIBOR member banks on any given date, depending on the currency and the duration of the loan.  This rate is set by the LIBOR member banks each day and is intended to reflect the true cost of borrowing in any given economic environment, representing the amount of interest that one financial institution would charge for lending money to another financial institution in an arms-length transaction.

3.      Because LIBOR was believed to represent the true cost of borrowing, it could be and was used as a benchmark for setting interest rates for many types of transactions.  LIBOR is one of the most commonly used benchmark rates in the world, impacting everything from complex billion or multi-million dollar derivative contracts involving institutional investors, corporations and public entities, to simple bank loans for small businesses and individuals, to home mortgage loans taken out by individual American citizens.  Variable mortgage rates, for

example, can be pegged to LIBOR.  Interest rates on variable rate instruments are often expressed at LIBOR plus X number of basis points, where a single basis point represents one one-hundredth of a percentage point (0.01%).

4.      Investment banks, including the Defendant LIBOR member banks, compete with each other in the trading of interest rate derivatives, and the levels of these benchmark rates, LIBOR in particular, may affect either the cash flows that a bank receives from a counterparty, or the cash flow it needs to pay to the counterparty under interest rate derivative contracts.

5.      Defendants are global financial institutions involved in setting LIBOR each day, also referred to as LIBOR member banks.  The LIBOR banks manipulated LIBOR interest rates to the detriment of Plaintiffs because such manipulation, amongst other effects, deprived Plaintiffs of the rate of interest that Plaintiffs should have received from their investments or financial instruments.  Defendants manipulated LIBOR through fraud and deceit by, amongst other misconduct, reporting false information that did not reflect the Defendants' true borrowing costs.  Defendants manipulated LIBOR to increase their own revenues, and suppressed LIBOR artificially low to create the illusion of creditworthiness by suggesting that if their borrowing rate was low they were not a credit risk.  By acting in concert to knowingly misrepresent their true borrowing costs, Defendants caused LIBOR to be calculated artificially, and reaped billions of dollars in illegitimate gains.

6.      From at least as early as August of 2007, until no earlier than March of 2011 (the "Relevant Period"), the Defendant banks conspired to, and did, manipulate LIBOR by misreporting to the British Bankers' Association ("BBA") the accurate interest rate at which each expected they could borrow funds from the other LIBOR member banks. For example, in the case of artificially suppressing LIBOR, Defendants were able to significantly reduce the

amount that should be paid to counterparties, including Plaintiffs.  Certain Defendant LIBOR banks such as Rabobank and Barclays admit that LIBOR was manipulated LIBOR from as early as 2005.

7.      LIBOR is the benchmark interest rate used for a vast array of commercial and consumer financial transactions worth trillions of dollars annually.  LIBOR rates are set for ten different currencies for 50 different maturity dates, covering millions, if not hundreds of millions of transactions worldwide.  The fact that trillions of dollars in financial transactions can be linked to LIBOR demonstrates the confidence that has been placed on the reliability and trustworthiness of LIBOR and the banks that set LIBOR.  It also explains why the financial institutions at the heart of this conspiracy chose to manipulate LIBOR.  In the midst of one of the worst economic crises in world history and with billions of dollars at stake, the financial institutions engaged in improper and illegal LIBOR rate manipulation in order to deceive the public and to obtain massive profits to the detriment of institutional and individual investors.

8.      According to documents and evidence that have been made public, the manipulation of LIBOR was widespread and continued for years.  This wide-ranging investigation into the rigging of interest rates began with LIBOR, but evidence uncovered has also revealed that the LIBOR rate-rigging scandal has impacted and included the rigging of many different global benchmark rates, the including the U.S. Dollar LIBOR ("USD LIBOR" or "U.S. Dollar LIBOR"), Japanese Yen (JPY LIBOR), Tokyo Interbank Offered Rate ("TIBOR"), the Euro Interbank Offered Rate (EURIBOR), and other benchmark rates used worldwide.

9.      The Defendants are members of the BBA.  LIBOR is set based on information provided by each member bank to the BBA on a daily basis regarding their interbank borrowing rate.  This information is used by BBA and Thomson Reuters to calculate approximately 150

different LIBOR rates for the ten different currencies and 50 different durations.  From all of the interest rates reported by the BBA member banks to BBA and Thomson Reuters, the highest and lowest quartiles are removed and the middle two quartiles are averaged to reach the benchmark LIBOR rate.  This is done in an effort to prevent isolated incidents of deception.  By removing the highest and lowest quartiles, the BBA sought to prevent a single financial institution or even three or four, from manipulating LIBOR.  LIBOR could not be manipulated without the knowing involvement of most, if not all of the BBA member banks.

10.     In <u>March of 2011</u>, government regulators and prosecutors from around the world announced their investigations into the LIBOR rate manipulation by global financial institutions. Since then, these government investigations into the manipulation of LIBOR have been ongoing in the United States, United Kingdom, Switzerland, the European Union, Japan, Canada, and Singapore.  In the United States, several government agencies are involved, including the U.S. Department of Justice ("DOJ"), U.S. Commodity Futures Trading Commission ("CFTC"), and the U.S. Securities and Exchange Commission ("SEC").  In the United Kingdom, the Financial Services Authority ("U.K. FSA"), and it successor, the Financial Conduct Authority ("U.K. FCA"), as well as the European Commission ("EU"), have been investigating the LIBOR manipulation conspiracy.

11.     Plaintiffs, like so many others, relied on and believed in the trustworthiness of the BBA, its member banks and the LIBOR rate calculation system.  The announcement of government investigations into potential widespread collusion amongst the BBA member banks to manipulate one of the bedrock benchmark interest rates used by everyone from investors, lenders, banks and pension funds to value and price financial instruments has shaken the global financial system, with the global economy still on rocky ground.  Revelations of such a wide-

ranging scandal have raised serious questions about the integrity of LIBOR and other global benchmark interest rates.

12.     In prosecutions of this nature, criminal charges and indictments have continued for years after the investigation had begun as individuals and entities are either convicted or agree to cooperate with authorities.  According to government investigators and regulators from the U.S., Europe and elsewhere, their investigations have revealed a fuller picture of the rate-rigging conspiracy, which impacts LIBOR and other global benchmark interest rates that underpin hundreds of trillions of dollars in assets.

13.     A source familiar with the European investigation told *Reuters* that "[m]ore than a handful of traders at different banks are involved."  According to *Reuters*, A more than a dozen current and former employees of several large financial banks are under investigation based on credible evidence that they are involved with LIBOR manipulation.  In the United States, the regulatory investigation into LIBOR rate manipulation is led by the CFTC, which has made the LIBOR investigation one of its top priorities.

14.     Based on the evidence available to government investigators, some of which has been made public, there is substantial evidence showing the existence of a conspiracy to manipulate global benchmark interest rates and the involvement of each of the LIBOR member banks in this conspiracy, including the named Defendants in this action.

15.     The Defendant LIBOR banks in this case engaged in illegal, fraudulent and improper conduct and engaged in a criminal conspiracy that caused harm to public entities and hundreds of millions of people around the world, both directly and indirectly.  Defendants did this in order to protect their own self-interests and to reap millions or billions of dollars in improper and unwarranted gains without regard to the detriment of public entities and their

citizens.  The named Defendants in this complaint dealt directly with Mendocino for years, while concealing from Mendocino the fact that they were providing false reports to the BBA about their borrowing costs in order to manipulate LIBOR.  The Defendants' deceptive and illegal acts have damaged Plaintiffs who bring this lawsuit in order to recover those monies that were improperly taken from Plaintiffs and their constituents and beneficiaries.

16.     Except as alleged herein, Plaintiffs do not have access to all of the underlying facts relating to Defendants' improper conduct, in particular all of the internal documentation of the Defendants which provide further evidence of Defendants' pattern of illegal and fraudulent conduct in regards to LIBOR.  Such information is exclusively within the possession, custody and control of the Defendant banks and other insiders and unnamed co-conspirators, which prevents Plaintiffs from further detailing Defendants' misconduct.  Moreover, numerous pending government investigations – both domestic and foreign, including by the DOJ, CFTC, SEC, U.K. FSA now the U.K. FCA, and the EU – concerning potential LIBOR manipulation and collusion could yield more information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence...because of the difficulty in proving that banks reported borrowing costs for LIBOR at one rate and obtained funding at another."[1]  Plaintiffs thus believe further evidentiary support for their allegations will be revealed after they have a reasonable opportunity to conduct discovery.

---

[1] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," MarketWatch, March 17, 2011.

17.    In the meantime, several Defendant LIBOR member banks have reached settlements with governmental authorities relating to their collusive manipulation of LIBOR. As of June 2014, agreements were executed by nine Defendant LIBOR member banks to pay more than $3 billion in penalties to end investigations in the U.S. and U.K., not including investigations elsewhere in the world.  Those Defendant banks that have settled with U.S. and U.K. authorities include Deutsche Bank, Societe Generale, UBS, Royal Bank of Scotland, Barclays, Rabobank, Lloyds, and in the U.S., JP Morgan Chase and Citigroup.  UBS, alone, agreed to pay $1.5 billion.

18.    Defendant LIBOR banks that acknowledge the existence of the LIBOR rate manipulation conspiracy admit to their involvement in colluding to manipulate LIBOR.  In June 2012, Barclays was the first financial institution to settle potential criminal and regulatory claims against it. Barclays agreed to pay £290 million ($453.6 million) as part of a settlement with the U.K. FCA, the CFTC, the DOJ's Fraud Section, and others relating to its involvement in the LIBOR rate manipulation. Barclays' admission that it was involved in a widespread LIBOR manipulation scandal resulted in the resignation of Barclays' Chief Executive Officer Bob Diamond.  In December 2012, UBS announced a $1.5 billion settlement with regulators in the U.S., U.K. and Switzerland regarding its role in the manipulation of LIBOR.

19.    On February 2013, RBS agreed to pay a total of $612 million in penalties for manipulating LIBOR.  On February 6, 2013, RBS Securities Japan Limited, a wholly owned subsidiary of RBS, and the DOJ announced that it agreed to plead guilty to felony wire fraud and admit its role in manipulating the Japanese Yen LIBOR rate and to pay a penalty of $50 million.  That same day it was announced by the CFTC that it had ordered RBS and RBS Securities Limited Japan to pay a $325 Million penalty to settle charges of manipulation,

attempted manipulation, and false reporting of Yen and Swiss Franc LIBOR.  Later that year, RBS Chairman Phillip Hampton admitted, "We acknowledged back in February that there were serious shortcomings in our systems and controls on the issue, but also in the integrity of those past failings and nobody should be in any doubt about how seriously we have taken this issue."

20.     On October 29, 2013, Rabobank and the DOJ announced that a settlement had been reached pursuant to which Rabobank agreed to pay a $325 million criminal penalty to resolve violations arising from its submissions for LIBOR and Euribor.  That same day the CFTC announced that Rabobank would pay penalties of $475 million to settle manipulation and false reporting charges related to LIBOR and Euribor.

21.     On July 28, 2014, the DOJ announced that Lloyds agreed to pay $86 million for manipulation of submissions for LIBOR.  In addition, on the same day, the CFTC released an Order pursuant to which Lloyds agreed to pay a civil monetary penalty of $105 million for its role in the manipulation of LIBOR.

22.     Defendants' admissions in the settlement statements and documentary evidence are revealing for what they confirm: (i) the Defendant LIBOR member banks engaged in a conspiracy to manipulate the benchmark interest rate, and (ii) the conspiracy was on a global scale.  Examples of admissions about the conspiracy include the following:

   •    In August 2007, a senior RBS trader of Yen LIBOR told one of his
        colleagues that LIBOR is a "cartel now in London."[2] This price-fixing
        cartel existed from August 2007 through May 2010.

---

[2] *In the Matter of The Royal Bank of Scotland plc and RBS Securities Japan Limited*, CFTC Docket No. 13-14. Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (Feb. 6, 2013) ("RBS CFTC") at 14.

- On <u>August 13, 2007</u>, a Rabobank U.S. Dollar Trader ("Trader-2") messaged Submitter-1: "High 3s and 6s today mate (esp 6mths!!) if u would be so kind.. Gotta make money somehow!" Submitter-1 replied: "cool" Trader-2 messaged back: "Cheers [Submitter-1].. Every little helps!" This is but one example of Rabobank's admitted *upward* manipulation of 6-month and 12-month U.S. Dollar LIBOR. [3]

- On <u>October 17, 2007</u>, a U.S. Dollar swap trader for Rabobank emailed the U.S. Dollar LIBOR submitter:  "A nice low 1 month for the rest of the week please, Matey. Cheers" Rabobank's submissions for the rest of the week were consistent with this request. [4]

- On <u>November 29, 2007,</u> Barclays learned the confidential USD LIBOR submissions of *every* defendant before they were made public and adjusted its LIBOR submission downward by 20 basis points in order to stay within the pack of other banks' low LIBOR submissions.[5] Barclays managers issued standing instructions to stay within specific ranges of other panel banks' LIBOR submissions, indicating that Barclays believed that it would have continued access to every other panel bank's confidential LIBOR submissions before they were published.  According to the CFTC's review of the evidence it collected, "Senior Barclays Treasury managers provided the [LIBOR] submitters with the *general guidance* that Barclays's submitted rates should be *within ten basis points* of the submissions by the other U.S. Dollar panel banks..."[6]

- That same day, on <u>November 29, 2007</u>, a Barclays manager explained that "other panel banks 'are reluctant to post higher and because no one will get out of the pack, *the pack sort of stays low*.'"[7] Barclays and UBS admitted that they issued and obeyed instructions to stay within the pack

---

[3] *United States of America v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank")* (October 29, 2013), Deferred Prosecution Agreement, Attachment A, Statement of Facts ("Rabobank SOF") ¶¶16, 21. , Rabobank admitted manipulating U.S. Dollar LIBOR from at least as early as 2005 through approximately December 2008; Rabobank swap traders admitted manipulating LIBOR and Euribor from as early as 2005 through at least November 2010.  *Id.* at ¶15.

[4] Rabobank SOF ¶17.

[5] Financial Services Authority, Final Notice to Barclays Bank Plc (June 27, 2012) ("Barclays FSA") ¶118.

[6] *In the matter of Barclays, PLC, Barclays Bank PLC, and Barclays Capital, Inc.,* CFTC Docket No. 12-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (June 27, 2012) ("Barclays CFTC") at 20 (emphasis added).

[7] Letter from Denis J. McInerney, Chief, Criminal Division, Fraud Section, United States Department of Justice, Appendix A (June 26, 2012 ("Barclays SOF") ¶ 43 (emphasis added).

of other banks' low LIBOR submissions during large portions of the Relevant Period.

- In communications between November 2007 and October 2008, Barclays' employees revealed that "all of the Contributor Panel banks, including Barclays, were contributing rates that were too low."[8]

- On April 17, 2008, a Barclays manager conceded, "to the extent that, um, the LIBORs have been understated, ***are we guilty of being part of the pack? You could say we are***."[9] As one Barclays submitter put it, "just set it where everyone else sets it, we do not want to be standing out."[10]

- In April 2008, the BBA acknowledged that no panel banks were "clean-clean" and that it understood what would happen to any bank that "moved against the trend of lower submissions."

- On May 21, 2008, when a Wall Street Journal reporter asked UBS by email why UBS had been "paying 12 basis points for [commercial paper] more than it was posting as a Libor quote," a senior manager at UBS told another senior UBS manager that "the answer would be 'because the whole street was doing the same and because we did not want to be an outlier in the libor fixings, just like everybody else.'"[11]

- On June 18, 2008, two UBS employees explained why it was important for banks to collusively suppress as part of an anticompetitive pack: "... ***[Senior Manager B] want[s] us to get in line with the competition by Friday ... if you are too low you get written about for being too low ... if you are too high you get written about for being too high.***"[12]

- Between June 2008 and April 2009, "UBS's 3-month U.S. Dollar LIBOR submissions were ***identical*** to the published LIBOR fix, and largely

---

[8] Barclays SOF ¶ 42.

[9] Barclays FSA ¶ 131 (emphasis added).

[10] Barclays FSA ¶ 123.

[11] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice (Dec. 18, 2012) ("UBS SOF") ¶ 117.

[12] Financial Services Authority, Final Notice to UBS AG ¶ 124 (Dec. 19, 2012) ("UBS FSA") (emphasis added).

consistent with the published LIBOR fix in the other tenors."[13] This was the case even though "[d]uring this 10-month period, there were significant disruptions in the financial markets, affecting individual financial institutions in different ways."[14]

- The empirical evidence shows that Defendants conspired to suppress USD LIBORs in a pack: they submitted LIBOR rates at similarly suppressed levels, which they could not have done without colluding because their submissions diverged dramatically and in unpredictable ways from benchmark rates that tracked market fundamentals.

- On February 11, 2013, during testimony before the Parliamentary Commission on Banking Standards, Johnny Cameron, the former Chairman of Global Banking and Markets at RBS Group, characterized the LIBOR manipulation efforts as "***a cartel of people across a number of banks who felt they could fix it.***"[15]

- On April 12, 2013, the DOJ charged RBS with one count of ***"price fixing" in violation of Section 1 of the Sherman Act.*** RBS admitted that it was responsible for the acts of its employees charged in the Information, which alleged that, from at least as early as 2007 through at least 2010, employees "engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce... the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key price component of the price thereof, on certain occasions." Documents show that RBS colluded with other defendants in this price-fixing conspiracy.

23.     Plaintiffs have suffered significant damages from this LIBOR manipulation, specifically from each of the named Defendants, several of whom directly did business with each Plaintiff as a counterparty on LIBOR-linked transactions.  Plaintiffs bring this action to recover losses suffered as a result of the Defendants' misconduct.

---

[13] UBS SOF ¶ 122 (emphasis added).

[14] UBS SOF ¶ 123.

[15] Parliamentary Commission on Banking Standards, Feb. 11, 2013; Testimony of Johnny Cameron.

## II.   JURISDICTION AND VENUE

24.      This Court has jurisdiction over this action pursuant to 28 U.S.C. Section § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

25.      Venue as to Defendants is proper in this district, as well as the Northern District of California, Southern District of California, and Central District of California pursuant to 15 U.S.C.§§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), in that more than one defendant resides in the abovementioned districts, is licensed to do business and/or is doing business in the abovementioned districts judicial districts.[16]  The interstate trade and commerce described herein has been carried out, in part, within the abovementioned districts.

26.      Defendants are subject to this Court's jurisdiction because of their nationwide contacts and other activities, as well as their contacts and other activities within the State of California.  The conspiratorial acts of the Defendants caused harm in the State of California and specifically within the abovementioned districts.

27.      Defendants' conspiracy to manipulate LIBOR substantially affected commerce in the State of California and within the abovementioned districts because Defendants, directly or

---

[16] Direct Action Plaintiffs' consolidated amended complaint is filed in the MDL but it is expected that each Plaintiff's case will return to the venue where it was originally filed for trial: *The Regents of the Univ. of California v. Bank of America Corp., et al.* (No. 3:13-cv-02921) (N.D. Cal.); *East Bay Municipal Utility District v. Bank of America Corporation, et al.* (No. 3:13-0109) (N.D. Cal.); *San Diego Assoc. of Governments v. Bank of America Corp., et al.* (No. 1:13-cv-01466) (S.D. Cal.); *City of Richmond, et al. v. Bank of America Corporation, et al.* (No. 3:13-0106) (N.D. Cal); *City of Riverside, et al. v. Bank of America Corporation, et al.* (No. 5:13-cv-00062-VAP-SP) (C.D. Cal.); *County of Mendocino v. Bank of America Corp., et al.* (3:13-cv-05278, N.D. Cal.); *County of Sacramento v. Bank of America Corp., et al.* (No. 2:13-cv-01476) (E.D. Cal.); *County of Sonoma et al v. Bank of America Corp., et al.* (No. 1:13-cv-02979) (N.D. Cal.); *County of San Diego v. Bank of America Corporation, et al.* (No. 3:13-00048) (S.D. Cal.); *County of San Mateo, et al. v. Bank of America Corporation, et al.* (No. 3:13-00108) (N.D. Cal.). Direct Action Plaintiff City of Houston has filed a separate amended complaint.

through their agents, engaged in activities affecting numerous individuals and entities, including Plaintiffs, who reside in the abovementioned districts.  Defendants have purposefully availed themselves of the laws of the State of California in connection with their activities relating to their manipulation of LIBOR.  Defendants intentionally targeted individuals and entities within the abovementioned districts as well as entered into a conspiracy in which the Defendants knew and intended to cause harm to Plaintiffs and others within the abovementioned districts.  As a result of the activities described herein, Defendants:

     a.    Caused damage to the residents of the State of California and the abovementioned districts;

     b.    Caused damage in the State of California and within the abovementioned districts by acts or omissions committed both inside and outside of the State of California by regularly doing or soliciting business in the State of California and within the abovementioned districts;

     c.    Engaged in persistent courses of conduct within the State of California and within the abovementioned districts and/or derived substantial revenue from LIBOR-linked transactions with individuals and entities in the State of California and within the abovementioned districts;

     d.    Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in the State of California and within the abovementioned districts while regularly doing or soliciting business in the State of California and within the abovementioned districts;

28.    The conspiracy described herein adversely affected Plaintiffs.

29.     LIBOR is a benchmark rate that impacts a wide range of commercial and consumer transactions and investments, including securities that were invested in, issued by and used by public entities, corporations, and individuals in the State of California and within the abovementioned districts.  The State of California has a public interest in protecting its residents and taxpayers from financial fraud and manipulation that adversely impacts its residents and taxpayers.  The State of California has a public interest in maintaining a business environment free of fraud and antitrust violations.  Without enforcing the federal antitrust laws and the antitrust laws and common law of the State of California, companies that violate the law will go unpunished.  Defendants knew that commerce in the State of California and within the abovementioned districts would be adversely affected by implementing their conspiracy.

30.     This Court has personal jurisdiction over all of the Defendants by virtue of their business activities in this jurisdiction.  In addition, all of the Defendants conduct substantial business within the State of California and many of them maintain a large office presence in the Northern District of California, Southern District of California, and Central District of California.

## III.   PARTIES

### A.     Plaintiffs

31.     Plaintiff **The Regents of the University of California ("The Regents")** is a corporation established under Article IX, Section 9 of the California Constitution, charged with the administration of a public trust known as the University of California ("UC"). The Regents govern the UC, part of the State's three-tier public higher education system, which includes ten campuses and five medical centers. UC Berkeley was the first campus opened in 1868, and the newest campus, UC Merced, was opened in the fall of 2005.  As of 2012, the combined student

body at this world-class educational institution was more than 237,000 undergraduate and graduate students, with nearly 19,000 faculty and more than 189,000 staff.  The Regents has invested in financial instruments the rates of return of which were tied to LIBOR.

32.     Plaintiff **East Bay Municipal Utility District ("EBMUD")** is a publicly owned utility formed in 1923 under the Municipal Utility District Act of 1921 to provide water services to part of Alameda and Contra Costa counties. EBMUD's water system collects, transmits, treats and distributes high-quality water to approximately 1.3 million users in a 331-square-mile service are extending from Crockett in the north, southward to San Lorenzo, eastward from San Francisco Bay to Walnut Creek, and south through the San Ramon Valley. In addition to providing water, EBMUD treats wastewater for more than 650,000 customers, and has been doing so for more than fifty years. EBMUD has invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, EBMUD issues municipal bonds to fund public projects in anticipation of tax and other revenues and for other purposes. Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one or more of the Defendants and/or other entities.

33.     Plaintiff **San Diego Association of Governments ("SANDAG")** is a legislatively-created regional government agency.  It is governed by a Board of Directors composed of mayors, councilmembers, and county supervisors from each of the 19 local governments in the San Diego County region, including the cities of Carlsbad, Chula Vista, Coronado, Del Mar, El Cajon, Encinitas, Escondido, Imperial Beach, La Mesa, Lemon Grove, National City, Oceanside, Poway, San Diego, San Marcos, Santee, Solana Beach, Vista, and San Diego County. Supplementing these voting members are nine advisory representatives,

including the California Department of Transportation (Caltrans), Metropolitan Transit

Authority, North County Transit District, Imperial County, U.S. Department of Defense, San

Diego Unified Port District, San Diego County Water Authority, Southern California Tribal

Chairmen's Association, and Mexico (Consulate General of Mexico).  SANDAG serves as a

forum for regional decision-making, obtains and allocates resources, engineers and builds public

transportation, administers state and local tax programs, and has the authority to issue bond

instruments. SANDAG has invested in financial instruments the rates of return of which were

tied to LIBOR.  For example, SANDAG issues municipal bonds to fund public projects in

anticipation of tax and other revenues and for other purposes.  Portions of the proceeds from

certain of these bond issuances may have been invested in Municipal Derivatives that were tied

to LIBOR with one or more of the Defendants and/or other entities.

34.     Plaintiff **City of Richmond ("Richmond")** is a chartered city and is located

sixteen miles northeast of San Francisco.  The City of Richmond's total area is 56.1 square

miles, 33.8 of which is land area and 22.3 water area.  The City of Richmond is located on the

western shore of Contra Costa County, and is the largest city in the "West County" region

consisting of five cities: Richmond, El Cerrito, San Pablo, Hercules, and Pinole.  The City of

Richmond has invested in multiple financial instruments the rates of return of which were tied to

LIBOR.  For example, the City of Richmond issues municipal bonds to bridge gaps between the

City's financial needs and revenue collection times to fund public projects.  Significant portions

of the proceeds from these bond issuances have been invested in Municipal Derivatives the

interest rates of which were tied to LIBOR with one or more of the Defendants and/or other

entities.

35.     Plaintiff **The Richmond Joint Powers Financing Authority ("Richmond JPFA")** was formed pursuant to a Joint Exercise of Powers Agreement, dated <u>December 1, 1989</u> (the "Joint Powers Agreement") by and between the City of Richmond and the former Redevelopment Agency of the City of Richmond, pursuant to the provisions of Articles 1 and 4 of Chapter 5 of Division 7 of Title 1 of the Government Code of the State.  The Richmond JPFA was formed to assist the City in the financing of public capital improvements.  The Richmond JPFA has invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, to meet its objectives, the Richmond JPFA issued municipal bonds to fund public projects and for revenue anticipated purposes.  Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one or more of the Defendants and/or other entities.

36.     Plaintiff the **Successor Agency to the Richmond Community Redevelopment Agency ("Richmond Successor RDA")** is a California entity organized under the provisions of AB1x26, enacted June 28, 2011 and AB 1484, enacted June 27, 2012.  The former Richmond Community Redevelopment Agency ("Richmond CRA") was formed by the City of Richmond in 1949.  The Richmond CRA invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, to meet its objectives, the Richmond CRA issued municipal bonds to fund public projects and for revenue anticipated purposes.  Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one or more of the Defendants and/or other entities.  Plaintiffs Richmond, Richmond JPFA, and Richmond Successor RDA" are referred to collectively herein as "**Richmond**."

37.     Plaintiff **City of Riverside ("Riverside")** is a city and a political subdivision of the State of California. Riverside was incorporated in 1883 and operates under a charter adopted in 1907.  The city is named for the nearby Santa Ana River, and is the birthplace of the California citrus industry.  Riverside encompasses 80 square miles in the western portion of Riverside County, approximately 60 miles east of downtown Los Angeles and 90 miles north of San Diego.  With a population of over 300,000, it is the largest city in the Inland Empire region of Southern California and has been hard hit by the current economic crisis.  The current unemployment rate is 11.6% in the City, and foreclosure rates in the City have been among the highest of anywhere in the country.  The City of Riverside has invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, the City of Riverside issues municipal bonds to bridge gaps between the City's financial needs and revenue collection times to fund public projects, including the Riverside Renaissance, a five-year, $1.68 billion public investment program approved in 2006 by Riverside's city council to dramatically upgrade the City of Riverside's aging water, sewer and electrical infrastructure, improve traffic flows, and expand and improve vital public services. Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one or more of the Defendants and/or other entities.

38.     Plaintiff **The Riverside Public Financing Authority ("Riverside PFA")** was established pursuant to a Joint Exercise of Powers Agreement dated December 15, 1987, by and between the City of Riverside and the former Riverside Redevelopment Agency (Riverside RDA"), pursuant to the provisions of Articles 1 through 4 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1 of the Government Code of the State of California.  The Riverside PFA was created for the purpose, among other things, of providing financing for

public capital improvements for the Riverside RDA, of making loans to the Riverside RDA to

finance such public capital improvements and of purchasing local obligations issued by the

Riverside RDA to finance public capital improvements.  The Riverside PFA has invested in

multiple financial instruments the rates of return of which were tied to LIBOR.  For example, to

meet its objectives, the Riverside PFA issued municipal bonds to fund public projects and for

revenue anticipated purposes.  Significant portions of the proceeds from these bond issuances

have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with

one or more of the Defendants and/or other entities.  Plaintiffs City of Riverside and The

Riverside Public Financing Authority are referred to collectively herein as "**Riverside**."

39.     Plaintiff **County of Mendocino ("Mendocino")** is a county and a political

subdivision of the State of California. Mendocino has a population of approximately 87,000

residents. Mendocino has invested in financial instruments the rates of return of which were tied

to LIBOR.  For example, at all times alleged herein, Mendocino had significant sums invested

in floating rate securities tied to LIBOR.

40.     Plaintiff **County of Sacramento ("Sacramento")** is a political subdivision of the

State of California and home to the State Capital.  The County is 994-square miles and includes

the seven incorporated cities of Citrus Heights, Elk Grove, Folsom, Galt, Isleton, Rancho

Cordova and Sacramento.  The County has a population of approximately 1.4 million and is the

core cultural and economic center of its four-county metropolitan area.  The County has

invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For

example, the County issues municipal bonds to fund public projects in anticipation of tax and

other revenues and for other purposes. Significant portions of the proceeds from these bond

issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one or more of the Defendants and/or other entities.

41.    Plaintiff **County of San Diego ("San Diego")** is a county and a political subdivision of the State of California, San Diego is the second most populous county in California, with a population exceeding 3 million residents.  San Diego has invested in financial instruments that the rates of return were tied to LIBOR.  San Diego issues municipal bonds to fund public projects in anticipation of tax and other revenues and for other purposes.  Portions of the proceeds from certain of these bond issuances may have been invested in Municipal Derivatives that were tied to LIBOR with one or more of the Defendants and/or other entities.

42.    Plaintiff **County of San Mateo ("San Mateo")** is a county and political subdivision of the State of California.  San Mateo is the 14th most populous county in California, with a population of more than 700,000 residents. San Mateo is home to a number of significant venues in Northern California, including the Cow Palace, San Mateo County Expo Center, and the South San Francisco Expo Center.  The County has invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, the County issues municipal bonds to bridge gaps between the County's financial needs and revenue collection times to fund public projects.  Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one of more of the Defendants and/or other entities.  In addition, the County maintains an investment pool to meet its liquidity and long-term investment needs.  Significant portions of the County's investment pool are, and were throughout the Relevant Period, invested in floating rate securities tied to LIBOR.

43.     Plaintiff **San Mateo County Joint Powers Financing Authority ("San Mateo JPFA")** was established pursuant to a Joint Exercise of Powers Agreement dated <u>May 15, 1995</u> by and between the County of San Mateo and the Community Development Commission of the County of San Mateo.  The Authority was formed to assist the County in the financing of public capital improvements.  The San Mateo JPFA has invested in multiple financial instruments the rates of return of which were tied to LIBOR.  For example, to meet its objectives, the San Mateo JPFA issued municipal bonds.  Significant portions of the proceeds from these bond issuances have been invested in Municipal Derivatives the interest rates of which were tied to LIBOR with one of more of the Defendants and/or other entities.  Plaintiffs County of San Mateo and San Mateo JPFA are referred to collectively herein as "**San Mateo**".

44.     Plaintiff **County of Sonoma ("Sonoma")** is a county and a political subdivision of the State of California. County of Sonoma has a population of approximately 491,000 residents. County of Sonoma has invested in financial instruments the rates of return of which were tied to LIBOR.  For example, at all times alleged herein, County of Sonoma had significant sums invested in floating rate securities tied to LIBOR.

45.     Plaintiff **David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma ("Sonoma Treasurer")**, has been delegated responsibility for the investment and reinvestment of County of Sonoma funds. County of Sonoma has established the Sonoma County Treasury Pooled Investment Fund (the "County Pool") as a pooled local agency investment fund under the laws of the State of California (including without limitation Government Code Sections 53601 and 53635).  The powers of the County of Sonoma Board with respect to the County Pool include the power to invest money for the benefit of the County of Sonoma and the other participants in the County Pool, and pursuant to Government Code

Section 53607, the County of Sonoma has delegated its authority to invest or to reinvest County of Sonoma funds, including but not limited to the funds of the County Pool, to the County Treasurer.  Plaintiffs County of Sonoma and the County Treasurer are referred to collectively herein as "**Sonoma**."  Plaintiffs Sonoma and the Sonoma Treasurer are referred to collectively herein as "**Sonoma**."

46.     Plaintiffs **The Regents**, **EBMUD**, **SANDAG**, **Richmond**, **Riverside**, **Mendocino**, **Sacramento**, **San Diego**, **San Mateo** and **Sonoma**, are referred to collectively herein as "Plaintiffs" or "Direct Action Plaintiffs".

### B.     Defendants

47.     Defendant **Bank of America Corporation** is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant **Bank of America, N.A.** is a federally-chartered national banking association headquartered in Charlotte, North Carolina and is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation.  Defendant Bank of America Corporation is the second-largest bank holding company in the United States by assets.  Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "**Bank of America**" or the "**Bank of America Defendants**."

48.     Defendant **Bank of Tokyo-Mitsubishi UFJ Ltd. ("Tokyo-Mitsubishi")** is a Japanese company headquartered in Tokyo, Japan.  Tokyo-Mitsubishi is the largest bank in Japan, which was established on <u>January 1, 2006</u> with the merger of the Bank of Tokyo-Mitsubishi, Ltd. and UFJ Bank Ltd.  The bank serves as the core retail and commercial banking operation for the Mitsubishi UFJ Financial Group.

49.     Defendant **Barclays Bank plc ("Barclays")** is a British public limited company headquartered in London, England.  Barclays is a British multinational banking and financial

services company headquartered in London, United Kingdom.  Barclays is one of the largest financial institutions in the world.

50.     Defendant **Citigroup, Inc.** is a Delaware corporation headquartered in New York, New York. Defendant **Citibank, N.A.** is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Citigroup, Inc. was formed from one of the largest mergers in history by combining the banking giant Citicorp and financial conglomerate Travelers Group.  **Citibank, N.A.** is the banking arm of Defendant Citigroup, Inc.  Citibank, N.A. is the third largest retail bank in the United States based on deposits, and it has Citibank branded branches in countries throughout the world.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "**Citigroup**" or the "**Citigroup Defendants**."

51.     Defendant **JPMorgan Chase & Co.** is a Delaware corporation headquartered in New York, New York.  Defendant **JPMorgan Chase Bank, N.A.** is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  JPMorgan Chase Bank, N.A. is the largest bank in the United States by assets.  JPMorgan is involved in all aspects of the financial markets, including investment banking, asset management, private banking, and private wealth management.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, National Association are referenced collectively in this Complaint as "**JPMorgan**" or the "**JPMorgan Defendants**."

52.     Defendant **UBS AG** ("**UBS**") is a Swiss company based in Basel and Zurich, Switzerland.  UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide.

53.     Defendant **Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank")** is a financial services provider headquartered in Utrecht, the Netherlands. Rabobank is a financial services provider with offices worldwide.  Rabobank is a global leader in Food and Agri financing and in sustainability- oriented banking.  Rabobank comprises 141 independent local Dutch Rabobanks, a central organization (Rabobank Nederland), and a large number of specialized international offices and subsidiaries.

54.     Defendant **Credit Suisse Group AG ("Credit Suisse")** is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse is a Swiss multinational financial services company with more than 250 branches in Switzerland and operations in more than 50 countries. Credit Suisse provides companies, institutional clients and high-net-worth private clients worldwide, as well as retail clients in Switzerland, with advisory services, comprehensive solutions, and products.

55.     Defendant **Deutsche Bank AG ("Deutsche Bank")** is a German financial services company headquartered in Frankfurt, Hesse, Germany.  Deutsche Bank is a global banking and financial services company that conducts business across the world.  Deutsche Bank offers financial products and services for corporate and institutional clients along with private and business clients.  Services include sales, trading, research and origination of debt and equity; mergers and acquisitions; risk management products, such as derivatives, corporate finance, wealth management, retail banking, fund management, and transaction banking.

56.     Defendant **HSBC Holdings plc** is a United Kingdom public limited company headquartered in London, England.  Defendant **HSBC Bank plc** is a United Kingdom public limited company headquartered in London, England and is a wholly-owned subsidiary of HSBC Holdings plc.  HSBC Bank plc is one of the four major clearing banks in the United Kingdom.

HSBC Bank plc's business ranges from personal finance and commercial banking, to private banking, consumer finance as well as corporate and investment banking.  Defendants HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as "**HSBC**."

57.     Defendant **The Royal Bank of Scotland Group plc** ("**RBS**") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  RBS is a British banking and insurance holding company.  RBS provides a wide variety of banking services ranging from personal and business banking, private banking, insurance and corporate finance throughout its operations across the world, including Europe, North America and Asia.

58.     Defendant **Société Générale, S.A. ("SocGen")** is a French corporation with its principal place of business in Paris, France.  Defendant SocGen is a large European bank and a major financial services company.  SocGen's three main divisions are Retail Banking & Specialized Financial Services, Corporate and Investment Banking and Global Investment Management & Services.  SocGen is present in over 33 countries across Europe, the Americas and Asia.

59.     Defendant **Lloyds Banking Group plc ("Lloyds")** is a United Kingdom public limited company headquartered in London, United Kingdom.  Defendant Lloyds was formed in 2009 through the acquisition of Defendant **HBOS plc ("HBOS")** - a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland - by Lloyds TSB Bank plc. Lloyds' activities are organized into four business divisions including Retail Banking, Wholesale, Life, Pensions & Insurance, and Wealth & International.   Lloyds' extensive operations span the globe including the United States, Europe, Middle East and Asia. Defendants Lloyds and HBOS are referenced collectively in this Complaint as "**Lloyds**".

60.     Defendant **Royal Bank of Canada ("RBC")** is a Canadian company with headquarters in Toronto, Canada.  Defendant RBC is the largest financial institution in Canada, as measured by deposits, revenues, and market capitalization.  RBC serves seventeen million clients and has 80,100 employees worldwide.

61.     Defendant **The Norinchukin Bank ("Norinchukin")** is a Japanese bank headquartered in Tokyo, Japan.  Defendant Norinchukin is a Japanese cooperative bank largely serving agricultural, fishing and forestry cooperatives.  Norinchukin is one of Japan's largest institutional investors and has a reputation as Japan's largest hedge fund.

62.     Defendant **Portigon AG, f/k/a WestLB AG ("WestLB AG"),** is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant **Westdeutsche ImmobilienBank AG** is a German company headquartered in Mainz, Germany.  Westdeutsche ImmobilienBank AG is currently a wholly-owned subsidiary of Erste Abwicklungsanstalt and formerly a wholly-owned subsidiary of WestLB AG.  WestLB AG is a European commercial bank which is partially owned by the German state of North Rhine-Westphalia.  WestLB AG was formerly a Landesbank, one of a group of state-owned banks that is unique to Germany. These banks are regionally organized and engage predominantly in wholesale banking. Defendants WestLB AG and Westdeutsche ImmobilienBank AG are referenced collectively in this Complaint as "**WestLB**."

63.     Defendants Bank of America, Barclays, Citigroup, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, Lloyds, SocGen, RBS, UBS, Tokyo-Mitsubishi, RBC, Norinchukin and WestLB (collectively, "Defendants") were involved in setting U.S. Dollar LIBOR as members of the British Bankers' Association USD-LIBOR panel during the Relevant Period.

### C.     Unnamed Co-Conspirators

64.     At all relevant times, other corporations, banks, investment companies, and other individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct against Plaintiffs.  Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of LIBOR.  In particular, certain individuals and entities agreed and conspired to manipulate and/or artificially suppress the LIBOR rate and the rate of other global benchmark interest rates to increase their profits to the detriment of Plaintiffs.  All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

### D.     Agents and Co-Conspirators

65.     At all times relevant to this complaint Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other, and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this complaint.

66.     Each of the Defendants has participated, as members of the conspiracy, and have acted with or in furtherance of said conspiracy, or aided and abetted, or otherwise assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of federal and California law.  Each of the Defendants acted both individually and in alignment with other Defendants with full knowledge of their respective wrongful conduct.  As such, the Defendants conspired together, building

upon each other's wrongdoing, in order to accomplish the acts outlined in this complaint. Defendants are individually sued as principals, participants, and aiders and abettors in the wrongful conduct complained of, the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## IV.   FACTUAL ALLEGATIONS

### A.   The London Interbank Offered Rate Defined

67.     The London Interbank Offered Rate ("LIBOR") is a global benchmark interest rate that is set every day based on submissions from the member banks of the British Bankers' Association ("BBA").  The Defendants in this case are those member banks who reported false borrowing rates to the BBA and who conspired to manipulate LIBOR by entering into agreements with each other to provide false submissions to the BBA.  LIBOR is intended to represent the true cost of borrowing between banks.  Since banks are traditionally in the business of lending and borrowing money, they have the best knowledge of what would be a fair interest rate for inter-bank loans.  LIBOR was believed to represent, on a daily basis, what was accepted by the global financial system as the true cost of borrowing between financial institutions.  LIBOR is used as a benchmark for other borrowers.  LIBOR-linked interest rates are commonly described as LIBOR plus X number of basis points.  Since LIBOR is the benchmark, however, the Defendants' manipulation of LIBOR has made every interest rate linked to LIBOR unreliable and the product of Defendants' wrongdoing.

68.     There are 150 different LIBOR rates calculated for ten different currencies on a daily basis by Thomson Reuters for the BBA for 15 borrowing periods ranging from overnight to 12 months.  LIBOR is set by the BBA and its member banks.  The BBA defines LIBOR as:

> *The rate at which an individual Contributor Panel bank could borrow*
> *funds, were it to do so by asking for and then accepting inter-bank offers*
> *in reasonable market size, just prior to 11:00 a.m. London time.*

69.     This has been the operational definition of LIBOR since approximately <u>1998</u>.

The LIBOR for a given currency is the result of a calculation based upon submissions from a

panel of banks for that currency (the "Contributor Panel") selected by the BBA banks.  The

Contributor Panel for the US Dollar LIBOR from at least <u>2005</u> through <u>2010</u> comprised of 16

banks.  Presently, there are 18 banks on the US Dollar Contributor Panel.  The 16 banks that

were part of the U.S. Dollar Contributor Panel from <u>2005</u> through <u>2010</u> were:

- Bank of America
- Bank of Tokyo-Mitsubishi UFJ
- Barclays
- Citibank
- Credit Suisse
- Deutsche Bank
- HSBC
- JPMorgan Chase
- Lloyds
- Rabobank
- Royal Bank of Canada
- Société Générale
- Norinchukin
- The Royal Bank of Scotland
- UBS
- WestLB

70.     In <u>2011</u>, the global investigations into widespread LIBOR manipulation began

and were first being disclosed to the public.  In 2011, WestLB left its position as a LIBOR

member bank of the U.S. Dollar Contributor Panel, and the Panel was joined by BNP Paribas,

Credit Agricole CIB and Sumitomo Mitsui Banking Corporation Europe Ltd. ("SMBCE").

71.     The BBA's fixing of LIBOR with its member banks for various currencies

reflects a global rate-setting cartel.  One commentator noted that, "LIBOR is not a real market

rate of interest and is instead set by a cartel of mostly foreign banks operating in London with

little or no oversight and no transparency. . . . *The Wall Street Journal* reported that the BBA is hesitant to change how LIBOR is calculated because it is worried about legal liability which is not a surprise.  If the BBA admits that LIBOR isn't a market rate but a cartel rate that was established through price fixing, it will be subject to global lawsuits resulting from fraudulent behavior and misrepresentations.  The likelihood of the BBA reforming itself, providing transparency and giving up its cartel monopoly is very low given the astronomical liability that will result."[17]  The BBA profits directly from LIBOR.  Since <u>2009</u>, it has operated BBA LIBOR, Ltd., which earns revenue from licensing the rate.

72.     According to the BBA website, it describes itself as "the leading trade association for the U.K. banking and financial services sector. We speak for over 200 member banks from 60 countries on the full range of U.K. and international banking issues."[18]  The Defendants are among the member banks of the BBA.  The BBA acknowledges that it is not a regulatory body and has no regulatory function.[19]  Its activities are not overseen or regulated by any U.K. or foreign regulatory agency.  It is governed by a board of its own member banks that meets four times each year.  The board is composed of senior executives from twelve banks, including Defendants Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[20]  "This is a

---

[17] http://www.thesunshinereport.net/marksunshine/?p=36, last accessed April 30, 2012.

[18] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[19] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012

[20] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

quaint, insider club which is clearly not fit for the 21st century," said Richard Werner, a finance professor at the University of Southampton, England.[21]

73.     The BBA began disseminating LIBOR in January 1986, initially in three currencies for U.S. dollars, Japanese Yen, and British pound sterling.  LIBOR is now disseminated for ten currencies, including the foregoing three, as well as the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc, and the Swedish krona.

74.     LIBOR is a daily benchmark interest rate that is fixed or adjusted according to a methodology created by the BBA, and based on an interest rate that designated Contributor Panel banks report they could borrow unsecured funds from other banks in the London wholesale money market for fifteen different maturities ranging from overnight to one year.  As "the primary benchmark for short term interest rates globally,"[22]  LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets.  For example, LIBOR is commonly used as the floating rate on interest rate swaps; market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (e.g., "LIBOR + [X] bps")[23] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR).

---

[21] http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html, last accessed on April 30, 2012.

[22] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[23] The term "bps" stands for basis points. 100 basis points equal 1%.

75.     LIBOR is used as the benchmark for pricing of trillions of dollars' worth of financial transactions.  In a May 21, 2009 press release, the BBA called LIBOR "the world's most important number."[24]  Among market participants it is well-established that LIBOR "matters, because the rate system plays a vital role in the economy."[25]

76.     According to the CFTC's Order in the UBS matter:

> LIBOR is the most widely used benchmark interest rate throughout the world. LIBOR is intended to be a barometer to measure strain in money markets and is often a gauge of the market's expectation of future central bank interest rates. Approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR. LIBOR also is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges, including the one-month and three-month Eurodollar futures contracts on the Chicago Mercantile Exchange ("CME"). Moreover, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers.[26]

77.     Moreover, according to Marvin Wheatley, the managing director of the U.K. FSA, LIBOR was used as the benchmark for 50% of certain financial instruments: floating rate notes, interest rate swaps, and forward rate agreements.[27]

78.     A LIBOR rate is set by a separate LIBOR panel established by the BBA for each of the ten currencies.  At all times alleged herein, designated Contributor Panels ranged in size

---

[24] http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily.

[25] Carrik Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

[26] *In the Matter of UBS AG and UBS Securities Japan Co., Ltd.*, CFTC Docket No. 13-09.  Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (Dec. 19, 2012) ("UBS CFTC") at 6.

[27] The Wheatley Review of LIBOR: Final Report (Sept. 2012), available at http://www.hm-treasury.gov.uk/wheatley_review.htm (last visited April 16, 2013).

from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. Dollar, British pound sterling, Euro, and Japanese yen panels. Membership among the Contributor Panels overlaps substantially.  For example, at all times alleged, nine of the sixteen banks that served on the U.S. Dollar panel also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[28]  Similarly, thirteen banks participated on both the dollar and yen LIBOR panels[29] and eleven banks participated on both the U.S. Dollar and Swiss franc LIBOR panels.[30]  A bank member of a LIBOR Contributor Panel is required to be regulated and authorized to trade on the London money market.  The BBA seeks to avoid responsibility for its member banks, as the BBA reported to Bloomberg: "As all contributor banks are regulated, they are responsible to their regulators, rather than us."[31]

79.    In setting LIBOR, each member is asked the same question: "*At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m. London time?*"  In response to that question, each member of the Contributor Panel submits its purported inter-bank borrowing rates every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London time.  Once each Contributor Panel bank has submitted its rate, the contributed rates are ranked.  The highest and lowest quartiles are excluded from the calculation, and the

---

[28] Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS

[29] Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB.

[30] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS.

[31] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.

middle two quartiles are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity.  By removing outliers from the algorithm, the formula theoretically eliminates any abnormal rates so that the final LIBOR rate is a more accurate reflection of actual interest rates being charged in the market.  As confirmed by the Department of Justice and the CFTC and admitted to by Barclays, LIBOR could not be manipulated without a concerted effort by the members of the BBA.

80.     According to the BBA website, "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  Contributor Panel banks inform the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months). Contributed rates are ranked in descending order and the arithmetic mean of only the middle two quartiles is used to formulate the resulting BBA LIBOR calculation for that particular currency and maturity.[32]

81.     Based on the foregoing methodology, Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London Time.  Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources.  The resulting calculated LIBOR is called the LIBOR fix is published by Thomson Reuters for the BBA along with each Contributor Panel bank's submitted rates along with the names of the banks.

---

[32] http://www.bbalibor.com/technical-aspects/setting-bbalibor, last accessed March 30, 2012.

82.     The LIBOR member banks' method for reporting their purported interbank offered rate is self-certifying and not transparent.  There is no oversight of the BBA or any of its member banks by any regulatory agency in setting LIBOR.  The resulting rates are neither filed with, nor subject to the approval of, any regulatory agency.  The BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[33]

83.     The LIBOR-setting process was supposed to be a competitive process in accordance with three key panel rules described below.  The rules were designed to produce competitively determined daily LIBOR rates and established a daily contest between the panel banks to signal their relative ranking in terms of credit risk, access to funding, and liquidity profile. Defendants took advantage of the LIBOR setting process.

84.     The first of the three key panel rule required each of the panel banks to independently exercise its good faith judgment each day about the interest rate that it would be required to pay, based upon its own expert knowledge of market conditions, including supply and demand conditions and the panel bank's own competitive posture as a borrower within the market for interbank loan funds.  Through the mechanism of individual submissions reflecting each submitting bank's honest competitive posture as a borrower each day, the composite LIBOR should have reflected, and moved from day to day based upon, actual competitive conditions in the London interbank loan market.  A panel bank's LIBOR submissions should accurately reflect the estimated costs of that bank's borrowing costs in the interbank lending

---

[33] http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

market and not represent an artificial number generated to benefit the bank's trading positions, enhance the bank's reputation as creditworthy, or something else.

85.     The second key panel rule required that each panel bank's daily submissions would remain <u>confidential</u> until after the calculation and publication of the daily LIBOR rates. Adherence to this rule would prevent collusion and ensure that each panel bank's submission would be independent of the others, and therefore reflect only that panel bank's independent expert judgment concerning its own competitive posture as a borrower within the market.

86.     The third key panel rule required that upon the publication of each day's LIBOR, the BBA, through Thomson Reuters, simultaneously published the individual rates submitted in the LIBOR-setting process for each panel bank, currency and tenor for that day.  This third rule made the process and the individual panel bank submissions transparent on an ex post basis, to the capital markets and the panel banks themselves.

87.     Operating in conjunction with the first two rules, this third rule was created so that the LIBOR-setting process would be a competitive process.  Because the capital markets view the funding costs of the panel banks as reflective of their relative creditworthiness and financial strength, the daily disclosure of the panel bank LIBOR submissions signaled each panel bank's creditworthiness and financial strength to the market.  Lower funding costs reflected greater creditworthiness and financial strength, and vice versa.

88.     Each panel bank was in competition with the others to submit the lowest honest funding cost estimate possible.  By creating this incentive to signal the lowest honest funding cost, this third rule was designed to ensure that the LIBOR setting process produce, as the BBA termed it, "a unique snapshot of competitive funding costs."

89.     These three rules were the safeguards ensuring that LIBOR would reflect the

forces of competition in the London interbank loan market.  Collusion to submit artificial and

coordinated rates not only violated the three rules but removed LIBOR's linkage to competition.

Defendants, including Barclays, UBS, and RBS, admitted to government regulators that they

violated these three golden rules.  Key among their admissions was that they violated the rule of

maintaining the public trust:  "a Contributor Panel banks' LIBOR submissions should not be

influenced by its motive to maximize profit or minimize losses in derivative transactions tied to

LIBOR."  *See* Barclays SOF ¶6; UBS SOF ¶7; RBS SOF ¶7.

90.     As alleged herein, Defendants, and each of them, were motivated to misrepresent

their creditworthiness, and advance their own profits and trading positions, to the detriment of

the public, including the Direct Action Plaintiffs.

**B.      Defendants' Global Conspiracy And Fraudulent Scheme To Manipulate LIBOR Is Supported By Substantial Evidence**

91.     At all times alleged herein, including from at least <u>August of 2007</u> and extending

until as late as <u>March of 2011</u> (the "Relevant Period"), Defendants conspired to artificially

suppress LIBOR below the levels at which it would have been set had Defendants accurately

reported their true borrowing costs to the BBA.

92.     Plaintiffs' allegations that Defendants manipulated LIBOR, by suppressing or

inflating their reported inter-bank borrowing rates, are supported by (1) Defendants' powerful

financial and economic incentives to mask their true borrowing costs and to reap unjustified

profits by setting artificially low interest rates on LIBOR-based financial instruments that

Plaintiffs and other investors purchased; (2) Barclays' settlements with government authorities

including the U.S. and U.K. which uncovered  documents and other evidence as part of these

settlements which implicates not only Barclays but the other Defendants in the LIBOR

conspiracy; (3) UBS's application for amnesty from government prosecution relating to its

involvement in the LIBOR conspiracy, the information it provided as part of its cooperation

with authorities, and its subsequent settlement with U.S., U.K., and Swiss regulators; (4) RBS's

settlement with U.S. and U.K. regulators; (5) Rabobank's settlement with U.S., U.K., and Dutch

regulators; (6) Lloyds' settlement with U.S. and U.K. regulators; (7) the results of the

investigation of LIBOR manipulation by Canadian regulatory authorities and the refusal of BBA

member banks, such as Defendant RBS, to produce documents regarding LIBOR to the

Canadian authorities, even if such a refusal was in violation of a court order; (8) the pending

arrests and indictments of individual traders employed by the Defendants for their involvement

in the LIBOR manipulation conspiracy; (9) reports of efforts by several BBA member banks to

jointly seek a group settlement for their involvement in the LIBOR manipulation conspiracy;

(10) other revelations in connection with the numerous governmental investigations by

prosecutors and regulatory authorities from across the world into potential manipulation of

USD-LIBOR and LIBOR for other currencies; and (11) economic and financial analyses that are

publically available that were either conducted by academics or by consulting experts retained

in similar litigation relating to LIBOR manipulation.

### C.      Defendants Had Financial Incentives To Conspire To Manipulate LIBOR

93.     Defendants had independent and substantial incentives to manipulate LIBOR.  As

alleged herein, there is substantial evidence of a conspiracy and fraudulent scheme among

Defendants to manipulate LIBOR since, at least, <u>August</u> of <u>2007</u>, if not earlier.  In the midst of

the financial crisis that began in <u>2007</u>, the Defendants all were motivated to manipulate LIBOR

for their own gain.  There were two main financial incentives for the Defendants to conspire to

manipulate LIBOR.

94.     First, the banks were motivated, particularly given investors' serious concerns

over the stability of the market in the wake of the 2007 financial crisis, to understate their

borrowing costs, and thus understate the level of risk associated with that bank.  No bank

wanted to stand out as bearing a higher degree of risk than its fellow banks, each bank shared a

powerful incentive to collude with its co-conspirators to ensure it was not the odd man out.

Given the nature of LIBOR, Defendants had to conspire in advance of reporting to the BBA

because if one of the banks publically posted higher borrowing rates than the other banks and

had to reduce them dramatically afterwards to follow the lead of the other Defendant banks, that

would have raised red flags with regulators, investors, the market and the media.

95.     Second, by artificially suppressing LIBOR, Defendants and others benefitted by

paying lower interest rates on LIBOR-based financial instruments they sold to investors.  At all

times alleged herein, Defendants (all of whom are major financial institutions) were largely in

positions that required them to make payments to counterparties based on LIBOR.  Thus, an

artificially suppressed LIBOR would significantly reduce the amount of money a Defendant

would be required to pay to others, such as Plaintiffs.

96.     For example, in 2009, Defendant Citibank, N.A. reported that it would make $936

million in net interest revenue if rates would fall by 25 basis points (0.25%) per quarter over the

next year and $1.935 billion if rates fell 1% instantaneously.  Defendant JPMorgan reported that

if interest rates increased by 1%, they would lose over $500 million in interest revenue.

Defendants HSBC and Lloyds also estimated that interest rate changes of less than 1% would

affect their profits by hundreds of millions of dollars in 2008 and 2009.  The sheer size of the

positions, in the billions and trillions of dollars, means that minute changes in the rate, even a

fraction of a single percentage point, would allow Defendants to reap hundreds of millions of

dollars in illegal and improper profits.  By artificially suppressing LIBOR during the time period

alleged herein, Defendants collectively reaped billions of dollars in illicit unearned net interest

revenues.

97.     A LIBOR panel bank that submitted a high LIBOR, meaning that its inter-bank

borrowing rate was high, would be perceived as not being creditworthy or being weak financial

institution, which could lead to negative consequences for the bank.  As UBS admitted to the

DOJ:

> Because a bank's LIBOR contributions, even if they are not based entirely
> on actual money market transactions, should correspond to the cost at
> which the bank perceives that it can borrow funds in the relevant market, *__a
> bank's LIBOR contributions may be viewed as an indicator of a bank's
> creditworthiness. If a bank's LIBOR contributions are relatively high,
> those submissions could suggest that the bank is paying more than
> others to borrow funds. Thus, a bank could be perceived to be
> experiencing financial difficulties because lenders were charging higher
> rates to that bank.__*

UBS SOF ¶¶98-99 (emphasis added).

98.     In the case of UBS, for example, instructions by management to UBS LIBOR

submitters that they report suppressed U.S. Dollar LIBOR in order to stay within the pack of

other banks and to err on the low side "were issued, at least in significant part, because of

concerns that if UBS submitted higher LIBOR rates relative to other banks, UBS could attract

negative attention in the media."  UBS SOF ¶100.  In so doing, UBS "sought to avoid negative

media attention and, relatedly, sought to avoid creating an impression that it was having

difficulty obtaining funds." *Id.*  To the extent those directions from UBS management "were

motivated by reputational concerns," they "were inconsistent with the definition of LIBOR." *Id.*

99.     On September 22, 2008, a UBS employee wrote in an electronic chat that "the

real cash market isn't trading anywhere near LIBOR," and he suspected the reason was that

Banks "undervalue [LIBOR] in times like this . . . so as to not show where they really pay in case it creates headlines about that bank being desperate for cash."  UBS SOF ¶ 101.

100.    Similarly, the CFTC found that Barclays' misconduct in knowingly submitting false LIBOR quotes stemmed from its desire "to protect [its] reputation against what it believed were negative and unfair media and market perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions." Barclays CFTC at 19.

a.    Barclays' improper submissions, according to admissions to the DOJ, "began in approximately late August 2007," shortly after Barclays "twice drew on the Bank of England's emergency liquidity facility (known as the 'window'), borrowing approximately £1.6 billion the second time."  Barclays SOF ¶39.  The DOJ further explained:

> News articles about the withdrawals in late August 2007 noted a decline in Barclays's share price and questioned Barclays's liquidity position, while Barclays explained publicly that the visits to the window were due to technical glitches. Meanwhile, because of the onset of the financial crisis, there was diminished liquidity in funding markets, and Barclays set certain of its LIBOR submissions relatively high compared to other Contributor Panel banks. In early September 2007, Barclays received negative press coverage concerning Barclays's high LIBOR submissions in Sterling, Euro, and Dollar. A news article questioned Barclays's liquidity position, in light of Barclays's high LIBOR submissions and its visits to the Bank of England's window, and noted that Barclays's share price had fallen.

*Id.*

b.    Senior managers at Barclays "expressed concern about the negative publicity."  *Id.* ¶40.  Managers on Barclays' money-markets desk and in its Treasury department "who gave the instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions," aimed "to avoid inaccurate, negative attention about Barclays's financial health as a result of its high LIBOR submissions relative to other banks."  *Id.*  They "wanted to prevent any adverse conclusions about Barclays's borrowing costs, and more generally, its financial

condition, because they believed that those conclusions would be mistaken and that other Contributor Panel banks were submitting unrealistically low Dollar LIBORs." *Id.*

      c.    Because those Barclays managers "sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape when compared to its peers," Barclays "engaged in this misconduct in order to reduce the reputational risk associated with proper, higher LIBOR submissions." *Id.* In other words, the DOJ explained— borrowing from Barclays employees' comments in internal communications—***"the purpose of the strategy of under-reporting Dollar LIBORs was to keep Barclays's 'head below the parapet' so that it did not get 'shot' off."*** *Id. (emphasis added).*

101.    Moreover, in an <u>April 10, 2008</u> report, analysts at Citigroup Global Markets, a subsidiary of Defendant Citigroup, also acknowledged the benefits of manipulating LIBOR:

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment. If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one higher than its competitors. Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding. With markets in such a fragile state, this kind of perception could have dangerous consequences.[34]

102.    Other Defendants likewise confirmed these incentives to manipulate LIBOR. William Porter, a credit strategist at Credit Suisse, said in <u>April 2008</u> that he believed the three-month USD-LIBOR was 40 basis points below where it should be.[35] And the next month, Tim Bond, head of asset-allocation research of Barclays Capital—a subsidiary of Defendant

---

[34] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic: Is LIBOR Broken?," April 10, 2008.

[35] Carrick Mollenkamp, "Libor Surges After Scrutiny Does, Too," *The Wall Street Journal*, April 18, 2008.

Barclays -- observed that banks routinely misstated borrowing costs to the BBA to avoid the perception that they faced difficulty raising funds as credit markets seized up.[36]

103.    It follows that for every LIBOR member bank to appear financially viable or creditworthy, reporting low LIBOR submissions would necessitate all of the LIBOR member banks to collude to suppress as a pack, and would not draw unwanted media and regulatory attention.  If a bank were to submit LIBORs that are above the pack would signal its relative weakness and illiquidity to the media and market.  As Barclays acknowledged, a bank submitting too high risked sticking its "head above the parapet," which could get it "shot" off by the financial press.  Barclays SOF ¶ 43.[37]

104.    On the other hand, if a bank were to submit LIBORs lower than the pack would risk drawing unwanted media and regulatory attention.  Moreover, a Defendant bank who acted alone to submit lower-than-accurate LIBOR would risk being reported by other Defendant banks who were (or should have been) competing to appear more creditworthy to the market by making truthful LIBOR submissions.  However, if all Defendants were colluding to suppress LIBOR, there was less risk that any Defendant would report another Defendant for submitting lower-than-accurate LIBOR.

---

[36] Gavin Finch and Elliott Gotkine, "Libor Banks Misstated Rates, Bond at Barclays Says," *Bloomberg*, May 29, 2008.

[37] Barclays agreed that it would not contest the accuracy of the DOJ Statement of Facts. DOJ Non-Prosecution Agreement at 1.

105.    Evidence obtained by the DOJ shows that reporting LIBOR close to the pack was important to make the conspiracy to manipulate LIBOR a success.  For example, an employee of Defendant UBS told UBS's Thomas Hayes, who the DOJ charged with criminal price-fixing, that he would "not set[] libor 7bp away from the truth" because "***i'll get ubs banned if I do that, no interest in that***."[38]  Also, in a June 18, 2008 chat, UBS employees discussed why it was important for LIBOR submissions to neither be too high nor low, but in the middle of the pack:

| | |
|---|---|
| Trader D: | "...[Senior Manager B] *want us to get in line with the competition by Friday ...*" |
| Trader Submitter E: | "... *if you are too low you get written about for being too low...if you are too high you get written about for being too high ...* " |
| Trader D: | "*middle of the pack there is no issue...*" |

UBS FSA ¶ 124.

106.    Due to the fact that a LIBOR bank did not want to stand out as bearing a higher degree of risk than other LIBOR banks, or as having submitted an artificially low LIBOR, each Defendant shared a powerful incentive to collude with its co-Defendants to ensure it was not the "odd man out."  Because all banks wanted to appear financially healthy during the financial crisis, they had a powerful incentive to collude to suppress their LIBOR submissions as a group.

### D.    Defendants' LIBOR Manipulation Harmed Numerous Types Of Financial Instruments And Investments With Interest Rates Set To LIBOR

107.    The significance of LIBOR in the global financial markets cannot be understated.  LIBOR is used as a benchmark interest rate for various types of financial instruments and investments, ranging from complex multi-million or multi-billion dollar derivative investment

---

[38] Complaint, *U.S. v. Hayes & Darin*, No. 12 Mag 3229 (S.D.N.Y.) (Dec. 12, 2012), Exhibit 2 (emphasis added).

instruments between large institutions, or transacted by public entities including Plaintiffs, to simple consumer loans.  In other words, LIBOR affects all facets of financial life from the institutional to individual people.  Common financial instruments with interest rates that are set LIBOR, not including consumer financing, include, but are not limited to, the following:

- Forward Rate Agreements
- Interest Rate Swaps
- Inflation Swaps
- Total Return Swaps
- Credit Default Swaps ("CDS")
- Asset Swaps
- Floating Rate Notes
- Syndicated Loans
- Collateralized Debt Obligations ("CDO")
- Options

108.    As described below, the foregoing reflects only a portion of the types of financial instruments or investments that have interest rates set to LIBOR.  Moreover, financial transactions whose interest rates are not directly tied to LIBOR are also impacted by the LIBOR rate manipulation as alleged herein.  For example, while the interest rate determining the payment on certain financial instruments may not be directly set to LIBOR, the value of the underlying asset could be tied to LIBOR (*e.g.* from student loans to subprime mortgages). Moreover, to determine whether to invest in variable rate financial instruments or fixed rate financial instruments, investors such as Plaintiffs conducted comparative analyses between LIBOR-based variable rates versus fixed rate instruments.  The LIBOR manipulated suppressed rate compromised this analysis making the LIBOR-based instrument appear more attractive than the alternative, thereby causing harm to Plaintiffs.

109.    Hundreds of trillions of dollars in financial instruments are impacted by LIBOR benchmark rates.  Different tenors of LIBOR are used to calculate interest rates for Credit

Default Swaps and Interest Rate Swaps with an estimated notional value of $350 trillion.  The notional value is the nominal or face amount that is used to calculate payments made on that instrument, or the value of a derivative product's underlying assets at the spot (cash) price.  Moreover, loans, securities, and abstract derivative contracts with a notional value of $800 trillion are also tied to LIBOR.

110.  **Forward Rate Agreements** are a type of derivative instrument based on a "forward contract."  The contract sets the rate of interest or the currency exchange rate to be paid or received on an obligation beginning at a future start date.  The contract will set the rates to be paid or received along with the termination date and notional value.  On this type of agreement, it is the differential that is paid on the notional amount of the contract.  That payment is made on the effective date of the contract.  The reference rate is fixed one or two days before the effective date, depending on the market convention for the particular currency.  Payment on a Forward Rate Agreement is only made once at maturity.  Forward Rate Agreements can be indexed to LIBOR.

111.  **Interest Rate Swaps** are a type of derivative instrument in which two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another, using different benchmarks for the two floating rates.  These are highly liquid financial derivatives.  Interest rate swaps are commonly used for both hedging and speculating.  In an interest rate swap, each party agrees to pay either a fixed or floating rate denominated in a particular currency to the other party at specific periods of time.  The fixed or floating rate is multiplied by a notional principal amount.  This notional amount is typically not exchanged between counterparties, but is used only for calculating the size of cash flows to be exchanged.  The counterparty that is

required to pay more on the swap can pay the difference instead of both counterparties exchanging monies.  Interest Rate Swaps can be indexed to LIBOR.

112.   **Inflation Swaps** are a type of derivative instrument used to transfer inflation risk from one party to another through an exchange of cash flows.  In an Inflation Swap, one party pays a fixed rate on a notional principal amount, while the other party pays a floating rate linked to an inflation index.  The party paying the floating rate pays the inflation adjusted rate multiplied by the notional principal amount.  Inflation Swaps can be indexed to LIBOR.

113.   **Total Return Swaps** are a type of derivative instrument based on financial contracts that transfer both the credit and market risk of an underlying asset.  These derivatives allow one contracting party to derive the economic benefit of owning an asset without putting that asset on its balance sheet.  The other contracting party, which retains the underlying asset on its balance sheet, is, in effect, buying protection against loss on that asset's value.  Total Return Swaps can be indexed to LIBOR.

114.   **Credit Default Swaps ("CDS")** are a type of over-the-counter ("OTC"), credit-based derivative whereby the seller of the CDS compensates the buyer of the CDS only if the underlying loan goes into default or has another "credit event."  The buyer of the CDS makes a series of payments (the CDS "fee" or "spread") to the seller and, in exchange, receives a payoff if the loan defaults.  In the event of default, the buyer of the CDS receives compensation (usually the face value of the loan), and the seller of the CDS takes possession of the defaulted loan. However, anyone can purchase a CDS, even buyers who do not hold the loan instrument and who have no direct insurable interest in the loan (these are called "naked" CDS).  The CDS fee can be indexed to LIBOR.

115.   **Asset Swaps** are a type of derivative instrument in which one investor exchanges the cash flows of an asset or pool of assets for a different cash flow.  This is done without affecting the underlying investment position.  If a Defendant wanted to own a particular Euro-denominated bond, but preferred to receive a floating rate US dollar cash flow, the Defendant could purchase that Euro-denominated bond and then enter into asset swap with another bank or investor to receive US Dollar LIBOR payments (+/- spread) in return for paying a fixed rate coupon in Euros to the bank or investor.  This is akin to an interest rate swap except that it is based on the value of a specific asset owned by one of the counterparties.  Asset Swaps can be indexed to LIBOR.

116.   **Floating Rate Notes** are note obligations in which the amount of money paid by one party to the other is a floating rate that is tied to a benchmark.  The interest rate on these floating rate notes adjust at different periods of time based on the terms of the contract.  These floating rate notes can be tied to any index but LIBOR is one of the most common benchmarks used for setting the interest rate payments on floating rate notes.

117.   **Collateralized Debt Obligations ("CDOs")** are a type of structured asset backed security ("ABS").  CDOs have multiple tranches, or levels of risk, and are issued by "special purpose entities."  Investors buy into different tranches which have different levels of risk which correlate to the potential rate of returns on these securities.  These instruments are called Collateralized Debt Obligations because they consist of debt obligations, such as subprime mortgages or student loans, that are pooled together to form collateral for the instrument.  Each tranche has different exposure to the collateral.  Interest and principal payments on CDOs are made in order of seniority, so that junior tranches offer higher coupon payments (and interest rates) or lower prices to compensate for additional default risk; in general, "senior" tranches are

considered the safest securities.  CDOs can be indexed to LIBOR which sets the amount of money that is paid to CDO investors.

118.    **Options** are a type of derivative instrument based on a contract between two parties for a future transaction on an asset.  Options can be linked to swaps.  For example, an option on a swap is commonly referred to as a "swaption."  The buyer of an option gains the right, but not the obligation, to engage in that future transaction (buy or sell) while the seller of the option is obligated to fulfill the future transaction.  The buyer of the option pays a set amount of money to the option seller in order to acquire this option.  In general, the option's price is the difference between the asset's reference price and the value of the underlying asset (*i.e.*, a stock, bond, currency contract, or futures contract) plus a spread.  Thus, where the underlying asset is indexed to LIBOR, the option's price is impacted by LIBOR.

### E.    Defendants Colluded Among Themselves And Others To Manipulate LIBOR

119.    Contrary to the intended competitive nature of setting LIBOR, Defendants colluded to manipulate U.S. Dollar ("USD" or U.S. Dollar") LIBOR to benefit their profitability, trading positions and/or to mask the illiquidity of themselves and others.

120.    The global investigations into the LIBOR manipulation conspiracy and resulting plea agreements and settlements to date reveal that there was significant overlap of the entities and individuals who colluded to manipulate U.S. Dollar LIBOR and Yen LIBOR.  There are at least thirteen LIBOR banks that were involved in conspiring to manipulate both U.S. Dollar and Yen LIBOR.  This also includes the same individuals involved in manipulating both currencies, as well as common managerial oversight of manipulating both currencies. For example:

a.    At UBS, the same managers oversaw and knew about the conspiracy to manipulate Yen and USD LIBOR.  As set forth above, on <u>August 9, 2007</u>, the ALM global head

emailed a senior manager in Group Treasury, "the manager of the derivatives trading desk that submitted the majority of UBS's LIBOR contributions." The email stated:

> it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and [profit and loss] thereof is secondary priority for now.

UBS SOF ¶105.  A footnote indicates that "the email's reference to 'fixing risk' and profit and loss reflect an awareness that others at UBS were manipulating LIBOR to benefit trading positions." *Id.*

        b.     At RBS, in some instances the same people were involved in manipulating Yen and USD LIBORs, as they held positions that required both USD and Yen LIBORs to move in particular directions.  For example, on <u>August 17, 2007</u>, two RBS traders discussed their planned manipulation of both USD and Yen LIBORs: "so on Monday, usd libor will drop 5bps ..but jpy [LIBOR] will only follow suit a few days later."  RBS CFTC 17.

        c.     Other individuals were involved in both USD and Yen collusion.  For example, when Mr. Hayes asked a broker to speak to someone about Yen LIBOR collusion, the broker noted: "[Yen Bank K] rite I know him he speak to my dolla desk thats where r orders come from ill have a word with him amnd ask to get it up ok mate."  UBS CFTC 32.

     121.    Market participants commonly expressed the view that the collusive manipulation of LIBOR was widespread throughout the world.

        a.     In <u>August 2007</u>, a senior RBS trader of Yen LIBOR told one of his colleagues that LIBOR is a "cartel now in London."  RBS CFTC Order at 14.

b.      According to the Singapore lawsuit, Todd Morakis, who was the managing director at RBS, "orally confirmed to [Tan] round October [2011] that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'"

c.      A RBS Submitter "observed to a Broker during the financial crisis that, in the absence of liquidity, "people are just setting LIBORs to suit their books" and "it's just where you've got your fixings really…." RBS FSA ¶ 73.

d.      Johnny Cameron, the former Chairman of Global Banking and Markets at RBS Group, characterized the LIBOR manipulation efforts as "a cartel of people across a number of banks who felt they could fix it." (Parliamentary Commission on Banking Standards, Feb. 11, 2013; Testimony of Johnny Cameron.).

122.    The time periods of the collusion overlapped.  The Yen LIBOR collusion persisted through the entire period of the USD LIBOR collusion.

123.    The conspirators used similar means to collude, including by sharing advance confidential pricing information.

a.      For example, "Trader B of the Cooperating Party communicated with an IRD trader at Citi. They discussed their trading positions, advance[] knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions.  They also acknowledged efforts to get their banks to submit the rates they wanted."  May 2011 Elliott Affidavit (defined *infra*), ¶ 81.

b.      In the case of at least one bank, the instruction to suppress USD LIBOR extended to all currencies. For example, "in <u>2008</u>, UBS Group Treasury instituted a policy of

submitting LIBORs for all currencies, including Swiss Franc, in the middle of the pack of other banks' expected LIBOR submissions."  UBS SOF ¶129.

124.    In many instances, the same individuals at banks oversaw the submission process for multiple currencies.

a.    At Barclays, "Barclays' senior U.S. Dollar LIBOR submitter also had oversight responsibility for the submission of Barclays' Yen LIBOR which was handled daily by other submitters."  Barclays CFTC p. 7, n. 7.  And "Barclays' employees on its money markets desk in London have been responsible for contributing Barclays's Dollar, Sterling, and Yen LIBOR and its EURIBOR submissions ("submitters").

b.    At RBS, "[o]ne money market trader was primarily responsible for making both the Yen and Swiss Franc LIBOR submissions."  RBS CFTC at 5.

125.    Bob Diamond, the former head of Barclays, told the British Parliament the day after he stepped down last year: "There is an industry-wide problem coming out now."

126.    As alleged herein, the conspiracy to manipulate Yen LIBOR is highly probative of the conspiracy to suppress USD LIBOR.  The only plausible inference from the empirical evidence is that Defendants conspired to suppress LIBOR between at least August 2007 and March 2011.  For example, the empirical evidence from a Eurodollar study shows anomalous divergences during this period between the Eurodollar benchmark and LIBOR submissions. Those divergences are unprecedented before and after this period and not explainable by market fundamentals.  Before and after this time period, LIBOR and the Eurodollar benchmark were very closely correlated.  During the period from August 2007 through May 2010, the LIBOR submissions of the LIBOR member banks were, on average, approximately 29.4 basis points lower than the Eurodollar benchmark ("Eurodollar spread").  In addition, the LIBOR member

banks' patterns of divergence from the Eurodollar benchmark were very similar to each other during this period, as every LIBOR member bank, including the Defendants, had an average Eurodollar spread within 6 basis points of each other.  Other empirical studies show that LIBOR was manipulated during the Relevant Period.

127.    In addition to the empirical evidence showing that Defendants colluded with each other and with the co-conspirators, there is also ample direct and inferential evidence that Defendants colluded to suppress LIBOR.

128.    At all times alleged herein, Defendants subverted the U.S. Dollar LIBOR setting process by submitting daily U.S. Dollar borrowing rate estimates at rates lower than those at which they believed they could borrow.  These submissions were in violation of the first BBA LIBOR panel rule described above.  At the same time that the Defendants were intentionally providing false submissions to the BBA, knowing that this would result in a manipulation of the LIBOR rate, the Defendants were also entering directly into LIBOR-linked transactions with Plaintiffs as counterparties, and also acting as a broker on LIBOR-linked transactions.  Despite dealing directly with Plaintiffs, Defendants concealed their LIBOR manipulation scheme.

129.    At all times alleged herein, Defendants also violated the second panel rule described above by routinely sharing amongst themselves, directly and through cash brokers, their planned daily borrowing cost submissions for the purpose of coordinating their submissions to suppress U.S. Dollar LIBOR.  Defendants' collusive suppression of U.S. Dollar LIBOR removed competition as the primary determining factor for pricing LIBOR-based instruments, and replaced it with an artificially manipulated benchmark.

1.  **Each Defendant Knew Other LIBOR Banks Were Manipulating LIBOR**

130.    LIBOR was not manipulated in a vacuum.  LIBOR was manipulated collusively and purposefully to benefit the financial positions of the LIBOR member banks and trading positions of others.  Barclays was one of the first LIBOR banks to admit that LIBOR manipulation was collusive and that it knew the submissions of other LIBOR banks before the LIBOR rate was adjusted and made public.  According to authorities in the U.K., Barclays admitted, for example, that on November 29, 2007, Barclays learned the confidential submission for every LIBOR member bank for the one month U.S. Dollar LIBOR before the submissions were adjusted and made public.  On a conference call during which the banks' pending submissions were discussed, a Barclays manager remarked that "it's going to cause a shit storm" if Barclays' intended submission 20 basis points above the next highest submission was submitted as it would draw negative media attention. Barclays therefore submitted a lower rate in line with other bank submissions that day.  *See* Barclays FSA ¶118.

131.    Moreover, Barclays senior managers issued standing instructions to stay within specific ranges of other LIBOR banks' submissions. Barclays admitted that between August 2007 and January 2009, it often reported suppressed USD LIBOR rates at the direction of its managers.  These rates were false because they were lower than what Barclays would have submitted had it honored the definition of LIBOR:

> From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been. Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs. Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they

believed would be consistent with the submissions of other Dollar LIBOR
Contributor Panel banks, or at least, that would not be too far above the
expected rates of other members of the Contributor Panel. Consequently,
on some occasions, Barclays submitted rates that were false because they
were lower than Barclays otherwise would have submitted and contrary to
the definition of LIBOR.

Barclays SOF ¶ 36 (emphasis added); *see* Barclays CFTC at 20.

132.    Barclays also admitted that its submitters understood that Barclays was submitting

falsely suppressed USD-LIBOR rates during this period because "Barclays was submitting its

LIBOR contributions lower than the rate at which Barclays was borrowing or could have

borrowed funds, and lower than the rate at which Barclays should have been submitting its

LIBOR contributions." Barclays SOF ¶ 37.

a.    In December 2007, a senior Barclays U.S. Dollar LIBOR submitter

emailed his supervisor about submitting a one-month LIBOR lower than he would prefer if he

were "given a free hand," and explicitly stated: "My worry is that we (both Barclays and the

contributor bank panel) are being seen to be contributing patently false rates. We are therefore

being **dishonest by definition** and are at risk of damaging our reputation in the market and with

the regulators."  Barclays CFTC at 22 (emphasis added).  In another email, the senior Barclays

USD LIBOR submitter wrote: "I will be contributing rates which are nowhere near the clearing

rates for unsecured cash and therefore **will not be posting honest prices**."  *Id.* at 24 (emphasis

added).  In May 2008, Barclays did not want to disclose to the FSA that its reported LIBOR rates

understated its true borrowing costs for fear that reporting the "honest truth" would be a "can of

worms."  Barclays SOF ¶ 46.

b.    Barclays disregarded BBA rules to advance its own reputational purposes.

According to findings by the CFTC, "Barclays knew that accounting for its reputational risk in

its determination of LIBOR submissions was not permissible under BBA's definition and

criteria." Barclays CFTC at 20. Barclays' LIBOR submitters and their supervisor nonetheless "understood that they were to follow this directive regardless of market conditions or whether their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be otherwise." *Id.* In other words, "Barclays' U.S. Dollar LIBOR submitters knew that, by acting upon senior management's instruction . . . , they were making improper U.S. Dollar LIBOR submissions that were management's rates and not the rates that the submitters had determined were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing unsecured funds in the London interbank money market." *Id.* The CFTC further found that the senior Barclays Treasury managers "frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive." *Id.* The CFTC observed that those discussions "were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period." *Id.* Barclays also knew that the other panel banks, acting as a "pack," were submitting USD LIBOR rates that were too low. Barclays' employees revealed that "***all of the Contributor Panel banks***, including Barclays, were contributing rates that were too low." Barclays SOF ¶ 42 (emphasis added).

133.    The U.K. FSA also concluded that Barclays engaged in LIBOR manipulation to advance its financial self-interest despite the fact that "Barclays believed that the submissions of other contributing banks were inappropriate during the financial crisis." Barclays FSA ¶ 117.

a.    A Barclays senior compliance officer stated in an internal e-mail to several levels of Barclays' senior management that he had informed the FSA "that Barclays believed that LIBOR submissions by the panel banks were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go

higher given the negative media reporting about Barclays; that Barclays had concerns about the

trillions of dollars of derivatives fixed off LIBOR; and that there were 'problematic actions' by

some banks."  Barclays CFTC at 22.  That senior compliance officer did not, however, inform

the FSA "that Barclays was making its LIBOR submissions based on considerations of negative

market or press perceptions of Barclays or that its LIBOR submitters' assessments of the

appropriate rates for submission were being altered to adhere to the directive to be below 'the

parapet.'" *Id.*

> b.      On another occasion, following an <u>April 16, 2008</u> *Wall Street Journal*

article speculating "that panel member banks were making LIBOR submissions lower than what

they were actually paying for funds to prevent the market from concluding that the banks were

desperate for cash," a senior Barclays Treasury manager informed the BBA "that [Barclays] had

not been reporting accurately," although he further noted "Barclays was not the worst offender of

the panel bank members."  *Id.* at 39.

134.    In accord with findings by other government investigators, the DOJ also

concluded that "During approximately <u>November 2007</u> through approximately <u>October 2008</u>,

certain employees at Barclays sometimes raised concerns with individuals at the BBA, the U.K.

FSA, the Bank of England, and the Federal Reserve Bank of New York concerning the

diminished liquidity available in the market and their views that the Dollar LIBOR fixes were

too low and did not accurately reflect the market."  Barclays SOF ¶42.  Those employees, the

DOJ found, "attempted to find a solution that would allow Barclays to submit honest rates

without standing out from other members of the Contributor Panel, and they expressed the view

that Barclays could achieve that goal if other banks submitted honest rates." *Id.*  The DOJ noted,

however, Barclays' communications to regulators "were not intended and were not understood

as disclosures through which Barclays self-reported misconduct to authorities." *Id.*  Indeed,

following those communications, "Barclays continued improperly to take concerns about

negative publicity into account when making its submissions."  *Id.* Moreover, the DOJ

emphasized, "on other occasions, those employees did not provide full and accurate information

during their conversations with these external parties."  *Id.*

135.    Conduct by UBS was no different from Barclays.  According to the CFTC, UBS's

LIBOR submissions were also false:

> A bank's concerns about its reputation, negative market or press reports,
> or its trading positions and related profits are not legitimate or permissible
> factors upon which a bank may base its daily benchmark interest rate
> submissions. Benchmark interest rate submissions convey market
> information about the costs of borrowing unsecured funds in particular
> currencies and tenors, the liquidity conditions and stress in the money
> markets and a bank's, such as UBS's ability to borrow funds in the
> particular markets. By basing its submissions, in whole or in part, on
> UBS's trading positions and at times its reputational concerns, UBS
> knowingly conveyed false, misleading or knowingly inaccurate reports
> that its submitted rates for LIBOR, Euribor, and Euroyen TIBOR were
> based on and solely reflected the costs of borrowing unsecured funds in
> the relevant interbank markets and were truthful and reliable.

UBS CFTC at 52.

136.    On May 21, 2008, a *Wall Street Journal* reporter asked UBS, by email, why, back

in mid-April, UBS had been "paying 12 basis points for [commercial paper] more than it was

posting as a Libor quote?" The senior manager heading ALM forwarded a proposed answer to

the question to the Group Treasury senior manager in Stamford, stating: "the answer would be

'because ***the whole street was doing the same and because we did not want to be an outlier in***

***the libor fixings, just like everybody else.***'"  UBS DOJ ¶ 117 (emphasis added).

137.    UBS and Barclays admitted what the other LIBOR member banks knew:  all the other Defendant LIBOR member banks were submitting manipulated U.S. Dollar LIBOR rates, and this was known by every Defendant.[39]

## 2.    Defendants Colluded to Manipulate LIBOR as a "Pack"

138.    At all times alleged herein, Defendants, and each of them, knew that all of the LIBOR member banks were artificially suppressing USD LIBOR as a "pack."  UBS admitted and acknowledged corporate responsibility, acknowledging that, "[a]t least some at UBS recognized that during this period, the 'pack' of Contributor Panel banks was not a reliable reference point for the bank's LIBOR submissions."  UBS SOF ¶ 101.  A September 22, 2008 electronic chat between an ALM[40] employee and another UBS employee shows that UBS and other LIBOR banks suppressed their reported LIBOR rates to conceal their financial weakness:

| | |
|---|---|
| UBS Employee: | why is the [Investment Bank] cash curve for USD so much higher than Libor?  offered 35bps above libor currently |
| ALM employee: | because the real cash market isn't trading anywhere near Libor . . . Libors currently are even more ficticious than usual |
| UBS Employee: | isn't libor meant to represent the rate at which banks lend to each other? |
| ALM employee: | that's the theory . . . in practise, it's a made up number . . . hence all the critisism it was getting a few months ago[[14]] |
| UBS Employee: | why do banks undervalue it in times like this? |
| ALM employee: | so as to not show where they really pay in case it creates headlines about that bank being desparate for cash . . . I suspect |

[39] While the DOJ's agreement with RBS does not discuss USD suppression, RBS's agreement with DOJ "encompasses RBS's submissions for the additional benchmark rates listed in Attachment C," which is held in confidence. RBS DPA ¶ 2. In addition, "In April 2010, RBS began an investigation into potential USD LIBOR-related misconduct in the form of potential USD suppression." Financial Services Authority, Final Notice to The Royal Bank of Scotland plc (Feb. 6, 2013) ("RBS FSA"), ¶ 90. The results of that investigation have not been published.

[40] ALM refers to the Asset and Liability Management group at UBS. According to the DOJ agreement, ALM "is the part of the Investment Bank Division which managed the bank's liquidity buffer and issuance of new commercial paper and certificates of deposit. Group Treasury provided guidance to ALM on funding issues. The head of ALM worked for the Investment Bank Division." UBS SOF ¶ 17.

UBS SOF ¶101 (DOJ citations omitted).

139.   Defendants functioned as a pack and suppressed LIBOR jointly and collaboratively as they submitted LIBOR rates at similarly suppressed levels and yet diverged dramatically and in unexplainable ways from other benchmark rates that tracked market fundamentals.  Government investigations confirm that Defendants attempted to, and did, stay "within the pack" of LIBOR submissions – a pack that "stayed low."  As Barclays admitted,

> Manager-1 explained that Contributor Panel banks are submitting rates that are too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at." Manager-1 explained his/her view that Barclays was posting higher LIBORs than any other bank, and that other banks "are reluctant to post higher and because no one will get out of the pack, **the pack sort of stays low**."

Barclays SOF ¶ 43 (emphasis added).[41]

140.   To promote the pack, UBS issued standing instructions at all times alleged herein to stay within the middle of the pack of USD LIBOR submissions.  For example, "[o]n April 17, 2008, Submitter Advisor-2 – who was tasked with advising the U.S. Dollar submitter each day – sent an email to the U.S. Dollar LIBOR submitter informing him/her that 'the guidance I got from my management with regards to libors is that we should aim to be in the ***middle of the pack***.'" UBS SOF ¶ 115 (emphasis added).  "Immediately after this direction was issued on or about April 17, 2008, UBS's LIBOR submissions were in the middle of the submissions of the Contributor Panel banks for the next several days."  *Id*. ¶ 116.

---

[41] In another discussion, the DOJ notes that Manager-1 "did not disclose Barclays's management directive to submit lower LIBORs in order to avoid negative media attention, which directive had resulted in improperly low LIBOR submissions." Barclays SOF ¶ 44.

141.     Subsequent internal communications at UBS discussing the reasons behind the
"middle of the pack" directive revealed that all of the LIBOR member banks were following
similar instructions to stay within the middle of the pack.  As a UBS employee explained, "***the
whole street was doing the same*** and we did not want to be an outlier in the libor fixings, just
like everybody else." UBS SOF ¶ 117 (emphasis added).

142.     UBS briefly attempted on June 2, 2008 to move its submissions "closer" to its
actual inter-bank borrowing rate in response to media pressure, but quickly reversed course and,
during the week of June 16, 2008, resumed conspiring to manipulate LIBOR when "a Zurich-
based UBS senior manager directed U.S. Dollar LIBOR submitters to lower their submissions
over the next three days 'to ***get in line with the competition***' because, by contributing LIBOR
submissions closer to CD and CP issuance levels, UBS was becoming an outlier relative to other
Contributor Panel banks."  UBS SOF ¶120.  Following this instruction, "on June 18, 2008,
UBS's 3-month U.S. Dollar LIBOR submissions immediately dropped 5 basis points, to the
'middle of the pack' of the Contributor Panel banks."  *Id.* ¶ 121.

143.     UBS thus admitted that, "[f]rom that time, and for approximately the next 10
months, UBS's 3-month U.S. Dollar LIBOR submissions were ***identical*** to the published
LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors." UBS SOF
¶122 (emphasis added).  This was the case even though "[d]uring this 10-month period, there
were significant disruptions in the financial markets, affecting individual financial institutions in
different ways."  UBS SOF ¶ 123.  "Communications reflecting this 'middle of the pack'
approach [at UBS] to formulating LIBOR submissions continued in late 2008 and early 2009."
UBS SOF ¶124.

144.     Defendants each pursued a similar pack mentality and approach to manipulating

LIBOR.  For example, on May 6, 2008, an HBOS senior manager in an email to two other

HBOS senior managers and other HBOS personnel, including the senior manager of the LIBOR

submitters, reported that "it will be readily apparent that in the current environment no bank can

be seen to be an outlier. The submissions of all banks are published and we could not afford to

be significantly away from the pack."  Lloyds' CFTC at 14.

145.     Barclays was also part of the pack during all times alleged herein, admitting that it

followed instructions from its managers to stay "within the pack" of submissions from other

LIBOR Contributor Panel banks:

> According to internal Barclays communications, for certain time periods,
> Barclays management instructed the Barclays Dollar LIBOR submitters not to be
> an "outlier" compared to other Contributor Panel banks, even if Barclays
> contributed the highest rate; Barclays could be "at the top of the pack" but not too
> far above the next highest contributor. In adopting that approach, certain
> managers believed that Barclays's submitted rates typically would be in the upper
> quartile of rates submitted by the Contributor Panel banks and thus excluded from
> the rates used in the calculation of the LIBOR fix. For certain other periods,
> however, management did not want Barclays to submit a rate higher than other
> Contributor Panel banks, and instructed the Dollar LIBOR submitters to stay
> "within the pack" of other members of the Dollar LIBOR Contributor Panel, and
> to submit rates "in line" with the other contributors. To the extent that those
> managers had any concerns about Barclays's submissions being used in the
> calculation of the LIBOR fix, those concerns apparently were outweighed by their
> priority for Barclays's submissions to be "***within the pack***."

Barclays SOF ¶37 (emphasis added).

146.     On April 17, 2008, a Barclays manager conceded, ***"to the extent that, um, the***

***LIBORs have been understated, are we guilty of being part of the pack? You could say we***

***are.***" Barclays FSA ¶ 131.  As one Barclays submitter put it, "just set it where everyone else sets

it, we do not want to be standing out." Barclays FSA ¶ 123.

147.     In late <u>October 2008</u>, for example, "a member of senior management conveyed an instruction to the LIBOR submitters, through their supervisor, that Barclays' U.S. Dollar and Sterling LIBOR submissions needed to be lowered to be within the pack."  Barclays CFTC 24. "In emails and other communications, Barclays' submitters continued to indicate into at least <u>mid-2009</u> that they were still basing their submissions at levels to minimize market or press speculation about Barclays." Barclays CFTC 25.

148.     On <u>November 27, 2007</u>, a Barclays manager expressed the view, just as UBS had, that other banks also wanted to stay within the pack: "other banks 'are reluctant to post higher and because no one will get out of the pack, the pack sort of stays low.'" Barclays SOF ¶ 43.

149.     Barclays instructed its employees to follow the directive to stay within the pack on a day-to-day basis.  On <u>November 30, 2007</u>, for example, a "senior Barclays Treasury manager" spoke with Barclays' "senior U.S. Dollar LIBOR submitter," who was "seeking guidance on his submissions."  Barclays CFTC at 21.  During that conversation, the senior Treasury manager "related his understanding that senior management had discussed the issue and directed them to continue to 'stick within the bounds[,] so no head above [the] parapet.'" *Id.*  The Treasury manager also told the LIBOR submitter "that they would have to deal with the settings, meaning how to make LIBOR submissions per this directive, on 'a day-to-day-basis.'"

150.     The BBA was not above reproach, either, acknowledging that, at least by <u>April 2008</u>, it knew that no panel banks were "clean-clean" and that it understood what would happen to any bank that "moved against the trend of lower submissions."

> At this time, a senior Barclays Treasury manager informed BBA in a telephone call that it had not been reporting accurately, although he noted that Barclays was not the worst offender of the panel bank members. "We're clean, but we're dirty-clean, rather than clean-clean." ***The BBA representative responded, "no one's clean-clean."*** The senior Barclays Treasury manager replied "no, because of the very fact of what happened to us… We were clean .. the market … reacted

accordingly. And that's why we stepped away again." The senior Barclays Treasury manager was referencing the market speculation about Barclays' high LIBOR submission in early fall 2007. ***The BBA representative indicated that he understood what happened to any bank that moved against the trend of lower submissions...***

Barclays did not explain in these calls that it was making its LIBOR submissions pursuant to a management directive and not in accordance with BBA's definition and criteria or consistent with the costs of obtaining unsecured funds in the London interbank money market.

Barclays CFTC at 23 (emphasis added).

### 3.   **Defendants' Collusion to Manipulate LIBOR Had A Global Impact**

151.   Defendants' conspiracy to suppress LIBOR was facilitated by sharing LIBOR bids with each other ***before they were submitted***, in contravention of the second LIBOR panel rule that required the submissions remain confidential.  This is shown by direct evidence.  For example, a <u>November 29, 2007</u> email shows that Barclays knew, in advance of the submission deadline, the proposed confidential submissions of ***every USD LIBOR panel bank***.

On 29 November 2007, all the contributing banks' submissions for one month US dollar LIBOR increased by a range of 35 to 48 basis points. Barclays' submission increased from 4.86 on 28 November to 5.3 on 29 November (an increase of 44 basis points). The offer that Barclays saw in the market was 30 basis points higher, at 5.60. Barclays' Submitter had intended to submit a rate of 5.50 on that day. However he was overruled on a conference call during which the submissions were discussed, as a rate of 5.50 was expected to draw negative media attention (***as this would have been 20 basis points above the next highest submission***). Manager E said on the call that "***it's going to cause a shit storm***". Barclays therefore submitted a rate of 5.30, which was in line with another contributing bank's submission that day.

Barclays FSA ¶118 (emphasis added).

152.   Indeed, given the requirement that submission be confidential, Barclays could not have known in advance that its proposed submission would be "20 basis points above the ***next highest submission***" unless it knew the proposed submissions of ***every other panel bank before those rates were published***.  A review of the publicly available 1M LIBOR submissions

confirms what is implied by Barclays: Barclays had advance knowledge that the "next highest submission" of the other 15 panel banks was going to be 5.30, which is exactly 20 basis points below the 5.50 that Barclays *had intended to submit that day*.  Barclays (U.K. FSA ¶ 118). Barclays used its advance knowledge of every bank's confidential submissions to alter its submission to further suppress LIBOR to stay within the pack.

153.    Between November 28 and November 29, 2007 the high volatility in LIBOR submissions also shows why it would have been impossible for Barclays – or any other panel bank – to stay within the pack without colluding to share confidential LIBOR submissions.  But for the conspiracy, the banks could not have predicted the submissions of other panel banks on November 29, 2007 based solely on the previous day's public submissions because submissions moved on average approximately 40 basis points from the previous day.  Nor could they have predicted the submissions of other panel banks on November 29, 2007 based on publicly available information about market fundamentals.  The Eurodollar benchmark, which captured changes in market fundamentals, moved much more dramatically between November 28 and November 29 than LIBOR did: the Eurodollar benchmark moved 70 basis points that day (from 4.9 to 5.6), whereas LIBOR only moved 40 basis points (from 4.82 to 5.22).  Rather than basing their November 29, 2007 submissions on the LIBOR definition, or on predictions of what other banks would do, the only plausible inference is that every panel bank colluded to share pricing information in order to stay low as a pack.

154.    This was not an isolated event.  Barclays' managers issued standing instructions for certain periods not to be too far above the "next highest contributor" (Barclays SOF ¶ 37) – something that could not be achieved unless Barclays expected that it would continue to have access to the advance, confidential submissions of every other panel bank on an ongoing basis.

And the instructions were very precise.  According to the CFTC's review of the evidence it collected, "Senior Barclays Treasury managers provided the [LIBOR] submitters with the general guidance that Barclays's submitted rates should be *__within ten basis points__* of the submissions by the other U.S. Dollar panel banks . . . ." Barclays CFTC 20 (emphasis added). Similarly, on <u>April 26, 2008</u>, a senior Barclays treasury manager asked USD submitters to "not sort of be *__ten basis points above the next__*" highest submitter.  Barclays CFTC p. 23.[42] Submitters could not be expected to stay within 10 basis points of the next highest submitter unless the senior treasury manager expected that Barclays would continue to have access to every Defendant's confidential LIBOR submissions in advance.  The Barclays Settlements indicate other instances when Barclays had advance knowledge of other banks' supposedly secret LIBOR quotes, either directly, through communication with brokers, or both. *e.g.*, Barclays FSA ¶ 117 ("[B]rokers tell me that [another panel bank] is going to set at 5.15 for both (up 8.5 and 10 from yesterday)" (quoting Barclays email)); Transcript of Telephone Conference between Barclays and Federal Reserve Bank of New York, Oct. 24, 2008 ("[T]hree-month libor is going to come in at 3.53. . . . it's a touch lower than yesterday's but please don't believe it. It's absolute rubbish.").

155.    The plausible inference to be drawn is that Defendants shared confidential LIBOR submissions in advance of making the submission to the BBA.  This enabled Defendants to collude to suppress LIBOR.  Plaintiffs anticipate that discovery will reveal substantial additional

---

[42] Upon hearing this, the submitter told his supervisor that "he thought there was a compliance issue, [but] no internal action was taken to address his concerns." Barclays CFTC p. 23.

evidence of Defendants' collusion to share their LIBOR submissions prior to making those submissions to the BBA.

**F.  Defendants Conspired To Manipulate U.S. Dollar And Other LIBOR Rates To Benefit Their Profits, Credit-Worthiness And Trading Positions**

156.    In addition to the foregoing allegations as to Defendants' motivations for manipulating U.S. Dollar LIBOR and other LIBOR benchmarks, Defendants were further motivated to participate in the conspiracy to suppress USD LIBOR, in part, to also benefit the daily their trading positions and the trading positions of non-LIBOR banks.  The time period of manipulating USD LIBOR for Rabobank, manipulation of U.S. Dollar LIBOR occurred from at least as early as <u>September 2005</u> through approximately <u>December 2008</u> when multiple swap traders in New York, London, and Utrecht made frequent requests for favorable U.S. Dollar LIBOR contributions to the Rabobank U.S. Dollar submitters on the London money markets desk.  Rabobank SOF ¶¶16-17.  Robobank Dollar LIBOR submitters accommodated the requests on numerous occasions and submitted Rabobank's contributions consistent with the requests:

> For example, on Wednesday, October 17, 20117, a U.S. Dollar swaps trader ("Trader-1") emailed the Rabobank U.S. Dollar LIBOR submitted ("Submitter-1"):  "A nice low 1 month for the rest of the week please matey. Cheers"  Rabobank's submissions for the rest of the week were consistent with this request.  That day, Rabobank's 1-month U.S. Dollar LIBOR submission dropped four basis points whereas the rest of the Contributor Panel's submissions either remained unchanged or dropped one or two basis points from the previous day.  The day before the request, Rabobank's 1-month U.S. Dollar LIBOR submission had been the fifth lowest submission of the banks on the Contributor Panel.  Immediately after this request for a low submission, Rabobank's submission sank to the lowest submission of any bank on the Contributor Panel.  On Thursday, October 18, 2007, Rabobank's 1-month submission was tied for the second lowest submission of any bank of the Contributor Panel.  According to multiple Rabobank employees, Trader-1 and at least one other U.S. Dollar LIBOR swaps trader also ***made regular verbal requests to the submitters for submissions that would benefit their positions***.

Rabobank SOF ¶¶17-18.

157.     The manipulation of LIBOR among the LIBOR member banks had a profound

effect on the interest rates of financial instruments including derivatives and benefitted the

positions of the traders for these instruments who worked for the LIBOR member banks or

elsewhere worldwide.  For example:

> When Rabobank derivatives traders made requests of Rabobank rate submitters in
> order to influence Rabobank's benchmark interest rate submissions, and when the
> submitters accommodated those requests, the manipulation affected the fixed rates on
> various occasions.
>
> Likewise, when Rabobank derivatives traders influenced the submissions of other
> Contributor Panel banks by seeking and receiving accommodations from their
> counterparts at such banks, and when Rabobank derivatives traders accommodated the
> requests of traders at other Contributor Panel banks and non-panel banks, the
> manipulation of those submissions affected the fixed benchmark rates on various
> occasions.

Rabobank SOF ¶¶91-92.

158.     LIBOR manipulation created symbiotic relationships between and among the

submitters and traders.  LIBOR was manipulated by LIBOR member banks to benefit the

trading positions of derivatives traders for the submitting bank and sometimes in competition

with and to the detriment of submitters and derivatives traders at other LIBOR member banks:

> Indeed, the purpose of this activity was to manipulate benchmark submissions
> from Rabobank and other banks to influence the resulting fixes and thus to have a
> favorable effect on the derivatives traders' trading positions.  Because traders'
> compensation was based in part on the profit and loss calculation of their trading books,
> derivatives traders' requests were intended to benefit their compensation as well.

Rabobank SOF ¶93.

159.     Given the size of the financial instruments or investments with rates set to

LIBOR, even small shifts in LIBOR settings can have a significant impact on the profitability of

Defendants' LIBOR-based financial instruments.  In the case of Rabobank, for example,

because of the high notional amounts underlying derivatives transactions tied to LIBOR and

Euribor, even very small movements in those rates could have had a significant positive impact

on the profitability of a trader's trading portfolio, and a correspondingly negative impact on

their counterparties' trading positions. Rabobank SOF ¶94.

160.    In the Statement of Facts to the DOJ's <u>October 2013</u> Deferred Prosecution

Agreement, Rabobank described how small movements in rates of manipulated LIBOR

impacted its counterparties:

> Rabobank entered into interest rate derivatives transactions tied to LIBOR and
> Euribor – such as derivatives, forward rate agreements, and futures – with counterparties
> to those transactions.  Many of those counterparties are located in the United States.
> Those United States counterparties included, among others, asset management
> corporations, mortgage and loan corporations, and insurance companies.  Those
> counterparties also included banks and other financial institutions in the United States or
> located abroad with branches in the United States.

Rabobank SOF ¶95.

> In the instances when the published benchmark interest rates were manipulated in
> Rabobank's favor due to Rabobank's manipulation of its own or any other Contributor
> Panel bank's submissions, that manipulation benefitted Rabobank derivatives traders to
> the detriment of counterparties, at least with respect to the particular transactions
> comprising the trading positions that the traders took into account in making their
> requests to the rate submitters.  Certain Rabobank derivatives traders and rate submitters
> who tried to manipulate LIBOR and Euribor submissions understood the features of the
> derivatives products tied to these benchmark interest rates; accordingly, they understood
> that to the extent they increased their profits or decreased their losses in certain
> transactions from their efforts to manipulate rates, their counterparties would suffer
> corresponding adverse financial consequences with respect to those particular
> transactions.

Rabobank SOF ¶96.

> When the requests of derivatives traders for favorable LIBOR and Euribor
> submissions were taken into account by the Rabobank rate submitters, Rabobank's rate
> submissions were false and misleading.  Those false and misleading LIBOR and Euribor
> contributions affected or tended to affect the price of commodities, including futures
> contracts.  Moreover, in making and in accommodating these requests, the derivatives
> traders and submitters were engaged in a deceptive course of conduct in an effort to gain
> an advantage over their counterparties.  As part of that effort:  (1) derivatives traders and
> submitters submitted and caused the submissions to materially false and misleading
> LIBOR and Euribor contributions; and (2) derivatives traders, both before and after

initiating and continuing their effort to manipulate LIBOR and Euribor contributions, negotiated and entered into derivative transactions with counterparties that did not know that Rabobank employees were often attempting to manipulate the relevant rate.

Rabobank SOF ¶97.

161.    UBS also took advantage of manipulating LIBOR in small increments to its advantage.  UBS admitted to the DOJ that "Because of the high value of the notional amounts underlying derivatives transactions tied to Yen and Swiss Franc LIBOR, even very small movements in those rates could have a significant positive impact on the profitability of traders' trading portfolios, and a correspondingly negative impact on their counterparties' trading positions."  UBS SOF ¶78.  For example, in October 2008, a UBS manager advised that "UBS had trading positions that would cause losses of ***USD 4m per basis point*** if 'libors move higher.'"  UBS U.K. FSA ¶ 103.

162.    Collusion to suppress LIBOR and collusion to manipulate LIBOR to benefit individual trading positions were motivated by precisely the same improper purpose: illegitimately protecting the banks' profitability using the banks' control of LIBOR.

**1.      Barclays' Role in LIBOR Manipulation**

163.    On June 26, 2012, Barclays Bank plc ("Barclays") entered into a Non-Prosecution Agreement with the DOJ Criminal Division, Fraud Section ("Barclays NPA").  Under the Barclays NPA, Barclays, which was on the BBA Contributor Panel for U.S. Dollar LIBOR from at least 2005 through 2010, agreed to pay penalties of $160 million, and admitted and accepted responsibility for colluding to manipulate LIBOR (and Euribor) dating back to 2005:

> From at least approximately August 2005 through at least approximately May
> 2008, certain Barclays swaps traders communicated with swaps traders at other
> Contributor Panel banks and other financial institutions about requesting LIBOR
> and EURIBOR contributions that would be favorable to the trading positions of
> the Barclays swaps traders and/or their counterparts at other financial institutions.

*See* Barclays Statement of Facts, Appendix A to Barclays NPA ("Barclays SOF") ¶¶7, 23.  A

true and correct copy of the Barclays NPA with SOF is attached hereto as **EXHIBIT 1.**

164.     On June 27, 2012, the CFTC entered into cease and desist order with Barclays

PLC, Barclays Bank PLC and Barclays Capital Inc. ("Barclays") under which Barclays agreed

to pay a civil monetary penalty of $200 million, and to cease and desist from attempting to

manipulate LIBOR (and Euribor).[43]  Under the CFTC Order Barclays admitted that its

submitters and swaps traders improperly communicated to manipulate U.S. Dollar LIBOR in

order to benefit Barclays' derivatives trading positions and the profitability of their particular

trading books and desks:

>    Specifically, during the period from at least mid-2005 through the fall of 2007,
> and sporadically thereafter into 2009, interest rate swaps traders, primarily located in
> Barclay's New York and London offices, regularly requested that the Barclays'
> employee(s) responsible for determining and submitting Barclays' daily LIBOR and
> Euribors ("submitters") submit a particular rate or adjust their submitted rates higher or
> lower in order to affect the daily, official published LIBOR or Euribor.  **Barclays' swaps
> traders were improperly attempting to benefit Barclays' derivatives trading
> positions and the profitability of their particular trading books and desks.
> Barclays' swaps traders also facilitated former Barclays swaps traders' requests to
> alter LIBOR** or Euribor submissions by passing along the former traders' requests to the
> Barclays LIBOR or Euribor submitters as if they were their own.  The Barclays
> submitters routinely based their LIBOR and Euribor submissions on the traders' requests
> in furtherance of the attempts to manipulate LIBOR and Euribor.  **The majority of
> Barclays' violative conduct involved U.S. Dollar LIBOR** and Euribor, but also, at
> limited times, involved Yen and Sterling LIBOR submissions.

Barclays CFTC at 3, 7-11 (emphasis added).  A true and correct copy of the Barclays CFTC

Order is attached hereto as **EXHIBIT 2.**

---

[43] *See In the Matter of Barclays PLC,Barclays Bank PLC and Barclays Capital Inc.,* Order Instituting and
Proceedings Pursuant to Sections 6( c) and (d) of the Commodity Exchange Act, As Amended, Making Findings and
Imposing Remedial Sanctions (June 27, 2012) ("Barclays CFTC").

165.    Barclays' attempts to manipulate U.S. Dollar LIBOR occurred at times on a daily

basis. Barclays acted as a counterparty to clients in many interest rate swaps transactions:

> Multiple interest rate swaps traders located in Barclays' New York, London and Tokyo offices asked Barclays' LIBOR submitters to make certain LIBOR submissions in order to affect the official BBA LIBOR fixings for certain tenors, **thereby benefitting their respective derivatives trading positions and either increasing their profits or minimizing their losses.** The vast majority of these requests came from traders on Barclays' New York Interest Rate Swaps Desk ("NY Swaps Desk") located in New York and London and involved U.S. Dollar LIBOR.

Barclays CFTC at 8 (emphasis added).

> The NY Swaps Desk trades in a variety of products, including interest rate swaps, FRAs, Treasury bonds, and Treasury futures, as well as the CME one-month and three-month Eurodollar futures and options contracts.  The interest rate swaps traded by the NY Swaps Desk were generally tied to various tenors of U.S. Dollar LIBOR.  **Barclays acted as a counterparty to many interest rate swaps transactions.**  The derivatives instruments traded by the NY Swaps Desk were used to hedge the desk's interest rate risk and also to generate profits for the desk.

*Id. a*t 8 (emphasis added).

> Senior trades on the NY Swaps Desk instructed several other swaps traders to make the requests of the LIBOR submitters on Barclays' London Money Market Desk for certain LIBOR submissions in order to move their LIBOR submissions in a direction to benefit the desk's derivatives trading positions.  **The traders' conduct was common and pervasive, and known by other traders and trading desk managers located near the interest rate swaps desk, both in New York and London.  None of the traders attempted to conceal the requests from supervisors at Barclays during the entire period that the activity occurred.  In fact, on occasion, the traders discussed their requests with trading desk managers**.

*Id.* (emphasis added).

166.    Barclays also admitted that its traders coordinated and aided and abetted traders at

other banks:

> Additionally, certain Barclays swaps traders received external requests to alter Barclays' U.S. Dollar LIBOR submissions from former Barclays swaps traders who and left Barclays and now were employed by other financial institutions.  These former Barclays employees made the requests to benefit their derivatives trading positions, and expected that not only would these requests be forwarded to the LIBOR submitters, but that Barclays' LIBOR submitters would take their requests into account when making

their LIBOR submissions. These requests were made typically by email or by instant message.

Barclays CFTC at 3, 9.

The swap traders' requests, whether internal or external, **typically concerned the one-month and three-month U.S. Dollar LIBOR submissions. The traders' requests also included either a specific rate to be submitted or the direction, higher or lower, that they wanted Barclays' LIBOR submission to move.** Sometimes, the traders asked the submitters to try to have Barclays excluded ("kicked out" or "knocked out") from the LIBOR calculation by being in the top or bottom quartile, in an attempt to influence the official LIBOR fixing. Sometimes the requests covered several days or even weeks of submissions at a time.

Barclays CFTC at 9 (emphasis added).

167.    The Barclays' traders' false rate requests, whether internal or external, typically concerned one-month and three-month U.S. Dollar LIBOR submissions. The traders' requests also included either a specific rate to be submitted or the direction, higher or lower, that they wanted Barclays' LIBOR submission to move. Sometimes the traders would ask submitters to try and have Barclays excluded from the LIBOR calculation by being in the top or bottom quartile in an attempt to influence the fixing of LIBOR. The following are examples of numerous improper communications between traders and submitters uncovered by the CFTC:

> *"WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!!  We need a 4.17 fix in 1m (low fix) We need a 4.41 fix in 3m (high fix)"* (November 22, 2005, Senior Trader in New York to Trader in London);

> *"You need to take a close look at the reset ladder. We need 3M to stay low for the next 3 sets and then I think that we will be completely out of our 3M position. Then its on. [Submitter] has to go crazy with raising 3M Libor."* (February 1, 2006, Trader in New York to Trader in London);

> *"Your annoying colleague again ... Would love to get a high 1m Also if poss a low 3m... ifposs ... thanks"* (February 3, 2006, Trader in London to Submitter);

> "*This is the [book's] risk. We need low 1M and 3M libor. PIs ask [submitter] to get 1M set to 82. That would help a lot*" (March 27, 2006, Trader in New York to Trader in London);

"*We have another big fixing tom[orrow] and with the market move I was hoping we could set the 1M and 3M Libors as high as possible*" (May 31, 2006, Trader in New York to Submitter);

"*Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the lib or fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot.*" (September 13, 2006, Senior Trader in New York to Submitter);

"*For Monday we are very long 3m cash here in NY and would like the setting to be set as low as possible ... thanks*" ( December 14, 2006, Trader in New York to Submitter); and

"*PIs. go for 5.36 Libor again tomorrow, very long and would be hurt by a higher setting ... thanks.*" (May 23, 2007, Trader in New York to Submitter).

Barclays CFTC at 9-10 (emphasis added).

168.     The LIBOR submitters regularly considered the traders' requests when determining and making Barclays' U.S. Dollar LIBOR submissions.  To accommodate the traders, the submitters would move Barclays' U.S. Dollar LIBOR submissions by one or more basis points in the direction requested by traders.

169.     The submitters frequently responded to traders that they would accommodate their requests, often by saying "sure," "will do my best," or similar agreements.  The following are examples of numerous trader requests uncovered by the CFTC:

"*Am going 13. think market will go 12-12 ~.*" (November 14, 2005, Submitter's response to a swaps trader request for a very high one-month U.S. Dollar LIBOR submission, preferably a submission of "13+");

"*[Senior Trader] owes me!*" (February 7, 2006, Submitter's response when swaps trader called him a "*superstar*" for moving Barclays' U.S. Dollar LIBOR submission up a basis point more than the submitter wanted and for making a submission with the intent to get "*kicked out*");

"*Going 58 [in 1 month] and 73 [in 3 month] and fully expecting to be knocked out.*" (February 8, 2006, Submitter's response to a swaps trader request for high one-month and three-month LIBOR submissions);

*"For you ... anything. I am going to go 78 and 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least."* (March 16, 2006, Submitter's response to swaps trader's request for a high one-month and low three-month U.S. Dollar LIBOR);

*"Always happy to help, leave it with me, Sir."* (March 20, 2006, Submitter's response to a request);

*"Done ... for you big boy ..."* (April 7, 2006, Submitter's response to swaps trader requests for low one-month and three-month U.S. Dollar LIBOR); and

*"Set it at 5.345 against a consensus of 34."* (March 5, 2007, Submitter's response to swaps trader request for high three-month U.S. Dollar LIBOR).

170.    Requests were made by Barclays' US Dollar derivatives traders on 16 out of the 20 days on which Barclays made US Dollar LIBOR submissions in <u>February 2006</u> and on 14 out of the 23 days on which it made US Dollar LIBOR submissions in <u>March 2006</u>.

171.    Just as the NY Swaps Desk openly discussed requests to LIBOR submitters, Barclays' Euro Swaps traders' requests to Barclays' Euribor submitters to change their submissions to benefit the traders' derivatives trading positions were an open and common practice on the desk.  Multiple traders engaged in this conduct, and no attempt was made by any of the traders to conceal the requests from supervisors at Barclays during the more than four-year period in which the activity occurred.

172.    On <u>June 27, 2012</u>, the U.K. FSA (now U.K. FCA) issued its Final Notice to Barclays ("Barclays FSA"), finding direct evidence that Barclays attempted to collude on USD LIBOR and Euribor submissions between at least <u>February 2006</u> and <u>October 2007</u>:

Between February 2006 and October 2007, ***Barclays' Derivatives Traders made at least 63 requests to external traders with the aim that those traders would pass on the requests for EURIBOR and US dollar LIBOR submissions to their banks' submitters. 56 of those requests related to EURIBOR submissions. Five Derivatives Traders made the requests to external traders.***

Barclays FSA ¶ 89 (emphasis added).

173.    The Barclays Settlements do not identify the other banks who participated in the

agreement, but at least some were members of the USD LIBOR panel. *See id* ¶¶ 23–24;

Barclays FSA ¶ 82; Barclays CFTC at 28.

174.    There is direct evidence that Barclays colluded with another USD LIBOR panel

bank to collude to manipulate USD LIBOR, in order to benefit Barclays' trading positions:

> On 28 February 2007, Trader B made a request to an external trader in relation to
> three month US dollar LIBOR: "*duuuude ... whats up with ur guys 34.5 3m fix ...
> tell him to get it up!!*" the external trader responded "*ill talk to him right away*".

Barclays FSA ¶ 91.

175.    Similarly, another trader from an unidentified financial institution requested that

Barclays set its LIBOR quote low: "I know I'm asking for much, but ONLY if u guys care, a

low 3m libor would be great…anywhere below 5.35…thanks dude." Barclays SOF ¶¶ 27.

**2.   UBS's Role in LIBOR Manipulation**

176.    In <u>December 2012</u>, UBS AG executed a Non-Prosecution Agreement ("UBS

NPA") with the DOJ in exchange for not being criminally prosecuted for manipulating

benchmark interest rates including LIBOR, EURIBOR, TIBOR.  Only UBS Securities Japan

Co., Ltd., was charged and agreed to plead guilty to wire fraud and pay a $100 million fine for

its role in manipulating LIBOR.  UBS Japan admitted in its plea that false and misleading

LIBOR submissions were "material" from the perspective of counterparties to financial

transactions.  UBS admitted to the DOJ that it colluded regularly with UBS to manipulate Yen

LIBOR from at least as early as <u>February 2007</u> through <u>2010</u>.  UBS agreed to pay more than

$1.5 billion in penalties and disgorgement. Under the UBS NPA, UBS, on behalf of itself and its

subsidiaries and affiliates, agreed to pay a $400 million penalty, and agreed to admit, accept,

and acknowledge responsibility for the conduct set forth in the Statement of Facts, appended to

the NDA as Appendix A ("UBS SOF").  A true and correct copy of the UBS NPA with SOF is attached hereto as **EXHIBIT 3.**

177.     In addition, UBS agreed to pay penalties of $700 million to the CFTC; $259.2 million to settle an action by the U.K. FSA; and $64.3 million as a result of an action by the Swiss Financial Market Authority ("FINMA").  A true and correct copy of the UBS CFTC Order is attached hereto as **EXHIBIT 4.**

178.     In announcing the UBS NPA at the time, Attorney General Eric Holder stated, "By causing US and other financial institutions to spread false and misleading information about LIBOR, the alleged conspirators we've charged – along with others at UBS – manipulated the benchmark interest rate upon which many transactions and consumer financial products are based.  They defrauded the company's counterparties of millions of dollars.  And they did so primarily to reap increased profits, and secure bigger bonuses, for themselves."

179.     Also in December 2012, prosecutors with the DOJ charged a former employee of UBS Japan, Thomas A. W. Hayes and a former colleague, Roger Darin, with conspiracy to commit fraud by attempting to manipulate LIBOR.[44]  Hayes, at the time a 33-year old British citizen, was a former trader at UBS and Citigroup, and a primary target of investigators in the U.S. and U.K. for allegedly being at the center of efforts by some of the world's largest financial institutions to inflate or suppress LIBOR, occurring on nearly a daily basis over several years. According to the DOJ, while at UBS Hayes openly discussed his plans during morning meetings

---

[44] Complaint, *U.S. v. Hayes & Darin*, No. 12 Mag 3229 (S.D.N.Y.) (Dec. 12, 2012) ("Hayes-Darin Cmplt").

and his personal Facebook page sometimes included messages about where he wanted LIBOR

to move.  Hayes' activities were known to his superiors. Indeed, when U.K. and U.S. authorities

believe that settled with UBS in 2012, they released documents that indicated that Hayes'

superiors were aware of his alleged tactics. Mr. Hayes has not commented on his alleged role in

the LIBOR manipulation, except that in a January 2013 text message he sent to the Wall Street

Journal he offered, "*this goes much much higher than me.*"

180.    Hayes worked at UBS from the spring of 2006 through December 2009, and was

criminally charged with violating the Sherman Act by conspiring to fix Yen LIBOR, which is a

component of price of LIBOR-based instruments:

> In or about May 2009, in the Southern District of New York and elsewhere, TOM
> ALEXANDER WILLIAM HAYES, the defendant, and his co-conspirators,
> including an employee at a major financial institution, and others known and
> unknown, engaged in a combination and conspiracy in unreasonable restraint of
> interstate and foreign trade and commerce in violation of Section 1 of the
> Sherman Act. The aforesaid combination and conspiracy consisted of an
> agreement, understanding, and concert of action among HAYES and his co-
> conspirators, the substantial terms of which were to fix Yen LIBOR, a key price
> component of Yen LIBOR-based derivative products.

181.    Documents show that, while Hayes was at UBS, UBS colluded with other Yen

panel banks to manipulate Yen LIBOR with great frequency and for enormous profit from at

least as early as January 2007 through at least September 2009.  According to CFTC's review of

the documents:

> The [UBS] Senior Yen Trader conducted his extensive, systematic course of
> unlawful conduct to manipulate Yen LIBOR and periodically, Euroyen TIBOR,
> from shortly after he joined UBS in early July 2006 until his departure in the fall
> of 2009, following a dispute with UBS over his compensation.
>
> UBS CFTC 11.
>
> As with his internal requests, the Senior Yen Trader began coordinating regularly
> with derivatives traders at other panel banks by January 2007. The Senior Yen
> Trader coordinated with traders primarily at four panel banks whom he knew or
> had worked with previously.

UBS CFTC 17.

182.    The CFTC gave the following summary of a small sampling of the numerous

communications between Mr. Hayes and other Yen Panel banks.

As with his internal requests, the Senior Yen Trader began coordinating regularly
with derivatives traders at other panel banks by January 2007. The Senior Yen
Trader coordinated with traders primarily at four panel banks whom he knew or
had worked with previously. The Senior Yen Trader, or others acting on his
behalf, made about 100 requests of traders at the other panel banks.

The Senior Yen Trader generally made requests of the other banks' traders, who
regularly agreed to pass his requests to their Yen LIBOR or, on occasion, Euroyen
TIBOR submitters. The Senior Yen Trader also made requests directly of the
submitter of at least one bank. The other traders often conveyed success with
comments such as, "done" and "we normally do well for u!!!"

For their own manipulative purposes of benefiting their derivatives trading
positions, certain of the derivatives traders at the other banks sought reciprocating
assistance from the Senior Yen Trader to make requests on their behalf to UBS's
submitters. The Senior Yen Trader readily agreed to help the other traders. In fact,
he often encouraged them to ask for help as a way to curry favor and ensure his
requests were accommodated.

The following small sampling of the numerous communications between the
Senior Yen Trader and derivatives traders at the other panel banks reveal:

- descriptions of the Senior Yen trader's strategy and his success in keeping
  rates "artificially high;
- how, as with the internal requests, the Senior Yen Trader pressed traders at
  the other banks for assistance particularly on key fixing dates around the
  IMM dates or the turn of the calendar year;
- how routine the requests were and how the traders believed that LIBOR
  was vulnerable to manipulation at their whim and for their benefit;
- that the requests covered a number of days of LIBOR submissions at
  times, such that one request could result in multiple days of false LIBOR
  submissions potentially affecting the fixing for the same period;
- the pressure the Senior Yen Trader felt to keep making money for UBS;
  and
- that the traders believed that they succeeded at times.

CFTC 17-18.

183.    Within the collection of documents reviewed by the FSA, Mr. Hayes was

involved in a high number of written requests evidencing collusion with other panel banks:

> The Senior Yen Trader and others at UBS made approximately 2,000 written
> requests of UBS's Trader-Submitters, traders at other panel banks and interdealer
> brokers to try to achieve their manipulative goals. The written requests of the
> Senior Yen Trader and others occurred on approximately 570 trading/reporting
> days, mostly between late 2006 and late 2009, which is approximately 75% of the
> time.

184.    UBS, through Mr. Hayes, colluded with other Yen LIBOR panel banks to

suppress Yen LIBOR to benefit Mr. Hayes's trading positions.  Mr. Hayes colluded either

directly with other Yen LIBOR panel banks or through intermediaries such as interdealer

brokers.  For example:

a.       On February 25, 2009, Mr. Hayes asked an employee at an interdealer

broker, "Broker B"[45] for "low 1m and 3m," saying "we must keep 3m down" and "try for low on

all of em." The broker responded: "ok ill do my best for those tday."[46]

b.       On March 6, 2007, an employee at a bank identified in the Hayes-Darin

Complaint ("Hayes-Darin") as "a global financial services company headquartered in Edinburgh,

Scotland" ("Trader C") requested that Mr. Hayes take steps to ensure low UBS Yen LIBOR

submissions for all maturities: "can u go fr low everything plse?" Mr. Hayes responded that he

would make the request but he personally needed a high 3-month Yen LIBOR fixing.  Mr. Hayes

then made a request to a UBS LIBOR submitter for low 1-month and 6-month Yen LIBOR

---

[45] The Hayes-Darin Complaint identifies "Broker B" as "a broker employed at Brokerage Firm B, "a London-based,
inter-dealer broker that, in exchange for commissions or other fees, matched buyers and sellers in various financial
products, enabling them to engage in transactions." Hayes-Darin at 5.

[46] Hayes-Darin Cmplt., Exh. 9.

submissions "hi pls don't forget low 1m and 6m!"  The Hayes-Darin complaint notes that "[t]hat

day, compared to the previous day, UBS's 1-month and 6-month Yen LIBOR submissions

dropped by 2.0 and 2.5 basis points, respectively, consistent with Trader C's request to Hayes."

Hayes-Darin at 22.

        c.     Between about <u>April 19</u> and <u>April 24, 2007</u>, Mr. Hayes requested low Yen

LIBOR submissions from Trader C.

        i.     On <u>April 19, 2007</u>, Mr. Hayes asked Trader C "can you do me a

favour and ask your cash guys for a low 3m" because Mr. Hayes had "some huge huge fixes."

Trader C responded "will do my best I am pretty flat at the moment" "so don't really care."[47]

The Hayes-Darin Complaint notes: "That same day, Bank C's 3-month Yen LIBOR submission

was 0.65 percent, down from 0.67 percent the previous day." Hayes-Darin at 22–23.

        ii.     The next day, Mr. Hayes thanked Trader C: "hi mate thanks for

keeping 3m low y/day wd really appreciate it if u cld try for the same over the next few days... ."

Hayes-Darin Cmplt., Exh.15.  Later that day, Mr. Hayes asked Trader C again: "I know I only

talk to you when I need something but if you could ask your guys to keep 3m low wd be massive

help as long as it doesn't interfere with your stuff." *Id.*  Mr. Hayes followed up later, asking

Trader C "mate did you manage to spk to your cash boys?" Trader C responded "yes u owe me

they are going 68 and 71" Mr. Hayes responded "thx mate yes I do . . . in fact I owe you big

time." Then later, after learning that Bank C had made a 3-month Yen LIBOR submission of

---

[47] Hayes-Darin Cmplt., Exh. 15.

0.64 percent that day. Mr. Hayes exclaimed: "mater they set 64! . . . that's beyond the call of duty!" *Id.*

        iii.    On <u>April 24, 2007</u>, Mr. Hayes wrote "Trader C": "hello mate thanks for the help on libors, if you cld ask for a low 3m for one last day wd be big help" *Id.*

        iv.    The Hayes-Darin Complaint notes: "After three consecutive trading days at 0.64 percent, Bank C's 3-month Yen LIBOR submission increased to 0.65 percent the following day, on or about Wednesday, April 25, 2007."  Hayes-Darin at 23.

185.    Further, after Mr. Hayes left UBS and started working with "Bank D," which the Hayes-Darin Complaint identifies as "a global financial services company headquartered in New York, New York" (Hayes-Darin at 5)[48], Mr. Hayes continued to collude to manipulate Yen LIBOR to benefit his trading positions, for example:

        a.    On <u>May 12, 2010</u>, Mr. Hayes told a rate submitter at UBS: "libors are going down tonight" "because I am going to put some pressure on people."[49]

        b.    Between <u>March 3 and 4, 2010</u>, Mr. Hayes attempted to influence Bank C's Yen LIBOR submissions.

        i.    Mr. Hayes told a broker on <u>March 3, 2010</u>, "I really need a low 3m jpy libor into the imm [the International Monetary Market date, which occurs quarterly on the third Wednesday of March, June, September, and December]," and "any favours you can get

---

[48] The Hayes-Darin Complaint notes that "From in or about December 2009 through in or about September 2010, after leaving UBS, HAYES was employed as a senior Yen swaps trader at Bank D in Tokyo." Hayes-Darin Cmplt. at 6. The Wall Street Journal identified Defendant Citigroup as Mr. Hayes' employer immediately after Defendant UBS. David Enrich, "Rate-Rig Spotlight Falls on 'Rain Man'," Wall Street Journal, Feb. 8, 2013.

[49] Hayes-Darin Cmplt. Exh. 17.

with the due at [Bank C] would be much appreciated" "even if he on;ly move 3m down 1bp."

The broker said "i'll give him a nudge later, see what he can do" and then asked the Bank C

submitter: "u see 3m jpy libor going anywhere btween now and imm?" noting "we have a mutual

friend who'd love to see it go down, no chance at all?" The Bank C submitter said "haha TH by

chance," and the broker responded "shhh." Hayes-Darin Cmplt., Exh. 18.

        ii.      The Hayes-Darin Complaint notes that, the next day, Bank C's 3-

month Yen LIBOR submission decreased by one basis point compared to the previous day.

Hayes-Darin Cmplt. at 26. After the LIBOR submissions were posted, the Bank C LIBOR

submitter reported back to the broker: "Libor lower ;)," and the broker responded "good

work!!!!" *Id.*

     186.     The UBS Japanese unit where Hayes worked pled guilty to U.S. fraud charges

relating to manipulation of Yen LIBOR.

     187.     Hayes enlisted the help of brokers to collude, or attempt to collude, with a large

number of panel banks –on one occasion, a plausible inference is that Hayes asked a broker to

contact every Yen panel bank to attempt to collude with them. Reaching out to brokers to

influence other banks' submissions was a common practice at UBS:

> At all times alleged herein [i.e., January 1, 2005 through December 31, 2010], the
> UBS Traders (one of whom was a Manager) were directly involved in making
> more than 1000 documented requests to 11 Brokers at six Broker Firms" to
> "attempt to influence the JPY LIBOR submissions of other banks."

UBS FSA ¶ 13.

     188.     Hayes, in particular, would often speak to brokers to enlist their help in colluding

with other Yen panel banks.  On <u>March 31, 2009</u>, for example, UBS admitted that Trader-1

(identified in the press as Hayes)[50] "asked Broker C to help influence 9 of the 16 banks by convincing them to lower their LIBOR submissions from the previous day, thus lowering the resulting 1-month and 3-month Yen LIBOR fix."

189.    After September 2009, "UBS Yen Trader 2 also reached out for help to Derivatives Broker B1, who similarly reassured him that *__he regularly spoke to at least seven other panel bank submitters__* and he would try to help Yen Trader 2, if he needed the help." UBS CFTC 37 (emphasis added).

190.    The breadth and scope of the conspiracy is illustrated by what the CFTC and Mr. Hayes referred to as the "Turn Campaign."

> The Turn Campaign commenced in early June 2009. The Senior Yen Trader's derivatives positions tied to six-month Yen LIBOR were due to reset or mature on June 29, 2009 and would benefit from a high six-month Yen LIBOR. A single basis point move in Yen LIBOR was worth approximately $2 million to him. The Senior Yen Trader coordinated with the UBS Yen Trader-Submitter I, the primary four brokers he used, and his friend, the Trader-Submitter at Yen Bank F, to try to keep six-month Yen LIBOR high.

UBS CFTC 29.

191.    To ensure that submissions moved in the right direction on June 29, 2009, Mr. Hayes persuaded a broker to approach *__every panel bank__* to seek their help in raising Yen LIBOR that day:

> In an electronic chat on 29 June 2009, Trader A informed Broker A of the rates that UBS and Panel Bank 2 would submit for six month JPY LIBOR. *__Trader A instructed Broker A what six month JPY LIBOR submissions he wanted from every Panel Bank__*, going through them one by one. Trader A told Broker A ".. . do your best and i'll sort u out". *__Trader A stressed to Broker A that it was crucial__*

---

[50] The CFTC refers to Trader-1 as "Senior Yen Trader." UBS CFTC 25-26. The press identifies the Senior Yen Trader as Mr. Hayes. See http://online.wsj.com/article/SB10001424127887324445904578285810706107442.html

*__that he approached the Panel Banks__*, saying "v v v important pls try extra extra hard mate". Broker A confirmed he would try hard to assist.

UBS FSA ¶ 80.b.

192.    While spoof bids were sometimes contemplated,[51] Mr. Hayes expected the broker to try to persuade every bank to collude to submit higher LIBOR that day. Mr Hayes asked the broker to "*__contact each panel bank__*" and "*__make sure [the banks] all know it's the turn__*" [i.e., the day when Mr. Hayes could make a lot of money from a move in LIBOR submissions]." UBS CFTC 32.[52]  This shows that Mr. Hayes reasonably expected that he could earn and had earned the collusive cooperation from each and every panel bank. Although the Yen LIBOR fixing had been dropping slowly over the month of June 2009, 7 panel banks reversed course on June 29, 2009 and placed higher submissions that were consistent with Mr. Hayes' requests.

| | |
|---|---|
| Trader-1: | mate we have to get 1m and 3m down . . . 1m barely fell yesterday . . . real important |
| Broker-C: | yeah ok |
| Trader-1: | banks to have a go w in 1m are |
| Trader-1: | [Bank-F] |
| Trader-1: | [Bank-G] |
| Trader-1: | [Bank-H] |
| Trader-1: | [Bank-E] |
| Trader-1: | [Bank-I] |
| Trader-1: | [Bank-C] |
| Trader-1: | [Bank-A] |
| Trader-1: | [Bank-J] |
| Trader-1: | and [Bank-K] |
| Trader-1: | pls |
| Broker-C: | got it mate |

[51] The CFTC gives the following description of spoofing the market: "The Senior Yen Trader also asked certain brokers to post false bids and offers for cash trades to further disseminate false pricing information to the market and other Yen panel banks and thereby benefit his positions. This is sometimes known as 'spoofing the market.'" UBS CFTC 26.

[52] The broker with whom Mr. Hayes was speaking agreed that he need to remind the other banks, saying: "yeah thats needed bevcasuse sometimes poepel forget and set them the same ..."

193.    In 2009, Citibank wooed Hayes from UBS. According to a press report, "[w]hen Citigroup in 2009 sought to lure [Hayes] away from UBS with a $5 million job offer, some at UBS fought to keep Hayes by telling UBS executives of his ability to tap contacts who could nudge Libor up or down."[53] According to the same press report, "After Citigroup offered Hayes more than double the nearly $2 million he was earning at UBS, his UBS boss, Michael Pieri, lobbied a senior UBS executive to counter with a big bonus, according to people familiar with the offer. Emails released by the Justice Department show Hayes's boss cited the trader's 'strong connections with Libor setters in London. This information is invaluable for the derivatives books.'"

194.    After an investigation into Hayes' conduct, which involved several banks, he was eventually terminated. In a text message to the press, Hayes said that "this goes much much higher than me."  His close friend told the press that "[t]rying to rig Libor 'was common industry practice.'"

195.    Following in the footsteps of the U.S., in June 2013, the U.K.'s Serious Fraud Office ("U.K. SFO") filed fraud charges against Hayes.  British prosecutors charged him with eight counts of "conspiracy to defraud" in an alleged attempt to manipulate LIBOR. According to a June 21, 2013 Wall Street Journal article, Hayes was a derivatives trader in Tokyo from 2006 through 2010, the period during which prosecutors allege he attempted to manipulate LIBOR.  He was referred to by colleagues as the "Rain Man" for his sharp intellect and socially awkward demeanor, but was also regarded as one of the top traders while working

---

[53] http://online.wsj.com/article/SB10001424127887324445904578285810706107442.html

for UBS in Tokyo.  In fact, he was lured away by Citigroup with a $5 million job offer.  In 2010, Citigroup suspended Hayes on suspicion of approaching a London trading desk about manipulating LIBOR.

196.     According to a June 21, 2013 Wall Street Journal article, each of the eight charges accuse Hayes of "dishonestly seeking to manipulate [LIBOR]... with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another."  In addition, the British charges accuse Hayes of allegedly conspiring with employees at eight banks and interdealer brokerage firms, as well as with colleagues at UBS and Citigroup. The banks include New York based J.P. Morgan Chase & Co.; Germany's Deutsche Bank AG; British banks HSBC Holdings PLC and Royal Bank of Scotland Group PLC; and Dutch lender Rabobank Groep NV.

197.     Prosecutors also allege that Hayes also worked with employees of ICAP PLC, Tullett Prebon PLC and R.P. Martin Holdings Ltd.  Two R.P. Martin employees were arrested along with Hayes in December 2012, but no charges were brought at the time.  Since then, R.P. Martin suspended both its chief executive and executive director.  In fact, on the same day that British prosecutors announced filing charges against Hayes, the Hong Kong Monetary Authority announced that its investigation into possible manipulation of the Hong Kong interbank offered rate has expanded to include HSBC Holdings PLC among other banks.  The probe, which the agency launched in 2012, originally focused solely on UBS.

**3.  RBS' Role in LIBOR Manipulation**

198.     In a deferred prosecution agreement filed on February 6, 2013, RBS acknowledged and agreed that the DOJ would file a two-count criminal Information in the United States, alleging "one count of *price-fixing*, in violation of the Sherman Act, Title 15,

United States Code, Section 1."[54]  As part of that agreement, RBS "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts." RBS DPA ¶2.  A true and correct copy of the RBS NPA with appended Statement of Facts ("RBS SOF") is attached hereto as **EXHIBIT 5**.

199.    RBS also agreed to pay a civil penalty of $325 million to the CFTC for its role in attempting to manipulate LIBOR.  *See In the Matter of The Royal Bank of Scotland plc and RBS Securities Japan Limited*, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (February 6, 2013) ("RBS CFTC Order").  A copy of the RBS CFTC Order is attached hereto as **EXHIBIT 6**.

200.    RBS agreed that by colluding to manipulate Yen LIBOR, RBS colluded to fix the price of LIBOR-based instruments because Yen LIBOR is a component of price of LIBOR-based instruments:

> Traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen LIBOR submissions, causing the manipulation of the LIBOR reference rate on certain occasions. Because Yen LIBOR was a pricing component of derivatives contracts held by the financial institutions, the traders benefited from this agreement by affecting the profitability of the contracts on particular settlement dates.

RBS SOF ¶ 82.

---

[54] Deferred Prosecution Agreement, *U.S. v. The Royal Bank of Scotland plc*, No. 3:13-CR-74 (MPS) (D. Conn.) (Apr. 12, 2013) (Doc. No. 5) ("RBS DPA"),  ¶1 (emphasis added).

201.    On <u>April 12, 2013</u>, the DOJ charged RBS with one count of "price-fixing" in violation of Section 1 of the Sherman Act.  RBS admitted that it was responsible for the following acts, as charged in the Information:

> From at least as early as 2007 through at least 2010, Defendant THE ROYAL BANK OF SCOTLAND PLC, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce. The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendant and its co-conspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key price component of the price thereof, on certain occasions.

RBS SOF ¶ 2.

202.    RBS also agreed that its Yen LIBOR price-fixing conspiracy lasted from at least as early as <u>February 2007</u> through <u>2010</u>:

> From at least as early as February 2007 through 2010, RBS regularly colluded with UBS to request that their respective Yen LIBOR submitters contribute Yen LIBOR submissions to benefit their trading positions. ¶ 43- 65.

RBS SOF ¶43.

> Similarly, the FSA found that:
> Between February 2007 and June 2010, RBS, through two of its Derivatives traders, colluded with Panel Banks and Broker Firms in relation to JPY and CHF LIBOR submissions.

RBS FSA ¶ 9.

203.    Documents published in the RBS orders and reports confirm that RBS colluded, or expected that it would be able to collude, with every Yen panel bank:

        a.    Emails show that RBS colluded with at least 5 different Yen Panel Banks in fixing Yen LIBOR.  RBS FSA ¶¶ 59-60, 65-67.  For example, on <u>June 6, 2009</u>, a RBS trader (identified as Derivatives Trader B) enlisted a Broker to collude with at least 4 different panel banks to lower LIBORs in several tenors:

| Broker A: | *Alright okay, alright, no we've okay just confirming it. We've, so far we've spoke to [Panel Bank 3].  We've spoke to a couple of people so we'll see where they come in alright. We've spoke, basically... basically we spoke to [Panel Bank 3], [Panel Bank 4], [Panel Bank 5], who else did I speak to? [Panel Bank 6]. There's a couple of other people that the boys have a spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?* |
| --- | --- |
| **Derivatives Trader B:** | *Cheers.* |

b.      As the FSA concluded, RBS engaged in "at least 30 wash trades in order to facilitate corrupt brokerage payments to Broker Firms," in many instances in exchange "for efforts to influence Panel Banks' JPY LIBOR submissions."  RBS FSA ¶¶ 63, 65.

c.      RBS also colluded with a sixth bank -- a Swiss Panel Bank - to fix CHF (Swiss Franc) LIBOR.

204.    Documents also confirm that, according to RBS, price-fixing of LIBOR was the norm, not the exception, during the financial crisis: A RBS Submitter "observed to a Broker during the financial crisis that, in the absence of liquidity, 'people are just setting LIBORs to suit their books' and 'it's just where you've got your fixings really….'" RBS FSA ¶71.

205.    RBS manipulated USD LIBOR and other LIBOR currencies for its own profit. For example, the FSA found, after reviewing the documents, that RBS "Primary Submitters took into account the impact of LIBOR or RBS's LIBOR submissions on the profitability of transactions in their money market trading books as a factor when making (or directing others to make) RBS's JPY, CHF and USD LIBOR submissions." RBS FSA ¶ 105.

206.    "In total, the misconduct involved at least 21 individuals at RBS, at least one of whom was a Manager."  Barclays FSA ¶ 109.

4. **Lloyds' and HBOS' Role in LIBOR Manipulation**

207.    In <u>July 2014</u>, Lloyds Banking Group plc ("Lloyds") entered into a Deferred

Prosecution Agreement with the DOJ ("Lloyds DPA"), pursuant to which Lloyds agreed to pay

a criminal penalty of $86 million to the U.S. Treasury and accept responsibility for its role in the

manipulation of U.S. Dollar LIBOR and other currency benchmark rates.  On the same day,

Lloyds entered into an Order with the CFTC pursuant to which Lloyds agreed to pay civil

penalties of $105 million and accept responsibility for its role in the manipulation of U.S. Dollar

LIBOR and other currency benchmark rates.[55]  Lloyds also settled with the U.K. FCA for $178

million, bringing the total amount paid by Lloyds to almost $370 million.

208.    In the Statement of Facts appended to the DOJ DPA ("Lloyds SOF"), and in the

CFTC Order ("Lloyds CFTC"), Lloyds made a number of significant admissions.  A true and

correct copy of the Lloyds DPA with SOF is attached hereto as **EXHIBIT 7**.  A true and correct

copy of the Lloyds CFTC Order is attached hereto as **EXHIBIT 8.**

209.    Lloyds and HBOS plc were both members of the LIBOR Contributor Panel, and

independently manipulated LIBOR.  Lloyds acquired HBOS in <u>January 2009</u>.  Prior to the

acquisition of HBOS, the U.S. Dollar submitters at both HBOS and Lloyds altered LIBOR

submissions to benefit the submitters' and traders' cash and derivatives trading positions.  After

Lloyds acquired HBOS and the two companies were consolidated, the submitters, who were

located in separate offices, coordinated with one another to adjust LIBOR submissions to

benefit their respective trading positions.  Lloyds CFTC at 2-3.  For example:

---

[55] *In the Matter of Lloyds Banking Group plc and Lloyds Bank plc*, Order Instituting Proceedings Pursuant to
Sections 6 (c) and  6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions,
CFTC Docket No. 14-18 (July 28, 2014) ("Lloyds CFTC").

Between at least as early as 2006 and at least as late as July 2009, Yen, Dollar, and Pound Sterling LIBOR submitters at [Lloyds] and HBOS submitted LIBOR rates intended to benefit trading positions, rather than rates that complied with the definition of LIBOR. The submitters contributed to these improper rates in order to benefit their own trading positions or the trading positions of others. At times, the submitters contributed to improper rates at the request of traders in the U.K., Japan, and Australia.

Lloyds SOF ¶14.

210.     Lloyds admitted that its LIBOR submitters manipulated U.S. Dollar LIBOR to

benefit the trading positions of Lloyds, and numerous other LIBOR member banks. For

example:

From at least July 2007 through February 6, 2009, Submitter-1 was the Dollar LIBOR submitter for HBOS. Between at least as early as January 2008 and February 2009, Submitter-1 contributed rates intended to benefit HBOS's trading positions instead of the rates that complied with the definition of LIBOR.

Lloyds SOF ¶15.

For example, on January, 7, 2008, an HBOS derivatives trader in Sydney, Australia ("Trader-1") wrote an email to Submitter-1: "3mth higher today pls!" Submitter-1 responded: "Should be 92 for guide ill put in 93 to get counted." Trader-1 replied: "Good man then lower tomorrow if convenient …." On January 17, 2008, Submitter-1 put in a submission – as he indicated he would – of 3.92, the composition of the rates used to calculate the LIBOR fix for that day would have been different.

Lloyds SOF ¶16.

On May 19, 2009, a money markets trader who was a former U.S. Dollar LIBOR submitter at a subsidiary of Lloyds wrote to the then-current U.S. Dollar LIBOR submitter: "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's." Later that day, the Dollar LIBOR submitter told the money markets trader in a phone call: "obviously we got the Libors down for you."

Lloyds SOF ¶ 20.

## 5.  **Rabobank's Role in LIBOR Manipulation**

211.     On <u>October 29, 2013</u>, Defendant Rabobank announced settlements with

regulators in the U.S., U.K., and the Netherlands, under which Rabobank would pay a total of

approximately $1.06 billion. Under the DOJ settlement, Rabobank agreed to pay $325 million,

$475 to the CFTC, approximately $170 million to the U.K. FCA and $96 million to Dutch authorities.

212.    As part of the DOJ agreement, Rabobank entered into a Deferred Prosecution Agreement with the DOJ ("Rabobank DPA"), and agreed to continue cooperating with the government investigations.  Appended to the Rabobank DPA was a 42-page Statement of Facts ("Rabobank SOF") in which Rabobank admitted to manipulating LIBOR and other similar benchmark rates.  A true and correct copy of the Rabobank DPA with SFO is attached hereto as **EXHIBIT 9**.

213.    The following are examples of internal Rabobank communications concerning its manipulation of U.S. Dollar LIBOR:

August 13, 2007:

- Trader-2: "High 3s and 6s pls today mate (esp 6mths!!) if u would be so kind.. Gotta make money somehow!"

- Submitter-1: "cool.."

- Trader-2: "Cheers [Submiter-1].. Every little helps!"

August 14, 2007:

- Trader-3: "any feeling for libors today? Specifically, 6mth."

- Submitter-3: hi 1,2,3 month …59 ,56 , 53.5 …6 month 42 , i think thats what [Trader-2] needs."

- Trader-3: "it's actually me that needs it, but thanks."

- Submitter-3: "ahh [Trader-2] , taking all the credit !!"

October 17, 2007:

- Submitter-1: "A nice low 1 month for the rest of the week please matey. Cheers."

March 12, 2008:

- Trader-2: "High 3s and 6s pls tomorrow."

- Submitter-2: "Yes ..Low 1s though."

- Trader-2: "Low 1s is fine, I have a lot in 3s and 6s tho (about 75k/bp)!"

214.    These are just a few examples of the evidence set forth in the Statement of Facts that is related to the Deferred Prosecution Agreement entered into between Defendant Rabobank on the one hand and United States, United Kingdom and Dutch authorities on the other hand. This is only a small portion of the evidence available to government authorities and regulators, which resulted in Rabobank agreeing to a massive $1.06 billion settlement.

215.    According to the CFTC Order, Rabobank made further admissions:  As a member of both the BBA and the EBF, Rabobank admitted that it is, or was during the period of <u>2005</u> through early <u>2011</u>, one of the panel banks that submits rates for the determination of LIBOR in various currencies including U.S. Dollar, Yen and Sterling, and Euribor.  Until <u>January 2009</u>, Rabobank made its LIBOR submissions for certain currencies, including U.S. Dollar, Yen and Sterling, out of its London office, and Euribor submissions out of its Utrecht, Netherlands headquarters office.  In <u>January 2009</u>, Rabobank transferred the LIBOR submission process for all currencies, except Sterling, to its Utrecht office, as part of its efforts to centralize business operations.  Rababank CFTC at 5.  A true and correct copy of the Rabobank CFTC Order is attached hereto as **EXHIBIT 10**.

216.    Rabobank assigned responsibility for making its LIBOR and Euribor submissions to traders who traded both cash and derivatives trading products.  These traders regularly transacted in interbank cash deposits and loans to meet the bank's funding needs each day in all currencies, and in derivatives products, including interest rate swaps, forward rate agreements, foreign exchange forwards, cross-country swaps, overnight index swaps and tenor basis swaps. The traders engaged in derivatives transactions not only to hedge risk but also to generate profits

in a proprietary fashion.  The positions held by the traders were often priced off of LIBOR, particularly U.S. Dollar, Yen and Sterling LIBOR, and Euribor, and settled or reset on International Monetary Market ("IMM") dates, which are quarterly dates in March, June, September and December.  LIBOR and Euribor submissions, by definition, are to relate solely to the costs of borrowing in the relevant markets, and not upon derivatives trading positions.  By assigning derivative traders whose profits depended upon the fixings of LIBOR and Euribor, Rabobank created an inherent conflict of interest.  Rabobank CFTC at 6.

217.    This conflict of interest was heightened by the fact that Rabobank had its LIBOR and Euribor submitters sitting next to and working with the other derivatives traders on trading desks.  Rabobank managers and at least one senior manager expected the traders and submitters to communicate about relevant market conditions and individual trading positions.  A senior manager in LONDON ("Senior Manager 1"), who was Rabobank's representative to the BBA, oversaw cash and derivatives traders, which included the traders responsible for Rabobank's LIBOR submissions for all currencies and Euribor.  A former LIBOR submitter himself, Senior Manager 1 encouraged communication among the traders and submitters, and even instructed one Yen LIBOR submitter to contact derivatives traders in another office to obtain the rates to submit each day.  Traders, submitters and Senior Manager 1 openly discussed individual trading positions across the trading desks, and also utilized Bloomberg chat terminals and email to provide each other with instant and continuous written communication about such positions.  This free flow of information increased the risk that submitters would make LIBOR and Euribor submissions which were beneficial to Rabobank's traders' derivatives trading positions.  *Id.*

218.    Rabobank's LIBOR and Euribor submitters considered certain market information in determining Rabobank's submissions, such as Rabobank's cost of funds, money market

transactions, broker indications, Rabobank's liquidity position, Rabobank's submissions from the previous day and Rabobank's credit rating vis-à-vis other panel banks.  However, due to the submitters' dual role as submitters and traders, and the open communication policy promoted by certain senior managers which encouraged the sharing of information about trading positions, several submitters routinely and improperly considered their own and other traders' trading positions when determining their LIBOR and Euribor submissions.  As a result, the submitters often skewed their U.S. Dollar and Yen LIBOR and Euribor submissions, and, on occasion, Sterling LIBOR submissions, to benefit those trading positions by attempting to manipulate the fixings of LIBOR and Euribor.  In addition, certain submitters and traders coordinated, at times, with brokers and traders from at least two other panel banks in their attempts to manipulate Yen LIBOR.  Rabobank's Euribor submitter also accommodated requests from traders at a non-panel bank for preferential Euribor submissions to benefit those traders' derivatives trading positions.  Rabobank CFTC at 6-7.

219.    Over a period of more than three years, from at least <u>mid-2005</u> through at least late <u>2008</u>, Rabobank frequently attempted to manipulate U.S. Dollar LIBOR, and often made false LIBOR submissions in furtherance of those attempts.  Rabobank's U.S. Dollar LIBOR submissions were made out of the London office by two traders ("U.S. Dollar Trader-Submitter 1" and "U.S. Dollar Trader-Submitter 2"), who were supervised by Senior Manager 1.  Senior Manager 1 accepted and relayed requests for preferential LIBOR submissions from traders and, as noted above, encouraged the submitters and traders he supervised to speak openly about their trading positions and make LIBOR submissions to benefit Rabobank traders' U.S. Dollar trading positions.  Rabobank CFTC at 7-8.

220.     For the entire relevant period of <u>mid-2005</u> through <u>2008,</u> a senior London derivatives trader ("Senior U.S. Dollar Trader"), known by the submitters and others as the "Ambassador" of "Ambass," sitting with the U.S. Dollar Trader-Submitters at the same desk, regularly made oral requests for preferential U.S. Dollar LIBOR submissions.  In a few instances, the Senior U.S. Dollar Trader made written requests as well.  The Senior U.S. Dollar Trader often barked his requests across the desk and expected his requests to be followed. Rabobank CFTC at 8.

221.     Another U.S. Dollar derivatives trader and his manager located in Rabobank's New York office ("U.S. Dollar Trader" and "U.S. Dollar Desk Manager") also made preferential requests through at least <u>June 2008</u> for LIBOR rates utilizing Bloomberg chats and internal emails to the U.S. Dollar Trader-Submitters.[56]  *Id.*

222.     The U.S. Dollar Trader-Submitters and Senior Manager 1 knew that the derivatives traders were making these LIBOR requests to benefit their trading positions.  The U.S. Dollar Trader-Submitters improperly took the preferential LIBOR request into account and submitted Rabobank's U.S. Dollar LIBOR in order to benefit their respective trading positions.  Given the transparent conflict of interest Rabobank created by having traders act as submitters, the U.S. Dollar Trader-Submitters took into account their own trading positions when making their U.S. Dollar LIBOR submissions.  For example, on <u>September 19, 2007</u>, U.S. Dollar Trader-Submitter 1 commented to another colleague, "today i have fixing so am low on the 3mth…I did)*3's fra over today last night so want low fixing today."  Thus, the U.S. Dollar

---

[56] Rabobank derivatives traders located in Singapore, Hong Kong and Tokyo also made a few requests for beneficial U.S. Dollar LIBOR submissions.

Trader-Submitters; LIBOR submissions reflected their and other traders' financial interests, rather than the costs of borrowing U.S. Dollars in the London interbank market. *Id.* at 8-9.

**G.     Government Investigations Reveal That The LIBOR Manipulation Conspiracy By Defendants And Unnamed Co-Conspirators Was Global**

223.     As alleged herein, government investigations of the LIBOR manipulation conspiracy are underway around the world and are ongoing in the United States, the United Kingdom, Switzerland, Japan, Canada, the European Union and Singapore.  In the United States, multiple governmental agencies, including DOJ, SEC and the CFTC have all been involved in the LIBOR probe.  In the United Kingdom, the U.K. FSA, and it successor, the U.K. FCA, has been the lead agency investigating LIBOR manipulation, as well as the EU Commission.

**1.     European Commission Antitrust Regulators Fine Citigroup, JP Morgan, Deutsche Bank, UBS, RBS and Others For LIBOR Manipulation**

224.     In <u>December 2013</u>, the European Commission ("EU") announced settlements by its antitrust regulators against eight international financial institutions participating in the LIBOR manipulation cartel.  These were the first settlements among the ongoing government investigations worldwide.  According to the EU, Defendant LIBOR banks UBS and Barclays avoided fines of 2.5 billion euros and 690 million euros, respectively, for revealing the existence of the cartel to EU regulators.  However, Defendant LIBOR banks JP Morgan, Citigroup, Deutsche Bank, RBS, Societe Generale were fined a total of $2.3 billion (1.71 billion euros) for participating in the manipulation cartel.

225.     In <u>May 2014</u>, the EU informed JP Morgan, Credit Agricole, HSBC, of its preliminary view that they may have breached EU antitrust rules by colluding to manipulate the pricing of interest rate derivatives denominated in the euro currency, including EURIBOR.

According to the EU, antitrust regulators began investigating the cartel in 2011 and opened proceedings against the banks in February 2013, charging the banks for participating in illegal cartels in markets for financial derivatives covering the European Economic Area (EEA). Interest rate derivatives (e.g., forward rate agreements, swaps, futures, options) are financial products which are used by banks or companies, including Plaintiffs, for managing the risk of interest rate fluctuations.  These products are traded worldwide and lay a key role in the global economy.  They derive their value from the level of a benchmark interest rate, such as the London Interbank Offered Rate (LIBOR) – which is used for various currencies including the Japanese Yen (JPY) – or the Euro Interbank Offered Rate (EURIBOR), for the euro.

226.    According to an article published by the *Wall Street Journal* on March 18, 2011, governmental authorities around the world are attempting to determine "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."  Though the proceedings are ongoing, several Defendants have admitted that government entities - including the DOJ, the SEC, and the CFTC - have targeted them in seeking information about potential misconduct.  Defendants, and each of them, are implicated in the conspiracy, either through their own admissions, through direct evidence demonstrating their involvement, or other publically available information that shows their LIBOR submissions were not accurate reflections of their true borrowing costs.

227.    A number of Defendants have acknowledged worldwide LIBOR manipulation and their involvement in the conspiracy.  On June 27, 2012, Defendant Barclays announced it was entering into a settlement agreement with the U.K. FSA, the U.S. CFTC and the U.S. DOJ's Fraud Section for its role in LIBOR manipulation and to resolve the ongoing investigation against it.  As part of the settlement, Barclays agreed to pay £290 million ($453.6 million) to

regulators.  In addition, Barclays agreed to cooperate with investigators and provided volumes of evidence revealing the LIBOR conspiracy.  Only some of that evidence has been made public but the information publically available demonstrates that this did not involve isolated moments of LIBOR manipulation by rogue employees but a wide-ranging conspiracy involving all of the Defendants at all levels of their respective institutions.

228.    UBS, another Defendant, has sought amnesty from the U.S. D.O.J. and the Swiss Competition Commission.  Pursuant to that amnesty application, UBS has agreed to cooperate fully with the authorities.  UBS' cooperation implicates not only itself in the LIBOR manipulation conspiracy but also numerous other Defendants who communicated with and conspired with UBS to manipulate and artificially suppress LIBOR.

229.    On December 19, 2012, Defendant UBS announced it was entering a settlement agreement with the U.K. FSA, the U.S. CFTC, the U.S. DOJ's Fraud Section, and the Swiss Financial Markets Authority for its role in LIBOR manipulation and to resolve the ongoing investigation against it.  As part of the settlement, UBS agreed to pay $1.5 billion to regulators, and subsidiary UBS Securities Japan Co. Ltd. agreed to plead guilty to felony wire fraud.  On the same day, criminal conspiracy charges were unsealed in the Southern District of New York against two former senior UBS traders, Tom Alexander William Hayes and Roger Darin, for their roles in manipulating Yen-LIBOR.

230.    On February 6, 2013, Defendant RBS announced a settlement with the U.K. FSA, and the CFTC and DOJ's Fraud Section.  RBS agreed to pay approximately $612 million to regulators and its subsidiary, RBS Securities Japan Limited, agreed to plead guilty to felony wire fraud.

231.     On <u>October 29, 2013</u>, Defendant Rabobank announced a settlement with the DOJ pursuant to which Rabobank would pay a criminal penalty of $325 million.  The announcement also mentioned approximately $740 million in criminal and regulatory penalties imposed by other agencies in actions arising out of the same conduct – $475 million by the Commodity Futures Trading Commission (CFTC) action, $170 million by the U.K. Financial Conduct Authority (FCA) action and approximately $96 million by the Openbaar Ministerie (the Dutch Public Prosecution Service).

232.     On <u>July 28, 2014</u>, Defendant Lloyds announced a settlement with the DOJ pursuant to which Lloyds would pay a criminal penalty of $86 million.  The announcement also mentioned approximately $283 million in criminal and regulatory penalties imposed by other agencies in actions arising out of the same conduct – $105 million by the Commodity Futures Trading Commission (CFTC), and approximately $178 million by the U.K. Financial Conduct Authority (FCA).

233.     According to an article published by *Reuters* on <u>July 22, 2012</u>, government authorities in the United States and Europe have informed the defense attorneys for numerous executives of the Defendant LIBOR member banks that they plan to arrest and indict many of these individuals.  According to reports, there have been on-going discussions between the defense attorneys with various government authorities regarding potential pleas by the individual executives in exchange for their cooperation to provide evidence demonstrating Defendant banks' involvement in the LIBOR manipulation conspiracy.

234.     As alleged, supra, evidence obtained from the government investigations of certain Defendants, such as Barclays, UBS, RBS, Rabobank and Lloyds as well as the publically disclosed documents from those produced by other Defendants to government investigators demonstrates that US Dollar LIBOR was manipulated as part of the global conspiracy.

Furthermore, documents submitted in connection with legal proceedings in Canada, Singapore and Japan reveal that certain Defendants also underreported their borrowing costs to artificially suppress Yen-LIBOR and LIBOR for other currencies.

### 2. Government Investigations into Defendants' Conspiracy to Manipulate LIBOR Became Public in March 2011

235.    The first public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011, when Defendant UBS disclosed in a Form 20-F, an annual report filed with by foreign corporations with the SEC, that the bank had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]." UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." UBS further disclosed that it had "received an order to provide information to the Japan Financial Supervisory Agency concerning similar matters." UBS stated it was "conducting an internal review" and was "cooperating with the investigations." Prior to that date, the Defendants adamantly denied manipulating LIBOR or conspiring to manipulate LIBOR. Defendants denied that any anomalies in LIBOR were the result of any fraud and intentional malfeasance.

236.    On March 16, 2011, the *Financial Times* reported that Defendants UBS, Bank of America, Citigroup, and Barclays were all subpoenaed by U.S. regulators "probing the setting of" US Dollar LIBOR "between 2006 and 2008." The manipulation of LIBOR may have been going on since as early as 2006. The *Financial Times* reported that investigators had "demanded information from" "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information." The investigation

that followed uncovered significant evidence showing that all 16 of the former members of the

US Dollar LIBOR Contributor Panel were involved with the LIBOR manipulation conspiracy.

237.    On March 16, 2011, *MarketWatch* similarly reported that "[m]ultiple U.S. and

European banks, which provide borrowing costs to calculate Libor every day, have been

contacted by investigators," including the DOJ, the SEC, and the CFTC.

238.    On March 17, 2011, *Bloomberg* reported that Defendants Barclays and Citigroup

had received subpoenas from U.S. regulators and that WestLB, Lloyds, and Bank of America,

all three of whom are either Defendants or Co-Conspirators also had been contacted by

regulators.

239.    On March 23, 2011, *Bloomberg* reported that Defendants Citigroup, Deutsche

Bank, Bank of America and JPMorgan had been directed by U.S. regulatory authorities "to

make employees available to testify as witnesses" in connection with the ongoing investigation

into the LIBOR manipulation conspiracy.

240.    On March 24, 2011, the *Financial Times* of London reported that Defendant

Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging

of [LIBOR]."  Barclays would eventually be the first financial institution to settle and cooperate

with investigators by providing documents and other information showing how it conspired with

the other Defendants to manipulate LIBOR.  Furthermore, according to the *Financial Times*,

investigators were "probing whether communications between [Barclays'] traders and its

treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-

sharing between different parts of the bank."  Barclays' traders had an unlawful vested interest

in controlling LIBOR rates, and therefore should have been walled off from the treasury

department which handles Barclays' LIBOR submissions.  The *Financial Times* further reported

that investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008.

241.    Defendant Barclays stated on an "Interim Management Statement" filed on April 27, 2011, that it was "cooperating with" the investigations by the FSA, CFTC, SEC, and DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

242.    On May 6, 2011, Defendant RBS disclosed in a Form 6-K filed with the SEC that it was "co-operating with" the investigations being conducted by the CFTC, SEC, and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

243.    On May 16, 2011, Lloyds disclosed that it "had received requests for information as part of the Libor investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."  The *London Daily Telegraph* reported that HBOS, which merged with Lloyds in January 2009 to form the Lloyds Banking Group, "was the main target given its near collapse in late 2008 as it lost access to wholesale funding markets."

244.    On May 23, 2011, the *Daily Telegraph* further reported that the United States Federal Bureau of Investigation ("FBI") had become involved and was working closely with U.S. and Foreign regulatory authorities in connection to the LIBOR probe.  The U.K. Serious Fraud Office, which handles criminal investigations into financial matters, "revealed it is also taking an active interest" in the LIBOR probe.  Announcing the involvement of the FBI and the U.K. Serious Fraud Office made clear that the LIBOR manipulation investigation had gone beyond merely a civil probe, but raised the specter that criminal arrests and charges were not only possible but likely.

245.    On July 26, 2011, UBS filed a Form 6-K filed with the SEC in which it disclosed that it had requested and been granted conditional immunity from criminal charges and was

eligible for reduced civil penalties as a result of its admission that it had engaged in a conspiracy with the other Defendants to manipulate LIBOR.

246.    On <u>August 1, 2011</u>, in an interim report, Defendant HSBC disclosed that it and/or its subsidiaries had "received requests" from various regulators to provide information and were "cooperating with their enquiries."

247.    On <u>September 7, 2011</u>, the *Financial Times* reported that as part of their LIBOR investigations, the DOJ and the CFTC were assessing whether the Defendant banks violated the Commodity Exchange Act, which can result in criminal liability, by examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."

248.    The LIBOR manipulation conspiracy involves numerous foreign currencies.  On <u>October 19, 2011</u>, *The Wall Street Journal* reported that the European Commission "seized documents from several major banks" the previous day, "marking the escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or EURIBOR which is an interest rate benchmark similar to LIBOR.  EURIBOR, which is set by more than 40 banks, is used to determine interest rates on trillions of Euros' worth of Euro-denominated loans and debt instruments.  According to *The Wall Street Journal*, the EURIBOR inquiry constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing for more than a year. According to *The Wall Street Journal*, also reported that while the list of financial firms raided by the European Commission was not available people familiar with the situation indicated that "a large French bank and a large German bank" among the targets, and the coordinated raids "occurred in London and other European cities."

249.    On <u>October 31, 2011</u>, the *Financial News* observed that "[a]n investigation into price fixing, first ordered by the [SEC] in <u>2008</u>, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."

250.    On <u>December 9, 2011</u>, *Law360* reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. ("CGM Japan") and UBS Securities Japan Ltd. ("UBS Japan"), which are related to Defendants Citigroup and UBS, "employed staffers who attempted to influence" the Euroyen Tokyo InterBank Offered Rate ("TIBOR") "to gain advantage on derivative trades."  The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies.  The SESC stated that Defendant Citigroup's head of G-10 rates and one of its traders, as well as a UBS trader, were involved in misconduct related to the TIBOR.  The SESC found that, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets."  Moreover, the SESC added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem."  *Law360* reported that the SESC released "a similar statement" about UBS's alleged conduct.

251.    Defendants Citigroup and UBS did not deny the SESC's findings.  In response, Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation.  The company has started working diligently to address the issues raised."  A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had

been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved."  She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

252.    Defendant Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against CGM Japan for its involvement in rate manipulation.  The JFSA issued a Business Improvement Order and suspended CGM Japan's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from January 10, 2012 to January 23, 2012.  On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan Ltd.'s retail business and also noted that the communications made by the CGM Japan traders to employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank Japan Ltd.'s management team.

253.    UBS likewise recently revealed further details regarding the Japanese regulators' findings and the resulting disciplinary action. Specifically, the bank announced that on December 16, 2011, the JFSA commenced an administrative action against UBS Japan, based on findings by the SESC that:

> (i) a trader of UBS Securities Japan engaged in inappropriate conduct relating to Euroyen TIBOR and Yen LIBOR, including approaching UBS AG, Tokyo Branch, and other banks to ask them to submit TIBOR rates taking into account requests from the trader for the purpose of benefitting trading positions; and
>
> (ii) serious problems in the internal controls of UBS Securities Japan resulted in its failure to detect this conduct.

254.    Based on the findings of the SESC, the JFSA "issued a Business Suspension Order requiring UBS Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR" from January 10, 2012 to January 16, 2012, with a few limited exceptions.  The JFSA also issued a Business Improvement Order requiring UBS Japan

to enhance "compliance with its legal and regulatory obligations" and to establish a "control framework" designed to prevent similar improper conduct.  Based on the evidence uncovered to date by government investigators, prosecutors and regulators, the manipulation engaged in by CGM Japan and UBS Japan, which resulted in trading suspensions and Business Improvement Orders was not limited to Japan and these two entities but was widespread amongst the Defendants.

255.    According to The *Wall Street Journal*, the UBS trader who was involved in the rate manipulations at UBS Japan was Thomas Hayes, who joined UBS Japan in 2006 "and traded products linked to the pricing of short-term yen-denominated borrowings."  Mr. Hayes worked at UBS Japan for about three years.  Criminal conspiracy charges against Mr. Hayes and fellow former UBS senior trader Roger Darin were unsealed on December 19, 2012.

256.    Throughout the end of 2011 and the beginning of 2012, there were numerous articles relating to government investigations and probes relating to illegal collusion and agreements amongst the BBA member banks, including the Defendants in this litigation, to manipulate LIBOR and other global benchmark interest rates.  For example, on February 3, 2012, Defendant Credit Suisse disclosed that the Swiss Competition Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including Defendant Credit Suisse, concerning potential collusion among traders to affect and influence the bid ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies by manipulating the rates.

257.    Additionally, on February 14, 2012, *Bloomberg* reported that two people with knowledge of the ongoing LIBOR probe disclosed that global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the

world."  The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), added that investigators also had "received e-mail evidence of potential collusion" between the banks that set LIBOR.  According to Bloomberg's sources, the FSA was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."

258.   *Bloomberg* further reported that Defendant RBS had "dismissed at least four employees in connection with the probes," and Defendants Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

259.   According to *Bloomberg's* February 14, 2012 article, European Union antitrust regulators joined the investigation regarding whether the Defendant banks formed a global cartel and coordinated falsifying their reported borrowing costs in response to the economic crisis that began in 2007.  All of the Defendants had a joint vested interest to create the illusion that they were in good financial health and used LIBOR reporting as an opportunity to improve their own trading position in LIBOR-linked transactions and financial instruments.

260.   In March of 2012, the Monetary Authority of Singapore disclosed that it had been approached by regulators from other countries to join in the probe of possible manipulation of global benchmark interest rates.  The investigation of the Monetary Authority of Singapore has revealed widespread collusion amongst the Defendants, operating across the world, to manipulate global benchmark interest rates.

261.   On January 24, 2013, the *Daily Mail* reported that documents released in connection with litigation in London identified 104 current and former Barclays employees whose emails were turned over to U.K. regulators in their probe of Barclays.

262.     On January 25, 2013, the *Financial Times* reported that evidence presented in the litigation indicated that top executives at Barclays knew as early as November 2007 that Barclays was suppressing LIBOR submissions.

263.     On February 12, 2013, the *Wall Street Journal* reported that the U.S. DOJ and CFTC are investigating interdealer brokers ICAP PLC and R.P. Martin Holdings Ltd. Subsequently, in a September 25, 2013, press release, the DOJ Antitrust Division criminal enforcement program announced that in a complaint unsealed that day, two former derivatives brokers and a former cash broker of London-based brokerage firm ICAP, Colin Goodman, Daniel Wilkinson and Darrell Read, were charged were charged with conspiracy to commit wire fraud and two counts of wire fraud "for conspiring to manipulate benchmark interest rates that determined the profitability of their client's trades."  And, on May 15, 2014 the CFTC announced that it had charged RP Martin Holdings Limited and its subsidiary, Martin Brokers (UK) Limited, with manipulation and attempted manipulation of Yen Libor and that it had ordered RP Martin to pay a $1.2 million civil monetary penalty.

264.     According to the *Daily Mail*, investigations by the SEC, the FSA, the Swiss Competition Commission, and regulators in Japan have focused on three areas of concern about interest rate manipulation.  The first area of concern is whether banks artificially suppressed LIBOR during the financial crisis, making Defendants' financial status appear more secure than in actuality.  The second area of concern is whether bankers setting LIBOR transactions leaked their data to traders before officially providing the banks' LIBOR submissions to the BBA.  The third area of concern is whether and to what extent traders at the Defendant banks and at other organizations (such as hedge funds), influenced LIBOR by making suggestions or demands on the bankers for the other Defendants to set LIBOR and other global benchmark interest rates at

specific levels.  By colluding on their LIBOR submissions the Defendants were able to manipulate LIBOR-linked transactions and financial instruments in their favor to the detriment of their transactional counterparties and other investors in LIBOR-based financial instruments, including Plaintiffs.

265.    The LIBOR manipulation investigations have begun to make inroads, with the Barclays, UBS, RBS's, Rabobank's and Lloyds' settlements.  As part of those settlements, Barclays, UBS, RBS, Rabobank, and Lloyds agreed to cooperate with authorities, and Barclays and UBS have admitted that there was a worldwide conspiracy to manipulate LIBOR and other global benchmark interest rates and that their traders were involved in that conspiracy.  Through their cooperation which includes volumes of documentary evidence, including e-mails, Instant Messages and other forms of communication, there is significant evidence implicating the other Defendants in the global conspiracy to manipulate LIBOR.  Furthermore, with the pending criminal indictments of the Defendant banks' individual traders and executives, government prosecutors have, in their opinion, accumulated sufficient evidence to meet the criminal burden of proof for convicting Defendants' executives and traders for their involvement in the manipulation of LIBOR and other global benchmark interest rates.  Finally, there are reports that most, if not all, of the Defendants and the Co-Conspirators (who are the members of the US Dollar Contributor Panel for LIBOR) are negotiating a potential group settlement with global prosecutors and regulators regarding the LIBOR manipulation conspiracy.

**3.  <u>Barclays Settles Criminal and Civil Claims with Prosecutors and Regulators in the United Kingdom and United States</u>**

266.    Barclays was one of the major players in the LIBOR manipulation and avoided prosecution in the U.K. and U.S. by entering into settlements with the FSA, CFTC, and DOJ's

Fraud Section.  In the United Kingdom, as part of the settlement with the FSA, Barclays agreed

to pay £290 million ($453.6 million) in fines.

267.    In the United States on June 27, 2012, the CFTC issued an *Order Instituting*

*Proceedings* ("CFTC Order") finding that Barclays PLC, Barclays Bank PLC and Barclays

Capital Inc. violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C.

§§ 9, l3b and 13(a)(2) (2006).  Significant portions of the CFTC Order are cited earlier herein to

show the existence and extent of the LIBOR conspiracy.

268.    The investigations that led to Barclays' settlements uncovered numerous

documents demonstrating Barclays' involvement in the LIBOR manipulation conspiracy.  On

numerous occasions, between January 2005 and June 2009, Barclays' derivatives traders made

requests to its Submitters[57] to make false submissions that favored their trading positions vis-à-

vis their transactional counterparties and other investors in LIBOR-based financial instruments,

such as Plaintiffs.  The majority of these requests came from traders on Barclays' New York

Interest Rate Swaps Desk ("NY Swaps Desk") located in New York and London and involved

U.S. Dollar LIBOR.  These included requests made on behalf of derivatives traders at other

banks.  The derivatives traders were motivated to benefit Barclays' trading positions, not to

accurately report Barclays' actual lending and borrowing rates, which is what Barclays was

required to do.  The aim of these requests was to influence the calculation of the final

benchmark interest rates, including LIBOR.  The derivatives traders openly discussed the

requests at their desks.  At least one derivatives trader at Barclays would shout across the euro

---

[57] Submitters are the individuals responsible for providing Barclays' daily submissions for benchmark interest rates such as LIBOR.

Swaps Desk to confirm that other traders had no conflicting rate preferences prior to making a request to the Submitters.

269. The CFTC found that senior traders on Barclays' NY Swaps Desk instructed several other swaps traders to make the requests of the LIBOR submitters on Barclays' London Money Market Desk for certain LIBOR submissions in order to move their LIBOR submissions in a direction to benefit the desk's derivatives trading positions. The traders' conduct was common and pervasive, and known by other traders and trading desk managers located near the Interest Rate Swaps Desk, both in New York and London. The traders never attempted to conceal their discussions and rate requests from supervisors at Barclays.

270. Requests by derivative traders to submit false ratings to Barclays' Submitters were made verbally, by e-mail and by instant message. On a few occasions, some traders would even make entries in their electronic calendars to remind themselves what requests to make of Barclays' LIBOR submitters the next day. There is both testimonial and documentary evidence showing the manipulation of LIBOR rates by Barclays' derivatives traders.

271. After determining how moves in EBF Euribor would affect the desk's profitability, Barclays' Euro swaps traders contacted the Euribor submitters, including via email and through an instant messaging system, to request that the submissions be moved either higher or lower in a particular tenor. On a few occasions, one swaps trader made entries in electronic calendars to remind himself what requests to make of Barclays' Euribor submitters the next day.

272. Additionally, one former Barclays' senior Euro swaps trader on occasion sent requests to alter Barclays' Euribor submissions to his former fellow traders after he had left Barclays and was employed by other financial institutions. He made the requests to benefit his derivatives trading positions. These requests were made by email or by instant message. The

114

following are examples of communications between the traders and submitters uncovered by the

CFTC:

June 1, 2006:

- Senior Euro Swaps Trader: *"Hi [Euribor Submitter], is it too late to ask for a low 3m?"*

- Euribor Submitter: *"Just about to put them in ..... so no."*

September 7, 2006:

- Senior Euro Swaps Trader: *"I have a huge 1m fixing today and it would really help to have a low 1m tx a lot."*

- Euribor Submitter: *"I'll do my best."*

- Senior Euro Swaps Trader: *"because I am aware some other bank need a very high one ... .if you could push it very low it would help. I have 50bn fixing."*

October 13, 2006:

- Senior Euro Swaps Trader: *"I have a huge fixing on Monday ... something like 30bn 1m fixing ... and I would like it to be very very very high ..... Can you do something to help? I know a big clearer will be against us ... and don't want to lose money on that one."*

- Euribor Submitter forwarded the request to another Euribor submitter, advising: *"We always try and do our best to help out. .... "*

- Senior Euribor Submitter to Senior Euro Swaps Trader: *"By the way [Euribor Submitter] tells me that it would be good to see a high lmth fix on Monday, we will pay for some cash that morning so hopefully that will help."*

January 12, 2007:

- Senior Euro Swaps Trader: *"hi [Euribor Submitter]. we need a low 1m in the coming days if u can .... "*

- Senior Euribor Submitter: *"hi [Senior Euro Swaps Trader], we will keep the 1mth low for a few days."*

April 2, 2007:

- Euro Swaps Trader: *"hello [Senior Euribor Submitter], could you please put in a high 6 month euribor today?"*

- Senior Euribor Submitter: *"will do."*

July 29, 2008:

- Euro Swaps Trader to Senior Euro Swaps Trader: *"I was discussing the strategy [to get a high fixing] with [Senior Euribor Submitter] earlier this morning - today he will stay bid in the mkt and put a high fixing but without lifting any offer, and then he will be really paying up for cash tomorrow and Thursday which is when the big positive resets are."*

273.   The CFTC found that during the period from at least mid-2005 through mid-2008, certain Barclays Euro swaps traders, led by the same former Barclays' senior Euro swaps trader, coordinated with traders at certain other panel banks to have their respective Euribor submitters make certain Euribor submissions in order to affect the official EBF Euribor fixing.

274.   The former Barclays senior Euro swaps trader, while still employed by Barclays, spoke daily with traders at certain panel banks concerning their respective derivatives positions in order to determine how to change the official EBF Euribor fixing in a manner that benefitted their derivatives positions.

275.   In these conversations, the traders agreed to contact their respective Euribor submitters to request the agreed-upon Euribor submission.  The following are examples uncovered by the CFTC and FSA of the communications among the Barclays Senior Euro Trader, Barclays' Euribor submitters and traders at other banks:

August 14, 2006:

- Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low one month and high three month and six month Euribor.

- Barclays' Senior Euro Swaps Trader agreed to do so and promised to contact the trader at Bank B to make the same request.

- Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor Submitter: *"We have some big fixings today. Is it possible to have a very low 1m and high 3m and 6m? Thx a lot for your help."*

- Barclays' Senior Euribor Submitter responded: *"Sure, will do."*

November 10, 2006:

- Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low one month Euribor setting at Barclays and at Bank B.

- Barclays' Senior Euro Swaps Trader made the request of the trader at Bank B.

- Barclays' Senior Euro Swaps Trader emailed the request to the Barclays Senior, Euribor Submitter: *"hi [Senior Euribor Submitter]. I know you can help. On Monday we have a huge fixing on the 1m and we would like it to be low if possible. Tx for your kind help."*

- Barclays' Senior Euribor Submitter replied: *"of course we will put in a low fixing."*

November 13, 2006:

- Barclays' Senior Euro Swaps Trader discussed the need for low one month Euribor with traders at Bank A and Bank B, and contacted a trader at Bank C.

- Barclays' Senior Euro Swaps Trader then reminded Barclays' Senior Euribor Submitter of his request from Friday: *"hi [Senior Euribor Submitter]. Sorry to be a pain but just to remind you the importance of a low fixing for us today."*

- Barclays' Senior Euribor Submitter replied: *"no problem, I had not forgotten. The [voice] brokers are going for 3.372, we will put in 36 for our contribution;"*
- Barclays' Senior Euro Swaps Trader's responded: *"I love you."*

December 5, 2006:

- Barclays' Senior Euro Swaps Trader requested that traders at Banks A, Band C have their Euribor submitters make a high six month Euribor submission.

- When the trader at Bank C stated that he needed the same submission, Barclays' Senior Euro Swaps Trader agreed to make the request of the Barclays Euribor submitters.

- Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor Submitter: *"hi [Senior Euribor Submitter] is it possible to have a high 6m ficxing [sic]? Where do you think it will fix?"*
- Barclays' Senior Euribor Submitter responded: *"Hi [Senior Euro Swaps Trader]. we have posted 3.73, hope that helps .. can put in higher if you like?"*

- Barclays' Senior Euro Swaps Trader replied: *"thats fine tx a lot for your help."*

February 12, 2007:

- Barclays' Senior Euro Swaps Trader agreed with traders at Banks A and B to have their respective one month Euribor submissions lowered.

- Barclays' Senior Euro Swaps Trader submitted that request to the Barclays Senior Euribor Submitter, stating: *"hi [Senior Euribor Submitter]. Is it possible to have a low 1m fix today?"*

- Barclays' Senior Euribor Submitter replied: *"will do."*

276.    In addition, the U.K. FSA made several findings in its <u>June 2012</u> Final Notice

("Barclays FSA") regarding Barclays' involvement in a LIBOR manipulation conspiracy,

finding that Barclays violated several principles of the FSA's Principles for Businesses.  FSA's

Principles for Businesses set forth the rules for proper business practices in the financial

services industry.  The FSA determined, based on the evidence set forth in this memo, and other

evidence (some of which has not yet been publically disclosed) that Barclays' was engaged in

widespread and pervasive wrongdoing in regards to its LIBOR and EURIBOR submissions.

277.    The FSA has found that: (1) between <u>January 2005</u> and <u>May 2009</u>, at least 173 requests for US Dollar LIBOR submissions were made by derivative traders to Barclays' Submitters (including 11 requests based on communications from derivatives traders at other banks); (2) between <u>September 2005</u> and <u>May 2009</u>, at least 58 requests for EURIBOR submissions were made by derivatives traders to Barclays' Submitters (including 20 requests based on communications from derivative traders at other banks); and (3) between <u>August 2006</u> and <u>June 2009</u>, at least 26 requests for Yen LIBOR submissions were made to Barclays' Submitters.

278.    At least 14 derivatives traders at Barclays were involved in this manipulation, including several senior derivative traders.   In addition, trading desk managers received or participated in inappropriate communications on, at least, the following occasions: (1) on <u>March 22, 2006</u>, Trader A (a US Dollar derivatives trader) stated in an email to Manager A that Barclays' Submitter ***"submits our settings each day, we influence our settings based on the fixings we all have"***; (2) on <u>February 5, 2008</u>, Trader B (another US Dollar derivatives trader) stated in a telephone conversation with Manager B that Barclays' Submitter was submitting ***"the highest LIBOR of anybody […] He's like, I think this is where it should be.  I'm like, dude, you're killing us"***.  Manager B instructed Trader B to: ***"just tell him to keep it, to put it low"***. Trader B said that he had "begged" the Submitter to put in a low LIBOR submission and the Submitter had said he would ***"see what I can do"***; and (3) in <u>July 2008</u>, euro derivatives traders sent emails to Manager C indicating that they had spoken to Barclays' Submitter about the desk's reset positions and he had agreed to assist them.

279.    Barclays' derivative traders would request high or low submissions regularly in e-mails.  On Friday, <u>March 10, 2006</u>, two US Dollar derivatives traders made e-mail requests for a

low three month US Dollar LIBOR submission for the coming Monday: (1) Trader C stated

*"We have an unbelievably large set on Monday (the IMM).  We need a really low 3m fix, it could potentially cost a fortune.  Would really appreciate any help"*; (2) Trader B explained *"I really need a very very low 3m fixing on Monday – preferably we get kicked out.  We have about 80 yards [billion] fixing for the desk and each 0.1 [one basis point] lower in the fix is a huge help for us.  So 4.90 or lower would be fantastic"*.  Trader B also indicated his preference that Barclays would be kicked out of the average calculation; and (3) On Monday, <u>March 13, 2006</u>, the following email exchange took place:

> **Trader C:**      *"The big day [has] arrived… My NYK are screaming at me about an unchanged 3m libor.  As always, any help wd be greatly appreciated.  What do you think you'll go for 3m?"*
>
> **Submitter:**      *"I am going 90 altho 91 is what I should be posting"*.
>
> **Trader C:**       *"[…] when I retire and write a book about this business your name will be written in golden letters […]"*.
>
> **Submitter:**  *"I would prefer this [to] not be in any book!"*

280.     The derivatives traders made requests to manipulate interest rates on a routine basis.  For example, the following e-mail exchange took place on <u>May 27, 2005</u>:

> **Submitter:**      *"Hi All, Just as an FYI, I will be in noon'ish on Monday […]"*.
>
> **Trader B:**      *"Noonish?  Whos going to put my low fixings in? hehehe"*
>
> **Submitter:**      *"[…] [X or Y] will be here if you have any requests for the fixings"*.

281.     Trader D set calendar entries on at least 4 occasions in <u>2006</u> to remind him to make requests for EURIBOR submissions: "Ask for Low Reset Rate" and "Ask for High 6M Fix".  The routine nature of the requests demonstrates that Barclays' Submitters actively incorporated the requests of Barclays' derivatives traders in determining its submissions.

Furthermore, there is documentary evidence of Submitters manipulating LIBOR rates at the direction of Barclays' derivatives traders.

282.    In response to a request from Trader C for a high one month and low three month US dollar LIBOR submission on <u>March 16, 2006</u>, a Submitter responded: ***"For you…anything. I am going to go 78 and 92.5.  It is difficult to go lower than that in threes, looking at where cash is trading.  In fact, if you did not want a low one I would have gone 93 at least"***.

283.    At 10:52 a.m. on <u>April 7, 2006</u> (shortly before the submissions were due to be made), Trader C requested low one month and three month US dollar LIBOR submissions: ***"If it's not too late low 1m and 3m would be nice, but please feel free to say "no"... Coffees will be coming your way either way, just to say thank you for your help in the past few weeks"***.  A Submitter responded ***"Done…for you big boy"***.  On June 29, 2006, a Submitter responded to Trader E's request for EURIBOR submissions ***"with the offer side at 2.90 and 3.05 I will input mine at 2.89 and 3.04 with you guys wanting lower fixings (normally I would be a tick above the offer side)"***.

284.    On <u>August 6, 2007</u>, a Submitter even offered to submit a US Dollar rate higher than that requested:

> ***Trader F:***      ***"Pls set 3m libor as high as possible today"***
>
> ***Submitter:***      ***"Sure 5.37 okay?"***
>
> ***Trader F:***      ***"5.36 is fine"***

285.    The FSA Final Notice illustrates through a series of graphs how Barclays' U.S. Dollar LIBOR submissions were relative to the final LIBOR benchmark rate.  When compared with dates when there were known requests and efforts to manipulate LIBOR, Barclays' U.S. Dollar submissions demonstrate the existence and scope of the conspiracy.







4. **UBS Settles Criminal and Civil Claims with Prosecutors and Regulators in the United States, United Kingdom and Switzerland**

286.   On <u>December 19, 2012,</u> Defendant UBS announced a settlement with regulators in the U.K., U.S., and Switzerland, under which UBS would pay over $1.5 billion.  As part of the settlement, subsidiary UBS Securities Japan Co. Ltd. entered into a Plea Agreement, under which it pled guilty to felony wire fraud and agreed to pay a $100 million fine to the U.S. DOJ's Fraud Section.  The court approved the $100 million fine on <u>September 18, 2013</u>.  Additionally, Defendant UBS agreed to pay a $400 million penalty to the U.S. DOJ's Fraud Section as part of a Non-Prosecution Agreement ("UBS NPA") and, also agreed to admit to a 51-page Statement of Facts appended to the UBS NPA, setting forth in great detail its manipulation of LIBOR and other similar benchmark rates. ("UBS SOF").  A copy of the UBS NPA and UBS SOF are attached hereto as **EXHIBIT 3**. UBS agreed to pay another $700 million to the U.S. CFTC,

$259.2 million to the U.K. FSA, and $64.3 million to the Swiss Financial Markets Authority.  A copy of the UBS CFTC Order is attached hereto as **EXHIBIT 4.**

287.    As with the Barclays settlement, when the UBS settlement was announced, the CFTC and other regulators disclosed the contents of dozens of communications evidencing the misconduct of UBS' traders and Submitters, and their cooperation with employees of other banks and brokerage firms to make false submissions to favor UBS' trading positions vis-à-vis their transactional counterparties and other investors in LIBOR-based financial instruments, such as Plaintiffs.  The following are examples of internal UBS emails, as well as emails between UBS traders and third party brokers and traders employed by other banks, taken from the CFTC's December 19, 2012 *Order Instituting Proceedings:*

December 24, 2008:

- UBS Yen Trader: "Can we pls go for lower Libors tonight, across all tenors (1 m 3m and 6m) much appreciated"

- UBS Yen Trader-Submitter: "Will do"

November 8, 2006:

- UBS Senior Yen Trader: "have put some pressure on a few people I know to get libors up today, mailnly 6pm as I am paid that one, let me know if that doesn't suit or if there are any particularly you need up..."

February 27, 2007:

- UBS Senior Yen Trader: "hi... can we go low 1m and 3m again pls"

- UBS Senior Yen Trader-Submitter: "we'll try...but there's a limit on to how much [w]e can shade it i.e. we still have to be within an explainable range"

April 20, 2007:

- UBS Senior Yen Trader: "I know I only talk to you when I need something but if you could ask your guys to keep 3m low wd be massive help as long as it doesn't interfere with your stuff  tx in advance ... mate did you manage to spk to your cash boys?"

- Yen trader at "Bank B": "yes u owe me they are going 65 and 71"

- UBS Senior Yen Trader: "thx mate yes I do  in fact I owe you big time  mater they set 64!  thats beyond the call of duty!"

November 1, 2007:

- UBS Senior Yen Trader: "hello mate, real big favour to ask.  could you try for low 6m fix today pls wld be most appreciated.  Thx mate"

- Yen trader at "Bank B": "will try my best due hows u ??"

July 7, 2008:

- UBS Senior Yen Rates Trader: "1m libor is causing me a real headache .. I need it to start coming lower"

- Derivatives Broker [at unidentified brokerage firm]: "yeah I know mate ... ill try and push a few fictitious offers ard this mng see if tahts helps"

September 18, 2008:

- UBS Senior Yen Trader [to Derivatives Broker at unidentified brokerage firm]:

  "... I need you to keep it as low as possible... I'll pay you, you know, 50,000

  dollars, 100,000 dollars ... whatever you want... I'm a man of my word."

**5.  The First Individuals Face Criminal Charges and Arrests**

288.   On December 11, 2012, the U.K. Serious Fraud Office arrested three individuals as part of its criminal investigation.  The individuals arrested were Tom Alexander William Hayes, who had worked as a trader for Defendants UBS and Citigroup, and Terry Farr and Jim Gilmour, both employees of brokerage firm RP Martin Holdings Ltd.

289.    On December 19, 2012, the same day that UBS announced its settlement with regulators, the U.S. DOJ's criminal complaint against former senior UBS traders Tom Alexander William Hayes and Roger Darin was unsealed in the Southern District of New York. Hayes and Darin were charged with conspiracy to commit wire fraud.  Hayes, who was arrested by the U.K. Serious Fraud Office the previous week, was also charged with wire fraud and a price fixing violation.  The complaint alleges that Hayes and Darin conspired with others inside UBS, as well as brokerage firms and other banks, to manipulate Yen-LIBOR to benefit UBS' trading positions vis-à-vis their transactional counterparties and other investors in LIBOR-based financial instruments, such as Plaintiffs.

290.    On June 18, 2013, Hayes was charged with eight counts of fraud by the U.K. Serious Fraud Office.  On July 15, 2013, the U.K. Serious Fraud Office charged Farr with two counts of conspiracy to defraud, and Gilmour with one.

### 6.  **The Royal Bank of Scotland Settles Criminal and Civil Claims with Prosecutors and Regulators in the United States and United Kingdom**

291.    On February 6, 2013 Defendant RBS announced a settlement with regulators in the U.K., and U.S., under which RBS would pay approximately $612 million.  As part of the settlement, subsidiary RBS Securities Japan Limited entered into a Plea Agreement, under which it pled guilty to felony wire fraud and agreed to pay a $50 million fine to the U.S. DOJ's Fraud Section.  Additionally, subsidiary Royal Bank of Scotland plc agreed to pay a $100 million penalty to the U.S. DOJ's Fraud Section as part of a Deferred Prosecution Agreement. Under the Deferred Prosecution Agreement, RBS also agreed to admit to an 11-page Statement of Facts, setting forth in great detail its manipulation of LIBOR and other similar benchmark rates.  RBS agreed to pay another $325 million to the U.S. CFTC, and approximately $137 million to the U.K. FSA.

292.     When the RBS settlement was announced, the CFTC and other regulators disclosed the contents of dozens of communications evidencing the misconduct of RBS' traders and submitters, their cooperation with employees of other banks and brokerage firms to make false submissions to favor RBS' trading positions vis-à-vis their transactional counterparties and other investors in LIBOR-based financial instruments, such as Plaintiffs, and knowledge of other banks' wrongdoing.  The following are examples of internal RBS emails, as well as emails between RBS traders and traders employed by other banks, taken from the CFTC's February 6, 2013 *Order Instituting Proceedings:*

May 3, 2007:

- Senior Yen Trader: "can you drop a note to [Primary Submitter] to set low 1m and low 3m JPY libor today please? Thanks"

- Yen Trader 5: "just gave him a shout, said already on it..."

- Senior Yen Trader: "thanks"

- Yen Trader 5: "no probs"

December 3, 2007:

- Yen Manager: "for choice we want lower libors.. Let the [Money Market] guys know pls"

- Yen Trader 2: "sure I am setting today as [Yen Trader 1] and cash guy off [Primary Submitter]"

- Yen Manager: great set it nice and low"

- Yen Trader 2: "1.02 in 6m or lower"

- Yen Manager: "yeh lower"

- Yen Trader 2: "1.01 then cant really go much lower than that"

- Yen Manager: "ok"

August 20, 2007:

- Senior Yen Trader: "this libor setting is getting nutss..."

- Bank B Trader: "[UBS] is lending dolls through my currencies in 3 month do u see him doing the same in urs..."

- Senior Yen Trader: "yes, he always led usd in my mkt[,] the jpy libor is a cartel now... its just amazing how libor fixing can make you that much money"

August 20, 2007:

- Yen Trader 1: "where would you like it[,] libor that is[,] same as yesterday is call"

- Yen Trader 4: "haha, glad you clarified ! mixed feelings but mostly I'd like it all lower so the world starts to make a little more sense."

- Senior Yen Trader: "the whole HF [hedge fund] world will be kissing you instead of calling me if libor move lower"

February 15, 2007:

- RBS Yen Trader 2: "how many people can u get to put this 1m libor low"

- UBS Yen Trader: well us[,] [Bank E,] and a few others I think"

June 26, 2009:

- Interdealer Broker B: "Hello mate, [Yen Trader 1]? You all set?"

- RBS Yen Trader 1: "Yeah."

- Interdealer Broker B: "Right listen we've had a couple of words with them, you want them lower right?"

- RBS Yen Trader 1: "Yeah."

- Interdealer Broker B: "Alright okay, alright listen, we've had a couple words with them. You want them lower, right?"

- RBS Yen Trader 1: "Yeah."

- Interdealer Broker B: "Alright okay, alright, no we're okay just confirming it. We've, so far we've spoke to [Bank F]. We've spoke to a couple of people so we'll see where they come in alright. We've spoke, basically one second,

basically we spoke to [Bank F], [Bank G], [Bank H], who else did I speak to? [Bank I]. There's a couple of other people that the boys have spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?"

7.  **Rabobank Settles with Prosecutors and Regulators in the United States, United Kingdom, and the Netherlands**

293.    On October 29, 2013, Defendant Rabobank announced a settlement with

regulators in the U.S., U.K., and the Netherlands, under which Rabobank would pay

approximately $1.06 billion.  Under the settlement, Rabobank agreed to pay $325 million to the

DOJ, and $475 to the CFTC, as well as approximately $170 million to the U.K. FCA and $96

million to Dutch authorities.  As part of the agreement, Rabobank entered into a Deferred

Prosecution Agreement with the DOJ, and agreed to continue cooperating with the government

investigations.  On the same day, Piet Moerland, the Chairman of Rabobank's executive board,

resigned from the bank.

294.    On June 10, 2014, Takayuki Yagami, a former Rabobank Yen derivatives trader

pleaded guilty for his role in a conspiracy to commit wire and bank fraud by manipulating

Rabobank's Yen LIBOR submissions to benefit his trading positions.  Yagami worked as a

senior trader at Rabobank's Money Market/FX Forwards desks in Tokyo and elsewhere in Asia.

Yagami was the ninth person charged by the DOJ in the U.S. in connection with the industry-

wide LIBOR investigation.  He pleaded guilty to the criminal information before United States

District Judge Jed S. Rakoff the Southern District of New York.

295.    On August 18, 2014, Paul Robson, of the U.K., and a former Rabobank Yen

LIBOR submitter pleaded guilty for his role in a conspiracy to commit wire and bank fraud by

manipulating Rabobank's Yen LIBOR submissions to benefit trading positions.  According to

court documents, Robson worked as senior trader at Rabobank's Money Markets and Short

Term Forwards desk in London and also served as Rabobank's primary submitter of Yen LIBOR to the BBA. Robson was the second employee at Rabobank to plead guilty to participating in the global fraud scheme. Robson was criminally charged by the DOJ and pleaded guilty before District Court Judge Rakoff.

296.     Yagami admitted to conspiring with Robson, as well as Paul Thompson of Australia, and Tetsuya Motomura of Japan. All four are former Rabobank employees. Robson, Thompson and Motomura were charged with conspiracy to commit wire fraud and bank fraud as well as substantive counts of wire fraud in a fifteen-count indictment returned by a federal grand jury in the Southern District of New York on April 28, 2014. Robson worked as a senior trader at Rabobank's Money Markets and Short Term Forwards desk in London; Thompson was Rabobank's head of Money Market and Derivatives Trading Northeast Asian and worked in Singapore.

297.     Robson admitted that he accommodated the requests of his co-defendants and other traders. For example, on September 21, 2007, after Robson allegedly received a request from Yagami for a high one-month Yen LIBOR, Rabobank submitted a one-month Yen LIBOR rate of 0.90, which was seven basis points higher than the previous day and five basis points above where Robson said that "bookies" predicted it, and which moved Rabobank's submission from the middle to the highest of the panel.

**8.  Lloyds and HBOS Settles with Prosecutors and Regulators in the United States and the United Kingdom**

298.     On July 28, 2014, Lloyds entered into settlements with the DOJ, CFTC, and FSA. As part of the settlement with the DOJ, Lloyds agreed to pay an $86 million penalty for manipulation of LIBOR. Under the Lloyds Deferred Prosecution Agreement, Lloyds also admitted to a significant Statement of Facts, setting forth in great detail its manipulation of

LIBOR and other similar benchmarks.  Lloyds agreed to pay another $105 million to the U.S. CFTC and £105 million (approximately $178 million) to the U.K.'s FCA, bringing the total amount paid by Lloyds to authorities in the U.S. and U.K. to almost $370 million.

299.    As a result of its investigation, the DOJ found that, "[f]or more than three years, traders at Lloyds manipulated the bank's LIBOR submissions for three currencies to benefit the trading positions of themselves and their friends, to the detriment of the parties on the other side of the trades."  The DOJ also found that, "Lloyds manipulated benchmark rates, allowing its traders to increase their profits unfairly and fraudulently.  Lloyds's conduct undermined financial markets domestically and abroad."  DOJ Press Release.

300.    On the same day, Lloyds also settled charges with the CFTC for acts of false reporting and attempted manipulation of LIBOR for Sterling, U.S. Dollar, and Yen committed by employees of Lloyds TSB and HBOS plc (HBOS), which was acquired by Lloyds Banking Group in January 2009.  As part of this settlement, Lloyds TSB admitted that it was successful in its manipulation of Sterling LIBOR and Yen LIBOR and that it aided and abetted the attempts of derivatives traders at Rabobank to manipulate Yen LIBOR. As a part of the settlement, Lloyds agreed to pay a $105 million civil monetary penalty to cease and desist from their violations of the Commodity Exchange Act, and to adhere to specific undertakings to ensure the integrity of LIBOR submissions in the future.

301.    The CFTC concluded that the unlawful conduct of Lloyds undermined the integrity of LIBOR, a critical global interest rate benchmark that is the basis of trillions of dollars of financial instruments.  Lloyds, through HBOS, attempted to manipulate LIBOR, at times successfully, to benefit cash derivatives trading positions.  The Order also found that

HBOS altered and lowered its Sterling and U.S. Dollar LIBOR submissions to protect its reputation at the time HBOS was being acquired by Lloyds.

302.     On July 28, 2014, the U.K. FCA fined Lloyds and Bank of Scotland plc, both part of Lloyds Banking Group, £105 million for serious misconduct relating to the Special Liquidity Scheme (SLS), the Repo Rate benchmark and LIBOR.  £70 million of the fine relates to attempts to manipulate the fees payable to the Bank of England for the firms' participation in the SLS, a taxpayer-backed government scheme designed to support the U.K.'s banks during the financial crisis.  The £105 million total fine is the joint third highest ever imposed by the FCA or its predecessor, the Financial Services Authority, and the seventh penalty for LIBOR-related failures.

303.     The U.K. FCA also found that Lloyds and RBS' LIBOR-related misconduct was similar to that of other financial institutions' manipulation of the Repo Rate benchmark in order to reduce the firms' SLS fees is misconduct of a type that has not been seen in previous LIBOR cases.  Tracey McDermott, the FCA's director of enforcement and financial crime, said:

> "The firms were a significant beneficiary of financial assistance from the Bank of England through the SLS.  Colluding to benefit the firms at the expense, ultimately, of the U.K. taxpayer was unacceptable.  This falls well short of the standards of the FCA and the market is entitled to expect from regulated firms. The abuse of the SLS is a novel feature of this case but the underlying conduct and the underlying failings – to identify, mitigate and monitor for obvious risks – are not new.  If trust in financial services is to be restored then market participants need to ensure they are learning the lessons from, and avoiding the mistakes of, their peers.  Our enforcement actions are an important source of information to help them do this."

304.     The U.K. FCA concluded that between April 2008 and September 2009, the firms manipulated their Repo Rate submissions to reduce the fees payable by them to the Bank of England for participation in the taxpayer-backed SLS.  The Repo Rate, a now discontinued benchmark rate, was published daily by the BBA until December 2012.  Repo Rate panel banks

submitted the rates, across a range of maturities, at which they were prepared to trade in the repo market.

### 9.  ICAP Fined by Regulators as Employees Face Criminal Charges

305.    On September 25, 2013, the CFTC and the U.K. FCA fined broker ICAP Europe Ltd. $87 million, and charged it with manipulation and attempted manipulation of LIBOR. ICAP Europe Ltd. was ordered to pay $65 million to the CFTC, and approximately $22 million to the FCA.  On the same day, the DOJ filed criminal charges against former ICAP employees Darrell Read, Daniel Wilkinson, and Colin Goodman.  Read, Wilkinson, and Goodman were each charged with one count of conspiracy to commit wire fraud and 2 counts of wire fraud. The DOJ's criminal complaint alleges that the three conspired with UBS' Hayes and others to "...*influence and manipulate the benchmark interest rates* to which the profitability of Hayes's derivatives trades were tied,  [and] *defraud Hayes's counterparties of money and property* by disseminating false and fraudulent statements regarding predicted Yen LIBOR….".  Complaint, *U.S. v. Read, et al.,* No. 13 MAG 2224 (S.D.N.Y.) (Sept. 13, 2013) at ¶ 19.  The Complaint notes that Goodman was often referred to by his colleagues as "'lord libor.'" *Id.* at ¶ 20(b)(iii).

306.    On March 28, 2014, the U.K. Serious Frauds Office ("U.K. SFO") initiated criminal proceedings against three former employees of the brokerage firm ICAP Plc, Danny Martin Wilkinson, Darrell Paul Read and Colin John Goodman, in connection with the manipulation of LIBOR.  The charges allege that they conspired to defraud between August 8, 2006 and September 7, 2010. The U.K. SFO is an independent government department responsible for investigating and prosecuting serious and complex fraud, bribery and corruption.

307.    On June 11, 2014, the EU's antitrust arm filed a complaint against ICAP for colluding to manipulate Yen LIBOR.  The complaint alleges that ICAP "acted as a facilitator to

breaches of EU competition law by certain banks in relation to Yen LIBOR for isolated periods between 2007 and 2010.

**10. RP Martin Settles in Exchange for Cooperating with the CFTC**

308.    On May 15, 2014, the CFTC issued an order against RP Martin filing and settling charges of manipulation, attempted manipulation, false reporting, and aiding and abetting derivatives traders' actions of manipulation and attempted manipulation of Yen LIBOR.  The Order states that from at least September 2008 through at least August 2009, RP Martin brokers on its Yen desk, at times, knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate, at times successfully, the official fixing of the daily Yen LIBOR.  RP Martin brokers did so primarily to aid and abet a senior Yen derivatives trader (Senior Yen Trader) employed at UBS and later at another bank, who was attempting to manipulate Yen LIBOR to benefit his derivatives trading positions tied to this benchmark.  According to the Order, In exchange for this unlawful assistant, RP Martin brokers accepted payments totaling more than $400,000 through the form of wash trades that were designed solely to generate commissions for RP Martin.

**11. Evidence Disclosed to Date in Canada and Singapore Confirms that Certain Defendants Conspired to Manipulate Yen-LIBOR**

309.    Documents submitted in pending legal proceedings in Canada and Singapore strongly indicate some Defendants manipulated Yen-LIBOR, the Yen-based rate set by a 15 member BBA panel that, during the Relevant Period consisted of (and still consists of) many of the same banks whose borrowing-cost quotes determine USD-LIBOR, including Barclays, Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, RBS, and UBS. The facts (some provided by Defendants themselves) demonstrating Defendants' misconduct with respect to

Yen-LIBOR illustrate both their desire and ability to manipulate interest rates, and the method by which they have done so.

### a.      **Canadian Investigation**

310.    In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior Court of Justice, East Region.  Specifically, the May 2011 Elliott Affidavit sought orders requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank, J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the "Participant Banks") to produce documents in connection with an inquiry concerning whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from 2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."

311.    The May 2011 Elliott Affidavit further states the Competition Bureau "became aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that bank's application for immunity, its counsel "orally proffered information on the Alleged Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011. Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have conducted an internal investigation of the Cooperating Party that included interviews of

employees of the Cooperating Party who had knowledge of or participated in the conduct in

question, as well as a review of relevant internal documents."  The Affidavit also notes that on

May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with

"electronic records," which Elliot "believe[s] to be records of some of the communications

involving the Cooperating Party that were read out as part of the orally proffered information by

counsel for the Cooperating Party."

      312.    The Affidavit recounted that, according to counsel, the Cooperating Party

"entered into agreements to submit artificially high or artificially low [LIBOR] submissions in

order to impact the Yen LIBOR interest rates published by the [BBA]." Those entities engaged

in that misconduct to "adjust[] the prices of financial instruments that use Yen LIBOR rates as a

basis."  The Affidavit further states the Cooperating Party's counsel "indicated the Participant

Banks submitted rates consistent with the agreements and were able to move Yen LIBOR rates

to the overall net benefit of the Participants."  The Participant Banks were BBA member banks

who were responsible for providing quotes for that particular LIBOR rate which were used by

BBA and Thomson Reuters to calculate LIBOR.

      313.    More specifically, counsel proffered that at all times alleged herein, the

Participant Banks "communicated with each other and through the Cash Brokers to form

agreements to fix the setting of Yen LIBOR," which "was done for the purpose of benefitting

trading positions, held by the Participant Banks, on IRDs [interest rate derivatives]."  By

manipulating Yen LIBOR, the Affidavit continues, "the Participant Banks affected all IRDs that

use Yen LIBOR as a basis for their price."  The misconduct was carried out "through e-mails

and Bloomberg instant messages between IRD traders at the Participant Banks and employees

of Cash Brokers (who had influence in the setting of Yen LIBOR rates)."  The Affidavit details:

IRD traders at the Participant Banks communicated with each other their desire to see a higher or lower Yen LIBOR to aid their trading position(s). These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent.  The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR.  The traders would then communicate to each other confirming that the agreed up rates were submitted.  Cash Brokers were an instrumental part of the conspiracy described by the Affidavit.

The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks.

314.    The Affidavit indicates the Cooperating Party's counsel further proffered that at least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank.  In that regard, the Affidavit specifies:

Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes.  Attempts through the HSBC trader to influence Yen LIBOR were not always successful.  Trader A also communicated his desire for a certain movement in the Yen LIBOR rate with the Cash Brokers.  He instructed them to influence the Yen LIBOR submitters of HSBC.  The Cash Brokers acknowledged making these attempts.

Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes.  The Deutsche IRD trader also shared his trading positions with Trader A.  The Deutsche IRD trader acknowledged these requests.  Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR.  The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party, HSBC and Deutsche. Not all attempts to change the LIBOR rate were successful.

Trader A explained to RBS IRD trader who his collusive contacts were and how he had and was going to manipulate Yen LIBOR.  Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave

instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes. The RBS IRD trader acknowledged these communications and confirmed that he would follow through. Trader A and the RBS IRD trader also entered into transactions that aligned their trading interest in regards to Yen LIBOR.  Trader A also communicated to another RBS IRD trader his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes.  The second RBS IRD trader agreed to do this.

Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them [two JPMorgan IRD traders] to get JPMorgan to make Yen LIBOR submissions consistent with his wishes. Trader A also asked if the IRD traders at JPMorgan required certain Yen LIBOR submissions to aid their trading positions. The JPMorgan IRD traders acknowledged these requests and said that they would act on them. On another occasion, one of the JPMorgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with. Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JPMorgan. Trader B of the Cooperating Party communicated with an IRD trader at Citi. They discussed their trading positions, advanced knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions. They also acknowledged efforts to get their banks to submit the rates they wanted.

315.    On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit.

316.    Elliott submitted another affidavit in June 2011 (the "June 2011 Elliot Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd." The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the Relevant Period.

317.    The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move." Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading

positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen."  The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests. The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market. Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker. Not all efforts to influence Yen LIBOR panel banks were successful. Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

318.    On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

319.    According to press reports, UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

### b.    Singaporean Legal Action

320.    In addition to UBS's admissions in the Canadian proceedings of the existence of a LIBOR manipulation conspiracy and its involvement in that conspiracy, in a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank permitted collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits. In the same filing, Min stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

321.    Min was later terminated by RBS, allegedly be being engaged in 'gross misconduct".  Min revealed that RBS's internal investigations "were intended to create the

impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals."  Defendant RBS, like many of the other Defendants in this case, have sought to minimize their own responsibility by scapegoating their own executives, traders and employees were either directly or indirectly urged to engage in LIBOR manipulation.

322.    Min further alleges that it was "part of his responsibilities to provide input and **submit requests to the rate setter and there is no regulation, policy, guideline or law that he has** infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate."  Those requests, Min specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight."  Min added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

323.    In responding to Min's allegations, RBS admitted that Min had tried to improperly influence RBS rate-setters from <u>2007</u> to <u>2011</u> to submit LIBOR rates at levels that would benefit him and his trading positions while at RBS.

324.    According to Min, who has admitted to manipulating LIBOR, he could not have influenced the rate on his own.  Min disclosed that it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR rate.

**H.    Comparison Of Adjusted LIBOR With The Federal Reserve Eurodollar Deposit Rate Indicates LIBOR Was Artificially Suppressed**

325.    The Federal Reserve Eurodollar Deposit Rate ("Eurodollar Deposit Rate") is a rate that is prepared and published by the U.S. Federal Reserve to reflect the rates at which

banks in the London Eurodollar money market lend U.S. dollars to one another.  This rate is analogous to LIBOR in that it is intended to reflect the true cost of borrowing in a given currency amongst financial institutions on any given day.  The Eurodollar Deposit Rate, however, is calculated and determined using a different methodology.  The Eurodollar Deposit Rate is based on data that the Federal Reserve obtains from Bloomberg and the ICAP brokerage company.  The Eurodollar Deposit Rate's calculation is not limited to sample self-reported data from 16 (now 18) banks chosen by the BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.  ICAP surveys its client banks and updates its Eurodollar deposit rates about 9:30 a.m. each morning.

326.   Because of the nature of the relationship between the Eurodollar Deposit Rate and LIBOR, it would be unusual even for one bank to submit a LIBOR bid below the Eurodollar Deposit Rate.  Therefore, if all of the Defendant banks submitted LIBOR bids below the Eurodollar Deposit Rate, this would be strong evidence of collusion amongst the Defendants.

327.   Under widely-recognized and accepted statistical analyses, using the Eurodollar Deposit Rate as a measure to analyze the integrity of LIBOR and the Defendants' LIBOR submissions is logical because there is a correlation between those rates.  Statistically, this can be measured using the "spread," which in this case is the difference between the LIBOR figure from BBA and the Eurodollar Deposit Rate.

328.   Since both LIBOR and the Eurodollar Deposit Rate measure the lending cost to banks, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the spread.  In other words, the same market forces should have the

exact same impact on both LIBOR and the Eurodollar Deposit Rate. If the two rates start deviating, the only possible explanation is that there is rate manipulation since regular market forces cannot explain why the two rates are deviating. By focusing on the spread, the model factors out normal and expected co-movements in banks' LIBOR submissions that arise from normal changes in market fundamentals, as opposed to rate manipulation.

329.     To analyze how well the Eurodollar Deposit Rate captures changes in market fundamentals and absorbs variations in LIBOR that are driven by such market fundamentals, independent consulting experts retained by counsel in these actions used a regression analysis to measure the day-to-day changes in the spread against changes in the T-Bill rate and the commercial paper rate. The T-Bill rate and the commercial paper rate are essentially risk-free rates that would reflect changes in market fundamentals. This regression analysis shows that day-to-day changes in the Eurodollar Deposit Rate effectively capture day-to-day movements in LIBOR caused by market fundamentals.

330.     Because market fundamentals are fully captured by the spread, absent manipulation, the spread should always be zero or close to zero. Thus, any changes in the spread between the Eurodollar Deposit Rate and LIBOR would be unrelated to market fundamentals. The evidence uncovered to date demonstrates that this spread can be explained best by LIBOR rate manipulation.

331.     Figures 1 and 2 shows the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid-2012. As can be seen, between January 5, 2000 and August 7, 2007, the Federal Reserve Eurodollar Deposit Rate tracked LIBOR very closely and the spread remained positive and very close to zero. This suggests that the spread between LIBOR and the Eurodollar Deposit Rate effectively captures

the shared risks of the banks sampled by BBA, Bloomberg and ICAP.  The fact that the spread

remains close to zero despite several major impacts on market fundamentals, including the

bursting of the dot-com bubble and the terrorist attacks of <u>September 11, 2001</u>, demonstrate that

the spread is able to successfully capture most, if not all, of the market fundamentals that could

impact LIBOR and that any discrepancies between LIBOR and the Eurodollar Deposit Rate is

the result of LIBOR manipulation.





332.    Figure 3 shows the spread between 3-month U.S. Dollar LIBOR and the Federal

Reserve Eurodollar Deposit Rate from <u>January 2006</u> through early <u>April 2012</u>.



333.    Beginning in <u>August of 2007</u>, the statistical analysis shows that the spread had moved significantly into negative territory and remained there.  The fact that the spread remained negative for a long period of time lends support to the assertion that this discrepancy was not the result of isolated incidents or statistical anomalies but the product of an intentional and prolonged effort to manipulate LIBOR.  During the early part of <u>August of 2007</u>, the Federal Reserve Eurodollar Deposit Rate stayed around 5.36%.  On <u>August 8</u>, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis points to 5.41%, while LIBOR did not keep pace.  The spread turned negative 3 basis points on <u>August 8, 2007</u>.  The spread remained mostly negative after <u>August 7, 2007</u> so that by <u>August 15, 2007</u>, the trailing 10-day moving-average of the spread also turned negative.  By <u>August 31, 2007</u>, the Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while LIBOR was lagging.  The negative spread on <u>August 31, 2007</u> grew to -16 basis points.

334.    The spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate remained negative over the next year.  Between <u>August 31, 2007</u> and <u>September 15, 2008</u>, the spread remained negative on 234 of the 255 days, or 91.7% of the days.  The magnitude of the negative spread averaged about -12 basis points.  During this approximately one year period, the negative spread exceeded -25 basis points on 18 days.  After many years of a spread being near zero, the fact that the spread would be consistently negative for such a long period could not be explained absent active manipulation.

335.    The bankruptcy of Lehman Brothers on <u>September 15, 2008</u> was a major shock to the global financial system and impacted LIBOR and the spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate.  The increased concerns about the health of the big banks were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate.

On September 15, 2008, the Federal Reserve Eurodollar Deposit Rate equaled 3.0%, increasing

to 3.2%, 3.75%, and 5% over the following three days.  By September 30, 2012, the Federal

Reserve Eurodollar Deposit Rate doubled to 6%.

336.    After the Lehman Brothers bankruptcy, LIBOR did not keep pace with the

Federal Reserve Eurodollar Deposit Rate, causing the spread to move deeper and deeper into

negative territory.  On September 16, 2008, the negative spread nearly doubled to -32 basis

points. The next day, on September 17, 2008, the negative spread doubled again, reaching -69

basis points. On September 18, 2008, the negative spread more than doubled once again,

reaching -180 basis points.  By September 30, 2008, the negative spread reached -195 basis

points.

337.    Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve

Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the

financial condition of the Defendant banks, while LIBOR increased by less than one-half of

that, during the exact same period.  Both the Federal Reserve Eurodollar Deposit Rate and

LIBOR should be reflecting the exact same market fundamentals.  The deviation between the

two rates strongly supports the finding that Defendants were intensifying their manipulation of

LIBOR during this time, and did so not only to manipulate LIBOR to benefit their trading

positions but also to understate their borrowing costs in the face of increasing concerns about

the health of the banks.

338.    The spread remained negative for more than one and a half years following the

Lehman Brothers bankruptcy.  The spread between LIBOR and the Federal Reserve Eurodollar

Deposit Rate finally turned positive for the first time during the post-Lehman bankruptcy period

on May 17, 2010.  However, following this date, the Spread again became negative.  The

dramatic period of negative spread during the Relevant Period, following years of uniform

behavior between each individual Defendants' LIBOR submissions and the Federal Reserve

Eurodollar Deposit Rate, is consistent across all of the LIBOR member banks, including the

named Defendants.  Figures 4 to 19 show the negative spread on a bank by bank basis for all of

the LIBOR member banks, all of whom were involved with the LIBOR manipulation scandal:

































339.    As the following chart demonstrates, the average spread between LIBOR and the

Federal Reserve Eurodollar Deposit Rate for each of the individual LIBOR member banks,

including the Defendants was uniformly negative throughout the entire Relevant Period,

strongly supporting that each of these banks was part of the conspiracy to manipulate their

LIBOR submissions and thereby artificially suppressing reported LIBOR.

| BANK NAME | Average Spread between August 8, 2007 through May 17, 2010 |
|---|---|
| 1.    Bank of Tokyo-Mitsb. | -25 basis points |
| 2.    Bank of America | -30 basis points |
| 3.    Barclays | -25 basis points |
| 4.    Citi | -32 basis points |
| 5.    CSFB | -27 basis points |
| 6.    Deutsche Bank | -31 basis points |
| 7.    HBOS | -29 basis points |
| 8.    HSBC | -32 basis points |
| 9.    JP Morgan Chase | -35 basis points |

| | BANK NAME | Average Spread between August 8, 2007 through May 17, 2010 |
|---|---|---|
| 10. | Lloyds | -30 basis points |
| 11. | Norin Bank | -25 basis points |
| 12. | Rabo Bank | -32 basis points |
| 13. | Royal Bank of Canada | -28 basis points |
| 14. | Royal Bank of Scotland | -26 basis points |
| 15. | UBS | -29 basis points |
| 16. | WestLB | -35 basis points |

340.    Moreover, as set forth in the following chart, during the critical two-week period following the bankruptcy of Lehman Brothers, each of the LIBOR member banks, including the Defendants dramatically increased their respective collusive suppression of LIBOR.

| | BANK NAME | Average Spread between September 16, 2008 and September 30, 2008 |
|---|---|---|
| 1. | Bank of Tokyo-Mitsb. | -120 basis points |
| 2. | Bank of America | -144 basis points |
| 3. | Barclays | -87 basis points |
| 4. | Citi | -142 basis points |
| 5. | CS | -122 basis points |
| 6. | Deutsche Bank | -129 basis points |
| 7. | HBOS | -110 basis points |
| 8. | HSBC | -141 basis points |
| 9. | JP Morgan Chase | -153 basis points |
| 10. | Lloyds | -146 basis points |
| 11. | Norin Bank | -126 basis points |
| 12. | Rabo Bank | -143 basis points |
| 13. | Royal Bank of Canada | -140 basis points |
| 14. | Royal Bank of Scotland | -140 basis points |
| 15. | UBS | -141 basis points |
| 16. | West | -138 basis points |

341.    As detailed above, statistical analyses based on common and well-accepted methodologies strongly supports the conclusion that suppression of LIBOR occurred during the Relevant Period, accomplished through the collusive conduct of all of the Defendants.  The

sustained period during which the Federal Reserve Eurodollar Deposit - LIBOR spread fell and remained starkly negative, as seen in Figure 2 above, is not plausibly achievable absent collusion among the LIBOR member banks. The intensified suppression from September 16, 2008 to September 30, 2008 (following the Lehman bankruptcy), in defiance of economic expectations, provides further support for the suppression of LIBOR achieved through the fraudulent and collusive acts of the Defendants and the Co-Conspirators.  The Lehman Brothers bankruptcy also provides a strong explanation for the motivation behind the LIBOR manipulation conspiracy.  With the eyes of the world on Lehman Brothers and its impact on the other financial institutions, all of the Defendants had a strong motivation to take part in the manipulation because none of the Defendants could stand being the "odd man out."

342.    Due to the fact that no Defendant member bank - absent collusive conduct - could know what LIBOR submission another LIBOR member bank of the BBA actually submitted prior to those numbers being made public after 11:00 a.m. London time, the fact that all Defendants submitted LIBOR submissions below the Federal Reserve Eurodollar Deposit Rate over the Relevant Period provides strong evidence that each of the Defendants were involved in the suppressive and collusive scheme.  If only a single Defendant had made LIBOR submissions below the Federal Reserve Eurodollar Deposit Rate, it could have been a statistical anomaly.  It would also have been ineffective in manipulating LIBOR over a sustained period of time. Consistent and prolonged LIBOR submissions below the Federal Reserve Eurodollar Deposit Rate, by all of the Defendant banks, along with the Co-Conspirators, demonstrates a wide-ranging conspiracy amongst the LIBOR member banks, including the Defendants.

I.        **Empirical Analyses Indicates Artificial Suppression Of LIBOR**

343.    In addition to the foregoing, analyses by academics and other commentators also

support Plaintiffs' allegations.  These studies collectively indicate LIBOR was artificially

suppressed during the Relevant Period.

1.        **The Discrepancy Between Defendants' LIBOR Submissions and Their Credit Default Swap Spreads Indicates They Misreported LIBOR**

344.    At all times alleged, one important economic indicator supporting allegations that

Defendants suppressed U.S. Dollar LIBOR is the variance between Defendants' LIBOR

submissions and their contemporaneous costs to buy default insurance on debt they issued

during that period.  A Credit Default Swap ("CDS") is insurance against the default on an

instrument or a party.  With a CDS, the CDS buyer typically makes a series of payments (often

referred to as the CDS "fee" or "spread") to the CDS seller in exchange for a fixed payment in

the event of default.  The CDS fee or spread is akin to a premium that is paid in order to obligate

the CDS seller to make a payment when a specific event (in this case a default) occurs.

345.    The CDS fee or spread serves as a measure of the perceived risk of default by the

entity issuing the underlying instrument against which the CDS is based.  The greater the risk of

default on the underlying financial instrument, the greater the CDS spread.  In the case of a CDS

for which the underlying instrument consists of an interbank loan where a U.S. Dollar LIBOR

Contributor Panel bank is the borrower, the greater the perceived risk the BBA Contributor

Panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread

represents the cost of insuring against the increased risk of a default on the underlying loan.

Basically, the CDS fee or spread reflects the same thing that LIBOR does, which is the risk of

default on U.S. Dollar LIBOR Contributor Panel banks.  Therefore, if the CDS fee or spread

begins to increase, it means the market is concerned about the risk of default, and LIBOR

should also increase to reflect the same concern.

346.    According to market watchers, "The cost of bank default insurance has generally

been positively correlated with LIBOR.  That is, in times when banks were thought to be

healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks

were thought to be in poor condition, both increased."   During the Relevant Period, however,

those historically-correlated indicia of banks' borrowing costs diverged significantly.

347.    The LIBOR – CDS discrepancy was addressed in a May 29, 2008 *Wall Street

Journal* article reporting the results of a study it had commissioned.  *The Wall Street Journal's*

analysis indicated numerous banks caused LIBOR, "which is supposed to reflect the average

rate at which banks lend to each other," to "act as if the banking system was doing better than it

was at critical junctures in the financial crisis."  *The Wall Street Journal* found that beginning in

January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect

rising default-insurance costs."

348.    Moreover, *The Wall Street Journal* observed that the widest gaps existed with

respect to the LIBOR quotes of LIBOR member banks Citigroup, WestLB, HBOS, JPMorgan,

and UBS. According to the Wall Street Journal, the Citigroup Defendants' LIBOR submissions

differed the most from what the CDS market suggested the bank's borrowing cost was.

Defendant Citigroup is one of the banks heavily implicated in the global probe into

manipulation of global benchmark interest rates.  On average, the rates at which Citigroup

reported it could borrow dollars for three months (*i.e.*, its three-month LIBOR rates) were about

87 basis points lower than the rates calculated using CDS data.  Based on the massive dollar

amounts at stake in LIBOR-linked transactions and financial instruments, an 87 basis point manipulation equates to hundreds of millions of dollars for Defendant Citigroup alone.

349.     WestLB, HBOS, JPMorgan, and UBS likewise exhibited significant discrepancies between LIBOR and CDS fees/spreads of 70, 57, 43, and 42 basis points, respectively.  Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and RBS each exhibited discrepancies of approximately 30 basis points, on average.  The study's authors concluded "one possible explanation for this gap is that banks understated their borrowing rates." This study, in conjunction with the other evidence of collusion, demonstrates that there was widespread collusion amongst the Defendants during all times alleged herein to fraudulently misrepresent and manipulate the LIBOR rate.

350.     Another example of suspicious conduct was noted by *The Wall Street Journal* on the afternoon of <u>March 10, 2008</u>, when investors in the CDS market were betting that WestLB, hit especially hard by the credit crisis, was nearly twice as likely to renege on its debts as Defendant Credit Suisse, which was perceived to be in better shape, yet the next morning the two banks submitted identical LIBOR submissions.  Absent manipulation, this result would be impossible since their costs of borrowing could not have been the same.

351.     Having compared the LIBOR member banks' LIBOR submissions to their actual costs of borrowing in the commercial-paper market, *The Wall Street Journal* reported that there were wide discrepancies.  For example, in mid-<u>April 2008</u>, Defendant UBS paid 2.85% to borrow dollars for three months, but on <u>April 16, 2008</u>, the bank quoted a borrowing cost of 2.73% to the BBA.

352.     *The Wall Street Journal* further noted an uncanny convergence between the U.S. Dollar Contributor Panel's LIBOR submissions: the three-month borrowing rates the banks

reported remained within a range of only 0.06 of a percentage point, even though at the time their CDS insurance costs (premiums) varied far more widely, reflecting the market's differing views as to the Defendants' creditworthiness.

353.    According to Stanford University professor Darrell Duffie, with whom the authors of *The Wall Street Journal* article consulted, the unity of the Defendants' LIBOR submissions was "far too similar to be believed."

354.    *The Wall Street* Journal's methodology was reviewed by David Juran, a statistics professor at Columbia University.  He similarly concluded that *The Wall Street Journal's* calculations demonstrate "very convincingly" that reported LIBOR rates are lower, to a statistically significant degree, than what the market thinks they should be.  At that time, statisticians and academics were attempting to determine why the LIBOR submissions would diverge so much from the true costs of borrowing for these financial institutions.  Revelations from the Barclays' settlement, the UBS amnesty application and from various government investigations now show that the explanation for this divergence was a conspiracy amongst the LIBOR member banks, including the Defendants, to manipulate LIBOR.

355.    As part of an exercise to determine the impact of this divergence, *The Wall Street Journal* calculated an alternate borrowing rate incorporating CDS spreads.  *The Wall Street Journal* estimated that underreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (the banks) did not pay to lenders (investors in debt instruments issued by the banks) that they would otherwise have had to pay.  Plaintiffs were among those lenders who have suffered significant damage in the form of reduced payments.

356.    According to *The Wall Street Journal*, it had three independent academics, including Professor Duffie, review its methodology and findings, at the paper's request.  All

three agreed that the methodology was sound and that its findings were based on well-accepted statistical and economic principles.

357.    Further economic analyses support the correlation seen in *The Wall Street Journal's* report.  A study was conducted by Connan Snider and Thomas Youle, of the economics departments at UCLA and the University of Minnesota, respectively.[58]  In their study, the professors concluded that LIBOR did not accurately reflect average bank borrowing costs, its "ostensible target."  Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if LIBOR submissions "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance." According to Snider and Youle, the U.S. Dollar LIBOR Contributor Panel banks submitted LIBOR quotes that deviated significantly from their costs of borrowing, as reflected in CDS spreads.

358.    For example, comparing the 12 month U.S. Dollar LIBOR submissions of Defendants Citigroup and Tokyo-Mitsubishi, together with the banks' respective one-year senior CDS spreads, Snider and Youle observed "that while Citigroup has a substantially higher CDS spread than [Tokyo-Mitsubishi], it submits a slightly lower Libor quote." Accordingly, the authors explain, while the CDS spreads "suggest that the market perceives Citigroup as riskier than [Tokyo-Mitsubishi], as it is more expensive to insure against the event of Citigroup's default," the banks' LIBOR quotes "tell the opposite story."

---

[58] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* Social Science Research Network (April 2, 2010), available at http:// www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

359.     Snider and Youle noted that the size of the difference between Defendant Citigroup's CDS spread relative to its LIBOR submissions was "puzzling."  The authors explained, "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread."  But the authors observed that Defendant Citigroup's LIBOR submissions were often "significantly below its CDS spread," implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them a guaranteed 5 percent loss."  That discrepancy contravenes basic rules of economics and finance.  This demonstrates that Defendant Citigroup artificially suppressed LIBOR by underreporting its true cost of borrowing.  The fact that these results were commonplace amongst all of the Defendants demonstrates that this was the byproduct of a conspiracy and not individual action by various actors.

## 2.  Cross-Currency Discrepancies in Defendants' LIBOR Submissions Indicates Suppression of U.S. Dollar LIBOR

360.     According to Snider and Youle, Defendants' LIBOR submissions also displayed inexplicable "cross-currency rank reversals."  According to their study, at least some Defendants reported lower rates on U.S. Dollar LIBOR than did other Contributor Panel members but, for other currencies, provided higher rates than did those same fellow banks. Bank of America and Tokyo-Mitsubishi, for instance, provided submissions for both U.S. Dollar LIBOR and Yen-LIBOR during the period under study, yet Defendant Bank of America quoted a lower rate than Tokyo-Mitsubishi for U.S. Dollar LIBOR and a higher rate for Yen-LIBOR.  Other Defendants examined in Snider and Youle's analysis, including Defendants Barclays, Citigroup, and JPMorgan, displayed similar anomalies across currencies.  Defendant

Citigroup, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the U.S. Dollar scale.  Because, "the same bank is participating in each currency," the credit risk "is the same for loans in either currency"; thus these "rank reversals" demonstrate that differences in the banks' LIBOR quotes "are not primarily due to differences in credit risk, something we would expect of their true borrowing costs."  The discrepancy can only be explained by intentional manipulation of LIBOR by a number of member banks working together.

### 3. The "Bunching" of Certain Defendants' LIBOR Submissions Around the Fourth-Lowest Quote of the Day Indicates LIBOR Manipulation

361.    At all times alleged herein, the rates reported by certain Defendants, in particular Defendants Citigroup, Bank of America and JPMorgan, shows suspicious "bunching" around the fourth lowest quote submitted by the 16 U.S. Dollar LIBOR Contributor Panel banks to the BBA.  Indeed, submission by the Citigroup Defendants and the Bank of America Defendants often tended to be identical to the fourth-lowest quote for the day.  Because the LIBOR calculation involved excluding the lowest (and highest) quartiles on any given day, "bunching" around the fourth-lowest rate statistically would push LIBOR to the lowest possible level.  Having multiple Contributor Panel banks reporting at the fourth-lowest quote, from a statistical perspective, would effect of driving the reported LIBOR rate to the lowest possible rate.

362.    This type of "bunching" among Defendants' respective LIBOR submissions also indicates that Defendants intended to report the same or similar rates, notwithstanding the banks' differing financial conditions, which should have resulted in differing LIBOR submissions if those LIBOR submissions were true reflections of that bank's true cost of borrowing, which LIBOR was supposed to reflect.  This "bunching" is strong evidence of

collusion and demonstrates an intentional effort to subvert the most commonly used global benchmark interest rate to benefit the Defendants to the detriment of others, such as Plaintiffs.

363.    According to Snider and Youle, the fact that observed "bunching" occurred around the pivotal fourth-lowest reported rate reflects the reporting banks' intention to ensure the lowest borrowing rates were included in the calculation of U.S. Dollar LIBOR.

364.    Moreover, further demonstrating the suspicious character of bunching observed around the fourth-lowest quote, Snider and Youle noted "the intraday distribution of other measures of bank borrowing costs do not exhibit this bunching pattern."  Put simply, LIBOR was uniquely experiencing "bunching" as opposed to other measures that were intended to represent the same thing.  This is strong evidence that LIBOR submissions were being manipulated and were not accurately reflecting what LIBOR was supposed to.

365.    Additionally, Snider and Youle detailed a discrepancy between U.S. Dollar LIBOR Contributor Panel banks' LIBOR submissions and their CDS spreads.  "[W]ith the intra-day variation of both Libor quotes and CDS spreads increasing from their historical levels," the CDS spreads' intraday variation "grew considerably larger than that of Libor quotes."

366.    Given the method by which the BBA calculates LIBOR, which all of the Defendants understood, the "bunching" around the fourth-lowest rate is precisely what would occur if a number of banks worked in concert to depress LIBOR.

**4.  LIBOR's Divergence from its Historical Relationship with the Federal Reserve Auction Rate Indicates LIBOR Was Suppressed**

367.    Another comparative analysis that suggests Defendants artificially suppressed LIBOR at all times alleged herein, is the LIBOR and the Federal Reserve auction rate.  An April 16, 2008 Wall Street Journal article noted that the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82% - 10

basis points higher than the comparable U.S. Dollar LIBOR rate.  That differential would make

no economic sense if the reported LIBOR rate was accurate, *The Wall Street Journal* observed:

"Because banks put up securities as collateral for the Fed loans, they should get them for a

lower rate than Libor, which is riskier because it involves no collateral."  In other words,

LIBOR should have been higher than the Federal Reserve auction rate, not lower.

368.    *The Wall Street Journal* later raised further concerns about LIBOR's accuracy

based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve

auction rate.  According to *The Wall Street Journal*, because the Federal Reserve requires

collateral:

> banks should be able to pay a lower interest rate [to the Fed] than they do when
> they borrow from each other [e.g., as ostensibly measured by LIBOR] because
> those loans are unsecured. It is the same reason why rates for a mortgage, which
> is secured by a house, are lower than those for credit cards, where the borrower
> doesn't put up any collateral. In other words, the rate for the Fed auction should
> be lower than Libor.

369.    To the contrary, though, two days before *The Wall Street Journal* article, the rate

for the 28-day Fed facility was 3.75%, significantly higher than one-month LIBOR, which was

3.18% that day (September 22, 2008).

**5.  LIBOR's Divergence from its Historical Correlation to Overnight Index Swaps Also Suggests LIBOR Was Artificially Suppressed**

370.    Another measure of LIBOR's aberrant behavior with respect to other measures of

banks' borrowing costs during the Relevant Period is its deviation from the overnight-index

swap ("OIS") rate.  In his article analyzing LIBOR data for the second half of 2007 and 2008,

Justin Wong observed that between 2001 and July of 2007, when the global credit and financial

crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points."  By

July 2008, on the other hand, that gap approached 100 basis points and by October 2008, "it

peaked at 366 basis points."  While the spread "receded somewhat in <u>November 2008</u> to 209 basis points," that was still "far above the pre-crisis level."

### 6.  <u>LIBOR May Have Been Manipulated as Early as 2005</u>

371.    A number of Defendants have admitted to manipulating LIBOR as early as <u>2005</u>. For example, Rabobank admitted that its manipulation of U.S. Dollar LIBOR occurred from at least as early as <u>September 2005</u> through approximately <u>December 2008</u> when multiple swap traders in New York, London, and Utrecht made frequent requests for favorable U.S. Dollar LIBOR contributions to the Rabobank U.S. Dollar submitters on the London money markets desk.  Rabobank SOF ¶¶16-17.  Barclays admitted that it was manipulating U.S. Dollar LIBOR from at least <u>2005</u>.  Barclays CFTC at 9-10.  In addition, from at least mid-<u>2005</u> through mid-<u>2008</u>, certain Barclays Euro swaps traders, led by the same former Barclays' senior Euro swaps trader, coordinated with traders at certain other LIBOR panel banks to have their respective Euribor submitters make certain Euribor submissions in order to affect the official EBF Euribor fixing.  Barclays CFTC at 3, 7-11.

372.    Other data also shows at a minimum, manipulation was occurring as early as <u>2006</u>.  In a recent paper, Rosa Abrantes-Metz (of NYU Stern School of Business's Global Economics Group) and Albert Metz (of Moody's Investors Service) compared one-month LIBOR against the Fed Funds effective rate and the one-month Treasury Bill ("T-Bill") rate. Studying the period spanning early <u>August 2006</u> through early <u>August 2007</u>, the authors observed the level of one-month LIBOR was "virtually constant," while the Fed Funds effective rate and the one-month T-Bill rate did "not present such striking stability." In other words, LIBOR was suspiciously consistent during a period of significant economic change.  Because of that "highly anomalous" discrepancy, Abrantes-Metz and Metz examined the individual

submissions of the U.S. Dollar Contributor Panel banks, which showed that during the studied period, the middle eight quotes used to set LIBOR each day were "essentially identical day in and day out."  This was another "highly anomalous" finding.

373.    Abrantes-Metz and Sofia B. Villas-Boas (of UC-Berkeley's Department of Agricultural & Resource Economics) used another methodology - Benford second-digit reference distribution - to track the daily one-month LIBOR rate over the period <u>2005-2008</u>. Based on this analysis, the authors found that, for sustained periods in <u>2006</u> and <u>2007</u>, the empirical standard-deviation distribution differed significantly from the Benford reference distribution for nearly all banks submitting quotes.  The authors also observed large deviations from Benford for a sustained period in <u>2008</u>.

374.    Those studies indicate at least a possibility that Defendants' suppression of LIBOR occurred before <u>August of 2007</u>, by which time the evidence demonstrates conclusively that LIBOR manipulation was already occurring in secret.

### J.    Defendants' Difficult Financial Situations Caused Them To Suppress Their LIBOR Submissions To Falsely Enhance Their Credit Worthiness

375.    The LIBOR submissions of most, if not all, of the Defendants, did not reflect the true dire financial circumstances they were facing.  Based on empirical evidence, including Defendants' own public disclosures or their admissions in government settlements, Defendants were facing serious liquidity crises from approximately <u>2008</u> when the financial crisis was in full swing.  Many required capital infusions or governmental guarantees in order to avoid failing due to the massive amount of toxic assets on their balance sheets relating to the subprime mortgage crisis. Defendants' LIBOR submissions were deliberately suppressed and were too low in comparison to what their true cost of unsecured borrowing should have been at the time, but were suppressed in order to misrepresent creditworthiness and to avoid negative scrutiny by

the markets and media.  The following are examples of Defendants that falsely suppressed their

LIBOR submissions to avoid market and media scrutiny of their liquidity or financial problems:

### 1.  **Defendant Citigroup**

376.  On <u>November 21, 2008,</u> the Wall Street Journal reported that Citigroup

executives "began weighing the possibility of auctioning off pieces of the financial giant or even

selling the company outright" after the company faced a plunging stock price.  The article noted

Citigroup executives and directors "rushing to bolster the confidence of investors, clients and

employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-

related holdings.  On <u>November 24, 2008,</u> CNNMoney wrote:

> If you combine opaque structured-finance products with current fair-value
> accounting rules, almost none of the big banks are solvent because that system
> equates solvency with asset liquidity. So at this moment Citi isn't solvent. Some
> argue that liquidity, not solvency, is the problem. But in the end it doesn't matter.
> Fear will drive illiquidity to such a point that Citi could be rendered insolvent
> under the current fair-value accounting system.

377.  On <u>January 20, 2009,</u> Bloomberg reported that Defendant Citigroup "posted an

$8.29 billion fourth-quarter loss, completing its worst year, and plans to split in two under Chief

Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis. The

article further stated, "The problems of Citi, Bank of America and others suggest the system is

bankrupt."

378.  Despite the serious financial problems at Citigroup, which required government

intervention and prompted discussions about splitting Citigroup into its component parts, the

Citigroup Defendants continued to provide LIBOR submissions that were suspiciously close to

the other BBA member banks.  This is not possible absent manipulation since the actual cost of

borrowing for Defendant Citigroup could not have been the same as the other Defendant BBA

member banks.

2.      **Defendant RBS**

379.    An April 23, 2008 analyst report from Société Générale stated that, with respect

to Defendant RBS's financial condition during that time period:

> Given the magnitude and change in direction in a mere eight weeks, we believe
>
> that management credibility has been tarnished.
>
> We also remain unconvinced that the capital being raised is in support of growth
> rather than merely to rebase and recapitalise a bank that overstretched itself at the
> wrong point in the cycle in its pursuit of an overpriced asset.
>
> *  *  *
>
> [I]n our eyes, RBS has not presented a rock solid business case that warrants
> investor support and the bank has left itself almost no capital headroom to support
> further material deterioration in either its assets or its major operating
> environments. We believe £16bn (7% core tier I ratio) would have provided a
> solid capital buffer.

380.    The Société Générale analysts further opined, "[W]e are not of the belief that all

of RBS' problems are convincingly behind it."  They further explained, "When faced with the

facts and the events leading up to yesterday's request for a £12bn capital injection, we believe

shareholders are being asked to invest further in order to address an expensive mishap in H2 07

rather than capitalise on growth opportunities."

381.    On October 14, 2008, the Herald Scotland reported that the government had

injected £37 billion of state capital into three leading banks, including Defendants RBS and

HBOS.  The article observed, "Without such near-nationalisations, . . . Royal Bank of Scotland

and HBOS, would almost certainly have suffered a run on their remaining reserves and been

plunged into insolvency. Their share prices could scarcely have taken much more of their recent

hammering."

### 3.   **Defendant HBOS/Lloyds**

382.    On <u>December 12, 2008</u>, Bloomberg reported that shareholders approved HBOS's takeover by Lloyds following bad-loan charges in <u>2008</u> rising to £5 billion and an increase in corporate delinquencies.  The article also quoted analysts characterizing HBOS' loan portfolio as "generally of a lower quality than its peers." Bloomberg further observed that HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and losses on investments increased from £100 million to £800 million for the year.

383.    A <u>January 20, 2009</u> analyst report from Société Générale stated: "We would note that given the 67% drop in the share price following [RBS]'s announcements yesterday [relating to capital restructuring due to greater-than-expected credit-market related write downs and bad debt impairments in Q4], the loss of confidence in the bank's ability to continue to operate as a private sector player and concern over the potential ineffectiveness of the Asset Protection Scheme may prompt the UK government to fully nationalise the bank.  In this instance, the shares could have very limited value, if at all."

384.    On <u>March 9, 2009</u>, Bloomberg reported that Lloyds "will cede control to the British Government in return for state guarantees covering £260 billion ($A572 billion of risky assets)."  The article further observed that in September 2008, Lloyds agreed to buy HBOS for roughly £7.5 billion as the British Government sought to prevent HBOS from collapsing after credit markets froze.  The HBOS loan book was described as "more toxic than anyone ever dreamed."

385.    On <u>November 24, 2009</u>, Bloomberg reported the Bank of England provided £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the

height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept

secret until now to prevent unnerving markets."

386.   With HBOS' financial condition deteriorating to the point where it needed

assistance from the government and a buy-out by Lloyds, its actual costs of borrowings could

not have been the same as the other Defendant BBA member banks.  Similarly, Lloyds' cost of

borrowing would also be significantly different.  The fact that these banks provided very similar

LIBOR submissions as other BBA member banks is strong evidence of the existence of a

conspiracy to manipulate and artificially suppress LIBOR.

### 4.   Defendant WestLB

387.   A September 9, 2008 article in Spiegel Online reported WestLB was "heavily hit

as a result of the US sub-prime crisis and the resulting credit crunch.  Ill-advised speculation

resulted in a 2007 loss of €1.6 billion -- leading the bank to the very brink of insolvency."  The

article reported that in early 2008, a special investment vehicle was set by WestLB's primary

shareholders to "guarantee €5 billion worth of risky investments."  The European Commissioner

approved the public guarantee but demanded that the bank be "completely restructured to avoid

falling afoul of competition regulations."  The European Commissioner for Competition later

warned that if WestLB did not significantly improve its restructuring package, Brussels would

not approve the public assistance that European Union had already provided to the bank.

Further, if that occurred, WestLB would have to pay back €12 billion to the EU.

388.   On November 24, 2009, Bloomberg reported that BNP Paribas SA said

"[i]nvestors should buy the euro [ ] on speculation that capital will need to be repatriated to

support German bank WestLB AG."  Furthermore, two German regional savings bank groups

that hold a majority stake in WestLB were "prepared to let the Dusseldorf-based lender become

insolvent" and that "the prospect of insolvency may force state-owned banks and savings banks outside North Rhine-Westphalia, WestLB's home state, to contribute to capital injections." Moreover, WestLB needed "as much as 5 billion euros ($7.5 billion) in capital and may be shut by Nov. 30 unless a solution for its capital needs can be found.

389.    Similarly, WestLB's unique financial condition would have resulted in it putting in different LIBOR submissions than the other LIBOR member banks, if there was no collusion amongst the LIBOR member banks to manipulate LIBOR.  WestLB would have different borrowing costs than the other LIBOR member banks and that these differences should have been reflected in its LIBOR submissions.

### 5.    Defendant Barclays

390.    During the financial crisis period, Barclays directed the U.S. Dollar LIBOR submitters to lower their daily U.S. Dollar LIBOR submissions in order to protect Barclays' reputation against what it believed were negative and unfair media and market perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions. Barclays CFTC at 19.

391.    On September 3, 2007, Bloomberg featured Barclays in a news article entitled "Barclays Takes a Money-Market Beating."  The article speculated that Barclays may have been having liquidity problems, because on two occasions Barclays had to borrow Sterling from the emergency lending facility of the Bank of England, and because of Barclays' relatively high LIBOR submissions in Sterling, Euro, and U.S. Dollar. The article posed the question, "So what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest in the money market?  Other newspapers, including the U.K. Financial times and the Standard, ran similar articles about LIBOR and Barclays.  *Id.*

392.    On the day of the Bloomberg article, Barclays' U.S. Dollar LIBOR submissions in at least three tenors were the highest submissions of all panel banks, and were over six to nine basis points higher than the official BBA LIBOR fixing at those tenors.  Barclays believed that its high LIBOR submissions caused its financial condition to be misperceived by the public and the media.  Barclays CFTC at 20.

393.    The negative media speculation caused significant concern within Barclays and was discussed among high levels of management within Barclays Bank.  As a result, certain senior managers within Barclays Bank Treasury ("senior Barclays Treasury managers") instructed the U.S. Dollar LIBOR submitters and their supervisors to lower Barclays' LIBOR submissions, so that they were closer in range to the submitted rates by other banks but not so high as to attract media attention.  Barclays CFTC at 20.

394.    Senior Barclays Treasury managers coined the phrase "head above the parapet" to describe being an outlier on the U.S. Dollar LIBOR panel, which meant making high LIBOR submissions relative to the submitted rates of the other banks and attracting media attention.  Senior Barclays Treasury managers directed Barclays' U.S. Dollar LIBOR submitters that their LIBOR submissions should not be at a level where Barclays was "sticking its head above the parapet," in order to avoid unwanted market and media attention for high LIBOR submissions that could potentially damage Barclays' reputation. Senior Barclays Treasury managers provided the submitters with the general guidance that Barclays' submitted rates should be within ten basis points of the submissions of the other U.S. Dollar panel banks to be in compliance with the directive.  Barclays CFTC at 20.

395.    Barclays knew that accounting for its reputational risk in its determination of LIBOR submissions was not permissible under BBA's definition and criteria.  The submitters

and their supervisor, however, understood that they were to follow this directive regardless of market conditions or whether their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to the otherwise.  Barclays' U.S. Dollar submitters knew that, by acting upon senior management's instructions to be below "the parapet," they were making improper U.S. Dollar LIBOR submissions that were management's rates and not the rates that the submitters had determined were the correct rates, *i.e.,* those that reflected Barclays' assessment of its cost of borrowing unsecured funds in the London interbank money market. Barclays CFTC at 20.

**K.**     **Defendants Materially Misrepresented and Concealed Information For Which They Had a Duty to Disclose to Plaintiffs**

396.     At all times alleged herein, Defendants, and each of them, intentionally and knowingly conspired to manipulate LIBOR rates, both to conceal their own financial weakness during the economic crisis but more importantly, to reap significant profits by manipulating rates used in derivative instruments that the Defendants themselves were parties to.  In this way, the Defendants could deceive and improperly defraud counterparties to the LIBOR-linked derivative instruments that they entered into.  The Defendants are liable to Plaintiffs for fraud and fraudulent concealment because the Defendants made direct material misrepresentations that they knew would be relied upon by other parties, such as the Plaintiffs, in establishing the exchange rate on LIBOR-linked derivative instruments.

397.     On a daily basis, Defendants reported to the BBA regarding their borrowing rates with full knowledge that the BBA would use those results to set LIBOR.  The Defendants not only knew how the BBA calculated LIBOR but they also knew how LIBOR was used in the larger worldwide financial markets.  Indeed, the Defendants had been instrumental in creating this market and relied upon this market for many of their own transactions.  In fact, the

Defendants knowingly and intentionally manipulated LIBOR with the knowledge and expectation that it would be relied upon by others in a vast number of transactions, ranging from interest rate swaps to mortgage rates.  The Defendants themselves were counterparties to many of these same transactions.  Every day that the Defendants provided false information to the BBA regarding their borrowing rates was a false statement that the Defendants knew would affect and distort the LIBOR rates for multiple currencies, including the US Dollar.  The Defendants, as members of the various LIBOR Contributor Panels, including the USD Contributor Panel, were the only ones who could affect and manipulate the LIBOR rate.  Each day when the Defendants made false and misleading reports to the BBA about their borrowing rates, the Defendants did so with the knowledge and intent that those false reports would be relied upon by other parties in the financial markets, such as Plaintiffs.

398.    By making these false daily reports to the BBA, with the knowledge that it would be relied upon by thousands, if not millions, of parties who enter into LIBOR-based transactions, Defendants, and each of them, imposed upon themselves a duty to be honest and completely truthful.  Defendants are liable for fraudulent concealment for failing to reveal to the BBA and to the public that the reports they were making were false and fraudulent.  Defendants intentionally concealed the truth about their manipulation from the BBA because they knew the BBA would report to the public, including to Plaintiffs, that Defendants were engaging in fraud and were engaged in a conspiracy to manipulate LIBOR rates.  When Defendants made the decision to report their borrowing rates to the BBA, they had an obligation to act in good faith and to be honest in making LIBOR submission to the BBA.  The Defendants concealed from the BBA that they were reporting incorrect rates and they were doing so in order to manipulate LIBOR for their own benefit.

399.     Plaintiffs did, in fact, rely upon the manipulated LIBOR rate in entering into LIBOR-linked derivative instruments, and in making and receiving payments on those LIBOR-linked derivative instruments.  Plaintiffs suffered harm and damages in an amount to be determined at trial from those manipulations.

400.     Plaintiffs also entered into LIBOR-linked transactions with some of the Defendants as direct counterparties.  Those Defendants are also directly liable to Plaintiffs for fraud and fraudulent misrepresentation because they directly made false misrepresentations to Plaintiffs and concealed information from Plaintiffs that they had a duty to disclose.  When the Defendants entered into a LIBOR-linked transaction, the Defendants made false misrepresentations regarding the LIBOR rate which would govern the transaction.  The Defendants were making affirmative misrepresentations regarding what the true rate of interest on the LIBOR-linked transaction was, stating that it would be related to LIBOR as a neutral benchmark rate, instead of truthfully stating that it would be related to LIBOR as a benchmark mark that was manipulated by the Defendants.  The Defendants also had a duty to be fully honest with Plaintiffs when entering into these LIBOR-linked transactions and had an obligation to inform Plaintiffs that the LIBOR rate that the transaction was indexed to was a manipulated rate that was being suppressed in the best interests of the Defendants.  By failing to do so, the Defendants intentionally and knowingly concealed information that they had a duty to disclose.

## V.   PLAINTIFFS DIRECTLY ENTERED INTO TRANSACTIONS WITH DEFENDANT LIBOR BANKS, WHO BREACHED THEIR CONTRACTUAL OBLIGATIONS TO PLAINTIFFS AND FRAUDULENTLY DECEIVED PLAINTIFFS ABOUT THEIR MANIPULATION OF LIBOR

### A.   The Regents

401.    At all times alleged herein, Plaintiff The Regents had significant sums invested in LIBOR-based financial instruments in which Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank, HSBC, Rabobank, Royal Bank of Canada, Royal Bank of Scotland, and UBS were counterparties or issuers, pursuant to which Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank, HSBC, Rabobank, Royal Bank of Canada, Royal Bank of Scotland, and UBS were obligated to pay Plaintiff Mendocino an interest rate based on LIBOR.  The following is a sampling of LIBOR-based financial instruments purchased by UC Regents.

### 1.   Defendant Bank of America

402.    On May 5, 2008, on UC Regents' behalf, State Street Global Advisors, a division of State Street Bank & Trust Company, ("State Street") purchased $250,000,000 in bank notes issued by Defendant Bank of America for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of May 12, 2010 and bore an interest rate tied to 3 Month LIBOR.

403.    On May 12, 2010, on UC Regents' behalf, State Street purchased $92,000,000 in bank notes issued by Defendant Bank of America for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of September 13, 2010 and bore an interest rate tied to 3 Month LIBOR.

404.    On January 18, 2007, UC Regents entered into an ISDA Master Agreement with Merrill Lynch Capital Services, Inc.

405.     On <u>January 18, 2007</u>, UC Regents entered into an interest rate swap with Merrill Lynch Capital Services, Inc. in connection with its Medical Center Pooled Revenue Bonds, 2007 Series B.  The swap had an effective date of <u>January 30, 2007</u>, carried a notional value of $96,155,000, and was set to mature on <u>May 15, 2032</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, UC Regents would pay Merrill Lynch Capital Services, Inc. a fixed interest rate of 3.5897%, and would receive an interest rate of 58% of 1 Month LIBOR plus 48 basis points.  Merrill Lynch Capital Services, Inc. became a subsidiary of Defendant bank of America in <u>January 2009</u>.

### 2.     **Defendant Barclays**

406.     On <u>March 3, 2008</u>, on UC Regents' behalf, State Street purchased $350,000,000 in certificates of deposit issued by Defendant Barclays for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of <u>January 8, 2010</u> and bore an interest rate tied to 1 Month LIBOR.

407.     On <u>May 6, 2009</u>, on UC Regents' behalf, State Street purchased $100,000,000 in certificates of deposit issued by Defendant Barclays for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of <u>November 9, 2009</u> and bore an interest rate tied to 1 Month LIBOR.

### 3.     **Defendant JPMorgan**

408.     On <u>January 17, 2008</u>, on UC Regents' behalf, State Street purchased $250,000,000 in bank notes issued by Defendant JPMorgan for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of <u>November 19, 2009</u> and bore an interest rate tied to 3 Month LIBOR.

409.    On November 19, 2009, on UC Regents' behalf, State Street purchased $200,000,000 in corporate notes issued by Defendant JPMorgan for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of January 22, 2010 and bore an interest rate tied to 3 Month LIBOR.

### 4.    Defendant Citigroup

410.    On May 2, 2008, on UC Regents' behalf, State Street purchased $180,000,000 in corporate notes issued by Defendant Citigroup for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of May 7, 2010 and bore an interest rate tied to 3 Month LIBOR.

### 5.    Defendant Deutsche Bank

411.    On July 13, 2010, on UC Regents' behalf, State Street purchased $250,000,000 in certificates of deposit issued by Deutsche Bank Securities Inc., a subsidiary of Defendant Deutsche Bank, for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of January 10, 2011 and bore an interest rate tied to 1 Month LIBOR.

412.    On October 21, 2008, UC Regents entered into an ISDA Master Agreement with Defendant Deutsche Bank.

413.    On October 21, 2008, UC Regents entered into four interest rate swaps with Defendant Deutsche Bank.  These swaps were replacements for swaps that had previously been entered between UC Regents and Lehman Brothers Special Financing Inc., which were terminated on October 21, 2008 following Lehman Brothers' bankruptcy.  The swaps with Defendant Deutsche Bank had an effective date of October 21, 2008, carried a combined notional value of $189,775,000, and had maturity dates ranging from May 15, 2030 to May 15,

2047.  Under the terms of the swaps, as set forth in the applicable swap confirmations, UC

Regents would pay Defendant Deutsche Bank fixed interest rates ranging from 4.55% to

4.710%, and would receive interest rates tied to 3 Month LIBOR.

### 6.    Defendant HSBC

414.    On August 6, 2010, on UC Regents' behalf, State Street purchased $200,000 in

bank notes issued by HSBC Bank USA, a subsidiary of Defendant HSBC, for the UC Regents'

separate account for securities lending cash collateral.  The bank notes had a maturity date of

August 3, 2012 and bore an interest rate tied to 3 Month LIBOR.

### 7.    Defendant Rabobank

415.    On May 15, 2008, on UC Regents' behalf, State Street purchased $150,000,000 in

bank notes issued by Defendant Rabobank for the UC Regents' separate account for securities

lending cash collateral.  The bank notes had a maturity date of May 19, 2010 and bore an

interest rate tied to 3 Month LIBOR.

416.    On July 21, 2010, on UC Regents' behalf, State Street purchased $250,000,000 in

bank notes issued by Defendant Rabobank for the UC Regents' separate account for securities

lending cash collateral.  The bank notes had a maturity date of January 26, 2012 and bore an

interest rate tied to 3 Month LIBOR.

### 8.    Defendant Royal Bank of Canada

417.    On December 14, 2010, on UC Regents' behalf, State Street purchased

$200,000,000 in corporate notes issued by Defendant Royal Bank of Canada for the UC

Regents' separate account for securities lending cash collateral.  The bank notes had a maturity

date of December 12, 2012 and bore an interest rate tied to 3 Month LIBOR.

9.      **Defendant Royal Bank of Scotland**

418.    On April 20, 2010, on UC Regents' behalf, State Street purchased $400,000,000 in certificates of deposit issued by Defendant Royal Bank of Scotland for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of April 15, 2011 and bore an interest rate tied to 3 Month LIBOR.

419.    On October 18, 2010, on UC Regents' behalf, State Street purchased $250,000,000 in certificates of deposit issued by Defendant Royal Bank of Scotland for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of October 18, 2010 and bore an interest rate tied to 3 Month LIBOR.

10.     **Defendant UBS**

420.    On February 9, 2011, on UC Regents' behalf, State Street purchased $150,000,000 in certificates of deposit issued by Defendant UBS for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of August 10, 2011 and bore an interest rate tied to 1 Month LIBOR.

421.    On December 22, 2011, on UC Regents' behalf, State Street purchased $60,000,000 in certificates of deposit issued by Defendant UBS for the UC Regents' separate account for securities lending cash collateral.  The bank notes had a maturity date of April 5, 2012 and bore an interest rate tied to 3 Month LIBOR.

11.     **Transactions with Third Parties**

422.    In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff UC Regents entered into numerous LIBOR-based financial instruments with third parties.  UC Regents estimates that during the Relevant Period, it had at least $18.9 billion just within its securities lending cash collateral account, and at least

another $2.9 billion in internally-managed portfolios invested in floating rate securities whose

interest rate was based on LIBOR.  UC Regents was damaged in each of these investments by

Defendants' suppression of LIBOR.

      **B.**     **Plaintiff EBMUD**

    423.    At all times alleged herein, Plaintiff EBMUD had significant sums invested in

LIBOR-based financial instruments in which Defendants Citigroup, JPMorgan, and Bank of

America were counterparties or issuers, pursuant to which Defendants Citigroup, JPMorgan,

and Bank of America were obligated to pay Plaintiff EBMUD an interest rate based on LIBOR.

For example:

       **1.**     **Defendant Citigroup**

    424.    On January 31, 2002, EBMUD entered into an ISDA Master Agreement with

Salomon Brothers Holding Company Inc., a subsidiary of Defendant Citigroup.

    425.    On January 31, 2002, EBMUD entered into an interest rate swap with Salomon

Brothers Holding Company Inc. in connection with its Water System Subordinated Revenue

Bonds, Series 2002A and Series 2002B.  The swap had an effective date of March 6, 2002,

carried a notional value of $161,235,000, and was set to mature on June 1, 2025.  Under the

terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay

Salomon Brothers Holding Company Inc. a fixed interest rate of 3.835%, and would receive an

interest rate of 65% of 1M LIBOR.  In 2003, Salomon Brothers Holding Company Inc. became

Citigroup Financial Products Inc.

    426.    On October 17, 2002, EBMUD entered into another ISDA Master Agreement

with Salomon Brothers Holding Company Inc.

427.     On October 17, 2002, EBMUD entered into an interest rate swap with Salomon Brothers Holding Company Inc. in connection with its Wastewater System Subordinated Revenue/Refunding Bonds, Series 2003B.  The swap had an effective date of March 5, 2003, carried a notional value of $37,525,000, and was set to mature on June 1, 2027.  Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Salomon Brothers Holding Company Inc. a fixed interest rate of 3.468%, and would receive an interest rate of 65% of 1M LIBOR.  In 2003, Salomon Brothers Holding Company Inc became Citigroup Financial Products Inc.

### 2.     Defendant JPMorgan

428.     On January 31, 2002, EBMUD entered into an ISDA Master Agreement with Bear Stearns Capital Markets Inc.

429.     On January 31, 2002, EBMUD entered into an interest rate swap with Bear Stearns Capital Markets Inc. in connection with its Water System Subordinated Revenue Bonds, Series 2002A and Series 2002B.  The swap had an effective date of March 6, 2002, carried a notional value of $80,615,000, and was set to mature on June 1, 2025.  Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Bear Stearns Capital Markets Inc. a fixed interest rate of 3.835%, and would receive an interest rate of 65% of 1M LIBOR.  The swap was transferred to Defendant JP Morgan Chase Bank, N.A. in October 2008.

430.     On October 17, 2002, EBMUD entered into another ISDA Master Agreement with Bear Stearns Capital Markets Inc.

431.     On October 17, 2002, EBMUD entered into an interest rate swap with Bear Stearns Capital Markets Inc. in connection with its Wastewater System Subordinated Revenue/Refunding Bonds, Series 2003B.  The swap had an effective date of March 5, 2003,

carried a notional value of $37,525,000, and was set to mature on June 1, 2027. Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Bear Stearns Capital Markets Inc. a fixed interest rate of 3.468%, and would receive an interest rate of 65% of 1M LIBOR.  The swap was transferred to Defendant JP Morgan Chase Bank, N.A. in October 2008.

432.    On May 4, 2005, EBMUD entered into an interest rate swap with Bear Stearns Capital Markets Inc. in connection with its Water System Subordinated Revenue Refunding Bonds, Series 2005B.  The swap had an effective date of June 2, 2005, carried a notional value of $115,000,000, and was set to mature on June 1, 2038.  Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Bear Stearns Capital Markets Inc. a fixed interest rate of 3.115%, and would receive an interest rate of 62.3% of 1M LIBOR. The swap was transferred to Defendant JP Morgan Chase Bank, N.A. in October 2008.

### 3.    Defendant Bank of America

433.    On May 4, 2005, EBMUD entered into an ISDA Master Agreement with Merrill Lynch Capital Services, Inc.

434.    On May 4, 2005, EBMUD entered into an interest rate swap with Merrill Lynch Capital Services, Inc. in connection with its Water System Subordinated Revenue Refunding Bonds, Series 2005B.  The swap had an effective date of June 2, 2005, carried a notional value of $115,000,000, and was set to mature on June 1, 2038. Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Merrill Lynch Capital Services, Inc. a fixed interest rate of 3.115%, and would receive an interest rate of 62.3% of 1M LIBOR. Merrill Lynch Capital Services, Inc. became a subsidiary of Defendant bank of America in January 2009.  In April 2011, the swap was transferred to Defendant Bank of America, N.A.

### 4. **Transactions with Third Parties**

435. In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff EBMUD entered into numerous LIBOR-based financial instruments with third parties. At all times alleged herein, EBMUD had at least $711,900,000 in interest rate swaps in which it received an interest rate based on LIBOR. EBMUD was damaged in each of these investments by Defendants' suppression of LIBOR.

436. Specific examples of Plaintiff EBMUD's LIBOR-based financial instruments with third parties include:

- On May 4, 2005, EBMUD entered into an interest rate swap with Lehman Brothers Special Financing Inc. in connection with its Wastewater System Subordinated Revenue Refunding Bonds, Series 2005. The swap had an effective date of June 2, 2005, carried a notional value of $70,000,000, and was set to mature on June 1, 2038. Under the terms of the swap, as set forth in the applicable swap confirmation, EBMUD would pay Lehman Brothers Special Financing Inc. a fixed interest rate of 3.098%, and would receive an interest rate of 62.3% of 1M LIBOR. On September 25, 2008, the swap was replaced by a swap between EBMUD and Dexia Credit Local. The replacement swap carried a notional value of $68,925,000, and the other terms remained the same as the original swap. In December 2008, the swap was amended in order to change the floating rate on the swap from 62.3% of 1-month LIBOR to 62.3% of 3-Month LIBOR.

- On May 4, 2005, EBMUD entered into an interest rate swap with Lehman Brothers Special Financing Inc. in connection with its Water System Subordinated Revenue Refunding Bonds, Series 2005B. The swap had an

effective date of <u>June 2, 2005</u>, carried a notional value of $45,000,000, and was

set to mature on <u>June 1, 2038</u>.  Under the terms of the swap, as set forth in the

applicable swap confirmation, EBMUD would pay Lehman Brothers Special

Financing Inc. a fixed interest rate of 3.115%, and would receive an interest rate

of 62.3% of 1M LIBOR.  On <u>September 25, 2008</u>, the swap was replaced by a

swap between EBMUD and The Bank of New York Mellon. The replacement

swap carried a notional value of $44,480,000, and the other terms remained the

same as the original swap.

- On <u>May 4, 2005</u>, EBMUD entered into an interest rate swap with SBS Financial

   Products Company, LLC in connection with its Water System Subordinated

   Revenue Refunding Bonds, Series 2005B.  The swap had an effective date of <u>June</u>

   <u>2, 2005</u>, carried a notional value of $50,000,000, and was set to mature on <u>June 1,</u>

   <u>2038</u>.  Under the terms of the swap, EBMUD would pay SBS Financial Products

   Company, LLC a fixed interest rate of 3.115%, and would receive an interest rate

   of 62.3% of 1M LIBOR.  In <u>June 2012</u>, SSBS Financial Products Company, LLC

   exercised its right to transfer the swap to Merrill Lynch Capital Services, Inc., a

   subsidiary of Defendant Bank of America.

## C.     <u>Plaintiff SANDAG</u>

437.    At all times alleged herein, Plaintiff SANDAG, through the San Diego County

Regional Transportation Commission, a blended component unit of SANDAG and part of

SANDAG's primary government (referred to herein as "SANDAG"), had significant sums

invested in LIBOR-based financial instruments in which Defendant Bank of America was a

counterparty, pursuant to which Defendant Bank of America was obligated to pay Plaintiff SANDAG an interest rate based on LIBOR.  For example:

> 1.   **Defendant Bank of America**

438.   On <u>November 22, 2005</u>, SANDAG entered into an ISDA Master Agreement with Defendant Bank of America.

439.   On <u>November 22, 2005</u>, SANDAG entered into a forward-starting interest rate swap with Defendant Bank of America in connection with its planned variable rate bond issuances.  The swap had an effective date of <u>April 1, 2008</u>, carried a notional value of $200,000,000 and was set to mature on <u>April 1, 2038</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, SANDAG would pay Bank of America a fixed interest rate of 3.41% and would receive an interest rate of 65% of 1 Month LIBOR.

440.   On <u>November 22, 2005</u>, SANDAG entered into an ISDA agreement with Merrill Lynch Capital Services, Inc.

441.   On <u>November 22, 2005</u>, SANDAG entered into a forward-starting interest rate swap with Merrill Lynch Capital Services, Inc. in connection with its planned variable rate bond issuances.  The swap had an effective date of <u>April, 1, 2008</u>, carried a notional value of $200,000,000 and was set to mature on <u>April 1, 2038</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, SANDAG would pay Merrill Lynch Capital Services, Inc. a fixed interest rate of 3.8165% and would receive an interest rate of 65% of 1 Month LIBOR.  Merrill Lynch Capital Services, Inc. became a subsidiary of Defendant bank of America in <u>January 2009</u>.

## 2.   **Transactions with Third Parties**

442.   In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff SANDAG entered into numerous LIBOR-based financial instruments with third parties.  At all times alleged herein, SANDAG had at least $634,210,000 in interest rate swaps and/or swaptions in which it received an interest rate based on LIBOR.  SANDAG was damaged in each of these investments by Defendants' suppression of LIBOR.

443.   Specific examples of Plaintiff SANDAG's LIBOR-based financial instruments with third parties include:

- On <u>November 22, 2005</u>, SANDAG entered into a forward starting swap with Goldman Sachs Mitsui Marine Derivative Products, L.P. in connection with its planned variable rate bond issuances.  The swap had an effective date of <u>April 1, 2008</u>, carried a notional value of $200,000,000 and was set to mature on <u>April 1, 2038</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, SANDAG would pay Goldman Sachs Mitsui Marine Derivative Products, L.P. a fixed interest rate of 3.8165% and would receive an interest rate of 65% of 1 Month LIBOR.

- On <u>February 13, 2003</u>, SANDAG initiated a forward starting swaption with Morgan Stanley Capital Services Inc.  The swaption had an effective date of <u>April 1, 2006</u>, carried a notional value of $34,210,000, and was terminated on <u>April 1, 2008</u>. Under the terms of the swaption, SANDAG paid a fixed interest rate of 3.45%, and received an interest rate equal to one-month LIBOR.

### D.   **Plaintiff Richmond**

444.   At all times alleged herein, Plaintiff Richmond had significant sums invested in LIBOR-based financial instruments in which Defendants Citigroup, JPMorgan, and Bank of America were counterparties or issuers, pursuant to which Defendants JPMorgan and Royal Bank of Canada were obligated to pay Plaintiff Richmond an interest rate based on LIBOR.  For example:

#### 1.   **Defendant JPMorgan**

445.   On September 13, 2006, Richmond entered into an ISDA Master Agreement with Bear Stearns Capital Markets Inc.

446.   On September 13, 2006, Richmond entered into an interest rate swap with Bear Stearns Capital Markets Inc. in connection with its City of Richmond Wastewater Revenue Bonds, Series 2006B. The swap had an effective date of October 26, 2006, carried a notional value of $32,260,000, and was set to mature on August 1, 2037.  Under the terms of the swap, as set forth in the applicable swap confirmation, Richmond would pay Bear Stearns Capital Markets Inc. a fixed interest rate of 3.661%, and would receive an interest rate of 63.42% of 1 Month LIBOR plus 22 basis points.  In 2008, Bear Stearns Capital Markets Inc. became a subsidiary of Defendant JPMorgan.

#### 2.   **Defendant Royal Bank of Canada**

447.   On June 26, 2007, Richmond entered into an ISDA Master Agreement with Defendant Royal Bank of Canada.

448.   On June 26, 2007, Richmond entered into an interest rate swap with Defendant Royal Bank of Canada in connection with its Richmond Community Redevelopment Agency Subordinate Tax Allocation Bonds (Merged Project Areas) 2007 Series A.  The swap had an

effective date of July 12, 2007, carried a notional value of $65,400,000, and was set to mature

on September 1, 2036.  Under the terms of the swap, as set forth in the applicable swap

confirmation, Richmond would pay Royal Bank of Canada a fixed interest rate of 3.99%, and

would receive an interest rate of 68% of 1 Month LIBOR.

     449.    On August 30, 2007, Richmond entered into another ISDA Master Agreement

with Defendant Royal Bank of Canada.

     450.    On August 30, 2007, Richmond entered into an interest rate swap with Defendant

Royal Bank of Canada in connection with its Richmond Joint Powers Financing Authority

Lease Revenue Bonds (Refunding and Civic Center Project), Series 2007.  The swap had an

effective date of September 19, 2007, carried a notional value of $101,420,000, and was set to

mature on August 1, 2037.  Under the terms of the swap, as set forth in the applicable swap

confirmation, Richmond would pay Royal Bank of Canada a fixed interest rate of 3.657%, and

would receive an interest rate of 68% of 1 Month LIBOR.

     451.    On November 19, 2009, Richmond entered into another ISDA Master Agreement

with Defendant Royal Bank of Canada.

     452.    On November 19, 2009, Richmond entered into an interest rate swap with

Defendant Royal Bank of Canada.  This swap replaced the swap entered into on September 13,

2006 between Richmond and Bear Stearns Capital Markets Inc.  The swap had an effective date

of November 23, 2009, carried a notional value of $32,260,000, and was set to mature on

August 1, 2037.  Under the terms of the swap, as set forth in the applicable swap confirmation,

Richmond would pay Royal bank of Canada a fixed interest rate of 3.897%, and would receive

an interest rate of 63.42% of 1 Month LIBOR plus 22 basis points.

E.      **Plaintiff Riverside**

453.    At all times alleged herein, Plaintiff Riverside had significant sums invested in

LIBOR-based financial instruments in which Defendants Bank of America and JPMorgan were

counterparties or issuers, pursuant to which Defendants Bank of America and JPMorgan were

obligated to pay Plaintiff Riverside an interest rate based on LIBOR.  For example:

1.      **Defendant Bank of America**

454.    On September 14, 2005, Riverside entered into an ISDA Master Agreement with

Merrill Lynch Capital Services, Inc.

455.    On September 14, 2005, Riverside entered into an interest rate swap with Merrill

Lynch Capital Services, Inc. in connection with its Electric Revenue Bonds, Issue of 2004B.

The swap had an effective date of September 16, 2005, carried a notional value of $82,500,000,

and was set to mature on October 1, 2029.  Under the terms of the swap, as set forth in the

applicable swap confirmation, Riverside would pay Merrill Lynch Capital Services, Inc. a fixed

interest rate of 3.111%, and would receive an interest rate of 62.68% of 1 Month LIBOR plus 12

basis points.  Merrill Lynch Capital Services, Inc. became a subsidiary of Defendant Bank of

America in January 2009.

456.    On March 29, 2007, Riverside entered into an ISDA Master Agreement with

Defendant Bank of America.

457.    On March 27, 2007, Riverside entered into two interest rate swaps with Defendant

Bank of America in connection with its Certificates of Participation (Various Capital

Improvement Projects) Series 2007A&B.  The swaps had an effective date of March 29, 2007,

carried a combined notional value of $118,975,000, and were set to mature on March 1, 2037.

Under the terms of the swaps, as set forth in the applicable swap confirmations, Riverside would

pay Defendant Bank of America a fixed rate of 3.396%, and would receive 63% of 1 Month

LIBOR plus 7 basis points.

<div align="center">2.    <b>Defendant JPMorgan</b></div>

458.    On <u>September 15, 2005</u>, Riverside entered into an ISDA Master Agreement with

Bear Stearns Capital Markets Inc.

459.    On <u>September 15, 2005</u>, Riverside entered into an interest rate swap with Bear

Stearns Capital Markets Inc. in connection with its Water Refunding/Revenue Bonds, Issue of

<u>2005</u>.  The swap had an effective date of <u>October 6, 2005</u>, carried a notional value of

$62,125,000, and was set to mature on <u>October 1, 2035</u>.   Under the terms of the swap, as set

forth in the applicable swap confirmation, Riverside would pay Bear Stearns Capital Markets

Inc. a fixed interest rate of 3.2%, and would receive an interest rate of 62.68% of 1 Month

LIBOR plus 12 basis points.  In <u>2008</u>, Bear Stearns Capital Markets Inc. became a subsidiary of

Defendant JPMorgan.

460.    On <u>September 15, 2005</u>, Riverside entered into an interest rate swap with Bear

Stearns Capital Markets Inc. in connection with Riverside's Electric Revenue/Refunding Bonds,

Issue of 2005A. The swap had an effective date of <u>January 5, 2006</u>, carried a notional value of

$57,850,000 and was set to mature on <u>October 1, 2035</u>. Under the terms of the swap, as set forth

in the applicable swap confirmation, Riverside would pay Bear Stearns Capital Markets Inc. a

fixed interest rate of 3.201%, and would receive an interest rate of 62.68% of 1M LIBOR plus

12 basis points.  In <u>2008</u>, Bear Stearns Capital Markets Inc. became a subsidiary of Defendant

JPMorgan.

461.    On <u>September 15, 2005</u>, Riverside entered into an interest rate swap with Bear

Stearns Capital Markets Inc. in connection with Riverside's Electric Revenue/Refunding Bonds,

Issue of 2005B.  The swap had an effective date of <u>February 6, 2006</u>, carried a notional value of $57,875,000, and was set to mature on <u>October 1, 2035</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, Riverside would pay Bear Stearns Capital Markets Inc. a fixed interest rate of 3.204%, and would receive an interest rate of 62.68% of 1M LIBOR plus 12 basis points.  In <u>2008</u>, Bear Stearns Capital Markets Inc. became a subsidiary of Defendant JPMorgan.

### F.   **Plaintiff Mendocino**

462.   At all times alleged herein, Plaintiff Mendocino had significant sums invested in LIBOR-based financial instruments in which Defendants Barclays, Deutsche Bank, Credit Suisse, JPMorgan, Bank of America, and HSBC were counterparties or issuers, pursuant to which Defendants Barclays, Deutsche Bank, Credit Suisse, JPMorgan, Bank of America, and HSBC were obligated to pay Plaintiff Mendocino an interest rate based on LIBOR.  For example:

### 1.   **Defendant Barclays**

463.   On <u>December 11, 2007</u>, Plaintiff Mendocino purchased $5,465,000 in certificates of deposit issued by Defendant Barclays with a maturity date of <u>March 13, 2009</u> and bearing an interest rate of 3 Month LIBOR plus 1 basis point.

464.   On <u>August 5, 2009</u>, Plaintiff Mendocino purchased $5,000,000 in certificates of deposit issued by Defendant Barclays with a maturity date of <u>February 5, 2010</u> and bearing an interest rate of 1 Month LIBOR plus 35 basis points.

465.   On <u>November 30, 2009</u>, Plaintiff Mendocino purchased $5,000,000 in certificates of deposit issued by Defendant Barclays with a maturity date of <u>November 30, 2012</u> and bearing an interest rate of 3 Month LIBOR plus 70 basis points.

466.     On <u>February 5, 2010</u>, Plaintiff Mendocino purchased $5,000,000 in certificates of deposit issued by Defendant Barclays with a maturity date of <u>February 7, 2011</u> and bearing an interest rate of 1 Month LIBOR plus 20 basis points.

467.     On <u>February 7, 2011</u>, Plaintiff Mendocino purchased $5,000,000 in securities issued by Defendant Barclays with a maturity date of <u>February 7, 2013</u> and bearing an interest rate of LIBOR plus 75 basis points.

### 2.      **Defendant Deutsche Bank**

468.     On <u>June 20, 2008</u>, Plaintiff Mendocino purchased $5,000,000 in certificates of deposit issued by Defendant Deutsche Bank with a maturity date of <u>July 30, 2009</u> and bearing an interest rate of 3 Month LIBOR plus 1 basis point.

### 3.      **Defendant Credit Suisse**

469.     On <u>December 18, 2009</u>, Plaintiff Mendocino purchased $5,000,000 in corporate notes issued by Defendant Credit Suisse with a maturity date of <u>April 12, 2013</u> and bearing an interest rate of 3 Month LIBOR plus 25 basis points.

### 4.      **Defendant JPMorgan**

470.     On <u>May 12, 2010</u>, Plaintiff Mendocino purchased $6,348,000 in corporate notes issued by Defendant JP Morgan with a maturity date of <u>February 26, 2013</u> and bearing an interest rate of 3 Month LIBOR plus 65 basis points.

### 5.      **Defendant HSBC**

471.     On <u>April 20, 2007</u>, Plaintiff Mendocino purchased $6,000,000 in corporate notes issued by Defendant HSBC with a maturity date of <u>May 10, 2010</u> and bearing an interest rate of 3 Month LIBOR plus 25 basis points.

### 6.     **Defendant Bank of America**

472.    On <u>February 28, 2006</u>, Plaintiff Mendocino purchased $5,000,000 in corporate notes issued by Defendant Bank of America with a maturity date of <u>February 11, 2009</u> and bearing an interest rate of 3 Month LIBOR plus 25 basis points.

473.    On <u>August 10, 2009</u>, Plaintiff Mendocino purchased $6,830,000 in corporate notes issued by Merrill Lynch, a subsidiary of Defendant Bank of America, with a maturity date of <u>July 25, 2011</u> and bearing an interest rate of 3 Month LIBOR plus 20 basis points.

### 7.     **Transactions with Third Parties**

474.    In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff Mendocino entered into numerous LIBOR-based financial instruments with third parties.  At all times alleged herein, Mendocino had at least $171,643,000 in floating rate securities whose interest rate was based on LIBOR.  Mendocino was damaged in each of these investments by Defendants' suppression of LIBOR.

475.    Specific examples of Plaintiff Mendocino's LIBOR-based financial instruments with third parties include:

- $6,000,000 in corporate notes issued by General Electric Capital Corporation, purchased on <u>April 18, 2008</u>, with a maturity date of <u>April 10, 2012</u> and bearing an interest rate of 3 Month LIBOR plus 12 basis points;

- $4,000,000 in corporate notes issued by Wells Fargo, purchased on <u>February 9, 2009</u>, with a maturity date of <u>March 1, 2012</u> and bearing an interest rate of 3 Month LIBOR plus 15 basis points;

- $5,000,000 in corporate notes issued by Goldman Sachs, purchased <u>April 3, 2007</u>, with a maturity date of <u>June 23, 2009</u> and bearing an interest rate of 3 Month LIBOR plus 9 basis points.

**G.    Plaintiff Sacramento**

476.    At all times alleged herein, Plaintiff Sacramento had significant sums invested in LIBOR-based financial instruments in which Defendants Bank of America and Deutsche Bank were counterparties or issuers, pursuant to which Defendants Bank of America and Deutsche Bank were obligated to pay Plaintiff Sacramento an interest rate based on LIBOR.  For example:

**1.    Defendant Bank of America**

477.    On <u>October 9, 2002</u>, Sacramento entered into an ISDA Master Agreement with Defendant Bank of America.

478.    On <u>October 9, 2002</u>, Sacramento entered into an interest rate swap with Defendant Bank of America.  The swap had an effective date of <u>January 2, 2003</u>, carried a notional value of $89,950,000, and was set to mature on <u>June 1, 2020.</u>  Under the terms of the swap, as set forth in the applicable swap confirmation, Sacramento would pay Bank of America a fixed interest rate of 4.534%, and would receive an interest rate of 67% of 1 Month LIBOR.

**2.    Defendant Deutsche Bank**

479.    On <u>October 22, 2008</u>, Sacramento entered into an ISDA Master Agreement with Defendant Deutsche Bank.

480.    On <u>October 22, 2008,</u> Sacramento entered into an interest rate swap with Defendant Deutsche Bank.  The swap had an effective date of <u>October 24, 2008</u>, carried a notional value of $134,000,000, and was set to mature on <u>July 1, 2009</u>.  Under the terms of the

swap, as set forth in the applicable swap confirmation, Sacramento would pay Defendant Deutsche Bank a fixed interest rate of 5.935%, and would receive an interest rate of 1 Month LIBOR.

481.    On October 22, 2008, Sacramento entered into a swaption with Defendant Deutsche Bank.  Under the terms of the swaption, as set forth in the applicable confirmation, Sacramento and Deutsche Bank entered into an interest rate swap on July 1, 2009, upon the termination of the previous swap entered on October 22, 2008.  This replacement swap was set to mature on July 1, 2022.  Under the terms of the replacement swap, Sacramento would pay Defendant Deutsche Bank a fixed interest rate of 6.04%, and would continue to receive an interest rate of 1 Month LIBOR.

### 3.    Transactions with Third Parties

482.    In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff Sacramento had at least $83,475,000 invested in LIBOR-based financial instruments in which third parties paid Sacramento an interest rate based on LIBOR during the Relevant Period.  Sacramento was damaged in each of these financial instruments by Defendants' suppression of LIBOR.

483.    Specific examples of Plaintiff Sacramento's LIBOR-based financial instruments with third parties include:

- On September 8, 2004, Sacramento entered into an interest rate swap with Morgan Stanley Capital Services Inc.  The swap had an effective date of May 2, 2006, carried a notional value of $83,475,000, and was set to mature on July 1, 2024.  Under the terms of the swap, as set forth in the applicable swap confirmation, Sacramento would pay

Morgan Stanley Capital Services Inc. a fixed interest rate of 3.785%, and would receive an interest rate of 68% of 1 Month LIBOR.

**H.**   **Plaintiff San Diego**

484.   At all times alleged herein, Plaintiff San Diego had significant sums invested in LIBOR-based financial instruments in which Defendant Citigroup was a counterparty, pursuant to which Defendant Citigroup was obligated to pay Plaintiff San Diego an interest rate based on LIBOR.  For example:

485.   On September 17, 2002, San Diego entered into an ISDA Master Agreement with Defendant Citigroup.

486.   On September 17, 2002, San Diego entered into an interest rate swap with Defendant Citigroup in connection with its Taxable Pension Obligation Bonds, Series 2002B. The swap had an effective date of September 17, 202, carried a notional value of $263,325,000 and was set to mature on February 15, 2031. Under the terms of the swap as set forth in the applicable swap confirmation, San Diego would pay Defendant Citigroup a fixed interest rate of 5.300%, and would receive a floating interest rate of 1 Month LIBOR.

**1.**   **Transactions with Third Parties**

487.   In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff San Diego entered into numerous LIBOR-based financial instruments with third parties.  During the Relevant Period, San Diego had at least $405,125,000 in interest rate swaps in which it received an interest rate based on LIBOR.  San Diego was damaged in each of these investments by Defendants' suppression of LIBOR.

488.   Specific examples of Plaintiff San Diego's LIBOR-based financial instruments with third parties include:

- On <u>September 17, 2002</u>, San Diego entered into an interest rate swap with Morgan Stanley Capital Services Inc. in connection with its Taxable Pension Obligation Bonds, Series 2002B.  The swap had an effective date of <u>September 17, 2002</u>, carried a notional value of $141,800,000 and was set to mature on <u>February 15, 2031</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, San Diego would pay Morgan Stanley Capital Services Inc. a fixed interest rate of 5.30%, and would receive a floating interest rate of 1M LIBOR.

## I.   **Plaintiff San Mateo**

489.   At all times alleged herein, Plaintiff San Mateo had significant sums invested in LIBOR-based financial instruments in which Defendants Citigroup, Credit Suisse, Bank of America, Deutsche Bank, UBS, JPMorgan, and Royal Bank of Canada were counterparties or issuers, pursuant to which Defendants Citigroup, Credit Suisse, Bank of America, Deutsche Bank, UBS, JPMorgan, and Royal Bank of Canada were obligated to pay Plaintiff San Mateo an interest rate based on LIBOR.  For example:

### 1.   **Defendant Citigroup**

490.   On <u>November 14, 2003</u>, San Mateo entered into an ISDA Master Agreement with Defendant Citigroup.

491.   On <u>November 14, 2003</u>, San Mateo entered into two interest rate swaps with Defendant Citigroup in connection with its San Mateo County Joint Powers Financing Authority Lease Revenue Bonds (Youth Services Campus), 2003 Series A, 2003 Series B, and 2003 Series C.  The swaps had an effective date of <u>November 18, 2003</u>, carried a combined notional value of $934,500,000 and were set to mature on <u>July 15, 2036</u>.  Under the terms of the swaps, as set

forth in the applicable swap confirmations, San Mateo would pay Citigroup a fixed interest rate of 3.33%, and would receive an interest rate of 55.5% of 1 Month LIBOR plus 29 basis points.

492.     On March 14, 2007, San Mateo purchased $10,000,000 in floating rate securities issued by Defendant Citigroup with a maturity date of March 12, 2010 and bearing an interest rate tied to 3 Month LIBOR.

### 2.     Defendant Credit Suisse

493.     On October 5, 2007, San Mateo purchased $10,100,000 in floating rate securities issued by Defendant Credit Suisse with a maturity date of June 2, 2008 and bearing an interest rate tied to 3 Month LIBOR.

### 3.     Defendant Bank of America

494.     On November 30, 2007, San Mateo purchased $41,000,000 in floating rate securities issued by Defendant Bank of America with a maturity date of July 25, 2008 and bearing an interest rate tied to 1 Month LIBOR.

### 4.     Defendant Deutsche Bank

495.     On February 15, 2008, San Mateo purchased $25,000,000 in floating rate securities issued by Defendant Deutsche Bank with a maturity date of February 16, 2010 and bearing an interest rate tied to 3 Month LIBOR.

### 5.     Defendant UBS

496.     On April 21, 2008, San Mateo purchased $10,000,000 in floating rate securities issued by Defendant UBS with a maturity date of July 23, 2009 and bearing an interest rate tied to 3 Month LIBOR.

### 6.     Defendant JPMorgan

497.     On May 2, 2008, San Mateo purchased $25,000,000 in floating rate securities issued by Defendant JPMorgan with a maturity date of June 26, 2009 and bearing an interest rate tied to 1 Month LIBOR.

### 7.     Defendant Royal Bank of Canada

498.     On October 31, 2011, San Mateo purchased $10,000,000 in floating rate securities issued by Defendant Royal Bank of Canada with a maturity date of October 30, 2014 and bearing an interest rate tied to 3 Month LIBOR.

### 8.     Transactions with Third Parties

499.     In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff San Mateo entered into numerous LIBOR-based financial instruments with third parties.  For example, on September 30, 2007, San Mateo's investment pool held at least $569,000,000 in floating rate securities whose interest rate was based on LIBOR, and on December 31, 2009, San Mateo's investment pool held at least $181,000,000 in floating rate securities whose interest rate was based on LIBOR. San Mateo was damaged in each of these investments by Defendants' suppression of LIBOR.

500.     Additional examples of Plaintiff San Mateo's LIBOR-based financial instruments with third parties include:

- On November 14, 2003, San Mateo entered into an interest rate swap with AIG Financial Products Corp. in connection with its San Mateo County Joint Powers Financing Authority Lease Revenue Bonds (Youth Services Campus), 2003 Series A, 2003 Series B, and 2003 Series C.  The swap had an effective date of November 18, 2003, carried a notional value of $40,100,000, and was set to

mature on <u>July 15, 2036</u>.  Under the terms of the swap, as set forth in the applicable swap confirmation, San Mateo would pay AIG Financial Products Corp. a fixed interest rate of 3.33%, and would receive an interest rate of 55.5% of 1 Month LIBOR plus 29 basis points.

- On <u>November 25, 2003</u>, San Mateo entered into an Investment Agreement with AIG Matched Funding Corp. in order to invest bond proceeds from its San Mateo County Joint Powers Financing Authority Lease Revenue Bonds (Youth Services Campus), 2003 Series C Reserve Fund.  Under the terms of the Investment Agreement, San Mateo would deposit $1,267,499.95 and receive an interest rate of 1 Month LIBOR minus 20 basis points. The investment was set to mature on <u>July 15, 2036</u>.

- On <u>November 25, 2003</u>, San Mateo entered into a Flexible Draw Investment Agreement with MBIA Inc. in order to invest bond proceeds from its San Mateo County Joint Powers Financing Authority Lease Revenue Bonds (Youth Services Campus), 2003 Series A, 2003 Series B, and 2003 Series C Capitalized Interest Fund. Under the terms of the Investment Agreement, San Mateo would deposit $3,908,249 and receive an interest rate of 1 Month LIBOR minus 15 basis points. The investment was set to mature on <u>November 1, 2006</u>.

**J.    <u>Plaintiff Sonoma</u>**

501.    At all times alleged herein, Plaintiff Sonoma had significant sums invested in LIBOR-based financial instruments in which Defendants Citigroup, JPMorgan, and Bank of America were counterparties or issuers, pursuant to which Defendants Citigroup, JPMorgan,

and Bank of America were obligated to pay Plaintiff Sonoma an interest rate based on LIBOR. For example:

### 1.    Defendant Citigroup

502.    On September 23, 2005, Plaintiff Sonoma purchased $10,000,000 in securities issued by Defendant Citigroup Inc. with a maturity date of June 9, 2009 and bearing an interest rate of 6 Month LIBOR plus 10 basis points.

### 2.    Defendant JPMorgan

503.    On May 12, 2008, Plaintiff Sonoma purchased $18,201,000 in securities issued by Defendant JP Morgan Chase & Co. with a maturity date of March 15, 2010 and bearing an interest rate of 3 Month LIBOR plus 17 basis points.

### 3.    Defendant Bank of America

504.    On December 4, 2007, Plaintiff Sonoma purchased $10,000,000 in securities issued by Defendant Bank of America Corporation with a maturity date of February 12, 2010 and bearing an interest rate of 3 Month LIBOR plus 12 basis points.

### 4.    Transactions with Third Parties

505.    In addition to the LIBOR-based financial instruments entered into with Defendant Member Banks described above, Plaintiff Sonoma entered into numerous LIBOR-based financial instruments with third parties.  At all times alleged herein, Sonoma had at least $347,486,000 in floating rate securities whose interest rate was based on LIBOR.  Sonoma was damaged in each of these investments by Defendants' suppression of LIBOR.

506.    Specific examples of Plaintiff Sonoma's LIBOR-based financial instruments with third parties include:

- $10,000,000 in securities issued by Wells Fargo & Company, purchased on February 28, 2005, with a maturity date of September 15, 2009 and bearing an interest rate of 3 Month LIBOR plus 10 basis points;

- $12,500,000 in securities issued by General Electric Capital Corporation, purchased on October 23, 2007, with a maturity date of January 26, 2011 and bearing an interest rate of 3 Month LIBOR plus 9 basis points;

- $10,000,000 in securities issued by Morgan Stanley, purchased on January 17, 2007, with a maturity date of January 15, 2010 and bearing an interest rate of 3 Month LIBOR plus 12 basis points.

## VI.   PLAINTIFFS DID NOT KNOW, NOR COULD THEY REASONABLY HAVE KNOWN, ABOUT DEFENDANTS' MISCONDUCT CONCERNING LIBOR UNTIL AT LEAST MARCH 2011

507.   Before Defendant UBS' March 15, 2011 announcement that it had been subpoenaed in connection with the U.S. government's investigation into possible LIBOR manipulation, Plaintiffs had not discovered, and could not with reasonable diligence have discovered, facts indicating Defendants were engaging in fraudulent misconduct that caused LIBOR to be artificially depressed during the Relevant Period.  Indeed, Defendants had actively sought to conceal the conspiracy and their wrongful conduct.  Even now, with global investigators conducting a massive probe into potential LIBOR manipulation, it has taken more than a year and a half for governments from across the world to even begin to grasp the true size and scope of the conspiracy.

508.   Although some market participants voiced concerns earlier that LIBOR did not reflect the Defendants' true borrowing costs, those concerns were dismissed in large part because the Defendants actively denied the existence of a conspiracy.  While there may have

been general concern about LIBOR, there was no indication that Defendants were engaged in a

fraud or a conspiracy.  At that time, due to the importance of LIBOR and its role as a global

benchmark interest rate, Plaintiffs and other market participants believed in the integrity of the

financial market and did not believe that the Defendants would manipulate a benchmark that

was so fundamentally important to global financial markets.

### A.     Defendants' Unlawful Activities Were Inherently Self-Concealing

509.    Defendants conspired to share information regarding their LIBOR submissions

and to misrepresent their borrowing costs to the BBA.  In so doing, Defendants intended to

manipulate and did manipulate LIBOR by artificially depressing LIBOR, which allowed them to

pay unduly low interest rates on LIBOR-based financial instruments they or others issued or

sold to investors, including Plaintiffs.

510.    Defendants' misconduct was, by its very nature, self-concealing. First, those

banks' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering

it impossible for investors, including Plaintiffs, to discern (without sophisticated expert analysis)

any discrepancies between Defendants' publicly disclosed LIBOR submissions and other

measures of those banks' actual or reasonably expected borrowing costs.  Second, internal

communications within and among the banks likewise were not publicly available, which

further precluded investors, including Plaintiffs, from discovering Defendants' misconduct,

even with reasonable diligence.  It was not until the Barclays settlement and other government

investigations began that the truth about the conspiracy came to light.  Even then, only a fraction

of the total evidence against all of the Defendants has been disclosed.  However, the evidence

obtained pursuant to government subpoenas and document requests, as well as from the

cooperation of Barclays and UBS show the size and scope of the LIBOR manipulation

conspiracy.  It required over a year and a half of an intensive global probe, involving investigators and regulatory authorities from multiple different countries to uncover the conspiracy, something that ordinary investors, such as Plaintiffs, could not have done.

511.    As a result of the self-concealing nature of Defendants' collusive scheme, no person of ordinary ability or intelligence would have discovered, or with reasonable diligence could have discovered, facts indicating Defendants were unlawfully suppressing LIBOR during the Relevant Period and were engaging in the misconduct set forth in this complaint.  Indeed, the Defendants actively concealed the conspiracy through misrepresentations to the public and to government agencies, as well as by concealing information.  Even now, the full scope of the conspiracy remains unknown as investigations continue.

**B.      Defendants and The British Bankers' Association Deflected Concerns Raised by Market Observers and Participants about LIBOR's Accuracy**

512.    While there were some market participants who had concerns about LIBOR's accuracy, no one could have reasonably expected that Defendants would conspire to manipulate one of the most important and commonly used global benchmark interest rates or engage in outright fraud.  No one could have expected all of the LIBOR member banks to have colluded to engage in the fraudulent and deceptive misconduct.  Defendants and the BBA actively concealed the conspiracy and represented that any discrepancies were anomalous events.  At all times alleged herein, Defendants denied the existence of the global conspiracy that investigators have determined existed.  Moreover, despite concerns raised, Defendants adamantly denied that they were engaged in fraudulent and deceptive misconduct towards investors such as Plaintiffs. Certainly, Plaintiffs had no reason to believe that the named Defendants, who did business with Plaintiffs on a daily basis, would engage in such blatant misconduct in regards to one of the United States' largest institutional investor.

513.    When certain market participants raised concerns about potential LIBOR manipulation in 2007 and 2008, the BBA agreed to conduct an inquiry into the allegations. Notably, shortly after the BBA announced its investigation had begun, the LIBOR U.S. Dollar Contributor Panel banks raised their submissions, causing LIBOR to record its biggest increase since August 2007.  This rise was the result of a concerted effort amongst the Defendants to respond to the BBA investigation.  Again, these sizeable shifts in LIBOR during the Relevant Period could not have occurred, from a statistical perspective, without concerted effort by the LIBOR member banks, including in particular the Defendants.

514.    The BBA determined that LIBOR had not been manipulated, thus providing further assurance to investors that the concerns expressed by some market participants were unfounded.  However, as the global investigations have determined, the BBA was wrong in its determination.  BBA, either through negligence or collusion, had failed to detect the LIBOR manipulation conspiracy.  Regardless, investors such as Plaintiffs had no reason to disbelieve the assurances by BBA that LIBOR was not being manipulated.

515.    Defendants engaged in a media strategy that diffused the speculation that had arisen concerning LIBOR, which allowed them to conceal the conspiracy.  For example, on April 21, 2008, Dominic Konstam of Defendant Credit Suisse affirmatively stated the low LIBOR rates were attributable to the fact that U.S. banks, such as Defendant Citigroup and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks: "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply."  Through this media campaign, the Defendants sought to provide alternative explanations for any LIBOR

discrepancies (such as cash hoarding) that would be a plausible to investors so that they would

not uncover the truth, which is that the Defendants engaged in a massive conspiracy to

manipulate LIBOR.

516.     In an April 28, 2008 interview with the *Financial Times*, Mr. Konstam continued

to defend LIBOR's reliability:

> Libor has been a barometer of the need for banks to raise capital. The main
> problem with Libor is the capital strains facing banks ... Initially there was some
> confusion that Libor itself was the problem, with talk of the rate being
> manipulated and not representative of the true cost of borrowing.

517.     On May 16, 2008, in response to a media inquiry, JPMorgan commented "[t]he

Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed

largely on reluctance among banks to lend to each other amid the current credit crunch."

518.     The same day, Colin Withers of Defendant Citigroup assured the public that

LIBOR remained reliable, emphasizing "the measures we are using are historic -- up to 30 to 40

years old."

519.     And in May 2008, the Wall Street Journal asked numerous Defendants to

comment on the media speculation concerning aberrations in LIBOR.  Rather than declining or

refusing to comment, those Defendants made affirmative representations designed to further

conceal their wrongdoing.  For example, on May 29, 2008, Defendant Citigroup affirmatively

denied the existence of a LIBOR manipulation conspiracy and any involvement in any such

conspiracy, stating that it continued to "submit [its] Libor rates at levels that accurately reflect

[its] perception of the market."  Defendant HBOS similarly asserted its LIBOR submissions

constituted a "genuine and realistic" indication of the bank's borrowing costs.  Plaintiffs and

other investors had no reason to disbelieve those representations or suspect that the Defendants

were knowingly colluding to suppress LIBOR.

**C.     Plaintiffs Could Not Have Known or Reasonably Discovered Until at Least March 2011 Facts Suggesting Defendants Knowingly Colluded to Suppress LIBOR**

520.     While there were some questions raised in late 2007-early 2008 concerning LIBOR's reliability, in light of the BBA's and Defendants' vociferous and public refutations that there was any cause for concern, Plaintiffs had no reason to suspect, and did not suspect, that the Defendants were knowingly colluding to suppress LIBOR, in breach of their contracts with Plaintiffs and were intentionally engaging in fraud and deceit in its dealings with Plaintiffs. Even when Defendant UBS first announced that it was being investigated for LIBOR manipulation on March 15, 2011, Plaintiffs did not realize the full scope of the conspiracy. Considering the reputation of the Defendants, their staunch and public denials of wrongdoing, and the crucial importance of LIBOR as a recognized, worldwide benchmark, Plaintiffs had no reason to believe that the Defendants had engaged in tortious misconduct and relied on the denials of the Defendants.  Plaintiffs entered into LIBOR-linked transactions and financial instruments during the Relevant Period, including many with Defendants.  Plaintiffs still believed in March of 2011 that there were only isolated incidents of LIBOR manipulation. However, it was not until the recent revelations in 2012 and 2013, from such sources as the Barclays settlement and UBS amnesty application, as well as the news of mass arrests and indictments that investors, such as Plaintiffs, could have known of the full scope of the conspiracy.  Indeed, as a result of Defendants' secret conspiracy and their fraudulent concealment of relevant information, it was not until then that Plaintiffs were on inquiry notice that the Defendants had engaged in the tortious conduct that is the subject of this lawsuit.

**D.**     **The Statute of Limitations is Tolled by the *American Pipe* Doctrine**

521.     Furthermore, Plaintiffs' statute of limitations is tolled by the filing of the first

putative class action complaint relating to the LIBOR manipulation conspiracy.  In *American*

*Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the United States Supreme Court held

that the filing of a putative class action tolls the statute of limitation for all members of that

putative class.

522.     Defendants are equitably estopped to assert that any other period of limitations

has run.

523.     Defendants' conduct as alleged herein constitutes a continuing violation of law.

**VII.   PLAINTIFFS HAVE SUFFERED SIGNIFICANT INJURY AS A RESULT OF
         DEFENDANTS' LIBOR MANIPULATION CONSPIRACY**

**A.**     **Defendants' Manipulation of LIBOR Broadly Impacted LIBOR-Based
            Financial Instruments and Investments**

524.     At all times alleged herein, Defendants' manipulation of LIBOR caused damage

to Plaintiffs by inflating or artificially suppressing the interest earned and/or rate of return on

LIBOR-linked transactions and financial instruments that Plaintiffs held or purchased during the

Relevant Period.  Defendants' manipulation of LIBOR and other global benchmark interest rates

have caused significant harm to Plaintiffs in the form of interest payments that were greater than

what Plaintiffs should have paid, or below what should have been paid to Plaintiffs.  While this

Complaint relates to LIBOR, Plaintiffs believe that other global benchmark interest rates were

manipulated during the Relevant Period by the Defendants, and other financial institutions.

These probes are ongoing.  Furthermore, the time period of the conspiracy is also not currently

known because, while there is indisputable evidence that, by at least August of 2007, the

conspiracy had begun, there is also evidence that the conspiracy may have begun earlier.

525.     At all times alleged herein, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, inflate, suppress and stabilize LIBOR and thus the prices and rates of return on LIBOR-Based Derivatives sold by them.

526.     In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress, inflate, and otherwise make artificial the price of LIBOR-Based Derivatives. These activities included the following:

a.     Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Thomson Reuters for calculation of the daily LIBOR;

b.     Defendants agreed during those meetings and conversations to unlawfully report their borrowing rates to Reuters for calculation of LIBOR in order to drive down LIBOR and otherwise to depress, inflate, or make artificial LIBOR;

c.     Defendants signaled to one another their intention to depress or otherwise make artificial LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose; and

d.     Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress, inflate, or otherwise make artificial the price of LIBOR-Based Instruments.

527.     The Defendants are liable to Plaintiffs for fraud and negligent misrepresentation for making material misrepresentations and for concealing the true nature of LIBOR. Defendants are also liable to Plaintiffs for breach of contract and for breach of the implied

covenant of good faith and fair dealing by entering into a transaction governed by a rate

(LIBOR) that the Defendants were intentionally manipulating in their favor.  Defendants also

intentionally interfered with Plaintiffs' contracts and economic relations through their

manipulation of LIBOR, which Defendants know is a key global benchmark rate used by

investors across the world, including investors like Plaintiffs, in valuing various types of

financial instruments.  Defendants, several of whom did substantial business with Plaintiffs,

knew that Plaintiffs engaged in substantial business with the Defendants and other third parties

in LIBOR-linked transactions and knowingly manipulated LIBOR, to the detriment of Plaintiffs.

Defendants were also unjustly enriched by their wrongful conduct.

> **B.**     **Plaintiffs Transacted LIBOR-Based Financial Instruments That Paid
> Artificially Low Interest Rates or Charged Artificially High Interest Rates**

528.     At all times alleged herein, Plaintiffs held, entered into, and/or purchased

LIBOR-linked transactions and financial instruments impacted by Defendants' misconduct.

Those transactions were either directly with a Defendant, with third parties that Defendants, and

each of them, knew would be impacted by Defendants' misconduct, or sold by dealer entities

that were subsidiaries of, or otherwise affiliated with Defendants including, but not limited to:

(i) Deutsche Bank Securities; (ii) Banc of America Securities, LLC; (iii) Barclays Capital Inc.;

(iv) Credit Suisse Securities (USA) LLC; (v) UBS Financial Services Inc.; (vi) Citigroup Global

Markets Inc.; (vii) Citigroup Funding, Inc.; (viii) RBS Securities, Inc. (f/k/a Greenwich Capital

Markets, Inc.); (ix) Bank of Scotland plc; (x) JPMorgan Chase Bank, N.A.; (xi) J.P. Morgan

Securities Inc. (f/k/a Bear Stearns & Co.); (xii) JP Morgan Securities LLC; (xiii) HSBC Bank

USA, N.A.; (xiv) HSBC Finance Corporation; (xv) HSBC Securities (USA) Inc.

529.    When Defendants manipulated LIBOR in a way that benefitted their trading

positions, their counterparties, including Plaintiffs, lost money as a result of that collusive

manipulation.

     a.    UBS admitted that:

When UBS derivatives traders influenced the submissions of other Contributor
Panel banks – either by (1) seeking and receiving accommodations from their
counterparts at such banks, or (2) influencing the submissions from other banks
with assistance from cash brokers who disseminated misinformation in the
marketplace – the manipulation of those submissions affected the fixed
benchmark rates on various occasions….

In the instances when the published benchmark interest rates were manipulated in
UBS's favor due to UBS's manipulation of its own or any other Contributor Panel
bank's submissions, that manipulation benefitted UBS derivatives traders, or
minimized their losses, to the detriment of counterparties, at least with respect to
the particular transactions comprising the trading positions that the traders took
into account in making their requests to the rate submitters.

UBS SOF ¶¶ 92, 96.

     b.    RBS admitted that:

[RBS] negotiated and entered into derivatives transactions with counterparties
knowing that that those counterparties were unaware of the efforts by RBS
employees to manipulate the relevant LIBOR rate.

Traders, former traders, and/or submitters at competing financial institutions
agreed to coordinate with regard to Yen LIBOR submissions, causing the
manipulation of the LIBOR reference rate on certain occasions. Because Yen
LIBOR was a pricing component of derivatives contracts held by the financial
institutions, the traders benefited from this agreement by affecting the profitability
of the contracts on particular settlement dates.

RBS SOF ¶81-82.

     c.    Barclays admitted that:

In the instances when the published rates were manipulated in Barclays's favor
due to Barclays's manipulation of its submissions, that manipulation benefitted
Barclays swaps traders, or minimized their losses, to the detriment of
counterparties, at least with respect to the particular transactions comprising the

trading positions that the traders took into account in making their requests to the rate submitters.

Barclays SOF ¶32.

530.    Plaintiffs and other public entities also paid supracompetitive prices and made inflated payments to Defendants on LIBOR-linked transactions, in that Plaintiffs assumed significant credit risks for which it was not adequately compensated. A party entering into a LIBOR-based instrument with a Defendant wanted to know not just the financial terms of the instrument (for example, the fixed rate in an interest rate swap) but also the creditworthiness of its counterparty and the systemic stresses faced by the financial system as a whole that could impact its counterparty's creditworthiness. A party transacting with a less creditworthy counterparty or at a time of system wide financial stress that could affect its counterparty would demand better terms—for example, the ability to pay a lower fixed rate in an interest rate swap—to compensate for exposure to increased credit risk. However, because of Defendants' collusive LIBOR suppression, each Defendant's individual LIBOR quotes were lower than they should have been (so that they did not accurately reflect each Defendant's creditworthiness), and the composite LIBOR was lower than it should have been (so that it did not accurately reflect the systemic stresses faced by the financial system as a whole). Plaintiffs thus overpaid by assuming credit risk for which they were not adequately compensated due to both (a) bank-specific credit risk that was higher than it appeared due to artificially low LIBORs and (b) systemic stresses to the financial system that were more severe than they appeared due to artificially low composite LIBOR.

531.    In fact, Plaintiffs directly transacted with the Defendants using a rate as the benchmark that the Defendants knew was manipulated because the Defendants themselves had

manipulated it.  Plaintiffs were undercompensated for the risk they were taking due to

Defendants' misconduct, both on a specific Defendant bank basis and also on a systematic basis.

### C.  Plaintiffs Suffered Antitrust Injury

532.    Plaintiffs suffered antitrust injury as a result of at least the following

anticompetitive aspects of Defendants' conduct.[59]

533.    First, Defendants' anticompetitive conduct had severe adverse consequences on

competition in that Plaintiffs and other public entities that traded in LIBOR-Based Instruments

during the Relevant Period were trading at artificially determined prices that were made

artificial as a result of Defendants' horizontal price-fixing.  As a consequence thereof, Plaintiffs

and other public entities suffered financial losses and were, therefore, injured in their business

or property as alleged herein.

534.    The conspiracy consisted of an agreement, understanding and concert of action

among the Defendants, the substantial terms of which were to fix the price of LIBOR-based

instruments by fixing LIBOR, a key component of the price thereof, during the Relevant Period.

As the DOJ charged RBS on April 12, 2013, and RBS admitted, by colluding to fix LIBOR,

Defendants conspired to fix the price of LIBOR-based instruments, which was a conspiracy "in

unreasonable restraint of interstate and foreign commerce."[60]  The Information filed in regards

to RBS states as follows:

---

[59] The statute of limitations for Plaintiffs' antitrust claims is tolled by virtue of proceedings instituted by the United States against Defendants pursuant to 15 U.S.C. ¶16(i).

[60] In its Deferred Prosecution Agreement, RBS "acknowledge[d] and agree[d]" that the DOJ would file a criminal Information charging it with "one count of price-fixing, in violation of the Sherman Act, Title 15, United States Code, Section 1." RBS DPA p. 1. RBS also admitted that "the allegations described in the Information . . . are true and accurate." *Id.* p. 2.

COUNT TWO
(Price Fixing)

From at least as early as 2007 through at least 2010, Defendant THE ROYAL
BANK OF SCOTLAND PLC, through its employees, and its co-conspirators,
engaged in a combination and conspiracy in unreasonable restraint of interstate
and foreign commerce. The aforesaid combination and conspiracy consisted of an
agreement, understanding and concert of action among the Defendant and its
coconspirators, the substantial terms of which were to fix the price of Yen
LIBOR-based derivative products by fixing Yen LIBOR, a key component of the
price thereof, on certain occasions.

RBS SOF ¶ 2.

535.    Defendants admit that they are competitors and not passive actors involving

LIBOR.  For example, Defendants admit in their motions to dismiss the class actions that they

are direct horizontal competitors with respect to the sale of LIBOR-Based Instruments.  *See*

Mem. of Law in Supp. of Defs. Mot. to Dismiss Antitrust Claims at 3 (June 29, 2012) (Doc. No.

166) ("Defendants do compete for the provision of loans and other financial products, some of

which are indexed to USD LIBOR . . . ."); *id*. at 22 ("Banks are expected to compete in the

marketplace of making loans, etc. . . .").

536.    LIBOR is a component of the price of LIBOR-based financial instruments. In the

"statement of facts" attached to its agreement with DOJ, RBS admitted that "Yen LIBOR was a

pricing component of derivatives contracts held by the financial institutions." RBS SOF ¶87.

The DOJ has also charged a former UBS employee, Thomas Hayes, with violating the Sherman

Act by conspiring to fix Yen LIBOR as a component of price of LIBOR-based instruments.  *See*

Hayes-Darin Cmplt. at 3 ("The aforesaid combination and conspiracy consisted of an

agreement, understanding, and concert of action among HAYES and his co-conspirators, the

substantial terms of which were to fix Yen LIBOR, a key price component of Yen LIBOR-

based derivative products.").

537.    At all times alleged herein, Defendants used LIBOR as the floating component of price on trillions of dollars of financial instruments, including the instruments or investments transacted by Plaintiffs, many of which Plaintiffs entered into directly with Defendants. Defendants' collusive manipulation of LIBOR therefore directly affected a component of the price of the instruments or investments transacted by Plaintiffs: it directly affected the rate used to compute the realized cash-flows on Plaintiffs' LIBOR-based financial instruments, such as Certificates of Deposit and corporate notes in which Mendocino received payment based on a rate that was linked to LIBOR.

538.    Rather than obtaining products from Defendants whose value reflected an untainted index—the Federal Reserve Eurodollar rate, or the Treasury Bill rate, or even an untainted LIBOR—Plaintiffs obtained financial products whose value was reduced by Defendants' collusive suppression of a component of the price.

539.    The Department of Justice charged RBS with price-fixing in violation of the Sherman Act and RBS admitted to the underlying facts. By letter dated <u>March 22, 2013</u>, the Department of Justice notified entities that entered into transactions with RBS that they may be victims of and may have been harmed by an antitrust violation by RBS, explaining:

> RBS and RBSSJ [RBS Securities Japan Limited] admit that certain RBS and RBSSJ traders attempted to manipulate and manipulated certain Yen and Swiss Franc LIBOR fixings on certain dates from 2006 through 2010 to benefit their trading positions in derivatives contracts to the detriment of counterparties to those contracts. RBS also admitted that certain traders conspired to fix prices in connection with Yen LIBOR from 2007 through 2010. To the extent RBS or RBSSJ traders were successful in manipulating Yen and/or Swiss Franc LIBOR, other parties to derivatives contracts, mortgages, loans, and/or credit cards that were tied to manipulated LIBOR rates also may have been harmed.

The DOJ's actions unequivocally demonstrate that the conduct engaged in by at least RBS was the type of which the antitrust laws were designed to prohibit and may have harmed those persons who concluded transactions at the fixed price.

540.    Plaintiffs and other public entities—as in the RBS case, "parties to derivatives contracts" and "loans," among other financial products—have suffered a similar type of harm from collusive LIBOR suppression that victims in the RBS case suffered from RBS's LIBOR manipulation: they paid more, received less, or both on financial instruments tied to LIBOR than they would have absent Defendants' conspiracy to fix prices.

541.    Second, Defendants' collusion restrained competition as to the benchmark in floating rate financial products.

542.    In a free and competitive market, Defendants would have competed vigorously as to the benchmark used to calculate the floating component of price on various financial products to provide the best and most competitive products to their customers.  They plainly did not do that.

543.    As this Court noted:

> LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments.

*In re LIBOR-Based Financial Instruments Antitrust Litigation*, No. 11 MD 2262(NRB), 2013 WL 1285338, at *16 (S.D.N.Y. Mar. 29, 2013).  But because of Defendants' collusion, LIBOR no longer accurately reflected the competitively-determined outcomes of the interbank lending market during the Relevant Period. Knowing that their collusion meant that LIBOR no longer served the function it was supposed to serve, Defendants in a competitive market would have competed to use alternative benchmarks that more accurately and reliably reflected actual

competitive forces in the market. Instead, during the Relevant Period, Defendants adhered to LIBOR.

544.     Evidence demonstrates that Defendants wanted to preserve the centrality of LIBOR rather than some other benchmark precisely because Defendants controlled LIBOR and could collude to manipulate it for their own ends.  According to a press report, in <u>November 2008</u>, in response to complaints about LIBOR manipulation, the BBA "drew up plans to license Libor to an independent third party that would pay a fee to administer the rate instead of the BBA."[61]  This proposal was rejected by Defendants because "when BBA staffers pitched the idea to industry executives, they got the impression that ***the big banks***—which paid most of the BBA's bills through their membership fees—***wanted Libor kept in-house so that they could continue to influence it***, according to people familiar with the talks." *Id.* (emphasis added). By restraining competition as to the benchmark used to calculate the floating component of price, Defendants were able to maintain the dominance of LIBOR—a benchmark that they controlled and could collusively manipulate for their own ends, whether to generate profits for their trading books, to bolster their reputations in times of financial stress, or some other end.

545.     Competitive market forces should have eliminated the use of LIBOR in financial instruments.  That did not happen. Instead, LIBOR was the dominant benchmark for financial instruments sold by Defendants during the Relevant Period, including those sold to Plaintiffs. Defendants' anticompetitive conduct directly harmed Plaintiffs and other public entities, who

---

[61] David Enrich and Max Colchester, Before Scandal, Clash Over Control of Libor, Wall St. J., Sept. 12, 2012, *available at:*
http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html (emphasis added).

were sold trillions of dollars of financial instruments whose price included a collusively-set

LIBOR as a component.

546.   Third, Defendants' conduct restrained competition as to creditworthiness.

547.   LIBOR submissions reflect perceived creditworthiness. As the DOJ explained,

and UBS admitted:

> Because a bank's LIBOR contributions, even if they are not based entirely on
> actual money market transactions, should correspond to the cost at which the bank
> perceives that it can borrow funds in the relevant market, a bank's LIBOR
> contributions may be viewed as an indicator of a bank's creditworthiness. If a
> bank's LIBOR contributions are relatively high, those submissions could suggest
> that the bank is paying more than others to borrow funds. Thus, a bank could be
> perceived to be experiencing financial difficulties because lenders were charging
> higher rates to that bank.

UBS SOF ¶99.

548.   Composite LIBOR reflected the creditworthiness of all large banks by acting as a

measure of the stress faced by the financial system as a whole. As the BBA stated: "BBA

LIBOR rates are calculated daily from the rates at which banks will agree to lend each other

money, so it is accepted as an accurate barometer of how global markets are reacting to

prevailing market conditions." (BBA, "Understanding BBA Libor—a briefing by the British

Bankers' Association," May 27, 2010, *available at* bbalibor.com/download/1191).

549.   In a competitive market, Defendants would compete with their peers, including

other panel banks and all market participants, as to their perceived creditworthiness. Greater

perceived creditworthiness benefits a bank in many ways, including in the market for LIBOR-

Based Instruments: it can yield better collateral terms or fixed rates in interest rate swaps and

other derivatives, and better terms in LIBOR-based business lending and borrowing. Similarly,

weak perceived creditworthiness can lead to lower ratings, collateral calls, and other actions that

can harm or even threaten the life of a bank.

550.    LIBOR member banks who could truthfully post lower LIBOR submissions had a competitive advantage over LIBOR member banks who could not truthfully post lower LIBOR submissions because of LIBOR's importance as an indicator of a bank's creditworthiness. In a free and competitive market, then, each LIBOR member bank would have competed to appear more creditworthy than other panel banks through the posting of lower truthful LIBOR submissions, and the stronger banks would not have tolerated artificially low LIBOR submissions from the weaker banks.

551.    However, at all times alleged herein, Defendants restrained competition among the banks for the best market perception of their creditworthiness. Instead of competing fully with each other to post the lowest but accurate LIBOR submissions, they conspired to post artificially low LIBOR submissions as a "pack," which reduced or otherwise altered the magnitude of the differences between their relative creditworthiness.  The more creditworthy banks did not force the less creditworthy banks to post accurate LIBOR submissions so that the less creditworthy banks could be revealed as weaker, permitting the stronger banks to take their business.  Instead, the stronger banks collusively agreed with the weaker banks to post falsely low LIBORs.

552.    The restraint of competition as to creditworthiness harmed Plaintiffs in two ways. First, it enabled collusive suppression. Had Defendants competed vigorously over their creditworthiness by striving to submit the lowest but accurate LIBORs relative to the competition, the suppression conspiracy could never have happened in the first place.

553.    Second, the reduction of competition as to creditworthiness injured Plaintiffs and other public entities by causing them to assume credit risk for which they were not adequately compensated. With competition for creditworthiness restrained, each Defendant was not posting

accurately low LIBORs but rather artificially low LIBORs, and so Plaintiffs and other public entities transacting in LIBOR-linked investments were overpaying because they were transacting on terms that did not accurately reflect each Defendant's true credit risk.  Further, the restraint on competition as to creditworthiness resulted in artificially low composite LIBORs, causing Plaintiffs to overpay because it was not adequately compensated for the systemic stress faced by the financial system as a whole, which was not accurately reflected during the Relevant Period in composite LIBOR.

554.    The aforementioned anticompetitive aspects of Defendants' collusive conduct are not exhaustive, and Plaintiffs believe that with the benefit of additional discovery and expert analysis additional anticompetitive aspects will be discerned from their horizontal price-fixing scheme.

555.    In the alternative to the per se theory of liability, Plaintiffs allege that Defendants conspired to engage in an unreasonable restraint of trade that is anticompetitive under the rule of reason.

556.    At all times alleged herein, there were relevant markets for each category of LIBOR-Based Instruments identified in ¶¶ 88–99.  They are the relevant markets for LIBOR-Based Asset Swaps, Collateralized Debt Obligations, Credit Default Swaps, Forward Rate Agreements, Inflation Swaps, Interest Rate Swaps, Total Return Swaps, Options, and floating rate notes, and other LIBOR-linked Derivative and Non-Derivative Instruments.

557.    Defendants have market power in each of the relevant markets.  Defendants, as a majority of the members of the LIBOR panel, had the ability to control and exercised control over LIBOR.

558.     The control over LIBOR exercised by Defendants meant that they were able, in fact, to suppress LIBOR and cause prices of LIBOR-Based Instruments to be supracompetitive in the relevant markets and the other injuries and anticompetitive effects as alleged herein. Defendants' ability to cause supracompetitive prices for LIBOR-Based Instruments in the relevant markets demonstrates their market power.

559.     In addition, Defendants' agreement to exchange confidential, pre-publication LIBOR quotes also caused supracompetitive prices for LIBOR-Based Instruments in the relevant markets and the other injuries and anticompetitive effects as alleged herein.

560.     Plaintiffs and other public entities were injured by the misconduct of Defendants because they transacted in LIBOR-based transactions at artificially-manipulated rates: Plaintiffs and other public entities paid more, received less, or both, on LIBOR-linked financial instruments than they would have absent Defendants' collusive restraint.  Plaintiffs directly transacted in LIBOR-linked financial instruments with several of the Defendants.  One of the common types of financial instruments frequently based on LIBOR is the floating rate security. At all times alleged herein, Plaintiffs had significant sums invested in financial instruments tied to LIBOR.

## VIII.  CLAIMS FOR RELIEF

<div align="center">

### FIRST CAUSE OF ACTION
### FRAUD AND DECEIT (AFFIRMATIVE AND CONCEALMENT)

### (Against all Defendants)

</div>

561.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

562.    The Defendants, and each of them, knowingly and intentionally, or with reckless disregard for the truth, made, authorized, and caused to be made material representations concerning their borrowing costs and the proper level of LIBOR that were false and misleading, including but not limited to making affirmative misrepresentations directly to Plaintiffs as well as making affirmative misrepresentations to third parties such as the British Bankers' Association ("BBA"), that they knew, intended and expected to be relied upon by Plaintiffs. The Defendants also concealed material information from Plaintiffs that the Defendants had a duty and obligation to disclose to Plaintiffs, a duty that arose from the decision to the Defendants to make affirmative representations, which then imposed on them a duty to ensure that those representations were completely truthful and accurate.  Defendants concealed from Plaintiffs the fact that they were involved in manipulating LIBOR, which impacted transactions and financial instruments in which Plaintiffs entered into with one or more of the Defendants in this action, as well as transactions and financial instruments with third parties.

563.    Defendants made these misrepresentations and omissions of material fact while entering directly into transactions with Plaintiffs which involved LIBOR in the determination of either the value of the transaction or financial instruments or the amount that would be paid to the Plaintiffs.  In a number of the transactions that Plaintiffs entered into with the Defendants, there would be documents, such as Term Sheets which stated that LIBOR (which was represented to be an honest reflection of interbank borrowing rates) would be the index rate for the transactions.  This was false because the Defendants knew that the index rate that would actually govern the transaction was a fraudulent and manipulated index rate.

564.    The Defendants also engaged in their intentional fraud with full knowledge that their misrepresentations would be transmitted to the BBA and would therefore impact LIBOR.

Indeed, the Defendants fully understood how the BBA calculated LIBOR and therefore knew and expected their misrepresentations to affect LIBOR rates in a very specific way for their benefit.  The Defendants therefore fully knew how their misrepresentations would impact the financial markets and entities and individuals who deal in the financial markets, such as Plaintiffs.

565.    Defendants had a duty to disclose to their counterparties and the public, including Plaintiffs, the conspiracy to manipulate LIBOR and the manipulation of LIBOR, which directly impacted LIBOR-linked transactions and financial instruments.  However, Defendants failed to disclose this information.  The duties to disclose were triggered not only by direct transactions between the parties, but also by Defendants' exclusive knowledge about the true, manipulated nature of LIBOR, and Defendants' participation in submitting LIBOR bids to the BBA without disclosing the manipulation and suppression, and by falsely denying manipulation had taken place.

566.    Indeed, because the Defendants were making affirmative statements that were untrue, and because certain Defendants had entered into direct transactions with Plaintiffs, the Defendants had an obligation and duty to disclose to the Plaintiffs that they manipulated LIBOR and were involved in a conspiracy to manipulate LIBOR which directly impacted LIBOR-linked transactions and financial instruments between Plaintiffs and one or more of the Defendants, as well as transactions with third parties that the Defendants knew would be impacted by Defendants' fraud.

567.    The Defendants, and each of them, made the representations and failed to disclose and suppressed information they had a duty to disclose, as set forth in this complaint.  For example, the Defendants made direct misrepresentations to Plaintiffs and intentionally

concealed material facts from Plaintiffs. Defendants also concealed from the BBA and others the scope and nature of their LIBOR manipulation. The Defendants did so with knowledge of the falsity of their statements and representations and knew that they were failing to disclose material facts which they had a duty to disclose.

568. At the time these misrepresentations were made and the material facts not disclosed, Plaintiffs were ignorant of the true facts. If Plaintiffs had known the truth, Plaintiffs would have either not entered into the transactions or acquired the financial instruments or insisted on using a different benchmark interest rate.

569. Plaintiffs reasonably and justifiably relied on these representations and omissions in entering into transactions and holding or trading financial instruments linked to LIBOR.

570. As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiffs entered into transactions and held or traded in financial instruments linked to LIBOR and have since suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

## SECOND CAUSE OF ACTION
## AIDING AND ABETTING FRAUD

### (Against all Defendants)

571. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporate them by reference as though set forth in full herein.

572. Defendants aided and abetted the fraud of the other LIBOR Panel banks.

573. By falsifying their own LIBOR submissions to the BBA, and by omitting and failing to inform the investing public and Plaintiffs that LIBOR was systematically manipulated

and suppressed, each Defendant gave substantial assistance to the other Panel banks in their conspiratorial efforts to suppress LIBOR.

574. Each of the Defendants knew of the fraud perpetrated by the other Panel banks, including other Defendants. Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.

575. Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other Panel banks in their fraud by colluding to manipulate and artificially suppress LIBOR.

576. Each Defendant's submission was a necessary input for calculation of the published LIBOR.

577. Plaintiffs reasonably and justifiably relied on Defendants' false representations and misleading omissions in purchasing, selling, or holding LIBOR-linked securities and other investments.

578. Defendants' acts constituted a civil conspiracy and corrupt agreement to manipulate and suppress their LIBOR submissions during the Relevant Period. Accordingly, each Defendant is being sued both individually as a primary violator of the law and as a co-conspirator.

579. Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false LIBOR quotes to the BBA on a daily basis, actively concealing their misconduct by intentionally making false and misleading statements to the public, and/or directly to Plaintiffs, about LIBOR's integrity, or by intentionally failing to disclose the material information that Defendants were manipulating

and/or suppressing LIBOR. Defendants acted with malice, and intended to injure investors and Plaintiffs through the actions described herein.

580.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

581.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiffs entered into transactions and held or traded in financial instruments linked to LIBOR and have since suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

### (Against all Defendants)

582.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

583.    The Defendants, and each of them, made material representations which were false and misleading, including but not limited to making affirmative misrepresentations directly to Plaintiffs as well as making affirmative misrepresentations to third parties such as the British Bankers' Association ("BBA") that they knew, intended and expected to be relied upon by Plaintiffs.  The Defendants made these misrepresentations with reckless disregard for the truth of those statements, knowing that they were making those statements based on directives from senior management to improve the financial position of the Defendants and to conceal the Defendants' financial weakness from the markets.  Instead of making true and honest submissions to the BBA, as they were required to, the Defendants recklessly made submissions to the BBA irrespective of the truth.  The Defendants also made material misrepresentations to

the Plaintiffs with reckless disregard of the truth regarding what the true interest rate was on transactions entered into between Plaintiffs and certain of the Defendants.

584.    Defendants made these misrepresentations of material fact while entering directly into transactions with Plaintiffs which involved LIBOR in the determination of either the value of the transaction or financial instruments or the amount that would be paid to the Plaintiffs.  In a number of the transactions that Plaintiffs entered into with the Defendants, there would be documents, such as Term Sheets which stated that LIBOR (which was represented to be an honest reflection of interbank borrowing rates) would be the index rate for the transactions. This was false because the Defendants knew that the index rate that would actually govern the transaction was a fraudulent and manipulated index rate.

585.    The Defendants also made material misrepresentations to the BBA with full knowledge that their misrepresentations would impact LIBOR.  Indeed, the Defendants fully understood how the BBA calculated LIBOR and therefore knew and expected their misrepresentations to affect LIBOR rates in a very specific way for their benefit.  The Defendants therefore fully knew how their misrepresentations would impact the financial markets and entities and individuals who deal in the financial markets, such as Plaintiffs.

586.    The Defendants, and each of them, made false representations to Plaintiffs and others, as set forth in this complaint, including but not limited to direct misrepresentations to Plaintiffs as well as misrepresentations to the BBA about their true borrowing costs.   The Defendants did so with reckless disregard of the falsity of their statements and representations. At the time the Defendants made these material misrepresentations, Defendants did not have a reasonable basis to believe those statements to be true and, further, Defendants intended that Plaintiffs and others would rely upon these material misrepresentations.

587.     At the time these misrepresentations were made Plaintiffs were ignorant of the true facts.  If Plaintiffs had known the truth, Plaintiffs would have either not entered into the transactions or acquired the financial instruments or insisted on using a different benchmark interest rate.

588.     Plaintiffs reasonably relied on these representations in entering into transactions and trading and holding financial instruments linked to LIBOR.

589.     As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiffs entered into transactions and held or traded in financial instruments linked to LIBOR and have since suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

<div align="center">

**FOURTH CAUSE OF ACTION**
**BREACH OF CONTRACT**

**(Against Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank, Credit Suisse, HSBC, Rabobank, RBC, RBS, and UBS)**

</div>

590.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

591.     The following Plaintiffs bring this claim against the following Defendants:

- Plaintiff UC Regents against Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank, HSBC, Rabobank, RBC, RBS, and UBS;

- Plaintiff EBMUD against Defendants Citigroup, JPMorgan, and Bank of America;

- Plaintiff SANDAG against Defendant Bank of America;

- Plaintiff Richmond against Defendants JPMorgan and RBC;

- Plaintiff Riverside against Defendants Bank of America and JPMorgan;

- Plaintiff Mendocino against Defendants Barclays, Deutsche Bank, Credit Suisse, JPMorgan, Bank of America, and HSBC;

- Plaintiff Sacramento against Defendants Bank of America and Deutsche Bank;

- Plaintiff San Diego against Defendant Citigroup;

- Plaintiff San Mateo against Defendants Citigroup, Credit Suisse, Bank of America, Deutsche Bank, UBS, JPMorgan, and RBC; and

- Plaintiff Sonoma against Defendants Citigroup, JPMorgan, and Bank of America.

592.   Plaintiffs entered into contracts with several of the Defendants by entering into LIBOR-linked financial transactions in which the payments to be made were dependent on LIBOR.  For example, Plaintiffs would be a party to a debt instrument with one of the Defendants in which that Defendant would owe Plaintiffs a variable rate based on LIBOR plus a certain amount of basis points.  All of these contracts were set forth in writing, either through formal contracts or in transaction documents.  Defendants were the counterparties in these transactions in which the Defendants were making payments to Plaintiffs based on the LIBOR rate.

593.   Defendants breached the contractual obligations owed to Plaintiffs as both counterparties and brokers to Plaintiffs by entering into and executing transactions using an index rate that the Defendants had intentionally manipulated.  Plaintiffs had no knowledge that

the Defendants were entering into LIBOR-linked transactions and executing LIBOR-linked transactions directly with Plaintiffs at the same time the Defendants were manipulating LIBOR.

594.    In each of the contracts entered into with Defendants in which one of the Defendants was a counterparty, one of the contract terms was that the Defendants would make payments to Plaintiffs based on a LIBOR index rate, which was represented to be an honest reflection of the interbank offering rate.  Instead, the LIBOR index rate that was actually being used to calculate the payments owed to Plaintiffs by Defendants was a fraudulent and manipulated rate.

595.    Plaintiffs have done all, or substantially all of the significant things that they were required to do pursuant to the LIBOR-linked transactions and/or financial instruments, or they were excused from having to do those things.

596.    All conditions required for the performance of the Defendants of their obligations had occurred.

597.    Defendants breached their obligations under the contracts by manipulating LIBOR and fraudulently reporting to the BBA false rates that did not accurately reflect their true interbank borrowing rates.  Defendants breached their obligations under the contracts by entering LIBOR-linked transactions with Plaintiffs as counterparties at the same time that Defendants were fraudulently manipulating LIBOR.

598.    As a direct and proximate result of Defendants' contractual breaches, Plaintiffs have been damaged in an amount to be ascertained at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

**FIFTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**

**(Against Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank,**
**Credit Suisse, HSBC, Rabobank, RBC, RBS, and UBS)**

599.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint

and incorporates them by reference as though set forth in full herein.

600.    The following Plaintiffs bring this claim against the following Defendants:

- Plaintiff UC Regents against Defendants Bank of America, Barclays, JPMorgan, Citigroup, Deutsche Bank, HSBC, Rabobank, RBC, RBS, and UBS;

- Plaintiff EBMUD against Defendants Citigroup, JPMorgan, and Bank of America;

- Plaintiff SANDAG against Defendant Bank of America;

- Plaintiff Richmond against Defendants JPMorgan and RBC;

- Plaintiff Riverside against Defendants Bank of America and JPMorgan;

- Plaintiff Mendocino against Defendants Barclays, Deutsche Bank, Credit Suisse, JPMorgan, Bank of America, and HSBC;

- Plaintiff Sacramento against Defendants Bank of America and Deutsche Bank;

- Plaintiff San Diego against Defendant Citigroup;

- Plaintiff San Mateo against Defendants Citigroup, Credit Suisse, Bank of America, Deutsche Bank, UBS, JPMorgan, and RBC; and

- Plaintiff Sonoma against Defendants Citigroup, JPMorgan, and Bank of America.

601.    Plaintiffs have entered into LIBOR-linked transactions directly with one or more of the Defendants.  Those transactions and/or financial instruments in which the Defendants were the counterparties required that Defendants make payments to Plaintiffs premised on LIBOR.  An artificially suppressed LIBOR allowed the Defendants to pay Plaintiffs less than what Plaintiffs had a right to earn.  An artificially inflated LIBOR allowed Defendants to reap higher returns than what they were entitled to earn.  In regards to those LIBOR-linked transactions in which Defendants were the counterparty, Defendants understood that they were making payments to Plaintiffs based on LIBOR.  As such, Defendants had a duty to act in good faith and not to manipulate LIBOR to artificially and fraudulently reduce the payments owed to Defendants.  Implied into every contract is an obligation by the contracting parties to act in good faith and to deal fairly with each other, such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  The Defendants, by fraudulently manipulating the key index rate that governs the payments owed by Defendants to Plaintiffs (which is the core purpose of the transaction), were destroying and injuring Plaintiff's right to receive the fruits of the contracts.

602.    Plaintiffs have done all, or substantially all of the significant things that they were required to do pursuant to the LIBOR-linked transactions and/or financial instruments, or they were excused from having to do those things.

603.    All conditions required for the performance of the Defendants of their obligations had occurred.

604.    The Defendants breached the implied covenant of good faith and fair dealing by improperly colluding amongst each other to manipulate and artificially suppress or artificially inflate the rate of LIBOR during the Relevant Period.  By doing so, the Defendants were able to

improperly reduce the amount of monies that were owed to the Plaintiffs by the Defendants. The Defendants also breached the implied covenant of good faith and fair dealing by brokering and/or executing LIBOR-linked transactions using a LIBOR rate that they themselves had fraudulently manipulated for their own advantage.

605.    Within each contract there is implied a covenant of good faith and fair dealing. The Defendants had a duty not to act in a manner that would deprive the Plaintiffs of the benefit of their bargains with the Defendants.  By manipulating and artificially suppressing or inflating LIBOR, Defendants acted in an unlawful way to violate the spirit of the agreements between the Defendants and the Plaintiffs by changing the benchmark used to calculate how much money was owed by Defendants to Plaintiffs.

606.    As a direct result of the improper breach of the implied covenant of good faith and fair dealing, Plaintiffs have been injured in an amount to be proven at trial, but no less than what Plaintiffs should have received on LIBOR-linked transactions and/or financial instruments but for the manipulation of LIBOR by the Defendants.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

### SIXTH CAUSE OF ACTION
### INTERFERENCE WITH ECONOMIC ADVANTAGE

### (Against all Defendants)

607.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

608.    An economic relationship existed between the Plaintiffs and issuers or sellers of LIBOR-linked financial instruments, which obligated the issuers or sellers to make payments to Plaintiffs at a rate dependent on LIBOR.

609.     As a direct result of Defendants' unlawful manipulation and artificial suppression

or inflating of LIBOR, the amounts owed to Plaintiffs by these issuers and sellers of LIBOR-

linked financial instruments was not accurate and was reduced or inflated, as the case may be.

The Defendants' misconduct interfered with and disrupted the relationship between Plaintiffs

and others (all of which can be easily identified as the counterparties to LIBOR-linked

transactions and/or financial instruments) by turning a global benchmark interest rate that all

parties relied on as being honest and reliable into a number that was pre-determined by the

Defendants pursuant to a conspiracy.  Since LIBOR was manipulated, Plaintiffs received less

money on LIBOR-linked transactions and/or financial instruments than it should have, as well

as overpaid on LIBOR-linked transactions and/or financial instruments.

610.     Defendants acted with knowledge that their misconduct and wrongful acts would

interfere with and disrupt the relationship between buyers and sellers of LIBOR-linked financial

instruments, including Plaintiffs.  Defendants are all major players in the global financial

markets and were full aware of the importance of LIBOR and the number of transactions that

used LIBOR as a benchmark.  Defendants also had specific knowledge about Plaintiffs'

LIBOR-linked transactions since several of the Defendants acted as counterparties with

Plaintiffs such that they were specifically aware of Plaintiffs' LIBOR-linked transactions and

the significant financial windfall that would come to the Defendants by manipulating LIBOR to

the detriment of Plaintiffs.

611.     Defendants knew that the financial instruments linked to LIBOR have, in total, a

notional value in the trillions of dollars.  Defendants specifically were aware of Plaintiffs'

exposure to LIBOR because of their own business dealings with Plaintiffs.  Defendants knew

and intended that their actions and misconduct would have significant impacts on many others,

including Plaintiffs.  Otherwise, Defendants would have no reason to manipulate LIBOR if they did not know such manipulation would impact such a large number of individuals and entities that it would allow the Defendants to reap hundreds of millions of unlawful profits if they could manipulate LIBOR by just a fraction of one percentage point.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

### (Against all Defendants)

612.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

613.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs.  Defendants were unjustly enriched because they directly entered into LIBOR-linked transactions with Plaintiffs such that the Defendants owed payments to Plaintiffs that were directly linked to LIBOR.  Suppression of LIBOR would directly reduce the amounts owed by the Defendants to Plaintiffs.

614.    Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiffs.

615.    Through their unlawful conduct, Defendants knowingly received and retained wrongful benefits and funds from the Plaintiffs, funds that are intended to fund various public projects for Plaintiffs, including needed services for their students, children, workers, elderly citizens, and other members of the taxpaying public.  Defendants thereby acted with conscious disregard for the Plaintiffs and its rights, as well as the rights of Plaintiffs' constituents and beneficiaries.

616.     As a result of their unlawful conduct, Defendants have realized substantial ill-gotten gains. Defendants have unlawfully manipulated LIBOR at the expense of, and to the detriment of, Plaintiffs, to the unlawful benefit of the Defendants.

617.     Plaintiffs' detriment and Defendants' enrichment are traceable to, and resulted directly and proximately from, the conduct challenged in this Complaint.  Defendants' retention of such funds under these circumstances constitutes unjust enrichment as Defendants have no right to the benefits that were obtained through their manipulation of LIBOR.

618.     The financial benefits that Defendants derived from their illegal and unlawful manipulation of LIBOR rightfully belong to Plaintiffs.  The Court should compel Defendants to disgorge to Plaintiffs all unlawful or inequitable proceeds Defendants received.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

### EIGHTH CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA CARTWRIGHT ANTITRUST ACT

### (Against all Defendants)

619.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

620.     The Defendants violated California Business and Professions Code section 16700, *et seq.* (the "Cartwright Act"), by forming one or more combinations to accomplish purposes prohibited by and contrary to the Cartwright Act.  They engaged in an agreement, contract, combination, trust and/or conspiracy to manipulate LIBOR and thus manipulate the value and amounts paid on LIBOR-linked financial instruments, to the harm and detriment of those receiving monies on those LIBOR-linked financial instruments, many of which were LIBOR-linked financial instruments in which one of the Defendants was a counterparty.

621.    The Defendants committed acts that constituted prohibited conduct under the Cartwright Act, including but not limited to making illegal agreements among themselves to artificially manipulate LIBOR and thereby reduce the returns that public entities, including Plaintiffs, earned on LIBOR-linked financial instruments, or increased the interest rates that public entities, including Plaintiffs, should have paid LIBOR-linked financial instruments.  This scheme involved reaching agreements amongst the Defendants and their unnamed co-conspirators regarding how much to lower LIBOR in order to best effectuate the pecuniary interest of the Defendants.  Once that agreement was reached, the Defendants would conspire to quote LIBOR rates to the BBA and Thomson Reuters that would manipulate LIBOR to reach the rates pre-determined by the Defendant co-conspirators.  Defendants' conduct has unfairly and unlawfully decreased the return that Plaintiffs and other public entities are able to earn on LIBOR-linked financial instruments, or increased the interest rates that public entities, including Plaintiffs, should have paid LIBOR-linked financial instruments.

622.    As a direct result of the unlawful and unfair actions of Defendants, which actions are continuing, Plaintiffs suffered injury to their business and property.  As a direct result of the conduct of the Defendants, the Plaintiffs have received, *inter alia*, lower interest rate, or paid higher interest rates, for LIBOR-linked financial instruments than they would have in a free and fair market without market collusion, and not been subject to uncompensated, higher credit risks for accepting lower, or paying higher, LIBOR interest rates on financial instruments than they would have otherwise but for the LIBOR price manipulation of the Defendants.  Thus, as a direct and proximate result of the illegal and unlawful acts of the Defendants, Plaintiffs have been injured and financially damaged in their business and property in an amount to be

determined according to proof.  These injuries have caused, and will continue to cause, damages to Plaintiffs.

623.    As a direct and legal result of the acts of Defendants, Plaintiffs were required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

624.    Pursuant to the Cartwright Act, Plaintiffs are authorized to recover three times the damages they sustained plus interest and reasonable attorneys' fees, costs and expenses.

625.    Plaintiffs are entitled to monetary relief, as trebled under the statute, as well as an injunction against Defendants, preventing and restraining the violations alleged herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF SHERMAN ANTITRUST ACT (15 U.S.C. §§ 1, ET SEQ.)

### (Against all Defendants)

626.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint and incorporates them by reference as though set forth in full herein.

627.    Although the precise dates are not known to Plaintiffs but are known to the Defendants   Plaintiffs allege upon information and belief that from as early as August of 2007, and potentially continuing through the present, Defendants, and each of them, and their unnamed co-conspirators entered into agreements, understandings, and a conspiracy in restraint of trade to artificially fix, manipulate and/or suppress LIBOR, which significantly impacts the interest payments, price and value of financial instruments and investments linked to LIBOR. These agreements, understandings, and the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1.

628.    The conduct of Defendants and their co-conspirators as alleged herein were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.  Defendants and their unnamed co-conspirators entered into and committed acts in furtherance of a conspiracy to manipulate LIBOR and thus manipulate the value and amounts paid on LIBOR-linked financial instruments and investments, to the significant financial detriment of Plaintiffs.  In entering into this conspiracy and committing these acts, Defendants, and each of them, violated the federal antitrust laws, including the Sherman Antitrust Act and the Clayton Antitrust Act.

629.    In entering into and conducting the conspiracy as agreed, Defendants, and each of them, and their unnamed co-conspirators committed the acts they agreed to commit, including those specifically set forth herein and additional acts and conduct in furtherance of the conspiracy, with the specific goals and intent to commit the following:

      a.    fix, manipulate and/or suppress LIBOR during the Relevant Period;

      b.    submit false and incorrect LIBOR quotes in order to fix, manipulate and/or suppress LIBOR;

      c.    fix, manipulate and/or suppress the amount of interest payments Defendants were required to make on financial instruments linked to LIBOR.

630.    The impact on Plaintiffs of the wrongful conduct of the Defendants and their unnamed co-conspirators includes the following:

      a.    Restraint of, and/or manipulation of LIBOR rates in the United States;

      b.    Manipulation of LIBOR by deliberate suppression, resulting in artificially low and non-competitive LIBOR rates for Defendants, allowing the

Defendants to reduce the amount of money paid on LIBOR-linked

financial instruments;

c.    Self-certifying manipulation of LIBOR, by over-reporting, resulting in

artificially high and non-competitive LIBOR rates for Defendants,

allowing Defendants to reap wrongful gains;

d.    Denial to the public of a LIBOR benchmark rate free of manipulation,

inflating, and suppression; and

e.    Loss of the integrity of the global financial system, especially as it relates

to global benchmark interest rates that are central to the operation of

global financial markets.

631.    Plaintiffs have been injured and will continue to be injured in their business and

property by receiving less money from LIBOR-linked financial instruments during the time

when LIBOR was artificially manipulated and suppressed and as a result, are receiving less

money than they should have received in a perfectly competitive market in which there was no

collusion in an amount according to proof.  Plaintiffs have also received far less money from

LIBOR-linked financial instruments to reflect the true risk taken on by the Plaintiffs in

acquiring those LIBOR-linked financial instruments.

632.    Conversely, when Defendants, and each of them, and their unnamed co-

conspirators were not engaged in suppressing LIBOR, they were manipulating LIBOR by

reporting inaccurately higher borrowing rates when it served their financial advantage to the

detriment of Plaintiffs.  Thus, Plaintiffs have also been injured and will continue to be injured in

their business and property by paying higher interest on LIBOR-linked financial instruments

during the time LIBOR was artificially manipulated by being inflated and as a result, paid more

money than they should have paid in a perfectly competitive market in which there was no collusion, in an amount according to proof.  For these LIBOR-linked financial instruments Plaintiffs paid far more money that fails to reflect the true risk taken on by the Plaintiffs in acquiring those LIBOR-linked financial instruments.

633.    Pursuant to the Clayton Antitrust Act, Plaintiffs may be authorized to recover three times the damages it sustained plus interest and reasonable attorneys' fees, costs and expenses.

634.    Plaintiffs are entitled to monetary relief, as trebled under the statute, as well as an injunction against Defendants, preventing and restraining the violations alleged herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set forth below.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that:

A.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful;

B.    That the Court enter judgment awarding the Plaintiffs damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages they suffered as a result of Defendants' conduct, or rescission, together with pre- and post-judgment interest at the maximum rate allowable by law;

C.    That the Court award Plaintiffs exemplary or punitive damages against Defendants to the extent allowable by law;

D.      That the Court award Plaintiffs damages against Defendants for Defendants'

violation of the federal antitrust laws and California state antitrust laws in an amount to be

trebled in accordance with those laws;

E.      That the Court issue an injunction prohibiting Defendants from continuing the

misconduct alleged in this Complaint, including their ongoing manipulation of LIBOR;

F.      That the Court order the disgorgement of the ill-gotten gains Defendants derived

from their misconduct;

G.      That the Court award the Plaintiffs restitution of all amounts they paid to

Defendants as consideration for notes and other financial instruments affected by Defendants'

misconduct;

H.      That the Court award Plaintiffs their costs of suit, including reasonable attorneys'

fees and expenses; and

I.      That the Court award such other and further relief as the Court may deem just and

proper.

Dated: October 6, 2014                    **COTCHETT, PITRE & McCARTHY, LLP**


By:    _/s/ Nanci E. Nishimura_____
           **NANCI E. NISHIMURA**
           *Attorneys for Plaintiffs*

## X.    <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: October 6, 2014          **COTCHETT, PITRE & McCARTHY, LLP**


By:   */s/ Nanci E. Nishimura*
          **NANCI E. NISHIMURA**
          *Attorneys for Plaintiffs*