# APPENDIX A

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| Barclays PLC, Barclays Bank PLC | ) |
| and Barclays Capital Inc., | ) |
| | ) |
| Respondents. | ) |
| | ) |

CFTC Docket No. 12 – __25__

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, AS
AMENDED, MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that Barclays PLC, Barclays Bank PLC ("Barclays Bank") and Barclays Capital Inc. ("Barclays Capital") (collectively, "Respondents" or "Barclays") have violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act (the "Act" or the "CEA"), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

II.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against Barclays by, or any agreement with, the Department of Justice or any other governmental agency or office, Respondents herein consent to the entry and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor do Respondents consent to the use of the Offer or this Order, or the findings in this Order consented to in the Offer, by any other party in any other proceeding.

III.

The Commission finds the following:

A.   **Summary**

Over a period of several years, commencing in at least 2005, Barclays PLC, Barclays Bank and Barclays Capital, by and through their agents, officers and employees located in at least New York, London and Tokyo, repeatedly attempted to manipulate and made false, misleading or knowingly inaccurate submissions concerning two global benchmark interest rates, the British Bankers' Association's ("BBA") London Interbank Offered Rate ("LIBOR") and the European Banking Federation's ("EBF") Euro Interbank Offered Rate ("Euribor").

LIBOR and Euribor are leading short-term interest rate benchmarks intended to reflect the costs of borrowing unsecured funds in certain interbank markets. LIBOR and Euribor are critical to financial markets worldwide. They are used to price a variety of global financial products, including U.S.-based swaps transactions and futures contracts, as well as home mortgages and commercial and personal consumer loans. According to the Bank for International Settlements ("BIS"), over-the-counter interest rate derivatives, such as swaps and Forward Rate Agreements ("FRAs"), comprised over $449 trillion in notional value at the end of 2009, and over $500 trillion in notional value at the end of 2011.

Barclays Bank was, and is, a member of the panel of banks that submits rates for the daily calculation and global publication of various currencies of LIBOR and Euribor. The rates submitted by panel banks should reflect or relate to the costs of borrowing unsecured funds in certain interbank markets.

Barclays' violative conduct involved multiple desks, traders, offices and currencies, including United States Dollar ("U.S. Dollar"), Sterling, Euro and Yen. The wrongful conduct spanned from at least 2005 through at least 2009, and at times occurred on an almost daily basis. Barclays' conduct included the following:

(1) During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions; this same conduct occurred with respect to Barclays' Euribor submissions for the period of at least mid-2005 through mid-2009 (*see* pp. 3 – 4, 7 – 11, 13 – 15, *infra*);

(2) During the period from at least mid-2005 through at least mid-2008, certain Barclays Euro swaps traders, led by a former Barclays senior Euro swaps trader, coordinated with, and aided and abetted traders at certain other banks to influence the Euribor submissions of multiple banks, including Barclays, in order to affect

2

the official published Euribor, and thereby benefit their respective derivatives trading positions (*see* pp. 3 – 4, 15 – 18, *infra*); and

(3) During the volatile, global market conditions of the financial crisis of late August 2007 through early 2009 (the "financial crisis period"), Barclays lowered its LIBOR submissions in order to manage what it believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions relative to the low submissions of other panel banks that Barclays believed were too low given market conditions. Pursuant to a directive by certain members of Barclays' senior management, Barclays submitted lower rates for U.S. Dollar LIBOR, and at limited times Yen and Sterling LIBOR, than what it had determined to be the appropriate rates reflecting the costs of borrowing unsecured funds in the relevant markets (*see* pp. 4, 19 – 25, *infra*).

Barclays' lack of specific internal controls and procedures concerning its submission processes for LIBOR and Euribor and overall inadequate supervision of trading desks allowed this conduct to occur.

Specifically, during the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, interest rate swaps traders, primarily located in Barclays' New York and London offices, regularly requested that the Barclays' employee(s) responsible for determining and submitting Barclays' daily LIBORs and Euribors ("submitters") submit a particular rate or adjust their submitted rates higher or lower in order to affect the daily, official published LIBOR and Euribor. Barclays' swaps traders were improperly attempting to benefit Barclays' derivatives trading positions and the profitability of their particular trading books and desks. Barclays' swaps traders also facilitated former Barclays swaps traders' requests to alter LIBOR or Euribor submissions by passing along the former traders' requests to the Barclays LIBOR or Euribor submitters as if they were their own. The Barclays submitters routinely based their LIBOR and Euribor submissions on the traders' requests in furtherance of the attempts to manipulate LIBOR and Euribor. The majority of Barclays' violative conduct involved U.S. Dollar LIBOR and Euribor, but also, at limited times, involved Yen and Sterling LIBOR submissions.

In addition, during the period from at least mid-2005 through mid-2008, certain Barclays Euro swaps traders, led by a former Barclays senior Euro swaps trader, coordinated with and aided and abetted traders at certain other banks in attempts to manipulate Euribor. The Barclays swaps traders coordinated with traders at other banks on the rates to be submitted by their respective Euribor submitters in order to benefit their bank's derivatives trading positions. These Barclays Euro swaps traders agreed to ask, and did ask, the Barclays submitters for rates that benefited the trading positions of the traders at the other banks. The Barclays swaps traders made these requests as if they were their own requests and were to benefit Barclays' trading positions. The submitters routinely accommodated those requests. The Barclays Euro swaps traders also made similar requests to the traders at the other banks in order to benefit Barclays' derivatives trading positions.

A bank's derivatives trading positions or profitability are not legitimate or permissible factors on which to base a bank's daily LIBOR and Euribor submissions. By basing its LIBOR and Euribor submissions on Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' LIBOR submissions were not consistent with the BBA's definitions and criteria for LIBOR submissions. Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR and Euribor were based on and solely reflected the costs of borrowing unsecured funds in the relevant interbank markets. Accordingly, Barclays regularly attempted to manipulate and knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports concerning U.S. Dollar LIBOR and Euribor, and at times, Yen and Sterling LIBOR, which are all commodities in interstate commerce.

During the financial crisis period, Barclays believed that the market and media inaccurately perceived Barclays as having liquidity problems in part because the rates submitted for LIBOR by Barclays were significantly higher at times than the rates submitted by other banks. Barclays contended the other banks' submissions were inappropriately low given the realities of the market conditions and lack of transactions occurring in the interbank markets. To manage public perceptions that its higher LIBOR submissions meant Barclays was a weaker institution, Barclays' senior management directed the Barclays submitters to lower Barclays' submissions in order to be closer to the rates submitted by the other banks, and thus, be a less noticeable outlier from the rest of the banks. The Barclays submitters complied with the management directive by submitting artificially lower rates than they would have otherwise submitted and that were inconsistent with the definition and criteria for submitting LIBOR. As a result, Barclays did not submit rates reflecting or relating to borrowing of unsecured funds in the relevant interbank markets.

The management directive impacted at least Barclays' U.S. Dollar LIBOR submissions in multiple maturities ("tenors") on a regular basis throughout the financial crisis period. The directive, on occasion, also impacted Barclays' Sterling and Yen LIBOR submissions. Concerns for one's reputation or negative market or press reports are not legitimate or permissible factors upon which a bank may base its daily LIBOR submissions. Accordingly, during the financial crisis period, Barclays, through its submissions, knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, a commodity in interstate commerce.[2]

***

In accepting Barclays' Offer, the Commission recognizes Respondents' significant cooperation during the Division of Enforcement's investigation of this matter, which included providing important information and analysis to the Division that helped the Division efficiently and effectively undertake its investigation.

---

[2]   While Barclays typically was one of the highest submitters of the LIBOR panel banks during the financial crisis period, Barclays' submissions, at times, were part of the calculation of the official published LIBOR. However, the Commission has not found evidence that Barclays lowered its LIBOR submissions in response to the management directive during the financial crisis period with the intent to affect the official published LIBOR.

**B.   Respondents**

**Barclays PLC** is a British banking and financial services company headquartered in the United Kingdom ("U.K."). It has operations in over 50 countries and territories including the United States.

**Barclays Bank PLC** is a global banking and financial services company based in the U.K. that is engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services. It is wholly owned by Barclays PLC, and has offices in New York, New York.

**Barclays Capital Inc.** is a wholly owned subsidiary of Barclays PLC and engages in investment banking, wealth management and investment management services. It has been registered with the Commission as a Futures Commission Merchant since 1990, an approved Exempt Foreign Agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009. It maintains a business address and an active trading office in New York, New York.

**C.   Facts**

   **1.   Barclays, Through the Acts of its Swaps Traders and Submitters, Made False LIBOR Reports and Attempted to Manipulate LIBOR**

   **a.   LIBOR and the BBA Fixing of LIBOR**

   The BBA is a U.K. trade association for the U.K. banking and financial services sector and is comprised of member banks. The BBA is not regulated. The BBA defines the term LIBOR and the criteria a panel bank is required to use in making its submissions, selects the banks for the LIBOR panels for each currency, and oversees the process of LIBOR submissions and publication of LIBOR. The BBA also enters into licensing agreements with third parties, including parties in the U.S., to allow dissemination of the LIBOR data. Thomson Reuters is the BBA's agent for the collection, calculation and publication of the daily LIBORs.

   The BBA represents that LIBOR is intended to be a barometer to measure strain in money markets, that it often is a gauge of the market's expectation of future central bank interest rates, and that approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR. LIBOR also is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges, including the three-month and one-month Eurodollar contracts on the Chicago Mercantile Exchange ("CME"). Measured by the notional value of open interest, the CME Eurodollar contract is the most liquid and largest notional futures contract traded on the CME and in the world. The total traded volume of the CME Eurodollar contract had a notional value of over $437 trillion in 2009 and $564 trillion in 2011. It settles based on the three-month U.S. Dollar LIBOR published on the Monday before

5

the last trading day of the contract month.[3] Moreover, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers. LIBOR also affects businesses seeking credit, consumers obtaining mortgages or personal loans, and market participants transacting in numerous other financial contracts in the U.S. and abroad that are based on the benchmark interest rates.

Daily LIBORs are issued for ten currencies with fifteen tenors ranging from overnight through twelve months. According to the BBA, LIBOR "is based on offered inter-bank deposit rates contributed in accordance with the Instructions to BBA LIBOR Contributor banks." The BBA requires that "[a]n individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to [11:00 a.m. London time]."[4] By its definition, LIBOR requires the submitting panel banks to determine the rates at which they can obtain funds in the London interbank market. The definition of LIBOR does not permit consideration of factors unrelated to the costs of borrowing unsecured funds.

Every business day shortly before 11:00 a.m. London time, the banks on the LIBOR panels submit their rates to Thomson Reuters. On behalf of the BBA, Thomson Reuters compiles a day's LIBOR for each currency and tenor by excluding the top and bottom quartile of rates and averaging the remaining eight rates. That average rate becomes the official BBA daily LIBOR (the "LIBOR fixing"). The BBA then makes public the daily LIBOR fixing for each currency and tenor, as well as the daily submissions of each panel bank, through Thomson Reuters and the other data vendors licensed by the BBA. This information is made available and relied upon throughout the world, including in the United States.

b.    **Barclays' Money Market Desk and its LIBOR Submission Process**

Barclays Bank is a member of the BBA and is one of the panel banks that submit rates for the determination of LIBOR for U.S. Dollar, Sterling, Euro, Yen and other currencies.[5] During the times relevant herein, a Barclays Bank employee sat on the Steering Committee and Foreign Currency and Money Market ("FX & MM") Committee of the BBA. The FX & MM Committee has responsibility for the operations and management of LIBOR. The Steering Committee was responsible for the annual review of the LIBOR definition and of the contributors to the BBA LIBOR panels to determine whether they were still appropriate to remain on the panels.

---

[3]    The CME has a licensing agreement with the BBA that "permits the [CME] to use BBA LIBOR as the basis for settling Three–Month Eurodollar futures contracts and to refer to BBA LIBOR in connection with creating, marketing, trading, clearing, settling and promoting Three–Month Eurodollar futures contracts." CME Rulebook, Chapter 452, Three-Month Eurodollar Futures. The CME also has the same licensing agreement to use BBA LIBOR as the basis for settling CME one-month Eurodollar contracts.

[4]    This definition of LIBOR has been used by the BBA from 1998 to the present. In June 2008, in the wake of press questioning the underpinnings of LIBOR, the BBA provided additional information concerning the definition that it said provided more guidance.

[5]    Barclays Bank also was, and is, on the panels for making LIBOR submissions for Swiss franc, Canadian dollar, Australian dollar, Swedish krona and Danish krone.

Barclays Bank makes its daily submissions through Barclays' London Non-Sterling Liquidity Management Desk (the "London Money Market Desk"). The primary responsibility of the London Money Market Desk, and the LIBOR submitters on the desk, is to manage Barclays' liquidity position and ensure that Barclays is fully funded each day in all currencies, including U.S. Dollar.[6] Until approximately the end of 2008, the London Money Market Desk maintained its own trading book with profit and loss targets.

Throughout the periods relevant herein, Barclays regarded its senior and primary U.S. Dollar LIBOR submitter as the expert on the U.S. Dollar money markets. This submitter had over 25 years of experience in the U.S. Dollar money markets and had been a long-standing employee of Barclays. He had been determining Barclays' daily U.S. Dollar LIBOR submissions since 1995.[7] Another money market trader assisted the senior U.S. Dollar LIBOR submitter, and at times determined Barclays' U.S. Dollar LIBOR submissions.

Barclays' U.S. Dollar LIBOR submitters were the persons best situated to understand Barclays' ability to borrow funds in the London interbank market, and therefore to determine the appropriate U.S. Dollar LIBOR submissions to make on behalf of Barclays.

Barclays' U.S. Dollar LIBOR submitters based their daily submissions on certain market information, including, but not limited to, the following: (1) cash transactions that had taken place in the London U.S. Dollar money market and Barclays' ability to obtain funds in reasonable size at those rates; (2) market information obtained from London interdealer brokers, *i.e.*, voice brokers, overnight financial news, and/or internal Barclays research documents; (3) central banks' decisions with respect to interest rates; (4) prior LIBOR submissions by Barclays and other panel banks; and (5) expectations of Federal Open Market Committee decisions regarding interest rates. After considering these factors, the Barclays U.S. Dollar LIBOR submitters determined a rate figure for each tenor and entered it into a spreadsheet for submission.

Barclays did not have specific internal controls or procedures, written or otherwise, regarding how LIBOR submissions should be determined or monitored. Barclays also did not require documentation of the submitters' LIBOR determinations.

c.   **Barclays Attempted to Manipulate LIBOR to Benefit Derivatives Trading Positions**

From at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays, through the acts of its swaps traders and submitters, attempted to manipulate U.S.

---

[6]   Because most of the LIBOR conduct at issue involves Barclays' U.S. Dollar LIBOR submissions, the factual findings focus on U.S. Dollar LIBOR. As noted, however, the Commission finds violative conduct at limited times with respect to Barclays' Yen and Sterling LIBOR submissions.

[7]   Barclays' senior U.S. Dollar LIBOR submitter also had oversight responsibility for the submission of Barclays' Yen LIBOR which was handled daily by other submitters.

Dollar LIBOR, and on occasion, Yen and Sterling LIBORs, for certain tenors. Barclays' attempts to manipulate U.S. Dollar LIBOR occurred at times on a daily basis.

Multiple interest rate swaps traders located in Barclays' New York, London and Tokyo offices asked Barclays' LIBOR submitters to make certain LIBOR submissions in order to affect the official BBA LIBOR fixings for certain tenors, thereby benefitting their respective derivatives trading positions and either increasing their profits or minimizing their losses.[8] The vast majority of these requests came from traders on Barclays' New York Interest Rate Swaps Desk ("NY Swaps Desk") located in New York and London and involved U.S. Dollar LIBOR.[9]

The NY Swaps Desk trades in a variety of products, including interest rate swaps,[10] FRAs, Treasury bonds, and Treasury futures, as well as the CME one-month and three-month Eurodollar futures and options contracts. The interest rate swaps traded by the NY Swaps Desk were generally tied to various tenors of U.S. Dollar LIBOR. Barclays acted as counterparty to clients in many interest rate swaps transactions. The derivatives instruments traded by the NY Swaps Desk were used to hedge the desk's interest rate risk and also to generate a profit for the desk.

Senior traders on the NY Swaps Desk instructed several other swaps traders to make the requests of the LIBOR submitters on Barclays' London Money Market Desk for certain LIBOR submissions in order to move their LIBOR submissions in a direction to benefit the desk's derivatives trading positions.[11] The traders' conduct was common and pervasive, and known by other traders and trading desk managers located near the interest rate swaps desk, both in New York and London. None of the traders attempted to conceal the requests from supervisors at Barclays during the entire period that the activity occurred. In fact, on occasion, the traders discussed their requests with trading desk managers.

The swaps traders made the requests in person, via email, and through electronic "chats" over an instant messaging system. On a few occasions, some swaps traders even made entries in electronic calendars to remind themselves what requests to make of Barclays' LIBOR submitters the next day. For a time, a trader sitting in London facilitated many of the requests on behalf of the New York swaps traders by forwarding the requests in person or by email to the submitters.

---

[8]   Prior to the financial crisis period, LIBOR generally was a stable rate with minute fluctuations. In addition, the range among the panel banks submissions was narrow, and panel banks frequently submitted the same rates.

[9]   There were several requests to alter Yen LIBOR from swaps traders in Barclays' Tokyo office and at least one request to alter Sterling LIBOR from a Barclays trader in Barclays' Singapore office.

[10]   An interest rate swap generally exchanges a fixed payment for a floating payment, wherein one party to a swap would pay a fixed rate and the other party to the swap would pay a floating rate, which is generally tied to three-month LIBOR.

[11]   Almost all of the traders involved in this conduct are no longer employed at Barclays.

The swaps traders expected that the LIBOR submitters would take their requests into account when determining their LIBOR submissions.[12]

Additionally, certain Barclays swaps traders received external requests to alter Barclays' U.S. Dollar LIBOR submissions from former Barclays swaps traders who had left Barclays and now were employed by other financial institutions. These former Barclays employees made the requests to benefit their derivatives trading positions, and expected that not only would these requests be forwarded to the LIBOR submitters, but that Barclays' LIBOR submitters would take their requests into account when making their LIBOR submissions. These requests were made typically by email or by instant message.

The swaps traders' requests, whether internal or external, typically concerned the one-month and three-month U.S. Dollar LIBOR submissions. The traders' requests also included either a specific rate to be submitted or the direction, higher or lower, that they wanted Barclays' LIBOR submission to move. Sometimes, the traders asked the submitters to try to have Barclays excluded ("kicked out" or "knocked out") from the LIBOR calculation by being in the top or bottom quartile, in an attempt to influence the official LIBOR fixing. Sometimes the requests covered several days or even weeks of submissions at a time.

The following are just some examples of the numerous trader requests over the years in question:

1) "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!! We need a 4.17 fix in 1m (low fix) We need a 4.41 fix in 3m (high fix)" (November 22, 2005, Senior Trader in New York to Trader in London);

2) "You need to take a close look at the reset ladder. We need 3M to stay low for the next 3 sets and then I think that we will be completely out of our 3M position. Then its on. [Submitter] has to go crazy with raising 3M Libor." (February 1, 2006, Trader in New York to Trader in London);

3) "Your annoying colleague again...Would love to get a high 1m Also if poss a low 3m ... if poss... thanks" (February 3, 2006, Trader in London to Submitter);

4) "This is the [book's] risk. We need low 1M and 3M libor. Pls ask [submitter] to get 1M set to 82. That would help a lot" (March 27, 2006, Trader in New York to Trader in London);

5) "We have another big fixing tom[orrow] and with the market move I was hoping we could set the 1M and 3M Libors as high as possible" (May 31, 2006, Trader in New York to Submitter);

---

[12]   Appropriate daily supervision of the desk by the supervisors, as well as periodic review of the communications, should have discovered the conduct. However, Barclays lacked specific internal controls and procedures that would have enabled Barclays' management or compliance to discover this conduct.

9

6) "Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the libor fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot." (September 13, 2006, Senior Trader in New York to Submitter);

7) "For Monday we are very long 3m cash here in NY and would like the setting to be set as low as possible... thanks" ( December 14, 2006, Trader in New York to Submitter); and

8) "Pls. go for 5.36 Libor again tomorrow, very long and would be hurt by a higher setting... thanks." (May 23, 2007, Trader in New York to Submitter).

The LIBOR submitters regularly considered the swaps traders' requests when determining and making Barclays' U.S. Dollar LIBOR submissions. To accommodate the swaps traders, the submitters moved Barclays' U.S. Dollar LIBOR submissions by one or more basis points in the direction requested by swaps traders, or submitted a specific rate depending on the particulars of the swaps traders' requests.

The submitters frequently responded affirmatively to the traders that they would accommodate the requests, often by saying "sure," "will do my best," or similar wording. In addition, the submitters in a couple of instances made entries in their own electronic calendars to remind themselves what rate to submit in order to accommodate a request made by swaps traders the previous day. Examples of the many instances where the submitters agreed to make the false submissions and attempted to manipulate the rate are:

1) "Am going 13. think market will go 12-12 ½." (November 14, 2005, Submitter's response to a swaps trader request for a very high one-month U.S. Dollar LIBOR submission, preferably a submission of "13+");

2) "[Senior Trader] owes me!" (February 7, 2006, Submitter's response when swaps trader called him a "superstar" for moving Barclays' U.S. Dollar LIBOR submission up a basis point more than the submitter wanted and for making a submission with the intent to get "kicked out");

3) "Going 58 [in 1 month] and 73 [in 3 month] and fully expecting to be knocked out." (February 8, 2006, Submitter's response to a swaps trader request for high one-month and three-month LIBOR submissions);

4) "For you ...anything. I am going to go 78 and 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least." (March 16, 2006, Submitter's response to swaps trader's request for a high one-month and low three-month U.S. Dollar LIBOR );

5) "Always happy to help, leave it with me, Sir." (March 20, 2006, Submitter's response to a request);

6) "Done ... for you big boy..." (April 7, 2006, Submitter's response to swaps trader requests for low one-month and three-month U.S. Dollar LIBOR); and

10

7) "Set it at 5.345 against a consensus of 34."(March 5, 2007, Submitter's response to swaps trader request for high three-month U.S. Dollar LIBOR).

Barclays' submitters knew it was improper to consider swaps traders' derivatives trading positions in determining the bank's LIBOR submissions. A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily LIBOR submissions. By basing its U.S. Dollar LIBOR submissions on Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' LIBOR submissions were not consistent with the BBA's definitions and criteria for LIBOR submissions. Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR were based on and solely reflected its costs of borrowing unsecured funds in the London interbank money market. Accordingly, Barclays regularly attempted to manipulate and knowingly delivered false, misleading or knowingly inaccurate reports concerning U.S. Dollar LIBOR, and at times, Yen and Sterling LIBOR, which are all commodities in interstate commerce.[13]

## 2. Barclays Attempted to Manipulate Euribor, Made False Euribor Reports and Coordinated with Other Banks in its Attempts to Manipulate Euribor

Barclays, through its swaps traders and submitters, also attempted to manipulate Euribor through internal requests by traders, which were accommodated by Barclays' submitters. The Euro swaps traders' at times coordinated their requests with swaps traders at certain other banks. The requests were made in order to benefit Barclays' derivatives trading positions and the derivatives trading positions of the other individual institutions involved.

### a. Euribor and the EBF Fixing of Euribor

The EBF is an unregulated non-profit association of the European banking sector based in Brussels, Belgium. Among other functions, the EBF oversees the publication of Euribor, the predominant money market reference interest rate for the Euro currency. Euribor is used internationally in derivatives contracts, including interest rate swaps and futures contracts.[14] According to the BIS, over-the-counter interest rate derivatives, such as swaps and FRAs, comprised contracts worth over $175 trillion in notional value referenced to Euro rates at the end of 2009, and over $220 trillion in notional value at the end of 2011.

Euribor is defined as the rate "at which Euro interbank term deposits are offered by one prime bank to another prime bank" within the Economic and Monetary Union of the European Union ("EMU") at 11:00 a.m. Central European Time ("CET") daily. Euribor is determined using submissions from a panel of over 40 mostly European banks considered to be the most active in the Euro zone with the highest volume of business in the EMU. According to the EBF instructions, panel banks "must quote the required euro rates to the best of their knowledge."

---

[13] As previously noted, there were some similar requests in this same period that the submitters make certain submissions involving Yen and Sterling LIBOR.

[14] In October 2011, the CME launched the Euribor Futures contract, which settles based on the three-month Euribor.

11

The panel banks are to observe the market and base their submissions on where the Euro is trading in that market. By its definition, Euribor requires the submitting panel banks to determine the rates at which funds may be obtained in the Euro interbank money market. The definition of Euribor does not permit consideration of factors unrelated to the costs of borrowing unsecured funds. Euribor is fixed every business day for fifteen tenors, ranging from one week to twelve months.

Like the BBA panel banks, the Euribor panel banks submit their rates electronically to Thomson Reuters, which manages the official Euribor process by collecting the submitted rates from the contributing banks, calculating the rate, and then releasing it for publication just before noon CET. Thomson Reuters computes that day's published Euribor by eliminating the highest and lowest fifteen percent of submissions collected, and averaging the remaining submissions. That average rate becomes the official daily EBF Euribor (the "Euribor fixing"). On behalf of EBF, Thomson Reuters then issues the Euribor fixing and the submissions of each panel bank to its subscribers and other data vendors. Through these licensing agreements with third parties, such as Thomson Reuters, EBF disseminates the information throughout the world, including in the United States.

### b. Barclays' Money Market Desk and its Euribor Submission Process

Barclays' London Money Market Desk was also responsible for Barclays Bank's daily Euribor submissions. Throughout the periods relevant herein, Barclays regarded its primary and senior Euribor submitter as the expert on the Euro money markets. Barclays' senior Euribor submitter had over 20 years of experience in the London money markets and had been with Barclays for over 35 years. He had been determining Barclays' daily Euribor submissions since 1999. Two other money market traders assisted the senior Euribor submitter and also determined Barclays' Euribor submissions.

Barclays' Euribor submitters were the persons best situated to understand Barclays' ability to borrow unsecured funds in the Euro interbank market, and therefore, to determine the costs, real and perceived, of borrowing unsecured funds and the appropriate Euribor submissions to make on behalf of Barclays Bank.

In determining their daily Euribor submission, Barclays' Euribor submitters considered Barclays' Euro transactions in the various tenors applicable to Euribor and information received from market intermediaries, such as voice brokers, indicating the prices at which the Euro was trading. Barclays' Euribor submitters made their submission to Thomson Reuters shortly before 11:00 a.m. CET.

Barclays did not have specific internal controls or procedures, written or otherwise, regarding how Euribor submissions should be determined or monitored. Barclays also did not require documentation of the submitters' Euribor determinations.

12

c.   **Barclays Swaps Traders Requested Certain Euribor Submissions to Benefit Derivatives Trading Positions**

During the period from at least mid-2005 through mid-2009, Euro interest rate swaps traders located in Barclays' London office made requests to Barclays' Euribor submitters for higher or lower Euribor submissions with the purpose of affecting the official Euribor fixing.[15] Certain of these traders, in particular one former senior Euro swaps trader, also regularly contacted or were contacted by traders at certain other banks on the EBF Euribor panel to coordinate the rates each trader would request of their own respective submitters. In making these requests, the traders attempted to manipulate the official EBF Euribor fixings for various tenors in order to benefit the traders' Euro derivatives trading positions and thereby increase Barclays' profits or minimize its losses.

Barclays' Euro interest rate swaps desk was primarily responsible for trading Euro-denominated interest rate swaps. The desk also traded EONIA[16]-based swaps, Euro-based FRAs, and Euro-based futures and options. The traders held Euro-based interest rate swaps positions generally tied to various tenors of the EBF Euribor. The traders hedged those positions with other derivatives instruments. Just as the NY Swaps Desk benefitted from movements in the LIBOR fixing, the traders' derivatives positions benefited if the official EBF Euribor fixing moved in a certain direction depending on the characteristics of particular transactions. The traders' derivatives positions were most affected by the Euribor fixing in the one-month, three-month, and six-month tenors. These were the tenors in which the traders most frequently requested a high or low submission by the Euribor submitters.

i.   **Improper Communications Between Barclays' Traders and Barclays' Submitters**

Just as the NY Swaps Desk openly discussed requests to LIBOR submitters, Barclays' Euro swaps traders' requests to Barclays' Euribor submitters to change their submissions to benefit the traders' derivatives trading positions were an open, common and pervasive practice on the desk. Multiple traders engaged in this conduct, and no attempt was made by any of the traders to conceal the requests from supervisors at Barclays during the more than four-year period in which the activity occurred.[17] In fact, traders would often shout across the trading desk to fellow traders to confirm there were no conflicting requests before they sent their requests to the Euribor submitters, and, on occasion, the traders discussed their requests with trading desk managers.

---

[15]   The Euro swaps traders and Euribor submitters are different individuals than the U.S. Dollar swaps traders and LIBOR submitters discussed above.

[16]   EONIA, or the Euro OverNight Index Average, is EBF's overnight reference rate for the Euro. It is a weighted average of all overnight unsecured lending transactions undertaken by panel banks in the Euro interbank market.

[17]   Appropriate daily supervision of the desk by the supervisors as well as periodic review of the communications should have discovered the conduct. However, Barclays lacked specific internal controls and procedures that would have enabled Barclays' management or compliance to discover this conduct.

After determining how moves in EBF Euribor would affect the desk's profitability, Barclays' Euro swaps traders contacted the Euribor submitters, including via email and through electronic "chats" over an instant messaging system, to request that the submissions be moved either higher or lower in a particular tenor. On a few occasions, one swaps trader made entries in electronic calendars to remind himself what requests to make of Barclays' Euribor submitters the next day.

Barclays' Euribor submitters accommodated the requests, frequently expressly responding in the affirmative to the traders' requests. The Euro swaps traders expected that the Euribor submitters would take their requests into account when determining their Euribor submissions.

Additionally, one former Barclays' senior Euro swaps trader on occasion sent requests to alter Barclays' Euribor submissions to his former fellow traders after he had left Barclays and was employed by other financial institutions. He made the requests to benefit his derivatives trading positions. These requests were made at a minimum by email or by instant message.

The following are just some of the numerous examples of the communications between the traders and submitters:

1) June 1, 2006:

   o Senior Euro Swaps Trader: "Hi [Euribor Submitter], is it too late to ask for a low 3m?"

   o Euribor Submitter: "Just about to put them in…..so no."

2) September 7, 2006:

   o Senior Euro Swaps Trader: "i have a huge 1m fixing today and it would really help to have a low 1m tx a lot."

   o Euribor Submitter: "I'll do my best."

   o Senior Euro Swaps Trader: "because I am aware some other bank need a very high one….if you could push it very low it would help. I have 50bn fixing."

3) October 13, 2006:

   o Senior Euro Swaps Trader: "I have a huge fixing on Monday… something like 30bn 1m fixing… and I would like it to be very very very high….. Can you do something to help? I know a big clearer will be against us … and don't want to lose money on that one."

   o Euribor Submitter forwarded the request to another Euribor submitter, advising: "We always try and do our best to help out….."

    o  Senior Euribor Submitter to Senior Euro Swaps Trader: "By the way [Euribor Submitter] tells me that it would be good to see a high 1mth fix on Monday, we will pay for some cash that morning so hopefully that will help."

4) January 12, 2007:

    o  Senior Euro Swaps Trader: "hi [Euribor Submitter]. we need a low 1m in the coming days if u can...."

    o  Senior Euribor Submitter: "hi [Senior Euro Swaps Trader], we will keep the 1mth low for a few days."

5) April 2, 2007:

    o  Euro Swaps Trader: "hello [Senior Euribor Submitter], could you please put in a high 6 month euribor today?"

    o  Senior Euribor Submitter: "will do."

6) July 29, 2008:

    o  Euro Swaps Trader to Senior Euro Swaps Trader: "I was discussing the strategy [to get a high fixing] with [Senior Euribor Submitter] earlier this morning - today he will stay bid in the mkt and put a high fixing but without lifting any offer, and then he will be really paying up for cash tomorrow and Thursday which is when the big positive resets are."

    **ii.**    **Barclays' Coordination and Communications with Certain Other Banks to Attempt to Manipulate Euribor**

During the period from at least mid-2005 through mid-2008, certain Barclays Euro swaps traders, led by the same former Barclays' senior Euro swaps trader, coordinated with traders at certain other panel banks to have their respective Euribor submitters make certain Euribor submissions in order to affect the official EBF Euribor fixing. These requests to and among the traders were made to benefit the traders' respective derivatives trading positions and either maximize their profits or minimize their losses.

The former Barclays senior Euro swaps trader, while still employed by Barclays, spoke daily with traders at certain panel banks concerning their respective derivatives positions in order to determine how to change the official EBF Euribor fixing in a manner that benefitted their derivatives positions.[18] In these conversations, the traders agreed to contact their respective Euribor submitters to request the agreed-upon Euribor submission. The Barclays senior Euro swaps trader also received at times requests for certain Euribor submissions from traders at the other banks, which he then made of the Barclays Euribor submitters as if the requests were his

---

[18]   When he was out of the office, the Barclays senior Euro swaps trader directed other traders on the desk to contact the traders at the other banks on his behalf.

own, at times blind carbon copying the external trader on his emails to Barclays' Euribor submitters. By such conduct, the Barclays Euro Traders were attempting to manipulate Euribor and aiding and abetting the attempts to manipulate Euribor by other banks.

The following are examples of the communications among the Barclays Senior Euro Trader, Barclays' Euribor submitters and traders at other banks:

1) August 14, 2006:

   o Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low one month and high three month and six month Euribor.

   o Barclays' Senior Euro Swaps Trader agreed to do so and promised to contact the trader at Bank B to make the same request.

   o Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor Submitter: "We have some big fixings today. Is it possible to have a very low 1m and high 3m and 6m? Thx a lot for your help."

   o Barclays' Senior Euribor Submitter responded: "Sure, will do."

2) November 10, 2006:

   o Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low one month Euribor setting at Barclays and at Bank B.

   o Barclays' Senior Euro Swaps Trader made the request of the trader at Bank B.

   o Barclays' Senior Euro Swaps Trader emailed the request to the Barclays Senior Euribor Submitter: "hi [Senior Euribor Submitter]. I know you can help. On Monday we have a huge fixing on the 1m and we would like it to be low if possible. Tx for your kind help."

   o Barclays' Senior Euribor Submitter replied: "of course we will put in a low fixing."

3) November 13, 2006:

   o Barclays' Senior Euro Swaps Trader discussed the need for low one month Euribor with traders at Bank A and Bank B, and contacted a trader at Bank C.

   o Barclays' Senior Euro Swaps Trader then reminded Barclays' Senior Euribor Submitter of his request from Friday: "hi [Senior Euribor Submitter]. Sorry to be a pain but just to remind you the importance of a low fixing for us today."

   o Barclays' Senior Euribor Submitter replied: "no problem, I had not forgotton. The [voice] brokers are going for 3.372, we will put in 36 for our contribution;"

16

o  Barclays' Senior Euro Swaps Trader's responded: "I love you."

4)  December 5, 2006:

    o  Barclays' Senior Euro Swaps Trader requested that traders at Banks A, B and C have their Euribor submitters make a high six month Euribor submission.

    o  When the trader at Bank C stated that he needed the same submission, Barclays' Senior Euro Swaps Trader agreed to make the request of the Barclays Euribor submitters.

    o  Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor Submitter: "hi [Senior Euribor Submitter] is it possible to have a high 6m ficxing [sic]? Where do you think it will fix?"

    o  Barclays' Senior Euribor Submitter responded: "Hi [Senior Euro Swaps Trader]. we have posted 3.73, hope that helps..can put in higher if you like?"

    o  Barclays' Senior Euro Swaps Trader replied: "that's fine tx a lot for your help."

5)  February 12, 2007:

    o  Barclays' Senior Euro Swaps Trader agreed with traders at Banks A and B to have their respective one month Euribor submissions lowered.

    o  Barclays' Senior Euro Swaps Trader submitted that request to the Barclays Senior Euribor Submitter, stating: "hi [Senior Euribor Submitter]. Is it possible to have a low 1m fix today?"

    o  Barclays' Senior Euribor Submitter replied: "will do."

In one instance of coordination over a four-month period, the Barclays senior Euro swaps trader orchestrated an effort to align trading strategies among traders at multiple banks with the goal of influencing the official EBF three-month Euribor fixing on the International Monetary Market ("IMM") date[19] of March 19, 2007, in order to profit from their futures trading positions. This scheme began at least in December 2006 and continued until the March 2007 IMM date. It involved multiple and successive requests over this period of time by the Barclays senior Euro swaps trader to Barclays' Euribor submitters and traders at other banks to lower the three-month Euribor submission on dates leading up to and including the March 2007 IMM date. The following are examples of the communications involved in this scheme:

---

[19]  IMM dates are standard quarterly settlement dates in March, June, September and December. Many derivatives contracts are settled or reset on these dates, including various Euribor futures contracts.

1) December 27, 2006:

   o Barclays' Senior Euro Swaps Trader: "Hi [Barclays Euro Swaps Trader]. A few
     things. Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A]
     to put it low as well."

   o Two days later, Barclays' Euro Swaps Trader emailed the Euribor requests as
     instructed to the Barclays Euribor Submitters and the traders at the other banks.

2) February 12, 2007:

   o Barclays' Senior Euro Swaps Trader bragged to a trader at Bank D that he was
     going to "push the cash to the basement" on the next IMM March date in
     order to make money on trades, claiming that he will have 80,000 lots in the
     Euribor futures contract on it. He swore the trader at Bank D to secrecy,
     claiming that if they did not keep the plan secret it would not work. Barclays'
     Senior Euro Swaps Trader also claimed that his "treasury [or Euribor
     Submitter] has the power to move 3m cash to the basement."

3) March 19, 2007:

   o Barclays' Senior Euro Swaps Trader emailed the Barclays Euribor submitter:
     "As discussed could …put the 3m as low as possible…."

   o The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

   o Barclays' Senior Euro Swaps Trader stated to trader at Bank A that they
     needed to have the three month Euribor fixing go up slowly to avoid drawing
     any attention.

   o Barclays' Senior Euro Swaps Trader told the trader at Bank A that he believed
     he was able to influence five other panel member banks the day before to
     lower their Euribor submissions as they both desired.

Barclays' Euribor submitters knew it was improper to consider swaps traders' derivatives
trading positions in determining the bank's Euribor submissions. A bank's financial derivatives
trading positions are not legitimate or permissible factors on which to base a bank's daily
Euribor submissions. By basing its Euribor submissions upon Barclays' derivatives traders'
requests, and thereby on Barclays' derivatives trading positions, Barclays' Euribor submissions
were not consistent with the EBF's definitions and criteria for Euribor submissions. Instead,
Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for
Euribor were based on and solely reflected the costs of borrowing unsecured funds in the Euro
money market. Accordingly, Barclays regularly attempted to manipulate and knowingly
delivered false, misleading or knowingly inaccurate reports concerning Euribor, a commodity in
interstate commerce.

18

3.    **During the Financial Crisis, Barclays Senior Management Directed that LIBOR Submissions Be Lowered**

During the financial crisis period, Barclays directed its U.S. Dollar LIBOR submitters to lower their daily U.S. Dollar LIBOR submissions in order to protect Barclays' reputation against what it believed were negative and unfair media and market perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions.[20]

Beginning in August 2007, market conditions began to deteriorate significantly. At times during the financial crisis period, there was severe illiquidity in the London interbank money market, resulting in no interbank lending in certain tenors. Barclays' U.S. Dollar LIBOR submitters continued to utilize the same factors, as described above, for determining LIBOR submissions, but had substantially fewer transactions and offers to consider which made determining Barclays' submissions more difficult. Prior to the financial crisis period, Barclays' U.S. Dollar LIBOR submitters considered "reasonable size" for a transaction by Barclays in the London U.S. Dollar money markets to be $250-$500 million. During the financial crisis period, a reasonable sized transaction was significantly lower.

However, the LIBOR panel bank submitters were still required to adhere to the LIBOR definition and criteria and submit rates based on their evaluation of the costs of borrowing unsecured funds in the London interbank market.

In late August 2007, Barclays' senior U.S. Dollar LIBOR submitter began emailing liquidity reports within Barclays, commenting about the money markets and other banks. Initially, in these market reports, the senior U.S. Dollar LIBOR submitter expressed his belief that in setting Barclays' submission higher relative to others, he was setting correctly and that a number of banks were submitting rates that were "unrealistically low," particularly in a market environment where banks were reluctant to lend money for longer than a one-month period. The senior U.S. Dollar LIBOR submitter often acknowledged in these reports that his own U.S. Dollar LIBOR submissions were not accurate, and were lower than where he thought the cost of borrowing unsecured funds was for Barclays. He recognized, at times, that if he were to submit higher, accurate LIBORs, then the market or press would report that Barclays was experiencing difficulty in funding itself.

On September 3, 2007, Bloomberg featured Barclays in a news article entitled "Barclays Takes a Money-Market Beating." The article speculated that Barclays may have been having liquidity problems, because on two occasions Barclays had to borrow Sterling from the emergency lending facility of the Bank of England,[21] and because of Barclays' relatively high LIBOR submissions in Sterling, Euro and U.S. Dollar. The article posed the question, "So what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest in the money market?" Other newspapers, including the U.K. Financial Times and the Standard, ran similar articles about LIBOR and Barclays.

---

[20]    At limited times this management directive also impacted submissions for Sterling and Yen LIBOR.

[21]    According to Barclays, Barclays had to borrow from the Bank of England due to operational errors caused by other banks' late payments to Barclays.

On the day of the Bloomberg article, Barclays' U.S. Dollar LIBOR submissions in at least three tenors were the highest submissions of all panel banks, and were over six to nine basis points higher than the official BBA LIBOR fixing at those tenors. Barclays believed that its high LIBOR submissions caused its financial condition to be misperceived by the public and the media.

The negative media speculation caused significant concern within Barclays and was discussed among high levels of management within Barclays Bank. As a result, certain senior managers within Barclays Bank Treasury ("senior Barclays Treasury managers") instructed the U.S. Dollar LIBOR submitters and their supervisor to lower Barclays' LIBOR submissions, so that they were closer in range to the submitted rates by other banks but not so high as to attract media attention.

Senior Barclays Treasury managers coined the phrase "head above the parapet" to describe being an outlier on the U.S. Dollar LIBOR panel, which meant making high LIBOR submissions relative to the submitted rates of the other banks and attracting media attention. Senior Barclays Treasury managers directed Barclays' U.S. Dollar LIBOR submitters that their LIBOR submissions should not be at a level where Barclays was "sticking its head above the parapet," in order to avoid unwanted market and media attention for high LIBOR submissions that could potentially damage Barclays' reputation. Senior Barclays Treasury managers provided the submitters with the general guidance that Barclays' submitted rates should be within ten basis points of the submissions by the other U.S. Dollar panel banks to be in compliance with the directive.

Barclays knew that accounting for its reputational risk in its determination of LIBOR submissions was not permissible under BBA's definition and criteria. The submitters and their supervisor, however, understood that they were to follow this directive regardless of market conditions or whether their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be otherwise. Barclays' U.S. Dollar LIBOR submitters knew that, by acting upon senior management's instruction to be below "the parapet," they were making improper U.S. Dollar LIBOR submissions that were management's rates and not the rates that the submitters had determined were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing unsecured funds in the London interbank money market.

The senior Barclays Treasury managers frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive. In these discussions, the senior U.S. Dollar LIBOR submitter consistently made clear that they were not setting Barclays' submissions at the rates that reflected Barclays' cost of obtaining unsecured funds. These discussions were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period.

For example, on November 28, 2007, Barclays' senior U.S. Dollar LIBOR submitter emailed a large group of Barclays' employees, including the senior Barclays Treasury managers, stating "LIBORs are not reflecting the true cost of money. I am going to set ..., probably at the

top of the range of rates set by libor contributors ... [T]he true cost of money is anything from 5-15 basis points higher." A senior Barclays Treasury manager endorsed the submissions, replying "[f]ine on LIBOR settings - thanks for remaining pragmatic but at the upper end."

On November 29, 2007, the supervisor of the U.S. Dollar LIBOR submitters convened a telephone discussion with the senior Barclays Treasury managers and the U.S. Dollar LIBOR submitters. The supervisor said if the submitters submitted the rate for a particular tenor at 5.50, which was the rate they believed to be the appropriate submission, Barclays would be twenty basis points above "the pack" and "it's going to cause a shit storm." The supervisor asked that the issue be taken "upstairs," meaning that it should be discussed among more senior levels of Barclays' management. The most senior Barclays Treasury manager agreed that he would do so. For the LIBOR submission, the group decided to compromise by determining to set at the same level as another bank, a rate of 5.3, which was, again, not at the rate the submitters believed to be appropriate for Barclays.

In this November 29, 2007 conversation, the group also discussed their belief that other banks were submitting unrealistically low rates and speculated that other banks were basing submissions on derivatives' positions. The group agreed that their concerns should be raised to the BBA. One of the senior Barclays Treasury managers called a BBA representative and stated that he believed that LIBOR panel banks, including Barclays, were submitting rates that were too low because they were afraid to "stick their heads above the parapet," and that "no one will get out of the pack, the pack sort of stays low." He also relayed his belief that other panel banks relied too much on information from voice brokers to determine appropriate rates in the market, instead of making independent determinations for their own institutions. He encouraged the BBA to react and be heavy handed, suggesting the sanction that banks involved in such conduct be removed from the panel. In apparent response to Barclays' call, the BBA sent an email to the Steering Committee of the BBA, which is comprised of certain panel bank members including Barclays, requesting views on whether rates were artificially low and how to address this. The senior Barclays Treasury manager responded to the email consistent with his conversation with the BBA, noting his belief that "LIBORS are lower than market levels even given the lack of liquidity" and "[s]ome banks are getting close to looking like they are actively not recognizing the actual market levels." Barclays did not disclose at this time that it was lowering its LIBOR submissions pursuant to a management directive.

The following day, the same senior Barclays Treasury manager had another conversation with the senior U.S. Dollar LIBOR submitter, who was again seeking guidance on his submissions. In this conversation, the senior Barclays Treasury manager related his understanding that senior management had discussed the issue and directed them to continue to "stick within the bounds[,] so no head above [the] parapet." In other words, the concerns and objections of the submitters and supervisor as raised the day before were overruled. The senior Barclays Treasury manager also told the U.S. Dollar LIBOR submitter that they would have to deal with the settings, meaning how to make LIBOR submissions per this directive, on "a day-to-day basis."

In early December 2007, Barclays' senior U.S. Dollar LIBOR submitter again warned his supervisor that Barclays was not setting "honest" rates when making its LIBOR submissions.

The senior U.S. Dollar LIBOR submitter emailed his supervisor stating that he submitted Barclays' one month LIBOR at 5.30 percent, which was four basis points over the next highest submission and almost five basis points over the LIBOR fixing. However, this submitted rate was well below the 5.40 percent that Barclays was paying (*i.e.*, asking) to borrow funds in the market, and that "given a free hand [he] would have set around 5.45%." He continued, "My worry is that we (both Barclays and the contributor bank panel) are being seen to be contributing patently false rates. We are therefore being dishonest by definition and are at risk of damaging our reputation in the market and with the regulators. Can we discuss urgently please?" The supervisor directed these concerns to a senior compliance officer and a member of senior management of Barclays.

The Barclays senior compliance officer subsequently had a conversation with the U.K. Financial Services Authority ("FSA") in which LIBOR was discussed. The senior compliance officer stated in an internal email directed to several levels of Barclays' senior management that he informed FSA of the following: that Barclays believed that LIBOR submissions by the panel banks were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go higher given the negative media reporting about Barclays; that Barclays had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were "problematic actions" by some banks. However, the Barclays' senior compliance officer did not inform the FSA that Barclays was making its LIBOR submissions based on considerations of negative market or press perceptions of Barclays or that its LIBOR submitters' assessments of the appropriate rates for submission were being altered to adhere to the directive to be below "the parapet." After this conversation, the same Barclays senior compliance officer did not follow up internally with the LIBOR submitters or their supervisor to confirm that Barclays was making its LIBOR submissions properly in accordance with the BBA's definition and criteria for LIBOR. Instead, the management directive remained in effect, and in fact, senior Barclays Treasury managers ensured that the U.S. Dollar LIBOR submitters continued to adhere to that directive.

For example, in early March 2008, the senior U.S. Dollar LIBOR submitter noted in a telephone call to a colleague that there was no money in the market and that he had submitted a rate for 12-month LIBOR that was several basis points lower than the rate at which he was willing to pay to borrow funds in the market, because he had been advised by senior management that he should not make his submission any higher. The senior U.S. Dollar LIBOR submitter commented that he was unable to find funds to borrow in the market even when paying (*i.e.*, asking) to borrow funds at a rate well above where he submitted his 12-month LIBOR. He remarked that the senior Barclays Treasury manager told him that he should "not be quite as aggressive" in his submissions, meaning his submissions were too high.

Throughout the financial crisis period, Barclays' employees, including the submitters, received routine surveillance telephone calls from staff members of the FSA, the Bank of England and the Federal Reserve Bank of New York. These conversations concerned the deepening global financial crisis and were to gauge the level of liquidity in the markets. These calls increased in frequency as the crisis worsened. In these calls, LIBOR was discussed as a measure of the severe illiquidity in the markets, and in that context, in some calls, Barclays' employees expressed their opinion that Barclays and other panel banks were submitting rates that

were too low given the market conditions. However, in those conversations, the Barclays' employees did not explain that Barclays was not determining its LIBOR submissions in accordance with the BBA's definition and criteria for LIBOR but instead was making its submissions in a manner to avoid negative market and media attention.

On April 16, 2008, the Wall Street Journal published an article questioning the integrity of LIBOR, entitled "Libor Fog: Bankers Cast Doubt on Key Rate Amid Crisis."[22] The article speculated that panel member banks were making LIBOR submissions lower than what they were actually paying for funds to prevent the market from concluding that the banks were desperate for cash. The Barclays senior U.S. Dollar LIBOR submitter in a telephone call to a senior Barclays Treasury manager expressed concerns about the article and stated that he was doing the same thing as other banks, by submitting at one level while paying (*i.e.*, asking to borrow funds) at a higher level in the market. He noted his prior LIBOR submissions were lower than where he thought he could obtain funds. He stated, "I would be paying … [2.98] today and I'm going to be setting my LIBOR at [2.74] and I'm as guilty as hell. … I will go [2.74] unless I'm given permission to go otherwise, but I would be prepared to pay [2.98]." The senior Barclays Treasury manager replied, "I'm happy for you to be at and around the top of the pack but can we please not sort of be ten basis points above the next…?" The U.S. Dollar LIBOR submitter followed up with his supervisor, saying he thought there was a compliance issue, but no internal action was taken to address his concerns.

At this time, a senior Barclays Treasury manager informed BBA in a telephone call that it had not been reporting accurately, although he noted that Barclays was not the worst offender of the panel bank members. "We're clean, but we're dirty-clean, rather than clean-clean." The BBA representative responded, "no one's clean-clean." The senior Barclays Treasury manager replied "no, because of the very fact of what happened to us…We were clean …the market… reacted accordingly. And that's why we stepped away again." The senior Barclays Treasury manager was referencing the market speculation about Barclays' high LIBOR submission in early fall 2007. The BBA representative indicated that he understood what happened to any bank that moved against the trend of lower submissions. The same senior Barclays Treasury manager had a similar conversation with the FSA during a surveillance call regarding market liquidity conditions.

Barclays did not explain in these calls that it was making its LIBOR submissions pursuant to a management directive and not in accordance with the BBA's definition and criteria or consistent with the costs of obtaining unsecured funds in the London interbank money market. Furthermore, throughout the financial crisis period, Barclays continued to make its LIBOR submissions pursuant to this management directive and regularly submitted rates artificially lower than where it believed it could obtain funds. At the same time, the senior U.S. Dollar LIBOR submitter, in his regular market commentaries, continued to document the increasing lack of transactions that could be meaningful to his LIBOR submissions, his own artificially low

---

[22]   In response to press inquiries after the Wall Street Journal article, individuals within Barclays discussed internally how to respond and agreed to state that Barclays' LIBOR submissions reflected the market stress and that Barclays "always quote[d] accurate and fair LIBORs." Barclays did not disclose that in fact it lowered its submissions to avoid negative media speculation.

LIBOR submissions, and his belief that the official BBA LIBOR fixing was too low for market conditions.[23]

Going into the last quarter of 2008, particularly after the failure of Lehman Brothers in September 2008, the financial crisis worsened and financial institutions faced increased concerns about liquidity and perceptions of financial viability. Barclays increasingly felt tremendous external pressures concerning how it was being perceived in the market and media, particularly due to its higher LIBOR submissions relative to the other panel banks. Barclays continued to believe that the other panel banks' LIBOR submissions were unrealistically low. Even though it maintained that its liquidity position was in fact strong, Barclays was increasingly worried about these market and media perceptions. At this time, the Bank of England had a conversation with a senior individual in Barclays, in which it raised questions about Barclays' liquidity position and its relatively high LIBOR submissions.[24]

In late October 2008, reacting to this pressure and the discussion with the Bank of England, Barclays believed it needed to lower its LIBOR submissions even further. As a result, a member of senior management conveyed an instruction to the LIBOR submitters, through their supervisor, that Barclays' U.S. Dollar and Sterling LIBOR submissions needed to be lowered to be "within the pack," meaning Barclays' LIBOR submissions were to be made at or around the same rate as the other panel banks. The same senior manager confirmed and reiterated this directive in a meeting with the supervisors and some of the submitters a few days later.

The LIBOR submitters complied with this additional directive and sent their supervisor emails confirming their reluctant acquiescence. The senior U.S. Dollar submitter emailed his supervisor, "following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested. I disagree with this approach as you are well aware. I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."[25]

---

[23]    In the wake of the Wall Street Journal article, in June 2008, the BBA conducted a review of the definition of LIBOR and the submission process. Barclays and other panel bank members actively participated in this review. In August 2008, the BBA published its findings from the review and concluded from the contributing panel banks' comments, including Barclays, that the contributing banks were confident that their submissions reflected the costs of borrowing in the London interbank money market, and that the existing process for LIBOR submissions was appropriate and should be retained without modification. Accordingly, the BBA merely provided "amplification" to the LIBOR definition. As noted above, despite its participation in this review, Barclays continued to follow the senior management instruction to lower LIBOR submissions artificially.

[24]    Throughout the financial crisis, in addition to the regulatory staff level surveillance calls noted above, the Bank of England had discussions with certain senior managers of Barclays about its funding and liquidity position and LIBOR. Barclays' high LIBOR submissions relative to other panel bank submissions, and whether such submissions were appropriate, were discussed at times in these conversations.

[25]    The senior LIBOR submitter for Sterling sent a similar email to the same supervisor and then forwarded it to a senior compliance officer of Barclays. A senior compliance officer responded that the submitters should set where they see it, follow BBA rules, and avoid potential action by the BBA. The

At or around the time of this further directive, central banks were taking several measures to ease the liquidity strains in the marketplace. As a result, market and media speculation receded and the directive had less impact on submissions. Nonetheless, the original management instruction from late 2007, to stay below "the parapet," was not rescinded throughout the remainder of the financial crisis period. In emails and other communications, Barclays' submitters continued to indicate into at least mid-2009 that they were still basing their submissions at levels to minimize market or press speculation about Barclays.

Throughout the financial crisis period, Barclays often submitted among the highest rates as compared to the submissions made by the other banks on the U.S. Dollar panel, and, at times, was excluded from the calculation of the daily official LIBOR fixing, because Barclays' submission was in the highest quartile. However, Barclays was also at times one of the middle averaged rates used in the calculation of the daily official LIBOR fixing.

Barclays' submitters knew that reputational concerns or negative market or press reports were not legitimate or permissible factors on which to base their daily LIBOR submissions. By determining Barclays' LIBOR submissions on such considerations during the financial crisis period, those submissions did not reflect or relate to the cost of borrowing unsecured funds in the relevant interbank markets. Yet, during this time, Barclays' submitters routinely made their Barclays' U.S. Dollar LIBOR submissions for multiple tenors, and at limited times their Sterling and Yen LIBOR submissions, in accordance with senior management's instructions, and not in accordance with the definition and criteria for LIBOR. Accordingly, Barclays, through its submissions, knowingly delivered, or caused to be delivered, LIBOR submissions that constituted false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, which is a commodity in interstate commerce.

## IV.

## LEGAL DISCUSSION

### A. Barclays Made False, Misleading or Knowingly Inaccurate Reports Concerning the Costs of Borrowing Unsecured Funds in Violation of Section 9(a)(2) of the Act

Section 9(a)(2) makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2) (2006); *U.S. v. Brooks*, No. 09-20871, 2012 WL 1768061 (5th Cir. May 18, 2012); *United States v. Valencia*, 394 F.3d 352 (5th Cir. 2004); *see also CFTC v. Johnson*, 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005) (same).

---

senior compliance officer also stated he was unaware of any external pressure to reduce rates to join the pack, but he would raise it with senior management. He never did so.

25

On a daily basis, Barclays, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its U.S. Dollar, Yen, and Sterling LIBOR and Euribor submissions through the mails or interstate commerce. Barclays' submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the U.S., of the panel banks' submissions by Thomson Reuters on behalf of BBA and EBF, and other third party vendors. The panel banks' submissions are used to determine the official published rates for LIBOR and Euribor, which are calculated based on a trimmed average of the submissions (as described above in Section III.C.1.a). Barclays' daily LIBOR and Euribor submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and Barclays' ability to borrow funds in the particular markets. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which BBA U.S. Dollar, Yen and Sterling LIBOR and EBF Euribor are fixed.

Throughout the periods relevant to the conduct described herein, Barclays' LIBOR submissions for U.S. Dollar, Yen, and Sterling and Euribor submissions were false, misleading or knowingly inaccurate because they were routinely based on impermissible factors such as (1) the management directive to lower Barclays' submitted rates to manage market and media perceptions of Barclays, and (2) the derivatives positions of swaps traders, and were not based on the costs of borrowing unsecured funds in the pertinent markets, as required. By using these impermissible factors in making its LIBOR and Euribor submissions and without disclosing that it based its submissions on these impermissible factors, Barclays conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Moreover, Barclays' submitters knew that Barclays' LIBOR and Euribor submissions contained false and misleading rates. By such conduct, Respondents violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

**B.      Respondents Attempted to Manipulate LIBOR and Euribor**

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of attempted manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2006). Section 6(c) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act . . . ." 7 U.S.C. § 9 (2006). Section 6(d) of the Act is substantially identical to section 6(c). *See* 7 U.S.C. § 13b (2006).

The following two elements are required to prove an attempted manipulation: (1) an intent to affect the market price, and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477

26

(CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005). To prove the intent element of attempted manipulation, it must be shown that Barclays "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, at 27,283 (CFTC Dec. 17, 1982). "[W]hile knowledge of relevant market conditions is probative of intent, it is not necessary to prove that the accused knew to any particular degree of certainty that his actions would create an artificial price. It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.' *See U.S. v. U.S. Gypsum Co*, 438 U.S. [442, 445 (1978)]." *Id*. A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

Here, as evidenced by the extensive communications among traders and submitters, Barclays' traders and submitters each specifically intended to affect the price at which the daily BBA LIBOR for U.S. Dollar, Sterling, and Yen (for particular tenors), and the EBF Euribor (for particular tenors), all commodities in interstate commerce, would be fixed. Moreover, the evidence reflects that the traders' motives were to try to affect the BBA LIBOR and EBF Euribor fixings in order to benefit their derivatives trading positions or to benefit the derivatives trading positions of traders at other banks, with whom they actively coordinated. The evidence also shows that the submitters understood the traders' motives and acted with manipulative intent by submitting false, misleading or knowingly inaccurate market information that purported to reflect the costs of borrowing unsecured funds, but in reality, reflected the profit motive of the swaps traders.

The Barclays traders' requests for certain rates to be submitted which would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the submitters making LIBOR and Euribor submissions reflecting the traders' requests, constitute overt acts in furtherance of their intent to affect the BBA LIBOR and EBF Euribor fixings. By doing so, Barclays engaged in repeated acts of attempted manipulation in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

C. **Respondents Aided and Abetted the Attempts of Other Traders at Other Banks to Manipulate Euribor**

Pursuant to Section 13(a) of the Act, Barclays aided and abetted the attempts of traders at other banks to manipulate LIBOR and Euribor in violation of the CEA. 7 U.S.C. § 13c(a) (2006). Liability as an aider and abettor requires proof that: (1) the CEA was violated, (2) the aider and abettor had knowledge of the wrongdoing underlying the violation, and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See In re Sharokh Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129, at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct is not necessarily required to be demonstrated. *See In re*

27

*Lincolnwood Commodities, Inc.,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the surrounding facts and circumstances. *Id. See also In re Buckwalter,* [1990-1992 Transfer Binder] Comm. Fut. L . Rep. (CCH) ¶ 24,995, at 37,686 (CFTC Jan. 25, 1991).

Through daily communications, certain Barclays swaps traders and the traders at the other panel banks discussed LIBOR and Euribor rates that would benefit their banks' respective derivatives trading positions. The traders at the other panel banks asked the Barclays swaps traders to have the Barclays LIBOR and Euribor submitters submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the derivatives' positions of the traders at the other panel banks. The Barclays swaps traders agreed and made the requests of the Barclays LIBOR and Euribor submitters. The Barclays LIBOR and Euribor submitters made their LIBOR and Euribor submissions based on the Barclays swaps traders' requests. Accordingly, by seeking to affect the rate at which LIBOR and Euribor were fixed, traders at other banks attempted to manipulate LIBOR and Euribor in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006). Barclays' traders had knowledge of and intentionally assisted the attempts of the traders at the other banks to manipulate the rate at which LIBOR and Euribor were fixed. By such acts of the Barclays swaps traders, Barclays aided and abetted the attempts of traders at other banks to manipulate LIBOR and Euribor in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

**D.      Barclays PLC, Barclays Bank and Barclays Capital Are Liable for the Acts of their Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2012) provide that the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust. Pursuant to Section 2(a)(1)(B) of the CEA and Commission Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC,* 837 F.2d 847, 857-58 (9th Cir. 1988).

Barclays Bank and Barclays Capital are liable for the acts, omissions and failures of the traders, managers, and submitters who acted as their employees and/or agents in the conduct described above. Barclays PLC, which wholly owns Barclays Bank and Barclays Capital, is liable for the acts, omissions and failures of Barclays Bank and Barclays Capital with respect to the conduct described above. Accordingly, Barclays PLC, Barclays Bank and Barclays Capital violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), as set forth above.

## V.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## VI.

### <u>OFFER OF SETTLEMENT</u>

Respondents, without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against Barclays by, or any agreement with, the Department of Justice or any other governmental agency or office, have submitted the Offer in which they:

A.     Acknowledge receipt of service of this Order;

B.     Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.     Waive:

    1.     the filing and service of a complaint and notice of hearing;

    2.     a hearing;

    3.     all post-hearing procedures;

    4.     judicial review by any court;

    5.     any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    6.     any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2012), relating to, or arising from, this proceeding;

    7.     any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

    8.     any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.     Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

E.     Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.   makes findings by the Commission that Respondents violated Section 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

2.   orders Respondents to cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

3.   orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of $200,000,000, plus post-judgment interest; and

4.   orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.   Respondents shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006) of the Act.

B.   Respondents, jointly and severally, shall pay a civil monetary penalty of $200 Million Dollars ($200,000,000), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

30

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.     Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

  1.   PRINCIPLES[26]

      i.   Barclays agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

      ii.  Barclays represents and undertakes that each Benchmark Interest Rate Submission by Barclays shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

---

[26]   The following terms are defined as follows:

**Benchmark Interest Rate**: An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

**Benchmark Publisher**: A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

**Submission(s)**: The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher. For example, if Barclays submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

**Submitter(s)**: The person(s) responsible for determining and/or transmitting the Submission(s); and

**Supervisor(s)**: The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

2.   INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE
     SUBMISSIONS

   i.   DETERMINATION OF SUBMISSIONS: Barclays shall determine its
        Submission(s) based on the following Factors, Adjustments and
        Considerations, unless otherwise prohibited by or contrary to an
        affirmative obligation imposed by any law or regulation, or the rules or
        definitions issued by a Benchmark Publisher. Barclays' transactions shall
        be given the greatest weight in determining its Submissions, subject to
        applying appropriate Adjustments and Considerations in order to reflect
        the market measured by the Benchmark Interest Rate.[27]

        Barclays shall determine its Submissions as described in these
        Undertakings within fourteen (14) days of the entry of this Order.

        ▪   Factor 1 — Barclays' Borrowing or Lending Transactions
            Observed by Barclays' Submitters:

            a.   Barclays' transactions in the market as defined by the
                 Benchmark Publisher for the particular Benchmark Interest
                 Rate;

            b.   Barclays' transactions in other markets for unsecured
                 funds, including, but not limited to, certificates of deposit
                 and issuances of commercial paper; and

            c.   Barclays' transactions in various related markets, including,
                 but not limited to, Overnight Index Swaps, foreign currency
                 forwards, repurchase agreements, futures, and Fed Funds.

        ▪   Factor 2 — Third Party Transactions Observed by Barclays'
            Submitters:

            a.   Transactions in the market as defined by the Benchmark
                 Interest Rate relevant to each of the Submission(s);

            b.   Transactions in other markets for unsecured funds,
                 including, but not limited to, certificates of deposit and
                 issuances of commercial paper; and

            c.   Transactions in various related markets, including, but not
                 limited to, Overnight Index Swaps, foreign currency
                 forwards, repurchase agreements, futures, and Fed Funds.

---

[27]   The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be
consistent with each other, and provide different levels of guidance as to how to make Submissions.

- Factor 3 — Third Party Offers Observed by Barclays' Submitters:

  a. Third party offers to Barclays in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to Barclays by interdealer brokers (*e.g.,* voice brokers); and

  c. Third party offers provided to Barclays in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- Adjustments and Considerations:  All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. Time:  With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. Market Events:  Barclays may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. Term Structure:  As Barclays applies the above Factors, if Barclays has data for any maturity/tenor described by a Factor, then Barclays may interpolate or extrapolate the remaining maturities/tenors from the available data;

  d. Credit Standards:  As Barclays applies the above Factors, adjustments may be made to reflect Barclays' credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above. Additionally, Barclays may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

        e.   <u>Non-representative Transactions</u>: To the extent a transaction included among the Factors above significantly diverges in an objective manner from other transactions, and that divergence is not due to market events as addressed above, Barclays may exclude such transactions from its determination of its Submission(s).

ii.   <u>SUPERVISOR(S) REVIEW</u>: Effective within fourteen (14) days of the entry of this Order, each daily Submission shall be reviewed by a Supervisor on a daily basis after the Submission(s) are made to the Benchmark Publisher.

iii.   <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>: All Submitter(s) shall have significant experience in the markets for the Benchmark Interest Rate to which they are submitting or a comparable market, but may designate less experienced parties, who routinely work under their supervision, to make Submission(s) during limited periods of absence. All Supervisors shall have significant experience in the markets for the relevant Benchmark Interest Rate or a comparable market. Submitters, Supervisors and any parties designated to make Submission(s) when the Submitter(s) are absent shall not be assigned to any derivatives trading desk, unit or division within Barclays, or participate in derivatives trading other than that associated with Barclays' liquidity and liability management. The compensation of Submitter(s) and Supervisor(s) also shall not be directly based upon derivatives trading, other than that associated with Barclays' liquidity and liability management.

iv.   <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER COMMUNICATIONS AND SUBMISSIONS</u>: Barclays shall implement internal controls and procedures to prevent improper communications with Submitter(s) and Supervisor(s) regarding Submission(s) or prospective Submission(s) to ensure the integrity and reliability of its Submission(s). Such internal controls and procedures shall include, but not be limited to:

- The "firewalls" contemplated herein will be implemented through written policies and procedures that delineate proper and improper communications with Submitter(s) and Supervisor(s), whether internal or external to Barclays. For these purposes, improper communications shall be any attempt to influence Barclays' Submission(s) for the benefit of any derivatives trading position (whether of Barclays or any third party) or any attempt to cause Barclays' Submitter(s) to violate any applicable Benchmark Publisher's rules or definitions, or Section 2 of these Undertakings; and

- A requirement that the Submitter(s) shall not be located in close proximity to traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to which Barclays contributes any Submission(s). The two groups should be separated such that neither can hear the other.

v. <u>DOCUMENTATION</u>: Barclays shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, Barclays shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that Barclays used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining Barclays' Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

  c. Relevant data and information received from interdealer brokers used in connection with determining Barclays' Submission(s) including, but not limited to, the following:

     - Identification of the specific offers and bids relied upon by Barclays when determining each Submission; and

     - The name of each company and person from whom the information or data is obtained;

  d. Barclays' assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with

35

Submission(s) be of "reasonable market size" (or any other such criteria);

    e.  Information regarding market events considered by Barclays in connection with determining its Submission(s), including, without limitation, the following:

        • The specific market announcement(s) or event(s); and

        • Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

    f.  The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

- For each Submission, Barclays shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by Barclays to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to Barclays at the time of the Submission(s):

    a.  Instrument;
    b.  Maturity/tenor;
    c.  Trade type (*i.e.*, loan/deposit, placing/taking);
    d.  Buy/sell indicator;
    e.  Transaction date (in mmddyyyy format);
    f.  Maturity date (in mmddyyyy format);
    g.  Value date (in mmddyyyy format);
    h.  Loan effective date;
    i.  Customer number;
    j.  Currency;
    k.  Ticket ID;
    l.  Timestamp;
    m.  Counterparty A (buyer/bidder);
    n.  Counterparty B (seller/offeror);
    o.  Nominal/notional size of the transaction;
    p.  Interest basis (360/365 day year);
    q.  The fixed interest rate; and
    r.  Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

- Transaction Records:  Barclays shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and

risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- Requirement To Record Communications: Barclays shall record and retain to the greatest extent practicable all of the following communications:

    a. All communications concerning the determination and review of the Submission(s); and

    b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent Barclays from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located in the London, Tokyo, and/or New York office of Barclays, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, Barclays' audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi. MONITORING AND AUDITING:

- Monitoring: Barclays shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and if there is any

37

significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the Submission is adequately substantiated. If it is not substantiated, Barclays shall notify its chief compliance officer(s) and the Benchmark Publisher;

- <u>Periodic Audits</u>: Starting six (6) months from the date of the entry of this Order, and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, Barclays shall conduct internal audits of reasonable, random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

- <u>Annual Audits By Third Party Auditors</u>: Starting one (1) year from the date of the entry of this Order, and continuing annually for four (4) additional years thereafter, Barclays shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

    a. Reviewing communications of Submitter(s) and Supervisor(s);

    b. Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by Barclays;

    c. Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by Barclays, that the Submission(s) were consistent with this Order, the policies and procedures in place for making Barclays' Submission(s), and the definitions applicable to the Benchmark Interest Rate for which Barclays made Submission(s); and

    d. A written audit report to be provided to Barclays and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii. <u>POLICIES, PROCEDURES AND CONTROLS</u>: Within sixty (60) days of the entry of this Order, Barclays shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, Barclays shall develop policies, procedures and controls to ensure the following:

- The supervision of the Submission process;

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning Barclays' Submissions are reported to and investigated by Barclays' compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- Not less than monthly, the periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate in connection with these Policies, Procedures and Controls;

- The handling of complaints concerning the accuracy or integrity of Barclays' Submission(s) including:

  a. Memorializing all such complaints;

  b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

- The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. TRAINING: Barclays shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate. Submitters and Supervisors shall be provided with preliminary training regarding the policies, and procedures and controls developed pursuant to Section 2(vii) of these Undertakings. By no later than March 29, 2013, all Submitters, Supervisors, and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein. Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of Barclays' regular training programs. The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

39

- The Undertakings set forth herein;

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of Barclays' Submission(s);

- The requirement to conduct all business related to Barclays' Submission(s) on Barclays' recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on Barclays' recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with Barclays' Submission(s) or process for determining Submission(s).

ix. <u>REPORTS TO THE COMMISSION</u>:

- <u>Compliance with Undertakings</u>: Every four (4) months, starting 120 days from the entry of this Order, Barclays shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein. Within 365 days of the entry of this Order, Barclays shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein. The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings. The report shall contain a certification from a representative of Barclays' Executive Management, after consultation with Barclays' chief compliance officer(s), that Barclays has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in the Order;

- <u>Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks</u>: Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, Barclays shall provide, meet with

40

and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate. Within that same time frame, Barclays shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

- ▪ Disciplinary and Other Actions: Barclays shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK INTEREST RATES

To the extent Barclays is or remains a contributor to any Benchmark Interest Rate, Barclays agrees to make its best efforts to participate in efforts by current and future Benchmark Publishers, other price reporting entities and/or regulators to ensure the reliability of Benchmark Interest Rates, and through its participation to encourage the following:

i. METHODOLOGY: Creating rigorous methodologies for the contributing panel members to formulate their Submissions. The aim of such methodologies should be to result in a Benchmark Interest Rate that accurately reflects the rates at which transactions are occurring in the market being measured by that Benchmark Interest Rate;

ii. VERIFICATION: Enforcing the use of those methodologies through an effective regime of documentation, monitoring, supervision and auditing, required by and performed by the Benchmark Publishers, and by the contributing panel members internally;

iii. INVESTIGATION: Facilitating the reporting of complaints and concerns regarding the accuracy or integrity of Submissions to Benchmark Interest Rates or the published Benchmark Interest Rate, and investigating those complaints and concerns thoroughly;

iv. DISCIPLINE: Taking appropriate action if, following a thorough confidential investigation, the Benchmark Publisher determines that a

41

complaint or concern regarding the accuracy or integrity of a Submission or the published Benchmark Interest Rate has been substantiated;

v.  <u>TRANSPARENCY</u>:  Making regular reports to the public and the markets of facts relevant to the integrity and reliability of each Benchmark Interest Rate.  Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the Benchmark Publisher should display prominently whether each rate is based entirely on transactions in the market the rate is supposed to reflect, or whether it instead is based, in whole or in part, on other data or information;

- The Benchmark Publisher also should make periodic reports regarding the number and nature of complaints and concerns received regarding the accuracy or integrity of Submissions or the published Benchmark Interest Rate while maintaining the anonymity of all those who have reported or are the subject of complaints and concerns;

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi.  <u>FORMULATION</u>:  Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

Barclays shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between Barclays and Benchmark Publishers.

Order. Should Barclays seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs. Any person designated to receive such request shall be located in the United States of America; and

iii. Barclays and the Commission agree that nothing in these Undertakings shall be construed so as to compel Barclays to continue to contribute Submission(s) related to any Benchmark Interest Rate. Without prior consultation with the Commission, Barclays remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

5. PROHIBITED OR CONFLICTING UNDERTAKINGS

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on Barclays by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then Barclays shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, Barclays will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions. Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6. PUBLIC STATEMENTS

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D. <u>Partial Satisfaction</u>: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

The provisions of this Order shall be effective as of this date.

By the Commission.

David A. Stawick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:   June 27, 2012