# APPENDIX B

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**8:00 am, Dec 19, 2012**

In the Matter of:            )
                             )
UBS AG and UBS Securities Japan   )
Co., Ltd.,                   )        CFTC Docket No. 13-09_
                             )
        Respondents.         )
                             )
                             )
_____)

## ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

### I.

The Commodity Futures Trading Commission (the "Commission" or the "CFTC") has reason to believe that UBS AG and UBS Securities Japan Co., Ltd. (collectively, "Respondents" or "UBS") have violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act (the "Act" or the "CEA"), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

### II.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against UBS by, or any agreement with, the Department of Justice or any other governmental agency or office, Respondents herein consent to the entry and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1]     Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order or where Respondents have admitted findings as set forth above. Nor do Respondents consent to the use of the Offer or this Order, or the findings in this Order consented to in the Offer, by any other party in any other proceeding.

III.

The Commission finds the following:

A.   <u>Summary</u>

For more than six years, since at least January 2005, UBS, by and through the acts of dozens of employees, officers and agents located around the world, engaged in systemic misconduct that undermined the integrity of certain global benchmark interest rates, including, but not limited to, the London Interbank Offered Rate ("LIBOR") for certain currencies, the Euro Interbank Offered Rate ("Euribor") and the Euroyen Tokyo Interbank Offered Rate ("Euroyen TIBOR"), that are critical to international financial markets.

UBS engaged in two overarching courses of misconduct. *First,* from at least January 2005 to at least June 2010, UBS made knowingly false submissions to rate-fixing panels to benefit its derivatives trading positions or the derivatives trading positions of other banks in attempts to manipulate Yen, Swiss Franc, Sterling and Euro LIBOR and Euribor, and, periodically, Euroyen TIBOR. UBS, through certain derivatives traders, also colluded with traders at other banks and coordinated with interdealer brokers in its attempts to manipulate Yen LIBOR and Euroyen TIBOR. For certain currencies and benchmark interest rates, this conduct occurred on a regular basis and sometimes daily. UBS was, at times, successful in its attempts to manipulate Yen LIBOR.

*Second,* from approximately August 2007 to mid-2009, UBS, at times, used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself against media speculation concerning its financial stability during the financial crisis.

*Manipulative Conduct for Profit*

Throughout the period, UBS routinely skewed its submissions to interest rate-fixing panels for Yen, Swiss Franc, Sterling and Euro LIBOR and Euribor and, at times, Euroyen TIBOR, to benefit UBS's derivatives trading positions that were tied to those particular benchmarks. UBS used a flawed submission process that relied on inherently conflicted employees to make submissions. UBS made derivatives traders responsible not only for trading their derivatives books for a profit, but also for determining UBS's benchmark interest rate submissions. As a result, when determining the rates to submit to the official panels, UBS's submitters for these currencies and benchmarks often took into consideration how the submissions might benefit their trading positions. These UBS submitters also accommodated requests of other UBS derivatives traders for submissions that would be beneficial to their trading positions, by either maximizing their profits or minimizing their losses. (see pp. 10-37 for Yen LIBOR and Euroyen TIBOR, p. 38 for Swiss Franc LIBOR, pp. 38-39 for Sterling LIBOR, and pp. 39-41 for Euro LIBOR and Euribor, *infra*.)

This profit-driven conduct spanned from at least January 2005 through June 2010 and, at times, occurred on an almost daily basis. It involved more than three dozen traders and submitters located in multiple offices, from London to Zurich to Tokyo, and elsewhere. The

2

misconduct included several UBS managers, who made requests to benefit their trading positions, facilitated the requests of their staff for submissions that benefited their trading positions, or knew that this was a routine practice of the traders and did nothing to stop it. UBS traders inappropriately viewed their benchmark interest rate submissions, such as UBS's LIBOR submissions, as mere tools to help the traders increase the profits or minimize losses on their trading positions. To be sure, UBS's benchmark interest rate submissions frequently were not a reflection of UBS's assessment of the costs of borrowing funds in the relevant interbank markets, as each of the benchmark definitions required.

In this environment, UBS, primarily through the acts and direction of a senior Yen derivatives trader, orchestrated a massive, multi-year course of unlawful conduct to manipulate Yen LIBOR on, at times, an almost daily basis and, periodically, Euroyen TIBOR. This senior Yen trader, known as one of the largest traders in the entire Yen market, took on significant, high-risk derivatives trading positions that generated hundreds of millions of dollars for UBS. He implemented at least three manipulative strategies, which he often used simultaneously to increase the likelihood that he would be successful: (i) he had UBS Yen LIBOR and Euroyen TIBOR submitters make submissions for particular maturities ("tenors") reflecting his preferred rates (see pp. 12-17, *infra*.); (ii) he cultivated prior working relationships and friendships with derivatives traders from at least four other banks and had them make requests of their Yen LIBOR submitters based on his preferred rates (see pp. 17-20, *infra*.); and (iii) he used at least five interdealer brokers, who intermediated cash and derivatives transactions for clients, including other banks that made benchmark interest rate submissions, to disseminate false market information relating to Yen LIBOR to multiple panel banks in order to impact their submissions to his benefit. (see pp. 20-29, *infra*.)

The UBS senior Yen trader had the interdealer brokers utilize various methods to try to affect the submissions of other banks, including: (i) disseminating false "run-throughs" of suggested Yen LIBOR to many, if not all, of the panel banks (see pp. 22-24, *infra*.); (ii) contacting directly other bank submitters (see pp. 24-26, *infra*.); (iii) publishing false market cash rates over certain dedicated electronic screens available to clients (see p. 26, *infra*.); and (iv) "spoofing" or making fake bids and offers, all tailored to drive the submissions of the other banks to the rates that benefited the senior Yen trader's derivatives positions. (see pp. 26-27, *infra*.) To secure the cooperation of the brokers and, at times, other derivatives traders, the senior Yen trader found ways to compensate them, including by executing additional trades or wash trades to generate commissions for the brokers and by negotiating an extra UBS-paid fee or bonus to one interdealer broker, totaling about $216,000 over an approximately two-year period.

UBS, through the senior Yen trader and others, made approximately 2,000 written internal and external requests in attempts to manipulate Yen LIBOR in just a three-year period, accounting for 75% of the days in which Yen LIBOR submissions were made by UBS during that period.[2] Sometimes, the senior Yen trader sought to manipulate particular tenors on one

---

[2]    For purposes of this Order, the term "request" means a request for a preferential submission for a particular tenor. For example, if a UBS derivatives trader asked a UBS submitter that preferential rates be submitted for three tenors, then the Commission views that as constituting three separate requests made on that particular day.

day, and sometimes he looked ahead and conducted sustained manipulative operations for weeks to move Yen LIBOR in the direction he needed, even coining names for these longer-term schemes, such as "the Turn Campaign" and "Operation 6m." (see pp. 29-36 *infra*). At times, UBS was successful in its attempts to manipulate Yen LIBOR for certain tenors.

UBS, through certain Yen traders, continued to use these strategies to attempt to manipulate Yen LIBOR and Euroyen TIBOR, even after the senior Yen trader departed UBS in late 2009, as UBS managed the massive trading positions he had accumulated for the firm.

*False Reports to Protect Reputation*

During the financial crisis, certain UBS managers issued directions for making UBS benchmark interest rate submissions in order to protect against what UBS perceived as unfair and inaccurate negative public and media perceptions about UBS. UBS first directed that UBS's submissions should "err on the low side" of the panel banks' submissions, a direction its submitters generally followed. UBS subsequently directed that UBS's submissions be "in the middle of the pack" of the panel banks' submissions, and the submitters followed the direction again. These directions at times improperly influenced submissions for U.S Dollar LIBOR, as well as LIBORs for other currencies, and Euribor and Euroyen TIBOR, and at times resulted in submissions that did not solely reflect UBS's assessment of the borrowing costs of unsecured funds in the relevant interbank markets, as required. At times, these directions resulted in UBS knowingly making false, misleading or knowingly inaccurate LIBOR, Euribor and Euroyen TIBOR submissions from early August 2007 to at least mid-2009. (see pp. 41-52, *infra*.)[3]

A bank's concerns about its reputation, negative market or press reports, or its trading positions and related profits are not legitimate or permissible factors upon which a bank may base its daily benchmark interest rate submissions. Benchmark interest rate submissions convey market information about the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets and a bank's, such as UBS's ability to borrow funds in the particular markets. By basing its submissions, in whole or in part, on UBS's trading positions and at times its reputational concerns, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR, Euribor, and Euroyen TIBOR were based on and solely reflected the costs of borrowing unsecured funds in the relevant interbank markets and were truthful and reliable. Thus, UBS's false submissions contained market information that affected or tended to affect LIBOR, Euribor and Euroyen TIBOR, commodities in interstate commerce.

*The Conduct Continued After UBS Was on Notice of the CFTC Investigation*

UBS continued to engage in all of the conduct described above, particularly the trader manipulative conduct, long after it was on notice that the CFTC was investigating UBS in connection with its U.S. Dollar LIBOR practices. UBS received a demand for documents and

---

[3]     These directions to be "in the middle of the pack," by definition, resulted in UBS's submissions at times being part of the calculation of the official published LIBOR. However, the Commission has not found evidence that UBS issued or acted upon the directions with the intent to manipulate the official published LIBOR for any currency or other benchmark interest rates.

information from the CFTC's Division of Enforcement in October 2008; yet the conduct of the traders and submitters, including the collusive conduct, occurred well into 2010. The rampant misconduct across benchmarks at UBS only came to light as a result of the CFTC's subsequent request in April 2010 that UBS conduct an internal investigation relating to its U.S. Dollar LIBOR practices.

***************

Commencing in or about late December 2010, Respondents provided substantial assistance to the Division of Enforcement in its investigation, including information and analysis. In accepting UBS's Offer, the Commission recognizes Respondents' cooperation as of late December 2010.

## B.  Respondents

**UBS AG** is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland that provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide. It has operations in over 50 countries, including the United States. The Investment Banking division of UBS is responsible for making submissions for benchmark interest rates.

**UBS Securities Japan Co., Ltd.** is the successor company to UBS Securities Japan, Ltd., which, at all times during the periods covered by this Order, was a wholly-owned subsidiary of UBS AG and engaged in investment banking operations and was a securities broker-dealer. It had a branch office in Tokyo, Japan.

## C.  Facts

### 1.  UBS Made False Reports and Attempted to Manipulate LIBOR and Other Benchmark Interest Rates, at Times Successfully, to Benefit UBS's Derivatives Positions

From at least January 2005 through at least June 2010, UBS, through the acts of its derivatives traders, benchmark interest rate submitters and managers, made false benchmark interest rate submissions in an effort to manipulate the official fixings of Yen, Swiss Franc, Sterling and Euro LIBOR, Euribor and Euroyen TIBOR. The goal was simple: to profit. UBS held significant derivatives positions whose value depended on benchmark interest rates fixed by rate-setting panels. As more fully described below, the panels fixed and issued the respective benchmarks based on rates submitted by banks on the respective panels, such as UBS, that were supposed to reflect an assessment of the costs of borrowing unsecured funds in the relevant interbank money markets. UBS, however, made false submissions intended to manipulate these benchmarks to make its derivatives positions more profitable or to minimize losses.

Interest rate swaps traders ("Derivatives Traders"), located in UBS's London, Zurich and Tokyo offices, routinely asked their UBS colleagues who determined UBS's submissions to make certain submissions to affect the daily fixings for certain tenors of various LIBOR

5

currencies, Euribor and, at times, Euroyen TIBOR. The Derivatives Traders' purpose was to benefit their respective derivatives trading positions. The UBS submitters often based their submissions on the traders' requests. Making matters even worse, for most of the period, until approximately September 2009, UBS's submitters wore two "hats" – they were also derivatives traders themselves ("Trader-Submitters") – and they also based UBS's submissions on their own desk's trading positions.

Accordingly, throughout the six-year period, UBS, through its Trader-Submitters and others, made benchmark interest rate submissions as set forth below reflecting rates that benefitted UBS's derivatives trading positions, rather than their assessment of the costs of borrowing funds in the relevant markets. As detailed below, for certain benchmark interest rate submissions, this occurred on an almost daily basis. The conduct of the dozens of Derivatives Traders and Trader-Submitters occurred openly and was pervasive at UBS on certain trading desks, even involving the participation or knowledge of desk managers and senior managers.[4]

### a. The Fixing of BBA LIBOR, EBF Euribor and JBA Euroyen TIBOR

*LIBOR and its Fixing*

LIBOR is the most widely used benchmark interest rate throughout the world. LIBOR is intended to be a barometer to measure strain in money markets and is often a gauge of the market's expectation of future central bank interest rates. Approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR. LIBOR also is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges, including the one-month and three-month Eurodollar futures contracts on the Chicago Mercantile Exchange ("CME"). Moreover, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers.

Daily LIBORs are issued on behalf of the British Bankers' Association ("BBA")[5] for ten currencies, including Yen, Sterling, Euro and Swiss Franc, with fifteen tenors ranging from overnight through twelve months. According to the BBA, LIBOR "is based on offered inter-bank deposit rates contributed in accordance with the Instructions to BBA LIBOR Contributor banks." The BBA requires that:

---

[4]    The term "Senior Manager" generally references UBS employees with responsibilities (either formally or informally delegated) broader than management of trading desks, although their responsibilities may have at times included managing trading desks. The term "Senior Manager" does not include executive managers or the board of directors of UBS.

[5]    The BBA is a United Kingdom trade association for the United Kingdom banking and financial services sector and is comprised of member banks. The BBA is not regulated.

"[a]n individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to [11:00 a.m. London time]."[6]

Every business day shortly before 11:00 a.m. London time, the banks on the LIBOR panels submit their rates to Thomson Reuters. A trimmed averaging process is used to exclude the top and bottom quartile of rates and then average the remaining rates for each currency and tenor. That average rate becomes the official BBA daily LIBOR (the "LIBOR fixing"). The BBA then makes public the daily LIBOR fixing for each currency and tenor, as well as the daily submissions of each panel bank, through Thomson Reuters and the other data vendors licensed by the BBA. This information is made available and relied upon by market participants and others around the world, including in the United States.

*Euribor and its Fixing*

Euribor is the predominant money market reference interest rate for the Euro currency and is used internationally in derivatives contracts, including interest rate swaps and futures contracts.[7] At the end of 2011, according to the Bank for International Settlements ("BIS"), over-the-counter interest rate derivatives in the Euro currency, such as swaps and forward rate agreements ("FRAs"), comprised contracts worth over $220 trillion in notional value. Euribor is fixed every business day for fifteen tenors, ranging from one week to twelve months.

Euribor is defined by the European Banking Federation ("EBF")[8] as the rate "at which Euro interbank term deposits are offered by one prime bank to another prime bank" within the Economic and Monetary Union of the European Union at 11:00 a.m. Central European Time ("CET") daily. According to the EBF instructions, panel banks "must quote the required euro rates to the best of their knowledge." The panel banks are to observe the market and base their submissions on where the Euro is trading in that market.

The daily official fixing of EBF Euribor ("Euribor fixing") is also calculated based on a trimmed averaging methodology. On behalf of EBF, Thomson Reuters issues the daily Euribor fixing and the submissions of each panel bank to its subscribers and other licensed data vendors. Through these licensing agreements, this information is made available and relied upon by market participants and others around the world, including in the United States.

---

[6]  This definition of LIBOR has been used by the BBA from 1998 to the present.

[7]  In October 2011, the CME launched the Euribor Futures contract, which settles based on the three-month Euribor.

[8]  The EBF, an unregulated non-profit association of the European banking sector based in Brussels, Belgium, oversees the publication of Euribor.

*Euroyen TIBOR and its Fixing*

Euroyen TIBOR is used internationally in derivatives contracts, including interest rate swaps and futures contracts on exchanges around the world, including the CME's Euroyen TIBOR futures contract.[9] Yen traded in a money market outside of Japan is referred to as Euroyen. Euroyen TIBOR reflects the prevailing money market rates in the Japan offshore market. At the end of 2011, according to the BIS, over-the-counter interest rate derivatives in the Yen currency, such as swaps and FRAs, comprised contracts worth over $66 trillion in notional value referenced to Yen rates. Euroyen TIBOR is fixed daily for thirteen tenors.

According to the Japanese Bankers Association's ("JBA") instructions,[10] the contributing panel banks quote rates where they believe a prime bank would transact in the Japan offshore market as of 11:00 a.m. Tokyo time. These quotes should not be representative of the banks' own positions in the marketplace. Further, the rates quoted by reference banks are not intended for use in trading by the reference banks. The daily fixing of JBA Euroyen TIBOR ("Euroyen TIBOR fixing") is also calculated based on the trimmed averaging methodology. Through licensing agreements, this information is made available and relied upon by market participants and others around the world, including in the United States.

*************

By their definitions, LIBOR, Euribor and Euroyen TIBOR require that the submitting panel banks exercise their judgment to determine the rates at which, depending on the benchmark, they or a prime bank may obtain unsecured funds in the respective London, Euro and Tokyo interbank markets. These definitions require that submissions relate to funding and do not permit consideration of factors unrelated to the costs of borrowing unsecured funds, such as derivatives trading positions or concerns about reputational harm or negative media attention.

### b. **UBS Used Derivatives Traders to Make UBS's Submissions**

UBS made Trader-Submitters who worked in UBS's Investment Banking Division responsible for making all benchmark interest rate submissions that are subject to this Order. From at least January 2005 through September 2009, Derivatives Traders, who sat on Short Term Interest Rate ("STIR") trading desks in Zurich and traded short-term derivatives products, made submissions for all LIBOR currencies (except U.S. Dollar and Euro), Euribor and Euroyen TIBOR. The submissions for U.S. Dollar and Euro LIBOR were made by Derivatives Traders who sat on the U.S. Dollar and Euro desks in the London office of the Rates Division ("Rates"). The Rates Division consisted of derivatives traders in London, Zurich, Tokyo, Connecticut and elsewhere, who traded derivatives products with a duration or maturity of more than a year. UBS's Derivatives Traders traded LIBOR, Euribor and Euroyen TIBOR-based swaps, FRAs, and futures contracts. Many of their derivatives contracts settled or reset on International

---

[9]    The CME Euroyen TIBOR futures contract had active trading volumes during the relevant periods discussed *infra.* (see pp. 10-37); at present, it has no trading volume.

[10]    JBA is an industry banking association and oversees the publication of Euroyen TIBOR.

Monetary Market ("IMM") dates, making the benchmark interest rates on these particular dates especially important.[11]

In October 2008, responsibility for U.S. Dollar and Euro LIBOR submissions was transferred from the London Rates desk to the STIR desk in Zurich. The STIR and Rates desks were part of the Global Fixed Income, Currency and Commodities Division ("FICC").

The STIR and Rates desks were profit centers for UBS and generated significant income for UBS based on trading derivatives products, such as interest rate swaps whose value depended on LIBOR, Euribor, Euroyen TIBOR and other benchmark interest rates. STIR also managed UBS's short-term cash position and engaged in cash trading in the money markets for each currency, primarily through traders located in Connecticut, Zurich and Singapore. STIR was also responsible for hedging UBS's interest rate risk.

In September 2009, UBS transferred responsibility for determining all LIBOR submissions to the Asset and Liability Management ("ALM") group within FICC, located in Zurich. In October 2009, ALM also became responsible for Euribor submissions, and in January 2010, for Euroyen TIBOR submissions. ALM was also responsible for determining the size and price, known as the external issuance levels, at which UBS would issue commercial paper ("CP") and certificates of deposit ("CDs") to fund the bank. ALM did not trade derivatives products.

Prior to September 2009, ALM provided input at times into the determination of various benchmark interest rate submissions to the Trader-Submitters and eventually provided the actual rates to be submitted. After ALM assumed such responsibility, UBS Derivatives Traders on occasion still made requests for preferential submissions.

### c. Conflicts of Interest and Lack of Internal Controls Allowed Misconduct to Flourish For Years

UBS's dual role of traders acting as submitters created a conflict of interest that compromised the integrity of UBS's submission process, thus establishing an environment ripe for the Derivatives Traders and Trader-Submitters to abuse. UBS's Trader-Submitters had an inherent interest in making submissions that benefited their derivatives trading positions. This interest conflicted with UBS's responsibility to make honest and reliable assessments of the costs of borrowing unsecured funds in the relevant markets, and ensure its benchmark interest rate submissions were made in accordance with the relevant definitions and criteria. Until August 2008 at the earliest, UBS had no specific internal controls or procedures governing its benchmark interest rate submissions to manage the conflicts of interest and ensure that its submissions did not take into account impermissible factors, such as UBS's derivatives trading positions. UBS provided no training concerning the benchmark interest rate submission process or how to manage the inherent conflict between making such submissions and the fact that the Trader-Submitters were supposed to make money for UBS.

---

[11]  IMM dates are standard quarterly settlement dates in March, June, September and December.

Even after conducting a limited review and developing some procedures for its submission process in the wake of an April 2008 *Wall Street Journal* ("WSJ") article critical of the accuracy of banks' LIBOR submissions, UBS did not remove the inherent conflict of interest described above or provide meaningful guidance or any training to the Trader-Submitters. Rather than strengthening its internal controls and removing the conflict of interest embedded in the submission process, UBS instead delegated oversight responsibility for the benchmark interest rate submissions to managers who not only knew that Derivatives Traders and Trader-Submitters were engaged in efforts to manipulate the official fixings of LIBOR, Euribor and Euroyen TIBOR, but who also made *their own requests* for submissions to benefit their individual derivatives trading positions. At least certain Derivatives Traders, Trader-Submitters and managers disregarded the few procedures UBS eventually implemented in August 2008.

UBS's lack of specific internal controls and procedures and overall lax supervision concerning its submission processes for benchmark interest rates, allowed this misconduct to occur across multiple benchmarks and currencies and in several offices around the world. This environment enabled certain Derivatives Traders to engage in widespread, long-term systematic misconduct to manipulate Yen LIBOR and, at times, Euroyen TIBOR, alone and in concert with other banks and interdealer brokers.

### d. The Manipulation and False Reporting of Yen LIBOR and Euroyen TIBOR

Over a period of approximately six years, from at least January 2005 through at least June 2010, UBS Derivatives Traders and Trader-Submitters routinely attempted to manipulate the daily fixings of Yen LIBOR and, at times, Euroyen TIBOR to benefit UBS's derivatives trading positions. At times, UBS's attempts to manipulate Yen LIBOR were successful.

Many UBS Yen Derivatives Traders and managers were involved in the manipulative conduct and made requests to serve their own trading positions interests. But the volume of unlawful requests submitted by one particular senior Yen Derivatives Trader in Tokyo ("Senior Yen Trader") dwarfed them all.[12] The Senior Yen Trader spearheaded a massive effort, attempting to manipulate the Yen LIBOR fixings, at times nearly daily, and periodically the Euroyen TIBOR fixings, by making and directing requests to alter UBS's submissions to benefit his derivatives trading positions and thereby maximize his profits or minimize his losses.

The Yen Derivatives Traders' requests, including the Senior Yen Trader's, typically were for the one, three, and six-month tenors for Yen LIBOR and Euroyen TIBOR. The Trader-Submitters on many occasions acquiesced to those requests and made Yen LIBOR and Euroyen TIBOR submissions with the purpose of benefiting UBS's derivative trading positions. The requests were made over UBS's email or chat networks and additional requests were made orally

---

[12]  In fact, some UBS Yen Derivatives Traders made requests at times to Yen LIBOR Trader-Submitters to adjust their Yen LIBOR submissions to benefit derivatives trading positions long before the Senior Yen Trader joined UBS. A year before, for example, on November 28, 2005, a Yen Derivatives Trader referred to her derivatives trading position when she asked a senior Yen LIBOR Trader-Submitter, "re 6m libor we want higher fixing as we 'have long 177 bio fra fix today." The senior Yen LIBOR Trader-Submitter replied, "ok."

by traders who sat near to or spoke by telephone with Trader-Submitters, with traders at other banks or with brokers. In addition, certain Trader-Submitters based submissions at times on his or her own or the desk's trading positions, without consulting with anyone else.

The UBS Yen Derivatives Traders making the requests and the Yen LIBOR and Euroyen TIBOR Trader-Submitters were located in Tokyo and Zurich. Over one dozen Yen Derivatives Traders and Trader-Submitters were involved, including at least two desk-level managers who were involved or aware of the conduct. At times, the desk-level managers made requests for beneficial submissions themselves or facilitated the conduct of the traders and submitters that they supervised. Moreover, senior managers of UBS above the desk-level managers had knowledge of the conduct.

The Yen LIBOR and Euroyen TIBOR Trader-Submitters considered several factors in making their submissions, but frequently gave weight and priority to the Yen Derivatives Traders' requests for specific rates or directional moves to benefit their derivatives trading positions. The Yen LIBOR Trader-Submitters also took into account their own derivatives trading positions. At times, to accommodate the Yen Derivatives Traders, the Yen LIBOR and Euroyen TIBOR Trader-Submitters submitted rates that were one or more basis points in the direction requested by the Yen Derivatives Traders, or submitted a specific rate depending on the particulars of the traders' requests.

### *The Senior Yen Trader's Illegal Manipulative Conduct*

The Senior Yen Trader conducted his extensive, systematic course of unlawful conduct to manipulate Yen LIBOR and periodically, Euroyen TIBOR, from shortly after he joined UBS in early July 2006 until his departure in the fall of 2009, following a dispute with UBS over his compensation. Indeed, the Senior Yen Trader started making the unlawful requests during his "probationary" period as a new employee when, pursuant to UBS policy, he was not permitted to trade except under supervision.

The Senior Yen Trader employed multiple methods in his attempts to manipulate Yen LIBOR and Euroyen TIBOR. He made internal requests of the UBS Yen LIBOR and Euroyen TIBOR Trader-Submitters. But, not satisfied with altering UBS's submissions alone, he went outside UBS in an effort to influence the submissions of other banks and increase the likelihood that his attempts would be successful. Thus, he not only coordinated requests with derivatives traders at several other panel banks, but he also used several interdealer brokers to disseminate false information about Yen LIBOR and Euroyen TIBOR to other panel banks, expecting that the other banks would rely on that information when they made their own submissions. At times, he was successful in his efforts to manipulate the official Yen LIBOR fixing for a particular tenor.

The Senior Yen Trader and others at UBS made approximately 2,000 written requests of UBS's Trader-Submitters, traders at other panel banks and interdealer brokers to try to achieve their manipulative goals. The written requests of the Senior Yen Trader and others occurred on approximately 570 trading/reporting days, mostly between late 2006 and late 2009, which is approximately 75% of the time.

11

The Senior Yen Trader was widely considered the dominant trader in the Tokyo Yen swaps market because he traded in enormous volumes and accepted large trading risks. In fact, his trades were so large and aggressive, he reputedly contributed substantially to developing the Yen Swaps market into a robust derivatives market. Historically, the Yen swaps market was relatively stable. From 2000 to 2006, Yen LIBOR rates remained relatively flat, evidencing minimal fluctuations up or down. Given the lack of volatility in the Yen markets, there were fewer traders who focused exclusively on Yen products, and, therefore, less liquidity for traders interested in such products. All of this changed when UBS hired the Senior Yen Trader and permitted him to take large positions in the Yen market. His trades immediately injected significant liquidity in a previously illiquid market. Not surprisingly, brokers were eager to develop relationships with the Senior Yen Trader in an effort to obtain a piece of his business.

UBS highly valued the Senior Yen Trader because his trading generated nearly $260 million in revenue for UBS. Each year, he increased the revenue he reaped compared to the year before. In 2007, he generated approximately $40 million; in 2008, he generated approximately $80 million, and in 2009, before he stopped trading for UBS in late summer, he generated approximately $116 million, about three times what he generated in 2007. At the height of his trading at UBS, the Senior Yen Trader was given a risk limit of $2 million to $3 million per basis point. While concerns were raised at times within UBS about the amount of risk that the Senior Yen Trader was taking in the market, UBS never curtailed his trading or lowered his risk limits until near the end of his employment when he was cautioned to reduce the risk in his positions.

### Internal Requests to Adjust Submissions

The Senior Yen Trader regularly made internal requests, either directly or through other traders and his manager at UBS, to the Yen LIBOR and, periodically, Euroyen TIBOR Trader-Submitters for adjustments in the UBS submissions that benefitted the Senior Yen Trader.

Multiple UBS traders and submitters, including the Senior Yen Trader's supervisor ("Yen Desk Manager"), were aware of the Senior Yen Trader's attempts to manipulate Yen LIBOR and Euroyen TIBOR through his internal requests to the submitters. UBS managers in Tokyo and Zurich also were aware of the Senior Yen Trader's requests. The UBS managers allowed the Senior Yen Trader to engage in his conduct, which ended only when he decided to leave UBS over a pay dispute. No one involved in or aware of the misconduct reported it as wrongful to more senior management, or to UBS's compliance or legal departments. On the contrary, some of these individuals, including the Yen Desk Manager in Tokyo, engaged in the same misconduct by making their own requests to UBS's Trader-Submitters for the manipulation of Yen LIBOR and Euroyen TIBOR, or facilitating the Senior Yen Trader's requests.

The Senior Yen Trader, directly or indirectly, made at least 800 requests in writing, on UBS's email and chat systems, to the Trader-Submitters for adjustments to UBS's Yen LIBOR submissions, usually focused around the one, three and six-month tenors. The Senior Yen Trader and others on his behalf also made similar requests for adjustments to the Euroyen TIBOR Trader-Submitters to benefit his trading positions, albeit on a significantly smaller scale. Sometimes, the Senior Yen Trader made requests to benefit the trading positions of other UBS

Yen Derivatives Traders on the desk, if it happened that Yen LIBOR or Euroyen TIBOR fixings would not impact his own positions.

In making requests, the Senior Yen Trader at times identified the tenor and/or direction for which he sought assistance, using terms such as "low 1m" (indicating that he wanted a low submission for the Yen LIBOR one-month tenor submission), "high 3m" (for the three-month Yen LIBOR submission) or "unchanged." Often, the Senior Yen Trader's requests focused on key benchmark rate fixing dates for his swap transactions around the IMM dates (quarterly settlement dates in March, June, September and December) or the turn of the calendar year. The requests were so common that the Senior Yen Trader sometimes merely asked for the "usual axe on libors," meaning his typical requests. Certain Trader-Submitters also understood that the Senior Yen Trader had a "standing order," meaning the Senior Yen Trader had a preference for a higher or lower submission and that this preference remained in operation for a period of several days. Moreover, the Trader-Submitters sometimes initiated contact with the Senior Yen Trader to see if he needed any adjustments made to the Yen LIBOR submissions.

The Trader-Submitters regularly accommodated the Senior Yen Trader's requests. In fact, one Yen Trader-Submitter indicated that he would at times adjust his submissions by up to several basis points to accommodate the requests of the Senior Yen Trader. The requests and accommodations occurred on a regular basis even after UBS had received the CFTC Division of Enforcement's demand in October 2008 for information and documents relating to UBS's U.S. Dollar LIBOR practices.

The following are a few typical examples of the Senior Yen Trader or other Derivatives Traders, including the Yen Desk Manager, asking in electronic chat rooms for submissions and the Trader-Submitters readily acquiescing, including an early request made soon after the Senior Yen Trader began to trade for UBS:

November 14, 2006: (Emphasis added.)[13]
> Senior Yen Trader: "hi … who sets our libors?"
> Senior Yen Trader-Submitter: "me (or the guy in zurich) we use the cash to derive them"
> Senior Yen Trader: "ok cld really do w 6m up pls if poss …"
> Senior Yen Trader-Submitter: "we been on the high side for aw hile"
> Senior Yen Trader: "or on the fair side"
> Senior Yen Trader-Submitter: "fair side .. exactly my thoughts but **will give it an extra notch today**"
> Senior Yen Trader: "cheers most of my fixing roll off on friday for 4 days or so thanks for that"
> Senior Yen Trader-Submitter: "no prob"

---

[13] The communications quoted in this Order contain shorthand trader language and many typographical errors. The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

December 5, 2006:  (Emphasis added.)
>  Senior Yen Trader:  "tibors still low  the question is which will move first cash or futures?'
>  Senior Yen Trader-Submitter:  "yes, trying to push those up a bit without affecting libors but not sure it'll work  re what's first - thought about it y'day after u brought it up...think odds are for fixings to move cause it's them being wrong"
>  Senior Yen Trader:  **"yes have lots of 1m fixes up till imm so am trying to hold 1m down!"**
>  Senior Yen Trader-Submitter:  "we not touching 1mos tibor  1mos libor we keep lower  and try to up 2mos tib & out ..."
>  Senior Yen Trader:  "thanks for that"

February 8, 2007:
>  Senior Yen Trader:  "hi [Senior Yen Trader-Submitter] could really do with a low 1m over the next few days as have 17.5m fixings if ok with you?"
>  Senior Yen Trader-Submitter:  "np"
>  Senior Yen Trader:  "thx guess you'll be trying to get 3m down for l/t [*i.e.*, libor/tibor] as well?"
>  Senior Yen Trader-Submitter:  "unless u specicy otherwise  i will have 1 and 3mos low."
>  Senior Yen Trader:  "yes am all out of 3m but am long l/t like you  so suits both of us."

March 16, 2007:
>  Senior Yen Trader:  "strange request i know but can we go for a high 6m fix but a low 7m fix pls"
>  Senior Yen Trader-Submitter:  "7mos .... sep turn ?"
>  Senior Yen Trader:  "have a big interp fix today between 6m and 7m offset by straight 6m"
>  Senior Yen Trader-Submitter:  "but can be done"
>  Senior Yen Trader:  "if suits, assume you don't have a 7m fix? :)"
>  Senior Yen Trader-Submitter:  ":-)"

February 4, 2008:
>  Yen Trader 1:  "Hi ..... My name is [Yen Trader 1] and I work with [Senior Yen Trader] in Tokyo. [Senior Yen Trader] (in Sydney) asked me to ask you, if it is possible that you could kindly set 1mL and 3mL higher."

December 24, 2008:
>  Yen Trader 2:  "Can we pls go for lower Libors tonight, across all tenors (1 m 3m and 6m)  much appreciated"
>  Yen Trader-Submitter 1:  "Will do"

July 24, 2009:
>  Senior Yen Trader:  "[Senior Yen Trader-Submitter] talking again about lowering 3m tibor  please can you head it off ... is that sorted ...?"

14

> Yen Desk Manager: "yep."
> Senior Yen Trader: "thx"
> Yen Desk Manager: "all ok on the fix?"
> Senior Yen Trader: "y"

The Senior Yen Trader sometimes emphasized to the Trader-Submitters when one of his requests was particularly important, such as by saying he had a "big fix" or even a "massive fix." At times, the Senior Yen Trader was more specific, quantifying the potential benefit to the Derivatives Traders' position: "have 385b 6m fix today. so really need it low… half a point is 10m jpy!" As the Senior Yen Trader once exclaimed to the Senior Yen Trader-Submitter: **"I live and die by these libors, even dream about them."** (Emphasis added).

*Reconciliation of Conflicting Internal Trading Positions.*

To ensure that the Trader-Submitters implemented his requests, the Senior Yen Trader was careful not to cause a conflict with the Trader-Submitters' trading positions. At times, the Senior Yen Trader asked the Trader-Submitters whether his request would help or hurt the latter's derivative positions. For example, in the following chat, the Senior Yen Trader's request served both of their interests:

> January 31, 2007: (Emphasis added.)
> Senior Yen Trader-Submitter: "…as we move into February, we'll struggle a bit on keeping the 3mos fixings high we need t/l back into +ve area well positive"
> Senior Yen Trader: "sure i have my last big 3m fix on feb 6th is that ok? can we last till then?"
> Senior Yen Trader-Submitter: "that's fine…no prob keeping it up till then"
> Senior Yen Trader: "after that am mixed on 3m need 6m high tho, are you worried about 6m l/t?"
> Senior Yen Trader-Submitter: "not at this stage"
> Senior Yen Trader: "ok i am v long 3m l/t too so suits"
> Senior Yen Trader-Submitter: *"one happy family then :-)"*

However, sometimes the Trader-Submitters' own derivatives positions stood to suffer if they accommodated the Senior Yen Trader's request. To manage that problem and make sure his preferred submissions were made, the Senior Yen Trader would enter into a separate transaction with the Trader-Submitter that would help offset any negative impact on the Trader-Submitter's position from a submission that was made to benefit the Senior Yen Trader's position. Such a solution was the subject of the following chats:

> November 17, 2006: (Emphasis added.)
> Senior Yen Trader: "thx for libor y/day i have 25m of fixes in 6m the next few days so any help gratefully received, **if you are the other way round at all let me know and we can try to do what we did y/day which worked out well for both of us!"**

15

Senior Yen Trader-Submitter: "mrng mate it did work indeed your man for the next few days is [Yen Trader-Submitter 2] the guy coming from Zurich to cover while i'm on leave will pass it on re fixings"

Senior Yen Trader: "thanks for that"

Senior Yen Trader-Submitter: "good chance we're same way round on most days"

Senior Yen Trader: "yes i seem to be long 6m libor till next thursday then i'm quite clean thereafter"

Senior Yen Trader-Submitter: "noted"

February 23, 2007: (Emphasis added.)

Senior Yen Trader: "**hi do you have any 6m fixes today? if not can we set low today pls along with 1m and 3m!**"

Senior Yen Trader- Submitter: "**think i got some fixings, actually** let me check which way round they r **i'm long a 6m fra 50 yds ntg 3s**"

Senior Yen Trader: "**ok where do you see 6m today unch? ie you need 6m high?**"

Senior Yen Trader-Submitter: "**a higher fixing gwould suit me let's see if i can sell it in mkt today ...**"

Senior Yen Trader: "**which wd be your mid**"

Senior Yen Trader- Submitter: "**seeing it L +0.5 from y'day so .70125 for today ?**"

Senior Yen Trader: "**if i can get the .7 bid i'll deal then write a tck with you at .70125? 50b?**"

Senior Yen Trader- Submitter: "**50 yds. ... dun worry abt the 0.125**"

Senior Yen Trader: "**no appreciate the help so happy to write it there...**"

Senior Yen Trader-Submitter: "**FRA or SPS [single period swap]?**"

Senior Yen Trader: "**whatever suits**"

Senior Yen Trader- Submitter: "**FRA then pls i'll send the ticket**"

Senior Yen Trader: "**ta**"

Senior Yen Trader- Submitter: "**tnx ... low fixing it is then low 1,3,6 mos**"

Senior Yen Trader: "**ta**"

*The Senior Yen Trader-Submitter's Knowledge that the Conduct Was Improper*

From the outset, the Senior Yen Trader-Submitter knew that requests to alter Yen LIBOR or Euroyen TIBOR were inappropriate and could impact the ultimate Yen LIBOR and Euroyen TIBOR fixings. Shortly after the Senior Yen Trader joined UBS in the last quarter of 2006 and started making his requests, the Senior Yen Trader-Submitter recognized that his submissions on behalf of the Senior Yen Trader were false and would be difficult to justify or explain, absent the influence of the Senior Yen Trader.

November 8, 2006:

Senior Yen Trader: "have put some pressure on a few people i know to get libors up today, mailnly 6m as i am paid that one, let me know if that doesn't suit or if

16

there are any particularly you need up. ... only did a few 1yr trades, wish i'd done a lot more now!"

Senior Yen Trader-Submitter: "thanks mate...wouldnt mind fixings all backup but not due to positions, rather to get things back in line with reality there shud be an obligation to deal oñ those fixings"

Senior Yen Trader: "yes that will be the day!"

February 27, 2007: (Emphasis added.)

Senior Yen Trader: "hi ... can we go low 1m and 3m again pls"

Senior Yen Trader-Submitter: "we'll try...**but there's a limit on to how much [w]e can shade it i.e. we still have to be within an explainable range**"

March 29, 2007: (Emphasis added.)

Senior Yen Trader: "hi ... can we go low 3m and 6m pls? 3m esp."

Senior Yen Trader-Submitter: "ok"

Senior Yen Trader: "... FYI [Yen Banks A, B, C, D] are setting .66 and [Yen Bank E] .67 what are we going to set? got tols cash was 64/62 in 3m?"

Senior Yen Trader-Submitter: "too early to say yet ... prob .69 would be our unbiased contribution"

Senior Yen Trader: "ok wd really help if we cld keep 3m low pls"

Senior Yen Trader-Submitter: "think [Yen Bank D] paying .6675 / [Yen Bank B] 66.25 bid out there as i said before - i dun mind helping on your fixings, **but i'm not setting libor 7bp away from the truth i'll get ubs banned if i do that, no interest in that**"

Senior Yen Trader: "ok obviousl;y no int in that happening either not asking for it to be 7bp from reality anyway any help appreciated"

On one occasion, the Senior Yen Trader-Submitter even commented to the Senior Yen Trader about feeling sorry for those traders whose trades are based on "'fair' fixings.'"

### *UBS's Collusion with Other Banks and Interdealer Brokers*

The Senior Yen Trader augmented his internal efforts to manipulate Yen LIBOR and, on occasion, Euroyen TIBOR for multiple tenors by coordinating with derivative traders at other panel banks and by using interdealer brokers who intermediated Yen transactions to influence, directly or indirectly, submitters at other panel banks. Thus, the Senior Yen Trader wanted to better exploit the averaging methodology used to calculate fixings by increasing the likelihood that more than one corrupted submission would be included in, or could impact, the official daily fixing of Yen LIBOR and Euroyen TIBOR.

### *Collusion with Other Panel Banks*

As with his internal requests, the Senior Yen Trader began coordinating regularly with derivatives traders at other panel banks by January 2007. The Senior Yen Trader coordinated with traders primarily at four panel banks whom he knew or had worked with previously. The

Senior Yen Trader, or others acting on his behalf, made about 100 requests of traders at the other panel banks.

The Senior Yen Trader generally made requests of the other banks' traders, who regularly agreed to pass his requests to their Yen LIBOR or, on occasion, Euroyen TIBOR submitters. The Senior Yen Trader also made requests directly of the submitter of at least one bank. The other traders often conveyed success with comments such as, "done" and "we normally do well for u!!!"

For their own manipulative purposes of benefiting their derivatives trading positions, certain of the derivatives traders at the other banks sought reciprocating assistance from the Senior Yen Trader to make requests on their behalf to UBS's submitters. The Senior Yen Trader readily agreed to help the other traders. In fact, he often encouraged them to ask for help as a way to curry favor and ensure his requests were accommodated.

The following small sampling of the numerous communications between the Senior Yen Trader and derivatives traders at the other panel banks reveal:

- o descriptions of the Senior Yen trader's strategy and his success in keeping rates "artificially high;"

- o how, as with the internal requests, the Senior Yen Trader pressed traders at the other banks for assistance particularly on key fixing dates around the IMM dates or the turn of the calendar year;

- o how routine the requests were and how the traders believed that LIBOR was vulnerable to manipulation at their whim and for their benefit;

- o that the requests covered a number of days of LIBOR submissions at times, such that one request could result in multiple days of false LIBOR submissions potentially affecting the fixing for the same period;

- o the pressure the Senior Yen Trader felt to keep making money for UBS; and

- o that the traders believed that they succeeded at times.

January 19, 2007: (Emphasis added.)
Senior Yen Trader: "hi [...], **bit cheeky but** if you know who sets your libors and you aren't the other way I have **some absolutely massive 3m fixes the next few days and would really appreciate a high 3m fix,** [Yen Bank C] were one of the lowest y/day at .51. **Anytime i can return the favour let me know as the guys here are pretty accomodating to me..."**
Yen Bank C Trader: "I will try my best, but really fed up with my guys, wanted a high 6m yesterday, but came in really low (our guys one of the main culprits) - got quite badly hit on that."
Senior Yen Trader: **"you and me both, you need 6m high? if so will get my guys to set high for you today, yesterday they set 3m up at 57 for me!"**

Yen Bank C Trader: "got nothing significant for next 7 days - so will try to get high for you - just really gutted about yesterday cost me a lot."

February 2, 2007: (Emphasis added.)
Senior Yen Trader: "if not the spread may fix round 15 at the worst, **but 3m libor is too high cause i have kept it artificially high**"
Yen Bank B Trader 1: "**how?**"
Senior Yen Trader: "**being mates with the cash desks, [Yen Bank C] and i always help each other out too**"
Yen Bank B Trader 1: "ok thats useful to know so i assume come 1s4s it will be soft"
Senior Yen Trader: "well i am long libor in 1v4m so will try to keep high then but basically is 1bp too high right now adn come may i'll get it 1bp too low net net a 2bp swing in the fix"
Yen Bank B Trader 1: "**good man**"

February 15, 2007: (Emphasis added.)
Yen Bank B Trader 1: "u heard where this 1 mth libor is being called"
Senior Yen Trader: "yes doing everthing i can to keep it low aiming for .47 fix or better ... **i have lost about 1m usd in the last 3m on crap 1m fixes** will try too keep low"
Yen Bank B Trader 1: "me too but our cash guy is not here today so [Yen Bank B Submitter] will be putting them in and he wants a high 3s..."
Senior Yen Trader: "**GREAT !!! what about 1m? can you ask him to keep that really low? wd really help me**"
Yen Bank B Trader 1: "**i did but he will put it wherever suits his and [Yen Bank B Trader 2]'s book and i think they have paid all these spreads !! ... how many people can u get to put this 1m libor low**"
Senior Yen Trader: "**well us [Yen Bank C] and a few others i think**"

April 20, 2007: (Emphasis added.)
Senior Yen Trader: "**i know i only talk to you when i need something but if you could ask your guys to keep 3m low wd be massive help as long as it doesn't interfere with your stuff tx in advance ...** mate did you manage to spk to your cash boys?"
Yen Bank B Trader 1: "yes u owe me they are going 65 and 71"
Senior Yen Trader: "thx mate yes i do **in fact i owe you big time** mater they set 64! **thats beyond the call of duty!**"

June 29, 2007: (Emphasis added.)
Yen Bank B Trader 1: "yeah sorry the usual guy is not here at the moment the trainee is doing it **we normally do well for u !!!**"
Senior Yen Trader: "**no worries mate, if you could go high from monday for next week that wld be graet as i have 1.5t notional fixings in 6m next week! ie 75m jpy a point**"
Yen Bank B Trader 1: "wow ok then"

19

November 1, 2007: (Emphasis added.)
    <u>Senior Yen Trader</u>: "hello mate, real big favour to ask. could you try for low 6m fix today pls wld be most appreciated. thx mate"
    <u>Yen Bank B Trader 1</u>: "will try my best dude hows u ??"
    <u>Senior Yen Trader</u>: "ok, trading like an idiot today, to be honest just want to take some risk off my book before i come back in dec, **have had ok year but management still pushing me for more, have huge 6m fix** so if you could help out today would really really really appreciate it! how are you?"

September 18, 2008: (Emphasis added.)
    <u>Senior Yen Trader</u>: "you got any ax on 6m fix tonight?"
    <u>Yen Bank F Trader-Submitter</u>: "absoluetly none but i can help"
    <u>Senior Yen Trader</u>: "**can you set low as a favour for me?**"
    <u>Yen Bank F Trader-Submitter</u>: "**done**"
    <u>Senior Yen Trader</u>: "**i'll return favour when i can** just ask have 75m m jpy a bp tonight"
    <u>Yen Bank F Trader-Submitter</u>: "np"
    <u>Senior Yen Trader</u>: "thanks so much"

*Coordination with Interdealer Brokers to Manipulate Yen LIBOR*

From the outset of his employment with UBS, the Senior Yen Trader also coordinated on almost a daily basis with several interdealer brokers employed by at least five different brokerage firms to try to impact the Yen LIBOR and, on occasion, Euroyen TIBOR submissions of other panel banks. The Senior Yen Trader asked the interdealer brokers to utilize various means of influencing the other panel banks, including by asking the brokers to: (i) disseminate false "run-throughs" of suggested Yen LIBORs to many, if not all, of the panel banks; (ii) contact directly other bank submitters; (iii) publish false market cash rates over certain dedicated electronic screens available to clients; and (iv) "spoof" or make fake bids and offers. As set forth below, in exchange for their help, the Senior Yen Trader saw to it that the brokers were compensated in various ways such as by directing to brokers commission-generating business including "wash trades," and even by having UBS structure fees to carve out cash bonuses for brokers. He also kept them in line by sometimes threatening to move his considerable volume of business to another broker. During this period of late 2006 to late 2009, the Senior Yen Trader made approximately 1,200 such requests to brokers.

Interdealer brokers, sometimes known as voice brokers, act as intermediaries between buyers and sellers in the money markets and derivatives markets. The brokers match buyers and sellers in return for commissions, and also can be an important source of market information for banks. Typically, commissions are based on a percentage of the notional value of consummated transactions, which means that brokers get paid more by brokering larger trades. Within a brokerage firm, there are brokers for different currencies who intermediate derivatives transactions ("Derivatives Brokers") and brokers who intermediate cash transactions ("Cash Brokers"). In order to find matching counterparties, brokers provide bid or offer prices for a financial transaction. Those prices are conveyed in multiple ways. Brokers use "squawk boxes,"

which are speakerphones that can speak simultaneously to numerous trading desks of their bank clients at once, to broadly disseminate bid and offer prices. Brokers also frequently use Bloomberg instant message chats and other messaging platforms, email, and dedicated telephone lines.

Interdealer brokers provide bank traders their views on pricing and market trends, known as "market color," and the banks rely on brokers for such information. For example, some brokers circulate each morning daily "run-throughs" of the actual rates they expect to be published for key benchmark interest rates that day, such as LIBOR in various currencies and tenors. Some also share such information directly with benchmark interest rate submitters by telephone.

Through the brokers, the Senior Yen Trader was able to influence potentially all of the other fifteen banks on the Yen LIBOR panel. Even unwitting submitters at panel banks that tried to make benchmark interest rate submissions that reflected their honest assessment of the costs of borrowing funds may have had their submissions improperly influenced because they relied upon the brokers' purported unbiased market information. Reflective of the importance of the brokers in his scheme, the Senior Yen Trader heralded certain of the brokers with such laudatory terms as "Hero" and "SUPERMAN."

Generally, the Senior Yen Trader contacted Derivatives Brokers with unlawful requests for beneficial rates, who would then convey the requests to and pressure their Cash Broker colleagues to implement the Senior Yen Trader's requests by going to other panel banks.[14] Because this was such a standard practice and the brokers were eager to retain UBS's business, the brokers anticipated or even solicited the Senior Yen Trader's requests at times.

The following are examples of typical communications between the Senior Yen Trader and the brokers, indicating how Derivatives Brokers pressured Cash Brokers to make sure the wishes of the Senior Yen Trader were met, that the Senior Yen Trader often wanted the requests to stay in place over a number of days or weeks, and that the Senior Yen Trader recognized when the brokers had accommodated him.

September 10, 2007: (Emphasis added.)
Senior Yen Trader: **"once again thx libors"**
Derivatives Broker A1: "no problem just starting to worry about how i am going to push them lower next week!!"
Senior Yen Trader: "no just leave em high need high at start of oct"
Derivatives Broker A1: "ok mate"
Senior Yen Trader: "then we can make a push for lower fixes"
Derivatives Broker A1: "gotcha ...**just give me a 'wish list' at the start of each day and i will compose a beeging letter to [Cash Broker A] after lunch."**

---

[14]  At one such brokerage firm, the Derivatives Broker was also the Cash Broker.

> Senior Yen Trader: "ok thx mate.one thing which i don't think you can do is push them one then the other way need to be consistent ie alll lower every day or vice versa"
>
> Derivatives Broker A1: "no smalls maybe but you are better looking at the bigger picture and basing your requests on the macro outlook rather than the micro :-)"[15]

May 29, 2008: (Emphasis added.)
> Derivatives Broker A1: "if [Senior Yen Trader-Submitter] his marking his 0/6's there you are going to have to work hard on his libor sets......if [Cash Broker A] is doing his best to get them low and your own bank fixes high!"
>
> Senior Yen Trader: "i knoww mate we are holding 6m but bring 3m down"
>
> Derivatives Broker A1: "...[Cash Broker A] has knocked 3m down small **(already v low and says if it goes any further he will lose credibility)** and 6m down another 1/2bp"

February 9, 2009: (Emphasis added.)
> Senior Yen Trader: "do you know your cash desk? ie the guy who covers yen on your cash desk"
>
> Derivatives Broker C/D 1:[16] "yes mate i do"
>
> Senior Yen Trader: "right from now on I need you to **ask him a favour on the fixes  i will make sure it comes back to you  i alrteady do it with [Brokerage A]** basically can you ask him to broke 3m cash ie libor lower for me today  **i will look after you off the back of it i do that for [Brokerage B] too** so emphasise the importance to you  just suggest it looks a little softer to his accounts"
>
> Derivatives Broker C/D 1: "ok mate I understand i will go and speak to him"
>
> Senior Yen Trader: "stuff like that  thanks mate  is very important to me today"
>
> Derivatives Broker C/D 1: "**just spoke to them and they are on the case**"
>
> Senior Yen Trader: "**ok mate much appreciated  if we do this going forwards it will come back to you in spades did you emphasise the importance?**"
>
> Derivatives Broker C/D 1: "i did"
>
> Senior Yen Trader: "ta"

*Using False "Run-Throughs" of Predicted Yen LIBORs*

The Senior Yen Trader repeatedly had at least one broker distribute false Yen LIBOR predictions that were skewed to benefit the Senior Yen Trader's derivatives trading positions by

---

[15]  To avoid detection, the Senior Yen Trader and at least one broker used code words at times. But undermining their efforts to conceal, they blatantly discussed the need to use code words in electronic chats.  In late 2007, Brokerage A told the Senior Yen Trader that they both needed to "be a little more subtle in [their] views" and his emails "needed to be worded more carefully." The Senior Yen Trader and Derivatives Broker A1 decided to use code words to mask the requests by using words such as "political correctness," "arbitrage," "arb," or "arbi."  Despite the agreed-upon code words, as evidenced above, for the most part the UBS Senior Yen Trader spoke plainly about his desire to manipulate rates.

[16]  During the course of the Senior Yen Trader's employment at UBS, Derivatives Broker C/D 1 moved from Brokerage C to Brokerage D, where he continued to broker the Senior Yen Trader's transactions and assist him in his manipulative schemes.

means of lists known as "run-throughs" that brokers would send to numerous, if not all, of the Yen LIBOR panel banks. As a service, cash brokers at the brokerage firms disseminated daily run-throughs to inform the banks of trading ranges observed by brokers for certain types of Yen transactions over the prior 24 hours as well as Yen LIBOR fixings anticipated or "suggested" by the brokers. These broker predictions became increasingly influential during the financial crisis that commenced in August 2007, as discussed *infra*, when the number of observable interbank transactions diminished. At least several panel banks relied on the run-throughs for making their Yen LIBOR submissions and, at times, some banks simply submitted the very rates suggested by the brokers. The Senior Yen Trader knew that panel bank submitters frequently used broker-suggested rates in making their own Yen LIBOR submissions.

To exploit the run-through process to his advantage, the Senior Yen Trader regularly asked that Brokerage A's run-throughs reflect "suggested rates" that would benefit the Senior Yen Trader's position. He communicated with Derivatives Broker A1, who then conveyed the request to Cash Broker A, intending for the rest of the panel banks to follow Cash Broker A's suggestions. Derivatives Broker A1 typically confirmed back that he had sent the request on to Cash Broker A. The Derivatives Broker A1 often made such comments as:

- o "i'll get [Cash Broker A] to send what we need and we will just have to hope they follow his lead;"

- o "yes he knows what we need need..thats where he reckons they will come in though even with his massaging;" and

- o "[Cash Broker A] sending out higher than he thinks so **hopefully the sheep will just copy**." (Emphasis added.)

The Senior Yen Trader frequently succeeded in getting Brokerage A to send false LIBOR predictions, and sometimes even to change already distributed run-throughs to his advantage. For example, on June 28, 2007, Cash Broker A had already sent his daily run-throughs with six-month Yen LIBOR "suggested" at a rate of 0.86. Derivatives Broker A1 pressured Brokerage A management to have the run-throughs re-sent with a higher six-month rate, 0.865, that was more skewed toward the Senior Yen Trader, along with the added instruction that Cash Broker A "get his banks setting high." Derivatives Broker A1 emphasized that "[Senior Yen Trader] is not happy." Cash Broker A dutifully re-sent his "suggested Libors" with six-month Yen LIBOR set at 0.865, as demanded.

In another similar example, on September 4, 2007, the Senior Yen Trader and Derivatives Broker Trader A1 discussed the need to send a revised "run-through," which Brokerage A management accommodated:

Derivatives Broker A1: "[Cash Broker A's] libors 1m 81...3m unchanged (though he says the yen bids are still very high for $)...6mos unchanged you ought to be able to help yourself in 3mos, [Senior Yen Trader-Submitter] moved down from 99 to 96 yetserday and in 6mos if you want that higher..."

Senior Yen Trader: "...**can we try to get 6m up today pls mate**"

Derivatives Broker A1: "think flat will be the best looking at the cash rates but **will ask [Cash Broker A] to send out another run higher**"
Senior Yen Trader: "thx."
(Emphasis added.)
******
Derivatives Broker A1: "try and get [Cash Broker A] to send out a revised libor run with 3m and 6m higher please ...."
Brokerage A Yen Manager: "will do...**on the back of his revised libors, sent at your request** but he thinks it might be nearer 107 than 106"
(Emphasis added.)

In statements made to the Senior Yen Trader, Derivatives Broker A1 often claimed success in getting panel banks to contribute advantageous submissions to the Yen LIBOR panel:

o "...[Cash Broker A] has been doing a number on some of the contributors because a couple of them were edging their libors slightly lower yesterday before he intervened;"

o "morning mate...seems [Cash Broker A's] cover does have some influence, people actually took notice of his 87 libor! will be back on his case again today;"

o "i hope that 6m libor has got me back in your good books!! used all my powers of persuasion on that one;-) .. think [Yen Banks G and H] must have looked at [Cash Broker A's] first suggestion....they both moved up 11bps to 1.10;" and

o "you have a really big fix tonight i believe? if [Cash Broker A] sends out 6m at a more realistic level than 1.10 i reckon [Yen Banks G and H] will parrot him, it might mean 6m coming down a bit."

*Using Interdealer Brokers to Help Pressure Other Banks*

The Senior Yen Trader routinely requested that the brokers use their bank relationships to help pressure banks to make submissions in his favor. Set forth below are examples of communications within brokers or between brokers and the Senior Yen Trader concerning their respective efforts with specific banks. The discussions reveal how the Senior Yen Trader and the brokers worked together as a team to ensure that he got the rates he wanted.

September 4, 2007:
Derivatives Broker A1: "hi mate,see you dropped your 3m and 6m libors yesterday making you one of the lowest fixers!!"
Senior Yen Trader: "...ok i'll have a word on 3m they are getting pressure from above"
Derivatives Broker A1: "...you are just about the lowest now"
Senior Yen Trader: "yes i know....[Yen Bank B] shifted down 5bp too will ask [Yen Bank B Trader 1] if he can do me a favour with a high fix"
Derivatives Broker A1: "ok i'll see if [Yen Bank B Submitter] is doing libors at the mom,he never seems too bothered...though not sure he is"
Senior Yen Trader: "thx"

November 1, 2007: (Derivatives Broker A1 to Brokerage A Yen Manager)

> Derivatives Broker A1: "[Senior Yen Trader] WOULD LIKE YOU TO ASK [Yen Bank B Submitter] (Yen Bank B) IF HE'S NOT FUSSED TO TRY AND KNOCK HIS LIBOR A BIT LOWER.   HE HAS SOLD A LOAD OF 1Y WITH ME TODAY AND HE HAS A LOT OF FIXE S COMING UP.   THANKS."

February 26, 2009: (Emphasis added.)

> Senior Yen Trader: "right mate i really need 2 things 1 low 3m 2 high 6m i know 1m goes over turn but try to keep that down too pls high 6m is v v v important"
>
> Derivatives Broker B1: "high 6s ok mate let me bid that up and ill have another word **i did get couple people to change em in 3s yesterday** but that tossser ay [Yen Bank I] put em up im sure he did such an a holen he is."

March 19, 2009: (Emphasis added.)

> Senior Yen Trader: "need low everything pls try really hard to get [Yen Bank J] down"
>
> Derivatives Broker B1: "ok did he put them down yesterday ?"
>
> Senior Yen Trader: "nah same"
>
> Derivatives Broker B1: "ok"
>
> Senior Yen Trader: "[Yen Bank I] too for 3m the people are [Yen Bank I] at 63 [Yen Bank J] 62 [Yen Bank H] 62 [Yen Bank B] 62 [Yen Bank K] 63 he def should be lower [Yen Bank A] 62 [Yen Bank G] 63 **all those we can get down to 60 or 61…**"
>
> Senior Yen Trader: "ok try for [Yen Panel Bank J] and the Japanese [panel banks] and [Yen Bank I] as priority pls"
>
> Derivatives Broker B1: "kkk"
>
> Senior Yen Trader: ""thx…pls push really hard."
>
> Derivatives Broker B1: "**yes already had a word with a couple of them** [Yen Bank J] n [Yen Bank B] said they should be lower workin on [Yen Bank A] n [Yen Bank K]"
>
> Senior Yen Trader: "ta."

March 23, 2009: (Sent as a blind message simultaneously to Derivatives Broker B1 and Derivatives Broker C/D 1.)

> Senior Yen Trader: "Hi need LOW 3m and 1m HIGH 6M, 3m is most important [Yen Bank A] and [Yen Bank K] both setting 62 they should be lower [Yen Bank A] is setting lower in 3m tibor [Yen Banks I, H and G] both at 62 , they can go to 61? For 6m push for higher thanks"

March 31, 2009:

> Senior Yen Trader: "mate we have to get 1m and 3m down 1m barely fell yesterday real important"
>
> Derivatives Broker C/D 1: "yeah ok"

> Senior Yen Trader: "banks to have a go w in 1m are   [Yen Banks A, I, D, H, L, C, B, K and G]  pls"
> Derivatives Broker C/D 1: "got it mate"

*Publishing False Market Rates to Panel Banks on Broker Screens*

The Senior Yen Trader asked certain brokers to falsify the purported prevailing market rates that brokers displayed on electronic screens made available to clients, such as the panel banks. The screens were intended to show prices of actual cash or derivatives trades, which panel banks then could take into consideration in determining Yen LIBOR submissions. The Senior Yen Trader wanted brokers to report false prices on the screens in an effort to skew other banks' Yen LIBOR submissions. Because these screens were available to several, if not all, of the panel bank members and the submitters used this information at times in determining submissions, dissemination of false market rates had the potential of improperly influencing many of the Yen LIBOR submissions on any given day.

Below are examples of Derivatives Broker A1 and the Senior Yen Trader discussing how Derivatives Broker A1 would falsify the screen rates to assist the Senior Yen Trader's fraudulent influence on other panel bank submissions:

> September 15, 2008:  (Emphasis added.)
> Senior Yen Trader: "hi mate i am going to be super busy, **can you do me a favour and keep the 1yr screen as low as reasonably possible…libors were good.**"
> Derivatives Broker A1:  **"OK MATE NO WORRIES WILL DO ALL I CAN….SAW THE LIBORS, GOOD NEWS"**

> June 3, 2009:  (Emphasis added.)
> Senior Yen Trader: "**can you get the swasp [swaps] on the screen all lower 1y18m2y3y…**"
> Derivatives Broker A1:  "…**will move the screen as the futures open** , you lioke low everything?"

*"Spoofing:" Publication of False Bids and Offers*

The Senior Yen Trader also asked certain brokers to post false bids and offers for cash trades to further disseminate false pricing information to the market and other Yen panel banks and thereby benefit his positions. This is sometimes known as "spoofing the market." Cash and Derivatives Brokers, as intermediaries in the market, disseminate bids and offers they receive from clients, in search of counterparties. As the Senior Yen Trader knew, panel banks took these bids and offers into consideration when determining their submissions because they help measure borrowing costs. Seeking to exploit that process for his own benefit, the Senior Yen Trader encouraged brokers to provide false bids and offers to certain Yen LIBOR submitters to influence their submissions. For example:

July 7, 2008: (Emphasis added.)
> Senior Yen Rates Trader: "**1m libor is causing me a real headache ..** i need it to start coming lower"
> Derivatives Broker B1: "yeah i know mate … **ill try and push a few fictitious offers** and this mng see if tahts helps"

March 30, 2009: (Emphasis added.)
> Senior Yen Trader: "i REALLY REALLY need 1m down to 35 and 3m down to 59 6m i'd prefer unchanged … use the turn to push 1m and 3m down as much as you can … but **need 3m lower pls by 2bp or so**"
> Derivatives Broker B1: "ok mate ustd ill get on the case … ok **im gonna get some spoof offers on the baord 1 3s**"
> Senior Yen Trader: "… you working hard for me?"
> Derivatives Broker B1: "sure mate of course i know the rules"

*The Senior Yen Trader Ensured Interdealer Brokers Were Compensated for Assisting the Manipulative Scheme*

Throughout the period, the Senior Yen Trader sought to ensure the cooperation of brokers by compensating them in various ways, from offering drinks and bottles of champagne to steering them additional commission-generating business, to ensuring at least one broker personally received large cash bonuses. The Senior Yen Trader also used his financial leverage with at least one broker for whom UBS generated significant commissions by threatening to cut off UBS's business with the brokerage if the firm did not comply with his requests.

*Extra Trades to Generate Commissions*

The Senior Yen Trader routinely offered brokers at Brokerages B, C and D extra transactions or other business, and thus UBS-paid commissions, to ensure they would provide needed assistance. For example, the Senior Yen Trader told them:

- o "I still owe you some deals;"
- o "we'll do some big tix soon i promise;"
- o "do the bisness and i'll sort you out MASSIVE;"
- o "if you get 3m down you'll get a decent deal from me tomorrow;"
- o "if you manage that for the next 2 weeks you will see the benefits;"
- o "make sure they know that it pays for them to help out;" and
- o "i need to pay .. to give u a trade."

*"Wash" Trades to Generate Commissions*

For at least one of the brokers, the Senior Yen Trader used "wash" or "switch" trades to generate additional commissions in return for the broker's assistance. Generally, a "wash" trade is a pair of offsetting trades that are intended to negate risk or price competition and that result in a financial nullity. The trades, however, generate commissions. For example, on September 18,

27

2008, the Senior Yen Trader offered Derivatives Broker B1 $50,000 or $100,000 or more in commissions for his assistance in the Senior Yen Trader's attempts to manipulate Yen Libor:

> "if you keep 6s unchanged today I will do fucking one humongous deal with you…Like a 50,000 buck deal whatever. I need you to keep it as low as possible …I'll pay you, you know, 50,000 dollars, 100,000 dollars … whatever you want… I'm a man of my word."

Less than a week later, on September 24, 2008, upon the apparent success of Derivatives Broker B1, the Senior Yen Trader used this broker to engage in a series of "wash" trades with several derivatives traders at other panel banks to generate the promised $50,000 in commissions and fees for Derivatives Broker B1. In fact, from September 2008 to August 2009, the Senior Yen Trader used Derivatives Broker B1 to engage in at least eight "wash" trades with various panel banks, generating approximately $286,000 in commissions for Derivatives Broker B1, all as a payoff for the Derivative Broker B1's manipulative efforts on behalf of UBS's Senior Yen Trader.

*UBS Paid a Special Bonus for Cash Broker A*

The Senior Yen Trader steered a significant volume of UBS business to his favored brokers. *i.e.*, those that helped him in the manipulative scheme. For example, he singlehandedly accounted for approximately twenty percent of Brokerage A's Yen Desk's business, making him that desk's biggest client. In return, as described above, Derivatives Broker A1 was one of the Senior Yen Trader's key contacts for his collusive efforts and they worked as a team in the manipulative scheme.

The Senior Yen Trader considered Cash Broker A very effective in the scheme, particularly Cash Broker A's provision of false information via "run-throughs" to influence panel banks. However, at times, Cash Broker A resisted the Senior Yen Trader's requests and complained internally that he was not adequately compensated for his "services" to the Senior Yen Trader.

To maintain Cash Broker A's valuable assistance, the Senior Yen Trader not only encouraged Brokerage A to pay Cash Broker A bonuses, he also secured a special compensation package through UBS to pay Cash Broker A as well as the other individual brokers at Brokerage A who helped the scheme. During the time UBS was renegotiating UBS's fee structure with Brokerage A because of all the business UBS generated for Brokerage A, the Senior Yen Trader lobbied UBS to pay Brokerage A an additional quarterly payment of approximately $27,000 for the "fixing service," amounting to approximately $110,000 annually. The payment was ultimately shared by several other individuals at Brokerage A, with Cash Broker A receiving approximately $9,000 quarterly. This special compensation package was in place for approximately two years totaling more than $216,000.

After securing this special compensation for Brokerage A, the Senior Yen Trader became even more demanding, and expected the brokers at Brokerage A to implement all of his unlawful requests for false Yen LIBOR suggestions and incorporate them into the run-throughs. On occasions when Cash Broker A did not honor such requests, the Senior Yen Trader became

angry and threatened to take away his business. Those threats were taken seriously. The Senior Yen Trader's primary contact there, Derivatives Broker A1, and Brokerage A Yen Manager pressured Cash Broker A to honor the Senior Yen Trader's requests. For example, on June 28, 2007, Cash Broker A resisted sending a revised "run-through" reflecting the Senior Yen Trader's preferred six-month rate. Derivatives Broker A1 and Brokerage A Yen Manager had the following exchange (all caps in original):

> Derivatives Broker A1: "...THIS IS GETTING SERIOUS [Senior Yen Trader] NOT HAPPY WITH THE WAY THINGS ARE PROGRESSING HE IS GOING TO HAVE A WORD WITH [Derivatives Broker E1] TO RECTIFY THE SITUATION. CAN YOU PLEASE GET HOLD OF [Cash Broker A] AND GET HIM TO SEND OUT 6 MOS L IBOR AT 0.865 AND TO GET HIS BANKS SETTING IT HIGH. **THIS IS VERY IMPORTANT BECAUSE HE IS QUESTIONING MY (AND OUR) WORTH.....GET 6MOS HIGH PLEASE."**
> Brokerage A Yen Manager: "mailed him spoke to him, **he realises that the carrot might go if this carries on."**

Ultimately, Cash Broker A sent the demanded revised run-through with the six-month suggested Yen LIBOR at the level requested by the Senior Yen Trader.

### Summer 2009 Schemes: the "Turn Campaign" and "Operation 6M"

Throughout his tenure at UBS, the Senior Yen Trader routinely employed each of his means of manipulation — internal requests, collusion with other panel banks, and coordination with brokers. At times, he used all three means simultaneously for a longer period to achieve his objective. This is illustrated by two long-term efforts from June through August 2009, which were dubbed the "turn campaign" and "operation 6m," respectively.

By June 2009, the Senior Yen Trader had amassed significant positions in Yen interest rate swaps tied to one, three and six-month Yen LIBOR, in spreads between the various tenors of swaps (such as the spread between three-month yen swap and six-month yen swap), and in spreads between swaps tied to Euroyen TIBOR and Yen LIBOR. The Senior Yen Trader's positions became so large at various points that the Senior Yen Trader was close to exceeding internal risk limits imposed by UBS. The largest positions were tied to six-month Yen LIBOR. Rather than entering into legitimate hedging positions that would offset his risk, however, the Senior Yen Trader made two coordinated and sustained pushes, to manipulate the official fixings of six-month Yen LIBOR and Euroyen TIBOR in ways that would benefit his massive positions.

### The Turn Campaign

The Turn Campaign commenced in early June 2009. The Senior Yen Trader's derivatives positions tied to six-month Yen LIBOR were due to reset or mature on June 29, 2009 and would benefit from a high six-month Yen LIBOR. A single basis point move in Yen LIBOR was worth approximately $2 million to him. The Senior Yen Trader coordinated with the UBS Yen Trader-Submitter 1, the primary four brokers he used, and his friend, the Trader-Submitter at Yen Bank F, to try to keep six-month Yen LIBOR high. He explained how they should

accomplish his objective. He quantified and emphasized for them the potential impact on his derivatives trading positions. He encouraged the brokers to push submitters at other panel banks for high six-month Yen LIBOR submissions and to provide "spoof bids" to the market so market participants believed the rates were rising. At times, some of the brokers agreed to enforce the plan by confronting other banks that acted against his interests.

The following are examples of Turn Campaign communications:

June 10, 2009: (Emphasis added.)
    Senior Yen Trader: "LOW 1m LOW 3m HIGH 6m  6m is important today mate **pls spoof bids.**"
    Derivatives Broker B1: "rite ok mate ill make a special effort"

June 12, 2009: (Emphasis added.)
    Senior Yen Trader: "i have such big positions  on monday **i have 1.5m usd a bp 6m fix**  will ask [Yen Bank F Trader/Submitter] for a one day favour  we will move up for one day too"
    Derivatives Broker A2: "i know mate, i'm trying to keep on top of it, if it moves out of line for 10 secs you know i'll see it and pull it back."

June 16, 2009: (Emphasis added.)
    Derivatives Broker A1: "Good morning mate.....,**the "turn campaign" begins today.** Will put an e-mail together at lunchtime to [Cash Broker A]."
    Senior Yen Trader: "thx."

June 17, 2009: (Emphasis added.)
    Senior Yen Trader: "**can you start having chats with your boys about 6m over the turn?** i'd be interested to see what they think it'll go up by  anyway low3, low1m] high 6m"
    Derivatives Broker B1: "ok mate will do"
    Senior Yen Trader: "but to be honest am quite happy with them all unchanged so don't bust a gut  **main thing now is to start planting the seed of the turn just casual chatting you know**"
    Derivatives Broker B1: "yep sure thing mate  ill start having the converstaion with some guys here"
    Senior Yen Trader: "just ask em what they think it'll move by...and **say other people think maybe 3bp ie talk it up lots**"
    Derivatives Broker B1: "yes ok mate understood ill do what i can to help"
    Senior Yen Trader: "**u da man**"
    Derivatives Broker B1: "**aim to please mate**"

June 24, 2009: (Emphasis added.)
    Senior Yen Trader: "6m is huge for me on monday..."
    Derivatives Broker A1: "i have been putting **arbi** pressure on [Cash Broker A] and [Brokerage A Yen Manager]...**would help your cause to also speak to**

[Brokerage A Yen Manager] on friday regarding the turn squeeze and its importance… i will remind you."
Senior Yen Trader: "…thanks i will get [Derivatives Broker B1] on the case too remind me to get in touch with [Yen Bank F Trader-Submitter]."
Derivatives Broker A1: "yeah need to pull out the big guns for this one, don't let [Yen Bank F Trader-Submitter] forget either. :-)es"

June 25, 2009:
Senior Yen Trader: "can you put 6m up on monday when we go through the turn just for a week or so? … you did say you'd try to help me out!"
Yen Bank F Trader-Submitter: "yes have eno fixing untill 06/07 so i can"
Senior Yen Trader: "thanks mate"

June 26, 2009:  (Emphasis added.)
Senior Yen Trader: "pls tell your cash boys i need a high 6m is v v important"
Derivatives Broker C2: "what lvl shall I suggest? .. yesterday's drop was a bit of a shocker (in 6m libor) any idea why that happened? …"
Senior Yen Trader: "2 people moved it 11bp between them"
Derivatives Broker C2: "the check who was it?"
Senior Yen Trader: "[Yen Bank M] and [Yen Bank N]. if you can have a word"
Derivatives Broker C2: "will do mate"

*******

Senior Yen Trader: "i need you to move 6m up for 2 weeks mate…but please move 6m up on monday."
Yen Bank F Trader/Submitter: "understood"
Senior Yen Trader: "thx i need you in the panel on Monday"
Yen Bank F Trader/Submitter: "ok enough"

On the day of the fixing, June 29, 2009, the Senior Yen Trader made one final push to manipulate higher the six-month Yen LIBOR fixing. He confirmed his expectations of a high submission with the UBS Yen Trader-Submitter 1 and Yen Bank F Trader-Submitter. He also ensured that Derivatives Broker A1 would contact each panel bank. They discussed the expected submission by each bank and what strategy Brokerage A would employ to try to get each submission higher to meet Senior Yen Trader's goal, such as a "few spoof bids" or direct urging of the various submitters. The following are excerpts from the numerous conversations the Senior Yen Trader had that day with Yen Bank F Trader-Submitter, UBS Yen Trader-Submitter 1 and the brokers:

June 29, 2009:
Internal Request:  (Emphasis added.)
Senior Yen Trader: "hi….6m cash crosses the year end today we have huge fixings"
Yen Trader-Submitter 1: "indeed"
Senior Yen Trader: "can we set 6m libor high pls?…"
Yen Trader Submitter 1: "…we dont have any fix at mom"

31

> Senior Yen Trader: **"can we go 74 or 75?** we have 2m usd a bp fix for the next week i think a lot of people are going to move it up today well i hope"
> Yen Trader-Submitter 1: "yes sure will. **i go with 0.75 for you."**

> \*\*\*\*\*\*\*

> *External Request to Yen Bank F*: (Emphasis added.)
> Senior Yen Trader: "pls remember 6m today..."
> Yen Bank F Trader-Submitter: "yah no worries...6m libor today good contrib?"
> Senior Yen Trader: **"high pls as high as you can manage we are going 75 anyway whatever you can do** thx."
> Yen Bank F Trader-Submitter: "sure np..."

> \*\*\*\*\*\*\*

> *Request to Broker*: (Emphasis added.)
> Senior Yen Trader: **"ok lets go thru em one by one."**
> Derivatives Broker B1: "sure"
> Senior Yen Trader: "first up try to get all libors up i don't care if 1m and 3m go up too lets go for 3bp on 6m also tibors were up pls use that with the japanese banks"
> Derivatives Broker B1: "ok"
> Senior Yen Trader: **"...make sure [the banks] all know its the turn..."**
> Derivatives Broker B1: "yeah thats needed bevcasuse sometimes poepel forget and set them the same..."
> Senior Yen Trader: "...do your best and i'll sort u out."
> Derivatives Broker B1: "[Yen Bank K] rite i know him he speak to my dolla desk thats where r orders come from ill have a word with him amnd ask to get it up ok mate"
> Senior Yen Trader: "v v v important. pls try extra extra hard mate"
> Derivatives Broker B1: "i will mate i know yu need it."
> Senior Yen Trader: **"ok mate i going in 3m pls pls pls try we are going 75 so is [Yen Bank F]"**
> Derivatives Broker B1: "ok cheers."
> Senior Yen Trader: "get em up mate"
> Derivatives Broker B1: **"ill trying really hard"**

Although the Yen LIBOR fixing began to drop slowly over the month of June 2009, the fixing actually rose by three quarters of a basis point on June 29, as compared to the previous fixing on June 26. UBS increased its submission on June 29 by 3 basis points, and Yen Bank F increased its submission by 6 basis points. Five other banks in the panel, all of which were discussed by the Senior Yen Trader and Derivatives Broker B1 in their planning call on June 29, also increased their submissions two to five basis points.[17] While the move in the fixing was not as great as needed for his positions, the increase was sufficient enough to reduce the losses experienced by the Senior Yen Trader.

---

[17] The Commission finds that other panel banks made submissions that were consistent with the Senior Yen Trader's requests. The Commission does so without addressing whether or not such banks made such submissions as a result of the Senior Yen Trader's requests.

*Operation 6M*

During the Turn Campaign, the Senior Yen Trader began his second effort to push six-month Yen LIBOR high after June, in an effort he dubbed, "Operation 6m." Operation 6m was a campaign by the Senior Yen Trader to manipulate the six-month Yen LIBOR fixing upwards over several weeks through July, and then to cause the six-month Yen LIBOR fixing to drop dramatically in mid-August. The Senior Yen Trader also remained focused on the Euroyen TIBOR fixing, which would impact his derivatives trading positions on the spread between Euroyen TIBOR and Yen LIBOR.

The motivation for this effort was clear. If the Senior Yen Trader was successful in causing an increase to the six-month Yen LIBOR between the end of July and then a drop in the fixing in mid-August, the UBS Yen Desk stood to gain hundreds of millions of dollars.

As with the Turn Campaign, the Senior Yen Trader's key contacts at certain brokerages and his friend Yen Bank F Trader-Submitter were critical to his plan. The Senior Yen Trader emphasized that he was trying to benefit his derivatives trading positions and manage his massive risk position. He explained he was under pressure from UBS to reduce his substantial risk position.

The following are examples of the communications surrounding the beginning of Operation 6m in late June and July.

June 24, 2009: (Emphasis added.)
Derivatives Broker A1: "Morning…, [Yen Bank B] must have had some fixings, not helping"
Senior Yen Trader: **"he on drugs for once i just want them static and they are falling!...pls try to keep 1y low on screen mate yeah i just need thgis 6m gap for 2weeks"**
Derivatives Broker A1: "will do my best mate"
Senior Yen Trader: "then they can all go down hopefully tibor will stay high *operation 6m*."
Derivatives Broker A1: ";-)…"

June 26, 2009:
Senior Yen Trader: "…but for the next 2weeks i really really need you to put 6m higfher"
Yen Bank F Trader-Submitter: "what is the adte just that i know?"
Senior Yen Trader: "july 14…after that i need 6m to crash off like you."
Yen Bank F Trader-Submitter: "that is no problem for me, i do nothing with the cash guys until then, … "
Senior Yen Trader: "… i will then get our 6m way down after july 18th it is
Yen Bank F Trader-Submitter: "ok"
Senior Yen Trader: "and will try to get everyone else down too"

Yen Bank F Trader-Submitter: "when is the lest fixing date?...the last july fixing date??"

Senior Yen Trader: "18th...then i a need low low low...sry 17th...i happy for all libors off after that date...only reason i on bid is i have huge huge position that way  so am happy for to come lower after the 17th"

Yen Bank F Trader-Submitter: "ok enough enopugh..."

July 1, 2009:

Senior Yen Trader: "hi ....  are we planning on moving libors or just going unch?"

Yen Trader- Submitter 1: "i would have gone slightly lower in 6s but if you wish i can leave it unchanged"

Senior Yen Trader: "thx  really need it unch for next 2wk then low as you want"

Yen Trader- Submitter 1: "ok 0.71 unc"

Senior Yen Trader: "ta."

July 7, 2009:  (Emphasis added.)

Senior Yen Trader: "mate u gotta help with [Yen Bank J]"

Derivatives Broker B1: "ill do my best to ask amte ok"

Senior Yen Trader: "pls if he only goes up 2bp that brings em back 0.25   no one will notice"

Derivatives Broker B1: "sure ok mate ill try  ill run him thru a bit higher this mng aswell to try and show it small higher"

Senior Yen Trader: "just bid him some as well  then he can tell his bosses look its bid here  thats all he needs to do say well its bid here and we can't offer it"

Derivatives Broker B1: "ok sure mate i can only ask not tell him as yu know ok"

Senior Yen Trader: "y  but he loves you  mate  he told me."

Derivatives Broker B1: "hahahah rite  ill try and be his friend nomn juts his broker"

July 14, 2009:

Senior Yen Trader to Yen Bank F Trader-Submitter: "...just fyg after eom [end of month] will get 6m down a lot.  we will move from top to bottom and so will [Yen Panel Bank J]"

July 15, 2009:  (Emphasis added.)

Derivatives Broker C/D 1: "... ha ha ok mate i can see you as captain chaos cash still looking a touch easier but nothing much going on arbi are starting to produce bids so hopefully the offers may go back"

Senior Yen Trader: "ok i only need 6m high this month  then you MUST get it lower  a lot lower pls keep 3m and 1m unch."

Derivatives Broker C/D 1: "ok ..."

*Avoiding Conflict with Yen Bank F Trader-Submitter's Interests*

During Operation 6m (and at other times), the Senior Yen Trader offered to enter into trades with Yen Bank F Trader-Submitter to ensure that their respective interests aligned and Yen Bank F Trader would not have a conflict that prevented him from helping the Senior Yen Trader with his attempt to manipulate the Yen LIBOR fixing.[18] The Senior Yen Trader urged Yen Bank F Trader: "tell me what you need to see. i have a vested interest in making sure our fixings match." As he was so concerned that Yen Bank F not make a competing submission, the Senior Yen Trader offered such trades even at prices that were not beneficial to him to entice Yen Bank F Trader-Submitter, and the latter often accepted. For example on July 21, 2009, the Senior Yen Trader outlined his plan, the size of his positions, the need to reduce his risk and how Yen Bank F Trader-Submitter could benefit from an attractive trade:

> Senior Yen Trader:  "i been asked to reduce risk a bit"
> Yen Bank F Trader-Submitter:  "ok"
> Senior Yen Trader:  "i still going for lower 6m next month but position is huge  if you want to do some 1y l/t 1 wld help me on risk limits  obviously i am still very much paid and need a low 6m from next week"
> Yen Bank F Trader-Submitter:  "me paying 1 in 1y?"
> Senior Yen Trader:  "y  i don't want to do it but **risk are going nuts   position is v v big  i told them already 6m will be lower next month  problem is all my 6m fixes this month rolled and i am left too 1 way**  completely up to you  if not i'll give some 3m l/t."
> Yen Bank F Trader-Submitter:  "... does not suit me taht much today need high 6m libor today....."
> Senior Yen Trader:  "same  how about we do 0v6 spot as well?  so no fix today **i just need to keep the risk guys at bay  200b 1y will bring me in limit  i will pay you .665 for 0v6 today in same amount to knock the fix out if you need  i** think it does nothing today  the fix that is  wld be a massive favour…if you do 200b 1y then what net fix are you left with?  i will hedge the balance so you are neutral"
> Yen Bank F Trader-Submitter:  "**can i do 200 and lower my 6m quote?  oor we cross fra up to you mate**"
> Senior Yen Trader:  "**rahter just cross the fra pls**"
> Yen Bank F Trader-Submitter:  "**that is fair  ok we done**"
> Senior Yen Trader:  "thanks"
> (Emphasis added.)

*The Last Phase of Operation 6M*

As Operation 6m moved from the end of July, the Senior Yen Trader shifted his efforts from attempting to increase the six-month Yen LIBOR higher, to ensuring that the fixing would be lower in August to benefit his derivative trading positions that were due to reset in mid-

---

[18]  The Senior Yen Trader offered similar offsetting trades to UBS Trader-Submitters when their positions stood to be negatively impacted by a manipulation that favored the Senior Yen Trader. (see pp. 15-16.)

August. Derivatives Broker A1 advised the Senior Yen Trader to be careful with his efforts and to avoid too obvious changes in the rate. The Senior Yen Trader assured him not to worry, and that he was coordinated with Yen Panel Banks F and J:

> July 22, 2009: (Emphasis added.)
> Senior Yen Trader: "11th aug is the big date  i still have lots of 6m fixings till the 10th"
> Derivatives Broker A1: "christ keeps getting extended  started off as 14th of this month:-)"
> Senior Yen Trader: "i know"
> Derivatives Broker A1: "**if you drop your 6m dramatically on the 11th mate, it will look v fishy, especially if** [Yen Bank J] **and** [Yen Bank F] **go with you  I'd be v careful how you play it,** there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you."
> Senior Yen Trader: "don't worry **will stagger the drops  ie 5bp then 5bp**"
> Derivatives Broker A1: "ok mate, don't want you getting into sh it"
> Senior Yen Trader: "**us then** [Yen Bank F] **then** [Yen Bank J] **then us then** [Yen Bank F] **then** [Yen Bank J]"
> Derivatives Broker A1: "**great the plan is hatched** and sounds sensible"

In August 2009, when the Senior Yen Trader was on an extended absence from the office, he ensured that in his absence the brokers and UBS Yen Trader 2 had instructions on how to attempt to move the six-month Yen LIBOR. Derivatives Broker A1 followed through and worked closely with Yen Trader 2 to accomplish the objectives of the Senior Yen Trader. In his conversations with Yen Trader 2, Derivatives Broker A1 assured him, "I know what you need in terms of libors and will let you know what my cash guru in london honestly feels as to their movements each day....he has his 'arbitrage' instructions!"

In July, the submissions of UBS and Yen Bank F both moved higher consistent with the plan. In August, the submissions of all three banks, UBS, Yen Bank F and Yen Bank J, all moved lower consistent with the plan. By August 11, the day of the Senior Yen Trader's desired ·drop in the fixing, the submissions of all three banks dropped, such that Yen Banks F and J were in the bottom quartile of the submitting banks while UBS was included in the fix calculation. Specifically, from late July through mid-August, UBS's submission fell 12 basis points, and Yen Banks F and J's submissions fell by 14 and 15 basis points, respectively.[19] In contrast, the largest change in any other submitting bank's submission during this time was a drop of eight basis points and the average change among the other thirteen banks was a decrease of about four basis points.

---

[19]  Again the Commission finds that other panel banks made submissions that were consistent with the Senior Yen Trader's requests. The Commission does so without addressing whether or not such banks made such submissions as a result of the Senior Yen Trader's requests.

***UBS Continued Manipulative Conduct Concerning Yen LIBOR and Euroyen TIBOR After the Senior Yen Trader Left UBS***

Traders on UBS's Yen Desk continued, at times, to attempt to manipulate Yen LIBOR and Euroyen TIBOR to benefit UBS's derivatives trading positions after the Senior Yen Trader left UBS in September 2009.[20] These traders utilized some of the same methods — internal requests, use of interdealer brokers and attempts to coordinate with other banks. At least one broker reached out shortly after the Senior Yen Trader's departure to assure a UBS Yen Derivatives Trader that he would continue to help UBS influence how the rates were submitted by other banks. For example, on September 10, 2009, UBS Yen Trader 2 reminded Derivatives Broker A1 that "Monday is the d-day" due to big fixes on swap transactions tied to three and six-month LIBOR, both of which he needed low. Derivatives Broker A1, who by then was deeply experienced with the manipulative scheme, assured the Yen Trader 2 that they could influence the three-month fix, and that the broker stood ready to help:

> "…you realise that you have the ability to influence the 3m fix, you are currently sitting at the upper end of the range. The 6m will have to come down to others as you are already v low…i'll remind you to chase your cash boys as well:-)"

UBS Yen Trader 2 also reached out for help to Derivatives Broker B1, who similarly reassured him that he regularly spoke to at least seven other panel bank submitters and he would try to help Yen Trader 2, if he needed the help.

The UBS Yen Derivatives Traders, on their own and at the direction of the Yen Desk Manager, also on occasion continued to try to manipulate the Yen LIBOR and Euroyen TIBOR through UBS's submissions in order to manage the Senior Yen Trader's positions and minimize UBS's losses as it attempted to trade out of those positions he left behind, or to benefit their own derivatives trading positions. For example:

February 19, 2010:
Yen Trader 3: "need it to not go up in jpy basically unchanged for our libor suggestions pls"
Yen Trader-Submitter 1: "yes especially 6m agreed"

March 23, 2010:
Yen Trader-Submitter 1: "[Yen Trader 2] doesnt really want us to move 6s lib lower as other market players might figure out our posi when we are too extreme. for the mom he suggested to leave it unch. last time i lowered it was when we discussed it a few weeks back. since then always unch fyi"
Yen Trader 3: "ok unch is a good idea"

---

[20]  Prior to the Senior Yen Trader's departure, as he was trying to renegotiate his compensation, at least one UBS manager elevated concerns about the "embarrassing" practices of the Senior Yen Trader to higher level managers. Despite such concerns being elevated, those at UBS who had been unaware of the misconduct made no meaningful efforts to determine whether the Senior Yen Trader had engaged in inappropriate or unlawful behavior.

### e. UBS's Attempts to Manipulate Other LIBOR Currencies and Euribor

Numerous UBS derivatives traders attempted to manipulate the official fixings of LIBORs for currencies other than Yen, including Swiss Franc, Sterling and Euro, and other benchmark interest rates, including Euribor, to benefit their derivatives trading positions.[21] Moreover, the Trader-Submitters for certain benchmark interest rates regularly made submissions to benefit their trading positions. With respect to at least some currencies during certain periods, this occurred on a daily basis.

*Swiss Franc LIBOR*

From at least January 2005 through at least September 2009, on a regular basis, UBS's Swiss Franc Trader-Submitters adjusted UBS's Swiss Franc LIBOR submissions to benefit UBS's trading positions. The Swiss Franc Trader-Submitters' standard practice was to round their Swiss Franc LIBOR submissions by a quarter or a half of a basis point to benefit UBS's net Swiss Franc LIBOR position based on STIR's Swiss Franc trading book and other Swiss Franc LIBOR-related positions that were reported to them. This was known on the desk as the "fixing interest."

The Swiss Franc LIBOR Trader-Submitters also accommodated the requests of other Swiss Franc Derivatives Traders. For example, on July 5, 2006, a Swiss Franc Derivatives Trader told a Swiss Franc Trader-Submitter that he was on the receiving end of a large fixing tied to one-month Swiss Franc LIBOR at the end of July, and, therefore, he wanted a high one-month fixing. The Trader-Submitter agreed to make his submission high, stating that it would not be a problem. Such requests were either in written, in chats, or oral.

*Sterling LIBOR*

From at least November 2007 through at least September 2009, UBS Sterling Derivatives Traders responsible for Sterling LIBOR submissions received at least ninety requests from Derivatives Traders to adjust UBS's Sterling LIBOR submissions in a manner that would benefit their derivatives trading positions. The focus of requests, as with other currencies, was greatest when the Derivatives Traders had significant fixings on their swaps positions. UBS's Sterling Trader-Submitters regularly acknowledged and followed these requests. On occasion, the Trader-Submitters contacted the Derivatives Traders before making submissions to determine if the Derivatives Traders had any preferences as to the rates UBS would submit for Sterling LIBOR. In addition, the Sterling Trader-Submitters at times would consider the STIR desk's own derivatives trading positions, and adjust the Sterling LIBOR submissions to benefit those trading positions. For example, in February, 2008, a Sterling Trader-Submitter and a manager had the following communications:

---

[21] Through its internal investigation, UBS identified evidence of similar misconduct involving submissions for at least the Hong Kong Interbank Offered Rate ("HIBOR"), the Singapore Interbank Offered Rate ("SIBOR"), the Singapore Swap Offer Rate ("SOR") and the Australian Bank Bill Swap Rate ("BBSW").

February 27, 2008:  (Emphasis added.)
>    Sterling Trader-Submitter 1:  "do u guys have any axe?"
>    Rates Manager A:  "let me check  as high as possible pls sir"
>    Sterling Trader-Submitter 1:  "ok i go 70... u shd let me know ur [daily] axes for fixings mate"
>    Rates Manager A:  "will do on days we have big fixings"

February 28, 2008:
>    Rates Manager A:  "hey mate  we want a really low fixing tomorrow in 3m"
>    Sterling Trader-Submitter 1:  "i have no axe mate  so that fine..."
>    Rates Manager A:  "...try and get the fixing lower  have a £100k fixing tomorrow"
>    Sterling Trader-Submitter 1:  "wow ok k"

Commencing in or around the summer of 2008 and continuing until September 2009, a member of UBS's STIR management also sought to ensure that derivatives trading positions were consistently being taken into account.  Senior STIR Manager A instructed the Trader-Submitters who were based in Zurich to consult each morning with the UBS Sterling Derivatives Traders in London to determine their net risk with respect to the derivatives trading positions and to adjust UBS's Sterling LIBOR submissions accordingly to benefit those positions.  The Trader-Submitters complied with the instruction and at that point adjusted their Sterling LIBOR submissions each day based on information obtained daily from the London-based traders about their net positions tied to Sterling.  For example, on March 16, 2009, a Sterling Trader-Submitter and a Derivatives Trader had the following communication:

>    Sterling Trader 1:  "ive got a big 6m fix  rec 110k gbp of the fix  so a nice high one will be nice"
>    Sterling Trader-Submitter 2:  "so very high 6m"
>    Sterling Trader 1:  "yes pls!"
>    Sterling Trader-Submitter 2:  "ok"

*Euro LIBOR and Euribor*

Over an approximately four-year period, from at least September 2005 through at least October 2009, UBS's Euro LIBOR and Euribor submissions were based, at times, in whole or in part, on UBS's Euro-based derivatives positions.

UBS Euro Trader-Submitters considered UBS's net Euro positions on the Rates desk that were valued or priced off of Euro LIBOR or Euribor.  To determine the rates to submit that would be beneficial to UBS's trading positions, the Trader-Submitters reviewed UBS's derivatives transactions and consulted with and obtained information from other UBS Euro Derivatives Traders.  Based on that information, UBS's Euro Trader-Submitters adjusted UBS's Euro LIBOR and Euribor submissions to benefit the derivatives trading positions.  This occurred on a regular, if not daily, basis.

Moreover, senior managers made their own requests for specific Euribor submissions that would benefit their trading positions and, at times, communicated with each other about their requested submissions. For example:

August 7, 2007:

> Senior Rates Manager B: "hi [Senior STIR Manager B], what you putting in for 3mth and 6mth euribor fixing today?"
>
> Senior STIR Manager B: "goo[d] question ... need a low fix personally in 3s"
>
> Senior Rates Manager B: "...i have a 2bn fixing today and i'm also looking to sell 1bn of the 6mth at about 4.42  fun times with the fixings at the moment"
>
> Senior STIR Manager B: "i'll shoot for low then and hope some other do too and we dont fall out .."
>
> Senior Rates Manager B: "if i don't sell the 6mth before the fix, i need a high fixing  3mth i'm now flat  over the next few weeks we've got a lot of 6mtth fixing coming off"
>
> Senior STIR Manager B: "ill stick 4.42 in for 6s then"
>
> Senior Rates Manager B: "we are receiving the fixing"
>
> Senior STIR Manager B: "gotscha"

Multiple UBS Euro Derivatives Traders also occasionally made requests to the Euro Trader-Submitters for submissions that would benefit their derivatives trading positions. The Euro Trader-Submitters agreed to the requests and solicited the Derivatives Traders for their preferences for submissions. The Trader-Submitters took the specific requests into account when determining UBS's Euro LIBOR and Euribor submissions.

On June 25, 2009, more than eight months after the CFTC had launched its investigation of UBS and demanded information and documents from UBS in October 2008, a senior manager warned the Euro Derivatives Traders and the Trader-Submitters not to make requests for beneficial LIBOR and Euribor submissions on a "public chat."

June 25, 2009:  (Emphasis added.)

> Euro Trader-Submitter 1: "u need low 3s and/or 6s?  we need low 6s ... boys, we send the fixings in about 1hr, so let us know pls"
>
> Euro Trader 1:  "low 6s high 12s please"
>
> Euro Trader-Submitter 1: "noted"
>
> Rates Manager A: "**JUST BE CAREFUL DUDE**"
>
> Euro Trader-Submitter 1: "yeah [Sterling Trader-Submitter 1] gave me ur call update  **i agree we shouldnt ve been talking about putting fixings for our positions on public chat**  just wanted to get some transparency though  otherwise we end up with the same talks afterwards why we fixed it low or high, from u boys in ldn"

However, neither the UBS senior managers in the chat above nor any other UBS managers instructed UBS's Derivatives Traders and Trader-Submitters to stop the practice of taking into account trading positions. Instead, the conduct continued unabated. In fact, a written

request for a specific Euribor submission involving a senior STIR manager occurred as late as June 30, 2010.

### f.  By Such Conduct, UBS Made Knowingly False Reports

UBS, through its Derivatives Traders, Trader-Submitters and/or managers, knew it was improper to consider derivatives trading positions in determining the bank's benchmark interest rate submissions.  A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily LIBOR, Euribor or Euroyen TIBOR submissions.  By basing its benchmark interest rate submissions on rates that benefited UBS's derivatives positions, UBS's submissions were not made in accordance with the BBA, EBF or JBA's definitions and criteria for benchmark interest rate submissions.  Instead, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR, Euribor and Euroyen TIBOR were based on and solely reflected its assessment of the costs of borrowing unsecured funds in the relevant interbank money markets.  Accordingly, UBS regularly attempted to manipulate the official fixings of and knowingly delivered false, misleading or knowingly inaccurate reports concerning Yen LIBOR, Swiss Franc LIBOR, Sterling LIBOR, Euro LIBOR, Euribor and Euroyen TIBOR, which are all commodities in interstate commerce.

### 2.  During the Financial Crisis, UBS Made Submissions Based in Whole or in Part on Certain UBS Managers' Directions That Reflected Concerns for UBS's Reputation

During the financial crisis, commencing in early August 2007, certain managers of UBS's Group Treasury and ALM issued directions concerning the determination of its U.S. Dollar LIBOR and other benchmark interest rate submissions arising out of a concern of protecting UBS's reputation and avoiding what it perceived as unfair and inaccurate negative media speculation about UBS's fundraising ability and creditworthiness.[22]

The key directions were, at first, to "err on the low side" of the submissions of the panel banks, and, later, to make submissions in the "middle of the pack" of the panel banks.  Certain Group Treasury and ALM managers issued the broad directions without ascertaining or requiring the Trader-Submitters to ascertain the costs of borrowing unsecured funds in the relevant markets or ensuring that such directions were in accord with the definitions and criteria of the benchmark interest rates.  These Group Treasury and ALM managers did not provide any guidance to its submitters as to how to implement these directions, other than simply to follow them.  When the submitters followed the directions, they impacted UBS's submissions.  As a result, at times during the financial crisis, UBS's submissions did not accurately or solely reflect or relate to UBS's assessment of the costs of borrowing funds in the relevant interbank markets.[23]

---

[22]  UBS's directions also impacted other LIBOR submissions and its Euribor and Euroyen TIBOR submissions.

[23]  Consistent with UBS's lack of internal controls over its benchmark interest rate submissions, the Group Treasury and ALM managers did not have a formal role or supervisory responsibility over the

Prior to August 2007, LIBOR and other benchmark interest rates were generally steady day-to-day with little variance among the submissions from panel banks, which led to a relative predictability of benchmark interest rates. UBS's LIBOR submissions also were relatively stable. UBS's submissions for at least U.S. Dollar LIBOR were frequently included in the calculated average for the BBA's LIBOR fixings. With the onset of the financial crisis, liquidity in the London interbank market began to diminish dramatically and severe dislocations in the relevant unsecured cash markets developed. The media focused on the loss of liquidity in the markets and the financial well-being of the major financial institutions. The media analyzed LIBOR submissions, among other market indicators, to ascertain each panel bank's strength and ability to borrow funds. Questions arose in the media about the integrity of the panel banks' submissions.

The rapidly diminishing interbank transactions affected the panel banks' ability to make submissions. However, the panel banks were nonetheless required to adhere to the benchmark definition and criteria and submit rates based on their evaluation of the costs of borrowing unsecured funds in the interbank markets, namely, for LIBOR, the London interbank market. The definitions and criteria did not permit panel banks to base their submissions, in whole or in part, on a bank's desire to avoid negative media attention or reputational harm.

*The Beginning of the Financial Crisis – August 2007 through early April 2008: The "Err on the Low Side" Direction*

On August 9, 2007, Bloomberg published an article about rising LIBOR submissions for the overnight tenor entitled, "Lending Rates Rise, Overnight Dollar Surges." The Bloomberg article highlighted a 65-basis point jump in UBS's LIBOR submission for the overnight tenor from the prior day's submission, as well as similar jumps by other panel banks. The article suggested that the jump in LIBOR submissions reflected an elevation of bank borrowing costs as losses at banks mounted based on exposures to subprime mortgages. The article further suggested that a bank's borrowing costs reflected its creditworthiness relative to other panel banks.

Prior to the publication of the article, an inquiry from Bloomberg reverberated within UBS, causing concern as the press sought further comment from UBS and as UBS was to announce quarterly results the following week. In alerting senior Group Treasury members about the media inquiry, an employee commented, "Given that we are announcing our results next week this will need urgent attention."

UBS concluded that the 65-basis point spike in its U.S. Dollar overnight LIBOR submission was the result of an error. On August 9, 2007, the same day as the Bloomberg

---

LIBOR submissions; yet, as set forth above, they became part of the process and at times had an impact on UBS's submissions.

article, an ALM manager sent the following direction by email to senior managers and others in UBS's Group Treasury and derivatives trading divisions:[24]

> "After the happenings of today with the [overnight] Libor fixings, can you pls advise whoever contributes fixings on the rates derivs side to co-ordinate the numbers with the STIR desk in Zurich. **It is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and PNL thereof is secondary priority for now."**

(Emphasis added). This direction stemmed from a desire to ensure that UBS's LIBOR submissions did not convey to the media or market what UBS believed to be an inaccurate message about UBS's financial stability or otherwise harm UBS's reputation in the increasingly uncertain environment created by the financial crisis. The idea was that, going forward, UBS's submissions were to portray a view that UBS was more creditworthy than other panel banks and, therefore, UBS should not make higher submissions and be an outlier as compared to other panel banks. Neither Group Treasury nor ALM managers took any steps to ensure that the "err on the low side" direction for making LIBOR submissions complied with the BBA's definition and criteria for making LIBOR submissions or that it related to UBS's costs of borrowing in the London interbank market.[25]

UBS promptly disseminated the direction to err on the low side. That same day, August 9, Rates Manager A confirmed that the necessary coordination was in place: "We have already co-ordinated our efforts with [Senior Rates/STIR Manager] and [U.S. Dollar Trader-Submitter 1] on the usd libors will be speaking to [U.S. Dollar Trader 1] and [Euro Trader 1] will be liaising with [Senior STIR Manager B] on the eurolibors before our numbers are input." U.S. Dollar Trader 1 in Zurich and U.S. Dollar Trader-Submitter 1 in London discussed the "err on the low side" direction, and their submissions immediately started reflecting the directions. For example, on August 10, 2007, the traders had the following communication:

---

[24] During this time, UBS's U.S. Dollar LIBOR submissions were made by a U.S. Dollar swaps trader ("U.S. Dollar Trader-Submitter 1") who traded medium tenor derivatives. Prior to August 9, 2007, UBS did not provide the Trader-Submitter with access to UBS's money market transactions or other information about UBS's costs of borrowing. Following the August 9, 2007 direction, a U.S. Dollar Stir Trader provided U.S. Dollar Trader-Submitter 1 with the rates he should submit for the short end tenors.

[25] The email's last sentence also reflects that UBS's Trader-Submitters otherwise were taking into account UBS's risk and profits and losses of UBS's derivatives trading positions in making UBS's submissions. Here, this senior manager was directing that the franchise protection concerns trumped those other improper considerations. However, as noted herein and as demonstrated by the numerous examples of Derivatives Traders and Trader-Submitters communications set forth above, UBS's Trader-Submitters continued to regularly account for UBS's derivatives trading positions in the determination of its submissions throughout the financial crisis, as they had before and would do so after.

> U.S. Dollar Trader 1: "o;/n just trading way lower . . . so I would go for a pretty
> low run . . . **aim should really be to be on the lower side of range"**
> U.S. Dollar Trader-Submitter 1: "just looking for early indications for o/n 1w and
> 2wks – understand mkt dropping fast – so early indics for now then true [levels]
> at 11 am – pls"
> U.S. Dollar Trader 1: "o/n would go for 5.70 . . . 1wk 5.70 . . . 2wk 5.60 . . . **this
> seems probably a tad low right now, but recon thats what we should try to
> be"**
> U.S. Dollar Trader-Submitter 1: **"kk — will check back at 11[when the
> submissions had to be made] — as you say always want to err on the low
> side** - thks for colour - may even swap ideas about 1m 2m and 3 mo with you too
> in curect climate - sure few weeks down the road then will only need to chat about
> v short dates ie <1mo - appreciate colour"
> U.S. Dollar Trader 1: "np at all . . . we just dont want to give the market a wrong
> impression . . . we not struggling to get cash . . . so therefore dont want to be on
> the highs of libors"
> (Emphasis added.)

A few days later, on August 14, 2007, U.S. Dollar Trader 1 confirmed again, "my indications are deliberately on the low side…" and U.S. Dollar Trader-Submitter 1 agreed, "y[es] pls err on the side of caution as before – once teh mkt normalises…then we can adj accordingly…."

On September 3, 2007, U.S. Dollar Trader 1 explained to an ALM Manager his understanding of why UBS wanted to "err on the low side," stating that UBS did not want "to be seen to pay higher or at libor in the market to avoid trouble." On September 5, 2007, U.S. Dollar Trader-Submitter 1 explained he was following the "err on the low side" direction to his supervisor, Senior Rates Manager C:

> "fyi libor has been fuctioning well for many years - current turbulance and
> american home owners exposure to libor may trigger further questions - since the
> mkt dislocation I am now keeping a record of UBS libor fixings vs the implied
> rates - we are **fixing on the low side of all other banks in the libor panel in the
> 4- 12 mo period by several bps** - and we are still fixing 12 - 15 over implied
> rates - **I can justify my fixings each day if asked** - I se longer dated libors even
> lower however the rest of he mkt continue to call libors higher than UBS - **we
> should be protected from moral hazard as a bank. Short rates coming grom
> Zurich now - again asa bank we are erring on the low side."**

(Emphasis added.)[26] As noted above, this particular Trader-Submitter never had direct access to information about UBS's actual costs of borrowing unsecured funds in the relevant market for U.S. Dollar LIBOR.

---

[26]   On the same day, after Derivatives Broker A1 commented on how low UBS was on the Yen LIBOR fixes, stating, "you are conspicuous by how low you are on the fixes now..2bps below the lowest and about 5bps below the norm! ... I take it [Senior Yen Trader-Submitter] is the other way", the UBS Senior Yen Trader responded, "no is all senior mngment mate  want to show the world we are the strongest

Thereafter, UBS managers monitored how UBS's LIBOR submissions sent signals to the markets and the press about UBS's ability to obtain funds. At this time, as part of their daily internal calls about liquidity and funding as the financial crisis intensified, UBS managers received internal analyses about UBS's LIBOR submissions relative to other panel banks. Specifically, UBS ALM Manager A circulated spreadsheets about the panel banks' submissions for U.S. Dollar, Euro, Sterling, Swiss Franc and Yen LIBOR, showing how UBS compared to the other banks. For example, in an email on September 4, 2007, ALM Manager A wrote, "For those interested, this new tool shows where each bank on the Libor fixing panel quoted their offer level in today's fixing. Should give some insights into the funding situation at our peers. Note Barclays are consistently amongst the highest contributors and UBS are often the lowest." On September 10, 2007, the same person commented, "we're still contribute the lowest rates in most currencies." Notably, the spreadsheets and "tools" provided to the managers did not include information about UBS's actual transactions in the relevant unsecured interbank cash markets or any other information relating to costs of borrowing in those markets.

The "err on the low side" direction generally applied to UBS's U.S. Dollar LIBOR submissions for the rest of 2007, as reflected in communications between U.S. Dollar Trader 1 and U.S. Dollar Trader-Submitter 1, such as the following:

November 5, 2007:
<blockquote>

U.S. Dollar Trader 1: "I left 2s and 3s a tad on low side just not to stir any additional"

U.S. Dollar Trader-Submitter 1: "great - do appreciate your input each day"

U.S. Dollar Trader 1: "but I have been on lower end def"

U.S. Dollar Trader-Submitter 1: "I know - I am same with 4mo - out -"

U.S. Dollar Trader 1: "ok perfect"

U.S. Dollar Trader-Submitter 1: "we are towards to lower end across the board"

U.S. Dollar Trader 1: "yep we are"[27]
</blockquote>

---

bank with loads of liquidity we'd lend at 0 us! has been a lot of media focus on Barclays libor fixes so they are paranoid…" (Emphasis added.)

[27] The "err on the low side" direction did not deter certain Derivatives Traders trying to benefit their trading positions with higher submissions. On November 30, 2007, U.S. Dollar Trader 1, when providing the rates to be submitted under Group Treasury's instruction, told U.S. Dollar Trader-Submitter 1, "go 5.18 ( will be low) if you have exposure, let me know, happy to go a bit higher." On December 11, 2007, the Yen Desk Manager, asked for relief from Group Treasury's instructions and questioned what was in the best interests of UBS in making its LIBOR submissions – maximizing its profit or concern for its reputation:

<blockquote>
"Currently, we are in the bottom quartile. A move into the middle is worth 500k. **There is some reluctance on their part to move it higher as they are concerned about the reputational risks of putting in a high fix.** I'd agree with this if we were to set in the top quartile that may be the case, but I don't think anyone's really got their eye on UBS's 3m yen fix. If our position is bigger then [STIR], we should be doing what's best for the bank…."
</blockquote>

45

November 23, 2007:

> U.S. Dollar Trader 1:  "again... we are probably low 1-3month..."
> U.S. Dollar Trader-Submitter 2:  "y but 7 bp?"
> U.S. Dollar Trader 1:  "well [U.S. Dollar Bank A] is constantly lower than us  i am happy to move em up to 4.99 the 2s and 3s  the 1s is ok  its about 2 [bp]."
> U.S. Dollar Trader-Submitter 2:  "3 month is about m5.045  so that is like 6.5 bp away"
> U.S. Dollar Trader 1:  "04 ist the last I heard ... I mean agree... 4.99 is probably low  we can go to 5.00 ... but there are other people on the  other side of the extrem in my opinion"
> U.S. Dollar Trader-Submitter 2:  "i see where u are coming from  ok will show 5"
> U.S. Dollar Trader 1:  "ok cheers."

UBS's submissions moved to the lowest quartile of the panel submissions almost immediately after the issuance of the August 9, 2007 direction and, in some tenors, often remained in the lowest quartile for the rest of the year and through March 2008. In fact, UBS remained on the "low side" of the submissions, despite reporting two significant write-downs of assets in late 2007. On October 1, 2007, UBS reported it would record negative revenues of approximately $3.42 billion in its Fixed Income business and then on December 10, 2007, UBS reported a $10 billion write-down of assets.

UBS's drop to the "low side" is evidenced by the marked increase in the percentage of instances after August 9 when UBS's submissions were excluded from the BBA's U.S. Dollar LIBOR fixing for each of the key one, three, six and twelve-month tenors because UBS's submissions were in the lowest quartile of all sixteen banks, as reflected in the following chart:

Percentage of UBS's Submissions in the Lowest Quartile

| | January 1, 2007 to August 9, 2007 | August 10, 2007 to March 31, 2008 |
|---|---|---|
| 1-month tenor | 3% | 39% |
| 3-month tenor | 16% | 47% |
| 6-month tenor | 42% | 77% |
| 12-month tenor | 22% | 67% |

By the spring of 2008, UBS's financial position began to worsen significantly, impacting its ability to borrow unsecured funds in the relevant interbank markets. On April 1, 2008, UBS announced a net loss of approximately 12 billion Swiss Francs for the first quarter of 2008, attributable to approximately $19 billion lost on U.S. real estate and related "structured credit positions." UBS also announced it was seeking shareholder approval of a 15 billion Swiss Franc increase in share capital underwritten by a syndicate of banks, including JP Morgan Chase Bank ("JP Morgan"). That same day, Moody's Investor Service ("Moody's") downgraded UBS's

---

(Emphasis added.) He emphasized a few days later that UBS had the ability to impact the fixing in its favor: "(The yen fix is 16 banks, of which the top and bottom four are excluded. This leaves 8 banks that determine the fix. Our rate input can make a significant difference)."

46

credit rating from "Aaa" to "Aa1," noting that a further downgrade was possible. Other rating agencies also downgraded UBS. At the same time, UBS's costs of borrowing funds were rising. Nevertheless, despite these events and conditions, the "err on the low side" direction remained in place into mid-April 2008.

*April-May 2008: The "Middle of the Pack" Direction*

As the financial crisis deepened, the press scrutiny of banks' LIBOR submissions increased. Around this time, on April 10, 2008, certain UBS managers, involved in the issuance and implementation of the directions commented on the impact that Group Treasury was having on LIBOR submissions.

> Rates Manager A: "... here is a mind fuck for you  if we are doing CP at 2.81% and that is 3m usd libor + 10 why arent we putting our 3m rate in at 2.81% for libors"
> ALM Manager B: "we should"
> Rates Manager A: "but then GT will rip our boys a new one for being the highest bank in the poll"
> ALM Manager B: "you can't win..."

That same day, a U.S. Dollar Trader involved in the LIBOR submission process commented to Rates Manager A that "libors have totally de-linked with real cash markets ... the libors have become a total joke ... and certainly no reflection of the cash market." Rates Manager A noted that a higher LIBOR would have "GT chewing your head off," and the U.S. Dollar Trader responded: "we got clapped our fingers back in august when we put high libors in yep  GT is the one."

On April 16, 2008, the WSJ published an article entitled, "LIBOR Fog Bankers Cast Doubt on Key Rate Amid Crisis." The article stated the concern that "[s]ome banks don't want to report the high rates they are paying for short-term loans because they don't want to tip off the market that they're desperate for cash." That same day, ALM Manager B and Rates Manager A discussed the WSJ article, noting that UBS was funding at rates higher than the LIBOR fixing and that the article might increase the scrutiny of banks' LIBOR submissions:

> Rates Manager A: "...great article in the WSJ today about the libor problem"
> ALM Manager B: "...we issue way above libor in usd..."
> Rates Manager A: "...rumour BBA denying the earlier story...this turn of events is very interesting it forces transparency"
> ALM Manager B: "y, the central banks and the regulators have us by our balls these days...pull your pants down"

Thereafter, Group Treasury and ALM issued a new direction for submissions to be higher, specifically in the "middle of the pack" of sixteen panel banks. On April 17, the day following the WSJ article, UBS and most other panel banks dramatically raised their LIBOR submissions. UBS's one-month tenor submission increased by eight basis points, the three-month by nine and a half basis points, the six-month by fifteen basis points, and the twelve-

47

month by eighteen basis points, placing UBS's submissions in the middle eight of the panel banks and thus included in the calculation of the LIBOR fixings. That day, U.S. Dollar Trader 1 told U.S. Dollar Trader-Submitter 1: "the guidance I got from my management with regards to libors is that **we should aim to be in the middle of the pack** they also want to see the levels we are posting trough [sic] the hole [sic] curve. **(they got GT on their back again as well).**" (Emphasis added.) On April 18, ALM Manager A informed other senior managers: "With 18 April levels. As you can see another big increase in USD Libors (1M +7.4; 3M +9.0; 6M +13.7; 12M +15.6) **and UBS again in the middle of the pack.**" (Emphasis added.)

On April 22, 2008, a senior Group Treasury manager ("Group Treasury Senior Manager") in Stamford, Connecticut, determined that UBS's LIBOR submissions were "lagging the panel and peer banks" and therefore decided to adjust UBS's submissions upward towards its CP/CD issuance levels. The Group Treasury Senior Manager apparently believed, incorrectly, that LIBOR served as an "advertisement" of the rate that UBS would pay for funds, and not the rate at which UBS could borrow funds in the London interbank market. As a result, he was purportedly concerned that UBS's LIBOR submissions were not competitive and should more closely reflect the bank's issuance rates for CP/CDs to attract potential clients. That same day, ALM Manager B informed other senior managers and the traders primarily responsible for the U.S. Dollar LIBOR submissions:

> "[Group Treasury Senior Manager] requested today that we fix our libors in $ a few bps higher going fwd, as we still fix below where we post issuance. I went through the other banks that issue and are on the libor panel, and only [U.S. Dollar Bank B] fixes lower than where they post issuance (same as UBS). Suggest we hike our fixings 2-3 bps out to 6 month and 4-5 bps out to 1 year, and we will still not be the highest fixing. You ok with that?"

After receiving this new direction, U.S. Dollar Trader 1 commented to U.S. Dollar Trader-Submitter 1: "that libor setting is getting a bit of a joke...they seem to want us to fix higher again cause they issue higher."

ALM Manager B made sure that the new revised direction was followed. For example, upon hearing that the U.S. Dollar Trader-Submitter 1 was resisting some of the directed submissions and had commented "since its my name on the libor fixings then I will fix them appropriately...," ALM Manager B stated "...he'll go with our levels." This revised direction appears to have been in place and followed from approximately late April to June 1, 2008.

On May 21, 2008, UBS received an inquiry from a WSJ reporter who was preparing an article concerning LIBOR. The reporter asked, "...it is now my understanding that UBS was willing to pay 2.85% to sell three-month commercial paper in mid-April. However, this was some 12 basis points above the Libor rate UBS quoted on April 16 for the three-month dollar rate of 2.73%. Can UBS explain why it was paying 12 basis points for CP more than it was posting as a Libor quote?" This press inquiry was elevated to the highest levels of UBS's Group Treasury, who remained concerned about the signals that UBS's LIBOR submissions sent to the market. During discussions about a potential response to the WSJ, ALM Manager B frankly stated that: "**the answer would be 'because the whole street was doing the same and because**

we did not want to be an outlier in the libor fixings, just like everybody else' ...." (Emphasis added.)

The WSJ article, which ran on May 29, 2008, focused on UBS and other banks, and indicated that UBS's LIBOR submissions were significantly lower than where other market measures indicated that they should have been. Consistent with the inquiry to UBS on May 21, the WSJ reported that "[i]n mid-April, UBS, which has suffered some $38 billion in write-downs on investments gone bad, was offering to pay an annual rate of about 2.85% to borrow dollars for three months in the commercial-paper market, according to a person familiar with the matter. But when it reported for LIBOR on April 16, UBS said it could borrow for three months from other banks at 2.73%--in line with all the other panel banks. A UBS spokesperson declined to comment."

*Early June 2008: Direction to More Closely Track CP/CD Rates, Rendering UBS an Outlier*

On May 30, Rates Manager A, UBS's representative on the BBA's Foreign Exchange and Money Markets ("FX/MM") Committee, reported his understanding that BBA supported panel banks using CP/CD rates to determine LIBOR submissions. As a result of these factors, UBS began to incrementally move its submissions closer to UBS's CP/CD rates, even if those rates were high, and even if the submissions placed UBS out of the middle of the pack.

On June 2, 2008, UBS's U.S. Dollar Trader-Submitter 3 in Zurich confirmed to U.S. Dollar Trader-Submitter 1 that they were being told to track CP/CD issuance rates in their LIBOR submissions: "just had to run it through with alm desk...here is what they have come up with...o/n 2.28, 1w 2.36, 2wk 2.36, 1m 2.405, 2m 2.54, 3m 2.65, 4m 2.74, 5m 2.82, 6m 2.90, 9m 3.03, 1y 3.16 **(thats very diff from what we would hv set)** as it is following more closely to where issuance is being done."[28] (Emphasis added.)

---

[28] On June 2, 2008, the Rates and ALM managers again expressly recognized the issues surrounding the LIBOR submission process and the role of Group Treasury in UBS's LIBOR submissions, including whether Group Treasury would acknowledge its role:

> Rates Manager A: "this libor submissions thing is gaining speed the Fed and the BBA are doing a thorough investigation...you know GT will wash their hands of any involvement"
> ALM Manager B: "just what we needed of course as always"
> Rates Manager A: "i will be vocal if anyone in FXMM or Rates gets pulled aside for that very vocal in fact"
> ALM Manager B: "a gun might be loud enough..."

On the same day, U.S. Dollar Trader-Submitter 1 made the following comments in a UBS group chat to the U.S. Dollar Trader-Submitter 3:

> U.S. Dollar Trader-Submitter 1: "will be interesting to see - all we can keep doing is keep being as fair and as honest as possible - have re read the BBA libor defintions and we continue to be in lne with their letter and spirit, however they do leave room for interpretation."

Over the next two weeks in June, UBS concluded that it was the only bank apparently trying to base its LIBOR submissions on its CP/CD issuance rates after the FX/MM Committee meeting. As ALM Manager A wrote to Group Treasury, "it seems we're the only bank trying to even move in that direction."

When UBS adjusted its submissions closer to its CP/CD issuance levels, it became a somewhat high outlier on the U.S. Dollar LIBOR panel. During the two weeks up to June 16, 2008, for the one, three, six and twelve-month tenors in U.S. Dollar LIBOR, UBS rose from being in the lowest quartile or the middle of the pack to being in the highest quartile of submitting banks, and was therefore excluded from the calculation of the U.S. Dollar LIBOR fixings.

*June 17, 2008 through 2009: UBS Returns to the "Middle of the Pack" Direction*

By June 17, 2008, in reaction to being a high outlier on the U.S. Dollar panel, UBS decided to return to the "middle of the pack." On that day, Senior STIR Manager C went to the trading floor in Zurich and directed that UBS's LIBOR submissions be lowered so that UBS would be in "the middle of the pack" of the submitting banks.

That day, U.S. Dollar Trader-Submitter 3 discussed with ALM Manager B the need to implement the "middle of the pack" direction quickly and that the "middle of the pack" direction would be in place "until further notice:"

> U.S. Dollar Trader-Submitter 3: "just spoke to [U.S. Dollar Trader-Submitter 1 in London]…**we will start lowering over the next few days to get to more or less middle of the pack until further notice** did you need me for anything else?"
> ALM Manager B: "nope that was it, thx **we should bring it down fast so we are in line by friday with the pack…**"
> U.S. Dollar Trader-Submitter 3: "we will get there by friday"
> ALM Manager B: "and out to 6m you can be in line tomorrow"
> U.S. Dollar Trader-Submitter 3: "sure"
> (Emphasis added.)

The next day, June 18, U.S. Dollar Trader-Submitter 3 explained the revised direction to U.S. Dollar Trader-Submitter 1, confirming that Senior STIR Manager C was the source of this direction and that the proposed LIBOR submissions were "instructions" from ALM. U.S. Dollar Trader-Submitter 1 expressed frustration with media scrutiny:

> U.S. Dollar Trader-Submitter 3: "i think its been good we bounce the levels off each other"
> U.S. Dollar Trader-Submitter 1: "so many interested parties and hidden agendas out there - fro mthe press to hedge funds to home owners - 100% agree about boucing thoughts and ideas of each other - so frustration when all we have tried to be is honest and transparent and you still get attached in the press - it is so much in our interest that libor is 'accurate'"

U.S. Dollar Trader-Submitter 3: "its with him [ALM Manager A] and [ALM Manager B] i get the instructions how we want to set"
U.S. Dollar Trader-Submitter 1: "understand"
U.S. Dollar Trader-Submitter 3: "didnt like that comment very much . . . and of all the days today we fixed lower"
U.S. Dollar Trader-Submitter 1: "it is wrong - however it is a conclusion which will be reached by others . . . we are still 10 bps over the competition . . . in the 12mo"
U.S. Dollar Trader-Submitter 3: "yeah but they want us to get in line with competition by Friday"
U.S. Dollar Trader-Submitter 1: "who is the they ?"
U.S. Dollar Trader-Submitter 3: "[Senior STIR Manager C] gave instructions to alm . . . i will discuss with alm"
U.S. Dollar Trader-Submitter 1: "we should be consistent"

. . .

U.S. Dollar Trader-Submitter 3: "i sent [Senior STIR Manager C] and alm that comment . . . will discuss with alm when there are some bodies abt"

. . .

U.S. Dollar Trader-Submitter 1: "if you are too low you get written about for being too low if you are too high you get writen about for being too high"
U.S. Dollar Trader-Submitter 3: "middle of the pack there is no issue"
U.S. Dollar Trader-Submitter 1: "and if you are in line with the crowd you get wrtiine about because the crowd is too low"
U.S. Dollar Trader-Submitter 3: "thats why for a long time we were in the middle of the pack and only after [Rates Manager A]'s meeting with bba did we start moving towards our issuance level"
U.S. Dollar Trader-Submitter 1: "understand reasonnig behind the move"
U.S. Dollar Trader-Submitter 3: "me too. just surprised others didnt interpret it like that"
U.S. Dollar Trader-Submitter 1: "again there is no 'right' answer – which think is what the press does not like"
(Emphasis added.)

From June 17 through December 2008, UBS was in middle of the pack virtually every day, with very little deviation in its submissions.[29] UBS remained in the middle of the pack even after October 16, when it received approximately $59 billion in funds from the Swiss government and the Swiss National Bank and borrowed over $77 billion from the various liquidity programs of the Federal Reserve Bank.[30] UBS continued to submit in the middle of the

---

[29] U.S. Dollar Trader-Submitter 3 made sure in December 2008 that the back-up submitter adhered to the direction in her absence: "We want our fixings to be roughly in the middle of the pack."

[30] In October 2008, UBS's implementation of the "middle of the pack" direction in Yen LIBOR again conflicted with the Senior Yen Trader's efforts to use UBS's Yen LIBOR submissions to skew the BBA's Yen LIBOR fixings in favor of his derivatives trading positions. On October 8, 2008, the Yen Desk Manager asked Senior Rates Manager C for relief from the Group Treasury direction:

pack throughout at least the first half of 2009, despite UBS's February 10, 2009 announcement of an 8.1 billion Swiss Franc loss for the fourth quarter of 2008.

UBS, through its managers, Derivatives Traders and Trader-Submitters, knew that concerns about reputation or perceived inaccurate negative market or press reports were not legitimate or permissible factors on which to base their daily LIBOR and other benchmark interest rate submissions. Yet, during the financial crisis, UBS at times made its U.S. Dollar LIBOR submissions and other benchmark interest rate submissions in accordance with Group Treasury and ALM managers' directions, and not in accordance with the relevant definitions and criteria for those rates. These submissions based in whole or in part on these considerations were knowingly false because such submissions did not reflect solely UBS's assessment of the costs of borrowing unsecured funds in the relevant interbank market at that time. Accordingly, UBS at times, through its submissions, knowingly delivered, or caused to be delivered, benchmark interest rate submissions that constituted false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, Euribor or Euroyen TIBOR, all commodities in interstate commerce.

## IV.

## LEGAL DISCUSSION

**A.  UBS Made False, Misleading or Knowingly Inaccurate Reports Concerning the Costs of Borrowing Unsecured Funds in Violation of Section 9(a)(2) of the Act**

Section 9(a)(2) of the Act makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2) (2006); *U.S. v. Brooks*, No. 09-20871, 2012 WL 1768061, *691 (5th Cir. May 18, 2012); *United States v. Valencia*, 394 F.3d 352, 354-355 (5th Cir. 2004); see also *CFTC v. Johnson*, 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005) (same).

On a daily basis, UBS, through the transmission of an electronic spreadsheet to the service provider of the BBA, EBF and JBA who calculates their official fixings (*e.g.*, Thomson Reuters), knowingly delivered or caused to be delivered its U.S. Dollar, Swiss Franc, Sterling,

---

"We have a large tibor/libor position which loses if libors move higher. 4mio/bp **Group treasury has informed Stir to put all fixings in the middle of the pack.** This has resulted in UBS personally contributing to a 1/2bp higher fixing today. **Last year when we wanted Libors higher, we were told our fixing had to be low to show UBS's compartive strength.** Now there are 7 banks showing lower fixes than us in 3m yen. How do I get some focus on this?"

(Emphasis added.)

52

Euro and Yen LIBOR, Euribor and Euroyen TIBOR submissions through the mails or interstate commerce. UBS's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official benchmark interest rates by at least Thomson Reuters on behalf of the BBA, EBF and JBA, and other third party vendors. The panel banks' submissions are used to determine the official published rates for LIBOR, Euribor and Euroyen TIBOR, which are calculated based on a trimmed average of the submissions. UBS's daily LIBOR, Euribor and Euroyen TIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and UBS's ability to borrow funds in the particular markets. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which U.S. Dollar, Swiss Franc, Sterling, Euro and Yen LIBOR, Euribor and Euroyen TIBOR are fixed.

During the periods relevant to the conduct described herein, UBS's submissions for LIBOR for Swiss Franc, Sterling, Euro, Yen and U.S. Dollar, Euribor and Euroyen TIBOR were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, specifically: (1) the derivatives positions of traders, which occurred routinely, and at least for certain currencies and periods, daily; and/or (2) at times during the financial crisis commencing in early August 2007, UBS's Group Treasury and ALM managers' directions that UBS's submissions be either on the low side or in the middle of the pack of the panel bank submissions to manage market and media perceptions of UBS and protect its reputation. By using these impermissible and illegitimate factors in making its LIBOR, Euribor and Euroyen TIBOR submissions, UBS conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related solely to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Certain of UBS's managers, traders and submitters knew that certain UBS's LIBOR, Euribor and Euroyen TIBOR submissions contained false, misleading and knowingly inaccurate information concerning the submitted rates. By such conduct, Respondents violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

**B.** **UBS Manipulated Yen LIBOR at Times for Certain Tenors**

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of manipulation or attempted manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2006). Section 6(c) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist if the Commission "has reason to believe that any person . . . is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act . . . ." 7 U.S.C. § 9 (2006). Section 6(d) of the Act is substantially identical to Section 6(c). See 7 U.S.C. § 13b (2006).

53

Manipulation under the Act is the "intentional exaction of a price determined by forces other than supply or demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991). The following four elements must be met, by a preponderance of the evidence, to show a successful manipulation has occurred:

> (1) the [respondent] had the ability to influence market prices;
> (2) the [respondent] specifically intended to do so;
> (3) artificial prices existed; and
> (4) the [respondent] caused an artificial price.

*In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,786 at 34,061 (CFTC July 15, 1987). The test for manipulation, however, is a practical one:

> We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand.

*Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

"[I]ntent is the essence of manipulation." *Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 21,796, at 27,282 (CFTC Dec. 17, 1982). The manipulator's intent separates "lawful business conduct from unlawful manipulative activity." *Id.* at 27,283. To prove the intent element of manipulation, it must be shown that UBS "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Id.*

The Commission has observed that "intent must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances." *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977). "[O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium or efficient price – the price which reflects market forces of supply and demand – the mental element of manipulation may be inferred." *Indiana Farm Bureau*, (CCH) ¶ 21,796 at 27,283. "It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id.* (quoting *U.S. v. United States Gypsum Co.*, 438 U.S. 442, 445 (1978)). A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, (CCH) ¶20,271, at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

An artificial price (also termed a "distorted" price) is one "that does not reflect market or economic forces of supply and demand." *Cox*, ¶ 23,786 at 34,064; *Indiana Farm Bureau*, ¶

54

21,796 at 27,288 n. 2. As the Commission noted with approval in *DiPlacido*, ¶ 30,970, at 62,484 (quoting *Indiana Farm Bureau*, ¶ 21,796 at 27,300 (Commissioner Stone concurring)), a Commissioner has commented: "[t]his is more an axiom than a test." In determining whether an artificial price has occurred:

> [O]ne must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing down on a particular market are all legitimate, it follows that the price will not be artificial. On the other hand when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial. Thus, the focus should not be as much on the ultimate price as on the nature of the factors causing it.

*Indiana Farm Bureau*, ¶ 21,796 at 27,288 n. 2. *See also DiPlacido*, ¶ 30,970 at 62,484 (finding that the placement of uneconomic bids or offers results in artificial prices because those prices are not determined by the free forces of supply and demand on the exchange").

Causation of artificial prices is established when it is demonstrated that artificial market prices resulted from the conduct of a trader, or group of traders acting in concert, rather than legitimate forces of supply and demand. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1171-72 (8th Cir. 1971) (price squeeze "intentionally brought about and exploited by Cargill"); *Cox*, ¶ 23,786 at 34,067 (proof of causation requires the Division to show that "the respondents' conduct 'resulted in' artificial prices").

There can be multiple causes of an artificial price. *DiPlacido*, ¶ 30,970, at 62,485. The manipulator's actions need not be the sole cause of the artificial price. "It is enough for purposes of a finding of manipulation in violation of Sections 6(b) and 9 of the Act that respondents' action contributed to the price [movement]." *In re Kosuga*, 19 A.D. 603, 624 (1960). *See also Cox* ¶ 23,786 at 34,066 (recognizing there can be multiple causes of an artificial price and holding that a charge of manipulation can be sustained where respondents' acts are a proximate cause of the artificial price).

Here, as a member of the BBA's Yen LIBOR panel, UBS made daily submissions that purported to reflect its assessments of the costs of borrowing unsecured funds in the London interbank market for Yen LIBOR across tenors. The official LIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks. By virtue of this methodology, UBS had the ability to influence or affect the rate that would become the official Yen LIBOR for any tenor.

As evidenced by the extensive communications and other facts set forth above, in making the false Yen LIBOR submissions, several UBS Trader-Submitters and Derivatives Traders, in particular the Senior Yen Trader, specifically intended to affect the daily Yen LIBOR for certain tenors, including one-month, three-month, six-month, and twelve-month. Their intent is also made clear by the evidence that Derivatives Traders' and Trader-Submitters' motives were to

benefit UBS's derivatives trading position, or, at times, the derivatives trading positions of other panel banks with whom some UBS Derivatives Traders colluded.

On certain occasions, UBS's false, misleading or knowingly inaccurate Yen LIBOR submissions were illegitimate factors in the pricing of the daily Yen LIBOR fixings and affected the official Yen LIBOR for certain tenors, resulting in artificial Yen LIBOR fixings. Thus, UBS's actions were a proximate cause of the artificial Yen LIBOR fixings.

Accordingly, on certain occasions, UBS manipulated Yen LIBOR for certain tenors, a commodity in interstate commerce, in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.

## C.    UBS Attempted to Manipulate LIBOR, Euribor and Euroyen TIBOR

To prove attempted manipulation, two elements are required: (1) an intent to affect the market price; and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005). The intent standard is the same as that for manipulation. *See Indiana Farm Bureau* and *Hohenberg Bros.*, *supra*.

As with Yen LIBOR and as evidenced by the extensive communications, several UBS's Derivatives Traders and Trader-Submitters each specifically intended to affect the rate at which the daily LIBOR for Yen, Sterling, Swiss Franc and Euro, Euribor and Euroyen TIBOR would be fixed to benefit UBS's derivatives trading positions or to benefit the derivatives trading positions of colluding traders at other banks. The UBS Derivatives Traders' requests for certain rates to be submitted that would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the Trader-Submitters making submissions for LIBOR for Yen, Sterling, Swiss Franc and Euro, Euribor, and Euroyen TIBOR reflecting rates beneficial to UBS's derivatives trading positions, rather than reflecting, as required, UBS's assessments of the costs of borrowing unsecured funds, constitute overt acts in furtherance of their intent to affect the fixings of LIBOR for those currencies, Euribor and Euroyen TIBOR. By doing so, UBS engaged in repeated acts of attempted manipulation in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## D.    Respondents Aided and Abetted the Attempts of Other Traders at Other Banks to Manipulate Yen LIBOR and Euroyen TIBOR

Pursuant to Section 13(a) of the Act, UBS aided and abetted the attempts of traders at other banks to manipulate Yen LIBOR and Euroyen TIBOR in violation of the Act. 7 U.S.C. 13c(a) (2006). Liability as an aider and abettor requires proof that: (1) the Act was violated; (2) the aider and abettor had knowledge of the wrongdoing underlying the violation; and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See In re Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129 at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct need not be demonstrated. *See In re Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶

21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the surrounding facts and circumstances. *Id.*

As evidenced by the extensive communications, certain UBS Yen Derivatives Traders, primarily the Senior Yen Trader, and traders at other panel banks coordinated about Yen LIBOR and Euroyen TIBOR rates that would benefit their banks' respective derivatives trading positions. At times, the traders at the other panel banks asked the UBS Yen Derivatives Traders to have the UBS Yen Trader-Submitters submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the derivatives' positions of the traders at the other panel banks. The UBS Yen Derivatives Traders agreed and made the requests of the UBS Yen Trader-Submitters, who in turn made their Yen LIBOR submissions based on the UBS Yen Derivatives Traders' requests. Accordingly, by seeking to affect the rate at which LIBOR and Euroyen TIBOR were fixed, traders at other banks attempted to manipulate LIBOR and Euroyen TIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006). Certain UBS Yen Derivatives Traders had knowledge of and intentionally assisted the attempts of the traders at the other banks to manipulate the rate at which LIBOR and Euroyen TIBOR were fixed. By such acts of those UBS Yen Derivatives Traders, UBS aided and abetted the attempts of traders at other banks to manipulate LIBOR and Euroyen TIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

E. **UBS AG and UBS Securities Japan Co., Ltd. Are Liable for the Acts of their Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2012) provide that the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation or trust within the scope of his employment or office shall be deemed the act, omission or failure of such individual, association, partnership, corporation or trust. Pursuant to Section 2(a)(1)(B) of the CEA and Commission Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC,* 837 F.2d 847, 857-58 (9th Cir. 1988).

UBS AG and UBS Securities Japan Co., Ltd. are liable for the acts, omissions and failures of the traders, managers and submitters who acted as their employees and/or agents in the conduct described above. UBS AG, which wholly owns UBS Securities Japan Co., Ltd., is liable for the acts, omissions and failures of UBS AG and UBS Securities Japan Co., Ltd. with respect to the conduct described above. Accordingly, UBS AG and UBS Securities Japan Co., Ltd. violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), as set forth above.

V.

**FINDINGS OF VIOLATIONS**

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006).

VI.

57

## OFFER OF SETTLEMENT

Respondents, without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against UBS by, or any agreement with, the Department of Justice or any other governmental agency or office, have submitted the Offer in which they:

A.   Acknowledge receipt of service of this Order;

B.   Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.   Waive:

    1.   the filing and service of a complaint and notice of hearing;

    2.   a hearing;

    3.   all post-hearing procedures;

    4.   judicial review by any court;

    5.   any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    6.   any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2012), relating to, or arising from, this proceeding;

    7.   any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

    8.   any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.   Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

E.   Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.  makes findings by the Commission that Respondents violated Section 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006);

2.  orders Respondents to cease and desist from violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006 & Supp. V 2012);

3.  orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of $700,000,000, plus post-judgment interest; and

4.  orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.  Respondents shall cease and desist from violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006 & Supp. V 2012).

B.  Respondents, jointly and severally, shall pay a civil monetary penalty of 700 Million U.S. Dollars ($700,000,000), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.   Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1.   PRINCIPLES[31]

    i.   UBS agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

    ii.   UBS represents and undertakes that each Benchmark Interest Rate Submission by UBS shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

---

[31]   The following terms are defined as follows:

    **Benchmark Interest Rate**:  An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

    **Benchmark Publisher**:  A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

    **Submission(s)**:  The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher.  For example, if UBS submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

    **Submitter(s)**:  The person(s) responsible for determining and/or transmitting the Submission(s); and

    **Supervisor(s)**:  The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

2. INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS

    i. <u>DETERMINATION OF SUBMISSIONS</u>:  UBS shall determine its Submission(s) based on the following Factors, Adjustments and Considerations, unless otherwise prohibited by or contrary to an affirmative obligation imposed by any law or regulation, or the rules or definitions issued by a Benchmark Publisher.  UBS's transactions shall be given the greatest weight in determining its Submissions, subject to applying appropriate Adjustments and Considerations in order to reflect the market measured by the Benchmark Interest Rate.[32]

UBS shall determine its Submissions as described in these Undertakings within fourteen (14) days of the entry of this Order.

- Factor 1 — UBS's Borrowing or Lending Transactions Observed by UBS's Submitters:

    a. UBS's transactions in the market as defined by the Benchmark Publisher for the particular Benchmark Interest Rate;

    b. UBS's transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

    c. UBS's transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures and Fed Funds.

- Factor 2 — Third Party Transactions Observed by UBS's Submitters:

    a. Transactions in the market as defined by the Benchmark Interest Rate relevant to each of the Submission(s);

    b. Transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

    c. Transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

---

[32]  The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be consistent with each other, and provide different levels of guidance as to how to make Submissions.

- Factor 3 — Third Party Offers Observed by UBS's Submitters:

  a. Third party offers to UBS in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to UBS by interdealer brokers (*e.g.*, brokers); and

  c. Third party offers provided to UBS in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- Adjustments and Considerations: All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. Time: With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. Market Events: UBS may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. Term Structure: As UBS applies the above Factors, if UBS has data for any maturity/tenor described by a Factor, then UBS may interpolate or extrapolate the remaining maturities/tenors from the available data;

  d. Credit Standards: As UBS applies the above Factors, adjustments may be made to reflect UBS's credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above. Additionally, UBS may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

e. <u>Non-representative Transactions</u>: To the extent a transaction included among the Factors above significantly diverges in an objective manner from other transactions, and that divergence is not due to market events as addressed above, UBS may exclude such transactions from its determination of its Submission(s).

ii. <u>SUPERVISOR(S) REVIEW</u>: Effective within fourteen (14) days of the entry of this Order, each daily Submission shall be reviewed by a Supervisor on a daily basis after the Submission(s) are made to the Benchmark Publisher.

iii. <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>: All Submitter(s) shall have significant experience in the markets for the Benchmark Interest Rate to which they are submitting or a comparable market, but may designate less experienced parties, who routinely work under their supervision, to make Submission(s) during limited periods of absence. All Supervisors shall have significant experience in the markets for the relevant Benchmark Interest Rate or a comparable market. Submitters, Supervisors and any parties designated to make Submission(s) when the Submitter(s) are absent shall not be assigned to any derivatives trading desk, unit or division within UBS, or participate in derivatives trading other than that associated with UBS's liquidity and liability management. The compensation of Submitter(s) and Supervisor(s) also shall not be directly based upon derivatives trading, other than that associated with UBS's liquidity and liability management.

iv. <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER COMMUNICATIONS AND SUBMISSIONS</u>: UBS shall implement internal controls and procedures to prevent improper communications with Submitter(s) and Supervisor(s) regarding Submission(s) or prospective Submission(s) to ensure the integrity and reliability of its Submission(s). Such internal controls and procedures shall include, but not be limited to:

- The "firewalls" contemplated herein will be implemented through written policies and procedures that delineate proper and improper communications with Submitter(s) and Supervisor(s), whether internal or external to UBS. For these purposes, improper communications shall be any attempt to influence UBS's Submission(s) for the benefit of any derivatives trading position (whether of UBS or any third party) or any attempt to cause UBS's Submitter(s) to violate any applicable Benchmark Publisher's rules or definitions, or Section 2 of these Undertakings; and

- A requirement that the Submitter(s) shall not be located in close proximity to traders who primarily deal in derivatives products that

reference a Benchmark Interest Rate to which UBS contributes any Submission(s). The two groups should be separated such that neither can hear the other.

v. <u>DOCUMENTATION</u>: UBS shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, UBS shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that UBS used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining UBS's Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

  c. Relevant data and information received from interdealer brokers used in connection with determining UBS's Submission(s) including, but not limited to, the following:

    • Identification of the specific offers and bids relied upon by UBS when determining each Submission; and

    • The name of each company and person from whom the information or data is obtained;

  d. UBS's assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with Submission(s) be of "reasonable market size" (or any other such criteria);

64

e. Information regarding market events considered by UBS in connection with determining its Submission(s), including, without limitation, the following:

- The specific market announcement(s) or event(s); and

- Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

f. The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

■ For each Submission, UBS shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by UBS to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to UBS at the time of the Submission(s):

a. Instrument;
b. Maturity/tenor;
c. Trade type (*i.e.*, loan/deposit, placing/taking);
d. Buy/sell indicator;
e. Transaction date (in mmddyyyy format);
f. Maturity date (in mmddyyyy format);
g. Value date (in mmddyyyy format);
h. Loan effective date;
i. Customer number;
j. Currency;
k. Ticket ID;
l. Timestamp;
m. Counterparty A (buyer/bidder);
n. Counterparty B (seller/offeror);
o. Nominal/notional size of the transaction;
p. Interest basis (360/365 day year);
q. The fixed interest rate; and
r. Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

■ <u>Transaction Records</u>:  UBS shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a

65

Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- Requirement To Record Communications: UBS shall record and retain to the greatest extent practicable all of the following communications:

  a. All communications concerning the determination and review of the Submission(s); and

  b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent UBS from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located at least in the London, Zurich, Tokyo, and Stamford, Connecticut office of UBS, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, UBS's audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi. MONITORING AND AUDITING:

- Monitoring: UBS shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and, if there is any significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the

66

Submission is adequately substantiated. If it is not substantiated, UBS shall notify its chief compliance officer(s) and the Benchmark Publisher;

- Periodic Audits: Starting six (6) months from the date of the entry of this Order and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, UBS shall conduct internal audits of reasonable and random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

- Annual Audits By Third Party Auditors: Starting one (1) year from the date of the entry of this Order and continuing annually for four (4) additional years thereafter, UBS shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

  a. Reviewing communications of Submitter(s) and Supervisor(s);

  b. Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS;

  c. Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by UBS, that the Submission(s) were consistent with this Order, the policies and procedures in place for making UBS's Submission(s), and the definitions applicable to the Benchmark Interest Rate for which UBS made Submission(s); and

  d. A written audit report to be provided to UBS and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii. POLICIES, PROCEDURES AND CONTROLS: Within sixty (60) days of the entry of this Order, UBS shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, UBS shall develop policies, procedures and controls to ensure the following:

- The supervision of the Submission process;

67

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning UBS's Submissions are reported to and investigated by UBS's compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- The periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to observe and ensure compliance with these Policies, Procedures and Controls, which shall be conducted not less than monthly;

- The handling of complaints concerning the accuracy or integrity of UBS's Submission(s) including:

  a. Memorializing all such complaints;

  b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

- The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. <u>TRAINING</u>: UBS shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate. Submitters and Supervisors shall be provided with preliminary training regarding the policies, procedures and controls developed pursuant to Section 2(vii) of these Undertakings. By no later than September 20, 2013, all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein. Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of UBS's regular training programs. The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

- The Undertakings set forth herein;

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of UBS's Submission(s);

- The requirement to conduct all business related to UBS's Submission(s) on UBS's recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on UBS's recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with UBS's Submission(s) or process for determining Submission(s).

ix.  <u>REPORTS TO THE COMMISSION</u>:

- <u>Compliance with Undertakings</u>:  Every four (4) months, starting 120 days from the entry of this Order, UBS shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein.  Within 365 days of the entry of this Order, UBS shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein.  The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings.  The report shall contain a certification from a representative of UBS's Executive Management, after consultation with UBS's chief compliance officer(s), that UBS has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in the Order;

- <u>Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks</u>:  Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, UBS shall provide, meet with and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that

69

reference a Benchmark Interest Rate. Within that same time frame, UBS shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

- Disciplinary and Other Actions: UBS shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK INTEREST RATES

To the extent UBS is or remains a contributor to any Benchmark Interest Rate, UBS agrees to make its best efforts to participate in efforts by current and future Benchmark Publishers, other price reporting entities and/or regulators to ensure the reliability of Benchmark Interest Rates, and through its participation to encourage the following:

i. METHODOLOGY: Creating rigorous methodologies for the contributing panel members to formulate their Submissions. The aim of such methodologies should be to result in a Benchmark Interest Rate that accurately reflects the rates at which transactions are occurring in the market being measured by that Benchmark Interest Rate;

ii. VERIFICATION: Enforcing the use of those methodologies through an effective regime of documentation, monitoring, supervision and auditing, required by and performed by the Benchmark Publishers, and by the contributing panel members internally;

iii. INVESTIGATION: Facilitating the reporting of complaints and concerns regarding the accuracy or integrity of Submissions to Benchmark Interest Rates or the published Benchmark Interest Rate, and investigating those complaints and concerns thoroughly;

iv. DISCIPLINE: Taking appropriate action if, following a thorough confidential investigation, the Benchmark Publisher determines that a complaint or concern regarding the accuracy or integrity of a Submission or the published Benchmark Interest Rate has been substantiated;

v. <u>TRANSPARENCY</u>: Making regular reports to the public and the markets of facts relevant to the integrity and reliability of each Benchmark Interest Rate. Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the Benchmark Publisher should display prominently whether each rate is based entirely on transactions in the market the rate is supposed to reflect, or whether it instead is based, in whole or in part, on other data or information;

- The Benchmark Publisher also should make periodic reports regarding the number and nature of complaints and concerns received regarding the accuracy or integrity of Submissions or the published Benchmark Interest Rate while maintaining the anonymity of all those who have reported or are the subject of complaints and concerns;

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi. <u>FORMULATION</u>: Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

UBS shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between UBS and Benchmark Publishers.

4. COOPERATION WITH THE COMMISSION

i. Respondents shall cooperate fully and expeditiously with the Commission, including the Division, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission

71

investigation related thereto. As part of such cooperation, Respondents agree to the following for a period of five (5) years from the date of the entry of this Order, or until all related investigations and litigation are concluded, including through the appellate review process, whichever period is longer:

- Preserve all records relating to the subject matter of this proceeding, including, but not limited to, audio files, electronic mail, other documented communications, and trading records;

- Comply fully, promptly, completely, and truthfully with all inquiries and requests for information or documents;

- Provide authentication of documents and other evidentiary material;

- Provide copies of documents within UBS's possession, custody or control;

- Subject to applicable laws and regulations, UBS will make its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of UBS, regardless of the individual's location, and at such location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including, but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

- Subject to applicable laws and regulations, UBS will make its best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of UBS;

ii. UBS also agrees that it will not undertake any act that would limit its ability to cooperate fully with the Commission. UBS will designate an agent located in the United States of America to receive all requests for information pursuant to these Undertakings, and shall provide notice regarding the identity of such agent to the Division upon entry of this Order. Should UBS seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs. Any person designated to receive such request shall be located in the United States of America; and

iii. UBS and the Commission agree that nothing in these Undertakings shall be construed so as to compel UBS to continue to contribute Submission(s)

72

related to any Benchmark Interest Rate. Without prior consultation with the Commission, UBS remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

5. **PROHIBITED OR CONFLICTING UNDERTAKINGS**

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on UBS by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then UBS shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, UBS will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions. Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including, but not limited to, Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6. **PUBLIC STATEMENTS**

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D.     <u>Partial Satisfaction</u>: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

The provisions of this Order shall be effective as of this date.

By the Commission.

Sauntia S. Warfield
Assistant Secretary of the Commission
Commodity Futures Trading Commission

Dated:  December  19 , 2012

74