# APPENDIX D

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**



RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**6:40 am, Feb 06, 2013**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| The Royal Bank of Scotland plc and | )  CFTC Docket No. 13 –14 |
| RBS Securities Japan Limited, | ) |
| | ) |
| Respondents. | ) |
| | ) |

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO**
**SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, MAKING**
**FINDINGS AND IMPOSING REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission" or "CFTC") has reason to believe that The Royal Bank of Scotland plc and RBS Securities Japan Limited (collectively, "RBS" or "Respondents") have violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act (the "Act" or the "CEA"), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2006). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against RBS by, or any agreement with, the Department of Justice or any other governmental agency or office, Respondents herein consent to the entry and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1]  Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor do Respondents consent to the use of the Offer or this Order, or the findings in this Order consented to in the Offer, by any other party in any other proceeding.

## III.

The Commission finds the following:

A.   **Summary**

The London Interbank Offered Rate ("LIBOR") is a leading global benchmark interest rate, critical to international financial markets.  LIBOR is determined each day based on rates submitted by a select panel of banks.  The rates contributed by the panel banks are supposed to reflect each bank's honest assessment of the costs of borrowing unsecured funds in the London interbank market, not the profit motives of traders.  Over a period of more than four years, RBS violated this fundamental precept and undermined the integrity of LIBOR for Yen and Swiss Franc.

Commencing in at least mid-2006 and continuing through 2010, RBS made hundreds of attempts to manipulate Yen and Swiss Franc LIBOR and, on numerous occasions, made false LIBOR submissions to benefit its derivatives and money market trading positions.  At times, RBS also aided and abetted other panel banks' attempts to manipulate those same rates.  This misconduct involved more than a dozen RBS derivatives and money market traders, one manager, and multiple offices around the world, including London, Singapore and Tokyo.  Sometimes, RBS was successful in manipulating Yen and Swiss Franc LIBOR.

The ways in which RBS conducted this scheme all followed a similar theme.  The profitability of RBS's Yen and Swiss Franc derivatives positions, such as interest rate swaps, depended on Yen and Swiss Franc LIBOR, as did certain of RBS's money market positions.  RBS traders would ask their colleagues to make false submissions that were beneficial to RBS's trading positions.  The traders' requests were either for falsely high submissions or falsely low ones, whatever was needed to turn a profit.  The submitters often accommodated those requests by making false submissions.  The statement of an RBS trader at the time makes their motivation clear: "[I]ts [sic] just amazing how libor fixing can make you that much money."

RBS created an environment for a number of years that eased the path to manipulation inasmuch as RBS sat derivatives traders and submitters together on the same desk, heightening the conflict of interest between the profit motives of the traders and the responsibility of submitters to make honest submissions.  When derivatives traders and submitters eventually were separated (for business, not compliance reasons), the misconduct continued through Bloomberg chats and an internal instant messaging system ("instant messages") rather than by one trader merely turning in his chair to speak to his colleague on the desk.  Some of these submitters were even traders themselves, and skewed their LIBOR submissions to drive the profitability of their own money market and derivatives trading positions.

RBS derivatives traders also unlawfully worked in concert with a trader from a UBS AG subsidiary ("UBS"), also a LIBOR panel bank, in attempts to manipulate Yen LIBOR, and with a trader at another panel bank in attempts to manipulate Swiss Franc LIBOR.  RBS also aided and abetted UBS's attempts to manipulate Yen LIBOR by executing wash trades (trades that result in financial nullities) in order to generate extra brokerage commissions to compensate two interdealer brokers for assisting UBS in its unlawful manipulative conduct.  On at least one

2

occasion, RBS also requested the assistance of an interdealer broker to influence the submissions of multiple panel banks in an attempt to manipulate Yen LIBOR.

RBS engaged in its attempts to manipulate Yen and Swiss Franc LIBOR despite the questions that arose in the media in 2007 and 2008 about the integrity of banks' LIBOR submissions, LIBOR reviews and guidance by the British Bankers' Association in 2008 and 2009, and the Commission's request in April 2010 that RBS conduct an internal investigation relating to its U.S. Dollar LIBOR practices. In fact, certain RBS employees involved in the misconduct were aware of the CFTC LIBOR investigation, and nonetheless continued their manipulative conduct while at the same time trying to conceal those efforts by not using Bloomberg chats or instant messages.

RBS's traders were able to carry out their many attempts to manipulate Yen and Swiss Franc LIBOR for years because RBS lacked internal controls, procedures and policies concerning its LIBOR submission processes, and failed to adequately supervise its trading desks and traders. RBS did not institute any meaningful controls, procedures or policies concerning LIBOR submissions until in or about June 2011. During this time, RBS was experiencing significant growth on its Yen and Swiss Franc trading desks, generating revenues for RBS that were multiplying over the years.

\*\*\*

In accepting RBS's Offer, the Commission recognizes Respondents' cooperation during the Division of Enforcement's investigation of this matter, which helped the Division efficiently and effectively undertake its investigation.

**B.**   **Respondents**

**The Royal Bank of Scotland plc** is a British banking and financial services company headquartered in the United Kingdom ("U.K."). It has operations in approximately forty (40) countries and territories, including the United States and Singapore. On December 31, 2012, The Royal Bank of Scotland plc was provisionally registered as a swap dealer with the Commission.

**RBS Securities Japan Limited** is a wholly owned subsidiary of The Royal Bank of Scotland plc engaged in market operations and is a securities broker-dealer. It has an office in Tokyo.

**C.**   **Facts**

Commencing in at least mid-2006, RBS, through the acts of its derivatives and money market traders and other employees located in London, Tokyo and Singapore, often attempted to manipulate the fixings of Yen and Swiss Franc LIBOR.[2] On a number of those occasions, RBS made false LIBOR submissions in furtherance of its manipulative attempts, which at times were

---

[2]   Most of the traders involved in this conduct are no longer employed at RBS.

3

successful.[3]  The RBS traders engaged in this manipulative conduct to profit on RBS's significant derivatives and money market trading positions that were indexed to and therefore valued based on Yen and Swiss Franc LIBOR.  At times, RBS derivatives traders also colluded with traders at other panel banks and coordinated with interdealer brokers in attempts to manipulate Yen and Swiss Franc LIBOR.[4]

### 1.    LIBOR and the BBA Fixing of LIBOR

LIBOR is the most widely used benchmark interest rate in the world.  Approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR.  It is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges and is used as a barometer to measure strain in money markets and is often a gauge of the market's expectation of future central bank interest rates.  To be sure, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers.

Daily LIBORs are issued on behalf of the British Bankers' Association ("BBA")[5] for ten currencies, including Yen and Swiss Franc, with fifteen tenors ranging from overnight through twelve months.  According to the BBA, LIBOR "is based on offered inter-bank deposit rates contributed in accordance with the Instructions to BBA LIBOR Contributor banks."  The BBA requires that:

> [a]n individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to [11:00 a.m. London time].[6]

Every business day shortly before 11:00 a.m. London time, the banks on the LIBOR panels submit their rates to Thomson Reuters.  A trimmed averaging process is used to exclude the top and bottom quartile of rates and the remaining rates are averaged for each tenor.  That average rate becomes the official BBA daily LIBOR (the "LIBOR fixing").  The LIBOR submission of each submitting panel bank is submitted between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places.  For purposes of LIBOR, one basis point (or "bp") is one-hundredth of one percent (0.01%).  The BBA then makes public the daily LIBOR fixing for each currency and tenor, as well as the daily submissions of each panel

---

[3]    RBS traders engaged in similar misconduct in connection with the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offered Rate ("SOR").  Some SIBOR and SOR-related misconduct took place from May 2010 through August 2011, even as RBS was conducting its internal investigation.

[4]    RBS, through a Euro derivatives trader, also colluded with traders at other banks on at least a handful of occasions relating to another benchmark interest rate, Euribor, by asking for beneficial Euribor submissions to be made by the other banks.  This conduct occurred from September 2007 through at least mid-2008.

[5]    The BBA is a trade association for the United Kingdom banking and financial services sector and is comprised of member banks.

[6]    This definition of LIBOR has been used by the BBA from 1998 to the present.

4

bank, through Thomson Reuters and the other data vendors licensed by the BBA. This information is made available and relied upon by market participants and others throughout the world, including in the United States.

By its definition, LIBOR requires that the submitting panel banks exercise their judgment to determine the rates at which they may obtain unsecured funds in the London interbank market. These definitions require that submissions relate to funding and do not permit consideration of factors unrelated to the costs of borrowing unsecured funds, such as the benefit to a bank's derivatives or money market trading positions.[7]

## 2. RBS's LIBOR Submission Process

RBS is a member of the BBA and is one of the panel banks that submits rates for the determination of LIBOR in Yen, Swiss Franc, and other currencies.[8] During the periods relevant herein, an RBS representative participated on two key BBA committees: the Foreign Currency and Money Market ("FX & MM") Committee responsible for the operation and management of LIBOR; and the Steering Committee responsible for annual reviews of the LIBOR definition and determining the composition of panel banks. RBS also participated in critical BBA reviews of the LIBOR process in 2008 and 2009 after questions arose about the integrity of the process.

*RBS's Money Market Traders Were Responsible for Determining LIBOR Submissions*

Responsibility for making RBS's LIBOR submissions was assigned to certain London-based money market traders until March 2012. RBS money market traders were responsible for ensuring that the bank met its funding needs each day in all currencies, including Yen and Swiss Franc. To do so, RBS money market traders engaged in both intra-bank and inter-bank borrowing and lending transactions. RBS money market traders also traded derivatives products that were indexed to, and therefore valued based on, LIBOR, including Yen and Swiss Franc LIBOR. One money market trader was primarily responsible for making both the Yen and Swiss Franc LIBOR submissions ("Primary Submitter").

The Primary Submitter considered certain market information in determining RBS's Yen and Swiss Franc LIBOR submissions, such as RBS's funding needs, money market transactions, futures and other derivatives prices, "market color" communications with derivatives traders, information from interdealer brokers, arbitrage transactions, and synthetic cash deposits in various currencies. But the Primary Submitter also improperly considered requests to benefit derivative traders' positions or his own positions. At times, the Primary Submitter skewed the LIBOR submissions to benefit those positions.

---

[7]   In June 2008, the BBA clarified that the basis for a panel bank's submission must be the rates at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivative trading book, consider that the bank can borrow unsecured interbank funds in the London market. The BBA also clarified that panel banks could not contribute a rate based on the pricing of any derivative financial instrument.

[8]   During the relevant period, RBS also submitted rates for the determination of LIBOR in other currencies such as U.S. Dollar, Australian Dollar, Canadian Dollar, Danish Krone, Euro, New Zealand Dollar, Sterling, and Swedish Krona.

After considering these factors, the Primary Submitter or his backups determined a rate for each tenor and input the rates into a spreadsheet that was then submitted to Thomson Reuters shortly before 11:00 a.m. London time.

*RBS Organized Trading Desks to Encourage Money Market and Derivatives Traders to Communicate*

RBS Yen and Swiss Franc derivatives traders traded various derivatives instruments that were priced based on Yen or Swiss Franc LIBOR. These products included interest rate swaps,[9] Forward Rate Agreements, foreign exchange ("FX") forwards, cross-currency swaps, overnight index swaps and tenor basis swaps. The derivatives instruments traded by the interest rate desks globally throughout RBS were used to hedge the desk's interest rate risk and also to generate a profit for the desk. Many of their derivatives contracts settled or reset on International Monetary Market ("IMM") dates, which are quarterly dates in March, June, September and December.

In October 2006, RBS senior management decided to facilitate more communication between derivatives traders and money market traders, some of whom were also LIBOR submitters, by locating them on the same RBS currency trading desks. This co-location plan was known as the Short-Term Markets Desk ("STM"). One of the express purposes of STM was to encourage derivatives and money market traders to communicate about the relevant market conditions that could impact trading and funding decisions. The seating arrangement, however, magnified the preexisting conflict of interest between the profit motive of traders and the responsibility of LIBOR submitters to assess honestly RBS's costs of borrowing unsecured funds in the London interbank market. RBS did not provide any guidance or controls over what constituted appropriate communications between the derivative traders and money market traders who were the LIBOR submitters. The result was an environment where the RBS Yen and Swiss Franc traders had increased opportunities to attempt to manipulate Yen and Swiss Franc LIBOR to RBS's benefit.

RBS's Yen and Swiss Franc derivatives traders quickly took advantage of this new arrangement. Sitting with the Primary Submitter, the traders not only shared their views of market conditions, or "market color," but they also told him what their trading positions were and encouraged him to make submissions that would make their positions more profitable. At times, if the Primary Submitter was not at the desk, the traders made written requests via Bloomberg chats or instant messages.

If the Primary Submitter was absent, junior derivatives and money market traders determined RBS's Swiss Franc LIBOR submissions, and a London-based derivatives trader ("Yen Trader 1") made the Yen LIBOR submissions. The substitute submitters took advantage of those opportunities to ensure that the Yen and Swiss Franc LIBOR submissions were beneficial either to those of other RBS traders, or at times positions held in RBS's Yen or Swiss Franc money market trading book.

---

[9]   An interest rate swap generally exchanges a fixed payment for a floating payment, which is usually tied to LIBOR.

STM was in place formally until mid-2008 and continued informally for Yen and Swiss Franc traders into 2009. In the spring of 2009, the trading floor was reorganized, and the derivatives traders and submitters were separated onto different desks. The seating change did nothing to slow the scheme. When they were no longer in close proximity to the submitters, the traders increased their use of Bloomberg chats and instant messages to continue making requests for beneficial submissions, which were frequently accommodated.

> **3.**     **RBS Made False Reports, Manipulated and Attempted to Manipulate Yen and Swiss Franc LIBOR for Certain Tenors Over Several Years to Benefit RBS Trading Positions**

From at least mid-2006 through at least late 2010, RBS frequently attempted to manipulate Yen LIBOR, and on numerous occasions made false Yen LIBOR submissions in furtherance of those attempts. From late 2006 through late 2009, RBS also attempted to manipulate Swiss Franc LIBOR, and made false Swiss Franc LIBOR submissions on a number of occasions, in furtherance of its manipulative attempts. At times, RBS was successful in manipulating Yen and Swiss Franc LIBOR.

> **a.**     **RBS's False Reporting and Manipulation of Yen LIBOR to Benefit Trading Positions**

Prior to 2006, the Yen swaps market was relatively stable and substantially smaller than the U.S. Dollar and Sterling markets. RBS was not a significant participant in the Yen swaps market. By mid-2006, the Yen swaps market became much more active and trading volume increased. Desiring a bigger presence, RBS recruited two experienced Yen derivatives traders for its subsidiary in Tokyo, RBS Securities Japan Limited, one to act as a manager responsible for RBS's Yen trading globally ("Yen Manager") and the other as a senior Yen derivatives trader ("Senior Yen Trader").[10] Both were well known in the industry as successful traders.

RBS gave the Senior Yen Trader and Yen Manager significant discretion to assume sizable risk and establish RBS as a major player in the Yen interest rate derivatives market. They succeeded, generating revenues from Yen interest rate derivatives trading alone of almost $200 million from 2006 through 2010.[11] RBS's Yen derivatives trading books were traded 24 hours a day, from RBS trading desks in the United States, U.K., and Asia under the direction of Yen Manager and the Senior Yen Trader. The Senior Yen Trader generally managed the trading of short-term tenors of the Yen trading book, assisted by a Yen derivatives trader in Connecticut and Yen Trader 1 located in London. Yen Trader 1 also was the backup Yen LIBOR submitter. Yen Manager generally managed the trading of longer-term tenors, assisted by another Yen

---

[10]    In 2009, the Senior Yen Trader relocated to the Singapore office of The Royal Bank of Scotland plc, where he continued attempting to manipulate Yen LIBOR as found herein.

[11]    From 2006 to 2007, RBS's Yen traders increased RBS's revenues from trading in the Yen interest rate derivatives market, from a small loss to a gain of over $20 million. In 2008, RBS's revenues from Yen interest rate derivatives trading more than quadrupled, exceeding $90 million. In 2009 and 2010 combined, RBS reaped more than $90 million in additional revenue from Yen interest rate derivatives trading. The Yen desk also traded other Yen based products that generated additional significant revenue for RBS.

derivatives trader in London ("Yen Trader 2"). At the end of the trading day in Asia, RBS passed its Yen trading book first to London, then to Connecticut, and back to Asia when trading resumed in Asia.

From mid-2006 through late 2010, RBS's Yen LIBOR submissions for the one, three, and six-month tenors were included in the official Yen LIBOR trimmed average rate the vast majority of the time, as set forth in the following table.

| PERCENTAGE OF RBS YEN LIBOR SUBMISSIONS INCLUDED IN FINAL LIBOR FIXING | | | |
|---|---|---|---|
| YEAR[12] | 1 MONTH TENOR | 3 MONTH TENOR | 6 MONTH TENOR |
| 2006 | 91.3% | 18.8% | 62.4% |
| 2007 | 78.7% | 69.2% | 82.2% |
| 2008 | 73.6% | 75.6% | 79.1% |
| 2009 | 93.3% | 87.0% | 83.8% |
| 2010 | 95.3% | 88.9% | 92.5% |

During the same time frame, multiple RBS Yen traders and at least one manager attempted to manipulate LIBOR by making hundreds of requests of the Primary Submitter and London-based traders, including Yen Traders 1 and 2. At times, they were successful in manipulating Yen LIBOR. The Senior Yen Trader made most of the requests, but Yen Manager and other RBS Yen traders also made such requests. London-based Yen derivatives traders also made their own requests of the Primary Submitter, both in person as they sat together during the STM period, and through Bloomberg chats and other means. The traders' requests for preferential Yen LIBOR submissions were common and made openly on the trading floors in Asia and London. At times, at least one RBS manager was present when requests were made. The requests were often accommodated by the Primary Submitter and by the backup submitters, including most often Yen Trader 1 when he was the backup.

Yen derivatives traders' requests for beneficial submissions were usually for the most frequently traded tenors: one-month, three-month, and six-month. At times, the requests covered other tenors as well. Always seeking to maximize profit, the traders either asked for specific rates to be submitted or asked for a directional move, either higher or lower, in RBS's submissions. The requests were either for a particular day or for several days, and on some occasions, even weeks of submissions.

i.  **Internal Yen Requests by the Senior Yen Trader and Others**

In addition to the oral requests for preferential Yen LIBOR submissions made by RBS Yen traders, the Yen traders made hundreds of improper requests by Bloomberg chat and other means.[13] The following are some examples of such written requests:

---

[12]  The 2006 percentages are calculated from June 1, 2006 through December 31, 2006.

**August 29, 2006:**[14]

| | |
|---|---|
| Yen Trader 3: | big 6m fix today, […] |
| Yen Trader 4: | we got loads yeh […] need it kept low but I think we're on the low side of the fix anyway |
| Yen Trader 3: | will try to get it as low as possible |

**February 14, 2007:**

| | |
|---|---|
| Senior Yen Trader: | 3m libor seem to be set low today ..we have big fixing tomorrow[,] luckily 6m libor comes in higher than yest |
| Yen Trader 1: | yes[,] slightly[,] 250 fixing tomorrow? |
| Senior Yen Trader: | yep |
| Yen Trader 1: | [Primary Submitter] will try for us |

**May 3, 2007:**

| | |
|---|---|
| Senior Yen Trader: | can you drop a note to [Primary Submitter] to set low 1m and low 3m JPY libor today please?  Thanks |
| Yen Trader 5: | just gave him a shout, said already on it… |
| Senior Yen Trader: | thanks |
| Yen Trader 5: | no probs |

**September 3, 2009:**

| | |
|---|---|
| Senior Yen Trader: | [Yen Trader 6], can you ask [Primary Submitter] to drop 3m Libor by 1 bps?  hold 6m libor unchange [sic] thanks |
| Yen Trader 6: | Yes[,] going over to his desk now[,] yup, 6s going unch, 3s will drop by 1 |
| Senior Yen Trader: | domo |

**May 20, 2010:**

| | |
|---|---|
| Senior Yen Trader: | [Yen Trader 1/Yen Trader 6] can ask [Primary Submitter] to bump up 6m JPY libor by 1 bp |
| Yen Trader 1: | sure |
| Senior Yen Trader: | tx |
| Yen Trader 6: | yes |

---

[13]  For purposes of this Order, the term "request" means a request for a preferential submission for a particular tenor.

[14]  The communications quoted in this Order contain shorthand trader language and many typographical errors.  The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

9

The Senior Yen Trader and other Yen traders knew that they could impact the fixing of the daily Yen LIBOR and were aware that LIBOR submissions might be questioned by the BBA. In the following example, the Senior Yen Trader boasts about how RBS succeeded in moving six-month Yen LIBOR and then discussed what false story they could give to justify a low submission if necessary:

**April 2, 2008:** (Emphasis added.)

| | |
|---|---|
| Senior Yen Trader: | **nice libor[.] our 6m fixing move the entire fixing[.] hahahah** |
| Yen Trader 1: | **the BBA called to ask me about that today** |
| Senior Yen Trader: | **really?** |
| Yen Trader 1: | **yes** |
| Senior Yen Trader: | **they complain?** |
| Yen Trader 1: | **asked to speak to me about the low 6m rate** |
| Yen Trader 1: | **no[,] just to make sure i was happy with it [...]** |
| Senior Yen Trader: | **i think some banks must have complain** |
| Yen Trader 1: | **he called b4 any of the other banks saw our data[,] at about 11.15[,] to check it was ok** |
| Senior Yen Trader: | **oh then its fine** |
| Yen Trader 1: | **before publishing** |
| Senior Yen Trader: | **i am sure some HF [hedge fund] will complain tomorrow ..** |
| Yen Trader 1: | **tough** |
| Senior Yen Trader: | **we will say we lower every tenor ..1m 3m 6m ..we feel rbs name has very good credit ..no problem getting money in good way to boost share price!** |
| Senior Yen Trader: | **our 3m libor is at top end ...6m at bottom end ...just the ideal level!** |

### ii.   The Knowing Participation of Yen Manager

As noted above, Yen Manager, a trader as well as the manager responsible for RBS's global Yen derivatives trading, was not only aware of improper requests for false submissions by others, but also personally asked RBS's long-term tenor Yen traders located in London, primarily Yen Trader 2, to submit rates to benefit his positions. Yen Manager's participation in the attempts to manipulate is reflected below:

**August 22, 2007:**

| | |
|---|---|
| Yen Manager: | Hi Mate, where are u calling the 6m and 3s Libor today ? |
| Yen Trader 1: | i put in 1.05 and 1.15 |
| Yen Manager: | ok cool...is that close to consensus ? |

| | |
|---|---|
| Yen Trader 1: | i think my 3s are too high[,] 6s will prob be 1.13 too[,] but i wanted high fixes today |
| Yen Manager: | ok cool[,] its all a random variable for us at this stage it is just we have some small fixings |
| Yen Trader 1: | well let me know if you have any preferencves [sic][,] each day |
| Yen Manager: | thx will do |

**December 3, 2007:**

| | |
|---|---|
| Yen Manager: | for choice we want lower libors...let the [Money Market] guys know pls |
| Yen Trader 2: | sure i am setting today as [Yen Trader 1] and cash guy off [Primary Submitter] |
| Yen Manager: | great set it nice and low |
| Yen Trader 2: | 1.02 in 6m or lower |
| Yen Manager: | yeh lower |
| Yen Trader 2: | 1.01 then cant really go much lower than that |
| Yen Manager: | ok |
| Yen Trader 2: | u care for 1m and 3m too[?] looks to me like fra map pretty flat |
| Yen Manager: | lower generally dude |
| Yen Trader 2: | cool |
| Yen Manager: | within the acceptable bounds |

**December 13, 2007:** (Referencing that backup submitter is accounting for his own positions.)

| | |
|---|---|
| Yen Trader 2: | um will have a word with our guy in sec[,] he was out yest |
| Yen Manager: | get them to set where the real mkts are not bl**dy 1.12[,] massive rec in short end |
| Yen Trader 2: | [Yen Trader 1] wants high still […] |
| Yen Trader 2: | [Yen Trader 1] is goi[n]g 1.12 again :-( […] |
| Yen Manager: | can you please ask him what sought [sic] of size fixing has he got |
| Yen Trader 2: | 200bn |
| Yen Trader 2: | sorry that tomorrow |
| Yen Trader 2: | 50 bn today |
| Yen Manager: | for 50bn he is setting so high???? |
| Yen Trader 2: | well he has a lot tomorrow200bn 6m and 300bn 3m[,] so high today and tomorrow then collapse IMM |
| Yen Manager: | we got 120bn today can u let him know that |

11

| Yen Manager: | as long [as] these fixing are fair its fine ...just setting crazy fixings when things are trading way below |
| Yen Trader 2: | Do u want to speak to him [Yen Manager] u r the boss he will not listen to me |
| Yen Trader 2: | I agree with u |
| Yen Manager: | ok will speak to him |

**February 29, 2008:**

| Yen Manager: | get our boys to put higher libors then |
| Yen Manager: | bought more mar asset at 28 all together we are long 490 |
| Yen Trader 2: | ok [...] |
| Yen Manager: | higher libor will be nice |
| Yen Trader 2: | mkt is going to be illiquid as hell today can tell already |
| Yen Trader 2: | will try |
| Yen Trader 2: | we will go hiogh [sic] [...] |
| Yen Trader 4: | gave 2yr basis here so high 3s too |
| Yen Trader 2: | yeh we are going high everything [sic] |

**March 18, 2008:**

| Yen Manager: | mng |
| Yen Trader 2: | [Yen Manager] give us a shout when u can plse[,] libors calls lads here are[,] 1m 84.25[,] 3m 96.75[,] 6m 1.02[,] i ahve [sic] asked our guy if he can go low |

### iii.   The Senior Yen Trader Expected His Requests to be Followed

   The Senior Yen Trader expected his requests to be followed by the Primary Submitter and grew frustrated when they were not.  In the following communications, the Senior Yen Trader and others discussed that conflicting positions with other traders, including traders outside of RBS, might be why his requests for beneficial Yen LIBOR submissions were not being followed.  To resolve internal conflicting positions and related requests, usually between short-end traders (*i.e.*, Senior Yen Trader) and long-end traders (*i.e.*, Yen Manager and Yen Trader 2), the Senior Yen Trader suggested engaging in offsetting transactions to minimize any negative impact his request might have on others.

**March 27, 2008: (Emphasis added.)**

| Senior Yen Trader: | rumours going ard it seems[,] we change the libor lower? [...] |

| Yen Trader 1: | dont ask[,] I was in a novation meeting and [Yen Trader 2] asked [Yen Trader 5] to put it low |
| Senior Yen Trader: | **[Yen Trader 2] shud have just sq[uar]ed it with us if he need it lower[,] cos i dont think they have as big position as us next few weeks** |
| | [...] |
| Yen Trader 1: | cant believe he put it at 99 |
| | [...] |
| Senior Yen Trader: | thats probably gonna cost us 200k gbp |
| Yen Trader 1: | ive told them |
| Senior Yen Trader: | **does he need it or [UBS Yen Trader]<sup>15</sup> ask him to do it? cos wanted low** |
| Yen Trader 1: | [Yen Trader 2] sais [sic] he needed low[,] it wont be for [UBS Yen Trader] |
| | [...] |
| Senior Yen Trader: | tomorrow we need to bump it way up high...highest among all if possible |
| Yen Trader 1: | they wont do that again for sure |
| Senior Yen Trader: | even tho we are short fixing..i can cover that in mrng.. |
| | [...] |
| Senior Yen Trader: | we need to bump up all the way in the 3mth libor tomorrow as well |
| Yen Trader 1: | we will put it in tonmorrow [sic] morning and no one will touch it i promise you |

**June 29, 2009:** (Emphasis added.)

| Senior Yen Trader: | i thot we going low 6m! [Primary Submitter] hike up 2 bps |
| Yen Trader 1: | what did [Primary Submitter] go ? |
| | [...] |
| Yen Trader 1: | oops |
| Senior Yen Trader: | **thats 0.25 hike to the libor due to us** |
| | [...] |
| Senior Yen Trader: | maybe he wasnt on his desk and someone change it |
| Yen Trader 1: | i dont understand why they do that[,] it happens often[,] its like they do it deliberately to show that they wont be told what to d oby [sic] us |

---

<sup>15</sup>  As discussed below, certain RBS traders were aware that a senior Yen trader at UBS ("UBS Yen Trader"), who was a former RBS trader, was engaged in similar attempts to manipulate Yen LIBOR and at times colluded with two RBS derivatives traders in an attempt to achieve a manipulated rate.

**December 1, 2009:** (Emphasis added.)

| | |
|---|---|
| Senior Yen Trader: | whats [Primary Submitter] fixing today? |
| Yen Trader 1: | 1 lower |
| Senior Yen Trader: | all tenor? |
| Yen Trader 1: | yes[,] says this has nothing to do with his fixings and wont change |
| Senior Yen Trader: | that's fine |
| Yen Trader 1: | **but is going 1 lowert [sic] out of sympathy** |
| Senior Yen Trader: | unchange 6m would be better |

### iv. RBS Traders were Aware of Other Banks that were also Manipulating Yen LIBOR

RBS Yen traders knew that they were engaging in wrongful conduct and that Yen LIBOR was being manipulated to benefit trading positions throughout the market. As the Senior Yen Trader, Yen Manager, and other Yen traders coordinated their requests for beneficial LIBOR submissions with the Primary Submitter, they discussed at times how the Yen LIBOR panel was a "cartel" in which rates were being "manipulated." RBS traders, including the Senior Yen Trader, also discussed how the UBS Yen Trader was attempting to manipulate Yen LIBOR, including by coordinating with others. Despite the recognition that manipulation was occurring, at least one RBS trader welcomed having the UBS Yen Trader in the market because his aggressive trading brought increased liquidity, allowing traders, such as the RBS traders, to take on larger positions and potentially obtain greater trading profits. Examples of such communications include the following:

**August 20, 2007:**

| | |
|---|---|
| Yen Manager: | it seems to be [UBS] is pushing for these libors partnering up with number of cash guys as well […] |
| Yen Trader 2: | yeah [UBS Yen Trader] all over it |

**August 20, 2007:** (Emphasis added.)

| | |
|---|---|
| Senior Yen Trader: | this libor setting is getting nutss […] |
| Bank A Trader: | im puzzled as to why 3m libor fixing not coming off after the FED action […] |
| Bank B Trader: | [UBS] is lending dolls through my currencies in 3 month do u see him doing the same in urs […] |
| Senior Yen Trader: | yes[,] he always led usd in my mkt[,] the jpy libor is a cartel now […] |
| Senior Yen Trader: | **its just amazing how libor fixing can make you that much money** |

14

| | |
|---|---|
| Senior Yen Trader: | [...]<br>**its a cartel now in london[.] they smack all<br>the 1yr irs ..and fix it very high or low** |

December 5, 2007: (Emphasis added.)
| | |
|---|---|
| Yen Trader 2: | FYI libors higher again today<br>[...] |
| Yen Trader 4: | 'ucksake. keep ours low if poss. don't<br>understand why needs to go up in yen |
| Yen Trader 2: | **no reason dude[,] [Bank C] and [Bank D]<br>went high yest** |
| Yen Trader 4: | send the boys round<br>[...] |
| Yen Manager: | **pure manipulation going on** |

### v. The Primary Submitter Based Certain RBS Yen LIBOR Submissions on Traders' Requests or at times Based on His Own Trading Positions

The Primary Submitter and his backup submitters often considered and at times based Yen LIBOR submissions on the rates or levels requested by the RBS Yen derivatives traders to benefit their trading positions, as well as to benefit their own money market and derivatives trading positions.  The Primary Submitter knew that the Yen derivatives traders were making the requests to benefit their Yen derivatives trading positions.  To accommodate the traders, the Primary Submitter often moved RBS's Yen LIBOR submissions by one or more basis points in the direction requested by the Yen traders, or submitted a specific rate depending on the particulars of the traders' requests.  At times, RBS's false submissions affected the fixing of Yen LIBOR.

As noted above, for a significant period of time many of those communications were oral, since the Primary Submitter was seated near the London-based Yen traders.  After the Primary Submitter was relocated away from the Yen traders, written communications capture his ready acquiescence to making the LIBOR submissions based on the requests of the traders, as exemplified by the following chats:

April 15, 2009:
| | |
|---|---|
| Yen Trader 1: | high 6s low 3s please [Primary Submitter] |
| Primary Submitter: | np |

April 21, 2009:
| | |
|---|---|
| Yen Trader 1: | can we bump up 6m libor pls |
| Junior Trader: | sure what level works for you |
| Junior Money Markets Trader: | aahaha |
| Yen Trader 1: | 755[,] what diod we do yerst ? [sic] |
| Primary Submitter: | 75 |
| Primary Submitter: | 75 |
| Yen Trader 1: | 755 ? |

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Primary Submitter:  | we go 76 today                                         |
| Yen Trader 1:       | thks                                                   |

**May 20, 2009:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 1:       | high 3s and low 6s pls [Primary Submitter]             |
| Primary Submitter:  | no problems                                            |
| Yen Trader 1:       | grazias amigo                                          |
| Yen Trader 1:       | where will you lower 6s to ?                           |
| Primary Submitter:  | 70                                                     |

**September 14 and 15, 2009:** (Primary Submitter agrees to switch direction of submissions over two consecutive days.)

**September 14:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 1:       | high 3s and 6s please                                  |
| Primary Submitter:  | ok                                                     |

**September 15:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 1:       | can we lower our fixings today please [Primary Submitter] |
| Primary Submitter:  | make your mind up[,] haha , yes no probs               |
| Yen Trader 1:       | im like a whores drawers                               |

**September 18, 2009:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 6:       | Morning [Primary Submitter][,] can we hike 6m libor by 1 p today if possible |
| Primary Submitter:  | For u yes                                              |
| Yen Trader 6:       | hnaks [sic] [Primary Submitter]                        |

**September 23, 2009:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 6:       | canwe [sic] lower 3mnth Libor by 1 bp if possible      |
| Primary Submitter:  | [Yen Trader 6] , sure                                  |
| Yen Trader 6:       | thanks [Primary Submitter]                             |

**September 24, 2009:**

|                     |                                                        |
|---------------------|--------------------------------------------------------|
| Yen Trader 6:       | Morning [Primary Submitter]                            |
| Primary Submitter:  | HI                                                     |
| Yen Trader 6:       | Can we lower 3m and 6m libors by 1 bp if ppossible [sic] |
|                     | [...]                                                  |
| Primary Submitter:  | Only as its you                                        |
| Yen Trader 6:       | :0                                                     |
| Yen Trader 6:       | :-).                                                   |

The Primary Submitter also often considered, and at times based his Yen LIBOR submissions on his money market and derivatives trading positions. As he commented to an interdealer broker in March 2010, "always suits me if anything to go lower as i rcve [sic] funds."

### vi. The Main Backup Yen LIBOR Submitter, a Yen Derivatives Trader, Frequently Based Submissions on Trading Positions

Yen Trader 1 also acted as the main backup Yen LIBOR submitter when the Primary Submitter was either out of the office or busy with other tasks. At those times, Yen Trader 1 often made RBS's Yen LIBOR submissions to increase the profitability of his own derivatives trading positions or the positions of the Senior Yen Trader, Yen Manager, or other Yen derivatives traders. The following examples show his close coordination with the Senior Yen Trader.

**August 17, 2007: (Emphasis added.)**

| | |
|---|---|
| Senior Yen Trader: | we need usd libor to drop faster |
| Yen Trader 1: | jpy libors v high[,] i set them then [Primary Submitter] overrides them[,] he has gone now for 2 weeks |
| | [...] |
| Senior Yen Trader: | I dont think 3m jpy libor will drop that much[,] 3m jpy at most down 1bps |
| Yen Trader 1: | **oh no[,] not if i have anything to do with it[,] and i do have somethin gto do with it ! lol** |
| | [...] |
| Senior Yen Trader: | only way is to bump up sep bucket for 6m.jpy up more |
| Yen Trader 1: | its at 14 already |
| Senior Yen Trader: | try 17? |
| Yen Trader 1: | hahah[,] i will keep our number sflat |
| | [...] |
| Senior Yen Trader: | so on monday , usd libor will drop 5bps,.but jpy will only follow suit a few days later |

**August 20, 2007: (Emphasis added.)**

| | |
|---|---|
| Yen Trader 4: | where's young [Yen Trader 1] thinking of setting it? |
| Yen Trader 1: | **where would you like it[,] libor that is[,] same as yesterday is call** |
| Yen Trader 4: | haha, glad you clarified ! mixed feelings but mostly I'd like it all lower so the world starts to make a little more sense. |
| Senior Yen Trader: | the whole HF [hedge fund] world will be kissing you instead of calling me if libor move lower |

| | |
|---|---|
| Yen Trader 1: | ok, i will move the curve down[,] 1bp[,] maybe more[,] if I can |
| Senior Yen Trader: | maybe after tomorrow fixing hehehe |
| Yen Trader 1: | fine[,] will go with same as yesterday then |
| Senior Yen Trader: | cool |
| Yen Trader 1: | maybe a touch higher tomorrow |

**August 22, 2007:**

| | |
|---|---|
| Yen Manager: | Hi Mate, where are u calling the 6m and 3s Libor today ? |
| Yen Trader 1: | i put in 1.05 and 1.15 |
| Yen Manager: | ok cool...is that close to consensus ? |
| Yen Trader 1: | i think my 3s are too high[,] 6s will prob be 1.13 too[,] but i wanted high fixes today |
| Yen Manager: | ok cool[,] its all a random variable for us at this stage it is just we have some small fixings |
| Yen Trader 1: | well let me know if you have any preferencves [sic][,] each day |
| Yen Manager: | thx will do |

**December 12, 2007:**

| | |
|---|---|
| Yen Trader 2: | they r calling libors a bit lower heree [sic] at mom |
| Yen Trader 2: | 1.03 and 1.0675 |
| Yen Trader 1: | i will keep ours higher though fyg |
| Yen Trader 4: | lower the better as usual |
| Yen Trader 4: | oh good |
| Yen Trader 2: | [Yen Trader 1] wants high |
| Yen Trader 1: | sry |
| Yen Trader 4: | [Yen Trader 1] you need high ongoing or just today? |
| Yen Trader 1: | for the next week or so |

**August 28, 2008:**

| | |
|---|---|
| Yen Trader 1: | where shall we put libors |
| Senior Yen Trader: | high 3m ...low 6m |
| Yen Trader 1: | 1s? |
| Senior Yen Trader: | low[,] so we dont need to change 1 today[,] pretend we forgot[,] we can change it tomorrow[,] assuming no one else in bank has any position in 1s |
| Yen Trader 1: | thats fine |

### vii.   Collusion with UBS Yen Trader

On a number of occasions from at least early 2007 through at least mid-2009, RBS, through two traders, colluded with the UBS Yen Trader in coordinated attempts to manipulate Yen LIBOR. Another RBS derivatives trader engaged in wash trades with UBS to generate brokerage commissions to compensate interdealer brokers for assisting UBS's attempted manipulations. That same RBS derivatives trader also attempted to manipulate Yen LIBOR at least once by coordinating with an interdealer broker to influence the submissions of other panel banks.

Beginning in early 2007 through at least late 2008, the UBS Yen Trader, who was a former employee of RBS, exploited his friendship with an RBS derivatives trader, Yen Trader 2, in his many attempts to manipulate Yen LIBOR to his advantage. Frequently, the two traders discussed how changes in Yen LIBOR could benefit their respective trading positions. Through written communications, the UBS Yen Trader asked Yen Trader 2 to make requests of the RBS Primary Submitter for certain Yen LIBOR submissions that would benefit the UBS Yen Trader's positions. Yen Trader 2 often agreed to and did make the requests of the Primary Submitter. The Primary Submitter accommodated some of those requests.[16]

The following are some of the examples of collusive requests from the UBS Yen Trader:

**February 8, 2007:**

| UBS Yen Trader: | can you do me a huge favour, can you ask your cash guys to set 1m libor low for the next few days[,] i'll return the favour as when you need it[,] as long as it doesn't go against your fixes[,] have 30m jpy of fixes over the next few days |
| Yen Trader 2: | yeah i will try |
| UBS Yen Trader: | anytime you need high 6m or whatever just ask[,] thanks ever so much [...] |
| UBS Yen Trader: | really need a hand on 1m lib[,] pls don't forget |
| Yen Trader 2: | ok i will try my best |
| UBS Yen Trader: | cheers |

**February 9, 2007:**

| UBS Yen Trader: | thx help 1m y/day appreciated |
| Yen Trader 2: | no worries [...] |
| UBS Yen Trader: | can you ask for a low 1m again today pls if ok? todays fix is 12m[,] you need anything on 3m or 6m? |

---

[16]   The Primary Submitter had better relationships with other RBS traders than he had with Yen Trader 2.

| Yen Trader 2: | no my book is still tiny i will go for a low libor again[.] it suits me too as i am short the spreads |
| UBS Yen Trader: | ok thanks |
| | [...] |
| Yen Trader 2: | i told my cash guy i want low 1m and 3m fixes and high 6 m that suits uu right ?? |
| UBS Yen Trader: | yes absolutely, is that ok with you? we will be exactly the same[.] am going to talk to [Bank E] as well |
| Yen Trader 2: | perfect |
| UBS Yen Trader: | cool[.]  you in monday? |
| Yen Trader 2: | yeah a bit |
| UBS Yen Trader: | ok get them to set the same fixes monday as well if ok |
| Yen Trader 2: | sure |

As the following chat exemplifies, Yen Trader 2 occasionally asked the UBS Yen Trader to have UBS make submissions for the benefit of the trading positions of Yen Trader 2.  Yen Trader 2 also knew that the UBS Yen Trader tried to influence the Yen LIBOR submissions of other panel banks to benefit his trading positions and asked the UBS Yen Trader to do the same for him.

**February 15, 2007:**

| Yen Trader 2: | how many people can u get to put this 1m libor low |
| UBS Yen Trader: | well us[,] [Bank E,] and a few others i think |

**February 21, 2007:**

| Yen Trader 2: | what ur guys calling 3s libor[?] we need to get some low fixes |
| UBS Yen Trader: | .64[,] yes will ask for low low high[,] 1m 3m 6m |
| Yen Trader 2: | our guy agrees but reckons it will be 67[,] not good |
| UBS Yen Trader: | no way! |
| | [...] |
| UBS Yen Trader: | [...] make sure your boys set low 1m and 3m |
| Yen Trader 2: | will try though [Yen Trader 1/backup Yen LIBOR submitter] wants high 3s and 6s |
| UBS Yen Trader: | we want high 6's too? don't let [Yen Trader 1] keep 3m high to help [Senior Yen Trader][,] i hate that guy |

Commencing in 2008, on at least a few occasions, the UBS Yen Trader reached out to another former colleague at RBS, a Sterling cash trader in London ("Sterling Cash Trader"), in his attempts to manipulate Yen LIBOR. The Sterling Cash Trader was a friend of the Primary Submitter, and readily agreed to help the UBS Yen Trader, asking the Primary Submitter to make submissions reflecting the rates specified by the UBS Yen Trader, as shown below. The Primary Submitter accommodated those requests.

**May 7, 2008:**

| | |
|---|---|
| UBS Yen Trader: | Hi [Sterling Cash Trader] if this is you can you pls ask for a low 6m in jpy for the next few days[.] Hope you are ok, was good seeing you last week[.] Cheers [UBS Yen Trader] |
| Sterling Cash Trader: | Hi mate, I mentioned it to our guy on Friday and he seemed to have no problem with it, so fingers crossed. |

**November 3, 2008:**

| | |
|---|---|
| UBS Yen Trader: | can you do me a favour and ask your guys for a low JPY 3m fix today if they can? |
| Sterling Cash Trader: | me |
| UBS Yen Trader: | wld be massiive [sic] help |
| Sterling Cash Trader: | will ask |
| UBS Yen Trader: | have monster fix[.] thanks [Sterling Cash Trader] |

### viii.    Coordination with an Interdealer Broker

In early 2010, the Sterling Cash Trader left RBS to work at an interdealer broker ("Interdealer Broker A"). Interdealer brokers, also called voice brokers, act as intermediaries between buyers and sellers in the money markets and derivatives markets, including banks on the Yen and Swiss Franc LIBOR panels. The interdealer brokers match buyers and sellers in return for commissions.[17]

While working for Interdealer Broker A, on limited occasions, the now former Sterling Cash Trader continued to ask the Primary Submitter to submit rates favorable to the positions of the UBS Yen Trader, who by then had left UBS and was trading for Bank C. The Primary Submitter agreed to accommodate those requests. For example:

---

[17]    Within an interdealer broker, there are brokers for different currencies who intermediate derivatives transactions and brokers who intermediate cash transactions. In order to find matching counterparties, brokers provide bid or offer prices for a financial transaction. Those prices are conveyed in multiple ways. Brokers use "squawk boxes," which are speakerphones that can speak simultaneously to numerous trading desks of their bank clients at once, to broadly disseminate bid and offer prices. Brokers also frequently use Bloomberg instant message chats and other messaging platforms, email, and dedicated telephone lines. Interdealer brokers also provide bank traders their views on pricing and market trends, known as "market color," and the banks rely on brokers for such information.

**March 3, 2010:** (Emphasis added.)

| | |
|---|---|
| Former Sterling Cash Trader: | can i pick ur brain? |
| Primary Submitter: | yeah |
| Former Sterling Cash Trader: | u see 3m jpy libor going anywhere btween now and imm? |
| Primary Submitter: | looks fairly static to be honest , poss more pressure on upside , but not alot |
| Former Sterling Cash Trader: | oh[,] we hve a mutual friend who'd love to see it go down, no chance at all? |
| Primary Submitter: | haha [former UBS Yen Trader at Bank C] by chance |
| Former Sterling Cash Trader: | shhh |
| Primary Submitter: | hehehe , mine should remain flat , always suits me if anything to go lower as i rcve funds |
| Former Sterling Cash Trader: | gotcha, thanks, and, if u cud see ur way to a small drop there might be a steak in it for ya, haha |
| Primary Submitter: | noted ;-) |
| Former Sterling Cash Trader: | 8-) |

**May 13, 2010:** (Emphasis added.)

| | |
|---|---|
| Former Sterling Cash Trader: | alloo, can i just chk ur leaving urs unch? |
| Primary Submitter: | oh yes[,] might even just go lower for the fun of it :-) |
| Former Sterling Cash Trader: | really, how much. |
| Primary Submitter: | Know [sic] unchanged but i knew [former UBS Yen Trader at Bank C] would get exicted [sic] by that |
| Former Sterling Cash Trader: | ha |

### ix. RBS Yen Trader 1 also Attempted to Manipulate Yen LIBOR through Interdealer Brokers and Engaged in Wash Trades to Compensate Dealers for Their Assistance

By January 2007, Yen Trader 1 at RBS came to suspect that the UBS Yen Trader was using interdealer brokers to manipulate Yen LIBOR. At that time, he commented to another RBS trader, stating: "do you think brokers go and tell small banks where it should be? [...] on behalf of the bigger banks  i could imagine UBS telling the brokers to go and get all the small banks to mark libor up." Several months later, in August 2007, Yen Trader 1 commented again to the Senior Yen Trader about information he learned from Interdealer Broker B, "i was out with [Interdealer Broker B] yesterday every day [UBS Yen Trader] comes down and asks the jpy desk to tell all the banks to set libor low."

Beginning a year later, from September 2008 to August 2009, as requested by at least two interdealer brokers, Interdealer Brokers B and C, Yen Trader 1 agreed to execute "wash" or

"switch" trades[18] with UBS, to compensate Interdealer Brokers B and C for assisting the attempts of the UBS Yen Trader to manipulate Yen LIBOR.[19]  Examples of the communications between Yen Trader 1 and the interdealer brokers coordinating on wash sales include the following:

**September 19, 2008:**

| | |
|---|---|
| Interdealer Broker B: | can you do me a favour … you're not going to get paid any bro for this and we'll send you lunch around for the whole desk.  Can you flat…can you switch two years semi at 5 3/4 , 100 yards [meaning 100 billion] … between UBS. Just get … take it from UBS, give it back to UBS.  He wants to pay some bro.  We won't bro you… |
| Yen Trader 1: […] | Yeah, yeah |
| Interdealer Broker B: | Yeah.  Yeah.  100 yards … actually can you make it 150 and I'll send lunch around for everybody? |
| Yen Trader 1: | Yeah. |
| Interdealer Broker B: | Thanks very much.  Cheers.  Cheers, mate and you choose lunch. |

That same day, Interdealer Broker B asked Yen Trader 1 to accept wash trades with UBS of an additional 100 billion Yen to enable the UBS Yen Trader to pay approximately $31,000 in brokerage fees to Interdealer Broker B as compensation for the latter's assistance in the manipulation.  By agreeing to do so, Yen Trader 1 knowingly assisted the UBS Yen Trader's manipulative attempts because he helped ensure that the interdealer broker was compensated.

Yen Trader 1 eventually asked Interdealer Broker B, on at least one occasion, to try to influence other panel banks' Yen LIBOR submissions to benefit the trading positions of Yen Trader 1, as is reflected below.

**June 26, 2009:**

| | |
|---|---|
| Yen Trader 1: | Has [UBS Yen Trader] been asking you to put LIBORs up today? |
| Interdealer Broker B: | [speaking to another person] What's [UBS Yen Trader] want on LIBORs today?  Is he fixing anything about LIBORs?  What does he want?  What way does he want it? |

---

[18]   Generally, a "wash" trade is a pair of offsetting trades that are intended to negate risk or price competition and that result in a financial nullity.  One financial consequence of such trades, however, is that they generate commissions for the firm brokering the transactions.

[19]   RBS paid brokerage commissions on some of these wash trades to maintain good relationships with the interdealer brokers.

|                       |                                                                                                                                                                                                                                                                                                                                                                     |
| --------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                       | [speaking to Yen Trader 1] Did you hear that?                                                                                                                                                                                                                                                                                                                        |
| Yen Trader 1:         | No.                                                                                                                                                                                                                                                                                                                                                                  |
| Interdealer Broker B: | He wants ones, ones and threes a little bit lower and sixes probably about the same where they are now.  He wants them to stay the same.                                                                                                                                                                                                                              |
| Yen Trader 1:         | I want them lower.                                                                                                                                                                                                                                                                                                                                                   |
| Interdealer Broker B: | You want them lower?  What the sixes?                                                                                                                                                                                                                                                                                                                                |
| Yen Trader 1:         | Yeah.                                                                                                                                                                                                                                                                                                                                                                |
| Interdealer Broker B: | Alright, well, alright, alright, we'll work on it.                                                                                                                                                                                                                                                                                                                   |

Later that same day, Interdealer Broker B reported back to Yen Trader 1 as follows:

|                       |                                                                                                                                                                                                                                                                                                                                                                     |
| --------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| Interdealer Broker B: | Hello mate, [Yen Trader 1]?  You all set?                                                                                                                                                                                                                                                                                                                            |
| Yen Trader 1:         | Yeah.                                                                                                                                                                                                                                                                                                                                                                |
| Interdealer Broker B: | Right listen we've had a couple of words with them, you want them lower right?                                                                                                                                                                                                                                                                                       |
| Yen Trader 1:         | Yeah.                                                                                                                                                                                                                                                                                                                                                                |
| Interdealer Broker B: | Alright okay, alright listen, we've had a couple words with them.  You want them lower, right?                                                                                                                                                                                                                                                                       |
| Yen Trader 1:         | Yeah.                                                                                                                                                                                                                                                                                                                                                                |
| Interdealer Broker B: | Alright okay, alright, no we're okay just confirming it.  We've, so far we've spoke to [Bank F].  We've spoke to a couple of people so we'll see where they come in alright.  We've spoke, basically one second, basically we spoke to [Bank F], [Bank G], [Bank H], who else did I speak to?  [Bank I].  There's a couple of other people that the boys have spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright? |
| Yen Trader 1:         | Cheers.                                                                                                                                                                                                                                                                                                                                                              |
| Interdealer Broker B: | Cheers no worries mate.                                                                                                                                                                                                                                                                                                                                              |

Yen Trader 1 then executed a wash trade with UBS to compensate Interdealer Broker B for its assistance, generating about $20,000 in commissions for Interdealer Broker B.

  **b.**  <u>RBS's False Reporting and Manipulation of Swiss Franc LIBOR to Benefit Trading Positions</u>

On numerous occasions, from at least late 2006 through mid-2009, RBS attempted to manipulate Swiss Franc LIBOR to benefit the trading positions held by RBS Swiss Franc derivatives traders, mainly the principal Swiss Franc derivatives trader for RBS ("Swiss Franc

Trader"), and by the Primary Submitter. On a number of those occasions, RBS made false LIBOR submissions in furtherance of its manipulative attempts. At times, the Swiss Franc Trader also coordinated with a former RBS trader at another bank about Swiss Franc LIBOR submissions. At times, RBS succeeded in manipulating Swiss Franc LIBOR.

### i. Internal Requests to Skew Swiss Franc LIBOR Submissions

From 2007 through 2009, RBS's submissions for three and six-month tenors were included in the official Swiss Franc LIBOR trimmed average rate the vast majority of the time, as set forth in the following table:

| PERCENTAGE OF RBS SWISS FRANC LIBOR SUBMISSIONS INCLUDED IN FINAL LIBOR FIXING | | |
|---|---|---|
| YEAR | 3 MONTH TENOR | 6 MONTH TENOR |
| 2007 | 79.1% | 78.3% |
| 2008 | 86.2% | 90.6% |
| 2009 | 74.7% | 97.6% |

As of December 2006, the Swiss Franc Trader sat next to the Primary Submitter in London, as part of the STM seating arrangement. The Swiss Franc Trader and the Primary Submitter were the only senior traders at RBS who traded Swiss Franc LIBOR-linked financial instruments.[20]

From the outset, consistent with the improper communications occurring with the Yen traders, the Primary Submitter regularly asked the Swiss Franc Trader at what level he wanted Swiss Franc LIBOR to be submitted that day, and the Swiss Franc Trader often asked for Swiss Franc LIBOR submissions that would benefit his trading positions. The requests typically related to the three and six-month tenors of Swiss Franc LIBOR, with occasional requests regarding the one-month tenor. The Primary Submitter often considered and frequently based RBS's Swiss Franc LIBOR submissions on the Swiss Franc Trader's requests. The Primary Submitter also made submissions to benefit his own money market and derivatives trading positions.

Initially, the Swiss Franc Trader's frequent requests for beneficial LIBOR submissions were made mostly in person because he sat next to the Primary Submitter. Occasionally, if the Primary Submitter was away from his desk, the Swiss Franc Trader made written requests for beneficial Swiss Franc LIBOR submissions. The following are examples:

**December 4, 2008:**

| | |
|---|---|
| Swiss Franc Trader: | can u put 6m swiss libor in low pls? |
| Primary Submitter: | NO |

---

[20]  During this period, as with its Yen interest rate derivatives trading, RBS's revenues from Swiss Franc interest rate derivatives trading grew significantly, from over $15 million in 2007 to over $78 million in 2009. The Swiss Franc desk also traded other Swiss Franc based products that generated additional significant revenue for RBS.

| | |
|---|---|
| Swiss Franc Trader: | should have pushed the door harder |
| Primary Submitter: | Whats it worth |
| Swiss Franc Trader: | ive got some sushi rolls from yesterday? [...] |
| Primary Submitter: | ok low 6m , just for u |
| Swiss Franc Trader: | wooooooohooooooo[,] 0.01%? thatd be awesome |
| Primary Submitter: | 1.33 |
| Swiss Franc Trader: | perfect[.] u r a nice man |

**December 31, 2008:**

| | |
|---|---|
| Swiss Franc Trader: | High 3m libor pls!!!!!!! |
| Primary Submitter: | ok if i must |
| Swiss Franc Trader: | Yes pls [...] |
| Swiss Franc Trader: | U the man |

In 2009, the Swiss Franc Trader began using Bloomberg chats more frequently to make his requests, particularly after being re-located away from the Primary Submitter. Throughout the first half of 2009, the requests were frequent, as often as several times per week. The following are examples of his many communications with the Primary Submitter:

**January 16, 2009: (To Primary Submitter.)**

| | |
|---|---|
| Swiss Franc Trader: | high 3m libor pls!!!!!! |
| Swiss Franc Trader: | low 6m libor pls!!!!!!!! |

**January 30, 2009:**

| | |
|---|---|
| Swiss Franc Trader: | high 3m libors pls!!!!!! |
| Primary Submitter: | 0.50?? |
| Primary Submitter: | 0.51 |
| Primary Submitter: | 0.52 |
| Primary Submitter: | 0.53 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | 0.54 |
| Swiss Franc Trader: | and low 6m |
| Primary Submitter: | Ok i get ya |
| Swiss Franc Trader: | 0.65 |
| Swiss Franc Trader: | 0.65 |
| Swiss Franc Trader: | 0.65 |
| Swiss Franc Trader: | 0.65 |
| Primary Submitter: | ok |

26

| | |
|---|---|
| Primary Submitter: | libors as requested |
| Swiss Franc Trader: | you a top dog |

**February 11, 2009:**

| | |
|---|---|
| Junior Money Markets Trader: | chf libors anyting special? |
| Swiss Franc Trader: | high 3m pls[,] 6m neutral[,] hanks thanks |

**March 19, 2009:**

| | |
|---|---|
| Swiss Franc Trader: | hello mr [Primary Submitter][,] can we go unch for libors again pls? 42 54? or any lower in 6m would make u the best guy ever |
| Primary Submitter: | 40 52 |
| Swiss Franc Trader: | can we make the 3m higher pretty pretty please?  how about 41 53 ? |
| Primary Submitter: | ok you win |
| Swiss Franc Trader: | u r the man |

**May 5, 2009:**

| | |
|---|---|
| Swiss Franc Trader: | can we get high 3m, low 6m pls! |
| Primary Submitter: | maybe |
| Swiss Franc Trader: | PPPPLLLLLEEEEEAAAAASSSSEEEEEE |
| Primary Submitter: | ok 41 52 |
| Swiss Franc Trader: | perfect perfect |

    ii.    **RBS Coordinated Swiss Franc Submissions at times with a Former RBS Employee at Another Bank**

The Swiss Franc Trader also discussed and coordinated trading with a former RBS trader who traded Swiss Franc derivatives for a different LIBOR panel bank, Bank E.  Through near-daily Bloomberg chats, the two traders discussed their respective Swiss Franc trading positions which were linked to LIBOR.  In the following communications, the two traders also discussed their preferred Swiss Franc LIBOR rates, the amount of the potential benefit they could receive from such rates, and the requests they made of their respective submitters:

**July 4, 2007: (To Bank E Swiss Franc Trader.)**

| | |
|---|---|
| Swiss Franc Trader: | yes.. they called 3m libor unchanged this morn[,] so i complained[,] so its all moved |

**July 24, 2007:**

| | |
|---|---|
| Bank E Swiss Franc Trader: | 1m libor not a bit high? |
| Swiss Franc Trader: | yes it s ajoke.  im so annoyed |
| Bank E Swiss Franc Trader: | This is shittt[,] With a fwd of 29.2 should be pretty much same as yesterday no? |
| Swiss Franc Trader: | yep [...] 1m libor should not be higher |
| Bank E Swiss Franc Trader: | I told them |

| Swiss Franc Trader: | what they say? i moaned too.. they had 6m libor at 85.. i was gonna lose 1.25 bps on 2k futs |
| Bank E Swiss Franc Trader: | Where should 6m be then?  I need it low |
| Swiss Franc Trader: | well 6m 3s irs is 86.4.. so you will still make 0.4 ag fix |

**April 15, 2008:**

| Bank E Swiss Franc Trader: | you know what i hope[,] that libor 3m is not going up |
| | […] |
| Swiss Franc Trader: | Yes.. Should not go up..  Just hang here |
| Bank E Swiss Franc Trader: | ok[,] just weird that zurich put it at  2.77 today |
| Swiss Franc Trader: | So fx basis will go negative if 3m usd ever starts to go down |
| | […] |
| Bank E Swiss Franc Trader: | you should tell [Primary Submitter][,] if you can[,] the set it at 2.78 |
| | […] |
| Swiss Franc Trader: | I ask him for low today[,] 3m and 6m |
| Bank E Swiss Franc Trader: | hahah[,] 'yes ok mate i am heading out for a run[,] enjoy[,] talk tom[,] get those fixings down |

**October 21, 2008:**

| Swiss Franc Trader: | we need that libor down fast |
| Bank E Swiss Franc Trader: | yes[,] exactly |
| | […] |
| Swiss Franc Trader: | and [Primary Submitter] says he will set lower |

**March 17, 2009:**

| Swiss Franc Trader: | we need a few days unch |
| Bank E Swiss Franc Trader: | yes |
| Swiss Franc Trader: | i ask [Primary Submitter] now to fix unch every day |

**May 14, 2009:** (Related Bloomberg chats reflecting attempts to manipulate Swiss Franc LIBOR.)

**Chat With Primary Submitter:**

| Swiss Franc Trader: | [Primary Submitter] pls can we get super high 3m[,] super low 6m |
| Swiss Franc Trader: | PRETTY PLEASE! |
| Primary Submitter: | 41 & 51 |

| Swiss Franc Trader: | if u did that[,] i would lvoe [sic] u forever |
| Primary Submitter: | 41 & 55 then ... |
| Swiss Franc Trader: | if u did that i would come over there and make love to you[,] your choice |
| Primary Submitter: | 41+51 it is |
| Swiss Franc Trader: | thouht [sic] so |
| Primary Submitter: | so shallow |

**Chat With Bank E Swiss Franc Trader:**

| Swiss Franc Trader: | we are good! |
| Bank E Swiss Franc Trader: | yes[,] look at it now[,] low libor[,] and chf libor good too [...] |
| Swiss Franc Trader: | [Primary Submitter] did me big favour today[,] he set 41 and 51 |
| Bank E Swiss Franc Trader: | sweet |

**c.**     <u>RBS Attempted to Manipulate LIBOR after the Press Became Critical of Banks' LIBOR Submissions and after Being Placed on Notice of the CFTC's Investigation</u>

During the global financial crisis commencing in approximately late summer 2007, the press began raising questions about panel banks' LIBOR submissions. For example, in April of 2008, the *Wall Street Journal* published an article entitled *LIBOR Fog Bankers Cast Doubt On Key Rate Amid Crisis* that questioned the integrity of panel banks' LIBOR submissions and whether panel banks were making LIBOR submissions for improper purposes. In the wake of the increased media attention, the BBA conducted some reviews of LIBOR practices, in which RBS participated. In April 2010, the CFTC asked RBS to conduct an internal investigation of its U.S. Dollar LIBOR practices.

Despite the increased scrutiny from the media and the BBA, and notwithstanding the CFTC's investigation, RBS continued the manipulative activity throughout the financial crisis. With respect to at least Yen LIBOR, RBS's manipulative activity continued into late 2010, and for some other benchmark interest rates into August 2011.[21] As of the summer of 2010, RBS Yen traders knew about and discussed an investigation into RBS's U.S. Dollar LIBOR submission practices, which was the CFTC's investigation. As the following examples show, the RBS Yen traders became careful about their communications to avoid detection and decided that they could ignore the on-going investigation for now:

**September 24, 2010:**

| Senior Yen Trader: | hey [Yen Trader 1], can you ask [Primary Submitter] to push 6m JPY Libor up 2 bps to 44 [...] |
| Yen Trader 1: | ha ... will mention it ... no emails anymore ... after [UBS Yen Trader] |

---

[21]    Other conduct related to SIBOR and SOR referenced in note 2 *supra* occurred as late as August 2011.

| Senior Yen Trader: | haha ... i heard he called up BBA to ask them to change the way they fix the libor ... in not so polite request |
| Yen Trader 1: | hahah |
| | [...] |
| Yen Trader 1: | what would he want them to change to |
| Senior Yen Trader: | to suit his book I guess |
| Yen Trader 1: | but how ... put him on fixing board ... just him ... haha |

**November 22, 2010:** (Emphasis added.)

| Senior Yen Trader: | hey ...you think we be able to convince [Primary Submitter] to change the libor today? |
| Yen Trader 1: | i can try |
| Senior Yen Trader: | need to drop 3mth Libor and hike 6m Libor he dropped 6m by 2 bps last Friday |
| Yen Trader 1: | **at the moment the FED are all over us about libors** |
| Senior Yen Trader: | **thats for the USD?** |
| Yen Trader 1: | **ye[]s** |
| Senior Yen Trader: | **dun think anyone cares the JPY libor** |
| Yen Trader 1: | **not yet[,] i will walk over ot [sic] them** |

By the end of 2010, the Primary Submitter became sufficiently cautious to feign refusal of a written request of the Senior Yen Trader for a false LIBOR submission, only then to promptly telephone and assure his cohort that he was only playacting on the chat to avoid detection, and would follow through on the request.

**November 24, 2010:**

| Senior Yen Trader: | was wondering if it suits you guys on hiking up 1bp on the 6mth Libor in JPY ... it will help our position tremendously |
| Primary Submitter: | how you doing with all the volatilities these days? ... to be honest happy with levels we see at the moment |
| Senior Yen Trader: | ok no prob ... wouldn't want to cause any problem ... thanks mate |

**November 24, 2010:** (Audio recording.)

| Senior Yen Trader: | Hello? |
| Primary Submitter: | Morning, [Senior Yen Trader]?  Hi, [Primary Submitter]. |
| Senior Yen Trader: | Yeah, how are you? |
| Primary Submitter: | I'm pretty good sir.  Very Good.  We're just not, we're not allowed to have those conversations on [instant messages]. |

| Senior Yen Trader: | Oh, sorry about that. I didn't know. |
| Primary Submitter: | (laughter) |
| Senior Yen Trader: | (laughter) Oh because of the, the BBA thing? |
| Primary Submitter: | Yes, exactly. |
| Senior Yen Trader: | Ah, ok ok. |
| Primary Submitter: | So yeah, leave it with me, and uh, it won't be a problem. |
| Senior Yen Trader: | Ok, great. |

### d. The Manipulation and False Reporting of Yen and Swiss Franc LIBOR

As evidenced above, the RBS Yen and Swiss Franc traders and the Primary Submitter and backup submitters regularly attempted to manipulate Yen and Swiss Franc LIBOR for certain tenors – one-month, three-month and six-month – primarily through the internal requests of the derivatives traders which the submitters often accommodated. Likewise, the Primary Submitter also based his Yen and Swiss Franc LIBOR submissions on the benefit to his own money market and derivatives trading positions. In addition, certain RBS traders coordinated with traders at other panel banks and interdealer brokers about LIBOR submissions, all in attempts to manipulate Yen and Swiss Franc LIBOR.

RBS made these repeated attempts to manipulate in order to affect the official fixing of Yen and Swiss Franc LIBOR at a rate that would benefit its derivatives and money market trading positions, or other panel banks' trading positions. At times, RBS was successful in its attempts to manipulate the official Yen and Swiss Franc LIBOR fixing for a particular tenor.

RBS, through its derivatives traders and submitters, knew it was improper to consider derivatives trading positions in determining the bank's LIBOR submissions. A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily LIBOR submissions. By basing its Yen and Swiss Franc LIBOR submissions on rates that benefited RBS's or any other bank's derivatives positions, RBS's submissions were not made in accordance with the BBA definition and criteria for LIBOR submissions. Instead, RBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Yen and Swiss Franc LIBOR were based on and solely reflected its assessment of the costs of borrowing unsecured funds in the relevant interbank money markets. Accordingly, RBS regularly attempted to manipulate, and at times succeeded in manipulating the official Yen and Swiss Franc LIBOR fixings in particular tenors, and knowingly delivered false, misleading or knowingly inaccurate reports concerning Yen LIBOR and Swiss Franc LIBOR, commodities in interstate commerce.

### e. RBS Lacked Internal Controls, Failed to Implement Controls and Allowed Conflicts of Interest to Exist

During the relevant period, RBS allowed conflicts of interest to exist, failed to adequately supervise its derivatives traders, LIBOR submitters and the LIBOR submission process, and did not have any policies, internal controls or procedures for determining or monitoring its LIBOR

submissions to ensure that RBS's submissions reflected an honest assessment of the costs of borrowing unsecured funds in the London interbank market. Despite the media speculation and BBA inquiries as well as the Commission investigation and other regulatory inquiries, RBS did not have any policies regarding its LIBOR submissions process or improve its internal controls until March 2011, and did not materially strengthen those policies or controls until June of 2011. RBS did not identify or address the risk of money market traders' compensation being partly based on LIBOR referencing transactions until 2012.

RBS allowed conflicts of interest to exist and affect its LIBOR submissions. The creation of STM, which placed derivatives traders with the money market traders for the purpose of, among other things, increasing communications among them about market conditions, created a situation where derivatives traders with a profit motive could communicate with money market traders who had the responsibility to determine RBS's LIBOR in accordance with the BBA's definitions and criteria. The Primary Submitter had his own conflict of interest, as he held derivatives and money market positions tied to Yen and Swiss Franc LIBOR. RBS's lack of supervision of STM and the LIBOR submission process allowed the derivatives traders to successfully pressure the Primary Submitter to accommodate them. Indeed, for almost the entire period, it was unclear who had the day-to-day responsibility for supervising the Primary Submitter. When it was clear, no supervision was provided. During the STM period, RBS's organizational structure had the Primary Submitter reporting to two managers, one located in London who created STM and was the London short-term derivatives trading manager, and the other located in Asia, who was a money market manager. The Primary Submitter believed he reported to both of them. Neither one of those managers, however, acknowledged responsibility for managing him. Neither knew who made the Yen or Swiss Franc LIBOR submissions when the Primary Submitter was absent. After STM was disbanded, the U.S. Dollar LIBOR submitter was given supervisory responsibility for the Primary Submitter. Again, no supervision was provided. In addition, derivatives traders acted as the backup submitters, which presented a conflict of interest between their profit motive and the responsibility to make honest LIBOR submissions.

In 2008 and again in 2009, after the media questioned the integrity of LIBOR and the panel banks' submissions, the BBA reviewed its LIBOR submissions process and issued new guidance governing how banks should make LIBOR submissions. RBS participated in the reviews and sat on the FX & MM and Steering Committees for the BBA. In April 2010, RBS received the Commission's request that it conduct an internal investigation of its U.S. Dollar LIBOR practices. Yet RBS did not implement policies or internal controls until March 2011, and RBS's traders and submitters continued to attempt to manipulate LIBOR into late 2010 and other benchmark interest rates well into 2011. For example, throughout the relevant period, RBS failed to provide its benchmark interest rate submitters with any training or supervision related to the setting of LIBOR, factors to be considered in the setting of LIBOR, or the LIBOR submission process in general. RBS also did not require documentation of its submitters' LIBOR determinations. Finally, RBS failed to provide its employees with any training regarding appropriate communications between derivatives traders and LIBOR submitters. This lack of supervision and training permitted RBS employees to knowingly make repeated false Yen and Swiss Franc LIBOR submissions for years.

32

## IV.

## LEGAL DISCUSSION

**A.** **RBS Made False, Misleading or Knowingly Inaccurate Reports Concerning the Costs of Borrowing Unsecured Funds in Violation of Section 9(a)(2) of the Act**

Section 9(a)(2) of the Act makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2) (2006); *United States v. Brooks*, 681 F.3d 678, 691 (5th Cir. 2012); *United States v. Valencia*, 394 F.3d 352, 354-355 (5th Cir. 2004); *see also CFTC v. Johnson*, 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005) (same).

On a daily basis, RBS, through the transmission of an electronic spreadsheet to the service provider of the BBA, who calculates their official fixings (*i.e.*, Thomson Reuters), knowingly delivered or caused to be delivered its Yen and Swiss Franc LIBOR submissions through the mails or interstate commerce. RBS's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official benchmark interest rates by at least Thomson Reuters on behalf of the BBA and other third party vendors. The panel banks' submissions are used to determine the official published rates for LIBOR which are calculated based on a trimmed average of the submissions. RBS's daily LIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and RBS's ability to borrow funds in the particular markets. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which Yen LIBOR and Swiss Franc LIBOR are fixed.

At times, during the periods relevant to the conduct described herein, RBS's submissions for certain tenors of Yen and Swiss Franc LIBOR were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, specifically RBS's derivatives and money market trading positions. By using these impermissible and illegitimate factors in making its LIBOR submissions, RBS at times conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related solely to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Moreover, RBS traders, submitters and at least one manager knew that certain RBS LIBOR submissions contained false, misleading and knowingly inaccurate information concerning the submitted rates. By such conduct, Respondents violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

**B.** **RBS Manipulated Yen and Swiss Franc LIBOR at Times for Certain Tenors**

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of manipulation or attempted manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to

33

manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2006). Section 6(c) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, . . . or otherwise is violating or has violated any of the provisions of [the] Act . . . ." 7 U.S.C. § 9 (2006). Section 6(d) of the Act is substantially identical to Section 6(c). *See* 7 U.S.C. § 13b (2006).

Manipulation under the Act is the "intentional exaction of a price determined by forces other than supply or demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991). The following four elements must be met, by a preponderance of the evidence, to show a successful manipulation has occurred:

> (1) the [respondent] had the ability to influence market prices;
> (2) the [respondent] specifically intended to do so;
> (3) artificial prices existed; and
> (4) the [respondent] caused an artificial price.

*In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,786, at 34,061 (CFTC July 15, 1987). The test for manipulation, however, is a practical one:

> We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand.

*Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

"[I]ntent is the essence of manipulation." *Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 21,796, at 27,282 (CFTC Dec. 17, 1982). The manipulator's intent separates "lawful business conduct from unlawful manipulative activity." *Id.* at 27,283. To prove the intent element of manipulation, it must be shown that RBS "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Id.*

The Commission has observed that "intent must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances." *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977). "[O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium or efficient price – the price which reflects market forces of supply and demand – the mental element of manipulation may be inferred." *Indiana Farm Bureau Cooperative Ass'n, Inc.*,

34

[1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) at 27,283. "It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id.* (quoting *United States v. United States Gypsum Co.*, 438 U.S. 442, 445 (1978)). A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, (CCH) ¶ 20,271, at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

An artificial price (also termed a "distorted" price) is one "that does not reflect market or economic forces of supply and demand." *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 34,064; *Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) at 27,288 n. 2. As the Commission noted with approval in *DiPlacido*, ¶ 30,970, at 62,484 (quoting *Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) at 27,300 (Commissioner Stone concurring)), a Commissioner has commented: "[t]his is more an axiom than a test." In determining whether an artificial price has occurred:

> [O]ne must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing down on a particular market are all legitimate, it follows that the price will not be artificial. On the other hand when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial. Thus, the focus should not be as much on the ultimate price as on the nature of the factors causing it.

*Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep (CCH) at 27,288 n.2. *See also In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 62,484 (finding that the placement of uneconomic bids or offers results in artificial prices because those prices are not determined by the free forces of supply and demand on the exchange).

Causation of artificial prices is established when it is demonstrated that artificial market prices resulted from the conduct of a trader, or group of traders acting in concert, rather than legitimate forces of supply and demand. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1171-72 (8th Cir. 1971) (price squeeze "intentionally brought about and exploited by Cargill"); *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 34,067 (proof of causation requires the Division to show that "the respondents' conduct 'resulted in' artificial prices").

There can be multiple causes of an artificial price. *In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 62,485. The manipulator's actions need not be the sole cause of the artificial price. "It is enough for purposes of a finding of manipulation in violation of Sections 6(b) and 9 of the Act that respondents' action contributed to the price [movement]." *In re Kosuga*, 19 A.D. 603, 624 (1960); *see also In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 34,066 (recognizing there can be multiple causes of an artificial price and

holding that a charge of manipulation can be sustained where respondents' acts are a proximate cause of the artificial price).

Here, as a member of the BBA's Yen and Swiss Franc LIBOR panels, RBS made daily submissions that purported to reflect its assessments of the costs of borrowing unsecured funds in the London interbank market for Yen and Swiss Franc LIBOR across tenors. The official LIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks. By virtue of this methodology, RBS had the ability to influence or affect the rate that would become the official Yen and Swiss Franc LIBOR for any tenor.

As evidenced by the extensive communications and other facts set forth above, in making the false Yen and Swiss Franc LIBOR submissions, several RBS derivatives traders and submitters specifically intended to affect the daily Yen and Swiss Franc LIBOR for certain tenors, including one-month, three-month, and six-month. Their intent is also made clear by the evidence that the derivatives traders and submitters' motives were to benefit RBS's derivatives and at times money market trading positions, or, at times, the derivatives trading positions of other panel banks with whom certain RBS derivatives traders colluded.

On certain occasions, RBS's false, misleading or knowingly inaccurate Yen and Swiss Franc LIBOR submissions were illegitimate factors in the pricing of the daily Yen and Swiss Franc LIBOR fixings and affected the official Yen and Swiss Franc LIBOR for certain tenors, resulting in artificial Yen and Swiss Franc LIBOR fixings. Thus, RBS's actions were a proximate cause of the artificial Yen and Swiss Franc LIBOR fixings.

Accordingly, on certain occasions, RBS manipulated Yen and Swiss Franc LIBOR for certain tenors, commodities in interstate commerce, in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.

## C. RBS Attempted to Manipulate Yen and Swiss Franc LIBOR

To prove attempted manipulation, two elements are required: (1) an intent to affect the market price; and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005). The intent standard is the same as that for manipulation. *See Indiana Farm Bureau and Hohenberg Bros., supra.*

As found above, several RBS derivatives traders and submitters specifically intended to affect the rate at which the daily LIBOR for Yen and Swiss Franc would be fixed to benefit RBS's derivatives trading and, at times, money market positions or to benefit the derivatives trading positions of colluding traders at other banks. The RBS derivatives traders' requests for beneficial Yen and Swiss Franc LIBOR submissions and the RBS submitters making submissions based on those requests constitute overt acts in furtherance of their intent to affect the fixings of LIBOR for those currencies. By doing so, RBS engaged in repeated acts of attempted manipulation in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13a(2) (2006).

36

**D.** **Respondents Aided and Abetted the Attempts of Traders at Other Banks to Manipulate Yen and Swiss Franc LIBOR**

Pursuant to Section 13(a) of the Act, RBS aided and abetted the attempts of traders at other banks to manipulate Yen and Swiss Franc LIBOR in violation of the Act. 7 U.S.C. § 13c(a) (2006). Liability as an aider and abettor requires proof that: (1) the Act was violated; (2) the aider and abettor had knowledge of the wrongdoing underlying the violation; and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See In re Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129, at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct need not be demonstrated. *See In re Lincolnwood Commodities*, Inc., [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the surrounding facts and circumstances. *Id.*

As evidenced by the communications set forth above, certain RBS Yen and Swiss Franc derivatives traders and derivatives traders at other panel banks coordinated about Yen and Swiss Franc LIBOR rates that would benefit their banks' respective derivatives trading positions. At times, the traders at the other panel banks asked the RBS traders to have RBS LIBOR submitters submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the derivatives' positions of the traders at the other panel banks. The RBS Yen derivatives traders agreed and made the requests of the RBS submitters, and at times, those requests were accommodated by the RBS submitters. Accordingly, by seeking to affect the rates at which Yen and Swiss Franc LIBOR were fixed, traders at other banks attempted to manipulate Yen and Swiss Franc LIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006). Certain RBS Yen and Swiss Franc derivatives traders had knowledge of and intentionally assisted the attempts of the traders at the other banks to manipulate the rates at which LIBOR was fixed. In addition, at least one RBS Yen trader knowingly assisted the UBS Yen Trader in his attempts to manipulate Yen LIBOR by agreeing to act as counterparty to wash trades opposite UBS to provide extra brokerage commissions to the interdealer brokers as payment for their assistance in trying to manipulating Yen LIBOR. By such acts of those RBS Yen and Swiss Franc derivatives traders, RBS aided and abetted the attempts of traders at other banks to manipulate LIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

**E.** **The Royal Bank of Scotland plc and RBS Securities Japan Limited Are Liable for the Acts of their Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), provide that the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation or trust within the scope of his employment or office shall be deemed the act, omission or failure of such individual, association, partnership, corporation or trust. Pursuant to Section 2(a)(1)(B) of the CEA and Commission Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988).

The Royal Bank of Scotland plc and RBS Securities Japan Limited are liable for the acts, omissions and failures of the traders, managers and submitters who acted as their employees and/or agents in the conduct described above and accordingly, violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), as set forth above.

## V.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## VI.

## OFFER OF SETTLEMENT

Respondents, without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against RBS by, or any agreement with, the Department of Justice or any other governmental agency or office, has submitted the Offer in which they:

A.  Acknowledge receipt of service of this Order;

B.  Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waive:

1.  the filing and service of a complaint and notice of hearing;

2.  a hearing;

3.  all post-hearing procedures;

4.  judicial review by any court;

5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6.  any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2012), relating to, or arising from, this proceeding;

7.  any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat.

847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

8.   any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.   Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

E.   Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.   makes findings by the Commission that Respondents violated Section 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

2.   orders Respondents to cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

3.   orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of Three Hundred Twenty Five Million U.S. Dollars ($325,000,000) plus post-judgment interest; and

4.   orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.   Respondents shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006) of the Act.

B.   Respondents, jointly and severally, shall pay a civil monetary penalty of Three Hundred Twenty Five Million U.S. Dollars ($325,000,000) within ten (10) days of the date of entry of this Order (the "CMP Obligation").[22] If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order

---

[22]   Effective June 18, 2008, the Act imposes a $1,000,000 civil monetary penalty for each act of attempted and completed manipulation in violation of the Act. Many of RBS's violations of the Act for attempted and completed manipulation occurred after June 18, 2008.

pursuant to 28 U.S.C. § 1961 (2006).  Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondents and the name and docket number of this proceeding.  The paying Respondents shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.    Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

>    1.  PRINCIPLES[23]

>        i.  RBS agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in

---

[23]  The following terms are defined as follows:

**Benchmark Interest Rate**:  An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

**Benchmark Publisher**:  A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

**Submission(s)**:  The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher.  For example, if RBS submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

**Submitter(s)**:  The person(s) responsible for determining and/or transmitting the Submission(s); and

**Supervisor(s)**:  The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

ii. RBS represents and undertakes that each Benchmark Interest Rate Submission by RBS shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

2. INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS

i. <u>DETERMINATION OF SUBMISSIONS</u>: RBS shall determine its Submission(s) based on the following Factors, Adjustments and Considerations, unless otherwise prohibited by or contrary to an affirmative obligation imposed by any law or regulation, or the rules or definitions issued by a Benchmark Publisher. RBS's transactions shall be given the greatest weight in determining its Submissions, subject to applying appropriate Adjustments and Considerations in order to reflect the market measured by the Benchmark Interest Rate.[24]

RBS shall determine its Submissions as described in these Undertakings within fourteen (14) days of the entry of this Order.

- Factor 1 — <u>RBS's Borrowing or Lending Transactions Observed by RBS's Submitters</u>:

    a. RBS's transactions in the market as defined by the Benchmark Publisher for the particular Benchmark Interest Rate;

    b. RBS's transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

    c. RBS's transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

---

[24] The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be consistent with each other, and provide different levels of guidance as to how to make Submissions.

- Factor 2 — Third Party Transactions Observed by RBS's Submitters:

  a. Transactions in the market as defined by the Benchmark Interest Rate relevant to each of the Submission(s);

  b. Transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

  c. Transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

- Factor 3 — Third Party Offers Observed by RBS's Submitters:

  a. Third party offers to RBS in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to RBS by interdealer brokers (*e.g.*, voice brokers); and

  c. Third party offers provided to RBS in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- Adjustments and Considerations: All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. Time: With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. Market Events: RBS may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. Term Structure: As RBS applies the above Factors, if RBS has data for any maturity/tenor described by a Factor, then

42

RBS may interpolate or extrapolate the remaining maturities/tenors from the available data;

d. <u>Credit Standards</u>: As RBS applies the above Factors, adjustments may be made to reflect RBS's credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above. Additionally, RBS may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

e. <u>Non-representative Transactions</u>: To the extent a transaction included among the Factors above significantly diverges in an objective manner from other transactions, and that divergence is not due to market events as addressed above, RBS may exclude such transactions from its determination of its Submission(s).

ii. <u>SUPERVISOR(S) REVIEW</u>: Effective within fourteen (14) days of the entry of this Order, each daily Submission shall be reviewed by a Supervisor on a daily basis after the Submission(s) are made to the Benchmark Publisher.[25]

iii. <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>: All Submitter(s) shall have significant experience in the markets for the Benchmark Interest Rate to which they are submitting or a comparable market, but may designate less experienced parties, who routinely work under their supervision, to make Submission(s) during limited periods of absence. All Supervisors shall have significant experience in the markets for the relevant Benchmark Interest Rate or a comparable market. Submitters, Supervisors and any parties designated to make Submission(s) when the Submitter(s) are absent shall not be assigned to any derivatives trading desk, unit or division within RBS, or participate in derivatives trading other than that associated with RBS's liquidity and liability management. The compensation of Submitter(s) and Supervisor(s) also shall not be directly based upon derivatives trading, other than that associated with RBS's liquidity and liability management.

---

[25] Insofar as this Section 2 of the Undertakings entitled "INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS" applies to RBS offices in Russia, Romania and Indonesia, RBS shall have until October 25, 2013 to implement the provisions of this section with respect to those three offices; provided, however, for those offices, RBS must comply with Section 2(i) above and make its Submissions in accordance with the Factors, Adjustments and Considerations identified above within 14 days of the entry of the Order.

iv. <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER COMMUNICATIONS AND SUBMISSIONS</u>: RBS shall implement internal controls and procedures to prevent improper communications with Submitter(s) and Supervisor(s) regarding Submission(s) or prospective Submission(s) to ensure the integrity and reliability of its Submission(s). Such internal controls and procedures shall include, but not be limited to:

- The "firewalls" contemplated herein will be implemented through written policies and procedures that delineate proper and improper communications with Submitter(s) and Supervisor(s), whether internal or external to RBS. For these purposes, improper communications shall be any attempt to influence RBS's Submission(s) for the benefit of any derivatives trading position (whether of RBS or any third party) or any attempt to cause RBS's Submitter(s) to violate any applicable Benchmark Publisher's rules or definitions, or Section 2 of these Undertakings; and

- A requirement that the Submitter(s) shall not be located in close proximity to traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to which RBS contributes any Submission(s). The two groups should be separated such that neither can hear the other.

v. <u>DOCUMENTATION</u>: RBS shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, RBS shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that RBS used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining RBS's Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

44

c. Relevant data and information received from interdealer brokers used in connection with determining RBS's Submission(s) including, but not limited to, the following:

- Identification of the specific offers and bids relied upon by RBS when determining each Submission; and

- The name of each company and person from whom the information or data is obtained;

d. RBS's assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with Submission(s) be of "reasonable market size" (or any other such criteria);

e. Information regarding market events considered by RBS in connection with determining its Submission(s), including, without limitation, the following:

- The specific market announcement(s) or event(s); and

- Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

f. The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

- For each Submission, RBS shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by RBS to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to RBS at the time of the Submission(s):

a. Instrument;
b. Maturity/tenor;
c. Trade type (*i.e.*, loan/deposit, placing/taking);
d. Buy/sell indicator;
e. Transaction date (in mmddyyyy format);
f. Maturity date (in mmddyyyy format);
g. Value date (in mmddyyyy format);
h. Loan effective date;

45

    i.   Customer number;
    j.   Currency;
    k.   Ticket ID;
    l.   Timestamp;
    m.  Counterparty A (buyer/bidder);
    n.   Counterparty B (seller/offeror);
    o.   Nominal/notional size of the transaction;
    p.   Interest basis (360/365 day year);
    q.   The fixed interest rate; and
    r.   Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

- Transaction Records: RBS shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- Requirement To Record Communications: RBS shall record and retain to the greatest extent practicable all of the following communications:

    a. All communications concerning the determination and review of the Submission(s); and

    b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent RBS from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located in the London, Tokyo, Singapore, and Connecticut offices of RBS, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, RBS's audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; [26] and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi. MONITORING AND AUDITING:

- Monitoring: RBS shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and if there is any significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the Submission is adequately substantiated. If it is not substantiated, RBS shall notify its chief compliance officer(s) and the Benchmark Publisher;

- Periodic Audits: Starting six (6) months from the date of the entry of this Order, and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, RBS shall conduct internal audits of reasonable, random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

- Annual Audits By Third Party Auditors: Starting one (1) year from the date of the entry of this Order, and continuing annually for four (4) additional years thereafter, RBS shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

---

[26] RBS also shall improve its current and future proprietary messaging systems within six (6) months of the entry of this Order. To ensure the prompt searching and retrieval of such internal messages, RBS shall retain all such messages in a form that identifies clearly the following information: a unique identifying code for each such internal communication such that it can be retrieved and referenced; specific identification of each participant in such a communication; with respect to a communication that takes the form of a chat room with three or more participants, the date and time (including applicable time zone) that each person joined and left that chat room; and the text of each message within each communication, including a date and time stamp for each message within a communication (including the applicable time zone).

47

      a.  Reviewing communications of Submitter(s) and Supervisor(s);

      b.  Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by RBS;

      c.  Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by RBS, that the Submission(s) were consistent with this Order, the policies and procedures in place for making RBS's Submission(s), and the definitions applicable to the Benchmark Interest Rate for which RBS made Submission(s); and

      d.  A written audit report to be provided to RBS and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii.  <u>POLICIES, PROCEDURES AND CONTROLS</u>:  Within sixty (60) days of the entry of this Order, RBS shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, RBS shall develop policies, procedures and controls to ensure the following:

- The supervision of the Submission process;

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning RBS's Submissions are reported to and investigated by RBS's compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- Not less than monthly, the periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate in connection with these Policies, Procedures and Controls;

- The handling of complaints concerning the accuracy or integrity of RBS's Submission(s) including:

      a.  Memorializing all such complaints;

          b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

- The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. <u>TRAINING</u>: RBS shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate. Submitters and Supervisors shall be provided with preliminary training regarding the policies, and procedures and controls developed pursuant to Section 2(vii) of these Undertakings. By no later than October 25, 2013, all Submitters, Supervisors, and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein. Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of RBS's regular training programs. The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

- The Undertakings set forth herein;

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of RBS's Submission(s);

- The requirement to conduct all business related to RBS's Submission(s) on RBS's recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on RBS's recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with RBS's Submission(s) or process for determining Submission(s).

ix. <u>REPORTS TO THE COMMISSION</u>:

- <u>Compliance with Undertakings</u>: Every four (4) months, starting 120 days from the entry of this Order, RBS shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein. Within 365 days of the entry of this Order, RBS shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein. The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings. The report shall contain a certification from a representative of RBS's Executive Management, after consultation with RBS's chief compliance officer(s), that RBS has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in this Order;

- <u>Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks</u>: Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, RBS shall provide, meet with and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate. Within that same time frame, RBS shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

- <u>Disciplinary and Other Actions</u>: RBS shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

50

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK
   INTEREST RATES

To the extent RBS is or remains a contributor to any Benchmark Interest Rate,
RBS agrees to make its best efforts to participate in efforts by current and future
Benchmark Publishers, other price reporting entities and/or regulators to ensure
the reliability of Benchmark Interest Rates, and through its participation to
encourage the following:

    i. <u>METHODOLOGY</u>: Creating rigorous methodologies for the contributing
panel members to formulate their Submissions. The aim of such
methodologies should be to result in a Benchmark Interest Rate that
accurately reflects the rates at which transactions are occurring in the
market being measured by that Benchmark Interest Rate;

    ii. <u>VERIFICATION</u>: Enforcing the use of those methodologies through an
effective regime of documentation, monitoring, supervision and auditing,
required by and performed by the Benchmark Publishers, and by the
contributing panel members internally;

    iii. <u>INVESTIGATION</u>: Facilitating the reporting of complaints and concerns
regarding the accuracy or integrity of Submissions to Benchmark Interest
Rates or the published Benchmark Interest Rate, and investigating those
complaints and concerns thoroughly;

    iv. <u>DISCIPLINE</u>: Taking appropriate action if, following a thorough
confidential investigation, the Benchmark Publisher determines that a
complaint or concern regarding the accuracy or integrity of a Submission
or the published Benchmark Interest Rate has been substantiated;

    v. <u>TRANSPARENCY</u>: Making regular reports to the public and the markets
of facts relevant to the integrity and reliability of each Benchmark Interest
Rate. Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the
  Benchmark Publisher should display prominently whether each
  rate is based entirely on transactions in the market the rate is
  supposed to reflect, or whether it instead is based, in whole or in
  part, on other data or information;

- The Benchmark Publisher also should make periodic reports
  regarding the number and nature of complaints and concerns
  received regarding the accuracy or integrity of Submissions or the
  published Benchmark Interest Rate while maintaining the
  anonymity of all those who have reported or are the subject of
  complaints and concerns;

51

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi. <u>FORMULATION</u>: Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

RBS shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between RBS and Benchmark Publishers.

4. COOPERATION WITH THE COMMISSION

i. Respondents shall cooperate fully and expeditiously with the Commission, including the Division, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto. As part of such cooperation, Respondents agree to the following for a period of five (5) years from the date of the entry of this Order, or until all related investigations and litigation are concluded, including through the appellate review process, whichever period is longer:

- Preserve all records relating to the subject matter of this proceeding, including, but not limited to, audio files, electronic mail, other documented communications, and trading records;

- Comply fully, promptly, completely, and truthfully with all inquiries and requests for information or documents;

- Provide authentication of documents and other evidentiary material;

- Provide copies of documents within RBS's possession, custody or control;

- Subject to applicable laws and regulations, RBS will make its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of RBS, regardless of the individual's location, and at such location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including, but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

- Subject to applicable laws and regulations, RBS will make its best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of RBS;

ii. RBS also agrees that it will not undertake any act that would limit its ability to cooperate fully with the Commission. RBS will designate an agent located in the United States of America to receive all requests for information pursuant to these Undertakings, and shall provide notice regarding the identity of such Agent to the Division upon entry of this Order. Should RBS seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs. Any person designated to receive such request shall be located in the United States of America; and

iii. RBS and the Commission agree that nothing in these Undertakings shall be construed so as to compel RBS to continue to contribute Submission(s) related to any Benchmark Interest Rate. Without prior consultation with the Commission, RBS remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

## 5. PROHIBITED OR CONFLICTING UNDERTAKINGS

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on RBS by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then RBS shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, RBS will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions. Nothing in

53

these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6. PUBLIC STATEMENTS

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D. Partial Satisfaction: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Melissa Jurgens
Secretary of the Commission
Commodity Futures Trading Commission

Dated: February 6, 2013

54