## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In RE: | MDL No. 2262 |
| LIBOR-Based Financial Instrument Antitrust Litigation | Master File No. 1:11-md-2262-NRB |
| *This Applies to All Cases* | |
| THIS DOCUMENT RELATES TO: | |
| CARL A. PAYNE, et al. | Civil Action No.: 1:13-cv-00598-NRB |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................3

III.    PARTIES ..............................................................................................................4

        A.      Plaintiffs ...................................................................................................4

        B.      Defendants ................................................................................................5

IV.     TOLLING OF STATUTE OF LIMITATIONS ..................................................7

V.      FACTUAL ALLEGATIONS ...............................................................................8

        A.      What is the London Interbank Offered Rate and How Was it Set During
                the Manipulation Period?..........................................................................8

        B.      Defendants' Had Reason to Expect that Plaintiffs Would Rely on LIBOR ...........9

        C.      Defendants' Had Significant Financial and Reputational Interests in
                Artificially Suppressing LIBOR During the Manipulation Period .......................11

        D.      Defendants' Colluded and Conspired to Manipulate LIBOR During the
                Manipulation Period.................................................................................13

VI.     ANALYSES AND STUDIES SUPPORTS PLAINTIFFS' THEORY THAT
        DEFENDANTS COLLUDED TO ARTIFICIALLY SUPPRESS LIBOR ........................17

        A.      The Rates Submitted for USD LIBOR Vary From the LIBOR Rates
                Submitted For Other Currencies .............................................................17

        B.      Defendants "Bunching" of USD Libor Submissions Around the Fourth
                Lowest Submission Strongly Suggests That Defendants Were Colluding to
                Manipulate and Artificially Suppress LIBOR .......................................19

        C.      Defendants USD LIBOR Submissions Were Inconsistent with Actual
                Market Lending Rates in the Eurodollar Market ....................................20

VII.    GOVERNMENT INVESTIGATIONS PROVE THAT DEFENDANTS
        COLLUDED TO MANIPULATE LIBOR.........................................................21

        A.      Barclays Bank PLC..................................................................................25

        B.      UBS AG ....................................................................................................37

i

C.      The Royal Bank of Scotland ........................................................................42

D.      Cooperative Centrale Raiffeisen-Boerenleenbank B.A. .........................................44

E.      Lloyds Banking Group PLC ........................................................................51

F.      Antitrust Regulators in Europe Fine Various Defendants in Connection with Scheme to Manipulate LIBOR ........................................................56

G.      Deutsche Bank and HSBC Set Aside Billions of Dollars in Connection with Government Investigations and Pending Litigation ......................................57

VIII.   DEFENDANTS' LIBOR MANIPULATION CAUSED INFLATED INTEREST RATES ON ADJUSTABLE RATE MORTGAGES ......................................................57

CLASS ACTION ALLEGATIONS ...................................................................................61

FIRST CLAIM FOR RELIEF ........................................................................................65

SECOND CLAIM FOR RELIEF ....................................................................................67

THIRD CLAIM FOR RELIEF ........................................................................................68

FOURTH CLAIM FOR RELIEF ....................................................................................69

FIFTH CLAIM FOR RELIEF ........................................................................................70

SIXTH CLAIM FOR RELIEF ........................................................................................71

PRAYER FOR RELIEF ..................................................................................................73

DEMAND FOR JURY TRIAL ......................................................................................75

For their complaint against Defendants Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays Bank PLC, Citigroup, Inc., Citibank N.A., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group, AG, Deutsche Bank AG, HSBC Holdings  PLC, HSBC Bank PLC, JPMorgan Chase & Co., JPMorgan Chase Bank, National Association, Chase Bank USA, N.A., Lloyds Banking Group PLC, Royal Bank of Canada, Société Générale S.A., The Norinchukin Bank, Royal Bank of Scotland, UBS AG and Portigon AG f/k/a WestLB AG (collectively "Defendants"), Plaintiffs Carl A. Payne, Kenneth W. Coker, Carlito J. Rivera, and Philip Maresca (collectively "Plaintiffs"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, allege as follows:

## I.        NATURE OF THE ACTION

1.        This case concerns Defendants' manipulation and artificial suppression of the London Interbank Offered Rate for the U.S. Dollar ( "LIBOR") from at least March 2007 through at least March 2011 (the "Manipulation Period").  LIBOR is a widely used global benchmark interest rate, intended to reflect the average rate at which banks can borrow unsecured funds from other banks.  LIBOR is tied to financial products worth *trillions* of dollars, including U.S. residential mortgage loans.

2.        Plaintiffs bring this case on behalf of themselves and all U.S. residents who obtained a LIBOR-based Adjustable Rate Mortgage ("ARM") loan during the Manipulation Period.

3.        LIBOR is one of the primary indices for setting the interest rates for ARMs in the United States.  During the Manipulation Period, Defendants were members of the British Bankers Association ("BBA") and were assigned to the panel responsible for making daily U.S. Dollar LIBOR ("USD LIBOR") submissions.  Defendants understood that the BBA publically reported LIBOR as the primary benchmark for short term interest rates globally, including rates on U.S. mortgage ARM loans.

4.        For their own financial gain and to protect their reputation in the financial markets

and media, Defendants misrepresented their borrowing costs to the BBA.  These misrepresentations caused LIBOR to be artificially suppressed.

5.      In or around March 2011, government regulators and prosecutors from all over the world announced their investigations into the global scheme to manipulate LIBOR.

6.      Since this announcement, there have been investigations launched in the United States, United Kingdom, Switzerland, the EU, Japan, Canada, and Singapore.  Certain Defendants have resolved the civil and criminal claims against them, but many of these investigations are still ongoing.  To this day, these investigations continue to uncover substantial evidence which shows that this successful scheme to manipulate LIBOR was a result of collusion amongst Defendants and was conducted over the course of many years.

7.      The Chairman of the United States Commodity Futures Trading Commission had the following to say about the scheme to manipulate LIBOR:

> …as law enforcement actions brought by the CFTC, the FCA and the U.S. Justice Department, among others, have shown, LIBOR and other benchmark interest rates have been readily and pervasively rigged.  Barclays, UBS and RBS paid fines of approximately $2.5 billion for manipulative conduct relating to these rates.  At each bank, the misconduct spanned many years.  At each bank it took place in offices in several cities around the globe.  **At each bank it included numerous people—sometimes dozens, among them senior management. Each case involved multiple benchmark rates and currencies.  In one case, there were over 2,000 instances of misconduct during a six-year period.  And in each case, there was evidence of collusion with other banks.**  In the UBS and RBS cases, one or more inter-dealer brokers painted false pictures to influence submissions of other banks, i.e. to spread the falsehoods more widely. Barclays and UBS also were reporting falsely low borrowing rates in an effort to protect their reputations.  Thus we find ourselves in a situation where there are both the incentives and ability to manipulate a critical rate in our markets.[1]

8.      Defendants understood the significance of making false LIBOR submissions.  By artificially suppressing USD LIBOR, Defendants caused each of the Plaintiffs and the class members to incur artificially higher interest rates on their ARM loans and, consequently, to pay

---

[1] U.S. Commodity Futures Trading Commission Speeches & Testimony, *Remarks of Chairman Gary Gensler at London City Week on Benchmark Interest Rates*, April 22, 2013, *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-140.

thousands of dollars, or more, in excess interest payments.

9.      Defendants also knew that artificially suppressing LIBOR to increase revenues or to protect their reputation in the marketplace and media had the strong likelihood of destabilizing the global market and significantly damaging the purpose of LIBOR.

## II.      JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

11.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, because this is a civil action arising under the laws of the United States.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

12.     This Court has personal jurisdiction over all Defendants by virtue of their business activities in this jurisdiction.  Defendants all transacted business and derived substantial revenue from that business within New York and this District.  Most, if not all, Defendants have offices located in New York and/or have engaged in regular and continuous course of business in New York.  Some Defendants are resident corporations of New York, with their headquarters or primary place of business located within the state.  Furthermore, all Defendants acted as co-conspirators with each other.  Defendants therefore purposefully availed themselves of the privilege of conducting activities in New York, including in the Southern District of New York, in connection with the wrongful activities described in this Complaint.

13.     This action was originally filed in the United States District Court, Northern District of California before being transferred to this Court by the JPML as part of the LIBOR MDL Proceedings.  State and federal courts in California, including the Northern District of

3

California, have personal jurisdiction over Defendants by virtue of their general business activities in California.

14.     Defendants are sophisticated participants in the financial markets that knew, or should have known, that their manipulation and artificial suppression of LIBOR would disrupt financial markets all over the world and have substantial and foreseeable effects in the United States and in the  Northern District of California.

15.     Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), and under 18. U.S.C. § 1965, because each defendant transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims in this lawsuit occurred, among other places, in this District.  Venue is also proper in this District given that this case was transferred to the Southern District of New York by order of the JPML.

16.     Consistent with Northern District of California Civil Local Rule 3-5(b), Venue was and would continue to be proper in California and the Northern District, including assignment to the San Francisco or Oakland Division, under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this lawsuit occurred, among other places, in the Northern District of California, in San Francisco.

## III.     PARTIES

### A.     Plaintiffs

17.     Plaintiff **Carl A. Payne** is an individual residing in San Francisco, California, and is a citizen of the State of California.

18.     Plaintiff **Kenneth W. Coker** is an individual residing in San Francisco, California, and is a citizen of the State of California.

19.     Plaintiff **Carlito J. Rivera** is an individual residing in Carlsbad, California, and is a citizen of the State of California.

20.     Plaintiff **Philip Maresca** is an individual residing in San Francisco, California, and is a citizen of the State of California.

**B.     Defendants**

21.     Defendant **Bank of America Corporation** is a Delaware corporation headquartered in Charlotte, North Carolina.

22.     **Defendant Bank of America, N.A.** is a federally-chartered national banking association incorporated in North Carolina with its principal place of business in Charlotte, North Carolina.  It is a wholly-owned subsidiary of Defendant Bank of America Corporation. Defendants Bank of America, N.A. and Bank of America Corporation are collectively referred to as "Bank of America."

23.     Defendant **Bank of Tokyo-Mitsubishi UFJ Ltd.** ("Bank of Tokyo") is a Japanese subsidiary of Mitsubishi Financial Group, Inc., and is headquartered in Tokyo, Japan, with an office in New York.

24.     Defendant **Barclays Bank PLC** ("Barclays") is a British public limited company headquartered in London, England, with offices in New York.

25.     Defendant **Citigroup, Inc.** ("Citigroup") is a Delaware corporation headquartered in New York, New York.

26.     Defendant **Citibank, N.A.** is a federally-chartered, wholly-owned subsidiary of Citicorp Holdings, Inc., which is wholly owned by Defendant Citigroup, Inc., a United States financial services corporation headquartered in New York, New York.  Defendants Citibank, N.A. and Citigroup, Inc. are collectively referred to as "Citibank."

27.     Defendant **Cooperative Centrale Raiffeisen-Boerenleenbank B.A.** ("Rabobank") is a financial services company headquartered in Utrecht, the Netherlands, with an office in New York.

28.     Defendant **Credit Suisse Group AG** ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland.

29.     Defendant **Deutsche Bank AG** ("Deutsche Bank") is a financial services company headquartered in Frankfurt, Germany, with an office in New York.

30.     Defendant **HSBC Holdings PLC** is a British public limited company

headquartered in London, England.

31.     Defendant **HSBC Bank PLC** is a British public limited company headquartered in London, England and a wholly-owned subsidiary of HSBC Holdings PLC.  Defendants HSBC Holdings PLC and HSBC Bank PLC are collectively referred to as "HSBC."

32.     Defendant **JPMorgan Chase & Co.** is a Delaware financial holding company headquartered in New York, New York.

33.     Defendant **JPMorgan Chase Bank**, **National Association** is a federally chartered national banking association headquartered in New York, New York, and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

34.     Defendant **Chase Bank USA**, **National Association**, is a Delaware federally-chartered national banking association headquartered in New York, New York, and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and Chase Bank USA, N.A. are collectively referred to as "JPMorgan Chase."

35.     "Defendant **Lloyds Banking Group PLC** ("Lloyds") is a British public limited company headquartered in Edinburgh, Scotland.  Defendant Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc.  Prior to 2009, HBOS and Lloyds TSB Bank plc were members of the British Banking Association's U.S. Dollar LIBOR Contributing Panel.

36.     Defendant **Royal Bank of Canada** ("RBC") is a financial services company headquartered in Toronto, Canada.

37.     Defendant **Société Générale S.A.** ("Société Générale") is a financial services company headquartered in Paris, France.

38.     Defendant **The Norinchukin Bank** ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan, with an office in New York.

39.     Defendant **The Royal Bank of Scotland Group PLC** ("RBS") is a British public limited company headquartered in Edinburgh, Scotland, with an office in New York.

40.     Defendant **UBS AG** ("UBS") is a Swiss company based in Basel and Zurich, Switzerland, with an office in New York.

41.     Defendant **Portigon AG f/k/a WestLB AG** ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.

42.     During the Manipulation Period, each of the Defendants listed above was a member of the BBA panel responsible for making daily LIBOR submissions for the U.S. Dollar LIBOR.

43.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

## IV.     TOLLING OF STATUTE OF LIMITATIONS

44.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, and misleading actions, as alleged herein.  Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of knowledge on their part.

45.     It was not until June 27, 2012 that Barclays admitted to the world that it played a role in the global scheme to manipulate LIBOR and that it had the participation of all the other Panel Banks.  Plaintiffs and members of the Class could not have reasonably discovered prior to the Barclays' announcement, the true nature of Defendants' scheme to artificially suppress LIBOR.  Indeed, Plaintiffs could not have learned from reviewing their mortgage statements, or otherwise, that their LIBOR rates were artificially suppressed.

46.     Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their scheme to manipulate LIBOR.  Plaintiffs and members of the Class, who are not sophisticated investors, reasonably relied upon Defendants' knowing, affirmative, and active concealment.  Plaintiffs and members of the Class did not discover, and could not

7

have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein until after Barclays announced to the world its role in the scheme to manipulate LIBOR, and the role of other Panel Banks.

47.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

## V.     FACTUAL ALLEGATIONS

### A.     What is the London Interbank Offered Rate and How Was it Set During the Manipulation Period?

48.     LIBOR is published under the auspices of the BBA and is supposed to represent the rates at which a bank can borrow unsecured funds from another bank on a given day for a specific period of time.  During the Manipulation Period, LIBOR was supposed to be set using strict guidelines established by the BBA.

49.     The BBA is the leading banking association in the United Kingdom, with more than 240 member banks that are spread throughout 180 countries.[2]  Each business day, Thomson Reuters, as an agent for the BBA, calculated and published LIBOR based on rate submissions from BBA member banks.  The BBA is not a regulatory agency nor does it having any regulatory power.  It is governed by a board composed of senior executives from its member banks, such as Barclays, Bank of America, Lloyds, RBS.[3]

50.     During the Manipulation Period, the BBA calculated and published LIBOR on a daily basis for ten different currencies, including the U.S. Dollar, Euro, and Japanese Yen, at fifteen maturities (also known as "tenors"),  ranging from overnight to one year.

51.     Each business day, a unique panel of banks ("Contributing Panel") which composed of a set number of BBA member banks ("Panel Banks") responded to the following question posed by the BBA: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable  market size, just prior to 11 [a.m.]

---

[2] https://www.bba.org.uk/about-us/, last accessed October 30, 2014.
[3] https://www.bba.org.uk/about-us/bba-board/, last accessed October 30, 2014.

London time?"

52.     Once all rates are were received, the top and bottom quartiles were removed and the two middle quartiles were averaged, creating the published rates.  Top and bottom quartiles were <u>not</u> factored into the calculation of the published rates.  In other words, the process of calculating the published rates was designed in a way so that they could <u>not</u> be manipulated unless there was collusion amongst all or most of the Defendants.

53.     Because LIBOR was represented to be the *true cost* of borrowing, institutions across the globe have tied LIBOR to many financial products, such as ARMs.

54.     During most of the Manipulation Period,  the USD LIBOR panel was made up of sixteen (16) BBA member banks.  Those banks were as follows:

- o   Bank of America
- o   Bank of Tokyo
- o   Barclays
- o   Citibank
- o   Credit Suisse
- o   Deutsche Bank
- o   HSBC
- o   JPMorgan Chase
- o   Lloyds
- o   Rabobank
- o   RBC
- o   Société Générale
- o   Norinchukin
- o   RBS
- o   UBS
- o   WestLB

55.     Once the global investigations began in or around March 2011, WestLB left its position as a USD LIBOR Panel Bank.

**B.     Defendants' Had Reason to Expect that Plaintiffs Would Rely on LIBOR**

56.     According to the BBA, LIBOR:

…is the primary benchmark for short term interest rates globally and is used as the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges.  It has also been used as a barometer to measure

the health of financial money markets **and is used in many loan agreements throughout the global markets including mortgage agreements.**[4]

57.     In its Order against Barclays, the United States Commodity Futures Trading Commission ("CFTC") found that LIBOR is "…used to price a variety of global financial products, including U.S.-based swaps transactions and futures contracts, as well as **home mortgages** and commercial and personal consumer loans."[5]  The CFTC went further and stated that "…LIBOR is fundamentally critical to financial markets and has enormously widespread impact on global markets and consumers.  **LIBOR also affects** businesses seeking credit, **consumers obtaining mortgages or personal loans**, and market participants transacting in numerous other financial contracts in the U.S. and abroad that are based on benchmark interest rates."[6]  The United States Department of Justice ("DOJ") noted in the Deferred Prosecution Agreements it entered into with Barclays, UBS, RBS, Rabobank, and Lloyds that "…**mortgages**, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate."

58.     Defendants knew or should have known that LIBOR was and continues to be a common index used in connection with ARM loans.  In fact, many of the Defendants were and continue to be in the business of originating LIBOR-based ARM loans.

59.     Defendants knew or should have known that Plaintiffs and members of the Class, who are not sophisticated investors, could not have known that LIBOR was being manipulated until Barclays admitted to the world that it, and the other Panel Banks, were submitting fraudulent rates on June 27, 2012.

60.     Defendants knew or should have known that by artificially suppressing LIBOR,

---

[4] http://www.bbalibor.com/explained (emphasis added), last accessed October 30, 2014.
[5] *In the Matter of Barclays PLC, Barclays Bank PLC and Barclays Capital Inc.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, As Amended, Making Findings & Imposing Remedial Sanctions ("CFTC Barclays"), at 2 (CFTC Dkt. No 12-25) (emphasis added) (June 27, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbar claysorder062712.pdf.
[6] CFTC Barclays at 6 (emphasis added).

they were causing Plaintiffs and members of the Class to incur artificially higher interest rates on their ARM loans and, consequently, to pay thousands of dollars, or more, in excess interest payments.

**C.  Defendants' Had Significant Financial and Reputational Interests in Artificially Suppressing LIBOR During the Manipulation Period**

61.     As alleged herein, Defendants had a strong incentive to manipulate LIBOR.  The ongoing government investigations which span across the globe have unearthed an abundance of evidence supporting Plaintiffs' assertion that Defendants colluded to artificially suppress LIBOR during the Manipulation Period.  Government authorities have uncovered two primary reasons why Defendants colluded to manipulate LIBOR: (1) to profit from large trading positions tied to LIBOR; and (2) to protect their reputation in the marketplace and media.

62.     It has been estimated that the financial products indexed to LIBOR have a notional value in the hundreds of *trillions* of dollars.  During the Manipulation Period, each of the Defendants managed extensive investment portfolios tied to LIBOR.  A slight movement on any given day would generate (or cost) Defendants millions of dollars.  For example, certain Defendants reported increased net interest revenues in the first quarter of 2009, when LIBOR fell dramatically.

63.     In 2009, Citibank reported it would make $936 million in net interest revenue if rates fell by 25 basis points (0.25%) per quarter over the next year and $1.935 billion if rates fell 1%.  Defendant JPMorgan Chase & Co. also reported significant exposure to interest rates in 2009 estimating a loss of over $500 million if interest rates increased by 1%.  Similarly, Defendants HSBC Holdings PLC and Lloyds Banking Group PLC also predicted they would earn hundreds of millions of dollars in 2008-2009 if interest rates fell and would lose similar amounts if interest rates increased.  In an October 2008 exchange between two managers at UBS, one manager said to another manager that UBS would lose $4 million per basis point

(0.01%) if LIBORs were to move any higher.[7]

64.     By manipulating LIBOR, each of the Defendants were able to profit tremendously or protect themselves from significant losses.

65.     Also, during the 2007 global financial crisis, the market and the media seriously questioned the stability of the financial sector.  This increased scrutiny motivated Defendants to artificially suppress LIBOR which allowed them to understate their borrowing costs and risk of default.

66.     LIBOR submissions are not to be shared with an individual or institution during the submission process.  Rate submissions are made available to the public only after LIBOR is calculated and published.  Once the submissions are made public, the market has the ability to analyze Defendants true borrowing costs.  In the eyes of the market and media, higher the submission, the greater the risk of default.

67.     As a result, each Defendant had a strong incentive to collude and conspire with one another to ensure that their LIBOR submissions were not significantly higher when compared to the others.

68.     Given the method in which LIBOR is calculated, Defendants had no choice but to collude with one another in advance of making their submissions.  Without collusion, any Defendant who submitted substantially higher rates in comparison to the others would not only damage its reputation, but would also raise flags if it were to suddenly bring rates down to levels comparable to the others.

69.     As alleged throughout this Complaint, a significant amount of evidence has been uncovered which shows senior management for many of the Defendants directed their respective USD LIBOR submitters to make artificially suppressed submissions in an effort to maintain an image that Defendants were stable and liquid.

70.     By maintaining a strong reputation in the market, Defendants were able to

---

[7] U.K. Financial Services Authority, Final Notice to UBS AG ("FSA UBS") ¶ 103 (Dec. 19, 2012), *available at* http://www.fsa.gov.uk/static/pubs/final/ubs.pdf.

maintain a façade of creditworthiness in the market and the media.

71.      Defendants behavior completely disregarded the repercussions such significant manipulation of LIBOR would have on the market and Plaintiffs.

**D.      Defendants' Colluded and Conspired to Manipulate LIBOR During the Manipulation Period**

72.      During the Manipulation Period, Defendants colluded to manipulate and artificially suppress USD LIBOR in an effort to benefit their respective trading positions, to maintain a false picture of creditworthiness for the media and market, and to reduce their borrowing costs.  This systematic manipulation of LIBOR was to the detriment of Plaintiffs, who continue to be harmed on a daily basis in connection with their LIBOR-based ARM loans that originated during the Manipulation Period and have artificially high margins which are set for the life of the loan.

73.      In blatant disregard for the LIBOR submission guidelines set by the BBA, Defendants conspired to and regularly made daily LIBOR submissions that were lower than their *true* cost to borrow unsecured funds on the open market.  Furthermore, Defendants shamelessly disregarded the BBA's rule that LIBOR submissions are not to be shared amongst Panel Banks before the official rate is published.  Defendants regularly shared their rates with each other in an effort to manipulate and artificially suppress LIBOR.

74.      During the Manipulation Period, traders and LIBOR submitters employed by Defendants openly discussed the manipulation of LIBOR.  In many instances, USD LIBOR submitters were ordered by senior management from their respective banks to manipulate their submissions. The WSJ  has reported that "former traders have said that for years it was viewed as business-as-usual for trading desks at many banks to try to sway their banks' Libor submissions to benefit their trading positions."[8]

---

[8] David Enrich & Atsuko Fukase, *LIBOR Rate-Probe Spotlight Shines on Higher-Ups at Citigroup, Other Banks,* Wall St. J., Aug. 28, 2013, *available at* http://online.wsj.com/articles/SB10001424127887324165204579028703364511212.

13

75.     Traders who worked for Defendants regularly shared information with each other in an effort to manipulate and artificially suppress LIBOR.  One method of sharing this information was through interdealer brokers.  Interdealer brokers act as a middleperson between banks.  To assist in the manipulation of LIBOR, interdealer brokers would facilitate direct requests from traders and submitters and/or circulate their view of the markets along with suggested LIBOR submissions to large groups of traders from multiple banks.

76.     Interdealer brokers were financially rewarded by traders for their efforts to help manipulate LIBOR.  The *Wall Street Journal* reported that:

> …some brokers exploited this middleman role to help attempted rate-rigging mushroom from a small group of bank traders into a world-wide effort that distorted interest rates.  In return, traders gave the brokers business to boost their commissions and other rewards, regulators have said.[9]

77.     Various government investigations have uncovered numerous illicit dealings between traders and interdealer brokers.  For example:

> RBS derivatives traders also unlawfully worked in concert with a trader from a UBS AG subsidiary ("UBS"), also a LIBOR panel bank, in attempts to manipulate Yen LIBOR, and with a trader at another panel bank in attempts to manipulate Swiss Franc LIBOR. RBS also aided and abetted UBS's attempts to manipulate Yen LIBOR by executing wash trades (trades that result in financial nullities) in order to generate extra brokerage commissions to compensate two interdealer brokers for assisting UBS in its unlawful manipulative conduct. On at least one occasion, RBS also requested the assistance of an interdealer broker to influence the submissions of multiple panel banks in an attempt to manipulate Yen LIBOR.[10]

78.     In its investigation, the CFTC also discovered that a senior Yen trader, who was

---

[9] David Enrich, *ICAP in Talks to Settle U.S., U.K. Rate Probe*, Wall St. J., Sept. 5, 2013, *available at*
http://online.wsj.com/news/articles/SB10001424127887324123004579057032665066684.
[10] *In the Matter of The Royal Bank of Scotland plc & RBS Sec. Japan Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC RBS"), at 2 (CFTC Dkt. No 13-14) (Feb. 6, 2013), *available at*
http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfrbsorder020613.pdf.

known as one of the largest traders in the Yen market, generated hundreds of millions of dollars for UBS through various "manipulative strategies," one of which being his use of "…at least five interdealer brokers, who intermediated cash and derivative transactions for clients, including other banks that made benchmark interest rate submissions, to disseminate false market information relating to Yen LIBOR to multiple panel banks in order to impact their submissions to his benefit."[11]  This same senior trader also had the interdealer brokers:

> …utilize various methods to try to affect the submissions of other banks, including: (i) disseminating false "run-throughs" of suggested Yen LIBOR to many, if not all, of the panel banks…(ii) contacting directly other bank submitters…;(iii) publishing false market cash rates over certain dedicated electronic screens available to clients…and (iv) "spoofing" or making fake bids and offers, all tailored to drive the submissions of the other banks to the rates that benefitted the senior Yen trader's derivatives positions.[12]

79.     There has also been significant evidence uncovered implicating Defendants' collusion through interdealer brokers.  For example, on June 6, 2009, an interdealer broker who was working with an RBS trader sent the following message:[13]

> Broker: Alright okay, alright, no we've okay just confirming it.  We've, so far **we've spoke to [Contributing Bank 3]**.  We've spoke to a couple of people so we'll see where they come in alright.  We've spoke, basically … **basically we spoke to [Contributing Bank 3], [Contributing Bank 4], [Contributing  Bank 5], who else did I speak to?  [Contributing Bank 6].  There's a couple of other people that the boys have a spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?**

> Trader: Cheers.

---

[11] *In the Matter of UBS AG & UBS Sec. Japan Co., Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC UBS"), at 3 (CFTC Dkt. No 13-09) (Dec. 9, 2012) (citations omitted), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfubsorder121912.pdf.

[12] *Id.*

[13] U.K. Financial Services Authority, Final Notice to The Royal Bank of Scotland plc ("FSA RBS"), ¶¶59-60, 65-67 (Feb. 6, 2013) (emphasis added), *available at* http://www.fsa.gov.uk/static/pubs/final/rbs.pdf.

80.     ICAP plc ("ICAP"), one of the most well-known interdealer brokers in the world played a significant role in the global manipulation of LIBOR.  According to the CFTC:

> For more than four years, from at least October 2006 through at least January 2011…, ICAP brokers on the Yen derivatives and cash desks knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate, at times successfully, the official fixing of the daily Yen LIBOR. ICAP brokers, including one known as "Lord LIBOR," engaged in this misconduct primarily to aid and abet a highly valued client, who was a senior Yen derivatives trader employed at UBS Securities Japan Co., Ltd…and later at another bank, in his relentless attempts to manipulate Yen LIBOR to benefit his derivatives trading positions that were tied to this benchmark.[14]

81.     It was uncovered that "…the Senior Yen Trader made more than 400 manipulative requests, which they often accommodated."[15]

82.     On September 13, 2013, the United States Department of Justice ("DOJ") charged three former ICAP brokers for their role in manipulating Yen LIBOR.

83.     On September 25, 2013, ICAP agreed to pay approximately $87 million to the United States Commodity Futures Trading Commission ("CFTC") and the United Kingdom's Financial Conduct Authority ("FCA") in connection with its role in manipulating Yen LIBOR.[16]

84.     United Kingdom authorities have also brought criminal charges against former interdealer brokers from RP Martin Holdings Ltd., for conspiring with employees at banks such as UBS to manipulate LIBOR.[17]  RP Martin Holdings, Ltd. has paid more than $2 million in fines to the CFTC and FCA.[18]

---

[14] *In the Matter of ICAP Europe Limited*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC ICAP"), at 2 (CFTC Dkt. No 13-38) (Sep. 25, 2013) (footnote omitted), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enficap order092513.pdf.
[15] *Id*. at 3.
[16] Kirstin Ridley, Clare Hutchison, & Aruna Viswanatha, *ICAP fined $87 million over Libor, three former staff charged,* Reuters, Sep. 25, 2013, *available at* http://www.reuters.com/article/2013/09/25/us-icap-libor-idUSBRE98O0BX20130925.
[17] Lindsay Fortado & Silla Brush, *RP Martin Fined $2.3 Million Over Libor by Regulators*, Bloomberg, May 15, 2014, *available at* http://www.bloomberg.com/news/2014-05-15/rp-martin-fined-2-3-million-over-libor-by-regulators.html.
[18] *Id*.

85.     As pointed out by Martin Wheatley, chief executive of the FCA, "[t]he disturbing events we have uncovered in the manipulation of Libor have severely damaged our confidence and trust—it has torn the very fabric that our financial system is built on."[19]  Mr. Wheatley also pointed out that this global scheme was not the result of "a few rogue individuals" but instead was a "**systematic problem**."[20]

86.     The civil settlements and criminal investigations of Barclays, UBS, RBS, Lloyds, HBOS, and Rabobank have also shined a light on the reckless and unchecked behavior of Defendants to collude and manipulate LIBOR in total disregard for the market and Plaintiffs.

87.     As alleged throughout this Complaint, the evidence from these investigations coupled with extensive analyses and studies conducted by academics and financial experts show that this global scheme would have been impossible if the Defendants did not collude and coordinate their efforts during the Manipulation Period.

## VI.  ANALYSES AND STUDIES SUPPORTS PLAINTIFFS' THEORY THAT DEFENDANTS COLLUDED TO ARTIFICIALLY SUPPRESS LIBOR

88.     There have been various comparisons made and methods used by commentators, academics, and experts to support the theory that Defendants colluded to artificially suppress by Defendants during the Manipulation Period.  Such comparisons and methods include: (1) comparing Defendants' USD LIBOR submissions against LIBOR submissions for other currencies; (2) monitoring how often Defendants clustered their USD LIBOR submissions around the fourth-lowest submission on any given day; and (3) comparing Defendants' USD LIBOR submissions against the Eurodollar Bid Rate.

### A.     The Rates Submitted for USD LIBOR Vary From the LIBOR Rates Submitted For Other Currencies

89.     On April 2, 2010, Connan Snider and Thomas Youle ("Snider and Youle")

---

[19] Phillipa Leighton-Jones, *Sold for £1.  NYSE Euronext Takes Over Libor*, Wall St. J., Jul. 9, 2013, *available at* http://blogs.wsj.com/moneybeat/2013/07/09/libor-sold-to-nyse-euronext-how-did-we-get-here/.
[20] *Id.* (emphasis added).

published a paper entitled *Does the LIBOR reflect banks' borrowing costs*. One of the concepts discussed was "cross-currency rank reversals." Put simply, Snider and Youle found that it was common for some of the Defendants included on more than one currency LIBOR Contributing Panel to "…simultaneously quote a higher rate than another bank in one currency panel and a lower rate in another currency."[21] In other words, certain Defendants reported lower rates on certain currencies (i.e. USD LIBOR) when compared to other banks, but higher rates for other currencies (i.e. Yen LIBOR) when compared to those same banks.

90.     For example, Bank of America would regularly quote a lower USD LIBOR than Bank of Tokyo-Mitsubishi and a higher Yen LIBOR rate than Bank of Tokyo-Mitsubishi.[22] Other Panel Banks, such as Barclays Bank, Deutsche Bank, Citigroup, Credit Suisse, HSBC, and JP Morgan engaged in the same inconsistent rate reporting, as revealed in the following graphs:[23]



91.     The credit risk for Defendants should not vary from currency to currency. According to Snider and Youle, "[s]ince the same bank is participating in each currency, the

---

[21] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 5 (Apr. 2, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.
[22] *Id.*
[23] *Id.* at 20.

credit risk is the same for loans in either currency."[24]   Snider and Youle went further and stated that these rate irregularities across currencies "…**shows that differences in banks' Libor quotes are not primarily due to differences in credit risk, something we would expect of their true borrowing costs**."[25]   Put another way, Defendants with such irregularities were factoring in more than their true borrowing costs when making USD LIBOR submissions.

**B.      Defendants "Bunching" of USD Libor Submissions Around the Fourth Lowest Submission Strongly Suggests That Defendants Were Colluding to Manipulate and Artificially Suppress LIBOR**

92.      During the Manipulation Period, the submitted rates of certain Defendants were found at times to have been questionably "bunched" around the fourth lowest USD LIBOR submission of the day.[26]   At times, certain Defendants such as Citigroup and Bank of America, were even found to be submitting rates <u>identical</u> to the fourth-lowest submission even though their financial conditions were different.[27]

93.      As discussed above, when LIBOR is calculated, the bottom and top quartile of the submissions are <u>not</u> factored in.   This is done to protect the rate from manipulation.

94.      By "bunching" rates with the fourth lowest submission on a particular day, Defendants gave themselves the ability to have their lower submissions factored in, which in turn would artificially suppress LIBOR.

95.      The act of "bunching" strongly suggests collusion because in order for Defendants to effectively bunch rates, they had to share them amongst each other prior to submission.   The sharing of rates prior to submission violated BBA guidelines.

96.      Also, as discussed in the section above, the intra-day variation of CDS spreads grew considerably larger than USD LIBOR quotes during the global financial crisis.   Snider and Youle pointed out that even with this significant variation, "[l]ibor quotes are much more

---

[24] *Id*. at 5.
[25] *Id*. (emphasis added).
[26] *Id*. at 6.
[27] *Id.* at 7.

clustered around the day's fourth lowest quote than CDS spreads are of the fourth lowest spread."[28] Based on this irregularity, they concluded that, "[i]f banks were truthfully quoting their costs…we would expect these distributions to be similar."[29]

### C.    Defendants USD LIBOR Submissions Were Inconsistent with Actual Market Lending Rates in the Eurodollar Market

97.    Eurodollars are U.S. Dollar deposits which are held in banks outside of the United States.[30]  The "Eurodollar Bid Rate" is the market rate at which Eurodollar deposits are loaned out to other banks.[31]  Eurodollars have been and continue to be an important source of funding for large U.S. banks.[32]

98.    The Eurodollar Bid Rate was known to have a historically tight relationship with LIBOR.  As outlined in the study conducted by Snider and Youle:

> Prior to August 2007, indeed **for the whole history of the Libor** prior to then, the **banks submitted quotes between 6 to 12 basis points above the Eurodollar Bid Rate. Banks were treating the Libor, the London Interbank *Offered* Rate, as their perception of the ask rate corresponding to the listed bid rate for eurodollars.** The Eurodollar Bid Rate-Libor spread of 6-12 basis points was then simply something like a bid-ask spread. **Since 2007, for the first time the Libor descended below the Eurodollar Bid Rate and at times quite dramatically**.[33]

99.    Since LIBOR and the Eurodollar Bid Rate are both used to measure a particular banks actual lending costs, variations in the rates due to changes in the market or particular risks that may be associated with a bank should have similar effects on both rates.

100.    From August 2007 through at least January 2009, LIBOR and the Eurodollar Bid Rate began to deviate significantly amongst Defendants.

101.    Instead of maintaining rates that were within 6 to 12 basis points, the average spread for every single Panel Bank on the USD LIBOR Contributing Panel went negative.

---

[28] *Id.* at 6.
[29] *Id.*
[30] Snider & Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 7.
[31] *Id.*
[32] *Id.*
[33] *Id.* (emphasis added).

102.    The following chart represents the Defendants spreads Pre-August 2007, August 2007 through August 2008, and post-January 2009:[34]

Table 3: Average Magnitude of Quote Skewing: Eurodollar Bid Rate - Libor Quote

| Bank | Pre Aug. 07 mean | sd. | Aug. 07 - Aug. 08 mean | sd. | Post Jan. 09 mean | sd. |
|---|---|---|---|---|---|---|
| Barclays | .02 | .01 | - .081 | .10 | -.37 | .13 |
| Bank of America | .02 | .02 | -.11 | .10 | -.393 | .14 |
| Bank of Tokyo-Mitsubishi | .029 | .01 | -.095 | .10 | -.320 | .14 |
| Citigroup | .022 | .01 | -.118 | .10 | -.400 | .13 |
| CSFB | .022 | .01 | -.097 | .10 | -.370 | .13 |
| Deutsche Bank | .02 | .01 | -.106 | .10 | -.412 | .14 |
| HBOS | .023 | .01 | -.111 | .10 | -.382 | .13 |
| HSBC | .022 | .01 | -.11 | .10 | -.51 | .13 |
| J.P. Morgan | .023 | .01 | -.111 | .11 | -.434 | .13 |
| Lloyd's | .022 | .01 | -.108 | .11 | -.381 | .13 |
| Norin | .03 | .02 | -.090 | .10 | -.31 | .14 |
| Rabo Bank | .022 | .01 | -.111 | .10 | -.403 | .13 |
| RBOS | .019 | .01 | -.097 | .10 | -.301 | .12 |
| Royal Bank of Canada | .015 | .01 | -.119 | .10 | -.345 | .10 |
| UBS | .022 | .01 | -.111 | .10 | -.361 | .11 |
| WestLB | .022 | .01 | -.098 | .10 | -.333 | .17 |

103.    This negative average is a strong indicator that Defendants were colluding to manipulate LIBOR.

## VII.    GOVERNMENT INVESTIGATIONS PROVE THAT DEFENDANTS COLLUDED TO MANIPULATE LIBOR

104.    The Department of Justice has stated that it "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies.  The investigation consists of a joint effort by the DOJ's criminal and antitrust divisions.  Authorities are attempting to determine, among other things, "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."

105.    On March 11, 2011, UBS disclosed in a Form 20-F (annual report) filed with the SEC that the bank had "received subpoenas" from the SEC, CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]"  UBS stated it understood "that the

---

[34] *Id*. at 8.

investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times."

106.    On March 16, 2011, the Financial Times reported that UBS, Bank of America, Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" USD-LIBOR "between 2006 and 2008."  The Times further reported that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[35]

107.    The same day, Market Watch reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC.

108.    The next day, Bloomberg reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that Defendants WestLB, Lloyds, and Bank of America had been contacted by regulators.

109.    On March 23, 2011, Bloomberg reported that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.[36]

110.    The next day, the Financial Times reported that Defendant Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]." According to the Times article, investigators were "probing whether communications between

---

[35] Brooke Masters & Patrick Jenkins, *Banks served subpoenas in Libor case*, Financial Times, Mar. 16, 2011, *available at* http://www.ft.com/intl/cms/s/52958d66-501f-11e0-9ad1-00144feab49a,Authorised=false.html?_i_location=http%3A%2F%2Fwww.ft.com%2Fcms%2Fs%2F0%2F52958d66-501f-11e0-9ad1-00144feab49a.html%3Fsiteedition%3Dintl&siteedition=intl&_i_referer=http%3A%2F%2Fwww.bing.com%2Fsearch%3Fq%3DBanks%2520served%2520subpoenas%2520in%2520Libor%2520Case%2520Financial%2520Times%26qs%3Dn%26form%3DQBRE%26pq%3Dbanks%2520served%2520subpoenas%2520in%2520libor%2520case%2520financial%2520times%26sc%3D0-0%26sp%3D-1%26sk%3D%26cvid%3D66dd845e873d48b98d06f6cab04cb215#axzz3I2GfLhem.

[36] Joshua Gallu & Donal Griffin, *Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank*, Bloomberg, Mar. 23, 2011, *available at* http://www.bloomberg.com/news/2011-03-24/libor-manipulation-probe-spurs-witness-call-up-at-citigroup-deutsche-bank.html.

the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank." The Times further reported that investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.

111.    Additionally, in an "Interim Management Statement" filed on April 27, 2011, Barclays revealed that it was "cooperating with" the investigations by the UK Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

112.    RBS also disclosed, in a Form 6-K filed with the SEC on May 6, 2011, that it was "co-operating with" the investigations conducted by the CFTC, the SEC and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

113.    On May 16, 2011, Lloyds revealed that it too "had received requests for information as part of the LIBOR investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."

114.    On May 23, 2011, the Telegraph reported that the Federal Bureau of Investigation was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

115.    Additionally, in a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo Interbank Offered Rate)."

116.    Similar to the other Defendants discussed above, HSBC, in an interim report filed in August, 2011, disclosed that it or its subsidiaries had "received requests" from various regulators to provide information and were "cooperating with their enquiries."

117.    On September 7, 2011, the Financial Times reported that as part of their LIBOR investigation, the DOJ and the CFTC were examining "whether traders placed bets on future yen

23

and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."

118.    On October 31, 2011, the Financial News reported that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."

119.    On February 14, 2012, Bloomberg reported that "[g]lobal regulators have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world…"[37]  It was also reported that Citigroup and Deutsche Bank had "dismissed, put on leave or suspended" traders in connection with the government investigations.[38]

120.    On February 15, 2012, Reuters reported that Canada's Competition Bureau was "targeting" HSBC, RBS, Deutsche Bank, JPMorgan and Citigroup for "alleged collusive conduct."[39]

121.    Defendants' misconduct was self-concealing. Their actual or reasonably expected costs of borrowing were not publicly disclosed, making it impossible for Plaintiffs to detect any discrepancies between Defendants' publicly disclosed LIBOR quotes and other measures of those banks' actual borrowing costs.

122.    To date, Barclays, UBS, RBS, Lloyds and Rabobank have agreed to resolve civil and criminal charges in connection with their roles in the global scheme to manipulate LIBOR. These Defendants have paid billions of dollars in fines to various government agencies around the globe and have agreed to cooperate in ongoing investigations. Though only a fraction of the evidence uncovered has been made public, the information currently available tells a compelling story of a larger scheme to collude and manipulate LIBOR.  This evidence coupled with

---

[37] Lindsay Fortado & Joshua Gallu, *Libor Probe to Expose Collusion, Lack of Internal Controls*, Feb. 14, 2012, *available at* http://www.bloomberg.com/news/2012-02-15/libor-investigation-said-to-expose-collusion-lack-of-internal-controls.html.
[38] *Id.*
[39] Reuters, *Canda investigating some bank as LIBOR probe widens*, Reuters, Feb. 15, 2012, *available at* http://ca.reuters.com/article/businessNews/idCATRE81E08I20120215.

significant analysis has proven that during the Manipulation Period, LIBOR could not have been artificially suppressed by these five banks only.  Put another way, the systematic and constant manipulation of the LIBOR during the Manipulation Period required collusion amongst *all* of the Defendants.

### A.   Barclays Bank PLC

123.   Barclays Bank PLC ("Barclays") was on the USD LIBOR Contributing Panel during the Manipulation Period and was responsible for submitting rates used in the daily calculation and global publication of the USD LIBOR.  The rates submitted by Barclays were supposed to reflect its true cost of borrowing unsecured funds from other banks on the open market—they did not.

124.   On June 27, 2012, it was announced that Barclays had agreed to resolve civil and criminal charges with regulators in the United States and United Kingdom in connection with its role to  manipulate LIBOR.

125.   Barclays was ordered to pay $200 million to the CFTC[40]; $160 million to the DOJ[41]; and £59.5 million to the U.K. Financial Services Authority ("FSA")[42].  These penalties totaled approximately $453 million.

126.   The CFTC, DOJ, and FSA all found that Barclays knowingly made false LIBOR submissions in an effort to benefit its own trading positions and to protect its reputation in the marketplace.  It was also found that Barclays encouraged other Panel Banks to falsify its LIBOR submissions.

127.   According to the CFTC, starting in at least 2005, Barclays repeatedly made false, misleading, and knowingly inaccurate USD LIBOR submissions in an effort to benefit trading

---

[40] CFTC Barclays at 30.
[41] The United States Department of Justice Press Release, *Barclays Bank PLC Admits Misconduct Related to Submissions for the London Interbank Offered Rate and the Euro Interbank Offered Rate and Agrees to Pay $160 Million Penalty*, (Jun. 27, 2012), *available at* http://www.justice.gov/opa/pr/barclays-bank-plc-admits-misconduct-related-submissions-london-interbank-offered-rate-and.
[42] U.K. Financial Services Authority, Final Notice to Barclays Bank Plc ¶ 1 (June 27, 2012) ("FSA Barclays"), *available at* http://www.fsa.gov.uk/static/pubs/final/barclays-jun12.pdf.

positions:

> Specifically, during the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, interest rate swaps traders, primarily located in Barclays' New York and London offices, regularly requested that the Barclays' employee(s) responsible for determining and submitting Barclays' daily LIBORs and Euribors ("submitters") submit a particular rate or adjust their submitted rates higher or lower in order to affect the daily, official published LIBOR and Euribor. Barclays' swaps traders were improperly attempting to benefit Barclays' derivatives trading positions and the profitability of their particular trading books and desks. Barclays' swaps traders also facilitated former Barclays swaps traders' requests to alter LIBOR or Euribor submissions by passing along the former traders' requests to the Barclays LIBOR or Euribor submitters as if they were their own. The Barclays submitters routinely based their LIBOR and Euribor submissions on the traders' requests in furtherance of the attempts to manipulate LIBOR and Euribor. **The majority of Barclays' violative conduct involved U.S. Dollar LIBOR** and Euribor, but also, at limited times, involved Yen and Sterling LIBOR submissions.[43]

128.    The CFTC found that Barclays' rate swap traders, including former Barclays swap traders, were frequently requesting that Barclays LIBOR submitters make fraudulent submissions in order to benefit Barclays' derivative trading positions.[44]  Barclays' LIBOR submissions were consistent with the requests made by traders at least 70% of the time.[45]

129.    Barclays' traders were also found to have been requesting that USD LIBOR submitters manipulate their submissions at the request of traders from other banks:

> **Additionally, certain Barclays swaps traders received external requests to alter Barclays' U.S. Dollar LIBOR submissions from former Barclays swaps traders who had left Barclays and now were employed by other financial institutions.** These former Barclays employees made the requests to benefit their derivatives trading positions, and expected that not only would these requests be forwarded to the LIBOR submitters, but that Barclays' LIBOR submitters would take their requests into account when making their LIBOR submissions. These requests were made typically by email or by instant message.[46]

> The swaps traders' requests, whether internal or external, typically concerned the one-month and three-month U.S. Dollar LIBOR submissions. The traders' requests also included either a specific rate to be submitted or the direction, higher or lower, that they wanted Barclays' LIBOR submission to move. Sometimes, the traders asked the submitters to try to have Barclays excluded ("kicked out" or "knocked out") from the LIBOR calculation by being in the top or bottom

---

[43] CFTC Barclays at 3 (emphasis added).
[44] *Id.*
[45] FSA Barclays ¶ 71.
[46] CFTC Barclays at 9 (emphasis added).

quartile, in an attempt to influence the official LIBOR fixing. Sometimes the requests covered several days or even weeks of submissions at a time.[47]

130.    According to the FSA, Barclays' USD LIBOR submitters factored in requests from <u>other</u> banks at least eleven (11) times between January 2005 through May 2009.[48]

131.    Barclays' traders would frequently ask LIBOR submitters to manipulate their LIBOR submissions via electronic mail and instant message.  The following are just a few examples of the numerous requests uncovered by the CFTC:

> "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!! We need a 4.17 fix in 1m (low fix)…" (November 22, 2005, Senior Trader in New York to Trader in London)[49]

> "You need to take a close look at the reset ladder. We need 3M to stay low for the next 3 sets and then I think that we will be completely out of our 3M position…" (February 1,2006, Trader in New York to Trader in London)[50]

> "Your annoying colleague again ... Would love to get a high 1m Also if poss a low 3m ... if poss ... thanks" (February 3, 2006, Trader in London to Submitter)[51]

> "This is the [book's] risk. We need low 1M and 3M libor. PIs ask [submitter] to get 1M set to 82. That would help a lot" (March 27,2006, Trader in New York to Trader in London)[52]

> "Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the lib or fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot." (September 13, 2006, Senior Trader in New York to Submitter)[53];

> "For Monday we are very long 3m cash here in NY and would like the setting to be set as low as possible ... thanks" ( December 14, 2006, Trader in New York to Submitter)[54]

> "PIs. go for 5.36 Libor again tomorrow, very long and would be hurt by a higher setting ... thanks." (May 23, 2007, Trader in New York to Submitter)[55]

---

[47] *Id*.
[48] FSA Barclays ¶ 56
[49] CFTC Barclays at 9.
[50] *Id*.
[51] *Id*.
[52] *Id*.
[53] *Id*. at 10.
[54] *Id*.
[55] *Id*.

132.    Instead of refusing such requests, Barclays' LIBOR rate submitters would factor these requests into their daily rate submissions.  The following are just a few examples of responses from rate submitters uncovered by the CFTC:

> "For you ... anything. I am going to go 78 and 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least." (March 16, 2006, Submitter's response to swaps trader's request for a high one-month and low three-month U.S. Dollar LIBOR)[56]

> "Always happy to help, leave it with me, Sir." (March 20,2006, Submitter's response to a request)[57]

> "Done ... for you big boy ... " (April 7, 2006, Submitter's response to swaps trader requests for low one-month and three-month U.S. Dollar LIBOR)[58]

133.    Between January 2005 and May 2009, Barclays' LIBOR submitters were asked to alter their LIBOR submissions at least 173 times.[59]  At times, requests to manipulate USD LIBOR would occur on a daily basis.

134.    Barclays' traders and LIBOR submitters would openly and regularly discuss requests to manipulate LIBOR:

> Senior traders on the NY Swaps Desk instructed several other swaps traders to make the requests of the LIBOR submitters on Barclays' London Money Market Desk for certain LIBOR submissions in order to move their LIBOR submissions in a direction to benefit the desk's derivatives trading positions.  **The traders' conduct was common and pervasive, and known by other traders and trading desk managers located near the interest rate swaps desk, both in New York and London. None of the traders attempted to conceal the requests from supervisors at Barclays during the entire period that the activity occurred. In fact, on occasion, the traders discussed their requests with trading desk managers**.[60]

135.    Barclays' LIBOR submitters knew it was against BBA rules to consider Barclays' traders derivative trading positions when formulating their daily LIBOR submissions.  Barclays knew, or should have known, that it was conveying false and misleading USD LIBOR

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] FSA Barclays ¶ 56 (footnote omitted).
[60] CFTC Barclays at 8 (emphasis added).

submissions to the BBA.  These false submissions were premeditated attempts to manipulate the daily, published USD LIBOR to the detriment of Plaintiffs.

136.    It was also found that Barclays would frequently suppress its LIBOR submissions "…in order to manage what it believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions relative to the low submissions of other panel banks that Barclays believed were too low given market conditions."[61]

137.    According to the CFTC, Barclays' senior management directed Barclays' submitters to lower LIBOR submissions and to keep them aligned with rates submitted by other Panel Banks.[62]  Senior management wanted Barclays' LIBOR submissions to be "…closer in range to the submitted rates by other banks but not so high as to attract media attention."[63]

138.    As early as August 2007, a Barclays' senior U.S. Dollar LIBOR submitter began circulating liquidity reports within Barclays and providing comments about the money markets and other banks.[64]  Initially, the submitter was of the opinion that "…in setting Barclays' submissions higher relative to others, he was setting correctly and that a number of banks were submitting rates that were 'unrealistically low,' particularly in a market environment where banks were reluctant to lend money for longer than a one-month period."[65]  This same rate submitter also acknowledged that "…his own U.S. Dollar LIBOR submissions were not accurate, and were lower than where he thought the cost of borrowing unsecured funds was for Barclays."[66]

139.    Senior Barclays Treasury managers adopted the term "head above the parapet."[67] This term was used to describe a Panel Bank that would make high LIBOR submissions relative

---

[61] CFTC Barclays at 3.
[62] *Id*. at 4.
[63] *Id*. at 20.
[64] *Id*. at 19.
[65] *Id*.
[66] *Id*.
[67] *Id*. at 20.

to other Panel Banks and attract media attention.[68]  Barclays' USD LIBOR submitters were under direction from Senior Treasury managers to not stick Barclays' "head above the parapet." The CFTC noted that Senior Barclays Treasury Managers instructed the USD LIBOR submitters to keep their submitted rates within ten basis points of the submissions of other Panel Banks.[69]

140.    On May 29, 2008, Barclays' strategist Tim Bond was quoted as saying that, "[b]anks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up."[70]  Mr. Bond went further and pointed out that "[t]he rates the banks were posting to the BBA became a little bit divorced from reality."[71]

141.    On November 16, 2007, one Barclays' LIBOR submitter admitted in an internal email that Barclays was "going 4.98 for libor only because of the reputational risk…"[72]

142.    On November 19, 2007, a submitter revealed that a Barclays' manager asked him to "…keep libors within the group (pressure from above)."[73]

143.    On November 28 and November 29, 2007, the following conversations took place amongst a group of Barclays' employees:

> Barclays' senior U.S. Dollar LIBOR submitter emailed a large group of Barclays' employees, including the senior Barclays' Treasury managers, stating "LIBORs are not reflecting the true cost of money. I am going to set ... , probably at the top of the range of rates set by libor contributors ... [T]he true cost of money is anything from 5 - 15 basis points higher." A senior Barclays Treasury manager endorsed the submissions, replying" [f]ine on LIBOR settings - thanks for remaining pragmatic but at the upper end." (November 28, 2007)[74]

> The supervisor of the U.S. Dollar LIBOR submitters convened a telephone discussion with the senior Barclays Treasury managers and the U.S. Dollar LIBOR submitters. The supervisor said if the submitters submitted the rate for a

---

[68] *Id.*
[69] *Id.*
[70] Gavin Finch & Elliott Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says (Update2)*, Bloomberg, May 29, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.
[71] *Id.*
[72] FSA ¶ 116
[73] *Id.*
[74] CFTC Barclays at 20-21.

particular tenor at 5.50, which was the rate they believed to be the appropriate submission, Barclays would be twenty basis points above "the pack" and "it's going to cause a shit storm." The supervisor asked that the issue be taken "upstairs," meaning that it should be discussed among more senior levels of Barclays' management. The most senior Barclays Treasury manager agreed that he would do so. For the LIBOR submission, the group decided to compromise by determining to set at the same level as another bank, a rate of 5.3, which was, again, not at the rate the submitters believed to be appropriate for Barclays. (November 29, 2007)[75]

144.   According to the FSA, the rate that Barclays actually saw in the market that day was 5.60.[76]   In other words, the rate submitted by Barclays that day was 30 basis points lower than Barclays actual rate.

145.   On November 29, 2007, the same group also discussed their belief that other Panel Banks were submitting artificially suppressed rates and further speculated that those same Panel Banks were basing submissions on derivatives' positions.  These concerns were brought to the BBA. According to the CFTC:

One of the senior Barclays Treasury managers called a BBA representative and stated that he believed that LIBOR panel banks, including Barclays, were submitting rates that were too low because they were afraid to "stick their heads above the parapet," and that "no one will get out of the pack, the pack sort of stays low." He also relayed his belief that other panel banks relied too much on information from voice brokers to determine appropriate rates in the market, instead of making independent determinations for their own institutions. He encouraged the BBA to react and be heavy handed, suggesting that banks involved in such conduct be removed from the panel. In apparent response to Barclays' call, the BBA sent an email to the Steering Committee of the BBA, which is comprised of certain panel bank members including Barclays, requesting views on whether rates were artificially low and how to address this. The senior Barclays Treasury manager responded to the email consistent with his conversation with the BBA, noting his belief that "LIBORs are lower than market levels even given the lack of liquidity" and "[s]ome banks are getting close to looking like they are actively not recognizing the actual market levels." Barclays did not disclose at this time that it was lowering its LIBOR submissions pursuant to a management directive.[77]

146.   Nonetheless, the following day, the senior Barclays Treasury manager who contacted the BBA advised the senior U.S. Dollar LIBOR rate submitter that senior management

---

[75] *Id*. at 21.
[76] FSA ¶ 117.
[77] CFTC Barclays at 21.

had discussed the issue with rate submissions and "directed them to continue to 'stick with the bounds[,] so no head above [the] parapet'"[78]  The senior Barclays Treasury manager further advised the senior USD LIBOR submitter that they would deal with the LIBOR submissions directive on a "day-today  basis."[79]

147.    In December 2007, a Barclays' senior USD LIBOR submitter again approached his supervisor and informed him that the rates being submitted to the BBA were not "honest."[80] He provided a specific example where he submitted Barclays' one month LIBOR at 5.30 percent, which was four basis points above the next highest submission but below the 5.40 percent Barclays was asking to borrow funds in the market.[81]  According to this senior U.S. Dollar LIBOR rate submitter, if he was "given a free hand [he] would have set around 5.45%.[82]" He expressed his worry that Barclays and the other panel banks were "seen to be contributing patently false rates."[83]  He went further and said "we are therefore being dishonest by definition and are at risk of damaging our reputation in the market and with the regulations.  Can we discuss urgently please?"[84]  The senior rate submitter had his concerns directed to a senior compliance offer and a member of senior management at Barclays.[85]  According to the CFTC:

> The Barclays senior compliance officer subsequently had a conversation with the U.K. Financial Services Authority ("FSA") in which LIBOR was discussed. The senior compliance officer stated in an internal email directed to several levels of Barclays' senior management that he informed FSA of the following: that Barclays believed that LIBOR submissions by the panel bank were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go higher given the negative media reporting about Barclays; that Barclays had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were "problematic actions" by some banks. However, the Barclays senior compliance officer did not inform the FSA that Barclays was making its LIBOR submissions based on considerations of negative market or press perceptions of Barclays or that its LIBOR submitters'

---

[78] *Id*.
[79] *Id*.
[80] *Id*.
[81] *Id*. at 22.
[82] *Id*.
[83] *Id*.
[84] *Id*.
[85] *Id*.

assessments of the appropriate rates for submission were being altered to adhere to the directive to be below "the parapet." After this conversation, the same Barclays senior compliance officer did not follow up internally with the LIBOR submitters or their supervisor to confirm that Barclays was making its LIBOR submissions properly in accordance with the BBA's definition and criteria for LIBOR. Instead, the management directive remained in effect, and in fact, senior Barclays Treasury managers ensured that the U.S. Dollar LIBOR submitters continued to adhere to that directive.[86]

148.    Even after Barclays contacted the FSA and informed them of its belief that there was collusion and systematic manipulation of LIBOR submissions occurring amongst other Panel Banks, its senior management continued to maintain a directive ordering Barclays' USD LIBOR submitters to artificially suppress their submissions.[87]  For example, the CFTC found that:

In March 2008, the senior U.S. Dollar LIBOR submitter noted in a telephone call to a colleague that there was no money in the market and that he had submitted a rate for 12-month LIBOR that was several basis points lower than the rate at which he was willing to pay to borrow funds in the market, because he had been advised by senior management that he should not make his submission any higher. The senior U.S. Dollar LIBOR submitter commented that he was unable to find funds to borrow in the market even when paying (i.e., asking) to borrow funds at a rate well above where he submitted his 12-month LIBOR. He remarked that the senior Barclays Treasury manager told him that he should "not be quite as aggressive" in his submissions, meaning his submissions were too high.[88]

149.    In 2008, a Barclays' senior USD LIBOR submitter during a telephone call with a senior Barclays Treasury manager expressed concerns about the article and stated that "[h]e was doing the same thing as other banks, by submitting at one level while paying (i. e., asking to borrow funds) at a higher level in the market."[89]  He also stated that he "…would be paying ... [2.98] today and I'm going to be setting my LIBOR at [2.74] and I'm as guilty as hell .... 1 will go [2.74] unless I'm given permission to go otherwise, but I would be prepared to pay [2.98]."[90]  In response, the senior Barclays' Treasury manager said "I'm happy for you to be at and around the top of the pack but can we please not sort of be ten basis points above the next…?"[91]  According

---

[86] Id.
[87] Id.
[88] Id.
[89] CFTC Barclays at 23.
[90] Id.
[91] Id.

to the CFTC, the USD LIBOR submitter went to his supervisor and told him that he thought there was a compliance issue, but no internal action was ever taken.[92]

150.    Even with the threat of regulatory scrutiny, Barclays' continued to artificially suppress its LIBOR submissions.  In October 2008, a senior Barclays' LIBOR submitter, in response to being told by his supervisor to continue to suppress LIBOR said, "I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested…I will be contributing to rates that are nowhere near the clearing rates for unsecured cash and therefore will not be posing honest prices."[93]

151.    Barclays' LIBOR submitters knew it was against BBA rules to consider the potential for damage to Barclays' reputation when formulating their daily LIBOR submissions. Barclays knew, or should have known, that by following instructions given by Barclays' management, they were conveying false and misleading USD LIBOR submissions to the BBA. These false submissions were premeditated attempts to manipulate the daily, published LIBOR to the detriment of Plaintiffs.

152.    In addition to monetary penalties, Barclays also entered into a non-prosecution agreement with the DOJ and agreed to continue cooperating with the DOJ in its ongoing investigation into the scheme to manipulate LIBOR.

153.    As part of the non-prosecution agreement, Barclays admitted to and accepted responsibility for its role in the global scheme to manipulate LIBOR.  For example, Barclays admitted that:

> From approximately 2005 through 2007, and occasionally thereafter through approximately 2009, certain Barclays swaps traders requested that certain Barclays LIBOR and EURIBOR submitters submit LIBOR and EURIBOR contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR and EURIBOR. Those swaps traders either proposed a particular LIBOR or EURIBOR contribution for a particular tenor and currency, or proposed that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency. The swaps traders made these requests via electronic messages, telephone conversations, and in-person conversations. The LIBOR and EURIBOR submitters

---

[92] *Id.*
[93] *Id.* at 24.

agreed to accommodate, and accommodated, the swaps traders' requests for favorable LIBOR and EURIBOR submissions on numerous occasions.[94]

From at least as early as June 2005 through approximately September 2007, in New York, New York and in London, England, several Barclays Dollar swaps traders made frequent requests for favorable Dollar LIBOR contributions to the Barclays Dollar LIBOR submitters on the London money markets desk. From approximately September 2007 through approximately May 2009, such requests were made occasionally. Barclays Dollar LIBOR submitters accommodated the requests on numerous occasions and submitted Barclays's Dollar LIBOR contributions consistent with the requests.[95]

From at least approximately August 2005 through at least approximately May 2008, certain Barclays swaps traders communicated with swaps traders at other Contributor Panel banks and other financial institutions about requesting LIBOR and EURIBOR contributions that would be favorable to the trading positions of the Barclays swaps traders and/or their counterparts at other financial institutions.[96]

From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been.  Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs. Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel. Consequently, on some occasions, Barclays submitted rates that were false because they were lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR.[97]

Senior managers within Barclays expressed concern about the negative publicity. The managers on the money markets desk and in the treasury department who gave the instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions, sought to avoid inaccurate, negative attention about Barclays's financial health as a result of its high LIBOR submissions relative to other banks. Those managers wanted to prevent any adverse conclusions about Barclays's borrowing costs, and more generally, its financial condition, because they believed that those conclusions would be mistaken and that other Contributor Panel banks were submitting unrealistically low

---

[94] Appendix A to the Non-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section, and Barclays Bank PLC Barclays Bank, Dep't of Justice ("DOJ Barclays") (June 26, 2012) ¶ 11, *available at* http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf.
[95] *Id*. ¶ 12.
[96] *Id*. ¶ 23.
[97] *Id*. ¶ 36.

Dollar LIBORs. Those Barclays managers sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape when compared to its peers. Thus, Barclays engaged in this misconduct in order to reduce the reputational risk associated with proper, higher LIBOR submissions. In other words, as Barclays employees stated in internal communications, the purpose of the strategy of under-reporting Dollar LIBORs was to keep Barclays's "head below the parapet" so that it did not get "shot" off.[98]

During approximately November 2007 through approximately October 2008, certain employees at Barclays sometimes raised concerns with individuals at the BBA, the Financial Services Authority, the Bank of England, and the Federal Reserve Bank of New York concerning the diminished liquidity available in the market and their views that the Dollar LIBOR fixes were too low and did not accurately reflect the market. In some of those communications, those employees advised that all of the Contributor Panel banks, including Barclays, were contributing rates that were too low. Those employees attempted to find a solution that would allow Barclays to submit honest rates without standing out from other members of the Contributor Panel, and they expressed the view that Barclays could achieve that goal if other banks submitted honest rates. These communications, however, were not intended and were not understood as disclosures through which Barclays self-reported misconduct to authorities. Indeed, after the communications, Barclays continued improperly to take concerns about negative publicity into account when making its submissions. Moreover, on other occasions, those employees did not provide full and accurate information about their conversations with these external parties. Further, at least one occasion when Barclays's Dollar LIBOR submissions were questioned by the media, Barclays responded that Barclays always posted correct LIBORs.[99]

154.    The DOJ also noted "[b]ecause **mortgages** … rely on LIBOR … as reference rates, the manipulation of submissions used to calculate those rates can have significant negative effects on consumers and financial markets worldwide.  For years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered."[100]

155.    Barclays, through its submitters, traders and  managers, knew it was against BBA

---

[98] *Id*. ¶ 40.
[99] *Id*. ¶ 42.
[100] Department of Justice Office of Public Affairs, *Barclays Bank PLC Admits Misconduct Related to Submissions for the London Interbank Offered Rate and the Euro Interbank Offered Rate and Agrees to Pay $160 Million Penalty*, June 27, 2012, (emphasis added) *available at* http://www.justice.gov/opa/pr/barclays-bank-plc-admits-misconduct-related-submissions-london-interbank-offered-rate-and.

rules to consider trading positions and/or its reputation in the media and/or markets when computing its LIBOR submissions. Barclays' trading positions and/or reputation in the media and/or markets are not legitimate or permissible factors to base LIBOR submissions. By basing LIBOR submissions on rates that benefited traders' trading positions and/or its reputation in the media and/or markets, Barclays conveyed false, misleading and knowingly inaccurate LIBOR submissions that in no way were based on and did not solely reflect its cost of borrowing unsecured funds in the relevant interbank markets. Furthermore, even though government regulators did not disclose to the public the identity of other banks who were found to be connected to Barclays' efforts to manipulate LIBOR, it has been established that Barclays was colluding with various members of the USD LIBOR Contributing Panel. Accordingly, Barclays colluded with Defendants in its efforts to manipulate and knowingly deliver, or cause to be delivered, false, misleading, and knowingly inaccurate USD LIBOR submissions.

**B.      UBS AG**

156.    UBS AG ("UBS") was on the USD LIBOR Contributing Panel during the Manipulation Period and was responsible for submitting rates used in the daily calculation and global publication of the USD LIBOR. The rates submitted by UBS were supposed to reflect its true cost of borrowing unsecured funds from other banks on the open market—they did not.

157.    On December 19, 2012, it was announced that UBS and its subsidiary UBS Securities Japan had agreed to resolve civil and criminal charges with regulators in the United States, United Kingdom, and Switzerland in connection with its role to manipulate LIBOR. UBS was ordered to pay more than $1.5 billion.[101]

158.    In addition to the monetary penalties, UBS also entered into a Non-Prosecution Agreement with the DOJ. UBS accepted and admitted to the following facts:

> From as early as 2001 through at least June 2010, certain UBS derivatives traders requested and obtained benchmark interest-rate submissions which benefited their

---

[101] Mark Thompson & James O'Toole, *UBS pays $1.5 billion to settle Libor claims*, CNN Money, December 19, 2012, *available at* http://money.cnn.com/2012/12/19/news/companies/ubs-libor/index.html.

trading positions. These derivatives traders requested, and sometimes directed, that certain UBS LIBOR, Euroyen TIBOR, and Euribor submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR, Euroyen TIBOR and Euribor. Those derivatives traders either requested or directed a particular LIBOR, Euroyen TIBOR or Euribor contribution for a particular tenor and currency, or requested that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency. The derivatives traders made these requests in electronic messages, telephone conversations, and in-person conversations. **The LIBOR**, Euroyen TIBOR, and Euribor **submitters regularly agreed to accommodate the derivatives traders' requests and directions for favorable benchmark interest rate submission**s.[102]

159.    Significant evidence has been uncovered proving UBS was misrepresenting its USD LIBOR submissions in order to benefit its trading positions and to protect its reputation in the market.  The CFTC presented examples of numerous communications from UBS personnel instructing UBS USD LIBOR submitters to submit particular rates to either benefit trading positions or to protect UBS from negative media speculation about its liquidity or creditworthiness.

160.    For example, on August 10, 2007, a UBS U.S. Dollar Trader and USD LIBOR submitter had the following discussion about artificially suppressing various LIBOR rates:[103]

> U.S. Dollar Trader 1: "o;/n just trading way lower ... so I would go for a pretty low run ... **aim should really be to be on the lower side of range**"
>
> U.S. Dollar Trader 1: "o/n would go for 5.70 ... 1wk 5.70 ... 2wk 5.60 ... **this seems probably a tad low right now, but recon thats what we should try to be**"
>
> U.S. Dollar Trader-Submitter 1: "**kk-will check back at ll [when the submissions had to be made] -as you say always want to err on the low side** - thks for colour- may even swap ideas about 1m 2m and 3 mo with you too in curect climate - sure few weeks down the road then will only need to chat about v short dates ie <1mo- appreciate colour"
>
> U.S. Dollar Trader 1: "np at all ... we just dont want to give the market a wrong impression ... we not struggling to get cash ... so therefore dont want to be on the highs of libors"

161.    On August 14, 2007, U.S. Dollar Trader 1 again told U.S. Dollar Trader-

---

[102] Appendix A to the Non-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section, and UBS AG ("DOJ UBS") (Dec. 18, 2012) at ¶ 20, *available at* http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf (emphasis added).
[103] CFTC UBS at 44.

Submitter 1 "my indications are deliberately on the low side…" in which U.S. Dollar Trader-Submitter 1 responded "y[es] pls err on the side of caution as before – once teh mkt normalizes…then we can adj accordingly…"[104]

162.    On September 3, 2007, U.S. Dollar Trader 1 discussed with a UBS manager ("UBS ALM Manager A") his understanding of why UBS was artificially suppressing USD LIBOR submissions.  In that conversation, U .S. Dollar Trader 1 stated that UBS did not want "to be seen to pay higher or at libor in the market to avoid trouble."[105]

163.    On September 5, 2007, the U.S. Dollar Trader-Submitter 1 explained to his supervisor, Senior Rates Manager C, that he was following the UBS directive to "err on the low side" when submitting USD LIBOR submissions.[106]  U.S. Dollar Trader-Submitter 1 told his supervisor the following:

> **"fyi libor has been fuctioning well for many years - current turbulance and american home owners exposure to libor may trigger further questions** - since the mkt dislocation I am now keeping a record of UBS libor fixings vs the implied rates - we are fixing on the low side of all other banks in the libor panel in the 4- 12 mo period by several bps - and we are still fixing 12 - 15 over implied rates - I can justify my fixings each day if asked - I se longer dated libors even lower however the rest of he mkt continue to call libors higher than UBS – we should be protected from moral hazard as a bank. Short rates coming grom Zurich now - again asa bank we are erring on the low side."[107]

164.    UBS managers closely monitored how UBS's LIBOR submissions were perceived by the media and market.[108]  During certain parts of the global financial crisis, UBS managers participated in daily internal calls about liquidity and funding.[109]  The UBS managers received internal analyses about UBS's LIBOR submissions relative to other Panel Banks.[110]  For example, UBS ALM Manager A circulated spreadsheets about the Panel Banks' submissions for USD LIBOR and other benchmark interest rates to show how UBS submissions compared to

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id* (emphasis added).
[108] CFTC UBS at 45.
[109] *Id.*
[110] *Id.*

other Panel Banks.[111]   In an e-mail dated September 4, 2007, UBS ALM Manager A wrote "For those interested, this new tool shows where each bank on the Libor fixing panel quoted their offer level in today's fixing. Should give some insights into the funding situation at our peers. Note Barclays are consistently amongst the highest contributors and UBS are often the lowest."[112]   The spreadsheets and tools provided to the managers did not include information about UBS's actual transactions in the relevant unsecured interbank cash markets or any other information relating to costs of borrowing in those markets.[113]

165.   On November 5, 2007, U.S. Dollar Trader 1 and U.S. Dollar Trader-Submitter 1 had another exchange where they discussed their artificial suppression of various USD LIBOR rates:[114]

> U.S. Dollar Trader 1: "I left 2s and 3s a tad on low side just not to stir any additional"
> U.S. Dollar Trader-Submitter 1: "great- do appreciate your input each day"
> U.S. Dollar Trader 1: "but I have been on lower end def"
> U.S. Dollar Trader-Submitter 1: "I know- I am same with 4mo -out-"
> U.S. Dollar Trader 1: "ok perfect"
> U.S. Dollar Trader-Submitter 1: "we are towards to lower end across the board"
> U.S. Dollar Trader 1: "yep we are

166.   On November 23, 2007, U.S. Dollar Trader 1 had a similar conversation with U.S. Dollar Trader-Submitter.  During this conversation, they discussed how low UBS rates were being suppressed in comparison to other U.S. panel banks:[115]

> U.S. Dollar Trader 1: "again ... we are probably low 1-3rnonth ... "
> U.S. Dollar Trader-Submitter 2: "y but 7 bp?"
> U.S. Dollar Trader 1: "well [U.S. Dollar Banlc A] is constantly lower than us I am happy to move ern up to 4.99 the 2s and 3s the 1s is ole its about 2 [bp]."
> U.S. Dollar Trader-Submitter 2: "3 month is about rn5.045 so that is like 6.5 bp away"

---

[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.* (footnote omitted)
[115] *Id.* at 46.

<u>U.S. Dollar Trader 1</u>: "04 ist the last I heard ... I mean agree ... 4.99 is probably low we can go to 5.00 ... but there are other people on the other side of the extrern in my opinion"
<u>U.S. Dollar Trader-Submitter 2</u>: "i see where u are corning from ole will show 5"
<u>U.S. Dollar Trader 1</u>: "ole cheers."

167.    Following the August 2007 directive from UBS management to artificially suppress USD LIBOR submissions, UBS submissions moved to the lowest quartile of the panel bank submissions and for some maturities remained in the lowest quartile through March 2008.[116]  UBS remained in the lowest quartile even after reporting negative revenues of $3.42 billion in its Fixed Income Business on October 1, 2007 and a $10 billion write-down of assets on December 10, 2007.[117]  This artificial suppression is apparent, especially with the 1-month, 3-month, 6-month, and 12-month USD LIBOR rates.  The following chart shows the percentage of UBS submissions in the lowest quartile from January 1, 2007 to March 31, 2008:[118]

|  | January 1, 2007 to August 9, 2007 | August 10, 2007 to March 31, 2008 |
| --- | --- | --- |
| 1-month tenor | 3% | 39% |
| 3-month tenor | 16% | 47% |
| 6-month tenor | 42% | 77% |
| 12-month tenor | 22% | 67% |

168.    UBS's financial position began to further deteriorate in April 2008.  On April 1, 2008, UBS announced a first quarter net loss of approximately 12 billion Swiss Francs and that it would be seeking shareholder approval of a 15 billion Swiss Franc increase in share capital underwritten by various banks.[119]  That same day, Moody's downgraded UBS's credit rating from "Aaa" to "Aa1" and stated that a further downgrade was possible.[120]  Other rating agencies

---

[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.* at 46-47.

also downgraded UBS.[121]  Even with these significant events occurring, UBS continued to make USD LIBOR submissions  "on the low side." [122]

169.    Other than a short period in June 2008 where UBS adjusted its submissions upwards to closer to CP/CD issuance levels, UBS USD LIBOR submissions remained "middle of the pack" pursuant to UBS management direction through at least the first half of 2009.  UBS USD LIBOR submissions deviated very little during this timeframe even though UBS received approximately $59 billion from the Swiss government, borrowed over $77 billion from the Swiss National Bank and reported a 8.1 billion Swiss Franc 2008 fourth quarter loss.[123]

170.    UBS, through its submitters, traders and  managers, knew it was against BBA rules to consider trading positions and/or its reputation in the media and/or markets when computing LIBOR submissions. UBS's trading positions and/or reputation in the media and/or markets are not legitimate or permissible factors to base LIBOR submissions. By basing LIBOR submissions on rates that benefited traders' trading positions and/or its reputation in the media and/or markets, UBS conveyed false, misleading and knowingly inaccurate LIBOR submissions that in no way were based on and did not solely reflect its cost of borrowing unsecured funds in the relevant interbank markets. Furthermore, even though government regulators did not disclose to the public the identity of other banks who were found to be connected to UBS's efforts to manipulate LIBOR, it has been established that UBS was colluding with various members of the USD LIBOR Contributing Panel.  Accordingly, UBS colluded with Defendants in its efforts to manipulate and knowingly deliver, or cause to be delivered, false, misleading, and knowingly inaccurate USD LIBOR submissions.

### C.    The Royal Bank of Scotland

171.    The Royal Bank of Scotland ("RBS") was on the USD LIBOR Contributing Panel during the Manipulation Period and was responsible for submitting rates used in the daily

---

[121] *Id*. at 47.
[122] *Id*.
[123] *Id*. at 51-52.

calculation and global publication of the USD LIBOR.  The rates submitted by RBS were supposed to reflect its true cost of borrowing unsecured funds from other banks on the open market—they did not.

172.    On February 6, 2013, it was announced that RBS had agreed to resolve civil and criminal charges with regulators in the United States and the United Kingdom in connection with its role in the global manipulation of LIBOR.

173.    RBS was ordered to pay $325 million to the CFTC[124]; $150 million to the DOJ[125]; and £87.5 million to the FSA.[126]  These penalties totaled approximately $612 million.

174.    In additional to the monetary penalties, RBS also entered into a Deferred Prosecution Agreement with the DOJ.  In its agreement, RBS acknowledged and agreed that the DOJ would file a two-count criminal Information, charging RBS with one count of wire fraud and one count of price-fixing.[127]  As part of the agreement with the DOJ, RBS admitted that:

> From as early as 2006 through at least 2010, certain RBS derivatives traders requested and obtained LIBOR submissions that benefited their trading positions. These derivatives traders requested that certain RBS LIBOR submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definition of LIBOR. These derivatives traders either requested a particular LIBOR contribution for a particular tenor and currency, or requested that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency.[128]

175.    According to the FSA, RBS "…inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make)…USD LIBOR submissions."[129] The FSA found that, "RBS's misconduct undermined the integrity of LIBOR."[130]

176.    The FSA also uncovered at least 5 written requests made by RBS's derivative

---

[124] CFTC RBS at 39.
[125] Deferred Prosecution Agreement, *United States v. Royal Bank of Scotland PLC*, ¶ 7 (D. Conn. Feb. 5, 2013) ("DOJ RBS"), *available at* http://www.justice.gov/atr/cases/f292500/292555.pdf.
[126] FSA RBS ¶ 1.
[127] DOJ RBS ¶ 1.
[128] *Id.*, Attach. A ¶ 14.
[129] FSA RBS ¶ 5.
[130] *Id.*

traders to RBS's LIBOR submitters in an attempt to influence USD LIBOR submissions.[131]

177.    RBS had knowledge that other Panel Banks were fabricating their LIBOR submissions.  On August 20, 2007, Paul Walker, RBS's head of money-markets in London and the person responsible for making RBS's USD LIBOR submissions told a colleague when discussing LIBOR that "[p]eople are setting to where it suits their books" and that "Libor is what you say it is."[132]

178.    RBS, through its submitters, traders and  managers, knew it was against BBA rules to consider trading positions and/or its reputation in the media and/or markets when computing its LIBOR submissions. RBS's trading positions and/or reputation in the media and/or markets are not legitimate or permissible factors to base its LIBOR submissions. By basing its LIBOR submissions on rates that benefited traders' trading positions and/or its reputation in the media and/or markets, RBS conveyed false, misleading and knowingly inaccurate LIBOR submissions that in no way were based on and did not solely reflect its cost of borrowing unsecured funds in the relevant interbank markets. Furthermore, even though government regulators did not disclose to the public the identity of other banks who were found to be connected to RBS's efforts to manipulate LIBOR, it has been established that RBS was colluding with various members of the USD LIBOR Contributing Panel.  Accordingly, RBS colluded with Defendants in its efforts to manipulate and knowingly deliver, or cause to be delivered, false, misleading, and knowingly inaccurate USD LIBOR submissions.

**D.    Cooperative Centrale Raiffeisen-Boerenleenbank B.A.**

179.    Defendant Cooperative Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") was on the USD LIBOR Contributing Panel during the Manipulation Period and responsible for submitting rates used in the daily calculation and global publication of the USD LIBOR.  The rates submitted by Rabobank were supposed to reflect its true cost of borrowing unsecured funds

---

[131] *Id.* at 48 (footnote omitted).
[132] Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, *available at* www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

from other banks on the open market—they did not.

180.    On October 29, 2013, it was announced that Rabobank had agreed to resolve civil and criminal claims with regulators in the United States, United Kingdom, and the Netherlands in connection with its role in the global manipulation of LIBOR.  Rabobank was ordered to pay fines totaling more than $1 billion.

181.    Rabobank was ordered to pay $475 million to the CFTC[133]; $325 million to the DOJ[134]; £105 million to U.K.'s Financial Conduct Authority ("FCA")[135]; and €70 million to Dutch authorities[136].  These fines totaled more than $1 billion.

182.    According to the FCA, between May 2005 and January 2011, Rabobank attempted to manipulate USD LIBOR by making fraudulent submissions and colluding with other Defendants in an effort to benefit its trading positions.[137]  Tracey McDermott, director of enforcement and financial crime stated that:

> Rabobank's misconduct is among the most serious we have identified on LIBOR.
> Traders and submitters treated LIBOR submissions as a potential way to make
> money, with no regard for the integrity of the market."[138]

183.    From May 2005 through possibly December 2008, Rabobank derivative and money market traders made 112 written internal requests to Rabobank USD LIBOR

---

[133] *In the Matter of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC Rabobank"), at 51 (CFTC Dkt. No 14-02) (Oct. 29, 2013), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfrab obank102913.pdf.

[134] The United States Department of Justice Press Release, *Rabobank Admits Wrongdoing In LIBOR Investigation, Agrees to Pay $325 Million Criminal Penalty*, (Oct. 29, 2013), *available at* http://www.justice.gov/atr/public/press_releases/2013/301368.htm.

[135] U.K. Financial Conduct Authority, Final Notice to Coöperatieve Centrale Raiffeisen-Boekenleenbank B.A. ('Rabobank') ¶ 1.1 (October 29, 2013) ("FCA Rabobank"), *available at* http://fca.org.uk/static/documents/final-notices/rabobank.pdf.

[136] Rabobank Press Release, *Rabobank settles Libor and Euribor Investigations*, (October 29, 2013), *available at* https://www.rabobank.com/en/press/search/2013/libor.html.

[137] FCA Rabobank ¶ 2.5.

[138] Financial Conduct Authority Press Release, *The FCA fines Rabobank £105 million for serious LIBOR-related misconduct*, (Oct. 29, 2013), *available at* http://www.fca.org.uk/news/the-fca-fines-rabobank-105-million-for-serious-libor-related-misconduct.

submitters.[139]

184.    It was also discovered that Rabobank traders frequently made oral requests to USD LIBOR submitters.[140]  For example, a senior London derivatives trader ("Senior U.S. Dollar Trader") who was known as the "Ambassador" or "Ambass" shared a desk with the USD LIBOR submitter and would regularly make oral requests for beneficial USD LIBOR submissions.[141]  The Senior U.S. Dollar Trader "…often barked his requests across the desk and expected his requests to be followed."[142]  In the words of a Rabobank Trader, traders were used to "help[ing] ourselves to the libors."[143]

185.    Coupled with numerous internal requests, the FCA also found that Rabobank colluded with individuals from other Panel Banks to make fraudulent USD LIBOR submissions.[144]

186.    From June 2005 through at least October 2008, "at least one Rabobank Trader and one Rabobank Submitter took into account at least seven documented requests from at least two individuals at two other Panel Banks."[145]

187.    In addition to the monetary penalties, Rabobank entered into a Non-Prosecution Agreement with the DOJ.  Rabobank accepted and admitted that:

> From at least as early as September 2005 through approximately December 2008, in New York, London, and Utrecht, multiple Rabobank Dollar swaps traders made frequent requests for favorable Dollar LIBOR contributions to the Rabobank Dollar LIBOR submitters on the London money markets desk. Rabobank Dollar LIBOR submitters accommodated the requests on numerous occasions and submitted Rabobank's Dollar LIBOR contributions consistent with the requests.[146]

---

[139] FCA Rabobank ¶ 2.6(2) (footnote omitted).
[140] *Id.* ¶ 2.8.
[141] CFTC Rabobank at 8.
[142] *Id.*
[143] FCA Rabobank ¶ 2.8.
[144] *Id.* ¶ 2.11.
[145] *Id.*
[146] Attachment A to the Non-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section, and the United States Department of Justice, Antitrust Division, and Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), Dep't of

188.     The DOJ found that the Rabobank U.S. Dollar LIBOR submitters normally accommodated the traders' requests and that these submissions (at times) affected the published LIBOR rate.  The DOJ provided the following examples:

> For example, on Wednesday, October 17, 2007, a U.S. Dollar swaps trader ("Trader-1") emailed the Rabobank U.S. Dollar LIBOR submitter ("Submitter-1"): "A nice low 1 month for the rest of the week please matey. Cheers." Rabobank's submissions for the rest of the week were consistent with this request. That day, Rabobank's 1-month U.S. Dollar LIBOR submission dropped four basis points whereas the rest of the Contributor Panel's submissions either remained unchanged or dropped one or two basis points from the previous day. The day before the request, Rabobank's 1-month U.S. Dollar LIBOR submission had been the fifth lowest submission of the banks on the Contributor Panel. Immediately after this request for a low submission, Rabobank's 1-month LIBOR submission sank to the lowest submission of any bank on the Contributor Panel. On Thursday, October 18, 2007, Rabobank's 1-month submission was tied for the second lowest on the Contributor Panel, and on Friday, October 19, 2007, Rabobank's 1-month submission was again the lowest submission of any bank of the Contributor Panel.[147]

> On November 15, 2007, another Rabobank submitter ("Submitter-9") explained to Submitter-1: "The fixinh should be done by cash desk in agreement with deriv. I do the fixing I ask swap desk what they have." Submitter-1 replied: "[Trader-1] had big fixing so we help him today," and further explained: "i am low because [Trader-1] has fixing ..i go higher tomorrow."[148]

> In another exchange, on September 16, 2008, Trader-1 wrote to the backup U.S. Dollar LIBOR submitter ("Submitter-2") with the subject line: "I don't want to have a row about it [Submitter-2] but can't understand why you were such an arse this morning?" In the body of the message, Trader-1 pasted the LIBOR submissions for 8 banks, including Rabobank, and stated: "Before justifying from a cash perspective where the true rate should be etc, I, and you, know that if you were short of 1 month fixing you'd have put in a mid '60's LIBOR. P+L wise I couldn't give a fack but I just can't get my head around why you were being such an arse." Submitter-2 replied: "Mate I had no intention to be or desire to be , I have no upside upseting you or setting the libor too high," continuing: "i honestly thought and still do think 2.78 was fair, obviuosly from ur perspective nearer 2.70 would have helped and I apologise for that.. ..i knew you trying to broke me to an extent, but as you know anything lower from me would only have helped by 1-

---

Justice ("DOJ Rabobank") ¶ 16, *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf.
[147] *Id*. ¶ 17 (footnote omitted).
[148] *Id*. ¶ 19.

2bp," and adding: "So I would rather we move on from this , and anything u need torn tell me again and ill try my best."[149]

As another example, on the morning of Monday, August 13, 2007, another U.S. Dollar Trader ("Trader-2") messaged Submitter-1: "High 3s and 6s pis today mate (esp 6mths!!) if u would be so kind.. Gotta make money somehow!"   Submitter-1 replied: "cool.." Trader-2 messaged back: "Cheers [Submitter-1].. Every little helps!" That day, Rabobank's 3-month U.S.  Dollar LIBOR submission went down two basis points, while the other banks in the Contributor Panel ranged from decreasing their submissions by seven basis points to increasing them by seven basis points. Rabobank's submission went from being tied for the seventh highest submission on the previous day to being tied for the fifth highest submission. Rabobank's 6-month U.S. Dollar LIBOR submission went up by one basis point from its previous submission, from 5.40 to 5.41, while the other banks' submissions remained constant, on average. Rabobank went from being tied for the third lowest submission on the Contributor Panel on Friday, August 10, 2007, to making the second highest submission of any bank on the Contributor Panel.[150]

Later that same day, Trader-2 messaged Submitter-1: "where do u see 6m LIBOR tomorrow pis?" Submitter-1 wrote back: "where do you like to see it, is more the question?" Trader-2 responded: "HAAA , trying to price a deal, could make/lose a tidy amount of cash!!" Submitter-1 replied: "arrh I see .. at moment 5.40 again but who knows ." Trader-2 stated: "Ok cheers mate." Later that day, Trader-2 messaged Submitter-1 again, stating: "We've dealt... gonna need a frickin high 6 mth fix tomorrow if ok with u... 5.42?" Submitter-1 replied: "send me an e mail matey for tomorrow ..my brain can't cope !!" Trader-2 responded: "Tell me about it... Cant believe how this market is moving ... I'll send a mail, write a post it not as well, its 750 mio 6mth fix! Could be risky!" The next day, August 14, 2007, a senior Rabobank trader and Trader-2's supervisor ("Trader-3"), messaged Submitter-1 's supervisor ("Submitter-3"), who served as Rabobank's Global Head of Liquidity and Finance and the head of Rabobank's money markets desk in London: "any feeling for libors today? specifically, 6mth." Submitter-3 wrote back: "hi 1,2,3 month ...59 ,56 , 53.5 .. .6 month 42 , i think thats what [Trader-2] needs." Trader-3 responded: "it's actually me that needs it, but thanks." Submitter-3 replied: "ahh [Trader-2], taking all the credit!!" That day, as requested, Rabobank's 6-month U.S. Dollar LIBOR submission was 5.42, the highest submission of any bank on the Contributor Panel.[151]

189.    Rabobank employees acknowledged that Trader-1 and at least one other USD

LIBOR trader "…also made regular verbal requests to the submitters for submissions that would

---

[149] *Id.* ¶ 20.
[150] *Id.* ¶ 21 (footnote omitted).
[151] *Id.* ¶ 22.

benefit their positions" and "[a]ccommodating such requests from traders was a regular part of the rate setting process at Rabobank"[152]

190.    Rabobank admitted that certain USD LIBOR submitters also took their own trading positions into account at times.[153]  On September 19, 2007, a Rabobank LIBOR submitter told another submitter that "today i have fixing so am low on the 3mth…"[154]  That same day, Rabobank's USD 3-month LIBOR submission went down 39 basis points while other Panel Banks (on average) 34 basis points lower than the previous day.[155]

191.    Rabobank also admitted that its LIBOR submitters had to balance competing requests because either (1) traders' requests would conflict with each other; or (2) traders' requests would conflict with the submitter's own trading position.[156]  For example:

> On March 17, 2008, Trader-2 messaged Submitter-1 and asked: "where r u gonna fix 3m today, any idea?" Submitter-1 replied: "no idea mate ..ive only been in 10 mins .. you want me to ask about ..don't think we have anything in 3's so hap[p[y to help." Trader-2 wrote back: "yes, I have 3k fixing today,,, highere the better." Submitter-1 responded: "ok mate ..[a specific swaps broker] is going 56 area.." Trader-2 replied: "go 60 pis!" Submitter-1 wrote back: "sure." Later in the conversation, Trader-2 asked: "can u go high Is as well today pis." Submitter-1 wrote back: "me & [Submitter-2] have got a couple of yards fixing today ..how much you got in it mate .. not sure we make a huge difference anyway ." Trader-2 wrote back: "2 bio... just 3s then matey." Submitter-1 replied: "ok cool.. i'll go flat to what [the swaps broker] says as probably won't make huge diff." That day, as requested, Rabobank's 3-month U.S. Dollar LIBOR submission was 2.60, tied for the highest submission of any bank on the Contributor Panel. On the previous trading day, Rabobank's submission had been tied for the ninth highest submission. Rabobank's 1-month LIBOR submission went down 22 basis points, approximately the same as the average change in the submissions of the other banks on the Contributor Panel.[157]

> Likewise, on March 12, 2008, Trader-2 wrote to Submitter-2 and asked: "High 3s and 6s pis tomorrow." Submitter-2 wrote back: "Yes ..Low Is though." Trader-2 responded: "Low is is fine, I have a lot in 3s and 6s tho (about 75k/bp)!" On March 13, 2008, Rabobank's 3-month U.S. Dollar LIBOR submission declined by

---

[152] *Id.*
[153] *Id.* ¶ 23.
[154] *Id.*
[155] *Id.*
[156] *Id.* ¶ 24.
[157] *Id.*

two and a half basis points, whereas the other panel banks' submissions decreased by approximately five basis points on average. Rabobank's submission went from being the lowest of any bank on the Contributor Panel on March 12, 2008, to being only the fifth lowest submission. Likewise, Rabobank's 6-month U.S. Dollar LIBOR submission declined by six basis points, whereas the other panel banks' submissions decreased by approximately eight and a half basis points on average. Rabobank's submission went from being the second lowest submission of any bank on the Contributor Panel on March 12, 2008, to being tied as the sixth lowest submission. In contrast, Rabobank's 1-month U.S. Dollar LIBOR submission declined by five basis points, whereas the other panel banks' submissions decreased by approximately four and three-quarters basis points on average. Rabobank's submission was the lowest submission of any bank on the Contributor Panel on both March 12, 2008, and March 13, 2008.[158]

On another occasion, on September 26, 2007, Trader-2 wrote Submitter-2 and Submitter-3 with the subject line: "High 3s tomorrow pls gents." Submitter-2 wrote back: "What 21 hahahahha." Trader-2 replied: "I'll get u [Submitter-2]!!" Submitter-2 wrote: "I'm setting it torn," to which Trader-2 responded: "25 (or higher) would be great CHEERS." Submitter-2 responded: "U do realise [Trader-1] wants the opposite ,ill do my best mate." Trader-2 replied: "Bugger.. We fixed at 24, anything higher is a bonus!" On September 27, 2007, Rabobank's 3-month U.S. Dollar LIBOR submission was 5.24, an increase of five basis points, whereas the other panel banks' submissions increased by approximately three basis points on average. Rabobank's submission went from being tied as the twelfth highest submission on the Contributor Panel on the previous day to being tied as the fifth highest submission on the Contributor Panel.[159]

192.    Rabobank, through its submitters, traders and  managers, knew it was against BBA rules to consider trading positions and/or its reputation in the media and/or markets when computing LIBOR submissions. Rabobank's trading positions and/or reputation in the media and/or markets are not legitimate or permissible factors to base LIBOR submissions. By basing LIBOR submissions on rates that benefited traders' trading positions and/or its reputation in the media and/or markets, Rabobank conveyed false, misleading and knowingly inaccurate LIBOR submissions that in no way were based on and did not solely reflect its cost of borrowing unsecured funds in the relevant interbank markets. Furthermore, even though government regulators did not disclose to the public the identity of other banks who were found to be connected to Rabobank's efforts to manipulate LIBOR, it has been established that Rabobank

---

[158] *Id*. at 25 (footnote omitted).
[159] *Id*. at 26.

was colluding with various members of the USD LIBOR Contributing Panel. Accordingly, Rabobank colluded with Defendants in its efforts to manipulate and knowingly deliver, or cause to be delivered, false, misleading, and knowingly inaccurate USD LIBOR submissions.

###    E.    Lloyds Banking Group PLC

193.    Defendant Lloyds Banking Group PLC ("Lloyds") was on the USD LIBOR Contributing Panel during the Manipulation Period and was responsible for submitting rates used in the daily calculation and global publication of the USD LIBOR. Lloyds was formed in 2009 after HBOS plc was acquired by Lloyds TSB (now Lloyds Bank plc). Lloyds Bank plc ("Lloyds Bank") is a subsidiary of Lloyds and is the current parent of HBOS. Prior to becoming Lloyds, both Lloyds Bank and HBOS were USD LIBOR Panel Banks and independently manipulated LIBOR.

194.    On July 28, 2014, it was announced that Lloyds had agreed to resolve civil and criminal charges with regulators in the United States and United Kingdom in connection with its role in the global manipulation of LIBOR.

195.    Lloyds was ordered to pay $105 million to the CFTC[160]; $86 million to the DOJ[161]; and £105 million to the FCA[162]. These penalties totaled approximately $612 million.

196.    In addition to the monetary penalties, Lloyds entered into a Non-Prosecution Agreement with the DOJ. Lloyds accepted and admitted that from at least January 2008 through at least February, 2009, HBOS USD LIBOR submissions were manipulated in order to benefit HBOS's trading positions.[163]

197.    For example, on January 17, 2008, an HBOS trader ("Trader-1") wrote an email

---

[160] U.S. Commodity Futures Trading Commission Press Release, *CFTC Charges Lloyds Banking Group and Lloyds Bank with Manipulation, Attempted Manipulation, and False Reporting of LIBOR*, (Jul. 28, 2014), *available at* http://www.cftc.gov/PressRoom/PressReleases/pr6966-14.
[161] Deferred Prosecution Agreement, *United States v. Lloyds Banking Group PLC*, No. 3:14-cr-00165-AWT, ¶7 (Dkt. No. 6) (D. Conn. July 28, 2014) ("DOJ Lloyds"), *available at* www.pacer.gov.
[162] Financial Conduct Authority Press Release, *Lloyds Banking fined £105m for serious LIBOR and other benchmark failings*, (July 28, 2014), *available at* http://www.fca.org.uk/news/press-releases/lloyds-banking-group-fined-105m-libor-benchmark-failings.
[163] DOJ Lloyds, Attach A. ¶ 15.

to Submitter-1 which said "3mth higher today pls!"[164]  Submitter-1 responded and said "Should

be 92 for guide ill put in 93 to get counted."[165]  Trader-1 then replied and said "Good man then

lower if convenient…."[166]  That same day, Submitter-1 submitted HBOS's USD 3-month

LIBOR at 3.93.[167]  Submitter-1 was the USD LIBOR submitter at HBOS from at least July 2007

through February 6, 2009.[168]

198.     Between at least May 2008 and through at least late May 2009, Lloyds USD

LIBOR submissions were manipulated to benefit Lloyds, and after the acquisition, HBOS trading

positions.[169]

199.     For example, on May 11, 2009, the following conversation took place between

Submitter-1 (who became a money-markets trader after the acquisition) and Submitter-2's

assistant:

> Submitter-1 (the former Dollar LIBOR submitter at HBOS, who remained a
> money- markets trader after the acquisition) wrote to Submitter-2's Assistant : "do
> u put in the usd libors?" Submitter- 2's Assistant responded : "yep [,] why my
> mate? don 't you?" Submitter-1
> replied: "we got kicked off remember but i used too."  Submitter-1 then asked:
> "can you put in a lower 1 month today pls cheers."  Submitter-2's Assistant
> responded: "hehehe what sort of fixings have you got?  Submitter-1 replied, "6
> yard liability," which referred to a $6-billion borrowing.  Submitter-1 later said in
> the same exchange that he was "being cheeky" to which Submitter-2's Assistant
> responded: "hehehe[,] will see what we can do….!"  Submitter-1 replied: "was
> just joking being silly but that being said I will tell you when we have big resets
> as to be honest we shoudl be coordinating the libor inputs to suit the books . for
> example later this month I have a 5y 3 month liability reset so we shoudl put in a
> low one there ill let u know." Submitter-2's Assistant responded: "of course , that
> is very sensible."[170]

200.     Just eight days later, Submitter-1 again reached out to Submitter-2 and Submitter-

2's assistant about suppressing USD 3-month LIBOR.  The following events and conversations

took place:

---

[164] *Id.* ¶ 16. (footnote omitted)
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.* ¶ 15.
[169] *Id.* ¶ 18.
[170] *Id.* ¶ 19

Submitter-1 wrote in a Bloomberg message to Submitter-2: "have 5 yard 3month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's." Submitter- 1 then sent a Bloomberg message to Submitter-2's Assistant : "do u normally put the usd libors in? or is it [Submitter-2] ." Submitter-2 's Assistant responded: "me , consulting with [Submitter-2] ." Submitter 1 replied: " ok cool ive already sent [Submitter-2) a bloomberg but he hasn't read it yet can u let him know that we hav 5 yards of 3 month liability resets so if it doesn't conflict with anythign you have a lower 3 month libor would be advantageous." Submitter-2's Assistant responded: "ok, tks." Submitter-1 then wrote another Bloomberg message to Submitter-2's Assistant: "can u get [Submitter-2] back to me when he has a second no rush." Submitter-2's Assistant wrote back: "just ask for him my friend he can hear you as is seating at his chair right now ….. but I will also tell him … he will talk to you in a min," followed by, "just to let you know we are going 74 i/o 75 in 3s ;) ." Submitter-1 replied: "legend." Later that day, Submitter-2 told Submitter-1 in a phone call: "obviously we got the Libors down for you."[171]

201.    On May 19, 2009, Lloyds' USD 3-month LIBOR rate was submitted at 0.74, which was five basis points lower than the previous day's submission.[172]

202.    USD LIBOR submitters at Lloyds also coordinated with submitters at HBOS **after the acquisition** to benefit their respective trading positions.  For example:

> A former HBOS U.S. Dollar LIBOR Submitter stated to the trader who assisted the Lloyds Bank U.S. Dollar LIBOR Submitter, "when we have big resets as to be honest we shoudl be co ordinating the libor inputs to suit the books. for example later this month i have a 5y 3 month liability reset so we shoudl put in a low one there ill let u know." (May 11, 2009).[173]

> A former HBOS U.S. Dollar LIBOR Submitter contacted the trader who assisted the Lloyds Bank U.S. Dollar LIBOR Submitter and specifically requested a lower three-month U.S. Dollar LIBOR submission to benefit his trading position. The Lloyds Bank U.S. Dollar LIBOR Submitter complied, stating on a telephone call, "we got the LIBORs down for you." (May 19, 2009).[174]

203.    HBOS was also found, through the acts of its USD LIBOR submitter and management, to have artificially suppressed USD LIBOR submissions during the global financial crisis in order to protect its reputation in the market.

204.    HBOS had been experiencing serious funding and liquidity issues and was

---

[171] *Id.* ¶ 20.
[172] *Id.*
[173] CFTC at 10
[174] *Id.*

perceived by the market to be in financial trouble during the global financial crisis.[175] Because HBOS managers knew the market viewed LIBOR submissions as a sign of a banks liquidity and viability, HBOS LIBOR submitters were directed by their supervisor to artificially suppress rates so HBOS did not look like an "outlier" relative to the other Panel Banks.[176]

205.    For example, on September 24, 2008, the HBOS USD LIBOR submitter increased his 3-month LIBOR submission by 1.2% (120 basis points) and on September 25, 2008, he increased it again by 35 basis points.[177]  HBOS' 3-month LIBOR submission was the highest relative to the other panel banks, making the bank an "outlier."[178]

206.    On September 26, 2008, the HBOS LIBOR Supervisor discussed HBOS LIBOR submissions with more senior HBOS managers.  Following these discussions, the HBOS LIBOR Supervisor informed the HBOS USD LIBOR submitters that submissions "…should be lower relative to the other panel members" and directed the submitters to "…reduce the spread between the HBOS U.S. Dollar LIBOR submissions and the submissions of the other panel members."[179] That same day, the HBOS USD LIBOR submitter, in a chat with an employee of another financial institution, was recorded saying "youll like this ive been pressured  by senior management to bring my rates down into line with everyone else."[180]

207.    On September 26, 2008, consistent with the order from the HBOS LIBOR supervisor, HBOS reduced its 3-month USD LIBOR submission by 55 basis points.[181]

208.    The CFTC discovered numerous internal communications in which HBOS senior managers (including the senior manager of the LIBOR submitters) and other HBOS personnel discuss artificially suppressing LIBOR to protect its reputation  in the market.  Here are a few examples:

---

[175] *Id*. at 14.
[176] *Id*.
[177] *Id*. at 15.
[178] *Id*.
[179] *Id*.
[180] *Id*.
[181] *Id*.

It will be readily apparent that in the current environment no bank can be seen to be an outlier. The submissions of all banks are published and we could not afford to be significantly away from the pack. (May 6, 2008. An HBOS senior manager in an email to two other HBOS senior managers, including the senior manager of the LIBOR submitters, and other HBOS personnel).[182]

As a bank we are extremely careful about the rates we pay in different markets for different types of funds as paying too much risks not only causing a re-pricing of all short term borrowing but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines. (August 8, 2008.  Excerpt from a presentation circulated by the same HBOS Senior Manager from May 6, 2008.  This presentation was disseminated to other HBOS managers and senior managers.)[183]

209.    The CFTC also found that HBOS U.S. Dollar LIBOR submitters were instructed by their supervisor <u>not</u> to make bids for cash in the market above the daily LIBOR fixing.[184]  For example, on October 30, 2008, the HBOS LIBOR supervisor emailed the submitters and advising them not to make LIBOR submissions based on the "expectation of where funds will come" but instead "continue to post levels at or slightly above the level we will pay for deposits of issue."[185]  Said another way, the HBOS LIBOR supervisor was ordering the submitters to make submissions using the rate HBOS bid for funds and not based on the rate HBOS was offered funds.

210.    Lloyds, through its submitters, traders and  managers, knew it was against BBA rules to consider trading positions and/or its reputation in the media and/or markets when computing LIBOR submissions. Lloyds's trading positions and/or reputation in the media and/or markets are not legitimate or permissible factors to base LIBOR submissions. By basing LIBOR submissions on rates that benefited traders' trading positions and/or its reputation in the media and/or markets, Lloyds conveyed false, misleading and knowingly inaccurate LIBOR submissions that in no way were based on and did not solely reflect its cost of borrowing unsecured funds in the relevant interbank markets. Furthermore, even though government

---

[182] *Id*. at 14.
[183] *Id*.
[184] *Id*. at 16.
[185] *Id*.

regulators did not disclose to the public the identity of other banks who were found to be connected to Lloyds's efforts to manipulate LIBOR, it has been established that Lloyds was colluding with various members of the USD LIBOR Contributing Panel.  Accordingly, Lloyds colluded with Defendants in its efforts to manipulate and knowingly deliver, or cause to be delivered, false, misleading, and knowingly inaccurate USD LIBOR submissions.

## F.    Antitrust Regulators in Europe Fine Various Defendants in Connection with Scheme to Manipulate LIBOR

211.    Certain Defendants have been investigated and/or fined by the European Commission for participating in various cartels whose aim was to manipulate LIBOR.  For example:

> On December 4, 2013, Barclays, Deutsche Bank, Société Générale, RBS, UBS, JPMorgan, Citigroup, and RP Martin were found to have participated in a cartel whose aim was to manipulate Yen LIBOR and Euribor."[186]  Barclays and UBS avoided fines for revealing the existence of the cartel to European regulators—the remaining six were fined approximately €1.71 billion.[187]

> On May 20, 2014, the European Commission informed Crédit Agricole, HSBC, and JPMorgan its "preliminary view" that the banks were colluding to manipulate the pricing of derivatives denominated in EURIBOR.[188]

> On October 21, 2014, the European Commission announced that it had found RBS and JPMorgan guilty of participating in a cartel whose aim was to influence the Swiss Franc LIBOR.  RBS avoided fines for revealing the existence of the cartel, but JPMorgan was fined €61.6 million.[189]  It was discovered that RBS and JPMorgan "…discussed the future Swiss Franc Libor rate submissions of one of the banks and at times exchanged information concerning trading positions and intended prices."[190]

---

[186] European Commission Press Release, *Antitrust: Commission fines banks €1.71 billion for participating in cartels in the interest rate derivatives industry*, (Dec. 4, 2013), *available at* http://europa.eu/rapid/press-release_IP-13-1208_en.htm.

[187] *Id.*

[188] European Commission Press Release, *Antitrust: Commission sends Statement of Objections to Crédit Agricole, HSBC and JPMorgan for suspected participation in euro interest rate derivatives cartel*, (May 20, 2014), *available at* http://europa.eu/rapid/press-release_IP-14-572_en.htm.

[189] European Commission Press Release, *Antitrust: Commission settles RBS-JPMorgan cartel in derivatives based on Swiss franc LIBOR; imposes €61.6 million on JPMorgan*, (Oct. 21, 2014), *available at* http://europa.eu/rapid/press-release_IP-14-1189_en.htm.

[190] *Id.*

G.   **Deutsche Bank and HSBC Set Aside Billions of Dollars in Connection with Government Investigations and Pending Litigation**

212.   On October 24, 2014, Reuters published an article entitled *Deutsche Bank Braces for $1.3 Billion In U.S., Libor Fines*.  According to this article, Deutsche Bank is near a deal with U.S. and U.K. authorities on settling allegations it attempted to manipulate LIBOR.[191]

213.   Deutsche Bank has already spent a staggering €6.1 billion in the past two and a half years in connection with litigation and investigations regarding its role in the global scheme to manipulate LIBOR.[192]

214.   Deutsche Bank has already paid approximately €725 million to the European Commission for manipulating LIBOR.

215.   On November 3, 2014, Reuters reported in an article entitled *HSBC sets aside $1.8 bln for forex probe, misconduct* that HSBC had set aside $1.8 billion for "misconduct settlements and compensation for customers, including a potential fine for rigging currency markets."[193]

216.   Deutsche Bank and HSBC continue to be investigated by government authorities in the United States, United Kingdom, and the EU for its role in the global scheme to manipulate LIBOR.

VIII.   **DEFENDANTS' LIBOR MANIPULATION CAUSED INFLATED INTEREST RATES ON ADJUSTABLE RATE MORTGAGES**

217.   Mortgage rates are typically established by market forces due to the size of the mortgage loan market and the large number of mortgage lenders.  The competition for mortgage loans creates a relatively narrow range of interest rates for loan products.

---

[191] Kathrin Jones & Arno Schuetze, *Deutsche Bank Braces for $1.3 Billion In U.S., UK Libor Fines*, Reuters, Oct. 24, 2014, *available at* http://www.reuters.com/article/2014/10/24/us-deutsche-bank-libor-idUSKCN0ID1G420141024.
[192] *Id.*
[193] Steve Slater and Matt Scuffham, *HSBC sets aside $1.8 bln for forex probe, misconduct*, Reuters, Nov. 3, 2014, *available at* http://in.reuters.com/article/2014/11/03/hsbc-results-idINKBN0IN14T20141103.

218.     Unlike a conventional 30-year fixed rate mortgage, where the interest rate is constant for the entire loan period, an ARM has an interest rate which varies over time.

219.     The key features of an ARM loan are:

o     An Index – a reference rate that is used to price an ARM loan.    Popular indices include LIBOR, U.S. Treasury Rates, and the Prime Rate.

o     A Margin – a set percentage (typically in the range of 2-3%) that is added to the Index for the life of the loan to obtain the "fully indexed rate," or the interest rate paid by the borrower.

o     An Initial Rate – the interest rate offered at the ARM loan's inception. The initial rate remains "fixed" for an agreed upon period (typically 1 or 5 years) until the loan "re-prices" (*i.e.* the interest rate "re-sets") at a later date, and periodically thereafter.

220.     The Margin on a LIBOR-based ARM loan is set by a lender at the time the loan originates and it is based on the Initial Rate for the loan product.  For example if the market rate for an ARM loan on a given day is 6.00%, and LIBOR is at 4.00%, then the Margin is 2% (*i.e.* LIBOR (4%) + Margin (2%) = Initial Rate (6%)).  Although the Margin is set at the time the loan is originated, it remains the same for the life of the loan.  Thus, after the Initial Rate period ends, the loan's interest rate is re-set based on the agreed upon Margin plus the LIBOR rate published on the day the loan re-resets.

221.     The Defendants' manipulation of LIBOR during the Manipulation Period caused all LIBOR-based ARMs that originated during the Manipulation Period to have artificially high

222.     Margins applied to the life of the ARM loans.  Thus, after the Initial Rate, all borrowers in LIBOR-based ARM loans paid a higher interest rate (typically at least .125% higher) than such borrowers would have paid had LIBOR not been manipulated.

223.     For example, in 2007 the average ARM loan had a market rate of approximately 6.5%.  If the manipulated LIBOR rate in 2007 was being reported at 4.0%, the interest rate charged to LIBOR-based ARM loan borrowers at origination would be calculated as follows:

LIBOR Index Rate (reported): 4.0%
+ Margin:                            2.5%
_____

= ARM Interest Rate:           6.5%

224.    However, had LIBOR been accurately reported in 2007 as 4.125% (instead of 4%) the interest rate charged to LIBOR-based ARM loan borrowers at origination would be calculated as follows:

LIBOR Index Rate (actual):   4.125%
+ Margin:                            2.375%
_____

=ARM Interest Rate:            6.5%

225.    Thus, as a result of the Defendants' LIBOR rate manipulation, the Margin actually charged to consumers who obtained a Libor-based ARM loan during the Manipulation Period was at least 0.125% greater than it would have been had the LIBOR rate been accurately reported.  Under the terms of standard ARM loan agreements, this inflated Margin rate is fixed for the entire term of the ARM loan.  Thus, when the interest rate was "re-set" following the Initial Rate period, borrowers were forced to pay more in interest for their LIBOR-based ARM loans than had they would have if the LIBOR rate had been accurately reported.

226.    On or about August 8, 2007, Plaintiff Carl A. Payne obtained a LIBOR-based ARM loan in connection with his purchase of a property in San Francisco, California.

227.    Plaintiff Carl A. Payne's LIBOR-based ARM loan had an Initial Rate of 7.00%, fixed until September 1, 2012.  Thereafter, the interest rate was calculated by taking the then-published LIBOR rate and adding a Margin of 2.250%.  Under the terms of his standard loan agreement, Plaintiff Carl A. Payne's Margin of 2.250% was set for the life of the ARM loan.

228.    On September 1, 2012, the interest rate on Plaintiff Carl A. Payne's LIBOR-based ARM loan "re-set," and his new interest rate was calculated by taking the then-published LIBOR rate and adding the Margin of 2.250%.

229.    Had the Defendants not manipulated the LIBOR rate at the time Plaintiff Carl A.

Payne obtained his LIBOR-based ARM loan, his Margin would have been lower by at least .125%. Thus, when Plaintiff Carl A. Payne's LIBOR-based ARM loan "re-set," his interest rate was artificially inflated by at least .125%.

230. On or about May 31, 2007, Plaintiff Kenneth W. Coker obtained a LIBOR-based ARM loan in connection with his purchase of a property located in San Francisco, California.

231. Plaintiff Kenneth W. Coker's LIBOR-based ARM loan had an Initial Rate of 6.875%, fixed until June 1, 2012. Thereafter, the interest rate was calculated by taking the then published LIBOR rate and adding a Margin of 2.75%. Under the terms of his standard loan agreement, Plaintiff Kenneth W. Coker's Margin of 2.75% was set for the life of the ARM loan.

232. On June 1, 2012, the interest rate on Plaintiff Kenneth W. Coker's LIBOR-based ARM loan "re-set," and his new interest rate was calculated by taking the then published LIBOR rate and adding the Margin of 2.75%.

233. Had the Defendants not manipulated the LIBOR rate at the time Plaintiff Kenneth W. Coker obtained his LIBOR-based ARM loans, his Margin would have been lower by at least .125%. Thus, when Plaintiff Kenneth W. Coker's LIBOR-based ARM loan "re-set," his interest rate was artificially inflated by at least .125%.

234. On or about November 29, 2007, Plaintiff Carlito J. Rivera obtained a LIBOR-based ARM loan in connection with his purchase of a property in Carlsbad, California.

235. Plaintiff Carlito J. Rivera's LIBOR-based ARM loan had an Initial Rate of 6.500%, fixed until December 1, 2012. Thereafter, the interest rate was calculated by taking the then-published LIBOR rate and adding a Margin of 2.250%. Under the terms of his standard loan agreement, Plaintiff Carlito J. Rivera's Margin of 2.250% was set for the life of the ARM loan.

236. On December 1, 2012, the interest rate on Plaintiff Carlito J. Rivera's LIBOR-based ARM loan "re-set," and his new interest rate was calculated by taking the then-published LIBOR rate and adding the Margin of 2.250%.

237. Had the Defendants not manipulated the LIBOR rate at the time Plaintiff Carlito

J. Rivera obtained his LIBOR-based ARM loan, his Margin would have been lower by at least .125%. Thus, when Plaintiff Carl A. Payne's LIBOR-based ARM loan "re-set," his interest rate was artificially inflated by at least .125%.

238.     On or about August 17, 2007, Plaintiff Philip Maresca obtained a LIBOR-based ARM loan in connection with his purchase of a property in San Francisco, California.

239.     Plaintiff Philip Maresca's LIBOR-based ARM loan had an Initial Rate of 6.500%, fixed until September 1, 2012.  Thereafter, the interest rate was calculated by taking the then-published LIBOR rate and adding a Margin of 2.2500%.  Under the terms of his standard loan agreement, Plaintiff Philip Maresca's Margin of 2.2500% was set for the life of the ARM loan.

240.     On September 1, 2012, the interest rate on Plaintiff Philip Maresca's LIBOR-based ARM loan "re-set," and his new interest rate was calculated by taking the then-published LIBOR rate and adding the Margin of 2.2500%.

241.     Had the Defendants not manipulated the LIBOR rate at the time Plaintiff Philip Maresca obtained his LIBOR-based ARM loan, his Margin would have been lower by at least .125%.  Thus, when Plaintiff Philip Maresca's LIBOR-based ARM loan "re-set," his interest rate was artificially inflated by at least .125%.

## CLASS ACTION ALLEGATIONS

242.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

243.     The Class Plaintiffs seek to represent is defined as follows:

All residents of the United States of America who obtained a LIBOR-indexed Adjustable Rate Mortgage loan during the Manipulation Period (the "Nationwide Class");

and

All residents of California who obtained a LIBOR-indexed Adjustable Rate Mortgage loan during the Manipulation (the "California Subclass");

and

All residents of the United States of America who obtained a LIBOR-indexed Adjustable Rate Mortgage loan from Defendant JPMorgan Chase & Co. during the Manipulation Period (the "JPMorgan Chase Class");

and

All residents of the United States of America who obtained a LIBOR-indexed Adjustable Rate Mortgage loan from Defendant Bank of America, N.A. during the Manipulation Period (the "Bank of America Class");

244.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Classes should be expanded or otherwise modified.

245.    Plaintiffs reserve the right to establish sub-classes as appropriate.

246.    This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Classes.

247.    <u>Community of Interest</u>:  There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

248.    <u>Numerosity</u>:  While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Classes includes hundreds of thousands of members.  Therefore, the Classes are sufficiently numerous that joinder of all members of the Classes in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

249.    <u>Ascertainability</u>:  Some names and addresses of members of the Classes are available from Defendants' records, and others can be ascertained through appropriate notice.

Notice can be provided to the members of the Classes through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

250.   Typicality:  Plaintiffs' claims are typical of the claims of the other members of the Classes which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Classes have been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

251.   Adequacy:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiffs are adequate representatives of the Classes, because they have no interests which are adverse to the interests of the members of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

252.   Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)   The expense and burden of individual litigation make it economically unfeasible for members of each Class to seek to redress their claims other than through the procedure of a class action.

(b)   If separate actions were brought by individual members of each Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)   Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

253.   Common questions of law and fact exist as to the members of each Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure

23(b)(3).

254.     The common questions of fact include, but are not limited to, the following:

(a)      Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 et seq.;

(b)      Whether Defendant JPMorgan Chase & Co. violated its contract with Plaintiff Payne and the other members of the JPMorgan Chase Class;

(c)      Whether Defendant JPMorgan Chase & Co. was unjustly enriched;

(d)      Whether Defendant Bank of America, N.A. violated its contract with Plaintiff Rivera and the other members of the Bank of America Class;

(e)      Whether Defendant Bank of America, N.A. was unjustly enriched;

(f)      Whether Defendants were members of, or participants in the conspiracy alleged herein;

(g)      Whether Plaintiffs and members of each class sustained damages, and if so, the appropriate measure of damages; and

(h)      Whether Plaintiffs and members of each class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

255.     In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)      The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications with respect to individual members of each Class which would establish incompatible standards of conduct for Defendants;

(b)      The prosecution of separate actions by individual members of each Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of each Class not parties to the adjudications, or substantially impair or impede their

ability to protect their interests; and

(c)    Defendants have acted or refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole and necessitating that any such relief be extended to members of each Class on a mandatory, class-wide basis.

256.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

### FIRST CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law**
**Business & Professions Code §§ 17200 *et seq*.**
**(Brought on Behalf of the California Subclass against All Defendants)**

257.    Plaintiffs bring this cause of action on behalf of themselves and the other members of the California Subclass.

258.    Plaintiffs and the other  members of the California Subclass incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

259.    California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

260.    Throughout the Manipulation Period, Defendants suppressed LIBOR by underreporting to the BBA the actual interest rates at which the Defendants expected they could borrow funds -- *i.e.*, their true costs of borrowing -- on a daily basis. The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set artificially low.

261.    Defendants' conduct constitutes an unlawful practice because they violate Title 18

65

United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, among others, and the common law.

262.     Defendants' conduct also constitutes an "unfair" business act and practice within the meaning of California Business and Professions Code sections 17200 *et seq.*, in that Defendants' conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.  Plaintiffs also assert a violation of public policy by withholding material facts from consumers.  Defendants' violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

263.     There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

264.     Defendants' conduct was also fraudulent, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200.

265.     In selecting a LIBOR-based ARM loan, Plaintiffs justifiably relied on their reasonable expectation that Defendants would truthfully report their borrowing costs to the BBA and not manipulate LIBOR.  Had the true nature of the understated borrowing costs and interest rate manipulation been disclosed to Plaintiffs and members of the Class, they would not have obtained a LIBOR-based ARM loan.

266.     Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.

267.     Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

268.     Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

## SECOND CLAIM FOR RELIEF
### Breach of Contract
### (Brought on Behalf of the JPMorgan Chase Class against
### Defendant JPMorgan Chase & Co.)

269.    Plaintiff Payne brings this cause of action on behalf of himself and the other members of the JPMorgan Chase Class.

270.    Plaintiff Payne and the other members of the JPMorgan Chase Class incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

271.    Plaintiff Payne entered into a Deed of Trust on August 8, 2007 with Washington Mutual Bank.  Incorporated into the Deed of Trust was a "Fixed/Adjustable Rate Rider." The rider memorializes the payment terms for Plaintiff Payne's LIBOR-based ARM loan.

272.    Washington Mutual Bank, which was subsequently acquired by Defendant J.P. Morgan Chase & Co. in or around September 2008, was a counterparty in this transaction in which Plaintiff Payne was making monthly payments based on a manipulated and artificially suppressed one-year USD LIBOR.  Defendant JPMorgan Chase & Co. continued the operations of Washington Mutual Bank.

273.    According to the terms of the rider, Plaintiff Payne's adjustable interest rate is based on an "Index," which the rider defines as:

> …the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London Market ("LIBOR"), as published in *The Wall Street Journal*.

274.    Plaintiff Payne's initial interest rate, which was set from August 8, 2007 to at least September 1, 2012, was calculated by taking the one-year USD LIBOR, adding 2.250%, and rounding up to the nearest one-eighth of one percentage point (0.125%).

275.    Defendant JPMorgan Chase & Co. breached its contractual obligations owed to Plaintiff Payne by systematically manipulating and artificially suppressing the Index rate which is tied to Plaintiff Payne's LIBOR-based ARM loan.  The Index rate used was represented to be

calculated in accordance with the standards set forth by the BBA, but it was not.

276.    Plaintiff Payne did not and could not have known Defendant JP Morgan Chase & Co. was manipulating and artificially suppressing LIBOR.

277.    Plaintiff Payne has performed all terms and conditions under his Deed of Trust and Fixed/Adjustable Rate Rider, except those that were excused or waived.

278.    As a direct and proximate result of Defendant JPMorgan Chase & Co.'s contractual breach, Plaintiff Payne has been damaged in an amount according to proof at trial.

<u>THIRD CLAIM FOR RELIEF</u>
**Breach of Contract**
**(Brought on Behalf of the Bank of America Class against**
**Defendant Bank of America, N.A.)**

279.    Plaintiff Rivera brings this cause of action on behalf of himself and the other members of the Bank of America Class.

280.    Plaintiff Rivera and the other members of the Bank of America Class incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

281.    Plaintiff Rivera entered into a Deed of Trust on November 29, 2007 with Defendant Bank of America, N.A.  Incorporated into the Deed of Trust was an "Adjustable Rate Rider."  The rider memorializes the payment terms for Plaintiff Rivera's LIBOR-based ARM loan.

282.    Defendant Bank of America, N.A. was a counterparty in this transaction in which Plaintiff Rivera was making monthly payments based on a manipulated and artificially suppressed one-year USD LIBOR.

283.    According to the terms of the rider, Plaintiff Rivera's adjustable interest rate is based on an "Index," which the rider defines as:

THE ONE-YEAR LONDON INTERBANK OFFERED RATE ("LIBOR")

WHICH IS THE AVERAGE OF INTERBANK OFFERED RATES FOR ONE-

YEAR U.S. DOLLAR-DENOMINATED DEPOSITS IN THE LONDON
MARKET.  AS PUBLISHED IN THE WALL STREET JOURNAL.

284.    Plaintiff Rivera's initial interest rate, which was set from November 29, 2007 to at
least December 1, 2012, was calculated by taking the one-year USD LIBOR, adding 2.250%,
and rounding up to the next highest one-eighth of one percentage point (0.125%).

285.    Defendant Bank of America, N.A. breached its contractual obligations owed to
Plaintiff Rivera by systematically manipulating and artificially suppressing the Index rate which
is tied to Plaintiff Rivera's LIBOR-based ARM loan.  The Index rate used was represented to be
calculated in accordance with the standards set forth by the BBA, but it was not.

286.    Plaintiff Rivera did not and could not have known Defendant Bank of America,
N.A. was manipulating and artificially suppressing LIBOR.

287.    Plaintiff Rivera has performed all terms and conditions under his Deed of Trust
and Adjustable Rate Rider, except those that were excused or waived.

288.    As a direct and proximate result of Defendant Bank of America, N.A.'s
contractual breach, Plaintiff Rivera has been damaged in an amount according to proof at trial.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Brought on Behalf of the JPMorgan Chase Class against
Defendant JPMorgan Chase & Co.)**

289.    Plaintiff Payne brings this cause of action on behalf of himself and the other
members of the JPMorgan Chase Class.

290.    Plaintiff Payne and the other members of the JPMorgan Chase Class incorporate
by reference in this cause of action each and every allegation of the preceding paragraphs, with
the same force and effect as though fully set forth herein.

291.    Defendant JP Morgan Chase & Co., by means of unlawful conduct set forth in
this Complaint, including making false submissions to the BBA in an effort to artificially
suppress U.S. Dollar LIBOR, profited unjustly from Plaintiff Payne and the other members of

69

the JPMorgan Chase Class.

292.    As a proximate result of Defendant JP Morgan Chase & Co.'s wrongful acts and omissions described herein, and as a result of Defendant JP Morgan Chase & Co.'s ill-gotten benefits and profits, Defendant JP Morgan Chase & Co. has been unjustly enriched at the expense of Plaintiff Payne and the other members of the JPMorgan Chase Class.

293.    The circumstances as described herein are such that it would be inequitable for Defendant JP Morgan Chase & Co. to retain these ill-gotten benefits and profits without paying the value thereof to Plaintiff Payne and the other members of the JPMorgan Chase Class.

294.    Plaintiff Payne and the other members of the JPMorgan Chase Class are entitled to restitution of the amount of Defendant JP Morgan Chase & Co.'s ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct, as described above.

295.    Accordingly, Plaintiff Payne and the other members of the JPMorgan Chase Class seek an order establishing Defendant JP Morgan Chase & Co. as constructive trustee of the gains, benefits and profits that served to unjustly enrich them, together with interest during the period in which Defendant JP Morgan Chase & Co. has retained such benefits and profits, and requiring Defendant JP Morgan Chase & Co. to disgorge those profits to Plaintiff Payne and the other members of the JPMorgan Chase Class in a manner to be determined by the Court.

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Brought on Behalf of the Bank of America Class against**
**Defendant Bank of America, N.A.)**

296.    Plaintiff Rivera brings this cause of action on behalf of himself and the other members of the Bank of America Class.

297.    Plaintiff Rivera and the other members of the Bank of America Class incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

298.    Defendant Bank of America, N.A., by means of unlawful conduct set forth in this Complaint, including making false submissions to the BBA in an effort to artificially suppress U.S. Dollar LIBOR, profited unjustly from Plaintiff Rivera and the other members of the Bank of America Class.

299.    As a proximate result of Defendant Bank of America, N.A.'s wrongful acts and omissions described herein, and as a result of Defendant Bank of America, N.A.'s ill-gotten benefits and profits, Defendant Bank of America, N.A. has been unjustly enriched at the expense of Plaintiff Rivera and the other members of the Bank of America Class.

300.    The circumstances as described herein are such that it would be inequitable for Defendant Bank of America, N.A. to retain these ill-gotten benefits and profits without paying the value thereof to Plaintiff Rivera and the other members of the Bank of America Class.

301.    Plaintiff Rivera and the other members of the Bank of America Class are entitled to restitution of the amount of Defendant Bank of America, N.A.'s ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct, as described above.

302.    Accordingly, Plaintiff Rivera and the other members of the Bank of America Class seek an order establishing Defendant Bank of America, N.A. as constructive trustee of the gains, benefits and profits that served to unjustly enrich them, together with interest during the period in which Defendant Bank of America, N.A. has retained such benefits and profits, and requiring Defendant Bank of America, N.A. to disgorge those profits to Plaintiff Rivera and the other members of the Bank of America Class in a manner to be determined by the Court.

## SIXTH CLAIM FOR RELIEF
### Fraud
### (Brought on Behalf of the Nationwide Class against All Defendants)

303.    Plaintiffs bring this cause of action on behalf of themselves and the other members of the Nationwide Class.

304.    Plaintiffs incorporate by reference in this cause of action each and every

allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

305.     The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his or her conduct in the transaction or type of transaction involved.

306.     Defendants concealed and suppressed material facts, namely, the fact that they had manipulated LIBOR in order to conceal their true borrowing costs and earn profits.

307.     Plaintiffs justifiably relied on the reasonable expectation that Defendants would act in compliance with the law, which included reporting their true borrowing costs to the BBA and not manipulating LIBOR.

308.     Had the true nature of the Defendants' manipulation been disclosed to Plaintiffs and members of the Class, they would not have obtained LIBOR-based ARMs during the Manipulation Period.

309.     Defendants knew their concealment and suppression of materials facts was false, misleading, and were fully aware that the false disclosures made to the BBA would be utilized to calculate and publish LIBOR, and, in turn, would be relied upon by Plaintiffs, and members of the Class, in obtaining a LIBOR-based ARM loans.

310.     As a result of Defendants' fraudulent omissions and misrepresentations, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property. Plaintiffs and members of the Class would not have obtained a LIBOR-based ARM loan, and would not have paid the resulting inflated Margin on such loans, had it not been for Defendants' concealment of material facts.

311.     Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information about their scheme to manipulate LIBOR, Defendants intended to induce Plaintiffs and members of the Class into

72

believing that LIBOR was accurately calculated.

312.   As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiffs and each member of the Class has been damaged in an amount according to proof at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.   Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.   Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3.   Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

4.   Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiff and members of the Class;

5.   Awarding Plaintiffs and the members of the Class punitive damages in an amount according to proof at trial;

6.   Awarding declaratory and injunctive relief as permitted by law or equity;

7.   Awarding Plaintiffs' interest on their damages from the date of collection through the date of entry of judgment in this action;

8.   Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.   For such other and further relief as the Court deems just and proper.

Dated:  November 13, 2014                     BARON & BUDD, P.C.


By: ____/s/Roland Tellis_____
     Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
David Fernandes (SBN 280944)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:     (818) 839-2333
Facsimile:     (818) 986-9698

Russell Budd (To be Admitted *Pro Hac Vice*)
rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181

Interim Lead Counsel for Plaintiffs and the Homeowner
LIBOR Suppression Class

John W. Sharbrough, III
JOHN W. SHARBROUGH, III, P.C.
114 Eaton Square
Mobile, Alabama 36608-1936
Telephone:     (251) 432-1413
Facsimile:     (251) 432-5297

Attorneys for Plaintiffs

74

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.


Dated:  November 13, 2014                    BARON & BUDD, P.C.


By:  ____/s/Roland Tellis_____
        Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
David Fernandes (SBN 280944)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:     (818) 839-2333
Facsimile:     (818) 986-9698

Russell Budd (To be Admitted *Pro Hac Vice*)
rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181

Interim Lead Counsel for Plaintiffs and the Homeowner
LIBOR Suppression Class

John W. Sharbrough, III
JOHN W. SHARBROUGH, III, P.C.
114 Eaton Square
Mobile, Alabama 36608-1936
Telephone:     (251) 432-1413
Facsimile:     (251) 432-5297

Attorneys for Plaintiffs