UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re LIBOR-Based Financial Instruments Antitrust Litigation | MDL No. 2262 |
| This Document Relates To: | Master File No. 1:11-md-02262-NRB<br><br>ECF Case |
| Amabile et al. v. Bank of Am. Corp. et al. | No. 13-cv-1700 |

**DECLARATION OF PETER BARKER IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS DIRECT ACTION CLAIMS COVERED BY PRIOR RULINGS**

Peter Barker declares as follows pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in support of the *Amabile* plaintiffs' ("plaintiffs") opposition to Defendants' Prior Rulings Brief with regard to when inquiry notice can be said to have been triggered for purposes of the Commodity Exchange Act.

2. I began working for the Chicago Mercantile Exchange ("CME") in 1994. From then until 2013, I had positions increasing in responsibility involving interest rate products, particularly Eurodollar futures and options. When I retired in January 2013, I was the executive director of interest rate products. During the relevant period asserted in the complaint, I was a senior director responsible for the creation, development, launch and distribution of all CME interest rate products. Other responsibilities include product pricing, incentive programs, and establishment of market structure and trading rules. Prior to my work at CME, I developed and executed client-focused hedging and trading strategies in global interest rate futures and options markets for JP Morgan and Indosuez Car Futures.

3.  Not only did I have a front-row seat regarding the interest rate based contracts the CME offered, I actively participated in certain CME responses to the global financial crisis of 2007-2008. And that crisis, widely regarded as the biggest financial meltdown since the Great Depression, provides the necessary context to gauge the underlying facts of the *Amabile* complaint.

4.  I have reviewed the news articles that the Court has considered in its Libor-based opinions, some of which I recall reading when originally published.

5.  Libor rates during the *Amabile* complaint period, but particularly in 2008, were erratic. Libor's swings, we felt, were a function of the financial times more than anything. To put it in perspective, Bear Stearns, considered a financial powerhouse, failed in March of 2008. That lending and credit tightened does not, in this context, indicate artificial prices; it indicates that the entire global economic system was out of order.

6.  The CME, however, needed to do its part to retain order. Eurodollar futures and options contracts are one of, if not, the biggest futures contract available on the CME. The primary economic utility of Eurodollar futures is that it provides users the ability to manage floating rate interest rate risk benchmarked to Libor. Because the value of Eurodollar futures is inextricably linked to Libor, the viability and reliability of Eurodollar futures goes hand-in-hand with the viability reliability of Libor as a benchmark interest rate.

7.  Throughout the 2007-2008 financial crisis, maintaining the reliability and credibility of Libor was a primary concern of the CME. With regard to the articles that appeared in the popular press during this time, they did cause some concern, however, I and many of my colleagues at CME did not think the reporting worthy of great weight. This is chiefly because not only were the facts then alleged publically refuted by equally respected sources, if true, the

allegations are diametrically opposed to the accepted business of banking. At its core, a bank's aim is to lend money at a higher rate than it borrows. All banks on the Libor panel are both borrowers and lenders of funds. Accordingly, purposefully suppressing the interest rate benchmark that a bank uses to lend money is inane. We did not think that Banks would forgo an opportunity on the lending side of the business to make money.

8. Second, the prevailing view was that there were too many built-in marketplace safeguards or checks and balances for the banks to systematically suppress and manipulate Libor. It is axiomatic that banking is built on trust. Untrustworthy banks will face a run on its funds, which was a very real concern during the financial crisis. It was also assumed that a bank engaging in manipulative or otherwise dishonest behavior would risk losing the client relationships upon which its business depends. Given the perceived high risk of manipulative behavior and the low perceived reward, I believed that dishonest behavior with regard to Libor was unlikely. During this time period, the savviest financial market participants – investment banks, pension funds, asset managers – all continued (and still continue) to do Libor-based business with the Libor banks.

9. Third, banks are supposed to (or prior to the Barclays, Rabobank, etc. settlements, were thought to) compete. Their later uncovered collusion was not fathomable at the time. As noted earlier, for every Libor borrower there is a Libor lender. My assumption at the time was that competition was sufficient to guarantee a lending bank would not allow it's Libor loans to be priced at an artificially below market rate by another bank. Based on these reasons and virtual assurances, the CME was satisfied to settle Eurodollar futures and options to Libor, a transition that occurred back in or around 1997.

10. Shortly after Bear Stearns collapsed, John Ewan of the BBA visited me and some others at the CME to address Libor concerns. First, he was irate at the financial reporting questioning Libor's accuracy. He termed it fanciful and unfounded; he charged that it was all a play to sell papers. The CME too felt, for the reasons named above, that price influencing was unlikely.

11. The main concern, shared by the CME and the BBA, was making sure that Libor remained an accurate interest rate benchmark in these uncertain economic times. The BBA sought comment from various entities, including the CME, on how to improve Libor. Principally, the BBA stated that it would heighten its scrutiny for outliers. Some of the Libor banks were on a FX&MM Committee assigned to conduct surveillance. I believed the BBA's recommendations were reasonable ones, given the thoughtfulness, breadth and depth of input they received from the trading community.

12. Given the Eurodollar futures contract's importance to the CME, the CME needed alternative interest rate based contracts should Libor-based trading cease. Accordingly, the CME readied an overnight index swap ("OIS") contract to join the existing federal funds futures contract. The thinking was, if traders no longer trusted Libor, they would move to trade OIS or federal funds contracts instead of Eurodollars. Also, in June 2008, interdealer broker ICAP launched the New York Funding Rate (NYFR), an additional interest rate index. No discernable business migrated from Libor to the alternative indices. Eurodollar futures remained the overwhelming interest rate contract hedge. In addition, there was no meaningful difference in the Libor rate and the NYFR from the NYFR's inception. Though ultimately incorrect, this suggested that the Libor-based commodities did not appear to be priced at manipulated or artificial levels.

13. Even if there was merit to the Libor-fixing news articles, whatever fixing might have occurred was likely resolved – or thought to have been resolved – by July or August 2008.

14. The Lehman Brothers collapse in September 2008 was the center of the financial world's focus. This created a sense of panic that made Bear Stearns' failure seem minor. The Lehman failure and the subsequent fallout further caused Libor to be erratic. This scenario underscores my initial impression: interest rate fluctuation responded to the global events. The rates cannot be more stable or predictable than the environment in which they exist. A person of ordinary intelligence would not correlate that futures prices were manipulated or artificial, just erratic.

15. It was not until various Libor banks entered into deferred prosecution agreements with governmental entities that we had any clear understanding that banks were engaged in the manipulation of Libor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___5___ th day of December, Chicago, Illinois.

_____
Peter Barker