**DICKSTEIN**SHAPIRO LLP

1825 Eye Street NW | Washington, DC 20006-5403
TEL (202) 420-2200 | FAX (202) 420-2201 | dicksteinshapiro.com

May 13, 2015

Via Facsimile and ECF

Honorable Naomi Reice Buchwald
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *In re LIBOR-Based Financial Instruments Antitrust Litigation*, MDL No. 2262, Case No. 1:11-md-02262-NRB – Request for Consideration of Deutsche Bank Government Resolutions

Dear Judge Buchwald:

Direct Action Plaintiffs ("DAPs")[1] write to provide this Court with copies of materials relating to settlements reached between Defendant Deutsche Bank AG ("DB") and various government agencies regarding LIBOR manipulation, and to ask the Court to consider both the settlements and certain facts contained within them in its analysis of the pending motions to dismiss DAPs' claims. Consistent with the Court's protocol for prior settlements involving Defendants Barclays and Rabobank, DAPs seek this relief *in lieu* of asking for permission to amend their respective complaints.[2] *See, e.g.*, Mem. and Order (Nov. 27, 2013) (Docket. No. 511).

On April 23, 2015, United States, New York, and United Kingdom enforcement agencies publicly disclosed plea and deferred prosecution agreements, statements of facts, and a stipulated consent order in which Deutsche Bank AG ("DB") and various of its affiliates admitted, or were found to have, manipulated USD LIBOR and other interest-rate benchmarks ("DB Settlement Documents").[3] Pursuant to these agreements, DB must pay the equivalent of approximately $2.5 billion to the various governments.[4]

---

[1] The OTC class joins the letter as well.

[2] For the Court's benefit and to ensure that the materials are part of the record, DAPs are separately providing the Court with a proposed order specifying the relief that DAPs seek.

[3] The DB settlements include three sets of documents containing DB admissions of fact, (1) a Deferred Prosecution Agreement with the United States ("DB DPA"), which included a Statement of Facts ("DB SOF"), (2) a Plea Agreement between the Fraud Section of the Criminal Division and the Antitrust Division of the United States Department of Justice and DB Group Services (UK) Ltd. ("DBGS PA"), which included a Statement of Facts incorporated by reference ("DBGS SOF"), and (3) a Consent Order entered into with the state of New York ("NYCO"). These materials are attached to this letter as Exhibits A–C, respectively. In addition, the settlements

Honorable Naomi Reice Buchwald
May 13, 2015
Page 2

    These materials provide additional factual support for the claims alleged by DAPs and refute Defendants' arguments seeking dismissal of DAPs' claims. DAPs highlight below certain facts revealed for the first time in the DB Settlement Documents.[5]

    A.    <u>Conspiracy Allegations</u>

    The DB Settlement Documents contain numerous facts supporting allegations that Defendants conspired to violate both the law and the LIBOR-setting rules. For example, in September 2007, a DB LIBOR submitter said he knew of "4 banks who are going to leave their libors unchanged." NYCO ¶ 42; *see also id.* ¶¶ 37-38 (DB communications with UBS). This admission expressly confirms that DB knew, in advance, what LIBOR submissions other banks would make. It also supports the inference that the panel banks secretly and unlawfully cooperated to coordinate their submissions.

    The Consent Order also reveals that on April 16, 2008, DB met privately with the BBA and other panel banks to discuss "inaccuracies from contributing banks, relating to the dollar rate," including "lowballing," (a phrase used to describe systematic depression of LIBOR). NYCO ¶ 63; Final Order ¶ 4.58. The meeting appears to be the same meeting of the FX&MM Committee at which Defendants surreptitiously agreed to initiate a "charm offensive" to quell concerns about USD LIBOR and agreed to dispatch BBA staff to the United States to "placate investors."[6] *See* Declaration of Lisa Kaas (Docket No. 892) ¶¶ 35-36, Ex. 5; PJ Opp'n at 24-25.

---

include two sets of documents containing findings of fact and law, (1) the United Kingdom's Financial Conduct Authority, as set forth in a written Final Notice summarizing its findings and conclusions ("Final Notice"), and (2) the Commodities Futures Trading Commission, as set forth in an Order summarizing its findings of fact and conclusions of law ("CFTC Order"). These materials are attached to this letter as Exhibits D and E, respectively. The fact of these settlements and resolutions alone support the plausibility of DAPs' claims. *See, e.g., In re Natural Gas Commodity Litig.*, 337 F. Supp.2d 498, 510 (S.D.N.Y. 2004).

[4] *See* DB DPA ¶ 7 ($625 million); NYCO ¶ 70 ($600 million); CFTC Order at 42 ($800 million); Final Notice ¶ 1.1 (£226.8 million); DBGS PA ¶ 17 ($150 million).

[5] These facts are particularly applicable to Direct Action Pls.' Joint Mem. Opp'n to Mot. to Dismiss for Lack of Personal Jurisdiction ("PJ Opp'n") (Docket No. 886) at 9-12; Direct Action Pls.' Joint Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Fraud and Related Claims ("Fraud Opp'n") (Docket No. 890) at 39-43; and Direct Action Pls.' Joint Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Based On Statutes of Limitations ("SOL Opp'n.") (Docket No. 875) at 1-7, 18. Those plaintiffs that still have antitrust claims (*see* Joint Mem. of Law of Certain Direct Action Pls. in Opp'n to Defs.' Mot. to Dismiss Direct Action Antitrust Claims Based On Prior Rulings (Docket No.883)) *sub judice* are submitting a separate letter on that topic.

[6] The BBA has previously said that committee meetings were confidential. The BBA did not disclose who participated, where the meetings were held, or what was discussed. *See, e.g.*, Complaint of Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks ("FDIC-R Compl.") ¶ 67.

Honorable Naomi Reice Buchwald
May 13, 2015
Page 3

      Shortly after this meeting, the BBA confidentially communicated to DB and other panel banks its belief that "LIBOR fixes were too low and did not accurately reflect the market." NYCO ¶ 63. This admission is directly contrary to what the BBA represented on numerous occasions[7] and confirms that Defendants, by and through the BBA, affirmatively misrepresented what LIBOR was and how it was determined. *See, e.g.*, PJ Opp'n at 5, 11, 24-25.

      The DB Settlement Documents further validate DAPs' allegations that the conspiracy to systematically depress USD LIBOR began no later than August 2007. NYCO ¶¶ 55-57. Around that time, for example, a DB senior manager directed a subordinate in writing to "Make sure our libors are on the low side for all [currencies]." *Id.* ¶ 57; Final Notice ¶ 4.61. This direction was given at the same time that other Defendants issued the same internal instructions. FDIC-R Compl. ¶¶ 83, 86-87. DB's USD LIBOR submissions were, in fact, consistently at the same admittedly depressed rates submitted by Defendants Barclays, UBS, and HBOS. *See* FDIC-R Compl. ¶¶ 82-89, 123-24 & nn.183, 184.[8]

      These new revelations firmly support the plausibility of DAPs' allegations of a conspiracy (involving the BBA) to systematically suppress USD LIBOR and to hide that systematic suppression from market participants.

      B.    <u>Intentional Contacts with the United States and New York in Particular</u>[9]

      The DB Settlement Documents include additional facts showing that DB engaged in suit-related conduct directed at the United States, and particularly New York. *See* PJ Opp'n at 1-3, 7-14, 15-17, 21-25. For example,

- Employees located in New York directly participated in DB's unlawful conduct. NYCO ¶¶ 11, 16; Final Notice ¶¶ 2.2, 2.6, 4.24; CFTC Order at 3. Some of the New

---

[7] *See, e.g.*, SOL Opp'n at 6 n.6 (BBA represented in August 2008 that it had conducted an independent review and confirmed that LIBOR was a "fundamentally robust *and accurate* benchmark" and that its findings were supported by respected market participants (emphasis added)); FDIC-R Compl. ¶ 93 (BBA claimed it was watching rates carefully and would take action as necessary), ¶ 94 (BBA would expel any contributor that deliberately submitted inaccurate submissions and did not believe that any bank submitted false quotes), ¶ 97 (BBA manager promised to investigate concerns), ¶ 103 (BBA statement that "we have *every* confidence in the integrity of the bbaLIBOR-setting process and the accuracy of the figures it produces" (emphasis added)), ¶ 105 (BBA statement that panel banks were uniquely creditworthy and that it was employing "tight scrutiny mechanism" to prevent manipulation), ¶ 132 (BBA claimed to be "shocked" by Barclays' disclosures of LIBOR manipulation).

[8] Information disclosed in previous settlements shows that in October 2008, DB submissions were "too low." *See, e.g.*, FDIC-R Compl. ¶ 113. Other publicly disclosed evidence shows that in August 2007, a DB trader received an electronic message from a former RBS trader that "It's just amazing how Libor fixing can make you that much money or lose if opposite. It's a cartel now in London." *Id.* ¶ 381.

[9] The Exchange-Based class joins in this portion of the letter.

Honorable Naomi Reice Buchwald
May 13, 2015
Page 4

- York employees who traded interest-rate derivatives linked to USD LIBOR made or received requests for LIBOR accommodations. DB SOF ¶¶ 18-20, 22, 25, 32-35; CFTC Order at 10-11.

- The purpose of DB's misconduct was to influence the ultimate rate published by and through the BBA. DB SOF ¶¶ 106-08. LIBOR manipulation affected USD LIBOR and harmed contract counterparties in the United States. DB SOF ¶¶ 109-12.

- DB's conduct harmed unidentified asset management corporations, business corporations, universities, non-profit organizations, insurance companies, banks, and other financial institutions in the United States. DB SOF ¶¶ 110, DBGS SOF ¶ 20. DAPs located in the forum states are among DB's counterparties for USD LIBOR derivatives.

C. <u>The Settlement Documents Support Allegations of Intentional Concealment and Conduct Which Prevented the Discovery of the Secret Systematic USD LIBOR Depression</u>

In addition to the facts discussed above, the DB Settlement Documents further show that (1) DB executives actively concealed their conduct, and (2) victims could not have discovered their tort claims with reasonable diligence. *See* SOL Opp'n at 6-8, 21 & nn.27-30. In particular, they show:

- To conceal LIBOR manipulation, DB submitted false rates that were within a range that DB believed could be reasonably justified by market conditions. DB SOF ¶ 23.

- DB manipulated LIBOR in all tenors "so that the manipulation was not conspicuous." DB SOF ¶¶ 22-23.

- DB provided a "completely false" formal attestation to the FCA that its LIBOR systems and controls were adequate.[10] Final Notice ¶¶ 2.15, 6.22, 4.97-4.108.

- DB destroyed 482 tapes containing "thousands of hours of potentially responsive audio recordings" sought by authorities. Final Notice ¶ 4.121; DB DPA ¶ 4.b.

- DB's "unacceptably slow and ineffective response" to government inquiries "prolonged the process of formal investigation significantly." Final Notice ¶¶ 2.3, 2.16, 4.118-121, 5.27-5.30.

---

[10] DB also provided inaccurate and misleading information to government enforcers regarding its ability to disclose a report commissioned by the BaFin (the Federal Financial Supervisory Authority for Germany) that discussed shortcomings in DB's internal investigation of LIBOR related misconduct. Final Notice ¶¶ 2.14, 4.81-4.96 (detailing series of events); DB DPA ¶ 4.b.

Honorable Naomi Reice Buchwald
May 13, 2015
Page 5

- In the spring of 2009, DB's internal Business Integrity Review Group ("BIRG") conducted a review of its trading desk and failed to identify any misconduct involving LIBOR. DB SOF ¶ 105.

D. The Settlement Documents Confirm That Defendants Knowingly Published False USD LIBOR to Defraud Plaintiffs

The DB Settlement Documents include facts, in addition to those discussed above, that raise more than a plausible inference of fraud. First, they provide even more evidence that Plaintiffs were among the class of persons that DB expected, and intended, to rely on the misrepresentations about the level of USD LIBOR and how it was determined. *See* Fraud Opp'n 15-19. Contrary to Defendants' repeated assertions that they knew no more than that it was *possible* some unknown investors might rely on LIBOR, DB admits that LIBOR was *intended* to be used in "standard derivative and loan documentation" and that DB *actually knew* that counterparties to those contracts would suffer economic losses as a result of LIBOR manipulation and specifically sought to "gain an advantage" over its counterparties through its "deceptive course of conduct." DB SOF ¶¶ 108-12. DAPs were among those deceived counterparties.

Moreover, DB now admits that it engaged in the unlawful conduct through employees in "multiple legal entities associated with" the corporate parent (DB). DBGS SOF ¶ 14. DB also accepted responsibility under United States law for the acts of its officers, directors, employees, and agents. DB DPA ¶ 2; DB SOF ¶ 113. These admissions undermine Defendants' attempts to hide behind corporate formalities at the pleading stage. *See* Fraud Opp'n at 10-14.

As the facts and admissions contained in the DB Settlement Documents have a direct bearing on the allegations and defenses currently before the Court, DAPs respectfully ask the Court to consider them in its analysis of the pending motions to dismiss.

Sincerely,

*/s/ Richard J. Leveridge*

Richard J. Leveridge
DICKSTEIN SHAPIRO LLP
(202) 420-4778 direct dial
(202) 379-9325 direct fax
leveridger@dicksteinshapiro.com

Attachments
cc:  All counsel of record by ECF