**DICKSTEIN**SHAPIRO LLP

1825 Eye Street NW | Washington, DC 20006-5403
TEL (202) 420-2200 | FAX (202) 420-2201 | dicksteinshapiro.com

May 13, 2015

Via Facsimile and ECF

Honorable Naomi Reice Buchwald
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *In re LIBOR-Based Financial Instruments Antitrust Litigation*,
MDL No. 2262, Case No. 1:11-md-02262-NRB – Antitrust Issue

Dear Judge Buchwald:

Plaintiffs the Federal Home Loan Mortgage Corporation, the Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks, Principal Funds, Inc., and Principal Financial Group, Inc. submit this letter to ask this Court to consider facts disclosed in connection with Defendant Deutsche Bank's ("DB") recent settlements with government regulators ("DB Settlement Documents") in its analysis of pending motions to dismiss their antitrust claims.[1] As set forth in their opposition to those motions to dismiss,[2] these plaintiffs (the "Antitrust Plaintiffs") have alleged additional facts and theories that were not alleged in other complaints and therefore state a claim for relief even if the Second Circuit affirms the Court's rulings in *LIBOR I* and *II*.

This letter focuses on the facts uniquely applicable to the pending antitrust claims and incorporates by reference the facts cited in the omnibus letter submitted separately on behalf of all Direct Action Plaintiffs (Docket No. 1132).

    A.    <u>The DB Settlement Documents Contain Statements and Admissions That Support Allegations of a Product Market for USD Interest-Rate Benchmarks</u>

In the Statement of Facts attached to its Deferred Prosecution Agreement ("DPA"), DB explained that over-the-counter interest-rate swaps are negotiated agreements in which one party agrees to pay "*a* reference rate . . . *like* LIBOR or EURIBOR" in exchange for a fixed rate of

---

[1] The claims for which Rule 54(b) certifications were granted are a subset of the Antitrust Plaintiffs' claims. All of the other antitrust claims subject to the Rule 54(b) certifications requested by other plaintiffs have been consolidated with the *Gelboim* appeal and are scheduled for oral argument on August 18, 2015.

[2] Joint Mem. of Law of Certain Direct Action Pls. in Opp'n to Defs.' Mot. to Dismiss Direct Action Antitrust Claims Based On Prior Rulings ("Antitrust Opp'n") (Docket No.883).

interest. DB SOF ¶ 12 (emphasis added). Similarly, the United Kingdom's Financial Conduct Authority wrote in its Final Notice that integrity of "benchmark reference rates *such as* LIBOR" are of "fundamental importance" to international financial markets. Final Notice ¶ 2.19 (emphasis added); *see also id.* ¶ 4.9; *In the Matter of Deutsche Bank AG*, CFTC No. 15-20 ("CFTC Order") at 44 n.27 (defining "benchmark interest rate" as "an interest-rate for a currency that is calculated based on data received from market participants and published to the market on a regular, periodic basis, *such as* LIBOR and Euribor" (emphasis added)).

These statements confirm that LIBOR was simply *a* product offered in the market for interest-rate benchmarks and the intertwined downstream markets for instruments that required interest-rate benchmarks, like interest-rate swaps and adjustable-rate loans. *See* Antitrust Opp'n., *passim*. In the absence of collusion, consumers would have had a choice of benchmarks (and Antitrust Plaintiffs allege Defendants' conduct limited that choice to the detriment of consumers).[3] Antitrust Opp'n at 10-18.

      B.      <u>The DB Settlement Documents Confirm the Agreements Alleged by the Antitrust Plaintiffs Harmed Competition to the Detriment of Consumers</u>

In announcing the DB settlements, the United States Department of Justice's ("DOJ") top antitrust official, Assistant Attorney General Bill Baer, said "financial markets function properly only if customers and competing banks have confidence that they are untainted by fraud and collusion."[4] Markets "function" through competition. Competition occurs not just on price, but on quality, innovation, and service. *See, e.g.*, Antitrust Opp'n at 2, 3, 10, 19. Mr. Baer's comments underscore anti-competitive effects of Defendants' conduct. The DOJ, in fact, required DB to hire an independent monitor to ensure future compliance with antitrust laws. *See* Attachment C to DPA.

The Commodities and Futures Trading Commission ("CFTC") confirmed that DB's conduct harmed competition by finding the conduct interfered with the "basic forces of supply and demand," thus causing "artificial" prices of financial instruments that incorporated USD LIBOR. CFTC Order at 37-39. Antitrust law is designed to ensure that prices are formed by competitive market forces and not collusion. The CFTC's finding thus supports allegations that the alleged conduct caused harm to competition and antitrust injury to consumers of financial instruments.

---

[3] This is a critical distinguishing factor because in *LIBOR I* and *II*, the market was defined as only "LIBOR-Based" derivatives, thus assuming that even in the absence of collusion there would be no competition over the choice of benchmark. *See* Antitrust Opp'n. at 16-17.

[4] *See* Assistant Attorney General Bill Baer Delivers Remarks for the Deutsche Bank Manipulation of Libor Conference Call (Apr. 23, 2015), *available at* http://www.justice.gov/atr/public/press_releases/2015/313382.htm.

      C.      The New York Consent Order Also Reveals for the First Time That Defendants Actually Colluded in the Interbank Loan Market

The Consent Order entered by the New York Financial Services Division cites an internal DB document from June 3, 2008, in which a LIBOR submitter wrote "banks have wised up to the fact" that they can submit two bids, one of which was artificially low, just to justify an artificially low "IBOR" submission. NYCO ¶ 50. In this context, "IBOR" submissions refer to benchmarks tied to interbank offered rates, such as LIBOR and EURIBOR. In the interbank loan market, a "borrowing bank" should bid for a loan at the interest rate (price) it believes will entice another bank to lend its cash. In the absence of collusion, borrowing banks compete for loans and therefore, each bid will be determined by competitive market forces. LIBOR was held out as a reliable representation of the average competitive "bid" rate for cash in the interbank loan market. Each panel bank represented that it submitted "competitive" bid rates. *See* Antitrust Opp'n at 7, 12.

The Consent Order, however, indicates for the first time that banks not only misrepresented their respective bid rates when making LIBOR submissions, they ***actually*** colluded in that closed and highly opaque market to manipulate bid rates. *Id.* This is a fact that no plaintiff could have pleaded earlier because Defendants alone possessed information about the real rates at which they sought and obtained interbank loans. *See, e.g.*, Complaint of Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks ¶ 61. It is a critical fact because it squarely addresses one of the core bases for this Court's dismissal of the prior antitrust claims in *LIBOR I*.

In *LIBOR I*, the Court wrote that plaintiffs might have suffered antitrust injury if defendants had restrained competition in the underlying market for interbank loans. *In re Libor-Based Fin. Instruments Antitrust Litig.*, 935 F.Supp.2d 666, 688 (S.D.N.Y. 2013). Based on the pleadings, the Court concluded that Defendants were alleged only to have lied about their bid rates but otherwise "competed normally" in the interbank loan market. DB's admission changes that view completely and thus provides an additional reason to deny the motions to dismiss the antitrust claims *sub judice*.[5]

      D.      DB Admitted to a *Per Se* Violation of the Sherman Act for Fixing the Prices of Interest-Rate Derivatives

DB admitted that it conspired with other banks to manipulate the price of financial instruments that incorporated interest-rate benchmarks in violation of Section 1 of the Sherman Act. DPA ¶ 1. Although DB limited its admissions to derivatives that incorporated Yen LIBOR

---

[5] While this issue relates expressly to the Court's prior decision, the allegations before the Court in *LIBOR I* and *II* are a subset of the Antitrust Plaintiffs' claims and are therefore properly before the Court.

and Euribor as the interest-rate benchmarks, competition in the markets for interest-rate derivatives should function the same regardless of the particular interest-rate benchmark incorporated into those derivatives. DB thus admitted that it engaged in concerted action with horizontal competitors in the markets for interest-rate derivatives that harmed competition in those markets to the detriment of counterparties. This further supports denial of the motions *sub judice*.

    Sincerely,

    */s/ Richard J. Leveridge*

    Richard J. Leveridge
    DICKSTEIN SHAPIRO LLP
    (202) 420-4778 direct dial
    (202) 379-9325 direct fax
    leveridger@dicksteinshapiro.com


Attachment
cc: All counsel of record by ECF