# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | ) MDL NO. 2262<br>) ECF Case<br>) NO. 1:11-MD-02262-NRB |
| THIS DOCUMENT RELATES TO: | |
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br>　　　　　　　Plaintiff,<br>　　　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | ) No. 13-cv-03952 |

## THE FEDERAL HOME LOAN MORTGAGE CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OR REARGUMENT OF *LIBOR IV*'S DISMISSAL OF ITS STATE LAW FRAUD CLAIMS

Plaintiff The Federal Home Loan Mortgage Corporation ("Freddie Mac") files this Memorandum in Support of its Motion for Reconsideration or Reargument of a portion of the Court's "*LIBOR IV*" Memorandum and Order.[1]  Freddie Mac requests that the Court reconsider its dismissal of Freddie Mac's state law fraud claims on statute of limitations grounds and the Court's finding that it lacked personal jurisdiction over Defendants that sold nearly three million individual loans with an aggregate principal balance of more than $500 billion, plus billions of dollars worth of mortgage-backed securities ("MBS") (collectively "Loan Products") to Freddie Mac.[2]

---

[1] *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 1:11-MD-02262-NRB (S.D.N.Y. Aug. 4, 2015), ECF No. 1164.

[2] Freddie Mac respectfully disagrees with other aspects of *LIBOR IV* and reserves the right to address those aspects at the appropriate time.  This motion focuses solely on allegations that Freddie Mac believes were overlooked in *LIBOR IV*.

## PRELIMINARY STATEMENT

Freddie Mac respectfully submits that in the Court's review and synthesis of dozens of complaints and thousands of allegations, the *LIBOR IV* opinion overlooked unique allegations in the Freddie Mac Complaint[3] that, had they been considered, would have resulted in denial of the Defendants' motion to dismiss Freddie Mac's state law fraud claim.

The relevant statute of limitations allegations fall into two categories: first, facts that Freddie Mac alleged but which were not addressed in *LIBOR IV*, and second, facts that Freddie Mac did not allege but which *LIBOR IV* imputes to Freddie Mac. As set forth more fully below, the first category includes the following:

(1) A New York Federal Reserve ("NY Fed") statement issued in May 2008 that "it is difficult to find convincing evidence of actual misreporting," FM ¶ 104;

(2) input from the International Monetary Fund ("IMF"), European Commission ("EC"), Chicago Mercantile Exchange ("CME") and others into a "Feedback Statement" published by the British Bankers' Association ("BBA") on August 5, 2008 regarding its investigation of alleged misconduct and how it planned to further improve LIBOR going forward, FM ¶ 114, Ex. 12;

(3) an October 2008 report issued by the IMF, following the Feedback Statement, that concluded "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. Dollar funding," FM ¶ 110, n.143;

(4) Freddie Mac's allegation that panel banks with better credit ratings had a reputational motive to prevent less creditworthy rivals from submitting artificially low LIBOR rates, FM ¶ 170;

(5) a drop in Barclays' stock price the day after it confessed its LIBOR manipulation, which implies that until then reasonable investors did not suspect that Barclays was propping up its reputation with artificially low LIBOR submissions, FM ¶ 156;

(6) a statement from the former head of the Commodities and Futures Trading Commission ("CFTC") that — even with its investigatory powers — his office was unable to develop actionable evidence for more than two years, FM ¶ 159;

---

[3] *Freddie Mac v. Bank of America*, No. 1:13-cv-03952-NRB, ECF No. 60 ("FM").

(7) a statement by the former head of the United Kingdom's Financial Services Authority in 2012 that there was "no information" of LIBOR during the relevant period manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision," FM ¶ 159;

(8) the lack of any public regulatory investigation despite the existence of the asserted "storm warnings" cited by the Court, FM ¶ 153; and

(9) statements by Defendants Lloyds and HBOS in settlement documents that their internal investigations could not unearth evidence of fraud until mid-2010.  FM ¶ 146.

With respect to the second category (facts imputed to Freddie Mac), Freddie Mac did not allege facts comparing any individual bank's USD LIBOR submissions to credit spreads nor did it allege comparisons of published USD LIBOR to other indices.  Nor did Freddie Mac allege an "uncanny jump" in USD LIBOR in 2008.  Accordingly, those facts cannot be considered on a motion to dismiss.  *See, e.g.*, *LIBOR IV* at 322 (finding that inquiry notice from 2008 articles could not be imputed to plaintiffs that did not plead knowledge of those articles); *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168 (3d Cir.1978) ("it is well-settled that, "[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)").

Freddie Mac respectfully submits that when these overlooked facts, viewed as a whole and accepted as true, are applied to the Virginia "weak inquiry notice" fraud accrual statute, it cannot be found as a matter of law at this early stage of the litigation that the statute of limitations expired more than two years before Freddie Mac filed suit.

As to personal jurisdiction, the opinion overlooked the following facts set forth in Freddie Mac's Complaint and the affidavit it submitted in opposition to the motions to dismiss showing:

(1) Freddie Mac's unique status as an entity Congressionally chartered to, in part, purchase Loan Products, FM ¶ 8;

3

(2) Defendants' knowledge of Freddie Mac's importance as one of the largest purchaser of Loan Products in the United States, FM ¶ 9; Declaration of Lisa MacVittie ¶ 11, ECF No. 889 ("MacVittie Decl.");

(3) Defendants engaged in a regular course of dealing with Freddie Mac in connection with these massive sales of Loan Products to Freddie Mac. Four Defendants sold more than three million individual mortgages with an aggregate $500 billion in unpaid principal balances to Freddie Mac over a seven-year period, and Defendants sold billions of dollars worth of MBS to Freddie Mac, FM ¶¶ 9,10, 223; MacVittie Decl. ¶ 11.

Freddie Mac seeks damages for the losses it suffered on these Loan Products on the fraud claims that *LIBOR IV* sustained on the merits, which means they qualify as suit-related contacts. FM ¶¶ 10, 179 298-301. Had these allegations and facts been considered, they would have firmly demonstrated that Freddie Mac's purchases of Loan Products were not "one-off events" as to which the Freddie Mac's location was fortuitous, but rather were the result of a purposeful, ongoing course of dealing with Freddie Mac in its home jurisdiction over time. *See LIBOR IV* at 77.

## BACKGROUND FACTS

In *LIBOR IV*, the Court stated "the facts underlying this case have been thoroughly discussed in *LIBOR I*." *LIBOR IV* at 14. Freddie Mac's Complaint, however, does not allege all of the same facts that were before the Court in *LIBOR I*. Freddie Mac does not, for example, base its fraud claims on news articles or statistical analyses of credit spreads and probabilities of default, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR I*), 935 F. Supp. 2d 666, 679 (S.D.N.Y. 2013). Nor does Freddie Mac allege that LIBOR's deviation from the Federal Reserve Eurodollar Deposit Rate could **only** be explained as the product of collusion. *Id.* at 679-80. It alleges instead that those deviations are consistent with Defendants' admissions of intentional persistent suppression and help quantify the scope of the losses that Freddie Mac suffered. *See* FM ¶¶ 92, 128, 130.

Freddie Mac's Complaint is founded on facts admitted by Defendants in settlements with government regulators and the Defendants' internal business records that were publicly disclosed in connection with those settlements.  *Id.* ¶ 153.  Until Barclays admitted that it and other panel banks had intentionally misrepresented their LIBOR submissions, the publicly available facts were insufficient to support a viable fraud claim under Virginia law.[4]  FM ¶ 157.

With regard to personal jurisdiction, Freddie Mac relied not only on its Complaint but also an affidavit that explained that Defendants Bank of America, N.A., Barclays Bank, plc, Citibank, N.A., and JPMorgan Chase Bank, N.A. regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages to sell nearly three million loans from 2007–2014 with unpaid principal balances exceeding $500 billion.  MacVittie Decl. ¶11.  Freddie Mac also purchased billions of dollars worth of MBS from the Bank Defendants that incorporated LIBOR as an interest-rate benchmark.  FM ¶ 134.  Freddie Mac's claimed damages include losses suffered in these transactions with Defendants.  *Id.* ¶¶ 186, 298, 301.

## I.   GOVERNING LEGAL PRINCIPLES

### A.   Motions for Reconsideration, *Gelboim*, and Local Civil Rule 6.3

A motion for reconsideration or reargument is the proper vehicle for bringing to the Court's attention matters it may have overlooked in its initial ruling or order.  *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 169 (E.D.N.Y. 2014).[5]  To establish grounds for reconsideration or reargument, a plaintiff must show that the court overlooked a material matter of fact in

---

[4] Indeed, this Court appeared to recognize as much in *LIBOR I* when it denied motions to dismiss CEA claims on their merits.  The Court sustained the CEA claims because the allegations, "together with the facts reported in the Barclays settlement documents," were sufficient to state a claim.  *LIBOR I*, 935 F. Supp. 2d at 716.

[5] "The standards for deciding motions for reargument and motions for reconsideration are the same."  *Horsehead Res. Dev. Co. v. B.U.S. Envtl. Servs., Inc.*, 928 F. Supp. 287, 289 (S.D.N.Y. 1996).

rendering its decision.  *Eisemann v. Greene*, 204 F.3d 393, 395 n.2 (2d Cir. 2000).  Local Civil

Rule 6.3 requires a party seeking reconsideration to set forth concisely the matters a party

believes the Court overlooked.

Each complaint in this MDL retains its separate identity and should be evaluated on its

own merits.  *Gelboim v. Bank of America Corp.*, 574 U.S. ___, 135 S. Ct. 897, 190 L. Ed. 2d 789

(2015).  Taking *Gelboim* and Local Civil Rule 6.3 together, that means that, as applied to this

motion, reconsideration would be appropriate if *LIBOR IV* overlooked facts presented in Freddie

Mac's Complaint which, had they been considered, might reasonably have altered the result of

the initial decision.  *Schrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

Freddie Mac identifies below (1) the discrete allegations that were not addressed in

*LIBOR IV* and (2) allegations apparently drawn from *LIBOR I* (or other complaints) that were,

but should not have been, imputed to Freddie Mac.  Freddie Mac respectfully submits that had

these allegations not been overlooked and allegations from other complaints not imputed to

Freddie Mac, the result in *LIBOR IV* would have been different.

### B.    Evaluation of Freddie Mac's Allegations Under a Rule 12(b)(6) Standard

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6), a court may consider only the pleadings, exhibits to the pleadings,

documents referred to within the pleadings, and documents subject to judicial notice.  *LIBOR IV*

at 100.  A court must accept as true all factual allegations in the complaint and draw all

reasonable inferences in plaintiff's favor.  *LIBOR IV* at 98.  The choice between two plausible

inferences that may be drawn from factual allegations is not a choice to be made on a Rule

12(b)(6) motion.  *Anderson News v. Am. Media, Inc.*, 680 F.3d 162,185 (2d Cir. 2012).

C.      **Elements and Accrual of Fraud Claims Under Virginia Law**

The elements of common law fraud in Virginia are (1) a false representation of a material fact, (2) made intentionally, (3) reliance on that false representation to the plaintiff's detriment, and (4) resulting damage. *Caperton v. A.T. Massey Coal Co.*, 285 Va. 537, 553 (2013). The standard of proof is clear and convincing evidence. *Id.*

Virginia has enacted a discovery statute specifically for fraud claims. Va. Code § 8.01–249(1); Direct Action Pls.' Joint Mem. of Law in Opp'n to Defs.' Mots. to Dismiss Based on Statutes of Limitations at 3, ECF No. 875 ("SOL Opp."). Under that statute, the claim does not accrue until "the fraud is discovered or by the exercise of due diligence reasonably should have been discovered." § 8.01–249(1). Applying Virginia law, courts have interpreted this language to mean the claim does not accrue until the plaintiff had the ability to plead every element of the claim. *See, e.g.*, *F.D.I.C. v. Cocke*, 7 F.3d 396 (4th Cir. 1993); *cf. City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) (observing that consistent with the general purpose of the statute of limitations, it is only logical that "[o]nly after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run").

Due diligence requires a plaintiff to act with "such a measure of prudence, activity, or assiduity, as is properly expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances." *STB Mktg. Corp. v. Zolfaghari*, 240 Va. 140, 144 (1990). "Plaintiffs will not be held wanting in diligence where defendants' 'conduct concealed the true nature of their fraudulent acts.'" *Id.* When a plaintiff discovered, or should have discovered, its fraud claim typically presents a question of fact not to be resolved on a motion to dismiss. *Carlucci v. Han*, 886 F. Supp. 2d 497, 516-17 (E.D. Va. 2012).

II.   **CREDITING FREDDIE MAC'S OVERLOOKED ALLEGATIONS, AND
      DISREGARDING FACTS IT DID NOT ALLEGE, A QUESTION OF FACT
      EXISTS AS TO WHEN FREDDIE MAC REASONABLY SHOULD HAVE
      DISCOVERED THE FRAUD IN THE EXERCISE OF DUE DILIGENCE**

    A.   **Freddie Mac Alleged That USD LIBOR's "Dislocations" Could Have Been
            Viewed at the Time as the Result of Extraordinary Market Events or Flaws
            in the LIBOR Product**

As it had in prior decisions, the Court in *LIBOR IV* relied on a "record" of public articles

and reports regarding LIBOR that were published between April and May 2008 in support of its

conclusion that plaintiffs were on "inquiry notice" of their fraud claims.  *LIBOR IV* at 276. [6]  The

court took judicial notice of these articles, for their existence but not their truth.  *LIBOR IV* at

100.

These articles must be viewed in the context of Freddie Mac's Complaint.  Freddie Mac

alleged that in the 2008–2009 time-period, Defendants, the BBA, and independent third parties

all offered facially plausible reasons other than intentional misrepresentations to explain the

movements of USD LIBOR during the financial crisis.  As specifically alleged by Freddie Mac,

these articles included statements that would suggest to a reasonable and prudent person that

factors other than intentional misrepresentations of material fact were driving USD LIBOR

submissions.  FM ¶¶ 108, 110, 137.

In addition, Freddie Mac cited a Reuter's article quoting the Director General for

economic policy and financial markets at the Austrian Finance Ministry as saying "There's more

wind being made about [the LIBOR] issue than is being merited by the facts."  *Id.*  ¶ 119, n.143.

Freddie Mac also quoted the NY Fed's statement in May 2008 that "it is difficult to find

convincing evidence of actual misreporting."  *Id.* ¶ 104.  Freddie Mac also cited the conclusion

---

[6] To be precise, the Court found that plaintiff's alleged knowledge of the BBA's
denials of LIBOR manipulation published through August 2008 would have lead a reasonable
investor to ask what the BBA was responding to, and ultimately, to discover the underlying news
articles reporting potential concerns about LIBOR.  *Id.* at 319.

of an October 2008 report published by the IMF that "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. Dollar funding." *Id.* ¶ 110, n.143.   These facts are not addressed in *LIBOR IV*.

Moreover, as Freddie Mac's Amended Complaint likewise stressed, in 2013, the former head of the United Kingdom's Financial Services Authority, Adair Turner, told Parliament that there was "no information" of LIBOR manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision." *Id.* ¶ 154.  At this stage of the case, Mr. Adair's statement must be accepted as true and credible.  *Anderson News*, 680 F.3d at 185.

These overlooked allegations further support the inference that a reasonable and prudent person could reasonably have believed that any perceived problems with USD LIBOR related to extraordinary market events, the lack of liquidity in the interbank loan market, or some other aspect of the LIBOR process, and not intentional misrepresentations by the panel banks.

> **B.    Freddie Mac Alleged Additional Facts Showing That Reasonable and Prudent People Could Reasonably Have Relied on the BBA To Detect and Deter Fraud**

In *LIBOR IV*, the Court adhered to its prior finding that a plaintiff could not reasonably have relied on assurances from the BBA because it had a strong incentive to maintain market confidence in LIBOR's integrity and no plausible inference to the contrary could have been drawn by an ordinary investor.  *LIBOR IV* at 276-77.  Freddie Mac's Complaint, however, alleges facts not contained in the prior complaints sufficient to infer that a reasonable and prudent person would have placed great weight at the time on the BBA's independence and integrity as LIBOR's administrator.

As Freddie Mac alleged, in the absence of collusion, benchmark providers have a significant interest in maintaining the integrity of their benchmarks and would vigilantly enforce

its rules to maintain customer confidence.  FM ¶ 51.  One of the hallmarks of a marketable benchmark is that it is "published by a provider with high professional standards and proven experience" with adequate controls in place to deter manipulation and ensure that rates are properly calculated in accordance with the published rules.  *Id*.  These additional allegations, which were not addressed in *LIBOR IV*, support the inference that a reasonable and prudent person could believe the BBA's legitimate incentive was not to conceal fraud through its own intentional misrepresentations but to instead ensure LIBOR is a reliable USD interest-rate benchmark.

Freddie Mac attached to its Complaint the BBA's "Feedback Statement" published in August 2008.  *Id*. ¶ 114, n.150, Ex. 12.[7]  That Statement was the result of a cooperative effort with a number of highly respected government bodies and market participants, including the EC, European Central Bank, IMF, and CME.  *Id*.  The Statement purported to confirm that the panel banks were confident that their LIBOR submissions complied with the LIBOR rules and indicated the BBA would nonetheless improve its internal governance mechanisms with the help of the law firm Clifford Chance.  The Feedback Statement asserts that respondents (including the market participants listed above) viewed the media reports on which the Court premised its opinion as "inaccurate and misconceived."  *Id*. ¶ 114, n.150, Ex. 12 ¶¶ 3.19, 1.16, 2.4.

Given the support the Feedback Statement received from these highly credible government bodies and market participants, a reasonable investor could have viewed the Feedback Statement as strong evidence that the BBA was working diligently and honestly, consistent with its legitimate incentives, to ensure that LIBOR submissions complied with the

---

[7] Because Freddie Mac attached the Feedback Statement as an exhibit to its Complaint, the Court may consider it on a motion to dismiss.

published rules and that it had been unable to discover any evidence of fraud through its superior access to the panel banks.

###### C.    Freddie Mac Alleged that Regulators Were Aware of Concerns About USD LIBOR but Took No Public Action

As reflected in the articles of which the Court took notice, it was public knowledge that regulators in the United States, United Kingdom, and elsewhere were aware of questions about LIBOR's reliability.  It was equally public knowledge that **no** regulator took any disciplinary action in 2008, 2009, or 2010.  FM ¶ 153.  *LIBOR IV* makes no mention of this conspicuous inaction.  A reasonable and prudent person could reasonably infer from this allegation that whatever questions there were about LIBOR's reliability, they did not involve intentional or material misrepresentations.

###### D.    Freddie Mac Provided Objective Evidence That Reasonable Investors Did Not Suspect That Defendants Were Artificially Suppressing USD LIBOR To Bolster Their Reputations

The day after Barclays confessed its involvement in LIBOR manipulation, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization.  FM ¶ 156.  One plausible inference to be drawn from the sudden drop is that market participants were unaware that Barclays had been submitting fraudulent LIBOR submissions to prop up its perceived creditworthiness.  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) (holding that similar allegations created fact questions whether reasonable investors suspected systematic LIBOR manipulation in 2007–2009).

This objective evidence is consistent with the statement of the former Chairman of the United States Federal Reserve, Alan Greenspan.  In 2013, Mr. Greenspan said, "in all of his experience he never contemplated that there were bankers who would purposely misrepresent

facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."  FM ¶ 7.

These additional allegations, not addressed in *LIBOR IV*, are independently sufficient to support an inference that reasonable investors would not — indeed, did not — reasonably suspect that LIBOR rates were the product of intentional and material misrepresentations until Barclays' confession.

### E.   Freddie Mac Did Not Allege the "Reputational Motive" on Which the Court's Decision Relied

The *LIBOR IV* opinion found that each panel bank had the same reputational motive to suppress its individual USD LIBOR submissions.  *LIBOR IV* at 321.  Freddie Mac, however, did not allege that reputational motive.  To the contrary, Freddie Mac alleged that panel banks with relatively good credit ratings had a reputational motive to ***prevent*** artificial suppression by their less creditworthy rivals.  *Id.* ¶ 170.  *LIBOR IV* does not address this allegation.  Taking Freddie Mac's well-pled allegation as true, a reasonable and prudent person at the time could have reasonably relied on the legitimate incentives those panel banks with better credit ratings had to deter and expose fraudulent submissions.[8]

### F.   Freddie Mac Had No Access to Direct Evidence of Fraud Until Barclays Disclosed the Fact and Scope of the Fraud

It is undisputed that Freddie Mac lacked direct evidence of fraud, and had no access to information that would have definitively exposed Defendants' lies.  FM ¶ 157.  Defendants were the ***only*** ones that knew what interest rates were really being charged in the opaque interbank loan market.  *Id.* ¶ 68.

---

[8] Defendants hypothesized that the stock price move could be attributed to fears of further fines or civil sanctions.  While that may be one inference that can be drawn from this allegation, it is certainly not the only one.

Without such information, Freddie Mac would not have been able to plead a fraud claim that would survive a motion to dismiss.  In Virginia, inferences of fraud are rarely allowed to stand against established facts like a defendant's affirmative denial.  *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014).  Thus, in order to state a claim for common law fraud, Freddie Mac would have needed especially compelling circumstantial evidence to succeed on the merits, which it did not have and could not have had prior to Barclays' admissions in 2012.

### G.   LIBOR IV's Conclusion That Plaintiffs Could Have Stated an Actionable Fraud Claim in Virginia in 2008 and 2009 Is Based On Alleged Facts That Freddie Mac's Complaint Does Not Plead

*LIBOR IV* relies on a belief that any prospective plaintiff could have discovered that it was injured by LIBOR suppression by comparing a banks' reported credit spreads to public data regarding the banks' credit, or comparing LIBOR rates to other indices.  *LIBOR IV* at 320-21.  Freddie Mac's Complaint makes no mention of credit spreads or comparisons to other indices.

The news articles cannot fill that gap because they are relevant only to show notice, not the truth of what they said.  *Global Network Commc'ns, Inc. v. City of New York* 458 F.3d 150, 157 (2d Cir. 2006).  Those articles are therefore outside of the pleadings and cannot be considered in determining what facts a reasonable investigation would have uncovered.  *See Johnson v. Levy*, No. 10-CV-3217 ADS ETB, 2012 WL 3580236, at *7 (E.D.N.Y. Aug. 17, 2012) (stating that the Second Circuit explicitly rejected attempts to use extraneous documents on a 12(b)(6) motion to dismiss "for the purpose of contradicting facts asserted in the complaint"); *cf. Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 203 (2d Cir. 2013) (concluding on a 12(b)(6) motion to dismiss, that district court improperly considered collective bargaining agreements that were extraneous to plaintiff's complaint).

13

*LIBOR IV* also found that a plaintiff could allege fraud based on the asserted fact that LIBOR submissions for many banks experienced an "uncanny jump immediately after the BBA threatened to monitor submissions more closely." *LIBOR IV* at 321. Freddie Mac made no allegations about this asserted jump. *See* FM ¶¶ 101-03. Therefore the Court may not consider that unalleged fact in deciding whether Freddie Mac's Complaint stated an actionable claim. *See, e.g.*, *LIBOR IV* at 420 (finding that it could not conclude from face of complaint that certain plaintiffs were aware of the 2008 articles in the press).

Because none of these "facts" are pled in Freddie Mac's Complaint, no inferences against Freddie Mac can be drawn from them. And because they provide the sole factual basis for *LIBOR IV*'s finding that a reasonable investor could have discovered facts sufficient to sustain a viable fraud claim, that aspect of the Court's decision cannot be applied to Freddie Mac.

### H.   Freddie Mac Sufficiently Alleged That a Reasonable Investigation Would Not Have Provided Actionable Evidence of Fraud Before the Barclays Admissions

Freddie Mac specifically alleged that it could not have discovered facts sufficient to support a viable fraud claim until Barclays publicly admitted its involvement in the unlawful conduct. As shown above, Freddie Mac backed up this allegation with factual support. It further quoted former CFTC Chairman Gary Gensler as saying he implored his team for 2-1/2 years to find a way to bring a case for LIBOR manipulation and that it took him that long to develop actionable evidence. FM ¶ 198.

Freddie Mac also cited representations made by Defendants Lloyds and HBOS in settlement documents approved by government regulators that they conducted internal investigations to ferret out persistent suppression but could find no such evidence until mid-2010. *Id.* ¶ 146, Ex. 16 at 5. Although the Court has viewed contemporaneous explanations from Defendants with skepticism because the panel banks had an incentive to cover up their

ongoing fraud, that rationale does not apply to statements made after Defendants had already admitted the violations in filings submitted by regulators.

These Freddie Mac allegations support the inference that a reasonable and prudent person, which would of course lack the investigatory tools, power, and budget of the CFTC, or Defendants' superior access to documents and witnesses, could not have discovered facts sufficient to bring a viable fraud claim until 2012, when Barclays disclosed the misconduct. *See id.* ¶ 157. Defendants themselves made sure that no reasonable measure of investigation would have uncovered the fraud earlier: they admittedly went to great lengths to obstruct investigations into their misconduct, for example by instructing employees to lie to attorneys for the company. *Id.* ¶ 158.

Freddie Mac respectfully submits that *LIBOR IV* overlooked these allegations. Considering those allegations, and drawing every inference from them in Freddie Mac's favor, it cannot be said as a matter of law at this stage of the case that Freddie Mac reasonably should have discovered the intentional misrepresentations and the other elements of a fraud claim necessary to bring an actionable claim in Virginia more than two years before it filed suit. This inference is consistent with the fact that Freddie Mac does not take lightly, nor should it be encouraged, to bring lawsuits against business partners based on speculation or asserted "storm warnings." *See, e.g.*, Fed. R. Civ. P. 11(b)(3) (factual contentions must have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery).

## III.   FREDDIE MAC ALLEGED THAT DEFENDANTS ACTIVELY SOLICITED LOAN PRODUCT SALES AND PURPOSELY DIRECTED THEIR SALES ACTIVITIES AT VIRGINIA

The Court found in *LIBOR IV* that it could assert personal jurisdiction over fraud claims based on plaintiffs' course of dealing in interest-rate derivatives with counterparty defendants.

*LIBOR IV* at 777.  The Court, however, declined to assert personal jurisdiction over any plaintiff's fraud claims for losses sustained in the purchase of Loan Products because those Loan Product transactions were "one-off events as to which the plaintiffs' location is fortuitous."  *Id*.  This aspect of the Court's ruling overlooks allegations in Freddie Mac's Complaint and the affidavit it submitted in support of personal jurisdiction with respect to Freddie Mac's purchase of Loan Products.

Freddie Mac is a relatively unique entity.[9]  Congress created it, in part, to purchase Loan Products.  FM ¶ 8.  True to that Congressional mandate, Freddie Mac was among the world's largest purchasers of Loan Products.  *Id.* ¶ 9.  Every Defendant knew of Freddie Mac's importance as a consumer of Loan Products.  *Id*. ¶¶ 9-10, 15.  Defendants thus engaged in a regular course of dealing to sell Loan Products to Freddie Mac.  *Id.* ¶¶ 9-10, 134; MacVittie Decl. ¶ 11.  Defendants knowingly and intentionally reached into Virginia over and over again to solicit Freddie Mac's business.  Defendants Bank of America, N.A., Barclays Bank, plc, Citibank, N.A., and JPMorgan Chase Bank, N.A. sold three million individual loans with a total principal unpaid balance of more than $500 billion to Freddie Mac in Virginia.  MacVittie Decl. ¶ 11.  The bank defendants also sold billions of dollars worth of MBS to Freddie Mac in Virginia.  FM ¶ 134.

These contacts demonstrate a course of dealing more constant and pervasive than those that resulted in the thousands of swap agreements that Defendants executed with Freddie Mac.  FM ¶ 223; MacVittie Decl. ¶ 12.  These are all suit-related contacts because Freddie Mac's

---

[9] The Federal National Mortgage Association (Fannie Mae) similarly is a government-sponsored enterprise, and it is charged by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.

claimed fraud damages include losses suffered in these transactions with Defendants.  FM ¶¶ 186, 298, 301.

*LIBOR IV* does not mention these Freddie Mac-specific facts and allegations.  When taken into account and construed in Freddie Mac's favor, the Court should exercise personal jurisdiction over those Defendants that engaged in course of dealing to sell Loan Products to Freddie Mac.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Reconsideration or Reargument should be granted, and upon reconsideration, the Court should deny Defendants' motion to dismiss Freddie Mac's fraud claims on statute of limitation grounds, and should assert personal jurisdiction over Defendants that sold Loan Products to Freddie Mac in Virginia.


Dated: August 18, 2015                               Respectfully submitted,

                                                     DICKSTEIN SHAPIRO LLP

                                                     By: /s/ *Richard J. Leveridge*
                                                     Richard J. Leveridge

                                                     Richard J. Leveridge
                                                     James R. Martin
                                                     Jennifer D. Hackett
                                                     Woody N. Peterson
                                                     DICKSTEIN SHAPIRO LLP
                                                     1825 Eye Street NW
                                                     Washington, DC 20006-5403
                                                     Tel.: (202) 420-2200
                                                     Fax: (202) 420-2201
                                                     E-mail: leveridger@dicksteinshapiro.com
                                                     martinj@dicksteinshapiro.com
                                                     hackettj@dicksteinshapiro.com
                                                     petersonw@dicksteinshapiro.com

                                                     *Attorneys for Plaintiff The Federal Home*
                                                     *Loan Mortgage Corporation*