

DALLAS I AUSTIN I LOS ANGELES I BATON ROUGE

Home Office:
Encino Plaza                          3102 Oak Lawn Avenue
15910 Ventura Boulevard                          Suite 1100
Suite 1600                       Dallas TX 75219-4281
Encino, CA 91436                               800.222.2766
800.887.6989                           tel 214.521.3605
tel 818.839.2333                         fax 214.520.1181
fax 818.986.9698

August 25, 2015

**<u>Via ECF and Hand Delivery</u>**

Honorable Naomi Reice Buchwald
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     *In re LIBOR-Based Financial Instruments Litigation*
        MDL No. 2262, Master File No. 1:11-md-2262-NRB

Dear Judge Buchwald:

    This Firm is Interim Lead Counsel for Plaintiffs Carl A. Payne, *et al.* and the Homeowner LIBOR Suppression Class (collectively "Plaintiffs"). We write on behalf of Plaintiffs, at the request of this Court, to: (1) advise the Court on whether Plaintiff Philip Maresca received a commitment letter concerning his LIBOR-based ARM loan before August 17, 2007, the date of Mr. Maresca's ARM Note; and (2) provide any additional case law supporting Plaintiffs' position that the National Bank Act ("NBA") does not preempt their UCL claims.

    *First*, Plaintiff Philip Maresca has conducted a diligent search of his files and located an "Approval Notice" issued by HSBC dated August 7, 2007. The Notice includes the same interest rate and margin reflected on Mr. Maresca's ARM Note, which was dated August 17, 2007. We respectfully submit that the import of the "Approval Notice" is unclear in the historical context of this case.

    In *LIBOR I*, the Court noted that, according to the exchange-based and over-the-counter plaintiffs, the Class Period was defined as "August 2007 to May 2010." (Dkt. 6 at p. 9). Similarly, in *LIBOR II*, this Court noted that "…we will assume for purposes of the present discussion that the Class Period begins in August 2007." (Dkt. 389, p. 21, n. 12). However, the Court observed that the exchange-based plaintiffs' allegations indicate that, prior to August 7, 2007, LIBOR submissions were artificial as a result of day-to-day trader-based manipulation (*i.e.* not "persistent suppression"), but such manipulation was not "so constant that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period." (*Id.* at 33). Accordingly, in *LIBOR III*, the Court permitted plaintiffs to "amend their complaint to include claims of trader-based manipulation based only on conduct that allegedly occurred between January 2005 and August 2007." (Dkt. 568, p. 22). Finally, in *LIBOR IV*, the Court again analyzed the dates of LIBOR manipulation for purposes of evaluating the statute of limitations applicable to the exchange-based plaintiffs' injuries. In that regard, the Court noted that, from the perspective of an investor in mid-2008, LIBOR manipulation occurred during the "credit crunch," which started on August 9, 2007. (Dk. 1164, p. 278, n. 143).



Heeding the Court's directive against revisiting issues in prior orders, we note that if the Court's prior orders reflect its determination that LIBOR manipulation began on August 9, 2007, then Mr. Maresca's August 7, 2007 Approval Notice indicates that his interest rate was set prior to the LIBOR manipulation period.

*Second*, turning to the issue of preemption, Plaintiffs' opposition to Defendants' motion to dismiss cited legal authority supporting their contention that Plaintiffs' claims under California's Unfair Competition Law (the "UCL") are not preempted by the National Bank Act (the "NBA"). The District Court's analysis of a similar argument in *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1083 (N.D. Cal. 2013) is also instructive.   There, the court noted that the NBA "…vests national banks []with [such] authority to exercise all such incidental powers as shall be necessary to carry on the business of banking." *Id.* (citations and internal quotations omitted). "Real estate lending is expressly designated as part of the business of banking." *Id.* (citing 12 U.S.C. § 371(a).)  To that end, the Office of the Comptroller of the Currency ("OCC") "has the primary responsibility for the surveillance of the 'business of banking' authorized by the [NBA]." *Id.* (citations omitted).  And, "[t]o carry out this responsibility, the OCC has the power to promulgate regulations and to use its rulemaking authority to define the 'incidental powers' of national banks beyond those specifically enumerated in the statute." *Id.* (citations omitted).  "The regulations possess the same preemptive effect of the NBA itself." *Id.*

However, when analyzing whether the NBA preempts state law, "…[courts must] ask whether the state law prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." *Id.* (citations and internal quotations omitted).  In performing this analysis, courts have routinely found that "[s]tate laws of *general application* continue to apply to national banks when doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.* (citations and internal quotations omitted) (emphasis added).[1]

Here, Defendants argue that Plaintiffs' UCL claims are preempted because national banks are permitted to make real estate loans without regard to state law limitations concerning "[d]isclosure and advertising." (Dkt. 975 at 15 (citing 12 C.F.R. § 34.4(a).).  But, in the context of this case, although a bank's "exercise of its powers" permits it to make real estate loans, it *does not* permit it to manipulate the LIBOR reference rate utilized in such loans or engage in any other fraudulent conduct.  Such conduct is governed by state laws of general application, such as the UCL.[2]

Similarly, in *Young et al. v. Wells Fargo & Company et al.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009), the court held that "when Congress enacted the NBA, it created a 'mixed state/federal regime[] in which the Federal Government exercises general oversight while

---

[1] For example, in *Martinez*, the Ninth Circuit noted that "[s]tate laws of general application, which merely require all businesses (**including national banks**) to refrain from fraudulent, unfair, or illegal behavior, do not necessarily impair a bank's ability to exercise its real estate lending powers … [because] [s]uch laws are not designed to regulate real estate lending, nor do they have a disproportionate or other substantial effect on lending." *Martinez v. Wells Fargo Home Mortg.*, 598 F.3d 549, 555 (9th Cir.2010) (emphasis added). The *Martinez* Court also noted that the OCC "…specifically cited the UCL in an advisory letter cautioning banks that they may be subject to such laws that prohibit unfair or deceptive acts or practices." *Id.* (citation omitted).

[2] *See Martinez*, 598 F.3d at 555-56 (explaining that various "courts have held that the [National Bank] Act does *not* preempt a claim of express deception asserted under state law") (emphasis in original).



leaving state substantive law in place." *Id.* at 1019.  The court found that the OCC regulations regarding preemption expressly provide that "[s]tate laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers: (1) Contracts; (2) Torts; . . ." *Id.* at 1020.  Specifically, the OCC regulations expressly permit the enforcement of state laws relating to contracts, torts, and any other law that only incidentally affects or is otherwise consistent with a bank's non-real estate lending powers. 12 C.F.R. § 7.4008(e).  The court further explained that, as the OCC regulations indicate, "the presumption is that a claim brought under state tort law, and by extension, under general state consumer protection statutes, will not be preempted unless the Court has reason to conclude the claim will have more than an incidental effect on the exercise of the national bank's real estate lending powers." *Id.*  To that end, the court held that "[n]umerous courts considering similar suits have concluded that claims brought under state "laws of general application, which merely require all businesses (including banks) to refrain from fraud [and] misrepresentations do not impair a bank's ability to exercise its lending powers and only incidentally affect the exercise of a national bank's powers." *Id.* at 1022 *citing Chase Home Finance*, 2008 U.S. Dist. LEXIS 101031) (N.D. Cal. Apr. 29, 2008) (rejecting Chase's argument that NBA and OCC regulations preempt consumer protection laws in connection with Chase's improper application of loan prepayments).

In sum, Plaintiffs' UCL claims do not have more than an "incidental affect," if any, on the Defendants' lending activities and, thus, are not preempted.  In this context, "incidental" does not mean *de minimus*.  Instead, a claim has an "incidental affect" on a national bank if the law underlying the claim is not directed exclusively against the bank -- that is, if it is a law of general applicability which governs all persons or entities, some of whom happen to include national banks.  As noted by the California Court of Appeal in *Gibson v. World Sav. & Loan Ass'n*, 103 Cal. App. 4th 1291, 1303-04 (2002):

> The duties to comply with contracts and the laws governing them and to refrain from misrepresentation, together with the more general provisions of the UCL, are principles of general application. They are not designed to regulate lending and do not have a disproportionate or otherwise substantial effect on lending. To the contrary, they are part of the legal infrastructure that undergird all contractual and commercial transactions. Therefore, their effect is incidental and they are not preempted.

*see also Hood v. Santa Barbara Bank & Trust*, 143 Cal. App. 4th 526, 538-40 (2006) (rejecting banks' argument that UCL claim was preempted by NBA or OCC regulations).

Because Plaintiffs' claims apply to all businesses, and not merely to banks, and because such claims pertain to acts of fraud and deception, the claims are "incidental" to the Defendants' lending functions, and are plainly not preempted.



Respectfully submitted,

/s/Daniel Alberstone

Daniel Alberstone