# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600
Fax. 212.751.2540
WWW.KMLLP.COM
Of counsel
   Roger W. Kirby
   Alice McInerney

January 5, 2016

**VIA ECF & HAND DELIVERY**
Honorable Naomi Reice Buchwald
United States District Judge
500 Pearl Street
New York, NY 10007-1312

      Re:   *In re LIBOR-Based Financial Instruments Antitrust Litig.*,
            No. 11 Civ. 2613 (NRB), Master File No. 1:11-md-2262-NRB

Dear Judge Buchwald:

      We write on behalf of the Exchange-Based Plaintiffs ("Plaintiffs") in the above-referenced matter. On June 29, 2015, Plaintiffs submitted a pre-conference letter seeking leave to file a proposed Third Amended Complaint ("TAC").[1] Certain existing Defendants[2] and proposed new Defendants[3] filed letters that challenge allegations in the TAC. Plaintiffs briefly respond to the arguments raised by Defendants' letters, but respectfully submit that these arguments are better addressed in evidentiary hearings or on summary judgment.

      **1.**    **Plaintiffs' allegations comport with the Court's personal jurisdiction rulings in *LIBOR IV* and *LIBOR V*.**[4] Defendants generally argue that the proposed amendments would be futile because the banks are not subject to general or specific jurisdiction under the standards set forth by this Court in *LIBOR IV* and *V*. Separately, the Parties are engaged in ongoing discussions to create a spreadsheet relating to the impact, if any, of the Court's jurisdiction rulings on certain Defendants. *See LIBOR V*, 2015 WL 6696407, at *8, Slip Op. at 24. Because this Court has already ruled that reasonableness under the Fifth Amendment cannot be disputed, the remaining issues focus on whether under the statutory jurisdiction provided by the Commodity Exchange Act ("CEA"), 7 U.S.C § 25(c), Plaintiffs have provided a sufficient showing of jurisdiction based on Defendants' alleged CEA violations or consent. Before discovery, a plaintiff need only allege facts that support (not prove) a *prima facie* basis for jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).

---

[1] *See* ECF Nos. 1159, 1159-1, 2. "¶" or "¶¶" are references to the TAC.

[2] *See* ECF No. 1256 (HSBC Holdings plc and HSBC Bank plc ("HSBC Defendants")); ECF No. 1258 (Société Générale ("SG")); ECF No. 1259 (Citibank, N.A. Citigroup Inc. ("Citi"), Deutsche Bank AG ("Deutsche Bank"), Lloyds Bank pic, Lloyds Banking Group pic and HBOS PLC (together, "Lloyds"), Royal Bank of Canada and RBC Capital Markets LLC (together, "RBC"), The Royal Bank of Scotland Group pic ("RBS Group") and The Royal Bank of Scotland pic ("RBS plc") (together, "RBS"), Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank")); ECF No. 1265 (The Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") and The Norinchukin Bank ("Norinchukin")).

[3] *See* ECF No. 1249 (Merrill Lynch International ("Merrill Lynch")); ECF No. 1254 (ICAP plc and ICAP Europe Ltd. ("ICAP")); ECF No. 1255 (Tullett Prebon plc ("Tullett")).

[4] *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015); *LIBOR V*, No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015).

**Kirby McInerney LLP**
Honorable Naomi Reice Buchwald
Page 2

To assess personal jurisdiction for Plaintiffs' CEA claims, it is not merely the presence of continuous and systematic contacts in any given state that supports personal jurisdiction, but rather the reasonableness under the Fifth Amendment of vindicating the substantial federal interest at stake in claims that arise out of the banks' manipulation of the price of *domestically* traded futures contracts. *Cf. Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2000) ("In cases brought under" nationwide service provisions, "the personal jurisdiction analysis must give appropriate consideration to the strong federal concerns involved."). As a result, Defendants misplace their reliance upon the "at home" test for general jurisdiction, and the "minimum contacts" test for specific jurisdiction applicable under the Fourteenth Amendment. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) ("the 'minimal contacts' principle does not, in our view, seem particularly relevant in evaluating the constitutionality of in personam jurisdiction based on nationwide . . . service of process"); *Hallwood*, 104 F. Supp. 2d at 286 ("*International Shoe* and its progeny, which rest on the Fourteenth Amendment, may not simply be transplanted to limit the exercise of personal jurisdiction in federal question cases."). In the TAC, Plaintiffs sufficiently plead proper venue in this District and an "articulable nexus or substantial relationship" between the Defendants' U.S. contacts and Plaintiffs' claims. *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 165 (2d Cir. 2013). The TAC alleges that Defendants actively participated in manipulation of U.S. Dollar LIBOR with and among **U.S.-based banks and traders**. *See* ¶¶55, 250-54, 259, 260-64, 266-74, 287, 296, 301, 312-14, 361.

Although this Court has required a "but for" connection between the banks' forum-*directed* activities and Plaintiffs' claims – consistent with the "effects" test,[5] *see Licci*, 732 F.3d at 173 – a causal relationship between the banks' forum *contacts* and Plaintiffs' injuries is not necessary in the Second Circuit to establish a "substantial connection.". Under *Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998), "causation is of no special importance." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 319-20 (3d Cir. 2007) (citing *Chew*); *see also Gucci Am., Inc. v. Weixing Li,* No. 10 Civ. 4974 (RJS), 2015 WL 5707135, at *4 (S.D.N.Y. Sept. 29, 2015) (it is enough that the claim is not "completely unmoored from" the former contact) (citing *Chew*). A single act can create a substantial connection sufficient to support jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985).

Plaintiffs' TAC meets these standard to state a *prima facie* basis for personal jurisdiction against Defendants in the TAC. At a minimum, these allegations are sufficient to entitle them to conduct discovery regarding where the banks' suit-related conduct actually occurred.

**2.  Plaintiffs adequately allege net injury and harm based on the Court's prior rulings and Second Circuit authority.**  Defendants wrongly assert that Plaintiffs do not

---

[5] Under the "effects" test, the relevant conduct directed at the forum need not be be solely, or even principally directed there. *SEC v. Straub*, 921 F. Supp. 2d 244, 255-56 (S.D.N.Y. 2013). Defendants and all of the LIBOR Panel banks did business internationally, including in the United States, and they engaged in a global conspiracy that purposefully and foreseeably caused harmful effects within the United States.

Kirby McInerney LLP
Honorable Naomi Reice Buchwald
Page 3

adequately allege injury, *i.e.*, that any Plaintiff actually held a net position that would have been harmed by the alleged manipulation.  The "Plaintiff(s) Harmed" column in Appendix A to the TAC *does* indicate which named Plaintiff held a *net* position on the specific day that was adversely affected by the alleged manipulation of LIBOR, which meets the pleading requirements set forth in *LIBOR II*, 962 F. Supp. 2d at 620-21.[6]  Plaintiffs attach to this letter a supplemental Appendix A that incorporates Plaintiffs' response to each of Defendants' challenges.

The fact that a named Plaintiff did not purchase on every single day of manipulation is legally irrelevant so long as (at the class certificate stage) at least one proposed class representative suffered harm from the manipulative scheme by each of the Defendants, which they indisputably did.[7]  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.")(internal citations omitted).

      **3.** **The TAC appropriately seeks to add affiliated Defendants.** Plaintiffs did not delay in seeking leave to amend, and given the procedural posture of the case, Defendants cannot claim prejudice as a result of the proposed amendments.  Moreover, the amendments would not be futile because claims against Defendants' affiliates relate back under Rule 15(c) for the same "conduct, transaction, or occurrence" set forth in the original complaint, and when "the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010); *Bishop v. Best Buy, Co. Inc.*, No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *3 (S.D.N.Y. Oct. 13, 2010).

---

[6] Defendants' argument that "netting" of gains and losses is required at the pleading stage is contrary to the law.  Within "this Circuit, netting of gains and losses is not a hard-and-fast rule." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015).  On the contrary, courts "decline to net where doing so would unjustly enrich the defendant, shelter it from any appreciable liability, or undermine the goal of deterrence." *Id*. (internal citations omitted).  *See also Randall v. Loftsgaarden*, 478 U.S. 647, 664, 660 (1986) ("deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss.").  Netting – to the extent it has been applied, is almost always applied at the summary judgment or trial stage.  *See Gordon v. Sonar Capital Mgmt*. LLC, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015); *Apex Oil Co. v. DiMauro*, 744 F. Supp. 53, 58 (S.D.N.Y. 1990); *Minpeco, S.A. v. Conticommodity Services, Inc.*, 676 F. Supp. 486, 490-491 (S.D.N.Y. 1987); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-601 n. 9 (S.D.N.Y. 2011) (noting that *Minpeco* did not establish netting requirement for the pleading stage, but "addressed only the plaintiff's obligation to prove losses at trial").

[7] *See, e.g.*, TAC at ¶¶236 (Plaintiff Atlantic Trading harmed by Deutsche Bank); 279 (Plaintiffs Atlantic Trading and 303030 Trading harmed by Barclays, RBC, and RBC Capital); 203 (Plaintiff Atlantic Trading harmed by Rabobank), 269 and 290 (Plaintiff Atlantic Trading harmed by Barclays, Citibank, CGMI, and Merrill Lynch); 287 (Plaintiff Atlantic Trading harmed by RBS and RBS Securities), 211 (Plaintiff FTC harmed by HBOS), and 214-15 (Plaintiff Atlantic Trading harmed by Lloyds).

Plaintiffs adequately allege claims against DB Group Services (UK) Ltd ("DBGS"), Deutsche Bank Securities Inc. ("DBSI"), and RBS Securities, Inc. ("RBSSI"). Defendants overlook critical details linking their affiliates to the alleged U.S. Dollar LIBOR manipulation. *E.g.*, ¶73 (DBGS entered into a criminal Deferred Prosecution Agreement with the DOJ). Derivative traders employed by DBGS were responsible from January 1, 2003 to May 31, 2011 for trading a variety of financial instruments tied to LIBOR. Likewise, DBSI is Deutsche's primary broker-dealer affiliate and shares certain employees and executives with Deutsche Bank. ¶72. Similarly, the TAC alleges that RBSSI derivatives trader Neil Smith discussed setting LIBOR to benefit derivatives positions in February 2007. This strengthens Plaintiffs' existing allegation that RBS derivatives traders made at least 5 written requests to influence RBS' U.S. Dollar LIBOR submissions between January 2006 and March 2012. ¶191. Affiliated entities that actually engaged in the alleged misconduct knew, or should have known that but for a mistake, that they would have been named as defendants.

### 4. The TAC Enhances Allegations Against Existing Defendants

**Rabobank.** Rabobank concedes the Court's jurisdiction over Plaintiffs' trader-based claims and does not dispute that Plaintiffs have already asserted viable trader-based claims against it. *See* ECF No. 1259 at 3.[8] There are open factual questions regarding where all of Rabobank's employees were located when they influenced, determined or submitted U.S. Dollar LIBOR submissions, or requested LIBOR submissions favorable to its derivative trading positions. Transcripts from a recent criminal trial in this District against LIBOR U.S. Dollar submitters Anthony Allen and Anthony Conti expose that Rabobank U.S. Dollar derivative traders (*e.g.*, Christian Schluep and Justin Sliney) were located in Rabobank's New York office, which Rabobank employees testified was a "major branch" and one of Rabobank's worldwide "centers of competency." *See United States v. Allen*, 14 Cr. 00272 (JSR) (S.D.N.Y.); Tr. 602:1-2. Excerpts of the S.D.N.Y. criminal trial transcripts are attached to the Declaration of David E. Kovel, filed contemporaneously herewith. By registering with the New York State Department of Financial Services ("NYSDFS"), Rabobank also has consented to jurisdiction.[9]

---

[8] Rabobank takes exception to the fact that Plaintiffs' TAC includes previously-dismissed claims to preserve them for appeal. *See* TAC at n. 1, 236 (noting that previously-dismissed claims are included in the TAC to preserve issues for appeal); *see also Laurent v. PricewaterhouseCoopers LLP*, No. 06 Civ. 2280 (JPO) (KNF), 2012 WL 3614043, at *2 (S.D.N.Y. Aug. 15, 2012) (the law in this circuit appears to be unsettled on whether plaintiffs need to re-plead dismissed claims to preserve them for appeal when granted leave to amend). Likewise, Plaintiffs have included allegations against dismissed defendant Société Générale ("SG") for this reason. *See* ECF No. 1258.

[9] *See Vera v. Republic of Cuba*, 91 F. Supp. 3d 561, 570-71 (S.D.N.Y. 2015); *Beach v. Citigroup Alternative Invs. LLC*, No. 12 CIV. 7717 (PKC), 2014 WL 904650, at *6-7 (S.D.N.Y. Mar. 7, 2014) (holding that consent by registering as a foreign corporation and designating a local agent is an independent basis for jurisdiction, separate from general jurisdiction analysis); *Matter of B&M Kingstone, LLC v. Mega Intl. Commercial Bank Co.*, Ltd., 131 A.D.3d 259, 15 N.Y.S.3d 318 (1st Dep't 2015) (by registering a branch under § 200, a bank consents to jurisdiction for any action). *See also Gucci Am., Inc. v. Weizing Li,* 768 F.3d 122, 137 (2d Cir. 2014) (on remand "the district court may also consider whether [the defendant] has consented to personal jurisdiction in New York by applying for authorization to conduct business in New York and designating the New York Secretary of State as its agent for service of process.").

Discovery also will strengthen the previously sustained allegations against Rabobank. Evidence in the criminal trial of Rabobank's U.S. Dollar submitters provides evidence of misconduct that extends far beyond what was disclosed in prior regulatory settlements. Testimony revealed that *every month* Rabobank employees, such as Mr. Schluep, would check in to discuss their derivative positions and what LIBOR movements would be favorable to their "fixings". Tr. 325:10-25, 326:10-18. Collectively, the criminal trial evidence, including reams of e-mails, demonstrated that the Rabobank submitters repeatedly manipulated LIBOR to benefit derivative trading positions of Schluep, Sliney and other traders. Tr. 186:17-19; 188:15-18; 191:9-11 189:14 – 190:9; 191:5-11; 192:1-15; 234:17 – 235:8; 283:9-11; 323:11-16; 324:2-24.

**Deutsche Bank.** The TAC includes extensive new allegations concerning Deutsche Bank's widespread manipulation of U.S. Dollar LIBOR that are derived from settlements announced by the CFTC, DOJ, FCA and NYSDFS, which resulted in fines totaling $2.5 billion. ¶¶218-221. Specifically, the TAC excerpts Deutsche Bank's admissions "that its submitters, traders, desk managers, and at least one of its senior managers engaged in systemic and pervasive manipulation of U.S. Dollar LIBOR and submissions for other currencies through its *New York office*." ¶71; *see also* ¶225(d) (Deutsche Bank's manipulation "was systemic and pervasive, occurring across multiple trading desks and offices, including London, Frankfurt, *New York*, Tokyo, and Singapore."), ¶229 ("Senior desk managers in . . . *New York* . . . also made requests to benefit their own trading positions, facilitated the requests from their traders for beneficial submissions, and generally promoted the practice of inappropriately using benchmark interest rate submissions to help the traders increase profits and minimize losses on their and the desk's trading positions.") (emphasis added).

The TAC vividly describes chats which make it clear that Deutsche Bank employees in their New York office made *regular* requests that their London counterparts manipulate LIBOR. ¶236 (involving New York-based U.S. Dollar traders and managers that requested Deutsche's LIBOR submitters manipulate LIBOR). This is more than enough to satisfy this Court's holding that "personal jurisdiction is available in the requester's forum, to which the submitter aimed its conduct and intended an effect *(i.e.*, bolstering the requester's trading position)." *LIBOR IV,* 2015 WL 6243526, at *32, Slip Op. at 79. By registering its New York Branch with the NYSDFS, Deutsche Bank also has consented to jurisdiction.

**Citibank.** Similarly, Plaintiffs assert new plausible trader-based allegations against Citi based on information derived from the Barclays Cooperation Materials. In particular, on September 28, 2006, a New York-based Barclays derivatives trader contacted a Citi trader to request a high U.S. Dollar LIBOR setting to benefit his trading position. ¶290. On that day, both Barclays and Citi's submission fell within the top quartile of banks in the 3-month LIBOR panel and were "kicked out" up from the LIBOR fixing that day and Plaintiff Atlantic Trading suffered a net injury. *Id.* Citi challenges that sufficiency of these allegations, while ignoring the fact that the same Barclays and Citi traders communicated about specific LIBOR submissions nearly two years later. ¶291.

Discovery will provide additional evidence regarding Citi's trader-based manipulation of

U.S. Dollar LIBOR. For example, the recently concluded criminal trial in the United Kingdom of Tom Hayes, a Yen interest-rate swap trader and Citi employee during 2010, exposed evidence of internal Citi communications between Andrew Thursfield, Citigroup's London-based head of European risk treasury desk and Scott Bere, the New York-based head of Citibank's North American Treasury unit. *See* ECF No. 1209. And recent testimony from the ongoing U.K. criminal trial of interdealer brokers charged with conspiring with Hayes, suggest that Bere's requests related to benefitting ███████████████████████████████████████████████████████████████████████████████." *R. v. Hayes*, Tr. Day 21, 91:18 -92:22. Likewise, communications between Citi's LIBOR submitter and a New York-based Senior U.S. Dollar trader evidence how the bank relied on █████████████████████████████████████████████████████████████████ to determine U.S. Dollar LIBOR submissions. *R. v. Read*, Tr. Day 21, 120:17 – 121:11. at 119-21. In addition, recent trial evidence suggests that Citi relied on inter-dealer brokers to convince other panel banks to manipulate U.S. Dollar LIBOR in its favor.[10]

**RBC.** The TAC asserts new trader-based allegations based on evidence provide by the Barclays Cooperation Materials. *E.g.*, ¶¶278-82. RBC incorrectly claims that these allegations do not comply with the Court's prior personal jurisdiction rulings. *See* ECF No. 1259 at 2. However, Frederick Gourtay – the RBC employee who communicated the requests to fix LIBOR, was the head of U.S. dollar swaps trading at RBC Capital Markets in **New York.** ¶278. Gourtay regularly made requests, from his base in New York, that LIBOR be manipulated. *See, e.g.,* ¶¶279-82. These allegations satisfy this Court's personal jurisdiction requirement as set out in *LIBOR IV*. Likewise, RBC's manipulation resulted in a net injury to plaintiffs on certain days, which belies RBC's suggestion otherwise. *See, e.g.*, ¶279, Appendix A (Plaintiffs Atlantic Trading and 303030 Trading were injured on March 17, 2006).

**RBS.** RBS challenges the sufficiency of the TAC's new allegations of trader-based manipulation. The TAC strengthens existing allegations of RBS' trader-based manipulation of U.S. Dollar LIBOR (¶¶191-92) and evidences a communication between Barclays and RBS derivative traders regarding the need to manipulate LIBOR to benefit trading positions. ¶285. RBS routinely told other banks and interdealer brokers what its LIBOR submission would be before publication, violating the BBA's rule that LIBOR submissions must remain confidential. RBS did so to ensure that other banks would submit appropriately skewed LIBOR quotes in order to benefit the bank's derivative positions. *See, e.g.*, ¶288 (on December 17, 2007, RBS allegedly suppressed LIBOR and was "kicked out" down from the LIBOR panel causing Barclays' submitter to quip the bank "[m]ust have [had] a fixing today"). Set against the

---

[10] For example, Hayes sought to exploit an arbitrage between U.S. Dollar LIBOR and TIBOR rates, and sometimes requested that interdealer brokers influence U.S. Dollar LIBOR to benefit his trading positions. This manipulative tactic is highlighted by the May 12, 2010 conversation where Tom Hayes requested that ICAP broker ████████ ████████████████████████████████████████████████████████████████████████████████ *R. v. Read*, Tr. Day 34, 92:21 – 93:1. Later that day, ██████████████████████████████████████████████████████████████ ████████ *Id.*, at 93:23 – 94:3.

**Kirby McInerney LLP**
Honorable Naomi Reice Buchwald
Page 7

backdrop of RBS' extensive operations in the United States, including significant derivative trading operations (¶¶64-69), and viewed in the light most favorable to Plaintiffs, these allegations are sufficient to establish a *prima facie* case that RBS' New York office at least occasionally shared information and directed the collusive manipulation of U.S. Dollar LIBOR. By registering its New York Branch with the NYSDFS, RBS also has consented to jurisdiction.

**HSBC.** The TAC contains numerous allegations concerning HSBC Bank plc's and HSBC Holdings plc's knowing participation in a conspiracy to manipulate U.S. Dollar LIBOR and does not simply describe various brokers' interpretations of HSBC's impending U.S. Dollar LIBOR submissions. The TAC describes how brokers and traders outside HSBC were in contact with HSBC concerning HSBC's U.S. Dollar LIBOR submissions and how HSBC was adjusting its U.S. Dollar LIBOR submissions in response to input from these outside parties.[11] The TAC bolsters these specific allegations of trader-based manipulation with data analysis indicating that HSBC was participating in manipulating U.S. Dollar LIBOR. ¶¶378-400, 424. Read in the light most favorable to Plaintiffs and factoring in HSBC Bank's and its affiliates' substantial U.S. operations (¶¶51-52, 98), these allegations are sufficient to establish a *prima facie* case that HSBC's New York office at least occasionally shared information concerning HSBC's planned U.S. Dollar LIBOR submissions and directed the collusive manipulation of U.S. Dollar LIBOR.

**Lloyds.** Plaintiffs' allegations against Lloyds Bank plc and its affiliates Lloyds Banking Group plc (together "Lloyds") and HBOS PLC ("HBOS") in the TAC state strong CEA claims. The TAC provides specific examples of significant U.S. contacts, including Lloyds admitting to deliberately manipulating LIBOR to the detriment of U.S. investors in a deferred prosecution agreement with the U.S. Department of Justice. ¶¶49-50, 53-54. By registering its New York Branch with the NYSDFS, Lloyds also has consented to jurisdiction.

The TAC also alleges that Lloyds, HBOS and Bank of Scotland colluded with other LIBOR panel banks, including U.S. banks; engaged in systematic false reporting of LIBOR; and manipulated the prices of LIBOR-based derivatives transacted in the U.S., including the prices of Eurodollar futures contracts traded on the CME, and over-the-counter LIBOR-based instruments. ¶¶ 208-17. Plaintiffs' allegations in the TAC are supported by multiple government settlements and a deferred prosecution agreement in which Lloyds admits that Lloyds and HBOS "borrowed and loaned money at interest rates tied to LIBOR and also entered into derivative transactions

---

[11] *See e.g.*, ¶286 (on September 13, 2007, a Barclays trader was informed that HSBC planned to submit a low LIBOR based on the availability of "cheap money", which prompted the Barclays trader to laugh at the assertion's implausibility); ¶300 (on November 21, 2007, a Barclays trader commented on his advance knowledge of HSBC's LIBOR submission stating that it was "too low"); ¶¶310-314 (on April 18, 2008, following an internal conversation at Barclays wherein traders commented that "we need to be careful about price collusion," a Barclays trader spoke to brokers to obtain HSBC's planned LIBOR submission and then passed HSBC's planned LIBOR submission to another trader at Barclays); ¶321 (on September 18, 2008, a Barclays trader commented on HSBC's recent LIBOR submissions noting that HSBC had already been "talked to [] about that"); ¶¶261, 326 (on November 27, 2009, a broker informed a Barclays trader that HSBC did not plan to change its LIBOR submission from the prior day and noted that "HSBC wants the LIBORs low, like everyone else does," to which the Barclays trader replied with a casual "yeah, yeah, yeah, yeah, yeah" indicating the habitual nature of LIBOR information sharing).

tied to LIBOR," and that "some of the counterparties to those transactions were located in the United States". *Id.* Lloyds and HBOS further admitted that their LIBOR "submitters and traders who tried to manipulate LIBOR submissions understood to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions." ¶44. The government settlements also establish that decisions to submit artificial LIBOR were executed not only by the official LIBOR submitters at Lloyds and HBOS, but also by multiple senior managers. *See, e.g.*, FCA Notice at 2.12-13, 19. The location of the managers and traders with influence over the LIBOR submissions and related decisions is currently not known to Plaintiffs. Plaintiffs have alleged that HBOS had its Treasury operations in New York. ¶49. Therefore, it is plausible that some of the managers and traders with influence over LIBOR submissions were located in the United States.

Plaintiffs also provide examples of trader-based manipulation by Lloyds and HBOS that are not time barred under this Court's current rulings, and which sufficiently allege harm. *See* Appendix A. All evidence of LIBOR manipulation (including during time barred periods) demonstrates unlawful intent. The TAC also states strong CEA aiding and abetting claims against Lloyds and HBOS (and Bank of Scotland) based on LIBOR suppression. Based on the Court's prior aiding and abetting and vicarious liability rulings, which provide for joint and several liability, Plaintiffs allege a *prima facie* case of jurisdiction over Lloyds and HBOS.

**BTMU and Norinchukin.** BTMU and Norinchukin argue that the TAC adds "nothing" to demonstrate that this Court's jurisdiction over either of them is proper, although they concede that the TAC alleges that BTMU and Norinchukin maintain a branch in New York that is subject to New York banking laws, licensed and by New York and federal regulators. *See* BTMU Letter at 1 (citing ¶¶80-81, 84-89). BTMU and Norinchukin each has consented to jurisdiction by registering its New York branch with the NYSDFS. Moreover, this Court has already held that venue in this District is appropriate and that BTMU and Norinchukin are jointly and severally liable for aiding and abetting and vicarious liability under the CEA for LIBOR suppression. Banks located in the U.S., *i.e.*, JPMorgan, Citibank and Bank of America, connected the entire unlawful scheme to suppress LIBOR to the U.S. Therefore, Plaintiffs have adequately alleged a *prima facie* basis for jurisdiction over all Panel Banks, including BTMU and Norinchukin. Exercising jurisdiction under the CEA over BTMU, Norinchukin and the all other US Dollar LIBOR Panel Bank Defendants under the facts of this case is constitutional, fair and reasonable. *See First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 634 F. Supp. 1341, 1350-51 (S.D.N.Y 1986) (when venue is proper as to the defendant under the federal statute, "personal jurisdiction over it is both constitutional and within the compass of the statute").

5. **The TAC Properly Adds Defendants Tullett and ICAP.** Tullett and ICAP, interdealer brokers, object to the TAC on grounds of lack of personal jurisdiction, futility, and statute of limitations. Each of these arguments is unavailing. Tullett and ICAP have substantial operations in the United States. ¶¶93, 95. ICAP and Tullett were a source of daily information about where U.S. Dollar LIBOR submissions were going to be set in advance of the submission

deadline. These interdealer brokers acted as intermediaries to convey and discuss information and influence positions of other banks on LIBOR rate settings, including Dollar LIBORs, during the Class Period. ¶¶ 254, 260, 321. Tullett and ICAP knowingly influenced where Panel banks set their artificial LIBOR submissions and aided and abetted the manipulation of Dollar LIBOR. ¶¶259-263, 296. ICAP and Tullett conspired with Defendant banks and their traders, often acting as "go between" among defendant banks, by collecting, conveying and distributing confidential information about their expected LIBOR submissions and fixes, assisting Defendants with rigging of daily rates and to benefit their trades. ¶¶236, 252-54, 269-64, 296, 316, 321. Tullett and ICAP routinely colluded with various Panel banks to manipulate LIBOR, including but not limited to Barclays, Deutsche, Citibank and HSBC. *Id.* The Barclays Cooperation Materials disclose that Peter Johnson, a Barclays London Dollar LIBOR submitter, spoke daily with Tullett and ICAP regarding various LIBOR fixes, including for U.S. Dollar LIBOR, before making Barclays submissions, and shared information with his New York colleagues. ¶¶254, 259-60. Tullett's employee, Burgess, noted on November 27, 2009, during a suppression period that HSBC "wants the LIBORs low, like everyone else does." At the same time, Burgess also told Barclays where other Defendants, including HSBC, Lloyds, and other banks, would be setting LIBOR that day. ¶261. Tullett's and ICAP's U.S. contacts and unlawful conduct satisfy jurisdiction standards under the CEA and the Fifth Amendment.

Plaintiffs' claims against Tullett and ICAP are not time barred, as they suggest. The Barclays settlement in 2012 does not refer to the role of any inter-dealer brokers in facilitating LIBOR manipulation. The February 14, 2013, *Financial Times* news article relied upon by Tullett refers only to Tullett and YEN LIBOR, *not* Dollar LIBOR. The article also reported that Tullett denied that it was under investigation. Further, on March 5, 2013, *Bloomberg Business* reported in an article entitled "Tullett Prebon CEO Says No Evidence Employees Helped Rig Libor", that CEO Terry Smith "said the interdealer broker has found no indications that employees were involved in rigging global benchmark interest rates".[12] The only public information about ICAP revealed in articles in January and February 2013 refers to ICAP's role with respect to YEN LIBOR. Thus, Plaintiffs were not on inquiry notice as to the probability in early 2013 that Tullett or ICAP was involved in rigging U.S. Dollar LIBOR.

   **6. The TAC Properly Adds Merrill Lynch International As a Defendant.**

Merrill Lynch objects to its addition as a Defendant in the TAC on grounds of "futility", lack of jurisdiction and statute of limitations [ECF No. 1249]. None of these arguments is meritorious. The TAC alleges that Merrill Lynch derivatives trader, Stylianos Contogoulas, communicated requests for preferential LIBOR submissions to Barclays and RBC-affiliated traders in New York, which were then acted upon by affiliated Panel banks. ¶¶9, 265-277. Therefore, Plaintiffs have asserted facts sufficient to establish personal jurisdiction over Merrill Lynch for trader-based manipulation. Merrill Lynch has not, nor can it, refute that New York is "the location of the person who requested the submitter to engage in manipulation." Further, Contogoulas was successful in convincing Barclays to manipulate LIBOR according to his

---

[12] *See* http://www.bloomberg.com/news/articles/2013-03-05/tullett-prebon-ceo-says-no-evidence-employees-helped-rig-libor.

**Kirby McInerney LLP**
Honorable Naomi Reice Buchwald
Page 10

preferences (prompting him to thank the Barclays traders and the bank's LIBOR submitters). ¶¶265-277. Merrill Lynch prematurely attempts to introduce a factual dispute relating to the impact of the alleged manipulation. *See* ECF 1249 at n.4. Defendants' contrary statements or evidence cannot be considered before Plaintiffs have a chance to test it through discovery and an evidentiary hearing. Plaintiffs have sufficiently pled jurisdiction by alleging that Merrill Lynch unlawfully influenced Barclays to make false submissions regarding 3-month LIBOR on specific dates that artificially impacted the prices of LIBOR based instruments, including those traded on the CME.

The Court previously acknowledged that there was likely trader-based manipulation on several of the same dates which Plaintiffs allege Merrill Lynch *succeeded* in convincing Barclays to make artificial LIBOR submissions (*i.e.*, October 26, 2006, February 28, 2007 and March 29, 2007). *See LIBOR IV*, at *44, Slip Op. at 110. More specifically, the Court observed, "If the other bank in each of these instances can be identified through discovery, then both Barclays and the other bank will be jointly liable for both banks' manipulation of LIBOR on these dates." *Id.* at *45, Slip Op. at 112. The Barclays Cooperation Materials enabled Plaintiffs to learn that Merrill Lynch was one entity involved in trader based LIBOR manipulation on these dates. *LIBOR IV* also recognized aiding and abetting, joint causation and a conspiracy theory of liability against Barclays and Merrill Lynch for trader-based manipulation. *Id* at *49-50, Slip Op. 121-125. In addition, Plaintiffs have adequately alleged that individual Plaintiffs were harmed on days where Merrill Lynch manipulated LIBOR (*i.e.*, September 27-28, 2006, February 28, 2007).[13]

Finally, Plaintiffs' claims against Merrill Lynch are not time barred. As the Court acknowledged in *LIBOR IV*, the identity of Barclays' co-conspirator was unclear from the Barclays regulatory settlements. *See In re Copper Antitrust Litig.*, 436 F.3d 782, at *789-790 (7th Cir. 2006) (summary judgment reversed where issue of material fact existed as to when plaintiffs had inquiry notice of JPMorgan's complicit conduct). Also, the January 25, 2013, *Financial Times* article that Merrill Lynch cites named 25 individuals and did not identify Contogoulas as Trader 1 or disclose his role in manipulating U.S. Dollar LIBOR. In fact, the British judge presiding over the matter explicitly stated "that it did not follow that all 25 were involved in rigging LIBOR."

For all of these reasons, and the reasons set forth in Plaintiffs' request for leave to amend and previous opposition to Defendants' jurisdictional arguments, the Court should grant Plaintiffs leave to file their Third Amended Complaint.

---

[13] Plaintiffs' allegations starkly contrast with the allegations in *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) where the plaintiff failed to plead "facts suggesting that the conduct of the two Barclays employees has any connection with the injury suffered by [the plaintiff]" *Id.* at *10.

**Kirby McInerney LLP**

Honorable Naomi Reice Buchwald
Page 11

Respectfully submitted,

|    */s/ Christopher Lovell*    |    */s/ David E. Kovel*    |
|---|---|
| Christopher Lovell | David E. Kovel |
| LOVELL STEWART HALEBIAN | KIRBY McINERNEY LLP |
|    JACOBSON LLP | 825 Third Avenue, 16th floor |
| 61 Broadway, Suite 501 | New York, New York 10022 |
| New York, New York 10006 | Telephone: (212) 371-6600 |
| Telephone: (212) 608-1900 | Email: dkovel@kmllp.com |
| Email: clovell@lshllp.com | |

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Proposed Class*

cc:    All Counsel of Record (by Electronic Filing)