**New Allegations Contained in Exchange-Based Plaintiffs' [Proposed]
Third Amended Complaint [ECF No. 1159-1] by Defendant**

## Table of Contents

NEW ALLEGATIONS AGAINST EXISTING DEFENDANTS ........................................................... 1

The Bank of America Defendants ........................................................................................... 1

The Bank of Tokyo – Mitsubishi Defendant ......................................................................... 2

The Citigroup Defendants ...................................................................................................... 3

The Credit Suisse Defendants ................................................................................................ 7

The Deutsche Bank Defendants ........................................................................................... 14

The HBOS Defendants ......................................................................................................... 41

The HSBC Defendants ......................................................................................................... 51

The JPMorgan Defendants ................................................................................................... 56

The Lloyds Defendants ........................................................................................................ 57

The Norinchukin Bank Defendant ....................................................................................... 70

The Rabobank Defendant ..................................................................................................... 72

The Royal Bank of Canada Defendants ............................................................................... 84

The Royal Bank of Scotland Defendants ............................................................................. 87

The UBS Defendants ............................................................................................................ 99

The Portigon, WestLB and WestDeutschelmmobilien Defendants...............................................104

NEW ALLEGATIONS AGAINST NEW DEFENDANTS...................................................................107

The Merrill Lynch International Defendant...............................................................................107

The ICAP Defendants...................................................................................................................114

The Tradition Defendant.............................................................................................................125

The Tullett Prebon Defendant.....................................................................................................129

NEW ALLEGATIONS INVOLVING DEFENDANTS SUBJECT TO PENDING SETTLEMENT ...................................140

The Barclays Defendants.............................................................................................................140

**NEW ALLEGATIONS AGAINST EXISTING DEFENDANTS**

| The Bank of America Defendants | |
|---|---|
| **IV. PARTIES**<br>    **B. Defendants**<br>        **1. The Bank of America Defendants** | |
| ¶¶35-36 | Defendant Bank of America, N.A. "BofA" is a federally chartered national banking association headquartered in Charlotte, North Carolina and an indirect, wholly owned subsidiary of Bank of America Corporation.  Bank of America, N.A. was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA.<br><br>Defendant Bank of America Corporation and Bank of America, N.A. are hereinafter referred to collectively sometimes as "BAC." |
| **V. FACTUAL ALLEGATIONS**<br>    **K. Findings from the Barclays Cooperation Materials**<br>        **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>            **a.  Evidence of LIBOR Suppression During Late 2007** | |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson.  During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |

| The Bank of Tokyo – Mitsubishi Defendant | |
|---|---|
| **IV. THE PARTIES** | |
|    **B. Defendants** | |
|      **16. The Bank of Tokyo – Mitsubishi Defendant** | |
| ¶80 | Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo" or "BTMU") is a financial institution incorporated in Japan with its headquarters in Tokyo, Japan.  BTMU was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA.  BTMU maintains numerous branches and offices in the United States, including a New York branch, and employs more than 2,300 full-time employees all over the United States.  Until March 2012, BTMU also maintained two branches in California, and subsequently BTMU has had only one branch and one representative office in California and one or more additional branches in the United States.  BTMU also has an agency office in Dallas, Texas and several subsidiaries in the U.S. |
| ¶81 | Between 2010 and 2014, BTMU's U.S. branches and offices generated substantial revenue totaling more than 692 billion yen (approximately $5.7 billion) and profit totaling more than 276 billion yen (approximately $2.3 billion).  BTMU is subject to the New York Banking Laws, and has recently entered into a Consent Order and paid a $315 million fine to the New York Department of Financial Services for misleading the Department about transactions that were settled through its New York Branch and other New York-based financial institutions.  The fines arose out of violations of New York Banking Law § 44 based upon unlawful clearing of 28,000 U.S. dollar payments, valued at approximately $100 billion, on behalf of foreign countries. |

2

| The Citigroup Defendants | |
|---|---|
| **IV. PARTIES** | |
|     **B. Defendants** | |
|         **3. The Citigroup Defendants** | |
| ¶¶39-40 | Defendant Citigroup Global Markets, Inc. ("CGMI") is a New York corporation and an affiliated investment bank of Citibank. CGMI is an indirect wholly-owned subsidiary of Defendant Citigroup, Inc. CGMI is registered as a broker-dealer and investment adviser and a swap dealer and FCM with the CFTC. CGMI has its principal place of business in New York, New York. During the Class Period, CGMI employed traders that participated in the manipulation of LIBOR.<br><br>Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation headquartered in New York, New York. Citigroup, which is the parent of Citibank and CGMI, reaped significant financial benefit from the suppression of LIBOR, actively participated in the conspiracy and manipulation of LIBOR. Citibank and CGMI are wholly-owned subsidiaries of Citigroup. |
| **V. FACTUAL ALLEGATIONS** | |
|     **C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide** | |
| ¶142 | The investigations uncovered a widespread manipulation of various LIBOR rates, including U.S. Dollar LIBOR. As a result of these investigations, governmental regulators have so far settled with six of defendant panel banks – Barclays, UBS, RBS, Rabobank, Lloyds, and Deutsche Bank – and two interdealer brokers – ICAP and RP Martin – in connection with Yen-LIBOR manipulation. Although Citibank was not identified in Final Notices of settlements with certain defendants for LIBOR manipulation, the FCA, DOJ and CFTC entered into settlements with Citibank for manipulation of foreign exchange rates and benchmarks in 2015. In the FCA's settlement agreement with Citibank, the British Financial Conduct Authority ("FCA") expressly noted that in response to Final Notices issued to other defendants by regulatory authorities for LIBOR manipulation, Citibank engaged in a remediation program to improve policies, procedures and training in connection with Citibank's LIBOR and other benchmark assessments and price formation processes. |
|     **I. Findings from the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** | |
|         **2. Findings Concerning Conspiring with Outside Banks and Entities** | |
| ¶238 | The New York Department of Financial Services found that Deutsche Bank "communicated and coordinated with employees of other banks and financial institutions regarding their respective rate contributions in advance of an LIBOR submission, including individuals at Barclays, BNP Paribas, Citibank, Merrill Lynch, Societe Generale and UBS, in an effort to manipulate rates." Deutsche Bank NYDFS Order ¶30. For example, on May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?" The external banker replied, "yeah… still." The vice president replied, "we all ahve same position no?" Id. ¶ 33. Similarly, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external |

|  | banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok." Id. ¶ 35. And on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?" The Head of the London Money Market Derivatives desk replied, "i will." Id. ¶ 36. On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing." Id. ¶ 42. It appears that some of these examples relate directly to Deutsche Bank's U.S. Dollar LIBOR submissions. Only discovery can confirm this fact, as well as the existence of other examples of conspiracy with outside banks. |
|---|---|
| **K. Findings from the Barclays Cooperation Materials** | |
| **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries** | |
| **e. Barclays and Citibank Conspired With One Another To Manipulate LIBOR Submissions** | |
| ¶¶290-91 | The Barclays Cooperation Materials also suggest that Barclays and Citibank requested and accommodated each other's preferred LIBOR setting. For example, on September 28, 2006, Don Lee, a New York-based Barclays derivative trader, sent Citibank trader Rajesh Ghude a Bloomberg message regarding LIBOR asking, "whats your cash guys going for 3m today? I would like it as high as possible!!!" As described above, Lee had already agreed to accommodate a request for a high 3 month LIBOR on behalf of Merrill Lynch trader Stylianos Contogoulas. Lee's request to Citibank, therefore, could be seen as a way to ensure that 3 month LIBOR would be set to benefit the trading positions of Barclays and Merrill Lynch. Ghude agreed to speak with Citibank's LIBOR submitter. Like Barclays, Citibank was also in the top quartile of banks in the 3 month LIBOR panel and was "kicked out" up from the LIBOR fixing that day. |
|  | The dialogue between Barclays' Lee and Citibank continued thereafter. For example, on May 16, 2008, Lee sent Citibank trader and CGMI Trader Rajesh Ghude, a Bloomberg message regarding LIBOR, noting "I am same way pleaaaaaase don't push it higher." In response, Ghude noted, "no way. i just have a small position and i am not going to push it up. no worries." Lee then thanked Ghude for the accommodation before launching in gossip about fellow traders. On that day, Barclays was in the top quartile of banks in the 3 month LIBOR panel and was "kicked out" up from the LIBOR fixing that day. Citibank fell within the interquartile range and consequently had a direct impact on the setting of 3 month LIBOR. |
| **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** | |
| **a. Evidence of LIBOR Suppression During Late 2007** | |
| ¶¶297-98 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions. After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden |

|  | sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such."  In response, Johnson noted, "No he's not, but he's still setting them lower than he should do."  Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth".<br><br>What prompted laughter in September 2007 provoked ire less than a month later.  On October 2, 2007, Johnson engaged an unidentified broker from another bank in conversation regarding what that bank would submit for its LIBORs.  After the broker identified where the bank planned to submit its LIBOR, the following conversation ensued:<br>PJ:  It's bollocks!<br>UM:  It is bollocks.  Total and utter.  But he is taking into consideration where the Citibanks [sic], UBSs and all these people are gonna go.<br>PJ:  Yeah well f*ck them!  They're wrong.<br>UM:  Yeah.<br>PJ:  That's, that's that's absolute f*cking bollocks.<br><br>Later in the same conversation, Johnson disclosed Lloyds' planned LIBOR submission and questioned where WestLB would submit 3 month LIBOR based on his knowledge of what WestLB is paying in the market.  Towards the end of the conversation, Johnson forced the broker to acknowledge that LIBOR submissions was flawed.<br>PJ:  Okay, well I think your LIBORs are just ridiculous.<br>UM:  Oh a disgrace, yeah, no, they are, but I'm uh uh you understand what we are d- all I'm saying to you is that where we think the market is gonna fix their LIBORs.  That's where the fix . . . . is gonna be. |
|---|---|
|  | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110]  Consider the following representative examples:<br>a.  Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to |

---

[110] *See* Barclays FCA Final Notice ¶11.

| | | speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day. |
|---|---|---|
| | | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**<br>  **3.  The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon.  *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br>    a.  On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth"; |
| fn. 236 | | New trader-based allegations against certain named defendants, such as Citibank and Lloyds, are in the previous sections and summarized in Appendix A. |

| Trader-Based Allegations Involving the Citigroup Defendants | | | | | |
|---|---|---|---|---|---|
| **Date** | **Defendant(s) Involved** | **Direction of Manipulation** | **Effect on 3-Month LIBOR** | **Source** | **Plaintiff(s) Harmed** |
| 9/28/2006 | Barclays, Citibank, CGMI Merrill Lynch | High 3M | Kicked Up (Barclays and Citibank) | ¶¶ 269, 290 | Atlantic Trading |
| 5/16/2008 | Barclays, Citibank, CGMI | Low | Kicked Up (Barclays), Interquartile (Citibank) | ¶ 291 | |

| The Credit Suisse Defendants | |
|---|---|
| **IV. THE PARTIES** | |
|    **B. Defendants** | |
|        **4. The Credit Suisse Defendants** | |
| ¶41 | Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss holding company headquartered in Zurich, Switzerland. Through its subsidiaries, Credit Suisse Group has more than 8,000 employees in the United States, substantially all of which are in New York. In 2014, Credit Suisse Group filed a Global Recovery and Resolution Plan with the Federal Reserve. In its Resolution Plan, Credit Suisse Group disclosed that it "operates as an integrated global bank" with "divisions supported" by "Shared Services functions". The Shared Services establishes group-wide policies for Credit Suisse Group and its consolidated entities, including Defendant Credit Suisse AG. Credit Suisse Group also disclosed that it provide investment banking services to clients through "regional and local teams based in major developed and emerging market centers." Credit Suisse Group's Investment Banking Department houses a Rate Products team that is a global market maker in cash and derivatives markets and a primary dealer in the United States, Europe and Japan and covers, inter alia, interest rate swaps and options and other risk management structures and forms. The global head of investment banking for Credit Suisse Group, James Armine, is based in New York. Also, the global head of Mergers and Acquisitions at Credit Suisse Group, Scott Lindsay, is based in New York. Mike Paliotta, Credit Suisse Group's co-head of U.S. Equities, is a senior manager based in New York. Dan Mathisson, the head of U.S. cash trading and execution and Timothy O'Hara, global head of equities likewise are based in the United States, with O'Hara based in New York. Another senior manager, Colin Lovemason, the head of market risk and quantitative analytics at Credit Suisse Group, is based in New York. Credit Suisse Group also disclosed in its Resolution Plan that it operates a global structure in four separate regions, which includes the "Americas" consisting of the United States, Canada, the Caribbean and Latin America. The Chief Executive Officer of Credit Suisse Americas is Robert Shafir, a citizen of the United States, and Mr. Shafir serves as the Chief Executive Officer of Asset Management for Credit Suisse Group and also serves as a member of the Executive Boards of Defendant Credit Suisse Group and Defendant Credit Suisse AG. |
| ¶42 | The Resolution Plan filed by Credit Suisse Group also confirmed that it is active in interest rate derivative trading markets and other activities using swaps, futures, options and a combination of derivatives for market making, positioning and arbitraging activities. Credit Suisse Group disclosed in its Resolution Plan that its "US derivatives businesses, currently booked in London through Credit Suisse International, are expected to be transferred to the US broker-dealer" known as Credit Suisse Securities (USA) LLC. Credit Suisse Group's shares are listed as American Depositary Shares on the New York Stock Exchange ("NYSE"). |

| ¶43 | Defendant Credit Suisse AG ("Credit Suisse") is a financial institution incorporated under the laws of Switzerland.  Credit Suisse is a subsidiary of Defendant Credit Suisse Group and is reported as a material legal entity in Credit Suisse Group's Resolution Plan filed with the Federal Reserve.  In 2014, Credit Suisse Group renewed for 15 years its lease for a massive 1.1 million square feet building lease at 11 Madison Avenue in Manhattan to house Credit Suisse and accommodate the American headquarters of Credit Suisse Group, which has held offices in the building since 1997. |
|------|------|
| ¶44 | Credit Suisse and its parent company share Executive Board members responsible for the day-to-day operations of Credit Suisse Group and its consolidated entities, including Credit Suisse.  In the United States, Credit Suisse has a branch office in New York and representative offices in Los Angeles, San Diego and San Francisco, California.  From 1999 until 2009, Credit Suisse operated a representative office in New York City, which was licensed by the New York State Banking Department (the predecessor to the New York State Department of Financial Services).  In May 2014, Credit Suisse entered into a Consent Order with the New York State Department of Financial Services and pled guilty to an Information filed in the U.S. District Court for the Eastern District of Virginia, which accused Credit Suisse of conspiracy to assist U.S. citizens in tax evasion and the filing of false tax returns and conducting an illegal cross-border banking business to open and maintain Swiss accounts that were undeclared and hidden from U.S. authorities.  The Consent Order details significant and continuous contacts and services that Credit Suisse and its employees used and operated out of Credit Suisse's New York Representative office to further the illegal cross-border banking scheme, including Swiss-based employees regularly traveling to New York to conduct activities that "furthered the illegal tax evasion scheme and constituted improper banking and investment advising activities".  Through the illegal scheme, Credit Suisse provided assistance for tax evasion to "thousands of New York taxpayers", according to the Consent Order.  Credit Suisse paid a civil monetary penalty to the New York State Department of Financial Services in the amount of $715 million for operating the illegal scheme in New York.  Credit Suisse's New York branch is defined in the Resolution Plan as a material legal entity. |
| ¶45 | Credit Suisse also operates in the United States through direct and indirect subsidiaries, including Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA), Inc., Credit Suisse Securities (USA) LLC and Credit Suisse International, which all have offices in New York.  Credit Suisse Securities (USA) LLC is a registered broker-dealer in the United States and transactions in derivatives, including exchange-traded instruments, and is a dealer for money market instruments.  In November 2014, a managing director of Credit Suisse filed a declaration with this Court in related actions stating that Credit Suisse was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. |

| | |
|---|---|
| ¶46 | Defendant Credit Suisse itself employs approximately 98 people in the United States and describes its New York branch as "significant to the activities of a core business line or critical operation." Credit Suisse's New York branch is located at 11 Madison Avenue, New York, New York 10010, and is registered with and subject to the New York State Department of Financial Services regulatory supervision. In its Form 20-F filed annually with the U.S. Securities Exchange Commission, Credit Suisse lists numerous securities that are listed on NYSE and other U.S. exchanges and discloses that Credit Suisse's banking operations are subject to extensive federal and state regulation and supervision in the U.S. It also discloses that the business of Credit Suisse Group is "substantially similar" to the business of Credit Suisse and that Credit Suisse is a wholly owned subsidiary of Credit Suisse Group. Both Credit Suisse and Credit Suisse Group are registered as financial holding companies for purposes of U.S. federal banking laws, which enables them to engaged in a broad range of financial activities in the U.S. Credit Suisse's fiscal year Form 20-F discloses that Credit Suisse has 80 percent of voting rights and 94 percent of equity interest in Credit Suisse International, which along with other Credit Suisse affiliates was fined 9.2 million Euros in 2014 by the European Commission for operating an illegal cartel to manipulate the spread of Swiss franc LIBOR-based derivatives to benefit traders' positions during the period May to September 2007, thereby harming competition. Credit Suisse International describes itself as a global market leader in OTC derivatives products and maintains an office in New York, from which in 2013, its operations derived $266 million in revenues. |

**IV. THE PARTIES**
    **D. Agents and Unnamed Co-Conspirators**

| | |
|---|---|
| ¶98 | During the Class Period, subsidiaries or other affiliates of Defendants, named as John Doe Defendants 4-25, joined and furthered the conspiracy by trading LIBOR-based financial instruments such as Eurodollar futures contracts at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of all Defendants: (i) Bank of America Securities LLC; (ii) Barclays Capital Inc.; (iii) Credit Suisse Securities (USA) LLC; (iv) HSBC Securities (USA) Inc.; (v) J.P. Morgan Clearing Corp.; (vi) J.P. Morgan Futures, Inc.; (vii) J.P. Morgan Securities LLC; (viii) Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ix) Mitsubishi UFJ Securities (USA), Inc.; (x) Mizuho Securities USA Inc.; (xi) Rabo Securities USA, Inc.; (xii) RBC Capital Markets Corporation; (xiii) SG Americas Securities, LLC; (xiv) UBS Securities LLC; (xv) UBS Financial Services; (xvi) WestLB Securities, Inc. |

**V. FACTUAL ALLEGATIONS**
    **K. Findings from the Barclays Cooperation Materials**
        **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**
            **a. Evidence of LIBOR Suppression During Late 2007**

| | |
|---|---|
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson. During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs. In a subsequent conversation the same morning, Johnson and |

|  | |
|---|---|
|  | an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission. After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?" In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low." Later that afternoon, Johnson spoke with another unidentified broker over the phone. In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate. In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest. And I'm gonna go upset these bastards. I'll be back." On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
| **b. Evidence of LIBOR Suppression During 2008** | |
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR. In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** | |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack. Consider the following examples: |

> 1. On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board. Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him." An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."

> 2. Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon. Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs." Burgess agreed to try to find additional market color but in the interim

<table>
<tr>
<td></td>
<td>

informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."

3. On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added).

4. On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey.  Johnson reached out to Ramsey to gather information prior to the LIBOR fix.  Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).  In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*"  (Emphasis added).  While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.

5. Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side."

</td>
</tr>
<tr>
<td>¶320</td>
<td>

Separately, and immediately before the September 18, 2008 LIBOR fix, Johnson shared his concerns with Tullett Prebon's Neil Burgess, who concurred with his assessment of the LIBOR settings being divorced from reality:

PJ:  I'm very disappointed at Credit Suisse being such a f*cking tool.  You know what that means?  He's in the sh*t.

NB:  Yeah.

PJ:  He must be in the sh*t, he's been told by his management to f*cking go low.

NB:  Yeah, I think so.  But that's.  Yeah, but the thing is, Pete, I [inaudible] th-the off balance sheet's runnin'

</td>
</tr>
</table>

|  | to cash in.  I went so many rounds this mornin'.<br><br>PJ:  Yeah.  Well they're all f*ckin' wrong mate.  We're right.  They're wrong.  We know it.<br><br>NB:  Mm hmm.<br><br>PJ:  They know it.<br><br>Ultimately, Barclays submitted a 3 month LIBOR of 3.7500 on September 18, 2008, and was kicked out up from the LIBOR panel.  Tellingly, Barclays' submission was a full 75 basis points higher than the lowest submitter, and 53 basis points higher than the average submission of the remaining 15 panel banks. |
|---|---|
| ¶323 | What seemed to offer Johnson comfort, however, was the hope that at least on occasion other LIBOR submitters would come close to submitting accurate LIBORs and occasionally venture above the parapet.  For example, on October 9, 2008, Johnson had a discussion with two unidentified brokers wherein he divulged Credit Suisse's expected (and actual) LIBOR submission for the following day.  Johnson initially inquired, "Any other reprobates doing anything thing in the, uh, threes?  So, I know Credit Suisse is going five."  Later Johnson added, "I know what it is, it's mutual respect, because we're the only two people who even tell, vaguely the truth."  Of course, mutual respect for merely approximating the truth was not a ringing endorsement for Credit Suisse, and is in fact an indictment of the accuracy of the LIBOR benchmark resulting from the panel bank's egregious behavior. |
|  | **L.  The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period.** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110]  Consider the following representative examples:<br><br>      b.  *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) *with* Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the next few days");<br><br>      c.  *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derivatives Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: '*I reckon you should be about four to five ticks higher*") (emphasis in original) *with* Rabobank DOJ SOF ¶ 26 (on September 26, |

---

|  | 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased about three basis points on average).<br><br>d.  *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) *with* Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, *inter alia* observed that Credit Suisse was "gonna go three percent from one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."<br><br>Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day. |
|---|---|
| **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.** | |
| **3.  The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions** | |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon.  *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br><br><div align="center">***</div><br>•  On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and<br><div align="center">***</div> |

| The Deutsche Bank Defendants | |
|---|---|
| **IV. PARTIES** | |
| **B. Defendants** | |
| **13. The Deutsche Bank Defendants** | |
| ¶70 | Defendant Deutsche Bank, AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. Deutsche Bank maintains a United States headquarters in New York located in this District at 60 Wall Street, New York, New York, which employs approximately 1,600 personnel, including 1,000 executives. Deutsche Bank also has subsidiaries (*e.g.*, Deutsche Bank Securities, Inc., headquartered in New York) with substantial operations in the United States, employing more than 10,000 full-time employees in the United States, with 1,700 employees at Deutsche Bank New York alone. Deutsche Bank's Branch in New York is registered with the New York Department of Financial Services, is subject to U.S. Federal Reserve System regulations, and is regulated by the CFTC as a registered swap dealer. Deutsche Banks's New York office operates as the North American Regional Head Office for Deutsche Bank, and serves as a critical hub of Deutsche Bank's core banking operations. |
| ¶71 | Deutsche Bank also has banking divisions and subsidiaries around the world, including in the United States, including a business unit known as Global Finance and Foreign Exchange ("GFFX"), which has employees in multiple legal entities around the world, including in London and New York. From 2006 through 2011, Deutsche Bank operated its Global Finance and Foreign Exchange business unit ("GFFX"), which according to a criminal Deferred Prosecution Agreement dated April 23, 2015 between Deutsche Bank and the DOJ is responsible for the misconduct related to interest rate benchmark submissions. Deutsche Bank's derivative traders that were responsible for trading a variety of financial instruments linked to LIBOR were primarily located in London and New York. Deutsche Bank also operated a money market derivatives desk in New York that traded derivative products tied to LIBOR. Deutsche Bank has admitted that its submitters, traders, desk managers, and at least one of its senior managers engaged in systemic and pervasive manipulation of U.S. Dollar LIBOR and submissions for other currencies through its New York office. |
| ¶72 | Defendant Deutsche Bank Securities, Inc. ("DBSI"), Deutsche Bank's indirect wholly-owned subsidiary, is a Delaware-chartered broker-dealer and investment adviser that is registered with the SEC. DBSI also is a commodity pool operator and Futures Commission Merchant, which is registered with the CFTC. Deutsche Bank and DBSI share certain employees and executives. |
| ¶73 | Defendant DB Group Services (UK) Limited ("DBGS") is a wholly owned, indirect subsidiary of Deutsche Bank. DB Group Services is incorporated and operates its principal place of business in the United Kingdom. DB Group Services also entered into a criminal Deferred Prosecution Agreement with the DOJ, admitting that it employed many of Deutsche Bank's London-based pool and MMD traders that were responsible for manipulating the LIBOR benchmarks. Derivative traders employed by DBGS were responsible during the period January 1, 2003 through May 31, 2011 for trading a variety of financial instruments that were tied to LIBOR. Many traders in Deutsche Bank's GFFX business unit were employed by DBGS, and the DOJ statement of facts related to DB Group Services' plea agreement and Deferred Prosecution Agreement, notes that Deutsche Bank's counterparties |

14

| | |
|---|---|
| | to interest rate derivative transactions tied to various LIBOR currencies were located in the United States, including, among others, asset management corporations, business corporations, universities, non-profit organizations, insurance companies, banks and other financial institutions. |
| **V. FACTUAL ALLEGATIONS** | |
| **C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide** | |
| ¶142 | The investigations uncovered a widespread manipulation of various LIBOR rates, including U.S. Dollar LIBOR. As a result of these investigations, governmental regulators have so far settled with six of defendant panel banks – Barclays, UBS, RBS, Rabobank, Lloyds, and Deutsche Bank – and two interdealer brokers – ICAP and RP Martin – in connection with Yen-LIBOR manipulation. Although Citibank was not identified in Final Notices of settlements with certain defendants for LIBOR manipulation, the FCA, DOJ and CFTC entered into settlements with Citibank for manipulation of foreign exchange rates and benchmarks in 2015. In the FCA's settlement agreement with Citibank, the British Financial Conduct Authority ("FCA") expressly noted that in response to Final Notices issued to other defendants by regulatory authorities for LIBOR manipulation, Citibank engaged in a remediation program to improve policies, procedures and training in connection with Citibank's LIBOR and other benchmark assessments and price formation processes. |
| ¶149 | On April 23, 2015, defendant Deutsche Bank settled civil and criminal cases with the DOJ, CFTC, New York Department of Finance and FCA concerning, inter alia, the manipulation of USD-LIBOR. Pursuant to the settlement and the guilty plea, Deutsche Bank paid the U.S. and U.K. authorities a total of approximately $2.5 billion, making it the largest LIBOR settlement to date. |
| **I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** | |
| ¶218 | The CFTC began investigating Deutsche Bank's LIBOR manipulation in 2010. It took the CFTC five years to complete its investigation.  On April 23, 2015, the CFTC announced for the first time the results of its investigation in an Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 15-20 (April 23, 2015) (hereinafter "Deutsche Bank CFTC Order").  The CFTC determined that Deutsche Bank violated Sections 6(c) and 6(d) and 9(a)(2) of the CEA, 7 U.S.C.  §§ 19, 13b and 13(a)(2). See Deutsche Bank CFTC Order, at 1. Deutsche Bank made an Offer of Settlement and agreed to the entry of a Deutsche Bank CFTC Order making findings and imposing sanctions.  Id.  Deutsche Bank agreed: to pay a civil monetary penalty of $800,000,000.00, id. at 42; to undertake corporate governance and internal controls to prevent further manipulation of U.S. Dollar LIBOR, including separation of its rate submission and trading functions, id. at 43. 44-56; and to cooperate with the CFTC's continuing investigation into LIBOR manipulation. Id. at 56-57. Deutsche Bank "consent[ed]" to the CFTC's "findings" that Deutsche Bank violated the Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. § 9, 13b, and 13(a)(2) (2006) and to cease and desist from further violations. Id. at 42. |
| ¶219 | On April 23, 2015, Deutsche Bank pled guilty in connection with the U.S. DOJ investigation and criminal charges in connection with Deutsche Bank's manipulation of LIBOR. Pursuant to its guilty plea, Deutsche Bank has agreed to pay $775 million in |

15

| | |
|---|---|
| | criminal penalties to the Justice Department. In addition, Deutsche Bank is required to continue cooperating with the Justice Department in its ongoing investigation and to retain a corporate monitor for three years. As part of the plea, Deutsche Bank admitted its role in manipulating LIBOR and participating in a price-fixing conspiracy in violation of the Sherman Act. |
| ¶220 | Also in April, 2015, the Financial Conduct Authority issued its Final Notice against Deutsche Bank relating to what it deemed "serious misconduct" in connection with manipulation of LIBOR rates, and imposed a fine of €226,800,000. |
| ¶221 | The New York State Department of Financial Services ("NY-DFS") also investigated Deutsche Bank and announced the results of its investigation for the first time on April 23, 2015. See Consent Order under New York Banking Law §§ 44 and 44-a (hereinafter "Deutsche Bank NYDFS Order"). Deutsche Bank agreed: to pay a civil monetary penalty of $600,000,000, id. ¶70; to terminate seven employees involved in the manipulation who had not yet been terminated by the Bank, id. ¶73; and to engage an independent monitor selected by the DFS to monitor the bank's LIBOR rate submission and trading policies. Id. ¶75. |
| | **1. Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures** |
| ¶222 | The CFTC Order describes LIBOR as the commodity underlying CME Eurodollar futures. U.S. Dollar LIBOR and other currency-denominated LIBOR "are commodities in interstate commerce." Deutsche Bank CFTC Order at 35. "The Eurodollar futures contract traded on the Chicago Mercantile Exchange ("CME") is one of the largest futures contract in the world based on open interest and notional value of trading volume and settles against U.S. Dollar LIBOR." Deutsche Bank CFTC Order at 2; see also id. at 35. "U.S. Dollar LIBOR is used as the basis for settlement of the CME's Eurodollar futures contracts." Id. at 5. Deutsche Bank's LIBOR manipulation "affects or tends to affect the prices of commodities in interstate commerce." Id. at 36. |
| ¶223 | The CFTC found that Deutsche Bank's LIBOR manipulation was directly tied to CME Eurodollar futures. Deutsche Bank's "Global Finance and Foreign Exchange Group ("GFFX") included "Pool Trading Desks and Money Market Derivatives ('MMD') desks." Deutsche Bank CFTC Order at 7. Deutsche Bank's LIBOR submitters sat on the Pool Trading desks, where they traded "both cash and derivatives trading products." The Pool Desks – which included LIBOR submitters and other Pool Desk Traders – regularly traded in interbank cash deposits and loans to meet the bank's funding needs, and also had "their own ***derivatives trading books*** that allowed them to not only hedge risk in their cash trading but also to generate profits for the desk in a proprietary fashion." Id. at 8 (emphasis added). "MMD traders, who also held proprietary books, primarily traded derivatives trading products." Id. "***Some of the derivative products traded by both pool and MMD traders included futures (including the CME Eurodollar futures contract)***, interest rate swaps, forward rate agreements, overnight index swaps and tenor basis swaps." Id. "The cash and derivatives positions held by the Deutsche Bank pool traders and MMD traders were often priced off of LIBOR . . . ." Id. (emphasis added). |
| ¶224 | Deutsche Bank's Global Senior Manager in charge of the Pool and MMD trading "instructed all traders to have open communications across offices and instilled an expectation that the derivatives traders and submitters would communicate routinely about relevant market conditions and individual trading positions." Id. at 8. Deutsche Bank's traders "routinely communicated to submitters their preferential requests for LIBOR . . . submissions which were beneficial to individual and trading desk positions." Id. at 8. These requests came in the form of shouts across the trading floor, requests passed on to traders who |

| | |
|---|---|
| | sat next to U.S. Dollar LIBOR submitters, and electronic communications via Bloomberg messaging terminals and Deutsche Bank's internal messaging systems. |
| ¶225 | The CFTC found that Deutsche Bank lacked any internal controls to prevent the U.S. Dollar LIBOR manipulation, Deutsche Bank CFTC Order at 4, which enabled the bank to manipulate U.S. Dollar LIBOR in a "systemic," "pervasive," "regular," "common," and "routine" fashion:<br><br>a.      "For more than six years, from at least 2005 through early 2011 . . . , Deutsche Bank . . . engaged in ***systematic and pervasive misconduct*** directed at manipulating critical, international financial benchmark rates, [including] the London Interbank Offered Rate," and that its "profit-driven misconduct undermined the integrity of LIBOR and . . . the integrity of the U.S. and global financial markets."  Deutsche Bank CFTC Order at 2  (emphasis added).<br><br>b.      "Through its ***regular***, false LIBOR and Euribor submissions, Deutsche Bank routinely attempted to manipulate LIBOR and Euribor in order to ensure that the published rates for each benchmark benefited its trading positions."  Id. at 2 (emphasis added).<br><br>c.      "Over this more than six year period and across currencies, Deutsche Bank's submitters ***routinely*** took into account other Deutsche Bank traders' derivatives trading positions, as well as their own cash and derivatives trading positions, when making the Bank's LIBOR and Euribor submissions."  Id. at 2 (emphasis added).<br><br>d.      The manipulation "was ***systemic and pervasive***, occurring across multiple trading desks and offices, including London, Frankfurt, ***New York***, Tokyo, and Singapore."  Id. at 2-3 (emphasis added).<br><br>e.      "As a result of this profit-based submission process, ***improper written and oral submission requests were common practice***, and LIBOR and Euribor submitters ***routinely*** skewed Deutsche Bank's contributions, ***routinely*** made false submissions, and ***routinely*** attempted to manipulate, and, at times, successfully manipulated LIBOR and Euribor."  Id. at 4 (emphasis added).<br><br>f.      "In addition to the ***pervasive*** oral requests, some of which were shouted across the combined trading desks, submitters and traders ***routinely*** communicated on Bloomberg chat terminals or internal Deutsche Bank messaging systems to discuss preferential LIBOR . . .requests."  Id. at 8-9 (emphasis added). |
| ¶226 | Throughout the period 2005-2011, "the Pool Trading and MMD desks together utilized a basis spread trading strategy (i.e., trading the spread between two or more tenors) to generate profits."  Deutsche Bank CFTC Order at 9. During the financial crisis, Deutsche Bank amplified this strategy by "enter[ing] into massive derivatives basis trading positions based upon the bet that the spread between tenors would continue to widen."  Id.  "Deutsche Bank's LIBOR . . . submitters were aware of this strategy, particularly during the financial crisis, and were cognizant of the particular LIBOR . . . submissions desired by traders to benefit those positions based on this strategy."  Id.  As such, the submitters ***routinely*** built this bias into Deutsche Bank's LIBOR . . . submissions, even in the absence of oral or written communications from traders."  Id. |
| ¶227 | "Deutsche Bank's Pool Trading and MMD desks posted tremendous profits during 2008 and 2009, at the height of the financial crisis, due in part to this trading strategy." Id. Deutsche Bank CFTC Order at 9. In particular, the bank's traders bet on the widening of the spread between 1 month, 3 month, and 6 month USD LIBOR that would result from the dislocation of financial markets. |

17

| | |
|---|---|
| | DOJ PA SOF ¶ 32.  On almost every day during this time period, Deutsche Bank's rate submitters altered the bank's USD LIBOR submissions to align with the needs of this trading strategy, i.e., persistently low 1 month and high 3 and 6 month USD LIBOR submissions.  Id.  And if the submissions did not align with this strategy, the bank's traders complained to the submitter.  Id. |
| ¶228 | The CFTC found that, "[o]ver this more than six year period and across currencies, Deutsche Bank's submitters routinely ***took into account other Deutsche Bank traders' derivatives trading positions***, as well as their own cash and derivatives trading positions, when making the Bank's LIBOR and Euribor submissions."  Deutsche Bank CFTC Order at 2 (emphasis added).  "Through its regular, false LIBOR and Euribor submissions, Deutsche Bank routinely attempted to manipulate LIBOR and Euribor ***in order to ensure that the published rates for each benchmark benefited its trading positions***."  Deutsche Bank CFTC Order at 2 (emphasis added). |
| ¶229 | The primary motivation for Deutsche Bank's manipulation of LIBOR was to benefit its trading positions, including positions in CME Eurodollar Futures.  As the CFTC found:

> Allowing submitters and traders to prioritize profit motives over appropriate submission considerations, Deutsche Bank permitted a culture of trader self-interest to exist and created conflicts of interest, which allowed the misconduct to occur. Certain managers encouraged continual information sharing between derivatives traders, money market traders, and submitters for the various benchmarks, even restructuring business lines such that, in Deutsche Bank's London office, derivatives traders and submitters sat together. In addition to making routine written requests for beneficial LIBOR and Euribor submissions, the traders often shouted their requests for beneficial submissions across the trading floor to the submitters. A senior manager regularly sat with the traders and encouraged them and their counterparts in other offices to communicate and exchange trading positions, so submitters became clearly aware of the submissions that were most favorable to the various desks' trading positions.  Senior desk managers in London, Frankfurt, New York, and in the Deutsche Tokyo Subsidiary also made requests to benefit their own trading positions, facilitated the requests from their traders for beneficial submissions, and generally promoted the practice of inappropriately using benchmark interest rate submissions to help the traders increase profits and minimize losses on their and the desk's trading positions. The cash and derivatives trading on the desks responsible for Deutsche Bank's misconduct increased throughout the relevant period and the desks generated significant revenues for Deutsche Bank, particularly during the global financial crisis of 2007 through 2009. Deutsche Bank CFTC Order at 3. |
| ¶230 | This practice was enabled by Deutsche Bank's merging of various trading desks around 2006.  "Deutsche Bank's merger of Pool Trading and MMD desks proved successful and resulted in significant profits for the bank."  Deutsche Bank CFTC Order at 9.  This merger of trading desks placed U.S. Dollar rate submitters in close proximity with traders, enabling a conflict of interest in which the rate submissions were based not on anticipated borrowing costs, but on derivatives positions. |
| ¶231 | The CFTC found that "Deutsche Bank further embedded this inherent conflict of interest in its Pool Trading desks when it allowed its pool traders to fill dual roles as both submitters and derivatives traders" which "allowed its pool traders to prioritize their |

| | |
|---|---|
| | individual and the desk's profits over their responsibility to make honest assessment of the costs of borrowing unsecured funds when submitting rates to the BBA . . . ." Deutsche Bank CFTC Order at 9. "Not only did the submitters *routinely* take into account the traders' preferential LIBOR . . . requests, the submitters also *regularly* and improperly considered their own trading positions when determining the LIBOR . . . submissions." Id. (emphasis added). "By failing to separate responsibilities for making LIBOR . . . submissions from its trading functions, Deutsche Bank allowed an environment to exist that yielded *significant opportunities* for traders and submitters to attempt to manipulate LIBOR . . . submissions to the benefit of the bank's trading positions, and the traders and submitters *took full advantage of those opportunities*." Id. "As a result, the submitters *routinely* skewed Deutsche Bank's LIBOR . . . submissions to benefit the bank's trading positions by attempting to manipulate the fixings of LIBOR . . ." and "[a]t times, their attempts to manipulate U.S. Dollar . . . LIBOR . . . were successful." Id. |
| ¶232 | During the period between 2003 and 2011, Deutsche Bank's London traders would request beneficial U.S. Dollar LIBOR submissions beneficial to their trading positions through requests "shouted across the trading floor, passed from one trader to another trader sitting next to the [U.S. Dollar LIBOR] submitter, or sent to submitters through electronic communications." Deutsche Bank CFTC Order at 11. In addition, Deutsche Bank's Pool and MMD traders and managers in New York and Frankfurt also requested beneficial LIBOR submissions. Id. And Deutsche Bank's LIBOR submitters contacted traders around the world to ask whether "they had requests for beneficial LIBOR submissions." Id. One Deutsche Bank rate submitter "became so familiar with the trading positions of the U.S. Dollar traders that he either informed the traders of his intent to submit a skewed LIBOR without waiting for a request or he simply submitted U.S. Dollar LIBOR submissions in a manner he believed would benefit their derivatives trading positions." Id. |
| ¶233 | In addition, between January 2008 and July 2009, derivatives traders made requests to broker firms in their attempts to influence the LIBOR submissions of other banks through information disseminated by the broker firms as part of market color they provide to their clients. FCA ¶ 4.46. |
| ¶234 | The CFTC found that Deutsche Bank "made repeated and regular attempts to manipulate U.S. Dollar, . . . LIBOR . . . in order to affect the official fixings of LIBOR . . . in a manner that would benefit its cash and derivatives trading positions," and that the bank "knew it was improper" to do so. Deutsche Bank CFTC Order at 35. Deutsche Bank knew that its U.S. Dollar Libor submissions—which were biased for trading positions—did not meet BBA standards, were therefore "false" and "misleading." Id. By attempting to skew U.S. Dollar LIBOR to benefit its trading positions, Deutsche Bank "regularly attempted to manipulate the official fixings for U.S. Dollar . . ." and "knowingly delivered false, misleading, or knowingly inaccurate reports concerning U.S. Dollar . . . LIBOR" which is a "commodity." Id. |
| ¶235 | The New York Department of Financial Services also found evidence of general suppression during the financial crisis: From approximately 2007 through 2009, a number of large international banks were receiving negative press coverage concerning their high and potentially inaccurate LIBOR submissions. Certain articles questioned particular banks' liquidity position regarding the high LIBOR submissions and, as a result, the banks' share prices fell. Various Deutsche Bank senior managers circulated and discussed these articles. For example, on October 4, 2007, the Head of Short Term Interest Rate Trading in Australia and New |

|  | Zealand forwarded an article, which reported a rumor that a large European bank was struggling for financing, including to senior management, commenting on the instability of the market, specifically in regards to bank illiquidity, and commented:<br><br>This market has the feel that we are about to have another run and panic on funding in my opinion just a gut feeling looking at the behavior of LIBORS if we look at the 3mth fix over the lst few days since we have gone over the TURN of the year there has been a bit of pressure… this feels like the period where we were edging up ever so slight back in early august where we fixed at 5.36 for months on end and then started edging up before the panic set in.<br><br>Deutsche Bank NYSDFS Order ¶¶55-57.  Later that day, a group head within the Global Finance and Foreign Exchange Unit forwarded the email to a London desk head, directing, "Make sure our libors are on the low side for all ccys." Id. |
|---|---|
| ¶236 | The CFTC, DOJ, FCA and NYDFS orders list some "examples" of the pervasive manipulation in their settlement papers, as have other regulators.  These examples are listed in the chart below. |

**EXAMPLES OF TRADER-BASED MANIPULATION**

| Date | Direction (Tenor) | Finding (emphasis in original) | Source | ¶/p. |
|---|---|---|---|---|
| 2005-02-21 | ↑ (6m) | For example, on February 21, 2005, a trader requested of another trader who performed submitter duties on a back-up basis, "can we have a high 6mth libor today pls gezzer?" The trader/submitter agreed, "sure dude, where wld you like it mate ?" The trader replied, "think it shud be 095?" The trader/submitter replied, "cool, was going 9, so 9.5 it is." The trader joked, "super – don't get that level of flexibility when [the usual submitter] is in the chair fyg!" | NYSDFS Consent Order | ¶14 |
| 2005-03-22 | ↑ | **March 22, 2005:** (emphasis added)<br><u>U.S. Dollar LIBOR Submitter</u>: **if you need something in particular in the libors i.e. you have an interest in a high or a low fix let me know and there's a high chance i'll be able to go in a different level. just give me a shout the day before or send an email from your blackberry first thing.**<br><u>New York U.S. Dollar Trader 1</u>: Thanks - our CP guys have been looking for it a bit | CFTC Examples of Misconduct-Written | p.1 |

| | | | | |
|---|---|---|---|---|
| | | higher - not a big deal<br>U.S. Dollar LIBOR Submitter: if anything the cash has actually cheapened up since yesterday too albeit | Comms | |
| 2005-04-01 | ↓<br>(6m) | **April 1, 2005:** (emphasis added)<br>London U.S. Dollar Trader 1: **COULD WE PLS HAVE A LOW 6MTH FIX TODAY OLD BEAN?** | CFTC Examples of Misconduct- Written Comms | p.1 |
| 2005-06-13 | ↓<br>(6m) | Deutsche Bank's six month USD LIBOR submissions on 13 June 2005 was 3.375 down from 3.39 the previous day. | FCA Order | ¶4.28 |
| 2005-09-21 | ↓ | The London MMD Manager, a submitter, sent daily messages which predicted where USD Libor would fix.<br><br>**September 21, 2005:** (emphasis added)<br>London MMD Manager: Subject: "$ LIBORS: 83, 89, 96 and 11<br>**LOWER MATE LOWER !!**<br>U.S. Dollar LIBOR Submitter: will see what i can do but it'll be tough as the cash is pretty well bid<br>London MMD Manager: **[Another U.S. Dollar Panel Bank] IS DOIN IT ON PURPOSE BECAUSE THEY HAVE THE EXACT OPPOSITE POSITION** - ON WHICH THEY LOST 25MIO SO FAR - LETS TAKE THEM ON!!<br>U.S. Dollar LIBOR Submitter: **ok, let's see if we can hurt them a little bit more then** | DOJ DBGS SOF<br><br>CFTC Examples of Misconduct- Written Comms | ¶35<br><br>p.1 |
| 2005-09-26 | ↓<br>(1m)<br><br>↑<br>(3m) | In another example, on September 26, 2005, Manager-1, a DBGS employee, solicited requests from Trader-1, a London-based MMD trader and also a DBGS employee, in an electronic chat: Manager-1: libors any requests? Trader-1: HIGH FREES, LOW 1MUNF Manager-1: what levels? | DOJ DBGS SOF | ¶36 |

21

| 2005-11-24 | ↑ (3m) | Having DB's USD LIBOR pool traders in London both submit LIBOR and trade financial products tied to USD LIBOR presented a conflict of interest that contributed to the manipulation of USD LIBOR submissions for the benefit of the submitting traders. For example, when Manager-2 from New York requested of Submitter-1 and Manager-1, in an email, that "3mo Libor be as high as possible Thursday and Friday, if you see the market higher" on November 24, 2005, Submitter-1 replied, "[Manager-2], we've gone in relatively neutral as a high 3s doesn't suit london at the moment. Hope that's ok." | DOJ DBGS SOF | ¶43 |
|---|---|---|---|---|
| 2005-11-24 | | In a separate, related email conversation between Submitter-1 and Manager-1 about Manager-2's request, Submitter-1 admitted to Manager-1 that he "…asked [Trader-1] this morning so went neutral. It's fence sitting I know but better to try to keep both parties somewhat on-side." Soon after this comment to Manager-1, Submitter-1 wrote to Manager-2, with Manager-1 cc'd, "I'll speak to [Trader-1] again tmrw and see if we can get something sorted…" | DOJ DB SOF | ¶35 |
| 2005-11-28 | ↑ | **November 28, 2005:** (emphasis added)<br>London Pool Trading Manager: **[an]ything either way from you guys? We are still short basis in 1mth so lowere the better**<br>New York Regional Manager: HAHAHAH, NEVER FAILS. WE WOULD PREFER IT HIGHER…WE HAVE ABOUT 15BB 1MO RECEIVES…**THANKS JUST ASKING IS VERY MUCH APPRECIATED…**<br>London Pool Trading Manger: will do like [U.S. Dollar LIBOR Submitter] then – ask, and do the opposite…let us know the days you rec, first fix tom will set the tone<br>New York Regional Manager: JUST TOMORROW ON THE REC, THEN PAYING 15BB 12/12 THRU | CFTC Order | p.12 |
| 2005-11-29 | ↑ (1m) | DB's USD LIBOR traders in New York also made requests of the bank's USD LIBOR submitters in London, Submitter-1, who was employed by DBGS, and were actively encouraged to do so by their supervisor, Manager-2, who was not employed by DBGS. For example, on November 28, 2005, Manager-2 and Manager-1, who was employed by DBGS, discussed, in email messages, Manager-2's present trading strategy and his need for a higher 1-month rate and Manager-1 prompted Manager-2 to keep Manager-1 | DOJ DBGS SOF | ¶40 |

| | | | | |
|---|---|---|---|---|
| | | informed. Then, on November 29, 2005, Manager-1 confirmed that they had taken Manager-2's request into account, in an email,"looking like 29 in 1 mth libor – we went in 295 for u." | | |
| 2006-02-24 | ↓ (1m) | As another example, on February 24, 2006, Manager-1 and a MMD trader, Trader-3, asked Submitter-1 to push DB's 1-month USD LIBOR submission as low as possible. After a broker had informed Manager-1 that USD LIBOR would probably be around 60.5, Manager-1 forwarded the email message to Trader-3, Submitter-1, and Trader-1, asking Submitter-1 to "Push for 60 [Submitter-1]." Trader-3 then pushed further, "or even 58 if u can Coffee on me." Submitter-1, in reply to both Manager-1 and Trader-3, stated, "ok right now we're looking like 60.5 given what people are saying. Will work on it all morning." | DOJ DBGS SOF | ¶37 |
| 2006-03-20 | ↑ (3m) | Trader-4, who was in New York and not employed by DBGS, made requests of DB's USD LIBOR submitters in London to benefit his trading positions. For example, on March 20, 2006, Trader-4 sent a USD LIBOR request, in an email, to Submitter-1, "Hi [Submitter-1] Regarding Mondays 3mLibor, MMD NY is receiving 3mL on USD 6.5 Bn so hoping for higher 3mL. Cheers [Trader-4]." | DOJ DBGS SOF | ¶41 |
| 2006-04-11 | ↑ (3m) | Trader-4, who was in New York and not employed by DBGS, made requests of DB's USD LIBOR submitters in London . . . Similarly, on April 11, 2006, Trader-4 sent an email request to Submitter-1, "Hi [Submitter-1] FYI I am receiving 3mL on 5.5 Bn of the April 12 fixing so a higher 3m Libor on Wed morning would help me. Regards [Trader-4]." Submitter-1 then passed along the request to Manager-1, in an email, noting "Hi [Trader-4], I'm off today but I'll pass the message on to [Manager- 1]. Thanjs." Submitter-1 passed the request along one minute later. | DOJ DBGS SOF | ¶41 |
| 2006-05-17 | ↑ (3m) | Trader-5, another MMD USD LIBOR trader in New York who was not employed by DBGS, likewise made a request. On May 17, 2006 Trader-5 sent a request, in an email, to Manager-1, "Hi [Manager-1], hope you've been well. If you can help we can use a high 3m fix tom," to which Manager-1 replied to Trader-5 and Submitter-1, "[Trader-5], I'm off but [Submitter-1] is your libor man [] [Submitter-1] could you take a look at 3s libor in the morning for [Trader-5]." | DOJ DBGS SOF | ¶42 |

| | | | | |
|---|---|---|---|---|
| | | Submitter-1 then agreed to accommodate the request, replying "Will do chaps." The following morning after he submitted DB's contribution, Submitter-1 wrote to Trader-5, in a chat, "morning [Trader-5], I went in at 19+ for the 3m libor, as you'll see it almost manage to reach 19." | | |
| 2006-06-09 | ? | For example, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok." | NYS DFS Consent Order | ¶35 |
| 2006-07-20 | ↓ (1m) | Trader-4, who was in New York and not employed by DBGS, made requests of DB's USD LIBOR submitters in London to benefit his trading positions. . . . Again, on July 20, 2006, Trader-4 told Submitter-1, in an email, "FYI I'm short (paying 1mL) on 6bn of the 1mL tomw in case you have a chance to make it lower" and Submitter-1 responded, "leave it with me on the 1m." | DOJ DBGS SOF | ¶41 |
| 2006-10-02 | ↑ (6m) | Similarly, on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?" The Head of the London Money Market Derivatives desk replied, "i will." | NYS DFS Consent Order | ¶36 |
| 2006-11-28 | ↓ (1m) | **November 28, 2006:** (email to London Pool Trading Manager) (emphasis added)<br>New York U.S. Dollar Senior Trader: **Altho I don't have a huge 1 mL fix tomw, I am paying 1 mL on about 40bn throughout December so I was hoping for a low 1 mL fix tomw to set the tone** | CFTC Examples of Misconduct-Written Comms | p. 2 |
| 2006-12-29 | ↓ (1m) | **December 29, 2006:** (emphasis added)<br>London U.S. Dollar Trader 2: Hello [U.S. Dollar LIBOR Submitter] Come on 32 on 1. Mth Cu my frd<br>U.S. Dollar LIBOR Submitter: ok **will try to give you a belated Christmas present…!** | CFTC Order | p.12 |

| | | have a good new year | | |
|---|---|---|---|---|
| 2007-02-28 | ↑ | **February 28, 2007:** (emphasis added)<br>New York U.S. Dollar Trader 2: **LIBOR HIGHER TOMORROW?**<br>U.S. Dollar LIBOR Submitter: shouldn't be<br>New York U.S. Dollar Trader 2: COME ON. **WE ALWAYS NEED HIGHER LIBORS !!!** HAHA<br>U.S. Dollar LIBOR Submitter: **haha, i'll do my best fkcer**<br>New York U.S. Dollar Trader 2: NO WORRIES. JUST CURIOUS, U<br>SURVE THE DEBACLE OF TH PAST 24 HRS> | CFTC Examples of Misconduct-Written Comms | p. 1 |
| 2007-03-14 | ↓<br>(3m) | **March 14, 2007:**<br>London Pool Trading Manager: These markets falling in is not good for us personally. We need good old fashioned boom time […]<br>U.S. Dollar LIBOR Submitter: […][Broker 1] reckon 3s libor only 34.75 fyg even with edh where it is now which is bllx<br>London Pool Trading Manager: Get it lower, we need it. [...]<br>U.S. Dollar LIBOR Submitter: just spoke to him. Now thinking 34.5, I think should be lower still will keep pressing will do | CFTC Order | p.14 |
| 2007-03-28 | ↑<br>(3m) | **March 28, 2007:**<br>Frankfurt Non-Euro Desk Manager: …I WOULD NEED A HIGH 3MTS LIBOR TODAY, BUT I THINK YOU DO TOO!!<br>London Pool Trading Manager: 35?<br>Frankfurt Non-Euro Desk Manager: YEP PSE | CFTC Order | p.13 |

| 2007-06-20 | ↓ (1m) | On various occasions, Deutsche Bank communicated with broker firms in an effort to influence LIBOR submissions through the information disseminated by brokers as part of the market color they provided to clients.<br><br>For example, on June 20, 2007, a London desk head wrote to a submitter, "…my friend we really need the 1 mth fixing to come down if you could do anything." The submitter replied, "SURE MAT E..WE TRY BEST HERE …OFFERING AT MOM IN 1M FOR U TO GET IT HOPEFULLY LOW FOR TOM … K I WILL ALSO OFFER LOW TO THE BROKERS AND WILL ALSO SEND LOW 1M FIXING ON GOING FORWARD .. WE WILL DO OUR BEST MATE" | NYS DFS Consent Order | ¶43-44 |
| 2007-06-26 | | On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing." | NYS DFS Consent Order | ¶42 |
| 2007-08-12 | ↓ (1m) | **August 12, 2007:** (emphasis added)<br><u>New York Regional Manager</u>: **If possible, we need in NY 1mo libor as low as possible next few days....tons of pays coming up overall**....thanks!<br><u>U.S. Dollar LIBOR Submitter</u>: **Will do our best** [New York Regional Manager]. **I'll coordinate the overnight in the same way as we did last week** with [New York U.S. Dollar Trader 1] tomorrow | CFTC Examples of Misconduct-Written Comms | p.2 |
| 2007-08-15 | ↓ (1m) | Three days later, on August 15, Submitter-1 wrote, in an email, that he was still keeping one month USD LIBOR low, noting "1m libor looking like 57 today [Manager-2]," to which Manager-2 replied, "Thanks [Submitter-1], you are the man!" | DOJ DBGS SOF | ¶40 |

26

| 2007-12-13 | ↑ (3m) | **December 13, 2007:** (emphasis added) <br> <u>Frankfurt Non-Euro Desk Manager</u>: [London Pool Trading Manager]**, I NEED YOUR HELP...IF IT SUITS YOU CAN WE PUT IN A HIGH LIBOR TILL NEXT TUESDAY IN THE 3 MTS?** <br> <u>London Pool Trading Manager</u>: ok | CFTC Examples of Misconduct-Written Comms | p.2 |
| 2008-02-27 | ↓ (1m) ↑ (3m) | **February 28, 2008:** <br> <u>Broker 2</u>: which direction do you want tom 1 mth libor pushed? <br> <u>London Pool Trading Manager</u>: lower and 3mth higher <br> <u>Broker 2</u>: imafraid that's not going to happen big boy <br> <u>London Pool Trading Manager</u>: its worked so far | CFTC Order <br><br> NYS DFS Consent Order | p.14 <br><br> ¶45 |
| 2008-05-15 | ↓ (1m) | On 15 May 2008, the same Derivatives Trader asked, "*Low 1mth today pls shag, paying on 18 bio.*" On 15 May 2008 Deutsche Bank's USD submission was 2.48 one basis point lower than the previous day. | FCA Order | ¶4.28 |
| 2008-08-13 | ↑ (3m) | **August 13, 2008:** (response to U.S. Dollar LIBOR Submitter's email) (emphasis added) <br> <u>New York U.S. Dollar Senior Trader</u>: **Subject: $ lsbors unch** <br> **Oh bullshit…..strap on a pair and jack up the 3M. Hahahahaha** | CFTC Examples of Misconduct-Written Comms | p.1-2 |
| 2008-09-16 | ↓ (1m) | In another instance, on September 16, 2008, the Head of the London Money Markets and Pool desk communicated with a broker at ICAP regarding specific LIBOR submissions. The broker wrote, "trying for you," and the Head of the London Money Markets and Pool desk requested, "lower 1mth PLEASE." The broker said, "ok not sure I can go lower than 8o," and the Head of the London Money Markets and Pool desk replied, "please go lower." | NYS DFS Order | ¶46 |

| | | | | |
|---|---|---|---|---|
| 2009-03-24 | ↓ (1m) | On 24 March 2009, Derivative Trader G contacted Broker Firm 3 and persuaded him to update the prediction he had circulated for the USD one month LIBOR setting with a lower number. | FCA Order | ¶4.48 |
| 2009-05-20 | ↑ (1m) ↓ (3m) | On May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?" The external banker replied, "yeah… still." The vice president replied, "we all ahve same position no?" | NYS DFS Order | ¶33 |

| **2. Findings Concerning Conspiring with Outside Banks and Entities** |
|---|

| | |
|---|---|
| ¶237 | The CFTC findings plausibly suggest that Deutsche Bank conspired with other banks.  It found that, "Deutsche Bank **aided and abetted other panel banks'** attempts to manipulate Euribor and Yen LIBOR." Deutsche Bank CFTC Order at 2 (emphasis added). These findings regarding Deutsche Bank's conspiracy with other banks concerning other currency-denominated LIBOR, coupled with Deutsche Bank's acknowledged wrongdoing with respect to U.S. Dollar Libor (its suppression and trader-requested manipulation), plausibly suggest that Deutsche Bank also conspired with other banks to manipulate U.S. Dollar LIBOR. |
| ¶238 | The New York Department of Financial Services found that Deutsche Bank "communicated and coordinated with employees of other banks and financial institutions regarding their respective rate contributions in advance of an LIBOR submission, including individuals at Barclays, BNP Paribas, Citibank, Merrill Lynch, Societe Generale and UBS, in an effort to manipulate rates." Deutsche Bank NYDFS Order ¶30. For example, on May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?"  The external banker replied, "yeah… still."  The vice president replied, "we all ahve same position no?"  Id. ¶ 33. Similarly, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok."  Id. ¶ 35.  And on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?"  The Head of the London Money Market Derivatives desk replied, "i will."  Id. ¶ 36.  On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing."  Id. ¶ 42.  It appears that some of these examples relate directly to Deutsche Bank's U.S. Dollar LIBOR submissions.  Only discovery can confirm this fact, as well as the existence of other examples of conspiracy with outside banks. |
| ¶239 | Likewise, the FCA found instances of collusion between Deutsche Bank and other banks, as well as between Deutsche Bank and interbank brokers.  See Deutsche Bank FCA Order ¶ 4.34. |

| | |
|---|---|
| | **3.  Findings that Negate Deutsche Bank's Statute of Limitations Defense in this Case** |
| ¶240 | The regulatory findings negate Deutsche Bank's statute of limitations defense in several ways:  (1) Deutsche Bank's LIBOR manipulation was inherently self-concealing; (2) The regulatory investigations did not commence until early 2010 (notwithstanding the existence of media questions concerning the accuracy of LIBOR in earlier years); (3) Deutsche Bank's senior management did not appreciate the existence of trader-based manipulation until 2011; (4) Deutsche Bank's traders and rate submitters appear to have stymied regulator-requested internal investigations; and (5) Deutsche Bank initially failed to cooperate with regulatory investigations. |
| ¶241 | The regulators' findings indicate that Deutsche Bank's manipulation was self-concealing.  For example, Deutsche Bank's USD LIBOR submitter would not simply alter one or two of the tenors for Deutsche Bank's daily USD LIBOR submissions. Instead, when the request was for a particular tenor, such as 3 month USD LIBOR, a submitter often altered the other tenors so that the manipulation was not conspicuous. In other words, a request for a change in one Deutsche Bank USD LIBOR tenor, when accommodated, often resulted in a change to the bank's submission for most tenors on that day.  Deutsche Bank DOJ SOF ¶ 30; see also Deutsche Bank DOJ SOF ¶ 22-3.  Similarly, in an effort to conceal the manipulation and make it less conspicuous, one of the submitters kept his submissions within or near a range he felt could be reasonably justified by market conditions. In other words, that submitter would choose the lower or higher end of the range that would not look conspicuous, based on trader requests, but he typically did not exceed a reasonable range because he did not want the manipulation to be noticeable.  Deutsche Bank DOJ SOF ¶ 31. |
| ¶242 | The CFTC appears to have not suspected Deutsche Bank of manipulating LIBOR until early 2010.  Deutsche Bank CFTC Order at 10.  At that time, it requested Deutsche Bank to initiate an internal investigation. Id. at 4.  That the conduct was inherently self-concealing and not known to regulators or the outside world is confirmed by the fact that the misconduct continued even after the CFTC requested Deutsche Bank to conduct an internal investigation: "Deutsche Bank engaged in this wrongful conduct even after the Division of Enforcement requested in April 2010 that Deutsche Bank conduct an internal investigation of its U.S. Dollar LIBOR submission practices." Id. Deutsche Bank impeded the CFTC's investigation from April 2010 through mid-2011: "The Commission [CFTC] notes that at the outset of the Division of Enforcement's investigation in April 2010 and continuing until mid-2011, Deutsche Bank's cooperation was not sufficient, and, in part, this affected a timely resolution of this matter." Id. at 5. |
| ¶243 | Deutsche Bank's senior management appears to have not known about the Libor manipulation within the bank until at the earliest mid-2011, when *it for the first time* began implementing *any* internal controls.  See Deutsche Bank CFTC Order at 4 (emphasis added). Concluding that the public was on inquiry notice before this time suggests one of two alternatives. The first is implausible: Deutsche Bank senior management suspected or knew that Libor manipulation was occurring within the bank but did nothing about it. The second is plausible: Deutsche Bank senior management – which had full access to all pertinent information – did not have sufficient facts to even suspect that Libor manipulation was occurring within the bank until mid-2011 or early 2011 (and then took a few months to implement internal controls). And if Deutsche Bank senior management could not have suspected |

29

| | |
|---|---|
| | LIBOR manipulation until early- or mid-2011 – notwithstanding its unfettered access to information – there is no way that the public – even sophisticated investors – could have suspected LIBOR manipulation.  Indeed, as the CFTC found, despite an internal investigation that commenced in April 2010, Deutsche Bank **failed to appreciate until mid-2011** the extent to which it had systemic and pervasive manipulative conduct by its traders and managers across multiple lines of business in offices around the world." Deutsche Bank CFTC Order at 10 (emphasis added).  "As a result, this conduct continued well after the Division of Enforcement began its investigation of Deutsche Bank's U.S. Dollar submissions in early 2010."  Id. |
| ¶244 | The NYDFS similarly found that Deutsche Bank's senior management failed to recognize the manipulation within the bank. "Notwithstanding their knowledge of the inaccuracies of LIBOR contributions in the industry, members of senior management failed to recognize and respond to warning signs that Deutsche Bank traders may be part of the misconduct."  Deutsche Bank NYDFS Order ¶64.  "Despite this awareness, it was not until 2011 that the Bank took steps to introduce LIBOR-specific systems and controls, and not until February 2013 LIBOR-specific systems and controls were put in place to address the inherent conflicts of interest prevalent at the Bank."  ¶66. |
| ¶245 | Likewise, the FCA has found that wrongdoers within DB misled their own senior management and compliance personnel, and that Deutsche Bank's internal investigations were slow and stymied as a result:  (A) In 2008, for example, notwithstanding his knowledge of LIBOR misconduct, one senior manager denied in internal and external conversations that there was any possibility of improper influence over LIBOR submissions.  On April 17, 2008, that senior manager – having been told of the BBA discussion the previous day – responded to the BBA that the suggestion traders "are manipulating [LIBOR] to make P&L is so far from factual" and that "people do not collude, banks do not collude to try and set a LIBOR rating." FCA ¶ 4.63.  As late as November 15, 2010, the senior manager insisted to a compliance officer that nobody other than the submitter himself would be interested in Deutsche Bank's LIBOR submissions.  FCA ¶ 4.63.  (B).  In the beginning of 2009, a group of senior managers reviewed the EURIBOR trading desk and did not find any manipulation.  In the Spring of 2009, a senior manager had the bank's internal Business Integrity Review Group (BIRG) review the desk because of the massive profits the desk made in 2008, and in particular that a single trader made. The final BIRG report revealed cultural and conduct issues, including issues relating to certain traders. Despite the fact that the attempts to manipulate LIBOR and EURIBOR were occurring openly over written communications and in verbal requests, and that the attempts to manipulate were known to a number of key managers at the bank, and were a natural result of having derivatives traders make submissions for benchmarks referenced in products actively traded by themselves or their direct supervisors, the BIRG review failed to identify any misconduct involving LIBOR and EURIBOR, and no disciplinary or remedial actions were taken. DOJ DPA SOF ¶ 105.  (C) On October 25, 2010, the supervisor of a compliance officer told the compliance officer that, because the Authorities were looking into LIBOR systems and controls, he wanted a formal review of those systems and controls across multiple currencies.  The compliance officer commented a few days later to another employee that if the review proceeded "the business is going to go completely mental" and that the idea was "crazy."  The review did not take place until five months later. FCA ¶ 4.64.  Only after evidence of trader manipulation of LIBOR submissions within Deutsche Bank had been **discovered in May 2011** did Deutsche Bank begin the process of introducing formal systems and controls into its |

| | |
|---|---|
| | LIBOR submission processes.  Deutsche Bank began to take steps in June 2011 to introduce specific LIBOR systems and controls. But, it was not until February 2013 that systems and controls fully addressing the inherent conflict of interest between traders and submitters were in place.  Id. ¶ 4.67. |
| ¶246 | Although Deutsche Bank appears to have cooperated during the later stages of the regulators' investigations, initially it failed to do so. Its failure to cooperate is exemplified in several ways:<br><br>a. Deutsche Bank was slow to produce timely information and documents. For example, Deutsche Bank did not timely produce certain information, including key information related to Deutsche Bank's Euro traders.  Another example is in a telephone conversation where two executive level managers discussed knowing that the regulators asked for relevant information and that the information had been withheld from the regulators and other U.S. authorities while acknowledging they probably would have to give the information to the European Union.<br><br>b. Deutsche Bank was not, by comparison to other settling institutions, proactive in its investigation and disclosure.  For example, Deutsche Bank's conduct included interbank coordination between it and other institutions, but it was the other institutions, not Deutsche Bank, which provided that information to the regulators.<br><br>c. Deutsche Bank's investigation was hampered by numerous significant mistakes in the preservation, collection, and production of documents, audio files, and data.  For example, Deutsche Bank destroyed thousands of hours of potentially responsive audio recordings due to the negligent execution of certain discovery holds.  As another example, Deutsche Bank discovered an important communications platform more than two years after receiving the regulators' initial request for information, which platform contained some of the most explicit documents.<br><br>d. Deutsche Bank caused the Department to be misinformed that the bank was not permitted to provide a report by Deutsche Bank's primary domestic regulator, BaFin, that discussed shortcomings in Deutsche Bank's internal investigation of LIBOR related misconduct.  Deutsche Bank DOJ DPA ¶ 4b. Deutsche Bank gave the FCA misleading information about its ability to provide a report commissioned by the German regulator, BaFin. Deutsche Bank did not disclose the report to the FCA and claimed that BaFin had prevented it from being shared when this was untrue.  See Deutsche Bank FCA Order passim.<br><br>e. Deutsche Bank falsely attested that its systems and controls in relation to LIBOR were adequate when in fact it knew that it lacked any systems and controls whatsoever. |

| | |
|---|---|
| **J. Findings from the ICAP Government Settlements**<br>    **2. Evidence of ICAP's U.S. Dollar LIBOR Manipulation** | |
| ¶252 | Though the ICAP government settlement documents focused primarily on Yen LIBOR manipulation, they also suggest that casual attitudes towards rate manipulation and ICAP's compliance failings created conditions ripe that led to ICAP's manipulation of the U.S. LIBOR benchmark.  In fact, as previously discussed (see Section V.I, supra), ICAP corresponded with Deutsche Bank regarding Deutsche Bank's preferred U.S. Dollar LIBOR settings.  See Deutsche Bank NYS DFS Order ¶¶ 45-46.  For example, on September 16, 2008, Deutsche Bank's Head of the London Money Markets and Pool desk requested and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission. Id. ¶ 46.  On that day, Deutsche Bank was "kicked out" down from the LIBOR fixing in the 1 month U.S. Dollar LIBOR tenor, however, Deutsche Bank was "kicked out" up from the LIBOR fixing in the 3 month U.S. Dollar LIBOR tenor. |
| ¶253 | ICAP's agreement to facilitate Deutsche Bank's manipulation of U.S. Dollar LIBOR is significant for two reasons.  First, ICAP's pledged assistance is directly analogous to the role it played in attempting to manipulate Yen LIBOR on the behalf of UBS. Second, by effectuating Deutsche Bank's manipulation, ICAP facilitated Deutsche Bank's "spread" trade whereby the bank sought to profit the widening of the gap between 1 and 3 month (and 1 and 6 month) LIBOR through derivative trading activities. See Section V.I, supra. |
| **K. Findings from the Barclays Cooperation Materials**<br>    **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>        **a.  Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** | |
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| **2.  Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>        **a.  Evidence of LIBOR Suppression During Late 2007** | |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson. During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to |

| | justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
|---|---|
| ¶297 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions.  After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such."  In response, Johnson noted, "No he's not, but he's still setting them lower then he should do."  Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth". |
| ¶300 | On November 21, 2007, Barclays' Johnson continued to probe other panel banks for insight into their planned LIBOR submissions.  After learning HSBC's planned submission from a broker, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's so scared of sticking its head above the parapet and being the highest fixer" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR (emphasis added). |
| | **b. Evidence of LIBOR Suppression During 2008** |
| ¶316 | On May 1, 2008, Johnson discussed that day's LIBOR expected setting and other panel banks' expected settings with unidentified brokers.  In particular, Johnson was interested in where Deutsche Bank was setting LIBOR, after learning that ICAP told Deutsche Bank that its LIBOR submissions were too low.  To wit, Johnson "quite like[d] this guy at Deutsche actually" as he believed that "he's [had] the right f*cking idea," based on Deutsche Bank's perceived willingness to at least occasionally rise above the parapet.  Conversely, Johnson was less pleased with an unnamed broker who Johnson perceived was encouraging artificially low LIBOR submissions which Johnson suggested was "a load of f*cking bollocks" before labeling the broker a "wanker".  Around 10:15 am, Johnson recognized during offline conversation that his expected submissions would be out of line with other panel banks and quipped, "Well, . . . if they don't like it they can stick it right where it f*cking hurts," before requesting that a colleague tell Deutsche Bank where Barclays planned to set its LIBORs.  On that day, Barclays and Deutsche Bank submitted the highest 3 month LIBOR submissions and were consequently "kicked out" up from the LIBOR panel. |
| | **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples: |

- On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board. Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him." An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."

- Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon. Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs." Burgess agreed to try to find additional market color but in the interim informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."

- On September 17, 2008, Johnson continued to probe for information and share it with other brokers. After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough." Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission. Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me." (emphasis added).

- On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey. Johnson reached out to Ramsey to gather information prior to the LIBOR fix. Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day). In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit. After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good. Now I'm gonna go higher than all of them.*" (Emphasis added). While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.

Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists

| | |
|---|---|
| | are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side." |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>       Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.<br><br>Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br>       PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br><br>       MS:  No, I know, I know, I know, and he's already talked to them about that.<br><br>       PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].<br><br>In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:<br><br>       Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers. |

| | |
|---|---|
| | This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  See Section V.I, supra. |
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶328 | Annexed hereto as Appendix A is a schedule derived from the Regulatory Settlements and Barclays Cooperation Materials that lists discrete days on which Defendants requested that U.S. Dollar LIBOR be manipulated for their own benefit.  This Appendix also shows how the conduct impacted Plaintiffs trading positions in Eurodollar futures.  The list of dates on which Defendants' manipulated LIBOR together is necessarily under-inclusive at this early stage of the litigation.  For example, as a preliminary matter, the CFTC determined that throughout the period of 2005 through 2011, Deutsche Bank routinely employed a trading strategy dependent upon LIBOR manipulation.  See Deutsche Bank CFTC Order at 2, 8-9.  During the financial crisis, this manipulation is alleged to have occurred almost daily, but only representative examples of the manipulation were provided.  See Deutsche Bank DOJ SOF ¶ 32. |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.   Consider the following representative examples: <br><br>     1.  *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) with Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the next few days"); <br><br>     2.  *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derviatives Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: 'I reckon you should be about four to five ticks higher") (emphasis in original) with Rabobank DOJ SOF ¶ 26 (on September 26, 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased about three basis points on average). <br><br>     3.  *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) with Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, inter alia observed that Credit Suisse was "gonna go three percent from |

one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."

Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR. After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS. Remind me to buy you all drinks." To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission. The Citigroup trader agreed to speak with the LIBOR submitter. On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day.

| | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.** |
|---|---|
| | **1. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. See Section V.K, supra. These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack". Consider the following examples: |

- On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks. In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";
- On November 21, 2007, Johnson expressed his general frustration to another broker: "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause *it's so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).
- On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money. I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday). The true cost of money is anything from 5-15 basis points higher. *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";

| | |
|---|---|
| | • On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added).<br><br>• On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."<br><br>• On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";<br><br>• On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and<br><br>• On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide." |
| **VI. INQUIRY NOTICE, EQUITABLE TOLLING AND FRAUDULENT     CONCEALMENT** | |
| **B. The BBA And Defendants Deflected Concerns Raised By Some Market Observers And Participants In Late 2007 And Early 2008 About LIBOR's Accuracy** | |
| ¶477 | For example, Deutsche Bank engaged in a number of activities designed to hide its participation in LIBOR manipulation.  *See* Section V.I, supra. |
| **J. The Manipulation Described In The Barclays, UBS and RBS Settlement Documents Were Not Publicly Available** | |
| ¶593 | This manipulation as described in the Barclays, Deutsche Bank and other settlement documents was more difficult to detect.  Indeed, although the market knew of dislocations in the interbank lending market between August 2007 and into 2010, there was no direct discussion of the smaller misreports used for trading gain that was the hallmark of this sort of manipulation strategy.   Because this strategy sometimes involved smaller misreports by the banks and was therefore largely undetectable without insider knowledge of the activities. |
| ¶602 | The RBS deferred prosecution agreement and settlement documents disclose that trading manipulation was ongoing in August 2007 and continued into 2010.  See RBS DPA; RBS FCA Final Notice ¶¶73-74.  The Deutsche Bank plea agreement with the DOJ discloses that trading manipulation was ongoing since "at least 2003 through at least 2010."  DB DOJ SOF ¶16. |

| | | Trader-Based Allegations Involving the Deutsche Bank Defendants | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 2/21/2005 | Deutsche Bank* | High 6M | Kicked Up | ¶ 236 | |
| 3/22/2005 | Deutsche Bank | High | Kicked Down | ¶ 236 | |
| 4/1/2005 | Deutsche Bank | Low 6M | Kicked Down | ¶ 236 | Atlantic Trading |
| 6/13/2005 | Deutsche Bank | Low 6M | Kicked Down | ¶ 236 | Atlantic Trading |
| 9/21/2005 | Deutsche Bank | Low | Kicked Down | ¶ 236 | |
| 9/26/2005 | Deutsche Bank | High 3M – Low 1M | Kicked Down | ¶ 236 | Atlantic Trading |
| 11/24/2005 | Deutsche Bank | High 3M | Kicked Up | ¶ 236 | |
| 11/28/2005 | Deutsche Bank | High 1M | Kicked Up | ¶ 236 | Atlantic Trading |
| 2/24/2006 | Deutsche Bank | Low 1M | Kicked Down | ¶ 236 | Atlantic Trading |
| 3/20/2006 | Deutsche Bank | High 3M (Deutsche) | Kicked Up (Deutsche) | ¶¶ 170, 236 | |
| 4/11/2006 | Deutsche Bank | High 3M | Kicked Up | ¶ 236 | Atlantic Trading |
| 5/17/2006 | Deutsche Bank | High 3M | Interquartile | ¶ 236 | |
| 7/20/2006 | Deutsche Bank | Low 1M | Kicked Up | ¶ 236 | |
| 10/2/2006 | Deutsche Bank | High 6M | Kicked Up | ¶¶ 236, 238 | |
| 11/28/2006 | Deutsche Bank | Low 1M | Kicked Up | ¶ 206 | |
| 12/29/2006 | Barclays, Deutsche Bank | Low 3M (Barclays), Low 1M (Deutsche) | Kicked Down (Barclays and Deutsche) | ¶ 173 | |
| 2/28/2007 | Deutsche Bank | High | Kicked Up | ¶ 236 | Atlantic Trading |
| 3/14/2007 | Deutsche Bank | Low 3M | Kicked Down | ¶ 236 | |
| 3/28/2007 | Deutsche Bank | High 3M | Kicked Up | ¶ 236 | |
| 6/20/2007 | Deutsche Bank | Low 1M | Kicked Down | ¶ 236 | Atlantic Trading, Metzler |
| 8/12/2007 | Deutsche Bank | Low 1M | Kicked Up | ¶ 236 | |
| 8/15/2007 | Deutsche Bank | Low 1M | Kicked Down | ¶ 236 | |

---

* As described in Plaintiffs' [Proposed] Third Amended Complaint, Deutsche Bank "engaged in systematic and pervasive misconduct directed at manipulating critical, international financial benchmark rates, [including] the London Interbank Offered Rate" during a 6 year period from "at least 2005 through early 2011." ¶ 260 (citing Deutsche Bank CFTC Order at 2). In particular, during 2008 and 2009, the DOJ determined that Deutsche Bank profited tremendously by employing an almost daily trading strategy dependent upon Deutsche Bank's rate submitters altering the bank's USD LIBOR submissions to generate a wider spread between 1 and 3 month U.S. Dollar LIBOR. ¶ 328 (citing Deutsche Bank DOJ SOF ¶ 32). Plaintiffs traded throughout the period.

| | | | Trader-Based Allegations Involving the Deutsche Bank Defendants | | |
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|---|---|---|---|---|---|
| 10/4/2007 | Deutsche Bank | Low | Kicked Up | ¶ 235 | |
| 12/13/2007 | Deutsche Bank | High 3M | Interquartile | ¶ 236 | |
| 2/27/2008 | Deutsche Bank | High 3M – Low 1M | Kicked Down | ¶ 236 | |
| 5/15/2008 | Deutsche Bank | Low 1M | Interquartile | ¶ 236 | Metzler |
| 8/13/2008 | Deutsche Bank | High 3M | Kicked Up | ¶ 236 | Metzler |
| 9/16/2008 | Deutsche Bank | Low 1M | Kicked Up | ¶ 236 | |
| 3/24/2009 | Deutsche Bank | Low 1M | Kicked Up | ¶ 236 | |
| 5/20/2009 | Deutsche Bank | Low 3M – High 1M | Kicked Down | ¶ 236 | |

| The HBOS Defendants |
|---|

**IV. PARTIES**
  **B. Defendants**
    **6. The HBOS Defendants**

| ¶49 | Defendant HBOS plc ("HBOS") is a wholly-owned subsidiary of Lloyds Banking Group plc, and a corporation organized under the laws of Scotland with its registered office located at The Mount, Edinburgh, Scotland and its principal place of business in the United Kingdom. Prior to its acquisition in January 2009 by Defendant Lloyds TSB Group plc (now known as Lloyds Banking Group plc) and merger with Defendant Lloyds TSB Bank plc, HBOS was a member of the USD LIBOR panel. In January 2010, Lloyds Bank plc acquired HBOS from Lloyds Banking Group plc. HBOS also was the holding company for Bank of Scotland plc. HBOS through wholly-owned subsidiaries such as HBOS Treasury Services plc and Bank of Scotland operated a banking branch in New York, New York. HBOS also maintained Treasury operations in its New York branch to manage and fund liquidity positions. In the weeks leading to HBOS's imminent demise prior to the Bank of England arranged acquisition by Lloyds, HBOS borrowed approximately $18 billion from the U.S. Fed through its Bank of Scotland subsidiary. During the Class Period, HBOS had a substantial presence in the United States, with a banking branch supported by a network of nine loan production offices. |
|---|---|
| ¶50 | Defendant Bank of Scotland plc ("Bank of Scotland") is a public limited company located in Edinburgh, Scotland. Bank of Scotland was a LIBOR panel bank member from September 2007 until February 6, 2009 and was a direct, wholly-owned subsidiary of HBOS. Following the merger of HBOS with Lloyds TSB Bank, Bank of Scotland ceased being a member of the LIBOR panel, although Bank of Scotland traders subsequently continued to influence LIBOR by making requests to Lloyds Bank traders to take Bank of Scotland money market positions into account when making Lloyds Bank's LIBOR submissions. Bank of Scotland operates a branch office in New York and is licensed as a New York branch of a foreign bank by the New York State Department of Financial Services and regulated by the Federal Reserve Bank of New York. Bank of Scotland also has operated representative offices in the United States in Chicago, Houston, Los Angeles, Minneapolis, Seattle and Boston. In a settlement agreement, the FCA disclosed that it found that Bank of Scotland traders made requests to traders at the Bank of Scotland and Lloyds who were responsible for determining LIBOR and that these requests were taken into account by the traders making the LIBOR submissions. |

    **8. The Lloyds Defendants**

| ¶53 | Defendant Lloyds Banking Group plc, formerly known as Lloyds TSB Group plc ("Lloyds Banking Group") is a corporation formed under the laws of Scotland with its principal place of business in London, England. Lloyds Banking Group was formed in 2009 as a result of the acquisition and merger of HBOS with Defendant Lloyds TSB Bank plc, which is now known as Lloyds Bank plc. Lloyds Bank plc is a wholly-owned subsidiary of Lloyds Banking Group and also is the principal banking subsidiary of Lloyds Banking Group. In addition, Lloyds Banking Group conducts its U.S. capital markets activities through its registered broker-dealer subsidiary Lloyds Securities Inc. Lloyds Banking Group generates on average £9.6 billion per year from its U.S. operations. Lloyds Banking Group's commercial banking activities in the U.S. are concentrated in and undertaken by New York |
|---|---|

41

| | branches of its subsidiaries Defendant Lloyds Bank plc and Bank of Scotland plc.  Lloyds Bank and Bank of Scotland each maintain a branch office in the same location in New York, and the Bank of Scotland also has representative offices in Chicago and Houston.  In 2014, Lloyds Banking Group employed approximately 326 full-time employees in the United States, with 306 of those employees based in New York. |
|---|---|
| **V. FACTUAL ALLEGATIONS** | |
| **H. Findings from the Lloyds and HBOS Settlements Involving USD LIBOR** | |
| ¶209 | Pursuant to the DOJ Statement of Facts, Lloyds admitted facts demonstrating CEA violations and accepted responsibility for its false and misleading LIBOR submissions.[76]  Among admitted facts are that Lloyds entered into derivatives transactions that were tied to LIBOR and that its LIBOR submitters contributed rates that were intended to benefit Lloyds' trading positions, instead of rates that complied with LIBOR submission requirements.[77]  Lloyds further admitted that on occasion when Lloyds TSB and HBOS submitters "contributed to benefit their own or others' trading positions, the manipulation of the submissions affected the fixed rates", which was the purpose of the unlawful activity.[78] |
| ¶210 | Lloyds' settlement agreements show that LIBOR submitters at Lloyds TSB and HBOS "knowingly" made "false Sterling, U.S. Dollar and Yen LIBOR submissions" and engaged in trader-based manipulation from mid-2006 through at least as late as July 2009.[79]  Furthermore, the settlement documents also reveal how from at least September 2008 through at least January 2009, during the "financial crisis period" HBOS submitted artificially low U.S. Dollar LIBOR quotes to keep its submissions in line with the artificially suppressed quotes of its fellow banks and avoid the appearance of financial weakness.  Also, subsequent to Lloyds' acquisition of HBOS in January 2009, the Lloyds TSB and HBOS submitters "coordinated with one another to adjust LIBOR submissions to benefit their respective trading positions."[80]  The likelihood that the U.S. Dollar LIBOR fix was affected increased when multiple LIBOR contributors also manipulated their LIBOR submissions as part of a coordinated effort.[81] |
| ¶211 | In addition, the evidence shows that HBOS submitted false U.S. Dollar LIBOR reports so to benefit HBOS's trading positions instead of the rates that complied with the definition of LIBOR.  For example on January 17, 2008, a HBOS derivatives trader |

[76] *See generally,* Statement of Facts attached to the Deferred Prosecution Agreement entered into between Lloyds Banking Group plc and the DOJ dated July 28, 2014 ("Lloyds DOJ SOF").

[77] *See id.* ¶¶ 13-20.

[78] *Id.* ¶¶ 40-41.

[79] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the CEA, as Amended, Making Findings and Imposing Remedial Sanctions in the Matter of Lloyds Banking Group plc and Lloyds Bank plc, dated July 28, 2014 ("Lloyds CFTC Order") at 6.

[80] *Id.* at 2, 10.

[81] Barclays DOJ SOF ¶ 24.

| | and HBOS's LIBOR submitter engaged in the following email exchange: |
|---|---|
| | Trader-1:  3mth higher today pls! |
| | Submitter-1:  Should be 92 for guide ill put in 93 to get counted. |
| | Trader- 1:  Good man then lower tomorrow if convenient . . . .[82] |
| | On January 17, 2008, HBOS was "kicked out" up from the LIBOR panel.  Plaintiff FTC was a net seller of Eurodollar futures on January 17, 2008 and was injured as a result of HBOS's manipulative conduct.  On January 18, 2008, HBOS lowered its LIBOR submission in accord with the derivative trader's request, but was still "kicked out" up from the LIBOR panel. |
| ¶212 | Likewise on September 26, 2008, the HBOS LIBOR supervisor instructed the bank's USD LIBOR submitter that the submissions "should be lower relative to the other panel members and directed him to reduce the spread between the HBOS U.S. Dollar LIBOR submissions and the submissions of the other panel members."[83]  That same day the HBOS U.S. Dollar LIBOR Submitter informed an employee at another financial institution that "youll like this ive been pressured by senior management to bring my rates down into line with everyone else."[84]  Consequently, on September 26, 2008, HBOS's 3 month USD LIBOR submission fell to the same level as the highest other submission.[85] |
| ¶213 | After HBOS was dropped from the LIBOR Panel on February 9, 2009 following its acquisition by Lloyds, HBOS "traders were no longer able to influence LIBOR submissions internally by taking their money market positions into account when making LIBOR submissions."[86]  Consequently, former HBOS traders became dependent on Lloyds to effectuate their desired manipulation and the former HBOS LIBOR submitters began to discuss their trading positions with Lloyds' LIBOR submitters so as to "coordinate[] on what submissions to make to benefit their trading positions."[87]  As the FCA observed, the language used to make the requests to manipulate LIBOR suggested that the practice was "casual and routine."[88] |
| ¶214 | For example, on May 11, 2009, HBOS's former U.S. Dollar LIBOR submitter (defined in the DOJ SOF as "Submitter 1") engaged the trading assistant of the Lloyds USD LIBOR submitter, who by his own admission put in Lloyds' U.S. Dollar LIBOR |

---

[82] *See* Lloyds CFTC at 10; Lloyds DOJ SOF ¶ 16.

[83] Lloyds CFTC Order at 15.

[84] *Id.* at 15; Final Notice of the Financial Conduct Authority issued to Lloyds dated July 28, 2014 ("Lloyds FCA Order") ¶ 4.54.

[85] *Id.*

[86] Lloyds FCA Order ¶ 4.32.

[87] *See* Lloyds CFTC Order at 10; Lloyds DOJ SOF ¶¶ 18-20; Lloyds FCA Order ¶¶ 4.32-35.

[88] Lloyds FCA Order ¶ 4.34.

submission after consulting the Lloyds' submitter in the following exchange:

> Submitter 1:  do u put in the usd libors?
> Submitter 2's Assistant:  yep [ , ] why my mate?  Don't you?
> Submitter 1:  we got kicked off remember but i used too.
> Submitter 1:  can you put in a lowe r 1 month today pls cheers.
> Submitter 2's Assistant:  hehehe what sort of f ixings have you got?
> Submitter1:  6 yard liability

While HBOS's former submitter went on to explain that he was "being cheeky", the assistant to Lloyds' submitter still acknowledged the request as legitimate by noting, "hehehe [,] will see what we can do . . . !"[89] On May 11, 2009, Lloyds submitted 1 and 3 month USD LIBORs that fell within the interquartile range.  Lloyds' attempt to manipulate LIBOR down directly harmed Plaintiff Atlantic Trading, which was a net buyer of Eurodollar future contracts on that day.

| ¶215 | The sincerity of HBOS's former submitter's May 11, 2009 request for a "lower 1 month" fixing, however, is underscored by his subsequent suggestion that Lloyds coordinate its LIBOR submission to benefits its trading positions:<br><br>Submitter 1:  to be honest we shoudl be coordinating the libor inputs to suit the books. for example later this month i have a 5y 3 month liability reset so we shoudl put in a low one there ill let u know.<br>Submitter 2's Assistant:  of course, that is very sensible. |
|---|---|
| ¶216 | On May 19, 2009, the former HBOS submitter followed up with the assistant to the Lloyds' LIBOR submitter in a Bloomberg message conversation.<br><br>Submitter 1:  have 5 yard 3 month liability rolls today so would be advantageous to have lower 3 month libor setting if doesn't conflict with any of your fix's.<br>Submitter 1:  do u normally put the usd libors in?  or is it [Submitter 2]?<br>Submitter 2's Assistant:  me, consulting with Submitter 2.<br>Submitter 1:  ok cool ive already sent Submitter 2 a Bloomberg but he hasn't read it yet can u let him know that we hav 5 yards of 3 month liability resets so if it doesn't conflict with anythign you have a lower 3 month libor would be advantageous.<br>Submitter 2's Assistant:  ok tks.<br>Submitter 1:  can u get Submitter 2 back to me when he has a second no rush. |

---

[89] Lloyds DOJ SOF ¶19.

| | |
|---|---|
| | Submitter 2's Assistant:  just ask for him my friend he can hear you and is seating at his chair right now . . . . . . but I will also tell him . . . he will talk to you in a min,<br>Submitter 2's Assistant:  just to let you know we are going 74 i/o 75 in 3s ;)<br>Submitter 1:  legend.[90]<br><br>Subsequently, the Lloyds USD LIBOR submitter called the former HBOS submitter to confirm that "obviously we got the Libors down for you."[91]  On May 19, 2009, Lloyds submitted a 3 month LIBOR that was 5 bps lower than its previous day's submission and the submission fell within the interquartile range. |
| ¶217 | In addition to disclosing representative examples of how HBOS and Lloyds manipulated USD LIBOR, the Lloyds settlement agreements reveal that Lloyds, like other Defendants, failed to supervise trading desks and implement internal control processes that could mitigate trader-based manipulation until well after the above-described instances.  *See, e.g.,* Lloyds CFTC Order at 6.  Indeed, Lloyds failed to "[p]ut in place any submissions-related systems and controls until March 2011."  Lloyds FCA Notice at 2.16.1.  However, the newly-implemented controls remained flawed until September 2012.  *Id.* at 2.17. |
| | **K. Findings from the Barclays Cooperation Materials**<br>    **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>        **a. Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** |
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>        **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson.  During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with |

---

[90] Lloyds DOJ SOF ¶ 20.

[91] Lloyds CFTC Order at 10.

| | |
|---|---|
| | Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
| ¶297 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions.  After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such."  In response, Johnson noted, "No he's not, but he's still setting them lower then he should do."  Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth". |
| ¶301 | On November 29, 2007, Barclays had an internal discussion calling the LIBOR market "broken", and being used by submitters to "deliberately" manipulate the fixing "in order to make money off the derivatives."  In addition, through communications with Defendants Tullett Prebon and Tradition, Barclays participants knew where HBOS would submit and where RBS would submit LIBOR in advance of the filing.  Barclays also knew from these brokers where composite LIBOR would end up on the day.  And based on the FX swap market, the Barclays participants knew that the demand for U.S. dollars was 55 basis points above the RBS submission and 40 basis points above the HBOS submission. |
| ¶303 | The pressure to submit LIBORs in line with other bank's submissions reached a breaking point on November 30, 2007.  On that day, Johnson spoke with Storey regarding how Barclays should position its LIBOR submission in the face of other panel banks' artificially low submissions.  Johnson advised Storey that he was in the process of figuring out when HBOS planned to submit its LIBOR because HBOS was "sort of was out with [Barclays] yesterday."  However, Storey advised Johnson that "the guidance is [to] stick within the bounds" and "no head above parapet, not partial bleeding," as "Mr. [Chris] Lucas [Barclays' then Chief Financial Officer] doesn't want [Barclays] to be outside the top end."  After Storey provided this guidance, Barclays received notice of RBS' planned LIBOR submissions, which were higher than RBS's prior day submissions.<br><br>     MS:  Well that shows that RBS is being dragged up doesn't it?<br><br>     PJ:  Yeah but they're only being dragged up to the to the tower.<br><br>     MS:  I know, but it's a start isn't it.<br><br>     PJ:  But why don't I go 32, 22 and 20?  So I'm 2 above the top.  So I'm, so I'm something ahead a little bit above |

|  | the parapet.<br><br>MS:  Tell you what, 30, 22, and 20.  In other words we're slightly above the parapet, but not in the one that people are going to publish.<br><br>PJ:  Okay so 30, 22, 20.<br><br>MS.  Yeah, I'm comfortable with that. |
|---|---|
|  | **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples:<br><br>   • On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board.  Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."  An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."<br><br>   • Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon.  Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs."  Burgess agreed to try to find additional market color but in the interim informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f\*cking idea."<br><br>   • On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added). |

<table>
<tr>
<td></td>
<td>

- On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey. Johnson reached out to Ramsey to gather information prior to the LIBOR fix. Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).  In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*" (Emphasis added). While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.

- Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side."

</td>
</tr>
<tr>
<td>¶321</td>
<td>

On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:

Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.

Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.

PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?

MS:  No, I know, I know, I know, and he's already talked to them about that.

PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].

</td>
</tr>
</table>

In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:

> Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.*

This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*.

**M.  The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**
    **3.  The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions**

¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack". Consider the following examples:

- On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";

- On November 21, 2007, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and*

<table>
<tr><td></td><td></td><td>

*being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).

- On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";

- On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added).

- On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."

- On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";

- On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and

- On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide."

</td></tr>
</table>

| | Trader-Based Allegations Involving the HBOS Defendants | | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 1/17/2008 | HBOS | High 3M | Kicked Up | ¶ 211 | FTC |
| 1/18/2008 | HBOS | Low 3M | Kicked Up | ¶ 211 | |
| 9/26/2008 | HBOS | Low 3M | Kicked Up | ¶ 212 | |

| The HSBC Defendants |
|---|
| **IV. PARTIES**<br>    **B. Defendants**<br>        **a.  The HSBC Defendants** |

| | |
|---|---|
| ¶¶51<br>-52 | Defendant HSBC Holdings plc ("HSBC Holdings") is a British public limited company headquartered in London, England. HSBC Holdings is the ultimate parent company of Defendant HSBC Bank plc.  HSBC Holdings and its subsidiaries provide services in HSBC's network covering 75 countries and territories organized into geographic regions, with approximately 21,000 employees in the U.S.  HSBC Holdings discloses approximately $22.6 billion in profit before tax for the year ended December 31, 2013, with $8.8 billion in revenue and $1.221 billion in profit before tax in North America.  HSBC North America Holdings Inc. ("HSBC Holdings U.S."), a wholly owned subsidiary of HSBC Holdings, is a Delaware corporation headquartered in New York.  HSBC Holdings U.S. is a bank holding company, and is the holding company for HSBC Holdings' operations in the U.S., including HSBC Bank USA, N.A.  In its Resolution Plan filed with the Fed in 2014, HSBC designates each of HSBC Bank U.S.A., N.A., HBSC U.S. and HSBC Securities (USA), Inc. as a "material entity" because of each of its important U.S. operations.  HSBC Holdings' ADRs are listed on the NYSE.<br><br>Defendant HSBC Bank plc ("HSBC"), a wholly-owned subsidiary of HSBC Holdings, is a United Kingdom public limited company headquartered in London, England.  HSBC was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA.  HSBC has 23 affiliates actively registered to do business in New York, including HSBC Securities (USA) Inc., which is a registered broker-dealer with the SEC and a registered Futures Commission Merchant with the CFTC. HSBC Securities (USA) Inc. engages in trading debt and equity securities, including as a primary dealer of US government and government agency securities and futures contracts.  In the July 2014 Resolution Plan that HSBC Holdings submitted to the Federal Reserve, HSBC Holdings identified HSBC Securities (USA) Inc. as a material entity to HSBC's U.S. operations.  HSBC Bank USA, N.A. ("HSBC US") also is an indirect wholly owned subsidiary of HSBC Holdings N.A. and is a national banking association with its principal place of business in New York, New York.  HSBC U.S. is HSBC's principal U.S. banking subsidiary, with 244 branches and 30 representative offices in the U.S., including 157 branches and 13 representative offices in the State of New York.  HSBC U.S. has its principal executive offices at 452 Fifth Avenue, New York, New York.  In its Resolution Plan, HSBC Holdings designates HSBC Bank as a non-U.S. material entity because of its close connections with HSBC's U.S. operations.  According to HSBC Bank's Annual Report and Accounts for the years 2009-2011, HSBC discloses revenues of between £1.9 and £2.2 billion per year for geographically segmented business, including those in the United States. |

| | |
|---|---|
| **V. FACTUAL ALLEGATIONS** | |
| **K. Findings from the Barclays Cooperation Materials** | |
| **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries** | |
| **a. Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** | |
| ¶261 | During the suppression period when the banks artificially lowered their LIBOR submissions to bolster public perceptions of their financial stability, Tullett Prebon and Tradition understood Defendants' mutual interest in keeping LIBOR fixes low and helped them achieve that goal. For example, Tullett Prebon's Burgess noted on November 27, 2009 that HSBC "wants the LIBORs low, like everyone else does." At the same time, Burgess told Barclays where other Defendants, including HSBC, Lloyd's, and other unnamed banks, would be setting LIBOR that day. In response, Barclays' Mathews quipped, "Yeah, yeah, yeah, yeah yeah," highlighting the casual and routine nature of Tullett Prebon's guidance that banks were manipulating LIBOR for their own benefit. This exchange demonstrates that traders at the banks were well aware of the LIBOR suppression and directing their trading to benefit from it. |
| **d. RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays** | |
| ¶286 | Even though available evidence does not suggest that RBS joined Barclays, RBC, and Merrill in seeking to manipulate LIBOR up on February 28, 2007, the Barclays Cooperation Materials provide ample evidence that RBS routinely shared its LIBOR submissions with interdealer brokers and other traders prior to the daily LIBOR fix in attempt to gain preferential settings. For example, Johnson learned on September 13, 2007 that both HSBC and RBS planned to submit low LIBORs based on claims of "cheap money" being available, which prompted Johnson's laughter. Days later, on September 17, 2007, Johnson, upon learning from an unidentified broker, that RBS was planning a low LIBOR fixing quipped, "RBS is obviously . . . setting his stall out." Subsequently, Johnson suggested that he would set a high LIBOR "just to f*ck [RBS] up". On September 17, 2007, RBS submitted the lowest 3 month U.S. Dollar LIBOR and was "kicked out" down from the LIBOR setting. Conversely, Barclays submitted the highest 3 month U.S. Dollar LIBOR and was "kicked out" up from the LIBOR setting. Therefore, by telegraphing its LIBOR submission through communications with third parties, RBS demonstrated an ability to influence the LIBOR setting or at least alter the rate submissions of other U.S. Dollar LIBOR panel members. |
| **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** | |
| **a. Evidence of LIBOR Suppression During Late 2007** | |
| ¶300 | On November 21, 2007, Barclays' Johnson continued to probe other panel banks for insight into their planned LIBOR submissions. After learning HSBC's planned submission from a broker, Johnson expressed his general frustration to another broker: "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its* |

| | |
|---|---|
| | *head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR (emphasis added). |

| | **b.  Evidence of LIBOR Suppression During 2008** |
|---|---|
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR.  In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| ¶314 | The following day, April 18, 2008, Johnson continued to probe the market for insights into where other panelists planned to submit LIBOR before reporting back to Storey to let him know HSBC, Lloyds and RBS' impending submissions and to where Tullett Prebon believed LIBORs would set.  Later in the conversation, Johnson recounted how Mark Dearlove spoke with the *Wall Street Journal* on April 17, 2008 and suggested that Barclays' submissions reflected the market sell off.  Recounting that explanation, which did not account for the behind the scenes calibration of LIBOR based on information shared among the panel banks, prompted laughter. |

| | **c.  Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
|---|---|
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.<br><br>Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br><br>PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br><br>MS:  No, I know, I know, I know, and he's already talked to them about that.<br><br>PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].<br><br>In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in |

|  | particular 1 month LIBOR, as low as possible: |
|---|---|
|  | Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.* |
|  | This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*. |
| ¶326 | As discussed above, Defendants' persistent manipulation of the U.S. Dollar became such a routine occurrence that daily chatter regarding various banks' suppression of LIBOR or individual requests to move LIBOR was no longer shocking.  For example, on November 27, 2009, a Tullett Prebon broker informed a Barclays derivatives trader that neither HSBC nor Lloyds planned to change its LIBOR from the prior day, because they wanted "LIBORs low, like everyone else. . . ."  The response: "Yeah, yeah, yeah, yeah, yeah."  This anecdote provides direct evidence of derivative traders at the panel banks understanding of U.S. Dollar LIBOR suppression and how they constructed trading strategies around it. |

| Trader-Based Allegations Involving the HSBC Defendants | | | | | |
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| --- | --- | --- | --- | --- | --- |
| 11/27/2009 | Barclays, HSBC, Lloyds, Tullett Prebon | Low | Kicked Down (Barclays), Interquartile (HSBC), Interquartile (Lloyds) | ¶¶ 16, 261, 326 | Various Plaintiffs traded during this period.  This allegation relates to an ongoing trader-based request for lower LIBOR settings around Nov. 27, 2009, and for example, Plaintiff Atlantic Trading held a "net" position on Dec. 1, 3 and 4, 2009, and was harmed by this manipulation.** |

---

** *See* ECF No. 1286, Appendix A at 45.  Atlantic Trading held a net long position on December 1, 3 and 4, 2009, which was harmed by Defendants' LIBOR continuing suppression on and around November 27, 2009.

| The JPMorgan Defendants |
|---|

| | **IV. PARTIES** |
|---|---|
| | **B. Defendants** |
| | **5. The JPMorgan Defendants** |
| ¶47 | Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York. |
| ¶48 | Defendant JPMorgan Chase Bank, N. A. ("J.P. Morgan"), a wholly owned subsidiary of JPMorgan Chase, is a federally chartered national banking association headquartered in New York, New York.  J.P. Morgan was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. |

| | **V. FACTUAL ALLEGATIONS** |
|---|---|
| | **K. Findings from the Barclays Cooperation Materials** |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** |
| | **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶324 | On October 29, 2008, Johnson emailed Mark Dearlove, Peter Spence, and Colin Bermingham to address their concerns that Barclays' LIBOR submissions were higher than other panel banks.  Johnson noted: |
| | *Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested.*  I disagree with this approach as you are well aware.  *I will be contributing rate which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices.*[109]  I am not sure that the BBA definition of libor would accept this approach.  Today for instance the only cash offer in 3 months has been Chase Nyk who is offering at 4%.  Please do not tell me that 3.42% was the correct rate as we both patently know that it was not.  I will continue to keep a record where money is or is not offered in the periods. |
| | COF spreads will have to go up massively in USD to compensate for fixing LIBOR rate unrealistically low. |
| | (Emphasis added).  As Johnson noted, 3 month U.S. Dollar LIBOR was set at 3.42% on October 29, 2008.  Barclays submitted a LIBOR submission of 4.0000%, which was an extreme outlier compared to the next highest submitter, RBS, which submitted 3.6000%, and the lowest submitter, J.P. Morgan, which submitted 3.1500%. |

---

[109] *See also* Barclays CFTC Order at 24.

| The Lloyds Defendants |
|---|
| **I. SUMMARY OF ALLEGATIONS** |
| ¶16   Evidence from the various government settlements available to date and the Barclays Cooperation Materials make clear that Defendants adopted a ready willingness to manipulate U.S. Dollar LIBOR throughout the Class Period.  The casual and routine nature of Defendants' manipulation is typified by a November 27, 2009 phone conversation between Barclays derivative trader Jonathan Mathew ("Mathew") and Tullett Prebon's Neil Burgess ("Burgess").  In the conversation, Burgess comments that Lloyds "wanted LIBORs lower, like everyone else."  Mathew's response, "Yeah, yeah, yeah, yeah, yeah," is one of absolute agreement.  The coordination among Defendants to manipulate LIBOR is encapsulated in this mundane exchange, which quickly brings together the interests of Lloyds' with that of Barclays and others.  Communications such as these provide direct evidence that derivative traders at the panel banks knew about the U.S. Dollar LIBOR suppression and constructed trading strategies to benefit from it. |
| **IV. PARTIES** |
|    **B. Defendants** |
|      **8. The Lloyds Defendants** |
| ¶53   Defendant Lloyds Banking Group plc, formerly known as Lloyds TSB Group plc ("Lloyds Banking Group") is a corporation formed under the laws of Scotland with its principal place of business in London, England.  Lloyds Banking Group was formed in 2009 as a result of the acquisition and merger of HBOS with Defendant Lloyds TSB Bank plc, which is now known as Lloyds Bank plc.  Lloyds Bank plc is a wholly-owned subsidiary of Lloyds Banking Group and also is the principal banking subsidiary of Lloyds Banking Group.  In addition, Lloyds Banking Group conducts its U.S. capital markets activities through its registered broker-dealer subsidiary Lloyds Securities Inc.  Lloyds Banking Group generates on average £9.6 billion per year from its U.S. operations.  Lloyds Banking Group's commercial banking activities in the U.S. are concentrated in and undertaken by New York branches of its subsidiaries Defendant Lloyds Bank plc and Bank of Scotland plc.  Lloyds Bank and Bank of Scotland each maintain a branch office in the same location in New York, and the Bank of Scotland also has representative offices in Chicago and Houston.  In 2014, Lloyds Banking Group employed approximately 326 full-time employees in the United States, with 306 of those employees based in New York. |
| ¶54   Defendant Lloyds Bank plc, which formerly was known as Lloyds TSB Bank plc ("Lloyds Bank"), is a corporation organized and existing under the laws of England and Wales with its principal place of business in the United Kingdom.  Lloyds Bank acquired HBOS from Lloyds Banking Group in 2010.  Lloyds Bank was at all relevant time a member of the panel of banks that submitted LIBOR rates to the BBA.  Lloyds Bank maintains a New York branch that is listed as a "material entity" and as "the primary operating entity for the [Lloyd Bank Group's] U.S. operations."  Lloyds Bank's New York branch, located at 1095 Avenue of the Americas, New York, New York 10036, employed more than 300 full-time employees as of September 2014, and is registered with and subject to the New York State Department of Financial Services regulatory supervision. |

| | |
|---|---|
| **V. FACTUAL ALLEGATIONS**<br>   **C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide** | |
| ¶142 | The investigations uncovered a widespread manipulation of various LIBOR rates, including U.S. Dollar LIBOR.  As a result of these investigations, governmental regulators have so far settled with six of defendant panel banks – Barclays, UBS, RBS, Rabobank, Lloyds, and Deutsche Bank – and two interdealer brokers – ICAP and RP Martin – in connection with Yen-LIBOR manipulation.  Although Citibank was not identified in Final Notices of settlements with certain defendants for LIBOR manipulation, the FCA, DOJ and CFTC entered into settlements with Citibank for manipulation of foreign exchange rates and benchmarks in 2015.  In the FCA's settlement agreement with Citibank, the British Financial Conduct Authority ("FCA") expressly noted that in response to Final Notices issued to other defendants by regulatory authorities for LIBOR manipulation, Citibank engaged in a remediation program to improve policies, procedures and training in connection with Citibank's LIBOR and other benchmark assessments and price formation processes. |
| ¶147 | On July 28, 2014, defendant Lloyds settled civil and criminal cases with the DOJ, CFTC and FCA concerning, *inter alia*, the manipulation of USD-LIBOR.  Pursuant to the settlement and the deferred prosecution agreement, Lloyds paid the U.S. and U.K. authorities a total of approximately $370 million. |
| | **H. Findings from the Lloyds and HBOS Settlements Involving USD LIBOR** |
| ¶208 | On July 28, 2014, Lloyds publicly disclosed that it had settled with various regulators and government agencies and admitted to U.S. Dollar LIBOR manipulation.  The Lloyds Settlements revealed the same types of misconduct by Lloyds with respect to its LIBOR submissions that previous settlements with other Defendants have exposed.  In total, Lloyds agreed to pay $105 million to the CFTC for violations of anti-manipulation and other provisions of the CEA.  In addition, Lloyds agreed to pay $176 million to the FCA.  Lloyds also entered into a criminal deferred prosecution agreement with and paid an $86 million penalty to the DOJ. |
| ¶209 | Pursuant to the DOJ Statement of Facts, Lloyds admitted facts demonstrating CEA violations and accepted responsibility for its false and misleading LIBOR submissions.[76]  Among admitted facts are that Lloyds entered into derivatives transactions that were tied to LIBOR and that its LIBOR submitters contributed rates that were intended to benefit Lloyds' trading positions, instead of rates that complied with LIBOR submission requirements.[77]  Lloyds further admitted that on occasion when Lloyds TSB and HBOS submitters "contributed rates to benefit their own or others' trading positions, the manipulation of the submissions affected the fixed rates", which was the purpose of the unlawful activity.[78] |

---

[76] *See generally,* Statement of Facts attached to the Deferred Prosecution Agreement entered into between Lloyds Banking Group plc and the DOJ dated July 28, 2014 ("Lloyds DOJ SOF").

[77] *See id.* ¶¶ 13-20.

[78] *Id.* ¶¶ 40-41.

| | |
|---|---|
| ¶210 | Lloyds' settlement agreements show that LIBOR submitters at Lloyds TSB and HBOS "knowingly" made "false Sterling, U.S. Dollar and Yen LIBOR submissions" and engaged in trader-based manipulation from mid-2006 through at least as late as July 2009.[79]  Furthermore, the settlement documents also reveal how from at least September 2008 through at least January 2009, during the "financial crisis period" HBOS submitted artificially low U.S. Dollar LIBOR quotes to keep its submissions in line with the artificially suppressed quotes of its fellow banks and avoid the appearance of financial weakness.  Also, subsequent to Lloyds' acquisition of HBOS in January 2009, the Lloyds TSB and HBOS submitters "coordinated with one another to adjust LIBOR submissions to benefit their respective trading positions."[80]  The likelihood that the U.S. Dollar LIBOR fix was affected increased when multiple LIBOR contributors also manipulated their LIBOR submissions as part of a coordinated effort.[81] |
| ¶213 | After HBOS was dropped from the LIBOR Panel on February 9, 2009 following its acquisition by Lloyds, HBOS "traders were no longer able to influence LIBOR submissions internally by taking their money market positions into account when making LIBOR submissions."[86]  Consequently, former HBOS traders became dependent on Lloyds to effectuate their desired manipulation and the former HBOS LIBOR submitters began to discuss their trading positions with Lloyds' LIBOR submitters so as to "coordinate[] on what submissions to make to benefit their trading positions." [87]  As the FCA observed, the language used to make the requests to manipulate LIBOR suggested that the practice was "casual and routine."[88] |
| ¶214 | For example, on May 11, 2009, HBOS's former U.S. Dollar LIBOR submitter (defined in the DOJ SOF as "Submitter 1") engaged the trading assistant of the Lloyds USD LIBOR submitter, who by his own admission put in Lloyds' U.S. Dollar LIBOR submission after consulting the Lloyds' submitter in the following exchange:<br><br>Submitter 1:  do u put in the usd libors?<br>Submitter 2's Assistant:  yep [ , ] why my mate?  Don't you?<br>Submitter 1:  we got kicked off remember but i used too.<br>Submitter 1:  can you put in a lowe r 1 month today pls cheers.<br>Submitter 2's Assistant:  hehehe what sort of f ixings have you got?<br>Submitter1:  6 yard liability |

---

[79] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the CEA, as Amended, Making Findings and Imposing Remedial Sanctions in the Matter of Lloyds Banking Group plc and Lloyds Bank plc, dated July 28, 2014 ("Lloyds CFTC Order") at 6.

[80] *Id.* at 2, 10.

[81] Barclays DOJ SOF ¶ 24.

[86] Lloyds FCA Order ¶ 4.32.

[87] *See* Lloyds CFTC Order at 10; Lloyds DOJ SOF ¶¶ 18-20; Lloyds FCA Order ¶¶ 4.32-35.

[88] Lloyds FCA Order ¶ 4.34.

|  | |
|---|---|
|  | While HBOS's former submitter went on to explain that he was "being cheeky", the assistant to Lloyds' submitter still acknowledged the request as legitimate by noting, "hehehe [,] will see what we can do . . . !"[89]  On May 11, 2009, Lloyds submitted 1 and 3 month USD LIBORs that fell within the interquartile range.  Lloyds' attempt to manipulate LIBOR down directly harmed Plaintiff Atlantic Trading, which was a net buyer of Eurodollar future contracts on that day. |
| ¶215 | The sincerity of HBOS's former submitter's May 11, 2009 request for a "lower 1 month" fixing, however, is underscored by his subsequent suggestion that Lloyds coordinate its LIBOR submission to benefits its trading positions:<br><br>Submitter 1:  to be honest we shoudl be coordinating the libor inputs to suit the books. for example later this month i have a 5y 3 month liability reset so we shoudl put in a low one there ill let u know.<br>Submitter 2's Assistant:  of course, that is very sensible. |
| ¶216 | On May 19, 2009, the former HBOS submitter followed up with the assistant to the Lloyds' LIBOR submitter in a Bloomberg message conversation.<br><br>Submitter 1:  have 5 yard 3 month liability rolls today so would be advantageous to have lower 3 month libor setting if doesn't conflict with any of your fix's.<br>Submitter 1:  do u normally put the usd libors in?  or is it [Submitter 2]?<br>Submitter 2's Assistant:  me, consulting with Submitter 2.<br>Submitter 1:  ok cool ive already sent Submitter 2 a Bloomberg but he hasn't read it yet can u let him know that we hav 5 yards of 3 month liability resets so if it doesn't conflict with anythign you have a lower 3 month libor would be advantageous.<br>Submitter 2's Assistant:  ok tks.<br>Submitter 1:  can u get Submitter 2 back to me when he has a second no rush.<br>Submitter 2's Assistant:  just ask for him my friend he can hear you and is seating at his chair right now . . . . . . but I will also tell him . . . he will talk to you in a min,<br>Submitter 2's Assistant:  just to let you know we are going 74 i/o 75 in 3s ;)<br>Submitter 1:  legend.[90] |

---

[89] Lloyds DOJ SOF ¶19.

[90] Lloyds DOJ SOF ¶ 20.

| | |
|---|---|
| | Subsequently, the Lloyds USD LIBOR submitter called the former HBOS submitter to confirm that "obviously we got the Libors down for you."[91]  On May 19, 2009, Lloyds submitted a 3 month LIBOR that was 5 bps lower than its previous day's submission and the submission fell within the interquartile range. |
| ¶217 | In addition to disclosing representative examples of how HBOS and Lloyds manipulated USD LIBOR, the Lloyds settlement agreements reveal that Lloyds, like other Defendants, failed to supervise trading desks and implement internal control processes that could mitigate trader-based manipulation until well after the above-described instances.  *See, e.g.,* Lloyds CFTC Order at 6.  Indeed, Lloyds failed to "[p]ut in place any submissions-related systems and controls until March 2011."  Lloyds FCA Notice at 2.16.1.  However, the newly-implemented controls remained flawed until September 2012.  *Id.* at 2.17. |
| | **K. Findings from the Barclays Cooperation Materials** |
| |     **1.  Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries** |
| |         **a.  Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** |
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| ¶263 | In addition, Tullett Prebon and Tradition played a key role in coordinating the LIBOR settings in the wake of the *Wall Street Journal* article that first suggested potential problems with LIBOR.  For example, on April 17, 2008, Barclays' Johnson said he would "probably go by what Prebon recommends" despite knowing that the resulting quotes would remain below LIBOR's true levels.  Barclays' Miles Storey recognized that their conduct could raise concerns about "quote collusion unquote."  On April 18, 2008, Barclays' Peter Johnson discussed the difference between Tullett Prebon's and Tradition's predictions of where six-month dollar LIBOR was fixing on April 18, 2008.  The call transcript demonstrates that at 10:55 a.m. Barclays was already aware that Lloyds was going to submit its six-month fixing at "three percent." |
| |         **d.  RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays** |
| ¶287 | Similarly, on December 14, 2007, RBS disclosed its likely LIBOR submissions to Tullett Prebon, which in turn passed this information along to the Barclays U.S. Dollar LIBOR submitter.  After Neil Burgess attempted to share this information blindly and Johnson wrongly guessed that Lloyds was attempting to suppress LIBOR (though Johnson still requested that Burgess tell Lloyds "to go an' stick it where the [s]un don't shine"), Burgess revealed that RBS intended to submit a low LIBOR.  Neil |

---

[91] Lloyds CFTC Order at 10.

| | |
|---|---|
| | Burgess of Tullett Prebon understood that this setting was made because RBS had just completed a trading position that required a specific fix. |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>    **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson. During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs. In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission. After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?" In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low." Later that afternoon, Johnson spoke with another unidentified broker over the phone. In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate. In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest. And I'm gonna go upset these bastards. I'll be back." On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
| ¶297 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions. After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such." In response, Johnson noted, "No he's not, but he's still setting them lower then he should do." Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth" |
| ¶298 | What prompted laughter in September 2007 provoked ire less than a month later. On October 2, 2007, Johnson engaged an unidentified broker from another bank in conversation regarding what that bank would submit for its LIBORs. After the broker identified where the bank planned to submit its LIBOR, the following conversation ensued:<br><br>    PJ:  It's bollocks!<br>    UM:  It is bollocks. Total and utter. But he is taking into consideration where the Citibanks [sic], UBSs and all<br>        these people are gonna go.<br>    PJ:  Yeah well f*ck them! They're wrong.<br>    UM:  Yeah. |

|  | PJ:  That's, that's that's absolute f*cking bollocks. |
|---|---|
|  | Later in the same conversation, Johnson disclosed Lloyds' planned LIBOR submission and questioned where WestLB would submit 3 month LIBOR based on his knowledge of what WestLB is paying in the market.  Towards the end of the conversation, Johnson forced the broker to acknowledge that LIBOR submissions was flawed.<br><br>PJ:  Okay, well I think your LIBORs are just ridiculous.<br>UM:  Oh a disgrace, yeah, no, they are, but I'm uh uh you understand what we are d- all I'm saying to you is that where we think the market is gonna fix their LIBORs.  That's where the fix . . . . is gonna be. |
| ¶307 | The Barclays Cooperation Materials suggest that LIBOR suppression continued unabated.  For example, on December 12, 2007, Barclays' Johnson learned in telephone call with an unnamed broker that both RBS and Lloyds planned to submit LIBORs well below what was conceivable in the London funding market.  He quipped, "What kind of drugs are they on?"  After pressing the broker further, Johnson added, "It's all a load of bollocks, isn't it?"  And the broker was forced to concede, "Eh, it's just complete[ly] false." |
| ¶308 | In fact, the next day, December 13, 2007, Johnson responded, "Give us a laugh" after an unidentified party offered to share Lloyds' U.S. Dollar LIBOR submissions (Lloyds' 3 month LIBOR submission for the day was "kicked out" down from the LIBOR panel).  Later that same morning, Johnson spoke with Neil Burgess of Tullett Prebon, who shared market color and in particular divulged details regarding RBS' expected LIBOR submissions.  Subsequently, Johnson learned that RBS had received a call from the BBA regarding its persistently low LIBOR submissions.  Collectively, these documents evidence the fact that the Panel Bank Defendants routinely disseminated their expected LIBOR submission with the desire and expectation that the information would influence other Panel Bank Defendants' LIBOR submissions. |
|  | **b.  Evidence of LIBOR Suppression During 2008** |
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR.  In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| ¶314 | The following day, April 18, 2008, Johnson continued to probe the market for insights into where other panelists planned to submit LIBOR before reporting back to Storey to let him know HSBC, Lloyds and RBS' impending submissions and to where Tullett Prebon believed LIBORs would set.  Later in the conversation, Johnson recounted how Mark Dearlove spoke with the *Wall Street Journal* on April 17, 2008 and suggested that Barclays' submissions reflected the market sell off.  Recounting that explanation, which did not account for the behind the scenes calibration of LIBOR based on information shared among the panel banks, prompted laughter. |

| | **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
|---|---|
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples: |

- On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board.  Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."  An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."

- Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon.  Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs."  Burgess agreed to try to find additional market color but in the interim informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."

- On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added).

- On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey.  Johnson reached out to Ramsey to gather information prior to the LIBOR fix.  Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).  In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*"  (Emphasis added).  While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.

- Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from

64

| | |
|---|---|
| | 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side." |
| ¶319 | On September 18, 2008, Johnson's frustrations boiled over as demonstrated by an excerpt from a lengthy conversation prior to that day's LIBOR fix:<br><br>I mean these banks, I mean that, the BBA just needs to get 'em together and tell 'em to sort their f\*cking lives out.  'Cause this really, it, it makes me look likely a f\*cking [inaudible].  *There I am, uh, th-there I am, um, just tryin' to set, see I think we should go five and a half, five, and four and a half.  Uh, and I will be, uh, up to two and a half percent higher than anybody else.  Yeah, and I'm right, I know I'm right.  Uh, oh, oh, yep. . .  It's bollocks, innit?  We know its bollocks.  It's absolute bollocks.*  I mean, you know, the, the only good thing about yesterday is, when all the Merrill Lynch [inaudible] like Barclays sets at three, [inaudible] three months, and Lloyds sets at two eight five is indication [inaudible] worth crap and we need the money, uh, but, then on ICAP three months [inaudible].<br><br>\*          \*          \*          \*<br><br>So, I'm ju- [inaudible].  But I mean [inaudible] my answer, that'll be for these a\*\*holes to set f\*cking LIBORs [inaudible] *I'd rather have children set them.* (emphasis added). |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.<br><br>Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br><br>PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br><br>MS:  No, I know, I know, I know, and he's already talked to them about that.<br><br>PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible]. |

|   | |
|---|---|
|   | In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:<br><br>Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.*<br><br>This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*. |
| ¶326 | As discussed above, Defendants' persistent manipulation of the U.S. Dollar became such a routine occurrence that daily chatter regarding various banks' suppression of LIBOR or individual requests to move LIBOR was no longer shocking.  For example, on November 27, 2009, a Tullett Prebon broker informed a Barclays derivatives trader that neither HSBC nor Lloyds planned to change its LIBOR from the prior day, because they wanted "LIBORs low, like everyone else. . . ."  The response: "Yeah, yeah, yeah, yeah, yeah."  This anecdote provides direct evidence of derivative traders at the panel banks understanding of U.S. Dollar LIBOR suppression and how they constructed trading strategies around it. |

**M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period**

    **3. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions**

|   | |
|---|---|
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br><br>    • On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the |

manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";

- On November 21, 2007, Johnson expressed his general frustration to another broker: "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).

- On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";

- On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires*."  (emphasis added).

- On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."

- On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";

|  | • On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and<br><br>• On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide." |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Trader-Based Allegations Involving the Lloyds Defendants** | | | | | |
| **Date** | **Defendant(s) Involved** | **Direction of Manipulation** | **Effect on 3-Month LIBOR** | **Source** | **Plaintiff(s) Harmed** |
| 5/11/2009 | Lloyds | Low 1M | Interquartile | ¶¶ 214-15 | Atlantic Trading |
| 5/19/2009 | Lloyds | Low 3M | Interquartile | ¶ 216 | |
| 11/27/2009 | Barclays, HSBC, Lloyds, Tullett Prebon | Low | Kicked Down (Barclays), Interquartile (HSBC), Interquartile (Lloyds) | ¶¶ 16, 261, 326 | Various Plaintiffs traded during this period.  This allegation relates to an ongoing trader-based request for lower LIBOR settings around Nov. 27, 2009, and for example, Plaintiff Atlantic Trading held a "net" position on Dec. 1, 3 and 4, 2009, and was harmed by this manipulation.** |

| The Norinchukin Bank Defendant | |
|---|---|
| **IV. THE PARTIES** | |
|    **B. Defendants** | |
|      **18. The Norinchukin Defendant** | |
| ¶84 | Defendant The Norinchukin Bank ("Norinchukin" or "Norin") is a Japanese cooperative bank incorporated under the laws of Japan and headquartered in Tokyo, Japan.  Norinchukin was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. Norin maintains a U.S. branch office, which is located at 245 Park Avenue, New York, New York, where it leases 36,300 square feet on the 21st floor of the building.  Norinchukin was at all relevant times a member of the LIBOR Panel.  Norinchukin's New York branch is licensed by the New York State Department of Financial Services, and it is deemed a bank holding company under the International Banking Act of 1978.  Norinchukin's New York branch also is overseen by the Federal Reserve in the United States. |
| ¶85 | According to Norinchukin's Annual Report for the fiscal period ending March 31, 2011, Norinchukin managed foreign currency funding operations through its head office in Tokyo and its three overseas branches in New York, London and Singapore.  *Id.* at 77.  According to Norinchukin's Annual Report and "Milestones" in its 91-year history, Norinchukin opened a Representative Office in New York in 1982, which was its "first overseas foothold".  *Id.* at 189.  In 1984, Norinchukin upgraded the Representative Office to Branch status. *Id.*  Norinchukin's New York branch also is a member of several U.S. payment clearing and settlement systems that enable Norinchukin to access systems necessary to service its customers and clients, such as SWIFT, Fedwire and the Fixed Income Clearing Corporation ("FICC"). |
| ¶86 | For the fiscal year ended March 31 2014, Norinchukin's Annual Report disclosed ordinary income from its New York branch and Cayman Islands office (*i.e.*, "the Americas") in the amount of $63 million, and further reported that the "U.S. Department of the Treasury" was a "Major Customer" that generated over $1.5 billion of ordinary income for Norinchukin in the fiscal year ended March 31, 2014. *Id.* at 101.  The Annual Report also disclosed "Tangible Fixed Assets" in the Americas of $4 million.  *Id.* |
| ¶87 | Norinchukin has designated the New York branch as a "material entity" because of the significance to its investment activities and ability to directly access U.S. dollar funding markets in the U.S.  The New York branch primarily engages in short-term U.S. dollar funding in support of Norinchukin's Head Office securities investment activities through repo transactions and unsecured funding such as Certificates of Deposit ("CDs"); wholesale corporate lending to Japanese agricultural, forestry and fishery co-operative members and subsidiaries of Japanese companies located mainly in the United States and Canada; and research on the U.S. economy and financial markets.  Norinchukin's New York branch's total assets as of March 31, 2013 were approximately $81.1 billion.  It generated substantial income of approximately $237 million and it employed approximately 70 people during each of the years during period 2011 through 2014. |

| ¶88 | Norinchukin holds a controlling interest in a broker-dealer subsidiary, Grosvenor Securities LLC, in Chicago, Illinois, and a commercial leasing business in New York, New York, known as JA Mitsui Leasing Capital Corp. |
| ¶89 | Norinchukin also maintains The Norinchukin Foundation, a New York domestic 501(c)(3) not-for-profit corporation operating a charitable foundation in the greater New York area.  The foundation was established in 1994 to commemorate the tenth anniversary of Norinchukin's New York branch. |

| The Rabobank Defendant |
|---|
| **IV. THE PARTIES** |
|    **B. Defendants** |
|       **17. The Rabobank Defendant** |

| | |
|---|---|
| ¶82 | Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial institution organized under the laws of the Netherlands, and its headquarters is in Utrecht, Netherlands. Rabobank was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. Rabobank is a cooperative banking organization and maintains banking divisions and branches around the world, including an FDIC insured branch in the United States in New York, New York. Rabobank's New York branch, located at 245 Park Avenue, New York, New York 10167, is registered as a foreign bank branch in New York and is subject to the New York State Department of Financial Services regulatory supervision. As of December 2013, Rabobank had approximately 550 employees in its New York branch, and it also maintains representative offices in Atlanta, Chicago, Dallas, St. Louis and San Francisco from which Rabobank employs additional fulltime employees. Rabobank conducts client marketing and service activities in the United States through its representative offices. |
| ¶83 | Defendant Rabobank employs derivatives traders throughout the world, including in New York, London, Utrecht, Tokyo, Hong Kong and Singapore. Rabobank's derivatives traders trade financial instruments tied to LIBOR, including interest rate swaps and Eurodollar futures contracts. From at least as early as September 2005 through approximately December 2008, in New York, London and Utrecht, multiple Rabobank swaps traders made frequent requests for favorable LIBOR contributions to Rabobank's US Dollar LIBOR submitters on the London money markets desk, which the Rabobank submitters accommodated on numerous occasions and submitted Rabobank's LIBOR contributions consistent with the traders' requests. In March 2015, a former Rabobank derivatives trader, Lee Stewart, pled guilty to criminal charges in U.S. federal court for his role in manipulating U.S. Dollar LIBOR and Yen LIBOR. The Rabobank trader pled guilty to one count of conspiracy to commit wire and bank fraud. |

| **V. FACTUAL ALLEGATIONS** |
|---|
|    **C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide** |

| | |
|---|---|
| ¶142 | The investigations uncovered a widespread manipulation of various LIBOR rates, including U.S. Dollar LIBOR. As a result of these investigations, governmental regulators have so far settled with six of defendant panel banks – Barclays, UBS, RBS, Rabobank, Lloyds, and Deutsche Bank – and two interdealer brokers – ICAP and RP Martin – in connection with Yen-LIBOR manipulation. Although Citibank was not identified in Final Notices of settlements with certain defendants for LIBOR manipulation, the FCA, DOJ and CFTC entered into settlements with Citibank for manipulation of foreign exchange rates and benchmarks in 2015. In the FCA's settlement agreement with Citibank, the British Financial Conduct Authority ("FCA") expressly noted that in response to Final Notices issued to other defendants by regulatory authorities for LIBOR manipulation, Citibank engaged in a remediation program to improve policies, procedures and training in connection with Citibank's LIBOR |

| | |
|---|---|
| | and other benchmark assessments and price formation processes. |
| ¶146 | On October 29, 2013, defendant Rabobank settled civil and criminal cases with the DOJ, CFTC and FCA concerning, *inter alia*, the manipulation of USD-LIBOR. Pursuant to the settlement and the deferred prosecution agreement, Rabobank paid the U.S. and U.K. authorities a total of approximately $1 billion. |
| **G. Findings from the Rabobank Settlements Involving USD LIBOR** | |
| ¶194 | On or about October 29, 2013, Rabobank settled with various regulators for conduct related to U.S. Dollar LIBOR Manipulation. Specifically, Rabobank paid $325 million to the U.S. DOJ, $475 million to the CFTC, $170 million to the FCA and approximately $96 million to the Openbaar Ministerie (the Dutch Public Prosecution Service). Rabobank's chief executive officer resigned after Rabobank's confessions of this systematic manipulation of LIBOR and other rates. |
| ¶195 | More specifically, the Rabobank settlement documents detail how from 2005 through early 2011, "Rabobank derivatives and cash traders frequently asked Rabobank's LIBOR and Euribor submitters to submit preferential rates in attempts to manipulate U.S. Dollar and Yen LIBOR, Euribor, and on occasion Sterling LIBOR, to benefit Rabobank traders' cash and derivatives trading positions that were tied to those benchmark interest rates."[54] In addition, the CFTC determined that the conflict of interest between submitting honest LIBOR and Euribor submitters rates and benefitting Rabobank's trading positions was heightened because Rabobank "grouped the submitters on the same desks with other derivative traders, which further facilitated the ease of coordinating on the submissions." [37] |
| ¶196 | According to the CFTC, Rabobank "regularly attempted to manipulate the official LIBOR fixings for U.S. Dollar, Yen and Sterling in particular tenors, and knowingly delivered false, misleading or knowingly inaccurate reports concerning LIBOR for U.S. Dollar, Yen and Sterling, commodities in interstate commerce."[38]  As a result, Rabobank's actions had the ability to influence the daily rates at which U.S. LIBOR was fixed. [39]  In addition, Rabobank's false and misleading U.S. Dollar LIBOR submissions "affected or tended to affect the price of commodities, *including futures contracts*."[40]  Eurodollar futures and option contracts traded on the CME are settled based on LIBOR and are among the commodities directly impacted by Rabobank's manipulative activities.[41] |

---

[37] Rabobank CFTC Order at 2.

[38] Rabobank CFTC Order at 38.

[39] *Id.* at 46.

[40] *Id.* at 46.

[41] Rabobank CFTC Order at 7-8; *see also* Rabobank DOJ SOF ¶¶ 12, 97; Rabobank CFTC Order at 3.

| | |
|---|---|
| **1. Rabobank Made False Reports and Attempted to Manipulate USD LIBOR to Benefit its Trading Positions** | |
| ¶197 | During a period of more than three years between at least mid-2005 and through at least late 2008, Rabobank regularly attempted to manipulate U.S. Dollar LIBOR and made false LIBOR submissions in furtherance of this goal. [42]   The CFTC determined: |
| | [T]wo traders ("U.S. Dollar Trader-Submitter 1" and "U.S. Dollar Trader-Submitter 2"), who were supervised by Senior Manager 1. Senior Manager 1 accepted and relayed requests for preferential LIBOR submissions from traders and, as noted above, encouraged the submitters and traders he supervised to speak openly about their trading positions and make LIBOR submissions to benefit Rabobank traders' U.S. Dollar trading positions. [43] |
| ¶198 | The CFTC also found that "Rabobank had its LIBOR and Euribor submitters sitting next to and working with the other derivatives traders on trading desks. Rabobank managers and at least one senior manager expected the traders and submitters to communicate about relevant market conditions and individual trading positions." [44]   Following the instruction of Rabobank management, traders and submitters openly discussed trading using electronic means such as email and Bloomberg messenger. [45]   In addition, Rabobank employees regularly made oral requests to alter U.S. Dollar LIBOR. [46]   Proximity fueled these requests. As the CFTC determined: |
| | **For the entire relevant period of mid-2005 through 2008**, a senior London derivatives trader ("Senior U.S. Dollar Trader"), *known by the submitters and others as the "Ambassador" or "Ambass," sitting with the U.S. Dollar Trader-Submitters at the same desk*, *regularly made oral requests for preferential U.S. Dollar LIBOR submissions*. In a few instances, the Senior U.S. Dollar Trader made *written requests* as well. The Senior U.S. Dollar Trader *often barked his requests across the desk and expected his requests to be followed.* [47] |
| ¶199 | While the frequency of oral requests for preferential U.S. Dollar LIBOR submissions prevented the regulators from providing an exhaustive summary, the Rabobank Settlement documents are replete with examples of Rabobank's U.S. Dollar LIBOR submitter accommodating such requests. In fact, the CFTC was able to uncover instances where a New York-based U.S. Dollar |

---

[42] Rabobank CFTC Order at 7; *see also* Rabobank DOJ SOF ¶16; Rabobank FCA Final Notice ¶ 2.6.

[43] *Id.*; *see also* Rabobank DOJ SOF ¶19; Rabobank FCA Final Notice ¶ 2.5.

[44] Rabobank CFTC Order at 6 (emphasis added).

[45] *Id.*; *see also* DOJ SOF ¶ 15.

[46] Rabobank CFTC Order 2-3; Rabobank DOJ SOF ¶15, 18; Rabobank FCA Final Notice ¶¶ 2.8, 4.11, 4.34.

[47] Rabobank CFTC Order at 7 (emphasis added).

| | derivatives trader and his manager requested preferential U.S. Dollar LIBOR submissions via Bloomberg chats and internal email.[48] |
|---|---|
| | **2.   Examples of Traders' Requests Within Rabobank for Favorable U.S. Dollar LIBOR Settings** |
| ¶200 | Regulators uncovered instances of Rabobank attempting to submit false U.S. Dollar LIBOR submissions during a three year period extending from at least mid-2005 through at least late 2008.[49]  Due to the length of the period covered and the frequency of the manipulation, the Rabobank settlement documents provide only a "*few examples of the written requests* from the traders to the submitters and the acceptance of those requests by the submitters."[50] |
| ¶201 | In fact, the FCA uncovered at least 112 documented internal requests by Rabobank derivatives traders to Rabobank's U.S. Dollar LIBOR submitter.[51]  The frequency of the requests prompted one manager to quip to one trader that the U.S. Dollar LIBOR submitter was in "fact turning into [that trader's] b*tch."[52]  In total the FCA determined that at least 21 individuals were directly involved in internal requests for beneficial U.S. LIBOR settings.[53] |
| ¶202 | The following examples highlight internal requests at Rabobank when its manipulated submissions alone impacted 3 month U.S. Dollar LIBOR. |
| ¶203 | On June 30, 2006, a Rabobank U.S. Dollar Trader wrote the U.S. Dollar Trader-Submitter, "MORNING MATE, HOPE U GOT THROUGH YESTERDAY OK. *USUAL REQUEST* .. LOW 1S, HIGH 3S IF U CAN."[54]  The Rabobank U.S. Dollar Trader-Submitter acknowledged the request by responding "will do fella . . ." On that day, Rabobank's 3 month U.S. Dollar submission fell within the interquartile range. Plaintiff Atlantic Trading, which was a net seller of Eurodollar futures contracts on that date, can plausibly allege that it was injured by Rabobank's alleged manipulation. |
| ¶204 | Other examples of Rabobank's U.S. traders successfully requesting that the bank's U.S. Dollar LIBOR submission be artificially increased include the following: |

---

[48] *Id.* at 7.

[49] Rabobank CFTC Order at 8; Rabobank Dutch Central Bank/Dutch Public Prosecution Letter at 10 (". . . . between September 2005 and late November 2010 . . . ."); Rabobank DOJ SOF ¶16 ("From at least as early as September 2005 through approximately December 2008 . . . . "); Rabobank FCA Final Notice ¶2.6 ("From May 2005 to November 2010. . . .").

[50] Rabobank CFTC Order at 8.

[51] Rabobank FCA Final Notice ¶ 2.6(2).

[52] *Id.*

[53] Rabobank FCA Final Notice ¶ 4.13.

[54] Rabobank CFTC Order at 9 (emphasis added).

- On September 1, 2006, a U.S. Dollar Trader wrote the U.S. Dollar Submitter, "HEY, HIGH 3MTH LIBOR FOR UR OLD MUCKER PLS CHIEF!" In response the U.S. Submitter wrote, "sure mate."[55] On September 1, 2006, Rabobank's U.S. Dollar LIBOR submission was kicked out up from the interquartile range. Plaintiffs 303030 Trading and Atlantic Trading, which were net sellers of Eurodollar futures contracts on that date, can plausibly allege that they were injured on this date by Rabobank's alleged manipulation.

- On September 15, 2006, a U.S. Dollar Trader wrote the U.S. Dollar Submitter, "HEY LONG TIME NO SPEAK ... USUAL FAVOURS, CAN U KEEP 3S LIBORAT 39 FOR THE NEXT FEW DAYS PLS MATE, CHEERS SPK 2 U SOON." In response, the U.S. Dollar Submitter wrote, "will do mate." On September 21, 2006, Rabobank continued to submit a 3 month LIBOR submission of 5.3900 and was kicked out up from the interquartile range.[56]

- On November 29, 2006, Trader-2 [USD Trader] again wrote to Submitter-3 [Rabobank's Global Head of Liquidity and Finance and the head of Rabobank's money markets desk in London]: 'Hi mate, low 1s high 3s LIBOR pls !!! Dont tell [Trader-1] haa haaaaaa. Sold the market today dooooooohhhh!' Submitter-3 replied:  "ok mate , will do my best.. .speak later." That day, Rabobank's 1-month U.S. Dollar LIBOR submission went up by two and a half basis points. In light of changes in the submissions of other banks on the Contributor Panel, however, Rabobank's submission went from being tied with the submissions of thirteen other banks on the Contributor Panel for the second highest submission to being tied for the twelfth highest submission. Rabobank's 3-month U.S. Dollar LIBOR submission was unchanged from the previous day.  Given changes in the submissions of other banks on the Contributor Panel, however, Rabobank's submission went from being tied for the third highest submission on the previous day to being tied for the second highest on November 29, 2006."[57]  On this day, Rabobank's 3 month U.S. Dollar submission was kicked out up from the interquartile range.  Plaintiff Atlantic Trading, which was a net seller of Eurodollar futures contracts on that date, can plausibly allege that it was injured by Rabobank's manipulative activity on this date.

- On August 13, 2007, U.S. Dollar Trader ("Trader-2") messaged Submitter-1:  "High 3s and 6s pls today mate (esp 6mths!!) if u would be so kind.. Gotta make money somehow!"[58] Submitter-1 [for USD LIBOR] replied: 'cool..' Trader-

---

[55] Rabobank CFTC Order at 9.

[56] Rabobank CFTC Order at 9.

[57] Rabobank DOJ SOF ¶ 28; Rabobank CFTC Order at 11.

[58] According to the Rabobank DOJ SOF, "'3s' and '3m' refer to the 3-month LIBOR tenor. Other tenors are commonly referenced in a similar manner such as "1s" and "lm" to refer to the 1-month LIBOR tenor, including the use of 'w' to refer to weeklong tenors." *Id.* at ¶ 21 n.2.

2 messaged back: 'Cheers [Submitter-1].. Every little helps!'  That day, Rabobank's 3-month U.S. Dollar LIBOR submission went down two basis points, while the other banks in the Contributor Panel ranged from decreasing their submissions by seven basis points to increasing them by seven basis points. Rabobank's submission went from being tied for the seventh highest submission on the previous day to being tied for the fifth highest submission. Rabobank's 6-month U.S. Dollar LIBOR submission went up by one basis point from its previous submission, from 5.40 to 5.41, while the other banks' submissions remained constant, on average. Rabobank went from being tied for the third lowest submission on the Contributor Panel on Friday, August 10, 2007, to making the second highest submission of any bank on the Contributor Panel."[59]  On that day, Rabobank's 3 month U.S. Dollar submission fell within the interquartile range.

- Later on August 13, 2007, traders pushed the U.S. Dollar LIBOR submitter to push LIBOR higher the following day.[60] On August 14, 2007, desk managers corresponded with each other making clear that a high 3 month LIBOR was also preferred:  "Manager 2: *any feeling for libors today? specifically 6mth.*  Manager 1: *hi 1, 2, 3 month . . . 59, 56, 53.5 . . . 6 month 42, I think thats what* [Trader 3] *needs.*  Manager 2:       *it's actually me that needs it, but thanks.*  Manager 1: **ahh** [Trader 3]*, taking all the credit!!.*  Manager 2: *Typical.*"[61]

- "On another occasion, on September 26, 2007, Trader-2 [USD Trader] wrote Submitter-2 [for USD LIBOR] and Submitter-3 [Rabobank's Global Head of Liquidity and Finance and the head of Rabobank's money markets desk in London] with the subject line:  **'High 3s tomorrow pls gents.'**  Submitter-2 wrote back: 'What . . . 21 . . . hahahahha.'  Trader-2 replied:  'I'll get u [Submitter-2]!!'  Submitter-2 wrote:  'I'm setting it [tomorrow],' to which Trader-2 responded:  '25 (or higher) would be great CHEERS.'  Submitter-2 responded: 'U do realise [Trader-1] wants the opposite ,ill do my best mate.'  Trader-2 replied: 'Bugger.. We **fixed** at 24, anything higher is a bonus!'  **On September 27, 2007, Rabobank's 3-month U.S. Dollar LIBOR submission was 5.24, an increase of five basis points, whereas the other panel banks' submissions increased by approximately three basis points on average.**  Rabobank's submission went from being tied as the twelfth highest submission on the Contributor Panel on the previous day to being tied as the fifth highest submission on the Contributor Panel."[62]  Plaintiff 303030 Trading, which was a net seller of Eurodollar futures contracts on this date, can plausibly allege that it was injured by Rabobank's manipulative activities.

---

[59] Rabobank DOJ SOF ¶ 21.

[60] Rabobank DOJ SOF ¶ 22; Rabobank CFTC Order at 10; Rabobank FCA Final Notice ¶4.16(3).

[61] Rabobank FCA Final Notice ¶ 4.16(3) (emphasis added).

[62] Rabobank DOJ SOF ¶ 26; Rabobank CFTC Order at 11.

|  | • "[O]n **March 12, 2008**, Trader-2 [USD Trader] wrote to Submitter-2 [for USD LIBOR] and asked: '**High 3s and 6s pls tomorrow**.' Submitter-2 wrote back: '**Yes ..Low 1s though**.' Trader-2 responded: '**Low 1s is fine, I have a lot in 3s and 6s tho (about 75k/bp)!**'[63]   **On March 13, 2008, Rabobank's 3-month U.S. Dollar LIBOR submission declined by two and a half basis points, whereas the other panel banks' submissions decreased by approximately five basis points on average.**  Rabobank's submission went from being the lowest of any bank on the Contributor Panel on March 12, 2008, to being only the fifth lowest submission.  Likewise, Rabobank's 6-month U.S. Dollar LIBOR submission declined by six basis points, whereas the other panel banks' submissions decreased by approximately eight and a half basis points on average. Rabobank's submission went from being the second lowest submission of any bank on the Contributor Panel on March 12, 2008, to being tied as the sixth lowest submission.  In contrast, Rabobank's 1-month U.S. Dollar LIBOR submission declined by five basis points, whereas the other panel banks' submissions decreased by approximately four and three-quarters basis points on average.  Rabobank's submission was the lowest submission of any bank on the Contributor Panel on both March 12, 2008, and March 13, 2008."[64]<br><br>• On March 17, 2008, Rabobank "Trader-2 [USD Trader] messaged Submitter-1 [for USD LIBOR] and asked: '**where r u gonna fix 3m today, any idea**?' Submitter-1 replied: 'no idea mate ..ive only been in 10 mins .. you want me to ask about ..**don't think we have anything in 3's so hap[p[y to help**.' Trader-2 wrote back: '**yes, I have 3k fixing today,,, highere the better**.' Submitter-1 responded: '**ok mate ..[a specific swaps broker] is going 56 area..' Trader-2 replied: 'go 60 pls!'  Submitter-1 wrote back: 'sure**.'  Later in the conversation, Trader-2 asked: '**can u go high 1s as well today pls**.' Submitter-1 wrote back: '**me & [Submitter-2] have got a couple of yards fixing today** ..how much you got in it mate .. not sure we make a huge difference anyway .' Trader-2 wrote back: '2 bio... just 3s then matey.' Submitter-1 replied: 'ok cool.. i'll go flat to what [the swaps broker] says as probably won't make huge diff.'  That day, as requested, Rabobank's 3-month U.S. Dollar LIBOR submission was 2.60, tied for the highest submission of any bank on the Contributor Panel. On the previous trading day, Rabobank's submission had been tied for the ninth highest submission. Rabobank's 1-month LIBOR submission went down 22 basis points, approximately the same as the average change in the submissions of the other banks on the Contributor Panel."[65]  Plaintiff Atlantic Trading, which was a net seller of Eurodollar futures contract on that date, can plausibly allege that it was injured by Rabobank's alleged manipulation. |
|---|---|
| ¶205 | On other days, Rabobank traders requested artificially low U.S. Dollar LIBOR submissions.  For example, on August 15, 2006, |

---

[63] According to the DOJ SOF, "'75k/bp' refers to a profit/loss exposure of $75,000 per basis point change in the final fixing of the U.S. Dollar LIBOR rate (*i.e.*, for every basis point increase or decrease in the U.S. Dollar LIBOR fixing, the trade would make or lose an additional $75,000 respectively)."  *Id.* at ¶ 25 n.3.

[64] Rabobank DOJ SOF ¶ 25.

[65] Rabobank DOJ SOF ¶ 24 (emphasis added).

| | |
|---|---|
| | a U.S. Dollar Trader wrote the U.S. Dollar LIBOR Submitter, "IF THE AMBASS DOESN[']T HV ANY PREFERENCES, CAN I HAVE LOW lS AND 3S THE NEXT FEW DAYS PLS MATEY ... CHEERS HOPE U R GOOD."  In response the U.S. Dollar LIBOR Submitter granted the request by noting that the Ambassador did not "give a f*ck."[66]  On August 16 and 17, 2006, Rabobank was kicked out down from the interquartile range in a manner consistent with the requested manipulation.  Plaintiff Atlantic Trading, which was a net buyer of Eurodollar futures contracts on August 17, 2006, can plausibly allege that it was injured on this date by Rabobank's alleged manipulation. |
| ¶206 | Other days where Rabobank's manipulated submission alone impacted 3 month U.S. Dollar LIBOR include the following:<br><br>• On October 13, 2006, a U.S. Dollar trader wrote the U.S. Dollar Submitter:  "HOW'S IT GOING [. . ..]??  LOOKING FORWARD TO THE WEEKEND I BET -AM OFF ON HOLS FOR A WEEK MYSELF, CANNOT WAIT!!  **IF U WOULD BE SO KIND AND KEEP 3S LOW FOR MONDAYS FIX ... THINK IT'LL COME IN AT 37.5, WOULD BE A BIT PAINFUL IF WAS MUCH HIGHER** ... ANYWAYS I'M BLABBING .. HOPE U R GOOD." The U.S. Dollar LIBOR Submitter acknowledged this request:  "hallo mate .. this week has been awful . Worst for me for a long long time . what's your thoughts on this mate .. **I'll sort out the 3's** & where u off to on holiday."[67]  On the next trading day, October 16, 2006, Rabobank's U.S. Dollar LIBOR submission was kicked out down from the interquartile range.<br><br>• On September 7, 2007, a U.S. Dollar trader wrote to the U.S. Dollar Submitter:  "WOW ... WHAT DO LIBORS DO NOW.. WILL U DROP THEM TOMORROW?"  The Submitter responded, "I think banks need to keep them high mate .. how can they drop them too much if they can't get the cash in to cover exsposure ..."  The U.S. Dollar trader then indicated a preference for a low LIBOR submission:  "OK MATE, IF U CAN KEEP EM UP THERE **THAT WOULD SAVE MY ARSE A BIT** (TIL SEP ROLLS OFF!), CHEERS MATEY," to which the Submitter indicated he would "do [his] best."[68]  On September 10, 2007, the next trading day, Rabobank lowered its 3 month U.S. Dollar LIBOR submission and was kicked out down from the interquartile range.  Plaintiff Atlantic Trading, which was a net buyer of Eurodollar futures on that date, can plausibly allege that it was injured on this date by Rabobank's alleged manipulation.<br><br>• On September 19, 2007, the U.S. Dollar Submitter took his own trading positions into account when submitting a low U.S. LIBOR.  He informed Rabobank's Euribor submitter:  "'today i have **fixing** so am low on the 3mth ...'  **That day,** |

---

[66] Rabobank CFTC Order at 11; *see also* Rabobank DOJ SOF ¶ 27.

[67] Rabobank CFTC Order at 9 (emphasis added).

[68] Rabobank CFTC Order 10 (emphasis added).

**Rabobank's 3-month U.S. Dollar LIBOR submission went down 39 basis points, whereas the average submission on the Contributor Panel went down approximately 34 basis points.** Rabobank's submission went from being tied for the third highest submission on the previous day to being tied for the lowest submission on the Contributor Panel."[69] Consequently, Rabobank's 3 month LIBOR submission was kicked out down from the interquartile range.

- "[O]n Wednesday, October 17, 2007, a U.S. Dollar swaps trader ("Trader-1") emailed the Rabobank U.S. Dollar LIBOR submitter ("Submitter-1"): 'A nice low 1 month for the rest of the week please matey. Cheers.' **Rabobank's submissions for the rest of the week were consistent with this request.** That day, Rabobank's 1-month U.S. Dollar LIBOR submission dropped four basis points whereas the rest of the Contributor Panel's submissions either remained unchanged or dropped one or two basis points from the previous day. The day before the request, Rabobank's 1-month U.S. Dollar LIBOR submission had been the fifth lowest submission of the banks on the Contributor Panel. Immediately after this request for a low submission, Rabobank's 1-month LIBOR submission sank to the lowest submission of any bank on the Contributor Panel. On Thursday, October 18, 2007, Rabobank's 1-month submission was tied for the second lowest on the Contributor Panel, and on Friday, October 19, 2007, Rabobank's 1-month submission was again the lowest submission of any bank of the Contributor Panel."[70] On each of these days, Rabobank's 3 month LIBOR submission was kicked out down from the interquartile range.

- "On **November 15, 2007**, another Rabobank [Euribor] submitter ('Submitter-9') explained to Submitter-1 [for USD LIBOR]: 'The fixinh should be done by cash desk in agreement with deriv. I do the fixing I ask swap desk what they have.' Submitter-1 replied: '**[Trader-1 for USD swaps] had big fixing so we help him today**,' and further explained: '**i am low because [Trader-1] has fixing ..i go higher tomorrow**.'"[71] On November 15, 2007, Rabobank's 3 month U.S. Dollar LIBOR submission fell within the interquartile range.

### 3. Rabobank's Manipulation of LIBOR in Collusion with Other Panel Banks.

---

[69] Rabobank DOJ SOF ¶23 (emphasis added).

[70] Rabobank DOJ SOF ¶17 (emphasis added; internal footnote omitted); *see also* Rabobank CFTC Order at 10. The Rabobank settlement documents describe instances of manipulation of 1-month and 6-month LIBOR in addition to 3-month LIBOR. Because of arbitrage and other facts that may be pleaded, Plaintiffs have good grounds to allege plausibly that Rabobank's manipulation of these other two tenors had a similar manipulative impact on the 3-month submissions and Eurodollar futures contract prices. Such allegations would include the generally strong correlation (around 80%) between 3-month LIBOR on the one hand and 1- and 6-month LIBOR on the other. In addition, there are other exchange-based products tied to these other tenors that were affected by this conduct.

[71] Rabobank DOJ SOF ¶19 (emphasis added).

| ¶207 | The FCA determined that "Rabobank *colluded* with individuals from *other Panel Banks to make submissions in relation to* JPY and *USD LIBOR that benefited trading positions* ('External Requests')."[72] Moreover, specifically the FCA found that during a period between June 2005 and October 2008, "at least one Rabobank Trader and one Rabobank Submitter made at least 12 documented External Requests to at least two individuals from one other Panel Bank."[73] Two of these requests were made to another LIBOR panel bank in connection with U.S. LIBOR.[74] Rabobank made such requests as "part of a collusive effort to manipulate the published JPY and USD [LIBOR] rates."[75] |
|---|---|
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction. When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110] Consider the following representative examples:<br><br>• *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) *with* Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the next few days");<br><br>• *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derviatives Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: '*I reckon you should be about four to five ticks higher*'") (emphasis in original) *with* Rabobank DOJ SOF ¶ 26 (on September 26, 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased |

---

[72] Rabobank FCA Final Notice ¶2.11.

[73] *Id.* ¶¶ 2.11, 4.23.

[74] *Id.* ¶ 4.23.

[75] *Id.* ¶ 4.24.

[110] *See* Barclays FCA Final Notice ¶ 11.

about three basis points on average).

- *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) *with* Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, *inter alia* observed that Credit Suisse was "gonna go three percent from one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."

- Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR. After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS. Remind me to buy you all drinks." To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission. The Citigroup trader agreed to speak with the LIBOR submitter. On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day.

| | | Trader-Based Allegations Involving the Rabobank Defendant | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 6/30/2006 | Rabobank | High 3M | Interquartile | ¶ 203 | Atlantic Trading |
| 8/16/2006 | Rabobank | Low 3M | Kicked Down | Rabobank CFTC Order at 11 Rabobank DOJ SOF ¶ 27 | |
| 8/17/2006 | Rabobank | Low 3M | Kicked Down | ¶ 205 | Atlantic Trading |
| 9/1/2006 | Rabobank | High 3M | Kicked Up | ¶ 204 | 303030 Trading, Atlantic Trading |
| 9/21/2006 | Rabobank | High 3M | Kicked Up | ¶ 204 | |
| 10/16/2006 | Rabobank | Low 3M | Kicked Down | ¶ 206 | |
| 11/29/2006 | Rabobank | High 3M | Kicked Up | ¶ 204 | Atlantic Trading |
| 8/13/2007 | Rabobank | High 3M | Interquartile | ¶ 204 | |
| 8/14/2007 | Rabobank | High 3M | Kicked Up | ¶ 204 | |
| 9/10/2007 | Rabobank | Low 3M | Kicked Down | ¶ 206 | Atlantic Trading |
| 9/19/2007 | Rabobank | Low 3M | Kicked Down | ¶ 206 | |
| 9/27/2007 | Rabobank | High 3M | Interquartile | ¶ 204 | 303030 Trading |
| 10/17/2007 | Rabobank | Low 1M | Kicked Down | ¶ 206 | |
| 10/18/2007 | Rabobank | Low 1M | Kicked Down | ¶ 206 | |
| 10/19/2007 | Rabobank | Low 1M | Kicked Down | ¶ 206 | |
| 11/15/2007 | Rabobank | Low | Interquartile | ¶ 206 | |
| 3/13/2008 | Rabobank | High 3M | Interquartile | ¶ 204 | |
| 3/17/2008 | Rabobank | High 3M | Kicked Up | ¶ 204 | Atlantic Trading, FTC |

| The Royal Bank of Canada Defendants | |
| --- | --- |
| IV. THE PARTIES | |
|    B. Defendants | |
|       14. The Royal Bank of Canada Defendants | |
| ¶74 | Defendant Royal Bank of Canada ("RBC") is a Canadian chartered bank organized under the laws of Canada with its corporate headquarters in Toronto, Ontario, Canada and its head office in Montreal, Quebec, Canada. At all relevant times, RBC was a member of the panel of banks that submitted LIBOR rates to the BBA. RBC and its subsidiaries presently employ more than 8,000 people in their U.S. branches and offices. RBC maintains (at the present time) ten corporate offices and branches in the United States, including three federally licensed branches in New York, one federally licensed branch in Florida and additional representative offices and agencies in the United States, including in Texas, California, Delaware and Washington. RBC and its subsidiaries generated substantial revenue of more than $4.7 billion CAD (2012) and more than $5.5 billion CAD (2013) from their U.S. operations, a substantial portion of which has been derived from RBC's three New York offices. |
| ¶75 | In the United States, RBC's derivative activities include the sale and trading of derivatives on behalf of clients in addition to using derivatives to hedge in conjunction with the management of interest rate, credit, equity and foreign exchange risk related to its funding, lending, investment activities and asset/liability management. |
| ¶76 | Defendant RBC Capital Markets LLC ("RBC Capital") is a Minnesota limited liability company and indirect wholly-owned subsidiary of Defendant RBC. RBC Capital is a registered broker-dealer with the U.S. Securities and Exchange Commission and a registered FCM with the CFTC. RBC Capital also is a member of the NYSE and other securities and commodities exchanges in the U.S. RBC Capital enters into derivative transactions to manage its exposure to risk resulting from trading activities and to satisfy the needs of its customers, including interest rate swaps and options and futures contracts. RBC Capital maintains a short-term (overnight) credit facility with Defendant RBC in the amount of $850 million and a $3.0 billion revolving credit agreement to manage short-term liquidity needs. Traders at RBC Capital entered into derivative transactions tied to U.S. LIBOR rates and caused LIBOR submitters to submit false LIBOR rates to the BBA. |
|    K. Findings from the Barclays Cooperation Materials | |
|       1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries | |
|         b. Merrill Lynch Frequently Requested that Barclays Manipulate LIBOR To Benefits Its Own Trading Positions | |
| ¶271 | In a February 27, 2007 email to Barclays trader Jay Merchant, Contogoulas explained why he relied on Barclays to influence LIBOR in ways beneficial to his own trading positions as Merrill Lynch did not have its own U.S. Dollar LIBOR submitter that he could lean on: "we don[']t have a cash guy who sets libor . . . . [n]ot one of the privileged 16 banks." (Emphasis added). Consequently, Merrill Lynch's Contogoulas requested that Barclays keep the 3 month LIBOR benchmark as high as possible on February 28, 2007. Merchant provided Contogoulas with reassurance noting that he had already spoken with the Barclays U.S. Dollar LIBOR submitter and Fred [presumably Frederic Gourtay, their former Barclays colleague and then RBC Capital |

| | |
|---|---|
| | derivatives trader] for the need for a high 3 month LIBOR in light of their short position in Eurodollar futures. |
| ¶272 | Indeed, on the following day, February 28, 2007, RBC's Gourtay fell in line and sought to ensure that RBC's 3 month LIBOR submission would be high.  On that day, Barclays submitted the highest 3 month LIBOR among the panel banks.  In addition, RBC's 3 month U.S. Dollar LIBOR submission fell within the interquartile range, which had a direct impact on that day's 3 month U.S. Dollar LIBOR setting.  Consequently, Barclays and RBC were apparently successful in helping Merrill Lynch and their former colleague Contogoulas manipulate the 3 month LIBOR setting up. |
| | **c. RBC Requested that Barclays Manipulate LIBOR to Benefit Trading RBC's Positions** |
| ¶278 | The Barclays Cooperation Materials highlight numerous occasions where RBC sought Barclays' assistance in manipulating the LIBOR fix.  The casual nature of these requests is perhaps explained by the fact that the RBC employee who communicated the requests, Frederic Gourtay, the former head of U.S. dollar swaps trading at RBC Capital Markets in New York, was previously employed by Barclays as a Director and U.S. Dollar derivatives trader.  In fact, Gourtay and Alex Pabon, a Barclays USD derivatives trader, had also previously worked together in the New York office of BNP Paribas. |
| ¶279 | Gourtay sought to inure benefits from relationships cultivated during his prior employment.  For example, on March 17, 2006, Pabon wrote Gourtay and noted:  "I have sold all the stub fras against ois.  Going to get pj to jam 3m libor lower."  In response, Gourtay acquiesced to Barclay's request, noting "Need that as well ill talk to my cash guys!!"  On that day, both Barclays and RBC both submitted a 3 month LIBOR of 4.9250 and their submissions were "kicked out" down. |
| ¶280 | RBC contacted Barclays on September 14, 2006 to request that LIBOR be manipulated down on both September 15, 2006 and September 18, 2006.  Gourtay specifically requested, "okay im off for next 1.5 days . . . make sure u tell ur cash guys for low 3m fix next 2 days..ciaao oo."  Barclays and RBC submitted LIBORs of 5.3900 on September 15, 2006 and September 18, 2006 and their submissions were "kicked-out" down on both days. |
| ¶281 | Similarly, as previously discussed (*see* Section V.K.1.c, *infra*), RBC worked with Barclays to increase the 3 month LIBOR rate setting for February 28, 2007, which also was undertaken at Merrill Lynch's behest in order to benefit its Eurodollar futures positions. |
| ¶282 | The collaboration between RBC's Gourtay and his former Barclays colleagues appeared to continue throughout 2008.  For example, on September 25, 2008, Gourtay wrote Barclays to request that LIBOR drop by 10 basis points the next day in order to help hedging his short derivative trading position.  The casual nature of the request underscores how routine Gourtay manipulating LIBOR for the benefit of his derivative trading book to be. |
| | **d. RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays** |
| ¶286 | Even though available evidence does not suggest that RBS joined Barclays, RBC, and Merrill in seeking to manipulate LIBOR up on February 28, 2007, the Barclays Cooperation Materials provide ample evidence that RBS routinely shared its LIBOR submissions with interdealer brokers and other traders prior to the daily LIBOR fix in attempt to gain preferential settings.  For example, Johnson learned on September 13, 2007 that both HSBC and RBS planned to submit low LIBORs based on claims of |

| | |
|---|---|
| | "cheap money" being available, which prompted Johnson's laughter.  Days later, on September 17, 2007, Johnson, upon learning from an unidentified broker, that RBS was planning a low LIBOR fixing quipped, "RBS is obviously . . . setting his stall out." Subsequently, Johnson suggested that he would set a high LIBOR "just to f*ck [RBS] up".  On September 17, 2007, RBS submitted the lowest 3 month U.S. Dollar LIBOR and was "kicked out" down from the LIBOR setting.  Conversely, Barclays submitted the highest 3 month U.S. Dollar LIBOR and was "kicked out" up from the LIBOR setting.  Therefore, by telegraphing its LIBOR submission through communications with third parties, RBS demonstrated an ability to influence the LIBOR setting or at least alter the rate submissions of other U.S. Dollar LIBOR panel members. |

| | | Trader-Based Allegations Involving the Royal Bank of Canada Defendants | | | |
|---|---|---|---|---|---|
| **Date** | **Defendant(s) Involved** | **Direction of Manipulation** | **Effect on 3-Month LIBOR** | **Source** | **Plaintiff(s) Harmed** |
| 3/17/2006 | Barclays, RBC, RBC Capital | Low 3M - High 1M | Kicked Down | ¶ 279 | 303030 Trading, Atlantic Trading |
| 9/14/2006 | Barclays, RBC, RBC Capital | Low 3M | Kicked Down (Barclays and RBC) | ¶¶ 186, 280 | |
| 9/15/2006 | Barclays, RBC, RBC Capital | Low 3M | Kicked Down (Barclays and RBC) | ¶¶ 186, 280 | |
| 9/18/2006 | Barclays, RBC | Low 3M | Kicked Down (Barclays and RBC) | ¶¶ 186, 280 | |
| 2/28/2007 | Barclays, Merrill Lynch, RBC, RBC Capital | High 3M | Kicked Up (Barclays), Interquartile (RBC) | ¶¶ 271-73, 281, 346 | Atlantic Trading |
| 9/25/2008 | Barclays, RBC, RBC Capital | Low | Kicked Up (Barclays), Interquartile (RBC) | ¶ 282 | |

| | |
|---|---|
| | **The Royal Bank of Scotland Defendants** |

**IV. PARTIES**
   **B. Defendants**
      **12. The Royal Bank of Scotland Defendants**

| ¶64 | Defendant The Royal Bank of Scotland Group plc ("RBS Group") is a United Kingdom bank holding company and public limited company incorporated in Scotland with its principal office in Gogarburn, Scotland. RBS Group is registered in the U.S. as a bank holding company and a financial holding company, and it is subject to regulation and supervision by the Federal Reserve. According to the Resolution Plan filed with the Federal Reserve in October 2014, the RBS Group is a "covered bank" under Dodd-Frank. In 2013, RBS Group generated approximately 20 percent of its global revenue and 24 percent of its consolidated income from operations in the United States. |
|---|---|
| ¶65 | Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom corporation incorporated in Scotland with its principal offices at Gogarburn, Edinburgh and in London, England. Defendant RBS is the principal operating subsidiary of Defendant RBS Group. Also, RBS was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. As part of a Deferred-Prosecution Agreement with the Criminal Fraud Section of the DOJ, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to LIBOR submissions (which were the subject of a two-count criminal information charging RBS with wire fraud and price fixing), and that Agreement refers to an ongoing investigation into misconduct related to additional, unidentified benchmark rates. RBS has admitted that from 2006 to 2010, its Global Banking and Markets ("GBM") business unit employed money market traders and derivatives traders throughout the world, including in New York. These derivative traders were responsible for trading a variety of financial instruments, including ones tied to LIBOR. RBS enters into economic hedges primarily to manage its interest rate risk, in financial assets/liabilities and non-trading positions. Derivative products, which are traded by the Rates core business line, include cleared and uncleared OTC swaps and uncleared OTC options; derivative trading conducted by the Asset-Backed Products and Rates core business lines. |
| ¶66 | RBS's New York branch was supervised by the New York State Department of Financial Services, and has recently been revised into a representative office. RBS maintains a branch office in Stamford, Connecticut and is supervised by the Connecticut Department of Banking. RBS also maintains representative offices in Chicago, Houston, San Francisco and Jersey City, New Jersey. RBS has approximately 350 employees based in the United States, with the majority of these employees based at the branch office in Connecticut. |
| ¶67 | In July 2011, RBS and RBS plc entered into an agreement with the Federal Reserve, the New York State Banking Department, the Connecticut Department of Banking and the Illinois Department of Financial and Professional Regulation to enter into a Cease and Desist Order to address risk management and compliance deficiencies at RBS and other subsidiaries and created a plan to strengthen board and senior management oversight of the corporate governance, management, risk management and operations of RBS Group's U.S. operations on an enterprise-wide and business line basis. |

| | |
|---|---|
| ¶68 | Defendant RBS Greenwich Capital now known as RBS Securities, Inc. ("RBS Securities") is a Delaware corporation with its headquarters in Stamford, Connecticut. RBS Securities is an indirect wholly-owned subsidiary of Defendant RBS Group. In 2011, RBS's investment bank made 35 percent of its revenues in the U.S., compared to only 27 percent in the United Kingdom, according to an investor presentation in March 2012. In 2011, RBS generated $3.4 billion in revenues in the U.S., with $640 million generated by banking and $2.8 billion by RBS Securities. RBS Securities is RBS Group's primary U.S. broker-dealer and is subject to regulation by the SEC and FINRA for securities activities, and is registered as a Futures Commission Merchant with the CFTC. RBS and RBS Securities both are members of the CME. As of June 30, 2010, RBS was among the fourteen largest broker/dealers of interest-rate derivatives. RBS also has an affiliated U.S. retail and commercial bank known as Citizens Financial Group, Inc. RBS also is a member of ICE Clear Credit, NYMEX, CBOT and COMEX. |
| ¶69 | RBS Group's affiliate, RBS Americas Property Corp. ("RBS Property"), is a Delaware corporation that provides property services to RBS Group's U.S.-based affiliates. One of RBS Property's principal assets is the Stamford, Connecticut headquarters of RBS, which comprises its North American headquarters. In 2009, RBS consolidated offices from Manhattan and Greenwich, Connecticut and underwent a $341 million renovation to create a state-of-the-art building located on 4.25 riverfront acres at 600 Washington Boulevard. RBS's headquarters in Stamford, Connecticut boasts approximately 1 million square feet of commercial space over twelve floors, with the 100,000 square-foot trading floor for up to 1,400 traders. |

**V. FACTUAL ALLEGATIONS**

   **K. Findings from the Barclays Cooperation Materials**

      **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**

         **d. RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays**

| | |
|---|---|
| ¶283 | The Barclays Cooperation Materials also provide evidence that RBS also sought to manipulate LIBOR both to maintain its reputation and to support its trading positions. Similarly, the Barclays Cooperation Materials also highlight how RBS worked with other panel banks and interdealer brokers to ensure that LIBOR moved in the direction RBS hoped. |
| ¶284 | RBS routinely told other banks and interdealer brokers what its LIBOR submission would be before publication, regularly violating the BBA's rule that LIBOR submissions must remain confidential until the day's LIBOR fix was calculated and published. RBS did so to ensure that other banks would submit appropriately skewed LIBOR quotes. |
| ¶285 | Indeed, on February 28, 2007, Jay Merchant, a Barclays derivatives trader, reached out to Neil Smith, a derivatives trader at RBS Securities, to question why RBS was setting its 3 month LIBOR low relative to other panel banks considering that RBS had "to be short march eurodollars like the rest of us --::)." In response, Smith expressed seeming frustration by acknowledging "what can i say, they [*i.e.*, the LIBOR submitter] are separate from us" before suggesting the RBS submitters set LIBOR low for their own independent purposes: "because of how they fund they want a low libor but the always go to the extreme so they set it so far out that they don't even influence the fixing which imho is silly.  but, hey, i'm not a cash guy so obviously what do |

| | |
|---|---|
| | i know." |
| ¶286 | Even though available evidence does not suggest that RBS joined Barclays, RBC, and Merrill in seeking to manipulate LIBOR up on February 28, 2007, the Barclays Cooperation Materials provide ample evidence that RBS routinely shared its LIBOR submissions with interdealer brokers and other traders prior to the daily LIBOR fix in attempt to gain preferential settings.  For example, Johnson learned on September 13, 2007 that both HSBC and RBS planned to submit low LIBORs based on claims of "cheap money" being available, which prompted Johnson's laughter.  Days later, on September 17, 2007, Johnson, upon learning from an unidentified broker, that RBS was planning a low LIBOR fixing quipped, "RBS is obviously . . . setting his stall out." Subsequently, Johnson suggested that he would set a high LIBOR "just to f*ck [RBS] up".  On September 17, 2007, RBS submitted the lowest 3 month U.S. Dollar LIBOR and was "kicked out" down from the LIBOR setting.  Conversely, Barclays submitted the highest 3 month U.S. Dollar LIBOR and was "kicked out" up from the LIBOR setting.  Therefore, by telegraphing its LIBOR submission through communications with third parties, RBS demonstrated an ability to influence the LIBOR setting or at least alter the rate submissions of other U.S. Dollar LIBOR panel members. |
| ¶287 | Similarly, on December 14, 2007, RBS disclosed its likely LIBOR submissions to Tullett Prebon, which in turn passed this information along to the Barclays U.S. Dollar LIBOR submitter.  After Neil Burgess attempted to share this information blindly and Johnson wrongly guessed that Lloyds was attempting to suppress LIBOR (though Johnson still requested that Burgess tell Lloyds "to go an' stick it where the [s]un don't shine"), Burgess revealed that RBS intended to submit a low LIBOR.  Neil Burgess of Tullett Prebon understood that this setting was made because RBS had just completed a trading position that required a specific fix. |
| ¶288 | The following Monday, December 17, 2007, Johnson continued to hear additional information regarding RBS' artificially low LIBOR submissions.  During a conversation with an unidentified broker, Johnson disclosed RBS' LIBOR submissions, which ultimately resulted in RBS being kicked out down from the LIBOR panel.  The unidentified broker exclaimed, "Oh, he's a complete c**t" before clarifying that the British vulgarism was in fact a "technical term" and reasoning that the RBS "[m]ust have [had] a fixing today."  This anecdote, therefore, provides additional evidence that RBS set its LIBOR to benefit its own trading positions. |
| ¶289 | Based on this information, it is even more significant that other banks often followed RBS's wishes by submitting similar LIBOR quotes.  For example, on November 13, 2008, an unknown submitter told Barclays employee Jonathan Mathew that his firm would be "copyin' RBS . . . at the moment."  Therefore, by leaking its planned U.S. Dollar LIBOR submissions prior to the LIBOR setting, RBS was able to directly and passively influence how other U.S. Dollar panel members set their own LIBORs, thereby magnifying the impact of its own manipulation. |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>        **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson. |

|  | During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
|---|---|
| ¶296 | Barclays' Johnson continued to express his indignation at how other Defendants planned to submit artificially suppressed LIBORs.  For example, on September 3, 2007, Johnson observed to an unidentified broker, "It pisses me off that we're the only people being honest about this and we are getting pilloried for it. . . .Really pisses me off."  To provide credence to Johnson's concern, the broker observed that RBS was setting its LIBOR below what another RBS trader was paying in the market.  Moreover, after Johnson shared with the broker what Tullett Prebon believed LIBOR to be and Johnson requested that the broker try to influence the market, the broker quipped, "I will do my best to influence but. . . it seems the people at Prebon/ICAP keep low balling it."  This suggests that ICAP and Prebon actively provided market guidance in line with their clients' desires as opposed to actual insights gleaned from the interbank lending market. |
| ¶301 | On November 29, 2007, Barclays had an internal discussion calling the LIBOR market "broken", and being used by submitters to "deliberately" manipulate the fixing "in order to make money off the derivatives."  In addition, through communications with Defendants Tullett Prebon and Tradition, Barclays participants knew where HBOS would submit and where RBS would submit LIBOR in advance of the filing.  Barclays also knew from these brokers where composite LIBOR would end up on the day.  And based on the FX swap market, the Barclays participants knew that the demand for U.S. dollars was 55 basis points above the RBS submission and 40 basis points above the HBOS submission. |

| ¶302 | Johnson distilled his concern over the perceived suppression of LIBOR and the need to avoid being seen away from the pack in a November 28, 2007 internal liquidity report.  Johnson observed: |
|---|---|
| | Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.* |
| | (Emphasis added).  In response to this email, Miles Storey ("Storey"), a manager in Barclays' Treasury department, thanked Johnson "for remaining pragmatic but at the upper end".  This effectively amounted to an acknowledgment and acceptance that Barclays was not submitting accurate LIBORs, but that Johnson should be praised for not manipulating LIBOR as egregiously as competitors while nonetheless still moving along with "the pack". |
| ¶303 | The pressure to submit LIBORs in line with other bank's submissions reached a breaking point on November 30, 2007.  On that day, Johnson spoke with Storey regarding how Barclays should position its LIBOR submission in the face of other panel banks' artificially low submissions.  Johnson advised Storey that he was in the process of figuring out where HBOS planned to submit its LIBOR because HBOS was "sort of was out with [Barclays] yesterday."  However, Storey advised Johnson that "the guidance is [to] stick within the bounds" and "no head above parapet, not partial bleeding," as "Mr. [Chris] Lucas [Barclays' then Chief Financial Officer] doesn't want [Barclays] to be outside the top end."  After Storey provided this guidance, Barclays received notice of RBS' planned LIBOR submissions, which were higher than RBS's prior day submissions. |
| | MS:  Well that shows that RBS is being dragged up doesn't it? |
| | PJ:  Yeah but they're only being dragged up to the to the tower. |
| | MS:  I know, but it's a start isn't it. |
| | PJ:  But why don't I go 32, 22 and 20?  So I'm 2 above the top.  So I'm, so I'm something ahead a little bit above the parapet. |
| | MS:  Tell you what, 30, 22, and 20.  In other words we're slightly above the parapet, but not in the one that people are going to publish. |
| | PJ:  Okay so 30, 22, 20. |
| | MS.  Yeah, I'm comfortable with that. |

| ¶307 | The Barclays Cooperation Materials suggest that LIBOR suppression continued unabated. For example, on December 12, 2007, Barclays' Johnson learned in telephone call with an unnamed broker that both RBS and Lloyds planned to submit LIBORs well below what was conceivable in the London funding market. He quipped, "What kind of drugs are they on?" After pressing the broker further, Johnson added, "It's all a load of bollocks, isn't it?" And the broker was forced to concede, "Eh, it's just complete[ly] false." |
|---|---|
| ¶308 | In fact, the next day, December 13, 2007, Johnson responded, "Give us a laugh" after an unidentified party offered to share Lloyds' U.S. Dollar LIBOR submissions (Lloyds' 3 month LIBOR submission for the day was "kicked out" down from the LIBOR panel). Later that same morning, Johnson spoke with Neil Burgess of Tullett Prebon, who shared market color and in particular divulged details regarding RBS' expected LIBOR submissions. Subsequently, Johnson learned that RBS had received a call from the BBA regarding its persistently low LIBOR submissions. Collectively, these documents evidence the fact that the Panel Bank Defendants routinely disseminated their expected LIBOR submission with the desire and expectation that the information would influence other Panel Bank Defendants' LIBOR submissions. |
| | **b.  Evidence of LIBOR Suppression During 2008** |
| ¶309 | The Barclays Cooperation Materials also demonstrate that internal and external communications regarding the suppressive manipulation of LIBOR continued into 2008. For example, in a March 18, 2008 phone conversation, Barclays trader Jonathan Mathew discussed where another bank planned to submit its LIBORs based in part on RBS' expected low submission:<br><br>JM:  How are you going fifty, if you got an offer at fifty five in the ones?<br><br>UM:  Because, it's not to do with the bloody market is it?  Nothing to do with markets.<br><br>JM:  Lovely, I-I'm telling it to PJ, I know but, . . . [h]e will get so infuriated."<br><br>    \*     \*     \*<br><br>UM:  I know.  Stupid.  I know, ex-exactly where you're coming from.  But uh, it's all, it's all grown on deriv-derivatives now, nothing to do with LIBORs, is it?<br><br>  JM:  Which is wrong, but anyway. |
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR. In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| ¶314 | The following day, April 18, 2008, Johnson continued to probe the market for insights into where other panelists planned to submit LIBOR before reporting back to Storey to let him know HSBC, Lloyds and RBS' impending submissions and to where Tullett Prebon believed LIBORs would set. Later in the conversation, Johnson recounted how Mark Dearlove spoke with the |

| | |
|---|---|
| | Wall Street Journal on April 17, 2008 and suggested that Barclays' submissions reflected the market sell off.  Recounting that explanation, which did not account for the behind the scenes calibration of LIBOR based on information shared among the panel banks, prompted laughter. |
| | **c.  Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples:<br><br>• On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board.  Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."  An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."<br><br>• Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon.  Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs."  Burgess agreed to try to find additional market color but in the interim informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."<br><br>• On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added).<br><br>• On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey.  Johnson reached out to Ramsey to gather information prior to the LIBOR fix.  Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).  In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*"  (Emphasis added).  While Barclays did in fact submit the highest 3 month |

| | |
|---|---|
| | LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.<br>• Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side." |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.<br><br>Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br><br>PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br><br>MS:  No, I know, I know, I know, and he's already talked to them about that.<br><br>PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].<br><br>In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:<br><br>Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a* |

|  | *hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.*<br><br>This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*. |
|---|---|
| ¶322 | Concern over how LIBOR rates would be perceived by other market participants and the public extended in October 2008.  For example, on October 2, 2008, Johnson learned that RBS would go only slightly higher on the previous day's low LIBOR settings.  Subsequently, Johnson blasted a mass internal email noting, "Hearing a libor contributor is paying 4.50 for 6 month USD (2 others are paying 3.97).  This particular contributor will be putting his libor substantially below the 4.5 level."  In fact, on that day, RBS submitted a 3 month LIBOR of 4.3500 which fell within the interquartile range, thereby directly impacting the LIBOR setting for the day.  After sending his internal email, Johnson called Burgess at Tullett Prebon, opening the dialogue by requesting, "Larrys, laughable Larry LIBORs, please" before going on to describe his dismay at RBS's LIBOR submissions.  Burgess acknowledged the absurdity of the submission by exclaiming "bloody hell" before quipping, "Some weird and wonderful things goin' on at the moment Pete it's all, payin' four and a half and . . ." only to have Johnson cut him off and add "And then pretending you're not."  Burgess attempted to offer Johnson solace in the fact that "You're the only one that lies straight in bed mate," but such sentiments rang hollow in the face of the persistent manipulation. |
| ¶324 | On October 29, 2008, Johnson emailed Mark Dearlove, Peter Spence, and Colin Bermingham to address their concerns that Barclays' LIBOR submissions were higher than other panel banks.  Johnson noted:<br><br>*Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested*.  I disagree with this approach as you are well aware.  *I will be contributing rate which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices*. [109]  I am not sure that the BBA definition of libor would accept this approach.  Today for instance the only cash offer in 3 months has been Chase Nyk who is offering at 4%.  Please do not tell me that 3.42% was the correct rate as we both patently know that it was not.  I will continue to keep a record where money is or is not offered in the periods.<br><br>COF spreads will have to go up massively in USD to compensate for fixing LIBOR rate unrealistically low.<br><br>(Emphasis added).  As Johnson noted, 3 month U.S. Dollar LIBOR was set at 3.42% on October 29, 2008.  Barclays submitted a LIBOR submission of 4.0000%, which was an extreme outlier compared to the next highest submitter, RBS, which submitted 3.6000%, and the lowest submitter, J.P. Morgan, which submitted 3.1500%. |

---

[109] *See also* Barclays CFTC Order at 24.

| | |
|---|---|
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110]  Consider the following representative examples: |

- *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) *with* Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the next few days");

- *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derviaties Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: '*I reckon you should be about four to five ticks higher*'") (emphasis in original) *with* Rabobank DOJ SOF ¶ 26 (on September 26, 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased about three basis points on average).

- *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) *with* Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, *inter alia* observed that Credit Suisse was "gonna go three percent from one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."

- Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however,

---

[110] *See* Barclays FCA Final Notice ¶ 11.

| | |
|---|---|
| | Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day. |
|  | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**<br>**3.  The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon.  *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br><br>• On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";<br><br>• On November 21, 2007, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).<br><br>• On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading."; |

|  | <ul><li>On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added).</li><li>On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."</li><li>On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";</li><li>On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and</li><li>On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide."</li></ul> |

| Trader-Based Allegations Involving the Royal Bank of Scotland Defendants | | | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 12/14/2007 | RBS, RBS Securities | Low 3M | Kicked Down | ¶ 287 | Atlantic Trading |
| 12/17/2007 | RBS, RBS Securities | Low 3M | Kicked Down | ¶ 288 | |

| | **The UBS Defendants** |
|---|---|
| | **IV. PARTIES**<br>    **B. Defendants**<br>        **11. The UBS Defendants** |
| ¶¶60-63 | Defendant UBS Group AG ("UBS Group") is a Swiss corporation and the holding company of the UBS Group, the largest wealth manager in the World.  In December 2014, UBS Group initiated proceedings to acquire all issued shares of Defendant UBS AG, which when completed will enable UBS Group to become a 100 percent owner of UBS AG.  Defendant UBS Group filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom and the United States.  UBS Group's shares are registered as Global Registered Shares on the New York Stock Exchange. |
| ¶61 | Defendant UBS AG ("UBS") is a Swiss banking and financial services corporation headquartered in Zurich and Basel, Switzerland.  UBS was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA.  UBS AG has entered a guilty plea with the United States DOJ for manipulating LIBOR.  Former traders of UBS also are being prosecuted criminally for their roles in the manipulation of Yen LIBOR.  During the trial of Thomas Hayes, one former UBS Yen-LIBOR trader, Hayes testified that UBS distributed "an instruction manual on fixing LIBOR" to suit UBS's trading positions. |
| ¶62 | UBS provides investment banking, asset management, and wealth management services for private, corporate and institutional clients worldwide.  UBS maintains a principal office and several branch offices in the United States, including in Connecticut, Illinois, Florida, California and New York, with its U.S. headquarters and "flagship" office is located at 1285 Avenue of the Americas, New York, New York 10019, where it has maintained a massive 700,000 square feet of space and bases the bulk of its investment banking operations.  During the Class Period, UBS also maintained an office and trading floors in Stamford, Connecticut, where it housed one of the largest trading spaces in the United States, as well as the world (according to Guinness World Records), with 103,000 square feet, although the office space has been converted over time for use by back office, legal and technology staff with approximately 2,000 employs, after traders have transitioned back to trading floors in Manhattan.  UBS engages in investment banking and employees derivatives traders throughout the world, including in Stamford, Connecticut and New York, who trade financial instruments tied to LIBOR, including interest rate swaps and Eurodollar contracts.  During the Class Period, UBS's Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps whose value depended on LIBOR.  The STIR desk also managed UBS's interest rate risk and short-term cash position by engaging in interest rate derivative transactions and transactions in the money markets for each currency, including the LIBOR, through traders located in Connecticut.  Many of UBS's counterparties to interest rate derivative transactions tied to LIBOR were located in the United States, including banks and other financial institutions, foreign banks with branches in the United States, asset management corporations, mortgage and loan corporations and insurance companies. |

| ¶63 | UBS also maintains a corporate headquarters in New Jersey located at Lincoln Harbor in Weehawken, New Jersey.  UBS is registered with the Office of the Comptroller of the Currency and the CFTC as a swap dealer.  UBS has elected treatment as a foreign bank and a financial holding company and is supervised by the Board of Governors of the Federal Reserve System.  As a financial holding company, UBS has broad authority to engage in activities to underwrite and deal in securities and commodities and to make merchant banking investments in commercial and real estate entities. |
|---|---|
| **D. Agents and Unnamed Co-Conspirators** | |
| ¶99 | In addition to the above entities' participation in selling LIBOR-based financial instruments to Plaintiffs during the Class Period, investigations regarding Defendants' manipulation of Yen-LIBOR (detailed below) and other "IBORs" have revealed that securities-dealer subsidiaries manipulated these benchmarks.  For example, the securities-dealer subsidiary of Defendant UBS, participated in manipulating Yen-LIBOR during the Class Period.  Based on these facts, Plaintiffs have reason to believe the dealer entities identified above materially aided or contributed to the manipulation of USD-LIBOR. |
| **V. FACTUAL ALLEGATIONS** | |
| **C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action Worldwide** | |
| ¶144 | Subsequently, in May 2015, the DOJ assessed and UBS agreed to pay an additional fine in the amount of $203 million for violation of the deferred prosecution agreement, which enabled UBS to avoid prosecution if for two years it did not commit any United States crime whatsoever.  By engaging in manipulation of foreign exchange rates and benchmarks during the two-year period covered by its deferred prosecution agreement, UBS violated its agreement with the DOJ and accepted the additional $203 million fine and a three-year term of probation. |
| **I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** | |
| **2. Findings Concerning Conspiring with Outside Banks and Entities** | |
| ¶238 | The New York Department of Financial Services found that Deutsche Bank "communicated and coordinated with employees of other banks and financial institutions regarding their respective rate contributions in advance of an LIBOR submission, including individuals at Barclays, BNP Paribas, Citibank, Merrill Lynch, Societe Generale and UBS, in an effort to manipulate rates."  Deutsche Bank NYDFS Order ¶30. For example, on May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?"  The external banker replied, "yeah… still."  The vice president replied, "we all ahve same position no?" Id. ¶ 33. Similarly, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok."  Id. ¶ 35.  And on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?"  The Head of the London Money Market Derivatives desk replied, "i will."  Id. ¶ 36.  On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some |

| | today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing." Id. ¶ 42.  It appears that some of these examples relate directly to Deutsche Bank's U.S. Dollar LIBOR submissions. Only discovery can confirm this fact, as well as the existence of other examples of conspiracy with outside banks. |
|---|---|
| | **J. Findings from the ICAP Government Settlements** |
| | **1. ICAP Manipulated Yen LIBOR** |
| ¶249 | However, these market forecasts were tainted by collusion.  Government investigations found that ICAP colluded with traders at UBS in order to skew the Yen LIBOR benchmark in directions favorable to UBS.[97]  ICAP effectuated these attempts to manipulate by emailing "deliberately skewed Run-Throughs to some Panel Banks" in addition to "directly request[ing] certain Panel Banks to make specific JPY LIBOR submissions that would benefit the traders."[98]  ICAP brokers sought to benefit UBS (and the banks derivative trading positions) "because UBS was a significant client which accounted for a substantial proportion of the revenue of the relevant desk."[99]  In particular, ICAP worked closely with former UBS Senior Yen Trader Thomas Hayes, but continued to collude with UBS to manipulate Yen LIBOR even after Hayes left UBS.[100]  In total, UBS requested ICAP's assistance in manipulating Yen LIBOR more than 400 times.[101]  Of course, because UBS made additional requests orally, the exact tally of requested manipulations cannot be accurately computed.[102]  ICAP's brokers were well compensated for colluding with UBS receiving hundreds of thousands of dollars in bribes and kickbacks for their "LIBOR services" in the form of additional commission generating trades, and promises of favors such as a curry meal, champagne and/or bonuses.[103] |
| | **K. Findings from the Barclays Cooperation Materials** |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** |
| | **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson.  During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an |

---

[97] *See, generally*, ICAP CFTC Order at 8-10; ICAP FCA Final Notice ¶¶ 10-15

[98] ICAP FCA Final Notice. ¶ 10.

[99] *Id.* ¶ 11.

[100] *Id.* ¶ 13.

[101] *See* ICAP CFTC Order at 9; ICAP FCA Final Notice ¶ 14.

[102] *Id.*

[103] *See* ICAP CFTC Order at 11.

|  | unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
|---|---|
| ¶297 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions.  After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such."  In response, Johnson noted, "No he's not, but he's still setting them lower then he should do." Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth". |
| ¶298 | What prompted laughter in September 2007 provoked ire less than a month later.  On October 2, 2007, Johnson engaged an unidentified broker from another bank in conversation regarding what that bank would submit for its LIBORs.  After the broker identified where the bank planned to submit its LIBOR, the following conversation ensued:<br><br>PJ:  It's bollocks!<br>UM:  It is bollocks.  Total and utter.  But he is taking into consideration where the Citibanks [sic], UBSs and all these people are gonna go.<br>PJ:  Yeah well f*ck them!  They're wrong.<br>UM:  Yeah.<br>PJ:  That's, that's that's absolute f*cking bollocks.<br><br>Later in the same conversation, Johnson disclosed Lloyds' planned LIBOR submission and questioned where WestLB would submit 3 month LIBOR based on his knowledge of what WestLB is paying in the market.  Towards the end of the conversation, Johnson forced the broker to acknowledge that LIBOR submissions was flawed.<br><br>PJ:  Okay, well I think your LIBORs are just ridiculous.<br>UM:  Oh a disgrace, yeah, no, they are, but I'm uh uh you understand what we are d- all I'm saying to you is that where we think the market is gonna fix their LIBORs.  That's where the fix . . . . is gonna be. |

| | |
|---|---|
| **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.** | |
| **3. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants' Communications Relating to Coordinated LIBOR Submissions** | |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*. These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack". Consider the following examples: |
| | • On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks. In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth"; |

| | The Portigon, WestLB and WestDeutschelmmobilien Defendants |
|---|---|
| | **IV. THE PARTIES**<br>   **B. Defendants**<br>      **10. The Portigon and WestLB Defendants** |
| ¶56 | Defendant Portigon AG ("Portigon"), formerly known as WestLB AG ("WestLB"), is an international financial services company, headquartered in Dusseldorf, Germany.  Up until August 2011, WestLB was a member of the panel of banks that submitted LIBOR rates to the BBA.  Following a decision by the European Union Commission (the "EU") in December 2011, WestLB began a rapid and orderly resolution and government-mandated cessation of all commercial banking and capital market activities, and in December 2012 changed its name to Portigon AG.  WestLB's financial troubles began to be publicly exposed in November 2008, when it announced its intention to obtain a government bailout and subsequently transferred billions of dollars in problem assets to a wind-down "bad bank" in Germany called Erste Abwicklungsanstalt or "EEA".  Portigon continues to act as the service provider and portfolio manager for assets and liabilities that were transferred from WestLB to EEA.  The wind down plan includes initiatives to close all locations other than New York, London and Dusseldorf.  Portigon maintains a banking license where necessary, including in New York where from at least 2005 through 2012, it provided financial services through its New York branch where it employed approximately 200 full-time employees.  Portigon's New York branch currently employs approximately 50 full-time employees.   Portigon's U.S. headquarters is in New York and is located at 7 World Trade Center, 250 Greenwich Street, New York, New York.  Portigon's New York branch is subject to Federal Reserve regulations and is registered with and subject to regulation by the New York State Department of Financial Services. |
| ¶57 | In 2011, WestLB AG, New York Branch filed a civil action in this District for breach of contract to enforce loan agreements with defendants known as BAC Florida Bank and U.S. Mortgage Finance LLC and U.S. Mortgage Finance II, LLC, and with which WestLB AG New York had entered into a Wholesale Warehouse Mortgage Agreements in 2005 and 2006.   WestLB AG loaned in excess of $360 million under these agreements.  *See* Complaint, *WestLB AG, New York Branch v. BAC Florida Bank*, No. 11 Civ. 05398 (S.D.N.Y. 2011) [ECF No. 8].  WestLB New York Branch also accessed the U.S. financial markets, for example launching a $3 billion commercial paper program for Canadian dealers.  As WestLB's successor, Portigon has continuously operated through an Executive Committee in New York with Treasury and Capital Markets business units located in the New York headquarters.  According to a Resolution Plan filed with the Federal Reserve in 2013, Portigon NY monitors an interest rate derivatives business consisting largely of an interest swap portfolio that is monitored by Portigon NY and managed by Portigon's London branch. Portigon also reported to the Fed that Portigon NY manages a municipal guaranteed contracts portfolio.  Portigon has maintained a corporate center in New York with departments consisting of human resources, compliance, audit and cost & service management, which support Portigon NY. |

| ¶58 | Portigon continues to operate as an international provider of portfolio and other management services for the financial industry, and with its wholly-owned subsidiary, Portigon Financial Services GmbH ("Portigon Financial") is known as the Portigon Group. Portigon Financial is an internationally operating financial services provider with offices in New York, London and Dusseldorf.  Portigon and Portigon Financial share supervisory Board members and managers.  Portigon also has wound down the operations of its investment banking enterprise and wholly owned subsidiary in the United States known as Portigon Securities, Inc. ("Portigon Securities"), which is a Delaware corporation and wholly-owned subsidiary of Portigon AG.  Portigon Securities was until recently an authorized broker-dealer under the regulatory control of the Financial Industry Regulatory Authority ("FINRA").  Portigon Securities engaged in trading for its own account, private placement of securities and brokering security transactions.  Since 2008, Portigon Securities' activity consisted primarily of clearing and custody for Portigon's New York branch, including winding down assets as of September 30, 2013 in the amount of $32 million.  Portigon Securities no longer is registered with FINRA. |
|---|---|
| ¶59 | Defendant Westdeutsche ImmobilienBank AG ("WestImmo") is a German company headquartered in Mainz, Germany. Prior to September 2012, WestImmo was a wholly owned subsidiary of Portigon f/k/a WestLB.  WestImmo operates a real estate finance corporation and formerly was a wholly-owned subsidiary of Defendant WestLB and its real estate lending subsidiary.  In the wake of WestLB's collapse and wind down process, WestImmo was spun into bad bank EEA after a failed sales effort by WestLB.  The European Commission forced WestLB to sell WestImmo as a condition of its bail-out package in October 2008, and WestImmo was transferred into EAA.  WestImmo's main business is the financing of commercial real estate transactions in the United State, Europe and Asia.  WestImmo has two offices in Germany and five outside of Germany, including a representative office in New York, New York.  WestImmo maintains at least 4 full-time employees in WestImmo's New York representative office.  At the end of 2010, WestImmo had North American assets of approximately $3.84 billion and a broad customer base serviced from its "branch in New York, including REITs, pension funds and asset managers for high net worth individuals."  WestImmo also was part of a consortium of lenders that provided $1.3 billion in financing for the Bank of America tower at One Bryant Part, the second-tallest building in New York, which was completed in 2009. |

| | |
|---|---|
| **V. FACTUAL ALLEGATIONS**<br>    **K. Findings from the Barclays Cooperation Materials**<br>       **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression**<br>           **of LIBOR Submissions**<br>           **a. Evidence of LIBOR Suppression During Late 2007** | |
| ¶298 | What prompted laughter in September 2007 provoked ire less than a month later.  On October 2, 2007, Johnson engaged an unidentified broker from another bank in conversation regarding what that bank would submit for its LIBORs.  After the broker identified where the bank planned to submit its LIBOR, the following conversation ensued:<br><br>PJ:  It's bollocks!<br>UM:  It is bollocks.  Total and utter.  But he is taking into consideration where the Citibanks [sic], UBSs and all these people are gonna go.<br>PJ:  Yeah well f*ck them!  They're wrong.<br>UM:  Yeah.<br>PJ:  That's, that's that's absolute f*cking bollocks.<br><br>Later in the same conversation, Johnson disclosed Lloyds' planned LIBOR submission and questioned where WestLB would submit 3 month LIBOR based on his knowledge of what WestLB is paying in the market.  Towards the end of the conversation, Johnson forced the broker to acknowledge that LIBOR submissions was flawed. |

**NEW ALLEGATIONS AGAINST NEW DEFENDANTS**

| | |
|---|---|
| **The Merrill Lynch International Defendant** | |
| **IV. THE PARTIES** | |
| **B. Defendants** | |
| **9. The Merrill Lynch Defendants** | |
| ¶55 | Defendant Merrill Lynch International ("Merrill Lynch") is a subsidiary of Merrill Lynch UK Capital Holdings, a company incorporated in the United Kingdom.  Merrill Lynch's ultimate parent company is Bank of America Corporation.  At least one trader at Merrill Lynch who was based in London, Stylianos Contogoulas ("Mr. Contogoulas"), had regular communications with US-based traders at LIBOR panel and other banks, and participated in the manipulation of LIBOR, which harmed Plaintiffs. |
| **V. FACTUAL ALLEGATIONS** | |
| **I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** | |
| **1.  Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures** | |
| ¶236 | On May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?" The external banker replied, "yeah… still." The vice president replied, "we all ahve same position no?" |
| **2.  Findings Concerning Conspiring with Outside Banks and Entities** | |
| ¶238 | The New York Department of Financial Services found that Deutsche Bank "communicated and coordinated with employees of other banks and financial institutions regarding their respective rate contributions in advance of an LIBOR submission, including individuals at Barclays, BNP Paribas, Citibank, Merrill Lynch, Societe Generale and UBS, in an effort to manipulate rates." Deutsche Bank NYDFS Order ¶30. For example, on May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?"  The external banker replied, "yeah… still."  The vice president replied, "we all ahve same position no?"  *Id.* ¶ 33.  Similarly, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok."  *Id.* ¶ 35.  And on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?"  The Head of the London Money Market Derivatives desk replied, "i will."  *Id.* ¶ 36.  On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing."  *Id.* ¶ 42.  It appears that some of these examples relate directly to Deutsche Bank's U.S. Dollar LIBOR submissions.  Only discovery can confirm this fact, as well as the existence of other examples of conspiracy with outside banks. |

| | K. Findings from the Barclays Cooperation Materials |
|---|---|
| ¶259 | *Fourth,* the Barclays Cooperation Materials also confirm that previously unnamed defendants who were not actual USD LIBOR Panel members, including ICAP, Tradition, Tullett Prebon and Merrill Lynch, successfully influenced Barclays LIBOR submissions.[125] |
| | **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>**b. Merrill Lynch Frequently Requested that Barclays Manipulate LIBOR To Benefits Its Own Trading Positions** |
| ¶265 | Barclays employees also communicated with traders at non-U.S. Dollar LIBOR Panel banks regarding their requests to manipulate LIBOR submissions to benefit each other's trading positions. |
| ¶266 | Although it was not one of the 16 panel banks, Merrill Lynch requested that various LIBOR submitters to manipulate LIBOR to its advantage. Starting in July 2006, Merrill Lynch employed a London-based interest rates swap trader, Stylianos Contogoulas. Contogoulas previously worked at Barclays as a derivatives trader. Contogoulas routinely contacted his former colleagues at Barclays about LIBOR fixings. Sometimes he simply shared or sought information. Often he made requests to Barclays to make higher or lower LIBOR submissions, which Barclays honored. |
| ¶267 | At least twice in September 2006, for example, Contogoulas requested specific submissions from Barclays, and Barclays obliged. For example, on September 25, 2006, Contogoulas asked Dong (Don) Kun Lee, a New York-based Barclays derivative trader, "Where do you guys think 3m libor will be? 36.5 or 36.75?" Lee responded, "36.75." Contogoulas then told Lee, "great. I wouldn't mind if it came in ay [sic] 37 ha ha . . . I'm short the stub." Barclays submitted at 5.37 – not 5.3675 – that day. |
| ¶268 | Just two days later on September 27, 2006, Contogoulas wrote Lee asking for insight into Barclays' expected LIBOR submission. When Lee informed him that Barclays planned to submit a 3 month LIBOR of 5.3700, Contogoulas enthusiastically wrote back: "i hope it's 37!!! The higher the better." On that day, Barclays did in fact submit a 3 month U.S. Dollar LIBOR of 5.3700 and was "kicked out" up from the LIBOR panel. |
| ¶269 | Later that afternoon, Contogoulas sent a message to Lee, "If it's not too much pain to ask, what are you guys going for 3m libor tomorrow [, September 28]? Have you spoken to P[eter] J[ohnson] at all?" Lee responded, "37.75 or 38. PJ is going with 37.75 for now . . . I want a hihg [sic] print . . . how about you?" Contogoulas replied, "YEEEEAH BABY!!! Please get a high one :-)" The following day, September 28, Contogoulas contacted Lee, and said "I hope we get a really high print . . . 38 would be great." Lee responded, "we[']re going 38," and Contogoulas replied, "you are STARS. Remind me to buy you all drinks." On September 28, 2006, Barclays was in the top quartile of banks and was "kicked out" up from the LIBOR fixing that day. |

[125] Plaintiffs previously named Defendants John Doe 1-5. John Does 1-5 were defined to include: "persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR." Based on the information disclosed in the Barclays Cooperation Materials, Plaintiffs are concurrently moving to substitute the ICAP Defendants, Tradition and Tullett Prebon for John Does 1-3 pursuant to F.R.C.P. 15(a).

| | |
|---|---|
| ¶270 | About a month later on October 26, 2006, Contogoulas again reached out to Lee at Barclays about manipulating three-month LIBOR, but downwards this time.  They had the following exchange at 7:12 a.m.:<br><br>Contogoulas: where do u think 3m libor will be today?<br>Lee: pj [Peter Johnson] thinks 38<br><br>Contogoulas:  wow…unchanged!!!?!??!  Short dates have rallied by 0.75bp…So I take it he's going unchanged?  If it comes in unchanged I'm a dead man ha ha<br><br>Lee: i'll have a chat.<br>Then at 10:29 that morning, Contogoulas contacted Lee:<br>Contogoulas:  Dude I owe you big time!  Come over one day after work and I'm opening a bottle of Bollinger!  Thanks for the libor.<br><br>Lee: know [sic] worries!!!<br><br>Barclays' 3-month LIBOR quote submission for October 26, 2006 fell from 5.3800 to 5.3750, and returned to 5.3800 again on October 27, 2006.  In addition, this anecdote provides an example of how the Barclays Cooperation Materials provides greater detail than the regulatory settlement documents.  *Compare* Section V.D.1. |
| ¶271 | In a February 27, 2007 email to Barclays trader Jay Merchant, Contogoulas explained why he relied on Barclays to influence LIBOR in ways beneficial to his own trading positions as Merrill Lynch did not have its own U.S. Dollar LIBOR submitter that he could lean on:  "*we don[']t have a cash guy who sets libor . . . . [n]ot one of the privileged 16 banks.*"  (Emphasis added).  Consequently, Merrill Lynch's Contogoulas requested that Barclays keep the 3 month LIBOR benchmark as high as possible on February 28, 2007.  Merchant provided Contogoulas with reassurance noting that he had already spoken with the Barclays U.S. Dollar LIBOR submitter and Fred [presumably Frederic Gourtay, their former Barclays colleague and then RBC Capital derivatives trader] for the need for a high 3 month LIBOR in light of their short position in Eurodollar futures. |
| ¶272 | Indeed, on the following day, February 28, 2007, RBC's Gourtay fell in line and sought to ensure that RBC's 3 month LIBOR submission would be high.  On that day, Barclays submitted the highest 3 month LIBOR among the panel banks.  In addition, RBC's 3 month U.S. Dollar LIBOR submission fell within the interquartile range, which had a direct impact on that day's 3 month U.S. Dollar LIBOR setting.  Consequently, Barclays and RBC were apparently successful in helping Merrill Lynch and their former colleague Contogoulas manipulate the 3 month LIBOR setting up. |
| ¶273 | Also on February 28, 2007, Contogoulas sought to influence Barclays' 3 month LIBOR rate setting for March 1, 2007, and wrote to the Barclays submitter regarding where Barclays expected to set LIBOR as the "Mar07 future [was] going crazy".  On the |

|  | following day, March 1, 2007, at 7:49 a.m., Contogoulas checked in with Barclays again this time contacting Lee to ask, "is pj going for a high 3m fix again today?  If not, PLEEEASE can he? :-)"  Subsequently, Contogoulas thanked Lee by noting, "Dude I owe you (and PJ a few drinks."  Consistent with Contogoulas' request, Barclays' submission was in the top quartile of the LIBOR panel and was "kicked out" up from the LIBOR fixing.  On March 9, 2007, Contogoulas went beyond mere begging and offers of alcohol.  Instead, he resorted to asking Lee to "pray for a high one for me."  The Merrill Lynch trader's prayers were seemingly answered for on that day Barclays submitted the highest 3 month LIBOR and was kicked out up from the LIBOR panel. |
|---|---|
| ¶274 | Later that month on Friday, March 23 at 7:42 a.m., Contogoulas sent Lee a message seeking a low 3-month USD LIBOR, "Yo I don't know whic hway [sic] round you are, but if you guys are neutral, 3m libor at 5.345 would be great (not 5.35).  If not, it doesnt [sic] matter anyway… :-)"  Lee replied, "done," to which Contogoulas responded, "you are a legend i cannot thank you enough."  Consistent with Contogoulas's request, Barclays submitted a 5.345 three-month LIBOR on March 23, 2007.  Later in the day, Contogoulas sent Lee a message, "Thank you very much for the 3m fix…appreciate it dude."  Lee replied, "anything for you."  Barclays' 3-month submission for March 23, 2007 was in the bottom quartile of panel bank submissions for the day. |
| ¶275 | Contogoulas made another request later that afternoon on March 23, "I know I'm pushing it…but…I am away monday…If you don't have the opposite interest AND if you remember, can you please tell PJ to set 3m Libor low if poss…5.345 would be great. If not, dont [sic] worry about it at all!! thanks and have a good weekend dude"  Lee assured Mr. Contogoulas, "will do."  Consistent with Contogoulas's request, on Monday March 26, 2007, Barclays submitted 5.3450 for its 3 month U.S. Dollar LIBOR on Monday, and was "kicked out" down from the LIBOR panel. |
| ¶276 | Later that week on Thursday, March 29, 2007, Contogoulas contacted Lee to ask for a "low 3m libor":  "I know I'm asking for much, but ONLY if u guys care, a low 3m libor would be great…anywhere below 5.35…"  Barclays submitted a 5.3450 three-month LIBOR that day, which was in the lowest quartile of three-month USD LIBOR submissions, and at 10:49 that morning, Contogoulas sent Lee a message, "Dude, thanks a lot for the libor, can you PLEASE thank PJ as well :-)"  Lee replied, "anything for you!!!" to which Contogoulas added, "seriously, thanks a million dude."  In addition, this anecdote provides another example of how the Barclays Cooperation Materials provided greater detail than the regulatory settlement documents.  *Compare* Section V.M.2. |
| ¶277 | On April 10, 2007, Contogoulas requested a "low 3m libor" of Lee.  Barclays was in the bottom quartile of 3-month LIBOR submissions that day, consistent with Contogoulas's request.  Contogoulas thanked Lee for the low fixing, "THANK YOU for the low 3m fixing.  You guys are stars." |
| | **c. RBC Requested that Barclays Manipulate LIBOR to Benefit Trading RBC's Positions** |
| ¶281 | Similarly, as previously discussed (*see* Section V.K.1.c, *infra*), RBC worked with Barclays to increase the 3 month LIBOR rate setting for February 28, 2007, which also was undertaken at Merrill Lynch's behest in order to benefit its Eurodollar futures positions. |

| | **e. Barclays and Citibank Conspired With One Another To Manipulate LIBOR Submissions** |
|---|---|
| ¶290 | The Barclays Cooperation Materials also suggest that Barclays and Citibank requested and accommodated each other's preferred LIBOR setting.  For example, on September 28, 2006, Don Lee, a New York-based Barclays derivative trader, sent Citibank trader Rajesh Ghude a Bloomberg message regarding LIBOR asking, "whats your cash guys going for 3m today?  I would like it as high as possible!!!"  As described above, Lee had already agreed to accommodate a request for a high 3 month LIBOR on behalf of Merrill Lynch trader Stylianos Contogoulas.  Lee's request to Citibank, therefore, could be seen as a way to ensure that 3 month LIBOR would be set to benefit the trading positions of Barclays and Merrill Lynch.  Ghude agreed to speak with Citibank's LIBOR submitter.  Like Barclays, Citibank was also in the top quartile of banks in the 3 month LIBOR panel and was "kicked out" up from the LIBOR fixing that day. |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** <br> **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶319 | On September 18, 2008, Johnson's frustrations boiled over as demonstrated by an excerpt from a lengthy conversation prior to that day's LIBOR fix: <br><br>     I mean these banks, I mean that, the BBA just needs to get 'em together and tell 'em to sort their f*cking lives out. 'Cause this really, it it makes me look likely a f*cking [inaudible].  *There I am, uh, th-there I am, um, just tryin' to set, see I think we should go five and a half, five, and four and a half.  Uh, and I will be, uh, up to two and a half percent higher than anybody else.  Yeah, and I'm right, I know I'm right.  Uh, oh, oh, yep. . .  It's bollocks, innit?  We know its bollocks.  It's absolute bollocks.*  I mean, you know, the, the only good thing about yesterday is, when all the Merrill Lynch [inaudible] like Barclays sets at three, [inaudible] three months, and Lloyds sets at two eight five is indication [inaudible] worth crap and we need the money, uh, but, then on ICAP three months [inaudible]. <br><br>                      \*       \*       \*       \* <br><br>     So, I'm ju- [inaudible].  But I mean [inaudible] my answer, that'll be for these a\*\*holes to set f\*cking LIBORs [inaudible] *I'd rather have children set them.* (emphasis added). |
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same |

direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[128]  Consider the following representative examples:

* * *

•       Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day.

| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|------|----------|----------|----------|----------|----------|
| **Trader-Based Allegations Involving the Merrill Lynch Defendant** | | | | | |
| 9/25/2006 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 267 | |
| 9/27/2006 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 268 | Atlantic Trading |
| 9/28/2006 | Barclays, Citibank, CGMI Merrill Lynch | High 3M | Kicked Up (Barclays and Citibank) | ¶¶ 269, 290 | Atlantic Trading |
| 10/26/2006 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶¶ 345, 354 | Atlantic Trading |
| 2/28/2007 | Barclays, Merrill Lynch, RBC,       RBC Capital | High 3M | Kicked Up (Barclays), Interquartile (RBC) | ¶¶ 271-73, 281, 346 | Atlantic Trading |
| 2/28/2007 | Deutsche Bank | High | Kicked Up | ¶ 236 | Atlantic Trading |
| 3/1/2007 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 273 | Atlantic Trading |

---

[128] *See* Barclays FCA Final Notice ¶ 11.

| | | | Trader-Based Allegations Involving the Merrill Lynch Defendant | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 3/9/2007 | Barclays, Merrill Lynch | High | Kicked Up | ¶ 273 | |
| 3/23/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 274 | |
| 3/26/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 274 | |
| 3/29/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶¶ 276, 347 | |
| 4/10/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 277 | |

| The ICAP Defendants | |
|---|---|
| **II. NATURE OF THE ACTION** | |
| ¶13 | Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by misreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – *i.e.*, their true costs of borrowing – on a daily basis.  The Defendant banks were aided and abetted by certain Interdealer Broker Defendants who helped the banks communicate what their intended LIBOR submissions would be.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set at artificial levels. |
| **IV. THE PARTIES** | |
| **C. Interdealer Broker Defendants** | |
| **1. The ICAP Defendants** | |
| ¶91 | Interdealer brokers, also known as voice or electronic brokers, act as intermediaries between major dealers in the money markets and the OTC derivatives markets to facilitate transactions and counterparties of traders and dealers.  Interdealer brokers assist banks in obtaining funding by facilitating the negotiation of deposits and loans, and in hedging those transactions with derivative trades, which are often referenced to LIBOR.  Interdealer brokers match buyers and sellers in return for commissions, and provide market information for banks, including Panel Bank Defendants.  Typically, broker commissions are based on a percentage of the notional value of consummated transactions (*i.e.*, the larger the notional value of a trade, the greater the commission).  Based on their role in the financial markets, interdealer brokers had a significant impact on Panel Bank Defendant's views of the interbank markets for cash deposits, and therefore had the distinct ability to potentially influence a panel bank's LIBOR submissions. |
| ¶92 | Defendant ICAP plc ("ICAP") through and including its subsidiaries is a leading voice and electronic interdealer broker and provider of post trade services with its head office in London, England.  ICAP is active in the wholesale markets in interest rates, credits, commodities, foreign exchange, emerging markets and equity derivatives.  ICAP and certain of its subsidiaries are involved in the brokering of cash deposits and derivatives based on U.S. LIBOR between banks, including Defendants.  According to ICAP's 2015 Annual Report, ICAP employs more than 1,500 brokers across its "Global Broking" group and reported revenues of £789 million during 2014. |
| ¶93 | Defendant ICAP Europe Limited ("ICAP Europe") is an indirect wholly-owned subsidiary of ICAP Group Holdings plc ("ICAP Group"), and a wholly-owned subsidiary of Defendant ICAP plc. Defendant ICAP Europe is headquartered in London, England and is responsible for managing some of ICAP Group's brokering business in Europe, including the unlawful conduct alleged herein.  Defendants ICAP and ICAP Europe are collectively referred to herein as "ICAP."  As detailed in its 2003 Annual Report, ICAP relocated its U.S. broker-dealer operations to New Jersey in November 2002 in order to capitalize on a local tax incentive programs over a ten-year period.  ICAP and its affiliates maintain an extensive presence across the United |

| | |
|---|---|
| | States, including four offices located in New York, New York, in addition to other offices in California, Connecticut, Florida, Illinois, Georgia, Kentucky, North Carolina and Texas. |
| ¶97 | Defendants ICAP, ICAP Europe, Tradition, Tullett Prebon and certain John Does 4-25 are sometimes referred herein as the "Interdealer Broker Defendants". |

**V. FACTUAL ALLEGATIONS**
**C. Defendants' Improper Activities Have Incited Governmental Investigations, Legal Proceedings and Disciplinary Action**
**Worldwide**

| | |
|---|---|
| ¶142 | The investigations uncovered a widespread manipulation of various LIBOR rates, including U.S. Dollar LIBOR.  As a result of these investigations, governmental regulators have so far settled with six of defendant panel banks – Barclays, UBS, RBS, Rabobank, Lloyds, and Deutsche Bank – and two interdealer brokers – ICAP and RP Martin – in connection with Yen-LIBOR manipulation.  Although Citibank was not identified in Final Notices of settlements with certain defendants for LIBOR manipulation, the FCA, DOJ and CFTC entered into settlements with Citibank for manipulation of foreign exchange rates and benchmarks in 2015.  In the FCA's settlement agreement with Citibank, the British Financial Conduct Authority ("FCA") expressly noted that in response to Final Notices issued to other defendants by regulatory authorities for LIBOR manipulation, Citibank engaged in a remediation program to improve policies, procedures and training in connection with Citibank's LIBOR and other benchmark assessments and price formation processes. |
| ¶148 | On September 25, 2013, defendant ICAP, one of the world's biggest interdealer brokers, was fined by both U.S. and U.K. authorities for helping traders to manipulate benchmark interest rates tied to Yen-LIBOR.  The CFTC ordered ICAP to pay $65 million, and the FCA ordered ICAP to pay £14 million (approximately $22 million) to settle allegations of wrongdoing. In addition to the fine, the U.S. Department of Justice charged three ICAP brokers, Darrell Read, Daniel Wilkinson, and Colin Goodman, with conspiracy to commit fraud and two counts of wire fraud in a criminal complaint. |

**I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR**
**1.  Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures**

| | |
|---|---|
| ¶233 | In addition, between January 2008 and July 2009, derivatives traders made requests to broker firms in their attempts to influence the LIBOR submissions of other banks through information disseminated by the broker firms as part of market color they provide to their clients.  FCA ¶ 4.46. |
| ¶236 | The CFTC, DOJ, FCA and NYDFS orders list some "examples" of the pervasive manipulation in their settlement papers, as have other regulators.  These examples are listed in the chart below.<br><br>• In another instance, on September 16, 2008, the Head of the London Money Markets and Pool desk communicated with a broker at ICAP regarding specific LIBOR submissions. The broker wrote, "trying for you," and the Head of the London Money Markets and Pool desk requested, "lower 1mth PLEASE." The broker said, "ok not sure I can go lower than 8o," and the Head of the London Money Markets and Pool desk replied, "please go lower." |

| | |
|---|---|
| **J. Findings from the ICAP Government Settlements** | |
| ¶247 | On September 25, 2013, ICAP reached a combined $87.4 million settlement with the CFTC and the FCA in connection with its role in a scheme to manipulate LIBOR benchmark rates.[92] Separately, the DOJ charged three former ICAP brokers, Darrell Read of New Zealand, Daniel Wilkinson and Colin Goodman, both of the United Kingdom, with conspiracy to commit wire fraud and wire fraud in connection with the manipulation of Yen-LIBOR from at least July 2006 through September 2010.[93]  Attorney General Eric Holder summarized the allegations against the former ICAP brokers by observing:  "They were supposed to be honest brokers, but instead, they put their own financial interests ahead of that larger responsibility.  And as a result, transactions and financial products around the world were compromised, because they were tied to a rate that was distorted due to the brokers' dishonesty."[94]  As described herein, Plaintiffs have a reasonable basis to believe that ICAP's dishonest behavior with respect to Yen LIBOR extended to the manipulation of U.S. Dollar LIBOR. |
| **1. ICAP Manipulated Yen LIBOR** | |
| ¶248 | Between at least October 2006 and January 2011, "ICAP brokers on the Yen derivatives and cash desks knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate, at times successfully, the official daily fixing of the Yen LIBOR."[95] More specifically, throughout this period, ICAP's brokers were in regular contact with the Panel Banks, and provided "Run-Through" emails on a daily basis that ICAP's assessment of where Yen LIBOR should be set.[96]  Panel banks increasingly relied on these "Run-Throughs" during the financial crisis, and the ICAP broker primarily responsible for these reports "was so certain of his status in the market with regard to his assessment of the correct level of LIBOR that he referred to himself as 'Mr. Libor' or even 'Lord Libor.'" |
| ¶249 | However, these market forecasts were tainted by collusion.  Government investigations found that ICAP colluded with traders at UBS in order to skew the Yen LIBOR benchmark in directions favorable to UBS.[97]  ICAP effectuated these attempts to manipulate by emailing "deliberately skewed Run-Throughs to some Panel Banks" in addition to "directly request[ing] certain Panel Banks to make specific JPY LIBOR submissions that would benefit the traders."[98]  ICAP brokers sought to benefit UBS |

[92] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions, In the Matter of ICAP Europe Limited, dated Sept. 25, 2013 ("ICAP CFTC Order"); Final Notice of the Financial Conduct Authority Issued to ICAP Europe Ltd. Dated Sept. 25, 2013 ("ICAP FCA Order").

[93] *See* "Complaint", *United States of America v. Darrell Read, Daniel Wilkinson, and Colin Goodman*, 13 MAG 2224 (S.D.N.Y. Sept. 13, 2013) ("DOJ Compl.").

[94] *See* http://www.justice.gov/opa/pr/icap-brokers-face-felony-charges-alleged-long-running-manipulation-libor-interest-rates.

[95] ICAP CFTC Order at 2; *see also* ICAP FCA Final Notice ¶¶ 5-6.

[96] ICAP FCA Final Notice ¶¶ 8-9.

[97] *See, generally*, ICAP CFTC Order at 8-10; ICAP FCA Final Notice ¶¶ 10-15

[98] ICAP FCA Final Notice. ¶ 10.

| | |
|---|---|
| | (and the banks derivative trading positions) "because UBS was a significant client which accounted for a substantial proportion of the revenue of the relevant desk."[99]  In particular, ICAP worked closely with former UBS Senior Yen Trader Thomas Hayes, but continued to collude with UBS to manipulate Yen LIBOR even after Hayes left UBS.[100]  In total, UBS requested ICAP's assistance in manipulating Yen LIBOR more than 400 times.[101]  Of course, because UBS made additional requests orally, the exact tally of requested manipulations cannot be accurately computed.[102]  ICAP's brokers were well compensated for colluding with UBS receiving hundreds of thousands of dollars in bribes and kickbacks for their "LIBOR services" in the form of additional commission generating trades, and promises of favors such as a curry meal, champagne and/or bonuses.[103] |
| ¶250 | The CFTC's Order and Findings of unlawful conduct by ICAP described ICAP Europe's integral role in providing "predictions or suggestions of where they believe key benchmark interest rates, such as LIBOR, would fix on specific days." The CFTC expressly found that ICAP Europe's brokers "at times shared with some panel banks the intended LIBOR submissions of other panel banks."   The CFTC expressly found that during the period, at least October 2006 through at least January 2011, ICAP Europe brokers and brokers at other interdealer broker firms "circulated via email or by telephone each morning daily Run Thrus of the rates they expected to be published for LIBOR in various currencies and tenors, as well as other pricing information."  Based on the foregoing, ICAP had ability to and did influence LIBOR through its direct communication panel banks regarding Yen LIBOR and other LIBOR currencies, including U.S. Dollar LIBOR.  However, ICAP's manipulative influence could be less direct.  Even submitters at panel banks that tried to make benchmark interest rate submissions that reflected an assessment of the costs of borrowing funds in the interbank Yen market may have passed on false or misleading submissions because they used ICAP brokers' purported unbiased assessments of Yen borrowing rates and suggested LIBORs to inform their submissions.  Their reliance on ICAP brokers meant that their submissions did not actually reflect borrowing costs, but rather Hayes' manipulated rates.  The ICAP brokers believed that the widespread dissemination of and reliance on the Suggested LIBORs would increase the chances that they would at times be successful in manipulating Yen-LIBOR submissions, and thereby Yen-LIBOR, for Hayes and others.  This was the "libor service" (as coined by the brokers involved) that they provided to Hayes. |
| ¶251 | Regulators determined that ICAP's collusive scheme to manipulate Yen LIBOR was made possible by the company's overly permissive culture.[104]  As the CFTC noted, "ICAP did not have adequate internal controls, policies and procedures to guide |

---

[99] *Id.* ¶ 11.

[100] *Id.* ¶ 13.

[101] *See* ICAP CFTC Order at 9; ICAP FCA Final Notice ¶ 14.

[102] *Id.*

[103] *See* ICAP CFTC Order at 11.

[104] *See, generally*, ICAP CFTC Order at 38-39; ICAP FCA Final Notice ¶¶ 16-23.

| | and monitor" and noted that compliance oversight was primarily left to the discretion of desk heads, who in the case of Yen trading was complicit in his broker's complicit scheme.[105]  In sum, "ICAP's lack of specific internal controls and procedures relating to external communications, and distinguishing between permissible and impermissible market information provided by its Yen brokers to clients and others, as well as its overall law supervision . . . allowed the misconduct to continue throughout the relevant period."[106]  Such pervasive compliance failings reasonably extended to the desk responsible for covering U.S. Dollar LIBOR. |
|---|---|
| **2. Evidence of ICAP's U.S. Dollar LIBOR Manipulation** | |
| ¶252 | Though the ICAP government settlement documents focused primarily on Yen LIBOR manipulation, they also suggest that casual attitudes towards rate manipulation and ICAP's compliance failings created conditions ripe that led to ICAP's manipulation of the U.S. Dollar LIBOR benchmark.  In fact, as previously discussed (*see* Section V.I, *supra*), ICAP corresponded with Deutsche Bank regarding Deutsche Bank's preferred U.S. Dollar LIBOR settings.  *See* Deutsche Bank NYS DFS Order ¶¶ 45-46.  For example, on September 16, 2008, Deutsche Bank's Head of the London Money Markets and Pool desk requested and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission.  *Id.* ¶ 46.  On that day, Deutsche Bank was "kicked out" down from the LIBOR fixing in the 1 month U.S. Dollar LIBOR tenor, however, Deutsche Bank was "kicked out" up from the LIBOR fixing in the 3 month U.S. Dollar LIBOR tenor. |
| ¶253 | ICAP's agreement to facilitate Deutsche Bank's manipulation of U.S. Dollar LIBOR is significant for two reasons.  First, ICAP's pledged assistance is directly analogous to the role it played in attempting to manipulate Yen LIBOR on the behalf of UBS.  Second, by effectuating Deutsche Bank's manipulation, ICAP facilitated Deutsche Bank's "spread" trade whereby the bank sought to profit the widening of the gap between 1 and 3 month (and 1 and 6 month) LIBOR through derivative trading activities.  *See* Section V.I, *supra*. |
| ¶254 | In addition, the Barclays Cooperation Materials provide discrete representative examples of how ICAP "tried" to manipulate the setting of the U.S. Dollar LIBOR benchmark on the behalf of other investment banks.  As Peter Johnson, Barclays' U.S. Dollar LIBOR submitter, explained in an October 10, 2008 phone conversation with his New York-based colleagues, consulting inter-broker dealers like ICAP and Tullett Prebon was part of his daily ritual prior to submitting his official U.S. Dollar LIBOR: |
| | *Every morning I go on to, say Prebon or ICAP and say right where do you reckon LIBORS are?* . . .First of all, they tell me where they think London LIBORS will set . . . .That is a totally different think from where they think LIBORs really are. . . . [I]n the morning, when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they think the market is, they're telling me where they think LIBOR's gonna set.  *It's become a bit like a fairy story. . . .And it seems to be being set by derivative traders rather than cash traders.* |

---

| | |
|---|---|
| | (Emphasis added). |
| **K. Findings from the Barclays Cooperation Materials** | |
| ¶259 | *Fourth,* the Barclays Cooperation Materials also confirm that previously unnamed defendants who were not actual USD LIBOR Panel members, including ICAP, Tradition, Tullett Prebon and Merrill Lynch, successfully influenced Barclays LIBOR submissions.[107] |
| **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>**a. Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** | |
| ¶260 | The Barclays Cooperation Materials provide substantial evidence of how Tullett Prebon and Tradition facilitated the manipulation of U.S. Dollar LIBOR.  Like its fellow interdealer broker ICAP, Tullett Prebon and Tradition routinely collected confidential information regarding where Defendants planned to submit their daily LIBOR quotes and disseminated that information among the other Defendants.  As Barclays' Peter Johnson explained on October 10, 2008:<br><br>*[E]very morning I go on to, say Prebon or ICAP and say right, where, where do you reckon LIBORs are? . . . [T]hey tell me where they think London LIBORs will set, uh based on where, ya know FRAs are trading, and ya know zeros threes and things like that have been trading, uh, uh and stuff like that.  That is a totally different thing from where they think LIBORs really are."*<br>                     \*     \*     \*<br>*. . . [I]n the morning when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they think the market is, they're telling me where they think LIBOR's gonna set.  It's become a bit like a fairy story.*<br>                     \*     \*     \*<br>*And it seems to be being set by derivatives traders rather than cash traders.  I think.*<br><br>(Emphasis added). |

[107] Plaintiffs previously named Defendants John Doe 1-5.  John Does 1-5 were defined to include: "persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR."  Based on the information disclosed in the Barclays Cooperation Materials, Plaintiffs are concurrently moving to substitute the ICAP Defendants, Tradition and Tullett Prebon for John Does 1-3 pursuant to F.R.C.P. 15(a).

**2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**

**a.  Evidence of LIBOR Suppression During Late 2007**

¶296 | Barclays' Johnson continued to express his indignation at how other Defendants planned to submit artificially suppressed LIBORs.  For example, on September 3, 2007, Johnson observed to an unidentified broker, "It pisses me off that we're the only people being honest about this and we are getting pilloried for it. . . .Really pisses me off."  To provide credence to Johnson's concern, the broker observed that RBS was setting its LIBOR below what another RBS trader was paying in the market.  Moreover, after Johnson shared with the broker what Tullett Prebon believed LIBOR to be and Johnson requested that the broker try to influence the market, the broker quipped, "I will do my best to influence but. . . it seems the people at Prebon/ICAP keep low balling it."  This suggests that ICAP and Prebon actively provided market guidance in line with their clients' desires as opposed to actual insights gleaned from the interbank lending market.

**b.  Evidence of LIBOR Suppression During 2008**

¶316 | On May 1, 2008, Johnson discussed that day's LIBOR expected setting and other panel banks' expected settings with unidentified brokers.  In particular, Johnson was interested in where Deutsche Bank was setting LIBOR, after learning that ICAP told Deutsche Bank that its LIBOR submissions were too low.  To wit, Johnson "quite like[d] this guy at Deutsche actually" as he believed that "he's [had] the right f*cking idea," based on Deutsche Bank's perceived willingness to at least occasionally rise above the parapet.  Conversely, Johnson was less pleased with an unnamed broker who Johnson perceived was encouraging artificially low LIBOR submissions which Johnson suggested was "a load of f*cking bollocks" before labeling the broker a "wanker".  Around 10:15 am, Johnson recognized during offline conversation that his expected submissions would be out of line with other panel banks and quipped, "Well, . . . if they don't like it they can stick it right where it f*cking hurts," before requesting that a colleague tell Deutsche Bank where Barclays planned to set its LIBORs.  On that day, Barclays and Deutsche Bank submitted the highest 3 month LIBOR submissions and were consequently "kicked out" up from the LIBOR panel.

**c.  Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy**

¶319 | On September 18, 2008, Johnson's frustrations boiled over as demonstrated by an excerpt from a lengthy conversation prior to that day's LIBOR fix:

I mean these banks, I mean that, the BBA just needs to get 'em together and tell 'em to sort their f*cking lives out.  'Cause this really, it it makes me look likely a f*cking [inaudible].  *There I am, uh, th-there I am, um, just tryin' to set, see I think we should go five and a half, five, and four and a half.  Uh, and I will be, uh, up to two and a half percent higher than anybody else.  Yeah, and I'm right, I know I'm right.  Uh, oh, oh, yep. . .  It's bollocks, innit?  We know its bollocks.  It's absolute bollocks.*  I mean, you know, the, the only good thing about yesterday is, when all the Merrill Lynch [inaudible] like Barclays sets at three, [inaudible] three months, and

120

| | |
|---|---|
| | Lloyds sets at two eight five is indication [inaudible] worth crap and we need the money, uh, but, then on ICAP three months [inaudible].<br><br><div align="center">*        *        *        *</div><br>So, I'm ju- [inaudible].  But I mean [inaudible] my answer, that'll be for these a**holes to set f*cking LIBORs [inaudible] *I'd rather have children set them.* (emphasis added). |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.<br><br>Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br><br>PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br>MS:  No, I know, I know, I know, and he's already talked to them about that.<br>PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].<br><br>In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:<br><br>Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.* |

| | |
|---|---|
| | This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*. |
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110]  Consider the following representative examples:<br><br>• *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) *with* Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the next few days");<br><br>• *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derviatives Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: '*I reckon you should be about four to five ticks higher*'") (emphasis in original) *with* Rabobank DOJ SOF ¶ 26 (on September 26, 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased about three basis points on average).<br><br>• *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) *with* Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, *inter alia* observed that Credit Suisse was "gonna go three percent from one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."<br><br>• Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that |

---

[110] *See* Barclays FCA Final Notice ¶ 11.

| | |
|---|---|
| | Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day. |
|  | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**<br>    **3. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants'**<br>    **Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br><br>• On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";<br><br>• On November 21, 2007, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).<br><br>• On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";<br><br>• On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to |

|  |  | avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added). |
|  |  | • On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices." |
|  |  | • On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going"; |
|  |  | • On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and |
|  |  | • On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide." |

| Trader-Based Allegations Involving the ICAP Defendants | | | | | |
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|---|---|---|---|---|---|
| 9/16/2008 | Deutsche Bank, ICAP | Low 1M | Kicked Up | ¶ 236 |  |

| The Tradition Defendant |
|---|

| **II. NATURE OF THE ACTION** |
|---|

| ¶13 | Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by misreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – *i.e.*, their true costs of borrowing – on a daily basis.  The Defendant banks were aided and abetted by certain Interdealer Broker Defendants who helped the banks communicate what their intended LIBOR submissions would be.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set at artificial levels. |
|---|---|

| **IV. THE PARTIES** |
|---|
|     **C. Interdealer Broker Defendants** |
|         **2. The Tradition Defendant** |

| ¶91 | Interdealer brokers, also known as voice or electronic brokers, act as intermediaries between major dealers in the money markets and the OTC derivatives markets to facilitate transactions and counterparties of traders and dealers.  Interdealer brokers assist banks in obtaining funding by facilitating the negotiation of deposits and loans, and in hedging those transactions with derivative trades, which are often referenced to LIBOR.  Interdealer brokers match buyers and sellers in return for commissions, and provide market information for banks, including Panel Bank Defendants.  Typically, broker commissions are based on a percentage of the notional value of consummated transactions (*i.e.*, the larger the notional value of a trade, the greater the commission).  Based on their role in the financial markets, interdealer brokers had a significant impact on Panel Bank Defendant's views of the interbank markets for cash deposits, and therefore had the distinct ability to potentially influence a panel bank's LIBOR submissions. |
|---|---|
| ¶94 | Defendant Tradition (UK) Limited ("Tradition") is a limited company in London, England and is one of the world's largest interdealer brokers in financial and commodity related products.  Tradition is a subsidiary of and operates the interdealer broking arm of Companie Financière Tradition S.A., which is headquartered in Lausanne, Switzerland and is listed on the Swiss stock exchange.  Defendant Tradition operates in the interdealer market along with affiliates in London known as Tradition Financial Services Limited and TFS Derivatives Limited, and in New York as Tradition (North America), Inc. and TFS Derivatives Corporation.  Tradition acts as an intermediary and facilitates transactions between financial institutions and other professional traders in the capital markets.  The financial markets that Tradition covers include money markets, interest rate and currency derivatives, equities and equity derivatives, bonds and repurchase agreements, and credit derivatives, and it operates in both exchange-traded and OTC markets.  Tradition employs over 125 voice brokers and operates global dealing desks, with offices in the United States in New York, New York, Boston, Massachusetts, Dallas and Houston, Texas and Stamford, Connecticut.  Tradition was in continual contact with the Panel Bank Defendants, and Tradition's role as an intermediary made it a key conduit for impermissible sharing of information to manipulate LIBOR during the Class Period by the Panel Bank Defendants and other |

| | Defendants. |
|---|---|
| ¶97 | Defendants ICAP, ICAP Europe, Tradition, Tullett Prebon and certain John Does 4-25 are sometimes referred herein as the "Interdealer Broker Defendants". |

**V. FACTUAL ALLEGATIONS**

   **I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR**

      **1. Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures**

| ¶233 | In addition, between January 2008 and July 2009, derivatives traders made requests to broker firms in their attempts to influence the LIBOR submissions of other banks through information disseminated by the broker firms as part of market color they provide to their clients.  FCA ¶ 4.46. |
|---|---|

**K. Findings from the Barclays Cooperation Materials**

| ¶259 | *Fourth*, the Barclays Cooperation Materials also confirm that previously unnamed defendants who were not actual USD LIBOR Panel members, including ICAP, Tradition, Tullett Prebon and Merrill Lynch, successfully influenced Barclays LIBOR submissions.[107] |
|---|---|

   **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**

      **a. Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation**

| ¶260 | The Barclays Cooperation Materials provide substantial evidence of how Tullett Prebon and Tradition facilitated the manipulation of U.S. Dollar LIBOR.  Like its fellow interdealer broker ICAP, Tullett Prebon and Tradition routinely collected confidential information regarding where Defendants planned to submit their daily LIBOR quotes and disseminated that information among the other Defendants.  As Barclays' Peter Johnson explained on October 10, 2008: |
|---|---|
| | *[E]very morning I go on to, say Prebon or ICAP and say right, where, where do you reckon LIBORs are? . . .* [T]hey tell me where they think London LIBORs will set, uh based on where, ya know FRAs are trading, and ya know zeros threes and things like that have been trading, uh, uh and stuff like that.  That is a totally different thing from where they think LIBORs really are." |
| | *     *     * |
| | . . . [I]n the morning when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they |

---

[107] Plaintiffs previously named Defendants John Doe 1-5. John Does 1-5 were defined to include: "persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR."  Based on the information disclosed in the Barclays Cooperation Materials, Plaintiffs are concurrently moving to substitute the ICAP Defendants, Tradition and Tullett Prebon for John Does 1-3 pursuant to F.R.C.P. 15(a).

| | |
|---|---|
| | think the market is, they're telling me where they think LIBOR's gonna set. *It's become a bit like a fairy story.*<br>           \*       \*       \*<br>    *And it seems to be being set by derivatives traders rather than cash traders.  I think.*<br><br>(Emphasis added). |
| ¶261 | During the suppression period when the banks artificially lowered their LIBOR submissions to bolster public perceptions of their financial stability, Tullett Prebon and Tradition understood Defendants' mutual interest in keeping LIBOR fixes low and helped them achieve that goal.  For example, Tullett Prebon's Burgess noted on November 27, 2009 that HSBC "wants the LIBORs low, like everyone else does."  At the same time, Burgess told Barclays where other Defendants, including HSBC, Lloyd's, and other unnamed banks, would be setting LIBOR that day.  In response, Barclays' Mathews quipped, "Yeah, yeah, yeah, yeah yeah," highlighting the casual and routine nature of Tullett Prebon's guidance that banks were manipulating LIBOR for their own benefit.  This exchange demonstrates that traders at the banks were well aware of the LIBOR suppression and directing their trading to benefit from it. |
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| ¶263 | In addition, Tullett Prebon and Tradition played a key role in coordinating the LIBOR settings in the wake of the *Wall Street Journal* article that first suggested potential problems with LIBOR.  For example, on April 17, 2008, Barclays' Johnson said he would "probably go by what Prebon recommends" despite knowing that the resulting quotes would remain below LIBOR's true levels.  Barclays' Miles Storey recognized that their conduct could raise concerns about "quote collusion unquote."  On April 18, 2008, Barclays' Peter Johnson discussed the difference between Tullett Prebon's and Tradition's predictions of where six-month dollar LIBOR was fixing on April 18, 2008.  The call transcript demonstrates that at 10:55 a.m. Barclays was already aware that Lloyds was going to submit its six-month fixing at "three percent." |
| ¶264 | Tullett Prebon and Tradition received two significant benefits from facilitating Defendants' manipulation of U.S. Dollar LIBOR.  *First*, helping Defendants achieve their unlawful ends strengthened Tullett Prebon's and Tradition's relationships with bankers, increasing the amount of business it received from them.  *Second*, knowing where LIBOR would fix and influencing the final fix benefited Tullett Prebon's and Tradition's clients and, thus, the interdealer brokers, themselves. |
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions**<br>    **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶301 | On November 29, 2007, Barclays had an internal discussion calling the LIBOR market "broken", and being used by submitters to "deliberately" manipulate the fixing "in order to make money off the derivatives."  In addition, through communications |

with Defendants Tullett Prebon and Tradition, Barclays participants knew where HBOS would submit and where RBS would submit LIBOR in advance of the filing.  Barclays also knew from these brokers where composite LIBOR would end up on the day.  And based on the FX swap market, the Barclays participants knew that the demand for U.S. dollars was 55 basis points above the RBS submission and 40 basis points above the HBOS submission.

| | |
|---|---|
| **The Tullett Prebon Defendant** | |
| **II. NATURE OF THE ACTION** | |
| ¶13 | Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by misreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – i.e., their true costs of borrowing – on a daily basis.  The Defendant banks were aided and abetted by certain Interdealer Broker Defendants who helped the banks communicate what their intended LIBOR submissions would be.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set at artificial levels. |
| ¶16 | Evidence from the various government settlements available to date and the Barclays Cooperation Materials make clear that Defendants adopted a ready willingness to manipulate U.S. Dollar LIBOR throughout the Class Period.  The casual and routine nature of Defendants' manipulation is typified by a November 27, 2009 phone conversation between Barclays derivative trader Jonathan Mathew ("Mathew") and Tullett Prebon's Neil Burgess ("Burgess").  In the conversation, Burgess comments that Lloyds "wanted LIBORs lower, like everyone else."  Mathew's response, "Yeah, yeah, yeah, yeah, yeah," is one of absolute agreement.  The coordination among Defendants to manipulate LIBOR is encapsulated in this mundane exchange, which quickly brings together the interests of Lloyds' with that of Barclays and others.  Communications such as these provide direct evidence that derivative traders at the panel banks knew about the U.S. Dollar LIBOR suppression and constructed trading strategies to benefit from it. |
| **IV. THE PARTIES** | |
| **C. Interdealer Broker Defendants** | |
| **3.  The Tullett Prebon Defendant** | |
| ¶91 | Interdealer brokers, also known as voice or electronic brokers, act as intermediaries between major dealers in the money markets and the OTC derivatives markets to facilitate transactions and counterparties of traders and dealers.  Interdealer brokers assist banks in obtaining funding by facilitating the negotiation of deposits and loans, and in hedging those transactions with derivative trades, which are often referenced to LIBOR.  Interdealer brokers match buyers and sellers in return for commissions, and provide market information for banks, including Panel Bank Defendants.  Typically, broker commissions are based on a percentage of the notional value of consummated transactions (*i.e.*, the larger the notional value of a trade, the greater the commission).  Based on their role in the financial markets, interdealer brokers had a significant impact on Panel Bank Defendant's views of the interbank markets for cash deposits, and therefore had the distinct ability to potentially influence a panel bank's LIBOR submissions. |
| ¶95 | Defendant Tullett Prebon plc ("Tullett Prebon"), an interdealer broker, is a United Kingdom public limited company headquartered in London, England.  Tullett Prebon has offices in New York City, as well as Texas and New Jersey.  The company has three subsidiary corporations registered as Foreign Business Corporations doing business in New York State: |

| | |
|---|---|
| | Tullett Prebon (Americas) Holdings Inc., Tullett Prebon Americas Corp., and Tullett Prebon Financial Services LLC.  All three subsidiaries have designated agents for service of process in New York State.  Tullett Prebon's revenue attributed to operations in the Americas for 2014 was £201.6 million and it employs roughly 550 brokers in the region. Tullet Prebon's CEO of the Americas, John Abularrage, recently stated that "The US is a key market for Tullett Prebon." |
| ¶96 | Defendants John Doe 4-25 include persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR.  During the Class Period, interdealer brokers provided voice and electronic brokering services to the Panel Bank Defendants, including sharing information between and among banks regarding pre- and post-trading information regarding interest rates and derivative transactions, including where the Panel Bank Defendants wanted to set LIBOR on certain days during the Class Period.  In certain instances these interdealer brokers received bribes from Defendants in the form of wash trades. |
| ¶97 | Defendants ICAP, ICAP Europe, Tradition, Tullett Prebon and certain John Does 4-25 are sometimes referred herein as the "Interdealer Broker Defendants". |
| **V. FACTUAL ALLEGATIONS** | |
| **I.   Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** | |
| **1.   Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures** | |
| ¶233 | In addition, between January 2008 and July 2009, derivatives traders made requests to broker firms in their attempts to influence the LIBOR submissions of other banks through information disseminated by the broker firms as part of market color they provide to their clients.  FCA ¶ 4.46. |
| ¶236 | In another instance, on September 16, 2008, the Head of the London Money Markets and Pool desk communicated with a broker at ICAP regarding specific LIBOR submissions. The broker wrote, "trying for you," and the Head of the London Money Markets and Pool desk requested, "lower 1mth PLEASE." The broker said, "ok not sure I can go lower than 8o," and the Head of the London Money Markets and Pool desk replied, "please go lower." |
| **J. Findings from the ICAP Government Settlements** | |
| **2. Evidence of ICAP's U.S. Dollar LIBOR Manipulation** | |
| ¶254 | In addition, the Barclays Cooperation Materials provide discrete representative examples of how ICAP "tried" to manipulate the setting of the U.S. Dollar LIBOR benchmark on the behalf of other investment banks.  As Peter Johnson, Barclays' U.S. Dollar LIBOR submitter, explained in an October 10, 2008 phone conversation with his New York-based colleagues, consulting inter-broker dealers like ICAP and Tullett Prebon was part of his daily ritual prior to submitting his official U.S. Dollar LIBOR:<br><br>*Every morning I go on to, say Prebon or ICAP and say right where do you reckon LIBORs are? . . .*First of all, they tell me where they think London LIBORS will set . . . .That is a totally different think from where they think LIBORs really are. . . . [I]n the morning, when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they think the market is, they're telling me where they think LIBOR's gonna set. *It's become* |

| | |
|---|---|
| | *a bit like a fairy story. . . .And it seems to be being set by derivative traders rather than cash traders.*<br><br>(Emphasis added). |
| **K. Findings from the Barclays Cooperation Materials** | |
| ¶259 | *Fourth,* the Barclays Cooperation Materials also confirm that previously unnamed defendants who were not actual USD LIBOR Panel members, including ICAP, Tradition, Tullett Prebon and Merrill Lynch, successfully influenced Barclays LIBOR submissions.[107] |
| | **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>    **a.  Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** |
| ¶260 | The Barclays Cooperation Materials provide substantial evidence of how Tullett Prebon and Tradition facilitated the manipulation of U.S. Dollar LIBOR.  Like its fellow interdealer broker ICAP, Tullett Prebon and Tradition routinely collected confidential information regarding where Defendants planned to submit their daily LIBOR quotes and disseminated that information among the other Defendants.  As Barclays' Peter Johnson explained on October 10, 2008:<br><br>        *[E]very morning I go on to, say Prebon or ICAP and say right, where, where do you reckon LIBORs are? . . .*<br>        [T]hey tell me where they think London LIBORs will set, uh based on where, ya know FRAs are trading, and ya<br>        know zeros threes and things like that have been trading, uh, uh and stuff like that.  That is a totally different<br>        thing from where they think LIBORs really are."<br>        \*        \*        \*<br>        . . . [I]n the morning when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they<br>        think the market is, they're telling me where they think LIBOR's gonna set.  *It's become a bit like a fairy story.*<br>        \*        \*        \*<br>        *And it seems to be being set by derivatives traders rather than cash traders.  I think.*<br><br>(Emphasis added). |
| ¶261 | During the suppression period when the banks artificially lowered their LIBOR submissions to bolster public perceptions of |

---

[107] Plaintiffs previously named Defendants John Doe 1-5.  John Does 1-5 were defined to include: "persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR."  Based on the information disclosed in the Barclays Cooperation Materials, Plaintiffs are concurrently moving to substitute the ICAP Defendants, Tradition and Tullett Prebon for John Does 1-3 pursuant to F.R.C.P. 15(a).

|  | their financial stability, Tullett Prebon and Tradition understood Defendants' mutual interest in keeping LIBOR fixes low and helped them achieve that goal.  For example, Tullett Prebon's Burgess noted on November 27, 2009 that HSBC "wants the LIBORs low, like everyone else does."  At the same time, Burgess told Barclays where other Defendants, including HSBC, Lloyd's, and other unnamed banks, would be setting LIBOR that day.  In response, Barclays' Mathews quipped, "Yeah, yeah, yeah, yeah yeah," highlighting the casual and routine nature of Tullett Prebon's guidance that banks were manipulating LIBOR for their own benefit.    This exchange demonstrates that traders at the banks were well aware of the LIBOR suppression and directing their trading to benefit from it. |
|---|---|
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| ¶263 | In addition, Tullett Prebon and Tradition played a key role in coordinating the LIBOR settings in the wake of the *Wall Street Journal* article that first suggested potential problems with LIBOR.  For example, on April 17, 2008, Barclays' Johnson said he would "probably go by what Prebon recommends" despite knowing that the resulting quotes would remain below LIBOR's true levels.  Barclays' Miles Storey recognized that their conduct could raise concerns about "quote collusion unquote."  On April 18, 2008, Barclays' Peter Johnson discussed the difference between Tullett Prebon's and Tradition's predictions of where six-month dollar LIBOR was fixing on April 18, 2008.  The call transcript demonstrates that at 10:55 a.m. Barclays was already aware that Lloyds was going to submit its six-month fixing at "three percent." |
| ¶264 | Tullett Prebon and Tradition received two significant benefits from facilitating Defendants' manipulation of U.S. Dollar LIBOR.  *First*, helping Defendants achieve their unlawful ends strengthened Tullett Prebon's and Tradition's relationships with bankers, increasing the amount of business it received from them.  *Second*, knowing where LIBOR would fix and influencing the final fix benefited Tullett Prebon's and Tradition's clients and, thus, the interdealer brokers, themselves. |
|  | **d.  RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays** |
| ¶287 | Similarly, on December 14, 2007, RBS disclosed its likely LIBOR submissions to Tullett Prebon, which in turn passed this information along to the Barclays U.S. Dollar LIBOR submitter.  After Neil Burgess attempted to share this information blindly and Johnson wrongly guessed that Lloyds was attempting to suppress LIBOR (though Johnson still requested that Burgess tell Lloyds "to go an' stick it where the [s]un don't shine"), Burgess revealed that RBS intended to submit a low LIBOR.  Neil Burgess of Tullett Prebon understood that this setting was made because RBS had just completed a trading position that required a specific fix. |

| | |
|---|---|
| | **2. Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** |
| | **a. Evidence of LIBOR Suppression During Late 2007** |
| ¶296 | Barclays' Johnson continued to express his indignation at how other Defendants planned to submit artificially suppressed LIBORs. For example, on September 3, 2007, Johnson observed to an unidentified broker, "It pisses me off that we're the only people being honest about this and we are getting pilloried for it. . . .Really pisses me off." To provide credence to Johnson's concern, the broker observed that RBS was setting its LIBOR below what another RBS trader was paying in the market. Moreover, after Johnson shared with the broker what Tullett Prebon believed LIBOR to be and Johnson requested that the broker try to influence the market, the broker quipped, "I will do my best to influence but. . . it seems the people at Prebon/ICAP keep low balling it." This suggests that ICAP and Prebon actively provided market guidance in line with their clients' desires as opposed to actual insights gleaned from the interbank lending market. |
| ¶301 | On November 29, 2007, Barclays had an internal discussion calling the LIBOR market "broken", and being used by submitters to "deliberately" manipulate the fixing "in order to make money off the derivatives." In addition, through communications with Defendants Tullett Prebon and Tradition, Barclays participants knew where HBOS would submit and where RBS would submit LIBOR in advance of the filing. Barclays also knew from these brokers where composite LIBOR would end up on the day. And based on the FX swap market, the Barclays participants knew that the demand for U.S. dollars was 55 basis points above the RBS submission and 40 basis points above the HBOS submission. |
| ¶308 | In fact, the next day, December 13, 2007, Johnson responded, "Give us a laugh" after an unidentified party offered to share Lloyds' U.S. Dollar LIBOR submissions (Lloyds' 3 month LIBOR submission for the day was "kicked out" down from the LIBOR panel). Later that same morning, Johnson spoke with Neil Burgess of Tullett Prebon, who shared market color and in particular divulged details regarding RBS' expected LIBOR submissions. Subsequently, Johnson learned that RBS had received a call from the BBA regarding its persistently low LIBOR submissions. Collectively, these documents evidence the fact that the Panel Bank Defendants routinely disseminated their expected LIBOR submission with the desire and expectation that the information would influence other Panel Bank Defendants' LIBOR submissions. |
| | **b. Evidence of LIBOR Suppression During 2008** |
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR. In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| ¶314 | The following day, April 18, 2008, Johnson continued to probe the market for insights into where other panelists planned to submit LIBOR before reporting back to Storey to let him know HSBC, Lloyds and RBS' impending submissions and to where Tullett Prebon believed LIBORs would set. Later in the conversation, Johnson recounted how Mark Dearlove spoke with the *Wall Street Journal* on April 17, 2008 and suggested that Barclays' submissions reflected the market sell off. Recounting that |

| | |
|---|---|
| | explanation, which did not account for the behind the scenes calibration of LIBOR based on information shared among the panel banks, prompted laughter. |
| ¶315 | Following this April 2008 exchange, Barclays continued to discuss the persistent yet undisclosed manipulation of LIBOR both internally and with other panel banks and broker-dealers like Tullett Prebon.  Consider the following examples: |
| | **c.   Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples: |

- On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board.  Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."  An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."

- Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon.  Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs."  Burgess agreed to try to find additional market color but in the interim informed Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."

- On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added).

- On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey.  Johnson reached out to Ramsey to gather information prior to the LIBOR fix.  Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).

|  | In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*"  (Emphasis added).  While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.<br><br>• Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side." |
| ¶320 | Separately, and immediately before the September 18, 2008 LIBOR fix, Johnson shared his concerns with Tullett Prebon's Neil Burgess, who concurred with his assessment of the LIBOR settings being divorced from reality:<br><br>PJ:  I'm very disappointed at Credit Suisse being such a f\*cking tool.  You know what that means?  He's in the sh\*t.<br>NB:  Yeah.<br>PJ:  He must be in the sh\*t, he's been told by his management to f\*cking go low.<br>NB:  Yeah, I think so.  But that's.  Yeah, but the thing is, Pete, I [inaudible] th-the off balance sheet's runnin' to cash in.  I went so many rounds this mornin'.<br>PJ:  Yeah.  Well they're all f\*ckin' wrong mate.  We're right.  They're wrong.  We know it.<br>NB:  Mm hmm.<br>PJ:  They know it.<br><br>Ultimately, Barclays submitted a 3 month LIBOR of 3.7500 on September 18, 2008, and was kicked out up from the LIBOR panel.  Tellingly, Barclays' submission was a full 75 basis points higher than the lowest submitter, and 53 basis points higher than the average submission of the remaining 15 panel banks. |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he |

wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him yet.

Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.

> PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?
> MS:  No, I know, I know, I know, and he's already talked to them about that.
> PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].

In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:

> Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  *Now, these guys are on wrong side of that.  They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers.*

This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*.

| | |
|---|---|
| ¶322 | Concern over how LIBOR rates would be perceived by other market participants and the public extended in October 2008.  For example, on October 2, 2008, Johnson learned that RBS would go only slightly higher on the previous day's low LIBOR settings. Subsequently, Johnson blasted a mass internal email noting, "Hearing a libor contributor is paying 4.50 for 6 month USD (2 others are paying 3.97).  This particular contributor will be putting his libor substantially below the 4.5 level."  In fact, on that day, RBS submitted a 3 month LIBOR of 4.3500 which fell within the interquartile range, thereby directly impacting the LIBOR setting for the day.  After sending his internal email, Johnson called Burgess at Tullett Prebon, opening the dialogue by requesting, "Larrys, laughable Larry LIBORs, please" before going on to describe his dismay at RBS's LIBOR submissions. Burgess acknowledged the absurdity of the submission by exclaiming "bloody hell" before quipping, "Some weird and |

| | |
|---|---|
| | wonderful things goin' on at the moment Pete it's all, payin' four and a half and . . ." only to have Johnson cut him off and add "And then pretending you're not."  Burgess attempted to offer Johnson solace in the fact that "You're the only one that lies straight in bed mate," but such sentiments rang hollow in the face of the persistent manipulation. |
| ¶326 | As discussed above, Defendants' persistent manipulation of the U.S. Dollar became such a routine occurrence that daily chatter regarding various banks' suppression of LIBOR or individual requests to move LIBOR was no longer shocking.  For example, on November 27, 2009, a Tullett Prebon broker informed a Barclays derivatives trader that neither HSBC nor Lloyds planned to change its LIBOR from the prior day, because they wanted "LIBORs low, like everyone else. . . ."  The response: "Yeah, yeah, yeah, yeah, yeah."  This anecdote provides direct evidence of derivative traders at the panel banks understanding of U.S. Dollar LIBOR suppression and how they constructed trading strategies around it. |
| | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**<br>  **3. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants'**<br>    **Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples:<br><br>   • On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";<br><br>   • On November 21, 2007, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).<br><br>   • On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher. *Not really sure why contributors are keeping them so* |

*low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";

- On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added).

- On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."

- On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";

- On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and

- On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide."

| | | Trader-Based Allegations Involving the Tullett Prebon Defendant | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 11/27/2009 | Barclays, HSBC, Lloyds, Tullett Prebon | Low | Kicked Down (Barclays), Interquartile (HSBC), Interquartile (Lloyds) | ¶¶ 16, 261, 326 | Various Plaintiffs traded during this period.  This allegation relates to an ongoing trader-based request for lower LIBOR settings around Nov. 27, 2009, and |

| | | Trader-Based Allegations Involving the Tullett Prebon Defendant | | | |
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|---|---|---|---|---|---|
| | | | | | for example, Plaintiff Atlantic Trading held a "net" position on Dec. 1, 3 and 4, 2009, and was harmed by this manipulation.** |

**NEW ALLEGATIONS INVOLVING DEFENDANTS SUBJECT TO PENDING SETTLEMENT**

| The Barclays Defendants |
|---|
| **II. NATURE OF THE ACTION** |
| ¶15   Through frequent communications with other Defendants, individual Defendants were well aware that they themselves and other panel banks were not submitting U.S. Dollar LIBOR rates in line with "true" LIBOR during the financial crisis. The fear of getting caught manipulating LIBOR was subordinate to the concern over submitting U.S. Dollar LIBOR rates that were out of line with the other Panel Bank Defendants. To avoid being the outlier, Defendants chose to fall in line by ensuring that their LIBOR submissions were in line with other Defendants. As Johnson noted in an October 29, 2008 email to senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices." |
| ¶16   Evidence from the various government settlements available to date and the Barclays Cooperation Materials make clear that Defendants adopted a ready willingness to manipulate U.S. Dollar LIBOR throughout the Class Period. The casual and routine nature of Defendants' manipulation is typified by a November 27, 2009 phone conversation between Barclays derivative trader Jonathan Mathew ("Mathew") and Tullett Prebon's Neil Burgess ("Burgess"). In the conversation, Burgess comments that Lloyds "wanted LIBORs lower, like everyone else." Mathew's response, "Yeah, yeah, yeah, yeah, yeah," is one of absolute agreement. The coordination among Defendants to manipulate LIBOR is encapsulated in this mundane exchange, which quickly brings together the interests of Lloyds' with that of Barclays and others. Communications such as these provide direct evidence that derivative traders at the panel banks knew about the U.S. Dollar LIBOR suppression and constructed trading strategies to benefit from it. |
| **IV. PARTIES** |
|    **B. Defendants** |
|       **2.    The Barclays Defendants** |
| ¶37   Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England. Barclays was at all relevant times a member of the panel of banks that submitted LIBOR rates to the BBA. Barclays' New York branch, located at 745 Seventh Avenue, is subject to the New York State Department of Financial Services regulatory supervision. One of Barclays' subsidiaries, Barclays Capital, Inc., employed traders that participated in the manipulation of LIBOR during the Class Period. |
| **V. FACTUAL ALLEGATIONS** |
|    **I. Findings From the Deutsche Bank Settlements Involving U.S. Dollar LIBOR** |
|       **1. Findings that LIBOR is a Commodity and Linking Deutsche Bank's Manipulation to CME Eurodollar Futures** |
| ¶236   The CFTC, DOJ, FCA and NYDFS orders list some "examples" of the pervasive manipulation in their settlement papers, as have |

| | other regulators.  These examples are listed in the chart below. |
|---|---|

| **EXAMPLES OF TRADER-BASED MANIPULATION** | | | | |
|---|---|---|---|---|
| **Date** | **Dire ctio n (Te nor)** | **Finding (emphasis in original)** | **Sour ce** | **¶/p.** |
| 2006-10-02 | ↑ (6m) | Similarly, on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?" The Head of the London Money Market Derivatives desk replied, "i will." | NYS DFS Conse nt Order | ¶36 |

| **2. Findings Concerning Conspiring with Outside Banks and Entities** | |
|---|---|
| ¶238 | The New York Department of Financial Services found that Deutsche Bank "communicated and coordinated with employees of other banks and financial institutions regarding their respective rate contributions in advance of an LIBOR submission, including individuals at Barclays, BNP Paribas, Citibank, Merrill Lynch, Societe Generale and UBS, in an effort to manipulate rates." Deutsche Bank NYDFS Order ¶30. For example, on May 20, 2009, a vice president wrote to an employee of Merrill Lynch, "everybody has an advantage to leave m libor high… everybody is received in tib/lib 6m… and we want low 3m right? and high 3m tibor?"  The external banker replied, "yeah… still."  The vice president replied, "we all ahve same position no?"  *Id.* ¶ 33.  Similarly, on June 9, 2006, the Head of the London Money Market Derivatives desk corresponded with an external banker, requesting, "low fix please I'm begging you," to which the external banker replied, "ok."  *Id.* ¶ 35.  And on October 2, 2006, an external banker, an employee of Barclays, corresponded with the Head of the London Money Market Derivatives desk requesting, "…if it suits you as well, could you ask your cash guys to put a high 6m fixing?"  The Head of the London Money Market Derivatives desk replied, "i will."  *Id.* ¶ 36.  On September 26, 2007, a submitter communicated with a director regarding LIBOR information obtained through brokers, stating, "Most of us in London want the same kind of fixings tmrw too. Some today thought we'd see 25 in 3s tmrw but I know of 4 banks who are going to leave their libors unchanged. Will let you know first thing."  *Id.* ¶ 42.  It appears that some of these examples relate directly to Deutsche Bank's U.S. Dollar LIBOR submissions.  Only discovery can confirm this fact, as well as the existence of other examples of conspiracy with outside banks. |
| **J. Findings from the ICAP Government Settlements** | |
| **2. Evidence of ICAP's U.S. Dollar LIBOR Manipulation** | |
| ¶254 | In addition, the Barclays Cooperation Materials provide discrete representative examples of how ICAP "tried" to manipulate the |

setting of the U.S. Dollar LIBOR benchmark on the behalf of other investment banks. As Peter Johnson, Barclays' U.S. Dollar LIBOR submitter, explained in an October 10, 2008 phone conversation with his New York-based colleagues, consulting inter-broker dealers like ICAP and Tullett Prebon was part of his daily ritual prior to submitting his official U.S. Dollar LIBOR:

> *Every morning I go on to, say Prebon or ICAP and say right where do you reckon LIBORs are? . . .First of all, they tell me where they think London LIBORS will set . . . .That is a totally different think from where they think LIBORs really are. . . . [I]n the morning, when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they think the market is, they're telling me where they think LIBOR's gonna set. It's become a bit like a fairy story. . . .And it seems to be being set by derivative traders rather than cash traders.*

(Emphasis added).

| | |
|---|---|
| **K. Findings from the Barclays Cooperation Materials** | |
| ¶255 | On October 7, 2014, Plaintiffs and Barclays executed a Settlement Agreement ("Barclays Settlement") whereby Barclays agreed to pay $19,975,000 in civil payments to class members (defined herein) in addition to providing cooperation in the form of documents and information concerning the alleged manipulation of U.S. Dollar LIBOR (the "Barclays Cooperation Materials"). The Bloomberg messages, emails, and telephone calls comprising the Barclays Cooperation Materials substantiate Plaintiffs' existing claims in four primary ways: |
| ¶256 | *First*, the Barclays Cooperation Materials confirm that the frequency and extent of U.S. Dollar LIBOR manipulation far exceeded what was previously suggested by the Barclays Government Settlement documents. Whereas the Barclays Government Settlement documents provided discrete representative examples of how Barclays manipulated LIBOR on at least 45 days, the Barclays Cooperation Materials indicates that Barclays engaged in the potential manipulation of U.S. Dollar LIBOR on at least 156 days of the Class Period. |
| ¶257 | *Second*, the Barclays Cooperation Materials provide greater detail regarding the mechanics of how Defendants were able to manipulate LIBOR. In particular, the Barclays Cooperation Materials provide additional representative examples of how Defendants successfully engaged in trader-based manipulation of LIBOR. Likewise, these documents also provide additional evidence concerning how Defendants actively suppressed LIBOR rates beginning in early August 2007 and continuing for years thereafter. The Barclays Cooperation Materials also provide further insight into the extent to which senior executives were aware of and participated in the response to LIBOR suppression. As noted by Mark Dearlove, the Head of Barclays Money Market Desk, in a November 30, 2007 telephone conversation, LIBOR was becoming "a real joke" because other banks were "making a Mickey Mouse" out of LIBOR. |
| ¶258 | *Third*, the Barclays Cooperation Materials demonstrate that trader-based manipulation and the suppression of LIBOR were not mutually exclusive, and in fact frequently occurred at the same time. Derivative traders at the panel banks constructed trading strategies designed to capitalize on the suppression of the U.S. Dollar LIBOR benchmark. |

| ¶259 | *Fourth*, the Barclays Cooperation Materials also confirm that previously unnamed defendants who were not actual USD LIBOR Panel members, including ICAP, Tradition, Tullett Prebon and Merrill Lynch, successfully influenced Barclays LIBOR submissions.[107] |
|---|---|
| | **1. Defendants Frequently Requested that Barclays Manipulate LIBOR and/or Telegraphed Their Artificial LIBOR Submissions to Other Panel Banks Both Directly and Through Intermediaries**<br>　　**a.  Tullett Prebon Participated In The Conspiracy By Acting As An Information Conduit And Encouraging Manipulation** |
| ¶260 | The Barclays Cooperation Materials provide substantial evidence of how Tullett Prebon and Tradition facilitated the manipulation of U.S. Dollar LIBOR.  Like its fellow interdealer broker ICAP, Tullett Prebon and Tradition routinely collected confidential information regarding where Defendants planned to submit their daily LIBOR quotes and disseminated that information among the other Defendants.  As Barclays' Peter Johnson explained on October 10, 2008:<br><br>　　*[E]very morning I go on to, say Prebon or ICAP and say right, where, where do you reckon LIBORs are? . . . [T]hey tell me where they think London LIBORs will set, uh based on where, ya know FRAs are trading, and ya know zeros threes and things like that have been trading, uh, uh and stuff like that.  That is a totally different thing from where they think LIBORs really are."*<br><div align="center">*        *        *</div>　　*. . . [I]n the morning when I sort of ask the brokers where is LIBOR gonna set, they're not telling me where they think the market is, they're telling me where they think LIBOR's gonna set.  It's become a bit like a fairy story.*<br><br><div align="center">*        *        *</div><br>　　*And it seems to be being set by derivatives traders rather than cash traders.  I think.*<br><br>(Emphasis added). |
| ¶261 | During the suppression period when the banks artificially lowered their LIBOR submissions to bolster public perceptions of their financial stability, Tullett Prebon and Tradition understood Defendants' mutual interest in keeping LIBOR fixes low and helped them achieve that goal.  For example, Tullett Prebon's Burgess noted on November 27, 2009 that HSBC "wants the LIBORs low, like everyone else does."  At the same time, Burgess told Barclays where other Defendants, including HSBC, Lloyd's, and other unnamed banks, would be setting LIBOR that day.  In response, Barclays' Mathews quipped, "Yeah, yeah, yeah, yeah yeah," |

---

[107] Plaintiffs previously named Defendants John Doe 1-5.  John Does 1-5 were defined to include: "persons and entities employed by or constituting interdealer brokers that directly or indirectly inappropriately influenced or attempted to influence submissions used to compile LIBOR."  Based on the information disclosed in the Barclays Cooperation Materials, Plaintiffs are concurrently moving to substitute the ICAP Defendants, Tradition and Tullett Prebon for John Does 1-3 pursuant to F.R.C.P. 15(a).

| | |
|---|---|
| | highlighting the casual and routine nature of Tullett Prebon's guidance that banks were manipulating LIBOR for their own benefit. This exchange demonstrates that traders at the banks were well aware of the LIBOR suppression and directing their trading to benefit from it. |
| ¶262 | Tullett Prebon and Tradition understood that the fixes it was communicating often reflected banks' trading positions rather than their true cost of borrowing.  For example, transcripts of voice broker calls show that Tradition participated in telephone conferences with Peter Johnson at Barclays regarding Barclays' and other Panel Bank Defendants' LIBOR submissions, including Lloyds, Deutsche Bank, and Bank of Scotland, on November 29, 2007 and September 17, 2008. |
| ¶263 | In addition, Tullett Prebon and Tradition played a key role in coordinating the LIBOR settings in the wake of the *Wall Street Journal* article that first suggested potential problems with LIBOR.  For example, on April 17, 2008, Barclays' Johnson said he would "probably go by what Prebon recommends" despite knowing that the resulting quotes would remain below LIBOR's true levels.  Barclays' Miles Storey recognized that their conduct could raise concerns about "quote collusion unquote."  On April 18, 2008, Barclays' Peter Johnson discussed the difference between Tullett Prebon's and Tradition's predictions of where six-month dollar LIBOR was fixing on April 18, 2008.  The call transcript demonstrates that at 10:55 a.m. Barclays was already aware that Lloyds was going to submit its six-month fixing at "three percent." |
| | **b. Merrill Lynch Frequently Requested that Barclays Manipulate LIBOR To Benefits Its Own Trading Positions** |
| ¶265 | Barclays employees also communicated directly with traders at non-U.S. Dollar LIBOR Panel banks regarding their requests to manipulate LIBOR submissions to benefit each other's trading positions. |
| ¶266 | Although it was not one of the 16 panel banks, Merrill Lynch requested that various LIBOR submitters to manipulate LIBOR to its advantage.  Starting in July 2006, Merrill Lynch employed a London-based interest rates swap trader, Stylianos Contogoulas.  Contogoulas previously worked at Barclays as a derivatives trader.  Contogoulas routinely contacted his former colleagues at Barclays about LIBOR fixings.  Sometimes he simply shared or sought information.  Often he made requests to Barclays to make higher or lower LIBOR submissions, which Barclays honored. |
| ¶267 | At least twice in September 2006, for example, Contogoulas requested specific submissions from Barclays, and Barclays obliged.  For example, on September 25, 2006, Contogoulas asked Dong (Don) Kun Lee, a New York-based Barclays derivative trader, "Where do you guys think 3m libor will be? 36.5 or 36.75?"  Lee responded, "36.75."  Contogoulas then told Lee, "great. I wouldn't mind if it came in ay [sic] 37 ha ha . . . I'm short the stub."  Barclays submitted at 5.37 – not 5.3675 – that day. |
| ¶268 | Just two days later on September 27, 2006, Contogoulas wrote Lee asking for insight into Barclays' expected LIBOR submission.  When Lee informed him that Barclays planned to submit a 3 month LIBOR of 5.3700, Contogoulas enthusiastically wrote back: "i hope it's 37!!!  The higher the better."  On that day, Barclays did in fact submit a 3 month U.S. Dollar LIBOR of 5.3700 and was "kicked out" up from the LIBOR panel. |
| ¶269 | Later that afternoon, Contogoulas sent a message to Lee, "If it's not too much pain to ask, what are you guys going for 3m libor tomorrow [, September 28]?  Have you spoken to P[eter] J[ohnson] at all?"  Lee responded, "37.75 or 38.  PJ is going with 37.75 for now . . . I want a hihg [sic] print . . . how about you?"  Contogoulas replied, "YEEEEAH BABY!!! Please get a high one :-)" |

|  | The following day, September 28, Contogoulas contacted Lee, and said "I hope we get a really high print . . . 38 would be great." Lee responded, "we[']re going 38," and Contogoulas replied, "you are STARS. Remind me to buy you all drinks." On September 28, 2006, Barclays was in the top quartile of banks and was "kicked out" up from the LIBOR fixing that day. |
|---|---|
| ¶270 | About a month later on October 26, 2006, Contogoulas again reached out to Lee at Barclays about manipulating three-month LIBOR, but downwards this time.  They had the following exchange at 7:12 a.m.: |
|  | Contogoulas:  where do u think 3m libor will be today? |
|  | Lee: pj [Peter Johnson] thinks 38 |
|  | Contogoulas:  wow…unchanged!!!?!??!  Short dates have rallied by 0.75bp…So I take it he's going unchanged? If it comes in unchanged I'm a dead man ha ha |
|  | Lee: i'll have a chat. |
|  | Then at 10:29 that morning, Contogoulas contacted Lee: |
|  | Contogoulas:  Dude I owe you big time!  Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor. |
|  | Lee: know [sic] worries!!! |
|  | Barclays' 3-month LIBOR quote submission for October 26, 2006 fell from 5.3800 to 5.3750, and returned to 5.3800 again on October 27, 2006.  In addition, this anecdote provides an example of how the Barclays Cooperation Materials provides greater detail than the regulatory settlement documents.  *Compare* Section V.D.1. |
| ¶271 | In a February 27, 2007 email to Barclays trader Jay Merchant, Contogoulas explained why he relied on Barclays to influence LIBOR in ways beneficial to his own trading positions as Merrill Lynch did not have its own U.S. Dollar LIBOR submitter that he could lean on:  "*we don[']t have a cash guy who sets libor . . . . [n]ot one of the privileged 16 banks*."  (Emphasis added). Consequently, Merrill Lynch's Contogoulas requested that Barclays keep the 3 month LIBOR benchmark as high as possible on February 28, 2007.  Merchant provided Contogoulas with reassurance noting that he had already spoken with the Barclays U.S. Dollar LIBOR submitter and Fred [presumably Frederic Gourtay, their former Barclays colleague and then RBC Capital derivatives trader] for the need for a high 3 month LIBOR in light of their short position in Eurodollar futures. |
| ¶272 | Indeed, on the following day, February 28, 2007, RBC's Gourtay fell in line and sought to ensure that RBC's 3 month LIBOR submission would be high.  On that day, Barclays submitted the highest 3 month LIBOR among the panel banks.  In addition, RBC's 3 month U.S. Dollar LIBOR submission fell within the interquartile range, which had a direct impact on that day's 3 |

| | |
|---|---|
| | month U.S. Dollar LIBOR setting.  Consequently, Barclays and RBC were apparently successful in helping Merrill Lynch and their former colleague Contogoulas manipulate the 3 month LIBOR setting up. |
| ¶273 | Also on February 28, 2007, Contogoulas sought to influence Barclays' 3 month LIBOR rate setting for March 1, 2007, and wrote to the Barclays submitter regarding where Barclays expected to set LIBOR as the "Mar07 future [was] going crazy".  On the following day, March 1, 2007, at 7:49 a.m., Contogoulas checked in with Barclays again this time contacting Lee to ask, "is pj going for a high 3m fix again today?  If not, PLEEEASE can he? :-)"  Subsequently, Contogoulas thanked Lee by noting, "Dude I owe you (and PJ a few drinks."  Consistent with Contogoulas' request, Barclays' submission was in the top quartile of the LIBOR panel and was "kicked out" up from the LIBOR fixing.  On March 9, 2007, Contogoulas went beyond mere begging and offers of alcohol.  Instead, he resorted to asking Lee to "pray for a high one for me."  The Merrill Lynch trader's prayers were seemingly answered for on that day Barclays submitted the highest 3 month LIBOR and was kicked out up from the LIBOR panel. |
| ¶274 | Later that month on Friday, March 23 at 7:42 a.m., Contogoulas sent Lee a message seeking a low 3-month USD LIBOR, "Yo I don't know whic hway [sic] round you are, but if you guys are neutral, 3m libor at 5.345 would be great (not 5.35).  If not, it doesnt [sic] matter anyway… :-)"  Lee replied, "done," to which Contogoulas responded, "you are a legend i cannot thank you enough."  Consistent with Contogoulas's request, Barclays submitted a 5.345 three-month LIBOR on March 23, 2007.  Later in the day, Contogoulas sent Lee a message, "Thank you very much for the 3m fix…appreciate it dude."  Lee replied, "anything for you."  Barclays' 3-month submission for March 23, 2007 was in the bottom quartile of panel bank submissions for the day. |
| ¶275 | Contogoulas made another request later that afternoon on March 23, "I know I'm pushing it…but…I am away monday…If you don't have the opposite interest AND if you remember, can you please tell PJ to set 3m Libor low if poss…5.345 would be great. If not, dont [sic] worry about it at all!! thanks and have a good weekend dude" Lee assured Mr. Contogoulas, "will do."  Consistent with Contogoulas's request, on Monday March 26, 2007, Barclays submitted 5.3450 for its 3 month U.S. Dollar LIBOR on Monday, and was "kicked out" down from the LIBOR panel. |
| ¶276 | Later that week on Thursday, March 29, 2007, Contogoulas contacted Lee to ask for a "low 3m libor":  "I know I'm asking for much, but ONLY if u guys care, a low 3m libor would be great…anywhere below 5.35…"  Barclays submitted a 5.3450 three-month LIBOR that day, which was in the lowest quartile of three-month USD LIBOR submissions, and at 10:49 that morning, Contogoulas sent Lee a message, "Dude, thanks a lot for the libor, can you PLEASE thank PJ as well :-)"  Lee replied, "anything for you!!!" to which Contogoulas added, "seriously, thanks a million dude."  In addition, this anecdote provides another example of how the Barclays Cooperation Materials provided greater detail than the regulatory settlement documents.  *Compare* Section V.M.2. |
| ¶277 | On April 10, 2007, Contogoulas requested a "low 3m libor" of Lee.  Barclays was in the bottom quartile of 3-month LIBOR submissions that day, consistent with Contogoulas's request.  Contogoulas thanked Lee for the low fixing, "THANK YOU for the low 3m fixing.  You guys are stars." |

| | **c. RBC Requested that Barclays Manipulate LIBOR to Benefit Trading RBC's Positions** |
|---|---|
| ¶278 | The Barclays Cooperation Materials highlight numerous occasions where RBC sought Barclays' assistance in manipulating the LIBOR fix.  The casual nature of these requests is perhaps explained by the fact that the RBC employee who communicated the requests, Frederic Gourtay, the former head of U.S. dollar swaps trading at RBC Capital Markets in New York, was previously employed by Barclays as a Director and U.S. Dollar derivatives trader.  In fact, Gourtay and Alex Pabon, a Barclays USD derivatives trader, had also previously worked together in the New York office of BNP Paribas.[108] |
| ¶279 | Gourtay sought to inure benefits from relationships cultivated during his prior employment.  For example, on March 17, 2006, Pabon wrote Gourtay and noted:  "I have sold all the stub fras against ois. Going to get pj to jam 3m libor lower."  In response, Gourtay acquiesced to Barclay's request, noting "Need that as well ill talk to my cash guys!!"  On that day, both Barclays and RBC both submitted a 3 month LIBOR of 4.9250 and their submissions were "kicked out" down. |
| ¶280 | RBC contacted Barclays on September 14, 2006 to request that LIBOR be manipulated down on both September 15, 2006 and September 18, 2006.  Gourtay specifically requested, "okay im off for next 1.5 days . . . make sure u tell ur cash guys for low 3m fix next 2 days..ciaoo oo."  Barclays and RBC submitted LIBORs of 5.3900 on September 15, 2006 and September 18, 2006 and their submissions were "kicked-out" down on both days. |
| ¶281 | Similarly, as previously discussed (*see* Section V.K.1.c, *infra*), RBC worked with Barclays to increase the 3 month LIBOR rate setting for February 28, 2007, which also was undertaken at Merrill Lynch's behest in order to benefit its Eurodollar futures positions. |
| ¶282 | The collaboration between RBC's Gourtay and his former Barclays colleagues appeared to continue throughout 2008.  For example, on September 25, 2008, Gourtay wrote Barclays to request that LIBOR drop by 10 basis points the next day in order to help hedging his short derivative trading position.  The casual nature of the request underscores how routine Gourtay manipulating LIBOR for the benefit of his derivative trading book to be. |
| | **d. RBS Frequently Communicated Its False LIBOR Submissions to Intermediaries Who Circulated The Submissions to Barclays** |
| ¶286 | Even though available evidence does not suggest that RBS joined Barclays, RBC, and Merrill in seeking to manipulate LIBOR up on February 28, 2007, the Barclays Cooperation Materials provide ample evidence that RBS routinely shared its LIBOR submissions with interdealer brokers and other traders prior to the daily LIBOR fix in attempt to gain preferential settings.  For example, Johnson learned on September 13, 2007 that both HSBC and RBS planned to submit low LIBORs based on claims of "cheap money" being available, which prompted Johnson's laughter.  Days later, on September 17, 2007, Johnson, upon learning from an unidentified broker, that RBS was planning a low LIBOR fixing quipped, "RBS is obviously . . . setting his stall out."  Subsequently, Johnson suggested that he would set a high LIBOR "just to f*ck [RBS] up".  On September 17, 2007, RBS submitted the lowest 3 month U.S. Dollar LIBOR and was "kicked out" down from the LIBOR setting.  Conversely, Barclays |

[108] http://www.prnewswire.com/news-releases/barclays-capital-adds-four-derivatives-traders-to-its-new-york-team-72587722.html.

|  | submitted the highest 3 month U.S. Dollar LIBOR and was "kicked out" up from the LIBOR setting.  Therefore, by telegraphing its LIBOR submission through communications with third parties, RBS demonstrated an ability to influence the LIBOR setting or at least alter the rate submissions of other U.S. Dollar LIBOR panel members. |
|---|---|
| ¶287 | Similarly, on December 14, 2007, RBS disclosed its likely LIBOR submissions to Tullett Prebon, which in turn passed this information along to the Barclays U.S. Dollar LIBOR submitter.  After Neil Burgess attempted to share this information blindly and Johnson wrongly guessed that Lloyds was attempting to suppress LIBOR (though Johnson still requested that Burgess tell Lloyds "to go an' stick it where the [s]un don't shine"), Burgess revealed that RBS intended to submit a low LIBOR.  Neil Burgess of Tullett Prebon understood that this setting was made because RBS had just completed a trading position that required a specific fix. |
| ¶288 | The following Monday, December 17, 2007, Johnson continued to hear additional information regarding RBS' artificially low LIBOR submissions.  During a conversation with an unidentified broker, Johnson disclosed RBS' LIBOR submissions, which ultimately resulted in RBS being kicked out down from the LIBOR panel.  The unidentified broker exclaimed, "Oh, he's a complete c**t" before clarifying that the British vulgarism was in fact a "technical term" and reasoning that the RBS "[m]ust have [had] a fixing today."  This anecdote, therefore, provides additional evidence that RBS set its LIBOR to benefit its own trading positions. |
| ¶289 | Based on this information, it is even more significant that other banks often followed RBS's wishes by submitting similar LIBOR quotes.  For example, on November 13, 2008, an unknown submitter told Barclays employee Jonathan Mathew that his firm would be "copyin' RBS . . . at the moment."  Therefore, by leaking its planned U.S. Dollar LIBOR submissions prior to the LIBOR setting, RBS was able to directly and passively influence how other U.S. Dollar panel members set their own LIBORs, thereby magnifying the impact of its own manipulation. |
| | **e.  Barclays and Citibank Conspired With One Another To Manipulate LIBOR Submissions** |
| ¶290 | The Barclays Cooperation Materials also suggest that Barclays and Citibank requested and accommodated each other's preferred LIBOR setting.  For example, on September 28, 2006, Don Lee, a New York-based Barclays derivative trader, sent Citibank trader Rajesh Ghude a Bloomberg message regarding LIBOR asking, "whats your cash guys going for 3m today?  I would like it as high as possible!!!"  As described above, Lee had already agreed to accommodate a request for a high 3 month LIBOR on behalf of Merrill Lynch trader Stylianos Contogoulas.  Lee's request to Citibank, therefore, could be seen as a way to ensure that 3 month LIBOR would be set to benefit the trading positions of Barclays and Merrill Lynch.  Ghude agreed to speak with Citibank's LIBOR submitter.  Like Barclays, Citibank was also in the top quartile of banks in the 3 month LIBOR panel and was "kicked out" up from the LIBOR fixing that day. |
| ¶291 | The dialogue between Barclays' Lee and Citibank continued thereafter.  For example, on May 16, 2008, Lee sent Citibank trader and CGMI Trader Rajesh Ghude, a Bloomberg message regarding LIBOR, noting "I am same way pleaaaaaase don't push it higher."  In response, Ghude noted, "no way.  i just have a small position and i am not going to push it up.  no worries."  Lee then thanked Ghude for the accommodation before launching in gossip about fellow traders.  On that day, Barclays was in the top |

|  | quartile of banks in the 3 month LIBOR panel and was "kicked out" up from the LIBOR fixing that day.  Citibank fell within the interquartile range and consequently had a direct impact on the setting of 3 month LIBOR. |
|---|---|
|  | **2.  Throughout the Financial Crisis, Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions** |
| ¶292 | As alleged herein, between August 2007 and May 2011, Defendants predominantly conspired to suppress LIBOR below the levels it would have been set at had Defendants accurately reported their borrowing costs to the BBA.  *See* Section V.B, *supra*.  The Barclays Cooperation Materials confirm that during this so-called "suppression period" Defendants consistently sought to artificially suppress their reported LIBOR for reasons, including but not limited to, benefiting their own derivative trading positions and to shielding themselves from the perception of financial weakness.  Defendants' coordinated conduct to generally lower LIBOR rates, however, did not preclude them from artificially increasing LIBORs opportunistically to benefit their derivative trading positions. |
| ¶293 | Throughout the suppression period, Barclays consistently discussed with other Defendants the suppression of LIBOR and its effects on the market.  Barclays U.S. Dollar LIBOR submitter, Peter Johnson, repeatedly expressed exasperation at the conduct of other panel members with equal measures of incredulity and indignation.  Consequently, the Barclays Cooperation Materials provide general examples of how Defendants undertook to artificially lower LIBOR rates during the so-called "suppression period".  Plaintiffs are confident that these examples, which are based on limited discovery to date, are representative of the degree to which Defendants coordinated their manipulative LIBOR submissions throughout the suppression period. |
|  | **a.  Evidence of LIBOR Suppression During Late 2007** |
| ¶294 | The Barclays Cooperation Materials provide substantial evidence of Barclays' internal response to the suppression of U.S. Dollar starting in August 2007.  The representative examples in particular demonstrate that trader-based manipulation was coincident with the artificial suppression of U.S. Dollar LIBOR. |
| ¶295 | An early example of the suppression period manipulation is provided by phone conversation transcripts involving Johnson.  During the morning of August 31, 2007, Johnson learned in a telephone conversation with an unidentified broker that RBS was planning to submit its LIBOR beneath its borrowing costs.  In a subsequent conversation the same morning, Johnson and an unidentified broker touched upon the activities of Bank of America, Credit Suisse, HBOS, RBS and UBS before fixating on Deutsche Bank's planned submission.  After the unidentified broker suggested that Deutsche Bank was likely quibbling with Barclays' relatively high LIBOR submissions, Johnson commented, "Well I thought Deutsche's a wanker, I'm quite prepared to justify mine is, he prepared to justify his?"  In a response marked by laughter and stammering, the unidentified broker conceded, "They're just too they're too low."  Later that afternoon, Johnson spoke with another unidentified broker over the phone.  In a conversation focused on the increasing separation of LIBOR from actual borrowing costs, the broker commented that Lloyds was forced to concede that they could not borrow at a specified rate.  In disgust, Johnson retorted, "So why the f*ck, and so they're basically admitting not being honest.  And I'm gonna go upset these bastards.  I'll be back."  On that day, Johnson seemingly acted on his threat by submitting the highest 3 month LIBOR submission, a full 20 basis points higher than the lower submission |

| | |
|---|---|
| | and nearly 13 basis points higher than that day's 3 month U.S. LIBOR. |
| ¶296 | Barclays' Johnson continued to express his indignation at how other Defendants planned to submit artificially suppressed LIBORs.  For example, on September 3, 2007, Johnson observed to an unidentified broker, "It pisses me off that we're the only people being honest about this and we are getting pilloried for it. . . .Really pisses me off."  To provide credence to Johnson's concern, the broker observed that RBS was setting its LIBOR below what another RBS trader was paying in the market.  Moreover, after Johnson shared with the broker what Tullett Prebon believed LIBOR to be and Johnson requested that the broker try to influence the market, the broker quipped, "I will do my best to influence but. . . it seems the people at Prebon/ICAP keep low balling it."  This suggests that ICAP and Prebon actively provided market guidance in line with their clients' desires as opposed to actual insights gleaned from the interbank lending market. |
| ¶297 | Later in the evening of September 3, 2007, Johnson continued to probe for information concerning other panel banks' expected LIBOR submissions.  After Johnson suggested that he already had obtained HBOS' expected submissions through "hidden sources", an unidentified broker observed, "I don't think he's [HBOS' submitter] one of the, ah the bad boys as such."  In response, Johnson noted, "No he's not, but he's still setting them lower then he should do."  Johnson and the unidentified broker also agreed that certain Defendants' LIBOR submission practices, including those of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and laughed as they labeled these banks "filth". |
| ¶298 | What prompted laughter in September 2007 provoked ire less than a month later.  On October 2, 2007, Johnson engaged an unidentified broker from another bank in conversation regarding what that bank would submit for its LIBORs.  After the broker identified where the bank planned to submit its LIBOR, the following conversation ensued:<br><br>      PJ:  It's bollocks!<br>      UM:  It is bollocks.  Total and utter.  But he is taking into consideration where the Citibanks [sic], UBSs and all<br>          these people are gonna go.<br><br>      PJ:  Yeah well f*ck them!  They're wrong.<br>      UM:  Yeah.<br>      PJ:  That's, that's that's absolute f*cking bollocks.<br><br>Later in the same conversation, Johnson disclosed Lloyds' planned LIBOR submission and questioned where WestLB would submit 3 month LIBOR based on his knowledge of what WestLB is paying in the market.  Towards the end of the conversation, Johnson forced the broker to acknowledge that LIBOR submissions was flawed.<br><br>      PJ:  Okay, well I think your LIBORs are just ridiculous. |

| | |
|---|---|
| | UM:  Oh a disgrace, yeah, no, they are, but I'm uh uh you understand what we are d- all I'm saying to you is that where we think the market is gonna fix their LIBORs.  That's where the fix . . . . is gonna be. |
| ¶299 | The pressure to submit LIBORs in line with other panel members is highlighted further by an October 11, 2007 telephone conversation between Johnson and a broker identified only by his first name Joe.  Following a broad discussion about keeping LIBOR rates high in the face of pressure to submit lower LIBORs, Joe suggested, "I think, I think that, I think all the banks that set the LIBORs need to go out, f*cking have a chat about what they're doing."  Johnson retorted, "Yeah, well it is crazy." |
| ¶300 | On November 21, 2007, Barclays' Johnson continued to probe other panel banks for insight into their planned LIBOR submissions.  After learning HSBC's planned submission from a broker, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause it's *so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR (emphasis added). |
| ¶301 | On November 29, 2007, Barclays had an internal discussion calling the LIBOR market "broken", and being used by submitters to "deliberately" manipulate the fixing "in order to make money off the derivatives."  In addition, through communications with Defendants Tullett Prebon and Tradition, Barclays participants knew where HBOS would submit and where RBS would submit LIBOR in advance of the filing.  Barclays also knew from these brokers where composite LIBOR would end up on the day.  And based on the FX swap market, the Barclays participants knew that the demand for U.S. dollars was 55 basis points above the RBS submission and 40 basis points above the HBOS submission. |
| ¶302 | Johnson distilled his concern over the perceived suppression of LIBOR and the need to avoid being seen away from the pack in a November 28, 2007 internal liquidity report.  Johnson observed:<br><br>Libors are not reflecting the trust cost of money.  I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.*<br><br>(Emphasis added).<br><br>In response to this email, Miles Storey ("Storey"), a manager in Barclays' Treasury department, thanked Johnson "for remaining pragmatic but at the upper end".  This effectively amounted to an acknowledgment and acceptance that Barclays was not submitting accurate LIBORs, but that Johnson should be praised for not manipulating LIBOR as egregiously as competitors while nonetheless still moving along with "the pack". |

| | |
|---|---|
| ¶303 | The pressure to submit LIBORs in line with other bank's submissions reached a breaking point on November 30, 2007.  On that day, Johnson spoke with Storey regarding how Barclays should position its LIBOR submission in the face of other panel banks' artificially low submissions.  Johnson advised Storey that he was in the process of figuring out where HBOS planned to submit its LIBOR because HBOS was "sort of was out with [Barclays] yesterday."  However, Storey advised Johnson that "the guidance is [to] stick within the bounds" and "no head above parapet, not partial bleeding," as "Mr. [Chris] Lucas [Barclays' then Chief Financial Officer] doesn't want [Barclays] to be outside the top end."  After Storey provided this guidance, Barclays received notice of RBS' planned LIBOR submissions, which were higher than RBS's prior day submissions.<br><br>     MS:  Well that shows that RBS is being dragged up doesn't it?<br>     PJ:  Yeah but they're only being dragged up to the to the tower.<br>     MS:  I know, but it's a start isn't it.<br>     PJ:  But why don't I go 32, 22 and 20?  So I'm 2 above the top.  So I'm, so I'm something ahead a little bit<br>     above the parapet.<br><br>     MS:  Tell you what, 30, 22, and 20.  In other words we're slightly above the parapet, but not in the one that<br>     people are going to publish.<br><br>     PJ:  Okay so 30, 22, 20.<br>     MS.  Yeah, I'm comfortable with that. |
| ¶304 | The attention that senior Barclays management paid to the bank's LIBOR submissions is further evidenced by a telephone conversation Mark Dearlove, the head of Barclays' money market desk, had with a regulator named George (last name unknown) shortly after the 11 a.m. LIBOR fixing on November 30, 2007.  In the course of explaining how Barclays felt that LIBOR was artificially suppressed, Dearlove commented, "But what our senior management has said is what *we don't want to do is attract any publicity where people think oh, Barclays has a funding crisis, and you're, you're thirty basis points higher than everybody else*."  (Emphasis added).  In response, George commented that LIBOR was being made into a "*Mickey Mouse*", a sentiment that Dearlove quickly seized upon before adding that LIBOR had "become a *real joke*" as the banks had abdicated their "obligation to set the . . . right rates." (Emphasis added). |
| ¶305 | Likewise, Storey shared his own concerns about LIBOR with John Ewan, Director of the BBA, in a November 30, 2007 email in response to Ewan's question from the prior day as to whether LIBOR rates were "artificially low."  Storey suggested that Ewan already understood his views but observed, *inter alia*, that "[s]ome banks are getting close to looking like they are actively not recognising the actual market levels" in addition to noting "[a] suggestion which may not be appropriate at the moment is to return to the anonymity of the contribution in some way to remove *the stigma of setting LIBORs too high relative to the pack and thus getting the wrong attention*."  (Emphasis added). |

| | |
|---|---|
| ¶306 | Johnson echoed these concerns in another internal email to Dearlove on December 4, 2007, which was subsequently forwarded to Barclays' former head of compliance Stephen Morse.  Expressing discomfort with how LIBOR rates were generally being set, Johnson explained, "My worry is that we (both Barclays and the contributor bank panel) are being seeing to be contributing patently false rates. *We are therefore being dishonest by definition* and are at risk of damaging our reputation in the market and with the regulators."  (emphasis added). |
| ¶307 | The Barclays Cooperation Materials suggest that LIBOR suppression continued unabated.  For example, on December 12, 2007, Barclays' Johnson learned in telephone call with an unnamed broker that both RBS and Lloyds planned to submit LIBORs well below what was conceivable in the London funding market.  He quipped, "What kind of drugs are they on?"  After pressing the broker further, Johnson added, "It's all a load of bollocks, isn't it?"  And the broker was forced to concede, "Eh, it's just complete[ly] false." |
| ¶308 | In fact, the next day, December 13, 2007, Johnson responded, "Give us a laugh" after an unidentified party offered to share Lloyds' U.S. Dollar LIBOR submissions (Lloyds' 3 month LIBOR submission for the day was "kicked out" down from the LIBOR panel).  Later that same morning, Johnson spoke with Neil Burgess of Tullett Prebon, who shared market color and in particular divulged details regarding RBS' expected LIBOR submissions.  Subsequently, Johnson learned that RBS had received a call from the BBA regarding its persistently low LIBOR submissions.  Collectively, these documents evidence the fact that the Panel Bank Defendants routinely disseminated their expected LIBOR submission with the desire and expectation that the information would influence other Panel Bank Defendants' LIBOR submissions. |
| | **b. Evidence of LIBOR Suppression During 2008** |
| ¶309 | The Barclays Cooperation Materials also demonstrate that internal and external communications regarding the suppressive manipulation of LIBOR continued into 2008.  For example, in a March 18, 2008 phone conversation, Barclays trader Jonathan Mathew discussed where another bank planned to submit its LIBORs based in part on RBS' expected low submission:<br><br>JM:  How are you going fifty, if you got an offer at fifty five in the ones?<br>UM:  Because, it's not to do with the bloody market is it?  Nothing to do with markets.<br><br>JM:  Lovely, I-I'm telling it to PJ, I know but, . . . [h]e will get so infuriated."<br><div align="center">*          *          *</div><br>UM:  I know.  Stupid.  I know, ex-exactly where you're coming from.  But uh, it's all, it's all grown on deriv-derivatives now, nothing to do with LIBORs, is it?<br><br>JM:  Which is wrong, but anyway. |

| | |
|---|---|
| ¶310 | Approximately, a month later, the separation of LIBOR from the cash market attracted the attention of the *Wall Street Journal* as described herein. *See infra* Section VI.F.  Yet, an internal conversation at Barclays between Peter Johnson, the LIBOR submitter, and Miles Storey, a Treasury Manager, suggests that the divergence was attributable to other panel banks' derivative position as opposed to a desire to portray a semblance of financial stability. <br><br>       MS:  And personally, I think it's derivative driven. <br>       PJ:  Yeah, um, I'm convinced it is. <br>       MS:  Myself.  I don't think it's anything to do with . . . umm . . . actual where I can get the cas-, sorry with the uh liquidity perception issue. <br>       PJ:  Yeah. <br>       MS:  Um, I think it's that they are, ya know, I'm being heretical in accusing people here on the phone and therefore I would not uh state this in a court of law, but . . . [y]a know, if you're a permanent seller of OIS swaps . . . [b]ecause you think they're overdone . . . [y]ou ain't going to uh crucify your mark to market are you? |
| ¶311 | Cognizant he was on a recorded line, Storey went on to disclose to Johnson that there were conversations among senior bankers at the BBA board level from various panel banks and gave him permission to move LIBOR "towards were . . . [Johnson] have always wanted to be."  However, after Johnson suggested that he would "probably go by what Prebon recommends", Storey cautioned, *"[W]e need to be careful about quote collusion unquote" and to be mindful of his "amount of verbiage . . . [o]n the wires*."  (Emphasis added). |
| ¶312 | After getting off the phone with Storey, Johnson spoke with unidentified brokers and Neil Burgess of Tullett Prebon to gain a better understanding of where other panel banks, including Credit Suisse, HSBC, Lloyds, RBS, would set LIBOR.  In particular, Burgess provided Johnson reassurance that Barclays' planned submissions would not be "too far out" only minutes before that day's LIBOR fixing. |
| ¶313 | Still, Johnson reserved enough time to call Storey back to recount what he had learned about other market participants' expected LIBOR submissions.  Johnson suggested that Barclays could justify its submission publicly by pointing to a sell-off in the futures market since the prior day's LIBOR fixing.  However, in summary, Johnson told Storey that "Yeah, well if-if what I'm being told is correct yeah u-u-u-uh it's quite interesting, *everyone wants to know what everybody else is setting*."  (Emphasis added). |
| ¶314 | The following day, April 18, 2008, Johnson continued to probe the market for insights into where other panelists planned to submit LIBOR before reporting back to Storey to let him know HSBC, Lloyds and RBS' impending submissions and to where Tullett Prebon believed LIBORs would set.  Later in the conversation, Johnson recounted how Mark Dearlove spoke with the *Wall Street Journal* on April 17, 2008 and suggested that Barclays' submissions reflected the market sell off.  Recounting that explanation, which did not account for the behind the scenes calibration of LIBOR based on information shared among the panel banks, prompted laughter. |
| ¶315 | Following this April 2008 exchange, Barclays continued to discuss the persistent yet undisclosed manipulation of LIBOR both |

| | internally and with other panel banks and broker-dealers like Tullett Prebon.  Consider the following examples: |
|---|---|
| ¶316 | On May 1, 2008, Johnson discussed that day's LIBOR expected setting and other panel banks' expected settings with unidentified brokers.  In particular, Johnson was interested in where Deutsche Bank was setting LIBOR, after learning that ICAP told Deutsche Bank that its LIBOR submissions were too low.  To wit, Johnson "quite like[d] this guy at Deutsche actually" as he believed that "he's [had] the right f*cking idea," based on Deutsche Bank's perceived willingness to at least occasionally rise above the parapet.  Conversely, Johnson was less pleased with an unnamed broker who Johnson perceived was encouraging artificially low LIBOR submissions which Johnson suggested was "a load of f*cking bollocks" before labeling the broker a "wanker".  Around 10:15 am, Johnson recognized during offline conversation that his expected submissions would be out of line with other panel banks and quipped, "Well, . . . if they don't like it they can stick it right where it f*cking hurts," before requesting that a colleague tell Deutsche Bank where Barclays planned to set its LIBORs.  On that day, Barclays and Deutsche Bank submitted the highest 3 month LIBOR submissions and were consequently "kicked out" up from the LIBOR panel. |
| | **c. Evidence of LIBOR Suppression Post-Lehman Brothers Bankruptcy** |
| ¶317 | On September 15, 2008, Lehman Brothers filed for bankruptcy.  As described herein, in spite of increased risks and worries about the banks after the Lehman bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread between the two rates to become more negative.  See Section V.N.1, *infra*.  Anecdotes provided by the Barclays Cooperation Materials confirm that U.S. Dollar LIBOR panel banks continued to manipulate LIBOR in the wake of the Lehman Brothers bankruptcy filing, and actively sought out as much guidance and cooperation from other panel banks as possible. |
| ¶318 | Telephone transcripts from the days immediately following the Lehman filing detail how Barclays painstakingly sought out market color from other panel banks in an effort to calibrate its own submission towards the pack.  Consider the following examples:<br><br>• On September 16, 2008, Johnson learned in an 8:40 a.m. that Credit Suisse planned to (and ultimately did) submit 3.0000 LIBORs across the board.  Johnson responded to the broker who shared this information by declaring, "Now look, can you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."  An hour later, Johnson informed someone named Bryce [last name unrecorded] that "the general consensus in the market seems, uh-eh, seems to be that this where [Credit Suisse] will set even if this is where they shouldn't be setting. . . ." before adding, "[a]nd by the way if he does, I will, cause I won't stand out."<br><br>• Minutes later, Johnson spoke with another broker who offered insight into Deutsche Bank's expected submissions, before speaking with Neil Burgess of Tullett Prebon.  Johnson made the explicit request "Uh, I'd like to know what other people are going for LIBORs."  Burgess agreed to try to find additional market color but in the interim informed |

Johnson of Lloyds' expected submission, which was so low that it prompted Johnson to retort "[h]e's got not f*cking idea."

- On September 17, 2008, Johnson continued to probe for information and share it with other brokers.  After learning Credit Suisse's expected submissions, Johnson quipped, "Okay, I-I-I admire his s-s-spunk, but I don't think he's high enough."  Subsequently, Johnson spoke with another broker who informed him that they acted on Johnson's intelligence on Credit Suisse's planned submission.  Johnson reiterated his prior sentiment this time adding "He's about the only eh-eh-eh *he's about the only person who's being even vaguely realistic out there* . . . . Sorry, apart from me."  (emphasis added).

- On September 17, 2008, Johnson engaged in a separate wide-ranging discussion regarding the submission with a broker named Ramsey.  Johnson reached out to Ramsey to gather information prior to the LIBOR fix.  Initially, Ramsey let Johnson know that he was trying to find out about Credit Suisse's submission, informed him that Deutsche Bank planned to (and did ultimately) submit a 3.1000 3 month LIBOR, and that Lloyds was planning to submit a low 3 month LIBOR of 2.8500 (which was Lloyds' actual submission and the lowest submission that day).  In jest, Johnson asked what Lloyds' subsidiary HBOS (terms of the Lloyds acquisition of HBOS were formally announced the next day) planned to submit.  After learning that HBOs and RBS both planned to submit higher LIBORs, Johnson responded, "*Good.  Now I'm gonna go higher than all of them.*"  (Emphasis added).  While Barclays did in fact submit the highest 3 month LIBOR on September 17, 2008, this is tempered by the fact that the broker indicated that the cheapest cash offer he observed in the market place was four percent.

- Also on September 17, 2008, Johnson reported on market sentiment in an internal liquidity report and observed "Libor panelists are going to put in yet another wide spread of libors – 1 mth will range from 2.80 to 3.40, 2 months from 2.85 to 3.30 and 3 mths from 2.90 to 3.20.  Feeling from brokers is that we will come high 90s in 1 mths, just of 3% in 2 and 3 months.  Needless to say I feel these are a tad on the low side."

| | |
|---|---|
| ¶319 | On September 18, 2008, Johnson's frustrations boiled over as demonstrated by an excerpt from a lengthy conversation prior to that day's LIBOR fix:<br><br>I mean these banks, I mean that, the BBA just needs to get 'em together and tell 'em to sort their f*cking lives out.  'Cause this really, it, it makes me look likely a f*cking [inaudible].  *There I am, uh, th-there I am, um, just tryin' to set, see I think we should go five and a half, five, and four and a half.  Uh, and I will be, uh, up to two and a half percent higher than anybody else.  Yeah, and I'm right, I know I'm right.  Uh, oh, oh, yep. . .  It's bollocks, innit?  We know its bollocks.  It's absolute bollocks.*  I mean, you know, the, the only good thing about |

| | |
|---|---|
| | yesterday is, when all the Merrill Lynch [inaudible] like Barclays sets at three, [inaudible] three months, and Lloyds sets at two eight five is indication [inaudible] worth crap and we need the money, uh, but, then on ICAP three months [inaudible].<br><br><div align="center">\*      \*      \*      \*</div><br>So, I'm ju- [inaudible].  But I mean [inaudible] my answer, that'll be for these a\*\*holes to set f\*cking LIBORs [inaudible] *I'd rather have children set them.*<br>(emphasis added). |
| ¶320 | Separately, and immediately before the September 18, 2008 LIBOR fix, Johnson shared his concerns with Tullett Prebon's Neil Burgess, who concurred with his assessment of the LIBOR settings being divorced from reality:<br><br>PJ:  I'm very disappointed at Credit Suisse being such a f\*cking tool.  You know what that means?  He's in the sh\*t.<br>NB:  Yeah.<br>PJ:  He must be in the sh\*t, he's been told by his management to f\*cking go low.<br>NB:  Yeah, I think so.  But that's.  Yeah, but the thing is, Pete, I [inaudible] th-the off balance sheet's runnin' to cash in.  I went so many rounds this mornin'.<br>PJ:  Yeah.  Well they're all f\*ckin' wrong mate.  We're right.  They're wrong.  We know it.<br><br>NB:  Mm hmm.<br><br>PJ:  They know it.<br><br>Ultimately, Barclays submitted a 3 month LIBOR of 3.7500 on September 18, 2008, and was kicked out up from the LIBOR panel.  Tellingly, Barclays' submission was a full 75 basis points higher than the lowest submitter, and 53 basis points higher than the average submission of the remaining 15 panel banks. |
| ¶321 | On September 19, 2008, Johnson and Barclays Treasury Manager Miles Storey engaged in a wide-ranging discussion on recent LIBOR activity.  Storey acknowledged that Johnson was in between "a rock and a hard place at the moment" as they had to stop "short of saying people are lying . . . ", before inviting Johnson to continue his "rant".  Among the topics covered by the rant, Johnson noted that he challenged RBS' submissions through ICAP and Tullett Prebon:<br><br>Mm.  I got told by Prebon, or ICAP, that RBS is gonna set his one month LIBOR at two, uh three fifteen.  So I said, why don't you go back to him and say that I'll pay him, his LIBOR plus a hundred for any amount that he wants to give me, he can just he's got a hundred basis points profit just like that.  I haven't heard back from him |

|  | yet. |
|---|---|
|  | Likewise, Johnson invited Storey to comment on recent HSBC and HBOS submissions.<br>    PJ:  Are you just gonna look at HSBC's two week and one month LIBOR [inaudible]?<br><br>    MS:  No, I know, I know, I know, and he's already talked to them about that.<br><br>    PJ:  And, and what about HBOS' two week LIBOR being, uh, fifty basis points below Lloyds's?  I, who's in trouble there?  You know, it's just fucking ridiculous.  It, it [inaudible].<br><br>In addition, Johnson speculated that derivative trading positions created perverse incentives for banks to keep LIBOR, and in particular 1 month LIBOR, as low as possible:<br><br>    Yeah, well, I-I think so.  I mean I'm, I'm telling our sales force who are listening to me, that when their clients ask about my LIBORs, just say look we know we're right, we know they're not getting money where they're saying they're getting money, and we know why they're doing it.  You know, like if you think, yo-, uh, uh, lo-, uh, for instance I was just thinking about this, um, like threes ones basis was, uh, um, a-a week ago was forty, plus forty bid, it's now minus fifteen offered.  So that's, uh fifty five basis points turnaround in the threes ones basis.  Now, these guys are on wrong side of that.  *They've got a vested interest in keeping one month down as much as they can.  And if it goes to where it really should be, that basis will go about, I don't know, minus a hundred, negative, you know minus a hundred.  And they will get taken away on stretchers*.<br><br>This trading strategy seemingly comports with the DOJ's findings with respect to Deutsche Bank's attempt to profit from the widening of the spread between 1 and 3 month (and 1 and 6 month) U.S. Dollar LIBOR.  *See* Section V.I, *supra*. |
| ¶322 | Concern over how LIBOR rates would be perceived by other market participants and the public extended in October 2008.  For example, on October 2, 2008, Johnson learned that RBS would go only slightly higher on the previous day's low LIBOR settings.  Subsequently, Johnson blasted a mass internal email noting, "Hearing a libor contributor is paying 4.50 for 6 month USD (2 others are paying 3.97).  This particular contributor will be putting his libor substantially below the 4.5 level."  In fact, on that day, RBS submitted a 3 month LIBOR of 4.3500 which fell within the interquartile range, thereby directly impacting the LIBOR setting for the day.  After sending his internal email, Johnson called Burgess at Tullett Prebon, opening the dialogue by requesting, "Larrys, laughable Larry LIBORs, please" before going on to describe his dismay at RBS's LIBOR submissions.  Burgess acknowledged the absurdity of the submission by exclaiming "bloody hell" before quipping, "Some weird and wonderful things goin' on at the moment Pete it's all, payin' four and a half and . . ." only to have Johnson cut him off and add "And then pretending |

| | |
|---|---|
| | you're not."  Burgess attempted to offer Johnson solace in the fact that "You're the only one that lies straight in bed mate," but such sentiments rang hollow in the face of the persistent manipulation. |
| ¶323 | What seemed to offer Johnson comfort, however, was the hope that at least on occasion other LIBOR submitters would come close to submitting accurate LIBORs and occasionally venture above the parapet.  For example, on October 9, 2008, Johnson had a discussion with two unidentified brokers wherein he divulged Credit Suisse's expected (and actual) LIBOR submission for the following day.  Johnson initially inquired, "Any other reprobates doing anything thing in the, uh, threes?  So, I know Credit Suisse is going five."  Later Johnson added, "I know what it is, it's mutual respect, because we're the only two people who even tell, vaguely the truth." Of course, mutual respect for merely approximating the truth was not a ringing endorsement for Credit Suisse, and is in fact an indictment of the accuracy of the LIBOR benchmark resulting from the panel bank's egregious behavior. |
| ¶324 | On October 29, 2008, Johnson emailed Mark Dearlove, Peter Spence, and Colin Bermingham to address their concerns that Barclays' LIBOR submissions were higher than other panel banks.  Johnson noted:<br><br>*Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested*.  I disagree with this approach as you are well aware.  *I will be contributing rate which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices*.[109]  I am not sure that the BBA definition of libor would accept this approach.  Today for instance the only cash offer in 3 months has been Chase Nyk who is offering at 4%.  Please do not tell me that 3.42% was the correct rate as we both patently know that it was not.  I will continue to keep a record where money is or is not offered in the periods.<br><br>COF spreads will have to go up massively in USD to compensate for fixing LIBOR rate unrealistically low.<br><br>(Emphasis added).  As Johnson noted, 3 month U.S. Dollar LIBOR was set at 3.42% on October 29, 2008.  Barclays submitted a LIBOR submission of 4.0000%, which was an extreme outlier compared to the next highest submitter, RBS, which submitted 3.6000%, and the lowest submitter, J.P. Morgan, which submitted 3.1500%. |
| ¶325 | During this time period, Barclays internally examined the foreign exchange ("FX") currency market derivatives to ascertain whether U.S. Dollar LIBOR was accurate.  A November 21, 2008 internal liquidity report, provides a stunning summary of the artificiality of the U.S. Dollar LIBOR quotes.  Colin Bermingham, the author of the report, states that "demand has picked up via the FX swap market, in 3 months the implied bid for USD cash through GBP is 4.26 and EUR 3.57 with the BBA $ Libor fixing at 2.1575."  The report goes on to show graphically the level of U.S. Dollar LIBOR implied by the FX swap rates over time.  In |

---

[109] *See also* Barclays CFTC Order at 24.

| | |
|---|---|
| | sum, the analysis shows that the implied bids for U.S. Dollar cash based on spreads against the British Pound and the Euro were significantly higher (sometimes by hundreds of basis points) than the reported LIBOR. |
| ¶326 | As discussed above, Defendants' persistent manipulation of the U.S. Dollar became such a routine occurrence that daily chatter regarding various banks' suppression of LIBOR or individual requests to move LIBOR was no longer shocking.  For example, on November 27, 2009, a Tullett Prebon broker informed a Barclays derivatives trader that neither HSBC nor Lloyds planned to change its LIBOR from the prior day, because they wanted "LIBORs low, like everyone else. . . ."  The response: "Yeah, yeah, yeah, yeah, yeah."  This anecdote provides direct evidence of derivative traders at the panel banks understanding of U.S. Dollar LIBOR suppression and how they constructed trading strategies around it. |
| | **L. The Regulatory Settlements and Barclays Cooperation Materials Provide Substantial Basis to Allege that Defendants Continually Manipulated U.S. Dollar LIBOR Throughout the Class Period** |
| ¶327 | The Regulatory Settlements and the Barclays Cooperation Materials provide ample evidence that Defendants intentionally sought to manipulate the U.S. LIBOR benchmark.  Because the Regulatory Settlements and Barclays Cooperation Materials only provide representative examples of dates on which individual defendants engaged in the manipulation of U.S. Dollar LIBOR.  The overall the scope of the alleged manipulation, including the amount of collusion and the "but-for" LIBOR, is still unknown.  Nevertheless, what is clear is that Defendants have engaged in widespread manipulation of U.S. Dollar LIBOR. |
| ¶328 | Annexed hereto as Appendix A is a schedule derived from the Regulatory Settlements and Barclays Cooperation Materials that lists discrete days on which Defendants requested that U.S. Dollar LIBOR be manipulated for their own benefit.  This Appendix also shows how the conduct impacted Plaintiffs trading positions in Eurodollar futures.  The list of dates on which Defendants' manipulated LIBOR together is necessarily under-inclusive at this early stage of the litigation.  For example, as a preliminary matter, the CFTC determined that throughout the period of 2005 through 2011, Deutsche Bank routinely employed a trading strategy dependent upon LIBOR manipulation.  *See* Deutsche Bank CFTC Order at 2, 8-9.  During the financial crisis, this manipulation is alleged to have occurred almost daily, but only representative examples of the manipulation were provided.  *See* Deutsche Bank DOJ SOF ¶ 32. |
| ¶329 | Nevertheless, the Regulatory Settlements and the Barclays Cooperation Materials provide sufficient evidence to suggest that Defendants' manipulation of U.S. Dollar LIBOR overlapped on certain days, and that the manipulation occurred in the same direction.  When two banks manipulate LIBOR, the degree of manipulation increases significantly.[110]   Consider the following representative examples:<br><br>• *Compare* Barclays CFTC Order at 10 (referring to a September 13, 2006 request that Barclays has a "big position in 3m libor for the next 3 days" and wants a low 3 month LIBOR) with Rabobank CFTC Order at 9 (referring to a September 15, 2006 request from a U.S. Dollar trader asking a U.S. Dollar LIBOR submitter to keep 3 month LIBOR at "39 for the |

[110] *See* Barclays FCA Final Notice ¶ 11.

next few days");

- *Compare* Barclays FCA Final Notice ¶ 168 ("Trader B [a U.S. dollar Derviaties Trader] stated to a Submitter that 'We're all rooting for a high LIBOR tomorrow on 26 September 2007 . . . [t]he Submitter responded: *I reckon you should be about four to five ticks higher*") (emphasis in original) *with* Rabobank DOJ SOF ¶ 26 (on September 26, 2007, a U.S. dollar trader asking a U.S. Dollar LIBOR submitter for a higher 3m for the next day, and on September 27, 2007, Rabobank's 3 month LIBOR was 5.24 "an increase of five basis points" whereas other panel banks' submission increased about three basis points on average).

- *Compare* Deutsche Bank NYS DFS Order ¶46 (Deutsche Bank's Head of the London Money Markets and Pool desk requested that and an ICAP broker agreed to try to facilitate a low 1 month U.S. Dollar LIBOR submission on September 16, 2008) *with* Barclays Cooperation Materials (in various pre-fixing telephone transcripts from September 16, 2008 Peter Johnson, Barclays U.S. Dollar LIBOR submitter, *inter alia* observed that Credit Suisse was "gonna go three percent from one month to one year", that he would attempt to mirror Credit Suisse's submission "cause [he] won't stand out", noted that Deutsche Bank was going to submit lower LIBORs than Credit Suisse, and discussed how Barclays could not receive market color from the "American bloke" sitting in for the RBS submitter and noted, "who can get sense out of a fat pig."

- Likewise, the Barclays Cooperation Materials highlight that on September 28, 2006, Merrill Lynch requested that Barclays submit a high 3 month LIBOR.  After hearing that the request would be granted, the Merrill Lynch trader noted, ""you are STARS.  Remind me to buy you all drinks."  To magnify, the impact of the manipulation, however, Barclays also approached a Citigroup trader about requesting a high submission.  The Citigroup trader agreed to speak with the LIBOR submitter.  On September 28, 2006, Barclays and Citigroup were in the top quartile of banks in the 3 month LIBOR panel and were "kicked out" up from the LIBOR fixing that day.

| | |
|---|---|
| | **M. The Regulatory Settlements and Disclosures Support Collusion during the Class Period.**<br>**3. The Barclays Cooperation Materials Provide Further Evidence of Cooperation Regarding Defendants'**<br>**Communications Relating to Coordinated LIBOR Submissions** |
| ¶361 | The Barclays Cooperation Materials provide further evidence of how Defendants frequently communicated with each other in order to coordinate LIBOR settings both directly in addition to through inter-dealer brokers such as ICAP and Tullett Prebon. *See* Section V.K, *supra*.  These communications generally highlight how Peter Johnson, Barclays U.S. Dollar LIBOR submitter, and his colleagues made and received requests to accommodate particular LIBOR settings but were also informed of how other panel banks sought to manipulate LIBOR and felt pressure to avoid being viewed as an outlier from the "pack".  Consider the following examples: |

- On September 3, 2007, Johnson learned the HBOS was "still setting [LIBOR] lower then he should do," but conceded that HBOS was relatively better behaved compared to other banks.  In particular, Johnson believed that the manipulative activities of Citibank, Deutsche Bank, Lloyds, and UBS, were particularly egregious and labeled these banks as "filth";

- On November 21, 2007, Johnson expressed his general frustration to another broker:  "My problem is, I know it's too low, but I don't know what this market's gonna do 'cause *it's so scared of sticking its head above the parapet and being the highest fixer*" in the course of learning that Deutsche Bank planned to submit an artificially low LIBOR. (emphasis added).

- On November 28, 2007, Johnson observed in an internal liquidity report, "Libors are not reflecting the trust cost of money. I am going to set 2 and 3 months today at 5.13 and 5.12 probably at the top of the range of rates set by libor contributors, although brokers tell me that RBS is going to set at 5.15 for both (up 8.5 and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.  *Not really sure why contributors are keeping them so low but it is not a good idea at the moment to be seen too far away from the pack*, although reality seems to be setting in for a few libor contributors who are belatedly moving libors up in line with where money is really trading.";

- On April 17, 2008, Barclays U.S. Dollar LIBOR submitter, Johnson, and a senior member of Barclays' Treasury group, Miles Storey ("Storey") discussed the continued artificial submissions of U.S. Dollar LIBOR and the need to avoid attention.  Storey cautioned, "*And we need to be careful about quote collusion unquote. . . . Um, and then there will be your amount of verbiage . . . . on the wires.*"  (emphasis added).

- On October 29, 2008, Johnson emailed senior Barclays executives, "Following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requests. . . . I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."

- On May 1, 2008, Johnson instructed to "[t]ell, ask Deutsche where he's going," before adding "Or, tell Deutsche where I'm going";

- On September 16, 2008, in the wake of the Lehman Brothers bankruptcy filing, Johnson instructed a broker, "Can you tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."; and

|   | • On November 13, 2008, an unidentified broker informed Jonathan Mathew, a Barclays derivatives trader, that his firm was "copyin' RBS", explaining to Mathew that the tip was "Just for your guide." |
|---|---|

| Trader-Based Allegations Involving the Barclays Defendants | | | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| 9/29/2005 | Barclays | High 3M | Kicked Up | ¶ 154 | Atlantic Trading |
| 11/14/2005 | Barclays | High 1M | Kicked Down | ¶ 166 | |
| 11/22/2005 | Barclays | High 3M – Low 1M | Kicked Up | ¶ 181 | Atlantic Trading |
| 11/23/2005 | Barclays | High 3M – Low 1M | Kicked Up | ¶ 181 | |
| 2/1/2006 | Barclays | Low 3M | Kicked Up | ¶ 182 | |
| 2/2/2006 | Barclays | Low 3M | Kicked Down | ¶ 182 | |
| 2/3/2006 | Barclays | Low 3M – High 1M | Kicked Down | ¶¶ 182-83 | |
| 2/7/2006 | Barclays | High 3M – High 1M | Kicked Up | ¶ 181 | |
| 2/8/2006 | Barclays | High 3M – High 1M | Kicked Up | ¶ 181 | |
| 2/15/2006 | Barclays | Low 3M | Kicked Down | ¶ 167 | |
| 2/22/2006 | Barclays | High 3M | Kicked Up | ¶ 168 | |
| 3/13/2006 | Barclays | Low 3M | Kicked Down | ¶¶ 156-57, 353 | |
| 3/16/2006 | Barclays | Low 3M - High 1M | Kicked Down | ¶ 169 | |
| 3/17/2006 | Barclays, RBC, RBC Capital | Low 3M - High 1M | Kicked Down | ¶ 279 | 303030 Trading, Atlantic Trading |
| 3/20/2006 | Barclays, Deutsche Bank | Ambiguous (Barclays) High 3M (Deutsche) | Kicked Down (Barclays) Kicked Up (Deutsche) | ¶¶ 170, 236 | |
| 3/27/2006 | Barclays | Low 3M – Low 1M | Kicked Down | ¶ 184 | |
| 4/7/2006 | Barclays | Low 3M – Low 1M | Kicked Down | ¶ 171 | 303030 Trading, Atlantic Trading |
| 5/31/2006 | Barclays | High 3M – High 1M | Kicked Up | ¶ 185 | |
| 9/14/2006 | Barclays, RBC, RBC Capital | Low 3M | Kicked Down (Barclays and RBC) | ¶¶ 186, 280 | |
| 9/15/2006 | Barclays, | Low 3M | Kicked Down | ¶¶ 186, 280 | |

| | Trader-Based Allegations Involving the Barclays Defendants | | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
| | RBC, RBC Capital | | (Barclays and RBC) | | |
| 9/18/2006 | Barclays, RBC | Low 3M | Kicked Down (Barclays and RBC) | ¶¶ 186, 280 | |
| 9/25/2006 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 267 | |
| 9/27/2006 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 268 | Atlantic Trading |
| 9/28/2006 | Barclays, Citibank, CGMI Merrill Lynch | High 3M | Kicked Up (Barclays and Citibank) | ¶¶ 269, 290 | Atlantic Trading |
| 10/26/2006 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶¶ 345, 354 | Atlantic Trading |
| 12/18/2006 | Barclays | Low 3M | Interquartile | ¶¶ 158, 173 | |
| 12/19/2006 | Barclays | Low 3M | Kicked Up | ¶ 173 | |
| 12/20/2006 | Barclays | Low 3M | Kicked Up | ¶ 173 | |
| 12/21/2006 | Barclays | Low 3M | Kicked Up | ¶ 173 | |
| 12/22/2006 | Barclays | Low 3M | Kicked Down | ¶ 173 | Atlantic Trading |
| 12/27/2006 | Barclays | Low 3M | Interquartile | ¶ 173 | Atlantic Trading |
| 12/28/2006 | Barclays | Low 3M | Kicked Down | ¶ 173 | |
| 12/29/2006 | Barclays, Deutsche Bank | Low 3M (Barclays), Low 1M (Deutsche) | Kicked Down (Barclays and Deutsche) | ¶ 173 | |
| 2/28/2007 | Barclays, Merrill Lynch, RBC, RBC Capital | High 3M | Kicked Up (Barclays), Interquartile (RBC) | ¶¶ 271-73, 281, 346 | Atlantic Trading |
| 3/1/2007 | Barclays, Merrill Lynch | High 3M | Kicked Up | ¶ 273 | Atlantic Trading |
| 3/6/2007 | Barclays | High 3M | Kicked Up | ¶ 187 | |
| 3/9/2007 | Barclays, | High | Kicked Up | ¶ 273 | |

| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|---|---|---|---|---|---|
| colspan=6 | **Trader-Based Allegations Involving the Barclays Defendants** |

| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|---|---|---|---|---|---|
|  | Merrill Lynch |  |  |  |  |
| 3/23/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 274 |  |
| 3/26/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 274 |  |
| 4/10/2007 | Barclays, Merrill Lynch | Low 3M | Kicked Down | ¶ 277 |  |
| 5/23/2007 | Barclays | Low 3M | Kicked Down | ¶ 188 |  |
| 5/24/2007 | Barclays | Low 3M | Kicked Down | ¶ 188 |  |
| 7/30/2007 | Barclays | High 3M | Kicked Up | ¶ 175 | Atlantic Trading |
| 8/6/2007 | Barclays | High 3M | Kicked Up | ¶ 176 | Atlantic Trading |
| 9/12/2007 | Barclays | High 3M | Kicked Up | ¶ 177 | Atlantic Trading |
| 9/17/2007 | Barclays, RBS, RBS Securities | Low (RBS), High (Barclays) | Kicked Down (RBS), Kicked Up (Barclays) | ¶ 286 |  |
| 9/26/2007 | Barclays | High 3M – High 1M | Kicked Up | ¶ 179 |  |
| 11/28/2007 | Barclays | High 3M | Kicked Up | ¶¶ 335, 341 |  |
| 11/29/2007 | Barclays | Ambiguous | Kicked Up | ¶¶ 336, 348 |  |
| 12/3/2007 | Barclays | Low 1M | Kicked Up | ¶¶ 331, 337 |  |
| 12/4/2007 | Barclays | Low 1M | Kicked Up | ¶¶ 331, 337 |  |
| 12/5/2007 | Barclays | Low 1M | Kicked Up | ¶¶ 331, 337 |  |
| 2/5/2008 | Barclays | Low 3M – Low 1M | Kicked Up | ¶ 180 |  |
| 5/16/2008 | Barclays, Citibank, CGMI | Low | Kicked Up (Barclays), Interquartile (Citibank) | ¶ 291 |  |
| 9/25/2008 | Barclays, RBC, RBC Capital | Low | Kicked Up (Barclays), Interquartile (RBC) | ¶ 282 |  |
| 11/27/2009 | Barclays, HSBC, | Low | Kicked Down (Barclays), | ¶¶ 16, 261, 326 | Various Plaintiffs traded during this |

| Trader-Based Allegations Involving the Barclays Defendants | | | | | |
|---|---|---|---|---|---|
| Date | Defendant(s) Involved | Direction of Manipulation | Effect on 3-Month LIBOR | Source | Plaintiff(s) Harmed |
|  | Lloyds, Tullett Prebon |  | Interquartile (HSBC), Interquartile (Lloyds) |  | period.  This allegation relates to an ongoing trader-based request for lower LIBOR settings around Nov. 27, 2009, and for example, Plaintiff Atlantic Trading held a "net" position on Dec. 1, 3 and 4, 2009, and was harmed by this manipulation.** |