PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K GARRISON (1946-1991)
RANDOLPH E PAUL (1946-1956)
SIMON H RIFKIND (1950-1995)
LOUIS S WEISS (1927-1950)
JOHN F WHARTON (1927-1977)

WRITER S DIRECT DIAL NUMBER

212-373-3460

WRITER S DIRECT FACSIMILE

212-492-0460

WRITER'S DIRECT E-MAIL ADDRESS

afinch@paulweiss.com

UNIT 3601 OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST SUITE 3100
PO BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W ABBOTT
EDWARD T ACKERMAN
JACOB A ADLERSTEIN
ALLAN J ARFFA
ROBERT A ATKINS
DAVID J BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
GEOFFREY R CHEPIGA
ELLEN N CHING
WILLIAM A CLAREMAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A FIELDSTON
ANDREW C FINCH
BRAD J FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
MANUEL S FREY
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
ROBERTO J GONZALEZ*
CATHERINE L GOODALL
ERIC GOODISON
CHARLES H GOOGE, JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
BRIAN S HERMANN
MICHELE HIRSHMAN
MICHAEL S HONG
DAVID S HUNTINGTON
AMRAN HUSSEIN
LORETTA A IPPOLITO
BRIAN M JANSON

JAREN JANGHORBANI
MEREDITH J KANE
ROBERTA A KAPLAN
BRAD S KARP
PATRICK N KARSNITZ
JOHN C KENNEDY
BRIAN KIM
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
GREGORY F LAUFER
DANIEL J LEFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JANE B O'BRIEN
ALEX YOUNG K OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
LORIN L REISNER
WALTER G RICCIARDI
WALTER RIEMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
JACQUELINE P RUBIN
RAPHAEL M RUSSO
ELIZABETH M SACKSTEDER
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
AUDRA J SOLOWAY
SCOTT M SONTAG
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
LAWRENCE G WEE
THEODORE V WELLS, JR
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JENNIFER H WU
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
TAURIE M ZEITZER
T ROBERT ZOCHOWSKI JR

*NOT ADMITTED TO THE NEW YORK BAR

January 28, 2016

**VIA ECF AND HAND DELIVERY**

The Honorable Naomi Reice Buchwald
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *In re LIBOR-Based Financial Instruments Antitrust Litigation*,
No. 11-cv-2613 (NRB), Master File No. 11-md-2262 (NRB)

Dear Judge Buchwald:

We represent Defendant Deutsche Bank AG ("DB") in the above-
captioned litigation, and write on behalf of DB and Defendants (and proposed new
defendants) The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU"), Citibank, N.A. and
Citigroup Inc. (together, "Citi"), Coöperatieve Rabobank U.A. (f/k/a/ Coöperatieve
Centrale Raiffeisen-Boerenleenbank B.A.) ("Rabobank"), Credit Suisse AG and Credit
Suisse Group AG ("Credit Suisse"), HSBC Holdings plc and HSBC Bank plc (together,
"HSBC"), ICAP plc and ICAP Europe Limited (together, "ICAP"), J.P. Morgan Chase &
Co. and J.P. Morgan Chase Bank, N.A. (together, "JPMorgan"), Lloyds Bank plc, Lloyds
Banking Group plc and HBOS PLC (together, "Lloyds"), Merrill Lynch International
("MLI"), The Norinchukin Bank, Portigon AG (formerly known as WestLB AG)
("Portigon"), the Royal Bank of Canada and RBC Capital Markets LLC (together,
"RBC"), The Royal Bank of Scotland Group plc ("RBS Group"), The Royal Bank of
Scotland plc ("RBS plc"), and RBS Securities Inc. ("RBSSI") (together, "RBS"), Tullett

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                                   2

Prebon plc ("Tullett"), UBS AG ("UBS"), Westdeutsche ImmobilienBank AG ("WestImmo"), and dismissed Defendant Société Générale ("SG") (collectively, "Opposing Defendants") in response to the Exchange-Based Plaintiffs' ("Plaintiffs") letter of January 5, 2015, ECF No. 1286 ("Pls.' Letter"), regarding their request for leave to file their Proposed Third Amended Complaint ("PTAC").

Plaintiffs' response confirms that the vast majority of the new claims set forth in the PTAC are deficient, either because the Court lacks personal jurisdiction over most of those claims, because they do not satisfy this Court's clear standards for pleading trader-based manipulation claims, or because those claims are time-barred.  Instead of explaining how the PTAC meets the Court's standards, Plaintiffs seek to relitigate this Court's prior rulings.  The Court should again reject Plaintiffs' arguments and, as requested in Opposing Defendants' letters,[1] deny Plaintiffs' request for leave to add the vast majority of the new claims.

## 1.    **Personal Jurisdiction**

In its prior rulings, this Court both made clear that the foreign Defendants are not "at home" (and therefore not subject to general jurisdiction) in New York, and articulated a clear standard for evaluating specific jurisdiction over trader-based manipulation claims:  There is specific jurisdiction only "where the LIBOR submission was determined or transmitted" and "in the location of the person who requested the submitter to engage in manipulation."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11-md-2262, 2015 WL 6243526, at *38 (S.D.N.Y. Oct. 20, 2015); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11-md-2262, 2015 WL 6696407, at *8 (S.D.N.Y. Nov. 3, 2015).  Plaintiffs now attempt to add numerous claims of trader-based manipulation based on communications between foreign traders and foreign submitters. *See* Opposing Defendants' December 15, 2015 markup of Appendix A, ECF No. 1259-1.  Under *LIBOR IV* and *LIBOR V*, there is no personal jurisdiction over these claims, and each of Plaintiffs' arguments to the contrary is without merit.[2]

---

[1]    ECF No. 1249 (MLI); ECF No. 1254 (ICAP); ECF No. 1255 (Tullett); ECF No. 1256 (HSBC); ECF No. 1258 (SG); ECF No. 1259 ("Dec. 15 Letter") (Citi, Rabobank, DB, Lloyds, RBC, and RBS); ECF No. 1265 (BTMU and The Norinchukin Bank).

[2]    To the extent Plaintiffs assert that the allegations added to the PTAC cure the jurisdictional deficiencies of the operative complaint for all claims against all Defendants and new, proposed defendants, such an assertion is without merit because the additional allegations fail to establish a *prima facie* case of personal jurisdiction under either the Court's "at home" test for general jurisdiction or its "minimum contacts" test for specific jurisdiction.  As an initial matter, much of this information was already considered.  For example, the PTAC adds additional allegations about Defendants' and new, proposed defendants' operations in the United States, including the number of their U.S.-based employees. *See, e.g.*, PTAC ¶¶ 41, 51, 54, 56.  Similar information was contained in the declarations Defendants submitted in connection with their motions to dismiss, ECF Nos. 977-1 through 977-4, and the Court found that this information did not establish personal jurisdiction. *LIBOR IV*, 2015 WL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                            3

    *First,* Plaintiffs attempt to recast their argument, rejected by the Court in *LIBOR IV*, 2015 WL 6243526, at \*26–27, that certain foreign bank Defendants' registration of branches with the New York State Department of Financial Services supports a finding of general jurisdiction. Pls.' Letter at 4, 5, 7, 8; *see also* PTAC ¶¶ 44, 46, 50, 54, 56, 70, 82, 84. Although Plaintiffs now argue that such registration constitutes consent to general jurisdiction in New York, the plain language of the relevant state statute is to the contrary. It expressly limits any consent based on appointment of the Superintendent of Banking as agent for service of process to a subset of specific jurisdiction—*i.e.*, only to "cause[s] of action *arising out of a transaction with [a defendant's] New York agency or agencies or branch or branches*." N.Y. Banking Law § 200(3) (emphasis added); *see, e.g., 7 W. 57th St. Realty Co.* v. *Citigroup, Inc.*, No. 13 Civ. 981, 2015 WL 1514539, at \*11 (S.D.N.Y. Mar. 31, 2015) (Gardephe, J.) ("The plain language of this provision [*i.e.*, § 200] limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction."); *Gliklad* v. *Bank Hapoalim B.M.*, No. 155195/2014, 2014 WL 3899209, at \*1 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 4, 2014) (same); *Varga* v. *Credit Suisse*, 5 N.Y.S.2d 655, 658 (Sup. Ct., N.Y. Cnty.) ("Clearly, the instant action [arising out of the bank's alleged conduct in Europe] does not come within the scope of that section" [*i.e.*, § 200(3)]), *aff'd*, 2 A.D.2d 596 (1st Dep't 1956).[3] Plaintiffs' claims simply do not arise out of any alleged "transaction with" any foreign bank Defendant's "New York agency or agencies or branch or branches," and Banking Law § 200(3) therefore provides no basis for jurisdiction in this case.[4]

---

6243526, at \*37–39. In any event, none of the additional allegations alters either the general jurisdiction or specific jurisdiction analysis. As to general jurisdiction, there are no additional allegations that any Defendant or new, proposed defendant was incorporated or had its principal place of business in New York and the additional allegations about Defendants' and new, proposed defendants' presence in the forum do not otherwise demonstrate any "exceptional case" where their forum contacts are "so substantial and of such a nature as to render the corporation at home in that State." *Id.* at \*25–26 (quoting *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 761 n.19 (2014)). As to specific jurisdiction, for the reasons explained herein, none of the allegations establishes the requisite causal link between Defendants' and new, proposed defendants' conduct in the forum and Plaintiffs' claims.

[3] This limitation is buttressed by the statute's historical evolution. The 1938 version of Banking Law § 200(3) provided *unlimited* consent for service of process in "any action or proceeding" brought by a resident of New York. N.Y. Banking Law § 200(3) (1938). The scope of the consent was limited in 1951, when the Legislature amended that service of process provision to limit it to "cause[s] of action arising out of a transaction with its New York agency or agencies." N.Y. Banking Law § 200(3) (1951).

[4] The cases Plaintiffs cite do not support the application of jurisdiction here. Pls. Letter at 4 n.9. *Beach* v. *Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014), addressed in *dicta* registration under a different statute—the New York Business Corporation Law, which does not limit consent to claims "arising out of" a transaction with the New York agency or branch—and predates *Gucci America, Inc.* v. *Li*, 768 F.3d 122 (2d Cir. 2014). Post-*Gucci* case law (cited *infra*) makes clear that registration does not constitute such consent. The two cases Plaintiffs cite involving post-judgment information subpoenas served on the New York branches of non-party foreign banks are equally inapposite. In *Vera* v. *Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015), and *B&M Kingstone, LLC* v. *Mega International Commercial Bank Co.*, 131 A.D.3d 259 (1st Dep't 2015), the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                                    4

Moreover, accepting Plaintiffs' countertextual reading of § 200 violates the foreign bank Defendants' due process rights, as recognized in the Second Circuit's decision in *Gucci America, Inc.* v. *Li*, 768 F.3d 122 (2d Cir. 2014), which held that a foreign bank is not subject to general jurisdiction due to the presence of a local branch of the foreign bank in the forum. *Id.* at 135. If obtaining a license to operate a bank branch under § 200 were tantamount to consent to general jurisdiction, then all foreign banks with New York branches would *always* be subject to general jurisdiction in New York. That outcome is contrary to *Gucci. See Motorola Credit Corp.* v. *Uzan*, No. 02 Civ. 666, 2015 WL 5613077, at *2 (S.D.N.Y. Sept. 9, 2015) (Rakoff, J.) ("*Gucci* stands for the proposition that mere operation of a branch office in a forum—and satisfaction of any attendant licensing requirements—is not constitutionally sufficient to establish general jurisdiction."). In addition, adopting Plaintiffs' interpretation of § 200(3) would violate the unconstitutional conditions doctrine by requiring defendants to surrender their constitutional rights (*i.e.*, the due process rights guaranteed under *Daimler* and *Gucci*) in order to receive a government benefit (*i.e.*, the privilege of registering a bank branch in New York). *See Koontz* v. *St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013). Accordingly, even if Plaintiffs' construction of § 200(3) were a "reasonable" one, which it is not, it should be rejected in order to "avoid[] the constitutional issue." *Legal Servs. Corp.* v. *Velazquez*, 531 U.S. 533, 545 (2001); *see also Courtesy Sandwich Shop, Inc.* v. *Port of N.Y. Auth.*, 190 N.E.2d 402, 405 (N.Y. 1963) ("[W]here there are two possible interpretations [of a New York statute] the court will accept that which avoids constitutional doubts."); *cf. Bensmiller* v. *E.I. DuPont de Nemours & Co.*, 47 F.3d 79, 84 (2d Cir. 1995) (construing Connecticut long-arm statute narrowly because, *inter alia*, "the construction asserted by plaintiffs . . . arguably offends the Due Process Clause of the Fourteenth Amendment").

*Second*, Plaintiffs claim that the "at home" and "minimum contacts" tests for general and specific jurisdiction, respectively, have no application to CEA claims. Pls.' Letter at 2. In *LIBOR IV*, however, this Court expressly held that the minimum contacts requirement is part of the specific jurisdiction analysis under the CEA, the only difference being that the contacts may be with the United States as a whole as opposed to a single state. 2014 WL 6243526, at *23; *see also LIBOR V*, 2015 WL 6696407, at *19 & n.27.[5] Similarly, the Court, in assessing general jurisdiction, has applied the "at home"

---

courts required non-party foreign banks' New York branches to comply with such subpoenas but neither court analyzed the wording of § 200(3) or applied (or had any occasion to apply) it to an action against a foreign bank. *See Vera*, 91 F. Supp. 3d at 570, 573; *B&M Kingstone*, 131 A.D.3d at 264–65. *Vera* and *B&M Kingstone* did not hold, as Plaintiffs ask this Court to do—contrary to the express wording of § 200(3)—that registering a New York branch constitutes consent to be sued on any claims, no matter where in the world they arose. *See First Am. Corp.* v. *Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) ("[A] person who is subjected to *liability* by service of process far from home may have better cause to complain of an outrage to fair play than one similarly situated who is merely called upon to supply documents or testimony.").

[5]     As explained in their motion-to-dismiss briefing, Opposing Defendants favor a state-contacts analysis but recognize that the Court accepted the national-contacts standard. It was Plaintiffs who argued for a

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                             5

test to all state and federal claims, including CEA claims. *See LIBOR IV*, 2015 WL 6243526, at *25–26.

    *Third*, Plaintiffs suggest that there is no need for *any* causal relationship between a defendant's forum contacts and a plaintiff's injuries to establish personal jurisdiction. Pls.' Letter at 2. Not so. This Court has warned against "'[c]onfus[ing] or blend[ing] general and specific jurisdiction inquiries,' by allowing a defendant's non-suit-related conduct to substitute, for personal jurisdiction purposes, for suit-related conduct." *LIBOR IV*, 2015 WL 6243526, at *28 (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 131 S. Ct. 2846, 2851 (2011)). Specific jurisdiction only exists "in a given forum on the basis of the in-forum effects of allegedly wrongful out-of-forum conduct where the defendant purposefully directed its conduct into that forum." *LIBOR V*, 2015 WL 6696407, at *19. The new allegations do not change the analysis. Plaintiffs must still satisfy "but for" causation. *LIBOR IV*, 2015 WL 6243526, at *28 (citing *Chew* v. *Dietrich*, 143 F.3d 24 (2d Cir. 1998)).[6] Plaintiffs also attempt to assert jurisdiction on the ground that the relevant instruments were domestically traded, Pls.' Letter at 2, but *LIBOR V* rejected Plaintiffs' argument for personal jurisdiction grounded in "a foreseeable effect on Eurodollar futures contract prices." *LIBOR V*, 2015 WL 6696407, at *19.

    *Fourth*, Plaintiffs suggest that establishing jurisdiction over one alleged instance of trader-based manipulation on a single date establishes jurisdiction over all trader-based misconduct, including purely foreign conduct, alleged against a defendant. *See* Pls.' Letter at 3. This argument is contrary to *LIBOR IV*, which held that a panel bank that cooperated with a request made by a trader in New York would be subject to personal jurisdiction in New York only "in connection with a claim arising out of *that request*." 2015 WL 6243526, at *32 (emphasis added). More generally, Plaintiffs' argument is contrary to the Court's overarching approach to claims of trader-based manipulation: As the Court has repeatedly explained, the sporadic and directionally inconsistent nature of the alleged trader-based manipulation means that each alleged incident gives rise to a separate alleged injury and is effectively a separate claim that must rise and fall on its own merits. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 620–23 (S.D.N.Y. 2013); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 464 (S.D.N.Y. 2014). Plaintiffs must therefore identify a New York connection establishing jurisdiction over

---

national-contacts standard in their brief. Exchange-Based Pls.' Mem. of Law in Opp. to Defs.' Motion to Dismiss the Putative Class Actions for Lack of Personal Jurisdiction, ECF No. 1111, at 8–10.

[6] Plaintiffs argue that no causal relationship is needed between Defendants' forum contacts and Plaintiffs' injuries. Pls.' Letter at 2. However, none of their cited cases stands for the proposition that where there is no "but for" connection between a defendant's forum-directed activities and plaintiffs' claims, defendant's non-suit-related, in-forum contacts alone are sufficient to satisfy the minimum contacts analysis. Indeed, the portion of the District Court's decision in *Gucci America* v. *Li*, No. 10 Civ. 4974, 2015 WL 5707135 (S.D.N.Y. Sept. 29, 2015), *appeal docketed,* No. 15-3850 (2d Cir. Dec. 1, 2015), cited by Plaintiffs addresses personal jurisdiction under the New York long-arm statute; the case expressly applies "but for" causation when addressing due process. *Id.* at *9.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                             6

each trader-based claim they seek to bring. *See Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).

      *Finally*, Plaintiffs claim they are entitled to jurisdictional discovery. Pls.' Letter at 2. Plaintiffs previously requested discovery in opposition to Defendants' motion to dismiss, ECF No. 1111, at 24–25, and the request was denied in *LIBOR V*.[7] Nothing in the PTAC requires this Court to revisit that decision. Courts routinely, and properly, exercise their sound discretion to deny requests for jurisdictional discovery where Plaintiffs fail to establish a *prima facie* case for personal jurisdiction. *See Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 255 (2d Cir. 2007) ("We conclude that the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction."); *Piraeus Bank S.A.* v. *Bank of New York Co.*, No. 02 Civ. 1285, 2002 WL 31106344, at *2 (S.D.N.Y. Sept. 19, 2002) (Buchwald, J.) (rejecting request for jurisdictional discovery because of plaintiff's failure to make a *prima facie* showing of jurisdiction). Plaintiffs have added no allegations to the PTAC that remedy their pleading deficiencies or constitute a threshold showing of jurisdiction over Defendants that would entitle them to discovery.

## 2.   **Net Injury / Harm**

      Plaintiffs' new trader-based manipulation claims largely fail to satisfy pleading standards set by this Court years ago in considering claims by the same Plaintiffs. In August 2013, in *LIBOR II*, this Court held that Plaintiffs must adequately plead injury suffered by named plaintiffs, not merely allege generalized harm to absent putative class members. *See* 962 F. Supp. 2d at 621. Over a year and a half ago, in *LIBOR III*, the Court helpfully provided Plaintiffs with a chart modeling the minimum level of particularity required. *See* 27 F. Supp. 3d at 464–65 ("[T]he addition of claims for trader-based manipulation that are as particular as the ones enumerated in the chart above would not be futile."); *see also LIBOR II*, 962 F. Supp. 2d at 621 (citing lack of "references to particular Eurodollar contracts"). The Court's chart, unlike the chart provided by Plaintiffs as Appendix A to their PTAC, specified whether a named plaintiff was a net buyer or seller of an instrument in the relevant tenor on each alleged date of trader-based manipulation. *LIBOR III*, 27 F. Supp. 3d at 464.

      Despite having ample time to consider and respond to Opposing Defendants' specific objections, Plaintiffs have not met (and cannot meet) the Court's pleading standards for their new claims. The information contained in the "Plaintiff Position" column of the Court's *LIBOR III* chart, *see id.*, is entirely absent from Plaintiffs' originally proposed amendments and their most recent response. Once again, Plaintiffs attempt to circumvent the Court's prior rulings, arguing they need not allege "net" position and that they can rely on alleged generalized injury to absent putative class members. Pls.' Letter at 3. In their latest markup of the chart, Plaintiffs rely on

---

[7]    Separately, on December 23, 2015, this Court rejected a similar request for jurisdictional discovery made by Direct Action Plaintiffs. Order, Dec. 23, 2015, ECF No. 1267.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                    7

conclusory allegations either that a particular plaintiff held a net position and was harmed
(without specifying whether the plaintiff was a net buyer or seller, as required by *LIBOR
III*), or that an unidentified putative class member was harmed. *See* App'x A, *passim.*[8]
As explained above, the Court has repeatedly rejected the sufficiency of such allegations
and should do so again.[9]

      Plaintiffs also do not adequately address Opposing Defendants' other
arguments regarding injury.  With respect to certain claims, Plaintiffs allege misconduct
that could not have affected the published rate, because the relevant submission was
excluded in the upper or lower quartile, opposite the direction of the alleged request.
*LIBOR IV*, 2015 WL 6243526, at *40 n.73.[10]  In addition, as Opposing Defendants
identified in our markup of Appendix A, Plaintiffs seek to add claims based on conduct
on dates on which a defendant's submission was identical to the submissions of so many
other panel banks that the alleged manipulation could not, mathematically, have impacted
the published rate, even if Plaintiffs' description of the "Effect on 3-Month LIBOR" is
technically accurate. *E.g.*, App'x A at 12–13.  Plaintiffs provide no meaningful response
to these objections other than to accuse Defendants of "ignor[ing]" that LIBOR was
calculated as a 'trimmed' arithmetic mean." *E.g.*, *id.*

      Plaintiffs also do not provide an adequate basis to assert claims based on
alleged requests for submissions in tenors other than 3-month USD LIBOR because they
allege an effect only on that one tenor.  Plaintiffs assert that there is a "correlation"
between different tenors such that any request would affect 3-month USD LIBOR, *e.g.*,
App'x A at 2, but the assertion, if true, that the published rates in different tenors
naturally move together due to market forces does not make it plausible that a request for
an *artificial submission* in one tenor would impact another tenor.  Plaintiffs also mention
"other exchange-based products" in those other tenors, *e.g.*, *id.*, but never allege that any
named plaintiff actually traded those products.[11]

### 3.    <u>Allegations That Concededly Fail Under Prior Rulings</u>

      Plaintiffs also now acknowledge that they include certain claims in the
PTAC either for purposes of appeal[12] or merely to "highlight" some aspect of their

---

[8]    Unless otherwise specified, all citations to Appendix A are to the version submitted by Plaintiffs on
January 5, 2016, ECF No. 1286-1.

[9]    *Cf. LIBOR V*, 2015 WL 6696407, at *22–24 (granting dismissal where plaintiff generally alleging
injury arising from interest rate swaps "was never exposed to fluctuations in LIBOR").

[10]    In at least two instances, Plaintiffs now assert that a Defendant's submission was "interquartile" within
the panel, but they initially alleged that the submission was "kicked up." App'x A at 21–22, 31.
Plaintiffs do not offer any explanation for these inconsistent factual allegations.

[11]    Indeed, Plaintiffs' response does not identify a single named plaintiff that actually held a product
related to a tenor other than 3-month USD LIBOR on the dates specified.

[12]    This affects the following dates in Appendix A:  8/16/2006, 9/21/2006, 10/16/2006, 8/12/2007,
8/13/2007, 8/14/2007, 9/10/2007, 9/12/2007, 9/17/2007, 9/19/2007, 9/26/2007, 9/27/2007, 10/4/2007,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                                         8

allegations against a particular defendant.[13]  *See* App'x A; Exchange-Based Plaintiffs'
January 19, 2016 Letter ("Jan. 19 Letter"), Ex. 2-B, App'x A, ECF No. 1301-3
(highlighting in blue some, but not all, of the dates that Plaintiffs concede remain only for
purposes of appeal).  By admitting that the claims on these dates merely support general
allegations of misconduct (rather than alleging a specific date on which a named plaintiff
was harmed) or reiterate claims already dismissed by the Court, Plaintiffs concede that
they cannot bring claims for conduct on those dates that comply with the Court's prior
rulings, and hence these amendments should be denied.  Further, it is unnecessary to
replead previously dismissed claims to preserve them for appeal, and leave to amend
should not be given with respect to those claims to the extent they appear either in
Appendix A or the PTAC itself.  *See, e.g.*, *P. Stolz Family P'ship L.P.* v. *Daum*, 355 F.3d
92, 96 (2d Cir. 2004) ("We will not require a party, in an amended complaint, to replead
a dismissed claim in order to preserve the right to appeal the dismissal when the court has
not granted leave to amend [the dismissed claim]."); *In re Alstom SA Sec. Litig.*, 454 F.
Supp. 2d 187, 216–17 (S.D.N.Y. 2006) (striking previously dismissed claims); *Laydon* v.
*Mizuho Bank, Ltd.*, No. 12-cv-03419-GBD-HBP, ECF. No. 558 (S.D.N.Y. Jan. 8, 2016)
(striking amended complaint because, among other defects, it included claims and
allegations that the court had previously dismissed).[14]

### 4.    Defendant-Specific Arguments[15]

#### (a)    Citi

Plaintiffs still fail to allege harm caused by Citi.  Plaintiffs make no new
factual allegations supporting a plausible inference of USD LIBOR wrongdoing by Citi,
and Plaintiffs include misleading references to conduct related to other benchmarks.

---

10/17/2007, 10/18/2007, 10/19/2007, 11/15/2007, 11/28/2007, 11/29/2007, 12/3/2007, 12/4/2007,
12/13/2007, 12/14/2007, 12/17/2007, 1/17/2008, 1/18/2008, 2/5/2008, 2/27/2008, 3/13/2008,
3/17/2008, 5/15/2008, 5/16/2008, 8/13/2008, 9/16/2008, 9/25/2008, 9/26/2008, 3/24/2009, and
5/11/2009.

[13]    This affects the following dates in Appendix A:  2/21/2005, 3/22/2005, 10/2/2006, 6/20/2007,
9/27/2007, and 5/20/2009.

[14]    The Second Circuit expressed no view on "the appropriate standard for cases where the district court
has granted leave to amend *a dismissed claim*," a circumstance that is not present here.  *P. Stolz*, 355
F.3d at 96 n.2 (emphasis added).  *Laurent* v. *PricewaterhouseCoopers LLC*, No. 06 Civ. 2280
(JPO)(KNF), 2012 WL 3614043, at *2 n.1 (S.D.N.Y. Aug 15, 2012), cited by Plaintiffs, misreads (or
misapplies) this language.  *See id.* at *2 n.1.  The *Laurent* plaintiffs were granted leave to add two *new
counts*, *see id.*, at *1, no amendment was sought or permitted with regard to the dismissed claim, and
the court therefore erred when it allowed plaintiffs to reassert that claim for appeal preservation.

[15]    As for BTMU and The Norinchukin Bank, Plaintiffs' only new allegations, *see* Jan. 19 Letter, Ex. 1,
ECF No. 1301-1, at 2, 70–71, concern general contacts with the United States and registration to do
business in New York, which, as addressed above, are insufficient for general or specific personal
jurisdiction.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                                    9

*First*, Plaintiffs cite two chats from the Barclays settlement materials that neither involve Citi nor demonstrate that Citi engaged in any wrongdoing. *See* Jan. 19 Letter, Ex. 1, ECF No. 1301-1, at 4–5. The chats involve two brokers discussing their opinion of Citi and that one of the brokers will take into consideration Citi's LIBOR submission. While Johnson and the other brokers provide their opinion on Citi's submissions, these communications contain no evidence of wrongdoing by Citi. Nor do Plaintiffs allege that Citi was involved in these communications or that Citi altered its submissions as a result of these communications.

*Second*, Plaintiffs cite a general statement from the New York Department of Financial Services Order ("DB DFS Order") associated with its settlement with Deutsche Bank to the effect that Deutsche Bank communicated and coordinated submissions with other banks, including Citi, in an effort to manipulate rates. *See* App'x A at 4. However, the only specific reference to Citi conduct in the DFS Order relates exclusively to Euribor. DB DFS Order ¶¶ 31–32. This allegation should be rejected because conduct relating to a different benchmark does not "suffice[] to overcome deficiencies in the pleading of actionable bad behavior in USD LIBOR." *LIBOR IV*, 2015 WL 6243526, at *45.

*Finally*, Plaintiffs restate the same allegations concerning the September 28, 2006 and May 16, 2008 communications between Rajesh Ghude and Barclays trader Don Lee that Citi addressed in Opposing Defendants' December 15, 2015 letter. Notably, however, Plaintiffs have not responded to Citi's argument in that letter as to why neither communication provides plausible evidence of LIBOR manipulation by Citi. As previously explained, *see* Dec. 15 Letter, ECF No. 1259, at 2, the 2006 communication involved a Citi employee who stated during the same conversation that he had "no clue" who made Citi's USD LIBOR submissions, and the 2008 communication occurred on a date when no plaintiff could have been harmed, and which is covered by the Court's prior limitations dismissal ruling. These allegations—based on only two inadequate and isolated communications across an eight-year proposed class period—plainly do not support an inference of culpable conduct by Citi that would provide grounds for new trader manipulation claims.

### (b)   Rabobank

Plaintiffs incorrectly assert that "Rabobank concedes the Court's jurisdiction over Plaintiffs' trader-based claims." Pls.' Letter at 4. In *LIBOR III*, this Court denied Plaintiffs leave to assert trader conduct claims against Rabobank with respect to 14 of the 18 dates in relation to which Plaintiffs seek to assert such claims in the PTAC.[16] Although Rabobank does not contest personal jurisdiction with respect to

---

[16]   *Compare* PTAC at App'x A (alleging trader conduct claims against Rabobank corresponding to 18 dates), *with* Exchange-Based Pls.' Supp. Mem. of Law Regarding Rabobank and in Further Support of Their Mot. for Recons. of the Court's Aug. 23, 2013 Mem. and Order, ECF. No. 523, at 3 (seeking to allege trader conduct claims with respect to same 18 dates); *and LIBOR III*, 27 F. Supp. 3d at 464 n.9

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                              10

the trader conduct claims the Court has authorized Plaintiffs to assert—claims related to alleged conduct on June 30, August 17, September 1, and November 29, 2006— Rabobank does ***not*** concede that the Court has personal jurisdiction over ***all*** trader conduct claims Plaintiffs assert (or may assert in the future).  As set forth above, this Court has upheld personal jurisdiction over trader conduct claims against a defendant only in a forum from which: (i) the defendant determined or transmitted a false LIBOR submission; or (ii) the defendant's trader allegedly requested an artificial submission to benefit a trading position.  *See supra* p. 2.  Undisputed declarations filed in this action— and the regulatory settlements that Plaintiffs incorporate into the PTAC—make clear that Rabobank determined and made its USD LIBOR submissions from Europe.[17] Accordingly, this Court—consistent with its prior rulings—has personal jurisdiction over trader conduct claims against Rabobank only where an employee made a request for a false USD LIBOR submission from the U.S.  To the extent Plaintiffs seek to assert additional trader conduct claims against Rabobank—beyond those previously authorized by the Court—Rabobank reserves its right to seek dismissal of those claims on all applicable grounds, including lack of personal jurisdiction.[18]

### (c)    Credit Suisse

In the PTAC, Plaintiffs seek to add Credit Suisse AG ("CSAG") as a named defendant and include various additional allegations about Credit Suisse Group AG's ("CSGAG") and CSAG's operations in New York and California.  These amendments are futile because *LIBOR V* dismissed CSGAG on personal jurisdiction grounds and, for the reasons stated herein, *see supra* pp. 2–6, none of the additional allegations establish personal jurisdiction over either CSGAG or CSAG.  The PTAC does not allege any trader-based conduct by CSGAG or CSAG.

---

[17]   (authorizing trader conduct claims against Rabobank corresponding to only four of the 18 dates: June 30, August 17, September 1 and November 29, 2006).

[17]   *See* Decl. of Andrew Sherman, ECF. No. 764, ¶ 10 ("Rabobank employees responsible for U.S. Dollar LIBOR submissions to the British Bankers' Association in the United Kingdom were located in London until December 2008, and in Utrecht starting in January 2009."); *see also* Rabobank DOJ Statement of Facts ¶ 14 ("Employees on Rabobank's money markets desks in London and Utrecht have been responsible for contributing Rabobank's LIBOR . . . submissions ('submitters'). Rabobank's Dollar LIBOR . . . submissions were made by submitters in London until December 2008, and by submitters in Utrecht starting in January 2009 . . . .").

[18]   Although Plaintiffs assert in the PTAC trader conduct claims in relation to the 14 dates this Court has already rejected purportedly "to preserve them for appeal" (Pls.' Letter at 4 n.8), the Second Circuit has expressly considered and rejected the assertion that a plaintiff must re-plead a dismissed claim in an amended complaint to preserve its rights to appeal. *See supra* pp. 7–8 and note 14. Plaintiffs should be denied leave to add claims against Rabobank in relation to these dates and they should be stricken from the Appendix A.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                              11

#### (d)   Deutsche Bank

Plaintiffs argue, both in their letter and throughout Appendix A, that DB engaged in "routine," "pervasive," and "systemic" conduct sufficient to establish personal jurisdiction, citing portions of the PTAC that rely on statements made in DB's CFTC settlement. Pls.' Letter at 5 (citing PTAC ¶¶ 71, 225(d), 229 (citing Order, *Deutsche Bank AG*, No. 15-20 (C.F.T.C. Apr. 23, 2015) ("DB CFTC Order"), at 2–3)). However, none of the statements in the regulatory settlements on which Plaintiffs rely specifically concern DB's conduct *in New York*. The DB CFTC Order, in discussing USD LIBOR, states in no uncertain terms that DB's "misconduct originated primarily out of Deutsche Bank's London Offices, and *at times*, its New York and Frankfurt offices." DB CFTC Order at 10 (emphasis added). Moreover, for reasons discussed above, Plaintiffs may not establish jurisdiction over trader requests made entirely outside of New York by pointing to instances of completely separate requests made from inside New York.[19] Rather, it remains Plaintiffs' burden to plead injury as the result of New York–based requests; for the reasons set forth in Opposing Defendants' markup of Appendix A, Plaintiffs have not met their burden.

Plaintiffs' attempt to add claims against DB's affiliates also fails. Plaintiffs' allegations against DBGS are insufficient for the same reasons as its allegations against DB. The trader-based claims are inadequate for the reasons explained above and in our December 15 letter, and there is no jurisdiction over DBGS for any reputation-based suppression of DB's LIBOR submissions (and in fact, DBGS's plea agreement does not refer to any reputation-based suppression of DB's LIBOR submissions). As for DBSI, Plaintiffs' only allegation against it is that "Deutsche Bank and DBSI share certain employees and executives." PTAC ¶ 72. The PTAC does not identify these "employees and executives," much less specify how they are connected to Plaintiffs' substantive allegations. An allegation that DB and DBSI share certain unnamed employees and executives is plainly insufficient either to "link[] [DBSI] to the alleged U.S. Dollar LIBOR manipulation" or to establish that DBSI "should have known that but for a mistake, [it] would have been named as [a] defendant[]." Pls.' Letter at 4.

Finally, Plaintiffs' response to DB's argument regarding the February 28, 2007 communication is unavailing. As alleged in the PTAC, the request in that communication was for a submission "TOMORROW," *i.e.*, on March 1, 2007. *See* PTAC ¶ 236; App'x A at 22–23. Plaintiffs offer no plausible explanation for how a request concerning DB's March 1, 2007 submission could have impacted DB's February

---

[19]   Nor should the Deutsche Bank regulatory settlements alter the Court's prior conclusion that "we cannot say that the alleged trader-based manipulation was so consistent that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period." *LIBOR II*, 962 F. Supp. 2d at 623. To the extent that there was a period in which DB's USD LIBOR submitters (in London) regularly altered submissions to benefit DB's position, *see* PTAC ¶¶ 226–227 (citing DB CFTC Order at 9), there is no alleged nexus between this conduct and New York.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                    12

28, 2007 submission.[20]  Instead, they merely add Deutsche Bank as one of the
"Defendant(s) Involved" on the March 1, 2007 entry in their chart. App'x A at 23.  But
Plaintiffs have not adequately alleged injury on that date. While the Court in *LIBOR III*
held that Plaintiffs had sufficiently pleaded their position as a net seller on February 28,
2007, *see* 27 F. Supp. 3d at 464, Plaintiffs have not stated whether the named plaintiff
was a net buyer or seller on March 1, 2007.

### (e)   HSBC

HSBC Holdings plc and HSBC Bank plc are among the defendants that
were dismissed in *LIBOR V* for lack of personal jurisdiction.  In their January 4 letter,
Plaintiffs seem to advance a new theory of personal jurisdiction over one, or perhaps
both, of the HSBC defendants based on vague assertions of trader-based manipulation in
"HSBC's New York office." Pls.' Letter at 7.  Plaintiffs ignore, of course, the
uncontroverted fact that neither HSBC Holdings plc nor HSBC Bank plc has any offices
or employees in New York. *See* ECF No. 977-3 [Ex. 10, at 5], ¶ 5; *id.* [Ex. 12, at 12],
¶ 5.  Instead, their PTAC merely adds allegations that these foreign HSBC entities have
affiliates with offices in New York, PTAC ¶¶ 51–52, but it contains absolutely no
allegations that any of such affiliates were involved in any acts of trader manipulation.

Plaintiffs make the similarly astounding assertion that the PTAC "contains
numerous allegations concerning HSBC Bank plc's and HSBC Holdings plc's knowing
participation" in trader manipulation. Pls.' Letter at 7.  But, again, this statement is
untethered to anything actually alleged in the PTAC, which merely asserts that someone
at another bank learned from a broker what HSBC's submission would be (or what the
broker ***thought*** it would be) on a handful of scattered days. *See id.* at 7 n.11 ("a Barclays
trader was informed that HSBC planned to submit a low LIBOR"; "a Barclays trader
commented on his advance knowledge of HSBC's LIBOR submission"; "a Barclays
trader spoke to brokers to obtain HSBC's planned LIBOR submission and then passed
HSBC's planned LIBOR submission to another trader at Barclays"; "a Barclays trader
commented on HSBC's recent LIBOR submissions"; "a broker informed a Barclays
trader that HSBC did not plan to change its LIBOR submission from the prior day").
Even with the benefit of Plaintiffs' spin, these allegations do nothing to demonstrate
either HSBC entity's "knowing participation in a conspiracy," as this Court has already
held. *See LIBOR IV*, 2015 WL 6243526, at *43.  They certainly do not indicate that there
were any HSBC employees in New York participating in any trader manipulation.

Finally, with regard to Plaintiffs' failure to plead injury attributable to any
conduct by either of the HSBC defendants, Plaintiffs argue that they need "not purchase

---

[20]   Plaintiffs assert that the requester's statement, "WE ALWAYS NEED HIGHER LIBORS," suggests
an "ongoing request for a preferential LIBOR setting." App'x A at 22.  This assertion is fanciful.  In
the context of the communication, it is clear that this statement was an attempt to persuade the
submitter, who initially indicated he would not make the requested submission, to accede to the
request. *See* PTAC ¶ 236 (2007-02-28 communication).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                              13

on every single day of manipulation" as long as "at least one proposed class representative suffered harm from the manipulative scheme by each of the Defendants[.]" Pls.' Letter at 3. First, Defendants made no such argument that Plaintiffs must have traded on every single day of purported manipulation in order to state a claim. But even under their own formulation of the pleading standard, Plaintiffs still fall far short with respect to the HSBC defendants. Although the PTAC suggests that "HSBC" was involved in manipulation on a single day in November 2009, App'x A at 45, it does not identify any specific plaintiff or trade impacted by the purported conduct. Indeed, Plaintiffs acknowledge this fact in their letter. In a footnote, Plaintiffs purport to identify which specific Plaintiff was allegedly harmed by which specific Defendant(s). Pls.' Letter at 3 n.7. Conspicuously absent from that footnote is any reference to any HSBC entity. Plaintiffs' characterization of their PTAC once again bears little to no resemblance to what is actually alleged with respect to the HSBC Holdings plc and HSBC Bank plc.

### (f)    ICAP

Plaintiffs' January 5 letter and accompanying Appendix A confirm that the PTAC lacks *any* specific allegations of ICAP's involvement in USD LIBOR manipulation. Indeed, although Plaintiffs point to several paragraphs of allegations concerning ICAP in the PTAC, none of those paragraphs implicate ICAP in manipulative conduct. Plaintiffs' only allegation purportedly implicating ICAP in USD LIBOR manipulation is an ambiguous and wholly inconclusive conversation with a Deutsche Bank trader on September 16, 2008, which Plaintiffs *now* concede they did not intend to assert "as a live claim but rather . . . for purposes of appeal." *See* App'x A at 40. Thus, even this single, ambiguous alleged conversation is not offered to the Court as a basis for asserting liability against ICAP. Moreover, and just as dispositive, the proposed PTAC fails to allege with specificity that one or more of the Plaintiffs suffered injury as a result of the purported September 16, 2008 conversation. *See LIBOR II*, 962 F. Supp. 2d at 620–21 ("[P]laintiffs do not include any allegations that make plausible (1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, or (2) that their positions were such that they were injured."). As noted in ICAP's December 11, 2015 letter to the Court, ECF No. 1254, the PTAC's remaining allegations against ICAP relate solely to Yen LIBOR and are inapplicable to this litigation.

Not only is there no allegation of ICAP's involvement in USD LIBOR manipulation, but Plaintiffs also fail to allege any facts supporting personal jurisdiction over ICAP. In their January 5 letter, Plaintiffs fall back on the broad assertion that "ICAP ha[s] substantial operations in the United States." *See* Pls.' Letter at 8. But even if this incorrect assertion is deemed to be true for pleading purposes, divorced as it is from any specific allegations of U.S.-based activity relating to USD LIBOR manipulation, it falls far short of demonstrating the necessary "'but for' connection between [ICAP's] forum-directed activities and the claim." *LIBOR IV*, 2015 WL 6243526, at *28.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                          14

### (g)   JPMorgan

Plaintiffs' proposed amendments add nothing concerning JPMorgan. Plaintiffs identify as purportedly related to JPMorgan a single internal Barclays communication. *See* Jan. 19 Letter, Ex. 1, ECF No. 1301-1, at 56 (citing PTAC ¶ 324). This communication is cited under a heading claiming that "Barclays and Other Defendants Repeatedly Discussed the Artificial Suppression of LIBOR Submissions." PTAC § V.K.2. But the cited communication is between Barclays employees exclusively and describes Barclays' LIBOR submissions. It does not mention JPMorgan or suggest that anyone at JPMorgan was discussing artificial LIBOR submissions with anyone at Barclays. Instead, Plaintiffs merely note that on the same day as the communication (October 29, 2008), JPMorgan had the lowest 3-month U.S. Dollar LIBOR submission, but offer nothing to support their bare allegation that JPMorgan discussed artificial LIBOR submissions with Barclays.

### (h)   Lloyds

Plaintiffs add allegations regarding Lloyds' supposed contacts with the U.S., *see* PTAC ¶¶ 53–54, 208–217, but for the reasons explained above, additional allegations regarding Lloyds' U.S. footprint (including the operation of New York branches of Lloyds Bank plc and Bank of Scotland plc, registered as branches of foreign banking corporations with the New York State Department of Financial Services)[21] do nothing to alter the general jurisdictional analysis. The fact remains that no Lloyds defendant is "at home" here, and Plaintiffs' claims against Lloyds have nothing to do with those New York branches. The proposed amendments are also devoid of allegations supporting specific jurisdiction over the Lloyds defendants because (1) Plaintiffs do not and cannot allege that any Lloyds defendant (all of which are based in the U.K.) determined, transmitted, or requested any LIBOR submission in or from the U.S,[22] and (2) allegations that Lloyds entered into an unstated number of unspecified transactions with unidentified U.S. counterparties (not Plaintiffs) are insufficient to establish specific jurisdiction as to Plaintiffs' claims. Nothing in the regulatory settlements involving Lloyds changes any of that.

Plaintiffs also add allegations relating to Lloyds from the Barclays Cooperation Materials, but none of those allegations supports a claim against the Lloyds defendants. The conversations at issue did not involve any Lloyds employees and merely

---

[21]   Lloyds Banking Group plc and its subsidiary HBOS plc, as holding companies, are not registered with the New York State Department of Financial Services.

[22]   *See* Decl. of Kevin P. McKendry, ECF No. 977-3 [Ex. 16, at pp. 28–29], ¶ 9 ("All of the individuals who made, or had input into the making of, [U.S. Dollar LIBOR] submissions were then employed in the United Kingdom and those submissions were made from London."); *see also* Lloyds DOJ Statement of Facts ¶ 13 (employees on Lloyds entities' "money-markets desk[s] in London were responsible for contributing [those entities' respective] LIBOR submissions").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                                    15

consisted of non-Lloyds personnel speculating, in general terms, about certain of Lloyds' LIBOR submissions.

As for the six specific dates listed on Appendix A that supposedly involve the Lloyds defendants, the proposed amendments are futile: (1) the Court previously held that claims relating to two of the dates, January 17 and 18, 2008, are time-barred;[23] (2) the Court has already rejected Plaintiff's proposed May 11, 2009 claim;[24] (3) Plaintiffs have failed to plead any actual injury or harm in connection with the January 18, 2008, September 26, 2008, or May 19, 2009 claims;[25] and (4) Plaintiffs offer no factual support for their claim that Lloyds manipulated LIBOR on November 27, 2009.[26]  The May 11, 2009 claim also appears, like many others in the PTAC, to have been included for purposes of appeal, which, as noted above, is unnecessary and improper.  *See, e.g., In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d at 216–17.  The same is true of the three dates listed on Appendix A in connection with HBOS PLC:  January 17, 2008, January 18, 2008, and September 26, 2008.

### (i)     MLI

Plaintiffs contend that proposed defendant MLI is properly subject to this Court's jurisdiction and that their claims against MLI are timely.  Their arguments lack merit.

*First*, Plaintiffs have not alleged facts that satisfy this Court's test for jurisdiction in *LIBOR IV*.  Plaintiffs contend that jurisdiction is proper because New York is "the location of the person who requested the submitter to engage in manipulation." *See* Pls.' Letter at 9 (quoting *LIBOR IV*, 2015 WL 6243526, at *38).  But the only person at MLI alleged to have "requested the submitter to engage in manipulation"—Stylianos Contogoulas—was concededly a "*London-based* interest rates swap trader," not someone located in New York.  PTAC ¶ 266 (emphasis added).  That Contogoulas's alleged requests *from London* to alter LIBOR submissions made *in London* were routed through someone outside MLI who happened to be located in New York makes no difference.

---

[23]   *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, Nos. 11 MDL 2262 (NRB), 11 Civ. 2613 (NRB), 2014 WL 6488219, at *3–4 (S.D.N.Y. Nov. 18, 2014) ("*LIBOR Nov. 18, 2014 Order*").

[24]   "[T]here is no evidence in the settlement documents cited by Plaintiffs that Lloyds made an artificial submission on that date." *LIBOR Nov. 18, 2014 Order*, at *4.

[25]   The Court has consistently required Plaintiffs to plead "(1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, [and] (2) that their positions were such that they were injured." *LIBOR II*, 962 F. Supp. 2d at 620–21.  Appendix A provides no such detail as to January 18, 2008, September 26, 2008, or May 19, 2009.

[26]   Plaintiffs merely allege that in a conversation between a Barclays derivatives trader and a Tullett Prebon broker, the broker "comment[ed] that Lloyds 'wanted LIBORs lower, like everyone else.'" PTAC ¶ 16.  Plaintiffs' claim of LIBOR manipulation on that date is based only on that single conversation in which two non-Lloyds employees speculated about Lloyds' desires—no basis for a plausible claim that Lloyds actually submitted an artificial USD LIBOR submission on that date.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald 16

Specific jurisdiction requires the defendant to have either "purposefully availed itself of the privilege of doing business in the forum" or to have taken "intentional and allegedly tortious actions . . . expressly aimed at the forum." *LIBOR IV*, 2015 WL 6243526, at \*27 (ellipsis in original) (citations and internal quotation marks omitted). By allegedly asking someone in New York to ask someone in London to alter LIBOR submissions, Contogoulas did not "purposefully avail[]" himself of the "privilege of doing business in New York," nor was his conduct "expressly aimed" at New York. *See id.*; *Fox* v. *Boucher*, 794 F.2d 34, 37 (2d Cir. 1986) ("It would offend 'minimum contacts' due process principles to force Boucher, a Massachusetts resident, to litigate this claim in a New York forum on the basis of one telephone call.").[27]

       Plaintiffs' personal jurisdiction argument fails for the additional reason that they have not alleged the requisite "but for" connection between MLI's "forum-directed activities" and their claims. *See LIBOR IV*, 2015 WL 6243526, at \*28.[28] MLI was not a panel bank and made no LIBOR submissions. Plaintiffs purport to identify a "factual dispute" about whether Contogoulas's messages influenced Barclays' LIBOR submissions on September 27–28, 2006 and February 28, 2007, but the only reasonable inference from the allegations in the PTAC is that they did not. On September 27, 2006, Contogoulas did not ask Barclays to depart from its "correct" submission; he is alleged merely to have notified him of approval of the submission that Barclays had already selected. PTAC ¶ 268. As for September 28, 2006, Barclays' submission would have been in the top quartile, and thus excluded from the final fix, regardless of whether it made the allegedly manipulated submission of 5.38 or the alleged "correct" submission of 5.3775.[29] And as for the February 28, 2007 submission, Contogoulas allegedly contacted

---

[27]   *See also Laydon* v. *Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515358, at \*3 (S.D.N.Y. Mar. 31, 2015) ("Communications that 'passed through and/or were stored within the United States' are insufficient to assert personal jurisdiction over a defendant.").

[28]   In their Appendix, Plaintiffs contend that MLI "do[es] not challenge" allegations of trader-based manipulation on a total of nine days. App'x A at 17–18, 23–25. That is incorrect. MLI has challenged Plaintiffs' allegations as to all nine. As to the alleged manipulation on September 27, 2006, MLI argued that it neither supported jurisdiction nor stated a claim on the merits because Contogoulas merely approved of a submission already selected. MLI Letter, ECF No. 1249, at 2–3 (citing PTAC ¶ 268). As to six other dates, MLI argued that no plaintiff was allegedly injured on those dates, precluding any claim both as a jurisdictional matter and on the merits. *Id.* at 2 n.4. And on the two remaining dates, MLI argued that the alleged manipulation could not have impacted the USD LIBOR fix at all. On October 26, 2006, the final LIBOR fix would have been rounded to 5.3775 regardless of whether Barclays' submission was 5.38 (the alleged manipulated value) or 5.375 (the alleged "correct" value), and on March 1, 2007, the final LIBOR fix would have been rounded to 5.3475 no matter what the value of Barclays' submission, because more than four other, middle submissions were 5.345 and more than four were at 5.35. *Id.*; *see* Frederick Sturm, *Eurodollar Futures: The Basics* at 6 (2011) (cited in *LIBOR III*, 27 F. Supp. 3d 447, 465 (S.D.N.Y. 2014)) (stating LIBOR fixes are rounded up for purposes of settlement of Eurodollar futures). That this Court previously sustained trader manipulation claims against other defendants on those two days is irrelevant because this argument was not previously raised. *See LIBOR IV*, 2015 WL 6243526, at \*44–45.

[29]   PTAC ¶ 269; *see* Simon Rogers, *The Libor Rate Submissions by Each Bank, 2005 to 2008*, THE GUARDIAN, July 2, 2012, *available at* http://www.theguardian.com/news/datablog/2012/jul/03/libor-rates-set-banks.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                    17

a Barclays trader who responded that "he had *already* spoken" with the Barclays and RBC submitters. *Id.* ¶ 271 (emphasis added). None of these allegations suggests that Contogoulas's messages had any effect on the LIBOR fixes. Plaintiffs therefore have not established the causation necessary to assert personal jurisdiction over MLI. For the same reasons, their claims fail on the merits as well. *See* MLI Letter, ECF No. 1249, at 3.

      *Second*, Plaintiffs' claims are time-barred. All purchasers of Eurodollar futures were on inquiry notice by the time of the Barclays settlements on June 27, 2012, over two years prior to the filing of the PTAC. *See LIBOR III*, 27 F. Supp. 3d at 458 n.5. Indeed, Plaintiffs do not dispute that those settlements referred to Trader-1 (*i.e.*, Contogoulas) and outlined the same manipulation allegations that Plaintiffs now assert against MLI. Plaintiffs contend only that they were previously unaware of Trader-1's identity and rely on an out-of-circuit case to argue that plaintiffs must be on notice of a defendant's identity before inquiry notice is triggered with respect to that defendant. This Court has expressly rejected that argument. *See LIBOR IV*, 2015 WL 6243526, at *134 ("[A] plaintiff has a duty to investigate warnings that he has been injured, regardless of whether the warning signs point to a particular defendant.").[30]

      Moreover, a reasonably diligent plaintiff would have identified Trader-1 as Contogoulas over two years prior to the filing of the PTAC, when his name was published on January 25, 2013 in the *Financial Times* article attached to MLI's Dec. 4, 2015 letter. Plaintiffs state that the article does not "disclose" Contogoulas's role, Pls' Letter at 10, but the article expressly states that all 25 individuals identified therein were "detailed anonymously" in the Barclays settlements, and Trader-1's description in the settlements not only matches the article's description of Contogoulas, but is inconsistent with the remaining 24. Plaintiffs do not dispute that an investigation consisting of *nothing more* than comparing the article with the Barclays settlements would have revealed Contogoulas's (and thus MLI's) identity and purported involvement in trader-based manipulation. The claims therefore arose by no later than January 25, 2013 and are time-barred.[31]

### (j)   Portigon

      The PTAC does not allege any trader-based conduct by Portigon, but does seek to add new party and jurisdictional allegations. PTAC ¶¶ 56–58. Plaintiffs' proposed amendments are futile. For the reasons stated herein, the additional allegations

---

[30]  In any event, *In re Copper Antitrust Litigation*, 436 F.3d 782, 789 (7th Cir. 2006), is distinguishable because, unlike the *Financial Times* article at issue here, no evidence available to plaintiffs there "indicated that [the defendant's] actions were unlawful or even that [the defendant] knew about [the alleged] fraudulent transactions." *See id.* at 789.

[31]  Plaintiffs' argument that a British judge stated "that it did not follow that all 25 [individuals named in the *Financial Times* article] were involved in rigging LIBOR" is irrelevant. Pls' Letter at 10. Regardless of whether some of the named individuals are exonerated, the fact remains that only Contogoulas matched the description of Trader-1.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                              18

do nothing to demonstrate a *prima facie* claim of personal jurisdiction over Portigon under the Court's *LIBOR IV* and *LIBOR V* rulings. *See, e.g., LIBOR IV*, 2015 WL 6243526, at *38 ("We uphold personal jurisdiction for [fraud and CEA-based] claims only where the LIBOR submission was determined or transmitted."); *id.*, at *32 n.52 ("Decl. of Frank Borstelmann, at ¶ 10, ECF No. 786 (Portigon submissions were made in London).").  Accordingly, Plaintiffs' request for leave to amend should be denied as to Portigon.

**(k)    RBC**

The PTAC does not allege any viable claims against RBC.  Plaintiffs' response focuses primarily on a single day, March 17, 2006, on which Plaintiffs allege that a Barclays trader asked an RBC trader to request a low submission and both Barclays' and RBC's submissions were kicked out down.  *See* Pls' Letter at 3 n.7, 6.

Plaintiffs' request to add a claim against RBC on that date should be denied because RBC's LIBOR submission on March 17, 2006 could not possibly have impacted the published LIBOR and therefore could not have caused actual damage to Plaintiffs.  On March 17, 2006, twelve of the sixteen panel banks submitted a fix of 4.93, which became the published LIBOR.[32]  Barclays, RBC, and Credit Suisse submitted rates lower than 4.93 and were kicked out down.  Bank of America submitted a rate of 4.94 and was kicked out upwards.  If RBC and Barclays had submitted fixes at or above 4.93, LIBOR would have remained exactly the same.  Rates above 4.93 would have been in the highest quartile and kicked out and the interquartile average would have remained 4.93.  Because twelve banks had submitted a fix of 4.93 it was impossible for RBC and Barclays to affect the published LIBOR.

The PTAC also attempts to allege claims against RBC on five other days, but none of those allegations state a claim consistent with the Court's prior rulings.  First, no named Plaintiff alleges that it held a position in Eurodollar futures on September 14, 15, and 18, 2006 or September 25, 2008.  Second, Plaintiffs cannot state a claim by alleging that RBC inflated its February 28, 2007 submission because that submission was tied with the lowest quartile.  *See supra* p. 7; *LIBOR IV*, 2015 WL 6243526, at *40 n.73.  Because the PTAC does not allege any instances where RBC could have caused a named Plaintiff actual damages, the request for leave should be denied as to RBC or, in the alternative, any allegations and claims concerning RBC should be stricken from the PTAC.

**(l)    RBS**

Plaintiffs' proposed amendment concerning RBS plc, RBS Group, and RBSSI should be rejected.  Plaintiffs' attempt to replead previously dismissed claims "to

---

[32]   Panel bank submissions are taken from the source that the Court relied on in *LIBOR IV*: Rogers, *supra* note 29.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                          19

preserve them for appeal," Pls.' Letter at 4 n.8, is not a basis to grant leave, *see supra*, pp. 7–8. Plaintiffs also acknowledge, as they must, that all of their *new* allegations of manipulation by RBS entities (including those related to proposed new defendant RBSSI) fail under the Court's prior rulings and are asserted solely "for purposes of appeal." *See* App'x A at 30, 33–34 (citing PTAC ¶¶ 286–288). That concession similarly means that the requested amendments should be denied under the law of the case.

   In any event, all of Plaintiffs' claims fail for multiple reasons. *First*, as Plaintiffs appear to recognize by their concession, both of the examples of supposed trader-based manipulation by RBS entities alleged in the PTAC are plainly time-barred under this Court's prior rulings. *See* Jan. 19 Letter, Ex. 1, ECF No. 1301-1, at 98 (alleging manipulation on December 14 and 17, 2007).

   *Second*, the same is true of any claim based on Plaintiffs' other new allegations concerning the RBS entities, virtually all of which concern conduct between August 31, 2007 and November 13, 2008. *See id.* at 88–98. The only exceptions are Plaintiffs' purported jurisdictional allegations, *see* PTAC ¶¶ 64–69, and their allegation concerning a single chat by an RBSSI trader on February 28, 2007—a date on which Plaintiffs concede the "available evidence does *not* suggest that RBS … [sought] to manipulate LIBOR," *id.* ¶ 286 (emphasis added).

   *Third*, under this Court's prior rulings, the proposed amendment (like the operative complaint) lacks any allegations sufficient to establish personal jurisdiction over RBS plc or RBS Group. Plaintiffs do not allege in relation to any RBS entity that LIBOR submissions were "determined or transmitted," or improper trader requests made, in New York, as required for specific jurisdiction. *See LIBOR IV*, 2015 WL 6243526, at *38. Nor are Plaintiffs' new allegations sufficient to establish general jurisdiction. *See supra* note 1.

   *Fourth*, Plaintiffs' new allegations do not plausibly state a claim against any RBS entity, instead consisting of a handful of communications among other banks' employees who claimed to be privy to RBS's LIBOR submissions. *See generally* Jan. 19 Letter, Ex A., ECF No. 1301-1, at 88–98. In particular, Plaintiffs' attempt to circumvent the Court's personal jurisdiction rulings by impleading Connecticut-based broker-dealer RBSSI fails because the PTAC lacks any factual allegations remotely sufficient to state a claim against that entity. The PTAC does not allege that RBSSI was on a LIBOR panel or was a counterparty to any transactions with Plaintiffs. In fact, Plaintiffs' *only* allegation concerning RBSSI, besides a recitation of its ownership and revenues, *see* PTAC ¶ 68, is the chat referenced above, in which an RBSSI trader states that the RBS LIBOR submitters are "separate from us," *id.* ¶ 285. Far from "linking [RBSSI] to the alleged U.S. Dollar manipulation," Pls.' Letter at 4, the lone substantive allegation concerning RBSSI in the PTAC *undermines* any such theory.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                               20

### (m)    Tullett

Plaintiffs' response to Tullett's initial letter, ECF No. 1255, does not try to meaningfully address Tullett's arguments opposing Plaintiffs' request for leave. Instead, Plaintiffs merely repeat the demonstrably false allegations contained in the PTAC and then assert in conclusory fashion that Tullett's "U.S. contacts and unlawful conduct satisfy jurisdiction standards under the CEA and Fifth Amendment." Pls.' Letter at 8–9. Putting aside their disregard for this Court's prior jurisdictional findings in this case, *see LIBOR IV*, 2015 WL 6243526, at *23, *25–26, Plaintiffs simply have ignored that (i) Tullett is a U.K.-based holding company, (ii) it is headquartered in London, (iii) it has no offices or employees anywhere in the United States, (iv) it does not employ a single non-executive employee (*i.e.*, traders or brokers), and, therefore, (v) Tullett could not possibly have engaged in *any* of the conduct Plaintiffs attribute to it in the PTAC.[33]  Nor do Plaintiffs even attempt to address Tullett's argument that Plaintiffs improperly seek to establish jurisdiction over Tullett by pointing to a handful of conversations between a U.K.-based broker—whom Plaintiffs erroneously allege worked for Tullett when, in fact, he worked for a subsidiary—and London-based Barclays traders, despite the fact that *LIBOR IV* precludes a finding of personal jurisdiction over London-based submitters. *See id.*, at *38.

Plaintiffs' argument as to why their claims against Tullett are not time-barred similarly misses the mark.  Plaintiffs contend that because one of the articles Tullett cited to in support of its position that a reasonably diligent plaintiff should have been able to assert a claim against Tullett by no later than March 2013 related only to the alleged manipulation of Yen LIBOR, Plaintiffs could not have been on inquiry notice of potential claims at that time.  However, Plaintiffs simply ignore the second article Tullett cited, in which it was reported that Tullett had asked the Financial Services Authority ("FSA") to clarify whether Tullett was the target of an FSA investigation relating to alleged LIBOR manipulation.  That article, dated March 5, 2013, was not in any way limited to claims relating to Yen LIBOR and plainly should have put Plaintiffs on notice of any potential claims against Tullett.  Thus, the two-year limitations period on CEA claims began to run no later than March 5, 2013, and that period expired before Plaintiffs filed the PTAC on June 29, 2015.

### (n)    UBS

In the PTAC, Plaintiffs seek to add allegations concerning UBS's supposed collusion with ICAP to manipulate Yen LIBOR.  *See* PTAC ¶ 248 *et seq*.  As this Court has stated repeatedly, this case is about USD LIBOR, not any other benchmark rate. *See, e.g.*, *LIBOR IV*, 2015 WL 6243526, at *45.  Accordingly, even if the Court grants Plaintiffs permission to file the PTAC, these allegations should be stricken as irrelevant and prejudicial. *See, e.g.*, *Morse* v. *Weingarten*, 777 F. Supp. 312, 319

---

[33]    As noted in Tullett's initial letter, at the Court's request, Tullett would submit a declaration attesting to these facts.

The Honorable Naomi Reice Buchwald                                    21

(S.D.N.Y. 1991) (striking references in a complaint that "are immaterial and impertinent to this case").

### (o)   WestImmo

The PTAC does not allege any trader-based conduct by WestImmo, but does seek to add new party and jurisdictional allegations. PTAC ¶ 59. Plaintiffs' proposed amendments are futile. For the reasons stated herein, the additional allegations do nothing to demonstrate a *prima facie* claim of personal jurisdiction over WestImmo under the Court's *LIBOR IV* and *LIBOR V* rulings. *See, e.g., LIBOR IV*, 2015 WL 6243526, at *38 ("We uphold personal jurisdiction for [fraud and CEA-based] claims only where the LIBOR submission was determined or transmitted."); Decl. of Andrew S. Cooper ¶ 9, ECF No. 787 ("WestImmo is not and has never been a member of the USD LIBOR panel, and has never been responsible for or involved in the determination or submission of rates for use in the calculation of USD LIBOR."). Accordingly, Plaintiffs' request for leave to amend should be denied as to WestImmo.

### (p)   SG

In their January 5 letter, Plaintiffs acknowledge, as they must, that SG is a dismissed defendant. *See* Pls.' Letter at 4 n.8. The PTAC does not allege any trader-based conduct by SG. Moreover, Plaintiffs do not dispute, and thus concede, that the PTAC asserts claims against SG only on behalf of a proposed expanded class, whose claims are plainly time-barred as to SG under the Court's rulings. Any new claims or allegations against SG, including those that attempt (futilely) to establish personal jurisdiction, should be disallowed or stricken, for this reason alone.

Plaintiffs further concede that they have included dismissed claims against SG only for appeal preservation purposes, but nonetheless argue that this is appropriate. As discussed, the Second Circuit has held otherwise in *P. Stolz Family P'ship L.P. See supra* p. 8. Plaintiffs' CEA and other claims against SG were dismissed with prejudice. Thus, there is no basis for including them in the PTAC.

Plaintiffs also cannot bolster their dismissed claims by attempting to add allegations against SG after the fact. In their January 19 submission, Plaintiffs purport to depict in blue text allegations that are included in the PTAC only for purposes of appeal. *See* Jan. 19 Letter at 1. Among these, however, are *new* allegations against SG that did not appear in any earlier complaint. *See* PTAC ¶¶ 77–79. Those allegations were not part of the record before the Court when the claims against SG were dismissed and thus cannot be considered in any future appeal. *See* Fed. R. App. P. 10(a)(1).

Accordingly, Plaintiffs' request for leave should be denied as to SG or, in the alternative, any allegations and claims concerning SG should be stricken from the PTAC.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                          22

### 5.    Class Period

As noted in dismissed defendant SG's December 15, 2015 letter, ECF No. 1258, Plaintiffs' PTAC extends the putative class period both forward (changing the ending date from May 2010 to May 31, 2011) and backward (changing the starting date from August 2007 to January 1, 2003).  PTAC ¶ 1.  The forward extension of the class period allegedly relates to both persistent suppression and trader-based conduct, *see* PTAC ¶¶ 693–703, while the backward extension relates solely to trader-based conduct, *see* PTAC ¶¶ 704–714.  In addition to the reasons provided in SG's December 15, 2015 letter, the extension of the class period is improper because the claims are either futile or time-barred, except for trader-based claims in the January 2005 to August 2007 period (and then, only to the extent those claims are adequately pleaded against particular defendants).

*First,* the claims in the extended class period do not relate back to the original complaint.[34]  Not only does extending the class period improperly modify the substance of Plaintiffs' claims,[35] but it also enlarges the putative class to include new potential plaintiffs.  It therefore effectively adds new parties and must satisfy the requirements of Rule 15(c)(1)(C), including that Defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii); *see Wilder* v. *News Corp.*, No. 11-cv-4947, 2015 WL 5853763, at *16 (S.D.N.Y. Oct. 7, 2015).  Plaintiffs have given no reason to believe the existing class period was the result of a case of mistaken identity.

*Second*, Plaintiffs' extension of the class period is time-barred to the extent it relates to suppression-based claims.  While the PTAC adds a conclusory allegation that persistent suppression occurred through May 2011, PTAC ¶ 292, Plaintiffs do not offer any justification for this amendment.  (In fact, the May 31, 2011 end date appears to come from DB's CFTC settlement, which did not involve findings of persistent suppression.  *See* PTAC ¶ 328 (citing DB CFTC Order at 2).)  Plaintiffs first sought to extend the time period for their suppression claims in June 2015, and so this extension is plainly time-barred under the CEA's two-year statute of limitations.

---

[34]   The only exception consists of trader-based claims during the period from January 2005 through August 8, 2007, which were the subject of earlier motions to amend.  This Court declined Plaintiffs' subsequent attempts to extend their proposed trader-based claims beyond this period.  *LIBOR III*, 27 F. Supp. 3d at 464.

[35]   *See Williams* v. *Shaner*, No. 96 Civ. 2002, 1999 U.S. Dist. LEXIS 11325, at *12 (S.D.N.Y. July 20, 1999) ("An amendment will not relate back if it sets forth a new set of operational facts; it can only make more specific what has already been alleged."); *Pruiss* v. *Bosse*, 912 F. Supp. 104, 106 (S.D.N.Y. 1996) (proposed amendment to add new defamation claim did not relate back to original complaint alleging defamation, even though "content of the defamatory statement in the proposed amended complaint is the same as the content of the statements in the original complaint," because proposed amendment implicated "a new party as well as new dates").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                          23

     *Third*, Plaintiffs' extension of the class period is futile to the extent it relates to trader-based manipulation outside of the period from January 1, 2005 through August 8, 2007 (the subject of their previous motions to amend).  Plaintiffs' only possible argument for their proposed expansion of the class period is based on DB's April 2015 regulatory settlements, one of which found that some conduct began in 2003 and one of which found that some conduct continued through early 2011.  *See, e.g.*, PTAC ¶ 73.  However, as explained above, Plaintiffs have not successfully pleaded any trader-based claims against DB; indeed, their Appendix A does not identify any conduct by any defendant on any dates in the extended class period.[36]

     *Fourth*, Plaintiffs' extension of the class period is time-barred to the extent it relates to trader-based manipulation outside of the January 1, 2005 through August 8, 2007 window.  The Court has adopted the same inquiry notice analysis for claims of persistent suppression and trader-based manipulation after 2007, because "although these two scenarios differ in how plaintiffs' injury would be caused, the injury would be the same."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 710 (S.D.N.Y. 2013).  Moreover, as the Court has held, inquiry notice in this case is not defendant-specific:  Once Plaintiffs were on notice of alleged misconduct by one defendant, "it would have been feasible to investigate each bank's submissions," for example by comparing them against other market data.  *Id.* at 707.  Because this Court has already held that inquiry notice of post-August 2007 conduct arose in May 2008, *see id.*, Plaintiffs' June 2015 attempt to extend the class period forward is time-barred under the CEA's two-year statute of limitations.

     Plaintiffs' backward extension of the pre-August 2007 class period for trader-based claims is similarly time-barred.  The Court previously found that Plaintiffs might not have been on inquiry notice of pre-August 2007 conduct until as late as June 27, 2012 (the date of the Barclays regulatory settlement).  *Id.* at 709.  However, even assuming that late inquiry-notice date, the Barclays settlement was sufficient to put Plaintiffs on notice of all pre-August 2007 conduct.  The Barclays settlement specified that the conduct at issue began in "*at least* 2005," PTAC ¶ 601 (emphasis added) (quoting Barclays CFTC Order at 2), but it did not foreclose the possibility of an earlier start date.  Therefore, beginning in June 2012 at the latest, Plaintiffs had the duty to investigate all potential misconduct involving defendant banks' pre-August 2007 submissions.  Given that more than three years elapsed between the Barclays settlement and Plaintiffs' June 2015 PTAC, the attempt to extend the class period backward is plainly time-barred.[37]

---

[36]    Even assuming *arguendo* that Plaintiffs could extend the class period back to 2003 as to DB based on its DOJ settlement (they cannot), Plaintiffs have not even attempted to articulate any basis for this overreach as to any other Defendant.

[37]    Plaintiffs are not saved by an argument that they may not have been able to plead their claims without the evidence provided by the regulatory settlements of banks that settled after Barclays because, as the Court has previously explained, under the CEA, Plaintiffs could have been placed on inquiry notice

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                    24

*                    *                    *

For the reasons set forth above, Opposing Defendants reiterate their request that the Court deny Plaintiffs' request for leave to add most of the new trader-based manipulation claims in their PTAC and to extend the class period.

Respectfully submitted,

Andrew C. Finch

cc:     All Counsel of Record (via ECF)

---

before obtaining the knowledge sufficient to plead their claims. *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 698–99.