# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: | MDL No. 2262<br>Master File No. 1:11-md-02262-NRB<br><br>**ORAL ARGUMENT REQUESTED** |
| JOSEPH AMABILE, *et al.*,<br>                  Plaintiffs,<br>        v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 13-cv-1700 |
| BAY AREA TOLL AUTHORITY,<br>                  Plaintiff,<br>        v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 14-cv-3094 |
| EAST BAY MUNICIPAL UTILITY DISTRICT,<br>                  Plaintiff,<br>         v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 13-cv-0626 |
| THE REGENTS OF THE UNIVIVERSITY OF CALIFORNIA,<br>                  Plaintiff,<br>         v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 13-cv-5186 |
| SAN DIEGO ASSOCIATION OF GOVERNMENTS,<br>                  Plaintiff,<br>         v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 13-cv-5221 |
| CITY OF RICHMOND, *et al.*,<br>                  Plaintiffs,<br>         v.<br>BANK OF AMERICA CORP., *et al.*,<br>                  Defendants. | No. 13-cv-0627 |

| | |
|---|---|
| CITY OF RIVERSIDE, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-0597 |
| COUNTY OF MENDOCINO, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-8644 |
| COUNTY OF SACRAMENTO,<br>                    Plaintiff,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-5569 |
| COUNTY OF SAN DIEGO, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-0667 |
| COUNTY OF SAN MATEO, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-0625 |
| COUNTY OF SONOMA, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., *et al.*,<br>                    Defendants. | No. 13-cv-5187 |
| DARBY FINANCIAL PRODUCTS, *et al.*,<br>                    Plaintiffs,<br>          v.<br>BARCLAYS BANK PLC, *et al.*,<br>                    Defendants. | No. 13-cv-8799 |

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP. as Receiver for AMCORE BANK, N.A., *et al.*, <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 14-cv-1757 |
| THE FEDERAL HOME LOAN MORTGAGE CORP., <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-3952 |
| CITY OF HOUSTON, <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-5616 |
| CITY OF PHILADELPHIA, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.* , <br> Defendants. | No. 13-cv-6020 |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD as Liquidating Agent for U.S. Central Federal Credit Union, *et al.*, <br> Plaintiff, <br> v. <br> CREDIT SUISSE GRP. AG, *et al.*, <br> Defendants. | No. 13-cv-7394 |
| PRINCIPAL FINANCIAL GROUP, INC., *et al.* <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-6014 |
| PRINCIPAL FUNDS, INC., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-6013 |

| PRINCIPAL FINANCIAL GROUP, INC., *et al.* Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 15-cv-9792 |
|---|---|
| PRINCIPAL FUNDS, INC., *et al.*, Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 15-cv-9793 |
| PRINCIPAL FINANCIAL GROUP, INC., *et al.* Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 16-cv-0592 |
| PRINCIPAL FUNDS, INC., *et al.*, Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 16-cv-0590 |
| PRUDENTIAL INVESTMENT PORTFOLIOS 2, *et al.*, Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 14-cv-4189 |
| SALIX CAPITAL US INC., Plaintiff, v. BANC OF AMERICA SECURITIES LLC, *et al.*, Defendants. | No. 13-cv-4018 |
| SCHWAB SHORT-TERM BOND MARKET FUND, *et al.*, Plaintiffs, v. BANK OF AMERICA CORP., *et al.*, Defendants. | No. 11-cv-6409 |

| CHARLES SCHWAB BANK, N.A., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 11-cv-6411 |
|---|---|
| SCHWAB MONEY MARKET FUND, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 11-cv-6412 |

**DIRECT ACTION PLAINTIFFS' JOINT MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS ALL
<u>ANTITRUST CLAIMS BASED ON THE EFFICIENT ENFORCER DOCTRINE</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

I.     DAPS SATISFY EACH *AGC* FACTOR .................................................................. 2

    A.    There Is a Single Link in the Chain of Causation Between Defendants'
         Persistent Suppression and DAPs' Injuries ................................................. 3

    B.    DAPs All Are "Direct Victims" of Defendants' Conspiracy ................................. 5

    C.    DAPs' Damages Are Not "Highly Speculative" ................................................ 5

    D.    There Is No Danger of Duplication or Complex Apportionment ........................... 6

II.    DEFENDANTS' DAP-SPECIFIC ARGUMENTS ARE WITHOUT MERIT ................ 6

    A.    DAPs' Complaints Have No "Pleading Deficiencies" ...................................... 6

    B.    DAPs' Claims Tied to Asset-Backed Securities Are Well-Pled ........................... 8

    C.    Salix, Prudential, Darby, and Philadelphia Plaintiffs ...................................... 9

    D.    California Consolidated Plaintiffs ("CCPs") ................................................. 9

    E.    Houston .......................................................................................... 11

    F.    NCUA and BATA ............................................................................... 12

    G.    Schwab ........................................................................................... 12

    H.    The FDIC-R, Freddie Mac, and Principal Plaintiffs ...................................... 15

         1)    These Plaintiffs Pleaded Facts and Antitrust Theories That Further
             Support Standing ................................................................ 15

         2)    The FDIC-R Complaint Suffers From No Pleading Deficiencies ............ 17

III.    *AGC* DOES NOT APPLY TO THE STATE LAW ANTITRUST CLAIMS ................ 17

CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*American Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352
    (2d Cir. 2016) .................................................................................................... 2

*Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327 (1988) ................................................ 20

*Aryeh v. Canon Bus. Solutions, Inc.,* 55 Cal. 4th 1185 (2013) ...................................... 18

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................................... 1

*Bergstrom v. Noah,* 266 Kan. 829, 974 P.2d 520 (1999) ............................................... 19

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251 (1946) .................................................. 5

*Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980) ............................................ 14

*Dayton Superior Corp. v. Marjam Supply Co.,* 2011 WL 710450
    (E.D.N.Y. Feb. 22, 2011) ..................................................................................... 7

*D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006) ...................... 18

*Federal Housing Finance Agency, as Conservator for the Federal National Mortgage
    Association and Federal Home Loan Mortgage Corporation v. Nomura Holding
    America Inc., et al.,* 68 F. Supp. 3d 439 (S.D.N.Y. 2014) ................................... 9

*Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir. 2003) ...................... 15

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,* 711 F.3d 68 (2d Cir. 2013) .................... 19

*Gelboim v. Bank of America Corp.,* 823 F.3d 759 (2d Cir. 2016) ....................... passim

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) ....................................................... 10

*In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979) ................... 14, 15

*In re Capacitors Antitrust Litig.,* 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ............... 18, 19

*In re Credit Default Swaps Antitrust Litig.,* 2014 WL 4379112
    (S.D.N.Y. Sept. 4, 2014) ..................................................................................... 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR IV)*,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ...................................... passim

*In re Linerboard Antitrust Litig.,* 305 F.3d 145 (3d Cir. 2002) .................................... 15

*In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 4955377
    (N.D. Cal. Oct. 2, 2014)............................................................................18, 19, 20

*In re Pool Products Distribution Mkt. Antitrust Litig.,* 946 F. Supp. 2d 554
    (E.D. La. 2013) ............................................................................................18

*In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13 (3d Cir. 1978)...............................15

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* 586 F. Supp. 2d 1109
    (N.D. Cal. 2008).......................................................................................18, 19

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ...................................4

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ...............15, 19

*Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)..............15

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014)........................2

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335
    (N.D. Cal. Aug. 11, 2015).............................................................................18

*Nat'l Credit Union Admin. Bd. v. Barclays Capital, Inc.,* 785 F.3d 387
    (10th Cir. 2015)..............................................................................................1

*Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC,* 939 F. Supp. 2d 1113
    (D. Kan. 2013) ...............................................................................................9

*Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, 2014 WL 241739
    (S.D.N.Y. Jan. 22, 2014)...............................................................................9

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 665 F. Supp. 869
    (E.D. Cal. 1986) ............................................................................................15

*Orr v. BHR, Inc.,* 4 F. App'x 647 (10th Cir. 2001)...................................................19

*O'Brien v. Leegin Creative Leather Products, Inc.,* 294 Kan. 318, 277 P.3d 1062 (2012) ..........19

*O'Regan v. Arbitration Forums, Inc.,* 121 F.3d 1060 (7th Cir. 1997)..........................19

*People v. Crawford Distrib. Co.,* 53 Ill. 2d 332, 291 N.E.2d 648 (1972).....................19

*Reinforce, Inc. v. Birney,* 308 N.Y. 164 (Ct. App. 1954) .............................................19

*Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.3d 323 (9th Cir. 1980) ..................3

*Samsung Elecs. Co. v. Panasonic Corp.,* 747 F.3d 1199 (9th Cir. 2014)....................19

*Sanner v. Board of Trade of City of Chicago,* 62 F.3d 918 (7th Cir. 1995) ..................3

*Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41 (2d Cir. 1980)..........................................................3

*Telematics Intern., Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703 (1st Cir. 1992)........................1

*United States ex rel. Blaum v. Triad Isotopes, Inc.,* 104 F. Supp. 3d 901 (N.D. Ill. 2015) ..........19

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940)....................................................14

*Vinci v. Waste Mgmt., Inc.,* 36 Cal. App. 4th 1811, 43 Cal. Rptr. 2d 337 (1995) ........................19

*Warth v. Seldin,* 422 U.S. 490 (1975) ............................................................................................13

*Watson v. Am. Red Cross Blood Servs.,* 468 F. Supp. 2d 484 (W.D.N.Y. 2007) ...........................7

*Wrobel v. Avery Dennison Corp.,* 2006 WL 7130617 (D. Kan. Feb. 1, 2006)..............................19

## Statutes

12 U.S.C. § 1787(b)(14) ...................................................................................................................1

12 U.S.C § 1821(d)(4) ......................................................................................................................1

740 Ill. Comp. Stat. 10/1 ............................................................................................................17, 18

740 Ill. Comp. Stat. 10/7(2) ............................................................................................................18

740 Ill. Comp. Stat. 10/11 ...............................................................................................................20

Cal. Bus. & Prof. Code § 16700 ......................................................................................................17

Cal. Bus. & Prof. Code § 16750 ......................................................................................................18

Cal. Bus. & Prof. Code § 16750(a)..................................................................................................11

Cal. Bus. & Prof. Code § 17200 ......................................................................................................17

KS.A. § 50-101 .................................................................................................................................18

K.S.A. § 50-161 ................................................................................................................................18

K.S.A. § 50-163 ................................................................................................................................20

N.Y. Gen. Bus. L. § 340 ...................................................................................................................18

N.Y. Gen. Bus. L. § 340(6)..............................................................................................................18

**<u>Rules</u>**

Fed. R. Civ. P. 8(a) ..................................................................................................6, 7, 8

Fed. R. Civ. P. 9(b) ........................................................................................................7

**<u>Other Authorities</u>**

ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES:
    LEGAL AND ECONOMIC ISSUES (2d ed. 2010)............................................................5

Stigum, Marcia, THE MONEY MARKET (3d ed. 1990) ..................................................14

## INTRODUCTION

There are numerous reasons why the Direct Action Plaintiffs ("DAPs") satisfy the four-factor test that courts apply to determine whether a plaintiff is an "efficient enforcer" of the antitrust laws:  (1) causation; (2) the absence of more direct victims; and damages that are not (3) highly speculative, or (4) duplicative.  *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-45 (1983) ("*AGC*").  Many of those reasons are common to all plaintiffs and are capably argued by the OTC and Bondholder classes, so DAPs incorporate, but do not repeat, those arguments.  Because most DAPs are in many ways similarly situated to those classes,[1] if the Court finds that either (or both) of them are efficient enforcers, then the Court should find that DAPs are as well.

DAPs are uniquely well positioned as efficient enforcers for additional reasons that do not apply to the class plaintiffs.  DAPs include cities, municipalities, institutional investors, government-sponsored enterprises, and agencies of the United States government, all of which have a strong incentive (and in the case of some DAPs a Congressional mandate) to investigate and pursue claims for losses caused by Defendants' anticompetitive conspiracy.[2]

As to causation, this Court has already found that DAPs sufficiently alleged that persistent suppression proximately caused them to suffer ascertainable damages.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2015 WL 6243526, at *62-64, *68 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*").  That finding alone moots many of Defendants'

---

[1] The Amabile Plaintiffs are similarly situated to the Exchange-Based Plaintiffs and join their opposition Memorandum.

[2] The Federal Deposit Insurance Corporation ("FDIC") and National Credit Union Administration ("NCUA") each have a statutory duty to bring private actions to protect depositors and creditors of failed banks or credit unions. *Telematics Intern., Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 705 (1st Cir. 1992) (FDIC); *Nat'l Credit Union Admin. Bd. v. Barclays Capital, Inc.*, 785 F.3d 387, 389 (10th Cir. 2015) (NCUA).  For example, Congress granted the FDIC and the NCUA special powers to maintain private actions on behalf of creditors of the insured institutions even for "expired" claims.  *See, e.g., LIBOR IV* at *120-22; 12 U.S.C. § 1787(b)(14) (NCUA); 12 U.S.C § 1821(d)(4) (FDIC).

arguments as to DAPs and warrants denial of Defendants' motion.  As to directness, Defendants do not even contend that there are "more direct" victims than DAPs.  Finally, DAPs seek damages for a defined set of transactions using methodologies consistent with those that this Court has already approved.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), ECF No. 1380 at 8-10 (Apr. 15, 2016) ("Apr. 15 Order") (granting Berkshire Bank leave to amend).

Many of the additional considerations noted by the Second Circuit in *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 778 (2d Cir. 2016), *e.g.*, whether damages are "disproportionate" or there is a "need for an antitrust remedy," do not apply to DAPs.  In any event, federal courts should not consider such prudential considerations to determine standing for statutory causes of action.  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387-88 (2014).[3]

As set forth in Section II following, Defendants' motion should also be denied because (1) DAPs' complaints satisfy all pleading requirements, (2) certain DAPs have alleged additional facts and theories that provide independent reasons that they are efficient enforcers, and (3) the *AGC* factors do not apply to the state law antitrust claims raised by certain DAPs.

## I.   DAPS SATISFY EACH *AGC* FACTOR

Like the OTC plaintiffs, many DAPs obtained LIBOR-based instruments directly from Defendants.  If the Court concludes that plaintiffs that transacted directly with a Defendant are efficient enforcers, the only remaining question – what transactions are actionable in this

---

[3] In *Lexmark*, the Supreme Court clarified that federal courts should not "limit a cause of action that Congress has created [as it did in the Clayton Act] merely because 'prudence' dictates."  *134 S.Ct.* at 1388; *see also American Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 360 (2d Cir. 2016) ("We do not ask whether in our judgment Congress should have authorized [plaintiffs'] suit, but whether Congress in fact did so.") (quoting *Lexmark)*.  The appellants in *Gelboim* did not brief the effect of *Lexmark* on *AGC* because that issue was not before the Second Circuit.

litigation – is one of damages that need not be answered at this stage.  This includes transactions with subsidiary and affiliated broker-dealers of Defendants.[4]

Even in the unlikely event that the Court grants motions to dismiss all of the class complaints, however, DAPs are still efficient enforcers because they independently and uniquely meet each of the factors set forth in *AGC*.

### A.   There Is a Single Link in the Chain of Causation Between Defendants' Persistent Suppression and DAPs' Injuries

The first *AGC* factor is "directness or indirectness of the asserted injury."  *Gelboim*, 823 F.3d at 778.  *AGC* thus requires DAPs to allege a "chain of causation" linking Defendants' price-fixing conduct to DAPs' asserted injuries.  *Id*.  In *LIBOR IV*, the Court held that DAPs have done so, finding that Defendants' persistent suppression of USD LIBOR "proximately caused" the economic losses DAPs suffered in trading "well-known LIBOR-based securities, such as interest-rate swaps, mortgage-backed securities, and floating-rate bonds."  *LIBOR IV* at *62. That finding by itself is sufficient to establish DAPs' antitrust standing as efficient enforcers. *See, e.g.*, *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995) ("Essentially, the doctrine of antitrust standing is the equivalent of the common-law tort limitation of proximate cause.").

Defendants ignore this obviously correct conclusion, instead arguing that in order to evaluate the chain of causation between Defendants' persistent suppression of USD LIBOR and DAPs' injuries, this Court would have to "reconstruct the choices of multiple independent decision-makers, recreate the operation of independent market variables, and eliminate the

---

[4] *See, e.g.*, *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 48-49 & n.18 (2d Cir. 1980) ("a court must guard against a situation in which a seller interposes a middleman as a shield against antitrust liability") (citing *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.3d 323, 326 & n.6 (9th Cir. 1980)).  Even if the Court elects to segregate claims by "type" in deciding a motion to dismiss, for the reasons set forth in the Bondholders' and Exchange-Based Plaintiffs' oppositions, DAPs would independently be efficient enforcers for purchases from non-Defendants.

effects of countless intervening causal factors that influence the price of any of the numerous financial instruments." Mem. at 3.[5]  Defendants are wrong for at least three reasons.

First, DAPs present a straightforward claim:  suppressing USD LIBOR caused DAPs to receive less money in interest payments on their USD LIBOR-based investments.  LIBOR is an "inseparable" part of the "price" of LIBOR-based instruments – *i.e.*, it determined among other things the amount of money to be paid from one party to the other.[6]  *Gelboim*, 823 F.3d at 771. As such, no "intervening" factors or "independent decision makers" lie between the conspiracy to persistently suppress USD LIBOR and the actual suppression of price (USD LIBOR) that caused DAPs' economic losses.

Second, Defendants' argument as to "independent market variables" that may affect causation under *AGC* is a red herring.  *Every* price-fixing case involves such variables and in *every* case (including this one) plaintiffs may overcome this concern by employing commonly accepted methods to isolate the causal effects of a price-fixing conspiracy on the plaintiff.[7] Defendants' contentions at most relate to proving the amount of damages and are irrelevant to showing proximate cause under *AGC*.  Even if it were proper for this Court to consider the sufficiency of DAPs' possible damages theories in evaluating causation, it is well established that, when proving damages, plaintiffs may rely on assumptions and inferences supported by real-world data, evidence, and economic theory to quantify their losses because "[p]roving as a

---

[5] Joint Memorandum of Law in Support of Defendants' Motion to Dismiss All Antitrust Claims Based on the Efficient Enforcer Doctrine, July 6, 2016, ECF No. 1481 ("Mem.").

[6] Certain DAPs alleged that the unlawful conspiracy also affected the quality of LIBOR-based instruments.  The theories are two sides of the same coin.  *LIBOR IV* at *89.  In both cases, the conspiracy directly caused the increase in price and/or reduction in quality with no intervening forces.

[7] For example, in *In re Urethane Antitrust Litig.*, class and direct purchasers brought price-fixing claims against a cartel that fixed the price of certain chemicals that the plaintiffs had purchased in individually negotiated transactions over a 10-year period.  768 F.3d 1245, 1251 (10th Cir. 2014).  The plaintiffs isolated the effect of the conspiracy on price from other market factors, such as changing raw material costs and varying supply and demand conditions.  *Id.*

4

fact something that never occurred ('what the plaintiff's situation would have been in the absence of the defendant's antitrust violation') is impossible."   ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 56 (2d ed. 2010); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

Third, many of Defendants' purported concerns about "market variables" seem to involve the administrability of these claims on a class basis – impermissible prudential considerations that are in any event irrelevant to DAPs.   To the extent that damages, causation, or other issues arise, DAPs will be able to address those issues far more easily than what might have to be done in a class action.   DAPs unquestionably meet the *AGC* "directness" factor.

**B.      DAPs All Are "Direct Victims" of Defendants' Conspiracy**

DAPs easily satisfy the second factor of the *AGC* test, "the existence of [no] more direct victims."   *Gelboim*, 823 F.3d at 778.   Defendants do not address this factor with respect to DAPs, likely because the Second Circuit recognized that consumers, like DAPs, are textbook direct victims.   *Id.*   In fact, the Second Circuit recognized that anyone holding a financial instrument pegged to LIBOR would likely satisfy this factor, *id.*, a standard DAPs certainly meet.

**C.      DAPs' Damages Are Not "Highly Speculative"**

Defendants' contention that DAPs' damages would be "highly speculative" is also unavailing because this Court has concluded that DAPs sufficiently alleged non-speculative damages arising from persistent suppression of USD LIBOR, *LIBOR IV* at *62-64, *68.   And in a different Order, the Court specifically endorsed two potential damage methodologies, advanced by the lender class as non-speculative in the context of a persistent suppression claim.   Apr. 15 Order at 8-10.   Thus, there is nothing speculative about asserting, or proving, a damages theory that looks at a component of price and estimates what it should have been had it not been fixed by Defendants.   *See* OTC Opp. I.B.

Defendants' final damages argument, that DAPs "may" have held financial instruments that "offset" their losses, Mem. at 5, n.40, is both speculative and irrelevant at this stage of the litigation, as the OTC class explains.   *See, e.g.*, OTC Opp. I.D.   Moreover, Defendants' speculation as to each DAP's damages is clearly an issue that cannot be resolved now.   *Gelboim*, 823 F.3d at 782 ("The net impact of a tainted LIBOR in the credit market is an issue of causation reserved for the proof stage.").   In any event, if this Court were to determine that "netting" in any form is appropriate, either within a given transaction with a plaintiff or with respect to other transactions within that plaintiff's portfolio, such issues could be resolved as a matter of simple arithmetic, particularly for DAPs who have a defined set of transactions.

### D.   There Is No Danger of Duplication or Complex Apportionment

Class plaintiffs comprehensively address and rebut Defendants' flawed assertion that standing cannot be granted to *any* plaintiff without creating a risk of duplication or complex apportionment.   *See* OTC Opp. IV; Bondholders' Opp. IV.   DAPs have met this, and every other *AGC* factor.

## II.   DEFENDANTS' DAP-SPECIFIC ARGUMENTS ARE WITHOUT MERIT

### A.   DAPs' Complaints Have No "Pleading Deficiencies"

DAPs' Complaints have no pleading deficiencies that support dismissal based on lack of antitrust standing.   For example, Defendants incorrectly contend that DAPs failed to plead with specificity the "relevant transactions," "how the various instruments were priced," or "the role USD LIBOR played in determining those prices."[8]   Mem. at 37.   Such detail is not required at the pleading stage and specificity of pleading is not part of the *AGC* test.   Even if they were, DAPs have alleged these facts in sufficient detail to meet the requirements of Fed. R. Civ. Proc.

---

[8] DAPs incorporate by reference Direct Action Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Fraud and Related Claims, Dec. 8, 2014, ECF No. 890, which addressed many of the same causation and pleading arguments asserted by Defendants in their renewed motion.

8(a).  *Watson v. Am. Red Cross Blood Servs.*, 468 F. Supp. 2d 484, 488 (W.D.N.Y. 2007)

("Under the notice pleading practice established by Rule 8, plaintiff is not required to set forth all

facts on which he relies to support his claim.").

Two facts are sufficient to dispose of Defendants' notion that the "relevant transaction"

allegations are "deficient."   First, DAPs allege that they traded "well-known LIBOR-based

securities, such as interest rate swaps, mortgage-backed securities, and floating-rate bonds."

*LIBOR IV* at *62.   Second, this Court found in *LIBOR IV* that DAPs had sufficiently alleged

fraud claims related to those transactions under the heightened standard of Fed. R. Civ. P. 9(b).

*LIBOR IV* at *62.   Defendants cite no case that requires more specificity as to what transactions

are at issue for DAPs' antitrust allegations, which are governed by the more lenient notice

pleading requirements contained in Federal Rule of Civil Procedure 8(a).[9]   *Dayton Superior*

*Corp. v. Marjam Supply Co.,* No. 07-cv-5215, 2011 WL 710450, at *8 (E.D.N.Y. Feb. 22, 2011).

Defendants' feigned confusion over the role price-fixed LIBOR played in DAPs'

instruments is similarly meritless, especially given that Defendants themselves were

counterparties to many of the LIBOR-based instruments at issue.   USD LIBOR directly

determined interest payments on DAPs' LIBOR-based instruments.  *LIBOR IV* at *6, 52.  As the

Second Circuit held, the conspiracy put plaintiffs, including DAPs, in a "worse position" than

they would have been in without collusion.  *Gelboim,* 823 F.3d at 775.  "Persistent suppression

harmed any investor or speculator who received a floating rate" tied to LIBOR because plaintiffs

---

[9] Although DAPs believe they have far exceeded what they need to allege to meet the requirements of Rule 8(a), DAPs could, if required, move for leave to amend their Complaints regarding the instruments for which they seek damages, including CUSIPs, names of sellers, dollar amounts, and the like.  Leave to amend would be particularly appropriate for those DAPs whose antitrust claims have never previously been subject to a motion to dismiss, since they were removed by stipulation so that they could participate in the consolidated *Gelboim* appeal.  Such DAPs have never had the opportunity to amend *any* antitrust allegations to address *any* perceived shortcomings.

received too-low payments on their instruments.  *LIBOR IV* at *7.[10]  As such, DAPs' Complaints easily satisfy the requirements of Fed. R. Civ. P. 8(a).

### B.    DAPs' Claims Tied to Asset-Backed Securities Are Well-Pleaded

Certain DAPs, including the Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks ("FDIC-R"), Freddie Mac, the Principal Plaintiffs, and Prudential, have additional claims based on losses tied to asset-backed securities ("ABS") that they purchased from Defendants and third parties.  ABS are instruments that, like swaps and bonds, paid investors amounts expressly determined by USD LIBOR.  Defendants contend that damages on ABS are "extraordinarily speculative" because third-party servicers, underwriters, and other actors were involved in those instruments.  Defendants improperly conflate the issuance price with the LIBOR-based payments owed under the terms of the ABS.  While ABS have a different issuance process than bonds or swaps, the relevant inquiry here is functionally the same:  determining the impact of LIBOR suppression on the payments owed under the ABS.  As with bonds or swaps with payment streams pegged to LIBOR, ABS incorporating LIBOR also paid investors less than the ABS should have paid during the time that LIBOR was suppressed.

Defendants also speculate, without factual or legal support, that the trustee of an ABS, rather than purchasers, "may be" the proper party to maintain antitrust claims.  Mem. at 37-38. All Defendants can point to is a statement by the Court in *LIBOR IV* regarding DAPs' breach of contract claims.  *Id.* at *84-85.  But whether the trustee or the underlying party has standing to sue for *breach of contract* has no bearing on who actually suffered the harm and therefore has standing to sue for *antitrust violations*.  As *LIBOR IV* recognized, holders of financial

---

[10] Even if the Court were to find that DAPs must stand solely on a theory of damages tied to the purchase price, the impact of LIBOR suppression would be just as simple:  DAPs overpaid for a product of subpar quality.  As discussed above, that in the "but-for" world everyone *might* have acted differently, is simply not a pleading issue. And the irrelevance of that hypothetical is particularly plain for purchases made before LIBOR suppression began.

instruments, including ABS, suffered injuries proximately caused by Defendants' wrongdoing. *Id.* at \*62.[11]

      **C.**     <u>**Salix, Prudential, Darby, and Philadelphia Plaintiffs**</u>

Other than to repeat arguments such as the purported pleading deficiencies about the identity of the transactions at issue[12] and causal mechanism discussed above, Defendants' only argument with respect to Salix and Prudential is that their claims for losses caused by collateral calls on LIBOR-based swaps are "too attenuated."  Mem. at 36 n.42, 38 n.47.  However, Salix and Prudential entered into LIBOR-based swaps, and received too-low interest payments on those swaps when Defendants suppressed LIBOR.  They are thus efficient enforcers just like other plaintiffs that held LIBOR-based investments during the suppression period.  Whether Salix and Prudential's claims could *also* allow recovery for losses incurred as a result of collateral calls is simply not an issue that the Court need decide now.[13]

      **D.**     <u>**California Consolidated Plaintiffs ("CCPs")**</u>

Defendants contend CCPs' allegations suffer from "pleading deficiencies."  Mem. at 35.[14]  This is untrue.  The CCPs have provided extensive detail regarding Defendants' wrongful

---

[11] Further, in the analogous context of securities law claims, federal courts routinely permit purchasers to pursue federal statutory claims against ABS counterparties (many of whom are the *same defendants* as in this case).  *See, e.g., Federal Housing Finance Agency, as Conservator for the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation v. Nomura Holding America Inc.,* 68 F. Supp. 3d 439 (S.D.N.Y. 2014); *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.,* No. 13-6705, 2014 WL 241739 (S.D.N.Y. Jan. 22, 2014); *Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC,* 939 F. Supp. 2d 1113 (D. Kan. 2013).  Defendants' argument also rests on the mistaken assumption that the trustees were neutral third parties when, in fact, they were often Defendants.

[12] Such argument is particularly inapt for these DAPs.  *See, e.g.,* Salix Compl. Exs. A-B, Prudential Compl. Exs. A-B, Darby Compl. Exs. A-B, Philadelphia Compl. Ex. A.  These DAPs also of course explain the common-sense relationship between LIBOR suppression and the harm felt on their LIBOR-based investments.  *See, e.g.,* Salix Compl. ¶¶ 3, 6-7, 12, 277-78, 282-319, 571-78; Prudential Compl. ¶¶ 3, 6-7, 250-87, 514-21; Darby Compl. ¶¶ 6, 14, 268-78, 288-312, 496-503; Philadelphia Compl. ¶¶ 11-12, 15, 285-319, 506-09.

[13] For the same reasons, the Court need not determine whether the Court's management-fee ruling in *LIBOR IV* also serves as a limiter on what damages Salix may eventually be allowed to recover as part of its antitrust claim.

[14] This attack is leveled at just three CCPs:  Regents – Cal. Consol. Compl. ¶¶ 402-03, 406-11, 414-21; Mendocino – Cal. Consol. Compl. ¶¶463-73; and Sonoma – Cal. Consol. Compl. ¶¶503-04.

conduct, *see* Cal. Consol. Compl. ¶¶ 119-324, 375-400, and regarding CCPs' floating rate security transactions, including: par value; CUSIP number; and issuing party.[15]  *See* Cal. Consol. Compl. ¶¶ 402-03, 406-11, 414-21, 463-73, 503-04; Declaration of Nanci E. Nishimura in Support of California Public Plaintiffs' and City of Houston's Opposition to Defendants' Motion To Dismiss ("Nishimura Decl.") (Dkt. No. 995) ¶¶ 6, 9, 12-16, 18, 20-21, 23-25, 27-28, 30, 50, 52-56, 58-59, 61-62, 67-72, 73-75.  Nevertheless, the CCPs provide herewith additional detail regarding their floating rate security transactions.[16]  *See* Declaration of Nanci E. Nishimura in Support of Opposition to Defendants' Motion To Dismiss All Antitrust Claims Based on the Efficient Enforcer Doctrine ("Nishimura Decl. II") ¶¶ 5-41.  Coupled with information already provided, this is more than sufficient to rebut Defendants' attack and to demonstrate that CCPs entered into LIBOR-based transactions, received lowered interest payments because of Defendants' wrongful conduct, and have standing.

Defendants next assert that CCPs' claims for purchase of instruments through brokers should be dismissed per *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Mem. at 35.  As noted above, however, CCPs are direct victims of Defendants' wrongful conduct.  *See supra* Section I.B.  The presence of a broker in any given transaction does not undercut CCPs' "efficient enforcer" status.  *See supra* at 2-3 and n.4.

In addition, the argument is misplaced, as it improperly conflates the question of "efficient enforcer" with the separate issue of standing under *Illinois Brick*.  However, even if the CCPs are determined to be indirect purchasers regarding certain transactions, that is no

---

[15] CCPs also previously provided extensive detail regarding their swap transactions.  *See, e.g.*, Cal. Consol. Compl. ¶¶ 412-13; Nishimura Decl. ¶19 (providing ISDA Master Agreement, schedules thereto, and letter agreements confirming terms of the swaps).

[16] This information includes, *inter alia*: from whom the instrument was purchased, par value, CUSIP number, and pricing.  CCPs note, as well, that allegations relating to pricing are contained within CCPs' Complaint.  *See, e.g.*, Cal. Consol. Compl. ¶¶ 110-118, 530-31, 533, 537-38, 553.

impediment to standing and no obstacle to recovery, as California's antitrust law (the Cartwright Act) recognizes claims by direct and indirect purchasers.  Cal. Bus. & Prof. Code § 16750(a). And, while Defendants assert that the federal *AGC* factors would be applied to a claim under the Cartwright Act, just the opposite is true.  *See infra* Section III**.**[17]

### E.    Houston

Defendants argue that Houston's allegation that it suffered losses on auction rate securities based on instances of manipulation that resulted in "inflated LIBOR" is "disconnected" from persistent suppression.  Mem. at 36.  The fact that Houston's antitrust injury as to one category of instruments was caused by certain instances of upward manipulation arising from a trader-based conspiracy, however, does not remove Houston from the class of persons who may allege antitrust injury as to suppression.   Whether such upward manipulation decreased Houston's losses from persistent suppression is something that will be addressed at the proof stage.[18]  This Court has already held that Houston's allegation of isolated incidents of upward manipulation is not inconsistent with its allegation that it was also harmed by "persistent suppression."  *LIBOR IV* at *6 n.6, 68[19] (auction-rate securities at issue effectively became ordinary LIBOR-based floating-rate bonds).  Put simply, "[w]hen Defendants artificially inflated

---

[17] Defendants incorrectly argue that the CCPs have not identified "a single transaction where any compromised comparative analysis caused them any losses."  Mem. at 36.  That mischaracterizes the cited paragraph of the complaint and is misleading.  The paragraph in question illustrated just one of the many ways in which Defendants caused purchasers of LIBOR-linked instruments to suffer loss.  In fact, CCPs have sufficiently alleged antitrust damages.  *See, e.g.*, Calif. Consol. Compl. ¶¶ 401-506; 524-60.  This reasoning applies with equal force to the City of Houston's Complaint.  *See, e.g.*, Houston Compl. ¶¶ 386-94, 413-49.  *See* Section II.E below.

[18] Similarly, Defendants' assertion that Houston purchased LIBOR-based instruments as part of a larger hedging strategy is irrelevant to whether Houston has sufficiently alleged antitrust injury – which it has – and constitutes an impermissible attack as to the complexity of damages at the pleading stage.  *See* Mem. at 35 n.40; Houston Compl. ¶¶ 387-94, 413-49.

[19] Defendants' further argument that, "this Court has already found Houston's pleading inadequate" (Defs. Br. at 36) does not square with the fact that – at the time of *LIBOR IV* – the Court was not considering whether Houston had adequately pleaded antitrust standing.

LIBOR . . . Houston was damaged in that it had to pay an inflated rate to its bondholders." Houston Compl. ¶ 395.

### F.    NCUA and BATA

Defendants assert (Mem. at 36) that NCUA has not provided sufficient information concerning the investments purchased by Constitution Federal Credit Union.  Not true.  It has explicitly pled that the five failed credit unions for which it asserts claims "held tens of billions of dollars in investments and other assets pegged to LIBOR" including "more than $10 billion in interest rate swaps that were pegged to LIBOR" of which "[a]t least $8 billion . . . were entered into directly with certain Defendant banks or their subsidiaries."[20]   These investments include both interest rate swaps and residential mortgage-backed securities that were purchased from the Defendants or their affiliates, and from non-panel banks.

Likewise, BATA's alleged transactions predominantly consist of interest rate swaps indexed to LIBOR directly with Defendants.  BATA Compl. ¶¶ 250-52, 284-86.  It also alleges interest rate swaps indexed to LIBOR with other counterparties on which it suffered damages. *Id.* ¶ 253.  No other information is necessary to resolve Defendants' motion as to NCUA and BATA.

### G.    Schwab

The Schwab Plaintiffs purchased floating-rate securities with payments indexed to LIBOR directly from Defendants and fifteen of their broker/dealer subsidiaries and affiliates. *E.g.*, Schwab Bond Funds 2012 Compl. ¶¶ 190-201; Schwab Money Funds 2012 Compl. ¶¶ 194-213; Schwab Bank 2012 Compl. ¶¶ 190-200; Schwab 2014 Compl. ¶¶ 268-300.  They also purchased from Defendants or their broker dealer/affiliates fixed-rate instruments that were

---

[20] *See* NCUA Am. Compl., Case No. 13-2497, *NCUA v. Credit Suisse Group, AG, et al.* ¶¶ 4, 226 & Appx. A-D, Oct. 6, 2014, ECF No. 662.

priced according to their spreads to LIBOR.  *Id.*  The Schwab Plaintiffs' instruments were mainly bought in initial offerings and held to maturity; and the Schwab Plaintiffs seldom, if ever, made payments based on LIBOR.  Hastings (Schwab) Decl. ¶¶ 2, 7; Goldman (Schwab) Decl. ¶¶ 3, 4, 8; Klingman (Schwab) Decl. ¶¶ 7, 9).[21]  Schwab's affected transactions with Defendants and their affiliates total over $350 billion; Schwab also had substantial affected transactions with non-parties. *See, e.g.*, Schwab 2014 Compl. ¶¶ 268-300.

Defendants incorrectly argue, without any citation, that Schwab "conceded" that LIBOR was not a "price component" of the fixed-rate instruments and therefore any losses that Schwab suffered are "too attenuated" to support antitrust standing for these transactions.  Mem. at 39, n.50.  To the contrary, the complaints allege in detail the manner in which LIBOR formed a component of the interest rate charged on the fixed-rate instruments – just as Defendants intended it to be when they made it the "world's most important number."  *E.g.*, Fund Compl. ¶¶ 7, 197.  That LIBOR is the universally accepted pricing "component" for these categories of instruments is further confirmed by the declarations of Schwab's investment managers:  "For both fixed-rate and floating-rate instruments, one of the most important components of that price is LIBOR which is used as a benchmark by portfolio managers to compare offerings. . . . Thus, to the extent LIBOR was kept artificially low, the yield on the Money Funds' investment would have been correspondingly lower. . . . This is standard industry practice; buyers and sellers of short-term certificates of deposit and commercial paper universally use LIBOR as a benchmark."

---

[21] In addition, the Schwab Plaintiffs submit three affidavits by senior investment managers (Matt Hastings, Dennis Goldman, and Linda Klingman) further explaining the harm caused by LIBOR suppression.  Plaintiffs may properly submit and rely on affidavits, if necessary, to supplement allegations of standing.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  The submitted affidavits include as attachments the amended complaint filed by the Schwab Plaintiffs in No. 13-cv-7005, which this Court dismissed in *LIBOR IV*.  Schwab Plaintiffs believed it would be most efficient and consistent with the briefing schedule ordered by the Court *ex ante* to submit these materials in this manner rather than requesting leave to amend and a delay to the schedule.  If the Court prefers that these materials and allegations be incorporated in another set of complaints, then the Schwab Plaintiffs request leave to amend.

Klingman (Schwab) Decl. ¶¶ 5-6.  *See also* Hastings (Schwab) Decl. ¶ 2 (same); Goldman (Schwab) Decl. ¶ 3 (same).[22]

Defendants' legal theory is also entirely unclear.  If they mean to say that fixing a pricing benchmark as opposed to explicitly fixing price levels does not violate the Sherman Act, the Second Circuit has already settled this question against them in *Gelboim*, 823 F.3d at 771.  Indeed, it is hornbook law that "the machinery employed by a combination for price-fixing is immaterial."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).  For instance, in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980), the Supreme Court applied this reasoning to an alleged effect on price resulting from the restraint of collateral trade credit terms, a far more "attenuated" causal link than that alleged by Schwab with respect to fixed-rate transactions. Similarly, in *In re Beef Industry Antitrust Litigation*, the Fifth Circuit found that a class of beef producers had standing to sue for the effect on their prices of a conspiracy among retailers to suppress the prices they paid to beef packers.  600 F.2d 1148, 1154 (5th Cir. 1979).  Even though the beef producers did not directly receive the suppressed price, the Fifth Circuit found they had standing based on a market convention to use the wholesale price as the basis for the price paid to the producers:  "[t]he packer's habitual use of predetermined formulae would enable measurement of the effect on prices for fat cattle of changes in wholesale prices[.]"  *Id.* at 1165-67 (emphasis added).  Or, in the words of the Ninth Circuit, "[t]o constitute horizontal price fixing, the agreement among competitors need not involve the ultimate price."  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 990 n.8 (9th Cir. 2000) (applying *AGC*

---

[22] *See also* Stigum, Marcia, THE MONEY MARKET (3d ed. 1990) at 1023 ("Today, U.S. commercial paper trades at a spread off LIBOR[.]"). Elsewhere in their papers, Defendants twice cite, without meaningful explanation, conjecture by the Court about how Schwab's damages might have been mitigated resulting in a "windfall."  Mem. at 14, 19 (quoting *LIBOR IV* at *70).  Schwab's investment managers, who have multiple decades of experience in these markets, aver under oath that the conjecture is wrong as a matter of fact, particularly as to the Schwab Plaintiffs. (Hastings (Schwab) Decl. ¶ 7; Goldman (Schwab) Decl. ¶ 10; Klingman (Schwab) Decl. ¶ 9).

to Cartwright Act, finding that milk producers had standing to sue milk buyers cartel that "rigged the price for bulk cheese" to influence a state agency to depress milk prices)[23]; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (recognizing a claim by MLS subscribers who claimed their fee for accessing the MLS had been inflated by an upstream fee agreed to by an association of realtors).[24]

Last, Defendants' argument that Schwab's damages are speculative is contradicted by the complaints on file, which illustrate the availability of necessary data and statistical methods to analyze LIBOR.  *E.g.*, Schwab Money Funds 2012 Compl. ¶¶ 44-108.   In fact, Defendants' own analysts claim to have estimated the effect of LIBOR suppression.  *E.g.*, *id.* ¶¶ 5, 41.

### H. The FDIC-R, Freddie Mac, and Principal Plaintiffs

#### 1) These Plaintiffs Pleaded Facts and Antitrust Theories That Further Support Standing

The FDIC-R, Freddie Mac, and the Principal Plaintiffs ("P-Fin." and "P-Funds") (collectively the "FFMPP Plaintiffs") have alleged additional facts and antitrust theories that support their antitrust claims notwithstanding the Court's rulings in *In re: LIBOR–Based Financial Instruments Antitrust Litig.*, ("*LIBOR I*"), No. 11-MD-2262, 935 F. Supp. 2d 666,

---

[23] As explained in Section III *infra*, *AGC* no longer applies to the Cartwright Act; but *Knevelbaard* remains persuasive authority as an application of *AGC* to analogous facts.

[24] Although the *Beef* and *Freeman* courts were also addressing an exception to the *Illinois Brick* rule, this simply illustrates that Schwab's standing is clear in the case of fixed-rate instruments, where the Defendants do not even raise *Illinois Brick*, and Schwab has direct purchases.  *See also, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-60 (3d Cir. 2002) (plaintiffs who purchased corrugated sheets and boxes containing price-fixed linerboard from defendants were "direct purchasers"); *In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13, 18 (3d Cir. 1978) (same for candy and sugar); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 665 F. Supp. 869, 872 (E.D. Cal. 1986) (same).  Defendants' citation of *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 GBD, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) is misplaced because that case involved very different facts.  There, the plaintiffs alleged manipulation of one benchmark affected the value of holdings tied to a different benchmark.  *Id.* at *9.  Here, by contrast, LIBOR was the benchmark used to set rates of return on fixed-rate instruments and thereby a "component" of those rates.

(S.D.N.Y. 2013).[25]   *See LIBOR IV* at *85-92.[26]   The FFMPP Plaintiffs allege four discrete relevant markets:   (1) USD interest-rate benchmarks, (2) OTC USD interest-rate derivatives, (3) USD floating-rate mortgage-backed securities, and (4) USD floating-rate retail loans. FFMPP Antitrust Mem. at 8-12, 16-20.   They further alleged that Defendants were the dominant players in those defined markets and that (in addition to *per se* price-fixing) Defendants excluded competition in each of those markets.   *LIBOR IV* at *89-90; FFMPP Antitrust Mem. at 2-3, 8-24, 16-19.   Finally, the FFMPP Plaintiffs alleged they were consumers of financial products in each of the relevant markets.   FFMPP Antitrust Mem. at 20-24.[27]

These additional allegations not only provide independent reasons to deny Defendants' motion, they also address two issues raised by the Second Circuit in *Gelboim*.   First, the Second Circuit queried whether the relevant market was a potentially overbroad "worldwide market for money" or a narrower market.   *Id.*, 823 F.3d at 778.   The FFMPP Plaintiffs plead narrower markets for widely traded LIBOR-based instruments.   Second, the Second Circuit indicated that Defendants might be exposed to "disproportionate" liability if they accounted for a "small percentage" of broadly defined markets.   *Gelboim* at 779.   But the FFMPP Plaintiffs allege that Defendants dominated each of the four defined markets and, in doing so, reaped billions of dollars in illicit profits in those markets.   Thus, FFMPP Plaintiffs have answered the Second Circuit's questions and shown that they are efficient enforcers of the antitrust violations they allege (and which must be assumed to exist).

---

[25] The FFMPP Plaintiffs explained their claim at length in their Joint Memorandum of Law of Certain Direct Action Plaintiffs in Opposition to Defendants' Motion to Dismiss Direct Action Antitrust Claims Based on Prior Rulings, Dec. 8, 2014, ECF No. 883 ("FFMPP Antitrust Mem.") (incorporated by reference in this Memorandum).

[26] The Court dismissed those antitrust claims in *LIBOR IV*.   The Second Circuit's opinion effectively vacated that dismissal.   Thus, for the limited purpose of evaluating antitrust standing on this motion to dismiss, courts in this District assume "the existence of a violation."   *Gelboim* at 770-71.

[27] *See also, e.g.*, FM ¶¶ 203, 205, 213, 218, 223; P-Fin. ¶¶ 50, 163, 172, 178, 183; P-Funds ¶¶ 48, 161, 170, 176, 181; FDIC-R ¶¶ 420, 428, 433, 438.   *See also* Declaration of Eddie Vonnahme.

16

### 2) *The FDIC-R Complaint Suffers From No Pleading Deficiencies*

Defendants' contention that the FDIC-R provides "no factual details" regarding the millions of LIBOR-based loans the Closed Banks issued or the specific harm resulting from those loans, Mem. at 37, ignores the many detailed allegations in the FDIC-R's Complaint and depends on a pleading standard that has no basis in law. *See supra* II.A. This Court has already rejected one attack on the sufficiency of the FDIC-R's damages allegations. *LIBOR IV* at *68. Defendants' second effort should fare no better.

The FDIC-R uniquely alleges how the market for floating-rate loans operated, why market participants incorporated USD LIBOR as the interest-rate benchmark, and how the 38 Closed Banks, as holders of such loans, suffered a loss of cash flows due to the Defendants' suppression of LIBOR. FDIC-R ¶¶ 31-56, 117-28. The FDIC-R alleges why, as lenders, the 38 Closed Banks were "consumers" of USD short-term interest-rate benchmarks who incorporated LIBOR into their financial instruments and suffered direct injury because they were forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks. *Id.* ¶¶ 36-48, 405-420. These allegations, taken as true, are more than sufficient to defeat a motion to dismiss. *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, 13-md-2476 (DLC), 2014 WL 4379112, at *7-8 (S.D.N.Y. Sept. 4, 2014) (plaintiffs who purchased financial instruments in market lacking unrestrained competition deemed efficient enforcers).

## III.   *AGC* DOES NOT APPLY TO THE STATE LAW ANTITRUST CLAIMS

Finally, Defendants' contention that the *AGC* test for standing under *federal* antitrust law determines Plaintiffs' standing to bring *state* antitrust claims is wrong—including the "indirect purchaser" claims that these "repealer" states have specifically authorized.[28] Federal courts have

---

[28] Plaintiffs have brought claims under the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; the Illinois Antitrust Act, 740 Ill.

recognized that "it is inappropriate to broadly apply the *AGC* test" to state antitrust claims "in the absence of a clear directive from those states' legislatures or highest courts."[29]   Accordingly, "[t]he *AGC* factors apply to standing inquiries under state antitrust laws only to the extent that a state has adopted them." *In re Pool Products Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2013).   This is particularly true where the state's legislature has decided to depart from federal antitrust law and expressly granted standing to indirect purchasers.  *See D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 494-95 (E.D. Pa. 2006).  Because the legislatures and high courts of California, Illinois, New York, and Kansas have not adopted the *AGC* factors, it is incorrect to apply *AGC* to claims brought under the antitrust laws of those states.

The California Supreme Court has repeatedly instructed that federal antitrust law should not control the interpretation of California's antitrust law.   *See, e.g., Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) (interpretation of federal antitrust law is "not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes, but instead on statutes enacted by California's sister states").  Given this direct instruction, there is a broad consensus among federal courts that the California Supreme Court would reject application of the *AGC* factors to California antitrust claims.[30]

---

Comp. Stat. 10/1 *et seq*.; the Donnelly Act, N.Y. General Business Law § 340 *et seq*.; and the Kansas Restraint of Trade Act, K.S.A. § 50-101 *et seq*.   All four states − California, Illinois, New York, and Kansas − have adopted antitrust laws that reject *Illinois Brick* and expressly permit indirect purchasers to recover damages for antitrust violations (*i.e.*, "*Illinois Brick* repealer statutes"). *See* Cal. Bus. & Prof. Code § 16750; K.S.A. § 50-161; 740 Ill. Comp. Stat. 10/7(2); N.Y. Gen. Bus. L. § 340(6).  This is in addition to the kinds of claims permitted under *Illinois Brick*, which these state laws also recognize.

[29] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("antitrust standing under state law is just that, a matter of *state* law").

[30] *See, e.g.*, *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co*., No. 13-CV-01180-BLF, 2015 WL 4755335, at *19 n.10 (N.D. Cal. Aug. 11, 2015) ("In light of the California Supreme Court's repeated instruction that federal antitrust law does not control interpretation of the Cartwright Act, this Court concludes that the California Supreme Court . . . would not apply AGC."). *See also, e.g.*, *In re Capacitors Antitrust Litig.*, 106 F.

Defendants rely on two cases that predate the California Supreme Court's decision in *Aryeh* by over a decade, including *Knevelbaard Dairies,* 232 F.3d 979, 987 (9th Cir. 2000).[31] But the Ninth Circuit has since held that, after *Aryeh*, it "is no longer the law in California" that federal antitrust law controls the interpretation of California's antitrust law, and it was error for the district court to assume that these laws were "coextensive." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014).

Similarly, the Illinois, New York, and Kansas Supreme Courts have never held that *AGC* applies to state antitrust claims. Indeed, all three Supreme Courts have specifically cautioned that federal antitrust law is "not binding" on their state's courts in interpreting state antitrust law;[32] and federal courts have refused to apply *AGC* to Illinois and Kansas antitrust claims.[33]

Defendants have not cited a single Illinois, New York, or Kansas state case holding that *AGC* applies to Illinois, New York, and Kansas antitrust claims.[34] Instead, Defendants point

---

Supp. 3d 1051, 1073 (N.D. Cal. 2015) (holding that the federal standing test under *AGC* does not apply to California antitrust claims); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (same). Other federal and state courts permit suits by indirect purchasers under California law without applying the *AGC* factors.

[31] Defendants also cite *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1813-14, 43 Cal. Rptr. 2d 337, 338–39 (1995). However, as other federal courts have recognized, "*Aryeh* casts a significant shade over the reasoning of *Vinci*, which based its application of *AGC* to Cartwright Act claims on the fact that the Cartwright Act and federal antitrust law have 'similar language.'" *In re Lithium Ion Batteries Antitrust Litig.*, No. 13–MD–2420 YGR, 2014 WL 4955377, at *11 (N.D. Cal. Oct. 2, 2014).

[32] *See People v. Crawford Distrib. Co.*, 53 Ill. 2d 332, 338-39, 291 N.E.2d 648, 652 (1972); *Bergstrom v. Noah*, 266 Kan. 829, 845, 974 P.2d 520, 531 (1999); *Reinforce, Inc. v. Birney*, 308 N.Y. 164, 172-73 (Ct. App. 1954); *see also O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 342, 277 P.3d 1062, 1079 (2012).

[33] *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *11 (N.D. Cal. Oct. 2, 2014) (Kansas; Illinois).

[34] Defendants cite federal cases, none of which are controlling. **Illinois:** *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997) contains no mention of *AGC*. The court in *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 930 (N.D. Ill. 2015) did not apply *AGC*; because the plaintiff's Illinois antitrust claims failed for other reasons, the question of "whether Illinois' Illinois Brick repealer statute (which repealed one antitrust-standing opinion) would motivate Illinois courts to decline to follow AGC (a subsequent antitrust-standing opinion)" was purely "academic."). **Kansas:** *Orr v. BHR, Inc.*, 4 F. App'x 647, 651 (10th Cir. 2001) concerned an issue of antitrust standing and nowhere mentioned *AGC*. *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617, at *3 (D. Kan. Feb. 1, 2006) relied on cases from states *other than Kansas*, and denied the defendants' motion to dismiss without conducting an *AGC* test. **New York:** *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 81 (2d Cir. 2013) (cited at 40 of Mem.) did not dispose of this undecided issue as matter of New York law,

(Mem. at 39 n.51) to the "harmonization" provisions in these states' antitrust laws, which generally allow state courts to look to federal antitrust law for guidance; but, these "harmonization" provisions do not require state courts to follow federal law when doing so would be inconsistent with the language or legislative goals of state antitrust law.  Indeed, Illinois' "harmonization" provision specifically provides that its courts should look to federal antitrust law "as a guide" only where the language of Illinois' antitrust law "is identical or similar to that of a federal antitrust law." 740 Ill. Comp. Stat. 10/11.  Kansas' "harmonization" provision provides that courts should construe Kansas' antitrust law "in harmony" with federal antitrust law "[e]xcept as otherwise provided in subsection[] (d)"; subsection (d)(2) states that Kansas' antitrust law "shall not be construed to prohibit . . . actions or proceedings by indirect purchasers." K.S.A. § 50-163.  The New York Court of Appeals has held that the Donnelly Act should be construed to reflect "differences in the statutory language or the legislative history" from that of federal law.  *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988).[35]

## CONCLUSION

As set forth above, DAPs have more than sufficiently alleged that they are efficient enforcers of Defendants' alleged antitrust conspiracy.   This Court should therefore deny Defendants' Motion to Dismiss.

---

and relied on a New York case which did not conduct an *AGC* test and dismissed claims for failure to plead antitrust injury.

[35] Even if it were appropriate to use *AGC* to analyze whether plaintiffs were efficient enforcers of state antitrust laws (it is not), the Court would need to apply a modified version of the *AGC* test to accommodate indirect purchasers; this "modification may consist of, for example, a loosening of requirements of directness, a greater tolerance for the existence of other parties who may bring suit, or lessened concern over duplicative recoveries." *In re Lithium Ion Batteries*, 2014 WL 4955377, at *9.  Thus, even assuming that *AGC* forecloses some federal antitrust claims (and it does not), it would not foreclose these state antitrust claims.

Dated:  August 5, 2016

Respectfully submitted,

ZELLE LLP

By:   _/s/ James R. Martin_____
       James R. Martin

James R. Martin
Jennifer D. Hackett
Woody N. Peterson
ZELLE LLP
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
Tel:  (202) 899-4100
Fax:  (612) 336-9100
Email:   jmartin@zelle.com
       jhackett@zelle.com
       wpeterson@zelle.com

Richard J. Leveridge
ADAMS HOLCOMB LLP
1875 Eye Street, NW, Suite 810
Washington, DC  20006
(202) 580-8817
(202) 580-8821
Email:    leveridge@adamsholcomb.com

*Counsel for Plaintiffs*
*The Federal Home Loan Mortgage Corporation*
*and The Federal Deposit Insurance Corporation*
*as Receiver for 38 Closed Banks*

By: _/s/ Scott P. Schlesinger_
     Scott P. Schlesinger

Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Fort Lauderdale, FL 33316
Tel:  (954) 320-9507
Fax:  (954) 320-9509
Email:    scott@schlesingerlaw.com
            jhaberman@schlesingerlaw.com
            jgdanski@schlesingerlaw.com

*Counsel for Plaintiffs Amabile, et al.*

By: _/s/ Nanci E. Nishimura_
     Nanci E. Nishimura

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Tel:  (650) 697-6000
Fax:  (650) 697-0577
Email:    nnishimura@cpmlegal.com
            medling@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Tel:  (212) 201-6820
Fax:  (646) 219-6678
Email:    abarnett@cpmlegal.com

*Counsel for Plaintiffs The Regents of the University of California; East Bay Municipal Utility District; San Diego Association of Governments; City of Richmond; Richmond Joint Powers Financing Authority; Successor Agency to the Richmond Community Redevelopment Agency; City of Riverside; Riverside Public Financing Authority; County of Mendocino; County of Sacramento; County of San Diego; County of San Mateo; San Mateo County Joint Powers Financing Authority; County of Sonoma, and David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma*

By: _/s/ Richard W. Mithoff_
     Richard W. Mithoff

Richard W. Mithoff
Warner V. Hocker
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
500 Dallas Street
Houston, TX 77002
Tel:  (713) 654-1122
Fax:  (713) 739-8085
Email:    Rmithoff@mithofflaw.com
        whocker@mithofflaw.com


By: _/s/Nanci E. Nishimura_
     Nanci E. Nishimura

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Tel:  (650) 697-6000
Fax:  (650) 697-0577
Email:    nnishimura@cpmlegal.com
        medling@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Tel:  (212) 201-6820
Fax:  (646) 219-6678
Email:    abarnett@cpmlegal.com

*Counsel for Plaintiff The City of Houston*

By: _/s/ David C. Frederick_
     David C. Frederick

David C. Frederick
Wan J. Kim
Andrew C. Shen
KELLOGG, HUBER, HANSEN,
    TODD, EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
Email:    dfrederick@khhte
        ashen@khhte
        wkim@khhte

*Counsel for National Credit Union
Administration Board as Liquidating Agent
for U.S. Central Federal Credit Union, et al.*

By:   */s/ Daniel L. Brockett*
      Daniel L. Brockett

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Tel.:  (212) 849 7000
Fax:  (212) 849-7100
E-mail:
    danbrockett@quinnemanuel.com
    danielcunningham@quinnemanuel.com
    steigolson@quinnemanuel.com
    jacobwaldman@quinnemanuel.com

Jeremy D. Andersen (pro hac vice)
Chris R. Barker (pro hac vice)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel.: (213) 443-3000
Fax: (213) 443-3100
E-mail:
    jeremyandersen@quinnemanuel.com
    chrisbarker@quinnemanuel.com

*Counsel for the Darby, Philadelphia,
Prudential, and Salix Plaintiffs*

By:   */s/ Mathieu J. Shapiro*
      Mathieu J. Shapiro

Mathieu J. Shapiro (PA 76266)
OBERMAYER REBMANN MAXWELL &
    HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
Tel:  (215) 665-3014
Fax:  (215) 665-3165
Email:   mathieu.shapiro@obermayer.com

Michael J. Boni (PA 52983)
Joshua D. Snyder (PA 88657)
John E. Sindoni (PA 91729)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel.: (610) 822-0200
Fax: (610) 822-0206
Email:   mboni@bonizack.com
      jsnyder@bonizack.com
      jsindoni@bonizack.com

*Counsel for Plaintiffs The City of
Philadelphia and The Pennsylvania
Intergovernmental Cooperation Authority*

By: _/s/ Steven E. Fineman_
     Steven E. Fineman

Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel:  (212) 355-9500
Faax:  (212) 355-9592
Email:  sfineman@lchb.com
       mmiarmi@lchb.com

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel:  (415) 956-1000
Fax:  (415) 956-1008
Email:  rheimann@lchb.com
      efastiff@lchb.com
      bglackin@lchb.com

*Counsel for Plaintiffs Bay Area Toll Authority, Schwab Short-Term Bond Market Fund, et al., Charles Schwab Bank, N.A., et al., and Schwab Money Market Fund, et al.*

By: _/s/ Stacey P. Slaughter_
     Stacey P. Slaughter

Stacey P. Slaughter
ROBINS KAPLAN LLP
601 Lexington Avenue
Suite 3400
New York, NY 10022-4611
Tel:  (212) 980-7400
Email:  SSlaughter@RobinsKaplan.com

K. Craig Wildfang (MN Bar No. 117043)
Thomas J. Undlin (MN Bar No. 8018)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402–2015
Tel:  (612) 349–8500
email:  KCWildfang@RobinsKaplan.com
      TUndlin@RobinsKaplan.com

*Counsel for Plaintiffs Principal Financial Group, Inc.; Principal Financial Services, Inc.; and Principal Life Insurance Company and Principal Funds, Inc.; PFI Bond & Mortgage Securities Fund; PFI Bond Market Index Fund; PFI Core Plus Bond I Fund; PFI Diversified Real Asset Fund; PFI Equity Income Fund; PFI Global Diversified Income Fund; PFI Government & High Quality Bond Fund; PFI High Yield Fund; PFI High Yield Fund I; PFI Income Fund; PFI Inflation Protection Fund; PFI Short-Term Income Fund; PFI Money Market Fund; PFI Preferred Securities Fund; Principal Variable Contracts Funds, Inc.; PVC Asset Allocation Account; PVC Money Market Account; PVC Balanced Account; PVC Bond & Mortgage Securities Account; PVC Equity Income Account; PVC Government & High Quality Bond Account; PVC Income Account; and PVC Short-Term Income Account*