# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: | MDL No. 2262<br>Master File No. 1:11-md-02262-NRB<br><br>**ORAL ARGUMENT REQUESTED** |
| JOSEPH AMABILE, *et al.*,<br>              Plaintiffs,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 13-cv-1700 |
| BAY AREA TOLL AUTHORITY,<br>              Plaintiff,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 14-cv-3094 |
| THE REGENTS OF THE UNIVIVERSITY OF CALIFORNIA,<br>              Plaintiff,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 13-cv-5186 |
| EAST BAY MUNICIPAL UTILITY DISTRICT,<br>              Plaintiff,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 13-cv-0626 |
| SAN DIEGO ASSOCIATION OF GOVERNMENTS,<br>              Plaintiff,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 13-cv-5221 |
| CITY OF RICHMOND, *et al.*,<br>              Plaintiffs,<br>       v.<br>BANK OF AMERICA CORP., *et al.*,<br>              Defendants. | No. 13-cv-0627 |

| | |
|---|---|
| CITY OF RIVERSIDE, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-0597 |
| COUNTY OF MENDOCINO, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-8644 |
| COUNTY OF SACRAMENTO,<br>                              Plaintiff,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-5569 |
| COUNTY OF SAN DIEGO, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-0667 |
| COUNTY OF SAN MATEO, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-0625 |
| COUNTY OF SONOMA, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BANK OF AMERICA CORP., *et al.*,<br>                              Defendants. | No. 13-cv-5187 |
| DARBY FINANCIAL PRODUCTS, *et al.*,<br>                              Plaintiffs,<br>                    v.<br>BARCLAYS BANK PLC, *et al.*,<br>                              Defendants. | No. 13-cv-8799 |

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP. as Receiver for AMCORE BANK, N.A., *et al.*, <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 14-cv-1757 |
| THE FEDERAL HOME LOAN MORTGAGE CORP., <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-3952 |
| CITY OF HOUSTON, <br> Plaintiff, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-5616 |
| CITY OF PHILADELPHIA, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.* , <br> Defendants. | No. 13-cv-6020 |
| SCHWAB SHORT-TERM BOND MARKET FUND, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 11-cv-6409 |
| CHARLES SCHWAB BANK, N.A., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 11-cv-6411 |
| SCHWAB MONEY MARKET FUND, *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 11-cv-6412 |

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD as Liquidating Agent for U.S. Central Federal Credit Union, *et al.*, <br> Plaintiff, <br> v. <br> CREDIT SUISSE GRP. AG, *et al.*, <br> Defendants. | No. 13-cv-7394 |
| PRINCIPAL FINANCIAL GROUP, INC., *et al.* <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-6014 |
| PRINCIPAL FUNDS, INC., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 13-cv-6013 |
| PRINCIPAL FINANCIAL GROUP, INC., *et al.* <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 15-cv-9792 |
| PRINCIPAL FUNDS, INC., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 15-cv-9793 |
| PRINCIPAL FINANCIAL GROUP, INC., *et al.* <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 16-cv-0592 |
| PRINCIPAL FUNDS, INC., *et al.*, <br> Plaintiffs, <br> v. <br> BANK OF AMERICA CORP., *et al.*, <br> Defendants. | No. 16-cv-0590 |

| | |
|---|---|
| PRUDENTIAL INVESTMENT PORTFOLIOS 2, *et al.*, <br><br>                      Plaintiffs, <br>      v. <br>BANK OF AMERICA CORP., *et al.*, <br>                      Defendants. | No. 14-cv-4189 |
| SALIX CAPITAL US INC., <br>                      Plaintiff, <br>      v. <br>BANC OF AMERICA SECURITIES LLC, *et al.*, <br>                      Defendants. | No. 13-cv-4018 |
| ELLEN GELBOIM, *et al.*, <br>                      Plaintiffs, <br>      v. <br>CREDIT SUISSE GROUP AG, *et al.*, <br>                      Defendants | No. 12 CV 1025 (NRB) |
| MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*, <br>                      Plaintiffs, <br>      v. <br>CREDIT SUISSE GROUP AG, *et al.*, <br>                      Defendants. | No. 11-cv-5450 (NRB) |
| METZLER INVESTMENT GmbH, *et al.*, <br>                      Plaintiffs, <br>      v. <br>CREDIT SUISSE GROUP AG, *et al.* <br>                      Defendants. | No. 11-cv-2613 (NRB) |

**PLANITIFFS' JOINT MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
ALL ANTITRUST CLAIMS FOR LACK OF PERSONAL JURISDICTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

LEGAL PRINCIPLES .................................................................................3

ARGUMENT ..............................................................................................5

I.   THE EXERCISE OF SPECIFIC PERSONAL JURISDICTION OVER
     DEFENDANTS FALLS WELL WITHIN THE LIMITS OF DUE PROCESS.................5

     A.   Defendants Carried Out Their Conspiracy in the United States .............5

          1.   By Selling or Trading USD LIBOR-Based Products to Plaintiffs
               in the United States, Defendants Voluntarily Created Contacts
               with the United States ...................................................................6

          2.   By Transmitting False USD LIBOR Rates to Thomson Reuters
               in New York, Defendants Committed Conspiratorial Acts in
               the United States ...........................................................................7

          3.   By Directing False USD LIBOR Submissions from the United
               States, Defendants Conspired in the United States .....................8

          4.   Defendants Used Subsidiaries and/or Affiliates in the United States
               To Implement the Conspiracy in the United States ....................9

     B.   Defendants Purposefully Availed Themselves of the United States Forum
          Because Their Minimal Contacts Here "Relate to" Plaintiffs' Claims.................11

     C.   Under *Calder*'s "Effects Test," Defendants Are Subject To Specific
          Jurisdiction for Foreign Conduct ...........................................................13

          1.   Defendants Committed Unlawful Acts and Expressly Aimed
               Their Profit-Motivated Conspiratorial Conduct At, and Caused
               Harm Within, the United States................................................15

          2.   The Panel Bank Defendants Published False USD LIBOR Submissions
               in the United States To Mislead United States Investors About
               Defendants' Reputation .............................................................19

          3.   The United States Was a Focal Point of the Harm Caused by
               Defendants' Alleged Conspiracy ...............................................19

i

D. Defendants' Acts in Furtherance of the Conspiracy in the United States May Be Attributed To Foreign Defendants for Purposes of Establishing Foreign Defendants' Contacts with the United States ...........................................21

  1. Conspiracy-Based Jurisdiction Is a Recognized Theory of Jurisdiction.............................................................................................21

  2. The Elements of Conspiracy Jurisdiction Are Met....................................25

  3. There Is a Statutory Basis for Conspiracy Jurisdiction.............................27

E. Defendants Cannot Carry Their Heavy Burden of Demonstrating That Exercising Personal Jurisdiction Would Offend Traditional Notions of Fair Play and Substantial Justice.......................................................................30

II. EXERCISING PERSONAL JURISDICTION IS PROPER DESPITE THE OBJECTIONS OF CERTAIN DEFENDANTS AS TO VENUE.....................................32

III. FEDERAL RULE OF CIVIL PROCEDURE 4(K)(2) PROVIDES AN ALTERNATIVE STATUTORY BASIS ON WHICH TO EXERCISE JURISDICTION ...............................................................................................................35

IV. DEFENDANTS WHO HAVE FORFEITED OR WAIVED JURISDICTION ARGUMENTS CANNOT RAISE THEM NOW................................................................35

V. THE COURT SHOULD EXERCISE SUPPLEMENTAL PERSONAL JURISDICTION OVER ANTITRUST CLAIMS RELATING TO SPECIFIC TRANSACTIONS ALREADY FOUND TO TRIGGER JURISDICTION .....................38

VI. SPECIFIC JURISDICTION OVER RABOBANK AND DEUTSCHE BANK HAS ALREADY BEEN DEMONSTRATED BY EXCHANGE-BASED PLAINTIFFS ...................................................................................................................40

VII. TO THE EXTENT (IF AT ALL) THE COURT DETERMINES IT HAS ANY QUESTION AS TO WHETHER IT CAN EXERCISE PERSONAL JURISDICTION, IT SHOULD PERMIT LIMITED JURISDICTIONAL DISCOVERY......................................................................................................................40

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*AFL Fresh & Frozen Fruits & Vegetables v. De-Mar Food Servs.*,
2007 WL 4302514 (S.D.N.Y. Dec. 7, 2007) ................................................ 39

*AFL-CIO Pension Fund v. Herrmann*,
9 F.3d 1049 (2d Cir. 1993) ....................................................................... 31

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
596 F.Supp.2d 630 (E.D.N.Y. 2009) .......................................................... 33

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
782 F. Supp. 215 (S.D.N.Y. 1992) .............................................. 22, 24, 29, 30

*Andre Emmerich Gallery, Inc. v. Segre*,
1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) ................................................ 21

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
2007 WL 4326793 (S.D.N.Y. Dec. 7, 2007) ............................................... 35

*Aquadrill, Inc. v. Envtl. Compliance Consulting Servs.*,
558 N.W.2d 391 (Iowa 1997) .................................................................... 28

*Banana Distribs., Inc. v. United Fruit Co.*,
269 F.2d 790 (2d Cir. 1959) ...................................................................... 33

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002) .......................................................... 4, 11, 12, 13

*BBK Tobacco & Foods LLP v. Juicy eJuice*,
2014 WL 1686842 (D. Ariz. Apr. 29, 2014) ............................................... 20

*Bense v. Interstate Battery Sys. of Am.*,
683 F.2d 718 (2d Cir. 1982) ................................................................... 7, 40

*BeoCare Grp., Inc. v. Morrissey*,
124 F. Supp. 3d 696 (W.D.N.C. 2015) ....................................................... 23

*Best Chairs Inc. v. Factory Direct Wholesale, LLC*,
121 F. Supp. 3d 828 (S.D. Ind. 2015) ........................................................ 23

*Bey v. City of New York*,
454 F. App'x 1 (2d Cir. 2011) .................................................................... 34

*Black v. Acme Mkts., Inc.*,
564 F.2d 681 (5th Cir. 1977) ..................................................................... 33

*Brown v. Kerkhoff*,
   504 F. Supp. 2d 464 (S.D. Iowa 2007) ........................................................ 28

*Burger King v. Rudzewicz*,
   471 U.S. 462 (1985) ............................................................................... 5, 6

*Calder v. Jones*,
   465 U.S. 783 (1984) ...................................................................... 2, 5, 14, 19

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India*,
   551 F.3d 285 (4th Cir. 2009) .................................................................... 28

*CFTC v. Wilson*,
   27 F. Supp. 3d 517 (S.D.N.Y. 2014) ............................................................. 3

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2012) ..................................................................... 37

*Chloé v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) .............................................................. 4, 7, 11

*Chrysler Corp. v. Fedders Corp.*,
   643 F.2d 1229 (6th Cir. 1981) .................................................................. 23

*Cleft of the Rock Found. v. Wilson*,
   992 F. Supp. 574 (E.D.N.Y. 1998) ............................................................. 21

*Commissioning Agents, Inc. v. Long*,
   143 F. Supp. 3d 775 (S.D. Ind. 2015) ......................................................... 10

*Corporacion Mexicana De Mantenimiento Integral v. Pemex-Exploracion Y Produccion*,
   Dkt. 13-4022, slip op. at 14 (2d Cir. Aug. 2, 2016) .................................... 37, 38

*Crompton Corp. v. Clariant Corp.*,
   221 F. Supp. 2d 683 (M.D. La. 2002) ......................................................... 14

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ...................................................................... 4, 10, 31

*Daniel v. Am. Bd. of Emergency*,
   428 F.3d 408 (2d Cir. 2005) ............................................................. 4, 29, 35

*Dixon v. Mack*,
   507 F. Supp. 345 (S.D.N.Y. 1980) .............................................................. 25

*Dunham's, Inc. v. Nat'l Buying Syndicate*,
   614 F. Supp. 616 (E.D. Mich. 1985) ............................................................ 33

iv

*Emerald Asset Advisors, LLC v. Schaffer*,
  895 F. Supp. 2d 418 (E.D.N.Y. 2012) ............................................... 21

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*,
  2008 WL 4126602 (D.N.J. Aug. 27, 2008) ....................................... 20

*Exclaim Assocs. Ltd. v. Nygate*,
  2005 WL 3501559 (Sup. Ct. Sept. 15, 2005) ................................... 27

*Expoconsul Int'l, Inc. v. A/E Sys., Inc.*,
  711 F. Supp. 730 (S.D.N.Y. 1989) ..................................................... 33

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ...................................................... passim

*Gen. Elec. Co. v. Bucyrus-Erie Co.*,
  550 F. Supp. 1037 (S.D.N.Y. 1982) ................................................... 29

*Gramercy Advisors, LLC v. Ripley*,
  2014 WL 5847444 (S.D.N.Y. Nov. 12, 2014) ................................... 32

*Green v. U.S. Chewing Gum Mfg. Co.*,
  224 F.2d 369 (5th Cir. 1955) ............................................................. 33

*Gucci Am., Inc. v. Weixing Li*,
  768 F.3d 122 (2d Cir. 2014) ......................................................... 4, 36

*Hanna v. Blanchette*,
  2014 WL 4185816 (S.D. Tex. Aug. 21, 2014) ................................... 23

*HealthSpot, Inc. v. Computerized Screening, Inc.*,
  66 F. Supp. 3d 962 (N.D. Ohio 2014) ............................................... 35

*Heinfling v. Colapinto*,
  946 F. Supp. 260 (S.D.N.Y. 1996) ..................................................... 26

*In re Aluminum Warehousing Antitrust Litigation*,
  90 F. Supp. 3d 219 (S.D.N.Y. 2015) ..................................... 23, 24, 30

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) .............................. 27, 30

*In re Automotive Parts Litig.*,
  2015 WL 4508938 (E.D. Mich. July 24, 2015) ................................. 23

*In re Auto. Refinishing Paint Antitrust Litig.*,
  358 F.3d 288 (3d Cir. 2004) .............................................................. 29

v

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.,*
    2007 WL 2212713 (D.N.J. July 30, 2007)............................................................ 14, 20

*In re Capacitors Antitrust Litig.,*
    2015 WL 3638551 (N.D. Cal. June 11, 2015) ................................................ 17

*In re Cardizem CD Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000)........................................................ 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    27 F. Supp. 3d 1002 (N.D. Cal. 2014) .................................................... 10, 17

*In re Chicken Antitrust Litig.,*
    407 F. Supp. 1285. (N.D. Ga. 1975) ............................................................ 33

*In re Elec. Books Antitrust Litig.,*
    2014 WL 1642813 (S.D.N.Y. April 24, 2014) .............................................. 34

*In re Fasteners Antitrust Litig.,*
    2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ...................................... 14, 17, 20

*In re Foreign Exch. Benchmark Antitrust Litig. (FOREX),*
    2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ........................................... 5, 18

*In re Isostatic Graphite Antitrust Litig.,*
    2002 WL 31421920 (E.D. Pa. Sept. 19, 2002) ............................................. 9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................... 6

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR III),*
    27 F. Supp. 3d 447 (S.D.N.Y. 2014).......................................................... 40

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR IV),*
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ........................................ passim

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR V),*
    2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016)................................. 14, 18, 36, 40

*In re Magnetic Audiotape Antitrust Litig.,*
    334 F.3d 204 (2d Cir. 2003)..................................................... 14, 17, 30, 40

*In re Optical Disk Drive Antitrust Litig.,*
    2015 WL 1926635 (N.D. Cal. April 28, 2015)............................................. 17

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,*
    230 F. Supp. 2d 376 (S.D.N.Y. 2002).......................................................... 10

*In re Terazosin Hydrochloride Antitrust Litig.*,
    352 F. Supp. 2d 1279 (S.D. Fla. 2005) ........................................................ 19

*In re Terrorist Attacks on Sept. 11, 2011*,
    538 F.3d 71 (2d Cir. 2008) ............................................................................ 21

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................ 23, 26, 28

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 5444261 (N.D. Cal. Nov. 9, 2011) ............................................... 17

*In re Vitamin C Antitrust Litig.*,
    2012 WL 12355046 (S.D.N.Y. Aug. 8, 2012) ....................................... 14, 17

*In re Vitamin C Antitrust Litig.*,
    2012 WL 2930109 (E.D.N.Y. July 18, 2012) ........................................ 29, 34

*In re Vitamins Antitrust Litig.*,
    270 F. Supp. 2d 15 (D.D.C. 2003) .................................................. 10, 14, 22

*In Re Western States Wholesale Natural Gas Antitrust Litig.*,
    715 F.3d 716 (9th Cir. 2013) ....................................................................... 14

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ..................................................................................... 33

*J. McIntyre Machinery, Ltd. v. Nicastro*,
    564 U.S. 873 (2011) ............................................................................... 11, 37

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ....................................................................................... 5

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    410 F. Supp. 2d 592 (E.D. Ky. 2006) .......................................................... 22

*Kernan v. Kurz–Hastings, Inc.*,
    175 F.3d 236 (2d Cir.1999) .................................................................. 13, 20

*Kitto v. Thrash Oil & Gas Co.*,
    1990 WL 33217 (W.D.N.Y. Mar. 20, 1990) ................................................ 32

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) .......................................................................... 13, 26, 29

*Laydon v. Mizuho Bank, Ltd.*,
    2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ............................................. 37

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  468 F.2d 1326 (2d Cir. 1972), abrogated on other grounds by *Morrison v.
  Nat'l Australia Bank Ltd.*, 561 U.S. 274 (2010) ............................................................ 4, 20

*Lehigh Valley Indus., Inc. v. Birenbaum*,
  527 F.2d 87 (2d Cir. 1975) ................................................................................. 25

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ............................................................................................ 34

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  673 F.3d 50 (2d Cir. 2012) .................................................................................. 3

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ..................................................................... 7, 11, 13

*MM Glob. Servs. Inc. v. Dow Chem. Co.*,
  404 F. Supp. 2d 425 (D. Conn. 2005) ................................................................ 9

*Nathan v. Takeda Pharm. Am. Inc.*,
  83 Va. Cir. 216 (2011) ...................................................................................... 28

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*,
  673 F.3d 84 (2d Cir. 2012) ................................................................................ 32

*Nw. Aluminum Co. v. Hydro Aluminum Deutschland GmbH*,
  2003 WL 23571744 (D. Or. Sept. 23, 2003) ................................................... 20

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*,
  260 F.3d 453 ..................................................................................................... 38

*Peterson v. Wallace*,
  622 F. Supp. 2d 791 (D. Minn. 2008) ............................................................... 26

*Philan Ins. Ltd. v. Frank B. Hall & Co.*,
  215 A.D.2d 112, 626 N.Y.S.2d 85 (1995) ........................................................ 29

*Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*,
  875 F. Supp. 2d 297 (S.D.N.Y. 2012) ................................................................ 9

*Remmes v. Int'l Flavors & Fragrances, Inc.*,
  389 F. Supp. 2d 1080 (N.D. Iowa 2005) ..................................................... 24, 28

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
  48 F. Supp. 3d 675 (S.D.N.Y. 2014) ................................................................ 10

*S. New Eng. Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ................................................................................ 3

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................... 30

*Sherwin-Williams Co. v. Avisep, S.A. De C.V.*,
    2016 WL 354898 (S.D.N.Y. Jan. 28, 2016) ...................................... 12

*Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*,
    859 N.W.2d 182 (Iowa 2015) ............................................................ 28

*Spivak v. Law Firm of Tripp Scott, P.A.*,
    2015 WL 1084856 (N.D. Ohio Mar. 10, 2015) ................................ 23

*State v. Tonelli*,
    749 N.W.2d 689 (Iowa 2008) ............................................................ 28

*State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 487 (App. Div. 2006) ........................... 28

*Stauffacher v. Bennett*,
    969 F.2d 455 (7th Cir. 1992) ..................................................... 22, 24

*Sugartown Worldwide LLC v. Shanks*,
    2015 WL 1312572 (E.D. Pa. Mar. 24, 2015) ................................... 28

*Tadayon v. DATTCO, Inc.*,
    2016 WL 1257798 (D. Conn. Mar. 30, 2016) .......................... 21, 23

*Tymoshenko v. Firtash*,
    2013 WL 1234943 (S.D.N.Y. Mar. 27, 2013) .................................. 24

*United Phosporus, Ltd., v. Angus Chemical Co.*,
    43 F. Supp. 2d 904 (N.D. Ill. 1999) ................................................. 22

*United States ex rel. Rudick v. Laird*,
    412 F.2d 16 (2nd Cir. 1969)............................................................... 33

*United States v. Hayes*,
    118 F. Supp. 3d 620 (S.D.N.Y. 2015)......................................... 3, 20

*United States v. Hayes*,
    99 F. Supp. 3d 409 (S.D.N.Y. 2015).............................................. 20

*United States v. Scophony Corp.*,
    333 U.S. 795 (1948) .......................................................................... 33

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).............................................................................. 4

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) .................................................................................................... Passim

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286, 292 (1980) ...................................................................................................... 30

**Statutes**

7 U.S.C. § 25(c) ............................................................................................................................... 3

15 U.S.C. § 22 .................................................................................................................................. 4

18 U.S.C. § 371 .............................................................................................................................. 24

18 U.S.C. § 1349 ............................................................................................................................ 24

28 U.S.C. § 1367 ............................................................................................................................ 39

28 U.S.C. § 1367(c) ....................................................................................................................... 40

28 U.S.C. § 1391(b) ................................................................................................................. 31, 35

Cal. Civ. Proc. Code § 410.10 ...................................................................................................... 31

Va. Code § 8.01-328.1 ................................................................................................................... 28

**Rules**

Fed. R. Civ. P. § 12(b), *et seq.* ............................................................................................. passim

Fed. R. Civ. P. § 12(h) ............................................................................................................ 29, 36

Fed. R. Civ. P. § 15(a)(1)(B) ........................................................................................................ 35

N.Y. C.P.L.R. § 302 ...................................................................................................................... 26

N.Y. C.P.L.R. § 302(a)(1) ............................................................................................................. 29

N.Y. C.P.L.R. § 302(a)(2) ....................................................................................................... 28, 29

**Other Authorities**

Manual for Complex Litigation § 20.132 ..................................................................................... 34

Model Penal Code § 5.03 ............................................................................................................... 24

Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law ¶ 1906a (2010)) ........................ 19, 20

Restatement (Second) of Torts § 876 ............................................................................................ 24

## PRELIMINARY STATEMENT

The Second Circuit's decision in *Gelboim* not only reinstated Plaintiffs' antitrust claims and revived Plaintiffs' conspiracy allegations, it fundamentally widened the lens through which Defendants' conduct should be viewed in the context of personal jurisdiction.[1]  The Second Circuit confirmed that Plaintiffs plausibly allege that Defendants formed an "uncomplicated" price-fixing cartel and acted with a "common motive to conspire" for "increased profits" and to project "financial soundness" by persistently suppressing USD LIBOR.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771, 781-82 (2d Cir. 2016).[2]  *Gelboim* thus brings into the jurisdictional analysis of Plaintiffs' antitrust claims a wider range of conduct than that which was relevant to the non-conspiratorial "data fraud" claims.  Yet Defendants argue that *Gelboim* changed nothing.[3]  When viewed through the post-*Gelboim* lens, Defendants' Motion should be dismissed for at least the following reasons:

First, personal jurisdiction is proper over Defendants that affirmatively engaged in acts in furtherance of the alleged conspiracy **in the U.S.**  *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). Every time a Defendant or its subsidiary and/or affiliate sold a USD LIBOR-based product to a U.S. counterparty, paid interest on a USD LIBOR-based bond in the U.S., or traded on a domestic

---

[1] "Plaintiffs" includes the entities identified in the accompanying Appendix A. "Complaints" and "allegations" refer to the operative and amended complaints identified in Appendix A, which are incorporated by reference herein. "Defendants" is used both generally to refer to all defendants subject to the above-mentioned Complaints, and specifically to refer to those moving to dismiss a plaintiff's antitrust claim on the basis of jurisdiction or venue, *see* Schedules B & C to Defs.' Master App., ECF No. 1480-1.  ECF references are to the docket for Master File No. 11-md-2262.  Appendix A further defines certain defendant groups referred to in this Memorandum:  "Domestic Defendants," "Foreign Defendants," "Panel Bank Defendants," and "Venue Defendants."

[2] Unless otherwise stated, all internal citations and quotation marks have been omitted and all emphasis added.

[3] Joint Mem. Law Supp. Defs.' Mot. Dismiss All Antitrust Claims for Lack of Personal Jurisdiction ("Defs. PJ Br.") 1, ECF No. 1483.  For example, Defendants continue to rely on this Court's conclusion in *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*), No. 11-md-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) to assert that Plaintiffs "cannot show" Defendants "aimed their manipulative conduct at the United States."  Defs. PJ Br. 18.  The Court's conclusion there related to data fraud, not an antitrust conspiracy to reap illicit profits from U.S. consumers.

exchange, with an artificially suppressed LIBOR interest rate, it voluntarily created contacts with the U.S. in furtherance of the profit-motivated conspiracy.  Further, contrary to Defendants' conclusory declarations, recent public disclosures reveal that at least some Defendants submitted or directed false USD LIBOR rates *from* the U.S. and/or transmitted USD LIBOR rates to Thomson Reuters *in New York* for purposes of calculating and publishing the price-fixed rate.

Second, personal jurisdiction is proper because Defendants participated in the alleged conspiracy with the express purpose and effect of reaping illicit profits in the U.S.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984).  Under *Calder*, this Court may exercise personal jurisdiction over all Defendants even if one assumes (counterfactually) that all of the alleged conduct occurred entirely outside the U.S.  Recent public disclosures reveal that Defendants targeted USD LIBOR consumers in the U.S. and "Panel Bank Defendants" were concerned about protecting their reputation with investors and regulators in the U.S.  Defendants affirmatively knew and intended that their misconduct would affect USD LIBOR-based instruments in the U.S. because, *inter alia*, every Defendant (or their agents) sold or issued LIBOR-based instruments to and/or traded with American counterparties.

Third, consistent with well-settled principles of agency and civil conspiracy, a co-conspirator's in-forum acts in furtherance of a conspiracy can be attributed to its fellow co-conspirators for personal jurisdiction purposes.  Accordingly, a dismissal of claims against any Defendant for lack of jurisdiction would require finding not only that the Defendant acted wholly outside the U.S., but also that *all* of the Defendants acted outside the U.S.

Fourth, "Venue Defendants" contend that Plaintiffs fail to establish venue in accordance with the Clayton Act, but that argument is both meritless and too late:  Defendants waived the privilege of challenging venue and the Clayton Act as a statutory basis of jurisdiction.

At its core, Defendants' Motion rests on the absurd premise that domestic victims of a price-fixing cartel should be precluded from bringing suit in the U.S. against the members of that cartel, some of whom are domiciled in the U.S., for harm caused by the cartel's conduct in or aimed at the U.S.  Defendants' position is so far contrary to law and policy that, if accepted, it would have dangerous consequences for American consumers, potentially even shielding illegal conspiracies from governmental regulatory action.  For example, the CFTC has taken a leadership role in uncovering wrongdoing by many foreign defendants, including persistent suppression, relying on the same jurisdictional principles that apply to private antitrust plaintiffs.[4]  The Court should decline Defendants' invitation to rewrite the law of personal jurisdiction and immunize the cartel from liability.

## LEGAL PRINCIPLES

To defeat a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(2), Plaintiffs need only make a *prima facie* showing of personal jurisdiction by pleading sufficient factual allegations that, if true, would establish jurisdiction.  *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).  Affidavits or other material supplement the allegations. *Id.*  The Court must accept as true all allegations of facts and resolve all doubts in Plaintiffs' favor. *LIBOR IV*, 2015 WL 6243526, at *21.

A plaintiff makes a *prima facie* showing of jurisdiction by alleging a statutory basis for personal jurisdiction that renders service of process effective and that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles."  *Licci ex rel. Licci v.*

---

[4] *E.g.*, *CFTC v. Wilson*, 27 F. Supp. 3d 517, 530 (S.D.N.Y. 2014) (finding that although plaintiffs bringing private rights of action under the CEA may sue under 7 U.S.C.A. § 25(c), the government may not and must instead utilize the New York long-arm statute); *see also United States v. Hayes*, 118 F. Supp. 3d 620, 629 (S.D.N.Y. 2015) (in criminal trial for trader-based LIBOR manipulation, finding that under Fifth Amendment analysis, acts of domestic conspirator could be imputed to foreign defendant).

*Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).  Section 12 of the Clayton Act provides a statutory basis for the exercise of personal jurisdiction so long as venue is properly laid.[5]  Due process requires that (1) the defendant have sufficient "minimum contacts" with the relevant forum and (2) the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[6]  In federal antitrust cases, the relevant forum in which to assess a defendant's "minimum contacts" is the U.S. as a whole.  *LIBOR IV*, 2015 WL 6243526, at *23 (collecting cases).[7]  Courts look to the totality of the evidence to evaluate a foreign defendant's contacts with the U.S.  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Where "the claim arises out of, or relates to, the defendant's contacts with the forum – i.e., specific jurisdiction – minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).  A defendant's physical entry into the forum – either "in person or through an agent, goods, mail, or

---

[5] 15 U.S.C. § 22; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005).  Venue is proper under Section 12 in any District in which defendant is "an inhabitant" or "may be found or transacts business."

[6] *Walden*, 134 S. Ct. at 1121; *see also LIBOR IV*, 2015 WL 6243526, at *6 ("[B]ecause the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the jurisdictional analysis.").  There are, however, additional strong Fifth Amendment interests in protecting Americans inherent in enforcing this Sherman Act matter in a U.S. forum that are not present in diversity cases implicating the Fourteenth Amendment.  *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) (antitrust laws and the Sherman Act are the "Magna Carta of free enterprise").

[7] Given that the relevant forum is the U.S., "Domestic Defendants" have no due process challenge.  *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  Nonetheless, under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) and *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014), Domestic Defendants have the requisite minimum contacts with the U.S. to subject them to general jurisdiction in U.S. federal courts, as each indisputably is incorporated in, and maintains its principal places of business in, this country.  *See, e.g.*, FM Compl. ¶¶ 18, 22, 27.  Indeed, Domestic Defendants did not contest personal jurisdiction in their 12(b)(2) motion subject to *LIBOR IV* with respect to Amabile's CEA claims.  Defs.' Mot. Dismiss Direct Action Claims, Master App., Nov. 5, 2014, ECF No. 743-1.  Domestic Defendants, UBS, and Rabobank (for Period Zero) did not contest personal jurisdiction in their 12(b)(2) motion with respect to EBP's CEA claims.  Defs.' Mot. Dismiss Putative Class Action Complaints ("2015 MTD Class"), Schedule A, Jan. 16, 2015, ECF No. 966.

some other means" – constitutes contact with the forum sufficient to support specific jurisdiction. *Walden*, 134 S.Ct. at 1122; *see also In re Foreign Exch. Benchmark Antitrust Litig.* (*FOREX*), No. 13 Civ. 7789 (LGS), 2016 WL 1268267, at *4 (S.D.N.Y. Mar. 31, 2016) (specific jurisdiction exists where "the cause of action arises out of the very activity being conducted, ***in part***, inside the forum" (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984))).   A foreign defendant's out-of-forum acts also support minimum contacts if the defendant expressly aims its conduct at the forum where the plaintiff feels the effects.   *Walden*, 134 S. Ct. at 1122-24 (citing *Calder*, 465 U.S. at 789).

Once the plaintiff establishes minimum contacts, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would nonetheless be so unreasonable as to "offend traditional notions of fair play and substantial justice."   *LIBOR IV*, 2015 WL 6243526, at *27-28.  As shown below, Plaintiffs have met their burden; Defendants have not.

## ARGUMENT

## I.   THE EXERCISE OF SPECIFIC PERSONAL JURISDICTION OVER DEFENDANTS FALLS WELL WITHIN THE LIMITS OF DUE PROCESS[8]

### A.   Defendants Carried Out Their Conspiracy in the United States

Plaintiffs' burden of showing that Defendants engaged in suit-related conduct in the U.S. is minimal:  "So long as it creates a substantial connection with the forum, even a single act can support jurisdiction."  *Burger King v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985).  Plaintiffs' pleadings and supporting materials show that Defendants committed hundreds of thousands of acts

---

[8] Normally, a court analyzes whether there is a statutory basis for exercising jurisdiction before considering whether such exercise is consistent with due process.  Due process, however, is the prominent focus of Defendants' memorandum and addressed first there.   Plaintiffs begin with due process as well for that reason and because Defendants waived their arguments concerning the statutory basis for personal jurisdiction and venue (*see* Sections II & IV *infra*) such that the Court need only address Defendants' constitutional challenge.

in furtherance of the conspiracy *in the U.S.* directly and/or via their domestic subsidiaries or affiliates.

### 1. By Selling or Trading USD LIBOR-Based Products to Plaintiffs in the United States, Defendants Voluntarily Created Contacts with the United States

There can be no legitimate dispute that the Court can exercise personal jurisdiction over those Defendants who carried out the profit-motivated conspiracy by transacting in LIBOR-based instruments directly with U.S. Plaintiffs or traded Eurodollar futures and options contracts on the Chicago Mercantile Exchange.[9]  Defendants voluntarily reached out to Plaintiffs in the U.S., both from foreign offices and through U.S. branches and affiliates (including those in New York[10]), and engaged in a course of dealing with respect to LIBOR-based instruments.[11]  Thus, at the very least,

---

[9] *LIBOR IV*, 2015 WL 6243526, at *31, 62; Order at 12-13, ECF No. 1357.  For example, Deutsche Bank AG, UBS AG, and Credit Suisse International entered into price-fixed swaps and made price-fixed payments to the named OTC plaintiffs, acting through Defendants' U.S. employees.  For other Plaintiffs, the Complaints specifically identify such purchases and the particular Defendants and are thus a matter of record.  *See, e.g.*, FM Compl. ¶¶ 4-6, 10, 224-79; Schwab Bond Funds 2012 Compl. ¶¶ 190-201; Schwab Bank 2012 Compl. ¶¶ 190-200; Schwab Money Funds 2012 Compl. ¶¶ 194-213; Schwab 2014 Compl. ¶¶ 268-300; BATA Compl. ¶¶ 250-53; PFG Compl. at ¶¶ 10-12, 202-03, 205, 216-19; PF Compl. ¶¶ 10-12 200-01, 203, 214-17; Exch. Compl. ¶¶ 1-2, 17, 222; MacVittie Decl. ¶¶ 3-16, ECF No. 889; Vonnahme Decl.  All declarations and briefing filed in connection with DAPs' oppositions to Defendants' November 2014 motion to dismiss (ECF No. 743) are incorporated by reference herein.

[10] *E.g.*, Moldovan Decl., ECF No. 1077; Banker Decl., ECF No. 1078.

[11] Additionally, numerous Defendants (or their agents) regularly solicited many Plaintiffs to purchase products tied to USD LIBOR.  *See, e.g.*, Schwab Bond Funds 2012 Compl. ¶¶ 190-201; Schwab Bank 2012 Compl. ¶¶ 190-200; Schwab Money Funds 2012 Compl. ¶¶ 194-213; Schwab 2014 Compl. ¶¶ 268-300; Goldman (Schwab) Decl. ¶¶ 1-7; Klingman (Schwab) Decl. ¶¶ 1-7; Hastings (Schwab) Decl. ¶¶ 1-5; DAP EE Opp.  12-13 (transactions in both floating- and fixed-rate instruments are actionable under the antitrust laws).  In making those solicitations, these Defendants or their agents failed to disclose that LIBOR was suppressed.  *E.g.*, Schwab Compl. ¶ 10; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 728 (S.D.N.Y. 2013) ("If the offering materials described how LIBOR was calculated by reference to the proper procedures rather than the manipulation that allegedly was occurring, they would contain a material misrepresentation.  If they did not describe how LIBOR was calculated, they would still be omitting that LIBOR was being manipulated, surely a material omission.").  These Defendant-driven contacts are far from the "fortuitous, plaintiff-driven contact" the Court envisioned in *LIBOR IV* in suggesting "broadly-traded securities such as bonds and MBS . . . may arrive in the hands of plaintiffs and other investors anywhere in the world by the investors' own trades–not at the direction of the issuers."  2015 WL 6243526, at *31.  The Supreme Court has noted the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."  *Burger King*, 471 U.S. at 476.

Moreover, standardized ISDA swap contracts contained forum-selection clauses that clearly demonstrate Defendants' anticipation that they would be haled into Court in the U.S.  *See LIBOR IV*, 2015 WL 6243526, at *34 ("Courts in this Circuit and elsewhere give a broad reading to the phrase 'relating to' . . . in forum selection clauses"); Miarmi Decl.

the Court can assert personal jurisdiction over any Defendant that transacted in LIBOR-based instruments with a named Plaintiff.  Defendants nevertheless insist this Court lacks any power over them for even these plainly U.S. contacts.  Defs. PJ Br. 7-8.  Defendants' position illustrates how disconnected their arguments are from the facts Plaintiffs put forth, as well as the Second Circuit's articulation of these claims in *Gelboim*, 823 F.3d at 766, 781-82.[12]

## 2. By Transmitting False USD LIBOR Rates to Thomson Reuters in New York, Defendants Committed Conspiratorial Acts in the United States

Recent public disclosures reveal that at least Rabobank sent its daily USD LIBOR submissions to Thomson Reuters *in New York* by means of an electronic wire transmission. SSAJF ¶ 24.  Thomson Reuters was the "designated distributor" of BBA LIBOR rates, and as such, it received all contributions to the LIBOR rate-setting process on a daily basis, and "compile[d], calculate[d] and then distribute[d]" the fixes."  *Id.*  The daily transmissions of collusive rates to Thomson Reuters in New York, which used those submissions for purposes of calculating and distributing the price-fixed USD LIBOR and the individual contributions in the U.S. and elsewhere, constitute acts within the U.S., out of which Plaintiffs' antitrust claims arise.[13]  That alone is enough to satisfy the Due Process Clause.[14]  Further, because it is implausible that

---

(BATA) Ex. B, at 9 (Bank of America, N.A. consent to jurisdiction in California), Ex. G, at 12 (Citibank, N.A. consent to jurisdiction in California), Ex. K, at 18 (JPMorgan Chase Bank, N.A. consent to jurisdiction in California); *see also Bense v. Interstate Battery Sys. of Am.*, 683 F.2d 718, 720, 722 (2d Cir. 1982) (holding that a forum selection clause applying to "causes of action arising directly or indirectly" from an agreement covered federal antitrust actions relating to that agreement).

[12] *See Chloé*, 616 F.3d at 167 (explaining that district court's exclusive focus in a trademark case on whether the shipment of a single infringing bag conferred jurisdiction "too narrowly constru[ed] the nexus requirement," "which merely requires the cause of action to relate to defendant's minimum contacts with the forum," and concluding that the sale of other, non-infringing handbags showed that the shipment of the single counterfeit bag was part of a larger business plan purposefully directed at New York consumers).

[13] Plaintiffs respectfully submit that these newly disclosed facts go beyond the allegation "that Thomson Reuters is headquartered in New York," which this Court reasoned "has no bearing on whether defendants are subject to personal jurisdiction in New York or elsewhere."  *LIBOR IV*, 2015 WL 6243526, at *32 n.53.

[14] *See Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 170 (2d Cir. 2013) (foreign bank's use of "dollar-denominated wire transfers through its AmEx correspondent account in New York" satisfies due process).

Thomson Reuters would have Rabobank, but not other Panel Banks, submit rates to Thomson Reuters in New York, these disclosures also make it at least *plausible* that *all* Panel Bank Defendants voluntarily availed themselves of the privilege of doing business in the U.S. by sending their collusive USD LIBOR submissions to Thomson Reuters in New York.[15]   Accordingly, this Court may assert personal jurisdiction over all Panel Bank Defendants.

### 3.   By Directing False USD LIBOR Submissions from the United States, Defendants Conspired in the United States

Recent public disclosures not only cast serious doubt on Panel Bank Defendants' self-serving statements that they only sent USD LIBOR contributions to London, the disclosures also undermine Defendants' Declarations that asserted nobody in the U.S. ever played a role in determining what those contributions should be.   Defendants rely on these conclusory Declarations to controvert Plaintiffs' allegations that Defendants carried out their conspiracy in the U.S.

Defendants' reliance on these Declarations fails for at least two reasons.   First, Defendants' actions in furtherance of the antitrust conspiracy necessarily include a broader range of conduct than that relevant to each Defendants' unilateral data fraud.   Thus, while the location of USD submissions and determinations is one relevant factor to the jurisdictional analysis for profit-motivated conspiracy claims, *LIBOR IV*, 2015 WL 6243526, at *38,[16] it is not the *only* factor. Second, recent public disclosures call into question the accuracy of averments made in some of these declarations.   For example, a publicly released document from Defendant Citibank quotes one of its USD LIBOR submitters as saying: "we got calls from *[U.S. Dollar Submitter 2] in New York*" demanding depressed LIBOR.   SSAJF ¶ 17 (alteration in original).   Similarly, Defendant

---

[15] OTC and Exchange-Based Plaintiffs served interrogatories and requests for admissions on every Defendant to ascertain whether this was true, and every Defendant refused to respond on the ground that this was improper jurisdictional discovery.

[16] *See also Gelboim*, 823 F.3d at 767 n.5 (directive to stay in the middle of the pack supports allegations of conspiracy).

UBS admitted that an executive *in Connecticut* directed that submissions for all currencies stay low and instituted a policy that submissions for all currencies stay within "the pack."  *Id.* ¶¶ 31, 32.  The contradiction between Defendants' conclusory Declarations and these public disclosures at the very least creates a factual issue that may not be resolved against Plaintiffs at this stage of the case,[17] thus making dismissal of Panel Bank Defendants for lack of personal jurisdiction improper.

### 4.  Defendants Used Subsidiaries and/or Affiliates in the United States To Implement the Conspiracy in the United States

Many Foreign Defendants operated directly in the U.S. through "branch" offices, rather than a "separate" affiliate or subsidiary.[18]  There is no question that these Defendants' sales of LIBOR-based instruments to Plaintiffs support personal jurisdiction over that branch, and sales of LIBOR-based instruments to other U.S. investors should be viewed as part of the Defendant's purposeful availment of the U.S. laws.  *See* Section I.A.1 *supra*.

Foreign Panel Bank Defendants are also subject to personal jurisdiction where they sold, issued, or traded a USD LIBOR-based product or engaged in a course of the dealing in the U.S. through a subsidiary or affiliate.[19]  Courts routinely assert personal jurisdiction over foreign members of price-fixing cartels that implement the conspiracy in the U.S. through their domestic subsidiaries or affiliates.[20]  The assertion of jurisdiction in such circumstances rests on the long-

---

[17] Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp., 875 F. Supp. 2d 297, 304 (S.D.N.Y. 2012).

[18] *See, e.g.*, Kurtzberg Decl., ECF No. 1484, Ex. 1 (Sabella Decl. ¶¶ 4.1-4.2 (Bank of Tokyo Mitsubishi); Sherman Decl. ¶ 5 (Rabobank); Schreiber Decl. ¶ 3 (Credit Suisse AG); Cambria Decl. ¶¶ 7-12 (Deutsche Bank AG); McKendry Decl. ¶ 6 (Lloyds Bank TSB, HBOS); Takashima Decl. ¶4 (Norinchukin); Desena Decl. ¶ 3 (Royal Bank of Canada); Gougherty Decl. ¶12 (Royal Bank of Scotland plc); Bourrinet Decl. ¶ 5 (Societe Generale); Borstelmann Decl. ¶ 5 (Portigon); Cooper Decl. ¶ 5 (WestDeutsche Immobilienbank AG)), Ex. 2 (Connors Decl. ¶ 5, Nov. 2015 (UBS AG)).

[19] This intra-bank parent-subsidiary relationship is completely distinguishable from Defendants' incorrect assertion that a controlling agency relationship between inter-bank co-conspirators engaged in horizontal price-fixing is necessary before conspiracy jurisdiction may be found.  *See* Section I.D *infra*.

[20] *E.g.*, *MM Glob. Servs. Inc. v. Dow Chem. Co.*, 404 F. Supp. 2d 425, 435 (D. Conn. 2005); *In re Isostatic Graphite Antitrust Litig.*, No. 00-CV-1857, 2002 WL 31421920, at *3 (E.D. Pa. Sept. 19, 2002); *In re Vitamins Antitrust Litig.*,

accepted principle that a foreign parent may have sufficient contact with the forum through a subsidiary's conduct when the subsidiary acts as its parent's agent.[21]  A subsidiary's contacts with the forum can be imputed to the parent where, as here, the subsidiary was either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself[22] or where plaintiffs plausibly allege that the entities engaged in an inter-corporate conspiracy.[23]

Plaintiffs have established that such imputation is justified here.  In addition to the allegations in their Complaints,[24] Plaintiffs provide substantial corroborating facts that surfaced in recent trials and regulatory actions with respect to certain Panel Bank Defendants' corporate relationships and the manner in which the banks operated through their corporate subsidiaries in the U.S.  SSAJF ¶¶ 37-46.  Plaintiffs allege that the other foreign Panel Bank Defendants operated their businesses similarly, i.e., employing business units that operated globally and without regard to corporate formalities, units that included employees in the U.S. who participated in USD LIBOR suppression and intentionally victimized U.S. entities by selling price-fixed USD LIBOR-based instruments to extract artificially high profits from the U.S.[25]

---

270 F. Supp. 2d 15, 27 (D.D.C. 2003); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 675-76 (E.D. Mich. 2000).

[21] *E.g.*, *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 687 (S.D.N.Y. 2014); *see also Daimler,* 134 S. Ct. at 759 n.13 ("Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction. . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 793 (S.D. Ind. 2015) ("The acts of an agent in a forum subject the principal to the personal jurisdiction of that forum state.").

[22] In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 230 F. Supp. 2d 376, 385-86 (S.D.N.Y. 2002).

[23] *E.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002 (N.D. Cal. 2014); *see also LIBOR IV*, 2015 WL 6243526, at *44-45.

[24] *See, e.g.*, FM Compl. ¶¶ 19, 25-26, 29-33, 65-69, 72-75, 77, 79-80, 83, 85; FDIC-R Compl. ¶¶ 11-27; PFG Am. Compl. ¶¶ 14-32; PF Compl.¶¶ 13-30; Kaas Decl. ¶¶ 7-8, 39-44, 53-54, ECF No. 892.

[25] *See* note 24 *supra*.  While the allegations set forth in Plaintiffs' Complaints and the Supplemental Statement are significant in this regard, and make out a *prima facie* showing of personal jurisdiction, any more specific details concerning the relationship between parents and subsidiaries are necessarily within Defendants' control and thus would only be available to Plaintiffs through jurisdictional discovery.  This informational imbalance is particularly

This Court has already held that Plaintiffs plausibly alleged that Defendants Barclays and Lloyds engaged in "intra-bank collaboration" to carry out trader-based conspiracies. In light of this ruling and *Gelboim*'s conspiracy ruling, personal jurisdiction over Panel Bank Defendants is appropriate because Plaintiffs sufficiently allege that the foreign Panel Bank Defendants used their U.S. employees and affiliates to implement the conspiracy.

### B.   Defendants Purposefully Availed Themselves of the United States Forum Because Their Minimal Contacts Here "Relate to" Plaintiffs' Claims

Even if one assumed *arguendo* that Plaintiffs' claims did not directly "arise from" any given Defendant's U.S. contacts, those claims at the very least "relate to" the U.S. contacts and that is sufficient to support personal jurisdiction over every Defendant, even under Defendants' own view of the law, *see* Defs. PJ Br. 7 ("claim must arise from *or relate to*" defendants' contacts). In *Licci*, the Second Circuit explained that the key question was whether the in-forum activity sufficiently reflected the defendant's "purposeful availment" of the privilege of carrying on its activities. 732 F.3d at 171.[26]

The facts and analysis in *Bank Brussels* are instructive. Writing for the Second Circuit, then-Judge Sotomayor criticized the district court for focusing on whether the claims directly arose from the forum contacts: "*while [defendants'] contacts may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it*." 305 F.3d at 128. In *Bank Brussels*, a Belgian bank with a New York branch sued its Puerto Rico law firm for legal malpractice. The

---

acute as to Defendants that have not (yet) been forced to disclose internal documents and other evidence in trials in the U.S. or the United Kingdom. To the extent that the Court finds Plaintiffs' allegation insufficient in this regard, Plaintiffs would request jurisdictional discovery on this relevant information.

[26] Consistent with *Bank Brussels*, it is black letter law that the only nexus required between the forum contacts and the claim is that they must "*relate to*" each other. *See Chloé*, 616 F.3d at 167 ("[T]he nexus requirement . . . merely requires the cause of action to '*relate to*' defendant's minimum contacts with the forum" (citing due process and long-arm cases)). The cases Defendants cite say the same thing. *See, e.g., J. McIntyre Machinery, Ltd. v. Nicastro,* 564 U.S. 873, 881 (2011) (claim must "aris[e] out of *or relate[] to* the [Defendants'] contacts with the forum").

Second Circuit agreed that because the law firm did not specifically seek out the representation in New York, its forum-related conduct did not directly "g[ive] rise" to the bank's claim.  *Id.* at 127-28.  But the Second Circuit found specific jurisdiction because the claim "related to" other forum contacts out of which the suit did ***not*** arise, such as the law firm's service of ***other*** clients in New York and the law firm's general marketing materials sent to New York residents.  *Id.*  *Bank Brussels* remains good law after *Walden*.  *See, e.g.*, *Sherwin-Williams Co. v. Avisep, S.A. De C.V.*, No. 14-cv-6227, 2016 WL 354898, at *4 (S.D.N.Y. Jan. 28, 2016).

As set forth above, each Defendant's forum contacts are at least as significant as the contacts in *Bank Brussels* and unquestionably "relate to" Plaintiffs' antitrust claims, even if they did not directly give rise to Plaintiffs' claims (which they also do).  For example, Plaintiffs allege that ***every Panel Bank Defendant*** sold or issued a USD LIBOR-based product with an artificially suppressed LIBOR interest rate ***in the U.S.*** to a ***U.S.*** counterparty (although not necessarily a named Plaintiff), or traded artificially suppressed LIBOR-based instruments on U.S. exchanges; thus, with ***every sale***, and every payment of "reduced rates of return"[27] on those instruments from and to the U.S., ***every Defendant*** profited from price-fixed USD LIBOR instruments with U.S. counterparties (often with forum selection clauses mandating New York courts), agreed to suppress ***USD*** LIBOR, and deprived American consumers of free choice and unrestrained competition in the U.S. markets for LIBOR-based products.[28]  Panel Bank Defendants also marketed LIBOR to U.S. investors, press, and regulators in an attempt to encourage U.S. parties

---

[27] *See Gelboim*, 823 F.3d at 771 (antitrust violation consisted in price-fixing to pay "reduced rates of return" on instruments).

[28] *See, e.g.*, FM Compl. ¶¶ 18-38, 134, 194; FDIC-R Compl. ¶¶ 10-30, 126, 128, 408, 415; Kaas Decl. ¶¶ 7-8, 42-43, 48, 56, 66, 69, 86; Kovel & Hausfeld Decl. ¶¶ 7-13, tbl. 1 (Aug. 5, 2016).

to use and trust the accuracy of USD LIBOR – just as the law firm did in *Bank Brussels*.[29]  These

facts overwhelmingly show Defendants engaged in unlawful conduct related to Plaintiffs' claims

and therefore availed themselves of the privilege of doing business in the U.S. sufficient to confer

personal jurisdiction over them.[30]  While Plaintiffs respectfully disagree that any causal connection

must be drawn between the forum-directed conduct and the antitrust claims,[31] Plaintiffs have easily

alleged such a connection.  For example, but for the Panel Banks' transmission of individual quotes

to Thomson Reuters in New York or Defendants' conspiracy to publish USD LIBOR into the U.S.

and to sell LIBOR-based derivatives in the U.S., the injury would not have occurred.[32]

### C.   Under *Calder*'s "Effects Test," Defendants Are Subject To Specific Jurisdiction for Foreign Conduct

In cases involving intentional torts that occur outside the forum, a defendant may have

minimum contacts based on the effects of its conduct in the forum, under the "effects test"

---

[29] *See, e.g.*, FM Compl. ¶¶ 80, 93, 101-02, 108-14, 161, 281, 285; Kaas Decl. ¶¶ 19-20.  Panel Bank Defendants may try to distinguish *Bank Brussels* because that case involved malpractice regarding "representation of a New York client" – but that is wrong: first, the Second Circuit agreed that the firm's "unsolicited representation" of the New York client was incidental to the suit; second, many Panel Banks sold directly to Plaintiffs in the forum and every Panel Bank sold directly to residents here; third, just as in *Bank Brussels*, the banks' *related* LIBOR conduct in the forum makes it proper to hale them to court in the forum where every bank sold the price-fixed instruments and every plaintiff bought them.  305 F.3d at 128-29.

[30] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997) (confirming in RICO case that price-fixing cartel member's sale of a price-fixed product into a forum is an overt act in furtherance of the conspiracy).

[31] In *Licci*, the Second Circuit accepted the New York Court of Appeals' certified answer that no "***causal link***" is required between the New York contacts and the injury – instead, the only requirement is "a ***relatedness*** between the transaction and the legal claim such that the latter is not completely unmoored from the former."  732 F.3d at 168–73 (finding this comported with Due Process).  In *LIBOR IV*, this Court stated that there was a but-for connection in *Bank Brussels* because "a law firm had engaged in malpractice in connection with a New York transaction."  2015 WL 6243526, at *28 n.46.  The law firm in *Bank Brussels* had nothing to do with the $225 million New York transaction, other than providing a fairness opinion, which did not involve any contacts with New York that gave rise to the claims. 305 F.3d at 123, 127-28.  This illustrates how low the bar must be for any but-for causation test.

[32] Nor is there any merit to Defendants' argument that the effects in the U.S. were merely "foreseeable" because the Defendants had not aimed their persistent suppression at any particular forum state. It is black letter law in this Circuit that a worldwide sales agreement constitutes purposeful availment of a forum, even if products are only sold ***indirectly*** there.  *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir.1999) (defendants purposefully availed themselves of New York forum, and jurisdiction there was not merely foreseeable under Due Process Clause, where "'exclusive sales rights' agreement, which contemplates that Kurz–Hastings will sell Navitas's machines in North America and throughout the world, serves as evidence of Navitas's attempt to serve the New York market, albeit indirectly").

fashioned in *Calder*, 465 U.S. at 789-90, and later reaffirmed in *Walden*, 134 S. Ct. at 1124.  In the antitrust context, the Second Circuit and numerous other courts have invoked *Calder* to exercise specific personal jurisdiction over foreign defendants who engaged in wholly foreign conduct directed at the U.S. (and elsewhere) and caused harmful effects in the U.S.  *E.g.*, *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (per curiam) (application of effects test proper to exercise specific personal jurisdiction over a foreign antitrust defendant whose extraterritorial actions were directed at and produced harmful effects in the U.S.).[33]  Under *Calder*, plaintiffs need show only that the defendant committed an unlawful act, "expressly aimed" at the forum in which the action was brought, and the forum was the "focal point" of the harm suffered.  465 U.S. at 789-90.

While this Court previously declined to apply *Calder* to assert personal jurisdiction for data fraud claims, concluding that persistent suppression was not designed to "benefit Defendants' trading position"[34] and "it d[id] not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state,"[35] Plaintiffs respectfully submit that this Court's conclusions on data fraud do not apply to the antitrust allegations that

---

[33] *See also, e.g.*, *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 12355046, at *12 (S.D.N.Y. Aug. 8, 2012) (exercising jurisdiction over a Chinese company that participated in a cartel "with the express purpose of inflicting supra-competitive prices on foreign countries such as the United States"); *In re Fasteners Antitrust Litig.*, No. 08-MD-1912, 2011 WL 3563989, at *13 (E.D. Pa. Aug. 12, 2011) (exercising jurisdiction under effects test based on international price-fixing conspiracy that allegedly affected U.S. prices); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, No. Civ. 02-6030(WHW), 2007 WL 2212713, at *6-9 (D.N.J. July 30, 2007) (exercising personal jurisdiction over foreign defendants who participated in an international price-fixing conspiracy directed in part at the U.S.); *Vitamins*, 270 F. Supp. 2d at 32 (application of effects test to price-fixing conspiracy); *Crompton Corp. v. Clariant Corp.*, 221 F. Supp. 2d 683, 691-92 (M.D. La. 2002) (personal jurisdiction found where plaintiffs alleged foreign defendants' participation in a price-fixing conspiracy impacting U.S. purchasers); *cf. In Re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 742-43 (9th Cir. 2013) (reversing district court's dismissal for lack of personal jurisdiction over foreign defendants that manipulated price indices pursuant to a conspiracy to inflate natural gas prices).

[34] *In re: LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 (NRB), 2016 WL 1558504, at *6-7 (S.D.N.Y. Apr. 15, 2016).

[35] *LIBOR IV*, 2015 WL 6243526, at *32.

14

Defendants had a "common motive to conspire" to suppress USD LIBOR for "increased profits," *Gelboim*, 823 F.3d at 781-82.  Viewed in that light, Plaintiffs satisfy every element of the *Calder* analysis for their antitrust claims.

> **1.  Defendants Committed Unlawful Acts and Expressly Aimed Their Profit-Motivated Conspiratorial Conduct At, and Caused Harm Within, the United States**

There is no dispute that Plaintiffs plausibly allege that Defendants engaged in an illegal price-fixing conspiracy to suppress USD LIBOR, thus satisfying the first element of *Calder*'s test. *Gelboim*, 823 F.3d at 770-71.[36]  Plaintiffs further allege that all Defendants "intentionally directed their unlawful [conspiracy] at the United States."[37]

Defendants' alleged conspiracy to suppress LIBOR directly implicates the U.S., as Defendants deliberately targeted the LIBOR rate for ***U.S.*** dollars.  Indeed, recent public disclosures confirm that the "overwhelming[]" focus of Defendants' persistent LIBOR suppression was ***USD*** LIBOR, more so than LIBOR for any other currency.[38]  These disclosures are consistent with Plaintiffs' allegations that Defendants profited from U.S. consumers, consumers who composed by far the largest percentage of users of USD LIBOR (as opposed to other LIBOR currencies).[39] Defendants issued billions of dollars of debt tied to USD LIBOR, traded billions of futures and options on U.S. exchanges, and held billions of dollars in interest-rate swaps and other derivatives in the U.S. through their U.S. subsidiaries.[40]

---

[36] *See supra* note 33 and accompanying text (collecting cases in which alleged antitrust violations were considered torts for purposes of meeting the first prong of the effects test).

[37] *See, e.g.*, FM Compl. ¶ 14; OTC Compl. ¶¶ 86, 129, 166, 362; Exch. Compl. ¶ 684.

[38] SSAJF ¶¶ 8, 9; *see also, e.g.*, Kaas Decl., Ex. 5-2, at 54, ECF No. 892-6.

[39] *See, e.g.*, SSAJF ¶ 10; FM Compl. ¶¶ 8, 14; FDIC-R Compl. ¶ 3.

[40] SSAJF ¶ 47; *see also, e.g.*, Schwab 2014 Compl. ¶¶ 21, 268-300; Goldman (Schwab) Decl. ¶¶ 1-7; Klingman (Schwab) Decl. ¶¶ 1-5; Hastings (Schwab) Decl. ¶¶ 1-5; BATA Compl. ¶¶ 250-53.

Moreover, recent public disclosures indicate that certain Defendants, acting through, *inter alia*, the Foreign Exchange and Money Markets Committee ("FXMMC"), routinely met and communicated to discuss USD LIBOR suppression and its effect on counterparties, lenders, and investors **in the U.S.** and to otherwise implement their unlawful agreements.[41]  SSAJF ¶¶ 6-8.  In *LIBOR IV*, Defendants led this Court to believe that the FXMMC was a legitimate subcommittee of the BBA.  2015 WL 6243526, at *48.  The BBA itself has admitted that was not true, claiming it was merely the FXMMC's agent.[42]  *Id.* ¶¶ 3-4.  Without the benefit of jurisdictional discovery, much remains unknown regarding the FXMMC's members, meetings, and conduct.  Recent public disclosures, however, provide some insights into how Defendants used the FXMMC to target and implement their conspiracy in the U.S.  *Id.* ¶¶ 2-13.  Public disclosures reveal that they met frequently to discuss USD LIBOR suppression, decided not to enforce rules against cheating, and "agreed" not to support U.S. rivals in the market for USD interest-rate benchmarks, including one potential benchmark titled New York Funding Rate, and to keep individual contributions within a certain range.  *Id.* ¶¶ 5, 6, 8.  Members discussed using the BBA as a hub to "get around the sort of collusion bit" when they wanted to coordinate their USD LIBOR contributions.[43]  *Id.* ¶ 8  Additionally, when U.S. publications raised questions about the reliability of USD LIBOR, the

---

[41] *See also, e.g.*, FM Compl. ¶ 74; FDIC-R Compl. ¶ 67; PFG Compl. ¶¶ 54-55; PF Compl. ¶¶ 52-53; Kaas Decl. ¶¶ 36-38.  Defendants whose executives are known to have been members of the FXMCC during all or some portion of the conspiracy period include Barclays Bank plc; Citibank, N.A.; Credit Suisse AG; Deutsche Bank AG; HBOS plc; HSBC Bank plc; Lloyds Bank plc; Rabobank; RBS plc; and UBS AG.  *Gelboim*, 823 F.3d at 766 n.2; SSAJF ¶ 7.  Recent public disclosures reveal that **non**-FXMCC Panel Banks were also privy to agreements among the FXMCC members.  SSAJF ¶¶ 7, 8.  One BBA executive referred to the Panel Bank Defendants generally as "our colluding members."  *Id.* ¶ 8.

[42] BBA executives (including the signatory for the BBA's jurisdictional declaration) have testified that the FXMMC was primarily responsible for overseeing LIBOR, and the conduct of the panel banks in connection with setting LIBOR, including detecting and disciplining cheaters, and dealing with other day-to-day issues involving LIBOR.  *Id.* ¶¶ 4, 5.  The FXMMC operated "outside" of the BBA and was comprised of panel bank executives responsible for USD LIBOR – at least two of whom have been convicted of manipulating USD LIBOR.  *Id.* ¶¶ 5, 7.

[43] *See also* FM Compl. ¶¶ 14, 107, 174, 178, 194, 211; FDIC-R Compl. ¶ 99; PFG Compl. ¶¶ 93, 153, 161; PF Compl. ¶¶ 91, 151, 159.

16

FXMMC expressly directed a BBA employee, John Ewan, to take his "charm offensive" to the U.S. to meet with financial institutions, regulators, members of the press, and others.[44]  Kaas Decl. ¶¶ 36-37; SSAJF ¶ 8.

These allegations closely resemble those in other international cartel cases where courts have applied *Calder* to exercise jurisdiction over a foreign defendant.  For example, in *In re Fasteners Antitrust Litigation*, the court held that plaintiffs' allegations that one of defendant's executives attended two meetings, both outside the U.S., in which the alleged co-conspirators discussed a "worldwide minimum price provision, which presumably includes the United States" and "future price increases in North America" made out a *prima facie* case of personal jurisdiction over the defendant.  2011 WL 3563989, at *13.  Similarly, in *CRT*, the court exercised personal jurisdiction over a French company that "fixed CRT prices abroad and ensured that United States customers paid supra-competitive prices." 27 F. Supp. 3d at 1012.[45]  Much like the Defendants here, the conspirators in *CRT* "coordinated pricing decisions in relation to United States market conditions, and discussed CRT prices in U.S. dollars" and directly sold price-fixed goods in the U.S.  *Id.*  ("[D]irect sales to a United States business would suffice to show purposeful direction of anticompetitive activity to the United States.").

---

[44] Mr. Ewan visited at least the New York Fed and Chicago Mercantile Exchange.  SSAJF ¶ 20.

[45] *See also Magnetic Audiotape*, 334 F.3d at 208 (theorizing that a foreign defendant's attendance at one meeting at which prices were fixed "arguably would satisfy the 'effects' test frequently used in the analysis of specific personal jurisdiction"); *Vitamin C*, 2012 WL 12355046, at *12 (applying effects test to exercise personal jurisdiction over foreign cartel members who participated in meetings at which the conspiracy was discussed); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 5444261, at *5 (N.D. Cal. Nov. 9, 2011) (holding that a Taiwan corporation was subject to personal jurisdiction where the plaintiffs demonstrated that it exchanged competitor pricing information for products sold in the U.S.); *In re Optical Disk Drive Antitrust Litig.*, No. 10-MD-02143-RS, 2015 WL 1926635, at *2 (N.D. Cal. April 28, 2015) (same); *In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2015 WL 3638551, at *2-3 (N.D. Cal. June 11, 2015) (participation in conspiracy meetings and sale of price-fixed products into the U.S. via subsidiary sufficient to establish personal jurisdiction).

Significantly, Plaintiffs' allegations also closely mirror those on which Judge Schofield relied in exercising personal jurisdiction over Defendants BTMU and SocGen in *FOREX*.  The *FOREX* plaintiffs alleged that the effects of the defendants' conspiracy were felt in "supra-competitive profits" reaped "at the expense of Plaintiffs and the classes."  2016 WL 1268267, at *5.  BTMU and SocGen, as dominant dealers in the FX derivatives markets, "knew the results" of the collusion would be felt in the U.S.  *Id.*  Judge Schofield inferred from the size of BTMU's and SocGen's FX businesses in the U.S. that they expressly aimed their conduct there.  *Id.* at *6.

This Court previously distinguished the effects-test portion of *FOREX* on the ground that the Court had "already held that plaintiffs have failed to show that defendants engaged in their purported suppression of LIBOR in order to benefit their Eurodollar trading position."  *LIBOR V*, 2016 WL 1558504, at *6-7.  Plaintiffs respectfully submit that *FOREX* can no longer be so distinguished in light of *Gelboim* because Plaintiffs expressly pled, and the Second Circuit held, that one object of Defendants' conspiracy was to systematically depress USD to profit from their LIBOR-based financial transactions – a large portion of which are in the U.S.  *FOREX* at *4 (evidence supported reasonable inference that defendants "participated in the alleged conspiracy in the United States *or* participated elsewhere with the aim to cause harm in the United States") (emphasis added).  Moreover, the fact that the conspiracy also implicated other markets does not diminish the fact that it was directed to the U.S. market, as discussed in Section I.C.3 below.

When viewed in their totality, Plaintiffs' allegations are more than enough at this stage of the litigation to show that Defendants expressly aimed their conduct at the U.S.

## 2. The Panel Bank Defendants Published False USD LIBOR Submissions in the United States To Mislead United States Investors About Defendants' Reputation

Plaintiffs also allege that Panel Bank Defendants had a "reputational incentive" to under-report their borrowing costs.  *LIBOR IV*, 2015 WL 6243526, at *115.  Panel Bank Defendant members of the FXMMC agreed to, and did, publish their individual USD LIBOR submissions into the U.S.  SSAJF ¶¶ 2-5; Kaas Decl., Ex. 5-2, at 55.  By doing so, these Defendants wanted to inflate their apparent creditworthiness in order to better their bargaining power with their U.S. counterparties and their ability to engage in the lucrative U.S. market at all.  *E.g.*, FDIC-R Compl. ¶ 127; Exch. Compl. ¶¶ 124-29.  In short, as in *Calder*,[46] the Panel Bank Defendants could only have suffered a loss of reputation in the U.S. if their true individual contributions were communicated to, and read and understood by, investors in the U.S.  Conversely, the Panel Bank Defendants could only forestall the reputational loss by reporting understated USD LIBOR quotes in the U.S.

## 3. The United States Was a Focal Point of the Harm Caused by Defendants' Alleged Conspiracy

Finally, because Plaintiffs paid or received artificial amounts for financial instruments tied to LIBOR in the U.S. as a result of Defendants' conspiracy,[47] Plaintiffs "suffered the brunt of the

---

[46] In *Calder*, an actress who lived and worked in California brought suit for libel in California in connection with a National Enquirer article.  The National Enquirer was incorporated and had its principal place of business in Florida, where the article at issue was written and edited.  The petitioners (the writer and editor of the article) argued that the article's circulation in California, a process in which they had no input and over which they had no control, was an insufficient basis for the exercise of personal jurisdiction.  465 U.S. at 789.  The Supreme Court disagreed, distinguishing for purposes of the minimum contacts analysis, between "mere untargeted negligence" and "intentional, and allegedly tortious, actions . . . expressly aimed at California."  As defendants engaged in intentional misconduct knowing it would cause serious harm in California, jurisdiction in California therefore was proper.  *Id.*

[47] *E.g.*, FM Compl. ¶ 186; Exch. Compl. ¶¶ 128, 723-25; Schwab 2014 Compl. ¶¶ 21, 25-37, 268-300; PFG Compl. ¶¶ 4, 169, 185, 211, 223, 234; PF Compl.¶¶ 4, 167, 183, 209, 221, 232; Goldman (Schwab) Decl. ¶¶ 1-10; Klingman (Schwab) Decl. ¶ 1-9; Hastings (Schwab) Decl. ¶¶ 1-7.  Among the harms caused by Defendants' antitrust conspiracy was reduced product quality that resulted in diminished interest payments to Plaintiffs.  *See* FDIC-R Compl. ¶ 126. Agreements to reduce product quality are deemed *per se* output restrictions.  *Id.*; *see also In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1314 (S.D. Fla. 2005) (*citing* Phillip E. Areeda and Herbert

harm here."[48]  That is all that is necessary to satisfy this requirement.  That USD LIBOR was not for exclusive use or publication in the U.S. or that the U.S. was not the exclusive target of Defendants' conspiracy does not diminish the conspiracy's purposeful connection with the U.S.[49] It is not uncommon for conspirators in global price-fixing cases to target the U.S. as one of multiple geographic regions,[50] and it would be unreasonable to conclude that Defendants' global conspiracy was expressly aimed everywhere ***except*** the U.S.[51]

Defendants contend that the fact they "entered a conspiracy with knowledge of foreseeable effects in the United States is insufficient to confer jurisdiction."  Defs. PJ Br. 18.  But here, the effects were more than simply foreseeable.  As shown above, Defendants' conspiracy expressly targeted the U.S.  Moreover, Defendants affirmatively knew and intended that their misconduct would affect billions of dollars of LIBOR-based instruments in the U.S. because Defendants sold LIBOR-based instruments to American counterparties.[52]  Further, Defendants knew that LIBOR-based instruments were consistently traded in the U.S. on American-run exchanges and regulated

---

Hovenkamp, Antitrust Law ¶ 1906a (2010)).  Antitrust injury occurs where the consumer pays artificially an inflated price.  *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, No. CIVA05-6042 (JBS), 2008 WL 4126602, at *4 (D.N.J. Aug. 27, 2008).

[48] *Bulk Graphite Prods.*, 2007 WL 2212713, at *10; *see also BBK Tobacco & Foods LLP v. Juicy eJuice*, No. CV-13-00070-PHX-GMS, 2014 WL 1686842, at *6 (D. Ariz. Apr. 29, 2014).

[49] *See, e.g.*, *Bulk Graphite Prods.*, 2007 WL 2212713, at *6-9 (exercising personal jurisdiction over defendant pursuant to the effects test where defendant conspired to fix prices worldwide, including both in Europe and the U.S.); *Nw. Aluminum Co. v. Hydro Aluminum Deutschland GmbH*, No. Civ. 02-398-JE, 2003 WL 23571744, at *4 (D. Or. Sept. 23, 2003) ("There is no dispute that this case does not involve individualized targeting in that there is no single victim. . . . [T]he intent [of the price-fixing conspiracy] was to affect the entire world market and, thus, the effect on the U.S. was foreseeable, but not a precisely defined target."); *cf. Kernan,* 175 F.3d at 243.

[50] *E.g.*, *Fasteners*, 2011 WL 3563989, at *13; *Bulk Graphite Prods.*, 2007 WL 2212713, at *6-9.

[51] *See United States v. Hayes*, 99 F. Supp. 3d 409, 423 n.4 (S.D.N.Y. 2015) (questioning theory of Yen-LIBOR criminal defendant that under *Leasco Data Processing Equipment Corp.,* 468 F.2d 1326, "his knowledge that the LIBOR figures were published globally is an insufficient connection to the United States because 'worldwide reliance' cannot provide a sufficiently targeted basis for personal jurisdiction."  Acceptance of this theory "would work to insulate from prosecution those accused of wide-ranging frauds merely because of their expansive scope."  "[O]ne who enters in a conspiracy with a global scale 'risk[s] being held to account for his illegal actions where[ever] his [ ] manipulation efforts had effects.'" (alterations in original)), *aff'd on other grounds*, 118 F. Supp. 3d 620.

[52] *See, e.g.*, SSAJF ¶ 47; FM Compl. ¶¶ 18-38; Exch. Compl. ¶¶ 1-2, 17, 222.

by the U.S. government and that manipulation of USD LIBOR would harm thousands of investors in the U.S.[53]  Defendants' knowledge of this direct and automatic consequence is a far cry from the "random, fortuitous, or attenuated contacts" found insufficient in *Walden*, 134 S. Ct. at 1123. The link between Defendants' suppression of USD LIBOR and the resulting harm in the U.S. likewise is far more direct than the "causal chain" found lacking in *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94 (2d Cir. 2008).

**D.      Defendants' Acts in Furtherance of the Conspiracy in the United States May Be Attributed To Foreign Defendants for Purposes of Establishing Foreign Defendants' Contacts with the United States**

As shown in Section I.A, above, each Defendant has committed countless overt acts in the U.S. in furtherance of the conspiracy, any one of which is sufficient to confer personal jurisdiction over that Defendant.  Thus, the Court need not resort to conspiracy jurisdiction to assert personal jurisdiction over all Defendants.  Nevertheless, the known and intended acts of co-conspirators in the U.S is a separate and independently sufficient basis for asserting jurisdiction.

**1.   Conspiracy-Based Jurisdiction Is a Recognized Theory of Jurisdiction**

The conspiracy theory of jurisdiction derives from the principle that "because co-conspirators are deemed to be each other's agents, the contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators."  *LIBOR IV*, 2015 WL 6243526, at *29.  Courts in this Circuit regularly exercise personal jurisdiction over alleged co-conspirators based on in-forum conduct of another co-conspirator.[54]  The courts in this Circuit are not alone.  Courts in antitrust cases

---

[53] *E.g.*, SSAJF ¶¶ 11, 19, 33, 36, 43, 47; FM Compl. ¶¶ 80,81; FDIC-R Compl. ¶¶ 73, 74.

[54] *See, e.g., Tadayon v. DATTCO, Inc.*, No. 3:12-CV-01610 (JAM), 2016 WL 1257798, at *6 (D. Conn. Mar. 30, 2016); *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 434 (E.D.N.Y. 2012); *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 585 (E.D.N.Y. 1998) (finding the conspiracy theory of jurisdiction comported with due process because a defendant who joined conspiracy in which co-conspirators acted in the forum inserted himself into the forum); *Andre Emmerich Gallery, Inc. v. Segre*, No. 96 CIV. 889 (CSH), 1997 WL 672009, at *6 (S.D.N.Y. Oct.

regularly apply the theory in assessing whether a defendant's contacts with the forum comport with due process.[55]  The Seventh Circuit had "difficulty understanding why . . . [i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should be allowed to escape being sued there by hiding in another jurisdiction." *Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) (Posner, J.), *superseded by statute on other grounds*.

Faced with decades of case law against them, Defendants contend that the Supreme Court upended this entire field of law with its decision in *Walden*.[56]  Not so.  *Walden* itself makes clear that courts can constitutionally assert personal jurisdiction over foreign defendants based on the acts of agents in the forum.[57]  *Walden* did not, expressly or implicitly, address the conspiracy theory of jurisdiction other than to recognize that a defendant may physically enter a forum through "an agent." *Id.* at 1122.  Defendants argue, however, that conspiracy-based jurisdiction is improper because *Walden* demands that the forum contacts be those "'that the defendant ***himself*** creates with the forum State.'"[58]  Defendants quote this language out of context.  There were only two individuals in *Walden*: a plaintiff and a defendant.[59]  The Court merely concluded that out of these two parties, it is the defendant's contacts with the forum that create jurisdiction, not the plaintiff's

---

29, 1997); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (collecting district court cases from the Second Circuit applying conspiracy theory of jurisdiction).

[55] *See, e.g.*, *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592, 600 (E.D. Ky. 2006) (plaintiff in antitrust action made a *prima facie* showing of personal jurisdiction based on conspiracy theory); *Vitamins*, 270 F. Supp. 2d at 28 (same); *United Phosporus, Ltd., v. Angus Chemical Co.*, 43 F. Supp. 2d 904, 912 (N.D. Ill. 1999) (same).

[56] Although Defendants insinuate that *Walden* announced a new principle of law, Defs. PJ Br. 9 ("Post-*Walden*, vicarious conspiracy jurisdiction should not be recognized."), *Walden* itself did not purport to break any new ground. *See* 134 S. Ct. at 1126 ("Well-established principles of personal jurisdiction are sufficient to decide this case.").

[57] 134 S. Ct. at 1122.

[58] Defs. PJ Br. 13 (quoting *Walden*, 134 S. Ct. at 1122) (emphasis in original).

[59] In *Walden*, a police officer from Georgia submitted an affidavit in Georgia that happened to impact an individual "with a 'significant connection' to Nevada." *Id.* at 1120.  The *Walden* Court held that Nevada did not have jurisdiction because the officer's conduct was purely foreign and not directed at Nevada. *Id.* at 1126.

contacts.  The quoted language is thus irrelevant to whether acts by co-conspirators are tantamount to the defendant's own acts.  Not surprisingly, then, courts post-*Walden* continue to exercise jurisdiction over co-conspirators where (as here) it is appropriate.[60]

Defendants' post-*Walden* authority is similarly unavailing.  *In re Automotive Parts Litigation*[61] and *Spivak v. Law Firm of Tripp Scott, P.A.*[62] are limited to specific state or circuit law not relevant to this case, and neither court opines on the constitutionality of the conspiracy theory of jurisdiction post-*Walden*.  In *Hanna v. Blanchette*, the court determined only that the plaintiffs failed to plead any connection between the alleged conspiracy and the forum, not that the conspiracy theory of jurisdiction was unconstitutional.  No. H-13-3119, 2014 WL 4185816 (S.D. Tex. Aug. 21, 2014).  Nor does *In re Aluminum Warehousing Antitrust Litigation*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015), stand for the blanket proposition that "conspiracy jurisdiction" is "inconsistent with due process."  Defs. PJ Br. 11.[63]  Instead, *Aluminum* cited as the "most instructive case from this District" on the issue the decision in *In re Terrorist Attacks on September 11*, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), which expressly recognized that the acts of a co-conspirator can give rise to personal jurisdiction under New York's long-arm statute.  The narrow holding of *Aluminum* is that if jurisdiction over co-conspirators is premised only on Rule 4(k)(2), then conspiracy jurisdiction may be improper because Rule 4(k)(2) does not reach the full limits

---

[60] *E.g.*, *Tadayon*, 2016 WL 1257798, at *6; *BeoCare Grp., Inc. v. Morrissey*, 124 F. Supp. 3d 696, 701-06 (W.D.N.C. 2015); *Best Chairs Inc. v. Factory Direct Wholesale, LLC*, 121 F. Supp. 3d 828, 840 (S.D. Ind. 2015).

[61] No. 12-MD-02311, 2015 WL 4508938, at *4 (E.D. Mich. July 24, 2015) (observing that *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 (6th Cir. 1981), neither adopted or rejected the "conspiracy theory" of personal jurisdiction and thus, declining to adopt the theory "in the absence of an explicit directive by the Sixth Circuit to do so").

[62] No. 1:13 CV 1342, 2015 WL 1084856, at *5 (N.D. Ohio Mar. 10, 2015) (applying Ohio law).

[63] Defendants argue that *Aluminum* "considered the viability of vicarious conspiracy jurisdiction post-*Walden* [and] rejected it." *Id.* at 23.  *Aluminum* makes no mention of *Walden*.

of the Due Process Clause.[64]  But here, as discussed below, jurisdiction is appropriate over at least

one co-conspirator under both the Clayton Act and New York's long-arm statute, both of which

permit conspiracy jurisdiction.[65]  *Aluminum* is thus off-point.

Consistent with *Aluminum,* this Court in *LIBOR IV* explained that a "bare allegation" of a

conspiracy between the defendant and a person within the personal jurisdiction of the court is "not

enough," nor is the mere presence of one conspirator sufficient to confer personal jurisdiction over

another conspirator, 2015 WL 6243526, at *29.  Plaintiffs allege much more.  Specifically, as

shown above (and in the complaints and materials provided in support of this opposition),

Defendants (1) participated in specific meetings in which persistent suppression was discussed,

(2) engaged in multiple overt acts committed in the U.S., (3) knew of those overt acts, and (4) had

a "profit motive" that depended on victimization of U.S. investors.[66]

The numerous well-grounded decisions on which Plaintiffs rely (unlike the law review

articles Defendants cite) reflect the bedrock principle that when a defendant enters into an illegal

conspiracy, it is liable – criminally, civilly, and jurisdictionally – for the acts of its co-

conspirators.[67]

---

[64] Other cases cited by Defendants make the same point, recognizing that conspiracy jurisdiction is proper on other statutory bases beyond Rule 4(k)(2). *Tymoshenko v. Firtash*, No. 11-CV-2794, 2013 WL 1234943, at *1, 4 (S.D.N.Y. Mar. 27, 2013) ("In this Circuit, decisions that have attributed the contacts of a defendant's co-conspirators have done so by applying New York state's long-arm statute under Rule 4(k)(1), *not* under Rule 4(k)(2)").

[65] In addition to courts in this district routinely applying the conspiracy doctrine under New York's long-arm statute, courts in this district have applied the conspiracy approach to federal statutes, like the Clayton Act, that permit nationwide service of process.  *See* Section I.D.3 *infra*.

[66] *See, e.g.*, SSAJF ¶¶ 6-8; Kaas Decl ¶¶ 35-38.  *Aluminum* is further distinguishable from the instant matter, as the *Aluminum* case was decided only after plaintiffs had "massive discovery."  90 F. Supp. 3d at 239.

[67] *See* 18 U.S.C. § 371; 18 U.S.C. § 1349; Restatement (Second) of Torts § 876; Model Penal Code § 5.03; *Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1095 (N.D. Iowa 2005) ("As the Seventh Circuit Court of Appeals cogently noted, it is not clear why personal jurisdiction should be an exception to the general rule of attributing the acts of one conspirator within the scope of the conspiracy to the other conspirators." (citing *Stauffacher*, 969 F.2d at 459)); *Allstate*, 782 F. Supp. at 221.

### 2.  The Elements of Conspiracy Jurisdiction Are Met

To sufficiently allege personal jurisdiction under the conspiracy theory of jurisdiction, a plaintiff must (1) make a *prima facie* showing of a conspiracy, (2) allege specific facts warranting the inference that the defendants were members of the conspiracy, and (3) show that the conspirators engaged in acts in furtherance of the conspiracy in the forum.  *LIBOR IV*, 2015 WL 6243526, at *29.

The Second Circuit confirmed that Plaintiffs plausibly allege the first and second of these elements for every Defendant.  *See Gelboim*, 823 F.3d at 781-82.  Defendants nonetheless argue that they do not satisfy the second "membership" element because they did not direct or control the U.S. conduct.  *See* Defs. PJ Br. 13-14.  But the law of the case is that every Defendant is plausibly a member of the "inter-bank conspiracy."  *Gelboim*, 823 F.3d at 782.  Nothing more is needed.  Plaintiffs need not allege a formal agency relationship between Defendants.  *Dixon v. Mack*, 507 F. Supp. 345, 349 (S.D.N.Y. 1980) ("The Second Circuit has repudiated the requirement of a formal agency relationship as a basis for imputing acts to a co-conspirator for jurisdictional purposes."  (citing *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 90 n.3 (2d Cir. 1975)).

Even if membership in the conspiracy were somehow an open question, Plaintiffs' allegations would still meet the three-part standard that Defendants propose: first, all Defendants had an "awareness of the effects" in the U.S. of their activity because they all sold or issued price-fixed products in the U.S. (indeed, that was one of the ***intended*** consequences); second, the activity in the U.S. (described in Section I.A above) was "to the benefit of the out-of-state" conspirators because each conspirator needed the others to suppress LIBOR for the conspiracy to work and to

avoid detection;[68] and third, given that Defendants all agreed to conspire to suppress LIBOR, and that each conspirator needed the other to stay in the pack to avoid detection, the co-conspirators who gave directions from the U.S. to suppress and stay within the pack (as described above) were acting "at the request of" and "on behalf of" the Foreign Defendants. *Terrorist Attacks*, 349 F. Supp. 2d at 805; *see also LIBOR IV*, 2015 WL 6243526, at *49 (recognizing that "each persistent suppressor needed all (or at least significant number) of the other banks to suppress LIBOR simultaneously in order to avoid immediate detection").

Defendants argue at length that foreign conspirators must "control" acts in the U.S., but they rely on a case interpreting the Minnesota long-arm statute[69] and they ignore that acts of co-conspirators are imputed to each other.  Even the *Terrorist Attacks* case Defendants rely upon, recognizes that domestic acts "on behalf of" or "at the request" of foreign conspirators are enough.[70]  One of the components of the conspiracy – like all other "uncomplicated" price-fixing conspiracies – is the sale of price-fixed goods.[71]  All members of the conspiracy were aware that their co-conspirators were selling price-fixed goods (financial instruments) in the U.S.  *See* Section I.C. *supra*.

As to the third element, Plaintiffs' pleadings and supporting materials sufficiently demonstrate that Defendant co-conspirators engaged in not one, but numerous overt acts in furtherance of the conspiracy in the U.S.  *See* Section I.A. *supra*.[72]  For example, employees of

---

[68] FM Compl. ¶¶ 16, 162-63; FDIC-R Compl. ¶¶ 18, 377-78.

[69] *Peterson* v. *Wallace*, 622 F. Supp. 2d 791, 801 (D. Minn. 2008).

[70] Similarly, *Heinfling v. Colapinto,* cited by Defendants, recognizes that New York's long-arm statute "does not require a formal agency relationship."  946 F. Supp. 260, 265 (S.D.N.Y. 1996). Tellingly, Defendants avoid citing the long-arm statute itself, N.Y. C.P.L.R. § 302, which makes no mention of "control" as a requirement for jurisdiction.

[71] *See Klehr*, 521 U.S. at 189–90 (observing in RICO case that "each sale to the plaintiff" is an "overt act that is part of [the price-fixing conspiracy]").

[72] Additional facts showing Defendants engaged in, and implemented, the conspiracy in the U.S. are set forth in the Plaintiffs' Complaints and supporting materials.  *E.g.*, SSAJF ¶¶ 8, 16-46; FDIC-R Compl. ¶¶ 81-114; *see also* Joint

three[73] Defendants gave the direction to suppress and stay within the pack from the U.S., which the Second Circuit determined is evidence of the conspiracy, and several Defendants directly sold price-fixed instruments to plaintiffs through Defendants' U.S. employees, and paid billions less in LIBOR payments to plaintiffs to and from U.S. bank accounts.  *Id.*[74]

### 3.  There Is a Statutory Basis for Conspiracy Jurisdiction

Defendants argue there is no statutory basis for jurisdiction, but focus their arguments only on whether there is statutory authority for conspiracy jurisdiction.  Defendants thus implicitly concede there is statutory jurisdiction under the Clayton Act where it is shown, as it is here, that Defendants acted, or expressly aimed their conduct at and caused effects, within the U.S.

Defendants incorrectly argue that even if conspiracy jurisdiction is proper under the Due Process Clause, there is no statutory basis for jurisdiction under this theory.  Every case cited by Defendants recognizes that conspiracy jurisdiction can be proper under Rule 4(k)(1) and New York's long-arm statute, provided (1) at least one co-conspirator committed tortious acts in New York in furtherance of conspiracy, within the meaning of N.Y. C.P.L.R. 302(a)(2),[75] and (2) the

---

Mem. Law Opp'n Defs. Mot. Dismiss Direct Actions Lack Jurisdiction 11-12, 23-26, 34-37, 40-42, 47, 49-52, ECF No. 886.

[73] *See* OTC Plaintiffs' supplemental memorandum regarding personal jurisdiction, which contains facts gleaned from Defendants' document productions produced under a Protective Order that prevents certain DAPs from seeing facts drawn from those documents.

[74] Although Plaintiffs do not contend it is required, this Court has already recognized that Defendants' persistent suppression proximately caused their economic losses.  *LIBOR IV*, 2015 WL 6243526, at *52-68.  As the Second Circuit explained, "when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Gelboim*, 823 F.3d at 772.

[75] N.Y. C.P.L.R. § 302(a)(2) (permitting jurisdiction over non-resident defendants "who did not themselves commit a tort while physically present in New York but who can be deemed responsible for such a tort based upon theories of agency or conspiracy"); *see also Exclaim Assocs. Ltd. v. Nygate*, No. 600510/05, 2005 WL 3501559, at *5 (Sup. Ct. Sept. 15, 2005) ("Under New York law, where an act in the furtherance of fraud is committed by a co-conspirator or agent of a defendant within New York, the act is sufficient to obtain jurisdiction over a non-New York defendant pursuant to CPLR 302(a)(2), even if the foreign defendant never stepped foot in New York.") (collecting cases).

remaining three-part test of *Terrorist Attacks* is met, *Terrorist Attacks*, 349 F. Supp. 2d at 805.[76]

Plaintiffs satisfy both requirements.  First, tortious acts were committed in New York within the

meaning of N.Y. C.P.L.R. 302(a)(2).  Several Defendants sold price-fixed instruments directly to

Plaintiffs from their New York branches, and paid billions less in LIBOR-based payments to

Plaintiffs as a result of the conspiracy, often to and from New York bank accounts.[77]  Several New

York employees also helped effectuate and continue the conspiracy from New York.  The BBA,

in particular, at the direction of Defendant members of the FXMMC, purposefully reached out to

the New York Fed, among others, in an effort to convince regulators that USD LIBOR was not

being persistently suppressed.[78]  All of these are tortious acts in furtherance of the conspiracy

---

[76] Virginia, as Defendants concede, likewise authorizes conspiracy-based jurisdiction over non-residents where it is reasonable to expect that the acts of the conspiracy would cause injury in Virginia, and at least one co-conspirator has sufficient contacts with the Commonwealth. Va. Code § 8.01-328.1; *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009); *Nathan v. Takeda Pharm. Am. Inc.*, 83 Va. Cir. 216 (2011).

Pennsylvania also recognizes conspiracy jurisdiction. *See Sugartown Worldwide LLC v. Shanks*, 2015 WL 1312572, at *4 (E.D. Pa. Mar. 24, 2015).  As for New Jersey, though the State Supreme Court has not reached the issue, the appeal courts have recognized conspiracy jurisdiction. *See, e.g., State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 487, 503-04 (App. Div. 2006) (holding that foreign defendants joined in a conspiracy that targeted New Jersey, and thus could be held liable in New Jersey).

While the Iowa Supreme Court has "never decided whether to adopt a civil conspiracy theory of personal jurisdiction," *Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 195 n.4 (Iowa 2015), it has held that Iowa's long-arm statutes extend to the limits of due process. *Aquadrill, Inc. v. Envtl. Compliance Consulting Servs.*, 558 N.W.2d 391, 392-93 (Iowa 1997).  Federal courts considering the question have thus undertaken a Constitutional analysis.  Chief Judge Bennett, in *Remmes*, 389 F. Supp. 2d 1080, reasoned that under classic conspiracy principles, each conspirator is an agent of each other conspirator, and "it is not clear why personal jurisdiction should be an exception to the general rule of attributing the acts of one conspirator within the scope of the conspiracy to the other conspirators." *Id.* at 1095.  He then surveyed other federal courts, and found that the majority agree that "jurisdiction based on the conspiracy theory does not violate due process." *Id.*  In contrast, *Brown v. Kerkhoff*, 504 F. Supp. 2d 464 (S.D. Iowa 2007) rejected co-conspirator jurisdiction under the facts before it, noting that "co-conspirators are not always each other's agents" but recognizing that "co-conspirators must take care not to be agents of each other, lest both be haled into a forum where either resides," *id.* at 517-18.  Nevertheless, as a matter of Iowa law, members of a conspiracy are mutual agents when acting in furtherance of that conspiracy. *See State v. Tonelli*, 749 N.W.2d 689, 692-93 (Iowa 2008).  In the event that the Court were to exercise jurisdiction over any of the Defendants under any of the state long-arms, venue would be proper. *See* note 95 *infra*.

[77] *See, e.g.*, TCEH Declaration ¶¶ 6-9, 13.

[78] *E.g.*, SSAJF ¶ 20.  Moreover, at least one Defendant proposed to use the BBA as a hub to "get around the collusion sort of bit." *Id.* ¶ 8.  The BBA actively sought to exclude potential competitors from the market for interest-rate benchmarks. *Id.*  The BBA entered into dozens of licensing agreements with U.S. entities to distribute USD LIBOR and reaped profits from those licenses. *See, e.g.*, FDIC-R Compl. ¶¶ 12-13, 64-73, 85, 89, 94-95, 98, 99-113, 151, 378, 381, 383; Exh. Prop. Am. Compl. ¶¶ 100-23; Kaas Decl. ¶¶ 9-38.  As shown, through BBA's direct contacts and

28

committed in New York that satisfy N.Y. C.P.L.R. 302(a)(2).[79]  Second, as shown above, Plaintiffs also meet *Terrorist Attacks*'s three-part test.

Section 12 of the Clayton Act provides another statutory basis for the conspiracy theory of jurisdiction.  Under Section 12, if a defendant "transacts business" in the chosen forum, then "personal jurisdiction may be established through worldwide service of process."  *In re Vitamin C Antitrust Litigation*, No. 06-MD-1738 (BMC)(JO), 2012 WL 2930109, at *4 (E.D.N.Y. July 18, 2012).  Section 12 is both a venue statute and a personal jurisdiction statute:  if the venue provision in Section 12 ("transacts business") is satisfied, then Section 12 confers personal jurisdiction worldwide.  *Daniel*, 428 F.3d at 427.  As shown below, venue is proper in each of the challenged districts because Defendants **directly** transact business there.[80]

Section 12 reaches the full limits of the Due Process Clause[81] – therefore, insofar as conspiracy jurisdiction is consistent with Due Process, the Clayton Act permits it too.[82]  Courts in this district

---

those through its co-conspirators, personal jurisdiction over BBA is proper under both New York and Virginia long-arm statutes.  The BBA has waived any challenge to jurisdiction under either long-arm statute because it affirmatively chose not to raise it in its 2014 motion to dismiss, Joint Mem. Law Supp. Defs.' Mot. Dismiss Direct Actions Lack Personal Jurisdiction ("2014 MTD DAP") 6-7, Nov. 5, 2014, ECF No. 745 ("the court need not assess each jurisdiction's long-arm statute").  Fed. R. Civ. P. 12(h).

[79] *See, e.g.*, *Philan Ins. Ltd. v. Frank B. Hall & Co.*, 215 A.D.2d 112, 112, 626 N.Y.S.2d 85, 86 (1995) ("By alleging that [Defendant's] agent entered New York to take part in *discussions directly related* to [Defendant's] allegedly tortious conduct, plaintiffs sufficiently pleaded facts … showing jurisdiction under CPLR 302(a)(1) and (2)) (emphasis added);  *Allstate Life Ins. Co.*, 782 F. Supp. at 223 (finding that plaintiffs satisfied the "tortious act by defendant's co-conspirator" element of conspiracy jurisdiction with regard to foreign banks because the co-conspirator sent the fraudulent prospectus "to purchasers, some of whom are United States and New York residents"); *see also Klehr*, 521 U.S. at 189–90 (in RICO case, Supreme Court confirmed that price-fixing cartel member's sale of a price-fixed product into a forum is an overt act in furtherance of the conspiracy); *Bank Brussels*, 171 F.3d at 783 (injury occurred in New York when injured foreign bank's funds were first disbursed "from an account in New York").

[80] Only those Venue Defendants who contest venue under Section 12 contest that Section 12 confers personal jurisdiction.  The remaining Defendants concede that there is a statutory basis for personal jurisdiction, and argue only that conspiracy jurisdiction cannot be applied under the statute.

[81] *Gen. Elec. Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037, 1043 (S.D.N.Y. 1982) ("Section 12 personal jurisdiction is . . . intended to be as broad as due process"); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 299 (3d Cir. 2004) ("personal jurisdiction under Section 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment").

[82] Defendants also contend that *Aluminum* says that conspiracy jurisdiction is improper under Section 12.  *Aluminum* says no such thing – it rejected jurisdiction for reasons unrelated to conspiracy jurisdiction.  90 F. Supp. 3d at 234.

have applied the conspiracy approach to other federal statutes, like the Exchange Act, that permit nationwide service of process.[83]  Defendants contend that because courts have rejected "conspiracy venue," then "conspiracy jurisdiction" must also fail.  Defs. PJ Br. 11-12.  Whether Congress has declined to make conspiracy venue available by statute has no bearing on whether conspiracy jurisdiction comports with the Constitution.[84]

### E.   Defendants Cannot Carry Their Heavy Burden of Demonstrating That Exercising Personal Jurisdiction Would Offend Traditional Notions of Fair Play and Substantial Justice

Defendants cannot "present a compelling case" that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice.  *LIBOR IV*, 2015 WL 6243526, at *33.[85]  This inquiry focuses on (1) the burden on the defendants in litigating in a foreign forum, (2) the interest of the forum in adjudicating the dispute, and (3) the interests of the plaintiffs in obtaining efficient and convenient relief.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  Defendants have not come close to satisfying this stringent standard.  Their argument consists largely of restating the arguments they made to this Court – unsuccessfully – in *LIBOR IV*, which rely on generalized concerns regarding fairness, reasonableness, and international comity.  2015 WL 6243526, at *33.  Defendants also fail to address persuasively the

---

The court also **asserted** jurisdiction over one foreign defendant.  2015 WL 6472656, at *12-14 (S.D.N.Y. Oct. 23, 2015) (citing *Magnetic Audiotape*, 334 F.3d at 208).

[83] *See, e.g.*, *Allstate Life Ins. Co.*, 782 F. Supp. at 221-23 (cited in *LIBOR IV*) (applying § 27 of the Securities Exchange Act to exercise personal jurisdiction over an in-state defendant and imputing the in-state defendant's jurisdictional contacts to its co-conspirators).

[84] Moreover, as shown above, even if the "conspiracy venue" cases had held (as opposed to suggesting in dicta) that the first part of Section 12 must independently be satisfied for each defendant, such a holding would be of no help to Defendants.

[85] That burden is heavy indeed:  The reasonableness inquiry "is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved."  *SEC v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013).  And, "while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few (and none in [the Second] Circuit) have ever declined jurisdiction, on fairness grounds, in such cases."  *Id.*

three *World-Wide Volkswagen* factors.  Defendants are major international banks, with significant contacts with the U.S. that enjoy profits in the billions of dollars.  Each has sophisticated international operations, previously availed itself of our domestic court system, and engages in extensive business that earn significant profits in the U.S.  The burden on Defendants of litigating in this country is minimal to nonexistent.  In contrast, the U.S. has a substantial interest in adjudicating the dispute.  Significant numbers of U.S. citizens and corporations purchase derivatives, mortgages, and other financial instruments tied to LIBOR.  The U.S. has an abiding interest in ensuring that its citizens are not being preyed upon by banks artificially fixing returns on those transactions.  Finally, Plaintiffs have a substantial interest in obtaining efficient and convenient relief in the forum under whose laws they purchased price-fixed products.  Defendants' reasonableness argument accordingly fails.[86]

---

[86] In addition to exercising personal jurisdiction over Defendants with respect to Plaintiffs' Sherman Act claims, the Court should exercise pendent personal jurisdiction over Plaintiffs' claims under state antitrust laws.  *See LIBOR IV*, 2015 WL 6243526, at *23.  In exercising pendent jurisdiction in *LIBOR IV* over Amabile Plaintiffs' unjust-enrichment claims based on its upholding (in part) of their CEA claims, the Court observed that "'where a federal statute authorizes nationwide service of process, and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.'"  *Id.* (quoting *AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)).  The Court's rationale applies equally to Plaintiffs' federal and state antitrust claims.

In the event the Court dismisses a Plaintiff's Sherman Act claims (on "efficient enforcer" grounds, for example) but upholds that Plaintiff's Cartwright Act claims (which, as discussed in the efficient enforcer opposition, are not subject to an efficient-enforcer analysis), personal jurisdiction would nonetheless exist under California's long-arm statute, Cal. Civ. Proc. Code § 410.10, which applies "to the full extent permissible under the U.S. Constitution."  *Daimler*, 134 S. Ct. at 753.  Accordingly, the discussion *supra* with respect to constitutional due process equally supports jurisdiction under California's long-arm statute.  While Defendants contend California does not recognize conspiracy-based jurisdiction, the California Supreme Court has not resolved the issue; further, because (as demonstrated by the authority Plaintiffs cite) the conspiracy-jurisdiction doctrine is constitutionally permissible, it is likewise permissible under California's long-arm statute.  In any event, Defendants are subject to California long-arm jurisdiction independent of the conspiracy doctrine, based on their conduct within, or directed at, California.  *See* Sections I.A-C *supra* (discussing Defendants' solicitation and sale of LIBOR-based financial instruments in, *inter alia*, California).  Additionally, were the Court to exercise California long-arm jurisdiction, venue would be proper as to all Defendants under 28 U.S.C. § 1391(b)(2).  *See* note 95 *infra*.  Alternatively, to the extent (if at all) the Court were to deem venue lacking as to certain Defendants anywhere in the U.S., 28 U.S.C. § 1391(b)(3) would allow for venue in the Northern District of California, thus precluding dismissal by this Court (as the transferee court) for improper venue.

## II.   EXERCISING PERSONAL JURISDICTION IS PROPER DESPITE THE OBJECTIONS OF CERTAIN DEFENDANTS AS TO VENUE

As a threshold, Venue Defendants have waived venue and personal jurisdiction under the Clayton Act.   Although jurisdiction and venue under Section 12 were pled in Plaintiffs' Complaints,[87] Venue Defendants did not raise a venue defense or challenge the Clayton Act as statutory basis for jurisdiction in their 12(b) motions filed in 2012 (with respect to the OTC, Exchange-Based, Bondholder, and Schwab 2012 Complaints) and 2014 (with respect to the DAP Complaints, including Schwab 2014 Complaints).[88]   Venue Defendants have thus waived any defense of improper venue under Section 12 of the Clayton Act – and accordingly their defense to personal jurisdiction under Section 12 as well.   *See Kitto v. Thrash Oil & Gas Co.*, No. CIV-88-169E, 1990 WL 33217, at *1 (W.D.N.Y. Mar. 20, 1990) (ruling that although defendants raised challenges to personal jurisdiction, they waived their privilege of challenging ***venue and jurisdiction*** pursuant to the Exchange Act by failing to contest venue because venue under implies jurisdiction under the Act).   Defendants make no venue arguments in this motion that they could not have raised in their earlier motions.[89]

In any event, there is venue in the challenged districts – and hence personal jurisdiction – under Section 12 of the Clayton Act.   The Supreme Court has construed the term "transacts business" to mean "the practical and broader business conception of engaging in any substantial

---

[87] *See, e.g.*, OTC Compl. ¶ 11.

[88] In their November 2014 Rule 12(b) motions concerning DAP Complaints, Defendants made only a cursory argument –without explanation or citation to authority – that the Clayton Act did not provide a sufficient statutory grant based on improper venue.   Courts, including the Second Circuit, generally do not consider such arguments to be adequately raised.   *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Gramercy Advisors, LLC v. Ripley*, No. 13-CV-9070 (VEC), 2014 WL 5847444, at *2 (S.D.N.Y. Nov. 12, 2014).

[89] Defendants rightly do not contend that their venue arguments were unavailable to them before the Supreme Court's rulings in *Daimler* or *Walden*, as those decisions addressed personal jurisdiction only, not the "distinct" issue of venue. *See United States ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2nd Cir. 1969).

business operations," rejecting a restrictive interpretation that overly relied upon the "artful arrangement of agents' authority, or of their comings and goings, or of the geography of minute incidents in contracting" if that would bar an aggrieved person from establishing venue locally. *United States v. Scophony Corp.*, 333 U.S. 795, 807, 808 n.19 (1948).

The concept of "transacting business" for venue purposes is more lenient than that of *International Shoe*'s jurisdictional analysis of "minimum contacts." *Dunham's, Inc. v. Nat'l Buying Syndicate*, 614 F. Supp. 616, 624 (E.D. Mich. 1985). A defendant that maintains offices and provides customer assistance in the district is considered to transact business in that district. *Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d 790, 794 & n.8 (2d Cir. 1959). A defendant that exercises control over a subsidiary or affiliate that transacts business in the district is also considered to have transacted business in the district via the subsidiary or affiliate.[90] Even if a corporation's agents never set foot in a district, their purchases and sales in the district "constitute the transaction of business" there. *Black v. Acme Mkts., Inc.*, 564 F.2d 681, 687 (5th Cir. 1977). Whether these purchases and sales can confer venue is "to be judged from the point of view of the average businessman and not in proportion to the sales or revenues of the defendant." *Id.*[91] Indeed, a single transaction in the district may confer venue if it is related to the cause of action. *In re Chicken Antitrust Litig.*, 407 F. Supp. 1285, 1291. (N.D. Ga. 1975).

---

[90] *Vitamin C*, 2012 WL 2930109, at *5-7; *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund,* 596 F.Supp.2d 630, 637 (E.D.N.Y. 2009) ("The exercise of [Clayton Act] jurisdiction is simply that, and is not equivalent to piercing the corporate veil for the purpose of imposing liability on the parent entity.").

[91] *Accord Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 711 F. Supp. 730, 733 (S.D.N.Y. 1989) ("The test of substantiality is whether the dollar volume of business, viewed objectively and without reference to the total volume of business of the corporation, is substantial from the point of view of the average businessman. From this viewpoint, as little as $30,000 of sales is substantial, and sales that constitute less than 2% of the defendant's business is not insubstantial."). To hold otherwise would allow a large corporation to "engage in the same acts which would subject a smaller corporation to jurisdiction and venue" without liability. *Green v. U.S. Chewing Gum Mfg. Co.*, 224 F.2d 369, 372 (5th Cir. 1955).

33

Venue Defendants challenge venue only in certain Challenged Districts. Moreover, Venue Defendants do not dispute that they transact business in the Challenged Districts; instead they exclusively rely on factual averments in declarations that relate only to jurisdiction. Venue Defendants thus leave uncontroverted the numerous allegations in Plaintiffs' Complaints, declarations, and other supporting materials showing that Venue Defendants transacted substantial business in each of the Challenged Districts.[92] Venue Defendants' contention that venue does not lie in those forums with respect to them accordingly should be rejected.[93]

---

[92] In Appendix B, Plaintiffs summarize on a forum-by-forum and Venue Defendant-by-Venue Defendant basis the facts showing that Plaintiffs have made out a *prima facie* showing of venue in each forum state. The Court has already found that swap and derivative counterparties engaged in a "course of dealing" in each of these districts with Plaintiffs located there. *LIBOR IV*, 2015 WL 6243526, at *31.

[93] If the Court does not find venue to be proper in the Challenged Districts, then the Court should grant transfer of venue to the Southern District of New York for Plaintiffs who amend their complaints to allege new venue. So, for example, although the Principal Plaintiffs filed their original complaints in Iowa, they were permitted by this Court to amend the complaints under FRCP 15(a)(1)(B). The Principal Plaintiffs amended their complaints to allege a new venue in the Southern District of New York and personal jurisdiction in New York. *See* P-Fin Am. Compl. ¶¶ 7-8; P-Funds Am. Compl. ¶¶ 7-8. The Court rejected the venue amendments, finding that *Lexecon's* reasoning applies equally to transfers pursuant to any venue statute. *LIBOR IV*, 2015 WL 6243526, at *63. But the Principal Plaintiffs did not ask for a venue transfer. They amended their complaints to allege new venue in the Southern District of New York. The case would therefore be remanded to the S.D.N.Y., but not necessarily to this Court, for trial.

The Court also noted that "[b]ecause of the multiplicity of defendants joined in almost every complaint, there may be no single venue in which all defendants are subject to personal jurisdiction. . . ." *Id.* at *39. With the revival of the antitrust claims, that is no longer the case. *See* App. B.

If the Court determines that personal jurisdiction over Defendants does not exist in Iowa, then the Principal Plaintiffs renew their argument that their New York complaints are operative. Amending venue in an MDL proceeding is an appropriate means to assert venue in a transferee court without offending *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach et al.*, 523 U.S. 26 (1998). *Manual for Complex Litigation* § 20.132. When a plaintiff actually files an amended complaint to assert venue in a new district, the new venue allegations do not even implicate the waiver rule. *See In re Elec. Books Antitrust Litig.*, No. 12 Civ. 3394 (DLC), 2014 WL 1642813, at *9-10 (S.D.N.Y. April 24, 2014). Rather, the Supreme Court in *Lexecon* held that regardless of whether permitting transferee courts to make self-assignments would be more desirable than preserving a plaintiff's choice of venue, § 1407(a) categorically ***limits the court's authority to override the plaintiff's choice*** and establishes a right to remand once the pretrial stage has been completed. *Lexecon*, 523 U.S. 26 (rejecting the ***defendants'*** motion to transfer the case). Indeed, "[o]nce an amended complaint is interposed, the original pleading no longer performs any function in the case." *Bey v. City of New York*, 454 F. App'x 1, 3 (2d Cir. 2011). The Principal Plaintiffs incorporate by reference all prior briefing on this matter (ECF No. 886, at 26-28, 43 n.90); (ECF No. 1025).

Additionally, Principal Plaintiffs, among others, also filed separate complaints in the S.D.N.Y. (Nos. 15-9792 & 15-9793) and in W.D.N.C., which have been transferred into this MDL (Nos. 16-592 & 16-590). Certainly these complaints allege jurisdiction adequately.

34

## III.   FEDERAL RULE OF CIVIL PROCEDURE 4(K)(2) PROVIDES AN ALTERNATIVE STATUTORY BASIS ON WHICH TO EXERCISE JURISDICTION

Rule 4(k)(2) allows a court to exercise personal jurisdiction over any defendant where (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction,[94] and (3) the exercise of jurisdiction comports with due process.  For the reasons set forth above, if the Court decides that Plaintiffs failed to establish that any Foreign Defendant transacted business in a particular forum, the Court may still assert personal jurisdiction under 4(k)(2).[95]

## IV.   DEFENDANTS WHO HAVE FORFEITED OR WAIVED JURISDICTION ARGUMENTS CANNOT RAISE THEM NOW

The Federal Rules mandate waiver of defenses (or related arguments) not raised in a party's initial Rule 12 motion.  *See* Fed. R. Civ. P. 12(h).  Defendants have waived or forfeited the following jurisdictional arguments:  First, Defendants waived any challenge to state long-arm statutes that confer personal jurisdiction.  Defendants could have, but did not, raise those arguments in either of their Rule 12(b) motions filed in 2012 (with respect to the OTC, Exchange-Based, Bondholder, and Schwab 2012 Complaints) and 2014 (with respect to the DAP Complaints, including Schwab 2014 Complaints).  Defendants thus cannot do so now.  *See HealthSpot, Inc. v.*

---

[94] If the Court determines a certification is necessary, the Court should require Plaintiffs to submit such certification only in the unlikely event the Court decides Plaintiffs have not demonstrated personal jurisdiction exists over the Defendants in any of the challenged forums.  *See Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05 CV 4880 (CBA), 2007 WL 4326793, at *9 (S.D.N.Y. Dec. 7, 2007) (if plaintiff does not file certification within thirty days, defendant's motion to dismiss will be granted; defendant given thirty days after certification to produce evidence that there is at least one specific state in which defendant would be subject to suit).

[95] In the event the Court relies on Rule 4(k)(2), venue would be proper in the forum under 28 U.S.C. § 1391 because (1) Defendants have not challenged application of § 1391 and therefore waived any such argument and (2) a substantial part of the events giving rise to the claim occurred in the forums where Plaintiffs purchased LIBOR-based instruments.  *Daniel*, 428 F.3d at 432-33 (§ 1391(b)(2)).  Even if that statute did not apply, the catch-all venue provision, § 1391(b)(3), would permit venue because at least one defendant is subject to jurisdiction venue in every Challenged Forum.

*Computerized Screening, Inc.*, 66 F. Supp. 3d 962, 967 (N.D. Ohio 2014) (holding that "particular arguments challenging personal jurisdiction may be waived or forfeited").[96]

Second, Defendant UBS previously failed to challenge personal jurisdiction in certain DAPs' cases filed in New York and New Jersey.[97]   Indeed, in moving to dismiss these DAPs' claims, UBS affirmatively stated that it "does not seek dismissal of actions filed in New York for lack of personal jurisdiction."[98]   UBS thus has waived personal jurisdiction and venue defenses.

Third, Defendants without branches in New York[99] waived personal jurisdiction as to claims asserted in the OTC, Exchange-Based, Bondholder, and Schwab 2012 Complaints by previously moving to dismiss without asserting that defense.   Defendants cannot excuse their inaction based on a change in intervening law under *Gucci* because these Defendants **did not have branches in New York**, and *Daimler* did not overturn any "controlling precedent" **relevant to them**.[100]

---

[96] *See also* note 78 *supra* (BBA waived long-arm argument).  Moreover, Foreign Defendants erroneously rely on the Court's prior decisions in *LIBOR IV* and *LIBOR V*, which relate to jurisdiction "**in the Challenged Jurisdictions**," to dispute Plaintiffs' allegations supporting jurisdiction over Foreign Defendants **in the U.S.**   The "Challenged Jurisdictions" are all individual states; previous arguments regarding them – and the resulting rulings – did not involve the minimum contacts with the entire country.   *See J. McIntyre Mach., Ltd.*, 564 U.S. at 884 (plurality opinion) ("Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State").

[97] These DAPs include Darby (NY), FDIC-R (NY), Prudential (NJ), and Salix (NY).

[98] 2014 MTD DAP at 3 n.3. Further, the arguments UBS tries to raise now were available to it in November 2014. Unlike the defendants in *LIBOR V*, whom the Court found did not waive their jurisdictional arguments "[i]n light of the change in the law of personal jurisdiction as applied to foreign banks under *Daimler* and *Gucci*," 2015 WL 6696407, at *17, UBS AG had access to those rulings months before its November 2014 motion.  Indeed, Defendants who *did* contest jurisdiction at that time heavily relied on both *Daimler* and *Gucci*.

[99] The following Defendants have submitted declarations stating that they have no branch offices in New York.  *See* Decl. of K. McKendry (ECF No. 781) ¶ 6 (Lloyds Banking Group and HBOS); Decl. of Elaine Williams (ECF No. 772) ¶¶ 3-5 (HSBC Holdings plc); Decl. of N. Black (ECF No. 790) ¶¶ 3-6 (HSBC Bank plc); Decl. of M. Gregory (ECF No. 774) ¶¶ 3-4 (Hongkong and Shanghai Banking Corporation Limited); Decl. of W. Gougherty (ECF No. 784) ¶¶ 4, 6, 12 (RBS Group); ECF No. 978-1 at 4 (CSGAG ).

[100] *See Gucci Am., Inc.*, 768 F.3d at 136 (waiver excused only when initial argument "would have been directly contrary to controlling precedent in this Circuit," which was that a "foreign bank **with a branch in New York**" was properly subject to general personal jurisdiction in New York); *LIBOR V*, 2015 WL 6696407, at *18 (permitting waived jurisdictional defenses only because "*Daimler* and *Gucci* made new personal jurisdictional defenses available to foreign banking enterprises **with United States branches**").

Fourth, every Defendant waived personal jurisdiction by not raising the defense in the Second Circuit in *Gelboim*.  All Defendants affirmatively asked the Second Circuit to assert jurisdiction over them for purposes of dismissing the antitrust claims on the merits.  None asserted lack of personal jurisdiction as a ground to dismiss the appeal.  They did that for an obvious strategic reason:  a dismissal for lack of personal jurisdiction would have expunged this Court's merits ruling favorable to them, robbing it of precedential effect.  In sharp contrast to Defendants' calculated conduct here, the appellant-defendant in *Gucci* submitted "post-argument letter briefs" to the Second Circuit contesting personal jurisdiction soon after *Daimler* was issued.  768 F.3d at 135.  Here, Defendants sat on their privilege of raising jurisdiction.[101]  Now that Defendants have lost in the Second Circuit, they have come back to this Court contending it lacks jurisdiction.  This gambit must fail.  *See Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1499185, at *6 (S.D.N.Y. Mar. 31, 2015) (personal jurisdiction waived when "Defendants continued to ask this Court to assert jurisdiction over them for purposes of their Rule 12(b)(6) motions").

Just this week, the Second Circuit held that a defendant waived personal jurisdiction when it previously had briefed personal jurisdiction arguments to the Second Circuit, but then successfully moved to remand based on an intervening decision that it hoped would give it a dismissal **on the merits**, without arguing lack of personal jurisdiction in the remand motion.  *Corporacion Mexicana De Mantenimiento Integral v. Pemex-Exploracion Y Produccion*, Dkt. 13-4022, slip op. at 14 (2d Cir. Aug. 2, 2016).  The Second Circuit explained that this conduct forfeited personal jurisdiction because the defendant "affirmatively and successfully sought relief from this

---

[101] Worse still, Defendants' decision not to challenge personal jurisdiction deprived the Second Circuit of the opportunity to "address any challenge to personal jurisdiction prior to deciding the merits of the cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 (2d Cir. 2012).

Court remanding for a new merits determination in the Southern District" and it could not re-contest personal jurisdiction merely because it is dissatisfied with its tactical choice. *Id.* at 15.

The situation here is the exact parallel: having affirmatively sought relief from the Second Circuit **on the merits** of the antitrust claims, defendants forfeited their argument that personal jurisdiction is lacking – and they cannot re-contest personal jurisdiction because they are now dissatisfied with their tactical choice.[102]

## V.   THE COURT SHOULD EXERCISE SUPPLEMENTAL PERSONAL JURISDICTION OVER ANTITRUST CLAIMS RELATING TO SPECIFIC TRANSACTIONS ALREADY FOUND TO TRIGGER JURISDICTION

A district court with jurisdiction over a claim "shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy."  28 U.S.C. § 1367.  This Court has found that swap counterparties are subject to jurisdiction as to common law claims relating to transactions where permitted by a forum selection clause and where the plaintiff was located and, with respect to bond obligors, where the bond was issued.  *LIBOR IV*, 2015 WL 6243526, at *37. Plaintiffs also assert antitrust claims against those same counterparties and obligors relating to

---

[102] *See Corporacion Mexicana*, slip op. at 14. ("Having sought additional proceedings addressed to the merits, both here and in the Southern District, PEP may not now contest personal jurisdiction." (citing *PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 460-61 (5th Cir. 2001) ("[W]hen 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.'"))).  Specifically, with respect to EBPs, UBS already agreed to the exercise of personal jurisdiction regarding claims under the CEA, including suppression, and presents no reason to contest that consent to this Court's jurisdiction over those same suppression claims now.  2015 MTD Class, Schedule A, ECF No. 966.

those same transactions.[103]   The Court should exercise supplemental jurisdiction over those antitrust claims.[104]

For example, the antitrust claims asserted by BATA and some of the claims asserted by California Consolidated Plaintiffs ("CCPs") and Houston arise from ISDA swap agreements governed by forum-selection clauses providing for jurisdiction in California federal and state courts (with respect to BATA's and the CCPs'[105] claims) and Texas federal and state courts (with respect to Houston's claims).[106]   Those clauses broadly mandate jurisdiction in those Challenged Jurisdictions with respect to these Plaintiffs' antitrust claims.[107]   The subject Defendants have thus consented to jurisdiction in the states where swap counterparties reside, including the Northern District of California (where BATA, Regents, EBMUD, Richmond, and San Mateo initially filed suit), the Central District of California (where Riverside initially filed suit), the Eastern District of California (where Sacramento initially filed suit), the Southern District of California (where the SANDAG and San Diego initially filed suit), and in the Southern District of Texas (where Houston

---

[103] Defendants note that the state law claims the Court upheld relate to specific contracts, whereas the antitrust claims purportedly do not.  Defs. PJ Br. 29-30.  That is irrelevant.  Claims relating to the impact of LIBOR suppression on the **exact same transaction** are part of the same "case or controversy," regardless of the legal theory relied upon.  *See, e.g., AFL Fresh & Frozen Fruits & Vegetables v. De-Mar Food Servs.*, No. 06-CV-2142(GEL), 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007) (exercising supplemental jurisdiction over a breach of contract claim arising from the same transaction as a PACA claim).  Moreover, none of the statutory bases for a court to decline to exercise supplemental jurisdiction is present here.  *See* 28 U.S.C. § 1367(c).

[104] Indeed, because all claims arise out of the same core misconduct (LIBOR's suppression) supplemental jurisdiction exists over that defendant as to **all** transactions, not just the ones that gave initial personal jurisdiction over that defendant in the first instance.

[105] The CCPs with swap transactions are: Regents, EBMUD, SANDAG, Richmond, Riverside, Sacramento, San Diego, and San Mateo.

[106] *See* Miarmi Decl. (BATA) Ex. B 1, 9 (governing claims against Bank of America, N.A.), Ex. G at 1, 12 (governing claims against Citibank, N.A.), Ex. K 1, 18 (governing claims against JPMorgan Chase Bank, N.A.); Nishimura Decl. ¶¶ 10, 19, 31, 35, 36, 38, 40-49, 63-66, 76-78.

[107] *See, e.g.*, Miarmi Decl. (BATA) Ex. B at 9 ("[Bank of America, N.A.] consents to the initiation of ***any proceeding*** in any federal or state court of competent jurisdiction located in ***the State of California*** or the State of New York.").

initially filed suit).  *See LIBOR IV*, 2015 WL 6243526, at *34 (rejecting Defendants' "narrow" interpretation of forum-selection clauses).[108]

## VI.   SPECIFIC JURISDICTION OVER RABOBANK AND DEUTSCHE BANK HAS ALREADY BEEN DEMONSTRATED BY EXCHANGE-BASED PLAINTIFFS

Exchange-Based Plaintiffs have already plausibly pled specific jurisdiction over Rabobank and Deutsche Bank for purposefully directing the manipulation of USD LIBOR within and causing effects in the United States forum.[109]  These Defendants' conduct is more than sufficient to confer specific jurisdiction for conspiring and suppressing LIBOR.

## VII.  TO THE EXTENT (IF AT ALL) THE COURT DETERMINES IT HAS ANY QUESTION AS TO WHETHER IT CAN EXERCISE PERSONAL JURISDICTION, IT SHOULD PERMIT LIMITED JURISDICTIONAL DISCOVERY[110]

As the Court is aware, Defendants have refused to produce a complete set of their regulatory productions to DAPs or EBPs.  In the event the Court finds itself inclined to dismiss any Defendant for lack of jurisdiction, DAPs and EBPs respectfully ask that the Court postpone ruling until DAPs and EBPs have had a chance to review Defendants' regulatory productions and provide additional evidence to the Court.  *See Magnetic Audiotape,* 334 F.3d at 207-08 (finding trial court improperly denied plaintiffs an opportunity to engage in limited jurisdictional discovery prior to dismissing foreign defendant for lack of personal jurisdiction).

### CONCLUSION

The motion should be denied.

---

[108] *See also Bense*, 683 F.2d at 720.

[109] *In re: LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR III*), No. 11 MDL 2262 (NRB), 27 F. Supp. 3d 447, 462-466 (S.D.N.Y. 2014); *LIBOR V*, 2016 WL 1558504, at *10.

[110] The Court in *LIBOR IV* addressed DAPs' prior request for jurisdictional discovery only in the context of what the Court termed "data fraud" claims, and required Defendants to file declarations identifying where Defendants "submitted or determined" USD LIBOR.  *LIBOR IV*, 2015 WL 6243526, at *37 & n.63; Order at 1, Dec. 23, 2015, ECF No. 1267; Order at 6-7, Apr. 29, 2016, ECF No. 1396.

Dated:  August 5, 2016

Respectfully submitted,

ZELLE LLP

By:   _/s/ James R. Martin_
      James R. Martin

James R. Martin
Jennifer D. Hackett
Woody N. Peterson
ZELLE LLP
1775 Pennsylvania Avenue, NW, Suite 375
Washington, DC  20006
Tel:  (202) 899-4100
Fax:  (612) 336-9100
Email:   jmartin@zelle.com
         jhackett@zelle.com
         wpeterson@zelle.com

Richard J. Leveridge
ADAMS HOLCOMB LLP
1875 Eye Street, NW, Suite 810
Washington, DC  20006
(202) 580-8817
(202) 580-8821
Email:     leveridge@adamsholcomb.com

*Counsel for Plaintiffs The Federal Home
Loan Mortgage Corporation and The Federal
Deposit Insurance Corporation as Receiver
for 38 Closed Banks*

By:  _/s/ Scott P. Schlesinger_
     Scott P. Schlesinger

Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Fort Lauderdale, FL 33316
Tel:  (954) 320-9507
Fax:  (954) 320-9509
Email:    scott@schlesingerlaw.com
          jhaberman@schlesingerlaw.com
          jgdanski@schlesingerlaw.com

*Counsel for Plaintiffs Amabile, et al.*

By:  _/s/ Nanci E. Nishimura_
     Nanci E. Nishimura

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Tel:  (650) 697-6000
Fax:  (650) 697-0577
Email:    nnishimura@cpmlegal.com
          medling@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Tel:  (212) 201-6820
Fax:  (646) 219-6678
Email:    abarnett@cpmlegal.com

*Counsel for Plaintiffs The Regents of the University of California; East Bay Municipal Utility District; San Diego Association of Governments; City of Richmond; Richmond Joint Powers Financing Authority; Successor Agency to the Richmond Community Redevelopment Agency; City of Riverside; Riverside Public Financing Authority; County of Mendocino; County of Sacramento; County of San Diego; County of San Mateo; San Mateo County Joint Powers Financing Authority; County of Sonoma, and David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma*

By:   /s/ Richard W. Mithoff
      Richard W. Mithoff

Richard W. Mithoff
Warner V. Hocker
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
500 Dallas Street
Houston, TX 77002
Tel:  (713) 654-1122
Fax:  (713) 739-8085
Email:     Rmithoff@mithofflaw.com
          whocker@mithofflaw.com


By:   /s/Nanci E. Nishimura
      Nanci E. Nishimura

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Tel:  (650) 697-6000
Fax:  (650) 697-0577
Email:    nnishimura@cpmlegal.com
        medling@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Tel:  (212) 201-6820
Fax:  (646) 219-6678
Email:     abarnett@cpmlegal.com

*Counsel for Plaintiff The City of Houston*

By:   /s/ David C. Frederick
      David C. Frederick

David C. Frederick
Wan J. Kim
Andrew C. Shen
KELLOGG, HUBER, HANSEN,
    TODD, EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
Email:    dfrederick@khhte
        ashen@khhte
        wkim@khhte

*Counsel for National Credit Union*
*Administration Board as Liquidating Agent*
*for U.S. Central Federal Credit Union, et al.*

By:   */s/ Daniel L. Brockett*                
        Daniel L. Brockett

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Tel.:  (212) 849 7000
Fax:  (212) 849-7100
E-mail:
    danbrockett@quinnemanuel.com
    danielcunningham@quinnemanuel.com
    steigolson@quinnemanuel.com
    jacobwaldman@quinnemanuel.com

Jeremy D. Andersen (pro hac vice)
Chris R. Barker (pro hac vice)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel.: (213) 443-3000
Fax: (213) 443-3100
E-mail:
    jeremyandersen@quinnemanuel.com
    chrisbarker@quinnemanuel.com

*Counsel for the Darby, Philadelphia,*
*Prudential, and Salix Plaintiffs*

By:   */s/ Mathieu J. Shapiro*              
        Mathieu J. Shapiro

Mathieu J. Shapiro (PA 76266)
OBERMAYER REBMANN MAXWELL &
    HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
Tel:  (215) 665-3014
Fax:  (215) 665-3165
Email:   mathieu.shapiro@obermayer.com

Michael J. Boni (PA 52983)
Joshua D. Snyder (PA 88657)
John E. Sindoni (PA 91729)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel.: (610) 822-0200
Fax: (610) 822-0206
Email:  mboni@bonizack.com
       jsnyder@bonizack.com
       jsindoni@bonizack.com

*Counsel for Plaintiffs The City of*
*Philadelphia and The Pennsylvania*
*Intergovernmental Cooperation Authority*

By:  */s/ Steven E. Fineman*
      Steven E. Fineman

Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel:  (212) 355-9500
Faax:  (212) 355-9592
Email:  sfineman@lchb.com
        mmiarmi@lchb.com

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel:  (415) 956-1000
Fax:  (415) 956-1008
Email:  rheimann@lchb.com
        efastiff@lchb.com
        bglackin@lchb.com

*Counsel for Plaintiffs Bay Area Toll Authority,
Schwab Short-Term Bond Market Fund, et al.,
Charles Schwab Bank, N.A., et al., and Schwab
Money Market Fund, et al.*

By:  */s/ Stacey P. Slaughter*
      Stacey P. Slaughter

Stacey P. Slaughter
ROBINS KAPLAN LLP
601 Lexington Avenue
Suite 3400
New York, NY 10022-4611
Tel:  (212) 980-7400
Email:  SSlaughter@RobinsKaplan.com

K. Craig Wildfang (MN Bar No. 117043)
Thomas J. Undlin (MN Bar No. 8018)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402–2015
Tel:  (612) 349–8500
email:  KCWildfang@RobinsKaplan.com
        TUndlin@RobinsKaplan.com

*Counsel for Plaintiffs Principal Financial
Group, Inc.; Principal Financial Services,
Inc.; and Principal Life Insurance Company
and Principal Funds, Inc.; PFI Bond &
Mortgage Securities Fund; PFI Bond Market
Index Fund; PFI Core Plus Bond I Fund;
PFI Diversified Real Asset Fund; PFI Equity
Income Fund; PFI Global Diversified
Income Fund; PFI Government & High
Quality Bond Fund; PFI High Yield Fund;
PFI High Yield Fund I; PFI Income Fund;
PFI Inflation Protection Fund; PFI Short-
Term Income Fund; PFI Money Market
Fund; PFI Preferred Securities Fund;
Principal Variable Contracts Funds, Inc.;
PVC Asset Allocation Account; PVC Money
Market Account; PVC Balanced Account;
PVC Bond & Mortgage Securities Account;
PVC Equity Income Account; PVC
Government & High Quality Bond Account;
PVC Income Account; and PVC Short-Term
Income Account*

By:   _/s/ Michael D. Hausfeld_
        Michael D. Hausfeld

Michael D. Hausfeld
William P. Butterfield
Hilary Scherrer
Nathaniel C. Giddings
HAUSFELD LLP
1700 St. NW, Suite 650
Washington, D.C. 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
       wbutterfield@hausfeldllp.com
       hscherrer@hausfeldllp.com
       ngiddings@hausfeldllp.com

Gary Smith
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax:: (215) 985-3271
Email: gsmith@hausfeld.com

_Counsel for Baltimore, New Britain, and_
_TCEH and Interim Lead Counsel for the_
_Proposed OTC Plaintiff Class_

Max R. Schwartz (MS2517)
Donald A. Broggi
SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Tel: (212) 223-6444
Email: mschwartz@scott-scott.com
       dbroggi@scott-scott.com

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: cburke@scott-scott.com

By:   _/s/ William Christopher Carmody_
        William Christopher Carmody

William Christopher Carmody (WC8478)
Arun Subramanian (AS2096)
Seth Ard (SA1817)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Tel: 212-336-3330
Fax: 212-336-8340
Email: bcarmody@susmangodfrey.com
       asubramanian@susmangodfrey.com
       sard@susmangodfrey.com

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, California  90067-6029
Tel: (310) 789-3100
Email: mseltzer@susmangodfrey.com

Drew D. Hansen
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tele: (206) 516-3880
Fax: (206) 516-3883
Email: dhansen@susmangodfrey.com

Barry C. Barnett
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, TX 77002-5096
Tel: (713) 651-9366
Email: bbamett@susmangodfrey.com

_Counsel for Baltimore, New Britain, and_
_TCEH and Interim Lead Counsel for the_
_Proposed OTC Plaintiff Class_

*Additional Counsel for Plaintiffs*

By: ___/s/ David E. Kovel_____
        David E. Kovel

David E. Kovel
Karen M. Lerner, Of Counsel
Thomas W. Elrod
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fa::  (212) 751-2540
Email:    dkovel@kmllp.com
              klerner@kmllp.com
              telrod@kmllp.com

By: ___/s/ Christopher Lovell_____
        Christopher Lovell

Christopher Lovell
Jody R. Krisiloff
LOVELL STEWART HALEBIAN
    JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
Tel:  (212) 608-1900
Email:    clovell@lshllp.com
              jkrisiloff@lshllp.com

*Interim Co-Lead Counsel for Exchange-Based
Plaintiffs and the Proposed Class*

By: ___/s/ Karen L. Morris_____
        Karen L. Morris

Karen L. Morris
Patrick F. Morris
R. Michael Lindsey
Morris and Morris LLC
    Counselors At Law
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Tel:  (302) 426-0400

By: ___/s/ David H. Weinstein_____
        David H. Weinstein

David H. Weinstein
Robert S. Kitchenoff
Weinstein Kitchenoff &
    Asher LLC
100 South Broad Street, Suite 705
Philadelphia, PA 19110-1061
Tel:  (215) 545-7200

*Counsel for Bondholder Plaintiffs*