```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
In re:

LIBOR-Based Financial Instruments            MEMORANDUM AND ORDER
Antitrust Litigation.
                                             11 MD 2262 (NRB)
This Document Applies to:

Exchange-Based Plaintiff Action              11 CV 2613 (NRB)


------------------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

The defendants and the Exchange-Based plaintiffs have filed a number of submissions over the past few months pertaining to the Exchange-Based plaintiffs' action. This omnibus Order addresses these submissions, i.e.: (1) Exchange-Based plaintiffs' request for leave to file their proposed fourth amended complaint ("PFAC") (ECF No. 1726), defendants' response (ECF No. 1769), plaintiffs' reply (ECF No. 1787), and defendants' sur-reply (ECF No. 1821); (2) defendants' request for clarification on the status of trader-based antitrust claims (ECF No. 1702), Exchange-Based plaintiffs' response (ECF No. 1725), and defendants' reply (ECF No. 1742); (3) the request of C2C Capital Management, LLC ("C2C") for leave to intervene in the Exchange-Based plaintiffs' action (ECF No. 1659), defendants' response (ECF No. 1669), C2C's reply (ECF No. 1681), and defendants' sur-reply (ECF No. 1707-2); and (4) Exchange-Based plaintiffs' motion for reconsideration of LIBOR VI, 11 MD

1

2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) (ECF No. 1693), defendants' response (ECF No. 1729), and plaintiffs' reply (ECF No. 1746).  For the reasons described below, plaintiffs' rather extraordinary motions are denied with one exception.

It is incontrovertible that Federal Rule of Civil Procedure 15 does not authorize a limitless right to amend a complaint. Viewing plaintiffs' request to file a fourth amended complaint in the wider context of this complex multi-district litigation virtually dictates the ruling.  Six years have passed since the Exchange-Based plaintiffs filed their lawsuit on April 15, 2011. Since then, the litigation has voyaged to the Second Circuit and the Supreme Court.  This Court has issued six major opinions, each of which specifically addressed the Exchange-Based plaintiffs' case and together total almost a thousand pages, in addition to countless interim orders totaling hundreds of pages more.  Indeed, *four* years ago, the Court informed the Exchange-Based plaintiffs:

> In sum, given the competition to become interim lead counsel, which revealed the experience of the competitors; the number of original complaints that had been filed; and, the obvious motivation to craft sustainable first amended complaints containing all factual and legal allegations that supported plaintiffs' claims, the Court was entitled to rely on these pleadings to contain the strongest possible statement of plaintiffs' case based on the collective skills of plaintiffs' counsel. . . .

> This is surely a case in which "the defendants and the Court were entitled to the plaintiffs' best effort at presenting their claims in response to the objections raised by the defendants." . . . Plaintiffs "are not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." Indeed, to permit amendment here might have the perverse effect of turning defense counsel and the Court into plaintiffs' counsel's co-counsel, with plaintiffs waiting to see what objections defendants raise and how the Court rules on those objections and then amending their complaint as necessary based on what they learned in the process. Especially in a case of this magnitude, with so much at stake and with enormous expenditure of resources by defendants and the Court, that is an unacceptable way to operate a system of justice.

LIBOR II, 962 F. Supp. 2d 606, 626-27 (S.D.N.Y. 2013) (quoting In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005)) (alterations incorporated). These observations are truer still today, when, six years into the litigation, the parties have almost completed 16 months of class action discovery and are on the threshold of class certification briefing that will be fully submitted by August. Clearly, this is not a case where justice requires granting the motion. Rather the opposite is the case, as permitting the amendments would be wasteful, futile, and prejudicial (again, with one exception). While the ultimate answer is clear, nonetheless we will address certain specific deficiencies in plaintiffs' positions.

First, while the PFAC and the accompanying letter briefing prominently feature allegations relating to the British Bankers'

Association, the bottom line is that this argument has been previously rejected.  See, e.g., LIBOR IV, 11 MD 2262 (NRB), 2015 WL 6243526, at *48 (S.D.N.Y. Oct. 20, 2015); Burke Letter Ex. A (ECF No. 1769).  The plaintiffs' pretense otherwise is as bold as it is fruitless.  The effort to repackage the underlying and well-known facts into a conspiracy theory (which according to plaintiffs might or might not be standalone) simply makes no sense and clearly ignores this Court's decision in LIBOR VI.  Once again, plaintiffs' obsession with antitrust claims, rather than other types of claims, has resulted in hyperventilated illogic.

Second, as pleaded, the trader-based antitrust claims, either standing alone or joined with plaintiffs' other conspiracy theories, do not withstand even a modicum of logical scrutiny.  Rather, they reflect a misunderstanding of the law of conspiracy and a lack of concern with any internal contradictions.  What is more, Gelboim did not provide an opening of the floodgates for every plaintiff's every theory; Gelboim provides no support for trader-based antitrust claims as the decision simply did not address them.  Justice does not require permitting another attempt at pleading, as "the Court was entitled to rely on these pleadings to contain the strongest possible statement of plaintiffs' case based on the collective

4

skills of plaintiffs' counsel." LIBOR II, 962 F. Supp. 2d at 626.[1]

Third, where a CEA trader-based manipulation claim against a particular defendant has been previously upheld, it is not necessary for the plaintiffs to amend the complaint to add additional examples of such a claim.  In the past we engaged in a line-by-line analysis of trader-based manipulation claims against new defendants to ensure that plaintiffs had pled at least some concrete claims that conformed to our prior holdings. See LIBOR II, 962 F. Supp. 2d at 619-24; LIBOR III, 27 F. Supp. 3d 447, 462-66 (S.D.N.Y. 2014) (finding viable trader-based manipulation claims against Rabobank and Barclays); Mem. & Order, 2016 WL 1558504, at *8-11 (S.D.N.Y. Apr. 15, 2016), ECF No. 1380 (finding viable trader-based manipulation claims against Deutsche Bank).  Additional examples of the same claims are unnecessary.  At the same time, lest we be misunderstood, plaintiffs will only be able to recover on specific instances of trader-based manipulation that meet the Court's standards, e.g., where personal jurisdiction exists, the manipulation affected the published rate, a named plaintiff was injured, the claim is timely, and the like.  A review of Appendix A to the PFAC reveals both plaintiffs' acknowledgment that they re-pled

---

[1] The procedural dispute over the status of plaintiffs' trader-based antitrust claims against Merrill Lynch International, Royal Bank of Canada, RBC Capital Markets LLC, and RBS Securities Inc. is moot.

trader-based manipulation claims that the Court has already rejected as well as plaintiffs' brazen attempt to plead many new claims that are facially inconsistent with the Court's prior orders.

Fourth, to the extent that plaintiffs seek to expand the class period for persistent suppression claims to the period January 2005 to July 2007, i.e., before any alleged suppression arguably began, the effort is rejected. Even if the proposal survived a plausibility review, it would be rejected as untimely and unsaveable under American Pipe tolling or the relation-back doctrine.

Fifth, given the various issues raised by the parties' submissions on C2C's motion to intervene in the Exchange-Based plaintiffs' action, the motion is denied and C2C should file its own complaint if it decides to do so. Obviously, in no way should this be understood as a ruling on the viability of any such complaint.

Finally, however, plaintiffs are permitted to amend their complaint to provide new allegations bolstering the relationship between LIBOR and the trading price of a Eurodollar futures contract.[2] To explain this determination, we first address plaintiffs' motion for reconsideration of the portion of LIBOR VI that held that "a damages theory predicated on a direct link

---

[2] Plaintiffs also have permission to amend their complaint in ways that the Court has already approved, e.g., ECF No. 1380.

between an act of LIBOR suppression and an impact on Eurodollar futures trading prices in a particular amount is speculative." 2016 WL 7378980, at *23.  That motion for reconsideration is denied.

We have previously written on reconsideration in this case:

> Reconsideration is appropriate only where a court has overlooked controlling decisions or facts presented in the underlying motion which, had they been considered, might reasonably have altered the result of the initial decision.  Because the remedy of reconsideration does not provide relief where a party failed to present relevant factual or legal arguments, a party seeking reconsideration may not advance new facts, issues or arguments not previously presented to the Court.  Reconsideration is an extraordinary remedy to be employed sparingly, given the interests of finality and conservation of scarce judicial resources.  The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.

LIBOR III, 27 F. Supp. 3d at 457 (internal quotation marks and citations omitted).

Plaintiffs made a host of arguments in support of their motion.  Primarily they argued that the Court had already issued prior rulings about the sufficiency of their damages theory; that the Court incorrectly required more than a Twombly standard; and that the allegations in plaintiffs' Second Amended Complaint in fact showed a direct relationship between LIBOR and Eurodollar futures trading prices.

First, contrary to plaintiffs' assertion, this Court has never made prior rulings about the sufficiency of plaintiffs'

7

damages theory for the purposes of antitrust standing.  Our only statements about plaintiffs' claims were made in the context of other legal theories.  However, in the context of an efficient enforcer analysis, Supreme Court precedent indisputably requires a district court to make a more focused evaluation of a plaintiff's damages theory at the pleading stage than is otherwise required.  While we recognize that there is some inherent tension in this requirement, it is a requirement nonetheless, and the fact that we found the plaintiffs' pleading sufficient in other respects does not mandate the answer here.  See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 537, 545 (1983) ("The complaint does allege a causal connection between an antitrust violation and harm to the [plaintiff] and further alleges that the defendants intended to cause that harm.  As we have indicated, however, the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry. . . .  Other relevant factors . . . [including] the tenuous and speculative character of the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury . . . weigh heavily against judicial enforcement of the [plaintiff's] antitrust claim.").

Second, the Court applied Twombly and found the plaintiffs' pleadings as to efficient enforcer deficient.  The Court did a

close reading of Exchange-Based plaintiffs' complaint looking for allegations to support an inference that LIBOR and Eurodollar futures trading prices move in tandem. Cf. In re Foreign Exch. Benchmark Rates Antitrust Litig., No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016). We found many of the allegations vague and conclusory. See LIBOR VI, 2016 WL 7678980, at *21 (quoting Exchange-Based Compl. ¶¶ 439, 447). The only other basis provided for a tandem relationship was Figure 21, which did not "credibly support" such a relationship. Id. at *22.[3] It is not that the Court requires empirical evidence at a pleading stage; it is that the plaintiffs' proffered empirical evidence failed.[4] As the plaintiffs did not provide any other supporting allegations, the Court held that a damages theory predicated on intermediate trades was speculative. By contrast, given the well-established and undisputed relationship between LIBOR and Eurodollar futures settlement prices, the Court permitted a separate damages theory to proceed. Id. at *23.

---

[3] The plaintiffs should not be surprised at the Court's review of Figure 21, given the plaintiffs' own repeated reliance on Figure 21 at oral argument. Oct. 27, 2016 Hr'g Tr. 87:21-88:4, 89:2-18 ("Tr.").

[4] The plaintiffs also argue that the Court improperly "assumed that a one-for-one relation between spot prices and futures prices was necessary . . . ." Lovell & Kovel Letter 2 (ECF No. 1693). To the contrary, the Court merely noted that the one-to-one relationship was a "supposed" one. It was supposed *by the plaintiffs* in their opposition brief, in a statement which itself contains an interesting qualifier: "[I]n an efficient market, there will be a one-for-one relationship between Defendants' manipulations and Exchange Plaintiffs' injury." Exchange-Based Pls.' Mem. of Law in Opp'n 5 (ECF No. 1504).

Moreover, the plaintiffs' arguments in their motion for reconsideration regarding Figure 21 are self-defeating.  *Either* Eurodollar futures are traded in "anticipatory markets that lead[] as well as follow" LIBOR, respond more quickly than LIBOR does to third-party news, and have traded at levels that actually caused panel banks to change their LIBOR submissions in response;[5] *or* there is a "causal chain" running from LIBOR to Eurodollar futures in which "manipulation of LIBOR will result in manipulation of Eurodollar futures prices *that day*" in a "well-established mathematical relationship."[6]  While the latter could establish a non-speculative damages theory, it was the former that was pled in the Second Amended Complaint.  And if it is true that Eurodollar futures can "lead as well as follow" LIBOR, how will plaintiffs show that LIBOR suppression on, say, July 10 damaged a Eurodollar futures trade on July 9 rather than the trade on July 10 or July 11?  While perhaps this detail is not necessary in other cases, in this case Eurodollar futures traders seek to hold defendants responsible for treble damages for (1) LIBOR, set daily, and (2) on trades on contracts that may be held for as little as four days, Tr. 97:1-2.  In sum, plaintiffs did not meet the standard they set for themselves in

---

[5] Lovell & Kovel Letter 3-6 (ECF No. 1693); Exchange-Based Compl. ¶ 447.

[6] Lovell & Kovel Letter 2 (ECF No. 1693); Lovell & Kovel Letter 4-5 (ECF No. 1746) (emphasis in original).

alleging the necessary relationship.  Therefore, the motion for reconsideration is denied.

Despite plaintiffs' unsupportable assertions, including the assertion that post-Gelboim "a complaint is not the forum for Plaintiffs to prove causation," Lovell & Kovel Letter 23 (ECF No. 1787), nevertheless, because LIBOR VI was the first opinion in this MDL to address the issue of speculative damages in the context of the efficient enforcer analysis, we have concluded that plaintiffs should have a single opportunity to supplement their complaint in this respect, i.e., to add what are currently Paragraphs 894 to 904 of the PFAC.  Such leave is not a ruling on the sufficiency of the new allegations.  Given the current stage of the litigation, however, we will utilize Judge Caproni's approach and evaluate at the class certification stage based on a more fulsome record the effect of defendants' alleged manipulation on traded futures contracts.  In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig., No. 14-MD-2548 (VEC), 2016 WL 5794776, at *13 (S.D.N.Y. Oct. 3, 2016). At the same time, plaintiffs must be aware of the Court's continued skepticism as to such damages theories.  See id.; In re Platinum and Palladium Antitrust Litig., No. 14-cv-9391 (GHW), 2017 WL 1169626, at *23-25 (S.D.N.Y. Mar. 28, 2017); Sullivan v. Barclays PLC, No. 13-cv-2811 (PKC), slip op. at 3-4 (S.D.N.Y. Apr. 18, 2017) (ECF No. 339).  Additionally, in

11

granting plaintiffs leave to supplement their complaint in this single regard, we do not intend to suggest that plaintiffs should not have anticipated the need from the outset to plead non-speculative damages under an efficient enforcer analysis. We do, however, recognize that the focus on this issue is a consequence (perhaps unintended) of the decision to appeal this Court's dismissal of the antitrust claims in LIBOR I.

This Memorandum and Order resolves MDL docket entries 1659, 1693, 1702, and 1726.

**SO ORDERED.**

Dated:  New York, New York
        April 20, 2017

                                              /s/ Naomi Reice Buchwald
                                              NAOMI REICE BUCHWALD
                                              UNITED STATES DISTRICT JUDGE