**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Master File No. 11-md-2262 (NRB) |
| | **ORAL ARGUMENT REQUESTED** |
| THIS DOCUMENT RELATES TO: | |
| METZLER INVESTMENT GmbH, et al., | No. 11-cv-2613 (NRB) |
| Plaintiffs, | |
| v. | |
| CREDIT SUISSE GROUP AG, et al. | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.   THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(a)............ 5

    A.   The Proposed Class Is So Numerous That Joinder Is Impracticable .................. 5

    B.   There Are Questions of Law and Fact Common to the Class ............................ 7

    C.   Plaintiffs' Claims Are Typical of the Class's Claims........................................... 9

    D.   Plaintiffs Will Fairly and Adequately Represent the Interests of the Class........ 11

II.  THE PROPOSED CLASS SATISFIES THE RULE 23(B)(3)..................................... 14

    A.   Common Questions Predominate ...................................................................... 14

    1.   Courts Regularly Hold Under the Applicable Standards that Common Issues
        Predominate with Respect to Antitrust and CEA Claims .................................. 14

    2.   Common Issues Predominate With Respect to Defendants' Conspiracy to
        Suppress LIBOR .............................................................................................. 15

        a.   The Existence of a Conspiracy Is a Common Question ........................... 16

        b.   Impact of LIBOR Manipulation on Eurodollar Futures Contract
            Prices Is a Common Question.................................................................. 17

        c.   Plaintiffs Will Use a Common Methodology for Proving Damages........ 20

    3.   Common Issues Predominate With Respect to Defendants' Individual
        Suppression of LIBOR in Violation of the CEA ............................................... 20

        a.   Common Class Wide Evidence Will Be Used To Prove Each
            Defendants's Course of Conduct And Scienter ........................................ 20

        b.   Common Class Wide Evidence Will Be Used To Prove Aiding and
            Abetting ................................................................................................. 22

        c.   Common Class Wide Evidence Will Be Used To Prove Artificial
            Impact On Eurodollar Futures Prices ...................................................... 23

        d.   Common Class Wide Evidence Will Be Used To Prove Damages.......... 24

    4.   Common Class Wide Evidence Will Be Used To Prove Trader Based
        Manipulation.................................................................................................... 24

        a.   Common Class Wide Evidence Will Be Used To Prove Knowing
            False Reports ......................................................................................... 25

        b.   Common Class Wide Evidence Will Be Used To Prove Artificial
            Impact on Eurodollar Futures ................................................................ 27

i

          c.    Common Class Wide Evidence Will Be Used To Prove Damages .......... 28

   B.    A Class Action Is Superior to Other Methods of Adjudicating the Present Dispute ............................................................................................................... 28

III.    PLAINTIFFS' PROPOSED CLASS IS ASCERTAINABLE ....................................... 30

CONCLUSION ............................................................................................................................ 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                       **Page**

*Amabile v. Bank of America Corp.*,
  No. 13 Civ. 1700 (NRB) (S.D.N.Y. Mar. 13, 2013)....................................................... 29

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)....................................................................... 22

*In re Amaranth Natural Gas Commodities Litig. ("Amaranth II")*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................... *passim*

*In re Amaranth Nat. Gas Commodities Litig. ("Amaranth III")*,
  730 F.3d 170 (2d Cir. 2013)................................................................. 20, 22-23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).................................................................... 15-16, 29

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013).................................................................... 14

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)................................................................. 16

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)......................................................................... 1

*Brecher v. Republic of Arg.*,
  806 F.3d 22 (2d Cir. 2015)................................................................. 30

*Cange v. Stotler & Co., Inc.*,
  826 F.2d 581 (7th Cir. 1987) ............................................................. 1

*Casale v. Kelly*,
  257 F.R.D. 396 (S.D.N.Y. 2009) .......................................................... 4

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*,
  504 F.3d 229 (2d Cir. 2007)............................................................... 5

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013)..................................................................... 15

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)....................................................................... 16

iii

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir.)......................................................................................... 15

*In re Currency Conversion Fee Antitrust Litig.*,
    224 F.R.D. 555 (S.D.N.Y. 2004) ................................................................16-17

*In re Currency Conversion Fee Antitrust Litig. ("Currency Conversion II")*,
    264 F.R.D. 100 (S.D.N.Y. 2010) ......................................................... 9, 13, 30

*Damassia v. Duane Reade, Inc.*,
    250 F.R.D. 152 (S.D.N.Y. 2008) .................................................................. 13

*Davis v. City of N.Y.*,
    296 F.R.D. 158 (S.D.N.Y. 2013) .................................................................. 13

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108, 121 (S.D.N.Y. 2015),
    *amended by*, No. 13 Civ. 6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).................. 30

*Duarte v. Tri-State Physical Med. & Rehab., P.C.*,
    No. 11 Civ. 3765 (NRB), 2012 WL 2847741 (S.D.N.Y. July 11, 2012)........................... 5

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) ..................................................... 30

*In re Elec. Books Antitrust Litig.*,
    No. 11 MDL 2293 (DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)....................... 16

*In re Ethylene Propylene Diene Monomer ("EPDM") Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009)..................................................................... 17

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ........................................................ 4, 12, 31

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).................................................................... 5, 11-12

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)............................................................................ 2

*In re Initial Pub. Offerings Sec. Litig. ("IPO")*,
    471 F.3d 24 (2d Cir. 2006).................................................................... 4, 30

*Jackson v. Bloomberg, L.P.*,
    298 F.R.D. 152 (S.D.N.Y. 2014) .................................................................. 11

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    244 F.R.D. 469 (N.D. Ill. 2007),
    *aff'd* 571 F.3d 672 (7th Cir. 2009) .......................................................................... 13, 20

*Kottler v. Deutsche Bank AG*,
    No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) .......................... 9

*Laumann v. Nat'l Hockey League*,
    105 F. Supp. 3d 384 (S.D.N.Y 2015) ........................................................................ 12, 31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262, 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) ................................. 11

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR I")*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................... 2, 20, 22

*In re LIBOR-Based Financial Instruments Antitrust Litigation ("LIBOR II")*,
    962 F. Supp.2d 606 (S.D.N.Y. 2013)................................................................................ 2

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR III")*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014).............................................................. 2, 10, 21, 25

*In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR IV")*,
    No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), ....................... 2

*In re LIBOR-Based Financial Instruments Antitrust Litigation ("LIBOR V")*,
    No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov 3, 2015) ..................................... 2

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 Md. 2262, 2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016) ................................... 11

*In re LIBOR-Based Financial Instruments Antitrust Litigation ("LIBOR VI")*,
    No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016)......................... 2

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)............................................................................................ 4

*Megason v. Starjem Rest. Corp.*,
    No. 12 Civ. 1299, 2014 WL 113711 (S.D.N.Y. Jan. 13, 2014)....................................4-5

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) .................................................................................. 31

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)....................................................................................................... 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................ 8, 16

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) .......................................................................................... 29

*In re Natural Gas Commodities Litig.*,
   231 F.R.D. 171 (S.D.N.Y. 2005) ...................................................................... *passim*

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   No. 08 Civ. 5653 (PAC), 2014 WL 1013835 (S.D.N.Y. Mar. 17, 2014) .......................... 9

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .................................................................................. 13

*In re Platinum & Palladium Commodities Litig.*,
   No. 10 Civ. 3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2015) ...................................... 8

*In re Playmobil Antitrust Litig.*,
   35 F. Supp. 2d 231 (E.D.N.Y. 1998) ........................................................................ 7-8

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) .......................................................................... 11, 30

*In re Prudential Sec. Inc. Ltd. P'Ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 2008) ................................................................................ 9

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ................................................................................ 14-15

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) .................................................................... *passim*

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
   262 F.3d 134 (2d Cir. 2001) ...................................................................................... 15

*Strobl v. N.Y. Mercantile Exch.*,
   582 F. Supp. 770, 772 (S.D.N.Y. 1984),
   *aff'd* 768 F.2d 22 (2d Cir. 1985) .......................................................................... 16

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) ............................................................................ 12, 14, 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S.Ct. 1036 (2016) .................................................................................................. 14

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
  209 F.R.D. 353 (S.D.N.Y. 2002) ...................................................................... 9

*United States v. Peoni*,
  100 F.2d 401 (2d Cir. 1938) ............................................................................ 22

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ............................................................................ 14

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ............................................................................ 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007),
  *aff'd* 838 F.3d 223 (2d Cir. 2016) .................................................................. 29

*Wal–Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................... 7, 13

**Rules**

Fed. R. Civ. P. 23 ................................................................................... *passim*

Fed. R. Civ. P. 23 ........................................................................................... 24

**Other Sources**

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002) ........................ 8

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
  Procedure (3d ed. 2005) ................................................................................. 8

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
  Procedure (3d ed. 2005) ............................................................................... 14

Herbert B. Newberg & Alba Conte, Newberg on Class Actions (5th ed. 2014) ................... 12, 16

H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57 ............................................... 1

## PRELIMINARY STATEMENT

The Exchange-Based Plaintiffs ("Plaintiffs")[1] respectfully submit this memorandum and the accompanying expert reports and declarations[2] in support of their motion pursuant to Federal Rule of Civil Procedure 23 to certify this action as a class action for their claims under the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*. ("Sherman Act") and Commodity Exchange Act, 7 USC § 1 *et seq*. ("CEA").

The Court is acquainted with Plaintiffs' factual allegations.  During the Class Period, Plaintiffs allege that Defendants individually and collectively manipulated BBA U.S. Dollar LIBOR to benefit their trading positions and engaged in the suppression of LIBOR.  Additional factual support is discussed throughout this brief and is set forth in the Elrod Declaration and other supporting documents filed herewith.

An overlapping purpose of the Sherman Act and the CEA prohibitions in cases like this is to protect the integrity of the process by which prices are determined and provide remedies for those who are injured by artificial prices.[3]  The government orders, guilty pleas, allocutions, and criminal convictions as well as the limited documents and audio files produced herein all indicate

---

[1] Plaintiffs are Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, and Nathanial Haynes.

[2] All references to "Elrod Decl." are to the Declaration of Thomas W. Elrod filed contemporaneously herewith. All "Ex." references are to the "Elrod Decl." unless otherwise noted. Plaintiffs are filing copies of their class certification expert reports contemporaneously herewith under seal.  Those reports include: (i) Expert Report of H. Nejat Seyhun ("Seyhun Report"); (ii) Expert Report of Janet S. Netz, Ph.D. ("Netz Report"); and (iii) Expert Report of Craig S. Beevers ("Beevers Report"). References to Defendants' class certification expert reports are to: (i) Expert Report of Janusz A. Ordover, Ph.D. ("Ordover Report"); (ii) Expert Report of Robert D. Willig ("Willig Report"); (iii) Expert Report of Christopher L. Culp, Ph.D. ("Culp Report"); and (iv) Expert Report of Glenn Hubbard ("Hubbard Report").

[3] *Compare Cange v. Stotler & Co.*, 826 F.2d 581, 594-595 (7th Cir. 1987) (citing to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57) ("Congress viewed private lawsuits as "critical to protecting the public and fundamental to maintaining the credibility of the futures market") *with Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983), (the passage of the Clayton Antitrust Act was intended to empower individuals to bring suit against large violators of the antitrust laws).

that Defendants engaged in extensive unlawful conduct that manipulated prices in the Chicago

Mercantile Exchange ("CME") Eurodollar futures and options market.

All Plaintiffs and Class members transacted in the same standardized contracts, subject to

the same rules in that same centralized CME marketplace.  The Class should be certified because

all Plaintiffs and Class members must answer the same three common questions:

> 1) Did Defendants, individually or collectively, engage in the unlawful conduct
> alleged herein?
>
> 2) Did such unlawful conduct cause artificial prices in the Eurodollar futures
> market?
>
> 3) Did each Plaintiff or Class member suffer damages in its transactions made in
> such market at such artificial prices?

These three questions are the predominant common questions in this action because

Plaintiffs will develop the same massive corpus of common evidence[4] to answer such questions,

and each Plaintiff and Class member will then submit their transaction records to an administrative

claims process to determine damages.  Plaintiffs' proposed definition of the Class has been

adjusted to correspond to this Courts' prior rulings.[5]  Subpart "A" of the Class definition follows

this Court's rulings concerning Plaintiffs' role as efficient enforcers under the Sherman Act.

*LIBOR VI*, 2015 WL 6243526, at *15-24, Slip Op. at 38-66.  Subpart "B" follows this Court's

---

[4] There will be some differences in the common corpus of evidence for Trader Based Manipulation ("TBM") in what this Court has called Period 0, January 1, 2005 – August 8, 2007, because Period 0 came before the LIBOR suppression associated with the financial crisis.  *See infra.*

[5] *Compare Gelboim v. Bank of Am. Corp.*, 823 F.3d 759,764-66 (2d Cir. 2016) ("Gelboim"), *with In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR I")*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) [ECF No. 286]; *e.g., In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR II")*, 962 F. Supp.2d 606 (S.D.N.Y. 2013) [ECF No. 389]; *In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR III")*, 27 F. Supp. 3d 447 (S.D.N.Y. 2014) [ECF No. 568]; *In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR IV")*, No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct 20, 2015) [ECF No. 1222];   *In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR V")*, No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov 3, 2015) [ECF No. 1234]; *In re Libor-Based Financial Instruments Antitrust Litigation ("LIBOR VI")*, No. 11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) [ECF No. 1676].

rulings prior rulings on TBM.[6]  Subpart "C" encompasses Period 3 (as defined in the Court's prior

rulings) and responds to this Court's statute of limitations and CEA rulings.  *E.g.*, *LIBOR I*, 935 F.

Supp. 2d at 695, Slip Op. at 47-50, 712-713; *LIBOR II*, 962 F. Supp.2d at 609 n. 1, Slip Op. at 1

n.1; *LIBOR III*, 27 F. Supp. 3d at 471, Slip Op. at 40-42; *LIBOR IV*, 2015 WL 6243526, at *9-11,

Slip Op. at 23-27.  Thus, the proposed Class definition is as follows:

> All persons, corporations and other legal entities (other than Defendants[7], their employees, affiliates, parents, subsidiaries, and co-conspirators) ("Eligible Persons") that transacted in Eurodollar futures and options on Eurodollar futures on the Chicago Mercantile Exchange between January 1, 2005 and May 17, 2010 (the "Class Period") and that were harmed or satisfy one or more of "A," "B," or "C" below.

> **SUBPART A. [Efficient Enforcers who sold prior to August 7, 2007 and held until the final expiration of the Eurodollar futures contract after August 7, 2007 during Periods 1-3**.]  Eligible Persons that sold a Eurodollar futures contract, or bought a put option or sold a call option on Eurodollar futures before August 7, 2007 and purchased all or part of this short position back at the final expiration formula price of a Eurodollar futures contract expiring after August 7, 2007 and before May 17, 2010.

> **SUBPART B.** [**Period 0.]**  Eligible Persons that (1) purchased Eurodollar futures contract(s) or call options on Eurodollar futures on the following dates: April 7, 2006, August 17, 2006, October 26, 2006, and December 22, 2006; or (2) sold Eurodollar futures contracts or purchased put options on Eurodollar futures on the following dates: September 29, 2005, November 28, 2005, June 30, 2006, September 1, 2006, November 29, 2006, February 28, 2007, March 1, 2007, July 30, 2007, and August 6, 2007; or (3) purchased or sold Eurodollar futures contracts (or options) and that were harmed between January 1, 2005 and August 6, 2007 inclusive.

> **SUBPART C.** [**Period 3 CEA suppression and TBM claims**] Eligible Persons that initiated a Eurodollar futures contract or options position on or after April 15, 2009 and on or before May 17, 2010 ("Period 3"), and who satisfy "1" or "2" below.

---

[6] *Compare LIBOR III*, 27 F. Supp. 3d 447, 462-66 [ECF No. 568], *with In re Libor-Based Financial Instruments Antitrust Litigation*, No. 11 MDL 2262 at p. 6 (S.D.N.Y. Apr. 20, 2017) [ECF No. 1859] (Memorandum and Order).

[7] Defendants are listed in the proposed Fourth Amended Complaint.  ECF No. 1726-1.  Many of these have been dismissed but continue to include the following entities or their subsidiaries or affiliates: Bank of America Corporation; Bank of America, N.A.; J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; Barclays Bank Plc; Citibank N.A.; Citi Bank Plc; UBS Group AG, UBS AG, Coöperatieve Rabobank U.A. (formerly known as Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.) ("Rabobank").

3

1. Eligible Persons included in "C" are those that purchased or sold a Eurodollar futures or options contract to initiate a position during Period 3 and that were harmed.

2. Eligible Persons included in "C" are also those that purchased a Eurodollar futures contract (including Eurodollar futures contracts the expiration for which was less than 365 calendar days after the date of such purchase) to initiate a long position during Period 3, and continued to hold all or part of such long position until liquidating the position after Period 3.

There are no inherent conflicts between or among members of the proposed Class or Subparts. Accordingly, there is no need for either compulsory subclasses or for separate counsel to represent each of the potential Subparts of the Class. *See* Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 7:29 (5th Ed. 2014) ("Because there is no conflict of interest at issue, there is no necessity that each subclass have different representation and independently comply with all of the requirements of Rule 23(a), (b), and (g), and hence, Rule 23(c)(5) is inapplicable."). However, so-called "permissive" or case management subclasses may, if desired, be used for administrative convenience in managing this case.[8] As described below, the Class and each Subpart satisfy all of the requirements for class certification under Rule 23.

## ARGUMENT

Courts take care to apply Rule 23 in a liberal fashion, erring on the side of certifying a proposed class. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015). To qualify for certification as a class action, "[t]he plaintiff bears the burden of satisfying by a preponderance of the evidence each Rule 23(a) and 23(b)(3) requirement." *Megason v.*

---

[8] *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (noting that subclasses might "spar[e] the parties from directionless and haphazard discovery"; the court can "weed out, and, if necessary, dismiss those claims for which no named plaintiff is an adequate representative"; and subclasses might foster a "more orderly" trial); *Casale v. Kelly*, 257 F.R.D. 396, 408-09 (S.D.N.Y. 2009) (a case-management subclass may be "created solely to expedite resolution of the case by segregating [a distinct legal] issue [that is] common to some members of the existing [class].").

Rule 23(d)—which grants a court leeway in managing a class suit—governs such permissive subclasses. *Casale*, 257 F.R.D. at 408-09; *see also* Fed. R. Civ. P. 23(d) ("In conducting an action under [Rule 23], the court may issue orders that determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument . . . [or] deal with similar procedural matters.").

*Starjem Rest. Corp.*, No. 12 Civ. 1299 (NRB), 2014 WL 113711, at *5 (S.D.N.Y. Jan. 13, 2014). A court must undertake a "rigorous analysis" to determine if Rule 23's requirements have been met, including receiving evidence and resolving factual disputes relevant to each requirement. *In re Initial Pub. Offerings Sec. Litig. ("IPO")*, 471 F.3d 24, 33 (2d Cir. 2006). Nevertheless, "[t]he certifying court should not make any factual findings or merits determinations that are not necessary to the Rule 23 analysis, and any factual determinations made at the certification stage are not binding on a subsequent factfinder, even the certifying court." *Megason*, 2014 WL 113711, at *6 (internal quotation marks and citation omitted).

## I.     THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(a)

Plaintiffs must show, by a preponderance of the evidence, that they satisfy the four subsections of Rule 23(a). *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34-35 (2d Cir. 2009). Rule 23(a) requires a showing by the preponderance of the evidence that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Each of these requirements is satisfied.

### A.     The Proposed Class Is So Numerous That Joinder Is Impracticable

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is "presumed" to be satisfied if a class consists of forty members or more. *Duarte v. Tri-State Physical Med. & Rehab., P.C.*, No. 11 Civ. 3765 (NRB), 2012 WL 2847741, at *8 (S.D.N.Y. July 11, 2012); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC,* 504 F.3d 229, 244-45 (2d Cir. 2007). Courts routinely find classes in commodities manipulation cases to be sufficiently

numerous to satisfy Rule 23(a)(1).  *See, e.g.*, *In re Amaranth Natural Gas Commodities Litig.* *("Amaranth II")*, 269 F.R.D. 366, 378–79 (S.D.N.Y. 2010); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005).

The Class and each of the Subparts contains far more than forty geographically dispersed members.  The Chicago Mercantile Exchange's production of large trader reports and the Commodity Futures Trading Commission's ("CFTC") Commitment of Traders reports indicate that there were in excess of approximately 2,000 large traders who transacted between 2008 and 2010.  Ex. 30. The number of large traders in a futures contract is typically only a fraction of the total number of traders in such futures contract.  *See Natural Gas*, 231 F.R.D. at 179. Therefore, the proposed class includes literally thousands of geographically dispersed Class members. Rule 23(a)(1) is satisfied.

Regarding Subpart "A" of the Class definition, on August 7, 2007, there was a total open interest of 11,750,632 Eurodollar futures contracts and 21,995,150 Eurodollar futures and options contracts.  Ex. 256.  With regard to the first quarterly Eurodollar futures contract that expired after August 7, 2007, there was an open interest of 1,536,356 contracts on the final expiration day of the September 2007 contract.   Large numbers of futures contracts continued to expire on the quarterly Eurodollar futures settlements in December 2007 and thereafter.   Considering the quarterly Eurodollar futures, as well as the monthly Eurodollar futures settlements, it is highly likely that a significant multiple of 40 Class members held short positions in Eurodollar futures or options on August 7 and liquidated those positions at the final settlement price formula during August-December 2007 and later.

Regarding Subpart "B" of the Class definition, there were millions of Eurodollar futures contracts traded between January 1, 2005 and August 7, 2007.  There is no reason to believe that

there is not a similar number of large traders (approximately 2000) who transacted in Eurodollar futures during Period 0 as were present during 2008-2010.  Ex. 256.  Again, the number of large traders is typically only a small fraction of the total number of traders.  Accordingly, there are many multiples of 40 members of the Class who qualify for the Subpart B definition and the likely number is at least in the thousands.

Regarding Period C, there were 7,622,681 Eurodollar futures contracts and 13,559,632 Eurodollar options contracts open as of May 18, 2010.[9]  Accordingly, the number of Class members who satisfy Subpart "C" far exceeds 40 and the likely number is in at least the thousands.

The proposed Class (and each of the Subparts) satisfies Rule 23(a)(1)'s numerosity requirement.

### B.      There Are Questions of Law and Fact Common to the Class

For purposes of satisfying Rule 23(a)'s commonality requirement, Plaintiffs need only show that there is a "single common question" of law or fact.  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quotation marks, brackets, and citation omitted).  A "common question" is one that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  A court may find a common issue even though there exists "some factual variation among class members' specific grievances."  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).

Plaintiffs' Sherman Act claims plainly satisfy the commonality requirement.   Here, common questions of law and fact central to Plaintiffs' antitrust claims include: (1) whether Defendants submitted "false" LIBOR rates; (2) whether Defendants conspired to artificially

---

[9]  *See* CFTC Commitment of Traders Report (May 18, 2010), available at http://www.cftc.gov/files/dea/cot archives/2010/futures/deacmelf051810.htm; *see also* Ex.256.

manipulate the LIBOR rate during the Class Period; (3) whether this conspiracy constitutes an unreasonable restraint of trade for purposes of Sherman Act § 1; (4) the relationship between LIBOR and the price of Eurodollar futures and options on Eurodollar futures; (5) whether Plaintiffs are efficient enforcers under the Sherman Act; (6) whether Defendants' conspiracy to manipulate LIBOR impacted the entire class; and (7) what is the proper method for determining damages (including for purposes of "netting").

Each of these issues is independently sufficient to satisfy commonalty.  For instance, in this case, "the overarching questions are whether the Defendants manipulated" the LIBOR rate, which "will be determined on a classwide basis without regard for evidence pertaining to individual class members." *In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2015).  Moreover, "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)).[10]  It also "well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *Playmobil*, 35 F. Supp. 2d at 240.

Plaintiffs' CEA claims likewise raise numerous common legal and factual questions. These include (1) whether Defendants had the ability to influence market prices; (2) whether an artificial price existed; (3) whether Defendants caused the artificial price; (4) whether Defendants

---

[10] *See also* 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:10 (4th ed. 2002) (in the antitrust context, "courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy" the commonality requirement"); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1763 at 230- 31 (3d ed. 2005) ("the claimed existence of a conspiracy to fix prices . . . in violation of the antitrust laws has been found to present common questions in actions brought by plaintiffs who asserted that they had been harmed by those activities").

knowingly made false reports of LIBOR which they knew would affect Eurodollar futures prices; (5) what is the commodity underlying Eurodollars futures contracts; (6) what is the proper method for determining damages (including "netting"); and, (7) whether Defendants willfully aided and abetted in the manipulation of LIBOR.

Courts have held that such questions suffice to satisfy Rule 23's commonality requirement in CEA cases because they may be proven using common evidence.  In *Amaranth II*, 269 F.R.D. at 383, for instance, the court noted that ability and intent under the CEA "present issues of law and fact that are common to the entire class" because the intent "may be shown, for example, by the conduct and internal communications of its traders," while the ability is proven with evidence of "market position and whether such a market position would allow it to manipulate prices."  *See also Natural Gas*, 231 F.R.D. at 180 ("the claims of all class members arise from a common course of conduct by the Defendants"); *In re Sumitomo Copper Litig*., 182 F.R.D. 85, 92-94 (S.D.N.Y. 1998).

Plaintiffs meet Rule 23(a)(2)'s commonality requirement.

**C.  Plaintiffs' Claims Are Typical of the Class's Claims**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The Typicality requirement is liberally construed.  *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'Ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995).  It "does not require a showing that the named plaintiffs' claims are identical to those of the class members but merely that the claims arise from the same course of events." *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356 (S.D.N.Y. 2002) (Buchwald, J.).   "The focus of the typicality inquiry is not on the plaintiffs' behavior, but rather on the defendant's actions."  *Kottler v. Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010).  As such, typicality is met where "each class member's claim

arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Currency Conversion Fee Antitrust Litig. ("Currency Conversion II")*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010); *see also N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc*., No. 08 Civ. 5653 (PAC), 2014 WL 1013835, *5 (S.D.N.Y. Mar. 17, 2014) ("[W]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." (internal quotation marks and citation omitted)).

**Suppression Period.** Because the existence *vel non* of Defendants' agreement to suppress LIBOR will drive the outcome of the antitrust claims in this action (Subpart A), each Plaintiffs' Sherman Act claims are typical of those Class members who are members of this Subpart.  The CEA claims of each member of the Class (Subpart C) likewise arise from the same course of conduct during the Suppression Period by each Defendant.  Moreover, each member of Subparts A and C has made and will make identical arguments regarding controlling questions of law.  *Id.* Accordingly, Plaintiffs' claims are typical of Class members in Subparts A and C.

**TBM Periods.**  Each Plaintiff and Class member in Subpart B and C will also make the same legal arguments to prove Defendants' liability.  The one relevant course of dealing or conduct by each Defendant during the TBM Period was whether, and by how much, they were able to manipulate LIBOR.  This is a common inquiry not involving suppression during Period 0.  Every Plaintiffs and Class member in Subparts B and C will rely on the relevant objective evidence concerning whether any Defendant engaged in TBM.  Based on their analysis so far, Plaintiffs contend that at least three Defendants engaged in TBM during the TBM period under this Court's recent, April 20, 2017 order.  ECF No. 1859; *see* generally Elrod Decl. ¶¶ 199-243.  Accordingly,

the claims of Plaintiffs who transacted in the TBM Period are typical of the members of Subparts B and C.[11]

### D.  Plaintiffs Will Fairly and Adequately Represent the Interests of the Class

Rule 23(a)(4) provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4)*; see also* Fed. R. Civ. P. 23(g)(1) (providing that "a court that certifies a class must appoint class counsel" who will "fairly and adequately represent the interests of the class").  "Adequacy of representation is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs."  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014); *see also Flag Telecom Holdings*, 574 F.3d at 35.

Proposed Class Counsel Kirby McInerney and Lovell Stewart Halebian Jacobson LLP will continue to vigorously represent the Class.[12]  Their pertinent experience is set forth in their firm resumes.  Ex. 257-258.  "Adequacy of counsel asks whether the attorneys who seek to represent the class are competent to do the job."  Newberg on Class Actions § 3:54 (5th ed.).  Here, the Court has previously acknowledged the qualifications of Interim Co-Lead Counsel and that Interim Co-Lead Counsel are experienced in complex class litigation involving antitrust and CEA claims such as the claims at issue here.  *See generally, In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) [ECF No. 66] (appointing Interim Co-Lead Counsel for the Exchange-Based Plaintiffs); *see also In re Petrobras Sec. Litig.*,

---

[11]  Plaintiffs also allege TBM claims in Period 3, Subpart C.  In Period 0, Plaintiffs have alleged viable claims under law of the case.  *See LIBOR III*, 27 F. Supp. 3d 447, 464 n. 9, Slip Op. at 24 (S.D.N.Y. 2014) [ECF No. 568], *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* No. 11 Md. 2262*,* 2016 WL 1558504, at *10, Slip Op. at 29 (S.D.N.Y. Apr. 15, 2016) [ECF No. 1380].

[12]  To the extent that this Court deems separate counsel necessary or helpful for certain Subparts, Miller Law LLC is proposed additional counsel for and Cafferty Clobes Meriwether & Sprengel LLP "Cafferty Clobes") is proposed additional counsel.  *See* Ex. 260 (Miller Law's firm resume); Ex. 279 (Cafferty Clobes's firm resume).

11

312 F.R.D. 354, 362 (S.D.N.Y. 2016) (concluding that proposed class counsel was adequate because it is "an established firm with considerable class action experience, and the Court has now had multiple opportunities to observe [proposed class counsel's] performance").  Interim Co-Lead Counsel have diligently represented the interests of the Class in this litigation and will continue to do so.

Additionally, Plaintiffs will adequately represent the class.  "Under Rule 23(a)(4) of the Federal Rules of Civil Procedure, adequacy is satisfied unless plaintiff's interests are antagonistic to the interest of other members of the class." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015) (internal quotation marks and citation omitted).  "In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be 'fundamental.'" *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395 (S.D.N.Y 2015) (quoting *Flag Telecom Holdings*, 574 F.3d at 35).  Courts deny class certification on the basis of the inadequacy of class representatives "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case.'" *Facebook IPO*, 312 F.R.D. at 345 (internal quotation marks and citation omitted).  "If there are any doubts about adequate representation or potential conflicts, courts tend to either resolve them in favor of upholding the class, subject to later possible reconsideration, or to create subclasses."  Newberg on Class Actions § 3:55 (5th ed.).

None of the Plaintiffs has an interest that is antagonistic to the other members of the class, much less a "fundamental" conflict.  In other cases involving exchange-based trading, courts in this District and elsewhere have consistently rejected attempts by defendants to manufacture conflicts based on "factual differences in the amount of damages, date, size or manner of purchase,

the type of purchaser, the presence of both purchasers and sellers, and other such concerns." *Sumitomo*, 182 F.R.D. at 92.[13]

Moreover, the presence of numerous questions of law and fact common to Plaintiffs and the Class (and its Subparts) demonstrates that their interests are aligned and supports a finding that Plaintiffs are adequate class representatives. *See Davis v. City of N.Y.*, 296 F.R.D. 158, 167 (S.D.N.Y. 2013) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5) ("In practice, the 'commonality and typicality requirements of Rule 23(a) tend to merge,' and 'those requirements . . . also tend to merge with the adequacy-of-representation requirement.'"); *see also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) ("The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class."). Every Plaintiff and Class member traded standardized Eurodollar futures and options contracts on the same exchange subject to the same rule set, customs, and procedures and alleges injury from the same type of exogenous false input, *i.e.*, a false report of LIBOR. Their interests in proving the scope of this manipulation are aligned. *See Currency Conversion II*, 264 F.R.D. at 113 (finding class representatives adequate because they had "every incentive to expose the full scope of the conspiracy and have shown that they will zealously pursue the interests of the entire class.").

---

[13] *See also Amaranth II*, 269 F.R.D. at 380 ("Even assuming defendants' assertions regarding the Optimal Start Dates are correct, this position has been expressly rejected by most courts considering analogous issues."); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009) (noting that "[t]o the extent that different formulas may apply to the calculation of any damages suffered . . . this Court can order certification of appropriate sub-classes as a later juncture within its broad discretion in arranging the structure of a class action litigation" and citing cases); *Natural Gas*, 231 F.R.D. at 185 ("The presence of both purchasers and sellers, other differences in members' characteristics, and the possibility of unique defenses in the damages stage of the litigation does not warrant denial of class action certification."); *Kohen v. Pac. Inv. Mgmt. Co., LLC,*, 244 F.R.D. 469, 479 (N.D. Ill. 2007) ("Despite defendants' arguments that there exists a potential conflict of interest in proving various levels of artificiality on different dates throughout the class period, courts have rejected similar arguments when certifying classes."), *aff'd,* 571 F.3d 672 (7th Cir. 2009).

The requirements of Rule 23(a)(4), as well as the requirements of Rule 23(g) relating to the qualifications of Interim Co-Lead Counsel, are satisfied.

## II.      THE PROPOSED CLASS SATISFIES THE RULE 23(B)(3)

### A.      Common Questions Predominate

#### 1.      Courts Regularly Hold Under the Applicable Standards that Common Issues Predominate with Respect to Antitrust and CEA Claims

Under Rule 23(b)(3), Plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  In other words "Rule 23(b)(3) requires a showing that questions common to the class predominate, *not that those questions will be answered, on the merits, in favor of the class*." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1191 (2013) (emphasis added). Moreover, "individual questions need not be absent. . . .   The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Sykes*, 780 F.3d at 81 (citation omitted).  Predominance is satisfied 'if resolution of some of the **legal *or* factual** questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (emphasis added) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages. . . .'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 123-24 (3d ed. 2005) (footnotes omitted)); *accord Sumitomo*, 182 F.R.D. at 91 (citation

omitted).  Even after *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1431 (2013), it remains "well-established in this Circuit that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)."  *Roach*, 778 F.3d at 405 (citation and internal quotations omitted).

Plaintiffs' showing of common questions here is like typical antitrust conspiracy cases and similar to those brought in prior CEA cases.  Moreover, there are far fewer individual questions at issue here than the individual causation, timeliness and other questions that were present in the certified class in *Sykes*.  *Sykes*, 780 F.3d at 87-90.

### 2.    Common Issues Predominate With Respect to Defendants' Conspiracy to Suppress LIBOR

During the Suppression Period, Plaintiffs have two different legal claims.  With respect to their Sherman Act § 1 claim, each Class member must establish (1) the existence of a conspiracy or agreement, (2) the resulting antitrust injury, and (3) damages.  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Dr. Netz opines that all three elements may be proved through common evidence.  *See generally,* Netz Report, *passim*.  Dr. Netz's findings are consistent with the Supreme Court's acknowledgement that predominance is often readily shown in "cases alleging … violations of antitrust laws."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  An agreement or conspiracy to manipulate a commodity also violates the CEA.[14]  For similar reasons, common questions also predominate with respect to Plaintiffs' CEA claim premised on Defendants' conspiracy to suppress LIBOR.

---

[14] *Strobl v. N.Y. Mercantile Exch.*, 582 F. Supp. 770, 772 (S.D.N.Y. 1984); *aff'd* 768 F.2d 22 (2d Cir. 1985); *Sumitomo*, 182 F.R.D. at 93 ("all class members are unified in their task to prove the common existence of **the conspiracy to manipulate** copper futures prices and develop the related proof thereon. . . .")(emphasis added); *see also Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 141 (2d Cir. 2001).

### a.   The Existence of a Conspiracy Is a Common Question

Plaintiffs propose to prove Defendants' agreement or conspiracy by an extensive corpus of common class wide evidence.  The questions relating to Defendants' agreement or conspiracy must be decided "based on the evidence as whole".  *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690 (1962).   An agreement or combination may be proved through direct or circumstantial evidence.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987).

The cases finding that the existence of a conspiracy is a common class wide question are legion.  "Courts have repeatedly held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present." *NASDAQ Market-Makers*, 169 F.R.D. at 518;  *see also In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 562 (S.D.N.Y. 2004) ("Indeed, allegations concerning the existence, scope and efficacy of an alleged antitrust conspiracy are sufficient to show that the commonality and typicality requirements of Rule 23(a)(2) are met.");  *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *13 (S.D.N.Y. Mar. 28, 2014) (certifying class and holding that predominance is easily satisfied in cases alleging Sherman Act violations);  *see also Amchem*, 521 U.S. at 625 (predominance is readily shown "in certain cases alleging ... violations of the antitrust laws."); Newberg on Class Actions § 20:38 and § 20.52 (5th Ed.) ("courts in nearly every circuit have quoted an earlier edition of the Treatise's conclusion that, as a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions").

The alleged conspiracy here is no different.  The question whether Defendants entered an agreement or conspiracy will be answered by proof of Defendants' frequent interbank communications, their joint conduct on the BBA, their internal statements reflecting what one

16

Defendant said to one another, the economic evidence showing that Defendants had an incentive to agree and could better accomplish their objective through agreement, and the depositions of Defendants' witnesses probing Defendants' anticipated denials, and extensive other common evidence.  *See generally,* Netz Report, *passim*.  The issue of agreement and conspiracy is common to all Class members.

### b.    Impact of LIBOR Manipulation on Eurodollar Futures Contract Prices Is a Common Question

Plaintiff is **not** required to establish common impact at the class certification stage, as that is a question for the proof on the merits.  At the class certification stage, "[p]laintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *Currency Conversion*, 224 F.R.D. at 565; *see also In re Ethylene Propylene Diene Monomer ("EPDM") Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009) ("To meet the predominance requirement of Rule 23 for class certification, the plaintiffs must show that injury-in-fact, or impact, can be proven by evidence common to the class.").

Plaintiffs' plausible methodology for showing impact involves an extensive body of common evidence consisting of Defendants' own contemporaneous statements, Plaintiffs' expert opinions, and other supporting evidence.  *E.g*., Seyhun Report pp. 1, 3-5, 10-11, 25, 44; Netz Report pp. 3, 7-11, 29-32, 34-48; *see generally* Exs. 33-198 (describing exhibits containing documentary support for Defendants' awareness of the manipulation and suppression of LIBOR).  Taken together, they demonstrate that common class wide proof of impact will likely be available at the trial stage.

Defendants contemporaneously stated and discussed that overall LIBOR was suppressed, that individual banks' submissions were suppressed, and that LIBOR submissions did not reflect actual Eurodollar loans.  *See, generally* Exs 33-198.  Defendants first began making these

17

statements in August and September 2007, which is when Plaintiffs' economic modeling shows that LIBOR began to be suppressed.  In analyzing whether LIBOR was suppressed, Professor Seyhun determined that there was a well-established relationship between LIBOR and two benchmark rates. One benchmark was the ICAP-Ask:

> In contrast to the Defendants' production, bid offer data was consistently maintained by ICAP. The ICAP-Ask data is, in my opinion, an appropriate metric to use to analyze LIBOR. My bases for this opinion are developed below.

Seyhun Report ¶ 20.  The other benchmark was the Federal Reserve Eurodollar Deposit Rate ("FRED").  Professor Seyhun conducted multiple regression analyses that compared LIBOR to the ICAP Ask, which showed LIBOR suppression.  Professor Seyhun's comparison of LIBOR to FRED ran from January 1986 to October 2016.  *E.g.*, Seyhun Report ¶ 60, and figures 1.1, 1.2, and 1.3.

Professor Seyhun's multiple regression analyses and cointegration tests (*id.* ¶¶63-64) demonstrate that, during August 2007, LIBOR deviated from ICAP-Ask as well as FRED.  Seyhun Report pp. 20, 24, Figures 1.4 and 1.6.  In each instance, this deviation was in the same direction: LIBOR became suppressed relative to FRED and ICAP-Ask.  *Id.*  (Also, during August-September 2007, the contemporaneous statements made by Defendants and BBA officials indicate that LIBOR and individual LIBOR submissions were suppressed.  *See, e.g.,* Exs. 34, 37-38, 51, 53, 66, 68, 73, 77-78, 99, 102.) Using ICAP-Ask, Professor Seyhun then estimated the approximate amounts of the suppression of LIBOR for each day of the Suppression Period.  Seyhun Report ¶152, Tables 2.3 and 2.4.

Professor Seyhun further opined that common evidence will likely be available at the proof stage to show that the suppression of LIBOR caused artificial Eurodollar futures and options prices, and to estimate the reasonable amounts of such suppression.  Seyhun Report ¶¶ 150-62.

Professor Seyhun's analysis began by addressing the fact that Eurodollar futures contracts are a derivative asset of LIBOR because they settle at a price of 100-LIBOR. ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████    ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

Accordingly, Eurodollar futures contract prices will not change unless information is new, it is different from what is previously known, and it is expected by market participants to affect future LIBOR. Thus, when Eurodollar futures prices move during the day, they are moving because they think that the news will impact LIBOR.

Given this, Professor Seyhun opined that there is economic causation between LIBOR and Eurodollar futures contract prices. He explained that the relationship between LIBOR and Eurodollar futures is such that, under economic principles, changes in LIBOR cause changes in Eurodollar futures prices. Seyhun Report ¶¶ 121-122.

Bolstering his discussion of the principles of economic causation, Professor Seyhun performed numerous economic regression analyses expressed in three different models. Seyhun Report ¶¶ 96-122. These models each showed a strong relationship between changes in LIBOR and changes in Eurodollar futures contract prices. *Id.* at ¶¶ 114-121. In Professor Seyhun's Model 1 and Models 2A and 2B, Professor Seyhun performed well accepted mathematical tests to determine the amount of changes in Eurodollar futures prices associated with the given change in LIBOR. *Id.* at ¶¶ 123-142. These tests mutually support Professor Seyhun's estimated "impact parameters" for the amount of change in each expiration of Eurodollar futures contract prices that

is caused by a change in LIBOR.  *Id.*  Professor Seyhun then demonstrated that the changes in Eurodollar futures contract prices caused changes in the Eurodollar futures options prices and that the amounts of such changes may be reasonably estimated. *Id.* at ¶103.

Based on the foregoing and other regressions, as well as Defendants' own statements, Professor Seyhun opined that class wide regression models will be available at the proof stage to answer the question of whether the artificially manipulated LIBOR caused artificial increases in Eurodollar futures contract prices. *Id.*  ¶ 129.

**c.      Plaintiffs Will Use a Common Methodology for Proving Damages.**

The damages for each Class member may be established by applying the estimated amounts of Eurodollar futures and options artificiality to the transactions in such contracts made by each class member.  Netz Report Section XI; Seyhun Report ¶¶150-64.  Further, Professor Seyhun opines that a class wide estimate of damages may be made.  Seyhun Report ¶154.

**3.      Common Issues Predominate With Respect to Defendants' Individual Suppression of LIBOR in Violation of the CEA**

To the extent that Plaintiffs do not prove an agreement or conspiracy among Defendants, Plaintiffs may still prevail on their CEA claim by establishing individual manipulation or aiding and abetting manipulation by the Defendants. *LIBOR I*, 935 F. Supp. 2d at 715-717, 722, Slip Op. at 99-106, 116-119.

**a.      Common Class Wide Evidence Will Be Used To Prove Each Defendant's Course of Conduct And Scienter.**

In prior CEA manipulation cases, the proof of scienter has depended on the "totality of the circumstances."  *In re Amaranth Nat. Gas Commodities Litig. ("Amaranth III")*, 730 F.3d at, 180 (2d Cir. 2013); *Kohen*, 244 F.R.D. at 482.  In establishing the scienter for false reports, each Class member needs to show "(1) defendants knew that they were submitting inaccurate LIBOR quotes,

20

(2) defendants understood the impact on Eurodollar futures contract prices from doing so, and (3) there is no conceivably legitimate purpose for submitting inaccurate LIBOR quotes." *LIBOR III*, 27 F. Supp. 3d at 470–71, Slip Op. at 40-42.  Each of the foregoing will be established by all Class members through the same common evidence. Such common evidence will include Defendants' own contemporaneous written statements, the depositions and further discovery in the case, and expert opinions.  For example, various statements by Defendants indicated that LIBOR was suppressed. *See, e.g.,* Exs. 36, 41, 53, 56, 67, 70, 75, 78, 80, 99, 103. Similarly, various statements by Defendants indicate that they were intentionally making a false submission. *See, e.g.,* Exs. 62-63, 68, 82, 94, 100-101, 131, 166, 178, 182.  Also, various statements by Defendants reflect that Defendants understand that changes in LIBOR cause changes in Eurodollar futures. *See, e.g.,* Exs. 244-251.  These are all important matters for discovery.

Next, with respect to each Defendant, common economic evidence indicates that such Defendant engaged in a course of conduct throughout the Suppression Period to falsely suppress it's LIBOR submission.  Seyhun Report ¶165.  This economic proof of such common course of conduct of each Defendant is yet another part of the "totality of the circumstances" that shows knowledge of false reports and is common to all Class members.

Plaintiffs will also offer expert opinions to show that Defendants, as sophisticated market participants, were aware that changes in LIBOR cause changes in Eurodollar futures. *E.g.*, Beevers Report ¶¶129-30.  Common evidence will also include expert opinions as to the meaning of the jargon used in Defendants' emails, and the depositions and other merits discovery that will be taken in order to establish that each defendant suppressed its LIBOR quotes.  Netz Report Section X.A.

In the foregoing ways and through each Defendant's internal and external communications, as well as its conduct in making consistently suppressed reports, common evidence will be submitted on behalf of all Class members to show that such Defendant's LIBOR quotes were suppressed.

### b.    Common Class Wide Evidence Will Be Used To Prove Aiding and Abetting

The elements of a CEA aiding and abetting claim have previously been delineated by this Court.[15]   Even if Plaintiffs' evidence does not prove conspiracy, the fact and opinion evidence establishing that each Defendant engaged in a knowing parallel course of conduct to suppress their LIBOR reports will support a showing under each element of aiding and abetting. Also common to the proof of aiding and abetting is each Defendant's knowledge that LIBOR was suppressed and that other Defendants were making LIBOR submissions at rates other than the market was trading. Certain examples of the extensive record here include the following. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████   *see, generally,* Exs. 33-198.

These examples could be greatly multiplied because each Defendant and various BBA officials basically knew from August or September 2007 forward that the LIBOR submissions and

---

[15] *LIBOR I*, 935 F. Supp. 2d at 722, Slip Op. at 118 ("'[T]o state a claim for aiding and abetting a violation of the CEA, plaintiffs must allege that a defendant, [1] knowing of a principal's intent to manipulate the market and [2] intending to further that manipulation, [3] performed an act in furtherance of the manipulation." quoting *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 541 (S.D.N.Y. 2008)."); *Amaranth III*, 730 F.3d at 182 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)) ("that [defendant] (1) had knowledge of the principal's . . . intent to" submit a false LIBOR report; "(2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective.").

composite LIBOR did not reflect where the LIBOR was trading.   Each Defendant materially

assisted another Defendants knowing false reports by (a) making its own knowing false reports,

(b) failing, if that Defendant was on the BBA FX&MM Committee,[16] in their duty to ensure the

integrity of LIBOR, and/or (c) affirmatively acting on the BBA's FX&MM Committee to avoid

stopping that suppression or to cause BBA officials to lie about same.   In this respect, aiding and

abetting "should not be evaluated in isolation" and should be considered in light of the complaint

as a whole. *Amaranth III*, 730 F.3d at 183.  Just as common class wide evidence will be available

to show whether each Defendant acted with scienter to suppress LIBOR, common class wide

evidence also will be available to show whether each defendant aided and abetted the other

Defendants.

### c.      Common Class Wide Evidence Will Be Used To Prove Artificial Impact On Eurodollar Futures Prices

As with the suppression conspiracy claim, Professor Seyhun's economic principles and

econometric modeling, combined with Defendants' contemporaneous statements, will supply

common evidence to show that Defendants' individual manipulations and aiding and abetting did

cause artificial Eurodollar futures prices and the amount thereof.  This is the same type of evidence

that has sufficed in prior CEA manipulation class motions to show that common proof of impact

will be available.[17]  Professor Seyhun is also opining on the amounts of suppression of LIBOR

that each Defendant, on its own, was causing each day.  Seyhun Report ¶165.  Supposing there is

a finding by the Court at the first stage of the trial herein that only some Defendants manipulated

---

[16]   On information and belief, the Members of the BBA FX&MM Committee included at least the following representatives of Defendants: Barclays: Miles Storey; Bank of America: Dan Knight; BTMU: Shunichiro Totsuka and/or Phil Rowley; Citibank: Andrew Thursfield; Credit Suisse: Tony Miller; Deutsche Bank: Mike Curtler; HBOS: Ian Fox; HSBC: Jon Wood; JPM Chase: Frederic Mouchel; Lloyds: Clive Jones; Rabobank: Jason Van Praagh; RBS: Scott Nygaard and Mark Thomasson; Societe Generale: John Bourke; and UBS: Gaspare La Sala.
[17] *See* fns. 13-14 *supra*.

LIBOR and others did not, see Fed. R. Civ. P. 42(b) (allowing severance of parties for trial), then Professor Seyhun's analyses may be appropriately adjusted to determine, for those Defendants, the amount by which LIBOR was suppressed. *Id.* Professor Seyhun's regression analyses for determining the amount of impact on Eurodollar futures and options prices of changes in LIBOR may then be applied to such reduced amounts of LIBOR suppression. *Id.* at ¶ 153. In sum, it is more likely than not that common class wide evidence will be available at the trial stage to determine whether Eurodollar futures prices were caused to be artificial and, if so, the approximate amounts of such artificiality.

>### d.      Common Class Wide Evidence Will Be Used To Prove Damages.

The amounts of daily artificiality in Eurodollar futures that were caused by those Defendants who manipulated or aided and abetted manipulation during the Suppression Period may be applied to each Class member's transactions on each day in order to determine net damages. Professor Seyhun can provide aggregate damages estimates once the days of manipulation are known. Seyhun Report ¶164

>## 4.      Common Class Wide Evidence Will Be Used To Prove Trader Based Manipulation

Professor Seyhun has opined that there is one daily artificial impact on Eurodollar futures and options prices during the Suppression Period. Seyhun Report, *passim*. Defendants allegedly engaged in trader based manipulation throughout the entire Class Period, Periods 0-3. But the net impact on LIBOR and, accordingly, the dominating impact on Eurodollar futures and options prices during the Suppression Period, was suppression. Seyhun Report ¶166. Accordingly, the common evidence described above relating to the Suppression Period also covers and will be part of the common evidence in proving and TBM during the suppression period.

In addition, similar common evidence will establish each element of the CEA claim that a given Defendant engaged in trader based manipulation on the various days that Plaintiffs have identified and all other days that satisfy this Court's filter[18] during the TBM period.  This is because similar inquiries in the Defendants' actions, submissions and data will be required to identify this type of conduct.

**a.      Common Class Wide Evidence Will Be Used To Prove Knowing False Reports**

Each Defendant engaged in one course of conduct concerning TBM. For the Defendants that engaged in TBM, this course of conduct likely includes only a few days in which written evidence of the TBM exists and a vast preponderance of days for which such explicit written evidence does not exists.  *See, e.g.,* Elrod Decl. ¶ 261, Exs. 7 at 8, 16 at 8; Beevers Report ¶¶5, 69, 118 and 132.

Against the Defendants which engaged in TBM, Plaintiffs have alleged instances that satisfy this Court's standards.[19]  There are written documents that tend to indicate a false report and Defendant's knowledge for each of these dates.  However, in analyzing the "totality of the circumstances" relating to whether the Defendant did make a knowingly false report, Plaintiffs and each Class member will have to (or be very well advised to) submit additional evidence that is probative of the "totality of the circumstances".  The additional "totality of the circumstances" evidence for one instance of TBM by a given Defendant will likely be the self-same "totality of the circumstances" evidence for all of the other TBMs by that Defendant.

---

[18] *See LIBOR III,* 27 F. Supp. 3d 447, 464 n. 9, Slip Op. at 24 (S.D.N.Y. 2014) [ECF No. 568], *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* No. 11 Md. 2262, 2016 WL 1558504, at *10, Slip Op. at 29 (S.D.N.Y. Apr. 15, 2016) [ECF No. 1380].

[19] *See* fn 18, *supra.*

25

This will include guilty pleas, government orders, such Defendant's manipulative course of TBM conduct, and economic evidence.

The manipulative intent in this case will depend on a common corpus of fact and opinion evidence as to each Defendant.  This include each Defendant's written communications involving TBM both on the specific occasion in question, as well as on other occasions.  *E.g.*, Exs. 199-243; Netz Report Sections VII.A.1 and C; and PFAC ¶¶ 161-188, 200-207, 238, 290-326, 341-361. Plaintiffs' experts' interpretations of the evidence will also be included.  Beevers Report ¶¶7, 38-39 and 119.  Economic evidence showing that that submission is out of line will also support the "knowingly false" object of proof.  *E.g.*, Seyhun Report ¶¶ 95-102, Table 2.5.

Another common question relating to TBM is the significance of each Defendant's document productions and trading positions.   The respective governments that investigated Defendants were not obligated to prove and did not have the incentive to develop evidence of each and every day when Defendants manipulated and, if so, by how much they manipulated LIBOR. Accordingly, the government documents produced to Plaintiffs by Defendants would not, in the best of circumstances, likely include documents that Plaintiffs needed regarding Defendants' trading positions.   Further, there are significant questions concerning the documents that Defendants did produce.  *See* Elrod Decl. ¶¶ 261-268.  This specifically includes whether Defendants produced documents adequate to assess the Defendants' motive to engage in TBM on a daily or other basis.  Beevers Decl. ¶¶7, 64-72; Elrod Decl. ¶¶ 261, 263.  For the Defendant (Deutsche Bank) that produced the least incomplete evidence of their trading positions, Plaintiffs have identified literally hundreds of consecutive days of manipulation.  *See, generally,* Beevers Report.  Accordingly, other common questions relating to the knowing false report element include how Plaintiffs will obtain adequate production during the merits phase of the case (or sooner) and

whether that will greatly multiple the instances of knowingly false reports in the TBM conduct by each Defendant.

### b.   Common Class Wide Evidence Will Be Used To Prove Artificial Impact on Eurodollar Futures

At the conclusion of the merits stage, a common corpus of fact and opinion evidence will be available to show whether each instance of TBM caused artificial futures and options prices and, estimate the amounts of such artificiality.  Why would such TBM Defendants risk hundreds of millions of dollars in fines (and jail for the employees) unless they thought they were moving Eurodollar futures (or other) prices in favor of their trading positions?  Elrod Decl. ¶¶ 199, 224, 233 (citing documents showing TBM on Eurodollar futures expiry).

Professor Seyhun proposed a working regression analysis method that uses the ICAP Ask benchmark among other possible variables to assess whether each instance of TBM caused artificial Eurodollar futures and options prices.  Netz Report Sections VIII and IX;  Seyhun Report at ¶77. This ICAP Ask benchmark is extremely highly correlated with LIBOR and is an appropriate benchmark.  *Id.*  Professor Seyhun proposes to enhance that method with additional variables (including indicator variables for the days of TBM).  Seyhun Report ¶88 (indicator variables take advantage of independent evidence, such as all the days of TBM, to help the regression analysis focus on the events of interest).  Based upon the information available when he submitted his report, Professor Seyhun opined that it was premature to refine the working method and specify all the variables for a final model.  *Id.* ¶¶ 86-89.  Courts in prior CEA cases have found that the burden is met notwithstanding the need for significant further refinements in the proposed common evidence of impact.  Plaintiffs are:

> not required to successfully employ their proposed methods at the class certification stage.  [The expert's] methods will undoubtedly need refinement before they are effectively applied at trial. Regardless, at this stage of the litigation, the proposed

methods are sufficiently developed to permit the conclusion that they can be used to demonstrate liability on a class-wide basis.

*Amaranth II*, 269 F.R.D.at 385.

Professor Seyhun's description of the working model (Seyhun Report ¶88) has permitted Plaintiffs' experts to opine that a fully specified model and common evidence will be available at the merits stage to determine whether each instance of TBM caused futures and options artificiality and estimate the amounts thereof.  Seyhun Report ¶¶165-66;  Netz Report Section XI.

### c.    Common Class Wide Evidence Will Be Used To Prove Damages

Here again, common evidence of damages may be presented by applying the daily amounts of artificiality in Eurodollar futures and options to each Class member's transactions through proof of claim procedures.[20]

### B.    A Class Action Is Superior to Other Methods of Adjudicating the Present Dispute

Rule 23(b)(3)'s "superiority" requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Class treatment is superior if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem*, 521 U.S. at 615.  In making this determination, a court must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

---

[20] *See* Ex. 32 (Miller Decl.)

Fed. R. Civ. P. 23(b)(3); *accord In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006). All four factors strongly favor superiority and certification.

**Rule 23(b)(3)(A)**. Rule 23(b)(3)(A) invites a court to evaluate "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Many of the class members' claims will be small relative to the high cost of litigating a manipulation claim. *See Natural Gas*, 231 F.R.D. at 185. Extensive discovery, compilation of large databases, and application of complex methodologies by experts make these claims too expensive for the vast majority of class members to bring as individual claims. *Id.* Moreover, Plaintiffs filed this class action over six years ago. Since then, only one separate action alleging Eurodollar futures contract price manipulation has been filed. *See Amabile v. Bank of America Corp.*, No. 13 Civ. 1700 (NRB) (S.D.N.Y. Mar. 13, 2013). Compared to the large number of Class members, the filing of only one case shows that the overwhelming number of Class members are unlikely to pursue individual litigation. Substantial legal work has been required simply to plead the claims successfully. Class discovery has also involved extensive effort. Given this, it is reasonable to infer that almost all claims of Class members are likely to be "negative value" claims. That is, the high cost associated with prosecuting an individual claim would greatly outweigh the prospective benefit of prosecuting it. *See Natural Gas*, 231 F.R.D. at 185.

**Rule 23(b)(3)(B).** Rule 23(b)(3)(B) tests the nature and extent of concurrent litigation. Plaintiffs are aware of only one other suit advancing claims against Defendants based on their manipulation of Eurodollar futures. Thus, this factor favors certification.

**Rule 23(b)(3)(C).** Rule 23(b)(3)(C) requires a court to "evaluate whether allowing a Rule 23(b)(3) action to proceed will prevent the duplication of effort and the possibility of inconsistent results." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 106 (S.D.N.Y. 2007), *aff'd* 838

F.3d 223 (2d Cir. 2016) (quotation marks and citation omitted).  The Judicial Panel on Multidistrict Litigation has already concluded that judicial economy favors concentrating this litigation in this District.  ECF No. 1. As a result of the MDL proceeding, the Court already has significant experience with the issues in this case, including an extraordinary amount of work involved with simply sorting out the legal claims.  *Currency Conversion II*, 264 F.R.D. at 117.  "Class relief is superior where, as here, class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency."  *Dial Corp. v. News Corp*., 314 F.R.D. 108, 121 (S.D.N.Y. 2015), *amended by*, No. 13 Civ. 6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).  Accordingly, superiority is met.

**Rule 23(b)(3)(D).**  Rule 23(b)(3)(D) requires a court to ask whether the class action, if tried, would present intractable management problems.  The "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001); *see also Petrobras Securities Litig.*, 312 F.R.D. at 363; *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014).  Courts confronted with complex commodity futures manipulation cases have repeatedly found that such complexities were manageable and that the claims at issue could be maintained as class actions.  *See supra*, fn. 13.  Consequently, this final factor also favors certification.

Accordingly, Plaintiffs' proposed class satisfies Rule 23(b)(3)'s superiority requirement.

## III.      PLAINTIFFS' PROPOSED CLASS IS ASCERTAINABLE

The Second Circuit has construed Rule 23 to include an "implied requirement of ascertainability."  *IPO*, 471 F.3d at 30.  "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."  *Brecher v. Republic of Arg.*, 806 F.3d 22, 24-25 (2d Cir. 2015)

(internal citations omitted).  "The standard for ascertainability is not demanding.  It is designed only to prevent the certification of a class whose membership is truly indeterminable."  *Facebook IPO*, 312 F.R.D. at 353.  Moreover, "[c]lass members need not be ascertained prior to certification"—there need only be a method for determining the membership of the class "at some point in the case."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).

Courts regularly certify classes in commodities manipulation cases like this one.  *See, e.g.*, *Amaranth II*, 269 F.R.D. at 387; *Natural Gas*, 231 F.R.D. at 186; *Sumitomo*, 182 F.R.D. at 97.  In such cases, courts have concluded that the proposed classes are ascertainable even where (1) both sellers and purchasers are part of the class and (2) complex calculations may be required, including in order to identify net losers.  *See Amaranth II*, 269 F.R.D. at 381 ("Courts have consistently certified classes that include both purchasers and sellers of any contract relating to a specific underlying commodity during the class period."); *Natural Gas*, 231 F.R.D. at 180 ("Class membership based upon [a class definition including both buyers and sellers] is readily ascertainable").

This case is no different from other commodities manipulation cases where proposed classes have been deemed ascertainable.  As in those cases, it is feasible using objective criteria to determine from the available trading records whether individuals transacted in Eurodollar futures in the United States, as specified in the proposed class definition, and whether such individuals' net positions were negatively impacted by Defendants' actions.  *See* Exs. 29-31, Miller Decl. ¶¶ 24-26; *see also Laumann*, 105 F. Supp. 3d at 394 n.21  (ascertainability "readily and precisely ascertained" when "tethered directly to a specific, easily-traceable economic decision . . . to purchase").

31

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion to certify their claims for class action treatment.

Dated: May 2, 2017

**KIRBY McINERNEY LLP**

By: */s/ David E. Kovel*

David E. Kovel
Karen Lerner
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
dkovel@kmllp.com
klerner@kmllp.com
telrod@kmllp.com

**LOVELL STEWART HALEBIAN JACOBSON LLP**

By: */s/ Christopher Lovell*
Christopher Lovell
Gary S. Jacobson
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
clovell@lshllp.com
gsjacobson@lshllp.com

*Interim Lead Counsel for the Proposed Class*