# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262<br>Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | **ORAL ARGUMENT REQUESTED** |
| THE BERKSHIRE BANK, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BANK OF TOKYO MITSUBISHI UFJ LTD.; BARCLAYS BANK PLC; BRITISH BANKERS' ASSOCIATION; BBA ENTERPRISES LTD.; BBA LIBOR LTD.; CITIGROUP, INC.; CITIBANK, N.A.; COÖPERATIEVE CENTRALE RAIFFEISENBOERENLEENBANK B.A.; CREDIT SUISSE GROUP AG; DEUTSCHE BANK AG; HSBC HOLDINGS PLC; HSBC BANK PLC; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, NATIONAL ASSOCIATION; LLOYDS BANKING GROUP PLC; HBOS PLC; ROYAL BANK OF CANADA; THE NORINCHUKIN BANK; THE ROYAL BANK OF SCOTLAND GROUP PLC; UBS AG; WESTLB AG; and WESTDEUTSCHE IMMOBILIENBANK AG,<br><br>     Defendants. | No. 12-CV-5723-NRB |

# DEFENDANTS' JOINT MEMORANDUM ON "DOWNSTREAM" ISSUES IN OPPOSITION TO LENDER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND IN SUPPORT OF DEFENDANTS' MOTION TO <u>EXCLUDE THE TESTIMONY OF ROBERT IVORY WEBB Ph.D.</u>

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND FACTS PERTINENT TO THE PROPOSED CLASS ...........................4

ARGUMENT ....................................................................................................................6

I.  Plaintiffs Have Not Shown that They Can Prove Classwide Injury Through
    Common Evidence............................................................................................7

    A.  Plaintiffs' Failure to Identify and Account for the Alternative
        Investment(s) Each Class Member Would Have Made Precludes
        Class Certification...............................................................................7

    B.  There Is No Common Proof that Suppression Caused Injury to All
        Class Members on Particular LIBOR-Based Loans .............................12

    C.  Plaintiffs Have Failed to Establish a Common, Net Injury on a
        Classwide Basis .................................................................................15

    D.  Prof. Webb's Analysis of Injury Is Fundamentally Unreliable and
        Inadmissible under *Daubert*...............................................................17

II. Individualized Issues of Reliance, Notice, and Mitigation Preclude Class
    Certification ...................................................................................................19

III. Plaintiffs Have Failed to Meet Their Burden to Prove that a Class Action
     Would Be Manageable in Light of Variations in State Law ................................25

    A.  Plaintiffs Ignore Numerous Material Variations in State Fraud Law ...................25

    B.  Subclasses Cannot Resolve These Issues of State-Law Variations .......................28

IV. Berkshire Is Not an Adequate Class Representative.............................................29

CONCLUSION ..............................................................................................................31

# TABLE OF AUTHORITIES

CASES

PAGE(S)

*Adkins v. Morgan Stanley,*
   307 F.R.D. 119 (S.D.N.Y. 2015) ................................................................. 7

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
   133 S. Ct. 1184 (2013) ................................................................. 19

*Amorgianos v. Amtrak,*
   303 F.3d 256 (2d Cir. 2002) ................................................................. 19

*Ansari v. N.Y. Univ.,*
   179 F.R.D. 112 (S.D.N.Y. 1998) ................................................................. 17

*Apex Oil Co. v. DiMauro,*
   744 F. Supp. 53 (S.D.N.Y. 1990) ................................................................. 15, 16

*Ault v. J.M. Smucker Co.,*
   310 F.R.D. 59 (S.D.N.Y. 2015) ................................................................. 9

*Bausch & Lomb Inc. v. Mimetogen Pharm.,*
   No. 14-CV-6640-FPG, 2016 WL 2622013 (W.D.N.Y. May 5, 2016) ................................................................. 28

*Bayridge Volvo Am., Inc. v. Volvo Cars of N. Am., Inc.,*
   No. 01 Civ. 1890 (RMB)(KNF), 2004 WL 1824379 (S.D.N.Y. Aug. 13, 2004) ................................................................. 17

*Beverly Hills Surgery Ctr. v. Cigna HealthCare of Cal.,*
   No. 2:14cv05171-SVW-VBK, 2014 WL 12560691 (C.D. Cal. Aug. 14, 2014) ................................................................. 28

*Byrne v. Weichert Realtors,*
   675 A.2d 235 (N.J. App. Div. 1996) ................................................................. 29

*Comcast Corp. v. Behrend,*
   133 S. Ct. 1426 (2013) ................................................................. 7, 8, 9

*Conder v. A.L. Williams & Assocs.,*
   739 P.2d 634 (1987) ................................................................. 26

*Cornell v. Wunschel,*
   408 N.W.2d 369 (Iowa 1987) ................................................................. 26

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ................................................................. 18

*Dawson v. Withycombe,*
   216 Ariz. 84 (2007) ................................................................. 26

*Delacorte v. Transcon. Land & Cattle Corp.,*
   486 N.Y.S.2d 811 (1985) ................................................................. 16

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) .................................................................................. 7

*Dresser v. Sunderland Apts. Tenants Ass'n*,
    465 A.2d 835 (D.C. 1983) ................................................................................. 29

*Ebin v. Kangadis Food*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ...................................................................... 26

*Edward J. DeBartolo Corp. v. Coopers & Lybrand*,
    928 F. Supp. 557 (W.D. Pa. 1996) .................................................................. 29

*Emergent Capital Inv. Mgmt., L.L.C. v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ............................................................................. 23

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ............................................................................. 29

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    No. 11cv6201 (DLC), 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ................. 18

*Gasperoni v. Metabolife*,
    No. 00-71255, 2000 WL 33365948 (E.D. Mich. Sept. 27, 2000) .................... 21

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) .......................................................................................... 17

*Gordon v. Sonar Capital Mgmt. L.L.C.*,
    92 F. Supp. 3d 193 (S.D.N.Y. 2015) ............................................................... 30

*Gross v. Sussex Inc.*,
    630 A.2d 1156 (Md. 1993) ............................................................................... 26

*Grumman Allied Indus. v. Rohr Indus.*,
    748 F.2d 729 (2d Cir. 1984) ............................................................................. 23

*Hale v. Citibank, N.A.*,
    198 F.R.D. 606 (S.D.N.Y. 2001) ..................................................................... 29

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209 (KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ..... 13, 19

*In re Currency Conversion Fee Antitrust Litig.*,
    230 F.R.D. 303 (S.D.N.Y. 2004) ..................................................................... 25

*In re Estate of McKenney*,
    953 A.2d 336 (D.C. 2008) ................................................................................ 29

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    No. 04–md–1628 (RMB)(MHD), 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) ...... 17, 19

*In re IMAX Sec. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) ................................................................. 29, 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ................................................................. 7, 9

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) ...................................................................... 25

*In re US FoodService Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ................................................................... 25, 26

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011) ............................................................ 21

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000) ............................................................ 18

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ........................................................................... 13

*Kaczmarek v. IBM*,
    186 F.R.D. 307 (S.D.N.Y. 1999) .................................................................... 28

*Kassover v. Coeur D'Alene Mines Corp.*,
    No. 92-0015-N-HLR, 1992 WL 509995 (D. Idaho Sept. 2, 1992) .................... 26

*Klaiber v. Freemason Assocs.*,
    587 S.E.2d 555 (Va. 2003) ............................................................................. 29

*Laumann v. NHL*,
    117 F. Supp. 3d 299 (S.D.N.Y. 2015) ............................................................ 18

*Lewis Tree Serv. v. Lucent Techs., Inc.*,
    211 F.R.D. 228 (S.D.N.Y. 2002) .................................................................... 25

*LIBOR I (In re LIBOR-Based Fin. Instruments Antitrust Litig.)*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................................ 24

*LIBOR IV*,
    No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) .................................. *passim*

*LIBOR V*,
    No. 11 MDL 2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov 3, 2015) .................................. *passim*

*LIBOR VI*,
    No. 11 MDL 2262 (NRB),  2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ................................... 15, 16

*Long Island Sav. Bank v. Bigman*,
    No. CV 89–0927, 1991 WL 144224 (E.D.N.Y. June 25, 1991) ........................ 16

*Matana v. Merkin*,
    989 F. Supp. 2d 313 (S.D.N.Y. 2013) ............................................................ 19

*Maywalt v. Parker & Parsley Petrol. Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ...................................................................... 26

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016) ................................................................ 14, 17

*McConkey v. AON Corp.*,
    804 A.2d 572 (N.J. Super. 2002) ............................................................... 29

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ................................................................ 19, 20

*Morasch v. Hood*,
    222 P.3d 1125 (Or. Ct. App. 2009) ........................................................... 28

*N.J. Carpenters Health Fund v. Residential Capital, L.L.C.*,
    272 F.R.D. 160 (S.D.N.Y. 2011) .............................................................. 21

*Niermeyer v. Cook's Termite & Pest Control*,
    No. 05AP-21, 2006 WL 330099 (Ohio Ct. App. Feb. 14, 2006) .................... 26

*Nordyne, Inc. v. Fla. Mobile Home Supply*,
    625 So. 2d 1283 (Fla. 1st DCA 1993) ....................................................... 28

*Oscar v. BMW of N. Am.*,
    274 F.R.D. 498 (S.D.N.Y. 2011) .............................................................. 25

*Penn. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014) .................................................................. 3, 19

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    No. 93 Civ. 4001 (NRB), 2004 WL 345551 (S.D.N.Y. Feb. 20, 2004) ........... 19

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
    687 F. Supp. 2d 381 (S.D.N.Y. 2010) ....................................................... 12

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ...................................................................... 22

*Schur v. Sprenkle*,
    No. CL10-4495, 2012 WL 7985730 (Va. Cir. Ct. Apr. 11, 2012) ................... 29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................. 7

*Smokler v. New Woman, Inc.*,
    No. 84 Civ. 0899 (JFK), 1986 WL 4903 (S.D.N.Y. Apr. 22, 1986) ................ 27

*Spencer v. Hartford Fin. Servs. Grp.*,
    256 F.R.D. 284 (D. Conn. 2009) .............................................................. 26

*Stout v. Turney*,
    586 P.2d 1228 (Cal. 1978) ...................................................................... 28

*Sykes v. Mel S. Harris & Assocs. L.L.C.*,
    780 F.3d 70 (2d Cir. 2015) ..................................................................... 7, 9

*Toy v. Metro. Life Ins. Co.*,
    928 A.2d 186 (Pa. 2007) ......................................................................... 29

*Trepel v. Dippold*,
    No. 04 Civ. 8310 (DLC), 2006 WL 3054336 (S.D.N.Y. Oct. 27, 2006) ........................................... 25

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010) ................................................................. 20, 21

*Vaccariello v. XM Satellite Radio*,
    295 F.R.D. 62 (S.D.N.Y. 2013) ................................................................. 7, 9

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................. 3, 7, 19

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ......................................................................... 29

## STATUTES & RULES

28 U.S.C. § 2072(b) ......................................................................... 7

42 Pa. Cons. Stat. Ann. § 5524 ......................................................................... 29

D.C. Code § 12-301 ......................................................................... 29

Fed. R. Civ. P. 23 ......................................................................... 7

Fed. R. Civ. P. 23(a)(3) ......................................................................... 17

Fed. R. Civ. P. 23(a)(4) ................................................................. 17, 29

Fed. R. Civ. P. 23(b)(3) ................................................................. *passim*

Fed. R. Evid. 702 ......................................................................... 18

N.J. S.A. 2A:14-1 ......................................................................... 29

Va. Code Ann. § 8.01-243 ......................................................................... 29

## OTHER AUTHORITIES

Bd. of Governors of the Fed. Reserve Sys., *Discontinuance of several rates on October 11, 2016*,
    https://www.federalreserve.gov/feeds/h15.html ......................................................................... 10

Fed. Judicial Center, Manual for Complex Litigation § 21.23, at 272 (4th Ed. 2004) ........................... 28

Mark E. Schweitzer & Guhan Venkatu, *Adjustable-Rate Mortgages and the Libor Surprise*,
    Fed. Reserve Bank of Cleveland, https://www.clevelandfed.org/newsroom-and-
    events/publications/economic-commentary/economic-commentary-archives/2009-economic-
    commentaries/ec-20090109-adjustable-rate-mortgages-and-the-libor-surprise.aspx
    (last visited June 29, 2017) ................................................................. 11, 12

Restatement (Second) of Torts § 549 ................................................................... 28

Restatement (Second) of Torts § 918 (1979) ......................................................... 25

The undersigned Defendants submit this Opposition to the motion for class certification (the "Motion") of plaintiff The Berkshire Bank ("Berkshire") on behalf of a putative class of lending institutions ("Plaintiffs"). This brief concerns the "downstream" issues in the Lender action, which focus on whether Plaintiffs have shown that they can prove class members' claims through common evidence even assuming LIBOR was persistently suppressed. Defendants also submit this brief in support of their motion to exclude the testimony of Plaintiffs' expert, Robert Ivory Webb, Ph.D.

## PRELIMINARY STATEMENT

Plaintiffs have had over six years to develop evidence satisfying the rigorous standard for class certification, but their motion ignores the thousands of individualized inquiries necessary to determine whether each putative class member can state a claim. Notwithstanding this Court's clear guidance to the contrary in multiple opinions, Plaintiffs' sole expert, Prof. Webb— ███████████ ████████████████████████████ —assumes that calculating but-for LIBOR rates is all that is required to show classwide injury and certify a class action. For the reasons discussed below, as well as those in the expert reports of Prof. Janusz Ordover (an NYU Emeritus Professor of Economics and former Deputy Assistant Attorney General for Economics at the DOJ Antitrust Division) and Mr. Brian Kelley (who has over 35 years of experience in management at lending institutions), a host of individualized issues predominate over any common questions, and Plaintiffs fall far short of meeting the standards for class certification.

*First*, Plaintiffs—who assert only fraud and conspiracy to commit fraud claims—have ignored the Court's clear instructions that the measure of damages for their New York fraud claims "depends critically upon comparing a plaintiff's investment with the alternatives that would have existed were it not for the defendant's fraud." *LIBOR V*, 2015 WL 6696407, at *10 (S.D.N.Y. Nov. 3, 2015). This is the very issue on which the claims of the only remaining named plaintiff (Berkshire) originally foundered. The Court allowed Berkshire to revive its claims only after it

1

pleaded the specific alternative investments that it would have pursued had it known of the alleged fraud.

In their motion and Prof. Webb's reports, Plaintiffs disregard this critical issue and, instead, revert to the theory this Court previously rejected, namely, that damages equal the difference between actual LIBOR and but-for LIBOR. Plaintiffs and Prof. Webb say nothing to address the legal standard set forth by this Court and upon which their amended complaint survived dismissal. In particular, they offer no method to identify the alternative investments that class members would have pursued had they known about the alleged suppression of LIBOR, much less attempt to show that such alternative investments can be identified for thousands of disparate class members through common evidence. Nor have they tried to show that, during an unpredictable financial crisis, every class member would have been better off with its alternative investment of choice. For this reason alone, Plaintiffs' motion for class certification should be denied.

*Second*, even if, contrary to *LIBOR V*, the relevant methodology for establishing injury involved merely determining the effect of purported LIBOR suppression on each Plaintiff's LIBOR-linked transactions, Plaintiffs utterly fail to carry their burden of identifying common evidence showing that all class members suffered injury from the alleged suppression. Instead, Plaintiffs make the implausible assumption that every LIBOR-based loan would exist with the exact same terms—and perform exactly the same—in the but-for world of higher LIBOR. Basic economics dictates that higher LIBOR rates would reduce the origination of (profitable) loans, reduce loan origination and servicing fees, increase loan default rates, reduce the spread on some loans (*e.g.*, LIBOR $\underline{+ 2\%}$), and reduce the use of interest rate floors. These factors make it impossible to use common evidence to determine the net effects of any LIBOR suppression on each lender's loan portfolio. Yet neither Plaintiffs nor Prof. Webb even attempt to account for these factors in their analysis. Indeed, Prof.

Webb's failure to do so is so egregious as to render his report inadmissible under *Daubert*.

*Third*, even if one accepts Plaintiffs' erroneous damages methodology and implausible assumptions about the but-for world, Plaintiffs also fail to account for the fact that many if not all class members' businesses consist of much more than just LIBOR-based loans. Plaintiffs do not dispute that many class members also **borrow** money at LIBOR or **hedge** their LIBOR exposure through derivatives such as interest rate swaps or Eurodollar futures, yet Plaintiffs offer no means to deal with complex net injury determinations stemming from gains on LIBOR-based borrowings or hedges. Indeed, Plaintiffs fail to perform this analysis even for Berkshire itself, despite unfettered access to its records. Moreover, Defendants have learned through discovery ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Berkshire thus likely **benefited** from any alleged LIBOR suppression, making it an inadequate class representative.

*Fourth*, issues of reliance, statute of limitations, and mitigation of damages also make it impossible to resolve class members' claims "in one stroke." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011). Courts "ordinarily preclude" certification of fraud claims as class actions because issues of reliance are individualized, *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120-21 (2d Cir. 2014) (citation omitted), and Plaintiffs have put forward no evidence to suggest a different outcome should apply here. Nor could they. Lenders' understanding of the LIBOR definition, reliance on LIBOR's accuracy, awareness of reports of LIBOR manipulation, and amount of investigation, if any, in response necessarily differ. Indeed, the lenders that lent to the panel banks would have had actual knowledge as to the accuracy of some submissions. Similarly, this Court has noted that "the statute of limitations issue will likely prove a difficult hurdle for the Lender Plaintiffs to clear" at class certification, Sept. 20, 2016 Order, ECF 1574, at 5, yet Plaintiffs

have not so much as mentioned the phrase "statute of limitations" in their class certification brief or expert reports.  Nor have they made any effort to address mitigation of damages issues, which this Court has noted "undoubtedly" raise "individual issues." *Id.*

*Fifth*, Plaintiffs fail to satisfy their "burden of showing, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." *Id.* at 2-3 (quotation omitted).  Plaintiffs do not dispute the numerous material variations in state law that Defendants identified in prior letters to the court.  Instead, Plaintiffs merely offer high-level recitations of the elements of a common law fraud claim and the *ipse dixit* that there are no material variations of state law.  There are, however, real substantive differences in state laws relating to Plaintiffs' fraud claims—including as to reliance, statutes of limitation, inquiry notice, and damages.  As a result, certification of a nationwide class, or any manageable number of subclasses, is impossible.

*Sixth*, Berkshire has a conflict of interest that prevents it from adequately serving as a class representative.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████  Yet class counsel never disclosed this relationship to the Court or Defendants in a motion for appointment as class counsel or otherwise, and Defendants uncovered it only through discovery.  There is, moreover, no evidence that Mordchai Krausz has performed any meaningful work in this case.  This arrangement is improper and precludes Berkshire from being an adequate class representative.

## BACKGROUND FACTS PERTINENT TO THE PROPOSED CLASS

Plaintiffs claim that Defendants committed (and conspired to commit) fraud, in their reporting of LIBOR from August 2007 through May 2010.  They seek to certify a diverse class of U.S. lending institutions that originated, held, or purchased LIBOR-linked loans during this nearly

three-year period. As discussed in the Expert Report of Brian Kelley, who has more than 35 years of experience in the lending industry, the proposed class encompasses every possible type of lending institution in the United States, including many of the largest global financial institutions (*e.g.*, Goldman Sachs, Morgan Stanley, and Wells Fargo), wholesale lenders, mortgage companies, syndicated structured finance lenders, specialty lenders, asset-based lenders, and community banks. Kelley Rpt., Ex. 1 ¶¶ 19-69.[1] Proposed class members pursue varying business models and strategies, funding sources, asset-liability management strategies, and hedging activities, among many other differences between class members. *Id.* ¶¶ 19-69; 77-79; 91-92; 94; 99-100.

Many putative class members **borrow** at a LIBOR-based rate, *e.g.*, *id.* ¶¶ 14, 30, 118; Webb Reb. Rpt., Ex. 5 ¶ 115, raising the individualized question of whether class members may have saved as much or more than what they purportedly lost based on lower LIBOR. Indeed, while LIBOR (and interest rates more generally) usually decreased during the class period, average net interest margins (*i.e.*, the margin between a bank's lending and borrowing rates) of U.S. banks remained nearly **constant**, implying that class members generally attempted to insulate themselves from changes in interest rates. *See* Appendix 1, attached hereto; Kelley Rpt., Ex. 1 ¶¶ 78, 115.

The only lender seeking to represent this diverse class, Berkshire (a mid-sized community bank based in New York) illustrates the individualized nature of a lender's LIBOR-based lending and borrowing portfolios and its overall exposure to LIBOR movements. ███████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[1] All exhibits cited herein are exhibits to the Declaration of Paul S. Mishkin filed concurrently with this brief.

[REDACTED]

Moreover, Berkshire's corporate parent created two statutory trusts that owed $22 million in LIBOR-linked debt (in the form of preferred trust debentures) during the class period to "augment [Berkshire] Bank's capital." Berkshire Bancorp Inc., 2007 Form 10-K, Ex. 12, at 22; *see* Berkshire Bancorp Inc., 2010 Form 10-K, Ex. 15, at 74-[REDACTED]

[REDACTED]

[REDACTED].[3]

## ARGUMENT

Plaintiffs must affirmatively demonstrate their compliance with Rule 23 of the Federal Rules

---

[2] Defendants took two 30(b)(6) depositions of Plaintiff Berkshire Bank, one of Berkshire's CFO, David Lukens, and the other of Berkshire's CEO, Moses Krausz, to address certain specific, additional topics.

[3] [REDACTED]

of Civil Procedure by a preponderance of the evidence. *Wal-Mart*, 564 U.S. at 351. Class

"certification is proper only if the trial court is satisfied, after a rigorous analysis," that Plaintiffs have

met their burden. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Plaintiffs fail to do so.

## I.    Plaintiffs Have Not Shown that They Can Prove Classwide Injury Through Common Evidence

At the class certification stage, Plaintiffs must show that they can prove, "through common

evidence, that all class members were . . . injured by the alleged conspiracy." *Sykes v. Mel S. Harris*

*& Assocs.*, 780 F.3d 70, 82 (2d Cir. 2015) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*,

725 F.3d 244, 252 (D.C. Cir. 2013)).[4] Plaintiffs need not demonstrate "the precise amount of

damages incurred by each class member," but they must proffer "common evidence to show all class

members suffered some injury." *Id.* (quoting *Rail Freight*, 725 F.3d at 252). Because Plaintiffs offer

no such common evidence of injury, they are unable to meet the predominance requirement of Rule

23(b)(3) as a matter of law. *See Rail Freight,* 725 F.3d at 252-53.

### A.    Plaintiffs' Failure to Identify and Account for the Alternative Investment(s) Each Class Member Would Have Made Precludes Class Certification

#### 1.    Plaintiffs Have Ignored Their Obligation to Show the Alternative Investment(s) Each Class Member Would Have Made

In *LIBOR V*, this Court dismissed Berkshire's claims for fraud and conspiracy to commit

fraud for failure to adequately plead damages. The Court set forth precisely what a plaintiff must

show to prove injury on a fraud claim under New York law: "[T]he measure of damages in a fraud

---

[4] *See also Denney v. Deutsche Bank*, 443 F.3d 253, 263-64 (2d Cir. 2006); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 144 n.32 (S.D.N.Y. 2015) ("[S]howing injury by general proof is precluded by uncertainty about what the alternatives . . . [to the alleged harm] would have been, and how they would have been distributed amongst the plaintiffs." (alterations in original)); *Vaccariello v. XM Satellite Radio*, 295 F.R.D. 62, 74 (S.D.N.Y. 2013) ("[I]nability to prove class wide injury through common evidence is, alone, grounds for denying Rule 23(b)(3) certification based on a lack of predominance."). Rule 23 permits adjudication of multi-party claims only in a way that "leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs. v. Allstate Ins.*, 559 U.S. 393, 408 (2010) (plurality opinion). Indeed, the Rules Enabling Act expressly prohibits the use of any procedural device—like the class action—to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Permitting uninjured class members to bring claims through a class action that they cannot bring individually violates these fundamental principles.

case depends critically upon comparing a plaintiff's investment with the alternatives that would have existed were it not for the defendant's fraud." 2015 WL 6696407, at *10. Unless the plaintiff identifies the specific alternative investment it would have chosen but-for LIBOR suppression, the Court will "compare the cash flows received with those that would have been received if the plaintiff had invested in a hypothetical interest-bearing deposit." *Id.* at *11; *see also* Apr. 15, 2016 Order, ECF 1380, at 8.

Because Berkshire did not plead any specific alternative investment, the Court dismissed its claims for failure to plead a cognizable injury under New York law. *LIBOR V*, 2015 WL 6696407, at *11; *see also* Apr. 15, 2016 Order, ECF 1380, at 8. The Court explained that it is not sufficient to plead that "if LIBOR was persistently suppressed, the interest payments on the loans were lower than the payments would have been if the payments had been calculated from 'true LIBOR.'" *LIBOR V*, 2015 WL 6696407, at *9. That is because a cognizable injury in this context focuses on what the plaintiff would have done, ***not*** merely on what LIBOR would have been (absent suppression).

In response, Berkshire sought leave to amend its complaint to allege that "if it had known that defendants were manipulating LIBOR, it would have used the [Federal Reserve Eurodollar Deposit Rate]" or "exchanged its LIBOR-based cash flows for a fixed rate cash flow by purchasing a swap." Apr. 15, 2016 Order, ECF 1380, at 9. On that basis, the Court found Berkshire's amended allegations sufficient to plead damages and reinstated its claims. *Id.*

Given this governing law, to satisfy Rule 23(b)(3), Berkshire must offer a reliable method to identify, through common evidence, the alternative investment that each class member in New York (and states with similar laws) would have made, and quantify the outcome of each alternative relative to each actual LIBOR-based loan. *See Comcast*, 133 S. Ct. at 1432-33 ("If [a damages] model does not even attempt to [measure damages attributable to plaintiffs' theory], it cannot possibly establish

that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Calculations need not be exact, but at the class-certification stage . . ., any model supporting a plaintiffs' damages case must be consistent with its liability case."). It is not enough to speculate as to what a lender might have done; Berkshire must show what it "would have . . . received" and identify the "specific investment opportunity." *LIBOR V*, 2015 WL 6696407, at *11 & n.19.

Plaintiffs completely ignore this Court's clear directive and therefore run afoul of *Comcast*. Their Motion does not even purport to offer any common evidence to identify the specific investments that particular class members would have made in the but-for world. Instead, Plaintiffs revert to the damages theory based on "counterfactual LIBOR" (*i.e.*, what LIBOR would have been absent alleged suppression) that this Court rejected in *LIBOR V*.[5] This is a complete abdication on a dispositive issue as to which Plaintiffs bear the burden of proof, *see Sykes*, 780 F.3d at 82; *Vaccariello*, 295 F.R.D. at 74, which precludes certification of both of Plaintiffs' fraud claims: "No damages model, no predominance, no class certification." *Rail Freight*, 725 F.3d at 253.[6]

### 2. Identifying Alternative Investments Class Members Would Have Made Is Inherently Individualized

Plaintiffs' failure to address alternative investments alone dooms their motion. But in any event, the alternative investments issue is plainly individualized. A class member could have taken a wide variety of measures to minimize the impact of any LIBOR suppression, or done nothing at all. *See* Kelley Rpt., Ex. 1 ¶¶ 141-46. Simply positing the existence of some alternative does not provide

---

[5] *See, e.g.*, Webb Rpt., Ex. 4 ¶ 63; Webb Reb. Rpt., Ex. 5 ¶¶ 21-33, 116; Webb Dep., Ex. 6 at 256:18-22. █████████████████████████████████████████████████████████████████████████████████████████████████████████████

[6] This Court has previously denied class certification for similar reasons. In *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59 (S.D.N.Y. 2015), this Court found that the plaintiff's proposed damages methodology is not "consistent with [plaintiff's] liability case," as required by *Comcast*, "because it ma[de] no attempt to calculate the amount that consumers actually overpaid due to" the defendant's alleged mislabeling of a product. *Id.* at 67. As here, the plaintiff "point[ed] to no *alternate* product whose market price could be used as a yardstick to determine what [p]laintiff would have paid, but for the alleged misrepresentation." *Id.* at 68 (emphasis added).

any basis for common proof of which alternative class members would have chosen. Different alternatives have different consequences. There is no basis to assume that lenders—from Goldman Sachs to a small community bank—would have consistently chosen the same alternative index *and* that the chosen index would have outperformed LIBOR over the full course of a loan. Nor is there any way to know how the choice of an alternative index would have altered other loan terms.

Berkshire's own facts show the impossibility of using common evidence to reliably prove each class member's alternative investment. To overcome dismissal, Berkshire previously alleged that it would have used derivative hedging instruments and the Federal Reserve Eurodollar Rate ("FRED") as alternatives to LIBOR. Second Am. Consol. Class Action Compl. ("SAC") ¶ 12, ECF 1383. Yet neither alternative is supported by the record.

**FRED.** Berkshire alleges a loan linked to FRED as one of only two alternative investments. *Id.* But discovery has disproven that theory.



Moreover, Prof. Webb offers no evidence that U.S. banks even use the FRED index. This is no surprise. Publicly available lists of variable rate indices typically do not even mention this index,[8] and the Fed discontinued the rate in 2016. *See* https://federalreserve.gov/feeds/h15.html.

---

[7] ████████████████████████████████████████████

[8] *See, e.g.*, Ex, 18, *ARM Index Rates: Treasuries, Libor Rates, Prime Rate and Other Common ARM Indexes*, HSH Associates, http://www.hsh.com/idxhst.html (last visited June 29, 2017).

**Hedging.** Berkshire's only other alleged alternative investment is hedging through derivatives, SAC ¶ 12, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ For example, some institutions ███████████████ might not need to rely on derivatives because their exposure to LIBOR is similar on both the funding and lending sides of the business.[10] Prof. Webb does not dispute this.

**Risk-free Indices.** Absent a specific alternative, this Court has noted that "the risk-free interest rate is the most appropriate neutral comparator." *LIBOR V*, 2015 WL 6696407, at *11, n.19. But Berkshire does not and cannot rely on that alternative as a basis for damages, because risk-free indices, such as Treasury Bills, performed worse than LIBOR (even with the alleged suppression). ███████████████████████████████████████████████ According to the Cleveland Federal Reserve, "since 2007, the rates on which the indexes are based have diverged sharply, and borrowers with Libor-based adjustable-rate mortgages are likely to ***pay more*** than they would have had their mortgages been tied to treasuries."[11] ████████████████████████████



[9] ████████████████████████████████████████████████
██████████████████████████████████

[10] ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[11] Mark E. Schweitzer & Guhan Venkatu, *Adjustable-Rate Mortgages and the Libor Surprise*, Fed. Reserve Bank of Cleveland (emphasis added), https://www.clevelandfed.org/newsroom-and-events/publications/economic-

[redacted].[12]

## B. There Is No Common Proof that Suppression Caused Injury to All Class Members on Particular LIBOR-Based Loans

Even if Plaintiffs could simply ignore alternative investments, Plaintiffs and Prof. Webb—

[redacted]

[redacted]—present a highly oversimplified but-for world that assumes, without proof, that one could calculate the impact of LIBOR suppression simply by adjusting the interest rate and holding all else constant. This defies basic economic principles because it ignores the important and individualized complexities regarding how increases in interest rates actually affect loans.

**Reduced demand and payments.** Plaintiffs ignore the basic principles that higher interest rates impact loan demand and performance. Kelley Rpt., Ex. 1 ¶ 125. Higher rates would deter some borrowers from taking out new loans (or refinancing old loans) in the but-for world. *See id.*; Ordover Rpt., Ex. 2 ¶ 46.[13] Higher rates also impair some borrowers' ability to meet their payment obligations. *See* Kelley Rpt., Ex. 1 ¶ 132; Ordover Rpt., Ex. 2 ¶ 45. [redacted]

[redacted]

[redacted]

[redacted]

---

commentary/economic-commentary-archives/2009-economic-commentaries/ec-20090109-adjustable-rate-mortgages-and-the-libor-surprise.aspx (last visited June 29, 2017).

[12] It is too late for Plaintiffs to somehow address the "alternative investment" issue on reply, especially given that it was central to Berkshire's avoidance of dismissal in the first place. The Court set a class certification discovery and briefing schedule that is "fixed and firm." Dec. 23, 2015 Order, ECF 1268, at 1; June 7, 2016 Order, ECF 1441, at 1. "It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden." *Revise Clothing v. Joe's Jeans Subsidiary*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010).

[13] [redacted] elley Rpt., Ex. 1 ¶127.

Defense experts raised these points in their reports, but Prof. Webb's rebuttal report did nothing to identify common evidence that could: (1) identify those loans that would not have been made in the but-for world given higher LIBOR; (2) identify the borrowers who would have defaulted on their loans (or stopped performing, in part, on their payment obligations) in the but-for world; and (3) quantify the loss of income associated with such loans. Webb Reb. Rpt., Ex. 5.[14]

**Loan spreads.** The "spread" on a loan typically refers to the fixed amount above a floating rate, for example, LIBOR $+ 2\%$. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ And spreads on commercial loans in particular are sensitive to changes in interest rates. *Id.* at 143:12-16.

**Interest rate floors.** Plaintiffs and Prof. Webb also ignore the impact of interest rate floors, which set a minimum rate below which reductions in LIBOR have no effect. Many lenders began using floors in their loans during the financial crisis as a result of falling LIBOR. Kelley Rpt., Ex. 1 ¶¶ 102-114. The use of LIBOR floors, which varied from bank to bank and even from loan to loan,

[14] ███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████ but that gets things completely backward. It is not Defendants' burden in opposing class certification to provide a classwide model showing how loan demand, default rates, or other variables were impacted in the but-for world (in fact, Defendants' experts have opined that it would not be possible to do so using common, classwide evidence). Rather, it is *Plaintiffs'* and, by extension, their expert's burden to prove by a preponderance of the evidence that LIBOR suppression would have resulted in classwide injury. *See Johnson v. Nextel Commc'ns*, 780 F.3d 128, 137 (2d Cir. 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *13 (S.D.N.Y. Oct. 29, 2013) (explaining that it is "irrelevant" whether defendants' experts have proffered an analysis to "disprove" that of the plaintiffs' expert because "defendants do not bear such a burden"; instead the court determines whether "notwithstanding the criticisms [of defendants' experts], plaintiffs have carried their burden").
[15] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

*id.* ¶¶ 113-14, introduces at least two additional individualized inquiries.

    *First*, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.* at ¶ 105. Plaintiffs do not even attempt to explain how one would determine, through common

evidence on a classwide basis, whether or at what level a floor would have existed on a particular

loan during this period of extreme financial turbulence.

    *Second*, a floor insulates the lender if LIBOR falls too low, and thus requires Plaintiffs to

identify any floors and prove that the but-for rate would have been above the floor. *Id.* at ¶ 106.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Thus, accounting for

loan floors in any analysis of lenders' injury is a quintessentially individualized issue. *See Mazzei v.*

*Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) ("A classwide resolution . . . was not possible

because . . . the fact-finder would have to look at every class member's loan documents to determine

who did and who did not have a valid claim."). Prof. Webb ignores the topic altogether.[16]

    **Purchased loans.** Although Plaintiffs include purchasers of LIBOR-linked loans in the

proposed class definition, Plaintiffs and Prof. Webb ignore the ***prices*** that purchasers paid for loans,

focusing only on the interest rates on the underlying loans. It is not possible to calculate the net

impact to a loan purchaser without considering the purchase price because that price likely would

---

[16] Other individualized factors that impact a lender's exposure to LIBOR, ████████████████████
████████████████████████████████ include options embedded in loans to choose different
benchmarks, as well as renegotiations or modifications of LIBOR-linked loans. *See* Statement of Facts *supra*;
Kelley Rpt., Ex. 1 ¶ 17.

have been higher in the but-for world of higher LIBOR. Lukens Dep., Ex. 7 at 286:5-10; 320:11-22;

*see LIBOR VI*, 2016 WL 7378980, at \*19 (S.D.N.Y. Dec. 20, 2016) (making similar point with

respect to bond pricing).[17] For example, a purchaser who bought a loan during the period of alleged

suppression (and likely paid a lower price for the loan) may have received a windfall when the

alleged suppression diminished or ended and LIBOR was allegedly higher. Kelley Rpt., Ex. 1 ¶ 122.

The purchaser might well have been better off with suppression, depending on the timing of the

purchase and the amount by which the price was reduced.[18]

### C. Plaintiffs Have Failed to Establish a Common, Net Injury on a Classwide Basis

Even if one accepted the oversimplified and incorrect but-for LIBOR rates that Plaintiffs and

Prof. Webb propose, Plaintiffs are still unable to satisfy Rule 23(b)(3) because they have failed to

show a common *net* injury on a classwide basis after accounting for class members' LIBOR-based

borrowings, hedges, and other transactions.

The law requires a plaintiff pursuing a fraud claim to reduce its claim to account for any

benefits that it received from the alleged conduct. *See, e.g.*, *Apex Oil v. DiMauro*, 744 F. Supp. 53,

54 (S.D.N.Y. 1990) (rejecting argument in New York common-law fraud case that "counterclaimant

should be able to recover for each of its losses, without offsetting those losses against its gains" and

noting that "[counterclaimant] has provided no precedent, and the court knows of none, for

---

[17] ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████ He ignores that
different lenders may use different discount rates, which may not be LIBOR-linked. Thus, for example, discount
rates could be tied to a lender's internal cost of funds, T-bills, the prime rate, or many other measures that may not
be affected by LIBOR suppression. *See id.* ¶ 97. Prof. Webb offers no evidence that all class members would use
the same discount rates (or even that any class member's discount rates would be linked to LIBOR). As a result, his
argument about the effects of changes in discount rates renders the injury question *more*, not *less*, individualized.

[18] The class definition is also overbroad on its face because it focuses on whether a loan adjusted during the class
period, not whether a class member actually received an adjusted loan payment during the class period. The class
definition thus literally includes lenders who originated a loan but never received any floating rate payment during
the alleged suppression period—such as a lender who sold a loan during the initial fixed rate period, or where the
loan was in default or non-performing.

permitting damage claims for common law fraud … in cases where the claimant actually benefited from the alleged wrongdoing").[19]

This Court has previously recognized the need to prove a net injury. In *LIBOR V*, this Court dismissed Highlander Realty, finding that it suffered no injury (and lacked standing) because it "simultaneously took out a floating-rate loan from Citizens Bank and used an interest rate swap to exchange its floating-rate obligations for fixed-rate obligations" and therefore "was never exposed to fluctuations in LIBOR at all." 2015 WL 6696407, at *3, 23.[20] Plaintiffs must therefore show that they can prove by common evidence that each lender lost more on their LIBOR-linked loans than they gained on their LIBOR-linked borrowings, hedges, or other transactions. They have not even attempted to meet this burden.

Lender-to-lender variation in the use of LIBOR-based funding requires individualized inquiries. Some banks are able to profit from, or remain unaffected by, falling interest rates. *See* Lukens Dep., Ex. 7 at 123:6-25 █████████████████████████████████████████
███████████████████████████████████████ Kelley Rpt., Ex. 1 ¶ 115. Whether a bank has suffered a loss from alleged LIBOR suppression requires assessing its net exposure to LIBOR based on, among other things, its particular mix of LIBOR-linked funding and lending cash flows, as well as any hedges, which requires an individualized review of each lender's transactions. *See* Webb Reb. Dep., Ex. 9 at 246:15-249:20 █████████████████████████████████████

---

[19] *See also, e.g.*, *Long Island Sav. Bank v. Bigman*, 1991 WL 144224, *6-7 (E.D.N.Y. June 25, 1991) (deducting from damages the value of seven apartments that plaintiff-bank had recovered and sold through foreclosure as a result of defendants' fraud); *Delacorte v. Transcon. Land & Cattle*, 486 N.Y.S.2d 811, 813 (Sup. Ct. 1985) (reducing plaintiff's damages by the tax benefits plaintiff realized as a result of the fraud).

[20] *See also LIBOR V*, 2015 WL 6696407, at *11 (inquiring "whether Berkshire suffered any net loss on any mortgage or other loan"); *LIBOR VI*, 2016 WL 7378980, at *18 ("[W]e agree that plaintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the same transaction or in a different transaction.").

███████████████████████████████████████████████████.[21]  Engaging in such an analysis

across the thousands of lending institutions in the putative class "would result in thousands of mini-

trials," rendering any class action unmanageable.[22]

Tellingly, Prof. Webb has not even attempted to determine Berkshire's net loss, despite

access to all of its documents and a limited number of transactions to parse.  Webb Reb. Dep., Ex. 9

at 245:7-23, 248:12-249:20.  Moreover, Defendants' investigation into Berkshire's net exposure to

LIBOR has revealed that ███████████████████████████████████████████████████

███████████████████████████████████████  Berkshire therefore

likely **benefited** from alleged LIBOR suppression (███████████████████████████

██████████████████████████████) and has no claim, making it an atypical and

inadequate class representative under Rule 23(a)(3) and (a)(4).  *See, e.g.*, *Gen. Tel. Co. of S.W. v.*

*Falcon*, 457 U.S. 147, 156 (1982) ("[A] class representative must be part of the class and possess the

same interest and suffer the same injury as the class members." (citation omitted)).[23]

### D.  Prof. Webb's Analysis of Injury Is Fundamentally Unreliable and Inadmissible under *Daubert*

For the reasons set forth in Parts I and II above, Prof. Webb not only fails to provide a

classwide method for proving injury, his "downstream" analysis—*i.e.*, his analysis of whether

putative class members were injured assuming LIBOR was suppressed, *see* Webb Rpt., Ex. 4 ¶¶ 74-

---

[21] *See also* Lukens Dep., Ex. 7 at 173:9-15 (███████████████████████████); Kelley Rpt., Ex. 1 ¶¶ 30, 34, 46, 50, 77-96; Kelley Dep., Ex. 8 at 57:13-24; 60:19-61:6; 70:7-10.

[22] *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *9 (S.D.N.Y. Sept. 30, 2009); *see also Mazzei*, 829 F.3d at 272-73 (denying class certification where "fact-finder would have to look at every class member's loan documents to determine who . . ha[d] a valid claim").

[23] A class action is also not a superior method of adjudicating Plaintiffs' claims because each putative class member "appears fully able 'to litigate with defendant [their] claims even in the absence of class determination.'" *Bayridge Volvo Am. v. Volvo Cars of N. Am.*, 2004 WL 1824379, at *1 (S.D.N.Y. Aug. 16, 2004) (citation omitted); *see also, e.g.*, *Ansari v. NYU*, 179 F.R.D. 112, 115-16 (S.D.N.Y. 1998).  Plaintiffs assert without support that class members lack the ability to prosecute their claims independently, but this is not the typical class action where "small claimants" seek "redress for claims which would otherwise be too small to warrant individual litigation." *Bayridge*, 2004 WL 1824379, at *1.  Here, "none of the Proposed Class Members is a 'small consumer or investor.'" *Id.* Rather, the proposed class consists exclusively of financial institutions.

86; Webb Reb. Rpt., Ex. 5 ¶¶ 98-140—is so unreliable as to warrant its exclusion under Federal Rule

of Evidence 702. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

Expert testimony that "fail[s] to account for significant variables" is subject to exclusion.

*Fed. Hous. Fin. Agency v. Nomura Holding Am.*, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015)

(citing cases). A recent antitrust case, *Laumann v. National Hockey League*, 117 F. Supp. 3d 299,

305 (S.D.N.Y. 2015), is instructive. In *Laumann*, the court considered plaintiff's expert's model (a

model much more sophisticated than Prof. Webb's analysis here), *see id.* at 305-15, and excluded it

under *Daubert* because plaintiffs did not "prove that there is a scientifically-reliable way to predict

with some precision the prices of [certain sports telecasts] in the future[.]" *Id.* at 315. The court

acknowledged that doing so was "enormously challenging," but concluded that "the law is clear" that

the expert's opinion is inadmissible if unreliable, "no matter how burdensome or difficult collecting

relevant data or devising methods to apply to that data may be." *Id.*

Similarly, in *Johnson Electric N.A. v. Mabuchi Motor America*, 103 F. Supp. 2d 268

(S.D.N.Y. 2000), the court excluded expert testimony regarding patent infringement damages that

was far more "detailed" and sophisticated than Prof. Webb's, *id.* at 273, because the expert (1) made

assumptions that contradicted the legal standards that the court had previously applied, *id.* at 280-82;

and (2) employed unrealistic assumptions about the "but for" world that amounted to "speculative

economic analysis," *see id.* at 284-86.

Exclusion of Prof. Webb's analysis follows *a fortiori* from *Laumann* and *Johnson Electric*.

First, Prof. Webb's methodology fails on its face to supply the complete analysis necessary to

support any determination that a particular lender was injured under the legal standards this Court has

set forth. *See Johnson Electric*, 103 F. Supp. 2d at 280-82; Part I.A *supra*. Second, by failing to

account for what alternative investments lenders would have obtained, what demand and default

rates for their LIBOR-linked loans would have been, how alleged LIBOR suppression would have

affected the price and other terms of their LIBOR-linked loans, and how lenders' LIBOR-linked

borrowings, hedges, and other transactions would have been impacted, it is simply impossible to

know whether any particular lender would have been injured by alleged LIBOR suppression.  Prof.

Webb's damages methodology thus presents a fundamentally incomplete picture of the but-for world

and cannot be relied upon to provide an accurate measure of putative injury.  Accordingly, Prof.

Webb's analysis of putative class members' injury fails *Daubert* and must be excluded.[24]

## II.     Individualized Issues of Reliance, Notice, and Mitigation Preclude Class Certification

Plaintiffs cannot satisfy Rule 23(b)(3) because they offer no common evidence showing that

reliance, inquiry notice, and mitigation of damages issues can be resolved on a classwide basis.  For

example, what each lender knew about alleged LIBOR suppression, when it knew it, and what it did

to investigate are questions central to the validity of Plaintiffs' fraud claims, yet they have put forth

***no*** evidence showing that such issues can be resolved "in one stroke."  *Wal-Mart*, 564 U.S. at 350.

**Reliance.**  It is Plaintiffs' burden on a fraud claim to establish that they reasonably relied on

defendants' alleged misrepresentations.  *Matana v. Merkin*, 989 F. Supp. 2d 313, 320 (S.D.N.Y.

2013).  As the Supreme Court and Second Circuit have both recognized, courts " ***ordinarily*** preclude

certification of a class action seeking money damages [for fraud] because individual reliance issues

would overwhelm questions common to the class."  *Penn. Pub.*, 772 F.3d at 120-21 (emphasis

added) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1993 (2013));

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (requiring an individualized

---

[24] *See also, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (rejecting expert testimony where the "methodology . . . [is] simply inadequate to support the conclusion reached"); *IBEW*, 2013 WL 5815472, at *15-16 (rejecting expert's methodology that ignored highly relevant factors); *Del Monte*, 2009 WL 3241401, at *7-8 (excluding expert testimony where expert "overlook[ed] relevant facts" that undermined his analysis); *Point Prods. v. Sony Music Entm't*, 2004 WL 345551, at *6-7 (S.D.N.Y. Feb. 23, 2004) (Buchwald, J.) (finding expert testimony "unreliable and indefensible" in light of "gaping omissions of real world events that were highly material").

showing of reliance with respect to common-law fraud claims). And this Court has previously recognized that determinations of reasonable reliance would likely require fact-specific inquiries particular to each plaintiff of the kind rendering class certification inappropriate.[25] Consistent with these observations, Plaintiffs have made no credible showing that issues of reliance can be resolved classwide through common proof.

Plaintiffs are incorrect that reliance can be proven on a classwide basis because "LIBOR was uniformly misrepresented to all Class members" and "expressly incorporated into the terms of their contract/loans." As an initial matter, Plaintiffs are incorrect that the panel banks made "uniform misrepresentations" to all class members. As set forth in Defendants' accompanying "upstream" brief, Plaintiffs' claims of LIBOR suppression necessarily vary by date, tenor, and bank. As a result, any inquiry into reasonable reliance will require the review of different submissions, by different banks, in different tenors, occurring at different times, for different plaintiffs.[26]

Moreover, there is no evidence that class members shared the same interpretation of the LIBOR question, resulting in additional, individualized reliance issues. As discussed at length in the upstream brief, Plaintiffs' and Prof. Webb's suppression argument relies on an interpretation of the LIBOR question that ignores panel banks' actual London borrowing costs. But any lender that, consistent with Plaintiffs' complaint, understood LIBOR to concern panel banks' actual London borrowing costs has no claim because it is undisputed that there was no persistent suppression relative to those costs (and thus those lenders were not misled).[27] *See UFCW Local 1776 v. Eli Lilly*

---

[25] *See LIBOR IV*, 2015 WL 6243526, at *67 (assessing reliance requires, at a minimum, consideration of (1) "each particular plaintiff's reasons for investing in LIBOR-based instruments," (2) "the alternatives available to each particular plaintiff," (3) "each particular plaintiff's ability to investigate the possibility of LIBOR manipulation," and (4) "how much credence a reasonable investor would have lent to new articles criticizing LIBOR").

[26] Moreover, LIBOR-linked loan transactions between a class member and a panel bank raise additional individualized issues based on the contractual language in the parties' agreements, including non-reliance clauses.
[27] ███████████████████████████████████████████████████████

& *Co.*, 620 F.3d 121, 135 (2d Cir. 2010) (reversing class certification order because "some [absent class members] were not misled," making "general proof of but-for causation impossible").

Furthermore, that each class member incorporated LIBOR into its loan instruments does not mean that it did so in reliance on LIBOR's ***accuracy***. As this Court has noted, the individualized factors relevant to determining reliance include "each particular plaintiff's reason for investing in LIBOR-based instruments." *LIBOR IV*, 2015 WL 6243526, at *67 (S.D.N.Y. Oct. 20, 2015). Determining what those reasons were for each lender requires individualized inquiries because Plaintiffs have identified no common evidence to recreate their negotiations for every loan. For example, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[28] As another example of lack of reliance, a bank that was LIBOR-neutral might be indifferent to whether LIBOR is precisely accurate, because changes in LIBOR have no net effect on such a bank.[29]

Moreover, Plaintiffs' argument only relates to the question of whether each class member ***actually*** relied on an accurate LIBOR and says nothing about whether or when that reliance was ***reasonable*** in light of public reports of alleged LIBOR manipulation. Failure to show on a classwide basis that lenders reasonably relied on LIBOR's accuracy is fatal to Plaintiffs' class certification motion. *See, e.g.*, *N.J. Carpenters Health Fund v. Residential Capital*, 272 F.R.D. 160, 170 (S.D.N.Y. 2011) (holding individualized issues "predominate over the common issues" where "[t]he proposed class would . . . include investors with different levels of knowledge").

---

[28] █████████████████████████████████████████████████████████████

[29] Nor can any presumption of reliance overcome the necessity of individualized inquiries into reliance such as with Berkshire above. In New York (as well as other jurisdictions), no presumption of reliance applies to common law fraud claims. *Int'l Fund Mgmt. v. Citigroup*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011); *see also, e.g., Gasperoni v. Metabolife, Int'l*, 2000 WL 33365948, at *6 (E.D. Mich. Sept. 27, 2000) (applying Michigan law).

Berkshire's facts are instructive. Under New York law, where "[c]ircumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations," the plaintiff "must make additional inquiry to determine [the representations'] accuracy." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (citation omitted). █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ It was thus Berkshire's own oversight and lack of investigation that caused it to ignore reports of LIBOR manipulation, and any reliance it may have had on LIBOR's accuracy was therefore unreasonable. At a minimum, this raises a fact issue specific to Berkshire that would need to be resolved at trial. Adjudicating such issues classwide across thousands of lending institutions is impossible. *See Schlaifer Nance*, 119 F.3d at 98 ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.").

Indeed, issues of reliance are particularly acute among Plaintiffs given that many were sophisticated institutions that actively participated in LIBOR-based lending markets,[31] including

---

[30] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[31] *See LIBOR V*, 2015 WL 6696407, at *11 ("Our doubts about the reasonableness of reliance are even stronger as to the Lender Plaintiffs than in other contexts, especially for mortgages that the Lenders themselves issued.").

some who lent directly to panel banks.[32]  Sophisticated institutions such as Goldman Sachs had no

need to rely on the accuracy of LIBOR submissions since they would have known whether LIBOR

was diverging from the lending markets.  Where, as will often be the case with Plaintiffs,

"sophisticated businessmen engaged in major transactions enjoy access to critical information but fail

to take advantage of that access, New York courts are particularly disinclined to entertain claims of

justifiable reliance."  *Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 737 (2d Cir. 1984).[33]

      Nor have Plaintiffs put forward any classwide proof of reliance as to the subset of lenders that

purchased LIBOR-based loans on the secondary market.  Although this Court previously suggested

that reliance might be more reasonable if "the secondary mortgage market was so dominated by

LIBOR-based loans that it would have been difficult in practice for the plaintiffs to restrict their

investments to non-LIBOR-based loans," *LIBOR V*, 2015 WL 6696407, at *11, Plaintiffs offer no

evidence that this was the case.  To the contrary, ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████  There is accordingly nothing to suggest that LIBOR-based loan purchasers were

limited to investing in LIBOR-based loans.

      **Statutes of Limitations.**  The viability of each putative class member's claims under state

statutes of limitations will also turn on individualized questions of knowledge and inquiry notice.  As

this Court noted in its opinion on Defendants' motion to strike Plaintiffs' class allegations, "the

statute of limitations issue will likely prove a difficult hurdle for the Lender Plaintiffs to clear."  Sept.

20, 2016 Order, ECF 1574, at 5.  Yet the phrase "statute of limitations" does not even appear in

Plaintiffs' class certification brief, nor is it addressed in Plaintiffs' expert reports.  Plaintiffs have put

---

[32] *See* Willig Rpt., Ex. 3 at App. 3 (████████████████████████████████████████████████).
[33] *See also Emergent Capital Inv. Mgmt. v. Stonepath Grp.*, 343 F.3d 189, 195 (2d Cir. 2003) (determining whether reliance is reasonable requires "consider[ing] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them").

forward **no** evidence to support the notion that statute-of-limitations issues can be resolved classwide through common evidence.  Nor can they.  Whether, and to what extent, a lender's claim is time-barred will depend on when that particular class member was placed on actual or inquiry notice of its alleged harm, which turns on various individualized issues, including when the entity actually learned of alleged LIBOR manipulation, what it did to inquire, and whether the timing and extent of its inquiry were reasonable based on its individual circumstances, including the institution's sophistication and access to information. As this Court has observed, these are fact-specific issues that depend on the particular plaintiffs at issue.[34]

One basic individualized question is whether particular lenders suspected LIBOR suppression before publication of the May 29, 2008 *Wall Street Journal* article that this Court identified as placing many plaintiffs on inquiry notice.  Some putative class members may have suspected LIBOR suppression well in advance of that article, either because (1) they lent money to a LIBOR panel bank and noticed what they believed was a discrepancy between that panel bank's borrowing rate and its LIBOR submission; (2) they reviewed prior articles that called attention to LIBOR's divergence from other rates during this period[35]; or (3) they conducted their own investigation into LIBOR suppression based on their own observations of rate movements.[36] Plaintiffs do not explain how their class can be certified despite such individualized issues.

**Mitigation of Damages.**  Whether a putative class member fulfilled its duty to mitigate damages also presents individualized issues.  Although state law varies as to the specifics, a plaintiff typically must mitigate fraud damages upon becoming actually or constructively aware of the alleged

---

[34] *See, e.g.*, *LIBOR IV*, 2015 WL 6243526, at *165 (observing that "[i]t is difficult to believe that an institutional entity tasked with purchasing and guaranteeing residential mortgages did not inform itself of readily available information regarding a critical ingredient of many of the adjustable-rate mortgages in its portfolio").

[35] *See LIBOR I*, 935 F. Supp. 2d 666, 701-05 (S.D.N.Y. 2013) (identifying news articles suggesting LIBOR was being manipulated).

[36] Kelley Rpt., Ex. 1 ¶ 18 (███████████████████████████████████████████).

misrepresentation.  *See* Restatement (Second) of Torts § 918 (1979); *see also Trepel v. Dippold*, 2006 WL 3054336, at \*7 (S.D.N.Y. Oct. 27, 2006).  This duty to mitigate damages affects not only the amount of particular lenders' damages, but also whether they suffered any injury at all.  For example, if a lender became actually or constructively aware of alleged manipulation before its loan began paying a LIBOR-based rate (for example because the loan(s) had initial fixed-rate periods), the lender would have had a duty to avoid or mitigate its injury if reasonable under the circumstances, such as by entering into an offsetting transaction or selling the loan before the LIBOR-based rate went into effect.  In such circumstances, the lender may not have suffered any loss at all on its LIBOR-based loan.  As this Court has recognized, mitigation of damages "undoubtedly" raises "individual issues."  Sept. 20, 2016 Order, ECF 1574, at 5-6.  Plaintiffs do not contend otherwise.

### III. Plaintiffs Have Failed to Meet Their Burden to Prove that a Class Action Would Be Manageable in Light of Variations in State Law

#### A. Plaintiffs Ignore Numerous Material Variations in State Fraud Law

Plaintiffs seek to assert a class action on behalf of a diverse collection of lending institutions in all 50 states as well as U.S. territories.  Accordingly, under Rule 23(b)(3), Plaintiffs bear "the burden of showing 'through an extensive analysis of state law variances, that class certification does not present insuperable obstacles.'"  *Id.* at 3 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013)).[37]  Plaintiffs have failed to carry that burden.

In its motion to strike opinion, this Court cautioned Plaintiffs that "defendants' submissions certainly suggest that material differences exist between state fraud laws and that proving predominance and superiority will be challenging."  Sept. 20, 2016 Op. at 3.[38]  Plaintiffs leave these

---

[37] *See also Oscar v. BMW of N. Am.*, 274 F.R.D. 498, 509 (S.D.N.Y. 2011); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 71 n.59 (S.D.N.Y. 2002) (noting that the "'extensive analysis' often include[s] model jury instructions and verdicts forms, as well as an attempt to group state laws by their relevant differences" (citations omitted)).

[38] *See also, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004) (finding that "courts routinely deny class certification" where application of all 50 states' laws is required); *Lewis Tree Serv. v. Lucent Techs.*, 211 F.R.D. 228, 236 (S.D.N.Y. 2002).

concerns wholly unaddressed, instead providing only a superficial recitation of the elements of state fraud laws in Appendix A of their class certification brief, and offering the conclusory and unsupported assertion that "there are no material differences between the fraud laws of the various states."[39]  Tellingly, some of the cases Plaintiffs themselves cite expressly note material variations in state law.[40]  Moreover, Plaintiffs simply ignore the many variations in state law that Defendants previously identified in letters to the Court.  *See* ECF 1398; ECF 1450.

**Reliance.**  States have differing rules as to the nature and extent of the information that would trigger a plaintiff's duty to investigate for purposes of determining whether the plaintiff's reliance on a misrepresentation is reasonable.  For example, Ohio imposes a duty on the plaintiff to investigate an alleged misrepresentation if a "person of ordinary care" would do so.  *Niermeyer v. Cook's Termite & Pest Control*, 2006 WL 330099, at *6 (Ohio Ct. App. Feb. 14, 2006).  Utah imposes a duty to investigate only if the need for an investigation is apparent to someone of plaintiff's "knowledge and intelligence" or if the plaintiff has been "warn[ed] that he is being deceived." *Conder v. A.L. Williams & Assocs.*, 739 P.2d 634, 638 (Utah Ct. App. 1987).  And Arizona appears to preclude reasonable reliance when a misrepresentation is "obviously false." *Dawson v. Withycombe*, 216 Ariz. 84, 98 (Ct. App. 2007).

Each of these standards requires materially different jury instructions and could yield

---

[39] The cases Plaintiffs cite in support of their argument are distinguishable because they (1) do not involve common law fraud, *In re U.S. Foodservice*, 729 F.3d at 115; (2) only address fraud laws across a handful of states, *Ebin v. Kangadis Food*, 297 F.R.D. 561, 570 (S.D.N.Y. 2014); (3) do not actually decide the issue in plaintiffs' favor, *Maywalt v. Parker & Parsley Petroleum*, 147 F.R.D. 51, 58 (S.D.N.Y. 1993) (declining to conclusively determine whether certification was appropriate given uncertainty about which substantive law would govern the adjudication of pendent state law claims); or (4) do not discuss most or all of the variances in state common law fraud relevant to this case, *see Spencer v. Hartford Fin. Servs. Grp.*, 256 F.R.D. 284, 301 (D. Conn. 2009) (comparing only differences in burden of proof and between "reasonable" and "justifiable" reliance); *Kassover v. Coeur D'Alene Mines*, 1992 WL 509995, at *4 (D. Idaho Sept. 2, 1992) (not addressing any of the differences in state law relevant to this case).

[40] For example, in *Gross v. Sussex Inc.*, 630 A.2d 1156, 1161 (Md. 1993), the Maryland Supreme Court expressly distinguishes Maryland's standard of reasonable reliance from the standard applicable in Maine.  And in *Cornell v. Wunschel*, 408 N.W.2d 369, 381-82 (Iowa 1987), the Iowa Supreme Court catalogs the different approaches to determining common law fraud damages taken by different states.

different outcomes in this case. For example, this Court has held that a reasonable person may very well, but would not necessarily, investigate the accuracy of LIBOR after the publication of an article questioning the accuracy of LIBOR. *See LIBOR IV*, 2015 WL 6243526, at *67. A lender of more sophisticated "knowledge and intelligence," however, would be more likely to undertake such an investigation, and may even do so before the publication of articles questioning LIBOR's accuracy. *See id.* at *165. On the other hand, a person would be less likely to undertake an investigation if required to do so only if LIBOR was "obviously false."

**Statutes of Limitations and Inquiry Notice.** As this Court already outlined in *LIBOR IV*, state fraud statutes of limitations apply to different time periods and apply different inquiry notice rules for accrual of the statute of limitations. *See id.*, at *126-38. As a result, the Court will be required to undertake a state-by-state analysis to determine, among other things:

- Standards for inquiry notice, which not only vary by state but sometimes include state-specific exceptions, such as California's rule regarding the use of news articles to establish inquiry notice, *see id.* at *127.

- Whether a state would apply *American Pipe* tolling to toll a class member's applicable statute of limitations in a suit filed in federal court (so-called "cross-jurisdictional tolling"), a question on which "[s]tates are split," *id.* at *139.

**Damages.** Damages methodologies for fraud claims also vary by state. Although the majority rule is that a fraud plaintiff is entitled to recover "benefit of the bargain" damages, *i.e.*, damages based on what the parties' contract ***would have*** yielded absent the fraud,[41] a significant minority of states (including Berkshire's home state of New York) apply an "out of pocket loss" rule that limits a plaintiff's recovery to the amount that would return them to the same position they were

---

[41] *Smokler v. New Women*, 1986 WL 4903, at *6 (S.D.N.Y. 1986) (contrasting New York rule with "numerous other states [that] use the 'benefit of the bargain' measure of damages, which provides for damages which, in effect, 'track' contract damages").

in ***before*** the transaction in question.[42]  Another group of states applies the so-called Restatement

approach, which requires an individualized inquiry into the circumstances surrounding an alleged

fraud to determine a fair and equitable damages award.[43]

The application of these damages rules impacts not only the amount of damages but also

whether a plaintiff can recover at all.  For example, plaintiffs subject to an "out of pocket loss" rule

would often have no damages to claim, as they may have been better off with their LIBOR-based

loan than if they had never entered into the transaction.  *See, e.g.*, *Stout v. Turney*, 586 P.2d 1228,

1234-35 (Cal. 1978) (holding plaintiff suffered no out-of-pocket loss unless he paid more than the

value of what he received); *Morasch v. Hood*, 222 P.3d 1125, 1130 (Ore. Ct. App. 2009) (same).[44]

## B.      Subclasses Cannot Resolve These Issues of State-Law Variations

There is no feasible manner of subdividing claims by state so as to remedy the manageability

concerns raised by differences in state fraud laws.[45]  Whereas a certain group of states may overlap

on certain elements at issue, they may diverge on others.  For example, this Court has held that

Virginia, Washington, D.C., New Jersey, and Pennsylvania all apply a form of "weak" inquiry notice

rule, rather than one of the several other accrual rules identified in *LIBOR IV*, 2015 WL 6243526, at

---

[42] *See, e.g.*, *LIBOR V*, 2015 WL 6696407, at *11 n.19.  Moreover, certain states that sometimes apply the benefit-of-the-bargain rule will refuse to apply it in third-party fraud cases like this one.  *See, e.g.*, *Beverly Hills Surgery Ctr. v. Cigna HealthCare of Cal.*, 2014 WL 12560691, at *4 (C.D. Cal. Aug. 14, 2014).

[43] *See, e.g.*, Restatement (Second) of Torts § 549; *Nordyne, Inc. v. Fla. Mobile HomeSupply*, 625 So. 2d 1283, 1286 (Fla. Dist. Ct. App. 1993).

[44] In addition to the variations in state law described above, Plaintiffs' claims may also vary based on the choice-of-law clauses contained in their contracts.  Under New York law, for example, under a theory of "direct benefits estoppel," the defendant may estop the plaintiff from asserting tort claims under the law of a jurisdiction other than the law reflected in the plaintiff's contract that forms the basis for its suit.  *See Bausch & Lomb Inc. v. Mimetogen Pharm.*, 2016 WL 2622013, at *7 (W.D.N.Y. May 5, 2016) (estopping plaintiff from asserting tortious interference with contract claim against third party based on state law other than that reflected in the contract).  This raises a host of individualized issues, as it requires a review of the choice of law clause in each plaintiff's loan contracts to determine which state's (or foreign country's) law(s) should apply as well as an analysis of those jurisdictions' laws.

[45] *See Kaczmarek v. IBM*, 186 F.R.D. 307, 312 (S.D.N.Y. 1999) (rejecting subclasses because "if the litigation were so subdivided, it would be unmanageable"); *see also* Manual for Complex Litigation § 21.23, at 272 (2004) ("The creation of a number of subclasses may . . . make the case unmanageable").

\*126-38.  But those states have different statutes of limitations,[46] standards for reasonable reliance,[47] and methodologies for determining damages.[48]  Creating subclasses consisting only of states that are alike as to every element is not possible.[49]

## IV.    Berkshire Is Not an Adequate Class Representative

Defendants have learned through discovery that one of the attorneys representing Berkshire in this case, Mordchai Krausz, is the son of Berkshire's CEO Moses Krausz.  *See* Berkshire 2012 Engagement Letter ("2012 Letter"), Ex. 16; Berkshire 2016 Engagement Letter ("2016 Letter"), Ex. 17; Lukens Dep., Ex. 7 at 294:14-295:6; 305:18-306:4.  This representation renders Berkshire an inadequate class representative under Rule 23(a)(4) because it gives Berkshire an incentive to make decisions on behalf of the class that benefit Mordchai Krausz rather than the class as a whole.

A plaintiff "cannot fairly and adequately represent the interests of the putative class" where "there is a potential conflict of interest between [the plaintiff's] duties to the prospective class" and a family member's "contingent financial interest in the fees, if any, obtained by the law firm proposed to represent the class."  *Hale v. Citibank*, 198 F.R.D. 606, 607 (S.D.N.Y. 2001).[50]  That is the case

---

[46] *See* Va. Code Ann.§ 8.01-243 (two-year limitations period for fraud claims); D.C. Code § 12-301 (three years); N.J. S.A. 2A: 14-l (six years); 42 Pa. Cons. Stat. Ann. § 5524 (two years).

[47] Pennsylvania may require no investigation. *Toy v. Metro. Life Ins.*, 928 A.2d 186, 207 (Pa. 2007).  D.C. requires that the plaintiff take advantage of "an adequate opportunity to conduct an independent investigation."  *In re Estate of McKenney*, 953 A.2d 336 (D.C. 2008).  In New Jersey, a plaintiff cannot claim reasonable reliance on an alleged misrepresentation when it chooses to undertake its own independent analysis and relies on it.  *Byrne v. Weichert Realtors*, 675 A.2d 235, 241 (N.J. App. Div. 1996).  Virginia requires an investigation if that is what the "reasonable and prudent man under the particular circumstances" would have done.  *Schur v. Sprenkle*, 2012 WL 7985730, at \*2 (Va. Cir. Ct. 2012).

[48] Pennsylvania limits any recovery to out-of-pocket losses.  *Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 567 (E.D. Pa. 1996).  D.C. does as well, except in "rare cases where necessary to effect justice." *Dresser v. Sunderland Apartments Tenants Ass'n*, 465 A.2d 835, 840 (D.C. 1983).  By contrast, Virginia and New Jersey permit recovery of benefit-of-the-bargain damages in certain instances.  *See Klaiber v. Freemason Assoc.*, 587 S.E.2d 555, 558-59 (Va. 2003); *McConkey v. AON Corp.*, 804 A.2d 572, 588-89 (N.J. Super. 2002).

[49] Even if subclasses were feasible, Berkshire cannot serve as a "representative plaintiff[]" for any non-New York subclass.  *See Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

[50] *See also Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) (holding it improper for class representative to be the son-in-law of class counsel); *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155-56 (S.D.N.Y. 2015) (finding that where there is a close business or personal relationship between class representative and class counsel, "courts are concerned that . . . [the class representative] may permit a settlement less favorable to the interests of absent class

here, 

.[51]  Indeed, the case for Berkshire's inadequacy as a class representative is particularly

compelling, as it does not appear that Mr. Krausz has performed any meaningful work in this case,

.  Mr. Krausz has not filed a

notice of appearance, nor has he ever been included in any communications with defense counsel.

Moreover, even though Mr. Krausz has ostensibly been involved in this litigation since its

outset, *see* 2012 Letter, Ex. 16, neither his representation of Berkshire nor his relationship with its

CEO was disclosed by Plaintiffs as part of Pomerantz's application to serve as class counsel or

otherwise.  *See* ECF Nos. 644-46 (Sept. 15, 2014 Mot. for Appoint. of Interim Class Counsel, Mem.

of Law, and Decl.).  Instead, these facts were only uncovered by Defendants through discovery.  That

is telling and militates further in favor of holding Berkshire inadequate to represent the class.[52]  At

this stage, moreover, over five years into the litigation and after extensive discovery and briefing,

Berkshire's inadequacy cannot be remediated and mandates denial of class certification.[53]

---

members").

[51]

[52] *See In re IMAX*, 272 F.R.D. at 155-56 (denying appointment of class representative where entity failed to disclose that, in addition to the lead counsel appointed by the Court, it was also represented by an attorney with whom it had a close business and personal relationship); *Gordon v. Sonar Capital Mgmt.*, 92 F. Supp. 3d 193 (S.D.N.Y. 2015) (finding that class representative's failure to disclose that he was being represented by attorney who was his "longtime family attorney and cousin by marriage" "creates, at a minimum, the appearance of impropriety").

[53] Berkshire's inadequacy cannot be remedied by merely disqualifying Mordchai Krausz as class counsel.  Even if Mordchai Krausz were disqualified from representing Berkshire in this case, the conflict would remain,

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied with prejudice.

Dated: June 30, 2017

Respectfully submitted,

/s/  Arthur J. Burke
Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
Patrick W. Blakemore
Peter J. Davis
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
patrick.blakemore@davispolk.com
peter.davis@davispolk.com

*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

/s/  Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
Taylor M. Steffan
Benjamin L. Cavataro
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com
tsteffan@cov.com
bcavataro@cov.com

/s/  Lev Dassin
Lev Dassin
Jonathan S. Kolodner
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
ldassin@cgsh.com
jkolodner@cgsh.com

*Attorneys for Defendants Citibank, N.A. and*
*Citigroup Inc.*

/s/  Abram J. Ellis
Thomas C. Rice
Paul C. Gluckow
Alan C. Turner
Omari L. Mason
Alexander Li
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
pgluckow@stblaw.com
aturner@stblaw.com
omason@stblaw.com
zander.li@stblaw.com

Abram J. Ellis
900 G Street NW
Washington, D.C. 20001
Telephone:  (202) 636-5500
Fax:  (202) 636-5502
aellis@stblaw.com

*Attorneys for Defendants JPMorgan Chase &*
*Co. and JPMorgan Chase Bank, N.A.*

/s/  Peter Sullivan
Peter Sullivan
Eric J. Stock
Jefferson E. Bell
Matthew Greenfield
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com
mgreenfield@gibsondunn.com

*Attorneys for Defendants UBS AG*



**All US Banks
LIBOR v. Net Interest Margin**
2007 – 2010