# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262<br>Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | |
| METZLER INVESTMENT GmbH, et al.,<br>                    Plaintiffs,<br>          v.<br>CREDIT SUISSE GROUP AG, et al.,<br>                    Defendants. | No. 11-cv-2613 |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al.,<br>                    Plaintiffs,<br>          v.<br>CREDIT SUISSE AG, et al.,<br>                    Defendants. | No. 11-cv-5450 |
| THE BERKSHIRE BANK, et al.,<br>                    Plaintiffs,<br>          v.<br>BANK OF AMERICA CORP., et al.,<br>                    Defendants. | No. 12-cv-5723<br><br>**ORAL ARGUMENT REQUESTED** |

# DEFENDANTS' JOINT MEMORANDUM ON "UPSTREAM" ISSUES IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND FACTS PERTINENT TO UPSTREAM ISSUES ............................ 4

ARGUMENT ............................................................................................................. 5

I.   PROOF OF WHETHER EACH INDIVIDUAL SUBMISSION WAS BELOW
     THAT PANEL BANK'S LONDON INTERBANK BORROWING COSTS IS
     NOT COMMON. ................................................................................................ 6

     A.   The Panel Banks' London Interbank Borrowing Transactions Show That
          There Is No Common Proof That Each Bank's LIBOR Submissions Were
          Suppressed. ........................................................................................... 6

          1.   The London Interbank Borrowing Transactions Are Highly
               Relevant to the LIBOR Question. .................................................. 6

          2.   The London Interbank Borrowing Transactions Provide
               Individualized Refutations of Plaintiffs' Theory of Suppression. ............. 9

          3.   Plaintiffs' Attacks on the London Interbank Borrowing
               Transaction Data Are Without Merit and Cannot Diminish the
               Data's Role ...................................................................................... 10

     B.   Other Evidence For Testing Whether A Submission Was Low Will Be
          Submission-Specific. .......................................................................... 16

II.  PLAINTIFFS' PROPOSED COMMON EVIDENCE OF SUPPRESSION IS
     UNRELIABLE AND CANNOT PRECLUDE INDIVIDUALIZED DEFENSES......... 17

     A.   Plaintiffs' Statistical Models Of Purported Suppression Are Unreliable. ............ 17

          1.   Plaintiffs' Models Persistently Generate False Positives.......................... 17

          2.   Plaintiffs' Models Are Not Specific to the Panel Banks' Costs. .............. 19

          3.   Plaintiffs Mischaracterize the Data Upon Which Their Models
               Rely. ................................................................................................ 20

          4.   Plaintiffs' Models Rely Upon Sparse Transactional Data, if any. ............ 21

          5.   Prof. Webb's Models Are Unreliable for Additional Reasons. ................ 21

     B.   The Non-Statistical Evidence Cannot Constitute Reliable Common
          Evidence That The Panel Banks Persistently Suppressed LIBOR. ...................... 21

# TABLE OF CONTENTS

Page

      1.    Government Investigations Do Not Provide Common Evidence of Suppression. ............................................................................................. 22

      2.    Contemporaneous Business Documents Do Not Provide Common Evidence of Suppression. ....................................................................... 23

III.    THE DISTINCTION BETWEEN COLLUSIVE AND UNILATERAL CONDUCT REVEALS OTHER FLAWS IN PLAINTIFFS' THEORIES. ................... 24

    A.    Plaintiffs' Theories Of Collusion Are Vague And Unsupported. ......................... 25

      1.    Plaintiffs Fail to Define the Alleged Conspiracy. ..................................... 25

      2.    Plaintiffs Offer No Reliable Evidence of an Alleged Over-Arching Conspiracy. ............................................................................................. 26

      3.    Plaintiffs' Models Fail to Isolate the Effects of Collusion, if any. ........... 32

    B.    Under Plaintiffs' Unilateral Theories Of Suppression, There Is No Reliable Common Evidence That The LIBOR Rate Was Reduced. .................... 33

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Interco Inc.*,
719 F.2d 23 (2d Cir. 1983)..................................................................33

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)............................................................................34

*Andrews v. Metro N. Commuter R.R.*,
882 F.2d 705 (2d Cir. 1989)...................................................................8

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
2008 WL 9358563 (N.D. Ga. Apr. 23, 2008) ........................................22

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ...........................................................17, 32, 34

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006)................................................................10

*In re AIG, Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012)..................................................................6

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)........................................25

*In re Currency Conversion Fee Antitrust Litig.*,
224 F.R.D. 555 (S.D.N.Y. 2004) .........................................................25

*In re EPDM Antitrust Litig.*,
256 F.R.D. 82 (D. Conn. 2009)............................................................25

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008)..........................................6

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)..................................................................25

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*")..............................33

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*")......................22, 26, 27

# TABLE OF AUTHORITIES

<u>Page</u>

*In re LIBOR-Based Financial Instruments Antitrust Litig*,
  2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) ("*LIBOR V*")......................................................4

*In re Plastics Additives Antitrust Litig.*,
  2006 WL 6172035 (E.D. Pa. Aug. 31, 2006) ...........................................................................26

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................................................22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013).........................................................................................17, 18

*Kendler v. Federated Dep't Stores Inc.*,
  88 F.R.D. 688 (S.D.N.Y. 1981) ...............................................................................................26

*Laumann v. Nat'l Hockey League*,
  117 F. Supp. 3d 299 (S.D.N.Y. 2015)......................................................................................32

*McLaughlin v. Am. Tob. Co.*,
  522 F.3d 215 (2d Cir. 2008)............................................................................................10, 32

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)....................................................................................................6

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................................................35

*United States v. Anthem, Inc.*,
  2017 WL 685563 (D.D.C. Feb. 21, 2017) ................................................................................5

Defendants[1] submit this Opposition addressing "upstream" issues[2] relevant to class certification in the OTC, Exchange-Based and Lender putative class actions.

## PRELIMINARY STATEMENT

The upstream analysis introduces two core individualized issues—one going to suppression and one going to collusion—facing each of the putative classes.  Under Rule 23(b)(3), these grounds preclude class certification and, especially when combined with the additional individualized downstream issues, confirm that individualized issues will overwhelm any common issues and render these putative class actions unmanageable.

Any persistent suppression claim first requires common proof that LIBOR submissions were, in fact, persistently suppressed relative to the proper measure of the reasonable range of submissions.  But determining whether a particular submission was low must be based on evidence specific to that submission.  A class member asserting a claim that it received an improperly low LIBOR-based payment cannot sustain that claim by relying on evidence that a submission was low on some other day or for some other tenor.

In determining whether each of the *tens of thousands* of submissions at issue was too low to be reasonable, it is plainly relevant to test a panel bank's submission against its actual borrowing costs for that day and tenor in the London Interbank Borrowing ("LIB") market.  For years, all Plaintiffs maintained that, in answering the LIBOR question each day, a panel bank should have submitted a rate that reflected its LIB costs.  Their complaints, other pleadings, oral

---

[1] Each Defendant facing persistent suppression claims joins this brief in full, except as noted in the signature block which identifies each action, if any, as to which a Defendant is not joining this brief.

[2] The upstream issues concern the setting of LIBOR each day, and include Plaintiffs' lack of any reliable common evidence that LIBOR was persistently or collusively suppressed across the thousands of discrete daily submissions during the proposed Class Periods.  The "downstream" issues, which focus on whether persistent suppression of LIBOR, if any, would have injured all or nearly all class members, and several other class-specific issues, are addressed in Defendants' separate Oppositions in each of the three putative class actions.

arguments, and discovery positions are replete with such references.  Rightly so—the LIBOR question asks the rate at which a panel bank could borrow if it were to ask for *and accept* an offer in the LIB market just before 11:00 a.m. London time.  A bank's actual LIB costs—the rates at which it did borrow—are the best evidence of the rate at which it could borrow and the rate it would accept at the relevant time.

But, once they received the banks' voluminous LIB data in discovery, all Plaintiffs did a 180-degree reversal on the crucial question of how a class member would show that LIBOR was suppressed on the specific date(s) and for the specific tenor(s) involved in its LIBOR-based transactions.  That data showed the impossibility of using common evidence to prove that panel banks persistently suppressed their LIBOR submissions during the Class Periods.  The vast majority of the panel banks' LIBOR submissions were *at or above* their LIB costs for transactions that can be matched with their LIBOR submissions.  No Plaintiff disputes that math.  Submissions below LIB costs were few, isolated, episodic, and exhibited no discernible pattern, thereby requiring individualized inquiry into the circumstances surrounding each allegedly "low" submission.  In response to this revelation, Plaintiffs now disavow their prior positions and insist that, in answering the daily LIBOR question, a panel bank's actual LIB costs are "irrelevant."

They are wrong.  The wording of the LIBOR question, instructions from the current and former LIBOR administrators, the views of U.S. and U.K. authorities, and many of Plaintiffs' own fact and expert witnesses confirm the critical role of actual LIB costs.  Beyond the LIB data, numerous individualized factors, such as a submitter's intentions and any pertinent developments prior to that day's submission, also would need to be considered.  This analysis, which includes the bank's subjective views of many aspects of market activity, would be highly individualized

by bank and unique to each tenor of each day.  Because not all Plaintiffs have an interest in each

tenor for each day,[3] that analysis is also—by definition—not common and not class-wide.

As to the second requirement, no common evidence connects any "low" submissions to

any common conspiracy.[4]  As a threshold matter, Plaintiffs cannot articulate any coherent over-

arching conspiracy.  In most antitrust or other price-related conspiracy cases, plaintiffs allege a

conspiracy with some specific agreed term, *e.g.*, raising prices by 10% or imposing a specific

new charge.  Often, common evidence can test whether the conspiracy occurred and did, in fact,

raise prices by 10%, etc.  Plaintiffs articulate no such conspiracy here, nor could they.  They

cannot prove a scheme to persistently suppress by some pre-set amount because their own

models find that any purported suppression varied widely by day, tenor, and bank.  They cannot

prove a scheme to stabilize LIBOR itself, because LIBOR fluctuated violently during the Class

Periods.  They cannot prove a plan to align submissions because the submissions were *ten times

more* dispersed from bank to bank in the Class Periods, compared to earlier years.

After many multi-year investigations in several countries, with extensive discovery, no

government authority even claims to have found any evidence of a multi-bank (much less a 16-

bank) conspiracy to suppress LIBOR.  Now, after the receipt of "four million documents and

100,000 audio tapes," ECF 1851 at 1, and other discovery, Plaintiffs can do no better.  Neither

---

[3] A lender, bondholder, or swapholder must prove suppression on the specific date(s) used in calculating the floating interest rate on its particular LIBOR-linked instrument(s). Such date(s) will often consist of the specific reset date(s) for the particular instrument(s) and will vary based on the contract terms regarding interest rate resets. An Exchange Plaintiff must prove suppression on the date(s) that the Plaintiff's instrument(s) settled. None of those dates are necessarily common to members of each class, and indeed the interest of putative class members within each class is highly differentiated.

[4] Plaintiffs' causes of action have somewhat different elements, but as applied to the persistent suppression theory, they all require proof of at least these facts for each of the relevant banks, days, and tenors:  (1) actual suppression of the submission(s), (2) a resulting reduction in LIBOR, and (3) an element of wrongfulness, such as collusion or scienter/intent.

they nor their six experts can point to any communication remotely evidencing such a broad conspiracy.

Unable to articulate, much less document, any specific over-arching scheme, Plaintiffs instead contend that some banks sometimes agreed to reduce submissions for some tenors by some unspecified amount.  Plaintiffs propose nothing more than an ill-defined series of mini-conspiracies requiring bank-, day-, and tenor-specific evidence to determine the existence of a conspiracy for any given bank, day, and tenor of LIBOR—a necessarily individualized task.

Absent a viable class-wide collusion theory, Plaintiffs are left with the unilateral conduct of 16 panel banks.  That requires separate analyses of not only the submissions and conduct of individual banks, but also the LIBOR process, in which half of the submissions are excluded in calculating the average.  Each of these steps requires a bank-by-bank, day-by-day, tenor-by-tenor determination of whether and to what degree any individual bank's submission (even if improperly suppressed) changed the resulting LIBOR rate.

## BACKGROUND FACTS PERTINENT TO UPSTREAM ISSUES

For each business day of the various Class Periods, each of the 16 panel banks made submissions in 2 to 15 tenors.  For each of those 16,864 (OTC), 167,920 (Exchange) and 171,296 (Lender) separate submissions at issue here,[5] a panel bank was directed to estimate its own "cost of funds in the interbank market," BBA Report, June 2008, Ex. 29[6] at ¶ 12.2, not that of banks generally.  Each panel bank reported "the rate at which [it] … could borrow funds, were

---

[5] The broad range stems from the longer Class Periods and greater number of tenors alleged by Exchange and Lender Plaintiffs.  OTC Plaintiffs assert claims for 527 days from August 2007 - August 31, 2009 for two tenors (1-month and 3-month).  Willig OTC Rpt., Ex. 1 at 31, n.46.  Exchange Plaintiffs assert claims for all tenors for 701 days from August 2007 - May 17, 2010.  Willig Exchange Rpt., Ex. 5 at 31, n.48.  Lender Plaintiffs assert claims for 715 days from August 2007 - May 31, 2010.  Willig Lender Rpt., Ex. 3 at 32, n.46.  The claims for August 1-8, 2007 are improper.  *In re LIBOR-Based Financial Instruments Antitrust Litig*, 2015 WL 6696407, at *3 (S.D.N.Y. Nov. 3, 2015) ("*LIBOR V*").

[6] All exhibit numbers refer to the exhibits to the Heine Declaration, unless otherwise noted.

it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time." *Id*. (the "LIBOR question").

Plaintiffs do not submit any reliable common proof of persistent suppression.  Instead, Plaintiffs' experts offer incorrect interpretations of the LIBOR question and propose various alternative benchmarks for estimating what LIBOR "should" have been.  In response, Defendants submit the expert reports of Prof. Robert Willig, who has been a Professor of Economics and Public Affairs (now Emeritus) at Princeton since 1978.[7]  Through detailed analyses of the evidence, particularly each panel bank's extensive LIB transactions, Prof. Willig demonstrates that common evidence cannot show that each panel bank persistently suppressed its submissions, that LIBOR was thereby suppressed, or that any suppression resulted from collusion.  Instead, each issue must be addressed primarily with evidence specific to each plaintiff and transaction in question.

## ARGUMENT

The upstream issues are overwhelmingly individualized.  An individual plaintiff has a claim for suppression only on the specific days and tenors that impacted its transactions.  The date(s) for which a plaintiff needs to prove suppression vary depending on the particular instrument(s) held by the plaintiff.  Moreover, on the non-joint and several liability claims, a plaintiff has a claim only for any reduction in LIBOR caused by an individual panel bank.  If a

---

[7] Among his many other credentials, Prof. Willig has authored more than 80 articles and two books on economics. He has served on the editorial boards of three economics journals.  He was the Chief Economist of the Antitrust Division of the Department of Justice from 1989-1991.  OTC Plaintiffs' attack on his credentials is misplaced, as they support it by quoting a court's criticism of another expert, Dr. Mark Israel.  OTC Br. 24, n.65 (misrepresenting *United States v. Anthem, Inc.*, 2017 WL 685563, at *53 n.42 (D.D.C. Feb. 21, 2017)).

plaintiff brought an individual claim based on transactions on specific days, it would need to prove that LIBOR was wrongfully suppressed on the specific days linked to that transaction. That principle does not change merely because the plaintiff is part of a class.

Thus, the nature of LIBOR submissions here contrasts with the conspiracy cases upon which Plaintiffs rely.  Whether or not a submission was "low," whether that submission affected the LIBOR rate, and whether it was suppressed due to some wrongful conduct are all questions addressed through evidence largely specific to that submission, and are therefore inherently individualized.  In determining whether common issues "are more substantial than the issues subject only to individualized proof," *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002), these upstream issues require substantial non-common elements of proof which are cumulative of the many individualized downstream and other claim-specific issues.

The upstream issues also demonstrate Plaintiffs' inability to satisfy Rule 23(b)(3)'s manageability requirement.  *See In re AIG, Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) ("A key question in a litigation class action is manageability—how the case will or can be tried….") (quotation marks and citation omitted); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 WL 5661873, at *9 (S.D.N.Y. Feb. 20, 2008) ("[T]he fourth factor—'manageability'—is critical to the Rule 23(b)(3) analysis.").  Addressing issues of suppression, impact on LIBOR, and collusion for each of tens of thousands of submissions is inherently unmanageable.

I.   **PROOF OF WHETHER EACH INDIVIDUAL SUBMISSION WAS BELOW THAT PANEL BANK'S LONDON INTERBANK BORROWING COSTS IS NOT COMMON.**

A.   **The Panel Banks' London Interbank Borrowing Transactions Show That There Is No Common Proof That Each Bank's LIBOR Submissions Were Suppressed.**

1.   **The London Interbank Borrowing Transactions Are Highly Relevant to the LIBOR Question.**

For many years, all Plaintiffs have alleged that LIBOR should reflect "the actual interest rates at which [the panel banks] expected they could borrow funds—*i.e.*, their true costs of borrowing…."  OTC Third Am. Compl. ¶ 5, ECF 1857;[8] *see also* Exchange Third Am. Compl. ¶ 5, ECF 1159-1 (LIBOR concerns "the interest rate a bank pays"); Lender Sec. Am. Compl. ¶ 261, ECF 1383 (LIBOR should reflect "actual borrowing costs").[9]

Plaintiffs told this Court that "[t]he LIBOR definition required banks to report their best estimate of their actual costs of borrowing."  ECF 526 at 16; *see also* ECF 208 at 1 n.2 (LIBOR is "intended to reflect a certain bank's costs of borrowing").  They said the relevant "inputs to show what happened each day are going to be what was submitted, what was the borrowing rate…."  ECF 1271 at 37:23-38:1.  Plaintiffs likewise told the Second Circuit that the LIBOR rules were "meant to ensure that LIBOR reflected the actual cost of borrowing."  Case No. 13-3565 (2d Cir.), ECF 342 at 9.  The named Plaintiffs' recent testimony confirmed that view: ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[8] The OTC Plaintiffs maintain this allegation in their latest complaint, which was filed *after* they submitted Prof. Bernheim's reports, which argue that the actual LIB data are misleading.

[9] *See also id*. ¶ 52 (LIBOR reflects "competitive interbank interest rates"); ¶ 262 (Defendants falsely submitted "that their funding costs were lower than they actually were"); ¶ 318 (alleging suppression where submissions were "lower than what they were actually paying"); ¶ 369 (LIBOR was false because it was "less than the rates at which Panel Bank Defendants actually borrowed funds in the interbank market").

███████████████████████████████████████████████████████

████████████████████████████████

To circumvent the statute of limitations, some Plaintiffs argued that the critical data on LIB costs were confidential.  *See* ECF 1383 ¶ 328 (Lenders could not have known of suppression because of the "lack of available data on interbank lending").  Because the LIB data were confidential, "only Defendants could know whether they were accurately reporting the rates at which they could borrow."  *Id*. ¶ 333; *see also* ECF 343 at 12 (Exchange Plaintiffs:  "the submitting banks' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it impossible for Plaintiffs … to discern [manipulation]").

In discovery, Plaintiffs said "[t]he term 'LIBOR Suppression' means making LIBOR Submissions below the LIBOR Panel Bank's actual cost of borrowing in the London Interbank Market."  OTC 2d and 3d Doc Requests, Ex. 28 at 6.  In scheduling class proceedings, they told this Court that, to show suppression, they "would need data from the defendants on their borrowing costs."  ECF 1271 at 9:7-8.  They then insisted on moving parts of the briefing schedule because of the critical importance of receiving all of the LIB data.  *See* ECF 1587, 1603.  Even if the class certification papers sought to erase this history (which they do not), "[t]he amendment of a pleading does not make it any less an admission of the party."  *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989).

Now, having seen that the LIB data refute their theory of persistent suppression, Plaintiffs claim the data are "irrelevant," Lender Br. at 21, n.12, █████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████  Plaintiffs were right the first time.

## 2. The London Interbank Borrowing Transactions Provide Individualized Refutations of Plaintiffs' Theory of Suppression.

Plaintiffs disown the LIB data they previously embraced for one reason: It allows Defendants to refute, for any putative class member and any transaction,[10] Plaintiffs' theory of persistent suppression. Each panel bank produced data regarding its LIB transactions, ███████

███████████████████████████████████████████████████

███ LIB transactions are highly probative in evaluating LIBOR submissions at that time: In each LIB transaction, the borrower is a panel bank, the lender is a commercial bank, the location is London, and the instrument is an unsecured, fixed-rate loan of a reasonable market size. *Id*. ¶¶ 21-27. Each panel bank's actual LIB costs can be matched against its LIBOR submission for the applicable tenor to test whether that submission was higher or lower than its LIB costs. *Id*. ¶ 29.

The results belie the possibility of showing persistent suppression applicable to all class members. █████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

---

[10] For example, former named plaintiff (and current absent class member) SEIU asserted claims based, in part, on a bond purchased from a Credit Suisse entity which made payments on six dates during the Class Period. ████████ In an action by SEIU, Credit Suisse and all Defendants have a right to assert that defense.

[11] A basis point (often abbreviated "bp") is one-hundredth of 1%.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████[12]

Contrary to Plaintiffs' argument, analyzing LIB data is not just another form of common proof.  The LIB data are transaction-specific.  Testing whether bank A suppressed tenor B on day C involves different LIB data (among other factors) than a test for whether bank X suppressed tenor Y on day Z.  *E.g.*, *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006) (finding that individual issues predominated to defeat class certification for a putative class of concert ticket buyers because—even though purchasers within a given city might use similar proof—there were varied geographic markets and different proof would be needed for consumers residing in different geographic markets), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).  And, as is undisputed, the results vary dramatically by bank, tenor, and day, such that each such analysis stands (or falls) on its own.[13]

### 3. Plaintiffs' Attacks on the London Interbank Borrowing Transaction Data Are Without Merit and Cannot Diminish the Data's Role.

Having seen the results of the LIB data, Plaintiffs now offer several arguments to distance themselves from that data.  These arguments are wrong and, at most, go only to the weight of the LIB data, not its admissibility in support of *individualized* defenses.

---

███████████████████████████████████████████

███████████████████████████████████████████

[13] Some of the data are presented in a more aggregated form.  The fact that experts must summarize voluminous individualized evidence—to show that it varies in important ways—cannot transform it into common evidence. *E.g.*, *McLaughlin v. Am. Tob. Co.*, 522 F.3d 215, 225-26 (2d Cir. 2008) (describing the market's general response to new information, *e.g.*, "the market did not shift," to show the individualized nature of reliance).



That argument is contrary to Plaintiffs' oft-made statements about LIBOR measuring "actual borrowing costs," the testimony of the named Plaintiffs described above, and all of the following:

**The wording of the LIBOR question**.  Plaintiffs' argument contradicts the LIBOR question itself, which asks at what rate the panel bank "*could borrow*" and what offer it would "*accept[]*."  Plaintiffs' newly minted interpretation strikes those phrases from the LIBOR question by excluding final, accepted offers (and other intermediate offers) from consideration. Instead, Plaintiffs read into the LIBOR question a critical qualifier—"initial"—that is not there.

**Market perspective**.  Plaintiffs' new interpretation contradicts the alleged motivation for colluding, *i.e*., that "the capital markets view the funding costs of the panel banks as reflective of their relative creditworthiness."  OTC Third Am. Compl. ¶ 70, ECF 1857.  Capital markets would care about a bank's actual funding costs, not the starting point of its negotiations.

**The BBA**.  According to the BBA, rather than reflect the negotiation's starting point, LIBOR should reflect the "true cost of interbank funding."  BBA *LIBOR Basics* (2010), Ex. 33. In directing that "rates are not necessarily based on actual transaction[s]," the BBA validated the use of actual transactions where they exist.  *Id*.  Even where a bank has no transactions, it should consider "the rates at which it has dealt … to predict … maturities in which it has not been

11

active." *Id.*  The BBA acknowledged the "bid-offer spread" highlighted by Plaintiffs, but directed that submissions be based on where the banks "take funds" unless the transaction does not reflect conditions at 11:00 a.m. London time.  BBA, *Guidelines for Contributing BBA LIBOR Rates* (2009), Ex. 34 at 2.

**ICE**.  ICE, which replaced the BBA as the LIBOR administrator, stated that "submitters already use a wide range of transactions to anchor their LIBOR submissions."  ICE, *Position Paper on the Evolution of ICE LIBOR* (2014), Ex. 35 at ¶ 3.6.  Although there is a "spectrum of methodology practices amongst benchmark submitters," they share "a common starting point of their observable transactions in the market."  *Id*. at ¶ 5.1.  Plaintiffs' position contradicts ICE's instruction that LIBOR "submissions [be] based on the lowest perceived rate at which a bank can obtain funding" in the London interbank money market.  *Id.* at ¶ 5.7.6.

**Governmental Investigators**.  The CFTC has *directed* Citi that, in making submissions, Citi's "transactions shall be given the greatest weight."  CFTC Citibank Order, Ex. 32 at ¶ 25.  The second priority is transactions by other banks, with "offers" to Citi as the third (lowest) priority.  *Id*. at 26.[14]  The *Wheatley Review of LIBOR: Final Report* (2012), commissioned by the British Chancellor of the Exchequer,[15] finds that submissions should be based upon a "hierarchy," with highest priority given to "[c]ontributing banks' transactions."  Ex. 36 at ¶ 28.  It, too, distinguishes between a transaction rate and mere "[q]uotes by third parties offered to contributing banks" and gives far higher priority to actual transactions.  *Id*.

---

[15] The *Wheatley Review* made some criticisms of the LIBOR process, but did not identify any collusion.

The U.K. Financial Stability Board, in a report reflecting input from the world's leading financial authorities, observed that LIBOR should be based on "actual transactions" but noted the occasional "scarcity" of such transactions.  FSB, *Reforming Major Interest Rate Benchmarks* (2014), Ex. 38 at 39.  Contrary to Plaintiffs' argument that the "O" in LIBOR precludes reliance on transactions, the FSB proposed "LIBOR+" which, like LIBOR, is a "transactions-based rate" but goes beyond interbank borrowing and includes "commercial paper and money market transactions."  *Id*. at 40; *see also* FSB 2016, Ex. 39 at 9 ("After the proposed changes …, LIBOR will be anchored in transactions using a broader set of [transaction types].").[16]

**Some of Plaintiffs' own experts**.



---

[16] Many other statements confirm Government investigators' understanding that LIBOR concerns "actual money market transactions," where such transactions exist.  Lender Sec. Am. Compl. ¶ 265, ECF 1383 (quoting DOJ); *see also* U.K. Financial Services Authority, Barclays Final Notice, Ex. 30 at ¶ 105 (submitters could consider "transactions" where they exist); CFTC Barclays Order, Ex. 31 at 2 (LIBOR is "intended to reflect the costs of borrowing unsecured funds"); CFTC Citibank Order, Ex. 32 at 2 ("each bank is to make an honest assessment of the costs of borrowing funds in the relevant markets"); *id*. at 19 (Citi's LIBOR submissions should be based on "what Citi paid or could expect to pay").



**ICAP**. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

    In an effort to save Plaintiffs' claims, their experts now rely on benchmarks disconnected from actual transactions. ███████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Because LIBOR concerns *interbank* transactions, his bid/ask spreads do not represent actual transaction rates.  If two banks each quote a bid (borrow) rate of 1.00% and an ask (lend) rate of 1.20%, it makes no sense to say that a transaction between the two banks must occur at the 1.20% ask rate.  That might please the lender, but the borrower hopes to pay only 1.00%.  Only the LIB data analyzed by Prof. Willig reveal how those differences were resolved in the marketplace.

██████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████ As the BBA's definition of LIBOR implies, an initial "offer" (made by a potential lender in response to a panel bank's "ask") likely differs from an initial "bid" (made by the potential borrower in response to a lender's request).  BBA Report, June 2008, Ex. 29 at 9. ███

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

_____

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

      ██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

      █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ █ ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Although a "low" submission in

this sense hardly evidences intentional suppression, it is simply untrue that Prof. Willig's

analyses are constructed to always find high submissions.

      ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

---

[19] As shown in sections II.B.2 and III.A.2, Plaintiffs' use of isolated anecdotal evidence is incomplete, frequently misleading, readily contested on an instance-by-instance basis, and certainly not dispositive proof of the propositions for which they cite such evidence.



**B.      Other Evidence For Testing Whether A Submission Was Low Will Be Submission-Specific.**

For any given Plaintiff, individual LIB transactions are only the beginning, not the end, of the suppression inquiry.  Panel banks rarely entered into borrowing transactions satisfying the LIBOR question at or immediately before 11:00 a.m. London time, let alone across all 15 tenors. Moreover, the BBA not only does not define what market size is "reasonable," but explains that the absence of a definition "is intentional, as reasonable market size will vary according to prevailing liquidity and credit conditions as well as between currencies and even quoting banks." BBA Report, June 2008, Ex. 29 at ¶ 12.3.

As a result, panel banks often had to make subjective judgments about their LIBOR submissions.  These judgments could produce a range of reasonable submissions.  Thus, determining whether a panel bank submitted a false rate—intentionally or not—for a particular day-tenor is not simply a mechanical exercise of comparing a particular submission to a corresponding transaction rate (or benchmark), but rather requires assessing the reasonableness of each panel bank's judgment as to each specific rate based on a range of evidence specific to

each submission (and a class member allegedly affected by that submission).  That evidence includes:  the panel bank's cost of borrowing outside of the London Interbank market, trends in borrowing costs, borrowing costs from prior days, the submitter's impressions of macroeconomic events and developments specific to that panel bank, the bank's view of a reasonable market size for that day and tenor, the bank's need to borrow funds, the sources and costs of available funds, and many more factors.  Willig OTC Rpt., Ex. 1 at ¶¶ 40, 44, 48, 77.

## II.   PLAINTIFFS' PROPOSED COMMON EVIDENCE OF SUPPRESSION IS UNRELIABLE AND CANNOT PRECLUDE INDIVIDUALIZED DEFENSES.

### A.   Plaintiffs' Statistical Models Of Purported Suppression Are Unreliable.

Class certification requires a reliable damages model.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

All Plaintiffs now reject actual LIB transactions in favor of other benchmarks. ████

██████████████████████████████████████████████████████

███████████████████ ██ ████████████████████████████████

████████████████████████████████████████████████████

All of these models suffer from a host of defects that render each of them unreliable. These models cannot eliminate Defendants' right to defend each submission through individualized evidence, such as any actual LIB costs applicable to that submission.

### 1.   Plaintiffs' Models Persistently Generate False Positives.

All of Plaintiffs' models generate false positive damages when applied to a wide range of alternative interest rates and transactions that could not have been suppressed by the panel banks.

---

█ ████████████████████████████████████████████████████████

███████████████████████████████████████████

Specifically, the models consistently generate "suppression" during the Class Periods when applied to each of five alternative data sets that closely tracked Plaintiffs' benchmarks before and after the Class Periods:  (1) Treasury Bills, (2) the Overnight Indexed Swap ("OIS") rate, (3) the Federal Reserve index for commercial paper, (4) the Federal Reserve index for certificates of deposit, and (5) the panel banks' LIB transactions.  Willig Exchange Rpt., Ex. 5 at ¶¶ 105-15; Willig OTC Rpt., Ex. 1, at ¶¶ 105-12; Willig Lender Rpt., Ex. 3 at ¶¶ 144-51.[22]  These false positives range from 10-104 basis points of average suppression.  Just as a diagnostic test is defective if it generates substantial positive results when applied to people who could not have that disease, these false positives "shred" the case for class certification.  *Rail Freight*, 725 F.3d at 252.

These false positives are no accident.  They stem from the fact that Plaintiffs' models all use benchmark periods of relative financial calm, and the observed relationships became inapplicable during the financial crisis of 2007-2010 for at least two reasons.  First, in a crisis, borrowers' credit risks will diverge significantly and the high end of the range of offers will not reflect what some or all of the panel banks would pay.  ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

_____

█ ██████████████████████████████████████████████████████
██████████████████████████████████████████



Plaintiffs' models cannot show whether the divergence between LIBOR and their benchmarks, which concern offers to other (frequently non-panel) banks, (i) is a natural result of financial crises or (ii) reflects LIBOR suppression.

These results cannot be explained away by hypothesizing that LIBOR suppression somehow also suppressed all of these other data sets.  The alternative data sets involve enormous markets not susceptible to suppression.  As Prof. Bernheim admitted, a theory that LIBOR suppression affected the risk-free rate of return (which is reflected in Treasury Bills and the OIS index) "doesn't seem … to be something terribly likely."  Bernheim Dep., Ex. 16 at 88:3-16.

**2.     Plaintiffs' Models Are Not Specific to the Panel Banks' Costs.**

It should not be surprising that a benchmark that includes offers to riskier non-panel banks would diverge from LIBOR during a financial crisis.  The BBA explained this error: "LIBOR contributions could be

compared with the indicative rates from brokers shown on Thomson Reuters and Bloomberg screens.  However, this is unlikely to provide any useful insights…."  Committee, 11/17/08, Ex. 37 at ¶ 2.8.  The *Wheatley Review* concludes that "[g]reatest emphasis should be placed on transactions undertaken by the contributing bank."  Ex. 36 at 28.  A LIBOR researcher who lacks access to the confidential LIB data might use a publicly available benchmark, but none says he would do so if he had the panel banks' LIB data.

3.      **Plaintiffs Mischaracterize the Data Upon Which Their Models Rely.**

All three putative classes rely upon data from ICAP, a broker, to attempt to estimate LIBOR suppression.  ICAP provided to Bloomberg two sets of data on Eurodollar deposit rates—a high rate and a low rate. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

They are wrong to do so. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Instead, Plaintiffs ignore ICAP's

warning that "picking the upper limit of rates being paid by active participants almost by definition produces a rate that is too high."  Wrightson ICAP, 'Fed Policy' (2008), Ex. 42 at 1.[24]

### 4. Plaintiffs' Models Rely Upon Sparse Transactional Data, if any.

Plaintiffs' attack on the volume of the LIB data eviscerates their own benchmarks. ██

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

### 5. Prof. Webb's Models Are Unreliable for Additional Reasons.

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

### B. The Non-Statistical Evidence Cannot Constitute Reliable Common Evidence That The Panel Banks Persistently Suppressed LIBOR.

---

[24] ████████████████████████████████████████████████████████
█████████████████████████████████████  But since the lower data are not bid data, but actually are offer data to a wide range of banks, it is no surprise that the panel banks were often able to borrow at even lower rates.

For each class, the lack of a reliable damages model is dispositive.  The other evidence cited by Plaintiffs cannot cure this deficiency and just creates more individualized issues.

### 1.    Government Investigations Do Not Provide Common Evidence of Suppression.

Plaintiffs cite actions by government investigators which, if they are evidence at all, fail to support Plaintiffs' allegations.  No authority found that any panel bank engaged in persistent suppression nearly as broad as these Class Periods.[25]  The reputation-based suppression conduct mentioned in the investigatory materials is unilateral and isolated (involving only four of the 17 panel banks), and far from common evidence of persistent suppression.  For example, the DOJ alleged that Deutsche Bank's 3- and 6-month USD LIBOR submissions were "persistently … high" during the 2008-09 period.  DB DOJ SOF, Ex. 43 at ¶ 24.  UBS's strategy allegedly varied from (1) "err on the low side," (2) be in the "middle of the pack," (3) "move its submissions closer to UBS's [commercial paper]/CD rates, even if those rates were high, and even if the submissions placed UBS out of the middle of the pack," and (4) again, be in the "middle of the pack."  UBS CFTC, Ex. 44 at 41-50.  Barclays adjusted its submissions "up or down."  Barclays FSA, Ex. 30 at ¶ 68.  The CFTC noted that Citi "moved from among the lowest of the panel banks' submissions to among the highest … by the end of March 2008."  CFTC Citibank Order, Ex. 32 at 15.  At most, government entities alleged that a few banks suppressed "at times," *id.* at 3, or "on numerous occasions."  Barclays FSA, Ex. 30 at ¶ 12.[26]

---

[25] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████   Those are not relevant.  *See LIBOR IV*, 2015 WL 6243526, at *45.

[26] Moreover, the investigatory materials are not common *evidence*.  Even if they are admissible against the bank in question, they do not constitute an admission against any other bank, the vast majority of which have never been alleged by investigators to have engaged in any LIBOR misconduct.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (CFTC consent order inadmissible); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 9358563, at *4-6 (N.D. Ga. Apr. 23, 2008) (SEC order irrelevant at class certification stage because inadmissible at trial).

**2.** **Contemporaneous Business Documents Do Not Provide Common Evidence of Suppression.**

The documents Plaintiffs cite often do not stand for the proposition for which Plaintiffs cite them or actually illustrate the individualized nature of proving suppression by a given bank on a given day. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Instead of proving the irrelevance of individualized evidence, such documents exemplify the kinds of individualized evidence the parties might use at trial.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

_____

████████████████████████████████████████████████████████████████
████████████████████



III.   **THE DISTINCTION BETWEEN COLLUSIVE AND UNILATERAL CONDUCT REVEALS OTHER FLAWS IN PLAINTIFFS' THEORIES.**

Each putative class asserts theories involving collusion and theories involving unilateral conduct.  Plaintiffs routinely ignore that distinction by citing unilateral documents while discussing a theory or model that assumes collusion.[29]  Regardless, none of Plaintiffs' models

---

[28] Documents are quoted as is, without correction of typos, misspellings, etc.

can account for each Defendant's right to defend its submissions based on considerations unique to it.  Those defenses may vary by Plaintiff and transaction and are therefore individualized.

### A.       Plaintiffs' Theories Of Collusion Are Vague And Unsupported.

Though not engaging in a free-ranging inquiry on the merits, courts must resolve merits issues to the extent relevant to class certification.  *In re Initial Pub. Offerings Sec. Litig*., 471 F.3d 24, 41-42 (2d Cir. 2006).  Here, the enormous gulf between Plaintiffs' theory of a single overarching conspiracy and the actual evidence provides several barriers to class certification.

### 1.       Plaintiffs Fail to Define the Alleged Conspiracy.

In the cases upon which Plaintiffs rely, the conspiracies had some clearly defined term, such as raising prices by a specified amount.[30]  Proof of the existence (or not) of such a conspiracy may well be common.  Here, Plaintiffs allege nothing of the sort.  They do not and cannot allege an agreement to stabilize LIBOR:  LIBOR fluctuated wildly during the Class Periods.  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

For Rule 23 purposes, given Plaintiffs' failure to meaningfully define the conspiracy's supposed terms, each class member will require a separate set of inquiries corresponding to their

---

██████████████████████████████████████████████████████████████████

[30] *See In re Air Cargo Shipping Servs. Antitrust Litig*., 2014 WL 7882100, at *1-2 (E.D.N.Y. Oct. 15, 2014) (recommending that class certification be granted for an alleged conspiracy by air cargo carriers to "calculate their fuel surcharge rate based on … this single index"), *adopted by* 2015 WL 5093503 (E.D.N.Y. Jul. 10, 2015); *In re EPDM Antitrust Litig*., 256 F.R.D. 82, 84, 89 (D. Conn. 2009) (certifying a class for an alleged conspiracy in which "defendants took turns leading EPDM price increases, conferring months in advance of an announced price increase about whose turn it was to raise prices … [resulting in] six across-the-board list price increases for EPDM, which the defendants do not dispute"); *In re Currency Conversion Fee Antitrust Litig*., 224 F.R.D. 555, 559 (S.D.N.Y. 2004) (finding a class action to be the appropriate mechanism to litigate an alleged conspiracy to "automatically impose this currency conversion fee" totaling 3%).

transactions:  What did each bank allegedly agree to for that day/tenor, and was the conduct of each of the 16 panel banks consistent with such an agreement, given their actual submissions, their actual LIB costs, and other individualized factors?  Lacking a coherent theory of an over-arching conspiracy, the case will devolve into hundreds of purported mini-conspiracies, which bars class certification.  *See In re Plastics Additives Antitrust Litig.*, 2006 WL 6172035, at *6 (E.D. Pa. Aug. 31, 2006) (the "evidence … supports a theory of … multiple, segment-specific conspiracies"); *Kendler v. Federated Dep't Stores Inc.*, 88 F.R.D. 688, 693 (S.D.N.Y. 1981) ("to establish defendant's liability in this action, plaintiffs must demonstrate the existence of 16,000 mini-conspiracies between Bloomingdale's, as represented by the 219 buyers").

### 2. Plaintiffs Offer No Reliable Evidence of an Alleged Over-Arching Conspiracy.

As the Court has recognized, no government investigation has found any evidence of an over-arching conspiracy to suppress.  *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 6243526, at *43 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*").  To the contrary, after extensive, multi-year investigations by the DOJ, the CFTC, and the U.K. FSA, no regulator alleges, much less has found, multi-bank collusion to suppress LIBOR.  Plaintiffs' experts fare no better.[31]  Profs. Bernheim and Webb did not analyze conspiracy issues.[32]

[33]



[33] Prof. Stiglitz's opinions should be excluded for the reasons stated in Defendants' Motion to Exclude OTC Plaintiffs' Proposed Expert Joseph Stiglitz.

He testified that collusion just requires some unspecified "minimum number" of panel banks and he has not studied "who was participating or anything."  Stiglitz Dep., Ex. 18 at 120:2-121:3.

After reviewing more than 4 million documents and 100,000 audio tapes, Plaintiffs offer no communication reflecting a broad agreement to suppress LIBOR.  Certain Plaintiffs theorize that the conspiracy began in August 2007 at an FX & MM Committee conference call to discuss whether there was a need to clarify the LIBOR definition in light of market conditions.[34]  But Plaintiffs offer no evidence of any agreement, let alone a conspiracy to suppress USD LIBOR submissions.  To be clear, "there is nothing inherently wrong or suspicious about banks forming a committee within the BBA to administer LIBOR."  *LIBOR IV*, 2015 WL 6243526, at *48.  Indeed, despite Plaintiffs' mischaracterization, the FX & MM Committee documents referenced by Plaintiffs suggest only a good faith effort by the Committee to continue setting LIBOR during tumultuous market conditions, with different members expressing differing opinions.[35]  That does not suggest a conspiracy.

---

[34] In any event, the BBA offered to contact any panel banks that appeared to be submitting out of line with their purported funding costs, which is entirely inconsistent with the existence of a conspiracy.



Plaintiffs' unsupported disagreement with the BBA's conclusion does not turn the FX & MM Committee, or the USD LIBOR panel banks, into conspirators.

In any event, it is "not unreasonable for a trade organization to keep legitimate meetings among its members private."  *LIBOR IV*, 2015 WL 6243526, at *48.

[35] Plaintiffs' suggestion that the panel banks carried out their alleged conspiracy through the FX & MM Committee is unsupported by the evidence.  OTC Br. at 10-13.  The Committee's alleged failure to change LIBOR practices is hardly proof that there was collusion necessitating such a change.

This would have been an immensely complex conspiracy, involving 16 panel banks from eight countries and daily submissions over 514-715 days across 2 to 15 tenors.  It is far unlike a conspiracy in which firms agree to charge $10/widget or agree not to compete for certain customers, which could operate with occasional communications.  Here, during unprecedented financial turmoil, 3-month LIBOR, for example, fluctuated from more than 5% to less than 3%, then back to almost 5%, and then down to less than 1%, all in a two-year period. ███████████

████████████  Because the purported levels of suppression varied wildly over time, from below zero to more than 250 basis points, Heine Decl. ¶ 84, any conspiracy would have required daily communications among the 16 panel banks to formulate that day's submissions for each tenor.  Yet, no communication reflects even two panel banks agreeing on a specific level of LIBOR for even a single tenor on a single day.[36] ██████████████████████████

████████████████████████

Unlike common evidence, Plaintiffs' cited documents confirm how each of the events at best yields mini-trials about the banks, tenors, and days involved.  Here are some examples:

- ████████████  but Bank of America's Sept. 22, 2008 submission of 3.10 for the 1-, 2-, and 3-month tenors differed from those of RBS and HSBC by two to eight basis points.  Heine Decl. ¶ 81.

- 

- <u>OTC Br. n.17, n.19</u>:  In the first example, Barclays and Deutsche Bank both submitted 2.85 for the 3-month tenor on May 1, 2008, but those were the two *highest* submissions and were dropped from the calculation.  In the second example, Barclays and Credit Suisse both submitted 3.0 for 1-month and 3-month on Sept. 16, 2008, which tied for the highest submissions.  The next day the gap between the two banks' submissions was 15 basis points for 1-month and 10 basis points for 3-month.  By the end of the month, the gap was 50 basis points for both tenors.  *Id*. ¶¶ 74, 77, 79-80.

- 

- ██████████████████████████████████████ Less than a month later (Dec. 24, 2008), RBS had the highest 3-month and 1-month submissions of all banks.  *Id*. ¶¶ 89-90.

- <u>OTC Br. n.24</u>:  JPM moved up for 3-month on Jan. 6, 2009 and moved up for 1-month on Jan. 5, 6, and 7, 2009 ████████████████████ JPM was consistently excluded from the 1- and 3-month LIBOR calculations that month.  *Id*. ¶¶ 91-92. ██████████████████████████████████████████

- <u>OTC Br. n.25</u>:  The Court has previously reviewed this document and determined it to be nothing more than market color.  *See* ECF Nos. 1510, 1724-1, 1769, 1859. ████████████████████████████████████████████████████

- <u>OTC Br. n.28</u>:  On Nov. 29, 2007, ████████████████████████████████████████ Of the next five weeks, Barclays was the outright highest submitter on all but two days (where it tied for highest).  Heine Decl. ¶ 69.

---

[37] ████████████████████████████████████ On that day, the three cited banks' submissions varied by 90 basis points.  *Id*. ¶ 88.

- <u>OTC Br. n.31</u>: ██████████████████████████ Barclays submitted 3.1 for 1-year. Although one bank (Credit Suisse) submitted 3.0 for 1-month to 1-year on Sept. 16, 2008, two weeks later, Barclays' 1-year submission was 50 basis points higher than Credit Suisse's submission.  *Id*. ¶ 78, 87.

- ████████████████████████████████████████ ████████████████████████████████████████

- ████████████████████████████████████████ ████████████████████████████████████████

- <u>OTC Br. n.34</u>: █████████████████████████ Citi actually increased its 1-month submission by 17 basis points over the next two days (13 basis points for 3-month), while Barclays' submissions did not change.  *Id*. ¶¶ 66-67.

None of these examples fits any common narrative of a sustained 16-bank conspiracy.

Each involves just a few banks; those banks were behaving differently from each other; the

direction of the movement was up and down; banks were moving into and out of the middle

eight; and submissions on one day could vary dramatically from those just a few days later.

Those rebuttals are based on the submissions data alone.  Actual trial of these separate events

would also include the LIB data and the subjective view of the Defendants' submitters.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

Indeed, on July 31, 2007 (the last day before the start of any Class Period) the spread from highest to lowest submission for 1- and 3-month was just *one basis point*.  Heine Decl. ¶ 65.  On September 30, 2008 (the date the conspiracy allegedly was at maximum effectiveness) the spread was *130 basis points* for 1-month and *115 basis points* for 3-month.  *Id*. ¶¶ 84-86.

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ █ ██████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

Many other facts are inconsistent with common proof of conspiracy.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

---

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ The DOJ now agrees that the statement "is not accurate" and says only that "UBS's 3-month U.S. Dollar LIBOR submissions were on occasion identical to the published LIBOR fix…."  Letter from DOJ to David P. Burns, April 19, 2017, Ex. 60 at 1.



[39]

### 3. Plaintiffs' Models Fail to Isolate the Effects of Collusion, if any.

All of Plaintiffs' damages models estimate the amount of suppression without regard to whether there was collusion or unilateral conduct.  Even though all Plaintiffs allege unilateral motivations for suppressing LIBOR,[40]

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ This failure to disaggregate is fatal; "a model purporting to serve as evidence of damages … must measure only those damages attributable to [the theory accepted by the court]."  *Comcast*, 133 S. Ct. at 1433; *cf. McLaughlin*, 522 F.3d at 223-26 (2d Cir. 2008) (de-certifying class due to the inability to separate effects of fraudulent communications from other reasons to smoke light cigarettes).

---

[39] *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 317-18 (S.D.N.Y. 2015) (excluding antitrust damages model whose "distribution of results makes no sense").

[40] *E.g.*, OTC Third Am. Compl. ¶ 74, ECF 1857 ("every panel bank was motivated to understate its borrowing costs"); ¶ 126 ("to benefit their net trading positions"); Exchange Third Am. Compl. ¶¶ 124-29, ECF 1159; Lender Sec. Am. Compl. ¶ 261, ECF 1383; █████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

**B.      Under Plaintiffs' Unilateral Theories Of Suppression, There Is No Reliable Common Evidence That The LIBOR Rate Was Reduced.**

Claims based on the conduct of one panel bank face the further individualized problem that because only the middle eight submissions are included, suppression by one bank may not affect the LIBOR rate. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Whether a higher but-for submission by one bank would have produced a higher but-for LIBOR rate depends on many variables.  That calculation must be repeated for each of the thousands of submissions in various Class Periods.

These facts make the individualized LIBOR calculations alone utterly unmanageable for a jury.  An expert's team can calculate but-for LIBOR in a report that accepts all of the expert's assumptions.  But what if a jury finds that a given bank suppressed only on some days or by smaller amounts?  Plaintiffs are silent on how the jury could determine how that alternative set of but-for LIBOR submissions would have affected LIBOR, if at all.  *See Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) (affirming denial of class certification in part because of "serious problem of manageability" due to individualized damages, among other complications).

In addition, each putative class has other fatal defects in its claims for common proof that LIBOR was suppressed by the unilateral conduct of individual Defendants.

**OTC Plaintiffs**. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013) ("*LIBOR I*") (plaintiff must allege, among other things, that "the other party was enriched") (quotation and citation omitted).

Second, the OTC Plaintiffs' state law claims create a conflict stemming from Prof.

Bernheim's calculation of damages under two competing approaches: ███████

███████████████████ █ ███████████████████████

███████████████████████████████

███████████████████████████████

███████████████████ Counsel cannot represent class members

with such conflicting interests.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997).

**Exchange Plaintiffs**. ████████████████████████

██████████████████████████████

███████████████████████ Neither is reasonable.

████████████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████████████████

and fails the *Comcast* requirement that a damages model "must measure only those damages

attributable to [the theory accepted by the district court]."  133 S. Ct. at 1433.

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

---

█ ███████████████████████████████████

██████████████████████



Prof. Seyhun thus gets his results only because he "cherry-picks" his benchmark period. *See Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) ("When constructing a benchmark statistic, the regression analysis may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger." (citation omitted)).[43]

**Lender Plaintiffs**.

## CONCLUSION

For the foregoing reasons and for those set forth in the Oppositions specific to each of the three putative class actions, this Court should deny all three motions for class certification.

June 30, 2017

Respectfully submitted,

/s/ Arthur J. Burke

Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
Patrick W. Blakemore
Peter J. Davis
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
patrick.blakemore@davispolk.com
peter.davis@davispolk.com

*Attorneys for Defendants Bank of America Corporation and Bank of America, N.A.*

/s/ Thomas A. Isaacson

Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
Taylor M. Steffan
Benjamin L. Cavataro
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com
tsteffan@cov.com
bcavataro@cov.com

Lev Dassin
Jonathan S. Kolodner
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
ldassin@cgsh.com
jkolodner@cgsh.com

*Attorneys for Defendants Citibank, N.A., and Citigroup Inc.*
*(Not joining as to Exchange Action)*

/s/ Moses Silverman
Moses Silverman
Aidan Synnott
Hallie S. Goldblatt
Noah A. Mamis
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Fax: (212) 757-3990
msilverman@paulweiss.com
asynnott@paulweiss.com
hgoldblatt@paulweiss.com
nmamis@paulweiss.com

*Attorneys for Defendant Deutsche Bank AG
(Not joining as to Exchange Action and
Lender Action)*

/s/ Abram J. Ellis
Thomas C. Rice
Paul C. Gluckow
Alan C. Turner
Omari L. Mason
Alexander Li
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
pgluckow@stblaw.com
aturner@stblaw.com
omason@stblaw.com
zander.li@stblaw.com

Abram J. Ellis
900 G Street NW
Washington, D.C.  20001
Telephone:  (202) 636-5500
Fax:  (202) 636-5502
aellis@stblaw.com

*Attorneys for Defendants JPMorgan Chase &
Co. and JPMorgan Chase Bank, N.A.*

/s/ Joel Kurtzberg
Herbert S. Washer
Elai Katz
Joel Kurtzberg
Jason Hall
Lauren Perlgut
Adam Mintz
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com
jhall@cahill.com
lperlgut@cahill.com
amintz@cahill.com

*Attorneys for Defendant Credit Suisse AG and
Credit Suisse (USA) Inc.
(Not joining as to Exchange Action and
Lender Action)*

/s/ Christian T. Kemnitz
Arthur W. Hahn
Christian T. Kemnitz
Brian J. Poronsky
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: (312) 902-5200
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
brian.poronsky@kattenlaw.com

*Attorneys for Defendant Royal Bank of
Canada
(Not joining as to Exchange Action and
Lender Action)*

37

/s/ Peter Sullivan
Peter Sullivan
Eric J. Stock
Jefferson E. Bell
Matthew Greenfield
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com
mgreenfield@gibsondunn.com

*Attorneys for Defendant UBS AG*