**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262<br>Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | **ORAL ARGUMENT REQUESTED** |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al.,<br>　　　　　　　　Plaintiffs,<br>　　　v.<br>CREDIT SUISSE AG, et al.,<br>　　　　　　　　Defendants. | No. 11-cv-5450 |

**DEFENDANTS' JOINT MEMORANDUM ON "DOWNSTREAM" ISSUES IN OPPOSITION TO OTC PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ......................................................................................... vii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 5

I.  PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE AND
    SUPERIORITY UNDER RULE 23(b)(3) ................................................................ 6

    A.  Individual Issues of Injury and Damages Predominate on All
        Claims ......................................................................................................... 6

    B.  Further Individual Issues Predominate on Plaintiffs' State Law
        Claims ......................................................................................................... 23

    C.  A Class Action is Not a Superior Vehicle for Adjudication of
        These Claims ............................................................................................... 27

II. PLAINTIFFS HAVE NOT DEMONSTRATED TYPICALITY AND
    ADEQUACY UNDER RULE 23(a) ....................................................................... 28

    A.  Plaintiffs Have Not Established Typicality .................................................. 28

    B.  Plaintiffs Have Not Established Adequacy .................................................. 28

III. PLAINTIFFS LACK STANDING TO BRING CLAIMS ON BEHALF
     OF BONDHOLDERS .............................................................................................. 29

CONCLUSION .................................................................................................................. 30

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Abrams v. Interco Inc.*,
719 F.2d 23 (2d Cir. 1983) ....................................................................... 28

*Allied Orthopedic Appliances, Inc. v.*
*Tyco Healthcare Group, L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................... 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) ....................................................................... 28

*Bank of N.Y. v. Yugoimport*,
745 F.3d 599 (2d Cir. 2014) ....................................................................... 25

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ....................................................................... 9

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ....................................................................... 13

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ....................................................................... 24

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-*
*Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) .................................................................... 29

*Clay* v. *Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) ....................................................................... 23, 27

*Cole v. Gen. Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) ....................................................................... 23

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ....................................................................... 6, 7, 18

*Cons. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995) ....................................................................... 30

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ....................................................................... 2, 8, 9

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ....................................................................... 28

*Food Lion, LLC v. Dean Foods Co.*,
  312 F.R.D. 472 (E.D. Tenn. 2016) ........................................................... 9

*Formosa Plastics Corp. USA v.*
  *Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41
  (Tex. 1998) ............................................................................................... 27

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................. 10

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996) ...................................................................... 25

*Gerloff v. Hostetter Schneider Realty*, No. 12 Civ. 9404 (LGS),
  2014 WL 1099814 (S.D.N.Y. Mar. 20, 2014) ........................................ 25

*Glenn Mech., Inc. v. S. Ark. Reg. Health Ctr., Inc.*,
  278 S.W.3d 583 (Ark. Ct. App. 2008) .................................................... 26

*Gustafson v. BAC Home Loans Servicing, LP*,
  294 F.R.D. 529 (C.D. Cal. 2013) ............................................................ 27

*In re Canon Cameras*,
  237 F.R.D. 357 (S.D.N.Y. 2006) ............................................................. 23

*In re Currency Conversion Fee Antitrust Litig.*,
  230 F.R.D. 303 (S.D.N.Y. 2004) ....................................................... 26, 27

*In re Fosamax Prod. Liab. Litig.*,
  248 F.R.D. 389 (S.D.N.Y. 2008) ............................................................. 26

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  No. 04-md-1628 (RMB), 2008 WL 5661873
  (S.D.N.Y. Feb. 20, 2008) ........................................................................ 28

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ................................................................. 9, 20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR II*),
  962 F. Supp. 2d 606 (S.D.N.Y. 2013) ..................................................... 24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*),
  No. 11-md-2262 (NRB), 2015 WL 6243526
  (S.D.N.Y. Oct. 20, 2015) .......................................................... 25, 27, 30

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR V*),
  No. 11-md-2262 (NRB), 2015 WL 6696407
  (S.D.N.Y. Nov. 3, 2015) ..................................................... 8, 14, 21, 30

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VI*),
  No. 11-md-2262 (NRB), 2016 WL 7378980
  (S.D.N.Y. Dec. 20, 2016) ........................................................... 11, 12, 14, 19

*In re Nexium Antitrust Litigation*,
  777 F.3d 9 (1st Cir. 2015) .................................................................. 9, 12

*In re Parmalat Sec. Litig.*,
  No. 04 MD 1653 (LAK), 2008 WL 3895539
  (S.D.N.Y. Aug. 21, 2008) ......................................................................... 30

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
  214 F.R.D. 614 (W.D. Wash. 2003) ........................................................ 23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 224 (D.C. Cir. 2013) ................................................................... 9

*In re Salomon Analyst Level 3 Litig.*,
  350 F. Supp. 2d 477 (S.D.N.Y. 2004) ..................................................... 30

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ....................................................................... 7

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) .......................................................... 7, 25, 26

*Klay* v. *Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ............................................................... 23

*Kottler v. Deutsche Bank AG*,
  No. 05 Civ. 7773 (PAC), 2010 WL 1221809
  (S.D.N.Y. Mar. 29, 2010) ......................................................................... 27

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011) ..................................................................... 23

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ..................................................................... 9

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ...................................................................... 9

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
  100 F. App'x 296 (5th Cir. 2004) ............................................................ 13

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of
  Chicago v. Bank of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014) ............................................................... 5, 30

*Richmond Sq. Capital Corp. v. Ins. House*,
   744 A.2d 401 (R.I. 1999) ................................................. 26

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)............................................... 7

*Robinson v. Tex. Auto. Dealers Assn.*,
   387 F.3d 416 (5th Cir. 2004).......................................... 12, 13

*Rodriguez v. It's Just Lunch, Int'l*,
   300 F.R.D. 125 (S.D.N.Y. 2014) ....................................... 27

*Ruffo v. Adidas Am. Inc.*,
   No. 15-cv-5989 (AKH), 2016 WL 4581344
   (S.D.N.Y. Sept. 2, 2016) ............................................. 9, 26

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.
   GlaxoSmithKline, PLC*,
   No. Civ.A. 04-5898, 2010 WL 3855552
   (E.D. Pa. Sept. 30, 2010).............................................. 10

*Sonterra Capital Master Fund, Ltd. v. UBS AG*,
   No. 15-cv-5844 (GBD), 2017 WL 1091983
   (S.D.N.Y. Mar. 10, 2017).............................................. 29

*Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*,
   298 F.R.D. 54 (E.D.N.Y. 2014). ...................................... 23

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)............................................... 7

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008)............................................. 5

*Thompson v. Jiffy Lube Int'l, Inc.*,
   250 F.R.D. 607 (D. Kan. 2008) ....................................... 27

*Tropical Sails Corp v. Yext*,
   No. 14 Civ. 7582 (JFK), 2017 WL 1048086
   (S.D.N.Y. Mar. 17, 2017).............................................. 27

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) .......................................... 6, 10, 20

*Vaccariello v. XM Satellite Radio*,
   295 F.R.D. 62 (S.D.N.Y. 2013) ....................................... 23

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
    No. 2:06-CV-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ............................................ 9

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................................ 6

*Walsh v. Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ............................................................................................ 26

*Weiner v. Snapple Beverage Corp.*,
    No. 07 Civ. 8742 (DLC), 2010 WL 3119452
    (S.D.N.Y. Aug. 5, 2010) ....................................................................................................... 23

*Wells Fargo Bank v. Ariz. Laborers*,
    38 P.3d 12 (Ariz. 2002) ......................................................................................................... 27

*Yarger v. ING Bank*,
    285 F.R.D. 308 (D. Del. 2012) .............................................................................................. 27

## STATUTES AND RULES

Fed. R. Civ. P. 23 .................................................................................................................... passim

## OTHER AUTHORITIES

1 McLaughlin on Class Actions § 5:36 (13th ed. 2016) ............................................................... 7

1 McLaughlin on Class Actions § 5:60 (13th ed. 2016) ............................................................. 27

ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL,
    PRACTICAL, AND TECHNICAL ISSUES (2005) ....................................................................... 10

Int'l Swaps & Derivatives Ass'n, 2013 ISDA Arbitration Guide
    (2013), *available at*
    https://www2.isda.org/attachment/NTg0MQ==/ISDA_Arbitrati
    on_Guide_Final_09.09.13.pdf ............................................................................................... 24

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Ordover Rpt.** | Expert Report of Janusz A. Ordover, Ph. D. (Apr. 21, 2017), Ellis Decl., Ex. 1 |
| **Ordover Reb. Rpt.** | Sur-Rebuttal Expert Report of Janusz A. Ordover, Ph. D. (July 3, 2017), Ellis Decl., Ex. 2 |
| **Bernheim Rpt.** | Expert Report of B. Douglas Bernheim, PHD (Feb. 2, 2017), Ellis Decl., Ex. 3 |
| **Bernheim Reb. Rpt.** | Rebuttal Expert Report of B. Douglas Bernheim, PHD (May 9, 2017), Ellis Decl., Ex. 4 |
| **Bernheim Dep.** | Deposition of B. Douglas Bernheim (Mar. 20, 2017), Ellis Decl., Ex. 5 |
| **Bernheim Reb. Dep.** | Deposition of B. Douglas Bernheim (June 17, 2017), Ellis Decl., Ex. 6 |
| **Yale Dep.** | Deposition of Yale University by Michael Finnerty (May 23, 2017), Ellis Decl., Ex. 7 |
| **TCEH Dep.** | Deposition of Texas Competitive Electric Holdings ("TCEH") by Kristopher Moldovan (March 27, 2017), Ellis Decl., Ex. 8 |
| **OTC Mem.** | Memorandum of Law in Support of OTC Plaintiffs' Motion to Certify Class as Class Action and Appoint Class Counsel, MDL ECF No. 1905 |
| **Upstream Class Cert. Opp.** | Defendants' Joint Memorandum of Law on "Upstream" Issues in Opposition to Plaintiffs' Motions for Class Certification, MDL ECF No. 2030 (June 30, 2017) |
| **Exchange Class Cert. Opp.** | Defendants' Joint Memorandum on "Downstream" Issues in Opposition to Exchange-Based Plaintiffs' Motion for Class Certification, MDL ECF No. 2009 (June 30, 2017) |

Defendants[1] respectfully submit this Memorandum of Law in opposition to the Over-the-Counter ("OTC") Plaintiffs' Motion for Class Certification, MDL ECF No. 1904.  Defendants incorporate by reference the Upstream Class Cert. Opp. and address in this brief Plaintiffs' failure to (1) show predominance under Rule 23(b)(3) on the "downstream" issues relating to the impact, if any, that persistent suppression of LIBOR would have had on the putative OTC class, (2) meet the Rule 23(a) prerequisites for certifying a class, and (3) establish standing to represent bondholders.

## PRELIMINARY STATEMENT

Plaintiffs seek to certify a diverse class of sophisticated entities, including financial institutions, cities, pension funds, and universities, that purchased bespoke swaps with trillions of dollars in notional value directly from the Defendant banks.  Plaintiffs contend that Defendants colluded with each other and with other LIBOR-panel banks to suppress LIBOR and that this suppression harmed those swapholders.  Plaintiffs assert that without examining the context of any particular transaction or even the direction of any putative class member's overall exposure to LIBOR, they can use evidence common to all class members to determine who would have been better off (and by how much) in an alleged but-for world where, for a specific 2-year period, LIBOR was persistently but not uniformly higher.

Defendants did not collude to suppress LIBOR and disagree that LIBOR was suppressed or that any suppression can be reliably shown or quantified using common evidence.  *See* Upstream Class Cert. Opp.  But even if it could, the impact of any suppression on swapholders

---

[1] As used in this memorandum, "Defendants" refers to the undersigned defendants in the putative OTC class action against which claims presently survive.  With the withdrawal of SEIU as a class representative, *see* MDL ECF No. 1992, there is no class representative with a claim remaining against Defendants Credit Suisse AG and Royal Bank of Canada.  Those Defendants have sought leave to move to dismiss on that ground, *see* MDL ECF No. 1993; to the extent they are still in the case, they join the arguments in this brief and also respectfully submit that class certification would be improper as to them for the additional reason that there are no adequate class representatives with claims against them.

cannot be determined using common evidence and instead requires individualized inquiries that will predominate over any common questions of fact or law.  This is for five core reasons.

*First*, the proposed class indisputably contains members who were not injured, in violation of the rule that "no class may be certified that contains members lacking Article III standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).[2]  In *LIBOR V*, this Court dismissed Highlander Realty ("Highlander") for lack of standing because its swap and bond transactions, taken together, left it with no exposure to LIBOR; yet Highlander and other similarly situated investors fall squarely within the definition of the class that Plaintiffs seek to certify, in violation of *Denney*'s clear directive.  Furthermore, Plaintiffs offer no way to identify uninjured members like Highlander using common proof, instead dismissing a plaintiff's exposure to LIBOR as a mere question of damages.  But the Court's dismissal of Highlander for lack of *standing* shows that the question of LIBOR exposure is relevant to the existence of injury, not merely the quantum of damages; and the Court's careful examination of Highlander's swap and bond holdings demonstrates that an individualized inquiry is necessary to determine whether a plaintiff had exposure to LIBOR (and if so, in what direction) and whether it therefore could have been injured at all.  The Court's analysis of Highlander thus compels the conclusion that the proposed class is uncertifiable.

*Second*, as this Court recognized in *LIBOR VI*, any persistent suppression of LIBOR would be absorbed to some degree into the price and other terms of the instruments at issue.  The price a party is willing to pay for a stream of LIBOR-based payments, and at which the counterparty is willing to sell, depends upon the parties' expectations of future LIBOR.  If, as Plaintiffs posit, LIBOR would have been persistently higher absent the alleged conduct, then one

---

[2] Unless otherwise indicated, all quotations omit internal quotation marks, ellipses, brackets, and citations, and all exhibit references are to the Declaration of Abram J. Ellis, submitted herewith.

must determine the extent to which those higher LIBOR levels would have increased the "price" each Plaintiff would have paid for its LIBOR-based instruments.  Absorption has dramatic consequences because many of the financial instruments were entered into during the alleged suppression period but lasted for decades beyond it.  For example, a 30-year swap entered into in the middle of the alleged suppression period would have experienced reduced floating rate payments for approximately one year, before the suppression ended — but any corresponding reduction in the fixed rate paid by the swapholder would have lasted for *30 years*.  Yale is a case in point: ███████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

    Critically, the degree of this absorption is idiosyncratic and can be determined only through an individualized factual inquiry into the parties' expectations of future LIBOR and how those expectations would have changed in a but-for world where LIBOR was persistently higher.  As the named Plaintiffs' data illustrate, the financial terms of swaps negotiated in the OTC market vary widely, even when background conditions are similar.  And as Plaintiffs' expert concedes, those variances cannot be explained absent ████████████████████████

█████████████████████  Bernheim Dep., Ex. 5, at 215:25–216:3.  Those "circumstances," including the parties' varying expectations of future LIBOR, led to different financial terms even in swaps of similar duration entered into at similar times and would result in highly idiosyncratic

responses in a but-for world where LIBOR was different.  Thus, determining how any given swap transaction would have changed in the but-for world requires an individualized analysis of the parties' expectations and how they would have been affected by a change in LIBOR. Plaintiffs' expert has not shown that this task can be accomplished using common proof.

*Third*, as *LIBOR VI* holds and Highlander illustrates, the Court will be required to "net" each plaintiff's losses against its gains to determine whether it was injured by any suppression of LIBOR.  There are two types of netting that Plaintiffs ignore, both of which demonstrate that determining whether a putative class member was injured requires individual inquiries.  The first type is "transaction-specific" netting, which for each putative class member nets any benefits from the alleged LIBOR suppression against any harms from the alleged LIBOR suppression on the same instrument.  This requires accounting for absorption into the fixed leg of a swap, as discussed above, as well as situations where the plaintiff both makes and receives LIBOR-based payments on the same instrument (for example, a swap in which the parties exchange payments linked to one tenor of LIBOR for payments linked to a different tenor of LIBOR).

The second type of netting Plaintiffs ignore is "cross-transaction" netting, in which a putative class member suffered a net harm on a swap but also received a net benefit from a different LIBOR-based transaction.  Unlike purchasers of physical goods and services, it is beyond debate that purchasers of LIBOR-based swaps routinely seek to hedge their interest rate exposure; that is, they have transactions on which, in direct opposition to their class instruments, they are making payments tied to LIBOR.  For example, Plaintiff TCEH █████████████
█████████████████████████████████████████████
███████████████████████ Determining whether a class member was injured, on net,

4

from any suppression therefore requires individualized evaluation not only of the particular transactions at issue, but also the class member's potentially diverse LIBOR-based exposures.

*Fourth*, the state law implied covenant and unjust enrichment claims present additional individual issues.  Not only does the substantive and procedural law vary significantly across the 50 states and the District of Columbia — in California, for example, the statute of limitations for contract claims is four years from *discovery* of the cause of action, while in New York the statute runs for six years from the *breach* — but the contracts are bespoke.  Plaintiffs do not grapple with the differences in either the contract language or the state laws under which they sue.

*Fifth*, the named Plaintiffs cannot establish the requirements of typicality or adequacy; nor can they show standing to represent bondholders.  They cannot show typicality because they are subject to unique defenses:  None of the named Plaintiffs has established net injury, as Plaintiffs' expert concedes.  They cannot show adequacy because their interests diverge:  Depending on their specific transactions, for the same date some may need to show higher suppression and some may need to show lower suppression in order to establish injury or maximize damages.  And the named Plaintiffs cannot represent bondholders because none of them could have been injured on bonds.

## ARGUMENT

To obtain class certification, Plaintiffs must establish by a preponderance of the evidence (1) each of the four prerequisites of Rule 23(a), *viz.*, numerosity, typicality, commonality, and adequacy, and (2) predominance and superiority under Rule 23(b)(3).  *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir. 2008).  The named Plaintiffs must also establish Article III and class standing to bring claims for the putative class.  *See Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 159–61 (2d Cir. 2014).  The moving party "must affirmatively

demonstrate his compliance with the Rule," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), and "certification is proper only if the trial court is satisfied, after a rigorous analysis," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013), that the moving party has met its burden.  Plaintiffs have not met their burden here.

## I.  PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE AND SUPERIORITY UNDER RULE 23(b)(3)

Plaintiffs must show (1) "that questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Whether a question is "individual" or "common" turns on the proof: "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Even setting aside the individual questions of collusion, suppression, and extent of suppression addressed in Defendants' "upstream" brief, individual inquiries into injury and damages — *i.e.*, whether a class member was injured in fact by the assumed suppression, and if so, by how much — "will inevitably overwhelm questions common to the class."  *Comcast*, 133 S. Ct. at 1433. Compounding the difficulty, Plaintiffs' implied covenant and unjust enrichment claims face variations in law across 51 jurisdictions and in the contract language.

### A.  Individual Issues of Injury and Damages Predominate on All Claims

The OTC Plaintiffs assert antitrust, implied covenant, and unjust enrichment claims on behalf of a putative class of persons who purchased, directly from a panel bank or its affiliate, either (1) an interest rate swap, or (2) a bond or floating rate note (collectively, "bonds"), under

which a panel bank paid interest tied to 1-month or 3-month USD LIBOR, where the interest rate was set between August 2007 and August 2009 (the "Class Period").[3]

"In an antitrust conspiracy action, plaintiffs must demonstrate that common questions predominate over individual questions as to the:  (1) existence of a conspiracy; (2) antitrust impact on each class member; and (3) antitrust damages."  1 McLaughlin on Class Actions § 5:36 (13th ed. 2016); *accord In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).  The second and third requirements — injury and damages — are not limited to antitrust actions but apply to any cause of action, including the state law claims here.  *See, e.g.*, *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. 2015).  As to injury, Plaintiffs must "show that they can prove, through common evidence, that *all* class members were . . . injured by the alleged conspiracy."  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (emphasis added).  Separate from injury, "the fact that damages may have to be ascertained on an individual basis is [also] a factor that [the Court] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015); *see also Comcast*, 133 S. Ct. at 1433 (plaintiff must show "damages are capable of measurement on a classwide basis").

As discussed further below, expert evidence confirms that neither the fact of injury nor the calculation of damages can be determined without individualized inquiry.  But the Court need not review the expert reports to see that this is so.  The example of Highlander, an OTC Plaintiff previously dismissed by the Court for lack of injury yet still within the OTC proposed class definition, illustrates why classwide injury cannot be shown with common proof.

---

[3] *See* MDL ECF No. 1904.  Plaintiffs also seek to certify Defendant-specific subclasses for their state law claims.

### 1. Highlander's Inclusion in the Class Illustrates Plaintiffs' Inability to Show Injury Using Common Proof

In *LIBOR V*, this Court considered claims asserted by Highlander, which "present[ed] itself as an OTC Plaintiff that was exposed to LIBOR suppression by trading an interest rate swap with . . . an affiliate of the Royal Bank of Scotland." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR V*), No. 11-md-2262 (NRB), 2015 WL 6696407, at *22 (S.D.N.Y. Nov. 3, 2015). Although Highlander's swap was tied to LIBOR, Highlander had simultaneously taken out a floating-rate loan from Citizens Bank that fully offset its exposure to LIBOR on the swap. *Id.* "The effect of the combined agreements was to insulate Highlander completely from changes in LIBOR." *Id.* at 23. Because "Highlander did not suffer injury from manipulation of LIBOR," *id.* at *3, the Court "dismiss[ed] Highlander Realty's complaint for lack of standing," *id.* at *22.

Despite its dismissal for lack of standing, Highlander falls within the class definition and could — absent individualized inquiry of the nature the Court undertook in *LIBOR V* — proceed through the class when it could not individually. Consistent with the class definition, Highlander allegedly purchased, directly from a panel bank affiliate, a swap that paid interest indexed to LIBOR set during the Class Period. *See id.* at 22–23; Swap Confirmation CED14314, MDL ECF No. 968-2, at 1–4 (Jan. 16, 2015). To determine whether Highlander was injured in fact, the Court examined Highlander's concurrent loan transaction — a paradigmatically individual inquiry. Because the proposed class would include Highlander (and presumably numerous other similarly uninjured individuals), certification would run afoul of the Second Circuit's instruction that a certified class contain no uninjured members. *See Denney*, 443 F.3d at 264.

Plaintiffs do not dispute that their proposed class includes members that were not injured. *See* OTC Mem. at 27. Instead, Plaintiffs argue that: (1) a certified class may include a "*de minimis*" number of uninjured parties, and (2) injury is established with "a single overcharge,"

regardless of whether a plaintiff suffered "net" injury.  *Id.* at 27–28 (citing *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015)).  Based upon this relaxed understanding of "injury," Plaintiffs' expert Dr. Bernheim opines that ███████████████████████████████████ ███  *Id.* at 27.  If either of Plaintiffs' premises is wrong, however, class certification should be denied.  Here, both premises are wrong and class certification should be denied.

(a)      The Second Circuit Does Not Recognize a *De Minimis* Exception to the Requirement of Classwide Injury

*Denney* makes clear that there is no *de minimis* exception in this Circuit:  Plaintiffs must be able to show, using common evidence, that *all* members of a proposed class were injured in fact.  443 F.3d at 264 ("The class must . . . be defined in such a way that anyone within it would have standing"); *see also Ruffo v. Adidas Am. Inc.*, No. 15-cv-5989 (AKH), 2016 WL 4581344, at *3 (S.D.N.Y. Sept. 2, 2016) (denying class certification in part because 0.7% defect rate "seriously undermines the proposition that *every* person who bought the Springblade shoes eventually experienced harm due to the alleged defect").  Other courts agree.[4]  By allowing parties who suffered no injury to join the class and potentially recover against Defendants, a *de minimis* exception would "offend[] both the Rules Enabling Act and the Due Process Clause." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (decertifying class in part because damages calculation failed to accurately reflect "the number of plaintiffs actually injured by defendants and . . . the amount of economic harm actually caused by defendants").

---

[4] *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 224, 252 (D.C. Cir. 2013) ("[W]e do expect the common evidence to show all class members suffered *some* injury."); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("No class may be certified that contains members lacking Article III standing."). Addressing antitrust impact in particular, courts have held that "where fact of damage cannot be established for *every* class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (emphasis added); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (similar); *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 487 (E.D. Tenn. 2016) (similar).  And citing Third Circuit precedent, one district court has expressly declined to adopt *Nexium*'s holding that "plaintiffs' failure to identify a methodology for distinguishing between injured and uninjured class members did not preclude class certification." *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *11 (E.D. Pa. June 10, 2015).

9

Contrary to Plaintiffs' suggestion, *see* OTC Mem. at 27, *Tyson Foods* does not undermine the requirement of classwide injury.  There, the Supreme Court expressly declined to address "whether a class may be certified if it contains members who were not injured and have no legal right to any damages."  136 S. Ct. at 1049.  Instead, the Court ruled on a different question — whether, in proving a claim under the Fair Labor Standards Act of 1938 ("FLSA"), a plaintiff could use a "representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records."  136 S. Ct. at 1047.  The Supreme Court answered in the affirmative, reasoning that "[r]ather than absolving the employees from proving individual injury, the representative evidence here was a permissible means of making that very showing."  *Id*.  That holding has no application here, both because this is not a FLSA case,[5] and because Plaintiffs do not seek to use representative evidence to prove injury.  Indeed, Dr. Bernheim opines █████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

        (b)     <u>Regardless of Whether There Is a *De Minimis* Exception, Plaintiffs Have Not Shown Classwide Injury</u>

Even if a *de minimis* exception were permissible (which, under *Denney* and numerous other authorities, it is not), Plaintiffs have not demonstrated that they can show, using classwide

---

[5] The Supreme Court explained that representative evidence is permissible under the FLSA because "when employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making the burden of proving uncompensated work an impossible hurdle for the employee."  *Tyson Foods*, 136 S. Ct. at 1047.  In antitrust cases, by contrast, the use of averages to show classwide impact "can lead to serious analytical problems" because, among other reasons, "averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact."  *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. Civ.A. 04-5898, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) (quoting ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 220 (2005)).  For this reason, courts have disfavored the use of averages to show classwide impact in antitrust cases.  *See, e.g.*, *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 152 (S.D.N.Y. 2006) (Proof of "an increase in the *average* price, . . . even though made on a classwide basis, cannot establish injury to each individual class member.").

proof, that only a *de minimis* number of class members were uninjured by the alleged

suppression of LIBOR.  As discussed *infra* Section I.A.2, Dr. Ordover estimates 

Ordover Rpt., Ex. 1, at ¶

113 & tbl. 21.  This number is not *de minimis*.  For his part, Dr. Bernheim ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bernheim Reb. Dep., Ex. 6, at 357:4-

12.

 Unable to show that only a *de minimis* number of putative class members were uninjured

in real economic terms, Plaintiffs wish away the task.  They argue the Court can essentially

assume classwide injury because "*impact* is demonstrated by a single overcharge (here, a

suppressed LIBOR payment), whether or not it is offset."  OTC Mem. at 28.  But the Court

rejected the notion that receipt of a single suppressed payment, without more, constitutes injury

when it dismissed Highlander for lack of standing in *LIBOR V*; and it rejected Plaintiffs' premise

yet again when it held, in *LIBOR VI*, that "plaintiffs may ultimately recover only to the extent of

their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the

same transaction or in a different transaction."  *In re LIBOR-Based Fin. Instruments Antitrust

Litig.* (*LIBOR VI*), No. 11-md-2262 (NRB), 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016).

 The overcharge cases Plaintiffs cite where courts have not inquired into offsets, *see* OTC

Mem. at 28 & n.68, are inapposite here.  As the Court has explained, "the effect of a change in

LIBOR cannot be isolated in the same way as the overcharge of a typical price-fixed product

---

[6] The absorption rates, such as 50% and 100%, refer to the extent to which the fixed leg was reduced by the alleged suppression.  For example, if the applicable tenor of LIBOR were allegedly suppressed by 20 basis on the date the swap was entered, a 50% absorption rate would mean that the fixed leg was reduced by 10 basis points.  Of course, while the floating leg would fluctuate thereafter (and the suppression would drop to zero after August 2009), the effect on the fixed leg would continue throughout the duration of the swap.

such as a book." *LIBOR VI*, 2016 WL 7378980, at *18.  Unlike the prescription drugs in *Nexium*, LIBOR is not a consumable good whose price is the sole determinant of injury — it is an interest rate benchmark referenced in various financial instruments.  And whether a class member was injured by the alleged persistent suppression of LIBOR turns on the relationship between LIBOR and the total economics of the class member's LIBOR-linked transactions, including any offsetting LIBOR exposure it may have had.  Plaintiffs have not established, and cannot establish, that only a *de minimis* number of putative class members are uninjured in this full economic sense.

In sum, this is not an overcharge case, *LIBOR VI*, 2016 WL 7378980, at *18, and determining classwide injury requires a complex analysis of the net impact of the alleged LIBOR suppression on each class member's LIBOR-linked portfolio, not merely a particular instrument plucked out of that portfolio.  But even if this were an overcharge case, courts have declined to certify classes where, as here, the impact of the alleged overcharge on class members could not be reliably determined using common proof.  For example, in *Robinson v. Texas Automobile Dealers Association*, 387 F.3d 416, 420 (5th Cir. 2004), the plaintiffs sought to certify a class of car purchasers who paid a Texas Vehicle Inventory Tax ("VIT") as a separate addition to the price of the car.  Under the plaintiffs' theory, if the VIT did not exist, "the consumer would pay that much less, or at least some amount less" for a car.  *Id.* at 423.  The Fifth Circuit found this assumption "defies the realities of the haggling that ensues in the American market when one buys a vehicle" because some "bottom-line purchasers" negotiate with an eye towards the "*final* purchase price, including every tax, fee, and surcharge" and therefore "do[] not pay more because of the presence of the VIT."  *Id.*  Because "a court would have to hear evidence regarding each purported class member and his transaction" to determine whether the member

negotiated in a "bottom-line fashion" — and therefore suffered no injury — predominance was not met. *Id.* at 424.[7]  Similarly, in this case, the parties to each swap "haggled" over the financial terms (just as the parties to a car sale haggle over the price and what it includes), and a change to LIBOR could have affected the other terms of the swap (just as the inclusion of the VIT could have affected the non-VIT portion of the price).  Thus, even if this were an overcharge case (and it is not), class certification would be inappropriate because the alleged overcharge did not necessarily cause injury to any putative member of the class.

### 2.  Expert Evidence Confirms That the Fact of Injury and Calculation of Damages Require Individualized Inquiry

Expert evidence reinforces what Highlander shows:  Plaintiffs cannot establish injury or damages using common proof.  This is for two reasons, both addressed by the Court in *LIBOR VI*.  First, any persistent suppression of LIBOR would be absorbed to some degree into the price and other terms of the swaps at issue.  The extent of absorption is transaction-specific; it cannot be determined using common proof but requires an individualized inquiry into how the negotiating counterparties would have adjusted their expectations of future LIBOR, and recrafted their transaction, in a but-for world where LIBOR was higher.  Second, a plaintiff must net its losses against its gains to determine whether it was injured (and if so, by how much) by the alleged suppression of LIBOR.  Netting requires individualized assessment of the impact of suppression on the transaction at issue and on the plaintiff's other LIBOR-based transactions.

---

[7] *See also Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005) (affirming denial of class certification in part because "the market for seeds is highly individualized, requiring particularized evidence to determine the competitive price that would have prevailed in the locality of any individual farmer"); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 300 (5th Cir. 2004) (affirming denial of class certification where court was unpersuaded that "a reliable formula for damages can be devised which will yield statistically significant results, that the data that would have to be plugged into such a formula can be assembled, that the relevant variables like negotiating skill can be quantified, and that all of this can be used to reliably measure antitrust damages for each of the many thousands of members of the proposed class"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*, 247 F.R.D. 156, 165–74 (C.D. Cal. 2007) (denying class certification where determining the price a class member would have paid in the but-for world would require a highly individualized inquiry due to negotiations over price and class members' preferences).

(a)     Absorption

In *LIBOR VI*, this Court explained that any persistent suppression of LIBOR would be "absorbed" into the negotiated components of a swap:[8]

> [I]n entering into a swap transaction the parties take into consideration the present level of LIBOR and their view of how LIBOR will change in the future.  The parties respond to these considerations when they set the non-LIBOR portions of the swap. . . .  Thus, in our view, the point of the Second Circuit's observation is that when swaps were entered into during the suppression period, the negotiated components absorbed the effects of LIBOR suppression.

2016 WL 7378980, at *20.  This makes sense because, as the parties' experts agree, ██████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Bernheim Rpt., Ex. 3, at ¶ 189; *accord* Ordover Rpt., Ex. 1, at ¶ 29.

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████ █████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[8] With the withdrawal of SEIU, there is no longer any named Plaintiff with standing to represent bondholders.  *See infra* Section III.  Should the Court disagree, the basic economic principles of absorption and netting applicable to swaps will also extend to bonds.  *See LIBOR VI*, 2016 WL 7378980, at *19 (persistent suppression would be absorbed into "the expected future interest payments and the purchase price of [a] bond"); *LIBOR V*, 2015 WL 6696407, at *22 (netting Highlander's bond and swap transactions).  The calculations, however, will differ.  *See* Ordover Rpt., Ex. 1, at ¶¶ 84–94.

[9] ████████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

     Absorption plays a critical role in the total economics of a swap transaction — and

indeed can be determinative of whether a swapholder was injured at all.  Take, for example, ██

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

15

███████████████████████████████████████████████████████

████████████████████████████████████████████████

Of course, it is not possible to determine using common proof which putative class members would actually have been injured.  For each putative class member, an individualized inquiry is necessary to determine how much absorption would have occurred and how that absorption would have affected the total economics of its transactions.  This is because the extent of absorption is not uniform across transactions.  █████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Simply put, different counterparties would have had different expectations of future LIBOR in the but-for world.  *See* Bernheim Reb. Dep., Ex. 6, at 366:2-8 (████████████████

█████████████████████████████████████████████████████

██████████████).  Adding to the complexity is the fact that all defendants and many plaintiffs are entities.  Expectations of future LIBOR may therefore vary, at any given time, not only across plaintiffs and defendants generally, but also across the particular individuals at each defendant and plaintiff entity that negotiated the transactions at issue.  Because expectations of future LIBOR are heterogeneous in the but-for world, the extent of absorption cannot be measured using common proof.

███████████████████████████████████████████████

█████████████████████████████████████████████████████

[10]

[11]

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

        ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

        (b)     Netting

Consistent with its dismissal of Highlander for lack of injury, this Court held in *LIBOR VI* that "plaintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the same transaction or in a different transaction." 2016 WL 7378980, at *18. Despite the Court's rulings, Plaintiffs make no attempt to integrate netting into their models of injury or damages, and instead merely assure the Court that netting is "even simpler to do on a class-wide basis." OTC Mem. at 30. But "[a] party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is

19

insufficient." *Hydrogen Peroxide*, 552 F.3d at 318.  Plaintiffs' (and their expert's) reliance upon

terms like "mechanical calculation," OTC Mem. at 31, is a red herring, for what determines

whether a question is individualized is not the sophistication of the calculation but whether that

calculation — mechanical or not — requires individual *proof.  Tyson Foods,* 136 S. Ct. at 1045.

As Dr. Bernheim concedes, ████████████████████████████████████████████

████████████████  Bernheim Reb. Rpt., Ex. 4, at ¶ 375.  There is thus no dispute that netting is an

individualized inquiry — one that, as discussed below, would be a difficult and contentious

undertaking for even a single class member, let alone several thousand.

    Two types of netting are relevant here, and both are essential to determining whether any

putative class member was injured, and if so, by how much.  First, "transaction-specific" netting

occurs when a plaintiff was both benefited and harmed on a single swap.  As discussed in

Section I.A.2(a) above, this requires accounting for any absorption of alleged LIBOR

suppression into the fixed rate of a swap.[12]  Additionally, it requires netting benefits and harms

from alleged LIBOR suppression where the plaintiff both made and received LIBOR-based

payments on the same swap (a type of basis swap), such as a swap in which the parties exchange

payments linked to one LIBOR tenor (*e.g.*, 1-month LIBOR) for payments linked to a different

LIBOR tenor (*e.g.*, 3-month LIBOR).

    The second type of netting, "cross-transaction" netting, occurs when a plaintiff received

suppressed payments on a swap, but also received some benefit on a different LIBOR-based

---

[12] ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████

transaction.  For example, Highlander "simultaneously took out a floating-rate loan from Citizens Bank and used an interest rate swap to exchange its floating-rate obligations for fixed-rate obligations.  The effect of the combined agreements was to insulate Highlander completely from changes in LIBOR."  *LIBOR V*, 2015 WL 6696407, at *23.  When accounting for absorption and netting swap exposure across panel banks, Dr. Ordover calculates ███████████

███████████████████████████████████████████

███████████████████████████ Ordover Rpt., Ex. 1, at ¶ 113 & tbl. 21.

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ █ ████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████ █ ██████████████████████

███████████████████████████████████

---

[13] ██████████████████████████████████████
████████████████████████

[14] ███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████

21

In short, Plaintiffs cannot determine whether the putative class members were injured (and if so, by how much) without accounting for both absorption and netting — which they cannot do with common proof.  Their expert report reflects as much.  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

(c)      <u>Application to Named Plaintiffs</u>

Application of the foregoing principles to the named Plaintiffs' transactions illustrates that individualized inquiries are necessary to determine injury and damages.  Dr. Ordover's analysis shows that ████████████████████████████████████████████

████████████████████████████████████████████████████████

*See* Ordover Rpt., Ex. 1, at ¶¶ 126–52.  ████████████████████████

████████████████████████████████████████████████████ *See*

*id.* ¶¶ 137–42.  Performing this depth of analysis for each class member — a task Plaintiffs' expert does not even attempt — would "inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433.  This is particularly so given the negotiated character of the transactions at issue.  *See supra* note 7.

**B.      Further Individual Issues Predominate on Plaintiffs' State Law Claims**

Plaintiffs seek to certify a nationwide class asserting state law implied covenant and

unjust enrichment claims.[15]  As an initial matter, both claims require analysis of contractual

terms and states of mind that make them unsuitable for class treatment.  Moreover, Plaintiffs

must "show[], 'through extensive analysis of state law variances, that class certification does not

present insuperable obstacles.'"  Mem. and Order, MDL ECF No. 1574, at 2 (Sept. 20, 2016).

Plaintiffs conduct no choice-of-law analysis whatsoever, and that failure is dispositive.  *Cole v.

Gen. Motors Corp.*, 484 F.3d 717, 724–25 (5th Cir. 2007).

**1.      Unjust Enrichment and Implied Covenant Claims Require Individual
Assessment of Contractual Terms and State of Mind Evidence**

Even setting aside variations in governing state law, courts in the Second Circuit have

declined to certify class actions based on unjust enrichment claims because of the individual

considerations inherent in such claims.  *See, e.g.*, *Vaccariello v. XM Satellite Radio*, 295 F.R.D.

62, 75–76 (S.D.N.Y. 2013).[16]  For similar reasons, courts "properly refuse to certify breach of

contract class actions where the claims require examination of individual contract language."

*Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 74 (E.D.N.Y. 2014).[17]

Here, Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are

premised on ISDA Master Agreements.  These are not standard form contracts but are instead

---

[15] Plaintiffs also seek to certify Defendant-specific subclasses, but each proposed subclass would be nationwide.

[16] *See also Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *10–11 (S.D.N.Y. Aug. 5, 2010); *In re Canon Cameras*, 237 F.R.D. 357, 359–60 (S.D.N.Y. 2006).  Other courts agree that unjust enrichment claims are not appropriate for class treatment.  *See Klay* v. *Humana, Inc.*, 382 F.3d 1241, 1267 (11th Cir. 2004); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 620 n.8 (W.D. Wash. 2003); *Clay* v. *Am. Tobacco Co.*, 188 F.R.D. 483, 501–02 (S.D. Ill. 1999).

[17] Under New York law, a breach of implied covenant claim is substantially the same as a breach of contract claim. *See, e.g.*, *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n.17 (2d Cir. 2011).

heavily negotiated bespoke contracts — with many surviving for decades.[18]  Some may, for example, contain arbitration clauses that would prevent litigation of a claim.[19]  Plaintiffs make no attempt to show uniformity across the potentially myriad contracts at issue here.  *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts.").

Moreover, even if the contracts at issue were substantially similar, resolution of Plaintiffs' claims would require individualized analysis of the parties' intent.  For example, whether a class member would consider a LIBOR submission suppressed — in breach of an implied covenant — would depend in part on its understanding of the LIBOR question.  Plaintiffs concede that "a jury may decide that the LIBOR question" is consistent with Defendants' interpretation rather than Plaintiffs', OTC Mem. at 26, but fail to recognize that *class members* could also take different views on that question.  For example, ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████  Yale Dep., Ex. 7, at 19:19–23; *see also* Upstream Class Cert. Opp. at 7–8 (███████████████████████████████).  Only an individualized inquiry into each class member's understanding of the LIBOR question can determine whether it would have considered a submission "suppressed."  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR II*), 962 F. Supp. 2d 606, 632 (S.D.N.Y. 2013) ("In entering into these [swap] contracts, plaintiffs

---

[18] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████

[19] *See generally* Int'l Swaps & Derivatives Ass'n, 2013 ISDA Arbitration Guide (2013), *available at* https://www2.isda.org/attachment/NTg0MQ==/ISDA_Arbitration_Guide_Final_09.09.13.pdf.

allege, they expected LIBOR to be set according to its definition, such that it reflected the average interest rate being charged in the London interbank lending market.").

### 2.    Choice-of-Law Considerations Defeat Predominance

A choice-of-law analysis is required for each cause of action to determine "whether different state laws will apply to different members of the class." *Nextel*, 780 F.3d at 140.  Here, New York choice-of-law rules apply.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*), No. 11-md-2262 (NRB), 2015 WL 6243526, at *118 (S.D.N.Y. Oct. 20, 2015).  For contract claims, New York uses a "center of gravity" approach that may require analysis of "a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile . . . of the contracting parties," as well as any contractual choice-of-law provision.  *Bank of N.Y. v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014).  New York choice-of-law rules are less clear for unjust enrichment claims. *See Gerloff v. Hostetter Schneider Realty*, No. 12 Civ. 9404 (LGS), 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20, 2014) ("Whether to apply to an unjust enrichment claim New York's 'center of gravity' choice of law test applicable to contract disputes, or New York's 'interest analysis' test applicable to tort claims, is a matter of debate among district courts in this Circuit.").

Given these choice-of-law rules, the Court would have to conduct a separate inquiry for each class member to determine which jurisdiction's law governs for each cause of action.  *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) ("[B]ecause we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially.").  This would require the resolution of numerous plaintiff- and contract-specific questions, including:  (1) which jurisdiction has the "most significant relationship" to the contract based on the parties' negotiations, domicile, and place of performance; (2) whether the contract contains a choice-of-law provision; (3) which

jurisdiction is identified as the governing law; (4) whether any choice-of-law provision is valid and enforceable; (5) whether a "center of gravity" or "interest analysis" approach should apply to the unjust enrichment claims; and (6) which jurisdiction has the greatest interest in the unjust enrichment dispute, based on the parties' domiciles and the location of the alleged tort. The resolution of these individualized inquiries would almost certainly result in the application of the law of multiple jurisdictions, if not all 50 states, the District of Columbia, and many foreign countries. Plaintiffs proffer no evidence whatsoever to the contrary. "[C]ourts routinely deny class certification" in such circumstances. *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311–12 (S.D.N.Y. 2004); *see also Ruffo*, 2016 WL 4581344, at *3; *In re Fosamax Prod. Liab. Litig.*, 248 F.R.D. 389, 402 (S.D.N.Y. 2008).

### 3.     Variations in Substantive Law Defeat Predominance

Given that the substantive law of multiple jurisdictions will apply, Plaintiffs must "creditably demonstrate, through an *extensive analysi*s of state law variances, that class certification does not present insuperable obstacles." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (emphasis added); *see also Nextel*, 780 F.3d at 141. Plaintiffs have not even attempted the task. Instead, Plaintiffs declare, with no analysis or support, that common questions predominate. Plaintiffs are wrong.

*First*, the law of unjust enrichment varies substantially between jurisdictions. For example, some states preclude unjust enrichment claims where the subject matter is governed by a valid contract, *see, e.g.*, *Glenn Mech., Inc. v. S. Ark. Reg. Health Ctr., Inc.*, 278 S.W.3d 583, 587 (Ark. Ct. App. 2008), while other states allow breach of contract and unjust enrichment claims to overlap, *see, e.g.*, *Richmond Sq. Capital Corp. v. Ins. House*, 744 A.2d 401, 402 (R.I. 1999). "Where certification of a multistate unjust enrichment class is sought, variations in state

law . . . have precluded class certification."  1 McLaughlin on Class Actions § 5:60 (13th ed.

2016).  Courts frequently decline to certify multistate classes for this reason.[20]

*Second*, the substantive law governing Plaintiffs' implied covenant claims also differs

between jurisdictions.  For example, Texas recognizes no "general duty of good faith and fair

dealing in ordinary, arms-length commercial transactions," *Formosa Plastics Corp. USA v.*

*Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 52 (Tex. 1998), while Arizona recognizes a

more robust implied covenant that "extends beyond the written words of the contract," *Wells*

*Fargo Bank v. Ariz. Laborers*, 38 P.3d 12, 29 (Ariz. 2002).  Moreover, states vary in both the

length and determination of the statutes of limitations.[21]  For example, the statute of limitations

for contract claims in California is four years from *discovery* of the breach, while in New York it

is six years from the *breach*.  *See LIBOR IV*, 2015 WL 6243526, at **128, 131.  Courts have

denied certification of implied covenant classes involving far fewer jurisdictions than potentially

at issue here.  *See, e.g.*, *Yarger v. ING Bank*, 285 F.R.D. 308, 325–26 (D. Del. 2012) (16 states).

### C.  A Class Action is Not a Superior Vehicle for Adjudication of These Claims

Key to determining whether "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy" are "the likely difficulties in managing a class

action."  Fed. R. Civ. P. 23(b)(3)(D).  Manageability — which "encompasses the whole range of

practical problems that may render the class action format inappropriate for a particular suit,"

---

[20] *See, e.g.*, *Tropical Sails Corp v. Yext*, No. 14 Civ. 7582 (JFK), 2017 WL 1048086, at *13 (S.D.N.Y. Mar. 17, 2017) ("[I]f the law of multiple states applied to the unjust enrichment claim, that alone may defeat certification of [Plaintiff's] nationwide class."); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 142–43 (S.D.N.Y. 2014); *Kottler v. Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *4 (S.D.N.Y. Mar. 29, 2010); *Currency Conversion*, 230 F.R.D. at 303; *see also Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 548–50 (C.D. Cal. 2013); *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008); *Clay*, 188 F.R.D. at 500–01.

[21] Even assuming New York law applies to every contract at issue, New York's borrowing statute, N.Y. CPLR § 202, requires the cause of action be timely under the limitations of both New York and the jurisdiction where the cause of action accrued.  *LIBOR IV*, 2015 WL 6243526, at *118.  Since the Court's decision in *LIBOR IV*, the First Department has clarified that contractual choice-of-law provisions do not bar the application of New York's borrowing statute.  *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 144 A.D.3d 122, 126 (1st Dep't 2016).

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) — weighs heavily against certification

where, as here, individualized questions of injury "would result in thousands of mini-trials," *In*

*re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628 (RMB), 2008 WL 5661873, at

*9 (S.D.N.Y. Feb. 20, 2008); *see also Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983)

(noting "the scores of different products involved, varying local market conditions, fluctuations

over time, and the difficulties of proving consumer purchasers after a lapse of five or ten years").

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED TYPICALITY AND ADEQUACY UNDER RULE 23(a)

### A.   Plaintiffs Have Not Established Typicality

The typicality requirement of Rule 23(a)(3) is not met where the named Plaintiffs are

"subject to unique defenses which threaten to become the focus on the litigation." *Baffa v.*

*Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).  Here, each of the

named Plaintiffs is subject to the unique defense that it suffered no injury.  Indeed, the highly

individualized, economically complex analysis required to evaluate injury for each of these

named Plaintiffs — none of which has established net injury[22] — reinforces that similar

individualized inquires would need to be made for each class member, and that lead Plaintiffs are

thus not "typical."  Each of the named Plaintiffs may also be subject to unique defenses on its

state law claims based upon the governing law and contract language at issue.

### B.   Plaintiffs Have Not Established Adequacy

TCEH, Yale, Jennie Stuart, and New Britain cannot "fairly and adequately protect the

interests of the class," Fed. R. Civ. P. 23(a)(4), because they likely benefited from any persistent

suppression.  *See supra* Section I.A.2(c).  But even assuming *arguendo* that all named Plaintiffs

suffered injury, they are not adequate representatives because their "interests are antagonistic to

---

[22] ██████████████████████████████████████████████████████████████

██████████████████████████████████

the interest of other members of the class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).  This is inherent in the absorption issue.  A class member would want to show there was little or no suppression at the time of its transaction (and thus it received no benefit on the fixed leg of its swap), and that suppression increased thereafter.  Thus, New Britain, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

## III.   PLAINTIFFS LACK STANDING TO BRING CLAIMS ON BEHALF OF BONDHOLDERS

Following the withdrawal of SEIU, *see* MDL ECF No. 1992, no named Plaintiff alleges a purchase of a LIBOR-based bond.  The remaining named Plaintiffs, who allege transactions only in interest rate swaps, therefore lack standing to bring claims on behalf of bondholders.

In his March 2017 decision in *Sonterra Capital Master Fund, Ltd. v. UBS AG*, Judge Daniels held the named plaintiffs lacked Article III standing to bring claims on Yen LIBOR-based forward rate agreements ("FRAs") because they did not transact in those instruments.  No. 15-cv-5844 (GBD), 2017 WL 1091983, at *2 (S.D.N.Y. Mar. 10, 2017).  Rejecting the argument that FRAs were "nearly identical to the Yen-LIBOR-based interest rate swaps [a named plaintiff] traded and are affected by Defendants' anticompetitive conduct in the same way," Judge Daniels held that "[b]ecause Plaintiffs did not transact in Forward Rate Agreements, they could not have suffered any injury traceable to these instruments and lack standing to bring these claims."  *Id.*  Here, the named Plaintiffs likewise did not transact in bonds and "could not have suffered any injury traceable to these instruments."  They therefore lack Article III standing to sue on bonds.

The named Plaintiffs also have not shown class standing to represent bondholders.  In the lead case on class standing, the Second Circuit held that the named plaintiffs could not sue on

residential mortgage backed securities trusts in which they did not invest because "Plaintiffs' claims do not implicate the same set of concerns as those of absent class members who purchased certificates issued by trusts in which no named Plaintiff invested." *Ret. Bd.*, 775 F.3d at 163.[23]  Here, claims by swapholders and claims by bondholders also implicate a different "set of concerns" because swap and bond transactions are economically distinct.  *See LIBOR V*, 2015 WL 6696407, at *22 ("Unlike a discrete swap transaction, a bond issuance is a major corporate event that officers and directors of the corporate parent would typically oversee.").  Swap and bond transactions require different levels of negotiation, are governed by different kinds of agreements, and bear a different economic relationship to LIBOR.  *See generally LIBOR VI*, 2016 WL 7378980, at *18–20.  Indeed, Plaintiffs' expert ███████████████████████████ ██████████████████  *See* Bernheim Reb. Rpt., Ex. 4, at ¶ 384 n.311 (████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████).[24]

## CONCLUSION

The OTC Plaintiffs' motion for class certification should be denied.[25]

---

[23] *See also In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008) (common stock holders lacked standing to bring claims on behalf of debt holders "notwithstanding the allegations that the same general course of conduct allegedly engaged in by defendants caused injury to all putative class members"); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 497 (S.D.N.Y. 2004) (dismissing claims where "named plaintiffs who have only alleged injury on the basis of their equity purchases lack standing to pursue a claim that the alleged misrepresentations caused injuries by artificially inflating the prices of certain bonds, where none of the named plaintiffs purchased those bonds.").

[24] Plaintiffs cannot show numerosity as to a swapholder sub-class against Credit Suisse AG.  During the relevant period, Credit Suisse AG ████████████████████████████████████  Kurtzberg Decl. ¶6, Exs. 1–3.  *See Cons. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity is presumed at a level of 40 class members).

[25] Plaintiffs' alternative request for "certification as to common questions regarding liability and damages" under Rule 23(c)(4), Pls' Mem. at 33 n.72, should also be denied because there simply are no "common questions regarding liability and damages."  Whether a particular plaintiff was injured, and if so by how much, can be determined only through individualized proof.  *See* Section I.A.

Dated:          New York, New York
                July 3, 2017

                                        Respectfully submitted,


/s/ Arthur J. Burke                     /s/ Abram J. Ellis
Arthur J. Burke                         Thomas C. Rice
Paul S. Mishkin                         Paul C. Gluckow
Adam G. Mehes                           Alan C. Turner
Patrick W. Blakemore                    Omari L. Mason
Peter J. Davis                          Alexander Li
DAVIS POLK & WARDWELL LLP               SIMPSON THACHER & BARTLETT LLP
450 Lexington Avenue                    425 Lexington Avenue
New York, New York 10017                New York, New York 10017
Telephone: (212) 450-4000               Telephone: (212) 455-2000
Fax: (212) 450-4800                     Fax: (212) 455-2502
arthur.burke@davispolk.com              trice@stblaw.com
paul.mishkin@davispolk.com              pgluckow@stblaw.com
adam.mehes@davispolk.com                aturner@stblaw.com
patrick.blakemore@davispolk.com         omason@stblaw.com
peter.davis@davispolk.com               zander.li@stblaw.com

*Attorneys for Defendants Bank of America*   Abram J. Ellis
*Corporation and Bank of America, N.A.*      900 G Street NW
                                             Washington, D.C.  20001
                                             Telephone:  (202) 636-5500
                                             Fax:  (202) 636-5502
                                             aellis@stblaw.com

                                             *Attorneys for Defendants JPMorgan Chase &*
                                             *Co. and JPMorgan Chase Bank, N.A.*

/s/ Joel Kurtzberg
Herbert S. Washer
Elai Katz
Joel Kurtzberg
Jason Hall
Lauren Perlgut
Adam Mintz
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com
jhall@cahill.com
lperlgut@cahill.com
amintz@cahill.com

*Attorneys for Defendants Credit Suisse AG
and Credit Suisse (USA) Inc.*

/s/ Moses Silverman
Moses Silverman
Aidan Synnott
Hallie S. Goldblatt
Noah A. Mamis
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Fax: (212) 757-3990
msilverman@paulweiss.com
asynnott@paulweiss.com
hgoldblatt@paulweiss.com
nmamis@paulweiss.com

*Attorneys for Defendant Deutsche Bank AG*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
Taylor M. Steffan
Benjamin L. Cavataro
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com
tsteffan@cov.com
bcavataro@cov.com

Lev Dassin
Jonathan S. Kolodner
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
ldassin@cgsh.com
jkolodner@cgsh.com

*Attorneys for Defendants Citibank, N.A.
and Citigroup Inc.*

/s/ Christian T. Kemnitz
Arthur W. Hahn
Christian T. Kemnitz
Brian J. Poronsky
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: (312) 902-5200
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
brian.poronsky@kattenlaw.com

*Attorneys for Defendant Royal Bank of Canada*

/s/ Peter Sullivan
Peter Sullivan
Eric J. Stock
Jefferson E. Bell
Matthew Greenfield
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com
mgreenfield@gibsondunn.com

*Attorneys for Defendant UBS AG*