## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262<br>Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | **ORAL ARGUMENT REQUESTED** |
| METZLER INVESTMENT GmbH, FTC FUTURES FUND SICAV, FTC FUTURES FUND PCC LTD., ATLANTIC TRADING USA, LLC, 303030 TRADING LLC, GARY FRANCIS, and NATHANIAL HAYNES, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, N.A., HSBC HOLDINGS PLC, HSBC BANK PLC, HBOS PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, LLOYDS TSB BANK PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, THE NORINCHUKIN BANK, ROYAL BANK OF CANADA, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., COOPERATIVE CENTRAL RAIFFEISENBOERENLEENBANK B.A., SOCIÉTÉ GÉNÉRALE S.A., CITIGROUP, INC., CITIBANK NA, and JOHN DOES 1-5,<br><br>        Defendants. | No. 11-cv-2613-NRB |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO THE EXCHANGE PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT D. WILLIG

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT .................................................................................................................... 3

I.   A Panel Bank's Actual LIB Costs Are Important to Determining Whether Its LIBOR Submissions Were Suppressed ..................................................................... 3

    A.   The Exchange Plaintiffs Themselves Have Repeatedly Interpreted The LIBOR Question to Concern Actual Borrowing Costs ................................... 3

    B.   The Wording, Administration, History, and Purpose of the LIBOR Question All Confirm the Use of Actual LIB Costs in Making a Submission ...................................................................................................... 5

        1.   The Wording of the LIBOR Question Supports the Use of LIB Data. ....................................................................................................... 6

        2.   The LIBOR Administrators' Instructions and Views Support the Use of LIB Data ...................................................................................... 6

        3.   The History of the LIBOR Question Supports the Use of LIB Data .......... 8

    C.   A Wide Range of Other Authorities Confirm the Importance of Actual LIB Costs in Determining Submissions ................................................................ 9

    D.   Exchange Plaintiffs' Contention That Bid-Ask Spreads Widened During the Class Period Does Not Undermine Prof. Willig's Analysis ........................... 12

II.   Exchange Plaintiffs' Contention That the Panel Banks' LIB Transaction Data Is Too Limited to Use Is Unsupported by Any Evidence ..................................................... 15

III.   Exchange Plaintiffs' Assertion That Prof. Willig Provides a Merits Opinion Is Incorrect and, in Any Event, Not a Basis for a *Daubert* Motion ..................................... 17

CONCLUSION ..................................................................................................................... 18

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989) ....................................................5

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ...........................................................18

*In re Digital Music Antitrust Litig.*,
  No. 06-md-1780 (LAP), 2017 WL 3037577 (S.D.N.Y. July 18, 2017) ..................6

*Faulkner v. Arista Records L.L.C.*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014) ...........................................3

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982) .............................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .............................................................18

## PRELIMINARY STATEMENT

For years, Exchange Plaintiffs have alleged that Defendants suppressed LIBOR by underreporting their "actual borrowing costs," repeatedly urging that they needed Defendants' internal borrowing data to test those allegations.  Defendants produced that data and Defendants' "upstream" expert, Prof. Robert Willig, compared it to Defendants' LIBOR submissions—precisely the exercise that Exchange Plaintiffs themselves said was required.  Unhappy with what that comparison shows, Exchange Plaintiffs now claim that use of the comparison is "unusual" and "unreliable," rendering Prof. Willig's conclusions inadmissible.  In other words, Exchange Plaintiffs not only abandon their longstanding position that LIBOR submissions are properly compared to the banks' borrowing costs, but go so far as to claim that their prior position was sufficiently wrong to flunk *Daubert*.  Exchange Plaintiffs' motion is baseless and should be denied.

Exchange Plaintiffs' newly minted theory is that LIBOR has nothing to do with panel banks' actual borrowing costs and that, instead, the benchmark they characterize as "the world's most important number" is actually merely an obscure measure of initial offers received from counterparties—*i.e.*, the starting point for certain interbank borrowing negotiations.  This argument is contradicted not only by Exchange Plaintiffs' own prior representations repeated over the course of years, but also by ████████████████████████████████ ███████ (iii) the wording of the LIBOR question; (iv) the British Bankers Association ("BBA"), as expressed in several contemporaneous guidance documents interpreting LIBOR; (v) the current LIBOR administrator, the Intercontinental Exchange ("ICE"); (vi) U.S. and U.K. regulators tasked with investigating alleged LIBOR manipulation; (vii) the Financial Stability Board, an international investigative body that represents all G20 countries and is chaired by the Governor of the Bank of England; and (viii) multiple academic scholars who have studied the

question.  Exchange Plaintiffs' revised interpretation of the LIBOR question is meritless, and certainly not a basis for excluding Prof. Willig's testimony.

Exchange Plaintiffs' alternative arguments do not fare any better.  Exchange Plaintiffs contend that Prof. Willig's use of the 95th percentile of borrowing costs as a benchmark for LIBOR submissions is "arbitrary," but they provide no evidence to suggest it is incorrect, and indeed ███████████████████████████████████ ██ ████████████ ███████████████████████████████.  Exchange Plaintiffs also contend that Prof. Willig's analysis should be excluded because the panel banks' LIB borrowing data is too sparse to use in assessing whether LIBOR was suppressed.  That contention is untenable: Prof. Willig—an Emeritus Professor of Economics at Princeton and former Chief Economist at the DOJ Antitrust Division— analyzed nearly ████████ panel bank LIB transactions and over █████████ panel bank borrowing transactions in total during the Class Period.  Finally, Exchange Plaintiffs contend that Prof. Willig has issued an improper "merits" opinion at the class certification stage.  But Exchange Plaintiffs mischaracterize Prof. Willig's opinion:  Prof. Willig does not opine on whether LIBOR was or was not suppressed on any particular day during the Class Period; rather, he concludes that common evidence cannot show that LIBOR was *persistently* suppressed during the Class Period and that individualized inquiries are necessary to determine whether LIBOR submissions were suppressed on any particular day, by any particular bank, in any particular tenor.  In any event, it is not improper for Prof. Willig to opine on questions that overlap with merits issues in this case.  To the contrary, as the Supreme Court made clear in *Wal-Mart* and *Comcast*, courts must resolve merits issues to the extent necessary to determine whether a class should be certified.

## ARGUMENT

Mere disagreement with an expert's testimony is not grounds for exclusion; rather, to warrant exclusion, the burden is on Exchange Plaintiffs to show that Prof. Willig's opinions are fundamentally unreliable. *See, e.g.*, *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 382 (S.D.N.Y. 2014) (although movant "disagree[d] with [expert's] conclusions," court denied motion to exclude because movant did not show a "serious flaw in [the expert's] reasoning"). Exchange Plaintiffs do not meet that burden.

I.   **A Panel Bank's Actual LIB Costs Are Important to Determining Whether Its LIBOR Submissions Were Suppressed**

A.   **The Exchange Plaintiffs Themselves Have Repeatedly Interpreted the LIBOR Question to Concern Actual Borrowing Costs**

Exchange Plaintiffs have long contended that the LIBOR panel banks conspired to suppress LIBOR because the panel banks' "LIBOR quotes during the Class Period did not appropriately reflect those banks' *actual borrowing costs* at that time." *E.g.*, Exchange Prop. Fourth Am. Compl. ("PFAC") ¶ 131, ECF No. 1726 (emphasis added); *see also, e.g.*, *id.* (alleging a "striking discrepancy between Defendants' submissions to the BBA and their *actual borrowing costs*" (emphasis added)).[1]   Indeed, according to Exchange Plaintiffs, panel banks' purported desire to make their actual borrowing costs seem lower than they were was the very *raison d'être* of the alleged conspiracy.  Exchange Plaintiffs explain "that *the interest rate a bank pays* (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with the bank," and therefore the panel banks purportedly "understated *their borrowing costs* to the British Bankers' Association ("BBA") (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually

---

[1] *See also* Exchange Am. Compl. ¶ 122, ECF No. 134; Exchange Second Am. Compl. ¶ 162, ECF No. 438; Exchange Prop. Third Am. Compl. ¶ 130,. ECF No. 1159.

were." *E.g.*, *id.* ¶ 5 (emphasis added); *see also, e.g.*, *id.* ¶ 13 (alleging panel banks conspired to suppress LIBOR by "acting together and in concert to knowingly understate *their true borrowing costs*" (emphasis added)).

Moreover, to avoid the statute of limitations, Exchange Plaintiffs have alleged that the panel banks' "actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it impossible for Plaintiffs . . . to discern [LIBOR suppression]." *E.g.*, *id.* ¶ 729.[2]  And Exchange Plaintiffs interpreted the LIBOR question as concerning actual transaction rates at the start of class certification discovery when they defined "LIBOR Suppression" as "making LIBOR Submissions below the LIBOR Panel Bank's *actual cost of borrowing* in the London Interbank Market" in their document requests.  Exchange Second Omnibus Doc Req., Declaration of Paul S. Mishkin Ex. 12 at 7 (emphasis added).[3]



---

[2] Indeed, if Exchange Plaintiffs were correct that, as they now contend, the accuracy of LIBOR submissions can be verified simply by comparing LIBOR to the public FRED or ICAP Ask rates, then the purported suppression of LIBOR was easily detectible and any reasonable investor was on inquiry notice as soon as LIBOR began to diverge from those indices.

[3] Citations to the exhibits accompanying the Declaration of Paul S. Mishkin will be referred to as "Mishkin Decl., Ex. __".



[4]

Having now seen that the panel banks' LIB transaction data refute their theory of persistent suppression, Exchange Plaintiffs want to erase this history.  They cannot do so.  *See Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party.")  Exchange Plaintiffs' argument that Prof. Willig erred in using the same LIB data that Exchange Plaintiffs repeatedly contended was important to determining whether the panel banks suppressed LIBOR is a last-ditch effort to salvage their case after the theory they had espoused for years was shown to be false.

### B.  The Wording, Administration, History, and Purpose of the LIBOR Question All Confirm the Use of Actual LIB Costs in Making a Submission

The LIBOR question's plain text, the LIBOR administrators' instructions to panel banks, the LIBOR question's drafting history, and the views of regulators, international bodies, and academics all support the conclusion that actual LIB transactions entered into by panel banks are

---

[4] Citations to the exhibits accompanying the Declaration of Fred T. Isquith Jr. will be referred to as "Isquith Decl., Ex. __".

highly relevant in determining whether LIBOR submissions were persistently suppressed.  That mountain of evidence is more than sufficient to deny Exchange Plaintiffs' *Daubert* motion.  *See In re Digital Music Antitrust Litig.*, 2017 WL 3037577, at *10 (S.D.N.Y. July 18, 2017) ("Where expert witnesses disagree on the interpretation of evidence properly admitted before the Court, it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.").

### 1.   The Wording of the LIBOR Question Supports the Use of LIB Data

The plain text of the LIBOR question—"At what rate could you borrow funds, were you to do so by asking for and then accepting interbank offers in a reasonable market size just prior to 11 am London time?"—confirms that LIBOR is intended to reflect the transaction rate that a panel bank would obtain were it to ask counterparty banks for offers, as opposed to merely the opening offer(s) that the panel bank would receive from those counterparties.  First, as discussed in greater detail in the Lender *Daubert* Opposition, both the phrase "could . . . borrow funds" and the term "accepting" imply consummated transactions that would occur after the solicitation of offers, not merely starting points for negotiations.  *See* Lender *Daubert* Opp. at 8-9.  Second, Exchange Plaintiffs' interpretation of the LIBOR question as referring exclusively to opening offers reads the word "initial" or "opening" before the word "offer" in the LIBOR question when those words are not there.  *See id.*  The offer a bank would accept is the *final* offer, not any *initial* offer it might have received.  The Court should reject Exchange Plaintiffs' attempt to rewrite the LIBOR question.

### 2.   The LIBOR Administrators' Instructions and Views Support the Use of LIB Data

As more fully discussed in the Lender *Daubert* Opposition, the BBA's contemporaneous views during the Class Period—including its description that "BBA LIBOR reflects the actual

6

rate at which banks borrow money from each other"[5]—affirm that the LIBOR question is intended to reflect actual transaction rates (under the conditions specified in the LIBOR question), not merely initial offers as Exchange Plaintiffs contend.  Lender *Daubert* Opp. 9-11.

Exchange Plaintiffs' selective quotations from certain BBA guidance only undermine their newly minted interpretation of the LIBOR question.  Revealingly, although Exchange Plaintiffs purport to quote the 2009 "Guidelines for Contributing BBA LIBOR Rates" for the proposition that LIBOR is "'not based on actual transaction[s],'" Exchange-Based Plaintiffs' Memorandum of Law in Support of Motion to Exclude the Opinions of Robert D. Willig ("Mot.") at 9-10 (quoting Isquith Decl., Ex. 5) (emphasis omitted), that quote does not appear in the cited document.  Instead, the document on which Exchange Plaintiffs rely provides the opposite guidance, saying, "BBA LIBOR reflects *the cost of funds* in London," "the rates submitted into the process are a bank's own view of its *cost of funds*," and "the contributing Bank is required to . . . supply an appropriate rate that is, as far as is possible, a fair and accurate reflection of that bank's opinion of its *cost of funds*."  Isquith Decl., Ex. 5, at 1 (emphases added).  The term "cost of funds" refers to the cost a bank would actually incur for its funds, not merely initial offers that could be above the bank's actual costs.  The BBA guidance itself makes this clear, stating that "a bank's LIBOR submissions are its own perception of where it could *take funds*."  *Id.* (emphasis added); *see also id.* at 2 (stating LIBOR question refers to "the rate a bank could *take funds* at an arbitrary time in the market" (emphasis added)).  The document explains, "[I]f a bank *has taken money* or been given a firm quote at two different tenors it should be able to use this . . . to form a view on its *cost of funds* at points between or beyond where it has traded."  Isquith Decl., Ex. 5, at 2 (emphases added).  Thus, although

---

[5] BBA, *Key facts about BBA LIBOR* (2007), Mishkin Decl., Ex. 6 at 1.

unconsummated London interbank offers to a panel bank may be of relevance in determining what that panel bank's LIBOR submission should be, the BBA understood the LIBOR question to ask about where a panel bank would actually transact, not merely the opening offers it might receive.

Exchange Plaintiffs' quote from the BBA that a LIBOR submission "must represent rates at which a bank would be *offered* funds in the London interbank market" is entirely consistent with Prof. Willig's interpretation.  Mot. at 10 (quoting Isquith Decl., Ex. 8).  Neither Prof. Willig nor Defendants dispute that the LIBOR question asks about offered rates.  Rather, Exchange Plaintiffs misconstrue the reference to "offered rates" to refer exclusively to initial offers, as opposed to final offers that would result in transactions.  As discussed above and more fully in the Lender *Daubert* Opposition, Exchange Plaintiffs' interpretation is contrary to both BBA guidance and the purpose of LIBOR.  *See* Lender *Daubert* Opp. 9-12.

### 3.    The History of the LIBOR Question Supports the Use of LIB Data

As described at length in the Lender *Daubert* Opposition, the changes to the LIBOR question in 1998, which specified that submissions should be based on the rate at which a bank "could borrow funds" and would "accept[]" offers, further emphasize that the LIBOR question is an inquiry concerning transactional rates.  *See* Lender *Daubert* Opp. 12-13.  As the current LIBOR administrator explained, the 1998 change "was seen as effectively changing the rate from a hypothetical offered rate to a hypothetical transaction rate."  *See* ICE, *Position Paper On The Evolution Of LIBOR* (2014), Mishkin Decl., Ex. 10 at 7.

Exchange Plaintiffs quote BBA guidance stating that changes to the LIBOR question in 1998 "'enables accountability for the rates,'" Mot. at 12 (purporting to quote http://www.bbatrent.com/explained/definitions) (emphases omitted)), and they argue that such accountability was achievable only if each bank "preserved the 'offers' on which it based its

daily submissions," Mot. at 12.  As an initial matter, the quoted passage does not appear on the cited webpage.  *See* BBATrent Ltd., *Definitions*, Mishkin Decl., Ex. 8.  Moreover, Exchange Plaintiffs' argument regarding accountability ignores the obvious:  The reasonableness of panel banks' LIBOR submissions can be assessed by examining the banks' LIB transaction data (depending on the timing and nature of the transactions, among other factors).  As the BBA explained, if a panel bank makes a submission of "2.00000%" for an overnight loan, "it means that [a panel bank] would expect to pay 2% divided by 365" at the time of the submission.  BBA, LIBOR Basics, Mishkin Decl., Ex. 7 at 1-2.  Indeed, that is what Exchange Plaintiffs had argued from the outset of this case—until they actually analyzed the LIB data and did not like the result.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████ Exchange Plaintiffs' interpretation of the LIBOR definition is therefore inconsistent with the very "accountability" rationale they cite as the BBA's reason for adopting that definition.[6]

### C.   A Wide Range of Other Authorities Confirm the Importance of Actual LIB Costs in Determining Submissions

As detailed in the Lender *Daubert* Opposition, government authorities, the International Monetary Fund, academics, and panel bank documents all support the use of LIB transaction data in answering the LIBOR question.  Lender *Daubert* Opp. 13-17.  Exchange Plaintiffs' reliance on a working academic paper, *see* Mot. at 10 n.1, falls flat because the paper was not subject to peer review and the authors cite no explanation or authority to support their interpretation of the LIBOR question.  Moreover, the authors did not cite, and there is no

---

[6] Exchange Plaintiffs assert that Prof. Willig's analysis was "obviously designed to achieve his desired conclusion of 'no systematic suppression.'"  Mot. at 1.  Exchange Plaintiffs provide no evidence whatsoever for their baseless accusation.

evidence they were aware of, the BBA's instructions or the mountain of authority cutting against their view.  *See* Lender *Daubert* Opp. 13-17.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ quotes the BBA for the proposition that "[t]he [LIBOR] rates are not based on actual transaction [sic]."  *Id.* In fact, the BBA was merely noting that sometimes a panel bank will not have actual LIB transactions for a particular day or tenor and therefore will need to extrapolate its LIBOR submission from other sources.  The context of the quote makes this clear. ████████████████████████ continuing to quote from the BBA, "[T]his does not mean the rates do not reflect *true cost of interbank funding*.  A bank will know what its credit and liquidity risk profile is from rates *at which it has dealt*, and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  *Id.* (emphases added).  The BBA further clarified this when it later amended the sentence quoted by Exchange Plaintiffs to read "[t]he rates are *not necessarily* based on actual transaction[s]."[7] ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[7] BBA, *LIBOR Basics*, Mishkin Decl., Ex. 7 (emphasis added).



---

[9] Moreover, Exchange Plaintiffs cite dozens of documents in the declaration accompanying their *Daubert* motion that their own experts never relied on.  Prof. Willig had no obligation to opine on each of those documents, particularly when Exchange Plaintiffs' own experts did not find them relevant.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### D.    Exchange Plaintiffs' Contention That Bid-Ask Spreads Widened During the Class Period Does Not Undermine Prof. Willig's Analysis

Exchange Plaintiffs contend that Prof. Willig's analysis does not distinguish between "bid" and "offer" transactions and ignores the increased dispersion in bid-ask spreads during the Class Period, purportedly rendering "artificially low" his benchmarks based on panel banks' actual borrowing costs.  Mot. at 1-2.  This argument fails for at least two reasons.

First, ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████Thus, an inability to distinguish on a transaction-by-transaction basis between "bid" and "offer" transactions is a reflection of market reality, not a flaw in Prof. Willig's analysis.

Second, even assuming there were a clear and meaningful distinction between "bid" and "ask" borrowing rates in the LIB market during the Class Period, Prof. Willig accounts for that possibility in his analysis.  Importantly, Prof. Willig does *not* compare LIBOR submissions to the lowest rates at which panel banks were able to borrow during the Class Period.  Instead, he

looks to panel banks' average borrowing costs weighted by size, and thus overweights larger transactions, which tend to occur at higher interest rates. Willig Report ¶ 28 & n.34 (noting this benchmark is conservative); *cf.* Isquith Decl., Ex. 5, BBA, Guidelines for Contributing BBA LIBOR Rates at 2 (Oct. 19, 2009) ("Under certain circumstances, contributor banks will take funds at levels above or below LIBOR, for example when dealing in particularly large or particularly small size.").[10] Alternatively, Prof. Willig makes the even more conservative assumption that only the 95th percentile of LIB costs represent a proxy for offer rates. Willig Report ¶¶ 66-70.[11] If, as Exchange Plaintiffs contend, Defendants persistently suppressed their LIBOR submissions compared to their LIB costs at offered rates, and if such alleged conduct were susceptible of classwide proof, then those conclusions would be evident—at a minimum—in a comparison of LIBOR submissions to the upper range of panel banks' LIB costs. Willig Report ¶¶ 71-75. ████████████████████████████████████

██████████████████████

Exchange Plaintiffs criticize Prof. Willig's 95th percentile LIB cost benchmark as resting on a purportedly arbitrary assumption, Mot. at 2, but Exchange Plaintiffs ignore that the 95th percentile of LIB costs is already a conservative metric against which to compare panel banks'

---

[10] As discussed in his report, Prof. Willig excludes transactions that are outliers in size and therefore not of a "reasonable market size" as required by the LIBOR definition. Willig Report ¶¶ 16-17.

[11] Exchange Plaintiffs misquote the BBA for the proposition that, if LIBOR submissions reflected panel banks' borrowing costs, there would be an "enormous spread between the top and bottom of the quote, possibly 100 basis points at the moment." Mot. at 2 (quoting Isquith Decl., Ex. 11, BBA Suggestions for the Evolution of BBA LIBOR – A Discussion Paper ("BBA Discussion Paper"), at 3 (May 6, 2008)). In fact, the BBA was referring only to the hypothetical possibility of revising the LIBOR definition to reflect a panel bank's "true lowest cost of funding," *i.e.,* the absolute lowest rate each panel bank could borrow at each day (as opposed to the lowest rate in response to an offer). BBA Discussion Paper at 3. Were the BBA to have done *that*, it believed it would have led to an "enormous spread" of "possibly 100 basis points" between LIBOR quotes from the top and bottom panel bank. *Id.* But, as discussed, Prof. Willig's benchmarks do not rely on the lowest interest rate at which panel banks could borrow. Far from it. They are based on, alternatively, panel banks' (1) weighted average borrowing rates or (2) 95th percentile borrowing rates. Relying on Prof. Willig's benchmarks for LIBOR submissions does not yield anything close to spreads of 100 basis points between panel banks' LIBOR quotes.

LIBOR submissions. ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ It follows that, far from

being a benchmark that produces artificially low rates, a 95th percentile LIB cost metric would, if

anything, overstate the extent of alleged LIBOR suppression and is therefore conservative.

████████████████████████████████████████████ ███ ████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████ Thus, even if Exchange Plaintiffs were correct (which they are not)

that LIBOR rates should have been completely unmoored from actual transactions, it only

renders the question whether Exchange Plaintiffs were injured as a result of LIBOR suppression on a particular day more uncertain and therefore more individualized.

## II.   Exchange Plaintiffs' Contention That the Panel Banks' LIB Transaction Data Is Too Limited to Use Is Unsupported by Any Evidence

Exchange Plaintiffs also argue that the panel bank LIB data on which Prof. Willig relied is too sparse to support any reliable conclusions.  Mot. at 3-4.  Exchange Plaintiffs' only purported support for the argument rests on mischaracterizations of the LIB data.

Exchange Plaintiffs claim that "[o]ut of almost 700 trading days during the Suppression Period, Willig produces only ███████████████████████████."  *Id.* at 3.  That statement is severely inaccurate.  In fact, Prof. Willig's analysis relies on nearly █████ panel bank LIB transactions during the Class Period, Willig Report Ex. A, at 13, and is further supported by ██████████ transactions during the Class Period if one includes panel banks' short-term unsecured borrowing transactions more generally, *id.* Ex. C, at 19.  Exchange Plaintiffs advance no basis—and none exists—to conclude that this quantity of data is too sparse to support reliable conclusions regarding the panel banks' LIBOR submissions.

If Exchange Plaintiffs intended to limit their statement quoted above to ██████████
████████████████████████████████████████████████████
██████████████████████.  But Exchange Plaintiffs fail to explain why that very selective statistic is relevant.  As an initial matter, even if one were to focus exclusively on ████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████[12]).  Exchange Plaintiffs cannot credibly argue that this quantity of data provides an insufficient basis to investigate the existence or non-existence of classwide evidence of persistent suppression—let alone so insufficient as to render any such analysis inadmissible under *Daubert*.[13]

In any event, there is no basis to ██████████████████████████████████—and to thereby ignore the hundreds of thousands of LIB transactions (and millions of non-LIB transactions) collectively entered into by panel banks across other tenors—in evaluating whether panel banks suppressed their LIBOR submissions.  *See id.* Ex. A, at 13; Ex. C, at 19.  Indeed, such a narrow focus would be inconsistent with Exchange Plaintiffs' allegations and their own expert's testimony.  Exchange Plaintiffs' claim is that the panel banks "understated their borrowing costs to the British Bankers' Association ("BBA") (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were."  PFAC ¶ 5.  ████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████ Exchange Plaintiffs' claim makes sense only if panel banks suppressed all LIBOR tenors.  ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[12] Exchange Plaintiffs provide no basis for excluding panel banks' non-LIB and commercial paper transactions from the analysis, and indeed the benchmarks their own experts rely on are based largely on non-London, non-interbank, and even non-panel bank transactions.

[13] Exchange Plaintiffs do not, for example, allege or attempt to establish that the subgroup of panel banks that had fewer transactions in the three-month tenor during the Class Period suppressed their LIBOR submissions while other panel banks did not.

████████████████████████████████████████████████████████████

████████████████████   Thus, classwide evidence supporting Exchange Plaintiffs' allegations—

if it existed—would be found in a comparison of LIBOR submissions to LIB transactions in *any*

tenor, ████████████████████████████████████████████████████████

████████████.

### III.   Exchange Plaintiffs' Assertion That Prof. Willig Provides a Merits Opinion Is Incorrect and, in Any Event, Not a Basis for a *Daubert* Motion

Throughout their brief, Exchange Plaintiffs repeatedly assert that Prof. Willig's opinions

are "final and unqualified merits opinions on the ultimate issues in this case." *E.g.*, Mot. at 4.

Exchange Plaintiffs mischaracterize Prof. Willig's opinions.  As Prof. Willig states in his report,

he opines that common evidence cannot show that the panel banks' LIBOR submissions during

the Class Period were systematically suppressed or that such suppression occurred through joint

conduct among the panel banks.  Willig Report ¶ 6.  While Prof. Willig's findings are of course

highly relevant to merits issues in the case, he does not opine on the ultimate merits issue of

whether any particular LIBOR submission was suppressed (and if so, whether unilaterally or

through conspiracy) and therefore whether any particular putative class member may have a

claim at the merits stage.  Indeed, Prof. Willig opines that undertaking such a review would

require "[t]housands of separate, individualized inquiries . . . to analyze whether a particular

bank made a Low LIBOR submission for a particular tenor on a particular day." *Id.* ¶ 17.  Thus,

what Prof. Willig's report addresses, and what it refutes, is the argument that those thousands of

individualized inquiries are not required because common evidence shows that LIBOR was

systematically suppressed throughout the Class Period, which is the relevant inquiry at the class certification stage.[14]

No doubt Prof. Willig's findings strongly support the conclusion that, at least as a general matter, the panel banks did not suppress their LIBOR submissions.  But that his opinions overlap with merits issues in the case does not make them inappropriate at the class certification stage, let alone subject to exclusion under *Daubert*.  To the contrary, courts must resolve class certification issues at the class certification stage even if they overlap with merits issues.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Frequently th[e] 'rigorous analysis' [of determining whether a class can be certified] will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" (last alteration in original) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 160 (1982))); *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" (quoting *Wal-Mart*, 564 U.S. at 338)).

## CONCLUSION

For the foregoing reasons, Exchange Plaintiffs' Motion to Exclude the Opinions of Robert D. Willig should be denied.

---

[14] Exchange Plaintiffs' argument that Prof. Willig's report addresses only a "common question" is incorrect for the same reason. Mot. at 7-8.  Prof. Willig does not address whether any particular LIBOR submission was suppressed but rather addresses whether suppression can be established through common proof and concludes that it cannot be and that thousands of individualized inquiries for each bank, day, and tenor would instead be required.

Dated: July 21, 2017

Respectfully submitted,

/s/ Arthur J. Burke
Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
Patrick W. Blakemore
Peter J. Davis
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
patrick.blakemore@davispolk.com
peter.davis@davispolk.com

*Attorneys for Defendants Bank of America
Corporation and Bank of America, N.A.*

/s/ Paul C. Gluckow
Thomas C. Rice
Paul C. Gluckow
Alan C. Turner
Omari L. Mason
Alexander Li
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
pgluckow@stblaw.com
aturner@stblaw.com
omason@stblaw.com
zander.li@stblaw.com

Abram J. Ellis
900 G Street NW
Washington, D.C. 20001
Telephone: (202) 636-5500
Fax: (202) 636-5502
aellis@stblaw.com

*Attorneys for Defendants JPMorgan Chase &
Co. and JPMorgan Chase Bank, N.A.*

/s/ Peter Sullivan
Peter Sullivan
Eric J. Stock
Jefferson E. Bell
Matthew Greenfield
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com
mgreenfield@gibsondunn.com

*Attorneys for Defendant UBS AG*