# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | |
| METZLER INVESTMENT GmbH, *et al.*<br><br>                    Plaintiffs,<br><br>         v.<br><br>CREDIT SUISSE GROUP AG, et al.,<br><br>                    Defendants. | |

**EXCHANGE-BASED PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF ROBERT D. WILLIG**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT…………………………………..………………………….1

II. ARGUMENT……………………………………………………………………………………1

III. CONCLUSION………………………..…………………………………………………..10

# TABLE OF AUTHORITIES

**Rules**

Federal Rule of Evidence 702……………………………………………………….……………..1

Exchange-Based Plaintiffs ("Plaintiffs") respectfully submit this reply memorandum of law in further support of their motion to exclude the opinions set forth in the Expert Report of Robert D. Willig (the "Willig Report").

## I. PRELIMINARY STATEMENT

Throughout their opposition brief, Defendants consistently ignore the British Bankers Association ("BBA")'s clear instruction that the LIBOR question is based upon the offering rate, which in turn means borrowing costs, and not the bid rate or some negotiated transaction rate. Instead, Defendants take carefully excerpted sections from BBA documents and attempt to lower the benchmark upon which LIBOR submissions were required to be based so as to retroactively justify the prices caused by their systematic suppression of LIBOR during the Class Period.[1] However, a thorough reading of Defendants' cited materials demonstrates that the BBA requirement that LIBOR reflect the offering rate was firmly established prior to the Class Period and continued throughout the Class Period. Defendants continue to ignore the academic literature and contemporaneous documents of Defendants themselves, which contradict Dr. Willig's opinions that LIBOR was not persistently suppressed. ██████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████[2]

## II. ARGUMENT

---

[1] The Class Period is January 1, 2005 through May 17, 2010.
[2] ████████████████████████████████████████████████████████████

1

**Defendants attempt to sustain Dr. Willig's unreliable opinions based in part on Defendants' distorted interpretation of what BBA LIBOR means and what Plaintiffs and Plaintiffs' expert, Dr. Netz, have said about LIBOR.** ███████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████[6]

Plaintiffs have not added the words "initial" or "opening" before the word "offer" in the relevant BBA LIBOR question, Def.Opp.Br. at 6, nor have they ignored the BBA's use of

---

[3] Defendants' Memorandum in Opposition is herein cited as "EBP *Daubert* Opp. at __." Defendants also make many of their arguments in their EBP Opposition Brief by referencing Defendants' Memorandum in Opposition to the Berkshire Bank's Motion to Exclude the Expert Report of Robert D. Willig (cited herein as "Lender *Daubert* Opp. at __"). To the extent that Defendants' opposition is predicated upon arguments made in the Lender *Daubert* Opp., such arguments are inappropriate.

[4] Furthermore, Plaintiffs' quoted instruction from their Second Omnibus Request for Production and the quoted testimony from three named Plaintiffs are all predicated upon bank borrowing costs and how the suppression of LIBOR could create a false impression of what those borrowing costs really were. EBP *Daubert* Opp. at 4. These passages address an entirely different matter than whether Defendants were submitting rates that truthfully responded to the LIBOR question.

[5] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[6] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████



---

[7] ▮▮▮

[8] *See* Stewart Decl. Ex. 2, BBA LIBOR – The Basics (2010), p. 1 (hereinafter, The Basics).; Mishkin Decl. Ex. 7 to Lender *Daubert* Opp., *available at* https://web.archive.org/web/20101013074550/http://www.bbalibor.com/bbalibor-explained/thebasics (last accessed Aug. 1, 2017); Stewart Decl. Ex. 3, Supplementary memorandum from the British Bankers' Association, p. 1 (created May 22, 2008), https://www.publications.parliament.uk/pa/cm200708/cmselect/cmtreasy/536/536we05.htm (emphasis supplied) (last accessed July 31, 2017) (hereinafter, "BBA Supplementary Memorandum").

[9] *Id.*

[10] Exchange-Based Pls.' Mem. of Law in Supp. of Mot. to Exclude the Opinions of Robert D. Willig, filed July 10, 2017 (ECF No. 2073) ("EBP Willig Brief").

[11] ▮▮▮

[12] *See* discussion *infra*.

[13] ▮▮▮

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

"**LIBOR is an offer rate**. Libor measures the rate at which banks *estimate* they would be offered unsecured funds, not the rate at which they would be offered unsecured funds, and not the rate at which they would accept offers."[16] As explained in a Credit Suisse Fixed Income Research Report:

> The fixed LIBOR rate is not precisely linked to the rate a contributing bank would bid for funding, nor is it directly tied to the rate at which a given contributor would offer funding. Instead, it reflects where a given bank deems it could borrow funds in reasonable size should it seek to do so. In essence, the banks are being asked to disclose the rate at which they **believe** the market would be willing to offer cash to them should they desire funding. (emphasis in original)[17]

Banks needed to gauge an appropriate measure for refinancing costs; LIBOR was the answer. If "a lending bank's dollar deposits moved to another institution, the lending bank would seek to reacquire dollars by borrowing them from other banks in the London interbank market."[18]

████████████████████████████████████████████████████

---

[14] *See*, Stewart Decl. Ex. 3, BBA Supplementary Memorandum, *supra*, note 8 (emphasis supplied).
[15] *Id*.
[16] Stewart Decl. Ex. 5, Dennis Kuo, David Skeie and James Vickery, A comparison of Libor to other measures of bank borrowing costs, p. 7 (working paper, Federal Reserve Bank of New York 2012) ("Given the presence of a bid-ask spread, this would lead Libor to be higher than the average *observed* loan rate. When bid-ask spreads are large, such as during a crisis period, this difference will widen.") (emphasis original))
[17] Stewart Decl. Ex. 6, "Credit Suisse Basis Points – A Guide for the Front-End and Basis Swap Markets," (February 18, 2010), available at: www.acting-man.com/blog/media/2011/11/55021781-basis-pts.pdf (last visited Aug. 2, 2017)
[18] Stewart Decl. Ex. 7, Sean Vanatta, "Libor's Risks Emerged From Clubby London Banking Culture," Bloomberg (Aug. 14, 2012), *available at* https://www.bloomberg.com/view/articles/2012-08-14/libor-s-risks-emerged-from-clubby-london-banking-culture (last visited Aug. 2, 2017) (attached as Ex. 8 to the Stewart Decl.). Thus lending banks needed to receive interest on their loans at least at the rate they could be forced to pay, and this was necessarily a different rate from the rate at which the lender bank in question would accept deposits when approached (bid rate), or some negotiated transaction rate that might occur for an amount having no bearing on the lender bank's funding needs  The BBA was acutely aware of this necessity, and it led directly to the requirement that the offered rate be one that could be "accepted" if necessary to meet that funding goal.

███ ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████ fully the information that is being presented." *Id.* at 74109 (emphasis supplied).



---
19 ███████████████████████████████████████████████
████████████████████████████████████████████
21 ███

5











### III. CONCLUSION

Dr. Willig's modeling choices are unreliable, contrary to the facts and designed solely to achieve his *ipse dixit* opinion of no persistent suppression. For all the reasons stated above and previously stated in the EBP Moving Brief and supporting Declarations, Plaintiffs' Motion to exclude the opinions of Dr. Willig should be granted.

---

[33] [Proposed] Third Amended Consolidated Class Action Complaint (filed June 29, 2015) (ECF No. 1159) ¶ 19 (emphasis in original). Plaintiffs also alleged that the CFTC identified such extremely profitable spread trading strategies employed by Deutsche Bank and other Defendants during the Class Period. *See, e.g., id.* ¶¶ 226-27.
[34]

Dated: August 4, 2017

**KIRBY McINERNEY LLP**

By: *David E. Kovel*

David E. Kovel
Karen M. Lerner
Thomas W. Elrod
Meghan J. Summers
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
dkovel@kmllp.com
klerner@kmllp.com
telrod@kmllp.com
msummers@kmllp.com

**LOVELL STEWART HALEBIAN JACOBSON LLP**

By: *Christopher Lovell*

Christopher Lovell
Victor E. Stewart
Jody R. Krisiloff
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
clovell@lshllp.com
gsjacobson@lshllp.com

*Interim Co-Lead Counsel for the Exchange-Based Plaintiffs and for the Proposed Class*

11