**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB) |
| THIS DOCUMENT RELATES TO: | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CREDIT SUISSE AG, et al., <br><br> Defendants. | No. 11-cv-5450 (NRB) <br><br> **ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**OTC PLAINTIFFS' MOTION TO CERTIFY CASE AS CLASS ACTION AND**
<u>**APPOINT CLASS COUNSEL [ECF 1904]**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENTS & AUTHORITIES ...................................................................................... 2

    I.    Collusion and Suppression Are Common Questions ........................................... 2

        A.    Defendants' collusion and suppression arguments are improper merits arguments that do not bar certification ...................................................................... 2

        B.    Defendants' suppression merits arguments are wrong ................................... 4

            1.    Common expert evidence demonstrates suppression ............................ 4

                a.    LIBOR represents an offered rate ............................................... 4

                b.    Dr. Bernheim used appropriate offer data .................................. 6

                c.    Dr. Bernheim's model does not produce false positives ............. 6

                d.    Dr. Bernheim's model accounts for bank-specific considerations ........................ 7

                e.    Dr. Bernheim's model allows disaggregation .............................. 8

                f.    Dr. Willig's models use sparse data and defective procedures ............................ 8

            2.    Common fact evidence shows suppression .......................................... 10

        C.    Common expert and fact evidence demonstrates collusion ......................... 10

    II.    Netting and Absorption Do Not Defeat Class Certification ............................. 11

    A. Netting and absorption are not relevant to injury or standing ............................ 11

        1.    Netting and absorption are not relevant to antitrust impact or injury ...... 12

        2.    Netting and absorption are not relevant to Article III standing ................... 13

        B.    Netting and absorption can be calculated using class-wide methods .......... 16

            1.    Absorption can be calculated on a class-wide basis ............................. 16

            2.    Netting can be calculated on a class-wide basis .................................... 20

    III.    Common Issues Predominate on OTC Plaintiffs' State-Law Claims ........................... 24

        A.    Defendants identify no individual issues in the contract claims ................... 24

        B.    Defendants identify no individual issues in the unjust enrichment claims ................. 25

        C.    Case law supports certification of OTC Plaintiffs' state-law claims ............ 26

    IV.    Class Treatment Affords a Superior Way to Resolve the Disputes ............................. 27

    V.    OTC Plaintiffs Have Shown Typicality and Adequacy ...................................... 28

        A.    No unique defenses apply to OTC Plaintiffs .............................................. 28

        B.    Netting and absorption pose no fundamental conflict ................................. 28

    VI.    OTC Plaintiffs Have Standing to Bring Claims on Behalf of Bondholders ................. 28

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES[1]

Cases

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*,
    96 F. Supp. 3d 182 (S.D.N.Y. 2015)..................................................................... 27

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016)..................................................................... 14

*Allco Fin. Ltd. v. Klee*,
    861 F.3d 82 (2d Cir. 2017)..................................................................................... 14

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................. 1

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013)............................................................................................ 2, 23

*Aon Fin. Prod., Inc. v. Societe Generale*,
    476 F.3d 90 (2d Cir. 2007).................................................................................. 24, 25

*Baiul v. NBC Sports*,
    2016 WL 1587250 (S.D.N.Y. Apr. 19, 2016)........................................................ 27

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946)........................................................................................... 18, 20

*Bouaphakeo v. Tyson Foods, Inc.*,
    214 F. Supp. 3d 748 (N.D. Iowa).......................................................................... 2

---

[1] Unless otherwise indicated, all emphases are added and all internal citations and quotations have been omitted. Exhibits labeled "Ex. [#]" are exhibits attached to the Declaration of Michael C. Kelso [ECF 1906] (Exs. 1-137) and exhibits attached to the Reply Declaration of Michael C. Kelso, filed concurrently herewith (Exs. 138-49). Exhibits labeled "Heine Ex. [#]" are exhibits attached to the Declaration of Jaime A. Heine, submitted by Defendants [ECF 2031]. Exhibits labeled "Ellis Ex. [#]" are exhibits attached to the Declaration of Abram J. Ellis, submitted by Defendants [ECF 2033].

Furthermore, documents are abbreviated as follows: Memorandum of Law in Support of OTC Plaintiffs' Motion to Certify Case as Class Action and Appoint Class Counsel [ECF 1905] ("OTC Br."); Defendants' Joint Memorandum of Law on "Upstream Issues" in Opposition to Plaintiffs' Motions for Class Certification [ECF 2030] ("Upstream Br."); Defendants' Joint Memorandum of Law on "Downstream Issues" in Opposition to OTC Plaintiffs' Motion for Class Certification [ECF 2032] ("Downstream Br."); Expert Report of Dr. B. Douglas Bernheim [Ex. 2] ("Bern. R."); Rebuttal Expert Report of Dr. B. Douglas Bernheim [Ex. 3] ("Bern. R.R."); Expert Report of Dr. Robert D. Willig [Ex. 68] ("Will. R."); Expert Report of Dr. Janusz A. Ordover [Ex. 69] ("Ord. R."); Sur-Rebuttal Report of Janusz A. Ordover [Ellis Ex. 2] ("Ord. R.R."); 3/20/2017 Deposition of Dr. B. Douglas Bernheim [Ex. 148] ("Bern. D."); Deposition of Dr. Robert Willig [Ex. 139] ("Will. D."); Deposition of Dr. Janusz Ordover [Ex. 140] ("Ord. D."); 6/17/2017 Deposition of Dr. B. Douglas Bernheim [Ex. 149] ("Bern. R.D.").

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ................................................................... 24

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ................................................................... 23

*Cargill, Inc. v. Charles Kowsky Res., Inc.*,
   949 F.2d 51 (2d Cir. 1991) ...................................................................... 27

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................... 12

*Cazares v. AVA Rest Corp.*,
   2017 WL 1229727 (E.D.N.Y. Mar. 31, 2017) ........................................... 22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ................................................................... 26

*Cole v. Gen. Motors Corp.*,
   484 F.3d 717 (5th Cir. 2007) ................................................................... 25

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ............................................................................. 8

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ........................................................ 1, 13, 14, 15

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ................................................................ 7

*Ellsworth v. U.S. Bank, N.A.*,
   2014 WL 2734953 (N.D. Cal. June 13, 2014) ........................................... 27

*Ge Dandong v. Pinnacle Performance Ltd.*,
   2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ............................................ 25

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ........................................................ 12, 13, 14, 30

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996) ...................................................................... 25

*Heerwagen v. Clear Channel Commc'ns*,
   435 F.3d 219 (2d Cir. 2006) .................................................................. 4, 6

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..................................... passim

*In re Amaranth Nat. Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ........................................................... 8

*In re Blood Reagents Antitrust Litig.*,
   2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)............................................ 22

*In re Canon Cameras*,
   237 F.R.D. 357 (S.D.N.Y. 2006) ........................................................... 26

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297 (E.D. Mich. 2001) ....................................................... 12

*In re Chocolate Confectionary Antitrust Litig.*,
   289 F.R.D. 200 (M.D. Pa. 2012)........................................................... 12

*In re Currency Conversion Fee Antitrust Litig.*,
   264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................... 22

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012).................................................... 15

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ................................................................ 23

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
   317 F.R.D. 675 (N.D. Ga. 2016)..................................................... 12, 13

*In re Digital Music Antitrust Litig.*,
   2017 WL 3037577 (S.D.N.Y. July 18, 2017) ........................................ 23

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ....................................... 21

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014)................................... 15, 22

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009)............................................................... 3

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)................................................................... 28

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)..................................................... 14

*In re Fosamax Prods. Liability Litig.*,
   248 F.R.D. 389 (S.D.N.Y.) ................................................................... 25

*In re IMAX Sec. Litig.*,
   272 F.R.D. 138 (S.D.N.Y. 2010) ................................................................. 28

*In re Lehman Bros. Holdings Inc.*,
   553 B.R. 476 (Bankr. S.D.N.Y. 2016) ........................................................ 24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2016 WL 2851333 (S.D.N.Y. May 13, 2016) ................................... passim

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .............................. 3, 8, 10

*In re Lois/USA, Inc.*,
   264 B.R. 69 (Bankr. S.D.N.Y. 2001) .......................................................... 27

*In re Mercedes-Benz Tele Aid Contract Litig.*,
   257 F.R.D. 46 (D.N.J. 2009) ...................................................................... 27

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   319 F.R.D. 158 (E.D. Pa. 2016) ................................................................. 22

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................... 1

*In re Nassau Cty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) ....................................................................... 26

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016) ....................................................................... 21

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) .......................................................... 2, 12, 13, 14

*In re Parmalat Sec. Litig.*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ......................................... 30

*In re Petrobras Securities*,
   862 F.3d 250 (2d Cir. 2017) ....................................................................... 23

*In re Platinum & Palladium Commodities Litig.*,
   2014 WL 3500655 (S.D.N.Y. July 15, 2014) ............................................. 3

*In re Salomon Analyst Level 3 Litig.*,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004) ....................................................... 30

*In re Scrap Metal Antitrust Litig.*,
   2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) ........................................ 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010)............................................................ 10

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013).......................................... 22, 24, 25, 26

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001).................................................................. 26

*In re Vitamin C Antitrust Litig.*,
   279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................. 1

*In re Vitamins Antitrust Litig.*,
   2000 WL 1475705 (D.D.C. May 9, 2000) ......................................... 10

*In re Vivendi Universal, S.A. Sec. Litig.*,
   284 F.R.D. 144 (S.D.N.Y. 2012) ......................................................... 21

*Krumme v. WestPoint Stevens Inc.*,
   238 F.3d 133 (2d Cir. 2000).................................................................. 27

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
   2017 WL 985640 (D. Conn. Mar. 13, 2017) ..................................... 28

*LIBOR VI*,
   2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ........................ 12, 21, 30

*LIBOR*,
   II, 27 F. Supp. 3d 447 (S.D.N.Y. 2014).............................................. 21

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008).................................................................. 15

*Merrill Iron & Steel, Inc. v. Yonkers Contracting Co.*,
   2006 WL 2679940 (S.D.N.Y. Sept. 19, 2006) .................................. 27

*Minpeco, S.A. v. Hunt*,
   718 F. Supp. 168 (S.D.N.Y. 1989)...................................................... 21

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012).................................................................. 29

*NV Petrus SA v. LPG Trading Corp.*,
   2017 WL 1831096 (E.D.N.Y. May 4, 2017) ..................................... 27

*Pichardo v. Carmine's Broadway Feast Inc.*,
   2016 WL 4379421 (S.D.N.Y. June 13, 2016) ..................................... 2

*Retirement Board of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014).................................................................................30

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015).................................................................................23

*Ross v. Bank of Am., N.A.*,
  524 F.3d 217 (2d Cir. 2008).................................................................................14

*Ruffo v. Adidas Am. Inc.*,
  2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016)...........................................................15

*Sonterra Capital Master Fund, Ltd. v. UBS AG*,
  2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017)..........................................................29

*Spread Enters., Inc. v. First Data Merch. Servs. Corp.*,
  298 F.R.D. 54 (E.D.N.Y. 2014).............................................................................24

*Steinberg v. Nationwide Mut. Ins. Co.*,
  224 F.R.D. 67 (E.D.N.Y. 2004).............................................................................27

*Sullivan v. Barclays PLC*,
  2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)............................................................29

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)...................................................................................23

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016)..............................................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)...................................................................................passim

*United States v. Beaver*,
  515 F.3d 730 (2d Cir. 2008).................................................................................11

*Vaccariello v. XM Satellite Radio*,
  295 F.R.D. 62 (S.D.N.Y. 2013).............................................................................25

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  2015 WL 3623005 (E.D. Pa. June 10, 2015)..........................................................13

*Walsh v. Ford Motor Co.*,
  807 F.2d 1000 (D.C. Cir. 1986)............................................................................25

*Warth v. Seldin*,
  422 U.S. 490 (1975)...........................................................................................14

*Weiner v. Snapple Beverage Corp.*,
    2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)......................................................... 26

*Yarger v. ING Bank, fsb*,
    285 F.R.D. 308 (D. Del. 2012) ........................................................................... 25

<u>Other Authorities</u>

*The Puzzle of Class Actions with Uninjured Members*,
    82 Geo. Wash. L. Rev. 858 (2014) .................................................................... 15

## **INTRODUCTION**

OTC Plaintiffs' case presents predominant common questions of fact and law concerning what are described as "upstream issues"—whether Defendants suppressed and whether they colluded to suppress LIBOR. This is the linchpin of OTC Plaintiffs' case, and it turns solely on common evidence of Defendants' conduct. LIBOR, which is common to the class, was either suppressed or it was not; for each day and tenor, the question can have only *one* common answer, which is the same for *all* class members. Although they challenged nearly every other plaintiff's expert in the MDL, Defendants did not file a *Daubert* motion against Dr. Bernheim. Because the admissibility of Dr. Bernheim's opinions is not in dispute, deciding whether Dr. Bernheim is right or wrong as to suppression "is the near-exclusive province of the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016). Likewise, proof of collusion will be based solely on evidence concerning Defendants' conduct during the class period, not on any individualized question that differs plaintiff-by-plaintiff. Consistent with decades of caselaw, it is plain that the common questions concerning collusion and suppression will dominate the trial.[2]

Defendants' "downstream" arguments are also misguided. Defendants focus on two alleged offsets—"absorption" and "netting"—that they claim present individualized issues. They are incorrect on the law and the facts. The law is clear that because these offsets go to damages, not injury or standing, they do not bar class certification. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]he fact that an injury may be outweighed by other benefits,

---

[2] *E.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) ("the existence of a conspiracy is the predominant issue in price fixing cases"); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) ("[C]ourts have frequently held that the predominance requirement is satisfied [in price-fixing cases] because the existence and effect of the conspiracy are the prime issues in the case and are common across the class." (citing cases)).

while often sufficient to defeat a claim for damages, *does not negate standing*.")[3] Furthermore, while OTC Plaintiffs do not agree with Defendants' contention that netting or absorption must be taken into account, Dr. Bernheim demonstrates absorption and netting can be measured formulaically by methods common to the class. In fact, Dr. Bernheim used the structure of Defendants' own expert model to show that common, class-wide factors account for virtually all of the absorption that Defendants' expert identified. Netting is straightforward as well: the same but-for LIBOR that determines damages on receive-LIBOR transactions will determine offsets on pay-LIBOR transactions. Class members who suffer no net damages simply will not recover.[4]

## ARGUMENTS & AUTHORITIES

### I.      Collusion and Suppression Are Common Questions

#### A.      Defendants' collusion and suppression arguments are improper merits arguments that do not bar certification.

Defendants devote much of their "upstream" brief to disputing the quality of OTC Plaintiffs' evidence of collusion and suppression. As demonstrated *infra*, their arguments are wrong on the merits; but more importantly "[m]erits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The core questions in this litigation are whether LIBOR was suppressed and, if so, whether such

---

[3] *See also In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, *whether or not that injury is later offset* . . . . Here, if a class member is overcharged, there is an injury, *even if that class member suffers no damages*.").

[4] While Defendants are wrong to suggest that these damages issues can deprive plaintiffs of Article III standing, even if that argument were adopted, a narrower class should still be certified. Nearly all of Defendants' criticisms, if accepted, can be accounted for, either now or during or after trial, using common methods that both experts have applied to the facts of this case. *See Bouaphakeo v. Tyson Foods, Inc.*, 214 F. Supp. 3d 748, 751, 753-54 (N.D. Iowa) (on remand from Supreme Court, leaving intact class certification ruling and jury's liability verdict but adjusting damages award downward to account for uninjured class members); *see also Pichardo v. Carmine's Broadway Feast Inc.*, 2016 WL 4379421, at *4 (S.D.N.Y. June 13, 2016) ("Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification.").

suppression was pursuant to an agreement. These are classic common questions where the answer will not vary by class member. *See* OTC Br. at 20-23 (collecting cases); *see also, e.g.*, *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (certifying antitrust class to determine "whether the Defendants acted in an illegal combination or conspiracy"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("[T]he issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof."); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) (holding that question of "how far" a conspiracy "reached . . . is ultimately one of fact" for jury).

Defendants attempt to recast their merits arguments as class certification arguments by claiming certain collusion and suppression issues are "individualized" because they require an inquiry into particular circumstances of the Panel Banks' conduct. *See, e.g.*, Upstream Br. at 2. This is not the law. An issue is "individual" for Rule 23 purposes only when its proof will vary by class member; an issue that relates to *Defendants'* conduct—whether a particular bank suppressed a particular tenor of LIBOR on a particular day; whether and to what extent the banks' actions were pursuant to agreement—is a *common* issue under Rule 23. *See Tyson*, 136 S. Ct. at 1045; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 2851333, at *4 (S.D.N.Y. May 13, 2016) (stating that defendants have not "identified any reason to conclude that examining the relationship between the *defendants* and their affiliates entails an individual question"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014) (collusion evidence is "indisputably 'common' because it focuses on the allegedly unlawful actions of the defendants, not the actions of individual plaintiffs").

Defendants' lengthy, fact-intensive merits arguments simply demonstrate that the common collusion and suppression questions will be the central focus of the trial—thus proving that these questions predominate and that class certification is appropriate.

### B. Defendants' suppression merits arguments are wrong

#### 1. Common expert evidence demonstrates suppression

Defendants' critiques of Dr. Bernheim's opinions—which they concede do not raise to the level of a *Daubert* challenge—are without merit. The jury will have ample reason to credit Dr. Bernheim's suppression model.

##### a. LIBOR represents an offered rate

Defendants argue at length that Dr. Bernheim's finding of persistent suppression of LIBOR during the Class Period is incorrect because—contrary to its very title—the London Interbank *Offered* Rate is not truly an "offer rate." Upstream Br. at 10-12. Instead, Defendants claim that a LIBOR submission was not suppressed so long as it reflected a Panel Bank's actual borrowing costs, even if those were *below* the rate at which the Bank was "offered" funds. *Id.*

Defendants are mistaken for several reasons.[5] ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[5] OTC plaintiffs have never contended that LIBOR constitutes anything other than an "Offered" rate. Plaintiffs have consistently alleged that the banks "conspired to, and did, manipulate LIBOR by misreporting the actual interest rates at which they *expected* they *could* borrow funds"—not the rates at which they *had* borrowed or *did* borrow. ECF 1857 ¶ 5; *see* ECF 130 ¶ 6 (same). Defendants agree (and have consistently taken the position before the Court) that the definition of LIBOR required them to report the rates "Offered" to them—"the rates at which they believe they *could* borrow U.S. Dollars from other banks in London." ECF 166 at 2 (defining "London Interbank Offered Rate"). The banks' pretense otherwise is just that—pretense. The only case the banks cite, Upstream Br. at 10, concerned a claim under section 2 of the Sherman Act against a single firm, Clear Channel, for monopolizing a "national ticket market for live rock concerts." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 223 (2d Cir. 2006). The case turned on the ruling that the plaintiff herself would "have to rely on market specific evidence of Clear Channel's power in particular markets that will vary from one putative class member to another." *Id.* at 229.



Second, contemporaneous BBA and Panel Bank documents demonstrate that LIBOR represented an "offered" rate. For example, in 2008, the BBA told the British Parliament that the "key concept is that BBA LIBOR is based upon the *offered* rate, and not the bid rate."[7]

---

[7] Supplementary Memorandum from the British Bankers' Ass'n (May 22, 2008), https://publications.parliament.uk/pa/cm200708/cmselect/cmtreasy/536/536we05.htm.





### *e. Dr. Bernheim's model allows disaggregation*

Defendants' disaggregation argument also misses the mark: given that Dr. Bernheim's model measures but-for LIBOR *each* day during the class period for *each* Defendant, his model is easily "disaggregated" if certain Defendants were found not to have colluded or to have withdrawn from the conspiracy. Defendants also argue that the model somehow runs afoul of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), but their argument is premised on the mistaken belief that Dr. Bernheim assumed the entire amount of the suppression was due solely to collusion, Upstream Br. at 32. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ [16]

### *f. Dr. Willig's models use sparse data and defective procedures*

Dr. Willig's models—the basis of Defendants' no-suppression arguments—are clearly and obviously flawed. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

they include variables accounting for the major factors.); *In re Air Cargo*, 2014 WL 7882100, at *8.

[16] To the extent Defendants argue some suppression may be due to unilateral action, and some due to collusion, that is another common issue. *See In re Lithium Ion Batteries*, 2014 WL 309192, at *2 (holding that question of "how far" a conspiracy "reached . . . is ultimately one of fact" for jury). Further, if the jury were to find that certain Panel Banks were not a part of the conspiracy, Dr. Bernheim's model would still be able to calculate damages attributable only the collusive conduct, by recalculating composite but-for LIBOR by using the non-colluders actual LIBOR submissions. To the extent a sufficient number of Panel Banks were found, on the merits, to have not participated so as to affect Dr. Bernheim's calculations, that can be addressed in subsequent proceedings and is no bar to certification now. *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010) ("If there is an error to be made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."). Further, if the jury were to find that suppression resulted from collusion on certain days, and unilateral action on others, Dr. Bernheim's model would still be able to calculate the damages, since it is broken out by day.



2.      *Common fact evidence shows suppression*

Dr. Bernheim's expert evidence of suppression does not stand alone; it is supported by voluminous factual evidence. Barclays, UBS, Citi, and Lloyds/HBOS have all admitted that they persistently suppressed USD LIBOR during the class period.[22] That the heavily-negotiated settlement documents leave the end date uncertain does not imply that Defendants stopped suppressing LIBOR before the end of the class period.[23] Nor does Defendants' focus on statements about "high" submissions negate suppression. Upstream Br. at 22. The quotes largely state that a submission appeared high *relative to borrowing costs generally*—not high in the sense that it exceeded a Panel Bank's true offer-rate in the London interbank market.

Defendants' references to documents that they claim support their defenses are simply a merits argument for the jury.[24] ███████████████████████████████████████ ████████████████████████████████████████ While Defendants incorrectly dispute some of this evidence, the ample evidence and those disputes all raise common issues for the jury.

C.      **Common expert and fact evidence demonstrates collusion**

The fact and expert evidence before merits discovery is also consistent with the OTC Plaintiffs' claim that LIBOR suppression was pursuant to collusion rather than the product of

---

[22] Ex. 142 ¶ 36 (Barclays DOJ Non-Prosecution Agreement); Ex. 143 at 19 (Barclays CFTC Order); Ex. 144 at 69 (UBS DOJ Guilty Plea); Ex. 145 at 4 (UBS CFTC Order); Ex. 246 at 16-19 (Citi CFTC Order); Ex. 147 at 14 (Lloyds/HBOS CFTC Order).

[23] Ex. 142 ¶ 36 (stating that Barclays suppressed LIBOR "[f]rom approximately August 2007 through ***at least*** approximately January 2009"). Courts have stressed the inappropriateness of inferring the scope or duration of a conspiracy from a defendant's voluntary admission of guilt. *See In re Lithium Ion Batteries*, 2014 WL 309192, at *14 ("The reasonable doubt standard faced by the government makes criminal guilty pleas in antitrust cases like this one at once a strong indicator of the existence of a conspiracy but a weak indicator of the scope of that conspiracy."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010) (stating that "the scope and nature of . . . criminal guilty pleas are not determinative of the plaintiffs' potential claims in a civil antitrust suit"); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *18 (D.D.C. May 9, 2000) ("[T]he criminal guilty pleas do not establish boundaries for this civil litigation . . . .").

[24] ███████████████████████████████████████████████████████████████████████ ████████████████████████ he banks cannot argue that trader-based manipulation is irrelevant (as they have throughout this case) and then selectively offer it when arguably advantageous.

independent action.[25] This is undeniably a common question for the fact-finder. ███



███████████████████████████████████████████████████████

██████████████████████████████████████████ That is the

essence of a combination in "restraint of trade." ██████████████████████████

██████████████████████████████████████████.[26] ███

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████ And regardless, section 1 "does not outlaw only

perfect conspiracies to restrain trade." *United States v. Beaver*, 515 F.3d 730, 739 (2d Cir. 2008).

It also prohibits inelegant ones. Again, most important, the proof or disproof of *every* disputed

piece of collusion evidence is common and does not vary by class member.

## II. Netting and Absorption Do Not Defeat Class Certification

### A. Netting and absorption are not relevant to injury or standing

The Court has already recognized, consistent with Second Circuit and Supreme Court

authority, that "the fact that damages may have to be ascertained on an individual basis is not

sufficient to defeat class certification under Rule 23(b)(3)." *LIBOR*, 2016 WL 2851333, at *4. To

avoid the Court's decision, Defendants try to characterize their proposed offsets of "netting" and

"absorption" as issues of antitrust impact and standing. This argument is inconsistent with this

---

[25] *See* OTC Br. at 10-12 (citing collusion evidence); *id.* at 22 (discussing Dr. Stiglitz's opinions on collusion).

[26] It is telling that the banks rarely quote the documents they purport to rebut and that the sparse quotations they do offer are always heavily truncated.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Court's admonishment that arguments regarding absorption "present issues of proof, and not ones of standing." *LIBOR VI*, 2016 WL 7378980, at *19 (S.D.N.Y. Dec. 20, 2016).[28]

### 1. Netting and absorption are not relevant to antitrust impact or injury

As the Second Circuit recognized, this is a price-fixing case where the impact from the conspiracy is the "reduced rates of return" on OTC Plaintiffs' financial instruments. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016). ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Defendants cite *no* case holding that there is no antitrust impact in such a situation—to the contrary, the law is clear that receiving at least one suppressed payment shows antitrust impact or injury from the conspiracy; if that impact were offset somehow, such an offset would go at most to the quantum of *damages* rather than to the question of whether the class member was *injured* by the conspiracy. *Id.* at 28-29 (citing cases); *Nexium*, 777 F.3d at 27.[29]

Defendants argue that the Court should not follow *Nexium* and similar cases because LIBOR is not a product like prescription drugs sold to the class. But at least as to the OTC Plaintiffs, that is precisely what the OTC Plaintiffs allege: Defendants engaged in "horizontal

---

[28] *See also Tyson*, 136 S. Ct. at 1045 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* or some affirmative defenses . . . .'").

[29] *See also, e.g.*, *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 683-86 (N.D. Ga. 2016) ("'[A] person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the anticompetitive conduct at issue also results in offsetting benefits . . . . [S]uch benefits— which at most would affect only the calculation of damages—do not wipe away the antitrust injury suffered . . . .'"); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 222 (M.D. Pa. 2012) (accepting expert definition of impacted class members as anyone with "'at least one transaction'" at an artificial level even if they have "'a negative overcharge in the aggregate'"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 311-17 (E.D. Mich. 2001) ("Defendants' by-pass and offsetting benefits arguments relate to the quantum of damages; not the fact of injury."). This is an application of the well-recognized principle that a class member is injured by a price-fixing conspiracy if they were overcharged "at least once," and they need not prove that they "suffered an overcharge on each and every purchase they made." *In re Air Cargo*, 2014 WL 7882100, at *45; *see also Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) ("Antitrust impact is shown where class members suffered some loss in their business or property—here payment of an overcharge on at least one transaction.").

price-fixing" with respect to products sold *directly* to OTC Plaintiffs. *Gelboim*, 823 F.3d at 771. To the extent that Defendants' argument is simply that damages in this case are more complicated than cases like *Nexium*, that is wrong and irrelevant. The pricing of price-fixed products in other cases was hardly simple—in *Nexium*, an offset argument for insurance company class members turned on a complex analysis of whether changes in copays insurers would have received in the but-for world would offset damages from higher drug prices, *Nexium*, 777 F.3d at 28-29; and in *Delta*, the defendants claimed base-fare reductions offsetting the allegedly increased bag fees, 317 F.R.D. at 683. The law is the same for complex cases as for simple ones: a single overcharge (here, a suppressed payment)[30] causes injury; any offsets are relevant only to damages rather than injury.[31]

### 2. Netting and absorption are not relevant to Article III standing

The analysis for Article III standing is even less demanding. Defendants' argument that netting and absorption offsets defeat standing is flatly contrary to law. Defendants cite *no* authority for the proposition that allegedly offsetting benefits from a price-fixing conspiracy can defeat the Article III standing of a class member who was injured because she received at least one suppressed payment. To the contrary, the Second Circuit recognized in *Denney* that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, *does not negate standing*" and thus held that losses "*are not offset (for standing*

---

[30] As the Second Circuit and other courts have made clear, that the case involves underpayments rather than overpayments is of no consequence. *E.g.*, *In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *16-17 (N.D. Ohio Sept. 30, 2006) (in the class context, courts have regularly recognized "valid method[s] for determining a uniform undercharge (or overcharge, as the case may be)") (collecting cases).

[31] Defendants cite *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 WL 3623005, at *11 (E.D. Pa. June 10, 2015), which took issue with the *Nexium* court's failure to require a methodology to identify *which* class members suffered actual damages. ██████████████████████████████████████████████████████████████

*purposes) by the [money] saved*" as a result of the wrongful conduct. *Denney*, 443 F.3d at 265.[32]

Moreover, only class representatives must present proof of standing at the class certification stage. *Id.* at 263 ("We do not require that each member of a class submit evidence of personal standing."). For "purposes of determining standing, we 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party' (*i.e.*, the class members)." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). OTC Plaintiffs plainly meet the *Denney* test, alleging in their operative complaint that "Class Members were injured by the panel banks' anticompetitive collusion because they transacted in LIBOR-Based Instruments at supracompetitive prices: they paid more, received less, or both on LIBOR-Based Instruments than they would have absent the panel banks' collusive restraint." ECF 1857 ¶ 343. There should be no dispute that receiving a suppressed payment on a single LIBOR-based instrument is sufficient for Article III purposes.[33]

Contrary to Defendants' suggestion, OTC Plaintiffs bear no burden to show *absent class member* standing at the class certification stage.[34] Even if they did, Dr. Bernheim's analysis

---

[32] *See also Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 95 n.10 (2d Cir. 2017) ("However, 'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008))); *Ross*, 524 F.3d at 222 (quoting *Denney*, 443 F.3d at 264); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016) ("Defendants do not seriously contest that a plaintiff could establish injury-in-fact if it were to demonstrate that, because of an artificially induced shift in ISDAfix on a given day, it paid more than it should have (or was paid less than it should have been) . . . . That sort of 'paid too much' or 'received too little' harm is classic economic injury-in-fact. Of course, discovery may well show that, for some Plaintiffs on some days, the alleged ISDAfix manipulation actually resulted in a benefit. But the mere fact 'that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" (quoting *Ross*, 524 F.3d at 222)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (same).

[33] *Gelboim*, 823 F.3d at 770 ("[T]he harm component of constitutional standing is uncontested, and easily satisfied by appellants' pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR."); *Nexium*, 777 F.3d at 32 ("[N]amed plaintiffs have shown that they were overcharged for at least one Nexium transaction during the class period, establishing standing.").

[34] The proper time to present *evidence* concerning class members' standing is at the merits stage. *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213 (S.D.N.Y. 2012) (holding that, because class certification poses issues "logically antecedent" to standing of absent class members, "the weight of authority holds that in general class certification should come first" before proof of class members' standing.).

demonstrates the same type of injury for the rest of the class as for the OTC Plaintiffs: ███

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███ This meets *Denney*'s requirement that a class "must . . . be defined in such a way that anyone within it *would* have standing," 443 F.3d at 264.[35] As it is now defined, it is clearly possible that everyone in the class will have at least one suppressed LIBOR payment sufficient to grant Article III standing, which is all OTC Plaintiffs need show at this stage.[36] And even if something more were required at this stage of the proceedings, which OTC Plaintiffs do not believe is necessary, the class definition could be slightly modified to include only those who held LIBOR-based swaps or bonds during the class period and received a LIBOR-linked payment during one of Dr. Bernheim's suppression dates. That modification would employ entirely objective criteria and include only those specified by Dr. Bernheim's model.

The Court's dismissal of Highlander Realty is not to the contrary. To begin with, as the Court had dismissed the OTC Plaintiffs' antitrust claims prior to *LIBOR V*, the Court's dismissal of Highlander in that ruling had nothing to do with antitrust impact or standing in the Sherman

---

[35] *See* Joshua P. Davis et al., *The Puzzle of Class Actions with Uninjured Members*, 82 Geo. Wash. L. Rev. 858, 866 (2014) (construing *Denney* to mean that "the class must include only individuals who could *potentially* have viable claims" (emphasis in original)); *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 n.6 (9th Cir. 2016) (stating that "in context" *Denney* "signifies only that it must be possible that class members have suffered injury").

[36] *In re Elec. Books Antitrust Litig.*, 2014 WL 1641699, at *8-9 (S.D.N.Y. Apr. 24, 2014) ("*E-Books*") (explaining defendants misread *Denney* by "mistakenly conflating standing with persuasive proof of injury" and certifying class because it was "composed solely of consumers who purchased an e-book from a Publisher Defendant during the [conspiracy] period" and expert evidence on summary judgment showed that "99.8% of purchases . . . suffered an overcharge"). The same is true here: the class is solely those who owned LIBOR-instruments during the price-fixing conspiracy period, and plaintiff's expert evidence confirms, even at this early stage, that nearly all class members, at least, suffered an overcharge. Defendants' "de minimis" cases do not support their position. Neither mentions *Denney*. The *Ruffo* case, moreover, arose under a state-law deceptive trade practices statute and concerned a product that had only a 0.7% defect return rate—meaning that *approximately 99.3%* of class members were uninjured. *Ruffo v. Adidas Am. Inc.*, 2016 WL 4581344, at *3 (S.D.N.Y. Sept. 2, 2016). In the other case, the cigarette-smoking plaintiffs' model for determining "aggregate" damages bore "*little or no relationship*" to the amount of economic harm actually caused by defendants." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008).

Act context. The Court certainly did not rule that Highlander lacked Article III standing or even address the issue—nor did Defendants even so argue, *see* ECF 965 at 5-12, as such an argument would be directly contrary to *Denney*'s holding that an injury offset does not negate standing. Finally, even if "synthetic fixed-rate loan" recipients like Highlander should be excluded from the class on standing grounds as Defendants argue, this exclusion can be accomplished by simply excluding from the class persons who were receiving and paying the same LIBOR rate from and to the same bank. *LIBOR*, 2016 WL 2851333, at *2 (stating that "reformation of the class definition, if possible, is the appropriate response" to claim of class overbreadth)).

**B.     Netting and absorption can be calculated using class-wide methods**

The issues of netting and absorption are irrelevant to class certification because they relate only to damages, a question that the Court has affirmed is not sufficient to defeat certification here. *LIBOR*, 2016 WL 2851333, at *4. But for purposes of impact and damages, the analyses of both Dr. Bernheim and Dr. Ordover demonstrate that these issues are susceptible to proof by common methods that can be applied mechanically across the class.

*1.      Absorption can be calculated on a class-wide basis*







Accordingly, this is precisely the type of situation where representative evidence like that at issue in *Tyson* satisfies Rule 23 because it could be used in an individual as well as a class trial. 136 S. Ct. at 1045-46. At a minimum, Dr. Bernheim's statistical analysis provides a "just and reasonable estimate of the damage based on relevant data," which is all that is required in the antitrust context. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

Nor is there any reason to keep Dr. Bernheim's model from the jury. Not only is the persuasiveness of his model a common issue, but Dr. Ordover's criticisms of Dr. Bernheim's model miss the mark.

Finally, even if the Court were to find that absorption presents individualized issues that somehow prevent certification—notwithstanding that this is a damages issue—the Court should still certify a narrower class that is not affected by absorption.

19



### 2. Netting can be calculated on a class-wide basis

Defendants argue there are individualized issues related to netting. Downstream Br. at

19-22.

[51]

Whether to include cross-transaction netting (and if so, with which counterparties) itself



. *E.g.*, *In re Air* Cargo, 2014 WL 7882100,
at *44 ("Nothing in our class certification jurisprudence requires that every single class member suffer an impact or damages, regardless of the size of the class. To the contrary, courts have routinely recognized what an unrealistic burden this would put on plaintiffs."); *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 427 (3d Cir. 2016) ("[W]e have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable."). Indeed, the "all or virtually all" rule is so universally accepted that the reason the *Tyson* Court had no cause to address it was because the petitioner "concede[d]" and "abandon[ed]" its argument "that a class action (or collective action) can never be certified in the absence of proof that all class members were injured." *Tyson*, 136 S. Ct. at 1049.

presents a question common to the class—one that the Court need not decide now. Because OTC

Plaintiffs cannot recover for their *losses* in transactions with entities other than Panel Banks (and

in some instances Panel Bank affiliates in privity with OTC Plaintiffs), *see LIBOR II*, 27 F. Supp.

3d 447, 478-82 (S.D.N.Y. 2014); *LIBOR VI*, 2016 WL 7378980, at *16 (drawing "a line between

plaintiffs who transacted directly with defendants and those who did not"), any argument that

their damages should be reduced for their alleged *gains* in transactions with non-panel banks is

contrary to the law,[52] patently unfair, and ███████████████████████████████

███████████████████████████ If netting is limited to Panel-Bank OTC transactions, as it

at the least should be, then the analysis can be done on a class-wide basis using only Panel Bank

data. And even if netting were applied across non-Panel Bank transactions, the netting

calculation is the same—and can be performed mechanically in a post-trial claims administration

proceeding in which class members would be required to provide evidence of all their LIBOR-

linked transactions. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 156–57

(S.D.N.Y. 2012) (setting up post-verdict claims administration process whereby, after

"interrogatories" sent to claimants, the administrator determines whether each "claim yields net

losses (and, if so, how much) after applying Court-approved damages calculations").

███████████████████████████████████████████████████████

---

[52] In part because the court dismissed claims against counterparties other than Defendants, Defendants cannot use transactions with remote counterparties as the basis for netting or offset. *E.g., Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 183 (S.D.N.Y. 1989) (offsetting benefits from a transaction not with defendants but with "another party" have "a connection to the conspiracy [that] is much more attenuated" such that a commensurate reduction in damages "would fail to hold the defendants responsible" for their ill-gotten gains); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *19 (S.D.N.Y. Mar. 28, 2014) ("To the extent that Apple is referring to [offsets] on e-books not published by one the [] Defendants, this phenomenon is too remote from the e-book transactions at issue here to be relevant to the damages calculations."). In the same vein, any transaction dismissed in *LIBOR VI* on efficient enforcer grounds would be too remote to justify an offset or defense. To the extent that Defendants seek unspecified benefits from instruments OTC Plaintiffs do not seek damages for (*e.g.*, exchange transactions), or do not allege were suppressed (*i.e.*, LIBOR tenors other than 1 and 3 months), such transactions "do not directly relate to the transactions at issue here" and "any imagined benefits are too remote to be considered." *Id.* ███████████

███████████████████████████████████████



Defendants' position that a common formula fails to comply with Rule 23 because it relies on individual inputs misconstrues the law:

> Here, . . . calculating damages would be a "straightforward, mechanical process." . . . [D]etermining damages for plaintiffs' minimum wage, overtime, and spread-of-hour claims would be a matter of performing simple arithmetic using the data defendants have produced. That the rate of pay or the hours worked would vary for each Class Member does not defeat predominance because the same basic formula would apply to each class member.

*Cazares v. AVA Rest Corp.*, 2017 WL 1229727, at *8 (E.D.N.Y. Mar. 31, 2017).[53] This same formula would apply even if individual plaintiffs brought suit; common issues thus predominate.[54] To the extent that Defendants suggest that individualized damages calculations preclude class certification, they run afoul of the law of this Court, inside this Circuit, and outside this Circuit.[55]

---

[53] *See also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (affirming calculation of "individual damages" "on a class-wide basis with a simple formula using data extracted from [defendant's] databases"); *cf. E-Books*, 2014 WL 1641699, at *10 (if required, offsetting "undercharges enjoyed" on one set of relevant transactions with "overcharges suffered on another," "could easily be calculated on a classwide basis and so does not inject individual issues into the trial").

[54] *E.g., E-Books*, 2014 WL 1641699, at *9-10 (no reason to believe that a model "would have been any different had [the expert] been asked to calculate" overcharges "for a single plaintiff"); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 107-08 (S.D.N.Y. 2010) (certifying class where "individualized damages can be determined formulaically because the damages for each member of the Damages Class equals the actual issuer fees paid by a class member minus the but-for fee times the dollar value of the transactions to which the fee was applied"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 202 (E.D. Pa. 2016) (certifying class where expert "also ran separate regressions for each class member"); *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *19 (E.D. Pa. Oct. 19, 2015) (certifying class where expert "established a separate but-for price for each type of reagent for each year—constructing more than 2,100 but-for prices for the different TBR products," as "the customer transaction data is contained in a single database for each defendant and because the formula is common for all class members, it will be straightforward to calculate class-wide damages at the merits stage").

[55] *E.g., Amgen*, 133 S. Ct. at 1196; *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015); *LIBOR*, 2016 WL 2851333, at *4; *see also, e.g., In re Deepwater Horizon*, 739 F.3d 790, 815-17 (5th Cir. 2014) (argument

Finally, in a post-brief letter, Defendants argue that *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017), supports their predominance argument because "the fact-finder would have to look at every class member's transaction documents to determine who did and who did not have a valid claim." ECF 2101. But in *Petrobras*, the key individualized issue—whether a transaction was "domestic"—could not be answered using any class-wide method because it turned on individualized "facts concerning the formation of the contracts, the placement or purchase orders," and so forth. *Petrobras*, 862 F.3d at 272. Here, experts from both sides have offered models that can be applied class-wide to assess the absorption and netting issues that Defendants claim are individualized. Further, the key individualized issue in *Petrobras*--which did not find predominance lacking, but remanded for the district court to determine in the first instance—went to liability (whether the class members had a "valid claim") rather than simply to damages (as Defendants' absorption and netting issues do here), and the Court has already recognized that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)", *LIBOR*, 2016 WL 2851333, at *4. Defendants' letter also cites *In re Digital Music Antitrust Litig.*, 2017 WL 3037577, at *21-23 (S.D.N.Y. July 18, 2017); but the "individualized inquiries" into digital music prices and class member music purchase histories that the court found overwhelming there have no analogue here, where both sides' experts have already demonstrated that they can account for underpayment damages, absorption, and netting with methods that can be applied class-wide.[56]

---

that the need for individual damages calculations precludes certification is a "significant distortion of *Comcast*" that "has already been considered and rejected" by three other circuits); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800-01 (7th Cir. 2013) (same); *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 481 n.12 (3d Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain").

[56] Defendants also argue that *Petrobras* shows that state law and contract language present individualized questions, but as explained *infra*, these issues are not individualized either.

### III.   Common Issues Predominate on OTC Plaintiffs' State-Law Claims

#### A.   Defendants identify no individual issues in the contract claims

The Second Circuit does not require plaintiffs to show that relevant contract terms are the same from swap to swap and bond to bond. The party opposing certification must present evidence that material contract terms *do* vary.[57] Here, the record reflects that swaps used an ISDA standard form purporting to be based on "true" LIBOR; Defendants have not presented *any* proof that the parties had different understandings of these common contract terms.[58]

Nor have Defendants shown any material variation in law. The vast majority of the swaps in the class use an ISDA standard form contract that calls for application of New York law. The standard ISDA master agreement "serves as the contractual foundation for more than 90% of derivatives transactions globally," *In re Lehman Bros. Holdings Inc.*, 553 B.R. 476, 485 n.21 (Bankr. S.D.N.Y. 2016), and as the Second Circuit has explained, this "standard form . . . governs the *legal* and credit relationship between the parties" to the derivatives transaction, *Aon Fin. Prod., Inc. v. Societe Generale*, 476 F.3d 90, 93 n.4 (2d Cir. 2007); *see* Bern. R. ¶ 182. ISDA itself highlights the benefits of the "legal certainty" provided by the "standardized ISDA documentation," including the New York governing law provision, which allows "market participants [to] reasonably expect that courts in this jurisdiction will effectuate their contractual

---

[57] *See Foodservice*, 729 F.3d at 126 (rejecting defendants' "Contract Variations" argument because "the record does not indicate the existence of material differences in contract language or other significant individualized evidence").

[58] *Foodservice*, 729 F.3d at 125 ("Just as the record contains no evidence regarding individualized customer knowledge, it likewise includes no evidence of any USF customer's contract negotiations or individualized conduct in performing pursuant to the contract that tends to show either that the customer understood his contract to authorize the VASP arrangements or that he otherwise acquiesced in them."); *see* ECF 387 at 72:21-24 (bank counsel representing at Aug. 8, 2013 hearing that "these swaps and derivatives are generally governed by an ISDA master agreement"). For this reason, Defendants' reliance on *Spread Enterprises* is misplaced—the Court there found "*significant variations* in the way these Merchant Processing Agreements stipulate *which fees will be charged* and on *whether these fees will be assessed on a per item, per transaction or some other basis*." *Spread Enters., Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 74 (E.D.N.Y. 2014). Nor does *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), support Defendants; unlike the record here, the evidence in *Broussard* affirmatively showed that the key contract terms at issue were "materially different" and the "actual contractual undertaking of each was subject to several critical variables." *Id.* at 340.

intent."[59] Defendants' use of the standard ISDA form obviates a state-by-state review of the state law claims.[60] *Foodservice*, 729 F.3d at 127 ("Thus, the crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues."). Defendants' lengthy discourse on New York's choice-of-law rules thus has no bearing here, and the cases Defendants cite are inapposite.[61] Downstream Br. at 25-26. Moreover, "state contract law defines breach consistently such that the question will usually be the same in all jurisdictions."[62]

## B. Defendants identify no individual issues in the unjust enrichment claims

Whether class members' losses from lower LIBOR payments equate to enrichment by the banks presents a legal question (common to the class).[63] Dr. Bernheim thus did not need "to show that any Defendant was enriched," Upstream Br. at 33, nor does Dr. Bernheim's presentation of two ways to compute state-law damages create a "fundamental" conflict that

---

[59] Brief of *Amicus Curiae* in Support of the Brief of Defendant-Appellant at 11-12, *Aon*, 476 F.3d 90 (No. 06-1080), *available at* http://www.isda.org/speeches/pdf/ISDA-Amicus-Curiae-Brief05-08-06.pdf.

[60] Parties to an ISDA master agreement may choose English law instead of New York law, but the vast majority of the LIBOR-based instruments in the class—including all instruments held by OTC plaintiffs—are governed by New York law. To the extent English and New York law are materially different, the court may certify two subclasses. Likewise, the Court can limit its certification of the state-law subclasses to ISDA swaps and bonds.

[61] There was no contractual choice-of-law clause in either *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724–25 (5th Cir. 2007), or *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016–17 (D.C. Cir. 1986). And *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996), and *In re Fosamax Prods. Liability Litig.*, 248 F.R.D. 389 (S.D.N.Y.), were products liability cases, not breach of contract cases, and did not involve contractual choice-of-law clauses. Further, the Court in *Yarger v. ING Bank, fsb*, 285 F.R.D. 308 (D. Del. 2012), concluded the choice-of-law clauses at issue did not apply to the plaintiffs' claims. *Id.* at 322. Importantly, neither party here—***including the Defendants***—contests the enforceability of the choice-of-law clauses or their applicability to the OTC Plaintiffs' state-law claims.

[62] *Foodservice*, 729 F.3d at 127 (noting that "[a] breach is a breach is a breach" and that "contract law is not at its core diverse, nonuniform, and confusing"); *see also Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *12 (S.D.N.Y. Oct. 17, 2013) (certifying class on claim for breach of the implied covenant).

[63] That ability to show class-wide injury here (through suppressed LIBOR-based payments) is the element that was missing in the cases cited by Defendants. *Vaccariello v. XM Satellite Radio*, 295 F.R.D. 62, 75–76 (S.D.N.Y. 2013) ("Specifically, Plaintiff is unable to show injury to proposed class members on a class-wide basis, Defendant could submit individual defenses to Plaintiff's claims, and damage calculations require individual considerations."); *see also Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) ("As with their § 349 claim, plaintiffs have not shown that they will be able to prove on a class-wide basis that class members paid a price premium for Snapple beverages as a result of the 'All Natural' labeling, much less the amount of any such premium."); *In re Canon Cameras*, 237 F.R.D. 357, 359–60 (S.D.N.Y. 2006) ("A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase.").

might raise an adequacy of representation problem, *see* OTC Br. at 18-19 (discussing adequacy). By the time of trial the court likely will have determined which one applies as a matter of law, which suffices. *E.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 144 (2d Cir. 2001) (holding that "district court did not abuse its discretion by declining to decide [which of two measures of damages to use] at the certification stage") (Sotomayor, J.).[64]

### C.    Case law supports certification of OTC Plaintiffs' state-law claims

Courts regularly certify nationwide class actions alleging claims under state law, as "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of time, effort and expense, and promote uniformity of decision." *Foodservice*, 729 F.3d at 130. Defendants point to various issues that purportedly preclude certification, such as arbitration clauses in some unspecified number of ISDA agreements, Downstream Br. at 24, or differences in statutes of limitations, *id.* at 27, but differences in the applicability of affirmative defenses do "not compel a finding that individual issues predominate over common ones." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006).[65]

With respect to OTC Plaintiffs' unjust enrichment claims, as a threshold matter, Defendants may not rely on the alleged variability in the law of unjust enrichment across jurisdictions, when they previously conceded the applicability of New York law to these claims. *Compare* Downstream Br. at 25, 26-27, *with* ECF No. 508 at 22-25 (relying exclusively on New

---

[64] Defendants' only case on this point was an ERISA breach-of-fiduciary-duty case, where one group of plaintiffs was directly exposed to increases in prescription drug costs and argued that another group whose exposure was insured and capped should not recover at all from a settlement fund. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007). Notably, even under those circumstances, the Second Circuit remanded for certification of a sub-class—it did not de-certify the class. *Id.*

[65] *See also, e.g.*, *LIBOR*, 2016 WL 2851333, at *4; *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 78 (E.D.N.Y. 2004) ("Courts have been nearly unanimous . . . that possible differences in the application of a statute of limitations to individual class members, including the named plaintif[f], does not preclude certification . . . .").

York law in seeking dismissal of OTC plaintiffs' unjust enrichment claims), *and id.* at 24 (calling the New York Court of Appeals' "recent decision . . . instructive").[66] Furthermore, even if the Court were to apply a choice-of-law analysis, underlying OTC Plaintiffs' unjust enrichment claims are contracts containing New York choice-of-law provisions, so New York law would apply.[67] Finally, as with the contract claims, state-by-state variations in the law of unjust enrichment are not sufficiently material to preclude class certification.[68]

## IV.   Class Treatment Affords a Superior Way to Resolve the Disputes

Defendants have not offered any serious challenges to the superiority of proceeding as a class action. Indeed, the hundreds if not thousands of individual trials that would follow would undoubtedly rely on similar, formulaic and econometric evidence. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[66] In this Circuit, parties are bound to their choice of law. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law."); *see also Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("[C]onduct during litigation may indicate assent to the application of another's state's law."); *NV Petrus SA v. LPG Trading Corp.*, 2017 WL 1831096, at *5 (E.D.N.Y. May 4, 2017) ("The court finds that Defendants 'implied[ly] consent[ed]' to New York law governing this dispute, as they consistently relied on New York law in their memoranda of law."); *Baiul v. NBC Sports*, 2016 WL 1587250, at *12 (S.D.N.Y. Apr. 19, 2016) (party "waived [its] choice of law argument by affirmatively representing that New York law applies in numerous prior filings").

[67] *See 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 234 (S.D.N.Y. 2015) (concluding that "the more an unjust enrichment claim relates to an enforceable contract, the more likely it is to be considered contractual in nature," and finding the state of the contract's "choice-of-law provision" to be the "best fit"*); see also Merrill Iron & Steel, Inc. v. Yonkers Contracting Co.*, 2006 WL 2679940, at *3 (S.D.N.Y. Sept. 19, 2006) (questioning whether defendant could "avoid" a contractual choice-of-law clause when defending against claim for unjust enrichment); *In re Lois/USA, Inc.*, 264 B.R. 69, 106 (Bankr. S.D.N.Y. 2001) (applying contractual choice-of-law clause to unjust enrichment claim).

[68] *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict."); *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *27 (N.D. Cal. June 13, 2014) (certifying multistate class on claim for unjust enrichment).

██████████████████████████████████████████████████████████████

███████████████████████████ Absent certification, the Court would be required to resolve

the same disputes based on the same evidence time and time again.

### V.   OTC Plaintiffs Have Shown Typicality and Adequacy

#### A.   No unique defenses apply to OTC Plaintiffs

To defeat OTC Plaintiffs' showing of typicality, Defendants must prove that their "claims are 'subject to unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010). Because netting and absorption apply to, and can be addressed with the same common formula for, OTC Plaintiffs *and* absent class members, any differences in the specific inputs pose no risk of becoming the focus of the case.

#### B.   Netting and absorption pose no fundamental conflict

"A conflict 'between named parties and the class they seek to represent' will be sufficient to defeat class certification only if the conflict is 'fundamental.'" *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 2017 WL 985640, at *12 (D. Conn. Mar. 13, 2017) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). Defendants do not identify any significant conflict, much less a fundamental one. The Court will rule as a legal matter on the scope of any netting required, and common methods exist to mechanically apply those parameters to identify net-damaged class members.[69]

### VI.   OTC Plaintiffs Have Standing to Bring Claims on Behalf of Bondholders

OTC Plaintiffs have class standing to bring claims on behalf of both those who purchased swaps and those who purchased bonds tied to LIBOR because the *illegal* conduct that caused OTC Plaintiffs' injuries on their swap instruments—the panel banks' collusion and suppression

---

[69] Defendants' only other attack on the Rule 23(a) factors is the claimed numerosity issue with the Credit Suisse subclass. ████████████████████████████████████████████████████████████

pertaining to LIBOR—"implicates 'the same set of concerns'" as the *illegal* conduct which caused injuries to bondholders.[70] In fact, the conduct that caused injuries to swapholders and bondholders is *exactly the same*.[71] Judge Castel recently held that class representatives bringing Sherman Act claims for manipulation of the Euribor financial benchmark had class standing even if they did not transact in all categories of Euribor-linked derivatives included in the class. *See Sullivan v. Barclays PLC*, 2017 WL 685570, at *8 (S.D.N.Y. Feb. 21, 2017) ("[Forward Rate Agreements] are a different category of derivative than those transacted in by plaintiffs, but any harm suffered by a party to an FRA as a result of the Euribor's manipulation would have been caused by the identical misconduct of the identical parties.").[72]

Defendants' cases are not on point. In securities class actions, equity buyers and debt buyers might well have relied on different false statements, creating fundamental differences as to causation and reliance, such that class representatives from one group lack standing to assert claims on behalf of the other.[73] Furthermore, the Second's Circuit's decision in *Retirement Board of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*,

---

[70] *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("[A] plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants . . . .").

[71] That this Court previously held that swaps and bond issuances are different for the purposes of agency analysis, *see* Downstream Br. at 30, has nothing to do with the similarity of the banks' conduct in the class standing analysis.

[72] The decision in *Sonterra Capital Master Fund, Ltd. v. UBS AG*, 2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017), relied upon by the banks, *see* Downstream Br. at 29, is not persuasive. *Sonterra* concluded that plaintiffs who transacted in Yen-LIBOR-linked interest rate swaps did not suffer *injury-in-fact* with respect to Yen-LIBOR-linked forward rate agreements, *see* 2017 WL 1091983, at *2 ("Plaintiffs fail to articulate concrete injury . . . to satisfy the injury-in-fact requirement for Article III standing."), but this analysis ignores the Second Circuit's rule that the *injury-in-fact* element of class standing is satisfied as long as the class representative "has suffered *some* actual . . . injury," *NECA*, 693 F.3d at 162. In *NECA*, the Second Circuit explicitly rejected "the district court's requirement that [plaintiff] 'show[] that [its] injuries . . . are *the same* . . . as those allegedly suffered by [absent class members]." *Id.* Notably, the district court in *Sonterra* did not cite *NECA* or *Sullivan*.

[73] *E.g., In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008) (citing *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 497 (S.D.N.Y. 2004), which differentiated between "fraud perpetrated by means of false statements made . . . about the investment quality of a company's equity securities, especially where . . . *specifically* directed to the value and prospects of the equity securities," and the different alleged acts of fraud which caused "the injury claimed to bondholders").

775 F.3d 154 (2d Cir. 2014), turned on a close examination of how the single defendant's duty as trustee of various residential mortgage-backed securities trusts differed depending on the terms of each trust. *See id.* at 162. Here, in contrast, every OTC class member purchased an instrument in which LIBOR "forms a component of the return," *Gelboim*, 823 F.3d at 771, and the definition of LIBOR is the same regardless of whether it is incorporated into a swap or a bond.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ there is no distinction that matters: swapholders and bondholders were injured in the same way by the alleged suppression, and their damages are measured in the same way.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ Accordingly, injuries to swapholders and bondholders plainly raise a "similar set of concerns" under *NECA*.

## CONCLUSION

For the foregoing reasons, the Court should certify this case as a class action.

_____

██████████████████████████████████████

Dated: August 4, 2017

By:     */s/ Michael D. Hausfeld*                    */s/ William Christopher Carmody*

Michael D. Hausfeld                          William Christopher Carmody (WC8478)
Hilary Scherrer                              Arun Subramanian (AS2096)
Nathaniel C. Giddings                        Seth Ard (SA1817)
HAUSFELD LLP                                 Geng Chen (GC2733)
1700 St. NW, Suite 650                       SUSMAN GODFREY L.L.P.
Washington, D.C. 20006                       1301 Avenue of the Americas, 32nd Floor
Telephone: (202) 540-7200                    New York, NY 10019
Facsimile: (202) 540-7201                    Telephone: (212) 336-3330
mhausfeld@hausfeldllp.com                    Facsimile: (212) 336-8340
hscherrer@hausfeldllp.com                    bcarmody@susmangodfrey.com
ngiddings@hausfeldllp.com                    asubramanian@susmangodfrey.com
                                             sard@susmangodfrey.com
Scott A. Martin                              gchen@susmangodfrey.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor              Marc M. Seltzer
New York, NY 10004                           Glenn C. Bridgman
Telephone: (646) 357-1195                    SUSMAN GODFREY L.L.P.
Facsimile: (212) 202-5322                    1901 Avenue of the Stars
smartin@hausfeld.com                         Los Angeles, CA 90067-6029
                                             Telephone: (310) 789-3100
Gary I. Smith                                mseltzer@susmangodfrey.com
HAUSFELD LLP                                 gbridgman@susmangodfrey.com
325 Chestnut Street, Suite 900
Philadelphia, PA 19106                       Matthew Berry
Telephone: (267) 702-2318                    Drew D. Hansen
Facsimile: (215) 985-3271                    SUSMAN GODFREY LLP
gsmith@hausfeld.com                          1201 Third Avenue, Suite 3800
                                             Seattle, WA 98101
                                             Telephone: (206) 516-3880
                                             Facsimile: (206) 516-3883
                                             mberry@susmangodfrey.com
                                             dhansen@susmangodfrey.com

                                             Barry C. Barnett (BB1984)
                                             Karen Oshman
                                             Michael Kelso
                                             SUSMAN GODFREY L.L.P.
                                             1000 Louisiana Street, Suite 5100
                                             Houston, TX 77002-5096
                                             Telephone: (713) 651-9366
                                             bbamett@susmangodfrey.com
                                             koshman@susmangodfrey.com

mkelso@susmangodfrey.com

*Interim Co-Lead Class Counsel for the OTC Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2017 I caused the foregoing Reply Memorandum of Law in Support of OTC Plaintiffs' Motion to Certify Case as Class Action and Appoint Class Counsel [ECF 1904] to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Southern District of New York, on all parties registered for CM/ECF in the above-captioned matters.

Dated: August 4, 2017                        */s/ William Christopher Carmody*
                                             William Christopher Carmody