**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB) |
| THIS DOCUMENT RELATES TO: | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE AG, et al.,<br><br>                Defendants. | No. 11-cv-5450 (NRB) |

**OTC PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH
<u>CITIBANK, N.A. AND CITIGROUP INC.</u>**

## I.      INTRODUCTION

Plaintiffs Mayor and City Council of Baltimore, City of New Britain, Vistra Energy Corp., Yale University, and Jennie Stuart Medical Center, Inc. (collectively, "OTC Plaintiffs")[1] respectfully submit this memorandum in support of their motion for preliminary approval of the settlement ("Settlement") reached between OTC Plaintiffs, on behalf of themselves and the putative Class, and defendants Citibank, N.A. and Citigroup Inc. (collectively, "Citibank") (together with OTC Plaintiffs, the "Parties") in the above-captioned litigation (the "OTC Action").[2] If approved, the proposed Settlement, consisting of $130,000,000 cash and an agreement to provide significant cooperation to OTC Plaintiffs in pursuing their case against the non-settling defendants, will resolve this complex case against Citibank. This settlement was reached after extended, frank, and contentious negotiations over the course of more than two years, including a mediation conducted under the guidance of the Honorable Layn R. Phillips.[3] It is also substantially similar to the settlement reached between OTC Plaintiffs and Barclays Bank plc ("Barclays Settlement"), which this Court preliminarily approved on December 21, 2016. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 CV 5450 (NRB), 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) ("Barclays Order"). As demonstrated below, the proposed Settlement with Citibank, like the Barclays Settlement, is an excellent result for the Class; is fair, reasonable and adequate under the governing standards in this Circuit; and warrants approval.

---

[1] OTC Plaintiffs are Mayor and City Council of Baltimore; City of New Britain; Vistra Energy Corp.; Yale University; and Jennie Stuart Medical Center, Inc.

[2] Unless otherwise defined herein, all capitalized terms have the meaning ascribed to them in the Settlement Agreement Between OTC Plaintiffs, Citibank, N.A. and Citigroup Inc., dated July 27, 2017 (the "Settlement").

[3] For a more extended discussion of the procedural history of this case, including a summary of the claims, the settlement negotiations, and the terms of the settlement, OTC Plaintiffs hereby incorporate by reference the Declaration of Marc M. Seltzer ("Seltzer Decl."), filed concurrently herewith.

1

## II. PRELIMINARY APPROVAL OF SETTLEMENT IS APPROPRIATE

### A. Standard for Preliminary Approval

"Preliminary approval is generally the first step in a two-step process before a class-action settlement is approved." *In re Stock Exchanges Options Trading Antitrust Litig.*, No. 99 CIV 0962(RCC), 2005 WL 1635158, at *4 (S.D.N.Y. July 8, 2005). "In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice," and "[o]nce preliminary approval is bestowed, the second step of the process ensues; notice is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("*NASDAQ II*"). "Because of the two-step process, a grant of preliminary approval is 'at most a determination that there is what might be termed "probable cause" to submit the proposal to class members and hold a full-scale hearing as to its fairness.'" Barclays Order, 2016 WL 7625708, at *2 (quoting *In re Traffic Exec. Ass'n-E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980)).

In determining whether to grant preliminary approval to a settlement, the court considers both the "negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803–04 (2d Cir. 2009). Factors include whether the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval," *NASDAQ II*, 176 F.R.D. at 102, provides "intangible benefits, including cooperation against non-settling defendants," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 CIV. 2613 NRB, 2014 WL 6851096, at *2 (S.D.N.Y. Dec. 2, 2014), and grants the plaintiffs repose in the face of complex, uncertain litigation, *In re Initial*

*Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005). *See also* Barclays Order, 2016 WL 7625708, at *2.

While "[t]he decision to grant or deny such approval lies squarely within the discretion of the trial court," *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), courts in this District recognize that "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions," *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814, at *4 (S.D.N.Y. Sept. 9, 2015) (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998))).

As explained below, the Settlement is both substantively and procedurally fair such that it warrants preliminary approval.

**B.     The Settlement Is Entitled to a Presumption of Fairness**

Where, as here, the proposed settlement is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation," the settlement enjoys a "presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000); *see also In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 155 (S.D.N.Y. 2013) ("This presumption arises because if the negotiation process is fair 'the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides.'" (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381 (S.D.N.Y. 2013))). "Further, 'great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.'" *In re IMAX Sec. Litig.*, 283

3

F.R.D. 178, 189 (S.D.N.Y. 2012) (Buchwald, J.) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. at 125)).

Both of these aspects are present here. First, this Court has previously concluded that OTC Plaintiffs' Counsel has the requisite skills and experience in class actions to lead this litigation on behalf of the putative Class. *See* ECF No. 66. And it is beyond dispute that Citibank is represented by reputable and highly-experience counsel. Second, the settlement negotiations between OTC Plaintiffs and Citibank were vigorous, involved an accomplished and engaged mediator, and stretched out over more than two years. Seltzer Decl. ¶¶ 20-23. The use of a mediator "strengthen[s]" the presumption that the compromise is fair and reasonable. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010); *see also Capsolas v. Pasta Res. Inc.*, No. 10-CV-5595 RLE, 2012 WL 1656920, at *1 (S.D.N.Y. May 9, 2012) ("The assistance of an experienced mediator . . . reinforces that the Settlement Agreement is non-collusive."). That the mediator is a retired judge "further buttresse[s]" the "presumption of correctness." *See In re IMAX Sec. Litig.*, 283 F.R.D. at 189 (citing *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008)). In short, the Settlement is entitled to a "presumption of fairness, adequacy, and reasonableness." *See In re Citigroup Inc. Bond Litig.*, 296 F.R.D. at 155.

  C. **The Settlement is Substantively Fair**

While it is unnecessary to undertake "a full fairness analysis" at the preliminary approval stage, *Authors Guild v. Google, Inc.*, No. 05 CIV. 8136 (DC), 2009 WL 4434586, at *1 (S.D.N.Y. Dec. 1, 2009), some courts have looked to the nine factors announced in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), at the preliminary approval stage

(the "*Grinnell* factors"), *see, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. at 210. The *Grinnell* factors are as follows:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463.

As explained below, each of the applicable *Grinnell* factors weighs in favor of this Court granting preliminary approval to the Settlement. *See* Barclays Order, 2016 WL 7625708, at *2 ("The settlement is a significant recovery for OTC plaintiffs and includes the intangible benefit of cooperation against the non-settling defendants. The OTC plaintiffs also have obtained the certainty of a settlement in the face of a factually complex case with genuine legal uncertainties. Therefore, enough factors are present to permit the OTC plaintiffs to proceed to a full-scale fairness hearing." (citation omitted)); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2014 WL 6851096, at *2 ("In this instance, we grant the motion for preliminary approval, as there are enough factors to suggest that the Proposed Settlement is viable. First, the Proposed Settlement is the result of arm's-length negotiations . . . . Second, it is reasonable to expect that the Exchange-Based Plaintiffs will benefit considerably from Barclays's cooperation in producing evidence to use against the many non-settling defendants . . . . Third, to win an award without settling, the . . . Plaintiffs must prove a factually complex case with genuine legal uncertainties.").

    **1.**    **The Complexity, Expense, and Likely Duration of the Litigation.**

OTC Plaintiffs can think of no other case that better embodies the challenges faced by plaintiffs in antitrust litigation. *See Wal-Mart Stores*, 396 F.3d at 118 ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"). The OTC Action was initially filed almost six years ago, has survived multiple rounds of motions to dismiss on complex issues of antitrust injury and personal jurisdiction, and has not yet proceeded to merits discovery. OTC Plaintiffs' primary claim—their antitrust claim—was previously dismissed as to all defendants, reinstated by the Second Circuit, and dismissed again as to many defendants on personal jurisdiction grounds; another appeal is pending before the Second Circuit. Meanwhile, briefing on OTC Plaintiffs' motion for class certification has been extensive, and whichever side loses that motion will likely pursue a Rule 23(f) petition. Even if OTC Plaintiffs win the motion for class certification, they still face the monumental task of trudging through what is likely to be a highly contentious merits discovery process, including additional expert discovery, summary judgment briefing, and at the end of this process, a weeks if not months long trial, from which the losing party will almost certainly appeal. *See, e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. at 577 ("The costs and duration of . . . conducting merits . . . discovery, conducting expert discovery, litigating a motion for summary judgment, preparing for trial, conducting the trial itself, filing post-trial motions, and pursuing any appeals would vastly exceed the substantial time and money already spent."); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("*NASDAQ III*") (estimating that trial in a complex antitrust class action "could consume over a year").

In short, while OTC Plaintiffs' Counsel and the defendants have already expended significant resources litigating this case, "[t]here can be no doubt that this class action would be

enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *NASDAQ III*, 187 F.R.D. at 477. The first *Grinnell* factor supports preliminary approval.

### 2. The Reaction of the Class to the Settlement

Because notice has yet to be provided to potential members of the Class, courts generally do not consider this *Grinnell* factor at the preliminary approval stage. *See, e.g., Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006) ("Clearly, some of the[] [*Grinnell*] factors, particularly the reaction of the class to the settlement, are impossible to weigh prior to notice and a hearing."). In any event, all of the OTC Plaintiffs approve of this settlement, and should any objections be received prior to the Fairness Hearing, OTC Plaintiffs' Counsel will address those concerns in the final approval papers.

### 3. The Stage of the Proceedings

"The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Discovery need not be fully complete, or even under way, before a settlement can be approved. *See In re IMAX Sec. Litig.*, 283 F.R.D. at 190 ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties."). "[I]t is enough for the Parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make . . . an appraisal of the Settlement." *In re AOL Time Warner, Inc.*, 2006 WL 903236, at *10.

Numerous facts demonstrate that this *Grinnell* factor supports preliminary approval. First, the parties have been litigating this action for almost six years and have received at least seven lengthy rulings from the Court on the viability of their claims. *See* ECF Nos. 286; 389; 568;

7

1164; 1234; 1380; 1676; *see also In re IMAX Sec. Litig.*, 283 F.R.D. at 190 (noting that the case had "been pending for almost six years"). Second, the parties have briefed and argued the viability of the antitrust claim on numerous occasions both in the Second Circuit and before this Court. Third, OTC Plaintiffs obtained from Citibank and other defendants millions of documents and audio files previously provided to regulators as well as voluminous transaction data. Fourth, the parties are currently briefing and will soon argue OTC Plaintiffs' motion for class certification, which involves complex issues of both fact and law. This process has included extensive written submissions and deposition testimony from experts on both sides of the case. Fifth, OTC Plaintiffs have undertaken extensive legal analysis of the OTC Plaintiffs' claims and the reasonable value of the case. Sixth, OTC Plaintiffs' Counsel has engaged consulting experts to better understand the LIBOR market and the magnitude of harm inflicted on the Class. Seventh, OTC Plaintiffs' Counsel have learned additional facts through cooperation from Barclays as a result of the Barclays Settlement. Eighth, OTC Plaintiffs' Counsel and Citibank's Counsel conducted mediator-assisted settlement negotiations over the course of more than two years; these negotiations, which were extremely contentious, were accompanied by an honest and frank discussion on the relative strengths and weaknesses of the parties' claims and defenses. Seltzer Decl. ¶¶ 20-23. The information gained through these various means have provided OTC Plaintiffs' Counsel with a comprehensive understanding of the relative strengths and weaknesses of their case that has enabled OTC Plaintiffs' Counsel to negotiate a settlement believed to be an excellent result for the Class. The Court should therefore conclude that this third *Grinnell* factor supports preliminary approval of the Settlement.

### 4. The Risks of Establishing Liability and Damages

"In assessing the Settlement, the Court should balance the benefits afforded the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation."

8

*In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 CM, 2014 WL 7323417, at *8 (S.D.N.Y. Dec. 19, 2014). In this case, OTC Plaintiffs face significant risks in continuing to litigate this case, which are amplified by the complexity of the LIBOR market and the fact that defendants are global financial institutions with significant litigation resources.

This litigation presents the Court, the parties, and eventually, a jury, with the task of understanding extremely complex derivative instruments in an opaque, unregulated market. This risk will only be amplified as the case proceeds to discovery and substantive motions. And should the case proceed to trial, "[t]he complexity of Plaintiff's claims *ipso facto* creates uncertainty . . . . A trial on these issues would likely be confusing to a jury." *Park v. The Thomson Corp.*, No. 05 CIV.2931 (WHP), 2008 WL 4684232, at *4 (S.D.N.Y. Oct. 22, 2008); *see* 31 No. 7 Futures & Derivatives L. Rep. 1 ("Derivative instruments, in most cases, are highly complex and difficult to understand for even highly sophisticated and intelligent investors."). This makes proving liability and damages, both of which would have required the assistance of experts, all the more risky.[4]

Additional risk is created by the fact that Citibank and the non-settling defendants have significant litigation resources and are represented by some of the best law firms in the United States. Absent settlement, Citibank was most certainly prepared to vigorously contest its liability and damages. "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013). Put simply, "liability is never automatic." *Park*, 2008 WL 4684232, at *4. And even if

---

[4] It is a foregone conclusion that this case will require a "battle of the experts." "In this 'battle of experts,' it is difficult to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad of non-actionable factors . . . ." *In re Warner Commc'ns*, 618 F. Supp. 735, 744–45 (S.D.N.Y. 1985).

OTC Plaintiffs were able to establish Citibank's liability at trial, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *NASDAQ III*, 187 F.R.D. at 476. In sum, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away." *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85 CIV. 3048 (JMW), 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987). The fourth *Grinnell* factor weighs in favor of the Settlement.

### 5. The Risks of Maintaining the Class Action Through Trial

Although OTC Plaintiffs believe that their proposed litigation class will be certified, the defendants have vigorously contested their motion for class certification, and OTC Plaintiffs recognize that there is no guarantee that a litigation class will be certified. Assuming the litigation class is certified, the Court could nonetheless review and modify that grant of certification at any point prior to trial, such that the risk of maintaining the class through trial would never be 100% certain. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 CIV. 2207 JGK, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the appropriateness of certification at anytime during the proceedings."); *see also In re IMAX Sec. Litig.*, 283 F.R.D. at 191 (noting that "if insurmountable management problems were to develop at any point, class certification can be revisited at any time" (quoting *NASDAQ III*, 187 F.R.D. at 476)). This being the case, the fifth *Grinnell* factor weighs in favor of preliminary approval.

### 6. The Ability of Defendants to Withstand a Greater Judgment

While Citibank could withstand a greater judgement than the amount of compensation provided for in the Settlement, this alone is not sufficient for the Court to decline preliminary

approval of the Settlement. *In re IMAX Sec. Litig.*, 283 F.R.D. at 191 ("[T]his factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement."). In any event, a $130 million settlement is significant and, given the extent of the cooperation promised by Citibank beyond the cash payment, OTC Plaintiffs submit that application of the *Grinnell* factors weighs so strongly in favor of preliminary approval that consideration of this factor alone does not militate against granting preliminary approval of the settlement. *See In re Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Penn. 2008) ("Moreover, the benefit of obtaining the cooperation of the Settling Defendant[] tends to offset the fact that [it] would be able to withstand a larger judgment."); *see also* Barclays Order, 2016 WL 7625708, at *2 (noting with approval "the intangible benefit of cooperation against the non-settling defendants" in granting preliminary approval of the Barclays Settlement); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. at 157 (approving settlement with Citigroup Inc., one of the settling defendants, though "Citigroup could likely withstand a greater judgment"); *In re IMAX Sec. Litig.*, 283 F.R.D. at 191 ("But a defendant is not required to 'empty its coffers' before a settlement can be found adequate." (quoting *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 CIV. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008))).

### 7. The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In applying these factors, "[t]he adequacy of the amount achieved in settlement may not be judged in comparison with the possible recovery in the best of all possible worlds, but

rather in light of the strengths and weaknesses of plaintiffs' case." *In re IMAX Sec. Litig.*, 283 F.R.D. at 191 (quoting *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 162 (S.D.N.Y. 2011)); *see also NASDAQ III*, 187 F.R.D. at 478 ("Ultimately, the exact amount of damages need not be adjudicated for purposes of settlement approval."). Consequently, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2; *see also In re IMAX Sec. Litig.*, 283 F.R.D. at 191 ("[T]he Second Circuit 'has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought.'" (quoting *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989))).

Continuing this litigation against Citibank would, as outlined above, necessitate the expenditure of countless hours and dollars over several more years with no guarantee that OTC Plaintiffs would ever be able to certify a class, establish liability, and prove damages; all of which would be required for OTC Plaintiffs to recover anything at trial. These risks are arguably dispositive for these *Grinnell* factors. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) ("[T]he propriety of a given settlement amount is a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery).").

In comparison to the antecedent risks of continuing litigation against Citibank, this second Settlement provides OTC Plaintiffs and the Class both significant cash compensation ($130,000,000) and immediate and substantial cooperation. Seltzer Decl. ¶¶ 24-30. That OTC Plaintiffs and the Class will receive compensation now rather than years from now, if at all, weighs strongly in favor of preliminary approval. *See AOL Time Warner*, 2006 WL 903236, at

\*13 ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery."). And as to the cooperation, though this is not quantifiable in "dollars and cents," the value of Citibank's cooperation to the Class is arguably invaluable: as further specified in the Settlement Agreement, it will provide OTC Plaintiffs with, among other things, documents, witness interviews, data, and market knowledge that will assist OTC Plaintiffs in their continued litigation against the non-settling defendants. *See* Barclays Order, 2016 WL 7625708, at \*2 (noting "the intangible benefit of cooperation against the non-settling defendants"); *see also In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at \*10 (E.D. Mich. Feb. 22, 2011) (noting that cooperation "has already been beneficial to the OTC Plaintiffs in their continued prosecution of their claims against the non-settling Defendants"). As such, the cooperation provisions of the Settlement strongly weigh in favor of preliminary approval. *See In re Corrugated Container Antitrust Litig.*, No. M. D. L. 310, 1981 WL 2093, at \*16 (S.D. Tex. June 4, 1981), *aff'd*, 659 F.2d 1322 (5th Cir. 1981) ("The cooperation clauses constituted a substantial benefit to the class.").

Finally, similar to the Barclays Settlement, this Settlement has the potential to "facilitate a more expeditious outcome of the remaining claims, and may advance the final resolution of this litigation." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06MD1775JGVVP, 2009 WL 3077396, at \*7 (E.D.N.Y. Sept. 25, 2009); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Penn. 2003) (noting that an "early settlement" could "bring other defendants to the point of serious negotiations"). Thus, this Settlement could pay further dividends in the form of additional settlements (without the associated risks of continuing to litigate this case through trial) with other Defendants. As the court in *In re Corrugated Container Antitrust Litigation*, explained: "[T]his strategy was designed to achieve a maximum aggregate recovery for the class

and the fact that the later settlements were at considerably higher rates tends to show that the strategy was successful." 1981 WL 2093, at *23.

In sum, each of the relevant *Grinnell* factors weighs in favor of this Court granting preliminary approval to the Settlement.[5]

### III. OTC PLAINTIFFS' SEPARATE MOTION FOR APPROVAL OF A NOTICE PLAN AND PLAN OF DISTRIBUTION

OTC Plaintiffs are committed to the Net Settlement Fund being distributed in a reasonable and equitable fashion to members of the Class. As with the Barclays Settlement, OTC Plaintiffs respectfully propose to file a separate Motion for Approval of the Notice Program and Plan of Distribution within 30 days. At that time, OTC Plaintiffs' Counsel will recommend to the Court a proposed Notice Program and Plan of Distribution (including the claim form), which will include input from both economic consultants and allocation counsel. This Court previously approved such a course of action with respect to the Barclays Settlement, *see* Barclays Order, 2016 WL 7625708, at *3, and other courts have permitted this course of action in similarly complex cases, *see, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 1:13-CV-07789-LGS, 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2013 WL 4525323, at *5 (E.D.N.Y. Aug. 27, 2013).

### IV. CONCLUSION

For the foregoing reasons, OTC Plaintiffs respectfully request the Court grant their motion for preliminary approval of the Settlement and approve Kenneth Feinberg as Settlement

---

[5] OTC Plaintiffs also request that the Court appoint Kenneth Feinberg as Settlement Administrator, Rust Consulting, Inc. as Claims Administrator, and Huntington Bank as Escrow Agent. Kenneth Feinberg is the Settlement Administrator for the Barclays Settlement and is named in the Settlement Agreement for the same role here, Rust Consulting, Inc. is the Claims Administrator for the Barclays Settlement, and the Settlement names Huntington Bank as Escrow Agent. *See* ECF No. 1948; Settlement ¶ 2(n), 2(kk).

Administrator, Rust Consulting, Inc. as Claims Administrator, and Huntington Bank as Escrow Agent.

Dated: August 7, 2017

| By: | */s/ Michael D. Hausfeld* | */s/ William Christopher Carmody* |

Michael D. Hausfeld
Hilary Scherrer
Nathaniel C. Giddings
HAUSFELD LLP
1700 St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfeldllp.com
hscherrer@hausfeldllp.com
ngiddings@hausfeldllp.com

Scott A. Martin
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1195
Facsimile: (212) 202-5322
smartin@hausfeld.com

Gary I. Smith
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (267) 702-2318
Facsimile: (215) 985-3271
gsmith@hausfeld.com

William Christopher Carmody (WC8478)
Arun Subramanian (AS2096)
Seth Ard (SA1817)
Geng Chen (GC2733)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-3330
Facsimile: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
gchen@susmangodfrey.com

Marc M. Seltzer
Glenn C. Bridgman
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
gbridgman@susmangodfrey.com

Matthew Berry
Drew D. Hansen
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
mberry@susmangodfrey.com
dhansen@susmangodfrey.com

Barry C. Barnett (BB1984)
Karen Oshman
Michael Kelso
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
bbarnett@susmangodfrey.com
koshman@susmangodfrey.com

mkelso@susmangodfrey.com

*Interim Co-Lead Class Counsel for the OTC Plaintiffs*