HANPLIB1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re:

4   LIBOR-BASED FINANCIAL
    INSTRUMENTS ANTITRUST                    11 MD 2262 (NRB)
5   LITIGATION

6   ------------------------------x
                                         New York, N.Y.
7                                        October 23, 2017
                                         10:46 a.m.
8   Before:

9                   HON. NAOMI REICE BUCHWALD,

10                                       District Judge

11                          APPEARANCES

12
    SUSMAN GODFREY LLP
13       Attorneys for OTC Plaintiffs
    BY:  SETH ARD
14       GENG CHEN
         BARRY BARNETT
15
    HAUSFELD LLP
16       Attorneys for OTC Plaintiffs
    BY:  HILARY K. SCHERRER
17       SCOTT MARTIN

18  KIRBY MCINERNEY LLP
         Attorneys for Exchange Based Plaintiffs
19  BY:  KAREN LERNER

20  LOVELL STEWART HALEBIAN JACOBSON LLP
         Attorneys for Exchange Based Plaintiffs
21  BY:  GARY JACOBSON
         JODY KRISILOFF
22
    SULLIVAN & CROMWELL LLP
23       Attorneys for Defendant Barclays Bank PLC
    BY:  MATTHEW PORPORA
24       STEPHEN CLARKE

25

HANPLIB1

APPEARANCES (Continued)

BOIES SCHILLER FLEXNER
     Attorneys for Defendant Barclays Bank PLC
BY:  LEIGH NATHANSON

LOCKE LORD
     Attorneys for Defendants HSBC
BY:  ROGER COWIE
     GREGORY CASAMENTO

COVINGTON & BURLING LLP
     Attorneys for Defendants Citigroup Inc.
BY:  ANDREW RUFFINO

SIMPSON THACHER & BARTLETT LLP (NY)
     Attorneys for Defendants JP Morgan
BY:  PAUL GLUCKOW

DAVIS POLK & WARDWELL LLP
     Attorneys for Defendants Bank of America
BY:  ADAM GABOR MEHES

WEINSTEIN KITCHENOFF & ASHER LLC
     Attorneys for Bondholders
BY:  DAVID H. WEINSTEIN
     ROBERT S. KITCHENOFF

MORRIS AND MORRIS LLC COUNSELORS AT LAW
     Attorneys for Bondholders
BY:  KAREN L. MORRIS
     PATRICK F. MORRIS

JOSEPH D. CARNEY & ASSOCIATES, LLC
     Attorneys for Objector Managed Care Advisory Group, LLC
BY:  JOSEPH D. CARNEY

BRENNAN, MANNA & DIAMOND, LLC
     Attorneys for Objector Managed Care Advisory Group, LLC
BY:  VICTORIA LYNN FERRISE
     CHAD R. ROTHSCHILD

ARENT FOX, LLP
     Attorneys for Objector Maimonides Medical Center
BY:  LES JACOBOWITZ
     JENNIFER WHITE

HANPLIB1

```
 1              (In open court; case called)
 2              THE COURT:  Sit down, please.
 3              MR. ARD:  Good morning, your Honor.  Seth Ard, Susman
 4     Godfrey on behalf of the plaintiffs.
 5              MR. PORPORA:  Matthew Porpora, on behalf of Sullivan
 6     and Cromwell for Barclays.
 7              THE COURT:  There's a few other people in the room.  I
 8     guess most important is to note the presence of any objectors.
 9     So if there are some objectors in the room, would you stand,
10     let me know who you are and who you represent?
11              MR. CARNEY:  Joseph Carney, your Honor, from Joseph
12     Carney and Associates, representing Managed Care Advisory
13     Group, LLC.
14              THE COURT:  Okay.
15              MS. FERRISE:  Victoria Ferrise from Brennan, Manna and
16     Diamond, also for Managed Care Advisory Group.
17              MR. ROTHSCHILD:  Jack Rothschild, from Brennan, Manna
18     and Diamond, also representing Managed Care Advisory Group.
19              MR. CARNEY:  And we're here today, your Honor, with
20     two of our client representatives.
21              THE COURT:  Do you want to identify them, since I
22     thought it was a little unusual that you submitted objections
23     without, in the written material that I saw, identifying any
24     client at all?  So why don't we note the presence, who the
25     clients are.
```

HANPLIB1

1          MR. SCHMIDT:  Your Honor, Jim Schmidt, CEO of Managed

2     Care Advisory Group.

3          THE COURT:  Okay.

4          MR. KAMION:  And Kurt Kamion, Vice President, Managed

5     Care Advisory Group.

6          THE COURT:  Okay.  That is not what I meant about

7     clients.  The question in my mind was that you have never

8     identified an entity that you represent, like Sullivan and

9     Cromwell represents Barclays.  The Barclays part of that has

10    never been identified, in at least the papers that I saw,

11    including ones that, for some reason, you filed last night at

12    6:00.  Frankly, I don't understand a reason anytime a lawyer

13    does that.  Do you really not want the judge to know about it

14    and read it?

15         MR. CARNEY:  Your Honor, it took some time for that to

16    be prepared.

17         THE COURT:  Sir, how long has this been pending?  Did

18    you submit other material before?

19         MR. CARNEY:  Yes, your Honor.

20         THE COURT:  There's no excuse, none, zero.

21         MR. CARNEY:  I apologize, your Honor.

22         THE COURT:  Are there any other objectors?  You can

23    sit down.

24         MS. WHITE:  Yes, your Honor, from Arent Fox LLP.  This

25    is Jennifer White and Les Jacobowitz for my Maimonides Medical

HANPLIB1

1    Center.

2              THE COURT:  Okay.  I guess we will hear from the

3    plaintiffs first.  Mr. Ard?

4              MR. ARD:  Good morning again, your Honor.  Seth Ard,

5    Susman Godfrey on behalf of OTC plaintiffs.  We're here today

6    to request final approval of the settlement with Barclays plan

7    of allocation and our fee and cost application.  We settled

8    with Barclays, as your Honor is aware, in November 2015 for

9    $120 million and extensive cooperation for the benefit of the

10   class.  This is a tremendous result for the class under any

11   measure, especially given the risks at the time of the

12   settlement, when the antitrust claims had been dismissed on the

13   merits in California and had not been decided.

14             This settlement was reached after two years of arms'

15   length negotiations under the guidance of three investigators

16   in the country, Layn Phillips, Daniel Weinstein and Ken

17   Feinberg.  None of the settlement funds revert to Barclays and

18   the only claims against Barclays are the lease.  The

19   cooperation obligations include extensive proffers from

20   Barclays' counsel, with his interviews he brought document

21   production, declarations, trial testimony that has already

22   tremendously benefited the class, and that cooperation is

23   ongoing to this day.

24             Perhaps the most important endorsement of the

25   settlement is that we sent direct notice to around 200,000

HANPLIB1

1    sophisticated investors, over a hundred thousand of whom have

2    visited the settlement website already, and we disseminated a

3    notification in publications that reached millions of people.

4    And after all of that, we only have two objectors and only four

5    opt outs, excluding those who have already filed complaints in

6    this case.  That is a ringing endorsement of the settlement,

7    and it speaks volumes to the fairness, reasonableness and

8    adequacy of the settlement under rule 23.

9              So, your Honor, there are three main issues on the

10   table today, final approval of the settlement, the objections,

11   and the fee and expense award.  I can take each in turn, but

12   I'm subject to however the Court would like to handle the

13   hearing today.

14             THE COURT:  You can go sequentially, as you did.  I'm

15   probably most interested in hearing from you on the objectors.

16             MR. ARD:  Okay.  Well, if your Honor would like --

17             THE COURT:  You know, but I don't want to cut you off

18   from saying anything that you wanted to say.  You're certainly

19   absolutely free to make any record that you like.

20             MR. ARD:  Sure, your Honor.  Frankly, we could rest on

21   the papers but I can walk quickly through the Grinnell factors

22   if your Honor thinks it would help.

23             THE COURT:  Not personally to me.

24             MR. ARD:  Okay.

25             THE COURT:  I'm not always sure if I'm the audience.

HANPLIB1

1          MR. ARD:  Sure.  You know, we can rest on our papers.

2     I guess I can say very quickly that the Second Circuit

3     evaluates the settlement under, first, procedural fairness and

4     then substantive fairness.  Procedural fairness looks at the

5     process by which the settlement was reached, and I've already

6     touched on that and our papers address it extensively.

7          Great weight was placed on the recommendation of

8     counsel, especially when there's mediators involved, like there

9     were here.  Here, the negotiations lasted over two years.  It's

10     also significant, I think, that the class representatives

11     include sophisticated entities like Yale University and

12     Baltimore, who carefully weighed the settlement, and the case

13     law cited in our briefs recognize that that's a significant

14     factor too.

15          On substantive fairness, what's called the Grinnell

16     factors, there's nine of them.  Again, our brief, I think,

17     ostensibly walks through them, but I can just touch on each

18     quickly.  The first is the complexity, expense and likely

19     duration of litigation.  No one is more familiar with the

20     complexity of this litigation than your Honor.  You know the

21     history of this case better than anybody and the challenges

22     that it has faced.

23          The reaction of the class of the settlement I've

24     already talked about.  You know, Second Circuit recognizes that

25     when there are a few objectors, that speaks strongly in favor

HANPLIB1

1   of the settlement.  Here, we had an extensive notice program.

2   We had only four opt outs and two objectors, excluding the

3   entities that have already filed complaints in this case who

4   opted out.

5          The stage of the proceedings.  That sort of looks at

6   the knowledge of counsel and, again, our papers detail the

7   extensive knowledge that counsel has gained in this case, both

8   up to the present and prior to the settlement, and that

9   included, of course, extensive mediation briefing, where both

10  sides were frank about their positions and the strengths and

11  weaknesses of the evidence.

12         The risks of establishing liability damages.  Again, I

13  need not belabor the Court.  Nobody knows the risk of

14  establishing liability damages better than your Honor.

15         The risks of maintaining class action through trial is

16  factor six.  Again, this factor is measured at the time of

17  settlement, and while we are confident that we presented a

18  class certification brief that will meet your Honor's approval,

19  things were far less certain in November of 2015 on that score.

20         And, of course, there's always the risk that the class

21  won't be certified or that class could be decertified, as the

22  cases recognize.

23         Ability of the defendants to stand greater judgments.

24  Court recognizes when you're going against large corporations

25  like Barclays, that factor has little weight, and courts also

1    recognize that when you get extensive cooperation obligations,

2    that it offsets the fact that the defendant could pay a lot

3    more.

4           Reasonableness of the settlement in light of the best

5    possible recovery and the intendant risks of litigation.  Those

6    are factors eight and nine.  Again, these factors sort of

7    intertwine with each other.  And the settlement $120 million

8    and the extensive cooperation we're getting from Barclays, and

9    the proffers and everything else are an excellent result to the

10   class, especially in light of all the risks of the best

11   possible recovery.

12          And because, of course, this was the first settlement

13   in the case, with extensive cooperation, it has a potential to

14   bring other defendants to the table, which it already has done

15   with the Citibank.

16          Certification of the settlement class is the next

17   issue.  Again, we can rest on our papers both here and in the

18   preliminary approval and the merits briefing.  Your Honor last

19   week asked the question about how it is that certain defendants

20   can sort of concede class certification for settlement purposes

21   and contest it on the merits, and sort of how those two

22   overlap.

23          In Paragraph 7 of the proposed order, we stipulate

24   that the certification of the settlement class is, quote,

25   without prejudice to or the waiver of the rights of any

HANPLIB1

1   defendant to contest certification of any of the class and,

2   quote, shall have no effect on the Court's ruling on any other

3   motions certifying any class, and, quote, no party may settle

4   or refer to the Court's approval of the class as persuasive or

5   binding authority with respect to any motion to certifying such

6   class.

7           I believe that should address the Court's concern.

8   This is a frequent device that is used in class actions where

9   you have multiple defendants and you have staggered

10  settlements.  The most recent example that I found was in Laben

11  in a LIBOR case, they did the same thing, and there was a final

12  approval last summer, where some of the defendants had settled;

13  yet, they had the same sort of stipulation in there.  The

14  docket for that is 12 CV 3419 and the docket number is 720,

15  it's Paragraph 22.

16          But this happens all the time with multiple defendants

17  in a class action.  Without it, you couldn't settle early

18  defendants in these cases as often.  And, of course, the Second

19  Circuit has explained that the factors aren't the same anyway.

20  The manageability you don't need to prove to settle class

21  certification, and the Second Circuit in American International

22  Group in 2012 explained that manageability is also an important

23  factor relating to predominance, that actually figures in

24  predominance.  I think in that case, the Court said even if you

25  can't prove fraud in the market, the securities fraud case,

HANPLIB1

1  which may damn your ability to prove the merits of a class

2  certification, you still can get a settlement class certified

3  because manageability concerns are not there; so it's a very

4  difficult standard.

5        So as to the factors, again addressed in our brief,

6  but again quickly numerosity is obvious.  Anytime there's more

7  than 40 class members, there's the presumption of numerosity.

8        Commonality, you only need one common issue.  Here,

9  there are many including whether LIBOR is suppressed or whether

10 the banks colluded to suppress LIBOR, and so forth.

11        Typicality is met if the same allegedly unlawful

12 conduct was directed at the class and the named plaintiffs, and

13 that's clearly the case here.  The allegedly unlawful conduct

14 is a suppression, a collusion to suppress, and that affected

15 all class members equally.

16        Adequacy in this court, your Honor already rejected

17 the challenge to adequacy in the preliminary approval stage of

18 the settlement, holding that, quote, in the interest of class

19 representatives are aligned with other class members with

20 unasserted claims.  And that is largely the same objection

21 that's being repeated now, where they address adequacy.

22        And predominance is routinely satisfied in antitrust

23 cases, and that's true here.  The degree of suppression, the

24 existence of allocution are some of the main issues in the

25 case, and superiority, again, given the size of class and only

1    a few opt outs, classified resolution is clearly superior.  So

2    that's a brief overview of sort of our class certification

3    arguments in the briefing, which we rest upon.

4            Settlement class counsel, we request the Court approve

5    Susman Godfrey and --

6            THE COURT:  Why don't we leave that.

7            MR. ARD:  Sure.

8            THE COURT:  Okay.

9            MR. ARD:  Sure.  And, of course, I should have noted,

10   too, that nothing I've talked about so far -- well, at least

11   some of the class certification appointed Susman Godfrey.  None

12   of that has had any objectors, nobody --

13           THE COURT:  I'm sorry?  You mumbled.

14           MR. ARD:  I'm sorry, your Honor.  Nobody objected to

15   some class certification, nobody objected to the appointment of

16   Susman Godfrey, and I just wanted to point it out on the

17   record.

18           THE COURT:  Okay.

19           MR. ARD:  It may help your Honor, too, to understand

20   that the defendants reached out to us about certain concerns or

21   comments they had in the proposed final order, and they didn't

22   sort of address any of these issues in their comments, and we

23   commented on what they did address.

24           Notice plan, happy to rest on the papers there.  The

25   Court has already approved the preliminary notice program, and

1    again, no objections to the notice program.

2            So plan of distribution, here we're getting into one

3    of the objections, I think, as far as I understand it.  First,

4    it's probably important to lay out what the standards are for

5    the plan of distribution.  They began, the District Court has

6    broad supervisory powers with respect to the allocation of

7    settlement funds.  A plan of distribution need only have a

8    rational basis.  Your Honor recognized that in the Imax

9    securities litigation.  Judge Cote recognized that in CDS last

10   year, in re: credit default swaps.

11           A principal goal of the plan of distribution is the

12   equitable and timely distribution of the settlement fund, and

13   in the case of a large class action, the apportionment of the

14   settlement can never be tailored to the rights of each

15   plaintiff with mathematical precision.  Again, all that's

16   needed is a rational basis.  Those are all sort of from CDS and

17   from your Honor's decision in Imax.

18           The proposed plan of distribution is relatively

19   simple.  It pays out class members who had direct transactions

20   with panel banks; so those that had transactions that qualify

21   them to be part of the OTC class.  It's a pro rata distribution

22   based on their overall notional stake in the settlement, and

23   the overall notional stake is calculated as the sum of the

24   suppressed underpayments to that class member, and the

25   magnitude of daily suppression was developed by Dr. Bernheim

HANPLIB1

1    using the expert modeling that he spent over a year developing,

2    and that the charts reflecting that suppression are posted on

3    the website.

4            Again, there's no payment or transaction of non-panel

5    banks, and that's the subject, I believe, of an objection.  Out

6    of an abundance of caution, class counsel worked with

7    allocation counsel to meet at arms length, and after careful

8    deliberation, working with the settlement administrator, Ken

9    Feinberg, they adopted a proposed plan of allocation; so let me

10   jump in --

11           THE COURT:  What do you mean allocation counsel, if

12   you have a mathematical formula?

13           MR. ARD:  We just wanted to make sure that other

14   counsel looking at the same issue with Ken Feinberg, who was

15   designated as the settlement administrator, would reach the

16   same conclusion about sort of what was the right thing to do.

17   So we are the ones who made the decision, to be clear, and we

18   did it out of an abundance of caution.  They spent a few weeks

19   on it, and there's not that much lodestar that it generated.

20           But we did it out of an abundance of caution, sort of

21   foreseeing any sort of objection that may arise in the context,

22   but we don't think there's any issue there, to be frank.  And

23   plans with the pro rata distribution are frequently approved by

24   the courts in this district.  They are the preferred method of

25   distributing settlement funds, and our briefing cites plaintiff

HANPLIB1

1    cases saying that pro rata distribution is the right way to go.

2              THE COURT:  Your point is that no one has specifically

3    objected to that formula?

4              MR. ARD:  Correct, your Honor.

5              THE COURT:  All right.

6              MR. ARD:  Correct, your Honor.

7              So let me jump into the objections then, if there's no

8    question on what I've said so far.  And let me, since I just

9    talked about planned distribution, let me jump into that part

10   of MCAG's objection.  So MCAG objects there's no payment under

11   the planned distribution for transactions with non-paneled

12   banks.

13             First, I think it's important to note that many of the

14   major types of non-OTC transactions are not released.  There's

15   significant carve-outs here, and those carve-outs are for any

16   other cases that are being actively litigated.  So the

17   carve-outs are for exchange-based claims, bondholder claims,

18   Green Pond claims with 22 large financial institutions.

19             Except for Guarantee Bank, no one has brought suit on

20   Green Space on transactions with non-paneled banks and

21   Guarantee Bank itself has not prosecuted that action.  It's

22   been stayed for years.  That speaks volumes about the proposed

23   merits of those claims.  Guarantee Bank also did not make any

24   objection to the final approval of the planned distribution or

25   the releases.  It also speaks volumes.  It did so at the

1    preliminary approval.  Your Honor overruled their objections,

2    and they don't make any objections to the final approval.

3           Second, class counsel, of course, considered the value

4    of claims related to non-panel bank transactions, only those

5    that were released, and determined that the released claims

6    have no value.  It's appropriate value-ment is zero in the

7    proposed plan of distribution.  That's for a number of reasons.

8    It's important to think about what kind of claim we're talking

9    about here.  We're talking about a claim where Wells Fargo

10   entered into a LIBOR-based swap with Morgan Stanley, and

11   somehow Wells Fargo is going to sue Barclays for LIBOR out of

12   that transaction.  It's commonly referred to as umbrella theory

13   of damages, and it has not been met with a lot of favor in

14   court, but more importantly, your Honor has already rejected

15   these times of claims in LIBOR Six, and the objectors don't

16   feel with that fact in their objection.

17          THE COURT:  No, the objectors don't seem to be aware

18   of the Second Circuit's opinion in Gelboim.  They don't seem to

19   be aware of LIBOR Six, but you know, let me worry.

20          MR. ARD:  Yes, the unfortunate thing is we made them

21   aware of it in our reply brief last week, and they ignored it

22   last night in their surreply submitted at 6:00, which we think

23   should be struck anyway because it was filed untimely, and it's

24   far too long, and this thing has been on the record for months.

25   There's no reason they couldn't have sent the papers they did

HANPLIB1

last night months ago.  But regardless, we made them aware of

the issue and they didn't respond to it; so I don't know if

there is a response.

            THE COURT:  They might have been aware of it in the

first place, before they filed an objection, since those are

published opinions, you know, for all to see.

            MR. ARD:  Correct, your Honor.

            And the third point that I want to make, which I think

is crucial here, is that courts often approve plans of

distribution that value certain claims at zero dollars.  Again,

if they had looked at your jurisprudence on class action

litigation, they would have seen that in re: Imax Securities

Litigation, your Honor specifically held it permissible to

value reclaims of zero dollars, provided there is, quote, a

rational basis for doing so.

            Given your Honor already dismissed these types of

claims, there's clearly a rational basis for a valuing of zero.

And I think it's worth quoting from Imax explicitly, where your

Honor was dealing with planned distribution.  Your Honor said,

the assignment of no value to claims of investors who purchased

after August 9th, not unreasonably reflects what we agree would

be the considerable difficulty of establishing damages during

this time period.  The mere fact that lead plaintiff selects

zero as a proper correction of the share price during this

period of the settlement class does not alone undermine the

HANPLIB1

1   fairness of the plan of allocation because the selection of
2   zero seems rational here."

3           Other courts frequently do the same.  As recently as
4   this year, Central District of California decision Van Win
5   Gerden v. Cadiz, which is reported at 2017, U.S. District,
6   Lexus 18,800 at pages 23 to 27, the court approved a plan of
7   allocation, gave some claims arising from the early part of the
8   class period zero weight in the payment formula, and the court
9   also noted that those were claims released by the settlement.
10  It's not uncommon.  Courts do this all the time.  Your Honor
11  specifically held that you can do it if there is a rational
12  basis for doing so.  And, again, there's clearly a rational
13  basis for doing so here, given LIBOR Six, given Gelboim and the
14  strength of those claims.

15          So I think, I guess one other point I'd make on
16  planned distribution, or two more points.  One is, they cite
17  Super Suds and In re: Auction Houses, but that misses the mark.
18  In both those cases the court held that the released claims did
19  not arise out of the same factual predicate.  That's not this
20  case.  Your Honor has already explained that previously and,
21  you know, I know that in their sprawling surreply last night, I
22  didn't -- maybe I missed it, but I didn't see any of them
23  talking any more about how the claims don't arise out of the
24  same factual predicate.  I think they've kind of given up that
25  argument because clearly it does arise out of the same factual

HANPLIB1

predicate, as your Honor recognized, which is suppression of

LIBOR inclusions, plus LIBOR.  All of these claims arise out of

that factual predicate.

And in Wal-Mart, the Second Circuit decision from

2005, I believe, the Court recognizing that the holdings Super

Suds hinged on the fact that the class representatives did not

engage in the transactions for which there are releasing

claims, that's not our case.  Here, we have a class rep, had

OTC transactions and non-OTC transactions, as your Honor

already recognized in the preliminary approval order.

So that's the plan of allocation part of the

objection.  I think it has no merit, and frankly, that seems to

be the thrust, and perhaps the only part of their objection

that's left, after their surreply last night.  I can't tell,

but let me quickly talk about the merits of their other two

objections.

As far as I can discern what they are, the first, they

object to the broad releases, and they object specifically to

the release of non-OTC transactions.  Now, of course, as your

Honor is aware, and as Barclays can explain, if your Honor

likes, defendants often insist on peace when they get a

settlement.  That's what they want, and the Second Circuit has

held explicitly, and your Honor recognized in the preliminary

approval order, that you can release claims, any claims that

arise out of identical factual predicate.  And as your Honor

HANPLIB1

1    recognized in the preliminary approval order, that is the case

2    here because the claims against OTC banks and non-OTC banks all

3    arise out of suppression of LIBOR and the collusion of

4    suppressed LIBOR, same factual predicate.

5         You know, just to quote what your Honor said, your

6    Honor held that claims relating to non-panel bank transactions,

7    quote, do arise out of an identical factual predicate, which is

8    the alleged suppression and manipulation of LIBOR.  So this

9    issue has been decided correctly.  It's also worth noting, as

10   we explained in our reply brief for preliminarily approval,

11   which they, in fact, cited, even though they didn't cite your

12   order on that, that we cite other cases where there's far less

13   -- far more disparate claims are being released than those at

14   issue here.

15        For example, Lomelli's v. Securities Investment, which

16   is at 546 F.Appendix 3740, Second Circuit 2013, the court says

17   it is permissible to release both direct and derivative claims

18   against the defendants, even though those claims had disparate

19   elements, and the decision your Honor quoted in the preliminary

20   approval, is Adelphia and there the Second Circuit 2008, the

21   court held that various fraud claims based on false statements

22   made in different documents were based on the same core facts

23   and, therefore, arose out of the same factual predicate could

24   be released.

25        So we don't think there's much to that objection.

HANPLIB1

1    Your Honor has already rejected it, rightly so, and again,

2    reading the brief last night, I'm not sure they're even

3    pressing it anymore.

4         The last substantive objection they make is that the

5    class representatives are inadequate.  Again, your Honor

6    rejected that in the preliminary approval order.  You said the

7    class representatives adequately represent the class members

8    who have unasserted claims.  Quoting Wal-Mart, you said

9    adequate representatives -- adequate representation of a

10   particular claim is determined by alignment of interest of

11   class members.  And then you noted that given that class post

12   these claims had unnecessary claims, which means claims with

13   non-OTC banks, quote, the interest of the class representatives

14   are aligned with other class members on certain claims.  So we

15   don't think there's anything to that objection.

16        Let me now just say a couple of things about that

17   sprawling reply brief that was filed last night, surrebuttal.

18   I don't know what to call it.  They propose subclassing the OTC

19   class because of an alleged conflict.  There is no conflict.

20        They propose redrawing the plan of distribution to

21   assign value to claims related to the non-panel bank

22   transactions even though those claims clearly have no merit.

23        They propose assigning -- MCAG proposed to assign

24   itself to the committee in charge of redrawing the plan of

25   distribution.  This seems like a naked attempt to hold up final

HANPLIB1

1    approval of the settlement, and who knows what else the

2    objective is, but it doesn't accomplish anything.  And MCAG

3    provides no basis for including itself in the process.

4            This court -- on subclassing, this Court has

5    consistently rejected adversely subclassing OTC class such as

6    was made twice by OCIU.  There's no conflict requiring

7    subclassing.  The adequacy prong of rule 23 analyzes whether

8    there is a conflict, and as just discussed, your Honor has

9    already held that the named class representatives are adequate

10   because the named representatives hold OTC and non-OTC

11   transactions.  So there's no conflict, and that's all that

12   Wal-Mart requires.

13           MCAG makes this proposal that we need to quantify the

14   value of released claims, and we need to somehow figure out the

15   universe of all non-OTC transactions in the world.  They want

16   to have a committee in charge of that.  They want to be in

17   charge of this task force that's going to figure out how many

18   non-OTC transactions around the world and what they were all

19   valued at.

20           It's a waste of time.  It flies in the face of the

21   basic goal of planned distribution, which is timely

22   distribution to class members, and it serves no purpose because

23   it doesn't matter how many non-OTC transactions there are.  All

24   that matters is what each individual one is worth, and here,

25   there is a rational basis for saying they're worth zero, and

HANPLIB1

1    that's all that matters.  Nor do they say how they're going to

2    go about trying to figure out how -- what all the OTC

3    transactions in the world are.

4              So, I guess, standing, I think your Honor gets the

5    point.  I will say that we deposed them over the phone on

6    Thursday to try to determine whether they had any standing

7    because we read their papers, and we couldn't see any evidence

8    of standing.  So we took a short deposition, just to try to

9    figure it out, and the deposition confirmed that they have no

10   standing.  I have a copy of it.  We can hand it up, if your

11   Honor likes.

12             THE COURT:  Sure.

13             MR. ARD:  The first page of what I handed up, your

14   Honor, sort of calls out what we think are some of the -- I

15   have another copy.  The first page of what we handed up, your

16   Honor, sort of calls out what we think are some of the most

17   important sort of pieces of testimony that we got, but the gist

18   of it is that MCAG is yet to provide the name of a single class

19   member or identify the LIBOR-based instruments owned by any

20   class member.

21             We asked for documents showing who these alleged

22   clients are that they represent.  They gave us like ten or 12

23   contracts with the names of the entities that they allegedly

24   represent redacted, for some reason, even though there's a

25   protective order.  During the deposition, the deponent couldn't

HANPLIB1

1    name any of the people whose names were redacted from those ten

2    to 12.

3              MCAG itself has no standing.  It's never entered into

4    a LIBOR-based transaction.  The deposition revealed that MCAG

5    did not seek or obtain permission from any of its clients to

6    object before it did so.  That's Page 31, 10 to 23 of the

7    transcript.  MCAG said it doesn't believe it even needs to

8    notify its clients before objecting on their behalf.  That's at

9    deposition transcript Page 48, 16 to 22.  MCAG did not show

10   it's written objection to any clients prior to filing it.

11   That's at the MCAG depo transcript Page 50, 21, 25.

12             And to be fair, your Honor, when I said they produced

13   contracts, what I meant was they produced contracts between

14   MCAG and MCAG's clients, and those had its client's names

15   redacted.  They've never produced anything suggesting that any

16   of its clients had any transactions with the parent banks.

17   There's no --

18             THE COURT:  I followed that.

19             MR. ARD:  In the depo we asked them to identify any

20   particular client that they had that had a LIBOR-based

21   transaction with a OTC and a non-OTC paneled bank, and they

22   couldn't do so.  So, I mean, we're just left with no standing

23   whatsoever.  They didn't tell their clients about their

24   objections and so forth.

25             They cited some authority last night on standing

HANPLIB1

that's just completely irrelevant.  First, they cite the Second

Circuit decision Bhatia, B-h-a-t-i-a, and that allows a

non-class member to object to the settlement only if its meets,

quote, the required level of formal legal prejudice necessary

for standing.  As that decision explains, that level exists,

and this is a quote, only in those rare circumstances when, for

example, the settlement agreement formally strips a

non-settlement party of a legal claim or cause of action.

That is not this case.  They don't have any claims.

They're not class members.  MCAG has never transacted in LIBOR.

It also cites to some case on representational standing,

organizational standing.  It's an Article III case.  It has

nothing to do with class action certification.  Anyway, it

doesn't have representational standing or organizational

standing.  It's never produced any evidence that any client was

even affected, much less any client wanted to push this

objection.

And I guess it's worth noting, finally, for MCAG that

the requirements to object in the notice form that your Honor

approved specifically required any objector to, quote, provide

proof of membership in the class, including documentation

evidencing the purchase of the U.S. dollar LIBOR-based

instrument during the class period.  If not, the objection is

invalid.  MCAG didn't follow that because it can't, and the

objection should be struck.  By contrast, Maimonides did follow

HANPLIB1

1    that, showing that it's not that hard to follow, if you can,

2    but MCAG didn't.

3              Okay.  I think that's all I have to say about MCAG,

4    but I'm turning now, unless you have any questions.  Oh, you

5    don't have any.  So let me just briefly touch on Maimonides.

6    This one is a bit of a puzzler.

7              THE COURT:  Okay.  You can continue.

8              MR. ARD:  One correction to what I just said, your

9    Honor.  They didn't cite Bhatia.  Bhatia is the right response

10   to what they said.  So let me get the full cite for that

11   because, again, they filed this last night and some of our star

12   folk have already tracked down cases on this point.

13             THE COURT:  I'm much nicer.  I don't have my Cliff

14   work Sunday night.

15             MR. ARD:  So the cite is Bhatia v.

16   P-i-e-d-r-a-h-i-t-a, that's 756 F.3d at 211, Page 218, in a

17   Second Circuit 2014 published decision, and again, it says

18   non-class member can object only if the settlement agreement

19   formally strips them of a legal claim or cause of action.

20             Maimonides, again, it's a little puzzling what the

21   objection is.  They didn't file it with this court.  They sent

22   it to us in a letter, and the objection reads in full, let me

23   just read it:  The medical center's main objections include

24   breach of contract, unjust enrichment by the breaching

25   defendants, lack of transparency by the defendants,

insufficient class period time frame and inadequate

compensation of class members due to the overall significant

swapping exposure to class member.  These objections are

especially important to the minimum class members who are

not-for-profit corporations and governmental entities that are

still dealing with the aftermath of the recent financial

crisis.

I don't know what that means, your Honor.  The actual

papers they filed complain about having to pay too high a

termination fee in a transaction out of a Bank of America.

That has nothing to do with Barclays, and nothing to do with

this case.  They also seem to be dissatisfied with a settlement

amount they got in a different case called Municipal

Derivatives.  Again, it has nothing to do with this case or

Barclays.

You know, objections to class period time frame,

insofar as they're making that, are improper objections to the

scope of the class.  The decision on, I think we quote in re:

Wachovia in our reply brief on that point, saying your

objection regarding the scope of the class have no bearing on

the fairness of the settlement of the class itself.

And, again, objection to the size and settlement are

wrong and misplaced.  First of all, it's an incredible result

for the class, $120 million plus the cooperation, but second,

as the Court has recognized in the cases we cited in our reply

HANPLIB1

1   brief on final approval on Pages 9 and 10, the proper recourse,

2   if you don't think the settlement is big enough, is to opt out.

3           And the same is true for any client who's effected by

4   MCAG.  If it has a client, and we don't know if it does, but if

5   it ever has a client that thinks non-OTC transaction claims are

6   not getting enough money out of this, they can just opt out.

7   Okay.  So that's what I have, your Honor.  Any questions?

8           THE COURT:  No.

9           MR. ARD:  And then I haven't addressed the fee

10  application and cost application.

11          THE COURT:  Why don't we just finish with the

12  objections first, and then we'll talk about that.

13          MR. ARD:  Sure.  Thank you.

14          THE COURT:  Let's see.  We'll just do it in the order

15  that counsel spoke.  So, Mr. Carney, are you the spokesperson?

16          MR. CARNEY:  Myself and Ms. Ferrise.

17          THE COURT:  I think one of you is sufficient, either

18  one.

19          MR. CARNEY:  Thank you, your Honor.  I think in large

20  part, in summary, counsel for OTC plaintiffs just started their

21  argument by indicating that your Honor had dismissed their

22  claims.  The Biltmore case had not come down, and yet, they

23  negotiated $120 million settlement.

24          THE COURT:  Barclays rolled over with the

25  exchange-base plaintiffs, just as they did with the government.

HANPLIB1

1    They wanted to be the first in and first out.  That's just

2    historically what happened with Barclays.  I mean, they settled

3    with other people two years earlier, another subclass.

4              MR. CARNEY:  I understand, your Honor.  I appreciate

5    that.  My point was, with respect to the status of the case law

6    that was being raised as why these claims have no value, they

7    negotiated $120 million settlement at a certain status before

8    the Appellate court decision had come down.  My point is that

9    these claims, these non-panel bank transaction claims, may

10   still have value.

11             THE COURT:  You know, no judge should ever predict

12   exactly what is going to happen in the circuit, but if you've

13   read the circuit's opinion in Gelboim, LIBOR Six was not a

14   surprise, and I expect a certain consistency, and that

15   consistency applies.  Just as it did in the bondholder case, it

16   applies to all the claims brought against non-panel banks.

17             So, as far as I'm concerned, because I take my rulings

18   very seriously and very carefully, your claims have zero value.

19   And, frankly, it was unfortunate for people in your position,

20   the Gelboim planners went to the Supreme Court and got an

21   Appellate decision on this issue, which didn't go their way.

22   And perhaps the argument that you're making today would have

23   been more forceful, had there not been an Appellate decision,

24   which there are now two grounds to dismiss those claims, one of

25   which was reversed and another one that came to life.

HANPLIB1

1          The argument could have been made, had you only had a

2     District Court decision, that district judges get reversed

3     sometimes and, therefore, claims have value even if they've

4     been dismissed, but the history here is different.   There was a

5     decision by the Gelboim plaintiffs to go to the Supreme Court

6     and make law on the appealability in the middle of an MDL, and

7     that resulted in a Second Circuit decision which did not go

8     their way and a subsequent decision by me consistent with the

9     circuit.

10          So that is why, whatever may be the world in some

11     other case where you can argue that a dismissed claim has

12     value, in this case, that argument is particularly hollow.

13          MR. CARNEY:   I understand exactly what your Honor is

14     saying.   I appreciate that.

15          THE COURT:   Then there's very little else to say, sir.

16          MR. CARNEY:   I did want to take a moment, if I could,

17     your Honor, to address the standing question.   It is true that

18     we have not, as counsel and our client in the deposition was

19     not yet able to specifically disclose the large number of

20     clients we represent --

21          THE COURT:   You know what, where is that -- this sort

22     of reminds me of a joke of a friend from college, but it's sort

23     of, how about name one?   You have not named an entity.   You are

24     a business, as far as I can tell.   You're a professional

25     gadflies or whatever, but you don't have standing.

HANPLIB1

1        People who engaged in these transactions do.  It is

2   far from clear that they are not represented either in the

3   settlement proposed or in the Green Pond case because that is,

4   you know, out of this.  So the notion that as of Thursday and

5   as of your brief last night you have not identified an entity

6   that is somehow otherwise unrepresented and actually transacted

7   in LIBOR?  Really, how can you possibly think you have

8   standing?

9        MR. CARNEY:  We did bring, your Honor, financial

10  statements of approximately ten entities.  So we would like to

11  submit for in camera review.  The only reason is these entities

12  have not given us authority to disclose who they are.

13       THE COURT:  That's too bad.  You know, there's nothing

14  embarrassing about transacting in a LIBOR instrument.

15  Apparently lots of extremely wealthy and established

16  institutions have.  There's no privacy interest here that needs

17  to be protected and, besides, that totally prevents any party,

18  either the plaintiff class or the defendants, from challenging

19  the bona fides of any claim.

20       We're not doing that.  We've had lots of examples in

21  this case where claims have been made and blown up.  Okay?  So

22  it's not happening.

23       MR. CARNEY:  It was simply because of our

24  confidentiality agreements.  All right, but we will certainly

25  be filing here, your Honor --

HANPLIB1

| | |
|---|---|
| 1 | THE COURT:  You're done.  Last night, you were done. |
| 2 | You are past done. |
| 3 | MR. CARNEY:  In our argument, your Honor, what we did |
| 4 | point out was that -- and we have brought some other |
| 5 | information, which I would offer, which is the report of the |
| 6 | controller of currency with respect to the quantity of |
| 7 | transactions by the top 25 financial institutions.  All right? |
| 8 | And that report shows that, I would say certainly the majority |
| 9 | of these transactions, OTC transactions, in terms of the number |
| 10 | of participants, are from non-panel participants.  I think |
| 11 | there are six or seven panel participants, and we could |
| 12 | introduce that, your Honor, if we would be permitted to. |
| 13 | THE COURT:  You can certainly state on the record the |
| 14 | source of the argument that you're making. |
| 15 | MR. CARNEY:  Your Honor, it's a report of the |
| 16 | comptroller of currency, stating the no-show value of |
| 17 | derivatives -- |
| 18 | THE COURT:  Who did the date and cite idea?  I'm not |
| 19 | interested in your editorializing. |
| 20 | MR. CARNEY:  I believe, your Honor, it is a report |
| 21 | that gets updated; so I don't have a specific report. |
| 22 | THE COURT:  Then it's of no value. |
| 23 | MR. CARNEY:  Well, it covers every year of the class |
| 24 | period. |
| 25 | THE COURT:  Look, there is a way to cite a document. |

HANPLIB1

1    It could be an internet site, but it's got to be something that

2    the rest of us can retrieve.

3           MR. CARNEY:  Your Honor, I have brought ten copies.

4    I'm more than happy to hand them out, and it has the internet

5    site on it.

6           THE COURT:  Okay.  This is fascinating, but it really

7    has nothing to do with the law that's been established in this

8    case.  This is a document you created?

9           MR. CARNEY:  No, your Honor, just the cover.  The last

10   four pages are the comptroller of currency pages.  The

11   document, your Honor, contains annual reports by the

12   comptroller of currency for specific dates, June 30th, 2007;

13   March 31st, 2008; March 31st, 2009; March 31st, 2010.  The

14   number of institutions is approximately six panel banks on

15   there, six or seven, and the remainder are non-panel banks.

16           The point was to illustrate that there are a large

17   volume of transactions with the non-panel banks, and we heard

18   today that the OTC plaintiffs have valued them at a dollar --

19   or zero, zero dollars.  Before that, we could not tell, other

20   than the planned distribution said nothing about the non-panel

21   bank transactions.  So in trying to understand how they reached

22   that conclusion, we had --

23           THE COURT:  We read decisions, that's how you realize

24   that they're worth zero.  They've been dismissed.

25           MR. CARNEY:  I understand, your Honor.

HANPLIB1

1              THE COURT:  All right?

2              MR. CARNEY:  Now, with respect to the comment, we did

3     not want to appoint ourselves to the panel, we suggested it.

4     We did not suggest anything that we lead something.  We felt

5     that, look, the manner in which analysis was done was not

6     apparent to us, and we will be filing, your Honor, billions of

7     dollars of claims for our clients.  So our clients are asking

8     us about their transactions.

9              All right?  We have an interest in being able to fully

10    explain to them, you know, what is being made.  So there will

11    come a time, your Honor, after the claims are in, that all of

12    the clients that we have, which will be probably a hundred or

13    more, will have filed and it will be billions of dollars of

14    values.

15             THE COURT:  In claims involving non-panel banks?

16             MR. CARNEY:  No, no, involving panel banks.

17             THE COURT:  Then why can't your clients file their own

18    claims?

19             MR. CARNEY:  Your Honor, they like to hire firms.

20    We've been endorsed by many organizations and institutions,

21    financial and medical institutions.  All of these financial

22    institutions who use us, this is not something they do as part

23    of a regular process, but it's something we do as a regular

24    process.  Just as the same way, your Honor, the class counsel

25    brings this because it's not something that is brought on a

HANPLIB1

```
1    regular basis.  It really does require a lot of expertise.
2               THE COURT:  Well, if there are clients, who I suggest
3    file in their own names even if you've done the work for them,
4    they'll be, obviously, evaluated.
5               MR. CARNEY:  Your Honor, we still felt that it was
6    important to raise these issues.  Our clients have raised them
7    with us; so we wanted to bring them forth and, in that respect,
8    we filed claims for them.
9               THE COURT:  I think they would best be filed in client
10   name and not in your name because you didn't do any
11   transactions here.
12              MR. CARNEY:  They are filed --
13              THE COURT:  It has to be clear because the defendants
14   all have the right to examine the bona fides of those claims,
15   and if they're in your name, they can't.
16              MR. CARNEY:  Your Honor, we filed --
17              THE COURT:  I don't care who does the work.
18              MR. CARNEY:  Right.  I understand.
19              THE COURT:  But forewarned is forearmed.  It better be
20   filed in the names of the actual transacting parties.
21              MR. CARNEY:  And, your Honor, the Managed Care
22   Advisory Group has been filing in over 55 class action
23   settlements previously; so they're well recognized as being
24   able to comply fully with all of the instructions.
25              THE COURT:  Apparently you didn't in this case, but
```

HANPLIB1

1   that's okay.  Let's go on, if there's more.

2           MR. PORPORA:  Your Honor?

3           THE COURT:  Yes.

4           MR. PORPORA:  Sorry to interrupt.  Matthew Porpora for

5   Barclays.  I think your Honor doesn't need this additional

6   point, but I'll just make it nonetheless.  If this document is

7   intended to show that there's a serious quantum of transactions

8   with financial institutions, related claims of which would be

9   released by the settlement, that's not accurate.  The great

10  majority of the names listed here are actually entities that

11  are carved out as a part of the Green Pond settlement.  Again,

12  I'm not sure if your Honor needs that additional detail, but a

13  number of these show actually, and prove, that the biggest

14  institutions are, in fact, carved out in the settlement between

15  OTC and Barclays.

16          MR. CARNEY:  We understand the carve-outs, your Honor.

17  Our point was that we are looking at this $120 million that is

18  on the table today, and not with respect to the future and

19  other litigations.  That was our point in coming forward in

20  this case.  Give me one minute, your Honor.

21          (Pause)

22          Your Honor, my client has just -- yes, they filed in

23  the names of the clients.

24          THE COURT:  Good.

25          MR. CARNEY:  And our coming forth started out on an

HANPLIB1

1    informational basis, your Honor.  It did lead to the objection.

2    We appreciate everyone's attention.

3              THE COURT:  You know, just remember something.  There

4    are other rulings that have been made by me already and will, I

5    think, continue to be made in the context of the pending class

6    cert. motions.  Just remember that in the settlement there's no

7    netting.  So this is a cake-and-eat-it approach.  You know, you

8    need to realize that there are real pluses to settling and not

9    going all the way.

10             MR. CARNEY:  We understand, your Honor.

11             THE COURT:  And, actually, so does Maimonides Medical

12   Center have to realize that.

13             MR. CARNEY:  And we observed that certainly we do not

14   want to opt out.  We like the results.  We want our clients to

15   participate in this other aspect of it.

16             THE COURT:  Clients whose claims have not been

17   dismissed can participate, but either the carved-out ones --

18   and you just have to realize the consistency of the legal

19   position.  It extends past the bondholders.  Okay.  All right.

20   Thank you.

21             MR. CARNEY:  Thank you, your Honor.

22             THE COURT:  All right.  I'll hear from Arent Fox.

23   Sir?

24             MR. JACOBOWITZ:  Hi.

25             THE COURT:  Just state your name for the record.

HANPLIB1

1          MR. JACOBOWITZ:  Sure.  Les Jacobowitz of Arent Fox, a

2    partner in the finance and real estate group and dabble lately

3    in some litigation.

4          So, one, I appreciate the tremendous effort of

5    everyone in this room, the plaintiff's counsel, the defendants'

6    counsel, the plaintiffs themselves, the defendants, the

7    mediators, the Court in trying to get this settled, and to

8    point out what the judge has said, Maimonides doesn't disagree.

9    We agree that this should be settled.

10          This is a very complex case, a long, drawn-out case.

11    We're just tying to understand what the settlement means, as

12    far as determining whether it's a fair and reasonable

13    settlement, which I think is the standard for determining

14    whether the settlement is proper.  So, first, one of the first

15    things that I laid out in the letter to the Court was that

16    there was a lack of transparency regarding settlement recovery.

17          THE COURT:  What are you talking about?  I don't think

18    we understood and the plaintiff earlier said that he didn't

19    understand that.

20          MR. JACOBOWITZ:  I'll get to that.  The question is, I

21    am not -- we are not clear about what the percentage of

22    recovery is versus the overall damage.  Typically, there's a

23    dollar amount and a percentage, and it's not clear is this

24    being settled on ten cents on the dollar, eight cents?

25          THE COURT:  No one knows.  All right?  Doesn't it

HANPLIB1

1    depend on who makes claims?

2              MR. JACOBOWITZ:  Well, I assume you can estimate, just

3    based upon past history, that 40 percent of the people of the

4    class get put in claims.  So it's hard for Maimonides, or any

5    other institution, to determine whether it's a fair and just

6    settlement.

7              THE COURT:  What you're saying is not whether it's

8    fair and just, it's just you don't know how much you're going

9    to get.

10             MR. JACOBOWITZ:  No, I don't think that's true.  Maybe

11   you think it's true, but I think when I've done settlements, we

12   typically know and negotiate whether it's going to be ten cents

13   on the dollar, 50 cents on the dollar or 80 cents on the

14   dollar, and in this instance, it is not clear to the class

15   members what the percentage is.

16             THE COURT:  Well, I'll let counsel answer you because

17   they probably have a better idea, but the other point is that

18   this is one of two settlements involving Barclays and the

19   over-the-counter class.  There are a ton of issues left.  It is

20   conceivable that this is the end, in other words, and this is

21   different.  This is not there are other defendants, there are

22   issues up on appeal.

23             You know, your bottom-line question, how many cents on

24   the dollar, is unanswerable in a big picture because of the

25   state of the rest of the case, because of the limited

HANPLIB1

1    settlements.  Right?

2            MR. JACOBOWITZ:  No, I get that.

3            THE COURT:  This is very different from a case where

4    the settlement is the equivalent of the end.  This is not an

5    end.  This is like a footnote, at least certainly from my

6    perspective it's a footnote.

7            MR. JACOBOWITZ:  So I'm not clear, as part of the

8    settlement, what is covered.  So it covers bonds, swaps, loans

9    and swaps related to, I believe -- I'm not sure, or does it

10   not?

11           THE COURT:  I think you're right.

12           MR. JACOBOWITZ:  Okay.

13           THE COURT:  Do you want to --

14           MR. JACOBOWITZ:  Please, please.

15           THE COURT:  Let counsel answer you.

16           MR. ARD:  Sure.

17           THE COURT:  Maybe he knows what you're getting at

18   better than I do.

19           MR. ARD:  I don't, your Honor.  It's defined in the

20   settlement agreement and the proposed order, but it's

21   transactions on which the plaintiffs received LIBOR-based

22   payments and that were directly purchased from panel banks.  I

23   don't know what else.

24           MR. JACOBOWITZ:  So one question is, many hospitals

25   and colleges borrow money through banks and get equipment

HANPLIB1

1   leases.  So that is an active thing, especially with hospitals.

2   They're buying CAT scans and other equipment.  Is that covered

3   as part of the counsel, because these capitalized leases are

4   based on LIBOR often.

5           THE COURT:  No.  Frankly, the more you talk, the more

6   you are probably going to persuade me that the individual

7   issues outweigh the common issues when I start deciding the

8   class cert. motions.

9           MR. JACOBOWITZ:  All right.  Well, you know --

10          THE COURT:  I mean, I just make that point.

11          MR. JACOBOWITZ:  So another question on the

12  definition, and then I'll get into more broader questions.  So

13  swaps purchased before the class period and held during the

14  class period, and this is a question for everybody, is that

15  part of the settlement or not?

16          THE COURT:  Have you read my decisions?

17          MR. JACOBOWITZ:  No.

18          THE COURT:  Okay.  Well, there's an answer in there.

19          MR. JACOBOWITZ:  Okay.

20          THE COURT:  I don't have them all at my fingertips.

21          MR. JACOBOWITZ:  All right.  Well, I do believe it is

22  a disproportionate settlement.  With the Department of Justice,

23  CFTC and USFSA, they had an aggregate settlement of $435

24  million.  Here, the settlement with Barclays is $120 million.

25  Now, part of the settlement with respect to the regulators was

HANPLIB1

1    you're all LIBOR related, and part of it was LIBOR related.

2              So if you did the same percentage of the markets of

3    LIBOR related versus your LIBOR related, you would get a

4    settlement, using what the regulators use, of $191 million for

5    an equivalent type of settlement.

6              THE COURT:  Sir?

7              MR. JACOBOWITZ:  Yes.

8              THE COURT:  You need to know more about this case.

9    You need to understand that the banks have alleged a 16-bank

10   conspiracy and to date have not proven it.  Okay?

11             MR. JACOBOWITZ:  No, I --

12             THE COURT:  And do you realize that it is entirely

13   possible that the whole thing can explode at the end?  All

14   right?  So whatever the government is able to extract, they've

15   extracted, but there are enormous issues.

16             MR. JACOBOWITZ:  I can't agree with you more.

17             THE COURT:  Down the pike, they're merit based.

18   They're based on issues related to class certification.  There

19   are, I believe, ten Daubert motions addressed to the experts

20   proffered in this case.  This is very much, shall we call it, a

21   work in progress, and that is the world that you have to make

22   your decision in.

23             MR. JACOBOWITZ:  Yes, I'm not of the litigation world.

24   I'm of the finance world, and believe me, I know swaps are

25   complicated and this whole process is.

HANPLIB1

1          THE COURT:  That's not --

2          MR. JACOBOWITZ:  I'm agreeing with the judge's point.

3    There are also questions about other losses, and I read the

4    distribution plan.  I'm not clear, and it's not that I'm

5    questioning, I'm just not clear.  There were often termination

6    fees required over the years for a swap.  So Maimonides was

7    approached by the bank to pay $4 million several years ago to

8    terminate the swap.  They did not.  They restructured it, but

9    if they had terminated it, and many of the plaintiffs had

10   terminated, does that mean that as part of the distribution

11   that they get paid interest from that period of time

12   distributions -- termination to settlement, payment settlement?

13   That's a question.  I don't know the answer.

14         THE COURT:  Would counsel like to respond to him?

15         MR. ARD:  Sure, your Honor.  I mean, he said if they

16   had paid it.  I think the papers said this happened in 2012

17   after the class period ended.  You know, what we do in all of

18   these cases with other plaintiffs, and I'm a little perplexed

19   why Maimonides didn't do it here, is if anybody has a question

20   as whether an instrument falls in the class, they give us a

21   call and we tell them the answer.  And that happens with some

22   frequency in all class action settlements.

23         I can't speak in the abstract about some hypothetical

24   that didn't even happen and whether that would be released or

25   not.  I would say, for example, in CDS, just last year, Judge

HANPLIB1

```
1  │ Cote sort of dealt with a similar objection, which by the way,
2  │ they didn't had put in their papers.  If they had, we would
3  │ have addressed it today.
4  │        But Judge Cote felt and objection to the scope of the
5  │ leases and the objector was saying, well, it's not clear if
6  │ this is released or that is released.  And what Judge Cote said
7  │ last year was, you know what, that's something that you can
8  │ deal with in the future as the issue arises, and we can
9  │ litigate down the road whether the release applies to this
10 │ particular claim or that particular claim and so forth.
11 │        So I would say that's the simplest answer to this, is
12 │ that it's premature now, and if they had put this in a brief or
13 │ called us and talked to us about it, we could give them more
14 │ specifics, but it's hard for me to answer in the abstract.
15 │        MR. JACOBOWITZ:  Well, that's more concrete and not
16 │ with respect to Maimonides.  I don't represent the City of
17 │ Chicago.  They had to pay $400 million and had to borrow money
18 │ to pay that termination fee of $400 million.  And the question
19 │ is do borrowing costs, as well as when they had to do that, is
20 │ that being part of the settlement?  And that's a question, and
21 │ I guess the answer is no, and that's fine.  I'm just trying to
22 │ get clarity on the settlement distribution process.
23 │        The parties had to post collateral.  They had to post
24 │ hundreds of millions of dollars.  Maimonides and other entities
25 │ had to post collateral.  Is that collateral posting being
```

HANPLIB1

considered part of the distribution and the settlement?  And
again, I'm not clear it is, but maybe that's not how things are
supposed to work here in this distribution.

Swap, the banks are supposed to be fiduciaries.  They
have no obligation to the counterparties, meaning the
not-for-profits, the government entities, et cetera.  A CFO
once told me, who else am I going to rely on other than the
banks on structuring deals and on the swaps?  Well, there's new
SEC rules telling them who people are supposed to rely on.  The
rulings were in 2014 that underwriters in the banks do not have
a fiduciary duty to provide advice.  They have to get a
municipal advisor on a transaction.

Now, that doesn't apply here, of course, but the same
logic would apply, that in doing the settlement, there would be
someone who is familiar with swaps who would be a muni advisor.
And I'm not sure, I don't know, and this is out of ignorance, I
don't know if the people determining the distribution or the
settlement have consulted with municipal advisors who are now
required by the SEC to be registered, and anyone who today
would enter into a swap has to get a municipal advisor because
the bank cannot provide fiduciary advice.  They're excluded
from the swaps.  They said we don't provide any fiduciary
obligations to the bank.

And so the question is:  Is there a muni advisor?  And
I don't know the answer.  And a muni advisor is for bond deals,

HANPLIB1

1    swaps and any other sort of transactions relating to municipal

2    financial products.

3            The plaintiff's counsel went through the Grinnell

4    test, and again, most of it relates to continuing litigation

5    and Maimonides, and I think everyone in this room would agree

6    this case should be settled, but my only point really is with

7    respect to clarifying what the settlement process and

8    distribution is, could get a little clearer and would be

9    helpful to the class.

10           And as I said, there's no real estimation of whether

11   the 120 may be more than fair.  It may be less than fair.  I

12   just can't tell.  So the plaintiffs' counsel said sophisticated

13   investors and players are involved in the transaction.  Well,

14   in my practice, which is not litigation, obviously, it's

15   finance, I've represented banks and I've actually worked with

16   banks in unwinding swaps.  And often when I'm working with the

17   swap desk, they really even don't know how the swap termination

18   payments and the swaps are supposed to be online.

19           The plaintiffs, they're sophisticated, right?  They're

20   great at providing services, healthcare, education, government

21   services, but frankly, that's why they hire people like me.

22   They're not necessarily experts in finance or, in particular,

23   on swaps, which, as you pointed out, your Honor, are very

24   complex instruments.  So if you don't mind me indulging, I,

25   years ago, represented this institution on its first swap.  The

HANPLIB1

1    institution was Yale University.  They really had no idea how

2    the financing worked or the swap worked.

3           I presented to the board, in a two-and-a-half hour

4    meeting, the diligence and the structure of the transaction.

5    It was a hot summer, not air conditioned room, windows were

6    open, next door was the music building.  Every few minutes

7    there would be someone singing or playing the piano.  A certain

8    number of the board members, including some well-established

9    board members and people who you would know the names, were

10   asleep, and they really didn't quite fully understand the

11   transactions that they were having, and it actually made them

12   part of the settlement.

13          So as far as fairness goes, okay, if the 120 is right,

14   that's perfect, fantastic.  If it's not, this will increase

15   costs for healthcare, education, provision of government

16   services if they don't get the amount that they were due if

17   this were a fair settlement.  You can --

18          THE COURT:  If there was some amount of money that

19   years ago they should have gotten and they didn't get, then

20   they would get some money, that's a positive.  There's nothing

21   here going forward.

22          MR. JACOBOWITZ:  Oh, it's people.  Let's talk about

23   that.  They've gone into debt to pay -- Jefferson County had to

24   pay a billion dollars or more to unwind swaps.  They had to

25   raise taxes, water and sewer taxes down in Jefferson County in

HANPLIB1

1    Alabama.   This has real impact.   It happened years ago, but

2    it's impacting those communities today.   I could be wrong,

3    but --

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HANHLIB2

1          THE COURT:  We're not solving the entire world's

2    problems.

3          MR. JACOBOWITZ:  OK.

4          THE COURT:  I'd love to have the authority to do that,

5    but somehow I don't.

6          MR. JACOBOWITZ:  I spoke to the general counsel for

7    Maimonides a week and a half ago because the

8    plaintiff's counsel asked me to withdraw the objections.  So I

9    talked to her, and she said, well, you know, this was bad

10   behavior; right?  And I said --

11         THE COURT:  Not proven yet.

12         MR. JACOBOWITZ:  I was just going to say "allegedly."

13   And there were other alleged not proven behavior.  There was

14   bid rigging on swaps.  That was the case I was alluding to.  I

15   don't know if you're familiar with that case.  There was

16   mortgage fraud, some of which I worked on getting moneys for to

17   help communities and homeowners who were disadvantaged by the

18   housing crisis.  This is different.  This is the most

19   wide-sweeping alleged fraud on the market in history.  The

20   LIBOR market, the derivatives market, is -- you're not going to

21   believe me when I tell this to everyone in the room -- is

22   150 trillion, with a "T," dollars.  The U.S. economy is

23   18 trillion and change.  In the Barclays case, the chairman of

24   the board was forced to resign.  The next day the CEO resigned.

25   And my point, and I don't know how these settlement

HANHLIB2

1    negotiations -- it would be ironic if the 120 million was the

2    number that had come from Barclays in determining whether --

3    the settlement amount that is being decided today.

4              So, in conclusion, I've done 60 to $70 billion of

5    financing over my career.  I've done billions of dollars of

6    swaps.  I'm usually in a different environment than today,

7    usually at a conference table, but I think I myself am not

8    clear on whether the settlement is fair or not.  It may be the

9    most fair settlement possible; it may not.  I just can't

10   determine whether it is.  In any event, Maimonides Medical

11   Center and all the other Maimonides Medical Centers out there

12   who were impacted by this appreciate their day in court so you,

13   the Court, can arrive at a fair and just settlement.  Thank

14   you.

15             THE COURT:  Does any lawyer want to respond?

16             MR. ARD:  I can respond briefly.  Just a few points.

17   I mean, I hate to hearken back on it, but he's complaining

18   about the lack of transparency in the settlement agreement when

19   his objection is the least transparent objection I've ever

20   read.  Everything he said today was brand new.  I didn't

21   understand a lot of it, but if he'd raised that to us either

22   informally -- let me take the podium -- either in a call, which

23   is what all class members do, they reach out to claims

24   administrators, reach out to us, we can answer any questions

25   they have.  We don't ask questions in the abstract.  If you

1    want to show us a particular document, figure out if it's in

2    the class or not, happy to do it.  It's pretty easy.

3          The size of the settlement, as your Honor noted, it

4    depends on the claims rate.  There's no way of estimating the

5    claims rate, and that's true in just about every settlement,

6    especially true here.

7          What's in the class?  It's defined in paragraph 2QQ of

8    the settlement agreement, what a U.S. dollar LIBOR-based

9    instrument is, the class definition is there.  Maybe he didn't

10   read it, but it's there.  And, again, if he has any questions

11   about it, he can let us know.

12         He asked a bunch of hypotheticals about whether this

13   claim was paid by the settlement agreement.  I mean, the

14   answer, I think, is clear.  What the final distribution says is

15   that if you have LIBOR-based payments that are coming in, then

16   you get your payments based on the suppressed amount of LIBOR

17   as measured by Dr. Bernheim's model.  It's simple and pro rata,

18   and I don't understand the complication.

19         As to what claims are released, again, the release is

20   very straightforward.  It's what the Second Circuit has

21   repeatedly endorsed and it's what your Honor's already endorsed

22   on preliminary approval.  It's in FF of the settlement

23   agreement.  It's also in proposed final order.  You know, it

24   says, in avoidance of doubt, released claims do not to include

25   claims relating to or arising out of the purchase of non-U.S.

HANHLIB2

1    dollar LIBOR-based instruments, so that's an exclusion, or any

2    other claims that do not arise out of the factual predicate of

3    the OTC action.

4            So he gave all these hypotheticals about terminations

5    and all that and whether they're covered or not.  I mean, in

6    the end, it's a simple question:  Is he alleging that the

7    termination was the result of the suppression of LIBOR?  If so,

8    if that's the complaint that he were to make in the future,

9    then Barclays -- and they file their complaint against Barclays

10   even though their transaction was with Bank of America, then

11   Barclays could move to dismiss their complaint as being barred

12   by the release.  If he's not alleging that it arose out of the

13   factual predicate of the OTC action, then it's not released.

14   It's that simple.  That's what Judge Cote explained last year

15   in the CDS case is that you have to look at any claim that's

16   asserted in the future to figure out whether it's released or

17   not.  This is the exact kind of language the Second Circuit has

18   repeatedly endorsed.

19           I think that's all that he said that I sort of

20   understood in terms of its bearing on the settlement.  As far

21   as the overall recovery of the class, I mean, it's in the

22   expert report of Dr. Bernheim which your Honor has which is

23   under seal.  The Second Circuit has said that even recovery

24   that's a thousandth of a percent can be fair and reasonable

25   depending on the context of the case.  The expert did not do

HANHLIB2

1    analysis of Barclays because Barclays had settled long before

2    the expert reports were in.  But, regardless, the settlement is

3    meaningful, it's large, especially with the risks of this case.

4    And joint and several liability, of course, you can recover

5    claims against remaining in the rest of the case, anything

6    that's outstanding.  On page 9 and 10 of our reply brief, we

7    cite several cases that say that objection to the size of the

8    settlement is not normally heard on final approval, and the

9    remedy is to opt out if the objection is to size.  The most

10   important point which your Honor made is we can't estimate the

11   recovery of any particular class member in advance because it

12   just depends on the amount of claims made.  So Mr. Porpora may

13   have a few things to say.

14           MR. PORPORA:  Matthew Porpora for Barclays.

15           Your Honor, I want to join in the comments made by

16   Mr. Ard.  I also, quite frankly, didn't understand most of the

17   arguments being articulated by Mr. Jacobowitz.  But to the

18   extent that the hypotheticals he was articulating were meant to

19   describe situations where someone, for example, paid too much

20   money to terminate a swap and that was a direct cause of LIBOR

21   manipulation, manipulation of U.S. dollar LIBOR, to the extent

22   that he believes the plan of allocation doesn't adequately

23   cover his damages, he has every opportunity to opt out.

24           He talked about Jefferson County and needing to spend

25   loads of money.  I didn't follow the hypothetical totally, but

HANHLIB2

```
1    to the extent that he believes that if he represents someone
2    that suffered some damage as a direct result of manipulation to
3    the U.S. dollar LIBOR, he can look at the plan of allocation as
4    Mr. Ard just described it, and he can make a determination
5    about whether he believes it is in his interest to participate
6    in the settlement.  He has every opportunity to opt out if he
7    believes that it's unfair to his particular client under a
8    particular circumstance.
9             But, again, I agree with Mr. Ard that these are all
10   types of questions that he would have been able to put to the
11   OTC plaintiffs and flesh out in advance of today.  Barclays
12   routinely got questions from potential class members, and what
13   we did was we said:  Barclays doesn't take any position with
14   respect to the plan of distribution, as was set forth in the
15   settlement agreement itself.  Please call up counsel for the
16   OTC plaintiffs.  And folks did that quite regularly, so they
17   were able to explore these hypotheticals or actual
18   circumstances in relevant time and not burden the Court with
19   them here today.
20            THE COURT:  Sir.  We're going to let the inner
21   litigator in you come out again.
22            MR. JACOBOWITZ:  Not really.  So on timing, that is a
23   valid point.  The general counsel of Maimonides found out about
24   it, this settlement, I'm sorry, October 5.  How did they find
25   out?  They got a class claims notice from a –– it wasn't
```

HANHLIB2

1    actually from these guys.  It was another entity.  That's how

2    they found out about it and that's why they called me.  It's no

3    excuse.  It's just factually, and that's why I didn't -- one of

4    the sets of counsel here did call me, and we did talk about

5    some things.  They were confused and puzzled with some of the

6    objections.  So, to their credit, they reached out to me.

7              So opting out, that seems to be the answer that the

8    counsel think is good for everybody, but I think -- and, again,

9    I'm not the litigator -- if we opt out, isn't the statute of

10   limitations for most of these claims gone?  I'm asking.

11             THE COURT:  You can answer.

12             MR. ARD:  It was the same day that the objections were

13   due.  So the point is if you want to opt out, he could have

14   opted out then.

15             THE COURT:  No, no, he's asking about the statute of

16   limitations.  Could he now bring his own case?  And I think the

17   answer is if there's a pending class action in which he is a

18   class member, it stays the statute of limitations so that if he

19   opts out now, he can bring his own case.

20             MR. ARD:  Right.  And he can read LIBOR IV, I think it

21   is --

22             THE COURT:  I forget which one.

23             MR. ARD:  -- which has a hundred-page discussion of

24   cross-jurisdictional tolling.

25             THE COURT:  Let's put it this way:  It's an option,

HANHLIB2

1    but I just point out to you that to the extent that Maimonides

2    ever profited from LIBOR, that's going to count against you in

3    any individual case that you bring.  One of the clear, broadly

4    speaking, benefits of making your claim in the context of the

5    settlement is that that netting doesn't apply.

6         MR. JACOBOWITZ:  I appreciate it, and I appreciate the

7    Court understanding what all the netting aspect means in a

8    swap, so I do appreciate it.  And thank you.

9         THE COURT:  Well, that will just help you make your

10   decision, and you'll let us know, I guess.

11        MR. JACOBOWITZ:  Right.  I do want to answer or try to

12   answer the substantive stuff that I'm familiar with, and that

13   is swaps, when the financial crisis happened, interest rates

14   dramatically can decreased.  And what that meant was that there

15   was a termination value ascribed to swaps.  That termination

16   value was reflected in the not-for-profits and government's

17   financial statements on a yearly basis and on a quarterly

18   basis, and it was called mark to market.  The swap was marked

19   to market to whatever the value of the swap attributable at

20   that time based upon interest rates.  So if interest rates

21   dropped conversely, the mark to market increased dramatically.

22   So they had on their balance sheets significant liabilities

23   attributable to these swaps.

24        If at that point -- and it's not conjecture.  I have

25   other examples -- if at that point they wanted to terminate the

HANHLIB2

1    swap, why would they terminate the swap?  They wanted to

2    refinance.  They had to put up collateral, and they didn't have

3    it.  They needed to refinance because interest rates were going

4    down.  So there were a whole host of reasons that that swap

5    would be terminated.  At that point, whatever the

6    mark-to-market value as determined by the banks, because

7    they're the ones who provided the government and

8    not-for-profits the mark-to-market value, whatever that value

9    was, is the termination fee that had to be paid to Barclays and

10   other banks.  That termination fee was considerable often

11   because rates had dropped dramatically because of the onset of

12   the financial crisis.  So my example with Chicago was recently

13   they were downgraded as part of the financial crisis.  They

14   also had a tremendous collateral requirement for these swaps.

15   So they had to come up with cash or treasuries or other

16   securities to collateralize it.  They didn't have it, so they

17   refinanced the debts.  They had to borrow new money to pay the

18   termination fees for that swap.  So I don't know if that

19   clarifies things.

20             MR. ARD:  It's the same --

21             THE COURT:  He's a fairly good teacher, but, you know.

22             MR. ARD:  It's the same point I made earlier.  If he

23   brings a claim where he says that his client was harmed because

24   of the factual predicate of the OTC action, because of

25   suppression, or something else, the claim is released.  If he

HANHLIB2

1    has a claim that's based on something else, not because --

2            THE COURT:  The drop in interest rates is not totally

3    the consequence of any alleged action here.  You had a

4    recession.  So think whatever you do of the defendants here in

5    the context of this case.  We can't ascribe to them this

6    totally -- ability to control the world based on, frankly, any

7    of the evidence that has come out so far in the case.

8            MR. JACOBOWITZ:  Your Honor, you're right.  I should

9    elaborate a little more on the termination fee.  So

10   $4 million -- I'm giving them a modest example -- that was the

11   termination fee because of interest rates dropping.  Say, a

12   half a million was subscribed to the suppression of LIBOR.

13   That is the amount I'm talk talking about.

14           THE COURT:  I don't believe there's any -- I haven't

15   read all the expert reports yet.  I've gone through a number of

16   them.  I don't think there are any expert reports that deal

17   with that type of analysis, to my knowledge.  There's a bunch

18   of lawyers here who may want to challenge my understanding, but

19   having read the briefs, I don't think there's that kind of

20   analysis.  Part of the problem is that that, I think, raises

21   very individual issues that have a lot to do with the financial

22   strength of Maimonides verses the financial strength of General

23   Motors, or whatever, who may have had similar transactions, and

24   one could negotiate in and out of them in different ways.  So I

25   think that's probably not something that's likely to be very

HANHLIB2

1   subject to class action treatment, but I don't think anyone's

2   attempted to put that kind of issue into this case really.

3           MR. JACOBOWITZ:  I believe that if it's used in

4   numbers, 20 basis points suppression, alleged suppression, of

5   the banks, that would be the same to all class members, whether

6   it's General Motors or --

7           THE COURT:  I understand that, but that's not what I

8   understand you're raising.  We're probably off topic at this

9   point.

10          MR. JACOBOWITZ:  Yes, I understand.

11          THE COURT:  Thank you.

12          All right.  Does anybody else have anything to say on

13  the issue of objections, the settlement itself before we turn

14  to the attorney's fee issue?

15          MR. ARD:  No, your Honor.

16          THE COURT:  On attorney's fees, I have some things to

17  say.  Perhaps it's best that I just say them.

18          MR. ARD:  Sure.

19          THE COURT:  I think that the request for all your fees

20  and expenses to date seems totally inappropriate for a number

21  of reasons.  First, the overwhelming percentage of the fees and

22  expenses that have been incurred have absolutely nothing to do

23  with your settlement with Barclays.  It is literally

24  impossible, since you settled with Barclays on August 24, 2015,

25  over two years ago, that everything you've spent since then has

HANHLIB2

1    to do with Barclays.  There also must be a relationship between

2    fees and success.  In seeking all your time and expenses,

3    you're assuming total success.  But at most, including the

4    Citibank settlement, you've had success against two of 16

5    defendants, and if I am affirmed, even worse.  You've had a

6    loss of at least eight or so.  I don't remember the exact

7    number.

8           So based on what I've just said, it's clear that I'm

9    not approving the attorney's fee request.  You need to go back

10   to the drawing board from when you resubmit.  I will want

11   detail and backup.  I want it clarified as to what work relates

12   to the Barclays settlement, and I want some detail and not

13   statements like "we've spent $13 million on experts."  That's

14   not acceptable to me at all.  So whatever may be appropriate

15   and/or considered acceptable in the context of a settlement

16   that closes the case and you're ultimately just seeking a

17   percentage of recovery is not appropriate here at all.  So you

18   need, really, to go back to the drawing board on that.

19          I don't expect you to respond, but I actually did have

20   one more question that actually goes back a bit to our earlier

21   discussion.  In the context of both the settlements by the

22   bondholders and the settlements by the exchange-based

23   plaintiffs, the parties have pooled the settlement into a

24   single presentation to the Court, and so I do have a question

25   for you.  Why haven't you, and also, what is your distribution

HANHLIB2

1   plan?  Do you plan to wait to see if the Citibank settlement is

2   approved?  I think it's in January, perhaps.  Or do you plan on

3   doing this twice?  Or just enlighten me.

4              MR. ARD:  Sure.  I'll take the last question first.

5   The reason we didn't do them together is because of timing.  We

6   had already done the preliminary approval and notice plan, and

7   I think it was already out the door before we reached the

8   Citibank settlement, so we couldn't.  That's why we didn't do

9   it together.

10             The plan of distribution, when it's going to be

11  distributed, I think the claim forms are due in December.  So

12  we certainly could do one distribution.  I am not sure how much

13  efficiency that creates, but we're happy to do it.  The reason

14  I say it may not --

15             THE COURT:  Look, I've never personally distributed

16  $120 million or anything, so I'm not speaking from experience

17  here as to what is efficient or not.  It just seems to me that

18  doing -- that you're doing a mathematical calculation.  You

19  could do it for both settlements at one time and send one

20  check, or maybe you don't even send checks these days.  I'm

21  probably dating myself.  Frankly, my concern is not whether you

22  do it one way or the other in the abstract, and I'm not asking

23  you to do -- how could I put it?

24             MR. ARD:  Commit to anything.

25             THE COURT:  Commit to anything.  And I don't want you

HANHLIB2

```
 1      to do something just because I asked you a question about it,
 2      but I do want you to not spend the settlement funds in a
 3      profligate way.
 4                  MR. ARD:  Of course, your Honor.
 5                  THE COURT:  That's the point.  So the point is class
 6      members get the most possible amount, and if it makes sense to
 7      do a single distribution, that makes sense.  Maybe there's some
 8      adjustment that in some respect you -- something you should
 9      consider.  That's my only point.
10                  MR. ARD:  Sure, your Honor, and we will discuss it
11      with the claims administrator.  The reason I say it may not be
12      more efficient to do it once is because it's the same class
13      members and it's the same calculation.  So once you do the
14      calculation for Barclays, it's not like you have to do redo
15      those calculations for Citibank.  You just have to apply those
16      same calculations for Citibank.  There may be additional claims
17      that come in, but the work you've done for Barclays will not be
18      duplicated.  I'll talk with the plan administrator.  The only
19      reason we may do it earlier is because we don't want to presume
20      in December that your Honor is going to approve the Citibank
21      settlement in January, and we'd like to get the money in class
22      members hands as quickly as possible.  It's our intention to do
23      so.
24                  THE COURT:  Just think about it.
25                  MR. ARD:  We'll let you know.
```

HANHLIB2

1          On your preliminary comments, of course, your Honor,

2     we will submit more detail and backup.  I guess we can file a

3     settlement brief addressing these issues.  I anticipated these

4     questions because I heard you ask similar questions last week

5     to the bondholder plaintiffs, and I certainly can address them

6     now if you'd like, and then we can try to address them further

7     in our briefing.  I guess what I would say, briefly, is as it

8     is mentioned, it's the same class of people, the Barclays

9     class, the Citibank class, and the plan of distribution is

10    calling for everybody to get money equally no matter whether

11    you transacted with Barclays or you transacted with Citibank or

12    anybody else.  So all the costs that have been expended in

13    these case up until now have benefited the class equally, and

14    that's why we think it makes sense --

15          THE COURT:  But let's assume that two months from now

16    a decision comes down from the Supreme Court -- so this is

17    totally hypothetical -- and it blows this case out of the

18    water.

19          MR. ARD:  Yeah.

20          THE COURT:  And at that point you have settled with

21    two of the original defendants and the other 14 are totally

22    down the tubes.  Tell me why the class members should pay as if

23    you had had success against 16.  And the point is that if they

24    pay now and in the future the case goes south, the class

25    members have paid all your fees.  You come out fabulously, and

HANHLIB2

1   they come out paying for stuff they shouldn't have paid for,

2   and you're not recovering any of it from them.  That's the

3   point.  There has to be a relationship, because you don't have

4   the right to every penny because you couldn't possibly have

5   justified some of these expenditures in a case that was a

6   fraction of the size of the case that you actually brought.

7          MR. ARD:  Sure, your Honor.  I understand the point.

8   I guess we can address it.  It comes up too in the Citibank

9   context.  There, I think the settlement was reached, I want to

10  say, right around the time of the reply brief and class

11  certification, and that class certification briefing, expert

12  reports, and depositions certainly alleged strongly to that

13  settlement.  So I don't think that issue is really present at

14  that point in time.

15         With the fees, all I would say -- again, we can put

16  supplemental briefing on this, and we will -- if you look at

17  sort of the -- there are scores of cases where if you look just

18  at the $120 million settlement amount, we are asking for

19  30 percent net of costs, which would be, I think, 26.5 percent

20  of the gross amount is what our request is.  And just looking

21  at Barclays alone, that type of request is commonly granted in

22  this district.  The first case I point to --

23         THE COURT:  When the case is over totally, but that's

24  not this case.

25         MR. ARD:  Sure.

HANHLIB2

1          THE COURT:  This settlement was reached over two years

2     ago.  So while there are certainly efforts that you've made in

3     presenting the settlement and crafting the documents in

4     connection with the settlement that are specifically relevant,

5     there's an awful lot of stuff that has nothing to do with

6     Barclays.  You may be right that there's more that has to do

7     with Citibank, and you can decide whether you maybe want to

8     wait to seek your fees at that point.  But I still think that

9     there's a fundamental problem with lawyers who have had success

10    in an eighth of the case that they brought getting their entire

11    fees.

12          MR. ARD:  Sure.

13          THE COURT:  And that's going to remain even at the

14    Citibank point.

15          MR. ARD:  I understand.  All I want to say is that we

16    are seeking fees from Barclays alone because we're seeking fees

17    under the percentage method, and that has nothing to do with

18    any future settlements we may get with the other 16 defendants

19    or 15 defendants.  It's only from Barclays, so we are asking

20    your Honor to look just at the Barclays result.

21          THE COURT:  I understand that, and I'm not totally

22    prepared to do that --

23          MR. ARD:  Sure.

24          THE COURT:  -- for the reason that I explained to you

25    that if your case blows up, you have come out golden, but the

HANHLIB2

1    class members aren't doing so well if all your fees are already

2    been paid.

3              MR. ARD:  Sure, your Honor.  The percentage is coming

4    out of Barclays alone, so we're asking you to only look at the

5    Barclays settlement.  The question, I think, arises more in the

6    context of a lodestar multiplier cross-check and what lodestar

7    we're looking at when we are doing the cross-check, and we

8    certainly are happy to look at if your Honor --

9              THE COURT:  Look, you couldn't have spent $13 million

10   on expert fees to settle the Barclays case.  Can't.  So you're

11   asking for stuff that is so unrelated to Barclays by itself

12   that it does not seem -- I use the word "inappropriate" to not

13   use a more pejorative word.

14             MR. ARD:  Sure.  Your Honor, we will submit

15   supplemental briefing on this, and one thing that we can point

16   out in the supplemental briefing is that it is routine in class

17   action settlements where you have multiple defendants that you

18   get --

19             THE COURT:  But that's different.  It's different than

20   in your typical securities case.  So you might sue the company,

21   you might sue some individuals, you might sue the accountants,

22   you might sue the lawyers, but here, you alleged a conspiracy.

23   You alleged the same action against everybody, so it does

24   matter what your success is.  It's not the same as your case

25   against the accountants in the securities case.  That is more

HANHLIB2

1    divisible intellectually.  This case is not set up that way.

2            MR. ARD:  Sure.  I understand, your Honor.

3            THE COURT:  OK.

4            MR. ARD:  My only point -- I was thinking more of the

5    expenses issue, and we'll brief it.  But in countless cases

6    where you have multiple defendants in antitrust cases where

7    you're alleging conspiracy, you get an early settlement against

8    some defendants, and you have a bunch of defendants left in the

9    case, it's routine for courts (1) to approve all expenses up to

10   date in the case, even if the case could blow up, and (2) it's

11   also somewhat routine for courts to award a large portion of

12   early settlements to be earmarked for future expenses in the

13   case.  That's done in -- *Air Cargo* last year did it.  Judge

14   Marrero in *In Re Municipal Derivatives*, another antitrust case,

15   made the entire expenses payable from the first settlement.

16   And the reason, again, is because it's the same class.  And,

17   yes, of course the case could blow up, but that money was

18   incurred by counsel and the money was used for the benefit of

19   the entire class, and so it makes sense that it come out of the

20   first class settlement.

21           But, your Honor, I understand your point.  We'll

22   submit briefing on that.  We'll also break down the expenses

23   more.  And at the time of the Citibank settlement, perhaps your

24   Honor will agree that -- we'll be able to persuade your Honor

25   that all expenses should come out at that point.

HANHLIB2

1                    THE COURT:  All right.  Are we done for the day?

2      Anybody have anything they want to say?

3                    All right.  We'll take everything under advisement.

4      Thank you very much.

5                    MR. ARD:  Thank you, your Honor.

6                    (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25