# Arent Fox

**Arent Fox LLP** / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA / Washington, DC
www.arentfox.com

January 2, 2018

**Jennifer L. White**
Counsel
212.457.5411 DIRECT
212.484.3990 FAX
jennifer.white@arentfox.com

VIA ELECTRONIC FILING

Hon. Naomi Reice Buchwald
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:  IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION
MDL No. 2262, Master File No. 1:11-md-2262-NRB, Case No. 11-cv-5450 (NRB)

Your Honor:

We represent the Virgin Islands Public Finance Authority (the "Authority"), an objector to the settlement agreement between the OTC Plaintiffs and Citibank, N.A. and Citigroup Inc. in connection with the referenced matter. Enclosed is a copy of the objection and notice of intention to appear, mailed today in accordance with the instructions in the Long Form Notice published on the claims administrator's website in connection with this matter.

Respectfully submitted,

*Jennifer L. White*

Jennifer L. White

Enclosure

555 West Fifth Street, 48th Floor       1675 Broadway                        55 Second Street, 21st Floor         1717 K Street, NW
Los Angeles, CA 90013-1065             New York, NY 10019-5820              San Francisco, CA 94105-3470         Washington, DC 20006-5344
T 213.629.7400  F 213.629.7401         T 212.484.3900  F 212.484.3990       T 415.757.5500  F 415.757.5501       T 202.857.6000  F 202.857.6395

# Arent Fox

Arent Fox LLP / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA / Washington, DC
www.arentfox.com

**Les Jacobowitz**
Partner
212.492.3315 DIRECT
212.484.3990 FAX
les.jacobowitz@arentfox.com

January 2, 2018

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Hon. Naomi Reice Buchwald
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl Street
New York, New York  10007

William C. Carmody, Esq.
Susman Godfrey LLP
1301 Avenue of the America, 32nd Floor
New York, New York  10019

Andrew A. Ruffino, Esq.
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018

Re:   Objection and Notice of Intention to Appear:
      *In Re LIBOR-Based Financial Instruments Antitrust Litigation*, MDL No. 2262

On behalf of the Virgin Islands Public Finance Authority (the "Authority" or the "Objector"), this serves as the (i) objection to the proposed settlement between the OTC Plaintiffs and Citibank, N.A. and Citigroup Inc. (the "Proposed Settlement") in connection with the above-captioned litigation, and (ii) notice of intention to appear at the January 23, 2018 fairness hearing.

### NOTICE OF INTENTION TO APPEAR

The Authority plans to appear, and requests permission to speak, at the Fairness Hearing related to the Proposed Settlement, scheduled for January 23, 2018.

# Arent Fox

January 2, 2018
Page 2

## OBJECTION

### I. Contact Information for the Objector

The contact information of the Objector, as well as my contact information, is set forth below:

| NAME | CONTACT INFORMATION |
|---|---|
| **Virgin Islands Public Finance Authority** | Virgin Islands Public Finance Authority<br>5033 Kongens Gade<br>Government Hill<br>St. Thomas, U.S. Virgin Islands  00802<br>Attn:    Margaret Guarino<br>            Director of Finance and<br>            Administration<br>            Tel: (340) 714-1635 |
| **Objector's Counsel** | Arent Fox LLP<br>1675 Broadway<br>New York, New York  10019<br>Attn:    Les Jacobowitz, Esq.<br>            Tel: (212) 492-3315 |

### II. Proof of Membership in the Class

Attached hereto as Exhibit 1 are the documents evidencing the Authority's ownership of a U.S. Dollar LIBOR-Based Instrument during the Class Period (August 2007 – May 2010). Specifically, the documents constitute an interest rate swap entered into by the Authority in 2006 (the "Bond Swap") with UBS AG ("UBS"), one of the Non-Settling Defendants. As this U.S. Dollar LIBOR-Based Instrument is still in place, the Bond Swap was in effect during the entire Class Period.

### III. A Brief Background of the Objector and its LIBOR-Based Instruments

#### A. The Virgin Islands

The Virgin Islands is an unincorporated territory of the United States with separate executive legislative and judicial branches of government.  As an unincorporated territory of the United States, the Virgin Islands is subject to the plenary power of the United States Congress to make rules and regulations with respect to the Virgin Islands.  In addition, Congress has the power to

**Arent Fox**

January 2, 2018
Page 3

legislate directly for a territory or to establish the government for such territory, subject to Congressional control. Residents of the Virgin Islands have been citizens of the United States since 1917.

### B. The Authority

The Authority was created by the Government Capital Improvement Act of 1988 (United States Virgin Islands Act No. 5365 as amended), as a public corporation and governmental instrumentality for the purposes of aiding the Government of the United States Virgin Islands (the "USVI Government") in the performance of its fiscal duties and carrying out of its governmental responsibility of raising capital for essential public projects including, but not limited to, economic development projects.

### C. Financing/Swap – Background

The Authority issued its Revenue Bonds (Virgin Islands Gross Receipts Taxes Loan Note), Series 2006 in an original principal amount of $219,490,000 (the "Series 2006 Bonds"). In connection with the Series 2006 Bonds, the Authority entered into an interest rate swap with a matching notional amount.

The proceeds of the Series 2006 Bonds were used to: (i) refund a portion of the Authority's prior bonds in an aggregate principal amount of $162,870,000, (ii) pay the cost of a termination fee in connection with an outstanding swap option agreement in an amount of $26,910,000, (iii) fund certain necessary public sector improvements of the USVI Government and (iv) fund a net payments reserve account for a new swap agreement in an amount of $2,911,257.

The capital projects of the USVI Government financed in whole or in part from Series 2006 Bonds proceeds were: (i) construction of a new library on St. Thomas, (ii) construction of Annaly Bay Road on St. Croix and (iii) infrastructure work at Gallows Bay on St. Croix.

### IV. A Brief Background of the LIBOR Scandal Relevant to the Objection

This settlement arises out of the alleged manipulation of the London InterBank Offered Rate ("LIBOR"), an interest rate benchmark that has been called the "world's most important number."[1] LIBOR had been established through the British Bankers' Association, and had been set each day through submissions by sixteen (16) panel banks, all of whom are defendants in the instant case (collectively, the "LIBOR Panel Banks").[2] LIBOR is the most common index used

---

[1] *See* the Memorandum and Order of this Court, dated March 29, 2013 (quoting the British Bankers' Association), Dkt. No. 286, p. 1. *Note*: references to docket (Dkt.) numbers herein refer to the MDL docket numbers.

[2] There are actually seventeen (17) relevant panel banks as one bank was substituted during the Class Period.

**Arent Fox**

January 2, 2018
Page 4

for derivatives. The LIBOR scandal was the most wide-sweeping alleged fraud on the market in history.

According to Martin Wheatley, the first Chief Executive of the U.K. Financial Conduct Authority, the person and the entity given the primary responsibility to reform the LIBOR system, LIBOR was used in a vast number of financial transactions with a value of at least $300 trillion.[3] As a point of reference, the aggregate of the world's GDP was $75.3 trillion in 2016 according to the International Monetary Fund.[4] In his 2002 letter to Berkshire Hathaway shareholders, Warren Buffet warned that derivatives were "financial weapons of mass destruction," an opinion primarily based on the massive quantities of long-term derivatives on the market.[5]

Mr. Wheatley stated that "[t]he reason we are here . . . is that we have been misled. The [LIBOR] system is broken and needs a complete overhaul. The disturbing events we have uncovered in the manipulation of LIBOR have severely damaged our confidence and our trust – it has torn the very fabric that our financial system is built on."[6] He added that "[t]he shocking behavior exposed by the [U.K. Financial Services Authority] and others demonstrated that an independent review of LIBOR was needed."[7] Included in Mr. Wheatley's ten-point plan for comprehensive reform of LIBOR (which has since been implemented) were the following: (i) introduction of statutory regulation of administration of, and submission to, LIBOR and (ii) transfer of the British Bankers' Association's responsibilities to a new administration, now the Intercontinental Exchange (ICE Group).[8] Generally, in connection with LIBOR rates, the rate-setting body no longer utilizes a rate that a LIBOR Panel Bank estimates it can borrow on the London InterBank market, but instead it uses the actual borrowing rate for each LIBOR Panel Bank.

Attached hereto as Exhibit 2 is an article that appeared in *Banking New York* examining the LIBOR scandal as news of it was developing, and for which I was asked to express my views; select portions of my analysis are quoted in that article.

---

[3] The Wheatley Review of LIBOR: final report (Sept. 2012), pp. 3, 7, 75-76, *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf (last visited Dec. 29, 2017) (the "Wheatley Report").
[4] *See* https://en.wikipedia.org/wiki/List_of_countries_by_GDP_(nominal) (last visited Dec. 29, 2017); *cf.* http://www.imf.org/external/datamapper/datasets/WEO/1 (last visited Dec. 29, 2017).
[5] *Available at* http://www.berkshirehathaway.com/letters/2002pdf.pdf (last visited Dec. 29, 2017), p. 15.
[6] Martin Wheatley Speech – Wheatley Review Final Report Event (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928-mw.shtml (last visited Dec. 29, 2017).
[7] *Id.*
[8] *See* the Wheatley Report, pp. 8-9.

# Arent Fox

January 2, 2018
Page 5

### A. Manipulation by Panel Banks

During the relevant time period, the Defendant banks were motivated to manipulate LIBOR for two basic reasons: (i) generating LIBOR Panel Bank traders' profits due to rigged rates and (ii) projecting to the global stock and bond markets, as well as regulators, that the LIBOR Panel Banks were more stable than they actually were during the recent banking crisis (the "Market Fraud"). *See, e.g.,* discussion regarding trader-based suppression and persistent suppression in *LIBOR IV* (Dkt. 1164); *see also* the allegations contained in the Corrected Third Consolidated Amended Complaint (the "Complaint"), Dkt. 1857, ¶¶ 73-86.

1. Traders' Profits: An Example

During the Class Period, Citibank hired a derivatives trader, getting him from UBS by offering nearly $3 million more than the $2 million he had been making at UBS.[9] This trader, Tom Hayes, was convicted of charges relating to the manipulation of LIBOR and was sentenced to a 14-year prison term.[10] The sentencing judge appropriately observed: "[t]he conduct involved here is to be marked out as dishonest and wrong, and a message sent to the world of banking accordingly . . . Probity and honesty is essential, as is trust."[11] Hayes' comments reveal the extent of the culture of manipulation accepted and encouraged by the banks during this critical time. For example, Hayes said: "Not even Mother Teresa wouldn't manipulate LIBOR if she was setting it and trading it"; "I wanted every bit of money I could get because that's your performance metric, that's how you're judged"; and "We'd had no compliance training. We'd had no rules outlined to us, either internally or externally."[12]

2. Market Fraud: A Snapshot

Market Fraud is particularly troubling as it was likely approved and/or encouraged by senior LIBOR Panel Bank management and the product of concerted manipulation between and among multiple Panel Banks, as alleged in the complaint. *See, e.g.,* Complaint, ¶¶ 73-125.

The LIBOR scandal intensified on June 27, 2012 when (i) the U.S. Department of Justice announced that Barclays Bank PLC ("Barclays") admitted criminal misconduct for submissions of LIBOR and Eurolibor, and agreed to pay a $160 million penalty, (ii) the U.S. Commodity Futures Trading Commission ("CFTC") ordered Barclays to pay a $200 million penalty for

---

[9] *See* Complaint, ¶ 151 and cites therein.
[10] The sentence was later reduced to 11 years, but his conviction stood. *See, e.g.,* Dec. 21, 2015 Telegraph, http://www.telegraph.co.uk/finance/financial-crime/12062192/Tom-Hayes-Libor-sentence-cut-to-11-years.html (last visited Dec. 29, 2017) (the "Telegraph Article").
[11] *Id.*
[12] *See* Aug. 4, 2015 Telegraph Article, *available at* http://www.telegraph.co.uk/finance/financial-crime/11780670/Tom-Hayes-Libor-trial-the-top-quotes.html (last visited Dec. 29, 2017).

# Arent Fox

January 2, 2018
Page 6

attempted manipulation of, and false reporting, concerning LIBOR and Eurolibor, and (iii) the U.K. Financial Services Authority fined Barclays $93.6 million for significant failings in relation to LIBOR and Eurolibor.[13]

Importantly, all three of these regulatory actions cited Market Fraud by Barclays. These regulatory actions then led to other worldwide regulatory scrutiny, leading to findings and penalties against many of the LIBOR Panel Banks, including Citibank.

### B. Citibank's Substantial Role in the Manipulation

The CFTC issued an order on May 25, 2016 requiring Citibank N.A. ("Citibank") to pay a civil monetary penalty of $175 million, and filing and settling charges against Citibank relating to abuses of LIBOR and other indexes. Attached hereto as Exhibit 3 is the CFTC Order and the related press release. Citibank was also charged with false reporting of LIBOR at times to avoid generating negative media attention and to protect its reputation during the financial crisis – Market Fraud – beginning in the spring of 2008 through the summer of 2009. *Id.* During this time, Citibank received a significant infusion of funds from the U.S. Government (i.e. taxpayers) to alleviate its liquidity problems. *Id.* Even more troubling, according to the CFTC Order, Citibank engaged in this conduct *after* it knew that the CFTC was investigating Citibank's U.S. Dollar LIBOR submission practices.

The Bernheim suppression model approved as part of the Barclays and Citibank Settlements (the "Suppression Analysis")[14] shows the overall average manipulation of the LIBOR Panel Banks during the Class Period for multiple LIBOR calculation periods. But notably, Citibank was a particularly egregious offender. The Complaint alleges that the LIBOR submissions of Citigroup and two other banks, were particularly low given the financial troubles facing those banks during the Class Period (*see* ¶¶ 239-250), and market studies have agreed, *e.g.*: "In early 2010, two economics professors from UCLA and the University of Minnesota looked at Libor manipulation and found that, at least according to one measure, Citi had misstated its lending rate by more than any other large U.S. bank in the run up to the financial crisis."[15]

Thus, Citibank should not be given more favorable treatment than any of the other LIBOR Panel Banks in a damages determination, either in litigation or for purposes of any class action settlement. *See LIBOR IV* (Dkt. 1164), Article XIII, Section I entitled "Damages – Joint and Several Liability." However, the Proposed Settlement here would have Citibank paying little

---

[13] *See* Complaint, ¶ 7(a)(i)-(iii) and citations therein.
[14] *Available* on the administrator's website at https://usdollarliborsettlement.com/Portals/0/Documents/Suppression%20Charts.pdf (last visited Dec. 29, 2017).
[15] *See* July 19, 2012 article in *Fortune*, *available at* http://fortune.com/2012/07/19/barclays-the-biggest-libor-liar-no-that-may-have-been-citi/ (last visited Dec. 29, 2017).

# Arent Fox

more than ice-breaker settlor Barclays, even though Citibank was a larger player in the U.S. derivatives market (which involved LIBOR) and played a larger role in LIBOR manipulation than others.

### V.  The Reasons for the Objection

The Proposed Settlement does not pass the 9-factor *Grinnell* test[16] as readily as OTC Plaintiffs' counsel suggests. *See* Dkt. 2377. Indeed, application of at least 7 of its factors militate against approval.[17] While public policy favors the settlement of disputed claims among private litigants, including in class actions, approval is not intended to be a mere rubber stamp or awarded after a perfunctory review of the *Grinnell* factors. As courts have repeatedly emphasized, "mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice." *In re Corrugated Container Antitrust Litigation* ("*Corrugated Container*"), 643 F.2d 195, 212 (5th Cir. 1981) *quoting Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) *quoting Protective Committee v. Anderson*, 390 U.S. 414, 434 (1968).

Class actions require special treatment to ensure fairness to all Class Members, and particularly those who are absent. *See, generally,* F.R.C.P. 23(e); *see also In re General Motors Corp.*, 55 F.3d 768, 805 (3d Cir. 1995) (recognizing that "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims" and noting that courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified").

---

[16] *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

[17] The two remaining factors are: (1) the risks of maintaining the class action through trial (Factor 6); and (2) the reaction of the class to the settlement (Factor 2). We take no position with respect to factor 6. With respect to Factor 2, OTC Plaintiffs' counsel correctly note that the deadline for class members to object or opt out has not yet passed (Dkt. 2377, p. 8), so OTC Plaintiffs were in no position to meaningfully evaluate this factor in their submission. We are similarly unaware, as of this writing, of the number of Class Members who have chosen to object or to opt out. That few class members may have objected favors approval, however, "[t]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement…." *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1437 (E.D.N.Y. 1989), *aff'd in part, reversed in part*, 907 F.2d 1295 (2d Cir. 1990). We are aware that one likely strong reason why there may be only a small number of objectors is that an objection appears to be at odds with the interests of the banks; it is important for Class Members to maintain good relations with their lending institutions, and some fear retribution by LIBOR Panel Banks due to the banks' discretion not to renew line, loan and other credit facilities. The balance of power between the would-be objectors and the banks is not close to even. Thus, Class Members are deterred from objecting for reasons wholly unrelated to the reasonableness, fairness or adequacy of the settlement, and the Court's assessment of the same is critical.

**Arent Fox**

January 2, 2018
Page 8

Courts should and do reject settlements when warranted, and this settlement should be rejected. *See, e.g., Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F.Supp.2d 561, 574 (E.D.Pa. 2001) (withholding final approval after application of *Grinnell* factors because, inter alia, "the monetary value of the settlement fund is simply too low to conclude that the class members will receive meaningful compensation"); *cf. In re Traffic Executive Association-Eastern Railroads* ("*Traffic*"), 627 F.2d 631 (2d Cir. 1980) (denying writ of mandamus where the district judge properly exercised his discretion in disapproving the proposed settlement for inadequacy). In *Traffic*, the proposed settlement called for a payment of $900,000, compared to a possible recovery of $32-42 million. *Id.* at 633. The court there preliminarily approved the settlement and allowed notice to be sent to class members. *Id.* Even though no objections were received from the notified absentees, the court's "continued misgivings concerning the adequacy of the proposed settlement led him to disapprove it." *Id.*

We note that, while settling this matter may be desirable to the class (including the Objector), that does not mean that the class should, or would want to, settle under *any* terms, including those that are unfavorable. A settlement under fair and adequate terms would be appropriate, but this is not such a settlement.

This objection is especially important to the many Class Members (including, in particular, the USVI Government), who are governmental entities, as well as hospitals and not-for-profit corporations, that are still dealing with the aftermath of the recent financial crisis.

### A. The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation (Factors 8 & 9)

Just because the OTC Plaintiffs' counsel says that the settlement is reasonable does not make it so. Their argument as to the reasonableness of the financial compensation is as follows:

> Here, the $130 million Settlement is an excellent result. Not only will the cash provide an immediate monetary benefit to Class Members, but the Settlement also preserves their right to recover the entire amount of damages against the Non-Settling Defendants based on joint and several liability (after an offset post-trebling for the settlement amounts). *See In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at *17 (S.D. Tex. June 4, 1981) (noting that partial settlements preserved plaintiffs' ability to seek the entire amount of damages from non-settling defendants weighed in favor of settling approval).

# Arent Fox

January 2, 2018
Page 9

Dkt. 2377, p. 12.

The OTC Plaintiffs' counsel's attempt to justify the low financial compensation by citing authority discussing "ice-breaker" settlements. Dkt. 2377, pp. 12-13. But it should go without saying that a defendant does not get the financial benefit of being an "ice-breaker" if they are not, in fact, the first settling bank. Barclays was the ice-breaker, as OTC Plaintiffs' counsel previously argued in support of a lower financial payout in connection with the Barclays settlement. *See* Dkt. 2276, pp. 12-13.

The OTC Plaintiffs' counsel's assertion that the "financially unquantifiable" benefit of "Citi's obligation to provide information" justifies a smaller payout also fails. The proposed Barclays settlement (*see* Dkt. 1338) has this same "unquantifiable" benefit, and yet Citibank seems to have benefited much more from it, and for no justifiable reason. The proposed payouts from Barclays and Citibank are very similar ($120 million and $130 million, respectively), even though Citibank should bear greater responsibility for all of the reasons discussed herein and should not receive the benefits of certain discounts (e.g., ice-breaker status) that Barclays may receive.[18] And even taking the information-sharing obligation into account, the proposed settlement is financially inadequate.

As explained in Exhibit 4, no estimate of the best possible recovery or damages has been made available to us, and following our inquiry on the topic to OTC Plaintiffs' counsel, it appears that none exists. This alone poses an obvious impediment to approving the settlement as reasonable.

More importantly, our analyses show that the damages are potentially enormous: an estimated $23.9 billion, conservatively. Thus, the financial payout of $130 million in settlement is dramatically *un*reasonable when compared to the best possible recovery. *See* detailed information contained in Exhibit 4.

In *Corrugated Container*, the appellate court concluded that the district court's evaluation of a proposed class action settlement was inadequate, even though the analysis considered the amount of estimated damages (643 F.2d at 215); but here, we do not even have a damages estimate. Importantly, even if "more money could not have been obtained, there is no reason to approve an

---

[18] Relatedly, the ability to make up ground in recoveries against non-settling defendants (Dkt. 2377, p. 12) is meaningless in evaluating the fairness and reasonableness of *this* settlement. Even if that were a possibility, the Barclays settlement certainly did not provide the compensation necessary to suggest that compensatory recoveries will actually take place. In addition, with each low-compensation settlement that passes, the amount of ground that will need to be made up to compensate the class fairly grows larger (and the likelihood of it being made up more remote). But in any event, there is no entitlement to a reduction off of a fair settlement here on the basis that OTC Plaintiffs might recover the remainder later against a separate defendant.

**Arent Fox**

January 2, 2018
Page 10

otherwise inadequate settlement solely because it was the best offer defendants were willing to make." *Id.*

Surprisingly, the OTC Plaintiffs' counsel fail to address the "best possible recovery" at all, choosing to ignore this essential component entirely while summarily concluding that this factor supports settlement. It does not. When the best possible recovery here is actually considered, it is clear that the amount of compensation provided in the Proposed Settlement is far outside of the realm of reasonableness.

### B. The Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The OTC Plaintiffs' counsel's motion is silent on this point other than to concede that Citibank probably *can* withstand a larger judgment. *See* Dkt. 2377, p. 11 (making no argument that Citibank could not withstand a larger judgment, and owning that "large financial institutions [like Citi] ordinarily can withstand a greater judgment") (internal citation/quotation omitted).

This is not a situation that warrants a lower than fair compensation. The common circumstance in which this factor weighs in favor of settlement is where the defendant is insolvent or otherwise involved in bankruptcy proceedings, a circumstance not present here. Instead, Citibank can undoubtedly withstand a larger judgment. For 3Q 2017, Citigroup Inc. "reported net income for the third quarter 2017 of $4.1 billion, or $1.42 per diluted share, on revenues of $18.2 billion. This compared to net income of $3.8 billion, or $1.24 per diluted share, on revenues of $17.8 billion for the third quarter 2016" and also reported increased revenues of 2% from the prior year period.[19] In addition, for fiscal year 2016, Citigroup had net income of $14.3 billion, on net revenues of $69.9 billion.[20] Citibank can and should pay a larger sum, particularly given both the very large role that Citibank had in the LIBOR manipulation and the massive sums of money they likely made from it.

### C. The Complexity, Expense and Likely Duration of the Litigation (Factor 1) & The Stage of the Proceedings (Factor 3)

A significant portion of the expense has already been incurred and the work already done in this matter, as the OTC Plaintiffs' counsel explains. *See* Dkt. 2377, pp. 6-9 (referring to the "numerous" rulings already obtained from this Court and on appeal, the class certification

---

[19] *See* http://www.citigroup.com/citi/news/2017/third-quarter-2017-earnings.htm (last visited Dec. 29, 2017).
[20] *See* http://www.citigroup.com/citi/news/2017/fourth-quarter-2016-earnings.htm (last visited Jan. 2, 2018).

**Arent Fox**

January 2, 2018
Page 11

briefing already completed and expert analyses, and the review of over 1.1 million documents and thousands of audio files, among other things, all already completed).

Any doubt on this point is easily resolved via the OTC Plaintiffs' counsel's request for attorney fees, in which they seek reimbursement of $14,199,351.99 (Citibank) and $656,337.64 (Barclays; reduced from over $13 million originally sought) in litigation *expenses already incurred*. Dkt. 2390, p. 3 (Citibank); Dkt. 2350, p. 2 (Barclays). In addition, OTC Plaintiffs' counsel seeks interim attorneys' fee awards of $26 million (Citibank) and $24 million (Barclays). Dkt. 2390, p. 1; Dkt. 2350, p. 6; *see also* Dkt. 2351 (OTC Plaintiffs' counsel declares that "Class Counsel's attorneys and paralegals expended a total of 46,122.90 hours on this litigation through June 30, 2017" and the "total lodestar value of Class Counsel's professional services…is $25,993,802 through June 30, 2017…").

It has been observed that "[w]hile the prospect of a long, complex and expensive trial militates in favor of settlement, virtually all class actions will result in long, complex, and expensive trials. The question is whether the likelihood of an especially long and complex trial is enough in a particular case to warrant a substantial reduction in what the class might otherwise receive in settlement," and, importantly, "[i]t must be remembered that the settling defendant is also spared the expense of trying the case." *Corrugated Container*, 643 F.3d at 217.

Thus, there is no compelling reason to settle, or to include a discount in the settlement value, in exchange for avoiding the expense or mitigating against a long or complex litigation: *these things have already occurred*. The proposed settlement may have been more valuable earlier, after the matter had progressed far enough for OTC Plaintiffs' counsel to understand the case, and its strengths and weakness, but before enduring the full extent of the time and expense incurred, and before achieving certain victories. Factors 1 and 3 weigh against approval here.

### D. The Risks of Establishing Liability and Damages (Factors 4 & 5)

The OTC Plaintiffs' counsel's motion is silent on substance supporting the assertion that these factors weigh in favor of settlement. There is *always* a risk in litigation, for both plaintiffs and defendants, with respect to both liability and damages. This does not, however, mean that these factors *always* weigh in favor of approval; that would make them illusory factors.

Given the extensive work already done for over half a decade in this litigation, the risk is significantly lessened for plaintiffs. As discussed in Section C above, much has already been done to advance the class's litigation position, and various victories have already been realized. *See also* Dkt. 2377, pp. 6-9; Dkts. 2350-2351. In addition, unlike in a typical commercial litigation, significant work has already been done by others, e.g., government regulators. Here, there is a multi-year trail of government investigations, findings, orders and settlements

# Arent Fox

January 2, 2018
Page 12

pertaining to the LIBOR Panel Bank defendants, which at a minimum advances the case from the outset in plaintiffs' favor and lessens their litigation risk.

Thus, it is not appropriate to offer the absent class members a settlement that is less than fair, reasonable and adequate, but instead, OTC Plaintiffs' counsel should strive for appropriate compensation, whether in the form of a different settlement or via litigation. Simply put, the Proposed Settlement does not meet the criteria necessary for approval by this Court.

* * * * *

In the New Year, we look forward to responding to any questions regarding this objection and being heard at the Fairness Hearing. Thank you for your consideration.

Sincerely,

Les Jacobowitz

cc:   Valdamier O. Collens
      Commissioner of Finance
      United States Virgin Islands

      Margaret Guarino
      Director of Finance and Administration
      Virgins Islands Public Finance Authority