N.Y.S.D. Case #
13-cv-7005(NRB)
11-md-2262(NRB)

16-1189-cv
*Charles Schwab Corp., et al. v. Bank of America Corp., et al.*

# UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 23, 2018

August Term, 2017

Argued: September 25, 2017
Decided: February 23, 2018

No. 16-1189-cv

_____

CHARLES SCHWAB CORPORATION, CHARLES SCHWAB BANK, N.A., CHARLES SCHWAB & CO., INC., SCHWAB SHORT-TERM BOND MARKET FUND, SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S. DOLLAR LIQUID ASSETS FUND, SCHWAB MONEY MARKET FUND, SCHWAB VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND, SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES, SCHWAB YIELDPLUS FUND, SCHWAB YIELDPLUS FUND LIQUIDATION TRUST,

*Plaintiffs-Appellants,*

FTC CAPITAL GMBH, FTC FUTURES FUND PCC LTD, FTC FUTURES FUND SICAV, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM, RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, METZLER INVESTMENT GMBH, ROBERTO CALLE GRACEY, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, AVP PROPERTIES, LLC, 303030 TRADING LLC, ELLEN GELBOIM, ATLANTIC TRADING USA, LLC, COMMUNITY BANK & TRUST, THE BERKSHIRE BANK, ELIZABETH LIEBERMAN, 33-35 GREEN POND ROAD ASSOCIATES, LLC, TODD AUGENBAUM, GARY FRANCIS, NATHANIEL HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, ANNIE BELL ADAMS, DENNIS PAUL FOBES, LEIGH E. FOBES, GOVERNMENT

CERTIFIED COPY ISSUED ON 02/23/2018

DEVELOPMENT BANK FOR PUERTO RICO, MARGARET LAMBERT, DIRECTORS FINANCIAL GROUP, BETTY L. GUNTER, DIRECT ACTION PLAINTIFFS, CARL A. PAYNE, KENNETH W. COKER, CITY OF RIVERSIDE, THE RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN MATEO COUNTY JOINT POWERS FINANCING AUTHORITY, CITY OF RICHMOND, THE RICHMOND JOINT POWERS FINANCING AUTHORITY, SUCCESSOR AGENCY TO THE RICHMOND COMMUNITY REDEVELOPMENT AGENCY, COUNTY OF SAN DIEGO, GUARANTY BANK & TRUST COMPANY, HEATHER M. EARLE, HENRY K. MALINOWSKI, LINDA CARR, ERIC FRIEDMAN, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN WEGLARZ, SEIU PENSION PLANS MASTER TRUST, HIGHLANDER REALTY, LLC, JEFFREY D. BUCKLEY, THE FEDERAL HOME LOAN MORTGAGE CORPORATION, COUNTY OF SONOMA, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the County of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CEMA JOINT VENTURE, COUNTY OF SACRAMENTO, THE CITY OF PHILADELPHIA, THE PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, PRINCIPAL FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC., PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC SHORTTERM INCOME ACCOUNT, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC, PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union, FEDERAL NATIONAL MORTGAGE

ASSOCIATION, DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES INTERNATIONAL, BAY AREA TOLL AUTHORITY, PRUDENTIAL INVESTMENT PORTFOLIOS 2, on behalf of Prudential Core Short-Term Bond Fund, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, TRIAXX PRIME CDO 2006-1, LTD., TRIAXX PRIME CDO 2006-2, LTD., TRIAXX PRIME CDO 2007-1, LTD., THE FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver, DIRECT ACTION PLAINTIFF, DIRECT ACTION PLAINTIFFS, SALIX CAPITAL US INC., FRAN P. GOLDSLEGER, JOSEPH AMABILE, LOUIE AMABILE, NORMAN BYSTER, MICHAEL CAHILL, RICHARD DEOGRACIAS, MARC FEDERIGHI, SCOTT FEDERIGHI, ROBERT FURLONG, DAVID GOUGH, BRIAN HAGGERTY, DAVID KLUSENDORF, RONALD KRUG, CHRISTOPHER LANG, JOHN MONCKTON, PHILIP OLSON, BRETT PANKAU, DAVID VECHHIONE, RANDALL WILLIAMS, EDUARDO RESTANI, NICHOLAS PESA, JOHN HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER, CALIFORNIA PUBLIC PLAINTIFFS, NATIONAL ASBESTOS WORKERS PENSION FUND, PENSION TRUST FOR OPERATING ENGINEERS, HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS, CEMENT MASONS' INTERNATIONAL ASSOCIATION EMPLOYEES' TRUST FUND, AXIOM INVESTMENT ADVISORS, LLC, AXIOM HFT LLC, AXIOM INVESTMENT ADVISORS HOLDINGS L.P., AXIOM INVESTMENT COMPANY, LLC, AXIOM INVESTMENT COMPANY HOLDINGS L.P., AXIOM FX INVESTMENT FUND, L.P., AXIOM FX INVESTMENT FUND II, L.P., AXIOM FX INVESTMENT 2X FUND, L.P., EPHRAIM F. GILDOR, GILDOR FAMILY ADVISORS L.P., GILDOR FAMILY COMPANY L.P., GILDOR MANAGEMENT, LLC, CITY OF PHILDAELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, CITY OF NEW BRITAIN, LINDA ZACHER,

*Plaintiffs,*

— v. —

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANK OF TOKYO-MITSUBISHI UFJ, LTD., BARCLAYS BANK PLC, CITIGROUP INC., CITIBANK, N.A., COOPERATIEVE CENTRALE RAIFFEISENBOERENLEENBANK B.A., CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., LLOYDS BANKING GROUP PLC, HBOS PLC, ROYAL BANK OF CANADA, THE NORINCHUKIN BANK, THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG, PORTIGON AG, FKA WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG,

*Defendants-Appellees,*

RABOBANK GROUP, CREDIT SUISSE GROUP, NA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC, DEUTSCHE BANK SECURITIES INCORPORATED, BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA SECURITIES LLC, J.P. MORGAN CLEARING CORP., HSBC SECURITIES (USA) INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., NATIONAL ASSOCIATION, BANK OF NOVA SCOTIA, BNP PARIBAS S.A., CREDIT AGRICOLE, S.A., SUMITOMO MITSUI BANKING CORPORATION, BARCLAYS PLC, WESTLB AG, CHASE BANK USA, N.A., ROYAL BANK OF SCOTLAND PLC, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, CITIZENS BANK OF MASSACHUSETTS, agent of RBS Citizens Bank, NA, RBS Citizens, N.A., (f/k/a Citizens Bank of Massachusetts) incorrectly sued as Charter One Bank NA, STEPHANIE NAGEL, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD., BBA LIBOR, LTD., CREDIT SUISSE INTERNATIONAL, HSBC BANK USA, N.A., LLOYDS TSB BANK PLC, J.P. MORGAN BANK DUBLIN PLC, formerly known as Bear Stearns Bank PLC, UBS LIMITED, CITIGROUP FINANCIAL PRODUCTS INC., ICAP PLC, CREDIT SUISSE AG, CREDIT SUISSE (USA), INC., THE HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., J.P. MORGAN MARKETS LTD., LLOYDS BANK PLC, (formerly known as Lloyds TSB Bank PLC), RBC CAPITAL MARKETS, LLC, BANK OF AMERICA HOME LOANS, CITI SWAPCO INC., J.P. MORGAN SECURITIES, LLC, MERRILL LYNCH CAPITAL SERVICES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBS SECURITIES INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP FUNDING, INC., HSBC FINANCE CORPORATION, HSBC USA, INC., MERRILL LYNCH & CO., INC., MERRILL LYNCH INTERNATIONAL BANK, LTD., BEAR STEARNS CAPITAL MARKETS, INC., CITIZENS BANK N.A., CREDIT SUISSE SECURITIES (USA) INC., BARCLAYS CAPITAL (CAYMAN) LIMITED, SOCIETE GENERALE, S.A.

*Defendants.*

———————————

B e f o r e :

LIVINGSTON, LYNCH, and CHIN, *Circuit Judges*.

––––––––––––––

Plaintiffs-Appellants appeal from a judgment entered by the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *J.*) on April 11, 2016, dismissing their complaint. This case is one of dozens seeking to recover for harm allegedly resulting from a conspiracy among Defendants-Appellees, major banks, to manipulate the London Interbank Offered Rate, a set of benchmark interest rates that inform trillions of dollars of financial transactions. On appeal, Plaintiffs contend that the district court erred in dismissing its state-law claims on personal jurisdiction grounds, and in dismissing its claims for fraud, violation of the Securities Exchange Act, and unjust enrichment for failure to state a claim. Because we find that certain Defendants' actions in selling financial products to Plaintiffs give rise to personal jurisdiction, that other Defendants may be subject to personal jurisdiction as a result of the acts of their agents or co-conspirators, and that certain claims were prematurely dismissed at the pleading stage, we AFFIRM IN PART, VACATE IN PART, and REMAND for further proceedings.

––––––––––––––

THOMAS C. GOLDSTEIN (Eric F. Citron, *on the brief*), Goldstein & Russell, P.C., Bethesda, Maryland, *for* Plaintiffs-Appellants.

NEAL KUMAR KATYAL (Eugene A. Sokoloff, Marc J. Gottridge, Lisa J. Fried, Benjamin A. Fleming, *on the brief*), Hogan Lovells US LLP, Washington, D.C., *for* Defendants-Appellees Lloyds Banking Group plc and HBOS plc (additional counsel for the many parties and amici are listed in Appendix A).

––––––––––––––

GERARD E. LYNCH, *Circuit Judge*:

This case is one of dozens seeking to recover for harm allegedly resulting from a conspiracy among major banks to manipulate the London Interbank Offered Rate ("LIBOR"), a set of benchmark interest rates that affect financial transactions worth trillions of dollars. Plaintiffs-Appellants Charles Schwab Corporation, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, and Schwab YieldPlus Fund Liquidation Trust (collectively, "Schwab") claim to have suffered damages in connection with their purchase of hundreds of billions of dollars in debt securities.

Defendants-Appellees are the banks allegedly responsible. They are Bank of America Corporation and Bank of America, N.A. (together, "Bank of America"), Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo"), Barclays Bank PLC ("Barclays"), Citigroup Inc. and Citibank, N.A. (together, "Citibank"), Coöperatieve Centrale Raiffeisen Boerenleenbank B.A. ("Rabobank"), Credit

6

Suisse Group AG ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), HSBC Holdings plc and HSBC Bank plc (together, "HSBC"), JPMorgan Chase & Co. and JPMorgan Chase Bank (together, "JPMorgan Chase"), Lloyds Banking Group plc ("Lloyds"), HBOS plc ("HBOS"), the Norinchukin Bank ("Norinchukin"), Portigon AG and Westdeutsche ImmobilienBank AG (together, "WestLB"), Royal Bank of Canada ("RBC"), Royal Bank of Scotland Group plc ("RBS"), and UBS AG ("UBS") (collectively, "Defendants").

The United States District Court for the Southern District of New York (Naomi Reice Buchwald, *J.*) dismissed Schwab's state-law claims for lack of personal jurisdiction, and dismissed both federal and certain state-law claims for failure to state a claim. Schwab challenges the dismissal of all of its state-law claims on personal jurisdiction grounds, and the dismissal of certain of its claims on the merits. For the reasons that follow, we AFFIRM IN PART, VACATE IN PART, and REMAND for proceedings consistent with this opinion.

## BACKGROUND

### I.  Factual Background

LIBOR is a set of benchmark interest rates that approximate the average rate at which major banks can borrow money. LIBOR, which is published daily,

7

is used as a reference point in determining interest rates for financial instruments across the world.

The British Bankers' Association ("BBA"), a London-based trade association for the financial services industry, oversaw LIBOR during the relevant period. It calculated LIBOR in various currencies for different maturities (*e.g.*, one month, three months, six months) based on the submissions of member banks sitting on panels designated for a particular currency. Every day, panel members would answer the question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" J.A. 767. The published rates for the U.S. Dollar LIBOR were pegged to the mean of 16 panel members' quotes, after excluding the four highest and four lowest submissions.

Defendants are banks that sat on the U.S. Dollar LIBOR panel. According to Schwab, between August 2007 and May 2010, Defendants continuously misrepresented their borrowing costs to the BBA, and their false submissions caused LIBOR to be artificially suppressed. By understating their true borrowing costs, Defendants were able to project an image of financial stability to investors who were sensitive to risks associated with major banks following the financial

8

crisis that began in 2007. Suppressing LIBOR also had the immediate effect of lowering Defendants' interest payment obligations on financial instruments tied to LIBOR. Defendants allegedly conspired together to manipulate LIBOR. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765–67 (2d Cir. 2016).

Schwab invested in billions of dollars' worth of debt securities during the alleged LIBOR suppression period. Defendants' LIBOR manipulation allegedly harmed Schwab in connection with two types of financial products — floating-rate instruments and fixed-rate instruments — which it purchased exclusively through its trading desk in California.

A floating-rate instrument is a debt instrument that pays out interest tied to an external benchmark, such as LIBOR, that varies over time. Because Schwab held floating-rate instruments that were tied to LIBOR, Defendants' manipulation of LIBOR allegedly caused Schwab to receive lower returns than it would have had LIBOR reflected Defendants' true borrowing costs.

A fixed-rate instrument, in contrast, pays out the same amount of interest based on a fixed interest rate such that changes in LIBOR or other external benchmark interest rates do not affect the amount of interest that the instrument pays out. Schwab alleges, however, that when "considering whether to purchase

9

a fixed-rate instrument, [it] evaluated the difference (or 'spread') between the offered rate [on the fixed-rate instrument] and LIBOR." J.A. 867. Because "suppressing LIBOR would always, and obviously, tend to suppress the rates of return on fixed-rate instruments by making lower rates of return relatively more attractive," Schwab allegedly received lower returns on fixed-rate instruments than it would have if LIBOR had been properly set. *Id.*

Schwab did not purchase debt instruments from all Defendants. Defendants can be divided into three groups relative to Schwab's purchases.

First, Defendants HSBC, Citibank, Deutsche Bank, JPMorgan Chase, and UBS (the "direct seller Defendants") allegedly solicited and sold debt instruments directly to Schwab in California. The volume of these direct-sales transactions was significant: Schwab alleges that it purchased more than $1.8 billion in floating-rate instruments, and more than $174.8 billion in fixed rate instruments from these direct seller Defendants.

Second, Defendants Bank of America, Barclays, Credit Suisse, RBC, and RBS (the "indirect seller Defendants") allegedly sold debt instruments indirectly

10

to Schwab, through "broker-dealer subsidiaries or affiliates."[1] J.A. 868. Schwab

identifies a non-exhaustive list of seventeen broker-dealer subsidiaries or

affiliates, and alleges that the indirect seller Defendants "controlled or otherwise

directed or materially participated in the operations of those broker-dealers,

[and] reaped proceeds or other financial benefits from the broker-dealers' sales of

LIBOR-based financial instruments, including but not limited to instances where

[the indirect seller] Defendants issued the LIBOR-based financial instruments

that were then sold by their broker-dealer subsidiaries or affiliates." J.A. 868.

Schwab claims to have purchased more than $5.7 billion in floating-rate

instruments and $222.7 billion in fixed-rate instruments from Defendants' broker-

dealers.

Finally, Defendants Bank of Toyko, Lloyds, HBOS plc, Norinchukin,

Rabobank, and WestLB (the "non-seller Defendants") are not alleged to have sold

financial instruments to Schwab at all. Their principal connection to this case,

therefore, is that they allegedly conspired with the other Defendants to

manipulate LIBOR to Schwab's detriment.

---

[1] Schwab alleges that direct seller Defendants Citibank, Deutsche Bank, and UBS
also sold instruments to Schwab through affiliated broker-dealers.

In total, Schwab alleges that Defendants' LIBOR manipulation caused it economic harm in connection with $665 billion in transactions. More than $40 billion of the floating-rate and fixed-rate instruments Schwab purchased were issued by Bank of America, Citibank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Norinchukin, RBC, RBS, Rabobank, or UBS.

Based on Defendants' allegedly false submissions to the BBA as well as their fraudulent representations and omissions in connection with Schwab's purchase of the subject debt instruments, Schwab filed the present case. It asserts thirteen distinct causes of action: fraud; aiding and abetting fraud; unfair business practices under the California Business and Professions Code; interference with prospective economic advantage; breach of the implied covenant of good faith and fair dealing; violation of §§ 25400 and 25401 of the California Corporations Code; rescission of contract; unjust enrichment; violation of section 10(b) of the Securities Exchange Act; violation of section 20(a) of the Securities Exchange Act; violation of section 11 of the Securities Act of 1933; violation of section 12(a)(2) of the Securities Act of 1933; and violation of section 15 of the Securities Act of 1933.

## II. Procedural History

The present case is not the first in which Schwab has pursued claims relating to LIBOR manipulation. In August 2011, the various Schwab entities filed three actions against the same defendants named here. Those actions were consolidated in a Southern District of New York multidistrict litigation (the "LIBOR MDL") established to manage pretrial proceedings in lawsuits against banks that allegedly manipulated LIBOR and defrauded purchasers of LIBOR-based financial instruments. *See In re Libor–Based Fin. Instruments Antitrust Litig.,* 802 F. Supp. 2d 1380 (J.P.M.L. 2011).

Following transfer of Schwab's 2011 complaints to the LIBOR MDL, the defendants moved to dismiss them. The district court, in relevant part, dismissed Schwab's federal antitrust claims for failure to plead antitrust injury and, in the absence of any live federal claims, declined to exercise supplemental jurisdiction over Schwab's state common-law causes of action. *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 935 F. Supp. 2d 666, 686, 736 (S.D.N.Y. 2013) ("*LIBOR I*"). We later vacated that dismissal. *Gelboim*, 823 F.3d at 783, cert. denied, 137 S. Ct. 814 (2017). We held that Schwab had plausibly alleged antitrust injury and rejected the defendants' alternative argument that we should affirm the dismissal

13

on the ground that Schwab had failed to plead the existence of a conspiracy among the defendant banks to manipulate LIBOR. *Id.* at 772, 781–82.

In April 2013, while the antitrust appeal was pending, Schwab commenced the present case in state court in California. Schwab reasserted the common-law claims over which the district court had previously declined to exercise supplemental jurisdiction, and added new federal and state causes of action. The case was promptly removed to federal court, and it too was then transferred to the LIBOR MDL.

In November 2014, Defendants, together with 28 other entities defending against claims of LIBOR manipulation, moved to dismiss the complaints in 27 cases, including Schwab's, for lack of personal jurisdiction and for failure to state a claim. Fed. R. Civ. P. 12(b)(2), (6). The moving defendants filed a 98-page appendix listing the claims for which they sought dismissal, and filed seven supporting memoranda of law. Only one of those — Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Schwab Plaintiffs' Securities Claims — was specifically directed toward Schwab's complaint. Schwab and the other plaintiffs requested permission to file individual oppositions to the motion, but were directed to, and ultimately did, file their

14

responses jointly. Schwab was permitted to file a memorandum of law specifically responding to Defendants' memorandum addressing Schwab's federal securities claims.

The district court issued a herculean 436-page decision that endeavored to sort through the innumerable issues that the motion raised — a task complicated by the fact that the various cases differed in the claims asserted, the allegations pled, the forum of origin, and the applicable state law. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*"), on reargument in part, 2016 WL 1301175 (Mar. 31, 2016), and reconsideration denied, 2017 WL 946338 (Feb. 16, 2017). In several parts of its decision, the district court did not focus on the particulars of any one complaint and, instead, set out broad-stroke conclusions explaining why certain classes of claims would be dismissed. In regards to personal jurisdiction, the district court directed the parties to agree on which portions of which complaints fell within the categories of claims that, applying the district court's reasoning, should be dismissed. As will be seen, this approach, understandably adopted by the district court to manage the enormously complex litigation before it, somewhat complicates our task on appeal.

15

Schwab's complaint was dismissed in its entirety. The district court dismissed all of Schwab's state-law claims for lack of personal jurisdiction, and dismissed Schwab's Securities Exchange Act claims for failure to state a claim.[2] The court alternatively held that many of Schwab's state-law claims should be dismissed on the merits.[3] The district court further found that the unjust enrichment claims were partially time-barred. This appeal followed.

---

[2] Schwab abandoned its other federal claims, under the Securities Act, before the district court issued its decision.

[3] Based on our interpretation of the district court's broad-stroke conclusions and without the benefit of extensive briefing on the issue, the district court likely did not dismiss the following state-law claims on the merits: (1) Schwab's fraud claims insofar as they either concerned a contractual counterparty's omissions in the course of floating-rate instrument transactions, or concerned false LIBOR submissions that were made by Defendants in London and relied upon in entering transactions involving floating-rate instruments; (2) Schwab's aiding and abetting fraud claims; (3) Schwab's claims for interference with prospective economic advantage insofar as Defendants "knew of a specific contract and knew to a substantial certainty that its conduct would induce a breach, or . . . specifically intended to induce a breach of a category of contracts," *LIBOR IV*, 2015 WL 6243526, at *82; (4) Schwab's claims for breach of the implied covenant of good faith and fair dealing insofar as they were alleged against contractual counterparties; and (5) Schwab's claims for unjust enrichment insofar as they were alleged against counterparties or a wrongdoer's affiliates. Accordingly, to the extent those claims survived on the merits, they were dismissed solely based on the district court's conclusion that it lacked personal jurisdiction over Defendants. *See infra* 21–22 & n.5.

16

# DISCUSSION

We review de novo a district court's decision to grant motions under Rule 12(b)(2) and 12(b)(6). *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013); *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011).

On appeal, Schwab argues that the district court erred (1) in dismissing its state-law claims for lack of personal jurisdiction; (2) in dismissing its fraud claims relating to transactions in fixed-rate instruments for failure to state a claim; (3) in dismissing its Securities Exchange Act claims for failure to state a claim; and (4) in partially dismissing its unjust enrichment claims as untimely.

## I.    Dismissal of State-Law Claims for Lack of Personal Jurisdiction

Schwab first challenges the district court's dismissal of all of its state-law claims for lack of personal jurisdiction.

To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff "must make a prima facie showing that jurisdiction exists. Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir.

17

2010) (internal quotation marks and citation omitted; alteration in original). A

plaintiff must have a state-law statutory basis for jurisdiction and demonstrate

that the exercise of personal jurisdiction comports with due process. *Licci*, 732

F.3d at 168. Defendants do not contest Schwab's statutory basis for personal

jurisdiction under California state law.

The due process analysis proceeds in two steps. First, courts "evaluate the

quality and nature of the defendant's contacts with the forum state under a

totality of the circumstances test. Where the claim arises out of, or relates to, the

defendant's contacts with the forum — *i.e.*, specific jurisdiction is asserted —

minimum contacts necessary to support such jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the

forum and could foresee being haled into court there." *Id.* at 170 (internal

quotations marks, citation, and brackets omitted). Second, once minimum

contacts are established, a court considers those contacts "in light of other factors

to determine whether the assertion of personal jurisdiction would comport with

fair play and substantial justice." *Id.* at 170 (internal quotation marks omitted).

The district court did not find that considerations of fair play and substantial

justice provided an alternative basis for dismissal, and Defendants do not argue

18

that they provide an alternative basis for affirmance. Accordingly, only the first step of the due process inquiry is at issue here.

Schwab asserts three principal theories of personal jurisdiction: (1) transactions in California give rise to personal jurisdiction over both the direct and indirect seller Defendants, and jurisdiction, therefore, also lies as to the non-seller co-conspirator Defendants[4]; (2) Defendants' LIBOR manipulation in London was expressly aimed at California, satisfying the so-called "effects test" for personal jurisdiction; and (3) personal jurisdiction with respect to Schwab's Securities Exchange Act claims allows for pendent personal jurisdiction with respect to Schwab's state-law claims. Schwab alternatively argues that Defendants forfeited their personal jurisdiction defense.

As explained below, we agree with Schwab's arguments in part and further find that Schwab should be granted leave to amend to add certain

---

[4] Because Schwab initiated this action in California, California is the relevant forum for jurisdictional purposes. In the case of a MDL transfer, the "transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions . . . that the transferor judge would have had in the absence of transfer." *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987) (citation omitted). We nonetheless apply our "interpretations of federal law, not the constructions of federal law of the transferor circuit." *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993).

19

jurisdictional allegations.

## A.    Personal Jurisdiction Arising from Transactions in California

### 1.    *Direct Seller Defendants*

Schwab argues that jurisdiction exists over the direct seller Defendants as a result of "their solicitation of Schwab in California and their actual sales of LIBOR-based instruments to Schwab in that forum." Appellants' Br. 23.

Allegations of billions of dollars in transactions in California easily make out a prima facie showing of personal jurisdiction for claims relating to those transactions. In *Chloe v. Queen Bee of Beverly Hills, LLC*, for instance, we held that there was personal jurisdiction over a defendant in a trademark action based on allegations that the defendant offered bags for sale to New York consumers on a website and sold "at least one counterfeit Chloé bag" to a New Yorker in the process. 616 F.3d 158, 171 (2d Cir. 2010). We reached the same result in *Eades v. Kennedy, PC Law Offices*, where the out-of-state defendant "mail[ed] one debt collection notice to [one plaintiff in New York], engag[ed] in one debt collection phone call with [her], and mail[ed] a summons and complaint to [the plaintiffs' New York homes]." 799 F.3d 161, 168 (2d Cir. 2015). The solicitation of and sale of financial instruments to Schwab in California are equally sufficient.

Indeed, Defendants effectively concede that direct sales in California could give rise to personal jurisdiction for claims relating to those sales. They nonetheless argue that there is no jurisdiction over the direct seller Defendants here for two independent reasons.

First, Defendants argue that we are not faced with a direct sales case at all. They contend that the district court dismissed all "state-law claims arising out of [Defendants' alleged] sales of LIBOR-based instruments" and that the only claims not dismissed on the merits are "those based on allegedly false LIBOR submissions made to the BBA in London." Appellees' Br. 23 & n.7. As a result, allegations of "solicitation and sale of LIBOR-based instruments to Schwab in California" are irrelevant to the jurisdictional analysis, because they are not "sufficiently 'related to'" Defendants' actions to manipulate LIBOR in London. *Id.* at 23.

Defendants are mistaken that the district court dismissed on the merits all state-law claims arising from transactions in California. Specifically, Schwab's claims for fraud relating to *omissions* by Defendants in the course of selling floating-rate instruments, interference with prospective economic advantage, breach of the implied covenant, and unjust enrichment apply to financial

21

products sold to Schwab in California and appear to have survived such dismissal.[5] Therefore, to the extent Schwab's claims concern transactions in California (as most of its surviving ones do), there is jurisdiction over the Defendants who are clearly identified as having made direct sales.

Defendants are right, however, that sales in California do not alone create personal jurisdiction for claims premised solely on Defendants' false LIBOR submissions in London. A plaintiff "must establish the court's jurisdiction with respect to each claim asserted," *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis omitted), and we identify one claim surviving merits dismissal that does not track the analysis above: Schwab's claim that Defendants committed fraud through their daily LIBOR submissions to the BBA in London.

---

[5] Reversing the district court's 12(b)(2) decision with respect to those claims does not mean that the claims survive in full. Some of the claims were also subject to partial dismissal or perhaps even full dismissal on the merits. For example, although allegations of sales in California may suffice for personal jurisdiction, the district court held that claims for breach of the implied covenant of good faith "against entities that were merely involved in the sales of LIBOR-related securities" failed under Rule 12(b)(6). *LIBOR IV*, 2015 WL 6243526, at *75. Similarly, the parties dispute whether Schwab's fraud-by-omissions claims survive when Schwab did not plead that it entered into swap contracts. It will be for the district court, after resolving additional jurisdictional issues on remand, reviewing Schwab's amended pleadings, and considering those aspects of its judgment that we vacate, to determine which Defendants and claims remain in this action.

Because activities in London do not constitute California contacts, the relevant jurisdictional question for such fraud claims is whether the California transactions constitute "suit-related conduct [that] create[s] a substantial connection with [California]." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).

They do not. "Courts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit," and the plaintiff's claim must in some way "arise from the defendants' purposeful contacts with the forum." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016) (internal quotation marks omitted). Here, the California transactions did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions. That Schwab asserts its false submission claims against all Defendants, including those that did not sell any products to Schwab, only bolsters our conclusion. Accordingly, personal jurisdiction will not lie against any Defendant with respect to Schwab's fraud claims premised on false submissions in London.

Second, Defendants argue that Schwab's allegations are insufficiently "individualized" to make out a prima facie case of personal jurisdiction over any

particular Defendant. Appellees' Br. 20. As applied to Deutsche Bank and UBS, the argument is unpersuasive. Those Defendants are single entities that allegedly sold debt instruments directly to Schwab, and the complaint identifies the particular Plaintiffs with which each of those Defendants transacted.

As applied to Citibank, HSBC, and JPMorgan Chase, however, Defendants' argument carries some weight. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (holding that due process demands that courts assess "[e]ach defendant's contacts . . . individually"). Each of those "Defendants" is actually two distinct Defendants — a parent and a wholly owned subsidiary — that the complaint collapses into one. Because Schwab refers to only the grouped entities throughout its complaint, it is impossible to determine whether both Defendants in each pairing sold directly to Schwab and, if not, whether the Defendant that did not make direct sales should be considered an indirect seller or non-seller (or whether it belongs in this lawsuit at all).[6]

This deficiency might well be overcome as to one or the other or both of the grouped entities by amending the complaint to clarify the roles each parent

---

[6] This same pleading issue exists for indirect seller Bank of America — that is, Defendant Bank of America Corporation (the parent) and Defendant Bank of America, N.A. (the wholly owned subsidiary).

and subsidiary played in the subject transactions. Whether Schwab should be given the opportunity to amend is discussed below.

### 2. *Indirect Seller Defendants*

Schwab next argues that there is personal jurisdiction over Bank of America, Barclays, Credit Suisse, RBC, and RBS because these indirect seller Defendants sold debt instruments to Schwab in California through non-party broker-dealer subsidiaries or affiliates. Essentially, Schwab contends that the jurisdictional analysis that applies to the direct seller Defendants applies equally to the indirect sellers.

It is well established that a defendant can "purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 n.13 (2014). And though we have not clearly delineated the showing necessary before an agent's contacts will be imputed to its principal for purposes of personal jurisdiction under the Due Process Clause, our caselaw provides some guidance.

*Leasco Data Processing Equipment Corp. v. Maxwell*, for instance, involved claims that the defendants conspired to fraudulently induce the New York-based plaintiff to buy stock in Pergamon Press Limited, a British corporation. 468 F.2d.

25

1326, 1330 (2d Cir. 1972). We considered whether there was personal jurisdiction in New York over Isidore Kerman, a Pergamon director and senior partner at the law firm involved the sale of Pergamon stock. *Id.* at 1342. Kerman's personal participation in the sale was limited to attending meetings in London at which certain fraudulent representations allegedly were made and, possibly, communicating with another partner in the firm, Paul DiBiase, who handled negotiations in New York. *Id.* at 1342–43. We nevertheless found it a close question whether there was jurisdiction over Kerman. *Id.* at 1342. We observed that the "partnership relation between Kernan and DiBiase alone [would not] justify a conclusion that DiBiase's acts in New York were the equivalent, for purposes of personal jurisdiction, of acts by Kerman." *Id.* at 1343. But, we continued, "the matter could be viewed differently when the relationship was the closer one between a senior partner . . . and a younger partner to whom he has delegated the duty of carrying out an assignment over which the senior retains general supervision." *Id.* Because the latter scenario would permit jurisdiction over Kernan, we remanded for further discovery on the issue. *Id.* at 1333-34.

Our caselaw concerning the New York long-arm statute is also instructive. Under that statute, there is jurisdiction over a principal based on the acts of an

26

agent where "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981). Although the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have "purposefully availed itself of the privilege of doing business in the forum." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks omitted); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'"). And where we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law. *See Chloe*, 616 F.3d at 169 (New York law and due process satisfied based, in part, on imputation of company's contacts to individual defendant where defendant profited from company's in-forum handbag sales, had access to company bank account, and "shared in the decision-making and execution of the purchase and sale of handbags"); *Retail Software*

27

*Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (New York law and due process satisfied where corporate officers allegedly "benefitted from [corporation's in-forum] activities and exercised extensive control over [corporation] in the transaction underlying th[e] suit").

These cases make it plausible that an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent "indirectly" sells the securities. Schwab's sparse allegations of agency, however, are too conclusory to make a prima facie showing of personal jurisdiction. *See Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) (holding that "allegations concerning [non-party's] agency were entirely conclusory and thus inadequate" to establish personal jurisdiction over the principal). Although Schwab's complaint sets forth a non-exhaustive list of the broker-dealer entities from which it purchased debt instruments, it sheds no light on the relationship between Defendants and those broker-dealers. Instead, the complaint generally alleges that Defendants "controlled or otherwise directed or materially participated in the operations of th[e] broker-dealers, [and] reaped proceeds or other financial benefits from the broker-dealers' sales of LIBOR-based financial instruments,

28

including but not limited to instances where Defendants issued the LIBOR-based financial instruments that were then sold by their broker-dealer subsidiaries or affiliates." J.A. 868. That bare allegation does not allow us to determine whether any particular broker-dealer's contacts should be imputed to any particular Defendant.

Schwab's pleading deficiency is not insurmountable, and the indirect seller Defendants may well have purposefully availed themselves of California "by directing [their] agents" to transact with Schwab there. *Daimler AG*, 134 S. Ct. at 759 n.13. Again, whether Schwab should be allowed to amend is discussed below.

### 3.   *Non-Seller Defendants*

Finally, Schwab argues that "[a]s members of the conspiracy to suppress LIBOR, the non-selling defendants are subject to the personal jurisdiction of the California courts to the same extent as their co-conspirator selling defendants." Appellants' Br. 33.

The district court rejected this argument because it found that Schwab had not plausibly alleged a conspiracy to manipulate LIBOR. *LIBOR IV*, 2015 WL 6243526, at *29. As Defendants concede, that holding cannot stand in light of our

intervening decision in *Gelboim.* There, we considered the sufficiency of conspiracy allegations materially indistinguishable from those Schwab pleads in this action. *Gelboim*, 823 F.3d at 781 & n.19. We found that a LIBOR manipulation conspiracy was plausibly alleged, and explicitly noted our disagreement with the district court's contrary ruling in the present case. *Id.* at 780-81.

That Schwab plausibly alleges a conspiracy to manipulate LIBOR, however, does not mean that the forum contacts of the seller Defendants are necessarily imputed to the co-conspirators. Although neither this Court nor the Supreme Court has delineated when one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator, we have made clear that the mere existence of a conspiracy is not enough. *Leasco*, 468 F.2d at 1343. The courts of appeals that have examined the issue more thoroughly have determined that the in-forum acts must have been "in furtherance of the conspiracy." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013); *see Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) ("While a co-conspirator's presence within the forum might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken

30

in the forum, these elements are lacking here."); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997); *Textor v. Bd. of Regents of N. Illinois Univ.*, 711 F.2d 1387, 1392–93 (7th Cir. 1983). We agree that *Unspam* sets forth the appropriate test for alleging a conspiracy theory of jurisdiction: the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state. *Unspam*, 716 F.3d at 329. To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the "purposeful availment" requirement.

Here, Schwab's pleading does not permit an inference that certain Defendants' sales in California were in furtherance of the conspiracy. Schwab alleges that Defendants "reached a common plan or design to suppress" LIBOR, and furthered their conspiracy by "submitting false LIBOR quotes to the BBA . . . and actively concealing their misconduct, including by making false or misleading public statements concerning LIBOR." J.A. 875. As alleged, the conspiracy to manipulate LIBOR had nothing to do with the California transactions, and there is thus no reason to impute the California contacts to the

31

co-conspirators.

Schwab argues in its brief that Defendants conspired not only to manipulate LIBOR, but also "to earn profits" from that manipulation. Appellants' Reply Br. 12. Yet financial self-interest is not the same as furthering a conspiracy through California-directed sales, and nowhere in Schwab's complaint are there allegations that Defendants undertook such sales as part of the alleged conspiracy. Whether Schwab should be allowed to amend the complaint to correct this deficiency is considered below.

**B.     Personal Jurisdiction Arising From the "Effects" of LIBOR Manipulation in California**

In the alternative, Schwab argues that there is personal jurisdiction over all Defendants because the "obvious and direct *effects* of [their] actions in California suffice." Appellants' Br. 37.

The "effects test" theory of personal jurisdiction is typically invoked where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. Exercise of jurisdiction in such circumstances "may be constitutionally permissible if the

32

defendant expressly aimed its conduct at the forum." *Id.*, citing *Calder v. Jones*, 465 U.S. 783, 789 (2013). The "foreseeability of causing injury in another State," however, will not suffice. *Burger King Corp.*, 471 U.S. at 474 (emphasis omitted).

Mere foreseeability is exactly what Schwab claims here. It argues that the "effects test" is "broad enough to capture this case . . . because defendants surely knew that the brunt of th[e] injury would be felt by plaintiffs like Schwab in California." Appellants' Br. 37 (internal quotation marks omitted); *see also* J.A. 773 (alleging that "Defendants are sophisticated market participants that knew, or reasonably should have known, that their misconduct in causing LIBOR [suppression] . . . would produce substantial and foreseeable effects in the United States and in the Northern District of California").

That the effects of LIBOR manipulation were likely to reach an economy as large as California's does not mean that Defendants' conduct in London was "expressly aimed" at that state. Indeed, even if actions to manipulate U.S. Dollar LIBOR were aimed at the United States as a whole, it would not necessarily follow that such actions were aimed at California. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (in assessing whether "a defendant has followed a course of conduct directed at [a specific] society or economy," a court may

33

determine that the defendant is "subject to the jurisdiction of the courts of the United States but not of any particular State").

Accordingly, Schwab has not made a prima facie showing of personal jurisdiction pursuant to the effects test.

### C.    Pendent Personal Jurisdiction

As a further alternative argument, Schwab contends that the district court, by virtue of having personal jurisdiction with respect to the Securities Exchange Act claims, should exercise pendent personal jurisdiction over the state-law claims. The doctrine of pendent personal jurisdiction provides that "where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1056 (2d Cir. 1993) (internal quotation marks and citation omitted). The district court declined to exercise pendent personal jurisdiction here "on the ground that [Schwab's] federal claims [we]re dismissed at the outset of the litigation." *LIBOR IV,* 2015 WL 6243526, at *24.

34

As discussed below, we disagree with the district court's determination that Schwab cannot state a claim under the Securities Exchange Act, and vacate dismissal of those claims in part with an opportunity to amend on remand. Because pendent personal jurisdiction is a discretionary doctrine, *Hermann*, 9 F.3d at 1059, and because Schwab needs to amend in order to state a plausible claim, the district court should consider the issue of pendent personal jurisdiction in the first instance.

### D.  Forfeiture

As a final effort, Schwab argues that Defendants forfeited their challenge to personal jurisdiction based on their failure to raise that issue in response to the complaints in Schwab's three 2011 actions. The district court rejected that argument, reasoning that "the present Schwab case is not the same as the ones that were [previously] dismissed" and that, even if it were, Defendants would be entitled to assert a new personal jurisdiction defense based on a favorable change in the governing precedent — specifically, the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). *LIBOR IV,* 2015 WL 6243526, at *36.

The district court did not abuse its discretion in rejecting Schwab's forfeiture claim. *See Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58, 60 (2d Cir. 1999).

35

As we have generally explained, a "party's consent to jurisdiction in one case . . . extends to that case alone" and "in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given." *Klinghoffer v. S.N.C. Achille*, 937 F.2d 44, 50 n.5 (2d Cir. 1991). Although we do not appear to have considered the issue in the context of multiple cases in the same MDL, such circumstances do not command a different result. MDL or not, a party might have various reasons for declining to raise a personal jurisdiction defense in one case, including the perceived strength of other defenses that might result in a dismissal with prejudice. That Defendants did not raise a personal jurisdiction defense in response to Schwab's 2011 complaints does not mean that they forfeited such a defense here.

### E. Leave to Amend

The question remains whether Schwab should be given the opportunity to amend so that it may (1) clarify the status of the Defendants grouped under the labels "Citibank," "HSBC," "JPMorgan Chase," and "Bank of America," (2) add allegations regarding the relationship between the indirect seller Defendants and their broker-dealers, and (3) add allegations making it plausible that sales in California were in furtherance of Defendants' conspiracy.

As noted above, amendments along those lines would not necessarily be futile. Defendants, however, argue that leave to amend should be denied because plaintiffs forfeited their opportunity by not seeking leave to amend below. That argument might be persuasive in another case, but we reject it here for two reasons.

First, Defendants did not argue below that the aforementioned pleading deficiencies provided a basis for dismissing Schwab's claims, and Schwab thus had no reason to seek leave to amend in response to Defendants' motion to dismiss. In fact, Schwab plausibly argues that *Defendants* forfeited some of their arguments by failing to raise them in the district court, and making them for the first time on appeal. But the parties' mutual contentions of waiver and forfeiture must be understood in the context of how the district court chose to deal with the extraordinary scope of the litigation before it. The parties filed joint memoranda of law on personal jurisdiction, which had to cover a broad range of issues relating to dozens of complaints. Even the district court's 436-page decision did not set forth specific jurisdictional holdings with respect to each and every claim, instead leaving to the parties the task of applying the principles set forth in the opinion to the specific claims in each complaint. It gives us no great pause to

37

relax our usual preservation requirements — for both sides — in such circumstances.[7]

Second, and relatedly, the district court itself did not rely on the deficiencies we have identified in dismissing Schwab's claims. In addressing arguments that "defendants' wrongdoing in forum states supports jurisdiction over defendants in those states," the district court held broadly that the plaintiffs could establish personal jurisdiction only where a plaintiff established a prima facie case that "defendants' LIBOR *manipulation* took place in the relevant forum." *LIBOR IV*, 2015 WL 6243526, at *32 (emphasis added). Under that (erroneous) rationale, sales and solicitation in California were insufficient to give

---

[7] The district court's requirement of joint briefing with respect to many of the issues raised in multiple distinct complaints, and its decision to address certain of those issues by delineating broad principles, posed unusual difficulties for the parties to the litigation that went well beyond the usual constraints of page limitations. In so noting, we intend no criticism of the district court, which itself was faced with an extraordinary case-management challenge. Even with the limitations imposed by the court, the parties submitted thousands of pages of briefing and supporting materials on a plethora of issues relevant to 27 distinct complaints. The court's 436-page opinion impressively addressed those many issues, provided a blueprint for the more specific resolution of a wide range issues and the disposition of motions to dismiss filed in each of the cases, and set up many of the most important issues for appellate review. In that context, it is little wonder that where the district court erred in its analysis of an issue, application of the correct principles would bring to the forefront nuances that the parties had not addressed in earlier briefing.

rise to personal jurisdiction even over a specifically identified direct seller.

Therefore, there was no reason for Schwab to file a post-judgment motion

seeking leave to amend in order to clarify the identity of certain grouped entities,

to add allegations regarding the indirect seller Defendants, or to add allegations

about in-forum acts taken in furtherance of the conspiracy; the district court's

reasoning meant that no such amendments would remedy the defects that the

district court perceived.

###    F.    Summary

In sum, we hold that Schwab has established a prima facie case of personal

jurisdiction over direct seller Defendants Deutsche Bank and UBS for claims

concerning transactions in California; that Schwab should be granted leave to

amend so it can clarify the status of the grouped entities (Citibank, HSBC,

JPMorgan Chase, and Bank of America) and add allegations in support of its

agency and conspiracy theories of jurisdiction[8]; and that the district court should

consider on remand whether it is appropriate to exercise pendent personal

---

[8] We leave it to the district court to determine, in its discretion, whether Schwab should also be allowed to amend its complaint (if necessary) to more adequately allege claims that can survive a motion to dismiss. *See supra* 16 n.3, 21–22 & n.5.

jurisdiction. We affirm the district court's decision on personal jurisdiction in all other respects.

## II.     Dismissal of Fraud Claims Relating to Fixed-Rate Instruments

Schwab next argues that the district court erred in dismissing its fraud claims arising from transactions in fixed-rate instruments. We disagree.

Under California law, the elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003) (internal quotation marks omitted).

The district court effectively dismissed Schwab's claims relating to fixed-rate instruments for failure to plead justifiable reliance. It reasoned that "plaintiffs who used LIBOR-based pricing to decide whether to invest in LIBOR-based instruments" were relying on an impermissible "'fraud on the market' theory that efficient market forces embedded defendants' false information in otherwise reliable prices." *LIBOR IV*, 2015 WL 6243526, at *65. The fraud on the market doctrine "makes it unnecessary for buyers or sellers of stock to prove they relied on a defendant's misrepresentations, on the theory that whether or not

they relied[,] the misrepresentation influenced the market price at which they later bought or sold." *Small*, 30 Cal. 4th at 179. California has rejected the doctrine, meaning that "a plaintiff suing for fraud . . . under California law must prove actual reliance." *Id.* at 180.

Although the district court was right on the state of California law, it erred in finding that Schwab was relying on the fraud on the market doctrine in this case. Schwab alleges that, in connection with each transaction, it "evaluated the difference (or 'spread') between the offered rate and LIBOR," that a larger spread caused it to purchase fixed-rate instruments, and that it "relied on the accuracy of LIBOR in undertaking these transactions." J.A. 867. Those allegations set forth Schwab's theory of reliance, and they go beyond the bare assertion that Defendants' fraudulent LIBOR submissions were embedded in the price of fixed-rate instruments. The district court thus erred in dismissing Schwab's claims as precluded by California's rejection of the fraud on the market doctrine.

Defendants, however, identify an alternative basis on which to affirm the dismissal of the fraud claims involving fixed-rate instruments: the claims are beyond the scope of common law fraud.

41

California follows the Restatements of Torts, under which a defendant is liable to those "whom he intends or has reason to expect to" rely on a misrepresentation. Restatement (Second) of Torts ("Rest. 2d Torts"), § 531(1977); *id.* § 533; *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 415 (1992), as modified (Nov. 12, 1992) (en banc). "[R]eason to expect" is distinct from "the concept of foreseeability" and "bears more similarity to actual *intent* to cause third party reliance than it does to 'foreseeability.'" *Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 607 (Cal. Ct. App. 1st Dist. 1995) (emphasis in original); *see also Gawara v. U.S. Brass Corp.*, 63 Cal. App. 4th 1341, 1351 n.10 (Cal. Ct. App. 4th Dist. 1998). As a result, a plaintiff seeking to rely on a representation that the defendant made to a third party must show that the defendant "'ha[d] information that would lead a reasonable man to conclude that there is an especial likelihood that it [would] reach those persons [similarly situated to the plaintiff] and [would] influence their conduct.'" *Geernaert*, 31 Ca. App. 4th at 607, quoting Rest. 2d Torts § 531, cmt. d (italics omitted).

The Restatement also limits a defendant's liability "to pecuniary losses suffered in the type of transaction in which he intends or has reason to expect the

conduct of others to be influenced." Rest. 2d Torts § 531, cmt. g. As an

illustration, the Restatement explains that:

> A, seeking to sell a lot owned by him, publishes in
> newspapers fraudulent statements concerning the
> character of all lots in the real estate development in
> which it is located. B reads these statements, and in
> reliance upon them purchases another lot in the same
> development from C. A is not liable to B under the rule
> stated in this Section.

*Id.*

Defendants contend that Schwab's claims are beyond the scope of common

law fraud because they would make Defendants liable for misrepresentations

about LIBOR to parties that bought financial instruments that do not reference

LIBOR at all. Schwab responds that its claim is within the scope of common law

fraud because the complaint alleges that assessing the spread between LIBOR

and the offered rate for a fixed-rate instrument is a "common analysis

undertaken by participants in [the] market[]." J.A. 867. In other words, Schwab

argues that because LIBOR is an important financial consideration, Defendants

should have known that investors in debt instruments would consider LIBOR

when making investment decisions.

Schwab's allegation amounts to nothing more than mere foreseeability.

The chain of events that resulted in Schwab's reliance was extended: Defendants made false submissions to the BBA; their submissions collectively influenced LIBOR; LIBOR was incorporated into floating-rate instruments; (relatively) poor returns on floating-rate instruments caused Schwab to turn to fixed-rate instruments; and Schwab purchased such instruments after considering, among other factors, the expected return on floating-rate instruments in light of the rate at which LIBOR had been set. Schwab makes no allegations that Defendants had information about an "especial likelihood" of inducing purchases of fixed-rate instruments by anyone, let alone by Schwab in particular, Rest. 2d Torts § 531, cmt. d, and the losses Schwab allegedly suffered in purchasing fixed-rate instruments were different than the harm that Defendants intended or would have expected to cause by making false LIBOR submissions, *id.* § 531, cmt. g. In fact, Schwab's arguments would seem to apply equally to a plaintiff suing under a theory that LIBOR suppression influenced a decision to purchase equity securities, thereby making Defendants potentially liable to anyone who purchased any security in the relevant time period. California law does not provide for such boundless liability.

Accordingly, the district court's dismissal of Schwab's fraud claims

relating to fixed-rate instruments is affirmed.

## III.    Dismissal of Securities Exchange Act Claims

Schwab also challenges the dismissal of its Securities Exchange Act claims. Section 10(b) of the Act "prohibit[s] fraud in the purchase or sale of a security." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). To state a claim for violation of that provision, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted).

Schwab's Securities Exchange Act claims concern floating-rate as well as fixed-rate instruments. The district court held that Schwab failed to state a claim with respect to transactions in both types of instruments, for different reasons. Schwab argues that the court erred with respect to both. We agree in part.

### A.    Floating-Rate Instruments

The district court offered two reasons for dismissing Schwab's claims relating to floating-rate instruments. First, insofar as Defendants'

misrepresentations or omissions allegedly caused Schwab to purchase floating-rate instruments, the district court effectively held that Schwab failed to plead loss causation. It reasoned that because "a bond's price is equal to the present value of its expected future interest and principal payments," LIBOR suppression would lower the expected future interest on the bond, thus reducing the bond's purchase price. *LIBOR IV*, 2015 WL 6243526, at *70. In other words, as a matter of "common economic experience," LIBOR suppression could not have caused any losses connected to Schwab's purchase of floating-rate instruments because such suppression would have lowered the purchase price, and Schwab might have even received a windfall in terms of higher-than-expected coupon payments after LIBOR suppression ended. *Id.*

Second, insofar as Defendants' misrepresentations caused Schwab to receive artificially low interest payments on the floating-rate instruments, the district court held that receipt of interest payments did not qualify as a "purchase or sale" of securities, as required to state a claim. *Id.*

Schwab argues that the district court improperly bifurcated its claim and that, properly construed, its "straightforward allegation is that, because LIBOR was artificially suppressed, the *overall* return to Schwab from purchasing a

LIBOR-based bond . . . was artificially suppressed as well." Appellants' Reply Br. 27. We cannot agree. To whatever extent Schwab alleges that its overall return on its investments was reduced, that reduction must consist of one or both of two components: an artificially inflated purchase price or an artificially reduced interest rate. The district court did not err in examining these two components separately to determine whether either supports a cognizable claim.

We agree with the district court that to the extent Schwab seeks to impose liability for false LIBOR submissions that affected the amount of money it received on instruments it *had already purchased*, its claims fail. There is no authority for the proposition that an interest payment in itself qualifies as a "purchase or sale of a security," *Halliburton Co.*, 134 S. Ct. at 2407, and Defendants' LIBOR submissions, possibly occurring months after Schwab purchased a particular security, bore no relation to that original purchase.

We disagree with the district court, however, that misrepresentations and omissions that induced Schwab's purchase of floating-rate instruments could not have caused any losses. Although a depressed LIBOR that caused expectations of future interest payments to decrease might result in lock-step reductions in the price of floating-rate instruments, such an effect is not certain, and expert

47

testimony might well demonstrate that, in light of Defendants' manipulation, Schwab's floating-rate instruments should have been priced even lower than they were. The district court was thus wrong to assume, at the pleading stage, that Schwab was not harmed by, and may have even benefitted from, LIBOR manipulation.

As Defendants point out, Schwab would not have experienced any losses as result of a mispriced floating-rate instrument at the moment of purchase, because "the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 342 (2005). But that is not to say that no losses would ever be realized. If Schwab held a mispriced instrument to maturity, for instance, it might have incurred damages based on the reduced cash flow received from interest payments that were depressed because of Defendants' manipulation of LIBOR. Or if Schwab tried to sell a floating-rate instrument after LIBOR manipulation was revealed, it might have been forced to sell at a loss.

At this stage of the litigation, we cannot rule out either theory of loss causation — certainly not as a matter of "common economic experience," as the district court held. *LIBOR IV*, 2015 WL 6243526, at *70. What's unclear, however,

48

is whether Schwab's complaint actually encompasses either theory. Schwab

simply alleges that it purchased instruments that "bore artificially low rates of

return" and generally "suffered damages in connection with [its] purchases (and

other acquisitions) and sales of LIBOR-based financial instruments." J.A. 887–88.

Although the burden on a securities plaintiff to plead loss causation is "not a

heavy one," the complaint still must give "'some indication' . . . of a plausible

causal link" between the loss and the alleged fraud. *Loreley Fin. (Jersey) No. 3 Ltd.*

*v. Wells Fargo Sec., LLC*, 797 F3d 160, 187 (2d Cir. 2015), quoting *Dura*, 544 U.S. at

347. On remand, Schwab should add allegations clarifying the loss causation

theory or theories on which it relies. Upon satisfaction of its minimal pleading

burden, Schwab should then be permitted to proceed with Securities Exchange

Act claims concerning misrepresentations and omissions that induced Schwab's

purchase of floating-rate instruments.

Defendants make two alternative arguments in support of affirmance, both

of which we reject.

First, they argue that by not "alleg[ing] facts specific to the securit[ies] in

question including who said what to whom concerning" each particular security,

Schwab fails to plead its Securities Exchange Act claims with the requisite

particularity. Appellees' Br. 51 (internal quotation marks and emphasis omitted).

Under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities

Litigation Reform Act ("PSLRA"), a securities fraud complaint must "(1) specify

the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain

why the statements were fraudulent." *Employees' Ret. Sys. of Gov't of the Virgin*

*Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (internal quotation marks

omitted). The "primary purpose" of these requirements is to "afford [the]

defendant fair notice of the plaintiff's claim and the factual ground upon which it

is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (internal quotation

marks omitted).

We find the allegations here to be sufficiently particularized. Schwab's

claims concern Defendants' false submissions to the BBA and their failure to

disclose their manipulation of LIBOR when selling Schwab floating-rate

instruments tied to it. As to the false LIBOR submissions, the complaint contains

significant and sufficiently detailed allegations demonstrating that Defendants, in

their daily submissions as members of the U.S. Dollar LIBOR panel, misstated

their true borrowing costs, and we agree with the district court that these

"'LIBOR quotes' are sufficiently identifiable to pass muster under Rule 9(b)."

*LIBOR IV*, 2015 WL 6243526, at *62. As to omissions concerning the accuracy of

LIBOR, we again agree with the district court that, "because the point of an

omission is that information was missing from the contract and from

negotiations," Schwab did not need to "cite specific terms of a contract" and

could instead name a "set of contracts . . . and . . . [a] set of counterparties . . . that

failed to divulge information about the quality of LIBOR." *Id.* at *58. Schwab

defines these sets in its complaint, and it was not required to individually allege

the same omission for each and every floating-rate instrument transaction, for

billions of dollars' worth of transactions. There is no doubt that Defendants have

fair notice of, and understand the factual basis for, the misrepresentations and

omissions that underlie Schwab's claims. Accordingly, the particularity

requirements of Rule 9(b) and the PSLRA have been satisfied.

Second, Defendants argue that Schwab's claims are untimely. Securities

Exchange Act claims sounding in fraud must be filed within the earlier of five

years from the alleged violation or two years "after discovery of the facts

constituting the violation." 28 U.S.C. § 1658(b). "Discovery" in this context is

stricter than inquiry notice, and occurs when "a reasonably diligent plaintiff

51

would have sufficient information . . . to adequately plead [its claim] in a complaint." *City of Pontiac*, 637 F.3d at 175.

Defendants contend that the limitations period expired in March 2013, roughly a month before Schwab filed its April 2013 complaint, and two years after Schwab discovered Defendants' alleged fraud. In support, Defendants point to Schwab's allegation that it "had not discovered, and could not with reasonable diligence have discovered, facts indicting Defendants were knowingly engaging in misconduct that caused LIBOR to be artificially depressed" before March 15, 2011, when UBS disclosed in a public SEC filing that it had "'received subpoenas'" relating to an investigation into LIBOR manipulation. J.A. 856. According to Defendants, the "necessary implication of that allegation is that Schwab *was* on notice" after that date. Appellees' Br. 52. In addition, Defendants refer to other "widely publicized lawsuits alleging the same facts on which Schwab bases its Exchange Act claims," and argue that the "allegations of fraud in those complaints" — filed at some unspecified date more than two years before Schwab filed its complaint — "were more than enough to start the clock." *Id.*

52

Those arguments fall short. Even if UBS's SEC filing would have led a "reasonable investor to investigate the possibility of fraud," such inquiry notice "does not automatically begin the running of the limitations period" for Securities Exchange Act claims. *City of Pontiac*, 637 F.3d at 173–74 (internal quotation marks omitted). Instead, we must ask when an investigation would have given Schwab sufficient information to plead its claims with "sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 175. It is too soon to identify, from the face of the complaint and taking all inferences in Schwab's favor, the precise moment at which the two-year limitations period began to run. Defendants do not identify which allegations in which "widely publicized lawsuits" would have enabled Schwab to state its own viable claims, Appellees' Br. 52, and the mere fact that UBS disclosed the existence of an investigation into whether UBS had made "improper attempts . . . either acting on its own or together with others, to manipulate LIBOR rates at certain times" certainly does not prove that Schwab had all the information necessary to set forth its claims in sufficient detail, J.A. 856.[9]

---

[9] The district court did hold that Securities Exchange Act claims based on alleged violations occurring before April 27, 2008 — five years before Schwab filed its complaint – were time-barred. *See* 28 U.S.C. § 1658(b)(2). Schwab does not

For these reasons, we conclude that the district court erred in holding that Schwab could not establish loss causation for claims concerning misrepresentations and omissions that led Schwab to purchase floating-rate instruments tied to LIBOR, and that Schwab should be permitted to amend its complaint on remand to clarify its loss causation theory for such claims.

### B.    Fixed-Rate Instruments

The district court dismissed Schwab's Securities Exchange Act claims relating to fixed-rate instruments on the ground that Schwab "essentially [alleged] that it *declined* to purchase manipulated [floating-rate] securities" as a result of Defendants' misrepresentations, and that a decision not to purchase a security does not suffice to state a claim. *LIBOR IV*, 2015 WL 6243526, at *70. Schwab argues that the district court misconstrued its claim: it is not that Schwab simply declined to purchase floating-rate instruments, but rather that "in actually 'undertaking . . . transactions' in fixed-rate instruments, Schwab accepted materially worse overall returns because it relied on manipulated LIBOR." Appellants' Reply Br. 26.

---

challenge that determination on appeal, and nothing in our opinion disturbs that portion of the district court's judgment.

But Schwab's framing begs the question of whether Defendants' allegedly false LIBOR submissions were "in connection with" Schwab's transactions in fixed-rate instruments that did not incorporate LIBOR at all. Typically, a plaintiff satisfies the "in connection with" requirement when "the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value." *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993). A claim fails where the plaintiff does "not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108 (2d Cir. 1986); *see Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) ("The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions — to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.").

When Schwab purchased fixed-rate instruments, it received exactly what it expected. Defendants' alleged misrepresentations to the BBA were not made in connection with Schwab's purchase of fixed-rate instruments, which did not

55

reference or relate to Defendants' LIBOR submissions in any way. The district court's dismissal of Schwab's Securities Exchange Act claims concerning fixed-rate transactions is therefore affirmed.

## IV.   Partial Dismissal of Unjust Enrichment Claims

Lastly, Schwab argues that the district court erred in partially dismissing its unjust enrichment claims as untimely. We agree.

The district court held that claims arising before August 23 or 27, 2008, (depending on the particular Plaintiff) were untimely because they fell outside the three-year period before Schwab first filed complaints alleging unjust enrichment against Defendants.[10] Schwab contends that it did not discover its unjust enrichment claims until after that date, thus delaying the start of the three-year limitations period and making all of its claims timely.

The district court rejected that argument. Notably, the court refused to dismiss any of Schwab's tort claims as untimely because it determined that it was

---

[10] The district court held that Schwab's common-law claims "effectively relate[d] back" to Schwab's first set of cases, filed on August 23 and 29, 2011, in which the court declined to exercise supplemental jurisdiction over state-law claims. *LIBOR IV*, 2015 WL 6243526, at *177; *see also id.* at *158, *177 n.205. No party challenges the propriety of considering those dates to be the relevant filing dates for statute of limitations purposes.

56

unclear from the complaint at what point Schwab was put on inquiry notice of those claims — that is, when it "suspect[ed] or should [have] suspect[ed] that [its] injury was caused by wrongdoing." *Jolly v. Eli Lilly & Co.,* 44 Cal. 3d 1103, 1110 (1988). But, the district court continued, unjust enrichment was subject to a "more limited" discovery rule under which "the clock starts when the breach is no longer 'difficult . . . to detect.'" *LIBOR IV*, 2015 WL 6243526, at *128, quoting *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 831 (Cal. Ct. App. 2d Dist. 1983). Because "news articles had established the strong possibility of LIBOR manipulation" by May 29, 2008, *id.* at *115, the court held that Schwab's injuries were "no longer 'difficult . . . to detect'" by that date, meaning the discovery rule did not bring any pre-August 2008 claims within the limitations period, *id.* at *177.

The jurisprudential premise for the district court's analysis, however, does not withstand scrutiny. *April Enterprises* concerned whether the discovery rule applied at all in contract actions. 147 Cal. App. 3d at 828–33. In answering that question of first impression, the California Court of Appeal observed that in "all the types of actions where courts have applied the discovery rule," the "injury or the act causing the injury, or both, have been difficult for the plaintiff to detect."

57

*Id.* at 831. Although that rationale might not fit with the "typical" contract case where a party immediately learns that it has not received benefits due under an agreement, the California court held that the discovery rule would nonetheless apply to "breaches [of contract] which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Id.* at 832.

*April Enterprises* did *not* say, however, that where the discovery rule is available, courts should use anything other than California's ordinary inquiry notice standard in applying that rule. The reference to harm or wrongdoing that is "difficult for the plaintiff to detect" was simply a description of the general circumstances in which inquiry notice applies, *id.* at 831, and the California court cited inquiry notice cases for the standard that should govern contract cases, *id.* at 832–33. California cases relying on *April Enterprise* to apply the discovery rule in contract cases have followed suit. *See, e.g., Weatherly v. Universal Music Pub. Grp.*, 125 Cal. App. 4th 913, 919–20 (Cal. Ct. App. 2d Dist. 2004); *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 6 (Cal. Ct. App. 2d Dist. 2003).

The district court was wrong on the standard for a simpler reason as well: Schwab's unjust enrichment claims sound in fraud. *See* J.A. 884 (alleging that

58

"[b]y means of their unlawful conduct . . . including misrepresenting their costs of borrowing to the BBA to manipulate LIBOR, . . . [Defendants] knowingly received and retained wrongful benefits and funds from Plaintiffs"). Under California law, an "action for relief on the ground of fraud or mistake . . . is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Civ. Proc. Code § 338(d). California caselaw makes clear that "discovery" in the statute means inquiry notice, and that is the standard that the district court should have applied. *See FDIC v. Dintino*, 167 Cal. App. 4th 333, 350 (Cal. Ct. App. 4th Dist. 2008) (applying inquiry notice rule applicable to fraud and mistake claims where the plaintiff asserted unjust enrichment cause of action based on mistake).

Under the proper standard, Schwab's unjust enrichment claims were dismissed in error. The limitations period "begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing." *Jolly*, 44 Cal. 3d at 1110. In contrast to other inquiry notice jurisdictions, California courts have rejected the argument that press reporting that might make a reasonable person suspect wrongdoing is sufficient where there is no evidence that the plaintiff was aware of the reporting in question. *Nelson v. Indevus Pharm., Inc.*, 142

59

Cal. App. 4th 1202, 1206 (Cal. Ct. App. 2d Dist. 2006) ("The statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only once the plaintiff *has* a suspicion of wrongdoing." (internal quotation marks omitted)); *Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202, 1220–21 (N.D. Cal. 2014) (collecting cases).

Here, Schwab alleges that it "had not discovered . . . facts indicating Defendants were knowingly engaging in misconduct" until March 2011, J.A. 856, and as the district court properly determined in connection with Schwab's tort causes of action, the complaint does not reveal when Schwab "became aware of the news articles that would have put [it] on inquiry notice," *LIBOR IV*, 2015 WL 6243526, at *177. As a result, it is impossible to determine from the complaint when the statute of limitations began to run.

Moreover, even if Schwab were aware of news articles that raised the possibility that "LIBOR had been at artificial levels since August 2007," Appellees' Br. 57 (internal quotation marks omitted), it is not certain that any of Schwab's claims would be time-barred. The BBA responded to the negative press reporting by assuring investors and journalists that its own investigation had confirmed the accuracy of LIBOR. It is plausible that Schwab reasonably relied on

60

those assurances, thus delaying the start of the limitations period. *See BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (considering the same press reports at issue here, and reversing district court for "act[ing] too hastily" in dismissing LIBOR-manipulation claims as time-barred).

Discovery in this case may well reveal that Schwab should have suspected wrongdoing well before March 2011. At this stage, however, partial dismissal of the unjust enrichment claims was unwarranted.

## CONCLUSION

For the foregoing reasons, we VACATE those portions of the district court's judgment that (1) dismiss Schwab's state-law claims concerning products sold in California for lack of personal jurisdiction; (2) dismiss Schwab's Securities Exchange Act claims premised on misrepresentations and omissions that induced the purchase of floating-rate instruments on or after April 27, 2008; and (3) dismiss Schwab's unjust enrichment claims against counterparties or a wrongdoer's affiliates as time-barred. We AFFIRM the judgment in all other respects, and REMAND for proceedings consistent with this opinion.

# APPENDIX A

*Additional Counsel for Plaintiffs-Appellants on the Brief*

> Steven E. Fineman, Michael J. Miarmi, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, New York; Richard M. Heimann, Brendan P. Glackin, Lieff, Cabraser, Heimann & Berstein, LLP, San Francisco, California, *for* Plaintiffs-Appellants.

*Additional Counsel for Defendants-Appellees on the Brief*

> Arthur J. Burke, Paul S. Mishkin, Adam G. Mehes, Davis Polk & Wardwell LLP, New York, New York, *for* Defendants-Appellees Bank of America Corporation and Bank of America, N.A.

> Daryl A. Libow, Christopher M. Viapiano, Sullivan & Cromwell LLP, Washington, D.C., *for* Defendant Appellee Bank of Tokyo-Mitsubishi UFJ, Ltd.

> David H. Braff, Yvonne S. Quinn, Jeffrey T. Scott, Matthew J. Porpora, Sullivan & Cromwell, New York, New York; Jonathan D. Schiller, Leigh Nathanson, Amos Friedland, Boies Schiller Flexner LLP, New York, New York; Michael A. Brille, Boies Schiller Flexner LLP, Washington, D.C., *for* Defendant-Appellee Barclays Bank PLC.

> Andrew A. Ruffino, Covington & Burling LLP, New York, New York; Alan M. Wiseman, Thomas A. Isaacson, Jonathan Gimblett, Andrew D. Lazerow, Covington & Burling LLP, Washington, D.C.; Lev Dassin, Jonathan S. Kolodner, Cleary Gottlieb Steen & Hamilton LLP, New York, New York, *for* Defendants-Appellees Citigroup Inc. and Citibank, N.A.

> David R. Gelfand, Sean M. Murphy, Mark D. Villaverde, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, *for* Defendant-Appellee Coöperatieve Rabobank U.A.

Herbert S. Washer, Elai Katz, Joel Kurtzberg, Jason M. Hall, Adam Mintz,, Cahill Gordon & Reindel LLP, New York, New York, *for* Defendant-Appellee Credit Suisse Group AG.

Moses Silverman, Andrew C. Finch, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for* Deutsche Bank AG.

Gregory T. Casamento, R. James DeRose, III, Locke Lord LLP, New York, New York; Roger B. Cowie, Locke Lord LLP, Dallas, Texas; J. Matthew Goodin, Julia C. Webb, Locke Lord LLP, Chicago, Illinois, *for* Defendants-Appellees HSBC Holdings PLC and HSBC Bank PLC.

Thomas C. Rice, Paul C. Gluckow, Omari L. Mason, Simpson Thacher & Bartlett LLP, New York, New York; Abram J. Ellis, Simpson Thacher & Bartlett LLP, Washington, D.C., *for* Defendants-Appellees JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

Arthur W. Hahn, Christian T. Kemnitz, Brian J. Poronsky, Katten Muchin Rosenman LLP, Chicago, Illinois, *for* Defendant-Appellee Royal Bank of Canada.

Andrew W. Stern, Alan M. Unger, Thomas A. Paskowtiz, Sidley Austin LLP, New York, New York, *for* Defendant-Appellee Norinchukin Bank.

Fraser L. Hunter, Jr., David S. Lesser, Jamie S. Dycus, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Robert G. Houck, Clifford Chance US LLP, New York, New York, *for* Defendant-Appellee Royal Bank of Scotland Group plc.

Peter Sullivan, Lawrence J. Zweifach, Jefferson E. Bell, Gibson, Dunn & Crutcher LLP, New York, New York; Joel Steven Sanders, Gibson, Dunn & Crutcher LLP, San Francisco, California, *for* Defendant-Appellee UBS AG.

Christopher M. Paparella, Marc A. Weinstein, Hughes Hubbard & Reed

63

LLP, New York, New York, *for* Defendants-Appellees Portigon AG and Westdeutsche ImmobilienBank AG.

*Counsel for Amici Curiae*

Kevin C. Newsom, Blair Druhan Bullock, Bradley Arant Boult Cummings LLP, New York, New York; Edmund S. Sauer, Bradley Arant Boult Cummings LLP, Nashville, Tennessee, *for* Amici Curiae the Institute of International Bankers and the Clearing House Association L.L.C. in support of Defendants-Appellees.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit