

LISTEN. SOLVE. EMPOWER.

P: 330.253.5060  F: 330.253.1977  W: bmdllc.com
75 East Market Street, Akron, Ohio 44308

Victoria L. Ferrise
Partner
P: 330.374.5184
F: 330.374.5196
E: vlferrise@bmdllc.com

April 2, 2018

The Honorable Naomi Reice Buchwald
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: *In re LIBOR-based Financial Instruments Antitrust Litigation*, MDL No. 11-md-2262, Case No. 11-cv-5450 (S.D.N.Y.)

Dear Judge Buchwald:

We write in response to the letter sent to you on March 16, 2018 from William Carmody, Susman Godfrey LLP (the "Susman Letter"). In the Susman Letter, Mr. Carmody makes certain opinion statements about Managed Care Advisory Group, LLC ("MCAG"), and based solely on his incorrect opinions and allegations he requests the Court take action regarding MCAG's submissions in the above-named case and impose a series of harsh penalties without any legal basis or process.

Mr. Carmody asserts there are "serious concerns" about the authority of MCAG to file claims on behalf of class members to the Settlement Fund associated with the OTC Plaintiffs settlement with Barclays Bank, PLC. Mr. Carmody seems to think that MCAG's decision not to name all of its filed clients in our letter to the Court dated February 2, 2018 (Docket Number 2422) is somehow an admission of a lack of authority to file for other clients. Nothing could be further from the truth.

At the fairness hearing (held on October 23, 2017), MCAG offered to provide the Court with a sampling of executed client agreements and financial statements provided that such documents would be reviewed in camera. This sampling would have demonstrated that MCAG represents clients with Panel Bank transactions. The point here was to respond to the many statements of OTC Plaintiffs that MCAG represented no clients with substantial Panel Bank transactions and improperly asserted its objection. In his deposition, Mr. Schmidt of MCAG testified that MCAG has substantial clients but, with lack of confidentiality assurance in the deposition, could not name them. At the fairness hearing, the Court determined not to review in camera the offered client documents on the date of the hearing. Recently, MCAG agreed to produce yet another sample of its executed client agreements for OTC Plaintiffs' Counsel review provided that OTC

Plaintiffs' Counsel would also keep the client agreements confidential. A disagreement subsequently arose regarding OTC Plaintiffs' Counsel desire to distribute the information. This subset of information has been prepared to correspond to amounts discussed in our letter to the Court dated February 2, 2018, and not to address all MCAG clients.

MCAG's agreements with clients contain strict obligations regarding the confidentiality of clients' relationships with MCAG. For example, all MCAG client agreements contain a negotiated fee for service; which may be a unique fee per client. Disclosure of MCAG's business trade secret for setting appropriate and confidential fees would be damaging to MCAG's business. MCAG's client agreements may contain language and obligations unique to the client. Many of these clients compete with each other in their normal course of business (such as MCAG's healthcare clients). Thus, MCAG is simply not in the business of sharing such confidential client agreements, even client names, without assurance of confidentiality. On the other hand, MCAG clients are comfortable sharing confidential information, on a confidential basis, with MCAG so that it can be used to prepare claims filings. In addition, many MCAG clients are sensitive to upsetting their relationship publicly with their banking and financial institutions. The information here is squarely in that category of confidential information concerning banking and financial institution relationships.

Additionally, it should be noted that MCAG fulfilled its contractual obligation to its clients and partners by filing claims into the settlement. MCAG analyzed and researched claims to file only for clients that it believed may be eligible class members. MCAG realizes that some entities may not be able to tell whether or not their transactions are eligible, or may not be able to access the necessary documentation in a timely fashion. MCAG sought and received guidance from Rust Consulting, the Settlement Administrator, as to the best process for filing initial claims in this case. The process here and advice is consistent with other settlements. In short, the Settlement Administrator and MCAG are working together, observing standard practices that have been undertaken in settlements overseen by all of the settlement administrators with whom MCAG has interacted.

Relatedly, MCAG is obligated by its client agreements to submit a timely claim regardless of whether or not the class member client is able to provide the all the information to submit a full and complete claim at the time of the initial submission. The standard settlement process then calls for the settlement administrator to issue "deficiency notices" for any incomplete claim with a specified time period to cure such deficiencies (usually 20 to 30 days). Any claim that remains incomplete after such process would be denied or withdrawn. There may also be additional communications between the claims filer and Settlement Administrator prior to any claims denial. Moreover, claimants are always evaluating if they can locate without unreasonable effort or expense all of the documentation, and further evaluate if they want to continue. This process results in withdrawals of claims, but not based on the lack of authority to file them.

Next, Mr. Carmody cites "duplicate claims" filed by MCAG for some of MCAG's clients who also filed a separate, distinct claim. Duplicate claims are a fact of life in class actions where companies are class members. Duplicate claims are common and we doubt there are any settlements free from duplicate claims filings. In MCAG's experience, between 5% and 10% of

all claims filed in class action settlements are duplicate claims regardless of whether there was a third party filing entity, like MCAG, involved. MCAG believes that the Settlement Administrator would confirm that duplicate filers for company entities as class members are common and would be able to give its own estimate.

Normally, *both parties* (sometimes more than two) who filed a claim on behalf of the same company have the appropriate authority to do so. Many MCAG clients are very large businesses with many locations and departments who are not in close contact with each other on a daily basis. Importantly, filing class action claims is not a centralized function at most large clients in MCAG's experience. It is not unusual, depending on the claim filing requirements and how notices were sent to a class member company (sometimes to multiple addresses or multiple facilities), for a company to send more than one filing to a Settlement Administrator completely generated from internal sources (no third party filer). For example, multiple duplicate filings may occur because one department did not check with another department before filing. Indeed duplicate mailings to putative class members can go to multiple addresses and sometimes these are prefilled by the Settlement Administrator from defendant data (which may bear multiple class member addresses) in its efforts to broadly solicit submissions. Additionally, newspaper notices/solicitations may generate activity by a company at multiple locations resulting in the filing of duplicate claims. As a result, the submitted claims are not always complete. Some claims forms get signed and mailed on the spot by companies and some get sent to central sources to be more fully validated; others are forwarded to MCAG. If the entity is a returning or ongoing client, MCAG will reach out to the client to alert them of the settlement participation opportunity. In summary, it is not at all unusual nor indicative of any lack of authority that multiple claims for the same class member (directly or from third party filers) are filed. Divisions or plant locations of a company are not often acquainted with what other offices are doing and may not be aware their company's relationship with MCAG. Settlement Administrators are well acquainted with this process and these divergent circumstances.. There is nothing new or suspicious about duplicate filings getting sorted out during the settlement administration process. The assertions by OTC Plaintiffs are just inconsistent with the actual facts of essentially all class action settlements, not just this one.

Other reasons MCAG can file while the clients can also file stems from circumstances like the following. A client's finance department will approve MCAG's agreement and MCAG's claim filing while not knowing, for example, that general counsel's office, purchasing department or purchasing agents at various locations, filed claims.

MCAG has also run across numerous situations where two different departments in the same company hired *two different third party filing firms* to file claims into the same settlement. Most companies do not have controls in place to prevent duplicate efforts. This is not a core activity by class members who are not in the claims filing businesses. Class action claim filing is not yet typically a well-controlled activity on the company level, hence, the appeal of outsourcing to a service provider like MCAG. Most large entities generally do not have a process for organizing or filing such claims. It is, in essence, an ad-hoc activity.

In fact, MCAG's organization of claims is typically the most control brought into the claims filing process for a client. Sorting duplicate claims is part of the class action settlement process and every Settlement Administrator, including Rust Consulting, will verify that fact. In most cases, both parties filing the claim had the proper authority to file and the filing authority is not the key question. Instead, the settlement administrator simply notifies both parties and relies on both parties to resolve the matter to their mutual satisfaction. We are unaware of any situation where this has not been promptly and fully resolved.

Importantly, MCAG always defers to the instructions of its clients on the treatment of duplicate claims regarding the client. In MCAG's standard of practice, the client and MCAG will discuss the duplicate filings/claims identified by the Settlement Administrator, determine which claim (if either) is advantageous to the client and, in every case, MCAG withdraws its claim if the client is satisfied with its own filing. Alternatively if the MCAG claim is more advantageous the client may instruct MCAG to continue and the client will withdraw its claim.

Mr. Carmody then attempts to disparage MCAG by claiming that MCAG was somehow unresponsive to counsel's prior requests for documents regarding MCAG's authority to file claims on behalf of clients. MCAG's counsel has been in consistent contact with Mr. Carmody's firm. MCAG has done a great deal of work and incurred considerable expense in order to be responsive to OTC Plaintiffs' Counsel's requests. However, OTC Plaintiffs' Counsel declined to even consider executing a confidentiality agreement that would restrict the use and the distribution of said materials thus protecting the confidentiality of our clients' information.

As stated above and consistent with our representations at the fairness hearing, MCAG fully intends to honor our contractual commitments to our clients with respect to the confidentiality of their information we use in filing their claims. Thus, the documents supporting MCAG's authority to file claims into the OTC settlement for example, clients generally referenced in our February 2, 2018 letter, are assembled and available once the confidentiality agreement or protective order tailored to these circumstances can be arranged. MCAG's counsel has also communicated that it is drafting a Motion for Protective Order (in light of the Susman law firm's rejection of a confidentiality agreement) to address the unique issues as the standard protective order for the case does not address. We do, however, recognize and appreciate that OTC Plaintiffs' Counsel moved for seal treatment of the Exhibits.

Moreover, given the extensive dialogue and interaction with Rust Consulting, MCAG feels confident that Rust Consulting will ultimately request the same authoritative client agreements or evidence of client authority that they request as they process our claims on behalf of our clients. MCAG has an extensive and good relationship with Rust Consulting, having filed claims into numerous settlements they have administered. Rust Consulting and other settlement administrators generally require evidence of authority from MCAG (and other third party filers) at various stages as they process our claims. Likewise, Rust Consulting will request evidence of authority as they process our claims in this case and we will certainly provide the same to them at that time. As part of this process, Rust Consulting also sends deficiency notices for any claims that are deemed to be incomplete. MCAG then provides any and all information to the Settlement Administrator on behalf of, and with the assistance of, the client. A failure to provide

such information results in a denial of the claim(s), or a portion of the claim, by the Settlement Administrator. MCAG respectfully suggests that this process, as designed by the Settlement Administrator to be fair, competent, time-tested and reliable, should continue.

Mr. Carmody also grossly mischaracterizes and minimizes the significance of the partial interim report that MCAG produced in response to their request for claims filed by MCAG (Exhibit B to their letter). That interim report summarized the significant claims filed on behalf of a limited selection of 13 MCAG clients. The importance of the report is that MCAG clients, recognizing our authority to file on their behalf, had already provided us with very extensive necessary historical financial information required for claims under the Barclay's settlement. While Mr. Carmody may think those claims ($6+ billion) are insignificant from our 13 example clients, we disagree. MCAG's total filings are anticipated to increase as well. However, MCAG has not calculated the total at this point. The impetus for our February 2, 2018 letter to the Court was to refute the Susman law firm's challenge that MCAG did not have any clients with even one dollar of transactions with Panel Banks. We have always maintained that MCAG has numerous clients with Panel Bank transactions and we brought that evidence on the date of the fairness hearing. However, the February 2, 2018 letter gave a clear statement of just a few of MCAG's clients and gave a non-insubstantial number of $6 billion+ of Panel Bank transactions. It now seems to be that this tact to try to respond in part to the objection (e.g. the Susman suggestion that MCAG represents no clients with Panel Bank transactions), is no longer holding water. So the latest Susman letter, not mentioning that this issue has been resolved, then moves to a new ground of attack on an objector (MCAG).

With regards to Mr. Carmody's reference to the Visa Mastercard Settlement, MCAG's partners argued that their merchant agreements and standard practices regularly allowed for add-on items relative to their merchant services, such as our settlement recovery service specifically for the Payment Card Interchange Fee Settlement, to be offered on an opt-out/auto-enrollment basis. The Processors had the appropriate authority and MCAG and its partners believed that such a process would substantially increase class participation. That situation was one where another intermediary had thousands of agreements and requested MCAG make thousands of filings on behalf of its contract counterparties. However, after much deliberation, MCAG and its partners chose to pursue only a positive enrollment program as was preferred by the Court. The instant case is totally different from the Visa Mastercard Settlement. There is no one intermediary to the class members here; these are direct one-on-one relationships between MCAG clients and MCAG.

It is very unique that the Susman firm has taken aim to such a narrow target to suggest these issues with routine duplicate filings *against only MCAG*. In discussion, we asked counsel to OTC Plaintiffs if they were investigating any other duplicate filings, at which time *they refused to disclose*. It should be noted by the Court that the filing and the request for massive and expansive sanctions is made against the one of only two objectors to the Barclays settlement. Attacks on objectors should be put under heightened scrutiny as it threatens a meaningful quality of the fairness hearing process generally. We can certainly say that the approach of the Susman firm has had the effect of impressing on MCAG that OTC Plaintiffs will act with incredible

punitive filings if an objection is made. The full scope of activity of the OTC plaintiffs attacking MCAG supports this pattern.

It can also be noted that the attacks by OTC Plaintiffs have had their intended effect. MCAG did not object to the Citibank settlement as it was clear that these attacks would likely escalate if they did. That settlement also had other issues than the Barclays Settlement, namely the amount of the settlement in light of the amount of the transactions of Defendant Citibank. Thus, the Court, whether it would in any way agree or not, does not have an objection from MCAG to consider issues in the way MCAG might have raised them. The lack of follow-up objection from MCAG is an outcome of OTC Plaintiffs attack pattern of which the Susman Letter is the highest example. On the other hand, MCAG is pleased that there are settlements. Settlements generate money for MCAG clients that these clients are entitled to, and might not otherwise access. MCAG is an important part of trying to bring notice service to class members nationwide who might not typically pursue obtaining settlement proceeds. Thus, even setting aside any issues that may have been raised, MCAG is happy about the settlement process overall going forward. Accordingly, by obtaining these settlements MCAG believes the OTC Plaintiffs are trying to service the class members. However, OTC Plaintiffs arrows here are off the target in seeking to damage MCAG. MCAG is an agent of the class members, thus, any attempt to damage MCAG's ability to file claims is really an attempt to damage the class members themselves.

Indeed, the nature and form of OTC Plaintiffs' Counsel request warrants this Court's suspicion. While federal courts possess the requisite authority to administer and allocate settlement funds, that discretion is not unbounded. *In re Holocaust Victim Assets Litigation*, 424 F.3d 158, 165-66 (2d Cir. 2005). There must be some "evidentiary foundation" in support of settlement agreements. *Saylor v. Bastedo*, 623 F.2d 230, 239 n. 11 (2d Cir. 1980); *see also Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982), citing *In re General Motors Corporation Engine Interchange Litigation*, 594 F.2d 1106, 1125 (7th Cir. 1982) (the district court must make "findings of fact and conclusions whenever the propriety of a settlement is in dispute."). Moreover, that evidentiary foundation *"should not be based simply on the arguments and recommendations of counsel."* (Emphasis added.) *Id.*, citing *In re General Motors Corporation Engine Interchange Litigation,* supra.

As is plainly clear from the face of the document here, the Susman Letter is not a Complaint, nor any other type of pleading or motion within the purview of the Federal Rules of Civil Procedure. Moreover, it is not proof nor evidence of any kind. Instead, the Susman Letter is an out-of-order request by OTC Plaintiffs' Counsel to impart serious and irreparable harm upon a third-party claims filer who uniquely is one of two objectors (and its clients, here and in other cases by attempting to damage the relationship of MCAG and its clients), without any factual or legal support in the form of evidence or a record. Such baseless requests cannot, and have not, survive[d] judicial review. *See id.,* quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anserson*, 390 U.S. 313, 434 (1968) (recognizing that district court's determination regarding settlement funds will not survive appellate review when not based upon "well-reasoned conclusion arrived at after a comprehensive consideration of all relevant factors.").

Should OTC Plaintiffs' Counsel wish to ignore MCAG's good-faith attempt to resolve the instant dispute, and continue to pursue unbounded relief instead, it must do so through a proper filing. In such a case, the role of OTC Plaintiffs seeking to damage class members and class members filing agent must also be taken into consideration and appropriately set for examination, including granting MCAG the right to take discovery as needed to address the circumstances. It should not be forgotten that OTC Plaintiffs' Counsel is highly motivated to achieve settlements as this is the main route to being paid for their long work in these cases. But sometimes class action counsel strategies can go awry. *Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069 (8th Cir. 2017). It is not unfair to state that OTC Plaintiffs' Counsel have their own commercial motivation apart from the class in seeking to silence objectors. Fundamentally MCAG is in favor of that motivation when it operates to create cases and class settlements to benefit the class, as the class includes many of its clients. But applied here it raises doubt about motivations at work.

Finally, after being deposed, providing or tendering confidential documents, engaging in motion practice, being provided deadlines to produce a burdensome amount of information and being targeted for "investigation" into MCAG's authority has resulted in MCAG not pursuing any objection in the later Citibank settlement. Let that be clear. As these cases continue to settle and now provide returns for MCAG clients, MCAG cannot risk the waste of resources as it has become a target of OTC Plaintiffs' Counsel. While MCAG remain vigilant and fully authorized to act on behalf of its clients, MCAG sees no benefit to further object as obtaining funds for its clients is their goal.

Sincerely,

*[signature: Victoria Ferrise]*

Victoria L. Ferrise, Esq.
Joseph D. Carney, Esq.
*Counsel for Managed Care Advisory Group, LLC*