## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: | **MDL No. 2262**<br>**Master File No. 1:11-md-02262-NRB**<br><br>**ECF CASE** |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMCORE BANK, N.A., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A, *et al.*,<br>Defendants. | **Case No. 1:14-cv-01757-NRB** |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DORAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A, *et al.*,<br>Defendants. | **Case No. 1:18-cv-01540-NRB** |
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br>Defendants. | **Case No. 1:13-cv-03952-NRB** |

| | |
|---|---|
| PRINCIPAL FINANCIAL GROUP, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br> Defendants. | **Case No. 1:13-cv-6013-NRB** |
| PRINCIPAL FUNDS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br> Defendants. | **Case No. 1:13-cv-6014-NRB** |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, AS LIQUIDATING AGENT OF U.S. CENTRAL FEDERAL CREDIT UNION, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | **Case No. 13-cv-7394-NRB** |

**PLAINTIFFS FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR 38 CLOSED BANKS, FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR DORAL BANK,
THE FEDERAL HOME LOAN MORTGAGE CORPORATION,
PRINCIPAL FINANCIAL GROUP, INC., *ET AL.,* PRINCIPAL FUNDS, INC., *ET AL.,*
AND THE NATIONAL CREDIT UNION ADMINISTRATION BOARD AS
LIQUIDATING AGENT OF U.S. CENTRAL FEDERAL CREDIT UNION, *ET AL.,*
JOINT REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR
LEAVE TO AMEND COMPLAINTS ON JURISDICTION AND VENUE GROUNDS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

I.      INTRODUCTION ................................................................................1

II.     LEGAL PRINCIPLES ........................................................................3

III.    THE EXERCISE OF PERSONAL JURISDICTION OVER DEFENDANTS
        IS PROPER FOR PLAINTIFFS' COUNTERPARTY CLAIMS .......................................4

        A.      Specific Personal Jurisdiction Exists Over Direct Seller Defendants......................4

                1.      Personal Jurisdiction For Purchases Of Bonds And Securities
                        Is Not Limited To Where The Bond Or Security Was Issued ...................8

                2.      Moving Plaintiffs Need Not (But Did) Allege A Course Of
                        Dealing.................................................................................10

                3.      Principal Plaintiffs' Forum Selection Clauses Further Confer
                        Personal Jurisdiction ...............................................................11

        B.      Certain Plaintiffs Have Made A *Prima Facie* Case Of Personal
                Jurisdiction Over Indirect Seller Defendants...........................................11

IV.     MOVING PLAINTIFFS HAVE MADE A *PRIMA FACIE* CASE OF
        PERSONAL JURISDICTION OVER ALL PANEL BANK DEFENDANTS
        AND DEFENDANT THE BRITISH BANKERS' ASSOCIATION
        (THE "BBA") ...................................................................................16

        A.      Defendants Ignore *Schwab*'s Clear Statement Of The Conspiracy
                Theory Test ............................................................................16

        B.      Each Moving Plaintiff Has Plausibly Alleged A Conspiracy...............................17

                1.      Common Conspiracy Allegations................................................17

                2.      FFP Plaintiffs Allege A Broader Conspiracy ...................................18

        C.      The BBA Was A Member Of The Conspiracy.......................................20

        D.      Defendants' Overt Acts In The Relevant Forums Support A
                *Prima Facie* Case Of Personal Jurisdiction.........................................22

                1.      Defendants Voluntarily Transmitted Their Individual LIBOR
                        Submissions To Plaintiffs And Investors In The Relevant
                        Forums ................................................................................22

2.      Moving Plaintiffs Plausibly Alleged That Certain Panel Bank
        Defendants Committed Overt Acts By Promoting, And Profiting
        From, Their Financial Soundness ...............................................................23

3.      Defendants Committed Affirmative Acts Of Concealment In
        The United States ......................................................................................25

4.      Plaintiffs Allege That Defendants' False LIBOR Submissions
        Were Directed And Submitted From New York And The
        United States ............................................................................................27

        Barclays.....................................................................................................28

        Citibank.....................................................................................................29

        JPMorgan ..................................................................................................30

E.      Defendants Expressly Aimed Their Conduct At The United States And
        The Other Relevant State Forums.........................................................................30

V.      VENUE DEFENDANTS "TRANSACT BUSINESS" IN THE RELEVANT
        FORUMS, THUS SATISFYING THE CLAYTON ACT VENUE PROVISION............31

VI.     DEFENDANTS CANNOT CARRY THEIR HEAVY BURDEN OF
        DEMONSTRATING THAT EXERCISING PERSONAL JURISDICTION
        WOULD OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND
        SUBSTANTIAL JUSTICE..................................................................................33

VII.    CONCLUSION....................................................................................................34

## **TABLE OF AUTHORITIES**

**Cases**                                                                                       **Page(s)**

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund,*
    596 F. Supp. 2d 630 (E.D.N.Y. 2009) .................................................................32

*In re Aluminum Warehousing Antitrust Litig.,*
    90 F. Supp. 3d 219 (S.D.N.Y. 2015).................................................................13

*Banana Distribs., Inc. v. United Fruit Co.,*
    269 F.2d 790 (2d Cir. 1959).............................................................................31

*Beach v. Citigroup Alternative Investments LLC,*
    2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) ..................................................5, 6

*Black v. Acme Mkts., Inc.,*
    564 F.2d 681 (5th Cir. 1977) ...........................................................................32

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)....................................................................................23, 33

*In re Cal Dive Int'l, Inc.,*
    2018 WL 456156 (Bankr. D. Del., Jan. 16, 2018) ............................................4

*Canon U.S.A., Inc. v. F & E Trading LLC,*
    2017 WL 4357339 (E.D.N.Y. Sept. 29, 2017) ...............................................15

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018)....................................................................... *passim*

*Chew v. Dietrich,*
    143 F.3d 24 (2d Cir. 1998)..............................................................................12

*In re Chicken Antitrust Litig.,*
    407 F. Supp. 1285 (N.D. Ga. 1975) ................................................................32

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
    2017 WL 1476595 (E.D. La. Apr. 21, 2017),
    *reconsideration denied*, 2017 WL 5971622 (E.D. La. Nov. 30, 2017) ...................12

*Chloé v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158 (2d Cir. 2010)...............................................................7, 10, 14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)........................................................................................19

*CutCo Indus., Inc. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986)............................................................................14

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) .................................................................................................10, 11, 13

*Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*,
  7 N.Y.3d 65 (N.Y. 2006) ...........................................................................................23

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013)........................................................................................33

*Dunham's, Inc. v. Nat'l Buying Syndicate*,
  614 F. Supp. 616 (E.D. Mich. 1985)..........................................................................31

*Eades v. Kennedy, PC Law Offices*,
  799 F.3d 161 (2d Cir. 2015)........................................................................................7

*Elliott v. City of Hartford*,
  649 F. App'x 31 (2d Cir. 2016) .................................................................................11

*Elsevier, Inc. v. Grossman*,
  2015 WL 72604 (S.D.N.Y. Jan. 5, 2015) ..................................................................13

*Expoconsul Int'l, Inc. v. A/E Sys., Inc.*,
  711 F. Supp. 730 (S.D.N.Y. 1989)............................................................................32

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)...........................................................19

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017).............................................................25

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)...................................................................................7, 20

*Hoffman Motors Corp. v. Alfa Romeo S.p.A.*,
  244 F. Supp. 70 (S.D.N.Y. 1965)..............................................................................31

*Howard v. Mun. Credit Union*,
  2008 WL 782760 (S.D.N.Y. Mar. 25, 2008) ..............................................................15

*Iannelli v. United States*,
  420 U.S. 770 (1975)..................................................................................................23

*Ingenito v. Riri USA, Inc.*,
  89 F. Supp. 3d 462 (E.D.N.Y. 2015) .....................................................................13, 14

*Int'l Shoe Co. v. State of Washington*,
  326 U.S. 310 (1945)..................................................................................................31

*Jazini v. Nissan Motor Co., Ltd.*,
148 F.3d 181 (2d Cir. 1998)................................................................13

*Larsen v. Scholl*,
296 N.W.2d 785 (Iowa 1980) ............................................................12

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
2018 WL 2971135 (N.D. Tex. Mar. 16, 2018) .................................4

*Leasco Data Processing Equipment Corp. v. Maxwell*,
468 F.2d 1326 (2d Cir. 1972)......................................................16, 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"),
2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ............................. *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) ...................................6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"),
2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ............................. *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2017 WL 532465 (S.D.N.Y. Feb. 2, 2017)..........................................8

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012)..................................................................3

*In re Lithium Ion Batteries Antitrust Litig.*,
2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .....................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2015)..........................................................................29

*Mariash v. Morrill*,
496 F.2d 1138 (2d Cir. 1974)..............................................................4

*Metro. Life Ins. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996)..........................................................3, 33

*Nan Ya Plastics Corp. U.S.A. v. DeSantis*,
377 S.E.2d 388 (Va. 1989)................................................................12

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
894 F. Supp. 703 (S.D.N.Y. 1995).....................................................17

*Ocasio v. United States*,
136 S. Ct. 1423 (2016)......................................................................17

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d 968 (N.D. Ohio 2015)..................................................................19

*Retail Software Servs., Inc. v. Lashlee*,
    854 F.2d 18 (2d Cir. 1988)...................................................................................13

*Ross v. Thousand Adventures*,
    675 N.W.2d 812 (Iowa 2004) ...............................................................................12

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................................33

*Stateline Power Corp. v. Kremer*,
    148 F. App'x 770 (11th Cir. 2005) .........................................................................6

*Stutts v. De Dietrich Grp.*,
    465 F. Supp. 2d 156 (E.D.N.Y. 2006) ..................................................................13

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) .........................................................................19

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999)............................................................................20, 21

*United States v. Eisen*,
    974 F.2d 246 (2d Cir. 1992).................................................................................25

*United States v. Lopac*,
    411 F. Supp. 2d 350 (S.D.N.Y. 2006) ..................................................................21

*United States v. Maldonado–Rivera*,
    922 F.2d 934 (2d Cir.1990)..................................................................................19

*United States v. Mermelstein*,
    487 F. Supp. 2d 242 (E.D.N.Y. 2007) ..................................................................21

*United States v. Milstein*,
    401 F.3d 53 (2d Cir. 2005)...................................................................................21

*United States v. Scophony Corp.*,
    333 U.S. 795 (1948).............................................................................................31

*United States v. Topco Assocs.*,
    405 U.S. 596 (1972).............................................................................................34

*United States v. Torres*,
    901 F.2d 205 (2d Cir. 1990).................................................................................21

*United States v. Tzolov,*
    642 F.3d 314 (2d Cir. 2011) ............................................................21

*United States v. Ulbricht,*
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ...............................................21

*United States v. Weisberg,*
    2018 WL 1311938 (2d. Cir. Mar. 14, 2018) ....................................25

*Vantone Grp. LLC v. Yangpu NGT Indus. Co.,*
    2015 WL 4040882 (S.D.N.Y. July 2, 2015) .....................................15

*In re Vitamin C Antitrust Litig.,*
    2012 WL 2930109 (E.D.N.Y. July 18, 2012) ...................................31

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002) .........................................................19

*Walden v. Fiore,*
    571 U.S. 277 (2014) .........................................................................17

*Weiss v. Nat'l Westminster Bank PLC,*
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) .............................................33

*Wilder v. News Corp.,*
    2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ...............................12, 13

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) .........................................................................34

*Yousef v. Al Jazeera Media Network,*
    2018 WL 1665239 (S.D.N.Y. Mar. 22, 2018) .................................13

**Statutes**

15 U.S.C.A. § 22 ....................................................................................31

Va. Code Ann. § 8.01-328.1 ...................................................................12

## I.   INTRODUCTION[1]

In upholding the validity of agency and conspiracy theories of specific jurisdiction, the Second Circuit in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), provided clear guidance for this Court and the parties on remand.  Following the Second Circuit's direction, Moving Plaintiffs[2] propose amendments that allege with specificity facts that establish a *prima facie* showing of personal jurisdiction over the Direct and Indirect Seller Defendants for "counterparty claims" – claims for unjust enrichment, breach of implied covenant, and fraud-by-omission.  These additional allegations demonstrate that subsidiaries and affiliates of the Panel Bank Defendants acted in the relevant forums for the "benefit" of, with the "knowledge" of, and under "some control" by the Panel Bank Defendants.  *Id.* at 85.

Relying on the straightforward test for "conspiracy theory" personal jurisdiction, Moving Plaintiffs also allege numerous acts committed by Defendants in furtherance of the reputational objectives of the persistent suppression conspiracy.  These allegations include the transmission of individual LIBOR submissions directly to Moving Plaintiffs, Defendants' use of their reputations to solicit and consummate in-forum transactions in LIBOR-based instruments, affirmative acts of concealment during the conspiracy, and participation in persistent suppression by the Panel Bank Defendants' U.S. executives in the United States.

---

[1] This Reply addresses only the personal jurisdiction arguments raised by Defendants in their Joint Mem. Law Supp. of Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction and Venue and in Opp. to Pls.' Mots. for Leave to Amend Personal Jurisdiction and Venue Grounds, ECF No. 2627 ("Defs.' PJ Opp.").  This Reply does not include arguments specific to the *Schwab* Plaintiffs, who are addressing jurisdictional and merits issues in their separate opposition to Defendants' motions to dismiss.

[2] Unless otherwise specified, "Moving Plaintiffs" is defined in this brief as the Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks and Doral Bank ("Doral") (collectively, "FDIC-R"), The Federal Home Loan Mortgage Corporation ("Freddie Mac"), the National Credit Union Administration ("NCUA"), and Principal Financial Group, Inc. and Principal Funds, Inc. ("Principal Plaintiffs").  Though the FDIC as Receiver for Doral is in a different procedural posture than the other Moving Plaintiffs, the FDIC as Receiver for Doral is included in the definition of "Moving Plaintiffs" for ease of reference for the purpose of this memorandum.

Defendants' Opposition asserts that Moving Plaintiffs are re-arguing old issues. *E.g.*, Defs.' PJ Opp. at 3-4. Not only is this wrong, but the converse is actually true. In an effort to divert attention from the matters at hand, Defendants push outdated arguments against theories on which Moving Plaintiffs expressly do ***not*** rely (*e.g.*, arguments relating to the "profit motive") in the context of their motions for leave to amend. Defendants also improperly use their Opposition to attack pre-existing allegations (not proposed amendments) that could have been challenged in 2014. *See, e.g.*, *id.* at 28 (challenging personal jurisdiction over Freddie Mac's claims for losses on the purchase of single-family mortgages from Defendants), 29 n.57 (challenging personal jurisdiction over Moving Plaintiffs' swaps claims), 31 (same), and 32 (challenging personal jurisdiction based on forum-selection clauses for certain Closed Banks).

Where the Defendants do attempt to address the proposed amendments, Defendants' arguments fail because they refuse to accept the binding authority of the Second Circuit, which held that agency may be shown based on allegations of, *inter alia*, "some control" by Defendants over their U.S. agents. *Schwab*, 883 F.3d at 85. Ignoring the clear language of the Second Circuit's decision, Defendants insist (without authority) that "some" should really mean "pervasive." Defs.' PJ Opp. at 38. Similarly, the Second Circuit held that a *prima facie* case of jurisdiction is shown over all conspirators when "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum] to subject that co-conspirator to jurisdiction in that [forum]." *Schwab*, 883 F.3d at 87. Disregarding this unequivocal language, Defendants demand an additional showing that each of the co-conspirators "directed and controlled the agent's in-forum tortious conduct." Defs.' PJ Opp. at 40. This is the same erroneous argument that Defendants advanced – and lost – in the Second Circuit. *See* Section IV.A *infra*.

Application of the proper law to the well-pleaded allegations of the proposed complaints demonstrates that Moving Plaintiffs have established a *prima facie* showing of personal jurisdiction.  Moving Plaintiffs' motions should be granted in their entirety.

## II.   LEGAL PRINCIPLES

After five years of substantive rulings and two appeals, it may seem unnecessary to revisit the core legal principles for personal jurisdiction under which the motions for leave to amend will be decided.  Defendants, however, attempt to blur these principles, resulting in analyses that both factually and legally miss the mark.

At the pleading stage, a plaintiff must make only a *prima facie* showing of jurisdiction, which means that the plaintiff has alleged facts that, if credited, would suffice to establish jurisdiction over a defendant.  *Schwab*, 883 F.3d at 81.  The court is to construe allegations in the light most favorable to the plaintiff, resolving all doubts in the plaintiff's favor.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *8 (S.D.N.Y. Dec. 20, 2016).  A plaintiff makes a *prima facie* showing of jurisdiction by alleging a statutory basis for personal jurisdiction that renders service of process effective and that the "exercise of personal jurisdiction . . . comport[s] with constitutional due process principles."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).  Due process requires that (1) the defendant have sufficient "minimum contacts" with the relevant forum and (2) the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."  *Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568, 577 (2d Cir. 1996).  The minimum contacts analysis differs under specific and general jurisdiction; under both, however, the forums with which to assess a defendant's contacts are (1) for state law

claims brought in federal court, the state in which the federal court sits, and (2) for federal question claims brought in a federal court, the United States as a whole.[3]

In evaluating whether the exercise of specific personal jurisdiction is consistent with due process, courts analyze the quality and nature of a defendant's contacts with the forum "under a totality of the circumstances test." *Schwab*, 883 F.3d at 82. Where the claim "arises out of, or relates to" the defendant's contacts with the forum, minimum contacts exist if the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there. *Id.* This Court has held that relatedness means there is a "but for" connection between the forum-related contacts and the claim. *E.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11 MDL 2262 NRB, 2015 WL 6243526, at *8 (S.D.N.Y. Oct. 20, 2015).

## III. THE EXERCISE OF PERSONAL JURISDICTION OVER DEFENDANTS IS PROPER FOR PLAINTIFFS' COUNTERPARTY CLAIMS

### A.  <u>Specific Personal Jurisdiction Exists Over Direct Seller Defendants</u>

Many of the Moving Plaintiffs' counterparty claims against Direct Seller Defendants have already survived motions to dismiss for lack of personal jurisdiction. Neither *Schwab* nor the proposed amendments change this. For example, in *LIBOR IV*, the Court held that for counterparty claims, specific personal jurisdiction is properly exercised over swap counterparties and bond

---

[3] This Court's ruling in *LIBOR VI* that Defendants domiciled in the United States are not subject to general jurisdiction in federal courts for federal antitrust claims is being appealed by certain Plaintiffs in this MDL. For the "FFP Plaintiffs" (the FDIC-R, Freddie Mac, and Principal Plaintiffs), the decision is interlocutory, and as such, FFP Plaintiffs preserve for appeal their argument that the exercise of general jurisdiction is proper over Defendants domiciled in the United States for FFP Plaintiffs' federal antitrust claims. *See Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-03200-N, 2018 WL 2971135, at *2 (N.D. Tex. Mar. 16, 2018) (because plaintiff was a U.S. resident, court's assertion of personal jurisdiction in a federal antitrust case did not raise "due process concerns"); *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS), 2018 WL 456156, at *1-3 (Bankr. D. Del. Jan. 16, 2018) (residence in the United States sufficient to show "minimum contacts"); *see also Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) (domestic defendant served pursuant to a nationwide service of process provision had no basis on which to question a federal court's power to assert control over that defendant).

obligors where, *inter alia*, a forum-selection clause provided jurisdiction, a trader requested an artificial LIBOR submission, or specifically for swaps, where the plaintiff was located when it entered into the swap agreement.  2015 WL 6243526, at *34-35, 37.

Accordingly, Defendants conceded that the FDIC-R's and the Principal Plaintiffs' swap-based counterparty claims against direct seller Panel Bank Defendants survived Defendants' 2014 motions to dismiss.  Letter from Joel Kurtzberg & Richard J. Leveridge to Hon. Naomi Reice Buchwald at 52-67, 79-91 (Jan. 21, 2016), ECF No. 1303 ("Kurtzberg Letter").[4]  These are live claims, and nothing in the *Schwab* opinion changes or undermines that fact.  To the extent that the Principal Plaintiffs amended their swap-based counterparty claims, it was to add details regarding specific ISDA Master Agreements and swap transactions, as the Court required them to plead claims in tort (not contract).  Moreover, the FDIC-R's Proposed Second Amended Complaint, ECF No. 2565-01,[5] does not amend its swap-based counterparty claims against Panel Bank Defendants

---

[4] The FDIC-R also maintains live unjust enrichment and fraud-by-omission claims against direct seller non-Panel Bank Defendants, as to which these Defendants conceded there was personal jurisdiction following *LIBOR IV*. Kurtzberg Letter at 52-67.  Freddie Mac maintains live breach of implied covenant claims against direct seller Panel Bank Defendants.  With the exception of Credit Suisse AG, direct seller Panel Bank Defendants do not now challenge Freddie Mac's live breach of implied covenant claims. Defs.' PJ Opp., App'x. at 9, ECF No. 2627-3.  Credit Suisse AG offers no argument as to why Freddie Mac's breach of implied covenant claim should be dismissed on the basis of personal jurisdiction.  Freddie Mac originally pleaded that Credit Suisse AG and Credit Suisse International ("CSI") were liable as successors-in-interest for the breach of implied covenant claim.  During the meet-and-confer process with Credit Suisse AG, however, Freddie Mac concluded that Credit Suisse AG was identified as the successor-in-interest in error.  CSI is the correct counterparty to the swap contract, not Credit Suisse AG.  Freddie Mac's Proposed Third Amended Complaint corrects this error.  To the extent that there is ambiguity as to which Credit Suisse, HSBC, and The Royal Bank of Scotland entities are the subjects of Freddie Mac's breach of implied covenant claims, Freddie Mac confirms the correct counterparties are CSI, HSBC Bank USA, N.A., and The Royal Bank of Scotland plc, and if permitted to file its Proposed Third Amended Complaint, Freddie Mac would ensure its amendments clarify any confusion.

[5] Mem. Supp. Mot. Pls.' the Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks and the Federal Deposit Insurance Corporation as Receiver for Doral Bank for Leave to File Proposed Second Amended Compl., ECF No. 2565 ("FDIC-R Mem.").  The addition of Doral does not implicate the status of the FDIC-R's counterparty claims on behalf of the other 38 Closed Banks, and the Court's reasoning for upholding personal jurisdiction over swap-based counterparty claims in *LIBOR IV* applies with equal force to Doral's swap-based counterparty claims.  Defendants argue that the FDIC-R cannot rely on the forum selection clause in Doral's swap contract with CSI to confer personal jurisdiction over counterparty claims because the clause states that the parties submit to the "jurisdiction in the Courts of the State of New York."  Citing to *Beach v. Citigroup Alternative Invs. LLC*, No. 12 Civ. 7717(PKC), 2014 WL 904650, at *8 (S.D.N.Y. Mar. 7, 2014), Defendants argue that the clause excludes federal courts in New York.  But the issue before the *Beach* court was a narrow one, centering on the interpretation of a forum selection clause that read

and thus Defendants now have no basis on which to challenge jurisdiction. Accordingly, Defendants' new efforts to dismiss these claims should be summarily rejected.

Similarly, Defendants have no basis on which to disrupt the Court's prior jurisdictional holdings with respect to Moving Plaintiffs' other counterparty claims that survived motions to dismiss for lack of personal jurisdiction but were ultimately dismissed on the merits.[6] For example, Defendants contend that Freddie Mac's counterparty claims arising from Defendants' solicitation and sale of home loans fail to specify that the loans incorporated LIBOR. Defs.' PJ Opp. at 28. But this Court has already found personal jurisdiction could be properly exercised over those claims. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2016 WL 1301175, at *4 (S.D.N.Y. Mar. 31, 2016) ("[W]e agree with Freddie Mac that the sale of mortgage loans by defendants Bank of America, N.A., Barclays Bank, plc, Citibank, N.A., and JPMorgan Chase Bank, N.A. supports the exercise of personal jurisdiction."). Defendants have articulated no reason why this earlier holding no longer controls.

Moreover, Defendants' arguments in favor of dismissal of these claims are otherwise vague and unavailing. For example, Defendants cherry-pick allegations from Moving Plaintiffs' complaints and argue that Moving Plaintiffs fail to explicitly allege that the LIBOR-based instruments Moving Plaintiffs purchased from Defendants contained LIBOR terms or were held

---

"the courts of the State of New York **shall** have **exclusive** jurisdiction over any action." *Id.* at *3 (emphasis added). Here, the Doral-CSI contract states that the parties "submit[] to the jurisdiction of the Courts of the State of New York," and contains no language requiring "exclusive" jurisdiction or specifying where a suit "shall" be brought. The language in the Doral-CSI contract is nearly identical to that of the forum selection clause at issue in *Stateline Power Corp. v. Kremer*, 148 F. App'x 770 (11th Cir. 2005), which the Eleventh Circuit interpreted to include both state and federal courts. *Id.* at 771 (analyzing clause that stated, the parties "consent to the jurisdiction of the courts of the State of Florida over any action").

[6] In fact, for many of these claims, following *LIBOR IV*, Defendants conceded personal jurisdiction. Kurtzberg Letter at 52-67, 68-70, 73-78, 79-91.

during the relevant time period.  Defs.' PJ Opp. at 28.  Not only is Defendants' argument contrary to the Court's prior findings, it requires an impermissibly fragmented reading of the pleadings.[7]

With regard to Moving Plaintiffs' counterparty claims against Direct Seller Defendants for which the Court did not earlier find personal jurisdiction, the proposed amendments remedy the shortcomings perceived by this Court in *LIBOR IV* and the Second Circuit in *Schwab*.  *Schwab* held that the "solicitation of and sale of financial instruments" in a forum "easily make[s] out a *prima facie* showing of personal jurisdiction for claims relating to those transactions."  *Schwab*, 883 F.3d at 82-83.  Indeed, the Second Circuit in *Schwab* confirmed that even a single transaction can support personal jurisdiction over a defendant.  *Schwab*, 883 F.3d at 82-83 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) and *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015)).  Thus, the Second Circuit concluded, for Schwab's counterparty claims, "there is jurisdiction over the Defendants who are clearly identified as having made direct sales."  *Id.* at 83.

Moving Plaintiffs meet this same, unambiguous threshold for direct sales, alleging that Defendants directly sold LIBOR-based financial instruments, including bonds, to Moving Plaintiffs in the relevant forums.[8]  Moving Plaintiffs also allege that as a result of Defendants' persistent suppression of LIBOR, they "got less for their money" on those transactions.  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 774 (2d Cir. 2016).  Defendants attempt to challenge

---

[7] *See, e.g.*, Freddie Mac's Proposed Third Am. Compl. ¶¶ 16, 30, 45, 68, 87, 99, 116, 129, 167, ECF No. 2566-01 ("FM PTAC") (swaps and MBS); Principal Financial Proposed Second Am. Compl. ¶¶ 4, 221-239, 286, 305, 313, 318, 323, 346, 350, 355-56, ECF No. 2547-01 ("PFin PSAC"); Principal Funds Proposed Second Am. Compl. ¶¶ 4, 220-238, 285, 304, 312, 317, 322, 345, 349, 354-55, ECF No. 2554-01 ("PFunds PSAC"); Decl. Eddie Vonnahme in Supp. of Principal Pls.' Opp. to Defs.' Motions to Dismiss ¶¶ 5-6, 9-14, 17-20, 23-25, 28-34, 37-38, 40, 43, 45-46, 48-50, 53-57, 60-63, 65-66. 68, 70-74, 76-77, 81, 83, 85-86, 88-90, 93-94, 97-98, 101-04, 106-10, 113-18, 120-23, ECF No. 1503 ("Vonnahme Decl.").

[8] Notably, in *Schwab*, the Second Circuit observed that Defendants "effectively concede[d]" Schwab's direct sales in a forum could give rise to specific personal jurisdiction for claims relating to those sales.  883 F.3d at 83.

7

these allegations by incorrectly arguing that (1) Moving Plaintiffs fail to satisfy what Defendants term as the "Obligor Requirements"; (2) for bonds, sales are irrelevant to establishing jurisdiction, which can only be found where the bond was issued; and (3) direct sales can only sustain personal jurisdiction "following a course of solicitation in the forum." Defs.' PJ Opp. at 26-27. These supposed requirements are absent from, and inconsistent with, *Schwab*.

Moreover, Defendants are mistaken in citing *Schwab* to support their contention that personal jurisdiction only exists as to sales made during the alleged LIBOR suppression period. Defs.' PJ Opp. at 28. The Second Circuit in *Schwab* merely accepted as true allegations that Defendants' transactions with Schwab occurred during the conspiracy period. This Court has already denied Defendants' request to dismiss antitrust claims for losses on LIBOR-based products purchased before the start of the conspiracy. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2017 WL 532465, at *2 (S.D.N.Y. Feb. 2, 2017). Nothing in *Schwab* undermines that ruling. Even if applied, the purported Obligor Requirements would not defeat Moving Plaintiffs' well-pleaded allegations in support of personal jurisdiction.

### 1. Personal Jurisdiction For Purchases Of Bonds And Securities Is Not Limited To Where The Bond Or Security Was Issued

Defendants' argument that personal jurisdiction for claims based on purchases of LIBOR-based bonds or securities exists only where the bond or security was issued ignores the facts and plain language of *Schwab*, and misreads *LIBOR IV*. *Schwab* addressed personal jurisdiction for all "floating-rate instruments" that incorporated LIBOR. *Schwab*, 883 F.3d at 78, 83. It made no special rules for bonds or securities.

In *LIBOR IV*, this Court upheld jurisdiction where the bond was issued but "***not necessarily***" where the plaintiff suffered its injury because, once issued, a bond could be traded anywhere in the world without action by the issuer. 2015 WL 6243526, at *37 (emphasis added).

The proposed amendments allege in detail that specific Defendants affirmatively reached out to Moving Plaintiffs in the relevant forums to solicit, negotiate, and consummate transactions in LIBOR-based bonds and securities.[9]   Whereas mere issuance of a LIBOR-based bond or security would not necessarily support personal jurisdiction without some additional connection to the buyer, Moving Plaintiffs allege direct sales, *i.e.*, that the named Defendants purposely directed those bonds and securities into Moving Plaintiffs' home forums.  *Id.*  Such actions are more than sufficient to establish personal jurisdiction under *Schwab* and *LIBOR IV*.  *Schwab*, 883 F.3d at 83; *LIBOR IV*, 2015 WL 6243526, at *31.

Defendants also challenge Freddie Mac's proposed amendments providing additional detail on MBS transactions in order to remedy the merits-based deficiencies identified earlier by the Court.  Defs.' PJ Opp. at 28 n.55, 37 n.72.  As shown in the Reply to Defendants' Opposition to Plaintiffs' Motions for Leave to Amend, Freddie Mac has provided the detail this Court found lacking in its 2016 ruling denying reconsideration of its dismissal of Freddie Mac's MBS claims.[10] Freddie Mac did not propose curative amendments in 2016 because the Court dismissed Freddie Mac's fraud claims entirely on an independent basis (timeliness).  *See Schwab*, 883 F.3d at 90 (upholding Schwab's right to seek leave to amend despite not doing so earlier because "the district court's reasoning meant that no such amendments would remedy the defects that the district court perceived").

---

[9] *See, e.g.*, Mem. Supp. Mot. Pl. The Federal Home Loan Mortgage Corp. for Leave to File Proposed Third Amended Compl. at 7-11, ECF No. 2566 ("FM Mem."); Vonnahme Decl. ¶¶ 5-6, 9-14, 17-20, 23-25, 28-34, 37-38, 40, 43, 45-46, 48-50, 53-57, 60-63, 65-66. 68, 70-74, 76-77, 81, 83, 85-86, 88-90, 93-94, 97-98, 101-04, 106-10, 113-18, 120-23.

[10] Reply to Defs.' Opp. to Plfs.' Mots. For Leave to Amend Compls. at 7 ("Pls.' Amend Reply").

### 2.      Moving Plaintiffs Need Not (But Did) Allege A Course Of Dealing

Defendants incorrectly argue that Moving Plaintiffs must establish a "course of dealing" to make a *prima facie* showing of personal jurisdiction over any Defendant.  This argument suffers from at least two significant flaws.  First, as shown above, it is not the law.  Section III.A *supra*; *see also Schwab*, 883 F.3d at 83-84; *LIBOR IV*, 2015 WL 6243526, at *31 ("a continuing relationship is not necessary for conduct to be purposefully directed at the forum" (citing *Chloé*, 616 F.3d at 171)).  The "commission of some single or occasional acts" by a corporation or its agent in a state is enough to "subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).  The exercise of personal jurisdiction as to such claims is appropriate "whether pleaded in contract, unjust enrichment, or tort." *LIBOR IV*, 2015 WL 6243526, at *31.  Indeed, as the Second Circuit confirmed in *Schwab*, the commission of a single in-forum act is sufficient to confer specific jurisdiction over a direct seller.  883 F.3d at 82-83.

Second, even if that was the law, Moving Plaintiffs **have** alleged, in extensive detail, a course of dealing.  Freddie Mac's proposed amendments, for example, show that Defendants solicited Freddie Mac's business for, *inter alia*, swaps, mortgage-loans, and mortgage-backed securities on an all-day, every-day basis.  FM Mem. at 6-7.  Similarly, Principal Plaintiffs have provided evidence that Defendants regularly solicited and sold various financial instruments to Principal in the Southern District of Iowa, where Principal brought suit.[11]

---

[11] *See* Vonnahme Decl. ¶¶ 3, 6, 9-11, 17-18, 23-25, 27-29, 33-34, 37-38, 45-46, 48-49, 53-55, 60-61, 71-72, 77, 83, 85-86, 88-89, 93, 97, 101-02, 107-09, 113-14, 116-17, 120-21.

### 3.    Principal Plaintiffs' Forum Selection Clauses Further Confer Personal Jurisdiction

Principal Plaintiffs respect this Court's prior rulings precluding a re-allegation of venue, and so have provided information on their dealings with Defendants in Iowa. In the alternative, however, Principal Plaintiffs maintain their argument that jurisdiction should be determined in the Southern District of New York, where Principal Plaintiffs' forum selection clauses are effective. *See* Joint Mem. Law Opp. to Defs.' Mot. Dismiss the Direct Actions for Lack of Personal Jurisdiction at 26-28, (Dec. 8, 2017), ECF No. 886.  In their First Amended Complaint, Principal Plaintiffs re-alleged venue in the Southern District of New York.  As Defendants correctly note, the Court in *LIBOR IV* found that Principal Plaintiffs' allegations of venue were ineffective, and that the allegations in the original complaint controlled.  *LIBOR IV*, 2015 WL 6243526, at *54. But since that time, the Second Circuit has once again instructed that, when a plaintiff amends a complaint, it "supersedes the original, and renders it ***of no legal effect***."  *Elliott v. City of Hartford*, 649 F. App'x 31, 32 (2d Cir. 2016) (emphasis added).  *Elliott* directly contradicts *LIBOR IV*'s ruling that the Principal Plaintiffs' amendments re-alleging venue were ineffective because that ruling required that Principal Plaintiffs' original complaints control with regard to venue.

Pursuant to their express contracts with Principal Plaintiffs, each Defendant with whom Principal entered into an ISDA Master Agreement has "waive[d] the right to object, with respect to [these] Proceedings, that [this] court does not have any jurisdiction over such party." *See, e.g.*, PFin PSAC Ex. 23 at § 13(b)(ii); PFunds PSAC Ex. 23 at § 13(b)(ii).

### B.    Certain Plaintiffs Have Made A *Prima Facie* Case Of Personal Jurisdiction Over Indirect Seller Defendants

"It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'"  *Schwab*, 883 F.3d at 84 (quoting *Daimler*, 571 U.S. at 135 n.13).  Consistent with this unassailable principle, the proposed amendments contain

detailed allegations describing how certain Indirect Seller Defendants purposefully availed themselves of the relevant forums (Iowa and Virginia) through their subsidiaries and affiliates.  As alleged, those Defendants did so by, *inter alia*, soliciting business in LIBOR-based products from and selling LIBOR-based products to Plaintiffs in these forums through these corporate agents as part of the strategy and operation of global business units, which operated across intrabank corporate entities, and under which, Indirect Seller Defendants shared, *inter alia*, common branding (often unit-specific), management, and policy with their respective subsidiaries and affiliates.  *See, e.g.*, FM Mem. at 7-11.  Defendants object to these proposed amendments on three grounds, all of which are unconvincing.[12]

First, Defendants' argument that the law requires proof of the defendant's "pervasive control"[13] over the agent is contrary to the express language of the Second Circuit in *Schwab*. Under the Due Process Clause, the agency theory of specific jurisdiction requires only that a plaintiff allege facts that show the defendant "purposefully avail[ed]" itself of a forum by "directing its agents or distributors to take action there."  *Schwab*, 883 F.3d at 84-86.  In evaluating this standard with respect to acts of agents, the *Schwab* court held that the principles of due process

---

[12] Indirect Seller Defendants appear to challenge this aspect of Plaintiffs' personal jurisdiction argument only under constitutional principles, and as such, the law of the Second Circuit controls.  *Chew v. Dietrich*, 143 F.3d 24, 30 (2d Cir. 1998).  In any event, the relevant forum states generally accept the premise that an agent's contacts may be imputed on a principal to exercise jurisdiction over the principal and/or generally acknowledge that their respective long-arm statutes extend to the limits of due process.  In Virginia, the long-arm statute confers jurisdiction "over nonresidents who engage in some purposeful activity in Virginia, to the extent permissible under the Due Process Clause of the Constitution of the United States," *Nan Ya Plastics Corp. U.S.A. v. DeSantis*, 377 S.E.2d 388, 391 (Va. 1989); Va. Code Ann. § 8.01-328.1, and courts applying Virginia law have exercised jurisdiction over a principal based on the in-forum contacts of its agent.  *E.g.*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. CV 09-02047, 2017 WL 1476595, at *32 (E.D. La. Apr. 21, 2017), *reconsideration denied*, No. MDL 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017).  The Iowa Supreme Court likewise has recognized that the Iowa Code "expands Iowa's jurisdictional reach to the widest due process parameters of the federal constitution."  *Larsen v. Scholl*, 296 N.W.2d 785, 788 (Iowa 1980).  As such, due process permits jurisdiction to be asserted over a principle whenever the agent "act[s] in the forum state under the control of the nonresident principal."  *Ross v. First Sav. Bank of Arlington*, 675 N.W.2d 812, 819 (Iowa 2004).

[13] Defs.' PJ Opp. at 38 (citing *Wilder v. News Corp.*, No. 11 Civ. 4947(PGG), 2015 WL 5853763, at *6 (S.D.N.Y. Oct. 7, 2015)).

are consonant with the requirements that the agent acted in the forum for "the benefit of, with the knowledge and consent of, and under *some* control by" the foreign defendant. 883 F.3d at 84-85 (citing *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (emphasis added)). The "benefit, knowledge, and some control" standard has been applied by district courts in this District and others in evaluating the same question. *See, e.g.*, *Elsevier, Inc. v. Grossman*, No. 12 CIV. 5121 KPF, 2015 WL 72604, at *10 (S.D.N.Y. Jan. 5, 2015); *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015).

Defendants' cited case, *Wilder*, does not say any differently. In context, the *Wilder* court uses "pervasive" to describe the showing necessary to exercise *general* personal jurisdiction over a foreign principal based on the agent's presence in the forum alone, a necessarily more rigorous test, which, post-*Daimler*, generally requires something more akin to piercing the corporate veil. *Wilder*, 2015 WL 5853763, at *6. For this reason, Defendants' attempt to create an analogy between the allegations in this case and those in general jurisdiction cases[14] fails and should be rejected.

Specific jurisdiction is distinct from general jurisdiction in this regard. As the Supreme Court held in *Daimler*, a subsidiary might be "its parent's agent for claims arising in the place where the subsidiary operates, yet not its agent regarding claims arising elsewhere." 571 U.S. at 135. As such, the Due Process Clause does not demand that a plaintiff pierce the corporate veil to make a *prima facie* showing of specific personal jurisdiction over a defendant under an agency theory of jurisdiction. *Yousef v. Al Jazeera Media Network*, No. 16-CV-6416 (CM), 2018 WL 1665239, at *9 (S.D.N.Y. Mar. 22, 2018) (Even "[w]here the parent is not involved in the day-to-

---

[14] Defs.' PJ Opp. at 35-38 (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227, 234-35 (S.D.N.Y. 2015); *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 167-68 (E.D.N.Y. 2006)).

day operations of its subsidiary, or, where the entities observe corporate formalities, the subsidiary and parent can nonetheless have an agency relationship because they are engaged in a 'common business enterprise.'").  Nor does the Due Process Clause require the plaintiff to plead a formal agency relationship between the defendant and its "agent."  *Chloé*, 616 F.3d at 167-68; *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (courts look to "the realities of the relationship in question rather than the formalities of agency law"); *Ingenito*, 89 F. Supp. 3d at 476.

Second, Defendants incorrectly argue that the proposed amendments lack specificity. Defs.' PJ Opp. at 34-38 (claiming allegations are "conclusory," "generalized," "bare," and "generic").  Moving Plaintiffs have alleged with substantial particularity the manner in which the Indirect Seller Defendants operated in order to show benefit, knowledge, and some control.[15]  For example, the proposed amendments show on a defendant-by-defendant basis that, *inter alia*, each Indirect Seller Defendant operated the investment arm of its operations (the part of the business that, generally, engaged in LIBOR-based transactions with Plaintiffs) as a single business unit in which the subsidiary/affiliate was merely an operating arm of the business unit acting at the direction of the Indirect Seller Defendant in the United States.  *See, e.g.*, FM Mem. at 7-11.  The Indirect Seller Defendant's key executives were also executives of the subsidiary/affiliate.  *Id.*  The Indirect Seller Defendant treated the subsidiary/affiliate's profits as its own and benefited from the sale of LIBOR-based instruments in the relevant forums.  *Id.*  But for the existence of the subsidiary/affiliates, the parent would have performed equivalent services.  *Id.*  Freddie Mac further alleges that each Indirect Seller Defendant determined and set the relevant business unit's strategy targeting Freddie Mac as an important institutional client and solicited Freddie Mac's

---

[15] *See* FDIC-R Mem. at 6 & nn.19-23; FM Mem. at 7-11; PFin PSAC ¶¶ 24-77; PFunds PSAC ¶¶ 23-76.

business in Virginia (in part, by marketing the Indirect Seller Defendant's financial soundness). *E.g.*, FM PTAC ¶¶ 10-12, 23, 76, 108, 176, 195.[16]

Moving Plaintiffs can, of course, only allege as much as they can glean from public sources and the limited documents that Defendants have provided Moving Plaintiffs to date.  As this Court recognized in *LIBOR IV*, "the internal division of labor between [institutional] entities is peculiarly within the knowledge of those institutions" and therefore declined to hold Plaintiffs to "an especially high standard of particularity with respect to pleading the activities of each entity." 2015 WL 6243526, at *44.  The Court should apply the same standard here.

Third, Defendants' complaints of "group pleading," Defs.' PJ Opp. 34, likewise are unavailing, because Moving Plaintiffs have alleged the role that each Defendant and its subsidiaries/affiliates played in the unlawful conduct, thus providing Defendants with sufficient notice of the claims asserted against them.  "[N]othing in Rule 8 [of the Federal Rules of Civil Procedure] prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Vantone Grp. LLC v. Yangpu NGT Indus. Co.*, No. 13CV7639-LTS-MHD, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015); *see also, e.g., Canon U.S.A., Inc. v. F & E Trading LLC*, No. 2:15-cv-6015 (DRH) (AYS), 2017 WL 4357339, at *7-8 (E.D.N.Y. Sept. 29, 2017) (finding allegations against "Defendants" and "Corporate Defendants" sufficient because the complaint defined those terms, alleged defendants were similarly situated, and alleged common claims); *Howard v. Mun. Credit Union*, No. 05 CIV. 7488 (LAK), 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) ("While Rule 8 does not prohibit collective allegations against multiple defendants, . . . it does require that the allegations be

---

[16] Consistent with *Schwab*, Freddie Mac's proposed amendments also provide greater specificity as to the non-Defendant subsidiaries or affiliates through which Indirect Seller Defendants sold Freddie Mac single family loans, and as such, these Indirect Seller Defendants purposefully availed themselves of the Eastern District of Virginia. *E.g.*, FM PTAC ¶¶ 68, 87, 99, 167, 181, 190.

sufficient to put each [d]efendant on notice of what they allegedly did or did not do." (citation omitted)).

## IV.   MOVING PLAINTIFFS HAVE MADE A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION OVER ALL PANEL BANK DEFENDANTS AND DEFENDANT THE BRITISH BANKERS' ASSOCIATION (THE "BBA")

### A.   Defendants Ignore *Schwab*'s Clear Statement Of The Conspiracy Theory Test

The *Schwab* court delineated a straightforward test for specific personal jurisdiction under the conspiracy theory.   Plaintiffs need only allege a conspiracy, in which the defendant participated, and that "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [forum] to subject that co-conspirator to jurisdiction in that [forum]."   883 F.3d at 87.   Moving Plaintiffs have done just that.

Despite the Second Circuit's precision in outlining this test, Defendants seek to recast it to add an additional condition, that the "defendant directed and controlled the agent's in-forum tortious conduct."   Defs.' PJ Opp. at 40-41.   This is the same argument that Defendants unsuccessfully advanced in the Second Circuit.   *See* Br. Defs.-Appellees at 30-34, *Charles Schwab Corp. v. Bank of Am. Corp.*, No. 16-1189-cv, ECF No. 148 (arguing that Due Process requires a plaintiff to show "direction, control, and supervision").   Defendants nevertheless endeavor to impose their standard once again by arguing that the Second Circuit had no occasion to decide whether plaintiffs met the overt-act requirement.   Defs.' PJ Opp. at 40-41 & n.75.   Defendants' contention is disingenuous at best.   The Second Circuit in *Schwab* articulated the test specifically to provide guidance on remand.   883 F.3d at 86-87.

Defendants, in fact, appear to recognize that they lost this issue in *Schwab* by arguing that the *Schwab* panel could not "overrule" a prior Second Circuit decision, *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972).   Defs.' PJ Opp. at 40, 41 & n.75.   But

there was nothing to overrule.  *Leasco* simply does not say what Defendants claim it does.  Nor does *Walden v. Fiore*, 571 U.S. 277 (2014), or any of the other cases Defendants cite.  Liability in conspiracy cases can be predicated on a single overt act.  *See In re Nasdaq Mkt.-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim"); *cf. Ocasio v. United States*, 136 S. Ct. 1423, 1430, 1441-42 (2016) (a conspiracy is a partnership and "each and every member" of a conspiracy is an agent of the others "in carrying out the conspiracy").  The *Schwab* panel rejected Defendants' interpretation of the law.

### B.      Each Moving Plaintiff Has Plausibly Alleged A Conspiracy

#### 1.      Common Conspiracy Allegations

The conspiracies alleged in the Moving Plaintiffs' complaints share a common set of facts. All Moving Plaintiffs allege a conspiracy among Panel Bank Defendants to manipulate LIBOR for profit-motivated and reputational reasons.  For purposes of their motions for leave, Moving Plaintiffs accept as law of the case the Court's finding that the only sufficiently pled goal of that conspiracy was the "projection of financial soundness" where increased profits followed from a positive reputation.  *LIBOR VI*, 2016 WL 7378980, at *5, 7.[17]

In *Schwab*, the Second Circuit denied personal jurisdiction for claims that Defendants "committed fraud through their daily LIBOR submissions to the BBA in London" because the complaint lacked allegations that Defendants furthered the conspiracy through forum-directed sales.  883 F.3d at 83.  The Second Circuit also held that purposeful direction was not shown

---

[17] This aspect of the Court's decision is currently on an appeal, to which the NCUA is a party, before the Second Circuit.  *Schwab Short-Term Bond Market Fund v. Lloyds Banking Grp. Plc*, No. 17-1569 (2d Cir.).  FFP Plaintiffs reserve their right to petition the Court as necessary following the Second Circuit's determination regarding this issue. Moving Plaintiffs do not abandon their other theories concerning the purpose of Defendants' conspiracy.

because the Schwab Plaintiffs there argued only that Defendants "surely knew" that the financial effects of suppression would be felt in California.  *Id*. at 87.  The *Schwab* Court sanctioned amendment to add such allegations in support of the conspiracy theory of jurisdiction.  *Id.* at 90.

The proposed amendments provide these missing allegations.  As alleged, Defendants furthered their reputational objectives by conspiring with the BBA to transmit those daily submissions to investors in the United States, including Moving Plaintiffs, and Defendants affirmatively reached out to Moving Plaintiffs to solicit sales in reliance on their perceived financial soundness.  *LIBOR VI*, 2016 WL 7378980, at *5 (profits followed from the projection of financial soundness).  This conduct was expressly aimed at the United States because Defendants were concerned about protecting their reputations (and projecting financial soundness) in the U.S. market.[18]

## 2.    FFP Plaintiffs Allege A Broader Conspiracy

Defendants attack FFP Plaintiffs' "boycott" allegations as improper, arguing that this Court has already rejected FFP Plaintiffs' supposedly distinct "boycott theory" of conspiracy.  Defs.' PJ Opp. at 9 n.13, 13, 15, 21.  These allegations, however, are merely one aspect of the much larger persistent suppression conspiracy.  Although FFP Plaintiffs did not mention these allegations in their moving papers as a reason to grant leave, Defendants' assertion that these allegations are jurisdictionally irrelevant is simply wrong.

---

[18] *See also, e.g.*, FM Mem. at 5-11 (discussing the significant and longstanding relationships Freddie Mac has maintained with Defendants, which includes Freddie Mac's purchasing of LIBOR-based instruments from Defendants, and how these relationships are largely dependent upon Freddie Mac's assessment of Defendants' financial strength and viewed credit risk), 16-17 (describing how Defendants projected financial soundness to U.S. investors, including Freddie Mac, by directly or indirectly communicating Defendants' individual USD LIBOR submissions); FM PTAC ¶¶ 249-51 (USD LIBOR most important, particularly for swaps and "US mortgage products"), ¶ 275 (concerns about Barclays Capital securities unit's exposure to U.S. subprime mortgages), ¶ 287 (suppression "particularly obvious in dollars"), ¶ 304 (LIBOR suppression focused on USD LIBOR), ¶ 303 (BBA met and spoke with U.S. regulators), ¶¶ 313-15 (Defendants made decisions "taking into consideration the U.S. market" and the "need to manage the [NY Fed's] perception"), ¶ 348 (purpose of Société Générale's directive was to mislead U.S. investors), ¶ 395 ("American investors are really sensitive" to individual LIBOR submissions).

A defendant's in-forum contacts need not support a viable claim on their own in order to confer personal jurisdiction.  Rather, the in-forum contacts must only be "related to" (as held by this Court, a "but-for" cause of) a viable claim.  *LIBOR IV*, 2015 WL 6243526, at *27-28.  *LIBOR IV* suggested that the "boycott" allegations could be a but-for, but not proximate, cause of FFP Plaintiffs' injuries.  *Id.* at *87 & n.109, 88, 91 (using a hypothetical that assumes a conspiracy that is a "but-for cause of the injury" but is "not an antitrust injury").  The "boycott" allegations, like Defendants' efforts to falsely assure investors about LIBOR's reliability, were among the ways Defendants effectuated the conspiracy.[19]

Whether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury.  *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 996 (N.D. Ohio 2015).[20]  The principal considerations in determining the number of conspiracies are "the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings."  *In re Polyurethane Foam*, 152 F. Supp. 3d at 996.  "The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes."  *Id.* (citing *United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)).  Here, accepting the Court's rulings as law of the case, the common goal of the conspiracy was to use LIBOR to falsely project financial soundness.  To succeed, Defendants needed U.S.-

---

[19] *See In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606–07 (N.D. Cal. 2010) (finding that the "defendants may not recast plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period."); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002) ("The plaintiffs have not alleged multiple conspiracies–they have alleged a single price fixing conspiracy.... '[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts but only by looking at it as a whole.'" (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962))).

[20] *See also In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("The question in this case is not whether any conspiracy existed, only how far it reached. That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings." (citing *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014))).

based investors to trust in, and rely upon, USD LIBOR.  *E.g.*, FM PTAC ¶¶ 3, 253-55; PFin PSAC ¶ 264; PFunds PSAC ¶ 263.

### C.      The BBA Was A Member Of The Conspiracy

Membership in a conspiracy is evinced by allegations that the defendant engaged in some "purposeful behavior aimed at furthering the goals of the conspiracy" and, once a conspiracy has been shown, "the evidence sufficient to link another defendant to it need not be overwhelming." *United States v. Diaz*, 176 F.3d 52, 97 (2d Cir. 1999).  The proposed amendments easily clear this threshold.  *See* FM Mem. at 12-16.

As alleged, the BBA was a crucial and essential participant in the conspiracy.  It acted as a hub for communications among the Panel Bank Defendants.  *Id.*  It falsely assured investors that LIBOR was not being manipulated.  *Id.*  It worked with the Panel Bank Defendants to prevent the emergence of any LIBOR rivals.  *Id.*  It knew Panel Bank Defendants' USD LIBOR submissions were artificially low and took steps to ensure panel banks' individual submissions were aligned, regardless of the submissions' accuracy, including by contacting panel banks with outlier submissions and orchestrating "coordinated action."  *Id.* at 16.  Despite the clarity and number of concrete allegations directly tying the BBA to the conspiracy, the BBA spuriously argues that those allegations are insufficient.

First, the BBA claims it cannot be deemed a member of the conspiracy because the Second Circuit in *Gelboim* did not expressly state that the BBA was a member of the conspiracy.  Defs.' PJ Opp. at 39 n.74. But the Second Circuit's decision did not address whether the BBA was a member of the conspiracy.

Second, the BBA incorrectly argues that the FFP Plaintiffs cannot "shoehorn the BBA" into the alleged conspiracy by pointing to alleged false assurances of the accuracy of LIBOR.  *Id.* But rather than "shoehorn," the FFP Plaintiffs allege that the BBA was an active, and indeed,

central participant in, *inter alia*, "efforts to conceal [the] conspiracy."   *United States v. Mermelstein*, 487 F. Supp. 2d 242, 261 (E.D.N.Y. 2007) (citing *United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005)).   The law recognizes that such efforts "may properly be charged as overt acts in furtherance of it."   *Id*.   Moreover, to qualify as an "overt act," the conduct need "not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy."   *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011).   That is what Moving Plaintiffs allege.

Third, the BBA argues that the FFP Plaintiffs failed to plausibly allege that it stood to gain "from artificially suppressed LIBOR submissions."   Defs.' PJ Opp. at 39 n.74.   But, as noted above, such allegations are not necessary and the BBA had other well-pleaded motives to participate in the unlawful conduct.   A defendant need not have a "financial stake in the objective" of the conspiracy, so long as it was "not indifferent" to its outcome.   *United States v. Lopac*, 411 F. Supp. 2d 350, 361 (S.D.N.Y. 2006) (citing *United States v. Torres*, 901 F.2d 205, 245 (2d Cir. 1990)).   For example, bookkeepers, accountants, and enforcers may all further the objective of a narcotics conspiracy without having a financial stake in distributing the drugs.   *United States v. Ulbricht*, 31 F. Supp. 3d 540, 561 (S.D.N.Y. 2014).   Here, the allegations show that the BBA shared Defendants' incentive to portray LIBOR as a reliable benchmark, to appease its constituent members and to profit from the licensing of LIBOR (a trademarked product).   FM PTAC ¶¶ 246, 330-31; PFin. PSAC ¶ 301; PFunds PSAC ¶ 300.   That is more than enough to plausibly allege "purposeful behavior aimed at furthering the goals of the conspiracy," *Diaz*, 176 F.3d at 97, and is certainly not at cross-purposes with it.

Fourth, the BBA contends that the Court should ignore Defendants' shared incentive to maintain LIBOR's status as the dominant interest-rate benchmark because the Court has "rejected"

that "theory."  Defs.' PJ Opp. at 39 n.74.  As demonstrated, there are many other allegations showing the BBA's membership in the conspiracy.  *See, e.g.*, FM Mem. at 12-16.

### D.   Defendants' Overt Acts In The Relevant Forums Support A *Prima Facie* Case Of Personal Jurisdiction

#### 1.   Defendants Voluntarily Transmitted Their Individual LIBOR Submissions To Plaintiffs And Investors In The Relevant Forums

Moving Plaintiffs previously demonstrated that Panel Bank Defendants communicated individual USD LIBOR submissions both directly and indirectly to Freddie Mac and others to falsely promote Defendants' respective reputations.  FM Mem. at 16-18.  Moving Plaintiffs also explained how Panel Bank Defendants profited from Freddie Mac and others by promoting Defendants' financial reputations.  *Id.* at 18-19.

Ignoring these detailed allegations, Defendants recycle their shopworn "marketing and trading activities" characterization.  Defs.' PJ Opp. at 18-21.  Defendants cannot rely on these stale arguments because (1) the Court's evaluation of marketing and trading activities pre-dated *Schwab* and (2) those activities were evaluated in the context of the profit-motive that this Court deemed implausible.  Defendants did not promote their reputation by confidentially sending their individual LIBOR contributions to London; they did so by sending those contributions ***directly*** to investors, such as Freddie Mac.  Defendants, who determined the rules for LIBOR, voluntarily ***chose*** to do so.  FM Mem. at 16-17.

Nor was it necessary for those individual submissions to go through London.  *Id.* at 17. There are only two links in the chain for the transmission of individual contributions: (1) Panel Bank Defendants transmit their individual USD LIBOR submission to their agent, Thomson Reuters (in New York or London), for the purpose of transmitting those submissions to investors (including Freddie Mac and other Moving Plaintiffs); and (2) Thomson Reuters transmits those submissions to Freddie Mac, Bloomberg, the Wall Street Journal and others.  *Id*.  It is difficult to

22

imagine a more concrete showing that Panel Bank Defendants purposefully availed themselves of the United States and where applicable, the relevant state forums.  Those transmissions were the central mechanism of the conspiracy.  Each transmission was an overt act in furtherance of the reputational aspects of the conspiracy.[21]

Neither this Court nor the Second Circuit has addressed these allegations.  Prior rulings instead have all involved the determination and transmission of LIBOR itself (as distinct from each defendant's individual contribution to the determination of LIBOR) and, as this Court found, the transmission of LIBOR was not a suit-related contact for a reputation-motivated conspiracy. Defendants' arguments implicitly concede as much.  *See, e.g.*, Defs.' PJ Opp. at 22 (arguing the Court previously rejected allegations about the "calculation" of LIBOR itself).

Finally, as alleged, the reputation-motivated conspiracy would not have occurred but for these in-forum acts.  FM Mem. at 23; *see also LIBOR IV,* 2015 WL 6243526 at *45 (recognizing that publication of individual LIBOR contributions created the incentive for persistent suppression).

### 2. Moving Plaintiffs Plausibly Alleged That Certain Panel Bank Defendants Committed Overt Acts By Promoting, And Profiting From, Their Financial Soundness

Freddie Mac's proposed amendments further allege that numerous Panel Bank Defendants profited from their positive reputations, at Freddie Mac's expense, and earned those reputations as

---

[21] *See, e.g.*, *Iannelli v. United States,* 420 U.S. 770, 785 n.17 (1975); *United States v. Sindzingre,* Case No. CR 17-464 (Grand Jury Indictment of Société Générale executives alleging as overt acts the transmission of artificially suppressed individual submissions to New York to project financial soundness). Each overt act, individually, is sufficient to show that Panel Bank Defendants purposefully directed their reputation-based conspiracy at the United States and to the relevant forum states.  *See, e.g.*, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 478 (1985) (wire communications sent across state lines sufficient to establish specific personal jurisdiction as "in forum" acts); *Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71 (N.Y. 2006) (New York Court of Appeals recognized long-arm jurisdiction over "commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions"); *Schwab,* 883 F.3d at 85 (New York long-arm statute is "consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'").

a direct result of the conspiracy as recognized by the Court.   Thus, these acts furthered the conspirators' reputations and increased their profits (insofar as those profits flowed from the projection of a false reputation for financial soundness) objectives.   *LIBOR VI*, 2016 WL 7378980, at \*5 (profits followed from the projection of financial soundness); *Schwab*, 883 F.3d at 87 (allegations that "Defendants undertook [] sales" to Schwab "as part of the alleged conspiracy" could establish personal jurisdiction).   Defendants ignore these contacts, other than to mischaracterize them as the same "marketing activities" this Court considered in *LIBOR IV*.  Defs.' PJ Opp. at 22-23.

Defendants' perceived financial soundness mattered – to both the Defendants and Moving Plaintiffs.   For example, Freddie Mac authorized its traders to transact business only with counterparties that were pre-approved by Freddie Mac's Counterparty Credit Risk Management ("CCRM") group.   FM PTAC ¶¶ 11, 23.   The CCRM assigned credit ratings to counterparties based on, *inter alia,* the counterparty's perceived credit risk.   *Id.*   The strength of a counterparty's parent was considered as part of these ratings.   *Id.* ¶ 11.   Counterparties that fell below a certain rating would not be approved.   *Id.* ¶¶ 11, 23.

Accordingly, each Seller (Direct and Indirect) Defendant earned millions of dollars from USD LIBOR-based and other transactions with Freddie Mac based, at least in part, on the Seller Defendant's reputation for financial soundness that the Seller Defendant carefully cultivated, including through the transmission of false LIBOR submissions.  *See id.* ¶¶ 30-31, 39, 44-45, 58, 68, 73, 87, 99, 116, 129, 167, 190.   Seller Defendants likewise earned similar returns based on their transactions with other Moving Plaintiffs.[22]

---

[22] *See* PFin PSAC ¶¶ 221-39, 286, 305, 313, 318, 323, 346, 350, 355-56; PFunds PSAC ¶¶ 220-38, 285, 304, 312, 317, 322, 345, 349, 354-55; Vonnahme Decl. ¶¶ 3, 6, 9-11, 17-18, 23-25, 27-29, 33-34, 37-38, 45-46, 48-49, 53-55, 60-61, 71-72, 77, 83, 85-86, 88-89, 93, 97, 101-02, 107-09, 113-14, 116-17, 120-21.

Defendants mistakenly characterize these allegations as "ordinary business activities" that lack a connection to "overseas" manipulation of LIBOR.  Defs.' PJ Opp. at 24.  Defendants miss the point.  The profit motive this Court deemed plausible related to profits that followed from the projection of financial strength.    The proposed amendments show a connection between Defendants' false projection of financial soundness and Defendants' efforts to take advantage of that misconduct in business transactions with Freddie Mac and other Moving Plaintiffs.   The Moving Plaintiffs show that they would not have suffered the same harm but for Defendants' transmission of individual submissions to and false portrayal of their reputations in activities that directly involved Freddie Mac and other Moving Plaintiffs.  *LIBOR IV*, 2015 WL 6243526, at *8. This establishes the relevant causal connection.

### 3.    Defendants Committed Affirmative Acts Of Concealment In The United States

It is well established that affirmative acts of concealment committed during the conspiracy are relevant to both jurisdictional and merits-based issues.  *United States v. Wiseberg*, No. 17-331, 2018 WL 1311938, at *6 (2d Cir. Mar. 14, 2018) (evidence that defendant engaged in conduct "designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of" unlawful drug sale proceeds was sufficient to support criminal conviction); *United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("[A]cts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263 (AKH), 2017 WL 3600425, at *13 (S.D.N.Y. Aug. 18, 2017) (recognizing relevant acts of concealment in conspiracy to manipulate financial benchmark because "by its very nature, the conspiracy could not succeed unless kept a secret.").  The proposed amendments allege numerous such acts in the United States.

Defendants' sole argument against the proposed amendments is that these allegations concern the BBA and the Foreign Exchange and Money Market Committee ("FXMMC") and were supposedly rejected by this Court.  Defs.' PJ Opp. at 23.  That argument cannot withstand scrutiny.

First, it is factually incorrect.  The allegations also concern false assurances from Barclays, Citibank, Deutsche Bank, HBOS, JPMorgan, Société Générale, WestLB, and all the members of the FXMMC.  *See, e.g.,* FM PTAC ¶¶ 241, 303, 317-18, 326, 328, 339, 399, 404, 406, 409, 495; PFin PSAC ¶¶ 263, 265-67; PFunds PSAC ¶¶ 262, 264-66.

Second, Defendants fail to explain why it would matter if the allegations only concerned the BBA and FXMMC.  The BBA is a named Defendant in FFP Plaintiffs' complaints.  The FXMMC was an "independent" group, comprised of thirteen Panel Bank Defendants, that was more like a walking conspiracy (meeting in secret, without lawyers or public identification of minutes or members) than any traditional trade association committee.  *See, e.g.*, FM PTAC ¶¶ 63, 241, 273, 299-305, 311, 343.  Defendants incorrectly argue in a footnote that allegations that the BBA was an "agent" of the Panel Bank Defendants are "conclusory."  Defs.' PJ Opp. at 36 n.71. As shown above, that also is wrong.  *See also, e.g.*, FM Mem. at 14, n.7; FM PTAC ¶¶ 62-63, 65, 231, 303 (the BBA served at the direction of its member banks and the FXMMC, banks asked the BBA to develop LIBOR, and the FXMMC "dispatched" the BBA to the United States on a "charm offensive"), 326 (published paper "represents the views" of the FXMMC); PFin PSAC ¶¶ 23, 79-80, 86-87, 105-09, 264, 276, 301-02; PFunds PSAC ¶¶ 22, 78-79, 85-86, 104-08, 263, 275, 300-01.

Third, *Schwab* confirmed that allegations of false assurances could be deemed acts in furtherance of the conspiracy.  This Court has not held otherwise.

### 4.   Plaintiffs Allege That Defendants' False LIBOR Submissions Were Directed And Submitted From New York And The United States

The proposed amendments allege facts showing that at least Barclays, Citibank, and JPMorgan directed and supervised false USD LIBOR submissions from New York and the United States.  In response, Defendants inaccurately accuse Moving Plaintiffs of asserting allegations only based upon documents to which Moving Plaintiffs previously cited in earlier complaints and/or affidavits and other papers filed in support of jurisdiction.  Defs.' PJ Opp. at 24, 25 & nn.48-49.[23] This argument is flawed.  To the extent to which Moving Plaintiffs rely on documents that they previously cited,[24] the proposed amendments clarify and/or supplement the allegations based on these documents and/or create further context for the documents' jurisdictional relevance.

For example, Defendants reference paragraph 277 of Freddie Mac's proposed amended complaint, which cites to an internal Citibank email between Scott Bere (Citibank's Head of Risk Treasury in the United States) and Andrew Thursfield (Citibank's representative on the FXMMC, who also oversaw Citibank's USD LIBOR submitters) (the Global Head of Risk Treasury, who oversaw both Messrs. Bere and Thursfield, was also copied on the email).  In that email, Mr. Bere wrote, "assuming we aren't adversely impacting our reset risk, I think it may be prudent to show leadership and try to hold line" on Citibank's USD LIBOR submissions.  When this email is viewed in the context of Freddie Mac's proposed amended complaint, a narrative exists in which Mr. Bere (in the United States) is shown to a have a pattern of influence over Citibank's USD

---

[23] Defendants argue that certain allegations are based on documents already rejected by the Court in *LIBOR VI*.  *Id.* at 25 n.48.  Neither the allegations nor the documents identified by Defendants, however, were expressly considered (or rejected) by this Court.

[24] Defendants unfairly treat Moving Plaintiffs as if they had the same access to documents produced in the class certification proceedings when, at the time of briefing in *LIBOR VI*, Defendants would not permit most Moving Plaintiffs (and other Direct Action Plaintiffs) to access the documents produced to class members.  As shown below, the proposed amendments are new and sufficient to show in-forum conduct by at least Barclays, Citibank and JPMorgan in furtherance of the reputational motives of the conspiracy.

LIBOR submissions, motivated not by personal interests, but for the benefit of Citibank, as shown, in part, by allegations concerning Mr. Bere's responsibility for managing Citibank's balance sheet "risks" and his efforts to encourage USD LIBOR suppression from at least Barclays.  *See, e.g.*, FM PTAC ¶¶ 274-79, 316, 338; *see also* FM Mem. at 21-22.[25]

### Barclays

Defendants admit that the allegation that former Barclays CEO Robert Diamond was in New York when he directed and oversaw LIBOR suppression is a new fact.  Defs.' PJ Opp. at 25 n.50.  Instead, Defendants argue that Mr. Diamond's physical location is irrelevant, *id.*, but this Court has never wavered from its view that personal jurisdiction may be asserted in the forum "containing the office from which a defendant determined, or transmitted, a false LIBOR submission."  *LIBOR IV*, 2015 WL 6243526, at *32.

Defendants' factual assertion that Mr. Diamond was merely in New York during "a single telephone call," Defs.' PJ Opp. at 25 n.50, conflicts this Court's prior rulings and with the well-pleaded allegations in the proposed amendments.  It is further emblematic of the game being played by Defendants, who repeatedly make self-serving, conclusory, "factual" allegations prior to the commencement of discovery that are improper at the pleading stage.  As alleged, Mr. Diamond worked from Barclays' New York office from 2008 forward.  FM Mem. at 23.  From that office, he gave the instruction to depress LIBOR and oversaw its implementation.  *Id.*  Far from being "random" or "fortuitous," Mr. Diamond's location in New York was both long-term and fixed.

Defendants' argument that Moving Plaintiffs could have alleged this fact earlier, Defs.' PJ Opp. at 25 n.50, merely repeats the same erroneous contentions that the Court should reject non-

---

[25] Defendants rely on the arguments made in their 2016 *LIBOR VI* Jurisdictional Allegations Appendix, Defs.' PJ Opp. at 25 & nn.48-49.  But those arguments are not only superseded by the proposed amendments, they are also almost entirely predicated upon factual determinations inappropriate for resolution at the pleading stage of litigation.

futile amendments without any showing of prejudice.  That is not the law in this Circuit.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2015) (reversing denial of leave to amend as an abuse of the district court's discretion); *see also* Pls.' Amend Reply at 2-3.  *LIBOR VI* revealed this Court's view that the physical location of the intermediary transmitting Mr. Diamond's directive was not relevant, and the proposed amendments provide the fact this Court deemed missing.  *Id.* at *10 n.17.  That allegation is highly relevant.

### Citibank

*LIBOR VI* addressed an allegation that a Citibank submitter determined LIBOR submissions from New York.  Relying on a sworn declaration from Citibank, the Court discounted that allegation because the individual stated that he was not a LIBOR submitter at the time he was in New York.  *LIBOR VI*, 2016 WL 7378980, at *11.  The proposed amendments clarify that the individual in that specific episode was the submitter's superior at the time.  The amendments further allege facts showing that Citibank's submitter – in fact, submitters at all Panel Bank Defendants – lacked the authority to unilaterally suppress LIBOR without direction from their superiors.  FM Mem. at 21-22.  As Citibank's LIBOR submitter said in 2008, "we are not allowed to be" the highest contributor.  *Id.* at 21.  Citibank executives with authority to give that directive were all in New York.  *Id.* at 21-22.  In declining to find the in-forum conduct of an intermediary to be jurisdictionally relevant in *LIBOR VI*, 2016 WL 7378980, at *10 n.17, this Court implicitly recognized that the conduct of the ranking executive was important in the jurisdictional analysis. Here, that is exactly what the proposed amendments allege.

The proposed amendments further reveal that, at least for Citibank, the witness who declared to this Court that LIBOR was "determined and transmitted" in London lacked the foundation to answer the critical question posed by this Court:  From where did the Panel Bank determine **false** (not legitimate) LIBOR submissions?  *See LIBOR IV*, 2015 WL 6243526, at *32.

Citibank's declarant has testified that he has no idea who instructed Citibank's submitters to engage in such conduct.  FM Mem. at 22.  Citibank did not deny any of this in its Opposition.  All that remains is a question of fact unsuitable for resolution at this stage of the case.

### JPMorgan

The proposed amendments allege that JPMorgan executives in New York directed and oversaw the submission of false LIBOR contributions.  FM Mem. at 22-23.  Defendants' Opposition makes no mention of these allegations whatsoever.  Defendants do not even suggest that this Court already considered the same allegations.

Accepting those allegations as true and drawing all reasonable inferences in Moving Plaintiffs' favor, the proposed amendments thus plausibly allege that JPMorgan determined false LIBOR contributions in New York.  As with the other Panel Bank Defendants, JPMorgan's declarant does not address the critical questions of where JPMorgan determined its unlawful LIBOR contributions and who gave the directive.  Moving Plaintiffs' allegations that JPMorgan did so in New York, and at the direction of a New York-based executive thus stand unrebutted.

### E.    Defendants Expressly Aimed Their Conduct At The United States And The Other Relevant State Forums

As alleged, Defendants' transmission of individual LIBOR contributions, false assurances of LIBOR's reliability, use of financial reputation to profit from Freddie Mac and investors, and exclusion of U.S.-based LIBOR competitors were all acts that were expressly aimed at the United States because Defendants knew and intended for the consequences to be felt here.  *See supra* note 19.  Moving Plaintiffs thus allege far more than foreseeable effects.

## V.      VENUE DEFENDANTS "TRANSACT BUSINESS" IN THE RELEVANT FORUMS, THUS SATISFYING THE CLAYTON ACT VENUE PROVISION

The venue provision of Section 12 of the Clayton Act requires only that the defendant "be found or transacts business" in the forum. 15 U.S.C.A. § 22.[26]  In this context, the Supreme Court construes the term "transacts business" broadly, defining it as "the practical and broader business conception of engaging in any substantial business operations" and rejecting a restrictive interpretation that overly relies upon the "artful arrangement of agents' authority, or of their comings and goings, or of the geography of minute incidents in contracting" if that would bar an aggrieved person from establishing venue locally.  *United States v. Scophony Corp.*, 333 U.S. 795, 807, 808 n.19 (1948).  Accordingly, the concept of "transacting business" for venue purposes is more lenient than that of *International Shoe*'s jurisdictional analysis of "minimum contacts."  *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310 (1945); *Dunham's, Inc. v. Nat'l Buying Syndicate*, 614 F. Supp. 616, 624 (E.D. Mich. 1985); *Hoffman Motors Corp. v. Alfa Romeo S.p.A.*, 244 F. Supp. 70, 76 (S.D.N.Y. 1965).

A broad range of conduct constitutes "transacting business" for purposes of satisfying the venue provision of the Clayton Act.  A defendant that maintains offices and provides customer assistance in a district is considered to transact business in that district.  *Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d 790, 794 & n.8 (2d Cir. 1959).  A defendant that exercises control over a subsidiary or affiliate that transacts business in the district is also considered to have transacted business in the district via the subsidiary or affiliate.  *In re Vitamin C Antitrust Litig.*, No. 06-MD-

---

[26] Consistent with Defendants' incorporation of their venue-related arguments advanced in connection with their briefing leading up to this Court's decision in *LIBOR VI*, Moving Plaintiffs too incorporate by reference their venue-related filings submitted in connection to *LIBOR VI*.  Specifically, Plaintiffs incorporate by reference Pls.' Supplemental Statement of Additional Jurisdictional Facts, ECF No. 1517; Pls.' Joint Mem. Law Opp. to Defs.' Mot. Dismiss All Antitrust Claims for Lack of Personal Jurisdiction, ECF No. 1524 ("PJ Mem."); PJ Mem., App'x. B, ECF No. 1524-02; Vonnahme Decl.

1738(BMC)(JO), 2012 WL 2930109, at *5-7 (E.D.N.Y. July 18, 2012); *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 637 (E.D.N.Y. 2009).  Even if a defendant's agents never set foot in a district, their purchases and sales in the district "constitute[] the transaction of business" there.  *Black v. Acme Mkts., Inc.*, 564 F.2d 681, 687 (5th Cir. 1977).  The defendant's purchases and sales are "to be judged from the point of view of the average businessman and not in proportion to the sales or revenues of the defendant."  *Id.*; *Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 711 F. Supp. 730, 733 (S.D.N.Y. 1989).  Indeed, even a single transaction in the district may confer venue under the Clayton Act if the transaction is related to the cause of action.  *In re Chicken Antitrust Litig.*, 407 F. Supp. 1285, 1291 (N.D. Ga. 1975).

Moving Plaintiffs offer numerous allegations showing that Venue Defendants transact business in the relevant districts.[27]  For example, Moving Plaintiffs allege, *inter alia*, that Venue Defendants have offices or branches, offer client services, exercised control over a subsidiary or affiliate that transacted business, solicited business, and/or made sales in the relevant districts.[28]  Indeed, many of the Venue Defendants solicited and made direct sales of LIBOR-based products to Moving Plaintiffs in these districts.  *See* Section III *supra*.  The Court has already found that swap and derivative counterparties engaged in a "course of dealing" in each of these districts with Plaintiffs located there.  *LIBOR IV*, 2015 WL 6243526, at *31.

Venue Defendants do not refute these allegations.  Instead, Venue Defendants offer the conclusory statement that "Plaintiffs fail to allege that Venue Defendants . . . 'transact[] business

---

[27] *See, e.g.*, FDIC-R Proposed Second Am. Compl. ¶¶ 8, 34, 59-60, 79, 139, ECF No. 2566-01; FM PTAC ¶¶ 22, 45-52, 80-81, 86-90, 99-102, 117, 151-52, 159-60, 164-65, 167-71, 181-82, 190-94, 492, 513, 527, 534; PJ Mem., App'x. B at 21-24, 53-75, 82-114; PFin PSAC ¶ 11; PFunds PSAC ¶ 11; Vonnahme Decl.

[28] *E.g.*, FDIC-R Proposed Second Am. Compl. ¶¶ 16-104; FM PTAC ¶¶ 26-203; PFin PSAC ¶¶ 221-239, 286, 305, 313, 318, 323, 346, 350, 355-56; PFunds PSAC ¶ 220-238, 285, 304, 312, 317, 322, 345, 349, 354-55; Vonnahme Decl. ¶¶ 5-6, 9-14, 17-20, 23-25, 28-34, 37-38, 40, 43, 45-46, 48-50, 53-57, 60-63, 65-66. 68, 70-74, 76-77, 81, 83, 85-86, 88-90, 93-94, 97-98, 101-04, 106-10, 113-18, 120-23.

in' in the relevant districts," Defs.' PJ Opp. at 45, and cite to factual averments in declarations that relate ***only to jurisdiction***. *Id.* at 45 & n.85 (citing to Kurtzberg Decl. Exs. 1-2). Even if Venue Defendants' affidavits did directly rebut Moving Plaintiffs' detailed allegations, on a motion to dismiss, all factual disputes would have to be resolved in the plaintiff's favor. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). Accordingly, Venue Defendants' contention that venue does not lie in the relevant forums should be rejected.[29]

## VI.   DEFENDANTS CANNOT CARRY THEIR HEAVY BURDEN OF DEMONSTRATING THAT EXERCISING PERSONAL JURISDICTION WOULD OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE

Defendants bear the heavy "burden" of presenting "a compelling case" that the exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice. *LIBOR IV*, 2015 WL 6243526, at *33; *SEC v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013) (The reasonableness inquiry is "largely academic" in cases brought under federal law because of the "strong federal interests" involved.). "Where a defendant purposefully has directed its suit-related conduct at the forum," as the Defendants have shown to have done here, "'dismissals resulting from the application of the reasonableness test should be few and far between.'" *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 288 (E.D.N.Y. 2016) (quoting *Metro. Life*, 84 F.3d at 575 (citing *Burger King*, 471 U.S. at 477)). While "most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few (and none in [the Second] Circuit) have ever declined jurisdiction, on fairness grounds, in such cases." *Straub*, 921 F. Supp. 2d at 259.

---

[29] As an unincorporated association, the BBA is not subject to the Clayton Act's venue provision. Moving Plaintiffs have shown that the BBA availed itself of the laws of New York and other forum states.

The reasonableness inquiry focuses on (1) the burden on the defendants in litigating in a foreign forum, (2) the interest in the forum in adjudicating the dispute, and (3) the interests of the plaintiffs in obtaining efficient and convenient relief. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Defendants have not come close to satisfying this stringent standard.

Defendants are major international banks, with significant contacts with the United States, including Iowa, Kansas, New York, and Virginia. Each has sophisticated international operations, has previously availed itself of our domestic court system, and operates extensive businesses that derive significant profits in the United States, including Iowa, Kansas, New York, and Virginia. *See, e.g.*, *supra* Sections III-V; PJ Mem., App'x. B, ECF No. 1524-02. The burden on Defendants of litigating in this country is minimal to nonexistent. The United States, by contrast, has a substantial interest in adjudicating the dispute. *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972). Significant numbers of U.S. citizens and corporations purchase derivatives, mortgages, and other financial instruments tied to LIBOR. The United States has an abiding interest in ensuring its citizens are not being preyed upon by banks artificially fixing returns on those transactions. Finally, Plaintiffs have a substantial interest in obtaining efficient and convenient relief in the forum under whose laws they purchased Defendants' price-fixed products. Defendants' reasonableness argument accordingly fails.

## VII.    CONCLUSION

For the reasons stated above, and in Moving Plaintiffs' opening memoranda, their motions for leave to amend their complaints should be granted.

Dated:  August 9, 2018

**ZELLE LLP**

By:  */s/ James R. Martin*
James R. Martin
Jennifer D. Hackett
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
jmartin@zelle.com
jhackett@zelle.com
Tel: 202-899-4100
Fax: 612-336-9100

*Attorneys for Plaintiffs Federal Deposit*
*Insurance Corporation, as Receiver for*
*Amcore Bank, N.A., et al. and as Receiver*
*for Doral Bank*

Respectfully submitted,

**ZELLE LLP**

By:  */s/ James R. Martin*
James R. Martin
Jennifer D. Hackett
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
jmartin@zelle.com
jhackett@zelle.com
Tel: 202-899-4100
Fax: 612-336-9100
                                          and
Richard J. Leveridge
ADAMS HOLCOMB LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
leveridge@adamsholcomb.com
Tel: 202-580-8817

*Attorneys for Plaintiff The Federal Home Loan*
*Mortgage Corporation*

**ROBINS KAPLAN LLP**


By:  */s/ Stacey P. Slaughter*
K. Craig Wildfang
Thomas J. Undlin
Stacey P. Slaughter
Geoffrey H. Kozen
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
Tel: 612-349-8500
Fax: 612-339-4181

*Attorneys for Plaintiffs*
*Principal Financial Group, Inc., et al. and*
*Principal Funds, Inc., et al.*

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**

By:  */s/ David C. Frederick*
David C. Frederick
Gregory G. Rapawy
Andrew C. Shen
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

George A.  Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

Norman E. Siegel (D. Kan. # 70354)
Rachel E. Schwartz (Kan.# 21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

Of Counsel:
Michael J. McKenna, General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

*Attorneys for Plaintiff National Credit Union Administration Board,
As Liquidating Agent of U.S. Central Federal Credit Union, et al.*