## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Master File No. 1:11-md-2262-NRB<br><br>ECF Case |
| This Document Relates to:<br><br>THE CHARLES SCHWAB CORPORATION, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>BANK OF AMERICA CORPORATION, et al.,<br><br>　　　　　　　　Defendants. | Case No. 13-cv-7005<br><br>**ORAL ARGUMENT REQUESTED** |

## SCHWAB'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS <u>THE SECOND AMENDED COMPLAINT</u>

## KEY OF RELEVANT TERMS

| Term | Definition |
|---|---|
| Added Defendants | Bank of Scotland plc<br>Credit Suisse AG<br>Lloyds Bank plc<br>The Royal Bank of Scotland plc |
| Bank Affiliates | Banc of America Securities LLC<br>Barclays Capital Inc.<br>Chase Securities Inc.<br>Citigroup Funding, Inc.<br>Citigroup Global Markets Inc.<br>Credit Suisse Securities (USA) LLC<br>  &bull; f/k/a Credit Suisse First Boston LLC<br>Deutsche Bank Securities Inc.<br>Deutsche Bank Trust Corporation<br>HSBC Finance Corp.<br>JPMorgan Chase Capital XXI<br>J.P. Morgan Clearing Corp.<br>J.P. Morgan Securities, LLC<br>  &bull; f/k/a J.P. Morgan Securities, Inc.<br>Mitsubishi UFJ Trust and Banking Corporation<br>RBC Capital Markets LLC<br>RBC Dain Rauscher Inc.<br>RBS Capital Trust IV<br>RBS Securities Inc.<br>  &bull; f/k/a Greenwich Capital Inc. and RBS Greenwich Capital<br>UBS Securities LLC |
| Domestic Panel Bank Defendants | Bank of America, N.A.<br>Citibank, N.A.<br>JPMorgan Chase Bank, N.A. |
| Domestic Parent Company Defendants | Bank of America Corporation<br>Citigroup Inc.<br>JPMorgan Chase & Co. |
| Fixed-Rate Issuer Defendants | Bank of America Corporation<br>Bank of America, N.A.<br>Bank of Scotland plc<br>The Bank of Tokyo Mitsubishi UFJ, Ltd.<br>Barclays Bank plc<br>Citibank, N.A.<br>Credit Suisse AG<br>Deutsche Bank AG<br>HSBC Bank plc<br>JPMorgan Chase & Co.<br>JPMorgan Chase Bank, N.A. |

|  | Lloyds Bank plc<br>The Norinchukin Bank<br>Rabobank<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc<br>UBS AG |
|---|---|
| Floating-Rate Issuer Defendants | Bank of America, N.A.<br>Barclays Bank plc<br>Citigroup Inc.<br>Credit Suisse AG<br>Deutsche Bank AG<br>JPMorgan Chase & Co.<br>JPMorgan Chase Bank, N.A.<br>Rabobank<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc<br>UBS AG |
| Floating-Rate Seller Defendants | Bank of America, N.A.<br>Deutsche Bank AG<br>JPMorgan Chase Bank, N.A.<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc |
| Foreign Panel Bank Defendants | Bank of Scotland plc<br>The Bank of Tokyo-Mitsubishi UFJ, Ltd.<br>Barclays Bank plc<br>Credit Suisse AG<br>Deutsche Bank AG<br>HBOS plc<br>HSBC Bank plc<br>Lloyds Bank plc<br>The Norinchukin Bank<br>Coöperatieve Rabobank U.A. ("Rabobank")<br>    • f/k/a Coöperatieve Centrale Raiffeisen-<br>      Boerenleenbank B.A.<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc<br>Portigon AG<br>UBS AG |
| Issuer Defendants | Bank of America Corporation<br>Bank of America, N.A.<br>Bank of Scotland plc<br>The Bank of Tokyo Mitsubishi UFJ, Ltd.<br>Barclays Bank plc<br>Citibank, N.A.<br>Citigroup Inc.<br>Credit Suisse AG |

|  | Deutsche Bank AG<br>HSBC Bank plc<br>JPMorgan Chase & Co.<br>JPMorgan Chase Bank, N.A.<br>Lloyds Bank plc<br>The Norinchukin Bank<br>Rabobank<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc<br>UBS AG |
|---|---|
| Panel Bank Defendants | Bank of America, N.A.<br>Bank of Scotland plc<br>The Bank of Tokyo-Mitsubishi UFJ, Ltd.<br>Barclays Bank plc<br>Citibank, N.A.<br>Credit Suisse AG<br>Deutsche Bank AG<br>HBOS plc<br>HSBC Bank plc<br>JPMorgan Chase Bank, N.A.<br>Lloyds Bank plc<br>The Norinchukin Bank<br>Rabobank<br>Royal Bank of Canada<br>The Royal Bank of Scotland plc<br>Portigon AG<br>UBS AG |
| Parent Company Defendants | Bank of America Corporation<br>Citigroup Inc.<br>Credit Suisse Group AG<br>HSBC Holdings plc<br>JPMorgan Chase & Co.<br>Lloyds Banking Group plc<br>The Royal Bank of Scotland Group plc |
| Schwab | The Charles Schwab Corporation<br>Charles Schwab Bank, N.A.<br>Charles Schwab & Co., Inc.<br>The Charles Schwab Family of Funds<br><ul><li>on behalf of its series Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, and Schwab Advisor Cash Reserves</li></ul>Charles Schwab Worldwide Funds plc |

|  | • on behalf of its series Schwab U.S. Dollar Liquid Assets Fund<br>Schwab Investments<br>• on behalf of its former series Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, and Schwab YieldPlus Fund |
| --- | --- |
| Tortious Interference ("TI") Defendants | The Bank of Tokyo-Mitsubishi UFJ, Ltd.<br>Citibank, N.A.<br>HSBC Bank plc<br>JPMorgan Chase Bank, N.A.<br>The Royal Bank of Scotland plc |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

AMENDMENTS AND CLAIMS IN THE SAC ..................................................... 3

ARGUMENT ......................................................................................................... 5

I.      SCHWAB'S AMENDMENTS ARE PROCEDURALLY PROPER ............................. 5

      A.     Schwab's Identification of Certain Defendants as both Direct and Indirect Sellers Should Be Permitted. ............................................................ 5

      B.     As Schwab's Claims Against the Added Defendants Relate Back to Its 2013 Complaint, They Are Timely. .................................................... 7

II.     SCHWAB MAKES A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION FOR EACH OF ITS CLAIMS ...................................................... 10

      A.     Personal Jurisdiction Exists as to All of Schwab's Exchange Act Claims. ......... 10

            1.     The Domestic Panel Bank Defendants and the Domestic Parent Company Defendants are subject to general personal jurisdiction as to Schwab's Section 10(b) and 20(a) claims............................................. 11

            2.     Under the national contacts analysis, specific personal jurisdiction lies over the Floating-Rate Issuer Defendants based on their issuance of notes in the United States....................................................... 13

            3.     Specific jurisdiction lies as to Exchange Act claims arising from the Floating-Rate Seller Defendants' *sales* of securities issued by others............................................................................................................. 15

            4.     Specific jurisdiction also lies as to Schwab's Section 10(b) claims against all Defendants based on their false LIBOR submissions. ........... 17

      B.     The Court Should Exercise Pendent Personal Jurisdiction Over Schwab's State Law Claims, Which Are Closely Related to Its Exchange Act Claims. ................................................................................................................ 18

      C.     Even Absent Pendent Personal Jurisdiction, Specific Jurisdiction Exists as to State Law Claims Against Defendants that Directly or Indirectly Sold Financial Instruments to Schwab. ......................................................................... 20

            1.     Bank Affiliates sold notes to Schwab for the benefit of, with the knowledge and consent of, and under at least some control by, the Issuer Defendants................................................................................... 21

            2.     Defendants' arguments and authorities miss their mark........................ 25

      D.     Conspiracy Jurisdiction Applies to Schwab's Claims Against All Defendants. ............................................................................................................. 28

            1.     *Walden* did not eviscerate conspiracy jurisdiction.................................. 29

# TABLE OF CONTENTS
(continued)

Page

2. Conspiracy *jurisdiction* is not limited to claims for which conspiracy can support *liability*. ............................................... 30

3. Defendants' argument regarding California's long-arm statute is both forfeited and meritless. ................................................... 30

E. This Court Already Has Rejected Defendants' "Reasonableness" Argument, Which Has Not Improved with Age. ................................. 32

III. DEFENDANTS' RULE 12(b)(6) CHALLENGES ARE UNAVAILING ..................... 33

A. Schwab Sufficiently Pleads Section 10(b) Claims ................................. 33

1. Defendants' recycled challenge to loss causation contravenes the Second Circuit's mandate, and is meritless in any event. ........................ 33

2. Certificates of deposit and bank notes are "securities." ........................ 36

B. Schwab Sufficiently Pleads Section 20(a) Claims Against the Parent Company Defendants and Barclays Bank ............................................ 37

1. Assuming Schwab must plead "culpable participation" by the Section 20(a) Defendants, it has done so. ................................................. 38

2. Schwab sufficiently alleges BCI violated Section 10(b). ........................ 39

3. Schwab alleges a predicate violation of Section 10(b) by HSBC Bank plc, subjecting HSBC Holdings plc to liability under Section 20(a). ....................................................................................... 41

C. Defendants' Arguments Regarding Schwab's Unjust Enrichment Claims Are Misleading and Contrary to Law. ............................................ 41

1. Schwab has always asserted unjust enrichment claims based on fixed-rate transactions, and they were upheld in *LIBOR IV*. .................. 41

2. Schwab Sufficiently Pleads Unjust Enrichment Based on Fixed-Rate Transactions. .......................................................................... 42

D. Schwab's Tortious Interference Claims Are Timely and Well-Pleaded. ............ 47

1. Rule 15 and the discovery rule render Schwab's claims timely. ............... 47

2. Defendants' pleading challenge contravenes the law of this case. .......... 50

CONCLUSION .................................................................................... 50

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdell v. City of New York,*
2006 WL 2620927 (S.D.N.Y. Sept. 12, 2006) .......................................................... 9

*Achtman v. Kirby, McInerney & Squire, LLP,*
464 F.3d 328 (2d Cir. 2006) ..................................................................................... 19

*Alexander v. Exxon Mobil,*
219 Cal. App. 4th 1236 (2013) ........................................................................... 48, 49

*Alexander v. FedEx Ground Package Sys., Inc.,*
765 F.3d 981 (9th Cir. 2014) .................................................................................... 24

*Barrow v. Wethersfield Police Dep't,*
66 F.3d 466 (2d Cir. 1996) ......................................................................................... 9

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,*
289 F.R.D. 401 (S.D.N.Y. 2013) .............................................................................. 10

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................. 36

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.,*
291 F.3d 1000 (7th Cir. 2002) .................................................................................. 47

*Cabot Hosiery Mills, Inc. v. 7mesh Indus. Inc.,*
No. 16-5, 2016 WL 9526678 (D. Vt. June 8, 2016) ................................................ 23

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.,*
230 F.3d 934 (7th Cir. 2000) .................................................................................... 30

*Charles Schwab Corp. v. Bank of America Corp.,*
883 F.3d 68 (2d Cir. 2018) ................................................................................. passim

*Chloé v. Queen Bee of Beverly Hills, LLC,*
616 F.3d 158 (2d Cir. 2010) ..................................................................................... 22

*City of New York v. Mickalis Pawn Shop, LLC,*
645 F.3d 114 (2d Cir. 2011) ..................................................................................... 31

*Cohen v. Facebook, Inc.,*
252 F. Supp. 3d 140 (E.D.N.Y. 2017) ................................................................ 12, 19

*Cornwell v. Robinson,*
23 F.3d 694 (2d Cir. 1994) ......................................................................................... 9

*County of San Bernardino v. Walsh,*
158 Cal. App. 4th 533 (2007) ................................................................................... 45

*Cruz v. City of New York,*
2007 WL 1223225 (S.D.N.Y. Apr. 25, 2007) ............................................................ 9

**TABLE OF AUTHORITIES**
(continued)

Page

*CutCo Indus., Inc. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986) ............................................................................ 21

*D. Klein & Son, Inc. v. Good Decision, Inc.*,
   147 F. App'x 195 (2d Cir. 2005) .................................................................... 27

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ................................................................................. 11, 21

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
   290 F.3d 42 (1st Cir. 2002) ........................................................................... 21

*Donoghue v. Dicut, Inc.*,
   2002 WL 1728539 (S.D.N.Y. July 24, 2002) ........................................... 10, 15

*Elbit Systems, Ltd. v. Credit Suisse Group*,
   917 F. Supp. 2d 217 (S.D.N.Y. 2013) ........................................................... 27

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985) .......................................................................... 37

*Geernaert v. Mitchell*,
   31 Cal. App. 4th 601 (1995) .......................................................................... 46

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) .......................................................................... 32

*Gerstle v. Nat'l Credit Adjusters, LLC*,
   76 F. Supp. 3d 503 (S.D.N.Y.2015) .............................................................. 25

*Hargrave v. Oki Nursery, Inc.*,
   646 F.2d 716 (2d Cir. 1980) .......................................................................... 20

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ................................................................................. 11, 13

*Hunter v. Deutsche Lufthansa AG*,
   2013 WL 752193 (E.D.N.Y. Feb. 27, 2013) ................................................... 9

*In re Aluminum Warehousing Antitrust Litig.*,
   90 F. Supp. 3d 219 (S.D.N.Y. 2015) ............................................................. 27

*In re Cigna Corp. Sec. Litig.*,
   459 F. Supp. 2d 338 (E.D. Pa. 2006) ............................................................ 35

*In re Coupon Clearing Serv., Inc.*,
   113 F.3d 1091 (9th Cir. 1997) ....................................................................... 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*),
   2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ......................................... passim

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR V*),
2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015)...................... 23, 26, 27, 50

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VI*),
2016 WL 7378980, (S.D.N.Y. Dec. 20, 2016) ................... 28, 39

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VII*),
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................ 35

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003) ................................ 28

*In re Roman Catholic Diocese of Albany, N.Y., Inc.*,
745 F.3d 30 (2d Cir. 2014) ................................. 13

*In re TFT-LCD Flat Panel Antitrust Litig.*,
2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ................. 42

*In re Vivendi Universal, S.A. Sec. Litig.*,
284 F.R.D. 144 (S.D.N.Y. 2012) ............................ 35

*Ingenito v. Riri USA, Inc.*,
89 F. Supp. 3d 462 (E.D.N.Y. 2015) ........................ 25

*Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1988) ............................... 27

*Krupski v. Costa Crociere S. p. A.*,
560 U.S. 538 (2010) ..................................... 7, 8, 9

*Landreth Timer Co. v. Landreth*,
471 U.S. 681 (1985)....................................... 36

*Leasco Data Processing Equipment Corp. v. Maxwell*,
468 F.2d 1326 (2d Cir. 1972) .............................. 29

*Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
179 F. Supp. 2d 159 (S.D.N.Y. 2001) ....................... 37

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ............................... 15

*Loreley Fin.(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ............................... 7, 20

*Los Angeles Mem. Coliseum Comm'n v. Insomniac, Inc.*,
233 Cal. App. 4th 803 (2015) .............................. 30

*Mariash v. Morrill*,
496 F.2d 1138 (2d Cir. 1974) .............................. 11

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Marine Bank v. Weaver,*
  455 U.S. 551 (1982) ................................................................................ 36, 37

*Marine Midland Bank, N.A. v. Miller,*
  664 F.2d 899 (2d Cir. 1981) ........................................................................ 27

*Moore v. PaineWebber, Inc.,*
  189 F.3d 165 (2d Cir. 1999) ........................................................................ 35

*Olson v. E.F. Hutton & Co.,*
  957 F.2d 622 (8th Cir. 1992) .................................................................. 36, 37

*Omega Advisors, Inc. v. Lewis,*
  2010 WL 726956 (S.D.N.Y. Feb. 17, 2010) ................................................. 5

*Pasternack v. Shrader,*
  863 F.3d 162 (2d Cir. 2017) .......................................................................... 5

*Pinker v. Roche Holdings Ltd.,*
  292 F.3d 361 (3d Cir. 2002) ......................................................................... 15

*Porina v. Marward Shipping Co.,*
  521 F.3d 122 (2d Cir. 2008) ......................................................................... 13

*Retail Software Servs., Inc. v. Lashlee,*
  854 F.2d 18 (2d Cir. 1988) ........................................................................... 21

*Schoolcraft v. City of New York,*
  81 F. Supp. 3d 295 (S.D.N.Y. 2015) ............................................................. 9

*SEC v. Committee on Ways and Means of the U.S. House of Representatives,*
  161 F. Supp. 3d 199 (S.D.N.Y. 2015) .......................................................... 12

*SEC v. Straub,*
  921 F. Supp. 2d 244 (S.D.N.Y. 2013) ..................................................... 15, 32

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) ....................................................................... 10

*Sharette v. Credit Suisse Int'l,*
  127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................................................ 35

*Slayton v. Am. Express Co.,*
  460 F.3d 215 (2d Cir. 2006) ......................................................................... 49

*Staats v. Vintner's Golf Club, LLC,*
  --- Cal. Rptr. 3d ---, 2018 WL 3640830 (Cal. Ct. App. Aug. 1, 2018) ........ 47

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
  547 F.3d 406 (2d Cir. 2008) ......................................................................... 49

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Strada v. City of New York*,
2014 WL 3490306 (E.D.N.Y. July 11, 2014) ............................................................ 9

*Stratagem Dev. Corp. v. Heron Int'l N.V.*,
153 F.R.D. 535 (S.D.N.Y. 1994) ............................................................................... 28

*Stutts v. De Deitrich Grp.*,
465 F. Supp. 2d 156 (E.D.N.Y. 2006) ...................................................................... 27

*Taylor-Rush v. Multitech Corp.*,
217 Cal. App. 3d 103 (1990) ................................................................................... 32

*Tlapanco v. Elges*,
2017 WL 4329789 (S.D.N.Y. Sept. 14, 2017) .......................................................... 31

*Union Carbide Corp. v. Montell N.V.*,
944 F. Supp. 1119 (S.D.N.Y. 1996) .......................................................................... 50

*Unspam Techs., Inc. v. Chernuk*,
716 F.3d 322 (4th Cir. 2013) ................................................................................... 30

*Uzyel v. Kadisha*,
188 Cal. App. 4th 866 (2010) ............................................................................ 44, 47

*Walden v. Fiore*,
571 U.S. 277 (2014) ................................................................................................. 29

*Webber v. Inland Empire Inv.*,
74 Cal. App. 3th 884 (1999) .................................................................................... 30

*Wilder v. News Corp.*,
015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ............................................................... 27

*Wiwa v. Royal Dutch Petrol. Co.*,
226 F.3d 88 (2d Cir. 2000) ...................................................................................... 21

*Wolf v. Banco Nacional de Mexico, S.A.*,
739 F.2d 1458 (9th Cir. 1984) ................................................................................. 36

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1990) ................................................................................................. 15

*Yu v. Premiere Power LLC*,
2015 WL 4629495 (S.D.N.Y. Aug. 4, 2015) ........................................................ 12, 13

**STATUTES**

15 U.S.C. § 78c(a)(1) ................................................................................................... 36

Cal. Civ. Proc. Code § 410.10 ..................................................................................... 31

**TABLE OF AUTHORITIES**
(continued)

**Page**

**RULES**

Fed. R. Civ. P. 15(a)(2)................................................................................ 5

Fed. R. Civ. P. 15(c)(1)................................................................................ 8

**TREATISES**

1 Witkin, Summary 11th Contracts § 1052 (2018)................................... 46

MOORE'S FEDERAL PRACTICE (3d ed. 2017), vol. 16.............................. 11

Restatement (Second) of Torts § 531 (1977).......................................... 46

Restatement (Third) of Agency § 1.01 cmt. c........................................ 23

Restatement (Third) of Agency § 2.03 ................................................... 25

Restatement (Third) Restitution § 1, cmt. a........................................... 42

Restatement 3d, Restitution and Unjust Enrichment, Foreword, vol. 1, p. XIII......................... 46

**REGULATIONS**

17 C.F.R. § 240.10b-5.............................................................................. 16

Schwab respectfully submits this opposition to Defendants' motions to dismiss its second amended complaint ("SAC") under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

In *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018) ("*Schwab*"), the Second Circuit vacated this Court's ruling that the primary determinant of specific jurisdiction was the location where the Panel Bank Defendants transmitted their daily submissions for use in calculating LIBOR throughout the period relevant to Schwab's claims, August 2007 to May 2010 ("Relevant Period").  The court of appeals also said it was "plausible" that Schwab could, subject to alleging the types of facts now included in the SAC, sufficiently plead jurisdiction over the Issuer Defendants based on their associated Bank Affiliates' solicitation and sales of notes to Schwab in California.  *Id.* at 85-86.  Additionally, the court held that, subject to carrying its "minimal pleading burden" to clarify its theory or theories of loss causation, Schwab "should . . . be permitted to proceed with Securities Exchange Act claims concerning misrepresentations and omissions that induced Schwab's purchase of floating-rate instruments." *Id.* at 93-94.  Those rulings, together with Schwab's additional allegations in the SAC, mean two things:  Schwab has numerous live claims, and this Court has jurisdiction over them.

Failing to appreciate *Schwab*'s impact on this case or the law regarding personal jurisdiction as to claims under the Securities Exchange Act ("Exchange Act"), Defendants insist Schwab has few, or even no, claims subject to the jurisdiction even of a *U.S.* court applying *federal* law under a statute providing for *worldwide* service of process.  To the contrary, Defendants—all massive U.S.-based and foreign banks, many of which issued and/or sold

---

[1] Unless otherwise indicated, (i) citations to "¶ __" refer to paragraphs of the SAC; (ii) citations to "Dkt. __" refer to the MDL docket (Master File No. 11-md-2262); and (iii) all emphasis in this brief has been added, and all internal citations and quotation marks have been omitted.

(whether directly or through their affiliates) billions of dollars in financial instruments to Schwab—should have anticipated being haled into a U.S. court to answer for unlawfully suppressing "the world's most important number." ¶ 3. And given the live Exchange Act claims, pendent personal jurisdiction exists as to all of Schwab's state law claims, which, as this Court has found with respect to other federal and state claims in this MDL, arise from the same common nucleus of operative fact as Schwab's Exchange Act claims. The jurisdictional inquiry should end there.

In any event, Schwab has made a *prima facie* showing of jurisdiction based on direct sales by certain Issuer Defendants, sales through Bank Affiliates of those and other Issuer Defendants, or by virtue of the plausibly alleged conspiracy to persistently suppress LIBOR. In challenging Schwab's allegations, particularly regarding agency jurisdiction, Defendants downplay the strength of the numerous specific facts Schwab presents and overstate its burden on this pre-discovery pleading motion. The SAC *plausibly alleges* the Bank Affiliates acted as the Issuer Defendants' agents in soliciting and selling notes to Schwab—all that is required. And at the very least, Schwab has made a showing sufficient to warrant jurisdictional discovery regarding facts bearing on agency.

Defendants' 12(b)(6) arguments fare no better. Their resurrected challenge to loss causation runs headlong into the Second Circuit's mandate and improperly conflates *pleading causation* with *proving damages*. Defendants also challenge Schwab's unjust enrichment claims to the extent they arise from transactions in fixed-rate instruments, notwithstanding the modest pleading burden for those claims and the Second Circuit's determination that Schwab sufficiently alleges it was foreseeable to Defendants that Schwab would rely on LIBOR in deciding whether to purchase fixed-rate notes. Defendants further claim Schwab never before alleged unjust

enrichment based on fixed-rate transactions, when the record plainly shows otherwise. Finally, Defendants assert Schwab should not be permitted to amend on matters the Second Circuit did not directly address. But the court of appeals expressly left it to this Court's discretion whether to allow Schwab to do so, and the amendments fall well within Rule 15's ambit, particularly given the extraordinary procedural circumstances of this case.

Not only do Defendants' arguments lack merit, it is often difficult to discern which claims, against which Defendants, they are attacking. In contrast to the highly specific SAC, Defendants often lump Schwab's allegations together with those of other plaintiffs, and challenge some claims "in part" while failing to identify which claims or which parts. Defendants try to gloss over these shortcomings by proposing that *the parties* ultimately determine which claims are in and which are out. The Court should decline Defendants' invitation to further prolong the Rule 12 process. In the nearly seven years since Schwab first brought its claims, it has faced four motions to dismiss, been on appeal three times, and received not one document from Defendants. Enough is enough—it is time for this case to move past the pleading stage.

## AMENDMENTS AND CLAIMS IN THE SAC

In response to the Second Circuit's and this Court's rulings, Schwab amended its allegations to provide additional clarity regarding its transactions, claims, and bases for personal jurisdiction. Specifically, in the body of the SAC, Schwab (1) identifies all transactions giving rise to the claims asserted in this case, including by reference to the accompanying Appendices A, B, and C, which list each relevant transaction (¶¶ 159-78); (2) details the theory or theories of liability with respect to each claim (¶¶ 179-217); and (3) articulates the bases for exercising personal jurisdiction over each Defendant with respect to each claim (¶¶ 218-67). Further, Appendix A (Dkt. 2564-1) identifies all subject transactions in floating-rate notes; Appendix B

3

(Dkt. 2564-2) identifies all subject transactions in fixed-rate notes issued by Panel Bank Defendants, which are relevant to Schwab's claims for unjust enrichment; and Appendix C (Dkt. 2564-3) identifies all subject transactions in fixed-rate notes issued by Parent Company Defendants, which are also relevant to Schwab's unjust enrichment claims. *See, e.g.*, ¶¶ 177-78, 208.  The Appendices provide (to the extent available) salient details of each transaction, including the trade date, asset ID/CUSIP, type of instrument, maturity date, the entity that issued the note, and the broker-dealer that sold it to Schwab.  The identities of the issuers and sellers are especially significant, as Schwab asserts most of its claims against issuers (as well as certain Exchange Act claims against sellers of floating-rate notes), and alleges the broker-dealers regularly solicited and sold notes to Schwab (¶¶ 132-58), which is particularly relevant to personal jurisdiction. *See, e.g.*, ¶¶ 244-52.

Additionally, as this was Schwab's first opportunity since October 2014 to amend its allegations, Schwab also (1) included Credit Suisse AG ("CSAG"), Lloyds Bank plc ("Lloyds Bank"), Bank of Scotland plc ("Bank of Scotland"), and The Royal Bank of Scotland plc ("RBS plc") among the Panel Bank Defendants, correcting Schwab's prior mistake of identifying those entities' respective parent companies Credit Suisse Group AG ("CSGAG"), Lloyds Banking Group plc ("LBG plc"), and The Royal Bank of Scotland Group plc ("RBS Group plc") as panel banks (¶¶ 48, 84, 104); (2) clarified that Defendants Bank of America, N.A., Royal Bank of Canada, and RBS plc sold notes both directly and indirectly to Schwab, rather than only the latter (¶¶ 26, 94, 105, 161); and (3) modified its claim for interference with prospective economic advantage ("economic advantage") to tortious interference with contract ("tortious interference"), to account for this Court's upholding of the latter type of claim in *LIBOR IV*[2] and

---

[2] *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*), 2015 WL 6243526, at *80-82 (S.D.N.Y. Oct. 20, 2015).

Schwab's further review of the transactions giving rise to its claims (¶¶ 210-12, 509-12).

The SAC asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act, as well as state law claims for fraud, aiding and abetting fraud, breach of the implied covenant of good faith and fair dealing ("implied covenant"), unjust enrichment, and tortious interference, and alleges Defendants conspired to manipulate LIBOR.  ¶¶ 179-217, 468-521.  A chart identifying the claims against each Defendant is included as Appendix 1 to this brief.[3]

## ARGUMENT

### I.   SCHWAB'S AMENDMENTS ARE PROCEDURALLY PROPER

#### A.   Schwab's Identification of Certain Defendants as both Direct and Indirect Sellers Should Be Permitted.

Schwab's amendments identifying certain Defendants as both direct and indirect sellers, rather than only the latter, fall well within Rule 15's directive that leave to amend "should 'freely' be given 'when justice so requires.'"  *Omega Advisors, Inc. v. Lewis*, 2010 WL 726956, at *1 (S.D.N.Y. Feb. 17, 2010) (Buchwald, J.) (quoting Fed. R. Civ. P. 15(a)(2)).  Defendants assert that *Schwab* and this Court's April 11, 2018 Order (Dkt. 2490) foreclose these amendments, and that they come too late.  Defendants are wrong on both counts.

Most importantly, Defendants claim neither prejudice as a result of these amendments, nor that Schwab has acted in bad faith in bringing them.  Those concessions alone are dispositive, as "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."  *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (alteration and ellipsis in original).

In any event, a defendant may only be "prejudiced" within the meaning of Rule 15 if the amendment would "require [defendant] to expend significant additional resources to conduct

---

[3] As the Court is aware, Schwab's federal and state antitrust claims are pending in separate actions that are currently on appeal before the Second Circuit.

discovery and prepare for trial" or would "significantly delay the resolution of the dispute."  *Id.*

Neither of those circumstances is present here, as Defendants have thus far expended *no*

resources to conduct discovery relating to Schwab (as Schwab has been precluded from

participating in discovery), and trial is likely years away.  Nor would including additional

*transactions* against *the same Defendants* (and one Added Defendant, RBS plc, that is closely

related to Original Defendant RBS Group plc) "significantly delay" the resolution of this case.

Accordingly, that Schwab's trading records were "available to it since before it filed its initial

complaint" (Merits Br. (Dkt. 2623) 19 n.28) is irrelevant.  Particularly so given that Defendants

did not challenge specific jurisdiction as to Schwab's claims based on their status as direct or

indirect sellers before the *LIBOR IV* appeal.  Indeed, in rejecting Defendants' argument that

Schwab should not be permitted to amend on remand, the Second Circuit agreed "Schwab

plausibly argues that *Defendants* forfeited some of their arguments by failing to raise them in the

district court, and making them for the first time on appeal."  *Schwab*, 883 F.3d at 89 (emphasis

in original).  But the court of appeals explained "contentions of waiver and forfeiture"—the

essence of Defendants' challenge to these amendments—must be understood in the context of

"the extraordinary scope of the litigation."  *Id.*  So too, here.

Nor are these "unrelated allegations that [Schwab] wishes had been better pleaded in the

first instance," Apr. 11, 2018 Order (Dkt. 2490), as Defendants assert.  *See* Merits Br. 19 n.28.

These additional facts regarding the identities of the issuers and sellers involved in the

transactions encompassed by this case are very much "related" to the issues addressed in

*Schwab*.  In any event, this case had until recently been on appeal for nearly two years, rendering

Schwab unable to amend during that time.  And any amendment before then would have been

futile given this Court's central rulings on personal jurisdiction, under which Schwab's claims

were dismissed in their entirety regardless of the detail with which Schwab pleaded them. These amendments accordingly fall well within Rule 15's "permissive" scope, which reflects the Second Circuit's "strong preference for resolving disputes on the merits." *Loreley Fin.(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

### B.     As Schwab's Claims Against the Added Defendants Relate Back to Its 2013 Complaint, They Are Timely.[4]

Defendants contend relation back does not apply to Schwab's claims against the Added Defendants because Schwab "knew that these Defendants were LIBOR panel banks" by July or November 2014. That argument is wrong, for two reasons.

*First*, "[b]y focusing on [Schwab]'s knowledge, [defendants] chose the wrong starting point." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010). As the Supreme Court has instructed, "[t]he question under Rule 15(c)(1)(C)(ii) is not whether [Schwab] knew or should have known the identity of [CSAG, Lloyds Bank, Bank of Scotland, and RBS plc] as the proper defendant[s], but whether [those entities] knew or should have known that [they] would have been named as . . . defendant[s] but for an error." *Id.* Information in Schwab's possession "is relevant only if it bears on the defendant's understanding of whether [Schwab] made a mistake regarding the proper party's identity." *Id.* This standard "is consistent with the purpose of relation back: to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Id.* at 550.

*Second*, to the extent the information available to Schwab matters at all, the pertinent inquiry is what information was available as of 120 days after Schwab filed its *initial complaint*

---

[4] In addition to arguing these claims are time-barred, Defendants assert the inclusion of the Added Defendants in the SAC is foreclosed by *Schwab* and this Court's April 11, 2018 Order. The same authorities and arguments defeating Defendants' arguments with respect to transactions relating to direct sellers likewise render these amendments proper under Rule 15. *See supra* pp. 6-7.

7

in this case *in April 2013*—the complaint as to which Schwab seeks relation back.  *See* Fed. R.

Civ. P. 15(c)(1) (prescribing conditions under which amendment "relates back to the date of the

*original pleading*"); *Krupski*, 560 U.S. at 548 ("Rule 15(c)(1)(C)(ii) asks what the prospective

*defendant* knew or should have known during the Rule 4(m) period [i.e., 120 days after the

original complaint was filed], not what the *plaintiff* knew or should have known at the time of

filing her *original complaint*") (first and second emphases in original).

Schwab's 2013 complaint alleged CSGAG, LBG plc, and RBS Group plc were panel

banks, and the Added Defendants—the actual panel banks—clearly knew or should have known

by late August 2013 (120 days after Schwab's initial complaint was filed) that Schwab would

have named them "but for [that] error."  *Krupski*, 560 U.S. at 548.  Further, "[t]he reasonableness

of [Schwab]'s mistake is not itself at issue."  *Id.* at 549.

RBS plc nonetheless asserts its February 2013 settlements with government regulators

"made clear that it was on the LIBOR panel."  Merits Br. 20 n.31.  But the Final Notice of the

U.K. Financial Services Authority, on which Defendants rely, addressed RBS plc's manipulation

of *Yen*-LIBOR, and the paragraph they cite states "[i]n the Relevant Period" (defined as January

2006 to March 2012) RBS plc "contributed to the calculation of LIBOR rates for several

currencies, including JPY, CHF and USD by making daily rate submissions."  RBS FSA Final

Notice ¶ 37.  That single, generalized sentence, which barely mentions USD LIBOR, does not

establish Schwab "ma[de] a deliberate choice" in April 2013 "to sue [RBS plc] instead of [RBS

Group plc] while fully understanding the factual and legal differences between the two parties."

*Krupski*, 560 U.S. at 549.

Lloyds Bank and Bank of Scotland contend Schwab "was made aware that [they] were

LIBOR panel banks on July 28, 2014."  Merits Br. 20.  (On the other hand, Defendants point to

no facts even suggesting Schwab knew or should have known by April 2013, *or even by October 2014*, that CSAG, rather than CSGAG, was a panel bank.)  As discussed above, what *Schwab* may have known *as of July 2014* is irrelevant; *these Defendants* knew or should have known as of August 2013 that but for a mistake, they would have been named as defendants.

And even assuming *arguendo* information available to Schwab as of July 2014 does bear on the Added Defendants' understanding about whether they were mistakenly not named as defendants, the facts nonetheless show a "mistake," which the Supreme Court has defined to include "'a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention.'"  *Krupski*, 560 U.S. at 548-49 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1092 (9th ed. 2009)).  Defendants claim no more than "inattention" by Schwab. Their reliance on decisions where newly added defendants had not been named earlier because plaintiffs "did not know their identities," *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1996), is accordingly misplaced.[5]

Additionally, that plaintiffs in two other cases entered into a stipulation in December 2014 through which Bank of Scotland and CSAG (as well as HSBC Bank plc, which was already named as a defendant in this case) were substituted as defendants is, again, irrelevant to what the

---

[5] *See also Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994) (no mistake where plaintiff "[p]lainly . . . knew the identities of the . . . employees who she contended had harassed and discriminated against her" and "an exhibit to the original complaint identified those individuals and set out details of their alleged misconduct"); *Schoolcraft v. City of New York*, 81 F. Supp. 3d 295, 301 (S.D.N.Y. 2015) ("An amended complaint seeking to replace a John Doe with a named defendant after the expiration of the statute of limitations does not relate back to the initial complaint under Rule 15(c)[.]"); *Cruz v. City of New York*, 2007 WL 1223225, at *1, *3-4 (S.D.N.Y. Apr. 25, 2007) (in case involving, *inter alia*, "thirty unidentified New York City Police Officers," plaintiff sought to add individual defendants unrelated to the previously named defendant, and did not claim a mistake in not naming them earlier); *Abdell v. City of New York*, 2006 WL 2620927, at *5 (S.D.N.Y. Sept. 12, 2006) (no mistake where plaintiffs asserted "they did not discover until after they filed their Complaint that [the new defendant] had contributed to the arrest decision," which was "just another way of saying that Plaintiffs lacked knowledge regarding [his] potential liability"); *Strada v. City of New York*, 2014 WL 3490306, at *5-6 (E.D.N.Y. July 11, 2014) (plaintiff attempted to substitute names for defendants previously identified as "John Does," and "after the close of discovery"); *Hunter v. Deutsche Lufthansa AG*, 2013 WL 752193, at *4 (E.D.N.Y. Feb. 27, 2013) (applying *Krupski*, court observed that "[t]he allegations in the original complaint premised liability solely on plaintiff's interaction with Lufthansa and Etihad representatives in the Frankfurt airport," and explained "[p]laintiff's decision to sue those airlines was not a mistake, nor was it based on any misimpression on plaintiff's part").

Added Defendants knew or should have known in 2013 about Schwab's mistake.[6]

Further, by late 2014 Defendants had already moved to dismiss all of Schwab's claims for lack of personal jurisdiction.  It would have made no difference to the outcome of that motion whether Schwab sought to include the Added Defendants at that time.  And this Court then dismissed Schwab's case in its entirety on grounds not relevant to which entities were named as defendants.  There was thus "no reason for Schwab to file a post-judgment motion seeking leave to amend in order to clarify the identity of [the Added Defendants]," as *LIBOR IV*'s reasoning "meant that no such amendments would remedy the defects that [this Court] perceived." *Schwab*, 883 F.3d at 90.  Schwab cannot be faulted for "declin[ing] to sue these Defendants until June 2018" (Merits Br. 21), when Schwab's case *had been dismissed or on appeal since LIBOR IV was issued in 2015*.  There has been no undue delay.

## II.   SCHWAB MAKES A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION FOR EACH OF ITS CLAIMS

### A.   Personal Jurisdiction Exists as to All of Schwab's Exchange Act Claims.

Section 27 of the Exchange Act, which authorizes worldwide service of process, "permits the exercise of personal jurisdiction to the full limit of the Fifth Amendment's Due Process Clause." *Donoghue v. Dicut, Inc.*, 2002 WL 1728539, at *1 (S.D.N.Y. July 24, 2002) (Buchwald, J.).  Accordingly, for Exchange Act claims, "the relevant forum is the United States, not a particular district," and "Second Circuit authority dictates that a district court may exercise its personal jurisdiction in a securities action if the defendant's activities 'could reasonably be expected to be visited upon United States shareholders.'"  *Id.* (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)).  The Exchange Act's expansive jurisdictional reach

---

[6] That Schwab has added, rather than substituted, these Defendants makes no difference.  *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 289 F.R.D. 401, 406 (S.D.N.Y. 2013) ("There is no requirement . . . that an amendment must replace a party in order to establish a mistake warranting relation back.  Amendments adding new defendants may relate back if the requirements [of Rule 15(c)(1)(C)] are met.").

encompasses all of Schwab's claims.  In challenging jurisdiction, Defendants fail to confront the Exchange Act on its own terms, relying instead on prior rulings regarding *state law claims*, which are subject to more-limited jurisdiction.  Defendants also misconstrue, and at times outright ignore, the impact of the Second Circuit's rulings in *Schwab* on this litigation.

> 1. **The Domestic Panel Bank Defendants and the Domestic Parent Company Defendants are subject to general personal jurisdiction as to Schwab's Section 10(b) and 20(a) claims.**

For nearly 45 years, the law of this Circuit "plainly" has been that "where, as here, the defendants reside within the territorial boundaries of the United States, the 'minimal contacts,' required to justify the federal government's exercise of power over them, are present."  *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).  Contrary to Defendants' assertion, nothing in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), which examined the reach of general jurisdiction under the *Fourteenth* (not the Fifth) Amendment through *a state long-arm statute*, addressed— let alone overturned—that principle.  Because the Domestic Panel Bank Defendants and the Domestic Parent Company Defendants are domiciled in the United States, their contacts with this country are sufficiently "continuous and systematic" to subject them to general jurisdiction with respect to Schwab's Exchange Act claims.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *see generally* MOORE'S FEDERAL PRACTICE (3d ed. 2017), vol. 16, § 108.120 (collecting cases).

Defendants misread *Daimler* as somehow establishing that, with respect to *federal* claims subject to *nationwide* contacts under the *Fifth* Amendment, a corporation can be subject to general jurisdiction only in the *state* where it is incorporated or maintains its principal place of business.  PJ Br. (Dkt. 2627) 46.  Unsurprisingly, they cite no decision supporting that untenable interpretation of the law, and Schwab has found none.  On the other hand, several post-*Daimler* decisions from within this Circuit have confirmed *Mariash*'s continued vitality.

In *Cohen v. Facebook, Inc.*, for example, Judge Garaufis held "[t]here is no question that Facebook has the required contacts with the United States as a whole" to afford personal jurisdiction under the Anti-Terrorism Act ("ATA"), given that "Facebook is incorporated in Delaware and has its principal place of business in California." 252 F. Supp. 3d 140, 153 (E.D.N.Y. 2017). Citing both *Mariash* and *Daimler*, the court added, "[a]s a United States resident, Facebook could hardly argue that it lacks the required contacts with the country as a whole," and exercising jurisdiction over Facebook with respect to ATA claims thus "comports with the requirements of due process." *Id.* at 153-54. And in *SEC v. Committee on Ways and Means of the U.S. House of Representatives*, Judge Gardephe, also citing *Mariash*, held personal jurisdiction existed with respect to Exchange Act claims against U.S. entities by virtue of their residency in this country. 161 F. Supp. 3d 199, 222 (S.D.N.Y. 2015). Judge Failla held similarly with respect to Exchange Act claims in *Yu v. Premiere Power LLC*, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) ("[W]hile some of the alleged fraudulent conduct took place while Plaintiffs were traveling abroad, Defendant was at all relevant times a resident of Oklahoma. This alone satisfies the minimum contacts requirement.") (citing, *inter alia*, *Mariash*). This well-established principle applies equally here.

Defendants rely on this Court's statement, following *LIBOR VI*, that it did not "intend[] to assert general jurisdiction over all United States-domiciled defendants for Sherman Act claims regardless of the state in which the individual action was filed." Feb. 2, 2017 Order (Dkt. 1761), at 2. Observing that "[g]eneral jurisdiction and specific jurisdiction require different legal analyses," the Court reasoned "the question of minimum contacts only applies in a specific jurisdiction analysis." *Id.* at 2-3. Defendants echo the Court's reasoning, and further suggest that because *Mariash* refers to "minimum contacts," it addresses only specific, not general,

jurisdiction and is therefore inapposite.  *See* PJ Br. 46 & n.87.  That is wrong.

The law is clear that the minimum contacts test applies to *both* specific and general jurisdiction.  *See, e.g.*, *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 38 (2d Cir. 2014) (observing, post-*Daimler*, that "[b]ecause general jurisdiction is not related to the events giving rise to the suit, . . . courts impose a more stringent *minimum contacts test*") (ellipsis in original); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 128 (2d Cir. 2008) (explaining that because plaintiffs "ma[d]e no serious attempt to show that their suit either arises out of, or is related to, Marward's contacts with the United States," plaintiffs "must satisfy the more stringent *minimum contacts test for general jurisdiction cases*, by showing that Marward had continuous and systematic general business contacts with the United States").  *Mariash* and cases following it simply recognize that by incorporating and maintaining its principal place of business in this country, a corporation maintains "continuous and systematic general business contacts" necessary to impute general jurisdiction over it with respect to claims subject to nationwide service of process.  In short, the Domestic Panel Bank Defendants and the Domestic Parent Company Defendants "reside[] within the United States, . . . conduct[] business within the United States, and [they] should reasonably anticipate being haled into court in the United States."  *Yu*, 2015 WL 4629495, at *5.  That ends the jurisdictional inquiry as to them.

> ### 2. Under the national contacts analysis, specific personal jurisdiction lies over the Floating-Rate Issuer Defendants based on their issuance of notes in the United States.

This Court has held jurisdiction exists with respect to claims against bond obligors "where the bond was issued."  *LIBOR IV*, 2015 WL 6243526, at *37.  Accordingly, for Schwab's Exchange Act claims, which are subject to a national contacts test, jurisdiction exists as to claims arising from issuances *within the U.S.*; the particular state in which the issuances occurred is irrelevant.  *See LIBOR IV*, 2015 WL 6243526, at *23 ("[w]hen the national sovereign is applying

national law, the relevant contacts are the contacts between the defendant and the sovereign's nation") (alteration in original).[7]  Schwab asserts Section 10(b) claims arising from issuances by (1) Domestic Panel Bank Defendants Bank of America, N.A. and JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank"), as well as Domestic Parent Company Defendants Citigroup Inc. and JPMorgan Chase & Co., which by definition occurred within the U.S.; and (2) Foreign Panel Bank Defendants Barclays Bank plc ("Barclays Bank"), CSAG, Deutsche Bank AG, Rabobank, Royal Bank of Canada, RBS plc, and UBS AG, mostly (if not entirely) through their New York or Stamford, Connecticut branches.  ¶¶ 161-64, 168-69, 186-87.  Further, as Defendants acknowledge, a *prima facie* showing of personal jurisdiction based on the location of the notes' issuance does not require alleging a "course of dealing" with these Defendants, *see* PJ Br. 29 n.58, though Schwab does allege that.  ¶¶ 28, 37, 43, 52, 57, 73, 99, 109, 116, 134-58, 161-64.

Defendants assert, however, that while Schwab identifies the underwriters or agents that sold the notes to it (*see* ¶¶ 162-74 & App'xs A, B, C), its allegations do not suffice in light of this Court's explanation that *LIBOR IV*'s reference to "where the bond was issued (i.e. where the bond was placed with an underwriter or agent for sale or marketing)" means "the 'office [of the underwriter or agent] where the deal was actually done.'"  PJ Br. 31 (quoting May 19, 2016 Tr. (Dkt. 1429) at 3:10-15).  But the SAC and accompanying Appendix A, which details all floating-rate transactions encompassed by the SAC, identify all *U.S.-based* sellers.  The seller's specific office location within the U.S. is immaterial to the national contacts analysis.  Further, to the extent (if at all) there is any ambiguity regarding whether a seller was located within the U.S., it is reasonable to infer at this stage that with respect to notes issued by U.S.-based issuers or domestic branches of foreign issuers, and purchased by Schwab in the U.S., "the deal was

---

[7] As Defendants do not challenge venue as to Schwab's Exchange Act (or other) claims, Schwab need only sufficiently allege a basis for personal jurisdiction within the U.S.

actually done" (May 19, 2016 Tr. at 3:11) in this country.[8]

Additionally, by issuing notes to be sold by U.S.-based broker-dealers, the issuer

Defendants referenced above engaged in activities that "could reasonably be expected to be

visited upon United States [investors]," and so were directed to the U.S. *Donoghue*, 2002 WL

1728539, at *2; *see also SEC v. Straub*, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013) ("Where an

executive of a foreign securities issuer, wherever located, participates in a fraud directed to

deceiving United States shareholders in violation of federal regulations requiring disclosure of

accurate information to holders of securities traded in the United States, . . . direct consequences

[in the United States] have occurred."). That also applies to issuances that may have occurred

outside of this country, as the foreign issuer Defendants referenced above "deliver[ed] [their]

products into the stream of commerce with the expectation that they w[ould] be purchased by

[investors] in the [United States]." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

298 (1990).[9]

### 3. Specific jurisdiction lies as to Exchange Act claims arising from the Floating-Rate Seller Defendants' *sales* of securities issued by others.

Contrary to Defendants' assertion, this Court's prior dismissal of claims against "non-

obligor Defendants" on the merits (PJ Br. 27 n.54) does not apply to Schwab's Exchange Act

claims against the Floating-Rate Seller Defendants, for three reasons.

*First*, the Second Circuit's core personal jurisdiction ruling in *Schwab*—that

"[a]llegations of billions of dollars in transactions in California easily make out a prima facie

---

[8] *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) ("In evaluating whether the requisite showing [of personal jurisdiction] has been made, we construe the pleadings and any supporting materials in the light most favorable to the plaintiffs.").

[9] *See also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 371-72 (3d Cir. 2002) ("A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market."); *Straub*, 921 F. Supp. 2d at 257-58 ("Although Defendants' alleged bribes may have taken place outside of the United States . . ., their concealment of those bribes, in conjunction with [the company]'s SEC filings, was allegedly directed toward the United States.").

showing of personal jurisdiction for claims relating to those transactions," 883 F.3d at 82—
fatally undermines Defendants' jurisdictional challenge to Section 10(b) claims against the
Floating-Rate Seller Defendants.  Schwab alleges each of those Defendants sold hundreds of
millions, or billions, of dollars in floating-rate notes to Schwab, and in doing so failed to disclose
that LIBOR was artificially suppressed.  ¶ 187.  Accordingly, under the law of this case, personal
jurisdiction exists as to these claims.

 *LIBOR IV* is not to the contrary.  This Court did not hold these claims cannot lie against
Defendants based on their sales of notes to Schwab; rather, it dismissed Section 10(b) claims for
failure to sufficiently plead a connection with a "purchase or sale of a security" and loss
causation, which the Second Circuit vacated as to "misrepresentations and omissions that
induced Schwab's purchase of floating-rate instruments."  *Schwab*, 883 F.3d at 93.  Nor does the
law regarding Section 10(b) support Defendants' asserted limitation.  By soliciting and selling
floating-rate notes to Schwab while failing to disclose that LIBOR was manipulated, the
Floating-Rate Seller Defendants made false or misleading statements under Rule 10b-5.  *See* 17
C.F.R. § 240.10b-5 (declaring it unlawful to, *inter alia*, "omit to state a material fact" necessary
to render statement "not misleading").

 *Second*, these claims arise from or relate to the Floating-Rate Seller Defendants' sales of
notes to Schwab in the United States, irrespective of the identities of the issuers.  Indeed, those
transactions bear an *even stronger* relationship to Schwab's Exchange Act claims than the state
law claims the Second Circuit addressed, as these claims require that a material misstatement or
omission be made "in connection with the purchase or sale of a[] security."  17 C.F.R.
§ 240.10b-5.  There is thus, at a minimum, "a 'but for' connection between the defendant[s']
forum-directed activities and the[se] claim[s]."  *LIBOR IV*, 2015 WL 6243526, at *28.

*Third*, Defendants incorrectly assert Schwab's Section 10(b) claims are based *solely* "upon (i) the panel banks' allegedly false LIBOR submission[s] to the BBA and (ii) alleged omissions made by the panel banks and parent companies in issuing floating rate notes purchased by Schwab." Merits Br. 9 n.14. Schwab's Section 10(b) claims are based on those misrepresentations *as well as* the Floating-Rate Seller Defendants' failure to disclose, in soliciting and selling notes to Schwab, that LIBOR was manipulated (¶¶ 184-87)—claims the Second Circuit has held are cognizable. *See Schwab*, 883 F.3d at 94 (observing that Schwab's Exchange Act claims are based on, *inter alia*, defendants' "failure to disclose their manipulation of LIBOR when selling Schwab floating-rate instruments tied to it," and holding "the particularity requirements of Rule 9(b) and the PSLRA have been satisfied" as to those claims). Accordingly, to the extent Defendants contend personal jurisdiction does not lie as to these claims because they fail on the merits, they are mistaken.

### 4. Specific jurisdiction also lies as to Schwab's Section 10(b) claims against all Defendants based on their false LIBOR submissions.

Schwab also asserts Section 10(b) claims against all Defendants arising from their false LIBOR submissions to the BBA throughout the Relevant Period. ¶ 185. The Second Circuit upheld these claims to the extent they arise from floating-rate transactions Schwab entered into from April 27, 2008 to May 2010. *See Schwab*, 883 F.3d at 93-94. As with Schwab's Section 10(b) claims specific to the Floating-Rate Issuer Defendants and the Floating-Rate Seller Defendants, there is at least a "but for" connection between the sale of floating-rate notes to Schwab in the United States and Section 10(b) claims against all Defendants based on their false LIBOR quotes, as Schwab would not have a claim at all against any of these Defendants for those misrepresentations absent its "purchase or sale of a security."

Defendants' attempt (*see* PJ Br. 20-21) to shoehorn these claims into *Schwab*'s ruling that

17

"sales in California do not alone create personal jurisdiction for [state law] claims premised solely on Defendants' false LIBOR submissions," 883 F.3d at 83, is accordingly unavailing. The Second Circuit was not addressing personal jurisdiction with respect to Schwab's Exchange Act claims, and the court's analysis regarding state law claims is, by its very terms, inapplicable here. The court determined the California transactions neither caused Defendants' false LIBOR submissions "nor . . . in some other way *g[a]ve rise to claims seeking to hold Defendants liable for those submissions*." *Id.* at 84. As explained above, that is definitively *not so* with respect to Schwab's Exchange Act claims.

### B. The Court Should Exercise Pendent Personal Jurisdiction Over Schwab's State Law Claims, Which Are Closely Related to Its Exchange Act Claims.

The doctrine of pendent personal jurisdiction "provides that where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available." *Id.* at 88. This Court has previously exercised pendent jurisdiction over state law claims based on sufficiently pleaded federal claims in this MDL, recognizing that the claims derived from the same nucleus of facts relating to Defendants' alleged unlawful suppression of LIBOR. *See LIBOR IV*, 2015 WL 6243526, at *24 (exercising pendent jurisdiction over unjust enrichment claims by virtue of Commodity Exchange Act claims). Defendants offer no credible challenge to pendent jurisdiction with respect to Schwab's state law claims.

*First*, Defendants once again urge the Court to decline to exercise pendent jurisdiction because, they say, Schwab's Exchange Act claims fail on the merits. But the Second Circuit has already held Schwab can plead Exchange Act claims, and as detailed *infra* pp. 33-36, the SAC fills the loss causation gap the court of appeals identified with respect to the 2014 complaint.

18

Defendants' attempt to reanimate this merits-based argument accordingly falls flat.

*Second*, Defendants contend state law "Non-Counterparty Claims," which they define as "premised on [LIBOR] submissions outside the United States," do not share a common nucleus of operative fact with "Counterparty-based Exchange Act claims," which they define as "arising from alleged sales to the Schwab Plaintiffs in California." PJ Br. 43-44. But pendent jurisdiction is not so restrictive. A "common nucleus" exists "where 'the facts underlying the federal and [non-federal] claims substantially overlap[] [or] the federal claim necessarily [brings] the facts underlying the [non-federal] claim before the court.'" *Cohen*, 252 F. Supp. 3d at 154 (alterations in *Cohen*) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006)). At minimum, Schwab's federal and state claims "substantially overlap": all of Schwab's claims arise from—indeed, turn on—Defendants' false LIBOR submissions. For the same reason, Schwab's Exchange Act claims "necessarily" bring the facts underlying its state law claims before the Court. That some of Schwab's claims (i.e., "Non-Counterparty Claims") do not *also* require a direct or indirect sale to Schwab, while others (i.e., "Counterparty Claims") do, is therefore immaterial for purposes of pendent jurisdiction.

Defendants go so far as to assert pendent jurisdiction cannot lie "over state law Counterparty Claims that are premised on *transactions* other than those that underlie their Counterparty-based Exchange Act claims." PJ Br. 44 n.82. In Defendants' view, then, each of Schwab's thousands of transactions arises from a separate set of facts, such that they are entirely unrelated for jurisdictional purposes. Defendants offer no authority for that proposition, which if endorsed would undermine the entire point of pendent personal jurisdiction—to allow *similar* (not necessarily *identical*) claims to proceed together, serving the twin goals of fairness to litigants and judicial efficiency. *See Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 720 (2d Cir.

19

1980) (encouraging disparate proceedings to address related claims would impose "burdens . . .

on the federal judiciary and on the litigants[,] hardly serving the goal of a speedy and just

determination of litigation").

Finally, Defendants misleadingly suggest the Court has "reject[ed] any attempt by

Plaintiffs 'to exercise jurisdiction over pendent or otherwise 'supplemental' claims unrelated to

defendants' contacts with the forum state.'"  PJ Br. 44 (selectively quoting *LIBOR IV*, 2015 WL

6243526, at *23 n.40).  Defendants omit the rest of the Court's statement, which continues: "in

the absence of *a federal statute* or rule authorizing such jurisdiction."  *LIBOR IV*, 2015 WL

6243526, at *23 n.40.  The Court was thus addressing a distinct "version of pendent personal

jurisdiction under which a federal court may 'entertain [state-law] claims that are not expressly

covered by the long-arm statute.'"  *Id.* (alteration in original).  Here, by contrast, pendent

jurisdiction *does* derive from a federal statute (the Exchange Act) authorizing jurisdiction over

claims "unrelated to defendants' contacts with the forum *state*."  *Id.*

> **C.  Even Absent Pendent Personal Jurisdiction, Specific Jurisdiction Exists as to State Law Claims Against Defendants that Directly or Indirectly Sold Financial Instruments to Schwab.**

In light of the Second Circuit's ruling in *Schwab*, Defendants cannot contest jurisdiction

as to Schwab's claims against Defendants Bank of America, N.A., Deutsche Bank AG, Royal

Bank of Canada, and RBS plc arising from transactions in which they issued floating-rate notes

and sold them directly to Schwab.  ¶¶ 26, 54, 94, 105, 161.[10]  Jurisdiction also lies over Issuer

Defendants based on their associated Bank Affiliates' solicitation and sale of notes to Schwab.

It is "well established that a defendant can purposefully avail itself of a forum by

---

[10] Defendants contend Schwab should not be permitted to allege Bank of America, N.A., Royal Bank of Canada, and RBS plc sold notes *both* directly to Schwab and indirectly (through their associated Bank Affiliates), because Schwab previously identified them only as indirect sellers.  As discussed *supra* pp. 5-7, that argument disregards Rule 15's "permissive standard," *Loreley*, 797 F.3d at 190, as well as the extraordinary procedural history of Schwab's claims.

directing its agents or distributors to take action there."  *Schwab*, 883 F.3d at 84 (quoting

*Daimler*, 571 U.S. at 135 n.13).  No "formal agency relationship" is required, *Retail Software*

*Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988), and the principal need not "exercise[]

direct control over its putative agent."  *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95 (2d Cir.

2000).  The Court should look to "the realities of the relationship in question rather than the

formalities of agency law."  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).

In short, even if the subject relationship "were to fall slightly outside of the confines of . . .

specific [agency] doctrines, the question . . . is whether a sufficient relationship exists under the

Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint

venture, or other particular relationship . . . exists."  *Daynard v. Ness, Motley, Loadholt,*

*Richardson & Poole, P.A.*, 290 F.3d 42, 56-57 (1st Cir. 2002).  Schwab's agency allegations are

sufficient.

### 1. Bank Affiliates sold notes to Schwab for the benefit of, with the knowledge and consent of, and under at least some control by, the Issuer Defendants.

The Second Circuit has instructed that jurisdiction attaches when the agent "acted in [the

forum] for the benefit of, with the knowledge and consent of, and under some control by, the

nonresident principal."  *Schwab*, 883 F.3d at 85; *see also Daimler*, 571 U.S. at 135 n.13 ("[T]he

commission of some single or occasional acts of the corporate agent in a state may sometimes be

deemed sufficient to render the corporation liable to suit on related claims.").  Schwab plausibly

alleges all three prerequisites to jurisdiction.

*First*, the Bank Affiliates acted in the U.S. "for the benefit of" the Issuer Defendants.

*Schwab*, 883 F.3d at 85.  In this regard, the purpose and mechanics of note issuances are

important.  Note sales allow issuers to essentially borrow money on specified terms from

investors.  ¶ 127.  When a note is sold, the obligor (issuer) and purchaser enter into a contractual

relationship that entitles the latter to ongoing interest payments.  *Id.*  While issuers sometimes sell notes directly to investors, they do so more commonly through broker-dealers.  ¶ 130.  Issuers design offerings and draft offering documents (such as prospectuses) that specify which broker-dealers will sell the offerings to investors.  *Id.*  The specified broker-dealers then solicit investors to purchase the notes, marketing them using the offering documents drafted by the issuer.  ¶ 131.  Broker-dealers accordingly facilitate the contractual relationship between issuers and investors.  The Bank Affiliates served that function in connection with the transactions at issue in this case, which supports affording jurisdiction over the Issuer Defendants based on their associated Bank Affiliates' solicitation and sale of those Defendants' notes to Schwab in California.  *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010) (upholding jurisdiction because principal "shared in the profits" of agent's sales).

*Second*, the Bank Affiliates' sales were made with the Issuer Defendants' "knowledge and consent."  *Schwab*, 885 F.3d at 85.  Those Defendants knew and consented that their affiliated broker-dealers would sell the notes in the U.S. market generally and in California specifically.  Each of the Bank Affiliates is, moreover, a U.S. broker-dealer, registered for the very purpose of selling securities in the U.S. market.  ¶¶ 24-116, 122.  And the Issuer Defendants knew their affiliates would sell the notes in California to large institutional investors like Schwab because it was the Bank Affiliates' regular practice to do so, as confirmed by senior Schwab investment managers who were continually solicited by numerous Defendants and their Bank Affiliates during the Relevant Period.  ¶¶ 28, 37, 43, 52, 57, 73, 99, 109, 116, 132 & n.137.

Indeed, this Court has upheld allegations by SEIU Pension Plans Master Trust ("SEIU") that in issuing bonds, Credit Suisse (USA), Inc. "acted as an agent of CSGAG," explaining:

> Unlike a discrete swap transaction, a bond issuance is a major corporate event that officers and directors of the corporate parent would typically oversee.  Complex

> financial entities coordinate their financing with extraordinary care and are
> unlikely to allow entities to issue securities without top-level approval. At the
> very least, it is plausible that [Credit Suisse (USA), Inc.] did not strike out on its
> own to issue a bond, but instead acted at the direction of its corporate parents.

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR V*), 2015 WL 6696407, at *22

(S.D.N.Y. Nov. 3, 2015). The same is true of sales by affiliated broker-dealers; sophisticated

financial entities that issue notes "are unlikely to allow entities to [underwrite] securities without

top-level approval." *Id.* That fundamental reality of note issuances supports agency-based

jurisdiction here. *See Cabot Hosiery Mills, Inc. v. 7mesh Indus. Inc.*, 2016 WL 9526678, at *3

(D. Vt. June 8, 2016) (jurisdiction existed given that "Defendant permitted an independent

contractor to act as its sales agent in [the forum] and was aware that the independent contractor

would solicit sales on its behalf in the forum").

    *Third*, the Bank Affiliates acted at least "under some control by" the Issuer Defendants.

*Schwab*, 883 F.3d at 85. The Issuer Defendants designed the offerings and specified the broker-

dealers authorized to market them, and had the ability and the right to determine the scope of the

Bank Affiliates' authority with respect to an offering. ¶ 131. Those are indicators of at least

"some control" by the Issuer Defendants over their associated Bank Affiliates. *Schwab*, 883

F.3d at 85; *see also In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997)

(emphasizing that under California law, "[t]he *right* to control, rather than its exercise, is

sufficient to meet the [agency] standard"); Restatement (Third) of Agency § 1.01 cmt. c ("A

principal's failure to exercise the right to control does not eliminate it."). Further, the Issuer

Defendants specifically controlled the content and form of the offering documents the Bank

Affiliates provided to Schwab when marketing the notes, which give rise to some of Schwab's

claims. ¶¶ 28, 43, 99, 116, 131, 248-49; *see also Alexander v. FedEx Ground Package Sys., Inc.*,

765 F.3d 981, 989 (9th Cir. 2014) (under California law, whether "the principal . . . supplie[d] the instrumentalities [or the] tools" is probative of an employment relationship).

*Fourth*, at least some of the Floating-Rate Issuer Defendants have *acknowledged* that their associated Bank Affiliates act as their agents.  Defendant Barclays Bank, for example, identifies its Bank Affiliate Barclays Capital Inc. ("BCI") as one of its "[p]rincipal subsidiaries," and acknowledges "[s]ubsidiaries are entities over which Barclays Bank has control."  ¶ 35.  Further, BCI is Barclays Bank's "Section 20" subsidiary, which permits Barclays Bank to engage in securities transactions it could not without BCI.  ¶ 36.  Similarly, Defendant Citigroup Inc., parent of Defendant Citibank, N.A., explains it "conducts securities, underwriting, brokerage and dealing activities through" its Bank Affiliate Citigroup Global Markets Inc.  ¶ 43.  Defendant Royal Bank of Canada likewise has described its Bank Affiliate RBC Capital Markets LLC as its "agent," and RBC Capital Markets LLC has acknowledged it is "controlled" by Royal Bank of Canada.  ¶ 97.  Finally, Defendant UBS AG states its "[s]ecurities activities in the US are conducted mainly through" its Bank Affiliate UBS Securities LLC.  ¶ 115.

*Fifth*, at least several Issuer Defendants also maintain substantial financial relationships with their Bank Affiliates.  ¶ 35 (joint bankruptcy claims in bankruptcy proceedings), ¶ 51 (CSGAG "manages [Bank Affiliate Credit Suisse Securities (USA) LLC's] funding activities"), ¶ 71 (Bank Affiliate J.P. Morgan Securities, LLC ("JPMS") acknowledges "its financial statements may not necessarily be indicative of the financial condition that would have exited if [it] had been operated as an independent entity"; further, JPMS and Defendant JPMorgan Chase Bank jointly developed investment products and have been found jointly and severally liable by the SEC); ¶ 72 (JPMS owed Defendant JPMorgan Chase & Co. more than $11 billion and had $400 million deposited with JPMorgan Chase Bank), ¶ 108 (substantial percentage of RBS plc

and subsidiaries' 2013 global revenue was attributable to its Bank Affiliate RBS Securities Inc.

and another RBS entity). These "substantial and continuing relationships" support jurisdiction.

*See Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476-79 (E.D.N.Y. 2015) (finding jurisdiction

where defendant "purposefully availed itself of the New York forum, establishing a United

States-based subsidiary with its principal place of business in New York, soliciting business

through that subsidiary, and otherwise maintaining a substantial and continuing relationship with

the New York office of [the subsidiary]").

     *Sixth*, the Bank Affiliates share corporate trade names with the Issuer Defendants (¶¶ 27,

34, 41, 55, 70, 95, 98, 106, 115), and in many instances have overlapping executives (¶¶ 35, 42,

51, 56) and/or lack independent websites (¶¶ 35, 51, 56). A third-party (such as Schwab)

interacting with a Bank Affiliate that shares corporate signifiers with its associated Issuer

Defendant and transmits offering documents bearing that Defendant's corporate name and

symbol would reasonably believe the Bank Affiliate was acting within authority delegated by the

Issuer Defendant—a strong indicator of agency. *See* Restatement (Third) of Agency § 2.03

("Apparent authority [applies] when a third party reasonably believes the actor has authority to

act on behalf of the principal and that belief is traceable to the principal's manifestations.").

### 2.   Defendants' arguments and authorities miss their mark.

     Defendants assert Schwab fails to plead the "specifics about the parent's involvement in

the particular transactions." PJ Br. 38. But Schwab does not rely on "boilerplate description[s],"

*Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 510 (S.D.N.Y.2015) (cited at PJ Br.

38), but rather identifies the salient details of all the subject transactions, including the associated

security IDs, purchase dates, issuers, and related Bank Affiliate sellers. ¶¶ 159-78; App'xs A, B,

C. Further, Schwab alleges Defendants offered securities according to standardized processes,

for which they repeatedly engaged the same Bank Affiliates. ¶¶ 28, 37, 43, 52, 57, 73, 99, 109,

116.  It is no stretch to infer that these note issuances involved the typical relationship between issuers and broker-dealers, as alleged in the SAC.

This Court has, moreover, rejected Defendants' argument that to sufficiently plead fraud claims in its 2014 complaint, Schwab needed to "cite specific terms of a contract," holding Schwab could instead identify "a set of contracts. . . . and . . . [a] set of counterparties . . . that failed to divulge information about the quality of LIBOR." *LIBOR IV*, 2015 WL 6243526, at *58; *see also Schwab*, 883 F.3d at 94 (affirming that holding).  Given Schwab's even more detailed allegations in the SAC regarding the relationships between the Issuer Defendants and their respective Bank Affiliates, as well as its allegations regarding the structure and purpose of note issuances, it is reasonable to infer at this stage that the Bank Affiliates acted as their respective Issuer Defendants' agents in connection with those issuances.

Defendants' reliance on *LIBOR V*'s holding that Texas Competitive Electric Holdings ("TCEH") did not sufficiently allege Credit Suisse International ("CSI") acted as CSGAG's agent for purposes of pleading the latter's *liability* in connection with a *swap transaction* is misplaced.  Indeed, it highlights the distinction this Court made in the same opinion regarding agency in the context of *bond issuances*.  *Compare* 2015 WL 6696407, at *21 (while TCEH pleaded facts suggesting CSI "could conceivably have acted as CSGAG's agent for some purposes," they did not "indicate[] that CSI acted as CSGAG's agent on swap transactions or that CSGAG supervised CSI's swap-trading operations"), *with id.* at *22 (contrasting "a discrete swap transaction" from "a bond issuance," which "is a major corporate event").  Further, the standard for assessing agency for personal jurisdiction is "'less onerous'" than for establishing

liability. *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005)

(quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).[11]

Nor can Defendants find support in *Jazini v. Nissan Motor Co.*, where plaintiffs "alleged

only that Nissan U.S.A. 'is able to act as would its parent, were [Nissan Japan] directly present in

the State of New York.'"  148 F.3d 181, 184 (2d Cir. 1988) (alteration in original).  Whereas that

allegation constituted merely a "restatement, with slight changes, of the legal standard for

determining agency," *id.*, Schwab's allegations are factually supported and plausible.[12]  Most of

Defendants' other cases likewise address disregarding the corporate form or establishing "alter

ego,"[13] neither of which (though potentially *sufficient* to plead agency) is required.  *See Schwab*,

883 F.3d at 85 (allegations of "benefit, knowledge, [and] some control[] are consonant with the

due process principle that a defendant must have purposefully availed itself of the privilege of

doing business in the forum").  Finally, the facts in *Elbit Systems, Ltd. v. Credit Suisse Group*

that Judge Stein deemed to "plausibly allege that [Credit Suisse Securities (USA) LLC] had

actual authority to transact business as [CSGAG]'s agent" were similar to those Schwab alleges.

*See* 917 F. Supp. 2d 217, 225-26 (S.D.N.Y. 2013) (alleging close corporate relationship,

including use of the same email suffixes and corporate logo, overlapping executives, and

CSGAG's control over aspects of Credit Suisse Securities (USA) LLC's business).  And the

---

[11] Defendants also read *LIBOR V* as holding a principal must "direct[] the specific activities that allegedly violated" the law.  2015 WL 6696407, at *21.  But while the Court suggested such allegations would be *sufficient* to plead agency, it did not hold they are *necessary*.  Regardless, Schwab alleges the Issuer Defendants controlled the content and dissemination of the false or misleading offering documents.  ¶¶ 28, 43, 99, 116, 131, 248-49.

[12] Further, *Jazini* addressed whether plaintiffs alleged "continuous and systematic" business by the agent in New York, which is required to plead the Japanese parent's "presence" in the state under *general* jurisdiction standards, *id.*, not *specific* jurisdiction as alleged here.

[13] *See Wilder v. News Corp.*, 2015 WL 5853763, at *9 (S.D.N.Y. Oct. 7, 2015) (plaintiffs did not sufficiently allege parent's control over subsidiary's executives and other personnel was "so pervasive as to warrant a finding that the corporate form was disregarded"); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 235 (S.D.N.Y. 2015) (plaintiffs "provide[d] no basis for an inference that [corporations] ignored corporate formalities or [we]re in some way indistinguishable"); *Stutts v. De Deitrich Grp.*, 465 F. Supp. 2d 156, 167-68 (E.D.N.Y. 2006) (plaintiffs failed to "establish that a subsidiary corporation [was] a 'mere department' of its parent" for purposes of *general* personal jurisdiction).

additional allegations included in *Elbit* are immaterial here, as that case evaluated agency in the *liability* context, a higher burden than for personal jurisdiction.

At the very least, Schwab has made a showing sufficient to warrant jurisdictional discovery limited to further exploring the Bank Affiliates' roles vis-à-vis their associated Issuer Defendants with respect to the subject note issuances.  While this Court has denied previous requests for jurisdictional discovery, the circumstances here are different, as Schwab has already provided significant detail about the subject entities' relationships, based on publicly available information and Schwab's transaction data.  Schwab has thus "made a sufficient start toward establishing personal jurisdiction."  *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (per curiam) (holding "it was premature to grant dismissal prior to allowing [jurisdictional] discovery on plaintiffs' insufficiently developed allegations regarding the relationship between SKM and its subsidiary").

## D.     Conspiracy Jurisdiction Applies to Schwab's Claims Against All Defendants.

While Schwab submits the conspiracy allegations in the SAC (*e.g.*, ¶¶ 253-64) suffice under the standard the Second Circuit endorsed in *Schwab*, 883 F.3d at 87, Schwab nonetheless recognizes this Court may reiterate its conclusions that "the object of the conspiracy that the [Second] Circuit recognized [in *Gelboim*] and which meets the plausibility test is the projection of financial soundness" and that "such an object is not sufficiently directed to the United States such as would support the exercise of personal jurisdiction over all panel banks."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VI*), 2016 WL 7378980, at *3 (S.D.N.Y. Dec. 20, 2016).  Schwab respectfully disagrees with both of those holdings, but in any event they are already on appeal before the Second Circuit.  Schwab accordingly focuses here on three arguments by Defendants that were not addressed in either *LIBOR IV* or *LIBOR VI*:  *first*, that

Schwab must plead, in addition to the elements the Second Circuit expressly articulated for conspiracy jurisdiction, that "*each Defendant*, either personally or through an agent under its control, *engaged in substantial suit-related conduct in the forum*" (PJ Br. 41); *second*, that conspiracy *jurisdiction* cannot lie with respect to claims for which conspiracy is not recognized as a basis for *liability*; and *third*, that California's long-arm statute does not allow for conspiracy jurisdiction.  None of these arguments have merit.

### 1. *Walden* did not eviscerate conspiracy jurisdiction.

Defendants assert the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), effectively eliminated conspiracy jurisdiction, or at least pushed it to the brink of extinction.  But *Walden* involved no conspiracy allegations and nowhere mentions conspiracy jurisdiction.  *See id.* at 279 (addressing "whether a court in Nevada may exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada").  Indeed, this Court was previously "unpersuaded" that "*Walden* dramatically revised the law of specific personal jurisdiction." *LIBOR IV*, 2015 WL 6243526, at *36 n.61.

Defendants' argument is even worse after *Schwab*, which post-dated *Walden* by several years and expressly affirmed that conspiracy jurisdiction turns on the three prerequisites—and no more—listed above.  883 F.3d at 87.  Defendants also suggest the Second Circuit somehow endorsed their "control" requirement for conspiracy jurisdiction more than 45 years ago in *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), even though *Schwab* both cites *Leasco* and nowhere endorses "control" as a prerequisite to conspiracy jurisdiction.  Indeed, Defendants reveal the actual thrust of their argument in a footnote suggesting *Schwab* was incorrectly decided (PJ Br. 41 n.76) ("The Fourth Circuit case *Schwab*

cited, *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322 (4th Cir. 2013), pre-dated *Walden*.")—a non-starter in this Court.

> ## 2.   Conspiracy *jurisdiction* is not limited to claims for which conspiracy can support *liability*.

Neither in their *LIBOR IV*-related briefing in this Court nor before the Second Circuit did Defendants assert that conspiracy jurisdiction, if otherwise appropriate, extends only to claims for which conspiracy can give rise to liability. *See, e.g.*, Br. for Appellees, *Schwab*, No. 16-1189, 2017 WL 395989 (2d Cir. Jan. 13, 2017). Regardless, this newfound argument finds no support in law or logic.

As personal jurisdiction and liability "are two separate inquiries," whether "a defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). Schwab's Exchange Act and state law claims all relate to Defendants' conspiracy to suppress LIBOR—even if some of those claims do not *require* a showing of conspiracy to establish liability—and so it does not offend due process for jurisdiction to extend to any member of the conspiracy so long as the acts relating to the Exchange Act violations were also in furtherance of the conspiracy.[14] Tellingly, Defendants offer no authority in support of their novel interpretation of conspiracy jurisdiction.

> ## 3.   Defendants' argument regarding California's long-arm statute is both forfeited and meritless.

In their prior motion to dismiss this case, Defendants "d[id] not oppose personal

---

[14] Further, Defendants are mistaken that fraudulent omission and tortious interference claims do not allow for conspiracy liability. *See Los Angeles Mem. Coliseum Comm'n v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 832-34 (2015) (reversing dismissal of fraudulent nondisclosure conspiracy claim); *Webber v. Inland Empire Inv.*, 74 Cal. App. 4th 884, 897-912 (1999) (affirming judgment for conspiracy to interfere with contract). There is also no logic or legal support for Defendants' assertion that unjust enrichment claims, which broadly provide for restitution where a defendant has unjustly obtained a benefit, *see infra* pp. 42-47, cannot be premised on conspiracy.

jurisdiction on the basis of the limiting principles of any state's long-arm statute." *LIBOR IV*, 2015 WL 6243526, at *21.  While that argument indisputably was available to Defendants in November 2014, they only now assert California law "do[es] not recognize conspiracy jurisdiction."  PJ Br. 42 & n.79.  Defendants have forfeited that aspect of their personal jurisdiction defense.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) (personal jurisdiction can "be purposely waived or inadvertently forfeited").  That it is a personal jurisdiction argument, rather than an entire defense, is immaterial.  *See Tlapanco v. Elges*, 2017 WL 4329789, at *4 (S.D.N.Y. Sept. 14, 2017) (holding plaintiff "could, and did, forfeit any *argument* that the case could not be transferred on the basis that Michigan lack[ed] personal jurisdiction over the New York Defendants by failing to timely raise that *argument* in his opposition brief to the transfer motion").[15]

    In any event, because California's long-arm statute affords jurisdiction "on any basis not inconsistent with the Constitution of [California] or of the United States," Cal. Civ. Proc. Code § 410.10, it allows for conspiracy jurisdiction to the extent the doctrine does not offend due process.  The Second Circuit has now held due process is satisfied upon a showing a conspiracy existed, the defendant participated in it, and "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Schwab*, 883 F.3d at 87.  There is no reason to expect the California Supreme Court would rule otherwise with respect to the long-arm statute.  *See LIBOR IV*, 2015 WL 6243526, at *141 ("Our duty is to predict accurately what the high court of a particular state would do in the same circumstance, and we fail equally in this duty when we erroneously dismiss a case that . . .

---

[15] Nor are Defendants saved by having raised this argument in moving to dismiss Schwab's other LIBOR cases.  *Cf. Schwab*, 883 F.3d at 88-89 (holding Schwab's cases were distinct for purposes of forfeiture of personal jurisdiction defense, court of appeals observed that "a party might have various reasons for declining to raise a personal jurisdiction defense in one case" and not another).

the state courts would sustain as we do when we erroneously sustain a case that a state court[] would dismiss.").[16]

### E. This Court Already Has Rejected Defendants' "Reasonableness" Argument, Which Has Not Improved with Age.

In *LIBOR IV*, this Court held Defendants failed to "'present a compelling case'" that "to the extent [the Court] find[s] minimum contacts sufficient to support personal jurisdiction, [it] should nonetheless conclude that personal jurisdiction fails at the reasonableness step." 2015 WL 6243526, at *33 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (1996)). Defendants nonetheless again urge "fair play, substantial justice, and international comity support dismissal." PJ Br. 47. What was a bad argument in 2014 is even worse now.

Defendants remain "sophisticated entities that, quite rightly, do not argue that they suffer any particularly compelling burden on the basis of litigating in the United States." *LIBOR IV*, 2015 WL 6243526, at *33. Further, Schwab now has live Exchange Act claims, and "[t]he reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *Straub*, 921 F. Supp. 2d at 259. Indeed, "while most courts continue to apply the test as a constitutional floor to protect litigants from *truly undue burdens*, few (and none in this Circuit) have ever declined jurisdiction, on fairness grounds, in such cases." *Id.* At its core, Defendants' contention is that some of the world's largest banks, most of which conduct extensive business in the United States and all of which engaged in a plausibly alleged conspiracy to suppress a critical financial benchmark, should be immune from suit in this

---

[16] Further, at least one California intermediate appellate court has recognized the validity of conspiracy jurisdiction under California law. *See Taylor-Rush v. Multitech Corp.*, 217 Cal. App. 3d 103, 114 (1990) (observing "the acts of a coconspirator within California may give rise to jurisdiction over a coconspirator in another state"). While the court in *Taylor-Rush* rejected "the bland allegation of conspiracy" there, *id.*, Schwab sets forth "numerous allegations that clear the bar of plausibility" with respect to Defendants' conspiracy to suppress LIBOR. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).

country for claims arising from their misconduct.  To state that argument is to refute it.

Perhaps recognizing how weak their position is, Defendants reiterate some of the same arguments they make with respect to minimum contacts (PJ Br. 47-48), rendering their reasonableness argument little more than makeweight.  It can be readily rejected.

## III.   DEFENDANTS' RULE 12(b)(6) CHALLENGES ARE UNAVAILING

### A.   Schwab Sufficiently Pleads Section 10(b) Claims.

#### 1.   Defendants' recycled challenge to loss causation contravenes the Second Circuit's mandate, and is meritless in any event.

In vacating the dismissal of Schwab's Exchange Act claims, the Second Circuit articulated a straightforward theory of loss causation: The court first explained "expert testimony might well demonstrate that, in light of Defendants' manipulation [of LIBOR], Schwab's floating-rate instruments should have been priced even lower than they were."  *Schwab*, 883 F.3d at 93.  The court then added that while Schwab "would not have experienced any losses as a result of a mispriced floating-rate instrument at the moment of purchase," as Schwab presumably could at that moment sell the instrument at the same manipulated price, "that is not to say that no losses would ever be realized."  *Id.*  If, for example, "Schwab held a mispriced instrument to maturity," it "might have incurred damages based on the reduced cash flow received from interest payments that were depressed because of Defendants' manipulation of LIBOR."  *Id.*  The court of appeals determined that "[a]t this stage of the litigation, we cannot rule out" that theory of loss causation.  *Id.*[17]  But because in its 2014 complaint Schwab "simply allege[d] that it purchased instruments that 'bore artificially low rates of return' and generally 'suffered damages in connection with [its] purchases (and other acquisitions) and sales of LIBOR-based financial

---

[17] The court of appeals also said loss causation might be shown "if Schwab tried to sell a floating-rate instrument after LIBOR manipulation was revealed," forcing it "to sell at a loss."  *Id.*  As Schwab almost always held instruments to maturity, ¶¶ 134-58, 194, it does not primarily rely on that theory.

instruments,'" *id.* (alteration in *Schwab*) (quoting 2014 complaint), the Second Circuit directed that Schwab should clarify on remand whether it alleged one or both of the loss causation theories the court had articulated. *Id.*

Schwab has satisfied its "minimal pleading burden." *Id.* Incorporating the firsthand accounts of senior Schwab investment personnel responsible for Schwab's investments during the Relevant Period, the SAC alleges Schwab almost always held instruments from issuance to maturity (¶¶ 134-58, 194)—meaning that, as the Second Circuit contemplated, Schwab suffered damages "based on the reduced cash flow received from interest payments that were depressed because of Defendants' manipulation of LIBOR." *Schwab*, 883 F.3d at 93; *see* ¶ 194. Notwithstanding the court of appeals' clear directive that in alleging precisely these sorts of allegations, "Schwab should then be permitted to proceed with Securities Exchange Act claims," *Schwab*, 883 F.3d at 93, Defendants urge this Court to revisit the merits of Schwab's loss causation allegations. Beyond the clear impropriety of that tactic, Defendants' argument is substantively meritless.

*First*, Defendants assert that by failing to identify whether each of the LIBOR-based securities encompassed by its Exchange Act claims was held to maturity, the SAC "does not even attempt to identify which transactions allegedly give rise to Exchange Act claims." Merits Br. 7. That ignores and unfairly characterizes Schwab's extraordinarily specific allegations. The SAC indeed identifies that Schwab's Exchange Act claims are based on transactions in Appendix A to the SAC that occurred on or after April 27, 2008. ¶¶ 160-74, 185-87. To contend allegations of this caliber "do[] not put the defendant[s] on notice as to the claim plaintiffs seek to raise" (Merits Br. 7 (second alteration in original)) is simply incredible, particularly given the low threshold for pleading loss causation. *See Schwab*, 883 F.3d at 93; *Sharette v. Credit Suisse*

*Int'l*, 127 F. Supp. 3d 60, 103 n.12 (S.D.N.Y. 2015) (noting "the prevailing practice in this District" of "analyz[ing] loss causation under the notice pleading standard of Rule 8").

*Second*, Defendants' reliance on this Court's observation that "'some degree of netting'" will ultimately be required to prove antitrust damages (Merits Br. 8 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VII*), 299 F. Supp. 3d 430, 591 (S.D.N.Y. 2018)) is misplaced.  As a threshold matter, "Rule 10b-5 and the PSLRA do not endorse any economic theory or methodology that should be used to quantify/demonstrate economic loss," *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 159 (S.D.N.Y. 2012), and it is unclear whether, or to what extent, netting is appropriate in determining damages under the Exchange Act.  *See, e.g.*, *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 354 (E.D. Pa. 2006) ("there is a significant amount of authority which would allow a jury to apply a transaction-based methodology, if based on adequate evidence, to calculate economic loss and damages, rather than requiring the jury to apply a cumulative approach that aggregates transactions and off-sets gains and losses stemming from different transactions"); *Vivendi*, 284 F.R.D. at 159 ("agree[ing] with plaintiffs that not all gains should or could be used to offset legally cognizable losses").

Further, *proving damages* is not the same as *pleading loss causation*.  *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 & n.6 (2d Cir. 1999) (holding plaintiffs sufficiently pleaded loss causation, adding "[t]his does not mean that issues as to the extent or even existence of damages may not arise as the litigation proceeds").  In any event, the SAC's allegations afford a plausible inference that Schwab lost more than it gained (if anything) through LIBOR-related transactions.  ¶¶ 134, 141, 147-48, 156-58, 192-94.  Defendants nonetheless claim Schwab's allegation that the Schwab Bond Funds "almost always *received* payments based on LIBOR, as opposed to *making* payments based on LIBOR," falls short because the SAC does not "describe

the relative amounts of LIBOR-based payments received and made."  Merits Br. 8.  That is simply false:  the SAC alleges the payments were "almost always" in the direction that would have harmed Schwab.  Moreover, Defendants propose something akin to "a probability requirement," when Schwab must merely provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of" damages.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Indeed, Defendants essentially ask the Court to once again "assume, at the pleading stage, that Schwab was not harmed by, and may have even benefitted from, LIBOR manipulation"—something the Second Circuit has expressly disapproved.  *Schwab*, 883 F.3d at 93.  The matter is settled:  Schwab has live Exchange Act claims.

### 2.     Certificates of deposit and bank notes are "securities."

The Exchange Act's definition of "security" is "quite broad," *Landreth Timer Co. v. Landreth*, 471 U.S. 681, 685 (1985), expressly excluding only currency and notes with a maturity of less than nine months.  15 U.S.C. § 78c(a)(1).  Consistent with the Act's plain text, the floating-rate instruments giving rise to Schwab's claims, including certificates of deposit ("CDs") and bank notes, constitute covered "securities."

Defendants rely primarily on *Marine Bank v. Weaver*, in which the Supreme Court held the federal securities laws did not encompass CDs that paid a "fixed rate of interest" and were "issued by a federally regulated bank [] subject to the comprehensive set of regulations governing the banking industry," ensuring that "the purchaser of a certificate of deposit is virtually guaranteed payment in full."  455 U.S. 551, 553 n.1, 557, 558 (1982).[18]  But *Marine Bank* does not, as Defendants contend, "conclusively hold that *all* CDs are beyond the purview of the securities laws."  *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 628 (8th Cir. 1992); *see also*

---

[18] Defendants also rely on *Wolf v. Banco Nacional de Mexico, S.A.*  But that case merely applied *Marine Bank*'s holding to conclude fixed-rate CDs issued by a bank "thoroughly regulate[d]" in Mexico were not securities.  739 F.2d 1458, 1459, 1462 (9th Cir. 1984).

*Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164-65 (S.D.N.Y. 2001).  Indeed, the Supreme Court itself cautioned:  "It does not follow that a certificate of deposit . . . invariably falls outside the definition of a 'security' as defined by federal statutes.  Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."  *Marine Bank*, 455 U.S. at 561 n.11.

Unlike the instruments at issue in *Marine Bank* (and *Wolf*), Schwab's Exchange Act claims are based on ordinary floating-rate instruments expressly tied to LIBOR.  ¶¶ 183-87; App'x A.  In "determining whether *Marine Bank* removes a given investment from the protection of the securities laws, courts have focused on whether existing regulations guarantee a return of the investment."  *Olson*, 957 F.2d at 628; *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985) (explaining that, under *Marine Bank*, "for an instrument to be a security the investor must risk loss").  Defendants point to no facts—aside from their unsupported statement that certain instruments "were FDIC-insured floating-rate notes" (Merits Br. 12), which in any event goes outside of the pleadings— suggesting Schwab did not "risk loss" with respect to these investments.  Further, Schwab alleges its return on the investments depended on LIBOR's integrity, which Defendants manipulated (¶¶ 278-430)—not merely "the future solvency of the issuing bank[s]."  *Gary Plastic*, 756 F.2d at 239-41.  Accordingly, "[t]he federal banking laws, including the FDIC, d[id] not eliminate the risk to [Schwab]."  *Id.*  At minimum, given the fact-intensive nature of this inquiry, it should not be decided at the pleading stage, but rather after discovery.

### B.     Schwab Sufficiently Pleads Section 20(a) Claims Against the Parent Company Defendants and Barclays Bank.

Schwab asserts Section 20(a) claims against (a) the Parent Company Defendants, arising

from their associated Panel Bank Defendants' multiple violations of Section 10(b); and (b) Panel

Bank Defendant Barclays Bank, arising from its Bank Affiliate Barclays Capital Inc.'s ("BCI")

violation of Section 10(b) in the course of soliciting and selling notes to Schwab.  ¶¶ 195-98.  In

addition to contending Schwab's Section 20(a) claims must be dismissed for failure to

sufficiently plead Section 10(b) claims (which, as discussed above, lacks merit), Defendants

assert Schwab (1) fails to plead that the Parent Company Defendants "culpably participated,"

i.e., knew of or recklessly disregarded, their associated Panel Bank Defendants' fraud; (2)

Schwab's Section 20(a) claim against Barclays Bank fails because Schwab does not sufficiently

allege BCI violated Section 10(b); and (3) Schwab's Section 20(a) claim against HSBC Holdings

plc fails because Schwab does not allege it purchased any floating-rate notes issued by HSBC

Bank plc.  Defendants are wrong on all counts.

> **1.     Assuming Schwab must plead "culpable participation" by the Section 20(a) Defendants, it has done so.**

As Defendants acknowledge (Merits Br. 10 n.15), there is a split of authority regarding

whether a Section 20(a) plaintiff must allege the control person "culpably participat[ed]" in the

fraud.  But even assuming (as this Court has held) it is required, Schwab's allegations and this

Court's ruling on fraud claims in *LIBOR IV* fatally undermine Defendants' challenge.

As the Court explained in upholding claims for fraud by omission in the course of

offering or trading securities, "plaintiffs need not plead scienter with great precision"; rather,

"[i]t is sufficient for plaintiffs to state plausibly that defendants were either themselves

manipulating LIBOR or that defendants were large banking institutions with access to nonpublic

data about real inter-bank transactions."  *LIBOR IV*, 2015 WL 6243526, at *58.  The Court

concluded "[t]his much may be fairly imputed as to transactions that defendants executed," *inter*

*alia*, "from August 2007 onward, when LIBOR suppression became so widespread that *any*

*major bank plausibly knew of manipulation.*" *Id.* That determination is borne out by Schwab's

allegations regarding the scope of LIBOR suppression throughout the Relevant Period (¶¶ 278-

430), which render it highly plausible that the Parent Company Defendants knew about or

recklessly disregarded it. Further, given the Court's reasoning with respect to "major bank[s],"

Defendants' reliance on its unrelated determination in *LIBOR VI* that plaintiffs did not plead

sufficient facts "'suggest[ing] that *any panel bank's United States-based affiliate* played a role in

that bank's alleged persistent [sic] suppression of LIBOR'" (Merits Br. 11 (quoting *LIBOR VI*,

2016 WL 7378980, at *10))—by which the Court was referring to "panel banks' subsidiaries and

affiliates in the United States," *id.*, not the Parent Company Defendants—is misplaced.

Further, Defendants' suggestion that Schwab does not plead culpable participation by

Barclays Bank, *a Panel Bank Defendant*, is fatuous. This Court already has held Schwab

sufficiently alleges the Panel Bank Defendants' scienter. *LIBOR IV*, 2015 WL6243526, at *58.

Defendants nonetheless inexplicably cite Schwab's allegation (supported by this Court's

determination in *LIBOR IV*) that BCI "collaborated" with Barclays Bank plc to manipulate

LIBOR, and offer the *non-sequitur* that "there is no cause of action for conspiracy to violate

Section 10(b) or Rule 10b-5." Merits Br. 11 n.16. That Barclays Bank and BCI collaborated

supports Schwab's allegation *that BCI violated Section 10(b)* (further discussed below), which in

turn subjects Barclays Bank to liability under Section 20(a). It does not detract from the co-

existing allegations that Barclays Bank also (whether independently or in collaboration with

BCI) participated in suppressing LIBOR through its false LIBOR quotes.

### 2. Schwab sufficiently alleges BCI violated Section 10(b).

Defendants' assertion that Schwab's allegations against BCI are insufficiently

particularized is both foreclosed by the law of this case and baseless. Schwab alleges BCI, in the

course of soliciting and selling floating-rate notes to Schwab, failed to disclose that LIBOR was

manipulated.  ¶¶ 195, 198.  "'[B]ecause the point of an omission is that information was missing from the contract and from negotiations,' Schwab did not need to 'cite specific terms of a contract' and could instead name a 'set of contracts . . . and . . . [a] set of counterparties . . . that failed to divulge information about the quality of LIBOR.'"  *Schwab*, 883 F.3d at 94 (ellipses and second alteration in *Schwab*) (quoting *LIBOR IV*, 2015 WL 6243526, at *58).  The SAC indeed goes *well beyond* that threshold, identifying each transaction on which Schwab's Section 20(a) claims are based.  *E.g.*, ¶ 198 ("Schwab asserts Section 20(a) claims against Barclays Bank plc based on all transactions (in any Floating-Rate Category) in which Barclays Capital Inc. sold notes to Schwab").  Barclays Bank can see each transaction for which it is liable under Section 20(a) by searching through the transactions listed in Appendix A to identify those for which BCI is listed as the "Broker."  *See* App'x A at 49-50.  Its contention that Schwab alleges neither any misstatement or omission by BCI nor the specifics of the subject transactions is thus demonstrably incorrect.

Defendants are also mistaken that to plead a Section 10(b) violation by BCI, Schwab must allege it purchased a floating-rate note issued by BCI.  As with its Section 10(b) claims against the Floating-Rate Seller Defendants (*see supra* pp. 15-17), Schwab alleges BCI made false or misleading statements in failing to disclose, in soliciting and selling notes to Schwab, that LIBOR was manipulated.  Further, in *LIBOR IV* this Court "accept[ed] as plausible, based on public settlement documents"—which are incorporated by reference into the SAC—"that Barclays Bank PLC and Barclays Capital Inc. collaborated in persistently suppressing LIBOR during the financial crisis."  2015 WL 6243526, at *44.  The SAC, including facts incorporated into it, thus sufficiently alleges BCI violated Section 10(b), rendering Barclays Bank liable under Section 20(a).

     **3.**     **Schwab alleges a predicate violation of Section 10(b) by HSBC Bank plc, subjecting HSBC Holdings plc to liability under Section 20(a).**

Finally, in arguing Schwab's Section 20(a) fails against HSBC Holdings plc because Schwab does not allege it purchased floating-rate notes issued by HSBC Bank plc, Defendants disregard that Schwab's Section 20(a) claims arise not only from certain Panel Bank Defendants' (or BCI's) sales of floating-rate notes, but also from *all* Panel Bank Defendants' false LIBOR submissions in connection with Schwab's purchases of floating-rate notes from April 27, 2008 to May 2010. ¶ 196. Accordingly, HSBC Holdings plc is liable under Section 20(a) based on Panel Bank Defendant HSBC Bank plc's submission of false LIBOR quotes.

     **C.**     **Defendants' Arguments Regarding Schwab's Unjust Enrichment Claims Are Misleading and Contrary to Law.**

     **1.**     **Schwab has always asserted unjust enrichment claims based on fixed-rate transactions, and they were upheld in *LIBOR IV*.**

Defendants argue that Schwab's 2014 complaint "did not state that Schwab sought to recover for fixed-rate transactions under an unjust enrichment theory," and that Defendants "have consistently taken the position that Schwab cannot assert any claims—regardless of form—for its transactions in fixed-rate instruments" (Merits Br. 15). The record readily demonstrates those assertions are incorrect. Schwab's 2014 complaint is crystal clear that its claims, including for unjust enrichment, are based on both floating- and fixed-rate transactions. 2014 Compl. ¶¶ 5, 12, 270. And while the paragraphs Defendants cite from the "Claims for Relief" section in that complaint do not expressly reference "fixed-rate instruments," neither do the paragraphs relating to Schwab's fraud claims—yet Defendants recognized Schwab's fraud claims were based on both types of instruments, and sought dismissal of fixed-rate claims. *See* Dkt. 756. Their revisionist attempt to distinguish Schwab's unjust enrichment claims fails.

Similarly, the prior motion-to-dismiss briefs Defendants cite referred only to Schwab's

*fraud* claims.[19]  That is why this Court in *LIBOR IV* addressed whether Schwab could

sufficiently plead *fraud* claims based on fixed-rate transactions, holding it could not.  On the

other hand, the Court did *not* draw a distinction between Schwab's floating-rate and fixed-rate

transactions in upholding unjust enrichment claims against note issuers.  And with good reason:

Defendants never asked it to.  Nor did they raise the issue on appeal, despite arguing for

numerous other alternative grounds for affirmance.  Permitting Defendants now to reopen

*LIBOR IV*'s ruling on unjust enrichment would be extremely unfair to Schwab.  Had Defendants

timely challenged Schwab's fixed-rate unjust enrichment claims in the briefing that led to *LIBOR

IV*, this Court could have ruled on it then, and Schwab in turn could have appealed any

unfavorable ruling.  Defendants' delay in raising this argument suggests gamesmanship, which

should be rejected.

### 2.  Schwab Sufficiently Pleads Unjust Enrichment Based on Fixed-Rate Transactions.

Unjust enrichment occurs where "a defendant has been unjustly conferred a benefit

'through mistake, fraud, coercion, or request.'"  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d

753, 762 (9th Cir. 2015) (quoting 55 Cal. Jur. 3d Restitution § 2).  It is "an equitable remedy, and

thus by its very nature is a flexible doctrine."  *In re TFT-LCD Flat Panel Antitrust Litig.*, 2011

WL 4501223, at *7 (N.D. Cal. Sept. 28, 2011) (citing Restatement (Third) Restitution § 1, cmt.

a).  Schwab's allegations detailing how the Fixed-Rate Issuer Defendants were unjustly enriched

by issuing fixed-rate notes that paid artificially low interest rates, due to *these same Defendants'*

(and other Defendants') *suppression of LIBOR*, easily satisfy Schwab's modest pleading burden.

Schwab alleges Defendants' manipulation of LIBOR caused Schwab to receive lower

---

[19] *See* Dkt. 756, at 25 (arguing Schwab and others "stretch the tort of *fraud* well past the breaking point" by asserting claims based on fixed-rate instruments); *id.* at 38-40 (arguing Schwab could not plead damages sufficiently "[t]o state a claim for *fraud*"); Dkt. 926, at 8-10 (discussing fixed-rate instruments in section titled, "Plaintiffs Fail to State a Claim for *Fraud*").

returns on fixed-rate notes in exchange for the use of its money than if the suppression had not occurred.  ¶ 208.  Schwab further details *why* that is so.  Specifically, as sworn to under oath by senior Schwab investment managers responsible for Schwab's investments in fixed-rate (and floating-rate) instruments during the Relevant Period, it is common practice to quote the "spread" over LIBOR as a means to evaluate credit and market risks and determine relative value of investments, as that spread reflects the credit risk of the issuer and other market dynamics. ¶ 139.  Accordingly, to the extent LIBOR was suppressed during the Relevant Period, the yield received on Schwab's investments was correspondingly lower—both for floating-rate *and* fixed-rate instruments.  *Id.*

Linda Klingman, Vice President of Taxable Money Market Strategies at Charles Schwab Investment Management, Inc. ("CSIM"), for example, explains that while issuers and dealers do not expressly quote fixed-rate instruments in terms of LIBOR, she and her team evaluate the yield quoted by the issuer or broker-dealer by comparing it to LIBOR and to other issuances, and make a relative-value decision based on the credit quality and how a security and/or issuer trades in the market.  ¶ 140.  Ms. Klingman, who has decades of experience in the money market industry and oversees investment management for the Schwab Money Funds (¶ 135), attests that Schwab's practice is standard in the industry; in other words, buyers and sellers of short-term, fixed-rate CDs and commercial paper universally use LIBOR as a benchmark.  ¶ 140.

Senior investment managers responsible for investments by the Schwab Bond Funds and the Schwab Treasury Entities during the Relevant Period likewise attest to LIBOR's centrality with respect to evaluating fixed-rate instruments.  Matthew Hastings, Vice President, Head of Taxable and Bond Strategies at CSIM, attests that many short-term fixed-rate bonds and commercial paper are typically "priced to LIBOR" for maturities of up to 13 months, essentially

43

taking LIBOR as a given component of the offered rate, which is the standard practice of the money market industry.  ¶¶ 143, 145.  And Dennis Goldman, who oversaw the Schwab Treasury Entities' investments for most of the Relevant Period, similarly attests that for fixed-rate instruments of less than 13 months maturity, LIBOR is the conventional pricing benchmark. ¶¶ 150, 155.  Given those market dynamics, Defendants' unlawful suppression of LIBOR allowed the Fixed-Rate Issuer Defendants to offer less interest in return for the use of Schwab's money than they would have if LIBOR had been set truthfully and accurately.  ¶ 208.  That is, because Schwab (like other market participants) used LIBOR as a barometer to determine whether an offered rate on a fixed-rate note appropriately reflected the issuer's credit risk and other factors, LIBOR's suppression allowed the Fixed-Rate Issuer Defendants to offer lower fixed rates than they otherwise would have, and Schwab in turn reasonably believed those (artificially low) rates were appropriate.  ¶¶ 138-40, 146, 155, 208.  In other words, "Schwab surrendered too much cash—i.e., overpaid—for fixed-rate notes, given the rates and yields it should have received in exchange had the suppression not occurred."  ¶ 208.  These Defendants were thus unjustly enriched, at Schwab's expense.

Given Schwab's clear allegations, Defendants' assertion that it does not plead "'a causal connection between the wrongful conduct and the profits to be disgorged,'" Merits Br. 14 (quoting *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 892 (2010)), is unavailing.  Their arguments on this score range from highly misleading, to inapposite, to actually *supportive of Schwab*.

*First*, Defendants claim Schwab "does not even attempt to allege that Defendants benefited on fixed-rate notes by allegedly suppressing LIBOR," but rather "alleges only that Defendants 'could offer less interest' on the *floating-rate* notes that they issued."  Merits Br. 14 (selectively quoting ¶ 208).  But as shown above, that is demonstrably incorrect.  Defendants

simply choose not to take Schwab's allegations as pleaded—indeed, they badly distort them—violating a bedrock Rule 12(b)(6) principle.

*Second*, Defendants' reliance on the Second Circuit's holding that Exchange Act claims could not arise from Schwab's fixed-rate transactions is misplaced.  Determining that the Panel Bank Defendants' LIBOR submissions "were not made in connection with Schwab's purchase of fixed-rate instruments," the court observed that a Section 10(b) claim "fails where the plaintiff does not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return," and reasoned "[w]hen Schwab purchased fixed-rate instruments, it received exactly what it expected."  *Schwab*, 883 F.3d at 96 (first alteration in original).  But whether Schwab "received exactly what it expected" regarding "the value of the securities" is not the relevant inquiry for unjust enrichment, as "[t]he emphasis is on the wrongdoer's enrichment, not the victim's loss."  *County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007).  In particular, "a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again."  *Id.*  Indeed, "[d]isgorgement . . . may compel a defendant to surrender all money obtained through an unfair business practice . . . regardless of whether those profits represented money taken directly from persons who were victims of the unfair practice."  *Id.* at 542-43.  In short, if (as Schwab alleges) the Fixed-Rate Issuer Defendants reaped higher returns from fixed-rate transactions due to their suppression of LIBOR than they would have obtained absent LIBOR's manipulation, restitution may be appropriate regardless of Schwab's "expectations" with respect to the value of the subject fixed-rate notes.  No more is required at the pleading stage.

Nor do these claims invite the "boundless liability" the Second Circuit posited in the

45

context of California fraud claims based on fixed-rate notes.  Unlike Schwab's fraud claims based on false LIBOR submissions, its unjust enrichment claims are asserted only against note issuers.  ¶¶ 206-09.  The universe of potentially liable entities and relevant transactions is accordingly limited.

*Third*, Defendants try to extend the Second Circuit's holding that Schwab's *fraud* claims based on fixed-rate transactions went "beyond the scope of common law fraud" as restrictively defined by California law, *Schwab*, 883 F.3d at 91, to these equitable claims for unjust enrichment.  But the court of appeals' reasoning in fact *supports* the sufficiency of Schwab's unjust enrichment claims.  California, the court observed, limits a defendant's liability for fraud to "those 'whom he intends or has reason to expect to' rely on a misrepresentation."  *Id.* (quoting Restatement (Second) of Torts § 531 (1977)).  The "reason to expect" concept "is distinct from 'the concept of foreseeability' and 'bears more similarity to actual *intent* to cause third party reliance than it does to foreseeability.'"  *Id.* (quoting *Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 607 (1995) (emphasis in *Geernaert*)).  Because Schwab's allegations regarding fixed-rate transactions amounted to "foreseeability," they could not sustain a claim under the restrictive standard particular to fraud claims.  *Id.*

As unjust enrichment does not sound strictly in tort, Defendants' argument amounts to trying to fit square pegs in round holes.  *See* 1 Witkin, Summary 11th Contracts § 1052 (2018) ("The original Restatement 'created a field of law by assembling justice-seeking doctrines that are not torts and not contracts.  The key words are 'unjust enrichment,' identifying transfer of money or other valuable assets to an individual or a company that is not entitled to them.'") (quoting Restatement 3d, Restitution and Unjust Enrichment, Foreword, vol. 1, p. XIII).  Regardless, the Second Circuit's determination that Schwab alleges foreseeability *more than*

*suffices* to plead unjust enrichment.  Foreseeability satisfies the highest standard of causation: proximate cause.  *See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1012 (7th Cir. 2002) ("Foreseeability is the cornerstone of proximate cause[.]").  Pleading unjust enrichment, on the other hand, *at most* requires alleging *but-for* cause.  *See Uzyel*, 188 Cal. App. 4th at 892.  And even that may not be necessary, as the central elements and remedy of this claim—unjustness, enrichment, and disgorgement—do not precisely map to tort principles.  Thus, as the court in *Uzyel* (which Defendants cite) explained, "[t]he presence or absence of but-for causation is not necessarily determinative of unjust enrichment."  *Id.* at 894.  Schwab accordingly has well surpassed its pleading burden.  To require more would invade the province of the factfinder, as "causation[] and injury are fact-specific issues for the trier of fact." *Staats v. Vintner's Golf Club, LLC*, --- Cal. Rptr. 3d ---, 2018 WL 3640830, at *6 (Cal. Ct. App. Aug. 1, 2018).[20]

### D.     Schwab's Tortious Interference Claims Are Timely and Well-Pleaded.

Defendants argue that Schwab's tortious interference claims—asserted against Defendants BTMU, Citibank, N.A., HSBC Bank plc, JPMorgan Chase Bank, N.A., and RBS plc—are barred by California's two-year statute of limitations and that Schwab fails to plausibly allege these Defendants "knew of their affiliates' transactions with Schwab" or "sought to induce breach of the contracts."  Merits Br. 18.  Once again, they are wrong.

### 1.     Rule 15 and the discovery rule render Schwab's claims timely.

Schwab's claims are timely due to two well-established doctrines:

*First*, under the discovery rule, these claims accrued fewer than two years before Schwab

---

[20] Defendants also state Schwab's unjust enrichment claims based on floating-rate notes should be limited to issuers. The SAC makes clear those claims are asserted against the Floating-Rate Issuer Defendants (¶¶ 206-07), and to the extent there is any confusion, Schwab confirms those claims are limited to transactions in which those Defendants issued the notes.

filed this case on April 29, 2013, i.e., no earlier than April 29, 2011.  The rule provides that "[a] cause of action . . . accrues when plaintiff either (1) actually discovered his injury *and its [tortious] cause* or (2) could have discovered injury and *cause* through the exercise of reasonable diligence."  *Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1251 (2013) (emphasis in original).  This entails a two-part analysis: the first step "focuses on whether the plaintiff possessed information that would cause a reasonable person to inquire into the cause of his injuries," with that duty of inquiry arising "when the plaintiff becomes aware of facts that would cause a reasonably prudent person to suspect his injuries were the result of wrongdoing."  *Id.*  If plaintiff possessed sufficient facts to trigger his duty to investigate, "it must next be determined whether such an investigation would have disclosed a factual basis for a cause of action."  *Id.*  The statute of limitations commences on that claim "when the investigation would have brought such information to light."  *Id.*

This Court already has held, with respect to Schwab's related claims for interference with prospective economic advantage, it "cannot determine when plaintiffs were on inquiry notice."  *LIBOR IV*, 2015 WL 6243526, at *177.  The Second Circuit held, moreover, "[i]t is plausible that Schwab reasonably relied on [the BBA's] assurances" following "negative press reporting" in 2008 about LIBOR.  *Schwab*, 883 F.3d at 98.  Further, Schwab plausibly alleges it "had no reason to suspect, at least until the existence of government investigations was revealed in March 2011, that Defendants were *knowingly acting* to suppress LIBOR."  ¶ 462 (emphasis in original).  Even then, Schwab was not necessarily yet aware it had suffered any injuries, or that any such injuries were caused by the TI Defendants.  At that point, Schwab's duty to investigate arguably was triggered.  But it was only after conducting a detailed inquiry regarding its Relevant Period transactions that Schwab determined it was injured, and that its injury was likely due to these and

other Defendants' suppression of LIBOR.  Only then did the statute of limitations on Schwab's tortious interference claims begin to run.  *See Alexander*, 219 Cal. App. 4th at 1251.  Schwab then filed its initial complaints expeditiously, in August 2011—just five months after UBS AG's March 2011 disclosure.  Given these facts, it is not "clear from the face of the [SAC], and matters of which the court may take judicial notice," that the limitations period for Schwab's tortious interference claims commenced before April 29, 2011.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis omitted).

*Second*, Schwab's tortious interference claims relate back to its April 2013 complaint because they arise from the same "general fact situation" as the claims for interference with prospective economic advantage asserted there, thus satisfying "the central inquiry" under Rule 15.  *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).  In asserting otherwise, Defendants exaggerate the differences between Schwab's initial claims for breach of prospective economic advantage and these claims for tortious interference with contract.  There is little material difference between a tortious interference claim alleging "that a *panel bank* entity intended to disrupt a specific contract," Merits Br. 17-18 (quoting *LIBOR IV*, 2015 WL 6243526, at *148 (emphasis in *LIBOR IV*)), and Schwab's allegations in its 2013 complaint that (1) "[a]n economic relationship existed between Plaintiffs and issuers or sellers," which "obligated the issuers or sellers to make payments to Plaintiffs at a rate dependent on LIBOR"; (2) "Defendants' unlawful manipulation of LIBOR interfered with and disrupted that relationship by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for those LIBOR-based financial instruments"; and (3) "[a]s a result, Plaintiffs received lower payments on those instruments than they otherwise would have, and overpaid for the instruments, and were damaged thereby."  2013 Compl. ¶¶ 346-47.  Relation

49

back is therefore proper.  *See Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1140 (S.D.N.Y. 1996) (tortious interference claim related back to claim for tortious interference with prospective contractual relationships, as the latter "set forth the general fact situation sufficiently to provide Defendants adequate notice of the matters raised in the amended pleading").[21]

### 2.       Defendants' pleading challenge contravenes the law of this case.

Defendants also challenge the sufficiency of Schwab's allegations that TI Defendants BTMU, Citibank, N.A., HSBC Bank plc, JPMorgan Chase Bank, N.A., and RBS plc knew of their respective Bank Affiliates' issuances to Schwab and sought to induce those Affiliates' breaches of contracts with Schwab.  But those arguments fail in light of this Court's holding in *LIBOR IV* that "[i]t is plausible that corporate affiliates are aware of each other's financing arrangements, so tortious interference claims *may proceed* against panel banks as to bonds issued by corporate affiliates."  2015 WL 6243526, at *84.

Defendants' attempt to wordsmith their way out of this unequivocal law of the case, contending the Court meant only it was *theoretically possible* that someone could allege such a claim (*see* Merits Br. 18-19), fails.  Particularly so given the Court's subsequent observation that "a bond issuance is a major corporate event that officers and directors of the corporate parent would typically oversee."  *LIBOR V*, 2015 WL 6696407, at *22.  Accordingly, "[a]t the very least, it is plausible that [Bank Affiliates] did not strike out on [their] own to issue a bond," and so Schwab's claims against [the TI Defendants]" should "survive on an agency theory."  *Id.*

### CONCLUSION

Defendants' motion to dismiss Schwab's second amended complaint should be denied.

---

[21] In the portion of *LIBOR IV* Defendants cite, the Court held "plaintiffs' tortious interference claims are insufficiently related to the claims stated by *the predicate classes*"—i.e., implied covenant, unjust enrichment, fraud, and antitrust—to afford *American Pipe* tolling.  2015 WL 6243526, at *148.  Schwab's prospective economic advantage claims, on the other hand, were far more factually and legally similar to its tortious interference claims. Relation back is therefore proper.

Dated:  August 9, 2018                    Respectfully submitted,

                                          **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**


                                          By: */s/ Steven E. Fineman*
                                          Steven E. Fineman
                                          Michael J. Miarmi
                                          250 Hudson Street, 8th Floor
                                          New York, NY 10013-1413
                                          Telephone:  (212) 355-9500
                                          Facsimile:  (212) 355-9592
                                          E-mail:  sfineman@lchb.com
                                                   mmiarmi@lchb.com

                                          Richard M. Heimann
                                          Eric B. Fastiff
                                          Brendan P. Glackin
                                          275 Battery Street, 29th Floor
                                          San Francisco, CA 94111-3339
                                          Telephone:  (415) 956-1000
                                          Facsimile:  (415) 956-1008
                                          E-mail:  rheimann@lchb.com
                                                   efastiff@lchb.com
                                                   bglackin@lchb.com

                                          Andrew R. Kaufman
                                          222 2nd Avenue South, Suite 1640
                                          Nashville, TN 37201-2379
                                          Telephone: (615) 313-9000
                                          Facsimile: (615) 313-9965
                                          E-mail:  akaufman@lchb.com

                                          *Attorneys for Plaintiffs*