# In the United States District Court
# For the Southern District of New York

| | |
|---|---|
| In re:<br><br>LIBOR-Based Financial Instruments<br>Antitrust Litigation | Civil Case No. 11–MD-2262 (NRB) |
| This document relates to:<br><br>Principal Financial Group, Inc.;<br>Principal Financial Services, Inc.; and<br>Principal Life Insurance Company<br><br>              Plaintiffs,<br>v.<br><br>Bank of America Corporation; Bank of America, N.A.; British Bankers' Association; BBA Enterprises, Ltd.; BBA Libor, Ltd.; Chase Bank USA, N.A.; Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.; Credit Suisse AG; Credit Suisse Group AG; Credit Suisse International; Credit Suisse Securities (USA) LLC; Deutsche Bank AG; Deutsche Bank Securities, Inc.; HBOS plc; JPMorgan Bank Dublin plc; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; J.P. Morgan Securities, LLC; Lloyds Banking Group plc; Lloyds Bank plc; Merrill Lynch Capital Services, Inc.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Royal Bank of Canada; The Royal Bank of Scotland Group plc; The Royal Bank of Scotland plc; RBS Securities, Inc.; UBS AG; and UBS Securities LLC;<br><br>              Defendants. | **Revised Second Amended Complaint**<br><br>**Jury Trial Demanded**<br><br>[Filed Under Seal] |

TABLE OF CONTENTS

PAGE

Nature of Claim ........................................................................................................... 1

Jurisdiction and Venue ................................................................................................ 2

Parties .......................................................................................................................... 5

Agents and Co-Conspirators ..................................................................................... 15

Unnamed Co-Conspirators ....................................................................................... 17

Factual Allegations .................................................................................................... 17

I.    Libor is administered by the BBA and advertised as a reflection of the costs paid by major banks to borrow funds in the London interbank lending market. ............... 17

II.   Defendants conspired to manipulate numerous interest-rate benchmarks, including USD Libor ................................................................................................ 22

    A.  Defendants had the means, motive, and opportunity to collude to suppress USD Libor. ............................................................................................ 22

        1.  The BBA's ownership of Libor and the Panel Bank Defendants' position on the USD Libor panel provided them the ideal means to manipulate Libor. .................................................................................................... 22

        2.  The Panel Bank Defendants had strong financial incentives to manipulate Libor. .................................................................................................... 23

        3.  The Panel Bank Defendants' interactions with interdealer brokers and the BBA provided Defendants ample opportunities to conspire. ....................... 25

III.  Empirical evidence confirms that USD Libor's aberrant behavior during the Conspiratorial Period was the result of Defendants' manipulation. ........................... 26

    A.  USD Libor's divergence from its historical relationship with the Eurodollar suggests manipulation. ........................................................................ 27

    B.  Comparing the Panel Bank Defendants' USD Libor submissions to the implied volatility of their equity options demonstrates that they artificially suppressed USD Libor. ........................................................................................ 29

    C.  USD Libor's divergence from its historical relationship with credit default swaps demonstrates that Defendants artificially suppressed USD Libor. ............ 39

    D.  Inconsistencies in the borrowing costs the Panel Bank Defendants reported across currencies suggest manipulation. ................................................ 40

E. Quote bunching strongly suggests that Defendants colluded to artificially suppress USD Libor. ...................................................................................43

IV. Defendants did conspire to persistently suppress Libor. ...........................................45

V. The alleged Conspiracy is plausible: To date, six Defendants and five non-Defendants have admitted to conspiring to manipulate various Libor currencies. ...49

A. Barclays settles Libor-manipulation charges with U.S. and U.K. authorities and admits to conspiring with other financial institutions to manipulate USD Libor, Euribor, Yen Libor, and Sterling Libor. ...................................50

1. Barclays' settlement with the CFTC. ......................................................50

2. Barclays' settlement with the DOJ. .........................................................55

B. UBS settles Libor-manipulation charges with U.S., U.K., and Swiss authorities and admits to colluding with other panel banks and interdealer brokers to manipulate Yen Libor, Euroyen Tibor, and Euribor...........57

1. UBS's settlement with the CFTC...........................................................57

2. UBS's settlement with the DOJ. ...........................................................57

C. Former UBS and RP Martin employees are criminally charged with violating the Sherman Act. ..............................................................................58

D. RBS settles Libor-manipulation charges with U.S., U.K., and Swiss authorities and admits to colluding with other panel banks and interdealer brokers to manipulate Yen and Swiss Franc Libor. ..............................59

1. RBS's settlement with the CFTC. ..........................................................59

2. RBS's Japanese subsidiary pleads guilty to wire fraud while RBS enters a deferred prosecution agreement with the DOJ for wire fraud and violation of Section 1 of the Sherman Act. ..............................63

E. ICAP settles Libor manipulation charges with U.S. and U.K. authorities and admits to manipulating Yen Libor......................................................63

F. Rabobank settles Libor manipulation charges with U.S., U.K., and Dutch authorities and admits to manipulating USD Libor, Yen Libor, Sterling Libor, and Euribor...................................................................................64

G. Barclays, Citigroup, Deutsche Bank, JPMorgan, RBS, RP Martin, SocGen, and UBS settle Libor-manipulation charges with the European Commission. ........................................................................................................65

H. RP Martin settles Libor manipulation charges with U.S. and U.K authorities and admits to manipulation Yen Libor......................................66

I. Lloyds settles with the CFTC and FCA and admits to colluding with other panel banks to manipulate USD, Sterling, and Yen Libor. ......................66

J.   Citibank Settles with the CFTC ................................................................68

VI. Plaintiffs purchased numerous Libor-based financial instruments directly from Defendants. ..............................................................................................69

   A.   Interest Rate Swaps and Swaptions .................................................69

   B.   Variable Rate Bonds and Asset-Backed Securities .........................71

VII.   The statute of limitations on Plaintiffs' claims is tolled under the discovery rule, the Clayton Act, and under the fraudulent concealment, continuous violation, and *American Pipe* doctrines...............................................73

   A.   The discovery rule.................................................................................73

   B.   Tolling under the Clayton Act ............................................................78

   C.   *American Pipe* tolling ...........................................................................79

   D.   Continuous violation tolling ...............................................................81

   E.   Fraudulent concealment.......................................................................82

Count One Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (Against All Defendants) ..............................................................................................84

   A.   *Per se* horizontal price fixing ..............................................................84

      1.   Unlawful agreement ...................................................................84

      2.   Antitrust injury...........................................................................87

   B.   Rule of Reason .......................................................................................91

      1.   Relevant Market: USD Short-Term Interest-Rate Benchmarks .........................91

      2.   Relevant Market: OTC USD Interest-Rate Derivatives .........................94

      3.   Relevant Market: USD Floating-Rate Retail Loans .........................96

      4.   Relevant Market: USD Floating-Rate MBS.........................98

   C.   Other antitrust allegations ...................................................................99

Count Two Violation of the Donnelly Act (N.Y. Gen. Bus. Law § 340)  (Against All Defendants).......................................................................................... 100

Count Three Breach of Contract and Covenant of Good Faith and Fair Dealing for Interest Rate Swaps (Against Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBC, RBS, and UBS)............................................ 101

Count Four Breach of Contract and Covenant of Good Faith and Fair Dealing for Variable-Rate Bonds and Asset-Backed Securities (Against Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS) ............................... 106

Count Five Fraud (Against All Defendants).................................................... 107

Count Six Aiding and Abetting Fraud (Against All Defendants) ................................... 109

Count Seven Negligent Misrepresentation (Against Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBC, RBS, and UBS) ................................................ 110

Count Eight Unjust Enrichment (Against Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBC, RBS, and UBS) .............................................................. 112

Relief Sought.................................................................................................................... 113

Demand For Jury Trial ..................................................................................................... 114

## COMPLAINT

Plaintiffs Principal Financial Group, Inc.; Principal Financial Services, Inc.; and Principal Life Insurance Company (collectively "Plaintiffs") bring this action against Defendants Bank of America Corporation; Bank of America, N.A.; British Bankers' Association; BBA Enterprises, Ltd.; BBA Libor, Ltd.; Chase Bank USA, N.A.; Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.; Credit Suisse AG; Credit Suisse Group AG; Credit Suisse International; Credit Suisse Securities (USA) LLC; Deutsche Bank AG; Deutsche Bank Securities, Inc.; HBOS plc; JPMorgan Bank Dublin plc; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; J.P. Morgan Securities, LLC; Lloyds Banking Group plc; Lloyds Bank plc; Merrill Lynch Capital Services, Inc.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Royal Bank of Canada; The Royal Bank of Scotland Group plc; The Royal Bank of Scotland plc; RBS Securities, Inc.; UBS AG; and UBS Securities LLC (collectively, "Defendants") for violations of the Sherman Act (15 U.S.C. § 1), Clayton Act (15 U.S.C. § 15) and Donnelly Act (N.Y. Gen. Bus. Law § 340) and for fraud, breach of contract and covenant of good faith and fair dealing, and unjust enrichment based on the following allegations:

## NATURE OF CLAIM

1.    This case arises from Defendants' conspiracy to manipulate the London Interbank Offered Rate ("Libor")—the world's leading short-term interest rate benchmark. As a benchmark, Libor is used as a reference point to set the interest rate for all types of financial products, from simple loans to complex derivatives. Libor is so pervasively used that it has assumed a fundamentally important role in financial systems throughout the world. Indeed, Defendants advertise Libor as "the world's most important number" and describe Libor as a "simple, transparent benchmark . . . [that is]

1

a reliable indicator of the state of the money markets, and one of the most reliable barometers of risk in the global economy."

2.      Unknown to investors like Plaintiffs, beginning in August of 2007, and continuing until at least May of 2010 (the "Conspiratorial Period"), Defendants conspired to manipulate Libor and fix it at artificially low levels in order to reap billions of dollars in ill-gotten profits (the "Conspiracy").

3.      Plaintiffs are Principal Financial Group, Inc.; Principal Financial Services, Inc.; and Principal Life Insurance Company. During the Conspiratorial Period, Plaintiffs held a variety of financial instruments tied to Libor and sold to them by Defendants, including interest-rate swaps, swaptions, corporate bonds, residential mortgage-backed securities ("RMBS"), commercial mortgage-backed securities ("CMBS"), loans, and various types of short-term paper.

4.      Defendants' Conspiracy to artificially suppress Libor rates during the Conspiratorial Period caused Plaintiffs substantial losses in that they earned less money from their Libor-tied investments than they would have absent Defendants' unlawful price fixing.

5.      Accordingly, Plaintiffs seek relief for the damages they have suffered as a result of Defendants' anticompetitive conduct under the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, the Clayton Act, 15 U.S.C. §§ 12, *et seq.*, and the Donnelly Act, N.Y. Gen. Bus. Law § 340. Plaintiffs additionally assert claims for breach of contract and covenant of good faith and fair dealing, fraud, aiding and abetting fraud, negligent misrepresentations and unjust enrichment.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

Additionally, this Court has supplemental jurisdiction over Plaintiffs' Donnelly Act, breach of contract and covenant of good faith and fair dealing, fraud, aiding and abetting fraud, negligent misrepresentation, and unjust enrichment claims under 28 U.S.C. § 1367, because these claims are so closely related to Plaintiffs' federal antitrust claim that they form part of the same case or controversy.

7.    This case was originally filed in the U.S. District Court for the Southern District of Iowa and was subsequently transferred to the *In re Libor Based Financial Instruments Antitrust Litigation* multi-district litigation proceedings in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407.

8.    In an August, 2014 letter to the Court, Defendants initially expressed their intention to challenge personal jurisdiction in Iowa.[1] To avoid unnecessary motion practice and streamline the issues before the Court, Plaintiffs waive their right under 28 U.S.C. § 1407 to have the case remanded to the Southern District of Iowa. Plaintiffs thus join other groups of plaintiffs in asserting personal jurisdiction in New York and asserting claims under New York state law.

9.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S. C. § 22) and N.Y. C.P.L.R. §§ 301 and 302. Defendants each caused false interest rate information to be published in the Southern District of New York. All Defendants transacted business and derived substantial revenue from that business within New York. Most, if not all, Defendants have offices located in New York and/or have engaged in a regular and continuous course of business in New York.

---

[1] All defendants named in Plaintiffs' original complaint stated their intention to move to dismiss for lack of jurisdiction except for UBS AG and RP Martin Holdings Ltd. ("RP Martin"). *See* August 13, 2014 Letter to Judge Buchwald from Cahill Gordon & Reindel LLP at p. 12 (ECF 600). UBS AG is also named as a defendant in this Amended Complaint. RP Martin is not.

10.    All Defendants transacted businesses and derived substantial revenues from their business within Iowa, including through engaging in a regular course of business with Plaintiffs. Defendants' contacts with Iowa are more fully laid out in the Declaration Of Eddie Vonnahme In Support Of Principal Plaintiffs' Opposition To Defendants' Motions To Dismiss, [Dkt. 1503] (Aug. 5, 2016).

11.    Plaintiffs entered ISDA Master Agreements with Defendants and their co-conspirators. *See* ISDA agreements with Bank of America, N.A. dated September 12, 1997 and amendments dated July 15, 2008; ISDA agreement with Merrill Lynch Capital Services, Inc. dated October 1, 1996; ISDA agreement with Barclays Bank PLC dated July 3, 1995; ISDA agreements with Citibank, N.A. dated July 11, 1990 and June 30, 2008; ISDA agreement with Credit Suisse First Boston International (f/k/a Credit Suisse Financial Products) dated March 2, 1992; ISDA agreement with Credit Suisse International dated January 16, 2007; ISDA agreement with Deutsche Bank AG dated February 2, 1995; ISDA agreement with Bear Stearns Bank PLC dated September 6, 2006; ISDA agreement with Royal Bank of Canada dated August 17, 1999; ISDA agreements with The Royal Bank of Scotland PLC dated February 3, 1999 and dated March 28, 2007; ISDA agreement with RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.) dated September 21, 2001; and ISDA agreements with UBS AG dated July 22, 1996, dated February 9, 2007, and dated June 10, 2008, each incorporated herein by reference and collectively referred to as "Defendants' ISDA Master Agreements."

12.    The prospectuses for many of the Defendant-issued and/or underwritten bonds Plaintiffs purchased select New York as the governing law and provide for non-exclusive jurisdiction in New York courts.

13.    Venue is proper in the Southern District of New York because one or more of the Defendants transacted business, were found, or had agents there; a substantial part of the events giving rise to Plaintiffs' claims arose there; and a substantial portion of the

affected interstate trade and commerce described in this Complaint was carried out there. Venue is proper for coordinated or consolidated pretrial proceedings in this Court under 28 U.S.C. § 1407.

## PARTIES

14.     Plaintiffs are Principal Financial Group, Inc.; Principal Financial Services, Inc.; and Principal Life Insurance Company. Plaintiffs owned financial products tied to Libor during the Conspiratorial Period and were significantly damaged by Defendants' illegal conduct. Plaintiffs are continuing their investigation to determine whether additional related entities were damaged by Defendants' conduct and should be added as plaintiffs to this Complaint.

15.     Plaintiff Principal Financial Group, Inc. is a Delaware corporation having its principal place of business at 711 High Street, Des Moines, Iowa 50392.

16.     Plaintiff Principal Financial Services, Inc. is an Iowa corporation having its principal place of business at 711 High Street, Des Moines, Iowa 50392.

17.     Plaintiff Principal Life Insurance Company, including its Separate Accounts, is an Iowa corporation having its principal place of business at 711 High Street, Des Moines, Iowa 50392.

18.     Defendants are a collection of the world's largest and most powerful financial institutions. Defendants are the British Bankers' Association, who administered USD Libor during the Conspiratorial Period and numerous banks that comprised the USD Libor panel during the Conspiratorial Period along with certain parents, subsidiaries, or affiliates.

19.     Defendant British Bankers' Association ("BBA") is a trade association based in the United Kingdom, which owned Libor throughout the 2000s. The BBA is governed

by a Board, which officially meets four times per year and is comprised of the BBA Chief Executive and Chief Executives of several Defendants. Defendant BBA Enterprises, Ltd. is a wholly-owned subsidiary of the BBA located in London, England. In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA Libor, Ltd. to house Libor. Following its incorporation, BBA Libor, Ltd. took over responsibility for the day-to-day running of the benchmark.

20.     The BBA advertised Libor in the United States and the Southern District of New York and solicited business in the United States. In 2007, the BBA sought and obtained a trademark from the U.S. Patent and Trademark Office for bbaLIBOR (No. 3212218). The BBA communicated news and information through the *Wall Street Journal*, various websites, and social media accessible in the Southern District of New York. The BBA participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and throughout the United States.

21.     The BBA claims that it operated at the direction of the "independent" Foreign Exchange & Money Markets Committee ("FXMMC") which was responsible for determining Libor rules, choosing panel banks, and making disciplinary decisions for panel banks that failed to adhere to Libor rules. During the Conduct Period, the FXMMC was comprised of 13 Panel Bank Defendants. The FXMMC was unlike a traditional trade association committee in that it met in secret, did not include an antitrust lawyer to oversee committee meetings and communications, did not publish minutes of its meetings, and did not publicly identify its members. Defendants BBA; BBA Enterprises, Ltd.; and BBA Libor, Ltd. are referred to collectively as the "BBA."

22.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina. Defendant Bank of America, N.A. (f/k/a NationsBank, N.A.) is a federally-chartered national banking association headquartered

6

in Charlotte, North Carolina, with offices in New York, New York, and is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation. Bank of America, N.A. is Bank of America Corporation's primary banking subsidiary. At all relevant times, Bank of America, N.A. was a member of the USD Libor panel.

23.    Bank of America and Bank of America, N.A. did not contemporaneously specify which of them served on the USD Libor panel, listing themselves only as "Bank of America."

24.    Banc of America Securities, LLC was a Delaware corporation with its principal place of business in New York City, New York, and a wholly-owned subsidiary of Bank of America Corporation. On November 1, 2010, Banc of America Securities, LLC was merged into Merrill Lynch, Pierce, Fenner & Smith, Inc. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. is a wholly-owned indirect subsidiary of Bank of America Corporation with offices in New York. As a surviving entity, Merrill Lynch, Pierce, Fenner & Smith, Inc. is the primary broker-dealer for Bank of America, N.A. in the United States. Prior to October 1, 2013, Merrill Lynch, Pierce, Fenner & Smith, Inc. was a wholly-owned subsidiary of Merrill Lynch & Co., Inc., which was a wholly-owned subsidiary of Bank of America Corporation. On October 1, 2013, Bank of America Corporation completed the merger of Merrill Lynch & Co., Inc. directly into Bank of America Corporation and assumed all of its obligations. Defendant Merrill Lynch Capital Services, Inc. is a subsidiary of Bank of America Corporation and is headquartered in New York.

25.    Bank of America operated in the United States and participated in the wrongful conduct alleged in this Complaint in the Southern District of New York and elsewhere in the United States. United States-based executives from Banc of America Securities, LLC, including Lawrence Faccini, Jeffrey Scharpf, and Tom Houghton,

communicated frequently with Dan Knight, Bank of America's London-based USD Libor submitter, regarding USD Libor.

26.     During the Conspiratorial Period, Bank of America, N.A. entered into swap agreements with Plaintiffs. Banc of America Securities, LLC and Merrill Lynch, Pierce, Fenner & Smith, Inc. engaged in financial transactions relating to USD Libor with Plaintiffs

27.     Bank of America Corporation; Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Merrill Lynch & Co., Inc.; Banc of America Securities LLC; and Merrill Lynch Capital Services, Inc. are referenced collectively in this Complaint as "Bank of America."

28.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a Dutch financial services provider headquartered in Utrecht, the Netherlands and branches in the United States, including in New York. At all relevant times, Rabobank was a member of the USD Libor panel.

29.     In addition, Rabobank employees in New York helped to determine Rabobank's Libor submissions.[2] A Rabobank USD Libor submitter told the FBI that he was "actively encouraged" by management to "speak to traders in New York" before making USD Libor submissions.[3] Rabobank USD Libor submitters and its derivative traders in New York followed that encouragement, and openly discussed USD Libor manipulation[4] for the purpose of helping Rabobank's USD Libor submitters determine Rabobank's USD Libor submissions.

---

[2] *See, e.g.*, Rabobank Traders Trial Tr., Oct. 19, 2015 (Day 4) at 241:9-243:20; Ex. DX 608I at 1.
[3] Rabobank Traders Trial, Ex. GX 219 at 6.
[4] *United States v. Conti.* 238:16-239:9, Oct. 19, 2015 (Day 4).

30.     Rabobank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.[5]

31.     Defendants Credit Suisse Group AG and its wholly-owned subsidiary Credit Suisse AG are Swiss companies headquartered in Zurich, Switzerland. At all relevant times, Credit Suisse AG was a member of the USD Libor panel.

32.     Defendant Credit Suisse International, a wholly-owned subsidiary of Credit Suisse AG, is an unlimited company based in London, England. Defendant Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston International) is a wholly-owned subsidiary of Credit Suisse AG headquartered in New York. Credit Suisse International is a wholly-owned subsidiary of Credit Suisse AG.[6] Credit Suisse International and Credit Suisse Securities (USA) LLC engaged in financial transactions relating to USD Libor with Plaintiffs and, knew of their parents' USD Libor manipulation.

33.     On information and belief, Credit Suisse Group AG and Credit Suisse AG participated in the unlawful conduct alleged in this Complaint both directly and through their subsidiaries and affiliates.

34.     Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, and Credit Suisse Securities (USA) LLC are referenced collectively in this Complaint as "Credit Suisse."

35.     Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Hesse, Germany. Deutsche Bank AG maintains a "regional

---

[5] *See* Plaintiff's Supplemental Statement of Additional Jurisdictional Facts [Dkt. 1517] at ¶ 41.
[6] Credit Suisse International Annual Report 2009, Credit Suisse, https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar17-consolidated-financial-statements-bank-en.pdf (last visited May 3, 2018).

head office" in New York. At all relevant times, Deutsche Bank was a member of the USD Libor panel.

36.    Defendant Deutsche Bank Securities, Inc. is an indirect wholly-owned subsidiary of Deutsche Bank AG headquartered in New York, New York. Deutsche Bank Securities, Inc. engaged in financial transactions relating to USD Libor with Plaintiffs and knew of Deutsche Bank AG's USD Libor manipulation.

37.    Deutsche Bank AG participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

38.    Deutsche Bank AG participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.[7] Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc. are referenced collectively in this Complaint as "Deutsche Bank."

39.    Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York. Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co. Several subsidiaries of JPMorgan Chase & Co. engaged in financial transactions relating to USD Libor with Plaintiffs and, on information and belief, knew of their parents' USD Libor manipulation. At all relevant times, JPMorgan Chase Bank, N.A. was a member of the USD Libor panel.

40.    Defendant Chase Bank USA, N.A. (f/k/a Chase Manhattan Bank), a wholly-owned subsidiary of JPMorgan Chase & Co., is a Delaware corporation based in Delaware. JPMorgan Bank Dublin PLC (f/k/a Bear Stearns Bank PLC), a subsidiary of JPMorgan Chase & Co., is a private limited company based in Dublin, Ireland. JP

---

[7] Vonnahme Decl. [Dkt. 1501] at ¶ 54 (Deutsche Bank Securities, Inc. employees transacted business with Plaintiffs on behalf of Deutsche Bank AG.)

Morgan Securities, LLC (f/k/a J.P. Morgan Securities Inc.) is a subsidiary of JPMorgan Chase & Co. headquartered in New York, New York. On information and belief, JPMorgan Chase & Co. participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates. Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N. A., Chase Bank USA, N.A., JPMorgan Bank Dublin PLC, and J.P. Morgan Securities, LLC are referenced collectively in this Complaint as "JPMorgan."

41.    Defendant Lloyds Banking Group plc is a United Kingdom public limited company headquartered in London, England. Defendant Lloyds Banking Group plc was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS")—a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland—by Defendant Lloyds Bank plc (f/k/a Lloyds TSB Bank plc). Defendants Lloyds Banking Group plc, HBOS plc, and Lloyds Bank plc are referenced collectively in this Complaint as ("Lloyds"). Lloyds operated directly, or through its wholly owned and controlled subsidiaries, affiliates, agents, and predecessors in the United States. On information and belief, Lloyds participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates. Lloyds Bank plc is the current parent of HBOS.

42.    Lloyds Bank plc was a member of the USD Libor panel until February 6, 2009, along with the Bank of Scotland. From at least 2007 through February 6, 2009, employees HBOS and Lloyds Bank plc were responsible for (1) contributing USD Libor submissions and (2) entering into borrowing and lending transactions on behalf of HBOS and Lloyds Bank plc at rates tied to USD Libor. Following the acquisition of

HBOS by Lloyds, Lloyds Banking Group replaced both Lloyds Bank plc and Bank of Scotland on the USD Libor panel.[8]

43.    Employees of HBOS and Lloyds Bank plc initiated USD Libor derivatives transactions with banks and other financial institutions in the United States. According to the United Kingdom's Financial Conduct Authority ("FCA"), there was a "culture of seeking to take a financial advantage [of GBP and USD Libor] wherever possible" at both HBOS and Lloyds Bank plc.[9]

44.    Lloyds Banking Group plc admitted through its Deferred Prosecution Agreement with the U.S. Department of Justice ("DOJ") that when USD Libor submitters contributed rates that took trading positions into account, the bank was engaged in a deceptive course of conduct.[10] Lloyds Banking Group plc further admitted that counterparties to derivatives trades, including Plaintiffs, were negatively impacted by the manipulation of USD Libor by Lloyds employees.[11] During the relevant period, Lloyds employees located in New York helped determine Lloyds's USD Libor submissions.

45.    Defendants Lloyds Banking Group plc, HBOS plc, and Lloyds Bank plc are referenced collectively in this Complaint as ("Lloyds").

46.    Defendant Royal Bank of Canada ("RBC") is a Canadian company headquartered in Toronto, Canada, with numerous corporate offices and branches in the Southern District of New York and the United States. At all relevant times, Royal Bank of Canada was a member of the USD Libor panel. RBC operated in the United

---

[8] *In re Lloyds Banking Group plc*, No. 14-18, at 2 n.2 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 5 and incorporated into this Complaint by reference.
[9] Final Notice from the FCA to Lloyds Bank plc & Bank of Scotland plc ¶ 2.14 (July 24, 2014) (hereinafter "Lloyds Final Notice"), attached as Exhibit 6 and incorporated into this Complaint by reference.
[10] *United States v. Lloyds Banking Group plc*, Deferred Prosecution Agreement, Attachment A, ¶ 45 (July 28, 2014) (hereinafter "Lloyds SOF"), attached as Exhibit 7 and incorporated into this Complaint by reference.
[11] *E.g.*, *id.* ¶¶ 41-42.

States directly and through its wholly-owned and/or controlled subsidiaries, affiliates, agents, and predecessors. On information and belief, RBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

47.    Defendant The Royal Bank of Scotland Group plc is a United Kingdom public limited company headquartered in Edinburgh, Scotland with an office in New York.[12] Defendant The Royal Bank of Scotland plc is a public limited company headquartered in Edinburgh, Scotland and a subsidiary of The Royal Bank of Scotland Group plc. It maintains an office in New York, New York, and a U.S. headquarters in Stamford, Connecticut. At all relevant times, The Royal Bank of Scotland plc was a member of the USD Libor panel.

48.    Defendant RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.), an indirect wholly-owned subsidiary of The Royal Bank of Scotland Group plc, is a Delaware corporation headquartered in Connecticut. According to RBS, "With respect to the execution of interest rate derivatives . . . RBS Securities, Inc. generally acts as agent for RBS which will be the principal in such transactions."[13]

49.    RBS Securities, Inc. knew of its parent's USD Libor manipulation.

50.    Through its GBM division, RBS traders, including those located in New York were involved in contributing USD Libor submissions.[14]

51.    The Royal Bank of Scotland Group plc and The Royal Bank of Scotland plc participated in the unlawful conduct alleged in this Complaint both directly and through their subsidiaries and affiliates. Defendants The Royal Bank of Scotland Group,

---

[12] RBS purchased ABN AMRO Bank's United States operations, among other parts of the bank, in 2007, and assumed the all of ABN AMRO's outstanding liabilities related to that division.
[13] https://www.fdic.gov/regulations/laws/federal/2012-ad-95-96-97/2012-ad-97_c_05-supp-2.pdf.
[14] ████████████████████████████████████████

plc, The Royal Bank of Scotland, plc and RBS Securities, Inc. are referenced collectively in this Complaint as "RBS."

52.    Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland. UBS AG is the successor-in-interest to Swiss Bank Corporation. UBS Investment Bank is a business group of UBS AG. At all relevant times, UBS AG was a member of the USD Libor panel. UBS AG's Group Treasury function, based in Stamford, Connecticut, had ultimate oversight responsibility for USD Libor submissions.[15]

53.    Defendant UBS Securities LLC (f/k/a UBS Warburg LLC), an indirect wholly-owned subsidiary of UBS AG, is a Delaware company headquartered in New York which serves as UBS's broker-dealer in the United States.

54.    In 2008, a senior manager in UBS' Group Treasury unit directed UBS' USD Libor submitters to persistently depress UBS's submissions.[16] The same manager, based in Stamford, Connecticut, sent an email to managers and directors at UBS, including the UBS USD Libor submitters, directing that UBS' USD Libor submissions be fixed.[17]

55.    UBS Securities LLC engaged in financial transactions relating to USD Libor with Plaintiffs and knew of UBS AG's USD Libor manipulation.

56.    UBS AG operated in the United States and participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates. Defendants UBS AG and UBS Securities LLC are referenced collectively in this Complaint as "UBS."

---

[15] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, U.S. Dep't Justice, App. A, Statement of Facts ¶ 129 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 9 and incorporated into this Complaint by reference.
[16] *Id*. at ¶ 100.
[17] *Id*. at ¶ 118.

57.    This Complaint refers to Defendants Bank of America, Rabobank, Credit Suisse, Deutsche Bank, JPMorgan, Lloyds, RBC, RBS, and UBS as the "Panel Bank Defendants."

## AGENTS AND CO-CONSPIRATORS

58.    Co-conspirator Barclays Bank plc is a United Kingdom public limited company headquartered in London, England. At all relevant times, Barclays Bank, plc was a member of the USD Libor panel. Co-conspirator Barclays Capital, Inc., a wholly-owned subsidiary of Barclays Bank, plc.

59.    Barclays employees in New York not only participated in manipulating Barclays's USD Libor submissions, those same employees aided at least one co-conspiring Panel Bank Defendant in fixing the USD Libor rate. Co-conspirators Barclays Bank plc and Barclays Capital, Inc. are referenced collectively in this Complaint as "Barclays."

60.    Co-conspirator Citigroup, Inc. is a Delaware corporation headquartered in New York, New York. Co-conspirator Citibank, N.A. is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of co-conspirator Citigroup, Inc. via wholly-owned intermediary holding company, Citicorp LLC. At all relevant times, Citibank, N.A. was a member of the USD Libor panel. Citibank, N.A. is the primary banking entity of Citigroup, Inc., providing consumer finance, investment banking, commercial banking, and other services around the world.

61.    Co-conspirator Citigroup Global Markets, Inc. is a subsidiary of co-conspirator Citigroup, Inc. headquartered in New York, New York. Citigroup Global Markets, Inc. engaged in financial transactions relating to USD Libor with Plaintiffs.

15

62.    On information and belief, Citigroup Global Markets, Inc. knew of its parents' USD Libor manipulation.

63.    Citibank, N.A. participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States. [18] Citibank, N.A. Libor submitters participated in the persistent suppression scheme. [19] Co-conspirators Citigroup, Inc., Citibank, N.A., and Citigroup Global Markets, Inc. are referenced collectively in this Complaint as "Citigroup."

64.    "When two persons engage jointly in a partnership for some criminal . . . objective, the law deems them agents for one another. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 316 (2d Cir. 2007) (citing *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002)). Each of the Defendants has participated, as a member of the Conspiracy, and has acted expressly or impliedly in furtherance of the Conspiracy, or aided or assisted in carrying out the purposes of the Conspiracy, and has performed acts and made statements in furtherance of the Conspiracy and other violations of federal and state law. Thus, as a matter of law, each conspirator acted as an agent of each of the other co-conspirators.

65.    "[A]n agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent "indirectly" sells the securities." *Charles Schwab Corp. et al. v. Bank of America Corp. et al.*, 883 F.3d 68, 85-86 (2d Cir. 2018). Each of the Defendants acted as the agents, employees, and/or representatives of each other, within the scope of their employment, in alignment with other Defendants, and with full

---

[18] *In re Citibank, N.A.*, No. 16-17, at 16-19 (C.F.T.C. May 25, 2016) (hereinafter "Citi CFTC Order"), attached as Exhibit 1 and incorporated into this Complaint by reference.
[19] *Id.*

knowledge of their respective wrongful conduct. Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint. Defendants are individually sued as principals, participants, and aiders and abettors in the wrongful conduct complained of, the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions described in this Complaint.

## UNNAMED CO-CONSPIRATORS

66.    Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the Conspiracy, and performed acts and made statements which aided and abetted and were in furtherance of the Conspiracy.

## FACTUAL ALLEGATIONS

## I.    Libor is administered by the BBA and advertised as a reflection of the costs paid by major banks to borrow funds in the London interbank lending market.

67.    Throughout the Conspiratorial Period, Libor was administered by the BBA. BBA's FXMMC had sole responsibility for the administration of Libor. Thirteen "active market practitioners" comprised the FXMMC.[20] The BBA claimed that the FXMMC was an "independent body,"[21] and did not disclose the names of committee members.[22] At least ███████████████████████████████████████████████████, RBS, and UBS,[23] had representatives on the FXMMC. The FXMMC acted

---

[20] *Understanding BBA LIBOR*, BBA Libor, https://web.archive.org/web/20130511195637/ http://www.bba.org.uk/media/article/understanding-bba-libor (last visited May 4, 2018).

[21] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny: Proposals Agreed by the FX & MM Committee § 1.6 (Nov. 17, 2008), *available at* www.bbalibor.com/download/4025.

[22] David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[23] Executives from the following banks have been revealed as members of the FXMMC: ███████████ ████████████████████████████████████████████████████████████

by agreement.[24] FXMMC members met at least every two months at undisclosed locations to discuss Libor.[25] The committee did not publish minutes.[26]

68.    The BBA advertised Libor as a benchmark reflecting the average cost (or interest rate) at which certain well-capitalized banks could borrow funds from other banks in the London interbank lending market for a given period and a given currency. This information was valuable because the interest rates paid by major banks in the competitive interbank lending market provided market participants a useful barometer of risk in the financial system.

69.    Libor is calculated using information reported from individual panel banks. Every business day by 11:10 a.m. London time, each panel bank sends data to Thompson Reuters Group ("Reuters"), a news information provider, reporting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11.00 [a.m.] London time."

---



UBS SOF ¶ 85; RBS Final Notice ¶ 89.

[25] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.
[26] *Id.*

70.    Libor is calculated for ten different currencies including the U.S. Dollar ("USD"), Japanese Yen, Euro, and Swiss Franc. Additionally, the Libor rate for each currency is calculated for numerous maturities. For example, USD Libor is calculated for fifteen maturities ranging from overnight to twelve months.

71.    A different panel of contributor banks is used for each of the ten currencies for which Libor is calculated. For example, prior to February 2011, the USD Libor panel consisted of sixteen banks. The Panel Bank Defendants are among the sixteen banks that, from August of 2007 until February of 2011, comprised the USD Libor panel. Many of the Panel Bank Defendants also sit on Libor panels for other currencies.

72.    Reuters calculated USD Libor using the Panel Bank Defendants' daily submissions. Each business day during the Conspiratorial Period, Reuters received sixteen different submissions for each maturity of USD Libor—one set of submissions from each of the sixteen panel banks. Reuters calculated USD Libor for each maturity by discarding the four lowest and four highest submissions for that maturity and averaging the remaining eight. The result for each maturity was then published as that day's USD Libor rate or "fixing." Figure 1 illustrates the Libor setting process.

**Figure 1:** Libor rate setting process (source: Bloomberg Markets)



73.    The same "interquartile averaging" method illustrated in Figure 1 is used to calculate Libor for other currencies. In other words, regardless of the currency, Libor is calculated by discarding the highest and lowest quartile, or 25%, of the submissions and averaging the remaining submissions.

74.    The BBA created rules ostensibly aimed at protecting Libor's integrity, which rules were known to the general public. For example, the BBA mandated that each panel bank's daily submissions would remain confidential until after the calculation and publication of the daily Libor rates. Adherence to this rule would help prevent collusion and ensure that each panel bank's submission was not influenced by other banks' submissions.

75.    The BBA also mandated that upon publication of each day's Libor, Reuters would simultaneously publish the individual rates submitted that day by each panel bank. This rule promoted competition between the panel banks both to submit the lowest accurate submissions and to monitor the accuracy of other panel banks' submissions. A bank's borrowing costs reflect the bank's creditworthiness and financial strength—the lower the borrowing costs, the greater the bank's perceived creditworthiness and financial strength. Because the panel banks were themselves competitors in selling financial services and products, no bank wished to appear less financially sound than its fellow panel banks. Thus, publishing each panel bank's submissions appeared to provide a strong disincentive to panel banks to submit artificially high rates. Additionally, because each panel bank faced competitive pressure to be perceived as financially stronger than its competitors, publishing each bank's individual submissions provided a strong incentive to each panel bank to police other banks' submissions and report any artificially low submissions.

76.    The BBA bolstered Libor's perceived integrity by touting it as a "simple, transparent benchmark . . . [that is] a reliable indicator of the state of the money markets, and one of the most reliable barometers of risk in the global economy." As the BBA put it, Libor was a valuable benchmark because it "represent[ed] a unique snapshot of competitive funding costs."

77.    Because it was thought to reflect competitive forces of supply and demand in the competitive interbank lending market, and because competition between the panel banks should have protected its integrity, Libor became the world's leading short-term interest rate benchmark. Libor is currently used to set the interest rate or price of numerous financial products including loans, mortgages, bonds, futures, options, swaps, and other derivative instruments. In 2012, the *New York Times* estimated that

$350 trillion in financial products were tied to Libor, substantiating the BBA's description of Libor as "the world's most important number."

## II. Defendants conspired to manipulate numerous interest-rate benchmarks, including USD Libor.

78.    The Defendants conspired among each other to manipulate various interest-rate benchmarks around the world, including USD Libor. As discussed below, Defendants not only had the means, motive, and opportunity to manipulate Libor, but also empirical evidence actually demonstrates that, during the Conspiratorial Period, the Panel Bank Defendants' USD Libor submissions did not accurately reflect their borrowing costs. Corroborating this data and eliminating any doubt as to the existence of the Conspiracy, eight Defendants and three non-defendants have settled with regulators and admitted to conspiring to manipulate various currencies of Libor during the Conspiratorial Period.

### A. Defendants had the means, motive, and opportunity to collude to suppress USD Libor.

#### 1. The BBA's ownership of Libor and the Panel Bank Defendants' position on the USD Libor panel provided them the ideal means to manipulate Libor.

79.    Defendants collectively possessed complete control over Libor. The BBA owned Libor and was responsible for creating and enforcing its rules and regulations. The Panel Bank Defendants not only exercised power over the BBA, as its most powerful and influential members and ████████████████, but also controlled the daily Libor fixings through their position as panel banks.

80.    Defendants demonstrated their control over Libor by manipulating its daily fixings during the Conspiratorial Period.

81.    Collusion allowed Defendants to manipulate USD Libor more dramatically. Collusion also allowed Defendants to better conceal their manipulation. It may draw suspicion if a single panel bank's submissions differed too dramatically from those of other panel banks with similar credit risk profiles. By colluding, however, Defendants could make even artificial rates appear legitimate.

82.    Lastly, the Panel Bank Defendants' positions on Libor panels for foreign currencies allowed them to leverage their collusion to manipulate Libor fixings for numerous currencies. While each currency has its own panel of contributor banks, the BBA allows a single bank to serve on numerous panels. This has led to significant overlap in the panel banks for different currencies. For example, during the Conspiratorial Era, nine of the sixteen banks that served on the USD panel also served on the Japanese Yen, Euro, and Swiss Franc panels. In particular, the USD and Yen Libor panels had nearly complete overlap—during the Conspiratorial Period, thirteen of the sixteen USD panel banks also served on the Yen panel. The Panel Bank Defendants leveraged their positions on numerous overlapping Libor panels to manipulate Libor fixings for numerous currencies including Yen, Euro, and Swiss Franc.

### 2.    The Panel Bank Defendants had strong financial incentives to manipulate Libor.

83.    The Panel Bank Defendants were motivated to manipulate Libor for their own gain by three primary incentives. First, investors' serious concerns regarding the stability of financial institutions during the financial crisis that began in 2007 provided a strong incentive for the Panel Bank Defendants to artificially suppress Libor. The Panel Bank Defendants knew that a bank's borrowing cost is widely viewed as reflecting that bank's creditworthiness and financial strength. This incentivized the Panel Bank Defendants to understate their borrowing costs (thereby suppressing Libor) to portray

themselves as economically healthier than they actually were. Moreover, because no one bank would want to stand out as bearing a higher degree of risk than its competitors, each Panel Bank Defendant shared a powerful incentive to collude with other Panel Bank Defendants to ensure it was not the odd man out.

84.    The third goal was that the Panel Bank Defendants themselves bought and sold numerous financial instruments tied to Libor. Each of the Panel Bank Defendants, however, was a net lender of Libor, and so stood to profit from a suppressed rate. During the Conspiratorial Period, the Panel Bank Defendants held numerous financial instruments that required them to make payments to counterparties in the United States based on Libor. Artificially suppressing Libor would significantly reduce the amount of money the Panel Bank Defendants were required to pay to others.

85.    The size of the Panel Bank Defendants' positions, in the billions and trillions of dollars, meant that minute reductions in the rate—even a fraction of a single percentage point—would result in hundreds of millions of dollars of ill-gotten profits for the Panel Bank Defendants.

86.    By artificially suppressing Libor during the Conspiratorial Period, Defendants collectively reaped billions of dollars in illicit unearned revenues.[27]

87.    Libor was so lucrative for the Panel Bank Defendants that *The Wall Street Journal* reported that around November 2008, BBA officials toyed with selling Libor or spinning it off into a wholly independent entity.[28] The BBA drew up plans to license Libor to an independent third party that would pay a fee to administer the rate instead of the BBA.[29] But when BBA staffers pitched the idea to industry executives, they got the impression that the big banks—which paid most of the BBA's bills through their

---

[27] *See* Bank of Am., 2008 Annual Report, at 88-90, 91 tbl.42 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.*Id.* at 91 tbl.42.
[28] David Enrich & Max Colchester, *Before Scandal, Clash Over Control of Libor*, The Wall St. J., Sept. 11, 2012.
[29] *Id*.

membership fees—wanted Libor kept in-house so that they could continue to influence it, according to people familiar with the talks.[30]

### 3. The Panel Bank Defendants' interactions with interdealer brokers and the BBA provided Defendants ample opportunities to conspire.

88.    The numerous channels of communication available to Defendants provided them with ample opportunity to plan, implement, and carry out the Conspiracy. Though many facts remain unknown to Plaintiffs, and are known only to Defendants and their co-conspirators, Defendants are believed to have had frequent contact with one another directly and through interdealer brokers. Interdealer money brokers (also called interdealer or cash brokers) are used by panel banks to gain "market color" and help banks estimate their own borrowing costs. These interdealer brokers provided a convenient mechanism for Libor panel banks to communicate indirectly with one another to coordinate their submissions in a way that benefited the panel banks' trading portfolios. Indeed, Defendants UBS and RBS have admitted to communicating with other panel banks both directly and indirectly through the interdealer brokers to influence panel banks' Libor submissions.

89.    The Panel Bank Defendants' executives are also believed to have had numerous private interactions with one another through their involvement with the BBA. Numerous Panel Bank Defendants held positions in the BBA's FX & MM Committee, which was responsible for scrutinizing panel banks' Libor submissions and the integrity of the Libor setting process. The BBA provided Defendants with a convenient mechanism to strengthen and reinforce their Conspiracy and offered a cloak of legitimacy to meetings between the Panel Bank Defendants' executives to discuss Libor.

---

[30] *Id.*

90.    For example, *The Wall Street Journal* reported that, in May of 2008 the BBA held a meeting of the Foreign Exchange & Money Markets Committee, a long-standing BBA-organized panel whose primary role is to make decisions about Libor.[31] The committee is made up of banking-industry officials whose names and affiliations the BBA will not disclose.[32] The meeting's agenda was how to improve Libor.[33] "We need to adopt a minimal approach," said one executive, identified in a transcript as Representative 2 of "Bank B."[34] "Too big a change would cause an explosive reaction."[35] Another bank representative argued that the BBA should deal with banks that report artificially low data "by just picking up the phone . . . and have a conversation behind closed doors."[36] The transcript indicates that other bank representatives agreed.[37]

91.    Defendants' interactions were not limited to USD Libor. Rather the Panel Bank Defendants served with one another on numerous Libor panels for other currencies. For example, from 2006 to 2009, thirteen of the sixteen banks on the USD Libor panel were also on the Yen Libor panel. The Panel Bank Defendants' frequent interactions and service on similar Libor panels allowed them to spread their Conspiracy across numerous Libor currencies, thereby increasing their ill-gotten profits.

## III.  Empirical evidence confirms that USD Libor's aberrant behavior during the Conspiratorial Period was the result of Defendants' manipulation.

92.    In 2007, growing concerns over the subprime mortgage market caused U.S. financial markets to experience severe illiquidity. Banks became reluctant to make loans, even to other banks. Historically, such periods have given rise to high Libor rates

---

[31] David Enrich & Max Colchester, *Before Scandal, Clash Over Control of Libor*, The Wall St. J., Sept. 11, 2012.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

as banks demand larger interest payments (even from each other) as a condition of loaning their funds. Nonetheless, in the early months of 2008, during the most significant financial crisis since the Great Depression, the Panel Bank Defendants' USD Libor submissions did not vary markedly, and neither increased nor decreased sharply, despite the Panel Bank Defendants' increased credit risk and decreased liquidity.

93.    This evidence and other empirical data suggests that Libor's aberrant behavior during the Conspiratorial Period was caused by Defendants' collusion to manipulate and suppress USD Libor. In particular, during the Conspiratorial Period, USD Libor deviated dramatically from its historic relationships with other economic indicators including Eurodollar, equity options implied volatility, and credit default swap rates. This evidence, as well as inconsistencies in the borrowing costs the Panel Bank Defendants reported for different currencies and quote bunching, strongly suggests that Defendants colluded to artificially suppress USD Libor during the Conspiratorial Period.

### A.    USD Libor's divergence from its historical relationship with the Eurodollar suggests manipulation.

94.    Eurodollar is a term used to describe USD-denominated time deposits which are located in foreign banks or in foreign branches of U.S. banks. The interest rate paid on these deposits for particular maturities (*e.g.*, overnight, one-month, or three-month) is commonly viewed as the best market proxy for USD Libor because the two have historically been closely correlated. Eurodollars are actively traded globally and their market rates are therefore readily observable. An analysis conducted by UCLA professor Connan Snider and PhD candidate Thomas Youle ("Snider and Youle"), emphasized that, prior to August 2007, the previous day's Eurodollar bid rate was a better predictor of Libor than the previous day's Libor.

95.    Historically, the difference between USD Libor and the Eurodollar rate, known as the USD Libor / Eurodollar spread (effectively USD Libor minus the Eurodollar bid rate), averages 2.75 basis points (equivalent to 0.0275%).[38] The spread has generally been positive, meaning the Eurodollar rate is slightly lower, reflecting the measurement of Libor as an offer rate and the Eurodollar rate as a bid rate on USD deposits. After August 2007, Defendants' manipulation and suppression of USD Libor resulted in a radical decoupling of USD Libor and the Eurodollar rate, and a reversal of the relationship so that the spread was negative. Figure 1 illustrates the decoupling of USD Libor and the Eurodollar rate during the Conspiratorial Period, as seen in a sudden and radical increase in the USD Libor / Eurodollar spread.

**Figure 1:** 3 Month USD Libor / Eurodollar Spread (source: Snider & Youle)



---

[38]    A "basis point" is a term commonly used to measure a financial instrument's interest rate. It is equal to 1/100th of 1 percent, and is useful because daily rate changes are typically smaller than 1 percent, though they still have huge financial effects.

96.    This change in the historical relationship to the Eurodollar is evidence that Defendants artificially depressed USD Libor. This wider than normal spread implies that the Panel Bank Defendants' were artificially suppressing USD Libor.

97.    When Snider and Youle performed the identical analysis for the period after August 2007, they found that the previous day's Eurodollar rate had less predictive power on USD Libor. In fact, as USD Libor dropped below the Eurodollar rate, the previous day's USD Libor became a better predictor of the current USD Libor. This demonstrates that USD Libor was no longer reflecting the Panel Bank Defendants' true borrowing costs, but instead was being manipulated.

**B.    Comparing the Panel Bank Defendants' USD Libor submissions to the implied volatility of their equity options demonstrates that they artificially suppressed USD Libor.**

98.    Stock markets provide a wealth of information regarding the financial health and credit risk of the companies whose stocks are publicly traded. During the Conspiratorial Period, eleven of sixteen USD Libor panel banks were publicly-traded companies.

99.    One of the most accepted and widely-used methods of measuring the financial risk of a publicly-traded company is to analyze the implied volatility of the company's equity options. Typically, assets which exhibit high volatility are considered to be riskier than assets with lower volatility. It is possible to derive, from stock (or equity) option prices, a forward-looking measure of volatility, known as "implied volatility," which measures market expectations regarding the instability or riskiness of future stock returns. Because they both measure financial risk, the accuracy of a bank's Libor submissions can be gauged by comparing the submissions to the implied volatility of the bank's equity options.

100.   A bank's Libor submissions reflect its borrowing costs, which are made up of two components: a "risk free" or "cost of funds" component, which compensates the lender for the lost use of its money, and a "risk premium" component, which compensates the lender for the risk that the borrowing bank will not repay the loan.

101.   Before comparing a bank's Libor submissions to its implied options volatility, one must remove the "risk free" or "cost of funds" component built into a bank's Libor submissions. This can be done by subtracting the Overnight Index Swap ("OIS") rate from the bank's USD Libor submissions. The OIS rate is the expected average of the effective federal funds rate over the duration of the interest rate swap. Swapping the two interest rates allows a bank to use the overnight market to fund their short-term lending. In this sense, a bank's cost to loan money for three months equals the 3–month OIS rate. There is very little default risk in the OIS market because there is no exchange of principal; funds are exchanged only at the maturity of the contract, when one party pays the net interest obligation to the other. In this sense, the OIS rate can be considered to be risk free.

102.   Subtracting the OIS rate from a bank's USD Libor submissions removes the "risk free" or "cost of funds" component from the bank's borrowing costs. What remains is the "risk premium" component, which is a pure reflection of the bank's creditworthiness. Because Libor is the rate at which other banks are willing to lend to a given bank, the difference between a bank's Libor submission and the OIS rate (referred to as the "Libor-OIS spread") measures the risk the lender assumes by lending to the bank. For example, if Bank A lends to Bank B at 3% and the OIS rate is 1% then the difference of 2% is the compensation for risk that Bank A assumes in lending to Bank B. The 1% OIS rate merely reflects Bank A's cost of raising the money it lends to Bank A. The Libor-OIS spread is widely recognized as a barometer for the financial health of a bank.

103.   Since the implied option volatility and the Libor-OIS spread both measure a panel bank's financial risk, they should be closely correlated. However, if the Panel Bank Defendants were artificially suppressing their USD Libor submissions, the close relationship between implied options volatility and Libor-OIS spread would break down. As Figure 2 demonstrates, the previously stable relationship between the Libor-OIS spread and the implied options volatility for each of the eleven publicly-traded panel banks was disrupted during the Conspiratorial Period. Specifically, Figure 2 shows that, between August 2007 and May 2010 the market attributed additional risk to each panel bank that was not reflected in the bank's USD Libor submissions.[39]

**Figure 2:** Libor OIS spread minus equity options implied volatility for eleven publicly-traded panel banks.



---

[39] Though Figure 2 uses equity options implied volatility, which is a forward-looking prediction of each bank's financial risk, comparing each bank's Libor-OIS spread to its historical options volatility shows similar disruption during the Conspiratorial Period.

















Bank of America
Libor OIS Spread Minus Equity Options Implied Volatility
0.0
-50.0
-100.0
-150.0
-200.0
-250.0
-300.0
01/02/04
05/02/04
09/02/04
01/02/05
05/02/05
09/02/05
01/02/06
05/02/06
09/02/06
01/02/07
05/02/07
09/02/07
01/02/08
05/02/08
09/02/08
01/02/09
05/02/09
09/02/09
01/02/10
05/02/10
09/02/10
01/02/11
05/02/11

Credit Suisse
Libor OIS Spread Minus Equity Options Implied Volatility
0.0
-20.0
-40.0
-60.0
-80.0
-100.0
-120.0
-140.0
01/02/04
05/02/04
09/02/04
01/02/05
05/02/05
09/02/05
01/02/06
05/02/06
09/02/06
01/02/07
05/02/07
09/02/07
01/02/08
05/02/08
09/02/08
01/02/09
05/02/09
09/02/09
01/02/10
05/02/10
09/02/10
01/02/11
05/02/11

**C.    USD Libor's divergence from its historical relationship with credit default swaps demonstrates that Defendants artificially suppressed USD Libor.**

104.    A credit default swap ("CDS") is a derivative instrument through which the buyer acquires, and the seller agrees to provide, protection against the possibility of credit default by a particular obligor or on a particular debt. The fee paid by the purchaser (also referred to as the CDS spread) serves as a measure of the seller's perceived risk of default by the entity whose performance is effectively being guaranteed. The greater the risk of default on the underlying instrument (typically a bond or loan) the greater the spread. This same concept applies to CDS instruments used to insure interbank loans made to Libor panel banks. The greater the perceived risk that the panel bank will default on the loan, the higher its CDS spread.

105.    CDSs are a useful proxy for Libor because both CDSs and Libor are a measure of perceived credit risk. During the Conspiratorial Period, the significant disparities between the assessment of certain Panel Bank Defendants' credit risk as reflected in the CDS market and their USD Libor reporting strongly suggest manipulation.

106.    In their analysis, Snider and Youle performed comparisons between USD Libor and CDSs to highlight inconsistencies in USD Libor reporting. They noted that a specific reporting bank may have a comparatively higher CDS spread than a second reporting bank (and therefore be perceived as comparatively "riskier"), while simultaneously having a lower Libor than the same bank (which would indicate that it is perceived as a "less risky" investment). For example, as Figure 2 illustrates, during the Conspiratorial Period, Citigroup consistently had a substantially higher CDS spread than Tokyo-Mitsubishi, yet Citigroup reported slightly lower USD Libor quotes. This seemingly anomalous observation can be rationally explained by intentional USD Libor manipulation.

**Figure 2:** One Year USD Libor Quotes versus CDS Spreads (source: Snider & Youle)



### D. Inconsistencies in the borrowing costs the Panel Bank Defendants reported across currencies suggest manipulation.

107.   Panel banks report Libor across different currencies each day. Since Libor is a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of panel banks should largely be the same across different currencies (allowing for the variation in panel composition across currencies). A comparison of Libor across different currencies shows this was not consistently so during the Conspiratorial Period.

108.   For example, Bank of America and Tokyo-Mitsubishi both report rates to Reuters for calculating USD and Yen Libor. However, during the Conspiratorial Period, it was common for Bank of America to quote a lower rate than Tokyo-Mitsubishi in USD Libor, while simultaneously quoting a higher rate in the Yen Libor. This type of cross currency rank reversal occurred between other Panel Bank Defendants as well.

Since institutional risk should be the same for each panel bank regardless of the currency in which it is measured, this strongly indicates that the reported rates did not accurately reflect the Panel Bank Defendants' true borrowing costs and were the likely product of manipulation.

**Figure 3:** Cross-Currency Rank Reversals (source: Snider & Youle)



**E.    Quote bunching strongly suggests that Defendants colluded to artificially suppress USD Libor.**

109.    Throughout the Conspiratorial Period, the USD Libor rates reported by certain Panel Bank Defendants "bunched" around the fourth lowest quote each day. That is to say, the rates reported by those Panel Bank Defendants to Reuters were consistently near the fourth lowest of the 16 panel banks. Since Reuters, at the time, calculated USD Libor by removing the lowest (and highest) four reported rates every day, bunching around the fourth lowest rate suggests that those Panel Bank Defendants colluded to suppress USD Libor.

110.    Initially, bunching among the Panel Bank Defendants' reported rates demonstrates that they intended to report the same or similar rates. Individual variation in the financial circumstances of each reporting bank should lead to differences in their reported rates. The fact that, throughout the Conspiratorial Period, certain Panel Bank Defendants repeatedly reported identical or nearly identical rates to Reuters is an indication that Defendants were conspiring to manipulate USD Libor.

111.    Further, certain Panel Bank Defendants' consistent bunching of their reported rates at or near the fourth *lowest* position is suggestive of their intent to artificially *suppress* USD Libor. This is because the fifth lowest quote is the lowest quote that is included by Reuters in calculating the day's USD Libor. The Panel Bank Defendants' clustering at or near the fourth lowest rate suggests they wanted to have the lowest rate possible counted in the USD Libor fixing, in order to artificially suppress USD Libor.

112.    Bunching also suggests that, at the time each Panel Bank Defendant reported its rates to Reuters, it was aware of the rates submitted by other Panel Bank Defendants. But the BBA's website states that "[a] bank cannot see other contributor rates during the submission [process]—this is only possible after final publication of the BBA LIBOR

data." Quote bunching indicates the Panel Bank Defendants communicated before submitting their USD Libor rates to coordinate their submissions—centering them around the fourth lowest quote—so as to ensure maximum downward pressure on USD Libor.

113.   Figure 4 illustrates the frequency with which the USD Libor rates Defendants Bank of America and JPMorgan, and co-conspirator Citigroup, submitted bunched around the fourth lowest quote. A negative difference means that they were below the fourth lowest quote, and therefore not included in the daily USD Libor calculation. Zero difference means that they either were the fourth lowest quote on a given day or tied at the same value as the fourth lowest quote (if there is a tie between Libor quotes on a given day, one of the banks' quotes is discarded at random).



**Figure 4:** Clustering of 3 Month USD Libor Quotes around Fourth Lowest Quote between August 2007 and October 2009 (source: Snider & Youle)

## IV.   Defendants did conspire to persistently suppress Libor.

114.   By August 16, 2007, all of the Panel Bank Defendants dropped their submissions significantly. The initial differences were consistent with the fact that the Panel Bank Defendants had different credit ratings and presented different risks for unsecured short-term wholesale lenders.[40] Libor submissions showed significant differences in early August but then showed significant uniformity by the end of the month. This pattern is consistent with allegations that the Panel Bank Defendants began colluding in August 2007.

---

[40] *See, e.g.*, Wheatley Final Report, *supra* note 32, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks.").

115.   On August 12, 2007, Deutsche Bank's New York-based Regional Manager, Matt Connolly, requested of Deutsche Bank's USD Libor submitter, James King, and Mr. King's supervisor, Michael Curtler: "If possible, we need in NY 1mo libor as low as possible next few days….tons of pays coming up overall….thanks!"[41] Mr. King responded: "Will do our best. I'll coordinate the overnight in the same way as we did last week with Andrew [Rivas, a New York-based Deutsche Bank USD Libor trader] tomorrow."[42] According to King's unclassified interview with the FBI, after being shown this document, Mr. King stated that Connolly's "reference to 'tons of pays coming up' meant the bank's USD desk in New York had a lot of trading positions rolling off (i.e., fixings),"[43] i.e. that Deutsche Bank would have to pay counterparties interest payments tied to USD Libor.

116.   Senior RBS managers reportedly knew that, at least as of August 2007, the Bank Defendants were systematically rigging Libor.[44]

117.   Similarly, internal documents from Lloyds reveal that an unidentified HBOS senior manager directed USD Libor submitters to contribute USD Libors at the rate of the expected USD Libor fixing so that HBOS did not stand out as an outlier relative to other Panel Banks.[45]

118.   In the event that a Panel Bank submitted a USD Libor submission outside of that range, the FXMMC privately and directly contacted that Panel Bank to tell the Panel Bank what other Panel Banks had submitted—even though the Libor rules stated that Panel Banks should not have any advance knowledge of other USD Libor

---

[41] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[42] Id.

[43] Unclassified FBI FD-302 memorandum of the Government's July 31, 2014 interview of James R. King, excerpt attached as Ex. C to the Supp. Decl. of Seth L. Levine in Further Support of Defendants' Joint Motion for a *Kastigar* Hearing, *United States v. Connolly et al.*, No. 1:16-cr-00370 at 31 (S.D.N.Y. Sept. 25, 2017).

[44] Id.

[45] Lloyds CFTC Order at 14 (HBOS could not "afford to be significantly away from the pack").

submissions. As agreed upon by the FXMMC members and USD Libor Panel Banks, the Panel Bank would then re-submit its USD Libor submission so that the submission was within the range of all other Panel Banks. When publishing each Panel Bank's individual USD Libor submissions, the BBA published only the re-submitted rate.

119.   Citibank wanted to push USD Libor down further, but needed Barclays (which was submitting suppressed rates that were at the high end of the scale) to reduce its submissions further so that Citibank (which was submitting suppressed rates that were at the low end of the scale) could further reduce its submissions without drawing unwanted scrutiny.

120.   On September 3, 2007, Bloomberg published a story titled "Barclays Takes a Money-Market Beating," that observed that Barclays' published 3-month USD Libor contribution was relatively high compared to other Panel Bank Defendants. The article speculated that Barclays and "its Barclays Capital securities unit" were struggling for cash due to their exposure to United States subprime mortgages. In response to this article, senior managers at Barclays instructed their USD Libor submitters to further depress their USD Libor submissions so that they would stay "within the pack" and be nearer to the depressed rates of other Bank Defendants.

121.   Barclays has admitted that its USD Libor submissions were false because they were lower than what Barclays would otherwise have submitted and contrary to the definition of Libor. [46]

122.   On November 29, 2007, Miles Storey, Head of Group Balance Sheet at Barclays and a member of the FXMMC contacted Mr. Ewan at the BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the Bank Defendants.[47] Mr. Storey explained that the

---

[46] Barclays SOF ¶ 36.
[47] Barclays SOF ¶ 43.

Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[48] Mr. Storey specifically identified certain other Bank Defendants that were submitting Libor rates lower than where those banks could actually get funds.

123.  Bank of America's and Lloyds USD Libor submissions were within two basis points of the run-through and published fix for eight tenors on that date.



---

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████ █

126.   On October 15, 2008, an unidentified Citibank USD Libor submitter wrote that "off the record, we are not allowed to be the highest" USD Libor contributor.[54] On information and belief, Citibank's New York office issued that directive.

127.   Publicly, however Panel Bank Defendants continued to falsely represent that Libor was based on accurate and honest submissions.

## V.   The alleged Conspiracy is plausible: To date, six Defendants and five non-Defendants have admitted to conspiring to manipulate various Libor currencies.

128.   To date, six Defendants—UBS, RBS, Rabobank, Deutsche Bank, JPMorgan, and Lloyds (the "Settling Defendants")—have admitted to manipulating various currencies of Libor. Five non-Defendants— Barclays, Citigroup, ICAP, RP Martin, and Societe Generale ("SocGen")—have also admitted to manipulating various currencies of Libor. These admissions resulted from ongoing government investigations in the United States, Switzerland, Japan, United Kingdom, Canada, the European Union, and Singapore by numerous governmental agencies, including the U.S. Department of Justice ("DOJ"), the Commodities Future Trading Commission ("CFTC"), and the U.K.'s Financial Conduct Authority ("FCA") (formerly the Financial Services Authority).

129.   The Settling Defendants have avoided prosecution for colluding to manipulate Libor by paying regulators a collective sum approaching $10 billion. In



[54] Citi CFTC Order at 18.

connection with these settlements, the Settling Defendants have admitted to manipulating various Libor currencies during the Conspiratorial Period. Other Defendants are still under scrutiny as part of the world-wide rate rigging probe.

### A.   Barclays settles Libor-manipulation charges with U.S. and U.K. authorities and admits to conspiring with other financial institutions to manipulate USD Libor, Euribor, Yen Libor, and Sterling Libor.

130.   On June 27, 2012, U.S. and U.K. authorities announced they had settled Libor-manipulation charges with Barclays. In order to avoid prosecution for its role in Defendants' Conspiracy, Barclays agreed to pay a combined $453.6 million to the CFTC, DOJ, and the FCA.

### 1.   Barclays' settlement with the CFTC.

131.   On June 27, 2012, the CFTC issued an Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions.[55]

132.   The Barclays CFTC Order concludes that Barclays' Libor manipulation spanned multiple desks, traders, offices, and currencies from at least 2005 through at least 2009. It also confirms that Barclays and its co-conspirators engaged in systemic suppression of Libor, not merely trader-based manipulation:

> (1) During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions; this same conduct occurred with respect to

---

[55] *In re Barclays plc*, No. 12-25, 2012 WL 2500330, at 22 (C.F.T.C. June 27, 2012) (hereinafter "Barclays CFTC Order"), attached as Exhibit 10 and incorporated into this Complaint by reference.

Barclays' Euribor[56] submissions for the period of at least mid-2005 through mid-2009;

(2) During the period from at least mid-2005 through at least mid-2008, certain Barclays Euro swaps traders, led by a former Barclays senior Euro swaps trader, coordinated with, and aided and abetted traders at certain other banks to influence the Euribor submissions of multiple banks, including Barclays, in order to affect the official published Euribor, and thereby benefit their respective derivatives trading positions; and

(3) During the volatile, global market conditions of the financial crisis of late August 2007 through early 2009 . . . Barclays lowered its LIBOR submissions in order to manage what it believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem based in part on its high LIBOR submissions relative to the low submissions of other panel banks that Barclays believed were too low given market conditions. Pursuant to a directive by certain members of Barclays' senior management, Barclays submitted lower rates for U.S. Dollar LIBOR, and at limited times Yen and Sterling LIBOR, than what it had determined to be the appropriate rates reflecting the costs of borrowing unsecured funds in the relevant markets.

133.   Barclays admitted that its swaps traders' practice of requesting Barclays' Libor submitters to alter Barclays' USD Libor submissions to favor Barclays' derivative trading positions was "common and pervasive" and at times "occurred on an almost daily basis."

134.   Barclays' traders also conspired with traders from other financial institutions to improperly influence USD Libor. For example, Barclays admitted that its swaps traders received external requests to alter Barclays' USD Libor submissions from "former Barclays swaps traders who had left Barclays and now were employed by other financial institutions."

---

[56] Euribor stands for the Euro Interbank Offered Rate, which like Libor, is a daily reference rate based on the averaged interest rates at which Eurozone banks offer to lend unsecured funds to other banks in the euro interbank market. It is distinct from the BBA-published Euro Libor.

135.   The false rate requests, whether internal or external, typically concerned USD Libor submissions. The following are examples, published in the Barclays CFTC Order, of such requests:

> 1) "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!! We need a 4.17 fix in 1m (low fix) We need a 4.41 fix in 3m (high fix)" (November 22, 2005, Senior Trader in New York to Trader in London);

> 2) "This is the [book's] risk. We need low 1M and 3M libor. Pls ask [submitter] to get 1M set to 82. That would help a lot" (March 27, 2006, Trader in New York to Trader in London);

> 3) "Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the lib or fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot." (September 13, 2006, Senior Trader in New York to Submitter);

> 4) "For Monday we are very long 3m cash here in NY and would like the setting to be set as low as possible ... thanks" ( December 14, 2006, Trader in New York to Submitter); and

> 5) "Pls. go for 5.36 Libor again tomorrow, very long and would be hurt by a higher setting ... thanks." (May 23, 2007, Trader in New York to Submitter).

136.   Barclays' Libor submitters frequently responded to traders that they would accommodate their requests, often by saying "sure," "will do my best," or words to similar effect. The following are examples of submitters agreeing to make false submissions in an attempt to alter the published USD Libor rate:

> 1) "For you ... anything. I am going to go 78 and 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least." (March 16, 2006, Submitter's response to swaps trader's request for a high one-month and low three-month USD LIBOR); and

> 2) "Done ... for you big boy ... " (April 7, 2006, Submitter's response to swaps trader requests for low one-month and three-month USD LIBOR).

137.   Although Barclays' Libor submitters knew it was inconsistent with the BBA's definition and criteria for Libor, they regularly submitted USD Libor rates that did not accurately reflect the bank's true borrowing costs.

138.   Barclays admitted that, beginning in August 2007 and continuing until at least mid-2009, the bank's senior management directed its USD Libor submitters to lower their daily USD Libor submissions, and further admitted that the lowered submissions financially benefited Barclays at the expense of counterparties.

139.   Barclays' Libor submitters followed management's directive to submit artificially low USD Libor rates. For example, on November 28, 2007, Barclays' senior USD Libor submitter emailed a large group of Barclays' employees, including the senior Barclays Treasury managers, stating "LIBORs are not reflecting the true cost of money. I am going to set . . . , probably at the top of the range of rates set by libor contributors . . . [T]he true cost of money is anything from 5–15 basis points higher." A senior Barclays Treasury manager endorsed the submissions, replying "[f]ine on LIBOR settings – thanks for remaining pragmatic but at the upper end."

140.   In early December 2007, Barclays' senior USD Libor submitter warned his supervisor that Barclays was not setting "honest" rates when making its Libor submissions. The senior USD Libor submitter emailed his supervisor stating that he submitted Barclays' one month USD Libor at 5.30 percent, which was four basis points over the next highest submission and almost five basis points over the USD Libor fixing. However, this submitted rate was well below the 5.40 percent that Barclays was paying (i.e., asking) to borrow funds in the market, and that "given a free hand [he] would have set around 5.45%." He continued, "My worry is that we (both Barclays and the contributor bank panel) are being seen to be contributing patently false rates. We are therefore being dishonest by definition and are at risk of damaging our reputation in the market and with the regulators. Can we discuss urgently please?" The supervisor

directed these concerns to a senior compliance officer and a member of Barclays' senior management.

141.   On or about April 2008, a Barclays senior USD Libor submitter spoke on the telephone with a senior Barclays Treasury manager and expressed concerns about Barclays' Libor submissions. The Libor submitter stated that he was doing the same thing as other banks, by submitting at one level while paying (i.e., asking to borrow funds) at a higher level in the market. He noted his prior Libor submissions were lower than where he thought he could obtain funds. He stated, "I would be paying . . . [2.98] today and I'm going to be setting my LIBOR at [2.74] and I'm as guilty as hell . . . . I will go [2.74] unless I'm given permission to go otherwise, but I would be prepared to pay [2.98]." The senior Barclays Treasury manager replied, "I'm happy for you to be at and around the top of the pack but can we please not sort of be ten basis points above the next . . . ?"

142.   Around this time, a senior Barclays Treasury manager informed the BBA in a telephone call that Barclays had not been reporting accurately, although he noted that Barclays was not the worst offender of the panel bank members. "We're clean, but we're dirty-clean, rather than clean-clean." The BBA representative responded, "no one's clean-clean."

143.   In late October 2008, believing that Barclays needed to lower its Libor submissions even further, a member of senior management instructed Barclays' Libor submitters, through their supervisor, that Barclays' USD and Sterling Libor submissions needed to be lowered to be "within the pack," meaning Barclays' Libor submissions were to be made at or around the same rate as the other panel banks. The same senior manager confirmed and reiterated this directive in a meeting with the supervisors and some of the submitters a few days later.

144.   Barclays' Libor submitters complied with management's additional directive and sent their supervisor emails confirming their reluctant acquiescence. The senior USD submitter emailed his supervisor, "following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested. I disagree with this approach as you are well aware. I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."

### 2.   Barclays' settlement with the DOJ.

145.   On June 27, Barclays entered a Non-Prosecution Agreement with the U.S. DOJ's Fraud Section.[57]

146.   While the DOJ's findings are similar to the CFTC's, in that they detail Barclays' pervasive and frequent manipulation of USD Libor, the Non-Prosecution Agreement contains some additional communications and admissions not contained in the CFTC's Order. For example, the Non-Prosecution Agreement states that on Friday, March 10, 2006, a Barclays Dollar swaps trader located in London ("Trader 1") sent an e-mail to a Barclays USD Libor submitter ("Submitter 1") stating: "Hi mate[.] We have an unbelievably large set on Monday (the IMM). We need a really low 3m [3–month] fix, it could potentially cost a fortune. Would really appreciate any help, I'm being told by my NYK [counterparts in New York] that it's extremely important. Thanks." Then, on Monday, March 13, 2006, at approximately 7:48 a.m., Trader 1 wrote to Submitter 1: "The big day has[] arrived . . . My NYK were screaming at me about an unchanged 3m libor. As always, any help wd [would] be greatly appreciated. What do you think you'll go for 3m?" Submitter 1 responded, "I am going 90 altho[ugh] 91 is what I should be

---

[57] Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 11 and incorporated into this Complaint by reference

posting." Trader 1 replied in part: "I agree with you and totally understand. Remember, when I retire and write a book about this business your name will be in golden letters . . . ." Submitter 1 replied, "I would prefer this not be in any books!" Barclays' 3–month USD Libor submission on March 13, 2006 was 4.90%, which was a rate unchanged from the previous trading day and was tied for the lowest rate submitted.

147.   The Non-Prosecution Agreement states that, from at least approximately August 2005 through at least approximately May 2008, certain Barclays swaps traders made requests of traders at other panel banks for favorable Libor or Euribor submissions from those banks. In addition, certain Barclays swaps traders received requests from traders at other banks for favorable Libor or Euribor submissions, which Barclays rate submitters accommodated.

148.   From at least approximately August 2006 through at least approximately June 2007, Trader 1, who had left Barclays and joined another financial institution, requested favorable USD Libor submissions from a current Barclays Dollar swaps trader in London ("Trader 6"), who agreed to make such requests of the Barclays USD Libor submitter. Barclays' USD Libor submitters accommodated Trader 1's requests on numerous occasions. In addition, from approximately March 2006 through approximately February 2007, another former Barclays Dollar swaps trader who had joined another financial institution communicated with Barclays swaps traders about requests for favorable USD Libor submissions.

149.   As an example, on October 26, 2006, at approximately 7:12 a.m., Trader 1 communicated by electronic messages with Trader 6, stating, "where do u think 3m libor will be today?" Trader 6 replied, "[Submitter 1] thinks 38." Trader 1 responded in part: "wow ... unchanged!!!?!??! Short dates have rallied by 0.75bp ... So I take it he's going unchanged? If it comes in unchanged I'm a dead man ha ha." (ellipses in original). Trader 6 replied, "i'll [sic] have a chat." Later that day, Trader 1 wrote: "Dude

I owe you big time! Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor." Trader 6 replied, "know [sic] worries!!!" Barclays' 3–month USD Libor submission on October 26, 2006 was 5.375%, which was lower than Barclays' submission on the previous trading day.

### B. UBS settles Libor-manipulation charges with U.S., U.K., and Swiss authorities and admits to colluding with other panel banks and interdealer brokers to manipulate Yen Libor, Euroyen Tibor, and Euribor.

150. On December 19, 2012, Defendant UBS announced a settlement with regulators in the U.K., U.S., and Switzerland, under which UBS would pay an aggregate fine of over $1.5 billion.

#### 1. UBS's settlement with the CFTC.

151. On December 19, 2012, UBS and its subsidiary, UBS Securities Japan Co. Ltd., agreed to pay $700 million to the CFTC pursuant to an Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions.[58] According to the UBS CFTC Order, from at least January 2005 through 2011, UBS by and through dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of various global benchmarks, including USD Libor.

#### 2. UBS's settlement with the DOJ.

152. As part of UBS's settlement with the DOJ, UBS Securities Japan Co. Ltd. pled guilty to felony wire fraud and agreed to pay a $100 million fine. Additionally,

---

[58] *In re UBS AG*, No. 13-09, at 41-52 (C.F.T.C. Dec. 19, 2012) (hereinafter "UBS CFTC Order"), attached as Exhibit 12 and incorporated into this Complaint by reference.

Defendant UBS AG executed a Non-Prosecution Agreement with the DOJ under which, UBS agreed to pay a $400 million penalty and admit to a 51–page Statement of Facts setting forth in great detail UBS's collusion with other panel banks and interdealer brokers to manipulate Yen Libor, Euroyen Tibor, and Euribor.[59] UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference Yen Libor and Euroyen Tibor.

### C.  Former UBS and RP Martin employees are criminally charged with violating the Sherman Act.

153.   On December 11, 2012, the U.K. Serious Fraud Office arrested three individuals as part of its criminal investigation. The individuals arrested were Tom Alexander William Hayes, who had worked as a trader for Defendant UBS and co-conspirator Citigroup, and Terry Farr and Jim Gilmour, both employees of interdealer broker RP Martin.

154.   On December 19, 2012, the same day that UBS announced its settlement with regulators, the DOJ's criminal complaint against Tom Hayes and former senior UBS trader Roger Darin was unsealed in the Southern District of New York. The complaint charged Mr. Hayes and Mr. Darin with conspiracy to commit wire fraud.[60] Mr. Hayes was also charged with wire fraud and violation of Section 1 of the Sherman Act for conspiring with others inside UBS, as well as interdealer brokers and other banks, to manipulate Yen-Libor. *The Wall Street Journal* has reported that it received a text message from Mr. Hayes in January of 2013 stating "this goes much much higher than me."[61]

---

[59] UBS SOF, Exh. 9.
[60] Compl., *United States v. Alexander*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 13 and incorporated into this Complaint by reference.
[61] David Enrich et al., *Trader Tied to Probe Departs*, The Wall St. J., June 26, 2013.

155.   In June, 2013, the U.K.'s Serious Fraud Office charged Mr. Hayes with eight counts of "conspiring to defraud" in an alleged attempt to manipulate Libor.[62] The charges read in court accused Mr. Hayes of conspiring with employees of Defendants JPMorgan, Deutsche Bank, HSBC, RBS, and Rabobank; interdealer brokers ICAP, Tullett Prebon, and RP Martin; and former colleagues at UBS and Citigroup.[63]

## D.   RBS settles Libor-manipulation charges with U.S., U.K., and Swiss authorities and admits to colluding with other panel banks and interdealer brokers to manipulate Yen and Swiss Franc Libor.

156.   On February 6, 2013, RBS paid an aggregate $612 million to the CFTC, DOJ, and FCA to settle Libor manipulation charges. As part of the settlement, RBS admitted to colluding with other panel banks to manipulate Yen and Swiss Franc Libor. Additionally, RBS entered a non-prosecution agreement with the DOJ for criminal wire fraud and criminal violation of Section 1 of the Sherman Act.

### 1.   RBS's settlement with the CFTC.

157.   RBS's settlement with the CFTC is memorialized in a February 6, 2013 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions.[64]

158.   The RBS CFTC Order states that, commencing in at least mid-2006 and continuing through 2010, RBS made hundreds of attempts to manipulate Yen and Swiss Franc Libor and, on numerous occasions, made false Libor submissions to benefit its derivatives and money market trading positions. The RBS CFTC Order also states that RBS succeeded in suppressing Yen and Swiss Franc Libor.

---

[62] David Enrich, *More Firms Named in Libor Case*, The Wall St. J., June 20, 2013.
[63] *Id*.
[64] *In re The Royal Bank of Scotland plc*, No. 13-14 (C.F.T.C. Feb. 6, 2013) (hereinafter "RBS CFTC Order"), attached as Exhibit 14 and incorporated into this Complaint by reference.

159.  RBS cooperated with other panel banks to manipulate Yen Libor. On a number of occasions from at least early 2007 through at least mid-2009, RBS colluded with a UBS Yen Trader ("UBS Yen Trader") in coordinated attempts to manipulate Yen Libor. RBS knew that other Yen Libor panel banks (referred to in the RBS CFTC Order as "Banks A through I") and interdealer brokers were also colluding with the UBS Yen Trader.

160.  For example, in the following communications, a manager of RBS's subsidiary in Tokyo who was responsible for RBS's Yen trading globally ("Yen Manager"), and numerous RBS yen traders discuss how the UBS Yen Trader has turned the Yen Libor panel into "a cartel."

<u>August 20, 2007</u>:

- Senior Yen Trader: this libor setting is getting nuts . . .

- Bank A Trader: im puzzled as to why 3m libor fixing not coming off after the FED action . . .

- Bank B Trader: [UBS] is lending dolls through my currencies in 3 month do u see him doing the same in urs . . .

- Senior Yen Trader: yes[,] he always led usd in my mkt[,] **the jpy libor is a cartel now** . . . [Emphasis added]

- Senior Yen Trader: its just amazing how libor fixing can make you that much money . . .

- Senior Yen Trader: **its a cartel now in london**[.] they smack all the 1yr irs .. and fix it very high or low [Emphasis added]

<u>December 5, 2007</u>:

- Yen Trader 2: FYI libors higher again today . . .

- Yen Trader 4: 'ucksake. keep ours low if poss. don't understand why needs to go up in yen

- Yen Trader 2: no reason dude[,] [Bank C] and [Bank D] went high yest

- Yen Trader 4: send the boys round . . .

- Yen Manager: pure manipulation going on

161.   Another RBS derivatives trader engaged in "wash trades"—a pair of offsetting trades that result in a financial nullity—with UBS to generate brokerage commissions to compensate interdealer brokers for assisting UBS's attempted manipulation. That same RBS derivatives trader also attempted to manipulate Yen Libor by coordinating with an interdealer broker to influence the submissions of other panel banks.

162.   For example, in the following communication, Yen Trader 1 asks an interdealer broker ("Interdealer Broker A") to try to influence other panel banks' Yen Libor submissions to benefit Yen Trader 1's trading positions:

June 26, 2009:

- Yen Trader 1: Has [UBS Yen Trader] been asking you to put LIBORs up today?

- Interdealer Broker A: [speaking to another person] What's [UBS Yen Trader] want on LIBORs today? Is he fixing anything about LIBORs? What does he want? What way does he want it? [speaking to Yen Trader 1] Did you hear that?

- Yen Trader 1: No.

- Interdealer Broker A: He wants ones, ones and threes a little bit lower and sixes probably about the same where they are now. He wants them to stay the same.

- Yen Trader 1: I want them lower.

- Interdealer Broker A: You want them lower? What the sixes?

- Yen Trader 1: Yeah.

- Interdealer Broker A: Alright, well, alright, alright, we'll work on it.

Later that same day, Interdealer Broker A reported back to Yen Trader 1 as follows:

- Interdealer Broker A: Hello mate, [Yen Trader 1]? You all set?

- Yen Trader 1: Yeah.

- Interdealer Broker A: Right listen we've had a couple of words with them, you want them lower right?

- Yen Trader 1: Yeah.

- Interdealer Broker A: Alright okay, alright listen, we've had a couple words with them. You want them lower, right?

- Yen Trader 1: Yeah.

- Interdealer Broker A: Alright okay, alright, no we're okay just confirming it. We've, so far we've spoke to [Bank F]. We've spoke to a couple of people so we'll see where they come in alright. We've spoke, basically one second, basically we spoke to [Bank F], [Bank G], [Bank H], who else did I speak to? [Bank I]. There's a couple of other people that the boys have spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?

- Yen Trader 1: Cheers.

- Interdealer Broker A: Cheers no worries mate.

Yen Trader 1 then executed a wash trade with UBS to compensate Interdealer Broker A for its assistance, generating about $20,000 in commissions for Interdealer Broker A.

163.   On numerous occasions, from at least late 2006 through mid-2009, RBS coordinated with other Libor panel banks to manipulate Swiss Franc Libor to benefit the trading positions held by RBS Swiss Franc derivatives traders.

### 2.   RBS's Japanese subsidiary pleads guilty to wire fraud while RBS enters a deferred prosecution agreement with the DOJ for wire fraud and violation of Section 1 of the Sherman Act.

164.   As part of RBS's settlement with the DOJ's Criminal Division, Fraud Section, and Antitrust Division, RBS executed a Deferred Prosecution Agreement, under which (1) RBS's Japanese Subsidiary, RBS Securities Japan Ltd., pled guilty to criminal wire fraud, and (2) the DOJ deferred prosecuting RBS for criminal wire fraud and *price-fixing in violation of Section 1 of the Sherman Act* based on its collusion with other Defendants to manipulate Yen and Swiss Franc Libor.[65]

### E.   ICAP settles Libor manipulation charges with U.S. and U.K. authorities and admits to manipulating Yen Libor.

165.   On September 25, 2013, interdealer broker ICAP Europe Limited paid a total of $87.4 million to settle Libor manipulation charges with the CFTC and FCA and admitted to manipulating Yen Libor. ICAP's settlement with the CFTC is memorialized in a September 25, 2013 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions.[66] The FCA also issued a Final Notice on September 25, 2013, in connection with its settlement with ICAP.[67]

---

[65] RBS SOF, Exh. 8.

[66] *In re ICAP Europe Limited*, No. 13-38 (C.F.T.C. Sep. 25, 2013) (hereinafter "ICAP CFTC Order"), attached as Exhibit 15 and incorporated into this Complaint by reference.

[67] Final Notice from the FCA to ICAP Europe Ltd. (Sep. 25, 2013) (hereinafter "ICAP Final Notice"), attached as Exhibit 16 and incorporated into this Complaint by reference.

166.   Also on September 25, 2013, the DOJ unsealed a Criminal Complaint charging two former ICAP derivatives brokers and a former ICAP cash broker with conspiracy to commit wire fraud and two counts of wire fraud. The Criminal Complaint alleges the defendants of "carrying out a scheme to influence and manipulate benchmark interest rates to which the profitability of certain trades was tied."[68]

### F.   Rabobank settles Libor manipulation charges with U.S., U.K., and Dutch authorities and admits to manipulating USD Libor, Yen Libor, Sterling Libor, and Euribor.

167.   On October 29, 2013, Rabobank paid an aggregate $1.07 billion to the CFTC, DOJ, the FCA, and Openbaar Ministerie (the Dutch public prosecutor's office) to settle Libor manipulation charges. In documents released by regulators, Rabobank admits to colluding with other panel banks and interdealer brokers to manipulate USD Libor, Yen Libor, Sterling Libor, and Euribor.

168.   For example, Rabobank's settlement with the CFTC is memorialized in a October 29, 2013 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions.[69] In the Rabobank CFTC Order, Rabobank admitted that "[its rate] submitters often skewed their U.S. Dollar and Yen LIBOR and Euribor submissions, and, on occasion, Sterling LIBOR submissions, to benefit those trading positions by attempting to manipulate the fixings of LIBOR and Euribor." With regard to USD Libor, the Rabobank CFTC Order states that "from at least mid-2005 through at least late 2008, Rabobank frequently attempted to manipulate U.S. Dollar LIBOR, and often made false LIBOR submissions

---

[68] Compl., *United States v. Read et al.*, No. 13 MAG 2224 (S.D.N.Y. Sep. 13, 2013), attached as Exhibit 17 and incorporated into this Complaint by reference.
[69] *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A*, No. 14-02 (C.F.T.C. Oct. 29, 2013) (hereinafter "Rabobank CFTC Order"), attached as Exhibit 18 and incorporated into this Complaint by reference.

in furtherance of those attempts." Rabobank further admits in the CFTC Order to colluding with other panel banks and interdealer brokers to manipulate Libor.

169.   In connection with its settlement with the DOJ, Rabobank entered a Deferred Prosecution Agreement, which attached: (1) a one-count criminal information charging Rabobank with wire fraud for its role in manipulating Libor and Euribor and (2) a Statement of Facts containing various admissions and emails demonstrating Rabobank's Libor manipulation.[70]

### G.   Barclays, Citigroup, Deutsche Bank, JPMorgan, RBS, RP Martin, SocGen, and UBS settle Libor-manipulation charges with the European Commission.

170.   On December 4, 2013, eight banks settled Libor and Euribor manipulation charges with the European Commission for a combined 1.7 billion euros ($2.3 billion). The European Commission found that Barclays, Deutsche Bank, SocGen, and RBS participated in a cartel to manipulate Euribor from September 2005 through May, 2008. The European Commission further found that UBS, RBS, Deutsche Bank, JPMorgan, Citigroup, and RP Martin participated in a cartel to manipulate Yen Libor between 2007 and 2010. All eight panel banks also served on the USD Libor panel during the Conspiratorial Period.

171.   The European Commission's Vice-President in charge of competition policy released the following statement regarding the settlement: "What is shocking about the LIBOR and EURIBOR scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other. Today's decision sends a clear message that the Commission is determined to fight and sanction these cartels in the

---

[70] *United States v. Cooperative Centrale Raiffeisen Boerenleenbank, B A.,* Deferred Prosecution Agreement, (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf (hereinafter "Rabobank SOF"), attached as Exhibit 19 and incorporated into this Complaint by reference.

financial sector. Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few."

### H. RP Martin settles Libor manipulation charges with U.S. and U.K authorities and admits to manipulation Yen Libor.

172. On May 15, 2014, interdealer broker RP Martin settled Libor manipulation charges with U.S. and U.K. authorities for a total of more than $2 million. RP Martin's settlement with the CFTC is memorialized in a May 15, 2014 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, in which RP Martin admits to manipulating Yen Libor.[71] The RP Martin CFTC Order states "[d]uring a period encompassing nearly twelve months, from at least September 2008 through at least August 2009, RP Martin, through certain of its brokers on the Yen desk, knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate, at times successfully, the official fixing of the daily Yen [Libor]."

173. Also, on May 15, 2014, the FCA released a Final Notice in which RP Martin admits to manipulating Yen Libor.[72]

### I. Lloyds settles with the CFTC and FCA and admits to colluding with other panel banks to manipulate USD, Sterling, and Yen Libor.

174. On July 28, 2014, Lloyds paid an aggregate $370 million to the CFTC and FCA to settle Libor manipulation charges. In documents released by regulators, Lloyds admits to colluding with other panel banks to manipulate USD, Sterling, and Yen Libor.

---

[71] *In re RP Martin Holdings Limited*, No. 14-16 (C.F.T.C. May 15, 2014) (hereinafter "RP Martin CFTC Order"), attached as Exhibit 20 and incorporated into this Complaint by reference.
[72] Final Notice from the FCA to Marin Brokers (UK) Ltd. (May 15, 2014) (hereinafter "RP Martin Final Notice"), attached as Exhibit 21 and incorporated into this Complaint by reference.

FCA found that traders at Lloyds and communicated with other Panel Banks to manipulate USD Libor for profit on derivative transactions.

175.   Lloyds' settlement with the FCA is memorialized in a July 28, 2014 Final Notice.[73] In the Final Notice, the FCA found that traders at Lloyds and HBOS communicated with other panel banks to manipulate Libor for profit, including a specific finding that by September 2008, managers had instructed traders to systemically lower USD Libor submissions.

176.   From August 2007 through February 6, 2009, employees on the money-markets desks of Bank of Scotland and Lloyds Bank plc were responsible for (1) contributing USD Libor submissions and (2) entering into borrowing and lending transactions on behalf of Bank of Scotland and Lloyds Bank plc at rates tied to USD Libor. During that time, the USD Libor submitters for both Bank of Scotland and Lloyds Bank plc contributed USD Libors that benefited their respective companies' derivatives positions instead of rates that complied with the definition of Libor. Employees of Bank of Scotland and Lloyds Bank plc initiated USD Libor derivatives transactions with banks and other financial institutions in the United States. By entering into these derivative transactions, Bank of Scotland and Lloyds Bank plc sought to, and did, profit at the expense of their counterparties in the United States, including Plaintiffs. According to the United Kingdom's Financial Conduct Authority ("FCA"), there was a "culture of seeking to take a financial advantage [of GBP and USD Libor] wherever possible" at both Bank of Scotland and Lloyds Bank plc.[74]

177.   In addition, the FCA found that in September and October 2008, an HBOS manager instructed HBOS traders to depress GBP and USD Libor submissions to stay in line with other Contributor Banks, rather than comply with the published methodology

---

[73] Lloyds Final Notice, Exh. 6.
[74] Lloyds Final Notice ¶ 2.14.

for Libor.[75] Lloyds and HBOS management claimed that they did not discover the unlawful conduct until after they had been asked to investigate potential issues in 2010.[76] In March 2011, Lloyds attested to the FCA that its systems and controls for its Libor submissions were adequate.[77] This attestation was false.[78]

178.  Lloyds' settlement with the CFTC is memorialized in a July 28, 2014 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions. The CFTC findings quote an HBOS USD Libor submitter as saying the following during an electronic chat with "an employee of another financial institution": "youll like this ive been pressured by senior management to bring my rates down into line with everyone else."[79]

## J.    Citibank Settles with the CFTC

179.  On May 25, 2016, Citibank, N.A. reached a settlement with the CFTC related to its manipulation of the Yen and U.S. Dollar Libor, and paid an aggregate fine of $175 million.

180.  Citibank's settlement with the CTFC is memorialized in a May 25, 2016 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (the "Citi CFTC Order"). The CFTC Order quotes a Citi USD Libor submitter saying the following in an internal communication during May 2008: "we were a little bit too aggressive and we were 2 basis points above the [LIBOR fixing] average, but still within the range. And then, you know, *we got calls from [U.S. Dollar Submitter 2] in New York* saying, 'Yeah, why are you posting high LIBORs?'" (alternations in original) (emphasis added).

---

[75] Lloyds Final Notice ¶¶ 4.48-59.
[76] *Id*. ¶ 4.70.
[77] *Id*. ¶ 5.15.
[78] *Id*.
[79] Lloyds CFTC Order, Exh. 5.

## VI. Plaintiffs purchased numerous Libor-based financial instruments directly from Defendants.

### A. Interest Rate Swaps and Swaptions

181. Interest rate swaps are agreements between two parties in which the parties agree to essentially swap a fixed interest rate on a specified notional amount for a floating rate. Payments are made between the parties on a regular basis, typically every three months.

182. A swaption is an option contract granting the owner the right to enter into an underlying swap.

183. Plaintiffs entered numerous interest rate swaps and swaptions directly with Defendants, where the interest Plaintiffs received was set according to USD Libor. Because Defendants conspired to artificially suppress USD Libor during the Conspiratorial Period, Plaintiffs received less interest on these interest rate swaps than they would have absent Defendants' manipulation, i.e. if Defendants had reported their true borrowing costs, as the definition of Libor required.

184. As shown in the below chart, Plaintiffs executed ISDA Master Agreements with Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBC, RBS, and UBS (collectively the "Swap Counterparty Defendants"), as well as co-conspirators Barclays and Citigroup:

| Swap Counterparty | ISDA Master Agreement Date(s) |
| --- | --- |
| Bank of America, N.A. | 9/12/1997, 7/15/2008 |
| Merrill Lynch Capital Services, Inc. | 10/1/1996 |
| Barclays Bank PLC | 7/13/1995 |
| Citibank, N.A. | 7/11/1990, 6/30/2008 |
| Credit Suisse First Boston International (f/k/a Credit Suisse Financial Products) | 3/2/1992 |

| | |
|---|---|
| Credit Suisse International | 1/16/2007 |
| Deutsche Bank AG | 2/2/1995 |
| JPMorgan Chase Bank, N.A.[80] | 10/17/1995 |
| Bear Stearns Bank PLC | 9/6/2006 |
| Royal Bank of Canada | 8/17/1999 |
| The Royal Bank of Scotland PLC | 2/3/1999,[81] 3/28/2007 |
| RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.) | 9/21/2001 |
| UBS AG | 7/22/1996,[82] 6/10/2008, 2/9/2007 |

185.   Each ISDA Master Agreement was supplemented by a Schedule, Credit Support Annex, and Confirmations, which joined with the ISDA Master Agreement to form a binding and enforceable contract (a "Swap Agreement" or, collectively, the "Swap Agreements").

186.   A chart of representative confirmations, including counterparty identity, date of the transaction, and date of termination, is attached hereto as Exhibit 24.

187.   Under the Swap Agreements, Plaintiffs agreed to pay the Swap Counterparty Defendants a fixed rate and, in exchange, the Swap Counterparty Defendants agreed to pay Plaintiffs a floating rate tied to "USD-LIBOR-BBA." One of Plaintiffs' purposes in entering the swaps was to receive a floating rate that reflected the then-current short-term interest rate.

---

[80] The original ISDA Master Agreement lists Chase Manhattan Bank as the Swap Counterparty, though later confirmations list JPMorgan Chase Bank, N.A. as the Swap Counterparty.
[81] ABN Amro Bank N.V. was the original swap counterparty to this ISDA Master Agreement but was succeeded by The Royal Bank of Scotland PLC through a Novation Agreement dated August 15, 2008.
[82] The original ISDA Master Agreement lists Swiss Bank Corporation as the Swap Counterparty. Swiss Bank Corporation merged into UBS AG on June 29, 1998.

188.   Interest rate swaps are a financial product, and Libor is a component of the price. Because Plaintiffs entered the swap agreements directly with Defendants, and were harmed directly and individually by Defendants' price fixing, there are no parties more directly harmed by Defendants' conduct as to Plaintiffs' swaps.

189.   Plaintiffs' swap agreements were entered into both before the alleged suppression period with payouts running through the period, and during the period of suppression.

## B.    Variable Rate Bonds and Asset-Backed Securities

190.   Variable-rate bonds (also called floating-rate bonds) are bonds that pay a variable interest rate. These bonds make periodic payments—typically occurring monthly or every three months—which may include an investor's principal with interest fixed according to a formula. For example, interest may be fixed as "USD Libor + 1%," which would mean that the interest paid to the bondholder is recalculated before each payment by taking whatever the USD Libor rate happens to be at the time and adding one percent.

191.   An asset-backed security is a security whose value and income payments are derived from (or backed) by a specified pool of underlying assets (also called collateral). Common types of collateral include mortgages, credit cards, auto loans, and student loans. Returns on an asset-backed security come from installment payments made on the collateral. For example, if an asset-backed security is backed by a pool of residential mortgages, the homeowners' monthly mortgage payments are collected and distributed to the owners of the asset-backed securities. Because the interest rate on the collateral— for example, the interest rate on a residential mortgage—is often tied to USD Libor, the payments the asset-backed security owners receive are affected by USD Libor. If USD

Libor is artificially suppressed, as it was during the Conspiratorial Period, then the payments the asset-backed security owners receive will also be suppressed.

192.   In addition to the collateral being tied to USD Libor, some securities themselves can pay interest tied to USD Libor. For example, when a pool of collateral is securitized, the resulting asset-backed securities are divided or "structured" into multiple tiers called "tranches," which range from senior to subordinate. Some tranches pay interest tied to USD Libor.

193.   Plaintiffs purchased numerous variable-rate bonds and asset-backed securities, including mortgage-backed securities (collectively, the "Bonds"), underwritten and/or issued by Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS (collectively, the "Bond Defendants"), as well as co-conspirators Barclays and Citigroup.[83] Many of the purchases were made directly from Defendants and their affiliated broker entities. For each Security, Plaintiffs were paid a rate tied to USD Libor.

194.   The price of a bond incorporates the expected cash flow from future interest payments, which is tied to Libor. For any given interest payment, only the then-owner of the bond receives the payment. Therefore, for any given interest payment, the owner at the time of the payment is directly and individually injured by Defendants' collusion to fix interest rate prices. There are no parties more directly harmed by Defendants colluding to reduce Libor-based bond interest. Plaintiffs thus are in the best position to adequately enforce the antitrust laws as to those payments they received as owners of the bonds.

---

[83] Instead of "underwriter," Defendants sometimes list their role as "manager," "bookrunner," or "agent." However, these roles appear to be equivalent to that of an underwriter.

195.   Attached as Exhibit 22 is a list of each Bond, identified by CUSIP number. Exhibit 22 also lists the Bond Defendant that either issued and/or underwrote each Bond.

196.   Plaintiffs purchased each of the Bonds pursuant to a registration statement, offering circular, prospectus, prospectus supplement, and/or other offering material. This created a binding contract between Plaintiffs and the Bond Defendants (collectively, the "Bond Agreements"), the terms of which are set forth in the registration statement, prospectus, and/or prospectus supplement.

197.   Each Bond Agreement, incorporated herein by reference and available from CUSIP, provides that Plaintiffs will receive a rate tied to USD Libor.

198.   Each Bond Agreement includes an implied covenant that each Bond Defendant will act in good faith and deal fairly with Plaintiffs, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

199.   Each Bond Defendant breached its Bond Agreement (and accompanying covenant of good faith and fair dealing) with Plaintiffs through its manipulation of USD Libor, its failure to disclose this conduct to Plaintiffs, and its failure to pay Plaintiffs a rate based on the USD Libor definition.

## VII.  The statute of limitations on Plaintiffs' claims is tolled under the discovery rule, the Clayton Act, and under the fraudulent concealment, continuous violation, and *American Pipe* doctrines.

### A.  The discovery rule

200.   The discovery rule tolls the statute of limitations for Plaintiffs' claims until Plaintiffs discovered or with reasonable diligence should have discovered their injury. Here, no reasonable investor could have known of Defendants' Libor manipulation

until at least March 15, 2011—the date when UBS publicly disclosed it had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]." This disclosure spurred investors to file numerous lawsuits in the following months against Defendants based on their USD Libor manipulation. The fact that, despite strong financial incentives to do so, no investor filed a lawsuit based on Defendants' Libor manipulation before UBS's March 15, 2011 disclosure demonstrates that even sophisticated and prudent investors did not and could not have reasonably known of Defendants' USD Libor manipulation prior to March 15, 2011.

201.   Prior to March 15, 2011, Defendants offered facially plausible pretextual explanations for so-called "dislocations" in Libor and repeatedly denied the existence of any fraudulent or collusive conduct relating to Libor submissions. Plaintiffs therefore did not know, and could not have known of the Unlawful Agreements.

202.   The day after Barclays' June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization, which is further evidence that market participants, including Plaintiffs, were unaware that Barclays had been propping up its creditworthiness through Libor manipulation.

203.   Until Barclays's disclosures in June 2012, Plaintiffs did not have access to any of the information that could have revealed the fraud and collusion, including, among other things, (a) the Bank Defendants' actual costs of borrowing, (b) internal communications at the Bank Defendants regarding fraud and collusion, (c) communications between and among the Bank Defendants regarding Libor, (d) communications between the Bank Defendants and government regulators, (e) documents produced in connection with the confidential investigations, (f) meetings of the FXMMC, or (g) access to communications within the BBA or between Panel Bank Defendants and the BBA.

204.   A reasonably diligent investigation would not have disclosed sufficient facts to state a viable fraud claim until, at the earliest, the Barclays admissions, as indicated by the fact that no private lawsuits alleging that the Panel Banks intentionally submitted artificially low Libor submissions were filed.

205.   Regulators too were unaware of Defendants' Libor manipulation until late in the Conspiratorial Period. For example, the FCA opened its investigation into rate manipulation in early 2010. Although previous "dislocations" in Libor had been observed, the FCA concluded that "[c]lear evidence of this dislocation did not, in itself, however, carry any implication that 'low-balling' was occurring."[84] Even now, with global investigators conducting a massive probe into Libor manipulation, the true scope of Defendants' Conspiracy is not yet apparent.

206.   Even with the benefit of hindsight, several reliable sources confirmed that during the financial crisis, a reasonable investigation would not have uncovered evidence that the Panel Bank Defendants fraudulently submitted artificially low USD Libor submissions. The U.K. Treasury Committee asked the Governor of the Bank of England why regulators had not spotted Libor manipulation earlier. The Governor testified under oath that "we had no evidence of wrongdoing." He further testified that "there were plenty of academic articles that looked in it and said that they could not see in the data any evidence of manipulation," and that "if you go back to the inquiries that the regulators made, it took them three years to work out and find the evidence of wrongdoing" and there was no reasonable way at the time to distinguish manipulation from a market that was "dysfunctional."

207.   The FSA conducted an internal audit in 2013 regarding the extent of awareness within the FSA of inappropriate Libor submissions. It found that Libor

---

[84] Lindsay Fortado & Ben Moshinsky, *FSA Mostly Clears Itself on Missed Libor-Rigging Signals*, Bloomberg, March 5, 2013.

"dislocation" manifested itself in five ways, including widening spreads between Libor and other rates and that the combination of deteriorating market conditions and structural issues in the Libor fixing process would have caused dislocation "completely independent of low-balling."[85]

208.   The admissions by Barclays, Lloyds, Rabobank, RBS, and UBS reveal some of the efforts that the Panel Bank Defendants undertook to conceal their fraudulent and collusive conduct. For example, (1) a UBS trader scolded a manager for internally transmitting in writing a request to manipulate a Libor submission,[86] (2) a Barclays trader consciously sought to move Libor submissions in small increments over time to avoid detection,[87] (3) a UBS derivatives desk manager instructed a Libor submitter to lie when interviewed by UBS attorneys investigating Libor manipulation,[88] and (4) in 2010, long after learning of the investigation into Libor, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED [sic] are all over us about libors."[89] In or about 2007, Rabobank set up a separate "cash book" account and told its derivative traders, including traders located in New York, to log transactions, for which Rabobank paid interest rates higher than USD Libor, into that book to conceal those transactions.[90]

209.   On information and belief, the other Panel Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD Libor. The evidence of such conduct is solely within the custody and control of the Panel Bank Defendants, the BBA, and government regulators.

---

[85] Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.
[86] UBS SOF ¶ 38.
[87] Barclays SOF ¶ 44.
[88] UBS SOF¶ 39.
[89] RBS Final Notice ¶ 52.
[90] Defense Ex. 608C at 17, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

210.   The Bank of England's Governor confirmed in a June 2012 hearing before the U.K. Treasury Committee that he "had no suspicion until two weeks [prior to the hearing] that anything had been going wrong in the LIBOR market[.]"[91] The former head of the FSA, Adair Turner, told Parliament on February 26, 2013, that there was "no information" of Libor manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[92] The Deputy Governor of the Bank of England, Paul Tucker, testified in 2012 that he did not suspect fraud or collusion in 2008 and that "[w]e would not have dreamt of using LIBOR as part of the pricing structure for Bank of England operations had we had doubts about what is now referred to as low-balling."[93] He further testified that "[w]e thought the underlying markets were dysfunctional, sporadically illiquid, much less reliable than normal, but we did not have suspicions of dishonesty and we thought, as I said just now, the pattern of LIBOR movements made sense."[94] The former Deputy Governor of the Financial Stability Board testified that he had no suspicions during the conspiracy period of intentional fraud. Similarly, former Chairman of the Federal Reserve Board Alan Greenspan was quoted as saying the following: "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities. You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[95] The CFTC, which led the effort to expose the unlawful conduct

---

[91] Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.
[92] Huw Jones, *It Was Impossible To Spot Libor Rigging: UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.
[93] Minutes of Evidence, U.K. House of Commons Treasury Comm., July 9, 2012, *available at* https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/120709.htm.
[94] *Id.*
[95] Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html. William Dudley, the President and Chief Executive Officer of the NY Fed, stated with respect to the Libor investigation: "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner." William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for

surrounding Libor, required twenty months to obtain actionable evidence of manipulation.[96]

211.   The first private lawsuits were thus not filed until mid-2011, in response to the first public disclosures of the fact of the CFTC's and DOJ's investigations into Libor manipulation.

## B.   Tolling under the Clayton Act

212.   The Clayton Act itself contains a tolling provision triggered whenever the United States institutes civil or criminal proceedings to prevent, restrain, or punish antitrust violations:

> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter.

15 U.S.C. § 16(i).

213.   As discussed above, on December 12, 2012, the DOJ filed a complaint charging Tom Hayes, a former trader for Defendant UBS and co-conspirator Citigroup, with criminal violation of Section 1 of the Sherman Act. Mr. Hayes' Yen Libor manipulation and Defendants' USD Libor manipulation were part of the same overarching conspiracy, which involved the same panel banks, the same means of submitting false rates, and the same objectives of boosting perceived financial health and profiting from derivative trading. Because Plaintiffs' claims are "based in whole or

---

the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* https://www.bis.org/review/r141003a.htm.
[96] Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

in part on any matter complained of" in the December 12, 2012 complaint against Mr. Hayes, the Clayton Act tolls Plaintiffs' claims against Defendants beginning on December 12, 2012 and continuing to the present.

214.   Additionally, on February 5, 2013, the DOJ entered a deferred-prosecution agreement with Defendant RBS, in connection with which the DOJ filed a criminal information charging RBS with one count of wire fraud and one count of price-fixing in violation of Section 1 of the Sherman Act. Because Plaintiffs' claims are "based in whole or in part on any matter complained of" in the criminal information, the Clayton Act tolls Plaintiffs claims against Defendants beginning on February 5, 2013 and continuing to the present.

### C.   *American Pipe* **tolling**

215.   Under the *American Pipe* doctrine, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 355 (1983).

216.   Numerous class actions have been filed against Defendants based on their USD-Libor manipulation during the Conspiratorial Period and consolidated in the multi-district litigation ("MDL") proceedings in the Southern District of New York. Plaintiffs were putative class members of many of these class actions and, therefore, reasonably and justifiably relied on the class representatives to protect their rights. The claims Plaintiffs assert in this Complaint are either the same as those asserted in the class actions in the Libor MDL proceedings or arise from the same wrongful acts and, therefore, concern the same evidence, memories, and witnesses as the class actions in the Libor MDL proceedings.

217.  For example, on August 5, 2011, the Mayor and City Council of Baltimore filed a class action against Defendants Bank of America, HSBC, JPMorgan, Lloyds, and UBS, co-conspirators Barclays and Citigroup, and non-Defendant WestLB asserting federal antitrust, unjust enrichment, and restitution claims on behalf of "[a]ll persons or entities . . . who purchased LIBOR-Based Derivatives [i.e. "financial products that had rates of return tied to LIBOR"] directly from Defendants . . . from August 1, 2007 through such time as the effects of Defendants' illegal conduct ceased." *Mayor & City Council of Baltimore v. Credit Suisse Group AG*, No. 11–cv-5450 (S.D.N.Y. Aug. 5, 2011). This class definition was later changed to "[a]ll persons or entities . . . that purchased in the United States, directly from a Defendant, a financial instrument that paid interest indexed to LIBOR . . . any time during the period August 2007 through May 2010." *Mayor & City Council of Baltimore v. Credit Suisse Group AG*, No. 12–md-2262 (S.D.N.Y. April 30, 2012). Because Plaintiffs fit within both the original and revised class definition, they reasonably and justifiably relied on the class representatives to protect their rights. Thus, the filing of the *Mayor & City Council of Baltimore* class action tolls Plaintiffs' claims against Defendants under the *American Pipe* doctrine beginning on August 5, 2011 and continuing to the present.

218.  Additionally, on February 9, 2012, Ellen Gelboim filed a class action asserting a federal antitrust claim against the Panel Bank Defendants "for herself and on behalf of all others who owned . . . any debt security: (a) that was issued by any Fortune 500 company; (b) on which interest was paid at any time between January 1, 2006 and December 31, 2010 . . . ; (c) where that interest was paid at a rate expressly linked to the U.S. Dollar Libor rate . . . ; and (d) that was underwritten, exclusively or with others, by any of the defendant banks . . . ." *Gelboim v. Credit Suisse Group AG*, No. 12–cv-01025–NRB (S.D.N.Y. February 9, 2012). This class definition was later revised to include all persons or entities "who owned . . . any U.S. dollar-denominated debt security (a) that

80

was assigned a unique identification number by the CUSIP system; (b) on which interest was payable at any time between August 2007 and May 2010 . . . ; and (c) where that interest was payable at a rate expressly linked to the U.S. Dollar Libor rate . . . [excluding] debt securities issued by any Defendant as obligor." *Gelboim v. Credit Suisse Group AG*, No. 11–md–02262–NRB (S.D.N.Y. April 30, 2012). Because Plaintiffs fit within both the original and revised class definition, they reasonably and justifiably relied on the class representatives to protect their rights. Thus, the filing of the *Gelboim* class action tolls Plaintiffs' claims against Defendants under the *American Pipe* doctrine beginning on February 9, 2012 and continuing to the present.

### D.   Continuous violation tolling

219.   Defendants began artificially suppressing USD Libor by at least August, 2007. Defendants were able to continuously keep USD Libor suppressed until at least May, 2010. Defendants accomplished this long-term USD Libor suppression by continuously and repeatedly making artificially low Libor submissions. Indeed, Barclays admitted to making false USD Libor submissions "on an almost daily basis" during the Conspiratorial Period. Defendants' continuous conduct successively damaged Plaintiffs in that they received lower cash flows from their USD Libor-tied investments, not for a brief or isolated time, but over the course of years.

220.   These facts require that any applicable statute of limitations be tolled until, at the earliest, the occurrence of Defendants' last bad act. Because admissions made by Barclays, UBS, and RBS demonstrate that Defendants' bad acts continued at least through May 2010, the statute of limitations on Plaintiffs' claims should be tolled until at least May 2010.

### E.    Fraudulent concealment

221.   Defendants' misconduct was, by its very nature, self-concealing. First, the Panel Bank Defendants' actual or reasonably expected borrowing costs were not publicly disclosed, rendering it difficult for investors, including Plaintiffs, to discern (without sophisticated expert analysis) any discrepancies between the Panel Bank Defendants' publicly disclosed Libor submissions and other measures of those banks' actual or reasonably expected borrowing costs. Second, internal communications within and among the banks likewise were not publicly available, which further precluded investors, including Plaintiffs, from discovering Defendants' misconduct, even with reasonable diligence.

222.   Defendants actively concealed the Conspiracy and, when questions were raised regarding anomalous Libor levels during the financial crisis, Defendants represented that any discrepancies were due to extreme market forces and were not the result of fraudulent reporting.

223.   For instance, on April 21, 2008, Dominic Konstam of Defendant Credit Suisse affirmatively stated the low Libor rates were attributable to the fact that U.S. banks, such as Defendant JPMorgan and co-conspirator Citigroup had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks.

224.   On May 16, 2008, in response to a media inquiry, JPMorgan commented that the Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch.

225.   The same day, Colin Withers of co-conspirator Citigroup assured the public that Libor remained reliable, emphasizing "the measures we are using are historic –up to 30 to 40 years old."

226.   Additionally, *The Wall Street Journal* asked numerous Defendants to comment on aberrations in Libor. On May 29, 2008, co-conspirator Citigroup affirmatively denied manipulating Libor, stating that it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market." In another article published that same day, the BBA insisted, "[w]e have every confidence in the integrity of the LIBOR-setting process and the accuracy of the figures it produces."

227.   On August 5, 2008 the BBA issued a report, titled *BBA Libor Consultation Feedback Statement, Approved by the Foreign Exchange and Money Markets Committee*. The Feedback Statement was purportedly the result of an in-depth review of the integrity of the Libor setting process and discussions with "a wide cross-section of the market." The Feedback Statement stated that current contributing panel banks were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs." The Feedback Statement concluded that "[a] general theme that emerged throughout the responses is that BBA LIBOR is an established, accepted benchmark which was been used by financial markets for many years. The emphasis was placed on the fact that although recent comments have focused on US Dollar LIBOR, this has been due to a period of unprecedented stress in the market." Based on the Feedback Statement, the BBA decided that no immediate changes to the Libor-setting process were necessary.

228.   These and other statements made by Defendants and their co-conspirators achieved their intended purpose—to reassure investors like Plaintiffs that aberrations in recent Libor levels were due to extreme market forces that existed during the financial crisis and were not the result of fraudulent reporting.

229.   It was not until the Barclays settlement in June 2012, that the existence of Defendants' Conspiracy was confirmed, and a reasonably diligent investigation would not have disclosed sufficient facts to state a viable fraud claim until those admissions were made. Even now, with this litigation proceeding for more than five years, Direct

Action Plaintiffs have yet to begin merits document discovery. The true scope of Defendants' Conspiracy is therefore not yet apparent.

<div align="center">

**COUNT ONE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**
**(AGAINST ALL DEFENDANTS)**

</div>

230.  Plaintiffs incorporate by reference the preceding allegations.

## A.  *Per se* horizontal price fixing

231.  The Panel Bank Defendants are horizontal competitors in the purchase and sale of financial products, including products indexed to USD Libor or alternative USD money market rates.

### 1.    Unlawful agreement

232.  During the Conspiratorial Period, Defendants and their unnamed co-conspirators agreed to and engaged in a conspiracy for the primary purpose and with the effect of depressing, fixing, pegging, and/or stabilizing the price of numerous investments tied to a USD interest-rate benchmark, including over-the-counter ("OTC") USD interest-rate derivatives, USD floating-rate retail loans, floating-rate mortgage-backed securities ("MBS"), and unsecured short-term wholesale funding.

233.  The Panel Bank Defendants agreed to keep their coordinated Libor submissions below the rates at which they would be offered funds in the London interbank lending market for USD, and keep those coordinated submissions within a narrow range.

234.  At least three Panel Bank Defendants—UBS, Barclays, and HBOS—have admitted to systemically submitting artificially depressed USD Libor rates to the BBA. Absent the involvement in the other Panel Bank Defendants in the conspiratorial

<div align="center">84</div>

conduct, submissions for these three banks would have been noticeably lower than submissions of other Panel Bank Defendants. They were not. Submissions for all Panel Bank Defendants, including UBS, Barclays, and HBOS—who have already admitted to consistently suppressing their submissions—remained closely grouped together throughout the Conspiracy Period. This could not plausibly have occurred absent explicit coordination.

235.   The evidence available to date confirms the existence of the unlawful agreement to coordinate systemically lower rates:







236.  Defendants' Conspiracy constitutes illegal price fixing and is a *per se* violation of Section 1 of the Sherman Act.

## 2.  Antitrust injury.

237.  Plaintiffs' injury was the direct result of at least three competition-reducing aspects of Defendants' collusion: (1) Defendants' collusion caused Plaintiffs to pay more for or receive less from their USD Libor tied investments than they would have had competitive market forces in the London interbank lending market (and not collusion) determined USD Libor, (2) Defendants' collusion suppressed competition for the USD interest-rate benchmark used to price financial instruments, and (3) Defendants' collusion restrained competition regarding creditworthiness and funding costs.

238.  First, Defendants' collusion caused Plaintiffs to pay supracompetitive prices for their USD Libor-tied financial instruments—that is, to pay more for or receive less from their USD Libor-tied investments than they would have had competitive market forces in the London interbank lending market (and not collusion) determined USD Libor. Plaintiffs received lower cash flows from their Libor-tied variable rate bonds, asset-backed securities, loans, and interest-rate swaps than they would have absent Defendants' collusion. Defendants' collusion also caused Plaintiffs to accept risk on certain Libor-tied instruments purchased directly from Panel Bank Defendants for which Plaintiffs were not compensated. This risk consisted of both bank-specific credit risk and systemic risk in the financial system. These supracompetitive prices injured Plaintiffs in their business or property in that they caused Plaintiffs financial losses.

239.  Second, Defendants' collusion also restrained competition as to the USD interest-rate benchmark used to price financial products. Libor is merely one of several proprietary benchmark products. In a free and competitive market, the Panel Bank Defendants would have competed as to the benchmark used to calculate the floating interest rate for various financial products. The Panel Bank Defendants knew that their competitors were promoting and using USD Libor—a benchmark that did not fairly reflect market conditions—in the financial products they sold. Competitive forces should have driven each Defendant to report that Libor was being manipulated and tie their financial products to a more efficient and truthful benchmark.

240.  Rather than competing, however, Defendants collectively agreed to conceal their collective Libor suppression, continue using Libor in their financial products to the exclusion of other comparable benchmarks, and promote the use of Libor through their positions in the BBA. Evidence demonstrates that Defendants wanted to preserve the centrality of Libor rather than some alternative benchmark precisely because Defendants controlled Libor and could collude to manipulate it for their own ends and to the detriment of others, including counterparties such as Plaintiffs on the financial products described in this Complaint. *The Wall Street Journal* reported that, in November 2008, in response to concern over Libor's accuracy, the BBA "drew up plans to license Libor to an independent third party that would pay a fee to administer the rate instead of the BBA."[103] This proposal was rejected by Defendants because "when BBA staffers pitched the idea to industry executives, they got the impression that the big banks— which paid most of the BBA's bills through their membership fees—wanted Libor kept in-house so that they could continue to influence it, according to people familiar with the talks."[104]

---

[103] David Enrich & Max Colchester, *Before Scandal, Clash Over Control of Libor*, The Wall St. J., Sept. 11, 2012.
[104] *Id.*

241.   That competitive forces should have driven the Panel Bank Defendants to replace Libor with alternative benchmarks is demonstrated by recent events. After recent media coverage of Defendants' Libor manipulation, demand has grown for an alternative, untainted benchmark. This forced the Panel Bank Defendants to increasingly offer products and services tied to alternative benchmarks. But for Defendants' collusion, competitive forces would have caused this shift from Libor to alternative USD interest-rate benchmarks much sooner.

242.   By restraining competition as to the benchmark used to calculate the floating component of price, Defendants were able to maintain Libor's dominance as the leading USD interest-rate benchmark used to price financial instruments and this directly caused Plaintiffs financial losses. Had Defendants not colluded, and had instead adopted a benchmark that accurately reflected risk in the financial system, Plaintiffs would have received higher cash flows on their Libor-tied financial instruments.

243.   Third, Defendants' conduct restrained competition as to creditworthiness and funding costs. Libor submissions were intended to reflect the panel banks' creditworthiness. Composite Libor was touted as reflecting the creditworthiness of all large banks by acting as a measure of the stress faced by the financial system as a whole. In a competitive market, the Panel Bank Defendants would compete with their peers, including other panel banks, to be perceived as the most creditworthy and thereby secure lower costs of funding than its competitors. Panel Bank Defendants who could truthfully post lower Libor submissions would have had a competitive advantage over Panel Bank Defendants who could not truthfully post lower Libor submissions because they would be perceived as more creditworthy. A more creditworthy panel bank would have a competitive advantage over less creditworthy panel banks in that: (1) market participants would perceive it as a more desirable and less risky counterparty and (2) it could obtain funding at lower costs. Absent collusion, the more creditworthy panel

bank would be expected to use its lower funding costs as a competitive advantage in that it could offer customers lower prices than its less creditworthy peers on interest-rate derivatives, loans, and other financial products. In a free and competitive market, then, each Defendant would have competed to appear more creditworthy than other panel banks through the posting of lower truthful Libor submissions, and the stronger banks would not have tolerated artificially low Libor submissions from the weaker banks.

244.   However, instead of competing fully with each other to post the lowest accurate Libor submissions during the Conspiratorial Period and obtain the lowest funding costs, the Panel Bank Defendants conspired to post artificially low Libor submissions as a "pack," which reduced or otherwise altered the differences between their relative creditworthiness and funding costs. And the more creditworthy banks did not force the less creditworthy banks to post accurate Libor submissions so that the less creditworthy banks could be revealed as weaker and be forced to pay higher funding costs. Instead, the stronger banks allowed the weaker banks to make artificially low Libor submissions and obtain funds at lower rates.

245.   The restraint of competition as to creditworthiness and funding costs harmed Plaintiffs in several ways. First, it allowed Defendants to artificially suppress USD Libor, which caused Plaintiffs to receive less from or pay more for their USD Libor tied investments than they would have absent collusion. Had the Panel Bank Defendants competed vigorously over their creditworthiness and funding costs by striving to make the lowest accurate Libor submissions relative to the competition, the Conspiracy could not have occurred. Second, the reduction of competition as to creditworthiness and funding costs injured Plaintiffs by causing them to assume credit risk for which they were not adequately compensated. This risk consisted of both bank-specific risk and systemic risk.

246.   The anticompetitive aspects of Defendants' collusion discussed above are non-exhaustive and Plaintiffs believe that with the benefit of additional discovery and expert analysis additional anticompetitive aspects will be discerned.

## B.    Rule of Reason

247.   In addition to constituting horizontal price fixing—a *per se* violation of Section 1 of the Sherman Act—Defendants' conspiracy also violates Section 1 of the Sherman Act in that it constitutes an unreasonable restraint of trade under the rule of reason. *See Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (discussing anticompetitive information exchanges).

248.   Analyzed under either a "quick look" or full rule-of-reason framework, Defendants' Conspiracy unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS. Defendants' Conspiracy arose from "competitor collaborations" as that term is used in the United States' Guidelines for Collaborations Among Competitors because the Panel Bank Defendants were purported competitors in each of the defined markets as well as in the market for unsecured short-term wholesale funding. As noted above, absent collusion, each Panel Bank Defendant would have individually competed to submit the lowest USD rates to the BBA consistent with the published USD Libor methodology and prevented any other Panel Bank Defendant from submitting artificially low rates to the BBA.

### 1.    Relevant Market: USD Short-Term Interest-Rate Benchmarks

#### a.    Market definition

249.   During the relevant period, there was no reasonable substitute for USD short-term interest-rate benchmarks. Interest-rate derivatives and floating-rate loans

require an interest-rate benchmark. The market for USD short-term interest-rate benchmarks was global.

250.    The Panel Bank Defendants and the BBA had substantial power in the market for short-term interest-rate benchmarks. USD Libor was by far the dominant short-term interest-rate benchmark and the phenomenon of network effects protected the Panel Bank Defendants' and the BBA's market power. Panel Bank Defendants served on the supposedly independent FX & MM Committee of the BBA responsible for overseeing and implementing USD Libor during the Conspiratorial Period. The Panel Bank Defendants were in the very small minority of financial institutions that could provide upstream information on the unsecured costs of funds for the largest commercial banks in the world. The Panel Bank Defendants were also among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important downstream users of USD short-term interest-rate benchmarks.

251.    In addition, Panel Bank Defendants were significant providers of USD floating-rate retail loans and floating-rate MBS, which increased their power in the market for USD short-term interest-rate benchmarks. The phenomenon of network effects further increased the Panel Bank Defendants' and the BBA's market power because end users will prefer to purchase interest-rate derivatives that incorporate the same short-term interest-rate benchmark that is incorporated into floating-rate loans and MBS that they held.

### b.    Harm to competition

252.    The unlawful agreements harmed competition in the market for USD interest-rate benchmarks by limiting choice, deterring innovation, artificially increasing barriers to entry, injecting false information into the market, limiting transparency, and

increasing prices. Defendants created the false impression that USD Libor was suited for its intended purpose—that users could reliably predict USD Libor over the term of interest-rate derivatives, floating-rate loans, and floating-rate MBS, and that it was carefully monitored by an "independent" overseer.

253.  One of the reasons that the Panel Bank Defendants and the BBA entered into the Conspiracy was to foreclose competition by alternative benchmarks and thereby insulate themselves from the forces of competition. The Panel Bank Defendants benefited from maintaining control of the market standard interest-rate benchmark, USD Libor, because it allowed them to profit on transactions involving interest-rate derivatives, floating-rate loans, and floating-rate MBS. In addition, the BBA generated millions of dollars in revenues through the licensing of USD Libor and the Panel Bank Defendants indirectly benefited from those licensing fees as BBA members.

254.  As shown above, if the Panel Bank Defendants and the BBA had publicly disclosed their agreement to disregard the published USD Libor methodology and governance mechanisms, then market participants would have sought out, or developed, alternative benchmarks that would better serve the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower prices, or higher interest rates that better reflected the additional uncertainty that had been created by the Panel Bank Defendants' and the BBA's self-serving disregard of the rules. In the absence of the agreement to secretly revise the USD Libor methodology and governance, the Panel Bank Defendants and the BBA would have been forced to compete on the merits to protect the status of USD Libor as the dominant USD short-term interest-rate benchmark.

255.  The unlawful agreements did not provide any pro-competitive benefits in this market.

### c.    Antitrust injury

256.   Reduced competition in the market for USD interest-rate benchmarks was a direct and material cause of Plaintiffs' injuries. Plaintiffs negotiated financial instruments with the Panel Bank Defendants and others that incorporated USD Libor as a price term. In a competitive market for interest-rate benchmarks untainted by Defendants' collusion, USD Libor would have been calculated according to its published rules and not subject to manipulation, or market forces would have driven the Panel Bank Defendants to price their financial products using an alternative USD interest-rate benchmark that more accurately reflected risk in the financial system. Due to Defendants' collusion, normal competition did not occur and Plaintiffs were damaged by receiving less from or paying more for their USD interest-rate benchmark tied products than they would have in a competitive market for USD interest-rate benchmarks.

## 2.    Relevant Market: OTC USD Interest-Rate Derivatives

### a.    Market definition

257.   OTC USD interest-rate derivatives include interest-rate swaps and similar instruments used by market participants to hedge exposure to interest rates. During the Conspiratorial Period, USD Libor was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

258.   The OTC interest-rate derivatives market differed from futures markets in a number of important respects. Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker/dealers that traded price information and negotiated transactions over electronic communications networks. Although a great deal of contract standardization exists in the OTC market, dealers active in this market

custom-tailor agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative agreements must bear some default or credit risk. The unlawful agreements made the OTC USD interest-rate derivatives market even more opaque during the Conspiratorial Period.

259.   OTC USD interest-rate derivatives are traded in a global market. A small set of dealers—comprised primarily of Panel Bank Defendants—dominated the market for OTC USD interest-rate derivatives during the Conspiratorial Period. According to a July 2010 ISDA market survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount. Of these 14 dealers, 10 were USD Libor panel banks: Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS. Similarly, the top five United States bank holding companies—Bank of America, Citigroup, JP Morgan, HSBC, and the investment bank Goldman Sachs, accounted for more than 95% of all OTC swaps and derivatives transactions in the United States.

260.   There were no reasonable alternatives to OTC USD interest-rate derivatives.

### b.    Harm to competition

261.   Competition in the OTC USD interest-rate derivatives market depends on a reliable and predictable interest-rate benchmark. As noted above, OTC dealers quote prices for interest-rate swaps in two parts: (1) an interest-rate based on a benchmark and (2) a fixed interest rate. The fixed rate is calculated to provide the net present value of the expected cash flows from the quoted benchmark over the life of the swap. The fixed-rate payer calculates the expected cash flows by applying the published rules of

the quoted benchmark to the predicted market conditions over the length of the swap to determine the price it will pay for that swap.

262.   The unlawful agreements harmed competition in the market for OTC USD interest-rate derivatives by undermining the integrity of the pricing process and excluding alternative benchmarks from being used to price OTC USD interest-rate derivatives. In a competitive market, USD Libor would have been a reliable benchmark or it would have been replaced by an alternative benchmark that better served its intended purposes.

263.   The unlawful agreements did not provide any pro-competitive benefits in this market.

### c.   Antitrust injury

264.   Plaintiffs' injuries arose from the harm to competition alleged above. In a competitive environment untainted by Defendants' collusion, Defendants could not have sustained their Conspiracy and USD Libor would have been calculated according to its published methodology, and therefore would have been consistently higher throughout the Conspiratorial Period. Plaintiffs' injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

### 3.   Relevant Market: USD Floating-Rate Retail Loans

### a.   Market definition

265.   USD floating-rate retail loans are loans made by banks, including the Panel Bank Defendants, for mortgages and other consumer uses. Retail loans were of longer duration than the loans available in the wholesale funding markets. There are markets for USD floating-rate retail loans worldwide. During the Conspiratorial Period, the

Panel Bank Defendants made and agented billions of dollars' worth of USD floating-rate retail loans, which Panel Bank Defendants packaged into MBS for sale to investors. For example, in 2010, more than half of all mortgages in the United States were originated by three banks: Wells Fargo, Bank of America, and JP Morgan. During the Conspiratorial Period, these three banks and Citigroup were consistently among the top five mortgage originators. They were also, by far, the four largest commercial banks in the United States. In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter, whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

266.  There were no reasonable substitutes for USD floating-rate retail loans. Participants in the market for floating-rate loans seek to transfer risk of higher future interest rates from the lender to the borrower for a price. Fixed-rate loans are an inadequate substitute for floating-rate loans.

### b.    Harm to competition

267.  Defendants' Conspiracy harmed competition in the market for USD floating-rate retail loans by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process. The Panel Bank Defendants were among the largest lenders and, as a result of their Conspiracy, foreclosed competition for interest-rate benchmarks. Also, as a result of the Conspiracy, lenders other than the Panel Bank Defendants were unaware that USD Libor no longer served its intended purpose and therefore non-defendant lenders had no incentive to demand alternative interest-rate benchmarks. The unlawful agreements therefore restricted choice, deterred innovation, artificially increased barriers to entry, limited transparency, and increased prices.

268.  The unlawful agreements did not provide any pro-competitive benefits in this market.

### c.    Antitrust injury

269.  Plaintiffs' injuries arose from this harm to competition. In a competitive environment untainted by Defendants' collusion, the Panel Bank Defendants and the BBA could not have sustained their conspiracy and USD Libor would have been calculated according to its published methodology. As a result of the reduction of competition in the market for interest-rate benchmarks, Plaintiffs lacked adequate alternatives to USD Libor and were deceived into believing that USD Libor sufficiently served its intended purpose. As a direct result of the competitive harms caused by the Panel Bank Defendants' conduct, payments to Plaintiffs on floating-rate loans that incorporated USD Libor were lower than they would have been in the absence of Defendants' Conspiracy.

### 4.    Relevant Market: USD Floating-Rate MBS

### a.    Market definition

270.  The market for USD floating-rate MBS was a global one. During the Conspiratorial Period, the Panel Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS. For example, in 2009 Bank of America was the leading underwriter of U.S. mortgaged-backed securities with 17.5 percent of the total market. Other USD panel banks in the top 10 included Barclays, Credit Suisse, JP Morgan, Citigroup, RBS, and Deutsche Bank.

271.  There were no reasonable substitutes for USD floating-rate MBS.

### b.  Harm to competition

272.  The unlawful agreements harmed competition in the market for USD floating-rate MBS by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process. The Panel Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS and, as a result of their Conspiracy, were uninterested in promoting competition for interest-rate benchmarks. As a result of Defendants' Conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products and received lower compensation. The unlawful agreements also limited choice, deterred innovation, artificially increased barriers to entry, injected false information into the market, and limited transparency.

273.  The unlawful agreements did not provide any pro-competitive benefits in this market.

### c.  Antitrust injury

274.  The harm to competition in the market for USD floating-rate MBS was a material contributing factor to Plaintiffs' injuries because Plaintiffs purchased significant amounts of USD floating-rate MBS from the Panel Bank Defendants and others. In a competitive environment untainted by Defendants' collusion, USD Libor would have been calculated according to its published methodology and Plaintiffs would not have suffered their injuries because the payments that Plaintiffs received from floating-rate MBS were less than they would have been in the absence of the Conspiracy.

## C.  Other antitrust allegations

275.  In furtherance of Defendants' Conspiracy, Defendants committed numerous overt acts including participating in meetings and/or conversations to discuss the

Conspiracy and reporting artificially suppressed borrowing rates to Reuters for calculation of Libor.

276.   Defendants' Conspiracy, and its resulting impact on the relevant markets, occurred in or affected interstate and foreign commerce.

277.   As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property including losses suffered on numerous USD Libor-tied investments such as variable-rate bonds, asset-backed securities, loans, and interest-rate swaps.

278.   Under Section 4 of the Clayton Act (15 U.S.C. § 15), Plaintiffs are each entitled to damages for the violations of the Sherman Act alleged herein.

## COUNT TWO
### VIOLATION OF THE DONNELLY ACT (N.Y. GEN. BUS. LAW § 340)
### (AGAINST ALL DEFENDANTS)

279.   Plaintiffs incorporate by reference the preceding allegations.

280.   The Panel Bank Defendants are horizontal competitors in the purchase and sale of financial products tied to USD Libor.

281.   During the Conspiratorial Period, Defendants and their unnamed co-conspirators agreed to and engaged in a conspiracy for the primary purpose and with the effect of depressing, fixing, pegging, and/or stabilizing the price of USD Libor and thus the rate of return and/or the sale price of USD Libor-tied financial instruments.

282.   In furtherance of Defendants' Conspiracy, Defendants committed numerous overt acts including participating in meetings and/or conversations to discuss the Conspiracy and reporting artificially suppressed borrowing rates to Reuters for calculation of Libor.

283.  Defendants' Conspiracy constitutes illegal price fixing and is a *per se* violation of N.Y. Gen. Bus. Law § 340 and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

284.  Defendants' Conspiracy, and its resulting impact on the market for USD Libor-based financial instruments, occurred in or affected commerce in New York.

285.  As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property including losses suffered on numerous USD Libor-tied investments such as variable-rate bonds, asset-backed securities, loans, and interest-rate swaps.

286.  Under N.Y. Gen. Bus. Law § 340, Plaintiffs are each entitled to damages for the violations of the Donnelly Act alleged herein.

## COUNT THREE
### BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING FOR INTEREST RATE SWAPS
### (AGAINST DEFENDANTS BANK OF AMERICA, CREDIT SUISSE, DEUTSCHE BANK, JPMORGAN, RBC, RBS, AND UBS)

287.  Plaintiffs incorporate by reference the preceding allegations.

288.  Under Defendants' ISDA Master Agreements, a party defaults if "[a] representation made or repeated or deemed to have been made or repeated by the party . . . proves to be incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated." *See* Exhibit 23 at § 5(a)(iv). [105]

289.  By artificially suppressing Libor rates, and by demanding performance based on a manipulated Libor, the Counterparty Defendants breached their respective ISDA Master Agreements with Plaintiffs and the underlying Interest Rate Swap transactions

---

[105] The original ISDA Master Agreement lists Chase Manhattan Bank as the Swap Counterparty, though later confirmations list JPMorgan Chase Bank, N.A. as the Swap Counterparty.

that form part of their ISDA Master Agreements. Specifically, each Counterparty Defendant promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA. In breach of this agreement, the Counterparty Defendants calculated interest payments and valued and settled trades at a rate that they knew, through their own false submissions and status as Libor panel banks, was not determined through a legitimate process and instead was false.

290.   The Counterparty Defendants' actions violated numerous provisions of their ISDA Master Agreement, including Section 4(c) of each ISDA, requiring counterparties to "comply in all material respects with all applicable laws and orders to which [they] may be subject." *See, e.g.* Exhibit 23 § 4(c).

291.   The Counterparty Defendants also breached material representations that they made in their respective ISDA Master Agreements. Every time they entered swap transactions under the ISDAs, the Counterparty Defendants represented that "No Event of Default or Potential Event of Default" had occurred or was continuing, *see, e.g.*, Exhibit 23 § 3(b), and that there was no pending or threatened action, suit, or proceeding that was likely to affect the legality, validity, or enforceability against them of the agreement or their ability to perform their obligations under the agreement, *see id.* § 3(c). Events of Default are triggered by the occurrence at any time of any of the following events:

> 1. Breach of Agreement. Failure by the party to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or

before the thirtieth day after notice of such failure is
given to the party;

2. Credit Support Default. (1) Failure by the party . . . to
comply with or perform any agreement or obligation to
be complied with or performed in accordance with any
Credit Support Document if such failure is continuing
after any applicable grace period has elapsed;

3. Misrepresentation. A representation . . . made or
repeated or deemed to have been made or repeated by
the party . . . in this Agreement or any Credit Support
Document proves to have been incorrect or misleading
in any material respect when made or repeated or
deemed to have been made or repeated.

*Id.* at § 5.[106] These representations were "repeated by each party on each date on which
a Transaction is entered into." *Id.* at § 3.

292. The Credit Support Annex, which supplements, forms part of, and is subject
to each ISDA Master Agreement, establishes that, "For the purposes of Section
5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if: . . .
(iii) that party fails to comply with or perform any agreement or obligation . . . and that
failure continues for 30 days after notice of that failure is given to that party." Exhibit 23
at Credit Support Annex, ¶ 7. In addition, each Counterparty Defendant promised and
represented that they would perform "all obligations under the Annex, including, but
not limited to, all calculations, valuations and determinations made by either party, . . .

---

[106] A Potential Event of Default "means any event which, with the giving of notice or the lapse of time or
both, would constitute an Event of Default." *Id.* § 14.

in good faith and in a commercially reasonable manner." *Id.* at Credit Support Annex, ¶ 11(d).

293.   From August 2007 through at least May 2010, the Counterparty Defendants repeatedly breached their representations regarding the absence of Events of Default, Potential Events of Default, and material threatened claims. Contrary to their contractual promises, Events of Default or Potential Events of Default had in fact occurred because the Counterparty Defendants breached their obligations under the Credit Support Annex by failing to act in good faith and in a commercially reasonable manner with respect to all calculations, valuations, and determinations regarding the swap transactions and the collateral underpinning the swap transactions. By extension and consequently, the Counterparty Defendants' representation regarding the absence of Events of Default or Potential Events of Default have proven to be incorrect or misleading, thereby triggering yet another Event of Default and/or Potential Event of Default. *See id.* § 5(a)(iv). Finally, the Counterparty Defendants' representation regarding the absence of pending or threatened claims was likewise untrue, because it is now known that they faced material threatened claims from regulators around the world regarding their Libor-fixing practices.

294.   Additionally, under each Swap Agreement, the Swap Counterparty Defendant agreed to act as calculation agent and calculate the amount owing from each party under the Contract. Under some or all of the Swap Agreements, the Swap Counterparty Defendants agreed, in connection with their role as calculation agent, to "make each calculation [under the Contracts] in good faith and in a commercially reasonable manner."

295.   Each Swap Agreement includes an implied covenant that each Swap Counterparty Defendant will act in good faith and deal fairly with Plaintiffs, and that

neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

296.   Each Swap Counterparty Defendant breached its Swap Agreements (and accompanying covenants of good faith and fair dealing) with Plaintiffs through its manipulation of USD Libor, its failure to disclose this conduct to Plaintiffs, and its failure to pay Plaintiffs a rate based on the USD Libor definition.

297.   The Swap Counterparty Defendants' collusion to manipulate the USD Libor rate, and/or submit rates that did not conform to the USD Libor definition, also frustrated one of Plaintiffs' purposes in entering the Swap Agreements, which was to receive a floating rate reflective of prevailing interest rates — i.e. a rate based on USD Libor as defined by the BBA. By suppressing USD Libor, the Swap Counterparty Defendants reduced the consideration Plaintiffs received and undermined the contractual bargain. In so doing, the Swap Counterparty Defendants injured Plaintiffs' right to receive the fruits of the contract.

298.   The material, continuing breaches of Swap Counterparty Defendants' ISDA Master Agreements,[107] reaffirmed upon the entry into each new Swap Agreement,[108] and the breaches of the covenant of good faith and fair dealing by the Swap Counterparty Defendants directly and proximately caused Plaintiffs substantial damages. Plaintiffs received less money from the Swap Counterparty Defendants than they would have if Defendants had not artificially suppressed USD Libor and had instead made USD Libor submissions consistent with the BBA's rules and published definition for Libor, in express breach of its contractual obligations. Plaintiffs have also

---

[107] Exhibit 23.
[108] Exhibit 24.

incurred, and are entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the ISDA Master Agreements.[109]

## COUNT FOUR
### BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING FOR VARIABLE-RATE BONDS AND ASSET-BACKED SECURITIES (AGAINST DEFENDANTS BANK OF AMERICA, CREDIT SUISSE, DEUTSCHE BANK, JPMORGAN, RBS, AND UBS)

299.  Plaintiffs incorporate by reference the preceding allegations.

300.  The Bond Defendants' collusion to manipulate the USD Libor rate, and submit rates that did not conform to the USD Libor definition, also frustrated one of Plaintiffs' purposes in entering the Bond Agreements, which was to receive a rate based on USD Libor as defined by the BBA. By suppressing USD Libor, the Bond Defendants reduced the consideration Plaintiffs received and undermined the contractual bargain. In so doing, the Bond Defendants injured Plaintiffs' right to receive the fruits of the contract.

301.  The breaches of contract and covenant of good faith and fair dealing by the Bond Defendants directly and proximately caused Plaintiffs' damages in that Plaintiffs received less money from the Bonds than they would have if Defendants had not artificially suppressed USD Libor and had instead made USD Libor submissions consistent with the BBA's rules and published definition for Libor.

---

[109] *See, e.g.*, Exhibit 23 § 11 ("A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party.")

## COUNT FIVE
## FRAUD
## (AGAINST ALL DEFENDANTS)

302. Plaintiffs incorporate by reference the preceding allegations.

303. Throughout the Conspiratorial Period, the BBA and each Panel Bank Defendant (who controlled and acted through the BBA) misrepresented the following material facts:

- The daily published USD Libor fix was set according to the BBA's published definition of Libor.

- USD Libor reflected the panel banks' competitively set borrowing rates in the London interbank market.

- Each panel bank's daily USD Libor submissions "are based upon the lowest perceived rate at which [it] could go into the London interbank money market and obtain funding in reasonable market size, for a given maturity and currency."

- Each panel bank's USD Libor submission for a given maturity reflected either (1) the bank's *actual* costs of borrowing funds of that maturity in the London interbank market or (2) where the bank had not borrowed funds of that maturity, the bank's *honest projection* of its costs of borrowing funds of that maturity in the London interbank market.

- Each panel bank's USD Libor submissions were made without reference to rates submitted by other panel banks.

- USD Libor was a "transparent" benchmark that served as a "reliable indicator" of the state of the money markets and risk in the global economy.

304. In connection with its 2008 review of the USD Libor setting process, the BBA misrepresented the following material facts:

- It actively monitored the panel banks' USD Libor submissions and believed that they were consistent with the published definition of Libor. (April 2008).

- It would expel any panel bank that made deliberately inaccurate USD Libor submissions. (April 2008).

- It would fast-track an "intensive review" of its USD Libor process. (April 2008).

- It completed a review of the USD Libor setting process and believed that the panel banks' USD Libor submissions were honest and accurate. (June 2008).

- Following its review, it was incorporating a tight scrutiny mechanism that would require any discrepancies in submissions to be reviewed and justified. (June 2008).

- Panel banks' submissions were "truly reflective of their perceived borrowing costs." (August 5, 2008).

- USD Libor was a "fundamentally robust and accurate benchmark." (August 5, 2008).

305. The Swap Counterparty and Bond Defendants also made material misrepresentations and omissions.

306. Both in the Swap Agreements and through negotiations with Plaintiffs, each Swap Counterparty Defendant represented that it would pay Plaintiffs a floating interest rate based on the BBA's published definition of USD Libor. Each Swap Counterparty Defendant also represented that, as calculation agent, it would "make each calculation [under the Contracts] in good faith and in a commercially reasonable manner."

307. Both in the Bond Agreements and through communications with Plaintiffs, each Bond Defendant represented that it would pay Plaintiffs a floating interest rate based on the BBA's published definition of USD Libor.

308. Despite making these representations regarding USD Libor, each Defendant failed to disclose to Plaintiffs additional facts needed to make their representations regarding USD Libor not materially misleading. Specifically, each Defendant failed to

disclose to Plaintiffs that it and its co-Defendants were manipulating USD Libor to their benefit or that USD Libor did not accurately reflect interbank lending rates or risk in the financial system.

309.   Each Defendant made these material misrepresentations and omissions knowing that they were false or with reckless disregard for their truth.

310.   Each Defendant knew and/or had reason to expect that Plaintiffs were among the class of people likely to receive and rely on its representations regarding USD Libor. By making such representations, each Defendant intended for Plaintiffs to rely on the representations in entering financial transactions tied to USD Libor.

311.   Plaintiffs reasonably relied on each Defendant's material misrepresentations and omissions in entering financial transactions tied to USD Libor.

312.   Each Defendant's material misrepresentations and omissions directly and proximately caused Plaintiffs damages in that Plaintiffs paid more for or received less from its USD Libor-based instruments than they would have absent Defendants' fraud. Further, absent Defendants' misrepresentations, Plaintiffs would have exercised their Right to Terminate Following Event of Default. Exhibit 23 at 6(a). Through their fraudulent acts, Defendants prevented Plaintiffs from mitigating their damages by opting out of their swap agreements.

313.   Each Defendant's fraudulent acts were willful and wanton, entitling Plaintiffs to punitive damages.

## COUNT SIX
### AIDING AND ABETTING FRAUD
### (AGAINST ALL DEFENDANTS)

314.   Plaintiffs incorporate by reference the preceding allegations.

315.   Defendants aided and abetted each other in the fraudulent conduct described in this Complaint.

316.   Each Defendant had actual knowledge of its co-Defendants' fraudulent acts.

317.   By making material misrepresentations regarding USD Libor and by failing to disclose its co-Defendants' fraudulent conduct, each Defendant provided substantial assistance to and participated in the fraudulent acts of its co-Defendants by making those acts more difficult to detect. If only one bank, or a few banks, had attempted to engage in persistent suppression of the magnitude displayed during the manipulation period, the submissions would have stood out as glaring. Each Panel Bank Defendant required substantially all of the other panel banks to persistently suppression Libor simultaneously in order to avoid immediate detection.

318.   As a direct and proximate result of Defendants' aiding and abetting each other's fraud, Plaintiffs were damaged by paying more for or receiving less from its USD Libor-based instruments, over a longer period of time, than they would have absent Defendants' fraud.

## COUNT SEVEN
### NEGLIGENT MISREPRESENTATION
### (AGAINST DEFENDANTS BANK OF AMERICA, CREDIT SUISSE, DEUTSCHE BANK, JPMORGAN, RBC, RBS, AND UBS)

319.   Plaintiffs incorporate by reference the preceding allegations.

320.   Defendants Bank of America, Credit Suisse, Deutsche Bank, JPMorgan, RBC, RBS, and UBS (collectively the "Counterparty Defendants") each had direct dealings with and entered into contractual relations with Plaintiffs. This relationship imposed a duty on the Counterparty Defendants to make accurate and good-faith representations in their dealings with Plaintiffs.

321.   Independent of their contractual relations with Plaintiffs, the Counterparty Defendants had a duty to make accurate and good-faith representations to Plaintiffs regarding USD Libor based on the Counterparty Defendants' superior knowledge and roles in both the BBA and ISDA. Each of the Counterparty Defendants held powerful positions within the BBA, which controlled the interest rate benchmark used in Swap Agreements and Bond Agreements, and the ISDA, which promulgated the model ISDA Master Agreement used for the parties' interest-rate swaps.

322.   Specifically, with regard to the BBA, the Counterparty Defendants voluntarily undertook to serve as a panel bank and to create, publicize, and market USD Libor to investors like Plaintiffs. Additionally, as the BBA's most powerful members, the Counterparty Defendants influenced and controlled the BBA's governance of Libor. The Counterparty Defendants had positions on the FXMMC, which was responsible for monitoring the panel banks' USD Libor submissions and scrutinizing the integrity of USD Libor. The Counterparty Defendants' roles within the BBA gave them superior and exclusive knowledge of the integrity and governance of USD Libor.

323.   In making the material misrepresentations and omissions outlined in this Complaint (and specifically, Count Five (Fraud)), each Counterparty Defendant was, at the very least, negligent and without reasonable justification.

324.   Each Counterparty Defendant failed to disclose to Plaintiffs additional facts needed to make its representations regarding USD Libor not materially misleading. Specifically, each Counterparty Defendant failed to disclose to Plaintiffs that it and its co-Defendants were manipulating USD Libor to their benefit and that USD Libor did not accurately reflect interbank lending rates or risk in the financial system.

325.   Each Counterparty Defendant made these material misrepresentations and omissions knowing that they were false or with reckless disregard for their truth.

326.   Each Counterparty Defendant knew and/or had reason to expect that Plaintiffs were among the class of people likely to receive and rely on its representations regarding USD Libor. By making such representations, each Counterparty Defendant intended for Plaintiffs to rely on the representations in entering financial transactions tied to USD Libor.

327.   Plaintiffs reasonably relied on each Counterparty Defendant's material misrepresentations and omissions in entering financial transactions tied to USD Libor.

328.   Each Counterparty Defendant's material misrepresentations and omissions directly and proximately caused Plaintiffs damages in that Plaintiffs paid more for or received less from its USD Libor-based instruments than they would have absent Defendants' fraud.

## COUNT EIGHT
## UNJUST ENRICHMENT
### (AGAINST DEFENDANTS BANK OF AMERICA, CREDIT SUISSE, DEUTSCHE BANK, JPMORGAN, RBC, RBS, AND UBS)

329.   Plaintiffs incorporate by reference the preceding allegations.

330.   As a result of their collusive, fraudulent, and inequitable acts, Counterparty Defendants enriched themselves and obtained material benefit at the expense of Plaintiffs.

331.   It would be inequitable and against good conscience for Counterparty Defendants to be permitted to retain their ill-gotten benefits.

332.   Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to the Counterparty Defendants from their unjust enrichment and inequitable conduct.

333.   Alternatively or additionally, each Counterparty Defendant should pay restitution or its own unjust enrichment to Plaintiffs.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand relief as follows:

A.    That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act as well as Sections 553.4 and 553.12 of the Donnelly Act;

B.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the Conspiracy alleged in the Complaint;

C.    That Plaintiffs recover damages, as provided under federal and New York antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against Defendants;

D.    That Plaintiffs recover their costs of the suit and out-of-pocket expenses, including attorneys' fees, as provided by law;

E.    That Plaintiffs recover damages or other relief permitted by law or equity for Defendants' breaches of contract and covenant of good faith and fair dealing, fraud, aiding and abetting fraud, negligent misrepresentations, and unjust enrichment; and

F.    That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: July 8, 2019                ROBINS KAPLAN LLP


/s/ K. Craig Wildfang

K. Craig Wildfang
Thomas J. Undlin
Stacey P. Slaughter
Geoffrey H. Kozen
800 LaSalle Avenue Suite 2800
Minneapolis, MN 55402–2015
(612) 349–8500
KCWildfang@RobinsKaplan.com
TUndlin@RobinsKaplan.com
SSlaughter@RobinsKaplan.com
GKozen@RobinsKaplan.com

*Counsel for Plaintiffs*

88917493.6

114