**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:  LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| v. | ) |
| | ) |
| CREDIT SUISSE GROUP AG; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; LLOYDS BANKING GROUP PLC; WESTLB AG; WESTDEUTSCHE IMMOBILIENBANK AG; UBS AG; THE ROYAL BANK OF SCOTLAND PLC; COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A.; THE NORINCHUKIN BANK; THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.; HBOS PLC; SOCIÉTÉ GÉNÉRALE S.A; ROYAL BANK OF CANADA; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; CITIGROUP, INC.; CITIBANK, N.A.; CITIGROUP FINANCIAL PRODUCTS; DEUTSCHE BANK AG; RABOBANK INTERNATIONAL; CITI SWAPCO INC.; HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; JPMORGAN CHASE & CO.; AND JPMORGAN CHASE BANK N.A. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) ) |

MDL No. 2262

Master File No. 1:11-md-2262-NRB

ECF Case 13-cv-7394-NRB

Case No.  13-cv-2497-KH

**FOURTH AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ...................................................................................2

II.  PARTIES AND RELEVANT NON-PARTIES .......................................................3

III.  JURISDICTION AND VENUE..............................................................................9

IV.  FACTUAL ALLEGATIONS.................................................................................10

    A.  Background.................................................................................................10

    B.  The Contributing Banks Are Competitors .................................................12

    C.  Defendants' Incentives To Suppress LIBOR..............................................13

    D.  The Contributing Banks Conspired To Suppress LIBOR During the Financial Crisis ..........................................................................................15

    E.  Direct Evidence that Barclays Conspired To Suppress LIBOR..................22

    F.  Direct Evidence that RBS Conspired To Suppress LIBOR .......................28

    G.  Direct Evidence that UBS Conspired To Suppress LIBOR .......................31

    H.  Direct Evidence that Lloyds and HBOS Conspired To Suppress LIBOR...................................................................................................37

    I.  Direct Evidence that Rabobank Conspired To Suppress LIBOR ...............41

    J.  Defendants Used Their Influence over the BBA To Further the Conspiracy.................................................................................................45

V.  Criminal and Regulatory Enforcement Actions ......................................................48

VI.  THE EMIPIRICAL EVIDENCE DEMONSTRATES THAT DEFENDANTS CONSPIRED TO ARTIFICIALLY DEPRESS LIBOR DURING THE RELEVANT PERIOD........................................................................................................54

    A.  The Contributing Banks' LIBOR Submissions Were Incompatible with Other Measures of the Cost of Borrowing ...................................................54

        1.  LIBOR and FRED Diverged........................................................54

        2.  The Contributing Banks' Submissions Were Inconsistent with their CDS Spreads..................................................................56

        3.  Contributing Banks Made Inconsistent LIBOR Submissions Across Currencies ..................................................................60

        4.  Contributing Banks Made LIBOR Submissions Inconsistent with the Federal Reserve Auction Rate ...........................................63

        5.  There was a Discrepancy between Defendants' LIBOR Quotes and Actual Market Lending Rates in the Eurodollar Market....................................................................................64

        6.  The Contributing Banks' LIBOR Submissions Were "Bunched" Together ........................................................................65

B.      The Contributing Banks Were Under Serious Financial Strain ...................................67

     1.      RBS, Lloyds, HBOS .................................................................67

     2.      WestLB .................................................................................69

     3.      Citigroup ..............................................................................70

VII.   THIS ACTION IS TIMELY ...........................................................................71

A.      The Extender Statute .........................................................................71

B.      The Conspiracy Could Not Reasonably Be Discovered Prior to
        March 15, 2011 ..................................................................................71

DEFENDANTS' ANTITRUST VIOLATIONS .....................................................................80

THE CREDIT UNIONS SUFFERED ANTITRUST INJURY AS A RESULT OF
DEFENDANTS' CONDUCT ...............................................................................................81

FIRST CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...81

SECOND CAUSE OF ACTION: VIOLATION OF STATE ANTITRUST, UNFAIR
COMPETITION, AND RESTRAINT OF TRADE LAWS ...............................................84

THIRD CAUSE OF ACTION: BREACH OF CONTRACT AND IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING WITH MEMBERS UNITED....................................85

FOURTH CAUSE OF ACTION: BREACH OF CONTRACT WITH SOUTHWEST...........87

FIFTH CAUSE OF ACTION: BREACH OF CONTRACT WITH WESCORP .....................89

SIXTH CAUSE OF ACTION: BREACH OF CONTRACT WITH U.S. CENTRAL.............93

SEVENTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH THE CREDIT
UNIONS' CONTRACTS WITH OTHER DEFENDANTS AND THIRD PARTIES...........96

EIGHTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH THE CREDIT
UNIONS' PROSPECTIVE ECONOMIC ADVANTAGE ........................................................97

NINTH CAUSE OF ACTION: UNJUST ENRICHMENT .................................................98

RELIEF SOUGHT .....................................................................................................98

Plaintiff, National Credit Union Administration Board ("NCUA"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and Constitution Corporate Federal Credit Union ("Constitution") (collectively the "Credit Unions") against members of the panel of banks that set the London Interbank Offered Rate ("LIBOR" or "Libor") for the U.S. Dollar.   From at least August 2007 to at least May 2010 ("the Relevant Period") Defendants conspired to suppress LIBOR in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Act, 15 U.S.C. § 12 *et seq.*, and state antitrust laws.  Certain Defendants violated contractual obligations to the Credit Unions, and all Defendants tortiously interfered with the Credit Unions' pay-fixed swap contracts and prospective economic advantage from such contracts during the Relevant Period.

The allegations set forth herein are based on corporate knowledge and documents and information in NCUA's possession, and upon information and belief developed through investigation by NCUA and by counsel that included a review of publicly available documents, including legal actions brought against Defendants, regulatory and criminal settlements of LIBOR manipulation charges, documents that appear to have been drafted in whole or in part by certain Defendants, Defendants' press releases and filings with the Securities and Exchange Commission ("SEC"), news articles, scholarly articles, and court documents submitted in LIBOR-related proceedings.[*]

---

[*] Pursuant to the Court's direction in its Memorandum and Order dated March 25, 2019, NCUA includes in the attached Addendum a representative sample of "no-action" clauses contained in the pooling and servicing agreements of the asset-backed securities that underlie NCUA's antitrust claims in this action.  Certain claims that have been dismissed under this Court's rulings are asserted in this Fourth Amended Complaint to preserve them for appeal.

## I.     NATURE OF THE ACTION

1.     This case arises from Defendants' multi-year conspiracy to artificially manipulate LIBOR – the benchmark interest rate for hundreds of trillions of dollars of financial instruments around the world, including variable interest-rate notes, interest rate derivative contracts, mortgages, credit cards, student loans, and other consumer lending products.  Defendants' scheme served at least two purposes.  By artificially manipulating LIBOR, Defendants advantaged their derivative trading positions, allowing them to earn significant undeserved profits.  Moreover, because a bank's LIBOR quote is an indication of the bank's financial health and liquidity position, Defendants' submission of artificially low LIBOR quotes allowed Defendants to portray themselves to the marketplace as financially healthier and more liquid than they actually were.

2.     From at least August 2007 to at least May 2010, Defendants conspired to, and did, manipulate LIBOR by falsely reporting, on a daily basis, the interest rates at which they believed they were able to borrow funds.  Defendants acted in concert to knowingly depress LIBOR rates, thereby reaping undeserved profits and other benefits.

3.     Investigations regarding Defendants' LIBOR manipulation are ongoing in the United States, Switzerland, Japan, the United Kingdom, Canada, the European Union, and Singapore by at least ten different government agencies, including the United States Department of Justice ("DOJ"), the Securities & Exchange Commission ("SEC"), and the United States Commodities Futures Trading Commission ("CFTC").  Defendants Barclays Bank plc, UBS AG, the Royal Bank of Scotland plc, Lloyds Banking Group plc, and Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. have settled regulatory actions alleging LIBOR manipulation and entered into non-prosecution or deferred prosecution agreements with the Criminal Division Fraud Section of the DOJ, wherein they have admitted to manipulating LIBOR rates.

2

4.      During the Relevant Period, the Credit Unions held tens of billions in investments and other assets that paid interest streams pegged to LIBOR.  These assets were purchased both from the Defendant banks and from non-Defendant banks and institutions.   In addition, the Credit Unions were parties to more than $10 billion in interest rate swaps that were pegged to LIBOR.  At least $8 billion of these swap contracts were entered into directly with certain Defendant banks or their subsidiaries.  As a direct result of Defendant's conspiracy to artificially depress LIBOR during the Relevant Period, the Credit Unions received less in interest income than they otherwise were entitled to receive.

## II.      PARTIES AND RELEVANT NON-PARTIES

5.      The National Credit Union Administration is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department by 2021 through assessments against all federally-insured credit unions.  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA is under the management of the NCUA Board.  *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCUA").

3

6.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.  As a corporate credit union, U.S. Central provided investment and financial services to other credit unions.

7.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

8.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.  As a corporate credit union, Southwest provided investment and financial services to other credit unions.

9.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois.  Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions.  As a corporate credit union, Members United provided investment and financial services to other credit unions.

10.     Constitution was a federally chartered corporate credit union with its offices and principal place of business in Wallingford, Connecticut.  As a corporate credit union, Constitution provided investment and financial services to other credit unions.

11.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant to the FCUA, 12 U.S.C. § 1751 *et seq.*

12.     On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship.

13.     On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation and appointed itself Liquidating Agent.

14.     On October 31, 2010, the NCUA Board placed Members United and Southwest into involuntary liquidation and appointed itself Liquidating Agent.

15. On November 30, 2010, the NCUA Board placed Constitution into involuntary liquidation and appointed itself Liquidating Agent.

16. Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the Credit Unions and of any member, account holder, officer, or director of the Credit Unions, with respect to the Credit Unions and their assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the Credit Unions and succeeds to all rights, titles, powers, and privileges of the Credit Unions. *See* 12 U.S.C. § 1787(b)(2)(A). The NCUA Board may also sue on the Credit Unions' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

17. Prior to being placed into conservatorship and involuntary liquidation, the Credit Unions were among the largest corporate credit unions in the United States.

18. Any recoveries from this legal action will reduce the total losses resulting from the failure of the Credit Unions. Losses from the Credit Unions' failures must be paid from the NCUSIF or the TCCUSF. Expenditures from these funds must be repaid through assessments against all federally-insured credit unions. Because of the expenditures resulting from the Credit Unions' failures, federally-insured credit unions will experience larger assessments, thereby reducing federally-insured credit unions' net worth. Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit unions. Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain. Any recoveries from this action will help to reduce the amount of any future assessments on federally-insured credit unions throughout the system, reducing the negative impact on federally-insured credit unions' net worth. Recoveries from

this action will benefit credit unions and their individual members by increasing net worth resulting in more efficient and lower-cost lending practices.

19.     The British Bankers' Association ("BBA") is a trade organization for the financial industry governed by a board composed of senior bank executives.  Until 2010, the BBA owned LIBOR.  In January 2010 the BBA created a separate entity, BBA LIBOR Ltd., to house LIBOR.

20.     Defendant Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.

21.     Defendant Barclays Bank plc is a British public limited company headquartered in London, England.  Defendant Barclays Capital Inc. is a subsidiary of Barclays Bank plc and a Connecticut corporation headquartered in New York, New York.  Barclays Bank plc and Barclays Capital Inc. are referenced together in this Complaint as "Barclays."

22.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.  Defendant Rabobank International is a department or trade name of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.  Rabobank has branches around the world, and its U.S. branch is headquartered in New York, New York.

23.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

24.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National Association is a federally-chartered national banking association headquartered in New York, New York and is a wholly-owned subsidiary of JPMorgan Chase & Co.  JPMorgan Chase & Co. and JPMorgan Chase Bank, National Association are referenced together in this Complaint as "JPMorgan."

6

25.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Defendant Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc – a United Kingdom company headquartered in Edinburgh, Scotland that was a holding company for Bank of Scotland plc – by Lloyds TSB Bank plc.  HBOS and Bank of Scotland plc are referenced together in this Complaint as "HBOS."

26.     Defendant Royal Bank of Canada ("RBC") is a Canadian company headquartered in Toronto, Canada.

27.     Defendant Société Générale S.A. ("SocGen") is a financial services company headquartered in Paris, France and is the parent company of Societe Generale Group.  SocGen offers commercial, retail, private banking services and investment banking services, including financial and commodities futures brokerage services.

28.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

29.     Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

30.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

31.     Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Westdeutsche ImmobilienBank AG – a German company headquartered in Mainz, Germany – is a wholly-owned subsidiary of WestLB AG.  Defendants WestLB AG and Westdeutsche ImmobilienBank AG are referenced together in this Complaint as "WestLB."

32.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A., is a Delaware corporation with

7

offices in New York, New York and is a wholly-owned subsidiary of Bank of America Corporation. Bank of America Corporation and Bank of America, N.A., are referenced together in this Complaint as "Bank of America."

33.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.  Defendant Citigroup Financial Products is a subsidiary of Citigroup, Inc. and a Delaware corporation headquartered in New York, New York.  Defendant Citi Swapco, formerly known as Salomon Swapco, is a subsidiary of Citigroup Financial Products.  Citigroup, Inc., Citigroup Financial Products, and Citi Swapco are referenced together in this Complaint as "Citigroup."

34.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany, with numerous offices including a regional head office in New York, New York.

35.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank USA, N.A., which has its principal office in New York, New York, is a subsidiary of HSBC Holdings plc.  HSBC Holdings plc and HSBC Bank USA, N.A. are referenced together in this Complaint as "HSBC."

36.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland, with offices in New York, New York.

37.     Defendants BTMU, Barclays, Rabobank, Credit Suisse, JPMorgan, HBOS, RBC, SocGen, Norinchukin, RBS, UBS, WestLB, Lloyds, Bank of America, Citigroup, HSBC, and UBS (collectively, "Defendants") were members of the panel of banks whose submissions to the BBA determined LIBOR during the Relevant Period.

38.     Other unnamed individuals, corporations, partnerships, associations, or entities also participated in the conspiracy to suppress LIBOR.

### III.    JURISDICTION AND VENUE

39.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and state law.

40.     This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

41.     This Court also has subject matter jurisdiction pursuant to: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA] Board shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

42.     Venue is proper in this District of Kansas pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to the NCUA's claims arose in the District of Kansas, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District.

43.     In particular, Defendants transacted substantial amounts of business with U.S. Central in the District of Kansas.  Payments relating to swaps between Members United and Bank of America were conducted through an account held at U.S. Central.  Moreover, when a Defendant sold a security to a Credit Union, the monies paid to the Defendant in connection with the transaction, and the security sold by the Defendant in the course of the transaction, was routed

9

through U.S. Central's safe-keeping accounts.  In the course of such transactions, U.S. Central took custody of any securities sold to the Credit Unions, and U.S. Central safe-kept any monies paid to the Defendants in the course of such transactions.  Moreover, U.S. Central safe-kept any interest coupon on the securities paid by the Defendants to the Credit Unions.

44.     Several Defendants were specifically on notice at the time of transacting with Members United, Southwest, or WesCorp of U.S. Central's role in those transactions.  In particular, transaction documents between Defendants Bank of America and JPMorgan, on the one hand, and Members United on the other expressly state that swap payments would be made to or from an account at U.S. Central and set forth an account number at U.S. Central.  Moreover, transaction confirmations sent from Defendants Barclays, Citigroup and Deutsche Bank, on the one hand, and Members United, Southwest, or WesCorp on the other provide that those Defendants would be paid for the transactions out of accounts controlled by U.S. Central, which was located in Kansas, and set forth a U.S. Central account number for such transactions.  Also, transaction confirmations between Defendants Bank of America, Credit Suisse, HSBC, and JPMorgan, on the one hand, and Members United, Southwest, or WesCorp on the other expressly set forth a U.S. Central account number from which payment for the transaction would be made.

45.     On October 18, 2013, the Panel on Multidistrict Litigation transferred this case from the District of Kansas to the Southern District of New York for pre-trial proceedings.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

46.     LIBOR is published under the auspices of the BBA, a trade association with over 250 member banks that addresses issues involving the U.K. banking and financial services industries. Since 1998, the BBA has defined LIBOR as: "The rate at which an individual Contributor Panel

bank could borrow funds, were it to do so by asking for and then accepting interbank offers in reasonable market size, just prior to 11:00am London time."[1]

47.    The BBA's website states that "[LIBOR] is the primary benchmark for short term interest rates globally" and is used as "the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges."[2]  Numerous other financial instruments, including debt securities, trust preferred securities, mortgages, credit cards, student loans, and other consumer lending products use LIBOR as a reference rate.

48.    LIBOR is calculated for ten currencies and fifteen maturities (or "tenors"), ranging from overnight to 12 months.  Prior to and during the Relevant Period, the BBA selected a unique panel for each currency that ranged in size from 8 banks (for the Australian dollar and Danish krone) to 16 banks (for the U.S. Dollar and Japanese Yen), but there was substantial overlap between the panels.  For example, during the Relevant Period, 13 of the 16 banks on the U.S. Dollar panel also served on the Japanese Yen panel.

49.    The LIBOR for a given currency and tenor is the result of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA. Each member of the Contributor Panel (each a "Contributing Bank") submits its rate by 11:10 a.m. London time each business day through electronic means to Thomson Reuters, which acts as the "calculation agent" for the BBA.  Once each Contributing Bank has submitted its rate, the contributed rates are ranked.  The highest and lowest quartiles are excluded and the middle two

---

[1]    Bbalibor, *Definitions*, http://www.bbalibor.com/explained/definitions (last visited Sept. 22, 2013).

[2]    Bbalibor, *The Basics*, http://www.bbalibor.com/explained/the-basics (last visited Sept. 22, 2013).

quartiles (50% of the submissions) are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and tenor.

50.    The LIBOR contribution of each Contributing Bank is submitted to between two and five decimal places and the LIBOR fix is rounded, if necessary, to five decimal places.

51.    Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and a variety of information sources.  Thomson Reuters also publishes each Contributing Bank's submitted rates, along with the names of the banks.

52.    From at least 2005 to the present, the BBA has required that each Contributing Bank submit its rates without reference to rates contributed by other Contributing Banks.  The BBA has further required that each Contributing Bank's submission be the rate at which members of the bank's staff primarily responsible for management of the bank's cash believe that the bank can borrow unsecured interbank funds in the London market.  As the BBA explains on its website, "a bank will know what its credit and liquidity risk profile is from the rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies and maturities in which it has not been active."

53.    A Contributing Bank is prohibited from submitting a rate based on any motive to maximize profit or minimize losses on any of its own transactions tied to LIBOR.

**B.    The Contributing Banks Are Competitors**

54.    The banks that compose the BBA's panels are direct horizontal competitors. Among other things, they compete in the market for financial services including banking, trading, and brokerage services; they compete as borrowers and lenders in the London inter-bank money market; and, they compete in the market for LIBOR-based financial instruments, including in their

capacity as issuers, underwriters, broker dealers, and sellers of securities whose interest coupon is tied to LIBOR, and as swap-counterparties in interest rate swaps that are tied to LIBOR.

55.     The Contributing Banks also act as competitors in making their daily LIBOR submissions.  As the BBA has explained in its own marketing materials, each Contributing Bank's LIBOR submissions are "a unique snapshot of competitive funding costs."  This is because a bank's LIBOR submission should, under BBA requirements, correspond to the cost at which the bank concludes that it can borrow funds.  A LIBOR submission that is high relative to those of the bank's peers would indicate that the bank's lenders are charging it a higher interest rate – a sign of credit and liquidity difficulty.

56.     Such a perception in the marketplace would have dire consequences to the bank's competitive position.  Banks that are perceived to be more creditworthy can obtain better collateral terms or fixed rates in interest rate swaps and other derivatives, and better terms in LIBOR-based lending and borrowing.  Conversely, when a bank is perceived to be less creditworthy than its peers this can lead to lower ratings, collateral calls, and other actions that could harm or threaten the life of the bank.

57.     Participants in the market for the financial products and services offered by the Contributing Banks therefore kept close tabs on each Contributing Bank's LIBOR submission.  A bank's LIBOR submission that was materially higher than those of other Contributing Banks would have a direct adverse effect on that bank's competitive position in the marketplace.

### C.     Defendants' Incentives To Suppress LIBOR

58.     Defendants had significant incentives to manipulate LIBOR.  First, Defendants manipulated LIBOR to benefit their trading positions.  Derivatives traders within the Defendant

banks held extensive trading positions tied to LIBOR.  For instance, Defendant JPMorgan had

interest rate swaps with a notional value of $49.3 trillion.[3]

59.     By artificially manipulating LIBOR, Defendants were able to book enormous

unearned profits.  In October 2008, a UBS manager noted that UBS stood to lose $4 million for

each one-basis-point increase in LIBOR.[4]  JPMorgan acknowledged in 2009 that a difference of 1%

(or 100 basis points) was worth over $500 million to the bank.

60.     Accordingly, as described in detail below, derivatives traders within the Defendant

banks frequently requested that the bank employees responsible for the banks' LIBOR submissions

submit rates that would benefit the banks' trading positions, as opposed to the true cost at which the

banks could borrow funds.  Derivatives traders within one Contributing Bank would also

communicate with those at other Contributing Banks about LIBOR submissions – either directly or

in communications funneled through third party brokers – that would benefit each of the banks'

trading positions.

61.     By providing artificially low LIBOR submissions, Defendants were further able to

portray themselves as more financially stable and liquid than they actually were.  As analysts at

Citigroup Global Markets Inc. – a subsidiary of Citigroup – stated in an April 10, 2008 report:

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being
> perceived as a weak hand in this fragile market environment.  If a bank is not held to
> transact at its posted LIBOR level, there is little incentive for it to post a rate that is more
> reflective of real lending levels, let alone one higher than its competitors.  Because all LIBOR
> postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being

---

[3]     Amit Pyakurel, *Libor Scandal and Its Possible Implication*, The Himalayan Times, *available at* www.thehimalayantimes.com/perspectives/fullnews.php?headline=Libor+scandal+and++its+possible+implication&newsid=MTM4OQ==.

[4]     *See* U.K. Financial Services Authority, Final Notice to UBS AG ("FSA UBS") ¶ 103 (Dec. 19, 2012), *available at* http://www.fsa.gov.uk/static/pubs/final/ubs.pdf.

perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences.[5]

62.     Similarly,  in a June 18, 2008 electronic chat, UBS employees discussed why it was important for UBS to make submissions that matched those of the other Contributing Banks:

Trader D:                  . . . [Senior Manager B] wants us to get in line with the competition by Friday . . .

Trader-Submitter E:     . . . if you are too low you get written about for being too low
                        . . . if you are too high you get written about for being too high
                        . . .

Trader D:                  middle of the pack there is no issue. . . [6]

63.     A few months later, on September 22, 2008, a UBS employee stated in an instant message to a colleague that "the real cash market isn't trading anywhere near Libor" and that the Contributing Banks "undervalue [LIBOR] in times like this . . . so as not to show where they really pay in case it creates headlines about the bank being desperate for cash."[7]

**D.     The Contributing Banks Conspired To Suppress LIBOR During the Financial Crisis**

64.     During the Relevant Period, Defendants conspired to suppress LIBOR in order to benefit their investments that were tied to LIBOR, to reduce their borrowing costs, to deceive the marketplace as to the true state of their creditworthiness, and to deprive investors of the interest rate payments to which they were entitled.

---

[5]     Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, *Special Topic:  Is LIBOR Broken?* (Citigroup Global Markets, Inc., Apr. 10, 2008), *available at* http://www.moneyscience.com/mod/file/download.php?file_guid=393006.

[6]     FSA UBS ¶ 124.

[7]     Settlement Agreement by and between U.S. Dep't of Justice and UBS AG, App'x A ("DOJ UBS") ¶ 101 (Dec. 18, 2012), *available at* http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf.

65.     In violation of the BBA's requirements and the market's expectations, Defendants each made LIBOR submission rates to the BBA that were lower than their true cost of borrowing. In further violation the BBA's rule that submissions remain confidential prior to submission, Defendants actively shared information about their future submissions and used this information to collectively and artificially depress LIBOR.

66.     During the Relevant Period, the Contributing Banks cultivated internal cultures that allowed and, in some cases, encouraged individual traders to move LIBOR by causing Contributing Banks to submit false rates.  *The Wall Street Journal* has reported that "former traders have said that for years it was viewed as business-as-usual for trading desks at many banks to try to sway their banks' Libor submissions to benefit their trading positions."[8]

67.     As set forth in detail below, traders from the various Defendant banks communicated directly with each other about their Banks' prospective LIBOR submissions and entered into agreements to artificially depress LIBOR rates.

Traders at the Defendant banks further funneled such communications through interdealer brokers, who are middlemen between financial institutions looking to buy or sell various products. These brokers influenced LIBOR submissions by making direct requests of traders and submitters to submit artificially low LIBOR bids; and by disseminating regular emails known as "run throughs" that were sent to large groups of traders from multiple banks describing their view of the money market and suggesting specific LIBOR submissions.  Traders from the Defendant banks rewarded brokers that assisted them in manipulating LIBOR with "wash trades" that generated large commissions for the brokers.  As recently reported by the *Wall Street Journal*: "some brokers

---

[8]     David Enrich & Atsuko Fukase, *LIBOR Rate-Probe Spotlight Shines on Higher-Ups at Citigroup, Other Banks*, Wall St. J., Aug. 28, 2013, *available at* http://online.wsj.com/article/SB10001424127887324165204579028703364511212.html.

exploited this middleman role to help attempted rate-rigging mushroom from a small group of bank traders into a world-wide effort that distorted interest rates.  In return, traders gave the brokers business to boost their commissions and other rewards, regulators have said."[9]  Investigations by government regulators have uncovered scores of additional examples of this type of collusion.  The Commodities Futures Trading Commission ("CFTC") has determined, for example, that traders from RBS and UBS often worked "in concert" to manipulate Yen LIBOR, and that RBS and UBS "execut[ed] wash trades (trades that result in financial nullities) in order to generate extra brokerage commissions to compensate two interdealer brokers" that assisted the traders in manipulating Yen LIBOR.[10]

68.    The CFTC has found that one UBS trader "used at least five interdealer brokers . . . *to disseminate* false market information relating to Yen LIBOR to multiple [Contributing Banks] in order to impact their submissions to his benefit."[11]  This trader asked the brokers to disseminate false "run-throughs," contact the LIBOR submitters at other banks, publish false cash rates that would appear on electronic screens visible to clients, and "spoof[]" the market by making fake bids and offers.[12]

---

[9]    David Enrich, et al., *ICAP in Talks to Settle U.S., U.K. Rate Probe*, Wall St. J., Sept. 5, 2013, *available at* http://online.wsj.com/article/SB10001424127887324123004579057032265066684.html.

[10]    *In the Matter of The Royal Bank of Scotland plc & RBS Sec. Japan Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) and 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC RBS"), at 2 (CFTC Dkt. No. 13-14) (Feb. 6, 2013), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfrbsorder020613.pdf.

[11]    *In the Matter of UBS AG & UBS Sec. Japan Co., Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC UBS"), at 3 (CFTC Dkt. No. 13-09) (Dec. 19, 2012) (emphasis added), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfubsorder121912.pdf.

[12]    *Id.*

69.     The UK Financial Services Authority found that on June 6, 2009, a broker sent an instant message to a trader at RBS reporting on his efforts to help the trader manipulate Yen LIBOR in several tenors:

> Broker:     Alright okay, alright, no we've okay just confirming it. We've, so far we've spoke to [Contributing Bank 3]. We've spoke to a couple of people so we'll see where they come in alright. We've spoke, basically . . . basically we spoke to [Contributing Bank 3], [Contributing Bank 4], [Contributing Bank 5], who else did I speak to? [Contributing Bank 6]. There's a couple of other people that the boys have a spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?
>
> Trader:     Cheers.[13]

70.     On September 5, 2013, the *Wall Street Journal* reported that ICAP PLC, a prominent interdealer broker is negotiating a settlement agreement with the CFTC, DOJ, and U.K.'s Financial Conduct Authority ("FCA") (a successor to the U.K.'s Financial Services Authority ("FSA")) concerning ICAP's role in LIBOR manipulation.

71.     The *Wall Street Journal* reported that regulators have evidence that ICAP conspired with UBS to manipulate LIBOR:

> A top executive at ICAP knew of an arrangement between the firm and UBS that regulators allege was part of a Libor-rigging plot . . . .
>
> David Casterton, ICAP's head of global broking, was included in emails between ICAP and UBS as they negotiated a deal that regulators said was designed to reward brokers for helping in the alleged manipulation, said people familiar with the matter.
>
> Mr. Casterton . . . signed off on a quarterly "fixing service" payment of about $27,000 that was shared among several ICAP employees, the people said. [14]

---

[13]   U.K. Financial Services Authority, Final Notice to The Royal Bank of Scotland plc ("FSA RBS"), ¶¶ 59-60, 65-67 (Feb. 6, 2013), *available at* http://www.fsa.gov.uk/static/pubs/final/rbs.pdf.

[14]   David Enrich, et al., *ICAP in Talks to Settle U.S., U.K. Rate Probe*, Wall St. J., Sept. 5, 2013, *available at* http://online.wsj.com/article/SB10001424127887324123004579057032665066684.html.

72.     On September 25, 2013, ICAP reached settlements with the CFTC and FSA, paying

$87 million in fines.[15]  The CFTC concluded that for more than four years from October 2006

through at least January 2011, ICAP brokers spread misleading information about Yen borrowing

rates for the benefit of a UBS trader.[16]  The CFTC found that one of the ICAP brokers involved

was so influential in Yen LIBOR setting that he was known as "Lord LIBOR."[17]

73.     The ICAP brokers assisted with the scheme to manipulate Yen LIBOR in two ways:

(1) disseminating false and misleading Suggested Yen LIBORs in "Run Thu" emails, and (2)

personally speaking with Yen derivatives traders and Yen LIBOR submitters to try to influence

them to submit specific rates.[18]

74.     On September 13, 2013, DOJ charged three former ICAP brokers with two counts

of wire fraud and one count of conspiracy to commit wire fraud.  The criminal complaint alleges

that these three brokers disseminated fraudulent statements about Yen borrowing in order to further

a scheme to influence and manipulate Yen LIBOR.

75.     U.K. authorities have also brought criminal charges against two former interdealer

brokers from RP Martin Holdings Ltd., Terry Farr and James Gilmour, for conspiring with

---

[15]     Mark Scott & Julia Werdigier, U.S. and British Officials Fine ICAP in LIBOR Case, N.Y.
Times (Sept. 25, 2013) http://dealbook.nytimes.com/2013/09/25/icap-to-pay-87-million-fine-in-
libor-fixing-case/.

[16]     *In the Matter of ICAP Europe Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of
the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC ICAP"), at 2
(CFTC Dkt. No. 13-38) (Sept. 25, 2013), *available at*
http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfic
aporder092513.pdf.

[17]     *Id.*

[18]     *Id. at* 9.

employees at, among other places, UBS, Rabobank and HSBC to manipulate LIBOR.  Both brokers are charged with "conspiracy to defraud."[19]

76.      On May 15, 2014, RP Martin Holdings Ltd. and its subsidiary Martin Brokers (UK) Ltd. reached settlements with the CFTC and FCA, paying more than $2 million in fines. The CFTC's investigation concluded that from at least September 2008 through at least August 2009, RP Martin's brokers knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate Yen LIBOR.[20]

77.      The RP Martin brokers assisted with the scheme to manipulate Yen LIBOR in three ways: (1) disseminating false and misleading suggested Yen LIBORs in "run through" emails; (2) personally speaking with Yen derivatives traders and Yen LIBOR submitters to try to influence them to submit specific rates; and (3) offering "spoof" bids to their clients, including clients who were Yen LIBOR submitters.[21]

78.      During the Relevant Period, Defendants capitalized on the culture of manipulation and their proven ability to successfully move LIBOR when multiple banks acted together to suppress LIBOR.  As described by Martin Wheatley, the Chief Executive of the FCA, LIBOR manipulation was not perpetrated by "a few rogue individuals," but was a "systemic problem."  For

---

[19]      Lindsay Fortado & Jeremy Hodges, *Ex-RP Martin Employees Have LIBOR Case Transferred*, Bloomberg Law, July 19, 2013, http://about.bloomberglaw.com/legal-news/ex-rp-martin-employees-have-libor-case-transferred/.

[20]      *In the Matter of RP Martin Holdings Ltd. & Martin Brokers (UK) Ltd.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC RP Martin"), at 2 (CFTC Dkt. No. 14-16) (May 15, 2014), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfrpmartinorder051514.pdf.

[21]      *Id*. at 3.

example, at Barclays "there was a web of traders that worked together to try to manipulate Libor to benefit one another."[22]

79.     Many of the details of how six U.S. Dollar LIBOR panel banks – Barclays, UBS, RBS, Lloyds, HBOS, and Rabobank – furthered the conspiracy to suppress LIBOR have been made public in conjunction with the civil settlements and criminal non-prosecution agreements that these Defendants entered into with U.S. and U.K. authorities.

80.     Gary Gensler, the Chairman of the CFTC, observed in February 2013:

> We have learned that LIBOR – central to borrowing, lending, and hedging in our economy – has been readily and pervasively rigged. . . . Barclays, UBS and RBS were fined $2.5 billion for manipulative conduct by the CFTC, the UK Financial Services Authority (FSA) and the Justice Department.  At each bank, the misconduct spanned many years, took place in offices in several cities around the globe, included numerous people – sometimes dozens, even included senior management . . . .  In each case, there was evidence of collusion.[23]

81.     But, the conspiracy was not limited to Barclays, UBS, RBS, Lloyds, HBOS, and Rabobank.  Indeed, it could not have succeeded without the universal or near-universal participation of the banks on the U.S. Dollar LIBOR panel.  On February 11, 2013, the former Chairman of Global Banking and Markets at RBS Group, Johnny Cameron, characterized LIBOR suppression as "a cartel of people *across a number of banks* who felt they could fix it."[24]  Likewise, Barclays's CEO

---

[22]     Phillipa Leighton Jones, *Sold for £1. NYSE Euronext Takes Over Libor*, MoneyBeat Blog, Wall St. J., July 9, 2013, http://blogs.wsj.com/moneybeat/2013/07/09/libor-sold-to-nyse-euronext-how-did-we-get-here/.

[23]     Gary Gensler, Chairman, Commodity Futures Trading Comm'n, Remarks on Libor before the Global Financial Markets Ass'n's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

[24]     Oral Evidence from Johnny Cameron taken before the House of Commons Parliamentary Comm'n on Banking Standards, Q3960 (HL Paper 27-III/HC 175-III) (Feb. 11, 2013) (emphasis added), *available at* http://www.publications.parliament.uk/pa/jt201314/jtselect/jtpcbs/27/130211a.htm.

Bob Diamond told Parliament on July 4, 2012: "There is a reason why an *industry-wide* problem is coming out now."[25]

### E.    Direct Evidence that Barclays Conspired To Suppress LIBOR

82.    Barclays has reached numerous settlements with U.S. and U.K. authorities as to its participation in LIBOR manipulation.  On June 27, 2012, Barclays agreed to pay a penalty of £59.5 million to the FSA;[26]  a civil fine of $200 million to the CFTC;[27] and a monetary penalty of $160 million to DOJ.[28]  In total, Barclays has agreed to pay approximately $443.6 million to government regulators.

83.    On June 26, 2012, Barclays also entered into a non-prosecution agreement with the Criminal Division Fraud Section of the DOJ, whereby it admitted to knowingly providing LIBOR submissions that were false because they were improperly influenced by the trading positions of its derivative traders as well as concerns about negative media attention relating to its liquidity position and default risk.  More specifically, it admitted the following facts:

- Beginning in at least June 2005, Barclays's "swaps traders requested that certain Barclays LIBOR and EURIBOR submitters submit LIBOR and EURIBOR contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR and EURIBOR. . . .  The swaps traders made these requests via electronic messages, telephone conversations, and in-person conversations.  The LIBOR and EURIBOR submitters agreed to

[25]    Oral Evidence from Bob Diamond taken before the House of Commons Treasury Committee, Q134, at 23 (to be published as HC 481-i) (July 4, 2012) (emphasis added), *available at* http://www.publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/uc481/uc48101.htm.

[26]    U.K. Financial Services Authority, Final Notice to Barclays Bank Plc ¶ 1 (June 27, 2012) ("FSA Barclays"), *available at* http://www.fsa.gov.uk/static/pubs/final/barclays-jun12.pdf.

[27]    *In the Matter of Barclays PLC, et al.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, as Amended, Making Findings and Imposing Remedial Sanctions, ("CFTC Barclays"), at 30 (CFTC Dkt. No. 12-25) (June 27, 2012) *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysorder062712.pdf.

[28]    Non-Prosecution Agreement Letter between Barclays Bank, Dep't of Justice ("NPA Barclays") (June 26, 2012) at 3, *available at* http://www.justice.gov/iso/opa/resources/337201271017335469822.pdf.

accommodate, and accommodated, the swaps traders' requests for favorable LIBOR and EURIBOR submissions on numerous occasions."[29]

- "From at least approximately August 2005 . . . certain Barclays swaps traders communicated with swaps traders at other Contributor Panel banks and other financial institutions about requesting LIBOR and EURIBOR contributions that would be favorable to the trading positions of the Barclays swaps traders and/or their counterparts at other financial institutions. . . .  Certain Barclays swaps traders made requests of traders at other Contributor Panel banks for favorable LIBOR or EURIBOR submissions from those banks.  In addition, certain Barclays swaps traders received requests from traders at other banks for favorable LIBOR or EURIBOR submissions from Barclays rate submitters.  When Barclays swaps traders did not have trading positions conflicting with their counterparts' requests, those Barclays swaps traders sometimes would agree to request a LIBOR or EURIBOR submission from the Barclays LIBOR or EURIBOR submitters that would benefit their counterparts' positions."[30]

- From at least August 2007 through at least January 2009, "Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been.  Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs.  Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel."[31]

84.     Contemporaneous with the announcement of the regulatory settlements, the FSA, CFTC, and DOJ also released summaries of the factual findings of their investigations.

85.     The FSA, CFTC, and DOJ found that during the relevant period Barclays made LIBOR submissions and encouraged other banks to make LIBOR submissions that did not reflect

---

[29]   Settlement Agreement by and between U.S. Dep't of Justice and Barclays Bank plc, App'x A, ¶ 11 (June 26, 2012) ("DOJ Barclays"), *available at* http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf.

[30]   *Id.* ¶¶ 23-24.

[31]   *Id.* ¶ 36.

their true cost of borrowing in order to increase its profits and to create the false appearance of creditworthiness.

86.     Barclays's traders routinely and openly asked Barclays's submitters to modify their LIBOR submissions for various currencies.  According to the FSA, Barclays's submitters were asked to modify their LIBOR submissions at least 173 times between January 2005 and May 2009.[32]  In February 2006, Barclays's submitters were asked to modify their LIBOR submissions on 16 out of 20 days (80%) and in March 2006, Barclays submitters were asked to modify their LIBOR submissions on 14 out of 23 days (over 60%).[33]  The FSA has determined that at least fourteen different Barclays's traders made such requests.[34]

87.     On numerous occasions, Barclays's employees asked Barclays's submitters to modify their LIBOR submissions in response to requests from traders at other banks.  The FSA identified eleven specific instances in which Barclays's submitters were asked to modify their LIBOR submissions based on communications from traders from other banks between January 2005 and May 2009.[35]

88.     Barclays's submitters responded positively to and acted upon requests to artificially manipulate the bank's LIBOR submissions.  According to an analysis conducted by the FSA, Barclays's submissions were clearly consistent with the requests made of the submitters at least 70% of the time.[36]

---

[32]    FSA Barclays ¶ 56(i).

[33]    *Id.* ¶ 55.

[34]    *Id.* ¶ 57.

[35]    *Id.* ¶ 56(i); CFTC Barclays at 10-11 (citing seven examples of "instances where the submitters agreed to make false submissions and attempted to manipulate the rate").

[36]    FSA Barclays ¶ 71(i).

89.     Barclays's traders asked other Contributing Banks' to modify their LIBOR submissions as well.  The FSA has identified five specific instances where a Barclays trader asked another Contributing Bank to modify its LIBOR submissions between February 2006 and October 2007.[37]

90.     The FSA, CFTC, and DOJ further found that with the onset of the financial crisis in 2007, Barclays had definitive knowledge that other Contributing Banks were making LIBOR submissions that did not reflect their true cost of borrowing.  Rather than raise any of these issues with regulators, Barclays continued its conspiracy with the other Defendant banks to submit false LIBOR submissions that did not reflect its true cost of borrowing in order to cultivate the perception that it was doing well financially.

91.     By mid 2007, Barclays was under serious financial stress.  It drew on the Bank of England's emergency liquidity facility twice before the end of August 2007.  The second time Barclays borrowed approximately £1.6 billion.  Rather than make accurate LIBOR submissions that would have revealed its true financial strain, however, Barclays resolved that it would fall in line with other Defendant banks who it knew were submitting artificial LIBOR rates.

92.     Tim Bond, a Barclays strategist has stated that the LIBOR submissions of other Contributing Banks in September 2007 were "a little bit divorced from reality."[38]  On November 16, 2007, a submitter wrote in an email to another submitter that LIBOR was "unrealistically low."[39] On November 27, 2007, a Barclays manager observed that "other banks 'are reluctant to post higher

---

[37]     *Id.* ¶ 89.

[38]     *See* Gavin Finch & Elliott Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg, May 29, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

[39]     FSA Barclays ¶ 116.

and because no one will get out of the pack, the pack sort of stays low.'"[40]  On November 28, 2007, a submitter wrote to a manager that LIBOR was "not reflecting the true cost of money.  One submitter told a manager in December 2007 that he was worried that all of the Contributing Banks were "contributing patently false rates" and were "therefore being dishonest."[41]

93.      Despite this knowledge, Barclays's submitters were instructed not to stick their "heads above the parapet," that is, not to make a submission inconsistent with those made by other Contributing Banks.[42]   This directive came from Barclays's senior management.  For instance, Barclays's COO Jerry del Missier has testified before Parliament that Barclays's CEO Bob Diamond instructed him to lower Barclays's LIBOR submissions.

94.      Barclays's submitters heeded these instructions.  One submitter wrote on November 16, 2007 that he made a LIBOR submission that was lower than Barclays's true cost of borrowing "because of the reputational risk."[43]  A submitter wrote on November 19, 2007 that he had been asked by a manager "to keep libors within the group (pressure from above)."[44]  And, on November 28, 2007, a submitter wrote that he made a LIBOR submission designed to be within the "pack" even though "[t]he true cost of money is anything from 5-15 basis points higher."[45]

95.      On April 27, 2008, a Barclays manager reflected "to the extent that, um, the LIBOR have been understated, are we guilty of being part of the pack? You could say we are."[46]

---

[40]   DOJ Barclays ¶ 43 .

[41]   *Id.* ¶ 171.

[42]   *Id.*

[43]   *Id.* ¶ 116.

[44]   *Id.*

[45]   *Id.* ¶ 117.

[46]   FSA Barclays ¶ 131.

96.     Because Barclays's LIBOR submissions were still high in comparison to those of other banks, senior management instructed Barclays's submitters to lower their LIBOR submissions even further in October 2008.  The most senior submitter for LIBOR wrote to his supervisor in response to this instruction: "I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested. . . . I will be contributing to rates that are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."[47]

97.     Barclays openly traded its prospective LIBOR submissions with other Contributing Banks.  For example, in a November 28, 2007 email a Barclays's submitter wrote:  "[B]rokers tell me that [another bank] is going to set at 5.15 for both [2 month and 3 month LIBOR] (up 8.5 and 10 from yesterday)."[48]  Barclays managers often instructed submitters to stay within 10 basis points of "the next highest contributor," something that could only be achieved if the submitter had information about other Contributing Banks' future submissions.[49]  When Barclays overhauled its LIBOR submission policy in June 2010, it banned this practice by adopting "fundamental rules" that submitters are "not to have any communications with other banks or market participants [such as brokers] that could be seen as an attempt to agree on or impact LIBOR levels."[50]

98.     On some days, Barclays LIBOR submissions were not only dishonest, but demonstrably false.  For example, on November 28, 2007, Barclays submitted a one month U.S. Dollar interest rate that was thirty basis points lower than an actual interest rate offered to Barclays in order to avoid, in the words of a manager, "a shit storm."[51]  And, on September 18, 2008,

---

[47]   CFTC Barclays at 24.

[48]   FSA Barclays ¶ 117.

[49]   DOJ Barclays ¶ 37; CFTC Barclays at 22.

[50]   FSA Barclays ¶ 155.

[51]   *Id.* ¶ 118.

Barclays submitted a one month U.S. Dollar interest rate that was twenty-five basis points lower than the actual interest rate at which Barclays had borrowed money.[52]

99.     After its investigation, DOJ concluded:

> From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that underreported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been. Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs.  Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel.  Consequently, on some occasions, Barclays submitted rates that were *false* because they were lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR.[53]

## F.     Direct Evidence that RBS Conspired To Suppress LIBOR

100.     RBS has also reached settlements with U.S. and U.K. authorities as to its participation in LIBOR manipulation.  On February 6, 2013, RBS agreed to pay a financial penalty of £87.5 million to the FSA;[54]  $325 million to the CFTC;[55] and $150 million to DOJ.[56]  In total, RBS agreed to pay $612 million.

101.     As part of its agreement with DOJ, RBS acknowledged that DOJ would file a criminal information alleging "one count of price-fixing in violation of the Sherman Act, Title 15 United States Code, Section 1."[57]  More specifically, it admitted the following facts:

---

[52]   *Id.* ¶ 142.

[53]   DOJ Barclays ¶ 36.

[54]   FSA RBS ¶ 1.

[55]   CFTC RBS at 39.

[56]   Deferred Prosecution Agreement ¶ 7, *United States v. Royal Bank of Scotland PLC,* (D. Conn. Feb. 5, 2013), *available at* http://www.justice.gov/atr/cases/f292500/292555.pdf.

[57]   *Id.* at 1.

- "At various times from at least 2006 through 2010, certain RBS Yen and Swiss Franc derivatives traders - whose compensation from RBS was directly connected to their success in trading financial products tied to LIBOR - attempted to manipulate and did manipulate RBS's LIBOR submissions for the benchmark interest rates in those currencies in order to benefit their derivatives trading positions."[58]

- "From approximately mid-2006 through 2010, in London, Tokyo, and elsewhere, a number of RBS employees engaged in efforts to manipulate Yen LIBOR to benefit RBS's trading positions and thereby benefit themselves.  This conduct encompassed hundreds of instances in which RBS employees sought to influence Yen LIBOR rates in two principal ways: (1) internally at RBS through requests by derivatives traders for favorable LIBOR submissions and (2) through communications with a derivatives trader at another Contributor Panel bank."[59]

- "[One manager] was aware of, and at times participated in, the manipulation of the RBS Yen LIBOR submissions by derivatives traders as described above."[60]

- "At least as early as February 2007, an RBS derivatives trader, Trader-3, and Tom Alexander William Hayes ('Hayes'), a derivatives trader at a Japanese subsidiary of another Yen LIBOR Contributor Panel bank, UBS AG ('UBS'), agreed to request that their respective Yen LIBOR submitters contribute Yen LIBOR submissions to benefit their trading positions."[61]

- "When RBS's Yen LIBOR and Swiss Franc LIBOR derivatives traders made requests of RBS's LIBOR rate submitters in order to influence RBS's benchmark interest rate submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed benchmark rates on various occasions. . . . Likewise, when traders, former traders, and/or submitters, including some at RBS, agreed to coordinate requests for favorable Yen LIBOR submissions, and when LIBOR submitters accommodated those requests, the manipulation of submissions affected the fixed benchmark rates on various occasions."[62]

- "When the requests of derivatives traders for favorable LIBOR submissions influenced the RBS rate submitters' contributions, RBS's rate submissions were false and misleading.  In making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct

---

[58]  *Id.*, Attach. A ¶ 13.

[59]  *Id.*, Attach. A ¶ 18.

[60]  *Id.*, Attach. A ¶ 40.

[61]  *Id.*, Attach. A ¶ 43.

[62]  *Id.*, Attach. A ¶¶ 75-76.

in an effort to gain an advantage over their counterparties.  As part of that effort: (1) derivatives traders and submitters submitted, and caused the submission of, materially false and misleading LIBOR contributions; and (2) derivatives traders, after initiating and while continuing their effort to manipulate LIBOR contributions, negotiated and entered into derivatives transactions with counterparties knowing that that those counterparties were unaware of the efforts by RBS employees to manipulate the relevant LIBOR rate."[63]

- "Traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen LIBOR submissions, causing the manipulation of the LIBOR reference rate on certain occasions." [64]

102.    Prior to, during, and after the height of the financial crisis, RBS made LIBOR submissions and encouraged other banks to make LIBOR submissions that did not reflect their true cost of borrowing.

103.    RBS's traders routinely asked RBS's submitters to modify their LIBOR submissions. While these requests often concerned LIBOR submissions for the Japanese Yen and the Swiss Franc, FSA has identified at least five instances where RBS's traders asked RBS's submitters to modify their LIBOR submissions in writing between October 2006 and November 2010.[65]  Many such requests, however, were made orally, rather than in writing.

104.    Managers were aware of and condoned these requests.  The CFTC has concluded, for example, that "the manager responsible for RBS's global Yen derivatives trading, was not only aware of improper requests for false submissions by others, but also personally asked . . . traders . . . to submit rates to benefit his positions."[66]

---

[63]   *Id.*, Attach. A ¶ 81.

[64]   *Id.*, Attach. A ¶ 82.

[65]   FSA RBS ¶¶ 7, 48, 73, 74.

[66]   CFTC RBS at 10.

105.     During the financial crisis, RBS traders and managers also knew that other banks were making LIBOR submissions that did not reflect their true cost of borrowing and that interdealer brokers were facilitating LIBOR manipulation.  On August 20, 2007, Paul Walker, RBS's head of money-markets trading in London and the person responsible for U.S. Dollar LIBOR submissions, called his colleague Scott Nygaard, who was in charge of short-term markets in Asia. Walker said: "People are setting to where it suits their book . . . Libor is what you say it is."  Nygaard responded:  "Yeah."[67]  The same day, a manager sent an instant message to a trader, saying "it seems to be [UBS] is pushing for these libors partnering up with number of cash guys as well."[68]

106.     RBS lowered its submissions to match those of the other Contributing Banks during the financial crisis.  As a result, RBS's submissions during the financial crisis were inconsistent with other economic indicators of RBS's borrowing costs.  *See infra* Part VI.

107.     On his last day at RBS, John Hourican, who was RBS's chief executive of markets and international banking during the financial crisis, issued a statement to his staff admitting to RBS's LIBOR manipulation: "Although the attempts to influence LIBOR submissions started before I took this job, it continued whilst I was in charge of the division.  The continuation of this behaviour during the company's darkest hours, when so many of us were fighting to ensure its survival, makes it all the more shameful."[69]

### G.     Direct Evidence that UBS Conspired To Suppress LIBOR

---

[67]     Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, *available at* http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

[68]     CFTC RBS at 14.

[69]     John Hourican, *Hourican's Farewell to RBS Staff*, Financial News, Feb. 6, 2013, *available at* http://www.efinancialnews.com/story/2013-02-06/rbs-john-hourican-memo.

108.    UBS has reached settlements with U.S., U.K., and Swiss authorities as to its participation in LIBOR manipulation.  On December 19, 2012, UBS agreed to pay £160 million to FSA;[70] $700 million to the CFTC;[71] $500 million to DOJ; and $64 million to the Swiss Financial Market Supervisory Authority ("FINMA").

109.    In December 2012, UBS entered into a non-prosecution agreement with DOJ, pursuant to which, UBS admitted that it had agreed with other Contributing Banks to submit, and did submit, false information to the BBA.  More specifically, it admitted the following facts:

- "Beginning in 2006, in Zurich, Tokyo, and elsewhere, several UBS employees engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen LIBOR . . . to benefit UBS's trading positions.  This conduct encompassed hundreds of instances in which UBS employees sought to influence benchmark rates; during some periods, UBS employees engaged in this activity on nearly a daily basis.  In furtherance of these efforts to manipulate Yen benchmarks, UBS employees used several principal and interrelated methods, including . . . :  a) internal manipulation within UBS of its Yen LIBOR . . . submissions; b) use of cash brokers to influence other Contributor Panel banks' Yen LIBOR submissions by disseminating misinformation; and c) efforts to collude directly with employees at other Contributor Panel banks, either directly or through brokers, in order to influence those banks' Yen LIBOR submissions."[72]

- UBS traders "engaged in this conduct on the majority of total trading days during [the] more-than-three-year period" between September 2006 and September 2009.[73]

- At least one new LIBOR submitter trained at UBS was "instructed that the primary factor in determining UBS's Yen LIBOR submissions each day was the UBS Yen derivatives traders' requests, which were to be accommodated."[74]

- "From at least 2007 and at various times through January 2010, two UBS Yen derivatives traders also used cash brokers to manipulate Yen LIBOR submissions by enlisting these brokers to disseminate misinformation to other Contributor

---

[70]   FSA UBS ¶ 1.

[71]   CFTC UBS at 59.

[72]   DOJ UBS ¶ 22.

[73]   *Id.* ¶ 24.

[74]   *Id.* ¶ 26.

Panel banks regarding Yen LIBOR."[75]  For example, one UBS trader used a particular broker firm to broker his (high-volume) derivative trades; "[a]nother broker at that firm, Broker-A2, distributed a daily email to the Contributor Panel banks, which included 'SUGGESTED LIBORS' purporting to represent where that broker thought Yen LIBOR should be set that day based on his/her market knowledge and experience.  Trader-1 used Broker-A1 to pass along requests to Broker-A2 to adjust these suggested LIBORs to benefit Trader-1's trading positions.  Broker-A2, at least on some occasions, accommodated these requests.  Trader-1's manager, who was well-aware of this manipulative tactic, later estimated that during one six-month period in 2007, this scheme was used on a daily basis and had a 50% to 60% success rate."[76]  The suggested LIBORs distributed by the broker firm were influential; "indeed, Broker-A2's suggestions appear to have been wholly adopted by Yen LIBOR submitters at three other Contributor Panel banks during certain time periods."[77]

- The same trader "also enlisted cash brokers to improperly influence other Contributor Panel banks' Yen LIBOR submissions through telephone conversations between brokers and Yen LIBOR submitters at the other panel banks."[78]  As an example, "in a March 31, 2009 electronic chat, Trader-1 asked Broker-C to help influence 9 of the 16 Contributor Panel banks by convincing them to lower their LIBOR submissions from the previous day, thus lower[ing] the resulting 1-month and 3-month Yen LIBOR fix . . . .  That day, consistent with Trader-1's request, 6 of the 9 Contributor Panel banks . . . lowered their 1-month Yen LIBOR submissions relative to the previous day, and the resulting published 1-month Yen LIBOR fix dropped by a full basis point from the day before."[79]

- The same UBS trader also "communicated with derivatives traders at other Yen LIBOR Contributor Panel banks in an effort to manipulate Yen LIBOR to benefit his trading positions."[80]  For example, the trader "asked his counterpart derivatives trader ('Trader-C') at a . . . Contributor Panel bank ('Bank-C') to have Bank-C contribute Yen LIBOR submissions to benefit UBS's Yen derivatives trading positions.  . . . [I]n a January 29, 2007 electronic chat with Trader-1, Trader-C asked: '[A]nything you need on libors today?  High 6m would help me.'  Trader-1 responded, 'high 3m I'll sort our 6m rate for you thanks.'  As

---

[75]   *Id.* ¶ 40.

[76]   *Id.* ¶ 44.

[77]   *Id.* ¶ 49.

[78]   *Id.* ¶ 51.

[79]   *Id.* ¶ 53.

[80]   *Id.* ¶ 62.

promised, Trader-1 made a request to the UBS Yen LIBOR submitter for a high 6-month contribution."[81]

- This trader openly boasted of his market manipulation to traders at other Contributing Banks, telling one that "'*3[month] libor is too high cause I have kept it artificially high.*'"[82]

- UBS's U.S. Dollar LIBOR submitters also routinely submitted false information concerning the rates at which they believed UBS would be able to borrow in the money markets. For instance, on August 9, 2007, the head of UBS's Asset and Liability Management group wrote the following to the manager of the derivatives trading desk that submitted the majority of UBS's LIBOR contributions, among others: "[I]t is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and [profit and loss] thereof is second priority for now."[83] The next day, UBS dropped its submission by 50 basis points.

110.    The CFTC also released a summary of the factual findings of its investigation, which concluded that prior to, during, and after the height of the financial crisis, UBS made LIBOR submissions and encouraged other banks to make LIBOR submissions that did not reflect their true cost of borrowing. The CFTC has concluded that "UBS's benchmark interest rate submissions frequently were not a reflection of UBS's assessment of the costs of borrowing funds."[84]

111.    UBS's traders routinely asked UBS's submitters to modify their LIBOR submissions. While these requests often concerned LIBOR submissions for Japanese Yen, FSA has also identified several instances where UBS's traders – including a manager – asked UBS's submitters to modify their LIBOR submissions.[85] Many such requests were made orally, rather than in writing.

---

[81]    *Id.* ¶ 66.

[82]    *Id.* ¶ 63 (emphasis added).

[83]    *Id.* ¶ 105.

[84]    CFTC UBS at 3.

[85]    FSA UBS ¶¶ 9(e), 92(d).

112.     UBS's submitters would also solicit requests to change UBS's LIBOR submissions from other traders.[86]  Until September 2009, UBS's submitters wore dual hats as derivatives traders and manipulated UBS's LIBOR submissions to benefit their own trading positions.[87]

113.     The CFTC has concluded that requests to modify UBS's LIBOR submissions were "routine"; that UBS's traders "believed that LIBOR was vulnerable to manipulation at their whim and for their benefit"; and that UBS's traders believed that they had succeeded in moving LIBOR at times.[88]

114.     During the financial crisis UBS knew that other banks were making LIBOR submissions that did not reflect their true cost of borrowing and made LIBOR submissions that did not reflect UBS's true cost of borrowing in order to cultivate the perception that these banks were doing well financially.  For instance, in a September 22, 2008 instant message conversation between two UBS employees, one declared LIBOR to be a fiction:

| | |
|---|---|
| UBS Employee 1: | why is the [Investment Bank] cash curve for USD so much higher than Libor?  Offered 35bps above libor currently |
| UBS Employee 2: | because the real cash market isn't trading anywhere near Libor . . . Libors currently are even more fictitious than usual |
| UBS Employee 1: | isn't libor meant to represent the rate at which banks lend to each other? |
| UBS Employee 2: | that's the theory . . . in practise, it's a made up number . . . hence all criticism it was getting a few months ago |
| UBS Employee 1: | why do banks undervalue in times like this? |

---

[86]   *Id.* ¶ 108(b).

[87]   CFTC UBS at 6.

[88]   *Id.* at 18.

UBS Employee 2:      so as not to show where they really pay in case it creates
headlines about the bank being desperate for cash . . . I
suspect[89]

115.     UBS consistently lowered its own LIBOR submissions to be in line with those from

other banks.  UBS's Group Treasury and Asset Liability Management Group issued an informal

directive to UBS's submitters to lower UBS's LIBOR submissions.[90]  UBS's submitters were initially

instructed to "err on the low side" and later instructed to stay "in the middle of the pack."[91]  When

one of UBS's submitters went on vacation in December 2008, he left a note directing his

replacement to submit rates that would be "roughly in the middle of the pack."[92]  DOJ found

communications reflecting the "middle of the pack" directive into late 2008 and early 2009.[93]

116.     On April 9, 2008, UBS submitted a three-month U.S. Dollar interest rate that was

higher than what it was paying in the market.[94]  When a *Wall Street Journal* reporter asked via email

why UBS was paying twelve basis points more for commercial paper than its LIBOR submission, a

senior manager remarked to another senior manager that the honest answer to the reporter's

question would be "because the whole street was doing the same and because we did not want to be

an outlier in the libor fixings, just like everybody else."[95]

117.     In response to this media pressure, UBS briefly moved its submissions closer to its

actual borrowing costs in early June 2008.  But, UBS reversed course by the middle of the month.

During the week of June 16, 2008 "a Zurich-based UBS senior manager directed U.S. Dollar

---

[89]     DOJ UBS ¶101.

[90]     FSA UBS ¶¶ 22, 98, 109, 115.

[91]     CFTC UBS at 4.

[92]     FSA UBS ¶ 126.

[93]     DOJ UBS ¶ 124.

[94]     FSA UBS ¶ 118.

[95]     DOJ UBS ¶ 117.

submitters to lower their submissions over the next three days 'to get in line with the competition' because, by contributing LIBOR submissions closer to [its true costs of borrowing], UBS was becoming an outlier relative to the other Contributor Panel Banks."[96]  The submitters complied with this instruction and on June 18, 2008, UBS's 3-month LIBOR submissions dropped 5 basis points with the result that UBS's submission was close to the middle of the Contributing Banks' submissions.

118.    The CFTC has concluded that UBS made "false" LIBOR submissions between August 2007 and mid-2009 "to protect itself from media speculation concerning its financial stability during the financial crisis."[97]

### H.    Direct Evidence that Lloyds and HBOS Conspired To Suppress LIBOR

119.    Lloyds has reached settlements with U.S. and U.K. authorities as to its participation in LIBOR manipulation.  On July 28, 2014, Lloyds agreed to pay £105 million to FCA,[98] $105 million to the CFTC,[99] and $86 million to DOJ.[100]  In total, Lloyds paid almost $370 million in fines.

---

[96]    *Id.* ¶ 120.

[97]    CFTC UBS at 2.

[98]    U.K. Financial Conduct Authority, Final Notice to Lloyds Bank plc & Bank of Scotland plc ("FCA Lloyds"), ¶ 1 (July 28, 2014), *available at* http://www.fca.org.uk/static/documents/final-notices/lloyds-bank-of-scotland.pdf.

[99]    *In the Matter of Lloyds Banking Group plc & Lloyds Bank plc*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC Lloyds"), at 23 (CFTC Dkt. No. 14-18) (July 28, 2014), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enflloydsorderdf072814.pdf.

[100]    DOJ Office of Public Affairs, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), *available at* http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

120.     In July 2014, Lloyds entered into a non-prosecution agreement with DOJ, pursuant to which Lloyds admitted that it had submitted false information to the BBA.  More specifically, it admitted the following facts:

- "Between at least as early as 2006 and at least as late as July 2009, Yen, Dollar, and Pound Sterling LIBOR submitters at [Lloyds] and HBOS submitted LIBOR rates intended to benefit trading positions, rather than rates that complied with the definition of LIBOR. The submitters contributed these improper rates in order to benefit their own trading positions or the trading positions of others."[101]

- The U.S. Dollar LIBOR submitter at HBOS "contributed rates intended to benefit HBOS's trading positions instead of rates that complied with the definition of LIBOR" between "at least as early as January 2008 and February 2009."[102]

- The U.S. Dollar LIBOR submitter at Lloyds "contributed rates to benefit [Lloyds] and, after the acquisition, HBOS's trading positions instead of rates that complied with the definition of LIBOR" between "at least as early as May 2008 and at least as late as May 2009."[103]

- "When [Lloyds] and HBOS submitters . . . contributed rates to benefit their own or others' trading positions, the manipulations of the submissions affected the fixed rates, at least on occasion."[104]

- "Submitters and traders who tried to manipulate LIBOR submissions understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions."[105]

- "When submitters made submissions that took trading positions into account, the submissions they contributed were false and misleading. . . . Moreover, the traders and submitters involved in the making of these false and misleading submissions were engaged in a deceptive course of conduct in an effort to gain an advantage over their

---

[101]   Deferred Prosecution Agreement, Statement of Facts, *United States v. Lloyds Banking Group plc*, No. 14-cr-165-AWT, ¶ 14 (Dkt. No. 6) (D. Conn. July 28, 2014) ("DOJ SOF Lloyds"), *available at* http://lib.law.virginia.edu/Garrett/prosecution_agreements/sites/default/files/pdf/lloyds_banking.pdf.

[102]   *Id.* ¶ 15.

[103]   *Id.* ¶ 18.

[104]   *Id.* ¶ 40.

[105]   *Id.* ¶ 44.

counterparties.  As part of that effort: (1) traders and submitters submitted and caused the submission of materially false and misleading LIBOR contributions; and (2) traders and submitters, both before and after initiating and continuing their efforts to manipulate LIBOR contributions, negotiated and entered into transactions with counterparties that did not know that [Lloyds] and HBOS employees were attempting to manipulate the relevant rate." [106]

121.    The CFTC and FCA released summaries of the factual findings of their investigations in July 2014.  The FCA's and CFTC's investigations concluded that Lloyds and HBOS manipulated their U.S. Dollar LIBOR submissions to benefit money market trading positions between at least January 2008 and May 2009.[107]

122.    On January 17, 2008, for example, an HBOS trader contracted the HBOS U.S. Dollar LIBOR submitter and wrote, "3mth higher today pls!"  The submitter replied, "Should be 92 for guide ill put in 93 to get counted."[108]

123.    On May 19, 2009, a trader who was a former U.S. Dollar LIBOR submitter at a subsidiary of Lloyds wrote to the then-current U.S. Dollar LIBOR submitter:  "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's."  Later that day, the then-current U.S. Dollar LIBOR submitter told the trader in a phone call:  "obviously we got the Libors down for you."[109]

124.    Regulators have concluded that the language used by traders to request the manipulation of U.S. Dollar LIBOR submissions suggest that the practice of making such requests

---

[106]   *Id.* ¶ 45.

[107]   FCA Lloyds ¶ 2.12(2); CFTC Lloyds at 3.

[108]   CFTC Lloyds at 10.

[109]   DOJ Office of Public Affairs, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), *available at* http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

was "casual and routine."[110]  Regulators also found that managers at Lloyds and HBOS were involved in or knew about, and permitted the practice of manipulating U.S. Dollar LIBOR.

125.    The FCA's and CFTC's investigations also concluded HBOS manipulated its U.S. Dollar LIBOR submissions to influence market perception of its financial strength in response to at least two management directives in September and October 2008.  In keeping with these directives, U.S. Dollar LIBOR submitters made artificially low LIBOR submissions for many months.[111]

126.    On September 26, 2008, for example, a HBOS manager instructed a trader to lower the bank's U.S. Dollar LIBOR submission so that it would be in line with the submissions from other banks.  The trader wrote in a message to another colleague, "ive been pressured by senior management to bring my rates down into line with everyone else."[112]  The trader reduced his three-month U.S. Dollar LIBOR submission for September 26, 2008 by 55 basis points.[113]

127.    On July 28, 2014, Lloyds issued a press release announcing that it had reached settlements with U.K. and U.S. authorities "regarding the manipulation . . . of . . . submissions to the British Bankers' Association (BBA) London Interbank Offered Rate (LIBOR)," and acknowledging that Lloyds employees engaged in the "totally unacceptable" "manipulation of submissions . . . between May 2006 and 2009." [114]  Lloyd's Chairman, Lord Blackwell, is quoted as saying, "The Board regards the actions of these individuals between 2006 and 2009 as completely

---

[110]   FCA Lloyds ¶ 4.34.

[111]   FCA Lloyds ¶ ¶ 2.13, 4.51; CFTC Lloyds at 3, 16.

[112]   FCA Lloyds ¶ 4.54.

[113]   CFTC Lloyds at 15.

[114]   Lloyds Banking Group, *Settlements Reached on Legacy LIBOR and BBA Repo Rate Issues* (July 28, 2014), *available at* http://www.lloydsbankinggroup.com/globalassets/documents/investors/2014/2014jul28_lbg_settlements_reached.pdf.

unacceptable."[115]  Lloyd's Chief Executive, António Horta-Osório, is quoted as saying, "The behaviours identified by these investigations are absolutely unacceptable.  We take the findings of these investigations, which relate to issues from some years ago, extremely seriously." [116]

## I.    Direct Evidence that Rabobank Conspired To Suppress LIBOR

128.    Rabobank has reached settlements with U.S. and U.K. authorities as to its participation in LIBOR manipulation.  On October 29, 2013, Rabobank agreed to pay £105 million to the FCA,[117] $475 million to the CFTC,[118] and $325 million to DOJ.[119] In addition, Rabobank paid roughly $96 million to Dutch authorities.[120]  These fines total roughly $1.07 billion.[121]

129.    In October 2013, Rabobank entered into a non-prosecution agreement with DOJ, pursuant to which, UBS admitted that it had submitted false information to the BBA.[122]  More specifically, it admitted the following facts:

---

[115]   *Id.*

[116]   *Id.*

[117]   U.K. Financial Conduct Authority, Final Notice to Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ('Rabobank') ("FCA Rabobank"), ¶ 1 (Oct. 29, 2013), *available at* http://www.fca.org.uk/static/documents/final-notices/rabobank.pdf.

[118]   *In the Matter of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, Order Instituting Proceedings Pursuant to §§ 6(c) & 6(d) of the Commodity Exch. Act, Making Findings & Imposing Remedial Sanctions ("CFTC Rabobank"), at 51 (CFTC Dkt. No. 14-02) (Oct. 29, 2013), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfra bobank102913.pdf.

[119]   DOJ Office of Public Affairs, *Rabobank Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $325 Million Criminal Penalty* (October 29, 2013), *available at* http://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty.

[120]   David Hou & David Skeie, *LIBOR: Origins, Economics, Crisis, Scandal, and Reform*, Federal Reserve Bank of New York Staff Reports, at 7 n.7 (March 2014), *available at* http://www.newyorkfed.org/research/staff_reports/sr667.pdf.

[121]   *Id.*

[122]   Deferred Prosecution Agreement, Statement of Facts, *United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, (D. Conn. Oct. 29, 2013) ("DOJ SOF Rabobank"), *available at* http://www.justice.gov/iso/opa/resources/976201310298727797926.pdf.

- "From at least as early as September 2005 through approximately December 2008, in New York, London, and Utrecht, multiple Rabobank Dollar swaps traders made frequent requests for favorable Dollar LIBOR contributions to the Rabobank Dollar LIBOR submitters on the London money markets desk.  Rabobank Dollar LIBOR submitters accommodated the requests on numerous occasions and submitted Rabobank's Dollar LIBOR contributions consistent with the requests."[123]

- Multiple Rabobank employees reported that at least two swaps traders made "regular verbal requests" to the U.S. Dollar LIBOR submitters "for submissions that would benefit their positions."[124]

- Accommodating requests from traders to manipulate Rabobank's U.S. Dollar LIBOR submissions "was a regular part of the rate setting process at Rabobank."[125]  For example, on November 15, 2007, one Rabobank submitter explained to a second submitter: "The fixinh should be done by cash desk in agreement with deriv. I do the fixing I ask swap desk what they have." The second submitter replied:  "[One trader] had big fixing so we help him today," and further explained: "i am low because [that trader] has fixing ..i go higher tomorrow."[126] Similarly, on the morning of Monday, August 13, 2007, a trader messaged a U.S. Dollar LIBOR submitter:  "High 3s and 6s pls today mate (esp 6mths!!) if u would be so kind.. Gotta make money somehow!"  The submitter replied: "cool."  The trader messaged back:  "Cheers . . . Every little helps!"[127]

- "Certain mid-level Rabobank managers were aware of, and participated in, the internal manipulation of LIBOR submissions by derivatives traders."[128]  Rabobank's Global Head of Liquidity and Finance knew that requests were made to Rabobank's U.S. Dollar LIBOR submitters to contribute submissions to benefit traders' books; he not only tolerated this activity, but directly participated in it.[129]  Rabobank's Head of Interest Rate Derivatives for North America made at least one request to the U.S. Dollar LIBOR submitter to benefit his own trading book.[130]

- "When Rabobank derivatives traders made requests of Rabobank rate submitters in order to influence Rabobank's benchmark interest rate submissions, and when the

---

[123]  *Id.* ¶ 16.

[124]  *Id.* ¶ 18.

[125]  *Id.* ¶ 19.

[126]  *Id.*

[127]  *Id.* ¶ 21.

[128]  *Id.* ¶ 85 (footnote omitted).

[129]  *Id.* ¶ 86.

[130]  *Id.* ¶ 89.

submitters accommodated those requests, the manipulation of the submissions affected the fixed rates on various occasions."[131]

- "In the instances when the published benchmark interest rates were manipulated in Rabobank's favor due to Rabobank's manipulation of its own or any other Contributor Panel bank's submissions, that manipulation benefited Rabobank derivatives traders to the detriment of counterparties . . . . Certain Rabobank derivatives traders and rate submitters who tried to manipulate LIBOR . . . understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions." [132]

- "When the requests of derivatives traders for favorable LIBOR . . . submissions were taken into account by the Rabobank rate submitters, Rabobank's rate submissions were false and misleading. . . .  Moreover, in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties." [133]

130.    The CFTC and FCA released summaries of the factual findings of their investigations.  The CFTC's investigation concluded that Rabobank's submitters regularly skewed their U.S. Dollar LIBOR submissions to benefit the bank's trading positions over more than three years, from at least mid-2005 to at least late 2008.[134]  The FCA found 112 documented internal requests regarding manipulation of Rabobank's U.S. Dollar LIBOR submissions.[135]  The FCA also found that managers were involved in or aware of at least 21 of these requests.[136]  On October 6, 2006, for example, a trader wrote to a manager, "HELLO SKIPPER, CAN U PUT 3S AT 37 FOR

---

[131]   *Id.* ¶ 91.

[132]   *Id.* ¶ 96.

[133]   *Id.* ¶ 97.

[134]   CFTC Rabobank at 7, 8.

[135]   FCA Rabobank ¶ 2.6(2).

[136]   *Id.* ¶ 4.13.

ME TOMORROW PLS . . . MANY THANKS." The manager responded, "NEVER IN DOUBT!" The next day, Rabobank made a 5.37 three-month U.S. Dollar LIBOR submission.[137]

131.    One senior manager was regularly involved in the practice of making false U.S. Dollar LIBOR submissions. This senior manager encouraged the submitters and traders he supervised to speak openly about their trading positions and make LIBOR submissions to benefit Rabobank traders' U.S. Dollar trading positions.[138]

132.    A senior derivatives trader in London nicknamed the "Ambassador" regularly made oral requests for U.S. Dollar LIBOR submissions that benefited his trading positions.[139] Other traders knew this and deferred to the Ambassador's preferences regarding Rabobank's U.S. Dollar LIBOR submissions. For example, on August 15, 2006, a trader wrote to a submitter, "If the Ambass doesnt hv any preferences, can I have low 1s and 3s the next few days pls matey."[140]

133.    Derivatives traders in New York often made their requests through Bloomberg chats and internal emails.[141] For example, on October 17, 2007, one trader emailed a submitter, "A nice low 1 month for the rest of the week please matey."[142]

134.    The FCA also concluded that Rabobank colluded with individuals from other U.S. Dollar LIBOR panel banks to make submissions favoring trading positions.[143]

135.    On October 29, 2013, Rabobank issued a press release announcing its settlements with U.S. and U.K. authorities. The press release stated, "30 Rabobank employees were in some

---

[137]   *Id.* ¶ 4.16(1).

[138]   CFTC Rabobank at 7-8.

[139]   *Id.* at 8.

[140]   *Id.* at 11 (emphasis omitted).

[141]   *Id.* at 8.

[142]   *Id.* at 10.

[143]   FCA Rabobank ¶ 2.11.

way involved in inappropriate conduct."[144]  The press release reported that the government

investigations found the following:

- "A number of employees inappropriately sought to influence certain Rabobank Libor . . . submissions between 2005 and 2010."[145]

- "Some Rabobank employees also inappropriately communicated with employees at other banks and brokers about certain Libor . . . submissions between 2005 and early 2011." [146]

**J.    Defendants Used Their Influence over the BBA To Further the Conspiracy**

136.    BBA staff knew or suspected that Contributing Banks were making LIBOR

submissions that did not reflect their true costs of borrowing during the financial crisis.  The BBA

did not act to reform LIBOR or to warn the public and the market that LIBOR had been

compromised.

137.    The BBA committees responsible for policing LIBOR – the Steering Committee and

Foreign Currency and Money Market ("FX & MM") Committee – were composed of bank

executives, including representatives from banks that U.S. and U.K. authorities had already

concluded manipulated LIBOR.  RBS, for example, was represented on both committees.

138.    *The Wall Street Journal* has reported that on November 15, 2007, the Bank of England

called a meeting attended by executives from the Contributing Banks and John Erwin, an employee

of the BBA who managed LIBOR, at which Defendants openly discussed that "Libor looked

---

[144]  Rabobank Press Release, *Rabobank Settles LIBOR and Euribor Investigations* (Oct. 29, 2013)*, available at* https://www.rabobank.com/en/press/search/2013/libor.html.

[145]  *Id.*

[146]  *Id.*

artificially low, signaling that banks might be understating their borrowing costs to mask their financial problems."[147]

139.   The *Wall Street Journal* has reported that when the BBA proposed licensing LIBOR to an independent third party in 2008, bank executives rejected it.  The BBA staffers who pitched the idea "got the impression that the big banks – which paid most of the BBA's bills through their membership fees – wanted Libor kept in-house so that they could continue to influence it."[148]

140.   Rather than rectify false and misleading LIBOR rates, the BBA took steps to insulate itself from future liability.  In 2009, the BBA incorporated a subsidiary to house LIBOR so that the BBA would no longer own LIBOR directly.  *The Wall Street Journal* reported that "[o]ne person involved in the decision says the BBA hoped to shield itself from potential liability."[149]  When the U.S. and U.K. governments began investigating LIBOR manipulation, the BBA's board saw these investigations as a "nonissue because [LIBOR] was run out of a subsidiary."[150]

141.   In September 2012, Martin Wheatley, the managing director of the FSA, issued a report on LIBOR that recommended that the BBA be stripped of its oversight role with respect to LIBOR.  Wheatley concluded: "The British Bankers' Association clearly failed to properly oversee the LIBOR-setting process and should take no further role in the administration and governance of LIBOR."[151]

---

[147]   David Enrich & Max Colchester, *Before Scandal, Clash Over Control of Libor*, Wall St. J., Sept. 11, 2012, *available at* http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[148]   *Id.* (emphasis added).

[149]   *Id.*.

[150]   *Id.*

[151]   Martin Wheatley, Managing Director, FSA, Speech, *Pushing the Reset Button on LIBOR* (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928 mw.shtml.

8

142.    He identified three crucial flaws in the BBA's management of LIBOR:

Oversight of LIBOR is currently the responsibility of the Foreign Exchange and Money Markets Committee (FX&MM).  Its remit includes the design of the benchmark and the governance and scrutiny of all data and panel bank contributions.  One of the important functions played by FX&MM is to set, and periodically review, the parameters against which submissions are verified by Thomson Reuters.  The Fixings and Oversight subcommittees of FX&MM are respectively responsible for investigating issues with submissions, and taking necessary action against contributors.

These arrangements have a number of potentially significant limitations.

First, there appears to be insufficient independence built into these governance structures.  There is currently a substantial overlap between the roles of contributing banks in providing the inputs that are used to compile LIBOR, and in overseeing the LIBOR setting process (including technical and procedural standards). . . .

Second, oversight is insufficiently robust . . .

Third, there is an apparent lack of transparency . . . [f]or example . . . the membership of FX&MM and its subcommittees is not publicly known . . . .[152]

143.    Wheatley has subsequently characterized the BBA's approach to LIBOR as "careless" and noted that the two BBA committees that were supposed to oversee LIBOR "hardly ever met."[153]

144.    In February 2013, the BBA agreed to cede control of LIBOR to a new operator and, on July 9, 2013, the *Wall Street Journal* reported that the BBA sold LIBOR to NYSE Euronext, the company that runs the New York Stock Exchange.  NYSE Euronext would take over LIBOR in early 2014.[154]

---

[152]  Martin Wheatley, *The Wheatley Review of LIBOR: Final Report* at 82-83, September 2012, *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf.

[153]  Wheatley, *Pushing the Reset Button on LIBOR.*

[154]  David Enrich, et al., *NYSE Euronext to Take Over Libor*, Wall St. J., July 9, 2013, *available at* http://online.wsj.com/article/SB10001424127887324507404578595243333548714.html.

## V.      Criminal and Regulatory Enforcement Actions

145.      Investigations regarding the Contributing Banks' LIBOR manipulation are ongoing in the United States, Switzerland, Japan, the United Kingdom, Canada, the European Union, and Singapore, by at least ten different national governmental agencies, including the DOJ, the SEC, and the CFTC.  Regulatory authorities in several states are also conducting investigations.

146.      During the fall of 2010, U.S. regulators issued informal information requests to each of the 16 banks that contributed to setting U.S. Dollar LIBOR rates between 2005 and 2009.  In March 2011, those regulators issued subpoenas to UBS, Citigroup, and Barclays.  In August and September 2011, they subpoenaed additional entities including:  BTMU, Credit Suisse, Lloyds, Rabobank, RBC, SocGen, Norinchukin, and WestLB.

147.      Barclays has entered a non-prosecution agreement with the Criminal Division Fraud Section of the DOJ, whereby it has admitted to knowingly providing LIBOR submissions that were false because they improperly took into account the trading positions of its derivative traders as well as reputational concerns about negative media attention.[155]

148.      UBS has entered into a non-prosecution agreement with the Criminal Division Fraud Section of the DOJ, and its Japanese subsidiary has agreed to enter a guilty plea for violating the federal wire fraud statute.  On December 19, 2012, UBS agreed to pay a $100 million fine as part of the plea agreement between DOJ and UBS's Japanese subsidiary.  Pursuant to UBS's settlement agreements with regulators, it admitted that it had agreed with other Contributing Banks to submit, and did submit, false information to the BBA. [156]

---

[155]   *See* NPA Barclays.

[156]   Plea Agreement at 10, *United States v. UBS Sec. Japan Co., Inc.* (D. Conn. Dec. 19, 2012), *available at* http://www.justice.gov/criminal/vns/docs/2012/12/2012-12-19-UBS-Plea-Agreement.pdf.

149.     RBS has entered into a deferred prosecution agreement with the Criminal Division Fraud Section of the DOJ, and its Japanese subsidiary has agreed to enter a guilty plea for violating the federal wire fraud statute.[157]

150.     Lloyds has entered into a deferred prosecution agreement with the Criminal Division Fraud Section of the DOJ.[158]

151.     Rabobank has entered into a deferred prosecution agreement with the Criminal Division Fraud Section of the DOJ.[159]   Sanctions are also being imposed on Rabobank by the Dutch Public Prosecution Service.[160]

152.     Two former UBS traders – Thomas Hayes and Roger Darin – have been charged with crimes in the United States related to their role in manipulating LIBOR.  In addition, Hayes and two interdealer brokers – Terry Farr and Jim Gilmour – have been arrested by U.K. authorities in connection with the Serious Fraud Office's criminal LIBOR probe.[161]

153.     Other individuals employed by  Contributing Banks and their affiliates and brokers have engaged in illegal communications and conduct among  Contributing Banks to make inaccurate

---

[157]   Plea Agreement at 7, *United States v. RBS Sec. Japan Ltd.*, (D. Conn. Feb. 5, 2013), *available at* http://www.justice.gov/iso/opa/resources/217201326133540747939.pdf.

[158]   DOJ Office of Public Affairs, *Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty* (July 28, 2014), *available at* http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

[159]   DOJ Office of Public Affairs, *Rabobank Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $325 Million Criminal Penalty* (October 29, 2014), *available at* http://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty.

[160]   *Id.*

[161]   *See* Harry Wilson & Jonathan Russell, *Three Arrested in SFO Libor-Rigging Investigation*, Telegraph, Dec. 11, 2012, *available at* http://www.telegraph.co.uk/finance/libor-scandal/9737068/Three-arrested-in-SFO-Libor-rigging-investigation.html.

LIBOR submissions.  They include, but are not limited to, the following individuals who have been

identified in the press or by government agencies as the targets of investigations:

(a)   Yvan Ducrot was the co-head of UBS's rates business.  According to an article in the *Financial Times*, he was suspended by UBS in connection with international probes.[162]

(b)   Holger Seger was the global head of short-term interest rates trading at UBS.  According to an article in the *Financial Times*, Seger was suspended by UBS in connection with international probes.[163]

(c)   Paul White was a principal rate-setter for Yen LIBOR for RBS.  According to an article in *Bloomberg*, White was fired by RBS in 2011.[164]

(d)   Tan Chi Min was the head of short-term interest rates trading for Yen and the head of delta trading at RBS.  RBS is believed to have fired him because he tried to improperly influence the bank's rate-setters from 2007 to 2011, to persuade them to offer LIBOR submissions that would benefit his trading positions.[165]

(e)   Sim Suh-Ting was the executive director and head of regulatory risk and compliance for RBS in South East Asia.  According to allegations in a former RBS employee's wrongful termination suit, Ting advised others within RBS that it was acceptable for traders to make requests about the level at which the swap-offer rate was set.[166]

(f)   Todd Morakis was head of trading for emerging markets at RBS.  According to allegations in the same suit, Morakis "orally confirmed . . . that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'"[167]

(h)   Brent Davies was a sterling trader at RBS in London.  According to an article in the *Telegraph*, Mr. Davies was named in Canadian Competition Law Officer

---

[162]   *See* Megan Murphy & Cynthia O'Murchu, *UBS Suspends Traders in Libor Probe*, Financial Times, Feb. 15, 2012, *available at* http://www.ft.com/intl/cms/s/0/705a1102-571f-11e1-be5e-00144feabdc0.html.

[163]   See *id.*

[164]   *See* Andrea Tan, *RBS Rate Traders Sat With Libor Setter, Fired Banker Says*, Bloomberg, Mar. 27, 2012, *available at* http://www.bloomberg.com/news/2012-03-27/rbs-rate-traders-sat-with-libor-setter-fired-employee-tan-says.html.

[165]   *See id.*

[166]   *See id.*

[167]   *Id.*

Brian Elliott's May 18, 2011 affidavit in *In re Competition Act*, R.S.C. 1985 c.C-34, as amended, as one of the traders believed to be involved in the manipulation of Yen LIBOR.[168]  According to a Reuters article, Thomas Hayes explained to Davies who his collusive contacts were and how he had and was going to manipulate Yen LIBOR.[169]  Hayes also communicated his trading positions and his desire for certain movement in Yen LIBOR, and gave instructions for Davies's trader to get RBS to make Yen LIBOR submissions consistent with Hayes's wishes.  Davies acknowledged these communications and confirmed that he would follow through.  Hayes and Davies also deliberately entered into transactions that aligned their trading interests in regards to Yen LIBOR.

(i)     Will Hall was a derivatives trader at RBS in London.  He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR.[170]  According to a Reuters article, Thomas Hayes communicated to Hall his trading positions, his desire for a certain movement in Yen LIBOR, and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes; Hall agreed to do so.[171]

(j)     Paul Glands was a derivatives trader with JPMorgan Chase.  He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR.[172]  According to a Reuters article, Thomas Hayes communicated to Glands his trading positions, his desire for a certain movement in Yen LIBOR, and instructions to get JPMorgan Chase to make Yen LIBOR submissions consistent with his wishes; Glands agreed to do so.[173]

(k)     Stuart Wiley was a derivatives trader with JPMorgan Chase.  He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen

---

[168]   Jason Lewis & Glenn Johnson, *RBS Fights to Keep its Libor Records Secret*, Telegraph, July 8, 2012 ("Lewis & Johnson, *RBS Fights to Keep Libor Records Secret*"), *available at* http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9383859/RBS-fights-to-keep-its-Libor-records-secret.html.

[169]   Carrick Mollenkamp & Emily Flitter, *At Least Three Banks Seen Central to Libor Rigging*, Reuters, July 28, 2012 ("Mokkenkamp & Flitter, *Three Banks Central to Libor Rigging*"), *availale at* http://www.reuters.com/article/2012/07/28/us-banking-libor-traders-idUSBRE86R03220120728.

[170]   Lewis & Johnson, *RBS Fights to Keep its Libor Records Secret*.

[171]   Mollenkamp & Flitter, *Three Banks Central to Libor Rigging*.

[172]   Lewis & Johnson, *RBS Fights to Keep Libor Records Secret*.

[173]   Mollenkamp & Flitter, *Three Banks Central to Libor Rigging*.

LIBOR.[174]  According to the affidavit, an external trader communicated to Wiley his trading positions, his desire for a certain movement in Yen LIBOR, and instructions to get JPMorgan Chase to make Yen LIBOR submissions consistent with his wishes; Wiley agreed to do so.

(n)     Andrew Hamilton is a former investment advisor at RBS in London. According to an article in *Bloomberg*, Hamilton was dismissed by RBS on October 21, 2011, and now is listed as "inactive" on the FSA's register of people approved to work in the industry.[175]

(o)     Neil Danzinger is a former trader at RBS in London.  According to an article in *Bloomberg*, Danzinger was dismissed by RBS on October 21, 2011, and now is listed as "inactive" on the FSA's register of people approved to work in the industry.[176]

(q)     Darrell Read, a former employee of ICAP PLC, was named by the Canadian Competition Bureau for his involvement in the alleged manipulation.[177]

(r)     Jezri Mohideen was formerly RBS's head of Yen products.[178]  Mohideen was suspended from his current position as head of rates trading for Europe and Asia Pacific for RBS, "after Bloomberg News reported he instructed colleagues to lower the British lender's submission to the [LIBOR] in 2007."[179]

(s)     In July 2012, Barclays's CEO, Robert Diamond, resigned following Barclays's settlement with regulators.[180]  Barclays's Chairman, Marcus Agius, and its Chief Operating Officer, Jerry del Missier, also resigned.[181]  In December

---

[174]   Lewis & Johnson, *RBS Fights to Keep Libor Records Secret*.

[175]   Lindsay Fortado & Gavin Finch, *RBS Said to Dismiss Four Bankers as Libor Investigation Widens to Brokers*, Bloomberg, Feb. 9, 2012, *available at* http://www.bloomberg.com/news/2012-02-09/rbs-said-to-dismiss-4-bankers-as-libor-probe-widens-to-brokers.html.

[176]   *Id.*

[177]   *See* Jane Eaglesham et al., *Traders Manipulated Key Rate, Bank Says*, Wall St. J., Feb. 17, 2012, *available at* http://online.wsj.com/article/SB10001424052970204059804577227452963906044.html.

[178]   Gavin Finch & Liam Vaughan, *RBS Said to Suspend European Rates Trading Head on Libor*, Bloomberg, Oct. 15, 2012, *available at* http://www.bloomberg.com/news/2012-10-15/rbs-said-to-suspend-european-rates-trading-head-in-libor-probe.html.

[179]   *Id.*

[180]   Liam Vaughan & Ambereen Choudhury, *Barclays CEO Quits After Record Libor-Rigging Fine*, Bloomberg BusinessWeek, July 3, 2012, *available at* http://www.businessweek.com/articles/2012-07-03/barclays-ceo-quits-after-record-libor-rigging-fine.

[181]   Barclays News, Board Changes (July 2, 2012), *available at* http://www.newsroom.barclays.com/Press-releases/Board-changes-905.aspx.

2012, the Independent reported that "Barclays investment banking chief Rich Ricci recently told MPs that five traders had been fired and another 13 disciplined as a result of the scandal."[182]

(t)   David Casterson, or "Clumpy," a top executive at ICAP PLC, was included on emails between ICAP and UBS that discussed compensation for the manipulation of LIBOR.  Casterson allegedly signed off on an arrangement that included kick-backs to ICAP employees for successful manipulation of LIBOR rates.[183]

(u)   Paul Walker was RBS's head of money-markets trading in London.  In a January 28, 2013 article in *Bloomberg*, Walker is implicated in conspiring to manipulate LIBOR with Scott Nygaard, a Tokyo-based head of short-term markets.  The article quotes Walker as saying, "People are setting to where it suits their book," and further, "Libor is what you say it is."[184]

(v)   In September 2013, DOJ charged three former ICAP employees, Darrell Read, Daniel Wilkinson, and Colin Goodman, with two counts of wire fraud and conspiracy to commit wire fraud.  The complaint alleges that these ICAP employees participated in a scheme to manipulate Yen LIBOR rates.

(w)   In February 2013, Deutsche Bank suspended four traders for taking one another's positions into account when making LIBOR submissions.[185]

(x)   In August 2014, Paul Robson, a senior trader and Yen LIBOR submitter at Rabobank, pleaded guilty to one count of conspiracy to commit wire fraud and bank fraud for manipulating Yen LIBOR in U.S. federal court. The indictment charged that Robson conspired with fellow Rabobank traders Paul Thompson, Tetsuya Motomura, and Takayuki Yagami.[186]

---

[182]   James Moore, *Three Men Arrested in LIBOR Rigging Inquiry*, Independent, Dec. 11, 2012, *available at* http://www.independent.co.uk/news/uk/crime/three-men-arrested-in-libor-rigging-inquiry-8405989.html.

[183]   David Enrich, *Libor Scandal Hits ICAP Executive*, Wall St. J., June 26, 2013, *available at* http://online.wsj.com/article/SB10001424127887323689204578569390138647624.html

[184]   Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, *available at* http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html

[185]   Eyk Henning, *Deutsche Bank, Suspended Traders to Seek Accord*, Wall St. J., July 18, 2014, *available at* http://online.wsj.com/articles/deutsche-bank-suspended-traders-to-seek-accord-1405689825?KEYWORDS=libor.

[186]   *See* Anna Prior, *Second Former Rabobank Trader Pleads Guilty in Libor Case*, Wall St. J., Aug. 18, 2014, *available at* http://online.wsj.com/articles/second-former-rabobank-trader-pleads-guilty-in-libor-case-1408395751?KEYWORDS=libor; DOJ, Former Rabobank LIBOR Submitter Pleads Guilty for Scheme

VI.   **THE EMPIRICAL EVIDENCE DEMONSTRATES THAT DEFENDANTS CONSPIRED TO ARTIFICIALLY DEPRESS LIBOR DURING THE RELEVANT PERIOD**

154.    The empirical evidence shows that the Contributing Banks' LIBOR submissions defied economic logic and were the product of a conspiracy to suppress LIBOR.  During the Relevant Period, Defendants' U.S. Dollar LIBOR submissions diverged substantially from historical benchmarks, including the spreads for credit default swaps insuring Defendants' debt, the federal funds auction rate, and the Eurodollar bid rate.  Defendants' LIBOR submissions were also suspiciously "bunched" around the fourth-lowest submission each day, notwithstanding stark differences in Defendants' creditworthiness and liquidity.  Moreover, Defendants submitted inconsistent LIBOR submissions for different currencies.  Finally, given the precarious financial and liquidity positions of several banks, the LIBOR quotes they provided to the BBA could not have reflected their true cost of capital, and instead reflected Defendants' conspiracy to artificially depress LIBOR.

A.   **The Contributing Banks' LIBOR Submissions Were Incompatible with Other Measures of the Cost of Borrowing**

1.   *LIBOR and FRED Diverged*

155.    U.S. Dollar LIBOR and the Federal Reserve's Eurodollar Deposit Rate ("the FRED Rate" or "FRED") are similar tools for measuring the rate at which banks lend U.S. Dollars to each other.  The FRED Rate is calculated from the results of a daily survey conducted by ICAP, a large broker-dealer in London.  Historically, LIBOR and the FRED Rate have closely tracked each other even during times of financial stress, such as the bursting of the dot-com bubble in 2000 and the terrorist attacks of September 2001.

---

to Manipulate Yen LIBOR (Aug. 18, 2014), *available at*
http://www.justice.gov/atr/public/press_releases/2014/308101.htm.

156.    The Federal Housing Finance Agency's Office of the Inspector General has compared the FRED Rates for 1-month obligations and 1-month LIBOR during the financial crisis and determined that "[a]s the financial crisis began to metastasize, LIBOR and [FRED] began to diverge substantially, eventually by as much as three percentage points at the end of September 2008."[187]  And, "in a marked contrast with previous behavior, LIBOR began to fall below [FRED] consistently."[188]



Figure 1.  Federal Reserve Eurodollar Deposit Rate vs LIBOR, 1Q06-2Q10

157.    The gap between FRED and LIBOR confirms that LIBOR was lower than it should have been as an economic matter.

---

[187]   Office of the Inspector General Staff Memo., FHFA, *Potential Losses to Fannie Mae and Freddie Mac due to LIBOR Manipulation* at 5 (Oct. 26, 2012), *available at* http://fhfaoig.gov/Content/Files/libor.pdf.

[188]   *Id.*

55

2.    *The Contributing Banks' Submissions Were Inconsistent with their CDS Spreads*

158.    In a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risks.  Accordingly, if LIBOR quotes express true, competitively determined borrowing costs, then they should be closely tied to other measures of credit risk, such as the cost of credit default swaps ("CDS").

159.    A CDS is an over-the-counter contract between two parties through which one of the parties' purchases protection or insurance against default on a specified reference obligation. The purchaser of the insurance pays a periodic premium (or "spread"), and in return the counterparty (or seller of the protection) guarantees that it will make the purchaser whole should a default (such as a credit downgrade or a failure to make an interest payment) occur with respect to the referenced entity.  The spread represents the perceived risk of default; the greater the risk of default, the higher the CDS spread.

160.    Historically, "[t]he cost of bank default insurance has generally been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[189]  During the Relevant Period, however, CDS spreads on the Defendant banks and their LIBOR submissions diverged dramatically.

161.    On May 29, 2008, the *Wall Street Journal* reported the results of a study that it conducted on the relationship between LIBOR and CDS spreads during the credit crisis.  That study found that Defendants Citigroup, WestLB, HBOS, JPMorgan, and UBS were "among the banks that have been reporting significantly lower borrowing costs for the London interbank offered rate, or

---

[189]    Justin Wong, *LIBOR Left in Limbo; A Call for More Reform*, 13 N.C. Banking Inst. 365, 371 (2009) (internal footnotes omitted), *available at* http://www.law.unc.edu/journals/ncbank/volumes/volume13/citation-13-nc-banking-inst-2009/libor-left-in-limbo-a-call-for-more-reform/.

Libor, than what another market measure suggests that they should be."  Specifically, the *Wall Street Journal* reported that in 2008, the gap between LIBOR and "the cost of insuring against banks defaulting on their debts" began to diverge "with reported LIBOR rates failing to reflect rising default-insurance costs."[190]

162.    Each of the Defendants reported three-month LIBOR quotes that were lower than the rate implied by its CDS spreads:



163.    The *Wall Street Journal*'s study further indicated that Defendants were submitting LIBOR quotes that were suspiciously similar.  In the first four months of 2008, "three-month

---

borrowing rates reported by the 16 banks on the Libor panel remained, on average, within a range of only 0.06 percentage point – tiny in relation to the average dollar Libor of 3.18%." Defendants reported similar borrowing rates even when the CDS market was "drawing big distinctions about their financial health. On the afternoon of March 10[, 2008], for example, investors in the default-insurance market were betting that WestLB, which was hit especially hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse . . . [which] was perceived to be in better shape. Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse." Overall, during this time period, the three-month and six-month U.S. Dollar LIBOR rates were approximately 25 basis points lower than the borrowing rates suggested by the CDS market. After the BBA announced its review of LIBOR in April 2008 the difference "shrunk to about [15 basis points]."[191]

164.    The *Wall Street Journal* also reported that Defendants' LIBOR quotes were significantly lower than their actual costs of borrowing in the commercial-paper market. For instance, in mid-April 2008, UBS was offering to pay an annual rate of 2.85% to borrow dollars for three months in the commercial-paper market, but when it reported its borrowing rate for LIBOR purposes, it submitted a rate of only 2.73%.

165.    Subsequent economic analysis supports the *Wall Street Journal*'s findings. A study by Connan Snider and Thomas Youle released in 2010 concluded that LIBOR did not accurately reflect average bank borrowing costs; quotes provided by U.S. Dollar LIBOR Contributing Banks deviated substantially from their costs of borrowing, as reflected in CDS spreads.[192]

---

[191]   Mollenkamp & Whitehouse, *Study Casts Doubt on Key Rate*.

[192]   Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 4 (Apr. 2, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

166.     For instance, Snider and Youle's study compared the 12-month U.S. Dollar LIBOR

quotes from Citigroup and BTMU with each bank's corresponding one-year senior CDS spread and

concluded "that while Citigroup has a substantially higher CDS spread than [BTMU], it submits a

slightly lower Libor quote."  Thus, while the CDS spreads "suggest that the market perceives

Citigroup as riskier than [BTMU], as it is more expensive to insure against the event of Citigroup's

default," their LIBOR submissions "tell the opposite story."[193]



167.     The Snider and Youle study also noted that the level of Citigroup's CDS spreads

relative to its LIBOR quotes was "puzzling":  "Given that purchasing credit protection for a loan

makes the loan risk free, one would expect [the] difference between the loan rate and the CDS

spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's interest rate

contains a credit premium, here measured by the CDS spread."  But Citigroup's quote was often

"significantly below its CDS spread," implying that "there were interbank lenders willing to lend to

---

[193] *Id.*

Citigroup at rates which, after purchasing credit protection, would earn them a guaranteed 5 percent loss."[194]

3.   *Contributing Banks Made Inconsistent LIBOR Submissions Across Currencies*

168.   The Snider and Youle study further explored Defendants' LIBOR submissions across various currencies and found that these quotes displayed inexplicable "cross currency rank reversals."  In other words, some Defendants reported lower rates than other panel members when submitting U.S. Dollar LIBOR quotes, but higher rates than the same panel members when submitting LIBOR quotes for other currencies.  As Snider and Youle explained, because "the same bank is participating in each currency, the credit risk is the same for loans in either currency."  A "rank reversal" demonstrates that differences in these banks' LIBOR quotes "are not primarily due to differences in credit risk, something we would expect of their true borrowing costs."[195]

169.   Bank of America and BTMU, for instance, quoted rates for U.S. Dollar LIBOR and Yen LIBOR during the period under study, yet Bank of America often quoted a lower rate than BTMU for U.S. Dollar LIBOR and a higher rate than BTMU for Yen LIBOR.  Other Defendant banks displayed similar anomalies across currencies, as demonstrated in the following graphs:

---

[194]   *Id.*

[195]   *Id.* at 5.









4.      *Contributing Banks Made LIBOR Submissions Inconsistent with the Federal Reserve Auction Rate*

170.     There was also a discrepancy between the Contributing Banks' LIBOR submissions and the rates at which they were borrowing from the Federal Reserve's Term Auction Facility. From late 2007 to mid-2010, the Federal Reserve conducted periodic auctions in which it made secured loans.  Because the Federal Reserve loans required the banks to put up collateral, a bank should not have been willing to bid more than its unsecured lending rate.  But, in fact, Contributing Banks submitted auction bids substantially above their LIBOR borrowing rates.[196]

171.     On April 16, 2008, a *Wall Street Journal* article noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82%, which was 10 basis points higher than the comparable LIBOR.[197]

172.     A September 24, 2008 *Wall Street Journal* article questioned LIBOR's accuracy based on the comparison of one-month LIBOR and the 28-day Federal Reserve auction rate.  The *Wall Street Journal* reported that "banks should be able to pay a lower interest rate [to the Federal Reserve] than they do when they borrow from each other [*i.e.*, as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral.  In other words, the rate for the Fed auction should be lower than Libor."[198]  The *Wall Street Journal* reported, however, that on September 22, 2008, the 28-day Federal Reserve auction rate was 3.75%, far higher than the one-month LIBOR, which was 3.19%.[199]

---

[196]   Carrick Mollenkamp, *Libor's Accuracy Becomes Issue Again*, Wall St. J., Sept. 24, 2008, *available at* http://online.wsj.com/article/SB122221601788869423.html.

[197]   Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, *available at* http://online.wsj.com/article/SB120831164167818299.html.

[198]   Mollenkamp, *Libor's Accuracy Becomes Issue Again*.

[199]   *Id.*

63

5.      *There was a Discrepancy between Defendants' LIBOR Quotes and Actual Market*
        *Lending Rates in the Eurodollar Market*

173.    The Eurodollar Bid Rate is a market rate for Eurodollar deposits.  Eurodollars are

dollars held by banks outside of the United States, and have been an important source of funding

for large American banks.  Historically, there has been a tight relationship between the Eurodollar

Bid Rate and LIBOR; as Snider and Youle note (at 7, emphasis in original) in their April 2010 study:

> Prior to August 2007, indeed for the whole history of the Libor prior to then, the
> banks submitted quotes between 6 to 12 basis points above the Eurodollar Bid Rate.
> Banks were treating the Libor, the London Interbank *Offered* Rate, as their perception
> of the ask rate corresponding to the listed bid rate for Eurodollars.  The Eurodollar
> Bid Rate-Libor spread of 6-12 basis points was then simply something like a bid-ask
> spread.

174.    The Snider and Youle study (at 9) sets forth the average magnitude of the spread

between the Eurodollar Bid Rate and LIBOR for each of the LIBOR Contributing Banks during

three separate periods:

**Average Magnitude of Quote Skewing:  Eurodollar Bid Rate − Libor Quote**

| Bank | Pre Aug. 07 | | Aug. 07 - Aug. 08 | | Post Jan. 09 | |
|---|---|---|---|---|---|---|
| | mean | sd. | mean | sd. | mean | sd. |
| Barclays | .02 | .01 | − .081 | .10 | −.37 | .13 |
| Bank of America | .02 | .02 | −.11 | .10 | −.393 | .14 |
| Bank of Tokyo-Mitsubishi | .029 | .01 | −.095 | .10 | −.320 | .14 |
| Citigroup | .022 | .01 | −.118 | .10 | −.400 | .13 |
| CSFB | .022 | .01 | −.097 | .10 | −.370 | .13 |
| Deutsche Bank | .02 | .01 | −.106 | .10 | −.412 | .14 |
| HBOS | .023 | .01 | −.111 | .10 | −.382 | .13 |
| HSBC | .022 | .01 | −.11 | .10 | −.51 | .13 |
| J.P. Morgan | .023 | .01 | −.111 | .11 | −.434 | .13 |
| Lloyd's | .022 | .01 | −.108 | .11 | −.381 | .13 |
| Norin | .03 | .02 | −.090 | .10 | −.31 | .14 |
| Rabo Bank | .022 | .01 | −.111 | .10 | −.403 | .13 |
| RBOS | .019 | .01 | −.097 | .10 | −.301 | .12 |
| Royal Bank of Canada | .015 | .01 | −.119 | .10 | −.345 | .10 |
| UBS | .022 | .01 | −.111 | .10 | −.361 | .11 |
| WestLB | .022 | .01 | −.098 | .10 | −.333 | .17 |

175.     The fact that the average spread in the period after August 2007 was uniformly negative strongly supports the conclusion that each of the Defendant banks was suppressing its LIBOR quotes, and colluding to suppress reported LIBOR.

6.     *The Contributing Banks' LIBOR Submissions Were "Bunched" Together*

176.     Even though the Contributing Banks were not supposed to know each others' submissions before 11 AM on any given day, the Contributing Banks' submissions "bunched" together around the fourth-lowest submission during the Relevant Period.   Because only the middle 50% of submissions were used to calculate LIBOR, the lowest submission used to calculate LIBOR was the fifth-lowest submission.

177.     The *Wall Street Journal* commented on this phenomenon in a May 29, 2008 article.   It noted that during the first four months of 2008, "three-month borrowing rates reported by the 16 banks on the Libor panel remained, on average, within a range of only 0.06 percentage point – tiny in relation to the average dollar Libor of 3.18%."   Contributing Banks reported similar borrowing rates even when the CDS market was "drawing big distinctions about their financial health.   On the afternoon of March 10[, 2008], for example, investors in the default-insurance market were betting that WestLB, which was hit especially hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse . . . [which] was perceived to be in better shape.   Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse."[200]

178.     This "bunching" strongly suggests that the  Contributing Banks aimed to report the same or similar rates despite having different borrowing costs; the  Contributing Banks were communicating directly or indirectly through brokers about their future LIBOR submissions; and

---

[200]     Mollenkamp & Whitehouse, *Study Casts Doubt on Key Rate*.

every  Contributing Bank aimed to report the lowest possible rate that would be used to calculate LIBOR on a given day.

179.    Between June 2008 and April 2009 UBS's 3-month LIBOR submissions were *identical* to the published LIBOR rate even though there were significant disruptions in the financial markets that affected individual financial institutions in different ways during this 10-month period.[201]

180.    The Snider and Youle study found that "Libor quotes are much more clustered around the day's fourth lowest quote than CDS spreads are of the fourth lowest spread.  If banks were truthfully quoting their costs . . . we would expect these distributions to be similar."[202]



12-Month U.S. Libor quotes and 1-Year Senior CDS spreads.

---

[201]    DOJ UBS ¶ 123.

[202]    Snider & Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 6.

181.   The study evaluated the frequency with which the LIBOR quotes submitted by JPMorgan, WestLB, Citigroup, and Bank of America fell within certain margins of the fourth-lowest quote, as reflected in the charts below:



### B.   The Contributing Banks Were Under Serious Financial Strain

182.   During the Relevant Period, several Contributing Banks were under severe financial strain, and yet they reported borrowing costs through the LIBOR process that were consistent with other Contributing Banks' reported borrowing costs.

### 1.   *RBS, Lloyds, HBOS*

183.   On October 14, 2008, The Herald Scotland reported a £37 billion injection of state capital into three leading banks, including RBS and HBOS.  The article observed, "Without such near-nationalisations . . . Royal Bank of Scotland and HBOS [] would almost certainly have suffered

a run on their remaining reserves and been plunged into insolvency.  Their share prices could scarcely have taken much more of their recent hammering."[203]

184.    On December 12, 2008, *Bloomberg* reported that shareholders approved HBOS's takeover by Lloyds TSB Group plc following bad-loan charges in 2008 rising to £5 billion and an increase in corporate delinquencies.  The article also quoted analysts characterizing HBOS's loan portfolio as "'generally of a lower quality than its peers.'"  *Bloomberg* further observed that HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and that losses on investments increased from £100 million to £800 million for the year.[204]

185.    A January 20, 2009 analyst report from SocGen stated:  "We would note that given the 67% drop in the share price following [RBS]'s announcements yesterday [relating to capital restricting due to greater-than-expected credit market-related write downs and bad debt impairments in Q4], the loss of confidence in the bank's ability to continue to operate as a private sector player and concern over the potential ineffectiveness of the Asset Protection Scheme may prompt the U.K. government to fully nationalize the bank.  In this instance, the shares could have very limited value, if at all."[205]

186.    On March 7, 2009, *Bloomberg* reported that Lloyds "will cede control to [the British Government] in return for state guarantees covering 260 billion pounds ($367 billion) of risky assets."  The article further observed that in September 2008, Lloyds agreed to buy HBOS for

---

[203]  Alf Young, *Reckless Banks Brought This Financial Firestorm Down upon Their Own Heads*, Herald Scotland, Oct. 14, 2008, *available at* http://www.heraldscotland.com/reckless-banks-brought-this-financial-firestorm-downupon-their-own-heads-1.891981.

[204]  Kevin Crowley & Andrew MacAskill, *HBOS Investors Back Sale to Lloyds as Bad Loans Surge (Update2)*, Bloomberg, Dec. 12, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4BTqdgwhPTc.

[205]  *See* Société Générale analyst report on Royal Bank of Scotland, *Little value left for shareholders* (Jan. 20, 2009).

roughly £7.7 billion as the British Government sought to prevent HBOS from collapsing after credit markets froze.  The HBOS loan book was described as "more toxic than anyone ever dreamed."[206]

187.    On November 24, 2009, *Bloomberg* reported the Bank of England provided £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept secret until now to prevent unnerving markets."  The Bank's Deputy Governor Paul Tucker was quoted as stating in evidence to the Treasury Committee in London that "'[h]ad we not done it, the cycle would have been a lot worse . . . .  This was tough stuff, a classic lender of last resort operation.'"[207]

2.    *WestLB*

188.    A September 9, 2008 article in *Spiegel Online* reported WestLB was "heavily hit as a result of the US sub-prime crisis and the resulting credit crunch.  Ill-advised speculation resulted in a 2007 loss of €1.6 billion – leading the bank to the very brink of insolvency."  The article reported that in early 2008, a special investment vehicle was set up by WestLB's primary shareholders to "guarantee €5 billion worth of risky investments."  The European Commissioner approved the public guarantee but demanded that the bank be "completely restructured to avoid falling afoul of competition regulations."  The European Commissioner for Competition warned that "if [WestLB] doesn't significantly improve its restructuring package . . . Brussels [would not] approve the public

---

[206]    Andrew MacAskill & Jon Menon, *Lloyds Cedes Control to Government, Insures Assets (Update2)*, Bloomberg, Mar. 7, 2009, *available at* http://www.bloomberg.com/apps/news?sid=a6eUD3OLhKPg&pid=newsarchive.

[207]    Gonzalo Vina, *RBS, HBOS Got 62 Billion-Pound Central Bank Loan (Update1)*, Bloomberg, Nov. 24, 2009, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a9MjQj6MNTeA&pos=6.

assistance that the European Union had already provided to the bank."  If that occurred, "WestLB would have to pay back €12 billion to the EU."[208]

189.    On November 24, 2009, *Bloomberg* reported that BNP Paribas SA said "[i]nvestors should buy the euro . . . on speculation that capital will need to be repatriated to support German bank WestLB AG."  Furthermore, two German regional savings bank groups that hold a majority stake in WestLB were "prepared to let the Dusseldorf-based lender become insolvent" and that "[t]he prospect of insolvency may force state-owned banks and savings banks outside North Rhine-Westphalia, WestLB's home state, to contribute to capital injections."  Moreover, WestLB needed "as much as 5 billion euros ($7.5 billion) in capital and may be shut by Nov. 30 unless a solution for its capital needs can be found."[209]

### 3.    *Citigroup*

190.    On November 21, 2008, the *Wall Street Journal* reported that Citigroup executives "began weighing the possibility of auctioning off pieces of the financial giant or even selling the company outright" after the company faced a plunging stock price.  The article noted Citigroup executives and directors "rushing to bolster the confidence of investors, clients and employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-related holdings.[210]  Similarly, on November 24, 2008, *CNNMoney* reported that:

> If you combine opaque structured-finance products with current fair-value accounting rules, almost none of the big banks are solvent because that system equates solvency with asset liquidity.  So at this moment Citi isn't solvent.  Some argue that liquidity, not solvency, is the

---

[208]  Anne Seith, *Banking Crisis: Germany's WestLB under Attack from Brussels*, Spiegel, Sept. 9, 2008, *available at* http://www.spiegel.de/international/business/banking-crisis-germany-s-westlb-under-attack-from-brussels-a-577142.html.

[209]  Matthew Brown, *BNP Says Buy Euro on Speculation WestLB to Be Rescued (Update1)*, Bloomberg, Nov. 24, 2009, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=asIRq_OljZTY.

[210]  David Enrich, *Citi Weighs Its Options, Including Firm's Sale*, Wall St. J., Nov. 21, 2008, *available at* online.wsj.com/article/SB122722907151946371.html.

problem.  But in the end it doesn't matter.  Fear will drive illiquidity to such a point that Citi could be rendered insolvent under the current fair-value accounting system.[211]

191.    On January 20, 2009, *Bloomberg* reported that Citigroup "posted an $8.29 billion fourth-quarter loss, completing its worst year, and plans to split in two under Chief Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis."  *Bloomberg* further reported that N.Y.U. Professor Nouriel Roubini said "'[t]he problems of Citi, Bank of America and others suggest the system is bankrupt.'"[212]

## VII.    THIS ACTION IS TIMELY

### A.    The Extender Statute

192.    When the NCUA Board brings suit as Liquidating Agent, the statute of limitations for actions sounding in tort is the longer of three years or the period applicable under state law.  12 U.S.C. § 1787(b)(14)(A)(ii).  That limitations period begins on the later of the date the cause of action accrues or the appointment of the Board as conservator or liquidating agent.  *Id.* § 1787(b)(14)(B).

193.    The earliest date the NCUA Board placed one of the Credit Unions into liquidation was October 1, 2010.  Accordingly, each of NCUA's claims is timely until three years later (October 1, 2013).

194.    In addition, the California and Illinois state antitrust claims have four-year statutes of limitations, making those claims timely until October 1, 2014.  *See* Cal. Bus & Prof. Code § 16750.1; 740 ILCS 10/7(2).

### B.    The Conspiracy Could Not Reasonably Be Discovered Prior to March 15, 2011

---

[211]    Katie Benner, *Citi's 'Slow, Grudging Nationalization'*, CNNMoney, Nov. 24, 2008, *available at* money.cnn.com/2008/11/21/news/companies/benner_citi.fortune/index.htm.

[212]    Henry Meyer & Ayesha Daya, *Roubini Predicts U.S. Losses May Reach $3.6 Trillion (Update1)*, Bloomberg, Jan. 20, 2009, *available at* www.bloomberg.com/apps/news?pid=newsarchive&sid=a746r_1q9OOY#.

195.     NCUA did not discover and could not have discovered through the exercise of reasonable diligence that it was injured by Defendants' manipulation of LIBOR, much less who caused that injury, until at the very earliest March 15, 2011, when the government investigations of Defendants were revealed to the public for the first time.

196.     Defendants conspired to share their interest rate information and falsely report interest rate information to the BBA and Thomson Reuters.  Their purpose was to manipulate the LIBOR rate for U.S. dollars and other currencies.

197.     By its nature, Defendants' misconduct was self-concealing.  First, Defendants' actual or realistic interest rates were not public information, making any comparison to the rates they reported to the BBA impossible.  Second, Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the specific misconduct of individual Defendants or the conspiracy.  Third, the Defendants' trades on the exchanges or in the markets for LIBOR products were not public information, making it impossible to discern that they were using false LIBOR reports to cause artificial prices and engage in manipulative trading.

198.     As a result of the self-concealing nature of Defendants' collusive scheme, no reasonable person or investor would previously have discovered Defendants' conspiracy to manipulate LIBOR.

199.     Defendants also engaged in a concerted media strategy of affirmatively providing plausible (but false) alternative explanations for manipulated LIBOR rates.

200.     In late spring 2008, the media began to engage in speculation that the Contributing Banks were under-reporting their cost of borrowing in LIBOR submissions.  Defendants engaged in a media strategy that had the effect of diffusing this speculation and further concealing their

conduct.  In particular, Defendants provided affirmative, public assurances that they were innocent and gave plausible explanations for the divergence in LIBOR quotes.

201.    For instance, on April 21, 2008, Dominic Konstam, head of interest rate strategy at Credit Suisse, affirmatively stated that low LIBOR quotes were attributable to the fact that U.S. banks – such as Citigroup and JPMorgan – had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks:  "'Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply.'"[213]

202.    On April 21, 2008, Jeffrey Rosenberg, head of credit strategy at Banc of America Securities, echoed Mr. Konstam's statement.  Mr. Rosenberg affirmatively represented that LIBOR's divergence was the result of systemic conditions, rather than active manipulation, explaining that the BBA approach "'works when both overall bank risk is low and the dispersion of risks across banks is small . . . [however, that] is clearly not the case currently.'"[214]

203.    In an interview published on July 29, 2008 with *The Financial Times* Credit Suisse's Dominic Konstam continued to reinforce LIBOR's reliability.  "Libor has been a barometer of the need for banks to raise capital.  The main problem with Libor is the capital strains facing banks . . . .  Initially there was some confusion that LIBOR itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing."[215]

---

[213]    Gillian Tett & Michael Mackenzie, *Doubts over Libor Widen*, Financial Times, Apr. 21, 2008, *available at* http://www.ft.com/intl/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html.

[214]    *Id.*

[215]    Michael Mackenzie, *Talk of Quick Fix Recedes as Libor Gap Fails to Close*, Financial Times, July 29, 2008, *available at* http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html.

204.    On May 16, 2008, in response to a media inquiry, JPMorgan affirmatively misrepresented that the LIBOR interbank rate-setting process was not broken and that recent rate volatility could be blamed largely on reluctance among banks to lend to each other amid the current credit crunch.  "'Everyone is funding at a similar level,'" said Terry Belton, head of global fixed income strategy at JPMorgan, "'but when credit conditions worsen and we have periods like this of unprecedented turmoil, the reality is there is not a single borrowing rate.'"[216]  This alternative explanation had the effect of diffusing speculation that Defendants were manipulating LIBOR.

205.    In May 2008, the *Wall Street Journal* asked various Defendants to comment on media speculation concerning divergence in LIBOR quotes.  Rather than declining or refusing to comment, many Defendants made affirmative representations designed to further conceal their wrongdoing.  For example, HBOS denied the *Wall Street Journal*'s allegations, asserting that its rate quotes were a "genuine and realistic" indication of its borrowing costs.[217]

206.    Similarly, in response to media scrutiny, Barclays publicly stated that its LIBOR submissions had not been influenced by improper factors.  A Barclays representative falsely stated that Barclays had always quoted accurate and fair LIBORs and had acted "in defiance of the market" rather than submitting incorrect rates.[218]

207.    In addition, throughout 2008, the BBA engaged in affirmative acts that diffused speculation that LIBOR had been or was being manipulated.  Although the BBA announced on April 17, 2008, that it would push forward its annual review of the LIBOR rate-setting process, a BBA spokesman affirmatively stated that the review was a "relatively simple auditing process to

---

[216]    Reuters, *Update 1-Libor Volatility Due to Poor Liquidity-JPMorgan*, May 16, 2008, *available at* http://in.reuters.com/article/2008/05/16/markets-libor-jpmorgan-idINN1644283620080516.

[217]    Mollenkamp & Whitehouse, *Study Casts Doubt on Key Rate*.

[218]    FSA Barclays ¶ 133.

check that the figures are consistent."[219]  The BBA spokesman assured the public that the BBA did not believe "'the data we collect is anything other than accurate.'"[220]

208.    LIBOR increased sharply in the days following the BBA's announcement.  The BBA's Libor Director acknowledged that banks "were likely to have reconsidered the information they supplied for use in setting Libor."  However, as reported on April 18, 2008, the BBA continued to affirmatively assert that rate quotes submitted prior to the BBA's announcement were more the result of "concerns about difficult market place conditions than questions about credibility."[221]

209.    Defendants also deliberately made false and misleading statements to regulators in an attempt to conceal their complicity in rate-fixing.  For instance, on March 5, 2008, the FSA asked Barclays what it was paying for funding in certain tenors and currencies.  A Barclays manager was informed by one of its LIBOR submitters that Barclays was then obtaining funds in one-year dollars at LIBOR plus 20 basis points.  The manager told the submitter that he would rather not disclose that Barclays was borrowing dollars "way over LIBOR" and would rather indicate that it was paying a rate equal to LIBOR.  The submitter noted that "it's a sad thing really because, you know, if they're truly trying to do something useful . . . it would be nice if they knew," but agreed that if he responded to the FSA's inquiry with "what the honest truth" was, it might open "a can of worms."

---

[219]    Alistair Barr, *BBA to Start Libor Review Earlier as Rate Spikes*, Wall St. J. MarketWatch, Apr. 17, 2008, *available at* http://articles.marketwatch.com/2008-04-17/news/30791717_1_lending-rates-interest-rates-libor.

[220]    AFX News, *UK's BBA Confirms Bringing Forward LIBOR Review but Denies Issues of Credibility*, FinanzNachrichten (Apr. 17, 2008), *available at* http://www.finanznachrichten.de/nachrichten-2008-04/10601945-uk-s-bba-confirms-bringing-forward-libor-review-but-denies-issues-of-credibility-020.htm.

[221]    Peter Taylor, *Dollar LIBOR Soars as Banks Rethink their Borrowing Rates*, Telegraph, Apr. 18, 2008, *available at* http://www.telegraph.co.uk/finance/markets/2788467/Dollar-Libor-soars-as-banks-rethink-their-borrowing-rates.html.

The submitter then responded to the FSA by inaccurately stating that Barclays was paying for one-year dollars at LIBOR "flat."[222]

210.    Similarly, a UBS manager instructed a UBS LIBOR submitter to lie when interviewed by UBS attorneys during their investigation into LIBOR manipulation.  As UBS acknowledged as part of its agreement with DOJ, the manager instructed the submitter to:  "falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen LIBOR; avoid mentioning Trader-1; [] falsely indicate that the Yen LIBOR submission process did not take into account trading positions; [] falsely claim that they never moved the Yen LIBOR submissions to benefit the Yen trading desks; [and] falsely claim that when contributing Yen LIBOR submissions, UBS tried to be 'as close to the market as possible.'"[223]

211.    In addition to directly making false statements to the media and to regulators, Defendants have undertaken to conceal their efforts to manipulate LIBOR.  For instance, as UBS has acknowledged, "after media reports regarding banks' suspected manipulation of LIBOR, the manager of the Yen derivatives desk cautioned that they should avoid creating written records and should instead use cell phones when contacting brokers.  Moreover, to avoid detection of their manipulation, UBS derivatives traders and brokers used coded language in communications to discuss the dissemination of misinformation to other Contributor Panel banks to influence the ultimate Yen LIBOR fix."[224]

212.    Likewise, in an electronic chat on July 21, 2009, a broker and the UBS trader with the largest role in the bank's Yen LIBOR-rigging efforts discussed how to continue manipulating the market without being detected by authorities.  The broker advised the trader that "'if you drop your

---

[222]   DOJ Barclays ¶ 46; FSA Barclays ¶ 127.

[223]   DOJ UBS ¶ 39.

[224]   *Id.* ¶ 61.

6m dramatically on the 11th mate, it will look v fishy, especially if [Bank D] and [Bank B] go with you.  I'd be v careful how you play it, there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you.'"  The trader responded:  "'don't worry will stagger the drops . . . ie 5bp then 5bp . . . us then [Bank B] then [Bank D] then us then [Bank B] then [Bank D].'"  The broker responded:  "'great the plan is hatched and sounds sensible.'"[225]

213.     Barclays's traders also took steps to conceal their role in manipulating LIBOR.  For instance, in a February 12, 2007 instant message with a trader at another  Contributing Bank, a Barclays trader said:  "'if you know how to keep a secret I'll bring you in on it . . . we're going to push the cash downwards on the imm day . . . if you breathe a word of this I'm not telling you anything else . . . I know my treasury's firepower . . . which will push the cash downwards . . . please keep it to yourself otherwise it won't work.'"[226]  After the trader's strategy was successful at depressing the final published benchmark rate, he wrote a trader at another  Contributing Bank to thank him for his role and to note, "'Please . . . don't make any noise about the 3m fixing.  [T]his can backfire against us.'"[227]

214.     The truth was not revealed until at the earliest March 15, 2011, when UBS released its annual report 20-F stating that it had received subpoenas from the DOJ, SEC, and CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA.  UBS described the focus of the investigations as "whether there were improper attempts by [UBS], either acting on its own or together with others, to manipulate LIBOR . . . at certain times."[228]

---

[225]   *Id.* ¶ 68.

[226]   FSA Barclays ¶ 96(iii).

[227]   DOJ Barclays ¶ 29; *see also* FSA Barclays ¶ 97.

[228]   UBS Investor Release, *UBS Board of Directors Authorizes Settlements of LIBOR-Related Claims with US and UK Authorities; Swiss Regulator to Issue Order* (Dec. 19, 2012), *available at*

215.    In addition, on March 15, 2011, *The Financial Times* reported that "[a]ll the panel members are believed to have received at least an informal request for information – an earlier stage in an investigative process before a subpoena."[229]

216.    In the weeks and months that followed, the extent of Defendants' collusive scheme to manipulate the value of the LIBOR was publicly revealed for the first time.  A steady stream of media reports revealed that a number of domestic and foreign regulatory and enforcement agencies had begun to investigate Defendants, finally indicating to the public that Defendants had indeed conspired to manipulate LIBOR.  By way of example:

- On March 23, 2011, *Bloomberg* revealed that Citigroup, Deutsche Bank, Bank of America, and JPMorgan had been asked by U.S. regulators "to make employees available to testify as witnesses in a probe of potential interest-rate manipulation."[230]

- The next day, the *Financial Times* reported that Defendant Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]." According to the *Financial Times*, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank."[231]

- On May 23, 2011, the *Telegraph* reported that the FBI was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."[232]

---

http://www.ubs.com/global/en/about_ubs/investor_relations/releases/news-display-investor-releases.html/en/2012/12/19/20121219a.html.

[229]   Brooke Masters, et al., *Big Banks Investigated over Libor*, Financial Times, Mar. 15, 2011, *available at* http://www.ft.com/intl/cms/s/0/ab563882-4f08-11e0-9c25-00144feab49a.html.

[230]   Joshua Gallu & Donal Griffin, *LIBOR Probe Spurs Witness Call-up at Citigroup, Deutsche Bank*, Bloomberg, Mar. 23, 2011, *available at* http://www.bloomberg.com/news/2011-03-24/libor-manipulation-probe-spurs-witness-call-up-at-citigroup-deutsche-bank.html.

[231]   Brooke Masters & Megan Murphy, *Barclays at Centre of LIBOR Inquiry*, Financial Times, Mar. 24, 2011, *available at* http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-00144feab49a.html#axzz2HKBNiDoU.

[232]   Harry Wilson & Jonathan Russell, *FBI Joins Inquiry into LIBOR Manipulation Claims against Banks*, Telegraph, May 23, 2011, *available at* http://www.telegraph.co.uk/finance/newsbysector/8529592/FBI-joints-inquiry-into-libor-manipulation-claims-against-banks.html.

- On October 19, 2011, the *Wall Street Journal* reported that the European Commission had "seized documents from several major banks" the previous day, "marking the escalation of a world-wide law-enforcement probe into how key interest rates are set."[233]

217.    In stark contrast to their earlier media campaign of offering innocent (but false) explanations for their LIBOR quotes, Defendants began simply declining to comment to the media. For example, since March 15, 2011, representatives of Credit Suisse, JPMorgan, Barclays, and Lloyds have specifically declined to comment in response to inquiries concerning whether Defendants colluded to artificially reduce LIBOR.

218.    Likewise, in contrast to its 2008 conclusion that the method used to set LIBOR was reliable, in February 2011 the BBA expanded the Contributor Panel for the LIBOR from 16 to 20 members.

219.    Moreover, while the investigations became public information in March 2011, the facts necessary to plausibly state the claims alleged herein have become available over time, as Defendants' improper motives have become apparent.

220.    NCUA had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on March 15, 2011.

221.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal their illegal conduct, NCUA could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on March 15, 2011.

---

[233]   Jean Eaglesham & David Enrich, *Banks' Files Are Seized*, Wall St. J., Oct. 19, 2011, *available at* http://online.wsj.com/article/SB10001424052970203658804576639484062369102.html.

222.    Because of Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by NCUA has been tolled during the period of such fraudulent concealment.

223.    In addition, any applicable statute of limitations affecting or limiting the rights of action by NCUA has been tolled by the filing of other class actions against Defendants, commencing in April 2011.

224.    Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

225.    Defendants' conduct as alleged herein constitutes a continuing violation of law. NCUA brings this action within the applicable statute of limitations period of such continuing violation.

## DEFENDANTS' ANTITRUST VIOLATIONS

226.    During the Relevant Period, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress, and stabilize LIBOR and thus the prices of and rates of return on financial instruments pegged to LIBOR including interest rate swaps and various types of securities.

227.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress, and otherwise make artificial the price of financial instruments pegged to LIBOR.  These activities included the following:

    (a)    Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Thomson Reuters for calculation of the daily LIBOR;

    (b)    Defendants agreed during those meetings and conversations to unlawfully report their borrowing rates to Thomson Reuters for calculation of LIBOR in order to drive down LIBOR or otherwise to depress or manipulate LIBOR;

(c)     Defendants signaled to one another their intention to depress or otherwise manipulate LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)     Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in a manner that naturally tended to depress or otherwise manipulate the price of LIBOR-Based Securities.

## THE CREDIT UNIONS SUFFERED ANTITRUST INJURY AS A RESULT OF DEFENDANTS' CONDUCT

228.     Defendants' anticompetitive conduct had severe adverse consequences on competition and directly damaged the Credit Unions.  The Credit Unions held tens of billions of dollars in investments and other assets that paid interest streams pegged to LIBOR.  These assets were purchased both from the Defendant banks and from non-Defendant banks and institutions. As a direct result of Defendant's conspiracy to artificially depress LIBOR during the Relevant Period, the Credit Unions received less in interest income than they otherwise were entitled to receive.

## FIRST CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL DEFENDANTS)

229.     NCUA incorporates by reference the preceding allegations.

230.     Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

231.     During the Relevant Period, Defendants controlled what LIBOR quote would be reported and therefore controlled the value of investments tied to LIBOR.

232.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed, stabilized and/or otherwise made artificial LIBOR and

81

thus the prices and rates of return on investments tied to LIBOR.  Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

233.    During the Relevant Period, Members United entered into pay-fixed swaps with Defendants, including the swaps listed in Appendix A, attached hereto.

234.    During the Relevant Period, Members United entered into pay-fixed swaps with counterparties other than Defendants, including the swaps listed in Appendix B, attached hereto.

235.    During the Relevant Period, Members United held non-swap securities linked to LIBOR that it had purchased from Defendants, including the securities listed in Appendix C, attached hereto.

236.    During the Relevant Period, Members United held non-swap securities linked to LIBOR that it had purchased from counterparties other than Defendants, including the securities listed in Appendix D, attached hereto.

237.    During the Relevant Period, Southwest entered into pay-fixed swaps with Defendants, including the swaps listed in Appendix E, attached hereto.

238.    During the Relevant Period, Southwest entered into pay-fixed swaps with counterparties other than Defendants, including the swaps listed in Appendix F, attached hereto.

239.    During the Relevant Period, Southwest held non-swap securities linked to LIBOR that it had purchased from Defendants, including the securities listed in Appendix G, attached hereto.

240.    During the Relevant Period, Southwest held non-swap securities linked to LIBOR that it had purchased from counterparties other than Defendants, including the securities listed in Appendix H, attached hereto.

241.     During the Relevant Period, WesCorp entered into pay-fixed swaps with Defendants, including the swaps listed in Appendix I, attached hereto.

242.     During the Relevant Period, WesCorp entered into pay-fixed swaps with counterparties other than Defendants, including the swaps listed in Appendix J, attached hereto.

243.     During the Relevant Period, WesCorp held non-swap securities linked to LIBOR that it had purchased from Defendants, including the securities listed in Appendix K, attached hereto.

244.     During the Relevant Period, WesCorp held non-swap securities linked to LIBOR that it had purchased from counterparties other than Defendants, including the securities listed in Appendix L, attached hereto.

245.     During the Relevant Period, U.S. Central entered into pay-fixed swaps with Defendants, including the swaps listed in Appendix M, attached hereto.

246.     During the Relevant Period, U.S. Central entered into pay-fixed swaps with counterparties other than Defendants, including the swaps listed in Appendix N, attached hereto.

247.     During the Relevant Period, U.S. Central held non-swap securities linked to LIBOR that it had purchased from Defendants, including the securities listed in Appendix O, attached hereto.

248.     During the Relevant Period, U.S. Central held non-swap securities linked to LIBOR that it had purchased from counterparties other than Defendants, including the securities listed in Appendix P, attached hereto.

249.     During the Relevant Period, Constitution held non-swap securities linked to LIBOR that it had purchased from Defendants, including the securities listed in Appendix Q, attached hereto.

250.     During the Relevant Period, Constitution held non-swap securities linked to LIBOR that it had purchased from counterparties other than Defendants, including the securities listed in Appendix R, attached hereto.

251.     As a direct and proximate result of Defendants' unlawful conduct, the Credit Unions have suffered injury to their business or property, including with respect to all instruments listed in Appendices A through R.  NCUA is entitled to treble damages on behalf of the Credit Unions for the violations of the Sherman Act alleged herein.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF STATE ANTITRUST, UNFAIR COMPETITION,**
**AND RESTRAINT OF TRADE LAWS**
**(ALL DEFENDANTS)**

252.     NCUA incorporates by reference the preceding allegations.

253.     Defendants, along with their unnamed co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade by, among other things, fixing, maintaining, suppressing, and stabilizing LIBOR and the prices of and rates of return on investments tied to LIBOR.

254.     As a result of Defendants' unlawful conduct, the Credit Unions were injured in their business and property, including with respect to all instruments listed in Appendices A through R.

255.     Defendants' unlawful conduct violated the following state antitrust, restraint of trade, and unfair competition laws:

- the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

- the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

- the Kansas Restraint of Trade Act, K.S.A. § 50-101 *et seq.*

## THIRD CAUSE OF ACTION:
## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING WITH MEMBERS UNITED
## (BANK OF AMERICA, JPMORGAN)

256.   NCUA incorporates by reference the preceding allegations.

257.   On December 10, 2004, Members United entered into an ISDA Master Agreement with Defendant Bank of America, under which Members United entered into pay-fixed swaps with Bank of America ("Members United-BOA Master Agreement").[234]

258.   On April 13, 2007, Members United entered into an ISDA Master Agreement with Defendant JPMorgan, under which Members United entered into pay-fixed swaps with JPMorgan ("Members United-JPMorgan Master Agreement").[235]

259.   In the Members United Master Agreements, the parties represented that the execution, delivery, and performance of the Master Agreements did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Members United Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Members United Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

260.   The Members United Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Members United Master Agreements provide that a

---

[234] The Members United-BOA Master Agreement is attached as Exhibit 1 and incorporated into this Complaint by reference.

[235] The Members United-JPMorgan Master Agreement is attached as Exhibit 2 and incorporated into this Complaint by reference.

defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Members United Master Agreements.  ¶ 11.

261.    The Members United Master Agreements state that all transactions between Members United and Bank of America or JPMorgan are entered into in reliance on the fact that the relevant Master Agreement and all confirmations form a single agreement between the parties. ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

262.    Each of the Members United Master Agreements includes an implied covenant that each contracting party will act in good faith and deal fairly with the other party, and neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

263.    During the Relevant Period, Members United entered into pay-fixed swaps governed by the Members United Master Agreements, including the swaps listed in Appendix A, attached hereto.

264.    Bank of America and JPMorgan breached and defaulted on the Members United Master Agreements and breached the implied covenant of good faith and fair dealing through their collusive conduct to suppress U.S. Dollar LIBOR, their failure to disclose their collusive conduct, and their underpayments to Members United tied to the artificially suppressed U.S. Dollar LIBOR rate.  As a consequence of this collusive conduct, Members United did not receive the benefit of its contracts.

265.    Bank of America and JPMorgan also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from their collusive and manipulative actions, in the form of paying less LIBOR-based payments at the expense of Members United.

266.     Bank of America's and JPMorgan's collusion to manipulate the LIBOR rate, and to make submissions that did not conform to the LIBOR definition, also frustrated the purpose of the Members United Master Agreements, which was to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition.

267.     As a result of Bank of America's and JPMorgan's breaches of the Members United Master Agreements, breaches of the covenant of good faith and fair dealing, and their frustration of the purpose of the Members United Master Agreements, Members United and the NCUA as Receiver and Liquidator for Members United have suffered damages under the Members United Master Agreements.

### FOURTH CAUSE OF ACTION:
### BREACH OF CONTRACT WITH SOUTHWEST
### (CITIGROUP)

268.     NCUA incorporates by reference the preceding allegations.

269.     On November 2, 2005, Southwest entered into an ISDA Master Agreement with Defendant Citigroup, under which Southwest entered into pay-fixed swaps with Citigroup ("Southwest-Citigroup Master Agreement").[236]

270.     In the Southwest-Citigroup Master Agreement the parties represented that the execution, delivery, and performance of the Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Southwest-Citigroup Master Agreement further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Southwest-Citigroup Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform

---

[236] The Southwest-Citigroup Master Agreement is attached as Exhibit 3 and incorporated into this Complaint by reference.

its obligations under the Southwest-Citigroup Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

271.    The Southwest-Citigroup Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Southwest-Citigroup Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Southwest-Citigroup Master Agreement. ¶ 11.

272.    The Southwest-Citigroup Master Agreement states that all transactions between Southwest and Citigroup are entered into in reliance on the fact that the Southwest-Citigroup Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

273.    The Southwest-Citigroup Master Agreement includes an implied covenant that each contracting party will act in good faith and deal fairly with the other party, and neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

274.    During the Relevant Period, Southwest entered into pay-fixed swaps governed by the Southwest-Citigroup Master Agreement, including the swaps listed in Appendix E, attached hereto.

275.    Citigroup breached and defaulted on the Southwest-Citigroup Master Agreement and breached the covenant of good faith and fair dealing through its collusive conduct to suppress U.S. Dollar LIBOR, failure to disclose its collusive conduct, and underpayments to Southwest tied

to the artificially suppressed U.S. Dollar LIBOR rate. As a consequence of this collusive conduct, Southwest did not receive the benefit of its contracts.

276.    Citigroup also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from their collusive and manipulative actions, in the form of paying less LIBOR-based payments at the expense of Southwest.

277.    Citigroup's collusion to manipulate the LIBOR rate, and to make submissions that did not conform to the LIBOR definition, also frustrated the purpose of the Southwest-Citigroup Master Agreement, which was to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition.

278.    As a result of Citigroup's breach of the Southwest-Citigroup Master Agreement, breach of the covenant of good faith and fair dealing, and its frustration of the purpose of the Southwest-Citigroup Master Agreement, Southwest and the NCUA as Receiver and Liquidator for Southwest have suffered damages under the Southwest-Citigroup Master Agreement.

## FIFTH CAUSE OF ACTION:
## BREACH OF CONTRACT WITH WESCORP
## (BANK OF AMERICA, BARCLAYS, DEUTSCHE BANK, HSBC,
## JPMORGAN, RBS, UBS, CITIGROUP)

279.    NCUA incorporates by reference the preceding allegations.

280.    On July 30, 1998, WesCorp entered into an ISDA Master Agreement with Defendant Bank of America, under which WesCorp entered into pay-fixed swaps with Bank of America ("WesCorp-BOA Master Agreement").[237]

---

[237] The WesCorp-BOA Master Agreement is attached as Exhibit 4 and incorporated into this Complaint by reference.

281.     On August 28, 2005, WesCorp entered into an ISDA Master Agreement with Defendant Barclays, under which WesCorp entered into pay-fixed swaps with Barclays ("WesCorp-Barclays Master Agreement").[238]

282.     On December 27, 2001, WesCorp entered into an ISDA Master Agreement with Defendant Deutsche Bank, under which WesCorp entered into pay-fixed swaps with Deutsche Bank ("WesCorp-Deutsche Bank Master Agreement").[239]

283.     On August 20, 2001, WesCorp entered into an ISDA Master Agreement with Defendant HSBC, under which WesCorp entered into pay-fixed swaps with HSBC ("WesCorp-HSBC Master Agreement").[240]

284.     On August 21, 2001, WesCorp entered into an ISDA Master Agreement with Defendant JPMorgan, under which WesCorp entered into pay-fixed swaps with JPMorgan ("WesCorp-JPMorgan Master Agreement").[241]

285.     On August 31, 2001, WesCorp entered into an ISDA Master Agreement with Defendant RBS, under which WesCorp entered into pay-fixed swaps with RBS ("WesCorp-RBS Master Agreement").[242]

---

[238] The WesCorp-Barclays Master Agreement is attached as Exhibit 5 and incorporated into this Complaint by reference.

[239] The WesCorp-Deutsche Bank Master Agreement is attached as Exhibit 6 and incorporated into this Complaint by reference.

[240] The WesCorp-HSBC Master Agreement is attached as Exhibit 7 and incorporated into this Complaint by reference.

[241] The WesCorp-JPMorgan Master Agreement is attached as Exhibit 8 and incorporated into this Complaint by reference.

[242] The WesCorp-RBS Master Agreement is attached as Exhibit 9 and incorporated into this Complaint by reference.

286.     On November 21, 2003, WesCorp entered into an ISDA Master Agreement with Defendant UBS, under which WesCorp entered into pay-fixed swaps with UBS ("WesCorp-UBS Master Agreement").[243]

287.     On December 19, 1996, WesCorp entered into an ISDA Master Agreement with Defendant Citigroup, under which WesCorp entered into pay-fixed swaps with Citigroup ("WesCorp-Citigroup Master Agreement"). [244]

288.     In the WesCorp Master Agreements, the parties represented that the execution, delivery, and performance of the WesCorp Master Agreements did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The WesCorp Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The WesCorp Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the WesCorp Master Agreements or any Credit Support Document to which it is a party. ¶ 4(c).

289.     The WesCorp Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The WesCorp Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable

---

[243] The WesCorp-UBS Master Agreement is attached as Exhibit 10 and incorporated into this Complaint by reference.

[244] The WesCorp-Citigroup Master Agreement is attached as Exhibit 11 and incorporated into this Complaint by reference.

out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the WesCorp Master Agreements.  ¶ 11.

290.    The WesCorp Master Agreements state that all transactions between the parties are entered into in reliance on the fact that the relevant Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

291.    Each of the WesCorp Master Agreements includes an implied covenant that each contracting party will act in good faith and deal fairly with the other party, and neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

292.    During the Relevant Period, WesCorp entered into pay-fixed swaps governed by the WesCorp Master Agreements, including the swaps listed in Appendix I, attached hereto.

293.    Bank of America, Barclays, Deutsche Bank, HSBC, JPMorgan, RBS, UBS, and Citigroup breached and defaulted on the WesCorp Master Agreements and breached the covenant of good faith and fair dealing through their collusive conduct to suppress U.S. Dollar LIBOR, failure to disclose their collusive conduct, and underpayments to WesCorp tied to the artificially suppressed U.S. Dollar LIBOR rate.  As a consequence of this collusive conduct, WesCorp did not receive the benefit of its contracts.

294.    Bank of America, Barclays, Deutsche Bank, HSBC, JPMorgan, RBS, UBS, and Citigroup also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from their collusive and manipulative actions, in the form of paying less LIBOR-based payments at the expense of WesCorp.

295.    Bank of America's, Barclays', Deutsche Bank's, HSBC's, JPMorgan's, RBS's, UBS's, and Citigroup's collusion to manipulate the LIBOR rate, and to make submissions that did not

conform to the LIBOR definition, also frustrated the purpose of the WesCorp Master Agreements, which was to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition.

296.     As a result of Bank of America's, Barclays', Deutsche Bank's, HSBC's, JPMorgan's, RBS's, UBS's, and Citigroup's breaches of the WesCorp Master Agreements, breach of the covenant of good faith and fair dealing, and frustration of the purpose of the WesCorp Master Agreements, WesCorp and the NCUA as Receiver and Liquidator for WesCorp have suffered damages under the WesCorp Master Agreements.

**SIXTH CAUSE OF ACTION:**
**BREACH OF CONTRACT WITH U.S. CENTRAL**
**(BANK OF AMERICA, BARCLAYS, DEUTSCHE BANK, JPMORGAN,**
**RABOBANK, RBS, UBS)**

297.     NCUA incorporates by reference the preceding allegations.

298.     On June 6, 2003, U.S. Central entered into an ISDA Master Agreement with Defendant Bank of America, under which U.S. Central entered into pay-fixed swaps with Bank of America ("U.S. Central-BOA Master Agreement").[245]

299.     On October 5, 2005, U.S. Central entered into an ISDA Master Agreement with Defendant Barclays, under which U.S. Central entered into pay-fixed swaps with Barclays ("U.S. Central-Barclays Master Agreement").[246]

---

[245] The U.S. Central-BOA Master Agreement is attached as Exhibit 12 and incorporated into this Complaint by reference.

[246] The U.S. Central-Barclays Master Agreement is attached as Exhibit 13 and incorporated into this Complaint by reference.

300.     On June 5, 2001, U.S. Central entered into an ISDA Master Agreement with Defendant Deutsche Bank, under which U.S. Central entered into pay-fixed swaps with Deutsche Bank ("U.S. Central-Deutsche Bank Master Agreement").[247]

301.     On September 10, 2002, U.S. Central entered into an ISDA Master Agreement with Defendant JPMorgan, under which U.S. Central entered into pay-fixed swaps with JPMorgan ("U.S. Central-JPMorgan Master Agreement").[248]

302.     On January 2, 2001, U.S. Central entered into an ISDA Master Agreement with Defendant Rabobank, under which U.S. Central entered into pay-fixed swaps with Rabobank ("U.S. Central-Rabobank Master Agreement").[249]

303.     On December 8, 2004, U.S. Central entered into an ISDA Master Agreement with Defendant RBS, under which U.S. Central entered into pay-fixed swaps with RBS ("U.S. Central-RBS Master Agreement").[250]

304.     On August 12, 2002, U.S. Central entered into an ISDA Master Agreement with Defendant UBS, under which U.S. Central entered into pay-fixed swaps with UBS ("U.S. Central-UBS Master Agreement").[251]

305.     In the U.S. Central Master Agreements, the parties represented that the execution, delivery, and performance of the Master Agreements did not violate or conflict with any law

---

[247] The U.S. Central-Deutsche Bank Master Agreement is attached as Exhibit 14 and incorporated into this Complaint by reference.

[248] The U.S. Central-JPMorgan Master Agreement is attached as Exhibit 15 and incorporated into this Complaint by reference.

[249] The U.S. Central-Rabobank Master Agreement is attached as Exhibit 16 and incorporated into this Complaint by reference.

[250] The U.S. Central-RBS Master Agreement is attached as Exhibit 17 and incorporated into this Complaint by reference.

[251] The U.S. Central-UBS Master Agreement is attached as Exhibit 18 and incorporated into this Complaint by reference.

applicable to it.  ¶ 3(a)(iii).  The U.S. Central Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The U.S. Central Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the U.S. Central Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

306.    The U.S. Central Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The U.S. Central Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the U.S. Central Master Agreements.  ¶ 11.

307.    The U.S. Central Master Agreements state that all transactions between the parties are entered into in reliance on the fact that the relevant Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

308.    Each of the U.S. Central Master Agreements includes an implied covenant that each contracting party will act in good faith and deal fairly with the other party, and neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

309.    During the Relevant Period, U.S. Central entered into pay-fixed swaps governed by the U.S. Central Master Agreements, including the swaps listed in Appendix M, attached hereto.

310.    Bank of America, Barclays, Deutsche Bank, JPMorgan, Rabobank, RBS, and UBS breached and defaulted on the U.S. Central Master Agreements and breached the covenant of good faith and fair dealing through their collusive conduct, failure to disclose their collusive conduct to suppress U.S. Dollar LIBOR, and underpayments to U.S. Central tied to the artificially suppressed U.S. Dollar LIBOR.  As a consequence of this collusive conduct, U.S. Central did not receive the benefit of its contracts.

311.    Bank of America, Barclays, Deutsche Bank, JPMorgan, Rabobank, RBS, and UBS also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from their collusive and manipulative actions, in the form of paying less LIBOR-based payments at the expense of U.S. Central.

312.    Bank of America's, Barclays', Deutsche Bank's, JPMorgan's, Rabobank's, RBS's, and UBS's collusion to manipulate the LIBOR rate, and to make submissions that did not conform to the LIBOR definition, also frustrated the purpose of the U.S. Central Master Agreements, which was to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition.

313.    As a result of Bank of America's, Barclays', Deutsche Bank's, JPMorgan's, Rabobank's, RBS's, and UBS's breaches of the U.S. Central Master Agreements, breach of the covenant of good faith and fair dealing, and frustration of the purpose of the U.S. Central Master Agreements, U.S. Central and the NCUA as Receiver and Liquidator for U.S Central have suffered damages under the U.S. Central Master Agreements.

### SEVENTH CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH THE CREDIT UNIONS'
### CONTRACTS WITH OTHER DEFENDANTS AND THIRD PARTIES
### (ALL DEFENDANTS)

314.    NCUA incorporates by reference the preceding allegations.

315.     The Credit Unions entered into pay-fixed swaps tied to U.S. Dollar LIBOR with certain Defendants and counterparties other than Defendants.

316.     Defendants knew, or should have known, that the Credit Unions had entered pay-fixed swaps tied to U.S. Dollar LIBOR with other Defendants and third-party counterparties.

317.     Defendants intentionally interfered with these swap contracts and agreements by their collusive manipulation of U.S. Dollar LIBOR.  Defendants' tortious acts caused those contracts to be breached and the Credit Unions to receive reduced payments from those contracts and/or decrease in their value.

318.     As a result of Defendants' intentional interference with the Credit Unions' contracts and agreements, the Credit Unions and NCUA as Receiver and Liquidator for the Credit Unions suffered damages in the form of, among other things, receiving lower interest rate payments from third-party counterparties and Defendants.

### EIGHTH CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH THE CREDIT UNIONS'
### PROSPECTIVE ECONOMIC ADVANTAGE
### (ALL DEFENDANTS)

319.     NCUA incorporates by reference the preceding allegations.

320.     The Credit Unions had valid business expectancies; they had an established practice of engaging in swaps tied to U.S. Dollar LIBOR pursuant to contracts with certain Defendants and third-party counterparties.  Defendants knew or should have known of the Credit Union's expected payments from these swap contracts based on the level of U.S. Dollar LIBOR.  In fact, several Defendants were counterparties to similar swaps with the Credit Unions that were tied to U.S. Dollar LIBOR.

321.     Defendants intentionally interfered with the Credit Unions' business expectancies by improper means, as described throughout this Complaint, and caused the Credit Unions to receive

reduced payments from these contracts and/or a decrease in value over what the Credit Unions would have realized, absent Defendants' conduct.

322.    As a result of Defendants' intentional interference with the Credit Unions' business expectancies, the Credit Unions and the NCUA as Receiver and Liquidator for the Credit Unions suffered damages in the form of, among other things, lower interest rate payments from certain Defendants and others, and paying artificially high prices for swaps tied to U.S. Dollar LIBOR.

## NINTH CAUSE OF ACTION:
## UNJUST ENRICHMENT
## (ALL DEFENDANTS)

323.    NCUA incorporates by reference all proceeding paragraphs.

324.    Defendants Bank of America, Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, Rabobank, RBS, and UBS entered a contractual relationship with one or more of the Credit Unions.

325.    It would be inequitable for Defendants Bank of America, Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, Rabobank, RBS, and UBS to be permitted to retain the benefit which Defendants obtained from their manipulative acts at the expense of those Credit Unions.

326.    NCUA is entitled to the establishment of a constructive trust impressed on the benefits to these Defendants from their unjust enrichment and inequitable conduct.

327.    Alternatively or additionally each of these Defendants should pay restitution of its own unjust enrichment to NCUA.

## RELIEF SOUGHT

328.    That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

329.    That the unlawful conduct alleged herein be enjoined;

330.     That NCUA recover antitrust damages on behalf of the Credit Unions, as provided under the federal antitrust laws and state antitrust laws, and that a joint and several judgment in favor of NCUA be entered against Defendants in an amount to be trebled in accordance with such laws;

331.     That NCUA recover for all economic, monetary, actual, consequential, and compensatory damages that the Credit Unions or the NCUA as Liquidator for the Credit Unions suffered as a result of Defendants' breaches of their own contractual obligations and tortious interference with the Credit Unions' contracts and business expectancies;

332.     That NCUA recover all damages permitted by equity for Defendants' unjust enrichment;

333.     That NCUA recover their costs of the suit, including attorneys' fees, as provided by law; and,

334.     That the Court direct such further relief it may deem just and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

335.     Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, NCUA demands a jury trial as to all issues triable by a jury.  Pursuant to Local Rule 40.2(a), Plaintiff hereby designates Kansas City, Kansas as the place of trial in this action.

Dated:  August 13, 2019

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

Norman E. Siegel (D. Kan. # 70354)
Rachel E. Schwartz (Kan. # 21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

Of Counsel:
Michael J. McKenna, General Counsel
NATIONAL CREDIT UNION
   ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal
Credit Union, Members United Corporate
Federal Credit Union, Southwest Corporate
Federal Credit Union, and Constitution
Corporate Federal Credit Union

By:    /s/ Andrew C. Shen

David C. Frederick
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999

*Attorneys for the National Credit Union Administration Board*