**Davis Polk**

Paul S. Mishkin
+1 212 450 4292
paul.mishkin@davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
davispolk.com

March 16, 2022

Re: *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 11-MD-2262 (NRB)

Honorable Naomi Reice Buchwald
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Buchwald:

      We represent Bank of America Corporation and Bank of America, N.A., and serve as liaison counsel for Defendants in the above-captioned LIBOR MDL. We have appended to this letter Defendants' proposed case management schedule ("Defendants' Schedule"). We respectfully request that the Court so-order Defendants' Schedule, or in the alternative, endorse the case management framework set forth herein and order the parties to confer regarding specific deadlines.

      As set out in the recently filed joint letters, the parties have discussed extensively a proposed schedule for discovery and briefing on key legal issues with respect to the more than 100 distinct parties in this MDL.[1] As a result of the conferrals, the parties have reached agreement on issues including a process for identifying currently live claims; a schedule for production of relevant regulatory materials produced to class plaintiffs; and coordination of discovery requests. Defendants set forth below their positions on the parties' remaining disagreements.[2]

### I. An Accelerated Schedule for Discovery on and Briefing of "Upstream" Issues Would Result in Substantial Efficiencies in Resolving This Litigation

      Defendants propose to stagger the deadlines for "upstream" and "downstream" issues across the cases. The scope and nature of this MDL litigation turn in large part on the outcome of threshold "upstream" issues—i.e., issues relating to Plaintiffs' allegations that Defendants *suppressed* and/or *conspired to suppress* LIBOR, including what "suppression" means in the context of the LIBOR question. Those upstream issues can and should be resolved earlier than the "downstream" issues, which relate to whether each of the approximately 90 distinct Plaintiffs in this MDL has a claim against a particular Defendant *if* the Defendant suppressed LIBOR or conspired to do so (e.g., whether Plaintiffs suffered a net injury as a result of alleged LIBOR manipulation, and Plaintiffs' notice of and reliance on an allegedly inaccurate LIBOR).

---

[1] By "distinct parties," Defendants refer to separate, unaffiliated entities or individuals, and include only plaintiffs whose claims have survived a motion to dismiss.

[2] Consistent with the Court's recent memorandum endorsement, *see* ECF No. 3371, the BBA Defendants (the "BBA") respectfully request that any discovery to or from the BBA remain stayed pending resolution of any motions to dismiss filed by the BBA, including in the Bay Area Tolling Authority ("BATA") action, and any disputes as to whether any Plaintiffs have live claims against the BBA. To the extent that other DAPs who named the BBA argue they should be permitted to take discovery from the BBA while the "Joint Memorialization" process is ongoing, the BBA submits that it would be inappropriate to do so when there remain live disputes about whether the BBA is subject to jurisdiction in the MDL and inefficient to subject the BBA to different discovery schedules in the BATA action relative to other actions.

**Davis Polk**   Honorable Naomi Reice Buchwald

Defendants propose simultaneous and immediate commencement of both upstream and downstream discovery, but with a shorter upstream track that would allow upstream-related dispositive issues to be presented to the Court much earlier than the conclusion of all discovery. Specifically, for upstream issues, Defendants' Schedule contemplates 8 months for document discovery, 4 months for fact depositions, and 6 months for expert work, followed promptly by upstream dispositive motions. For downstream issues, Defendants anticipate the parties realistically will need 12.5 months for document discovery and 13 months for fact depositions, followed—if dispositive motions on upstream issues do not resolve the case—by downstream expert work and further motion practice after the Court rules on the upstream-related motions. The benefits of this staggered approach are described below.

### A. The Upstream Issues Are Threshold Issues That May Obviate the Need for Some or All Downstream Discovery and Briefing

Resolving the upstream issues, i.e. whether any Defendant conspired to suppress LIBOR, or submitted an artificial LIBOR *at all*, may resolve this entire litigation or narrow it significantly, which would then streamline any downstream expert discovery and briefing that the approximately 100+ parties in this MDL may otherwise need to undertake.

For example, if, with the benefit of discovery, the evidence is insufficient to create a triable question of fact on Plaintiffs' allegations of a 16-bank conspiracy, that would (1) result in the dismissal of all or most antitrust claims; and (2) "call into question" any potential class certification motion with respect to the foreign Defendants in the OTC action, as to which a class has not yet been certified, and whether an OTC class against Bank of America and JPMorgan should remain certified. *See LIBOR VII*, 299 F. Supp. 3d 430, 607 n.189 (S.D.N.Y. 2018). Moreover, early resolution of upstream issues is particularly important for addressing whether personal jurisdiction exists over each Defendant in each action on the basis of conspiracy jurisdiction, the only theory of personal jurisdiction that the Second Circuit held Plaintiffs adequately alleged at the pleading stage.[3]

In addition, Defendants intend to argue that Plaintiffs' claims fail under the Second Circuit's recent decision in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022). As this Court has recognized, the meaning of the LIBOR question "is a merits question . . . that . . . has potentially significant consequences." ECF No. 2425 at 49:8–12. In *Connolly*, the Second Circuit addressed this very issue and held that "there was no one true [LIBOR] rate that [a panel bank] was required to submit" and that "[i]f the [panel bank's LIBOR] rate submitted is one that the bank could request, be offered, and accept, the submission, irrespective of its motivation, would not be false." 24 F.4th at 835, 837. Defendants contend that *Connolly* compels dismissal of Plaintiffs' claims, because Defendants' borrowing cost data conclusively shows that they did not systematically suppress their LIBOR submissions relative to the rates that they "could request, be offered, and accept." *Id.* at 835. Moreover, *Connolly* calls into question the reliability of OTC Plaintiffs' class damages model, which ignored entirely the panel banks' borrowing rate data in assessing alleged LIBOR suppression.

---

[3] To the extent that Plaintiffs claim there are factual disputes regarding conspiracy jurisdiction, Defendants may request that the Court hold an evidentiary hearing (after upstream discovery) to resolve such disputes.

### B.   Discovery on Upstream Issues Can Be Completed Much More Quickly Than Discovery on Downstream Issues

Staggered schedules for upstream and downstream discovery also makes sense because downstream discovery will be more complex and time-consuming than upstream discovery. Plaintiffs' proposed schedule ("Plaintiffs' Schedule") is both unrealistic and inefficient, including because it would delay any resolution of upstream issues until all downstream discovery is complete. As described in more detail below, it is highly unlikely that all discovery, including downstream discovery, could be completed in the timeframe Plaintiffs have proposed; inevitably, the parties will need more time, delaying resolution of potentially dispositive upstream issues.

*Document Discovery*—Plaintiffs' Schedule allows only 7.5 months for *all document discovery*.[4] In a complex MDL that includes 100+ distinct parties—including about 90 distinct Plaintiffs—it is wishful thinking to suggest that all parties could complete negotiations, collections, and productions on that timetable. Importantly, *no Direct Action Plaintiff has to date provided any discovery at all*. Plaintiffs that have provided *no discovery* include large financial institutions (e.g., Fannie Mae, Freddie Mac, Charles Schwab, Prudential), dozens of municipal government entities, and about 20 failed banks on whose behalf the FDIC has sued. Plaintiffs' proposal that all document discovery from about 90 Plaintiffs, and from Defendants relating to each of those 90 Plaintiffs, could be completed in just 7.5 months is unrealistic.[5]

Document discovery on *upstream* issues, however, *could* realistically be completed in about 7-8 months. That discovery will require production principally from Defendants and third parties, and many Defendants have already made substantial upstream document productions that there are good reasons to expect are sufficient.

For downstream document discovery, Defendants propose 12.5 months, which would be more reasonable in light of the 100+ parties involved (and faster than similar cases with far fewer parties). *See supra* note 5. More fundamentally, by decoupling those two deadlines, Defendants' Schedule ensures that any delays in downstream discovery will not delay threshold upstream issues.

*Depositions*—Plaintiffs' 8-month window for completing all fact depositions is also unrealistic.[6] Assuming—purely for illustrative purposes—that there were an average of 3 depositions per party across the 100+ distinct parties in this MDL, the parties would take more than 300 depositions (not including third-party depositions).[7] To complete that many depositions in the

---

[4] The length of time between Plaintiffs' proposed dates for "propound[ing] opening discovery requests" (April 1, 2022) and "[s]ubstantial completion" of document productions in response to those requests (November 14, 2022) is 7.5 months.
[5] For example, in the FX *Allianz* litigation, a case that involved only about 30 distinct parties, document discovery took more than 19 months. *See Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 18-cv-10364 (LGS) (S.D.N.Y.), ECF Nos. 453, 985. And in the *Gold* multidistrict litigation, also involving about 30 distinct parties, substantial completion of document discovery took 18 months. *See In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, 14-md-2548 (VEC) (S.D.N.Y.) ("*Gold*"), ECF Nos. 327, 445.
[6] The length of time between Plaintiffs' proposed dates for "[s]ubstantial completion of rolling production of documents responsive to Opening Requests" (November 14, 2022) and "[c]lose of fact discovery" (July 18, 2023) is 8 months.
[7] Defendants understand from the meet-and-confer process that Plaintiffs do not dispute that there will foreseeably be hundreds of depositions in this case. For the avoidance of doubt, Defendants reserve all rights as to the appropriate number of Plaintiff and Defendant depositions in this MDL.

time that Plaintiffs' Schedule allots would require the parties to take about 2 depositions *every non-holiday weekday, without interruption, for 8 months*.  That would be unrealistic in any litigation, let alone one in which many of the witnesses are no longer employed by the parties (as the events in question occurred 12-15 years ago), and many are located outside the U.S.  *See, e.g.*, *Gold*, ECF Nos. 429, 438, 443, 445 (more than 7 months to complete about 70–80 depositions).

Again, such a deposition schedule is unrealistic in substantial part because of the number of witnesses on *downstream* issues.  Witnesses from each of the approximately 90 Plaintiffs will need to testify regarding, for example, statute of limitations, reliance, causation, and damages issues, such as when and how Plaintiffs were on notice of alleged LIBOR manipulation, whether they relied on any alleged misrepresentations regarding the accuracy of LIBOR, the circumstances of Plaintiffs' LIBOR-based transactions and what they would have been "but for" alleged LIBOR manipulation, and Plaintiffs' hedging portfolios and the net extent of their alleged injuries.  Plaintiffs will undoubtedly also seek testimony from Defendants' witnesses on some of those same issues.  It is reasonable to assume these depositions alone would take 13 months, and possibly more, to complete.

By contrast, depositions of witnesses with knowledge of upstream issues could proceed far more quickly.  Those depositions would be limited principally to Defendants' current or former employees who were involved in the LIBOR submission process and targeted at Plaintiffs' allegations of LIBOR suppression and conspiracy.  Defendants believe that upstream depositions could be completed within 4 months after the close of upstream document discovery.

Setting different deadlines for upstream and downstream depositions would thus promote efficiency by allowing upstream issues to be resolved promptly, while downstream discovery would continue on a parallel but necessarily more extended track.

### II.  Plaintiffs' Proposed Schedule for Briefing Is Prejudicial to Defendants

Plaintiffs' Schedule would require that Defendants file summary judgment and *Daubert* motions and class certification oppositions before Plaintiffs serve their expert reply reports and expert depositions are complete—enabling Plaintiffs' experts to try to revise their analysis to address whatever deficiencies Defendants identify.  Indeed, under Plaintiffs' Schedule, Defendants would have no opportunity to address Plaintiffs' class certification expert reply reports *at all*.  Pls.' Sch. rows 23–24.  That is a recipe for unfairness and inefficiency.  This briefing on upstream and downstream issues should occur only *after* expert discovery on each of those issues is complete.

Similarly, there is no basis to permit Plaintiffs to file their summary judgment motions *after* Defendants have filed theirs or to deny Bank of America and JPMorgan a right to a reply brief on any motion for class decertification, as Plaintiffs propose.  Pls.' Sch. rows 22, 24.  If, as Plaintiffs claim, they wish to streamline the briefing process, they should file their motions when Defendants file theirs.  That approach also avoids the unfairness of giving Plaintiffs the last word on *all* briefing.

### III.  The Court Should Reject Certain Other Aspects of Plaintiffs' Proposed Schedule

- The Court should reject footnote 8 in Plaintiffs' Schedule, which would provide an open-ended extension of fact discovery to complete foreign depositions so long as an *initial* request is

submitted to this Court by the applicable deadline for Hague requests.  Pls.' Sch. row 14 n.8.  In many circumstances a deposition may be delayed due to a party's lack of diligence, even if it was initially requested in a timely manner.  The Court need not prejudge these issues; the parties are amply protected by the Court's authority to grant reasonable extensions for "good cause" shown.

- The Court should reject Plaintiffs' proposal of only an "initial" deadline for Hague requests, which would allow Hague requests to be made any time until the close of fact discovery.  The absence of a deadline for Hague requests will predictably result in requests for extension.  Defendants' Schedule solves for this issue, proposing that the deadline to serve Hague requests would be 45 days after the substantial completion of document productions (for upstream and downstream productions, respectively).  Defs.' Sch. rows 16, 23.

- The Court need not adopt Plaintiffs' blanket proposal that any Defendant that produced materials to class counsel as part of class certification discovery produce those materials to *all* DAPs, because the issue is not ripe.  Pls.' Sch. row 3 n.2.  The applicable Defendants do not object to producing such materials to DAPs that name them as defendants and whose claims have survived a motion to dismiss.  However, where a defendant is not even named in an action, the parties should meet and confer through the agreed deadline to amend complaints regarding whether production of such materials is appropriate, and raise with the Court any case-by-case issues that require resolution by that deadline.

- The Court should reject as premature Plaintiffs' inclusion of dates for remand to transferor courts, joint pretrial orders, and trial.  Pls.' Sch. rows 29-31.  Additional pretrial proceedings (e.g., motions *in limine*) may be appropriate before remand.  Moreover, Plaintiffs' inclusion of a specific trial date less than 3 months after summary judgment, *Daubert*, and class certification briefing is complete is unrealistic and underscores the prematurity of setting a trial date.  Such issues need not be resolved now.

- The Court should limit class certification briefing to the OTC case—not leave it open to any Plaintiffs to file further class motions on the same schedule.  Pls.' Sch. row 21.  Exchange Plaintiffs told Defendants just two days ago that they wish to reserve the right to file new certification motions.  But Exchange Plaintiffs have no basis to relitigate class issues; their certification motion was previously denied on grounds that have not been called into question.  Moreover, the OTC class schedule is not necessarily appropriate for other cases.  The Court should schedule only OTC class briefing now, without prejudice to Exchange Plaintiffs' ability to request a class briefing schedule promptly once they have met-and-conferred with Defendants.[8]

* * *

Defendants respectfully request that the Court so-order Defendants' Schedule, or, in the alternative, endorse the case management framework set forth in this letter and order the parties to meet and confer regarding specific deadlines to implement that framework.

---

[8] Defendants also note that Plaintiffs have refused to include certain reservation of rights and meet and confer language reflected in footnotes 1, 4, 6, 8, and 11 of Defendants' Schedule.  Defendants understand that Plaintiffs object merely to their inclusion in the schedule Plaintiffs seek to have the Court so-order.  Thus, Defendants do not believe there is a substantive disagreement that needs to be raised with the Court at this time with respect to those issues.

**Davis Polk**  Honorable Naomi Reice Buchwald

Respectfully yours,


*/s/ Paul S. Mishkin*
Paul S. Mishkin

Attachment

cc:   All Counsel of Record via ECF (with attachment)