October 6, 2022

Via CM/ECF

The Honorable Naomi Reice Buchwald
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: *In re LIBOR-Based Financial Instruments Antitrust Litigation*, MDL 2262

Dear Judge Buchwald:

    On behalf of Plaintiffs, we write pursuant to Section II.B. of the Court's Individual Practices to request an order compelling Defendants to (1) apply search terms to electronically stored information ("ESI") found in certain current and former employees' custodial files, and (2) produce all non-privileged and responsive documents that hit on those search terms and are relevant to the two upstream topics prioritized by the Court for summary judgment motions—the existence of a conspiracy to persistently suppress LIBOR and the effect of *United States v. Connolly*, 24 F. 4th 821 (2d Cir. 2022). ECF No. 3386.[1]

    Rule 26(b)(1) imposes upon Defendants an obligation to produce information that is relevant and proportional to the needs of the case "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Defendants claim that they need not search for any more documents because their productions to date, which generally consist of subsets of the productions that Defendants previously made to government regulators (the "Regulatory Productions"), satisfy that obligation and that the requested searches are not proportional and/or are unduly burdensome. But Defendants have failed to make any showing of undue burden despite the fact that Plaintiffs have specifically identified numerous gaps that are unquestionably relevant to the upstream topics and will provide evidence that Plaintiffs will use to meet their burden of proof. In fact, beyond the threadbare effort of producing a pre-existing collection of documents, Defendants have borne practically no discovery burden to date in this MDL on the upstream topics at issue in this letter. Plaintiffs' requests largely fall into six categories pertaining to the following:

(1) Defendants' suppression of LIBOR, in order to show that they collusively set their LIBOR contributions at rates that were not truthful answers to the LIBOR question;

(2) Defendants' efforts through interbank brokers to facilitate, monitor, and police their coordinated persistent suppression of LIBOR;

---

[1] Following the conference with the Court on September 28, 2022, the parties met and conferred with respect to the format of this pre-motion letter. The parties agreed that Plaintiffs would file a letter no longer than 15 single spaced pages on the common issues outlined for the Court and Defendants would file a response of the same length.

(3) Thomson Reuters' efforts to carry out so-called "tolerance checks" that Defendants used to monitor and enforce their coordinated persistent suppression of LIBOR;

(4) the roles of the British Bankers Association ("BBA") and related committees, including, but not limited to, the Foreign Exchange and Money Markets Committee ("FXMMC"), in the Defendants' coordinated persistent suppression of LIBOR;

(5) the role of the Bank of England ("BOE") in the Defendants' coordinated persistent suppression of LIBOR; and

(6) communications with the Federal Reserve Bank of New York ("NY Fed") regarding Defendants' persistent suppression of LIBOR.[2]

The requested information is directly relevant to upstream issues focusing on the existence of the conspiracy. As the Second Circuit noted in *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016), conspiracies are rarely evidenced by explicit agreements and must be proven through inferences that may fairly be drawn from the statements and actions of the alleged conspirators.[3] ESI—which includes commonly used forms of electronic communications such as emails and Bloomberg instant messages, as well as audio recordings—is the primary source of evidence for such statements and actions.

Defendants are in sole possession of the requested documents, have ample resources to respond to the discovery sought, and do not seriously dispute the relevance of information that Plaintiffs seek. Nor do they dispute that the upstream topics are critically important to the MDL or that the financial stakes of this MDL lie in the tens of billions of dollars, and likely more. Instead, they argue that the requested searches are not proportional and/or are unduly burdensome because *some* Defendants' Regulatory Productions already include *some* documents that fall within these categories. But producing an incomplete set of documents (culled from Defendants' pre-existing Regulatory Productions before Plaintiffs served their upstream requests for production in this MDL) does not absolve Defendants of their individual obligation to respond to legitimate discovery requests.

Further, in most cases, Defendants have done nothing to substantiate their claims of undue burden. They have not produced (1) deduplicated search term hit reports detailing the number and volume of unique documents Plaintiffs' proposed searches return (indeed only one Panel Bank,

---

[2] In accordance with the Court's instructions during the September 28, 2022 conference, Plaintiffs have focused this submission on common issues applicable to multiple Panel Banks and have not included issues peculiar to only a single bank. Nonetheless, Plaintiffs note that there are meaningful discovery issues, particularly pertaining to custodians but also affecting search terms, that are unique to one bank or another. Plaintiffs remain willing to submit bank-by-bank briefing on custodians and search terms should the Court be willing to entertain it.

[3] Parallel action is a "powerful form" of circumstantial evidence. *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018). So is "traditional evidence of conspiracy," such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* The trier of fact must look to the evidence as a whole, and not piecemeal, to determine the conspiracy question. *Id.* at 104.

Page 3

Credit Suisse, has produced any search term hit reports (albeit not deduplicated) at all),[4] (2) estimates of document review expenses, or (3) samples of non-responsive categories of documents, each of which would have allowed the parties to address the Defendants' claims and, if meritorious, provide insight into how the parties can further narrow Plaintiffs' proposals.

In contrast, Plaintiffs made numerous proposals to Defendants aimed at identifying and mitigating any purported burden. To account for the fact that the additional search terms and new custodians will inevitably identify some documents that were already produced, Plaintiffs proposed the use of routine "deduplication" techniques that would identify *only* new documents that were not produced to Plaintiffs. And, to the extent Defendants are cost-conscious or issues particular to a Defendant preclude perfect deduplication, Plaintiffs have offered to allow them to produce documents hitting on Plaintiffs' search terms without further review while maintaining the ability to claw back documents without waiving any applicable privilege or protection from disclosure. In addition, Plaintiffs have offered to consider hit-count reports that would allow the parties to see whether application of certain search terms return a disproportionately large number of documents even without deduplication, or to use responsiveness sampling to refine terms that Defendants take issue with. In that case, Plaintiffs would narrow or refine their proposed terms to limit the number or improve the responsiveness of the documents they are returning. Such iterative narrowing is the norm in complex cases involving ESI. *See, e.g.*, *Lareau v. Northwestern Medical Ctr.*, No. 2:17-cv-81, 2019 WL 1379872 (D.C. Vt. Mar. 27, 2019) ("In a typical case, a court will require the parties 'to test both the cost and the yield' of sample searches in order to determine whether the discovery request is reasonable."); *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 418 (S.D.N.Y. 2009) ("The concept of sampling to test both the cost and the yield is now part of the mainstream approach to electronic discovery."). Most Defendants have categorically refused to engage in these routine exercises and substantiate their claims of burden.

*Even if* Defendants' unsupported assertions of burden arising from Plaintiffs' proposed custodians and search terms were taken at face value, the fact that the requested searches may result in substantial productions confirms that the prior searches were inadequate. Moreover, the fact that Defendants may have to spend additional time to determine whether a document hitting on search terms is responsive does not make Plaintiffs' requests disproportionate to the needs of this important case. Defendants do not credibly argue that the burden or expense of the requested discovery outweighs the benefit—nor can they on the basis of their limited disclosures—and have completely failed to meet their burden of showing with specificity how the proposed search terms and custodians are unduly burdensome. Plaintiffs respectfully request that the Court therefore order Defendants to run the proposed search terms and produce all relevant, nonprivileged documents that have not already been produced.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure Rule 26(b)(1), parties may obtain discovery

---

[4] Running Plaintiffs' proposed search terms and producing a deduplicated hit report would reveal the number of unproduced documents hitting upon each proposed search term that Defendants would have to review for the first time, thus providing a concrete indication of the burden associated with each of Plaintiffs' requested searches. Deduplication is an automated process that can be done in a matter of days by document management vendors. The process requires *de minimis* attorney oversight or involvement.

regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. "Relevant evidence" means evidence having "any tendency to make a fact more probable or less probable than it would without the evidence" where "the fact is of consequence in determining the action." *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod., Inc.*, No. 19-cv-3766, 2020 WL 7342724, at *12 (S.D.N.Y. Dec. 11, 2020) (citation omitted). Relevance is an "extremely broad concept" for discovery requests. *Id*. at *11. In antitrust cases, courts generally allow even more liberal discovery because "the proof is largely in the hands of the alleged conspirators." *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018) (quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962)).[5] For example, one court recently wrote that a "plaintiffs' allegations of an antitrust conspiracy suggest that broader search terms may be warranted than in a case where pertinent communications might be less guarded." *In re Diisocyanates Antitrust Litig.*, No. 18-1011, 2021 WL 4295729, at *11 (W.D. Pa. Aug. 23, 2021).

The party seeking discovery bears the initial burden of showing relevance. *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012). Once the plaintiff has made a *prima facie* showing of relevance, the burden shifts to defendants to demonstrate that the discovery is overly broad or unduly burdensome. *Hicks v. Leslie Feely Fine Art, LLC*, No. 20-cv-1991, 2021 WL 3617208, at *4 (S.D.N.Y. Aug. 13, 2021). Conclusory allegations of undue burden will not suffice. The party resisting discovery must show "specifically how, despite the broad and liberal construction afforded [by] the federal discovery rules" the requests are unduly burdensome or oppressive with affidavits or evidence. *Neogenix Oncology, Inc. v. Gordon*, No. 14-cv-4427, 2017 WL 1207558, at *8 (E.D.N.Y. Mar. 31, 2017).

In large, complex cases such as this, it is customary for discovery to private plaintiffs to build upon and supplement existing regulatory productions. For example, in *Alaska Electrical Pension Fund v. Bank of America Corp.*, another financial services antitrust case, and in circumstances similar to this case's present posture, the Court observed that the defendants had "produced over 1.6 million pages of documents previously produced to the CFTC" at the outset of the discovery period, 2016 WL 6779901, at *2 (S.D.N.Y. Nov. 16, 2016). Notwithstanding that substantial initial production, defendants produced an additional 3.29 million documents to plaintiffs above-and-beyond those produced to regulators, for a total of 4.89 million documents. *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-cv-7126, ECF No. 682 at ¶ 37 (S.D.N.Y.). In that case, which affected a financial benchmark smaller than LIBOR with significantly less impact on the volume of commerce, the productions that were returned by the private plaintiffs' supplemental searches were **more than double** the size of the existing regulatory productions that the private plaintiffs sought to build upon.

Courts roundly reject the notion that Defendants are immune from requests for "similar searches . . . [of] custodians [previously searched] during DOJ investigation[s]," particularly

---

[5] *See also, e.g.*, *Markson v. CRST Int'l, Inc.*, No. 17-cv-1261, 2021 WL 4027499, at *5 (C.D. Cal. May 14, 2021) ("In antitrust conspiracy cases such as this, courts have generally allowed liberal discovery to 'uncover evidence of invidious design, pattern, or intent.'"); *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. CIV.A. 08-4168 MLC, 2011 WL 5416334, at *7 (D.N.J. Nov. 7, 2011) (same) (collecting cases); *Leonia Amusement Corp. v. Lowe's Inc.*, 16 F.R.D. 583 (S.D.N.Y. 1954) (noting that "[i]n such cases the facts of the conspiracy are largely in the possession and within the knowledge of the defendants" and "[t]he acts which constitute [the conspiracy] are usually unavailable and unknown to plaintiff").

where, as here, the DOJ searches were "more limited both in time frame and substance in terms of key words than what the [Plaintiffs] are now proposing." *In re Broiler Chicken Antitrust Litig.*, 2018 WL 3586183, at *2 (N.D. Ill. July 26, 2018); *see also, e.g.*, *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 104 (S.D.N.Y. 2013) (granting additional discovery because plaintiffs "provided sufficient justification for expanding search terms" by "highlight[ing] both general categories and concrete examples of documents . . . that are relevant but would not be discovered" by the current search); *In re Farm-Raised Salmon And Salmon Products Antitrust Litigation*, No. 19-cv-21551, ECF No. 533-1 ¶¶ 11, 25 (S.D. Fla.) (noting that the defendants produced 183,000 documents to the DOJ and the EC, but ultimately produced 872,000 documents, totaling more than 62 million pages to the plaintiffs in the civil litigation); *In re Domestic Airline Travel Antitrust Litig.*, No. 15-1404, ECF No. 270-1 at n.2, 12 (D.D.C.) (noting that four defendants collectively produced some 500,000 documents to the DOJ, while producing another 5.5 million unique documents (for a total of 6 million documents) to the private plaintiffs).

In the specific context of search terms, "Defendants have an obligation not just to assert their objection but explain the grounds for the objection and to point to evidence supporting it." *L-3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 670 (M.D. Fla. 2015) (citing *The Case for Cooperation*, 10 Sedona Conf. J. 339, 354 (2009)).[6] That means Defendants should provide hit reports, the time and expense of the requested review, the responsiveness rate of the search terms based on a representative sample, and/or examples of irrelevant documents upon which the search terms hit to allow for additional tailoring of the search parameters. *See, e.g.*, *Assured Guar. Mun. Corp. v. UBS Real Est. Sec. Inc.*, No. 12-cv-1579, 2012 WL 5927379, at *2 (S.D.N.Y. Nov. 21, 2012) (granting motion to compel where party's objections on burden grounds were based "exclusively" on the number of documents returned by search terms without any responsiveness sampling as "the total number of documents 'harvested' is not a particularly compelling statistic by itself, because it says nothing about the possible significance of the documents").[7]

### PLAINTIFFS' REQUESTS ARE RELEVANT AND PROPORTIONAL TO THE NEEDS OF THE MDL

**Common Gaps in the Search Methodologies Used by Defendants to Generate Their Regulatory Productions as to the Issues of Persistent or Coordinated Suppression**

---

[6] *See also, e.g.*, *Maurer v. Sysco Albany, LLC*, No. 19-cv-821, 2021 WL 2154144, at *4 (N.D.N.Y. May 27, 2021) (granting plaintiff's motion to include a search term where "defendants have not set forth arguments or evidence to support" claim that inclusion of search term was overly broad); *Montesa v. Schwartz*, No. 12-cv-6057, 2015 WL 13173164, at * 2 (S.D.N.Y. Feb. 20, 2015) (rejecting as "conclusory and therefore insufficient to bar discovery," defendant's undue burden objection to the inclusion of certain search terms, where defendant failed to "demonstrate burdensome nature of discovery by submitting affidavits or evidence revealing the nature of the burden").

[7] *See also, e.g.*, *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) (holding that the producing party could have provided "an estimate of the number of documents that it would be required to provide [the requesting party] in order to comply with the request, the number of hours of work by lawyers and paralegals required, and the expense.") (citations omitted); *Cty. of Cook v. Bank of Am. Corp.*, No. 14-cv-2280, 2019 WL 5393997, at *6 (N.D. Ill. Oct. 22, 2019) (granting motion to compel where no representative sampling or comparison of proposed searches to determine the extent to which the burden of reviewing documents that hit on search terms was disproportionate); *Finisar Corp. v. Nistica, Inc.*, No. 13-cv-03345, 2014 WL 12887160, at *3 (N.D. Cal. Dec. 12, 2014) ("[I]f a party insists that a search term results in too many hits, the party will have run the search and will be able to provide the opposing party with the number of hits and specific examples of irrelevant documents captured by the search.").

Plaintiffs have spent thousands of hours reviewing the Defendants' regulatory productions in this MDL and based on that review identified gaps in the productions and the search methodologies Defendants used to generate them. Plaintiffs have identified certain common gaps in both the search terms used to identify evidence of persistent suppression[8] and efforts to coordinate persistent suppression.

With respect to search terms, Plaintiffs have identified numerous relevant terms that the Defendants did not search. As one example, Defendants did not search for the term "lowball," which was a term of art that Defendants used to refer to persistent suppression.[9] As another, most Defendants searched only for "LIBOR"—but not "LIBOR*"—and thereby excluded from their collection sets relevant documents that only used the term LIBOR**s**, plural.[10] Other examples include Defendants' failure to search for terms that the Second Circuit referenced in its prior *LIBOR* decisions as probative of whether Plaintiffs have met their burden of proof, such as "middle of the pack," "err on the low side," and references to not wanting to be "an outlier in the libor fixings." *See Schwab Short Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 123 (2d Cir. 2021); *Gelboim*, 823 F.3d at 781 n.19.[11]

Similarly, Plaintiffs discovered in their document review that at least some Defendants implemented directives to submit LIBORs within a particular range of all submissions, e.g., within the top quartile, bottom quartile, or in the middle. Plaintiffs therefore propose additional terms not utilized in connection with the regulatory productions, such as "quartile," "kick* out," and "knock* out." Plaintiffs' terms generally combine commonly used phrases associated with the conspiracy to suppress LIBOR—such as "pack," (err w/15 (lo* or hi* or side)), "in*line," "consensus," "club," "outlier*"—combined with "LIBOR*" or common synonyms for LIBOR

---

[8] Evidence of persistent suppression across the Panel Banks demonstrates the existence of parallel conduct, which—coupled with either direct or circumstantial evidence (such as plus factors) indicating a formal or informal understanding among the Panel Banks to persistently suppress LIBOR—can satisfy Plaintiffs' burden of proof. *Gelboim*, 823 F.3d at 772; *Anderson News*, 899 F.3d at 104. Some Defendants have taken the position that evidence of persistent suppression is irrelevant to the upstream proceedings. That is false. Unless Defendants stipulate to the existence of parallel conduct in the form of persistent suppression across the Panel Banks during the relevant period, Plaintiffs are entitled to discovery into both persistent suppression as well as efforts to coordinate suppression.

[9] *E.g.*, Ex. 1,  Ex. 2, Ex. 3,

[10] *E.g.*, Ex. 4, Ex. 5, Ex. 6, Ex. 7,

[11] Plaintiffs attach as Appendix 1 a set of exemplar search terms that have served as the baseline "corpus" of search terms Plaintiffs used in negotiations. Consistent with the Court's instructions during the September 28, 2022 conference, Plaintiffs are presenting one common set of search terms, but note that they have modified the set applicable to particular Defendants based on search term hit reports (in the few instances they were provided to Plaintiffs) or other Defendant-specific issues. Plaintiffs remain willing to brief bank-by-bank search term proposals.

such as "rate*," "submi*," "set*," "fix*," or "level*." It is essential to employ search terms that are consistent with the manner of speech and slang terms that the Defendants' relevant custodians commonly used as synonyms for LIBOR, including references to synonyms for LIBOR submissions such as the terms "levels," "settings," or "rates."[12]

On custodians, Plaintiffs have identified relevant document custodians whose files were not previously searched—including some of the Panel Banks' actual U.S Dollar LIBOR submitters as well as high-level executives—that either gave instructions to suppress, implemented instructions to suppress, discussed anticipated USD LIBOR submissions with their counterparts at other (supposedly competing) Panel Banks, or admitted the existence or efficacy of LIBOR suppression. Previously unsearched custodial files touching upon these issues are appropriate sources of discovery in this action.

For example, certain Panel Banks (e.g., Bank of America and RBS) have refused to produce the files of custodians who appear to have communicated with other employees of other Panel Banks about anticipated LIBOR submissions.[13] Other Panel Banks (including RBS and Norinchukin) have even acknowledged that their regulatory productions missed the custodial files of at least one of their *USD LIBOR submitters*—searches of USD LIBOR submitters are both *ipso facto* relevant and proportional. Similarly, certain Panel Banks (e.g., Bank of America, JP Morgan, and RBS) have refused to search the files of individuals that appear to have admitted to the existence of at least parallel suppression by some of the Panel Banks.[14] Further, certain Panel Banks (e.g., JP Morgan, Deutsche Bank, HSBC, and RBS) have refused to produce documents from certain high-level executives simply because they were senior executives, even though the limited productions to date and publicly available documents show that those executives met with supposed competitors to coordinate their LIBOR strategies, issued directives to persistently suppress LIBOR, or acquiesced to requests from subordinates to persistently suppress LIBOR. For example, there are references

---



[12] *E.g.*, Ex. 8, ██████ Ex. 9, ██████ ; Ex. 10, ██████ Ex. 11, ██████

[13] *E.g.*, Ex. 12, ██████ Ex. 13, ██████ *see also, e.g.*, Ex. 14, ██████ Ex. 15, ██████

[14] *E.g.*, Ex. 16, ██████ Ex. 17, ██████ Ex. 18, ██████ Ex. 19, ██████

████ regulatory findings of an "undisputed reporting line" between senior executives and those tasked with "making sure our libors are on the low side for all ccvs [currencies]" (for Deutsche Bank), and evidence of meetings and conversations among those high-level executives regarding ways to coordinate their LIBOR submissions.[15] *See also* pp. 11-12, *infra* (discussing relevance of executives). These senior executives were in many instances the source of suppression directives and their documents should be searched and produced.

With only minor exceptions, Defendants have refused to run Plaintiffs' search terms on the basis that they are duplicative of prior searches and result in an undue burden that is disproportional to the needs of the case. Defendants' first argument lacks any factual support. Defendants cannot say "with certainty (or even confidence) that [the requested searches] do not [return] unique, relevant information," and that failure renders Defendants' assertions of duplication "completely speculative." *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, No. 14-cv-9372, 2018 WL 2215510, at *8 (S.D.N.Y. May 15, 2018). Defendants have almost across the board declined to produce any reporting of the number of documents retrieved by Plaintiffs' proposed searches, the number of documents retrieved by the searches after deduplication across their existing productions to Plaintiffs, or any sampling of the responsiveness rate of Plaintiffs' proposals. With a few exceptions, Defendants have also refused to disclose the relevance criteria used in responding to regulators' requests (which also have not been disclosed), which makes it impossible for Plaintiffs to know whether the Regulatory Productions would have captured the same information requested by Plaintiffs. This is insufficient to meet their burden to resist Plaintiffs' requests for relevant information.[16] And in any event, any such burden is of Defendants' own design, as Defendants remain free to produce documents without reviewing them and the Court is free to order the same, consistent with practice in other MDLs and Federal Rule of Evidence 502(d).[17]

---

[15] *E.g.*, Ex. 20, ████████████████████████████████████████████████

Ex. 21, ████████████████████████████████████████████████

[16] *See, e.g.*, *Zhulinska v. Niyazov L. Grp., P.C.*, No. 21-cv-1348, 2021 WL 5281115, at *3 (E.D.N.Y. Nov. 12, 2021) (defendants failed to establish undue burden as to search terms where "defendants have not actually performed any searches to determine how many emails would be captured by various search terms" and therefore "their claims of undue burden [we]re merely speculative"); *Thomas v. City of New York*, 336 F.R.D. 1, 3, 4 (E.D.N.Y. 2020) (finding defendants could not avoid ESI production where defendants' objections "[we]re devoid of any specific analysis of the burden of the ESI production being sought by Plaintiff," "[ga]ve no indication of the volume of responsive ESI," and "failed to demonstrate exceptional costs in reviewing allegedly redundant ESI"); *Black Love Resists in the Rust ex rel. Soto v. City of Buffalo*, 334 F.R.D. 23, 28 (W.D.N.Y. 2019) (rejecting claim of burden where defendants "have not quantified that burden in terms of the number of documents subject to collection and review or the amount of time and manpower that would be reasonably required to comply with the requests") (internal quotation marks and citation omitted); *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 418 (S.D.N.Y. 2009) ("The concept of sampling to test both the cost and the yield is now part of the mainstream approach to electronic discovery.").

[17] *See, e.g.*, *In re Actavis Holdco, U.S., Inc.*, 2019 WL 8437021, at *1 (3d Cir. Dec. 6, 2019) (affirming MDL district court's "wide latitude in controlling discovery," including discretion to order the "production of documents without a manual relevance review" and observing that "a similar approach is contemplated in Federal Rule of Evidence 502(d), by which a court may order production [even] without a privilege review") (collecting cases).

### Discovery Targeted at Interbank Brokers' Role in the LIBOR Suppression Cartel

Many Defendants did not use search terms targeted at communications with interbank brokers. Searches tailored to those communications are relevant and proportional to the needs of this MDL given that Defendants used interbank brokers for multiple purposes related to the LIBOR suppression cartel. Interbank brokers were used as conduits to communicate and coordinate with each other regarding their LIBOR submissions.[18] For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[19] Ex. 22, ▮▮▮▮▮▮ (emphasis added). Moreover, several interbank brokers admitted that they facilitated the exchange of Panel Banks' anticipated LIBOR submissions among the other Panel Banks.[20]

Defendants used brokers to establish a set of "predicted" LIBOR fixes on a daily basis and to circulate those predictions (known in the industry as "run throughs") to each other so that they could align their LIBOR submissions before publication. The brokers based their predictions on what the Defendants told them the rates should be. For example, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 27, ▮▮▮▮▮▮▮▮▮ Ex. 28, ▮▮▮▮▮ According to an internal note, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 29, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added). Through these conversations, the Defendants were able to align their respective submissions at artificially low levels and influence the rates that were ultimately submitted, without needing to explicitly share their individual submissions.

For example, Rabobank's LIBOR submitter told U.S. investigators that he was instructed "to base submissions on where brokers thought everyone else would set LIBOR" and that he "didn't spend time trying to determine where he perceived Rabobank could get cash, since his management just instructed him to get the predicted LIBOR rates from brokers."[21] Deutsche Bank's LIBOR submitters testified in the *Connolly* trial that they relied on discussions with five interbank brokers to get Deutsche Bank's submissions "in line with the actual U.S. dollar fixings that the brokers were predicting." *Connolly*, 24 F. 4th at 838; *see also* Ex. 31, ▮▮▮▮

---



[18] For example ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[19] Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[20] *See, e.g.*, Ex. 25, *In the Matter of: ICAP Europe Ltd.*, Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 13-38; Ex. 26, *In the Matter of: RP Martin Holdings Ltd. and Martin Brokers (UK) Ltd.*, Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 14-16.

[21] Ex. 30, FBI FD-302 memorandum of the Government's July 31, 2014, interview of Paul Robson at 3, Defense Exhibit 608C in *United States v. Anthony Allen, et al.*, No. 14-cr-00272-JSR.

██████████

This information is relevant to both upstream issues. It sheds light on direct and indirect interbank efforts in furtherance of the persistent suppression cartel and one of the mechanisms through which Defendants coordinated their LIBOR submissions. It also shows that Defendants were setting rates in alignment with each other instead of in accordance with the LIBOR definition, which affirmatively required Panel Banks to submit rates "without reference to rates contributed by other [Panel] Banks." *Connolly*, 24 F. 4th at 841.

### Discovery Targeted at Thomson Reuters' Role in the LIBOR Suppression Cartel

Defendants failed to employ search terms related to Thomson Reuter's key monitoring and compliance role in the Defendants' LIBOR suppression cartel. Those terms must be employed because Thomson Reuters acted as the "agent" of the BBA to collect LIBOR submissions every day, use those submissions to calculate LIBOR, and publish both LIBOR and Defendants' individual submissions. In addition to these functions, Defendants required Thomson Reuters to perform so-called "tolerance" checks on each Defendant's submissions before publication. The ██████████ *See, e.g.*, Ex. 32, ██████████ In such cases, ██████████ *See, e.g.*, Ex. 33, ██████████. The Panel Banks understood that when Thomson Reuters called to perform these checks, it did so on behalf of and as an agent of the BBA. *See, e.g.*, Ex. 30 at 3 (Rabobank's submitter told investigators that if his submission was inconsistent with other banks the BBA[22] would call and "tell him he's out of line, which would cause him to adjust his rates to be at the same or similar level to other panel banks").

In addition, Thomson Reuters alerted the BBA on a regular basis about LIBOR manipulation. *See, e.g.*, Ex. 34, Ian Pollock, *LIBOR: BBA 'warned weekly' says former rate-compiler*, BBC News (July 26, 2012). The BBA did nothing other than make false promises to investigate. *Id.* That is because "all the BBA seemed to care about was that panel banks would submit rates that were close to each other's rates." Ex. 35, Trial Tr. 553:11-14, Oct. 21, 2015 (Day 6), *United States. v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y); Ex. 36, Defense Ex. 608B at 11, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-5. These materials are relevant to both upstream issues because they show another method through which Defendants aligned their submissions at artificially low levels as well as Defendants' practice of submitting LIBORs without regard to the LIBOR question.

### Discovery Targeted at the BBA's Role in the LIBOR Suppression Cartel

Defendants did not undertake complete searches for documents referencing the BBA, its Board, its committees, or the supposedly independent the Foreign Exchange & Money Markets Committee ("FXMMC") that oversaw LIBOR. Those searches are necessary because those entities provided forums for Defendants to coordinate their LIBOR strategies. The BBA owned LIBOR,

---

[22] Based on the description of "tolerance checks," Plaintiffs believe that the Rabobank submitter was referring to Thomson Reuters acting as agent of the BBA.

profited off its licensing, and employed a manager, John Ewan, to oversee LIBOR. The BBA claims it delegated responsibility for policing LIBOR, choosing Panel Banks, and considering changes to the LIBOR definition to the supposedly "independent" FXMMC, but the BBA concedes that it oversaw the activities of the FXMMC. Moreover, the FXMMC was hardly independent or disinterested, with its membership including representatives from 14 Panel Banks and the BBA's John Ewan. Indeed, the committee collectively earned the moniker "our colluding members" from a BBA executive.[23] Through the BBA and its committees, the Panel Banks communicated directly with each other and the BBA regarding LIBOR suppression.

Evidence of these communications is important to the upstream topics. The FXMMC met on numerous occasions to discuss LIBOR suppression and reach agreements regarding how to address publicized allegations of manipulation. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 38, ▮▮▮▮▮▮▮▮▮▮; Ex. 39, Trial Tr. 91:4 – 19, July 7, 2016 (Day 24), *Property Alliance Group Ltd. v. The Royal Bank of Scotland PLC*, No. FL-2016-000004, United Kingdom High Court of Justice, Chancery Division. Ewan stated that he had received "more and more comments and queries on the levels at which rate are currently setting" and that those complaints "universally state that the rates are unrealistically low as the few offers of cash in the market are well above posted BBA LIBOR rates." *Id.* FXMMC members also sat on other committees such as the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the LIBOR Panel Bank and Users Group,[28] and the LIBOR Steering Group.[29] In those settings, Defendants discussed the LIBOR setting process, the suppression of LIBOR, the Panel Banks' submissions, and whether the submissions were realistic.[30]

The BBA also encouraged contacts among the Panel Bank Defendants at the CEO level, including among its Board of Directors. In 2008, for instance, the BBA's CEO, Angela Knight, sent a confidential memo to the members of the BBA Board and CEOs of the Panel Bank Defendants in which she wrote that USD LIBOR was "too low" by "20–30 basis points" and recommended that the issue be addressed through "coordinated action . . . directed from the most senior level" and "orchestrate[d]" by the BBA, which caused Defendants to briefly raise their

---

[23] Ex. 37, Trial Tr. 130:11-131:7, June 4, 2015 (Day 7), *Regina v. Tom Hayes*, No. T20137308, Southwark Crown Court ("Hayes"); *see also id.* at 70:14-71:14, June 6, 2015 (Day 10).

[24] Ex. 40, ▮▮▮▮▮▮▮▮▮▮

[25] Ex. 41, ▮▮▮▮▮▮▮▮▮▮

[26] Ex. 42, ▮▮▮▮▮▮▮▮▮▮

[27] Ex. 43, ▮▮▮▮▮▮▮▮▮▮; Ex. 44, ▮▮▮▮▮▮▮▮▮▮

[28] Ex. 45, *LIBOR Panel Banks and Users Group*, http://bbatrent.com/governance/libor-panel-banks-and-users-group.

[29] Ex. 46, ▮▮▮▮▮▮▮▮▮▮ Ex. 37, Hayes Tr. 137:24 – 138:5, June 4, 2015 (Day 7).

[30] *E.g.*, Ex. 40, ▮▮▮▮▮▮▮▮▮▮; Ex. 47, ▮▮▮▮▮▮▮▮▮▮

submissions by a small amount in unison, before quickly returning to suppressed levels. Ex. 48, ███ Ex. 49, ███ Ex. 50, ███ At another point in time, ███. Ex. 51, ███. In a recorded phone call, ███ Ex. 52, ███

There is no prohibition in the Federal Rules against seeking documents from senior executives—they are not above the law. *See*, p. 7 *supra* (discussing senior executives in context of major gaps in Defendants' searches). Here, that is especially true ███ *ee, e.g.*, Ex. 53, ███ Ex. 54, ███ Ex. 55, ███; Ex. 21, ███.[31] Any complaint by the Defendants that the additional custodians sought by Plaintiffs include senior executives is unavailing.

The search terms proposed by Plaintiffs likewise target relevant documents concerning the BBA and will disclose critical non-duplicative evidence relevant to both upstream topics. With regard to concerted action, the fact and substance of discussions among competitors at the highest level is precisely the type of "traditional evidence of conspiracy" that is so often at the heart of price-fixing cases. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012). With regard to falsity, the discovery will help confirm that Defendants knew that their LIBOR submissions were artificially low and that LIBOR itself did not reflect honest, realistic answers to the LIBOR question presented in the LIBOR definition.

### Discovery Targeted at the Bank of England's Roles in the LIBOR Suppression Cartel

Many Defendants did not search for documents relating to the Bank of England ("BOE")

---

[31] There is also evidence that some Defendants colluded with regard to how they responded to questions about LIBOR suppression. ███ Ex. 56, ███

Page 13

or key BOE individuals. Those documents are relevant because BOE took an active role in LIBOR suppression. It organized meetings of competitors. It facilitated coordination among the supposedly competing banks regarding their LIBOR strategies. For example, the BOE "encouraged contact" among (at least) the CEOs of Barclays, RBS, and HSBC to coordinate their LIBOR submission strategies. An email (publicly disclosed by the UK's Treasury Committee) from BOE Deputy Governor Paul Tucker to Barclays CEO Robert Diamond states "I have spoken to hsbc and rbs, stuart and johnny. Sense similar across all three of you. I encouraged contact amongst Mark Dearlove peer group." Ex. 57, Email from Paul Tucker (May 28, 2008, 11:24 AM). Plaintiffs understand that "Stuart" refers to former HSBC CEO Stuart Gulliver, "Johnny" refers to former RBS CEO Johnny Cameron, and "Mark Dearlove" refers to Barclays' head of money markets at the time.[32] Despite their relevance, HSBC and RBS continue to refuse to search their files for such documents.

In addition, numerous Panel Banks sat on the BOE Sterling Money Markets Liaison Group in which members discussed persistent suppression of USD LIBOR on an almost daily basis during the height of the financial crisis. Ex. 37, Hayes Tr. 86:3-23, June 5, 2015 (Day 8). Ewan also participated in this group. *Id.* Plaintiffs' search terms target discussions with that group as well as to identify non-duplicative documents relevant to the upstream topics.

### Discovery Targeted at the New York Fed's Oversight of LIBOR Suppression

Many Defendants did not use search terms targeted at communications with the New York Fed. Those communications must be searched because the NY Fed routinely asked the Panel Bank Defendants about their LIBOR settings and Defendant took actions to "manage the [NY Fed's] perception on LIBOR." Ex. 60, U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, at 158; Ex. 61, Trial Tr. 19:3-20:12, 25:3-4, Apr. 20, 2016 (Day 13), *R v. Stylianos Contogoulas*, Nos. T20147114, T20147116 and T20147239, Southwark Crown Court. By 2008, ███████████████████████████████████████████ Ex. 62, ███████████████████████ Documents pertaining to the Panel Bank's interactions with the NY Fed will evidence both the Panel Banks' parallel efforts to suppress LIBOR as well as their admissions that LIBOR submissions were not honest and realistic.

### CONCLUSION

Plaintiffs respectfully ask the Court to enter an order compelling Defendants to run the proposed search terms for the categories of information described above and to produce all non-privileged documents relevant to the upstream topics.

---

[32] Similarly, a 2016 news article reported that "senior executives" at Barclays, HBOS, HSBC, Lloyds, met with the Bank of England on August 14, 2007, and agreed that LIBOR rates did "not reflect where [the attendee banks] can borrow in decent size." *See* Andy Verity, New Libor disclosures in court, BBC News (Nov. 10, 2016). ███ Ex. 58, ██████████████████████████████████████████████████████████████████████████ Ex. 59, ████████

Respectfully yours,

| | |
|---|---|
| */s/ James Robertson Martin* | */s/ William Christopher Carmody* |
| James Robertson Martin<br>Counsel for The Federal Deposit Insurance Corporation as Receiver for 20 Closed Banks and The Federal Home Loan Mortgage Corporation and Liaison Counsel for the Direct Action Plaintiffs | William Christopher Carmody<br>Co-Lead Counsel for the OTC Plaintiffs and Liaison Counsel for the Class Plaintiffs |